JOHN L. BURRIS, STATE BAR NO. 69888
Law Offices of John L. Burris
Airport Corporate Centre
7677 Oakport Road, Suite 1120
Oakland, California 94621
Telephone:     510.839.5200
Facsimile:      510.839.3882
Attorneys for Plaintiffs


JAMES B. CHANIN, STATE BAR NO. 76043
JULIE M. HOUK, STATE BAR NO. 114968
Law Offices of James B. Chanin
3050 Shattuck Avenue
Berkeley, California 94705
Telephone:     510.848.4752
Facsimile:      510.848.5819
Attorneys for Plaintiffs

*(Additional Counsel on Next Page)*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DELPHINE ALLEN; et al; | **MASTER CASE NO. C-00-4599 TEH** |
| Plaintiff, | **JOINT STATUS CONFERENCE STATEMENT RE NON-MONETARY SETTLEMENT ISSUES** |
| vs. | |
| CITY OF OAKLAND, et al., | Date: January 26, 2012 |
| Defendant. | Time: 10:30 a.m. |
| | Courtroom 2, 17TH FLOOR |
| | Honorable Thelton E. Henderson |

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

Barbara J. Parker, City Attorney, State Bar No. 69722
Randolph W. Hall, Chief Assistant. City Attorney, State Bar No. 080142
Rocio V. Fierro, Senior Deputy City Attorney, State Bar No. 139565
*rvfierro@oaklandcityattorney.org*OFFICE OF THE CITY ATTORNEY
CITY OF OAKLAND
One Frank H. Ogawa Plaza, Sixth Floor
Oakland, California 94612
Telephone:     510.238.3601
Facsimile:     510.238.6500
Attorneys for Defendant CITY OF OAKLAND

GREGORY M. FOX, STATE BAR NO. 070876
Bertrand, Fox & Elliot
The Waterfront Building - 2749 Hyde Street
San Francisco, California  94109
Telephone:     415.353.0999
Facsimile:     415.353.0990
Attorneys for Defendant CITY OF OAKLAND

ROCKNE A. LUCIA, JR. STATE BAR NO. 109349
Rains Lucia Stern, PC
Attorneys & Counselors at Law
2300 Contra Costa Boulevard, Suite 230
Pleasant Hill, CA 94523
Tel: 925-609-1699
Fax: 925-609-1690
Attorneys for Intervenor OAKLAND POLICE OFFICERS ASSOCIATION

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

**INTRODUCTION**

This status conference is to discuss the progress of City of Oakland's ("City") efforts to achieve compliance with the 2010 Memorandum of Understanding (MOU), which ends on January 22, 2012. Plaintiffs will state their position and discuss their concerns with the rate and extent of the progress City has achieved during the last compliance period. City will set forth its plans to achieve full compliance under the Amended Memorandum of Understanding (AMOU) which covers the period of January 2012 through January 2014. City will also address the concerns of the Court and the Monitor regarding compliance with the remaining Active Tasks and will respond to other concerns raised by the Monitor in the Eighth Quarterly Report.

**PLAINTIFFS' CURRENT POSITION**

This is a further status conference concerning the progress of the non-monetary settlement in the "the "Riders Litigation" which was approved by the Court on January 22, 2003.

**I. Eighth Quarterly Report of the Independent Monitor**

January 22, 2012 marks the commencement of yet another extension of the NSA/MOU. It is now nine (9) years since the agreement was signed. Substantial compliance by the OPD is not yet in sight and progress toward this end has stagnated. In its most recent report, the Monitor noted that "in our two years on task here, we have reported little measurable progress by the Department". (Eighth Quarterly Report, page 80.) No overall compliance improvement was achieved during the Monitor's most recent reporting period. In fact, the task compliance level was higher in the Fifth and Sixth Quarterly Reports than it is now (See Chart in the Eighth Quarterly Report, page 79). Moreover, Task 40, the critical "Personnel Assessment System—Purpose" has now fallen out of compliance because (in part) the OPD "cannot report the number of arrests under the specific categories required by the NSA including disorderly conduct, interfering and assault on officers." This is a critical part of the information that goes into IPAS because it can identify officers who might use these arrests as "cover charges" for misconduct. The OPD also remained out of compliance with Task 41 (Use of the Personal Assessment System).

The OPD again has not attained full compliance in the critical areas including Task 5 (Complaint Procedures for IAD), Task 20 (Span of Control for Supervisors), Task 24 (Use of Force

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

Reporting Policy), Task 25 (Use of Force Investigations and Report Responsibility), Task 34 (Vehicle Stops, Field Investigation and Detentions or "Stop Data"), and Task 45 (Consistency of Discipline Policy).

The failure of the OPD to attain compliance is particularly disturbing given the fact that the OPD only has 22 remaining tasks that are under active monitoring. The IMT has not regularly audited the inactive tasks despite the fact they are permitted to do so. One would think that the OPD could more easily attain compliance given this fact, but they have made virtually no progress even though less than half of the original tasks remain under active monitoring.

The Eighth Quarterly Report also contained an appendix concerning the Parole and Probation Searches and "the high incidence of searches conducted by OPD personnel based on a citizen's status as a parolee or probationer." One of their major conclusions is that "There appears to be a potential disparate use of these searches with respect to race. The overwhelming number of cases we reviewed involved Blacks." (IMT Report page 88)

Parole searches in California are authorized under Penal Code Section 3067. This law allows parole searches without a warrant or probable cause. The California Legislature, however, did not give police officers unfettered discretion to harass parolees under this law and expressly said so in the statute. Cal. Penal Code Section 3067(a) and (d) provide as follows:

"(a) Any inmate who is eligible for release on parole pursuant to this chapter or post release community supervision pursuant to Title 2.05 (commencing with Section 3450) of Part 3 shall agree in writing to be subject to search or seizure by a parole officer or other peace officer at any time of the day or night, with or without a search warrant and with or without cause.

XXX
(d) **It is not the intent of the Legislature to authorize law enforcement officers to conduct searches for the sole purpose of harassment.**" (Emphasis added)

Prior to enactment of Penal Code Section 3067(d) in 1996, California Courts had already determined that arbitrary, capricious or harassing parole or probation searches would be unreasonable under the Fourth Amendment. *See, e.g., People v. Clower* (1993) 16 Cal.App.4th 1737, 1741 (Parole search unreasonable if done too often, at an unreasonable hour, unreasonably prolonged or for other

---

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

evidence of arbitrary or oppressive conduct by the officer ); *In re Anthony S.* (1992) 4 Cal.App.4th 1000, 1004 (Parole search arbitrary and capricious where motivation for the search is unrelated to rehabilitative, reformative or legitimate law enforcement purposes, or motivated by personal animosity); *People v. Bravo* (1987) 43 Cal.3d. 600, 610 (Applying arbitrary or capricious standard to probation searches).

In *United States v. Follette*, 282 F. Supp. 10, 13 (S.D.N.Y. 1968), *cert. denied*, 402 U.S. 984 (1971), the Court also stated parole searches could be unreasonable if made too often, at an unreasonable hour, if unreasonably prolonged or for other reasons establishing arbitrary or oppressive conduct.

