

# Eleventh Quarterly Report
## *of the* Independent Monitor
## *for the* Oakland Police Department

Robert S. Warshaw
Independent Monitor

Office of the Independent Monitor
Police Performance Solutions, LLC
P.O. Box 396, Dover, NH 03821-0396

October 15, 2012

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 1

## *Table of Contents*

## Section One

*Introduction*   2
*Compliance Assessment Methodology*   4
*Executive Summary*   6

## Section Two

*Compliance Assessments*
Task 2:   Timeliness Standards and Compliance with IAD Investigations   8
Task 3:   IAD Integrity Tests   10
Task 4:   Complaint Control System for IAD and Informal Complaint Resolution Process   13
Task 5:   Complaint Procedures for IAD   16
Task 6:   Refusal to Accept or Refer Citizen Complaints   25
Task 7:   Methods for Receiving Citizen Complaints   27
Task 16:   Supporting IAD Process - Supervisor/Managerial Accountability   29
Task 18:   Approval of Field-Arrest by Supervisor   31
Task 20:   Span of Control for Supervisors   33
Task 24:   Use of Force Reporting Policy   36
Task 25:   Use of Force Investigations and Report Responsibility   40
Task 26:   Use of Force Review Board (UFRB)   44
Task 30:   Firearms Discharge Board of Review   47
Task 33:   Reporting Misconduct   49
Task 34:   Vehicle Stops, Field Investigation, and Detentions   51
Task 35:   Use of Force Reports - Witness Identification   55
Task 37:   Internal Investigations - Retaliation Against Witnesses   57
Task 40:   Personnel Assessment System (PAS) – Purpose   58
Task 41:   Use of Personnel Assessment System (PAS)   61
Task 42:   Field Training Program   59
Task 43:   Academy and In-Service Training   74
Task 45:   Consistency of Discipline Policy   77

## Section Three

*Conclusion:  Critical Issues*   80

## Appendices

*A: Cumulative Key Indicator Data*   82
*B: Acronyms*   83

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 2

# Section One

## *Introduction*

This is the eleventh quarterly report of the Monitor of the Negotiated Settlement Agreement (NSA) in the case of *Delphine Allen, et al., vs. City of Oakland, et al.,* in the United States District Court for the Northern District of California.  In January 2010, under the direction of Judge Thelton E. Henderson, the Parties agreed to my appointment as Monitor of the Oakland Police Department (OPD).  In this capacity, I oversee the monitoring process that began in 2003 under the previous monitor, and produced 14 status reports.  The current Monitoring Team conducted our eleventh quarterly site visit from August 13, through 17, 2012, to evaluate the Department's progress with the NSA during the three-month period of April 1, through June 30, 2012.

In the body of this report, we again report the compliance status with the remaining active Tasks of the Agreement.  By the end of the seven-year tenure of the previous monitor, the Department was in full compliance with 32 of the 51 required Tasks, and in partial compliance with 16 additional Tasks.  As a result, the Parties agreed to reduce the number of Tasks under "active" monitoring to the current list of 22.

During this reporting period, we continue to find the Department in Phase 1, or policy, compliance with all 22 of the remaining active Tasks.  With regard to Phase 2, or full compliance, we find that OPD is in compliance with 12 of the 22 remaining Tasks.  This reflects a reversal, to out of compliance with one Task, and the change from partial compliance to deferred for another.

We are dismayed by the level of compliance reflected in this report, as should be the Department and the City of Oakland.  We can only characterize the current condition in the Department as one of stubborn resistance to compliance with an Agreement made long ago:  an Agreement that simply enumerates concepts common in police agencies across the country.  It is not that the foundation for embracing these reforms is absent; that is clear from our Phase 1 findings.  What has not followed, though, is the commitment and hard work required to *build* on that foundation, to do more than go through the motions, to fully adopt and internalize the principles of effective, Constitutional policing.  So much still remains to be done.

*Robert S. Warshaw*

Chief (Ret.) Robert S. Warshaw
*Monitor*

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 3

**Monitoring Team:**
Chief (ret.) Charles D. Reynolds
*Deputy Monitor*

Lt. Colonel (ret.) J. Rick Brown
Robin Busch-Wheaton
Eric P. Daigle, Esq.
Commander (ret.) John M. Girvin
John M. Klofas, Ph.D.
Assistant Director (ret.) Joseph R. Wolfinger

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 4

## *Compliance Assessment Methodology*

The body of this report is comprised of our assessments of compliance with the individual requirements of the 22 active Tasks of the NSA.  Each requirement is followed by information about the compliance status of the requirement during our previous reporting period, a discussion regarding our assessments and the current status of compliance, a summary notation of Phase 1 and Phase 2 compliance (see below), and our planned next steps in each area.

The Monitor's primary responsibility is to determine the status of the Oakland Police Department's compliance with the requirements of the 22 active Tasks.  To accomplish this, the Monitoring Team makes quarterly visits to Oakland to meet with OPD's Office of Inspector General (OIG) and other Department personnel – at the Police Department, in the streets, or at the office that we occupy when onsite in the City.  We also observe Departmental practices; review Department policies and procedures; collect and analyze data using appropriate sampling and analytic procedures; and inform the Parties and, on a quarterly basis, the Court, with information about the status of OPD's compliance.

Our Team determines compliance through an examination of policies and implementation of practices that are relevant to each of the active Tasks.  First, we determine if the Department has established an appropriate policy or set of procedures to support each requirement.  Following this, we determine if the Department has effectively implemented that policy.

Based on this process, we report the degree of compliance with requirements on two levels.  First, we report if the Department has met policy compliance.  Compliance with policy requirements is known as **Phase 1 compliance,** and the Department achieves it when it has promulgated appropriate policies and trained relevant Department members or employees in their content.  Second, we report on the extent to which the Department has implemented the required policies.  Implementation-level compliance is reported as **Phase 2 compliance.**  In general, to achieve full compliance, the Department must achieve both Phase 1 and Phase 2 compliance; that is, an appropriate policy must be adopted, trained to, and operationally implemented.

Our conclusions with regard to Phase 1 or Phase 2 compliance will fall into the following categories:

- **In compliance**:  This is reported when policy requirements are met (Phase 1) or effective implementation of a requirement has been achieved (Phase 2).

- **Partial compliance**:  This is reported when at least one, but not all, requirements of a Task have achieved compliance, showing progress toward full compliance.  Tasks will remain in partial compliance as long as we determine there is continued progress toward reaching substantial, or full, compliance.

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 5

- **Not in compliance**:  This is reserved for instances where partial compliance has not been achieved and no progress has been made.

Many sub-requirements of the 22 active Tasks require the analysis of multiple instances of activity, cases, or observations.  In these circumstances, our analysis is based on a review of all cases or data, or, when appropriate, on statistically valid samples of the population.  To reach our conclusions based on analyses of cases, the Department must meet a minimal standard.  The Parties have agreed upon these compliance standards, which range from 85% to 95%, or a Yes/No standard.

This methodology supports a sound and rigorous review of the Department's compliance with the requirements of the 22 active Tasks.  We recognize, however, that the high demands of this methodology may not be fully realized in all elements of all reviews.  There will be circumstances in which we will be unable to determine fully the compliance status of a particular requirement due to a lack of data, incomplete data, or other reasons that do not support the completion of our work in a manner consistent with timely reporting.  Under such circumstances, we will opt not to compromise our methodology by forcing a conclusion regarding compliance levels.  Instead, we will report a finding as **"Deferred."**  This finding is not intended to reflect negatively on the Department or to otherwise imply insufficient progress.  In such circumstances, we expect that a more complete assessment of compliance in the area in question will be determined in our next report.

Our compliance assessment methodology directs the Monitoring Team in our work and underlies the findings presented in this report.  We fully expect that this methodology will govern our work throughout our tenure in this project.  Any consideration of revision or change of this methodology will be presented to the Parties and the Court.

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 6

## *Executive Summary*

This is the eleventh report of the Monitoring Team in the case of *Delphine Allen, et al., vs. City of Oakland, et al.*  This Executive Summary is not intended to replicate the body of the entire report.  Instead, it highlights the more significant findings, trends, patterns, or concerns that materialized as a result of our evaluation.

From August 13, through 17, 2012, we conducted our eleventh site visit to Oakland.  As we do during each site visit, we met with several Department officials, including the Chief and Assistant Chief of Police and Deputy Chiefs; as well as personnel from the Office of Inspector General (OIG), Bureau of Field Operations (BFO), Bureau of Investigations (BOI), Bureau of Services (BOS), Internal Affairs Division (IAD), Training Section, and Communications Section; OPD officers, managers, supervisors, and commanders – including sergeants, lieutenants, and captains.  We also conferred with the Plaintiffs' attorneys, City Administrator, and Office of the City Attorney (OCA).  During and since the time of our site visit, we attended Department meetings and technical demonstrations; reviewed Departmental policies; conducted interviews and made observations in the field; and analyzed OPD documents and files, including misconduct investigations, use of force reports, crime and arrest reports, Stop Data Forms, and other documentation.

For the current reporting period, we find that there has been a decline in compliance levels from those noted in our last report.  While we find OPD in Phase 1 compliance with all 22 of the remaining active Tasks, with regard to Phase 2, the Department is in compliance with 12 (54%) of the 22 active Tasks.  The Department is in partial compliance with seven (32%) Tasks.  We deferred a compliance determination with two Tasks.  The return to "not in compliance" reflects the status of Task 41, which addresses the use of the risk management system.  For this report, the weight of the evidence supports the view that, although functioning and generally well maintained, the PAS system is not being effectively used by Department management to reduce risk over time.  The common thread through those Tasks that are not in full compliance is that the availability of technology, and the presence of policy, are insufficient to meet the standards of contemporary policing, including those agreed to in the NSA.  The Department finds itself in this state not for lack of equipment, or resources, or personnel, but for the seeming lack of commitment to the core principles that are at the foundation of an Agreement that is now a decade old.

Police departments are complex organizations, but the fundamental responsibilities of the Oakland Police Department relevant to the Tasks enumerated in the NSA are ministerial in nature.  They are consistent with the policies and actions that police departments throughout the country have undertaken for years, if not decades.  We have been consistent in our observation that if OPD were less consumed with compliance and more committed to sound police practices, the Department would quickly benefit from the residuals of such practices – compliance with the Tasks of the NSA.

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 7

It is our further observation that the Department lacks consistency of message and a unanimity of purpose.  We are well aware of the challenges that the brave men and women of the agency face on a daily basis.  We salute them for their efforts and call upon the supervisory, command, and executive structure to lead – and to do so in a way that facilitates the adoption of values and principles that can better assure the community of sustained compliance.

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 8

| Task | Phase 1: Policy and Training | Phase 2: Implementation | | | |
|---|---|---|---|---|---|
| | In Compliance | In Compliance | Partial Compliance | Not in Compliance | Deferred |
| Task 2: Timeliness Standards and Compliance with IAD Investigations | √ | | | | √ |
| Task 3: IAD Integrity Tests | √ | √ | | | |
| Task 4: Complaint Control System for IAD and Informal Complaint Resolution Process | √ | √ | | | |
| Task 5: Complaint Procedures for IAD | √ | | √ | | |
| Task 6: Refusal to Accept or Refer Citizen Complaints | √ | √ | | | |
| Task 7: Methods for Receiving Citizen Complaints | √ | √ | | | |
| Task 16: Supporting IAD Process - Supervisor/ Managerial Accountability | √ | √ | | | |
| Task 18: Approval of Field-Arrest by Supervisor | √ | √ | | | |
| Task 20: Span of Control for Supervisors | √ | | √ | | |
| Task 24: Use of Force Reporting Policy | √ | | √ | | |
| Task 25: Use of Force Investigations and Report Responsibility | √ | | √ | | |
| Task 26: Use of Force Review Board (UFRB) | √ | √ | | | |
| Task 30: Firearms Discharge Board of Review | √ | | √ | | |
| Task 33: Reporting Misconduct | √ | √ | | | |
| Task 34: Vehicle Stops, Field Investigation, and Detentions | √ | | √ | | |
| Task 35: Use of Force Reports – Witness Identification | √ | √ | | | |
| Task 37: Internal Investigations - Retaliation Against Witnesses | √ | √ | | | |
| Task 40: Personnel Assessment System (PAS) – Purpose | √ | | √ | | |
| Task 41: Use of Personnel Assessment System (PAS) | √ | | | √ | |
| Task 42: Field Training Program | √ | | | | √ |
| Task 43: Academy and In-Service Training | √ | √ | | | |
| Task 45: Consistency of Discipline Policy | √ | √ | | | |
| Total Tasks | 22 | 12 | 7 | 1 | 2 |

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 9

# Section Two

## *Compliance Assessments*

## Task 2:  Timeliness Standards and Compliance with IAD Investigations

<u>Requirements:</u>
*Fairness to complainants, members/employees and the public requires that internal investigations be completed in a timely fashion.*

> *1.     On or before December 1, 2003, OPD shall develop policies regarding timeliness standards for the completion of Internal Affairs investigations, administrative findings and recommended discipline.*
>
> *2.     Compliance with these timeliness standards shall be regularly monitored by IAD command and the Department's command staff.  If IAD experiences an unusual proliferation of cases and/or workload, IAD staffing shall be increased to maintain timeliness standards.*

(Negotiated Settlement Agreement III. B.)

<u>Comments:</u>
We found OPD in compliance with Task 2 during all of the previous reporting periods.  Per Departmental policy, in order to be considered timely, at least 85% of Class I misconduct investigations and at least 85% of Class II misconduct investigations must be completed within 180 days.[1]  During our last quarterly review, we found that 93% of Class I cases and 99% of Class II cases were in compliance with established timelines.  Additionally, for those cases that involved at least one sustained finding, 100% were in compliance with established discipline timelines.

<u>Discussion:</u>
As previously reported, OPD published Department General Order M-03, *Complaints Against Department Personnel and Procedures*, which incorporates the requirements of Task 2, on December 6, 2005.  General Order M-03 was revised in February 2008.  The revised policy also incorporates the requirements of Task 2.  As the Department has trained at least 95% of relevant personnel on this revised policy, we find OPD in continued Phase 1 compliance with this Task.

**Task 2.1** requires that internal investigations (IAD and Division Level) – including review, approval, findings, and discipline – be completed in accordance with the timeliness standards developed by OPD (compliance standard:  85%).  To assess this subtask, we reviewed a list of all

---

[1] OPD classifies misconduct as either "Class I" or "Class II."  Per DGO M-03, Class I offenses "are the most serious allegations of misconduct and, if sustained, shall result in disciplinary action up to and including dismissal and may serve as the basis for criminal prosecution."  Class II offenses include "all minor misconduct offenses."

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 10

internal investigations resulting in formal findings (unfounded, sustained, exonerated, or not sustained) that were approved between April 1, and June 30, 2012, and calculated the number of days between the complaint date and the approval date for each case.  We excluded from the dataset cases that were administratively closed, those that involved on-duty traffic accidents or service complaints, and those that did not involve Manual of Rules (MOR) violations.  We segregated the remaining cases into Class I or Class II categories.  If a case involved at least one alleged Class I violation, we classified it as Class I.

As noted above, Departmental policy requires that investigations be completed within 180 days.  Of the 76 Class I cases we reviewed, 67, or 88%, were in compliance with established timelines – a notable decrease from the 93% we found during the last reporting period.  In addition, seven of the Class I cases were completed in exactly 180 days, and 35 cases were completed in between 170 and 179 days.  Of the 146 Class II cases we reviewed, 143, or 98%, were in compliance with established timelines – a slight decrease from the 99% we found during the last reporting period.  Two of the Class I cases were completed in exactly 180 days, and 37 cases were completed in between 170 and 179 days.  Of the 44 sustained findings that we reviewed, 42 (95%) were in compliance with established discipline timelines.[2]  Prior to this reporting period, OPD was 100% in compliance with these timelines for eight consecutive reporting periods.

Notwithstanding these numbers, the failure of the Department in its acknowledged limited capacity to address its Occupy Oakland-related complaints is a deficit and blemish that cannot go unaddressed.  Accordingly, we find the Department to be in deferred compliance with Task 2.1.

**Task 2.2** requires that IAD and OPD command staff regularly monitor compliance with these timeliness standards (compliance standard:  Yes/No).  The primary responsibility for monitoring compliance with timeliness standards rests with IAD, which generates weekly reports listing the Department's open investigations and critical deadlines for investigations retained in IAD and those handled at the Division level.  The reports are distributed to IAD command staff and the respective Bureau Deputy Chiefs.

In addition to the reports, the IAD Commander discusses pending deadlines for key open investigations during IAD's weekly meetings with the Chief; the deadlines are also reflected in written agendas for these meetings.  IAD also occasionally, as needed, emails individual reminders on cases approaching due dates to investigators and their supervisors.  During this reporting period, we received and reviewed copies of individual Bureau and Department-wide Open Investigation Reports, Cases Not Closed Reports, 180-Day Timeline Reports, and agendas for the weekly meetings between the Chief and IAD staff.  The content of these documents demonstrates active monitoring of case timeliness.  A Monitoring Team representative also attended many of these weekly meetings.  The Department is in compliance with Task 2.2.

**Task 2.3** requires that if IAD experiences an unusual proliferation of cases and/or workload, IAD staffing be increased to maintain timeliness standards (compliance standard:  Yes/No).  For

---

[2] We reviewed 32 cases involving sustained findings; several cases involved more than one sustained finding.

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 11

the second consecutive reporting period since the beginning of our tenure, there was such a proliferation of cases – resulting primarily from the high number of complaints received by the Department following Occupy Oakland-related events.  During this reporting period, IAD opened 655 cases, an increase from the 548 cases opened during the previous reporting period.  To address this volume, OPD added three sergeants to serve as investigators in IAD, and five external contractors to investigate Occupy Oakland-related complaints.  In addition, during this reporting period, the Chief approved 451 cases, an increase from the 418 cases approved during the previous reporting period.

OPD is in compliance with Task 2.3.

Due to our placement of the Department in deferred Phase 2 compliance with Task 2.1 – the essence of this Task – we hold OPD in deferred Phase 2 compliance with Task 2.

<u>Compliance Status:</u>
Phase 1:  In compliance
Phase 2:  Deferred

<u>Next Steps:</u>
During the next reporting period, we will again confer with IAD command staff regarding workload trends and staffing requirements, including how the Department is handling the proliferation of cases related to Occupy Oakland events.  We will also examine closely the Department's significant delays in processing the investigations of such complaints.


# Task 3:  IAD Integrity Tests

<u>Requirements:</u>
*IAD shall be proactive as well as reactive.*
> 1. *IAD shall conduct integrity tests in situations where members/employees are the subject of repeated allegations of misconduct.*
> 2. *IAD shall have frequency standards, among other parameters, for such integrity tests.*

(Negotiated Settlement Agreement III. C.)


<u>Comments:</u>
OPD has been in compliance with this Task since the sixth reporting period.

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 12

Discussion:

As previously reported, OPD published Internal Affairs Policy & Procedures 07-01, *Integrity Testing,* which incorporates the requirements of this Task on January 25, 2007.  The Department updated this policy in January 2009.  The revised policy also incorporates the requirements of Task 3.  As the Department has trained at least 95% of relevant personnel on this revised policy, we find OPD in continued Phase 1 compliance with this Task.

**Task 3.1** requires that IAD conduct integrity tests in situations where members/employees are the subject of repeated allegations of misconduct (compliance standard:  Yes/No); and **Task 3.2** requires that IAD's integrity tests be conducted in accordance with the frequency standards and other parameters IAD has established (compliance standard:  90%).

To assess the Department's Phase 2 compliance with these subtasks, we reviewed files – including operations plans, after-action reports, supporting documents and evidence – related to the 17 integrity tests that were conducted from April 1, through June 30, 2012.  Our review focused on the scope of the investigations, whether OPD conducted integrity tests on members and employees who were the subject of repeated allegations, and whether the selective integrity tests that OPD conducted complied with the parameters established by IAD.  Of the 17 tests conducted during this reporting period, eight were planned tests, in which the Integrity Testing Unit reviewed the records of OPD members and employees to verify that their vital information and records were current and therefore compliant with Departmental policy.[3]  Our review of these tests found that all eight focused on individual members and employees of OPD who were the subjects of high numbers of allegations of misconduct over the 18 months prior; all eight planned tests passed.

The remaining nine integrity tests were selective tests, focusing on whether the officers who were subjects of the test failed to adhere to OPD policies.[4]  Seven of these tests were conducted on officers who were the subjects of repeated allegations, and addressed the sources of the repeated allegations.  Of the nine selective tests, seven passed and two failed.  As a result, one case was referred to IAD for further investigation; the officers involved in the two tests that failed were referred to PAS for supervisory monitoring; and three officers were assigned to receive additional training.

Two of the selective integrity tests conducted by the Bureau of Field Operations (BFO) reviewed the use of Portable Digital Recording Devices (PDRDs) to determine if two officers who had previously been reinstructed to use their PDRDs were using them pursuant to Departmental policy.  In the first test, BFO reviewed the subject officer's CAD (Computer Assisted Dispatch) incidents for three days, and verified that he had turned on his PDRD when required.  The audit identified that the camera was angled up and needed to be adjusted to provide useful video footage.  In the second test, BFO found that the officer had not recorded citizen contacts as

---

[3] Planned integrity tests are designed specifically to test the compliance – with Departmental policies or procedures – of specific members or employees who are identified as the subject of the test.
[4] Pursuant to Internal Affairs Policy & Procedures 07-01, selective integrity tests are targeted enforcement tools aimed at addressing specific issues regarding specific members, employees, or units.

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 13

required by policy.  Further investigation showed that the officer's PDRD had been broken for nearly two months, and that he had not sought a replacement.  This officer was referred to PAS for supervisory monitoring.

Seven selective integrity tests involved monitoring the performance of officers – including how they monitored radio traffic, documented stops, responded to calls, drove Department vehicles, and interacted with the public.  Following the tests, three officers were assigned to retraining for specific job tasks, including tactics and officer safety.  In one case, it was discovered during the review of PDRD footage that a subject wished to make a complaint, but that the officers failed to follow the complaint process.  The officer failed the ITU test, and the officer was referred to PAS for supervisory monitoring.

During this reporting period, the Integrity Testing Unit experienced a change of personnel:  the unit's longtime sergeant was transferred to IAD; and a new investigator was brought into the unit.  Over the last several reporting periods, ITU has made strides toward conducting more varied tests to ensure that OPD personnel are complying with OPD policies.  However, during this reporting period, we noted that the unit conducted fewer tests (only two types).  Given the duration of the NSA, a reduction in the number of integrity tests is wholly unacceptable.  We encourage the ITU to identify areas in which OPD members are not – or may not be – complying with OPD policies, and we look forward to reviewing a wide range of investigations in future reporting periods.

OPD is in Phase 2 compliance with Task 3.

Compliance Status:
Phase 1:  In compliance
Phase 2:  In compliance

Next Steps:
During our next site visit, we will again meet with ITU and the IAD Commander to discuss the Department's need to strengthen the Integrity Unit and its testing.  We will also verify OPD's compliance with established frequency standards for testing, as well as compliance with procedures specifically addressing officers or members who are the subjects of repeat allegations of misconduct.

