

# Seventeenth Quarterly Report
## *of the* Independent Monitor
## *for the* Oakland Police Department

Robert S. Warshaw
Independent Monitor

Office of the Independent Monitor
Police Performance Solutions, LLC
P.O. Box 396, Dover, NH 03821-0396

April 28, 2014

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 1

## *Table of Contents*

## Section One

| | |
|---|---|
| *Introduction* | 2 |
| *Compliance Assessment Methodology* | 4 |
| *Executive Summary* | 6 |

## Section Two

*Compliance Assessments*

| | | |
|---|---|---|
| Task 2: | Timeliness Standards and Compliance with IAD Investigations | 8 |
| Task 3: | IAD Integrity Tests | 10 |
| Task 4: | Complaint Control System for IAD and Informal Complaint Resolution Process | 12 |
| Task 5: | Complaint Procedures for IAD | 16 |
| Task 6: | Refusal to Accept or Refer Citizen Complaints | 24 |
| Task 7: | Methods for Receiving Citizen Complaints | 25 |
| Task 16: | Supporting IAD Process - Supervisor/Managerial Accountability | 28 |
| Task 18: | Approval of Field-Arrest by Supervisor | 30 |
| Task 20: | Span of Control for Supervisors | 32 |
| Task 24: | Use of Force Reporting Policy | 35 |
| Task 25: | Use of Force Investigations and Report Responsibility | 39 |
| Task 26: | Force Review Board (FRB) | 44 |
| Task 30: | Executive Force Review Board (EFRB) | 47 |
| Task 33: | Reporting Misconduct | 49 |
| Task 34: | Vehicle Stops, Field Investigation, and Detentions | 52 |
| Task 35: | Use of Force Reports - Witness Identification | 56 |
| Task 37: | Internal Investigations - Retaliation Against Witnesses | 57 |
| Task 40: | Personnel Assessment System (PAS) – Purpose | 59 |
| Task 41: | Use of Personnel Assessment System (PAS) | 63 |
| Task 42: | Field Training Program | 69 |
| Task 43: | Academy and In-Service Training | 75 |
| Task 45: | Consistency of Discipline Policy | 79 |

## Section Three

| | |
|---|---|
| *Conclusion* | 82 |

## Appendices

| | |
|---|---|
| *A: Cumulative Key Indicator Data* | 83 |
| *B: Selective Inactive Task Assessments* | 84 |
| *C: Acronyms* | 87 |

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 2

# Section One

## Introduction

This is the seventeenth quarterly report of the Monitor of the Negotiated Settlement Agreement (NSA) in the case of *Delphine Allen, et al., vs. City of Oakland, et al.,* in the United States District Court for the Northern District of California.  In January 2010, under the direction of Judge Thelton E. Henderson, the Parties agreed to my appointment as Monitor of the Oakland Police Department (OPD).  In this capacity, I oversee the monitoring process that began in 2003 under the previous monitor.  The current Monitoring Team conducted our seventeenth quarterly site visit from February 10, through February 14, 2014, to evaluate the Department's progress with the NSA during the three-month period of October 1, through December 31, 2013.

In the body of this report, we again report the compliance status with the remaining active Tasks of the Agreement.  By the end of the seven-year tenure of the previous monitor, the Department was in full compliance with 32 of the 51 required Tasks, and in partial compliance with 16 additional Tasks.  As a result, the Parties agreed to reduce the number of Tasks under "active" monitoring to the current list of 22.

During this reporting period, we continue to find the Department in Phase 1, or policy compliance, with all 22 of the remaining active Tasks.  With regard to Phase 2, or full compliance, we find that OPD is in compliance with 16 of the 22 remaining Tasks, and in partial compliance with six Tasks.  This is the highest number of Tasks in compliance that we have found since the beginning of our tenure.  These overall numbers reflect a change from *partial compliance* to *in compliance* with Task 33, Reporting Misconduct; and Task 37, Internal Investigations - Retaliation Against Witnesses.  During the last (sixteenth) reporting period, we found the Department in Phase 2 compliance with 14 Tasks, and in partial compliance with eight Tasks.

In our last quarterly report, we noted our disappointment over the decline in compliance levels by one Task following three straight quarters of improvement.  We are pleased to see that OPD is back on track and, in this report, has achieved its *highest level of compliance* since the beginning of our tenure.  The movement forward has also come in a broad area about which we have expressed concern in the past.  It is critically important that officers can objectively review the conduct of peers – and that the Department can engage in an effective process of self-correction.  The ability to recognize and correct problematic behavior is fundamental under the terms of the NSA.  Movement forward in this area is suggested by the improvements in officers reporting misconduct by their peers and prohibiting retaliation of any kind against officers or other employees for addressing poor conduct by other employees.

Having noted this progress, we must also note that it is not at all complete.  The Department has not yet achieved compliance with several other Tasks that address the oversight of officer behavior.  The review of uses of force through the Force Review Board and the Executive Force

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 3

Review Board remain problematic.  The status of the two Tasks related to the risk management system is now connected to the improvements in data collection, particularly with arrests and in the development of the new PAS database.  Another Task, related to officers' reports of stops, is also not yet in compliance – although we acknowledge that the recent public release of the Stop Data Report is an important step forward.

While there is still work to be done, the Mayor's active engagement in the process, coupled with the Department's earnest attempts to be transparent with the findings, constitute a new willingness to subject to public discourse a core issue of the NSA.  The City's imminent retention of a subject matter expert for the Department will assist the Department in better understanding behaviors and outcomes.  We are hopeful that this will lead to decisions that facilitate sustainable reforms and meaningful pubic dialogue.

Interim Chief Whent and his Executive Team are to be credited for their attention to the importance of this undertaking, and their commitment to making the Department an agency capable of sustained reforms in its police practices.

Chief (Ret.) Robert S. Warshaw
*Monitor*


**Monitoring Team:**
Chief (ret.) Charles D. Reynolds
*Deputy Monitor*

Lt. Colonel (ret.) J. Rick Brown
Robin Busch-Wheaton
Eric P. Daigle, Esq.
Commander (ret.) John M. Girvin
John M. Klofas, Ph.D.
Assistant Director (ret.) Joseph R. Wolfinger

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 4

## *Compliance Assessment Methodology*

The body of this report is comprised of our assessments of compliance with the individual requirements of the 22 active Tasks of the NSA.  Each requirement is followed by information about the compliance status of the requirement during our previous reporting period, a discussion regarding our assessments and the current status of compliance, a summary notation of Phase 1 and Phase 2 compliance (see below), and our planned next steps in each area.

The Monitor's primary responsibility is to determine the status of the Oakland Police Department's compliance with the requirements of the 22 active Tasks.  To accomplish this, the Monitoring Team makes quarterly visits to Oakland to meet with OPD's Office of Inspector General (OIG) and other Department personnel – at the Police Department, in the streets, or at the office that we occupy when onsite in the City.  We also observe Departmental practices; review Department policies and procedures; collect and analyze data using appropriate sampling and analytic procedures; and inform the Parties and, on a quarterly basis, the Court, with information about the status of OPD's compliance.

Our Team determines compliance through an examination of policies and implementation of practices that are relevant to each of the active Tasks.  First, we determine if the Department has established an appropriate policy or set of procedures to support each requirement.  Following this, we determine if the Department has effectively implemented that policy.

Based on this process, we report the degree of compliance with requirements on two levels.  First, we report if the Department has met policy compliance.  Compliance with policy requirements is known as **Phase 1 compliance,** and the Department achieves it when it has promulgated appropriate policies and trained relevant Department members or employees in their content.  Second, we report on the extent to which the Department has implemented the required policies.  Implementation-level compliance is reported as **Phase 2 compliance.**  In general, to achieve full compliance, the Department must achieve both Phase 1 and Phase 2 compliance; that is, an appropriate policy must be adopted, trained to, and operationally implemented.

Our conclusions with regard to Phase 1 or Phase 2 compliance will fall into the following categories:

- **In compliance**:  This is reported when policy requirements are met (Phase 1) or effective implementation of a requirement has been achieved (Phase 2).

- **Partial compliance**:  This is reported when at least one, but not all, requirements of a Task have achieved compliance, showing progress toward full compliance.  Tasks will remain in partial compliance as long as we determine there is continued progress toward reaching substantial, or full, compliance.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 5

- **Not in compliance**:  This is reserved for instances where partial compliance has not been achieved and no progress has been made.

Many sub-requirements of the 22 active Tasks require the analysis of multiple instances of activity, cases, or observations.  In these circumstances, our analysis is based on a review of all cases or data, or, when appropriate, on statistically valid samples of the population.  To reach our conclusions based on analyses of cases, the Department must meet a minimal standard.  The Parties have agreed upon these compliance standards, which range from 85% to 95%, or a Yes/No standard.

This methodology supports a sound and rigorous review of the Department's compliance with the requirements of the 22 active Tasks.  We recognize, however, that the high demands of this methodology may not be fully realized in all elements of all reviews.  There will be circumstances in which we will be unable to determine fully the compliance status of a particular requirement due to a lack of data, incomplete data, or other reasons that do not support the completion of our work in a manner consistent with timely reporting.  Under such circumstances, we will opt not to compromise our methodology by forcing a conclusion regarding compliance levels.  Instead, we will report a finding as **"Deferred."**  This finding is not intended to reflect negatively on the Department or to otherwise imply insufficient progress.  In such circumstances, we expect that a more complete assessment of compliance in the area in question will be determined in our next report.

Our compliance assessment methodology directs the Monitoring Team in our work and underlies the findings presented in this report.  We fully expect that this methodology will govern our work throughout our tenure in this project.  Any consideration of revision or change of this methodology will be presented to the Parties and the Court.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 6

## *Executive Summary*

This is the seventeenth report of the Monitoring Team in the case of *Delphine Allen, et al., vs. City of Oakland, et al.*  From February 10, through February 14, 2014, we conducted our seventeenth site visit to Oakland.  As we do during each site visit, we met with several Department officials, including the Chief and Assistant Chief of Police and Deputy Chiefs; as well as personnel from the Office of Inspector General (OIG), Bureau of Field Operations (BFO), Bureau of Investigations (BOI), Bureau of Services (BOS), Internal Affairs Division (IAD), Training Section, and Communications Section; OPD officers, managers, supervisors, and commanders – including sergeants, lieutenants, and captains.  We also conferred with the Plaintiffs' attorneys, City Administrator, and Office of the City Attorney (OCA).  During and since the time of our site visit, we attended Department meetings and technical demonstrations; reviewed Departmental policies; conducted interviews and made observations in the field; and analyzed OPD documents and files, including misconduct investigations, use of force reports, crime and arrest reports, Stop Data Forms, and other documentation.

For the quarter under review, we once again found OPD in Phase 1 compliance with all 22 of the remaining active Tasks.  The Department is in Phase 2 compliance with 16 (73%) of the 22 active Tasks and in partial compliance with six (27%) Tasks.  This report shows an increase in compliance levels by two Tasks from the last reporting period.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 7

| Task | Phase 1: Policy and Training | Phase 2: Implementation | | | |
|---|---|---|---|---|---|
| | In Compliance | In Compliance | Partial Compliance | Not in Compliance | Deferred |
| Task 2: Timeliness Standards and Compliance with IAD Investigations | √ | √ | | | |
| Task 3: IAD Integrity Tests | √ | √ | | | |
| Task 4: Complaint Control System for IAD and Informal Complaint Resolution Process | √ | √ | | | |
| Task 5: Complaint Procedures for IAD | √ | √ | | | |
| Task 6: Refusal to Accept or Refer Citizen Complaints | √ | √ | | | |
| Task 7: Methods for Receiving Citizen Complaints | √ | √ | | | |
| Task 16: Supporting IAD Process - Supervisor/ Managerial Accountability | √ | √ | | | |
| Task 18: Approval of Field-Arrest by Supervisor | √ | √ | | | |
| Task 20: Span of Control for Supervisors | √ | | √ | | |
| Task 24: Use of Force Reporting Policy | √ | √ | | | |
| Task 25: Use of Force Investigations and Report Responsibility | √ | √ | | | |
| Task 26: Force Review Board (FRB) | √ | | √ | | |
| Task 30: Executive Force Review Board (EFRB) | √ | | √ | | |
| Task 33: Reporting Misconduct | √ | √ | | | |
| Task 34: Vehicle Stops, Field Investigation, and Detentions | √ | | √ | | |
| Task 35: Use of Force Reports – Witness Identification | √ | √ | | | |
| Task 37: Internal Investigations - Retaliation Against Witnesses | √ | √ | | | |
| Task 40: Personnel Assessment System (PAS) – Purpose | √ | | √ | | |
| Task 41: Use of Personnel Assessment System (PAS) | √ | | √ | | |
| Task 42: Field Training Program | √ | √ | | | |
| Task 43: Academy and In-Service Training | √ | √ | | | |
| Task 45: Consistency of Discipline Policy | √ | √ | | | |
| *Total Tasks* | 22 | 16 | 6 | 0 | 0 |

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 8

# Section Two

## *Compliance Assessments*

## Task 2:  Timeliness Standards and Compliance with IAD Investigations

Requirements:
*Fairness to complainants, members/employees and the public requires that internal investigations be completed in a timely fashion.*

> 1. *On or before December 1, 2003, OPD shall develop policies regarding timeliness standards for the completion of Internal Affairs investigations, administrative findings and recommended discipline.*
> 2. *Compliance with these timeliness standards shall be regularly monitored by IAD command and the Department's command staff.  If IAD experiences an unusual proliferation of cases and/or workload, IAD staffing shall be increased to maintain timeliness standards.*

(Negotiated Settlement Agreement III. B.)

Background:
During the last reporting period, we found OPD in compliance with Task 2.  Per Departmental policy, in order to be considered timely, at least 85% of Class I misconduct investigations and at least 85% of Class II misconduct investigations must be completed within 180 days.[1]

Discussion:
As previously reported, OPD published Departmental General Order M-03, *Complaints Against Department Personnel and Procedures*, which incorporates the requirements of Task 2, on December 6, 2005.  General Order M-03 was revised in February 2008, and again in June 2013.  The revised policy also incorporates the requirements of Task 2.  As the Department has trained at least 95% of relevant personnel on this revised policy, we find OPD in continued Phase 1 compliance with this Task.

**Task 2.1** requires that internal investigations (IAD and Division Level) – including review, approval, findings, and discipline – be completed in accordance with the timeliness standards developed by OPD (compliance standard:  85%).  To assess this subtask, we reviewed a list of all internal investigations resulting in formal findings (unfounded, sustained, exonerated, or not sustained) that were approved between October 1, and December 31, 2013, and calculated the number of days between the complaint date and the approval date for each case.  We excluded from the dataset cases that were administratively closed, those that involved on-duty traffic

---

[1] OPD classifies misconduct as either "Class I" or "Class II."  Per DGO M-03, Class I offenses "are the most serious allegations of misconduct and, if sustained, shall result in disciplinary action up to and including dismissal and may serve as the basis for criminal prosecution."  Class II offenses include "all minor misconduct offenses."

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 9

accidents or service complaints, and those that did not involve Manual of Rules (MOR) violations.  We segregated the remaining cases into Class I or Class II categories.  If a case involved at least one alleged Class I violation, we classified it as Class I.

As noted above, Departmental policy requires that investigations be completed within 180 days.  Of the 70 Class I cases we reviewed, 65, or 93%, were in compliance with established timelines – a slight increase from the 91% we found during the last reporting period.  Eight of the Class I cases were completed in exactly 180 days, and 41 cases were completed in between 170 and 179 days.  Of the 109 Class II cases we reviewed, 104, or 95%, were in compliance with established timelines – a decrease from the 99% we found during the last reporting period.  Seven of the Class II cases were completed in exactly 180 days, and 65 cases were completed in between 170 and 179 days.  Of the 31 sustained findings that we reviewed, all (100%) were in compliance with established discipline timelines.[2]  This was the same percentage that we found during the last reporting period.

OPD is in compliance with Task 2.1.

**Task 2.2** requires that IAD and OPD command staff regularly monitor compliance with these timeliness standards (compliance standard:  Yes/No).  The primary responsibility for monitoring compliance with timeliness standards rests with IAD, which generates weekly reports listing the Department's open investigations and critical deadlines for investigations retained in IAD and those handled at the Division level.  The reports are distributed to IAD command staff and the respective Bureau Deputy Chiefs.

In addition to the reports, the IAD Commander discusses pending deadlines for key open investigations during IAD's weekly meetings with the Chief; the deadlines are also reflected in written agendas for these meetings.  IAD also occasionally, as needed, emails individual reminders on cases approaching due dates to investigators and their supervisors.  During this reporting period, we received and reviewed copies of individual Bureau and Department-wide Open Investigation Reports, Cases Not Closed Reports, 180-Day Timeline Reports, and agendas for the weekly meetings between the Chief and IAD staff.  The content of these documents demonstrates active monitoring of case timeliness.  A Monitoring Team representative occasionally attends and observes these weekly meetings.  The Department is in compliance with Task 2.2.

**Task 2.3** requires that if IAD experiences an unusual proliferation of cases and/or workload, IAD staffing be increased to maintain timeliness standards (compliance standard:  Yes/No).  During the current reporting period, IAD opened 227 cases, a decrease of 89 cases from the last reporting period.  The Chief approved 407 cases, a decrease of 102 cases from the last reporting period.  The Department attributes these reduced numbers to the implementation of the revised DGO M-03.  In addition, during this reporting period, OPD transferred five contractors from IAD.  OPD is in compliance with Task 2.3.

---

[2] We reviewed 14 cases involving sustained findings; several cases involved more than one sustained finding.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 10

OPD is in Phase 2 compliance with Task 2.


Compliance Status:
Phase 1:  In compliance
Phase 2:  In compliance


Next Steps:
During the next reporting period, we will again confer with IAD command staff regarding
workload trends and staffing requirements.



# Task 3:  IAD Integrity Tests


Requirements:
*IAD shall be proactive as well as reactive.*
>    1.    *IAD shall conduct integrity tests in situations where members/employees are the
>          subject of repeated allegations of misconduct.*
>    2.    *IAD shall have frequency standards, among other parameters, for such integrity
>          tests.*

(Negotiated Settlement Agreement III. C.)


Background:
OPD has been in compliance with this Task since the sixth reporting period.


Discussion:
As previously reported, on January 25, 2007, OPD published Internal Affairs Policy &
Procedures 07-01, *Integrity Testing,* which incorporates the requirements of this Task.  The
Department updated this policy in January 2009.  The revised policy also incorporates the
requirements of Task 3.  As the Department has trained at least 95% of relevant personnel on this
revised policy, we find OPD in continued Phase 1 compliance with this Task.

**Task 3.1** requires that IAD conduct integrity tests in situations where members/employees are
the subject of repeated allegations of misconduct (compliance standard:  Yes/No); and **Task 3.2**
requires that IAD's integrity tests be conducted in accordance with the frequency standards and
other parameters IAD has established (compliance standard:  90%).

To assess the Department's Phase 2 compliance with these subtasks, we reviewed files –
including operations plans, after-action reports, supporting documents, and evidence – related to
the 12 integrity tests that were conducted from October 1 through December 31, 2013.  Our
review focused on the scope of the investigations, whether OPD conducted integrity tests on
members and employees who were the subject of repeated allegations, and whether the selective
integrity tests that OPD conducted complied with the parameters established by IAD.  Of the 12
tests conducted during this reporting period, five were planned tests, in which the Integrity

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 11

Testing Unit reviewed the records of OPD members and employees to verify that their vital information and records were current and, therefore, followed Departmental policy.[3]  We found that all five planned tests focused on individual members and employees of OPD who were the subjects of high numbers of allegations of misconduct over the prior 18 months; all five planned tests passed.

The remaining seven integrity tests were selective tests, focusing on whether the officers who were subjects of the test failed to adhere to OPD policies.[4]  Two of these tests were conducted on officers who were the subjects of repeated allegations, and addressed the sources of the repeated allegations.  Of the seven selective tests, six passed and one of the tests failed administratively.

The selective tests during this reporting period covered a broad range of topics.  They included four tests that evaluated the use of Personal Digital Recording Devices (PDRDs) by OPD members.  The first of these was conducted following a complaint from the Alameda County Public Defender's Office alleging that an officer falsified his reports and took an illegal statement.  The ITU reviewed PDRD footage for the subject officer and compared it to written offense reports for accuracy, but did not discover any discrepancies.  In two others, the ITU randomly reviewed videos and corresponding reports of officers assigned to "specialty units" to ensure that officers were activating their PDRDs when required.  The ITU found that PDRD recordings were properly documented in corresponding police reports.  The fourth of these focused on an officer who had a high number of allegations of misconduct over the prior 18 months.  ITU reviewed the officer's PDRD footage, offense reports, and CAD notes to ensure that the officer appropriately conducted himself and documented his calls for service.  The ITU found that the officer failed to conduct proper preliminary investigations on three occasions.  As a result, the test failed administratively, and the discovered deficiencies were referred to the officer's chain of command.

Another selective test focused on the review of six completed background investigations for Police Officer Trainees who were currently in the Academy class.  The ITU conducted additional cyber-vetting, and found no damaging information.

An additional test focused on ensuring that officers were providing OPD informational business cards (IBCs), as required by the revised DGO M-03, and found that officers were providing the cards to citizens in accordance with Department policy.

The final test selected an officer who has a pattern of complaints related to his conduct to review his patrol history, submitted reports, and PDRD recordings to ensure that he was properly investigating crimes and in compliance with Department policy.  The ITU did not discover any policy violations in the review.

---

[3] Planned integrity tests are designed specifically to test the compliance – with Departmental policies or procedures – of specific members or employees who are identified as the subject of the test.
[4] Pursuant to Internal Affairs Policy & Procedures 07-01, selective integrity tests are targeted enforcement tools aimed at addressing specific issues regarding specific members, employees, or units.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 12

OPD is in Phase 2 compliance with Task 3.

Compliance Status:
Phase 1:  In compliance
Phase 2:  In compliance

Next Steps:
During our next site visit, we will again meet with ITU and the IAD Commander to discuss the Integrity Testing Unit and its testing.


# Task 4:  Complaint Control System for IAD and Informal Complaint Resolution Process

Requirements:

1. *Within 90 days, OPD shall develop a policy regarding an informal complaint resolution process which may be used by supervisors and IAD to resolve service complaints and Class II violations that do not indicate a pattern of misconduct as described in Section III, paragraph H (2).  This process shall document the receipt of the complaint, date, time, location, name or the person making the complaint, the name of the person receiving the complaint, how the matter was resolved and that the person making the complaint was advised of the formal complaint process with the CPRB.  The documentation shall be forwarded to an IAD Commander for review.  If the informal complaint resolution process fails to resolve the complaint or if the person making the complaint still wishes to make a formal complaint, the person receiving the complaint shall initiate the formal complaint process pursuant to Section III, paragraph E.  An IAD Commander shall make the final determination whether the ICR process will be utilized to resolve the complaint.  OPD personnel shall not unduly influence persons making a complaint to consent to the informal complaint resolution process.*

2. *IAD shall establish a central control system for complaints and Departmental requests to open investigations.  <u>Every complaint received by any supervisor or commander shall be reported to IAD on the day of receipt.  If IAD is not available, IAD shall be contacted at the start of the next business day.</u>  Each complaint shall be assigned an Internal Affairs case number and be entered into a complaint database with identifying information about the complaint.  OPD personnel shall notify IAD and the Chief of Police, or designee, as soon as practicable, in cases likely to generate unusual public interest.*

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 13

> 3.  *Criteria shall be established which must be met prior to moving, from "open" to "closed," any investigation in the complaint database.*[5]

(Negotiated Settlement Agreement III. D.)

Background:

Only two provisions of Task 4 (4.7 and 4.10) are being actively monitored under the MOU. During all of the previous reporting periods, we found OPD in compliance with both of these requirements.  Overall, we found that complaints received by any supervisor or commander were reported to IAD on the day of receipt or at the start of the next business day.  We also found that OPD complied with criteria it has established when resolving complaints via informal complaint resolution, administrative closure, or summary finding.

