# Second Progress Report of the Compliance Director for the Oakland Police Department

June 16, 2014

## Introduction

This is the second progress report issued in my capacity as both Monitor and Compliance Director of the Negotiated Settlement Agreement (NSA) in the case of *Delphine Allen, et al., vs. City of Oakland, et al.,* in the United States District Court for the Northern District of California.  In January 2010, under the direction of Judge Thelton E. Henderson, the Parties agreed to my appointment as Monitor of the Oakland Police Department (OPD).  With the assistance of the Monitoring Team, I determine the status of OPD's compliance with the requirements of the 22 active NSA Tasks.  Our quarterly assessments have found that while the Department has achieved compliance with several requirements, in other areas, progress has stagnated.

In December 2012, as a result of the City's slow progress with the NSA reforms, and following Court-ordered negotiations among the Parties, Judge Henderson established a Compliance Director position for the Department.  The Court's Order of December 12, 2012 outlined the Compliance Director's broad powers and responsibilities to "bring…[OPD] into sustainable compliance with the NSA and AMOU."[1]  On February 12, 2014, Judge Henderson issued an Order finding it "appropriate and effective to now concentrate the powers of the Compliance Director and Monitor into one position."[2]

Wearing two hats – as Monitor and Compliance Director – is an extraordinary charge.  It affords me many authorities:  to determine whether the Department has achieved compliance with the NSA; and also to provide certain direction to the agency in its efforts to attain compliance.

As Monitor, I continue to oversee the Monitoring Team's work as we assess the Department's progress.  The Monitoring Team makes quarterly visits to Oakland to meet with Department personnel; observe Departmental practices; review Department policies and procedures; collect and analyze data using appropriate sampling and analytic procedures; and inform the Parties – and, on a quarterly basis, the Court – with information about the status of OPD's compliance.

As Compliance Director, I hold more direct authority over the Department's NSA-related decisions.  I, with the assistance of a seasoned associate, serve as an agent of the Court, and work closely with the Department on a sustained basis.  My primary focus is, undeniably, for the Department to achieve and sustain compliance with the reforms

---

[1] United States District Court for the Northern District of California, Master Case File No. C00-4599 TEH, Order Re: Compliance Director, dated December 12, 2012.  The AMOU, or Amended Memorandum of Understanding Re: Post NSA Terms and Conditions Allowing For the Resolution of Plaintiffs' Claims for Injunctive Relief and For Dismissal of The Action, was approved by the Court on June 27, 2011.

[2] United States District Court for the Northern District of California, Master Case File No. C00-4599 TEH, Order Modifying Compliance Oversight Model, dated February 12, 2014.

outlined in the NSA. As directed by the Court, I "have the power to review, investigate, and take corrective action regarding OPD policies, procedures, and practices that are related to the objectives of the NSA…even if such policies, procedures, or practices do not fall squarely within any specific NSA task."[3] I shall become involved in all matters that directly relate to the NSA – as well as issues in which there is a reasonable nexus to the NSA or those that concern civil rights, which I view as central to the NSA.

As of the last quarterly monitoring report (issued in April 2014), the Department was in full compliance with 16 of the 22 Tasks, and in partial compliance with six additional Tasks. This is the highest number of Tasks in compliance since the beginning of our tenure. In this report, I will discuss the status of the six non-compliant Tasks – as well as the two that have recently come into compliance – and what the Department is doing currently to attain compliance with these requirements.

## News Since First Progress Report

There has been a flurry of activity at the Police Department since I issued my first progress report as Compliance Director two months ago. Most notably, after an extensive nationwide search process, Mayor Jean Quan named Sean Whent as the permanent Chief of Police. Shortly after his appointment, Chief Whent made permanent his full Executive Team, comprised of Assistant Chief Paul Figueroa; Deputy Chief Eric Breshears, who commands the Bureau of Services; Deputy Chief David Downing, who commands Bureau of Field Operations (BFO) 1; and Deputy Chief Danielle Outlaw, who commands BFO 2. Mayor Quan was deliberate in the selection process, and she is committed to the collective success and individual development of Chief Whent and the members of his Executive Team. In addition, new Interim City Administrator Henry Gardner has demonstrated acute sensitivity to issues of police reform in Oakland, and I look forward to working closely with him.

As noted above, the Department is currently in compliance with the highest number of Tasks in the 11-year history of the NSA. With the Chief and his Executive Team now stably in place, we are optimistic that the Department can soon cross the finish line into full compliance with the outstanding six Tasks. However, the Department still has much work to do to *institutionalize* these critical reforms – and the Court will not likely vacate this process until there is demonstrated evidence of sustainable reform. I encourage Department and City leaders to reject strategies that focus merely on achieving technical compliance with the NSA – but instead, to adopt a new ethos in which the reforms outlined in the NSA represent the fundamental principles upon which the Department is based.

