May 11, 2016

# Thirty-Second Report
## *of the* Independent Monitor
## *for the* Oakland Police Department

---

## Introduction

The Court's Order of May 21, 2015 modified the monitoring plan that has been in place since the beginning of our tenure to make more efficient use of resources while focusing on the long-term sustainability of the reforms in the Negotiated Settlement Agreement (NSA) in the case of *Delphine Allen, et al., vs. City of Oakland, et al.,* in the United States District Court for the Northern District of California.[1]  After 13 years of monitoring OPD's progress with the reforms, it is time for us to devote special attention to the most problematic component parts of the Tasks that are not yet in full compliance or have not been in compliance for at least one year, and those for whom factors currently make compliance determination uncertain.

To do this, per the Court Order, we have increased the frequency of our compliance assessments and our reports detailing our findings and other monitoring activities.  We provide increased technical assistance – via monthly joint monitoring/technical assistance visits by designated Team members – in these areas.  We also provide particular guidance and direction to the Department on the three Tasks (5, 34, and 45) that have been in partial compliance.  (As of our last quarterly report, OPD was in full compliance with all Tasks except for these three Tasks.) We also continue to monitor closely the Department's progress with the December 12, 2012 Court Order as it relates to Task 34 and other critical issues.

Our assessment of compliance for Task 5 takes into account the degree to which the City continues to implement the recommendations listed in the Court-Appointed Investigator's two reports on police discipline and arbitration (issued on April 16, 2015 and March 16, 2016), as well as current uncertainties associated with an ongoing Internal Affairs investigation.  The Court issued an Order on March 23, 2016 indicating that "irregularities and potential violations of the NSA" occurred in IAD investigation 15-0771.  The Order directs the Monitor/Compliance Director to take action to "to ensure that this case and any related matters are properly and timely investigated, and that all appropriate follow-up actions are taken."  As the Order states, "This case raises most serious concerns that may well impact Defendants' ability to demonstrate their commitment to accountability and sustainability – both of which are key to ending court oversight."

---

[1] United States District Court for the Northern District of California, Master Case File No. C00-4599 TEH, Order Modifying Monitoring Plan, dated May 21, 2015.

In this report, we describe our recent assessments of Tasks 5, 20, 34, and 41. As noted previously, because we now report on a monthly (as opposed to quarterly) basis, we do not assess and discuss each active or inactive Task in each report; however, for each report, we select several active and/or inactive requirements to examine, and discuss the most current information regarding the Department's progress with the NSA and its efforts at making the reforms sustainable.

Below is the current compliance status of the Tasks listed in the May 21, 2015 Court Order.

| Compliance Status of Tasks Listed in the May 21, 2015 Court Order | | |
|---|---|---|
| **Task** | **Description** | **Compliance Status** |
| 5 | Complaint Procedures for IAD | As of the twenty-first reporting period (covering October through December 2014), this Task was in partial compliance. A pending IA investigation now requires that this Task be found not in compliance. |
| 20 | Span of Control | In compliance since the nineteenth reporting period (covering April through June 2014). Now considered inactive. |
| 26 | Force Review Board (FRB) | In compliance since the nineteenth reporting period (covering April through June 2014). Now considered inactive. Not assessed in this report. |
| 30 | Executive Force Review Board (EFRB) | In compliance since the nineteenth reporting period (covering April through June 2014). Now considered inactive. Not assessed in this report. |
| 34 | Vehicle Stops, Field Investigation, and Detentions | In partial compliance since the fourth reporting period (covering July through September 2010). |
| 41 | Use of Personnel Assessment System (PAS) | In compliance since the twentieth reporting period (covering July through September 2014). Now considered inactive. |
| 45 | Consistency of Discipline Policy | As of the twenty-first reporting period (covering October through December 2014), in partial compliance. Not assessed in this report. |

## Increasing Technical Assistance

Per the May 21, 2015 Court Order, "The Monitor will provide increased technical assistance to help Defendants achieve sustainable compliance with NSA tasks and address, in a sustainable manner, the strategies and benchmark areas included in the Court's December 12, 2012 Order re: Compliance Director and the shortcomings identified in the Court Investigator's April 16, 2015 report." Accordingly, our Team has altered the nature of our monthly site visits so that they include both compliance assessments and technical assistance. As in the past, we meet with Department and City officials; observe Department meetings and technical demonstrations; review Departmental policies; conduct interviews and make observations in the field; and analyze OPD documents and files, including misconduct investigations, use of force reports, crime and arrest reports, Stop Data Forms, and other documentation. We also provide technical assistance in additional areas, especially those that relate to the remaining non-compliant Tasks or areas identified by the Department. Within the last few months, we have provided technical assistance to OPD officials in the areas of IAD investigations (Task 5); Executive Force Review Board (Task 30); stop data (Task 34); risk management (Task 41); and several key Department policies and procedures. We are also closely following the Department's adoption of Lexipol, the online policy platform, and occasionally observe meetings of OPD's Lexipol working group. To ensure continuing compliance with the NSA, the Monitoring Team and the Plaintiffs' attorneys will review and re-approve all polices related to all active and inactive Tasks.

## Building Internal Capacity at OPD

Per the May 21, 2015 Court Order, "The Monitor will also help Defendants institutionalize an internal system of monitoring by the Office of Inspector General or other City or Department entity, along with internal mechanisms for corrective action."

As reported previously, we continue to work closely with the Office of Inspector General's (OIG) lieutenant and his staff to identify areas that it should audit or review – and to help design approaches to these audits that are not cumbersome, so as to ensure sustainability. With two police auditors added late last year, OIG expanded the unit's staffing. More importantly, this change signaled a commitment by the Department to self-reflection and analysis.

OIG continues to expand its auditing role within the Department. Last month, we met with OIG to discuss and review its auditing plans through the end of 2016; over the year, OIG plans to assess more NSA-related subject areas that it has not reviewed in the past.

Each month, we review OIG's progress reports, which detail the results of its reviews; and continue to assist OIG as it becomes a stronger unit and further develops its capacity to monitor the Department's continued implementation of the NSA reforms. We look forward to reviewing future OIG progress reports and continuing to assist OIG as it becomes a stronger unit and further develops its capacity to monitor the Department's continued implementation of NSA reforms.

## *Focused Task Assessments*

## Task 5:  Complaint Procedures for IAD

Requirements:

1. *On or before December 1, 2003, OPD shall develop a policy so that, OPD personnel who become aware that a citizen wishes to file a complaint shall bring such citizen immediately, or as soon as circumstances permit, to a supervisor or IAD or summon a supervisor to the scene.  If there is a delay of greater than three (3) hours, the reason for such delay shall be documented by the person receiving the complaint.  In the event that such a complainant refuses to travel to a supervisor or to wait for one, the member/employee involved shall make all reasonable attempts to obtain identification, including address and phone number, as well as a description of the allegedly wrongful conduct and offending personnel, from the complainant and any witnesses.  This information, as well as a description of the complaint, shall immediately, or as soon as circumstances permit, be documented on a Complaint Form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander, and shall be treated as a complaint.  The supervisor or appropriate Area Commander notified of the complaint shall ensure the Communications Division is notified and forward any pertinent documents to the IAD.*

2. *An on-duty supervisor shall respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest.  The supervisor shall ensure the Communications Division is notified and forward any pertinent documents to the IAD.  All other misconduct complaints, by a jail inmate shall be handled in the same manner as other civilian complaints.*

3. *In each complaint investigation, OPD shall consider all relevant evidence, including circumstantial, direct and physical evidence, and make credibility determinations, if feasible.  OPD shall make efforts to resolve, by reference to physical evidence, and/or use of follow-up interviews and other objective indicators, inconsistent statements among witnesses.*

4. *OPD shall develop provisions for the permanent retention of all notes, generated and/or received by OPD personnel in the case file.*

