July 19, 2018

# Fifty-Fourth Report
## *of the* Independent Monitor
## *for the* Oakland Police Department

---

## Introduction

This is our fifty-fourth status report on the Negotiated Settlement Agreement (NSA) in the case of *Delphine Allen, et al., vs. City of Oakland, et al.,* in the United States District Court for the Northern District of California under the direction of Judge William H. Orrick.  I was appointed in 2010 to oversee the monitoring process of the Oakland Police Department (OPD) that began in 2003.

This report covers our site visit of May 31-June 1, 2018; and describes our recent assessments of NSA Tasks 5, 6, 34, and 41.  As we have noted previously, following the Court's Order of May 21, 2015, in our monthly reports, we devote special attention to the most problematic component parts of the Tasks that are not yet in full or sustained compliance, and discuss the most current information regarding the Department's progress with the NSA and its efforts at making the reforms sustainable.


## *Increasing Technical Assistance*

Each month, our Team conducts visits to Oakland that include both compliance assessments and technical assistance.  During our visits, we meet with Department and City officials; observe Department meetings and technical demonstrations; review Departmental policies; conduct interviews and make observations in the field; and analyze OPD documents and files, including misconduct investigations, use of force reports, crime and arrest reports, Stop Data Forms, and other documentation.  We also provide technical assistance in additional areas, especially those that relate to the remaining non-compliant Tasks or areas identified by the Department.

Within the last several months, we have provided technical assistance to OPD officials in the areas of IAD investigation quality (Task 5); stop data and related issues (Task 34); risk management and the ongoing maintenance issues and development of the Performance Reporting Information Metrics Environment (PRIME) systems (Task 41); and several Department policies and procedures, including policies related to PRIME, officer discipline, probationers and parolees, handcuffing, and the use of electronic control weapons.

## *Building Internal Capacity at OPD*

Also per the May 21, 2015 Court Order, we continue to work closely with the Office of Inspector General's (OIG) lieutenant and staff to identify areas that it should audit or review – and to help design approaches to these audits that are not cumbersome, so as to ensure sustainability.  We review OIG's now-quarterly progress reports, which are a valuable resource and assist us in assessing compliance with NSA requirements.

---

## *Focused Task Assessments*

## Task 5:  Complaint Procedures for IAD

**Requirements:**

1.   *On or before December 1, 2003, OPD shall develop a policy so that, OPD personnel who become aware that a citizen wishes to file a complaint shall bring such citizen immediately, or as soon as circumstances permit, to a supervisor or IAD or summon a supervisor to the scene.  If there is a delay of greater than three (3) hours, the reason for such delay shall be documented by the person receiving the complaint.  In the event that such a complainant refuses to travel to a supervisor or to wait for one, the member/employee involved shall make all reasonable attempts to obtain identification, including address and phone number, as well as a description of the allegedly wrongful conduct and offending personnel, from the complainant and any witnesses.  This information, as well as a description of the complaint, shall immediately, or as soon as circumstances permit, be documented on a Complaint Form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander, and shall be treated as a complaint.  The supervisor or appropriate Area Commander notified of the complaint shall ensure the Communications Division is notified and forward any pertinent documents to the IAD.*

2.   *An on-duty supervisor shall respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest.  The supervisor shall ensure the Communications Division is notified and forward any pertinent documents to the IAD.  All other misconduct complaints by a jail inmate shall be handled in the same manner as other civilian complaints.*

3. *In each complaint investigation, OPD shall consider all relevant evidence, including circumstantial, direct and physical evidence, and make credibility determinations, if feasible.  OPD shall make efforts to resolve, by reference to physical evidence, and/or use of follow-up interviews and other objective indicators, inconsistent statements among witnesses.*

4. *OPD shall develop provisions for the permanent retention of all notes, generated and/or received by OPD personnel in the case file.*

5. *OPD shall resolve each allegation in a complaint investigation using the "preponderance of the evidence" standard.  Each allegation shall be resolved by making one of the following dispositions:  Unfounded, Sustained, Exonerated, Not Sustained, or Administrative Closure.  The Department shall use the following criteria for determining the appropriate disposition:*

    a. *Unfounded:  The investigation disclosed sufficient evidence to determine that the alleged conduct did not occur.  This finding shall also apply when individuals named in the complaint were not involved in the alleged act.*

    b. *Sustained:  The investigation disclosed sufficient evidence to determine that the alleged conduct did occur and was in violation of law and/or Oakland Police Department rules, regulations, or policies.*

    c. *Exonerated:  The investigation disclosed sufficient evidence to determine that the alleged conduct did occur, but was in accord with law and with all Oakland Police Department rules, regulations, or policies.*

    d. *Not Sustained:  The investigation did not disclose sufficient evidence to determine whether or not the alleged conduct occurred.*

    e. *Administrative Closure:  The investigation indicates a service complaint, not involving an MOR violation, was resolved without conducting an internal investigation; OR*

    f. *To conclude an internal investigation when it has been determined that the investigation cannot proceed to a normal investigative conclusion due to circumstances to include but not limited to the following:*

        1) *Complainant wishes to withdraw the complaint and the IAD Commander has determined there is no further reason to continue the investigation and to ensure Departmental policy and procedure has been followed;*

        2) *Complaint lacks specificity and complainant refuses or is unable to provide further clarification necessary to investigate the complaint;*

