August 23, 2018

# Fifty-Fifth Report
## *of the* Independent Monitor
## *for the* Oakland Police Department

## Introduction

This is our fifty-fifth status report on the Negotiated Settlement Agreement (NSA) in the case of *Delphine Allen, et al., vs. City of Oakland, et al.,* in the United States District Court for the Northern District of California under the direction of Judge William H. Orrick.  I was appointed in 2010 to oversee the monitoring process of the Oakland Police Department (OPD) that began in 2003.

This report covers our site visit of July 9-10, 2018; and describes our recent assessments of NSA Tasks 20, 34, 41, and 45.  As we have noted previously, following the Court's Order of May 21, 2015, in our monthly reports, we devote special attention to the most problematic component parts of the Tasks that are not yet in full or sustained compliance, and discuss the most current information regarding the Department's progress with the NSA and its efforts at making the reforms sustainable.


## *Increasing Technical Assistance*

Each month, our Team conducts visits to Oakland that include both compliance assessments and technical assistance.  During our visits, we meet with Department and City officials; observe Department meetings and technical demonstrations; review Departmental policies; conduct interviews and make observations in the field; and analyze OPD documents and files, including misconduct investigations, use of force reports, crime and arrest reports, Stop Data Forms, and other documentation.  We also provide technical assistance in additional areas, especially those that relate to the remaining non-compliant Tasks or areas identified by the Department.

Within the last several months, we have provided technical assistance to OPD officials in the areas of IAD investigation quality (Task 5); stop data and related issues (Task 34); risk management and the ongoing maintenance issues and development of the Performance Reporting Information Metrics Environment (PRIME) systems (Task 41); and several Department policies and procedures, including policies related to PRIME, officer discipline, probationers and parolees, handcuffing, and the use of electronic control weapons.

## *Building Internal Capacity at OPD*

Also per the May 21, 2015 Court Order, we continue to work closely with the Office of Inspector General's (OIG) lieutenant and staff to identify areas that it should audit or review – and to help design approaches to these audits that are not cumbersome, so as to ensure sustainability.  We review OIG's now-quarterly progress reports, which are a valuable resource and assist us in assessing compliance with NSA requirements.

---

## *Focused Task Assessments*

## Task 20:  Span of Control

### **Requirements:**

*On or before August 14, 2003, OPD shall develop and implement a policy to ensure appropriate supervision of its Area Command Field Teams.  The policy shall provide that:*

1. *Under normal conditions, OPD shall assign one primary sergeant to each Area Command Field Team, and, in general, (with certain exceptions) that supervisor's span of control shall not exceed eight (8) members.*

2. *During day-to-day operations, in the absence of the primary supervisor (e.g., due to sickness, vacation, compensatory time off, schools, and other leaves), the appropriate Area Commander shall determine, based on Department policy and operational needs, whether or not to backfill for the absence of the sergeant on leave.*

3. *If a special operation, (e.g., Beat Feet, Special Traffic Offenders Program (STOP), etc.) requires more than eight (8) members, the appropriate Area Commander shall determine the reasonable span of control for the supervisor.*

4. *If long-term backfill requires the loan or transfer of a supervisor from another unit, the Chief of Police and/or the Deputy Chief of Police shall make that decision.*

(Negotiated Settlement Agreement IV. C.)

**Relevant Policy:**

Three Departmental policies incorporate the requirements of Task 20: Departmental General Order A-19, *Supervisory Span of Control,* issued on July 26, 2006; Departmental General Order D-13, *Assignment to Acting Higher Rank or Classification,* issued on June 17, 1999; and Departmental General Order D-13.1, *Assignment to Acting Sergeant of Police,* issued on May 14, 2014.  (The publication of DGO D-13.1 cancelled Special Order 8435, which previously governed the selection process of acting sergeants.)

**Commentary:**

To assess these requirements for this report, we reviewed spreadsheets prepared by the Department for the months of April, May, and June 2018 that, by date, note which type of sergeant supervised each applicable squad – a primary sergeant, relief sergeant, acting sergeant, other sergeant (one working overtime), or none.  (The Department refers to unsupervised squads as "open.")  We calculated per squad the compliance percentages for this subtask during this time period.  Each of the 49 applicable squads were in compliance – that is, all applicable squads during this time period were supervised by either a primary, relief, or other/overtime sergeant for at least 85% of their working shifts.  We also found that none of the applicable squads exceeded the required 1:8 supervisor to officer ratio at least 90% of their working shifts.

OPD continues to be in compliance with these important requirements.  We are encouraged that the Department has institutionalized the sound practices of tracking how each squad is supervised each day; planning, when possible, for expected absences; and thoughtfully considering how to fill in for personnel who are absent unexpectedly.

# Task 26:  Force Review Board (FRB)

**Requirements:**

*OPD shall develop and implement a policy concerning its FRB proceedings.  The policy shall:*

1.  *Set out procedures, membership and a timetable for FRB review of use of force investigations involving Level 2 incidents, as defined in Department General Order K-4, REPORTING AND INVESTIGATING THE USE OF FORCE;*

2.  *Require the FRB to review all use of force investigations;*

3.  *Require the FRB to make a recommendation as to whether the use of force was in policy or out of policy;*

4.  *Require the FRB to forward sustained policy violations to the Discipline Officer.*

5.  *Require the FRB not to review any use of force allegation until the internal investigations has been completed;*

6. *Authorize the FRB to recommend to the Chief of Police additional use of force training or changes in policies or tactics, or additional standards, investigatory policies, or training for use of force investigations;*

7. *Require the FRB to conduct an annual review of use of force cases examined, so as to identify any patterns of use of force practices that may have policy or training implications, and thereafter, issue a report to the Chief of Police;*

8. *Require that the FRB membership include, at a minimum, one member from the Training Division, one member from the Field Training Officer program, and either the Bureau of Field Operations Deputy Chief or his/her designee;*

9. *Minimally, that one member of the FRB shall be replaced at least annually.*

(Negotiated Settlement Agreement V. C.)


**Relevant Policy:**

Department General Order K-4.1, *Force Review Boards,* was originally published on February 17, 2006, and revised on December 21, 2015.


**Commentary:**

OPD Force Review Boards, comprised of three command-level staff, are periodically convened to examine the investigations conducted relative to the deployment and application of Level 2 uses of force.[1]  OPD achieved compliance with this Task during the nineteenth reporting period (April 1-June 30, 2014); we continue to assess the Department's compliance due to the serious nature, complexities involved, and negative impact inappropriate uses of force may have on the community.  Our review includes analyses of force reports and attendance at Force Review Boards when OPD conducts them during our site visits.

