September 13, 2018

# Fifty-Sixth Report
## *of the* Independent Monitor
## *for the* Oakland Police Department

## Introduction

This is our fifty-sixth status report on the Negotiated Settlement Agreement (NSA) in the case of *Delphine Allen, et al., vs. City of Oakland, et al.,* in the United States District Court for the Northern District of California under the direction of Judge William H. Orrick.  I was appointed in 2010 to oversee the monitoring process of the Oakland Police Department (OPD) that began in 2003.

This report covers our site visit of August 13-14, 2018; and describes our recent assessments of NSA Tasks 5, 34, and 41.  In this report, we also discuss our recent focused review of OPD data on use of force, to more fully understand the significant drops that have been reported in PRIME.

As we have noted previously, following the Court's Order of May 21, 2015, in our monthly reports, we devote special attention to the most problematic component parts of the Tasks that are not yet in full or sustained compliance, and discuss the most current information regarding the Department's progress with the NSA and its efforts at making the reforms sustainable.

### *Increasing Technical Assistance*

Each month, our Team conducts a visit to Oakland that includes both compliance assessments and technical assistance.  During our visits, we meet with Department and City officials; observe Department meetings and technical demonstrations; review Departmental policies; conduct interviews and make observations in the field; and analyze OPD documents and files, including misconduct investigations, use of force reports, crime and arrest reports, Stop Data Forms, and other documentation.  We also provide technical assistance in additional areas, especially those that relate to the remaining non-compliant Tasks or areas identified by the Department.

Within the last several months, we have provided technical assistance to OPD officials in the areas of IAD investigation quality (Task 5); stop data and related issues (Task 34); risk management and the ongoing maintenance issues and development of the Performance Reporting Information Metrics Environment (PRIME) systems (Task 41); and several Department policies and procedures, including policies related to PRIME, officer discipline, probationers and parolees, handcuffing, and the use of electronic control weapons.

## *Building Internal Capacity at OPD*

Also per the May 21, 2015 Court Order, we continue to work closely with the Office of Inspector General's (OIG) lieutenant and staff to identify areas that it should audit or review – and to help design approaches to these audits that are not cumbersome, so as to ensure sustainability. We review OIG's quarterly progress reports, which are a valuable resource and assist us in assessing compliance with NSA requirements.

---

# Focused Review of Recent Decline in Uses of Force

As previously reported, use of force data provided by OPD has shown a significant drop in officers use of force – i.e., a decrease of 75% in use of force incidents between 2012 and 2017. To date, 2018 force data indicates an additional decrease from 2017 of 34% for the period ending August 11. This data also indicate that the principal decrease is in the Level 4 category of force, which has decreased by 40%.[1]

While reductions in such a category might appear to be positive, this also suggests the need for further validation. To understand this, we reviewed arrest data for 2016-18 to determine whether the decrease in force could be attributed to a decrease in arrests. The data indicates that the number of arrests remained stable or slightly increased during the period in question; therefore, it is reasonable to conclude that this is not the case.

For further analysis, we reviewed arrest data for the initial 2018 three-month period. We examined arrest reports for offenses for cases including assault on an officer, disorderly conduct, and obstructing or resisting arrest. In our experience, these offenses have a high probability of involving a use of force. We requested, received, and reviewed arrest reports for these cases, when there was no attached use of force report. Our review found that several contained narrative descriptions of officers that appeared to reflect a use of force. Accordingly, we requested the accompanying videos of those events for review.

A detailed review of the selected video recordings found one instance where an officer, with his firearm out and displayed, was in foot pursuit of a suspect. Although this action is not force, when the officer subsequently and directly encountered the suspect, he pointed the firearm directly at the subject – which, according to policy, is a Level 4 use of force. We also identified two additional instances where an officer pointed a firearm directly at a suspect, and four instances where officers attempts to take an individual into custody involved physical force.

---

[1] OPD Level 4 uses of force include: "1) The intentional pointing of a firearm at a person. 2) A Weaponless Defense Technique is applied to a Vulnerable Area, excluding strikes (e.g., Hair grab, pressure to mastoid or jaw line; and shoulder muscle grab); 3) An on-duty firearm discharge to dispatch an injured animal; or 4) A weaponless Defense Technique Control Hold is applied: a. Escort (elbow); b. Twist lock: c. Arm-bar; or d. Bent-wrist. 5) A canine deployment in which a suspect is located by the canine, but no bite occurs."

For this analysis, we began by reviewing arrest reports and accompanying documents for 29 cases.  We reviewed videos for 10 cases; and in six of those cases, seven uses of force raised some possible concerns.  It is important to note that supervisors approved these reports – even though there were no accompanying force reports.

While to date, we have found no instance where the force used was unwarranted or inconsistent with policy, the actions described above are troubling and appear to depict reportable force that was, in fact, not reported.  This would indicate a significant supervisory failure.  In light of this preliminary finding, we are currently reviewing the second quarter 2018 reports for designated offenses that have no accompanying force report to determine the need to view related video data to consider whether force was used but not reported.

OIG is providing support for this review, and is also conducting its own internal assessment of the adequacy of force reporting.  We will discuss this further in future status reports.

