November 2, 2018

# Fifty-Seventh Report
## *of the* Independent Monitor
## *for the* Oakland Police Department

## Introduction

This is our fifty-seventh status report on the Negotiated Settlement Agreement (NSA) in the case of *Delphine Allen, et al., vs. City of Oakland, et al.,* in the United States District Court for the Northern District of California under the direction of Judge William H. Orrick. I was appointed in 2010 to oversee the monitoring process of the Oakland Police Department (OPD) that began in 2003.

This report covers our site visit of September 27-28, 2018; and describes our recent assessments of NSA Tasks 34, 41, and 45. As we have noted previously, following the Court's Order of May 21, 2015, in our monthly reports, we devote special attention to the most problematic component parts of the Tasks that are not yet in full or sustained compliance, and discuss the most current information regarding the Department's progress with the NSA and its efforts at making the reforms sustainable.

## *Increasing Technical Assistance*

Each month, our Team conducts a visit to Oakland that includes both compliance assessments and technical assistance. During our visits, we meet with Department and City officials; observe Department meetings and technical demonstrations; review Departmental policies; conduct interviews and make observations in the field; and analyze OPD documents and files, including misconduct investigations, use of force reports, crime and arrest reports, Stop Data Forms, and other documentation. We also provide technical assistance in additional areas, especially those that relate to the remaining non-compliant Tasks or areas identified by the Department.

Within the last several months, we have provided technical assistance to OPD officials in the areas of IAD investigation quality (Task 5); stop data and related issues (Task 34); risk management and the ongoing maintenance issues and development of the Performance Reporting Information Metrics Environment (PRIME) systems (Task 41); and several Department policies and procedures, including policies related to PRIME, officer discipline, probationers and parolees, handcuffing, and the use of electronic control weapons.

## *Building Internal Capacity at OPD*

Also per the May 21, 2015 Court Order, we continue to work closely with the Office of Inspector General's (OIG) lieutenant and staff to identify areas that it should audit or review – and to help design approaches to these audits that are not cumbersome, so as to ensure sustainability. We review OIG's quarterly progress reports, which are a valuable resource and assist us in assessing compliance with NSA requirements.

OIG published its most recent progress report (covering the first two quarters of 2018) in early October. We will discuss this further in our next monthly status report.

## Notes on Monitoring Team's Focused Review of Recent Decline in Uses of Force

Our inquiry to validate the significant drop in officers' use of force, described in our last quarterly status report, is ongoing. As we noted, use of force data dropped by 75% during the period 2012-2017; as of October 6, 2018, reported force data indicates an additional decrease of 23%. The latest data indicates the principal decrease continues to be in the Level 4 category of force, which has decreased by 24%.[1]

While a reduction in force, no matter the assigned category, is positive, the magnitude of this reported reduction warranted validation. Our review of arrest data for 2016-18 negated the premise that the decrease in force may be attributed to a decrease in arrests. In fact, the number of arrests remained stable or even slightly increased during the period under review.

Our analysis included separate reviews of 2018 first and second quarter arrest data. We selected arrest reports for offenses including assault on an officer, disorderly conduct, and obstructing or resisting arrest that did not have an accompanying use of force report for review, based on the increased probability that these arrests may involve a use of force. We received and reviewed over 100 such reports; and requested accompanying video recordings for 40 arrests that appeared or were likely to have involved a use of force, based on the circumstances described in these reports.

---

[1] OPD Level 4 uses of force include: "1) The intentional pointing of a firearm at a person. 2) A Weaponless Defense Technique is applied to a Vulnerable Area, excluding strikes (e.g., Hair grab, pressure to mastoid or jaw line; and shoulder muscle grab); 3) An on-duty firearm discharge to dispatch an injured animal; or 4) A weaponless Defense Technique Control Hold is applied: a. Escort (elbow); b. Twist lock: c. Arm-bar; or d. Bent-wrist. 5) A canine deployment in which a suspect is located by the canine, but no bite occurs."

Our review of the video recordings found no instances where the force used was unwarranted or inconsistent with policy; in fact, there were several instances where officers exhibited considerable patience and understanding, even though sometimes the subject of significant verbal abuse.  However, in 11 cases (25%), unreported use of force was apparent; and in seven cases, it is unclear whether force was used and/or there is no actual video of the arrest.  This is troubling – and also troubling is the inclusion of officers' boilerplate language that "no force was used or witnessed," which is routinely included in most arrest reports.

It is also worth noting that a significant number of cases we examined did not include videos that showed the actual arrest.  It was, therefore, impossible to determine whether a use of force report should have been written.  These cases also raise questions about whether they are consistent with Departmental policy regarding the use of body-worn cameras.

