BARBARA J. PARKER, City Attorney, SBN 069722
MARIA BEE, Chief Assistant City Attorney, SBN 167716
RYAN G. RICHARDSON, Special Counsel, SBN 223548
KIMBERLY A. BLISS, Supervising Deputy City Attorney, SBN 207857
JAMILAH A. JEFFERSON, Senior Deputy City Attorney, SBN 219027
One Frank H. Ogawa Plaza, 6th Floor
Oakland, California 94612
Telephone: (510) 238-7686; Facsimile: (510) 238-6500
Email: jjefferson@oaklandcityattorney.org
R20752/2599129

Attorneys for Defendant CITY OF OAKLAND

JOHN L. BURRIS, STATE BAR NO. 69888
Law Offices of John L. Burris
Airport Corporate Centre
7677Oakport Road, Ste. 1120
Oakland, California 94621
Telephone: (510) 839-5200; Facsimile: (510) 839-3882

JAMES B. CHANIN, STATE BAR NO. 76043
Law Offices of James B. Chanin
3050 Shattuck Avenue
Berkeley, California 94705
Telephone: (510) 848-4752; Facsimile: (510) 848-5819

Attorneys for PLAINTIFFS

*(Additional Counsel on Next Page)*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DELPHINE ALLEN, et al., | Case No. C 00-4599 WHO |
| Plaintiffs, | JOINT STATUS CONFERENCE STATEMENT |
| v. | |
| CITY OF OAKLAND, et al., | Date: November 27, 2018 |
| Defendants. | Time: 3:30 p.m. |
| | Courtroom 2 – 17th Floor |
| | The Honorable William H. Orrick |

1 | ROCKNE A. LUCIA, JR STATE BAR NO. 109349
Rains Lucia Stern St. Phalle & Silver, PC
2 | Attorneys & Counselors at Law
2300 Contra Costa Boulevard, Suite 500
3 | Pleasant Hill, CA 94523
Tel: 925-609-1699
4 | Fax: 925-609-1690
Attorneys for OAKLAND POLICE OFFICERS ASSOCIATION
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# I.   PLAINTIFFS' CURRENT POSITION

While the Oakland Police Department has made progress towards compliance with the Negotiated Settlement Agreement, several new problems have arisen which call into question whether the OPD has really moved as far as appeared to be the case earlier this year.  Use of Force statistics have been erratic to the point that years of statistics may be compromised. Pursuits and Complaints continue to rise with serious consequences.  Problems have been discovered with the hiring process which may explain the quality of a number of the new recruits.  The terms of the comparative discipline study, which has been extensively discussed, appears to be nearing agreement, but the study itself has not yet been started and this important issue involving Consistency of Discipline remains unresolved.  Moreover, there are continued problems identifying outlier officers and squads engaged in possible biased policing.  Specifically, the IMT has observed that, "despite repeated recommendations to do so, OPD continued to resist conducting a drill-down or in-depth analyses of squad or specific individual officer data to ascertain the basis for and/or to appropriately address such indicators when present."[1]  In addition, the last recruit class contained no women and there are issues involving the recruitment of women which must be resolved in a successful effort to recruit more women into the OPD.

Plaintiffs' attorneys would be very happy if the OPD attained compliance.  However, as residents of Oakland, we cannot agree to compliance just because this case had gone on for so long. We do not demand perfection, but we do insist that the OPD operate in a constitutional manner where its command staff can reasonably quickly identify problems based on reliable data and then have the ability and the integrity to act on those problems and resolve them in a manner that is consistent with officer safety, and that benefits the people of Oakland.  The failure to train OPD officers on standards that produce reliable reporting on the Use of Force, the rise in both pursuits and complaints, the failure to identify problem officers and deal with their conduct, and the issues

---

[1] 57th IMT Report, p. 8

1  referenced here on hiring new officers are not consistent with attaining compliance.  The OPD must

2  get back on track in order to achieve compliance in the near future.

3  ### A. CONSISTENCY OF DISCIPLINE STUDY

4        Since the last Case Management Conference, the parties have been negotiating on the terms

5  of a comprehensive study to determine if there is racial and/or gender bias applied in the Oakland

6  Police Department administrative discipline process.

7        The parties appear to have reached agreement that the study shall include all members

8  subject to the Manual of Rules and all recruits in the OPD Academy for the designated period

9  which is five years,  The subject matter should include at a minimum (a) a review of existing

10  Department policies, procedures and practices regarding misconduct investigations and discipline,

11  and (b) a review of the Department's historical data on misconduct investigations and discipline to

12  see if the data shows patterns of disparity in the treatment of minority officers and/or in relation to

13  gender.  The five year administrative discipline data will include 1) internally and externally

14  generated complaints; 2) the alleged policy violation(s); 3) text of policies (including effective dates

15  for policies that have changed during this period); 4) the race and gender of the complainant (and

16  rank if the complaint is internally generated); 5) the race and gender and rank of the accused

17  employee; 6) the race and gender and rank of OPD employees reviewing or making decisions on

18  the allegation from initiation to conclusion; and 7) the complaint finding including any discipline or

19  corrective action imposed.

20        The consultant who will do this study has not been selected, nor has a fee for their services

21  been specified and agreed to by the City of Oakland and the person performing this study.

22  Plaintiffs' attorneys urge that this job announcement be drawn up that is agreeable to the parties and

23  that a person be chosen who is acceptable to the parties and that this process be completed as soon

24  as possible given the need to choose the right person for this job.

25  / / /

26

## B. USE OF FORCE STATISTICS

For several years, the City of Oakland has touted decreasing use of force levels by members of the Oakland Police Department as a prime example of the cultural change that has come to the OPD.   The IMT, in its most recent quarterly report, noted that use of force data dropped 75% from 2012-2017 and that, as of October 6, 2018, reported force data indicates an additional decrease of 23%.  As recently as the September 9 to September 22, 2018 bi-weekly reporting period, OPD disclosed a total of 14 Use of Force incidents, including five that involved the pointing of a firearm. These numbers were generally consistent with Use of Force numbers in previous reporting periods.

However, during the very next biweekly reporting period, the total number of Use of Force incidents jumped to 56, including 40 related to the pointing of a firearm.  The most recent biweekly reporting period, October 7-20, 2018, saw a further spike upward: 85 total Use of Force incidents, including 66 related to the Pointing of a Firearm.  The OPD Office of Inspector General attributes these significant increases to a command level decision to direct additional lineup training on pointing of a firearm.

Plaintiffs' are troubled by the large discrepancy between the most recent figures and previous use of force numbers, and OPD must explain exactly what caused this significant increase. If the most recent data is, in fact, accurate, we can surmise that the Oakland Police Department has, for years, been reporting Use of Force levels at a fraction of the actual number.  This, in turn, suggests that all prior published data about Use of Force incidents, are wholly useless as data points.  These developments may also indicate a very serious training problem.

Pursuant to recent conversations between Plaintiffs' and members of the Oakland Police Department, Plaintiffs understand that the crux of the numerical discrepancy is at least in part related to confusion about the how "low ready"/retention positions must be reported.  OPD Department General Order K-4 re: Reporting and Investigating the Use of Force states that "the intentional pointing of a firearm at a person constitutes a Level 4 Use of Force, while the low

1  ready/retention position does not constitute a Use of Force." (p. 6) The Low Ready/Retention

2  Position is subsequently defined as a position "where the firearm is pointed at a 45-degree angle or

3  less and **not at a person**... [while] the use of low ready/retention position is not a reportable use of

4  force, members should document their use of the position in the appropriate report." (p. 24) Note

5  that the bolded emphasis in the above definition is taken directly from General Order K-4.

6    The fact that a low ready/retention position may constitute a Use of Force is not explained

7  until page 24 of General Order K-4 and even there, the language is confusing.  However, on page 6,

8  the low/ready position is essentially defined as not a Use of Force.  This discrepancy and the

9  manner in which Level 4 Use of Force is organized in General Order K-4 may well explain the

10  confusion among supervisors and officers as to what constitutes a Use of Force.  It may also

11  partially explain the dramatic rise in Level 4 Uses of Force, as discussed above.  In any event,

12  Plaintiffs' recommend an immediate revision of the General Order K-4 to discuss when the

13  pointing of a firearm may constitute a Use of Force under the Level 4 section of the policy now on

14  page 6.

15    The Department's Use of Force Reporting manual denotes, explicitly, that a low

16  ready/retention position involves only situations where a firearm is not pointed at a person.

17  Conversely, anytime a firearm is pointed at a subject, it must be reported as a Level 4 Use of Force.

18  Given the enormous disparity in Level 4 Use of Force reporting before and after the September 9-

19  22, 2018 biweekly reporting period, it appears that Officers were systematically under-reporting

20  incidents involving the intentional pointing of a firearm and/or incidents where a firearm was

21  pointed at a 45-degree angle or less but ALSO at a person.  This has been somewhat corroborated

22  by both the IMT and the OIG in their review of Body Worn Camera footage.

23    The fact that Use of Force incidents were, apparently, systematically underreported for

24  years, in a manner incongruent with the Department's own written policies, suggests that there are

25  serious training issues that the Department must address.  In addition, the dramatic rise in the

26

1   pointing of a firearm at Oakland residents must be investigated to determine if the conduct itself is

2   necessary and/or appropriate.

3        Plaintiffs look forward to working with the IMT and the OIG to ensure that Use of Forces

4   statistics are reported accurately and in accordance with General Order K-4. Plaintiffs also wish to

5   ascertain if in fact there are other reasons for the widespread underreporting of Level 4 Uses of

6   Force.  A comprehensive investigation must be undertaken, the causes of this problem must be

7   identified, and this problem must never be allowed to repeat itself.

8        Plaintiffs' concerns are augmented by the recent 57th IMT Report and subsequent follow-up

9   correspondence by the IMT.  The 57th IMT report suggests there are other recent Uses of Force that

10  are not reported besides the pointing of a firearm at a person.  It also disclosed a number of cases

11  where "it is unclear whether force was used and/or **there is no actual video of the arrest**" (page 2,

12  57th Report, emphasis added).  On November 14, 2018, the IMT provided follow-up information

13  regarding the 57th IMT Report to Plaintiffs' attorneys, the Chief of Police, and the City of Oakland

14  which indicated that they reviewed over one hundred (100) police reports. It is plaintiffs' attorneys'

15  understanding that the IMT subsequently requested body camera footage for 38 selected videos

16  containing possible charges (such as assault on an officer, obstructing, resisting arrest, etc.) that had

17  no accompanying use of force report.  After reviewing the videos, the IMT determined that in 14

18  cases that were reviewed, officers used force without completing a use of force report.  Six of those

19  incidents involved the use/pointing of a service weapon, and eight others contained force other than

20  the pointing of a firearm.  This means that more than half of the unreported Use of Force incidents

21  that the IMT recently discovered cannot be attributable in any way to confusion about the wording

22  regarding the low ready/retention position in General Order K-4.

23       At the last Case Management Conference, the court requested that the OPD and the City of

24  Oakland provide an updated list of the Persons Responsible for NSA Tasks.  In response, on

25  September 14, 2018, the City of Oakland filed a document that identifies the Command Staff

26

1 responsible for the issues set forth here and for all the other aspects of the NSA. Plaintiffs request

2 that the appropriate member of the Command Staff should issue a written report at least three

3 weeks prior to the next Case Management Conference designating what steps OPD has taken to

4 remedy the problems identified by the IMT in their reports and by Plaintiffs' Attorneys in this CMC

5 Statement.   Plaintiffs' attorneys also request that the Chief of Police or her designee appear at the

6 next Case Management Conference and tell the Court what steps they have taken to address this

7 issue and further, what steps OPD will take in the future to assure the Court, the Parties, and the

8 Monitor that this issue will not come up again.  Finally, Plaintiffs expect the Monitor be informed

9 as to what, if any, discipline is warranted  here, and the Court satisfy itself that such discipline, if

10 any, is appropriate.

