November 28, 2018

# Fifty-Eighth Report
## *of the* Independent Monitor
## *for the* Oakland Police Department

## Introduction

This is our fifty-eighth status report on the Negotiated Settlement Agreement (NSA) in the case of *Delphine Allen, et al., vs. City of Oakland, et al.,* in the United States District Court for the Northern District of California under the direction of Judge William H. Orrick.  I was appointed in 2010 to oversee the monitoring process of the Oakland Police Department (OPD) that began in 2003.

This report covers our site visit of October 29-30, 2018; and describes our recent assessments of NSA Tasks 5, 34, and 41.  As we have noted previously, following the Court's Order of May 21, 2015, in our monthly reports, we devote special attention to the most problematic component parts of the Tasks that are not yet in full or sustained compliance, and discuss the most current information regarding the Department's progress with the NSA and its efforts at making the reforms sustainable.

### *Increasing Technical Assistance*

Each month, our Team conducts a visit to Oakland that includes both compliance assessments and technical assistance.  During our visits, we meet with Department and City officials; observe Department meetings and technical demonstrations; review Departmental policies; conduct interviews and make observations in the field; and analyze OPD documents and files, including misconduct investigations, use of force reports, crime and arrest reports, Stop Data Forms, and other documentation.  We also provide technical assistance in additional areas, especially those that relate to the remaining non-compliant Tasks or areas identified by the Department.

Within the last several months, we have provided technical assistance to OPD officials in the areas of IAD investigation quality (Task 5); stop data and related issues (Task 34); risk management and the ongoing maintenance issues and development of the Performance Reporting Information Metrics Environment (PRIME) systems (Task 41); and several Department policies and procedures, including policies related to PRIME, officer discipline, probationers and parolees, handcuffing, and the use of electronic control weapons.

## *Building Internal Capacity at OPD*

Also per the May 21, 2015 Court Order, we continue to work closely with the Office of Inspector General's (OIG) lieutenant and staff to identify areas that it should audit or review – and to help design approaches to these audits that are not cumbersome, so as to ensure sustainability.  We review OIG's quarterly progress reports, which are a valuable resource and assist us in assessing compliance with NSA requirements.

OIG published its most recent progress report (covering the first two quarters of 2018) in early October.

---

## Additional Notes on Monitoring Team's Focused Review of Recent Decline in Uses of Force

While we have concluded our previously reported inquiry to validate the significant drop in officers' use of force, described in our last two status reports, our review of OPD's proposed and ongoing corrective measures is ongoing.

This review was prompted by an unexplained reduction of 75% in reported use of force during the period 2012-2017.  Decreases in reported force continued through October 6, 2018.  Principal decreases have been in the Level 4 category of force.[1]  While a reduction in force, no matter the assigned category, is positive, the magnitude of this reduction prompted our review for validation purposes.

We initially reviewed arrest data for 2016-18, which negated the premise that the decrease in force may be attributed to a decrease in arrests; as a result, we selected arrest reports involving specific offenses for which there were no accompanying use of force reports for a detailed review.[2]  We received and reviewed over 100 such reports.  Based on the circumstances described in these reports, we then received associated video recordings for 38 arrests that appeared or were likely to have involved a use of force.

---

[1] OPD Level 4 uses of force include: "1) The intentional pointing of a firearm at a person. 2) A Weaponless Defense Technique is applied to a Vulnerable Area, excluding strikes (e.g., Hair grab, pressure to mastoid or jaw line; and shoulder muscle grab); 3) An on-duty firearm discharge to dispatch an injured animal; or 4) A weaponless Defense Technique Control Hold is applied: a. Escort (elbow); b. Twist lock: c. Arm-bar; or d. Bent-wrist. 5) A canine deployment in which a suspect is located by the canine, but no bite occurs."

[2] Arrest reports for the offenses of assault on an officer, obstructing and/or resisting arrest were selected based on the increased probability that these arrests may involve a use of force.

Our review of the video recordings found no instances where the force used was unwarranted or inconsistent with policy; and as previously reported, we found several instances where officers exhibited considerable patience and understanding, even though they were often faced with resistance and significant verbal abuse.  However, based on our assessments of the video recordings, officers used force in 14 of the cases we reviewed; six of the involved officers pointing firearms at a person(s).  We also noted that the actual arrest was not video-recorded in six cases.  We recognize that the Chief, on October 13, 2018, sent a Department-wide reminder message underscoring OPD's policy relevant to PDRDs.

These findings are troubling – due first and foremost to the lack of force reporting described above; but also due to the lack of consistency regarding video activation during these activities, specifically during the arrest.  In addition, as previously reported, we are concerned with the inclusion of inaccurate, boilerplate including language stating that "no force was used or witnessed" in officers' arrest reports, a serious misrepresentation.  It is not clear whether these deficiencies result from supervisory direction or a lack thereof, a misinterpretation of OPD policy, or other reasons.  However, OPD must definitively determine this to assure confidence in the accuracy of its force data.

Prompted by our inquiry, OIG also initiated an internal review of the reported reduction of Level 4 force.  Although that review is reportedly incomplete, OIG has concluded that a lack of clarity regarding the pointing of a firearm and the definition of low-ready appears to be a "factor contributing to the drop" in reported force.  Although OPD policy appears clear on this issue, OPD nevertheless initiated corrective training to address this.[3]  This first step, which narrowly addresses the pointing of a firearm, is positive; it may be a contributing factor to the recently reported data indicative of what appears to be a more accurate reporting of Level 4 force.  However, our review suggests the need for a more broadly based inquiry and consideration of corrective measures to include policy revisions, training, and intervention where appropriate to ensure continued NSA compliance.

Our review of these measures continues.

