January 17, 2019

# Fifty-Ninth Report
## *of the* Independent Monitor
## *for the* Oakland Police Department

## Introduction

This is our fifty-ninth status report on the Negotiated Settlement Agreement (NSA) in the case of *Delphine Allen, et al., vs. City of Oakland, et al.,* in the United States District Court for the Northern District of California under the direction of Judge William H. Orrick. I was appointed in 2010 to oversee the monitoring process of the Oakland Police Department (OPD) that began in 2003.

This report covers our site visit of November 27-28, 2018; and describes our recent assessments of NSA Tasks 20, 41, and 45. As we have noted previously, following the Court's Order of May 21, 2015, in our monthly reports, we devote special attention to the most problematic component parts of the Tasks that are not yet in full or sustained compliance, and discuss the most current information regarding the Department's progress with the NSA and its efforts at making the reforms sustainable.

## *Increasing Technical Assistance*

Each month, our Team conducts a visit to Oakland that includes both compliance assessments and technical assistance. During our visits, we meet with Department and City officials; observe Department meetings and technical demonstrations; review Departmental policies; conduct interviews and make observations in the field; and analyze OPD documents and files, including misconduct investigations, use of force reports, crime and arrest reports, Stop Data Forms, and other documentation. We also provide technical assistance in additional areas, especially those that relate to the remaining non-compliant Tasks or areas identified by the Department.

Within the last several months, we have provided technical assistance to OPD officials in the areas of IAD investigation quality (Task 5); stop data and related issues (Task 34); risk management and the ongoing maintenance issues and development of the Performance Reporting Information Metrics Environment (PRIME) systems (Task 41); and several Department policies and procedures, including policies related to PRIME, officer discipline, probationers and parolees, handcuffing, and the use of electronic control weapons.

## *Building Internal Capacity at OPD*

Also per the May 21, 2015 Court Order, we continue to work closely with the Office of Inspector General's (OIG) lieutenant and staff to identify areas that it should audit or review – and to help design approaches to these audits that are not cumbersome, so as to ensure sustainability. We review OIG's quarterly progress reports, which are a valuable resource and assist us in assessing compliance with NSA requirements. OIG published its most recent progress report (covering the first two quarters of 2018) in early October.

# *Focused Task Assessments*

## Task 20: Span of Control

**Requirements:**

*On or before August 14, 2003, OPD shall develop and implement a policy to ensure appropriate supervision of its Area Command Field Teams. The policy shall provide that:*

1. *Under normal conditions, OPD shall assign one primary sergeant to each Area Command Field Team, and, in general, (with certain exceptions) that supervisor's span of control shall not exceed eight (8) members.*

2. *During day-to-day operations, in the absence of the primary supervisor (e.g., due to sickness, vacation, compensatory time off, schools, and other leaves), the appropriate Area Commander shall determine, based on Department policy and operational needs, whether or not to backfill for the absence of the sergeant on leave.*

3. *If a special operation, (e.g., Beat Feet, Special Traffic Offenders Program (STOP), etc.) requires more than eight (8) members, the appropriate Area Commander shall determine the reasonable span of control for the supervisor.*

4. *If long-term backfill requires the loan or transfer of a supervisor from another unit, the Chief of Police and/or the Deputy Chief of Police shall make that decision.*

(Negotiated Settlement Agreement IV. C.)

**Relevant Policy:**

Three Departmental policies incorporate the requirements of Task 20: Departmental General Order A-19, *Supervisory Span of Control,* issued on July 26, 2006; Departmental General Order D-13, *Assignment to Acting Higher Rank or Classification,* issued on June 17, 1999; and Departmental General Order D-13.1, *Assignment to Acting Sergeant of Police,* issued on May 14, 2014. (The publication of DGO D-13.1 cancelled Special Order 8435, which previously governed the selection process of acting sergeants.)

**Commentary:**

To assess these requirements for this report, we reviewed spreadsheets prepared by the Department for the months of July, August, and September 2018 that, by date, note which type of sergeant supervised each applicable squad – a primary sergeant, relief sergeant, acting sergeant, other sergeant (one working overtime), or none. (The Department refers to unsupervised squads as "open.") We calculated per squad the compliance percentages for this subtask during this time period. Each of the 49 applicable squads were in compliance – that is, all applicable squads during this time period were supervised by either a primary, relief, or other/overtime sergeant for at least 85% of their working shifts. We also found that none of the applicable squads exceeded the required 1:8 supervisor to officer ratio at least 90% of their working shifts.

