1  BARBARA J. PARKER, City Attorney, SBN 069722
   MARIA BEE, Chief Assistant City Attorney, SBN 167716
2  RYAN G. RICHARDSON, Special Counsel, SBN 223548
   KIMBERLY A. BLISS, Supervising Deputy City Attorney, SBN 207857
3  JAMILAH A. JEFFERSON, Senior Deputy City Attorney, SBN 219027
   One Frank H. Ogawa Plaza, 6th Floor
4  Oakland, California 94612
   Telephone: (510) 238-7686; Facsimile: (510) 238-6500
5  Email:  jjefferson@oaklandcityattorney.org
   R20752/2664421
6
   Attorneys for Defendant CITY OF OAKLAND
7

8                    **UNITED STATES DISTRICT COURT**

9                   **NORTHERN DISTRICT OF CALIFORNIA**

10

11  DELPHINE ALLEN, et al.,                 | **Case No. C 00-4599 WHO**

12                 Plaintiffs,              | **CITY OF OAKLAND'S STATUS
                                            | REPORT RE USE OF FORCE AUDITS**
13        v.

14  CITY OF OAKLAND, et al.,

15                 Defendants.

16

17

18

19

20

21

22

23

24

25

26

# I. INTRODUCTION

At the last Case Management Conference on November 27, 2018, the parties and the Court discussed concerns raised by both the IMT and the Department's Office of Inspector General ("OIG") about the potential underreporting of Level 4 uses of force.[1]  Both the IMT and the OIG noticed the significant downward trend in Level 4 uses of force that occurred over the past few years.  Accordingly, the IMT undertook a review of PDRD in certain cases involving arrests for crimes likely to involve active resistance.  At the same time, the OIG opened a formal audit into Level 4, Type 22 uses of force (intentional pointing of a firearm), because that type of force represents the overwhelming majority of officers' reported Level 4 uses of force.

At the conclusion of the CMC, the Court ordered the City to file the completed OIG audit on or before February 1, 2019.  Accordingly, attached hereto as Exhibit A is the OIG's "Audit of the Downward Trend in the Number of Reported Police Officers' Intentional Pointing of a Firearm at Subjects" (the "Firearm Audit"), including a command response to the OIG's findings and recommendations.  After the last CMC, the IMT identified the 14 cases in its review, and the Department's OIG then independently reviewed the documentation and PDRD footage in all 14 (the OIG's "Use of Force Review").  The Use of Force Review was not a formal audit, but the OIG prepared an Executive Summary of its findings for the Chief, which is attached hereto as Exhibit B.

Below is a quick overview of the Firearm Audit and Use of Force Review, as well as a status report on the City's intention to:  1) make necessary policy and training changes; and 2) conduct a larger formal audit on use of force reporting (referred to in the Department as the "Global Use of Force Audit").  To be sure, the Audit and Review did reveal concerns with underreporting, primarily caused by policy issues, but also involving training and supervisory

---

[1] Pursuant to Department General Order K-4 (Reporting and Investigating the Use of Force), Level 4 uses of force include:  the intentional pointing of a firearm at a person; a weaponless defense technique applied to a vulnerable area (such as a hair grab); the use of a control hold; an on-duty firearm discharge to euthanize an injured animal; and, a canine deployment that does not involve a bite.  The majority of Level 4 uses of force are the intentional pointing of a firearm at a person during a high-risk stop or arrest.

1  failures.  As a result, the Department referred several officers and supervisors for Internal Affairs

2  Investigations and possible disciplinary action.

3        But the Use of Review also confirmed a significant and positive point—all of the parties,

4  including the IMT and Plaintiff's counsel, agreed that in **all** of the cases reviewed, the force used

5  appeared "appropriate and justified" and that officers uniformly displayed patience and respect for

6  members of the community.  Accordingly, officers clearly are **not** underreporting force in an

7  attempt to hide **unjustified** force.  Nonetheless, the City recognizes that the proper reporting of

8  justified force is **absolutely necessary** for both the Department's ability to manage risk and its

9  obligation to be transparent with the community.  Thus, the City is committed to working with the

10  IMT and other stakeholders to ensure that officers are provided clear policy direction and training

11  on what force is reportable.

12        **II. THE AUDIT, THE REVIEW AND THE COMMAND RESPONSE**

13  **A.**    **The Firearm Audit**

14        The "Firearm Audit is being published as part of the "Oakland Police Department Office of

15  the Inspector General 3rd Quarterly Progress Report July – September, 2018" (the "Quarterly

16  Progress Report").[2]  The Quarterly Progress Report is attached hereto as Exhibit A, and the Firearm

17  Audit, including a Command Response, is found on pages 4-32.

18        Under the Department's 34-page policy governing the reporting and investigation of the Use

19  of Force (Department General Order K-4), the "intentional pointing" of a firearm at a suspect

20  constitutes a reportable use of force, while merely drawing a weapon and having it at "low-ready" is

21  not reportable.  The audit found that DGO K-4 has created confusion with respect to the definitions

22  of "intentional pointing" of a firearm and "low-ready", and resulted in an overemphasis on officers'

23  subjective intent.  It also found that while officers receive classroom instruction on the proper

24  reporting of force, their practical firearms training (*e.g.*, firearms qualifications and scenario-based

25  training on how and when to use a firearm) does not reinforce what constitutes a reportable

26        _____

    [2] The Department's OIG publishes its Quarterly Reports publicly on OPD's website.

1    intentional pointing of a firearm. Finally, the audit posited that low PAS/PRIME thresholds that

2    trigger a risk management review for Level 4 uses of force (including intentional pointing of a

3    firearm) may impact the reporting of such force.[3]

4        As a result, the OIG has recommended, *inter alia*: 1) that K-4 be rewritten to ensure clear

5    policy direction; 2) that the Department require the reporting of the low-ready position, in order to

6    better allow supervisors to monitor its use; and 3) that the Department update its practical firearms

7    training to mirror and support the classroom training governing the reporting of force; 4) that

8    PAS/PRIME thresholds for Level 4 uses of force are monitored; and 5) that supervisors should

9    monitor high risk stops where there was no reported pointing of a firearm to determine if officers

10    are engaged in unsafe tactics or are failing to report a use of force.

11        The **Chief's Command Response** is found on pages 30-32 of the Firearm Audit. OPD

12    command accepts the OIG's findings and recommendations, and agrees that policy and training

13    changes are necessary. On page 32, the Command provides a table indicating generally how each

14    recommendation will be implemented, who is responsible for the implementation and an estimated

15    timeline for implementation. As noted above, most of the recommended changes are tied to a

16    revision of DGO K-4. The Chief and the City want to move as expeditiously as possible to fix

17    DGO K-4, but are also aware that this very Firearm Audit provides evidence that lengthy written

18    policies drafted without sufficient stakeholder input and review may result in unclear direction and

19    unintended consequences.

20        While making minor changes to address the definitions of "intentional pointing" and "low-

21    ready" may seem easy, it is clear that additional and substantial changes to DGO K-4 will also need

22

23       [3] As described in more detail on page 25 of the Firearm Audit, PAS and PRIME are OPD's

personnel assessment and early intervention warning systems. The number of Level 4 uses of force

24    (including intentional pointing of a firearm) police officers report are compared to their peer groups,

and outlier officers are flagged for a risk management review. While risk management review is an

25    incredibly important tool to OPD's accountability efforts, thresholds that are **too** low are

problematic for several reasons—they may inadvertently encourage underreporting, or even impact

26    an officer's willingness to use force when it is legally justified and necessary to ensure officer and

public safety.

1  to be made as a result of the Use of Force Review (described further below).  Accordingly, while it

2  may take longer to achieve a final policy, it is clear that the City needs to address DGO K-4 in a

3  thoughtful, purposeful and holistic fashion.

4          Moreover, given the NSA and the City's Charter, new policy solutions must be reviewed by

5  Plaintiff's counsel, and approved by both the IMT and the City's Police Commission (which has

6  jurisdiction over the Department's use of force policy).[4]  The Department has already had meetings

7  with the IMT, Plaintiff's counsel and a representative of the Police Commission to discuss revisions

8  to DGO K-4.  While progress is being made, no consensus has yet been reached.  Additional

9  meetings are being scheduled, and the City hopes to provide a more thorough description of its

10 intentions in its Case Management Statement in mid-March.

11         Finally, it is worth noting that while the Chief cannot unilaterally change DGO K-4, she did

12 take an interim action to provide clear direction when she was first briefed on the OIG's concerns as

13 it conducted the Firearm Audit.  Last fall, the Chief issued a directive to the Training Department to

14 provide immediate re-training to all patrol officers regarding the meaning of "intentional pointing"

15 of a firearm (where the weapon is pointed at any part of the body, including the lower extremities)

16 versus low-ready (where the firearm is pointed at a 45-degree angle or less and not at a person).

17 After the completion of the training, the Department saw an immediate and marked increase in

18 reportable Level 4 uses of force, showing the effectiveness of the training.

19 **B.      Use of Force Review**

20         After the November 27, 2018, Case Management Conference, the IMT identified for the

21 Department the specific 14 cases (culled from a larger group of reports and PDRDs), that it believed

22 included unreported uses of force.  The Department immediately reassigned two Sergeants to the

23 OIG to assist with reviewing all reports and PDRD footage in the cases.  After the review, the OIG

24 issued an Executive Summary of its findings to the Chief, a copy of which is attached here as

25

26     [4] Once a new policy is agreed upon, it will need to be submitted to the Police Commission, which has 120 days to approve, reject or modify the policy.

1    Exhibit B.

2        During the January 2019 IMT site visit, the OIG, Department Command Staff, Departmental

3    Counsel from the Office of the City Attorney, the IMT and Plaintiff's counsel, Jim Chanin, met to

4    review the PDRD footage in the IMT's identified fourteen (14) cases and have an open discussion

5    about the parties' respective findings.  There were some disagreements about whether the PDRD in

6    certain individual cases reflected force that met the definition of "reportable" force under DGO K-4.

7    But, as noted in the Fifty-Ninth Report of the Independent Monitor for the Oakland Police

8    Department, the meeting was productive and the parties came to the joint conclusion that OPD's

9    policies could and should be improved to more clearly indicate when force must be reported (*see*

10   Doc. 1229, filed 1/17/19, at p. 11).[5]

11       As with the Firearm Audit, the Use of Force Review highlighted the need to improve DGO

12   K-4 and related policies and training.  As mentioned above, that process will necessarily involve

13   discussion with numerous stakeholders, and the approval of the IMT and Police Commission.  In

14   the meantime, in order to monitor the proper reporting of force under the current version of the

15   policy, the Chief issued a Special Order (attached hereto as Exhibit C) requiring all Sergeants to

16   review the PDRD of arrests made pursuant to California Penal Code sections 69 (Obstructing or

17   resisting executive officer in performance of duties), 148 (Resisting, delaying or obstructing) and

18   243(b) & (c) (battery on a peace officer).  These types of arrests generally involve physically

19   resistant subjects and are therefore more likely to involve an officer use of force.  The Chief's

20   Special Order requires Sergeants to view the video from the beginning of the incident through the

21

22       [5] As promised at the last Case Management Conference, and consistent with the Department's
     policies, those cases involving the underreporting of force—or any other observed policy
23   violation—were referred to Internal Affairs for a complete investigation and possible disciplinary
     action.  While a few cases seem to indicate a willful underreporting (because the use of force
24   observed was so clearly within the definition of "reportable" use of force), a number of cases seem
     to involve genuine confusion over whether a certain type of force meets the definition of a
25   reportable use of force in DGO K-4.  Indeed, as the parties and the IMT noted during their joint
     meeting, most officers were clearly not attempting to hide that some force (as opposed to reportable
26   force) was used because it was the officer's own description of a physical struggle in the crime
     report that led the IMT to chose the case as one to review.

1  arrest and document/annotate their review of the PDRD footage in OPD's PDRD software system.

2  **C.     Global Use of Force Audit**

3        In order to better understand and address the concerns that both the Department and the IMT

4  identified in the fourteen cases they reviewed together, the Department opened a more fulsome

5  formal audit into Use of Force reporting, which will include the 14 cases from the Use of Force

6  Review, as well as number of additional incidents from July-November 2018.  The OIG will not

7  limit itself to identifying unreported uses of force, but also review and identify any other conduct

8  and supervisory issues associated with incidents—*i.e.*, the OIG will also examine whether officer

9  and supervisors performed their duties in compliance with Departmental policy and training,

10  including but not limited to, acceptance and referral of complaints and PDRD activation.  Similar to

11  the methodology used to identify the 14 cases already examined, the OIG will be focusing on

12  incidents where there is a high probability that officers would be more likely to use force than not

13  (*e.g.*, firearms-related crimes, assault on a peace officer, resisting arrest, etc.).  The assessment will

14  include an examination of all reports, ancillary documents and PDRD footage associated with each

15  incident under review.  The OIG will keep the IMT informed on the audit's progress, and looks

16  forward to reporting to the Court regarding the status and anticipated completion date in its mid-

17  March Case Management Statement.

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

1

**III. CONCLUSION**

2   The City is concerned with the findings of the Firearm Audit and Use of Force Review and

3   understands the need to address the policy and training issues identified therein.  It will continue to

4   work with the IMT, Plaintiff's counsel and other stakeholders to create systemic changes that reflect

5   the City's commitment to the NSA and to fair, respectful and transparent policing.  The City will

6   update the Court on its progress in the next Case Management Conference statement, which is due

7   March.

8   Dated: January 31, 2019            BARBARA J. PARKER, City Attorney
                                       MARIA BEE, Chief Assistant City Attorney
9                                      RYAN G. RICHARDSON, Special Counsel
                                       KIMBERLY A. BLISS, Deputy City Attorney
10                                     JAMILAH A. JEFFERSON, Senior Deputy City Attorney

11                          By:    ___/s/ Barbara J. Parker_____
                                       Attorneys for Defendants
12                                     CITY OF OAKLAND, et al

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# EXHIBIT A

# Oakland Police Department
# Office of the Inspector General



# 3rd Quarterly
# Progress Report
# July – September, 2018

**Oakland Police Department**
**Office of Inspector General**
455 7th Street, 9th Floor | Oakland, CA  94607 | Phone: (510) 238-3868

## Contents

Introduction .................................................................................................................3

Audit of the Downward Trend in the Number of Reported Police Officers' Intentional Pointing of a Firearm at Subjects .......................................................................................................4

Property and Evidence: Management of Evidential Cash and Other Reportable Matters ...................33

Comparative Analysis of Vehicle Pursuit Policy ................................................................54

2

## Introduction

This *3rd Quarterly Report* covers three areas: 1) the downward trend in police officers' pointing of a firearm at subjects, 2) management of property and evidence and 3) a comparative analysis of the Oakland Police Department's vehicle pursuit policy.

In early 2018, the Office of Inspector General became concerned about the continued downward trend in uses of force, specifically the decline in pointing of a firearm at subjects, which the Department categorizes as a low-level use of force that is reportable, but does not require an investigation. The OIG initiated an audit to determine what factors might be causing the downward trend.  After reviewing policies and meeting with a number of supervisors and commanders in different Divisions/Bureaus, the OIG identified six factors that may be contributing to the downward trend, primarily in the areas of policy, training and monitoring of force.  Upon hearing of the preliminary audit findings in September, the Chief of Police directed re-training of all patrol officers to clarify what is a reportable pointing of a firearm.  Subsequent to the training, the Department has seen an increase in the numbers of this type of force.  Furthermore, the OIG has initiated a more comprehensive review of the reporting of all types of force, the results of which will be included in a future report.

Also in early 2018, the OIG initiated a review of the management of cash handling in the Property and Evidence Unit and other notable risks in the Unit.  Property and Evidence Units present tremendous risk for police departments given the high value items they process and store, as well as ensuring criminal evidence is properly tracked and maintained.  A lack of controls leaves departments vulnerable to theft, loss and improper destruction of evidence.  The OIG found several weaknesses in evidence storage, cash handling and working conditions.  Before the review was completed, the Department had already taken steps to remedy these weaknesses, including a remodel of the Unit.

Finally, OIG undertook a review of the Department's pursuit policy which was revised in August 2014. Police vehicle pursuits present significant risk to the Department and the public, so the Department revised its policy in 2014 to limit the types of crimes for which officers could pursue a suspect(s). Changes in pursuit characteristics and outcomes were compared for pursuits prior to the policy change in 2014 and after.  In addition, the review looked at the way the Department tracks pursuits.  The review found a significant drop in the number of pursuits after the policy change, but little change in the rate of property damage and injuries.

Respectfully,

Angelica Mendoza
Lieutenant of Police
Office of Inspector General

# Audit of the Downward Trend in the Number of Reported Police Officers' Intentional Pointing of a Firearm at Subjects

*By Rebecca Johnson, Lead Auditor; Kristin Burgess, MPA, CGAP, Police Performance Auditor Supervisor; Angelica Mendoza, Lieutenant of Police, and Vera Edwards, Contributing Auditor*

### Objectives

1. Determine the factor(s) causing a downward trend from 2013 to 2017 in the Oakland Police Department's number of reported incidents involving police officers pointing their firearms at subjects.

2. Evaluate the accuracy of the number of uses of force reported in the Oakland Police Department's Personnel Assessment System/Performance, Reporting, Information & Metrics Environment (PAS/PRIME).

### Background

Over the past several years, the OPD's total number of use of force incidents has been declining.  Further analysis of the data indicated that the major reduction was in the number of reported incidents involving police officers pointing their firearms at subjects.  The OIG initiated an audit to determine the factor(s) causing a downward trend in the OPD's number of reported incidents involving police officers pointing their firearms at subjects.  In addition, the auditor evaluated the accuracy of the number of uses of force reported in the PAS/PRIME system which was implemented in May 2017.

### Summary

Overall, the audit showed the need for policy changes, monitoring of police officers' performance, and training related to the pointing of the firearms at subjects.

### Key Weaknesses

- ✖ An inadequately designed policy fails to provide sufficient guidance to officers regarding when to report the pointing of the firearm at a subject(s).
- ✖ In practice, a police officer's "*intention*" is a dominant factor in determining whether the pointing of the firearm at the subject(s) is reportable, a result of an inadequately designed policy.
- ✖ Departmental General Order K-4 does not mandate the documentation of the low ready position, limiting supervisors' ability to monitor its use.
- ✖ There is a lack of a universal definition amongst police officers when determining a reportable pointing of the firearm.
- ✖ The sole non-reportable low ready position defined in policy and when to report the pointing of the firearm are not emphasized in police officers' practical firearms training, and are not in the practical firearms training curriculum.
- ✖ Low PAS/PRIME thresholds that trigger a risk management review for Level 4 uses of force may impact the reporting of such force.

### Key Strength

- ✓ The audit indicated that, overall, the number of uses of force reported by officers in the OPD's PAS/PRIME system is accurate

### Key Recommendations

The OIG made recommendations to update the Department's Use of Force policy to clarify a reportable pointing of the firearm at a subject; ensure practical firearms training and academic training are reinforcing when to report: and ensure the Department is appropriately monitoring force. For a complete list, please review the **Findings and Recommendations** section at the end of this audit.

### References

1. Special Order No. 8977 of the Chief of Police, *Use of Force Reporting*, December 17, 2012
2. Departmental General Order K-3, *Use of Force*, August 1, 2007 and the revision dated October 16, 2014
3. Departmental General Order K-4, Reporting and Investigating the Use of Force, August 1, 2007 and the revision dated October 16, 2014

## Overview

Last year, the Oakland Police Department (OPD) made 11,281 arrests, and most of the subjects were apprehended with police officers giving verbal commands.  However, there are times when police officers must use force to apprehend subjects, and when this happens, it is documented and categorized by severity.

