March 19, 2019

# Sixtieth Report *of the* Independent Monitor *for the* Oakland Police Department

## Introduction

This is our sixtieth status report on the Negotiated Settlement Agreement (NSA) in the case of *Delphine Allen, et al., vs. City of Oakland, et al.,* in the United States District Court for the Northern District of California under the direction of Judge William H. Orrick. I was appointed in 2010 to oversee the monitoring process of the Oakland Police Department (OPD) that began in 2003.

This report covers our site visit of January 7-8, 2019; and describes our recent assessments of NSA Tasks 26, 30, 34, and 41. As we have noted previously, following the Court's Order of May 21, 2015, in our status reports, we devote special attention to the most problematic component parts of the Tasks that are not yet in full or sustained compliance, and discuss the most current information regarding the Department's progress with the NSA and its efforts at making the reforms sustainable.

In a Case Management Conference in late November, the Court expressed its concerns with the Department's "checking boxes on compliance that will prove ephemeral over time." The Court noted the review we conducted, which was prompted by an unexplained reduction of 75% in reported use of force during the period 2012-2017 – with principal and substantial decreases in the Level 4 category of force. Ultimately, the Court reactivated Tasks 24 (Use of Force Reporting Policy), 25 (Use of Force Investigation and Report Responsibilities), and 31 (Officer-Involved Shooting Investigations). Following this, we requested reports and accompanying video and other documentation for all recent use of force incidents. Our first assessments of these reactivated Tasks are ongoing, and will be addressed in our next report.

## *Increasing Technical Assistance*

Each month, our Team conducts a visit to Oakland that includes both compliance assessments and technical assistance. During our visits, we meet with Department and City officials; observe Department meetings and technical demonstrations; review Departmental policies; conduct interviews and make observations in the field; and analyze OPD documents and files, including misconduct investigations, use of force reports, crime and arrest reports, Stop Data Forms, and other documentation. We also provide technical assistance in additional areas, especially those that relate to the remaining non-compliant Tasks or areas identified by the Department.

Within the last several months, we have provided technical assistance to OPD officials in the areas of IAD investigation quality (Task 5); stop data and related issues (Task 34); risk management and the ongoing maintenance issues and development of the Performance Reporting Information Metrics Environment (PRIME) systems (Task 41); and several Department policies and procedures, including policies related to PRIME, officer discipline, probationers and parolees, handcuffing, and the use of electronic control weapons.

## *Building Internal Capacity at OPD*

Also per the May 21, 2015 Court Order, we continue to work closely with the Office of Inspector General's (OIG) lieutenant and staff to identify areas that it should audit or review – and to help design approaches to these audits that are not cumbersome, so as to ensure sustainability.  We review OIG's quarterly progress reports, which are a valuable resource and assist us in assessing compliance with NSA requirements.  OIG published its most recent progress report (covering the first two quarters of 2018) in early October.

# *Focused Task Assessments*

## Task 26:  Force Review Board (FRB)

**Requirements:**

*OPD shall develop and implement a policy concerning its FRB proceedings.  The policy shall:*

> *1.  Set out procedures, membership and a timetable for FRB review of use of force investigations involving Level 2 incidents, as defined in Department General Order K-4, REPORTING AND INVESTIGATING THE USE OF FORCE;*
>
> *2.  Require the FRB to review all use of force investigations;*
>
> *3.  Require the FRB to make a recommendation as to whether the use of force was in policy or out of policy;*
>
> *4.  Require the FRB to forward sustained policy violations to the Discipline Officer.*
>
> *5.  Require the FRB not to review any use of force allegation until the internal investigations has been completed;*
>
> *6.  Authorize the FRB to recommend to the Chief of Police additional use of force training or changes in policies or tactics, or additional standards, investigatory policies, or training for use of force investigations;*
>
> *7.  Require the FRB to conduct an annual review of use of force cases examined, so as to identify any patterns of use of force practices that may have policy or training implications, and thereafter, issue a report to the Chief of Police;*

> 8. *Require that the FRB membership include, at a minimum, one member from the Training Division, one member from the Field Training Officer program, and either the Bureau of Field Operations Deputy Chief or his/her designee;*
>
> 9. *Minimally, that one member of the FRB shall be replaced at least annually.*

(Negotiated Settlement Agreement V. C.)

**Relevant Policy:**

Department General Order K-4.1, *Force Review Boards,* was originally published on February 17, 2006, and revised on December 21, 2015.

