1  BARBARA J. PARKER, City Attorney - SBN 069722
   MARIA BEE, Chief Assistant City Attorney – SBN 167716
2  DAVID A. PEREDA, Special Counsel – SBN 237982
   RYAN G. RICHARDSON, Special Counsel – SBN 223548
3  KIMBERLY A. BLISS, Supervising Deputy City Attorney – SBN 207857
   JAMILAH A. JEFFERSON, Senior Deputy City Attorney – SBN 219027
4  One Frank H. Ogawa Plaza, 6th Floor
   Oakland, California 94612
5  Telephone: (510) 238-7686  Fax: (510) 238-6500
   Email:jjefferson@oaklandcityattorney.org
6  R20752/2713526

7  Attorneys for Defendant CITY OF OAKLAND

8  JOHN BURRIS, STATE BAR NO. 69888
   Law Offices of John L. Burris
9  Airport Corporate Centre
   7677 Oakport Road, Ste. 1120
10 Oakland, California 94621
   Telephone: (510) 839-5200; Facsimile: (510) 839-3882

11
   JAMES B. CHANIN, STATE BAR NO. 76043
12 Law Offices of James B. Chanin
   3050 Shattuck Avenue
13 Berkeley, CA 94705
   Telephone: (510) 848-4752; Facsimile: (510) 848-5819

14
15 Attorneys for Plaintiffs

16 *(Additional Counsel on Next Page)*

17              **UNITED STATES DISTRICT COURT**

18             **NORTHERN DISTRICT OF CALIFORNIA**

19

| | |
|---|---|
| 20  DELPHINE ALLEN, et al., | Case No. C 00-4599 WHO |
| 21       Plaintiffs, | JOINT STATUS CONFERENCE STATEMENT |
| 22       v. | |
| 23  CITY OF OAKLAND, et al., | Date:     April 3 2019 |
| 24       Defendants. | Time:     3:30 p.m. |
| | Courtroom: 2 – 17th Floor |
| 25 | The Honorable William H. Orrick |

26

27

28

1   ROCKNE A. LUCIA, JR. STATE BAR NO. 109349
    Rains Lucia Stern St. Phalle & Silver, PC
2   Attorneys and Counselors at Law
    2300 Contra Costa Boulevard, Suite 500
3   Pleasant Hill, CA  94523
    Tel.:  925-609-1699
4   Fax:  925-609-1690

5   Attorneys for OAKLAND POLICE OFFICERS ASSOCIATION

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    The Parties submit this Joint Case Management Conference Statement in advance of the

2  April 3, 2019 further case management conference:[1]

3                        **I.     PLAINTIFFS' CURRENT POSITION**

4    Serious problems have arisen which have significantly set back OPD's momentum towards

5  full compliance.  At the last Case Management Conference, the flaws in the OPD's Use of Force

6  Statistics were so serious that the court reinstated three tasks as active and when audited, two of

7  these tasks, at a minimum, could prove to be out of compliance. Moreover, in the recent Sixtieth

8  Report of the Independent Monitor, the Monitor threatened to put Task 26 (Force Review Boards)

9  out of compliance due to the "apparent failure to address board deliverables in a timely fashion",

10  including, but not limited to, having one FRB report presented to the Chief on the date that the 3304

11  had run. Even worse, Task 30 (Executive Force Review Board) was found to no longer be in

12  compliance after being in compliance since 2014.

13    Task 30 reviews Executive Force Review Boards (EFRBs).  The EFRB consists of three top

14  command-level staff, who are charged with conducting thorough, detailed reviews of all Level 1

15  uses of force, which include in-custody deaths, police shootings resulting in death and/or serious

16  bodily injury, and vehicle pursuit-related deaths and serious injuries.  In three sessions ending in

17  January 2019, the OPD conducted an EFRB concerning the death of Joshua Pawlik.  This was the

18  first case that was made public under the new California Law regarding police records that took

19  effect on January 1, 2019, and the monitor's report, the EFRB Report and the Chief's decision all

20  were made public. At least one member of the Monitor Team attended all three sessions of this

21  board.  The Compliance Director overturned the Chief of Police's findings characterizing her

22  assessment as "disappointing and myopic."  He found that "neither the Executive Force Review

23  Board nor Chief Kirkpatrick adequately considered the event as a whole." Subsequently, Task 30

24  was found to be out of compliance.

25

26

27    [1] Although the Case Management Conference statement is generally not due until seven days before the
Conference, counsel for the parties had personal and professional conflicts for the week of March 25-29, and

28  accordingly agreed to file this Statement on March 22, 2019.

1    Furthermore, an "Open Letter to City Administrators" from the Oakland Black Police

2  Officers Association (OBOA) was published in an Oakland newspaper on March 13, 2019.  That

3  letter claimed that the OBOA went to Chief Kirkpatrick and accused the Background and

4  Recruiting Commander of discriminating against new and potential African American recruits in a

5  variety of ways, including applying biased standards such as rejecting qualified minority candidates

6  for very minor issues and considering candidates who had used illegal drugs more commonly used

7  by Caucasians, while automatically rejecting candidates who had used comparable illegal drugs

8  more common in the African American community.

9    Chief Kirkpatrick allegedly promised action but took none for nearly 90 days.  Finally, the

10  OBOA appealed to the City Administrator and the Mayor and the former "Unit Commander" was

11  removed from his position.

12    Plaintiffs' attorneys have not verified every detail of the OBOA letter, but are aware that the

13  Training Division Commander at the time of the OBOA complaint is no longer in charge of

14  Background and Recruiting. However, he is still in charge of the training division and still interacts

15  with Academy Recruits.  This situation appears to be highly problematic if the OBOA's charges and

16  the alleged need to involve the Mayor and City Administrator are true. If command staff and the

17  Compliance Director think this arrangement is appropriate, they need to make sure that all the

18  recruits are treated equally and the same standards are applied to all of them.

19    The reinstatement of three tasks was unprecedented as far as Plaintiffs' attorneys can

20  recollect.  The overruling of an EFRB was also unique in the history of the NSA. The Monitor's

21  decision to declare a task that was in compliance to be out of compliance, while not unique, has not

22  occurred since Task 5 was deemed to be in partial compliance (when it had been in full compliance)

23  following the "sex scandal" in 2016.

24    There is some good news. Assuming the validity of OPD Statistics on this issue, stops of

25  African Americans has decreased from 19,185 in 2017 to 10,874 in 2018, a 43% decrease in one

26  year. At the same time, crime has not increased and in fact has declined.  Plaintiffs' attorneys are

27  concerned that the proportion of African Americans stopped has not changed very much, but want

28  to credit the Oakland Police Department with significant progress in this important matter.

1    In addition, the Prime System is on schedule for the launch of Prime 2.0 this summer and

2    plaintiffs' attorneys' long stated goals of integrating body worn camera video into the prime system,

3    integrating stop data material into the prime system, and making data for the academy easier to

4    access by integrating this data into Prime all seem within reach after years of frustrating delays.

5    These very positive developments notwithstanding, the fact remains that the OPD is sliding

6    backwards on multiple fronts. These developments are extremely disappointing to plaintiffs'

7    attorneys who have worked on this case for over thirteen years.  If this negative trend is not reversed

8    in short order, plaintiffs' attorneys will have no choice but to consider additional measures such as

9    those which forced them to file the receivership motion and resulted in the creation of the

10   Compliance Director.

11   Finally, plaintiffs' attorneys note that John Burris is the civil counsel for the Pawlik family.

12   He has recused himself from any police department, monitor, plaintiffs' attorney, or compliance

13   director investigation and decision involving the Pawlik matter, except any court hearing that is

14   referenced in the December 12, 2012 Order of Judge Henderson.

15                    **A. CONSISTENCY OF DISCIPLINE STUDY**

16   There has been significant progress in designing and undertaking a study of comparing the

17   discipline given to Caucasian Oakland Police Officers with that given to Oakland Police Officers

18   who are people of color.

19   A company has been selected to do the study for a price below the maximum amount

20   allotted for this Project.   Plaintiffs' attorney John Burris has agreed to the selection of the company

21   chosen by the parties.  Even though none of the candidate companies has ever done a study of

22   police discipline issues such as the proposed study, it appears as though the chosen company is

23   capable of performing this study.

24   The City has yet to draw up a contract for this study but this appears imminent at this point.

25   The study will take 4-6 months to complete and will include members of the Academy, Field

26   Trainees, and all officers of all ranks up to and including Deputy Chief.

27

28

1    Plaintiffs' attorneys are cautiously optimistic that this study will answer many of the issues

2    around comparative discipline that have been the subject of discussion for many years.  We will

3    continue to inform the court on the progress of this important issue.

4    Additionally, plaintiffs' attorneys are concerned about issues recently raised by the Oakland

5    Black Officers Association concerning disparate treatment at the recruiting and hiring stages.  It is

6    Plaintiffs position that wherever Oakland police personnel makes decisions about who is hired and

7    retained should be included in this study.

8                                   **B.  USE OF FORCE**

9    For several years, the City of Oakland has touted decreasing use of force levels by members

10   of the Oakland Police Department.  These are cited as proof of an underlying cultural change within

11   the Department.  The IMT, in a recent report, noted that use of force data dropped 75% from 2012-

12   2017. (59th IMT Report, p. 11)  However, as noted in Plaintiffs last Case Management Conference

13   Statement, OPD use of force totals have ticked-up sharply in the last several months.  During the

14   biweekly reporting period from February 24, 2019 to March 9, 2019, OPD disclosed 61 total Uses

15   of Force.  This brings the total number of Use of Force incidents to 331 in 2019.  The year-to-date

16   Use of Force numbers through the same period in 2018 totaled 76.  This is a more-than four-fold

17   increase in the total number of use of force incidents during the first two-and-a-half months of 2019

18   vis-à-vis the same timeframe in 2018.

19   The Office of Inspector General attributes these significant increases to a command-level

20   decision to direct additional lineup training on pointing of a firearm. The most recent  update

21   submitted by the Office of the Chief of Police to the Monitor/Compliance Director states that Chief

22   Kirkpatrick "directed refresher training on the reporting of Type 22 use of force (intentionally

23   pointing a firearm at a person) in September 2018, and the number of reported uses of force has

24   increased significantly since then." (223rd Biweekly report, p. 2)

25   During the Monitor's most recent site visit in January 2019, the IMT and OPD reached the

26   joint conclusion that "OPD's policies regarding force and force reporting require adjustments to

27   more clearly indicate when force must be reported."  (59th IMT Report, p. 11)  Plaintiffs understand

28   that the IMT and OPD are in the process of modifying the appropriate policies, and look forward to

1   reviewing these policies to ensure that Use of Forces statistics are reported accurately and in

2   accordance with General Order K-4.  Nevertheless, as we have noted in the past, the very fact that

3   Use of Force incidents were systematically underreported for years speaks to supervisory

4   shortcomings throughout the Department, and indicates serious training issues that the Department

5   must address. Furthermore, at the current time, the OPD has no reliable use of force statistics that

6   can measure whether or not force is increasing or decreasing, and whether or not the use of force

7   has become a problem that needs to be seriously examined.  This serious flaw in record keeping

8   must be addressed as a very high priority.

9       Plaintiffs must also emphasize that these training and policy deficiencies related to Use of

10  Force are not limited to Type 22 (pointing of the firearm) violations. (231st Biweekly report, p. 2)

11  In the period since our most recent Case Management Conference, OPD completed an Executive

12  Force Review Board to review an officer-involved shooting incident where the subject (Joshua

13  Pawlik) was killed.  This is the third known incident where OPD officers have shot and killed an

14  armed, unconscious subject, (Joshua Pawlik, Demouria Hogg, and Maurice Esters) after waking

15  him up and observing him move and not respond to their orders when OPD members perceived

16  themselves to have inadequate cover.

17      We have been told that there are situations in which OPD officers have successfully arrested

18  unconscious and/or sleeping people who were a without injury to the arrested person or any of the

19  officers.  We would like to hear more about these situations.  In addition, there may be tactics and

20  planning in these situations which could become a model for a better policy and better training in

21  how to handle police encounters with unconscious and/or sleeping people with guns.

22      OPD Departmental General Order K-4.1 states that EFRBs shall analyze Level 1 uses of

23  force and identify whether the incident presents training opportunities, requires policy or procedure

24  revisions, and identify deficiencies related to tactics, strategies, and options pursued as events

25  unfolded.  Specifically, the EFRB is mandated to "assess and determine concluding

26  recommendations for the [Chief of Police] about the force use and performance by Department

27  members" (DGO K-4.1, p. 1) The narrative portion of the Executive Force Review Board Report

28  for the above-referenced incident did not detail how this incident presented training opportunities;

whether member could or should have made different tactical decisions that may have resolved the situation with less force, or none at all; and whether policies should be revised or created. Instead they made an extensive list of "Training Points and Deliverables" that were raised by this incident. Subsequently, deadlines were generated for the development of a policy to address sleeping, unconscious, or unresponsive armed individuals.

The EFRB's list of training and deliverables include, in part the following:

- The Training Division will develop additional training for all sworn members on handling incidents with unconscious, armed subjects,
- CID will develop and administer additional training on sequestration of members involved in level 1 use of force incidents.
- CID will look into the best practices on lethal force investigations from other departments, and will integrate any improvements into training for level 1 use of force investigators.
- IAD will ensure that all subjects that they feel should be interviewed in the course of a level 1 incident are interviewed, and will investigate circumstance if it is found that a key member was not interviewed by CID.
- The Training Division will create additional training on DATs (Designated Arrest Teams) for all sworn member, to include roles, responsibilities, contingencies, plain-English commands and communication, and supervisory responsibilities.  This training will include information and considerations regarding self-deploying into an established DAT or critical incident scene.
- The Training Division will formulate additional training for all sworn personnel on use of the Bearcat (an armored vehicle used by OPD), which will include supervisory and command consideration.
- The Special Operations Division will create procedures on the use of the Bearcat in the field, and will maintain a list of all officers trained in operating the Bearcat.
- The information technology unit will explore increasing the resolution of PDRD video, and will continue with their project to mount PDRDs to the Bearcat.

