PAMELA Y. PRICE, ESQ. (STATE BAR NO. 107713)
P.O. Box 5843
Oakland, CA  94605
Telephone:  (510) 452-0292
E-mail:  pamela@pypesq.com

LAWRENCE WHITE, ESQ. (STATE BAR NO. 69531)
195 - 41 Street, P.O. Box 11213
Oakland, CA 94611
Telephone: (510) 250-9040
E-mail:  larrywhitelcw@yahoo.com

Attorneys for Intervenors COALITION FOR
POLICE ACCOUNTABILITY, RASHIDAH
GRINAGE, SAIED KARAMOOZ, ANNE JANKS
AND JOHN JONES, III

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DELPHINE ALLEN, et al., | CASE NO.  C00-cv-04599-WHO |
| Plaintiffs, | DATE:       MAY 8, 2019 |
| | TIME:        2:00 P.M. |
| v. | DEPT:       2, 17TH FLOOR |
| CITY OF OAKLAND, et al., | |
| | HON. WILLIAM H. ORRICK |
| Defendants. | |

**INTERVENORS' NOTICE OF MOTION AND MOTION TO INTERVENE AS OF RIGHT, OR IN THE ALTERNATIVE, FOR PERMISSIVE INTERVENTION**

13512P301

NOTICE OF MOTION AND MOTION (C00-4599-WHO)

1

## TABLE OF CONTENTS

2

**TABLE OF CONTENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **i**

**TABLE OF AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **ii**

**MEMORANDUM OF POINTS AND AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . **1**

**INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**STATEMENT OF FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **3**

**STATEMENT OF ISSUES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **6**

**THE INTERVENORS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **6**

**I.     INTERVENTION IS AUTHORIZED UNDER FRCP RULE 24(a)** . . . . . . . .  **9**

**II.     PERMISSIVE INTERVENTION IS AUTHORIZED UNDER FRCP RULE 24(b)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **16**

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **17**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

3   *Alaniz v. Tillie Lewis Foods*, 572 F.2d 657 (9th Cir. 1978), cert. denied,
439 U.S. 837, 99 S.Ct. 123, 58 L.Ed.2d 134 . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

4   *Beckman Industries, Inc. v. International Insurance, Co.* (9th Cir. 1992) 966 F.2d 470
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

5
6   *Donnelly v. Glickman* (9th Cir. 1998) 159 F.3d 405 . . . . . . . . . . . . . . . . . . . . . . . . . . 11

7   *Freedom from Religious Foundation, Inc. v. Geithner* (9th Cir. 2011) 644 F.3d 836 . . . . . . 10, 16

8   *Hodgson v. United Mine Workers of America* (D.C. Cir. 1972) 473 F.2d 118 . . . . . . . . 12

9   *Janusziewicz v. Sun Shipbuilding & Dry Dock Co.* (3rd Cir. 1982) 677 F.2d 286 . . . . . . . . 12

10  *NAACP v. New York* (1973) 413 U.S. 345, 93 S.Ct. 2591, 37 L.Ed.2d 648 . . . . . . . . . . . . . . 11

11  *Peruta v. County of San Diego* (9th Cir. 2014) 771 F.3d 570 . . . . . . . . . . . . . . . . . . . . . . . . 16

12  *Smith v. Los Angeles Unified School District* (9th Cir. 2016) 830 F.3d 843 . . . . . . . . . . . 11, 16

13  *Trbovich v. United Mine Workers of America* (1972) 404 U.S. 528, 92 S.Ct. 630,
        30 L.Ed.2d 686 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

14  *United States v. Alisai Water Corp.* (9th Cir. 2004) 370 F.3d 915 . . . . . . . . . . . . . . . . . . . 11

15  *United States v. City of Los Angeles* (9th Cir. 2002) 288 F.3d 391 . . . . . . . . . . . . . . . . . . . 11

16  *United States v. Oregon* (9th Cir. 1984) 745 F.2d 550 . . . . . . . . . . . . . . . . . . . . . . . 11, 12

17  *Westlands Water District v. United States* (9th Cir. 1983) 700 F.2d 561 . . . . . . . . . . . . . . . 11

18  *Wilderness Social v. U.S. Forest Serv.* (9th Cir. 2011) 630 F.3d 1173 (9th Cir. 2011) . . . 11

19  **DOCKETED CASES**

20  *California Trucking Association v. Becerra*, Case No. 3:18-cv-02458-BEN-BLM . . . . . . . . 13

21  *Jack Marine International Services, Ltd v. Tilman Enterprises, Inc.*, Case
No. 18-cv-00693-BLF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

22  **FEDERAL STATUTES**

23  FRCP Rule 24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

24  **OTHER CITATIONS**

25  C. Wright & A. Miller, Federal Practice and Procedure § 1916 . . . . . . . . . . . . . . . . . . . . 11

26
27
28

13512P301TOA

**TO:    ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**NOTICE IS HEREBY GIVEN** that on May 8, 2019, or as soon as counsel may be heard in the above-entitled Court, the Coalition for Police Accountability, Rashidah Grinage, Saied Karamooz, Anne Janks and John Jones, III, will move the Court for an Order allowing them to intervene in this action forthwith on the grounds that community representation is essential to address the impact that the Negotiated Settlement Agreement ("NSA") is having on the residents of the City of Oakland, that community representation at this stage of the NSA will expedite the transformation of the Oakland Police Department and dramatically improve community-police relations and that the NSA is failing in part because it has not included the very people who are its intended beneficiaries and whose perspective could provide critical assistance to the Court in bringing the Oakland Police Department into compliance and terminating the NSA.