In 1998, the California Supreme Court also held that parole searches did not violate the Fourth Amendment, as long as they were not conducted for "arbitrary, capricious or harassing" purposes. *People v. Reyes* (1998) 19 Cal.4th 743, 752–753. See also, *In re Randy G.* (2001) 26 Cal. 4th 556, 564 (Noting the arbitrary, capricious standard applied to parole searches).

With the backdrop of the aforementioned precedent, the California Court of Appeal reviewed the appeal of Donald Curtis Samson from the denial of a suppression motion following his arrest after drugs were found on him during a parole search in 2002. *Samson v. California*, 547 U.S. 846-847 (2006).

In affirming denial of the suppression motion, the Court of Appeal determined that Penal Code Section 3067(a) authorized the search and that it was not "arbitrary or capricious." *Id*. Relying on *People v. Reyes, supra*, the Court held that a parole search was "reasonable within the meaning of the Fourth Amendment as long as it is not arbitrary, capricious or harassing'"; and specifically determined that the search did not violate this requirement. *Id*.

The United States Supreme Court affirmed the California Court of Appeal's decision. While recognizing parolees have a diminished expectation of privacy, Justice Thomas, writing for the Court, acknowledged that parolees do not waive all protection under the Fourth Amendment while on parole. *Id*. at 850, fn2. Addressing concerns raised by the dissent that suspicionless parole searches could result in the loss of all procedural safeguards for parolees against unreasonable searches, Justice Thomas wrote:

Nor is there merit to the argument that California's parole search law permits "a blanket grant of discretion untethered by any procedural safeguards,"[citation omitted] The concern that California's suspicionless search system gives officers unbridled discretion  to conduct searches, thereby inflicting dignitary harms that arouse strong resentment in parolees and undermine their ability to reintegrate into productive society, is belied by California's prohibition on "arbitrary, capricious or harassing" searches. [citations omitted]. The dissent's claim that parolees under California law are subject to capricious searches conducted at the unchecked "whim" of law enforcement officers, [citation omitted], ignores this prohibition.

*Id*. at 856-857.

The "Riders" case involved a large number of people who were on parole, were stopped by the OPD (often for no reason) and then were beaten and/or had drugs planted on them.  Only one of the 129 Riders plaintiffs was white, nearly all were African American.  Seven years after the Allen case damages case was resolved, the Oliver v. City of Oakland (CASE NO: C08-04914 TEH) was resolved.  The Oliver clients also consisted of a large number of people who were on parole and/or probation and whose houses were searched pursuant to search warrants that contained factual misstatements and/or outright perjury.  There were 100 Oliver plaintiffs: only one of them was white, the rest were people of color.

The Monitor's findings on parole and probation searches, coming over eleven years after the *Allen* case was filed, show that the OPD has not improved upon its stated commitment to treat all of its citizens equally under the law even after seven years of active monitoring.  The overwhelming concentration of racial minorities in the Riders (2000-2003) and Oliver (2008-2010) cases, demonstrates the continuation of civil rights abuses towards minorities during the very period when the OPD was subjected to a court order that it address this very issue.  Both the monitors' findings and the facts of these cases demonstrate that the OPD has made little or no improvement on a core issue that gave rise to the Allen case and the NSA.

**II. Developments since the last Case Management Conference**

In addition, there have been three new very disturbing developments since the last Case Management Conference.

The first is the discovery that a large majority of Internal Affairs findings have been classified as "unfounded" or exonerated (see Exhibit 1).  The NSA defined unfounded as "The investigation

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

disclosed sufficient evidence to determine that the alleged conduct did not occur" or when "the individuals named in the complaint were not involved in the alleged act" (NSA Page 10).

The NSA defined exonerated as "The investigation disclosed sufficient evidence to determine the alleged conduct did occur, but was in accord with law and with all Oakland Police Department rules, regulations, or policies." Unfounded and exonerated complaints are lumped together with "frivolous" complaints in California Penal Code Section 832.5. "Frivolous", unfounded, and exonerated complaints cannot be used for any punitive or promotional purposes.

The classification of a complaint as "unfounded" essentially means that the complainant has lied and made up a largely or totally false complaint against the officer. It is not the same as "not sustained" where it is not clear from the evidence whether the complainant is being truthful or there is not enough evidence to support the allegation. The reason unfounded complaints are not allowed to be used for punitive or promotional purposes is a legitimate concern that an officer not be punished for complaints which are basically lies. However, this concern should never justify the classification of a complaint as "unfounded", unless it is in fact a patently false allegation. Plaintiffs' attorneys have had potential clients make false allegations against police officers in their collective 65 + years of civil rights litigation. However, this number is very small. Most potential clients who do not have viable cases simply cannot prove their case, or it is not clear from the evidence whether their complaint is valid or not. Such cases would be "not sustained" if they were reported to Internal Affairs. As such, even though the officer would not be punished, the classification of their case as "not sustained" would allow the police department to look at the officer more closely if that officers' number of not sustained complaints was very high in comparison to other officers engaged in similar police work. Such an "early warning system" would not be possible if these complaints were classified as "unfounded."

The OPD's wholesale classification of complaints as "unfounded" basically undermines the entire IPAS system, the early warning system, and the ability of even the most well intentioned supervisor to identify problem officers. Moreover, the classification of a high number of complainants (most of whom live and work in Oakland) as essentially people who knowingly filed false or factually baseless complaints is an insult to those who are often trying to bring important

matters to the OPD's attention.  These individuals often provide the best early warning system to identify problem officers.  To cite but one example, it was a citizen's complaint which brought the sexual misconduct of Officer Valerga to the attention of appropriate OPD official after he had been sexually abusing immigrant Asian women for years without anyone in the OPD recognizing his often public behavior. See, Jane Smith No. 1, et al. v. City of Oakland, et al., Case No. C06-07171 MJJ

The Monitor's most recent report states that "a serious matter relevant to the Department's unusually high number of "unfounded" Internal Affairs investigation surfaced as a result of data compiled by the department itself" (Eighth Quarterly Report, page 6).

The IMT promised to closely scrutinize "the manner in which such determinations are made as a means to ensure that credibility and other assessments are undertaken in such a way that the rights and remedies that should be afforded complainants are, in fact, being respected and assured".  Plaintiffs' attorneys welcome this investigation.  We simply do not believe that the number of unfounded complaints is an accurate reflection of the complaints against the OPD and that if this proves true, OPD cannot possibly be found in compliance with Task 5 and Task 40 for the foreseeable future.

The second development is the quality of some of the OPD's recent promotions.  This issue has been the subject of extensive discussion between the OPD and plaintiffs' attorneys over the past two months.  Plaintiffs' attorneys concerns have not been resolved by these discussions.  While we do agree that police officers, like everyone else, are capable of redeeming themselves, we do not believe officers who are assessed punitive damages for lying in the course of their official duties should be promoted when there are so many other capable police officers in OPD who do not engage in such conduct. See Exhibit 2, especially pages 31:10-32:6, 37:25-39:12, 53:19-54:6 and Exhibit 3 page 3:19-25.  We do not believe that officers who are involved in major police misconduct incidents that costs the city millions of dollars should be promoted when there are hundreds of Oakland Police Officers who are never sued once in their entire career and are more that capable of being promoted to a more important position in the OPD.  And we do not believe that someone with numerous lawsuits, punitive damage awards and/or complaints should be allowed to re-enter the OPD when there are so many police officers with clean records who are more than capable of teaching officers

8

how to do their job.