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 14

## Task 4:  Complaint Control System for IAD and Informal Complaint Resolution Process

Requirements:

1.   *Within 90 days, OPD shall develop a policy regarding an informal complaint resolution process which may be used by supervisors and IAD to resolve service complaints and Class II violations that do not indicate a pattern of misconduct as described in Section III, paragraph H (2).  This process shall document the receipt of the complaint, date, time, location, name or the person making the complaint, the name of the person receiving the complaint, how the matter was resolved and that the person making the complaint was advised of the formal complaint process with the CPRB.  The documentation shall be forwarded to an IAD Commander for review.  If the informal complaint resolution process fails to resolve the complaint or if the person making the complaint still wishes to make a formal complaint, the person receiving the complaint shall initiate the formal complaint process pursuant to Section III, paragraph E.  An IAD Commander shall make the final determination whether the ICR process will be utilized to resolve the complaint.  OPD personnel shall not unduly influence persons making a complaint to consent to the informal complaint resolution process.*

2.   *IAD shall establish a central control system for complaints and Departmental requests to open investigations.  <u>Every complaint received by any supervisor or commander shall be reported to IAD on the day of receipt.  If IAD is not available, IAD shall be contacted at the start of the next business day.</u>  Each complaint shall be assigned an Internal Affairs case number and be entered into a complaint database with identifying information about the complaint.  OPD personnel shall notify IAD and the Chief of Police, or designee, as soon as practicable, in cases likely to generate unusual public interest.*

3.   <u>*Criteria shall be established which must be met prior to moving, from "open" to "closed," any investigation in the complaint database.*</u>[5]

(Negotiated Settlement Agreement III. D.)

Comments:

Only two provisions of Task 4 (4.7 and 4.10) are being actively monitored under the MOU.  During all of the previous reporting periods, we found OPD in compliance with both of these requirements.  Overall, we found that complaints received by any supervisor or commander were reported to IAD on the day of receipt or at the start of the next business day.  We also found that OPD complied with criteria it has established when resolving complaints via informal complaint resolution, administrative closure, or summary finding.

---

[5] The underlined requirements are the only provisions of Task 4 that are being actively monitored under the MOU.

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 15

Discussion:

There are four Departmental policies that incorporate the requirements of Tasks 4.7 and 4.10:

- **Department General Order M-03:**  As previously reported, OPD published Department General Order M-03, *Complaints Against Department Personnel and Procedures*, on December 6, 2005.  General Order M-03 was revised in February 2008.  The revised policy also incorporates the requirements of these subtasks.

- **Department General Order M-3.1:**  As previously reported, OPD published Department General Order M-3.1, *Informal Complaint Resolution Process,* which incorporates the requirements of these subtasks, on December 6, 2005.  General Order M-3.1 was revised in February 2008, and August 2008.  The revised policy also incorporates the requirements of these subtasks.

- **Special Order 8552:**  As previously reported, OPD published Special Order 8552, *Update of Departmental Training Bulletin V-T.1, Internal Investigation Procedure Manual*, on February 1, 2007.  This policy incorporates the requirements of these subtasks.

- **Communications Division Policy & Procedures C-02:**  As previously reported, OPD published Communications Division Policy & Procedures C-02, *Receiving and Logging Complaints Against Personnel and Use of Force Incidents,* on April 6, 2007.  This policy incorporates the requirements of these subtasks.

As the Department has trained at least 95% of relevant personnel on these policies, we find OPD in continued Phase 1 compliance with this Task.

**Task 4.7** requires that every complaint received by any supervisor or commander be reported to IAD on the day of receipt (compliance standard: Yes/No).  If IAD is not available, the supervisor or commander shall contact IAD at the start of the next business day.  To assess Phase 2 compliance for Task 4.7, we reviewed 94 Daily Incident Log (DIL) entries and a random sample of 86 IAD case files that were approved during the period of April 1, through June 30, 2012.  The Office of Inspector General (OIG) forwards completed DILs to us on a daily basis.  We found no evidence of unwarranted delay in the delivery of these complaints or in the intake process once IAD was made aware of them.  OPD is in compliance with Task 4.7.

**Task 4.10** requires that OPD comply with criteria it has established when resolving complaints through informal complaint resolution (ICR), administrative closure, or summary finding (compliance standard:  90%).[6]  This subtask is intended to ensure that OPD provides the proper level of investigation for each complaint, and does not resolve meritorious complaints of

---

[6] Summary findings are investigations in which the Department believes a proper conclusion can be determined based on a review of existing documentation with limited or no additional interviews and follow-up.

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 16

misconduct without determining – and documenting – whether the OPD member or employee committed misconduct.

During this reporting period, from a sample of IAD cases that were approved between April 1, and June 30, 2012, we reviewed 12 cases in which at least one allegation was resolved via administrative closure, 13 cases in which at least one allegation was resolved via informal complaint resolution (ICR), and 13 cases in which at least one allegation was resolved via summary finding.

In all but one of the ICRs we reviewed, the complainants agreed to the informal complaint resolution process.  Where an agreement was secured in a telephone conversation, that information was contained in the case documentation and in follow-up letters to the complainants.  Three of the cases involved the Animal Services Section.  One of these alleged improper demeanor; and in the others, complainants were dissatisfied with the resolution to their calls for service.

Five ICRs involved poor response times.  All but one were appropriate for the informal complaint resolution process.  In the case that caused us concern, the complainant refused to participate in the ICR process, as can be heard in her interview and documented in the case's chronological log.  Additionally, the nature of the complaint calls for some type of investigation – even a cursory one.  It took OPD approximately 28 hours to pick up a medically cleared patient from John George Pavilion (a psychiatric facility) and transport him to jail.  IAD classified this as a service complaint, and invoked the ICR process – over the complainant's objections.  In a breakdown of service of this magnitude, one cannot rule out possible performance of duty issues on multiple levels without some kind of inquiry.  If, in the end, it is determined that this was a policy or systems failure, OPD would benefit from identifying and addressing that situation, as well.

The administrative closures that we reviewed were investigated before IAD arrived at the determination that such a closure comported with policy.  Three of the cases were administratively closed because the complaints were withdrawn.  One involved allegations of improper demeanor against two animal control officers.  Another involved the search of an employee's car, which was reported as a suspicious vehicle.  While the employee was upset that a sergeant searched his vehicle attempting to identify its owner, he never intended to file a complaint, and withdrew the complaint when he learned that one had been generated on his behalf.  In the third case, due to the involvement of another law enforcement agency, a complaint was lodged for a patient care technician who was treating an OPD officer in a hospital.  The hospital worker never desired that a complaint be filed; and when she learned of it, she withdrew it.  All withdrawals were digitally recorded.

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 17

Four cases were administratively closed because no MOR violations were alleged.  For example, an inmate serving time for a 2006 conviction complained that officers spoke to his mother, causing her to have a fatal stroke a year later.  Suspending judgment on the merits of the complainant's hypothesis, the conversation, if it occurred, would not constitute a violation of any OPD policy.  In another case, a caller lodged an unspecified complaint against the Alameda County Sheriff's Office Retirees' Association.  First, no MOR violation was alleged; and second, the complaint did not involve OPD or its employees.

The remaining allegations that were administratively closed comported with policy, in that the complaints either lacked specificity, claimed innocence of charges best left to appropriate adjudication venues to decide, or otherwise did not constitute MOR violations.  Where they were accompanied by allegations that warranted a full investigation, these additional allegations were investigated in accordance with policy.

The cases resolved via summary finding were all approved for such designation as required by policy.  In two cases, the police/complainant interactions were captured on officers' Portable Digital Recording Devices (PDRDs), negating the need for some interviews.  In another case – a demeanor allegation against a dispatcher – a review of the recorded call to Communications proved sufficient to unfound the allegation and close the case.  Summary findings are further discussed in Task 5.

OPD is in compliance with Task 4.10.

OPD is in Phase 2 compliance with Task 4.

Compliance Status:
Phase 1:  In compliance
Phase 2:  In compliance


# Task 5:  Complaint Procedures for IAD

Requirements:

1.  *On or before December 1, 2003, OPD shall develop a policy so that, OPD personnel who become aware that a citizen wishes to file a complaint shall bring such citizen immediately, or as soon as circumstances permit, to a supervisor or IAD or summon a supervisor to the scene.  If there is a delay of greater than three (3) hours, the reason for such delay shall be documented by the person receiving the complaint.  In the event that such a complainant refuses to travel to a supervisor or to wait for one, the member/employee involved shall make all reasonable attempts to obtain identification, including address and phone number, as well as a description of the allegedly wrongful conduct and offending personnel, from the complainant and any witnesses.  This information, as well as*

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 18

*a description of the complaint, shall immediately, or as soon as circumstances permit, be documented on a Complaint Form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander, and shall be treated as a complaint. The supervisor or appropriate Area Commander notified of the complaint shall ensure the Communications Division is notified and forward any pertinent documents to the IAD.*

2. *An on-duty supervisor shall respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest. The supervisor shall ensure the Communications Division is notified and forward any pertinent documents to the IAD. All other misconduct complaints, by a jail inmate shall be handled in the same manner as other civilian complaints.*

3. *In each complaint investigation, OPD shall consider all relevant evidence, including circumstantial, direct and physical evidence, and make credibility determinations, if feasible. OPD shall make efforts to resolve, by reference to physical evidence, and/or use of follow-up interviews and other objective indicators, inconsistent statements among witnesses.*

4. *OPD shall develop provisions for the permanent retention of all notes, generated and/or received by OPD personnel in the case file.*

5. *OPD shall resolve each allegation in a complaint investigation using the "preponderance of the evidence" standard. Each allegation shall be resolved by making one of the following dispositions: Unfounded, Sustained, Exonerated, Not Sustained, or Administrative Closure. The Department shall use the following criteria for determining the appropriate disposition:*

   a. *Unfounded: The investigation disclosed sufficient evidence to determine that the alleged conduct did not occur. This finding shall also apply when individuals named in the complaint were not involved in the alleged act.*

   b. *Sustained: The investigation disclosed sufficient evidence to determine that the alleged conduct did occur and was in violation of law and/or Oakland Police Department rules, regulations, or policies.*

   c. *Exonerated: The investigation disclosed sufficient evidence to determine that the alleged conduct did occur, but was in accord with law and with all Oakland Police Department rules, regulations, or policies.*

   d. *Not Sustained: The investigation did not disclose sufficient evidence to determine whether or not the alleged conduct occurred.*

   e. *Administrative Closure: The investigation indicates a service complaint, not involving an MOR violation, was resolved without conducting an internal investigation; OR*

   f. *To conclude an internal investigation when it has been determined that the investigation cannot proceed to a normal investigative conclusion due to circumstances to include but not limited to the following:*

      1) *Complainant wishes to withdraw the complaint and the IAD Commander has determined there is no further reason to continue the investigation and to ensure Departmental policy and procedure*

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 19

        *has been followed;*

2)     *Complaint lacks specificity and complainant refuses or is unable to provide further clarification necessary to investigate the complaint;*

3)     *Subject not employed by OPD at the time of the incident; or*

4)     *If the subject is no longer employed by OPD, the IAD Commander shall determine whether an internal investigation shall be conducted.*

5)     *Complainant fails to articulate an act or failure to act, that, if true, would be an MOR violation; or*

6)     *Complaints limited to California Vehicle Code citations and resulting tows, where there is no allegation of misconduct, shall be referred to the appropriate competent authorities (i.e., Traffic Court and Tow Hearing Officer).*

g.     *Administrative Closures shall be approved by the IAD Commander and entered in the IAD Complaint Database.*

6.     *The disposition category of "Filed" is hereby redefined and shall be included under Administrative Dispositions as follows:*

a.     *An investigation that cannot be presently completed. A filed investigation is not a final disposition, but an indication that a case is pending further developments that will allow completion of the investigation.*

b.     *The IAD Commander shall review all filed cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed and may direct the closure or continuation of the investigation.*

7.     *Any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken. However, investigators, with the approval of an IAD Commander, are not required to interview and/or take a recorded statement from a member or employee who is the subject of a complaint or was on the scene of the incident when additional information, beyond that already provided by the existing set of facts and/or documentation, is not necessary to reach appropriate findings and conclusions.*

(Negotiated Settlement Agreement III. E.)


Comments:

During all of the previous reporting periods, we found OPD in partial compliance with Task 5.[7] Tasks 5.1-5.5 address the information gathered at the time a complaint is lodged and the notifications that are required. During the previous reporting period, we found OPD in compliance with all five subtasks in this group. In addition, we found that 92% of the cases we reviewed were in compliance with all elements of Tasks 5.15 and 5.16. We also found that the

---

[7] Pursuant to an agreement among the Parties, Tasks 5.7- 5.11, and 5.13-5.14 are not subject to active monitoring.

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 20

verification that all notes were contained in the file, as required by Task 5.17, was present in all of the cases we reviewed.  In 12% of the cases we reviewed, the preponderance of evidence standard was not applied to some or all of the allegations, as required by Task 5.18.  We also found OPD in compliance with Tasks 5.6 and 5.12 (jail complaints), Task 5.19 (proper dispositions), Task 5.20 (tolling and filed cases), and Task 5.21 (employee interviews).

Discussion:

There are several Departmental policies that incorporate the various requirements of Task 5:

- **Departmental General Order M-03:**  As previously reported, OPD published Department General Order M-03, *Complaints Against Department Personnel and Procedures*, on December 6, 2005.  General Order M-03 was revised in February 2008.  (The revised policy also incorporates the requirements of Task 5.)

- **Communications Division Operations & Procedures C-02:**  As previously reported, OPD published Communications Division Policy & Procedures C-02, *Receiving and Logging Complaints Against Personnel and Use of Force Incidents,* on April 6, 2007.

- **Training Bulletin V-T.1:**  As previously reported, OPD published Training Bulletin V-T.1, *Internal Investigation Procedure Manual,* on June 1, 2006.

- **Special Order 8270:**  As previously reported, OPD published Special Order 8270, *Booking of Prisoners at the Glenn E. Dyer Detention Facility*, on June 24, 2005.

- **Special Order 8565:**  As previously reported, OPD published Special Order 8565, *Complaints Against Department Personnel,* on May 11, 2007.

- **IAD Policy & Procedures 05-02:**  As previously reported, OPD published IAD Policy & Procedures 05-02, *IAD Investigation Process,* on December 6, 2005.

In addition, NSA stipulations issued on December 12, 2005, and March 13, 2007, incorporate the requirements of this Task.

As the Department has trained at least 95% of relevant personnel on the above-listed policies, we find OPD in continued Phase 1 compliance with this Task.

To verify Phase 2 compliance with Tasks 5.1 through 5.5, we reviewed 94 entries that appeared on the Daily Incident Logs (DILs) that were completed between April 1, and June 30, 2012.  We identified these by randomly selecting 19 dates during this reporting period and reviewing the entries for each of those dates.  (Some selected dates had no entries, but most had multiple entries.)

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 21

**Task 5.1** requires that when a citizen wishes to file a complaint, the citizen is brought to a supervisor or IAD, or a supervisor is summoned to the scene (compliance standard: 95%). During the last reporting period, we found OPD in compliance with this subtask. During the current reporting period, of the 94 DIL entries, seven cases were received by IAD, which, in turn, notified the Communications Division. Thirty-four complaints were taken by supervisors in the field, and in the remainder of the cases complainants called 911 to express their dissatisfaction. In these latter cases, IAD or field supervisors were notified, except when the complaints were against Communications personnel (these were handled by a Communications supervisor) or were clearly service complaints (e.g., slow response time with no specific officer complained of). We noted 28 such service complaints. During this reporting period, OPD has a 100% compliance rate with Task 5.1.

**Task 5.2** requires that if there is a delay of greater than three hours in supervisory response, the reason for the delay be documented (compliance standard: 85%). OPD has added a checkbox to the DIL to record such delays. In addition to reviewing this section of the logs, we also checked the times of complaint receipt and supervisor contact with the complainant (or attempted contact where the complainant was unavailable – see Task 5.3). Of the 94 DIL entries we reviewed, we did not identify any cases in which there appeared to be greater than a three-hour delay in contacting the complainant. OPD remains in compliance with Task 5.2.

**Task 5.3** requires that where a complainant refuses to travel to a supervisor, or wait for one, personnel make all reasonable attempts to obtain specific information to assist in investigating the complaint (compliance standard: 90%). Of the 94 records in our dataset, we identified nine instances in which the complainant "refused" interaction with a supervisor. In one, a complaint that an officer failed to stop when his vehicle struck a cat, the complainant advised Communications that she would prefer to speak with IAD rather than wait for a field supervisor. OPD facilitated that contact. In another, a complainant, who was upset with the traffic citation she received, refused to wait for a supervisor to respond to the scene. Her identifying information was on the citation. In three instances, complainants failed to answer return telephone calls to the contact numbers they provided. In one of these cases, a complainant indicated that she was struck in the head with a baton during a protest. When she failed to answer a call-back, officers were dispatched to a hospital in an unsuccessful attempt to locate her. In the remaining four cases, the complainants terminated their calls without providing a means to re-contact them. These were anonymous complaints called in on OPD telephone lines without automatic number identification (ANI). OPD is in compliance with Task 5.3.

**Task 5.4** requires that specific information be documented on a complaint form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander (compliance standard: 85%). In order to achieve compliance with this subtask, the DIL should contain the identification of personnel; witnesses or identifying information, if known (the log should state "unknown" if not known); the date, time, and location of the incident; and the time of contact or attempt to contact the complainant by a supervisor.

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 22

During the last reporting period, OPD had a 99% compliance rate with this subtask. During this reporting period, all of the logs we reviewed contained the required information ("unknown" was checked in 25 records). OPD has a 100% compliance rate during this reporting period, and is in compliance with Task 5.4.

**Task 5.5** requires that the supervisor or Area Commander notify Communications and forward any pertinent documents to IAD (compliance standard: 95%). OPD had a compliance rate of 100% with this subtask during the last reporting period. The DILs are administered by the Communications Section and forwarded to IAD each business day. Additionally, the DIL contains a field to record the name of Area Commander notified and the time of notification. This field was properly completed in all of the records we reviewed. OPD is in 100% compliance with Task 5.5 during this reporting period.

**Task 5.6** requires that an on-duty supervisor respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest of the inmate. To assess Task 5.6 during this reporting period, we reviewed all complaints that appeared to have originated from North County Jail, Santa Rita Jail, or Juvenile Hall, and were approved between April 1, and June 30, 2012. We identified ten such complaints using the IAD database. We reviewed these complaints for two triggering events: an allegation of Class I misconduct; and the complaint lodged at the time of arrest. If both of these were not present, the case was deemed in compliance if it was "handled in the same manner as other civilian complaints."

None of the complaints were lodged contemporaneous to the arrest of the complainant. Three cases involved the same complainant, who, while participating in an unrelated interview, alleged misconduct in three different incidents taking place from 12 to 18 months before the interview. Another complainant alleged false arrest in the case resulting in his manslaughter conviction six years prior.

Two of the cases involved complaints against other jurisdictions, and after appropriate investigation, IAD advised the other agencies and administratively closed the cases. One involved Alameda County Sheriff's Office deputies assigned to the airport, and the other involved a Taser deployment by the BART Police.

OPD is in compliance with Task 5.6.

**Task 5.12** requires that the Watch Commander ensure that any complaints that are applicable to Task 5.6 are delivered to and logged with IAD (compliance standard: 90%). Since by definition these complaints must be made contemporaneous with the arrest, an on-duty supervisor must respond to the jail. Under current policy, the Communications Section must record on the DIL complaints that are received and/or handled by on-duty supervisors; the DIL is forwarded daily to IAD. As mentioned in past reports, we deem the DIL system as functionally equivalent to the requirements of Task 5.12, and the Department remains in compliance with this subtask.

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 23

To assess **Tasks 5.15 through 5.19**, and **Task 5.21**, we reviewed a random sample of 25 IAD cases that were approved between April 1, and June 30, 2012.  This sample included investigations completed by IAD and Division-level investigations (DLIs).  It also included cases that were resolved via formal investigation and investigations that were resolved via summary finding.

As in our previous reviews, we treated **Tasks 5.15 and 5.16** as a single subtask with several elements, specifically that OPD:  gathers all relevant evidence; conducts follow-up interviews where warranted; adequately considers the evidence gathered; makes credibility assessments where feasible; and resolves inconsistent statements (compliance standard:  85%).  During the previous assessment period, we deemed the Department in compliance with *all* of these required elements 92% of the time.  Of the 25 investigations we reviewed for this reporting period, we deemed 22, or 88%, in compliance with *all* of these required elements.  This marks the third reporting period in which OPD reached the compliance standard for the requirements of these subtasks.

In five cases, investigators conducted follow-up interviews with officers or civilians to seek clarification.  In two cases, credibility assessments were problematic.  In the first – a complaint that officers failed to take a report in a prostitution-related case – the investigator wrote an entire page documenting the complainant's "questionable behavior and reactions."  She summarized by writing, "So though none of these things are going to discredit the current allegations, they must be considered as factors in the overall outcome of the case."  We believe that the investigator reached inappropriate findings in the case.  Fortunately, her reviewing captain did as well, and changed the not sustained findings to sustained.

In the second case – involving allegations of demeanor and failing to take a complaint – a witness was deemed not credible, in part, for not being able to recall specifically what she heard an officer say in the background of a telephone call she was having with the complainant.  The interview took place nearly four months after the incident.  We listened to her interview, and while she could not recall specifically what was said, she certainly sounded credible.  OPD also questioned her credibility because she wrote a letter of support to the District Attorney and failed to identify herself as the complainant's fiancée.  This is irrelevant to the allegations in the case.

**Task 5.17** requires that OPD permanently retain all notes generated and/or received by OPD personnel in the case file (compliance standard:  85%).  OPD personnel document that all investigative notes are contained within a particular file by completing IAD Form 11 (Investigative Notes Declaration).  During the previous reporting period, we found OPD in 100% compliance with this subtask.  During this reporting period, the form was again properly completed in all 25 cases we reviewed.  OPD is in compliance with this subtask.

**Task 5.18** requires that OPD resolve each allegation in a complaint investigation using the preponderance of the evidence standard (compliance standard:  90%).  During the previous reporting period, OPD complied with this subtask in 88% of the cases we reviewed.  During this reporting period, OPD complied with this subtask in 22 cases, or, again, 88%.  Two of the cases

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 24

involved demeanor allegations.  In each case, the investigator went to great lengths to identify what the subject officers said that would have been considered rude or unprofessional.  However, the complainants and witnesses in these cases took exception to the officers' tone, the manner in which they spoke, and the way in which they carried themselves.  MOR 314.07 (Conduct Towards Others – Demeanor) is applicable, and states, in part: "Members and employees shall perform their duties attentively and courteously, avoiding rude, threatening, harsh, insulting, insolent or demeaning language *and they shall maintain a professional bearing* regardless of provocation to do otherwise."  [Italics added.]  In one of these cases, the demeanor allegation was unfounded, and should have been not sustained.  In the other case, we believe that there was enough evidence to sustain the demeanor allegation.  The complainant and witnesses were hospital employees – not arrestees or the subjects of enforcement action.  The investigator accurately summarized the complainant's and witness' perceptions of the officer as "rude, arrogant, and egotistical."  Additionally, the subject officer has a history of similar allegations, including profanity, rudeness, and an allegation of treating a complainant "like a suspect."