Discussion:

There are four Departmental policies that incorporate the requirements of Tasks 4.7 and 4.10:

- **Department General Order M-03:**  As previously reported, OPD published Department General Order M-03, *Complaints Against Department Personnel and Procedures*, on December 6, 2005.  General Order M-03 was revised in February 2008, and again in June 2013.  The revised policy also incorporates the requirements of these subtasks.

- **Department General Order M-3.1:**  As previously reported, OPD published Department General Order M-3.1, *Informal Complaint Resolution Process,* which incorporates the requirements of these subtasks, on December 6, 2005.  General Order M-3.1 was revised in February 2008, and August 2008.  The revised policy also incorporates the requirements of these subtasks.

- **Special Order 8552:**  As previously reported, OPD published Special Order 8552, *Update of Departmental Training Bulletin V-T.1, Internal Investigation Procedure Manual*, on February 1, 2007.  This policy incorporates the requirements of these subtasks.

- **Communications Division Policy & Procedures C-02:**  As previously reported, OPD published Communications Division Policy & Procedures C-02, *Receiving and Logging Complaints Against Personnel and Use of Force Incidents,* on April 6, 2007.  This policy incorporates the requirements of these subtasks.

As the Department has trained at least 95% of relevant personnel on these policies, we find OPD in continued Phase 1 compliance with this Task.

---

[5] The underlined requirements are the only provisions of Task 4 that are being actively monitored under the MOU.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 14

**Task 4.7** requires that every complaint received by any supervisor or commander be reported to IAD on the day of receipt (compliance standard: Yes/No). If IAD is not available, the supervisor or commander shall contact IAD at the start of the next business day. To assess Phase 2 compliance for Task 4.7, we reviewed 92 Daily Incident Log (DIL) entries and a random sample of 73 IAD case files that were approved during the period of October 1, through December 31, 2013. The Office of Inspector General forwards completed DILs to us on a daily basis. We found no evidence of unwarranted delay in the delivery of these complaints or in the intake process once IAD was made aware of them. OPD is in compliance with Task 4.7.

**Task 4.10** requires that OPD comply with criteria it has established when resolving complaints through informal complaint resolution (ICR), administrative closure, or summary finding (compliance standard: 90%).[6] This subtask is intended to ensure that OPD provides the proper level of investigation for each complaint, and does not resolve meritorious complaints of misconduct without determining – and documenting – whether the OPD member or employee committed misconduct.

During this reporting period, from a sample of IAD cases that were approved between October 1, and December 31, 2013, we reviewed 11 cases in which at least one allegation was resolved via administrative closure, nine cases in which at least one allegation was resolved via informal complaint resolution (ICR), and 10 cases in which at least one allegation was resolved via summary finding.

In all but one of the ICRs we reviewed, the complainants agreed to the informal complaint resolution process. Where an agreement was secured in a telephone conversation, that information was contained in the case documentation (in many cases, the exact minute/second mark of the agreement was recorded) and in follow-up letters to the complainants. Six of the cases involved allegations of poor demeanor. In another case, the complainant was dissatisfied that the officers did not exit their vehicle during their response to the complainant's call for service. In another case, the complainant alleged that her cell phone was misplaced during the detention and booking process.

As mentioned above, in one case the complainant did not agree to the ICR process. The complainant alleged that an officer was talking on a cell phone while driving. The caller did not provide an address, and he failed to answer several return calls from OPD. The case was informally resolved pursuant to policy M-3.1, Section III.A.1.b, which affords the IAD Commander the discretion to invoke the process. Documentation was provided that the officer was counseled.

The administrative closures that we reviewed were investigated before IAD arrived at the determination that such a closure comported with policy. Four cases were administratively closed because they only involved complaints of delayed response times. Five cases were

---

[6] Summary findings are investigations in which the Department believes a proper conclusion can be determined based on a review of existing documentation with limited or no additional interviews and follow-up.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 15

administratively closed because they did not involve MOR violations.  For example, in one, a citizen apparently suffering from mental illness was taken into protective custody.  She indicated that she wanted to lodge a complaint against one of the responding officers, but when a sergeant responded, she indicated that she had no complaint and only wanted to be transported to a hospital.  In another, the complainant was upset that he received redacted reports in response to his records request.  His concerns were satisfied in a follow-up call by Records Section personnel.

One case involved an allegation that an officer failed to make an arrest in a domestic violence case 13 years ago.  Not only was the complaint untimely; the involved officers are no longer with the Department.

The remaining allegations that were administratively closed comported with policy, in that the complaints either lacked specificity, claimed innocence of charges best left to appropriate adjudication venues to decide, or otherwise did not constitute MOR violations.  Where they were accompanied by allegations that warranted a full investigation, these additional allegations were investigated in accordance with policy.  We also identified several administrative closures in our Task 7.3 (Anonymous Complaints) review, and they are further discussed in that section.

The cases resolved via summary finding were approved for such designation as required by policy.  In all of these cases, the interactions between officers and citizens were recorded on PDRDs, negating the need to interview all of the involved officers.  In three of the cases, the complainants alleged improper or false arrests.  In three others, excessive force was alleged, and in three others, the complainants complained of perceived improper searches.  Summary findings are further discussed in Task 5.

OPD is in compliance with Task 4.10.

OPD is in Phase 2 compliance with Task 4.

Compliance Status:
Phase 1:  In compliance
Phase 2:  In compliance

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 16

# Task 5:  Complaint Procedures for IAD

Requirements:

1. *On or before December 1, 2003, OPD shall develop a policy so that, OPD personnel who become aware that a citizen wishes to file a complaint shall bring such citizen immediately, or as soon as circumstances permit, to a supervisor or IAD or summon a supervisor to the scene.  If there is a delay of greater than three (3) hours, the reason for such delay shall be documented by the person receiving the complaint.  In the event that such a complainant refuses to travel to a supervisor or to wait for one, the member/employee involved shall make all reasonable attempts to obtain identification, including address and phone number, as well as a description of the allegedly wrongful conduct and offending personnel, from the complainant and any witnesses.  This information, as well as a description of the complaint, shall immediately, or as soon as circumstances permit, be documented on a Complaint Form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander, and shall be treated as a complaint.  The supervisor or appropriate Area Commander notified of the complaint shall ensure the Communications Division is notified and forward any pertinent documents to the IAD.*

2. *An on-duty supervisor shall respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest.  The supervisor shall ensure the Communications Division is notified and forward any pertinent documents to the IAD.  All other misconduct complaints, by a jail inmate shall be handled in the same manner as other civilian complaints.*

3. *In each complaint investigation, OPD shall consider all relevant evidence, including circumstantial, direct and physical evidence, and make credibility determinations, if feasible.  OPD shall make efforts to resolve, by reference to physical evidence, and/or use of follow-up interviews and other objective indicators, inconsistent statements among witnesses.*

4. *OPD shall develop provisions for the permanent retention of all notes, generated and/or received by OPD personnel in the case file.*

5. *OPD shall resolve each allegation in a complaint investigation using the "preponderance of the evidence" standard.  Each allegation shall be resolved by making one of the following dispositions:  Unfounded, Sustained, Exonerated, Not Sustained, or Administrative Closure.  The Department shall use the following criteria for determining the appropriate disposition:*

    a. *Unfounded:  The investigation disclosed sufficient evidence to determine that the alleged conduct did not occur.  This finding shall also apply when individuals named in the complaint were not involved in the alleged act.*

    b. *Sustained:  The investigation disclosed sufficient evidence to determine that the alleged conduct did occur and was in violation of law and/or Oakland Police Department rules, regulations, or policies.*

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 17

    c.    *Exonerated: The investigation disclosed sufficient evidence to determine that the alleged conduct did occur, but was in accord with law and with all Oakland Police Department rules, regulations, or policies.*

    d.    *Not Sustained: The investigation did not disclose sufficient evidence to determine whether or not the alleged conduct occurred.*

    e.    *Administrative Closure: The investigation indicates a service complaint, not involving an MOR violation, was resolved without conducting an internal investigation; OR*

    f.    *To conclude an internal investigation when it has been determined that the investigation cannot proceed to a normal investigative conclusion due to circumstances to include but not limited to the following:*

        1)    *Complainant wishes to withdraw the complaint and the IAD Commander has determined there is no further reason to continue the investigation and to ensure Departmental policy and procedure has been followed;*

        2)    *Complaint lacks specificity and complainant refuses or is unable to provide further clarification necessary to investigate the complaint;*

        3)    *Subject not employed by OPD at the time of the incident; or*

        4)    *If the subject is no longer employed by OPD, the IAD Commander shall determine whether an internal investigation shall be conducted.*

        5)    *Complainant fails to articulate an act or failure to act, that, if true, would be an MOR violation; or*

        6)    *Complaints limited to California Vehicle Code citations and resulting tows, where there is no allegation of misconduct, shall be referred to the appropriate competent authorities (i.e., Traffic Court and Tow Hearing Officer).*

    g.    *Administrative Closures shall be approved by the IAD Commander and entered in the IAD Complaint Database.*

6.    *The disposition category of "Filed" is hereby redefined and shall be included under Administrative Dispositions as follows:*

    a.    *An investigation that cannot be presently completed. A filed investigation is not a final disposition, but an indication that a case is pending further developments that will allow completion of the investigation.*

    b.    *The IAD Commander shall review all filed cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed and may direct the closure or continuation of the investigation.*

7.    *Any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken. However, investigators, with the approval of an IAD Commander, are not required to interview and/or take a recorded statement from a member or*

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 18

> *employee who is the subject of a complaint or was on the scene of the incident when additional information, beyond that already provided by the existing set of facts and/or documentation, is not necessary to reach appropriate findings and conclusions.*

(Negotiated Settlement Agreement III. E.)

Background:

During the last two reporting periods, we found OPD in compliance with Task 5. In each of the prior reporting periods, we found the Department in partial compliance with Task 5.[7]

Discussion:

There are several Departmental policies that incorporate the various requirements of Task 5:

- **Departmental General Order M-03:** As previously reported, OPD published Departmental General Order M-03, *Complaints Against Department Personnel and Procedures*, on December 6, 2005. General Order M-03 was revised in February 2008, and again in June 2013. (The revised policy also incorporates the requirements of Task 5.)

- **Communications Division Operations & Procedures C-02:** As previously reported, OPD published Communications Division Policy & Procedures C-02, *Receiving and Logging Complaints Against Personnel and Use of Force Incidents,* on April 6, 2007.

- **Training Bulletin V-T.1:** As previously reported, OPD published Training Bulletin V-T.1, *Internal Investigation Procedure Manual,* on June 1, 2006.

- **Special Order 8270:** As previously reported, OPD published Special Order 8270, *Booking of Prisoners at the Glenn E. Dyer Detention Facility*, on June 24, 2005.

- **Special Order 8565:** As previously reported, OPD published Special Order 8565, *Complaints Against Department Personnel,* on May 11, 2007.

- **IAD Policy & Procedures 05-02:** As previously reported, OPD published IAD Policy & Procedures 05-02, *IAD Investigation Process,* on December 6, 2005.

In addition, NSA stipulations issued on December 12, 2005, and March 13, 2007, incorporate the requirements of this Task.

---

[7] Pursuant to an agreement among the Parties, Tasks 5.7- 5.11, and 5.13-5.14 are not subject to active monitoring.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 19

As the Department has trained at least 95% of relevant personnel on the above-listed policies, we find OPD in continued Phase 1 compliance with this Task.

To verify Phase 2 compliance with Tasks 5.1 through 5.5, we reviewed 92 entries that appeared on the Daily Incident Logs (DILs) that were completed between October 1, and December 31, 2013.  We identified these by randomly selecting 47 dates during this reporting period and reviewing the entries for each of those dates.

**Task 5.1** requires that when a citizen wishes to file a complaint, the citizen is brought to a supervisor or IAD, or a supervisor is summoned to the scene (compliance standard:  95%).  During the last reporting period, we found OPD in compliance with this subtask.  During the current reporting period, of the 92 DIL entries, 31 complaints were taken by supervisors in the field; and in the remaining 61 cases, complainants called 911 to express their dissatisfaction.  In these latter cases, IAD or field supervisors were notified, except when the complaints were against Communications personnel (these were handled by a Communications supervisor) or were clearly service complaints (e.g., slow response time with no specific officer complained of).  We noted 31 such service complaints.  Three of these cases, however, did not include any detail that would allow us to verify that they were appropriately classified.  We again remind OPD that the DIL entry should contain some notation as to the nature of the service complaint.  During this reporting period, OPD remains in compliance with Task 5.1.

**Task 5.2** requires that if there is a delay of greater than three hours in supervisory response, the reason for the delay be documented (compliance standard:  85%).  OPD has added a checkbox to the DIL to record such delays.  In addition to reviewing this section of the logs, we also checked the times of complaint receipt and supervisor contact with the complainant (or attempted contact where the complainant was unavailable – see Task 5.3).  We identified two cases in which there appeared to be greater than a three-hour delay in contacting the complainant.  In the first case, the sergeant assigned to contact the complainant asked that the complaint be reassigned, as he became involved in another incident that required the investigation of a use of force.  Another supervisor was assigned the complaint, but when he responded to the complainant's location, he discovered that it was a multiple unit apartment building and the complainant's apartment number was unknown.  The complainant also refused to answer the callback number provided, and was not contacted on that date.

In the second case – a complaint of reckless driving by an unknown officer – it took the assigned supervisor over three-and-one-half hours to contact the complainant, despite several attempts to do so.  Since the reasons for the delays in contacting the complainants were explained in each of these instances, OPD remains in compliance with Task 5.2.

**Task 5.3** requires that where a complainant refuses to travel to a supervisor, or wait for one, personnel make all reasonable attempts to obtain specific information to assist in investigating the complaint (compliance standard:  90%).  Of the 92 records in our dataset, we identified three instances in which the complainant "refused" interaction with a supervisor.  In one case,

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 20

described above, the complainant did not answer the callback number provided.  In the other two cases, the complainants refused to provide phone numbers or addresses to facilitate a contact by a supervisor.  OPD is in compliance with Task 5.3.

**Task 5.4** requires that specific information be documented on a complaint form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander (compliance standard:  85%).  In order to achieve compliance with this subtask, the DIL should contain the identification of personnel; witnesses or identifying information, if known (the log should state "unknown" if not known); the date, time, and location of the incident; and the time of contact or attempt to contact the complainant by a supervisor.

During the last reporting period, OPD had a 100% compliance rate with this subtask.  During this reporting period, all of the logs we reviewed contained the required information ("unknown" was checked in 17 records).  OPD has a 100% compliance rate during this reporting period, and is in compliance with Task 5.4.

**Task 5.5** requires that the supervisor or Area Commander notify Communications and forward any pertinent documents to IAD (compliance standard:  95%).  OPD had a compliance rate of 100% with this subtask during the last reporting period.  The DILs are administered by the Communications Section and forwarded to IAD each business day.  Additionally, the DIL contains a field to record the name of Area Commander notified and the time of notification.  This field was properly completed in all of the records we reviewed.  OPD is in 100% compliance with Task 5.5 during this reporting period.

**Task 5.6** requires that an on-duty supervisor respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest of the inmate.  To assess Task 5.6 during this reporting period, we reviewed all complaints that appeared to have originated from North County Jail, Santa Rita Jail, Glenn E. Dyer Detention Facility, or Juvenile Hall, and were approved between October 1, and December 31, 2013.  We identified four such complaints using the IAD database.  We reviewed these complaints for two triggering events:  an allegation of Class I misconduct; and the complaint lodged at the time of arrest.  If both of these were not present, the case was deemed in compliance if it was "handled in the same manner as other civilian complaints."

Two of the four complaints were lodged contemporaneous to the arrest of the complainants, but neither of these contained at least one allegation of Class I misconduct.  We note, however, that in both of these incidents, on-duty supervisors responded and interviewed the complainants.  In one, the complainant alleged that she was falsely arrested for assault.  She was arrested for a domestic violence offense under OPD's mandatory arrest policy, even though the victim declined to prosecute.  A supervisor responded to the North County Jail and took her complaint.  In the other, an individual arrested on a warrant attempted to assault the arresting officers in the North County Jail as his handcuffs were being removed.  The subject suffered minor injuries while being subdued by the officers and Alameda County jail deputies.  A supervisor responded to Highland Hospital and took a complaint of excessive force from the complainant.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 21

Two complaints were not lodged contemporaneous with the arrests of the complainants.  In one, the complainant alleged that 22 years ago, an officer asked her to expose herself while she was being transported to jail.  Despite the extreme length of time between the alleged incident and the lodging of the complaint, OPD conducted full investigation.  In the other case, the complainant alleged that while being transported to jail in a patrol wagon five years ago, the driver stopped abruptly, causing the complainant to injure his neck.  This case was administratively closed, as the complainant could not provide more specific information and investigators could not confirm an incident involving the complainant around that timeframe by a search of OPD's databases.

OPD is in compliance with Task 5.6.

**Task 5.12** requires that the Watch Commander ensure that any complaints that are applicable to Task 5.6 are delivered to and logged with IAD (compliance standard: 90%).  Since by definition these complaints must be made contemporaneous with the arrest, an on-duty supervisor must respond to the jail.  Under current policy, the Communications Section must record on the DIL complaints that are received and/or handled by on-duty supervisors; the DIL is forwarded daily to IAD.  As mentioned in past reports, we deem the DIL system as functionally equivalent to the requirements of Task 5.12, and the Department remains in compliance with this subtask.

To assess **Tasks 5.15 through 5.19**, and **Task 5.21**, we reviewed a random sample of 25 IAD cases that were approved between October 1, and December 31, 2013.  This sample included investigations completed by IAD and Division-level investigations (DLIs)  It also included cases that were resolved via formal investigation and investigations that were resolved via summary finding.

As in our previous reviews, we treated **Tasks 5.15 and 5.16** as a single subtask with several elements, specifically that OPD:  gathers all relevant evidence; conducts follow-up interviews where warranted; adequately considers the evidence gathered; makes credibility assessments where feasible; and resolves inconsistent statements (compliance standard: 85%).  During the previous assessment period, we deemed the Department in compliance with *all* of these required elements 92% of the time.  Of the 25 investigations we reviewed for this reporting period, we deemed 25, or 100%, in compliance with *all* of these required elements.  This is the first time that OPD has achieved this standard.

In three cases, investigators conducted follow-up interviews with officers or civilians to seek clarification.  In two cases, the subject officers were re-interviewed.  In the remaining case, both the complainant and the subject officer were interviewed twice.

Credibility assessments were made in 20 of the 25 cases.  The five cases without credibility assessments were handled via summary finding, and by policy, investigators are not required to assess credibility in these instances since a determination can be made without interviewing all involved.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 22

In six cases, complainants or witnesses were appropriately deemed not credible.  In four of the cases, PDRD recordings directly contradicted their statements.  In the other two cases, physical evidence and/or their own inconsistent statements appropriately called into question the credibility of some of those interviewed.

We did not identify any cases in which relevant evidence was not identified or considered during this review.

**Task 5.17** requires that OPD permanently retain all notes generated and/or received by OPD personnel in the case file (compliance standard: 85%).  OPD personnel document that all investigative notes are contained within a particular file by completing IAD Form 11 (Investigative Notes Declaration).  During the previous reporting period, we found OPD in 100% compliance with this subtask.  During this reporting period, the form was again properly completed in all 25 cases we reviewed.  OPD is in compliance with this subtask.

**Task 5.18** requires that OPD resolve each allegation in a complaint investigation using the preponderance of the evidence standard (compliance standard:  90%).  During the last reporting period, OPD complied with this subtask in 92% of the cases we reviewed.  During this reporting period, OPD complied with this subtask in 25, or 100%, of the 25 cases in our sample.  Again, this is the first reporting period in which we have determined that OPD has used the preponderance of the evidence standard appropriately in each case reviewed.  OPD's review and consideration of electronic evidence has certainly contributed to this.  In 18 of the cases we reviewed, PDRD recordings proved material to arriving at the appropriate findings.  In two other cases – allegations involving Police Communications Dispatchers – recorded phone calls were instrumental in determining the correct findings without the need for further interviews.

OPD is in compliance with Task 5.18.

**Task 5.19** requires that each allegation of a complaint is identified and resolved with one of the following dispositions:  unfounded; sustained; exonerated; not sustained; or administrative closure (compliance standard:  95%).  Our sample of 25 cases contained 52 allegations that received dispositions as follows:  14 exonerated; three not sustained; 31 unfounded; two sustained; and two administratively closed.  PDRD video continues to be used in more and more cases to arrive at definitive conclusions.  We did not disagree with any of the findings, as noted in Task 5.18.  When OPD first adopted the use of PDRDs, the majority of officers were concerned that the technology would be used to "catch" officers behaving inappropriately.  Experience has now shown that, more often than not, the recordings support that officers are acting in accord with policy.  This has resulted in the high number of exonerated and unfounded findings.

With a 100% compliance rate, OPD remains in Phase 2 compliance with this subtask.

**Task 5.20** requires that the IAD Commander review all "filed" cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 23

(compliance standard: 90%). A filed case is defined as an investigation that cannot be presently completed and is pending further developments that will allow completion of the investigation; filed is not a final disposition. As part of our review of this Task, we also review cases that are tolling. OPD defines a tolled case as an administrative investigation that has been held in abeyance in accordance with one of the provisions of Government Code Section 3304.

During our most recent site visit, we met with the Deputy Chief of the Bureau of Risk Management and the commanding officer of IAD, who advised that as of that date, no cases were classified as filed, and one case was designated as tolling. In this case, the subject officer has been out on extended medical leave and is unavailable to be interviewed. The case appeared to be tolling according to policy. Filed and tolling cases are reviewed with the Chief during his weekly IAD meetings and are listed by case number on the printed meeting agendas. OPD is in compliance with this subtask.

**Task 5.21** requires that any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken (compliance standard: 90%). However, with the approval of the IAD Commander, investigators are not required to interview and/or take a recorded statement in all cases. For example, interviews are not needed from a member or employee who is the subject of a complaint, or who was on the scene of the incident when additional information – beyond that already provided by the existing set of facts and/or documentation – is not necessary to reach appropriate findings and conclusions. Seven of the 25 cases we reviewed were resolved via summary finding, and all but one were appropriately approved for such closure. (These do not include the cases referenced in Task 4, for which summary findings were also appropriate.) In five of these cases, the availability of PDRD video was the primary reason interviews were unnecessary.

In one case involving an allegation of excessive force, we did not locate the required prior approval of an IAD commanding officer to handle the case as a summary finding. We note, however, that the case was appropriate for a summary finding based on the availability of PDRD video; the IAD lieutenant and captain approved the investigation once it was completed.

OPD is in compliance with Task 5.21.

OPD is in Phase 2 compliance with Task 5.

Compliance Status:
Phase 1: In compliance
Phase 2: In compliance

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 24

## Task 6:  Refusal to Accept or Refer Citizen Complaints

<u>Requirements:</u>

*Refusal to accept a citizen complaint, failure to refer a citizen to IAD (when that citizen can be reasonably understood to want to make a citizen's complaint), discouraging a person from filing a complaint, and/or knowingly providing false, inaccurate or incomplete information about IAD shall be grounds for discipline for any OPD member or employee.*
(Negotiated Settlement Agreement III. F.)

<u>Background:</u>
During the previous reporting period, we found the Department in Phase 2 compliance with Task 6.

<u>Discussion:</u>
As previously reported, OPD published Departmental General Order M-03, *Complaints Against Department Personnel and Procedures*, which incorporates the requirements of Task 6, on December 6, 2005.  General Order M-03 was revised in February 2008, and again in June 2013.  The revised policy also incorporates the requirements of Task 6.  The requirements of this Task are also incorporated into Manual of Rules Sections 314.07, 398.70, and 398.76.  As the Department has trained at least 95% of relevant personnel on this policy, we find OPD in continued Phase 1 compliance with this Task.