After all, the true test of the legacy of this case is not whether officers check boxes on various forms – but whether the most meaningful, substantive reforms endure.

---

[3] United States District Court for the Northern District of California, Master Case File No. C00-4599 TEH, Order Re: Compliance Director, dated December 12, 2012.

Second Progress Report of the Compliance Director for the Oakland Police Department
June 16, 2014
Page 3 of 9

I am pleased to report that my associate and I have recently observed some advances toward this goal:

- The Department continues to improve its monthly Risk Management Meetings – both in terms of their content and the work that results from the discussions. At these meetings, Deputy Chiefs pose thoughtful, open-ended questions about problematic officers, supervisors, and squads – but they also command the Area Captains to take action, and require that they respond in writing within two weeks to Assistant Chief Figueroa on any outstanding issues.

- The Department is slowly, but steadily, improving the ways in which it gathers and analyzes data in critical areas, including criminal activity throughout the City and officers' productivity. Recently the Department revised the format of its NSA-related biweekly reports; the reports now provide information on "risk measures" including complaints, internal investigation timelines, uses of force, and pursuits.

- The Department recently finalized a contract with Professor Jennifer Eberhardt of Stanford University to assist the Department with its stop data analysis. One of Professor Eberhardt's first projects is to help OPD to develop interactive maps of the race of citizens who are stopped, which citizens are searched, and what is recovered from those searches.

## Discussion of Tasks

The Monitoring Team's assessments have shown that OPD has not yet achieved – or has had difficulty maintaining – compliance with the following eight Tasks:[4]

- Task 20, *Span of Control for Supervisors*
- Task 26, *Force Review Board (FRB)*
- Task 30, *Executive Force Review Board (EFRB)*
- Task 33, *Reporting Misconduct*
- Task 34, *Vehicle Stops, Field Investigation, and Detentions*
- Task 37, *Internal Investigations - Retaliation Against Witnesses*
- Task 40, *Personnel Assessment System (PAS) – Purpose*
- Task 41, *Use of Personnel Assessment System (PAS)*

Below I will discuss recent efforts by OPD to achieve compliance with these Tasks.

---

[4] The Monitoring Team found Tasks 33 and 37 in compliance in our 17th quarterly status report, issued in April 2014. We describe them both below because the Department has struggled to maintain compliance with these Tasks during our tenure.

Second Progress Report of the Compliance Director for the Oakland Police Department
June 16, 2014
Page 4 of 9

## Task 20, *Span of Control for Supervisors*

OPD has been in partial compliance with Task 20 since the beginning of our tenure due primarily to its non-compliance with the subtasks related to consistency of supervision (Task 20.2) and the actual ratio of supervisors to officers (Task 20.3).  During the last two months, on several occasions, my associate and I conferred with Department officials and the Plaintiffs' attorneys to revise the methodology for assessing these subtasks.  We believe that the proposal at hand will allow the Department to achieve compliance with Task 20 – but even more importantly, develop Task 20-related practices that are sustainable in the long term.  Among other issues, we discussed: "double absences," or instances in which both the primary and relief sergeants for a particular squad are absent; the development of new criteria for selecting overtime sergeants; and the sustainability of the relief supervision system that has been in place for over one year.

In the next few weeks, I will work with the Department and the Plaintiffs' attorneys to finalize a new, mutually agreeable methodology for assessing Task 20; review the analysis of double absences conducted by OPD, and determine whether these circumstances result from "bad luck" or "bad planning;" develop a long-term solution to the issue of relief sergeants for the two field-based units in the Criminal Investigation Division (CID); and assist OPD to improve its relief system for Watch Commanders.

## Task 26, *Force Review Board (FRB)*; and Task 30, *Executive Force Review Board (EFRB)*

OPD has been in partial compliance with Tasks 26 and 30 during many different reporting periods.  Last month, with the assistance of the Monitoring Team, the Department revised relevant policy Departmental General Order K-4.1, *Use of Force Boards*.  This policy requires the board proceedings to be more formal, efficient, and analytical.  I look forward to observing these improved practices at upcoming force review boards.

According to Department officials, some officers are concerned that supervisors, when reviewing use of force reports, believe that they are unable to conclude that the force used was inappropriate without ringing the bell to initiate the IAD process.  The Department maintains that this serves as a disincentive for sergeants to analyze incidents critically and, if necessary, take corrective action.  After I discussed this issue with the Chief and his Executive Team, they clarified to the Department that "identified safety/tactical deficiencies or inappropriate/disproportionate pointing of a firearm, that does not denote a Class 1 misconduct or a pattern of similar conduct, may be addressed through counseling and documentation in the members' SNF [supervisory notes file]."