5. *OPD shall resolve each allegation in a complaint investigation using the "preponderance of the evidence" standard.  Each allegation shall be resolved by making one of the following dispositions:  Unfounded, Sustained, Exonerated, Not Sustained, or Administrative Closure.  The Department shall use the following criteria for determining the appropriate disposition:*

    a. *Unfounded:  The investigation disclosed sufficient evidence to determine*

*that the alleged conduct did not occur.  This finding shall also apply when individuals named in the complaint were not involved in the alleged act.*

b.  *Sustained:  The investigation disclosed sufficient evidence to determine that the alleged conduct did occur and was in violation of law and/or Oakland Police Department rules, regulations, or policies.*

c.  *Exonerated:  The investigation disclosed sufficient evidence to determine that the alleged conduct did occur, but was in accord with law and with all Oakland Police Department rules, regulations, or policies.*

d.  *Not Sustained:  The investigation did not disclose sufficient evidence to determine whether or not the alleged conduct occurred.*

e.  *Administrative Closure:  The investigation indicates a service complaint, not involving an MOR violation, was resolved without conducting an internal investigation; OR*

f.  *To conclude an internal investigation when it has been determined that the investigation cannot proceed to a normal investigative conclusion due to circumstances to include but not limited to the following:*

   1)  *Complainant wishes to withdraw the complaint and the IAD Commander has determined there is no further reason to continue the investigation and to ensure Departmental policy and procedure has been followed;*

   2)  *Complaint lacks specificity and complainant refuses or is unable to provide further clarification necessary to investigate the complaint;*

   3)  *Subject not employed by OPD at the time of the incident; or*

   4)  *If the subject is no longer employed by OPD, the IAD Commander shall determine whether an internal investigation shall be conducted.*

   5)  *Complainant fails to articulate an act or failure to act, that, if true, would be an MOR violation; or*

   6)  *Complaints limited to California Vehicle Code citations and resulting tows, where there is no allegation of misconduct, shall be referred to the appropriate competent authorities (i.e., Traffic Court and Tow Hearing Officer).*

g.  *Administrative Closures shall be approved by the IAD Commander and entered in the IAD Complaint Database.*

6.  *The disposition category of "Filed" is hereby redefined and shall be included under Administrative Dispositions as follows:*

    a.    *An investigation that cannot be presently completed. A filed investigation is not a final disposition, but an indication that a case is pending further developments that will allow completion of the investigation.*

    b.    *The IAD Commander shall review all filed cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed and may direct the closure or continuation of the investigation.*

7.    *Any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken. However, investigators, with the approval of an IAD Commander, are not required to interview and/or take a recorded statement from a member or employee who is the subject of a complaint or was on the scene of the incident when additional information, beyond that already provided by the existing set of facts and/or documentation, is not necessary to reach appropriate findings and conclusions.*

(Negotiated Settlement Agreement III. E.)

**Relevant Policy:**

There are six Departmental policies that incorporate the requirements of Task 5: Department General Order M-03, *Complaints Against Department Personnel and Procedures* (published December 6, 2005 and revised most recently on August 22, 2013); Communications Division Policy & Procedures C-02, *Receiving and Logging Complaints Against Personnel and Use of Force Incidents* (published April 6, 2007); Training Bulletin V-T.1, *Internal Investigation Procedure Manual* (published June 1, 2006); Special Order 8270, *Booking of Prisoners at the Glenn E. Dyer Detention Facility* (published June 24, 2005); Special Order 8565, *Complaints Against Department Personnel* (published May 11, 2007); and IAD Policy & Procedures 05-02, *IAD Investigation Process* (published December 6, 2005). In addition, NSA stipulations issued on December 12, 2005, and March 13, 2007, incorporate the requirements of this Task.

**Commentary:**

OPD had been in partial compliance with Task 5 since the twenty-first reporting period. That status reflected a Court-ordered investigation regarding OPD and the City's discipline and arbitration process. On March 23, 2016, the Court issued a new Order indicating that irregularities and potential violations of the NSA occurred in an ongoing Internal Affairs investigation, 15-0771. The Order noted that the investigation raised issues of accountability and sustainability of compliance. The Court ordered that the Monitor/Compliance Director oversee that a proper and timely investigation occur and that appropriate follow-up action be taken. In light of the Court Order, we deemed Task 5 to be not in compliance.

Task 5 consists of several subtasks, briefly described below. Based on OPD's compliance history with many of the subtasks, not all are being actively monitored at this time.

**Task 5.1** requires that when a citizen wishes to file a complaint, the citizen is brought to a supervisor or IAD, or a supervisor is summoned to the scene.  **Task 5.2** requires that if there is a delay of greater than three hours in supervisory response, the reason for the delay must be documented.  **Task 5.3** requires that where a complainant refuses to travel to a supervisor, or wait for one, personnel make all reasonable attempts to obtain specific information to assist in investigating the complaint.  **Task 5.4** requires that specific information be documented on a complaint form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander.  **Task 5.5** requires that the supervisor or Area Commander notify Communications and forward any pertinent documents to IAD.

To assess compliance with Task 5.1 through and including Task 5.5, we reviewed the Daily Incident Logs (DILs) prepared by the Communications Division and forwarded to IAD each business day.  The DIL form has been modified several times during our tenure to elicit "forced responses" that gather all of the information required to evaluate compliance with these Tasks.  These modifications have significantly enhanced OPD's ability to document compliance by properly filling out and distributing the logs, and compliance rates with these subtasks have been near 100% for several years now.  Consequently, we no longer actively assess OPD's compliance with these subtasks, but we continue to receive daily both DILs and Daily Complaint Referral Logs (used to document when Information Business Cards (IBCs) are provided to citizens in lieu of a complaint forms).  We spot-check these forms regularly to verify that the quality of their completion has not diminished.

**Task 5.6** requires that an on-duty supervisor respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest of the inmate.  This subtask has not been actively monitored since December 2014, but for our twenty-eighth report and for this report, we specifically asked for and reviewed cases applicable to this requirement.

To assess Task 5.6, we reviewed all complaints closed in February 2016 that appeared to have originated from North County Jail, Santa Rita Jail, Glenn E. Dyer Detention Facility, Juvenile Hall, or John George Pavilion.  We reviewed these complaints for two triggering events:  an allegation of Class I misconduct; and the complaint lodged at the time of arrest.  If both of these were not present, the case was deemed in compliance if it was "handled in the same manner as other civilian complaints."

There were three such cases closed during the month of February 2016.  All cases originated from John George Pavilion, and in each case, the complainants felt that their psychiatric detentions were not justified.  None of the cases involved an allegation of Class I misconduct.  Only one complaint was made on the same date that the complainant's detention occurred, and this complaint was received by phone call in IAD after the complainant was admitted to the facility.  Therefore, while the flagged cases did not meet the criteria outlined for Task 5.6, they were reviewed for compliance with the other provisions of Task 5.

Task 5.12 requires that the Watch Commander ensure that any complaints that are applicable to Task 5.6 are delivered to and logged with IAD. Under current policy, the Communications Division must record on the DILs complaints that are received and/or handled by on-duty supervisors, and the DILs is forwarded daily to IAD.

OPD remains in compliance with Tasks 5.6 and 5.12 based on this review of these inactive Tasks.

**Task 5.15** through **Task 5.19**, and **Task 5.21,** collectively address the quality of completed IAD investigations, and therefore remain the subject of our focused Task assessments. To assess compliance with these Tasks, we reviewed 15 IAD cases that were approved in February 2016.

This sample included investigations completed by IAD and Division-level investigations (DLIs). It also included cases that were resolved via formal investigation and investigations that were resolved via summary finding.[2]

Together, **Tasks 5.15** and **Task 5.16** require that OPD: gathers all relevant evidence; conducts follow-up interviews where warranted; adequately considers the evidence gathered; makes credibility assessments where feasible; and resolves inconsistent statements.