        3) *Subject not employed by OPD at the time of the incident; or*

> 4)   *If the subject is no longer employed by OPD, the IAD Commander shall determine whether an internal investigation shall be conducted.*
>
> 5)   *Complainant fails to articulate an act or failure to act, that, if true, would be an MOR violation; or*
>
> 6)   *Complaints limited to California Vehicle Code citations and resulting tows, where there is no allegation of misconduct, shall be referred to the appropriate competent authorities (i.e., Traffic Court and Tow Hearing Officer).*
>
> g.   *Administrative Closures shall be approved by the IAD Commander and entered in the IAD Complaint Database.*
>
> 6.   *The disposition category of "Filed" is hereby redefined and shall be included under Administrative Dispositions as follows:*
>
> a.   *An investigation that cannot be presently completed. A filed investigation is not a final disposition, but an indication that a case is pending further developments that will allow completion of the investigation.*
>
> b.   *The IAD Commander shall review all filed cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed and may direct the closure or continuation of the investigation.*
>
> 7.   *Any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken. However, investigators, with the approval of an IAD Commander, are not required to interview and/or take a recorded statement from a member or employee who is the subject of a complaint or was on the scene of the incident when additional information, beyond that already provided by the existing set of facts and/or documentation, is not necessary to reach appropriate findings and conclusions.*

(Negotiated Settlement Agreement III. E.)


**Relevant Policy:**

There are six Departmental policies that incorporate the requirements of Task 5: Department General Order M-03, *Complaints Against Department Personnel and Procedures* (published December 6, 2005 and revised most recently on August 22, 2013); Communications Division Policy & Procedures C-02, *Receiving and Logging Complaints Against Personnel and Use of Force Incidents* (published April 6, 2007); Training Bulletin V-T.1, *Internal Investigation Procedure Manual* (published June 1, 2006); Special Order 8270, *Booking of Prisoners at the Glenn E. Dyer Detention Facility* (published June 24, 2005); Special Order 8565, *Complaints*

*Against Department Personnel* (published May 11, 2007); and IAD Policy & Procedures 05-02, *IAD Investigation Process* (published December 6, 2005).  In addition, NSA stipulations issued on December 12, 2005, and March 13, 2007, incorporate the requirements of this Task.

**Commentary:**

OPD had been in partial compliance with Task 5 since the twenty-first reporting period.  That status reflected a Court-ordered investigation regarding OPD and the City's discipline and arbitration process.  On March 23, 2016, the Court issued a new Order indicating that irregularities and potential violations of the NSA occurred in ongoing IAD investigation 15-0771.  The Order noted that the investigation raised issues of accountability and sustainability of compliance.

Task 5 consists of several subtasks, briefly described below.  Based on OPD's compliance history with many of the subtasks, not all are being actively monitored at this time.

**Task 5.1** requires that when a citizen wishes to file a complaint, the citizen is brought to a supervisor or IAD, or a supervisor is summoned to the scene.  **Task 5.2** requires that if there is a delay of greater than three hours in supervisory response, the reason for the delay must be documented.  **Task 5.3** requires that where a complainant refuses to travel to a supervisor, or wait for one, personnel make all reasonable attempts to obtain specific information to assist in investigating the complaint.  **Task 5.4** requires that specific information be documented on a complaint form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander.  **Task 5.5** requires that the supervisor or Area Commander notify Communications and forward any pertinent documents to IAD.

To assess compliance with Task 5.1 through and including Task 5.5, we reviewed the Daily Incident Logs (DILs) prepared by the Communications Division and forwarded to IAD each business day.  The DIL form has been modified several times during our tenure to elicit "forced responses" that gather all of the information required to evaluate compliance with these subtasks.  These modifications have significantly enhanced OPD's ability to document compliance by properly filling out and distributing the logs, and compliance rates with these subtasks have been near 100% for several years.  Consequently, we no longer actively assess OPD's compliance with these subtasks, but we continue to receive both the DILs and Daily Complaint Referral Logs (used to document when Information Business Cards [IBCs] are provided to citizens in lieu of a complaint forms).  We spot-check these forms regularly to verify that the quality of their completion has not diminished.  OPD remains in compliance with Tasks 5.1 through and including Task 5.5.

**Task 5.6** requires that an on-duty supervisor respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest of the inmate.  We have not actively monitored this subtask since December 2014, though we have reviewed cases applicable to this requirement in several recent reports.

**Task 5.12** requires that the Watch Commander ensure that any complaints that are applicable to Task 5.6 are delivered to and logged with IAD. Under current policy, the Communications Division must record on the DILs complaints that are received and/or handled by on-duty supervisors, and the DILs is forwarded daily to IAD.

OPD remains in compliance with Tasks 5.6 and 5.12.

**Task 5.15** through **Task 5.19**, and **Task 5.21,** collectively address the quality of completed IAD investigations, and therefore remain the subject of our focused Task assessments. To assess compliance with these Tasks, we reviewed 15 IAD cases that were approved in March 2018.

This sample included investigations completed by IAD and Division-level investigations (DLIs). It also included cases that were resolved via formal investigation and investigations that were resolved via summary finding.[1]

Together, **Tasks 5.15** and **Task 5.16** require that OPD: gathers all relevant evidence; conducts follow-up interviews where warranted; adequately considers the evidence gathered; makes credibility assessments where feasible; and resolves inconsistent statements.

In all of the cases we reviewed, we believe that OPD gathered all relevant evidence available, but we note four cases where the evidence was not adequately considered. In three of these cases, we believe the evidence warranted different findings (further described below); and in the fourth, the investigator failed to explore information from PDRD videos that supported the complainant's assertions during his interviews with the subject officers. As we normally find, video and/or audio recordings proved to be a significant factor in allowing OPD to reach a proper conclusion in many of the cases.

Investigators conducted follow-up interviews to seek clarification or resolve inconsistencies in three of the 15 cases we reviewed. In two of the cases, the complainants were interviewed three times; in another, the complainant was interviewed twice. In one of these cases, both subject officers were also re-interviewed to obtain clarifying information.