OPD conducted 19 Force Review Boards during 2017, and five thus far in 2018, one of which we observed during our July site visit.  The event the board examined involved officers stopping a vehicle and attempting to take the the an occupants into custody for narcotics violations.  The individual posed significant resistance, which resulted in officers grabbing, using control holds and strikes, and deploying the Electronic Control Weapon (Taser).

---

[1] According to OPD, Level 2 uses of force include: "1) Any strike to the head (except for an intentional strike with an impact weapon); 2) Carotid restraint is applied that does not result in the loss of consciousness; 3) Use of impact weapons, including specialty impact munitions or any other object, to strike a subject and contact is made, regardless of injury; 4) Any unintentional firearms discharge that does not result in injury; 5) A police canine bites the clothing or the skin of a subject, or otherwise injures a subject requiring emergency medical treatment (beyond first-aid) or hospital admittance; 6) Any use of force which results in injuries to the subject requiring emergency medical treatment (beyond first-aid) or hospital admittance; (NOTE: For the purposes of this order, an evaluation by a medical professional to assess a complaint of injury is not emergency treatment) 7) Any Level 3 use of force used on or applied to a restrained subject; 7.a) A restrained subject is a person who has been fully placed in a Department authorized restraint device such as both hands handcuffed, a WRAP or Rip Hobble; 7.b) A subject with only one handcuff on is not a restrained person."

The FRB conducted an intensive inquiry and assessment regarding OPD policy and training applicable to this event; in particular, the board questioned in-house subject matter experts regarding the specific training and accepted practice relating to the conditions confronting officers and appropriate responses (authorized force) applicable to each use of force officers deployed during this event.

After its lengthy, in-depth review of this event, the FRB found each use of force consistent with policy at the time each use of force was deployed.  We concur with the board's findings.

Force data provided by the Department indicates a decrease of 75% in use of force incidents between 2012 and 2017.  To date in 2018, force data indicates an additional decrease of 41% for the period ending June 30.  The principal decrease is reflected in Level 4 force, which alone has decreased by 46%.[2]

This progress and the resultant numbers should prompt a need for validation.  A first step is to determine whether arrests have decreased; accordingly, decreasing uses of force.  Our review of OPD arrest data for the period in question finds no commensurate reduction in arrests; rather, the data indicates that the number of arrests *remained stable or slightly increased* during the applicable time period.  We, with the assistance of the Officer of Inspector General (OIG), are continuing the validation process via a review of specified categories of arrest and use of force reports.  We will include the results of our review in a future monthly status report.

# Task 30:  Executive Force Review Board (EFRB)

**Requirements:**

> *1.  An EFRB shall be convened to review the factual circumstances surrounding any Level 1 force, in-custody death, or vehicle pursuit-related death incidents.  A firearm discharge at an animal shall be reviewed by the EFRB only at the direction of the Chief of Police.  The Board shall have access to recordings and/or transcripts of interviews of all personnel on the scene, including witnesses, and shall be empowered to call any OPD personnel to provide testimony at the hearing.*

> *2.  OPD shall continue the policies and practices for the conduct of EFRB, in accordance with the provisions of DGO K-4.1, FORCE REVIEW BOARDS.*

(Negotiated Settlement Agreement V. G.)

---

s[2] OPD Level 4 uses of force include: "1) The intentional pointing of a firearm at a person. 2) A Weaponless Defense Technique is applied to a Vulnerable Area, excluding strikes (e.g., Hair grab, pressure to mastoid or jaw line; and shoulder muscle grab). 3) An on-duty firearm discharge to dispatch an injured animal; or 4) A weaponless Defense Technique Control Hold is applied: a. Escort (elbow); b. Twist lock: c. Arm-bar; or d. Bent-wrist. 5) A canine deployment in which a suspect is located by the canine, but no bite occurs.

**Relevant Policy:**

Department General Order K-4.1, *Force Review Boards,* was published on February 17, 2006, and revised on December 21, 2015.

**Commentary:**

Executive Force Review Boards (EFRBs), consisting of three top command-level staff, conduct thorough, detailed reviews of all Level 1 uses of force, in-custody deaths, and vehicle pursuit-related deaths.

OPD achieved compliance with this Task during the nineteenth reporting period (April 1-June 30, 2014); we continue to review and report on the compliance status of this Task due to the serious nature of officers' Level 1 uses of force.

Consistent with our commentary in Task 26 above, the overall use of Level 1 force by officers has significantly decreased from an average of nine each year. Specifically, OPD recorded no officer-involved shooting events in 2016, one in 2017, and one in 2018. The 2018 event, which occurred in March, involved the use of deadly force by multiple officers and currently remains under investigation.

OPD remains in compliance with this Task.

# Task 34:  Vehicle Stops, Field Investigation, and Detentions

**Requirements:**

1. *OPD shall require members to complete a basic report on every vehicle stop, field investigation and every detention. This report shall include, at a minimum:*

   a. *Time, date and location;*

   b. *Identification of the initiating member or employee commencing after the first year of data collection;*

   c. *Reason for stop;*

   d. *Apparent race or ethnicity, and gender of individual(s) stopped;*

   e. *Outcome of stop (arrest, no arrest);*

   f. *Whether a search was conducted, and outcome of search;*

   g. *Offense categories (felony, misdemeanor or infraction).*

2. *This data shall be entered into a database that can be summarized, searched, queried and reported by personnel authorized by OPD.*

      3.     *The development of this policy shall not pre-empt any other pending or future policies and or policy development, including but not limited to "Promoting Cooperative Strategies to Prevent Racial Profiling."*

(Negotiated Settlement Agreement VI. B.)

**Relevant Policy:**

Department policies relevant to Task 34 include:  General Order M-19, *Prohibitions Regarding Racial Profiling and Other Bias-Based Policing;* Report Writing Manual (RWM) Inserts R-2, N-1, and N-2; Special Order 9042, *New Procedures Regarding Stop Data Collection* (published June 2010); and Special Order 9101, *Revised Stop Data Collection Procedures* (published November 2012).

**Commentary:**

Compliance with Task 34 includes three principal components:

1) The collection of stop data in a manner that will allow analysis for *data indicators of disparate treatment* among the identified population groups;

2) Departmental analyses of the data for the presence or absence of *indicators of disparate treatment* among the population groups, and where indicated; and

3) The implementation of corrective measures – i.e., policy revisions, training, or other individualized intervention – where warranted.

As noted in several previous status reports, OPD continues to collect and store data, as described in Task 34.1 (a.-g.), as required.  The data is sufficiently detailed, accurate, and voluminous for analysis to determine the lawful basis for stops and further to identify indicators of disparate treatment – therefore, satisfying component 1, above.  In addition, the collection process – internally developed by dedicated and talented OPD personnel – is continually assessed and strengthened; and which more recently, involves the development of proposed revisions to address state stop data reporting requirements outlined in California Assembly Bill 953.  During our monthly site visits, the Department provides us with regular briefings on its progress.