---

## *Focused Task Assessments*

## Task 5:  Complaint Procedures for IAD

**Requirements:**

> 1.  *On or before December 1, 2003, OPD shall develop a policy so that, OPD personnel who become aware that a citizen wishes to file a complaint shall bring such citizen immediately, or as soon as circumstances permit, to a supervisor or IAD or summon a supervisor to the scene.  If there is a delay of greater than three (3) hours, the reason for such delay shall be documented by the person receiving the complaint.  In the event that such a complainant refuses to travel to a supervisor or to wait for one, the member/employee involved shall make all reasonable attempts to obtain identification, including address and phone number, as well as a description of the allegedly wrongful conduct and offending personnel, from the complainant and any witnesses.  This information, as well as a description of the complaint, shall immediately, or as soon as circumstances permit, be documented on a Complaint Form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander, and shall be treated as a complaint.  The supervisor or appropriate Area Commander notified of the complaint shall ensure the Communications Division is notified and forward any pertinent documents to the IAD.*

2. *An on-duty supervisor shall respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest. The supervisor shall ensure the Communications Division is notified and forward any pertinent documents to the IAD. All other misconduct complaints by a jail inmate shall be handled in the same manner as other civilian complaints.*

3. *In each complaint investigation, OPD shall consider all relevant evidence, including circumstantial, direct and physical evidence, and make credibility determinations, if feasible. OPD shall make efforts to resolve, by reference to physical evidence, and/or use of follow-up interviews and other objective indicators, inconsistent statements among witnesses.*

4. *OPD shall develop provisions for the permanent retention of all notes, generated and/or received by OPD personnel in the case file.*

5. *OPD shall resolve each allegation in a complaint investigation using the "preponderance of the evidence" standard. Each allegation shall be resolved by making one of the following dispositions: Unfounded, Sustained, Exonerated, Not Sustained, or Administrative Closure. The Department shall use the following criteria for determining the appropriate disposition:*

   a. *Unfounded: The investigation disclosed sufficient evidence to determine that the alleged conduct did not occur. This finding shall also apply when individuals named in the complaint were not involved in the alleged act.*

   b. *Sustained: The investigation disclosed sufficient evidence to determine that the alleged conduct did occur and was in violation of law and/or Oakland Police Department rules, regulations, or policies.*

   c. *Exonerated: The investigation disclosed sufficient evidence to determine that the alleged conduct did occur, but was in accord with law and with all Oakland Police Department rules, regulations, or policies.*

   d. *Not Sustained: The investigation did not disclose sufficient evidence to determine whether or not the alleged conduct occurred.*

   e. *Administrative Closure: The investigation indicates a service complaint, not involving an MOR violation, was resolved without conducting an internal investigation; OR*

   f. *To conclude an internal investigation when it has been determined that the investigation cannot proceed to a normal investigative conclusion due to circumstances to include but not limited to the following:*

      1) *Complainant wishes to withdraw the complaint and the IAD Commander has determined there is no further reason to continue the investigation and to ensure Departmental policy and procedure has been followed;*

2) *Complaint lacks specificity and complainant refuses or is unable to provide further clarification necessary to investigate the complaint;*

3) *Subject not employed by OPD at the time of the incident; or*

4) *If the subject is no longer employed by OPD, the IAD Commander shall determine whether an internal investigation shall be conducted.*

5) *Complainant fails to articulate an act or failure to act, that, if true, would be an MOR violation; or*

6) *Complaints limited to California Vehicle Code citations and resulting tows, where there is no allegation of misconduct, shall be referred to the appropriate competent authorities (i.e., Traffic Court and Tow Hearing Officer).*

g. *Administrative Closures shall be approved by the IAD Commander and entered in the IAD Complaint Database.*

6. *The disposition category of "Filed" is hereby redefined and shall be included under Administrative Dispositions as follows:*

a. *An investigation that cannot be presently completed. A filed investigation is not a final disposition, but an indication that a case is pending further developments that will allow completion of the investigation.*

b. *The IAD Commander shall review all filed cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed and may direct the closure or continuation of the investigation.*

7. *Any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken. However, investigators, with the approval of an IAD Commander, are not required to interview and/or take a recorded statement from a member or employee who is the subject of a complaint or was on the scene of the incident when additional information, beyond that already provided by the existing set of facts and/or documentation, is not necessary to reach appropriate findings and conclusions.*

(Negotiated Settlement Agreement III. E.)

**Relevant Policy:**

There are six Departmental policies that incorporate the requirements of Task 5:  Department General Order M-03, *Complaints Against Department Personnel and Procedures* (published December 6, 2005 and revised most recently on August 22, 2013); Communications Division Policy & Procedures C-02, *Receiving and Logging Complaints Against Personnel and Use of Force Incidents* (published April 6, 2007); Training Bulletin V-T.1, *Internal Investigation Procedure Manual* (published June 1, 2006); Special Order 8270, *Booking of Prisoners at the Glenn E. Dyer Detention Facility* (published June 24, 2005); Special Order 8565, *Complaints Against Department Personnel* (published May 11, 2007); and IAD Policy & Procedures 05-02, *IAD Investigation Process* (published December 6, 2005).  In addition, NSA stipulations issued on December 12, 2005, and March 13, 2007, incorporate the requirements of this Task.

**Commentary:**

OPD had been in partial compliance with Task 5 since the twenty-first reporting period.  That status reflected a Court-ordered investigation regarding OPD and the City's discipline and arbitration process.  On March 23, 2016, the Court issued a new Order indicating that irregularities and potential violations of the NSA occurred in ongoing IAD investigation 15-0771.  The Order noted that the investigation raised issues of accountability and sustainability of compliance.

Task 5 consists of several subtasks, briefly described below.  Based on OPD's compliance history with many of the subtasks, not all are being actively monitored at this time.

**Task 5.1** requires that when a citizen wishes to file a complaint, the citizen is brought to a supervisor or IAD, or a supervisor is summoned to the scene.  **Task 5.2** requires that if there is a delay of greater than three hours in supervisory response, the reason for the delay must be documented.  **Task 5.3** requires that where a complainant refuses to travel to a supervisor, or wait for one, personnel make all reasonable attempts to obtain specific information to assist in investigating the complaint.  **Task 5.4** requires that specific information be documented on a complaint form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander.  **Task 5.5** requires that the supervisor or Area Commander notify Communications and forward any pertinent documents to IAD.