It is not clear whether these deficiencies resulted from supervisory direction or lack thereof, a misinterpretation of OPD policy due to a lack of clarity or other reasons.  However, OPD must work to determine the reasons, and follow up expeditiously with corrective measures.

OIG continues to provide support for this review and is also conducting its own internal assessment of force reporting.  Our review is continuing.

## *Focused Task Assessments*

## Task 26: Force Review Board (FRB)

**Requirements:**

*OPD shall develop and implement a policy concerning its FRB proceedings. The policy shall:*

1. *Set out procedures, membership and a timetable for FRB review of use of force investigations involving Level 2 incidents, as defined in Department General Order K-4, REPORTING AND INVESTIGATING THE USE OF FORCE;*

2. *Require the FRB to review all use of force investigations;*

3. *Require the FRB to make a recommendation as to whether the use of force was in policy or out of policy;*

4. *Require the FRB to forward sustained policy violations to the Discipline Officer.*

5. *Require the FRB not to review any use of force allegation until the internal investigations has been completed;*

6. *Authorize the FRB to recommend to the Chief of Police additional use of force training or changes in policies or tactics, or additional standards, investigatory policies, or training for use of force investigations;*

7. *Require the FRB to conduct an annual review of use of force cases examined, so as to identify any patterns of use of force practices that may have policy or training implications, and thereafter, issue a report to the Chief of Police;*

8. *Require that the FRB membership include, at a minimum, one member from the Training Division, one member from the Field Training Officer program, and either the Bureau of Field Operations Deputy Chief or his/her designee;*

9. *Minimally, that one member of the FRB shall be replaced at least annually.*

(Negotiated Settlement Agreement V. C.)

**Relevant Policy:**

Department General Order K-4.1, *Force Review Boards,* was originally published on February 17, 2006, and revised on December 21, 2015.

**Commentary:**

OPD Force Review Boards are regularly convened to examine the investigations conducted relative to the deployment and application of Level 2 uses of force.[2]  OPD achieved compliance with this Task during the nineteenth reporting period (April 1-June 30, 2014); however, we continue to assess the compliance with this Task due to both the seriousness of officers' use of force and its impact on the community.  Our review includes analyses of force reports and attendance at Force Review Boards when OPD conducts them during our site visits.

OPD conducted 19 Force Review Boards during 2017, and six thus far in 2018. With the exception of the board conducted in August, we have consistently found board reviews to be detailed and thorough, and therefore have concurred with board findings.  However, as previously reported, we noted the August board proceedings fell short of meeting the expected high investigative standards and a well-grounded *Graham* analysis by subject matter experts of the force reportedly employed.  Accordingly, we did not concur with the findings.[3]

The board review has been forwarded to and is being reviewed by the Chief for final disposition.

---

[2] According to OPD, Level 2 uses of force include: "1) Any strike to the head (except for an intentional strike with an impact weapon); 2) Carotid restraint is applied that does not result in the loss of consciousness; 3) Use of impact weapons, including specialty impact munitions or any other object, to strike a subject and contact is made, regardless of injury; 4) Any unintentional firearms discharge that does not result in injury; 5) A police canine bites the clothing or the skin of a subject, or otherwise injures a subject requiring emergency medical treatment (beyond first-aid) or hospital admittance; 6) Any use of force which results in injuries to the subject requiring emergency medical treatment (beyond first-aid) or hospital admittance; (NOTE: For the purposes of this order, an evaluation by a medical professional to assess a complaint of injury is not emergency treatment) 7) Any Level 3 use of force used on or applied to a restrained subject; 7.a) A restrained subject is a person who has been fully placed in a Department authorized restraint device such as both hands handcuffed, a WRAP or Rip Hobble; 7.b) A subject with only one handcuff on is not a restrained person."

[3] In *Graham v. Connor* (1989: 1871), the U.S. Supreme Court ruled that police use of force must be "objectively reasonable"—that an officer's actions were reasonable in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation. The Court stated that while "reasonableness . . . is not capable of precise definition or mechanical application," a number of factors require careful consideration before an officer can use force against a citizen, including: whether the suspect poses an immediate threat to the officer of others; the severity of the crime; whether the suspect is actively resisting arrest; and whether the suspect is a flight risk or attempting to escape custody.