11      The failure of officers to video tape their arrests and/or document every reportable use of

12 force pursuant to Department policy cannot be tolerated.  This is problem that was widespread a

13 number of years ago.  The reappearance of this problem is completely unacceptable.  Immediate

14 action must be taken to remedy this problem.  The Department must decide if discipline and/or

15 retraining are appropriate.  Whatever the decision, it must be made at the highest levels of the OPD.

16 Subsequently, those command officers will be responsible if this problem continues, and an

17 extensive audit must be undertaken to prove that this problem has been eradicated.

18      **C.  Rise in the Number of Pursuits and Complaints**

19      After many years of declines, the number of complaints has risen in 2018.  As of November

20 7, 2018, there were 1212 complaints, as compared with 1090 as of this time in 2017.

21      Plaintiffs would like to see a breakdown of these complaints to measure these figures more

22 precisely.  For example, if the complaint rise is due to "service calls", there may be adequate

23 explanations such as the officer was on a more important call or the problem is due to the financial

24 capacity of the City of Oakland to provide police services.  On the other hand, these same figures

25

26

1  may reveal systemic problems which can be fixed by the OPD without additional resources or can

2  be remedied by a reallocation of existing resources.

3      If the rise in the number of complaints includes a rise in excessive force complaints,

4  discourtesy, and related issues, the OPD needs to remedy this with training and/or discipline where

5  appropriate. We recognize that not all complaints have merit, but the rise in sustained complaints

6  from 41 in 2017 to 58 in 2018 indicates that the OPD itself believes some of them do.

7      The rise in the number of pursuits is clearly a problem. In June, 2018, the City of Oakland

8  paid $12,000,000 (twelve million dollars) to a man who was run over by a police officer while

9  riding his motorcycle downtown.  The man suffered massive injuries including having his lower left

10  leg amputated and his pelvis and vertebrae fractured. A video of the incident appears to show that

11  the officer violated the pursuit policy of the OPD and/or was driving too fast under the

12  circumstances.  More recently, another Oakland Police officer was found to have violated policy

13  and gave inconsistent statements to supervisors after a high-speed pursuit that resulted in major

14  injuries to a passenger in the fleeing vehicle.[2]

15      While liability payments for OPD excessive force cases appear to have declined, the single

16  payment this year is more than the payment to 119 plaintiffs in the Riders case.  Moreover, the

17  people injured in these out of compliance bad driving incidents and/or pursuits are just as hurt as if

18  they were victims of excessive force.  These victims may not have been injured intentionally, but

19  that is scant consolation to the people who, in some cases, have to live with injuries for the rest of

20  their life.  Moreover, the financial consequences to the City of Oakland are no less dramatic.

21      OPD policy on foot pursuits allows for the officer to break off a pursuit without any

22  disciplinary consequences.  This has undoubtedly reduced the number of incidents where an officer

23  chases a subject into a backyard, the subject turns around, and the officer has to make a split second

24

25  _____

[2] https://www.sfchronicle.com/crime/article/Oakland-officers-violated-policy-in-chase-that-13359241.php

26

1  decision on whether to shoot the subject or not.  This change in policy is no doubt one of the

2  significant factors in the decline of Officer Involved Shootings.

3       There is no comparable provision in OPD General Order J-4, Pursuit Driving.  Plaintiffs

4  strongly recommend the officer who breaks off a pursuit will never receive discipline for that

5  decision and that this be codified in DGO J-4.

6       Another factor is that a number of Academy Graduates have little or no experience in

7  driving.  The number of millennials who own and drive cars is less than previous generations.  If

8  these individuals are put behind the wheel of a patrol car, they need far more training than other

9  officers before they acquire the skills to engage in a pursuit.

10       This is just one aspect of an overall review of pursuits and training that the OPD needs to

11  review.  Pursuits have become a major risk management problem that must be addressed.  The

12  safety of both the officers and innocent citizen demands no less.

13  **D.  Lack of Women Recruits in the Academy**

14       A recent 2018 recruit class contained no women at all by the time the class graduated.  The

15  180th Academy started with 8 women out of 34.  The class is down to 5 women out of 24.  Women

16  are currently 21% of the class.  The national average has been stated to be 13-14%.

17       If the national statistics are accurate, the last two classes are 10.5% women (21% + 0%

18  divided by 2 =10.5%), which is below the national average.  In addition, none of the women in the

19  current Academy class have graduated. There were women in the earlier 2018 class, but they did

20  not graduate.

21       Almost every officer involved in the recent sex scandal had graduated from the OPD

22  Academy since 2015.  All of them were men.  It seems inconceivable that the OPD cannot find

23  women who are more qualified than these men who did graduate from the Academy.  Plaintiffs

24  recommend the OPD create a task force that will be charged with recruiting more women.  The task

25  force could review current efforts to see if all efforts are being made to recruit women.  Are officers

26

1   (preferably women officers in the OPD) going to the Colleges, Universities and High Schools to

2   talk about a career with the OPD?  Are they going to job fairs and other gatherings where they

3   would find women seeking employment?  If OPD officers are going to some of these gatherings,

4   should they go to more of them? Are there any women in the Training Bureau that relate to the

5   Academy and its members? These are just some of the ideas that should be considered to boost the

6   number of women in the Academy.

### E. Identifying Outlier Officers and Squads Engaged in Possible Biased Policing

8           Plaintiffs' have been encouraged by the Department's sincere efforts to examine implicit

9   and explicit bias at monthly Citywide Risk Management Meetings (RMM), during which

10  supervisors review stop data with an eye toward identifying and remedying indicators of disparate

11  treatment among population groups in Oakland.

12          However, the IMT's most recent (57th) Report raises some serious questions about OPD's

13  ability to translate the stop data they collect into meaningful interventions at the squad and/or

14  officer level.  Specifically, the IMT reports that "despite repeated recommendations to do so, OPD

15  continued to resist conducting a drill-down or in-depth analyses of squad or specific individual

16  officer data to ascertain the bases for and/or to appropriately address such indicators when present.

17  Rather, the discussion instead generally focuses on operational elements, including strengths and

18  shortcomings of the OPD intelligence-led policing model, which we acknowledge is also

19  important."[3]

20          During the most recent meeting of the Community Police Review Agency, Captain Nishant

21  Joshi acknowledged that the Department has "to drill down as… we do have work we have to do."

22  When pressed about Police Commission Chair Thomas Lloyd Smith about the IMT's "repeated

23  recommendations" to drill down, Captain Joshi reiterated that "there's still work to be done… I

24  understand that we need to be able to be a little more in-depth in our drill down."  Chief Kirkpatrick

25  _____

[3] 57th IMT Report, p. 8

26

1   then told the commissioners that she "accept[ed] ownership" over this issue, and that the

2   Department's resistance to the Monitor's repeated recommendations about drilling-down on stop

3   data "is not acceptable on our part…. We believe that at the next site visit, which is in a couple of

4   weeks, that we will have shown and demonstrated progress to that.  So, I accept full

5   responsibility."[4]

6          Plaintiffs' are baffled as to why the OPD has not fully implemented the IMT's repeated

7   suggestion that stop data should be effectively harnessed at the squad or individual level.  This

8   should have been done by now.  The OPD's intransigence undermines the very purpose of stop data

9   collection as a risk management tool and indicator of disparate treatment.  Policy revisions and

10  training modifications are an important corrective measure, and Plaintiffs' applaud the

11  Department's progress in these arenas.  Nevertheless, individualized interventions are sometimes

12  warranted, and we urge the Department to immediately heed the IMT's repeated recommendations

13  to drill-down on individual and squad-level data.

14                           **F.  Hiring of Qualified OPD Members**

15         As has been detailed extensively in previous Joint Statements to this court, the Oakland

16  Police Department has experienced a rash of officer misconduct by recent hires of the Department

17  in recent years.  Most prominently, officers allegedly sexually assaulted and trafficked a minor, and

18  several of these officers were criminally charged as a result.  Twelve Oakland Police Officers were

19  disciplined by the Department, and four were ultimately terminated.  More broadly, 23 Oakland

20  Police Officers hired between 2013 and 2015 were (1) charged with crimes during their tenure as

21  Oakland Police Officers, (2) the subject of internal affairs investigations, (3) named as defendants

22  in civil rights lawsuits, and/or (4) involved in controversial shootings.  Seven of the thirteen police

23  officers who discharged their service weapons in 2013 had served in the Department for less than

24

25  ───────────────

26  [4] http://oakland.granicus.com/MediaPlayer.php?publish_id=e805e80d-e44c-11e8-9302-0050569183fa

1   one year, and the City of Oakland was forced to pay millions of dollars to settle lawsuits related to

2   rookie-officer misconduct during this period.[5]

3          In the aftermath of these events, Plaintiffs demanded more robust hiring, background

4   checks, and recruiting procedures for new recruits and, on June 10, 2016, Oakland Mayor Libby

5   Schaaf announced at a press conference that the Department's own Office of Inspector General

6   (OIG) was conducting an audit of OPD's hiring, recruitment, and background check procedures.

7   One week later, Mayor Schaaf officially put City Administrator Sabrina Landreth in charge of the

8   Department, stating "I feel like this is an appropriate time to place civilian oversight to this police

9   department and to send a clear message of how we are not tolerating misconduct, unethical

10  behavior, and to root out what is clearly a toxic macho culture."[6]  On June 22, 2016, the Oakland

11  City Council voted to delay a planned 2017 Police Academy until OIG completed its audit of the

12  Department's recruitment and training policies.

13         In December of 2016, the Office of Inspector General published an audit titled *Officer

14  Integrity Trends and Other Critical Observations Regarding Hiring and Training Practices*.  This

15  report made eleven recommendations for improved internal controls over policies and practices

16  related to identifying, assessing, and managing personnel-related risks involving misconduct or

17  unethical behavior.   Upon publication, these recommendations were "wholly accepted"[7] by the

18  Department, and OPD issued written responses to each request that detailed the specific actions

19  OPD promised to undertake immediately to address these concerns, as well as a timetable for

20  completion.

21         A follow-up report by the Office of Inspector General in December 2017 concluded that six

22  of the eleven recommendations set out by the OIG in December 2016 were addressed by OPD in a

23  manner that the OIG deemed sufficient and complete.  The other five were only partially-addressed.

24  _____

25  [5] http://www.oaklandmagazine.com/November-2017/OPDs-Lost-Officer-Class
    [6] https://www.nytimes.com/2016/06/19/us/shaken-by-sex-scandal-oakland-police-to-get-new-leader-again.html

26  [7] *Officer Integrity Trends and Other Critical Observations Regarding Hiring and Training Practices – Second Follow-Up, p. 1*

1       In August 2018 the OIG released *Officer Integrity Trends and Other Critical Observations*

2  *Regarding Hiring and Training Practices – Second Follow-Up.*  This report addressed the five

3  outstanding recommendations, referenced above.  Per this most recent report, four

4  recommendations have not yet been resolved to OIG's satisfaction: Recommendation #3, Use of

5  Peer Evaluations; Recommendation #4: Tracking Employee Separation Based on Employment

6  Phase; Recommendation #5: Consolidate Applicant Performance Tracking; and Recommendation

7  #11: Training and Qualifications of Background Investigators.