---

[3] OPD General Order K- 4 II.D.1.a-b. describes Level 4 Force as "The intentional pointing of a firearm at a person…this includes intentional pointing a firearm loaded with less-lethal ammunition at a person…This does not include the low ready/retention position."  Section VI.A.4. further describes the Low Ready/Retention Position… is where a firearm is pointed at a 45-degree angle or less and **not at a person**…Although the use of the low ready/retention position is not a reportable use of force, members should document their use of the position in the appropriate report."

*Focused Task Assessments"*

## Task 5:  Complaint Procedures for IAD

**Requirements:**

1.  *On or before December 1, 2003, OPD shall develop a policy so that, OPD personnel who become aware that a citizen wishes to file a complaint shall bring such citizen immediately, or as soon as circumstances permit, to a supervisor or IAD or summon a supervisor to the scene.  If there is a delay of greater than three (3) hours, the reason for such delay shall be documented by the person receiving the complaint.  In the event that such a complainant refuses to travel to a supervisor or to wait for one, the member/employee involved shall make all reasonable attempts to obtain identification, including address and phone number, as well as a description of the allegedly wrongful conduct and offending personnel, from the complainant and any witnesses.  This information, as well as a description of the complaint, shall immediately, or as soon as circumstances permit, be documented on a Complaint Form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander, and shall be treated as a complaint.  The supervisor or appropriate Area Commander notified of the complaint shall ensure the Communications Division is notified and forward any pertinent documents to the IAD.*

2.  *An on-duty supervisor shall respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest.  The supervisor shall ensure the Communications Division is notified and forward any pertinent documents to the IAD.  All other misconduct complaints by a jail inmate shall be handled in the same manner as other civilian complaints.*

3.  *In each complaint investigation, OPD shall consider all relevant evidence, including circumstantial, direct and physical evidence, and make credibility determinations, if feasible.  OPD shall make efforts to resolve, by reference to physical evidence, and/or use of follow-up interviews and other objective indicators, inconsistent statements among witnesses.*

4.  *OPD shall develop provisions for the permanent retention of all notes, generated and/or received by OPD personnel in the case file.*

5.  *OPD shall resolve each allegation in a complaint investigation using the "preponderance of the evidence" standard.  Each allegation shall be resolved by making one of the following dispositions:  Unfounded, Sustained, Exonerated, Not Sustained, or Administrative Closure.  The Department shall use the following criteria for determining the appropriate disposition:*

a.   *Unfounded:  The investigation disclosed sufficient evidence to determine that the alleged conduct did not occur.  This finding shall also apply when individuals named in the complaint were not involved in the alleged act.*

b.   *Sustained:  The investigation disclosed sufficient evidence to determine that the alleged conduct did occur and was in violation of law and/or Oakland Police Department rules, regulations, or policies.*

c.   *Exonerated:  The investigation disclosed sufficient evidence to determine that the alleged conduct did occur, but was in accord with law and with all Oakland Police Department rules, regulations, or policies.*

d.   *Not Sustained:  The investigation did not disclose sufficient evidence to determine whether or not the alleged conduct occurred.*

e.   *Administrative Closure:  The investigation indicates a service complaint, not involving an MOR violation, was resolved without conducting an internal investigation; OR*

f.   *To conclude an internal investigation when it has been determined that the investigation cannot proceed to a normal investigative conclusion due to circumstances to include but not limited to the following:*

   1)   *Complainant wishes to withdraw the complaint and the IAD Commander has determined there is no further reason to continue the investigation and to ensure Departmental policy and procedure has been followed;*

   2)   *Complaint lacks specificity and complainant refuses or is unable to provide further clarification necessary to investigate the complaint;*

   3)   *Subject not employed by OPD at the time of the incident; or*

   4)   *If the subject is no longer employed by OPD, the IAD Commander shall determine whether an internal investigation shall be conducted.*

   5)   *Complainant fails to articulate an act or failure to act, that, if true, would be an MOR violation; or*

   6)   *Complaints limited to California Vehicle Code citations and resulting tows, where there is no allegation of misconduct, shall be referred to the appropriate competent authorities (i.e., Traffic Court and Tow Hearing Officer).*

g.   *Administrative Closures shall be approved by the IAD Commander and entered in the IAD Complaint Database.*

6.   *The disposition category of "Filed" is hereby redefined and shall be included under Administrative Dispositions as follows:*

a.   *An investigation that cannot be presently completed.  A filed investigation is not a final disposition, but an indication that a case is pending further developments that will allow completion of the investigation.*

b.   *The IAD Commander shall review all filed cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed and may direct the closure or continuation of the investigation.*

7.   *Any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken.  However, investigators, with the approval of an IAD Commander, are not required to interview and/or take a recorded statement from a member or employee who is the subject of a complaint or was on the scene of the incident when additional information, beyond that already provided by the existing set of facts and/or documentation, is not necessary to reach appropriate findings and conclusions.*

(Negotiated Settlement Agreement III. E.)

**Relevant Policy:**

There are six Departmental policies that incorporate the requirements of Task 5:  Department General Order M-03, *Complaints Against Department Personnel and Procedures* (published December 6, 2005 and revised most recently on August 22, 2013); Communications Division Policy & Procedures C-02, *Receiving and Logging Complaints Against Personnel and Use of Force Incidents* (published April 6, 2007); Training Bulletin V-T.1, *Internal Investigation Procedure Manual* (published June 1, 2006); Special Order 8270, *Booking of Prisoners at the Glenn E. Dyer Detention Facility* (published June 24, 2005); Special Order 8565, *Complaints Against Department Personnel* (published May 11, 2007); and IAD Policy & Procedures 05-02, *IAD Investigation Process* (published December 6, 2005).  In addition, NSA stipulations issued on December 12, 2005, and March 13, 2007, incorporate the requirements of this Task.