OPD continues to be in compliance with these requirements. We are encouraged that the Department has institutionalized the sound practices of tracking how each squad is supervised each day; planning, when possible, for expected absences; and thoughtfully considering how to fill in for personnel who are absent unexpectedly.

## Task 41: Use of Personnel Assessment System (PAS) and Risk Management

**Requirements:**

*Within 375 days from the effective date of this Agreement, OPD shall develop a policy for use of the system, including supervision and audit of the performance of specific members, employees, supervisors, managers, and OPD units, as well as OPD as a whole.*

*The policy shall include the following elements:*

1. *The Chief of Police shall designate a PAS Administration Unit. The PAS Administration Unit shall be responsible for administering the PAS policy and, no less frequently than quarterly, shall notify, in writing, the appropriate Deputy Chief/Director and the responsible commander/manager of an identified member/employee who meets the PAS criteria. PAS is to be electronically maintained by the City Information Technology Department.*

2. *The Department shall retain all PAS data for at least five (5) years.*

3. *The Monitor, Inspector General and Compliance Coordinator shall have full access to PAS to the extent necessary for the performance of their duties under this Agreement and consistent with Section XIII, paragraph K, and Section XIV of this Agreement.*

4. *PAS, the PAS data, and reports are confidential and not public information.*

5. *On a quarterly basis, commanders/managers shall review and analyze all relevant PAS information concerning personnel under their command, to detect any pattern or series of incidents which may indicate that a member/employee, supervisor, or group of members/employees under his/her supervision may be engaging in at-risk behavior. The policy shall define specific criteria for determining when a member/employee or group of members/employees may be engaging in at-risk behavior.*

6. *Notwithstanding any other provisions of the PAS policy to be developed, the Department shall develop policy defining peer group comparison and methodology in consultation with Plaintiffs' Counsel and the IMT. The policy shall include, at a minimum, a requirement that any member/employee who is identified using a peer group comparison methodology for complaints received during a 30-month period, or any member who is identified using a peer group comparison methodology for Penal Code §§69, 148 and 243(b)(c) arrests within a 30-month period, shall be identified as a subject for PAS intervention review. For the purposes of these two criteria, a single incident shall be counted as "one" even if there are multiple complaints arising from the incident or combined with an arrest for Penal Code §§69, 148 or 243(b)(c).*

7. *When review and analysis of the PAS threshold report data indicate that a member/employee may be engaging in at-risk behavior, the member/employee's immediate supervisor shall conduct a more intensive review of the*

> *member/employee's performance and personnel history and prepare a PAS Activity Review and Report. Members/employees recommended for intervention shall be required to attend a documented, non-disciplinary PAS intervention meeting with their designated commander/manager and supervisor. The purpose of this meeting shall be to review the member/employee's performance and discuss the issues and recommended intervention strategies. The member/employee shall be dismissed from the meeting, and the designated commander/manager and the member/employee's immediate supervisor shall remain and discuss the situation and the member/employee's response. The primary responsibility for any intervention strategies shall be placed upon the supervisor. Intervention strategies may include additional training, reassignment, additional supervision, coaching or personal counseling. The performance of members/ employees subject to PAS review shall be monitored by their designated commander/manager for the specified period of time following the initial meeting, unless released early or extended (as outlined in Section VII, paragraph B (8)).*

> 8. *Members/employees who meet the PAS threshold specified in Section VII, paragraph B (6) shall be subject to one of the following options: no action, supervisory monitoring, or PAS intervention. Each of these options shall be approved by the chain-of-command, up to the Deputy Chief/Director and/or the PAS Activity Review Panel.*
>
> *Members/employees recommended for supervisory monitoring shall be monitored for a minimum of three (3) months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor. The first at the end of one (1) month and the second at the end of three (3) months.*
>
> *Members/employees recommended for PAS intervention shall be monitored for a minimum of 12 months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor and designated commander/manager: The first at three (3) months and the second at one (1) year. Member/employees subject to PAS intervention for minor, easily correctable performance deficiencies may be dismissed from the jurisdiction of PAS upon the written approval of the member/employee's responsible Deputy Chief, following a recommendation in writing from the member/employee's immediate supervisor. This may occur at the three (3)-month follow-up meeting or at any time thereafter, as justified by reviews of the member/employee's performance. When a member/employee is not discharged from PAS jurisdiction at the one (1)-year follow-up meeting, PAS jurisdiction shall be extended, in writing, for a specific period in three (3)-month increments at the discretion of the member/employee's responsible Deputy Chief. When PAS jurisdiction is extended beyond the minimum one (1)-year review period, additional review meetings involving the member/employee, the member/ employee's designated commander/manager and immediate supervisor, shall take place no less frequently than every three (3) months.*