There are four levels of force, with **Level 1** being the most serious (any use of force resulting in death; any force which creates a substantial risk of causing death; serious bodily injury; and any intentional impact weapon strike to the head).  **Level 2** includes any strike to the head (except an intentional strike with an impact weapon); a carotid restraint that does not result in the loss of consciousness; use of impact weapons; police canine bites; and any use of force which results in injuries to the subject requiring emergency medical treatment (beyond first aid) or hospital admittance.  **Level 3** includes the use of pepper spray or other chemical agent; a Taser; a baton or any impact weapon; and weaponless defense techniques (i.e. hand/palm/elbow strikes, kicks, leg sweeps, and takedowns).  Lastly, **Level 4** includes the intentional pointing of a firearm; weaponless defense techniques (i.e. hair grab, pressure to mastoid or jaw line; and shoulder muscle grab); a weaponless defense technique control hold (i.e., an elbow escort, twist lock, arm-bar, or bent wrist); and a canine deployment in which a suspect is located by the canine but no bite occurs.[1]

An officer's pointing of a firearm at a subject is a Level 4 use of force and a seizure of the subject's right to leave the scene of an incident.  The *United States Constitution*, via the Fourth Amendment, protects people from unreasonable searches and seizures by the government.  In *Graham v. Connor* 490 U.S. 386 (1986), the United States Supreme Court decided that the reasonableness of a use of force must be judged from the perspective of a reasonable officer on the scene, without regard to the officer's underlying intent or motivation.  The determination of reasonableness must be based on the totality of circumstances and must include a consideration that police officers are often forced to make split second decisions in circumstances which are tense, uncertain, and rapidly evolving.  The determination of reasonableness is not based on the 20/20 vision of hindsight.

The OPD recognizes that drawing, exhibiting, and intentionally pointing a firearm at another person is threatening and intimidating and when unwarranted may cast a negative impression on police officers.[2]  Hence, the OPD, in its Personnel Assessment System (PAS)/PRIME[3] (hereafter referred to as the PAS/PRIME system), electronically tracks the number of times each officer points his/her firearm at a person(s).

Over the past several years, the OPD's total number of use of force incidents has been declining.  As the table below shows, between 2013 and 2017, the annual decrease ranged between 18 and 27 percent.

---

[1] Departmental General Order K-4: Reporting and Investigating the Use of Force, pgs. 4-7.

[2] Departmental General Order K-3, *Use of Force*, pg. 7

[3] PAS/PRIME (Performance, Reporting, Information and Metrics Environment) is the Department's database that captures risk data such as uses of force, complaints, pursuits, and collisions for all personnel.

5

**Total Use of Force Incidents**

| Year | 2013 | 2014 | 2015 | 2016 | 2017 | Total |
|---|---|---|---|---|---|---|
| Incidents | 835 | 611 | 503 | 414 | 309 | 2672 |
| % of Decrease | | -27% | -18% | -18% | -25% | |

In March 2018, the Office of Inspector General discovered a 10-day period (March 22-31, 2018) where there were no reports of force logged. Although a reduction in uses of force can signal improved risk management, it can also indicate changes in practices and training that warrant review. This discovery, along with the steady downward trend in use of force incidents, prompted the OIG to conduct additional analysis.

Further analysis of the data indicated that the major reduction was in the number of reported incidents involving police officers pointing their firearms at subjects. The numbers suggest the OPD is on course to rarely use this type of force, even in high risk situations. In 2013, there were 659 reported incidents involving officers pointing their firearms at persons, and in 2017 there were only 153 reported incidents, a 77 percent reduction. Over the five-year span, the number of reported incidents has been significantly decreasing as represented in the chart below.



From January to May 2018, OPD records show only 47 reported incidents of police officers pointing their firearms at subjects, suggesting that the downward trend in the number of reported incidents of pointing of a firearm continues.

The OIG conducted additional data analysis for the same period (2013 to 2017, still using 2013 as a baseline) to determine whether there was a significant change in (1) the number of subjects who had firearms pointed at them by officers; (2) the number of officers who reported they pointed their firearms at subjects; and (3) arrest data.  The results were that OPD had an 82 percent decrease in the number of subjects who had firearms pointed at them by officers and a 56 percent decrease in the number of officers who reported they pointed their firearms at subjects.  However, arrests steadily increased between 2013 and 2016 and then dropped off slightly in 2017.  Even with a slight drop between 2016 and 2017, there was still a 33% increase in arrests when comparing the number of arrests in 2013 to the number of arrests in 2017. The tables below show the increase/decrease for each category.



**Number of Subjects Who Had Firearms Pointed at Them by OPD Officers (2013 Baseline)**

|  | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| Subjects | 1099 | 722 | 507 | 361 | 198 |
| % of Decrease | 0% | -34% | -54% | -67% | -82% |

Oakland Police Department, Office of Inspector General
3rd Quarterly Progress Report (July–September, 2018)





Based on the data analysis above, in May 2018, the OIG initiated an audit to determine the factor(s) causing a downward trend in the OPD's number of reported incidents involving police officers pointing their firearms at subjects.  In addition, the Contributing Auditor evaluated the accuracy of the number of uses of force reported in the PAS/PRIME system which was implemented in May 2017.

Upon conclusion of the audit, there were six significant factors identified as contributing to a downward trend in the OPD's number of reported incidents involving police officers pointing their firearms at subjects. Four of the factors are related to policy deficiencies, one is related to training deficiencies and one is related to the monitoring of force.

### *Policy Deficiencies*

- ✗ An inadequately designed policy fails to provide sufficient guidance to officers regarding when to report the pointing of the firearm at a subject(s).
- ✗ In practice, a police officer's "*intention*" is a dominant factor in determining whether the pointing of the firearm at the subject(s) is reportable, a result of an inadequately designed policy.
- ✗ Departmental General Order K-4 does not mandate the documentation of the low ready position, limiting supervisors' ability to monitor its use.
- ✗ There is a lack of a universal definition amongst police officers when determining a reportable pointing of the firearm.

### *Training Deficiencies*

- ✗ The sole non-reportable low ready position defined in policy and when to report the pointing of the firearm are not emphasized in police officers' practical firearms training, and are not in the practical firearms training curriculum.

### *Monitoring of Force*

- ✗ Low PAS/PRIME thresholds that trigger a risk management review for Level 4 uses of force may impact the reporting of such force.

Although the evidence collected suggests these six factors contributed to a downward trend in the pointing of a firearm, there may be additional reasons why use of force numbers, including pointing of a firearm, have been dropping steadily since 2013. For example, starting in early 2013, focused training on force options, decision-making, de-escalation, pointing of a firearm (cross fire situations, tactical positioning, justification, too many officers pointing), and force on restrained subjects has been provided to officers.  In addition, scenario-based training and simulations training using the MILO interactive Use of Force simulator have been utilized. The increased emphasis on training related to the use of force and the tools used for training may have moved officers to re-evaluate force decisions, which could impact the overall force numbers.

The audit also indicated that, overall, the number of uses of force reported by officers in the Oakland Police Department's PAS[4]/PRIME system is accurate.


## Background

**Beginning in 2011, assessments from external entities called upon the OPD to reduce the number of inappropriate or unnecessary pointing of the firearm at subjects.**

---

[4] PAS (Performance Assessment System) is the Department's program for assessing risk data and determining if individual employees need monitoring or intervention for concerning behaviors, or recognition for exceptional performance.

In 2011, the Independent Monitoring Team, in the *Sixth Quarterly Report of the Independent Monitor for the Oakland Police Department,* began noting instances of inappropriate or unnecessary pointing of the firearm by OPD officers, and called upon the OPD to conduct its own introspective analysis of its uses of force in order to reduce the number of unnecessary or inappropriate pointing of firearms at subjects.

Furthermore, in a Court Order dated December 12, 2012, Judge Thelton E. Henderson of the United States Federal District Court mandated that upon his appointment of a Compliance Director, the incumbent will be responsible for benchmarking OPD's addressing, resolution, and reduction in incidents involving the unjustified use of force, including the drawing and the pointing of a firearm at a person.[5]

A Compliance Director was subsequently appointed on March 4, 2013, and in the first report, entitled *Oakland Police Department Remedial Action Plan First Report,* dated May 1, 2013, he, like the Monitor, held the OPD out of compliance with officers pointing firearms at subjects due to the number of unjustified gun pointing events.  As a result, OPD was tasked with providing enhanced use of force training for its officers that consisted of two parts: (1) understanding use of force policies and (2) scenario-based use of force training.  Subsequently, the OPD provided its police officers with an additional 21.33 hours of use of force training:

| Training Description | Activities | Frequency | Hours | Per Annum Hours |
|---|---|---|---|---|
| MILO (Use of Force Simulation Training) | Simulations | Semi-Annually | 2 hours | 4 hours |
| Supplemental UOF Training | Less-Lethal Shotgun, Taser, Oleoresin Capsicum, Scenario training | Annual | 10 hours | 10 hours |
| UOF Line-up Training | Training materials provided by Training Division; delivered by Watch Commanders | Quarterly | 0.5 hours | 2 hours |
| UOF Video-facilitated Training | Training materials provided by Training Division; delivered by 1st Line Supervisors | Quarterly | 0.5 hours | 2 hours |
| Additional UOF Training in Police Officer Continued Professional Training | Incident debriefs, MILO (Use of Force Simulation Training), Scenario training | Sesquiennial | 5 hours | 3.33 hours |

---

[5] Delphine Allen, et al. v City of Oakland (United States District Court for the Northern District of California 2012)

Between 2011 and 2013, the Monitor and Compliance Director tasked the OPD with doing something about the number of unjustified uses of force. Although the Monitor and Compliance Director were focusing on unjustified uses of force, the attention on the issue resulted in a review of policy regarding pointing of the firearm.

**OPD's Current Standards Related to the Pointing of the Firearm**

The intentional pointing of a firearm at a person is designed to defend, control, overpower, restrain or overcome the resistance of a person[6], and, therefore, the Oakland Police Department recognizes the act is a seizure and requires legal justification.  As a result, its use of force policy limits its police officers to drawing and pointing a firearm at or in the direction of a person only when there is a reasonable perception of a substantial risk that the situation may escalate to the point where lethal force would be permitted.[7]  In addition, when a police officer points his/her firearm at a person, the seizure must be objectively reasonable to affect a lawful police purpose and protect the safety of police officers or others based upon the totality of the circumstances, including the following three factors stipulated in *Graham v. Connor*:

1. The severity of the crime;
2. Whether the suspect poses an immediate threat; and
3. Whether the suspect is actively resisting arrest or attempting to evade arrest by flight.[8]

Every police officer who intentionally points his/her firearm at a person(s) is required to report the use(s) of force, and the reported force is further assessed by the officer's supervisor and/or commander as follows:

- First, the officer must notify and brief his/her supervisor immediately or as soon as practical after the pointing of the firearm at a person(s).
- Secondly, a *Use of Force Report* and a Crime or Supplemental Report must be completed, detailing the initial reason for the police encounter; the circumstances that resulted in the pointing of the firearm; the reasonableness of the pointing of the firearm, and the description of the force used.

Thirdly, the officer's supervisor and/or commander reviews the general circumstances of the incident to ensure the facts are consistent with the reported level of force.  If the pointing of the firearm at a person(s) is alleged to be unreasonable, the supervisor conducts a use of force investigation and initiates an internal investigation.[9]

Police officers can draw and point their firearms without reporting the force if they use the low ready/retention position as specified in policy.  In policy, drawing at the low ready/retention position is defined as an officer having his/her firearm pointed at a 45-degree angle or less, and **not at a person**. The purpose of the low ready/retention position is to:

---

[6] Departmental General Order K-3, pg. 3.
[7] Ibid., pg. 7.
[8] Ibid., pg. 2.
[9] Departmental General Order K-4, pgs. 24-25.

- Scan areas for threats without the weapon obscuring the officer's view;
- Make a proper assessment of persons by being able to see the hands and areas where weapons can be concealed; and
- Move around persons so the muzzle does not sweep them.

Although the use of the low ready/retention position is not a reportable use of force, the OPD advises its officers that they **should** document their use of the position in the appropriate report.[10] Supervisors are required to monitor their subordinates' use of such force via direct observation, report review, use of force investigations, if necessary, and any other methods to ensure the drawing at low ready or the pointing of a firearm at or in the direction of a person is safe, tactically sound, and reasonable.[11]

## Methodology

The established guidelines for using force by intentionally pointing a firearm at a person are found in Departmental General Orders K-3, *Use of Force* and K-4, *Reporting and Investigating the Use of Force*, both dated October 16, 2014.

To determine the factor(s) causing a downward trend in the OPD's number of reported incidents involving police officers pointing their firearms at subjects, the following five tests/interviews were conducted:

1. The Lead Auditor sought documentation (policies, procedures and/or reports) related to the pointing of the firearm that could stimulate the downward trend in the number of reported incidents since 2013.

2. The Audit Section Supervisor and Lead Auditor, during an entrance conference, interviewed the OPD's Training Division Captain and the Training Section Tactics Coordinator (a Sergeant) to gather information about policy and training regarding the pointing of a firearm and possible reasons for the downward trend in the number of reported incidents of police officers pointing their firearms at subjects.

3. The Lead Auditor reviewed a sample of Crime/Supplemental Reports with the type of arrests, based on the California Penal Code offenses, in which police officers are prone to point their firearms at subjects. The Lead Auditor read the reports seeking wording that indicated police officers drew and/or should have drawn their firearms.  In instances in which the Lead Auditor had questions about whether firearms were drawn or not drawn, the Lead Auditor reviewed the incident captured on the officer's/officers' Portable Digital Recording Device (PDRD) to determine what occurred.  If the footage showed an officer drew his/her firearm and the Lead Auditor deemed he/she pointed the firearm at the subject(s) and the pointing of the firearm was not documented in the respective Crime/Supplemental Report and/or the *Use of Force Report*, if applicable, the incident was flagged.

---

[10] Ibid., pg. 24
[11] Ibid., pg. 26

Subsequently, the OIG Commander, Audit Section Supervisor, and Lead Auditor showed all the flagged PDRD footage to the Training Division personnel to get their assessments of the officer's/officers' actions in the footage.  In addition, after hearing the Training Division's assessments, the OIG set aside PDRD video footage from two flagged incidents and two similar encounters in which officers pointed their firearms, reported the pointing of the firearms, and completed a *Use of Force Report*.  OIG showed the one or two flagged incidents and the corresponding one or two similar encounter(s) to various Bureau of Field Operations personnel to see if they could determine the incident(s) in which police officers reported the pointing of the firearm.

4.  The OIG Commander, Audit Section Supervisor, and Lead Auditor interviewed the Training Section's Firearms Instructors to get an overview of police officers' training related to reportable pointing of the firearm.

5.  The OIG Commander, Audit Section Supervisor, and Lead Auditor interviewed the Training Section's Lead Patrol Procedures Instructor to get an overview of police officers' training related to reportable pointing of the firearm.

6.  The Lead Auditor requested and received from the Personnel Assessment Unit the event count cutoff for Patrol Groups' Level 4 thresholds that were generated by the PAS/PRIME system around June 2013, June 2014, June 2015, June 2016, and June 2017.  The data was used to assess to what degree the thresholds were affected and officer behavior related to the pointing of the firearm.

To evaluate the accuracy of the number of uses of force reported in the OPD's PAS/PRIME system, the OIG reviewed a sample of *Use of Force Report* documents created between 2013 and 2017, prior to the inception of the PAS/PRIME system, to ensure the number of uses of force that were recorded in the paper *Use of Force Report* form matched the use of force data in the PAS/PRIME system.  A total of 112 UOF reports were reviewed.

## POPULATION/SAMPLE

### Objective 1

Using LEAP,[12] a Forensic Logic, Inc. database, the OIG queried for arrests made based on California Penal Code offenses in which police officers are prone to point their firearms at person(s).  The time- period for the query was January 1, 2018 to June 30, 2018.  In addition, the query included all arrests made due to subjects allegedly having committed one or more of the following offenses:

---

[12] According to Forensic Logic, Inc.'s LEAP Network™ *Operating Manual and Security Policy:  Requirements for User Compliance*, effective October 1, 2014, the LEAP Network is a multi-organization integrated information sharing and data analysis service.  It collects data from a variety of automated commercial, local, state and federal law enforcement and justice information systems on a frequent basis; reorganizes the data for easy access and analysis; and distributes the data and accompanying analysis to authorized users, also known as subscribers.

| Penal Code | Offense | No. |
|---|---|---|
| 1203.2 | Violation of probation | 393 |
| 1203.2 (A) | Probation violation (re-arrest/revoke) | 65 |
| 1203.3 | Probation revoked | 14 |
| 148 (A) (1) | Willfully resisting, delaying, or obstructing a peace officer | 40 |
| 182 (A)(1) | Two or more persons conspiring to commit a crime | 11 |
| 187 (A) | Murder, the unlawful killing of a human being | 17 |
| 211 | Robbery, the felonious taking of personal property in the possession of another | 155 |
| 212.5 (A) | Robbery of any person performing duties as operator of bus, taxi, etc. | 7 |
| 215 (A) | Carjacking, the felonious taking of a motor vehicle in the possession of another | 40 |
| 243 (B) | Battery against a peace officer.... engaged in the performance of his/her duties | 30 |
| 243 (C) (1) | Battery against emergency personnel, etc. | 3 |
| 243 (C) (2) | Battery against a peace officer | 9 |
| 245 (A) (1) | Assault upon the person of another with a deadly weapon on instrument | 171 |
| 245 (A) (2) | Assault upon the person of another with a firearm | 20 |
| 25400 (A) (1) | Carry concealed weapon in vehicle | 104 |
| 25400 (A) (2) | Carry concealed weapon on person | 57 |
| 25400 (A) (3) | Carry concealed weapon in vehicle: occupant | 23 |
| 25400 (C) (1) | Carry concealed weapon in vehicle with prior conviction | 22 |
| 25400 (C) (2) | Carry concealed stolen weapon | 12 |
| 25400 (C) (3) | Carry concealed weapon – criminal street gang | 2 |
| 25400 (C) (4) | Carry concealed weapon – unlawful possession | 43 |
| 25400 (C) (6) | Carry a loaded concealed weapon on person | 35 |
| 25400 (F) | Peace officer may arrest a person for a violation of paragraph (6) of subdivision (c) if the peace officer has probable cause to believe that the person is not listed with the Department of Justice pursuant to paragraph (1) of subdivision (c) of Section 11106 as the registered owner of the pistol, revolver, or other firearm capable of being concealed upon the person, and one or more of the conditions in subparagraph (A) of paragraph (6) of subdivision (c) is met. | 34 |
| 25850 (A) | Carry loaded firearm in public | 112 |
| 25850 (C) (1) | Carry loaded firearm with prior felony conviction | 43 |
| 25850 (C) (2) | Carry stolen loaded firearm | 43 |
| 25850 (C) (3) | Criminal street gang member carry loaded firearm | 4 |
| 25850 (C) (4) | Carry loaded firearm: unlawful, prohibited possession | 47 |
| 25850 (C) (5) | Carry loaded firearm while prohibited | 3 |
| 25850 (C) (6) | Carry loaded handgun: not registered owner | 117 |
| 29800 (A) (1) | Any person convicted of a felony or who is addicted to a | |

| | | narcotic drug and who owns or is in possession of a firearm is guilty of a felony | 162 |
|---|---|---|---|
| | 3056 | Parole violation | 88 |
| **Vehicle Code** | | **Offense** | **No.** |
| | 10851 (A) | Person who drives or takes a vehicle not his/her own | 258 |
| | | **TOTAL** | **2184** |

From January 1, 2018 to June 30, 2018, there were a total of 5,326 arrests made based on the offenses above.  However, the sample was chosen by selecting all arrests for the above offenses made March 21-27 and June 16-22, during which OPD records show no reported uses of force, including the pointing of the firearm by its officers.  Using OPD's Vision TEK Frontline® Field Based Reporting system, a computerized method for officers to write police reports[13], the Lead Auditor researched the corresponding report numbers and Crime/Supplemental Reports for each incident in which the arrests were made.  For March 21-27, the sample consisted of the review of 34 incidents in which 40 arrests were made based on the offenses.  For June 16-22, the sample consisted of the review of 45 incidents in which 46 arrests were made based on the offenses.