**Commentary:**

OPD Force Review Boards (FRBs) are regularly convened to examine the investigations conducted relative to the deployment and application of Level 2 uses of force.[1] OPD achieved compliance with this Task during the nineteenth reporting period (April 1-June 30, 2014); however, we continue to assess the compliance with this Task including our analyses of force reports and attendance at Force Review Boards when conducted during our site visits.

For this report, we reviewed six Force Review Board Reports that were completed and approved by the Chief of Police from November 2018-January 2019. In all but one case, the force was determined by the boards to be in compliance. The one exception was the accidental discharge of a shotgun. In each case, the Chief concurred with the findings without any modifications. In one case, the Chief noted that, "This case was given to me on the date that the 3304 had run." There were no sustained findings in that case; however it is concerning that the case management was such that the deadline could have been a factor.

In addition to reviewing the completed FRB reports, we observed three FRBs as they carried out their duties and deliberations. We observed two during our regular site visits, and one remotely via Skype. We noted that these boards followed appropriate policies and protocols.

---

[1] According to OPD, Level 2 uses of force include: "1) Any strike to the head (except for an intentional strike with an impact weapon); 2) Carotid restraint is applied that does not result in the loss of consciousness; 3) Use of impact weapons, including specialty impact munitions or any other object, to strike a subject and contact is made, regardless of injury; 4) Any unintentional firearms discharge that does not result in injury; 5) A police canine bites the clothing or the skin of a subject, or otherwise injures a subject requiring emergency medical treatment (beyond first-aid) or hospital admittance; 6) Any use of force which results in injuries to the subject requiring emergency medical treatment (beyond first-aid) or hospital admittance; (NOTE: For the purposes of this order, an evaluation by a medical professional to assess a complaint of injury is not emergency treatment) 7) Any Level 3 use of force used on or applied to a restrained subject; 7.a) A restrained subject is a person who has been fully placed in a Department authorized restraint device such as both hands handcuffed, a WRAP or Rip Hobble; 7.b) A subject with only one handcuff on is not a restrained person."

In addition to ruling on the appropriateness of uses of force, Force Review Boards will generally identify several follow-up items based on their review of the associated materials and the presentations made to them.  These can include items such as counseling and training for individual officers, publication of Department-wide training materials, and modifications to policy.  These deliverables are tracked in a spreadsheet.  The most recent version provided to us had 52 open items, five of them assigned in 2017.  Many of these items appear to be easily accomplished within a few days of being assigned, and this is reflected in their due dates.  Either the tracking spreadsheet is not being regularly maintained, or the due dates are being ignored with impunity.  Neither is acceptable.

OPD remains in compliance with this Task.  However, the Department risks falling out of compliance if appropriate personnel do not rectify the apparent failure to address board deliverables in a timely fashion.  One of the main functions of the FRBs is to identify opportunities for improvement at the individual and Department levels *and* to ensure that these changes are implemented.  Identification alone is not enough.

## Task 30:  Executive Force Review Board (EFRB)

**Requirements:**

1. An EFRB shall be convened to review the factual circumstances surrounding any Level 1 force, in-custody death, or vehicle pursuit-related death incidents.  A firearm discharge at an animal shall be reviewed by the EFRB only at the direction of the Chief of Police.

2. The Board shall have access to recordings and/or transcripts of interviews of all personnel on the scene, including witnesses, and shall be empowered to call any OPD personnel to provide testimony at the hearing.

3. OPD shall continue the policies and practices for the conduct of EFRB, in accordance with the provisions of DGO K-4.1, FORCE REVIEW BOARDS.

(Negotiated Settlement Agreement V. G.)

**Relevant Policy:**

Department General Order K-4.1, *Force Review Boards,* was published on February 17, 2006, and revised on December 21, 2015.

**Commentary:**

Executive Force Review Boards (EFRBs), consisting of three top command-level staff, conduct thorough, detailed reviews of all Level 1 uses of force, in-custody deaths, and vehicle pursuit-related deaths and serious injuries.  OPD conducted six EFRBs in 2018.

The final EFRB of 2018 reviewed an officer-involved shooting that occurred in March 2018. The board held two days of hearings and then returned the case to IAD for additional work. Consequently, the board did not complete its deliberations until January 2019. We observed all three days of deliberations, and reviewed the underlying investigations, including the follow-up investigation by IAD as directed by the board. We found the investigations wanting. The questioning lacked inquisitiveness, and served to support the officers' assertions of justification – rather than being directed towards resolving the inconsistencies between the officers' statements and available video evidence. The EFRB failed to address these deficiencies.