Plaintiffs' attorneys applaud the diligence with which the Oakland Police are approaching the issues identified by the Pawlik case including tactical considerations for sleeping, unconscious and unresponsive armed individuals as well as additional training on the responsibility of Designated Arrest Teams (D.A.T). However, this approach should have been undertaken long ago, since the Maurice Esters incident occurred in 2000 and was followed by at least one similar shooting death prior to the Pawlik case.  It is difficult to escape the conclusion that the Compliance

1   Director's decision to overrule the Oakland Police Department in the Pawlik case was the driving

2   force for all this activity, since there was no such action after the prior two cases.  This does not

3   reassure Plaintiffs' attorneys that the Oakland Police will show such initiative once the Monitor,

4   Compliance Director and plaintiffs' attorneys are no longer involved in the instant case.

5          Plaintiffs' attorneys will be closely watching to see if all this activity produces an

6   appropriate policy and training to deal with unconscious or sleeping individuals who possess

7   firearms. Plaintiffs look forward to reviewing these policy and training modifications when they are

8   completed.  As noted in Departmental General Order K-4.1, OPD must have a reverence for all life.

9   Plaintiffs are committed to working with the Department to ensure that the principles, tactics, and

10  strategies formulated in the aftermath of this incident accord with this universal principle without

11  negatively impacting officer and community safety.

12         The Oakland Police Department has represented that they will quickly develop a written

13  plan as directed in part by the EFRB's directive.  They have also noted that any final action on many

14  of these plans is dependent upon the approval by a number of parties including the Monitor, the

15  Plaintiffs' Attorneys, and the Police Commission.

16         Plaintiffs' Attorneys will do everything we can not to delay this process.  However, we do

17  not want another incident like this to happen while the process of getting all the stakeholders'

18  approval is going forward.  We expect an interim plan to be developed immediately. The Pawlik

19  incident was not unique.  We appreciate that our input will be considered but we do not want

20  ourselves, the Monitor, or the Police Commission to be blamed if an incident occurs in the near

21  future.  The Police Department must have a response ready for the next event like the Pawlik

22  incident even before the final policies are written and approved by all the relevant parties.

23                              **C.  STOP DATA**

24         The IMT's most recent quarterly report notes that OPD and its vendor are making progress

25  on the reconstruction of the PRIME database, and that this redesign is on schedule to be completed

26  by July 2019.  They also indicate that OPD's analysis and review of stop data "is not yet fully

27  integrated into the Department's risk management process." (59[th] IMT report, p. 8)  Until this

28  happens, OPD cannot achieve compliance with Task 41 of the NSA.

1    Plaintiffs are encouraged by the general trend in discretionary Stop Data comparison

2  statistics over recent years and months.  According to data received from OPD Office of Inspector

3  General last month, discretionary stops have been reduced across all races, including a 43%

4  reduction in African American discretionary stops, a 35% decrease in Hispanic discretionary stops,

5  and a 37% decrease in total discretionary stops between 2017 and 2018.  This downward trend is

6  also visible in the monthly stop data figures provided by OIG: In January 2018, OPD had 1,985 stop

7  data incidents involving 2,569 persons.  By December 2018, OPD reported 532 stop data incidents

8  involving 672 persons.

9    These figures are promising, and suggest that OPD is making meaningful progress on

10  reducing its policing "footprint" in the community.  Plaintiffs also note that the decrease in stop

11  data figures have not coincided with a rise in general crime statistics during the same period.  The

12  Oakland Police Department should be congratulated on the significant decline in stops of African

13  Americans and other people of color. This is a significant accomplishment that can and must be

14  sustained.

15    At the same time, the Department should reflect on the fact that a very large number of their

16  stops for many years apparently had virtually no impact on crime, and should consider how to

17  meaningfully utilize the significant amount of time now at their disposal that was formerly spent in

18  stopping individuals, mostly African American, with no corresponding decrease in crime. The OPD

19  must also consider whether the ratio of African Americans stopped, as compared to other races, can

20  be changed by further training and action that is compatible with officer safety.  Finally, the fact

21  remains that African Americans still constituted 55% of all discretionary stops in 2018.

22    Plaintiffs and the IMT remain concerned about OPD's ability to translate the stop data they

23  collect into meaningful interventions at the squad and/or officer level.  There is significant

24  information that the Department is beginning to conduct robust examinations of all stop data

25  components, including drill-down and in-depth analyses of squad or specific individual officer data,

26  to identify and address any and all indicators of disparate racial treatment.  This lies at the very heart

27  of stop data collection as a risk management tool and indicator of disparate treatment.  Officers

28  subject to intervention should be regularly reviewed in detail until their supervisors and

1    commanders are convinced they are no longer a problem.

2                              **D.  PURSUITS AND COMPLAINTS**

3          According to the most recent biweekly reporting by OPD, there have been 17 pursuit

4    incidents as of March 9, 2019.  There were 15 vehicle pursuit-related incidents during the same

5    timeframe in 2018.

6          This data does not paint a full picture of the dramatic rise in OPD pursuit incidents in recent

7    years.  According to data presented at a March 18, 2019 Citywide Risk Management Meeting, there

8    were 59 vehicle pursuits in 2016, 60 vehicle pursuits in 2017, and 105 vehicle pursuits in 2018.

9    Therefore, OPD has currently increased its total number of vehicle pursuits approximately 75%

10   over its 2016 and/or 2017 rates.

11         Pursuits are only part of the problem raised by the alarming number of traffic accidents

12   involving Oakland Police.  In fact, many of the most serious accidents have occurred when officers

13   are engaged in Code 3 responses.  These accidents compound the emergency that led to the Code 3

14   and causes additional problems for the OPD at the very moment they are responding to another

15   crisis.

16         It is clear that vehicle pursuits and accidents while responding Code 3 are major risk

17   management concern for the City and the Department.  Since 2015, the Oakland City Council has

18   authorized $15 million to settle 18 lawsuits brought against the Oakland Police Department for

19   automobile accidents, including vehicle pursuits.

20   (https://www.eastbayexpress.com/SevenDays/archives/2018/06/19/city-of-oakland-to-pay-12-

21   million-to-motorcyclist-hit-by-police-car)

22         One of plaintiffs' attorneys was recently told by members of the Oakland Police Department

23   that pursuits and Code 3 responses have increased due to the advances in the "information age",

24   which allow officers to more quickly respond to major crimes and other situations, including

25   emergencies.  At the same time, the amount of training for Code 3 responses, pursuits, and related

26   driving, has not increased correspondingly.  Plaintiffs' attorneys are not fully convinced that such

27   responses are necessary in all cases.  We need have to have more discussion as to what situations,

28   due to developments in the "information age", require additional pursuits and Code 3 responses.  In

addition, plaintiffs' attorneys need to see requisite additional training to compensate for the significant risk management problems associated with the increase in pursuits and Code 3 responses.  Finally, if there is no adequate explanation for the dramatic rise in pursuits and Code 3 responses, perhaps a revision of the pursuit policy and some limitation on Code 3 responses is in order.

To that end, plaintiffs' attorneys recently suggested that Field Training Officers and instructors in the Academy have the power to order young officers who present traffic risks to attend additional driving classes which have both simulated emergencies and actual driving scenarios. Currently, this additional training is given only after the officer is involved in one or more accidents.  Allowing Field Training Officers and Academy Instructors to order this training before the accidents happen would address a serious risk management problem.

Plaintiffs' attorneys have previously noted that while OPD policy regarding foot pursuits allows officers to break off a foot pursuit without any disciplinary consequences, no comparable provision exists in OPD General Order J-4, Pursuit Driving.  We have recommended that an officer who breaks off a vehicle pursuit will never receive discipline for that decision, and that this directive be codified in DGO J-4.

In fact, prior to the revision of Department General Order J-04 in August 2014, there was a provision that "any officer or monitoring supervisor/commander shall neither be criticized nor disciplined for terminating a pursuit".  Somehow, this language was removed from the policy when General Order J-04 was revised in August, 2014.

On December 28, 2018, Chief Kirkpatrick published a special order that reinstated the above directive.  The pursuit policy is undergoing further revision, and Plaintiffs' Attorneys look forward to reviewing the final product when it is done.

Complaints against the Oakland Police Department have steadily risen since 2015.  After a slight decline from 2014 (See 121st and 148th Biweekly Reports), complaints near the end of 2016 were over 15% higher than 2015. (See 148th and 174th Biweekly Reports).  In 2017, complaints again rose over 6% (See 200th and 174th Biweekly Reports).  In 2018, complaints rose another 10%

1  (See 226th and 200th Biweekly Reports).  Complaints in 2018 are over 30% higher than 2015 and the

2  number of complaints has risen every year since 2015.

3       The relentless rise in pursuits and complaints is cause for serious concern.  Yet there has

4  been no study from the OPD as to why this has occurred.  Our entry into the so-called "information

5  age" is not an explanation for the rise of complaints.  There may well be a need for further reform in

6  both officers' conduct towards the public and the pursuit policy.  A resolution to this ambiguity is

7  essential to the compliance effort.

8                              **CONCLUSION**

9       Despite the very promising figures on stops of African American and Latinos and the

10  progress on PRIME, the OPD is moving backwards on a variety of other issues.  Three tasks have

11  been reinstated and one additional task has just been deemed out of compliance.  Pursuits and

12  complaints have shown dramatic increases.  The Compliance Director has overruled an EFRB on a

13  death case for the first time in the history of the Negotiated Settlement Agreement. Use of force

14  statistics have been revealed to be problematic, if not useless. The Oakland Black Officers

15  Association published an open letter in a local newspaper which raises serious concerns about

16  hiring and recruiting issues.

17       Plaintiffs' attorneys do not expect perfection from the Oakland Police Department. The real

18  measure of compliance is not perfection, but how the OPD responds to its mistakes.  We need to see

19  that the OPD can learn and correct its mistake without the intervention of the Court, the

20  Monitor/Compliance Director, and the Plaintiffs' Attorneys.  Thus far, the OPD's record in this

21  regard is mixed.  The next six months will be a decisive test of how much longer the Negotiated

22  Settlement Agreement will need to continue.

23                         **II.       CITY OF OAKLAND**

24       This Case Management Conference Statement will focus on the four Negotiated Settlement

25  Agreement (NSA) tasks that are out of compliance or in partial compliance, including:

26            • Task 5 (Internal Affairs Division (IAD) Complaint Procedures) – out of compliance

27            • Task 30 (Executive Force Review Board) – out of compliance

28            • Task 34 (Stop Data), including updates on the Department's monthly Risk

1   Management Meetings (RMMs), implementation of Stanford's 50 recommendations,

2   and crime and use-of-force rates – out of compliance

3   • Task 45 (Consistency of Discipline), including a report on the upcoming study to

4   determine whether racial or gender disparities exist in the Department's

5   administrative investigation and discipline process – in partial compliance

6   In addition, the City provides updates on the following projects and issues:

7   • The Department's upcoming Discipline Disparity Study

8   • The implementation of PRIME (now called VISION)

9   • Data showing an increase in IAD Complaints over the past several years

10   • The Department's efforts to recruit and hire women

11   The City looks forward to discussing all of these issues in more depth at the upcoming Case

12   Management Conference.  To that end, knowledgeable OPD commanders responsible for each of

13   the above tasks and projects will be present to provide further information to the Court and answer

14   any questions the Court may have about the Department's commitment to sustainable reform and

15   the goals of the NSA.

16   **A.     Task 5 (Complaint Procedures)**

17   The Monitor last examined Task 5 in the Fifty-Sixth (Doc. No. 1213, filed September 13,

18   2018) and Fifty-Eighth (Doc. No. 1224, filed November 28, 2018) Reports.  In both reports, the

19   Monitor noted that OPD remains in compliance with many of the Task 5 subtasks, and not all are

20   actively being monitored.  Nonetheless, the City remains "not in compliance with task 5 based on

21   the provisions of the March 23, 2016 Court Order."  That Order noted irregularities in the

22   Department's IAD investigation of the sexual misconduct scandal, Case No. 15-0771, and

23   authorized the Compliance Director to use his authority to ensure that the case was properly and

24   timely investigated and that "all appropriate follow-up actions are taken." As noted in the last CMC

25   statement, the City has implemented <u>all</u> of the Court Investigator's recommendations related to

26   Task 5 subtasks.

27   Additionally, since July 2018, the Monitor's reviews of Task 5 have been almost universally

28   positive.  Most of the subtasks reviewed were specifically found to be "in compliance."  And the

Monitor's review of arguably the most important Task 5 subtasks – *i.e.*, those related to the quality of investigations (5.15-5.19 and 5.21) – shows substantial compliance and sustainable practices:

| Subtask | 56th Report | 58th Report |
|---|---|---|
| 5.15 and 5.16 | The Department gathered all relevant evidence and conducted appropriate follow up interviews, but the IMT disagreed with the assessment of the evidence in one (out of 15) cases | The Department gathered all relevant evidence, conducted appropriate interviews and properly assessed the evidence in all 18 cases |
| 5.17 | "OPD has a sustained history of 100% compliance with this task" | "OPD has a sustained history of 100% compliance with this task" |
| 5.18 and 5.19 | The IMT disagreed with findings in one case, out of a total of 15 cases reviewed | "We did not disagree with the findings in any of the [18] cases we reviewed."[2] |
| 5.20 | Not actively assessing this subtask | Noting an increase in DLI cases that exceeded the 180-day deadline, but noting that OPD has taken steps to remedy the situation |
| 5.21 | Approving all of the Department's administrative closures in the sample | Approving all of the Department's administrative closures in the sample |

The City believes this shows consistent and sustained improvement with respect to Task 5.

_____

[2] The Department recognizes that after the Fifty-Eighth Report the Compliance Director disagreed with—and used his authority to overrule—the Department's findings in a Class 1 case, which will be discussed in more detail below. Even with that disagreement, the IMT has collectively assessed the findings in 34 cases in the past six months and disagreed with the findings in only 2 cases (5.9 percent).

1    Given the full implementation of the Swanson recommendations and these reviews of Task 5, the

2    City respectfully seeks a clear compliance standard and specific guidance from the Compliance

3    Director and the Court with respect to what additional steps are necessary to come into compliance

4    with Task 5.