This Motion will be based on this Notice, the Memorandum of Points and Authorities, the Intervenors' Request for Judicial Notice, the Declarations of Rashidah Grinage, Saied Karamooz, Pamela A. Drake, Anne Janks, Cathy Leonard, John Jones, III, Lawrence White, Elise R. Bernstein and Rev. Dr. Harold Mayberry, all filed and served concurrently herewith, and upon such other and further matters as may be considered by the Court at the time of the hearing.

## Memorandum of Points and Authorities

### Introduction

This case began sixteen years ago, with the filing of several lawsuits alleging racial bias, excessive force and other serious constitutional violations by Defendants City of Oakland, the Chief of Police of the Oakland Police Department ("OPD") and several individual OPD officers.[1]

"In January 2003, the parties agreed to the Negotiated Settlement Agreement ("NSA"), which included fifty-one tasks that were scheduled to be completed by September 1, 2005.

---

[1]     This Introduction and the Statement of Facts hereinafter draw heavily on the prior Orders of this Court (per Henderson, J.) which summarize the history of the case and the Court's understanding of the issues.  (See *Order Modifying Monitoring Plan* (Doc. 1058) filed May 21, 2015, @ p. 1; *Order Modifying Compliance Oversight Model* filed February 12, 2014. Intervenors request that the Court take judicial notice of all of its prior Orders as indicated herein.

Defendants failed to meet that agreed-upon deadline, and the NSA was extended three times, first under its own terms and subsequently by the parties' Memorandum of Understanding ("MOU") and Amended Memorandum of Understanding ("AMOU"), which were entered as orders of this Court on November 24, 2009, and June 27, 2011, respectively. While Defendants made significant progress under these agreements, their inability to achieve compliance with several of the NSA's most critical provisions prompted Plaintiffs to file a motion to appoint a receiver in 2012. The Court ordered the parties to engage in settlement discussions after Defendants opposed the motion but acknowledged the need for further intervention by this Court. Those discussions resulted in the jointly proposed appointment of a Compliance Director, an unprecedented position giving directive authority over the City's police force."

(*Order Modifying Monitoring Plan* at p. 1.)

"The parties agreed to grant such authority – broad, essentially receiver-like powers in areas related to the negotiated reforms, including procurement authority for individual expenditures not exceeding $250,000 and the power to discipline, demote, or remove the Chief of Police – to a Compliance Director to be appointed by the Court.  Although the Court considered granting these additional powers to the Monitor instead of creating a second position, it endorsed the parties' agreement to vest such powers in a separate individual.  However, this arrangement [proved] to be unnecessarily duplicative and . . . less efficient and more expensive than the Court contemplated, and the Court [found] that it would be more appropriate and effective to now concentrate the powers of the Compliance Director and Monitor into one position."  (*Order Modifying Compliance Oversight Model* @ p. 2.)

Accordingly, on February 12, 2014, the Court terminated the authority of the Compliance Director and transferred his authority to the Court-appointed monitor, Robert S. Warshaw. (*Ibid.*)

Intervenors believe that the City has paid Mr. Warshaw and the plaintiffs' attorneys more than $29 million to monitor OPD. Despite the earnest efforts of Mr. Warshaw and the plaintiffs' attorneys and the Court's strident Orders, OPD continues to engage in unconstitutional conduct, including racial profiling targeting Black and Brown residents, use of excessive force, falsifying police reports, sex trafficking and obstruction of justice. Since the inception of the NSA, Intervenors believe the City of Oakland has paid more than $90,000,000 in settlements and judgments for abuse of police power. The City continues to be unable to hold OPD accountable or achieve compliance with the NSA. Despite the apparent forced resignation (or termination) of the former Chief Sean Whent, and the hiring of Chief Anne Kirkpatrick, OPD is going backwards.[2]

## Statement of Facts

Since 2014, the Court has appointed and re-appointed investigators to address OPD's persistent failure to comply with the NSA. On August 14, 2014, the Court directed the then Compliance Director to investigate the entire police disciplinary process. (*Order* (Doc. 1015).) The Court subsequently appointed Edward Swanson to assist the Compliance Director with this investigation. On April 16, 2015, Mr. Swanson issued a scathing indictment of OPD discipline and the City's arbitration practices (Report of the Court-Appointed Investigator in Delphine Allen v. City of Oakland (Doc. 1054) (hereinafter referred to as "Swanson I."). On August 20, 2015, the Court characterized the report as "both disappointing and shocking" and ordered the Defendants to work to eliminate the problems identified by the Court investigator. (*Order re: Investigator's Rep. on Arbitrations* (Doc. 1055).)