      The third development is OPD's response to the "Occupy Oakland" demonstrations.  The "Occupy" movement had demonstrations all over the country that were handled by hundreds of police departments.   They were undoubtedly some individuals in those demonstrations (including Oakland) who resorted to violence and deserved to be arrested and to be subjected to an appropriate use of force to stop them from endangering police officers and destroying property.  However, the response by some members of the OPD, like their response to the demonstrations against the War in Iraq in 2003, was singled out by the media and others as excessive and unnecessary.  Plaintiffs' attorneys note that the IMT is going to do a complete analysis of the OPD's response to Occupy Oakland and have already noted that although they were satisfied with the performance of the OPD in some instances, "yet in others we were, thoroughly dismayed by what we observed." (IMT Eight Quarterly Report Page 82). We welcome this decision and are looking forward to a full and frank discussion of the OPD response to Occupy Oakland.  We agree with the Monitor that "although progress on compliance has been slow, even those advancements may have been put in doubt in the face of these events."

### III. The future of the NSA

      The last nine years have brought improvements to the OPD.  Many antiquated policies have been rewritten and the OPD has been trained under these new policies.  The IPAS system has the promise of identifying "problem officers" and helping them and the City avoid expensive lawsuits, negative publicity, and damage to the Department's reputation. The Internal Affairs Bureau has been avoided missing 3304 deadlines for several years and the quality of their investigations has improved. Officers are in much greater compliance with Task 34 (Stop Data) and there is a real possibility that the OPD can identify and correct some problems that have damaged its standing with minority groups and others for many years.  There is some evidence of a culture change in the OPD that could make Oakland a police department that enjoys the widespread support of its citizens.

      However, the history of the OPD since 2003 shows that the NSA has not accomplished much of what it set out to do.  Recently, the local media did a study of which city had paid out the most for alleged victims of police abuse over the past ten years.  San Jose, with a population of one million

residents, has paid $8.6 million.  San Francisco, with 800,000 people paid nearly $28 million. Leading all cities was Oakland, with 400,000 residents.  The City of Oakland paid out over $57 million dollars over the past 10 years, almost the exact time period of the NSA. (See Exhibit 4.) Even discounting the instant Allen case, Oakland has paid $46 million, which is more than San Francisco and San Jose combined.  Moreover, most of these payments were for jury verdicts, or cases where the main police officer defendant was convicted of a crime, fled the country and/or was terminated.

During the NSA period, the OPD has suffered from scandals, adverse legal verdicts and settlements and jury verdicts, and changeover in command staff personnel.  This is reflected in its failure to achieve compliance with the NSA itself, even though we are at a point far beyond the time parameters conceived by the original agreement.  Implementing the agreement has cost millions of dollars in attorney fees, police hours, and monitors' fees.  It is clear that the number one reason for the failure of the OPD to achieve substantial compliance is the lack of accountability and particularly supervisory accountability.  Not one dollar of these settlements and verdicts has been paid by the police officers responsible for them.  Until recently, no one was ever disciplined for compliance related failures.  The OPD has simply asked the taxpayers and others to pay the bill and has gone on as if there were no problem.

The failure of the OPD to increase the tasks in compliance is almost incredible given the time and money spent to date.  While some officers and command staff are totally dedicated to working to achieve compliance, the lack of concern by more than a few OPD members has resulted in a problem that must be addressed:  The OPD may not be in compliance during this new extension and may never be in compliance given their lack of progress over the past nine years.  In their most recent report, the Monitor stated it succinctly:  "…we find ourselves facing an uncomfortable reality:  The path forward is not clear."

**IV. A New Approach is Needed**

    **A.  Receivership**

In a Joint Case Management Conference Statement filed by the parties on December 2, 2010, over a year ago, Plaintiffs' counsel expressed serious concerns about the continuing failure of the

City of Oakland to reach substantial practice compliance with the NSA.  Plaintiffs' counsel cited to excerpts from the transcript of a previous Case Management Conference where City officials had admitted to the Court that the City had failed to come into substantial practice compliance with the remaining tasks of the NSA.

At that time, Plaintiffs' counsel requested that a date be set for Plaintiffs to bring a motion concerning the City's lack of substantial compliance if the City of Oakland remained out of substantial compliance by March 2011 and if the parties did not reach an agreement to extend the NSA. (Joint Case Management Conference Statement, December 2, 2011, 5:26-6:10).  No motion dates were set at that time and, instead, the NSA was extended and further Case Management Conferences were held in 2011.  Nevertheless, during the course of 2011, it became painfully obvious that the City of Oakland would never reach substantial practice compliance by the end of January 2012.

The IMT's Eighth Report, the recent developments described above, and the one year compliance period make it certain that the OPD will not be in compliance at any time in 2012. The OPD's lack of progress in attaining compliance makes it very unlikely the OPD will achieve compliance in the current extension period which ends in January 2014.  If the City is allowed to pursue its "business as usual" approach, it is a virtual certainty that millions of dollars will be wasted and no compliance will be achieved.

In its October 3, 2011 Case Management Order, the Court directed Plaintiffs' counsel to make proposals for further proceedings in the event that they continued to be dissatisfied with the progress made by Defendant City of Oakland toward practice compliance with the remaining tasks of the NSA/AMOU.

It is patently clear from the Monitor's Eighth Report that Defendant City of Oakland has failed to make any substantial progress toward substantial practice compliance with the remaining tasks under the NSA.  As a result, Plaintiffs' counsel remain dissatisfied with the progress made by the City of Oakland and believe it is time for the Court and the parties to seriously consider the appointment of a receiver.

Given the bleak forecast for substantial practice compliance given in the Monitor's Eighth

Report, the City's lack of will to take the action necessary to come into substantial practice compliance and the prospects that there will be continuing delays with an accompanying waste of the City's limited resources, Plaintiffs believe that the court needs to set a firm date for the filing of a motion for receivership, an appropriate briefing schedule and a hearing date for the motion.

This Court possesses the authority to implement any remedies necessary to correct constitutional violations. *Washington v. Washington State Commercial Passenger Fishing Vessel Assoc.,* 443 U.S. 658, 695-96 (1979). Pursuant to its equity jurisdiction, the Court has the power to take broad remedial action to effectuate compliance with its orders. *Lewis v. Kugler*, 446 F.2d 1343, 1351-52 (3rd Cir. 1971).

This equitable power includes the power to appoint a receiver. *Id*. at 1351; *Plata v. Schwarzenegger*, No. C01-1351, 2005 U.S. Dist. LEXIS 43796  (N.D. Cal. Oct. 3, 2005)(Receiver appointed re: state prison health services); *Morgan v. McDonough*, 540 F.2d 527, 533 (1st Cir.1976) (approving temporary receivership of South Boston High School for purpose of desegregation); *Dixon v. Barry*, 967 F. Supp. 535, 550-52 (D.D.C. 1997) (upholding appointment of a receiver over the District of Columbia's Commission on Mental Health Services); *Shaw v. Allen*, 771 F. Supp. 760, 762 (S.D. W. Va. 1990) (appointing a receiver over a jail); *Newman v. Alabama*, 466 F. Supp. 628 (M.D. Ala. 1979) (appointing receiver for Alabama State Prisons); *Turner v. Goolsby*, 255 F. Supp. 724 (S.D. Ga. 1966) (maintaining receivership in school desegregation context).