In the third case – involving a firearms discharge by an off-duty officer – several discrepancies in the investigation went unaddressed.  While the investigation resulted in a sustained finding for firing a warning shot, the incident should have been investigated as potential Level 1 use of force (discharge of a firearm at a person).  See Task 30.3.

We noted two cases in which the recommended findings of the investigator were overturned during the review process.  In one, a case involving an allegation of failure to investigate and report, a captain appropriately changed not sustained findings to sustained.  In the other, a case involving allegations of demeanor and failure to take a complaint, the Assistant Chief changed the findings from exonerated to unfounded.  We believe, however, that not sustained findings were more appropriate.

OPD is not in compliance with Task 5.18.

**Task 5.19** requires that each allegation of a complaint is identified and resolved with one of the following dispositions:  unfounded; sustained; exonerated; not sustained; or administrative closure (compliance standard:  95%).  Excluding allegations that we deemed appropriately administratively closed (there were three such allegations), our sample of 25 cases contained 46 allegations that received dispositions as follows:  19 exonerated; five not sustained; 17 unfounded; and five sustained.  As noted in Task 5.18, we disagree with some of these findings.  Specifically, we believe that two of the unfounded dispositions should have been not sustained, and one of the not sustained findings should have been sustained.  One allegation went unaddressed.  OPD remains in Phase 2 compliance with this subtask.  However, with a compliance rate of 91%, OPD may fall out of compliance during the next reporting period if less than 95% of the allegations are compliant.  A reduction in the compliance rate for Task 5.19 at this stage of the NSA is inconsistent with the City's representations that it is moving toward a sustainable compliance period.

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 25

**Task 5.20** requires that the IAD Commander review all "filed" cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed (compliance standard: 90%). A filed case is defined as an investigation that cannot be presently completed and is pending further developments that will allow completion of the investigation; filed is not a final disposition. According to our review of the IAD database, OPD currently does not have any cases classified as filed. Cases categorized as "tolling" appear to fit this definition.[8]

During our most recent site visit, we met with the Deputy Chief of the Bureau of Risk Management and the commanding officer of IAD, who advised that as of that date, 14 cases were classified as tolling. Six involved civil litigation against the City and/or the Department; and in three, the subject or witness officers were unavailable. Four were awaiting the results of ongoing criminal investigations, and relate to Occupy Oakland incidents. In one case, the subject officer waived the one-year time period in writing.[9] All cases appeared to be tolling according to policy. These cases are reviewed with the Chief during his weekly IAD meetings and are listed by case number on the printed meeting agendas. OPD is in compliance with this subtask.

**Task 5.21** requires that any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken (compliance standard: 90%). However, with the approval of the IAD Commander, investigators are not required to interview and/or take a recorded statement in all cases. For example, interviews are not needed from a member or employee who is the subject of a complaint, or who was on the scene of the incident when additional information – beyond that already provided by the existing set of facts and/or documentation – is not necessary to reach appropriate findings and conclusions. Ten of the 25 cases we reviewed were resolved via summary finding, and all were appropriately approved for such closure. (These do not include the cases referenced in Task 4, for which summary findings were also appropriate.) In all cases, available documentation negated the need for certain interviews. For example, in three cases, Communications Division recordings were sufficient to reach a determination in complaints against dispatch personnel. In four cases, PDRD videos negated the need for certain officer interviews.

In one case, an employee who was the complainant in a case alleging preferential treatment and improper demeanor was not interviewed. She lodged her complaint via e-mail. The investigator wrote, "To date, [] has not provided a recorded statement to the IAD and has rebuffed numerous requests to sit down for an interview." Inexplicably, IAD did not order the employee to report to IAD and provide a recorded statement.

---

[8] OPD defines a tolled case as an administrative investigation that has been held in abeyance in accordance with one of the provisions of Government Code Section 3304.

[9] 9 Government Code Section 3304 reads, in part: "…no punitive action, nor denial of promotion on grounds other than merit, shall be undertaken for any act, omission, or other allegation of misconduct if the investigation of the allegation is not completed within one year of the public agency's discovery by a person authorized to initiate an investigation of the allegation of an act, omission, or other misconduct."

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 26

OPD is in compliance with Task 5.21.

OPD is in partial Phase 2 compliance with Task 5.

Compliance Status:
Phase 1:  In compliance
Phase 2:  Partial compliance

Next Steps:
As we have done previously, during our next site visit, we will meet with IAD and OIG
personnel regarding specific cases of concern that are referenced herein.


## Task 6:  Refusal to Accept or Refer Citizen Complaints

Requirements:
*Refusal to accept a citizen complaint, failure to refer a citizen to IAD (when that citizen can be
reasonably understood to want to make a citizen's complaint), discouraging a person from filing
a complaint, and/or knowingly providing false, inaccurate or incomplete information about IAD
shall be grounds for discipline for any OPD member or employee.*
(Negotiated Settlement Agreement III. F.)


Comments:
During the previous reporting period, we found the Department in Phase 2 compliance with Task
6.

Discussion:
As previously reported, OPD published Department General Order M-03, *Complaints Against
Department Personnel and Procedures*, which incorporates the requirements of Task 6, on
December 6, 2005.  General Order M-03 was revised in February 2008.  The revised policy also
incorporates the requirements of Task 6.  The requirements of this Task are also incorporated
into Manual of Rules Sections 314.07, 398.70, and 398.76.  As the Department has trained at
least 95% of relevant personnel on this policy, we find OPD in continued Phase 1 compliance
with this Task.

**Task 6** requires that OPD members and employees who refuse to accept a citizen complaint, fail
to refer a citizen to IAD (when the citizen can be reasonably understood to want to make a
citizen's complaint), discourage a person from filing a complaint, and/or knowingly provide
false, inaccurate, or incomplete information about IAD, are disciplined (compliance standard:
95%).

To assess Phase 2 compliance with this Task, we reviewed a random sample of 94 Daily Incident
Log entries from April 1, through June 30, 2012; and a random sample of 25 IAD investigations

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 27

(conducted by both IAD and via Division-level investigation) that were closed during the same period.  We found no cases in which an allegation of Failure to Accept or Refer a Complaint went unaddressed.

We also queried the IAD database to identify any allegations of MOR 398.70-1, Interfering with Investigations; MOR 398.76-1, Refusal to Accept or Refer a Complaint; and MOR 398.76-2, Failure to Accept or Refer a Complaint; that were investigated and approved during this same time period.  We identified 11 such cases.  None of these cases resulted in sustained findings for any of the applicable MOR violations.

In five of these cases, video and/or audio recordings were instrumental in determining the findings.  Three involved Portable Digital Recording Devices (PDRDs).  In one, officers recorded their interactions with a citizen they were taking into custody for a psychological evaluation, as they believed that he was a danger to himself or others.  The recordings refuted the man's claims of an illegal search, excessive force, and the failure to take a complaint.  In another case, the PDRD captured the complainant's reference to going to IAD *if* the involved officers continued to question the complainant about his sobriety.  The officers were satisfied with their inquiries and dropped the subject.  This was not interpreted as the complainant's desire to file a complaint.  In the third case, which stemmed from a domestic dispute, a sergeant equipped with a PDRD recorded his interactions with the complainant.  The sergeant asked the complainant at least four times if she wanted to make a complaint, and it was clear from the recording that she did not.

Two other cases involved audio recordings, and were related to complaints against dispatch personnel.  In one, a dispatcher received a complaint call on October 26, 2011, related to the Occupy Oakland protests of the prior day.  The dispatcher processed the call according to a protocol put in place on that day to deal with the high volume of complaint calls related to the incident.  The caller's information was recorded (he called from Portland, Oregon, to complain about what he witnessed on television), and it was ultimately forwarded to IAD.  The call was not forwarded to a supervisor as it normally would be.  We note that the dispatcher was following the protocol established by her supervisors to deal with the inordinately high volume of complaint calls, but we also note that OPD altered its complaint intake process without consultation with the Monitoring Team.  A few weeks later, during our November 2011 site visit, we discussed – and ultimately approved – a protocol to triage and address the Occupy Oakland-related complaints.

In the other case involving dispatch personnel, we believe the not sustained finding for MOR 398.76-2, Failure to Accept or Refer a Complaint (Unintentional) should have been sustained.  The caller expressed his displeasure over response time and comments made by a lieutenant at a neighborhood meeting.  During the recorded call, the complainant expressed his desire to file a complaint.  The dispatcher failed to address his request.  The investigator went to great lengths to make the case that the dispatcher must not have heard the request, citing that the dispatcher and the complainant were talking over each other, and that the caller had a low voice level.  The dispatcher, in fact, interrupted the caller twice as he was making the reference to the complaint.

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 28

The "disputed fact" in the investigation became, "Did the dispatcher hear the complainant state he wanted to file a complaint."  The caller's request to file a complaint was recorded; there is irrefutable evidence that it happened.  The dispatcher *may* not have heard it.  For whatever reason – and perhaps unintentionally as is referenced in the MOR – she failed to accept and refer a complaint as required.

OPD remains in Phase 2 compliance with Task 6.

Compliance Status:
Phase 1:  In compliance
Phase 2:  In compliance

## Task 7:  Methods for Receiving Citizen Complaints

Requirements:
*On or before December 1, 2003, OPD shall develop a policy to strengthen procedures for receiving citizen complaints:*

1.  *IAD or Communication Division personnel shall staff a recordable toll-free complaint phone line, 24-hours a day, and receive and process complaints in accordance with the provisions of Departmental General Order M-3.  The complainant shall be advised that the call is being recorded when a complaint is taken by IAD.*

2.  *Guidelines for filing a citizen's complaint shall be prominently posted and informational brochures shall be made available in key Departmental and municipal locations.*

3.  *OPD shall accept anonymous complaints.  To the extent possible, OPD shall ask anonymous complainants for corroborating evidence.  OPD shall investigate anonymous complaints to the extent reasonably possible to determine whether the allegation can be resolved.*

4.  *OPD personnel shall have available complaint forms and informational brochures on the complaint process in their vehicles at all times while on duty.  Members/employees shall distribute these complaint forms and informational brochures when a citizen wishes to make a complaint, or upon request.*

5.  *IAD shall be located in a dedicated facility removed from the Police Administration Building.*

6.  *Complaint forms and informational brochures shall be translated consistent with City policy.*

7.  *Complaint forms shall be processed in accordance with controlling state law.*[10]

(Negotiated Settlement Agreement III. G.)

---

[10] The underlined requirement is the only provision of Task 7 that is being actively monitored under the MOU.

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 29

Comments:
Only one provision of Task 7 (7.3) is being actively monitored under the MOU.  During the past several reporting periods, we found OPD in compliance with this Task.

Discussion:
OPD published Departmental General Order M-03, *Complaints Against Department Personnel and Procedures,* which incorporates the requirements of Task 7, on December 6, 2005.  General Order M-03 was revised in February 2008.  The revised policy also incorporates the requirements of Task 7.  As the Department has trained at least 95% of relevant personnel on this revised policy, we find OPD in continued Phase 1 compliance with this Task.

To assess Phase 2 compliance with this Task, we reviewed all cases listed in the Internal Affairs Division database as originating from complainants who were "anonymous," "unknown," "refused," or any forms of those terms (such as "unk") and that were approved between April 1, and June 30, 2012.  We also reviewed all complaints during this selected time period that were tagged by IAD as originating from an anonymous complainant, and complaints in which the complainant field in the database was blank, to determine whether any were made anonymously.

Based on the above-listed criteria, we identified 12 cases as potential anonymous complaints during this reporting period.  After review, we determined that 10 were true anonymous complaints, and the complainants were not identified during the course of the investigation.  In one of the remaining two cases, the complainant was identified except for his last name.  His address and telephone number were known, and he participated in two interviews.  The other case concerned an Occupy Oakland protest of January 28, 2012; and several anonymous complaints were combined with complaints from known callers and administratively closed pursuant to a protocol previously approved by the Monitoring Team.  The protocol allowed, in part, for administrative closure if complainants:

a) Were not directly involved; and
b) Were not a direct witness; and
c) Did not have direct contact with a person who was present at Occupy Oakland events who may have been subject to police misconduct; or
d) Only knew of the event via media:  newspapers, television, radio, blogs, etc.

Six of the remaining 10 complaints were received via telephone calls to the Communications Division.  Additionally, three were received in person, and one was lodged via an anonymous letter to the City Administrator.

Where possible, complainants were asked to provide corroborating evidence.  In nearly all cases, the complainants terminated the contact before OPD could secure additional details of the complaint.  However, the complaints were investigated to the extent reasonably possible as required by this subtask.  IAD or field supervisors attempted to re-contact complainants if a call-back number was available, even if the complainants expressly stated they wished to remain anonymous.

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 30

Eight of the 10 cases were closed via administrative closure.  Each met the criteria for such closure, and most lacked the details to identify the specific alleged misconduct and/or OPD personnel involved in the incidents.  One caller called 911 to complain of "police brutality," but provided no specific information before terminating the call.  Three attempts to call the number displayed in 911's Automatic Number Identification (ANI) system were unsuccessful.  In another case, a complainant alleged that a desk officer was "aggressive and inappropriate" during a telephone call, but the caller provided no further details.  Another complaint involved demeanor allegations against a possible OPD supervisor for using inappropriate language in the presence of recruit officers.  Based on the description of the vehicle and the location of occurrence, IAD ruled out OPD personnel and noted that another agency was most likely the involved.  Another case was determined to be a duplicate complaint of an incident already investigated by IAD.

Three cases did not, in our opinion, rise to the level of a complaint.  The fact that OPD classified them as complaints is not a compliance concern; we merely make the observation that the complaint process could have been avoided.  In one, an apparently intoxicated female citizen complained to a sergeant that she was not allowed re-entry into the Oakland Coliseum.  Her displeasure was with the facility's – not OPD's – policy.  In another case, a citizen asked a sergeant why a plainclothes officer was not wearing a nametag when the officer assisted at the scene of a motor vehicle accident.  (The officer was wearing a vest identifying him as an OPD officer.)  The sergeant provided an appropriate explanation that apparently satisfied the citizen – yet IAD generated a complaint memorandum.  In the third case, a citizen called 911 and asked to speak with a supervisor.  When the dispatcher began to ask the complainant questions, he hung up; he never mentioned any displeasure with OPD.

The Department remains in Phase 2 compliance with Task 7.3.

Compliance Status:
Phase 1:  In compliance
Phase 2:  In compliance

# Task 16:  Supporting IAD Process - Supervisor/Managerial Accountability

Requirements:
*On or before December 1, 2003, OPD shall develop a policy to ensure that supervisors and commanders, as well as other managers in the chain of command, shall be held accountable for supporting the IAD process.  If an IAD investigation finds that a supervisor or manager should have reasonably determined that a member/employee committed or violated a Class I offense, then that supervisor or manager shall be held accountable, through the Department's administrative discipline process, for failure to supervise, failure to review, and/or failure to intervene.*
(Negotiated Settlement Agreement III. O.)

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 31

Comments:
The Department has been in Phase 2 compliance with Task 16 since the second reporting period.

Discussion:
As previously reported, two Department policies, Department General Order M-03 and Training Bulletin V-T.1, incorporate the requirements of Task 16.  OPD published Department General Order M-03, *Complaints Against Department Personnel and Procedures*, on December 6, 2005. General Order M-03 was revised in February 2008.  (The revised policy also incorporates the requirements of Task 16.)  OPD published Training Bulletin V-T.1, *Internal Investigation Procedure Manual*, on June 1, 2006.  As the Department has trained at least 95% of relevant personnel on these policies, we find OPD in continued Phase 1 compliance with this Task.

**Task 16.1** requires that supervisors and commanders, as well as other managers in the chain of command, are held accountable for supporting the IAD process (compliance standard:  Yes/No); and **Task 16.2** requires that if an IAD investigation finds that a supervisor or manager should have reasonably determined that a member/employee committed or violated a Class I offense, the supervisor or manager is held accountable, through OPD's administrative discipline process, for failure to supervise, failure to review, and/or failure to intervene (compliance standard: 90%).

To assess Task 16 during this reporting period, we examined 94 Daily Incident Log entries from April 1, through June 30, 2012; a random sample of 86 IAD cases (investigated by both IAD and via Division-level investigation, or DLI) that were approved by the Chief between April 1, through June 30, 2012; and the 10 sustained Class I investigations that were approved by the Chief between April 1, through June 30, 2012.

Two of the 10 sustained Class I investigations resulted in sustained charges against a patrol sergeant.  The first case involved an officer who did not properly activate his lights and siren while following a vehicle that was weaving back and forth in traffic.  During the pursuit, the officer did not ask permission from his sergeant to continue, and the sergeant failed to clarify that the officer was in pursuit.  This resulted in sustained findings for both the officer and the sergeant.  In the second case, a sergeant failed to accept or refer a complaint when during the interview of an arrested suspect, an allegation of criminal conduct was identified.  The sergeant and officer who conducted the videotaped interview did not consider the allegations to be credible.

The remaining eight IAD investigations involved sustained Class I offenses.  In these cases, the supervisors were not found to have failed to properly supervise their subordinates.  Our review of the investigations found that most did not allow the evaluation of supervisors' conduct.  We will closely monitor the manner in which IAD continues to evaluate supervisors' responsibility in future IAD complaints.

OPD is in compliance with this Task.

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 32

Compliance Status:
Phase 1:  In compliance
Phase 2:  In compliance

Next Steps:
During our next site visit, we will again meet with the IAD Commander to discuss any Task 16-applicable cases for the next reporting period, and we will assess the propriety of IAD's findings and actions.

# Task 18:  Approval of Field-Arrest by Supervisor

Requirements:
*Within 260 days from the effective date of this Agreement, the Chief of Police shall, based on contemporary police standards and best practices, develop and implement policies to address the following standards and provisions:*

*Approval of Field-Arrest by Supervisor*
>1.   *OPD shall develop standards for field supervisors that encourage or mandate close and frequent supervisory contacts with subordinates on calls for service. The policies developed in this Section shall require supervisors to respond to the scene of (at least) the following categories of arrest, unless community unrest or other conditions at the scene make this impractical:*
>   a.   *All Felonies;*
>   b.   *All drug offenses (including narcotics, controlled substances and marijuana arrests if the subject is taken to jail).*
>   c.   *Where there is an investigated use of force;*
>   d.   *Penal Code §§69, 148 and 243(b)(c).*

*The responding supervisor shall review the arrest documentation to determine whether probable cause for the arrest, or reasonable suspicion for the stop, is articulated, to ensure that available witnesses are identified, to approve or disapprove the arrest in the field, and to log the time of the contact.*[11]

(Negotiated Settlement Agreement IV. A.)

Comments:
Only one provision of Task 18 (18.2.2) is being actively monitored under the MOU.  During all of the previous reporting periods, we found the Department in compliance with this subtask.

---

[11] The underlined requirement is the only provision of Task 18 that is being actively monitored under the MOU.

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 33

Discussion:

As previously reported, OPD published an arrest approval and report review policy, DGO M-18, *Arrest Approval and Review in the Field* (May 13, 2004; and updated October 1, 2005), which incorporates the requirements of Task 18.  In December 2006, OPD published Special Order 8536, *Probable Cause Arrest Authorization and Report Review.*  As the Department has trained at least 95% of relevant personnel on these policies, we find OPD in continued Phase 1 compliance with this Task.

We reported in our last quarterly report that OPD provided us with a copy of Training Bulletin I-O.4, *Legal Aspects Of Searching Persons On Parole And Probation,* effective November 23, 2011.  The purpose of the Training Bulletin is to guide OPD members on documenting the means of confirming the status of the parolee or, if a probationer, their status and whether an appropriate search clause exists.  The Training Bulletin also provides guidance in situations where inconsistent information is discovered in AWS, CORPUS, or CRIMS regarding a probationer's status.[12]

**Task 18.2.2** requires that supervisors review arrest documentation to verify that available witnesses are identified (compliance standard:  90%).  To assess Phase 2 compliance with this subtask, we reviewed arrest documentation for all of the applicable arrest categories, as well as documentation for arrests resulting in an investigated use of force.  Specifically, we reviewed a random sample of 70 adult and four juvenile arrest reports documenting felony arrests; drug arrests; and arrests for Penal Code 69, 148, and 243(b)(c); as well as documentation for 41 arrests resulting in an investigated use of force; that occurred between April 1, and June 30, 2012.  We reviewed these to determine if the reports listed witnesses or appropriately noted "no known witnesses," or referred to a canvass with no witnesses produced.  In keeping with previous practice, if there was no mention of any witnesses in the crime report narrative, we accepted a "0" in the "witness" box on the cover sheet as sufficient documentation.

Of the 70 adult arrest reports, we excluded 50 from our dataset; and of the four juvenile arrest reports, we excluded two from our dataset, for one or more of the following reasons:  the arrest involved a warrant or probation or parole warrant detention; the arrest occurred outside of our selected time period; the incident was, in fact, a psychiatric detention that did not involve an arrest; or the arrest involved a misdemeanor offense that was not one of the arrests applicable to Task 18.2.2.  Of the remaining 20 adult and two juvenile arrests, there were no reports that did not document the presence of witnesses or no known witnesses; and all arrests were approved by a supervisor.  This represents a 100% compliance rate relating to adult arrests for this subtask.  In addition, of the 30 arrests resulting in an investigated use of force, all were in compliance with Task 18.2.2.[13]  This represents a 100% compliance rate among arrests resulting in an investigated use of force for this subtask.

---

[12] Automated Warrant System, Criminal Oriented Records Production Unified System, or Consolidated Records Information Management System.

[13] This number includes only Level 1, 2, and 3 uses of force because per DGO K-4, the documentation of witnesses of Level 4 uses of force is not required.

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 34

Our review revealed an overall 100% compliance rate for Task 18.2.2.  OPD is in Phase 2 compliance with this requirement during this reporting period.

Compliance Status:
Phase 1:  In compliance
Phase 2:  In compliance

Next Steps:
We will again meet with OIG to provide feedback on problematic probation and parole arrests and discuss the Department's protocols for conducting audits of this Task.


## Task 20:  Span of Control for Supervisors

Requirements:
*On or before August 14, 2003, OPD shall develop and implement a policy to ensure appropriate supervision of its Area Command Field Teams.  The policy shall provide that:*

1. *Under normal conditions, OPD shall assign one primary sergeant to each Area Command Field Team, and, in general, (with certain exceptions) that supervisor's span of control shall not exceed eight (8) members.*
2. *During day-to-day operations, in the absence of the primary supervisor (e.g., due to sickness, vacation, compensatory time off, schools, and other leaves), the appropriate Area Commander shall determine, based on Department policy and operational needs, whether or not to backfill for the absence of the sergeant on leave.*
3. *If a special operation, (e.g., Beat Feet, Special Traffic Offenders Program (STOP), etc.) requires more than eight (8) members, the appropriate Area Commander shall determine the reasonable span of control for the supervisor.*
4. *If long-term backfill requires the loan or transfer of a supervisor from another unit, the Chief of Police and/or the Deputy Chief of Police shall make that decision.*

(Negotiated Settlement Agreement IV. C.)