**Task 6** requires that OPD members and employees who refuse to accept a citizen complaint, fail to refer a citizen to IAD (when the citizen can be reasonably understood to want to make a citizen's complaint), discourage a person from filing a complaint, and/or knowingly provide false, inaccurate, or incomplete information to IAD, are disciplined (compliance standard:  95%).

To assess Phase 2 compliance with this Task, we reviewed a random sample of 92 Daily Incident Log entries from October 1, through December 31, 2013; and a random sample of 25 IAD investigations (conducted by both IAD and via Division-level investigation) that were closed during the same period.  We found no cases in which an allegation of Failure to Accept or Refer a Complaint went unaddressed.

We also queried the IAD database to identify any allegations of MOR 398.70-1, Interfering with Investigations; MOR 398.76-1, Refusal to Accept or Refer a Complaint; and MOR 398.76-2, Failure to Accept or Refer a Complaint; that were investigated and approved during this same time period.  We identified two such cases.  However, none of these cases resulted in sustained findings for one or more of the applicable MOR violations.

In one case, a complainant alleged that an officer used excessive force during the arrest of her sister six months prior.  She also claimed that she reported the force to other officers four months after it occurred.  The complainant and her sister are apparently well known to OPD, and they are often subjected to involuntary psychiatric holds based on their behavior.  The initial and

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 25

follow-up contacts were recorded by PDRDs, and the recordings refuted both the claim of excessive force and the failure to take a complaint.

In the other case, also involving an involuntary psychiatric hold, a sergeant reviewing PDRD footage noted that a subject asked for responding officers' names and badge numbers, and they failed to advise the supervisor of this request.  However, when the subject asked for the officers' information, she was also violently resisting her arrest – including kicking and spitting on the officers, shouting profanities, and continuously resisting until she was secured in the back of a police vehicle.  Once she was subdued, the officers appropriately called the sergeant to the scene.  When the sergeant arrived, the subject was passive and apologetic, participated in the force investigation interview, and never expressed any desire to make a complaint.  The sergeant provided her with an informational business card (IBC), should she desire to make a complaint at a later time.  The potential discovered violation of failing to take a complaint was administratively closed, and the officers were counseled that they should have advised the sergeant of the request for their names and badge numbers.

OPD remains in Phase 2 compliance with Task 6.

Compliance Status:
Phase 1:  In compliance
Phase 2:  In compliance


# Task 7:  Methods for Receiving Citizen Complaints

Requirements:
On or before December 1, 2003, OPD shall develop a policy to strengthen procedures for receiving citizen complaints:

1. IAD or Communication Division personnel shall staff a recordable toll-free complaint phone line, 24-hours a day, and receive and process complaints in accordance with the provisions of Departmental General Order M-3.  The complainant shall be advised that the call is being recorded when a complaint is taken by IAD.

2. Guidelines for filing a citizen's complaint shall be prominently posted and informational brochures shall be made available in key Departmental and municipal locations.

3. OPD shall accept anonymous complaints.  To the extent possible, OPD shall ask anonymous complainants for corroborating evidence.  OPD shall investigate anonymous complaints to the extent reasonably possible to determine whether the allegation can be resolved.

4. OPD personnel shall have available complaint forms and informational brochures on the complaint process in their vehicles at all times while on duty.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 26

> *Members/employees shall distribute these complaint forms and informational brochures when a citizen wishes to make a complaint, or upon request.*
>
> 5. *IAD shall be located in a dedicated facility removed from the Police Administration Building.*
> 6. *Complaint forms and informational brochures shall be translated consistent with City policy.*
> 7. *Complaint forms shall be processed in accordance with controlling state law.*[8]

(Negotiated Settlement Agreement III. G.)

Background:

Only one provision of Task 7 (7.3) is being actively monitored under the MOU. During the past several reporting periods, we found OPD in compliance with this Task.

Discussion:

OPD published Departmental General Order M-03, *Complaints Against Department Personnel and Procedures,* which incorporates the requirements of Task 7, on December 6, 2005. General Order M-03 was revised in February 2008, and most recently in June 2013. The revised policy also incorporates the requirements of Task 7. As the Department has trained at least 95% of relevant personnel on this revised policy, we find OPD in continued Phase 1 compliance with this Task.

To assess Phase 2 compliance with this Task, we reviewed all cases listed in the Internal Affairs Division database as originating from complainants who were "anonymous," "unknown," "refused," or any forms of those terms (such as "unk") and that were approved between October 1, and December 31, 2013. We also reviewed all complaints during this selected time period that were tagged by IAD as originating from an anonymous complainant, and complaints in which the complainant field in the database was blank, to determine whether any were made anonymously.

Based on the above-listed criteria, we identified 18 cases as potential anonymous complaints during this reporting period. After review, we determined that 15 were true anonymous complaints. Of these 15, the complainant was identified during the course of the investigation in one case. A female citizen, who would only provide her first name, alleged that she was not advised of the reason her boyfriend was arrested during a search warrant. The investigator learned her identity and followed up with her. Her complaint was unfounded based on PDRD recordings that captured her conversation with an on-scene supervisor during the warrant execution.

Six of the remaining 14 complaints were received via telephone calls to the Communications Division. Three were received via telephone calls directly to IAD. Two were reported to officers or supervisors in the field. IAD's Mobile Complaint Unit took one complaint, one was lodged via email, and one was received via U.S. Mail.

---

[8] The underlined requirement is the only provision of Task 7 that is being actively monitored under the MOU.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 27

Where possible, complainants were asked to provide corroborating evidence.  In most of the cases, the complainants terminated the contact before OPD could secure additional details of the complaint.  However, the complaints were investigated to the extent reasonably possible as required by this subtask.  IAD or field supervisors attempted to re-contact complainants if a callback number was available, even if the complainants expressly stated they wished to remain anonymous.  In one case, calling back an uncooperative complainant resulted in an additional complaint for not adhering to the complainant's request.

Thirteen of the 14 cases were closed via administrative closure.  Each met the criteria for such closure, and most lacked the details to identify the specific alleged misconduct and/or OPD personnel involved in the incidents.  Two involved complaints of poor response time to calls for service.  Two others stemmed from contacts with officers working extra-duty at Oakland Raiders football games.  Two others involved unspecified allegations of harassment and discrimination.  In another case, the anonymous caller claimed that 911 dispatchers were rude, but offered no specifics.

The last of the 14 cases was closed via summary finding.  In this case, officers pulled over and ultimately arrested a subject for outstanding warrants and possession of cocaine.  The subject's passenger, known only by a first name, claimed that the officers were racist in the manner in which the stop was conducted.  He initially indicated that he wanted to file a complaint, but he left the scene before a supervisor arrived.  The allegation of bias was unfounded based on the review of PDRD recordings which captured the officers' interactions with the subject and his friend.

OPD continues to provide citizens with informational business cards when their intent to file a complaint is unclear.  The cards contain the information necessary to file a complaint at a later time if desired, and these citizen contacts are documented in a separate log in Communications.  Like the Daily Incident Logs, these are forwarded to IAD – and the Monitoring Team – on a daily basis.  This is the second reporting period in which this system has been used, and it appears to be having the desired effect of limiting those cases in which the complaint process is invoked unnecessarily.  Informational business cards are further discussed in Task 5.

The Department remains in Phase 2 compliance with Task 7.3.

Compliance Status:
Phase 1:  In compliance
Phase 2:  In compliance

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 28

## Task 16:  Supporting IAD Process - Supervisor/Managerial Accountability

Requirements:

*On or before December 1, 2003, OPD shall develop a policy to ensure that supervisors and commanders, as well as other managers in the chain of command, shall be held accountable for supporting the IAD process.  If an IAD investigation finds that a supervisor or manager should have reasonably determined that a member/employee committed or violated a Class I offense, then that supervisor or manager shall be held accountable, through the Department's administrative discipline process, for failure to supervise, failure to review, and/or failure to intervene.*
(Negotiated Settlement Agreement III. O.)

Background:
In the last reporting period, we found the Department to be in Phase 2 compliance with Task 16.

Discussion:
As previously reported, two Department policies, Departmental General Order M-03 and Training Bulletin V-T.1, incorporate the requirements of Task 16.  OPD published Departmental General Order M-03, *Complaints Against Department Personnel and Procedures*, on December 6, 2005.  General Order M-03 was revised in February 2008, and again in June 2013.  (The revised policy also incorporates the requirements of Task 16.)  OPD published Training Bulletin V-T.1, *Internal Investigation Procedure Manual,* on June 1, 2006; and Special Order 8552, *Update of Departmental Training Bulletin V-T.1, Internal Investigation Procedure Manual*, on February 1, 2007.  As the Department has trained at least 95% of relevant personnel on these policies, we find OPD in continued Phase 1 compliance with this Task.

**Task 16.1** requires that supervisors and commanders, as well as other managers in the chain of *command*, are held accountable for supporting the IAD process (compliance standard:  Yes/No); and **Task 16.2** requires that if an IAD investigation finds that a supervisor or manager should have reasonably determined that a member/employee committed or violated a Class I offense, the supervisor or manager is held accountable, through OPD's administrative discipline process, for failure to supervise, failure to review, and/or failure to intervene (compliance standard: 90%).

To assess Task 16 during this reporting period, we examined 92 Daily Incident Log entries from October 1, through December 31, 2013; a random sample of 73 IAD cases (investigated by both IAD and via Division-level investigation, or DLI) that were approved by the Chief between October 1, through December 31, 2013; and the ten sustained Class I investigations that were approved by the Chief between October 1, through December 31, 2013.

Each of the 10 sustained Class I investigations showed acceptable analyses of supervisors' abilities to identify the sustained misconduct.  These 10 cases included three force-related cases,

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 29

two cases where PDRDs were not activated, one off-duty arrest, and four cases where officer conduct was sustained as a policy violation.

In multiple cases, the conduct discovered was failure of the officer to activate his PDRD.  In these cases, we found no evidence that a supervisor knew of the conduct prior to it being discovered.

We also reviewed multiple investigations that were initiated after supervisors reviewed officers' uses of force.  In two such cases, the investigation resulted from supervisors' review of PDRD recordings.  In one case, the supervisor was reviewing the PDRD footage during a use of force investigation based on the deployment of the officer's canine, and discovered that the officer attempted to stop a stolen vehicle that led to a crash and ultimate deployment of the canine.  The sergeant found that the canine officer delayed in activating his PDRD, and also that the officer had prior sustained violations for the same conduct.  Based on his discovery, an investigation was initiated.  Due to the injuries that a canine can cause, it is necessary to ensure PDRD activation.

In a second case, an officer had deployed his electronic control weapon, and did not make contact with the subject.  During a review of the PDRD footage, the sergeant discovered that the electronic control weapon was deployed while the subject was running along a roof; and since the roof was an elevated area, the deployment violated policy.  The supervisor initiated the IAD investigation.  In both of these cases, the supervisors discovered the conduct, and initiated the investigations, ultimately leading to sustained findings.

Other cases involved the off-duty arrest of a dispatcher for public intoxication, the discovery of possession of a controlled substance by an officer, allegations that a male officer acted inappropriately when having contact with a female civilian employee, and allegations that an officer was discourteous.  In these cases, we found no evidence that a supervisor knew of the conduct prior to it being discovered.

As we discussed with OPD during our last site visit, the investigation report's member/employee accountability section should include an analysis of whether it was reasonable for a supervisor – through reviewing reports, investigating force, or supervising an officer – to identify misconduct. A transparent organization identifies – through close and effective supervision – any possible misconduct of its members.

During this reporting period, the cases that we reviewed properly evaluated supervisors' accountability.  OPD is in compliance with this Task.

Compliance Status:
Phase 1:  In compliance
Phase 2:  In compliance

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 30

Next Steps:
During our next site visit, we will, as in the past, meet with the IAD Commander to discuss any Task 16-applicable cases for the next reporting period and steps the Department is taking to improve IAD investigators' evaluations of supervisors' accountability.


# Task 18:  Approval of Field-Arrest by Supervisor

Requirements:
*Within 260 days from the effective date of this Agreement, the Chief of Police shall, based on contemporary police standards and best practices, develop and implement policies to address the following standards and provisions:*

*Approval of Field-Arrest by Supervisor*
　　1.　　*OPD shall develop standards for field supervisors that encourage or mandate close and frequent supervisory contacts with subordinates on calls for service. The policies developed in this Section shall require supervisors to respond to the scene of (at least) the following categories of arrest, unless community unrest or other conditions at the scene make this impractical:*
　　　　a.　　*All Felonies;*
　　　　b.　　*All drug offenses (including narcotics, controlled substances and marijuana arrests if the subject is taken to jail).*
　　　　c.　　*Where there is an investigated use of force;*
　　　　d.　　*Penal Code §§69, 148 and 243(b)(c).*

*The responding supervisor shall review the arrest documentation to determine whether probable cause for the arrest, or reasonable suspicion for the stop, is articulated, to ensure that available witnesses are identified, to approve or disapprove the arrest in the field, and to log the time of the contact.*[9]
(Negotiated Settlement Agreement IV. A.)


Background:
Only one provision of Task 18 (18.2.2) is being actively monitored under the MOU.  During all of the previous reporting periods, we found the Department in compliance with this subtask.


Discussion:
Three Departmental policies relate to Task 18.2.2:

- **DGO M-18,** *Arrest Approval and Review in the Field*:  As previously reported, this arrest approval and report review policy, DGO M-18, *Arrest Approval and Review in the Field* (May 13, 2004; and updated October 1, 2005), incorporates the requirements of Task 18.

---

[9] The underlined requirement is the only provision of Task 18 that is being actively monitored under the MOU.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 31

- **Special Order 8536,** *Probable Cause Arrest Authorization and Report Review***:**  In December 2006, OPD published Special Order 8536, *Probable Cause Arrest Authorization and Report Review*.  This policy incorporates the requirements of Task 18.

- **Training Bulletin I-O.4,** *Legal Aspects Of Searching Persons On Parole And Probation***:**  In November 2011, OPD published Training Bulletin I-O.4, *Legal Aspects Of Searching Persons On Parole And Probation*.  The purpose of the Training Bulletin is to guide OPD members on documenting the means of confirming the status of the parolee or, if a probationer, their status and whether an appropriate search clause exists.  The Training Bulletin also provides guidance in situations where inconsistent information is discovered in AWS, CORPUS, or CRIMS regarding a probationer's status.[10]

As the Department has trained at least 95% of relevant personnel on the above-listed policies, we find OPD in continued Phase 1 compliance with this Task.

**Task 18.2.2** requires that supervisors review arrest documentation to verify that available witnesses are identified (compliance standard:  90%).  To assess Phase 2 compliance with this subtask, we reviewed arrest documentation for all of the applicable arrest categories, as well as documentation for arrests resulting in an investigated use of force.  Specifically, we reviewed a random sample of 69 adult and five juvenile arrest reports documenting felony arrests; drug arrests; and arrests for Penal Code 69, 148, and 243(b)(c); as well as documentation for 17 arrests resulting in an investigated use of force; that occurred between October 1, and December 31, 2013.  We reviewed these arrests to determine if supervisors reviewed the reports that listed witnesses or appropriately noted "no known witnesses," or referred to a canvass with no witnesses produced.  In keeping with previous practice, if there was no mention of any witnesses in the crime report narrative, we accepted a "0" in the "witness" box on the cover sheet as sufficient documentation.

Of the 69 adult arrest reports, we excluded 51 from our dataset; and of the five juvenile arrest reports, we excluded four from our dataset; for one or more of the following reasons:  the arrest involved a warrant or probation or parole warrant detention; the arrest occurred outside of our selected time period; the incident was, in fact, a psychiatric detention that did not involve an arrest; or the arrest involved a misdemeanor offense that was not one of the arrests applicable to Task 18.2.2.  Of the remaining 18 adult arrests, there was one report that did not document the presence of witnesses or no known witnesses; and all arrests were approved by a supervisor.  The one relevant juvenile arrest documented the presence or witnesses or no known witnesses, and the arrest was approved by a supervisor.  This represents a 95% compliance rate relating to adult/juvenile arrests for this subtask.  In addition, of the 17 arrests resulting in an investigated use of force, all were in compliance with Task 18.2.2.[11]  This represents a 100% compliance rate among arrests resulting in an investigated use of force for this subtask.

---

[10] Automated Warrant System, Criminal Oriented Records Production Unified System, or Consolidated Records Information Management System.

[11] This number includes only Level 1, 2, and 3 uses of force because per DGO K-4, the documentation of witnesses of Level 4 uses of force is not required.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 32

Our review revealed an overall 97% compliance rate for Task 18.2.2.  OPD is in Phase 2 compliance with this requirement.

Compliance Status:
Phase 1:  In compliance
Phase 2:  In compliance

Next Steps:
We will meet with OIG to discuss the Department's protocols for conducting audits of this Task to ensure sustainability.

# Task 20:  Span of Control for Supervisors

Requirements:

*On or before August 14, 2003, OPD shall develop and implement a policy to ensure appropriate supervision of its Area Command Field Teams.  The policy shall provide that:*

1. *Under normal conditions, OPD shall assign one primary sergeant to each Area Command Field Team, and, in general, (with certain exceptions) that supervisor's span of control shall not exceed eight (8) members.*
2. *During day-to-day operations, in the absence of the primary supervisor (e.g., due to sickness, vacation, compensatory time off, schools, and other leaves), the appropriate Area Commander shall determine, based on Department policy and operational needs, whether or not to backfill for the absence of the sergeant on leave.*
3. *If a special operation, (e.g., Beat Feet, Special Traffic Offenders Program (STOP), etc.) requires more than eight (8) members, the appropriate Area Commander shall determine the reasonable span of control for the supervisor.*
4. *If long-term backfill requires the loan or transfer of a supervisor from another unit, the Chief of Police and/or the Deputy Chief of Police shall make that decision.*

(Negotiated Settlement Agreement IV. C.)

Background:
During all of the previous reporting periods, we found OPD in partial Phase 2 compliance with Task 20.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 33

Discussion:

As previously reported, directives relevant to this Task include:  Departmental General Order A-19, *Supervisory Span of Control,* issued on July 26, 2006; Departmental General Order D-13, *Assignment to Acting Higher Rank or Classification,* issued on June 17, 1999; and Special Order 8435, *Acting Sergeant Selection Process,* issued on July 26, 2006.  As of the publication of this report, the Department is revising its acting sergeants policy; we will discuss this further in our next report.

As the Department has trained at least 95% of relevant personnel on the above-listed policies, we find OPD in continued Phase 1 compliance with this Task.

**Task 20.1** requires that sufficient primary sergeants be assigned at the draw board/master detail level to permit one primary sergeant for every eight officers under normal conditions (compliance standard:  Yes/No).  During the third reporting period, we were granted access to Telestaff, the Department's electronic scheduling system.  Telestaff continues to function as a "master detail" that is updated at least daily as loans, transfers, and other personnel changes alter supervisory assignments.  OPD remains in compliance with Task 20.1.

**Task 20.2** requires that relevant squads – that is, Patrol squads, Problem-Solving Officer units, Crime Reduction Teams, Gang/Guns Investigation Task Force, and Foot Patrol – are actually supervised by their primary, or assigned, supervisors (compliance standard:  85%).

OPD uses a tiered system of supervision in the Bureau of Field Operations (BFO).  Under this system, each squad is assigned one primary sergeant and one relief sergeant.  In the absence of both the squad's primary and relief sergeants, the squad is supervised by one of four "Tier 2 relief supervisors."  To assess Tasks 20.2 and 20.3, we examine the supervision of *each squad* on *each day* of the reporting period, as opposed to the supervision of patrol squads on only a random sample of days.

We consider supervision by both primary sergeants and relief sergeants as in compliance for this subtask.  We do not, however, consider OPD's "certified acting sergeants" to be legitimate supervisors for this purpose – even if, according to the Department, these individuals were "assigned" as primary or relief sergeants for a particular squad.  Since the beginning of our tenure, we have expressed our concerns regarding the Department's practice of certified acting sergeants.  Sergeants are the building blocks of a police department's supervisory structure – they respond to scenes, handle complaints from citizens, approve arrests made by officers, and review and write reports that are eventually sent up the chain of command.  Officers must know who they report to; the consistency of supervision makes a police organization effective and increases officers' accountability to their department, and the department's accountability to the community it serves.  A so-called acting sergeant who is assigned to supervise a squad of officers does not provide the mentoring, training, guidance, and intervention that his/her squad needs.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 34

As noted previously, Department officials recently informed us that OPD has discontinued its use of acting sergeants for patrol-related duties. The Department continues to place acting sergeants in non-patrol assignments. As noted above, the Department is revising its related policy accordingly; we will discuss this further in our next quarterly report.

To assess Task 20.2 during this reporting period, we reviewed spreadsheets prepared by the Department for the months of October, November, and December 2013 that, by date, note which type of sergeant supervised each squad – a primary sergeant, relief sergeant, Tier 2 relief sergeant, or other. (Using Telestaff, we also spot-checked this data to verify its accuracy.) We calculated per squad the compliance percentages for this subtask during this reporting period. Every Task 20.2-applicable squad must be supervised by a legitimate primary or relief sergeant at least 85% of its working shifts in order for the Department to be in compliance with this subtask.

During the last reporting period, 27 of the 44 applicable squads were in compliance with this subtask. During this reporting period, of 42applicable squads, 25were in compliance – that is, 25squads were supervised by either a primary or relief sergeant for at least 85% of the reporting period. As 17squads were not in compliance with this subtask, OPD is not in compliance with Task 20.2.

The Department plans to add a significant number of sergeants in the near future; we look forward to monitoring how this change affects OPD's compliance with this subtask.

**Task 20.3** requires that a supervisor's span of control for the Department's relevant squads – that is, Patrol squads, Problem-Solving Officer units, Crime Reduction Teams, Gang/Guns Investigation Task Force, and Foot Patrol – does not exceed a 1:8 ratio on a day-to-day basis (compliance standard: 90%). As noted above, the Department's tiered system of supervision in BFO significantly affects the way in which we assess Task 20.3. During this reporting period, 16 of the 42 applicable squads were in compliance – that is, 16squads did not exceed the 1:8 supervisor to officer ratio at least 90% of the reporting period. As 26squads were not in compliance with this subtask, OPD is not in compliance with Task 20.3.

**Task 20.4** requires that the Department's Area Commanders make backfill decisions and that these decisions are consistent with policy and operational needs (compliance standard: 90%). Due to the Department's new supervisory structure, this subtask may no longer be applicable. As noted in our last quarterly report, we have initiated conversations with the Parties regarding this issue. For now, we are deferring our compliance determination with Task 20.4.

**Task 20.5** requires that the span of control for special operations is determined by an Area Commander and is reasonable (compliance standard: 90%). In addition, the Department requires that sergeants supervise all special operations. To assess this subtask, we reviewed a random sample of 25 special operations plans of the 90 total operations conducted between October 1, through December 31, 2013, to determine whether the span of control for these

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 35

operations was determined by the relevant commander and was reasonable.  Our review found that all 25 of the special operations in our sample met these requirements.  OPD is in compliance with Task 20.5.

**Task 20.6** requires that the Chief or his designee make decisions regarding any loans or transfers for long-term backfill (compliance standard:  85%).  An Area Commander "backfills" a sergeant's slot when the primary, or assigned, sergeant is unable to supervise his/her squad on a short-term basis.  However, the Chief or his designee (generally, the Assistant Chief or Deputy Chief) is required to determine any loans or transfers for *long-term* backfill.