My associate and I also inquired with OPD regarding the significant reductions in uses of force in the Department in recent months.  OPD attributes these drops largely to improved training and changes in policy that characterize uses of force differently.

In the next few weeks, I will continue discussions with the Department on these critical issues.  I will review more closely the downward trends in uses of force; assist the Department to improve its training to reduce officers' use of boilerplate language when justifying encounters that ultimately involve a use of force; and observe the force-related legal training sessions that OPD incorporated into its in-service training for officers and sergeants.

## Task 33, *Reporting Misconduct*

OPD recently regained compliance with Task 33 after being in partial compliance with this Task for the last four reporting periods due to the Department's failure of its officers to report misconduct during the Occupy Oakland events.  The Department reports that it is increasingly holding individuals accountable for failing to report misconduct or activate their Personal Data Recording Devices (PDRDs) as required.

Over the last few weeks, I have discussed with the Chief and his Executive Team ways in which the Department can increasingly hold individuals accountable for failing to report misconduct.  OPD's recent publication of a new PDRD policy and revision of its Discipline Matrix to include enhanced penalties for PDRD violations are positive steps toward this goal.  It is also heartening to learn that Chief Whent personally teaches all new members and employees about the NSA and the confidential reporting process.

In the next few weeks, I plan to learn more about how – and how frequently – sergeants are reviewing their subordinates' PDRD footage.  I also plan to determine if the Department currently has a sufficient inventory of PDRDs to equip each officer.

## Task 34, *Vehicle Stops, Field Investigation, and Detentions*

Task 34 is one of the NSA's most significant requirements – as it addresses the bias-based policing that was an original issue in this case.  OPD has been in partial compliance with Task 34 since the fourth reporting period.  Encouragingly, the Department has made strides in this area over the last several months.  As noted above, the Department recently finalized a contract with Professor Eberhardt of Stanford University to assist the Department with its stop data analysis; Professor Eberhardt is a consummate scholar and we look forward to learning more about her creative approach to this work.

In the next few weeks, I will explore with OPD some possible ways in which its stop data – and implications of the data – might be useful to the Department.  That said, and in the face of some concerns I still have, I will also engage the Department regarding its strategies to resolve the disparities discussed in its recently released stop data report.  I will also continue to work with the Department to refine the stop data content of its monthly Risk Management Meetings.

## Task 37, Internal Investigations – Retaliation Against Witnesses

OPD recently regained compliance with Task 37 after being in partial compliance with this Task for the prior two reporting periods due to the Department's failure to respond fully to the most serious allegation of retaliation observed by the Monitoring Team. OPD reports that it aggressively scrutinizes and investigates allegations of retaliation. The Department is providing improved training to new police officers and employees to, according to OPD, emphasize a culture of accountability and the importance of reporting misconduct.

In the next few weeks, I will continue to discuss and review OPD's training on these critical matters.

## Task 40, Personnel Assessment System (PAS) – Purpose; and Task 41, Use of Personnel Assessment System (PAS)

OPD has not been in compliance with Tasks 40 and 41 for several reporting periods. OPD recently completed the upgrade that allows arrest data from Alameda County to automatically populate the Records Management System (RMS) without requiring manual data entry; it appears that this upgrade has gone smoothly.

As part of its risk management system, the Department constructs lists of the "Top 30" members and employees within several categories of risk-related activity. Several months ago, the Monitoring Team conducted a supplementary review of the Top 30 lists to learn more about how OPD uses these lists and develops interventions for the individuals who appear on them.

In the next few weeks, I will work with the Department to review its strategies for members and employees who are "repeaters" – that is, those who continue to meet system thresholds without changing their behavior. Also, I will review Microsoft's proposed scope of work for the IPAS2 system, and make plans to review the system as Microsoft fulfills different components of the project in the coming year.

## Discussion of Matters Outlined in December 12, 2012 Court Order

The Court's Order of December 12, 2012 grants the Compliance Director the authority to assist OPD to "address, resolve, and reduce: (1) incidents involving the unjustified use of force, including those involving the drawing and pointing of a firearm at a person or an officer-involved shooting; (2) incidents of racial profiling and bias-based policing; (3) citizen complaints; and (4) high-speed pursuits."[5] The Order describes such matters as "key to driving the sustained cultural change envisioned by the parties when agreeing to the NSA and AMOU." The Order also states that the Department should develop "a

---

[5] United States District Court for the Northern District of California, Master Case File No. C00-4599 TEH, Order Re: Compliance Director, dated December 12, 2012.

personnel assessment system ('IPAS') that provides a sustainable early-warning system that will mitigate risk by identifying problems and trends at an early stage."