In all of the cases we reviewed, we believe that OPD gathered and considered all relevant evidence available. In the overwhelming number of cases, video and/or audio recordings proved to be a significant factor in reaching a proper conclusion. In three cases, OPD conducted follow-up interviews of the complainants in an attempt to seek clarification or resolve inconsistencies. In another case, OPD interviewed a witness twice.

Credibility assessments were made in seven of the 15 cases. The remaining eight cases were approved for summary finding, and by policy, investigators are not required to assess credibility in these instances since a determination can be made without interviewing all involved. In three cases, complainants were deemed not credible. One case involved an allegation of missing money; another involved a complaint of failing to take a report; and in the third case, the complainant alleged improper search. In all of these cases, PDRD recordings were in direct conflict with some of the complainants' assertions. In another case involving allegations of excessive force, a complainant was deemed credible, but the investigator went on to note "credibility concerns", including statements that conflicted with PDRD recordings. We have previously cautioned IAD to review credibility assessments for such equivocations.

In 12 of the cases we reviewed, OPD successfully resolved inconsistent statements. In 10 of these cases, PDRD recordings were available and assisted in the determination. Three cases were resolved with at least one finding of not sustained. Not sustained is an acceptable finding, and by definition, it implies that inconsistencies were not resolved despite investigative efforts.

**Task 5.17** requires that OPD permanently retain all notes generated and/or received by OPD personnel in the case file. OPD personnel document that all investigative notes are contained within a particular file by completing IAD Form 11 (Investigative Notes Declaration). OPD has a sustained history of 100% compliance with this subtask. During this reporting period, the form was again properly completed in all 15 cases we reviewed.

---

[2] Summary findings are investigations in which the Department believes a proper conclusion can be determined based on a review of existing documentation with limited or no additional interviews and follow-up.

**Task 5.18** requires that OPD resolve each allegation in a complaint investigation using the preponderance of the evidence standard.  **Task 5.19** requires that each allegation of a complaint is identified and resolved with one of the following dispositions: unfounded; sustained; exonerated; not sustained; or administrative closure.  Our sample of 15 cases contained 90 allegations that received dispositions as follows: 26 exonerated; 51 unfounded; six not sustained; three sustained; and four administratively closed.

We did not disagree with the findings – or the investigative steps to reach them – in any of the cases we reviewed for this report.

**Task 5.20** requires that the IAD Commander review all "filed" cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed.  A filed case is defined as an investigation that cannot be presently completed and is pending further developments that will allow completion of the investigation; filed is not a final disposition.  Traditionally, as part of our review of this Task, we also reviewed cases that are tolling.  OPD defines a tolled case as an administrative investigation that has been held in abeyance in accordance with one of the provisions of Government Code Section 3304.  While we are no longer actively assessing this subtask, we note that filed and tolling cases are reviewed with the Chief during his weekly IAD meetings and are listed by case number on the printed meeting agendas.  We receive and review these agendas regularly, and when available, we attend these meetings.

**Task 5.21** requires that any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken.  However, with the approval of the IAD Commander or her designee, investigators are not required to interview and/or take a recorded statement in all cases.  For example, interviews are not needed from a member or employee who is the subject of a complaint, or who was on the scene of the incident when additional information – beyond that already provided by the existing set of facts and/or documentation – is not necessary to reach appropriate findings and conclusions.  Eight of the 15 cases we reviewed were resolved via summary finding, and all were appropriately approved for such closure.  In all of these cases, the availability of PDRD video was the primary reason interviews were unnecessary.

In January 2016, the Court expressed concern that the City had not yet taken steps "sufficient to satisfy the recommendation that the City establish sustainable accountability procedures that will outlive this litigation" and re-engaged the Court-Appointed Investigator to examine the City's progress on the recommendations contained in his initial report.  He filed his second report on March 16, 2016.  Some implications relative to Task 5 are noted below.

The Court-Appointed Investigator identified significant improvement in the relationship between OPD and the Labor and Employment Unit of the Oakland City Attorney's Office (OCA), primarily because of the assignment of a Deputy City Attorney within IAD.  This attorney becomes involved in the investigation of certain cases from their inception, providing guidance and advice as the case progresses.  She assists with developing investigative strategies and witness interview questions, as well as reviewing investigative reports during the drafting process.

His second report, like his first report, contained several recommendations.  Those specific to Task 5 include:

- Wherever appropriate in the police discipline process, including during the investigative stages, OPD should examine not only whether a supervisor knew of misconduct that he or she did not report (currently identified in the Member/Employee Accountability section of investigative reports), but also: (1) whether a supervisor ordered or otherwise caused the misconduct; and (2) whether the supervisor failed to sufficiently supervise the officer accused of misconduct.  This review should extend to supervisor responsibility up the chain of command as necessary.

- The Department should establish a process to seek from IAD and others recommendations to improve Department policies, trainings, and police discipline process.

- The Civilian Manager within IAD should be responsible for developing institutional memory within IAD, potentially through the development of an IAD manual.

- Future City budgets should maintain the OCA attorney assigned to IAD by specifically including a full-time-equivalent attorney that is specifically charged with providing legal services to OPD related to IAD investigations, police arbitrations, and other police discipline matters.

OPD remains in non-compliant status with Task 5 pending satisfactory progress with the provisions of the March 23, 2016 Court Order.


# Task 20:  Span of Control for Supervisors

## Requirements:

*On or before August 14, 2003, OPD shall develop and implement a policy to ensure appropriate supervision of its Area Command Field Teams.  The policy shall provide that:*

1. *Under normal conditions, OPD shall assign one primary sergeant to each Area Command Field Team, and, in general, (with certain exceptions) that supervisor's span of control shall not exceed eight (8) members.*

2. *During day-to-day operations, in the absence of the primary supervisor (e.g., due to sickness, vacation, compensatory time off, schools, and other leaves), the appropriate Area Commander shall determine, based on Department policy and operational needs, whether or not to backfill for the absence of the sergeant on leave.*

3. *If a special operation, (e.g., Beat Feet, Special Traffic Offenders Program (STOP), etc.) requires more than eight (8) members, the appropriate Area Commander shall determine the reasonable span of control for the supervisor.*

4.   *If long-term backfill requires the loan or transfer of a supervisor from another unit, the Chief of Police and/or the Deputy Chief of Police shall make that decision.*

(Negotiated Settlement Agreement IV. C.)

**Relevant Policy:**

Three Departmental policies incorporate the requirements of Task 20:  Departmental General Order A-19, *Supervisory Span of Control,* issued on July 26, 2006; Departmental General Order D-13, *Assignment to Acting Higher Rank or Classification,* issued on June 17, 1999; and Departmental General Order D-13.1, *Assignment to Acting Sergeant of Police,* issued on May 14, 2014.  (The publication of DGO D-13.1 cancelled Special Order 8435, which previously governed the selection process of acting sergeants.)

**Commentary:**

Following discussions with our Team, the Department developed and implemented an alternate relief sergeant system in 2015.  While the plan reduced the number of relief sergeants assigned to Patrol, in 2016, we have not found that it has affected compliance with the NSA requirements related to consistency of supervision and span of control.

For our assessment for this report, we reviewed spreadsheets prepared by the Department for the months of January, February, and March 2016 that, by date, note which type of sergeant supervised each applicable squad – a primary sergeant, relief sergeant, acting sergeant, other sergeant (one working overtime), or none.  (The Department refers to unsupervised squads as "open.")  Using Telestaff, the Department's electronic scheduling system, we also spot-checked this data to verify its accuracy.  We calculated per squad the compliance percentages for this subtask during this reporting period.  Each of the 46 applicable squads were in compliance – that is, all applicable squads during this reporting period were supervised by either a primary, relief, or other/overtime sergeant for at least 85% of their working shifts.  We also found that none of the applicable squads exceeded the required 1:8 supervisor to officer ratio at least 90% of their working shifts.