OPD made credibility assessments for all involved parties in eight of the 15 cases. The seven remaining cases were approved for summary finding; and per policy, investigators are not required to assess the credibility of the involved officers and civilians in these instances.

In four cases, the complainants were deemed not credible. We agreed with these assessments in three of the four cases, where the complainants' assertions were clearly refuted by video evidence. In one case, while the complainant's statements were sometimes at odds with the PDRD recordings, the discrepancies were minor and immaterial.

In 12 of the 15 cases we reviewed, OPD successfully resolved inconsistent statements. In 11 of the cases, PDRD recordings were available and assisted in the determination. In another case, security camera footage allowed for a definitive conclusion. Three cases resulted in at least one finding of not sustained. Not sustained is an acceptable finding, and by definition, it implies that inconsistencies were not resolved despite investigative efforts.

---

[1] Summary findings are investigations in which the Department believes a proper conclusion can be determined based on a review of existing documentation with limited or no additional interviews and follow-up.

**Task 5.17** requires that OPD permanently retain all notes generated and/or received by OPD personnel in the case file. OPD personnel document that all investigative notes are contained within a particular file by completing an Investigative Notes Declaration Form. OPD has a sustained history of 100% compliance with this subtask. During this reporting period, the form was again properly completed in all 15 cases we reviewed.

**Task 5.18** requires that OPD resolve each allegation in a complaint investigation using the preponderance of the evidence standard. **Task 5.19** requires that each allegation of a complaint is identified and resolved with one of the following dispositions: unfounded; sustained; exonerated; not sustained; or administrative closure. Our sample of 15 cases contained 94 allegations that received dispositions as follows: 13 exonerated; 62 unfounded; five not sustained; and 14 administratively closed. There were no sustained findings.

We did not agree with the findings in three cases we reviewed. One case involved a motor vehicle accident during a pursuit. The investigation concluded that the accident occurred; yet the finding was not sustained. In another case, an officer was accused of rudeness and the comment complained of was caught on PDRD. The officer was referred for training in communications skills, and yet the allegation was inexplicably unfounded. In the third case, the complainant alleged that officers improperly searched him, thinking he was on probation when he was not. PDRD video and the investigation confirmed that this occurred, and yet the allegations were exonerated.

**Task 5.20** requires that the IAD Commander review all "filed" cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed. A filed case is defined as an investigation that cannot be presently completed and is pending further developments that will allow completion of the investigation; filed is not a final disposition. Traditionally, as part of our review of this Task, we also reviewed cases that are tolling. OPD defines a tolled case as an administrative investigation that has been held in abeyance in accordance with one of the provisions of Government Code Section 3304. While we are no longer actively assessing this subtask, we note that filed and tolling cases are reviewed with the Chief during her weekly IAD meetings and are listed by case number on the printed meeting agendas. We receive and review these agendas regularly, and a Monitoring Team member often attends these meetings.

**Task 5.21** requires that any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken. However, with the approval of the IAD Commander or his designee, investigators are not required to interview and/or take a recorded statement in all cases. For example, interviews are not needed from a member or employee who is the subject of a complaint, or who was on the scene of the incident when additional information – beyond that already provided by the existing set of facts and/or documentation – is not necessary to reach appropriate findings and conclusions. Seven of the 15 cases we reviewed were resolved via summary finding, and all were appropriately approved for such closure. In all of these cases, the availability of video and/or audio recordings was the primary reason interviews were unnecessary.

## Task 6:  Refusal to Accept or Refer Citizen Complaints

### Requirements:

*Refusal to accept a citizen complaint, failure to refer a citizen to IAD (when that citizen can be reasonably understood to want to make a citizen's complaint), discouraging a person from filing a complaint, and/or knowingly providing false, inaccurate or incomplete information about IAD shall be grounds for discipline for any OPD member or employee.*

(Negotiated Settlement Agreement III. F.)

### Relevant Policy:

The requirements of Task 6 are incorporated in Department General Order M-03, Complaints Against Department Personnel and Procedures (published December 6, 2005 and revised most recently on August 22, 2013).

### Commentary:

**Task 6** requires that OPD members and employees, who refuse to accept a citizen complaint, fail to refer a citizen to IAD (when the citizen can be reasonably understood to want to make a citizen's complaint), discourage a person from filing a complaint, and/or knowingly provide false, inaccurate, or incomplete information about IAD, are disciplined (compliance standard: 95%).  Task 6 has not been subject to regular inspection since 2015, although we do occasionally cases applicable to this Task in our Task 5 case samples.  For this report, we are including a spot audit of Task 6.

To assess Phase 2 compliance with this Task, we reviewed a random sample of Daily Incident Log entries from March 1-April 31, 2018; and a random sample of 15 IAD investigations (conducted by both IAD and via Division Level Investigation) that were closed during March 2018.

We also reviewed IAD data from the PRIME database to identify any allegations of MOR 398.70-1, Interfering with Investigations; MOR 398.76-1, Refusal to Accept or Refer a Complaint; and MOR 398.76-2, Failure to Accept or Refer a Complaint (Unintentional); that were investigated and approved during March and April 2018.  We identified seven such cases. Two of these cases resulted in sustained findings for one or more of the applicable MOR violations.  We found one case in which an allegation of Failure to Accept or Refer a Complaint went unaddressed.

In one of the sustained cases, an officer failed to accept or refer a complaint at the scene of a dispatched call for a disturbance.  The investigator, a field supervisor, appropriately sustained the allegation, and he also provided counseling to the officer shortly after the incident.  The Chief concurred with the finding, but determined that the counseling already provided would serve as the discipline in this case.