OPD compiles the stop data in a series of illustrations for analysis during monthly Risk Management Meetings, at which Area commanders review the illustrated data with the objective of identifying and addressing indicators of disparate treatment among the population groups.  The presentation often contains data that may be indicative of racial bias worthy of follow-up analysis, with the purpose of ascertaining whether or not it equates to disparate treatment of one or more population groups by an OPD Area, its supervisors, or individual officers.  However, rather than a detailed analysis and discussion regarding the specific reasons for data that may be indicative of racial disparities, the discussion at the Risk Management Meetings generally focuses on operational elements – including strengths and shortcomings of the OPD intelligence-led policing model (which is discussed below).  Accordingly, OPD has not yet fully achieved the requirements of component 2 or 3, which requires corrective measures when deemed necessary.

OPD is presently placing considerable emphasis of the full implementation of an intelligence-led policing model, which we have discussed in previous reports.  Per OPD, in such a model, "Officers possess knowledge, which can be linked to an articulable source, leading to the initiation of a stop.  The Intelligence-Led factor (source) may be very specific, such as a named person, or information about a recent crime trend or pattern tied to a specific location or area.  An officer's knowledge and intent at the time the stop is initiated is important in determining whether the stop in Intelligence-Led of an enforcement stop."

In addition, OPD continues to train officers on procedural justice, which per the National Initiative for Building Trust and Justice, is based on four central principles: "treating people with dignity and respect, giving citizens 'voice' during encounters, being neutral in decision making, and conveying trustworthy motives."  These initiatives are intended to: 1) focus attention on stops likely to have an effect on unlawful activities; and 2) ensure the best possible interaction with individuals stopped.  The intelligence-led policing initiative is credited with reducing the number of overall stops made by OPD officers, and therefore, a "reduced footprint" on the community, which is equated to reducing the racial impact specifically on the African American community.  However, data contained within the illustrative tables presented by OPD during the July Risk Management Meeting does not entirely support this representation.

The data from three OPD Area commands reviewed in July illustrated respective decreases of 26%, 50%, and 47% in the number of stops made during the period under review, which demonstrates an overall decrease in the policing footprint on the community.  However, it does not necessarily neutralize *disparate racial impact*.

Searches of individuals stopped by OPD increased in one of the three Areas (16%), which is consistent with emphasis on intelligence-led stops.  However, it decreased in the remaining two by 7% and 3%, respectively.  Another expected result of the emphasis on intelligence-led stops and accompanying searches is an increase in search recoveries; however, rather than an increase, overall search recoveries declined in the three Areas by 2%, 13%, and 10%, respectively. The specific reasons for these results remain in question.

Datasets illustrating search and search recovery rates by population group place overall search and search recovery rates at 40% and 24%, respectively, as illustrated in the table below:

|  | Average Search Rate | Average Recovery Rate |
|---|---|---|
| All | 37% | 21% |
| African American | 42% | 21% |
| Hispanic | 30% | 20% |
| White | 27% | 26% |
| Asian | 25% | 12% |
| Other | 21% | 19% |

Using these averages as a benchmark for discussion, the more detailed data presented for RMM review disclosed a search recovery rate of 6% for Hispanics in one Area and another Area with the highest average search rate of 44% yet the lowest average recovery rate of 14% inclusive of all population groups. The basis of these apparent disparities was not addressed.

The stop data for squads with the most and least stops also illustrated data is worthy of further analysis and/or resolution.  For example, one Area reported that 89% of all stops involved African Americans; 44% of all stops resulted in searches; and 14% of all searches had recoveries.  However, what was not disclosed was the percentage of African Americans – or any population group – that was searched, and similarly, the percentage of those searches resulting in recoveries, thus there is no ability to determine whether racial disparities requiring further analysis existed.  One squad searched 59% of individuals stopped and logged a recovery rate of a low 5%; another, a reasonable search rate of 15% – but a recovery rate of 8%.  These anomalies have not been nor are we advised they will be carefully analyzed for indicators of racial disparate treatment.

Stop data for officers with the most stops were also reviewed.  This data for the officer with the highest stop rate, 55% reportedly intelligence-led; 91% of which were African Americans; and a search rate of 36%, had a recovery rate of 0%.  Clearly further analyses are warranted to determine whether: this is an anomaly for this reporting period or representative of past and continued activity; the degree to which there may be indicators of racial disparate treatment; or whether there are factors warranting or supportive of these results.  We are not assured this analysis has been or is underway.

Additional officer data included data-points of concern as follows:

- Officer makes 64% intelligence-led stops, 70% of all stops are African American, 66% of all stops are searched, with a recovery rate of 9%;
- Officer makes 86% intelligence -led stops, 60% of all stops are African American, 36% of all stops are searched, with a resulting recovery rate of 6%;
- Officer makes 18% intelligence -led stops, 73% of all stops are African American, 59% of all stops are searched, with a resulting recovery rate of 0%;
- Officer makes 27% intelligence -leg stops, 56% of all stops are African American, 64% of all stops are searched, with a resulting recovery rate of 3%.

Each of these datasets raises issues from both an operational standpoint, and from the standpoint of ensuring that the high search rates and low recovery rates are not bias-based or representative of disparate treatment.  We are not assured such a process is in place.

Although the above narrative may appear critical, it is not intended to simply criticize, but to again stress the importance of and encourage a more detailed review of stop data for indicators of disparate treatment among the population groups. It is also intended to determine, to the extent possible, whether data disparities – i.e., a comparatively high search rate and accompanying low recovery – are the result of disparate treatment by officers or other factors external to a squad or officers' control. Recognizing the admonishment of Dr. Jennifer Eberhardt of Stanford University that bias cannot be proven, it remains important to do everything possible to prohibit its existence in a professional policing context.

Also, in context with above include commentary, we acknowledge and applaud the efforts of OPD to reduce "the risk of negative disparate impact on the community" through the initiation of an intelligence-led, precision-based policing model discussed above. We expect and again encourage OPD to conduct a robust assessment of the various stop data components to identify and appropriate respond to indicators of disparate treatment within the reduced database. As previously indicated, this will require the implementation of a consistent intervention strategy to address identified data disparities, abnormalities, and/or possible bias at the Area, squad, and individual officer levels – clearly our commentary above finds this a remaining issue. Generalized reviews of the data with findings that the stops were "consistent with expectations or policy" provide insufficient explanation of causation within a squad or by an individual officer.

OPD has provided assurances that these concerns will be addressed; we continue to be available and responsive to OPD in support of these objectives.

OPD continues its relationship with Stanford University and the decision to include the implementation of the 50 recommendations made by Dr. Eberhardt's staff in the 2016 study. OPD has fully implemented 36 of the 50 Stanford recommendations; the remaining 14 are in progress, 11 of which are the responsibility of OPD. (Stanford has assumed responsibility for three.)