To assess compliance with Task 5.1 through and including Task 5.5, we reviewed the Daily Incident Logs (DILs) prepared by the Communications Division and forwarded to IAD each business day.  The DIL form has been modified several times during our tenure to elicit "forced responses" that gather all of the information required to evaluate compliance with these Tasks.  These modifications have significantly enhanced OPD's ability to document compliance by properly filling out and distributing the logs, and compliance rates with these subtasks have been near 100% for several years.  Consequently, we no longer actively assess OPD's compliance with these subtasks, but we continue to receive both the DILs and Daily Complaint Referral Logs (used to document when Information Business Cards [IBCs] are provided to citizens in lieu of a complaint forms).  We spot-check these forms regularly to verify that the quality of their completion has not diminished.  OPD remains in compliance with Tasks 5.1 through and including Task 5.5.

**Task 5.6** requires that an on-duty supervisor respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest of the inmate.  This subtask has not been actively monitored since December 2014, though we have reviewed cases applicable to this requirement in recent reports.

**Task 5.12** requires that the Watch Commander ensure that any complaints that are applicable to Task 5.6 are delivered to and logged with IAD.  Under current policy, the Communications Division must record on the DILs complaints that are received and/or handled by on-duty supervisors, and the DILs is forwarded daily to IAD.

OPD remains in compliance with Tasks 5.6 and 5.12.

**Task 5.15** through **Task 5.19**, and **Task 5.21,** collectively address the quality of completed IAD investigations, and therefore remain the subject of our focused Task assessments.  To assess compliance with these Tasks, we reviewed 15 IAD cases that were approved in June 2018.  This sample included investigations completed by IAD and Division-level investigations (DLIs).  It also included cases that were resolved via formal investigation and investigations that were resolved via summary finding.[2]

Together, **Tasks 5.15** and **Task 5.16** require that OPD: gathers all relevant evidence; conducts follow-up interviews where warranted; adequately considers the evidence gathered; makes credibility assessments where feasible; and resolves inconsistent statements.

In all of the cases we reviewed, we believe that OPD gathered all relevant evidence available, but we note one case where the evidence was not adequately considered.  In this case, we believe the evidence warranted different findings.  (We further describe it below.)  As we often find, in many of the cases, video and/or audio recordings proved to be a significant factor in allowing OPD to reach an appropriate conclusion.

Investigators conducted follow-up interviews to seek clarification or resolve inconsistencies in three of the 15 cases we reviewed.  In one case, the complainant was interviewed twice; while in the other cases, subject employees were interviewed twice.  In another case, the investigator tried to re-interview the complainant, but was unable to re-contact him despite appropriate efforts to do so.

OPD made credibility assessments for all involved parties in six of the 15 cases.  Of the remaining cases, five were approved for summary finding; and per policy, investigators are not required to assess the credibility of the involved officers and civilians in these instances.  Another case stemmed from a Force Review Board (FRB), and credibility assessments are not required in that process.  In the three remaining cases, all allegations were closed via administrative closure or informal complaint resolution, neither of which requires credibility assessments.

---

[2] Summary findings are investigations in which the Department believes a proper conclusion can be determined based on a review of existing documentation with limited or no additional interviews and follow-up.

In two cases, the complainants were deemed not credible. We agreed with these assessments, as the complainants' assertions were clearly refuted by video evidence.

In nine of the 15 cases we reviewed, OPD successfully resolved inconsistent statements. In three of the cases, PDRD recordings were available and assisted in the determination. In three other cases, recorded calls to Communications allowed for a definitive conclusion. Two cases resulted in at least one finding of not sustained. Not sustained is an acceptable finding, and by definition, it implies that inconsistencies were not resolved despite investigative efforts. In the remaining cases, all allegations were closed via administrative closure or informal complaint resolution.

**Task 5.17** requires that OPD permanently retain all notes generated and/or received by OPD personnel in the case file. OPD personnel document that all investigative notes are contained within a particular file by completing an Investigative Notes Declaration Form. OPD has a sustained history of 100% compliance with this subtask. During this reporting period, the form was again properly completed in all 15 cases we reviewed.

**Task 5.18** requires that OPD resolve each allegation in a complaint investigation using the preponderance of the evidence standard. **Task 5.19** requires that each allegation of a complaint is identified and resolved with one of the following dispositions: unfounded; sustained; exonerated; not sustained; or administrative closure. Our sample of 15 cases contained 47 allegations that received dispositions as follows: eight exonerated; 19 unfounded; three not sustained; five sustained; and 12 administratively closed. Among these 12 administrative closures, there were two informal complaint resolutions, or ICRs. In one case, the complainant agreed to the ICR. In the other case, involving a complaint that an officer failed to collect and process evidence from a recovered stolen vehicle, the investigator reached a finding of sustained – a finding we concurred with. The Chief determined that the allegation should be handled via a "forced ICR," which is allowed by policy, and this was therefore a compliant case despite the change in finding.

We did not agree with the findings in one of the cases we reviewed. The complainant alleged that the officers on the scene of a motor vehicle accident allowed a hit-and-run suspect to leave the scene in the suspect vehicle. We believe that two of the exonerated findings were not appropriate based on the evidence available. The case also involved additional allegations with the same MOR violations in which the findings were not sustained.