## Task 30: Executive Force Review Board (EFRB)

**Requirements:**

1. *An EFRB shall be convened to review the factual circumstances surrounding any Level 1 force, in-custody death, or vehicle pursuit-related death incidents. A firearm discharge at an animal shall be reviewed by the EFRB only at the direction of the Chief of Police. The Board shall have access to recordings and/or transcripts of interviews of all personnel on the scene, including witnesses, and shall be empowered to call any OPD personnel to provide testimony at the hearing.*

2. *OPD shall continue the policies and practices for the conduct of EFRB, in accordance with the provisions of DGO K-4.1, FORCE REVIEW BOARDS.*

(Negotiated Settlement Agreement V. G.)

**Relevant Policy:**

Department General Order K-4.1, *Force Review Boards,* was published on February 17, 2006, and revised on December 21, 2015.

**Commentary:**

Executive Force Review Boards (EFRBs), consisting of three top command-level staff, conduct thorough, detailed reviews of all Level 1 uses of force, in-custody deaths, and vehicle pursuit-related deaths and serious injuries.

As noted previously, OPD achieved compliance with this Task during the nineteenth reporting period (April 1-June 30, 2014). We continue to review and report on the compliance status of this Task due to the serious nature of the cases reviewed by the board.

In early October, OPD conducted an EFRB for a pursuit resulting in serious injury to one of the subjects in the pursued vehicle. In this case, officers spotted a vehicle in a gas station being driven by a known juvenile and containing two passengers. The officers believed the driver and the passengers to be armed. As three officers in a marked vehicle approached the suspect vehicle, their vehicles collided and the suspect vehicle fled the scene. A chase ensued, which lasted for approximately 16 minutes and spanned more than 13 miles. Over the course of the chase, numerous OPD officers participated, and there were at least three collisions involving the suspect vehicle and uninvolved other vehicles. Shortly before the pursuit ended because of a collision that finally disabled the suspect vehicle, one of the passengers in the suspect vehicle exited the vehicle while it was still moving. He struck a stopped vehicle and suffered serious injurious which left him confined to a wheelchair and unable to speak.

The EFRB conducted an intensive, detailed review of the event. Both CID and IAD provided comprehensive presentations. Utilizing radio transmissions, PDRD, and videotaping the route of the pursuit, several representations of the path and conduct of the pursuit were produced, offering different analyses for consideration. IAD provided detailed summaries of the involved officers' statements and pointed out inconsistencies when compared to video and other available evidence. After deliberation, the board ruled the pursuit out of compliance, and agreed with IAD's sustained findings for the actions of individual officers during the pursuit. The board also sustained the sergeant and Watch Commander for failures of supervision for allowing the pursuit to continue contrary to the Department's pursuit policy.

OPD remains in compliance with this Task.

## Task 34: Vehicle Stops, Field Investigation, and Detentions

**Requirements:**

1. *OPD shall require members to complete a basic report on every vehicle stop, field investigation and every detention. This report shall include, at a minimum:*

    a. *Time, date and location;*

    b. *Identification of the initiating member or employee commencing after the first year of data collection;*

    c. *Reason for stop;*

    d. *Apparent race or ethnicity, and gender of individual(s) stopped;*

    e. *Outcome of stop (arrest, no arrest);*

    f. *Whether a search was conducted, and outcome of search;*

    g. *Offense categories (felony, misdemeanor or infraction).*

2. *This data shall be entered into a database that can be summarized, searched, queried and reported by personnel authorized by OPD.*

3. *The development of this policy shall not pre-empt any other pending or future policies and or policy development, including but not limited to "Promoting Cooperative Strategies to Prevent Racial Profiling."*

(Negotiated Settlement Agreement VI. B.)

**Relevant Policy:**

Department policies relevant to Task 34 include: General Order M-19, *Prohibitions Regarding Racial Profiling and Other Bias-Based Policing;* Report Writing Manual (RWM) Inserts R-2, N-1, and N-2; Special Order 9042, *New Procedures Regarding Stop Data Collection* (published June 2010); and Special Order 9101, *Revised Stop Data Collection Procedures* (published November 2012).

**Commentary:**

Compliance with this Task includes: 1) the collection of stop data in a manner that will allow analysis for *data indicators of disparate treatment* among the identified population groups; 2) OPD staff analyses of the data for the presence or absence of *indicators of disparate treatment* among the population groups, and where indicated; and 3) the implementation of corrective measures – i.e., policy revisions, training, or other individualized intervention where warranted.

OPD continues to collect and store data, as described in Task 34.1 (a.-g.). This data is sufficiently detailed to determine the lawful basis for stops and further to identify indicators of disparate treatment, as required. The efficacy of the collection process is continually assessed; and more recently, has focused on revisions to address state stop data reporting requirements outlined in what is commonly known as California Assembly Bill 953, or the California Racial and Identity Profiling Act of 2015. OPD provides regular progress briefings on its compliance with this new law for our review.