8       Plaintiffs concur with OIG's findings in these four areas, which are specified, in turn,

9  below:

10       OIG Recommendation #3: Use of Peer Evaluation.  The 2016 OIG Audit "strongly

11  recommends that the Department should codify the current practice of using the academy peer

12  evaluations into written policy with a provision that it be viewed as both a risk management tool

13  and as a hiring and training performance metric that will be routinely assessed."[8]  The

14  Department's written response acceded to this recommendation: "The Department concurs and has

15  revised the Academy Coordinator's Manual to reflect this recommendation…When a Police Officer

16  Trainee receives a significant amount of negative peer evaluations, it triggers an automatic review

17  of the trainee's file by the Academy Coordinator."[9]  The 2017 first follow-up report by OIG stated

18  that OIG "was unable to verify whether the Academy Coordinator's Manual was updated."[10]  The

19  most recent OIG report determined that, contrary to the Department's 2016 representation that "The

20  Department… has revised the Academy Coordinator's Manual to reflect [OIG's] recommendation",

21  no such manual ever existed.  OIG did discover that language pertaining to peer evaluations was

22  incorporated into the Police Officer Trainee Manual's section on peer evaluation, but concluded

23  that "the aspect of communicating the importance of managerial-accountability among Academy

24

---

25  [8] *Officer Integrity Trends and Other Critical Observations Regarding Hiring and Training Practices – Second Follow-Up, p. 3*

    [9] *Officer Integrity Trends and Other Critical Observations Regarding Hiring and Training Practices – Second Follow-Up, p. 4*

26  [10] *Officer Integrity Trends and Other Critical Observations Regarding Hiring and Training Practices – Second Follow-Up, p. 4*

1    staff – who have responsibility for the effective management of personnel and performance-related

2    risk – has not been institutionalized in policy."[11]

3        Despite stating in writing for over a year that they were revising the Academy Coordinator's

4    Manual, the Department now concedes that no Academy Coordinator's Manual was ever drafted.

5    Further, the OIG reports that "According to the Commanding Officer of the OPD Training

6    Division, codifying the use of the peer evaluations any further for management's use and

7    understanding will not be pursued; nor will an Academy Coordinator's Manual be drafted… due to

8    the overly burdensome demand it would place on the Academy Coordinator to write."[12] Plaintiffs

9    concur with OIG's 2018 conclusion that "the need for institutionalizing and supporting consistent

10    and sound risk management practices, that prevent or lessen the risk of misconduct (or

11    implementing alternative [sic] actions that equally confront this type of risk), has not been fully

12    addressed.  Indeed, the collective value to the Department in formalizing basic internal controls that

13    govern risk management practices exceeds the benefit of preserving managerial autonomy."[13]

14        Plaintiffs' understand that, as of the date of this filing, the Department expects to receive a

15    POST Desk Academy Manual in December of 2018, and that this document  will be used by

16    Academy Instructors going forward subject to review by Chief Kirkpatrick.  Meanwhile, the

17    document previously known as the "Police Officer Trainee Manual" has been revised (to

18    incorporate the role of peer evaluations in the Police Officer Trainee discipline process) and

19    renamed (it is now the Academy Manual).

20        Further, Plaintiffs' understand Lt. Frederick Shavies and Manager Tim Burch have revised

21    DGO B-13 (Basic Academy Performance Standards) to incorporate the role of peer evaluations in

22    the current POT hiring and discipline process, and that the revised policy has been submitted for

23    legal review.  Plaintiffs have not read this revised document, but have long-agreed with OIG that

24    _____

25    [11] *Officer Integrity Trends and Other Critical Observations Regarding Hiring and Training Practices – Second Follow-Up, p. 4*
     [12] *Officer Integrity Trends and Other Critical Observations Regarding Hiring and Training Practices – Second Follow-Up, p. 4*

26    [13] *Officer Integrity Trends and Other Critical Observations Regarding Hiring and Training Practices – Second Follow-Up, p. 5*

1    the Department should codify the use of peer evaluations as a risk management tool and hiring and

2    performance metric.  We look forward to the prompt completion of this task, and will follow this

3    issue closely and report all major developments to the Court.

4           OIG Recommendation #4: Tracking Employee Separation Based on Employment Phase.

5    The 2016 OIG audit concluded that the Department should "track separation based on employment

6    phase as a possible risk management performance metric to ensure that the Department is removing

7    those engaged in misconduct and/or unethical behavior as early as possible during probation."[14]  In

8    its written response to the 2016 OIG Report, the Department again acceded to the recommendation,

9    and stated that OPD "has requested funding to upgrade its current Personnel Database to capture

10   this information.  Until this upgrade takes place, the Department will create a system to track this

11   information manually."[15]  OIG's subsequent first follow-up report in 2017 determined that while

12   the Department did secure said funding, the database continued to lack the functionality to track

13   separation based on employment.  Furthermore, the database "does not assist the Department in

14   tracking rates which would serve as a risk management performance indicator reflecting the

15   Department's diligence in addressing personnel-related risk – depending on where in the

16   employment stage individuals are being removed (ideally, most occurring during the academy)."[16]

17          OIG's 2018 second follow-up report determined that the Personnel Section continues to

18   track separation manually.  Plaintiffs concur with OIG that further improvements to the

19   Performance Reporting Information Metrics Environment (PRIME, the database which tracks

20   evidence of racial profiling, racially disparate policing practices, use of firearms or other weapons,

21   dangerous incidents like high speed chases and vehicle accidents, and other factors) are overdue,

22   necessary, and critical to removing officers, trainees, and recruits that are engaged in unethical

23   behavior and/or misconduct at the earliest possible stage.

24   _____

25   [14] *Officer Integrity Trends and Other Critical Observations Regarding Hiring and Training Practices – Second Follow-Up, p. 5*
     [15] *Officer Integrity Trends and Other Critical Observations Regarding Hiring and Training Practices – Second Follow-Up, p. 6*

26   [16] *Officer Integrity Trends and Other Critical Observations Regarding Hiring and Training Practices – Second Follow-Up, p. 5-6*

1       OIG Recommendation #5: Consolidate Applicant Performance Tracking.  OIG's 2016 audit

2   recommended that OPD "develop a policy detailing the requirements for applicant/trainee tracking

3   and records maintenance, including consideration of consolidating siloed systems to ensure that

4   information is consistent among all units.  Additionally, OIG recommends that the Department

5   direct the Training Section to prioritize and organized system of record keeping (preferably

6   electronic) that would allow for a quick and comprehensive review of all trainees and overall

7   academy performance."[17]  Once again, the Department concurred with this recommendation, and

8   promised to develop more robust methods for capturing trainee data in its electronic databases

9   tracking performance, conduct, and employment status, including separation dates, stage of

10   separation, and the reason for separation.  OIG's 2017 first follow-up report determined that this

11   recommendation was only partially addressed, and encouraged the Department to "develop

12   training-related reporting and dashboards to… meet the risk management needs of the Department

13   from one integrated training database"[18] through PRIME or a future derivative of the PRIME

14   system.  However, the most recent second follow-up audit determined that OPD's Personnel

15   Section "continues to manually track separations in lieu of planned PRIME improvements."[19]

16   Plaintiffs are in strong agreement with OIG that the Department must prioritize comprehensive,

17   electronic applicant tracking and records maintenance, including a consolidated list of trainees who

18   separated from the Department at every stage of the hiring and background check process.

19       Recommendation #11: Training and Qualifications of Background Investigators.  OIG 2016

20   audit concluded that the Department should revise its policy so that "POST [Police Officer

21   Standards and Training] certified training is a requirement for those performing background

22   investigations that are not assigned to the R&B [Background and Recruiting] Unit.  Additionally,

23   background investigators should be required to have investigative experience, if they have never

24   _____

25   [17] *Officer Integrity Trends and Other Critical Observations Regarding Hiring and Training Practices – Second Follow-Up, p. 7*
    [18] *Officer Integrity Trends and Other Critical Observations Regarding Hiring and Training Practices – Second Follow-Up, p. 7*

26   [19] *Officer Integrity Trends and Other Critical Observations Regarding Hiring and Training Practices – Second Follow-Up, p. 7*

1    previously worked within the R&B Unit."[20]  This audit also encouraged greater managerial

2    oversight beyond POST-training.  Here, too, the Department agreed with OIG's recommendation,

3    and certified that it had already changed its policy to require all background investigators to meet

4    minimum qualifications that included a minimum number of years of experience, prior investigative

5    and background experience, and completion of a POST-certified background investigation course.

6         In spite of the Department's above-referenced claims, OIG's 2017 first follow-up report

7    determined only 57% of investigators (23 of 40) who completed background investigations in the

8    preceding years had received POST-certified training.  Further, OIG noted that background

9    investigators who registered for POST trainings were often given "competing priorities and

10   sometimes unpredictable work schedules"[21], which presented challenges for attending the training

11   course(s).  OIG therefore recommended that Department train an OPD employee to become a post-

12   certified instructor on the topic of background investigations.  This OIG follow-up report also

13   highlighted that the Department's draft policy regarding background investigator qualifications did

14   "not explicitly list attending implicit bias or procedural justice training as requirements for

15   background investigator selection."[22]

16        OIG's most recent, second follow-up report, concludes that the Department still "has not

17   fully trained all background investigators."[23]  Specifically, 32 of the 73 investigators who

18   performed a background investigation between January 1, 2018 and July 13, 2018 had not received

19   POST-certified training for background investigations, and no Department personnel have received

20   POST instruction training in order provide local POST-certified instruction to perform background

21   investigations.

22        Taken together, the long-unaddressed OIG recommendations described above suggested

23   that the Department was insufficiently serious about mitigating the risks of misbehavior or

24   _____

[20] *Officer Integrity Trends and Other Critical Observations Regarding Hiring and Training Practices – Second Follow-Up, p. 9*

25   [21] *Officer Integrity Trends and Other Critical Observations Regarding Hiring and Training Practices – Second Follow-Up, p. 10*

[22] *Officer Integrity Trends and Other Critical Observations Regarding Hiring and Training Practices – Second Follow-Up, p. 10*

26   [23] *Officer Integrity Trends and Other Critical Observations Regarding Hiring and Training Practices – Second Follow-Up, p. 11*

1 improper conduct by recent hires and Police Officer Trainees. These findings were as unacceptable

2 to Plaintiffs as they were to the authors of the OIG Reports, and Plaintiffs agree with OIG that the

3 Department's procedures for tracking, assessing, and monitoring personnel-related risks must

4 improve. Plaintiffs look forward to reviewing the revised version of DGO B-13, which we

5 understand will codify the practice of incorporating academy peer review evaluations as a risk

6 management tool and as a performance and hiring metric after it has been approved by the

7 Department in the coming weeks. Similarly, Plaintiffs' are eager to review the POST Desk

8 Academy Manual in the coming weeks.

9      Plaintiffs also agree with OIG that the Department must develop a comprehensive,

10 electronic system to track applicants through the training and hiring process, including information

11 about performance and specific reason for separation (as a possible risk management metric) (OIG

12 Recommendation #4); and must develop a policy that details the requirements for applicant/trainee

13 tracking and records maintenance (OIG Recommendation #5).

14      The Department has promised Plaintiffs that it will issue a plan to remedy the above-

15 described problems, and Plaintiffs appreciate the newfound diligence of the Department in some of

16 the above-mentioned areas. All parties listed here should share the common goal of improving the

17 recruiting, hiring, and training practices at the Department, and Plaintiffs eagerly await the

18 Department's input and proposed solutions to the issues and shortcomings detailed above.

19                                    **CONCLUSION**

20      Plaintiffs have no argument that the Oakland Police Department has made vast

21 improvements since the start of the Negotiated Settlement Agreement. However, those

22 improvements can slip away as quickly as they were achieved. Progress is a dynamic process that

23 must continue to take place. The recent problems of the OPD must be addressed by the leadership

24 of the department. Only when the OPD demonstrates that they can do this on their own will they

25 attain NSA compliance.

26

1    The OPD Office of Inspector General (OIG) is to be commended for identifying many of

2  the problems discussed in Plaintiffs' portion of the Case Management Conference.  However, the

3  issues surrounding the pointing of a firearm were extensively discussed with the OPD Command

4  Staff several years ago.  It is extremely unfortunate that this issue in particular is still a problem

5  given all the work that was done in the recent past.

6    There are relatively few issues remaining before NSA compliance is achieved.  The Prime

7  System appears to be on track for completion in the middle part of 2019.  The number of African

8  Americans who are subject to stops by the OPD has fallen dramatically.  This would be a bad time

9  for the OPD to slip backwards.

10                          **II.    CITY OF OAKLAND**

11    This Case Management Conference Statement will again focus on the Department's three

12  outstanding NSA tasks:

13    - Task 34 (Stop Data), including updates on the Department's monthly Risk

14       Management Meetings (RMMs), implementation of Stanford's 50 recommendations,

15       and crime and use of force rates

16    - Task 5 (IAD)

17    - Task 45 (Consistency of Discipline), including a report on the upcoming study to

18       determine whether racial or gender disparities exist in the Department's

19       administrative investigation and discipline process

20    Consistent with the Court's request at the last Case Management Conference, the City also

21  provides a more fulsome description of the status of the PRIME 2.0 project and its various

22  workstreams, which is progressing as planned for a July 2019 implementation date.