**Commentary:**

OPD had been in partial compliance with Task 5 since the twenty-first reporting period.  That status reflected a Court-ordered investigation regarding OPD and the City's discipline and arbitration process.  On March 23, 2016, the Court issued a new Order indicating that irregularities and potential violations of the NSA occurred in ongoing IAD investigation 15-0771.  The Order noted that the investigation raised issues of accountability and sustainability of compliance.

Task 5 consists of several subtasks, briefly described below.  Based on OPD's compliance history with many of the subtasks, not all are being actively monitored at this time.

**Task 5.1** requires that when a citizen wishes to file a complaint, the citizen is brought to a supervisor or IAD, or a supervisor is summoned to the scene.  **Task 5.2** requires that if there is a delay of greater than three hours in supervisory response, the reason for the delay must be documented.  **Task 5.3** requires that where a complainant refuses to travel to a supervisor, or wait for one, personnel make all reasonable attempts to obtain specific information to assist in investigating the complaint.  **Task 5.4** requires that specific information be documented on a complaint form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander.  **Task 5.5** requires that the supervisor or Area Commander notify Communications and forward any pertinent documents to IAD.

To assess compliance with Task 5.1 through and including Task 5.5, we reviewed the Daily Incident Logs (DILs) prepared by the Communications Division and forwarded to IAD each business day.  The DIL form has been modified several times during our tenure to elicit "forced responses" that gather all of the information required to evaluate compliance with these Tasks.  These modifications have significantly enhanced OPD's ability to document compliance by properly filling out and distributing the logs, and compliance rates with these subtasks have been near 100% for several years.  Consequently, we no longer actively assess OPD's compliance with these subtasks, but we continue to receive both the DILs and Daily Complaint Referral Logs (used to document when Information Business Cards [IBCs] are provided to citizens in lieu of a complaint forms).  We spot-check these forms regularly to verify that the quality of their completion has not diminished.  OPD remains in compliance with Tasks 5.1 through and including Task 5.5.

**Task 5.6** requires that an on-duty supervisor respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest of the inmate.  This subtask has not been actively monitored since December 2014, though we have reviewed cases applicable to this requirement in recent reports.

**Task 5.12** requires that the Watch Commander ensure that any complaints that are applicable to Task 5.6 are delivered to and logged with IAD.  Under current policy, the Communications Division must record on the DILs complaints that are received and/or handled by on-duty supervisors, and the DILs is forwarded daily to IAD.

OPD remains in compliance with Tasks 5.6 and 5.12.

**Task 5.15** through **Task 5.19**, and **Task 5.21,** collectively address the quality of completed IAD investigations, and therefore remain the subject of our focused Task assessments.  To assess compliance with these Tasks, we reviewed 18 IAD cases that were approved in June, July and August of 2018.  This sample included investigations completed by IAD and Division-level investigations (DLIs).  It also included cases that were resolved via formal investigation and investigations that were resolved via summary finding.[4]

---

[4] Summary findings are investigations in which the Department believes a proper conclusion can be determined based on a review of existing documentation with limited or no additional interviews and follow-up.

Together, **Tasks 5.15** and **Task 5.16** require that OPD: gathers all relevant evidence; conducts follow-up interviews where warranted; adequately considers the evidence gathered; makes credibility assessments where feasible; and resolves inconsistent statements.

In all of the cases we reviewed, we believe that OPD gathered all relevant evidence available. As we often find, in many of the cases, video and/or audio recordings proved to be a significant factor in allowing OPD to reach an appropriate conclusion.

Investigators conducted follow-up interviews to seek clarification or resolve inconsistencies in six of the 18 cases we reviewed. In four cases, the complainants were interviewed twice; in one case, the subject officer was interviewed twice; and in the remaining case, the complainant and two subject officers were all re-interviewed.

OPD made credibility assessments for all involved parties in 13 of the 18 cases. The remaining five cases were approved for summary finding; and per policy, investigators are not required to assess the credibility of the involved officers and civilians in these instances.

In one case, the complainant was deemed not credible. In another case, the subject officer was deemed not credible, and in a third case, the complainant, a witness, and a subject officer were all found to be not credible. We agreed with these assessments, based on Portable Digital Recording Device (PDRD) videos and other available documentation.

In 13 of the 18 cases we reviewed, OPD successfully resolved inconsistent statements. In seven of the cases, PDRD recordings were available and assisted in the determination. In another case, a recorded call to Communications allowed for a definitive conclusion. Five cases resulted in at least one finding of not sustained. Not sustained is an acceptable finding, and by definition, it implies that inconsistencies were not resolved despite investigative efforts.

**Task 5.17** requires that OPD permanently retain all notes generated and/or received by OPD personnel in the case file. OPD personnel document that all investigative notes are contained within a particular file by completing an Investigative Notes Declaration Form. OPD has a sustained history of 100% compliance with this subtask. During this reporting period, the form was again properly completed in all 18 cases we reviewed.

**Task 5.18** requires that OPD resolve each allegation in a complaint investigation using the preponderance of the evidence standard. **Task 5.19** requires that each allegation of a complaint is identified and resolved with one of the following dispositions: unfounded; sustained; exonerated; not sustained; or administrative closure. Our sample of 18 cases contained 68 allegations that received dispositions as follows: 11 exonerated; 26 unfounded; eight not sustained; 12 sustained; and 11 administratively closed.

We did not disagree with the findings in any of the cases we reviewed. We note that with respect to DLIs, chain of command reviews as well as reviews of these cases by IAD personnel are becoming more thorough. Notes contained in the case files indicate that cases are being returned to the initial investigator for correction with greater frequency. In one case, the investigating civilian supervisor retired, but the reviewing civilian manager identified numerous deficiencies with the case and ultimately changed one of the findings to sustained. We concur with this change; the case would have been non-compliant without this intervention. In another case, the reviewing field lieutenant authored a memo agreeing with the sustained findings for the subject officers, and he offered additional justification as to why the findings were appropriate.