9. *On a quarterly basis, Division/appropriate Area Commanders and managers shall review and analyze relevant data in PAS about subordinate commanders and/or managers and supervisors regarding their ability to adhere to policy and address at-risk behavior.  All Division/appropriate Area Commanders and managers shall conduct quarterly meetings with their supervisory staff for the purpose of assessing and sharing information about the state of the unit and identifying potential or actual performance problems within the unit.  These meetings shall be scheduled to follow-up on supervisors' assessments of their subordinates' for PAS intervention.  These meetings shall consider all relevant PAS data, potential patterns of at-risk behavior, and recommended intervention strategies since the last meeting.  Also considered shall be patterns involving use of force, sick leave, line-of-duty injuries, narcotics-related possessory offenses, and vehicle collisions that are out of the norm among either personnel in the unit or among the unit's subunits.  Division/appropriate Area Commanders and managers shall ensure that minutes of the meetings are taken and retained for a period of five (5) years.  Commanders/managers shall take appropriate action on identified patterns of at-risk behavior and/or misconduct.*

10. *Division/appropriate Area Commanders and managers shall meet at least annually with his/her Deputy Chief/Director and the IAD Commander to discuss the state of their commands and any exceptional performance, potential or actual performance problems or other potential patterns of at-risk behavior within the unit.  Division/appropriate Area Commanders and managers shall be responsible for developing and documenting plans to ensure the managerial and supervisory accountability of their units, and for addressing any real or potential problems that may be apparent.*

11. *PAS information shall be taken into account for a commendation or award recommendation; promotion, transfer, and special assignment, and in connection with annual performance appraisals.  For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

12. *Intervention strategies implemented as a result of a PAS Activity Review and Report shall be documented in a timely manner.*

13. *Relevant and appropriate PAS information shall be taken into account in connection with determinations of appropriate discipline for sustained misconduct allegations.  For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

14. *The member/employee's designated commander/manager shall schedule a PAS Activity Review meeting to be held no later than 20 days following notification to the Deputy Chief/Director that the member/employee has met a PAS threshold and when intervention is recommended.*

15. *The PAS policy to be developed shall include a provision that a member/employee making unsatisfactory progress during PAS intervention may be transferred and/or loaned to another supervisor, another assignment or another Division, at the discretion of the Bureau Chief/Director if the transfer is within his/her Bureau. Inter-Bureau transfers shall be approved by the Chief of Police. If a member/employee is transferred because of unsatisfactory progress, that transfer shall be to a position with little or no public contact when there is a nexus between the at-risk behavior and the "no public contact" restriction. Sustained complaints from incidents subsequent to a member/employee's referral to PAS shall continue to result in corrective measures; however, such corrective measures shall not necessarily result in a member/employee's exclusion from, or continued inclusion in, PAS. The member/employee's exclusion or continued inclusion in PAS shall be at the discretion of the Chief of Police or his/her designee and shall be documented.*

16. *In parallel with the PAS program described above, the Department may wish to continue the Early Intervention Review Panel.*

17. *On a semi-annual basis, beginning within 90 days from the effective date of this Agreement, the Chief of Police, the PAS Activity Review Panel, PAS Oversight Committee, and the IAD Commander shall meet with the Monitor to review the operation and progress of the PAS. At these meetings, OPD administrators shall summarize, for the Monitor, the number of members/employees who have been identified for review, pursuant to the PAS policy, and the number of members/employees who have been identified for PAS intervention. The Department administrators shall also provide data summarizing the various intervention strategies that have been utilized as a result of all PAS Activity Review and Reports. The major objectives of each of these semi-annual meetings shall be consideration of whether the PAS policy is adequate with regard to detecting patterns of misconduct or poor performance issues as expeditiously as possible and if PAS reviews are achieving their goals.*

18. *Nothing in this Agreement, and more specifically, no provision of PAS, shall be construed as waiving, abrogating or in any way modifying the Department's rights with regard to discipline of its members/employees. The Department may choose, at its discretion, to initiate the administrative discipline process, to initiate PAS review or to use both processes concurrently or consecutively.*

(Negotiated Settlement Agreement VII. B.)