### Objective 2

To help identify if PAS/PRIME data is accurate, the Contributing Auditor randomly selected 112 UOF reports from 2013-2017 that were completed before PAS/PRIME was implemented in early May 2017:

2013 – 25 reports
2014 – 25 reports
2015 – 25 reports
2016 – 25 reports
2017 – 12 reports

## Findings

### Finding #1

***An inadequately designed policy fails to provide sufficient guidance to officers regarding when to report the pointing of the firearm at a subject(s).***

An audit of the OPD's use of force policy since 2007 indicates the standard that must be met by officers to report the pointing of the firearm is inadequately designed.  The standard is a mere statement for each officer to interpret for himself/herself without sufficient guidance regarding when to report the pointing of the firearm at a subject.

In December 2012, the low ready/retention position (of the firearm) was introduced into policy.  However, it wasn't until December 2014 when the Department provided additional clarification in policy that low ready/retention position was not a reportable use of force.  While this clarification provides

---

[13] Departmental General Order I-14, 15 Dec 09, pg. 1.

some additional guidance about when to report the pointing of the firearm, it is limited to a position of the firearm. The table below shows the sequence of revisions to Departmental General Order (DGO) K-4, *Reporting and Investigating the Use of Force,* specifically regarding the pointing of the firearm at a subject.

| Policy | Language |
|---|---|
| DGO K-4, *Reporting and Investigating the Use of Force,* dated August 1, 2007[14] | A firearm is intentionally pointed at a person |
| Special Order No. 8977 of the Chief of Police,[15] *Use of Force Reporting— Pointing of Firearm/Restrained Subject/Use of Vehicle to Intentionally Strike Subject,* dated December 17, 2012 | Effective immediately, only the intentional pointing of a firearm at a person is a reportable use of force<br><br>***Low Ready/Retention Position***<br>The low ready/retention position is where the firearm is pointed at a 45-degree angle or less and not at a person. The purpose of the low ready/retention position is to:<br>• Scan areas for threats without the weapon obscuring the officer's view;<br>• Make a proper assessment of persons by being able to see the hands and areas where weapons can be concealed; and<br>• Move around persons so the muzzle does not sweep them. |
| DGO K-04, incorporating Special Order No. 8977, dated October 16, 2014 | **Pg. 6**<br>The intentional pointing of a firearm at a person.<br>    a. This includes intentional pointing a firearm loaded with less lethal ammunition at a person, except during Crowd Control Operation.<br>    b. This does not include the low ready/retention position as specified in Part VI, A, 4.)<br><br>**Pg. 24**<br>Low Ready/Retention Position<br>The low ready/retention position is where the firearm is pointed at a 45-degree angle or less and **not at a person**. The purpose of the low ready/retention position is to:<br>    a. Scan areas for threats without the weapon obscuring the officer's view;<br>    b. Make a proper assessment of persons by being able to see the hands and areas where weapons can be concealed; and |

---

[14] pgs. 6.3 and 10.1

[15] In Departmental General Order A-1, *Departmental Publications*, dated July 28, 2008, a Special Order of the Chief of Police (SO) is defined as a directive from the Chief of Police which sets forth official policy modifications until such revisions can be incorporated into a permanent departmental directive (i.e., Departmental General Order, Training Bulletin, Report Writing Manual, or Manual of Rules). An SO that modifies a specific permanent departmental directive shall terminate when incorporated into the referenced directive unless otherwise designated.

16

| | |
|---|---|
| | c.   Move around persons so the muzzle does not sweep them. |
| | Although the use of the low ready/retention position is not a reportable use of force, members should document their use of the position in the appropriate report. |

Not only is there insufficient guidance on when to report a pointing of the firearm, the current organization of DGO K-4, as it pertains to the pointing of a firearm, may contribute to a misunderstanding of low ready and how it relates to a reportable use of force. As listed in the above table, the current version of DGO K-4 covers the intentional pointing of a firearm and low ready in two sections.  Part II.D on Page 6 relates to use of force levels for reporting and investigating purposes only. It lists the intentional pointing of a firearm at a person as a level of force that must be reported.  In the same section, it states *"This does not include the low ready/retention position as specified in Part VI, A, 4."* Part VI, A, 4 on Page 24 defines low ready and clarifies that "the firearm is pointed at a 45-degree angle or less and **not at a person**." However, if an officer does not refer to Page 24 to get clarification on low ready, it is conceivable he/she could assume that the low ready position, even if the firearm is pointed at the person, is not a reportable use of force.

More direction is needed to know when to report "the intentional pointing of a firearm at a person." Insufficient guidance in policy regarding when to report the pointing of the firearm is a contributing factor in the downward trend in the OPD's number of reported incidents involving police officers pointing their firearms at subjects.

**Finding #2**

*In practice, a police officer's "intention" is a dominant factor in determining whether the pointing of the firearm at the subject(s) is reportable, a result of an inadequately designed policy.*

With the policy providing insufficient guidance regarding reportable pointing of the firearm, the OIG interviewed a few commanders and a sergeant, asking them, "What do you consider a reportable Level 4, Type 22, the pointing of a firearm?"  The responses indicated that a reportable use of force is one in which the officer *intends* to point his/her firearm at a subject, and only he/she knows whether the pointing of the firearm at a subject was intentional or not:

A Bureau of Field Operations 2 Captain answered, "The current policy added an addendum that states no *Use of Force Report* is required unless the officer *intentionally* points his/her firearm at a person.  The pointing of a firearm is subjective.  Officers are technically in compliance.  However, it requires a supervisor to know what is in the mind of an officer to determine whether he/she intentionally pointed the firearm at the person.  A supervisor should ask the officer of his/her intent to determine whether he/she pointed his/her firearm at the subject.  The policy states "*intentionally*."

A Bureau of Field Operations 1 Watch Commander answered, "Intentional, direct pointing at a person.  Officers are reporting correctly.  It's subjective because it's the

officer's state of mind that determines whether he/she is pointing his/her firearm at a person."

A Bureau of Field Operations 2 Watch Commander answered, "…The mindset of the officer is huge."

The Training Division's Tactics Coordinator (a sergeant) stated that "how the officer interprets the force determines whether it is reported or not."

The four responses in conjunction with the use of force data analysis (i.e., decrease in reported incidents, subjects who had firearms pointed at them, and police officers who pointed their firearms) suggest that, in practice, most officers do not *intend* to point their firearms at subjects and therefore do not consider the force to be reportable.  However, not intending to point a firearm at a subject does not necessarily equate to a firearm not being pointed at the subject.  A misunderstanding of a reportable pointing of the firearm at a subject is one of the effects of having an inadequately designed policy and is a contributing factor in the downward trend in the OPD's number of reported incidents involving police officers pointing their firearms at subjects.

**Finding #3**

***Departmental General Order K-4 does not mandate the documentation of the low ready position, limiting supervisors' ability to monitor its use.***

A review of the use of force policy regulating the monitoring of police officers' use of the low ready position indicated that the policy does not mandate officers to document their uses of the low ready position, and therefore the supervisors' ability to monitor police performance of the low ready position is limited.

Departmental General Order K-4, *Reporting and Investigating the Use of Force*, dated October 16, 2014, Section VI.B, states:

> "Supervisors shall monitor officers' performance through direct observation, use of force investigations, report review or other methods to ensure the drawing at low-ready or the pointing of firearms at or in the direction of a person is safe, tactically sound and reasonable.  If safety or tactical deficiencies are identified, or the level of force by the officer(s) is inappropriate or disproportionate (e.g. too many officers pointing a firearm at a single person), **AND** the deficiency or the level of force does not denote Class 1[16] misconduct or a pattern of similar conduct by the involved officer(s), supervisors shall address the matter by counseling the officer and documenting such counseling in the officers' Supervisory Note File."

However, Section VI.A.4 states that officers ***should*** document their use of the low ready in the appropriate report. Hence, it is not mandatory for an officer to document his/her use of the low ready position and therefore the frequency of how often an officer uses the low ready position is not

---

[16] Serious misconduct offenses such as use of excessive, unnecessary and/or unlawful force.

Oakland Police Department, Office of Inspector General
3rd Quarterly Progress Report (July-September, 2018)

transparent.  The policy was written without taking into consideration how supervisors are to "monitor officers' performance through…report review…to ensure the drawing at low ready…is safe, tactically sound and reasonable…" if there is not a mandate for police officers to document their use of the low ready position.  Not mandating police officers to document their use of the low ready position in their reports results in missed opportunities for supervisors to catch unreported "*reportable*" pointing of the firearm or ensure officers are engaged in tactically safe practices (e.g. pointing their firearms at subjects in high risk situations when warranted).  The lack of the requirement is a contributing factor in the downward trend in the number of reported incidents of police officers pointing their firearms at subjects.

## Additional Observations

### *No documentation of one or more officers' use of the low ready position in 16 of 40 high risk incidents reviewed by the Lead Auditor.*

During the audit, the Lead Auditor noted that not all officers document their use of the low ready position.  Upon review of Crime/Supplemental Reports and the respective PDRD footage for 40 high risk incidents, there were 16 incidents in which the reports did not document one or more officers using the low ready position.

### *A word search indicates that officers are documenting in their Crime/Supplemental Reports the use of the low ready position more often than the pointing their firearms at subjects.*

The Audit Section Supervisor and the Lead Auditor, during the entrance conference, interviewed the OPD's Training Division Captain and Tactics Coordinator (a sergeant) to gather information about policy and training regarding pointing of a firearm and possible reasons for the downward trend in the number of reported incidents of police officers pointing their firearms at subjects.  During this meeting, the OIG was informed that the decrease in the number of reported incidents may be based on the police officers' frequent use of the low ready position.  The Tactics Coordinator described the low ready position as a tactical assessment taught by the Training Division in which officers are taught to utilize the low ready position while assessing the positioning of the subjects' hands and/or any threats to the public/officer safety.  The Training Division Captain suggested that OIG query for "low ready," stating that an increase in the use of the phrase "low ready" may signify a change in OPD's method of documentation.

Subsequently, the OIG queried for "low ready."  Using LEAP,[17] the Forensic Logic, Inc. database in which the wording in an OPD Crime/Supplemental Report can be queried, the Lead Auditor queried for "low ready," "pointed my firearm," and "elected to point my firearm."  The results of the query are illustrated in the following chart:

---

[17] According to Forensic Logic, Inc.'s LEAP Network™ *Operating Manual and Security Policy:  Requirements for User Compliance*, effective October 1, 2014, the LEAP Network is a multi-organization integrated information sharing and data analysis service.  It collects data from a variety of automated commercial, local, state and federal law enforcement and justice information systems on a frequent basis; reorganizes the data for easy access and analysis; and distributes the data and accompanying analysis to authorized users, also known as subscribers.



## Results of LEAP Query

|  | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|
| "Low Ready" | 0 | 164 | 982 | 1080 | 1010 | 394 |
| "pointed my firearm" | 968 | 758 | 572 | 438 | 262 | 99 |
| "elected to point my firearm" | 18 | 29 | 19 | 20 | 13 | 6 |

Even though not all officers document their use of the low ready position in their respective reports, the LEAP query shows from 2013 to 2018[18] phrases that include *low ready* increased, while phrases that include *pointed my firearm* decreased. Phrases that include *elected to point my firearm* remained relatively low. These results strongly suggest that officers have changed their tactics to using the low ready position more often than they are pointing their firearms at subjects. In addition, the 77 percent reduction in the number of reported incidents involving police officers pointing their firearms at subjects; the 82 percent reduction in the reported number of subjects who had firearms pointed at them; and the 56 percent reduction in the number of officers who reported they pointed their firearms at subjects corroborate the change in habit. Lastly, the results show the importance of mandating police officers to document their use of the low ready position in their reports to ensure supervisors can adequately monitor the officers' performance and avoid missing opportunities to catch unreported "*reportable*" pointing of the firearm.

### Finding #4

***There is a lack of a universal definition amongst police officers when determining a reportable pointing of the firearm.***

At various times during the audit, the OIG met with commanders and sergeants from the Training Division and the Bureau of Field Operations. At each meeting, the OIG asked what is considered a reportable pointing of the firearm and received a variety of answers as follows:

---

[18] 2018 only covers January to May.

| Meeting | Response(s) |
|---------|-------------|
| Training Division/Section Commanders and Sergeants | <ul><li>How the officer interprets the force determines whether it is reported or not (Training Section Tactics Coordinator—a Sergeant).</li><li>The laser rule—if there was a laser on the firearm and the laser hits any part of the subject's body, it is reportable (Training Section Tactics Coordinator).</li><li>It can be low ready AND intentionally pointing. If officers intentionally pointed at someone, they need to report it (Training Section Academy Coordinator—a Sergeant).</li><li>If you intentionally point your gun at somebody, [it] is a reportable use of force (Training Division Captain).</li><li>Should report if you point your gun at somebody (Training Section Commander—a Lieutenant).</li></ul> |
| Bureau of Field Operations 2 Captain | <ul><li>Two versions, (1) the previous policy required a *Use of Force Report* to be completed when an officer "breaks/broke" the leather of their holster; (2) the current policy added an addendum that states that no *Use of Force Report* required unless the officer intentionally points his/her firearm at a person...The pointing of a firearm is subjective. However, it requires a supervisor to know what is in the mind of an officer to determine whether he/she "intentionally" pointed the firearm at the person. A supervisor should ask the officer his/her intent to determine whether he/she pointed his/her firearm at the subject. The policy states it, "intentionally."</li></ul> |
| Bureau of Field Operations 1 Watch Commander (a Lieutenant)<br><br>Bureau of Field Operations 1 2 Patrol Sergeants (Both former Training Division Firearm Instructors) | <ul><li>Intentional, direct pointing at a person. I review videos, and by definition, officers are reporting correctly. It's subjective because it's the officer's state of mind that determines whether he/she is pointing his/her firearm at a person (Bureau of Field Operations Watch Commander).</li><li>The policy is kind of vague, which is a potential problem. I perceive it to be that if there was a laser in line with the muzzle of the firearm and you intentionally had that laser make contact with any portion of someone's body, [it] would be a reportable use of force (Patrol Sergeant).</li><li>In DGO K-4, there is a perceived inconsistency in reporting [because of the words *intentional* and *not pointed at a person*] (Patrol Sergeant).</li></ul> |
| Bureau of Field Operations 2 Watch Commander (a Lieutenant and former Training Division Commander) | <ul><li>If there is a laser on a firearm and the laser brushes and cuts someone in half, unintentionally, it is a reportable Type 22 (the pointing of the firearm).</li><li>Finger indexed is not intentional.</li><li>Finger on trigger is intentional.</li><li>Ready and prepared to shoot is reportable, like being on the Range—the same discipline on the Range.</li><li>The mindset of the officer is a huge factor.</li></ul> |
| Lead Patrol Procedures Instructor (a Sergeant) | <ul><li>Asks officers if they would consider the barrel of the gun to be pointing at them if they were to put themselves in the subject's shoes.</li></ul> |

|  | <ul><li>Defined "*contact ready*" as reserved for ready to defend oneself.  He also stated that he does not teach officers to do anything at contact ready.</li><li>An officer may assume he/she is not intentionally pointing at a subject because he/she is trying to assess what the subject is doing (i.e., hands, waistband, etc.)—the definition of the low ready position.  He further stated that an officer may assume he/she is intentionally pointing if he/she is coming up to contact ready.</li></ul> |
|---|---|

The responses show that there is inconsistency when defining a reportable pointing of the firearm.  Is it in the officer's mind?  Is it the laser rule?  Is it when the finger is indexed?  Is it contact ready?  Is it if an officer would consider the barrel of the gun to be pointing at him/her if put in the subject's shoes?  Is it unknown because the policy is vague?  Defining, in policy, a reportable pointing of the firearm as "The intentional pointing of a firearm at a person...A self-reported use of force...Complete a Use of Force Report" allows too much room for interpretation, resulting in a plethora of definitions for a reportable pointing of the firearm.  The lack of agreement on what is a reportable pointing of the firearm is contributing to the downward trend in the number of reported incidents of police officers pointing their firearms at subjects.

**Additional Observations**

***The lack of a universal definition affects how OPD personnel interpret the pointing of the firearm in PDRD footage.***

The Lead Auditor reviewed OPD Crime/Supplemental Reports for 79 incidents and the corresponding PDRD footage for 40[19] incidents.  With a layman's eye, the Lead Auditor reviewed the PDRD footage and deemed seven incidents as having at least one or more officers pointing their firearms at the subject (s), but the officers' pointing of a firearm were not documented in the respective Crime/Supplemental Reports.  In addition, there were no corresponding *Use of Force Reports* completed to account for the officers perceived pointing of a firearm.

To corroborate whether officers were pointing their firearms in the seven flagged incidents, the OIG Commander, Audit Section Supervisor, and Lead Auditor met with the Training Division Captain and the Training Section Commander, Academy Coordinator, and Tactics Coordinator.  Video footage of the seven incidents in question was presented during the meeting.  The following observations and assessments were made by the Training Division:

- **2 incidents -** rated officers' firearms as being in the low ready position [due to scanning for the subjects' hands and waistband and the officers were not looking in their sights or at contact ready];
- **1 incident -** rated as officers could be pointing their firearms at the subject;

---

[19] Initially, the Lead Auditor selected 45 incidents to review, but there were five incidents in which there was no PDRD footage of the incidents or the officers' PDRD was not activated prior to initiating contact with the subject or prior to the subject's detention or arrest.

- **1 incident -** rated one officer's firearm in the low ready position [due to scanning for the subject's hands and/or waistband and officer not at contact ready] and unable to determine the other officer's firearm position; and
- **3 incidents -** rated as unable to determine the positioning of the officers' firearms.

The OIG was advised that it is difficult to determine the positioning of an officer's firearm when viewing the individual officer's PDRD footage.

After hearing the Training Division's assessments, the OIG set aside PDRD video footage from two of the seven flagged incidents and two similar encounters in which officers pointed their firearms, reported the pointing of the firearms, and completed a *Use of Force Report*. They held three separate meetings and met with (1) a Bureau of Field Operations 2 Captain; (2) a Bureau of Field Operations 1 Watch Commander (Lieutenant) and 2 Patrol Sergeants (both former Training Division Firearm Instructors); and (3) a Bureau of Field Operations 2 Watch Commander (a Lieutenant and former Training Section Commander). All attendees were asked by OIG, after viewing PDRD footage of two incidents (one in which there was no reportable pointing of the firearm and one in which police officers reported the pointing of their firearms), "Which officers reported the pointing of the firearms?" In general, the response was one or more officers were deemed to have reportable uses of force [intentionally pointed their firearms at the subject(s)] in the PDRD footage from one or both flagged incidents. However, the Lead Auditor did note that even if an attendee rated a flagged video as having an officer pointing his/her firearm at a subject, the attendee still, at some point during his conversation with OIG, referred to the officer's "intent" as a factor in determining whether the firearm is actually pointing at the subject(s).

*In practice, some officers' are positioning their firearms in ways that are not accounted for in the use of force policy and/or in firearms training.*

Upon reviewing the sampled PDRD footage, the Lead Auditor noted additional unknown tactics used and not mentioned in a Crime/Supplemental Report or in policy. The footage shows some officers' firearms were drawn and held in what appeared to be a version of contact/mid ready position because their firearms were pointed in a slightly offset position in relation to the subject(s). In addition, the footage showed some officers **"canting their weapons"** by rotating the firearm either clockwise or counter clockwise from vertical to horizontal. A Training Division Firearms Instructor was asked about this practice, and he stated that the Range does not teach **"canting"** [as part of the police officers' practical firearms training]. In addition, a Patrol Sergeant, who is a former Firearm Range Instructor, stated "canting of the weapon, angling off to the side, creates a non-reportable use of force, but it is a bad practice and not safe." Lastly, the footage showed some police officers' firearms were held in other unconventional ways that are not taught by the Training Division. These firearms positions are not accounted for in the Use of Force policy, so it is unclear if they are considered reportable.