The board relied almost exclusively on these investigations to make their determinations, despite having at their disposal the same information that the investigators did. Once the board entered the deliberation phase, little time was spent discussing the justification for the actual uses of force. The officers' actions were determined to have been within policy. By contrast, the board members spent an inordinate period of time debating appropriate findings for the ancillary issues arising from this case, including the quality of the supervision at the scene and other Manual of Rules violations.

The EFRB submitted its report to the Chief of Police. The Chief disagreed with some of the board's ancillary findings – and, in fact, *downgraded* their dispositions. The Monitoring Team disagreed with several findings of both the EFRB and the Chief.

As noted previously, OPD had achieved compliance with this Task during the nineteenth reporting period (April 1-June 30, 2014). We find the Department to no longer be in compliance with this Task.

## Task 34:  Vehicle Stops, Field Investigation, and Detentions

**Requirements:**

1. *OPD shall require members to complete a basic report on every vehicle stop, field investigation and every detention.  This report shall include, at a minimum:*

    a. *Time, date and location;*

    b. *Identification of the initiating member or employee commencing after the first year of data collection;*

    c. *Reason for stop;*

    d. *Apparent race or ethnicity, and gender of individual(s) stopped;*

    e. *Outcome of stop (arrest, no arrest);*

    f. *Whether a search was conducted, and outcome of search;*

    g. *Offense categories (felony, misdemeanor or infraction).*

2. *This data shall be entered into a database that can be summarized, searched, queried and reported by personnel authorized by OPD.*

> 3. *The development of this policy shall not pre-empt any other pending or future policies and or policy development, including but not limited to "Promoting Cooperative Strategies to Prevent Racial Profiling."*

(Negotiated Settlement Agreement VI. B.)

**Relevant Policy:**

Department policies relevant to Task 34 include:  General Order M-19, *Prohibitions Regarding Racial Profiling and Other Bias-Based Policing;* Report Writing Manual (RWM) Inserts R-2, N-1, and N-2; Special Order 9042, *New Procedures Regarding Stop Data Collection* (published June 2010); and Special Order 9101, *Revised Stop Data Collection Procedures* (published November 2012).

**Commentary:**

The collection and analysis of stop data by OPD over the past several years has laid a foundation for meeting the requirement of the State of California on this topic.  As of our January site visit, OPD reported that it anticipates being the first department to send data to the State.  The interface between the State and local departments is currently built with contributions from OPD.  As time goes on, the Department anticipates submitting its data on a quarterly basis.  Differences between the State requirements and the OPD's more expansive interests will be addressed by limiting the data transfer to include only the data needed under State law.  That will require de-identifying data and recording data into the categories of State interest.

For purposes of collecting data, the Department has integrated the State form with its own data collection process.  As expected, some data problems have been uncovered, but they are now being resolved.  Moving forward, OPD personnel have expressed that the Department is committed to collecting and using stop data consistent with its interests in crime reduction and for its assessment and management of risk through the risk management process and its monthly Risk Management Meetings (RMMs).

OPD's January Risk Management Meeting illustrated the integration of stop data into the wider framework of risk management.  The meeting began with an extensive review of "deliverables" from the previous meeting.  Among the points discussed was the unevenness of stop activity with some declines noted and some officers completing large numbers of stops.  That again led to discussion of the importance of intelligence-led stops and the need for stops to be related to some documentable crime-related information.

This issue is critical to interpretations of what is referred to in the Risk Management Meetings as the "footprint" of policing in Oakland. That concept includes interest in the overall number of stops, the number of searches from those stops, and the volume of cases resulting in some recovery of contraband and/or arrest. These factors are analyzed by geography, race of person stopped, and at the OPD squad and officer level. Analyzed that way, the number of stops that do not result in further action provides a useful measure of the footprint. For this review, Area stops resulting in recoveries ranged between five and seven percent.

Research elsewhere has shown that the highest volume of stops by police involves African Americans – and that is also true in Oakland. The reduction in the total number of stops and the reduction of disparity are both explicit goals of the practice of risk management in the Department.