5          **B.      Task 30:  Executive Force Review Board (EFRB)**

6          Just three days ago, the IMT found that the Department is no longer in compliance with

7    Task 30 as a result of the EFRB that was conducted regarding the officer-involved-shooting ("OIS")

8    that resulted in the death of Joshua Pawlik (Mr. Pawlik).

9          Given recent changes in state law (SB 1421), the investigation and discipline documents

10   related to the Pawlik OIS are public records, and the Department has begun to redact and release

11   them pursuant to the California Public Records Act.  Thus, it is public knowledge that the Chief and

12   the Compliance Director reached different conclusions regarding the findings in the Pawlik case.

13   Indeed, the City has produced, and consistent with its procedures, publicly posted the EFRB report,

14   the Chief's Addendum thereto and the Compliance Director's Addendum.[3]

15         The Department disagrees with the IMT's finding that the EFRB review in this case was

16   inadequate and should result in an "out of compliance" finding for this task.  The EFRB took place

17   over three days and was consistent with DGO K-4.1.  It involved extensive questioning of the IAD

18   and CID investigators, as well as subject matter experts on the Department's training regarding

19   critical incident tactics, supervision and the use of deadly force.  After sending IA investigators

20   back to do additional investigation and analysis, the Board engaged in its own analysis of whether

21   the force involved was in compliance with the law (*Graham v. Connor*) and policy.  The Board also

22   spent significant time examining issues of tactics and supervision to determine not only whether the

23   officers and supervisors complied with policy and training, but whether they could have used

24   different tactics that might have averted the need for deadly force.  As a result of the EFRB, the

25

26        [3] Under SB 1421, all investigatory materials and discipline proceedings (including EFRB reports) in Level 1 use of
force incidents and in-custody deaths will be publicly released under the California Public Records Act.  SB 1421 thus
27   will provide ongoing transparency and opportunity for the public to scrutinize the Department's investigations,
procedures and findings both while the Court continues to provide oversight and after the Department achieves full
28   compliance and is no longer under federal monitoring.

1   Board issued a detailed 45-page report that discussed its deliberations and findings.

2          Moreover, the Department has had five years of sustained compliance with EFRBs.  During

3   the last five years, the Department has conducted 17 EFRBs—all of which were found to be in

4   compliance with the NSA and Department policy, often with IMT comments about their

5   "thoroughness" and appropriate findings.  It is unrealistic to believe that the Department and the

6   Monitor will always agree on EFRB findings, or that complete agreement in all cases should be the

7   compliance standard.

8          Ultimately, the disagreement about the EFRB review of Mr. Pawlik's death and the ERFB's

9   findings puts the City in a very awkward position.  This case is not the place to litigate which

10  findings—the Chief's or the Compliance Director's—are "right."  To begin with, doing so could

11  improperly influence the City's ongoing investigation and discipline process, and potentially

12  undermine the City's ability to uphold any discipline imposed that may be challenged through the

13  grievance process.[4]  Moreover, whether or not the officers' actions were consistent with law and

14  policy may also ultimately be decided by the Judge or jury in the federal civil rights case filed by the

15  Pawlik family (who is represented by Plaintiffs' counsel, Mr. Burris) against the officers involved

16  in the incident.

17         Accordingly, the focus here should be on the following goals, which the City believes are

18  universally shared by the Department, the Police Commission, Plaintiffs' counsel, the IMT:

19         **First**, ensuring that the Department's training, tactics and supervision related to critical

20  incidents—particularly when officers are presented with sleeping, unconscious or unresponsive

21  individuals with a firearm—constitute best practices.  The Department's goal is always to preserve

22  the sanctity of life.  To that end, the Chief has already ordered a team of Department trainers and

23  subject matter experts (SMEs) to engage other agencies and review their policies, procedures and

24  training for critical incidents that involve sleeping, unconscious or unresponsive armed individuals.

25

26  [4] Although the Compliance Director overturned the Department's findings, the City's independent Community
    Police Review Agency has not yet completed its investigation or rendered its findings.  Pursuant to the City Charter, if
    the CPRA findings match the Department's findings (or, in this case, the Compliance Director's findings) then those
27  become the final City findings and discipline (subject to the grievance process in the OPOA MOU).  If, however, the
    CPRA disagrees with the Department's findings, then a discipline panel comprised of three Police Commissioners will
28  review both the Department and CPRA investigations and findings and render final findings and discipline.

Based on their research, this group will be tasked with outlining tactical considerations and strategies for safely mitigating these high-risk incidents.  They will also develop additional reality-based scenario training and classroom training.  The Department will partner with the Police Commission in developing final policy and training, and, as always, it will be shared with the IMT and Plaintiff's counsel.

**Second,** ensuring that the Department's Level 1 investigations follow best practices. Accordingly, the Chief has ordered a team of CID and IA commanders to jointly explore improvements to the Department's investigations of Level 1 use of force, including the potential development of a Force Investigations Team and policy.

**Third,** examining the Department's EFRB process for potential improvements that will continue to ensure a thorough process that focuses not just on appropriate findings, but that also provides a comprehensive review of policy, training and tactics with the goal of minimizing force while still ensuring officer and public safety.  Accordingly, a final group of commanders will examine and develop proposals for improving the EFRB process, including the possibility of incorporating additional voting or non-voting board members from outside of the Department.

**Finally**, as the Department continues to improve its Level 1 force investigation and review processes, the City also seeks an honest conversation and guidance regarding what is necessary to achieve compliance with this Task.  Currently, because of the Department's training in de-escalation and its reduction of Level 1 uses of force, there are no open Level 1 investigations (which include Level 1 uses of force, in-custody deaths and pursuits that result in a death), meaning the Department will not be conducting another EFRB for at least the next 10-12 months, and hopefully longer.

### C.     Task 34: Stop Data

#### 1.     The Department Leads California Law Enforcement Agencies in the Collection and Analysis of Stop Data

In the last few Case Management Conference Statements, the Department has recounted many of the City's industry-leading stop data achievements.  Those include, but are not limited to: the collection of more and better stop data than any other law enforcement agency in California; the

1  publication of Departmental stop data for review and study by third parties (including academic

2  researchers); the analysis of stop data to inform the Department's crime reduction strategies and

3  stops (intelligence-led and precision-based); and, an industry-leading requirement that officers use

4  body-worn cameras to record discretionary stops.

5      As noted in the last CMC statement, the Department completed revision of its stop data

6  forms for purposes of complying with AB 953 (the Racial Identity and Profiling Act of 2015),

7  which requires the Department to collect certain state-mandated categories of stop data starting on

8  January 1, 2019, and report its data to the state no later than April 1, 2020.  The Department's new

9  stop data forms not only collect the state-mandated data, but also a larger set of stop data categories

10  necessary to continue the Department's more robust stop data analysis and RMM efforts.  Officers

11  were trained on the new forms in December 2018.  The new forms were implemeted on December

12  20, 2018 in order to make sure that officers were proficient with the new forms by the January 1,

13  2019 deadline.

14          **2.      The Department Continues To Use Data To Reduce Its**
              **"Footprint" On the Community And Examine Outlier Squads**
15          **And Officers**

16      The Department's analysis of stop data during its monthly Risk Management Meetings

17  seeks to:  1) identify policies and practices which adversely impact communities of color (in

18  particular African-Americans) in order to reduce the Department's "footprint" on these traditionally

19  over-policed communities; and 2) identify and examine "outlier" squads and officers to determine

20  whether their actions are consistent with constitutional policing and Department directives, or are

21  instead indicate potential bias and/or disparate treatment.[5]

22          **a.      Severe Reductions In the Overall Number of Stops**

23      The Department's focus on intelligence-led policing continues to bring significant and

24  positive results.  The Department's percentage of "intelligence-led" stops is still increasing.  At the

25  same time, the Department continues to reduce its overall number of stops (particularly

26

27      [5] The Monitor has also recognized the Department's "integration of its stop data into the wider framework of risk management", which includes analysis of officer, squad, area and Department-wide data on complaints and discipline, uses of force, and pursuits and collisions, as well as a review of officers on intervention and supervisory monitoring.

28

discretionary stops), thus reducing the Department's impact on the community.

As the IMT recognizes, the "overall levels of stops" is a "key factor" for understanding stop data. (Sixtieth Report of the Independent Monitor for the Oakland Police Department ["Sixtieth Report"], Doc. No. 1238 at 7.)  Attached hereto as Exhibit A is a chart entitled "Oakland Police Department Discretionary Stops By Race:  2014-2018," which shows the overall number of discretionary stops by race for each of the last four years.  Total stops in 2014-2017 averaged over 30,000 per year.  After the implementation and training on intelligence-led policing, the Department reduced its stops by **37 percent** in 2018 for a total of 19,900 stops.[6]  The overall number of stops in every category of race (African American, Asian, Hispanic, White and Others) are down, but the drop for African-Americans is particularly substantial—from **19,185** in 2017, to **10,874** in 2018—a 43% reduction.  These statistics reinforce those presented at the last CMC for the first nine (9) months of 2018, and show that the Department's focus and training on intelligence-led policing represents a significant cultural shift in the Department's approach to patrol policing.  The Department is committed to sustaining these changes in the long-term.[7]

The Department's changes in policy and policing strategies have also had a small effect on racial disparities in the data—*i.e.*, the percentage of stops attributable to each racial group. Attached hereto as Exhibit B is a chart entitled "Discretionary Stops by Race:  2014-2018", which illustrates a six percent reduction in disparity related to African-Americans from 2017 to 2018.

As the IMT has noted, the Department is not unusual or atypical with respect to racial disparity:  "Research elsewhere has shown that the highest volume of stops by police involves African Americans – and that is also true in Oakland."  (Sixtieth Report, Doc. No. 1238 at p. 7.) While numerous articles and research establish that racial disparities exist in policing across the

---

[6] As noted on the chart, because of the implementation of new stop data forms on December 20, 2018, to comply with the state's new stop data requirements (AB 953), the data for 2018 includes stops through December 19, 2018. Even if one were to project a small adjustment for the last twelve days of the year based on a daily average of stops (54.5) over the course of the year, the final number (20,554) would still represent a massive reduction in overall stops. Moreover, the number is likely to be lower given that the last two weeks of the year—which involve the holidays—generally have lower numbers of stops per day.

[7] The City's final crime statistics for 2018 also continue to show that the severe reduction in stops attributable to intelligence-led policing has not come as a result of de-policing or at the cost of the Department's core mission: preventing and reducing crime.  (*See* Exhibit H.)

1   country, there is little to no research—and certainly no established "best practices"—on how to

2   actually reduce racial disparities in stop data.

3          To date, the Department's collection and analysis of stop data and work with outside

4   researchers has led to, *inter alia,* changes in its policing strategies (including the introduction of

5   intelligence-led policing and reduction of traffic citations for mechanical issues, which disparately

6   impact lower income and minority communities), changes in the Department's handcuffing policy

7   to address disparity in its handcuffing rates, a proposed probation and parole policy which includes

8   first-in-California restrictions on probation and parole searches of non-violent offenders (to address

9   disparity in searches), and Department-wide implicit bias training.   OPD is hopeful that these

10  changes (most of which took place over the last one to two years), are in fact having some effect on

11  racial disparities.

12         Ultimately, however, it is the Department's *process* of collecting and analyzing stop data to

13  identify and address racial disparities—as well as its willingess to collaborate with outside

14  researchers and academics—that represents industry-leading best practices.

15         **b.    The Identification and Analysis of Outlier Squads and Officers or**
               **"Drilling Down"**

16

17         The Department also continues to perfect its drill-down and in-depth analyses of squad and

    individual officer data to ascertain the basis for any identified disparate treatment.  In prior IMT

18  reports this had been an issue on which the IMT has openly criticized the Department.  During the

19  last two RMM meetings, however, the IMT has expressed approval of the Department's drill down

20  processes.  Continued criticism of the Department's drill down process is noticeably absent from

21  the Sixtieth Report.[8]  Indeed, the Monitor's report positively noted the Department's "extensive

22  review of 'deliverables'" provided to Area Commanders from the previous RMM, which often

23  includes deep dives into the data for outlier officers and squads.  (Sixtieth Report, Doc. No. 1238 at

24  pg. 6.)

25

    _____

26         [8] Last fall—when the issue of drilling down was a focus of the IMT's Task 34 criticism—the IMT informed the
    Department that its members would lead a RMM meeting.  Recently, the IMT decided to instead hold a RMM
27  "technical assistance" meeting, which took place during the March 2019 site visit.  That meeting did not offer criticism
    or improvement of the drill down process, but instead offered statistical instruction and commentary on how the
    Department should appropriately categorize, chart, and examine trends in stop data over time.

28

The Department has previously described the process of examining stop data for squads and officers whose data is not in line with the Department's expectations or deviates from the norm, including an extensive review of their stop data narratives and body camera footage.  Area commanders are then specifically and purposefully questioned regarding their review and conclusions during RMMs.  In order to institutionalize this process and ensure that all OPD members (including Sergeants and Officers) understand the RMM process and its goals, the Department has begun holding additional RMM meetings at the Area level.  That is, in each patrol area and the Ceasefire unit, Captains are meeting with their area Lieutenants and Sergeants to analyze and address the data in the same manner that the Executive Commanders do with Area Captains at the monthly Risk Management meetings.  The Department is hopeful that this process will result in an understanding and appreciation of the RMM management process at all levels of the Department.

### 3.    Status of Implementation of the Stanford "50 Recommendations"

The Department continues its work implementing the remaining Stanford 50 recommendations.  As part of this process, the Department also continues to provide monthly updates on the implementation to the IMT, Plaintiff's counsel and Dr. Eberhardt.