---

[2]     Mayor Libby Schaaf's public statements about the circumstances under which former OPD Chief Whent departed OPD have been both deceptive and confusing. Initially, in 2016, Mayor Schaaf proclaimed that Whent had stepped down for personal reasons, and that his departure had nothing to do with the sexual misconduct scandal. (See www.oaklandmagazine.com/Our-Backyard-Libby-Schaaf-Should-Apologize (accessed 3/31/19.) Later, when running for re-election in 2018, she claimed that she fired him. (Declaration of Saied Karamooz In Support of The Intervenors' Motion to Intervene As of Right, Or In the Alternative, For Permissive Intervention (hereinafter "Karamooz Dec.") filed and served concurrently herewith, @ 4:17-21.)

On January 26, 2016, the Court re-appointed Mr. Swanson to examine whether the City had implemented and was making sustainable progress on the recommendations in Swanson I. (*Order Re-Engaging Court Investigator* filed 1/26/16.) The Court was quite concerned about the City's response to its earlier Order and that the steps taken by the City did not "reflect full and sustainable implementation." (*Id. @* 1:23-2:28.)  The Court's concerns were "underscored" by information set forth in the two most recent Monitor Reports, including a case where ***"the investigator apparently ignored a video recording."*** (*Id. @* 2:17-19 (emphasis added).)

On March 23, 2016, the Court issued an Order regarding "irregularities and potential violations" of the NSA that occurred in connection with OPD's investigation of allegations of sexual misconduct by OPD officers.  The information came to the Court's attention following the suicide of OPD Officer Brendan O'Brien and the alleged suicide of his wife, Irma Huerta Lopez.[3] The Court ordered the Monitor to ensure that OPD investigated the sexual misconduct allegations thoroughly.  It appeared from the outset that OPD had made a conscious decision to conceal the allegations of sexual criminal misconduct from the Monitor and City officials. (See Court-Appointed Investigator's Report on the City of Oakland's Response to Allegations of Officer Sexual Misconduct filed June 21, 2017 (Doc. 1144) @ p. 4, Section III, Chronology of Key Events (hereinafter referred to as "Swanson II".)

Following the Court's Order, the OPD investigation was re-assigned and ultimately resulted in the discipline of twelve current and former officers, including the recommended termination of four officers. (Swanson II @ 5.)  Mr. Swanson was re-hired *a third time* to investigate "the quality and sufficiency of OPD's investigation of potential officer sexual misconduct" prior to the Court's March 23, 2016 Order.  (Swanson II @ 6.)  On June 21, 2017, Mr. Swanson issued another

---

[3] The City is currently facing two separate lawsuits by two OPD investigators who have alleged that OPD covered up the murder of Irma Huerta O'Brien by her husband, OPD Officer Brendan O'Brien.  (See *Gantt v. City of Oakland, et al.*, Alameda County Superior Court Case No. RG17850153 and *Oliver v. City of Oakland, et. al.*, Alameda County Superior Court Case No. RG19007795.  Copies of both complaints are attached to Intervenors' Request for Judicial Notice, Exhibits A and B.)

-4-
NOTICE OF MOTION AND MOTION (C00-4599 WHO)

completely damning report on OPD's "wholly inadequate" investigations and the City

administration's abject failure to provide leadership or oversight.  (Swanson II.)

On February 28, 2019, this Court re-appointed Mr. Swanson to advise Mr. Warshaw in

connection with the OPD investigation of the death of Joshua Pawlik.  (*Order Approving

Engagement of Edward Swanson* (Doc. 1235).)  On March 11, 2018, OPD officers woke up Joshua

Pawlik outside a home in North Oakland and shot him 22 times with AR-15 rifles.  In Mr.

Warshaw's review of OPD's Executive Force Review Board Report on Mr. Pawlik's death, he

found that the video of the shooting of Joshua Pawlik is inconsistent with the statements of the

officers who shot and killed Mr. Pawlik.

According to Mr. Warshaw, OPD investigators

(a) did not use the video to question the officers;

(b) did not address the inconsistencies between the video and the officers' statements; and

(c) used leading questions to support the justification of the officers' actions.

(See Compliance Director Robert S. Warshaw's Addendum to Oakland Police Department

Executive Force Review Board Report - Use of Force No. 18F-0067.)

According to Mr. Warshaw, the video shows minimal movements by Mr. Pawlik, consistent

with someone waking up.  The video "does not show an overt threatening action on his part."  Mr.

Warshaw concluded that there "was no information that Mr. Pawlik was an immediate threat to

anyone or had harmed anyone at that point." After reviewing all of the investigations undertaken by

the Department and the resultant deliberations of the Executive Force Review Board, Mr. Warshaw

rejected the Chief's principal conclusions.  OPD released the reports related to Mr. Pawlik's death

on March 7, 2019.

On March 19, 2019, Mr. Warshaw issued his Sixtieth status Report on the NSA.  (Sixtieth

Report of the Independent Monitor for the Oakland Police Department (Doc. 1238).  In his

conclusion, the Monitor reports:

> This incident [the March 2018 killing of Joshua Pawlik] and its
> aftermath speak not just to relevant Departmental policy - but
> transcend a multitude of Tasks that are either currently active, have

recently been reactivated by the Court, or are currently inactive. Accordingly, the developments brought about as a result of this matter have called into question the measure to which the Department fully understands its responsibilities pertaining to the relevant Tasks and the NSA in general.