In addition, the Court may appoint a receiver to force public officials to comply with court orders. *Lewis*, 446 F. Supp. at 1351-52; see also *Dixon*, 967 F. Supp. at 550 (citing *Morgan*, 540 F.2d at 534-35) (receivership justified given the local authorities' failure to comply with the court's desegregation orders).

The Court has the discretion to appoint a receiver where such action is reasonable under the particular circumstances of the case. See *Dixon*, 967 F. Supp. at 550. Courts have developed a multi-pronged test to guide this determination. The test includes the following elements, the first two of which are typically given predominant weight:

(1) whether there is a grave and immediate threat or actuality of harm to plaintiffs;

(2) whether the use of less extreme measures of remediation has been exhausted or proven

futile;

(3) whether continued insistence that compliance with the Court's order would lead only  to confrontation and delay;

(4) whether there is a lack of leadership to turn the tide within a reasonable period time;

(5) whether there is bad faith;

(6) what resources are being wasted; and

(7) whether a receiver is likely to provide a relatively quick and efficient remedy.

*Plata*, *2005 U.S. Dist. LEXIS 43796*; *Dixon*, 967 F. Supp. at 550; *Morgan*, 540 F.2d at 533.

As this Court noted in *Plata, supra,* this Court "is not required to restrict its powers to those means that have proven inadequate, or that show no promise of being fruitful . . . . '[F]ederal courts are not reduced to issuing injunctions against state officers and hoping for compliance. Once issued, an injunction may be enforced.'" *Plata*, *supra* (quoting *Hutto v. Finney* 437 U.S. 678, 690 (1979)).

In this case, each of the *Plata* factors weigh heavily in favor of the Court ordering the imposition of a receivership in this case. Defendant City of Oakland's history of non-compliance with the Court Ordered reforms spans some nine (9) years.

Residents of Oakland, visitors, working people and other traveling through Oakland remain in grave danger as a result of continuing violations of the NSA/AMOU reforms.  The appointment of a receiver will provide competent leadership over the OPD and bypass many of the obstacles that have prevented the City of Oakland from coming into practice compliance with the remaining tasks under the NSA/AMOU.

The Court can easily draw on its own experience and the Monitor's reports to conclude that maintaining the *status quo* will only result in more delays.  Over the past nine years, Defendant City of Oakland has repeatedly missed deadlines for compliance and/or has requested repeated extensions to the deadlines agreed upon by the parties. Given past performance, future missed deadlines are likely, and it is unlikely that the defendants would comply with further Court orders given their inability and/or outright refusal to comply with the NSA, which itself is an order of this Court.

This case is similar to *Dixon v. Barry*, 967 F. Supp. 535 (D.D.C. 1997), where the Court determined that the appointment of a receiver was necessary due to the Defendants' repeated delays

and failure to comply with Court Ordered reforms.  In *Dixon*, the District of Columbia entered into a Consent Order with the plaintiff class of mentally ill residents to overhaul its delivery of community mental health services to those individuals. The parties initially envisioned the reforms would be completed by 1985.  However, by 1985, the District still was not in compliance, and the Court issued a series of additional orders between 1985 and 1992 which set various time tables for compliance. When the District of Columbia still failed to comply, the Court first appointed a Special Master, but the District still failed to comply with its obligations under the consent decree. Dixon, 967 F. Supp. at 540.

Ultimately, the plaintiffs moved for the appointment of a receiver. In response, the District of Columbia argued that it was beginning to make progress and that the appointment of a receiver was unnecessary given its recent efforts.  The Court, however, refused to accept the District's claims of improvement given its repeated failure to comply with the consent decree.  Id. at 553.

In the instant case, Defendant City of Oakland has continuously made similar empty promises of reaching substantial practice compliance.  Sadly, it appears that there is no chance that the City of Oakland will reach substantial practice compliance without the imposition of a receivership.

Moreover, it appears that Defendant City of Oakland lacks the leadership necessary to reach substantial practice compliance.  The OPD has experienced a revolving door in the Chief's office during the pendency of this case and it currently lacks a permanent Chief.  Interim Chief Jordan has already served in this position and his tenure did not result in the OPD achieving substantial compliance.  He will have to do far more than tell the court and plaintiffs' counsel that he believes in the NSA and intends to comply with it.  He must to motivate his officers to achieve compliance which neither he nor any other city official has done to date.  This motivation must consist of appropriate harsh punishment to those who waste City resources and continue to be responsible for the OPD's failure to achieve compliance. So far, there is no real evidence that this has happened and no concrete evidence that it will happen.  While a few OPD members have labored tirelessly to achieve compliance, a more significant number has opposed the reforms or remained indifferent towards them.  A "business as usual" approach will not change this very longstanding trend.

It is now patently clear that the OPD leadership is incapable of reaching substantial practice

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

compliance with the remaining tasks under the NSA/AMOU unless it shows a will to take positions it has avoided for nine years.  The setting of a date for a receivership motion will force these individuals to act without delay, or no longer be in charge of the compliance effort.

The City's repeated failure to reach substantial compliance is in bad faith given the OPD's repeated and systemic civil rights violations, the wholesale classification of those who complain against the OPD as de facto liars, the widespread lack of equal protection afforded to the minority community, and the willful failure to follow the two teams of Monitors and plaintiffs' counsels' suggestions on achieving compliance.  Although this Court previously noted in *Plata* that a finding of bad faith is not required before the Court may appoint a receiver, it is a factor which the Court may consider in doing so.  Moreover, this Court in *Plata* found that a lack of will was a key factor contributing to the defendant's failure to comply with the Court's order.  Such a lack of will is clearly evident in this case, even if the Court were not to find that the City's failure to reach substantial compliance was not in bad faith.

Another factor for the Court to consider in appointing a receiver is whether the City's lack of effective leadership has resulted in a waste of limited resources and has contributed to their ongoing failure to comply with the Court ordered reforms.  Clearly, this is the case here.  Despite the passage of nine years, in which two separate Monitoring teams have found problems with the City's compliance with the NSA, the most recent Monitor's report shows that the City has failed to make any substantial progress in reaching substantial compliance with the remaining tasks under the NSA. All the while, the City of Oakland wasted its limited resources, and will likely continue to deplete its limited resources while failing to reach substantial compliance.  Therefore, a receivership is necessary to prevent the continuing waste of the City's limited resources.

Finally, a receivership is likely to force the City and OPD to comply with the Court ordered reforms under the NSA/AMOU. One of the reasons the appointment of a receiver would offer more efficient and effective relief than the current structure is that a receiver would be able to bypass the internal bureaucracy and politics which have prevented the City of Oakland to reach substantial compliance with the remaining tasks under the NSA/AMOU.  The receiver would have the authority and power to take swift and decisive action – something that has eluded the current and past

leadership of the OPD which have had to contend with internal OPD politics as well as the politics of City Hall.  With the elimination of these political concerns, a receiver can focus on reaching practice compliance with the remaining tasks under the NSA.

**B. Alternatives to Receivership**

Plaintiffs' counsel strongly urge the court to set a date for appropriate motions by the parties concerning receivership and related actions.  This date is necessary given the number of parties, the need for experts and others to save the date of this motion on their calendars, and most importantly, for the OPD and the City of Oakland to realize the gravity of the situation at hand.