Comments:
During all of the previous reporting periods, we found OPD in partial Phase 2 compliance with Task 20.  We did not assess Tasks 20.2, 20.3, and 20.4 during the last two reporting periods because OPD recently (February 2012) implemented a new, tiered system of supervision in BFO, using relief sergeants.  As we noted in our last two reports, this change will affect significantly the way in which we assess these subtasks.

Discussion:
As previously reported, directives relevant to this Task include:  Departmental General Order A-19, *Supervisory Span of Control,* issued on July 26, 2006; Departmental General Order D-13,

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 35

*Assignment to Acting Higher Rank or Classification,* issued on June 17, 1999; and Special Order 8435, *Acting Sergeant Selection Process,* issued on July 26, 2006.  Although Special Order 8435 updates the Department's policy on acting supervisors, we have previously encouraged OPD to update DGO D-13 so that it incorporates the updated information.  We learned recently from the Bureau of Field Operations (BFO) Deputy Chief that these revisions are currently underway.

As the Department has trained at least 95% of relevant personnel on the above-listed policies, we find OPD in continued Phase 1 compliance with this Task.

**Task 20.1** requires that sufficient primary sergeants be assigned at the draw board/master detail level to permit one primary sergeant for every eight officers under normal conditions (compliance standard:  Yes/No).

During the first two reporting periods, we did not assess this subtask due to the Department's lack of reliable documentation.  At that time, we reported that there was no official OPD "master detail" that both listed sergeants' assignments as of the time of the "draw" at the beginning of the year and was also updated throughout the year as loans, transfers, and other personnel changes alter supervisory assignments.  During the third reporting period, we were granted access to Telestaff, the Department's electronic scheduling system.  Telestaff continues to function as a "master detail" that is updated at least daily as loans, transfers, and other personnel changes alter supervisory assignments.  OPD remains in compliance with Task 20.1.

**Task 20.2** requires that relevant squads – that is, Patrol squads, Problem-Solving Officer units, Crime Reduction Teams, Neighborhood Enforcement Team, Gang/Guns Investigation Task Force, and Foot Patrol – are actually supervised by their primary, or assigned, supervisors (compliance standard:  85%); **Task 20.3** requires that a supervisor's span of control for the Department's relevant squads – that is, Patrol squads, Problem-Solving Officer units, Crime Reduction Teams, Neighborhood Enforcement Team, Gang/Guns Investigation Task Force, and Foot Patrol – does not exceed a 1:8 ratio on a day-to-day basis (compliance standard:  90%); and **Task 20.4** requires that the Department's Area Commanders make backfill decisions and that these decisions are consistent with policy and operational needs (compliance standard:  90%).

In February 2012, OPD implemented a new, tiered system of supervision in BFO, using relief sergeants; this change will affect significantly the way in which we assess Tasks 20.2, 20.3, and 20.4.  For this reason, we did not assess these subtasks for the last two reporting periods.

During this reporting period, we were prepared to examine the available data, but the Department did not provide materials we requested that were required to conduct our assessment.  Thus, for this reporting period, we will continue to withhold our compliance findings, for these subtasks.  As a result, OPD maintains our compliance findings from the eighth reporting period.  Therefore, OPD is not in compliance with Task 20.2; and is in compliance with Task 20.3 and 20.4.

**Task 20.5** requires that the span of control for special operations is determined by an Area Commander and is reasonable (compliance standard:  90%).  In addition, the Department

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 36

requires that sergeants or certified acting sergeants supervise all special operations. To assess this subtask, we reviewed a random sample of 25 special operations plans of the 63 total operations conducted between April 1, through June 30, 2012, to determine whether the span of control for these operations was determined by the relevant commander and was reasonable. Specifically, we looked at the nature of the operations, the number of officers involved in the operations, and if any acting supervisors were certified acting sergeants. Our review found that all 25 of the special operations in our sample met these requirements.

OPD is in compliance with Task 20.5.

**Task 20.6** requires that the Chief or his designee make decisions regarding any loans or transfers for long-term backfill (compliance standard: 85%). An Area Commander "backfills" a sergeant's slot when the primary, or assigned, sergeant is unable to supervise his/her squad on a short-term basis. However, the Chief or his designee (generally, the Assistant Chief or Deputy Chief) is required to determine any loans or transfers for *long-term* backfill.

We reviewed the Department's weekly Personnel Orders issued between April 1, through June 30, 2012, for the signature of the Chief or his designee. We found that all of the Personnel Orders during this time period contained such a signature, indicating the Chief's approval.

The NSA does not require written documentation of loans and transfers for long-term backfills – merely that the Chief or his designee approves such loans and transfers. However, OPD policy requires such documentation. Specifically, Departmental General Order B-4, *Personnel Assignments, Selection Process, and Transfers,* states, "A unit commander/manager who needs a loan of personnel shall submit a justifying loan request to his/her Deputy Chief/Director requesting the loan." As noted previously, 35% of loans and transfers reviewed by the Office of Inspector General (OIG) in a recent assessment were not included on the weekly Personnel Orders nor otherwise documented. Following these findings, Bureau of Field Operations (BFO) staff committed to improve its documentation of loans and transfers. Based on our recent discussions with the BFO Deputy Chief and other BFO personnel, as well as our review of Personnel Orders for other purposes (see above), it appears that OPD's practice comports with Departmental policy. OPD is in compliance with Task 20.6.

OPD is in partial Phase 2 compliance with Task 20.

Compliance Status:
Phase 1: In compliance
Phase 2: Partial compliance

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 37

## Task 24:  Use of Force Reporting Policy

Requirements:

*The policy shall require that:*

1. *Members/employees notify their supervisor as soon as practicable following any investigated use of force or allegation of excessive use of force.*

2. *In every investigated use of force incident, every member/employee using force, and every member/employee on the scene of the incident at the time the force was used, shall report all uses of force on the appropriate form, unless otherwise directed by the investigating supervisor.*

3. *OPD personnel document, on the appropriate form, any use of force and/or the drawing and intentional pointing of a firearm at another person.*

4. *A supervisor respond to the scene upon notification of an investigated use of force or an allegation of excessive use of force, unless community unrest or other conditions makes this impracticable.*

5. *OPD notify:*

   a. *The Alameda County District Attorney's Office immediately or as soon as circumstances permit, following a use of lethal force resulting in death or injury likely to result in death.*

   b. *The City Attorney's Office as soon as circumstances permit following the use of lethal force resulting in death or serious injury.  At the discretion of the City Attorney's Office, a Deputy City Attorney shall respond to the scene.  The Deputy City Attorney shall serve only in an advisory capacity and shall communicate only with the incident commander or his/her designee.*

   c. *Departmental investigators regarding officer-involved shootings, in accordance with the provisions of Section V, paragraph H, of this Agreement.*

6. *OPD enter data regarding use of force into OPD's Personnel Assessment System (PAS).*

(Negotiated Settlement Agreement V. A.)


Comments:

We found OPD in partial compliance with Task 24 during the last reporting period, as the Department was not in compliance with the requirements that OPD personnel on the scene of the incident report all uses of force on the appropriate form, and document every use of force and/or the drawing and intentional pointing of a firearm.


Discussion:

As previously reported, OPD published Departmental General Order K-4, *Reporting and Investigating the Use of Force* (February 17, 2006), which incorporates the requirements of Task 24.  OPD revised DGO K-4 on August 1, 2007.  On April 15, 2009, OPD issued Special Order 8977, amending DGO K-4.  The revised policy also incorporates the requirements of Task 24.  On November 23, 2010, OPD issued Special Order 9057, amending DGO K-4 to extend Level 1

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 38

and Level 4 reporting timelines.  As the Department has trained at least 95% of relevant personnel on these policies, we find OPD in continued Phase 1 compliance with this Task.

During our most recent site visit, we again met with OPD command personnel and provided feedback on problem areas with use of force reports and Force Review Board documentation provided for our quarterly reviews.  We continue to observe a number of these materials – including illegible chronological logs, which are required to assess timeliness and the proper application of extensions, as required by the NSA – that are incomplete and create barriers to assessing compliance.

We provided technical assistance to OIG by providing feedback on OIG's Level 4 review protocols.  Finally, we reminded the commanders of our continued concern with the lack of adequate justification in citizen encounters that leads to an investigated use of force.  We continue to encourage OPD command personnel to pay close attention to these issues.

We also notified OPD of our concerns about how their members use confidential informants that lead to citizen encounters and the pointing of firearms.  We are troubled that OPD officers are initiating stops and pointing their firearms at subjects based on information that has not been determined to be reliable.  Most informants have issues with their own conduct and credibility.  In our review of use of force reports, we have noted occasions where no further investigation was conducted to support the information provided by an OPD "confidential informant."

OPD recently hired an external auditor, Mark J. Wittenberg Training, to evaluate OPD's search warrants and confidential informant files.  The audit revealed seven areas for improvement involving search warrants, and 14 areas of concern involving the OPD's use of confidential informants.  The audit noted, among other points, that OPD does not mandate any experience or training requirements for managing confidential informants.  It also recommended that no informant should be used before proper vetting, and that the Department should deactivate any informant who is deemed unreliable.

During this reporting period, the sample we requested for review (71 total) included:  nine Level 2; 21 Level 3; and 41 Level 4 reports completed between April 1, and June 30, 2012.[14]

**Task 24.1** requires that members/employees notify their supervisor as soon as practicable following any reportable use of force or allegation of excessive use of force (compliance standard:  95%).  To assess this subtask, we reviewed the UOF reports, crime reports (when applicable), and Computer Assisted Dispatch (CAD) purges for all of the force incidents in our dataset.  We found that the documentation for all of the incidents we reviewed was in compliance with this requirement.

Level 4 uses of force are self-reporting, and consequently, less documentation is required than for Level 1, 2, and 3 incidents.  DGO K-4, Section VI A.1., states that involved personnel shall

---

[14] We requested 90 use of force reports, but determined that 19 of the reports were completed outside of the current reporting period.

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 39

notify and brief their supervisors immediately or as soon as practicable.  In all but one of the 71 incidents in our sample, a supervisor was promptly notified regarding the force incident.  The one incident involved a Level 2 use of force.  The supervisor was not notified until 17 hours after the incident, which occurred during the Occupy Oakland events of October 25, 2011.  OPD has a 99% compliance rate with this subtask.  OPD is in compliance with Task 24.1.

**Task 24.2** requires that in every reportable use of force incident, every member/employee on the scene of the incident at the time the force was used, reports all uses of force on the appropriate form, unless otherwise directed by the investigating supervisor (compliance standard:  95%); and **Task 24.3** requires that OPD personnel document, on the appropriate form, every use of force and/or the drawing and intentional pointing of a firearm at another person (compliance standard: 95%).  All of the use of force reports, crime reports, and supplemental reports for the incidents in our sample met these requirements.  We found that for Level 1 deadly force incidents, this information was contained in the crime and Internal Affairs Division reports; for Level 2 and Level 3 incidents, this information was contained in the use of force reports; and for Level 4 incidents, the information frequently appeared in the actual use of force, crime, or offense reports.  Accordingly, we find OPD in compliance with *the reporting requirements only* of Tasks 24.2 and 24.3.

***Officers Pointing Firearms:***  During this reporting period, we reviewed a total of 71 use of force incidents, and 38 of those incidents involved officers pointing firearms.  The 38 events included one Level 2, two Level 3, and 35 Level 4 uses of force.  The 38 incidents involved 119 instances of OPD officers drawing and pointing their firearms.[15]

Overall, we determined officers' pointing of their firearms to be appropriate in 103, or 87%, of the 119 instances we assessed.[16]  We were unable to find the pointing of a firearm necessary or justified in 16 instances, or 13%, of the 119 instances we assessed, due to the absence of any indication that the officer(s) or others faced imminent threat of harm.

The total racial breakdown for the 38 use of force events reviewed is as follows:  Black, 73%; Hispanic, 18%; White, 1%; Asian, 7%; and Other, 1%.  We also tabulated the racial breakdown of the subjects involved in the events where, in our opinion, the pointing of a firearm was not necessary or appropriate and found the following:  Black, 94%; and Hispanic, 6%.

In all cases, the supervisory review found the officers' use of force appropriate, objectively reasonable for a legitimate law enforcement purpose, and in compliance with OPD policy.  While officers' actions in particular cases are troubling, the apparent unquestioned supervisory

---

[15] The majority of the incidents we reviewed fell into one of the following categories:  officers making high-risk vehicle stops; officers searching and entering buildings or premises with or without search warrants; and officers were attempting to detain subjects, either by foot pursuit or by searching areas such as alleys and yards.

[16] As in our more in-depth assessment of such incidents during the sixth reporting period, we gave the benefit of the doubt to involved officers whenever there was a question as to whether an officer's action was appropriate.  We also assumed that the pointing of firearms was justified in cases where officers were responding to a burglary or criminal trespass involving an actual structure search, or when making a high-risk vehicle stop based on the legitimate belief that the vehicle was stolen.

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 40

and command approval – of both the documentation of officers' actions and the actions themselves – is illustrative of a need to address supervisory deficiencies.

OPD is not in compliance with Tasks 24.2 and 24.3.

**Task 24.4** requires that a supervisor respond to the scene upon notification of a Level 1, 2, or 3 use of force or an allegation of excessive use of force, unless community unrest or other conditions makes such response impracticable (compliance standard: 95%). Supervisors responded to the scene in all but one of the 30 applicable Level 2 and 3 incidents in our sample. This represents a 97% compliance rate. OPD is in compliance with Task 24.4.

Tasks 24.5, 24.6, and 24.8 require certain notifications in uses of force relative to officer-involved shootings and the use of lethal force.[17] Specifically, **Task 24.5** requires that following every use of lethal force resulting in death or injury likely to result in death, OPD notify the Alameda County District Attorney's Office immediately or as soon as circumstances permit (compliance standard: 95%). **Task 24.6** requires that following every use of lethal force resulting in death or injury likely to result in death, OPD notify the City Attorney's Office as soon as circumstances permit (compliance standard: 95%). **Task 24.8** requires that following every officer-involved shooting, OPD notify Homicide and Internal Affairs investigators (compliance standard: 95%). During this reporting period, there were no Level 1 use of force reports in our dataset. OPD is in compliance with these subtasks.

**Task 24.9** requires OPD to enter data regarding use of force into OPD's Personnel Information Management System (PIMS), now the Personnel Assessment System (PAS) (compliance standard: 95%). We previously noted that PAS contained only limited information about the use of force reports – namely, the report number, corresponding crime report number, the force level and type of force used, the incident date, and some other basic information. During the fourth reporting period, OPD began to enter narratives from the use of force reports into PAS. Our review during this reporting period indicated that use of force data continued to be entered into PAS. OPD is in compliance with Task 24.9.

OPD is in partial Phase 2 compliance with Task 24.

Compliance Status:
Phase 1: In compliance
Phase 2: Partial compliance

Next Steps:
We will continue to meet with OPD to provide feedback on specific use of force reports and to assess how the Department is addressing the serious issue of pointing firearms – the act of which may not only be unnecessary and inappropriate, but which also elevates the risk for unfortunate and unjustified firearm discharges.

---

[17] Task 24.7 is no longer applicable.

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 41

# Task 25:  Use of Force Investigations and Report Responsibility

<u>Requirements:</u>

*An on-scene supervisor is responsible for completing an investigated use of force report in accordance with the provisions of Departmental General Order K-4, "Reporting and Investigating the Use of Force."*

1. *OPD shall develop and implement a policy for conducting and documenting use of force investigations that include, at a minimum:*

    a. *Documentation of the incident in either an Offense or Supplemental Report from the member(s)/employee(s) using force; and/or, when necessary, a statement taken from the member(s)/employee(s) using force;*

    b. *Separating and separately interviewing all officers who were at the scene at the time of the incident;*

    c. *A Supplemental Report from other members/employees on the scene or a statement taken, if deemed necessary by the investigating supervisor;*

    d. *Identification and interviews of non-Departmental witnesses;*

    e. *Consideration of discrepancies in information obtained from members, employees and witnesses, and statements in the reports filed;*

    f. *Whether arrest reports or use of force reports contain "boilerplate" or "pat language" (e.g., "fighting stance", "minimal force necessary to control the situation");*

    g. *Documentation of physical evidence and/or photographs and a summary and analysis of all relevant evidence gathered during the investigation; and*

    h. *Consideration of training/tactical issues involving the availability and practicality of other force options.*

    i. *Supervisor's justification as to why any element of the policy was not documented; and*

2. *All supervisors shall be trained in conducting use of force investigations and such training shall be part of a supervisory training course.*

3. *Use of force investigations shall include a recommendation whether the use of force was objectively reasonable and within Department policy and training.  The recommendation shall be based on the totality of the circumstances and shall consider, but is not limited to, the following factors:*

    a. *Whether the force used was pursuant to a legitimate law-enforcement objective;*

    b. *Whether the type and amount of force used was proportional to the resistance encountered and reasonably related to the objective the members/employees were attempting to achieve;*

    c. *Whether the member/employee used reasonable verbal means to attempt to resolve the situation without force, if time and circumstances permitted such attempts;*

    d. *Whether the force used was de-escalated or stopped reasonably when resistance decreased or stopped;*

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 42

4.   *use of force reports shall be reviewed by the appropriate chain-of-review as defined by policy.*
     *The type of force used, the identity of the involved members, and the report preparer shall be the determining criteria for utilizing the appropriate chain-of-review.  Reviewers may include, when appropriate, the chain-of-command of the involved personnel, the appropriate Area Commander on duty at the time the incident occurred, other designated Bureau of Field Operations commanders, and as necessary, the chain-of-command of the involved personnel up to the Division Commander or Deputy Chief/Director, and the Internal Affairs Division.*
     *Reviewers for Level 1-3 use of force investigations shall:*

     a.   *Make a recommendation as to whether the use of force was in or out of policy,*

     b.   *Order additional investigation and investigative resources when necessary, and*

     c.   *Comment on any training issue(s) when appropriate.*

5.   *Any recommendation that the use of force did not comply with Department policy shall result in the incident being referred to the Internal Affairs Division to conduct additional investigation/analysis, if necessary.*

6.   *Members/employees involved in a use of force incident resulting in serious injury or death and/or an officer-involved shooting, shall be separated from each other as soon as practicable at the incident scene, and kept apart until they have completed their reports and been interviewed.*

(Negotiated Settlement Agreement V. B.)


Comments:

During the last four reporting periods, we found the Department in partial compliance with Task 25.


Discussion:

As previously reported, OPD published Departmental General Order K-4, *Reporting and Investigating the Use of Force* (February 17, 2006), which incorporates the requirements of Task 25.  OPD revised DGO K-4 on August 1, 2007.  The revised policy also incorporates the requirements of Task 25.  On November 23, 2010, OPD issued Special Order 9057, amending DGO K-4 to extend Level 1 and Level 4 reporting timelines.  As the Department has trained at least 95% of relevant personnel on these policies, we find OPD in continued Phase 1 compliance with this Task.


During this reporting period, we requested and reviewed 71 use of force reports, including:  nine Level 2; 21 Level 3; and a sample of 41 Level 4 use of force reports; that were completed between April 1, and June 30, 2012.


**Task 25.1** requires IAD to complete a use of force report for every Level 1 use of force, and an on-scene supervisor to complete a use of force report for every Level 2 and 3 use of force (compliance standard:  95%).  To assess this requirement during this reporting period, we

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 43

reviewed documentation for 30 Level 2 and 3 incidents.  In all of the incidents, a supervisor responded to the scene and completed a use of force investigation.  In addition, one Level 3 incident in our sample was downgraded to a Level 4 use of force incident by a supervisor who was at the scene; the changes were documented and comported with the governing documents.  OPD is in compliance with Task 25.1.

**Task 25.2** requires that use of force reports/investigations include NSA-required elements (compliance standard:  90%) and are timely pursuant to DGO K-4 (compliance standard:  95%).  All of the reports we reviewed for this subtask included the NSA-required elements.  To assess investigation timeliness, we used a 75-day time limit for Level 1 incidents (including IAD Commander approval) plus one documented extension approved by the Chief of Police in advance of the due date, and a 15-day time limit for Level 2 and Level 3 incidents.  For Level 4 incidents, as of November 23, 2010, OPD requires a review of the report by the end of the reviewing supervisor's next scheduled workday.  This is a change – which we supported – from requiring a supervisor's review by the end of the tour of duty; it became effective by Special Order 9057.

During this reporting period, three Level 2 and two Level 3 reports were not submitted in a timely fashion.  The remaining 66 completed use of force incidents were submitted within the time limits established by this subtask.  As noted above, Level 2 and Level 3 force investigations are considered timely if they are completed (including Division Commander approval) within 15 calendar days of the incident, with one documented approved extension by the Division Commander allowed.  We only consider extensions if they were approved by the appropriate personnel *prior* to the pre-extension due date.  The chronological logs that we assessed for this reporting period continue to lack adequate – or legible – documentation to show that the extensions were both properly requested and authorized by command personnel.  Once an extension is authorized, new due dates must be established and the timelines must be met.

During this reporting period, we noted that, in some cases, supervisors addressed discrepancies in the reports, and the use of "boilerplate" or "pat" language by investigators.  In addition, we noted slight improvement in the documentation of physical evidence, the inclusion of photographs, analyses of relevant evidence gathered, and consideration of tactical and training issues.

Although we noted some instances in which supervisors addressed officers who did not use their Portable Digital Recording Devices (PDRDs), we are again troubled by the large number of officers opting not to activate their recording devices when required.  OPD mandates, by policy, the activation of PDRDs by officers in certain circumstances.  We are further troubled that many supervisory personnel routinely address these violations of policy merely as training matters requiring counseling and an entry into officers' Supervisory Notes Files.

OPD's overall compliance rate for timeliness is 93%, and for NSA-required elements is 100%.  OPD is in compliance with Task 25.2.

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 44

**Task 25.3** requires that all supervisors are trained on how to conduct use of force investigations and such training is part of a supervisory training course (compliance standard:  95%).  OPD is incorporating use of force training into its sergeants' continued professional training that is offered every 18 months to two years.  As we have noted previously, we encourage OPD to continue to provide periodic refresher training to underscore to supervisors the importance of conducting complete, thorough, and impartial use of force investigations that are submitted in a timely fashion. OPD did not conduct any such training during this reporting period, but is currently identifying new trainers for future use of force courses.  OPD is in compliance with Task 25.3.