We reviewed the Department's weekly Personnel Orders issued between October 1, through December 31, 2013, for the signature of the Chief or his designee.  We found that all of the Personnel Orders during this time period contained such a signature, indicating the Chief's approval.  The NSA does not require written documentation of loans and transfers for long-term backfills – merely that the Chief or his designee approves such loans and transfers.  However, OPD policy requires such documentation.  Specifically, Departmental General Order B-4, *Personnel Assignments, Selection Process, and Transfers,* states, "A unit commander/manager who needs a loan of personnel shall submit a justifying loan request to his/her Deputy Chief/Director requesting the loan."  Based on our recent discussions with the BFO Deputy Chief and other BFO personnel, as well as our review of Personnel Orders for other purposes (see above), it appears that OPD's practice comports with Departmental policy.  OPD is in compliance with Task 20.6.

OPD is in partial Phase 2 compliance with Task 20.

Compliance Status:
Phase 1:  In compliance
Phase 2:  Partial compliance

# Task 24:  Use of Force Reporting Policy

Requirements:
>    *The policy shall require that:*
>    1.    *Members/employees notify their supervisor as soon as practicable following any investigated use of force or allegation of excessive use of force.*
>    2.    *In every investigated use of force incident, every member/employee using force, and every member/employee on the scene of the incident at the time the force was used, shall report all uses of force on the appropriate form, unless otherwise directed by the investigating supervisor.*
>    3.    *OPD personnel document, on the appropriate form, any use of force and/or the drawing and intentional pointing of a firearm at another person.*
>    4.    *A supervisor respond to the scene upon notification of an investigated use of force*

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 36

> *or an allegation of excessive use of force, unless community unrest or other*
> *conditions makes this impracticable.*
>
> 5. *OPD notify:*
>    a. *The Alameda County District Attorney's Office immediately or as soon as*
>       *circumstances permit, following a use of lethal force resulting in death or*
>       *injury likely to result in death.*
>    b. *The City Attorney's Office as soon as circumstances permit following the*
>       *use of lethal force resulting in death or serious injury.  At the discretion of*
>       *the City Attorney's Office, a Deputy City Attorney shall respond to the*
>       *scene.  The Deputy City Attorney shall serve only in an advisory capacity*
>       *and shall communicate only with the incident commander or his/her*
>       *designee.*
>    c. *Departmental investigators regarding officer-involved shootings, in*
>       *accordance with the provisions of Section V, paragraph H, of this*
>       *Agreement.*
>
> 6. *OPD enter data regarding use of force into OPD's Personnel Assessment System*
>    *(PAS).*

(Negotiated Settlement Agreement V. A.)

Background:
During the last reporting period, we found OPD in compliance with Task 24.

Discussion:
As previously reported, OPD published Departmental General Order K-4, *Reporting and*
*Investigating the Use of Force* (February 17, 2006), which incorporates the requirements of Task
24.  OPD revised DGO K-4 on August 1, 2007.  On April 15, 2009, OPD issued Special Order
8977, amending DGO K-4.  The revised policy also incorporates the requirements of Task 24.
On November 23, 2010, OPD issued Special Order 9057, amending DGO K-4 to extend Level 1
and Level 4 reporting timelines.  In December 2012, OPD issued a revision to Special Order
8977, *Use of Force Reporting – Pointing of Firearm/Restrained Subject/Use of Vehicle to*
*Intentionally Strike a Subject*.  The revision to this policy allows OPD officers to use a "low
ready"/retention position when un-holstering their firearms.  In this position, the firearm is
pointed at a 45-degree angle or less and not at a person.  The Department began training on the
revised policy immediately after its authorization.[12]  As the Department has trained at least 95%
of relevant personnel on these above-listed policies, we find OPD in continued Phase 1
compliance with this Task.

---

[12] Special Order 8977 affords officers an intermediate option that does not require them to point their firearm(s)
directly at a person, as was allowable by past Departmental policy.  For this reason, following the adoption of this
policy, we expected a decline in the number of gun pointing events.  However, the number of events where OPD
members have intentionally pointed their firearms has decreased *considerably* – significantly way more than
expected.  The Department experienced a 15% reduction in Level 4 uses of force from the last to the current
reporting period (from 483 to 412) after five consecutive reporting periods of steady decline.  During our next site
visit, we will discuss this with Department officials.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 37

During our November 2013 site visit, we again met with OPD command personnel and OIG to discuss ongoing issues in the Department's use of force reports and their supervisory reviews, and the Force Review Boards (FRB)/Executive Force Review Boards.  We also reminded the Department of our continued concern with the lack of adequate justification in citizen encounters that lead to an investigated use of force.  We continue to encourage OPD command personnel to pay close attention to these issues.

During this reporting period, the sample we requested for review (90 total) included:  seven Level 2; 10 Level 3; and 73 Level 4 reports completed between October 1, and December 31, 2013.

**Task 24.1** requires that members/employees notify their supervisor as soon as practicable following any reportable use of force or allegation of excessive use of force (compliance standard:  95%).  To assess this subtask, we reviewed the UOF reports, crime reports (when applicable), and Computer Assisted Dispatch (CAD) purges for all of the force incidents in our dataset.  The documentation for all of the incidents we reviewed was in compliance with this requirement.

Level 4 uses of force are self-reporting, and consequently, less documentation is required than for Level 1, 2, and 3 incidents.  DGO K-4, Section VI A.1., states that involved personnel shall notify and brief their supervisors immediately or as soon as practicable.  In 89 of the 90 incidents we reviewed, a supervisor was promptly notified regarding the force incident.  In the one incident in which the supervisor notification was not prompt, the notification took one hour and 48 minutes; however, the supervisor reviewing the case identified the supervisor notification issue in the report reviews and took the corrective action to address the deficiency.  The supervisor counseled the officer and placed documentation in the officer's Supervisory Notes Files.  Based on the corrective action taken for the aforementioned case, OPD has a 100% compliance rate with this subtask.  OPD is in compliance with Task 24.1.

**Task 24.2** requires that in every reportable use of force incident, every member/employee on the scene of the incident at the time the force was used, reports all uses of force on the appropriate form, unless otherwise directed by the investigating supervisor (compliance standard:  95%); and **Task 24.3** requires that OPD personnel document, on the appropriate form, every use of force and/or the drawing and intentional pointing of a firearm at another person (compliance standard: 95%).  All of the use of force reports, crime reports, and supplemental reports for the incidents in our sample met these requirements.  We found that for Level 1 deadly force incidents, this information was contained in the crime and Internal Affairs Division reports; for Level 2 and Level 3 incidents, this information was contained in the use of force reports; and for Level 4 incidents, the information frequently appeared in the actual use of force, crime, or offense reports.  Accordingly, we find OPD in compliance with Tasks 24.2 and 24.3.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 38

***Officers Pointing Firearms:***  During this reporting period, we reviewed a total of 90 use of force incidents; 71 of those incidents involved officers pointing firearms.  The 71 incidents included one Level 2, four Level 3, and 66 Level 4 uses of force; and involved 144 instances of OPD officers drawing and pointing their firearms.[13]

Overall, we determined officers' pointing of their firearms to be appropriate in 137, or 95%, of the 144 instances we assessed.[14]We also noted with concern, the absence of justification for the pointing of a firearm in seven (5%) of the 144 events; specifically, there was no indication that the officer(s) or others faced imminent threat of harm.

The total racial breakdown for the 71 use of force events reviewed is as follows:  Black, 79%; Hispanic, 15%; White, 5%; Asian, 0%; and Other, 1%.  We also tabulated the racial breakdown of the subjects involved in the events where, in our opinion, the pointing of a firearm was not necessary or appropriate and found the following:  the seven unjustified pointing of firearms involved four Black subjects and one White subject.

In all cases, the supervisory review found the officers' use of force appropriate, objectively reasonable for a legitimate law enforcement purpose, and in compliance with OPD policy.  While officers' actions in particular cases are troubling, the continued unquestioned supervisory and command approval – of both the documentation of officers' actions and the actions themselves – is illustrative of a need to address supervisory deficiencies.

OPD is in compliance with Tasks 24.2 and 24.3.

**Task 24.4** requires that a supervisor respond to the scene upon notification of a Level 1, 2, or 3 use of force or an allegation of excessive use of force, unless community unrest or other conditions makes such response impracticable (compliance standard:  95%).  Supervisors responded to the scene in all 17 applicable Level 2 and 3 incidents in our sample.  This represents a 100% compliance rate.  OPD is in compliance with Task 24.4.

Tasks 24.5, 24.6, and 24.8 require certain notifications in uses of force relative to officer-involved shootings and the use of lethal force.[15]  Specifically, **Task24.5** requires that following every use of lethal force resulting in death or injury likely to result in death, OPD notify the Alameda County District Attorney's Office immediately or as soon as circumstances permit (compliance standard:  95%).  **Task 24.6** requires that following every use of lethal force resulting in death or injury likely to result in death, OPD notify the City Attorney's Office as

---

[13] The majority of the incidents we reviewed fell into one of the following categories:  officers making high-risk vehicle stops; officers searching and entering buildings or premises with or without search warrants; and officers were attempting to detain subjects, either by foot pursuit or by searching areas such as alleys and yards.

[14] As in our more in-depth assessment of such incidents during the sixth reporting period, we gave the benefit of the doubt to involved officers whenever there was a question as to whether an officer's action was appropriate.  We also assumed that the pointing of firearms was justified in cases where officers were responding to a burglary or criminal trespass involving an actual structure search, or when making a high-risk vehicle stop based on the legitimate belief that the vehicle was stolen.

[15] Task 24.7 is no longer applicable.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 39

soon as circumstances permit (compliance standard: 95%). **Task 24.8** requires that following every officer-involved shooting, OPD notify Homicide and Internal Affairs investigators (compliance standard: 95%). During this reporting period, there were no Level 1 officer-involved shooting involving the use of lethal force in our dataset. OPD remains in compliance with these subtasks.

**Task 24.9** requires OPD to enter data regarding use of force into OPD's Personnel Assessment System (PAS) (compliance standard: 95%). PAS now allows personnel to access use of force reports directly. OPD is in compliance with Task 24.9.

OPD is in Phase 2 compliance with Task 24.

Compliance Status:
Phase 1: In compliance
Phase 2: In compliance

Next Steps:
We will continue to meet with OPD to provide feedback on specific use of force reports and to assess how the Department is addressing the serious issue of pointing firearms – the act of which may not only be unnecessary and inappropriate, but which also elevates the risk for unfortunate and unjustified firearm discharges.


# Task 25:  Use of Force Investigations and Report Responsibility

Requirements:
*An on-scene supervisor is responsible for completing an investigated use of force report in accordance with the provisions of Departmental General Order K-4, "Reporting and Investigating the Use of Force."*

1.  *OPD shall develop and implement a policy for conducting and documenting use of force investigations that include, at a minimum:*

    a.  *Documentation of the incident in either an Offense or Supplemental Report from the member(s)/employee(s) using force; and/or, when necessary, a statement taken from the member(s)/employee(s) using force;*

    b.  *Separating and separately interviewing all officers who were at the scene at the time of the incident;*

    c.  *A Supplemental Report from other members/employees on the scene or a statement taken, if deemed necessary by the investigating supervisor;*

    d.  *Identification and interviews of non-Departmental witnesses;*

    e.  *Consideration of discrepancies in information obtained from members, employees and witnesses, and statements in the reports filed;*

    f.  *Whether arrest reports or use of force reports contain "boilerplate" or "pat language" (e.g., "fighting stance", "minimal force necessary to*

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 40

       *control the situation");*

  g. *Documentation of physical evidence and/or photographs and a summary and analysis of all relevant evidence gathered during the investigation; and*

  h. *Consideration of training/tactical issues involving the availability and practicality of other force options.*

  i. *Supervisor's justification as to why any element of the policy was not documented; and*

2. *All supervisors shall be trained in conducting use of force investigations and such training shall be part of a supervisory training course.*

3. *Use of force investigations shall include a recommendation whether the use of force was objectively reasonable and within Department policy and training. The recommendation shall be based on the totality of the circumstances and shall consider, but is not limited to, the following factors:*

  a. *Whether the force used was pursuant to a legitimate law-enforcement objective;*

  b. *Whether the type and amount of force used was proportional to the resistance encountered and reasonably related to the objective the members/employees were attempting to achieve;*

  c. *Whether the member/employee used reasonable verbal means to attempt to resolve the situation without force, if time and circumstances permitted such attempts;*

  d. *Whether the force used was de-escalated or stopped reasonably when resistance decreased or stopped;*

4. *use of force reports shall be reviewed by the appropriate chain-of-review as defined by policy.*

 *The type of force used, the identity of the involved members, and the report preparer shall be the determining criteria for utilizing the appropriate chain-of-review. Reviewers may include, when appropriate, the chain-of-command of the involved personnel, the appropriate Area Commander on duty at the time the incident occurred, other designated Bureau of Field Operations commanders, and as necessary, the chain-of-command of the involved personnel up to the Division Commander or Deputy Chief/Director, and the Internal Affairs Division. Reviewers for Level 1-3 use of force investigations shall:*

  a. *Make a recommendation as to whether the use of force was in or out of policy,*

  b. *Order additional investigation and investigative resources when necessary, and*

  c. *Comment on any training issue(s) when appropriate.*

5. *Any recommendation that the use of force did not comply with Department policy shall result in the incident being referred to the Internal Affairs Division to conduct additional investigation/analysis, if necessary.*

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 41

> 6. *Members/employees involved in a use of force incident resulting in serious injury or death and/or an officer-involved shooting, shall be separated from each other as soon as practicable at the incident scene, and kept apart until they have completed their reports and been interviewed.*

(Negotiated Settlement Agreement V. B.)

Background:
During the last reporting period, we found OPD in compliance with Task 25.

Discussion:
As previously reported, OPD published Departmental General Order K-4, *Reporting and Investigating the Use of Force* (February 17, 2006), which incorporates the requirements of Task 25. OPD revised DGO K-4 on August 1, 2007. The revised policy also incorporates the requirements of Task 25. On November 23, 2010, OPD issued Special Order 9057, amending DGO K-4 to extend Level 1 and Level 4 reporting timelines. As the Department has trained at least 95% of relevant personnel on these policies, we find OPD in continued Phase 1 compliance with this Task.

During this reporting period, we requested and reviewed 90 use of force reports, including: seven Level 2; 10 Level 3; and a random sample of 73 Level 4 use of force reports; that were completed between October 1, and December 31, 2013.

**Task 25.1** requires IAD to complete a use of force report for every Level 1 use of force, and an on-scene supervisor to complete a use of force report for every Level 2 and 3 use of force (compliance standard: 95%). To assess this requirement during this reporting period, we reviewed documentation for 17 Level 2 and 3 incidents. In all of the incidents, a supervisor responded to the scene and completed a use of force investigation. In addition, three Level 3 incidents in our Level 4 sample of 73 incidents were downgraded appropriately to a Level 4 use of force by a supervisor who was at the scene; the changes were documented and comported with the governing documents. OPD is in compliance with Task 25.1.

**Task 25.2** requires that use of force reports/investigations include NSA-required elements (compliance standard: 90%) and are timely pursuant to DGO K-4 (compliance standard: 95%). All of the reports we reviewed for this subtask included the NSA-required elements. To assess investigation timeliness, we used a 75-day time limit for Level 1 incidents (including IAD Commander approval) plus one documented extension approved by the Chief of Police in advance of the due date, and a 15-day time limit for Level 2 and Level 3 incidents. For Level 4 incidents, as of November 23, 2010, OPD requires a review of the report by the end of the reviewing supervisor's next scheduled workday. This is a change – which we supported – from requiring a supervisor's review by the end of the tour of duty; it became effective by Special Order 9057.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 42

During this reporting period, 90, or 100%, of the 90 reports we examined were submitted within the time limits established by this subtask.  As noted above, Level 2 and Level 3 force investigations are considered timely if they are completed (including Division Commander approval) within 15 calendar days of the incident, with one documented approved extension by the Division Commander allowed.  We only consider extensions if they were approved by the appropriate personnel *prior* to the pre-extension due date.

Although we noted some instances in which supervisors addressed officers who did not use their Portable Digital Recording Devices (PDRDs), we are again troubled by the number of officers opting not to activate their recording devices when required.  During this reporting period, OPD commanders took supervisory action by admonishing officers for not using their PDRDs as required in the Level 2, 3, and 4 cases we assessed.  We are further troubled that many supervisory personnel routinely address these violations of policy merely as training matters requiring counseling and an entry into officers' Supervisory Notes Files.

OPD's overall compliance rate for timeliness is 100%, and for NSA-required elements is 100%.  OPD is in compliance with Task 25.2.

**Task 25.3** requires that all supervisors be trained on how to conduct use of force investigations, and that such training is part of a supervisory training course (compliance standard:  95%).  As we have noted previously, OPD has incorporated use of force training into the continued professional training (CPT) that is required for all sergeants every 18 months to two years.  During this reporting period, as part of CPT, OPD offered use of force training in areas including: firearms/force options; in-service firearms qualifications; and use of force case law review.  Although these courses do not specifically address conducting investigations, they help supervisors to develop their knowledge and understanding in critical areas before being assigned use of force investigations.  We encourage OPD to continue to provide periodic refresher training to underscore to supervisors the importance of conducting complete, thorough, and impartial use of force investigations that are submitted in a timely fashion.  OPD is in compliance with Task 25.3.

**Task 25.4** requires that the investigations include required recommendations (compliance standard:  90%).  Areas of recommendation include:  whether the force used was pursuant to a legitimate law enforcement objective; whether the type and amount of force used was proportional to the resistance encountered and reasonably related to the objective the officers were attempting to achieve; whether the officers used reasonable verbal means to attempt to resolve the situation without force, if time and circumstance permitted such attempts; and whether the force used was de-escalated or stopped reasonably when resistance decreased or stopped.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 43

During this reporting period, we reviewed five Level 4 use of force incidents that involved the unjustified pointing of firearms.  These five reports did not comport with NSA-required elements; each of the incidents involved an unnecessary escalation to potentially using lethal force in situations where other less lethal force options were available to the officers or should have been considered.

The remainder of the cases, however, contained information showing that the force was used for a legitimate law enforcement purpose, was reasonable to the resistance encountered, and was de-escalated when resistance decrease or stopped; and that verbal means were used to attempt to resolve the situation without force.

OPD's compliance rate for this subtask is 94%.  OPD is in compliance with Task 25.4.

**Task 25.5** speaks to the review process, which includes chain of command review, making assessments as required by the NSA and policy, and ensuring that any violation of policy results in the incident being referred to Internal Affairs to conduct additional investigations or analysis (compliance standard:  95%).  During this reporting period, we found that the supervisors included the required details, and the chain of command conducted critical reviews.  In all of the Level 2, 3, and 4 reports – with the exception of the five Level 4 cases involving the unjustified pointing of firearms– the chain of command reviewed and commented on the quality of the investigations, any corrective action that was identified, and the appropriate documentation required for Supervisory Notes Files.

We also noted during this reporting period, especially in the unjustified cases of officers pointing their firearms, officers citing their "training and experience" and the location (high-crime area) of the event as justification for their initial encounter with citizens.  The officers did not, however, document the additional and/or specific *circumstances present* justifying the particular stop.  Of course, all citizens who live in high-crime areas are not all involved in criminal activity – and that should not be assumed from the outset.  There has been an increase of these types of justifications for lethal encounters; we will address this with the OPD command staff and training personnel during our next site visit in an effort to ensure continued compliance with this requirement.

OPD's compliance rate for this subtask is 95%.  OPD is in compliance with Task 25.5.

**Task 25.6** addresses the need to keep officers involved in use of force incidents resulting in serious injury or death, or involved in a shooting, be separated from each other at the scene, and kept apart until they have been interviewed and completed their reports (compliance standard:  95%).  We found the applicable Level 2 reports in compliance with this requirement.  OPD is in compliance with Task 25.6.

OPD is in Phase 2 compliance with Task 25.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 44

Compliance Status:
Phase 1:  In compliance
Phase 2:  In compliance

Next Steps:
During our next site visit, we will continue to discuss with OPD the use of force command
review process involving the unjustified pointing of firearms, and the lack of use of the Portable
Digital Recording Devices (PDRDs) by officers in violation of OPD policy.

# Task 26:  Force Review Board (FRB)

Requirements:
*OPD shall develop and implement a policy concerning its FRB proceedings.  The policy shall:*
1. *Set out procedures, membership and a timetable for FRB review of use of force investigations involving Level 2 incidents, as defined in Department General Order K-4, REPORTING AND INVESTIGATING THE USE OF FORCE;*
2. *Require the FRB to review all use of force investigations;*
3. *Require the FRB to make a recommendation as to whether the use of force was in policy or out of policy;*
4. *Require the FRB to forward sustained policy violations to the Discipline Officer.*
5. *Require the FRB not to review any use of force allegation until the internal investigations has been completed;*
6. *Authorize the FRB to recommend to the Chief of Police additional use of force training or changes in policies or tactics, or additional standards, investigatory policies, or training for use of force investigations;*
7. *Require the FRB to conduct an annual review of use of force cases examined, so as to identify any patterns of use of force practices that may have policy or training implications, and thereafter, issue a report to the Chief of Police;*
8. *Require that the FRB membership include, at a minimum, one member from the Training Division, one member from the Field Training Officer program, and either the Bureau of Field Operations Deputy Chief or his/her designee;*
9. *Minimally, that one member of the FRB shall be replaced at least annually.*
(Negotiated Settlement Agreement V. C.)

Background:
During the last reporting period, we found OPD in partial compliance with Task 26.

Discussion:
As previously reported, our review of Department General Order K-4.1, *Force Review Boards*
(August 1, 2007), determined that this policy comports with the requirements of Task 26.  As the
Department has trained at least 95% of relevant personnel on these policies, we find OPD in
continued Phase 1 compliance with this Task.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 45

**Task 26.1** requires that the Force Review Board (FRB) review all Level 2 use of force investigations following the completion of the internal investigation (compliance standard: 95%). DGO K-4.1 requires that the FRB chair convene an FRB to review the factual circumstances of all Level 2 cases within 90 days of receipt of the use of force packet from IAD. OPD provided documentation for all eight incidents that were heard by the board during this reporting period of October 1, through December 31, 2013. We determined that all eight of the FRB reports we reviewed were timely. OPD is in compliance with this subtask.

**Task 26.2** requires that for every Level 2 use of force investigation, the FRB make a recommendation as to whether the use of force was in or out of policy (compliance standard: 95%). All eight FRB reports we reviewed contained recommendations noting that the use of force was in or not in compliance with policy, and all eight noted agreement or disagreement with the recommendation of the FRB by the Chief or his designee. The Chief disagreed with two FRB findings, and indicated that the use of force in these two cases was out of compliance with OPD policy.

We are concerned that one of the FRBs we reviewed involved a premature finding of compliance. In this case, the legality of the stop was still in question, despite the fact that the reason for the stop and the severity of the crime are important components for the analysis of the use of force. The FRB noted that it did not appear that the officers' actions fell within Department policy and that the activity by the officers amounted to a *de facto* detention (Terry Stop or investigatory detention) – and it directed IAD to conduct a supplemental investigation and re-interview the involved officers. However, despite this determination that additional investigation was necessary to complete the review process, it found the use of force to be in compliance. We reported a similar situation with an EFRB finding in our ninth quarterly report, and we will continue to discuss such issues with the Department.

We attended two FRBs during our November 2013 site visit. During one proceeding, the investigator provided an explanation for an officer's lack of providing commands to a suspect before using his Taser. However, the board did not address this issue with the investigator during the formal process or in the FRB report. We have observed that the FRBs are more routinely addressing deficient investigations conducted by investigators; however, the boards should more aggressively address the issue of investigators including justification for the involved officers' actions as part of their presentations.

OPD is not in compliance with Task 26.2.