The Department recently revised its NSA-related biweekly reports to include information on these metrics. According to the data, OPD has made improvements in all of these areas. For instance, thus far in 2014, the Department has logged 18 pursuits; at the same time last year, it had logged 42. As of the implementation of OPD's revised pursuit policy (which took effect in January 2014), OPD now also tracks its "non-pursuits" – that is, situations in which officers do not elect to pursue but in the past, under the former policy, likely would have. OPD continues to refine its policies on legitimate circumstances for pursuits.

Regarding "incidents of racial profiling and bias-based policing," I commend the Department for continuing to improve its practices of collecting stop data, retaining the services of Professor Eberhardt, and publicly releasing its stop data report. Yet bias-based policing in Oakland remains an issue that we must continue to address. We will discuss the meaning of the report's findings more fully in our forthcoming quarterly status report.

In the next few weeks, my associate and I will continue to engage City and Department officials regarding strategies to resolve the disparities discussed in the stop data report; as well as how best to measure OPD's progress in all of the critical areas outlined in the Court Order of December 12, 2012. I will discuss these matters further in future progress reports.

## Other Recent Activities of Compliance Director

Beyond what is noted above, my associate and I have been involved in many activities since I issued my first progress report as Compliance Director:

- Continuing to work closely with the Chief and his Executive Team to build capacity and foster leadership within the Department. We have ongoing discussions with the Chief and his Executive Team about upcoming transfers and promotions to determine if the Department is using its "best" people in the most effective ways.

- Working with the Department on revisions to several NSA-related policies. Most recently, these included those relating to acting sergeants (Task 20), Force Review and Executive Force Review Boards (Tasks 26 and 30), and the Field Training Program (Task 42).

- Continuing to observe OPD's monthly Risk Management Meetings and providing feedback to the Department on the structure of the meetings, and how the Department can most constructively follow up with Area Captains after the meetings. Following our discussions, the Department expanded the time period – from eight to 16 weeks – for its analysis. My associate and I have also suggested to OPD that it would be helpful to offer more bases for comparison, and other ways to make these meetings – and their follow-up – as useful and effective as possible.

Second Progress Report of the Compliance Director for the Oakland Police Department
June 16, 2014
Page 8 of 9

- Providing guidance, mentoring, and technical assistance to Department officials in several other key areas – including recent personnel transfers and promotions, new technological initiatives, and organizational changes.

In the next few weeks, beyond what I have listed above, my associate and I intend to work with the Department to:

- Build teamwork among members of the Executive Team.
- Enhance the Department's capacities for community interaction and engagement.
- Assist the Department to develop a training needs assessment.
- Revise critical Departmental policies, including those related to Task 20 and high-speed pursuits.

## Conclusion

It has now been four months since Judge Henderson's Order consolidated the roles of Monitor and Compliance Director.  Since I issued my first progress report as Compliance Director, Chief Whent and the members of his Executive Team have been named as permanent.  They work well together; and under their leadership, the Department has made many strides, not all directly related to the NSA but important to list here.  Chief Whent modified the Department's organizational structure and plans to create a new Research and Planning Section for the Department.  Civilians are now handling complaint intake at IAD, and that appears to be progressing smoothly; eventually, there will be five persons working in that capacity.  The Department is planning to overhaul its long-term strategic plan and establish a new policy management system.  Although at least partly attributable to changes in classifications, citizen complaints and uses of force have decreased significantly.  Forty-seven police officers recently graduated from the Academy and are currently in field training, 36 new officers are expected to graduate in July, 55 new officers are expected to graduate in October, and an additional 15 officers will join OPD from the Alameda County Sheriff's Office Academy within the next few months.

For all of these positive developments, I still have concerns.  In our interactions with Department officials, some focus merely on what needs to get done to get into compliance – and not on the import of the reforms, or how to sustain the reforms throughout the Department.  My associate and I will continue to engage Chief Whent and his Executive Team to inspire real cultural shifts at the Department.

There are reasons for bright optimism, but the burden remains with the Police Department to meet the mandates of the Court and the expectations of the community. The Plaintiffs' attorneys have been tenacious advocates for sustainable reform, and along with the broader community, shall be vigilant in ensuring that organizational reform is a perpetual goal of the Department.

*[signature: Robert S. Warshaw]*

Chief (Ret.) Robert S. Warshaw