OPD continues to be in compliance with these important requirements.  Even more encouragingly, as we have noted previously, the Department has institutionalized the sound practices of tracking how each squad is supervised each day; planning, when possible, for expected absences; and thoughtfully considering how to fill in for personnel who are absent unexpectedly.

Thirty-Second Report of the Independent Monitor for the Oakland Police Department
May 11, 2016
Page 12 of 29

# Task 26:  Force Review Board (FRB)

**Requirements:**

*OPD shall develop and implement a policy concerning its FRB proceedings.  The policy shall:*

1. *Set out procedures, membership and a timetable for FRB review of use of force investigations involving Level 2 incidents, as defined in Department General Order K-4, REPORTING AND INVESTIGATING THE USE OF FORCE;*

2. *Require the FRB to review all use of force investigations;*

3. *Require the FRB to make a recommendation as to whether the use of force was in policy or out of policy;*

4. *Require the FRB to forward sustained policy violations to the Discipline Officer.*

5. *Require the FRB not to review any use of force allegation until the internal investigations has been completed;*

6. *Authorize the FRB to recommend to the Chief of Police additional use of force training or changes in policies or tactics, or additional standards, investigatory policies, or training for use of force investigations;*

7. *Require the FRB to conduct an annual review of use of force cases examined, so as to identify any patterns of use of force practices that may have policy or training implications, and thereafter, issue a report to the Chief of Police;*

8. *Require that the FRB membership include, at a minimum, one member from the Training Division, one member from the Field Training Officer program, and either the Bureau of Field Operations Deputy Chief or his/her designee;*

9. *Minimally, that one member of the FRB shall be replaced at least annually.*

(Negotiated Settlement Agreement V. C.)


**Relevant Policy:**

Department General Order K-4.1, *Force Review Boards,* was published February 17, 2006, and most recently revised on December 21, 2015.

**Commentary:**

Force Review Boards are convened for the purpose of reviewing Level 2 use of force events.[3]

OPD has been in compliance with Task 26 since the nineteenth reporting period; however, due to the critical nature of officers' use of force, we continue to monitor compliance by attending, observing, and assessing the conduct of these boards when scheduled during our monthly visits.

The OPD has conducted five Force Review Boards involving 11 officers during current year 2016. All boards were conducted in compliance with the requirements of this Task. Three additional boards involving four officers are scheduled.

OPD remains in compliance with this Task.

# Task 30:  Executive Force Review Board (EFRB)

**Requirements:**

1.   *An EFRB shall be convened to review the factual circumstances surrounding any Level 1 force, in-custody death, or vehicle pursuit-related death incidents.  A firearm discharge at an animal shall be reviewed by the EFRB only at the direction of the Chief of Police.  The Board shall have access to recordings and/or transcripts of interviews of all personnel on the scene, including witnesses, and shall be empowered to call any OPD personnel to provide testimony at the hearing.*

2.   *OPD shall continue the policies and practices for the conduct of EFRB, in accordance with the provisions of DGO K-4.1, FORCE REVIEW BOARDS.*

(Negotiated Settlement Agreement V. G.)

**Relevant Policy:**

Department General Order K-4.1, *Force Review Boards,* was published February 17, 2006, and most recently revised on December 21, 2015.

---

[3] Level 2 Use of Force includes, 1)  Any strike to the head (except for an intentional strike with an impact weapon); 2) Carotid restraint is applied that does not result in the loss of consciousness; 3) Use of impact weapons, including specialty impact munitions or any other object, to strike a subject and contact is made, regardless of injury; 4) Any unintentional firearms discharge that does not result in injury; 5) A police canine bites the clothing or the skin of a subject, or otherwise injures a subject requiring emergency medical treatment (beyond first-aid) or hospital admittance; 6) Any use of force which results in injuries to the subject requiring emergency medical treatment (beyond first-aid) or hospital admittance; (NOTE: For the purposes of this order, an evaluation by a medical professional to assess a complaint of injury is not emergency treatment) 7) Any Level 3 use of force used on or applied to a restrained subject; 7.a) A restrained subject is a person who has been fully placed in a Department authorized restraint device such as both hands handcuffed, a WRAP or Rip Hobble; 7.b) A subject with only one handcuff on is not a restrained person.

Thirty-Second Report of the Independent Monitor for the Oakland Police Department
May 11, 2016
Page 14 of 29

**Commentary:**

Executive Force Review Boards (EFRBs) are convened for the purpose of reviewing Level 1 use of force events.[4]

OPD has been in compliance with Task 30 since the nineteenth reporting period; however, due to the critical nature of officers' use of force, we continue to observe and assess the conduct of EFRB activities conducted during our monthly site visits.

The OPD has conducted three involving eight officers during current year 2016. All boards were conducted in compliance with the requirements of this task.

OPD remains in compliance with this Task.

## Task 34:  Vehicle Stops, Field Investigation, and Detentions

**Requirements:**

1.  *OPD shall require members to complete a basic report on every vehicle stop, field investigation and every detention.  This report shall include, at a minimum:*

    a.   *Time, date and location;*

    b.   *Identification of the initiating member or employee commencing after the first year of data collection;*

    c.   *Reason for stop;*

    d.   *Apparent race or ethnicity, and gender of individual(s) stopped;*

    e.   *Outcome of stop (arrest, no arrest);*

    f.   *Whether a search was conducted, and outcome of search;*

    g.   *Offense categories (felony, misdemeanor or infraction).*

2.  *This data shall be entered into a database that can be summarized, searched, queried and reported by personnel authorized by OPD.*

---

[4] Level I Use of Force events include:  1) Any use of force resulting in death; 2) Any intentional firearm discharge at a person, regardless of injury; 3) Any force which creates a substantial risk of causing death, (The use of a vehicle by a member to intentionally strike a suspect shall be considered deadly force, reported and investigated as a Level 1 UOF under this section. This includes at any vehicle speed, with or without injury, when the act was intentional, and contact was made); 4) Serious bodily injury, to include, (a) Any use of force resulting in the loss of consciousness; and (b) Protracted loss, impairment, serious disfigurement, or function of any bodily member or organ (includes paralysis); 5) Any unintentional firearms discharge, (a) If a person is injured as a result of the discharge; or (b) As directed by the CID Commander; 6) Any intentional impact weapon strike to the head; 7) Any use of force investigation that is elevated to a Level 1 approved by a Watch Commander.

The EFRB consists of three senior commanders as voting members.  In addition, regular non-voting attendees include the Training Section Commander and a representative of the City Attorney's Office.

A Level 1 use of force may include both criminal and administrative elements; accordingly, both the Criminal Investigation Division (CID) and IAD present the results of their respective investigations to an EFRB

3.     *The development of this policy shall not pre-empt any other pending or future policies and or policy development, including but not limited to "Promoting Cooperative Strategies to Prevent Racial Profiling."*

(Negotiated Settlement Agreement VI. B.)

**Relevant Policy:**

Department policies relevant to Task 34 include:  General Order M-19, *Prohibitions Regarding Racial Profiling and Other Bias-Based Policing;* Report Writing Manual (RWM) Inserts R-2, N-1, and N-2; Special Order 9042, *New Procedures Regarding Stop Data Collection* (published June 2010); and Special Order 9101, *Revised Stop Data Collection Procedures* (published November 2012).

**Commentary:**

This Task requires the collection and retention of stop data in a manner that can be accessed and analyzed so as to identify, address, and resolve indicators of bias-based policing or racial profiling.  The task of developing the data collection process has been largely accomplished, but not without its challenges, given that there was and is no credible model available for reference.  This left OPD, utilizing the talents of its capable in-house staff, to design and build the present system.  An integral part of the process has included a continuous, critical review of the data collection processes to identify areas where improvement or adjustment may be warranted.  From time to time, problematic areas were identified, which necessitated changes in processes, forms, and policies and training.