In the other sustained case, the investigation determined that an officer working the Patrol Desk failed to take a complaint.  We note that IAD appropriately overruled the field supervisor in this Division Level Investigation, who unfounded the allegation.  The subject officer subsequently retired from the Department; but IAD sent him a letter advising that if he returned to employment with OPD, he would face discipline.  In one other case, the subject officer left the Department before the investigation commenced.  The case was administratively closed in accord with current policy.

In one case, we believe the evidence supported a sustained finding for Failure to Accept or Refer a Complaint (Unintentional).  The officer, along with others, responded to a domestic dispute.  PDRD footage clearly indicated that the complainant expressed his desire to lodge a complaint, and the officer, to his credit, admitted in his interview that the complainant told him he wanted to make a complaint.  Inexplicably, the investigation failed to identify the allegation for this officer or come to a finding.  We believe it should have despite the rationalization and equivocation contained in the investigative summary.

Despite our concerns with the above case, OPD remains in Phase 2 compliance with Task 6.


# Task 26:  Force Review Board (FRB)

**Requirements:**

*OPD shall develop and implement a policy concerning its FRB proceedings.  The policy shall:*

1.  *Set out procedures, membership and a timetable for FRB review of use of force investigations involving Level 2 incidents, as defined in Department General Order K-4, REPORTING AND INVESTIGATING THE USE OF FORCE;*

2.  *Require the FRB to review all use of force investigations;*

3.  *Require the FRB to make a recommendation as to whether the use of force was in policy or out of policy;*

4.  *Require the FRB to forward sustained policy violations to the Discipline Officer.*

5.  *Require the FRB not to review any use of force allegation until the internal investigations has been completed;*

6.  *Authorize the FRB to recommend to the Chief of Police additional use of force training or changes in policies or tactics, or additional standards, investigatory policies, or training for use of force investigations;*

7.  *Require the FRB to conduct an annual review of use of force cases examined, so as to identify any patterns of use of force practices that may have policy or training implications, and thereafter, issue a report to the Chief of Police;*

> 8.      *Require that the FRB membership include, at a minimum, one member from the Training Division, one member from the Field Training Officer program, and either the Bureau of Field Operations Deputy Chief or his/her designee;*

> 9.      *Minimally, that one member of the FRB shall be replaced at least annually.*

(Negotiated Settlement Agreement V. C.)

**Relevant Policy:**

Department General Order K-4.1, *Force Review Boards,* was originally published on February 17, 2006, and revised on December 21, 2015.

**Commentary:**

OPD Force Review Boards, comprised of three command-level staff, are periodically convened to examine the investigations conducted relative to the deployment and application of Level 2 uses of force.[2]

OPD achieved compliance with this Task during the nineteenth reporting period (April 1-June 30, 2014); however, we continue to review and report on the compliance status of this Task due to the serious nature of officers' use of force.  OPD conducted 19 Force Review Boards during 2017, and three thus far in 2018.

OPD force data indicates a continuing downward trend.  Use of force incidents decreased by 75% between 2012 and 2017; and recent 2018 data demonstrates a continuation of this downward trend – data indicating a decrease in overall uses of force from 285 to 169 (41%). This decrease, however, is represented primarily within the Level 4 category, which decreased from 242 to 127 (47%) uses of force.[3]  Level 1 uses of force increased from one to four; this data represents the discharge of weapons by four officers during one event.

---

[2] According to OPD, Level 2 uses of force include: "1) Any strike to the head (except for an intentional strike with an impact weapon); 2) Carotid restraint is applied that does not result in the loss of consciousness; 3) Use of impact weapons, including specialty impact munitions or any other object, to strike a subject and contact is made, regardless of injury; 4) Any unintentional firearms discharge that does not result in injury; 5) A police canine bites the clothing or the skin of a subject, or otherwise injures a subject requiring emergency medical treatment (beyond first-aid) or hospital admittance; 6) Any use of force which results in injuries to the subject requiring emergency medical treatment (beyond first-aid) or hospital admittance; (NOTE: For the purposes of this order, an evaluation by a medical professional to assess a complaint of injury is not emergency treatment) 7) Any Level 3 use of force used on or applied to a restrained subject; 7.a) A restrained subject is a person who has been fully placed in a Department authorized restraint device such as both hands handcuffed, a WRAP or Rip Hobble; 7.b) A subject with only one handcuff on is not a restrained person."

[3] OPD Level 4 uses of force include: "1) The intentional pointing of a firearm at a person. 2) A Weaponless Defense Technique is applied to a Vulnerable Area, excluding strikes (e.g., Hair grab, pressure to mastoid or jaw line; and shoulder muscle grab). 3) An on-duty firearm discharge to dispatch an injured animal; or 4) A weaponless Defense Technique Control Hold is applied: a. Escort (elbow); b. Twist lock: c. Arm-bar; or d. Bent-wrist. 5) A canine deployment in which a suspect is located by the canine but no bite occurs.

OPD's progress in this area is commendable; however, the significant reduction of Level 4 force has prompted our further verification via a review of specified categories of arrest and use of force reports.  We will include the results of our review in a future monthly status report.

OPD remains in compliance with this Task.

# Task 30:  Executive Force Review Board (EFRB)

**Requirements:**

1. *An EFRB shall be convened to review the factual circumstances surrounding any Level 1 force, in-custody death, or vehicle pursuit-related death incidents.  A firearm discharge at an animal shall be reviewed by the EFRB only at the direction of the Chief of Police.  The Board shall have access to recordings and/or transcripts of interviews of all personnel on the scene, including witnesses, and shall be empowered to call any OPD personnel to provide testimony at the hearing.*

2. *OPD shall continue the policies and practices for the conduct of EFRB, in accordance with the provisions of DGO K-4.1, FORCE REVIEW BOARDS.*

(Negotiated Settlement Agreement V. G.)