While OPD continues to advance its efforts to comply with requirements of this Task, we have previously reported that the below-described specific issues remain incomplete. Accordingly, we provide the following assessment, and will continue to monitor OPD's progress on these issues until the Department achieves full compliance.

Further, we will look for a clear and unambiguous commitment to the provisions of this Task to ensure that the protocols that have been undertaken will be institutionalized and remain an integral, sustainable practice:

- Implementation of general and specific intervention strategies to address data indicators of abnormalities and/or possible bias at the Area, squad, and individual officer levels;

- Implementation of processes to provide for a more expeditious compilation of stop data prior to, during, and following Risk Management Meetings. The City anticipates that this will be achieved by the summer of 2019 with the operational implementation of PRIME 2.0.

- Implementation of the applicable 50 recommendations contained in the 2016 Stanford University report. This requirement has been incorporated as an objective by OPD. We will continue to report on the progress of OPD's implementation.

# Task 41:  Use of Personnel Assessment System (PAS) and Risk Management

## Requirements:

*Within 375 days from the effective date of this Agreement, OPD shall develop a policy for use of the system, including supervision and audit of the performance of specific members, employees, supervisors, managers, and OPD units, as well as OPD as a whole.*

*The policy shall include the following elements:*

1. *The Chief of Police shall designate a PAS Administration Unit.  The PAS Administration Unit shall be responsible for administering the PAS policy and, no less frequently than quarterly, shall notify, in writing, the appropriate Deputy Chief/Director and the responsible commander/manager of an identified member/employee who meets the PAS criteria.  PAS is to be electronically maintained by the City Information Technology Department.*

2. *The Department shall retain all PAS data for at least five (5) years.*

3. *The Monitor, Inspector General and Compliance Coordinator shall have full access to PAS to the extent necessary for the performance of their duties under this Agreement and consistent with Section XIII, paragraph K, and Section XIV of this Agreement.*

4. *PAS, the PAS data, and reports are confidential and not public information.*

5. *On a quarterly basis, commanders/managers shall review and analyze all relevant PAS information concerning personnel under their command, to detect any pattern or series of incidents which may indicate that a member/employee, supervisor, or group of members/employees under his/her supervision may be engaging in at-risk behavior.  The policy shall define specific criteria for determining when a member/employee or group of members/employees may be engaging in at-risk behavior.*

6. *Notwithstanding any other provisions of the PAS policy to be developed, the Department shall develop policy defining peer group comparison and methodology in consultation with Plaintiffs' Counsel and the IMT.  The policy shall include, at a minimum, a requirement that any member/employee who is identified using a peer group comparison methodology for complaints received during a 30-month period, or any member who is identified using a peer group comparison methodology for Penal Code §§69, 148 and 243(b)(c) arrests within a 30-month period, shall be identified as a subject for PAS intervention review. For the purposes of these two criteria, a single incident shall be counted as "one" even if there are multiple complaints arising from the incident or combined with an arrest for Penal Code §§69, 148 or 243(b)(c).*

7.   *When review and analysis of the PAS threshold report data indicate that a member/employee may be engaging in at-risk behavior, the member/employee's immediate supervisor shall conduct a more intensive review of the member/employee's performance and personnel history and prepare a PAS Activity Review and Report.  Members/employees recommended for intervention shall be required to attend a documented, non-disciplinary PAS intervention meeting with their designated commander/manager and supervisor.  The purpose of this meeting shall be to review the member/employee's performance and discuss the issues and recommended intervention strategies.  The member/employee shall be dismissed from the meeting, and the designated commander/manager and the member/employee's immediate supervisor shall remain and discuss the situation and the member/employee's response.  The primary responsibility for any intervention strategies shall be placed upon the supervisor.  Intervention strategies may include additional training, reassignment, additional supervision, coaching or personal counseling.  The performance of members/ employees subject to PAS review shall be monitored by their designated commander/manager for the specified period of time following the initial meeting, unless released early or extended (as outlined in Section VII, paragraph B (8)).*

8.   *Members/employees who meet the PAS threshold specified in Section VII, paragraph B (6) shall be subject to one of the following options:  no action, supervisory monitoring, or PAS intervention.  Each of these options shall be approved by the chain-of-command, up to the Deputy Chief/Director and/or the PAS Activity Review Panel.*

   *Members/employees recommended for supervisory monitoring shall be monitored for a minimum of three (3) months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor.  The first at the end of one (1) month and the second at the end of three (3) months.*

   *Members/employees recommended for PAS intervention shall be monitored for a minimum of 12 months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor and designated commander/manager:  The first at three (3) months and the second at one (1) year.  Member/employees subject to PAS intervention for minor, easily correctable performance deficiencies may be dismissed from the jurisdiction of PAS upon the written approval of the member/employee's responsible Deputy Chief, following a recommendation in writing from the member/employee's immediate supervisor.  This may occur at the three (3)-month follow-up meeting or at any time thereafter, as justified by reviews of the member/employee's performance.  When a member/employee is not discharged from PAS jurisdiction at the one (1)-year follow-up meeting, PAS jurisdiction shall be extended, in writing, for a specific period in three (3)-month increments at the discretion of the member/employee's responsible Deputy Chief.  When PAS jurisdiction is extended beyond the minimum one (1)-year review period, additional review meetings*

*involving the member/employee, the member/ employee's designated commander/manager and immediate supervisor, shall take place no less frequently than every three (3) months.*

9.  *On a quarterly basis, Division/appropriate Area Commanders and managers shall review and analyze relevant data in PAS about subordinate commanders and/or managers and supervisors regarding their ability to adhere to policy and address at-risk behavior. All Division/appropriate Area Commanders and managers shall conduct quarterly meetings with their supervisory staff for the purpose of assessing and sharing information about the state of the unit and identifying potential or actual performance problems within the unit. These meetings shall be scheduled to follow-up on supervisors' assessments of their subordinates' for PAS intervention. These meetings shall consider all relevant PAS data, potential patterns of at-risk behavior, and recommended intervention strategies since the last meeting. Also considered shall be patterns involving use of force, sick leave, line-of-duty injuries, narcotics-related possessory offenses, and vehicle collisions that are out of the norm among either personnel in the unit or among the unit's subunits. Division/appropriate Area Commanders and managers shall ensure that minutes of the meetings are taken and retained for a period of five (5) years. Commanders/managers shall take appropriate action on identified patterns of at-risk behavior and/or misconduct.*