**Task 5.20** requires that the IAD Commander review all "filed" cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed. A filed case is defined as an investigation that cannot be presently completed and is pending further developments that will allow completion of the investigation; filed is not a final disposition. Traditionally, as part of our review of this Task, we also reviewed cases that are tolling. OPD defines a tolled case as an administrative investigation that has been held in abeyance in accordance with one of the provisions of Government Code Section 3304. While we are no longer actively assessing this subtask, we note that filed and tolling cases are reviewed with the Chief during her weekly IAD meetings and are listed by case number on the printed meeting agendas. We receive and review these agendas regularly, and a Monitoring Team member often attends these meetings.

**Task 5.21** requires that any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken. However, with the approval of the IAD Commander or his designee, investigators are not required to interview and/or take a recorded statement in all cases. For example, interviews are not needed from a member or employee who is the subject of a complaint, or who was on the scene of the incident when additional information – beyond that already provided by the existing set of facts and/or documentation – is not necessary to reach appropriate findings and conclusions. Five of the 15 cases we reviewed were resolved via summary finding, and all were appropriately approved for such closure. In all of these cases, the availability of video and/or audio recordings was the primary reason interviews were unnecessary. Additionally, in three cases, all allegations were closed via administrative closure or informal complaint resolution, negating the need for interviews.

OPD remains not in compliance with Task 5 based on the provisions of the March 23, 2016 Court Order.

# Task 26:  Force Review Board (FRB)

## **Requirements:**

*OPD shall develop and implement a policy concerning its FRB proceedings.  The policy shall:*

1. *Set out procedures, membership and a timetable for FRB review of use of force investigations involving Level 2 incidents, as defined in Department General Order K-4, REPORTING AND INVESTIGATING THE USE OF FORCE;*

2. *Require the FRB to review all use of force investigations;*

3. *Require the FRB to make a recommendation as to whether the use of force was in policy or out of policy;*

4. *Require the FRB to forward sustained policy violations to the Discipline Officer.*

5. *Require the FRB not to review any use of force allegation until the internal investigations has been completed;*

6. *Authorize the FRB to recommend to the Chief of Police additional use of force training or changes in policies or tactics, or additional standards, investigatory policies, or training for use of force investigations;*

7. *Require the FRB to conduct an annual review of use of force cases examined, so as to identify any patterns of use of force practices that may have policy or training implications, and thereafter, issue a report to the Chief of Police;*

8. *Require that the FRB membership include, at a minimum, one member from the Training Division, one member from the Field Training Officer program, and either the Bureau of Field Operations Deputy Chief or his/her designee;*

> 9.    *Minimally, that one member of the FRB shall be replaced at least annually.*

(Negotiated Settlement Agreement V. C.)


**Relevant Policy:**

Department General Order K-4.1, *Force Review Boards,* was originally published on February 17, 2006, and revised on December 21, 2015.


**Commentary:**

OPD Force Review Boards, comprised of three command-level staff, are convened to examine the investigations conducted relative to the deployment and application of Level 2 uses of force.[3] As noted previously, OPD achieved compliance with this Task during the nineteenth reporting period (April 1-June 30, 2014); however, we continue to assess the Department's compliance with this Task due to the seriousness of a police officer's use of force.  Our review includes analyses of force reports and attendance at Force Review Boards when OPD conducts them during our site visits.

OPD conducted 19 Force Review Boards during 2017, and six thus far in 2018 – including one in August, which we observed via a Skype connection.  In this event, officers engaged with an individual who was crossing the street against the pedestrian light (contrary to the vehicle code) in the early morning hours.  The individual did not comply with officer's requests to provide identification and attempted to walk away.  As officers attempted to arrest the individual, he resisted, which resulted in the officers' application of force, including an arm bar hammerlock, a bent wrist hold, and a leg sweep.  The force resulted in injuries to the individual, including a broken arm.

The FRB conducted its inquiry and assessment regarding OPD policy and training applicable to this event.  This included questioning in-house subject matter experts on the specific training and accepted practices related to each application of force as an appropriate, authorized response to the individual's resistance.

---

[3] According to OPD, Level 2 uses of force include: "1) Any strike to the head (except for an intentional strike with an impact weapon); 2) Carotid restraint is applied that does not result in the loss of consciousness; 3) Use of impact weapons, including specialty impact munitions or any other object, to strike a subject and contact is made, regardless of injury; 4) Any unintentional firearms discharge that does not result in injury; 5) A police canine bites the clothing or the skin of a subject, or otherwise injures a subject requiring emergency medical treatment (beyond first-aid) or hospital admittance; 6) Any use of force which results in injuries to the subject requiring emergency medical treatment (beyond first-aid) or hospital admittance; (NOTE: For the purposes of this order, an evaluation by a medical professional to assess a complaint of injury is not emergency treatment) 7) Any Level 3 use of force used on or applied to a restrained subject; 7.a) A restrained subject is a person who has been fully placed in a Department authorized restraint device such as both hands handcuffed, a WRAP or Rip Hobble; 7.b) A subject with only one handcuff on is not a restrained person."

After its lengthy review of this event, the FRB found each use of force consistent with policy. Although we have found previous FRB reviews to be detailed and thorough, we did not find these proceedings to meet high investigative standards; a thorough, well-grounded *Graham* analysis relating the force applied to the severity of the offense; professional well-grounded opinions from subject matter experts; and solidly based findings.[4]  Therefore, we do not concur with the FRB's findings.