As we have repeatedly reported, OPD compiles the stop data in a series of illustrations for analysis during monthly Risk Management Meetings, at which Area commanders review the illustrated data with the objective of identifying and addressing indicators of disparate treatment among the population groups. However, despite repeated recommendations to do so, OPD continued to resist conducting a drill-down or in-depth analyses of squad or specific individual officer data to ascertain the basis for and/or to appropriately address such indicators when present. Rather, the discussion instead generally focuses on operational elements, including strengths and shortcomings of the OPD intelligence-led policing model, which we acknowledge are also important.[4]

The implementation of the intelligence-led policing model has been challenging for OPD. This is evidenced by continued variances in and/or misunderstanding of what constitutes an intelligence-led or intelligence-based stop. Nevertheless, OPD's implementation is credited with meeting one of its objectives: reducing the overall policing "footprint" within the community. However, while the data demonstrates a decrease in the policing footprint within the community, it does not illustrate a neutralized disparate racial impact.

---

[4] OPD defines intelligence-led stops as follows: "officers possess knowledge, which can be linked to an articulable source, leading to the initiation of a stop. The Intelligence-Led factor (source) may be very specific, such as a named person, or information about a recent crime trend or pattern tied to a specific location or area. An officer's knowledge and intent at the time the stop is initiated is important in determining whether the stop in Intelligence-Led of an enforcement stop."

Our September site visit again included an opportunity for our observation of a Citywide Risk Management Meeting (RMM).  OPD provided the data prepared for the RMM for our review in advance of the meeting.  This data demonstrates a continued reduction in the number of stops in each of five commands scheduled for review – of between 15% and 31%.

The percentage of searches decreased from between 20% and 35%, as expected, due to a more focused, consistent intelligence-led approach.[5]  However, except for one Area in which recoveries increased from 11% to 22%; and a second Area that experienced a slight decrease to 40%; the recovery rates for the remaining three Areas have decreased to between 5% and 15%.  The 40% recovery rate is commendable; however, the variance between 40% and 5% is worthy of additional analysis given the reasonable expectation the intelligence-led policing model will result in focused, legally based searches and improved, consistent search recovery results across OPD.  This has not yet occurred – i.e., African Americans stopped are searched at the highest rate, ranging from 32% to 53%, with recoveries ranging from a low of 13% in one Area to a high of 31% in another.  The average recovery rate for all searches remains at approximately 19%.

Important to the above is the absence in-depth analyses of variances in searches, search recovery rates among the areas, squads and officers in general; however, more importantly is the lack of data analysis among the population groups, which are essential data points for assessing data disparities.  Such data are not included nor analyzed.

This raises issues from both an operational standpoint, and from the standpoint of ensuring that the high search rates and low recovery rates are not bias-based or representative of disparate treatment by OPD officers.  And while we commend the efforts of OPD to reduce "the risk of negative disparate impact on the community" through the initiation of an intelligence-led, precision-based policing model, we again encourage OPD to conduct a robust assessment of the various stop data components to identify and appropriately respond to indicators of disparate treatment.  This will require the implementation of a consistent intervention strategy to address identified data disparities reflective of possible bias at the Area, squad, and individual officer levels.  The customary findings that the stops were "consistent with expectations or policy" provide insufficient explanation of causation within a squad or by an individual officer.

OPD continues its relationship with Stanford University and the decision to include the implementation of the 50 recommendations made by Dr. Jennifer Eberhardt and her Stanford University team in the 2016 study.  OPD is continuing efforts to fully implement 47 of the 50 Stanford recommendations. Stanford has assumed responsibility for three.

---

[5] Excluding Ceasefire activities, which due to the specialized nature of its activities and limited numbers are excluded from this computation.

While OPD continues its efforts to comply with requirements of this Task, we have previously reported that the below-described specific issues remain incomplete.  Accordingly, we provide the following assessment, and will continue to monitor OPD's progress on these issues until the Department achieves full compliance.

Further, we will look for a clear and unambiguous commitment to the provisions of this Task to ensure that the protocols that have been undertaken will be institutionalized and remain an integral, sustainable practice:

- Implementation of general and specific intervention strategies to address data indicators of abnormalities and/or possible bias at the Area, squad, and individual officer levels;

- Implementation of processes to provide for a more expeditious compilation of stop data prior to, during, and following Risk Management Meetings.  The City anticipates that this will be achieved by the summer of 2019 with the operational implementation of PRIME 2.0.