23         **A.    Task 34: Stop Data**

24    Task 34 addresses the Department's collection and analysis of stop data for every

25  discretionary vehicle stop, field investigation and detention in an effort to ensure that the

26

1  Department is addressing crime through fair, quality policing.  The City's last Case Management

2  Conference Statement recounted many of the City's industry-leading stop data achievements.

3  Those include, but are not limited to:  the collection of more and better stop data than any other law

4  enforcement agency in California; the publication of Departmental stop data for review and study

5  by third parties (including academic researchers); the analysis of stop data to inform the

6  Department's crime reduction strategies and stops (intelligence-led and precision-based); and, an

7  industry-leading requirement that officers use body-worn cameras to record discretionary stops.

8        In recent months, the Department has also completed the revision of its stop data forms for

9  purposes of complying with AB 953 (the Racial Identity and Profiling Act of 2015), which requires

10  the Department to collect certain state-mandated categories of stop data starting on January 1, 2019,

11  and report its data to the state no later than April 1, 2020.  The Department has kept Stanford, the

12  IMT and Plaintiffs' counsel informed regarding its intended changes to the stop data forms and

13  collection process.  The Department is pleased to report that the new forms will not only collect and

14  transmit the state mandated data, but will also—as previously pledged—continue to collect, analyze

15  and publish a more robust set of stop data categories necessary to continue the Department's

16  industry-leading stop data collection and analysis efforts.  The new forms are currently being tested

17  before patrol officers receive training in early December and the forms are rolled out to all patrol

18  officers in mid-December.

19        **1.    Monthly Risk Management Meetings:  Reduction of The
          Department's "Footprint" and Racial Disparities**

20        The Department's current Task 34 efforts remain centered on its monthly Risk Management

21  Meetings ("RMMs"), during which the Department uses stop data to examine and assess area,

22  squad and officer performance.  As noted before, the Department's analysis of stop data during

23  RMMs seeks to:  1) identify policies and practices which adversely impact communities of color

24  (and, in particular, African-Americans) in order to reduce the Department's "footprint" on these

25  traditionally over-policed communities; and 2) identify and examine "outlier" squads and officers

26

1   to determine whether their actions are consistent with constitutional policing and Department

2   directives, or are rather indicative of potential bias and/or disparate treatment.[24]

3         As the IMT recognized in its most recent report, the Department's focus on intelligence-led

4   stops continues to significantly reduce the overall number of stops, thus reducing the Department's

5   impact (or "footprint") on the community. *See* Doc. 1219 at p. 9 (OPD "data demonstrates a

6   continued reduction in the number of stops in each of five commands scheduled for review – of

7   between 15% and 31%").  Attached hereto as Exhibit A is a chart entitled "Oakland Police

8   Department Discretionary Stops By Race:  January 1, 2017 to September 30, 2018", which shows

9   the overall **number** of discretionary stops by race for the last 21 months.  While certain months

10  reflect short-lived spikes (the causes of which are explored at the monthly RMMs), the overall

11  number of discretionary stops continues a significant downward trend.  In particular, discretionary

12  stops of African-Americans have been reduced <u>nearly in half</u> in the past year and a half.  Despite

13  the IMT's concern that implementation of the intelligence-led policing model has been

14  "challenging" at times, this reduction in footprint is clearly a tremendous success.  It represents

15  nothing less than a significant cultural shift in the Department's approach to patrol policing with a

16  measurable and positive impact on the community.

17        The Department has nonetheless been criticized that the data does not "illustrate a

18  neutralized disparate racial impact."  (Doc. 1219 at p. 8.)  As the Court itself noted at the last Case

19  Management Conference, there are complicated issues related to the reduction of racial disparities

20  in stop data.  Nonetheless, it does appear that the OPD's efforts in intelligence-led policing and

21  training on implicit bias are in fact having some effect on racial disparities.  Attached hereto as

22  Exhibit B is a second chart, which illustrates that since the introduction of intelligence-led policing

23  the disparity related to African-American stops has slowly but generally trended down from 62

24  _____

25  [24] In addition, over the past five months, the Department has lengthened the RMMs to allow a more
    fulsome analysis of the many other risk management factors other than stop data.  These include complaints,
26  uses of force, pursuits and collisions, and a review of officers on intervention and supervisory monitoring.

1  percent in January 2017 to 52 percent in September 2018.

2  **2.      The Identification and Analysis of Outlier Squads and Officers**

3  To be frank, the Department is somewhat confused by the IMT's recent criticism that it has

4  "resisted" conducting a drill-down or in-depth analyses of squad or specific individual officer data

5  to ascertain the basis for disparate treatment.  As described in the Department's last Case

6  Management Conference Statement, the Department absolutely examines stop data at the squad and

7  officer level and "drills down" on squads and officers whose data is not in line with the

8  Department's expectations or deviates from the norm.  Area Commanders are provided with their

9  respective area's stop data and are expected to review stop data narratives and body camera footage

10  to analyze whether their officers' stops are constitutional, in line with Department and Area policy

11  and direction and/or exhibit any indicators of bias.  They are asked to critically evaluate reasons for

12  disparities, which could include implicit bias, explicit bias/racial profiling, crime intelligence that

13  reflects disparities, crime prevention strategies, lack of direction or supervision, intentionally not f

14  following command direction, or Departmental policy, procedure or cultural practice.  The Area

15  Commanders are then specifically and purposefully questioned regarding their review and

16  conclusions during RMMs.  And the review—where warranted—results in corrective action,

17  including, but not limited to, the placement of Officers and supervising Sergeants on intervention or

18  monitoring.  When Area Commanders are unable to adequately address disparities at the RMM, the

19  Command Staff issues deliverables through OIG to do so in writing, including an analysis of how

20  improved stop decisions could impact racial disparities, impact the Department's overall footprint,

21  improve community trust and transparency, and reduce opportunities for racial bias.

22  As mentioned before, the Department also developed *written* guidelines for Area

23  Commanders with respect to RMMs, commonly referred to at the Department as the Risk

24  Management "Playbook."  The Playbook is meant to institutionalize (and provide sustainability of)

25  the Department's processes for identifying and addressing (or "drilling-down" on) outlier squads

26

1   and officers.  It discusses, *inter alia*, the process for further investigation and evaluation of outliers

2   to determine, if possible, whether data abnormalities are a result of bias, including in-person

3   discussions with officers regarding their stop data.  A copy of the Playbook was provided to both

4   Stanford and the IMT approximately six months ago, but the Department has not received any

5   specific comments or feedback on the language of the Playbook or how it fails to adequately

6   capture and describe an appropriate "drill-down" process.

7       Recently, the IMT informed the Department that its members—instead of the Department's

8   command staff—would lead the December RMM, but just this week the date was postponed until

9   sometime after the New Year.  The Department welcomes this technical assistance and is hopeful

10  that observing the IMT's approach will resolve this disconnect between what the Department thinks

11  it is doing and what the IMT is observing.  The Department looks forward to integrating any

12  strategies it learns as part of this process and reporting back to the Court on further progress.

13              **3.    Crime and Use of Force Rates**

14      The Department's focus on intelligence-led and precision-based policing strategies is also

15  still benefiting the Department's core mission:  fighting crime and promoting public safety.  The

16  Department tracks and publishes crime statistics on a weekly basis.  Attached hereto as Exhibit C is

17  the year-to-date Citywide Crime Report published on November 11, 2018.  While crime rates have

18  increased slightly in the five months since the last Case Management Conference, the data reveals

19  that—despite a significant reduction in discretionary patrol stops—the violent crime rate remains

20  fairly steady when compared to both the same time period in 2017 and the three-year year-to-date-

21  average.  And the non-violent crime rate is still down significantly when compared with those same

22  time periods.

23      As the parties noted at the last Case Management Conference, the Department experienced a

24  significant reduction in Level 4 uses of force in the early months of 2018, as is reflected in these

25

26

1 | Use of Force Totals for January – May 19, 2017 and 2018:[25]

2

3 |     Uses of Force Totals          Uses of Force Totals

4 |    January 1 – May 9, **2017**      January 1 – May 19, **2018**

| L1 | L2 | L3 | L4 | Total | | L1 | L2 | L3 | L4 | Total |
|----|----|----|----|-------|--|----|----|----|----|-------|
| 1 | 11 | 28 | 216 | 256 | | 4[26] | 11 | 27 | 110 | 152 |

After recognizing the trend, the Department's Office of Inspector General started an audit to determine the cause for the reduction. Although the audit is not yet complete and published with formal findings and recommendations, the OIG has continuously updated the Command Staff, the IMT and the Plaintiffs' counsel during monthly site visit meetings and all share concern that the data and information gathered for the audit may reflect an underreporting of Level 4 uses of force, particularly with respect to the pointing of a firearm at a suspect.[27]

Under the Department's use of force policy, the "intentional pointing" of a firearm at a suspect constitutes a reportable use of force, while merely drawing a weapon and having it at "low-ready" is not reportable. Accordingly, the Chief issued a directive to the Training Department to provide immediate re-training to all patrol officers regarding the meaning of "intentional pointing" of a firearm (where the weapon is pointed at any part of the body, including the lower extremities) versus low-ready (where the firearm is pointed at a 45-degree angle or less and not at a person).

---

[25] Pursuant to Department General Order K-4 (Reporting and Investigating the Use of Force), Level 4 uses of force include: the intentional pointing of a firearm at a person; a weaponless defense technique applied to a vulnerable area (such as a hair grab); the use of a control hold; an on-duty firearm discharge to euthanize an injured animal; and, a canine deployment that does not involve a bite. The majority of Level 4 uses of force are the intentional pointing of a firearm at a person during a high-risk stop or arrest.

[26] In these charts, the use of force numbers are pulled from PRIME, and include force used by multiple officers within each use of force incident. In both 2017 and 2018, the Department had a single officer-involved shooting incident. In 2018, that incident involved four officers (as opposed to one) discharging their firearms—hence the "increase" in Level 1 uses of force.

[27] The OIG expects to issue its final findings and recommendations before the end of the year.

1  After the completion of the training, the Department saw an immediate and marked increase in

2  reportable Level 4 uses of force.  The most recent year-to-date comparison (from November 7,

3  2018) shows similar numbers between 2017 (363) and 2018 (378).[28]

4         The Department recognizes that many questions still remain about this issue—e.g., What

5  was the cause of the underreporting of Level 4 uses of force earlier this year?  How did supervisors

6  fail to catch the underreporting?  And what additional actions will the Department take to ensure

7  that officers are properly trained and reporting use of force moving forward?  The Department fully

8  expects that the OIG's final audit findings will be typically thorough and help answer these

9  questions.  The audit will also undoubtedly include recommendations for changes to General Order

10  K-04 governing reportable uses of force and retraining of officers, as well as the methods for

11  supervisory monitoring of use of force.  Long-term departmental solutions must be crafted after a

12  thorough review of the OIG's final findings and recommendations and will necessarily include

13  conversations with stakeholders such as the IMT, Plaintiffs' counsel, the OPOA and the Police

14  Commission (which has jurisdiction over the Department's use of force policy).  The Department

15  accordingly expects that it will be able to provide a more thorough analysis and a list of additional

16  corrective actions at the next Case Management Conference.  In the meantime, it is clear that the

17  Chief's directive to retrain all patrol officers on "intentional pointing of a firearm" and "low-ready"

18  has provided an immediate and obvious course correction.

19         **4.      Status of Implementation of the Stanford "50 Recommendations"**

20         The Department continues its work implementing the remaining Stanford 50

21  recommendations.  As part of this process, the Department also continues to provide monthly

22  updates on the implementation to IMT, Plaintiff's counsel (Mr. Chanin) and Dr. Eberhardt.

23  _____

[28] While this underreporting is concerning, it is worth noting that: 1) it was immediately identified and
24  audited by the Department's OIG, reflecting the ability of the Department to self-audit and take corrective
action; and 2) that the Department has still experienced a true cultural shift with respect to the use of force.
25  The number of incidents involving a use of force has dropped from 1244 in 2012 to 309 in 2017 (before the
Department saw the significant drop in Level 4 uses of force).