**Task 5.20** requires that the IAD Commander review all "filed" cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed. A filed case is defined as an investigation that cannot be presently completed and is pending further developments that will allow completion of the investigation; filed is not a final disposition. Traditionally, as part of our review of this Task, we also reviewed cases that are tolling. OPD defines a tolled case as an administrative investigation that has been held in abeyance in accordance with one of the provisions of Government Code Section 3304. While we are no longer actively assessing this subtask, we note that filed and tolling cases are reviewed with the Chief during her weekly IAD meetings and are listed by case number on the printed meeting agendas. We receive and review these agendas regularly, and a Monitoring Team member often attends these meetings.

In its 221st Bi-Weekly Update provided on October 24, 2018, OPD advised that 17 cases during the reporting period exceeded the 180-day timeline to complete investigations (10 Class I cases and seven Class II cases). Additionally, two of the cases exceeded the Government Code Section 3304 deadline. Neither involved a sustained finding, and so there were no disciplinary implications. OPD cited extensive staff turnover in the Division Level Investigations Section of IAD as the major contributor to these timeliness issues. We discussed this situation with the IAD commanding officer during and after our most recent site visit; and he has taken steps to increase the case tracking capabilities within IAD and also to ensure that no additional cases exceed the 3304 date. We continue to receive regular updates on the backlog/timeliness issue.

**Task 5.21** requires that any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken. However, with the approval of the IAD Commander or his designee, investigators are not required to interview and/or take a recorded statement in all cases. For example, interviews are not needed from a member or employee who is the subject of a complaint, or who was on the scene of the incident when additional information – beyond that already provided by the existing set of facts and/or documentation – is not necessary to reach appropriate findings and conclusions. Five of the 18 cases we reviewed were resolved via summary finding, and all were appropriately approved for such closure. In three of these cases, the availability of video and/or audio recordings was the primary reason interviews were unnecessary. Additionally, in two non-summary finding cases, retired employees refused to be interviewed as part of the investigations. We note that OPD cannot compel retired employees to provide statements in these circumstances.

OPD remains not in compliance with Task 5 based on the provisions of the March 23, 2016 Court Order.

# Task 26:  Force Review Board (FRB)

**Requirements:**

*OPD shall develop and implement a policy concerning its FRB proceedings.  The policy shall:*

1.   *Set out procedures, membership and a timetable for FRB review of use of force investigations involving Level 2 incidents, as defined in Department General Order K-4, REPORTING AND INVESTIGATING THE USE OF FORCE;*

2.   *Require the FRB to review all use of force investigations;*

3.   *Require the FRB to make a recommendation as to whether the use of force was in policy or out of policy;*

4.   *Require the FRB to forward sustained policy violations to the Discipline Officer.*

5.   *Require the FRB not to review any use of force allegation until the internal investigations has been completed;*

6.   *Authorize the FRB to recommend to the Chief of Police additional use of force training or changes in policies or tactics, or additional standards, investigatory policies, or training for use of force investigations;*

7.   *Require the FRB to conduct an annual review of use of force cases examined, so as to identify any patterns of use of force practices that may have policy or training implications, and thereafter, issue a report to the Chief of Police;*

8.   *Require that the FRB membership include, at a minimum, one member from the Training Division, one member from the Field Training Officer program, and either the Bureau of Field Operations Deputy Chief or his/her designee;*

9.   *Minimally, that one member of the FRB shall be replaced at least annually.*

(Negotiated Settlement Agreement V. C.)

**Relevant Policy:**

Department General Order K-4.1, *Force Review Boards,* was originally published on February 17, 2006, and revised on December 21, 2015.

**<u>Commentary:</u>**

OPD Force Review Boards are regularly convened to examine the investigations conducted relative to the deployment and application of Level 2 uses of force.[5]  OPD achieved compliance with this Task during the nineteenth reporting period (April 1-June 30, 2014); however, we continue to assess the compliance with this Task including our analyses of force reports and attendance at Force Review Boards when conducted during our site visits.

OPD conducted 19 Force Review Boards during 2017, and seven thus far in 2018.  With the exception of the board review conducted in August, we have consistently found board reviews to be detailed and thorough; and therefore, we have concurred with the board's findings.

However, as previously reported, we did not concur with the August board findings, which were subsequently forwarded to the Chief for final review.  The Chief concurred with the board findings regarding the application of force; however, she reportedly met with senior staff and addressed "officers use of police powers…which should be used judiciously…based in the fundamental principles of Procedural Justice."  This message was further affirmed via the distribution of a Department-wide memorandum requiring "officers to actively consider alternatives to force when possible and use the lease amount of police powers to accomplish their goals…and seek to use the minimum amount of force necessary to accomplish their legitimate enforcement goals."  No further action is anticipated.

OPD conducted an additional board in October, examining an incident wherein officers were dispatched to a youth resident facility for a mental health evaluation.  Upon arrival, officers were directed to the hallway area, where they observed resident staff members attempting to physically restrain a youthful but strong resident who was struggling, screaming, and attempting to kick them.  Officers attempted to assist; however, they were met with extreme resistance, including struggling and kicking.  Nevertheless, after a period of time, the officers were able to secure and take the resident to the floor.

The board received the supervisor's detailed presentation of the event, including a viewing of the applicable video and photographs of the scene.  The board also received subject-matter expert reviews regarding applicable policies and training.  Following what we found to be a thorough review of the event, the board found the force used to secure the resident consistent with policy. We concur with this finding.

OPD remains in compliance with this Task.