**Relevant Policy:**

OPD revised and issued Departmental General Order D-17, *Personnel Assessment Program,* in November 2013. Since our last report, the Department has begun to address General Order D-17 as part of Department's ongoing policy review and revision program. The revised version of the relevant policy is currently under review.

**Commentary:**

OPD and its vendor continue to make progress on the reconstruction of the PRIME database and the related tools for effective use of the data.  The Department and the City's Information Technology Department report that principal contractor for the redesign, Sierra-Cedar, is moving forward on schedule and may finish early, although it currently maintains the planned completion date of July 2019.

A team from another vendor, Slalom, is constructing data dashboards that will be tailored to provide relevant data by position and management requirements in the Department.  With participation from the Monitoring Team, the Department recently reviewed the developing dashboards with Slalom personnel.  This review included a document summarizing the agreed-upon "Dashboard Business Requirements" and the dashboard "wireframes."  That is, the dashboards were presented in "doodle" form, or hand drawings – suitable for planning but not yet presenting actual data.  During the meeting, we discussed 10 dashboards covering the major categories of risk-related data, including stop data and arrest data.  The data presentations will eventually support reviews at the Department, by Patrol Area and special unit level; and will allow drilling down into the data at the squad and individual officer levels.  This will increase the accessibility of valuable data that supports the supervision of officers and the review of data through the Risk Management Meeting process.  The dashboards, however, carry with them new complexities in the analysis; and therefore, also present significant training concerns.  We will continue to monitor their development.

The presentation also provided an opportunity for a broad discussion of risk management.  We noted to the Department the importance of focusing on the key issues noted in Tasks 40 and 41 of the NSA.  Uses of force, complaints, and pursuits are core elements currently guiding the identification of risk-related behavior and the process of oversight and intervention to address that behavior.  Yet at the same time, the Department's analysis and review of stop data has become a central part of the Risk Management Meetings – but it has not been fully integrated into the Department's risk management process. The incomplete association of these ideas was evident in the level of attention given to stop data in the dashboard discussion.

The risk management system operates on a process involving thresholds, which trigger reviews, and then the consideration of non-punitive responses – including management supervision or intervention to reduce risk-related behavior.  Although OPD's discussion of stop data has been a significant part of Risk Management Meetings, it has not been incorporated into the risk management process.  This is not to argue that the same thresholds should exist across all risk measures.  However, this seems to be an opportune time to incorporate stop data into the existing risk management framework by incorporating it as a risk-related variable in Department policy, by articulating at least general standards and expectations, and by linking it to the existing review and intervention process.

These steps would help bring together currently parallel processes that exist even though stop data is already recognized as relevant to risk, and it is already agreed that the drill-down to the individual officer level is important.  Recognizing kinship across risk categories will only increase appreciation for the legitimacy of interest in stop-related behavior.  It will also build a practical bridge between Tasks 34 and 41.

The November Risk Management Meeting employed a process that brings the risk management of Task 41 and the stop data of Task 34 closer together. At the meeting, OPD personnel conducted an extensive review of deliverables, followed first by a review of the traditional risk-related data, and then by consideration of stop data. This order allowed for more seamless drill-down to officer-level data, and the combination of management responses across these areas of concern. It is also noteworthy that the Department returned to the production of compressive summaries of the complaint and use of force measures, including calculating rates based on numbers of arrest. Monthly tracking of that data over time provides valuable trend analyses for Department management. Norming stop data the same way would also advance those analyses.

## Task 45:  Consistency of Discipline Policy

**Requirements:**

*On or before October 6, 2003, OPD shall revise and update its disciplinary policy to ensure that discipline is imposed in a fair and consistent manner.*

1.  *The policy shall describe the circumstances in which disciplinary action is appropriate and those in which Division-level corrective action is appropriate.*

2.  *The policy shall establish a centralized system for documenting and tracking all forms of discipline and corrective action, whether imposed centrally or at the Division level.*

3.  *All internal investigations which result in a sustained finding shall be submitted to the Discipline Officer for a disciplinary recommendation. The Discipline Officer shall convene a meeting with the Deputy Chief or designee in the affected chain-of-command for a confidential discussion of the misconduct, including the mitigating and aggravating factors and the member/employee's overall performance.*

4.  *The COP may direct the Discipline Officer to prepare a Discipline Recommendation without convening a Discipline Conference.*

(Negotiated Settlement Agreement X. B.)