**Finding #5**

*The sole non-reportable low ready position defined in policy and when to report the pointing of the firearm are not emphasized in police officers' practical firearms training, and are not in the practical firearms training curriculum.*

Special Order No. 8977 introduced an alternate, non-reportable officer safety tactic involving a drawn, exhibited, and pointed firearm, called the "Low Ready/Retention Position" (hereafter referred to as low ready). The Special-Order outlines that when an officer's firearm is in drawn and pointed at a 45-degree angle or less, and **not at a person, it is in the low ready position**. The low ready position allows an officer to: (1) scan for threats without the firearm obscuring the officer's view; (2) make a proper assessment of persons by being able to see the hands and areas where weapons can be concealed; and (3) move around persons so the muzzle of his/her firearm does not sweep anyone.[20] This policy change does provide additional guidance to officers regarding when the pointing of the firearm is not reportable: firearm is drawn and pointed at a 45 degree angle or less, and **not at a person**. Moreover, officers are now able to draw their firearms without having to report a use of force related to the pointing of the firearm.

The OIG Commander, Audit Section Supervisor, and Lead Auditor visited the shooting range and met with two Training Division Firearms Instructors, who are responsible for administering police officers' practical firearms training. During the meeting, the OIG was given an overview of the firearms training program, and the Lead Auditor noted factor (s) that could contribute to the downward trend in OPD's number of reported incidents involving police officers pointing their firearms at subjects: The Firearms Instructors do not emphasize the low ready position as a 45-degree angle or less, as is defined in Departmental General Order K- 4, nor do they include in their instruction when to report the pointing of the firearm. In addition, according to the Training Division Commander, the low ready position as a 45-degree angle or less and when to report the pointing of a firearm are not part of the practical firearms training curriculum.

OIG was advised by the Firearms Instructors that they teach *low ready* as the lowering of one's firearm low enough to see the hands and waistband of the subject(s) and in doing so, the firearm may, in some cases, be pointing at the subject(s). However, teaching officers when to report the pointing of the firearm is not part of the curriculum. One Firearms Instructor stated, "Should officers be aware of where firearms are pointing? Yes, they should." Muzzle awareness is very important for many reasons (i.e., negligent discharge if an officer is startled, placing the community at risk, etc.). Recruits are advised that if they use low ready, articulate their low ready."

The Lead Auditor asked the Firearms Range Instructor if he teaches low ready as 45 degrees or less and he stated, "*No*", and referenced the lowering of one's firearm to scan the hands and waistband of the subject(s). This application of the low ready position also coincides with the statement provided to OIG by a Patrol Sergeant, who was also a former Training Division Firearms Instructor. He stated, "Low ready is not about the angle. It is actually used to assess the subject's hands and body." Another Patrol Sergeant, who is also a former Training Division Firearms Instructor, stated, "The low ready in policy is different than [the low ready taught in practical] training. It is not fully consistent with how we teach it in firearms and tactics training." In addition, the Lead Patrol Procedures Instructor, when interviewed by OIG, defined low ready as the gun is out of eyes' sight to assess the subject's waistband, hands, and

---

[20] Ibid.

what the person is doing.  He further stated that low ready is not taught as being at 45 degrees or less, which corroborates what the Firearm Instructors stated.

Based on the information gained via the statements above, the Lead Auditor assessed that the Firearms Instructors do not emphasize (1) the low ready position defined in policy as a non-reportable pointing of the firearm; and (2) when to report the pointing of the firearm.  Not teaching both topics in the police officers' practical firearms training is a contributing factor in the downward trend in the OPD's number of reported incidents involving police officers pointing their firearms at subjects.  This is an oversight caused by not ensuring policy and practice are cohesive.

Also problematic is the wording in the OPD's policy, which is very specific and offers officers only one "*ready*" position that is non-reportable.  It states that an officer's firearm is in the low ready position and non-reportable if his/her firearm is drawn and pointed at a 45-degree angle or less and **not at a person**.  Since officers are not trained, in their practical firearms training, on this definition of a low ready position by Firearms Instructors, they don't get the repetitions and reinforcement of what non-reportable pointing of the firearm looks like when the subject is present, and therefore may deem a reportable pointing of the firearm as non-reportable.  Not training officers in their practical firearms training to recognize his/her non-reportable pointing of the firearm at a 45-degree angle or less in relation to the subject on scene is a contributing factor in the downward trend in the number of reported incidents of police officers pointing their firearms at subjects.

Although, the Firearms Range Instructors do advise officers that their respective firearm may be pointing at a subject while in the low ready position, the practical firearms training curriculum is lacking an important element to reinforce the officers' knowledge of when to report the pointing of the firearm—when to complete a *Use of Force Report*.  The failure to associate the completion a *Use of Force Report* with the low ready position, if applicable, is a contributing factor in the downward trend in the number of reported incidents of police officers pointing their firearms at subjects.

**Finding #6**

***Low PAS/PRIME thresholds that trigger a risk management review for Level 4 uses of force may impact the reporting of such force.***

When reported, the pointing of a firearm is categorized as a Level 4 use of force.  The number of Level 4 uses of force police officers report impacts the thresholds in the PAS /PRIME system, which statistically establishes thresholds based on peer groups.  If officers in a peer group average a certain number of reportable uses of force and an officer, in the same peer group, exceeds that number, his/her activity profile (i.e. uses of force, complaints, sick leave, etc.) is reviewed.  A review by his/her supervisor and chain-of command will further occur to examine the data and other performance based metrics to mitigate and resolve risk, implement additional training/mentoring for the individual, and require supervisory monitoring or intervention if appropriate.  The lower the Level 4 thresholds are in PAS/PRIME, the fewer reportable uses of force an officer can have before his/her activity is "flagged," prompting a formalized supervisory/managerial review by his/her supervisor and chain of command.

As a result of the downward trend in the number of officers who reported they pointed their firearms at subjects, the thresholds for Level 4 have decreased as evidenced by the table below:



Event Count Cutoffs
for Patrol Peer Groups

|     | 2-Jul-13 | 2-Jun-14 | 6-Jul-15 | 12-Jun-16 | 11-Oct-17 | 25-Jul-18 |
|-----|----------|----------|----------|-----------|-----------|-----------|
| A   | 19       | 14       | 13       | 10        | 7         | 4         |
| B   | 34       | 15       | 12       | 11        | 9         | 6         |
| C   | 29       | 18       | 11       | 8         | 7         | 6         |

The table shows, as of July 25, 2018, if an officer in Group A had five or more reportable uses of force within an 18-month period (January 18, 2017 to July 18, 2018), his/her PAS/PRIME activity profile would have been "flagged," prompting a formalized supervisory/managerial review by his/her supervisor and chain of command.

If the PAS/PRIME review results in the officer being placed on supervisory monitoring or intervention, it may diminish his/her willingness to want to use force that is reportable, which can lead to officer safety issues during high risk encounters.  PAS/PRIME reviews may influence the mindset of other officers not wanting to be placed on supervisory monitoring or intervention. Moreover, the review may impact an entire squad's willingness to want to use force that is reportable, which includes the Level 4/ Type 22 Pointing of a Firearm.

**Finding #7**

***The number of uses of force reported in the OPD's PAS/PRIME System appears to be accurate.***

Upon comparing the 112 *Use of Force Report* documents against what was entered in the PAS/PRIME system, the audit indicated that force documented in all *Use of Force Report* paper forms were verified and matched what was recorded in the "Type of Force" section in the PAS/PRIME system.  The Contributing Auditor did note that there was one *Use of Force Report* (15F-0220) in which an officer used a weaponless defense technique on two unknown people. Instead of two separate entries for each unknown subject, there was one entry and the subject was listed as "Two unknown people." The more appropriate way of listing this in PAS/PRIME is to have two separate entries. This was identified as a training opportunity, as oppose to a systematic concern.

## Department Response

During the audit, the OIG shared the audit's preliminary findings and flagged PDRD video footage with the OPD's Executive Team.  The Executive Team agreed that more needs to be done to ensure police officers are accurately reporting the pointing of the firearm at a subject(s).  Consequently, in the short term, in September and October 2018, the OPD's Training Section staff conducted refresher training on the reporting requirements when pointing a firearm at a subject(s).

## Findings and Recommendations

| Findings | Recommendations |
|---|---|
| **Finding #1**:  An inadequately designed policy (Departmental General Order K-4) fails to provide sufficient guidance to officers regarding when to report the pointing of the firearm at a subject(s).<br><br>**Finding #2**:  In practice, a police officers' "intention" is a dominant factor in determining whether the pointing of the firearm at the subject(s) is reportable, a result of an inadequately designed policy.<br><br>**Finding #3**:  Departmental General Order K-4 does not mandate the documentation of the low ready position, limiting supervisors' ability to monitor its use.<br><br>**Finding #4**:  There is a lack of a universal definition amongst police officers when determining a reportable pointing of the firearm. | Update Departmental General Order K-4 to clarify a reportable pointing of the firearm at a subject(s):<br><br><ul><li>Reconsider the word "intentional" or provide additional guidance on how to interpret "intentional" for the purposes of reporting the pointing of the firearm at a subject(s).  When to report the pointing of a firearm at a subject should not be subjective and only in the mind of the officer using the force.</li><li>Ensure the policy reflects a clear, universal definition of a reportable use of force, specifically the pointing of the firearm at a subject(s).</li><li>Clarify what is reportable.  Since there are other firearm positions other than the "45 degrees or less" that may not be reportable, consider providing more guidance on low ready or removing low ready all together and replacing with another directive.</li><li>Ensure the policy is organized in a manner that does not contribute to a misunderstanding of a reportable low ready position.  Currently, the intentional pointing of a firearm as a reportable use of force is on Page 6 of the policy.  But it also states on Page 6, "*This does not include the low ready/retention position as specified in Part VI, A, 4.*"  Part VI, A, 4 is on Page 24, and it defines low ready and clarifies that "the firearm is pointed at a 45-degree angle or less and **not at a person**."  This requires an officer to refer to another section of the policy to get clarification on reporting requirements.</li><li>Ensure supervisors can monitor police performance of the low ready position by mandating that police officers document their use of the low ready position in their Crime/Supplemental Reports by</li></ul> |

| | changing the word "should" to "shall" in policy. |
|---|---|
| **Finding #5:** *The sole non-reportable low ready position defined in policy and when to report the pointing of the firearm are not emphasized in police officers' practical firearms training, and are not in the practical firearms training curriculum.* | Ensure practical training provided by the Firearms Instructors and the academic training provided by the Academy Coordinator on how to and when to report force are in synch with one another. The police officers' practical firearms training should reinforce when to report the pointing of the firearm at a subject(s). The police officers' academic training should reference the circumstances that are reportable.<br><br>Also, scenario based training on the pointing of a firearm and its reporting should be conducted routinely in the Bureau of Field Operations squad-based and other department wide trainings. |
| **Finding #6:** Low PAS/PRIME thresholds that trigger a risk management review for Level 4 uses of force may impact the reporting of such force | Ensure the PAS/PRIME thresholds for Level 4 uses of force are monitored, and the importance of correct use of force reporting is communicated to officers.<br><br>Ensure supervisors monitor:<br><br>• How often their subordinates are pointing their firearms and their subordinates use of force to arrest ratio<br>• High risk stops where there was no reportable pointing of the firearm at a subject(s) to determine if police officers are engaged in unsafe tactics or if there is a failure to report the pointing of a firearm at a subject(s)<br><br>Consider policy revisions to allot for a formulated time span in which all reports and PDRD footage pertaining to high risk stop arrests should be reviewed.<br><br>Commanders should be monitoring the use of force numbers and trends to determine if large increases or decreases are acceptable, or if evaluation of policy and practice is warranted. |

# ATTACHMENT A:  Response from the Chief of Police

### CITY OF OAKLAND

### Memorandum

| | |
|---|---|
| **TO:** | City Administrator's Office |
| **ATTN:** | Sabrina Landreth |
| **FROM:** | Chief Anne Kirkpatrick |
| **DATE:** | 28 Jan 19 |

| | |
|---|---|
| **RE:** | **Command Response to Level 4 / Type 22 OIG Audit** |

The Department reviewed the Audit report titled *Audit of the Downward Trend in Police Officers' Intentional Pointing of Firearms at Subjects*, completed by the Office of Inspector General (OIG). We appreciate the efforts of the OIG to complete this important review. The Department acknowledges the control weaknesses which were present in our identified policies and practices, and we are committed to implementing solutions to correct the identified issues.

In the Spring of 2018, the Independent Monitoring Team (IMT) and the Office of Inspector General (OIG) noted a significant reduction in the reporting of Level 4 / Type 22 (Pointing of a Firearm) uses of force.

High or low aggregate data serve as a pointer to look for a cause. In this case, were the low numbers for Level 4 / Type 22 uses of force reporting due to willful underreporting to avoid PAS thresholds or burdensome paperwork (the causal factor) or were the low numbers due to such factors as new de-escalation training, a woefully inadequate PRIME system or policy failure and the like? A formal audit was opened to answer these questions.

However; before the completion of this audit in September 2018 and after hearing OIG's preliminary audit findings, at my direction the Training Division conducted a refresher line up training for all Sworn personnel assigned to the Bureau of Field Operations (BFO) to clarify policy and expectations regarding the intentional pointing of the firearm and its required reporting as outlined in Departmental General Order K- 4 (DGO K-4). DGO K-4, which guides the reporting of the Level 4 / Type 22 was implemented on December 17, 2012. Since that time, OPD has hired 488 new police officers. Our Bureau of Field Operations is staffed with approximately 260 police officers. Due to attrition, I wanted to ensure that my expectations were clear with regards to what is a reportable pointing of a firearm. All new police officers are assigned to the Bureau of Field Operations.

The Audit identified six significant factors that contributed to the downward trend in the reported uses of force. Four of the six factors lie with a policy failure. One had to do with a training failure and one had to do with the low threshold triggers used as an early warning indicator.

1

Based on the findings of this audit, there is underreporting. This audit discovered several instances in which officers failed to properly report the pointing of a firearm. Although the auditor points to policy failures and training issues as the primary underlying cause of the failures, we know that there is willful reporting.

On the recommendation for policy update of DGO K- 4, the Police Commission has oversight of this policy and OPD intends to work collaboratively with the Commission on any policy changes involving use of force. To this end, the Department is working with the Commission to schedule meetings with the Commission's ad hoc policy committee.

Additionally, supervisors are now required to audit PDRD video of arrests/incidents involving 69PC, 148PC, and 243(b)&(c)PC within two business days of the incident.

Lastly, OIG has initiated a more comprehensive review of the reporting of all types of force, the results will be included in a future report.

Anne Kirkpatrick
Chief of Police
Oakland Police Department

2

Oakland Police Department, Office of Inspector General
3rd Quarterly Progress Report (July-September, 2018)

Addendum: Summary Table of Department's Response to Recommendations Presented by OIG in their January 2019 Report,
*Audit of the Downward Trend in Police Officers' Intentional Pointing of Firearms at Subjects*

| Finding # | OIG Recommendation | Department's Response | Responsible Manager/ Commander | Due Date |
|---|---|---|---|---|
| Finding 1-4 | Update Departmental General Order K-4 to clarify a reportable pointing of the firearm at a subject(s):<br><br>•Reconsider the word "intentional" or provide additional guidance on how to interpret "intentional'" for the purposes of reporting the pointing of the firearm at a subject(s).  When to report the pointing of a firearm at a subject should not be subjective and only in the mind of the officer using the force.<br>•Ensure the policy reflects a clear, universal definition of a reportable use of force, specifically the pointing of the firearm at a subject(s).<br><br>•Clarify what is reportable.  Since there are other firearm positions other than the "45 degrees or less" that may not be reportable, consider providing more guidance on low ready or removing low ready all together and replacing with another directive.<br><br>•Ensure the policy is organized in a manner that does not contribute to a misunderstanding of a reportable low ready position.  Currently, the intentional pointing of a firearm as a reportable use of force is on Page 6 of the policy.  But it also states on Page 6, "This does not include the low ready/retention position as specified in Part VI, A, 4."  Part VI, A, 4 is on Page 24, and it defines low ready and clarifies that "the firearm is pointed at a 45-degree angle or less and not at a person."  This requires an officer to refer to another section of the policy to get clarification on reporting requirements.<br><br>•Ensure supervisors can monitor police performance of the low ready position by mandating that police officers document their use of the low ready position in their Crime/ Supplemental Report by changing the word "should" to "shall" in policy. | The Department concurs with the recommendation to update DGO K-4.  OPD intends to work collaboratively with the Police Commission on any policy changes involving use of force.<br><br>Supervisors are now required to audit PDRD video of arrests/incidents involving 69PC, 148PC, and 243(b)&(c)PC within two business days of the incident. | Training Commander / Bureau of Service Deputy Director | 31-Jul-19 |
| 5 | Ensure practical training provided by the Firearms Instructors and the academic training provided by the Academy Coordinator on how to and when to report force are in synch with one another.  The police officers' practical firearms training should reinforce how and when to report the pointing of the firearm at a subject(s).  The police officers' academic training should reference the circumstances that are reportable.<br><br>Also, scenario based training on the pointing of a firearm and its reporting should be conducted routinely in the Bureau of Field Operations squad-based and other department wide trainings. | The Department concurs with this recommendation. The Training Division has conducted a refresher line-up training for all sworn personnel assigned to the Bureau of Field Operations (BFO) to clarify policy and expectations regarding the intentional pointing of the firearm and its required reporting as outlined in Departmental General Order K-4.<br><br>Future academy and in-service firearm training will integrate policy with practical skills. | Training  Commander | 31-Jul-19 |
| 6 | Ensure the PAS/PRIME thresholds for Level 4 uses of force are monitored, and the importance of correct use of force reporting is communicated to officers.<br><br>Ensure supervisors monitor:<br><br>•How often their subordinates are pointing their firearms and their subordinates use of force to arrest ratio<br><br>•High risk stops where there was no reportable pointing of the firearm at a subject(s) to determine if police officers are engaged in unsafe tactics or if there is a failure to report the pointing of a firearm at a subject(s)<br><br>Consider policy revisions to allot for a formulated time span in which all reports and PDRD footage pertaining to high risk stop arrests should be reviewed.<br><br>Commanders should be monitoring the use of force numbers and trends to determine if large increases or decreases are acceptable, or if evaluation of policy and practice is warranted | The Department concurs with this recommendation.  OIG is currently conducting a global use of force audit.<br><br>The Department will assess the PAS thresholds findings and recommendations at the completion of that audit, and respond accordingly. | Bureau of Service Deputy Director | 31-Jul-19 |

Oakland Police Department, Office of Inspector General
3rd Quarterly Progress Report (July-September, 2018)

# Property and Evidence: Management of Evidential Cash and Other Reportable Matters

*By Rose Sutton, MPP, CGAP, Police Performance Auditor and Aaron Bowie, Police Officer*

### Objective

Assess the operational conditions and processes related to the handling of cash by the Property and Evidence Unit (PEU) and report any other notable risks or functional achievements.

### Background

The Department carries a tremendous fiduciary and legal responsibility to store high-risk evidence like firearms and cash safely and securely. Without effective controls to properly manage these items, the Department may jeopardize fair legal proceedings. Additionally, the arrival of new command leadership overseeing the Bureau of Services necessitated a review of present PEU conditions in order to better understand possible risks associated with the PEU.