The goals of reducing disparities and reducing the size of the "footprint" are important. But the analysis undertaken in the process can become too complicated. With OPD, that analysis includes review of stops involving residents and non-residents of Oakland and it tries to incorporate the racial distributions of the City's population down to the level of police beats. However, population figures are complicated by commuting and travel patterns and a wide range of other factors. Rates of stops based on population factors are unsound methodologically and can provide little added value. The key factors for understanding stop data are the overall levels of stops, their results, their distribution by race, and their patterns across officers. Other factors may only make those data points more difficult to understand.

## Task 41: Use of Personnel Assessment System (PAS) and Risk Management

**Requirements:**

*Within 375 days from the effective date of this Agreement, OPD shall develop a policy for use of the system, including supervision and audit of the performance of specific members, employees, supervisors, managers, and OPD units, as well as OPD as a whole.*

*The policy shall include the following elements:*

1. *The Chief of Police shall designate a PAS Administration Unit. The PAS Administration Unit shall be responsible for administering the PAS policy and, no less frequently than quarterly, shall notify, in writing, the appropriate Deputy Chief/Director and the responsible commander/manager of an identified member/employee who meets the PAS criteria. PAS is to be electronically maintained by the City Information Technology Department.*

2. *The Department shall retain all PAS data for at least five (5) years.*

3. *The Monitor, Inspector General and Compliance Coordinator shall have full access to PAS to the extent necessary for the performance of their duties under this Agreement and consistent with Section XIII, paragraph K, and Section XIV of this Agreement.*

4. *PAS, the PAS data, and reports are confidential and not public information.*

5. *On a quarterly basis, commanders/managers shall review and analyze all relevant PAS information concerning personnel under their command, to detect any pattern or series of incidents which may indicate that a member/employee, supervisor, or group of members/employees under his/her supervision may be engaging in at-risk behavior. The policy shall define specific criteria for determining when a member/employee or group of members/employees may be engaging in at-risk behavior.*

6. *Notwithstanding any other provisions of the PAS policy to be developed, the Department shall develop policy defining peer group comparison and methodology in consultation with Plaintiffs' Counsel and the IMT. The policy shall include, at a minimum, a requirement that any member/employee who is identified using a peer group comparison methodology for complaints received during a 30-month period, or any member who is identified using a peer group comparison methodology for Penal Code §§69, 148 and 243(b)(c) arrests within a 30-month period, shall be identified as a subject for PAS intervention review. For the purposes of these two criteria, a single incident shall be counted as "one" even if there are multiple complaints arising from the incident or combined with an arrest for Penal Code §§69, 148 or 243(b)(c).*

7. *When review and analysis of the PAS threshold report data indicate that a member/employee may be engaging in at-risk behavior, the member/employee's immediate supervisor shall conduct a more intensive review of the member/employee's performance and personnel history and prepare a PAS Activity Review and Report. Members/employees recommended for intervention shall be required to attend a documented, non-disciplinary PAS intervention meeting with their designated commander/manager and supervisor. The purpose of this meeting shall be to review the member/employee's performance and discuss the issues and recommended intervention strategies. The member/employee shall be dismissed from the meeting, and the designated commander/manager and the member/employee's immediate supervisor shall remain and discuss the situation and the member/employee's response. The primary responsibility for any intervention strategies shall be placed upon the supervisor. Intervention strategies may include additional training, reassignment, additional supervision, coaching or personal counseling. The performance of members/ employees subject to PAS review shall be monitored by their designated commander/manager for the specified period of time following the initial meeting, unless released early or extended (as outlined in Section VII, paragraph B (8)).*

8. *Members/employees who meet the PAS threshold specified in Section VII,*

> *paragraph B (6) shall be subject to one of the following options: no action, supervisory monitoring, or PAS intervention. Each of these options shall be approved by the chain-of-command, up to the Deputy Chief/Director and/or the PAS Activity Review Panel.*
>
> *Members/employees recommended for supervisory monitoring shall be monitored for a minimum of three (3) months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor. The first at the end of one (1) month and the second at the end of three (3) months.*
>
> *Members/employees recommended for PAS intervention shall be monitored for a minimum of 12 months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor and designated commander/manager: The first at three (3) months and the second at one (1) year. Member/employees subject to PAS intervention for minor, easily correctable performance deficiencies may be dismissed from the jurisdiction of PAS upon the written approval of the member/employee's responsible Deputy Chief, following a recommendation in writing from the member/employee's immediate supervisor. This may occur at the three (3)-month follow-up meeting or at any time thereafter, as justified by reviews of the member/employee's performance. When a member/employee is not discharged from PAS jurisdiction at the one (1)-year follow-up meeting, PAS jurisdiction shall be extended, in writing, for a specific period in three (3)-month increments at the discretion of the member/employee's responsible Deputy Chief. When PAS jurisdiction is extended beyond the minimum one (1)-year review period, additional review meetings involving the member/employee, the member/ employee's designated commander/manager and immediate supervisor, shall take place no less frequently than every three (3) months.*