The current version of the Stanford Recommendations tracking sheet is attached hereto as Exhibit C, and includes anticipated completion dates for those recommendations that are still "in progress."[9]  The Department has now completed **42** of the Stanford recommendations.  The status of the remaining eight recommendations follows:

**Leverage Body-Worn Camera (BWC) Footage**

| 11 | **Invest in the development of a BWC early warning system** |
|---|---|
|  | As part of VISION (formerly "PRIME 2.0"), the Department will be integrating body worn camera footage to allow supervisors and commanders to immediately review stops, arrests and uses of force.  As described further below, automatic links between the Department's body worn camera system and VISION have proven technically |

---

[9] Before marking a recommendation as "implemented", the Department discusses the recommendation and the Department's response with Dr. Eberhardt and receives her agreement that implementation has been achieved.

| | |
|---|---|
| | impossible.  Accordingly, the Department is developing the capability to allow officers to manually link body worn camera footage to incident reports in VISION.  The Department anticipates this recommendation to be completed along with the implementation of PRIME 2.0 in July 2019. |
| 12 | **Build a stop data dashboard** <br><br> This recommendation will also be implemented as part of the development of VISION. As described further below, this workstream was temporarily paused due to the need for additional data elements, but has resumed.  Draft stop data dashboards have all been reviewed and agreed upon.  After full development, final versions of the dashboards will be reviewed beginning April 1, 2019, and fully implemented in VISION in July 2019. |

**Collaborate with Data Partners**

| | |
|---|---|
| 17 | **Hire a data manager** <br><br> The City has completed the job announcement and supplemental questions for this position, which have been shared with and approved by the IMT. <br><br> The City anticipates screening of applicants, interviews and hiring to be completed by the end of June 2019.  Job duties will include ensuring that OPD uses available data to better inform risk management efforts, including conducting statistical analyses of all OPD personnel to determine outliers for risk assessments.  The individual in this position will also work directly with OPD managers and supervisors to ensure that there is a clear understanding of the data available for managing risk and providing high-level policy and personnel recommendations to the Chief for purposes of risk management. Additional responsibilities will include working with developers to ensure the Department's risk management data is accurate and developing new systems to support risk management efforts. |

**Improve Feedback Channels**

| | |
|---|---|
| 23 | **Conduct customer-service audits after routine stops (Stanford)** <br><br> This recommendation was for an independent entity—such as a research team—to |

| | |
|---|---|
| | contact community members who have recently undergone a police stop and ask about their experience.  The Department has elected to have Stanford conduct these interviews.  The City expects this to be completed by June 2019. |
| 24 | **Regularly administer community surveys**<br><br>The City has selected a surveyor following a formal Request for Proposal process.  OPD's worked with the Mayor/City Administration and the vendor to finalize the scope and survey design, and is in the process of obtaining input on the survey scope from other stakeholders and community groups.  The City hopes to roll the completed survey out in April of 2019, and have survey results by the end of May 2019. |

**Train Officers in Social Tactics**

| | |
|---|---|
| 25 | **Make Trainings Shorter and More Frequent**<br><br>The Department's training division is currently developing scenario-based classes designed to improve police-community relations that range from 2-4 hours in length, and which will be offered more frequently.  A few of the other opportunities that have been or will be offered include, but are not limited to:<br><br>• Sworn personnel have been offered training opportunities through Citywide Training, including the "Advancing Racial Equality Academy – 4 modules."<br><br>• All sworn members received a second round of Procedural Justice Training before the end of November 2018.<br><br>• Working with Equal Justice USA to provide short, intimate training sessions on Trauma-Informed Policing through the International Association of Chiefs of Police Collective Healing Initiative (December 2018).<br><br>• Increase use of line-ups for regular, brief trainings on a monthly or bi-monthly basis.  Topics could include updates on relevant policy changes and curated videos that showcase relevant community events and information.<br><br>The Department hopes to have full implementation of this recommendation no later than May 2019. |

| 28 | **Incentivize training-in-action workshops**<br><br>The Department is working on developing both internal and external opportunities for officers to receive continued training, particularly on social tactics.  Officers who attend outside, non-mandatory trainings already receive positive supervisory notes in their personnel files.  The Department is also exploring other incentives, including Departmental recognition for those officers who exceed expectations with respect to their procedural justice performance. |
|---|---|
| | **Enhance Risk Management** |
| 49 | **Produce and publish an annual Racial Impact Report**<br>This report is in its final review stages with the City Administration, and the Department anticipates publishing the report in Spring 2019. |

The Department looks forward to updating the Court on its continued progress on the remaining Stanford Recommendations at the next Case Management Conference.

### D.      Task 45:  Consistency of Discipline

The Monitor's January 2019 Report (Doc. 1229) again assessed and approved several subtasks related to Task 45, including:

- The Department's maintenance of a centralized system for documenting and tracking discipline and corrective action, with 100% compliance

- The Department's appropriate application of its Discipline Matrix (adopted in March 2014) to all 18 of the cases with sustained findings that were approved between August 1 and September 30, 2018

- The Department's conduct of two *Skelly* hearings in September and October 2018, resulting in Skelly reports that "contained adequate justification for the results documented"

- The Department's adequate training of all current commanders and *Skelly* hearing officers

As discussed in the City's last CMC statement, the City completed implementation

1   of all of the Swanson Recommendations related to the sexual misconduct scandal last fall,

2   including those recommendations related to the investigation of misconduct and imposition

3   of discipline.  Nonetheless, the Fifty-Ninth Report finds that the Department remains in

4   "partial compliance" with Task 45.  It is unclear, however, what the basis is for the finding

5   of "partial compliance."  Accordingly, the City respectfully requests specific guidance from

6   the IMT or the Court on what additional steps, if any, are necessary to achieve full

7   compliance with this task.

8          **E.     The Discipline Disparity Study**

9          Although the parties still disagree on whether a study to determine if racial and gender bias

10  exists in the Department's administrative discipline process is a Task 45 issue that must be

11  completed before the City can be found in full compliance with the NSA, they nonetheless continue

12  to work cooperatively to complete such a study.

13         Since the last CMC, the City issued a Request for Proposals ("RFP") for a "Discipline

14  Disparity Study" that will be based on five years of data (2014-2018), and examine the

15  administrative investigation and discipline of sworn personnel and academy police officer trainees

16  in the Academy.  The Department received several quality proposals from very capable and

17  reputable consulting firms with investigative, statistical and law enforcement experience.  The City

18  invited Plaintiff's counsel, Mr. Burris, to participate in the review and selection of the vendor.[10]

19  The panel selected a vendor, and the contract is being finalized.  The vendor's scope of work has

20  been finalized and shared with the IMT, Plaintiff's counsel and the OPOA (and a copy of which is

21  attached hereto as Exhibit D).

22         The Department will continue to work with the other parties on this project and keep the

23  IMT and the Court informed of progress.

24         **F.     Development of VISION (formerly "PRIME 2.0")**

25         The City has renamed the anticipated PRIME 2.0 system "VISION."   Development of

26  VISION continues to make good progress towards project completion in July 2019.

27  _____

   [10] The Department also invited other stakeholders to participate in the process, including the City's Director of
28  Race and Equity programs and the OPOA.

Since the last reporting period the project has encountered a few minor delays due to "unknowns" typical of projects of this size and complexity.  In VISION's case, the major unanticipated delay was related to desired data elements that were missing from the Risk Management/Analytics component of the project.  The City noted this possibility of schedule slippage in the last CMC statement.  All missing data elements have been identified, a Change Request (CR) executed with the vendor, and the elements have been created and loaded into the data warehouse.  During the period of implementing the CR, the Risk Management project stream was halted because proceeding without the necessary data elements would have been an inefficient use of resources.  Due to this and a number of other smaller issues, the overall project is approximately 3 weeks behind the original schedule.  The original schedule, however, included an 8-week buffer in anticipation of the discovery of additional development tasks over the life of the project.

As a reminder, VISION consists of five separate workstreams.  Attached hereto as Exhibit E is a chart showing the schedule for the implementation of each workstream, and following is a summary of the City's progress in each of the five areas:

1)      **A new personnel database to track employee and supervisor assignments that is easier to use and integrates with other PRIME functions.**  The City's ITD completed development of this system, now referred to as "OPD HRM", in July 2018 and moved the system into full production in August 2018.

2)      **PRIME+ reengineering of PRIME 1.0 – operational data collection and reporting.**  This project stream is currently in the Development/Implementation phase and is now projected to have a completion date of June 2019.  The completion date has been adjusted due to implementation of the aforementioned CR and a number of less significant task delays.  Of the 10 modules that comprise this operational application, successful demos of three modules have been completed and demos of the remaining seven modules are scheduled during the next six weeks with target completion of May 1, 2019.

3)      **Ability to access an officers' complete training history.**  The City contracted with

LEFTA Corporation to develop a new Academy Training Module and to migrate OPD's existing training data from TMS and Power DMS into LEFTA's METR field training applications. Both of these tasks have been completed in addition to a Change Request to implement an application program interface (API) to allow for periodic extraction of the data for loading into the VISION data warehouse. Implementation of the METR to "go live" is currently underway with completion expected by the end of March 2019.

4) **Risk Management analytical reporting (being developed in collaboration with Stanford) and dashboards that assist in automatic analysis of stop data and other early-warning indicators.** As described above, this workstream was paused due to the need for additional data elements. All data elements have been resolved and the workstream has since resumed. At the time of the last CMC, the City and vendor (Slalom) were sharing the draft Dashboards with the IMT, Stanford and Mr. Chanin for review and comment. The dashboards have all been reviewed and agreed upon and are being implemented. The updated schedule calls for completion and demo of 2-3 dashboards every two weeks beginning April 1, 2019. Validation of data is also underway.

5) **Integration of body worn camera (BWC) footage into PRIME to allow immediate review of stops, arrests and uses of force.** The Department is committed to having video footage automatically linked to Incident Reports in the VISION system. As noted in the last CMC statement, however, the City anticipated possible technical difficulties with such links being automatically created. Discussions with the BWC vendor VieVu concerning development of an application programming interface (API) to access the video footage have indeed proven disappointing. At this time, it appears inclusion of automatically created video links may not be technically possible. Accordingly, the Department is pursuing the ability for officers to manually insert links of relevant footage into a Case/Incident report.

1    The City remains confident in final implementation of VISION in July 2019.

2        **G.     Force Reporting**

3        At the last CMC, given concerns with the potential underreporting of force, the Court

4    reactivated Tasks 24 (Use of Force Reporting Policy) and 25 (Use of Force Investigation and Report

5    Responsibilities).  During the last site visit, the Department had a productive meeting with the

6    Monitoring Team regarding Use of Force cases currently under review, and the City understands

7    that the Monitor's assessments of those tasks will be included in the next IMT report.[11]   The

8    Department welcomes this review and looks forward to establishing its ongoing and sustainable

9    compliance with these tasks.

10        In the meantime, the City wants to bring the Court up to speed on progress made since filing

11    its February 1, 2019 Status Report on Use of Force Audits.  That filing included the Office of

12    Inspector General's completed audit on the drop of Level 4 Intentional Pointing of a Firearm ("the

13    Firearm Audit") and the Command's response to OIG's audit findings.  (*See* Doc No. 1231.)  The

14    Status Report also discussed the OIG's review of all documentation and PDRD footage in all 14 of

15    the cases the Monitor flagged during its initial review of use of force cases (the "Use of Force

16    Review").

17        The Firearm Audit and Use of Force Review did reveal concerns with underreporting,

18    primarily caused by policy issues, but also involving training and supervisory failures.  As a result,

19    the Department referred several officers and supervisors for Internal Affairs Investigations and

20    possible disciplinary action.  Additionally, the Department's responses to the concerns identified in

21    the Firearm Audit and Use of Force Review are three-fold:

22        **First**, in order to address the supervisory failures, the Chief immediately issued a Special

23    Order requiring all Sergeants to review the PDRD of arrests made pursuant to California Penal

24    Code sections 69 (Obstructing or resisting executive officer in performance of duties), 148

25    (Resisting, delaying or obstructing) and 243(b) & (c) (battery on a peace officer).  These types of

26

27        [11] During this meeting, the IMT again reported that they had no concerns with the appropriateness of the force used,
but were instead reviewing whether reporting and supervisory review/investigation of the force was consistent with
28    Department policy.

arrests generally involve physically resistant subjects and are therefore more likely to involve an officer using force.  Accordingly, the Chief's Special Order requires Sergeants to view the video from the beginning of the incident through the arrest and document/annotate their review of the PDRD footage in OPD's PDRD software system.

**Second**, the Department is working to rewrite its Use of Force policies to address the policy issues raised by the Firearm Audit and Use of Force Review.  After numerous internal meetings with Command staff, Research and Planning and the Office of Inspector General (which conducted the audit), the Department has come up with multiple potential changes to DGO K-3 and K-4 to address problems of interpretation and reporting.  These changes are meant to ensure the collection of data any time officers are using force during a detention or arrest, as well as the appropriate supervisory review and investigation of force.  The Department's proposed changes currently include, but are not limited to:

- Removing the word "intentional" from language regarding the pointing of firearm at a person[12]
- Redefining "takedown" to a broader definition that captures all instances of officers using physical force to cause a person to go to the ground not under their own control
- Re-categorizing multiple types of force for reporting purposes to streamline and ensure accurate reporting
- Adding a new type of reported force to capture all instances where officers use any physical force to overcome resistance during an arrest or detention or defend themselves or others against combative action

In order to implement these—and potentially additional—changes, the Department has held two meetings with Plaintiffs' counsel (Mr. Chanin) and a member of the Police Commission to discuss

---

[12] By way of reminder, when it first became clear last fall that there was confusion regarding the meaning of "intentional pointing" of a firearm, the Chief issued a directive to the Training Division to provide immediate re-training to all patrol officers that a reportable pointing of a firearm exists when the weapon is pointed at any part of the body (including the lower extremities) versus low-ready (where the firearm is pointed at a 45-degree angle or less and not at a person).  After the completion of the training, the Department saw an immediate and marked increase in reportable Level 4 uses of force.  Reported Level 4 uses of force remain high in January and February 2019 (151 and 123, respectively).  Accordingly, although the Use of Force policy has not yet "officially" changed, it appears that officers have respondeed to the training and embraced the broader definition for purposes of reporting.

these proposed changes, and kept the IMT informed about its progress and intent.[13]  While the Department understands the urgency associated with making the necessary fixes to ensure accurate reporting of force, it also clear that the Department needs to address DGO K-3 and K-4 in a thoughtful, purposeful and holistic fashion.  The Department is not looking for a bandaid, but Use of Force and Force Reporting policies that are clear and sustainable.