(Doc. 1238 @ 13.)

## Statement of Issues

1.      Whether the Court is required to grant the instant motion as a matter "of right" under FRCP Rule 24(a); or

2.      Whether the Court should exercise its discretion under FRCP Rule 24(b) to allow the movants to intervene in this action.

## The Intervenors

**1.      The Coalition for Police Accountability ("the Coalition" or "CPA")**

The mission of the Coalition for Police Accountability ("the Coalition" or "CPA") is to advocate for accountability of the Oakland Police Department to the community so that the Oakland Police Department operates with equitable, just, constitutional, transparent policies and practices that reflect the values and engender the trust of the community.  (See the Declarations of Rashidah Grinage, Saied Karamooz, Lawrence White, Elise R. Bernstein and Anne Janks In Support of The Intervenors' Motion to Intervene As of Right, Or In the Alternative, For Permissive Intervention, all filed and served concurrently herewith.)[4]  Founded in 2011, the Coalition includes individuals and Oakland-based community and labor organizations.  (See Declaration of Rashidah Grinage (hereinafter "Grinage Dec." @ 4:3-4.)

The Coalition is a 501(c)(4) non-profit organization governed by a Board of Directors and an 11-member Steering Committee.  (Grinage Dec. @ 4:7-8.)  In April 2016, it launched a campaign to pass Measure LL, which transferred the power to discipline police officers from the City Administrator to a body of Oakland residents who serve as Police Commissioners.  The Commission also has the power to review and create policy and practices.  (Grinage Dec. @ 4:13-

---

[4]      The Coalition's website can be accessed at www.coalitionforpoliceaccountability.com.

-6-
NOTICE OF MOTION AND MOTION (C00-4599 WHO)

14.)  The Coalition's members drafted Measure LL, and brought it to the Oakland City Council as fully developed legislation.  (Declaration of Lawrence White (hereinafter "White Dec." @ 2:18-25.)  What was approved by the City Council and placed on the ballot was almost entirely the work of the Coalition.  (White Dec. @ 2:22-25.)  Measure LL passed overwhelmingly with 83% of the voters voting "yes."  (White Dec. @ 2:27; Declaration of Cathy Leonard In Support of The Intervenors' Motion to Intervene As of Right, Or In the Alternative, Permissive Intervention (hereinafter "Leonard Dec.") @ 4:21-28, filed and served concurrently herewith.) )

The Coalition's major activities are to monitor the implementation of Measure LL and the activities of the Oakland Police Commission, and inform and educate the community on issues related to policing policies and practices in Oakland.  (Grinage Dec. @ 4:9-26.) Two of the individual proposed intervenors serve on the Coalition's Steering Committee.  (Grinage Dec. @ 4:15-16; Karamooz Dec. @ 2:21-3:8.)

### 2.    Rashidah Grinage

Rashidah Grinage is a longtime resident of Oakland and the founder of the Coalition.  She currently serves as its Coordinator and as a member of the Steering Committee.  (Grinage Dec. @ 4:15-16.)  Rashidah's personal experience with the OPD includes the 1993 murder of her 63-year African-American husband and her 20-year old son in a botched attempt by OPD to quarantine her son's dog.  (Grinage Dec. @ 2:6-9.)  Her surviving three (3) sons also live in Oakland.  (Grinage Dec. @ 2:20-23.)  As the Executive Director of PUEBLO (People United for A Better Life in Oakland), Rashidah directed the Campaign for Community Safety and Police Accountability and served on Mayor Ronald V. Dellums' Police Issues Task Force.  (Grinage Dec. @ 3:1-9.)

Rashidah organized the community movement to pass Measure LL, the enabling legislation to create an independent police commission in Oakland.  (Grinage Dec. @ 3:21-4:2.)  She helped draft Measure LL, acquire City Council sponsors Noel Gallo and Dan Kalb and persuade the City Council to vote unanimously to place this measure on the 2016 ballot.  (Grinage Dec. @ 3:28-4:2.)  She has been in frequent communication with the attorneys for the plaintiffs, the Court-appointed monitor Robert Warshaw and regularly attends the meetings of the Oakland Police Commission.

(Grinage Dec. @ 4:16-18.)

### 3.   Saied Karamooz

Saied Karamooz is a member of the Coalition and serves on its Steering Committee. (Karamooz Dec. @ 3:2-5.)  He participated in the community movement to pass Measure LL, the enabling legislation which created the Oakland Police Commission.  (Karamooz Dec. @ 3:9-12.) Saied participates in a number of community organizations, including the Oakland Justice Coalition and the Oakland Privacy Advocacy Group, and has served as the President of the Jack London Improvement District.  (Karamooz Dec. @ 3:2-4; 3:12-14.)

Saied is a graduate of Penn State University where he earned his Bachelors degree in Computer Science (1986), Masters degree in Business Administration (2001) and a Masters degree in Information Sciences (2003).  (Karamooz Dec. @ 2:20-3:1.)  Saied has frequently personally observed what appears to be the use of excessive force against Black men by OPD in West Oakland.  (Karamooz Dec. @ 1:23-2:20.)