However, plaintiffs' counsel are willing to meet with the City to explore alternatives to receivership providing the meet and confer sessions are productive and the City makes proposals that recognizes that the current progress towards compliance is so inadequate that a new approach is needed.  Plaintiffs' counsel are also open to the suggestions by the Monitor that might result in more rapid progress towards compliance.

Meet and confer on these issues cannot be used as it has been in the past, to give the City an opportunity which only results in more wasted time and no progress towards reform.  If the City is not serious in exploring meaningful new approaches, plaintiffs' counsel ask the court leave to pursue a receivership motion without any further delay.

**DEFENDANT CITY OF OAKLAND'S POSITION**

The Negotiated Settlement Agreement (NSA) between plaintiffs and City requires City to demonstrate that the core operational areas of the Oakland Police Department function at the highest levels of professional and constitutional policing.

City submits this Statement to set forth the efforts of its staff and officials to achieve compliance with the tasks set forth in the NSA and to affirm City's commitment to implement the NSA reforms as quickly and completely as possible.  To support the City's efforts, City officers are working closely together to focus attention on this important goal.  Attached as Exhibit "5" is a letter to the Court from Mayor Jean Quan, City Administrator Deanna Santana and City Attorney Barbara Parker which expresses support of the City's compliance efforts.  City's good will and commitment to compliance is reflected in the work achieved since the last CMC hearing of September 22, 2011

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

and during the term of the NSA.  City has formed a cohesive team of high-level City officers charged with identifying and removing impediments to NSA compliance.  These City representatives communicate with Chief Warshaw for advice, guidance and recommendations.  City is confident that its continuing work will achieve NSA compliance under the new Amended Memorandum of Understanding.

### A.  Moving Forward Under Chief Howard Jordan

City Administrator Santana and Chief Jordan demonstrate a stronger organizational partnership and management tone relative to mutual leadership priorities, performance expectations, and overall accountability to achieve compliance.  With the support of City Administrator Santana, Interim Chief of Police Howard Jordan and his administration have renewed the Department's efforts to attain police standards mandated by the NSA.

The goal of meeting compliance goes beyond creating reporting requirements, drafting policies, implementing systems, and conducting audits and inspections to ensure sound management practices, risk management, and accountability. The purpose of the NSA was to change the culture of the police department, along with its management practices and to employ best police practices. The police department is different than it was over eight years ago. The culture has changed, albeit more is needed.  The recent creation of the Risk Management Bureau recognizes the critical and important role of the Office of Inspector General (OIG), Internal Affairs, and Training.  It elevates the OIG position to the level of a Deputy Chief, currently commanded by Deputy Chief Anthony Toribio. The former Internal Affairs Commander, Sean Whent has been promoted to Captain and now oversees the daily operations of the OIG. Attached as Exhibit "7" is the OPD Organizational Chart showing the establishment of the Risk Management Bureau.

Three other examples that highlight the change in culture are:

- The development of a proactive integrity testing unit. What is noteworthy is not the fact that the overwhelming number of officers pass integrity tests, but that Oakland Police officers are requesting integrity testing on officers that may be engaged in misconduct.

- The development of an early warning system (PAS) for identifying at-risk or problematic behavior.  PAS has thresholds which trigger supervisory and command performance review. More officers are recommended to formal monitoring or intervention and supervisors and

commanders to initiating reviews and intervention strategies to correct behavior and enhance performance.

- The reorganization of the Department which emphasizes monitoring and oversight of police performance.

Chief Jordan and City Officials understand the need to further change the Department's culture. Chief Jordan, in cooperation with the Monitor, the Plaintiffs, and the community plans on assessing the organizational structure to identify problems that are in the way of compliance, culture change, and sustainability. From this assessment a roadmap will be developed towards cultural change, compliance, and consistent with the best police practices of the 21st Century. Furthering cultural change includes the following goals:

- Enhancing hiring practices to employ the best candidates, preferably from Oakland and other urban communities.

- Improving the Department's community policing efforts.

- Improving the relationship between the police and youth to foster understanding, mutual respect, with the hope of developing interest in the law enforcement profession.

Chief Jordan has infused new energy, focus, and commitment to the compliance work of the OPD and has ordered greater emphasis on police ethics and integrity. Chief Jordan has established positive communications with Monitor Warshaw and has ordered all OPD personnel to work collaboratively with the Monitoring team. Chief Jordan's leadership and priorities will significantly improve the City's effort to create a police culture of fairness, integrity, and respect for the constitutional rights of individuals. Chief Jordan's Letter to the Court, attached as Exhibit "6" sets forth his efforts, commitment, and expectations toward achieving full NSA compliance and of his vision of what he would like the OPD to become.

**B.  Progress Achieved Since the Last CMC Hearing**

The Monitor reports that City must become more retrospect about compliance efforts in order to end the slow progress with task compliance. (IMT 8th Quarterly Report.)  City acknowledges the validity of the Monitor's observations and agrees that retrospection is necessary to move compliance forward. As such, City reinforces its commitment to continue and enhance its effort to identify and resolve the constraints that impede compliance.

Since the last CMC hearing, City has intensified its efforts to achieve systemic reform and

high professional policing standards through training, leadership, supervision, and accountability measures. Under the leadership and direction of City Administrator Santana and Chief Jordan, City continues its work in the following areas:

- The City Administrator began regular meetings to focus City staff efforts to achieve compliance and cultural change within OPD. The goal of cultural change is to create and institutionalize behavioral norms that all members of a modern, professional police department should accept as the guide for constitutional policing.
- Initiating meetings with the Oakland Police Officers Association's (OPOA) new leadership to further compliance and reform efforts.
- Strengthening communication and collaboration with the Monitor regarding compliance and reform.
- Reassigning or promoting command officers to enhance compliance and reform efforts, ensuring that the appropriate resources needed to support NSA progress are in place.
- The Chief is establishing his team that reflects his values and vision of the Department.
- Publishing OPD policies on the OPD website to promote transparency.
- Continuing to hold OPD members accountable for compliance deficiencies, policy violations and misconduct, and offering training and information bulletins to ensure continuous education in NSA compliance.
- Using the Action Plan to track compliance efforts, ensure that the Monitor's recommendations are followed and hold Commanders accountable for compliance deficiencies.
- **Task 3** (Integrity Testing): Robust unit began conducting integrity tests related to members/employees who may be abusing sick or injury leave.
- **Task 5** (IAD Investigations): Command review of Internal Affairs or division level investigations requires listening to complainant statements before approving investigations where complainant is deemed not credible. The Department has also provided extensive training on credibility assessments and preponderance of evidence standards.
- **Task 6** (Refusal to Accept or Refer Citizen Complaints): No longer utilizing Informal Complaint Resolution for Class II allegations of this type and now requires initiation of formal internal investigation.
- **Task 20.2** (Consistency of Supervision): Concept of team supervision and increased assignment of sergeants to patrol to improve consistency of supervision. A new shift plan is being implemented on February 4th.
- **Task 24** (Use of Force Reporting): Enhanced firearms training to include training scenarios where no force or display of force is needed. Pointing of firearm perception issue added to training on cultural diversity, perception, and bias; community member who has been subject to Level 4 Use of Force participates in discussion regarding perception and police conduct and professionalism. Providing additional training to supervisors at Continuing Professional Training.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

- **Task 34** (Stop Data): On December 30 2011, issued Information Bulletin on Stop Data Statistics. A more detailed report is under final review.  Additionally, a holistic, strategic plan is being developed that will impact all levels to address the issue with current officers but will also focus on who and how we recruit.
- **Task 41** (Use of PAS): Lowered Level 4 pointing of firearm thresholds for PAS review. In the process of adding normative comparison of arrest versus Level 4 pointing of firearm. Increasing required number of follow up meetings for personnel on monitoring or intervention.
- **Task 43** (Training): Enhanced training for Police Evidence Technicians to include participation in Continuing Professional Training, and development of additional training from the drug lab.
- **Task 45** (Consistency of Discipline): Standardized data entry process and modified IAD database to more accurately capture disciplinary action.