**Task 25.4** requires that the investigations include required recommendations (compliance standard:  90%).  Areas of recommendation include:  whether the force used was pursuant to a legitimate law enforcement objective; whether the type and amount of force used was proportional to the resistance encountered and reasonably related to the objective the officers were attempting to achieve; whether the officers used reasonable verbal means to attempt to resolve the situation without force, if time and circumstance permitted such attempts; and whether the force used was de-escalated or stopped reasonably when resistance decreased or stopped.

During this reporting period, we reviewed one Level 2, two Level 3, and six Level 4 use of force incidents that involved the unjustified pointing of firearms.  These nine reports did not comport with NSA-required elements:  Each of the incidents involved an unnecessary escalation to potentially using lethal force in situations where other less lethal force options were available to the officers or should have been considered.  The remainder of the cases, however, contained information showing that the force was used for a legitimate law enforcement purpose, was reasonable to the resistance encountered, and was de-escalated when resistance decrease or stopped; and that verbal means were used to attempt to resolve the situation without force.

We also noted an OPD policy concern related to the pointing of firearms.  OPD Training Bulletin TB III., *Use of the Taser*, H.1., paragraph 10., which states "Officers who are designated to deploy less-lethal weapons such as a Taser shall be provided with close lethal cover immediately in front or next to them.  This cover will ensure the officer has lethal force protection if confronted by an armed subject and the less-lethal weapon either fails or cannot be deployed effectively."  We reviewed one Level 3 use of force where a Taser was deployed on an unarmed subject on a busy street in a business district of Oakland.  The cover officer deployed lethal cover.  Another officer did not pull his firearm due to safety concerns for citizens in close proximity.  OPD policy is not clear on this issue and only broadly states "absent exigent circumstances."  The policy only mentioned confrontations with armed subjects.

We are also concerned that the Department's training sends mixed messages to officers relating to lethal cover when using less-lethal options that involve unarmed subjects.  OPD's compliance rate for this subtask is 87%.  OPD is not in compliance with Task 25.4.

**Task 25.5** speaks to the review process, which includes chain of command review, making assessments as required by the NSA and policy, and ensuring that any violation of policy results in

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 45

the incident being referred to Internal Affairs to conduct additional investigations or analysis (compliance standard:  95%).  During this reporting period, we found that the supervisors included the required details, and the chain of command conducted critical reviews.  In all but one of the Level 2 and 3 reports we reviewed, the chain of command reviewed and commented on the quality of the investigations, any corrective action that was identified, and the appropriate documentation required for Supervisory Notes Files.

OPD's compliance rate for this subtask is 97%.  OPD is in compliance with Task 25.5.

**Task 25.6** addresses the need to keep officers involved in use of force incidents resulting in serious injury or death, or involved in a shooting, be separated from each other at the scene, and kept apart until they have been interviewed and completed their reports (compliance standard:  95%).  We found the applicable Level 2 reports in compliance with this requirement.  OPD is in compliance with Task 25.6.

OPD is in partial Phase 2 compliance with Task 25.

Compliance Status:
Phase 1:  In compliance
Phase 2:  Partial compliance

Next Steps:
During our next site visit, we will further discuss with OPD the use of force command review process, investigator impartiality, and lack of use of the Portable Digital Recording Devices (PDRDs) by officers in violation of OPD policy.


# Task 26:  Use of Force Review Board (UFRB)

Requirements:
*OPD shall develop and implement a policy concerning its FRB proceedings.  The policy shall:*

1.   *Set out procedures, membership and a timetable for FRB review of use of force investigations involving Level 2 incidents, as defined in Department General Order K-4, REPORTING AND INVESTIGATING THE USE OF FORCE;*

2.   *Require the FRB to review all use of force investigations;*

3.   *Require the FRB to make a recommendation as to whether the use of force was in policy or out of policy;*

4.   *Require the FRB to forward sustained policy violations to the Discipline Officer.*

5.   *Require the FRB not to review any use of force allegation until the internal investigations has been completed;*

6.   *Authorize the FRB to recommend to the Chief of Police additional use of force training or changes in policies or tactics, or additional standards, investigatory policies, or training for use of force investigations;*

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 46

> 7.   *Require the FRB to conduct an annual review of use of force cases examined, so as to identify any patterns of use of force practices that may have policy or training implications, and thereafter, issue a report to the Chief of Police;*
> 8.   *Require that the FRB membership include, at a minimum, one member from the Training Division, one member from the Field Training Officer program, and either the Bureau of Field Operations Deputy Chief or his/her designee;*
> 9.   *Minimally, that one member of the FRB shall be replaced at least annually.*

(Negotiated Settlement Agreement V. C.)

Comments:

During the last two reporting periods, we found OPD in partial compliance with Task 26.

Discussion:

As previously reported, our review of Department General Order K-4.1, *Force Review Boards* (August 1, 2007), determined that this policy comports with the requirements of Task 26. As the Department has trained at least 95% of relevant personnel on these policies, we find OPD in continued Phase 1 compliance with this Task.

**Task 26.1** requires that the Force Review Board (FRB) review all Level 2 use of force investigations following the completion of the internal investigation (compliance standard: 95%). DGO K-4.1 requires that the FRB chair convene an FRB to review the factual circumstances of all Level 2 cases within 90 days of receipt of the use of force packet from IAD. OPD provided documentation for all nine incidents that were heard by the board during this reporting period of April 1, through June 30, 2012. We determined that all of the FRB reports were timely. OPD is in compliance with this subtask.

**Task 26.2** requires that for every Level 2 use of force investigation, the FRB make a recommendation as to whether the use of force was in or out of policy (compliance standard: 95%). All nine FRB reports we reviewed contained recommendations noting that the use of force was in or not in compliance with policy. All nine FRB reports noted agreement with the recommendation of the FRB by the Chief or his designee. OPD is in compliance with this subtask.

**Task 26.3** requires that all FRB determinations that a use of force is out of compliance with OPD policy be forwarded to IAD for investigation (compliance standard: 95%). There was one case during this reporting period in which that determination was made, and the case was referred to IAD. OPD is in compliance with this subtask.

**Task 26.4** requires that the FRB make recommendations to the Chief of Police regarding additional use of force training, changes in policies or tactics, additional standards, investigatory policies, or training for use of force investigations (compliance standard: Yes/No). During the current reporting period, the FRBs identified training issues; and discussed improper tactics, use of force reporting, activation of the PDRD, and the need for corrective supervisory counseling. OPD is in compliance with this subtask.

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 47

**Task 26.5** requires that the FRB conduct an annual review of use of force cases examined to identify any patterns of use of force practices (including K-3) that may have policy or training implications (compliance standard:  Yes/No); and **Task 26.6** requires that the FRB issue an annual report to the Chief of Police reporting on its annual review (compliance standard:  Yes/No).  The FRB conducted its most recent annual review, which tracked 92 reports, on March 14, 2011.  The review identified several patterns and practices, including:  officers are continuing to chase suspects who they believed to be armed with handguns into yards; and are striking resisting suspects to the head with either their fists and/or palm-hammer strikes.  In addition, the review found that many officers are documenting in their reports that they *had* to use force because of the risk that a suspect may be armed; and that they are not appropriately considering tactics during high-risk situations.  The review also emphasized the need for canine officers, supervisors, and commanders to consider modifying the canine announcement to fit the incident in question – for example, circumstances in which a warning announcement could jeopardize officer safety.

According to the annual review, the FRBs have been tasking supervisors to train their officers after the board has identified training issues.  The supervisors are required to document this training in the officers' Supervisory Notes File and enter the information into PAS.  More involved training is conducted by subject-matter experts, and a training roster is submitted to the Training Section.  The involved officer(s) are directed to be present during the presentation to receive training from the board's voting members and subject-matter experts, and/or praise for any outstanding work.  Additionally, as a result of the findings of the FRB, the Department revises or develops new information or training bulletins, which are distributed to OPD personnel via the Department's electronic PowerDMS system.

OPD is in compliance with these subtasks.

OPD is in Phase 2 compliance with Task 26.

Compliance Status:
Phase 1:  In compliance
Phase 2:  In compliance

Next Steps:
Since the beginning of our tenure, we have requested – in meetings with OPD and in all of our quarterly reports – that the Department schedule FRBs during our quarterly site visits, so that we may attend and observe the proceedings.  The Department scheduled four FRBs during our most recent site visit; we will discuss these in our next report.  We again request that the Department schedule its FRB hearings during our quarterly site visits; it is critical to our assessments that we be able to observe and evaluate the FRB process.

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 48

# Task 30:  Firearms Discharge Board of Review

Requirements:
>   1.   *An EFRB shall be convened to review the factual circumstances surrounding any Level 1 force, in-custody death, or vehicle pursuit-related death incidents.  A firearm discharge at an animal shall be reviewed by the EFRB only at the direction of the Chief of Police.  The Board shall have access to recordings and/or transcripts of interviews of all personnel on the scene, including witnesses, and shall be empowered to call any OPD personnel to provide testimony at the hearing.*
>   2.   *OPD shall continue the policies and practices for the conduct of EFRB, in accordance with the provisions of DGO K-4.1, FORCE REVIEW BOARDS.*

(Negotiated Settlement Agreement V. G.)

Comments:
During the tenth reporting period, we found the Department in partial compliance with Task 30.

Discussion:
As previously reported, OPD published Departmental General Order K-4.1, *Force Review Boards* (February 17, 2006), which incorporates the requirements of Task 30.  OPD revised DGO K-4.1 on August 1, 2007.  The policy also incorporates the requirements of Task 30.  As the Department has trained at least 95% of relevant personnel on these policies, we find OPD in continued Phase 1 compliance with this Task.

To assess the Department's compliance with this Task, in addition to reviewing EFRB documentation, we observed one EFRB during our May site visit.  The EFRB determined that both officers' use of lethal force, resulting in two fatalities, was in compliance with OPD policy.  This fatal shooting incident is summarized below.  (See the first incident in Task 30.1.)

**Task 30.1** requires that OPD convene an EFRB within 45 days of the completion of the use of force (UOF) report by IAD (compliance standard:  95%).  The EFRB reviewed four incidents during this reporting period:

- In the first, as part of a joint operation with two federal agencies, an OPD commander and patrol officer discharged their firearms, killing two subjects.

- In the second, an OPD officer fired three less lethal bean bag rounds at a subject he believed was arming himself.  One of the bean bags lodged into the rear of the subject's head, causing a significant wound.

- In the third, an OPD officer used his police vehicle to pin a wanted fugitive and a carjacking suspect against a car he was trying to steal.  The subject was then taken into custody.  The board voted, 2-to-1, for in compliance with OPD policy.  The Assistant Chief, the lone dissenter, determined that the officer did not see the suspect armed with a

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 49

gun; the suspect was attempting to get into the vehicle but was unable to do so; and that other reasonable alternatives were not exhausted.

- In the fourth, an off-duty OPD officer, armed with his Department-issued pistol, answered the doorbell to his residence after it was rung several times by a male subject. The officer followed the subject away from his house when he noticed two other men walking away from the side of his house. The officer alleged one of the men made a turning motion toward him with a metal object in his hand. The officer discharged a "warning shot" into the air.

We verified that the EFRBs held during this reporting period fell within 45 days of the completion of the use of force reports covering the incidents.

OPD is in compliance with this subtask.

**Task 30.2** requires that the EFRB has access to recordings and/or transcripts of interviews of all personnel on scene, including civilian witnesses, and is empowered to call in any OPD personnel it believes should testify (compliance standard: Yes/No). In the documentation we reviewed, recorded statements and/or transcripts were available from all officers on the scene and other personnel needed to testify. OPD is in compliance with this subtask.

**Task 30.3** requires that OPD complies with the policies and procedures set forth in DGO K-4.1, *Force Review Boards* (compliance standard: Yes/No). This policy outlines several requirements, including who comprises the board, the material to be made available for the board, the conduct of the board, the information to be memorialized and follow-up actions, if warranted. We reviewed the reports that were prepared for the four incidents that were heard by the board during the current reporting period. The required attendees were present in both cases. After review and deliberations, the board determined that the subject officers' actions in two of the four cases were in compliance with Departmental policy. The two cases were referred to IAD for resolution, as required. The Chief endorsed the EFRB findings within 60 days of the board's decision. The board identified the adequacy of equipment, tactics, analysis of each application of force, investigative concerns, and training issues that required the appropriate corrective action.

In the third incident described in Task 30.1, the involved officer's statement to IAD conflicted with the PDRD video; this went unaddressed by the EFRB.

In the fourth incident described in Task 30.1, several discrepancies in the investigation went unaddressed by the EFRB. While the investigation resulted in a sustained finding for firing a warning shot, the incident should have been investigated as potential Level 1 use of force (discharge of a firearm at a person).

OPD is not in compliance with this subtask.

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 50

During our May site visit, we discussed with both Department and City officials our concerns regarding the conduct and findings of recent Executive Force Review Boards (EFRB).  The Court was also advised of our concerns and on May 31, 2012 issued an order which reads in part:

> The Court hereby directs the Monitor to identify any systemic problems that exist in the process by which the Defendants evaluate (officer-involved shootings), as well as whether unique problems arose in any individual case, and recommended solutions to those problems.

We requested 10 of the Department's most recent officer-involved shootings to assess the EFRB findings.  The OPD provided nine cases for review.  The results of our assessment are included in our separate Officer-Involved Shooting Report.

OPD is in partial Phase 2 compliance with Task 30.

Compliance Status:
Phase 1:  In compliance
Phase 2:  Partial compliance

Next Steps:
Since the beginning of our tenure, we have requested – in meetings with OPD and in all of our quarterly reports – that the Department schedule EFRBs during our quarterly site visits, so that we may attend and observe the proceedings.  We again request that the Department schedule its EFRB hearings during our quarterly site visits; it is critical to our assessments that we be able to observe and evaluate the EFRB process.


# Task 33:  Reporting Misconduct

Requirements:
*Within 154 days from the effective date of this Agreement, OPD shall establish policy and procedures for the following:*

*Misconduct*
*OPD personnel shall report misconduct by any other member or employee of the Department to their supervisor and/or IAD.  The policy shall state that corrective action and or discipline shall be assessed for failure to report misconduct.  OPD shall require every member and employee encountering a use of force that appears inappropriate, or an arrest that appears improper, to report the incident to his/her supervisor and/or IAD.  OPD shall establish and maintain a procedure for a member/employee to report police misconduct on a confidential basis.*

> *1.   Any member/employee of OPD may report a suspected case of police misconduct confidentially to the commander of IAD.*
>
> *2.   The member/employee reporting this conduct shall indicate clearly to the*

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 51

> 3. *commander of IAD that the report is being made under these confidential provisions.*
>
> 3. *The report may be made in person, by telephone, or in writing.  The IAD Commander shall document the report in a confidential file that shall remain accessible only to the IAD Commander.*
>
> 4. *The case shall be investigated without disclosure of the complainant's name, unless and until such disclosure is required by law.*
>
> 5. *This confidential reporting procedure shall be made known to every member/ employee of OPD and to all new members/employees of OPD within two (2) weeks of hiring.*

(Negotiated Settlement Agreement VI. A.)


<u>Comments:</u>
Since monitoring under the NSA began, OPD has received confidential reports of misconduct in only three cases.  During the last five reporting periods, we found OPD in compliance with Task 33.


<u>Discussion:</u>
As we have noted previously, OPD has developed several policies that, in concert, incorporate the requirements of this Task.  These include:  Manual of Rules (MOR) Section 314.48, Reporting Violations of Laws, Ordinances, Rules or Orders; MOR Section 314.49, Confidential Reporting of Police Misconduct; Departmental General Order D-16, Check-In and Orientation; MOR Section 370.18, Arrests; and MOR Section 370.27, Use of Physical Force.  The Department has trained at least 95% of relevant personnel on these policies, and is in continued Phase 1 compliance with this Task.


**Task 33.1** requires that in all sustained internal investigations, OPD conduct an assessment to determine whether members/employees/supervisors knew or should have known that misconduct occurred (compliance standard:  95%); and **Task 33.2** requires that where OPD determines that members/employees/supervisors knew or should have known that misconduct occurred but did not report it as required, OPD is required to take appropriate action (compliance standard:  95%).


To assess OPD's Phase 2 compliance with these subtasks during this reporting period, we met with the Deputy Chief of the Bureau of Risk Management; and queried the IAD database to identify any cases with sustained findings that were approved between April 1, and June 30, 2012, that were applicable to Task 33.  We identified and reviewed 40 cases with 54 sustained findings that were approved during this reporting period.


As we have observed in previous reports, the IAD commander now requires investigators to specifically address whether members or employees or supervisors knew or should have known of the misconduct in a section of the investigative report entitled, "Member/Employee Accountability."  The reports we reviewed during this reporting period all contained this section

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 52

and addressed accountability appropriately.  In one case in which it was determined that an OPD supervisor may have failed to report misconduct, a new case was opened to investigate the allegation.  This investigation is still pending; we will report upon it in future reporting periods.

Despite this case, OPD remains in compliance with these subtasks.

**Task 33.3** requires that OPD must maintain a functioning procedure that incorporates the NSA requirements related to establishing and maintaining confidential reporting of misconduct.  These requirements include:  **Task 33.3.1**:  confidential reports of suspected misconduct may be made in person, by telephone, or in writing (compliance standard:  Yes/No); **Task 33.3.2**:  any OPD member/employee may report suspected misconduct confidentially to the IAD Commander, who shall document the report in a confidential file that shall remain accessible only to this IAD Commander (compliance standard:  Yes/No); **Task 33.3.3**:  confidentially reported cases are investigated without disclosure of the complainant's name, unless and until such disclosure is required by law (compliance standard:  95%); and **Task 33.3.4**:  OPD informs all new and current employees of OPD's confidential reporting procedures (compliance standard:  95%).

As we have reported previously, OPD has established procedures as required by Tasks 33.3.1, 33.3.2, 33.3.3, and 33.3.4.  Confidential reports of suspected misconduct may be made by various means to the IAD Commander; cases are investigated without identifying the complainant; and documentation of the report and investigation are kept in a confidential file maintained by the IAD Commander.  Since monitoring began under the NSA, OPD has received only three such confidential reports.  No new confidential reports were received during the current reporting period.

During this reporting period, OPD hired no new employees.  The Department remains in compliance with Tasks 33.3.1, 33.3.2, 33.3.3, and 33.3.4.

OPD is in Phase 2 compliance with Task 33.

<u>Compliance Status</u>:
Phase 1:  In compliance
Phase 2:  In compliance

# Task 34:  Vehicle Stops, Field Investigation, and Detentions

<u>Requirements</u>:

> *OPD shall require members to complete a basic report on every vehicle stop, field investigation and every detention.  This report shall include, at a minimum:*
>
> *a.    Time, date and location;*
> *b.    Identification of the initiating member or employee commencing after the first year of data collection;*

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 53

      c.     *Reason for stop;*

      d.     *Apparent race or ethnicity, and gender of individual(s) stopped;*

      e.     *Outcome of stop (arrest, no arrest);*

      f.     *Whether a search was conducted, and outcome of search;*

      g.     *Offense categories (felony, misdemeanor or infraction).*

2.    *This data shall be entered into a database that can be summarized, searched, queried and reported by personnel authorized by OPD.*

3.    *The development of this policy shall not pre-empt any other pending or future policies and or policy development, including but not limited to "Promoting Cooperative Strategies to Prevent Racial Profiling."*

(Negotiated Settlement Agreement VI. B.)

<u>Comments:</u>

During the last seven reporting periods, we found the Department in partial compliance with Task 34. We noted that officers entered the required stop data into the Field Based Reporting (FBR) computer system; however, we expressed concerns that the "reason for the stop" was not being clearly identified to support a Constitutional basis and authority for the stops.

<u>Discussion:</u>

As previously reported, General Order M-19, *Prohibitions Regarding Racial Profiling and Other Bias-Based Policing;* and Report Writing Manual (RWM) Inserts R-2, N-1, and N-2 incorporate the requirements of Task 34. As the Department has trained at least 95% of relevant personnel on the above-listed policies, we find OPD in continued Phase 1 compliance with this Task.

On June 12, 2010, OPD issued Special Order 9042, *New Procedures Regarding Stop Data Collection*, which updates DGO M-19 and RWM R-2; and used its electronic PowerDMS system to disseminate Special Order 9042 to the Department. During the sixth reporting period, OPD developed and began training on the definition and articulation of a consensual encounter and detention, along with training on how to complete Field Investigation Reports to adequately document investigative encounters. During the eighth reporting period, we verified that OPD trained at least 95% of relevant personnel on these subjects and Special Order 9042.

**Task 34.1** requires that Stop Data Forms be filled out for every vehicle stop, field investigation, and detention (compliance standard: 90%). To assess Task 34.1 during this reporting period, we reviewed a random sample of 400 stops to match them with corresponding completed Stop Data Forms. This sample included 200 Computer Aided Dispatch (CAD) entries, 100 Field Contact Cards, and 100 traffic citations. Using the Department's Forensic Logic Quicksearch program, we were able to locate a corresponding Stop Data Form for 94% of the stops in our sample. OPD is in compliance with Task 34.1.

**Task 34.2** requires that Stop Data Forms be filled out with the following information: 1) time; 2) date; 3) location; 4) identification of member making stop; 5) reason for stop; 6) apparent race/ethnicity of individual(s) stopped; 7) gender of individual(s) stopped; 8) outcome of stop (arrest or no arrest); 9) whether a search was conducted; 10) outcome of any search; and 11)

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 54

offense category (felony, misdemeanor, or infraction) (compliance standard: 85%). The entry of stop data into the Field Based Reporting (FBR) system requires officers to make a selection in each form field. If an officer fails to fill in the information in any field, the system does not allow the form to be completed.

As we have discussed for several reporting periods, we remain concerned that the reason for the stop is not clearly identified to support the Constitutional standards requirement. More specifically, none of the options available for officers to select under "5) reason for the stop" clearly elicit or help to articulate an identifiable basis and/or authority for the stop. During the seventh reporting period, OPD combined the Stop Data Form with the Field Contact Card in order to provide officers with a section upon which they could better articulate the totality of the circumstances focused on the officers' articulation of the reasonable suspicion that existed *prior* to the detention that justifies the detention. Based on OPD's continued failure to justify or adequately document the reasons for the stops in the samples we reviewed during the last five reporting periods, we again examined an expanded selection of pedestrian stops during this reporting period, and found that 95% identified the justification/reason for the stop. We will continue to monitor this issue closely.

Since the implementation of the combined Stop Data Form and Field Contact Card during the seventh reporting period, we have been concerned that the "reason for the encounter" is not accurately being captured. This significantly inhibits OPD's data analysis, and results from two ongoing issues: first, officers' failure to complete a Stop Data Form for each individual when a group is stopped on the street; and second, officers' classification of the reason as the *final disposition* for the contact, or their *perception* of the anticipated reason. For example, a stop based on a consensual contact or reasonable suspicion that results in the location of narcotics is often identified as the *reason* for the stop – based on a criminal felony or misdemeanor that is, of course, discovered *after* the stop.