**Task 26.3** requires that all FRB determinations that a use of force is out of compliance with OPD policy be forwarded to the Internal Affairs Division for disposition (compliance standard: 95%). Of the eight incidents that were heard by the board during this reporting period, two events were found out of compliance when the Chief disagreed with the FRB's finding, thereby requiring a referral to IAD that was not appropriately documented in the FRB reports provided. OPD is not in compliance with this subtask.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 46

**Task 26.4** requires that the FRB make recommendations to the Chief of Police regarding additional use of force training, changes in policies or tactics, additional standards, investigatory policies, or training for use of force investigations (compliance standard:  Yes/No).  During the current reporting period, the FRBs identified training issues; and discussed improper tactics, use of force reporting, activation of the PDRD, and the need for corrective supervisory counseling.  OPD is in compliance with this subtask.

**Task 26.5** requires that the FRB conduct an annual review of use of force cases examined to identify any patterns of use of force practices (including K-3) that may have policy or training implications (compliance standard:  Yes/No); and **Task 26.6** requires that the FRB issue an annual report to the Chief of Police reporting on its annual review (compliance standard: Yes/No).  The FRB issued its most recent annual review on April 23, 2013.  The review identified several patterns and practices, including:  officers are continuing to chase suspects who they believed to be armed with handguns into yards; and are striking resisting suspects to the head with either their fists and/or palm-hammer strikes.  In addition, the review found that many officers are documenting in their reports that they *had* to use force because of the risk that a suspect may be armed; and that they are not appropriately considering tactics during high-risk situations.  The review also emphasized the need for canine officers, supervisors, and commanders to consider modifying the canine announcement to fit the incident in question – for example, circumstances in which a warning announcement could jeopardize officer safety.

According to the annual review, the FRBs have been tasking supervisors to train their officers after the board has identified training issues.  The supervisors are required to document this training in the officers' Supervisory Notes Files and enter the information into PAS.  Subject-matter experts conduct more involved training, and a training roster is submitted to the Training Section.  The involved officer(s) are directed to be present during the presentation to receive training from the board's voting members and subject-matter experts, and/or praise for any outstanding work.  Additionally, as a result of the findings of the FRB, the Department revises or develops new information or training bulletins, which are distributed to OPD personnel via the Department's electronic PowerDMS system.  OPD is in compliance with these subtasks.

OPD is in partial Phase 2 compliance with Task 26.

Compliance Status:
Phase 1:  In compliance
Phase 2:  Partial compliance

Next Steps:
Since the beginning of our tenure, we have requested – in meetings with OPD and in all of our quarterly reports – that the Department schedule FRBs during our quarterly site visits, so that we may attend and observe the proceedings.  We again request that the Department schedule its FRB hearings during our quarterly site visits; it is critical to our assessments that we be able to observe and evaluate the FRB process.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 47

# Task 30:  Executive Force Review Board (EFRB)

Requirements:
1.   *An EFRB shall be convened to review the factual circumstances surrounding any Level 1 force, in-custody death, or vehicle pursuit-related death incidents.  A firearm discharge at an animal shall be reviewed by the EFRB only at the direction of the Chief of Police.  The Board shall have access to recordings and/or transcripts of interviews of all personnel on the scene, including witnesses, and shall be empowered to call any OPD personnel to provide testimony at the hearing.*
2.   *OPD shall continue the policies and practices for the conduct of EFRB, in accordance with the provisions of DGO K-4.1, FORCE REVIEW BOARDS.*

(Negotiated Settlement Agreement V. G.)

Background:
During the last two reporting periods, we found OPD in partial compliance with this Task.

Discussion:
As previously reported, OPD published Departmental General Order K-4.1, *Force Review Boards* (February 17, 2006), which incorporates the requirements of Task 30.  OPD revised DGO K-4.1 on August 1, 2007.  The policy also incorporates the requirements of Task 30.  As the Department has trained at least 95% of relevant personnel on these policies, we find OPD in continued Phase 1 compliance with this Task.

To assess the Department's compliance with this Task, we reviewed EFRB documentation and observed two EFRBs during our November site visit.(One was a follow-up to a previously held EFRB.)

**Task 30.1** requires that OPD convene an EFRB within 45 days of the completion of the use of force (UOF) report by IAD (compliance standard:  95%).  The EFRB reviewed two incidents during this reporting period:

- The first case was initially reviewed by the EFRB in August 2013; in November, the board reheard the case to address specific unanswered questions and resolve a discrepancy.  The incident involved a critical firearm discharge that resulted in the non-fatal shooting of an alleged robbery suspect.  The EFRB determined that the officer's lethal use of force was not in compliance with Department policy, and referred the incident to IAD for appropriate administrative action.

- The second incident involved a critical firearm discharge by an officer during a Ceasefire operation.  OPD received information from a reliable source that a subject was armed with a gun in a vehicle.  After officers attempted a traffic stop, the driver of the vehicle fled, leading the officers on a pursuit.  The pursuit was authorized by supervisory personnel as required.  The suspect exited the vehicle and fled on foot and entered a

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 48

walkway next to a residence where he turned and pointed a firearm at the involved officer.  The involved officer discharged his weapon and struck the suspect, who was pronounced dead at the scene.  The EFRB's final report was completed during this reporting period.  We will follow up with OPD and report on this critical firearm discharge event during the next reporting period.

We verified that the two EFRBs fell within 45 days of the completion of the use of force reports covering the incidents.

OPD is in compliance with this subtask.

**Task 30.2** requires that the EFRB has access to recordings and/or transcripts of interviews of all personnel on scene, including civilian witnesses, and is empowered to call in any OPD personnel it believes should testify (compliance standard:  Yes/No).  In the documentation we reviewed, recorded statements and/or transcripts were available from all officers on the scene and other personnel needed to testify.  OPD is in compliance with this subtask.

**Task 30.3** requires that OPD complies with the policies and procedures set forth in DGO K-4.1, *Force Review Boards* (compliance standard:  Yes/No).  This policy outlines several requirements, including who comprises the board, the material to be made available for the board, the conduct of the board, the information to be memorialized and follow-up actions, if warranted.  We reviewed the reports that were prepared for the two incidents that were heard by the board during the current reporting period.  The required attendees were present in both cases.  After review and deliberations, the board determined that the subject officers' actions in all four cases were in compliance with Departmental policy.  The Chief endorsed the EFRB findings within 60 days of the board's decision.  The board identified the adequacy of equipment, tactics, an analysis of each application of force, investigative concerns, and training issues that required the appropriate corrective action.

However, despite the Department's technical adherence to these provisions, we have observed during our recent site visits and technical assistance visits that the board's informality and lack of structure is not consistent with the conduct of a review process of this nature.  We intend to continue discussions with the Department regarding the necessity to improve the conduct of these boards.  OPD is currently revising DGO K-4.1, *Force Review Boards*, and has sought the input of the Monitor.  The policy revisions are still pending at this time.  Accordingly, OPD is not in compliance with this subtask.

Due to the first reviewed incident being a follow-up from an EFRB held during a previous reporting period, and the second reviewed incident's findings being held in abeyance while additional information is being obtained, OPD remains in partial Phase 2 compliance with Task 30.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 49

Compliance Status:
Phase 1:  In compliance
Phase 2:  Partial compliance

Next Steps:
Since the beginning of our tenure, we have requested – in meetings with OPD and in all of our quarterly reports – that the Department schedule EFRBs during our quarterly site visits, so that we may attend and observe the proceedings.  We again request that the Department schedule its EFRB hearings during our quarterly site visits; it is critical to our assessments that we be able to observe and evaluate the EFRB process.


# Task 33:  Reporting Misconduct

Requirements:
*Within 154 days from the effective date of this Agreement, OPD shall establish policy and procedures for the following:*

*Misconduct*
*OPD personnel shall report misconduct by any other member or employee of the Department to their supervisor and/or IAD.  The policy shall state that corrective action and or discipline shall be assessed for failure to report misconduct.  OPD shall require every member and employee encountering a use of force that appears inappropriate, or an arrest that appears improper, to report the incident to his/her supervisor and/or IAD.  OPD shall establish and maintain a procedure for a member/employee to report police misconduct on a confidential basis.*

1. *Any member/employee of OPD may report a suspected case of police misconduct confidentially to the commander of IAD.*
2. *The member/employee reporting this conduct shall indicate clearly to the commander of IAD that the report is being made under these confidential provisions.*
3. *The report may be made in person, by telephone, or in writing.  The IAD Commander shall document the report in a confidential file that shall remain accessible only to the IAD Commander.*
4. *The case shall be investigated without disclosure of the complainant's name, unless and until such disclosure is required by law.*
5. *This confidential reporting procedure shall be made known to every member/ employee of OPD and to all new members/employees of OPD within two (2) weeks of hiring.*

(Negotiated Settlement Agreement VI. A.)

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 50

Background:
Since monitoring under the NSA began, OPD has received confidential reports of misconduct in only four cases.  During the last four reporting periods, we found OPD to be in partial compliance with Task 33.

Discussion:
As we have noted previously, OPD has developed several policies that, in concert, incorporate the requirements of this Task.  These include:  Manual of Rules (MOR) Section 314.48, Reporting Violations of Laws, Ordinances, Rules or Orders; MOR Section 314.49, Confidential Reporting of Police Misconduct; Departmental General Order D-16, Check-In and Orientation; MOR Section 370.18, Arrests; and MOR Section 370.27, Use of Physical Force.  The Department has trained at least 95% of relevant personnel on these policies, and remains in Phase 1 compliance with this Task.

*Reporting Misconduct*
**Task 33.1** requires that in all sustained internal investigations, OPD conduct an assessment to determine whether members/employees/supervisors knew or should have known that misconduct occurred (compliance standard:  95%); and **Task 33.2** requires that where OPD determines that members/employees/supervisors knew or should have known that misconduct occurred but did not report it as required, OPD is required to take appropriate action (compliance standard:  95%).

During the last four reporting periods, we found OPD to be in partial compliance with these subtasks, as a result of IAD cases involving incidents that occurred during Occupy Oakland demonstrations.  In those cases, many officers claimed not to have observed actions that occurred close to them; officers consistently avoided commenting about the misbehavior – and sometimes, felonious actions – of their fellow officers; and while officers apparently remembered seeing participants in the demonstrations and riots clearly, they often could not say which officers were next to them even when they viewed videos of the incidents.

To assess OPD's Phase 2 compliance with these subtasks during this reporting period, we discussed management of reporting misconduct by officers and employees of the Department with the Assistant Chief; and queried the IAD database to identify any cases with sustained findings and discipline that were approved between October 1, and December 31, 2013, that were applicable to Task 33.  We identified and reviewed 18 cases with a total of 35 sustained findings involving 24 officers and employees that were approved during this reporting period.  We found no instances where OPD disregarded indications that its employees or officers failed to report misconduct.

*Management Action to Address Reluctance to Report Misconduct*
We noted previously that "the activation of PDRDs can be key in resolving allegations of use of force that arise from citizen contacts – particularly during demonstrations.  Accordingly, it is a serious violation for an officer dealing with such circumstances to fail to activate his/her PDRD."  This is especially critical in a police department where there is a culture that officers do not report serious misconduct by fellow officers.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 51

In our review of the 35 sustained findings, we found 12 in which an officer was equipped with an operational PDRD and should have activated it.  In all of the 12 cases, OPD imposed discipline.  Sanctions ranged from Counseling (one instance) and Written Reprimand (one instance) to Termination (two instances where other sustained findings dictated the outcome).  In another case, an officer resigned; and in seven cases, officers were suspended for one or two days.  There were no cases in which the failure to activate a PDRD went unaddressed.

We commented in our last report that OPD was proposing MOR revisions to include addressing the failure to activate a PDRD in a new section that, if implemented, will carry more significant discipline than we have observed in the past.  As of this reporting period, this and other revisions are still under review and being discussed with OPD employee unions.  We will discuss these revisions further in our next report.

Top OPD management has given attention to addressing the problem of failing to report misconduct.  The Chief provided training regarding the NSA to two Police Service Technician academies, the four most recent recruit academies, and the recent lateral academy.  Part of this training included instruction on the importance of – and the requirements for – reporting misconduct.

The Chief also discussed this topic, in the context of remaining issues needed to satisfy compliance with the NSA, at the Continuing Professional Training (CPT) courses for both officers and sergeants during 2013.  In March, the Chief will began speaking to the 2014 CPT classes.  He plans to continue this discussion to reinforce the requirements.

In August, according to OPD, IAD Command re-instructed IAD investigation personnel on Tasks 16 and 33.  The training, initially proposed to be one hour, was extended beyond that timeframe as the instruction transcended into an open discussion.  Since that time, OPD leaders report that they have observed that performance in these areas has improved.

*Confidential Reporting*

**Task 33.3** requires that OPD must maintain a functioning procedure that incorporates the NSA requirements related to establishing and maintaining confidential reporting of misconduct.  These requirements include:  **Task 33.3.1**:  confidential reports of suspected misconduct may be made in person, by telephone, or in writing (compliance standard:  Yes/No); **Task 33.3.2**:  any OPD member/employee may report suspected misconduct confidentially to the IAD Commander, who shall document the report in a confidential file that shall remain accessible only to this IAD Commander (compliance standard:  Yes/No); **Task 33.3.3**:  confidentially reported cases are investigated without disclosure of the complainant's name, unless and until such disclosure is required by law (compliance standard:  95%); and **Task 33.3.4**:  OPD informs all new and current employees of OPD's confidential reporting procedures (compliance standard:  95%).

As we have reported previously, OPD has established procedures as required by Tasks 33.3.1, 33.3.2, 33.3.3, and 33.3.4.  Confidential reports of suspected misconduct may be made by various means to the IAD Commander; cases are investigated without identifying the

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 52

complainant; and documentation of the report and investigation are kept in a confidential file maintained by the IAD Commander.  Since monitoring began under the NSA, OPD has received only four such confidential reports.  No new confidential reports were received during the period from October 1, through December 31, 2013.

There were 85 new hires during the current reporting period.  All were briefed/trained on confidential reporting procedures as required by Task 33.  All of the new employees signed documents to memorialize the training that is a part of the hiring module/practice before new employees report for duty/assignment.

We previously removed OPD from Phase 2 compliance due to the failure of its officers to report misconduct during the Occupy Oakland events.  OPD management is making progress in this area through training and efforts to secure use of PDRDs by its officers.  In this and the past two reporting periods, we found no instance where a failure to report misconduct was unaddressed.  Further, top management, particularly the Chief, has made a strong effort to convey to OPD employees their responsibility not to be tolerant of serious misconduct.  OPD is in compliance with this Task.

Compliance Status:
Phase 1:  In compliance
Phase 2:  In compliance

# Task 34:  Vehicle Stops, Field Investigation, and Detentions

Requirements:
> *OPD shall require members to complete a basic report on every vehicle stop, field investigation and every detention.  This report shall include, at a minimum:*
> a.    *Time, date and location;*
> b.    *Identification of the initiating member or employee commencing after the first year of data collection;*
> c.    *Reason for stop;*
> d.    *Apparent race or ethnicity, and gender of individual(s) stopped;*
> e.    *Outcome of stop (arrest, no arrest);*
> f.    *Whether a search was conducted, and outcome of search;*
> g.    *Offense categories (felony, misdemeanor or infraction).*
> 2.    *This data shall be entered into a database that can be summarized, searched, queried and reported by personnel authorized by OPD.*
> 3.    *The development of this policy shall not pre-empt any other pending or future policies and or policy development, including but not limited to "Promoting Cooperative Strategies to Prevent Racial Profiling."*

(Negotiated Settlement Agreement VI. B.)

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 53

Background:

OPD has been in partial compliance with this Task for the past 13 reporting periods, as we noted a number of operational practices requiring corrective measures that precluded a full compliance finding.  First, we noted that although officers were entering the required stop data into the Field Based Reporting (FBR) computer system, the reported and documented "reason for the stop" did not consistently and/or sufficiently meet Constitutional requirements and/or provide authority for the stops.  Also, when officers engaged a group of individuals, data was usually recorded for only one member of the group, which significantly distorted the stop data.  And finally, we found that officers were often incorrectly classifying the "reason for the stop."  Inasmuch as these issues invalidated the accuracy of the collected stop data, an analysis of the data was delayed until corrective measures were put in place.  We have worked with and provided ongoing technical assistance to OPD in an effort to ensure that the collected data is complete and accurate so as to provide a basis for meaningful analyses as required by Department policy.  OPD is in the process of conducting its first analysis of this data, which is expected to be completed and publicly released during the next reporting period.

Discussion:

General Order M-19, *Prohibitions Regarding Racial Profiling and Other Bias-Based Policing;* and Report Writing Manual (RWM) Inserts R-2, N-1, and N-2 incorporate the requirements of Task 34.  The Department trained 95% of relevant personnel on these policies as required.

OPD issued Special Order 9042, *New Procedures Regarding Stop Data Collection* in June 2010.  This policy revised DGO M-19 and RWM R-2 to provide further guidance regarding requirements related to consensual encounters and detention.  SO 9042 was appropriately disseminated.  During the sixth reporting period, OPD began training on these revisions, which included the definition and articulation of a consensual encounter and detention, along with training on how to properly document encounters in Field Investigative Reports.

OPD issued Special Order 9101, *Revised Stop Data Collection Procedures* in November 2012.  This policy further revised DGO M-19, *Racial Profiling,* to further clarify and define racial profiling, consensual encounters, detention, and the scope of the policy.

OPD issued revised Special Order 9101, *Revised Stop Data Collection Procedures* in March 2013.  This policy further revised DGO M-19, *Racial Profiling.*  Shortly thereafter, OPD issued a revision to the Report Writing Manual to address issues relating to completion of the Stop Data Form, specifically clarifying that a Stop Data Forms must be completed when self-initiated encounters are conducted; and that Stop Data Forms are not required for radio dispatch calls for service, citizen flag-downs, search warrants, and community caretaking incidents.  Also during the current reporting period, OPD continued training on the definitions of racial profiling to include the definition of a consensual encounter, what a detention is, and the scope of the policy.

OPD has trained at least 95% of relevant personnel on these subjects and the above-described policy revisions.  We continue to find OPD in Phase 1 compliance with this Task.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 54

**Task 34.1** requires that officers complete Stop Data Forms for every vehicle stop, field investigation, and detention (compliance standard:  90%).  To assess Task 34.1 compliance during this reporting period, we reviewed a random sample of 375 stops to match them with corresponding completed Stop Data Forms.  This sample included 125 Computer Aided Dispatch (CAD) entries, 125 Field Contact Cards, and 125 traffic citations.  Using the Department's Forensic Logic Quicksearch program, we located corresponding Stop Data Forms for 99% of the stops in our sample.  OPD is in compliance with Task 34.1.

**Task 34.2** requires that completed Stop Data Forms contain the following information:  1) time; 2) date; 3) location; 4) identification of member making stop; 5) reason for stop; 6) apparent race/ethnicity of individual(s) stopped; 7) gender of individual(s) stopped; 8) outcome of stop (arrest or no arrest); 9) whether a search was conducted; 10) outcome of any search; and 11) offense category (felony, misdemeanor, or infraction) (compliance standard:  85%).  The entry of stop data into the Field Based Reporting (FBR) system requires officers to make a selection in each form field.  If an officer fails to fill in the information in any field, the system does not allow the form to be completed.

During this reporting period, OIG conducted internal audits of its stop data forms.  We encourage OPD to continue to conduct these audits in future reporting periods.  We saw an improvement with OPD documenting the reason for the stop – and as such, OPD is in compliance with Task 34.2.

**Task 34.3.1** requires that OPD have a stop data database that can be summarized, searched, queried, and reported by personnel authorized by OPD (compliance standard:  Yes/No).  Special Order 9042 requires that officers  "complete an electronic FBR [Field Based Reporting] Stop Data Collection Form (SDF) for certain arrests, every detention not resulting in an arrest (vehicle, walking, and bicycle stops), every consent search of a person conducted and any other investigative encounter.  A SDF shall also be completed for consensual encounters (contacts) where the member talks with a person to confirm or dispel a suspicion that the person may be involved in criminal activity, although the person is free to leave."  Data from the electronic Field Based Reporting system is automatically sent to the Department's Forensic Logic Quicksearch program.  Quicksearch allows Department personnel to search for and query officers' stop data.  During this reporting period, we continued to experiment with the Quicksearch program, and found that the stop data is summarized and easy to review.  As noted above, in May 2011, OPD merged the Stop Data Form with the Field Contact Card, intending to provide one document for officers to enter stop data; and providing them with a narrative portion for which they can articulate the factual support for the stop.

During our most recent site visit, we again met with OPD personnel responsible for data collection and analysis.  We found that the Department's revisions to policies and additional training have resulted in the collection of what appears to be accurate data since April 2013.  The data is being organized into tables and graphs depicting – both globally and by district – the breakdown of stops, reasons for the stops and resulting action taken, including searches, the results of searches and arrests and other actions.  Although the data is sufficient to conduct

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 55

preliminary analyses to determine whether there *appears* to be disparate treatment within one or more population groups, we have cautioned OPD to approach such an analyses in a careful and deliberate manner.  For example, the data may appear indicative of disparate treatment with regards to the initial stops and or searches, either globally or within a specific district or squad.  However, initial indicators must be verified through an analysis of the documented basis for the stops and/or searches to ensure that each meets Constitutional standards.  In addition, the stop data database must be of sufficient size to preclude numerical distortions; we have suggested that 12 months of data should be sufficient.

OPD has established a base from which it can move forward with various analyses of the data to identify, correct and/or prevent any stop activities that are inconsistent with generally accepted police practices and constitutional standards.  As indicated above, the first step will be its preliminary analysis of data collected since April 2013.

We have also recommended that OPD take steps to elevate interest in and attention to stop data by officers, supervisors, and command staff through the issuance of training bulletins; and by way of briefings and general discussions about the present data.  In addition, we have recommended that command staff commence the development of possible intervention protocols should the data appear indicative of disparate treatment of any population group or groups.

Although OPD, specifically the Racial Profiling Manager, has not produced an official report containing an analysis of the data collected and relevant policy recommendations as required, the activities described above are indicative of progress with the November 15, 2004 policy.  This policy also requires that these data analyses reports be prepared for the Chief of Police at least twice per year.  We expect that OPD will issue its first, though preliminary, report during the next reporting period.  Following the issuance of the required report, OPD must carefully review the data and analysis to identify any disparities of treatment between the several population groups to "address, resolve and reduce…incidents of racial profiling or biased-based policing" should any be found.[16]Although we are encouraged by the progress made during recent reporting periods, OPD is not in full compliance with Task 34.3.1.

**Task 34.3.2** requires that the data captured on the Stop Data Forms be entered completely and accurately into the database (compliance standard:  85%).  As noted above, the entering of stop data into the Field Based Reporting system requires officers to make a selection in each form field.  If an officer fails to fill in the information in any field, the system will not allow the form to be completed.  Task 34.3.2 was created to govern the submission of data from the written forms to the computerized system.  Since this type of data entry is no longer necessary, the Department is in compliance with Task 34.3.2.

OPD is in partial Phase 2 compliance with Task 34.

---

[16]United States District Court for the Northern District of California, Master Case File No. C00-4599 TEH, Order Re: Compliance Director, dated December 12, 2012.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 56

<u>Compliance Status:</u>
Phase 1:  In compliance
Phase 2:  Partial compliance

<u>Next Steps:</u>
During our next site visit and upcoming technical assistance visits, we will again meet with
relevant Department personnel to discuss the Department's progress in this area.  We will further
discuss the Department's various Task 34-related data systems to assess their operability,
accuracy, and utility in storage, and ease of access to stop data.  We will continue to work with
OPD on ways to verify the legal basis for stops, searches, and other related activities to include
the conducting of internal audits of stop data to identify any disparities in its treatment of citizens
and the development of appropriate corrective intervention strategies where and if appropriate.