The most recent area of concern related to search recovery rates, which was identified in the latter part of 2015.  At that time, the data indicated a rapid and significant increase in the overall recovery rate of squads in the Area(s) under review.  Although we and OPD viewed the strong recovery rate numbers as positive, we determined that, given the magnitude of the increased recovery rates, the data required further examination so as to ensure accuracy.  That examination, in large part conducted by OIG, found again that officers were making lawful searches; however, it noted the following:

- Items – such as screwdrivers and pocket knives – discovered and temporarily held by officers for safety reasons but returned to the owners, were being recorded as recoveries even though they were not seized nor identified as either evidence or contraband; and
- The recovery of evidence and the number of persons searched during multiple person stops was not being recorded in a consistent manner.

OPD quickly initiated corrective measures to address these issues, which include officer training and revisions to the data entry form.  The training continues, and OPD has revised the data entry form to address these concerns.  OPD represents that the updated data entry form will be ready for beta-testing during our next (May) site visit with operational implementation to follow in June.

Despite the above-described issue, including adjusting for estimated variances in recovery data,

it is clear that there are increases in recovery rates.  However, *the degree of the increase* remains in question – and in particular, *the degree of the increase within the various population groups.* We expect that OPD will address these concerns as it broadens its analyses of the data.

OPD's collection of credible stop data information for more than two years provides a sufficient database for a variety of analyses, including, but not limited to: the identification of statistical indicators of *possible* disparate treatment at the Department, area, squad, and individual officer levels.  These indicators provide an opportunity for OPD to further examine activities to determine whether training or other intervention may be warranted at one or more of these levels.

The database provides pointers to specific police/public interactions indicative of possible disparate treatment amongst the identified population groups.  Thus far, the focus has been on squad data and, to a limited degree, on officer demographics – i.e., variances in search, recovery and other data between younger, less experienced vs. older, more experienced officers. However, we continue to suggest 1) OPD focus on individual officer data to specifically identify significant variances from the norm relative to stops, searches, and other actions involving the various population groups; 2) develop intervention strategies to address variances, as may be required; and 3) evaluate the effectiveness of officers' supervisors who have responsibility to train, guide, mentor, and correct officers' performance.

Assignment changes resulting from the annual draw (in which officers, in order of seniority, select their assignments and schedules for the year) present a unique opportunity for supervisors to review newly assigned officers' data, address any areas of concern, and enhance the performance of the officers they supervise.


STOP DATA REVIEWS

OPD conducts monthly detailed reviews of various risk management components for one of its five Area commands in rotation.  An important component of these meetings is an in-depth review of activities relating to stop data, including the identification of anomalies and/or variances in stop data between Citywide and their particular Area data.  To assist with this review, OPD provides the Area Commanders with data depicting various activities relating to interactions (stops), including data indicative of either the absence or presence of possible disparate treatment among population groups.  .

Commanders outline their examination of the data, their findings, and any interaction and/or intervention with officers regarding statistical anomalies.  To date, these interactions have been both general and officer-specific, but primarily relating to the experience level of officers or crime control strategies.  However, such interactions, with particular officers, are not consistently documented.  We suggest that the documentation of such interactions with officers is extremely important, given the high level of public and internal interest regarding the manner in which OPD addresses any indicators of disparate treatment.

As has been our practice in previous reports, we include a number of tables to illustrate various stop data; however, once again, we do so with the admonition that the stop data in and of itself is not dispositive of disparate treatment among the population groups.  Instead, it is an indicator of possible disparate treatment warranting further, careful analysis and – where warranted – intervention.

CITYWIDE STOPS

Tables One and Two illustrate Citywide vehicle and pedestrian stop data from OPD.

| TABLE ONE[5] Vehicle Stop Summary | | | | | |
|---|---|---|---|---|---|
| Race/Ethnicity | Stops | | Searches[6] | Recoveries | Arrests |
| African American | 10,232 | 57% | 27% | 50% | 8% |
| Asian | 1,196 | 7% | 9% | 56% | 2% |
| Hispanic | 3.938 | 22% | 13% | 54% | 6% |
| White | 2,008 | 11% | 5% | 57% | 4% |
| Other | 655 | 4% | 7% | 50% | 4% |
| Total | 18,029 | 100% | 19% | 51% | 7% |

| TABLE TWO[7] Pedestrian Stop Summary | | | | | |
|---|---|---|---|---|---|
| Race/Ethnicity | Stops | | Searches[8] | Recoveries | Arrests |
| African American | 2,082 | 69% | 46% | 46% | 30% |
| Asian | 138 | 5% | 33% | 67% | 41% |
| Hispanic | 469 | 15% | 37% | 55% | 26% |
| White | 274 | 9% | 22% | 60% | 27% |
| Other | 66 | 2% | 36% | 59% | 21% |
| Total | 3,029 | 100% | 42% | 49% | 29% |

As illustrated in the above tables, OPD officers stopped and interacted with a total of 21,058 individuals during the specified period of time or on average 115 per day. One in five of the stops resulted in a search with an average recovery rate of 50%, ranging from a low of 46% for African Americans to a high of 67% for Asians.

---

[5] This dataset includes activity for the period September 26, 2015 through March 25, 2016.
[6] Incident to arrest, weapons, and inventory searches Excluded.
[7] This dataset includes activity for the period September 26, 2015 through March 25, 2016.
[8] Incident to arrest, weapons, and inventory searches excluded.

Thirty-Second Report of the Independent Monitor for the Oakland Police Department
May 11, 2016
Page 18 of 29

MONTHLY REVIEW OF SELECTED AREA

During our March site visit, we attended the monthly Risk Management Meeting (RMM), at which OPD officials reviewed stop data for the selected Area. This was the fifth successive RMM during which the Area Commander and command staff had carefully reviewed and understood the data. The commanders' descriptions of Area activities, crime control strategies, and knowledge of the individual squad activities was broad and comprehensive.

### Vehicle and Pedestrian Stops

Officers assigned to the Area under review during the March RMM stopped and interacted with a total of 4,140 individuals during the specified period of time – or, on average, 23 per day – as illustrated in Tables Three and Four. One in four of the stops resulted in a search. African Americans were stopped and searched as the highest rates. See Tables Three and Four below.

| TABLE THREE[9] Area Vehicle Stop Summary | | | | | |
|---|---|---|---|---|---|
| Race/Ethnicity | Stops | | Searches[10] | Recoveries | Arrests |
| African American | 1,516 | 66% | 24% | 56% | 9% |
| Asian | 133 | 6% | 5% | 71% | 0% |
| Hispanic | 291 | 13% | 11% | 47% | 5% |
| White | 278 | 12% | 5% | 71% | 4% |
| Other | 84 | 4% | 5% | 25% | 5% |
| Total | 2,302 | 100% | 18% | 56% | 7% |

| TABLE FOUR[11] Area Pedestrian Stop Summary | | | | | |
|---|---|---|---|---|---|
| Race/Ethnicity | Stops | | Searches[12] | Recoveries | Arrests |
| African American | 428 | 74% | 49% | 65% | 34% |
| Asian | 12 | 2% | 14% | 100% | 50% |
| Hispanic | 72 | 13% | 35% | 53% | 29% |
| White | 54 | 9% | 26% | 50% | 28% |
| Other | 10 | 2% | 38% | 67% | 30% |
| Total | 576 | 100% | 44% | 64% | 33% |

### Pat-Down (Frisks) Searches

Tables Five illustrate the percentage of citywide stops resulting in pat-down or probation/parole searches. This data is provided for informational purposes.