**Relevant Policy:**

Department General Order K-4.1, *Force Review Boards,* was published on February 17, 2006, and revised on December 21, 2015.

**Commentary:**

Executive Force Review Boards (EFRBs), consisting of three top command-level staff, conduct thorough, detailed reviews of all Level 1 uses of force, in-custody deaths, and vehicle pursuit-related deaths.

OPD achieved compliance with this Task during the nineteenth reporting period (April 1-June 30, 2014); however, we continue to review and report on the compliance status of this Task due to the serious nature of officers' use of force.

Consistent with our commentary in Task 26 above, the overall use of force by officers has significantly decreased from an average of nine each year.  More recently, these events have been infrequent – i.e., OPD recorded no officer-involved shooting events in 2016, one in 2017, and one in 2018.  The 2018 event, which occurred in March, involved the discharge of weapons by four officers and is presently under investigation.

OPD remains in compliance with this Task.

# Task 34:  Vehicle Stops, Field Investigation, and Detentions

**Requirements:**

1.   *OPD shall require members to complete a basic report on every vehicle stop, field investigation and every detention.  This report shall include, at a minimum:*

     a.   *Time, date and location;*

     b.   *Identification of the initiating member or employee commencing after the first year of data collection;*

     c.   *Reason for stop;*

     d.   *Apparent race or ethnicity, and gender of individual(s) stopped;*

     e.   *Outcome of stop (arrest, no arrest);*

     f.   *Whether a search was conducted, and outcome of search;*

     g.   *Offense categories (felony, misdemeanor or infraction).*

2.   *This data shall be entered into a database that can be summarized, searched, queried and reported by personnel authorized by OPD.*

3.   *The development of this policy shall not pre-empt any other pending or future policies and or policy development, including but not limited to "Promoting Cooperative Strategies to Prevent Racial Profiling."*

(Negotiated Settlement Agreement VI. B.)


**Relevant Policy:**

Department policies relevant to Task 34 include:  General Order M-19, *Prohibitions Regarding Racial Profiling and Other Bias-Based Policing;* Report Writing Manual (RWM) Inserts R-2, N-1, and N-2; Special Order 9042, *New Procedures Regarding Stop Data Collection* (published June 2010); and Special Order 9101, *Revised Stop Data Collection Procedures* (published November 2012).


**Commentary:**

OPD continues to collect and store data described in Task 34.1 (a.-g.) as required.  The data is sufficiently detailed, accurate, and voluminous for analysis to determine the lawful basis for the stops and further to identify indicators of disparate treatment.  OPD continues to evaluate – and where deemed necessary – revise the collection and analyses processes to improve its ability to identify and address indicators of disparate treatment among population groups.  The Department's monthly Risk Management Meetings (RMMs), which we have described in previous status reports, have become integral to this process.

OPD's RMMs cover the activities of the five geographic Areas, Ceasefire, and the Traffic Division. Every third month, the RMM includes reviews of Citywide activities, involving all Areas and Divisions. The Chief leads the RMMs, during which each commander is tasked with describing initiatives and directives regarding crime control and other strategies particular to his/her area of responsibility and addressing stop and other risk management data depicted in a series of illustrative, comparative data tables. These tables relating to stop data include stops, searches, recoveries, and related activities for described population groups (African American, Asian, Hispanic, White, and Other), which provide for the identification of a variance in OPD discretionary stops among the groups – i.e., any variance in searches made and search recovery rates.

The RMM during our May-June visit was the third meeting using the above-described format. Each commander demonstrated a thorough understanding of his/her Area demographics, crime issues, and specific community interests; and in addition, presented their individualized, specific crime control and community interactive strategies. Consistent with the Chief's direction, commanders focused on strategies and results of emphasis having been placed on intelligence-led, precision-based policing strategies and the positive results. Prominent among them was an overall reduction in the number of stops and therefore, a reduced numerical footprint on the community – and at the same time, an apparent reduction in crime.

This achievement is clearly positive; however, stops made in the five Areas involving African Americans (56% to 79%) remain relatively unchanged, averaging 66% of all stops. In addition, the discretionary search rates for African Americans are higher (33%-51%) than the overall average search rates (29%-48%) in each of the five Areas.

The recovery rates for African American searches are slightly higher (12%-31%) than the average Area averages (12%-29%), and therefore a positive outcome. We also again note that periodic reviews of stop data reports demonstrate continued adherence to Constitutional and other legal standards for stops.

The data reviewed is indicative of continued progress; however, average data generally include highs and lows, which should be carefully examined for extremes that may be indicators of disparate activities. Accordingly, we continue to express our concerns regarding the lack of specific questioning regarding search, recovery, arrest data disparities at the squad, and/or officer levels during the RMMs.

Our assessment of the newer meeting format and the value of revised tables is ongoing. However, we again note the absence of the illustrative tables/data regarding stop activities relating to probation/parole stops and searches; and weapons searches (frisks). These omissions limit fact-based, focused discussion of these issues, which may prove to be detrimental.

OPD has progressed with its objective of reducing "the risk of negative disparate impact on the community" through the initiation of an intelligence-led, precision-based policing model designed to reduce the number of stops made by officers.  Nevertheless, a robust assessment of the various stop data components must identify and appropriate respond to indicators of disparate treatment within the reduced database.  This will require the implementation of a consistent intervention strategy to address identified data disparities, abnormalities, and/or possible bias at the Area, squad, and individual officer levels – which remains an issue.  Generalized reviews of the data with findings that the stops were "consistent with expectations or policy" provide insufficient explanation of causation within a squad or by an individual officer.  We have addressed this shortcoming directly with OPD personnel, who provided assurances that this concern will be addressed as part of the Department's ongoing efforts to improve police effectiveness via its review of data at RMMs and ongoing operational initiatives.