10. *Division/appropriate Area Commanders and managers shall meet at least annually with his/her Deputy Chief/Director and the IAD Commander to discuss the state of their commands and any exceptional performance, potential or actual performance problems or other potential patterns of at-risk behavior within the unit. Division/appropriate Area Commanders and managers shall be responsible for developing and documenting plans to ensure the managerial and supervisory accountability of their units, and for addressing any real or potential problems that may be apparent.*

11. *PAS information shall be taken into account for a commendation or award recommendation; promotion, transfer, and special assignment, and in connection with annual performance appraisals. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

12. *Intervention strategies implemented as a result of a PAS Activity Review and Report shall be documented in a timely manner.*

13. *Relevant and appropriate PAS information shall be taken into account in connection with determinations of appropriate discipline for sustained misconduct allegations. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

14. *The member/employee's designated commander/manager shall schedule a PAS Activity Review meeting to be held no later than 20 days following notification to the Deputy Chief/Director that the member/employee has met a PAS threshold and when intervention is recommended.*

15. *The PAS policy to be developed shall include a provision that a member/employee making unsatisfactory progress during PAS intervention may be transferred and/or loaned to another supervisor, another assignment or another Division, at the discretion of the Bureau Chief/Director if the transfer is within his/her Bureau. Inter-Bureau transfers shall be approved by the Chief of Police. If a member/employee is transferred because of unsatisfactory progress, that transfer shall be to a position with little or no public contact when there is a nexus between the at-risk behavior and the "no public contact" restriction. Sustained complaints from incidents subsequent to a member/employee's referral to PAS shall continue to result in corrective measures; however, such corrective measures shall not necessarily result in a member/employee's exclusion from, or continued inclusion in, PAS. The member/employee's exclusion or continued inclusion in PAS shall be at the discretion of the Chief of Police or his/her designee and shall be documented.*

16. *In parallel with the PAS program described above, the Department may wish to continue the Early Intervention Review Panel.*

17. *On a semi-annual basis, beginning within 90 days from the effective date of this Agreement, the Chief of Police, the PAS Activity Review Panel, PAS Oversight Committee, and the IAD Commander shall meet with the Monitor to review the operation and progress of the PAS. At these meetings, OPD administrators shall summarize, for the Monitor, the number of members/employees who have been identified for review, pursuant to the PAS policy, and the number of members/employees who have been identified for PAS intervention. The Department administrators shall also provide data summarizing the various intervention strategies that have been utilized as a result of all PAS Activity Review and Reports. The major objectives of each of these semi-annual meetings shall be consideration of whether the PAS policy is adequate with regard to detecting patterns of misconduct or poor performance issues as expeditiously as possible and if PAS reviews are achieving their goals.*

18. *Nothing in this Agreement, and more specifically, no provision of PAS, shall be construed as waiving, abrogating or in any way modifying the Department's rights with regard to discipline of its members/employees. The Department may choose, at its discretion, to initiate the administrative discipline process, to initiate PAS review or to use both processes concurrently or consecutively.*

(Negotiated Settlement Agreement VII. B.)

**Relevant Policy:**

OPD revised and issued Departmental General Order D-17, *Personnel Assessment Program,* in November 2013.  Since our last report, the Department has begun to address General Order D-17 as part of Department's ongoing policy review and revision program.  The revised version of the relevant policy is currently under review.


**Commentary:**

Our May 31-June 1, 2018 site visit included considerable activity related to Tasks 40 and 41.  The activity resulted in the juxtaposition of a monthly Risk Management Meeting, along with workshops that marked the beginning steps in the redesign of PRIME under a newly executed contract with a new software developer, Sierra-Cedar.  Taken together, these events show both the potential that risk management presents for the Department; but also raise the question about whether that potential may be fully realized.

The Risk Management Meeting brought together captains from three Department Patrol Areas.  The captains were well prepared for the questions they received from the Assistant Chief and Deputy Chiefs.  Some responses went deeply into the weeds of Area operations.  The meeting also included extensive discussion that went beyond the analysis of stop data, to also consider broader risk management information, as expected under the NSA.  It was not long ago that these meetings were less thorough – and arguably, less productive.

During the site visit, Sierra-Cedar also conducted workshops as an early step in its redesign of PRIME.  These workshops, on the PAS risk management process and on the complaint process, were intended to elaborate the workflow in preparation for software development.  Department members from the appropriate offices methodically walked the consultants through their procedures.

Sierra-Cedar's process elicited detailed information, but also suggested two potential problems with the Department's approach to this project.  First, command staff attended these meetings, but we are concerned that the conversations tended to describe current practices without acknowledging their limitations or problems.  The result was to add to the burden on the consultant to recognize and solve problems, rather than to share that burden more equitably with the local experts.

The second and related problem with the process was that the discussion did not challenge elements of clumsiness and redundancy in processes such as the multiple-step PAS review process.  The discussion did not explore the potential for better organization and greater efficiency.  Instead, those issues are being left to the consultants.  Although it may be to a lesser degree than in the past, this surrender of responsibility to the external team was one of the problems that affected the first unsuccessful development of the PRIME database.

Avoiding the problems of the past is clearly a goal of the Department's renewed effort.  Some key steps have been taken, and Sierra-Cedar's approach to the project is clearly helpful.  Yet project management within OPD has always been one of the organization's greatest challenges.  The project could benefit from the clear direction of a champion and increased involvement for Departmental leadership.

In addition, in the past, under the first work of PRIME, there was limited discussion of the data that would be collected, and how that data might be used for the reduction of risk – as well as for the broader purpose of managing the Department. The Department must avoid this problem if it is to be successful.

Below are five issues that the Department should consider as the development process continues:

1. First, the Department should better understand what information will help OPD maintain compliance with NSA requirements. Across virtually all NSA Tasks, it is clear that it will be important to use data to audit continued compliance. PRIME will be one of the main repositories for this data within the Department. In fact, data requirements for risk management are explicit in Task 40. Tracking of nearly 30 pieces of information – from number of uses of force and complaints, to numbers of cases rejected for prosecution – is not relevant only to achieving compliance, but it will also support the robust management and administrative process. This information should be tracked on a monthly basis, as it was before problems with PRIME development derailed the process. The Department should immediately return to collecting, analyzing, and tracking this data.

   The appendices to this report contain three tables that had been produced regularly, originally by the Monitoring Team and then by OPD. OPD ceased the production of these tables when the original PRIME development activity began and that condition was maintained as problems with PRIME prevented some data-reporting.

   - Table 1 tracks and charts the data required under Task 40.
   - Table 2 tracks the PAS review process, and allows for review of the number of officers reviewed; the consistency of decision-making across the levels of the process, and of the outcomes of the review process.
   - Table 3 tracks Department activity – including use of force, complaints, vehicle collisions, and lawsuits lodged against the Department; and reports that information based on the percentages of all arrests.