# Task 30:  Executive Force Review Board (EFRB)

**Requirements:**

1.  *An EFRB shall be convened to review the factual circumstances surrounding any Level 1 force, in-custody death, or vehicle pursuit-related death incidents.  A firearm discharge at an animal shall be reviewed by the EFRB only at the direction of the Chief of Police.  The Board shall have access to recordings and/or transcripts of interviews of all personnel on the scene, including witnesses, and shall be empowered to call any OPD personnel to provide testimony at the hearing.*

2.  *OPD shall continue the policies and practices for the conduct of EFRB, in accordance with the provisions of DGO K-4.1, FORCE REVIEW BOARDS.*

(Negotiated Settlement Agreement V. G.)

**Relevant Policy:**

Department General Order K-4.1, *Force Review Boards,* was published on February 17, 2006, and revised on December 21, 2015.

**Commentary:**

Executive Force Review Boards (EFRBs), consisting of three top command-level staff, conduct thorough, detailed reviews of all Level 1 uses of force, in-custody deaths, and vehicle pursuit-related deaths.

---

[4] In *Graham v. Connor* (1989: 1871), the U.S. Supreme Court ruled that police use of force must be "objectively reasonable"—that an officer's actions were reasonable in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation. The Court stated that while "reasonableness . . . is not capable of precise definition or mechanical application," a number of factors require careful consideration before an officer can use force against a citizen, including: whether the suspect poses an immediate threat to the officer of others; the severity of the crime; whether the suspect is actively resisting arrest; and whether the suspect is a flight risk or attempting to escape custody.

As noted previously, OPD achieved compliance with this Task during the nineteenth reporting period (April 1-June 30, 2014); we continue to review and report on the compliance status of this Task due to the serious nature of officers' Level 1 uses of force.

During our August site visit, OPD conducted an EFRB for an in-custody death.  In this case, an officer responded to reports of an individual who had been involved in a vehicle collision and was then engaging in erratic behavior.  To bring the chaotic event under control and subdue the individual, the officer elected to deploy the assigned Electronic Control Weapon (ECW).  Another officer shortly thereafter opined that the individual was exhibiting symptoms of excited delirium, suggesting the need for medical attention.  The officers placed the individual on the ground until medical assistance arrived and placed him into an ambulance.  While en route to the medical facility, the individual went into cardiac arrest; the ambulance pulled over and stopped.  An officer who was following in a police vehicle entered the ambulance and performed CPR, which was unsuccessful.  The individual's death was subsequently ruled to be the result of excited delirium.

The EFRB conducted an intensive, detailed review of the event – commencing with the vehicle crash; the individual's subsequent conduct; and officers' responses, including the ECW deployment.  The EFRB also queried several subject matter experts regarding several policy and training requirements, including those relating to ECW, also known as a Taser, and excited delirium.  The board concluded and found that the officer's tactics and the related force were inconsistent with OPD policy.  We concur.  However, we note that the basis for the board's finding was based strictly on policy requirements related to the ECW deployment, but unrelated to the death of the involved individual, which was determined to be the result of excited delirium.

OPD remains in compliance with this Task.

# Task 34:  Vehicle Stops, Field Investigation, and Detentions

**Requirements:**

1. *OPD shall require members to complete a basic report on every vehicle stop, field investigation and every detention.  This report shall include, at a minimum:*

   a. *Time, date and location;*

   b. *Identification of the initiating member or employee commencing after the first year of data collection;*

   c. *Reason for stop;*

   d. *Apparent race or ethnicity, and gender of individual(s) stopped;*

   e. *Outcome of stop (arrest, no arrest);*

   f. *Whether a search was conducted, and outcome of search;*

   g. *Offense categories (felony, misdemeanor or infraction).*

2.  *This data shall be entered into a database that can be summarized, searched, queried and reported by personnel authorized by OPD.*

3.  *The development of this policy shall not pre-empt any other pending or future policies and or policy development, including but not limited to "Promoting Cooperative Strategies to Prevent Racial Profiling."*

(Negotiated Settlement Agreement VI. B.)


**Relevant Policy:**

Department policies relevant to Task 34 include:  General Order M-19, *Prohibitions Regarding Racial Profiling and Other Bias-Based Policing;* Report Writing Manual (RWM) Inserts R-2, N-1, and N-2; Special Order 9042, *New Procedures Regarding Stop Data Collection* (published June 2010); and Special Order 9101, *Revised Stop Data Collection Procedures* (published November 2012).


**Commentary:**

Compliance with this Task includes: 1) the collection of stop data in a manner that will allow analysis for *data indicators of disparate treatment* among the identified population groups; 2) OPD staff analyses of the data for the presence or absence of *indicators of disparate treatment* among the population groups, and where indicated; and 3) the implementation of corrective measures – i.e., policy revisions, training, or other individualized intervention where warranted.

OPD continues to collect and store data, as described in Task 34.1 (a.-g.).  This data is sufficiently detailed, accurate, and voluminous for analysis to determine the lawful basis for stops and further to identify indicators of disparate treatment, as required. The collection process is continually assessed and strengthened; and more recently, has focused on the development of revisions to address state stop data reporting requirements outlined in what is commonly known as California Assembly Bill 953, or the California Racial and Identity Profiling Act of 2015. OPD provides regular progress briefings on its compliance with this new law for our review.

OPD compiles the stop data in a series of illustrations for analysis during monthly Risk Management Meetings, at which Area commanders review the illustrated data with the objective of identifying and addressing indicators of disparate treatment among the population groups. The presentation may contain indicators of racial bias worthy of follow-up analysis for the purpose of ascertaining whether or not it equates to disparate treatment of one or more population groups by an OPD Area, its supervisors, or individual officers.  This is the point at which OPD has been challenged to engage in further analysis and discussion regarding the specific reasons for data that may be indicative of racial disparities; however, the discussion instead generally focuses on operational elements, including strengths and shortcomings of the OPD intelligence-led policing model.  Accordingly, OPD does not fulfill the objective of identifying disparate treatment and/or initiating corrective measures when deemed necessary.