- Implementation of the applicable 50 recommendations contained in the 2016 Stanford University report.  This requirement has been incorporated as an objective by OPD.  We will continue to report on the progress of OPD's implementation.

# Task 41:  Use of Personnel Assessment System (PAS) and Risk Management

**Requirements:**

*Within 375 days from the effective date of this Agreement, OPD shall develop a policy for use of the system, including supervision and audit of the performance of specific members, employees, supervisors, managers, and OPD units, as well as OPD as a whole.*

*The policy shall include the following elements:*

1. *The Chief of Police shall designate a PAS Administration Unit.  The PAS Administration Unit shall be responsible for administering the PAS policy and, no less frequently than quarterly, shall notify, in writing, the appropriate Deputy Chief/Director and the responsible commander/manager of an identified member/employee who meets the PAS criteria.  PAS is to be electronically maintained by the City Information Technology Department.*

2. *The Department shall retain all PAS data for at least five (5) years.*

3. *The Monitor, Inspector General and Compliance Coordinator shall have full access to PAS to the extent necessary for the performance of their duties under this Agreement and consistent with Section XIII, paragraph K, and Section XIV of this Agreement.*

4. *PAS, the PAS data, and reports are confidential and not public information.*

5. *On a quarterly basis, commanders/managers shall review and analyze all relevant PAS information concerning personnel under their command, to detect any pattern or series of incidents which may indicate that a member/employee, supervisor, or group of members/employees under his/her supervision may be engaging in at-risk behavior. The policy shall define specific criteria for determining when a member/employee or group of members/employees may be engaging in at-risk behavior.*

6. *Notwithstanding any other provisions of the PAS policy to be developed, the Department shall develop policy defining peer group comparison and methodology in consultation with Plaintiffs' Counsel and the IMT. The policy shall include, at a minimum, a requirement that any member/employee who is identified using a peer group comparison methodology for complaints received during a 30-month period, or any member who is identified using a peer group comparison methodology for Penal Code §§69, 148 and 243(b)(c) arrests within a 30-month period, shall be identified as a subject for PAS intervention review. For the purposes of these two criteria, a single incident shall be counted as "one" even if there are multiple complaints arising from the incident or combined with an arrest for Penal Code §§69, 148 or 243(b)(c).*

7. *When review and analysis of the PAS threshold report data indicate that a member/employee may be engaging in at-risk behavior, the member/employee's immediate supervisor shall conduct a more intensive review of the member/employee's performance and personnel history and prepare a PAS Activity Review and Report. Members/employees recommended for intervention shall be required to attend a documented, non-disciplinary PAS intervention meeting with their designated commander/manager and supervisor. The purpose of this meeting shall be to review the member/employee's performance and discuss the issues and recommended intervention strategies. The member/employee shall be dismissed from the meeting, and the designated commander/manager and the member/employee's immediate supervisor shall remain and discuss the situation and the member/employee's response. The primary responsibility for any intervention strategies shall be placed upon the supervisor. Intervention strategies may include additional training, reassignment, additional supervision, coaching or personal counseling. The performance of members/ employees subject to PAS review shall be monitored by their designated commander/manager for the specified period of time following the initial meeting, unless released early or extended (as outlined in Section VII, paragraph B (8)).*

8. *Members/employees who meet the PAS threshold specified in Section VII, paragraph B (6) shall be subject to one of the following options: no action, supervisory monitoring, or PAS intervention. Each of these options shall be approved by the chain-of-command, up to the Deputy Chief/Director and/or the PAS Activity Review Panel.*

*Members/employees recommended for supervisory monitoring shall be monitored for a minimum of three (3) months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor. The first at the end of one (1) month and the second at the end of three (3) months.*

*Members/employees recommended for PAS intervention shall be monitored for a minimum of 12 months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor and designated commander/manager: The first at three (3) months and the second at one (1) year. Member/employees subject to PAS intervention for minor, easily correctable performance deficiencies may be dismissed from the jurisdiction of PAS upon the written approval of the member/employee's responsible Deputy Chief, following a recommendation in writing from the member/employee's immediate supervisor. This may occur at the three (3)-month follow-up meeting or at any time thereafter, as justified by reviews of the member/employee's performance. When a member/employee is not discharged from PAS jurisdiction at the one (1)-year follow-up meeting, PAS jurisdiction shall be extended, in writing, for a specific period in three (3)-month increments at the discretion of the member/employee's responsible Deputy Chief. When PAS jurisdiction is extended beyond the minimum one (1)-year review period, additional review meetings involving the member/employee, the member/ employee's designated commander/manager and immediate supervisor, shall take place no less frequently than every three (3) months.*