26

Recently, the Department updated its tracking spreadsheet regarding implementation to provide more detail regarding how each recommendation will be – or had already been – implemented.  The current version of the tracking sheet is attached hereto as Exhibit D, and includes anticipated completion dates for those recommendations that are still "in progress."[29]  The Department has now completed **40** of the Stanford recommendations.  Of the ten (10) recommendations that remain, seven are the responsibility of the City (OPD or ITD), and three are being completed by Stanford.  The status of all remaining 10 recommendations follows:

### Leverage Body-Worn Camera (BWC) Footage

| 11 | **Invest in the development of a BWC early warning system** |
|----|-----|
|    | As part of PRIME 2.0, the Department will be integrating body worn camera footage to allow supervisors and commanders to immediately review stops, arrests and uses of force.  The Department anticipates this recommendation to be completed along with the implementation of PRIME 2.0 in July 2019. |
| 12 | **Build a stop data dashboard** |
|    | This recommendation will also be implemented as part of the development of PRIME 2.0, to be completed in July 2019.  The City has engaged a vendor (Slalom) to build the stop data and risk management dashboards.  After meeting with stakeholders and Stanford, Slalom has created draft dashboards that are currently being shared with the IMT, Stanford and Mr. Chanin. |

---

[29] Before marking a recommendation as "implemented", the Department discusses the recommendation and the Department's response with Dr. Eberhardt and receives her agreement that implementation has been achieved.

| | | **Make Data Accessible** |
|---|---|---|
| 14 | | **Automate stop data narrative analysis (Stanford)** |
| | | Stanford has developed a software tool that improves OPD's abilities to search and analyze officers' narrative accounts, which will particularly assist the Department's Office of Inspector General in conducting audits of stops, handcuffing, searches and uses of force. Stanford needs to train individuals in the Department on the use of the software. The Department anticipates such training will take place in January or February 2019. |
| | | **Collaborate with Data Partners** |
| 17 | | **Hire a data manager** |
| | | The Department has worked with the City Administration and the Department of Human Resources to reclassify positions in the Department into a Police Program and Audit Supervisor position. The job duties will include ensuring that OPD uses available data to better inform risk management efforts, including conducting statistical analyses of all OPD personnel to determine outliers for risk assessments. The individual in this position will also work directly with OPD managers and supervisors to ensure that there is a clear understanding of the data available for managing risk and providing high-level policy and personnel recommendations to the Chief for purposes of risk management. Additional responsibilities will include working with developers to ensure the Department's risk management data is accurate and developing new systems to support risk management efforts.<br><br>The City is in the process of drafting the job announcement and supplemental questions for applicants, which it hopes to publish in mid to late December. The City would expect application screening through January 2019, with interviews of candidates sometime in February 2019. |

| | **Improve Feedback Channels** |
|---|---|
| 23 | **Conduct customer-service audits after routine stops (Stanford)** |
| | This recommendation was for an independent entity—such as a research team—to contact community members who have recently undergone a police stop and ask about their experience.  The Department has elected to have Stanford conduct these interviews.  Stanford is currently developing an audit protocol and determining an appropriate start date. |
| 24 | **Regularly administer community surveys** |
| | The City has selected a surveyor following a formal Request for Proposal process. OPD's Research and Planning Unit is currently working with the Mayor/City Administration and the vendor to finalize the scope and survey design.  After the initial design is complete, the vendor and the City intend to meet with community groups and members to obtain input on the survey scope.  The City hopes to roll the completed survey out in March or April of 2019, and have survey results by the end of May 2019. |

///
///
///
///
///
//
///
///
///
///

**Train Officers in Social Tactics**

| 25 | **Make Trainings Shorter and More Frequent** |
|---|---|
| | The Department's training division is currently developing scenario-based classes designed to improve police-community relations that range from 2-4 hours in length, and which will be offered more frequently.  A few of the other opportunities that have been or will be offered include, but are not limited to:
|  |  • Sworn personnel have been offered training opportunities through Citywide Training, including the "Advancing Racial Equality Academy – 4 modules." |
|  |  • All sworn members receiving a second round of Procedural Justice Training before the end of November 2018. |
|  |  • Working with Equal Justice USA to provide short, intimate training sessions on Trauma-Informed Policing through the International Association of Chiefs of Police Collective Healing Initiative (December 2018). |
|  |  • Increase use of line-ups for regular, brief trainings on a monthly or bi-monthly basis.  Topics could include updates on relevant policy changes and curated videos that showcase relevant community events and information. |
|  | The Department hopes to have full implementation of this recommendation no later than Spring 2019. |

| 28 | **Incentivize training-in-action workshops** |
|---|---|
| | The Department is working on developing both internal and external opportunities for officers to receive continued training, particularly on social tactics. Officers who attend outside, non-mandatory trainings already receive positive supervisory notes in their personnel files. The Department is also exploring other incentives, including Departmental recognition for those officers who exceed expectations with respect to their procedural justice performance. |
| 29 | **Rigorously measure the effects of all trainings (Stanford)** |
| | The Department has started this process by engaging Stanford to evaluate the mandatory, Department-wide Procedural Justice II training. All Department members will have undergone such training by the end of November 2018, and the Department expects that Stanford will start their analysis of the training and effects soon. |

**Enhance Risk Management**

| 49 | **Produce and publish an annual Racial Impact Report** |
|---|---|
| | This report is in its final review stages with the City Administration, and the Department anticipates publishing the report in January 2019. |

The Department looks forward to updating the Court on its continued progress on the remaining Stanford Recommendations the next Case Management Conference.

**B.    Task 5 (Complaint Procedures)**

As noted in the Monitor's Fifty-Sixth Report (Document 1213), OPD remains in compliance with a large number of the Task 5 subtasks, and not all are actively being monitored. Nonetheless, the City remains "not in compliance with task 5 based on the provisions of the March 23, 2016 Court Order." That Order noted irregularities in the Department's IAD investigation of the sexual misconduct scandal, Case No. 15-0771, and authorized the Compliance Director to use his authority

1    to ensure that the case was properly and timely investigated and that "all appropriate follow-up

2    actions are taken."  On June 21, 2017, the Court Investigator issued his report (the "June 21, 2017

3    Court Investigator's Report"), which contained five recommendations directly related to Task 5

4    subtasks:

5          • Recommendation 5:  IAD Should Involve [the] OCA Before Subject and Witness

6             Interviews in Investigations of Serious Allegations

7          • Recommendation 6:  Only the IAD Commander Should Be Permitted To Reject

8             Advice From [the] OCA

9          • Recommendation 7:  IAD Investigators Should Be Trained Regarding When It is

10            Appropriate to Downgrade a Subject Officer to a Witness

11         • Recommendation 8:  IAD Lieutenants Overseeing Investigations Should Review

12            Investigative Plans, Interview Questions and Interviews In Serious Cases

13         • Recommendation 9:  IAD Should Continue To Brief the City Administrator Monthly

14            on Major Investigations; the Chief of Police Should Meet With the Mayor Regularly

15            to Discuss IAD Matters

16   Recommendation No. 9 was immediately implemented in July 2017 and is ongoing.  The other four

17   recommendations (Nos. 5-8) were codified in a revised Training Bulletin V-T.1 (Internal

18   Investigation Procedures) ("TB V-T.1").  The revised TB V-T.1 was reviewed and approved by the

19   OPD command staff, the City Attorney's Office, Plaintiffs' counsel, the IMT, the OPOA, and

20   provided to the Police Commission.  TB V-T.1 became final on August 21, 2018, and all IAD

21   investigators have since received training on TB V-T.1's new requirements.

22         As noted in the concurrently-filed Twelfth Progress Report, all of the recommendations

23   contained in the June 21, 2017 Court Investigator's Report have now been fully adopted and

24   implemented, including those related to Task 5.  The Department is accordingly hopeful that full

25   implementation of the Swanson recommendations will result in Task 5 compliance, and looks

26

1   forward to receiving further guidance from the IMT and the Court on what additional "follow up

2   actions," if any, are necessary to achieve full compliance with this task.

3       C.      **Task 45:  Consistency of Discipline**

4               1.      **Partial Compliance**

5       The Monitor's latest Report (Doc. 1219) again assessed and approved several subtasks

6   related to Task 45, including:

7       •   The Department's maintenance of a centralized system for documenting and

8           tracking discipline and corrective action

9       •   The Department's appropriate application of its Discipline Matrix (adopted

10          in March 2014) to all 20 of the cases with sustained findings that were

11          approved between June 1 and July 31, 2018

12      •   The Department's conduct of two *Skelly* hearings, resulting in Skelly reports

13          that "contained adequate justification for the results documented"

14      •   The Department's adequate training of all current *Skelly* hearing officers[30]

15      Additionally, as noted in the concurrently filed 12th Progress Report, the City has

16  completed implementation of all of the Swanson Recommendations related to sexual

17  misconduct scandal, including those recommendations related to the investigation of

18  misconduct and imposition of discipline.  Nonetheless, the City remains in "partial

19  compliance" with Task 45 and accordingly looks forward to further and specific guidance

20  from the IMT and the Court on what additional steps, if any, are necessary to achieve full

21  compliance with this task.

22              2.      **Plaintiffs' Proposed Study of Consistency of Discipline**

23      The parties still disagree on whether a study to determine if racial and gender bias exists in

24  the Department's administrative discipline process is a Task 45 issue that must be completed before

25      [30] The Department also intends to offer all current commanders *Skelly* training at two separate command
    retreats scheduled for next month, December 2018.

26

1    the City can be found in full compliance with the NSA.  The parties are in complete agreement,

2    however, that the discipline process must be fair and unbiased and that Department personnel must

3    perceive it as such.  Accordingly, the Department, Plaintiffs' counsel and the OPOA have worked

4    cooperatively over the past months on scoping out a study to determine whether disparity patterns

5    exist in the administrative investigation and discipline process.

6           In order to comply with the City's contracting requirements, the City will be issuing a

7    Request for Proposals ("RFP") for a "Discipline Disparity Study" on November 16, 2018, with a

8    deadline for receiving proposals by December 14, 2018.  The study will be based on five years of

9    data, and examine the administrative investigation of sworn personnel and academy police officer

10   trainees in the Academy.  At a minimum, the study will include a review of existing Department

11   policies, procedures and practices regarding misconduct allegations and discipline, and a review of

12   the Department's historical data to see if the data shows patterns of disparity in the treatment of

13   minority officers and/or in relation to gender.  The intended scope of work has been shared with

14   Plaintiffs' counsel, the OPOA and the IMT.

15          The Department will continue to work with the other parties on this project and keep the

16   IMT and the Court informed of progress.

17   **D.**     **Redevelopment of PRIME 1.0 ("PRIME +") and Development of**
            **PRIME 2.0**
18

19          As the City has noted before, the development of PRIME 2.0 will proceed in tandem with

20   PRIME+ (reengineering PRIME 1.0), and includes the four functional areas of development, for a

21   total of five development or project streams.  For ease of reporting, the City calls the aggregate of

22   the five projects PRIME 2.0.  Attached hereto as Exhibit E is a chart showing the schedule for the

23   implementation of each workstream, and following is a summary of the City's progress in each of

24   the five areas:

25   **1)**     **A new personnel database to track employee and supervisor assignments that is**
            **easier to use and integrates with other PRIME functions.**  The City's ITD
26

completed development of this system, now referred to as "OPD HRM", in July

2018 and moved the system into full production in August 2018.  Since going live,

OPD Human Resources has successfully utilized the system.  Data from the new

system has been integrated into the data workflow of PRIME 1.0.  Other than a few

minor corrections and cleansing of data from the old database, the system has

performed as expected to date.

2)  **PRIME+ reengineering of PRIME 1.0 – operational data collection and**

**reporting.**  As previously reported to the IMT, the Professional Services Agreement

and Scope of Work were completed with Sierra in May 2018. Since then, work on

the project stream has proceeded as planned. The Discovery and Gap Analysis phase

was completed in September 2018.  It consisted of several workshops with OPD

personnel to establish the requirements for each module of the application and

identify the gaps between those requirements and Sierra's baseline application.