---

[5] According to OPD, Level 2 uses of force include: "1) Any strike to the head (except for an intentional strike with an impact weapon); 2) Carotid restraint is applied that does not result in the loss of consciousness; 3) Use of impact weapons, including specialty impact munitions or any other object, to strike a subject and contact is made, regardless of injury; 4) Any unintentional firearms discharge that does not result in injury; 5) A police canine bites the clothing or the skin of a subject, or otherwise injures a subject requiring emergency medical treatment (beyond first-aid) or hospital admittance; 6) Any use of force which results in injuries to the subject requiring emergency medical treatment (beyond first-aid) or hospital admittance; (NOTE: For the purposes of this order, an evaluation by a medical professional to assess a complaint of injury is not emergency treatment) 7) Any Level 3 use of force used on or applied to a restrained subject; 7.a) A restrained subject is a person who has been fully placed in a Department authorized restraint device such as both hands handcuffed, a WRAP or Rip Hobble; 7.b) A subject with only one handcuff on is not a restrained person."

# Task 30:  Executive Force Review Board (EFRB)

**Requirements:**

1.   *An EFRB shall be convened to review the factual circumstances surrounding any Level 1 force, in-custody death, or vehicle pursuit-related death incidents.  A firearm discharge at an animal shall be reviewed by the EFRB only at the direction of the Chief of Police.*

2.   *The Board shall have access to recordings and/or transcripts of interviews of all personnel on the scene, including witnesses, and shall be empowered to call any OPD personnel to provide testimony at the hearing.*

3.   *OPD shall continue the policies and practices for the conduct of EFRB, in accordance with the provisions of DGO K-4.1, FORCE REVIEW BOARDS.*

(Negotiated Settlement Agreement V. G.)

**Relevant Policy:**

Department General Order K-4.1, *Force Review Boards,* was published on February 17, 2006, and revised on December 21, 2015.

**Commentary:**

Executive Force Review Boards (EFRBs), consisting of three top command-level staff, conduct thorough, detailed reviews of all Level 1 uses of force, in-custody deaths, and vehicle pursuit-related deaths and serious injuries.

As noted previously, OPD achieved compliance with this Task during the nineteenth reporting period (April 1-June 30, 2014).  We continue to review and report on the compliance status of this Task due to the serious nature of the cases reviewed by the board.  OPD has conducted five EFRBs to date in the current year.

In our last monthly status report, we referred to the October EFRB that examined a pursuit that resulted in serious injury to one of the subjects in the pursued vehicle.  Over the course of the chase, numerous OPD officers participated, and there were at least three collisions involving the suspect vehicle and uninvolved other vehicles.  One of the passengers in the suspect vehicle suffered serious injuries, leaving him confined to a wheelchair and unable to speak.  As we noted in our last report, the EFRB conducted an intensive, detailed review of the event; ruled the pursuit out of compliance; and concurred with IAD's sustained findings for the actions of individual officers during the pursuit.  The board also sustained the sergeant and Watch Commander for failures of supervision for allowing the pursuit to continue contrary to the Department's pursuit policy.  Ultimately, the Chief determined discipline for the officers with sustained findings, which included several suspensions and one termination.

OPD remains in compliance with this Task.

## Task 34:  Vehicle Stops, Field Investigation, and Detentions

**Requirements:**

1.   *OPD shall require members to complete a basic report on every vehicle stop, field investigation and every detention.  This report shall include, at a minimum:*

   a.   *Time, date and location;*

   b.   *Identification of the initiating member or employee commencing after the first year of data collection;*

   c.   *Reason for stop;*

   d.   *Apparent race or ethnicity, and gender of individual(s) stopped;*

   e.   *Outcome of stop (arrest, no arrest);*

   f.   *Whether a search was conducted, and outcome of search;*

   g.   *Offense categories (felony, misdemeanor or infraction).*

2.   *This data shall be entered into a database that can be summarized, searched, queried and reported by personnel authorized by OPD.*

3.   *The development of this policy shall not pre-empt any other pending or future policies and or policy development, including but not limited to "Promoting Cooperative Strategies to Prevent Racial Profiling."*

(Negotiated Settlement Agreement VI. B.)


**Relevant Policy:**

Department policies relevant to Task 34 include:  General Order M-19, *Prohibitions Regarding Racial Profiling and Other Bias-Based Policing;* Report Writing Manual (RWM) Inserts R-2, N-1, and N-2; Special Order 9042, *New Procedures Regarding Stop Data Collection* (published June 2010); and Special Order 9101, *Revised Stop Data Collection Procedures* (published November 2012).


**Commentary:**

Compliance with this Task includes: 1) the collection of specific, detailed stop data; 2) staff analyses of the data to ascertain the presence or absence of indicators of disparate treatment among the population groups; and, where indicated, 3) the implementation of corrective measures – i.e., policy revisions, training, or other individualized intervention where warranted.

OPD continues to collect and store data, as described in Task 34.1 (a.-g.).  This data is sufficiently detailed to determine the lawful basis for stops and further to identify indicators of disparate treatment, as required.  The efficacy of the collection process is continually assessed; and more recently, is being revised to incorporate the data reporting requirements outlined in what is commonly known as California Assembly Bill 953, or the California Racial and Identity Profiling Act of 2015.  OPD provides regular progress briefings on its compliance with this new law for our review.

The data described above is compiled in a series of illustrations for analysis during monthly Risk Management Meetings (RMMs).  At these meetings, Area Commanders review the illustrated data to ascertain whether it appears to be reflective of Area objectives and/or to identify and address data variances indicative of disparate treatment among the population groups.  Clearly and consistently, commanders exhibit knowledge of their Area demographics, crime trends, and community concerns as well as their development and implementation of strategies/initiatives to address them.  However, analyses of the stop data illustrated and presented for review is limited.  Rather than addressing/analyzing data indicative of disparate treatment among the population groups, the focus often digresses to issues relating to intelligence-led and/or precision-based stops.  According to the Department, "An intelligence-led stop is defined as one where an officer possesses knowledge, which can be linked to an articulable source, leading to the initiation of the stop.  Precision-based policing is the design, communications and evaluation of strategies and tactics which serve to solve public safety problems and reduce crime while simultaneously reducing the 'footprint' the Department has on the community."