**Relevant Policy:**

Five Departmental policies incorporate the requirements of Task 45:  Departmental General Order M-03, *Complaints Against Department Personnel and Procedures* (published December 6, 2005 and revised most recently on August 24, 2013); Training Bulletin V-T.1 and V-T.2, *Internal Investigation Procedure Manual* (published July 17, 2008); Internal Affairs Policy and Procedure Manual (published December 6, 2005); and Training Bulletin V-T, *Departmental Discipline Policy* (published March 14, 2014). Several of these policies are currently being revised.

**Commentary:**

Task 45.2 requires that OPD maintain a centralized system for documenting and tracking all OPD forms of discipline and corrective action, whether imposed centrally or at the division level. To assess Phase 2 compliance with this subtask, we reviewed the 18 cases that contained at least one sustained finding that were approved in August and September 2018. All (100%) of these cases and findings contained all of the necessary information available on the spreadsheet generated by IAD for our review. OPD is in compliance with the requirement that it maintain an adequate system for documenting and tracking discipline and corrective action.

The NSA also requires that discipline be imposed in a manner that is fair and consistent. To this end, the Department developed a Discipline Matrix, which was adopted on September 2, 2010 and was in effect until a new Discipline Matrix was approved on March 14, 2014. This subsequent Matrix applies to violations after that date.

As noted above, we reviewed all 18 cases with sustained findings that were approved between August 1-September 30, 2018. One case involved the failure to accept or refer a complaint. In two cases, the subject officers were arrested for Driving Under the Influence (DUI), and both cases also involved ancillary sustained allegations for other OPD members. One case was sustained for improper demeanor, and one case was sustained for improper use of force. In another case, an officer lost an arrestee's personal property; while in another case, an officer was sustained for failing to properly store a personally owned firearm. Eleven cases involved preventable motor vehicle accidents.

In each case, unless otherwise documented in writing, the proposed discipline fell within the Discipline Matrix that was in effect at the time of the action for which the discipline was imposed.

During September and October 2018, OPD held two *Skelly* hearings for IAD cases involving employees with sustained findings in which discipline of a one-day suspension or greater was recommended. We reviewed the *Skelly* reports, and found that they contained adequate justification for the results documented. One case involved a sustained demeanor allegation. The proposed penalty of a two-day suspension was reduced to a one-day suspension, with the concurrence of the Chief of Police. The second case involved falsely reporting as sick to obtain time off by a civilian employee. The Discipline Matrix identifies the lower end of the discipline range as a 30-day suspension, but the *Skelly* Officer recommended a 20-day suspension. The Chief ultimately negotiated a 10-day suspension, with five days to be served and five days held in abeyance for two years.

A third *Skelly* hearing was scheduled, but was not held as the subject officer agreed to the discipline prior to the scheduled hearing date.

We reviewed the training records that OPD provided, and confirmed that all *Skelly* hearing officers received the approved *Skelly* Officer Training in January 2016.  Additionally, all active *Skelly* officers received refresher training on April 26, 2017; and again on December 3 and 10, 2018, on which the Department held a three-hour training on the *Skelly* process and discipline for commanders.

OPD did not receive any arbitration decisions during September and October 2018.

OPD remains in partial compliance with Task 45.

# Conclusion

Over the last several months, we examined OPD's significant drop in officers' use of force.  Our review was prompted by an unexplained reduction of 75% in reported use of force during the period 2012-2017 – with principal and substantial decreases in the Level 4 category of force.

Working with OPD, we identified a sample of cases, which, based on the circumstances of the encounter and the language in the associated reports, appeared to indicate that force was used but not reported.  We discussed these cases in detail with OPD during our most recent (January) site visit.  The meeting was productive, and we reached the joint conclusion that OPD's policies regarding force and force reporting require adjustments to more clearly indicate when force must be reported.  We note that in all of the cases we reviewed, the force used was appropriate and justified; and this is a reporting issue – not an issue of inappropriate force being used.

We will discuss this issue further in future monthly status reports.  Prior to our next site visit, we will work with OPD officials to resolve this issue and being the process of modifying the appropriate policies.

Chief (Ret.) Robert S. Warshaw
*Monitor*