### Summary

While not the initial focus of this review, it quickly became apparent that purging evidence eligible for disposal has not occurred at a sustainable rate, causing items to quietly accumulate over the years. The Department now faces very limited capacity to warehouse new evidence. And although a new electronic file management system increases the PEU's efficiency, it will do little to address storage constraints without additional labor to physically purge items.

### Key Weakness

✗ Evidence storage has reached maximum capacity with overflow items stored in less secure areas

✗ No routine or comprehensive inventory reviews are being performed, nor required by draft policy

✗ Water from heavy rains and leaky pipes threaten safe working conditions and jeopardizes the integrity of evidence

✗ Control deficiencies over cash pose risk of loss

### Key Strength

✓ The Property and Evidence Unit is organizationally independent and separate from police operational and investigatory functions, thereby limiting actual or perceived influence.

✓ A new electronic inventory management software provides increased efficiencies with upgraded security and tracking controls.

✓ The Department has begun to address added security features at the less secure areas used for evidence storage; a physical layout redesign for improved processing; internal process mapping to identify and reduce inefficiencies; and increasing coordination with CID in purging evidence. These are good first steps addressing some of the observed risks.

### Key Recommendation

• To improve storage capacity, increase purging of evidence that has passed its statute of limitations (e.g., for misdemeanor cases absent a warrant for a suspect and with no new leads); authorize overtime or otherwise assign additional staff to purge items; begin monitoring inventory levels by tracking the number of items received and purged per month; install high-density shelving to maximize space.

• To assess current workplace conditions, seek a professional inspection; consider purchasing moisture detectors and dehumidifiers to lessen the chance of mold and mildew growth.

• Review PEU's segregation of duties to ensure no one individual controls all key transactional duties.

## Scope and Objective

The Department carries a tremendous fiduciary and legal responsibility to store evidence[21] like cash safely and securely. Without effective safeguards to properly manage the handling of evidence in general, fair legal proceedings can be undermined, Department staff could be exposed to unsafe work conditions and high-risk items may go missing. Consequently, the objective of this performance review is to evaluate the Oakland Police Department's (Department) ability to account for its high-risk evidence. OIG considered the following operational areas:

- *Inventory Management* - Receiving, preserving, labeling, and storing of evidence while adhering to key statutes, regulations, industry guidelines and Department policy.
- *Documentation and Chain of Custody*[22] - All items maintain a consistent paper trail detailing pertinent information.
- *Physical Safety and Security* - Procedures guard against hazardous work conditions and prevent tampering, distortion, misrepresentation and contamination of evidence.
- *Disposition and Disposal* - Staff follow the legal statute of limitations and eligible items are purged to make space for new items.
- *Technology and Access Control* - The Department's electronic file management system is safeguarded against improper modification, which includes ensuring information's nonrepudiation and authenticity.

Any other observed deficiencies or functional achievements are also mentioned.

Found property (i.e., non-evidentiary items seemingly lost or abandoned) was excluded from review. And due to time constraints, narcotics and biohazardous material[23] (i.e., blood and other potentially infectious substances) analyzed by the Department's Crime Lab were also omitted. Consequently, this report does not represent an exhaustive appraisal and can only provide reasonable assurance as to present conditions. Sufficient, competent evidential matter does substantiate the subsequent findings reported herein.

---

[21] *Evidence* is property which may be related to a crime.
[22] *Chain of custody* refers to a formal, written procedure to record all individuals who have taken custody of evidence/property from the time it is received to its final disposition.
[23] *Biohazardous material* is blood or other potentially infectious material. It may include: semen, vaginal secretions or any body fluid that is visibly contaminated with blood, and all body fluids in situations where is it difficult or impossible to differentiate between body fluids as well as any unfixed tissue or organ from a human (living or dead) that can be collected at a crime scene or stored (*Occupational Safety & Health Administration, 2011*).

## Methodology

To conduct this review, the Office of Inspector General (OIG):

- Reviewed laws pertaining to the management of evidence and when needed, consulted with the Office of the City Attorney for clarity and assistance
- Reviewed IT security protocols pertaining to the electronic file management of evidence, and when needed, consulted with the Department of Information Technology for clarity and assistance
- Reviewed current and draft Department policies and procedures and industry guidelines[24]
- Spoke with CID stakeholders relevant to the PEU purging process
- Interviewed five Property and Evidence staff to gain an understanding of the evidence handling process
- Followed-up on previous OIG recommendations from 2016 suggesting the Property and Evidence Unit determine a retention schedule for cash deposit, dispose of decades old cash eligible for deposit, and begin routine monitoring of the PEU's cash safe to minimize risk of theft.
- Received a two-hour tour of the PEU storage spaces

## Background

The Department's Property and Evidence Unit is responsible for the safekeeping of all found property and evidence, apart from narcotics, which is stored by the Crime Lab. The Crime Lab is part of the Criminalistics Division and serves the dual purpose of scientifically analyzing physical evidence (like shell casings) and safekeeping suspected drug evidence.

The PEU has authorized staffing of eight full-time nonsworn personnel;

- 1 Police Property Supervisor
- 5 Police Property Specialists

### Purpose and Responsibility

*"The law enforcement evidence/property function exists in order for an agency to receive, catalog, safely store, and maintain the integrity of evidence, found property, and property for safekeeping. The function allows for the effective prosecution of criminal offenders while confirming innocence and victims may find truth and closure as justice is served. Lastly, law enforcement agencies have the legal obligation to restore evidence/property to rightful owners or facilitate the legal disposition of evidence/property in agency possession."*

The California Commission on Peace Officer Standards and Training. *Law Enforcement Evidence & Property Management Guide* [3rd edition]. (2013). Retrieved January 2, 2018, from source

---

[24] *The Biological Evidence Preservation Handbook: Best Practices for Evidence Handlers* sponsored by The National Institute of Justice, U.S. Department of Justice in conjunction with the National Institute of Standards and Technology, U.S. Department of Commerce; *Property and Evidence by The Book* by The International Association for Property and Evidence Inc.; and *The Law Enforcement Evidence and Property Management Guide* by The California Commission on Peace Officer Standards and Training (POST)

35

- 2 Police Services Technician II

One of the Police Property Specialist positions is filled by a temporary employee and their term is set to expire in October 2018.  In addition, the Unit currently has a Sergeant of Police assigned to help with the supervision and daily management of the Unit.

Those who handle evidence include Police Officers, Police Services Technicians, sworn investigators from the Criminal Investigation Division (CID), as well as professional staff from the PEU and Crime Lab. For investigative purposes, disposal of all evidence is authorized by CID investigators.

Evidence is eligible for disposal when:
- A criminal case is adjudicated (i.e., an official judicial outcome is reached, thus the evidence is no longer needed)
- Evidence is presented to the DA and not charged
- The statute of limitations has been reached
- It was determined that no crime was committed
- Evidence was not presented to the DA and filed

Evidence maintained by the Department can either be held in active storage (in a specific location), temporarily released (e.g., checked out to the courts, Crime Lab or CID for investigation, or checked out to an external law enforcement agency like the FBI), or disposed of through destruction, returning the item, diverting it for use or auctioning it off.  The PEU also keeps evidence for the Oakland Housing Authority's Police Department and the Oakland Unified School District Police Services Department.

*Figure 1 Simplified stages of evidence handling*



## Observations

### 1. No Routine or Comprehensive Inventory Reviews are Being Performed, Nor Required by New Policy

Performing routine inventory checks is reflected in several industry guidelines and standards as a fundamental requirement to the operational success of a well-functioning property and evidence room.[25] However, contrary to professional guidance, no comprehensive or routinely scheduled inventory checks, audits or inspections are being performed by the PEU on evidentiary items.[26]

Albeit a new draft policy does outline procedures for evidence inspection in general, it does not require a routine accounting of inventoried items, rather it simply states, "The evidence room shall be subject to unannounced inspection of evidence storage areas as directed by the Chief of Police." This provision falls noticeably short of industry practice and minimally guards against loss. It also does little to protect PEU staff from accusations of theft. PEU staff cannot recall the last time the Chief of Police directed an inspection and the last known full PEU inventory was performed in August 2000, per a 2007 consultant's report of the PEU.[27] During this review, the Chief of Police did tour the Property and Evidence Unit, the first of its kind in many years according to PEU personnel.

To ensure the reliability of PEU's storage and record-keeping processes, OIG recommends routine and comprehensive reviews of its inventory – where items and their corresponding chain of custody are reconciled – be performed.

More specifically, OIG recommends:

- Routine and comprehensive audits/inspections, with special emphasis on high-risk items, (i.e., firearms, cash, and other high-valued items) be performed. To offset the administrative burden, OIG suggests reviews be performed on a rotating quarterly basis so by year's end, all areas have been reviewed. To further offset the administrative burden, utilize retired annuitants, light duty officers and/or police trainees as auxiliary staff to assist with the task.
- Communicate in writing the inventory/inspection results to the commanding officer of the Bureau of Services.
- Require an automatic review when a breach in the reliability of PEU's storage and record-keeping processes has been detected.
- Amend policy to incorporate the aforementioned recommendations.

---

[25] The National Institute of Justice, U.S. Department of Justice; The International Association for Property and Evidence Inc.; The California Commission on Peace Officer Standards and Training; International Association of Chiefs of Police; and The Commission on Accreditation for Law Enforcement Agencies recommend routine audits.
[26] State guidelines recommend that; "In order to maintain a high degree of evidentiary integrity, ensure the safekeeping of all items, and preserve the chain of custody of evidence/property, regular audits, inventories, and inspections of the evidence/property facility are required and need to be conducted by qualified personnel and documented appropriately." *Law Enforcement Evidence & Property Management Guide* [3rd edition]. (2013). The California Commission on Peace Officer Standards and Training. Retrieved January 2, 2018, taken from source
[27] *Oakland Police Department; Property Room Audit. P. 32.* (2007). Burbank, CA: Evidence Control Systems, Inc.

2. **Purging Evidence is Hindered by Request Driven Practice and Poor Communication; Evidence Kept in Less Secure Areas than the Property and Evidence Room**

Because PEU staff serve as custodians of evidence items, their ability to purge evidence is wholly dependent on CID investigators who, "authorize the disposition or release of all evidence coming into the care and custody of the Department." [28] However, because of rotational staff transfers, high investigative case-load (some cases taking several years to reach a final disposition) and inconsistent notification from the courts of adjudicated cases, CID investigators are not consistently identifying, notifying and authorizing the disposal or release of eligible items, consequentially adding to a pileup of unnecessarily kept evidence.

To mitigate this condition and facilitate the return of items, Department policy (and State law) set the requirement that, "the CID shall make all reasonable attempts to identify and contact the rightful owner of evidence no longer needed for an investigation."[29] Yet, per CID staff, investigators typically authorize items for release when a request is proactively initiated by the owner or qualified recipient.

A 2007 consultant report made a related observation after having reviewed the Department's property and evidence procedures, reporting, "The lack of cooperation from investigators in the timely response to inquiries regarding evidence disposal is found to be lacking and has a direct impact upon the time required by the Property and Evidence Unit. To make the system more efficient, the cooperation and support of all components of the department is essential."[30]

Presently, CID has already begun to work collaboratively with Crime Lab staff in purging narcotics and biohazardous material in efforts to sustain adequate storage space. This collaborative task is encouraging and demonstrates the type of effective communication that is similarly expected between CID and the PEU. Based on interviews with PEU staff, it does not appear they have been

---

**Determining Adequate Staffing**

Industry standards state, "There is no one formula that can be used to determine the ideal number of employees in the property room," and state guidelines advise, "Agencies should ensure adequate staffing of the evidence/property function which allows all the duties and responsibilities to be carried out in an efficient and uninterrupted manner (e.g., audits, inventories, purging, and other staff-intensive functions.)"

International Association for Property and Evidence, Inc. (2015, March 8). *IAPE Standards Section 1 – Staffing, Standard 1.3: Staffing – Adequate Number of Personnel.* Retrieved February 7, 2018, from source

The California Commission on Peace Officer Standards and Training. *Law Enforcement Evidence & Property Management Guide* [3rd edition]. (2013). Retrieved January 2, 2018, from source

---

[28] *Draft Policy 802 Property and Evidence*. (2018). Oakland, CA: Oakland Police Department.
[29] For context, the level of administrative burden in making a reasonable attempt aligns with CA Penal Code § 1411.
[30] *Oakland Police Department; Property Room Audit*. p. 5 (2007). Burbank, CA: Evidence Control Systems, Inc.

consistently communicating with CID about their need to purge items.

As a result, evidence eligible for disposal has remained unnecessarily stored, thereby contributing to the pileup of accumulated items. Based on PEU staff interviews and a guided tour of stored evidence, storage is at, or over 95% capacity and finding new space for items is a daunting task.

Consequently, evidence is being stored in other less secure areas of the Department. This may threaten the integrity of evidence, while increasing the risk that items could be lost or misplaced. Moreover, other less secure areas being used lack the motion sensors, cameras and proxy cards used in the PEU.

To mitigate overcrowding of evidence, draft policy will, going forward, require the PEU to request the status of all property held over 180 days. According to the Department, it has since engaged in a more coordinated process and communication between CID and PEU. The Department will also be installing additional security measures in storage areas.

**3. Purging Evidence is Additionally Hindered by Limited Staff and the Exceeding Rate of New Items**

To maintain available space for new evidence, the number of items received annually should be less than or equal to the number of items removed. But at present, the PEU is likely only capable of handling baseline needs as the rate of new items being received out paces those being removed. To lessen the pileup, an adequate amount of staff should be made available to address such a significant undertaking – likely a multiyear project.

Unfortunately, measuring the exact magnitude of the pileup and approximating the amount of staff needed is challenging, considering older items are not entered into the new electronic file management system, making querying retention statuses inefficient.

Per PEU staff, since the arrival of the new electronic file management system in May 2017, about less than 1 percent of items (those received *after* the system was implemented) are electronically catalogued, meaning the remaining 99 percent remain logged on paper only. PEU staff surmise that for every 10 new items received, 2-3 are being removed. However, the PEU has for the first time been able to increase the amount of items eligible for release, as a result of a concerted, coordinated effort by staff. But inventorying and researching items eligible for disposal remains a labor and time intensive process. Cataloging old evidence into the new electronic file management is, according to PEU staff, absolutely desired, but not feasible given the amount of staff on hand. Staffing levels remain marginally unchanged since 2007, yet staff face diminishing capacity to catch up on the

*Figure 2 Causes and effect of evidence storage conditions*



Overcrowded Evidence Room

significant pileup of items yet to be purged.[31] Moreover, the personnel shortage to the PEU will result in a cutback in hours available to process new items of evidence.[32]

And despite present policy placing a six-month timeline for all evidentiary property to receive a final disposition (once all legal requirements have been met), because of the compounding factors previously mentioned, the PEU simply cannot with certainty, meet such an expectation.[33] To create additional space, OIG recommends:

- Increase purging of evidence that has passed its statute of limitations as outlined in the Department's administration disposition policy.[34]
- Monitor inventory levels by tracking the number of items received and purged, and report these levels to the Commander of the Bureau of Services on a quarterly basis.
- Explore the possibility of adding more high-density shelving to maximize the limited space available.
- To offset the administrative burden, utilize retired annuitants, light duty officers and/or police trainees as auxiliary staff to assist with the task.
- Amend policy to incorporate the aforementioned recommendations.

**4.   New Electronic Management Brings Improved Efficiencies**

In September 2016, the Department purchased an electronic file management and barcoding system. Manual work processes, like documenting chain of custody, have since been replaced with its partial roll out in May 2017, resulting in improved tracking and transfer of *new* evidence received.[35] This is a considerable advancement for PEU's capabilities as the software can also generate inventory and audit reports and can create owner notification letters, and disposition and property release reports. The software can also produce retention review reports that once assigned a code, lists items that are eligible for review and disposal. However, as previously mentioned, no such review or subsequent purge can take place without the items first being entered into the system. To enter older items into the system, additional labor is needed.

**5.   Water from Heavy Rains and Leaky Pipes Raise Safety Concerns**

In 2007, consultants reported concerns over rain water leaching through the ceiling and accumulating in the evidence storage area.[36] Consultants further observed that during operating hours, a bucket was

---

[31] Consultants in 2007 recommended the PEU receive 5 additional Property Specialists.
[32] Officers seeking to deposit new evidence while the PEU is closed will be directed to use lockers to store items that PEU will eventually retrieve.
[33] *Department General Order H-10; Property Clearance and Disposal*. (2011). Oakland, CA: Oakland Police Department.
[34] The Department's administration disposition policy found in DGO H-10 generally gives the Police Property Supervisor the ability to prepare items from cold case files for destruction.
[35] Full implementation is tentatively set for March/April 2018, once policies have been finalized, all user groups are defined and video training has been uploaded and administered to personnel.
[36] *Oakland Police Department; Property Room Audit.* p. 5 (2007). Burbank, CA: Evidence Control Systems, Inc.

placed under the leaky ceiling.[37] The consultants strongly urged an inspection be sought to professionally assess the safety conditions of the PEU.

An inspection was performed in 2008, and the State's Division of Occupational Safety and Health (CAL/OSHA) documented that;

> "During the inspection on 5/23/08 in the evidence room and associated offices, the ceiling and walls were water soaked for three days as a result of a pipe leak in the traffic division on the first floor. Very noticeable staining on the walls and ceiling resulted from the standing water in the ceiling and wall near the ceiling on the SW wall opposite row 6, in the ceiling beside 15, and W wall by 13. These particular areas were not kept clean or in sanitary condition."

Consequently, the Department was cited and a monetary penalty was proposed for violating the State's general industry safety and sanitation regulations.[38] Another CAL/OSHA inspection was performed in 2012, and found additional workplace violations.[39]

During this review, the PEU was breached by rain water (like many other areas of the building) and PEU staff also mentioned during interviews the occurrence of leaking overhead pipes causing wet floors. According to the City's Department of Facilities and Environment, regular building maintenance helps keep the aging building – built in 1959 – as operational as possible.

While no items appeared to have been compromised by the leaching water, it nonetheless presents the possibility that evidence could be irreversibly contaminated and that mold and mildew growth may result. The Department should consider purchasing moisture detectors and dehumidifiers to lessen the chance of mold and mildew growth.

### 6. Control Deficiencies Over Documenting the Release of Cash Pose Risk of Loss

The physical security and monitoring features of the 'cash safe' appear adequate;

- General facilities are restricted
- There's electronic monitoring (camera and motion detectors)
- Cash is kept physically separate and apart from other items of evidence

However, the PEU's internal processes over tracking and recording evidential cash presents a notable risk to loss. In the past, the PEU has on occasion self-identified and reported lost cash and associated paperwork (i.e., property records) from its cash safe to Internal Affairs, with the latest reported incident occurring in 2012. Such past losses have appropriately triggered, per departmental policy[40], internal investigations, with observations made about weak policies, procedures and cash handling practices having contributed to the mismanagement of accurate record-keeping. In one instance, Internal Affairs

---

[37] For context, the PEU is located in the basement of the Police Administration Building
[38] T8 CCR 3362(a) and T8 CCR 3362(g)
[39] 3241(c) Material stacked too high; 3249(b) No light switch/constant burning light inside freezer; 3249(c) Missing fire ax inside freezer; and 3272(b) Aisle width not maintain in freezer unit and back rows. OIG did not review present conditions related to these violations.
[40] DGO M-3 Complaints Against Departmental Personnel or Procedures

confirmed with the owner of the "missing" money that in fact he had collected it from the PEU and that the PEU very likely had not updated its records to reflect the authorized release.

The Department has drafted instructions for actions required when lost or stolen evidence is realized, as outlined in its draft procedure manual. These directives include preparing an offense report and notifying supervising staff of the lost or stolen cash from the PEU. The Department is presently working to remove much of its evidential cash from the PEU to the City's Treasury/banking institution, thereby lessening the amount of accessible cash.