9. *On a quarterly basis, Division/appropriate Area Commanders and managers shall review and analyze relevant data in PAS about subordinate commanders and/or managers and supervisors regarding their ability to adhere to policy and address at-risk behavior. All Division/appropriate Area Commanders and managers shall conduct quarterly meetings with their supervisory staff for the purpose of assessing and sharing information about the state of the unit and identifying potential or actual performance problems within the unit. These meetings shall be scheduled to follow-up on supervisors' assessments of their subordinates' for PAS intervention. These meetings shall consider all relevant PAS data, potential patterns of at-risk behavior, and recommended intervention strategies since the last meeting. Also considered shall be patterns involving use of force, sick leave, line-of-duty injuries, narcotics-related possessory offenses, and vehicle collisions that are out of the norm among either personnel in the unit or among the unit's subunits. Division/appropriate Area Commanders and*

> *managers shall ensure that minutes of the meetings are taken and retained for a period of five (5) years. Commanders/managers shall take appropriate action on identified patterns of at-risk behavior and/or misconduct.*
>
> 10. *Division/appropriate Area Commanders and managers shall meet at least annually with his/her Deputy Chief/Director and the IAD Commander to discuss the state of their commands and any exceptional performance, potential or actual performance problems or other potential patterns of at-risk behavior within the unit. Division/appropriate Area Commanders and managers shall be responsible for developing and documenting plans to ensure the managerial and supervisory accountability of their units, and for addressing any real or potential problems that may be apparent.*
>
> 11. *PAS information shall be taken into account for a commendation or award recommendation; promotion, transfer, and special assignment, and in connection with annual performance appraisals. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*
>
> 12. *Intervention strategies implemented as a result of a PAS Activity Review and Report shall be documented in a timely manner.*
>
> 13. *Relevant and appropriate PAS information shall be taken into account in connection with determinations of appropriate discipline for sustained misconduct allegations. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*
>
> 14. *The member/employee's designated commander/manager shall schedule a PAS Activity Review meeting to be held no later than 20 days following notification to the Deputy Chief/Director that the member/employee has met a PAS threshold and when intervention is recommended.*
>
> 15. *The PAS policy to be developed shall include a provision that a member/employee making unsatisfactory progress during PAS intervention may be transferred and/or loaned to another supervisor, another assignment or another Division, at the discretion of the Bureau Chief/Director if the transfer is within his/her Bureau. Inter-Bureau transfers shall be approved by the Chief of Police. If a member/employee is transferred because of unsatisfactory progress, that transfer shall be to a position with little or no public contact when there is a nexus between the at-risk behavior and the "no public contact" restriction. Sustained*

> *complaints from incidents subsequent to a member/employee's referral to PAS shall continue to result in corrective measures; however, such corrective measures shall not necessarily result in a member/employee's exclusion from, or continued inclusion in, PAS. The member/employee's exclusion or continued inclusion in PAS shall be at the discretion of the Chief of Police or his/her designee and shall be documented.*
>
> 16. *In parallel with the PAS program described above, the Department may wish to continue the Early Intervention Review Panel.*
>
> 17. *On a semi-annual basis, beginning within 90 days from the effective date of this Agreement, the Chief of Police, the PAS Activity Review Panel, PAS Oversight Committee, and the IAD Commander shall meet with the Monitor to review the operation and progress of the PAS. At these meetings, OPD administrators shall summarize, for the Monitor, the number of members/employees who have been identified for review, pursuant to the PAS policy, and the number of members/employees who have been identified for PAS intervention. The Department administrators shall also provide data summarizing the various intervention strategies that have been utilized as a result of all PAS Activity Review and Reports. The major objectives of each of these semi-annual meetings shall be consideration of whether the PAS policy is adequate with regard to detecting patterns of misconduct or poor performance issues as expeditiously as possible and if PAS reviews are achieving their goals.*
>
> 18. *Nothing in this Agreement, and more specifically, no provision of PAS, shall be construed as waiving, abrogating or in any way modifying the Department's rights with regard to discipline of its members/employees. The Department may choose, at its discretion, to initiate the administrative discipline process, to initiate PAS review or to use both processes concurrently or consecutively.*

(Negotiated Settlement Agreement VII. B.)