**Third**, the Department has opened and is currently conducting a "Global Use of Force Audit"—a more fulsome and formal audit into use of force reporting generally.  This Global Audit will include the 14 cases from the Use of Force Review, as well as a number of additional cases from 2018 that were identified using similar methodology.  The Global Audit will also include a deeper look at incidents from a small group of squads and supervisors that appear to be potential outliers with respect to the reporting and review of force.  As with the initial Use of Force Review, the Department has referred—and will continue to refer—any cases involving potential MOR violations to Internal Affairs for full investigation, findings, and, if necessary, the imposition of discipline.  The Department expects the Global Use of Force Audit to be complete, including findings and a Command response, in mid-June 2019.  Accordingly, the City anticipates filing the completed audit and the Department's Command Response (including additional proposed changes to training, policy or procedure) before the next regularly scheduled Case Management Conference.

### H.   Rising Trend In IAD Complaints

Every two weeks, the Department examines and reports statistics on Use of Force, Pursuits and Complaints to the Compliance Director.  As a result of this process, OPD and the IMT have noticed that the number of complaints and sustained complaints have trended slightly up over the last year.  The following table reflects the Department's overall complaint numbers and sustained complaints for 2017 and 2018:

---

[13] Pursuant to the City's Charter, the Police Commission must approve any changes to the Department's Use of Force policy.  Unfortunately, the Police Commissioner who participated in these discussions recently resigned and the Commission has elected new members, a new Chair and a new Vice Chair.  Accordingly, the Department is reaching out to the Commission to seek one or more new Commissioners to participate in this process.

| Year | Complaints | Sustained |
|------|------------|-----------|
| 2017 | 1267 | 50 |
| 2018 | 1400 | 66 |

Moreover, the data examined during the Department's risk management process reveals that the complaints have trended up four of the last five years.  (*See* Exhibit F.)

The Department has been drilling down in the complaint data to determine trends and manage risk, but does not yet have definitive answers—*e.g.*, are these trend lines in fact due solely to a change in officer behavior?  Are they also influenced by other factors, including but not limited to:  a more accessible and refined IAD intake process;  training and enforcement of DGO M-3's requirements that officers affirmatively ask clarifying questions to determine whether individuals want to file a complaint;  increased supervision and accountability in the Department resulting in more self-discovered IA cases; new technology that allows the Community Police Review Agency ("CPRA") to accept complaints via a phone-based app and the web (which clearly resulted in a "bump" of cases in early 2018); and an appropriately increased societal focus on police accountability nationally?[14]

Wanting a better understanding of officer behavior behind these numbers, the Department examined the specific allegations for every case in 2017 and 2018, resulting in the chart attached hereto as Exhibit G.  While there was an increase in overall *complaint* numbers and a general trend of the number of allegations increasing over the past five years, there was a 16 percent *decrease* in allegations from 3267 in 2017 to 2984 in 2018 in the number of *allegations*.  A single complaint represents a single IAD case, but allegations are the total number of potential MOR violations across all IAD cases.  For example, an Officer's non-preventable traffic incident would generally constitute a complaint with a single MOR violation allegation (*e.g.*, 342.00-2o DEPARTMENT PROPERTY AND EQUIPMENT – PREVENTABLE COLLISION).  A high-risk arrest involving multiple officers, however, could generate a single complaint with multiple allegations against

---

[14] Individuals can file complaints directly with the CPRA, which forwards those complaints to IAD for parallel investigation.

1    multiple officers (*e.g.*, false arrest, excessive force, conduct towards others, etc.).

2           The biggest increases in allegations came in two categories:  SERVICE COMPLAINTS

3    (0000.01-0b) and DEPARTMENT PROPERTY AND EQUIPMENT—PREVENTABLE

4    COLLISION (342.00-2o).  Service complaints are not allegations of misconduct, but are generally

5    complaints that do not constitute a violation of law or policy (generally, these are complaints that

6    the Department did not respond to calls for service quickly enough or in a manner that the

7    complainant desired but was not required by law or policy).  The increase in preventable collisions

8    MOR allegations is two-fold: 1) an actual increase in preventable collisions (which include several

9    cases where officers hit fixed objects while parking); and, more significantly, 2) a change in policy

10   that now initially captures all collisions as a 342.00-2o PREVENTABLE COLLISION complaint,

11   but if the collision is later determined non-preventable it is "administratively closed."[15]

12          It is important to note that the Department also saw a *decrease* in some key MOR violations

13   that speak to constitutional patrol policing, including PERFORMANCE OF DUTY

14   UNINTENTIONAL/IMPROPER SEARCH, SEIZURE OR ARREST (314.39-2e) and CONDUCT

15   TOWARD OTHERS – DEMEANOR (314.08-2a).

16          The Department will continue to actively and continuously monitor these numbers and

17   trends as part of its overall Risk Management process to identify any areas where Department and

18   Officer performance can be improved.

19      **I.      Recruiting Women To the Department**

20          Recruiting women into policing has never been easy.  It is even harder now when the job

21   market is strong.  But it is simply unacceptable to the Department to have an academy class with no

22   female recruits.

23          Accordingly, in 2018, OPD increased its focus on recruiting female officers. First, the

24   Department made some changes to its system for recruit testing in order to attract and accommodate

25   a larger and more diverse applicant pool.  Previously, the Department administered applicant testing

26

27          [15] The Department is taking a multi-pronged approach to the increase in collisions—including an increase in driver
     training in the Academy, new training tools for officers involved in collisions (including use of a driving simulator
     owned by the County), and an audit and examination of the Department's pursuit policy (which already severely
28   restricts the conditions under which officers may engage in a vehicle pursuit).

1    somewhat infrequently.  Now, the Department contracts with an outside vendor to conduct testing

2    on a more frequent basis on different days of the week and at different times.  This has increased the

3    overall number of recruits, including female applicants.  Second, the Department participated in

4    several panels and symposiums geared towards female recruits and junior college students.  Just this

5    last weekend, the Department hosted an open house for women interested in careers in law

6    enforcement at the Police Administration building, where approximately 30 women met with more

7    than a dozen current female officers.

8           The Department's efforts appear to be paying off—the Department's upcoming academy

9    class (starting on March 25, 2019) will have eight (8) female recruits in a class of 40 (or 20

10   percent).

11          **III.    INTERVENOR, OAKLAND POLICE OFFICERS ASSOCATION**

12          Intervener, Oakland Police Officers' Association continues to work collaboratively with the

13   City, Police Department and Plaintiffs' counsel toward full implementation and compliance with

14   the NSA.  To that end, Intervener stands ready to assist the Court in any manner it deems

15   appropriate

16

17   Dated: March 22, 2019

18                                          BARBARA J PARKER, City Attorney
                                            MARIA BEE, Chief Assistant City Attorney
19                                          DAVID A. PEREDA, Special Counsel
                                            RYAN G. RICHARDSON, Special Counsel
20                                          KIMBERLY A. BLISS, Supervising Deputy City Attorney
                                            JAMILAH A. JEFFERSON, Senior Deputy City Attorney

21

22                                   By:_____/s/ Barbara J. Parker_____
                                            Attorneys for Defendant(s)
23                                          CITY OF OAKLAND

24   Dated:  March 22, 2019          JOHN L. BURRIS
                                            Law Offices of John L. Burris
25
                                     By: _____/s/ John L. Burris_____
26                                          Attorney for Plaintiffs

27

28

1   Dated:  March 22, 2019          JAMES B. CHANIN
                                    Law Offices of James B. Chanin
2
                             By:   ___/s/ James B. Chanin_____
3                                   Attorney for Plaintiffs

4
    Dated:  March 22, 2019          ROCKNE A. LUCIA, JR.
5                                   Rains Lucia Stern St. Phalle & Silver

6                            By:   ___/s/ Rockne A. Lucia, Jr._____
                                    Attorney for Intervenor
7                                   OAKLAND POLICE OFFICERS ASSOCIATION

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# Discretionary Stops by Race
## 2014-2018*

— Afr American   — Asian   — Hispanic   — White   — Other



| Race | 2014 | 2015 | 2016 | 2017 | 2018 | % Change 2017/2018 |
|------|------|------|------|------|------|------|
| Afr American | 19,077 | 22,500 | 20,032 | 19,185 | 10,874 | 43% |
| Asian | 2,316 | 2,483 | 1,648 | 1,553 | 1,371 | 12% |
| Hispanic | 6,101 | 7,496 | 6,590 | 6,855 | 4,483 | 35% |
| White | 4,615 | 4,328 | 3,256 | 2,805 | 2,277 | 19% |
| Other | 1,142 | 1,148 | 1,043 | 1,130 | 895 | 21% |
| Total | 33,251 | 37,955 | 32,569 | 31,528 | 19,900 | 37% |

*Data through December 19, 2018. CA Assembly Bill 953 stop data collection requirements started on 12/20/18.

1

# EXHIBIT B

# Discretionary Stops by Race
## 2014-2018*

— Afr American  — Asian  — Hispanic  — White  — Other

| Race | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| Afr American | 57% | 59% | 62% | 61% | 55% |
| Asian | 7% | 7% | 5% | 5% | 7% |
| Hispanic | 18% | 20% | 20% | 22% | 23% |
| White | 14% | 11% | 10% | 9% | 11% |
| Other | 3% | 3% | 3% | 4% | 4% |
| Total | 100% | 100% | 100% | 100% | 100% |

*Data through December 19, 2018. CA Assembly Bill 953 stop data collection requirements started on 12/20/18.

2

# EXHIBIT C

| # | Stanford 50 Recommendations and Status | Implemented / Proposed Implementation Date | Total Implemented |
|---|---|---|---|
| 1 | **Continue Collecting Stop Data (SD)** – *AB953 will soon require all California law enforcement agencies to data on both vehicle and pedestrian stops statewide. OPD is well ahead of most agencies, as the department already collects the clear majority of measures this new law will require.* The Oakland Police Department (OPD) since 2007 has mandated that all members shall complete a Form for every vehicle, walking, and bicycle stop. The Department has been recognized nationwide for its early efforts; AB953 will soon require all California law enforcement agencies to collect similar data. | Implemented | 1 |
| 2 | **Add a Field on the SD Form to Capture Squad Information** – *Analysis by squad would allow researchers to better identify what accounts for variation in stop outcomes, and how the squad itself operates.* OPD's SD Form was revised and published 10/7/16, to include the following fields; a) Supervisor Assigned for This Incident, b) Regularly Assigned Supervisor, c) Squad Assigned for This Incident, and d) Regularly Assigned Squad. | Implemented | 2 |
| 3 | **Add a Field on the SD Form to Capture Squad Sergeant Information** – *Squad sergeant information would allow researchers to examine the relative contributions of officer experience and squad sergeant to the decisions officers are making about who to stop, search, handcuff, or arrest.* See above (#2) | Implemented | 3 |
| 4 | **Update the SD Form as Needed** *October 2016 Field Interrogation I / Stop Data Report (FI/SDR) Revision no longer required officers to create a separate form for each person. Additional changes were included to better reflect search types and results; body-worn camera activation; citation information; vehicle occupant information; and intelligence-led factors.* October 2016 FI/SDR Revision no longer required officers to create a separate form for each person. Additional changes included the following; a) Result Encounter selection should only be the "highest," b) Type of Search should only be the primary, c) Result of Search fields have expanded, d) PDRD activation field, e) Intelligence-Led Stop and "Intelligence-Led Factor" fields were added, f) Citation Issued & Number, g) Location of Vehicle Occupant field added, and h) Search Conducted of Vehicle field added. | Implemented | 4 |

| # | Description | Status | |
|---|---|---|---|
| 5 | **Standardize, Track and Analyze Crime-Related Communications Provided to Officers** – *The department should track and analyze the crime related communications given to line officers by creating a digital repository where such communications are automatically collected and time-stamped with clear distribution list. Opportunity to examine whether certain types of directives are more likely to increase racial disparities in stops.* All officers can now access Command Directives, Weekly Priorities, Daily Bulletins, & Law Enforcement Notifications. | Implemented | 5 |
| 6 | **Add a Field on the SD Form Regarding Body-Worn Camera (BWC) Usage** – *The department should add a stop data form text field where officers can indicate whether their camera was activated and, if not, why.* "PDRD* Activated" field was added to the revised FI/SDR form, to include a "Reason No PDRD" justification field. *PDRD = personal digital recording device | Implemented | 6 |
| 7 | **Capture/Tag BWC Footage** – *OPD's previous policy did not require officers to tag footage with an incident number. Recommended that the department begin tagging self-initiated footage with an incident number, which would allow the PD and researchers to associate each stop in the database with the BWC footage from that stop.* OPD Department General Order (DGO) I-15.1 requires that all members shall enter in VERIPATROL the RD# (report number) associated with each video file. This can be completed through the Mobile Data Terminal (MDT). | Implemented | 7 |
| 8 | **Use BWC Footage to Train Officers** – *The department should identify footage of exemplary interactions (such as those involving de-escalation), and then use that footage to teach officers best practices.* This practice is already mandatory for all Uses of Force, Internal Affairs Investigations and monthly one-on-one reviews between the Sergeant and officer. | Implemented | 8 |
| 9 | **Require Officers to Self-Audit Racially Charged BWC Footage** – *The department should require officers to flag two interactions per month that were especially tense and were captured on their own BWCs. This self-auditing process may even lead to change in policy* After further discussion between Stanford and OPD, this recommendation has been updated. OPD will audit annual racial discrimination complaints with a small group to identify trends and/or patterns that could lead to a reduction in such complaints through training. Closed IAD cases will be utilized. | Implemented | 9 |