### 4.   Anne Janks

Anne Janks is a longtime resident of Oakland and a member of the Coalition.  (Declaration of Anne Janks (hereinafter "Janks Dec.") @ 1:23; 2:15.)  Anne frequently observes police activity in her North Oakland neighborhood, including police vehicles speeding and driving recklessly in the streets and targeting her neighbors, especially Black men and boys.  (Janks Dec. @ 1:24-27.) Anne is deeply rooted in the Oakland community, having participated in a number of community organizations and civic activities, worked on campaigns to protect tenants, low-income workers, and immigrants.  (Janks Dec. @ 2:6-8.)  Anne also participated in the community movement to pass Measure LL, the enabling legislation to create an independent police commission in Oakland, by canvassing, collecting signatures and organizing education events for the public.  (Janks Dec. @ 2:9-11.)  Anne  regularly attends the meetings of the Oakland Police Commission.  (Janks Dec. @ 2:15-16.)

### 5.   John Jones III

Born, raised, and living in East Oakland, John Jones III is a third generation Oaklander, a

father of three, and was formerly incarcerated for 14 years in the California Youth Authority and state prison. (Jones Dec. @ 1:25-27.) John serves and gives back to his Community as a staunch advocate for criminal justice reform, housing, employment, public safety, and the human rights of all. (Jones Dec. @ 1:27-28.) John works as the Director of Community and Political Engagement at the Oakland-based Dellums Institute for Social Justice. (Jones Dec. @ 2:1-2.)

John is a member of the Coalition and served as the Vice Chair of the Selection Panel for the Oakland Police Commission. (Jones Dec. @ 3:6-7.) He is also a member of the Board of State and Community Corrections (BSCC) Proposition 47 Executive Steering Committee, as well as a Board Member for Planting Justice and Together We Stand. (Jones Dec. @ 2:2.) He was a leading organizer of the Oakland Justice Reinvestment Coalition and formerly employed as an organizer with Communities United for Restorative Youth Justice (CURYJ) in Oakland. (Jones Dec. @ 2:4-6.) John regularly attends the meetings of the Oakland Police Commission. (Jones Dec. @ 2:26-27.)

## I.   Intervention is Authorized Under FRCP Rule 24(a)

This Court has repeatedly observed and pointed out that the "overall objective" of the NSA is "to enhance the ability of the Oakland Police Department . . . to protect the lives, rights, dignity and property of the community it serves." (NSA at 1; *Order re: Force Review Board and Executive Force Review Board Policy* filed 12/11/15 (Doc. 1076) @ 2:14-18; *Order re: Investigator's Report on Arbitrations* filed 4/20/15 (Doc. 1055) @ 1:26-2:8; 3:28-4:4.)

In its April 2015 Order the Court stated:

As the January 2003 Negotiated Settlement Agreement ("NSA") makes clear, the goal in this litigation has always been to protect the public against police misconduct - including the racial bias, excessive force, planting of evidence, and falsifying of reports alleged by Plaintiffs - and to ensure accountability whenever misconduct occurs:

The parties join in entering into this Settlement Agreement . . . to promote police integrity and prevent conduct that deprives persons of the rights, privileges and immunities secured or protected by the Constitution or laws of the United States. The overall objective of this document is to provide for the expeditious implementation . . . of the best available practices and procedures for police management in the areas of supervision, training and accountability mechanisms, and to enhance the ability of the Oakland Police Department . . . to protect

the lives, rights, dignity and property of the community it serves.

NSA at 1. Notably, the City is a named party in this case and a signatory to the NSA; thus, while the OPD is the primary focus of the NSA reforms, the City as a whole bears ultimate responsibility.

\* \* \*

The City's shortcomings also have a significant impact on the public, which can have no confidence that the discipline system works if discipline is regularly overturned at arbitration. More fundamentally, reinstating officers whom the City has determined should be terminated for unjustified uses of force - including, as in the Jimenez case, a fatal shooting - creates very serious public safety risks.

(Doc. 1055 @ 1:26-2:11; 3:28-4:4.)

This Court's Orders and understanding of the fundamental purpose of the NSA go to the heart of the intervenors' motion to intervene in this litigation. For more than a decade, community activists have stood by while the City and OPD fumbled compliance with the NSA, *over and over again.* In 2011, these activists started the Coalition for Police Accountability. In 2016, they organized and led an electoral campaign to create the Oakland Police Commission. They are fully versed in the Court's Orders, have often sought to engage the Monitor and the plaintiffs' attorneys and regularly attend the meetings of the new independent Police Commission.

Under Rule 24, intervention is permitted either as a matter "of right" or permissively in the Court's discretion. There are four mandatory requirements for intervention as "of right":

(1)   The motion must be timely

(2)   The applicant must have a "significantly protectable" interest related to the transaction involved in the lawsuit

(3)   The disposition of the lawsuit may, as a practical matter, impair or impede the applicant's ability to protect his interest

(4)   The applicant's interest must be inadequately represented by the existing parties to the action.

FRCP Rule 24(a)(2); *Freedom from Religious Foundation, Inc. v. Geithner* (2011) 644 F.3d 836, 840-841.