The Monitor has also brought focus to the Department's ability to effectively "spread the message of reform" throughout the organization.  City is working diligently with the Monitor to address these concerns. The City's Action Plan incorporates the deficiencies and includes the Monitor's recommendations and next steps for resolving the concerns.  The Action Plan serves to guide the City's compliance efforts.  Attached hereto as Exhibit "8" is a copy of the City's current Action Plan.  These matters are discussed with the Monitor and plaintiffs' attorneys during Working Group meetings and we encourage continued collaboration in this area. The Department has taken the following steps to address the concerns:

- The Department provides continuing training on the conditions that led to the NSA and its purpose and goals during supervisory and officer training courses.

- The Chief of Police and the executive staff attend lineups and hold meetings to discuss the importance of compliance and reform.

- The Chief of Police and the executive staff meet with commanders and supervisors to discuss performance deficiencies related to compliance, clarify expectations and hold personnel accountable.

- The Department developed a two-day Internal Affairs course for new investigators, supervisors, and commanders that covers the technical aspects of compliance in investigating IAD cases but focuses on the risk management and community trust values furthered by proper handling of the investigations.

- The Department held a two-day leadership seminar for commanders and managers.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

In addition, City's efforts to achieve compliance have included the following initiatives:

- A Working Team supported by Mayor Quan, City Administrator Santana and City Attorney Parker was created to ensure that the correct focus is given to the City's compliance effort. (Joint Letter of City officials.) The Monitor acknowledges the leadership of the Mayor and City Administrator in this renewed effort.  (IMT PPS 8TH Quarterly Report.)
- Howard Jordan was appointed interim Chief of Police. Chief Jordan and representatives from the offices of the Mayor, City Administrator, and City Attorney, are now leading compliance efforts in a manner that is aligned with shared priorities.  The Monitor acknowledges the new leadership and open communication brought about by Chief Jordan.  (IMT PPS 8TH Quarterly Report.)
- The OPD has been reorganized with an emphasis in overseeing and monitoring police performance.  The reorganization establishes a Bureau of Risk Management, emphasizes the role of the Office of Inspector General (OIG), Internal Affairs, and Training, and elevates it to the level of a Deputy Chief commanded by Deputy Chief Anthony Toribio.  The former Internal Affairs Commander, Sean Whent has been promoted to Captain and now oversees the daily operations of the OIG. (OPD Organizational Chart.)

Communication between Chief Jordan and Chief Warshaw has improved in substance and in frequency.  And, collaboration between City and Chief Warshaw has increased.  More effective meetings are occurring between police representatives and the Monitoring Team during Technical Assistance sessions and in Working Group monthly meetings. City has continued focused and candid face to face meetings with Monitor Warshaw and Deputy Monitor Reynolds, and with plaintiffs' attorneys.  In the Working Group monthly meetings, City has been able to demonstrate its ability to self-identify problems, listen to criticisms, and discuss solutions in collaboration with plaintiffs' counsel and the Monitoring Team.  City also discusses its Action Plan and shares its compliance efforts with the Monitor and plaintiffs' counsel. Areas of discussion where City has followed the Monitor's recommendations have covered consistency of supervision and quality of Internal Affairs and force investigations.  City believes that its open communication, collaboration, and transparency, along with its interest in following the Monitor's recommendations demonstrate City's commitment to the reform process and cultural change. (See Exhibit 8, OPD Action Plan.)

Lack of accountability for poor performance and failures in command and supervision have also been noted by the Monitor as concerns. As reported in the last CMC statement, City continues to hold command and supervisors accountable for policy violations and performance deficiencies which show that the goals of the NSA are being realized.  OPD commanders and supervisors are accountable for failure to meet compliance requirements assigned to them under the Compliance

Action Plan and the IAD is in process of examining the "unfounded" complaints to determine validity, areas for IA investigation changes, and overall, to obtain a deeper understanding of this pattern. Specifically, since the September 22, 2011 CMC hearing, the Department has taken the following actions to hold commanders and supervisors accountable for work and performance deficiencies:

- Initiating 25 internal affairs investigations involving 29 command and supervisory personnel. The matters include command and supervision staff and their concerns involving performance of duty, conduct towards others, reporting violations of laws and departmental orders, and refusing to accept or refer a complaint.

- Sustaining six command and supervisory members for Manual of Rules violations, including four sergeants for improper supervision, performance of duty, and conduct towards others; and two commanders for failures in command, reporting violations of rules and orders, and for refusing to accept or refer a complaint.

- Taking corrective action for performance deficiencies and issuing 21 supervisory notes file entries, one letter of discussion and two performance deficiency notices.

**C. Progress Achieved During the Term of the NSA**

    **1.    Important Institutional Changes That Support Culture Change Were Achieved Under the NSA and Have Continued.**

The progress achieved under the NSA and which continues to this day cannot be overlooked. In executing the NSA, City understood the need to change the culture of the Police Department through institutional and organizational changes. The Department was required to develop new operational systems and protocols to operate a professional police department committed to effective policing and protecting the constitutional rights of all persons. When the NSA was executed, the OPD lacked a strong structural foundation and the operational systems necessary to run a strong, professional organization. System improvements were needed for the Department to properly supervise and monitor officer conduct, and for holding members accountable for policy violations. Enhancements to policies and training were also needed in the areas of police force, detentions and arrests, vehicle stops, biased policing, and other high-risk areas such as vehicle pursuits. NSA compliance and progress with establishing the required policies is reflected in the 8th Quarter report and has long been achieved.

The work environment that permeated the OPD in 2003 and which led to alleged

unconstitutional practices by some officers is long gone. There is more work to be done and isolated instances of misconduct may still occur, but the Department now has stronger operational systems and the institutional structure to ensure constitutional policing and promote effective and professional police practices.  In this regard, the goals of the NSA to remedy past unconstitutional practices, and prevent patterns or practices that lead to constitutional violations, are being realized.  (<u>Alabama Disabilities Advocacy Program v. Walley, et al</u>, 475 F.Supp.2d 1118 (2007) - consent decrees are intended to address elimination of institutional conditions that lead to constitutional violations.) Some of the structural and operational changes that have been institutionalized within the OPD are:

- The police department has been reorganized with an emphasis on effective and professional policing.  The Bureau of Risk Management has been established to focus on monitoring and overseeing high risk police actions and to incorporate risk assessment into the regular work of all personnel.  The Office of Inspector General Internal Affairs, Training and Research and Planning have been incorporated into the Risk Management Bureau.