OPD is currently revising a new Special Order that is intended to update DGO M-19, *Racial Profiling*. OPD has been working for a least three reporting periods on a simple revision to the Policy to correct these identified deficiencies. During the current reporting period and our most recent site visit, we again provided substantial feedback on the policy's substance and language. We have also discussed with OPD command staff for at least two reporting periods the need to conduct training on the revised policy to ensure that the data that is collected is accurate and useful for purposes of analysis.

The Department has advised us that it is conducting independent audits of stop data forms, and we look forward to reviewing them in future reporting periods. We urge OPD to stop delaying and implement the policy and necessary training to ensure that the justification exists prior to the temporary detention and that the reason for the encounter is properly identified. The Department is not in compliance with Task 34.2.

**Task 34.3.1** requires that OPD have a stop data database that can be summarized, searched, queried, and reported by personnel authorized by OPD (compliance standard: Yes/No). As per

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 55

Special Order 9042, officers "complete an electronic FPR [Field Based Reporting] Stop Data Collection Form (SDF) for certain arrests, every detention not resulting in an arrest (vehicle, walking, and bicycle stops), every consent search of a person conducted and any other investigative encounter.  A SDF shall also be completed for consensual encounters (contacts) where the member talks with a person to confirm or dispel a suspicion that the person may be involved in criminal activity, although the person is free to leave."  Data from the electronic Field Based Reporting system is automatically sent to the Department's Forensic Logic Quicksearch program.  Quicksearch allows Department personnel to search for and query officers' stop data.  During this reporting period, we continued to experiment with the Quicksearch program and found that the stop data is summarized and easy to review.  As noted above, in May 2011, OPD merged the Stop Data Form with the Field Contact Card, intending to provide one document for officers to enter stop data and providing them with a narrative portion for which they can articulate the factual support for the stop.

The Department produced multiple draft stop data summaries of the stop data collected between July 1, and June 30, 2011.  Our review of these summaries found the data contained therein sufficient to suggest whether or not officers are engaging in disparate treatment of minority groups – or, for that matter, any specific sub-population – and to design an appropriate action plan accordingly.  For example, we noted that the number of searches of persons within one sub-group is significantly higher than others; and, interestingly enough, that these searches appeared to form the basis for arrests less often than searches conducted in other sub-groups.  While acknowledging that this raw data alone does not – and *should* not – form the basis to conclude that OPD officers are engaging in bias-based policing or racial profiling, it clearly indicates the need for OPD command staff to conduct further analysis and appropriately address any appearance of disparate treatment with explanation or intervention.  Once OPD acknowledged that the data being collected was not accurately reflecting the stops being conducted and the reasons for the stop, it ceased attempting to conduct any form of analysis.

During our most recent site visit, we again met with OPD personnel responsible for this analysis, and discussed with them how and why the Department should conduct further analysis of its stop data.  OPD did not produce any additional data collection analysis during the current reporting period.  However, we were alerted to an continued issue with data collection that significantly impacts the value of the data, which we optimistically believed would be the basis for OPD compliance with this and related Tasks.  We have discussed this issue in detail with Department personnel, and are hopeful that OPD will expeditiously implement corrective measures.  While the Department contends that the NSA does not require analysis of the data, we strongly disagree.  The NSA requires that specific data be accurately collected and documented.  The only purpose for this collection is to determine if there is any desperate treatment occurring by OPD officers.  It is clear that the data currently being collected is not accurate, and therefore it may take multiple reporting periods of better data to make a necessary sample for analysis.  The data will not be accurate until OPD implements changes in policy and training as discussed above.

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 56

We have a significant interest in OPD resolving the above issue so that it can conduct appropriate analyses and, where necessary, address the outcomes of its analysis to ensure compliance with this Task.  While the ability to summarize, search, and analyze stop data is an important aspect of this requirement, it is not the purpose; rather, the results, intervention, and other strategies developed from the analyses are critically important to ensuring fair and equal treatment of all people with whom police officers interact.  The Department is not in compliance with Task 34.3.1.

**Task 34.3.2** requires that the data captured on the Stop Data Forms be entered completely and accurately into the database (compliance standard:  85%).  As noted above, the entering of stop data into the Field Based Reporting system requires officers to make a selection in each form field.  If an officer fails to fill in the information in any field, the system will not allow the form to be completed.  Task 34.3.2 was created to govern the submission of data from the written forms to the computerized system.  Since this type of data entry is no longer necessary, the Department is in compliance with Task 34.3.2.

OPD is in partial Phase 2 compliance with Task 34.

Compliance Status:
Phase 1:  In compliance
Phase 2:  Partial compliance

Next Steps:
During our next site visit and technical assistance visits, we will again meet with the relevant Department personnel to discuss the Department's progress in this area.  We will further discuss with the Department its various Task 34-related data systems to assess their operability, accuracy, and utility in storage and ease of access to stop data.  We will continue to work with OPD on ways to verify the legal basis for stops, searches, and other related activities expeditiously.  We will also review an expanded sample of walking stops to analyze the legitimacy of stops and/or subsequent activity.

# Task 35:  Use of Force Reports - Witness Identification

Requirements:
1.  *OPD shall require, by policy, that every use of force report, whether felonies were involved or not, include the names, telephone numbers, and addresses of witnesses to the incident, when such information is reasonably available to the members/employees on the scene.*

2.  *In situations in which there are no known witnesses, the report shall specifically state this fact.  Policy shall further require that in situations in which witnesses were present but circumstances prevented the author of the report from determining the identification or phone number or address of those witnesses, the report shall state the reasons why the member/employee was unable to obtain that*

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 57

> *information.  Reports shall also include the names of all other*
> *members/employees of OPD witnessing the use of force incident.*

(Negotiated Settlement Agreement VI. C.)

Comments:

During all of the previous reporting periods, we found OPD in compliance with Task 35.

Discussion:

As previously reported, OPD published Special Order 8066, *Use of Force—Witness Identification* (April 12, 2004), which incorporates the requirements of Task 35.  Additionally, OPD published Departmental General Order K-4, *Reporting and Investigating the Use of Force* (February 17, 2006), which also incorporates the requirements of Task 35.  OPD revised DGO K-4 on August 1, 2007.  The revised policy also incorporates the requirements of Task 35.  As the Department has trained at least 95% of relevant personnel on these policies, we find OPD in continued Phase 1 compliance with this Task.

To assess Phase 2 compliance for Task 35 for this reporting period, we reviewed 30 use of force reports, including:  nine Level 2; and 21 Level 3 use of reports covering incidents that occurred between April 1, and June 30, 2012.  (Per DGO K-4, Level 4 use of force reports do not require witness identification.)

We assessed Task 35.1 in conjunction with Task 35.2.  **Task 35.1** requires that use of force reports include the name, telephone number, and addresses of witnesses to the incident when such information is reasonably available to the members/employees on the scene (compliance standard:  90%); and **Task 35.2** requires that when there are no known witnesses, the use of force reports specifically state this fact (compliance standard:  90%).  All 30 reports that we reviewed comported with these requirements.  OPD is in compliance with these subtasks.

**Task 35.3** requires reports to document instances where witnesses are present but circumstances prevent the author of the report from gathering the data (compliance standard:  90%).  During this reporting period, two incidents fell into this category; both incidents were properly documented in the reports.  OPD is in compliance with Task 35.3.

**Task 35.4** requires that use of force reports include the names of all other OPD members/employees witnessing the incident (compliance standard:  90%).  We found no instances when an OPD witness was not documented in the 30 reports we reviewed.  OPD is in compliance with Task 35.4.

OPD is in Phase 2 compliance with Task 35.

Compliance Status:

Phase 1:  In compliance
Phase 2:  In compliance

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 58

Next Steps:

During our next site visit, we will examine any related audits completed by OIG to ensure that OPD is moving toward the long-term sustainability of this Task.


# Task 37:  Internal Investigations-Retaliation Against Witnesses

Requirements:

*OPD shall prohibit retaliation against any member or employee of the Department who:*
1.   *Reports misconduct by any other member or employee, or*
2.   *Serves as a witness in any proceeding against a member or employee.*
*The policy prohibiting retaliation shall acknowledge that retaliation may be informal and subtle, as well as blatant, and shall define retaliation as a violation for which dismissal is the presumptive disciplinary penalty.  Supervisors, commanders and managers shall be held accountable for the conduct of their subordinates in this regard.  If supervisors, commanders or managers of persons engaging in retaliation knew or reasonably should have known that the behavior was occurring, they shall be subject to the investigative, and if appropriate, the disciplinary process.*
(Negotiated Settlement Agreement VI. E.)


Comments:

During previous reporting periods, we found that all of the cases alleging retaliation against an employee or member of OPD were investigated as required, and that the IAD findings fell within policy.  As a result, we found the Department in compliance with Task 37.


Discussion:

As previously reported, we found OPD in continued Phase 1 compliance with this Task.  OPD published Special Order 8092 on November 23, 2003, which incorporated the requirements of Task 37.  This policy consists of two Manual of Rules (MOR) Sections:  398.73, *Retaliation Against Witnesses*; and 398.74, *Retaliation Against Witnesses, Accountability.*  These MOR provisions (revised in lieu of a City policy on retaliation) incorporate the requirements of Task 37.  OPD has trained at least 95% of relevant personnel on these policies.

**Task 37.1** requires that officers be held accountable for retaliating against employees or members who report misconduct or serve as witnesses in proceedings against other members/employees (compliance standard:  95%); and **Task 37.2** requires that supervisors, commanders, and managers be held accountable if they knew or reasonably should have known that persons under their supervision engaged in retaliation (compliance standard:  95%).

We reviewed six cases that OPD considered as containing allegations of retaliation during the period of April 1, through June 30, 2012.  We found that three of the six cases did not apply to Task 37 because they involved complaints lodged by citizens that an officer(s) "retaliated" against them.  Such cases do not fit the definitions of retaliation as set forth in Task 37, which

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 59

addresses retaliation against an *employee* or *member* of OPD who has reported misconduct or served as a witness.

We reviewed the three cases where allegations of retaliation were made by members or employees of OPD.  All three cases were sufficiently investigated, and the retaliation allegations were determined to be unfounded.

OPD is in Phase 2 compliance with Task 37.

Compliance Status:
Phase 1:  In compliance
Phase 2:  In compliance


# Task 40:  Personnel Assessment System (PAS) – Purpose

Requirements:
*Within 635 days from the effective date of this Agreement, OPD shall enhance its existing complaint-tracking and select indicator systems so that it has a fully implemented, computerized relational database for maintaining, integrating and retrieving data necessary for supervision and management of OPD and its personnel.  This data shall be used by OPD:  to promote professional police practices; to manage the risk of police misconduct; and to evaluate and audit the performance of OPD members of all ranks, employees, and OPD units, subunits and shifts. PAS shall contain information on the following:*

1. *All uses of force required to be reported by OPD;*
2. *OC spray canister check-out log (see Section V, paragraph D)*
3. *All police-canine deployments; where the canine is deployed in a search for or to apprehend a suspect(s).  It does not include, deployments for the purpose of locating bombs, narcotics, missing persons, etc., where the canine is not involved in an investigated use of force (i.e., deliberately or inadvertently bites or injures a person) If such force occurs, a Use of Force report is required.*
4. *All officer-involved shootings and firearms discharges, both on duty and off duty, excluding an intentional discharge while at a range facility; a discharge while engaged in a lawful recreational activity, such as hunting or target practice; a discharge by Criminalistics Division personnel for the purpose of scientific examination; and a discharge at an object (e.g., street light, alarm box, door lock or vehicle tire) to accomplish a tactical police purpose that does not result in injury;*
5. *All on-duty vehicle pursuits and on-duty vehicle collisions;*
6. *All complaints, whether made to OPD or CPRB;*
7. *All civil suits and/or tort claims related to members' and employees' employment at OPD, or which contain allegations which rise to the level of a Manual of Rules*

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 60

> *violation;*
> 8.     *Reports of a financial claim as described in Section VI, paragraph G (3).*
> 9.     *All in-custody deaths and injuries;*
> 10.    *The results of adjudications of all investigations related to items (1) through (9), above, and a record of investigative findings, including actual discipline imposed or non-disciplinary action administered;*
> 11.    *Commendations and awards;*
> 12.    *All criminal arrests of and charges against OPD members and employees;*
> 13.    *All charges of resisting or obstructing a police officer (Penal Code §§69 and 148), assault on a police officer (Penal Code §243(b)(c), or assault-with-a-deadly-weapon on a police officer [Penal Code §245(c)(d)];*
> 14.    *Assignment history and rank history for each member/employee;*
> 15.    *Training history for each member/employee;*
> 16.    *Line-of-duty injuries;*
> 17.    *Sick leave usage, particularly one-day sick leaves;*
> 18.    *Report Review Notices or Case Evaluation Reports for the reporting member/employee and the issuing investigator;*
> 19.    *Criminal cases dropped due to concerns with member veracity, improper searches, false arrests, etc.; and*
> 20.    *Other supervisory observations or concerns.*

(Negotiated Settlement Agreement VII. A.)


Comments:

In the last reporting period, we found OPD to be in partial Phase 2 compliance – following two reporting periods of non-compliance – as a result of persistent problems in accurately recording the number of arrests made by individual officers. Although the specific problems were identified, the Department "resolved" this issue through a process of entering data by hand. As noted in our last report, while this corrected the data, it is not an approach that stabilizes the system or assures continuing quality in data collection and storage.


Discussion:

General Order D-17, Personnel Assessment Program (July 11, 2012) incorporates the requirements of Tasks 40 and 41. A revised version of the policy reflects several changes, including changes in the review period from 30 months to 18 months, and the requirement that threshold analyses will be completed every six weeks rather than quarterly. The new policy also lowers thresholds for review based on Level 4 uses of force, and will support supervisory review based on referrals from the PAS Administration Unit. OPD remains in Phase 1 compliance with this Task.


The major data problems reported in the past three reports were addressed by reverting to entering arrest data manually rather than automatically from the Alameda County data feed. Plans exist to automatically enter data into the County system from electronic reports completed by officers. With that, Oakland will join most other police departments in the County that have reliable systems for automatically uploading arrest data. During our May site visit, OPD

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 61

reported that the changes were expected to occur within the next two months.  As of our August site visit, the new system had not yet been put in place.  The issue of continuing instability of the system, therefore, remains.  OPD reports that the problem is expected to be resolved soon.  We will continue to review the status of change in data collection and storage processes.

Tasks 40 and 41 are divided into 33 practice-related subtasks that include 12 additional lower-level provisions.  As with all previous reviews, we requested and received material for each of the Tasks and subtasks.  Our data request allowed for the replication and extension of the data analysis reflected in our earlier reports.

PAS records for the quarter of April 1, through June 30, 2012 indicate that data were entered for all of the fields required by Task 40 – including the arrest data.  The required data for the quarter included reports of 1,010 uses of force.  This is a decrease of 9% from the last reporting period.  The data for the current reporting period indicate that there were 3,649 arrests.

A further breakdown of the types of use of force shows that, for this reporting period, there were three Level 1 (down from four in the last reporting period); 14 Level 2; and 31 Level 3 uses of force.  The table also shows a decrease of 7% in Level 4 uses of force, to a total of 962.  The data count for the current reporting period and the four prior reporting periods is presented in the table below.

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 62

| OPD Performance Activity Comparison by Quarter 2011 | | | | | |
|---|---|---|---|---|---|
| **Performance Activity** | April 1 to June 30 2011 | July 1 to September 30 2011 | October 1 to December 31 2011 | Jan 1 to March 31, 2012 | April 1 to June 30, 2012 |
| Level 1 Uses of Force | 4 | 6 | 3 | 4 | 3 |
| Level 2 Uses of Force | 21 | 19 | 48 | 28 | 14 |
| Level 3 Uses of Force | 37 | 38 | 108 | 50 | 31 |
| Level 4 Uses of Force | 1154 | 1066 | 797 | 1034 | 962 |
| Unintentional Firearms Discharge | 0 | 0 | 0 | 0 | 0 |
| Sick Leave Hours | 9378.39 | 10406.31 | 12084.56 | 12734.56 | 11229.36 |
| Line of Duty Injuries | 40 | 52 | 43 | 47 | 50 |
| Narcotics Related Possessory Offenses Arrests | 426 | 482 | 445 | 641 | 452 |
| Vehicle Collisions | 15 | 11 | 7 | 13 | 15 |
| All Vehicle Pursuits | 82 | 117 | 89 | 77 | 99 |
| All Arrest | 3374 | 3470 | 3402 | 3656 | 3649 |
| Arrests including PC 69, 148(a), 243(b)(c) & 245(c)(d) | 63 | 61 | 61 | 58 | 72 |
| Arrests only for PC 69, 148(a), 243(b)(c) & 245(c)(d) | 17 | 16 | 24 | 38 | 24 |
| Awards | 160 | 70 | 65 | 66 | 99 |
| Assignment History | 9498 | 9498 | 9498 | 9414 | 9588 |
| Case Evaluation Reports | 629 | 321 | 193 | 209 | 191 |
| Report Review Notices--Positive | 2 | 0 | 1 | 6 | 7 |
| Report Review Notices--Negative | 0 | 0 | 0 | 1 | 0 |
| Canine Deployments | 92 | 112 | 71 | 96 | 93 |
| Financial Claims | 0 | 0 | 3 | 0 | 0 |
| Internal Affairs Complaints | 286 | 386 | 316 | 404 | 375 |
| In-Custody Injuries | 70 | 56 | 97 | 75 | 39 |
| Civil Suits (Tort Claims) | 32 | 7 | 22 | 11 | 7 |
| Criminal Cases Dropped | 0 | 0 | 0 | 20 | 87 |
| O.C. Checkouts | 42 | 41 | 34 | 55 | 29 |
| Officer Involved Shootings | 7 | 4 | 2 | 4 | 3 |
| Rank / Class History | 2336 | 2336 | 2336 | 2286 | 2272 |
| Training History | 14159 | 21017 | 21084 | 26100 | 11255 |
| Supervisory Notes | 3589 | 3338 | 3281 | 3568 | 3139 |
| Criminal Arrest Made Against OPD | 0 | 0 | 0 | 0 | 2 |

The PAS Administration Unit continues to audit the database to assure its accuracy on a nearly daily basis. That has allowed the Department to identify and rectify data problems on a regular basis. Undoubtedly, those functions will increase in number and complexity as system use expands. Most recently, officers have been permitted access to their PAS data and to comment on it for the record through their supervisors. In the last reporting period, these changes were too recent to evaluate. During our most recent site visit, PAS staff indicated that there was significant use of this process, but also noted that use dropped off substantially after the first few months.

OPD continues to pursue significant upgrades to the early warning system database, including new software. The City also released a request for qualifications (RFQ) in a search for a technical consultant. Three bids were received and a consultant was recommended after interviews. However, the process has not moved forward due to technical financial management issues. The City expects additional progress in this area early in the fall.

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 63

We noted in our last report that OPD had reverted to an inelegant solution of its data problems by entering arrests information by hand.  It was also noted that this is not a permanent fix as it leaves the system fragile and instable.  Without a more permanent solution, the current status of data collection and storage does not support a change in compliance status.

Compliance Status:
Phase 1:  In compliance
Phase 2:  Partial compliance


# Task 41:  Use of Personnel Assessment System (PAS)

Requirements:

*Within 375 days from the effective date of this Agreement, OPD shall develop a policy for use of the system, including supervision and audit of the performance of specific members, employees, supervisors, managers, and OPD units, as well as OPD as a whole.  The policy shall include the following elements:*

1. *The Chief of Police shall designate a PAS Administration Unit.  The PAS Administration Unit shall be responsible for administering the PAS policy and, no less frequently than quarterly, shall notify, in writing, the appropriate Deputy Chief/Director and the responsible commander/manager of an identified member/employee who meets the PAS criteria.  PAS is to be electronically maintained by the City Information Technology Department.*

2. *The Department shall retain all PAS data for at least five (5) years.*

3. *The Monitor, Inspector General and Compliance Coordinator shall have full access to PAS to the extent necessary for the performance of their duties under this Agreement and consistent with Section XIII, paragraph K, and Section XIV of this Agreement.*

4. *PAS, the PAS data, and reports are confidential and not public information.*

5. *On a quarterly basis, commanders/managers shall review and analyze all relevant PAS information concerning personnel under their command, to detect any pattern or series of incidents which may indicate that a member/employee, supervisor, or group of members/employees under his/her supervision may be engaging in at-risk behavior.  The policy shall define specific criteria for determining when a member/employee or group of members/employees may be engaging in at-risk behavior.*

6. *Notwithstanding any other provisions of the PAS policy to be developed, the Department shall develop policy defining peer group comparison and methodology in consultation with Plaintiffs' Counsel and the IMT.  The policy shall include, at a minimum, a requirement that any member/employee who is identified using a peer group comparison methodology for complaints received during a 30-month period, or any member who is identified using a peer group comparison methodology for Penal Code §§69, 148 and 243(b)(c) arrests within*

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 64

*a 30-month period, shall be identified as a subject for PAS intervention review. For the purposes of these two criteria, a single incident shall be counted as "one" even if there are multiple complaints arising from the incident or combined with an arrest for Penal Code §§69, 148 or 243(b)(c).*

7. *When review and analysis of the PAS threshold report data indicate that a member/employee may be engaging in at-risk behavior, the member/employee's immediate supervisor shall conduct a more intensive review of the member/employee's performance and personnel history and prepare a PAS Activity Review and Report.  Members/employees recommended for intervention shall be required to attend a documented, non-disciplinary PAS intervention meeting with their designated commander/manager and supervisor.  The purpose of this meeting shall be to review the member/employee's performance and discuss the issues and recommended intervention strategies.  The member/employee shall be dismissed from the meeting, and the designated commander/manager and the member/employee's immediate supervisor shall remain and discuss the situation and the member/employee's response.  The primary responsibility for any intervention strategies shall be placed upon the supervisor.  Intervention strategies may include additional training, reassignment, additional supervision, coaching or personal counseling.  The performance of members/ employees subject to PAS review shall be monitored by their designated commander/manager for the specified period of time following the initial meeting, unless released early or extended (as outlined in Section VII, paragraph B (8)).*

8. *Members/employees who meet the PAS threshold specified in Section VII, paragraph B (6) shall be subject to one of the following options:  no action, supervisory monitoring, or PAS intervention.  Each of these options shall be approved by the chain-of-command, up to the Deputy Chief/Director and/or the PAS Activity Review Panel.*
*Members/employees recommended for supervisory monitoring shall be monitored for a minimum of three (3) months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor.  The first at the end of one (1) month and the second at the end of three (3) months.*
*Members/employees recommended for PAS intervention shall be monitored for a minimum of 12 months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor and designated commander/manager:  The first at three (3) months and the second at one (1) year.  Member/employees subject to PAS intervention for minor, easily correctable performance deficiencies may be dismissed from the jurisdiction of PAS upon the written approval of the member/employee's responsible Deputy Chief, following a recommendation in writing from the member/employee's immediate supervisor.  This may occur at the three (3)-month follow-up meeting or at any time thereafter, as justified by reviews of the member/employee's performance.  When a member/employee is not discharged from PAS jurisdiction at the one (1)-year follow-up meeting, PAS jurisdiction shall be extended, in*