# Task 35:  Use of Force Reports - Witness Identification

<u>Requirements:</u>
1.   *OPD shall require, by policy, that every use of force report, whether felonies were
     involved or not, include the names, telephone numbers, and addresses of
     witnesses to the incident, when such information is reasonably available to the
     members/employees on the scene.*
2.   *In situations in which there are no known witnesses, the report shall specifically
     state this fact.  Policy shall further require that in situations in which witnesses
     were present but circumstances prevented the author of the report from
     determining the identification or phone number or address of those witnesses, the*
3.   *report shall state the reasons why the member/employee was unable to obtain that
     information.  Reports shall also include the names of all other
     members/employees of OPD witnessing the use of force incident.*
(Negotiated Settlement Agreement VI. C.)


<u>Background:</u>
During all of the previous reporting periods, we found OPD in compliance with Task 35.


<u>Discussion:</u>
As previously reported, OPD published Special Order 8066, *Use of Force—Witness
Identification* (April 12, 2004), which incorporates the requirements of Task 35.  Additionally,
OPD published Departmental General Order K-4, *Reporting and Investigating the Use of Force*
(February 17, 2006), which also incorporates the requirements of Task 35.  OPD revised DGO
K-4 on August 1, 2007.  The revised policy also incorporates the requirements of Task 35.  As
the Department has trained at least 95% of relevant personnel on these policies, we find OPD in
continued Phase 1 compliance with this Task.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 57

To assess Phase 2 compliance for Task 35 for this reporting period, we reviewed 17 use of force reports, including:  seven Level 2 and 10 Level 3 use of reports covering incidents that occurred between October 1, and December 31, 2013.  (Per DGO K-4, Level 4 use of force reports do not require witness identification.)

We assessed Task 35.1 in conjunction with Task 35.2.  **Task 35.1** requires that use of force reports include the name, telephone number, and addresses of witnesses to the incident when such information is reasonably available to the members/employees on the scene (compliance standard:  90%); and **Task 35.2** requires that when there are no known witnesses, the use of force reports specifically state this fact (compliance standard:  90%).  All 17 reports that we reviewed comported with these requirements.  OPD is in compliance with these subtasks.

**Task 35.3** requires reports to document instances where witnesses are present but circumstances prevent the author of the report from gathering the data (compliance standard:  90%).  During this reporting period no incidents fell into this category.  OPD is in compliance with Task 35.3.

**Task 35.4** requires that use of force reports include the names of all other OPD members/employees witnessing the incident (compliance standard:  90%).  We found no instances when an OPD witness was not documented in the 17 reports we reviewed.  OPD is in compliance with Task 35.4.

OPD is in Phase 2 compliance with Task 35.

Compliance Status:
Phase 1:  In compliance
Phase 2:  In compliance

Next Steps:
During our next site visit, we will continue to request and examine any related audits completed by OIG to ensure that OPD is moving toward the long-term sustainability of this Task.

# Task 37:  Internal Investigations-Retaliation Against Witnesses

Requirements:
*OPD shall prohibit retaliation against any member or employee of the Department who:*
   1.    *Reports misconduct by any other member or employee, or*
   2.    *Serves as a witness in any proceeding against a member or employee.*
*The policy prohibiting retaliation shall acknowledge that retaliation may be informal and subtle, as well as blatant, and shall define retaliation as a violation for which dismissal is the presumptive disciplinary penalty.  Supervisors, commanders and managers shall be held accountable for the conduct of their subordinates in this regard.  If supervisors, commanders or managers of persons engaging in retaliation knew or reasonably should have known that the*

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 58

*behavior was occurring, they shall be subject to the investigative, and if appropriate, the disciplinary process.*
(Negotiated Settlement Agreement VI. E.)

Background:

Following our review of retaliation cases in the fourteenth reporting period, we found OPD not in compliance with Task 37.  In that report, we cited a case we regarded as involving serious retaliation after an officer provided information about another officer's beating a handcuffed prisoner.  We noted that not enough was done to identify the perpetrator or protect the reporting officer when the retaliation came to light.  In the last reporting period, we found that in all three cases alleging retaliation, OPD conducted thorough investigations and concluded that the charge of retaliation was unfounded.

Discussion:

As previously reported, we have found OPD in continued Phase 1 compliance with this Task.  OPD published Special Order 8092 on November 23, 2003, which incorporated the requirements of Task 37.  This policy consists of two Manual of Rules (MOR) Sections:  398.73, *Retaliation Against Witnesses*; and 398.74, *Retaliation Against Witnesses, Accountability.*  These MOR provisions (revised in lieu of a City policy on retaliation) incorporate the requirements of Task 37.  OPD has trained at least 95% of relevant personnel on these policies.

**Task 37.1** requires that officers be held accountable for retaliating against employees or members who report misconduct or serve as witnesses in proceedings against other members/employees (compliance standard:  95%); and **Task 37.2** requires that supervisors, commanders, and managers be held accountable if they knew or reasonably should have known that persons under their supervision engaged in retaliation (compliance standard:  95%).

OPD identified five cases that it considered as containing allegations of retaliation during the period of October 1, through December 31, 2013.  One of the cases was not yet complete, so we will review it in a future reporting period.  Another case involved an allegation that an unidentified OPD officer would "retaliate" against a citizen.  Inasmuch as Task 37 specifies instances of retaliation against members or employees of OPD we did not consider this case for this Task.

We reviewed the remaining three cases; and found that OPD thoroughly investigated and concluded that the charge of retaliation was unfounded in all three.

During the last few reporting periods, we faulted OPD for failing to respond fully to the most serious allegation of retaliation that we have observed.  During this reporting period, we found that top OPD management gave attention to addressing the retaliation problem.  The Chief provided training regarding retaliation to two Police Service Technician academies, the four most recent recruit academies, and the recent lateral academy.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 59

The Chief also visited the Continuing Professional Training (CPT) courses for both officers and sergeants during 2013, to discuss this topic in the context of remaining issues needed to satisfy compliance with the NSA.  During the past year, he spoke to a total of 129 sergeants and 383 officers who attended CPT.

We find OPD in Phase 2 compliance with Task 37.

<u>Compliance Status:</u>
Phase 1:  In compliance
Phase 2:  In compliance

# Task 40:  Personnel Assessment System (PAS) – Purpose

<u>Requirements:</u>
*Within 635 days from the effective date of this Agreement, OPD shall enhance its existing complaint-tracking and select indicator systems so that it has a fully implemented, computerized relational database for maintaining, integrating and retrieving data necessary for supervision and management of OPD and its personnel.  This data shall be used by OPD:  to promote professional police practices; to manage the risk of police misconduct; and to evaluate and audit the performance of OPD members of all ranks, employees, and OPD units, subunits and shifts. PAS shall contain information on the following:*

1. *All uses of force required to be reported by OPD;*
2. *OC spray canister check-out log (see Section V, paragraph D)*
3. *All police-canine deployments; where the canine is deployed in a search for or to apprehend a suspect(s).  It does not include, deployments for the purpose of locating bombs, narcotics, missing persons, etc., where the canine is not involved in an investigated use of force (i.e., deliberately or inadvertently bites or injures a person) If such force occurs, a Use of Force report is required.*
4. *All officer-involved shootings and firearms discharges, both on duty and off duty, excluding an intentional discharge while at a range facility; a discharge while engaged in a lawful recreational activity, such as hunting or target practice; a discharge by Criminalistics Division personnel for the purpose of scientific examination; and a discharge at an object (e.g., street light, alarm box, door lock or vehicle tire) to accomplish a tactical police purpose that does not result in injury;*
5. *All on-duty vehicle pursuits and on-duty vehicle collisions;*
6. *All complaints, whether made to OPD or CPRB;*
7. *All civil suits and/or tort claims related to members' and employees' employment at OPD, or which contain allegations which rise to the level of a Manual of Rules violation;*
8. *Reports of a financial claim as described in Section VI, paragraph G (3).*
9. *All in-custody deaths and injuries;*

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 60

10.  *The results of adjudications of all investigations related to items (1) through (9), above, and a record of investigative findings, including actual discipline imposed or non-disciplinary action administered;*
11.  *Commendations and awards;*
12.  *All criminal arrests of and charges against OPD members and employees;*
13.  *All charges of resisting or obstructing a police officer (Penal Code §§69 and 148), assault on a police officer (Penal Code §243(b)(c), or assault-with-a-deadly-weapon on a police officer [Penal Code §245(c)(d)];*
14.  *Assignment history and rank history for each member/employee;*
15.  *Training history for each member/employee;*
16.  *Line-of-duty injuries;*
17.  *Sick leave usage, particularly one-day sick leaves;*
18.  *Report Review Notices or Case Evaluation Reports for the reporting member/employee and the issuing investigator;*
19.  *Criminal cases dropped due to concerns with member veracity, improper searches, false arrests, etc.; and*
20.  *Other supervisory observations or concerns.*

(Negotiated Settlement Agreement VII. A.)

Background:

In the previous eight reporting periods, we found OPD to be in partial Phase 2 compliance with Task 40 – following reporting periods of non-compliance that were related to data problems. The temporary solution to these problems had been to enter arrest data by hand as the Department moved forward with plans for the arrest data to be incorporated into the County's data system.  In our last report, we noted that the Department had been piloting the process with a limited number of officers as it examined data quality and solved emerging problems.

The Department now reports that automatic import of arrest data will be fully implemented during the upcoming reporting period.  During our next review, the new system of data recording will have been in place for the full reporting period.  That will permit a full assessment of the process as part of the compliance review.

The development of a new risk management database has continued to progress.  The RFP was released with January 31, 2014 date for proposal submissions.  As of the publication of this report, the City received one response to the RFP.  While that may be disappointing, OPD regarded the response as suitable for further review; we will discuss this further in our next report.

Discussion:

Departmental General Order D-17, Personnel Assessment Program, which incorporates the requirements of Tasks 40 and 41, has undergone extensive revision and was approved and signed off on by the Chief on November 20, 2013.  The policy alters the PAS review procedures to incorporate an initial internal review by the PAS Unit when officers meet thresholds, and then engages supervisors in developing and implementing risk reduction plans when appropriate.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 61

This procedure is intended to reduce the number of false positive findings that have created substantial work for supervisors and, in some cases, required resubmission when the supervisory reviews were judged inadequate.

With the new policy in place, we look forward to reviewing the results of data collection and the internal review procedures during our next site visit when a full quarter's worth of data will be available.

PAS records for the quarter of October 1, through December 31, 2013 indicate that data were entered for all of the fields required by Task 40 – including the arrest data. The required data for the quarter included reports of 346 uses of force. This is a reduction of nearly 20% from the previous reporting period, and continues a downward trend begun over a year ago. The overall decline is largely due to declines in Level 4 uses of force. The data for the current reporting period indicate that there were 3,156 arrests, which reflects a return to levels common before the decline noted last quarter. In our last report, we expressed concerns over whether that decline reflected data management problems. As of now, that question remains unresolved – but it suggests the importance of continuing to closely monitor these data.

A further breakdown of the types of use of force shows that, for this reporting period, there were no Level 1 uses of force. There were 24 Level 3, eight Level 2, and 314 Level 4 uses of force. With the exception of Level 4 declines, these are mostly minor differences from past patterns. As noted, the table shows another significant decrease in Level 4 uses of force: a decline of 25% from the last report; and a decline of over 70% from the consistently high levels found prior to 18 months ago when the decline began. The data counts for the current reporting period and the seven prior reporting periods is presented in the table below.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 62

| OPD Performance Activity Comparison by Quarter | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Performance Activity | Jan 1 to March 31, 2012 | April 1 to June 30, 2012 | July 1 to September 30, 2012 | October 1 to December 31, 2012 | January 1 to March 31, 2013 | April 1 to Jun 30, 2013 | July 1 to Sept 30, 2013 | Oct 1 to Dec 30, 2013 |
| Level 1 Uses of Force | 4 | 3 | 1 | 0 | 1 | 3 | 3 | 0 |
| Level 2 Uses of Force | 28 | 14 | 5 | 7 | 3 | 10 | 4 | 8 |
| Level 3 Uses of Force | 50 | 31 | 29 | 15 | 26 | 26 | 12 | 24 |
| Level 4 Uses of Force | 1034 | 962 | 741 | 612 | 509 | 483 | 412 | 314 |
| Unintentional Firearms Discharge | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sick Leave Hours | 12734.56 | 11229.36 | 9634.3 | 9857.65 | 11286.53 | 11041.94 | 11390 | 10935 |
| Line of Duty Injuries | 47 | 50 | 46 | 30 | 32 | 54 | 54 | 23 |
| Narcotics Related Possessory Offenses Arrests | 641 | 452 | 508 | 280 | 407 | 560 | 496 | 669 |
| Vehicle Collisions | 13 | 15 | 15 | 7 | 18 | 12 | 6 | 17 |
| All Vehicle Pursuits | 77 | 99 | 83 | 57 | 18 | 64 | 87 | 68 |
| All Arrest | 3656 | 3649 | 3516 | 2943 | 2853 | 3697 | 2759 | 3156 |
| Arrests including PC 69, 148(a), 243(b)(c) & 245(c)(d) | 58 | 72 | 58 | 31 | 34 | 36 | 28 | 27 |
| Arrests only for PC 69, 148(a), 243(b)(c) & 245(c)(d) | 38 | 24 | 8 | 7 | 9 | 4 | 5 | 2 |
| Awards | 66 | 99 | 121 | | 76 | 55 | 65 | 124 |
| Assignment History | 9414 | 9588 | 9720 | 9791 | 10361 | 10337 | 10257 | 33243 |
| Case Evaluation Reports | 209 | 191 | 453 | 203 | 635 | 444 | 338 | 497 |
| Report Review Notices--Positive | 6 | 7 | 12 | 12 | 5 | 8 | 1 | 1 |
| Report Review Notices--Negative | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Canine Deployments | 96 | 93 | 63 | 43 | 64 | 59 | 57 | 50 |
| Financial Claims | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Internal Affairs Complaints | 404 | 375 | 465 | 277 | 186 | 295 | 140 | 136 |
| In-Custody Injuries | 75 | 39 | 24 | 13 | 21 | 13 | 2 | 31 |
| Civil Suits (Tort Claims) | 11 | 7 | 11 | 3 | 4 | 4 | 2 | 4 |
| Criminal Cases Dropped | 20 | 87 | 300 | 91 | 416 | 282 | 207 | 352 |
| O.C. Checkouts | 55 | 29 | 15 | 11 | 58 | 16 | 61 | 13 |
| Officer Involved Shootings | 4 | 3 | 2 | 1 | 2 | 3 | 1 | 0 |
| Rank / Class History | 2286 | 2272 | 2338 | 2326 | 2391 | 2334 | 2357 | 7302 |
| Training History | 26100 | 11255 | 5182 | 2096 | 20108 | 19589 | 8557 | 13827 |
| Supervisory Notes | 3568 | 3139 | 3072 | 3117 | 3139 | 3304 | 2852 | 2957 |
| Arrest Made Against OPD | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 1 |

During the current reporting period, the Department continued to move forward in areas relevant to compliance. As noted above, the associated policy was approved, and substantial progress was made toward the implementation of IPAS 2. The arrest data problems persisted through a substantial part of the reporting period, thus supporting a continued finding of partial compliance. We will reexamine these areas for progress in our next report. At the current time, these issues support continued recognition of partial compliance with Task 40.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 63

Compliance Status:
Phase 1:  In compliance
Phase 2:  Partial compliance


# Task 41:  Use of Personnel Assessment System (PAS)

Requirements:
*Within 375 days from the effective date of this Agreement, OPD shall develop a policy for use of the system, including supervision and audit of the performance of specific members, employees, supervisors, managers, and OPD units, as well as OPD as a whole.  The policy shall include the following elements:*

1. *The Chief of Police shall designate a PAS Administration Unit.  The PAS Administration Unit shall be responsible for administering the PAS policy and, no less frequently than quarterly, shall notify, in writing, the appropriate Deputy Chief/Director and the responsible commander/manager of an identified member/employee who meets the PAS criteria.  PAS is to be electronically maintained by the City Information Technology Department.*

2. *The Department shall retain all PAS data for at least five (5) years.*

3. *The Monitor, Inspector General and Compliance Coordinator shall have full access to PAS to the extent necessary for the performance of their duties under this Agreement and consistent with Section XIII, paragraph K, and Section XIV of this Agreement.*

4. *PAS, the PAS data, and reports are confidential and not public information.*

5. *On a quarterly basis, commanders/managers shall review and analyze all relevant PAS information concerning personnel under their command, to detect any pattern or series of incidents which may indicate that a member/employee, supervisor, or group of members/employees under his/her supervision may be engaging in at-risk behavior.  The policy shall define specific criteria for determining when a member/employee or group of members/employees may be engaging in at-risk behavior.*

6. *Notwithstanding any other provisions of the PAS policy to be developed, the Department shall develop policy defining peer group comparison and methodology in consultation with Plaintiffs' Counsel and the IMT.  The policy shall include, at a minimum, a requirement that any member/employee who is identified using a peer group comparison methodology for complaints received during a 30-month period, or any member who is identified using a peer group comparison methodology for Penal Code §§69, 148 and 243(b)(c) arrests within a 30-month period, shall be identified as a subject for PAS intervention review.  For the purposes of these two criteria, a single incident shall be counted as "one" even if there are multiple complaints arising from the incident or combined with an arrest for Penal Code §§69, 148 or 243(b)(c).*

7. *When review and analysis of the PAS threshold report data indicate that a*

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 64

*member/employee may be engaging in at-risk behavior, the member/employee's immediate supervisor shall conduct a more intensive review of the member/employee's performance and personnel history and prepare a PAS Activity Review and Report. Members/employees recommended for intervention shall be required to attend a documented, non-disciplinary PAS intervention meeting with their designated commander/manager and supervisor. The purpose of this meeting shall be to review the member/employee's performance and discuss the issues and recommended intervention strategies. The member/employee shall be dismissed from the meeting, and the designated commander/manager and the member/employee's immediate supervisor shall remain and discuss the situation and the member/employee's response. The primary responsibility for any intervention strategies shall be placed upon the supervisor. Intervention strategies may include additional training, reassignment, additional supervision, coaching or personal counseling. The performance of members/ employees subject to PAS review shall be monitored by their designated commander/manager for the specified period of time following the initial meeting, unless released early or extended (as outlined in Section VII, paragraph B (8)).*

8.     *Members/employees who meet the PAS threshold specified in Section VII, paragraph B (6) shall be subject to one of the following options: no action, supervisory monitoring, or PAS intervention. Each of these options shall be approved by the chain-of-command, up to the Deputy Chief/Director and/or the PAS Activity Review Panel.*

*Members/employees recommended for supervisory monitoring shall be monitored for a minimum of three (3) months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor. The first at the end of one (1) month and the second at the end of three (3) months. Members/employees recommended for PAS intervention shall be monitored for a minimum of 12 months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor and designated commander/manager: The first at three (3) months and the second at one (1) year. Member/employees subject to PAS intervention for minor, easily correctable performance deficiencies may be dismissed from the jurisdiction of PAS upon the written approval of the member/employee's responsible Deputy Chief, following a recommendation in writing from the member/employee's immediate supervisor. This may occur at the three (3)-month follow-up meeting or at any time thereafter, as justified by reviews of the member/employee's performance. When a member/employee is not discharged from PAS jurisdiction at the one (1)-year follow-up meeting, PAS jurisdiction shall be extended, in writing, for a specific period in three (3)-month increments at the discretion of the member/employee's responsible Deputy Chief. When PAS jurisdiction is extended beyond the minimum one (1)-year review period, additional review meetings involving the member/employee, the member/ employee's designated commander/manager and immediate supervisor, shall take place no less*

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 65

*frequently than every three (3) months.*

9. *On a quarterly basis, Division/appropriate Area Commanders and managers shall review and analyze relevant data in PAS about subordinate commanders and/or managers and supervisors regarding their ability to adhere to policy and address at-risk behavior. All Division/appropriate Area Commanders and managers shall conduct quarterly meetings with their supervisory staff for the purpose of assessing and sharing information about the state of the unit and identifying potential or actual performance problems within the unit. These meetings shall be scheduled to follow-up on supervisors' assessments of their subordinates' for PAS intervention. These meetings shall consider all relevant PAS data, potential patterns of at-risk behavior, and recommended intervention strategies since the last meeting. Also considered shall be patterns involving use of force, sick leave, line-of-duty injuries, narcotics-related possessory offenses, and vehicle collisions that are out of the norm among either personnel in the unit or among the unit's subunits. Division/appropriate Area Commanders and managers shall ensure that minutes of the meetings are taken and retained for a period of five (5) years. Commanders/managers shall take appropriate action on identified patterns of at-risk behavior and/or misconduct.*

10. *Division/appropriate Area Commanders and managers shall meet at least annually with his/her Deputy Chief/Director and the IAD Commander to discuss the state of their commands and any exceptional performance, potential or actual performance problems or other potential patterns of at-risk behavior within the unit. Division/appropriate Area Commanders and managers shall be responsible for developing and documenting plans to ensure the managerial and supervisory accountability of their units, and for addressing any real or potential problems that may be apparent.*

11. *PAS information shall be taken into account for a commendation or award recommendation; promotion, transfer, and special assignment, and in connection with annual performance appraisals. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

12. *Intervention strategies implemented as a result of a PAS Activity Review and Report shall be documented in a timely manner.*

13. *Relevant and appropriate PAS information shall be taken into account in connection with determinations of appropriate discipline for sustained misconduct allegations. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

14. *The member/employee's designated commander/manager shall schedule a PAS Activity Review meeting to be held no later than 20 days following notification to the Deputy Chief/Director that the member/employee has met a PAS threshold and when intervention is recommended.*

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 66

15.  *The PAS policy to be developed shall include a provision that a member/employee making unsatisfactory progress during PAS intervention may be transferred and/or loaned to another supervisor, another assignment or another Division, at the discretion of the Bureau Chief/Director if the transfer is within his/her Bureau. Inter-Bureau transfers shall be approved by the Chief of Police. If a member/employee is transferred because of unsatisfactory progress, that transfer shall be to a position with little or no public contact when there is a nexus between the at-risk behavior and the "no public contact" restriction. Sustained complaints from incidents subsequent to a member/employee's referral to PAS shall continue to result in corrective measures; however, such corrective measures shall not necessarily result in a member/employee's exclusion from, or continued inclusion in, PAS. The member/employee's exclusion or continued inclusion in PAS shall be at the discretion of the Chief of Police or his/her designee and shall be documented.*

16.  *In parallel with the PAS program described above, the Department may wish to continue the Early Intervention Review Panel.*

17.  *On a semi-annual basis, beginning within 90 days from the effective date of this Agreement, the Chief of Police, the PAS Activity Review Panel, PAS Oversight Committee, and the IAD Commander shall meet with the Monitor to review the operation and progress of the PAS. At these meetings, OPD administrators shall summarize, for the Monitor, the number of members/employees who have been identified for review, pursuant to the PAS policy, and the number of members/employees who have been identified for PAS intervention. The Department administrators shall also provide data summarizing the various intervention strategies that have been utilized as a result of all PAS Activity Review and Reports. The major objectives of each of these semi-annual meetings shall be consideration of whether the PAS policy is adequate with regard to detecting patterns of misconduct or poor performance issues as expeditiously as possible and if PAS reviews are achieving their goals.*

18.  *Nothing in this Agreement, and more specifically, no provision of PAS, shall be construed as waiving, abrogating or in any way modifying the Department's rights with regard to discipline of its members/employees. The Department may choose, at its discretion, to initiate the administrative discipline process, to initiate PAS review or to use both processes concurrently or consecutively.*

(Negotiated Settlement Agreement VII. B.)

Background:

This requirement addresses the effectiveness of the use of PAS to manage risk in the Department. Much of the discussion below addresses to process with regard to identifying and assessing individual officers based on risk-related behavior and intervening as appropriate. The system also supports a broader approach to managing risk in which the Department continuously assesses activity and seeks to incorporate those assessments more broadly. The Department has continued to reflect the adoption of this perspective. The Department is holding monthly risk management meetings at which police district data are reviewed with command and district staff.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 67

Discussion:

As noted above and in our last report, OPD revised and issued Departmental General Order D-17, Personnel Assessment Program in November 2013.  Based on the existing policy, we again find OPD in continued Phase 1 compliance with this Task.