---

[9] This dataset includes activity for the period September 26, 2015 through March 25, 2016.
[10] Incident to arrest, weapons, and inventory searches excluded.
[11] This dataset includes activity for the period September 26, 2015 through March 25, 2016.
[12] Incident to arrest, weapons, and inventory searches excluded.

| CITYWIDE STOPS Percentage of Stops Resulting in Weapons or Probation/Parole Searches | | | | |
|---|---|---|---|---|
| Race/Ethnicity | Vehicle Stop Pat-downs (frisks) | Pedestrian Stop Pat-downs (frisks) | Vehicle Stop Probation/Parole Searches | Pedestrian Stop Probation/Parole Searches |
| African American | 11% | 16% | 40% | 33% |
| Asian | 9% | 21% | 26% | 17% |
| Hispanic | 16% | 21% | 24% | 24% |
| White | 14% | 21% | 27% | 11% |
| Other | 8% | 36% | 25% | 17% |
| **Total** | **12%** | **18%** | **36%** | **29%** |

OPD had made marked progress with the implementation of the requirements of this Task relating to the collection and retention of stop data in a manner that can be accessed and analyzed so as to identify, address, and resolve indicators of bias-based policing or racial profiling. What remains to be seen is whether OPD moves forward with solid analytical processes that point to the presence or absence of disparate treatment of one of more population groups, and where warranted, intervenes with corrective measures.

We will continue to monitor OPD's progress with the remaining issues until full compliance is achieved:

- Training and operational implementation of revised stop data forms to appropriately categorize pat-down search recoveries of both seized evidence and the return of items temporarily retained for safety purposes. OPD has implemented policy and training initiatives. OPD's revised Stop Data Collection Form – reflecting the return of seized items, in addition to other improvements – is scheduled for beta-testing during this month with full operational implementation in June;

- Completion of training regarding search recovery documentation in cases of multiple person stops and/or vehicle searches with multiple occupants. The first phase of the training is currently in progress, and OPD will initiate the second phase of the training when it adopts the revised Stop Data Collection Form.

- The implementation of general and specific intervention strategies to address data indicators of abnormalities and/or possible bias at the Area, squad, and individual officer levels. We are working with OIG to address these strategies.

- Assessing and addressing whether the present rotating review of stop data (once in five months) is sufficient to reliable identify possible bias and assure sustained intervention and/or prevention measures. (This objective is temporarily delayed awaiting the implementation of PRIME, which should assist with the gathering and presentation of the voluminous data reviewed/assessed during the Area Risk Management Meetings.)

- Receipt and implementation of Dr. Eberhardt's forthcoming report and recommendations. Dr. Eberhardt and OPD have developed a plan to assure wide distribution of the report, both internally and to the public to assure widespread understanding of what it finds, and equally important, what it does not find.  It is expected that the report will be publicly released within the month.

# Task 41:  Use of Personnel Assessment System (PAS) and Risk Management

### Requirements:

*Within 375 days from the effective date of this Agreement, OPD shall develop a policy for use of the system, including supervision and audit of the performance of specific members, employees, supervisors, managers, and OPD units, as well as OPD as a whole.  The policy shall include the following elements:*

1. *The Chief of Police shall designate a PAS Administration Unit.  The PAS Administration Unit shall be responsible for administering the PAS policy and, no less frequently than quarterly, shall notify, in writing, the appropriate Deputy Chief/Director and the responsible commander/manager of an identified member/employee who meets the PAS criteria.  PAS is to be electronically maintained by the City Information Technology Department.*

2. *The Department shall retain all PAS data for at least five (5) years.*

3. *The Monitor, Inspector General and Compliance Coordinator shall have full access to PAS to the extent necessary for the performance of their duties under this Agreement and consistent with Section XIII, paragraph K, and Section XIV of this Agreement.*

4. *PAS, the PAS data, and reports are confidential and not public information.*

5. *On a quarterly basis, commanders/managers shall review and analyze all relevant PAS information concerning personnel under their command, to detect any pattern or series of incidents which may indicate that a member/employee, supervisor, or group of members/employees under his/her supervision may be engaging in at-risk behavior.  The policy shall define specific criteria for determining when a member/employee or group of members/employees may be engaging in at-risk behavior.*

6. *Notwithstanding any other provisions of the PAS policy to be developed, the Department shall develop policy defining peer group comparison and methodology in consultation with Plaintiffs' Counsel and the IMT.  The policy shall include, at a minimum, a requirement that any member/employee who is identified using a peer group comparison methodology for complaints received during a 30-month period, or any member who is identified using a peer group*

*comparison methodology for Penal Code §§69, 148 and 243(b)(c) arrests within a 30-month period, shall be identified as a subject for PAS intervention review. For the purposes of these two criteria, a single incident shall be counted as "one" even if there are multiple complaints arising from the incident or combined with an arrest for Penal Code §§69, 148 or 243(b)(c).*

7.     *When review and analysis of the PAS threshold report data indicate that a member/employee may be engaging in at-risk behavior, the member/employee's immediate supervisor shall conduct a more intensive review of the member/employee's performance and personnel history and prepare a PAS Activity Review and Report. Members/employees recommended for intervention shall be required to attend a documented, non-disciplinary PAS intervention meeting with their designated commander/manager and supervisor. The purpose of this meeting shall be to review the member/employee's performance and discuss the issues and recommended intervention strategies. The member/employee shall be dismissed from the meeting, and the designated commander/manager and the member/employee's immediate supervisor shall remain and discuss the situation and the member/employee's response. The primary responsibility for any intervention strategies shall be placed upon the supervisor. Intervention strategies may include additional training, reassignment, additional supervision, coaching or personal counseling. The performance of members/ employees subject to PAS review shall be monitored by their designated commander/manager for the specified period of time following the initial meeting, unless released early or extended (as outlined in Section VII, paragraph B (8)).*

8.     *Members/employees who meet the PAS threshold specified in Section VII, paragraph B (6) shall be subject to one of the following options: no action, supervisory monitoring, or PAS intervention. Each of these options shall be approved by the chain-of-command, up to the Deputy Chief/Director and/or the PAS Activity Review Panel.*

*Members/employees recommended for supervisory monitoring shall be monitored for a minimum of three (3) months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor. The first at the end of one (1) month and the second at the end of three (3) months.*

*Members/employees recommended for PAS intervention shall be monitored for a minimum of 12 months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor and designated commander/manager: The first at three (3) months and the second at one (1) year. Member/employees subject to PAS intervention for minor, easily correctable performance deficiencies may be dismissed from the jurisdiction of PAS upon the written approval of the member/employee's responsible Deputy Chief, following a recommendation in writing from the member/employee's immediate supervisor. This may occur at the three (3)-month follow-up meeting or at any time thereafter, as justified by reviews of the member/employee's*

*performance.  When a member/employee is not discharged from PAS jurisdiction at the one (1)-year follow-up meeting, PAS jurisdiction shall be extended, in writing, for a specific period in three (3)-month increments at the discretion of the member/employee's responsible Deputy Chief.  When PAS jurisdiction is extended beyond the minimum one (1)-year review period, additional review meetings involving the member/employee, the member/ employee's designated commander/manager and immediate supervisor, shall take place no less frequently than every three (3) months.*

9.  *On a quarterly basis, Division/appropriate Area Commanders and managers shall review and analyze relevant data in PAS about subordinate commanders and/or managers and supervisors regarding their ability to adhere to policy and address at-risk behavior.  All Division/appropriate Area Commanders and managers shall conduct quarterly meetings with their supervisory staff for the purpose of assessing and sharing information about the state of the unit and identifying potential or actual performance problems within the unit.  These meetings shall be scheduled to follow-up on supervisors' assessments of their subordinates' for PAS intervention.  These meetings shall consider all relevant PAS data, potential patterns of at-risk behavior, and recommended intervention strategies since the last meeting.  Also considered shall be patterns involving use of force, sick leave, line-of-duty injuries, narcotics-related possessory offenses, and vehicle collisions that are out of the norm among either personnel in the unit or among the unit's subunits.  Division/appropriate Area Commanders and managers shall ensure that minutes of the meetings are taken and retained for a period of five (5) years.  Commanders/managers shall take appropriate action on identified patterns of at-risk behavior and/or misconduct.*