OPD continues its relationship with Stanford University and the decision to include the implementation of the 50 recommendations made by Dr. Eberhardt's staff in the 2016 study.  To date, OPD has fully implemented 36 of the 50 recommendations; the remaining 14 are in progress and scheduled for completion described below:

| No. | Status |
| --- | --- |
| 11 | **Invest in the development of a Body Worn Camera warning system**<br>Incorporated in PRIME 2.0, implementation July 2019 |
| 12 | **Build a stop data dashboard**<br>Incorporated in PRIME 2.0, implementation July 2019 |
| 14 | **Automate stop data narrative analysis**<br>Software developed, implementation July 2018 |
| 17 | **Hire a data manager**<br>Ongoing personnel challenges, resolution expected prior to December 2018 |
| 23 | **Conduct customer-service audits after routine stops**<br>Audit protocol under development, audit start date to be determined. |
| 24 | **Regularly administer community surveys**<br>OPD working to identify entity to conduct surveys, target start data September 2018. |
| 25 | **Make Trainings Shorter and More Frequent**<br>OPD Training Division projects completion no later than September 2018. |
| 26 | **Expand Training Topics**<br>OPD Training Division projects completion no later than September 2018. |
| 27 | **Let officers choose which trainings to take**<br>OPD Training Division projects a September 2018 completion date. |

| No. | Status |
|-----|--------|
| 28 | **Incentivize training-in-action workshops** <br><br> OPD projects a September 2018 implementation date. |
| 29 | **Rigorously measure the effects of all trainings** <br><br> Stanford anticipates completion of an analysis in or around September 2018 |
| 39 | **Host annual conference on police-community relations** <br><br> The conference is scheduled for July 19, 2018. |
| 47 | **Review search policies** <br><br> Draft policy has been presented to and reviewed by Monitoring Team.  Awaiting approval by the Police Commission. |
| 49 | **Produce and publish an annual Racial Impact Report** <br><br> Publication scheduled for release on July 19, 2018. |

OPD continues to make progress with Task 34.  The introduction of the intelligence-based stop and precision-based policing model has focused OPD activities and decreased the footprint of stops across racial lines.  Searches are based on a high degree of reasonable suspicion or probable cause, depending on the type of search.  Search recovery rates, which serve as the test to determine the validity of the search, have increased.  The newly revised RMM format provides for bimonthly reviews, and will result in a timelier review of stop data for indicators of disparate treatment and allow for in-depth analysis to ascertain whether the data disparities are or are not based on racial motivation.  The need to closely examine stop data and address disparities indicative of bias and/or disparate treatment – within the Area under review, within squads, or by individual officers – remains at issue.

While OPD continues to advance its efforts to comply with requirements of this Task, we have previously reported that the below-described specific issues remain incomplete.  Accordingly, we provide the following assessment, and will continue to monitor OPD's progress on these issues until the Department achieves full compliance.

Further, we will look for a clear and unambiguous commitment to the provisions of this Task to ensure that the protocols that have been undertaken will be institutionalized and remain an integral, sustainable practice:

- Implementation of general and specific intervention strategies to address data indicators of abnormalities and/or possible bias at the Area, squad, and individual officer levels;

- Implementation of processes to provide for a more expeditious compilation of stop data prior to, during, and following Risk Management Meetings.  The City anticipates that this will be achieved with implementation of PRIME 2.0, though at this time it is unclear when that version of the risk management system will be established;

- Implementation of the applicable 50 recommendations contained in the 2016 Stanford University report.  This requirement has been incorporated as an objective by OPD.  We will continue to report on the progress of implementation.

# Task 41:  Use of Personnel Assessment System (PAS) and Risk Management

**Requirements:**

*Within 375 days from the effective date of this Agreement, OPD shall develop a policy for use of the system, including supervision and audit of the performance of specific members, employees, supervisors, managers, and OPD units, as well as OPD as a whole.*

*The policy shall include the following elements:*

1.  *The Chief of Police shall designate a PAS Administration Unit.  The PAS Administration Unit shall be responsible for administering the PAS policy and, no less frequently than quarterly, shall notify, in writing, the appropriate Deputy Chief/Director and the responsible commander/manager of an identified member/employee who meets the PAS criteria.  PAS is to be electronically maintained by the City Information Technology Department.*

2.  *The Department shall retain all PAS data for at least five (5) years.*

3.  *The Monitor, Inspector General and Compliance Coordinator shall have full access to PAS to the extent necessary for the performance of their duties under this Agreement and consistent with Section XIII, paragraph K, and Section XIV of this Agreement.*

4.  *PAS, the PAS data, and reports are confidential and not public information.*

5.  *On a quarterly basis, commanders/managers shall review and analyze all relevant PAS information concerning personnel under their command, to detect any pattern or series of incidents which may indicate that a member/employee, supervisor, or group of members/employees under his/her supervision may be engaging in at-risk behavior.  The policy shall define specific criteria for determining when a member/employee or group of members/employees may be engaging in at-risk behavior.*

6.  *Notwithstanding any other provisions of the PAS policy to be developed, the Department shall develop policy defining peer group comparison and methodology in consultation with Plaintiffs' Counsel and the IMT.  The policy shall include, at a minimum, a requirement that any member/employee who is identified using a peer group comparison methodology for complaints received during a 30-month period, or any member who is identified using a peer group*

*comparison methodology for Penal Code §§69, 148 and 243(b)(c) arrests within a 30-month period, shall be identified as a subject for PAS intervention review. For the purposes of these two criteria, a single incident shall be counted as "one" even if there are multiple complaints arising from the incident or combined with an arrest for Penal Code §§69, 148 or 243(b)(c).*