   The information in these tables is useful for tracking processes and outcomes relevant to Tasks 40 and 41 – and to the overall management of the Department. OPD should recreate these tables to provide monthly reporting of data to support the management of risk by the Department.

2. A second and related issue that the Department should address as the PRIME rebuild progresses is the construction of reports that will assist the management process. It will be important to program standard reports that will be generated by the database at regular intervals. A wide range of reports should be designed. A focused process will be needed to determine what data, beyond the Task 40 information, will be useful for planning and decision-making. For example, it may be useful to regularly identify highly productive officers – as well as those for whom levels of documented activity such as pedestrian stops, citations, and arrests are low.

3. The two issues noted above suggest a more technical issue that should also be addressed. Decisions should be made not only regarding what data to track – but also what that data should look like and how it should be presented. In some cases, it may be useful to present counts of raw data, for example, to assess the stability of change in the numbers of arrested or patterns of arrest for specific offenses. For other purposes, it may be more useful to norm the data in particular ways. Rates of uses of force or complaints normed by the number of arrests are illustrative, but other compiled statistics may also be useful. That might include considering, for example, how far above or below the average officers in some assignments may be on stop data measures.

4. The two examples above also point to a more basic concern that should be addressed in parallel with the rebuild of PRIME. In its most general form, the key issue to address is to identify the questions the Department wants to be able to answer with data. For example, regular reviews of officer behavior resulting in discipline can provide information that can be useful for recruitment and training. Understanding officer productivity as it relates to assignments or years of service could help plan career paths, and patterns of sick time use might help in the design of officer wellness programs. In short, the rebuild of PRIME should be accompanied by a deliberate effort to identify the questions that the database can help answer and that can help inform management processes.

5. It is also important to consider how the data in PRIME can be used to assess how well the risk management system is working. Does the system identify the *right* officers? Does it do so in a timely fashion? What is the actual content of monitoring and intervention; and, of course, do these processes work? That is, do they change the officer behavior that led to their use in the first place?

# Task 45:  Consistency of Discipline Policy

**Requirements:**

*On or before October 6, 2003, OPD shall revise and update its disciplinary policy to ensure that discipline is imposed in a fair and consistent manner.*

1. *The policy shall describe the circumstances in which disciplinary action is appropriate and those in which Division-level corrective action is appropriate.*

2. *The policy shall establish a centralized system for documenting and tracking all forms of discipline and corrective action, whether imposed centrally or at the Division level.*

3.  *All internal investigations which result in a sustained finding shall be submitted to the Discipline Officer for a disciplinary recommendation.  The Discipline Officer shall convene a meeting with the Deputy Chief or designee in the affected chain-of-command for a confidential discussion of the misconduct, including the mitigating and aggravating factors and the member/employee's overall performance.*

4.  *The COP may direct the Discipline Officer to prepare a Discipline Recommendation without convening a Discipline Conference.*

(Negotiated Settlement Agreement X. B.)


**Relevant Policy:**

Five Departmental policies incorporate the requirements of Task 45:  Departmental General Order M-03, *Complaints Against Department Personnel and Procedures* (published December 6, 2005 and revised most recently on August 24, 2013); Training Bulletin V-T.1 and V-T.2, *Internal Investigation Procedure Manual* (published July 17, 2008); Internal Affairs Policy and Procedure Manual (published December 6, 2005); and Training Bulletin V-T, *Departmental Discipline Policy* (published March 14, 2014).  Several of these policies are currently being revised.


**Commentary:**

Task 45.2 requires that OPD maintain a centralized system for documenting and tracking all OPD forms of discipline and corrective action, whether imposed centrally or at the division level. To assess Phase 2 compliance with this subtask, we reviewed the 44 cases that contained at least one sustained finding that were approved in March, April, and May 2018.  All (100%) of these cases and findings contained all of the necessary information available on the spreadsheet generated by IAD for our review.  OPD is in compliance with the requirement that it maintain an adequate system for documenting and tracking discipline and corrective action.

The NSA also requires that discipline be imposed in a manner that is fair and consistent.  To this end, the Department developed a Discipline Matrix, which was adopted on September 2, 2010 and was in effect until a new Discipline Matrix was approved on March 14, 2014.  This subsequent Matrix applies to violations after that date.

As noted above, we reviewed all 44 cases with sustained findings that were approved between March 1-May 31, 2018.  Five cases involved the failure to accept or refer complaints, some with sustained charges for multiple officers.  The last review for Task 45 contained six cases for this MoR violation.  We are concerned with this trend, particularly since our spot review of Task 6 (Refusal to Accept or Refer Citizen Complaints) for our last report uncovered some compliance issues.

Three cases involved obedience to laws – specifically, an arrest for domestic violence, a citation for failure to properly secure a personal firearm, and a Driving Under the Influence (DUI) arrest. The latter case also involved a finding that the officer resisted arrest, and termination was the recommended penalty.  In two cases, untruthfulness was alleged.  Another case involved an allegation of excessive force; while in another, improper demeanor was alleged.  In one case, the officer was sustained for failing to serve a restraining order.  Twenty-six cases involved preventable motor vehicle accidents; and in the final case, officers were sustained for violating the pursuit policy.

In each case, unless otherwise documented in writing, the proposed discipline fell within the Discipline Matrix that was in effect at the time of the action for which the discipline was imposed.

During April, May, and June 2018, OPD held three *Skelly* hearings for IAD cases involving employees with sustained findings in which discipline of a one-day suspension or greater was recommended.  We reviewed the *Skelly* reports, and found that they contained adequate justification for the results documented.  Two cases involved preventable motor vehicle accidents.  The proposed suspensions (one and two days, respectively) were upheld, with the concurrence of the Chief.  The third case stemmed from the DUI arrest of a sworn officer, mentioned above.  The proposed penalty of termination was upheld, again with the concurrence of the Chief.  The reports were generally well-written and followed the established format.

We reviewed the training records that OPD provided, and confirmed that all *Skelly* hearing officers received the approved *Skelly* Officer Training in January 2016.  Additionally, all active *Skelly* officers received refresher training on April 26, 2017.  No additional training was provided during this reporting period.  We note that since the last refresher training was offered well over a year ago, the Department may want to consider providing another refresher, as well as initial training for any command staff promoted since the last training was offered.

OPD received two arbitration decisions during April, May, and June 2018.  The arbitrators in each case sided with the City on the merits of the case; but in one case, the proposed discipline of a ten-day suspension was reduced to five days.  Based on the documentation, it appeared that the City prepared and presented its cases in an exemplary manner.

OPD remains in partial compliance with Task 45.

# Conclusion

As the development of PRIME moves forward, it presents an opportunity to also look beyond the technology to how this system can best serve the Department.  Considering that now will be important to sustaining the progress that continues to be made under the NSA and for moving forward in the future.  The best way to take advantage of that opportunity is to carefully think through the specific details of how the risk management database and the risk management process can be used to advance Department management.