As previously reported, OPD continued to place considerable emphasis on the full implementation of an intelligence-led policing model.[5]  This initiative has resulted in a reduction of the total number of overall stops made by OPD officers; therefore, a "reduced footprint" on the community.  This is equated to adjusting or reducing the racial impact, specifically on the African American community.  However, while the data indicates a decrease in the policing footprint within the community, it does not illustrate a neutralized disparate racial impact.

Our August site visit did not allow for a regular Risk Management Meeting; however, OPD provided the data prepared for RMM for our review.  This data demonstrates a continued reduction in the number of stops in each of the three commands scheduled for review – of 51%, 51%, and 40%, respectively.

The average three-command search rate of African Americans stopped is the highest at 45%, followed closely by searches of Hispanics at 43%.  The percentage of search and search recoveries varies.  For example, in one command, African Americans are searched at the second highest rate (51%); however, the search recovery rate is 13%.  In another command, Hispanics are searched at 36%, with a search recovery rate of 13%.  Additional data includes African American and Hispanic search recovery rates at 22% and 29%, respectively, which is above the average of 19% and considered a positive development.  Nevertheless, the variances in searches, all of which must be predicated on lawful basis, require analysis to determine the basis for wide variances among the population groups.

Squad data includes one instance where 71% of all searches are intelligence-led, and the resulting search recovery rate is 12%; another squad has a search recovery rate of 4%.  Variances among the population groups, which are essential data points for assessing data disparities, are not included.

This data raises issues from both an operational standpoint, and from the standpoint of ensuring that the high search rates and low recovery rates are not bias-based or representative of disparate treatment by OPD officers.  Despite continued interaction with OPD regarding these concerns, we are not assured that such a process is in place.  We continue to encourage that OPD conduct a more detailed review of stop data for indicators of disparate treatment among the population groups; and to determine to the extent possible whether data disparities – i.e., a comparatively high search rate and accompanying low recovery – are the result of disparate treatment by officers or other factors external to a squad or officers' control.

---

[5] OPD defines intelligence-led stops as follows: "officers possess knowledge, which can be linked to an articulable source, leading to the initiation of a stop.  The Intelligence-Led factor (source) may be very specific, such as a named person, or information about a recent crime trend or pattern tied to a specific location or area.  An officer's knowledge and intent at the time the stop is initiated is important in determining whether the stop in Intelligence-Led of an enforcement stop."

Fifty-Sixth Report of the Independent Monitor for the Oakland Police Department
September 13, 2018
Page 15 of 21

In context with the above, we again acknowledge the efforts of OPD to reduce "the risk of negative disparate impact on the community" through the initiation of an intelligence-led, precision-based policing model.  However, we again encourage OPD to conduct a robust assessment of the various stop data components to identify and appropriately respond to indicators of disparate treatment within the reduced database.  This will require the implementation of a consistent intervention strategy to address identified data disparities, abnormalities, and/or possible bias at the Area, squad, and individual officer levels.  Generalized reviews of the data with findings that the stops were "consistent with expectations or policy" provide insufficient explanation of causation within a squad or by an individual officer.

OPD has provided assurances that these concerns will be addressed; we continue to be available and responsive to OPD in support of these objectives.

OPD continues its relationship with Stanford University and the decision to include the implementation of the 50 recommendations made by Dr. Jennifer Eberhardt and her Stanford University team in the 2016 study.  As of our August site visit, OPD has fully implemented 37 of the 50 Stanford recommendations; the remaining 13 are in progress, 10 of which are the responsibility of OPD or the City.  Stanford has assumed responsibility for three.

While OPD continues to advance its efforts to comply with requirements of this Task, we have previously reported that the below-described specific issues remain incomplete.  Accordingly, we provide the following assessment, and will continue to monitor OPD's progress on these issues until the Department achieves full compliance.

Further, we will look for a clear and unambiguous commitment to the provisions of this Task to ensure that the protocols that have been undertaken will be institutionalized and remain an integral, sustainable practice:

- Implementation of general and specific intervention strategies to address data indicators of abnormalities and/or possible bias at the Area, squad, and individual officer levels;

- Implementation of processes to provide for a more expeditious compilation of stop data prior to, during, and following Risk Management Meetings.  The City anticipates that this will be achieved by the summer of 2019 with the operational implementation of PRIME 2.0.

- Implementation of the applicable 50 recommendations contained in the 2016 Stanford University report.  This requirement has been incorporated as an objective by OPD.  We will continue to report on the progress of OPD's implementation.

# Task 41:  Use of Personnel Assessment System (PAS) and Risk Management

**Requirements:**

*Within 375 days from the effective date of this Agreement, OPD shall develop a policy for use of the system, including supervision and audit of the performance of specific members, employees, supervisors, managers, and OPD units, as well as OPD as a whole.*

*The policy shall include the following elements:*

1. *The Chief of Police shall designate a PAS Administration Unit.  The PAS Administration Unit shall be responsible for administering the PAS policy and, no less frequently than quarterly, shall notify, in writing, the appropriate Deputy Chief/Director and the responsible commander/manager of an identified member/employee who meets the PAS criteria.  PAS is to be electronically maintained by the City Information Technology Department.*

2. *The Department shall retain all PAS data for at least five (5) years.*

3. *The Monitor, Inspector General and Compliance Coordinator shall have full access to PAS to the extent necessary for the performance of their duties under this Agreement and consistent with Section XIII, paragraph K, and Section XIV of this Agreement.*