9. *On a quarterly basis, Division/appropriate Area Commanders and managers shall review and analyze relevant data in PAS about subordinate commanders and/or managers and supervisors regarding their ability to adhere to policy and address at-risk behavior. All Division/appropriate Area Commanders and managers shall conduct quarterly meetings with their supervisory staff for the purpose of assessing and sharing information about the state of the unit and identifying potential or actual performance problems within the unit. These meetings shall be scheduled to follow-up on supervisors' assessments of their subordinates' for PAS intervention. These meetings shall consider all relevant PAS data, potential patterns of at-risk behavior, and recommended intervention strategies since the last meeting. Also considered shall be patterns involving use of force, sick leave, line-of-duty injuries, narcotics-related possessory offenses, and vehicle collisions that are out of the norm among either personnel in the unit or among the unit's subunits. Division/appropriate Area Commanders and managers shall ensure that minutes of the meetings are taken and retained for a period of five (5) years. Commanders/managers shall take appropriate action on identified patterns of at-risk behavior and/or misconduct.*

10. *Division/appropriate Area Commanders and managers shall meet at least annually with his/her Deputy Chief/Director and the IAD Commander to discuss the state of their commands and any exceptional performance, potential or actual performance problems or other potential patterns of at-risk behavior within the*

   unit. Division/appropriate Area Commanders and managers shall be responsible for developing and documenting plans to ensure the managerial and supervisory accountability of their units, and for addressing any real or potential problems that may be apparent.

11. PAS information shall be taken into account for a commendation or award recommendation; promotion, transfer, and special assignment, and in connection with annual performance appraisals. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.

12. Intervention strategies implemented as a result of a PAS Activity Review and Report shall be documented in a timely manner.

13. Relevant and appropriate PAS information shall be taken into account in connection with determinations of appropriate discipline for sustained misconduct allegations. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.

14. The member/employee's designated commander/manager shall schedule a PAS Activity Review meeting to be held no later than 20 days following notification to the Deputy Chief/Director that the member/employee has met a PAS threshold and when intervention is recommended.

15. The PAS policy to be developed shall include a provision that a member/employee making unsatisfactory progress during PAS intervention may be transferred and/or loaned to another supervisor, another assignment or another Division, at the discretion of the Bureau Chief/Director if the transfer is within his/her Bureau. Inter-Bureau transfers shall be approved by the Chief of Police. If a member/employee is transferred because of unsatisfactory progress, that transfer shall be to a position with little or no public contact when there is a nexus between the at-risk behavior and the "no public contact" restriction. Sustained complaints from incidents subsequent to a member/employee's referral to PAS shall continue to result in corrective measures; however, such corrective measures shall not necessarily result in a member/employee's exclusion from, or continued inclusion in, PAS. The member/employee's exclusion or continued inclusion in PAS shall be at the discretion of the Chief of Police or his/her designee and shall be documented.

16. In parallel with the PAS program described above, the Department may wish to continue the Early Intervention Review Panel.

17. On a semi-annual basis, beginning within 90 days from the effective date of this Agreement, the Chief of Police, the PAS Activity Review Panel, PAS Oversight Committee, and the IAD Commander shall meet with the Monitor to review the operation and progress of the PAS. At these meetings, OPD administrators shall

> *summarize, for the Monitor, the number of members/employees who have been identified for review, pursuant to the PAS policy, and the number of members/employees who have been identified for PAS intervention. The Department administrators shall also provide data summarizing the various intervention strategies that have been utilized as a result of all PAS Activity Review and Reports. The major objectives of each of these semi-annual meetings shall be consideration of whether the PAS policy is adequate with regard to detecting patterns of misconduct or poor performance issues as expeditiously as possible and if PAS reviews are achieving their goals.*
> 
> 18. *Nothing in this Agreement, and more specifically, no provision of PAS, shall be construed as waiving, abrogating or in any way modifying the Department's rights with regard to discipline of its members/employees. The Department may choose, at its discretion, to initiate the administrative discipline process, to initiate PAS review or to use both processes concurrently or consecutively.*

(Negotiated Settlement Agreement VII. B.)

**Relevant Policy:**

OPD revised and issued Departmental General Order D-17, *Personnel Assessment Program,* in November 2013. Since our last report, the Department has begun to address General Order D-17 as part of Department's ongoing policy review and revision program. The revised version of the relevant policy is currently under review.