Following the Discovery and Gap Analysis phase is the Design phase of the project

stream, which was completed in October 2018.  In this phase, modifications needed

to address the gaps were developed.  In addition, a list of requirements outside of the

scope of the project will be compiled and presented to the City. The City is currently

awaiting this list; however, it should be noted that the list will contain requirements

beyond those required and/or requested by the NSA, the IMT and Plaintiffs' counsel.

The project stream is currently in the Development/Implementation phase and

tracking to plan with a projected completion date of May 2019.

3)  **Ability to access an officers' complete training history.**  The City issued a

purchase order (PO) to LEFTA Corporation in August 2018 to develop a new

Academy Training Module and to migrate OPD's existing training data from TMS

and Power DMS, the current field training applications. On both accounts, work is

1    proceeding and is on schedule.  LEFTA had done significant work on the Academy

2    Module prior to its formal engagement. A prototype of the system was given to OPD

3    and the vendor has worked with OPD to identify gaps between the prototype and

4    OPD requirements. Implementation of the identified gaps are underway.  The project

5    stream is projected to be completed in March 2019, including the Academy Module,

6    existing data migration, and integration of ongoing data into the PRIME application.

7    **4)**    **Risk Management analytical reporting (being developed in collaboration with**

8         **Stanford) and dashboards that assist in automatic analysis of stop data and**

9         **other early warning indicators.**  The City selected Slalom as the vendor of choice

10        to complete the Risk Management project stream. The Professional Services

11        Agreement, scope of work and terms and conditions were completed in September

12        2018. The Discovery phase of the project began in September and is nearing

13        completion. Several workshops were held with various divisions of OPD including

14        PAS, OIG, IAD, various department SMEs, as well as Professor Monin from

15        Stanford and various ITD technical resources.  Given the findings, mock-ups of the

16        various Dashboards and reports have been created and used as a vehicle to simulate

17        Risk Management scenarios/walkthroughs with the team.  OPD is currently sharing

18        the draft Dashboards with the IMT, Stanford and Mr. Chanin for review and

19        comment. This project stream is on track but has some risk of slippage due to the

20        timing of data availability from the PRIME+ project stream. If slippage does occur,

21        ITD anticipates it will be limited to a couple of weeks and will not impact the

22        completion of the overall PRIME 2.0 project.

23   **5)**    **Integration of body worn camera (BWC) footage into PRIME to allow**

24        **immediate review of stops, arrests and uses of force.**  The City executed a

25        contract earlier this year (April 2018) with VieVu for new body worn cameras and

26

has worked with VieVu on the requirement for including body worn camera footage in PRIME. Although a final solution has not yet been agreed upon, this is the least complicated of the work streams and the City does not anticipate this work impacting the overall schedule for final implementation of PRIME 2.0. It is the City's desire to have video footage linked to Incident Reports in the PRIME system, but there may be technical difficulties with such links being automatically created. However, in the event automatic links are not achievable in the short term, officers can manually and easily create links to the relevant footage as they draft Incident Reports in the PRIME system.

The City still anticipates final implementation of PRIME 2.0 in July 2019.

### III.    INTERVENOR, OAKLAND POLICE OFFICERS ASSOCIATION

Intervener, Oakland Police Officers Association ("OPOA" & "Association") has been actively participating with the City of Oakland ("City"), Oakland Police Department ("Department") as well as Plaintiffs' counsel on various NSA tasks and related matters. Specifically the OPOA was consulted regarding the ongoing review of the disciplinary process for sworn members vis-a-vis possible implicit bias. The OPOA will continue to collaborate with the parties to achieve full compliance with the NSA.

1    Dated: November 16, 2018      BARBARA J. PARKER, City Attorney

2                                MARIA BEE, Chief Assistant City Attorney
RYAN G. RICHARDSON, Special Counsel

3                                KIMBERLY A. BLISS, Deputy City Attorney
JAMILAH A. JEFFERSON, Senior Deputy City Attorney

4                         By:     /s/ Barbara J. Parker

5                                  Attorneys for Defendants
CITY OF OAKLAND, et al

6

7    Dated:  November 16, 2018     JOHN L. BURRIS
Law Offices of John L. Burris

8                         By:     /s/ John L. Burris

9                                  Attorney for Plaintiffs

10   Dated:  November 16, 2018     JAMES B. CHANIN
Law Offices of James B. Chanin

11

12                        By:     /s/ James B. Chanin

13                                 Attorney for Plaintiffs

14   Dated:  November 16, 2018     ROCKNE A. LUCIA, JR.
Rains Lucia Stern St. Phalle & Silver

15

16                        By:     /s/ Rockne A. Lucia, Jr.
Attorney for Intervenor
OAKLAND POLICE OFFICERS ASSOCIATI

17

18

19

20

21

22

23

24

25

26

# EXHIBIT A



# Oakland Police Department Discretionary Stops by Race
## January 1, 2017 to September 30, 2018

# EXHIBIT B



# EXHIBIT C



**OAKLAND**
POLICE DEPARTMENT
455 7TH ST., OAKLAND, CA 94607 | OPDCRIMEANALYSIS@OAKLANDNET.COM

**CRIME ANALYSIS**

# Year To Date Crime Report—Citywide
## 05 Nov — 11 Nov 2018

| Part 1 Crimes<br>*All totals include attempts except homicides.* | Weekly Total | YTD 2016 | YTD 2017 | YTD 2018 | YTD % Change<br>2017 vs. 2018 | 3-Year YTD Average | YTD 2018 vs. 3-Year YTD Average |
|---|---|---|---|---|---|---|---|
| **Violent Crime Index**<br>(homicide, aggravated assault, rape, robbery) | 99 | 5,187 | 4,988 | 5,014 | 1% | 5,063 | -1% |
| **Homicide – 187(a)PC** | 2 | 64 | 59 | 58 | -2% | 60 | -4% |
| **Homicide – All Other *** | - | 2 | 2 | 5 | 150% | 3 | 67% |
| **Aggravated Assault** | 56 | 2,362 | 2,486 | 2,579 | 4% | 2,476 | 4% |
| Assault with a firearm – 245(a)2PC | 8 | 282 | 251 | 245 | -2% | 259 | -6% |
|    Subtotal - Homicides + Firearm Assault | 10 | 348 | 312 | 308 | -1% | 323 | -5% |
| Shooting occupied home or vehicle – 246PC | - | 223 | 171 | 198 | 16% | 197 | 0% |
| Shooting unoccupied home or vehicle – 247PC | 11 | 347 | 339 | 398 | 17% | 361 | 10% |
| Non-firearm aggravated assaults | 37 | 1,510 | 1,725 | 1,738 | 1% | 1,658 | 5% |
| **Rape** | 2 | 182 | 208 | 189 | -9% | 193 | -2% |
| **Robbery** | 39 | 2,579 | 2,235 | 2,188 | -2% | 2,334 | -6% |
| Firearm | 8 | 1,078 | 838 | 714 | -15% | 877 | -19% |
| Knife | 15 | 136 | 148 | 150 | 1% | 145 | 4% |
| Strong-arm | 13 | 980 | 921 | 1,028 | 12% | 976 | 5% |
| Other dangerous weapon | - | 84 | 75 | 80 | 7% | 80 | 0% |
| Residential robbery – 212.5(a)PC | 2 | 87 | 88 | 62 | -30% | 79 | -22% |
| Carjacking – 215(a) PC | 1 | 214 | 165 | 154 | -7% | 178 | -13% |
| **Burglary** | 154 | 8,712 | 11,261 | 8,649 | -23% | 9,541 | -9% |
| Auto | 123 | 6,312 | 8,996 | 6,690 | -26% | 7,333 | -9% |
| Residential | 25 | 1,835 | 1,729 | 1,326 | -23% | 1,630 | -19% |
| Commercial | 3 | 403 | 350 | 488 | 39% | 414 | 18% |
| Other (Includes boats, aircraft, and so on) | 3 | 126 | 122 | 111 | -9% | 120 | -7% |
| Unknown | - | 36 | 64 | 34 | -47% | 45 | -24% |
| **Motor Vehicle Theft** | 78 | 6,793 | 6,104 | 5,139 | -16% | 6,012 | -15% |
| **Larceny** | 73 | 5,276 | 5,341 | 5,562 | 4% | 5,393 | 3% |
| **Arson** | 2 | 120 | 126 | 157 | 25% | 134 | 17% |
| **Total** | 406 | 26,090 | 27,822 | 24,526 | -12% | 26,146 | -6% |

**THIS REPORT IS HIERARCHY BASED. CRIME TOTALS REFLECT ONE OFFENSE (THE MOST SEVERE) PER INCIDENT.**

These statistics are drawn from the Oakland Police Dept. database. They are unaudited and not used to figure the crime numbers reported to the FBI's Uniform Crime Reporting (UCR) program. This report is run by the date the crimes occurred. Statistics can be affected by late reporting, the geocoding process, or the reclassification or unfounding of crimes. Because crime reporting and data entry can run behind, all crimes may not be recorded.

*\* Justified, accidental, fœtal, or manslaughter by negligence*
*PNC = Percentage not calculated — Percentage cannot be calculated.*
*All data extracted via the LEAP Network.*

# EXHIBIT D

| # | Stanford 50 Recommendations and Status | Implemented / Proposed Implementation Date | Total Implemented |
|---|---|---|---|
| 1 | **Continue Collecting Stop Data (SD)** – *AB953 will soon require all California law enforcement agencies to data on both vehicle and pedestrian stops statewide. OPD is well ahead of most agencies, as the department already collects the clear majority of measures this new law will require.*<br><br>The Oakland Police Department (OPD) since 2007 has mandated that all members shall complete a Form for every vehicle, walking, and bicycle stop. The Department has been recognized nationwide for its early efforts; AB953 will soon require all California law enforcement agencies to collect similar data. | Implemented | 1 |
| 2 | **Add a Field on the SD Form to Capture Squad Information** – *Analysis by squad would allow researchers to better identify what accounts for variation in stop outcomes, and how the squad itself operates.*<br><br>OPD's SD Form was revised and published 10/7/16, to include the following fields; a) Supervisor Assigned for This Incident, b) Regularly Assigned Supervisor, c) Squad Assigned for This Incident, and d) Regularly Assigned Squad. | Implemented | 2 |
| 3 | **Add a Field on the SD Form to Capture Squad Sergeant Information** – *Squad sergeant information would allow researchers to examine the relative contributions of officer experience and squad sergeant to the decisions officers are making about who to stop, search, handcuff, or arrest.*<br><br>See above (#2) | Implemented | 3 |
| 4 | **Update the SD Form as Needed** *October 2016 Field Interrogation / Stop Data Report (FI/SDR) Revision no longer required officers to create a separate form for each person. Additional changes were included to better reflect search types and results; body-worn camera activation; citation information; vehicle occupant information; and intelligence-led factors.*<br><br>October 2016 FI/SDR Revision no longer required officers to create a separate form for each person. Additional changes included the following; a) Result Encounter selection should only be the "highest," b) Type of Search should only be the primary, c) Result of Search fields have expanded, d) PDRD activation field, e) Intelligence-Led Stop and "Intelligence-Led Factor" fields were added, f) Citation Issued & Number, g) Location of Vehicle Occupant field added, and h) Search Conducted of Vehicle field added. | Implemented | 4 |
| 5 | **Standardize, Track and Analyze Crime-Related Communications Provided to Officers** – *The department should track and analyze the crime related communications given to line officers by creating a digital repository where such communications are automatically collected and time-stamped* | Implemented | 5 |