These digressions, though operationally significant, divert attention from a careful review/analysis of datasets that may be indicative of disparate treatment among the various population groups.  In addition, they limit the conducting of drill-downs or in-depth analyses of squad or specific individual officer data to ascertain the basis for and/or to appropriately address such indicators of disparities when present.

The data provided by OPD indicates that stops have generally decreased, and therefore meet the objective of implementing intelligence-led policing, or reducing the policing "footprint" in or on the community.  Whether there has been a reduction in disparate racial impact remains in question and will remain so absent detailed analysis.

Our October site visit again included an opportunity for our observation of a Risk Management Meeting (RMM).  This review included the three Area Commands within the Bureau of Field Operations 1 (BFO1).  OPD provided advance data prepared for the RMM for our review.

The BFO1 stops for the review period increased 5% to a monthly total of 625; the percentage of searches *decreased* from 37% to 31%; and in addition, search recoveries *increased* from 19% to 22%.[6]  These trends are a variance from previous analyses cited above and are positive; however, racial disparities remaining within the total data are yet to be addressed as evidenced by more specific search and recovery data.  This data sets forth that African Americans are stopped at the highest rate in the three Areas ranging from 57%-74%; are also searched at the highest rate ranging from 31%-40%; however, search recoveries range from a low of 14% in one Area to a

---

[6] Risk Management Data for Meeting BFO 1, Covering Jun '18 to Aug '18; Illustration No. 1, Trends in Stops Discretionary Searches, and Recoveries for the period March 18 through Aug 18.

high of 32% in another.  Search recoveries for Hispanics range from 12% to 23%; search recoveries for whites range from 25% to 46%; and search recoveries for Asians range from 17% to 64%.[7]

Significant to the above is the absence of in-depth analyses of variances in the data among the Areas, squads, and officers in general; however, more important is the lack of data analysis among the population groups, which are essential data points for assessing whether illustrated data disparities represent disparate treatment at the squad and officer levels or are the result of other causative factors.  Such data are not included nor analyzed.

Therefore, while we commend the efforts of OPD to reduce "the risk of negative disparate impact on the community" through the initiation of an intelligence-led, precision-based policing model, we again encourage OPD to conduct a robust assessment of the various stop data components to identify and appropriately respond to indicators of disparate treatment.  This will require the implementation of a consistent intervention strategy to address identified data disparities reflective of possible bias at the Area, squad, and individual officer levels.  The customary findings that the stops were "consistent with expectations or policy" provide insufficient explanation of causation within a squad or by an individual officer.

OPD continues its relationship with Stanford University and the decision to include the implementation of the 50 recommendations made by Dr. Jennifer Eberhardt and her Stanford University team in the 2016 study.  OPD is continuing its efforts to fully implement 47 of the 50 Stanford recommendations.  Stanford has assumed responsibility for three.  To date, Oakland has completed 40 of the 50 recommendations.

While OPD continues its efforts to comply with requirements of this Task, we have previously reported that the below-described specific issues remain incomplete.  Accordingly, we provide the following assessment, and will continue to monitor OPD's progress on these issues until the Department achieves full compliance.

Further, we will look for a clear and unambiguous commitment to the provisions of this Task to ensure that the protocols that have been undertaken will be institutionalized and remain an integral, sustainable practice:

- Implementation of general and specific intervention strategies to address data indicators of abnormalities and/or possible bias at the Area, squad, and individual officer levels;

- Implementation of processes to provide for a more expeditious compilation of stop data prior to, during, and following Risk Management Meetings.  The City anticipates that this will be achieved by the summer of 2019 with the operational implementation of PRIME 2.0.

- Implementation of the applicable 50 recommendations contained in the 2016 Stanford University report.  This requirement has been incorporated as an objective by OPD.  We will continue to report on the progress of OPD's implementation.

---

[7] Ibid. Illustration No. 2R, Stops, Discretionary Searches, and Recoveries by Race, Data from Jun 01, 2018 to Aug 31, 2018. Note: Data for the population group titled "Other" are not included.

## Task 41:  Use of Personnel Assessment System (PAS) and Risk Management

**Requirements:**

*Within 375 days from the effective date of this Agreement, OPD shall develop a policy for use of the system, including supervision and audit of the performance of specific members, employees, supervisors, managers, and OPD units, as well as OPD as a whole.*

*The policy shall include the following elements:*

1.  *The Chief of Police shall designate a PAS Administration Unit.  The PAS Administration Unit shall be responsible for administering the PAS policy and, no less frequently than quarterly, shall notify, in writing, the appropriate Deputy Chief/Director and the responsible commander/manager of an identified member/employee who meets the PAS criteria.  PAS is to be electronically maintained by the City Information Technology Department.*

2.  *The Department shall retain all PAS data for at least five (5) years.*

3.  *The Monitor, Inspector General and Compliance Coordinator shall have full access to PAS to the extent necessary for the performance of their duties under this Agreement and consistent with Section XIII, paragraph K, and Section XIV of this Agreement.*

4.  *PAS, the PAS data, and reports are confidential and not public information.*

5.  *On a quarterly basis, commanders/managers shall review and analyze all relevant PAS information concerning personnel under their command, to detect any pattern or series of incidents which may indicate that a member/employee, supervisor, or group of members/employees under his/her supervision may be engaging in at-risk behavior.  The policy shall define specific criteria for determining when a member/employee or group of members/employees may be engaging in at-risk behavior.*