Regardless of perceived or actual theft, or possible clerical error, OIG considers the risk to loss of cash and poor records management a prominent concern, given:

- Missing property records
- The number of known past occurrences
- The dollar amount lost
- Designated access to the cash safe and other incompatible duties presently assigned to individuals

Like the observations made by Internal Affairs personnel mentioned above, OIG considers the control deficiency in effectively tracking the disposal of cash likely caused by PEU's method of collecting and recording cash amounts, which was unlike industry practice up until recently.[41] Now, with the arrival of the PEU's new electronic inventory management software, the PEU records transactions electronically; creating an audit trail that cannot be changed by any user.

Moreover, the Department maintains draft language to instruct PEU staff to report any discrepancies identified between what is recorded in the inventory software and the money envelope in which the cash is placed.[42] In the event that cash is temporarily released and returned with an unresolved discrepancy over the amount present, the Department directs the PEU Supervisor to notify and forward to all involved parties, the chain of command over PEU and Internal Affairs a copy of a 'Report of Difference in Property Cash' memorandum.

Nevertheless, to further guard against perceived or actual cash loss, OIG recommends the Department review PEU's segregation of duties to ensure no one individual controls all key transactional duties. Generally, those primary incompatible duties that should be segregated include; recording receipt of cash, accessing the cash safe, authorizing the release of evidential cash and reconciling cash records. Compensating controls, in the event that the PEU cannot divvy up incompatible tasks due to staffing shortages, could include requiring two PEU personnel signatures during tasks, similar to how the department requires two individuals (i.e., those submitting the cash to PEU) to be present to count and sign the deposit of cash to the PEU. The Department should also consider the use of additional electronic surveillance.

---

[41] For security purposes, details regarding PEU's specific process and procedures for recording cash are omitted.
[42] *Draft Procedure Manual 802 Property and Evidence*. (2018). Oakland, CA: Oakland Police Department.

**7. New Cash Policy Sets Disposal Rules and Retention Schedule**

In February 2017, OIG reported that the PEU has decades-old cash that bares no need for continued safekeeping.[43] At the time, OIG recommended, given its high risk of theft, that all cash kept by the PEU that is eligible for release be promptly deposited. OIG additionally recommended a cash retention schedule be established.

Since these 2017 recommendations, the Department has drafted policy indicating a clear three-year retention period for found or seized money greater than $15.00 dollars that remains unclaimed. This new policy aligns with state law regarding unclaimed money.[44] Additionally, going forward, the PEU will be required to annually report its unclaimed cash inventory to the Department's Fiscal Services Division.

To further guard against cash loss, OIG recommends the Department mandate that no one individual can work alone with cash or high-valued items. Policy should be amended to incorporate this mandate.

**8. Appropriate Access and Edit Privileges Set for Electronic File Management Software, However Policy is Mute on Who Can Gain Edit Approval**

The City's Department of Information Technology provided a list of those personnel who have administrative access and edit rights to the PEU's electronic inventory management system. The list included personnel with a legitimate need to the database. No CID investigator, member of command staff, miscellaneous employee or former City employee has access to, nor can edit the database used to track and inventory all property and evidence submitted to the Department.[45] However, in reviewing policy and procedures, no language currently stipulates *who* may request and gain access to the database, therefore it is unclear what criteria may be used in determining who could alter evidence information in the future. This is especially important considering that duties and database access must be appropriately segregated among PEU staff so as not to allow any one person ultimate discretion over creating, deleting, or modifying records or user accounts, thereby increasing data integrity risk.

For added security against illegitimate modification, OIG recommends the Department manage user accounts by codifying appropriate policies and processes for the establishment, modification and closing of accounts of authorized personnel positions to PEU's electronic file management software.

**9. Data Back-Ups Are Performed Appropriately**

The City's Department of Information Technology manages data file and server system backups, with data backups performed routinely.

---

[43] *Property and Evidence Unit Confiscated and Found United States Currency Audit*. Monthly Progress Report of the Office of Inspector General. Oakland Police Department, Office of Inspector General. February 2017.
[44] CA Gov Code §50050 and §50055
[45] The Alameda County District Attorney's Office may have read only access to the electronic file management software.

Oakland Police Department, Office of Inspector General
3rd Quarterly Progress Report (July-September, 2018)

### 10. Handling of the Highly Toxic Opioid Fentanyl Poses an Emerging Concern

Increasing rates of harmful and sometimes deadly encounters with the opioid fentanyl (and chemically similar equivalents) has roused alarm among public health and safety agencies across the country. Small amounts of confiscated fentanyl can be unknowingly absorbed with minimal contact through the skin, eyes or inhaled, causing significant respiratory stress, and at worse, death. Two to three milligrams (about the size of 5-7 grains of table salt) can be lethal.

Figure 3 Heroin and fentanyl comparison

Source: New Hampshire Department of Safety Forensic Laboratory

OIG recommends the Department monitor trends in fentanyl encounters and regardless of the risk level, ensure personal protective equipment (e.g., nitrile gloves, safety glasses, N-95 dust masks, etc.) are readily available to staff who may encounter and handle narcotics. The Department should also review guidance offered in the Police Executive Research Forum's publication entitled, *The Unprecedented Opioid Epidemic: As Overdoes Become a Leading Cause of Death, Police, Sheriffs, and Health Agencies Must Step Up Their Response.*

### 11. Signage and Instructions for Evidence Submission Are Disorderly and Muddled

Best practice photos shared by the International Association for Property and Evidence, Inc., offer examples of efficient evidence intake counter spaces. The Department's PEU intake counter by comparison stands noticeably apart in its visual clutter and disorder when compared to best practice photos.

OIG recommends arranging signage in a manner that minimizes visual clutter and helps personnel understand how to comply with submission procedures.

Figure 4: Signs and Instructions posted at the PEU Intake Counter



*Source*: Photos taken by OIG in Jan. 2018

44

## Observations and Recommendations

| | OIG Observation | OIG Recommendation |
|---|---|---|
| 1 | No Routine or Comprehensive Inventory Reviews are Being Performed; Nor Required by New Policy | To ensure the reliability of PEU's storage and record-keeping processes, OIG recommends routine and comprehensive reviews of its inventory – where items and their corresponding chain of custody are reconciled – be performed. More specifically, OIG recommends: <br>• Routine and comprehensive audits/inspections, with special emphasis on high-risk items, (i.e., firearms, cash, and other high-valued items) be performed. To offset the administrative burden, OIG advises reviews be performed on a rotating quarterly basis so by year's end, all areas have been reviewed. To further offset the administrative burden, utilize retired annuitants, light duty officers and/or police trainees as auxiliary staff to assist with the task <br>• Communicate in writing the inventory/inspection results to the commanding officer of the Bureau of Services <br>• Require an automatic review when information is received suggesting a breach in the reliability of PEU's storage and record-keeping processes (e.g., a high-risk item is unaccounted for) <br>• Amend policy to incorporate the aforementioned recommendations |
| 2 | Purging Evidence is Hindered by Request Driven Practice and Poor Communication; Evidence Kept in Less Secure Areas than the Property and Evidence Room | To create additional space, OIG recommends: <br>• Increase purging of evidence that has passed its statute of limitations as outlined in the Department's administration disposition policy. <br>• Monitor inventory levels by tracking the number of items received and purged and report these levels to the Commander of the Bureau of Services on a quarterly basis |
| 3 | Purging Evidence is Also Hindered by Few Staff and the Exceeding Rate of New Items Over What is Being Removed | |

| | OIG Observation | OIG Recommendation |
|---|---|---|
| | | • Explore the possibility of adding more high-density shelving to maximize space the limited space available<br>• To offset the administrative burden, utilize retired annuitants, light duty officers and/or police trainees as auxiliary staff to assist with the task<br>• Amend policy to incorporate the aforementioned recommendations |
| 4 | New Electronic Management Brings Improved Efficiencies | No Recommendation |
| 5 | Water from Heavy Rains and Leaky Pipes Raise Safety Concerns | The Department should consider purchasing moisture detectors and dehumidifiers to lessen the chance of mold and mildew growth. |
| 6 | Control Deficiencies Over Cash Tracking Pose Risk of Loss | OIG recommends the Department review PEU's segregation of duties to ensure no one individual controls all key transactional duties. Generally, those primary incompatible duties that should be segregated include;<br>• Recording receipt of cash<br>• Accessing the cash safe<br>• Authorizing the release of evidential cash<br>• Reconciling cash records<br>Compensating controls, in the event that the PEU cannot divvy up incompatible tasks due to staffing shortages, could include requiring two PEU personnel signatures during tasks, similar to how the department requires two individuals (i.e., those submitting the cash to PEU) to be present to count and sign the deposit of cash to the PEU.<br><br>The should Department also consider the use of additional electronic surveillance. |
| 7 | New Cash Policy Sets Disposal Rules and Retention Schedule | To guard against cash loss, OIG recommends the Department mandate that no one individual can work alone with cash or high-valued items. Policy should be amended to incorporate this mandate. |
| 8 | Appropriate Access and Edit Privileges Set for Electronic File Management Software, However Policy Mute on Who Can Gain Edit Approval | Manage user accounts by codifying appropriate policies and processes for the establishment, modification and closing of |

| | OIG Observation | OIG Recommendation |
|---|---|---|
| | | accounts of authorized personnel positions to PEU's electronic file management software. |
| 9 | Data Back-Ups Are Performed Appropriately | No recommendation. |
| 10 | Handling of the Highly Toxic Opioid Fentanyl Poses an Emerging Concern | Department monitor trends in fentanyl encounters and regardless of the risk level, ensure personal protective equipment (e.g., nitrile gloves, safety glasses, N-95 dust masks, etc.) are readily available to staff who may encounter and handle narcotics. The Department should also review expert guidance offered in the Police Executive Research Forum's publication entitled, *The Unprecedented Opioid Epidemic: As Overdoes Become a Leading Cause of Death, Police, Sheriffs, and Health Agencies Must Step Up Their Response.* |
| 11 | Signage and Instructions for Evidence Submission Are Disorderly and Muddled | OIG recommends arranging signs in a manner that minimizes visual clutter and helps personnel understand how to comply with submission procedures. |

## ATTACHMENT A:  Bureau of Services Response to Audit

# CITY OF OAKLAND
# Police Department

### Memorandum

| | |
|---|---|
| TO: | Office of the Chief of Police |
| ATTN: | Chief Anne Kirkpatrick |
| FROM: | Captain Paul Figueroa |
| DATE: | 16 Nov 18 |
| | |
| RE: | Response to Property and Evidence Unit Audit |

The Property and Evidence Unit (PEU) received the Audit recommendations and take them very seriously. Several improvements have already been made based on the Audit and the remaining recommendations will be considered for the new policy expected to be implemented by February 2019.

Most notably, the new EvidenceOnQ system has been launched department wide. The system creates electronic records and issues barcoded tags for each item. Additionally, there is an audit log for each item which also captures the signatures of those signing items in or out of the PEU. The older Property Records will remain handwritten as entry into the new electronic system and subsequent barcoding of the older evidence would far exceed the capacity of the current staffing levels of the PEU.

An additional position of a Sergeant of Police has been added to assist with the management and supervision of the PEU. This additional supervision is critical to clear the accumulation of evidence in the Property and Evidence Unit. Staffing has remained very low in the PEU, but the recruitment for a new eligibility list has now begun. In the long term, there is a need to increase the overall staffing in the Unit to keep up with the demand for services. In 2018, there has been a concerted effort with staff on loan to the PEU to release or dispose of items no longer needed for criminal cases.

Finally, the office space in the Unit was decades old. The Department funded the complete remodel of the office space: floor, wall repairs, paint, new wiring, electrical, new desks, and new storage areas.  The remodel is complete and a significant improvement over the previous space. Appendix A lists a specific response to each recommendation.

Paul Figueroa
Captain of Police
Information Technology and Property Unit

Approved for Forwarding

Virginia Gleason
Deputy Director
Bureau of Services

48

# Appendix A:  Bureau of Services Response to Recommendations

| | OIG Observation | OIG Recommendation | Bureau of Services Response |
|---|---|---|---|
| 1 | No Routine or Comprehensive Inventory Reviews are Being Performed, Nor Required by New Policy | To ensure the reliability of PEU's storage and record-keeping processes, OIG recommends routine and comprehensive reviews of its inventory – where items and their corresponding chain of custody are reconciled – be performed. More specifically, OIG recommends: <br> • Routine and comprehensive audits/inspections, with special emphasis on high-risk items, (i.e., firearms, cash, and other high-valued items) be performed. To offset the administrative burden, OIG advises reviews be performed on a rotating quarterly basis so by year's end, all areas have been reviewed. To further offset the administrative burden, utilize retired annuitants, light duty officers and/or police trainees as auxiliary staff to assist with the task <br> • Communicate in writing the inventory/inspection results to the commanding | A draft policy and draft procedure manual was created for the PEU, which includes routine comprehensive inventory reviews with mandated updates to the Commander of the Bureau of Services.  The policy is in the stakeholder review process and we anticipate publication no later than February 2019. <br><br> In addition, the installation of EvidenceOnQ has greatly increased tracking and monitoring of all items submitted to the PEU. |

| | OIG Observation | OIG Recommendation | Bureau of Services Response |
|---|---|---|---|
| | | officer of the Bureau of Services<br>• **Require an automatic review when information is received suggesting a breach in the reliability of PEU's storage and record keeping processes (e.g., a high-risk item is unaccounted for)**<br>• **Amend policy to incorporate the recommendations** | |
| 2 | Purging Evidence is Hindered by Request Driven Practice and Poor Communication; Evidence Kept in Less Secure Areas than the Property and Evidence Room | To create additional space, OIG recommends:<br>• Increase purging of evidence that has passed its statute of limitations as outlined in the Department's administration disposition policy.<br>• Monitor inventory levels by tracking the number of items received and purged and report these levels to the Commander of the Bureau of Services on a quarterly basis<br>• Explore the possibility of adding more high-density shelving to maximize space the limited space available<br>• To offset the administrative burden, utilize retired annuitants, | All evidence located in less secure areas has been removed. The less secure area (double locked sally port room) is now a staging area for released items ready for auction or disposal.<br>• New high-density shelving was placed in the same room to provide more space.<br>• PEU supplies (other non-evidence items) were moved from the property room to the sally port room. The action created more secure space for purging evidence. |
| 3 | **Purging Evidence is Also Hindered by Few Staff and the Exceeding Rate of New Items Over What is Being Removed** | | Purging evidence and staffing continues to be the biggest obstacle for the PEU. When provided temporary staffing (light duty personnel, temporary admin assignment personnel, cadets, pre-hire POTs), the PEU has been able to purge far more items at a faster pace. To overcome the lack of signed property releases from CID, overtime is paid to sworn personnel to locate/review/confirm evidence items over the statute of limitations or that qualify for release/destruction.<br><br>Although temporary personnel (such as light duty officers) have increased in 2018, there continues to be a need for additional permanent staff assigned to the function of purging evidence.  Currently, there is no eligibility list for hiring additional Property staff, but the new recruitment to create the eligibility list is underway.<br>The following table lists the approximate number of items received (Intake) versus items Destroyed/Released/Auctioned |

| OIG Observation | OIG Recommendation | Bureau of Services Response | | |
|---|---|---|---|---|
| | light duty officers and/or police trainees as auxiliary staff to assist with the task<br>• Amend policy to incorporate the aforementioned recommendations | **Property & Evidence Unit stats** | | |
| | | Year | Intake | Destroyed/Released/Auctioned |
| | | 2016 | 34874 | 5296 |
| | | 2017 | 27761 | 2985 |
| | | 2018 YTD | 33988 | 16273 |
| | | | | |
| | | **Totals** | 96623 | 24554 |
| 4 | New Electronic Management Brings Improved Efficiencies | No recommendation. | The installation of EvidenceOnQ has greatly increased tracking of all items coming into the PEU and allowed for monitoring of those EvidenceOnQ items.<br><br>The Department is now 100% electronic on EvidenceOnQ. | | |
| 5 | Water from Heavy Rains and Leaky Pipes Raise Safety Concerns | The Department should consider purchasing moisture detectors and dehumidifiers to lessen the chance of mold and mildew growth. | The PEU will explore adding moisture detectors and dehumidifiers into the operational budget. | | |
| 6 | Control Deficiencies Over Cash Tracking Pose Risk of Loss | OIG recommends the Department review PEU's segregation of duties to ensure no one individual controls all key transactional duties. Generally, those primary incompatible duties that should be segregated include;<br>• Recording receipt of cash<br>• Accessing the cash safe<br>• Authorizing the release of evidential cash | The PEU has implemented a new procedure, that is being incorporated into the Procedure Manual, requiring dual signatures for the release of currency.  This prevents any one individual from having control of transactions through the entire process. It will also include the signature of the recipient of the cash. As improvements continue, the PEU will continue to consider additional surveillance. | | |

| | OIG Observation | OIG Recommendation | Bureau of Services Response |
|---|---|---|---|
| | | • Reconciling cash records<br>Compensating controls, in the event that the PEU cannot divvy up incompatible tasks due to staffing shortages, could include requiring two PEU personnel signatures during tasks, similar to how the department requires two individuals (i.e., those submitting the cash to PEU) to be present to count and sign the deposit of cash to the PEU.<br><br>The should Department also consider the use of additional electronic surveillance. | |
| 7 | New Cash Policy Sets Disposal Rules and Retention Schedule | To guard against cash loss, OIG recommends the Department mandate that no one individual can work alone with cash or high-valued items. Policy should be amended to incorporate this mandate. | The new PEU policy will contain this listed recommendation. |
| 8 | Appropriate Access and Edit Privileges Set for Electronic File Management Software, However Policy Mute on Who Can Gain Edit Approval | Manage user accounts by codifying appropriate policies and processes for the establishment, modification and closing of accounts of authorized personnel positions to PEU's electronic file management software. | The new PEU policy will require the PEU Supervisor to assign access permissions in the system. The PEU Supervisor will conduct a quarterly review to ensure employees who leave OPD no longer have access to the system. |
| 9 | Data Back-Ups Are Performed Appropriately | No recommendation. | |
| 10 | Handling of the Highly Toxic Opioid | Department monitor trends in fentanyl encounters and regardless of the risk | The Department published SO 9190 Narcan Administration effective 10 Sep 18. Some of the PEU staff have been trained in administration of Narcan and the dosages are available in the PEU. Protective equipment is readily available at the PEU |

| | OIG Observation | OIG Recommendation | Bureau of Services Response |
|---|---|---|---|
| | Fentanyl Poses an Emerging Concern | level, ensure personal protective equipment (e.g., nitrile gloves, safety glasses, N-95 dust masks, etc.) are readily available to staff who may encounter and handle narcotics. The Department should also review expert guidance offered in the Police Executive Research Forum's publication entitled, *The Unprecedented Opioid Epidemic: As Overdoes Become a Leading Cause of Death, Police, Sheriffs, and Health Agencies Must Step Up Their Response.* | and the PEU is coordinating with the Training Section for the remaining PEU members. |
| 1 1 | Signage and Instructions for Evidence Submission Are Disorderly and Muddled | OIG recommends arranging signs in a manner that minimizes visual clutter and helps personnel understand how to comply with submission procedures. | Property Intake was remodeled in September 2018; adding an intake computer monitor facing outward for EvidenceOnQ verification. The area is open and no items/signs are cluttering the area.<br><br>The old signage has been removed and any new signage will be professional and not cluttered. Many instructions are now expressed through departmental email for easy communication and professionalism. |

# Comparative Analysis of Vehicle Pursuit Policy

*By Charlotte Hines, Police Performance Auditor, Rose Sutton, MPP CGAP, Police Performance Auditor*

### Objectives

1. Determine if changes to the Department's vehicle pursuit policy affected risk factors and/or pursuit outcomes.
2. *Determine if vehicle pursuit investigations are complete, tracked, and reported to the California Highway Patrol (CHP)as required by California State Law mandate.*

### Background

Police pursuits of moving vehicles are inherently high risk and can result in serious injury or death, property damage, and lawsuits. California State law requires law enforcement agencies to report motor vehicle pursuit data to the California Highway Patrol, and encourages agencies to implement a vehicle pursuit policy. The Oakland Police Department has a vehicle pursuit policy, which was revised in August 2014 in an effort to reduce the risk associated with vehicle pursuits. The most significant change to the policy was the types of crimes for which officers could pursue a suspect(s) fleeing in a vehicle. The policy now restricts its vehicle pursuits to mostly violent crimes.