**Relevant Policy:**

OPD revised and issued Departmental General Order D-17, *Personnel Assessment Program,* in November 2013. The Department has begun to address General Order D-17 as part of the Department's ongoing policy review and revision program. The revised version of the relevant policy is currently under review.

**Commentary:**

During our January site visit, we received our regular updates on the progress of PRIME 2.0, which is the reengineering of the PRIME database, and the addition of other key data elements. The progress includes a now operational "data governance" process. This includes a higher level data governance council, which will provide direction with regard to strategy; a steering committee of subject matter experts within the Police Department; and a team of management-level data analysts. The overall "governance team" adds needed structure to the ongoing enterprise.

The addition of key data to the PRIME system is moving forward. The management and recording of Academy training was the topic of an OPD demonstration in January. The demonstration showed the system's flexibility in changing and adapting to new curricula and testing protocols. The link to the in-service training record system and the final contracts with the vendor are in progress. At this point, much of the work regarding stop data involves achieving compliance with requirements – which are continuing to be clarified as the State moves forward.

The overall PRIME project has reached a point at which the process of identifying gaps in data for inclusion in the data warehouse is taking place. These issues pertain to the work of multiple contractors and ensuring that the needs of contractors "downstream" are being met. This has meant that the work on dashboards, which will support the use of data by all levels of supervision and management, has been slowed as data gaps are identified and fixed. The City Information Technology Department does not believe that these issues will affect the date for the completion of the overall project, which remains slated for July 2019.

In the meantime, OPD reports that the use of the existing PRIME database continues, but that substantial effort is required to maintain the system and ensure its accuracy. The original vendor maintenance contract, which has been renewed several times is, again, expiring. Yet there are currently no plans to renew the contract at this time. Instead, in the interim, while progress continues on the development of Prime 2.0, Department personnel with the assistance of an "on demand support" maintenance contract with another vendor will maintain the current system.

As has become customary during our site visits, the Monitoring Team observed the Department's monthly Risk Management Meeting (RMM) in January. The meetings provide an opportunity for Area command staff to review and report on risk-related data and for the executive team to examine Area efforts to identify and reduce risk. In January, the agenda changed the order of discussion by moving the review of stop data to follow the review of uses of force, complaints, and pursuits. The positive effect of that change was to put stop data squarely in the context of risk management, rather than to see it as separate or independent. In that sense, potential bias was seen as a category of risk to be managed in the same way other forms of risk would be addressed.

The issues for further discussion addressed the broad topic of how the RMM process should continue to grow moving forward.  The Department has recently begun conducting Risk Management Meetings down at the local Area levels.  As Area command staff and supervisors engage in their own analysis and data-based management of risk, separate preparation for meetings should shift to focus on what steps are taken and how the Department can support the Area efforts.

It is expected that these meetings will continue to mature, for they have the potential for still more substantive contributions.  We will provide technical assistance in this area to the Department during our upcoming site visit.

## Conclusion

In the area of stop data, after over one year of preparation for the new State data collection requirements, the Department has integrated the State form with its own data collection process.  The Department has also been working to integrate stop data into the wider framework of risk management, as shown by its revised approach at its monthly Risk Management Meetings.  We look forward to providing technical assistance to the Department during our upcoming site visit and discussing this further.

In the area of PRIME, the City and its vendors are making progress on the development of the new system.

For the March 2018 officer-involved shooting, our Team observed all three days of EFRB deliberations, and reviewed the underlying investigations, including the follow-up investigation by IAD as directed by the board.  The investigations were deficient in several ways – and yet the EFRB relied almost exclusively on these investigations to make their determinations.

The incident and its aftermath speak not just to relevant Departmental policy – but transcend a multitude of Tasks that are either currently active, have recently been reactivated by the Court, or are currently inactive.  Accordingly, the developments brought about as a result of this matter have called into question the measure to which the Department fully understands its responsibilities pertaining to the relevant Tasks and the NSA in general.

*Robert S. Warshaw*

Chief (Ret.) Robert S. Warshaw
*Monitor*