| # | Description | Status | |
|---|---|---|---|
| 10 | **Use BWC Footage to Evaluate Policies/Ensure Compliance** – *The department could use BWC footage to evaluate the implementation and impact of new policies, as well as to check officers' compliance with existing policies.* Achieved through Supervisory Command and OIG reviews per DGO I-15.1. Information Bulletin "PDRD Review" released 18 November 14, requires sergeants to conduct a review of their officers PDRD recordings, and the officer self-identifies how the Procedural Justice tenets are followed or not followed. | Implemented | 10 |
| 11 | **Invest in the development of a Body Worn Camera early warning system** – *Invest in the development of an early warning system of BWC footage that would be integrated into the PRIME system. This would involve developing metrics for evaluating and analyzing police-community interactions captured on the cameras.* As part of VISION (formerly "PRIME 2.0"), OPD will be integrating body worn camera footage to allow supervisors and commanders to immediately review stops, arrests, and uses of force. | July 2019 | 10 |
| 12 | This recommendation will also be implemented as part of the development of VISION in July 2019. The City's Information Technology Department (ITD) is responsible for completing this recommendation. | July 2019 | 10 |
| 13 | **Build a SD dashboard** - *The department should build an interface in the PRIME early warning system that clearly summarizes and visualizes stop data – that is, a dashboard.* **Automate SD Analysis** – *Automate stop data analysis, to the extent possible, that reports can be produced and relied upon.* Stanford has confirmed that the development of the stop data Risk Management Meeting (RMM) Slides satisfies this recommendation. | Implemented | 11 |
| 14 | **Automate SD narrative analysis** – *The department should work with researchers to develop algorithms for analyzing officers' narrative accounts, exploring why officers stop, search, handcuff, and take other actions.* Originally, Stanford developed a software tool to improve OPD's abilities to search and analyze officers' narrative accounts to assist the Department's Office of Inspector General (OIG) in conducting audits. However, Stanford is satisfied that the addition of fields to the Department's Stop Data forms as a result of the implementation of AB 953 renders the tool unnecessary. Accordingly, this recommendation has been implemented. | Implemented | 12 |

| # | | | |
|---|---|---|---|
| 15 | **Assist Researchers in Building an Automatic Speech Recognition System for BWC** – *Analyzing officers' speech in BWC footage could allow the department to examine officers' language precisely and systematically, and then develop strategies for improving officer communication.*<br><br>Per Stanford, OPD is compliant with this recommendation, as the University has received all the necessary data from the department. | Implemented | 13 |
| 16 | **Improve Systems for Backing Up & Accessing BWC Footage** – *The department's current server is slow and frequently crashes when handling BWC footage.*<br><br>Upgrade of the data storage system took place in July 2016 and 500 terabytes of storage was added. | Implemented | 14 |
| 17 | **Hire a data manager** – *Recommended that the department hire a dedicated full-time data manager to oversee databases, data requests, research collaborations, and data for risk management.*<br><br>In process. Job duties will include ensuring that OPD uses available data to better inform risk management efforts, including conducting statistical analyses of all OPD personnel to determine outliers for risk assessments. The individual in this position will also work directly with OPD managers and supervisors to ensure that there is a clear understanding of the data available for managing risk and providing high level policy and personnel recommendations to the Chief for purposes of risk management. Additional responsibilities will include working with developers to ensure the Department's risk management data is accurate and developing new systems to support risk management efforts.<br><br>Job announcement written and approved by the IMT; to be posted in March 2019. Screening, interviews and hiring to be completed by June 2019. | **June 2019** | **14** |
| 18 | **Partner w/Outside Researchers to Analyze and Use Data** – *The department should work with researchers to adopt novel, sophisticated statistical techniques and analyze their own data in-house.*<br><br>Stanford is assisting with the Risk Management data analysis and presentation. | Implemented | 15 |
| 19 | **Partner w/Outside Researchers to Conduct High-Quality Studies** – *The department should work with researchers to implement systematic studies that are inspired by stop data and are designed to improve a specific outcome.*<br><br>OPD has been working with Stanford University since 2015. | Implemented | 16 |
| 20 | **Give Officers Individualized Feedback on their Stop Performance** – *Routinely discussing officers' performance to help them develop and reach their goals consistent with the broader mission of law enforcement agencies' becoming learning institutions –* | Implemented | 17 |

| | | | |
|---|---|---|---|
| | This task is considered implemented based on the Area Commanders currently conducting weekly meetings with their staff to discuss command directives, to include stop data. The information discussed is pushed to supervisors and officers. | | |
| 21 | **Create New Ways for Officers to Give Feedback to Command Staff** – *Just as supervisors and command staff could provide more feedback to line officers, so too could line officers to supervisors and command staff.* The department has developed new mechanisms for receiving feedback from OPD members on what is and is not working well department-wide. Small feedback sessions are held monthly, and anonymous comment cards are available in hardcopy and electronically. An Informational Bulletin was released in October 2017 for this process. | Implemented | 18 |
| 22 | **Use Complaint Data More Effectively** – *Recommended that the department identify not only areas of complaints, but also where complaints are surprisingly absent.* Addressed in the monthly Risk Management Meetings. | Implemented | 19 |
| 23 | **Conduct customer-service audits after routine stops** – *Recommended the department identify people who were recently stopped by OPD and following up with them with an online questionnaire, phone questionnaire, in-person questionnaire, or even a focus group. Receiving this feedback would allow the department to track the police-community interactions that community members find most or least satisfying.* OPD has elected to have Stanford conduct these interviews. Stanford is currently developing an audit protocol and determining an appropriate start date. The process is ready to go and just needs to be implemented. They have contracted with a rotary call service to implement. This is a one-time occurrence, funded through Stanford contract. | June 2019 | 19 |
| 24 | **Regularly administer community surveys** – *Recommended the department continue to work with researchers to collect community survey data. These data will help the department understand its reputation in the community at large* OPD and the Mayor's Office have selected a surveyor following a formal Request for Proposal process that included other stakeholders, including representatives from the Community Policing Advisory Board. | May 2019 | 19 |
| 25 | **Make trainings shorter and more frequent** – *Recommended the department break with industry tradition and offer more regular police-community training and more frequently.* | May 2019 | 19 |

| | | | | |
|---|---|---|---|---|
| | | Sworn personnel have been offered training opportunities through the Citywide Training Portal, including the "Advancing Racial Equality Academy – 4 modules."<br>• Discussions ongoing to host Racial Equity Academy at the PAB.<br>• Continuing to provide staff with Procedural Justice Training.<br>• Working with Equal Justice USA to provide short, intimate training sessions on Trauma-Informed Policing through the International Association of Police Chief's Collective Healing Initiative (December '18). Short sessions will support field implementation and procedural refinement, with follow-up EJUSA workshops.<br>• Increase use of line-ups for regular, brief trainings on a monthly or bi-monthly basis. Topics can cover updates on relevant policy changes and curated videos that showcase relevant community information which would offer officers more insight into community events. | | |
| 26 | **Expand training topics** – *Recommended the department should give officers a suite of trainings in social tactics, to include offering specialized training aimed at those who are playing a unique role within the department.*<br><br>OPD has hosted the initial FBI LEEDA Supervisor training. "Command Leadership" and "Executive Leadership" are scheduled for 25 Feb 19 – 1 Mar 19 and 13 May 19 – 17 May 19 respectively. The Training Division is working on finalizing classes more courses for Supervisor Leadership Institute and Leadership Integrity. Training Division still assessing possibility of developing new community-involved officer trainings and/or scenario-based trainings. Implementation confirmed with Stanford Dr. Jennifer Eberhardt on October 31, 2018. | Implemented | 20 |
| 27 | **Let officers choose which trainings to take:** *Allowing officers to choose which courses to take, and when, from a menu of options could dispel the notion that social tactics is punitive.*<br><br>An electronic course catalog (below) and calendar has been created allowing personnel to select the trainings they would like to take attend. Officers have the opportunity to log in and select courses:<br>• Trauma and Self Care<br>• Advancing Racial Equality Academy<br>• Race and Equity 101<br>• Implicit Bias, Social Power and Equity<br>• Inclusive Engagement, Accountability and City Government<br>• Emotional Intelligence (Dr. Gilmartin)<br>• City of Oakland Peacemaker Program<br><br>Officers currently have access to the State of California's POST Learning Portal which offers an electronic course catalog of Self-Paced Training.  Supervisors will be tasked with ensuring officers are logging in and completing training of their choice quarterly. Supervisors will document completed | Implemented | 21 |

| | | |
|---|---|---|
| | training in PRIME via Supervisory Notes. Officers also currently have access to the Blue Courage Learning Portal for additional Social Tactics training.<br><br>https://app.targetsolutions.com/tsapp/dashboard/pl_fb/index.cfm?fuseaction=c_pro_events.showHome | |
| 28 | **Incentivize training-in-action workshops** – *Recommended the department incentivize workshops for this who would like to continue meeting a topic after training has ended.*<br><br>OPD is working on developing internal and external opportunities for officers to receive continued training, particularly on social tactics. Officers who attend outside, non-mandatory trainings already receive positive supervisory notes in their personnel files.<br><br>Incentives:<br>Exceeds expectations in performance appraisals, positive Supervisory Note File (SNF) entries, Procedural Justice Pin for uniform (requires update of C-1 with criteria to receive pin) | April 2019 | 21 |
| 29 | **Rigorously measure the effects of all trainings** – *The department should insist on rigorously evaluating whether trainings improve police-community relations. This can be done by looking at community-level indicators before and after a training is deployed or, if the program is deployed progressively across the entire agency, by looking at outcomes for officers or squads who have already undergone training versus those who are still waiting to receive it.*<br><br>OPD has started this process by engaging Stanford to evaluate the mandatory, Department-wide Procedural Justice II training. Almost all OPD members have now undergone this training. Final trainings for last 200 or so will be started in September and will conclude in December 14, 2018. | Implemented | 22 |
| 30 | **Hire A Training Coordinator** – *Recommended the department hire a full-time training coordinator to manage and track the trainings offered in the department.*<br><br>Task is already performed by existing staff (Training Unit/Sgt. Miller). | Implemented | 23 |
| 31 | **Implement Living Room Meetings with Out of Uniform Officers and Residents** – *Hold relationship-building meetings, or "tables," that include members of OPD as well as community members who are committed to improving police-community relations.*<br><br>This practice has been early 2018 in two Police Areas; four living room meetings have taken place and more meetings area slated through the end of the year. Additionally, a draft of the OPD Community Engagement policy is in the final stages of review. | Implemented | 24 |

| | | | |
|---|---|---|---|
| 32 | **Enhance the Capacity of Community Resource Officers (CRO) Through Living-Room Meetings & Social Media** – *Improve police-community relations by increasing the capacity of the CRO's and making make the work they are doing for the community more visible.*<br><br>CRO's are utilizing the social media platform Next Door to send out event information applicable to their assigned neighborhoods, to include closed projects. CROs will conduct living-room meetings when requested by community members. Furthermore, starting in 2017, an annual two-day training is held specifically for the CROs, which includes use of social media and community relations. | Implemented | 25 |
| 33 | **Require Squad-Based Community Projects** – *Recommended that squads also begin working together on long-term projects in areas most affected by crime. Through these projects, officers could experience interaction with community members who are working hard to see the neighborhood thrive.*<br><br>Patrol squads have been directed to complete one project per year with a local partner (e.g. school, church, business, NGO, etc.) to develop positive community relationships. Individual squads will identify the project and the means for implementation. Each squad submits a project proposal to their Area Commander for approval. A draft of the Community Engagement policy is currently in progress and potential partnerships have been identified. | Implemented | 26 |
| 34 | **Train Officers & Community Members Together** – *Recommended that a limited number of social tactics trainings are offered to both officers and members of the public. These mixed classes would remind officers and community members of their shared goals.*<br><br>Implemented with the development of the Procedural Justice II training which should be fully completed by September 2018 | Implemented | 27 |
| 35 | **Encourage out-of-uniform contact with communities** – *see #31 above* | Implemented | 28 |
| 36 | **Provide Business Cards for Every Consensual Encounter, Detention & Community Contact** – *Presently, officers have generic cards that they distribute only when community members wish to file a complaint. Business cards can be used to establish positive relations with the public as well.*<br><br>On 30-Oct-17, a new policy (Lexipol 205) regarding the use of business cards was enacted, stating that every OPD member should provide a business card each time contact with a member of the public results in an investigative consensual encounter or detention. | Implemented | 29 |
| 37 | **Show More Care in High-Crime Areas through Contacting Residents** – *What people see matters. It's recommended OPD develop more crime reduction strategies that cast police officers as caretakers of the community.* | Implemented | 30 |

| # | | Status | |
|---|---|---|---|
| | Special Order 9186 was published on October 11, 2017. Door hangers provide contact OPD contact information to residents in areas where a ShotSpotter activation has occurred. Door hangers are available in the Report Writing Room at the PAB and line-up room at Eastmont. | | |
| 38 | **Hold Critical Incident Discussions and Training** – *When critical incidents occur, such as a controversial officer-involved shooting, it is recommended the department hold a series of discussions both internally and externally on how the department plans to respond.* | Implemented | 31 |
| | A Peer Support group protocol exists and is activated during every critical incident. | | |
| 39 | **Host annual conference on police-community relations** – *Recommended the department facilitate an annual conference on police-community relations that is planned and executed jointly by members of the department and community.* | Implemented | 32 |
| | Took place with the Mayor's Office at Laney College on 19Jul18. The department is slated to release its annual Racial Disparity Report in late June. | | |
| | OPD will coordinate with Mayor's Office on future annually conferences | | |
| 40 | **Develop and Track Measures of Positive Community Engagement** – *The department should consider using its metrics of positive community contact in evaluating officer's performance in addition to using standard measures like arrests, stops, searches, and search recoveries.* | Implemented | 33 |
| | Area Captains have created their own metrics to track the productivity of their subordinates. A standardized tracking sheet will be developed to be used citywide for standard operating procedures (SOP) for measuring productivity and community engagement. Furthermore, there is a master tracking sheet of all community engagements officers participate, patrol, CROs, Crime Reduction Team Officers, and Command Staff. | | |
| 41 | **Continue Risk Management Meetings** – *Once a month, the OPD command staff reviews data with a captain from one of the five areas of Oakland. Stop data reviews feature predominately in these meetings. These meetings are quite impressive, and we recommend continuing them.* | Implemented | 34 |
| | RMM process was revised in January 2018 by focusing on each of the 2 Bureau of Field Operations on a rotational basis, which encompasses the applicable command areas. OPD has placed an emphasis how the level of policing impacts Oakland communities (i.e. "footprint") as well as how intelligence-led policing can lower the footprint. Additionally, a "SD Playbook" has been developed as a means for additional evaluation by commanders of the potential disparate impact in different communities. Area Captains are given deliverables at the commencement of each meeting based on issues raised during | | |