In evaluating motions to intervene, "courts are guided primarily by practical and equitable considerations, and the requirements for intervention are broadly interpreted ***in favor of***

-10-
NOTICE OF MOTION AND MOTION (C00-4599 WHO)

*intervention*." (*United States v. Alisai Water Corp.*, 370 F.3d 915, 919 (9ᵗʰ Cir. 2004) (emphasis added); *see also Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173, 1179 (9th Cir. 2011) (en banc) (noting that "[a] liberal policy in favor of intervention serves both efficient resolution of issues and broadened access to the courts" (quoting *United States v. City of Los Angeles*, 288 F.3d 391, 397-98 (9th Cir. 2002) (alteration in original)); *Donnelly v. Glickman*, 159 F.3d 405, 409 (9th Cir. 1998).

With respect to the first requirement, this case has been pending for sixteen years.  The mere lapse of time, however, is not dispositive. (*United States v. Oregon*, 745 F.2d 550, 552 (9ᵗʰ Cir. 1984), citing C. Wright & A. Miller, supra, § 1916, at 574.)  In *Smith v. Los Angeles Unified School District*, 830 F.3d 843 (9ᵗʰ Cir. 2016), the Court ordered the district court to grant the motion to intervene filed twenty years after the commencement of the case, and seventeen years after the adoption of the first Consent Decree.

Moreover, the Supreme Court has held that the timeliness requirement for intervention as of right should be treated more leniently than for permissive intervention because of the likelihood of more serious harm.  (*NAACP v. New York*, 413 U.S. 345, 366, 93 S.Ct. 2591, 2603, 37 L.Ed.2d 648 (1973); *see also Alaniz v. Tillie Lewis Foods*, 572 F.2d 657, 659 (9th Cir. 1978), cert. denied, 439 U.S. 837, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978); *Westlands Water Dist. v. United States*, 700 F.2d 561, 563 (9th Cir.1983) (factors of Rule 24(a) should be construed favorably to intervenor); 7A C. Wright & A. Miller, Federal Practice and Procedure § 1916 (1972).

Under the NSA, the basic issues have all been determined and decided.  What remains "at issue" is the City's failure to comply with the NSA.  The Pawlik incident and its aftermath, however, places the litigation squarely at a crossroads and a new stage in the litigation with a possible motion to appoint a receiver and the possible termination of the current OPD Chief.⁵  The

---

⁵/   On March 11, 2019, following the release of the Pawlik reports, the CPA called upon Mr. Warshaw to terminate Chief Anne Kirkpatrick.  At the same time, there are rampant rumors circulating in the community that plaintiffs' counsel intend to file a motion to place OPD into receivership.  (Grinage Dec. @ 6:11-13; Janks Dec. @ 3:27-4:1.)

Pawlik documents were just released to the public on March 7, 2019, and it was then that the Coalition became aware of Chief Kirkpatrick's mendacity and Mr. Warshaw's critique of the investigation.

Shortly thereafter, on March 19, 2019, Mr. Warshaw filed his Sixtieth Report which found OPD "to no longer be in compliance" with Task 30. This finding represents a major step backward for OPD. Mr. Warshaw's findings of the serious deficiencies of the OPD investigations of Mr. Pawlik's killing prompted this Court to *re-appoint* Edward Swanson to conduct yet another investigation into what went wrong! As Mr. Warshaw points out, these developments "called into question the measure to which the Department fully understands its responsibilities pertaining to the relevant Tasks and the NSA in general." (Doc. 1238 @ 13.)

Under these circumstances, the intervenors feel compelled to act to represent and protect the interests of the community. Their decision, triggered by the current controversy, is very timely. A change of circumstance suggesting that the litigation is entering a new stage is considered a factor in favor of granting the application. (*See also Hodgson v. United Mine Workers of America*, 473 F.2d 118 (D.C.Cir. 1972) (request to intervene as of right after the trial stage allowed where applicants sought to participate in the remedial and appellate phases of the case and agreed not to reopen matters previously litigated)*; Janusziewicz v. Sun Shipbuilding & Dry Dock Co.*, 677 F.2d 286, 293 (3d Cir. 1982) (intervention should have been granted where applicant sought to participate in a new phase of litigation).

In this context, the only significant question before the Court is whether any party is unduly prejudiced by their entry in the case at this time. (*United States v. Oregon*, 745 F.2d *supra* at 552.) There does not appear to be any undue prejudice to any party.

With respect to the second requirement, a "significantly protectable" interest appears to require (1) an interest that is protected under some law; and (2) a relationship between the applicant's legally protected interest and the plaintiff's claims. The community and these intervenors clearly have a legally protected interest in (1) stopping OPD's use of excessive force which continues to result in tragic and unnecessary deaths; (2) eliminating racial profiling of Black

and Brown residents; and (3) ensuring accountability for misconduct by imposing appropriate discipline.  These are all concerns which were at the heart of the lawsuit.  Indeed, these concerns have been expressed over and over again by the Court in its frustrated efforts to get the City to comply with the NSA.