- The Patrol Division has been reorganized under the concepts of geographical command and team supervision.  This reorganization will further the practice of effective and professional policing, while enhancing supervision and accountability.

- Internal Comp Stat and Risk Management and Policy Compliance meetings are being held to emphasize the goals of effective and professional policing and risk management and commanders are responsible for developing effective crime reduction strategies in their areas and for the performance of their subordinates.

- The Office of Inspector General conducts regular audits, reviews, and line inspections of police operations.

- The Internal Affairs Division's Integrity Unit regularly conducts misconduct investigations and initiates integrity tests.

- The Personnel Assessment System (PAS) serves as an early warning system that allows for intervention and accountability when officers engage in improper conduct or exhibit at-risk behavior.

### 2.   Compliance Slowed Under the MOU But City Efforts Continue to Show Progress.

City acknowledged that it needed more time to complete the reform work and agreed to

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

extend the MOU for two additional years.  The new AMOU commences on January 23, 2012 and ends on January 22, 2014.  Under the MOU and AMOU, Monitor Warshaw emphasizes "substantive compliance" in the compliance process. This requires that all members of OPD understand and accept the overall purpose and objectives of the NSA in order to change the culture of the Department. City is realigning its efforts to create a more robust communication and training effort that ensures that compliance efforts are understood, but that also acknowledge the organizational and cultural values that require embracing to more holistically achieve sustaining results.

City is aware that it is at a critical juncture in this case and that it must demonstrate renewed commitment to complete the NSA reforms. This is especially true at a time when the Court and the Monitor have expressed concern and frustration about the slow pace of implementation of eight of the 22 remaining tasks, as reported in the Monitor's 8th Quarterly Report which covers the period of July through September, 2011.  The report states that City is failing to show progress in achieving full compliance with eight tasks that have remained under partial compliance for a considerable time. City understands these concerns and is working to overcome the factors that have delayed compliance with these specific tasks.  We believe that recent efforts advanced under Chief Jordan will demonstrate a higher level of compliance in April 2012.

City recommends further collaboration with the Monitor and Plaintiffs' Attorneys to establish timelines for achieving compliance. A work plan must be developed that integrates the Monitor and Plaintiffs' input and guidance. This effort will further ensure accountability and speed up compliance. The Monitor is also assisting the City to address the slow progress in several areas that have remained in "partial compliance" for long periods.  These include Task 40 – PAS Purpose and Use; Task 20.2 – Consistency of Supervision; Task 34 - Stop Data; Task 24 - Use of Force.

City respectfully asks the Court to consider all that has been accomplished during the term of the NSA and the City's commitment to improve compliance, along with its ability to work collaboratively with the Monitor and follow recommendations.   Relevant to the assessment of City's overall efforts to reach compliance are the following factors which City asks the Court to consider:

- City continues to show institutional capacity to maintain the reforms achieved under the NSA.

- City continues to demonstrate its ability to resolve barriers toward achieving compliance, notwithstanding challenges brought about by changes in City and OPD leadership, budget reductions and layoffs, OPD's reorganization, and changes in OPD's operations.

City thinks it noteworthy that it has achieved and maintains compliance with 28 NSA tasks and their hundreds of subtasks achieved under the NSA.  Based on City's progress with compliance, the Court removed the compliant tasks from active monitoring when the NSA was terminated in 2010.  Since January 2010 to the present, City continues to show consistent compliance with 12 of the 22 active tasks and that progress is continuing with eight tasks deemed in partial compliance. City has reduced the tasks "not in compliance" from five to one. (IMT 8th Quarterly Report.)  This overall improvement in task compliance and the structural, operational and preliminary cultural changes made within the OPD show continuing progress.  As a next step, with structure and organization in place, we endeavor to ramp up efforts to promote organizational cultural change.

Although specific task/subtask compliance has fluctuated during the nine years of this case, overall compliance has improved. For example, in 2006/2007 City reached full compliance with all the required policies of the NSA and this compliance has continued under the MOU and continues to date.  (IMT 8th Quarterly Report.) Training compliance was also achieved during this time and has continued to date. (IMT 8th Quarterly Report.)  In reviewing the practice compliance fluctuations that have occurred during the lifetime of this case, Defendants note that overall progress continued during these time periods. For instance, a review of the IMT's Quarterly Reports from 2005 through 2009 shows that City increased partial and full compliance in 2006 from four Tasks to 10 Tasks; in 2007 compliance was increased to 31 Tasks; in 2008 to 41 Tasks; and in 2009 to 45 Tasks. (IMT Quarterly Reports, 2005 to 2009.)  This meaningful progress led the former Monitors to recommend - and the Court to approve - the termination of the NSA and the filing of a new MOU under which the Parties reduces the Tasks from 51 to 22 for active monitoring. During the MOU, City was able to increase full and partial compliance levels from 16 Tasks in 2010 to 20 Tasks in 2011. (IMT 8th Quarterly Report.)

This historical record of effort and compliance should encourage the continued collaboration and collective effort of all stakeholders so that the work that began in 2003 can be completed under

the AMOU.

### 3. City Response to Inquiries Regarding the Occupy Oakland Incidents

The Monitor is conducting a review of the Occupy Oakland events and included a preliminary report with the Eighth Quarterly Report.  City welcomes this assessment and will work with the Monitor to address any deficiencies identified in police operations during the Occupy Oakland incidents.

City notes that its police department has handled numerous events related to the Occupy Oakland movement.  Calculating the number of officers and the number of Occupy participants, multiplied by the number of days of Occupy protests and activities, there have been thousands of police-citizen interactions during Occupy activities that included thousands of officers and tens of thousands of protesters. With the exception of isolated incidents involving individual officers, the Department was able to facilitate lawful and peaceful activity during the daily marches, meetings, and gatherings, which were accomplished without serious incident, injury, use of force, or significant arrests by police.

The City will investigate all complaints and allegations of misconduct and will take appropriate action for any violation of laws and policies. An independent investigator will investigate the misconduct complaints and review the Department's response to the October 25, 2011 and related Occupy incidents, including the City decisions and actions related to police planning, command and control, use of force, and coordination of mutual aid agencies. To further transparency, City posted on its website video recordings made by officers on duty during Occupy events and its operational plans and department policies on police force and crowd control.

### 4. City Response to Inquiries Regarding "Stop and Frisk" Practices Involving Parolees and Probationers

City is reviewing the concerns of the Monitor included in the Eighth Quarterly Report and will work with the Monitor on a resolution. City will prepare an Action Plan to track its efforts to resolve the concerns.  City has already taken steps to train officers on the legal and policy requirements for stopping and searching parolees and probationers, and to educate officers about the unintended negative impact of certain police interactions on this community.

On November 23, 2011, the Department published Training Bulletin (TB) I-O.4 - Legal Aspects of Searching Persons on Parole/Probation. This TB discusses the legal and policy mandates of conducting parole or probation searches, reporting requirements, and provides guidance for confirming parole/probation status.  Lineup training on this policy has been provided.  And on November 7, 2011, the Department provided training at the Transitional Academy about cultural diversity, perception and bias.  The Department invited a community representative who talked about negative interactions with police and that they erode trust and respect. The training also covered unintended assumptions that police officers may make about certain individuals.  The Department is also working with Oakland community representatives to develop a cultural competency class which will be taught in the Police Academy and the Continuing Professional Training Course for supervisors and officers.