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 65

*writing, for a specific period in three (3)-month increments at the discretion of the member/employee's responsible Deputy Chief. When PAS jurisdiction is extended beyond the minimum one (1)-year review period, additional review meetings involving the member/employee, the member/ employee's designated commander/manager and immediate supervisor, shall take place no less frequently than every three (3) months.*

9.   *On a quarterly basis, Division/appropriate Area Commanders and managers shall review and analyze relevant data in PAS about subordinate commanders and/or managers and supervisors regarding their ability to adhere to policy and address at-risk behavior. All Division/appropriate Area Commanders and managers shall conduct quarterly meetings with their supervisory staff for the purpose of assessing and sharing information about the state of the unit and identifying potential or actual performance problems within the unit. These meetings shall be scheduled to follow-up on supervisors' assessments of their subordinates' for PAS intervention. These meetings shall consider all relevant PAS data, potential patterns of at-risk behavior, and recommended intervention strategies since the last meeting. Also considered shall be patterns involving use of force, sick leave, line-of-duty injuries, narcotics-related possessory offenses, and vehicle collisions that are out of the norm among either personnel in the unit or among the unit's subunits. Division/appropriate Area Commanders and managers shall ensure that minutes of the meetings are taken and retained for a period of five (5) years. Commanders/managers shall take appropriate action on identified patterns of at-risk behavior and/or misconduct.*

10.   *Division/appropriate Area Commanders and managers shall meet at least annually with his/her Deputy Chief/Director and the IAD Commander to discuss the state of their commands and any exceptional performance, potential or actual performance problems or other potential patterns of at-risk behavior within the unit. Division/appropriate Area Commanders and managers shall be responsible for developing and documenting plans to ensure the managerial and supervisory accountability of their units, and for addressing any real or potential problems that may be apparent.*

11.   *PAS information shall be taken into account for a commendation or award recommendation; promotion, transfer, and special assignment, and in connection with annual performance appraisals. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

12.   *Intervention strategies implemented as a result of a PAS Activity Review and Report shall be documented in a timely manner.*

13.   *Relevant and appropriate PAS information shall be taken into account in connection with determinations of appropriate discipline for sustained misconduct allegations. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section*

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 66

> *3304.*

14. *The member/employee's designated commander/manager shall schedule a PAS Activity Review meeting to be held no later than 20 days following notification to the Deputy Chief/Director that the member/employee has met a PAS threshold and when intervention is recommended.*

15. *The PAS policy to be developed shall include a provision that a member/employee making unsatisfactory progress during PAS intervention may be transferred and/or loaned to another supervisor, another assignment or another Division, at the discretion of the Bureau Chief/Director if the transfer is within his/her Bureau.  Inter-Bureau transfers shall be approved by the Chief of Police.  If a member/employee is transferred because of unsatisfactory progress, that transfer shall be to a position with little or no public contact when there is a nexus between the at-risk behavior and the "no public contact" restriction.  Sustained complaints from incidents subsequent to a member/employee's referral to PAS shall continue to result in corrective measures; however, such corrective measures shall not necessarily result in a member/employee's exclusion from, or continued inclusion in, PAS.  The member/employee's exclusion or continued inclusion in PAS shall be at the discretion of the Chief of Police or his/her designee and shall be documented.*

16. *In parallel with the PAS program described above, the Department may wish to continue the Early Intervention Review Panel.*

17. *On a semi-annual basis, beginning within 90 days from the effective date of this Agreement, the Chief of Police, the PAS Activity Review Panel, PAS Oversight Committee, and the IAD Commander shall meet with the Monitor to review the operation and progress of the PAS.  At these meetings, OPD administrators shall summarize, for the Monitor, the number of members/employees who have been identified for review, pursuant to the PAS policy, and the number of members/employees who have been identified for PAS intervention.  The Department administrators shall also provide data summarizing the various intervention strategies that have been utilized as a result of all PAS Activity Review and Reports.  The major objectives of each of these semi-annual meetings shall be consideration of whether the PAS policy is adequate with regard to detecting patterns of misconduct or poor performance issues as expeditiously as possible and if PAS reviews are achieving their goals.*

18. *Nothing in this Agreement, and more specifically, no provision of PAS, shall be construed as waiving, abrogating or in any way modifying the Department's rights with regard to discipline of its members/employees.  The Department may choose, at its discretion, to initiate the administrative discipline process, to initiate PAS review or to use both processes concurrently or consecutively.*

(Negotiated Settlement Agreement VII. B.)


<u>Comments:</u>
The correction of problems with arrest information by entering data manually has resolved the related problems with the PAS review process.  That process remained current as of our most

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 67

recent site visit.  One issue discussed during the visit, which continues as a concern, is the number of reviews that result in no action being taken.

Discussion:

As noted above, OPD revised and issued Departmental General Order D-17, Personnel Assessment Program just prior to our last visit.  The risk management process is now operating under the revised policy.  Based on the policy and the related training that is ongoing, we again find OPD in continued Phase 1 compliance with this Task.

For this reporting period, we continued our examination of the stages of the PAS process consistent with this Task.  We examined the threshold analyses that were performed for the period of April 1, through June 30, 2012.  This included a review of peer-based threshold analyses completed by the PAS Administration Unit and the identification of officers meeting the single-event threshold.

During this reporting period, 152 officers were initially identified as meeting PAS thresholds.  This includes 23 who met more than one threshold.  Consistent with established practice, 26 officers were not selected for review based on recent review history.  That left 126 officers for notification for review.  We reviewed notification memoranda and other PAS activity review and report documents, as well as the use of PAS for reasons other than threshold-initiated reviews.  In accordance with this Task requirement, we reviewed PAS processes for the system's use in placement of officers on special assignment, transfer of officers, and commendations.  An important function of PAS is to regularly provide supervisors with relevant information on officers.  To consider that function, we also verified reports of regular quarterly PAS command reviews of officers by supervisors in select OPD units, including IAD and the Training Section.

The PAS process also calls for follow-up reports of officers under supervision or monitoring, as well as reports of officers not discharged from the process by the end of one year.  We reviewed the reports that were completed during the current reporting period.  Our examination included reviews of dispositions or follow-up reports on 52 officers.  These meetings all document supervisory reviews of officers who have been selected for some form of action as a result of PAS reviews.

Our reviews of the risk management process focus on the selection of officers for review and the process of review by supervisors, and then the consideration of those reviews up the chain of command.  For this reporting period, we examined the reports of 93 officers completed and/or signed during the quarter under review.  This is a 47% increase from the previous quarter.  In 35 (38%) of the cases, the reviews were prompted by Level 4 use of force activity.  The justification of one review was listed as "Management Referral."  No other justifications were consistent with discretionary decisions by supervisors or managers.

We also examined the content of PAS reviews.  It is critically important to understand that these reports do not – and are not – intended to reflect concerns with violations of policy or improper practice.  Other approaches, including discipline, are intended to address those.  The risk

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 68

management task is to identify behaviors and particularly patterns of behavior that reflect unacceptable levels of risk.  The important issue here is the degree of tolerance of risk by management in the Department.  The process of review up the chain of command reflects that degree of tolerance.

For the reporting period ending March 31, 2012, OPD concluded a total of 136 PAS reviews.  Reviews are included in the table below only after they are signed off through the level of the PAS Review Panel.  The number of reviews this quarter shows an increase of 142% and reflects the increased activity noted above.  These increases seem to result from both the addition of cases addressing actions related to the Occupy Oakland events and the change in Level 4 thresholds.

The table below tracks the review process and shows that supervisors recommended that no action be taken in 119, or 88%, of the 136 reviews for the current reporting period.  The table also shows that commanders disagreed with lower-level recommendations and prompted additional monitoring and supervision in less than 3% of cases.  Deputy Chiefs also disagreed with the commanders' decisions in less than 3% of their decisions, and the PAS Review Panel suggested revisions in 2% of the findings of the Deputy Chiefs.  These figures raise concerns that the review system reflects high tolerances for risk as it is defined by the criteria by which officers are selected for review.  The value of the data in the chart below is in tracking data over time, and using it to increase the rigors of the review process as it serves the goal of risk reduction.  The data for this reporting period are not consistent with that goal.

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 69

### Summary of PAS Reviews and Recommendations 2011-12

| | PAS Reviews Completed | Supervisor Rec - no action | % | Recognition | % | Supervisor Rec - Monitoring | % | Supervisor Rec - Intervention | % | Commander rec Concurs w Supervisor | % | Dep. Chief Concurs w Commander | % | PAS Panel Concurs w DC | % | Pending | Number of personnel that exceeded a threshold |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2011** | | | | | | | | | | | | | | | | | |
| January | 11 | 9 | 82% | 0 | 0% | 2 | 18% | 0 | 0% | 10 | 90% | 11 | 100% | 10 | 90% | 0 | 11 |
| February | 9 | 8 | 89% | 0 | 0% | 1 | 11% | 0 | 0% | 9 | 100% | 9 | 100% | 8 | 89% | 0 | 5 |
| March | 17 | 10 | 59% | 1 | 5% | 4 | 24% | 2 | 12% | 17 | 100% | 17 | 100% | 17 | 100% | 0 | 11 |
| April | 12 | 11 | 92% | 0 | 0% | 0 | 0% | 1 | 8% | 12 | 100% | 12 | 100% | 12 | 100% | 0 | 18 |
| May | 10 | 6 | 60% | 0 | 0% | 2 | 20% | 2 | 20% | 10 | 100% | 10 | 100% | 10 | 100% | 0 | 7 |
| June | 8 | 6 | 80% | 0 | 0% | 1 | 10% | 1 | 10% | 8 | 100% | 8 | 100% | 8 | 100% | 0 | 7 |
| July | 11 | 7 | 63% | 0 | 0% | 4 | 36% | 0 | 0% | 9 | 90% | 10 | 90% | 10 | 100% | 0 | 16 |
| August | 2 | 2 | 100% | 0 | 0% | 0 | 0% | 0 | 0% | 2 | 100% | 2 | 100% | 2 | 100% | 0 | 23 |
| September | 19 | 13 | 68% | 0 | 0% | 5 | 26% | 1 | 5% | 18 | 94% | 18 | 94% | 19 | 100% | 9 | 16 |
| October | 12 | 10 | 83% | 0 | 0% | 2 | 17% | 0 | 0% | 11 | 92% | 11 | 92% | 12 | 100% | 0 | 26 |
| November | 16 | 11 | 69% | 1 | 1% | 2 | 13% | 3 | 19% | 15 | 94% | 10 | 63% | 12 | 75% | 0 | 47 |
| December | 22 | 16 | 73% | 0 | 0% | 6 | 27% | 0 | 0% | 21 | 95% | 19 | 86% | 22 | 100% | 0 | 14 |
| **Total** | 149 | 109 | | 2 | | 29 | | 10 | | 142 | | 137 | | 142 | | 9 | 201 |
| *Average* | *12.4* | *9.1* | *77%* | *0.2* | *1%* | *2.4* | *0* | *0.8* | *6%* | *11.8* | *96%* | *11.4* | *94%* | *11.8* | *96%* | *0.8* | *16.8* |
| **2012** | | | | | | | | | | | | | | | | | |
| January | 7 | 5 | 71% | 0 | 0% | 2 | 29% | 0 | 0% | 7 | 100% | 7 | 100% | 7 | 100% | 7 | 14 |
| February | 5 | 4 | 80% | 0 | 0% | 1 | 20% | 0 | 0% | 2 | 40% | 2 | 40% | 2 | 40% | 0 | 59 |
| March | 19 | 12 | 63% | 0 | 0% | 4 | 21% | 3 | 16% | 18 | 95% | 17 | 89% | 18 | 95% | 33 | 7 |
| April | 25 | 17 | 68% | 0 | 0% | 5 | 20% | 3 | 12% | 25 | 100% | 25 | 100% | 25 | 100% | 22 | 41 |
| May | 27 | 17 | 63% | 0 | 0% | 2 | 7% | 0 | 0% | 26 | 96% | 25 | 92% | 27 | 100% | 14 | 58 |
| June | 43 | 41 | 95% | 0 | 0% | 2 | 5% | 0 | 0% | 41 | 95% | 42 | 98% | 43 | 100% | 15 | 17 |
| July | 66 | 61 | 92% | 1 | 5% | 3 | 5% | 2 | 30% | 65 | 98% | 65 | 98% | 64 | 97% | 0 | 18 |
| **Total** | 192 | 157 | | 1 | | 19 | | 8 | | 184 | | 183 | | 186 | | 91 | 214 |
| *Average* | *14.0* | *9.5* | *71%* | *0.0* | *0%* | *3.0* | *23%* | *1.5* | *7%* | *13.0* | *84%* | *12.8* | *82%* | *13.0* | *84%* | *15.5* | *30.3* |

In summary, our analysis of PAS during this reporting period suggests that the risk management process this quarter did not function in a manner consistent with the goals of continuous risk reduction. The low level of action resulting from reviews is problematic and begs for explanation. It can only suggest a high degree of acceptance of risk, or a misclassification of officer behavior as indicators of risk. Since the indicators are well established, standard risk measures, and when comparisons are used, result in selection of only the highest 5% of officers on the measures of risk, the argument that the system is not restrictive enough carries no weight. It is important to recognize that the risk management process is distinct from the disciplinary process and is intended to benefit the Department and the officers involved, that goal should set the standard of monitoring and intervention.

For this reporting period, we began the process of reviewing the PAS histories of officers who had either a Level 1 use of force or been arrested for a criminal offense in the past year. The

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 70

summaries are presented in the table below.  In the 14 of cases we examined, seven officers had substantial PAS histories in that they had previously met thresholds and been subject to PAS review.  As the table shows, the number of reviews is as high as five, and thresholds exceeded by an officer include as many as 31.

Reviews of PAS activity for officers identified through their involvement in significant events can provide useful insights.  This is, however, not a process the PAS Administration Unit is asked to do on a regular basis.  In this case, the reviews indicate that a high proportion of these officers have been subject to regular review; and it suggests the need for further analysis to consider whether the response to review has been effective.

| | Review Summary: Select Cases | | | |
|---|---|---|---|---|
| Significant PAS History | event | Reviews 2010-12 (inc. current) | other Thresholds met | PAS status at time of event |
| | Crim Arrest | 1 | 0 | None |
| | Crim Arrest | 1 | 1 | None |
| | | | | |
| X | Level 1 | 3 | 0 | past intervention |
| X | Level 1 | 3 | 16 | in Monitoring |
| X | Level 1 | 5 | 23 | on Intervention |
| X | Level 1 | 3 | 1 | off prior supervision |
| X | Level 1 | 4 | 31 | in Monitoring |
| X | Level 1 | 3 | 5 | past intervention |
| X | Level 1 | 5 | 6 | None |
| | Level 1 | 1 | 0 | None |
| | Level 1 | 1 | 0 | None |
| | Level 1 | 2 | 7 | None |
| | Level 1 | 1 | 0 | None |
| | Level 1 | 1 | 1 | None |

Our examination of the PAS process raises three important concerns.  First, there is concern over the extent to which needed information is actually used in the review process.  In most cases, the full reports, such as uses of force, which are used in the review process, are only available through IAD.  But these reports are only very rarely requested by supervisors conducting the reviews.  Second, the question remains whether the low level of monitoring and intervention resulting from reviews is consistent with proper use of this risk management tool and consistent with the goals of risk reduction.  Finally, the review of officers with Level 1 uses of force suggests the need to monitor the effectiveness of risk reduction among officers repeatedly identified as exceeding risk thresholds.

The PAS system has encountered, and continues to address, significant technical problems.  Those issues, however, should not be allowed to divert the Department's attention from the more critical concern about appropriate use of the system and the effectiveness of the review and intervention processes.  In those areas there are significant concerns.

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 71

Although these issues should be routinely addressed through the management process, the NSA specifically prescribes a setting in which the Department should identify and address PAS concerns. The semi-annual PAS activity review meeting with the Monitor was held during our most recent site visit. Although comprehensive material to support the review was provided at the meeting by the PAS Administration Unit, discussion of critical issues by the Department was, at best, limited. The key issues identified above were not discussed, and there was no indication they had been considered or would be considered at another time. In short, neither the routine management processes nor the specifically required forum, involved assessing the system and its use, and otherwise raising and addressing critical concerns.

The lack of effective review and repair mechanisms in the managerial oversight of the risk reduction system, when combined with the specific concerns noted above, raise issues that are nothing short of fundamental. They suggest the Department is currently incapable of identifying deficiencies and correcting them. As such, we cannot certify that the Department is in compliance with a Task that focuses on the effective use of the risk management system.

Compliance Status:
Phase 1: In compliance
Phase 2: Not in compliance

Next Steps:
During our next site visit, we will continue to work with the Department to examine the processes of collecting and storing data, and the use of that data in the PAS review process. We will examine issues relating to the reliability of data. We also continue to be interested in the Department's efforts to adopt and implement new technology that may help to stabilize the system. Of chief concern now, however, will be issues around the effective use of the risk management system. We will focus attention on: 1) the availability and use of the necessary information in the review process; 2) whether outcomes of the review process, and management oversight of it, are consistent with the goals of risk reduction; and 3) whether the review and intervention processes are effective in identified cases.

# Task 42: Field Training Program

Requirements:
*Within 323 days of the effective date of this Agreement, OPD shall develop and implement a plan to enhance its Field Training Program. This plan shall address the criteria and method for selecting FTOs, the training provided to FTOs to perform their duty, supervision and evaluation of FTOs, the length of time that trainee officers spend in the program, and the methods by which FTOs assess and evaluate trainee officers in field training. The plan must ensure proper reporting, review and approval of probationary officers' reports.*

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 72

### Field Training Program Coordinator

*The Chief of Police shall assign a full-time sergeant for the first year who shall develop and implement the new policies and procedures described in this section.  The Chief of Police shall determine, upon successful completion of the development and implementation of these policies, if it is necessary to continue the position at the rank of sergeant, but in any event, the position shall continue as a full-time position.*

### Trainee Rotation

*During their field training, trainee officers shall rotate to a new FTO and a new geographic area of the City at predetermined intervals.  Prior to rotation, trainee officers shall be interviewed by the Field Training Program Coordinator or his/her designee and given an opportunity to raise any questions or concerns they may have about the quality of training provided to them.*

### FTO Participation Incentives

*OPD shall increase the incentives for participation in the FTO program so that the Department will have a larger pool of qualified, experienced candidates from which to choose.*

### FTO Candidate Nomination and Requirements

*FTO candidates shall be nominated by field supervisors and commanders, but shall be approved for assignments to this duty, and for retention in it, by the Chief of Police.  All FTO candidates must have completed three (3) years of Departmental service before selection, unless specifically authorized by the Chief of Police.  FTO candidates shall be required to demonstrate their commitment to community policing, and their problem- solving and leadership abilities.  Ethics, professionalism, relationships with the community, quality of citizen contacts and commitment to OPD philosophy shall be primary criteria in the selection of FTOs.  Excessive numbers of sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304, or excessive numbers of use of force incidents shall bar a candidate from selection as an FTO for no less than two (2) years.*

### Decertification

*The presumptive result of sustained disciplinary action, completed within the time limits imposed by Government Code Section 3304, against an FTO or the FTO Program Coordinator for excessive force, unlawful arrest, false testimony, racial, ethnic, sexual-orientation or gender-based discrimination or slurs, or other serious examples of police misconduct, shall be removal from the FTO program.  The Deputy Chief of the member's chain of command may recommend to the Chief of Police to grant an exception to this presumption after conducting a hearing on the facts of the matter.  The Chief of Police shall document the approval/disapproval in writing.*

### FTO Assignment

*Assignment to an FTO position shall be contingent upon successful completion of a training course designed for this position and shall be approved by OPD and the State of California Peace Officers' Standards and Training.*

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 73

### FTO Evaluation

*At the end of a complete FTO cycle, trainee officers leaving the FTO program shall anonymously evaluate each of their FTOs. OPD shall develop a form for such evaluations which emphasize effectiveness at training and effectiveness at supervision. The evaluation form shall also assess the degree to which the FTO program reflected policies, procedures, values and other information taught in the recruit academy. The FTO evaluation forms shall be reviewed by the Field Training Program Coordinator and the individual FTO's commander and supervisor. The Field Training Program Coordinator shall provide evaluation information to the FTOs as a group, concerning program effectiveness. Each FTO shall also be provided with evaluation information regarding their individual performance. The individual evaluation forms shall not be made available to individual FTOs in the interest of maintaining anonymity of trainee officers who have completed the forms.*

### Daily Evaluation Audit

*The Field Training Program Coordinator, or his/her designee, shall conduct random audits of the FTO program to ensure that FTOs complete daily evaluations of trainee officers and that the selection standards for FTOs are maintained.*

### Trainee Officer Assignment

*When a trainee officer's FTO is absent, the trainee officer shall not be assigned to field duties with an "acting" FTO. They shall be placed with another certified FTO, or shall be assigned to non-field duties, pending the availability of a certified FTO.*

### Field Commander and FTO Supervisor Training

*OPD shall provide field commanders and supervisors with training on the FTO program, including the field-training curriculum, the role of the FTO, supervision of FTOs and probationary employees, the evaluation process and the individual duties and responsibilities within the FTO program.*

### Focus Groups

*The Field Training Program Coordinator and Academy staff shall conduct focus groups with randomly selected trainee officers midway through the field-training cycle, upon completion of field training, and six (6) months after completion of the field training program, to determine the extent to which the Academy instructors and curriculum prepared the new officers for their duties.*

### Consistency of Training

*The results of these focus group sessions shall be reviewed at a meeting to include the Training Division Commander, the FTO Program Coordinator, the BFO Deputy Chief, and the BOS Deputy Chief. If it is determined that there is a substantial discrepancy between what is taught in the Academy and what is taught in the FTO program, there shall be a determination as to which is correct, and either the training Academy or the FTO program shall make the necessary changes so that the desired training information is consistent. In the event that the discrepancies*

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 74

*appear to be the result of one or more individual FTOs, rather than the FTO program as a whole, the review group shall determine whether the discrepancies are serious enough to warrant removal of that officer or officers from the FTO program.  The results of the meeting of this review group shall be documented and this information shall be provided to the Monitor.*
(Negotiated Settlement Agreement VIII. A.-L.)

Comments:
The previous monitor found that the Department was in compliance with all of Task 42 except for two areas – namely, the Field Training Officer (FTO) selection process, and ensuring consistency of training in the Academy and Field Training Program (FTP) for trainee officers.

Since no Academy was planned for the near future, in August 2009, the Parties agreed that there would be no active monitoring of this Task.  In addition, since there were no new officers being trained, OPD decertified all then-current Field Training Officers.  During 2010, OPD recruited and began training 21 new officers and five lateral officers.  However, due to the City's budget cuts, OPD laid off all new officers, both trainees and laterals, and 80 full-time OPD officers.  As the program had been inactive and was reinstituted only recently, when OPD was able to hire new trainees; we have deferred our compliance finding for Task 42 since the beginning of our tenure.