For this reporting period, we continued our examination of the stages of the PAS process consistent with this Task.  We examined the threshold analyses that were performed for the period of October 1, through December 31, 2013.  This included a review of peer-based threshold analyses completed by the PAS Administration Unit and the identification of officers meeting the single-event threshold.

In accordance with this Task requirement, we reviewed PAS processes for the system's use in placement of officers on special assignment, transfer of officers, and commendations.  An important function of PAS is to regularly provide supervisors with relevant information on officers.  To consider that function, we again reviewed reports of regular quarterly PAS command reviews of officers by supervisors.  We found appropriate use of the system and no significant issues.

The PAS process also calls for follow-up reports of officers under supervision or monitoring, as well as reports of officers not discharged from the process by the end of one year.  We again reviewed reports that were completed during the current reporting period.  These document supervisory reviews of officers who have been selected for some form of action as a result of PAS reviews.

For the reporting period ending December 31, 2013, OPD concluded a total of 11 PAS reviews; down from 21 in the previous reporting period.  Those declines reflect both the change to initial internal reviews, which started under the revised policy during the quarter; and efforts to reduce the number of false positive finding where reviews revealed no significant problems.  Two additional reviews that were begun in the previous quarter were completed during the reporting period.  Reviews are included in the table below only after they are signed off through the level of the PAS Review Panel.  The table also shows that 26 officers exceeded thresholds for review during this quarter.

The table below tracks the review process and shows that supervisors recommended that no action be taken in 10, or 90% of the 11 reviews for the current reporting period.  That is up from 71% the previous quarter, and is higher than expected based on past practice.  The table also shows that Commanders and Deputy Chief did not disagree with any lower-level recommendations.  The PAS Review Panel reversed one on case by requiring monitoring.

During the current reporting period, there were substantial changes made to the risk management process.  Under the new policy, internal initial reviews within the PAS Unit began during the quarter.  The unit has also recently come under new leadership.  At the same time, OPD completed extensive work on the development and implementation of the new risk management database.  This activity and the small number of cases overall may contribute of the outcomes

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 68

showing low levels of monitoring and intervention for the quarter.  We will continue to scrutinize the process to assure that appropriate standards are maintained.

The value of the data in the chart below is in tracking data over time, and using it to increase the rigors of the review process as it serves the goal of risk reduction.

## Summary of PAS Reviews and Recommendations 2012-13

| | PAS Reviews Completed | Supervisor Rec – no action | % | Recognition | % | Supervisor Rec - Monitoring | % | Supervisor Rec- Intervention | % | Commander rec Concurs w Supervisor | % | Dep. Chief Concurs w Commander | % | PAS Panel Concurs w DC | % | Pending | Number of personnel that exceeded a threshold |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2012** | | | | | | | | | | | | | | | | | |
| January | 7 | 5 | 71% | 0 | 0% | 2 | 29% | 0 | 0% | 7 | 100% | 7 | 100% | 7 | 100% | 7 | 14 |
| February | 5 | 4 | 80% | 0 | 0% | 1 | 20% | 0 | 0% | 2 | 40% | 2 | 40% | 2 | 40% | 0 | 59 |
| March | 19 | 12 | 63% | 0 | 0% | 4 | 21% | 3 | 16% | 18 | 95% | 17 | 89% | 18 | 95% | 33 | 7 |
| April | 25 | 17 | 68% | 0 | 0% | 5 | 20% | 3 | 12% | 25 | 100% | 25 | 100% | 25 | 100% | 22 | 41 |
| May | 27 | 17 | 63% | 0 | 0% | 2 | 7% | 0 | 0% | 26 | 96% | 25 | 92% | 27 | 100% | 14 | 58 |
| June | 43 | 41 | 95% | 0 | 0% | 2 | 5% | 0 | 0% | 41 | 95% | 42 | 98% | 43 | 100% | 15 | 17 |
| July | 66 | 61 | 92% | 1 | 5% | 3 | 5% | 2 | 30% | 65 | 98% | 65 | 98% | 64 | 97% | 0 | 18 |
| August | 32 | 29 | 90% | 1 | 0% | 2 | 6% | 0 | 0% | 27 | 84% | 26 | 81% | 27 | 84% | 8 | 35 |
| September | 15 | 10 | 67% | 1 | 0.1 | 3 | 20% | 1 | 7% | 15 | 100% | 11 | 73% | 13 | 87% | 1 | 16 |
| October | 12 | 10 | 83% | 0 | 0% | 2 | 17% | 0 | 0% | 11 | 92% | 11 | 92% | 12 | 100% | 0 | 26 |
| November | 16 | 11 | 69% | 1 | 1% | 2 | 13% | 3 | 19% | 15 | 94% | 10 | 63% | 12 | 75% | 0 | 47 |
| December | 22 | 16 | 73% | 0 | 0% | 6 | 27% | 0 | 0% | 21 | 95% | 19 | 86% | 22 | 100% | 0 | 14 |
| **Total** | 289 | 233 | | 4 | | 34 | | 12 | | 273 | | 260 | | 272 | | 100 | 352 |
| *Average* | *24.1* | *19.4* | *76%* | *0.3* | *1%* | *2.8* | *0* | *1.0* | *7%* | *22.8* | *91%* | *21.7* | *84%* | *22.7* | *90%* | *8.3* | *29.3* |
| **2013** | | | | | | | | | | | | | | | | | |
| January | 27 | 19 | 70% | 1 | 4% | 7 | 26% | 0 | 0% | 27 | 100% | 27 | 100% | 24 | 89% | 5 | 14 |
| February | 13 | 13 | 100% | 0 | 0% | 0 | 0% | 0 | 0% | 9 | 69% | 8 | 62% | 10 | 77% | 5 | 7 |
| March | 10 | 10 | 100% | 0 | 0% | 1 | 10% | 0 | 0% | 10 | 100% | 10 | 100% | 6 | 60% | 6 | 11 |
| April | 10 | 10 | 100% | 0 | 0% | 0 | 0% | 0 | 0% | 10 | 100% | 10 | 100% | 9 | 90% | 2 | 4 |
| May | 14 | 8 | 57% | 2 | 14% | 2 | 14% | 2 | 14% | 14 | 100% | 13 | 93% | 12 | 86% | 8 | 18 |
| June | 11 | 10 | 91% | 0 | 0% | 1 | 9% | 0 | 0% | 11 | 100% | 10 | 91% | 8 | 73% | 1 | 4 |
| July | 4 | 2 | 50% | 0 | 0% | 1 | 25% | 1 | 25% | 4 | 100% | 4 | 100% | 4 | 100% | 2 | 12 |
| August | 9 | 6 | 67% | 0 | 0% | 3 | 33% | 0 | 0% | 7 | 78% | 8 | 89% | 7 | 78% | 1 | 12 |
| September | 8 | 7 | 88% | 0 | 0% | 0 | 0% | 1 | 13% | 8 | 100% | 8 | 100% | 7 | 88% | 0 | 0 |
| October | 2 | 2 | 100% | 0 | 0% | 0 | 0% | 0 | 0% | 2 | 100% | 2 | 100% | 2 | 100% | 0 | 0 |
| November | 2 | 2 | 100% | 0 | 0% | 0 | 0% | 0 | 0% | 2 | 100% | 2 | 100% | 1 | 50% | 5 | 11 |
| December | 7 | 6 | 86% | 0 | 0% | 1 | 14% | 0 | 0% | 7 | 100% | 7 | 100% | 7 | 100% | 4 | 15 |
| **Total** | 117 | 94 | | 3 | | 16 | | 4 | | 111 | | 109 | | 97 | | 39 | 108 |
| *Average* | *9.8* | *7.8* | *83%* | *0.3* | *1%* | *1.3* | *11%* | *0.3* | *4%* | *9.3* | *96%* | *9.1* | *95%* | *8.1* | *82%* | *3.3* | *9.0* |

For our quarterly reports, we also review the PAS histories of officers who had either a Level 1 use of force or been arrested for a criminal offense in the past quarter.  For this quarter, no officers fell into these categories.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 69

As noted above, during this reporting period, the Department dealt with a complicated agenda of risk management issues.  Significant policy changes occurred, new data processes were finalized and implemented Department-wide, the Risk Management Unit came under new leadership, and work toward a new risk management database was completed.  The outcome of all of this effort is, as yet, unclear.  We are concerned the large number of issues may distract from the day-to-day work of risk management.  The data on identification and intervention are unclear – given the small number of cases – but the potential for problems is suggested by the low levels of monitoring and intervention for the cases we reviewed in this reporting period.  This is an issue we will consider closely in our next review.

We look forward to resolving these concerns in our next review of both the technical and applied dimensions of the risk management process.

Compliance Status:
Phase 1:  In compliance
Phase 2:  Partial compliance

Next Steps:
For the next reporting period, we again anticipate that there will be significant further developments regarding risk management.  The problems with the arrest data should, at long last, be completely resolved based on the changes that occurred in this past quarter.  Progress should be clear on the development of IPAS2.  We will consider all of these matters in the next reporting period.  We will also be particularly interested to examine the PAS review process.  Our chief focus will remain on the effective use of the risk management system during the quarter.


# Task 42:  Field Training Program

Requirements:
*Within 323 days of the effective date of this Agreement, OPD shall develop and implement a plan to enhance its Field Training Program.  This plan shall address the criteria and method for selecting FTOs, the training provided to FTOs to perform their duty, supervision and evaluation of FTOs, the length of time that trainee officers spend in the program, and the methods by which FTOs assess and evaluate trainee officers in field training.  The plan must ensure proper reporting, review and approval of probationary officers' reports.*

*Field Training Program Coordinator*
*The Chief of Police shall assign a full-time sergeant for the first year who shall develop and implement the new policies and procedures described in this section.  The Chief of Police shall determine, upon successful completion of the development and implementation of these policies, if it is necessary to continue the position at the rank of sergeant, but in any event, the position shall continue as a full-time position.*

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 70

*Trainee Rotation*
*During their field training, trainee officers shall rotate to a new FTO and a new geographic area of the City at predetermined intervals. Prior to rotation, trainee officers shall be interviewed by the Field Training Program Coordinator or his/her designee and given an opportunity to raise any questions or concerns they may have about the quality of training provided to them.*

*FTO Participation Incentives*
*OPD shall increase the incentives for participation in the FTO program so that the Department will have a larger pool of qualified, experienced candidates from which to choose.*

*FTO Candidate Nomination and Requirements*
*FTO candidates shall be nominated by field supervisors and commanders, but shall be approved for assignments to this duty, and for retention in it, by the Chief of Police. All FTO candidates must have completed three (3) years of Departmental service before selection, unless specifically authorized by the Chief of Police. FTO candidates shall be required to demonstrate their commitment to community policing, and their problem- solving and leadership abilities. Ethics, professionalism, relationships with the community, quality of citizen contacts and commitment to OPD philosophy shall be primary criteria in the selection of FTOs. Excessive numbers of sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304, or excessive numbers of use of force incidents shall bar a candidate from selection as an FTO for no less than two (2) years.*

*Decertification*
*The presumptive result of sustained disciplinary action, completed within the time limits imposed by Government Code Section 3304, against an FTO or the FTO Program Coordinator for excessive force, unlawful arrest, false testimony, racial, ethnic, sexual-orientation or gender-based discrimination or slurs, or other serious examples of police misconduct, shall be removal from the FTO program. The Deputy Chief of the member's chain of command may recommend to the Chief of Police to grant an exception to this presumption after conducting a hearing on the facts of the matter. The Chief of Police shall document the approval/disapproval in writing.*

*FTO Assignment*
*Assignment to an FTO position shall be contingent upon successful completion of a training course designed for this position and shall be approved by OPD and the State of California Peace Officers' Standards and Training.*

*FTO Evaluation*
*At the end of a complete FTO cycle, trainee officers leaving the FTO program shall anonymously evaluate each of their FTOs. OPD shall develop a form for such evaluations which emphasize effectiveness at training and effectiveness at supervision. The evaluation form shall also assess the degree to which the FTO program reflected policies, procedures, values and other information taught in the recruit academy. The FTO evaluation forms shall be reviewed by the Field Training Program Coordinator and the individual FTO's commander and supervisor. The Field Training Program Coordinator shall provide evaluation information to the FTOs as a*

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 71

*group, concerning program effectiveness. Each FTO shall also be provided with evaluation information regarding their individual performance. The individual evaluation forms shall not be made available to individual FTOs in the interest of maintaining anonymity of trainee officers who have completed the forms.*

*Daily Evaluation Audit*
*The Field Training Program Coordinator, or his/her designee, shall conduct random audits of the FTO program to ensure that FTOs complete daily evaluations of trainee officers and that the selection standards for FTOs are maintained.*

*Trainee Officer Assignment*
*When a trainee officer's FTO is absent, the trainee officer shall not be assigned to field duties with an "acting" FTO. They shall be placed with another certified FTO, or shall be assigned to non-field duties, pending the availability of a certified FTO.*

*Field Commander and FTO Supervisor Training*
*OPD shall provide field commanders and supervisors with training on the FTO program, including the field-training curriculum, the role of the FTO, supervision of FTOs and probationary employees, the evaluation process and the individual duties and responsibilities within the FTO program.*

*Focus Groups*
*The Field Training Program Coordinator and Academy staff shall conduct focus groups with randomly selected trainee officers midway through the field-training cycle, upon completion of field training, and six (6) months after completion of the field training program, to determine the extent to which the Academy instructors and curriculum prepared the new officers for their duties.*

*Consistency of Training*
*The results of these focus group sessions shall be reviewed at a meeting to include the Training Division Commander, the FTO Program Coordinator, the BFO Deputy Chief, and the BOS Deputy Chief. If it is determined that there is a substantial discrepancy between what is taught in the Academy and what is taught in the FTO program, there shall be a determination as to which is correct, and either the training Academy or the FTO program shall make the necessary changes so that the desired training information is consistent. In the event that the discrepancies appear to be the result of one or more individual FTOs, rather than the FTO program as a whole, the review group shall determine whether the discrepancies are serious enough to warrant removal of that officer or officers from the FTO program. The results of the meeting of this review group shall be documented and this information shall be provided to the Monitor.*
(Negotiated Settlement Agreement VIII. A.-L.)

Background:
OPD has been in compliance with this Task for the last five reporting periods.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 72

Discussion:

As previously reported, OPD published Departmental General Order B-8, *Field Training Program*, which incorporates the requirements of Task 42, on March 2, 2009.  As the Department has trained at least 95% of relevant personnel on this revised policy, we find OPD in continued Phase 1 compliance with this Task.

As of the publication of this report, the Department is revising DGO B-8; we will discuss this further in our next report.

During our most recent review, we interviewed the former Field Training Coordinator and the sergeant who was recently appointed to serve as Field Training Coordinator; and reviewed related memoranda, evaluation forms, and other documentation.  The former FTO Coordinator has been transferred to a new assignment but loaned to the FTO Unit to ensure that the new coordinator has the full advantage of his knowledge about the program.

At the time of our November 2013 site visit, 36 trainees were in the field assigned to FTO officers.  These trainees had begun their FTO Program assignments in September and have been rotated to different FTOs once.  Thirty of these trainees have since graduated from the FTO Program and moved to full assignment as police officers.  Seven officers are currently in the FTO Program, including two who were extended, four who were in a transitional course, and one who resigned but has been permitted to return for a second attempt at the FTO Program.

As of our last site visit, there were 51 FTOs – eight of whom were unavailable for assignment as FTOs due to their current work assignment.  Twenty-three officers were being processed to serve as FTOs.  At the time of our November 2013 visit, these officers were awaiting panel interview and selection by the Chief.  During this reporting period, we found that the selection of the 23 officers had proceeded, and 18 had been recommended and approved by the Chief.  At present, OPD has 61 FTOs approved, of which 51 are available for assignment.  The rest are unavailable due to work assignment, injury, or medical status.

**Task 42.1** requires that the Field Training Program Coordinator is a full-time position (compliance standard: Yes/No).  A full-time sergeant is currently assigned to supervise the program.  There are two police officers assigned to assist the FTO Coordinator.  OPD is in compliance with this subtask.

**Task 42.2.1** requires that trainee officers rotate to a new Field Training Officer (FTO) and a new geographic area of the City at predetermined intervals (compliance standard:  90%).  Trainees are rotated every four weeks to a new assignment and new FTO.  While the FTO Program Coordinator reports that he finds it difficult to assign trainees to different sections of the City, when the recent rotations occurred, he was able to accomplish the required rotation.

**Task 42.3.1** requires that incentives for participation as an FTO be increased (compliance standard:  Yes/No).  Officers who serve as FTOs are paid incentive pay for their service.  In addition, the program includes several incentives (e.g., chevrons, administrative days, and

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 73

priority for selection as training) as incentives for participation.  No changes to the incentives for participation in the FTO Program have occurred during the current reporting period.  OPD is in compliance with this subtask.

**Task 42.4.1** requires that field supervisors and commanders nominate FTO candidates (compliance standard:  90%), and the Chief of Police determines FTO assignments and retention (compliance standard:  Yes/No); **Task 42.4.2** requires that FTO candidates complete three years of service before selection, unless authorized by the Chief (compliance standard:  Yes/No); **Task 42.4.3** requires that FTO candidates are required to demonstrate commitment to community policing and problem solving and leadership abilities (compliance standard:  95%); **Task 42.4.4** requires that ethics, professionalism, relationships with the community, quality of citizen contacts and commitment to OPD philosophy are primary criteria in the selection of FTOs (compliance standard:  95%); and **Task 42.4.5** requires that candidates with excessive numbers of citizen complaints, sustained investigations or excessive numbers of use of force incidents are barred from selection as an FTO for no less than two years (compliance standard:  95%).  Supervisors and commanders recommend candidates, who must have work and performance records as required by this section.  FTOs are screened for commitment to community policing and candidates with excessive numbers of complaints and/or sustained instances of uses of force are not selected.  The selection of all FTOs to be certified (newly selected FTOs) and those to be recertified (FTO previously selected and decertified when new officers were not being hired) followed the requirements outlined in the NSA.  As noted above, the screening of the 23 new candidates – 16 of which have been added to the FTO Program – has been completed.  OPD is in compliance with these subtasks.

**Task 42.5** requires that FTOs be decertified following sustained disciplinary action for serious misconduct specified (compliance standard:  Yes/No).  During the current reporting period, one officer was decertified for sustained Class 1 violation.  The FTO Program Coordinator identified this officer in his monthly review of IAD sustained findings, and removed the officer from the FTO Program.  Another officer was decertified because he was transferred to criminal investigative duties.  OPD is in compliance with this subtask.

**Task 42.6** requires that assignment to a FTO position is contingent upon successful completion of a training course for the position (compliance standard:  Yes/No).  FTOs are not assigned until they have successfully completed program training.  OPD is in compliance with this subtask.

**Task 42.7.1** requires that at the end of a complete FTO cycle, trainee officers anonymously evaluate each of their FTOs (compliance standard:  95%); **Task 42.7.2** requires that FTO evaluation forms are reviewed by the Program Coordinator and the FTO's commander and supervisor (compliance standard:  95%); **Task 42.7.3** requires that the Field Training Program Coordinator provides evaluation information to the FTOs as a group, concerning program effectiveness (compliance standard:  Yes/No); **Task 42.7.4** requires that each FTO is provided with evaluation information regarding his/her individual performance (compliance standard:  Yes/No); and **Task 42.7.5** requires that individual evaluation forms are not made available to individual FTOs in the interest of maintaining anonymity of trainee officers who have completed

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 74

the forms (compliance standard:  Yes/No).  Trainees are evaluated by their FTOs on a daily basis beginning with their second week of field assignment.  The patrol sergeant prepares a weekly progress report; and at the end of each four-week cycle, the FTO prepares an end-of-phase report.  Trainee officers anonymously evaluate their FTOs at the end of each phase.  Trainees are provided evaluations of their performance throughout the program.  FTOs do not receive individual evaluation forms but do receive feedback regarding their performance.  The evaluation forms are reviewed by the FTP Coordinator, commander, and supervisor; and filed in the FTO Coordinator's office.  OPD is in compliance with these subtasks.

**Task 42.8** requires that the Field Training Program Coordinator, or his/her designee, conduct random audits of the FTO program to ensure that FTOs complete daily evaluations of trainee officers (compliance standard:  Yes/No).  FTOs complete a daily evaluation of the trainees; and the FTO Program Coordinator receives, reviews, audits, and files all evaluation forms.  OPD is in compliance with this subtask.

**Task 42.9** requires that when a trainee officer's FTO is absent, the trainee officer is not assigned to field duties with an "acting" FTO, but is placed with another certified FTO, or assigned to non-field duties, pending the availability of a certified FTO (compliance standard:  95%).  If a trainee's FTO is unavailable, the trainee is assigned to another FTO.  If no FTO is available, the trainee is assigned to a sergeant or non-patrol assignment.  In the past there have been situations in which the FTO Coordinator discovered that a trainee officer had been assigned for a brief period to work with an officer who had not been approved as an FTO by the Chief.  The FTO Coordinator moved quickly to ensure that the trainee was reassigned to an approved FTO and that the supervisors and commanders were aware of the requirement that trainees can only work with Department-certified FTOs.  No such incident occurred during the third or fourth quarters of 2013.  OPD is in compliance with this subtask.

**Task 42.10** requires that Field Commanders and FTO Supervisors be provided training (compliance standard:  95%).  All sergeants and commanders to whom FTOs would be assigned were trained by the program in both group and individual sessions before they were assigned FTO duties.  OPD is in compliance with this subtask.

**Task42.11** requires that focus groups are conducted by the Field Training Program Coordinator and Academy staff with randomly selected trainee officers midway through the field-training cycle, upon completion of field training, and six months after completion of the field training program (compliance standard:  Yes/No).  The coordinator conducts focus groups with randomly selected trainees, as required by the NSA.  The focus group is designed to elicit issues encountered in the program and ensure that inconsistencies in training are identified and rectified.  During December 2013, the FTO Unit conducted focus groups for the trainees in the 166th Academy, the second focus group sessions, and for the 167th Academy, the first focus group sessions.  OPD is in compliance with this subtask.

**Task 42.12** requires that the results of the focus group sessions be reviewed at a meeting to include the Training Section Commander, the FTO Program Coordinator, the BFO Deputy

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 75

Chief, and the BOS Deputy Chief (compliance standard:  Yes/No).  The required meeting for the two focus groups held in December 2013 was held on December 19, 2013 and attended by the Deputy Chief of BFO1, the Training Commander (represented by a lieutenant), the BFO Administrative Commander (represented by a lieutenant), and the FTO Coordinator.  The results were documented in a memorandum for the Chief.

The FTO Program Coordinator explores the consistency of field training with that of the Academy at several points during the program.  He interviews every trainee every four weeks before they are rotated to new assignments and new FTOs.  He also participates in biweekly meetings with the Training Commander in which the FTO training is discussed to identify training issues.  At the end of the FTO training cycle, a final evaluation report of the trainee's performance is prepared; and trainees rate the FTOs and the program.  In order to ensure that training and the FTO Program are consistent, biweekly meetings attended by the Training Commander, the FTO Coordinator, and his lieutenant are held.  A final focus group was held on January 14, 2014, for the 166th Academy.  The information generated in that focus group was documented in a memorandum for the Chief and will be considered at the next quarterly panel review.

As we observed in our last four reports, OPD has fulfilled the requirements of Task 42.  Increasing the number of approved and trained FTOs who are available to work alongside a larger number of trainees is important to the continued success of the program.

OPD is in Phase 2 compliance with Task 42.