10.  *Division/appropriate Area Commanders and managers shall meet at least annually with his/her Deputy Chief/Director and the IAD Commander to discuss the state of their commands and any exceptional performance, potential or actual performance problems or other potential patterns of at-risk behavior within the unit.  Division/appropriate Area Commanders and managers shall be responsible for developing and documenting plans to ensure the managerial and supervisory accountability of their units, and for addressing any real or potential problems that may be apparent.*

11.  *PAS information shall be taken into account for a commendation or award recommendation; promotion, transfer, and special assignment, and in connection with annual performance appraisals.  For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

12.  *Intervention strategies implemented as a result of a PAS Activity Review and Report shall be documented in a timely manner.*

13.  *Relevant and appropriate PAS information shall be taken into account in connection with determinations of appropriate discipline for sustained*

*misconduct allegations. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

14. *The member/employee's designated commander/manager shall schedule a PAS Activity Review meeting to be held no later than 20 days following notification to the Deputy Chief/Director that the member/employee has met a PAS threshold and when intervention is recommended.*

15. *The PAS policy to be developed shall include a provision that a member/employee making unsatisfactory progress during PAS intervention may be transferred and/or loaned to another supervisor, another assignment or another Division, at the discretion of the Bureau Chief/Director if the transfer is within his/her Bureau. Inter-Bureau transfers shall be approved by the Chief of Police. If a member/employee is transferred because of unsatisfactory progress, that transfer shall be to a position with little or no public contact when there is a nexus between the at-risk behavior and the "no public contact" restriction. Sustained complaints from incidents subsequent to a member/employee's referral to PAS shall continue to result in corrective measures; however, such corrective measures shall not necessarily result in a member/employee's exclusion from, or continued inclusion in, PAS. The member/employee's exclusion or continued inclusion in PAS shall be at the discretion of the Chief of Police or his/her designee and shall be documented.*

16. *In parallel with the PAS program described above, the Department may wish to continue the Early Intervention Review Panel.*

17. *On a semi-annual basis, beginning within 90 days from the effective date of this Agreement, the Chief of Police, the PAS Activity Review Panel, PAS Oversight Committee, and the IAD Commander shall meet with the Monitor to review the operation and progress of the PAS. At these meetings, OPD administrators shall summarize, for the Monitor, the number of members/employees who have been identified for review, pursuant to the PAS policy, and the number of members/employees who have been identified for PAS intervention. The Department administrators shall also provide data summarizing the various intervention strategies that have been utilized as a result of all PAS Activity Review and Reports. The major objectives of each of these semi-annual meetings shall be consideration of whether the PAS policy is adequate with regard to detecting patterns of misconduct or poor performance issues as expeditiously as possible and if PAS reviews are achieving their goals.*

18. *Nothing in this Agreement, and more specifically, no provision of PAS, shall be construed as waiving, abrogating or in any way modifying the Department's rights with regard to discipline of its members/employees. The Department may choose, at its discretion, to initiate the administrative discipline process, to initiate PAS review or to use both processes concurrently or consecutively.*

(Negotiated Settlement Agreement VII. B.)

**Relevant Policy:**

OPD revised and issued Departmental General Order D-17, *Personnel Assessment Program,* in November 2013.

**Commentary:**

The OPD risk management system utilizing PAS continues to operate as designed, although OPD is not making revisions to it as the new system, PRIME (Performance Reporting Information Metrics Environment), nears the end of its initial development.  Risk management also continues to operate under Departmental General Order D-17, *Personnel Assessment Program*.  DGO D-17 has not yet been addressed under the Department's ongoing policy review and revision program.  It is clear that review and, at least, minor revisions will be needed as the Department moves to the use of the new PRIME system.  Even though they recognize that extensive work remains, risk management staff are reasonably confident that the vendor for PRIME has sufficient resources dedicated to the project and can expand those resources as needed to assure completion under the schedule as currently planned.

The "go-live" date for the new PRIME system remains scheduled for July of this year.  An early plan to switch off PAS at the time PRIME is initiated has instead given way to include a period during which both systems are in place.  This will ensure that the new system functions as anticipated, it will provide an opportunity to address any needed changes, and it will allow PAS to continue to serve the risk management process to the extent it is needed.

Even with these plans, it is evident that substantial work continues to be done to try to meet set deadlines.  One key aspect of the system, the administrative process, through which reviews are managed and documented, is not yet complete.  Additional work is also being done to ensure that the information presented through PAS is also consistently available in PRIME.  The new system also requires that information access and security be reconsidered.  A more complex system of permissions is being implemented to address the issue that searches are universal under PRIME and therefore, if limits are *not* established, would provide access to all reports involving the names used in any search.  Since all PAS reports will be completed within the PRIME system this requires special attention for the PAS Unit.

Task 41 is inexorably linked to Task 40, which addresses the data needed by the risk management process.  There are currently no significant issues regarding data quality and availability. The Department, through the PAS Administration Unit, continues to conduct internal audits of the required data and to correct any problems as they arise. The PAS Administration Unit is also in the best position to understand issues related to data that may be relevant to its review process.  The capacity to address core data issues may be critical as OPD moves forward with its new PRIME database.

PAS records for the quarter of January, February, and March 2016, as compiled by OPD, indicate that data were entered for all of the fields required by Task 40.  The required data for the quarter included reports of 178 uses of force.  This is a slight increase from the previous quarter but consistent with longer term downward trend.  The graphs at the end of the tables show that drops in the use of force have also been accompanied by increases in the numbers of arrests over time.

A further breakdown of the types of use of force shows that there were no Level 1 uses of force. There were 11 Level 3, four Level 2, and 163 Level 4 uses of force during the quarter.  Internal Affairs complaints show a small decline during the quarter and relative stability since July 2013. There were no officer-involved shootings during the quarter.

Thirty-Second Report of the Independent Monitor for the Oakland Police Department
May 11, 2016
Page 26 of 29

| OPD Performsance Activity Data | | | | | |
|---|---|---|---|---|---|
| Label | Jan-16 | Feb-16 | Mar-16 | Total | SPARKLINES (Jul 13 - Mar 16) |
| Level 1 Uses of Force | 0 | 0 | 0 | 0 | |
| Level 2 Uses of Force | 2 | 2 | 0 | 4 | |
| Level 3 Uses of Force | 2 | 6 | 3 | 11 | |
| Level 4 Uses of Force | 57 | 62 | 44 | 163 | |
| Unintentional Firearms Discharge | 0 | 0 | 0 | 0 | |
| Sick Leave Hours | 2819.4 | 2853.69 | 3417.56 | 9090.65 | |
| Line of Duty Injuries | 0 | 0 | 0 | 0 | |
| Narcotics Related Possessory Offenses Arrests | 353 | 302 | 352 | 1007 | |
| Vehicle Collisions | 9 | 8 | 2 | 19 | |
| All Vehicle Pursuits | 13 | 13 | 2 | 28 | |
| All Arrest | 1969 | 1933 | 1907 | 5809 | |
| Arrests including PC 69, 148(a), 243(b)(c) & 245(c)(d) | 29 | 24 | 29 | 82 | |
| Arrests only for PC 69, 148(a), 243(b)(c) & 245(c)(d) | 3 | 6 | 2 | 11 | |
| Awards | 5 | 11 | 25 | 41 | |
| Assignment History | 12918 | 12918 | 12918 | 38754 | |
| Case Evaluation Reports | 99 | 89 | 48 | 236 | |
| Report Review Notices--Positive | 0 | 1 | 1 | 2 | |
| Report Review Notices--Negative | 0 | 0 | 0 | 0 | |
| Canine Deployments | 29 | 23 | 10 | 62 | |
| Financial Claims | 0 | 0 | 0 | 0 | |
| Internal Affairs Complaints | 68 | 67 | 60 | 195 | |
| In-Custody Injuries | 2 | 0 | 0 | 2 | |
| Civil Suits (Tort Claims) | 0 | 3 | 1 | 4 | |
| Criminal Cases Dropped | 75 | 55 | 28 | 158 | |
| O.C. Checkouts | 78 | 3 | 16 | 97 | |
| Officer Involved Shootings | 0 | 0 | 0 | 0 | |
| Rank / Class History | 2676 | 2676 | 2676 | 8028 | |
| Training History | 1263 | 566 | 315 | 2144 | |
| Supervisory Notes | 1491 | 1416 | 1478 | 4385 | |
| Criminal Arrest Made Against OPD | 0 | 1 | 0 | 1 | |