7.   *When review and analysis of the PAS threshold report data indicate that a member/employee may be engaging in at-risk behavior, the member/employee's immediate supervisor shall conduct a more intensive review of the member/employee's performance and personnel history and prepare a PAS Activity Review and Report. Members/employees recommended for intervention shall be required to attend a documented, non-disciplinary PAS intervention meeting with their designated commander/manager and supervisor. The purpose of this meeting shall be to review the member/employee's performance and discuss the issues and recommended intervention strategies. The member/employee shall be dismissed from the meeting, and the designated commander/manager and the member/employee's immediate supervisor shall remain and discuss the situation and the member/employee's response. The primary responsibility for any intervention strategies shall be placed upon the supervisor. Intervention strategies may include additional training, reassignment, additional supervision, coaching or personal counseling. The performance of members/ employees subject to PAS review shall be monitored by their designated commander/manager for the specified period of time following the initial meeting, unless released early or extended (as outlined in Section VII, paragraph B (8)).*

8.   *Members/employees who meet the PAS threshold specified in Section VII, paragraph B (6) shall be subject to one of the following options: no action, supervisory monitoring, or PAS intervention. Each of these options shall be approved by the chain-of-command, up to the Deputy Chief/Director and/or the PAS Activity Review Panel.*

*Members/employees recommended for supervisory monitoring shall be monitored for a minimum of three (3) months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor. The first at the end of one (1) month and the second at the end of three (3) months.*

*Members/employees recommended for PAS intervention shall be monitored for a minimum of 12 months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor and designated commander/manager: The first at three (3) months and the second at one (1) year. Member/employees subject to PAS intervention for minor, easily correctable performance deficiencies may be dismissed from the jurisdiction of PAS upon the written approval of the member/employee's responsible Deputy Chief, following a recommendation in writing from the member/employee's immediate supervisor. This may occur at the three (3)-month follow-up meeting*

*or at any time thereafter, as justified by reviews of the member/employee's performance. When a member/employee is not discharged from PAS jurisdiction at the one (1)-year follow-up meeting, PAS jurisdiction shall be extended, in writing, for a specific period in three (3)-month increments at the discretion of the member/employee's responsible Deputy Chief. When PAS jurisdiction is extended beyond the minimum one (1)-year review period, additional review meetings involving the member/employee, the member/ employee's designated commander/manager and immediate supervisor, shall take place no less frequently than every three (3) months.*

9. *On a quarterly basis, Division/appropriate Area Commanders and managers shall review and analyze relevant data in PAS about subordinate commanders and/or managers and supervisors regarding their ability to adhere to policy and address at-risk behavior. All Division/appropriate Area Commanders and managers shall conduct quarterly meetings with their supervisory staff for the purpose of assessing and sharing information about the state of the unit and identifying potential or actual performance problems within the unit. These meetings shall be scheduled to follow-up on supervisors' assessments of their subordinates' for PAS intervention. These meetings shall consider all relevant PAS data, potential patterns of at-risk behavior, and recommended intervention strategies since the last meeting. Also considered shall be patterns involving use of force, sick leave, line-of-duty injuries, narcotics-related possessory offenses, and vehicle collisions that are out of the norm among either personnel in the unit or among the unit's subunits. Division/appropriate Area Commanders and managers shall ensure that minutes of the meetings are taken and retained for a period of five (5) years. Commanders/managers shall take appropriate action on identified patterns of at-risk behavior and/or misconduct.*

10. *Division/appropriate Area Commanders and managers shall meet at least annually with his/her Deputy Chief/Director and the IAD Commander to discuss the state of their commands and any exceptional performance, potential or actual performance problems or other potential patterns of at-risk behavior within the unit. Division/appropriate Area Commanders and managers shall be responsible for developing and documenting plans to ensure the managerial and supervisory accountability of their units, and for addressing any real or potential problems that may be apparent.*

11. *PAS information shall be taken into account for a commendation or award recommendation; promotion, transfer, and special assignment, and in connection with annual performance appraisals. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

12. *Intervention strategies implemented as a result of a PAS Activity Review and Report shall be documented in a timely manner.*

13. *Relevant and appropriate PAS information shall be taken into account in connection with determinations of appropriate discipline for sustained misconduct allegations.  For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

14. *The member/employee's designated commander/manager shall schedule a PAS Activity Review meeting to be held no later than 20 days following notification to the Deputy Chief/Director that the member/employee has met a PAS threshold and when intervention is recommended.*

15. *The PAS policy to be developed shall include a provision that a member/employee making unsatisfactory progress during PAS intervention may be transferred and/or loaned to another supervisor, another assignment or another Division, at the discretion of the Bureau Chief/Director if the transfer is within his/her Bureau.  Inter-Bureau transfers shall be approved by the Chief of Police.  If a member/employee is transferred because of unsatisfactory progress, that transfer shall be to a position with little or no public contact when there is a nexus between the at-risk behavior and the "no public contact" restriction.  Sustained complaints from incidents subsequent to a member/employee's referral to PAS shall continue to result in corrective measures; however, such corrective measures shall not necessarily result in a member/employee's exclusion from, or continued inclusion in, PAS.  The member/employee's exclusion or continued inclusion in PAS shall be at the discretion of the Chief of Police or his/her designee and shall be documented.*

16. *In parallel with the PAS program described above, the Department may wish to continue the Early Intervention Review Panel.*

17. *On a semi-annual basis, beginning within 90 days from the effective date of this Agreement, the Chief of Police, the PAS Activity Review Panel, PAS Oversight Committee, and the IAD Commander shall meet with the Monitor to review the operation and progress of the PAS.  At these meetings, OPD administrators shall summarize, for the Monitor, the number of members/employees who have been identified for review, pursuant to the PAS policy, and the number of members/employees who have been identified for PAS intervention.  The Department administrators shall also provide data summarizing the various intervention strategies that have been utilized as a result of all PAS Activity Review and Reports.  The major objectives of each of these semi-annual meetings shall be consideration of whether the PAS policy is adequate with regard to detecting patterns of misconduct or poor performance issues as expeditiously as possible and if PAS reviews are achieving their goals.*

> 18.  *Nothing in this Agreement, and more specifically, no provision of PAS, shall be construed as waiving, abrogating or in any way modifying the Department's rights with regard to discipline of its members/employees.  The Department may choose, at its discretion, to initiate the administrative discipline process, to initiate PAS review or to use both processes concurrently or consecutively.*

(Negotiated Settlement Agreement VII. B.)