Fifty-Fifth Report of the Independent Monitor for the Oakland Police Department
August 23, 2018
Page 20 of 24

As noted in our last report, the Monitoring Team is currently reviewing OPD data on use of force; we are concerned with the increase in complaints recently noted by the Department.  The purpose of our analysis is to more fully understand the significant drops that are being reported in PRIME.  Our analysis will compare arrest reports with use of force reports – particularly for cases such as those involving assault on an officer, disorderly conduct, and obstructing or resisting arrest.  We will report on this further in future monthly status reports.

Chief (Ret.) Robert S. Warshaw
*Monitor*

Fifty-Fifth Report of the Independent Monitor for the Oakland Police Department
August 23, 2018
Page 21 of 24

**Appendix Table 1.** *This table tracks and charts the data required by Task 40.*

| OPD Performance Activity Comparison by Quarter | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Performance Activity | January 1 to March 31, 2013 | April 1 to June 30, 2013 | Sept 1 to July 30, 2013 | Oct 1 to Dec 31, 2013 | March 1 to Jan 31, 2014 | April 1 to June 30, 2014 | Sept 1 to July 30, 2014 | Oct 1 to December 31 | Graph Last 8 Qrts |
| Level 1 Uses of Force | 1 | 3 | 3 | 0 | 0 | 0 | 0 | 0 | |
| Level 2 Uses of Force | 3 | 10 | 4 | 8 | 1 | 7 | 1 | 1 | |
| Level 3 Uses of Force | 26 | 26 | 12 | 24 | 14 | 16 | 7 | 17 | |
| Level 4 Uses of Force | 509 | 483 | 412 | 314 | 564 | 276 | 280 | 280 | |
| Unintentional Firearms Discharge | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | |
| Sick Leave Hours | 11286.53 | 11041.94 | 11390 | 10935 | 9724 | 7798.08 | 8693.47 | 9745.74 | |
| Line of Duty Injuries | 32 | 54 | 54 | 23 | 54 | 8 | 5 | 0 | |
| Narcotics Related Possessory Offenses Arrests | 407 | 560 | 496 | 669 | 914 | 804 | 690 | 528 | |
| Vehicle Collisions | 18 | 12 | 6 | 17 | 34 | 11 | 13 | 20 | |
| All Vehicle Pursuits | 18 | 64 | 87 | 68 | 43 | 16 | 28 | 28 | |
| All Arrest | 2853 | 3697 | 2759 | 3156 | 3743 | 4161 | 3756 | 4155 | |
| Arrests including PC 69, 148(a), 243(b)(c) & 245(c)(d) | 34 | 36 | 28 | 27 | 27 | 25 | 21 | 35 | |
| Arrests only for PC 69, 148(a), 243(b)(c) & 245(c)(d) | 9 | 4 | 5 | 2 | 1 | 12 | 5 | 14 | |
| Awards | 76 | 55 | 65 | 124 | 102 | 115 | 40 | 92 | |
| Assignment History | 10361 | 10337 | 10257 | 10361 | 11156 | 11337 | 34794 | 36084 | |
| Case Evaluation Reports | 635 | 444 | 338 | 497 | 315 | 198 | 225 | 446 | |
| Report Review Notices--Positive | 5 | 8 | 1 | 1 | 1 | 5 | 5 | 2 | |
| Report Review Notices--Negative | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | |
| Canine Deployments | 64 | 59 | 57 | 50 | 66 | 0 | 2 | 46 | |
| Financial Claims | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Internal Affairs Complaints | 186 | 295 | 140 | 136 | 150 | 192 | 207 | 174 | |
| In-Custody Injuries | 21 | 13 | 2 | 31 | 4 | 12 | 4 | 13 | |
| Civil Suits (Tort Claims) | 4 | 4 | 2 | 4 | 0 | 8 | 13 | 9 | |

Fifty-Fifth Report of the Independent Monitor for the Oakland Police Department
August 23, 2018
Page 22 of 24

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Criminal Cases Dropped | 416 | 282 | 207 | 352 | 226 | 116 | 132 | 290 | |
| O.C. Checkouts | 58 | 16 | 61 | 13 | 116 | 82 | 20 | 57 | |
| Officer Involved Shootings | 2 | 3 | 1 | 0 | 1 | 3 | 0 | 3 | |
| Rank / Class History | 2391 | 2334 | 2357 | 7302 | 2519 | 2521 | 2510 | 2507 | |
| Training History | 20108 | 19589 | 8557 | 13827 | 17239 | 22886 | 13273 | 8711 | |
| Supervisory Notes | 3139 | 3304 | 2852 | 2957 | 3114 | 3721 | 3635 | 4012 | |
| Arrest Made Against OPD | 0 | 0 | 0 | 1 | 1 | 0 | 1 | 0 | |

Fifty-Fifth Report of the Independent Monitor for the Oakland Police Department
August 23, 2018
Page 23 of 24

**Appendix Table 2.** *This table provides a summary of PAS decisions at every step of the process.*

| Summary of PAS Reviews and Recommendations | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | PAS Reviews Completed | Supervisor Re-action | % | Recognition | % | Supervisor Monitoring | % | Supervisor Intervention Reentc-ion | % | Supervisor concurs PA with Admin | % | Commander rec Conc Supervisor Cow | % | Dep. Chief Conc Commander urs w | % | PAS Panel Concurs w DC | % | Pending | Number of personnel that exceeded threshold |
| **2014** | | | | | | | | | | | | | | | | | | | |
| January | 3 | 2 | 67% | 0 | 0% | 1 | 33% | 0 | 0% | 3 | 100% | 3 | 100% | 3 | 100% | 2 | 67% | 5 | 18 |
| February | 0 | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 13 | 1 |
| March | 7 | 4 | 57% | 0 | 0% | 2 | 29% | 1 | 14% | 7 | 100% | 7 | 100% | 7 | 100% | 7 | 100% | 8 | 11 |
| April | 20 | 18 | 90% | 0 | 0% | 1 | 5% | 1 | 5% | 15 | 75% | 19 | 95% | 19 | 95% | 18 | 90% | 0 | 14 |
| May | 9 | 6 | 67% | 0 | 0% | 3 | 0% | 0 | 0% | 9 | 100% | 9 | 100% | 8 | 89% | 8 | 89% | 0 | 11 |
| June | 10 | 9 | 90% | 0 | 0% | 1 | 0% | 0 | 0% | 8 | 80% | 9 | 90% | 9 | 90% | 10 | 100% | 19 | 14 |
| July | 9 | 8 | 89% | 0 | 0% | 1 | 11% | 0 | 0% | 9 | 100% | 9 | 100% | 9 | 100% | 9 | 100% | 20 | 17 |
| August | 9 | 7 | 78% | 0 | 0% | 2 | 22% | 0 | 0% | 9 | 100% | 9 | 100% | 9 | 100% | 8 | 89% | 16 | 1 |
| September | 3 | 3 | 100% | 0 | 0% | 0 | 0% | 0 | 0% | 2 | 67% | 2 | 67% | 3 | 100% | 3 | 100% | 33 | 22 |
| October | 17 | 13 | 76% | 1 | 6% | 3 | 18% | 0 | 0% | 14 | 82% | 15 | 88% | 15 | 88% | 16 | 94% | 4 | 0 |
| November | 3 | 3 | 100% | 0 | 0% | 0 | 0% | 0 | 0% | 3 | 100% | 3 | 100% | 3 | 100% | 3 | 100% | 32 | 14 |
| December | 15 | 13 | 87% | 0 | 0% | 2 | 13% | 0 | 0% | 14 | 93% | 15 | 100% | 15 | 100% | 14 | 93% | 23 | 3 |
| **Total** | 105 | 86 | | 1 | | 16 | | 2 | | 93 | | 93 | | 101 | | 98 | | 116 |
| *Running Average* | *11.7* | *9.6* | *0.0* | *0.1* | *0.0* | *1.8* | *0.0* | *0.2* | *0.0* | | | *10.3* | *0.0* | *11.2* | *0.0* | *10.9* | *0.0* | *0.0* | *12.9* |