4. *PAS, the PAS data, and reports are confidential and not public information.*

5. *On a quarterly basis, commanders/managers shall review and analyze all relevant PAS information concerning personnel under their command, to detect any pattern or series of incidents which may indicate that a member/employee, supervisor, or group of members/employees under his/her supervision may be engaging in at-risk behavior.  The policy shall define specific criteria for determining when a member/employee or group of members/employees may be engaging in at-risk behavior.*

6. *Notwithstanding any other provisions of the PAS policy to be developed, the Department shall develop policy defining peer group comparison and methodology in consultation with Plaintiffs' Counsel and the IMT.  The policy shall include, at a minimum, a requirement that any member/employee who is identified using a peer group comparison methodology for complaints received during a 30-month period, or any member who is identified using a peer group comparison methodology for Penal Code §§69, 148 and 243(b)(c) arrests within a 30-month period, shall be identified as a subject for PAS intervention review. For the purposes of these two criteria, a single incident shall be counted as "one" even if there are multiple complaints arising from the incident or combined with an arrest for Penal Code §§69, 148 or 243(b)(c).*

7.     *When review and analysis of the PAS threshold report data indicate that a member/employee may be engaging in at-risk behavior, the member/employee's immediate supervisor shall conduct a more intensive review of the member/employee's performance and personnel history and prepare a PAS Activity Review and Report. Members/employees recommended for intervention shall be required to attend a documented, non-disciplinary PAS intervention meeting with their designated commander/manager and supervisor. The purpose of this meeting shall be to review the member/employee's performance and discuss the issues and recommended intervention strategies. The member/employee shall be dismissed from the meeting, and the designated commander/manager and the member/employee's immediate supervisor shall remain and discuss the situation and the member/employee's response. The primary responsibility for any intervention strategies shall be placed upon the supervisor. Intervention strategies may include additional training, reassignment, additional supervision, coaching or personal counseling. The performance of members/ employees subject to PAS review shall be monitored by their designated commander/manager for the specified period of time following the initial meeting, unless released early or extended (as outlined in Section VII, paragraph B (8)).*

8.     *Members/employees who meet the PAS threshold specified in Section VII, paragraph B (6) shall be subject to one of the following options: no action, supervisory monitoring, or PAS intervention. Each of these options shall be approved by the chain-of-command, up to the Deputy Chief/Director and/or the PAS Activity Review Panel.*

    *Members/employees recommended for supervisory monitoring shall be monitored for a minimum of three (3) months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor. The first at the end of one (1) month and the second at the end of three (3) months.*

    *Members/employees recommended for PAS intervention shall be monitored for a minimum of 12 months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor and designated commander/manager: The first at three (3) months and the second at one (1) year. Member/employees subject to PAS intervention for minor, easily correctable performance deficiencies may be dismissed from the jurisdiction of PAS upon the written approval of the member/employee's responsible Deputy Chief, following a recommendation in writing from the member/employee's immediate supervisor. This may occur at the three (3)-month follow-up meeting or at any time thereafter, as justified by reviews of the member/employee's performance. When a member/employee is not discharged from PAS jurisdiction at the one (1)-year follow-up meeting, PAS jurisdiction shall be extended, in writing, for a specific period in three (3)-month increments at the discretion of the member/employee's responsible Deputy Chief. When PAS jurisdiction is extended beyond the minimum one (1)-year review period, additional review meetings*

involving the member/employee, the member/ employee's designated commander/manager and immediate supervisor, shall take place no less frequently than every three (3) months.

9. On a quarterly basis, Division/appropriate Area Commanders and managers shall review and analyze relevant data in PAS about subordinate commanders and/or managers and supervisors regarding their ability to adhere to policy and address at-risk behavior. All Division/appropriate Area Commanders and managers shall conduct quarterly meetings with their supervisory staff for the purpose of assessing and sharing information about the state of the unit and identifying potential or actual performance problems within the unit. These meetings shall be scheduled to follow-up on supervisors' assessments of their subordinates' for PAS intervention. These meetings shall consider all relevant PAS data, potential patterns of at-risk behavior, and recommended intervention strategies since the last meeting. Also considered shall be patterns involving use of force, sick leave, line-of-duty injuries, narcotics-related possessory offenses, and vehicle collisions that are out of the norm among either personnel in the unit or among the unit's subunits. Division/appropriate Area Commanders and managers shall ensure that minutes of the meetings are taken and retained for a period of five (5) years. Commanders/managers shall take appropriate action on identified patterns of at-risk behavior and/or misconduct.

10. Division/appropriate Area Commanders and managers shall meet at least annually with his/her Deputy Chief/Director and the IAD Commander to discuss the state of their commands and any exceptional performance, potential or actual performance problems or other potential patterns of at-risk behavior within the unit. Division/appropriate Area Commanders and managers shall be responsible for developing and documenting plans to ensure the managerial and supervisory accountability of their units, and for addressing any real or potential problems that may be apparent.

11. PAS information shall be taken into account for a commendation or award recommendation; promotion, transfer, and special assignment, and in connection with annual performance appraisals. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.

12. Intervention strategies implemented as a result of a PAS Activity Review and Report shall be documented in a timely manner.

13. Relevant and appropriate PAS information shall be taken into account in connection with determinations of appropriate discipline for sustained misconduct allegations. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.