**Commentary:**

During our most recent site visit, the Department held a Risk Management Meeting that covered the entire City, lasting over four hours; and addressing risk indicators including complaints, issues of force, and pursuits, as well as a review of stop data. This was a more comprehensive discussion of risk management that we have observed in some time. Also during our visit, we reviewed with the Department and City the progress on the reconstruction of PRIME, including the additions of several categories of data and an update on the status of the PAS Administration Unit and the status of efforts to hire a "Data Scientist." We have frequently noted our concerns that the *actual* management of risk and the best use for the voluminous data collected for that purpose were being pushed aside by the concerns over the technology. These were at least temporarily assuaged by the Department's focus on the usability and on the actual use of the risk management system for its stated purpose.

There are, of course, continuing problems with the original construction of PRIME. The system is widely viewed as awkward and slow, and it requires frequent hand-checking of data. The City expects to extend its maintenance contract for that system one additional time. However, OPD and the City's Information Technology Department (ITD) reported that substantial progress on the redevelopment of PRIME with the work of the primary contractor Sierra-Cedar.

Sierra-Cedar has completed a gap analysis addressing the 15 major work streams. Sierra has also established what is known as a "sandbox" to give key users a chance to understand and test the system, and to identify problems early. OPD and City ITD continue to expect that the new system will be fully functional by July 2019. In the meantime, the existing database will continue to be used, but no revisions or enhancements to it are expected.

Sierra-Cedar is also reporting progress on the categories of data that will be added to the system. The link to the human resource database has been completed and tested. This will support the better tracking of employees, including tracking through separation from the Department for any reason. Training data, including Academy and in-service training data, are being migrated into part of the new system. Stop data are also being carried into the main risk management database.

In conjunction with the outside contractors, OPD is also taking advantage of the reconstruction of PRIME to rethink and reengineer some core risk management related processes. Under the original risk management system, the reviews to identify officer who surpass established thresholds for risk-related behavior had occurred at six-month intervals. With the new database, those reviews will reportedly be run daily.

This is not, however, only a technological change. Soon officers and supervisors, and the PAS Administration Unit, will be immediately notified when a pre-determined risk threshold is passed or when management referral for review occurs. This has also led to changes in the PAS process that will prompt immediate engagement of supervisors and the PAS Administration Unit, who will be expected to move expeditiously in responding to the risk-related issues. These revisions will also be accompanied by improved access to data through the use of data dashboards tailored to individual needs of supervisors and command staff. The vendor in this area is also working with OPD to create a collection of standard reports that will be regularly generated by the risk management system. This will support OPD in tracking the 20 data indicators detailed in Task 40, including the Department's tracking over time of such things as complaints, uses of force, and pursuits; and including norming those data by activity such as the number of arrests and officer has made.

To continue to support the ongoing risk management process, OPD is also working to address its staffing issues. The permanent position of PAS Administrator has been vacant for over 18 months due to the retirement of the employee who formerly held the position. It had been filled as a temporary assignment, but that too has turned over recently. Moving forward, OPD anticipates that a search to fill the permanent position. Given the new technology and revisions to the PAS process, this staff person will play a key role in optimizing the value of the risk management system.

The reengineering of PRIME has also led to concrete plans to add personnel to support the management database systems. ITD reports that it is moving forward with recruitment to fill two new technologist positions. These staff members will be supervised by ITD and OPD, and will be housed at the Police Department. Half their assignment will involve work on PRIME, and half will support other projects at OPD.

Finally, as our recent reports have noted, the Department appears to be moving forward with its plans to support a Data Scientist position to enhance the use of data and analysis for planning and operations.  The need for this position has grown out of the increasing desire to maximize the value of the extensive commitment the Department has made to the collection and use of information across a wide number of areas including risk management.  The Department intends to fill this job as a temporary position, which will later be converted to permanent.  Discussions of appropriate credentials and experience for the position are continuing, but Department officials are optimistic about the availability of highly qualified candidates.

## Task 45:  Consistency of Discipline Policy

**Requirements:**

*On or before October 6, 2003, OPD shall revise and update its disciplinary policy to ensure that discipline is imposed in a fair and consistent manner.*

1. *The policy shall describe the circumstances in which disciplinary action is appropriate and those in which Division-level corrective action is appropriate.*

2. *The policy shall establish a centralized system for documenting and tracking all forms of discipline and corrective action, whether imposed centrally or at the Division level.*

3. *All internal investigations which result in a sustained finding shall be submitted to the Discipline Officer for a disciplinary recommendation.  The Discipline Officer shall convene a meeting with the Deputy Chief or designee in the affected chain-of-command for a confidential discussion of the misconduct, including the mitigating and aggravating factors and the member/employee's overall performance.*

4. *The COP may direct the Discipline Officer to prepare a Discipline Recommendation without convening a Discipline Conference.*

(Negotiated Settlement Agreement X. B.)