| # | Stanford 50 Recommendations and Status | Implemented / Proposed Implementation Date | Total Implemented |
|---|---|---|---|
| | with clear distribution list. Opportunity to examine whether certain types of directives are more likely to increase racial disparities in stops. | | |
| | All officers can now access Command Directives, Weekly Priorities, Daily Bulletins, & Law Enforcement Notifications. | | |
| 6 | **Add a Field on the SD Form Regarding Body-Worn Camera (BWC) Usage** – *The department should add a stop data form text field where officers can indicate whether their camera was activated and, if not, why.*<br><br>"PDRD* Activated" field was added to the revised FI/SDR form, to include a "Reason No PDRD" justification field. *PDRD = personal digital recording device | Implemented | 6 |
| 7 | **Capture/Tag BWC Footage** – *OPD's previous policy did not require officers to tag footage with an incident number. Recommended that the department begin tagging self-initiated footage with an incident number, which would allow the PD and researchers to associate each stop in the database with the BWC footage from that stop*<br><br>OPD Department General Order (DGO) I-15.1 requires that all members shall enter in VERIPATROL the RD# (report number) associated with each video file. This can be completed through the Mobile Data Terminal (MDT). | Implemented | 7 |
| 8 | **Use BWC Footage to Train Officers** – *The department should identify footage of exemplary interactions (such as those involving de-escalation), and then use that footage to teach officers best practices.*<br><br>This practice is already mandatory for all Uses of Force, Internal Affairs Investigations and monthly one-on-one reviews between the Sergeant and officer. | Implemented | 8 |
| 9 | **Require Officers to Self-Audit Racially Charged BWC Footage** – *The department should require officers to flag two interactions per month that were especially tense and were captured on their own BWCs. This self-auditing process may even lead to change in policy* | Implemented | 9 |

| # | Stanford 50 Recommendations and Status | Implemented / Proposed Implementation Date | Total Implemented |
|---|---|---|---|
| | After further discussion between OPD and Stanford, this recommendation has been update. OPD will audit annual racial discrimination complaints with a small group to identify trends and/or patterns that could lead to a reduction in such complaints through training. Closed IAD cases will be utilized. | | |
| 10 | **Use BWC Footage to Evaluate Policies/Ensure Compliance** – *The department could use BWC footage to evaluate the implementation and impact of new policies, as well as to check officers' compliance with existing policies.*<br><br>Achieved through Supervisory Command and OIG reviews per DGO I-15.1. Information Bulletin "PDRD Review" released 18 November 14, requires sergeants to conduct a review of their officers' PDRD recordings, and the officer self-identifies how the Procedural Justice tenets are followed or not followed. | Implemented | 10 |
| 11 | **Invest in the development of a Body Worn Camera early warning system** – *Invest in the development of an early warning system of BWC footage that would be integrated into the PRIME system. This would involve developing metrics for evaluating and analyzing police-community interactions captured on the cameras.*<br><br>As part of Performance Reporting Information Metrics Environment (PRIME) 2.0, OPD will be integrating body worn camera footage to allow supervisors and commanders to immediately review stops, arrests, and uses of force. | **July 2019 (ITD)** | 10 |
| 12 | **Build a SD dashboard** - *The department should build an interface in the PRIME early warning system that clearly summarizes and visualizes stop data – that is, a dashboard.*<br><br>This recommendation will also be implemented as part of the development of PRIME 2.0 in July 2019. OPD is reliant upon the City of Oakland Information Technology Department (ITD) to complete this recommendation. | **July 2019 (ITD)** | 10 |
| 13 | **Automate SD Analysis** – *Automate stop data analysis, to the extent possible, that reports can be produced and relied upon.*<br><br>In late January 2018, DC Armstrong met with Dr. Eberhardt, who advised him that the development of the Risk Management Meeting (RMM) Slides satisfy this recommendation. | Implemented | 11 |

| # | Stanford 50 Recommendations and Status | Implemented / Proposed Implementation Date | Total Implemented |
|---|---|---|---|
| 14 | **Automate SD narrative analysis** – *The department should work with researchers to develop algorithms for analyzing officers' narrative accounts, exploring why officers stop, search, handcuff, and take other actions.*<br><br>Stanford has developed a software tool that improves OPD's abilities to search and analyze officers' narrative accounts, which will particularly assist the Department's Office of Inspector General (OIG) in conducting audits of stops, handcuffing, searches, and uses of force. Stanford needs to train individuals in OPD on the use of the software.<br><br>*Training date is still yet to be determined. Individuals who need the initial training have already been identified; scheduling dates with Stanford for both January and February 2019. | February 2019 (Stanford) | 11 |
| 15 | **Assist Researchers in Building an Automatic Speech Recognition System for BWC** – *Analyzing officers' speech in BWC footage could allow the department to examine officers' language precisely and systematically, and then develop strategies for improving officer communication.*<br><br>Per Stanford, OPD is compliant with this recommendation, as the University has received all the necessary data from the department. | Implemented | 12 |
| 16 | **Improve Systems for Backing Up & Accessing BWC Footage** – *The department's current server is slow and frequently crashes when handling BWC footage.*<br><br>Upgrade of the data storage system took place in July 2016 and 500 terabytes of storage was added. | Implemented | 13 |
| 17 | **Hire a data manager** – *Recommended that the department hire a dedicated full-time data manager to oversee databases, data requests, research collaborations, and data for risk management.*<br><br>The Department has worked with the City Administration and the Department of Human Resources to reclassify positions in the Department into a Police Program and Audit Supervisor position. The job duties will include ensuring that OPD uses available data to better inform risk management efforts, including conducting statistical analyses of all OPD personnel to determine outliers for risk assessments. The individual in this position will also work directly with OPD managers and supervisors to ensure that there is a clear understanding of the data available for managing risk and providing high level policy and personnel recommendations to the Chief for purposes of risk management. Additional responsibilities will include working with developers to ensure the | February/March 2019 | December 2018 |

| # | Stanford 50 Recommendations and Status | Implemented / Proposed Implementation Date | Total Implemented |
|---|---|---|---|
| 18 | Department's risk management data is accurate and developing new systems to support risk management efforts.<br><br>The City is in the process of drafting the job announcement and supplemental questions for applicants, which it hopes to publish in mid to late December. The City would expect application screening through January, with interviews of candidates sometime in February. f<br><br>**Partner w/Outside Researchers to Analyze and Use Data** – *The department should work with researchers to adopt novel, sophisticated statistical techniques and analyze their own data in-house.*<br><br>Stanford is assisting with the Risk Management data analysis and presentation. | Implemented | 14 |
| 19 | **Partner w/Outside Researchers to Conduct High-Quality Studies** – *The department should work with researchers to implement systematic studies that are inspired by stop data and are designed to improve a specific outcome.*<br><br>OPD has been working with Stanford University since 2015. | Implemented | 15 |
| 20 | **Give Officers Individualized Feedback on their Stop Performance** – *Routinely discussing officers' performance to help them develop and reach their goals consistent with the broader mission of law enforcement agencies' becoming learning institutions* –<br><br>This task is considered implemented based on the Area Commanders currently conducting weekly meetings with their staff to discuss command directives, to include stop data. The information discussed is pushed to supervisors and officers. | Implemented | 16 |
| 21 | **Create New Ways for Officers to Give Feedback to Command Staff** – *Just as supervisors and command staff could provide more feedback to line officers, so too could line officers to supervisors and command staff.*<br><br>The department has developed new mechanisms for receiving feedback from OPD members on what is and is not working well department wide. Small feedback sessions are held monthly, and anonymous comment cards are available in hardcopy and electronically. An Informational Bulletin was released in October 2017 for this process. | Implemented | 17 |
| 22 | **Use Complaint Data More Effectively** – *Recommended that the department identify not only areas of complaints, but also where complaints are surprisingly absent.* | Implemented | 18 |

| # | Stanford 50 Recommendations and Status | Implemented / Proposed Implementation Date | Total Implemented |
|---|---|---|---|
| | Addressed in the monthly Risk Management Meetings. | | |
| 23 | **Conduct customer-service audits after routine stops** – *Recommended the department identify people who were recently stopped by OPD and following up with them with an online questionnaire, phone questionnaire, in-person questionnaire, or even a focus group. Receiving this feedback would allow the department to track the police-community interactions that community members find most or least satisfying.*<br><br>OPD has elected to have Stanford conduct these interviews. Stanford is currently developing an audit protocol and determining an appropriate start date. The process is ready to go and just needs to be implemented. They have contracted with a rotary call service to implement. This is a one-time occurrence, funded through Stanford contract. | **May 2019 (Stanford)** | 18 |
| 24 | **Regularly administer community surveys** – *Recommended the department continue to work with researchers to collect community survey data. These data will help the department understand its reputation in the community at large*<br><br>OPD and the Mayor's Office have selected a surveyor following a formal Request for Proposal process. The Research and Planning Unit is currently working with the Mayor's Office and the vendor to finalize the scope in terms of qualitative and quantitative survey design. | **May 2019** | 18 |
| 25 | **Make trainings shorter and more frequent** – *Recommended the department break with industry tradition and offer more regular police-community training and more frequently.*<br><br>• Sworn personnel have been offered training opportunities through the Citywide Training Portal, including the "Advancing Racial Equality Academy – 4 modules."<br>• Discussions ongoing to host Racial Equity Academy at the PAB.<br>• Continuing to provide staff with Procedural Justice Training.<br>• Working with Equal Justice USA to provide short, intimate training sessions on Trauma-Informed Policing through the International Association of Police Chief's Collective Healing Initiative (December '18). Short sessions will support field implementation and procedural refinement, with follow-up EJUSA workshops. | **Begin December 2018 / Complete by Spring 2019** | 18 |

| # | Stanford 50 Recommendations and Status | Implemented / Proposed Implementation Date | Total Implemented |
|---|---|---|---|
| | • Increase use of line-ups for regular, brief trainings on a monthly or bi-monthly basis. Topics can cover updates on relevant policy changes and curated videos that showcase relevant community information which would offer officers more insight into community events. | | |
| 26 | **Expand training topics** – *Recommended the department should give officers a suite of trainings in social tactics, to include offering specialized training aimed at those who are playing a unique role within the department.*<br><br>OPD has hosted the initial FBI LEEDA Supervisor training. "Command Leadership" and "Executive Leadership" are scheduled for 25 Feb 19 – 1 Mar 19 and 13 May 19 – 17 May 19 respectively. The Training Division is working on finalizing classes more courses for Supervisor Leadership Institute and Leadership Integrity. Training Division still assessing possibility of developing new community-involved officer trainings and/or scenario-based trainings. Implementation confirmed with Stanford Dr. Jennifer Eberhardt on October 31, 2018. | Implemented | 19 |
| 27 | **Let officers choose which trainings to take:** *Allowing officers to choose which courses to take, and when, from a menu of options could dispel the notion that social tactics is punitive.*<br><br>An electronic course catalog* and calendar has been created allowing personnel to select the trainings they would like to take attend. Officers have the opportunity to log in and select courses:<br>• Trauma and Self Care<br>• Advancing Racial Equality Academy<br>• Race and Equity 101<br>• Implicit Bias, Social Power and Equity<br>• Inclusive Engagement, Accountability and City Government<br>• Emotional Intelligence (Dr. Gilmartin)<br>• City of Oakland Peacemaker Program<br><br>Officers currently have access to the State of California's POST Learning Portal which offers an electronic course catalog of Self-Paced Training.  Supervisors will be tasked with ensuring officers are logging in and completing training of their choice quarterly. Supervisors will document completed training in PRIME via Supervisory Notes. Officers also currently have access to the Blue Courage Learning Portal for additional Social Tactics training.<br><br>* | Implemented | 20 |