6.  *Notwithstanding any other provisions of the PAS policy to be developed, the Department shall develop policy defining peer group comparison and methodology in consultation with Plaintiffs' Counsel and the IMT.  The policy shall include, at a minimum, a requirement that any member/employee who is identified using a peer group comparison methodology for complaints received during a 30-month period, or any member who is identified using a peer group comparison methodology for Penal Code §§69, 148 and 243(b)(c) arrests within a 30-month period, shall be identified as a subject for PAS intervention review. For the purposes of these two criteria, a single incident shall be counted as "one" even if there are multiple complaints arising from the incident or combined with an arrest for Penal Code §§69, 148 or 243(b)(c).*

7.  *When review and analysis of the PAS threshold report data indicate that a member/employee may be engaging in at-risk behavior, the member/employee's immediate supervisor shall conduct a more intensive review of the*

*member/employee's performance and personnel history and prepare a PAS Activity Review and Report.  Members/employees recommended for intervention shall be required to attend a documented, non-disciplinary PAS intervention meeting with their designated commander/manager and supervisor.  The purpose of this meeting shall be to review the member/employee's performance and discuss the issues and recommended intervention strategies.  The member/employee shall be dismissed from the meeting, and the designated commander/manager and the member/employee's immediate supervisor shall remain and discuss the situation and the member/employee's response.  The primary responsibility for any intervention strategies shall be placed upon the supervisor.  Intervention strategies may include additional training, reassignment, additional supervision, coaching or personal counseling.  The performance of members/ employees subject to PAS review shall be monitored by their designated commander/manager for the specified period of time following the initial meeting, unless released early or extended (as outlined in Section VII, paragraph B (8)).*

8.    *Members/employees who meet the PAS threshold specified in Section VII, paragraph B (6) shall be subject to one of the following options:  no action, supervisory monitoring, or PAS intervention.  Each of these options shall be approved by the chain-of-command, up to the Deputy Chief/Director and/or the PAS Activity Review Panel.*

*Members/employees recommended for supervisory monitoring shall be monitored for a minimum of three (3) months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor.  The first at the end of one (1) month and the second at the end of three (3) months.*

*Members/employees recommended for PAS intervention shall be monitored for a minimum of 12 months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor and designated commander/manager:  The first at three (3) months and the second at one (1) year.  Member/employees subject to PAS intervention for minor, easily correctable performance deficiencies may be dismissed from the jurisdiction of PAS upon the written approval of the member/employee's responsible Deputy Chief, following a recommendation in writing from the member/employee's immediate supervisor.  This may occur at the three (3)-month follow-up meeting or at any time thereafter, as justified by reviews of the member/employee's performance.  When a member/employee is not discharged from PAS jurisdiction at the one (1)-year follow-up meeting, PAS jurisdiction shall be extended, in writing, for a specific period in three (3)-month increments at the discretion of the member/employee's responsible Deputy Chief.  When PAS jurisdiction is extended beyond the minimum one (1)-year review period, additional review meetings involving the member/employee, the member/ employee's designated commander/manager and immediate supervisor, shall take place no less frequently than every three (3) months.*

9. *On a quarterly basis, Division/appropriate Area Commanders and managers shall review and analyze relevant data in PAS about subordinate commanders and/or managers and supervisors regarding their ability to adhere to policy and address at-risk behavior. All Division/appropriate Area Commanders and managers shall conduct quarterly meetings with their supervisory staff for the purpose of assessing and sharing information about the state of the unit and identifying potential or actual performance problems within the unit. These meetings shall be scheduled to follow-up on supervisors' assessments of their subordinates' for PAS intervention. These meetings shall consider all relevant PAS data, potential patterns of at-risk behavior, and recommended intervention strategies since the last meeting. Also considered shall be patterns involving use of force, sick leave, line-of-duty injuries, narcotics-related possessory offenses, and vehicle collisions that are out of the norm among either personnel in the unit or among the unit's subunits. Division/appropriate Area Commanders and managers shall ensure that minutes of the meetings are taken and retained for a period of five (5) years. Commanders/managers shall take appropriate action on identified patterns of at-risk behavior and/or misconduct.*

10. *Division/appropriate Area Commanders and managers shall meet at least annually with his/her Deputy Chief/Director and the IAD Commander to discuss the state of their commands and any exceptional performance, potential or actual performance problems or other potential patterns of at-risk behavior within the unit. Division/appropriate Area Commanders and managers shall be responsible for developing and documenting plans to ensure the managerial and supervisory accountability of their units, and for addressing any real or potential problems that may be apparent.*

11. *PAS information shall be taken into account for a commendation or award recommendation; promotion, transfer, and special assignment, and in connection with annual performance appraisals. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

12. *Intervention strategies implemented as a result of a PAS Activity Review and Report shall be documented in a timely manner.*

13. *Relevant and appropriate PAS information shall be taken into account in connection with determinations of appropriate discipline for sustained misconduct allegations. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

14. *The member/employee's designated commander/manager shall schedule a PAS Activity Review meeting to be held no later than 20 days following notification to the Deputy Chief/Director that the member/employee has met a PAS threshold and when intervention is recommended.*

15.    *The PAS policy to be developed shall include a provision that a member/employee making unsatisfactory progress during PAS intervention may be transferred and/or loaned to another supervisor, another assignment or another Division, at the discretion of the Bureau Chief/Director if the transfer is within his/her Bureau.  Inter-Bureau transfers shall be approved by the Chief of Police.  If a member/employee is transferred because of unsatisfactory progress, that transfer shall be to a position with little or no public contact when there is a nexus between the at-risk behavior and the "no public contact" restriction.  Sustained complaints from incidents subsequent to a member/employee's referral to PAS shall continue to result in corrective measures; however, such corrective measures shall not necessarily result in a member/employee's exclusion from, or continued inclusion in, PAS.  The member/employee's exclusion or continued inclusion in PAS shall be at the discretion of the Chief of Police or his/her designee and shall be documented.*