The Office of Inspector General (OIG) initiated a review to determine if the risks associated with pursuits have been reduced as a result of the policy change, and to determine if pursuit documentation and reporting complies with Department and California State mandated requirements.

### Summary

Since the Department changed its vehicle pursuit policy in 2014, the total number of pursuits dropped by more than half. Despite this drop, the rate of property damage and injuries remained nearly the same. The Department continues to document and track pursuits, but stands to improve its mandated reporting to the CHP.

### Key Weaknesses

✘ No procedures are in place for tracking the mandated submission of the CHP 187a forms to the California Highway Patrol.

### Key Strengths

✓ The Department is appropriately completing and tracking vehicle pursuit investigations.
✓ Pursuit packets include most of the required documentation.

### Key Recommendations

The Department should consider implementing procedures for recording the submission of California Highway Patrol (CHP) 187A forms and adhering to the California State mandated reporting guidelines. Tracking the submission of 187A forms provides assurance that the Department is complying with the State's reporting mandates. Updating the pursuit form in PRIME with a field for tracking form submission should be considered.

### References

- Department General Order J-4 *"Pursuit Driving"* effective date August 25, 2014

- Commission on Police Officer Standards and Training (POST) – *"California Law Enforcement Vehicle Pursuit Guidelines" ... 2006 update*

- California Penal Code PEN §13519.8 (click here for details California Penal Code 13519.8)

- California Vehicle Code VEH §14602.1 (click here for details California Vehicle Code 14602.1)

- California Vehicle Code VEH §17004.7 (click here for details California Vehicle Code 17004.7)

## OVERVIEW

Police pursuits of moving vehicles are inherently high risk and can result in serious injury or death, property damage, and lawsuits.  In 2014, the Oakland Police Department revised its pursuit policy to help reduce the risk associated with police pursuits.  The most significant change to the policy was the types of crimes for which officers could pursue a suspect(s) fleeing in a vehicle.  For example, prior to the policy change, officers could pursue a vehicle for the sole apprehension of a suspect (s) in a reported stolen vehicle.   The policy now restricts pursuits to mostly violent crimes.

The Office of Inspector General initiated a review to determine if the risks associated with pursuits have been reduced as a result of the policy change, and to determine if pursuit documentation and reporting complies with Department and California State Law mandatory requirements.

## BACKGROUND

A vehicle pursuit is an event involving one or more law enforcement officers trying to apprehend a suspect(s) who is attempting to avoid arrest while operating a motor vehicle.  The suspect willfully fails to yield to an officer's signal to stop by using high speed driving and/or other evasive tactics such as driving off a highway, turning suddenly or driving in an illegal manner. However, not all vehicle pursuits are "high-speed" pursuits, sometimes suspects will continue driving at low speeds, but willingly fail to yield to law enforcement.

Police vehicle pursuits can be extremely dangerous for everyone involved, including innocent bystanders. Pursuits of suspected or known violators of the law expose law enforcement officers, fleeing violators and the public to serious risks, injury and/or death.  The location and time of day where a pursuit occurs is also a safety concern.  There are several legal ramifications for law enforcement agencies when a police vehicle pursuit results in injury and/or property damage.

California State Law[46] encourages Law Enforcement agencies to implement a pursuit policy that governs the agency's broad range of issues related to vehicle pursuits; however, adopting a policy is discretionary. California State Law requires law enforcement agencies to report motor vehicle pursuit data to the California Highway Patrol (CHP). The State mandates that CHP form 187A be submitted within 30 days of a vehicle pursuit. CHP form 187A includes, but is not limited to, information about the conditions of the pursuit (i.e., duration, mileage, number of law enforcement vehicles involved, weather conditions, maximum speeds); whether any person involved in a pursuit or a subsequent arrest was injured and the nature of the injury; and whether a pursuit resulted in a collision or property damage.[47] The Oakland Police Department's Safety Coordinator, who is assigned to the Training Division, collects and submits the 187A form for all pursuits involving Oakland police personnel to the CHP.

---

[46] California Vehicle Code VEH §17004.7
[47] California Vehicle Code §14602.1

The Oakland Police Department has established policy for members engaged in pursuing vehicles that begins with the following value statement:

> *The protection of human life shall be the primary consideration when deciding to engage in a vehicle pursuit. Vehicle pursuits are inherently dangerous, but at times may be necessary to apprehend dangerous criminals who evade police in an attempt to escape. However, the decision to engage in a vehicle pursuit solely to immediately apprehend a fleeing suspect requires a careful weighing of the risks to the safety of officers, motorists, bystanders and the public versus the benefit to public safety. Therefore, this policy only allows vehicle pursuits for violent forcible crimes[48] and/or crimes involving the use or possession of firearms.* (OPD Department General Order J-4, Pursuit Driving dated 25 Aug 14)

Departmental policy and procedures detail the responsibilities of supervisors and commanders pertaining to pursuit driving of subordinates and the use of pursuit intervention maneuver techniques. The Department's vehicle pursuit policy also lists several factors that are to be considered by officers and supervisors in making the decision to initiate, continue or terminate a vehicle pursuit.

The purpose of all vehicle pursuits is to safely apprehend violators when they refuse to voluntarily comply with the law without unnecessarily endangering the public, members, occupants in fleeing vehicles, and property. The protection of human life shall always be the primary consideration. The immediate apprehension of the violator is never more important than the safety of the public or the officers.

The Department's policy categorizes pursuits into three categories (Level 1, 2 and 3) based on the seriousness of outcomes (property damage and/or injury) and the tactics used during the pursuit.

- **Level 1:** a vehicle pursuit that results in death or serious injury likely to cause death or a Level 2 pursuit raised to a Level 1 by a supervisor or commander

- **Level 2:** a vehicle pursuit that involves injury or property damage and/or whenever a pursuit intervention maneuver[49] was utilized

- **Level 3:** a vehicle pursuit which does not result in injury or property damage, unless a pursuit intervention maneuver technique was utilized

The Department's pursuit policy requires that officers must get approval to pursue from a supervisor/commander as soon as reasonably practical, and that a supervisor/commander shall monitor the pursuit.  Level 2 and Level 3 pursuits require the completion of a pursuit report, which is reviewed through the chain of command, followed by the Departmental Safety Committee, which reviews the pursuits for compliance with OPD policy, training recommendations, and/or liability issues.  Level 2 pursuits, and any Level 3 pursuits recommended by the Committee, go to a full Departmental Safety Committee review, which includes a presentation from the investigating supervisor and subject

---

[48] See Appendix A
[49] A pursuit intervention maneuver is one or more authorized techniques designed to terminate a vehicle pursuit in a safe and prudent manner

members involved in the pursuit. Any pursuits found to be "Out of Compliance" as per departmental policy and procedure guidelines by the Departmental Safety Committee are forwarded to the Internal Affairs Division to initiate the discipline process.

According to the Department's Safety Committee Coordinator, the Departmental Safety Committee is comprised of members as outlined in Departmental General Order G-04 *"Departmental Safety"* dated August 24, 1998. The permanent members include:

- Commander of the Personnel and Training Division, who shall serve as Chairperson
- Departmental Safety Coordinator
- Traffic Division Administrative Sergeant
- City Attorney Representative (non-voting)

There are four temporary members, which are appointed by the Chief of Police for six-month terms each January and July (one Captain, one Lieutenant, one Sergeant, and one Police Officer).

Level 1 pursuits are investigated by both the Criminal Investigation Division (CID) and the Internal Affairs Division (IAD) in accordance to Departmental General Order DGO K-4 and J-4. Ultimately, the Chief of Police reviews all pursuits found to be "Out of Compliance" and is responsible for final approval.

In addition, the Department tracks Non-Response pursuits. A Non-Response Pursuit is when an officer attempts to stop a vehicle and the violator flees or fails to stop and the officer does not respond to the driver's action, making no attempt to keep up with or pursue the vehicle. A Non-Response Pursuit is not a vehicle pursuit. Officers must complete an offense report and/or other documentation detailing why the vehicle stop was attempted, and notify a supervisor/commander of the Non-Response pursuit. The supervisor/commander must review the offense report and/or other documentation.

## SCOPE AND METHODOLOGY

### Determine if changes in the Pursuit policy affected risk factors or pursuit outcomes

A copy of the former (effective date January 1, 2011) and current (effective date August 25, 2014) *Department General Order J-4 Pursuit Driving* policies were reviewed to assess and identify all changes between the former and current policies.[50] After identifying the changes, pursuit data and outcomes before and after the implementation of the current policy were compared.

Using a data extraction from the Performance, Reporting, Information, and Metrics Environment (PRIME[51]) for the period of January 1, 2013 through December 31, 2017, the auditor analyzed pursuit characteristics (i.e., reason for pursuit, distance, time, speed) and pursuit outcomes (injuries, property damage, compliance findings) and compared the results before and after the implementation of the

---

[50] See Appendix B
[51] The Performance, Reporting, Information & Metrics Environment (PRIME) is a web-based software system. PRIME is designed to make more efficient use of time by turning slower paper-based processes into faster digital workflows.

current policy.  Similar data was collected from the Departmental Training Division's hard copy pursuit packets cataloged and compared to the data in PRIME.

Discrepancies were found between the PRIME data and the pursuit packet data. When attempting to reconcile the discrepancies and after meeting with the Department's Safety Coordinator, it appears there are some inconsistencies in the reporting of property damage and/or injuries related to a pursuit. For example, a police vehicle's flat tire that happened around the time of the pursuit, may or may not be considered property damage related to the pursuit, or a fleeing suspect's injury during a fall, may or may not be considered an injury related to the pursuit depending on the proximity and time to the pursuit's termination.  In addition, the CHP 187A form, which captures property damage and injury information, may not get updated if there is a change by the supervisor or the Departmental Safety Committee; however, PRIME will be updated to reflect the change.  Thus, there are occasions when the form does not match the data in PRIME. For this review, the two data sets were reconciled to the best ability of the auditor.

### Determine if pursuit reports are complete, tracked and reported appropriately

The auditor reviewed the Training Section's hard copy pursuit packets to ensure that pursuits were recorded accurately, completely and timely. The auditor reviewed 439 pursuit packets for the period of January 1, 2012 to December 31, 2017. A more in depth look was conducted on the Level 1 and Level 2 pursuits (179 packets) to ensure that all relevant criteria as stated in *Departmental General Order J-4 Pursuit Driving* were included in the file. Level 1 and 2 are categorized as pursuits that result in death, injury, property damage and/or where a pursuit intervention maneuver was performed. Level 3 pursuits do not result in property damage or injury.

Specifically, the auditor sought to verify the agency initiating pursuit, the distance (miles) traveled, the length (minutes) of pursuit, as well as the maximum speed driven. The auditor also attempted to confirm the outcomes of each pursuit (i.e., person injuries, property damage, collisions, compliance findings). Finally, the completeness of each packet was determined by the presence of the following documentation:

- Pursuit report
- Tracking sheet
- CHP 187A form
- Collision report
- Radio purge
- Crime/offense report
- Other ancillary forms if applicable

Additional data collected from the pursuit packets focused on the existence of required documentation, including but not limited to, photographs and witness statements. Only information for Level 1 and Level 2 pursuits that occurred between January 1, 2013 and December 31, 2017 were collected.

The Daily Pursuit Tracking Logs (pursuit information required to be provided to and recorded by the Communications Section), which also include Non-Response Pursuits were reviewed. Department General Order J-4 requires a supervisor/commander to "contact and provide the Communications Section with the required pursuit information for entry on the Pursuit Tracking Log" for all Level 2 and 3 pursuits and all Non-Response pursuits.  For Level 1 pursuits, the IAD Investigators are required to contact the Communications Section to place the pursuit on the Pursuit Tracking Log. All Daily Pursuit Tracking Logs between late 2014 and December 2017 were reviewed and compared to the PRIME database to ensure that all applicable pursuits were recorded in both sources (PRIME and the Pursuit Tracking Log).

The auditor contacted the CHP and requested data to ensure that the Department was reporting all pursuits, as legally mandated. However, CHP was only able to provide information related to the date and time of the pursuits reported to them by the Oakland Police Department.

## OBSERVATIONS

### Observation 1

### *Did changes in the Pursuit policy effective August 25, 2014 affect risk factors and/or pursuit outcomes?*

### Decline in Pursuit Numbers

The Department's pursuit policy outlines a series of pursuit risk factors that must be considered by the officer and supervisor prior to initiating and during the pursuit up until the pursuits conclusion.  If the risk to public safety and officer safety outweighs the benefit of immediately apprehending the fleeing suspect, the officer and supervisor must terminate the pursuit.

When the pursuit policy changed on August 25, 2014, the most significant change was the authorized reasons for initiating a pursuit (type of crime). There were eleven reasons deleted from the former policy, one of which eliminated the authorization to pursue a stolen vehicle (10851 California Vehicle Code) unless there is reasonable suspicion to believe the suspect committed a violent forcible crime and/or a crime involving the use of a firearm.  The intent of the policy change reflects the Departments efforts to reduce risk associated with pursuits.

The policy change in the authorized reasons for initiating a pursuit has resulted in significantly fewer pursuits overall. Table 1 lists the reasons for pursuits in general crime categories between 2013 and 2017.  The total number of pursuits dropped from **144** in 2013 to **58** in 2017. Most of the decline reflected in pursuit numbers can be attributed to the pursuit of stolen vehicles, which dropped from **56** to **2**.

Oakland Police Department, Office of Inspector General
3rd Quarterly Progress Report (July-September, 2018)

Table 1: List of Pursuits by Year and Reason

| General Reason for Pursuit | 2013 | 2014 | 2015 | 2016 | 2017 | Grand Total |
|---|---|---|---|---|---|---|
| Robbery | 12 | 6 | 16 | 21 | 18 | 73 |
| Carjacking by force or fear/ Grand theft auto | 18 | 13 | 12 | 15 | 10 | 68 |
| *Stolen vehicle | 56 | 1 | | | 2 | 59 |
| Assault with deadly weapon | 8 | 7 | 12 | 8 | 8 | 43 |
| *Carrying a Loaded Firearm/ Rules violation | 9 | 7 | 3 | 6 | 7 | 32 |
| Murder | 1 | 1 | 2 | 2 | 9 | 15 |
| *Burglary of home or vehicle | 10 | 2 | 1 | | | 13 |
| Shooting | 3 | 1 | 1 | 2 | 2 | 9 |
| *Fail or refuse to comply with a lawful order, signal, or direction of officer | 5 | 1 | | 1 | | 7 |
| *Moving vehicle violation | 7 | | | | | 7 |
| *Vehicle equipment code violation | 6 | | | | | 6 |
| Kidnapping | | 2 | 2 | | | 4 |
| *Possession of a controlled substance | 3 | | | | | 3 |
| *Criminal Threats | 1 | 1 | | | 1 | 3 |
| *Probation/Parole violation | 3 | | | | | 3 |
| *Warrant | 2 | | | | | 2 |
| Lewd or Lascivious Acts with a Child | | | | 1 | | 1 |
| Domestic battery/dispute | | | | | 1 | 1 |
| *Brandishing a weapon | | | | 1 | | 1 |
| Human trafficking | | | 1 | | | 1 |
| Grand Total | 144 | 42 | 50 | 57 | 58 | 351 |

**\*Crimes for which the Department can no longer pursue based on the most recent changes to the Pursuit policy, dated 25Aug14.**

**Increase in Proportion of Serious Pursuits**

Level 1 and 2 pursuits are the more serious pursuits, resulting in property damage and/or injury.  Given these heightened risk factors, the number of Level 1 and 2 pursuits were compared to the number of Level 3 pursuits to determine if the policy change impacted the proportion of Level 1 and 2 versus Level 3 pursuits, as illustrated in Chart 1 below.

**Chart 1: Proportion of Level 1 and 2 Compared to Level 3 per Year**



Level 1 & 2 Pursuits vs. Level 3 Pursuits

| | Level 1 & 2 | Level 3 | Level 1 & 2 | Level 3 | Level 1 & 2 | Level 3 | Level 1 & 2 | Level 3 | Level 1 & 2 | Level 3 |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2013 | | 2014 | | 2015 | | 2016 | | 2017 | |
| % of L1/L2 | 36% | 64% | 48% | 52% | 45% | 55% | 45% | 55% | 45% | 55% |
| ■ Sum of Total | 54 | 94 | 20 | 22 | 24 | 29 | 26 | 32 | 26 | 32 |

Level 1 and 2 pursuits have increased as a percentage of all pursuits since the policy change, even though the total numbers have declined. In 2013, prior to the policy change, the percentage of Level 1 and 2 pursuits amounted to 36% of all pursuits for that year.  After the policy change, Level 1 and 2 pursuits increased to roughly 45% of all pursuits per year.

**No Change in Property Damage and Injuries**

Two adverse outcomes resulting from police vehicle pursuits include property damage and injuries. When measuring the percentage of these two variables against all pursuits occurring per year, a marginal increase of 5% in property damage incidents occurred from 2013 to 2014, and has remained roughly consistent since. Regardless of any changes in policy, about a third of all pursuits result in property damage.

Similarly, the percentage of injuries resulting from a vehicle pursuit have not fluctuated more than 3% within the period reviewed (i.e., 2013 to 2017). Again, despite a significant drop in overall pursuits beginning in 2014, roughly 10% of all pursuits continue to result in injury regardless of changes in Department policy. These observations are illustrated below in Chart 2. It is important to reiterate that OIG did identify data discrepancies between pursuit forms in PRIME and the hard copy pursuit packets.

Oakland Police Department, Office of Inspector General
3rd Quarterly Progress Report (July-September, 2018)

*Chart 2: Rate of Property Damage and Collisions in Comparisons to all Pursuits*



## No Connection Between Policy Change and Compliance Findings

The compliance findings for Level 1 and 2 pursuits were analyzed between 2013 and 2017.  Level 1 and 2 pursuits are reviewed by the chain of command of the officer(s) involved, and ultimately the Departmental Safety Committee makes the determination of whether the pursuit was found to comply per Departmental policy.  The percentage of Level 1 and 2 pursuits found out of compliance doesn't appear to have any connection to the policy change, rather the percentage of pursuits found out of compliance has fluctuated up and down between 2013 and 2017.

**Table 2: Pursuits Out of Compliance**

| Year | Out of Compliance Pursuits | In Compliance Pursuits |
|------|----------------------------|------------------------|
| 2013 | 7% | 93% |
| 2014 | 0% | 100% |
| 2015 | 17% | 83% |
| 2016 | 0% | 100% |
| 2017 | 8% | 92% |

The auditor did observe two instances in which a difference of opinion occurred regarding the compliance of the vehicle pursuit. In one instance, the involved officer's Chain of Command found the pursuit *"Out of Compliance"* and the Departmental Safety Committee ruled the same pursuit *"In Compliance,"* overturning the Chain of Command's findings.  In the other instance, the Chain of

Oakland Police Department, Office of Inspector General
3rd Quarterly Progress Report (July-September, 2018)

Command found the pursuit "Out of Compliance," and recommended the pursuit be reviewed by the Departmental Safety Committee by noting *"Refer to J4 Board."* The J4 Board (Departmental Safety Committee) overturned the Chain of Command and instead found the pursuit to be *"In Compliance."*

**Increase in Average Distance/Time of Pursuit, No change in Average Speed**

Averages for both miles traveled and duration of pursuits were also reviewed for Level 1 and 2 vehicle pursuits (Table 3). Since 2013, the average miles traveled and the average time of pursuits have steadily increased. However, there has been little change in the average speed of pursuits.