| | | | |
|---|---|---|---|
| | risk management meetings. Areas are beginning to hold their own area-wide Risk Management meetings where Captains examine the data with Lieutenants and Sergeants. | | |
| 42 | **Identify Outlier Officers** – *Recommended that the command staff begin to examine how much outlier status on stops or searches predicts outlier status on other dimensions in the PRIME system.* | Implemented | 35 |
| | Part of the monthly Risk Management Meetings. Complaints, Uses of Force, Collisions, Pursuits, and Sick Leave are all addressed. During these meetings, OPD Command also reviews individual sergeants and squads. | | |
| 43 | **Monitor and Reduce Time Pressure** – *Recommended that the department better track the amount of time officers spend on low-priority activities and maximizing the amount of time spent on high-priority activities. The reintroduction of daily activity tracking sheets will help.* | Implemented | 36 |
| | Daily activity logs track the amount of time officers spend on low-priority activities and maximizes the amount of time spent on high-priority activities.<br><br>The current OPD patrol schedule includes four shifts, three of which are 10 hours in length and the fourth is 12 hours in length. Two of the 10-hour shifts (1ˢᵗ Watch/Day Watch and 3ʳᵈ Watch/Dog Watch/Graveyard) have overlapping teams once a week and multiple briefings each day. Depending on the day of the week, there may be six briefings at each of the two OPD patrol facilities – resulting in 12 briefings covering four shifts. More importantly, there is little data that the current patrol schedule aligns personnel with call load. An analysis of call load by day of week and time of day should identify time of greatest need of personnel as well as time of least need. Aligning patrol schedules with this data should result in greater efficiencies, increased community satisfaction, and reduced response times. | | |
| 44 | **Monitor and Reduce Stress and Fatigue** – *The department should consider examining the potential influence of momentary stress and fatigue on self-initiated stops. Work schedules could influence officer decision-making during such stops, which could uncover patterns and suggest improvements.* | Implemented | 37 |
| | OPD Health & Wellness Unit (HWU) is a resource available to all personnel. It serves as the bridge between the professional resources available to the employees, including but not limited to: Peer Support Team, Critical Incident Response Team (CIRT), OPD Medical Unit, and, Employee Assistance (Claremont and Managed Health Network (MHN)). Additionally, "Blue Courage" training for both sworn and professional staff has been implemented and focuses heavily on health and wellness (stress management, grief and loss, managing change, and building resilience). Maintaining this program is critical to the well-being of department personnel, particularly officers. | | |
| 45 | **Identify Factors Associated w/High-Low Performing Squads** – *Recommended the department use data to identify high and low performing squads to examine how much these performance differences* | Implemented | 38 |

10

| | | | |
|---|---|---|---|
| | are due to the individual officer characteristics, squad characteristics, squad supervisors, and the directives officers receive from command staff. | | |
| | Part of the monthly Risk Management Meetings. The Area Commanders are expected to address why the two squads differ in productivity, to include any disparities and what measures have been implemented to ensure that each squad meets the directive of the Commander. | | |
| 46 | **Review Handcuffing Policies** – *A sample review found that 83% of searches involved handcuffing. Handcuffing is often viewed as an intrusive and humiliating action, OPD should review its handcuffing policies for their compliance with laws and best practices.*<br><br>The revised policy (Lexipol 302) was published 06/14/17, with an emphasis on the probation and parole status of the subject, which alone is not justification to use handcuffs. | Implemented | 39 |
| 47 | **Review search policies** – *Does the discovery that someone is on probation or parole always trigger a search? If so, the department examine whether this practice helps or hinders community-police relations, individuals' rehabilitation process, and the protection of the community from crime.*<br><br>Stanford's recommendation questions whether the discovery that an individual is on probation or parole should always trigger a search, and, if so, whether such practice helps or hinders community-police relations, individuals' rehabilitation processes, and the protection of the community from crime. A Departmental working group was formed and a new draft General Order R-02. Searches of Individuals On Probation Or Parole was written. The City Attorney's Office, the IMT and Plaintiffs' counsel reviewed and approved the draft policy, which emphasized that the primary purpose of probation and parole searches is to further legitimate law enforcement or rehabilitative interests, and that probation and parole searches shall not be arbitrary, capricious or harassing. The policy would also require officers to document articulable facts underlying their decision to initiate a parole or probation search.<br><br>Under the terms of the Charter Amendment establishing the City's new civilian Police Commission, the policy was presented to the Commission for review and approval. The Commission initially rejected the Department's policy. Recently, Department and an ad hoc group from the Commission met and made additional revisions. The full Commission, however, would like to take additional time to seek the input of additional stakeholders. The Department will continue to work with the Commission on a final policy.<br><br>Whichever version of the policy is ultimately adopted, Stanford considers this recommendation implemented. | Implemented | 40 |
| 48 | **Review Officer Inquiries Concerning Probation and Parole Status** – *An analysis revealed that 93% of probation/parole searches were of African Americans and Hispanics. Are members of these groups more likely to be asked this question than are Whites of Asians? It is recommended that recording in* | Implemented* | 41 |

| | | | |
|---|---|---|---|
| *the stop data report whether the officer asked about either probation or parole status, as well as the justification for asking the question.* | | | |
| 49 | **Produce and publish an annual Racial Impact Report** – *OPD should publish a report that not only tallies its successes but also candidly reports metrics such as racial differences in rates of handcuffing, searches, and arrests, and the results of community surveys, etc.*<br><br>The report is complete and is still under review. | **Spring 2019** | **41** |
| 50 | **Analyze Data for Trends over Time** – *The OPD leadership should begin to look at their stop data longitudinally and be mindful of increases in activities with the largest disparities, including traffic violations, handcuffing, and weapon searches.*<br><br>An on-going process through OIG Audits and the monthly Risk Management Meetings. | Implemented | 42 |

OPD and Stanford have both further studied this issue and this does not appear to be an issue after further reflection. An audit conducted in January 2017 by OIG found that of the 219 searches conducted, 96% of the reviewed incidents involving an officer's stop and search of a probationer or parolee, officers neither mentioned nor requested a person's probation or parole status prior to the status becoming independently known.   OPD is nonetheless working with the Police Commission on to make sure that the Department's new probation and parole policy reinforces that officers should not be asking a suspect's probation and parole status unless there are reasons for doing so.

# EXHIBIT D



City of Oakland

POLICE DISCIPLINE DISPARITY STUDY

Work Scope and Schedule

February 27, 2019
Revised Scope (Final)

HILLARD HEINTZE®

Protecting What Matters



**PROJECT STAGES AND TIMING**

During each stage of this engagement, a highly experienced team of support personnel will assist Hillard Heintze team leaders. This broader administrative and investigative group will include individual support staff, as well as Hillard Heintze subject-matter experts as a whole, undertaking key tasks such as assessment activities, gathering and sharing information, researching key issues as necessary, coordinating with the department's personnel and streamlining the reporting process.

**Stage I – Kick-Off Meeting, Validation, Scoping and Goal-Setting (Week 1)**

- Conduct a Project Kick-Off meeting with key stakeholders.

- Develop an understanding of the department's history, organization and cultural environment.

- Request all available policing, complaint-related documentation and staffing data needed to initiate the analysis relevant to the approved scope of the project – five (5) years of administrative discipline data, for the time frame January 1, 2014 – December 31, 2018.

To accomplish the work efforts for Stage I, Hillard Heintze team members in Chicago, in collaboration with Project Lead Rob Davis, will coordinate the project management efforts necessary to secure and prepare the subject-matter experts (SMEs) for the initial site visit to Oakland, including corresponding with the Oakland Police Department (OPD) Liaison to establish the agenda and interview schedule.

We then will have the Project Lead and two additional SMEs on the ground in Oakland for three days, with an additional SME (social scientist gathering analytical data) on the ground for two days. This is a total of 72 on-the-ground hours for three SMEs and 16 hours for one SME, totaling 88 hours. Additional time will then be spent off-site by the SMEs as they prepare written documentation of what was learned during the site visit, which is used to inform the specific work that will be completed during Stage II as well as to prepare data that will be included in the Final Assessment Report.

**Stage II – Strategic and Comprehensive Assessment Activities and Milestones (Weeks 2 to 10)**

- Undertake a review of the discipline process and administrative investigation of complaints of misconduct for sworn personnel of all ranks, Police Officer Trainees in the Oakland Police Academy, and Probationary Officers in the Field Training Program for the five year period of January 1, 2014 through December 31, 2018

- Identify the key components of the internal investigation process – including intake, assignment, investigation and adjudication.

- A review of existing Department policies, procedures and practices regarding misconduct investigations and discipline.

- Engage, review and assess internal investigations command and investigators to determine appropriate role, scope and functionality in assessing discipline.

- Develop an understanding of any ongoing initiatives related to discipline determinations.



- Receive and review documentation and data covering the dataset of the five (5) years of administrative discipline data, requesting any additional data required.

- Evaluate a percentage of the investigations, as driven by the data determinations.

- Conduct the analysis as previously outlined in our methodology for assessing whether there are disparities in discipline.

- Review and assess the OPD's use of data collection and the ability to intake, analyze, validate and disseminate data regarding discipline.

- Conduct face-to-face meetings with key stakeholders, including community stakeholders, union officials and officer interest groups.

Data analysis under Stage II will include a review of the Department's historical data on misconduct investigations and discipline to see if the data shows patterns of disparity in the treatment of minority officers and/or in relation to gender; and race. This review will include data within the last five (5) years and will assess:

- Internally and externally generated complaints;

- Alleged policy violation(s);

- Text of policies (including effective dates for policies that have changed during this period);

- The race and gender of the complainant (and rank if the complaint is internally generated);

- The race and gender and rank of the accused employee;

- The race and gender and rank of OPD employees reviewing or making decisions on the allegation from initiation to conclusion; and,

- The complaint finding including any discipline or corrective action imposed.

To accomplish the work efforts for Stage II, Hillard Heintze team members in Chicago, in collaboration with Project Lead Rob Davis, will coordinate the project management efforts necessary to secure and prepare the subject-matter experts (SMEs) for Site Visits 2, 3 and 4 to Oakland, including corresponding with the OPD Liaison to establish the agenda and interview schedule for each Site Visit.

For Site Visits 2 and 3, the Project Lead and two additional SMEs will be on the ground in Oakland for three days. This is a total of 72 on-the-ground hours for three SMEs. Two of the SMEs will be focused primarily on conducting a random sampling review of completed Internal Affairs investigations and any adjudication processes associated with them for a specified time period to be determined by the social scientist SME. The additional SME will focus primarily on conducting additional follow up with key stakeholders to conduct any necessary interviews to facilitate our assessment of the OPD's disciplinary review process. On each of Site Visits 2 and 3, the Project Lead will meet with key city stakeholders to inform them on the status of our assessment work. Additional time will then be spent off site by the SMEs as they prepare written documentation of what was learned during the Site Visits, which is used to inform the specific work that will be completed during Stage II as well as to prepare data that will be included in the Final Assessment Report.



For Site Visit 4, we then will have the Project Lead and one additional SME on the ground in Oakland for three days. This is a total of 48 on-the-ground hours for two SMEs. These SMEs will be focused primarily on completing any remaining work for the random sampling review of completed Internal Affairs investigations and any adjudication processes associated with them, as well as complete any remaining interviews needed to facilitate our assessment of the OPD's disciplinary review process. The Project Lead also will meet with key city stakeholders to inform them on the status of our assessment work, with a particular focus on discussing the next steps that will be taken to provide the OPD with the initial Draft of our Assessment Report. Additional time will then be spent off site by the SMEs as they prepare written documentation of what was learned during the Site Visit, which is used to inform the specific work that will be completed during Stage II as well as to prepare data that will be included in the Final Assessment Report.

During Site Visits 2, 3 and 4, additional research and analysis personnel based in our Chicago office will assist our on-the-ground team with the necessary research and analysis work necessary to allow for comparing and contrasting the OPD's disciplinary process with those of other similarly situated law enforcement agencies, which will be used to inform our assessment work and Final Assessment Report.

**Stage III – Discussion of Preliminary Findings (Week 12)**

- Hillard Heintze will schedule a meeting with the identified stakeholders you deem appropriate to present a final draft of the preliminary OPD Discipline Assessment Report, including all key findings, recommendations and high-level proposed strategies, as well as tactics for discussion by a panel of key personnel determined by the OPD for review, discussion and feedback.

- Based on input from this meeting, we will conclude by delivering a final OPD Discipline Assessment Report that explains the process undertaken, details of our findings and recommendations, and outlines opportunities for monitoring their effectiveness into the future.

- Present the final report and key findings to designated City of Oakland stakeholders.

To accomplish the work efforts for Stage III, Hillard Heintze team members in Chicago, in collaboration with Project Lead Rob Davis, will coordinate the project management efforts necessary to write and edit the Draft of the Assessment Report. Copies of this confidential draft will be forwarded to key OPD and City stakeholders the City identifies prior to our Site Visit to discuss the report and its findings and recommendations.

We then will have the Project Lead and one additional SME on the ground in Oakland for up to two days. This is a total of 48 on-the-ground hours. The purpose of this Site Visit will be to discuss the findings and recommendations from the draft report with key OPD and City stakeholders. Working with our team in Chicago, we will then make any necessary edits or clarifications to our Final Assessment Report. Our team will then forward to key OPD and City stakeholders the City identifies hard and electronic copies of the Final Assessment Report.

# EXHIBIT E

# PRIME 2.0 (VISION) Status



# EXHIBIT F



IAD cases are the number of complaints accepted by the Department.  Allegations are the total number of violations in each case.
IA cases may include multiple allegations involving multiple employees.