With respect to the third requirement, it is obvious that the Court's Orders, including the extension or expansion of Mr. Warshaw's powers, the re-appointment of Mr. Swanson, and certainly, the imposition of a receivership, as well as OPD and the City's continued recalcitrance, will impair or impede the community's ability to protect its interests.  The residents of Oakland are the ones who pay for the monitoring, the investigations, and the million dollar settlements resulting from OPD's continued misconduct.  While the City has covered these costs, the number of unhoused residents has spiralled out of control, and the City continues to operate in a budget deficit with no end in sight.  Additionally, the residents voted overwhelmingly to establish an independent Police Commission which also has no voice in any of the current decisions facing the Court.

With respect to requirement No. 4, the most important fact in determining adequacy of representation is how the interests compares with the interests of the existing parties.  In *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972), the Supreme Court held that this fourth element of Rule 24(a) intervention requires only a "minimal" showing that existing parties' representation "may be" inadequate.  (*Accord, Jack Marine International Services, Ltd v. Tilman Enterprises, Inc.,* Case No. 18-cv-00693-BLF (USDC ND Cal. 3/12/18); *California Trucking Assn. v. Becerra*, Case No. 3:18-cv-02458-BEN-BLM (USDC, SD Cal. 1/14/19).

Intervenors contend that at this stage of the litigation, the community's interest have diverged from the interests of the plaintiffs.  The original plaintiffs, acting by and through their counsel, are interested in the completion of the tasks set forth in the NSA, regardless of how long it takes the City to comply.  As long as the NSA is not complete, plaintiffs' counsel will be compensated for their services.  In fact, plaintiffs' lead counsel John L. Burris has directly benefitted from OPD's failures by being able to individually represent plaintiffs whose rights have

13512P301

been violated by OPD.[6]

The Coalition has made several public records requests over the years trying to "follow the money" spent on monitoring and settlements and judgments occurring even while OPD is being monitored.  Based on the documents it received from the City of Oakland listing the expenses of this case, it has calculated that the City has spent at least $29 million dollars just on the monitoring. (Grinage Dec. @ 5:11-17 and Exhibits thereto.)  The City administration, represented by the City Attorney's office, as observed by Judge Henderson has shown absolutely no concern whatsoever for the millions of dollars it has paid Mr. Burris and others to settle civil lawsuits, hundreds of thousands of dollars for back pay and attorneys' fees to reinstated officers or the substantial costs of monitoring.[7]

As reflected in both of the previous Swanson investigative reports commissioned by the Court, the actions of OPD and the City consistently raise ***"questions of sustainable progress in the absence of Court supervision."***  (Swanson II @ 30; (emphasis added); see also Sixtieth Report of the Independent Monitor for the Oakland Police Department (Doc. 1238 @ 13) ("the developments brought about as a result of this matter have called into question the measure to which the

---

[6]   According to the parties' Case Management Statement filed March 22, 2019 (Doc. 1240) @ 5:11-14, Attorney Burris now represents the Pawlik family and therefore will be recusing him from "any police department, monitor, plaintiffs' attorney, or compliance director investigation and decision-making involving the Pawlik matter except any court hearing that is referenced in the December 12, 2012 Order of Judge Henderson."  Over the past 16 years, Burris has frequently stepped in to represent victims of police misconduct that occurred "on his watch" and received substantial compensation for his services, including most recently, the plaintiff at the center of the OPD sexual misconduct scandal (Celeste Guap (settlement of $989,000) and the family of Demouria Hogg ($1.2 million).  The decision to recuse himself at this stage of the litigation may signal a new day and actually impact the plaintiffs' ability to pursue remedial action based on the failures highlighted by the Monitor in the Pawlik case.

[7]   *Order re: Investigator's Report on Arbitrations*, Doc. 1055 @ 2:26-3:4.  The Coalition has made several public records requests over the years trying to "follow the money" spent on monitoring and settlements and judgments occurring even while OPD is being monitored. Based on the documents received from the City of Oakland, the Coalition believes that the City has paid more than $70,000,000 for lawsuits based on OPD's misconduct since 2003.  (Grinage Dec. @ 5:16-17.)

-14-
NOTICE OF MOTION AND MOTION (C00-4599 WHO)

13512P301

1   Department fully understands its responsibilities pertaining to the relevant Tasks and the NSA in

2   general.")

3          In contrast, as long as the NSA is incomplete, the community is extremely prejudiced and

4   concerned about the financial burdens of paying plaintiffs' counsel, the Monitor, the special experts

5   and investigators. (Declaration of Rev. Dr. Harold Mayberry In Support of The Intervenors'

6   Motion to Intervene As of Right, Or In the Alternative, For Permissive Intervention (hereinafter

7   "Mayberry Dec.") @ 3:10-17; Leonard Dec. @ 3:3-9; 5:19-6:17; Karamooz Dec. @ 3:15-22.)  The

8   Coalition and the individual intervenors are strongly motivated by a desire to stop spending money

9   on unnecessary civil lawsuits and achieving an effective and expeditious end to the monitoring

10  process. (Grinage Dec. @ 5:1-10; Janks Dec. @ 3:15-20; Karamooz Dec. @ 4:8-11; Jones Dec. @

11  4:7-16; Declaration of Elise R. Bernstein In Support of The Intervenors' Motion to Intervene As of

12  Right, Or In the Alternative, For Permissive Intervention (hereinafter "Bernstein Dec.") @ 2:25-27;

13  3:14-19.)