## CONCLUSION

City respectfully submits that although there are certain Tasks of which it has not been able to achieve full compliance, its overall record since 2008 demonstrates a steady effort to work through many institutional obstacles impeding compliance. City believes that its overall record of NSA reforms that have been implemented, either in whole or in part, are evidence of its good faith effort to achieve compliance. Through this Court oversight process, City is acutely aware that it needs to identify and remove the root causes that have impeded compliance with the NSA reforms. As Chief Jordan will remark, City intends to retain expertise that will enable it to identify the root impediments to NSA compliance and implement strategies to permanently remove the impediments.

## POSITION OF INTERVENOR: OAKLAND POLICE OFFICERS ASSOCIATION

Intervenor Oakland Police Officers Association ("OPOA") believes that significant progress has been made in achieving full compliance with the Negotiated Settlement Agreement ("NSA"). While the Independent Monitoring Team identifies areas of concern in its most recent Quarterly Report, the OPOA asserts that the recently issued Quarterly Report is not reflective of the current state of affairs at the Oakland Police Department ("OPD" or "Department").  Since the appointment of Howard Jordan as the chief of police, there have been material and significant advances made by the Department toward full compliance with the NSA.  The commitment of Chief Jordan to achieve full compliance has been communicated to the rank and file as well as to the leadership of the OPOA.

1    Chief Jordan's leadership style and direction reflects a clear and focused effort to achieve full

2    compliance with the NSA.

3           With the encouragement of Chief Jordan, the OPOA and OPD commanders have formed an

4    "OPD/OPOA Working Group" and are meeting on a regular basis to focus efforts and discussions on

5    implementation issues relative to the NSA.   None of the prior chiefs of police had formally reached

6    out to the OPOA and established a formal structure to have ongoing dialogue and interaction between

7    the OPOA an OPD on NSA issues.   These "working group" meetings have led to numerous

8    accommodations and arrangements which are clearly moving the Department in a much more

9    accelerated and positive direction relative to the NSA.   The meetings are attended by the Executive

10   Board of the OPOA and Chief Jordan as well as all of the Deputy Chiefs.   Chief Jordan has

11   demonstrated his willingness to develop action plans and make immediate decisions at these meetings

12   to accelerate full compliance.   The OPOA has been a willing and cooperative participant in these

13   efforts.   Significant progress has been made on key issues as a result of this OPD/OPOA Working

14   Group.

15          In addition to the appointment of Chief Jordan, the hiring of Deanna Santana as the city

16   administrator has also brought a renewed focus and energy toward securing compliance with the

17   NSA.   Ms. Santana has been unwavering in her commitment to achieve full compliance with the

18   NSA.  The level of cooperation and coordination between Ms. Santana, Chief Jordan and the OPOA

19   is a dynamic not previously seen or experienced by the OPOA.   Despite the political and economic

20   challenges facing the City of Oakland, Ms. Santana has been relentless in her pronouncements that

21   the Department will secure full compliance with the NSA as soon as possible.   While resources are

22   limited and at times strained, Ms. Santana has not compromised on dedicating resources to the NSA.

23          As the Court is fully aware, Officer Hargraves and Sergeant Wong have been involved in

24   proceedings relative to a matter that occurred during an "Occupy Oakland" incident.   On January 9,

25   2011 all parties attended a hearing to address the Plaintiff's motion for sanctions against Officer

26   Hargraves and Sgt. Wong.   According to the "Civil Minutes" issued by the court, the hearing lasted

27   one hour and fifty minutes, and there was a partial hearing held *In Camera under seal* for forty

28   minutes.

1     At no time during the open court hearing was there any discussion related to the disciplinary

2  actions taken and *pending* against Officer Hargraves and Sgt. Wong.  The Court and parties agreed to

3  discuss the Department's disciplinary response in chambers.  During the *In Camera under seal*

4  hearing, where the Department, City, OPOA and Plaintiff's counsel were all present, it was first

5  communicated to the Court and Plaintiff's counsel what actions the Department had taken relative to

6  discipline.  Prior to engaging in any discussions in chambers, the record reflects that the discussions

7  were "under seal".

8     On January 10, 2011, the day after the hearing referenced above, *The Bay Citizen* published a

9  story titled: "2 Oakland Officers Disciplined for Occupy Misconduct: Bystander's video offered

10  evidence of violations," written by Shoshana Walter.  This story reported some details of the

11  disciplinary actions taken against Hargraves and Wong.  The information had not previously been

12  made public.

13     Officer Hargraves and Sgt. Wong have long-standing and unrefuted privacy interests and

14  protections afforded under California law.  Their privacy interests and the confidential nature of the

15  administrative/disciplinary process are well-defined in the California Government and Penal Codes.

16  (See: Govt. Code Section 3303; Penal Code Sections 832.5, 832.7, 832.8).  Moreover, the California

17  Supreme Court in *Copley Press Inc. v. Superior Court* (2006) 39 Cal.4[th] 1272 has held that the

18  confidentiality of peace officer records extends to an administrative proceeding where the officer is

19  appealing disciplinary action.  In that same case, the court went as far as precluding the disclosure of

20  the officer's identity.  Further, in *Berkeley Police Assn. v. City of Berkeley* (2008) 167 Cal.App.4[th]

21  385 the court held that investigative materials and findings by a city police review commission were

22  deemed confidential personnel records and thus were precluded from disclosure.

23     Unfortunately, as of the writing of this CMC statement, the OPOA as well as the

24  representatives of Officer Hargraves and Sgt. Wong are unaware of the identity of the individual(s)

25  who are responsible for this egregious breach of the Court's order and California law.  The Court

26  should be aware that Messrs. Burris and Chanin have personally indicated that they did not disclose

27  the confidential information.  The matter is clearly one of significant import to the affected officers

28  and the members of the OPOA.  In light of the sensitive nature of this matter, and the impact that it

may or may not have on pending matters before the Court, the OPOA is certainly interested in bringing the matter to the attention of the Court and exploring the Court's interest in pursuing the matter.  Officer Hargraves and Sgt. Wong will look to the Court's direction in determining what further action they may pursue.

Finally, despite the transgressions associated with the disclosure of the confidential personnel information of Officer Hargraves and Sgt. Wong, the OPOA remains enthusiastically optimistic that the Police Department has recently taken great strides toward securing full compliance with the NSA.


Dated:  January 19, 2012

_____
/s/
JOHN L. BURRIS
Attorney for Plaintiffs

Dated: January 19, 2012

_____
/s/
JAMES B. CHANIN
Attorney for Plaintiffs

Dated: January 19, 2012

_____
/s/
GREGORY M. FOX
Attorney for the Defendant

Dated: January 19, 2012

_____
/s/
ROCIO V. FIERRO
Attorney for the Defendant

Dated: January 19, 2012

_____
/s/
ROCKNE A.  LUCIA JR.
Attorney for the OPOA

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1

ATTORNEY ATTESTATION

2
   *I hereby attest that I have received telephonic or email authorization for any signatures*

3
*indicated by a "conformed" signature (/s/) within this E-filed document.*

4

5
*Dated: January 19, 2012*                 _____/s/_____
                                           GREGORY M. FOX

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT CASE MANAGEMENT CONFERENCE STATEMENT