Discussion:
During the last reporting period, in February 2012, 10 trainees began their first week of the Field Training Program.  At that time, we found that OPD had followed the FTO selection procedures required by the NSA.  We deferred our compliance assessment, since the program had not fully resumed.

During our most recent site visit, we interviewed the lieutenant and officer who are responsible for the Field Training Program.  We also reviewed related memoranda, evaluation forms, and other documentation.

We note the following related to each Task 42 requirement:

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 75

| Requirement | Comment |
|---|---|
| *Develop and implement a plan to enhance its Field Training Program* | The previous monitor found that the Department was in compliance with developing a plan that addressed the requirements of Task 42. |
| *Field Training Program Coordinator* | A full-time officer is currently assigned to supervise the program. |
| *Trainee Rotation* | Trainees are rotated every four weeks to a new assignment and new FTO. |
| *FTO Participation Incentives* | Officers who serve as FTOs are paid incentive pay for their service.  In addition, the program includes several incentives (e.g., chevrons, administrative days, and priority for selection as training) as incentives for participation. |
| *FTO Candidate Nomination and Requirements* | Candidates are recommended by their supervisors and commanders; and must have work and performance records as required by this section.  The selection of FTOs to be certified (newly selected FTOs) and those to be recertified (FTO previously selected and decertified when new officers were not being hired) followed the requirements outlined in the NSA. |
| *Decertification* | Since the recent selection of FTOs, none have been decertified. |
| *FTO Assignment* | FTOs are not assigned until they have successfully completed program training. |
| *FTO Evaluation* | Trainees are evaluated by their FTOs on a daily basis beginning with their second week of field assignment.  The patrol sergeant prepares a weekly progress report; and at the end of each four-week cycle, the FTO prepares an end-of-phase report.  Trainee officers anonymously evaluate their FTOs at the end of each phase. |
| *Daily Evaluation Audit* | FTOs complete a daily evaluation of the trainees; and the program coordinator receives, reviews, audits, and files all evaluation forms. |
| *Trainee Officer Assignment* | If a trainee's FTO is unavailable, the trainee is assigned to another FTO.  If no FTO is available, the trainee is assigned to a sergeant or non-patrol assignment. |
| *Field Commander and FTO Supervisor Training* | All sergeants and commanders to whom FTOs would be assigned were trained by the program in both group and individual sessions before they were assigned FTO duties. |
| *Focus Groups* | The coordinator conducts focus groups with randomly selected trainees, as required by the NSA.  The focus group is designed to elicit issues encountered in the program and ensure that inconsistencies in training are identified and rectified.  The results of the focus group are recorded in a memorandum and reviewed by the Chief, the Assistant Chief, the Deputy Chief overseeing field operations, the Training Commander, and the captain and sergeant who oversee the program..  To date, the |

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 76

| Requirement | Comment |
|---|---|
| | first two focus groups have been held and documented as required.  The final focus group is set for six months after completion of the training program and has not yet been held. |
| *Consistency of Training* | The coordinator explores the consistency of field training with that of the Academy at several points during the program.  He interviews every trainee every four weeks before they are rotated to new assignments and new FTOs.  He also participates in a monthly staff meeting that discusses the FTO training and trainees and as noted above conducts the focus groups.  At the end of the FTO training cycle, a final evaluation report of the trainee's performance is prepared; and trainees rate the FTOs and the program. |

As noted above, the first cycle of the Field Training Program is not yet complete.  Accordingly, we note that OPD has made progress toward compliance with the requirements of Task 42, but again defer a compliance finding with this Task.

Compliance Status:
Phase 1:  In compliance
Phase 2:  Deferred

# Task 43:  Academy and In-Service Training

Requirements:

A.    *Academy Training Plan*

*Within 540 days of the effective date of this Agreement, OPD shall develop and implement a plan to enhance its Academy and in-service training to ensure that OPD members, dispatchers, and civilian evidence technicians are adequately trained for their positions, and aware of and able to implement the most contemporary developments in police training.  This plan shall include a review of OPD's training curriculum, with additional emphasis on ethics and professionalism, critical thinking and problem solving, conflict resolution, and relationships with the community.  The plan shall also address the criteria and method for selecting OPD training instructors, the training provided to instructors, procedures for evaluating the content and quality of training provided to OPD personnel and procedures for maintaining training records for OPD personnel.  In arriving at the plan regarding staffing, training content and methodology, OPD shall consult with at least four (4) other, large law-enforcement agencies within the United States which have excellent reputations for professionalism.  In particular, OPD shall consult with these agencies about qualifications and other criteria to be used in selecting staff for training positions.  OPD shall also review the approach of these other law enforcement agencies in training both new staff and experienced staff on ethics and*

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 77

> *professionalism, critical thinking and problem solving, conflict resolution, and relationships with the community.*

B.   <u>*Professionalism and Ethics*</u>

> *OPD shall expand professionalism and ethics as a training topic within the recruit academy, in-service training, and field training.  Wherever possible, OPD shall include and address issues of professionalism and ethics using curricula that employ realistic scenario-based training exercises.*

C.   <u>*Supervisory and Command Training*</u>

> *OPD shall provide all sergeants and commanders with mandatory 40-hour in-service supervisory and leadership training.  Officers shall attend training prior to promotion to the rank of sergeant.  Lieutenants shall attend training within six (6) months of promotion.  Such training shall include supervisory and command accountability, and ethics and professionalism, with emphasis on supervisory and management functions and situations, and shall include both scenario-based training and case studies.*

D.   <u>*In-Service Training*</u>

> *OPD shall provide all members with forty (40) hours of in-service training every eighteen (18) months.*
>
> 1.   *Sergeants shall receive at least 20 hours of training designed for supervisors every 18 months.*
> 2.   *Members at the rank of lieutenant and above shall receive at least 20 hours of training designed for commanders every 18 months.*

E.   <u>*Training Staff Record Review*</u>

> *Appointment to the Academy staff or other staff training position shall also require a review of the record of the individual being considered, to ensure that the individual does not have a record of any Class I offense, as defined in Section III, paragraph H (1), within the prior two (2) years, and that the individual is supportive of the philosophy and values of OPD.[18]*
>
> (Negotiated Settlement Agreement IX. A.-E.)

<u>Comments:</u>

Only one provision of Task 43 (43.1.1) is being actively monitored under the MOU.  This subtask requires OPD to ensure that OPD members, dispatchers, and civilian evidence technicians are adequately trained for their positions.  During the last two reporting periods, we found that 97% of the members and employees in our sample received the required in-service training.

<u>Discussion:</u>

As previously reported, OPD published General Order B-20, *Departmental Training Program* (April 6, 2005), which incorporates the requirements of Task 43.  As the Department has trained at least 95% of relevant personnel on these policies, OPD is in continued Phase 1 compliance with this Task.

---

[18] The underlined requirement is the only provision of Task 43 that is being actively monitored under the MOU.

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 78

**Task 43.1.1** requires that OPD's training plan ensure that OPD members, dispatchers, and civilian evidence technicians are adequately trained for their positions (compliance standard: Yes/No).  For this reporting period, we reviewed the training records of a stratified random sample of 103 OPD members and employees – including 72 officers, 13 sergeants, four lieutenants, 11 dispatchers, and three police evidence technicians (PETs) – to determine if the members and employees received adequate training for their positions.  Six of the 103 individuals in our review were excused from training attendance due to medical leaves.  Accordingly, our review examined the records of a total of 97 members and employees.

The Department produced a record for each member and employee in our sample.  For each, we reviewed the training s/he received during previous years, and calculated the number of hours recorded in his/her record.  For the sworn officers in our sample, we credited the California Peace Officer Standards and Training (POST)-certified Continued Professional Training (CPT) as counting toward the requirement.  CPT is, according to California state requirements, to be delivered to every officer every two years; OPD uses an 18-month cycle.  We found that 95 (98%) of the 97 members and employees in our sample received training appropriate to their jobs.  The two employees who did not have sufficient training recorded were both dispatchers.  One received only 18 hours of non-first aid training in 2011 and 2012; the other received only five hours.  The following chart reflects the results of our survey.

| | Records Reviewed | Medically Excused | Available to Train | Training Received | % |
|---|---|---|---|---|---|
| **Officers** | 72 | 5 | 67 | 67 | 100% |
| **Sergeants** | 13 | 1 | 12 | 12 | 100% |
| **Lieutenants** | 4 | 0 | 4 | 4 | 100% |
| **Dispatchers** | 11 | 0 | 11 | 9 | 82% |
| **Police Evidence Technicians** | 3 | 0 | 3 | 3 | 100% |
| **Total** | 103 | 6 | 97 | 95 | 98% |

We noted in our last three reports that a lack of planning and attention to the training of PETs constituted a negative trend that needed to be addressed to ensure that the Department remains in Phase 2 compliance with this requirement.  We also noted that OPD had begun to address the issue.  This review revealed that all three PETs in our survey had attended a seven-and-one-half-hour "Crime Lab Overview and Process" course.

OPD is in Phase 2 compliance with Task 43.1.1.

We noted in our last report that the Training Section Commander had initiated a training needs assessment.  As we have observed in the past, a needs assessment is particularly important at a time when resources are declining to enable the Department to focus its assets on its most urgent training needs.  During our most recent site visit, we learned that OPD had, to date, conducted focus group interviews and a Department-wide training needs survey utilizing PowerDMS, the

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 79

Department's training document management system.  The primary areas of training needs that were recorded included:  use of force and use of force reporting; tactics and firearms; policy updates; handling complaints; and professionalism and customer service.  Respondents also cited their desires for additional scenario-based training and increased student involvement in their ongoing professional training.

The needs assessment memorandum concluded with recognition that "There remains work to be done" and that the "process identified major themes, which Training Section staff has already been brain storming for ways to meet the needs."  We agree.  A quality needs assessment should be a valuable tool in establishing an effective OPD training program.

Compliance Status:
Phase 1:  In compliance
Phase 2:  In compliance


# Task 45:  Consistency of Discipline Policy

Requirements:
*On or before October 6, 2003, OPD shall revise and update its disciplinary policy to ensure that discipline is imposed in a fair and consistent manner.*

1. *The policy shall describe the circumstances in which disciplinary action is appropriate and those in which Division-level corrective action is appropriate.*
2. *The policy shall establish a centralized system for documenting and tracking all forms of discipline and corrective action, whether imposed centrally or at the Division level.*
3. *All internal investigations which result in a sustained finding shall be submitted to the Discipline Officer for a disciplinary recommendation.  The Discipline Officer shall convene a meeting with the Deputy Chief or designee in the affected chain-of-command for a confidential discussion of the misconduct, including the mitigating and aggravating factors and the member/employee's overall performance.*
4. *The COP may direct the Discipline Officer to prepare a Discipline Recommendation without convening a Discipline Conference.*

(Negotiated Settlement Agreement X. B.)


Comments:
During the last two reporting periods, we found OPD in compliance with Task 45.

Discussion:
As previously reported, on December 5, 2006, OPD published General Order M-03, *Complaints Against Departmental Personnel or Procedures*; the Internal Investigation Procedure Manual (Training Bulletin Index Numbers V-T.1 and V-T.2); the Internal Affairs Policy and Procedure

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 80

Manual; and the Departmental Discipline Policy (Training Bulletin Index Number V-T), incorporate the requirements of Task 45.  As the Department has trained at least 95% of relevant personnel on these policies, we find OPD in continued Phase 1 compliance with this Task.

**Task 45.1** requires that OPD maintain a centralized system for documenting and tracking all forms of discipline and corrective action, whether imposed centrally or at the Division level (compliance standard:  Yes/No).  To assess Phase 2 compliance with this subtask, we observed demonstrations of the IAD database and discussed it with both IAD personnel who operate it and with senior IAD officers.  During this reporting period, we queried the IAD database to identify all of the cases with at least one sustained finding that were approved between April 1, through June 30, 2012.  This query yielded 40 cases containing 54 sustained findings.

We found that 48 of the 54 sustained findings listed the dates of the discipline conference and letter and the discipline imposed.  Our review revealed that the remaining six lacked this information because the discipline conferences were not held until July 2012.  Thus, the IAD records were accurate and complete in all (100%) cases where a finding was sustained during the quarter under review.

OPD is in compliance with Task 45.1.

**Task 45.4** requires that discipline be imposed in a manner that is fair and consistent (compliance standard:  95%).  To this end, the Department has developed and revised a Discipline Matrix.  The Department most recently updated and revised its Discipline Matrix on September 2, 2010.

We found that in 47 (98%) of the 48 sustained findings in which discipline was decided during the reporting period, the discipline fell within the Discipline Matrix in use or it was a reasonable application of discipline justified by an analysis of the facts of the case.  We found one case in which a citizen called to make a compliant that people were fighting in the streets.  The dispatcher who handled the call mistakenly thought that the caller had used a disparaging racist word, and an argument ensued in which the caller demanded to speak to the dispatcher's supervisor.  The dispatcher failed to place the caller in contact with her supervisor, and told the caller he could not make a complaint on the 911 line.  She failed to call him back to take a complaint or to notify her supervisor.  OPD considered this as an *unintentional* failure to accept or refer a complaint (398.76-2) for which the first offense ranges from counseling and training to a five-day suspension.  This case, however, clearly involved an *intentional* failure to accept or refer a complaint (398.76-1), for which the first offense ranges from a five-day suspension to termination.  As we have noted in past reports, the Department is not bound to its Discipline Matrix, but when it finds it necessary to go outside of the range specified for a particular violation, it must present a reasonable justification for doing so.  Rather than present a justification for a departure from its Matrix, OPD assigned the matter an inappropriate violation.

During the period of April 1, through June 30, 2012, there were 10 IAD cases containing 14 findings in which discipline of a one-day suspension or greater was recommended.  These cases were afforded Skelly hearings as requested by employees.  In eight cases containing 11 findings,

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 81

the Skelly hearing was held, and the originally recommended discipline was upheld and imposed.  In one case, the recommended discipline, a 10-day suspension, was reduced to a five-day suspension (that remained within the Matrix) and the case was settled.  In the remaining case, two sustained findings that resulted in termination were still under consideration by the Chief at the end of the reporting period.

OPD is in Phase 2 compliance with Task 45.

Compliance Status:
Phase 1:  In compliance
Phase 2:  In compliance

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 82

# Section Three

## *Conclusion:  Critical Issues*

This is our eleventh quarterly report.  The status of compliance with the 22 active requirements of the Negotiated Settlement Agreement is shown for all of our quarterly reports in the graph below.  It shows that compliance has decreased from the level noted in our last report.  In all, 54% of the Tasks are in Phase 2 compliance.  This level was exceeded in three previous reports, including the last.

The most significant change this quarter is seen in the decline of Task 41 from in compliance to not in compliance.  This reflects a collection of problems that are associated with the use of the risk management system, and the failure to adequately manage that system to improve risk reduction over time.  The struggles with PAS data are well known.  It should be clear in this report, however, that technological problems are not the only – or even the most important – concern.  The regression to not in compliance reflects the Department's apparent inability to effectively monitor and utilize the system to accomplish reduction of risk.  That is, although the system is functioning, it is not being used properly by Department management to control risk.  Seven additional Tasks remain in partial compliance, and our assessment of two is deferred.



Even with the reversal of compliance with one Task, the issues that stymie progress remain largely unchanged.  Like the problems with PAS, they relate primarily to processes of managerial oversight, from the review of investigations of misconduct to concern over documenting uses of force.  These issues center on reporting and review requirements that are at the heart of issues that originally resulted in the NSA.  Unsubstantiated negative assessments of

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 83

the credibility of witnesses in complaints remain an issue.  Problems also remain with reporting justifications for pedestrian and vehicle stops.  The Monitoring Team was not given the information needed to assess the important issues relating to maintaining the proper ratio of available supervisory staff.  As noted in our last report, it can be easy to understand the importance of the failure to adequately address these issues.  Supervision and review play critical roles in assuring Constitutional policing.  The effective use of critical management tools – such as PAS – is critical to proper functioning in the Department.  The lack of progress in those areas is a major limitation to achieving compliance with the Negotiated Settlement Agreement.

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 84

# Appendix A

*Cumulative Key Indicator Data*

PAS ADMIN UNIT STATISTICAL COMPARISON

## Oakland Police Department — Key Indicator By Month

| Percent of Assets Associated with | JUL.10 | AUG.10 | SEP.10 | OCT.10 | NOV.10 | DEC.10 | JAN.11 | FEB.11 | MAR.11 | APR.11 | MAY.11 | JUN.11 | JUL.11 | AUG.11 | SEP.11 | OCT.11 | NOV.11 | DEC.11 | JAN.12 | Feb.12 | Mar.12 | APR.12 | MAY.12 | JUN.12 | Graph |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| All Force Types 1,2,3,4** per reporting officer | 7.57 | 1.93 | 4.10 | 2.31 | 3.78 | 1.21 | 2.29 | 2.24 | 2.21 | 1.60 | 2.33 | 1.66 | 2.64 | 1.66 | 5.72 | 6.70 | 0.84 | 2.98 | 2.45 | 1.24 | 2.11 | 1.76 | 0.71 | | |
| A Use of Force (level 1,2,3,4** per reporting officer) | 42.30 | 36.37 | 49.03 | 39.24 | 52.02 | 47.44 | 37.98 | 37.98 | 25.91 | 29.34 | 42.82 | 35.61 | 32.24 | 32.31 | 31.15 | 24.68 | 23.17 | 34.21 | 25.76 | 34.88 | 31.94 | 34.62 | 27.22 | 24.57 | |
| A Use of Force (level 1) per reporting officer | 5.92 | 4.36 | 3.99 | 5.67 | 6.30 | 2.16 | 4.99 | 4.73 | 2.13 | 3.04 | 4.04 | 1.57 | 2.91 | 4.90 | 1.56 | 2.93 | 2.30 | 3.09 | 1.72 | 2.56 | 2.17 | 3.60 | 2.33 | 0.79 | |
| A Police Pursuit per reporting officer | 13.25 | 9.93 | 11.17 | 7.41 | 7.93 | 9.63 | 9.12 | 10.71 | 8.43 | 6.91 | 7.14 | 9.01 | 10.20 | 8.67 | 8.10 | 9.99 | 4.19 | 6.19 | 9.16 | 12.75 | 8.29 | 11.16 | 7.21 | 2.84 | |
| An IA Complaint per subject officer sworn only | 2.72 | 3.14 | 2.62 | 1.97 | 5.29 | 0.54 | 2.66 | 1.57 | 2.05 | 1.60 | 4.84 | 0.92 | 1.28 | 1.23 | 1.17 | 4.31 | 3.33 | 0.97 | 3.05 | 2.03 | 1.24 | 2.02 | 0.84 | 0.47 | |
| An In-Custody Injury (excludes civilians) | 303.79 | 330.37 | 290.42 | 364.04 | 323.43 | ###### | 216.71 | 254.17 | 170.88 | 180.53 | 226.38 | 221.01 | 210.02 | 229.31 | 184.11 | 290.26 | 283.83 | 253.15 | 227.23 | 249.13 | 277.60 | 283.70 | 209.65 | 158.94 | |
| Each Hour of Sick Leave (excludes civilians) | | | | | | | | | | | | | | | | | | | | | | | | | |

### Number of Assets per (blank if n cases)

| | JUL.10 | AUG.10 | SEP.10 | OCT.10 | NOV.10 | DEC.10 | JAN.11 | FEB.11 | MAR.11 | APR.11 | MAY.11 | JUN.11 | JUL.11 | AUG.11 | SEP.11 | OCT.11 | NOV.11 | DEC.11 | JAN.12 | Feb.12 | Mar.12 | APR.12 | MAY.12 | JUN.12 | Graph |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Officer Involved Shooting (includes shootings involving animals which includes force types 1,2) | 281.67 | 987.00 | 292.33 | 864.00 | 397.00 | 247.33 | 144.33 | 0.00 | 633.00 | 395.33 | 592.50 | 571.50 | 1098.00 | 571.00 | 1284.00 | 0.00 | 0.00 | 383.50 | 0.00 | 572.00 | 430.00 | 0.00 | 0.15 | 0.08 | |
| 24, 0* and 26-31) | 211.25 | 146.17 | | | 79.40 | 148.40 | 453.00 | 160.60 | 316.50 | 149.43 | 177.50 | 571.50 | 1098.00 | 285.50 | 351.00 | 336.25 | ###### | 182.43 | 0.00 | 215.50 | 0.53 | 0.31 | 0.08 | | |
| Whole Civilians (excludes civilians) | | | | | | | | | | | | | | | | | | | | | | | | | |
| Civil Suit (excludes civilians) | 140.83 | 82.25 | 100.67 | 72.00 | 99.25 | 67.43 | 78.73 | 47.67 | 211.00 | 197.67 | 56.05 | 1143.00 | 1098.00 | 808.67 | 1284.00 | 336.25 | 95.00 | 152.63 | 0.00 | 0.00 | 643.00 | 0.15 | 0.38 | 0.08 | |
| All Asset (totals) | 845 | 987 | 877 | 804 | 794 | 742 | 806 | 803 | 1186 | 1186 | 1065 | 1143 | 1098 | 1142 | 1284 | 1245 | 1043 | 1043 | 1067 | 1277 | 1144 | 1290 | 1138 | 1304 | 1266 | |

Eleventh Quarterly Report of the Independent Monitor
for the Oakland Police Department
October 15, 2012
Page 85

# Appendix B

## *Acronyms*

The following is a listing of acronyms frequently used in our quarterly reports.

| Acronym | Definition |
|---|---|
| ACSO | Alameda County Sheriff's Office |
| AWS | Automated Warrant System |
| BART | Bay Area Rapid Transit |
| BFO | Bureau of Field Operations |
| BOI | Bureau of Investigation |
| BOS | Bureau of Services |
| CAD | Computer Assisted Dispatch |
| CHP | California Highway Patrol |
| CID | Criminal Investigation Division |
| CORPUS | Criminal Oriented Records Production Unified System |
| CPRB | Citizens' Police Review Board |
| CPT | Continued Professional Training |
| CRIMS | Consolidated Records Information Management System |
| DGO | Departmental General Order |
| DIL | Daily Incident Log |
| DLI | Division-level investigation |
| EFRB | Executive Force Review Board |
| FRB | Force Review Board |
| FTO | Field Training Officer |
| FTP | Field Training Program |
| FTU | Field Training Unit |
| IAD | Internal Affairs Division |
| IB | Information Bulletin |
| ICR | Informal Complaint Resolution |
| IPAS | Input for Personnel Assessment System |
| LEWI | Law Enforcement Warrants Inquiry System |
| MOR | Manual of Rules |
| NSA | Negotiated Settlement Agreement |
| OCA | Office of the City Attorney |
| OIG | Office of Inspector General |
| OPD | Oakland Police Department |
| PAS | Personnel Assessment System |
| PDRD | Portable Digital Recording Device |
| POST | Peace Officer Standards and Training |
| RMM | Risk Management Memorandum |
| RWM | Report Writing Manual |
| SDF | Stop Data Form |
| SO | Special Order |
| TB | Training Bulletin |
| UOF | Use of force |