Compliance Status:
Phase 1:  In compliance
Phase 2:  In compliance


## Task 43:  Academy and In-Service Training

Requirements:
A.  *Academy Training Plan*
    *Within 540 days of the effective date of this Agreement,* <u>*OPD shall develop and implement a plan to enhance its Academy and in-service training to ensure that OPD members, dispatchers, and civilian evidence technicians are adequately trained for their positions, and aware of and able to implement the most contemporary developments in police training.*</u>  *This plan shall include a review of OPD's training curriculum, with additional emphasis on ethics and professionalism, critical thinking and problem solving, conflict resolution, and relationships with the community.  The plan shall also address the criteria and method for selecting OPD training instructors, the training provided to instructors, procedures for evaluating the content and quality of training provided to OPD personnel and procedures for maintaining training records for OPD personnel.  In*

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 76

> *arriving at the plan regarding staffing, training content and methodology, OPD shall consult with at least four (4) other, large law-enforcement agencies within the United States which have excellent reputations for professionalism.  In particular, OPD shall consult with these agencies about qualifications and other criteria to be used in selecting staff for training positions.  OPD shall also review the approach of these other law enforcement agencies in training both new staff and experienced staff on ethics and professionalism, critical thinking and problem solving, conflict resolution, and relationships with the community.*

B.    *Professionalism and Ethics*

> *OPD shall expand professionalism and ethics as a training topic within the recruit academy, in-service training, and field training.  Wherever possible, OPD shall include and address issues of professionalism and ethics using curricula that employ realistic scenario-based training exercises.*

C.    *Supervisory and Command Training*

> *OPD shall provide all sergeants and commanders with mandatory 40-hour in-service supervisory and leadership training.  Officers shall attend training prior to promotion to the rank of sergeant.  Lieutenants shall attend training within six (6) months of promotion.  Such training shall include supervisory and command accountability, and ethics and professionalism, with emphasis on supervisory and management functions and situations, and shall include both scenario-based training and case studies.*

D.    *In-Service Training*

> *OPD shall provide all members with forty (40) hours of in-service training every eighteen (18) months.*
>
> 1.    *Sergeants shall receive at least 20 hours of training designed for supervisors every 18 months.*
>
> 2.    *Members at the rank of lieutenant and above shall receive at least 20 hours of training designed for commanders every 18 months.*

E.    *Training Staff Record Review*

> *Appointment to the Academy staff or other staff training position shall also require a review of the record of the individual being considered, to ensure that the individual does not have a record of any Class I offense, as defined in Section III, paragraph H (1), within the prior two (2) years, and that the individual is supportive of the philosophy and values of OPD.[17]*
>
> (Negotiated Settlement Agreement IX. A.-E.)

Background:

Only one provision of Task 43 (43.1.1) is being actively monitored under the MOU.  This subtask requires OPD to ensure that OPD members, dispatchers, and civilian evidence technicians are adequately trained for their positions.  During the last reporting period, we found that 100% of the members and employees in our random sample received the required in-service training.  We expressed concern for the training of the Police Evidence Technicians, and noted that that five of 12 PETs had received inadequate training during the past two years.

---

[17]The underlined requirement is the only provision of Task 43 that is being actively monitored under the MOU.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 77

Discussion:

As previously reported, OPD published General Order B-20, *Departmental Training Program* (April 6, 2005), which incorporates the requirements of Task 43.  As the Department has trained at least 95% of relevant personnel on these policies, OPD is in continued Phase 1 compliance with this Task.

**Task 43.1.1** requires that OPD's training plan ensure that OPD members, dispatchers, and civilian evidence technicians are adequately trained for their positions (compliance standard: Yes/No).  For this reporting period, inasmuch as OPD has been in compliance since our first report (dated April 22, 2010) with providing adequate training to its officers, sergeants and dispatchers for over two years, we reduced the numbers of records we sampled to 30.  Our sample included 24 officers, four sergeants, one dispatcher, and one PET to determine if the members and employees received adequate training for their positions.

The Department produced a record for each member and employee in our sample.  For each, we reviewed the training s/he received during previous years, and calculated the number of hours recorded in his/her record.  For the sworn officers in our sample, we credited the California Peace Officer Standards and Training (POST)-certified Continued Professional Training (CPT) as counting toward the requirement.  CPT is, according to California state requirements, to be delivered to every officer every two years; OPD uses an 18-month cycle.

One officer in our survey was excused for medical reasons.  Overall, all 29 (100%) of the 29 members and employees in our sample who were available to train received appropriate training to their jobs.  The following chart reflects the results of our survey.

|  | Records Reviewed | Retired, Resigned or Medical | Available to Train | Adequate Training Received | % |
|---|---|---|---|---|---|
| Officers | 24 | 1 | 23 | 23 | 100% |
| Sergeants | 4 | 0 | 4 | 4 | 100% |
| Dispatchers | 1 | 0 | 1 | 1 | 100% |
| Evidence Technicians | 1 | 0 | 1 | 1 | 100% |
| Total | 30 | 1 | 29 | 29 | 100% |

*Training of PETs*

Training of Police Evidence Technicians (PETs) is the responsibility of the BFO where PETs are assigned.  The new PET Coordinator was appointed in January 2013.  During our last review, we found several continuing deficiencies in PET training.  The PETs are assigned to the BFO, and the PET Coordinator is a police officer.  The first and most obvious deficiency is the absence of

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 78

an initial training program.  The Department recently recruited a new PET and was conducting interviews to hire as many as four additional PETs.  New PETs are trained on-the-job, but OPD had no fixed training requirements or program for either initial or continuing job training.  There was not even a checklist of topics in which new employees are to be trained to guide the process.

We reviewed the training records for each of the 12 then current PETs, and found five lacking adequate training.  The first five columns in the chart below show total hours received in 2012 and to mid-September in 2013; and evidence-related training (legal, investigative, and evidence training) and our judgment as to its adequacy.  In our last report, we observed that only seven (58%) of the 12 PETs had received adequate training in 2012 and through September 2013.  In this review we found that four of the five PETs that we determined lacked adequate training have been scheduled for a significant DNA Training Course in April and May 2014.  The fifth PET that we identified has left the PET program and is now assigned other duties.

| Results of On-Site Survey November 2013 | | | | | February 2014 |
|---|---|---|---|---|---|
| PET | 2013 | 2012 | EVIDENCE RELATED TRAINING | EVALUATION (ADEQUATE/ INADEQUATE) | 24 HOUR SCHEDULED DNA TRAINING |
| PET 1 | 2.5 | 21 | 4 | INADEQUATE | 4/15-17/2014 |
| PET 2 | 3 | 34 | 31.5 | ADEQUATE | |
| PET 3 | 44.5 | 7.5 | 47.5 | ADEQUATE | 5/13-15/2014 |
| PET 4 | 81.5 | 85 | 139 | ADEQUATE | |
| PET 5 | 2.5 | 3.5 | 0 | INADEQUATE | 4/22-24/2014 |
| PET 6 | 2 | 1 | 0 | INADEQUATE | |
| PET 7 | 42 | 33 | 44 | ADEQUATE | |
| PET 8 | 43 | 13 | 7.5 | INADEQUATE | 4/22-24/2014 |
| PET 9 | 26 | 61.5 | 35.5 | ADEQUATE | |
| PET 10 | 1 | 10 | 0 | INADEQUATE | 5/13-15/2014 |
| PET 11 | 53 | 29 | 61.5 | ADEQUATE | 5/13-15/2014 |
| PET 12 | 29.5 | 21 | 28 | ADEQUATE | |

There are currently 13 Police Evidence Technicians (PET) employed with the Oakland Police Department.  OPD has recently taken several steps to develop a plan to ensure its PETs receive ongoing job training, including enrolling PETs in POST-certified courses on crime scene investigation and evidence recovery, and DNA evidence; developing a PET field training program manual; and exploring the possibility of offering training by Crime Lab personnel.

Given the critical nature of the job performed by PETs in support of OPD investigations and crime reduction efforts, the lack of training for technicians is a serious matter.  OPD is making progress in developing this training for its PETs.  We will continue to monitor this issue closely.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 79

OPD is in Phase 2 compliance with Task 43.1.1.

Compliance Status:
Phase 1:  In compliance
Phase 2:  In compliance

# Task 45:  Consistency of Discipline Policy

Requirements:
*On or before October 6, 2003, OPD shall revise and update its disciplinary policy to ensure that discipline is imposed in a fair and consistent manner.*
1. *The policy shall describe the circumstances in which disciplinary action is appropriate and those in which Division-level corrective action is appropriate.*
2. *The policy shall establish a centralized system for documenting and tracking all forms of discipline and corrective action, whether imposed centrally or at the Division level.*
3. *All internal investigations which result in a sustained finding shall be submitted to the Discipline Officer for a disciplinary recommendation.  The Discipline Officer shall convene a meeting with the Deputy Chief or designee in the affected chain-of-command for a confidential discussion of the misconduct, including the mitigating and aggravating factors and the member/employee's overall performance.*
4. *The COP may direct the Discipline Officer to prepare a Discipline Recommendation without convening a Discipline Conference.*

(Negotiated Settlement Agreement X. B.)

Background:
During the last reporting period, we found OPD in compliance with Task 45.

Discussion:
There are several Departmental policies that incorporate the requirements of Task 45:

- **Departmental General Order M-03:**  As previously reported, OPD published Departmental General Order M-03, *Complaints Against Department Personnel and Procedures*, on December 6, 2005.  General Order M-03 was revised in February 2008, and again in June 2013.  The revised policy also incorporates the requirements of these subtasks.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 80

- **Special Order 8552:**  As previously reported, OPD published Special Order 8552, *Update of Departmental Training Bulletin V-T.1, Internal Investigation Procedure Manual*, on February 1, 2007.  This policy incorporates the requirements of these subtasks.

- **Internal Investigation Procedure Manual:**  OPD published Training Bulletin V-T.1 and V-T.2, *Internal Investigation Procedure Manual,* on June 1, 2006.  This policy incorporates the requirements of these subtasks.

- **Internal Affairs Policy and Procedure Manual:**  OPD published the Internal Affairs Policy and Procedure Manual on December 6, 2005.  This policy incorporates the requirements of these subtasks.

- **Departmental Discipline Policy:**  OPD revised the Training Bulletin V-T on September 3, 2010.  This policy incorporates the requirements of these subtasks.

As the Department has trained at least 95% of relevant personnel on these policies, we find OPD in continued Phase 1 compliance with this Task.

**Task 45.1** requires that OPD maintain a centralized system for documenting and tracking all forms of discipline and corrective action, whether imposed centrally or at the Division level (compliance standard:  Yes/No).  To assess Phase 2 compliance with this subtask, we queried the IAD database to identify all of the cases with at least one sustained finding that were approved between October 1, through December 31, 2013.  This query yielded 18 cases, containing 35 sustained findings.  Of these 18 cases, 16 (89%) and 33 (94%) of the 35 findings contained all of the necessary information.  OPD is in compliance with the requirement that it maintain an adequate system for documenting and tracking discipline and corrective action.

**Task 45.4** requires that discipline be imposed in a manner that is fair and consistent (compliance standard:  95%).  To this end, the Department has developed and revised a Discipline Matrix. The Department most recently updated and revised its Discipline Matrix on September 2, 2010. A new revised Discipline Matrix is under consideration but has not yet been approved.  We reviewed all the cases with sustained findings that were decided during the period of October 1, through December 31, 2013.  In one finding, the employee resigned before discipline was imposed.  In the 34 other findings we found the discipline imposed was reasonable and fell within the Discipline Matrix.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 81

During the period of October 1, through December 31, 2013, Skelly hearings were held for 17 IAD cases involving 33 sustained findings in which discipline of a one-day suspension or greater was recommended.  In all (100%) of the 17 cases, the final discipline fell within the Discipline Matrix.  The recommended discipline was upheld in 25 findings and reduced in eight findings with adequate justification.

OPD is in compliance Phase 2 compliance with Task 45.

Compliance Status:
Phase 1:  In compliance
Phase 2:  In compliance

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 82

# Section Three

## *Conclusion*

This is our seventeenth quarterly report.  The status of compliance with the 22 active
requirements of the Negotiated Settlement Agreement is shown for all of our quarterly reports in
the graph below.  It shows an improvement of two Tasks in overall compliance, which was at the
highest level achieved in our last quarterly report.  In all, 16, or 73%, of the Tasks are in Phase 2
compliance.  These overall numbers reflect a change from partial compliance to in compliance
with Task 33, Reporting Misconduct; and Task 37, Internal Investigations - Retaliation Against
Witnesses.



Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 83

# Appendix A

## Cumulative Key Indicator Data

IAD ADMIN UNIT II STATISTICAL COMPARISON
OAKLAND POLICE DEPARTMENT - KEY INDICATOR BY MONTH 2011 - 2013

| | OCT 11 | NOV 11 | DEC 11 | Jan 12 | Feb 12 | Mar 12 | APR 12 | MAY 12 | JUN 12 | Jul 12 | Aug 12 | Sep 12 | Oct 12 | Nov 12 | Dec 12 | 13-Jan | 13-Feb | 13-Mar | 13-Apr | 13-May | 13-Jun | 13-July | 13-Aug | 13-Sept | 13-Oct | 13-Nov | 13-Dec | Graph |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Percent of Arrests Associated with stops | 5.72 | 6.70 | 6.94 | 7.08 | 2.42 | 1.24 | 1.76 | 0.77 | 0.40 | 1.26 | 0.99 | 1.08 | 0.79 | 0.35 | 1.38 | 0.84 | 1.67 | 0.91 | 1.29 | 1.07 | 0.98 | 0.45 | 0.59 | 1.30 | 0.75 | 0.05 | |
| # Use of Force reports per reporting officer | 24.68 | 25.17 | 34.21 | 26.05 | 14.53 | 33.96 | 34.62 | 37.22 | 24.66 | 23.13 | 18.53 | 34.44 | 17.90 | 20.73 | 25.48 | 17.45 | 16.67 | 13.38 | 19.04 | 16.52 | 17.52 | 11.25 | 18.53 | 13.80 | 9.08 | 8.73 | |
| # Policy force (stops) per reporting officer | 2.53 | 2.50 | 3.09 | 1.74 | 2.38 | 2.37 | 3.60 | 2.59 | 0.79 | 3.83 | 2.10 | 1.67 | 0.59 | 2.53 | 2.53 | 0.47 | 1.82 | 2.24 | 1.15 | 1.15 | 3.63 | 4.61 | 1.06 | 1.94 | 1.03 | 0.28 | |
| OPD Complaint per subject-officer count only | 9.39 | 9.19 | 4.39 | 9.26 | 12.64 | 8.28 | 11.16 | 7.25 | 2.96 | 12.95 | 10.95 | 8.80 | 5.21 | 7.49 | 5.75 | 3.65 | 3.65 | 6.28 | 6.58 | 7.73 | 6.48 | 4.61 | 4.94 | 5.04 | 3.46 | 3.13 | |
| Active Custody Intakes | 4.51 | 3.55 | 0.97 | 3.09 | 2.05 | 1.21 | 2.02 | 0.94 | 0.47 | 0.98 | 0.43 | 0.43 | 0.79 | 0.51 | 0.48 | 0.19 | 0.25 | 0.40 | 0.23 | 0.44 | 0.51 | 0.51 | 0.51 | 0.24 | 1.02 | 1.14 | |
| Each Use of OC/O.R.Leave (includes civilians) | 250.26 | 283.85 | 255.15 | 229.77 | 246.73 | 276.95 | 283.70 | 290.65 | 158.94 | 166.79 | 197.70 | 284.9 | 226.6 | 198.1 | 360.7 | 173.1 | 155.1 | 153.1 | 252.3 | 245.1 | 205.1 | 241.62 | 241.62 | 308.24 | 253.01 | 237.38 | |
| Number of Arrests per (black 14 cases) | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Officer Involved Shooting (includes shooting involving animals) which includes those types 120, 26, 27 and list 207 | 0.00 | 333.50 | | 377.50 | 431.00 | | 632.00 | 1264.00 | 2310.00 | | 12-Aug | 113.00 | 1025 | | 12-Dec | | 450 | 831 | 406 | 1291 | | 1019 | | | 216.2 | | 13-Dec | |
| Vehicle Collisions | 576.25 | 1065.00 | | 1065.1 | 0.10 | 215.50 | 389.47 | 526.00 | 91.25 | 196.17 | | 200.10 | 288.10 | 306.30 | 101.75 | 290.00 | 277.00 | 1046.00 | 302.75 | 293.50 | 291.50 | 510 | 298 | 850 | | 366 | | |
| All Arrests Totals | 1040 | 1040 | 1010 | 1035 | | 925 | 979 | 652 | 1209 | 1196 | 170 | 1135 | 1135 | 1025 | 1025 | 1030 | | 1046 | 1031 | 1126 | | 1019 | 899 | 850 | 1581 | 1068 | 1054 | |
| Number months in count | | 950 | 952 | 423 | 1035 | 1291 | 1136 | 1035 | 1094 | | 1135 | 1135 | 1025 | 3037 | 956 | 3037 | 956 | 1046 | | | | | | | | | | |

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 84

# Appendix B

## *Selected Inactive Task Assessments*

**During this reporting period, we conducted assessments of inactive Tasks12 and14.**

**Task 12** requires the following:

- **Task 12.1:** Investigators (IAD and Division Level) disclose in writing to their supervisors relationships which might lead to a bias or perception of bias regarding the subject(s) of any investigation, including relationships such as family relationships, outside business relationships, romantic relationships, close work or personal friendships (compliance standard:  90%).
- **Task 12.2:** Where an investigator believes that s/he cannot conduct a fair and impartial investigation, or that his/her involvement will compromise the investigative process, or where the investigator was directly involved in the incident being investigated, the investigator is removed from the investigation (compliance standard:  95%).
- **Task 12.3:** If an investigator indicates that s/he has a relationship with the involved parties that might lead to a perception of bias s/he provides details to the supervisor and the supervisor makes a recommendation regarding whether to replace the investigator, and, where appropriate, replaces the individual (compliance standard:  90%).

OPD demonstrates compliance with the requirements of Task 12 by completing an IAD Recusal Form (IAD Form 13).  On this form, the investigator must declare whether or not s/he had any involvement in the incident under investigation, and identify any relationships (including personal or professional) that s/he may have with any of the involved parties.  Based on this declaration, the investigator's supervisor must decide whether or not the case should be reassigned.  The supervisor's determination is also noted on the form.

In each of the cases we reviewed during this reporting period, we noted the inclusion of a properly completed IAD Form 13, signed by both the investigator and supervisor.  We did not note any cases that were reassigned based on potential investigator bias.

OPD is in compliance with Task 12.  We will review this Task again in a future reporting period.

**Task 14** requires the following:

- **Task 14.1:**  OPD investigates allegations of MOR violations resulting from lawsuits involving misconduct and legal claims, and/or tort claims involving Class I and Class II violations, treating them in the same manner as other citizens' complaints (compliance standard:  90%).
- **Task 14.2:**  The litigation and IAD process are handled separately and not delayed, halted, or modified because the underlying incident has resulted in civil litigation, unless

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 85

such delay is specifically authorized in writing by the Chief of Police (compliance standard:  90%).

- **Task 14.3:**  If the Chief of Police determines that concurrent civil litigation is likely to yield additional information relevant to an internal investigation, s/he may hold the findings of the internal investigation in abeyance.  Such delay shall last no longer than necessary to obtain the relevant information.  The reason(s) for any delay shall be documented in the Chronological Activity Log (CAL).  The Chief of Police shall ensure the investigation continues on all areas of the internal investigation (compliance standard:  90%).

To assess this Task, we requested and reviewed the litigation logs covering January 1, through December 31, 2013.  For each entry, we queried the IAD database and reviewed available documentation to ensure that there was a corresponding IAD investigation.  There were a total of 22 lawsuits listed on the logs, and we found a case corresponding with each.  One of the cases was still under investigation at the time of our review; the allegations in the other 21 cases were investigated and resolved.  From the documentation we reviewed, we determined that the litigation and IAD process were handled separately, as required; and none of the cases were delayed, halted, or modified.

OPD is in compliance with Task 14.  We will review this Task again in a future reporting period.

**During this reporting period, we also reviewed two audits recently conducted by an outside consultant retained by OIG – for inactive Task 22, Management Level Liaison; and inactive Task 47, Community Policing.**

**Task 22** requires the following:

- **Task 22.1:**  OPD maintains a management-level member or employee to act as a liaison (MLL) to the courts, District Attorney's Office, and the Public Defender's Office (compliance standard:  Yes/No).
- **Task 22.2:**  OPD tracks cases that are lost or dropped due to bad reports, defective search warrants, granted motions to suppress, contradictory evidence or testimony, or any other indication of performance problems or misconduct (compliance standard:  Yes/No).
- **Task 22.3:**  The MLL meets with and cooperates with the IMT (compliance standard:  Yes/No).
- **Task 22.4:**  The District Attorney's Office and Public Defender's Office attend meetings as they deem appropriate (compliance standard:  Yes/No).

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 86

The Task 22 assessment, which covered the time period of September 2012 through September 2013, found the Department in compliance with all of the requirements of this Task, with the exception of Task 22.2.  For this subtask, OIG's outside consultant found that the Department could not locate over one year's worth of "strike lists," which have been used by the MLL to track cases.   The assessment noted that the MLL has developed a new tracking system that appears to be sufficient for tracking cases.  We will follow up with OPD on this issue and discuss it in our next quarterly report.

**Task 47** requires, in part, that the Department host at least one community meeting per quarter in each Patrol Service Area (Task 47.1); and that each patrol supervisor, and officer assigned to a regular beat or geographic area of the City, attend a minimum of one community meeting per quarter in the Area s/he is regularly assigned (Task 47.2).

As of the publication of this report, OIG's outside consultant had issued the first segment of its two-part Task 47 assessment.  The assessment noted that officers attended community meetings, as required by this Task, but did not contain any descriptive information about the *content* of these meetings.  OPD has advised us that the second segment of the audit will include this information; we look forward to reviewing it and will discuss this further in our next quarterly report.

Seventeenth Quarterly Report of the Independent Monitor
for the Oakland Police Department
April 28, 2014
Page 87

# Appendix C

## *Acronyms*

The following is a listing of acronyms frequently used in our quarterly reports:

| | |
|---|---|
| ACSO | Alameda County Sheriff's Office |
| AWS | Automated Warrant System |
| BART | Bay Area Rapid Transit |
| BFO | Bureau of Field Operations |
| BOI | Bureau of Investigation |
| BOS | Bureau of Services |
| CAD | Computer Assisted Dispatch |
| CHP | California Highway Patrol |
| CID | Criminal Investigation Division |
| CORPUS | Criminal Oriented Records Production Unified System |
| CPRB | Citizens' Police Review Board |
| CPT | Continued Professional Training |
| CRIMS | Consolidated Records Information Management System |
| DGO | Departmental General Order |
| DIL | Daily Incident Log |
| DLI | Division-level investigation |
| EFRB | Executive Force Review Board |
| FRB | Force Review Board |
| FTO | Field Training Officer |
| FTP | Field Training Program |
| FTU | Field Training Unit |
| IAD | Internal Affairs Division |
| IB | Information Bulletin |
| IBC | Informational Business Card |
| ICR | Informal Complaint Resolution |
| IPAS | Input for Personnel Assessment System |
| LEWI | Law Enforcement Warrants Inquiry System |
| MOR | Manual of Rules |
| NSA | Negotiated Settlement Agreement |
| OCA | Office of the City Attorney |
| OIG | Office of Inspector General |
| OPD | Oakland Police Department |
| PAS | Personnel Assessment System |
| PDRD | Portable Digital Recording Device |
| POST | Peace Officer Standards and Training |
| RMM | Risk Management Memorandum |
| RWM | Report Writing Manual |
| SDF | Stop Data Form |
| SME | Subject matter expert |
| SO | Special Order |
| TB | Training Bulletin |
| UOF | Use of force |