Task 41 addresses the effectiveness of the use of the risk management process to establish a proper foundation to manage risk in the Department. Much of the discussion below addresses the process with regard to identifying and assessing individual officers based on risk-related behavior and intervening as appropriate. The system also supports a broader approach to managing risk in which the Department continuously assesses activity and seeks to incorporate those assessments more generally into its risk reduction effort. During our most recent site visit, the use of risk management concepts and data was again well illustrated in the monthly Risk Management Meeting. The meeting demonstrated high levels of risk-relevant knowledge by the Area command staff and supervisors.

At the same time, it is also worth noting that the Department's approach to risk management is consistent but not advancing significantly. Among the issues that have not been strongly addressed is how the risk management system will be used beyond the existing identification and review processes. In what has become an often-repeated refrain by the Monitoring Team: An important step in this process will be to formulate key questions so that they may be captured in reports through the new system. We are hopeful that the current status of this issue will change but we recognize that current conditions may reflect preoccupation with the major work going on with the development of PRIME, as well as other unfinished business including the soon-to-be released stop data analysis by Dr. Jennifer Eberhardt.

The Department's commitment in this area, as well as the City's, reflects recognition of the importance of the risk management process as outlined in the NSA. As development and implementation moves forward, it would be useful to look beyond the processes associated with the earlier system and toward broader questions as to how PRIME can more effectively support the management of the Department.

As we have done in the past, we continue our examination of the stages of the current PAS processes as required under Task 41. We examined the threshold analyses that were performed for the period of January 1, through March 31, 2016. This included a review of peer-based threshold analyses completed by the PAS Administration Unit and the identification of officers meeting the single-event threshold. In many cases, the data show that the distribution of risk factors are tightly distributed and therefore yield few or no outliers. This is a positive finding, but it may also indicate that it may now be appropriate to reconsider selection criteria.

In accordance with this Task requirement, we reviewed PAS processes for the system's use in placement of officers on special assignment, transfer of officers, and commendations. An important function of PAS is to regularly provide supervisors with relevant information on officers. To consider that function, we again reviewed reports of regular quarterly PAS command reviews of officers by supervisors. We again found appropriate use of the system and no significant issues.

The PAS process is generally initiated through comprehensive risk assessment reviews when thresholds are met. For the period covered in this report, we examined 21 reviews that were completed, and 19 additional reviews that were in process earlier and returned to the PAS Administration Unit during the period. We also examined Command Reviews in the patrol areas. The volume of these reports does not differ substantially from recent past quarters.

For the reporting period ending March 31, 2016, OPD completed a total of 35 PAS reviews that were processed up the chain of command and through the PAS Review Panel.  Reviews are included in the table below only after they are signed off through the level of the PAS Review Panel.  Examination of the reviews as completed by the PAS Administration Unit shows them to be thorough and complete.  The reviews include examination of all identified risk-related activity consistent with the policy.   The table also shows that 25 officers exceeded thresholds for review during this quarter, and that 41 reviews were completed by the end of the quarter.

The table below tracks the review process and shows that supervisors recommended that no action be taken in 36, or 88% of the 41 reviews for the current reporting period.  Four officers were recommended for monitoring, and none were recommended for intervention.  The table also shows that commanders and the Deputy Chief disagreed with none of the lower-level recommendations.  The PAS Review Panel also reversed one case.   In summary, the system shows moderately high levels of "no action" required on initial review – but also shows the willingness and capacity to reverse those decisions up the chain of command.

When assessed at the end of the review period, 13 officers were in monitoring and three in intervention.  Five officers were referred for review through the administrative referral process rather than for exceeding one of the set thresholds.  The data mean that, for this quarter, approximately 2.1% of all officers (Total N=745, monthly average) are on some risk management-related status; either monitoring or intervention.  When the percentage using patrol officers as the base (N=453) is considered, this increases to over 3.5% of all patrol officers.  These numbers are somewhat lower than expected under a system intended to continuously lower risk over time, and where there have been a significant number of new recruits for whom monitoring may be a beneficial adjunct to normal supervision.

The value of the data in the chart below is for tracking data over time, and using it to assess, and perhaps, increase the rigors of the review process as it serves the goal of risk reduction.

| Summary of PAS Reviews and Recommendations 1/16-3/16 | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PAS Reviews Completed | Supervisor Rec- no action | % | Recognition | % | Supervisor Rec - Monitoring | % | Supervisor Rec- Intervention | % | Supervisor concurs with PAS Admin | % | Commander rec Concurs w Supervisor | % | Dep. Chief Concurs w Commander | % | PAS Panel Concurs w DC | % | Pending | Number of personnel that exceeded a threshold |
| | | | | | | | | | | | | | | | | | | |
| **2016** | | | | | | | | | | | | | | | | | | |
| January | 10 | 9 | 90% | 1 | 10% | 0 | 0% | 0 | 0% | 10 | 100% | 10 | 100% | 10 | 100% | 10 | 100% | 1 | 2 |
| February | 12 | 11 | 92% | 0 | 0% | 1 | 8% | 0 | 0% | 10 | 83% | 12 | 100% | 12 | 100% | 11 | 92% | 3 | 23 |
| March | 19 | 16 | 84% | 0 | 0% | 3 | 16% | 0 | 0% | 18 | 95% | 19 | 100% | 19 | 100% | 19 | 100% | 1 | 0 |
| | | | | | | | | | | | | | | | | | | |

For our quarterly reports, we also review the PAS histories of officers who had a Level 1 use of force.  For this quarter, as was true last quarter, no officers fell into this category.

As we noted previously and also above, all of the risk management-related work that has been undertaken has positioned the Department well to take advantage of the capabilities of the new PRIME risk management database as it readies for implementation.  The current status of the risk management process, and the development of this new data system, together, can signal a new era in the Department's approach to risk management.  Setting and clarifying expectations for this new era still remains a vitally important task.  As we approach implementation of the new system, Task 41 remains in compliance with NSA requirements.

## Conclusion

OPD continues to meet the requirements of Task 41.  This, however, is occurring under the predecessor of the about-to-be-implemented PRIME system.  Exhaustive technical work has been done to prepare that system for implementation, but little attention has been paid to the use of the new system to enhance risk management.  It seems to be expected in the Department that replacing the use of the old system with the new will present few, if any, challenges.  This, however, seems unlikely for two reasons:  First, policy and practice will need careful review to be certain Task 41 requirements continue to be met; and second, to the extent improvement and advancement in risk management does not occur in conjunction with PRIME, the return on the investment made for this system may be disappointing.  We will continue to monitor this closely.

As described in our last report, we also continue to closely monitor the Department's handling of a specific Internal Affairs case that was referred to in a recent Court Order.  As this effort is ongoing, we will describe it more fully in a future report.

*Robert S. Warshaw*

Chief (Ret.) Robert S. Warshaw

*Monitor*