**Relevant Policy:**

OPD revised and issued Departmental General Order D-17, *Personnel Assessment Program,* in November 2013.  Since our last report, the Department has begun to address General Order D-17 as part of Department's ongoing policy review and revision program.  The revised version of the relevant policy is currently under review.


**Commentary:**

OPD achieved compliance with this Task under the old Personnel Assessment System (PAS) database, which it replaced by the long-faltering PRIME database in May 2017.  The Monitor's patience in this area has been influenced by continued incremental efforts, although not necessarily successful until recently, to make progress on PRIME.  There have recently been signs of progress in addressing the PRIME problems and adding greater utility to the database; OPD anticipates that a redesigned system will be implemented by the summer of 2019.

The Department has divided its efforts to address the issues with PRIME into three components. The first is the redesign of PRIME.  The second involves the addition of data – to include links with a new personnel database known as OPD's Human Resources Management System (HRMS), the incorporation of officer training data, and the addition of body-worn camera footage.  The third component focuses on minor adjustments, such as dashboard development and fixes, to maintain the modest degree of functionality the current PRIME system has achieved.

With regard to PRIME redesign, the City conducted proposal reviews and selected Sierra-Cedar as the vendor.  Technical contract problems postponed reaching an agreement, but they have been resolved, a plan of work has been developed, and Sierra-Cedar is now ready to begin work. OPD personnel have some concerns about the tightness of deadlines for them to accept or reject some work, and we will continue to monitor this closely.

Sierra-Cedar's original proposal for the work indicated that it would take one year for completion of PRIME redesign, so completion of redesign is expected in July 2019.  At the same time that this movement forward has been underway, OPD began working with a new consultant as part of its maintenance contract for PRIME.  The consultant recently identified a previously unknown problem.  New arrest records being loaded into PRIME on a nightly basis have been creating new unique records for all arrests, rather than only updating new or changed arrest data.  This has resulted in the storage of extra records in PRIME not related to any activity.  Although this has not compromised the arrest data in PRIME, it has affected the performance of the application.  Staff are hopeful that the resolution of this problem will have a major impact and may also expedite the redesign process.

The second and third components of PRIME rehabilitation, the addition of the new data and general fixes, all seem to be moving forward without major problems.  The work on PRIME, including the addition of the new data and several other information technology (IT) projects, will add significantly to the work load of what is best described as an ad hoc IT unit in OPD.  To address that, the City of Oakland is expected to add two staff members to be housed within the Department.  To maximize the use of the data available as a result of these developments, efforts are also being made to bring on a data scientist.

Beyond the technical computing issues associated with PRIME, the Monitoring Team has been interested in the effectiveness of the use of the data and the process of risk management as defined by Task 41.  The monthly Risk Management Meetings reflect a strong commitment from Department leadership and Area command staff to understanding and using data in the management of the Department.  That exercise has been focused mostly on stop data, but expanded at the Risk Management Meeting observed during this site visit.  The Citywide meetings dealt extensively with the data required under Task 40.  The discussion focused attention on uses of force, complaints, pursuits, and collisions.

It should be noted, however, that different OPD data summaries were unclear as to whether complaints had risen or fallen recently.  It was not known whether these differences reflected instability with PRIME or some other analysis errors.  Whatever its cause, the problem needs to be resolved.

At this month's Risk Management Meeting, there was also review of the PAS process for identifying risk related behavior in officers and intervening when appropriate.  A total of 37 officers were reported as being on intervention or supervisory monitoring.  Those officers had been identified through a combination of PAS reviews because they had exceeded risk-related thresholds, and administrative referrals in which managers recognized the potential value of additional attention.  In all, approximately 5% of all officers, and 8% of officers assigned to patrol, were in either intervention or monitoring.  That is a larger number than noted in the past, when about 2% of all officers were included in those categories.

## Conclusion

To facilitate the use of data more broadly, the Monitoring Team and the Department have discussed a broader role of the PAS Administration Unit in the monthly Risk Management Meetings.  There is room for greater emphasis on understanding the data broadly – including, but not limited to, use of force and complaint data.  The PAS Administration Unit can have capacity and responsibility that goes beyond the identification and review of staff in the PAS process.  That can also include analysis of the effectiveness of the process of identification and intervention.

Consistent with expectations regarding use of data, the Monitoring Team is reviewing the data on use of force; we are concerned with the increase in complaints noted by the Department in its recent Case Management Conference statement to the Court.  The goal of our analysis of the use of force is to more fully understand the significant drops that are being reported in PRIME.  The analysis will compare arrest reports with use of force reports – particularly for cases such as those involving assault on an officer, disorderly conduct, and obstructing or resisting arrest.  It is also important to recognize that the reported declines in use of force have occurred with Level 4 uses of force, which are mostly cases involve pointing a weapon.  The more serious Level 1, 2, and 3 uses of force are low, but do not show declines.

We will report on this further in future monthly status reports.

Chief (Ret.) Robert S. Warshaw

*Monitor*