**Appendix Table 3.**  *This table tracks OPD use of force, complaints, and other activity as a percentage of arrests.*

PAS ADMIN UNIT STATISTICAL COMPARISON — Oakland Police Department — Key Indicator By Month

| Percent of Arrests Associated with | JUL 10 | AUG 10 | SEP 10 | OCT 10 | NOV 10 | DEC 10 | JAN 11 | FEB 11 | MAR 11 | APR 11 | MAY 11 | JUN 11 | JUL 11 | AUG 11 | SEP 11 | OCT 11 | NOV 11 | DEC 11 | Jan 12 | Feb 12 | Mar 12 | APR 12 | MAY 12 | JUN 12 | Graph |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A Use of Force (levels 1,2,3** per reporting officer) | 7.57 | 1.93 | 4.10 | 2.31 | 3.78 | 1.21 | 2.89 | 2.24 | 2.21 | 1.60 | 2.35 | 1.66 | 2.64 | 1.66 | 1.01 | 5.72 | 6.70 | 0.84 | 2.98 | 2.45 | 1.24 | 2.11 | 1.76 | 0.71 | (line graph) |
| A Use of Force (levels 1,2,3,4** per reporting officer) | 43.20 | 36.37 | 49.03 | 39.24 | 52.02 | 47.44 | 37.64 | 37.98 | 25.91 | 29.34 | 42.82 | 35.61 | 32.24 | 32.31 | 31.15 | 24.68 | 25.17 | 34.21 | 25.76 | 34.88 | 31.94 | 34.62 | 27.22 | 24.57 | (line graph) |
| A Police Pursuit (per reporting officer) | 5.92 | 4.36 | 3.99 | 5.67 | 6.30 | 2.16 | 4.39 | 4.73 | 2.13 | 3.04 | 4.04 | 1.57 | 2.91 | 4.90 | 1.56 | 2.53 | 2.30 | 3.09 | 1.72 | 2.36 | 2.17 | 3.60 | 2.53 | 0.79 | (line graph) |
| An IA Complaint (per subject officer sworn only) | 13.25 | 9.93 | 11.17 | 7.41 | 7.93 | 9.43 | 9.12 | 10.71 | 8.45 | 6.91 | 7.14 | 9.01 | 10.20 | 8.67 | 8.10 | 9.59 | 9.19 | 6.19 | 9.16 | 12.76 | 8.29 | 11.16 | 7.21 | 2.84 | (line graph) |
| An In-Custody Injury | 2.72 | 3.14 | 2.62 | 1.97 | 5.29 | 0.54 | 2.66 | 1.37 | 2.05 | 1.60 | 4.04 | 0.52 | 1.28 | 1.23 | 1.17 | 4.31 | 3.35 | 0.37 | 3.05 | 2.10 | 1.24 | 2.02 | 0.84 | 0.47 | (line graph) |
| Each Hour of Sick Leave (excludes civilians) | 303.79 | 330.57 | 290.42 | 364.04 | 323.43 | #### | 216.71 | 254.17 | 170.88 | 180.53 | 226.38 | 221.01 | 210.02 | 229.51 | 184.11 | 230.26 | 283.83 | 235.15 | 227.25 | 249.13 | 277.60 | 283.70 | 209.65 | 158.94 | (line graph) |
| **Number of Arrests per** (blank if 0 cases) | JUL 10 | AUG 10 | SEP 10 | OCT 10 | NOV 10 | DEC 10 | JAN 11 | FEB 11 | MAR 11 | APR 11 | MAY 11 | JUN 11 | JUL 11 | AUG 11 | SEP 11 | OCT 11 | NOV 11 | DEC 11 | Jan 12 | Feb 12 | Mar 12 | APR 12 | MAY 12 | JUN 12 | |
| Officer Involved Shooting (includes shootings involving animals which includes force types 1,21, 24, 27 and 26-21)** | 281.67 | 987.00 | 292.33 | 864.00 | 397.00 | 247.33 | 144.33 | 0.00 | 633.00 | 395.33 | 532.50 | 571.50 | 1098.00 | 571.00 | 1284.00 | 0.00 | 0.00 | 533.50 | 0.00 | 572.00 | 430.00 | | | | (line graph) |
| Vehicle Collisions (excludes civilians) | 211.25 | 109.67 | 146.17 | 79.40 | 99.25 | 148.40 | 433.00 | 160.60 | 316.50 | 169.43 | 177.50 | 571.50 | 1098.00 | 285.50 | 321.00 | 336.25 | #### | 152.43 | 182.43 | 0.00 | 215.00 | 0.00 | 0.15 | 0.08 | (line graph) |
| Civil Suit (excludes civilians) | 140.83 | 82.25 | 109.63 | 72.00 | 67.45 | 78.73 | 47.24 | 211.00 | 197.67 | 56.05 | 1143.00 | 1098.00 | 380.67 | 321.00 | 336.25 | 95.00 | 152.43 | 0.00 | 0.00 | 645.00 | 0.53 | 0.31 | 0.08 | | (line graph) |
| All Arrest (totals) | 845 | 987 | 877 | 864 | 794 | 742 | 866 | 803 | 1266 | 1186 | 1065 | 1143 | 1098 | 1142 | 1284 | 1345 | 1045 | 1067 | 1277 | 1144 | 1290 | 1138 | 1304 | 1266 | (line graph) |