14.     *The member/employee's designated commander/manager shall schedule a PAS Activity Review meeting to be held no later than 20 days following notification to the Deputy Chief/Director that the member/employee has met a PAS threshold and when intervention is recommended.*

15.     *The PAS policy to be developed shall include a provision that a member/employee making unsatisfactory progress during PAS intervention may be transferred and/or loaned to another supervisor, another assignment or another Division, at the discretion of the Bureau Chief/Director if the transfer is within his/her Bureau.  Inter-Bureau transfers shall be approved by the Chief of Police.  If a member/employee is transferred because of unsatisfactory progress, that transfer shall be to a position with little or no public contact when there is a nexus between the at-risk behavior and the "no public contact" restriction.  Sustained complaints from incidents subsequent to a member/employee's referral to PAS shall continue to result in corrective measures; however, such corrective measures shall not necessarily result in a member/employee's exclusion from, or continued inclusion in, PAS.  The member/employee's exclusion or continued inclusion in PAS shall be at the discretion of the Chief of Police or his/her designee and shall be documented.*

16.     *In parallel with the PAS program described above, the Department may wish to continue the Early Intervention Review Panel.*

17.     *On a semi-annual basis, beginning within 90 days from the effective date of this Agreement, the Chief of Police, the PAS Activity Review Panel, PAS Oversight Committee, and the IAD Commander shall meet with the Monitor to review the operation and progress of the PAS.  At these meetings, OPD administrators shall summarize, for the Monitor, the number of members/employees who have been identified for review, pursuant to the PAS policy, and the number of members/employees who have been identified for PAS intervention.  The Department administrators shall also provide data summarizing the various intervention strategies that have been utilized as a result of all PAS Activity Review and Reports.  The major objectives of each of these semi-annual meetings shall be consideration of whether the PAS policy is adequate with regard to detecting patterns of misconduct or poor performance issues as expeditiously as possible and if PAS reviews are achieving their goals.*

18.     *Nothing in this Agreement, and more specifically, no provision of PAS, shall be construed as waiving, abrogating or in any way modifying the Department's rights with regard to discipline of its members/employees.  The Department may choose, at its discretion, to initiate the administrative discipline process, to initiate PAS review or to use both processes concurrently or consecutively.*

(Negotiated Settlement Agreement VII. B.)

**Relevant Policy:**

OPD revised and issued Departmental General Order D-17, *Personnel Assessment Program,* in November 2013.  Since our last report, the Department has begun to address General Order D-17 as part of Department's ongoing policy review and revision program.  The revised version of the relevant policy is currently under review.


**Commentary:**

The primary issues around Task 41 continue to be the development of PRIME 2.0, with work by the City's vendor Sierra-Cedar and related internal Oakland work and other external contracts.  OPD and the City expect that the overall project will be completed in July 2019, and all reports indicate that the PRIME 2.0 rebuild is on course.

Sierra-Cedar continues to report progress on the general redesign of the system, and notes that the baseline programs it has developed in work with other sites form a useful foundation for its work in Oakland.  The company also continues with an extensive calendar of meetings with OPD PRIME users and working group members to ensure that the baseline software is tailored to local needs.

Along with the basic rebuild, there are additions to the risk management database that are being developed by City Information Technology Department (ITD) working in conjunction with OPD.  First among them is the incorporation of the Human Resources Management System (HRMS), which will replace the Department's archaic Personnel Database.  At the time of our August site visit, this was undergoing "user acceptance testing."  Assuming success, OPD expects full deployment of the HR module within the month.

Second, progress on the integration of training information with the risk management data is also reported, although this is not as far along as the integration of human resource data.  The inclusion of training information requires migration of data on an Academy module, and with in-service training and includes links to the State training data.  City ITD has reported that basic work expectations have been set, a Statement of Work has been written, and significant work is expected to begin in September.

Third, the category of risk management related data enhancement combines what are being called "Risk Management- Stop-Data Analytics" and the creation of "dashboards" for supervisors and command staff as part of the PRIME 2.0 project.  For this work, the City is examining working with an external vendor with expertise in the area.  For that project, a nine-page Statement of Work has been drafted that draws heavily on the work of the Stanford University group (see Task 34) in its delineation of tables and charts currently used in the stop-data analysis and the other components of the monthly Risk Management Meetings.  However, this draft Statement of Work does not refer to the NSA data requirements that are included in Task 40, and which form the basis for analysis and intervention as spelled out in Task 41.  More specifically, the critical risk management issues of use of force and complaints are not explicitly mentioned.

The limited focus and the emphasis on external consultants for both the technical computing issues and, perhaps more importantly, the analysis and presentation of data, raises concerns over the development of the internal capacity of the Department.  The NSA makes the Department responsible for managing risk; and, therefore, presumes the development of a strong and lasting capacity for that function.

## Conclusion

Managing risk in the manner required under the NSA – and, sustaining that effort beyond the NSA – will require increasing the capacity of the Department to perform that function and to integrate data into its daily management operations.  An external expert approach may serve the Department well in the short term – though if not accompanied by developing internal expertise, that may be harmful in the long run.

One proposed partial solution to this dilemma has been the hiring of a "data scientist" to support the collection, retention, and analysis of data.  City officials informed us during our August site visit that after much discussion, this is now moving forward.  The Department has developed a job description for what was presumed to be a high-level position, which would necessitate substantial experience and education.  However, the City has set minimal conditions to require a bachelor's degree and experience.  This does not seem to be consistent with ongoing conversations about this position, and we will revisit this issue during our next site visit.

In addition, we will continue to monitor the Department's documentation of its uses of force; and will also assess the findings of the inquiry that the Office of Inspector General has undertaken.

For the last several months, the Parties have been discussing a study to address the Plaintiffs' concerns regarding inequities in the application of discipline.  As this matter has been looming over this project for such a protracted period, we encourage the Parties to work diligently to reach a mutually satisfactory agreement on this issue.

Chief (Ret.) Robert S. Warshaw
*Monitor*