**Relevant Policy:**

Five Departmental policies incorporate the requirements of Task 45:  Departmental General Order M-03, *Complaints Against Department Personnel and Procedures* (published December 6, 2005 and revised most recently on August 24, 2013); Training Bulletin V-T.1 and V-T.2, *Internal Investigation Procedure Manual* (published July 17, 2008); Internal Affairs Policy and Procedure Manual (published December 6, 2005); and Training Bulletin V-T, *Departmental Discipline Policy* (published March 14, 2014).  Several of these policies are currently being revised.

**Commentary:**

Task 45.2 requires that OPD maintain a centralized system for documenting and tracking all OPD forms of discipline and corrective action, whether imposed centrally or at the division level. To assess Phase 2 compliance with this subtask, we reviewed the 20 cases that contained at least one sustained finding that were approved in June and July 2018. All (100%) of these cases and findings contained all of the necessary information available on the spreadsheet generated by IAD for our review. OPD is in compliance with the requirement that it maintain an adequate system for documenting and tracking discipline and corrective action.

The NSA also requires that discipline be imposed in a manner that is fair and consistent. To this end, the Department developed a Discipline Matrix, which was adopted on September 2, 2010 and was in effect until a new Discipline Matrix was approved on March 14, 2014. This subsequent Matrix applies to violations after that date.

As noted above, we reviewed all 20 cases with sustained findings that were approved between June 1-July 31, 2018. Five cases involved the failure to accept or refer complaints, some with sustained findings for multiple officers. The last review for Task 45 also contained five cases for this MOR violation. We remain concerned with this trend, and will discuss this issue with OPD during our next site visit.

One case was sustained for improper demeanor. In other case, two officers were sustained for failure to take a report as required. One case involved the accidental discharge of a firearm, while another involved the use of an Electronic Control Weapon (ECW) that was deemed out of compliance with policy. Eleven cases involved preventable motor vehicle accidents.

In each case, unless otherwise documented in writing, the proposed discipline fell within the Discipline Matrix that was in effect at the time of the action for which the discipline was imposed.

During July and August 2018, OPD held two *Skelly* hearings for IAD cases involving employees with sustained findings in which discipline of a one-day suspension or greater was recommended. We reviewed the Skelly reports, and found that they contained adequate justification for the results documented. One case involved a sustained demeanor allegation. The proposed penalty of a one-day suspension was reduced to a written reprimand, with the concurrence of the Chief of Police. The second case involved a preventable motor vehicle accident. The proposed suspension of three days was upheld, with the concurrence of the Acting Chief.

We reviewed the training records that OPD provided, and confirmed that all *Skelly* hearing officers received the approved *Skelly* Officer Training in January 2016. Additionally, all active *Skelly* officers received refresher training on April 26, 2017. No additional training was provided during this reporting period. We continue to note that since the last refresher training was offered well over a year ago, the Department may want to consider providing another refresher, as well as initial training for any command staff promoted since the last training was offered.

OPD did not receive any arbitration decisions during July and August 2018. .

OPD remains in partial compliance with Task 45.

# Conclusion

During our September site visit, the Department held a Citywide Risk Management Meeting – which covered all five patrol Areas, as well as the Ceasefire program and Traffic Division. The meeting reviewed stop data, but added to recent meeting agendas a closer review of risk indicators – including complaints, uses of force, and pursuits. Department officials examined the raw counts of these data, but the counts were also converted to rates based on the numbers of arrests. The value of this became clear, for example, in the discussion of widely ranging complaint rates and use of force rates across officers. Area command staff reviewed these data, discussed their implications, and described plans to address differences across their officers.

The content of this meeting represented a return to detailed analysis of NSA Task 40-required risk management data, and the tracking of that data over time. Those reviews were interrupted by complications arising with the build of the original PRIME database in the spring of 2017. In the September Risk Management Meeting, command staff provided extensive information and understanding of the supervisors and officers in their sections; and the nature of the issues they address. As these meetings continue, we hope that they will give rise to numerous and significant specific plans, directives, and deliverables to address the issues uncovered in the data-based discussions. The meeting provides further opportunities for shared problem analysis, building consensus over issues of policy and practice, and for formulating and carrying specific management plans.

*[signature: Robert S. Warshaw]*

Chief (Ret.) Robert S. Warshaw

*Monitor*