| # | Stanford 50 Recommendations and Status | Implemented / Proposed Implementation Date | Total Implemented |
|---|---|---|---|
| | https://app.targetsolutions.com/tsapp/dashboard/pl_fb/index.cfm?fuseaction=c_pro_events.showHome | | |
| 28 | **Incentivize training-in-action workshops** – *Recommended the department incentivize workshops for this who would like to continue meeting a topic after training has ended.*<br><br>OPD is working on developing internal and external opportunities for officers to receive continued training, particularly on social tactics. Officers who attend outside, non-mandatory trainings already receive positive supervisory notes in their personnel files.<br><br>Incentives:<br>Exceeds expectations in performance appraisals, positive Supervisory Note File (SNF) entries, Procedural Justice Pin for uniform (requires update of C-1 with criteria to receive pin) | **January 2019** | **20** |
| 29 | **Rigorously measure the effects of all trainings** – *The department should insist on rigorously evaluating whether trainings improve police-community relations. This can be done by looking at community-level indicators before and after a training is deployed or, if the program is deployed progressively across the entire agency, by looking at outcomes for officers or squads who have already undergone training versus those who are still waiting to receive it.*<br><br>OPD has started this process by engaging Stanford to evaluate the mandatory, Department-wide Procedural Justice II training. Almost all OPD members have now undergone this training.  Final trainings for last 200 or so will be started in September and will conclude in December 14, 2018. | **December 2018**<br>**(Stanford)** | **20** |
| 30 | **Hire A Training Coordinator** – *Recommended the department hire a full-time training coordinator to manage and track the trainings offered in the department.*<br><br>Task is already performed by existing staff (Training Unit/Sgt. Miller). | Implemented | 21 |
| 31 | **Implement Living Room Meetings with Out of Uniform Officers and Residents** – *Hold relationship-building meetings, or "tables," that include members of OPD as well as community members who are committed to improving police-community relations.*<br><br>This practice has been early 2018 in two Police Areas; four living room meetings have taken place and more meetings area slated through the end of the year. Additionally, a draft of the OPD Community Engagement policy is in the final stages of review. | Implemented | 22 |

| # | Stanford 50 Recommendations and Status | Implemented / Proposed Implementation Date | Total Implemented |
|---|---|---|---|
| 32 | **Enhance the Capacity of Community Resource Officers (CRO) Through Living-Room Meetings & Social Media** – *Improve police-community relations by increasing the capacity of the CRO's and making make the work they are doing for the community more visible.*<br><br>CRO's are utilizing the social media platform Next Door to send out event information applicable to their assigned neighborhoods, to include closed projects. CROs will conduct living-room meetings when requested by community members. Furthermore, starting in 2017, an annual two-day training is held specifically for the CROs, which includes use of social media and community relations. | Implemented | 23 |
| 33 | **Require Squad-Based Community Projects** – *Recommended that squads also begin working together on long-term projects in areas most affected by crime. Through these projects, officers could experience interaction with community members who are working hard to see the neighborhood thrive.*<br><br>Patrol squads have been directed to complete one project per year with a local partner (e.g. school, church, business, NGO, etc.) to develop positive community relationships. Individual squads will identify the project and the means for implementation. Each squad submits a project proposal to their Area Commander for approval. A draft of the Community Engagement policy is currently in progress and potential partnerships have been identified. | Implemented | 24 |
| 34 | **Train Officers & Community Members Together** – *Recommended that a limited number of social tactics trainings are offered to both officers and members of the public. These mixed classes would remind officers and community members of their shared goals.*<br><br>Implemented with the development of the Procedural Justice II training which should be fully completed by September 2018 | Implemented | 25 |
| 35 | **Encourage out-of-uniform contact with communities** – *see #31 above* | Implemented | 26 |
| 36 | **Provide Business Cards for Every Consensual Encounter, Detention & Community Contact** – *Presently, officers have generic cards that they distribute only when community members wish to file a complaint. Business cards can be used to establish positive relations with the public as well.* | Implemented | 27 |

| # | Stanford 50 Recommendations and Status | Implemented / Proposed Implementation Date | Total Implemented |
|---|---|---|---|
| | On 30-Oct-17, a new policy (Lexipol 205) regarding the use of business cards was enacted, stating that every OPD member should provide a business card each time contact with a member of the public results in an investigative consensual encounter or detention. | | |
| 37 | **Show More Care in High-Crime Areas through Contacting Residents** – *What people see matters. It's recommended OPD develop more crime reduction strategies that cast police officers as caretakers of the community.*<br><br>Special Order 9186 was published on October 11, 2017. Door hangers provide contact OPD contact information to residents in areas where a ShotSpotter activation has occurred. Door hangers are available in the Report Writing Room at the PAB and line-up room at Eastmont. | Implemented | 28 |
| 38 | **Hold Critical Incident Discussions and Training** – *When critical incidents occur, such as a controversial officer-involved shooting, it is recommended the department hold a series of discussions both internally and externally on how the department plans to respond.*<br><br>A Peer Support group protocol exists and is activated during every critical incident. | Implemented | 29 |
| 39 | **Host annual conference on police-community relations** – *Recommended the department facilitate an annual conference on police-community relations that is planned and executed jointly by members of the department and community.*<br><br>Took place with the Mayor's Office at Laney College on 19Jul18. The department is slated to release its annual Racial Disparity Report in late June.<br><br>OPD will coordinate with Mayor's Office on future annually conferences | Implemented | 30 |
| 40 | **Develop and Track Measures of Positive Community Engagement** – *The department should consider using its metrics of positive community contact in evaluating officer's performance in addition to using standard measures like arrests, stops, searches, and search recoveries.*<br><br>Area Captains have created their own metrics to track the productivity of their subordinates. A standardized tracking sheet will be developed to be used citywide for standard operating procedures (SOP) for measuring productivity and community engagement. Furthermore, there is a master tracking | Implemented | 31 |

10

| # | Stanford 50 Recommendations and Status | Implemented / Proposed Implementation Date | Total Implemented |
|---|---|---|---|
| | sheet of all community engagements officers participate, patrol, CROs, Crime Reduction Team Officers, and Command Staff. | | |
| 41 | **Continue Risk Management Meetings** – *Once a month, the OPD command staff reviews data with a captain from one of the five areas of Oakland. Stop data reviews feature predominately in these meetings. These meetings are quite impressive, and we recommend continuing them.*<br><br>RMM process was revised in January 2018 by focusing on each of the 2 Bureau of Field Operations on a rotational basis, which encompasses the applicable command areas. OPD has placed an emphasis how the level of policing impacts Oakland communities (i.e. "footprint") as well as how intelligence-led policing can lower the footprint. Additionally, a "SD Playbook" has been developed as a means for additional evaluation by commanders of the potential disparate impact in different communities. Area Captains are given deliverables at the commencement of each meeting based on issues raised during risk management meetings. | Implemented | 32 |
| 42 | **Identify Outlier Officers** – *Recommended that the command staff begin to examine how much outlier status on stops or searches predicts outlier status on other dimensions in the PRIME system.*<br><br>Part of the monthly Risk Management Meetings. Complaints, Uses of Force, Collisions, Pursuits, and Sick Leave are all addressed. During these meetings, OPD Command also reviews individual sergeants and squads. | Implemented | 33 |
| 43 | **Monitor and Reduce Time Pressure** – *Recommended that the department better track the amount of time officers spend on low-priority activities and maximizing the amount of time spent on high-priority activities. The reintroduction of daily activity tracking sheets will help.*<br><br>Daily activity logs track the amount of time officers spend on low-priority activities and maximizes the amount of time spent on high-priority activities.<br><br>The current OPD patrol schedule includes four shifts, three of which are 10 hours in length and the fourth is 12 hours in length. Two of the 10-hour shifts (1st Watch/Day Watch and 3rd Watch/Dog Watch/Graveyard) have overlapping teams once a week and multiple briefings each day. Depending on the day of the week, there may be six briefings at each of the two OPD patrol facilities – resulting in 12 briefings covering four shifts. More importantly, there is little data that the current patrol schedule aligns personnel with call load. An analysis of call load by day of week and time of day should identify | Implemented | 34 |

| # | Stanford 50 Recommendations and Status | Implemented / Proposed Implementation Date | Total Implemented |
|---|---|---|---|
| | time of greatest need of personnel as well as time of least need. Aligning patrol schedules with this data should result in greater efficiencies, increased community satisfaction, and reduced response times. | | |
| 44 | **Monitor and Reduce Stress and Fatigue** – *The department should consider examining the potential influence of momentary stress and fatigue on self-initiated stops. Work schedules could influence officer decision-making during such stops, which could uncover patterns and suggest improvements.*<br><br>OPD Health & Wellness Unit (HWU) is a resource available to all personnel. It serves as the bridge between the professional resources available to the employees, including but not limited to: Peer Support Team, Critical Incident Response Team (CIRT), OPD Medical Unit, and, Employee Assistance (Claremont and Managed Health Network (MHN)). Additionally, "Blue Courage" training for both sworn and professional staff has been implemented and focuses heavily on health and wellness (stress management, grief and loss, managing change, and building resilience). Maintaining this program is critical to the well-being of department personnel, particularly officers. | Implemented | 35 |
| 45 | **Identify Factors Associated w/High-Low Performing Squads** – *Recommended the department use data to identify high and low performing squads to examine how much these performance differences are due to the individual officer characteristics, squad characteristics, squad supervisors, and the directives officers receive from command staff.*<br><br>Part of the monthly Risk Management Meetings. The Area Commanders are expected to address why the two squads differ in productivity, to include any disparities and what measures have been implemented to ensure that each squad meets the directive of the Commander. | Implemented | 36 |
| 46 | **Review Handcuffing Policies** – *A sample review found that 83% of searches involved handcuffing. Handcuffing is often viewed as an intrusive and humiliating action, OPD should review its handcuffing policies for their compliance with laws and best practices.*<br><br>The revised policy (Lexipol 302) was published 06/14/17, with an emphasis on the probation and parole status of the subject, which alone is not justification to use handcuffs. | Implemented | 37 |
| 47 | **Review search policies** – *Does the discovery that someone is on probation or parole always trigger a search? If so, the department examine whether this practice helps or hinders community-police relations, individuals' rehabilitation process, and the protection of the community from crime.* | Implemented | 38 |

12

| # | Stanford 50 Recommendations and Status | Implemented / Proposed Implementation Date | Total Implemented |
|---|---|---|---|
| | Stanford's recommendation questions whether the discovery that an individual is on probation or parole should always trigger a search, and, if so, whether such practice helps or hinders community-police relations, individuals' rehabilitation processes, and the protection of the community from crime. A Departmental working group was formed and a new draft General Order R-02: Searches of Individuals On Probation Or Parole was written. The City Attorney's Office, the IMT and Plaintiffs' counsel reviewed and approved the draft policy, which emphasized that the primary purpose of probation and parole searches is to further legitimate law enforcement or rehabilitative interests, and that probation and parole searches shall not be arbitrary, capricious or harassing. The policy would also require officers to document articulable facts underlying their decision to initiate a parole or probation search.

Under the terms of the Charter Amendment establishing the City's new civilian Police Commission, the policy was presented to the Commission for review and approval. The Commission rejected the Department's policy and implemented their own modifications which, among other things, would go beyond state law governing probation and parole search conditions to require the Department to have reasonable suspicion that an individual on probation or parole was involved in criminal activity before invoking the individual's probation or parole search clause. Under the City's Charter, the policy now goes to the Council to resolve the differences between the Department's proposed policy and the Commission's modifications.

Whichever version of the policy is ultimately adopted, Stanford considers this recommendation implemented. | | |
| 48 | **Review Officer Inquiries Concerning Probation and Parole Status** – *An analysis revealed that 93% of probation/parole searches were of African Americans and Hispanics. Are members of these groups more likely to be asked this question than are Whites or Asians? It is recommended that recording in the stop data report whether the officer asked about either probation or parole status, as well as the justification for asking the question.*

OPD and Stanford have both further studied this issue and this does not appear to be an issue after further reflection. An audit conducted in January 2017 by OIG found that of the 219 searches conducted, 96% of the reviewed incidents involving an officer's stop and search of a probationer or parolee, officers neither mentioned nor requested a person's probation or parole status prior to the status becoming independently known. | Implemented | 39 |

| # | Stanford 50 Recommendations and Status | Implemented / Proposed Implementation Date | Total Implemented |
|---|---|---|---|
| 49 | **Produce and publish an annual Racial Impact Report** – *OPD should publish a report that not only tallies its successes but also candidly reports metrics such as racial differences in rates of handcuffing, searches, and arrests, and the results of community surveys, etc.*<br><br>The report is complete and is currently under review. | **January 2019** | **39** |
| 50 | **Analyze Data for Trends over Time** – *The OPD leadership should begin to look at their stop data longitudinally and be mindful of increases in activities with the largest disparities, including traffic violations, handcuffing, and weapon searches.*<br><br>An on-going process through OIG Audits and the monthly Risk Management Meetings. | Implemented | 40 |

# EXHIBIT E