16.    *In parallel with the PAS program described above, the Department may wish to continue the Early Intervention Review Panel.*

17.    *On a semi-annual basis, beginning within 90 days from the effective date of this Agreement, the Chief of Police, the PAS Activity Review Panel, PAS Oversight Committee, and the IAD Commander shall meet with the Monitor to review the operation and progress of the PAS.  At these meetings, OPD administrators shall summarize, for the Monitor, the number of members/employees who have been identified for review, pursuant to the PAS policy, and the number of members/employees who have been identified for PAS intervention.  The Department administrators shall also provide data summarizing the various intervention strategies that have been utilized as a result of all PAS Activity Review and Reports.  The major objectives of each of these semi-annual meetings shall be consideration of whether the PAS policy is adequate with regard to detecting patterns of misconduct or poor performance issues as expeditiously as possible and if PAS reviews are achieving their goals.*

18.    *Nothing in this Agreement, and more specifically, no provision of PAS, shall be construed as waiving, abrogating or in any way modifying the Department's rights with regard to discipline of its members/employees.  The Department may choose, at its discretion, to initiate the administrative discipline process, to initiate PAS review or to use both processes concurrently or consecutively.*

(Negotiated Settlement Agreement VII. B.)


**Relevant Policy:**

OPD revised and issued Departmental General Order D-17, *Personnel Assessment Program,* in November 2013.  Since our last report, the Department has begun to address General Order D-17 as part of Department's ongoing policy review and revision program.  The revised version of the relevant policy is currently under review.

**Commentary:**

During our most recent site visit, we received another update on the development of the risk management database, Performance Reporting Information Metrics Environment (PRIME), and the associated information systems.  With regard to the rebuild of PRIME, sound progress was reported for the second quarter in a row.  That was true for the key areas that the City Information Technology Department (ITD) was working on, as well as the work of contractors.  The Department reported progress for the integration of the personnel database with PRIME.  Additionally, the Department also reported that work on the links with body-worn camera videos; training data, including Academy training; and development of data dashboards were advancing under contractors.  The integration of stop data is currently affected by state-wide developments in requirements, including changes to the Stop Data Reporting Form.  The Department is also engaged in another major data project, with the replacement of the Records Management System (RMS).

While progress is being made on the PRIME rebuild, the risk management system continues to operate under the problematic first iteration of PRIME.  That system now operates under a maintenance or "duct-taped" mode and is not receiving any significant further development.  The Department has renewed a pared down version of its maintenance agreement with the original vendor.  ITD and the Department do not anticipate any further renewals of that maintenance contract moving forward.

Our Team also observed a Risk Management Meeting (RMM) during our October site visit.  That meeting covered Area 1, 2, and 3 which comprise BFO1.  The meeting began with a lengthy review of the "deliverables" assigned following the commanders' attendance at their last RMM.  A review of current data and responses to questions followed; and, when judged appropriate, there was also the assignment of new deliverables.

The meeting material also indicated that the risk management process was being used by Area Commanders.  Across the three Areas discussed at the October RMM, a total of 13 officers were in supervisory monitoring and three were in intervention status.  The status of nearly half of that combined group was the result of management referrals, a clear sign of management commitment to officers and to risk management.

There are also reasons to expect the progress in risk management to continue.  The Department is beginning the process to fill the Risk Management Director position, which has had temporary leadership for some time.  Likewise, searches are in place for two new technology positions to will assist in managing data systems including PRIME.  Finally, a long-discussed Data Scientist position is moving forward under the classification of Performance Audit Supervisor.  That will increase the capacity of OPD to take advantage of the extensive information collected across the Department.

The Department is to be commended for its efforts to create a sustainable, informative risk management program.  The RMMs have placed new expectations on Area Commanders, the PAS Administration Unit has itself modified practices that are described in the existing policy, and further changes are already planned under the rebuild of PRIME.  For example, the timely daily review of officers surpassing risk thresholds will be implemented under the PRIME rebuild; and that will require immediate responses from supervisors and immediate

implementation of risk management plans.  Another recent change has been that all Level 1 uses of force will now result in supervisory monitoring status.  Those are new and significant enhancements of the risk management process.  With these things in mind, and with the progress made to date, this may be an opportune time for the Department to evaluate the program in terms of its efficacy and outcomes so appropriate adjustments and modifications can be made.

## Conclusion

The establishment of regular Risk Management Meetings, as well as issues raised at these meetings, suggests the need to review the relevant policy.  Stop data as a risk-related concept has become a central part of the risk management process in a way not anticipated when the policy was first created.  Likewise, the Department has associated relatively new vocabulary with risk assessment – including ideas of "intelligence-led stops" and a hybrid concept that is discussed as "precision-based policing."  Discussions at the RMMs suggest the value of establishing shared meanings to these concepts.  Furthermore, the October RMM revealed that Area Commanders occasionally remove officers from supervisory monitoring or intervention before the expected timeframes lapse.  To her credit, the Chief discouraged such changes during the meeting, but the practice indicates the need to catalog and review such *ad hoc* arrangements.  There are also occasional idiosyncratic references by commanders to otherwise undefined policing strategies. These practices and the underlying concepts require elaboration to achieve a common understanding.

Perhaps the most important reason to review policy and practice in this area, however, relates to the significant changes in data availability and its new potential use for managing risk.  The rebuild and revitalization of PRIME will create new opportunities for understanding and managing risk in the Department.  The Department has made great progress in using data in its management processes, but much of the potential for that remains untapped.  Additional technology resources and long anticipated specialized staff resources create new possibilities. The original edition of PRIME became technology largely divorced from well-considered utilization.  The resurrection of the risk management database presents an opportunity to improve on that record.

Chief (Ret.) Robert S. Warshaw
*Monitor*