**Table 3: OPD Pursuit Characteristics**

| Year | Level 1 & Level 2 | | | |
| --- | --- | --- | --- | --- |
| | Average Miles Traveled | Average Minutes Traveled | Average Street Speed (MPH) | Average Freeway Speed (MPH) |
| **2013** | 2.14 | 3.17 | 53 | 82 |
| **2014** | 2.26 | 2.81 | 53 | 82 |
| **2015** | 3.00 | 3.59 | 53 | 66 |
| **2016** | 3.18 | 4.10 | 58 | 81 |
| **2017** | 4.51 | 5.44 | 53 | 81 |

**Chart 3: Time and Distance of Pursuits**



**Pursuit Time and Distance**

63

**Chart 4: Pursuit Speeds (Street and Freeway)**



### Observation 2

*Are pursuits being completed and tracked accurately?*

All 179 pursuit packets reviewed by OIG with regards to Level 1 and Level 2 pursuits were properly completed and tracked. However, the audit revealed that there were sixteen incidents in which the property damage and/or injuries that occurred during and/or resulting from a vehicle pursuit were not migrated into the PRIME system accurately. The Departmental Safety Coordinator identified the discrepancies for twelve of the sixteen incidents by reviewing hard copy pursuit packets. However, three incidents occurred in 2012 and the paper files were unable to be located, and a search of the incidents in Field Based Reporting (FBR)[52] was unsuccessful using the FBR incident number. The one remaining incident indicated that the suspect vehicle struck a tour bus although the bus could not be located and no record of an accident report was found.

### Completeness of Packets

After the policy change, collision reports, photos and witness statements decreased. There are no exceptions to the collision report requirement. If there is an actual collision, there should always be a collision report as well as the activation of the Portable Digital Recording Device (PDRD) of all involved personnel as required per Department General Order I-15 *Portable Video Management System* Section II.A.4, dated July 16, 2015. DGO I-15 also authorizes and provides detailed directions for personnel to use the PDRD to record statements in lieu of taking a written statement. If the PDRD video recording is not available, at the very least, a request for the PDRD footage when available should be included in the pursuit packet. Photos and/or witness statements, on the other hand, may not always be available.

In 2017, there was no tracking sheet available for review in the pursuit packet for two pursuits. The tracking sheet is a requirement of policy that captures important data such as pursuit review approval

---

[52] Field Based Reporting (FBR), a computerized method of writing police reports, through the use of mobile data terminals (MDT) and authorized Departmental computers.

and compliance findings. It is the responsibility of the Supervisor/Commander to endorse (signature required) and to include the tracking sheet in the Pursuit Report packet.

During OIG's reconciliation of PRIME data and pursuit packet data, five pursuit packets were determined to be unaccounted for and/or missing. There were also two pursuits, one that involved a fatal injury and one found to be "Out of Compliance" that were forwarded to the Internal Affairs Division by the Supervisor and Departmental Safety Committee respectively. Department General Order J-4 states, "*For any pursuit received from the Department Safety Coordinator with an out of compliance finding, the Bureau of Field Operations Administrator is responsible for forwarding to an IAD Intake Officer for creation of an IAD case to track discipline.*"  Finally, two were marked for deletion by the Safety Committee Coordinator because it was determined they were Non-Response pursuits, after being reported as a pursuit.

### Tracking of Pursuits

There were 14 of the 392 pursuits listed on the Pursuit Logs that were not found in PRIME under the same Record Number listed on the log.  However, all but three were found in PRIME under a different Record Number. The three that were unable to be confirmed occurred in 2016 and may have also had incorrect Record Numbers on the log, but no associated pursuit was located in PRIME.

Prior to the implementation of the current policy, the Department did not track Non-Response pursuits. Non-Response pursuits are not pursuits, but are tracked to help assess how often an actual pursuit results from an incident where a vehicle flees from an officer's attempt to conduct an enforcement stop. There were 796 Non-Response pursuits during 2014-2017. They have consistently increased since the more restrictive policy has been in place.

**Table 4: Non-Response Pursuits**

| Year | Number of Non-Response Pursuits |
|------|--------------------------------|
| 2014 | 137 |
| 2015 | 197 |
| 2016 | 233 |
| 2017 | 229 |

### Observation 3

*Are pursuits reported to the California Highway Patrol in a timely manner?*

The Department is not reporting pursuits in a timely manner to the California Highway Patrol. For calendar years 2012 through 2017, the auditor reviewed 439 pursuit packets. As mandated by California State legislation, pursuits must be reported within **30 days** of the incident. The Department often reports less frequently than required. In addition, there are discrepancies between the annual number of pursuits the CHP has on record, compared to the number the Department has on record (Table 5 and Chart 2).  Although there are no imposed fines or penalties for timely reporting or underreporting

vehicle pursuits, failure to submit the required documents (CHP 187A form) violates California State mandates.

**Table 5: OPD and CHP reported pursuits comparison**

| Year | # of Pursuits recorded by OPD | # of Pursuits recorded by CHP | % of OPD Pursuits recorded by CHP |
|------|------|------|------|
| 2012 | 73 | 58 | 79% |
| 2013 | 153 | 48 | 31% |
| 2014 | 46 | 42 | 91% |
| 2015 | 52 | 52 | 100% |
| 2016 | 58 | 51 | 88% |
| 2017 | 56 | 46 | 82% |

**Chart 5: Yearly Comparison of OPD and CHP Recorded Pursuits**



The Department does not have any set procedures for tracking the CHP 187A forms it is required to submit to the CHP, nor does it reconcile its numbers with the CHP numbers. The non-existence of an efficient process allows the risk of the Department failing to adhere to the California State mandate for timely and accuracy in Data reporting as it pertains to Vehicle Pursuits in the City of Oakland.

**Other Reportable Matters**

***Should OPD change its policy to allow officers to pursue for stolen vehicles in the hopes that it'll lead to reducing more serious types of violent crime?***

Pursuit data from 2013 (prior to the policy change that prohibited vehicle pursuits for stolen vehicles, 10851 California Vehicle Code) offered little documentation to suggest criminal offenders used stolen vehicles as "*get-away cars*" to commit violent and forcible crimes. Limitations to OIG's cursory review of pursuit data included the lack of officers fully articulating evidence-led pursuits, which was not required in 2013.

OIG reviewed 51 narratives completed by officers in crime reports to assess whether officers included any prior knowledge of the driver, passenger(s) and/or the vehicle itself being involved in a violent forcible crime. In six instances, officers identified:

- A kidnapping suspect
- A home invasion and rape suspect
- An armed suspect
- A vehicle with matching stolen property (not considered a violent forcible crime)
- A vehicle involved in an earlier police pursuit (not considered a violent forcible crime)
- And a vehicle previously involved in an assault with a deadly weapon listed drug activity.

All other pursuits commenced as on views with officers observing a moving violation (e.g., running a stop sign), identified the vehicle as being listed as a stolen vehicle, or were alerted using an electronic license plate reader (LPR). Most other charges associated with these pursuits were related to the stolen vehicle and/or vehicle pursuit itself, such as evading a peace officer or knowingly receiving stolen property, apart from a few parole/probation violations and felony warrants.

Additionally, most stolen vehicle pursuits were disengaged by officers and/or their supervisors with few pursuits ending in the suspects' apprehension. Of those, few yielded evidence of a criminal offender being involved in serious violent forcible crime. Thus, there was not enough information collected in 2013 to substantiate a significant link that would warrant changing OPD's current pursuit policy.

However, upon further review of 2017 pursuits (most resulting from a violent and forcible crime); twenty-two of fifty-eight total pursuits (or 37%) included a stolen vehicle charge. Therefore, it is reasonably assumed that criminal offenders use stolen vehicles as *"get-away cars"* to aid in their crimes, like committing robberies, some of the time.

Oakland Police Department, Office of Inspector General
3rd Quarterly Progress Report (July-September, 2018)



OIG recommends the Department consider and discuss this information, in conjunction with other relevant factors, when weighing the risk factors in consideration of any change to the current pursuit policy.  The Department should be mindful that pursuits involving a stolen vehicle represent a very small portion of all crimes.

## OBSERVATIONS AND RECOMMENDATIONS

| No. | OIG Observation | OIG Recommendation |
|---|---|---|
| 3 | No procedures are in place for tracking the mandated submission of the CHP 187A forms to the California Highway Patrol. | The Department should consider implementing procedures for recording the submission of California Highway Patrol (CHP) 187A forms and adhering to the state mandated reporting guidelines. Tracking the submission of 187A forms provides assurance that the Department is complying with the State's reporting mandates. Updating the pursuit form in PRIME with a field for tracking form submission should be considered. |

# APPENDIX A

*"Violent Forcible Crime"* defined as the commission or attempted commission of one or more of the following actions:

- Murder;
- Manslaughter;
- Mayhem
- Kidnapping
- Robbery
- Carjacking
- Arson to an inhabited structure, inhabited property or that causes great bodily injury (GBI);
- Explode or ignite a destructive device or any explosive causing GBI or death;
- Use or possession of a weapon of mass destruction
- Use of a firearm in the commission of a felony;
- Assault with a deadly weapon, firearm;
- Assault with a deadly weapon, other than a firearm*, with serious bodily injury (SBI)/GBI

  *The use of a motor vehicle to solely flee a scene or enforcement action does not meet the criteria for this part unless there is a clearly articulable intentional act by the driver to use the vehicle as a weapon

- Aggravated Battery with SBI/GBI; and
- Any of the following sexual assaults committed against a person's will by means of force, violence, duress, menace, feat of immediate and unlawful bodily injury on the person or another, or in concert:

  - ❖ Rape;
  - ❖ Sodomy;
  - ❖ Oral Copulation;
  - ❖ Lewd Act on a child under the age of 14; or
  - ❖ Sexual penetration

## APPENDIX B

Pursuit Risk Factors

| Effective Date 25 Aug 2014 | Effective Date 01 Jan 2011 |
|---|---|
| ➢ The volume of vehicular and pedestrian traffic in the area | ➢ The volume of vehicular and pedestrian traffic in the area |
| ➢ Traffic conditions *new* | ➢ Location of pursuit |
| ➢ Location of pursuit | ➢ Safety of the public in the area of the pursuit |
| ➢ Safety of the public in the area of the pursuit | ➢ Safety of the involved officer(s) |
| ➢ Safety of the involved officer(s) | ➢ Road and weather conditions |
| ➢ Speeds of both officer and suspect vehicles *new* | ➢ Officer and supervisor familiarity with the area of pursuit |
| ➢ Road and weather conditions | ➢ Speeds involved in relation to all other risk factors *deleted* |
| ➢ Officer and supervisor familiarity with the area of pursuit | ➢ Time of day (or night) |
| ➢ Time of day (or night) | ➢ Quality of Communications between the pursuing vehicles, Communications Section and/or Supervisor |
| ➢ Quality of Communications between the pursuing vehicles, Communications Section and/or Supervisor | ➢ Performance capabilities of the police vehicle or the operation of emergency lights and siren |
| ➢ Performance capabilities of the police vehicle or the operation of emergency lights and siren | ➢ Availability of air or field support |
| ➢ Availability of air or field support | ➢ Whether the officer has a ride a long passenger with him/her |
| ➢ Whether the officer has a ride a long passenger with him/her | ➢ Whether the suspect is known and can be apprehended at a later time |
| Effective Date 25 Aug 14 *(cont.)* | Effective Date 01 Jan 11 *(cont.)* |

Oakland Police Department, Office of Inspector General
3rd Quarterly Progress Report (July-September, 2018)

| | |
|---|---|
| ➢ Whether the suspect is known and can be apprehended at a later time | ➢ Whether the suspect is known to be a juvenile |
| ➢ Whether the suspect is known to be a juvenile | ➢ When a non-suspect vehicle and/or pedestrian accident has occurred during a pursuit |
| ➢ When a non-suspect vehicle and/or pedestrian accident has occurred during a pursuit | ➢ The safety of the occupants in the fleeing vehicle |
| ➢ The safety of the occupants in the fleeing vehicle | ➢ The distance between the pursuit and fleeing vehicles is so great that further pursuit is futile |
| ➢ The distance between the pursuit and fleeing vehicles is so great that further pursuit is futile | ➢ The pursued vehicle's location is no longer known for a certainty. |
| ➢ The pursued vehicle's location is no longer known | |

# EXHIBIT B

Memorandum

To:     Office of the Chief of Police
Attn:   Chief A. Kirkpatrick
From:   Lieutenant Angelica Mendoza
Date:   January 03, 2019

Re:     Executive Summary of OIG's Review and Assessment of 14 UOF cases
        associated with OPD's 1st & 2nd Quarters Arrest Data

On December 4, 2018, the Office of Inspector General commenced its review and
assessment of 14 Use of Force incidents that were identified by the Independent
Monitoring Team (IMT) in their independent review of the Oakland Police Departments'
1st & 2nd Quarter Arrest Data of offenses in which force would be more likely to have
occurred.

The purpose of this review and assessment was to gather and identify any instances in
which a Use a Force occurred and was not reported in accordance to Departmental policy
and procedures as outlined in Departmental General Orders K-3 & K-4 to include
Training Bulletin III-I.1 (Weaponless Defense). Included, an additional assessment was
made with regards to Departmental Manual of Rules (MOR), Departmental General
Orders M-3, (Complaints Against Departmental Personnel or Procedures), Departmental
General Order I -15.,1 Portable Video Management System (PVMS), which includes a
Portable Digital Recording Device (PDRD) and Departmental General Orders M-18,
Supervisory Arrest Approvals (SAA).

The IMT outlined the following concerns in their review:

- Firearms being directly pointed at subjects, and not reported.
- Instances in which officer's attempt to take a subject into custody,
  involved physical force.
- Instances in which it was unclear whether force was used in 7 cases.
- Six cases involved pointing of the firearm at a person (s).
- Six cases in which there was no actual PDRD video of the arrest.
- Inclusion of inaccurate Boiler plate language that "no force was used or
  witnessed" in officer's arrests reports, a serious misinterpretation.
- Unclear whether these deficiencies result from supervisory direction or a lack
  thereof and/or a misrepresentation of OPD policy.

Based on the OIG Audit Team's review and assessments, the following analysis was
concluded:

- 5 incidents in which firearms were pointed at subjects, and not reported.
- 4 instances in which physical force was involved to take a subject into custody,
  and not reported. 5 cases in which in which a Weaponless Defense Technique

1

Control Hold was applied for handcuffing or escorts that did not result in injury or a complaint of injury to include instances in which some physical force was involved to take a subject into custody, but not reportable uses of force as per departmental policy, procedures and general orders.

- All 14 identified cases had associated PDRD video footage of the arrest.
- There were inclusions of declarative statements such as "no force was used or witnesses' in officer's arrest reports in which force was determined to have been used and/or witnesses were determined to be present.
- Several deficiencies were identified with regards to Supervision, Performance of Duties, Failures to Accept & Refer a Complaint, PDRD Activations and Deactivations, Training, Tactics and Report Writing.
- Two of the 9 cases in which a use of force should have been reported, include instances in which there appears to be a willful intent to not report to include a misrepresentation in the associated officer's arrests reports.
- Identified, were three outlier Supervisors and assigned squads in which a more robust based inquiry is in progress and will be reported on after OIG's Global Use of Force Audit.
- 11 Internal Affairs Division referrals were made and cases initiated.

OIG will provide its Audit Recommendations at the conclusions of its formalized findings in the Global Force Audit Report.

### *Preliminary Key Areas of Concern:*

✓ **Supervision:**  Substandard. Training on Uniformity, Communication, Reviews, Oversight, Scene Management of Use of Force, Preliminary Investigations and Demeanor/Direction towards subordinates.
Avoid "Stacking" Charges. Ensuring that elements of offenses are met prior to approving. Field Intake of Complaints.

✓ **Policy Revisions:** Streamline, clarify and train (DGO K-4) the Reporting of Uses of Force to avoid ambiguities to specifically address the "Low ready, and intentional", pointing of a firearm (*revise to required reporting anytime a target is acquired, as oppose to the language of Low Ready and Intentional*) and Weaponless Defense *"Take Downs"*. Consider the inclusion of identifying a reportable use force that aligns with DGO K-3, p.3 of 12, (c) *"Uses of Force, any physical or mechanical intervention used by a member or employee to defend, control, overpower, restrain or overcome the resistance of an individual"*.
Incorporate and train a Post- Use of Force Positioning and Monitoring component to the Use of Force policy which outlines what members **shall** do after gaining control of a subject. For example, the following: **1)** Avoid sitting, kneeling, or standing on a subject's back and/or chest, which may reduce

2

the subject's ability to breathe **2)** Position the subject in a manner to allow free breathing. Whenever feasible, the subject will not be forced to lie on his or her stomach. **3)** monitor subject until transported to a secure location **4)** request and offer medical aid to any injured department member, bystander, or subjects consistent with policy and procedures outline in DGO K-3 and K-4.

Clarify and train on the PDRD policy and procedures to address the substantial amounts of Activations and Deactivations, positioning, downloading and reviews. Include reminders that PDRD footage(s) are utilized in court hearings and become available through public records request which can involve multiple levels of scrutiny and reviews resulting in personal disrepute, but also brings departmental disrepute.

✓ **Training:** Report Writing as it pertains to the articulation and reporting of uses of force to avoid any inclusion of boiler plate language with emphasis on the individual's articulation and reporting of force. Include the re training of no "self- approved" Use of Force reports. Address affidavits as it pertains to search warrant language (articulate what occurred, sequence of events). Include report writing training that reinforces a report to reflect the associated PDRD footage. Avoid police jargon, clear articulation of what occurred and each officer's actions. Seek current best practices reality based scenarios to train during departmental continued professional training, with regards to dealing with the control and containment of uncooperative and resistant subjects to include the supervision and reporting of such incidents.

✓ **Intervention:** Supervisors review and awareness of officer's, address performance deficiencies and allegations of misconduct immediately. Review and evaluate whether the supervisor, squads/officers' decisions, performance, or outcomes may be addressed by intervention (training, direction, monitoring). Address Officer/Public Safety, Training & Tactical concerns in accordance to departmental policy and procedures.

Respectfully,

Angelica Mendoza
Lieutenant of Police
Office of Inspector General

3

# EXHIBIT C

OFFICE OF CHIEF OF POLICE
OAKLAND POLICE DEPARTMENT

SPECIAL ORDER 9191

TO:            All Commanders and Sergeants

SUBJECT:       Additional Audit of PDRD Video

EFFECTIVE DATE:   27 Nov 18

TERMINATION:   Upon Update of Policy

---

Recent audits conducted by the OIG and IMT revealed that there has been some potential use of force incidents not reported in accordance with DGO K-04. Frequently, the potential lack of reporting come from incidents involving 69PC, 148PC, and 243(b)&(c)PC arrests.

All Sergeants are required to audit the PDRD video of arrests/incidents involving 69PC, 148PC, and 243(b)&(c)PC arrests. Sergeants are required to view video footage from beginning of the incident to the arrest. The Sergeant shall annotate their view of the PDRD footage in the "Comment" area of the VIEVU-VERIPATROL software system.

Sergeants shall continue to respond to and approve arrests for all 69PC, 148PC, and 243(b)&(c)PC arrests. Sergeants shall continue to conduct monthly PDRD audits of each officer under their command. Sergeants shall also continue bi-weekly meetings with each officer under their command.

Like UOF incidents, Sergeants shall be required to view the PDRD footage within 2 business days of the incident.

By order of

Anne E. Kirkpatrick
Chief of Police
Oakland Police Department