10

# EXHIBIT G

## 2017-2018 Complaint Allegations

| MOR | DESCRIPTION | # of Allegations 2017 | # of Allegations 2018 | Difference |
|---|---|---|---|---|
| 000.01-0b | SERVICE COMPLAINT | 524 | 618 | 94 |
| 000.02-0b | NO MOR VIOLATION | 402 | 416 | 14 |
| 175.21-2b | OTHER TERMINOLOGY/DIRECTION - RULES/REGULATIONS | 2 | 0 | -2 |
| 234.00-2b | COMMANDING OFFICERS - AUTHORITY AND RESPONSIBILITIES Includes all of the 234.00 subsections | 8 | 2 | -6 |
| 234.12-2b | COMMANDING OFFICERS AUTHORITY AND RESPONSIBILITIES - COMMAND | 1 | 0 | -1 |
| 234.60-2b | COMMANDING OFFICERS AUTHORITY AND RESPONSIBILITIES - GRIEVANCE RESOLUTION | 1 | 0 | -1 |
| 285.00-1b | SUPERVISORS - AUTHORITY AND RESPONSIBILITIES (Gross dereliction of duty) Includes all of the 285.00 subsections except 285.90 | 0 | 1 | 1 |
| 285.00-2b | SUPERVISORS - AUTHORITY AND RESPONSIBILITIES Includes all of the 285.00 subsections except 285.90 | 5 | 2 | -3 |
| 285.90-2 | PREVENTION OF HARASSMENT, DISCRIMINATION AND RETALIATION | 1 | 3 | 2 |
| 314.03-2c | GENERAL CONDUCT | 12 | 13 | 1 |
| 314.04-1b | CONDUCT TOWARD OTHERS – HARASSMENT AND DISCRIMINATION | 55 | 34 | -21 |
| 314.04-1c | CONDUCT TOWARD OTHERS – Identity Profiling by Race or Ethnicity | 72 | 72 | 0 |
| 314.04-1d | CONDUCT TOWARD OTHERS – Identity Profiling by Nationality | 1 | 0 | -1 |
| 314.04-1e | CONDUCT TOWARD OTHERS – Identity Profiling by Gender | 0 | 4 | 4 |
| 314.04-1g | CONDUCT TOWARD OTHERS – Identity Profiling by Religion | 0 | 2 | 2 |
| 314.04-1h | CONDUCT TOWARD OTHERS – Identity Profiling by Gender Identity or Expression | 1 | 0 | -1 |
| 314.04-1i | CONDUCT TOWARD OTHERS – Identity Profiling by Sexual Orientation | 1 | 2 | 1 |
| 314.04-1j | CONDUCT TOWARD OTHERS – Identity Profiling by Mental Disability | 0 | 2 | 2 |
| 314.04-2a | CONDUCT TOWARDS OTHERS - UNPROFESSIONAL CONDUCT IN VIOLATION OF AI 71 | 8 | 4 | -4 |
| 314.05-1b | CONDUCT TOWARD OTHERS – WORKPLACE VIOLENCE | 2 | 0 | -2 |
| 314.07-2b | CONDUCT TOWARD OTHERS – DEMEANOR | 239 | 223 | -16 |
| 314.08-2a | CONDUCT TOWARD OTHERS – RELATIONSHIPS | 0 | 1 | 1 |
| 314.28-1b | NOTIFICATION - CRIMINAL | 2 | 3 | 1 |
| 314.28-2b | NOTIFICATION - CIVIL | 0 | 1 | 1 |
| 314.30-1c | INSUBORDINATION - FAILURE TO OBEY A LAWFUL ORDER | 1 | 6 | 5 |
| 314.32-2b | INSUBORDINATION - DISRESPECT | 3 | 0 | -3 |
| 314.38-1c | OBSTRUCTING THE INTERNAL AFFAIRS PROCESS | 2 | 1 | -1 |
| 314.39-1c | PERFORMANCE OF DUTY – INTENTIONAL SEARCH, SEIZURE, OR ARREST | 6 | 4 | -2 |
| 314.39-1d | PERFORMANCE OF DUTY – PLANTING EVIDENCE | 4 | 1 | -3 |

## 2017-2018 Complaint Allegations

| MOR | DESCRIPTION | # of Allegations 2017 | # of Allegations 2018 | Difference |
|---|---|---|---|---|
| 314.39-1e | PERFORMANCE OF DUTY – MIRANDA VIOLATION | 15 | 5 | -10 |
| 314.39-2e | PERFORMANCE OF DUTY – UNINTENTIONAL/IMPROPER SEARCH, SEIZURE, OR ARREST | 494 | 400 | -94 |
| 314.39-2f | PERFORMANCE OF DUTY - GENERAL | 508 | 451 | -57 |
| 314.39-2g | PERFORMANCE OF DUTY – CARE OF PROPERTY | 183 | 69 | -114 |
| 314.39-2h | PERFORMANCE OF DUTY – CHANGING WORK ASSIGNMENT | 0 | 1 | 1 |
| 314.39-2i | PERFORMANCE OF DUTY – PDRD | 43 | 29 | -14 |
| 314.42-1e | OBEDIENCE TO LAWS – FELONY | 16 | 13 | -3 |
| 314.42-1h | OBEDIENCE TO LAWS – DRIVING UNDER THE INFLUENCE | 5 | 12 | 7 |
| 314.42-2g | OBEDIENCE TO LAWS – MISDEMEANOR/INFRACTION | 12 | 14 | 2 |
| 314.48-1b | REPORTING VIOLATIONS OF LAWS, ORDINANCES, RULES OR ORDERS (CLASS I) | 10 | 16 | 6 |
| 314.69-1b | GIFTS, GRATUITIES – SOLICITING OR ACCEPTING | 4 | 4 | 0 |
| 314.74-2a | CONFLICT OF INTEREST | 0 | 1 | 1 |
| 328.07-1a | PROHIBITED ACTIVITY ON DUTY-SEXUAL ACTIVITY | 0 | 3 | 3 |
| 328.07-2c | PROHIBITED ACTIVITY ON DUTY | 15 | 2 | -13 |
| 328.49-2b | ABSENCE FROM DUTY | 1 | 10 | 9 |
| 328.53-1b | FALSE REPORTING OF ILLNESS OR INJURY | 1 | 3 | 2 |
| 328.63-1b | CONSUMPTION OF INTOXICANTS | 4 | 2 | -2 |
| 328.77-2b | USE OF TOBACCO PRODUCTS WHILE ON DUTY | 1 | 0 | -1 |
| 342.00-1c | DEPARTMENT PROPERTY AND EQUIPMENT - COLLISION W/ GROSS NEGLIGENCE | 1 | 0 | -1 |
| 342.00-2o | DEPARTMENT PROPERTY AND EQUIPMENT - PREVENTABLE COLLISION | 68 | 96 | 28 |
| 342.00-2q | DEPARTMENT PROPERTY AND EQUIPMENT - MISAPPROPRIATION/MISUSE | 0 | 2 | 2 |
| 342.00-2r | DEPARTMENT PROPERTY AND EQUIPMENT - LOSS/DAMAGE | 1 | 3 | 2 |
| 342.19-2b | DAMAGED, INOPERATIVE PROPERTY OR EQUIPMENT | 1 | 0 | -1 |
| 342.57-2b | CARE OF DEPARTMENT BUILDINGS | 1 | 0 | -1 |
| 356.89-1b | IMPROPER DISSEMINATION OF COMPUTER INFORMATION | 4 | 1 | -3 |
| 356.90-1b | UNAUTHORIZED USE OF ELECTRONIC SYSTEMS | 1 | 0 | -1 |
| 370.27-1f | USE OF PHYSICAL FORCE COMPARABLE TO LEVEL 1 | 4 | 13 | 9 |
| 370.27-1g | USE OF PHYSICAL FORCE - UNINTENTIONAL DISCHARGE OF FIREARM | 2 | 0 | -2 |
| 370.27-1h | USE OF PHYSICAL FORCE COMPARABLE TO LEVEL 2 | 27 | 19 | -8 |
| 370.27-1i | USE OF PHYSICAL FORCE COMPARABLE TO LEVEL 3 | 56 | 66 | 10 |
| 370.27-1j | USE OF PHYSICAL FORCE COMPARABLE TO LEVEL 4 | 158 | 111 | -47 |
| 370.27-1k | USE OF PHYSICAL FORCE - ANY | 78 | 95 | 17 |
| 370.27-1l | USE OF PHYSICAL FORCE - Non-Reportable Use of Force | 11 | 0 | -11 |
| 370.36-1b | CUSTODY OF PRISONERS - TREATMENT | 12 | 10 | -2 |
| 370.45-1e | REPORTS AND BOOKINGS | 9 | 3 | -6 |
| 370.63-1b | SECURITY OF DEPARTMENTAL BUSINESS | 3 | 0 | -3 |
| 370.90-2b | ENDORSEMENTS AND REFERRALS – NO FEE IS EXCHANGED | 1 | 0 | -1 |

## 2017-2018 Complaint Allegations

| MOR | DESCRIPTION | # of Allegations 2017 | # of Allegations 2018 | Difference |
|---|---|---|---|---|
| 370.72-1d | COMPROMISING CRIMINAL CASES | 0 | 3 | 3 |
| 370.81-1b | ASSISTING CRIMINALS | 0 | 1 | 1 |
| 384.70-1b | SUBVERSIVE ORGANIZATION | 1 | 0 | -1 |
| 398.16-1c | COURT APPEARANCES | 1 | 0 | -1 |
| 398.70-1b | INTERFERING WITH INVESTIGATIONS | 2 | 5 | 3 |
| 398.73-1b | RETALIATION | 9 | 6 | -3 |
| 398.74-1b | RETALIATION, ACCOUNTABILITY - SUPERVISORS | 1 | 0 | -1 |
| 398.76-1a | REFUSAL TO ACCEPT OR REFER COMPLAINT (INTENTIONAL) | 8 | 7 | -1 |
| 398.76-2a | FAILURE TO ACCEPT OR REFER A COMPLAINT (UNINTENTIONAL) | 83 | 65 | -18 |
| 398.77-1a | REFUSAL TO PROVIDE NAME OR SERIAL NUMBER | 39 | 22 | -17 |
| 398.80-1a | TRUTHFULNESS | 20 | 6 | -14 |
| | **Total Allegations** | 3267 | 2984 | -283 |
| | **Total Allegations minus "No MOR" and "Service Complaints"** | 2341 | 1950 | -391 |

# EXHIBIT H



**OAKLAND**
POLICE DEPARTMENT
455 7TH ST., OAKLAND, CA 94607 | OPDCRIMEANALYSIS@OAKLANDNET.COM

**CRIME ANALYSIS**

# End of Year Crime Report — Citywide
## 01 Jan. – 31 Dec., 2018

| Part 1 Crimes<br>*All totals include attempts except homicides.* | 2014 | 2015 | 2016 | 2017 | 2018 | Percentage Change 2017 vs. 2018 | 5-Year Average | 2018 vs. 5-Year Average |
|---|---|---|---|---|---|---|---|---|
| **Violent Crime Index**<br>(homicide, aggravated assault, rape, robbery) | **6,376** | **6,214** | **6,026** | **5,789** | **5,865** | 1% | 6,054 | -3% |
| **Homicide – 187(a)PC** | **79** | **83** | **85** | **71** | **68** | -4% | 77 | -12% |
| **Homicide – All Other \*** | **7** | **10** | **2** | **4** | **7** | 75% | 6 | 17% |
| **Aggravated Assault** | **2,696** | **2,739** | **2,736** | **2,865** | **3,006** | 5% | 2,808 | 7% |
| Assault with a firearm – 245(a)(2)PC | 420 | 342 | 331 | 281 | 277 | -1% | 330 | -16% |
| **Subtotal - Homicides + Firearm Assault** | 506 | 435 | 418 | 356 | 352 | -1% | 413 | -15% |
| Shooting occupied home or vehicle – 246PC | 333 | 297 | 270 | 197 | 217 | 10% | 263 | -17% |
| Shooting unoccupied home or vehicle – 247PC | 325 | 331 | 416 | 408 | 473 | 16% | 391 | 21% |
| Non-firearm aggravated assaults | 1,618 | 1,769 | 1,719 | 1,979 | 2,039 | 3% | 1,825 | 12% |
| **Rape** | **216** | **220** | **214** | **243** | **215** | -12% | 222 | -3% |
| **Robbery** | **3,385** | **3,172** | **2,991** | **2,610** | **2,576** | -1% | 2,947 | -13% |
| Firearm | 1,480 | 1,452 | 1,265 | 988 | 866 | -12% | 1,210 | -28% |
| Knife | 134 | 133 | 162 | 160 | 175 | 9% | 153 | 15% |
| Strong-arm | 1,256 | 1,203 | 1,126 | 1,076 | 1,199 | 11% | 1,172 | 2% |
| Other dangerous weapon | 78 | 82 | 96 | 89 | 87 | -2% | 86 | 1% |
| Residential robbery – 212.5(a)PC | 192 | 88 | 97 | 101 | 73 | -28% | 110 | -34% |
| Carjacking – 215(a) PC | 245 | 214 | 245 | 196 | 176 | -10% | 215 | -18% |
| **Burglary** | **11,542** | **11,307** | **10,423** | **12,924** | **10,107** | -22% | 11,261 | -10% |
| Auto | 7,563 | 7,973 | 7,601 | 10,374 | 7,802 | -25% | 8,263 | -6% |
| Residential | 3,063 | 2,620 | 2,129 | 1,928 | 1,548 | -20% | 2,258 | -31% |
| Commercial | 680 | 505 | 510 | 416 | 591 | 42% | 540 | 9% |
| Other (includes boats, aircraft, and so on) | 156 | 180 | 141 | 136 | 122 | -10% | 147 | -17% |
| Unknown | 80 | 29 | 42 | 70 | 44 | -37% | 53 | -17% |
| **Motor Vehicle Theft** | **7,487** | **7,608** | **7,973** | **6,933** | **6,092** | -12% | 7,219 | -16% |
| **Larceny** | **6,082** | **6,245** | **6,089** | **6,188** | **6,294** | 2% | 6,180 | 2% |
| **Arson** | **142** | **153** | **140** | **152** | **191** | 26% | 156 | 23% |
| **Total** | **31,636** | **31,537** | **30,653** | **31,990** | **28,556** | -11% | 30,874 | -8% |

THIS REPORT IS HIERARCHY BASED. CRIME TOTALS REFLECT ONE OFFENSE (THE MOST SEVERE) PER INCIDENT.

These statistics are drawn from the Oakland Police Dept. database. They are unaudited and not used to figure the crime numbers reported to the FBI's Uniform Crime Reporting (UCR) program. This report is run by the date the crimes occurred. Statistics can be affected by late reporting, the geocoding process, or the reclassification or unfounding of crimes. Because crime reporting and data entry can run behind, all crimes may not be recorded.

\* *Justified, accidental, fœtal, or manslaughter by negligence*
*PNC = Percentage not calculated — Percentage cannot be calculated.*
*All data extracted via the LEAP Network.*