14         These community advocates have demonstrated their commitment to sustainable progress

15  and effective oversight by creating an independent police commission, supporting it at every

16  opportunity and educating the community about the necessary steps to achieve compliance with the

17  NSA and real police reform. (Grinage Dec. @ 4:9-26; Janks Dec. @ 2:9-16; 3:15-25; Jones Dec.

18  @ 2:22-3:9; 3:17-21; Leonard Dec. @ 1:27-3:2; 3:10-4:28.)  The CPA and its community

19  advocates are the only ones with a vision of how to achieve effective and sustainable oversight after

20  the NSA finally ends, and a commitment to move in that direction.

21         Currently, none of the existing parties is advocating for community involvement,

22  notwithstanding the creation and existence of the Oakland Police Commission. (White Dec. @

23  3:11-4:1; 4:15-19; Janks Dec @ 3:15-20; 3:26-27.) As the proposer and instigator of the

24  Commission, the CPA is particularly suited to advocate for the community and the Commission to

25  have a voice in these matters.  Notably, at the very outset of the litigation, Ms. Grinage and other

26  activists suggested some form of community involvement in the NSA.  (Grinage Dec. @ 3:10-14.)

27  Attorney Burris disagreed and demurred.  (Grinage Dec. @ 3:15-16.) Sixteen years later, it appears

28

-15-
NOTICE OF MOTION AND MOTION (C00-4599 WHO)

that the community's exclusion from the process has not served the interests of the community. (White Dec. @ 4:2-19; Jones Dec @ 3:10-4:1; 4:7–16; Karamooz Dec @ 1:23-2:20; 3:15-4:11; Janks Dec @ 2:22-3:20; Bernstein Dec. @ 2:16-3:19; Mayberry Dec. @ 2:21-3:17.)

Given the liberal policy in favor of intervention and the practical and equitable considerations in this unprecedented case, intervenors respectfully request that they be permitted to intervene as a matter of right.

## II.   Permissive Intervention is Authorized Under FRCP Rule 24(b)

Intervenors request permission to intervene in the case in the alternative under FRCP Rule 24(b)(1)(B).  In the Ninth Circuit, permission intervention generally requires (1) an independent ground for jurisdiction; (2) a timely motion; and (3) a common question of law and fact between the movant's claim or defense and the main action."  (*Geithner*, 644 F.3d *supra* at 843.)

Permissive intervention does not require independent jurisdictional grounds where putative "intervenors do not seek to litigate a claim on the merits" or "become parties to the action." (*Beckman Industries, Inc. v. International Ins., Co.*, 966 F.2d 470, 473 (9th Cir. 1992).)  Intervenors "ask the court only to exercise the power that it already has, i.e., the power to modify the protective order.  For that reason, no independent jurisdictional basis is needed."  (*Ibid.* at 473.)

"Intervention, both of right and by permission, can occur only `[o]n timely motion.'" (*Peruta v. County of San Diego*, 771 F.3d 570, 572 (9th Cir. 2014) (quoting Rule 24).)  "Timeliness is determined with reference to three factors: `(1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay.'" (*Id.*) "[T]he only `prejudice' that is relevant under this factor is that which flows from a prospective intervenor's failure to intervene after he knew, or reasonably should have known, that his interests were not being adequately represented — and not from the fact that including another party in the case might make resolution more `difficult.'" (*Smith v. Los Angeles Unified Sch. Dist.*, 830 F.3d *supra* at 857.)

As set forth above, the Pawlik incident and its aftermath, however, places the litigation squarely at a crossroads and possibly a new stage in the litigation with a possible motion for a

1   receiver and the possible termination of the current OPD Chief.  The Pawlik documents were just

2   released to the public on March 7, 2019, and on March 19, 2019, Mr. Warshaw filed his Sixtieth

3   Report which found OPD "to no longer be in compliance" with Task 30.  This finding represents a

4   major step backward for OPD.  The Coalition's decision to intervene is both timely and appropriate.

5                                              **<u>Conclusion</u>**

6            Over the past sixteen years, the City and OPD have gone literally "one step forward, two

7   steps backward."  The monitoring process has dragged on more than eleven years past its five year

8   expiration date with no end in sight.  Yet, the passage of Measure LL and the creation of the

9   Oakland Police Commission signals that a new day is dawning in Oakland.  The time for the

10  community to participate in the reformation of its police department has come.  This motion gives

11  the Court a new ally, a new way forward and a greater chance of success in ending the NSA in a

12  way that is sustainable in the absence of court supervision.  For all of the reasons set forth herein,

13  the Motion should be granted.

14  Dated:  April 2, 2019                              Respectfully Submitted,

15

16                                        _____ /s/ _Pamela Y. Price_____
                                          PAMELA Y. PRICE, Attorney for
17                                        Intervenors COALITION FOR
                                          POLICE ACCOUNTABILITY, RASHIDAH
18                                        GRINAGE, SAIED KARAMOOZ, ANNE
                                          JANKS AND JOHN JONES, III
19

20

21

22

23

24

25

26

27

28