Pages 1 - 58

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

DELPHINE ALLEN; et al.,        )
                               )
          Plaintiffs,          )
                               )
  VS.                          )      **NO. C 00-04599 WHO**
                               )
CITY OF OAKLAND; et al.,       )
                               )
          Defendants.          )
_____)

                          San Francisco, California
                          Wednesday, April 3, 2019

                  **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    JAMES B. CHANIN LAW OFFICES
                    3050 Shattuck Avenue
                    Berkeley, California  94705
              BY:   **JAMES B. CHANIN, ATTORNEY AT LAW**

                    LAW OFFICES OF JOHN L. BURRIS
                    Airport Corporate Center
                    7677 Oakport Street - Suite 1120
                    Oakland, California  94621
              BY:   **JOHN L. BURRIS, ATTORNEY AT LAW**

            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

```
 1   APPEARANCES:   (CONTINUED)

 2   For Defendants:
                             OFFICE OF THE CITY ATTORNEY
 3                           1 Frank H. Ogawa Plaza - 6th Floor
                             Oakland, California  94612
 4                  BY:   KIMBERLY A. BLISS, SUPERVISING DEPUTY
                             CITY ATTORNEY
 5                        VERONICA L. HARRIS, Deputy City Attorney
                          BARBARA J. PARKER, CITY ATTORNEY
 6                        DAVID PEREDA, SPECIAL COUNSEL

 7   For Intervenor Oakland Police Officers Association:
                             RAINS LUCIA STERN ST. PHALLE
 8                             & SILVER PC
                             2300 Contra Costa Blvd. - Suite 500
 9                           Pleasant Hill, California  94523
                    BY:   ROCKNE A. LUCIA, JR., ATTORNEY AT LAW
10
     Also Present:         Mayor Libby Schaaf
11                         Sabrina Landreth, City Administrator
                           Police Chief Anne Kirkpatrick
12                         Darren Allison, Acting Assistant Chief
                           Oliver Cunningham, Deputy Chief
13                         Leronne Armstrong, Deputy Chief
                           Virginia Gleason, Deputy Director
14                         Kirk Coleman, Captain
                           Sekou Millington, Captain
15

16

17

18

19

20

21

22

23

24

25
```

<u>**Wednesday - April 3, 2019**</u>                                        <u>**3:37 p.m.**</u>

**P R O C E E D I N G S**

**---oOo---**

**THE CLERK:**  We are here in Case Number 00-4599, Allen, et al., versus City of Oakland, et al.

Counsel, if you would please come forward and state your appearance for the record.

**MR. CHANIN:**  James Chanin for plaintiffs, Your Honor.

**MR. BURRIS:**  John Burris for the plaintiffs, Your Honor.  Good afternoon.

**THE COURT:**  Good afternoon.

**MS. BLISS:**  Good afternoon, Your Honor. Kimberly Bliss for the City and County.

**THE COURT:**  Ms. Bliss.

**MS. BLISS:**  Sorry.  I used to work for San Francisco too often.  We're just a city.  The City of Oakland.

With me I have Barbara Parker, the City Attorney; a number of other attorneys from her office, including David Pereda and Veronica Harris.  I also have City Administrator Sabrina Landreth, Mayor Libby Schaaf, and the Chief of Police Anne Kirkpatrick.

**THE COURT:**  And, Ms. Bliss, I understand this may be your last appearance in this court; is that true?

**MS. BLISS:**  It is, Your Honor.

**THE COURT:**  I've enjoyed having you here.  You've done

1    an excellent job as an advocate.

2              **MS. BLISS:**  Thank you very much.

3              **MR. LUCIA:**  Good afternoon, Your Honor.  Rocky Lucia

4    for intervenor Oakland POA.

5              **THE COURT:**  Good afternoon.

6         All right.  So I've read the joint status conference

7    statement, the City's 3/22 status report, the FRB report on the

8    officer-involved shooting in March of 2018, Chief Kirkpatrick's

9    and the compliance director's addendums to it, and the

10   independent monitor's report.

11        Let me tell you what I know from those documents.  Number

12   one, at the last status I emphasized my concern that the

13   Oakland Police Department was not reporting use of force

14   incidents accurately, which undermined its credibility with the

15   Court.  Since then I note that the Department has referred

16   several officers and supervisors for Internal Affairs

17   investigations and possible disciplinary action and that it's

18   rewriting its use of force policies and modifying definitions,

19   training, and undertaking internal audits.  So that's great.

20        I also note that there has been an uptick in Level 3 uses

21   of force, and I'm interested in OPD's explanation for that.

22        Number two, OPD's data shows that the number of stops in

23   Oakland has fallen dramatically.  Assuming that that

24   information is reported accurately, that's very important and a

25   very positive accomplishment.  55 percent of those stops are

1  still of African Americans, basically the same percentage as in

2  the past.  I'm interested in how OPD is addressing that racial

3  disparity.

4        Number three, the City has completed 42 of the 50 Stanford

5  recommendations.

6        Number four, the City is on track to implement PRIME 2.0,

7  now known as VISION, in July on schedule.  This has been an

8  important priority and, if implemented and used to its

9  potential, will be a valuable technological tool supporting

10  constitutional policing.

11        Number five, complaints by citizens are trending up.  Why

12  is that?  I look forward to the City's analysis of this, as

13  well as to the monitor's perspective and analysis down the

14  road.

15        Number six, concerns are also reported from Oakland Black

16  Officers Association.  I'm going to address that in a moment.

17        Number seven, regarding the City's response to the

18  officer-involved shooting, that raised concerns with respect to

19  compliance with Task 5 concerning complaint procedures for IAD;

20  24, use of force reporting policy; 25, use of force

21  investigation and report responsibilities; 30, Executive Force

22  Review Board; and 31, officer-involved shooting investigations.

23        I've reactivated Tasks 24, 25, and 31 in November.  OPD

24  has proposed remedial steps to better address interaction with

25  the homeless and people who are unconscious, which is a good

1    start.

2        So I don't really need any presentation that rehashes

3    those facts.

4        Now I'm going to tell you what my concerns are.  The

5    genesis of this Court's involvement in this case was the

6    culture in OPD that allowed the Riders to flourish.  The

7    purpose of all the policies and procedures required by the NSA

8    was to provide a structure within which cultural change to

9    constitutional policing could occur, but all the great policies

10   in the world will not ensure cultural change.  That comes from

11   leadership, principled, ethical, courageous leadership from the

12   top that permeates throughout the organization.

13       It's leadership that is not transactional.  It demands the

14   best and it keeps its eyes on the prize, and the prize is not

15   ending court involvement with OPD, although that would be a

16   great by-product.  The prize is constitutional policing, and

17   anything less than that is insufficient.

18       The defendant in this case is the City of Oakland and

19   ultimately the responsibility for OPD's 15 years under court

20   supervision and the wholehearted implementation of the NSA lies

21   with City leaders, starting with the mayor.  Expectations are

22   set at the top and the demand for excellence must run through

23   the entire structure of the Police Department.

24       With that in mind, concerns about recruiting, hiring, and

25   hearing the grievances of African American, Latino, Asian, and

1  women officers is of great significance to me.  When it comes

2  to cultural change, their concerns are of particular interest.

3      Proactive rather than reactive responses to issues is

4  critical.  For example, credibility of data regarding the use

5  of force; failure to address policies, practices, and

6  procedures regarding the homeless and unconscious, which should

7  have occurred after the first incident resulting in the death

8  of a citizen, not the second.  Outside experts should not be

9  the force propelling OPD to constitutional policing.  That

10  should be internal coming from the mayor on down.

11      Cultural change is hard.  It's not about paper compliance

12  or checking boxes.  Officers' conduct and interactions with the

13  community are the products of leadership and supervision of the

14  front-line supervisors, their commanders, and the executives

15  above them.

16      So what I'm looking for is the manifestation of cultural

17  change concerning all of those issues that we've been talking

18  about since I took over.

19      So with that, Ms. Bliss.

20      **MS. BLISS:**  Thank you, Your Honor.

21      So as you know, this is my last case management conference

22  and I have generally made the City's substantive presentations

23  over the last two years; but to Your Honor's point, exactly

24  what you've just spoken about, cultural change and

25  understanding within the City and the command structure, we had

1  decided even before we got here today that we needed to do

2  something a little different for Your Honor.

3       I will not be making the City's substantive presentation.

4  You will be hearing from commanders in the Department itself,

5  and some of them do have prepared remarks.  They will try not

6  to repeat anything that the Court just said.  These

7  presentations are as to what you want to hear and speak

8  directly to those issues.

9       The Department's clearly faced some challenges over the

10  last six months, and in prior court orders and in CMC

11  conferences, you have mentioned that you want to, you know,

12  hold commanders accountable and hear from them when necessary.

13       And in the past monitor's report, the monitor questioned

14  whether the Department fully understands its responsibilities

15  under the NSA.  The commanders are here to tell you that they

16  do.

17       This is a large organization.  They have difficult

18  conversations every day about these matters, and they are

19  examining these issues wholeheartedly and transparently, and

20  not just trying to check boxes but affect cultural change.

21  Sometimes that takes time, but we want you to hear from them.

22       They bear primary responsibility for the tasks and the

23  NSA-related projects that we spoke about in the CMC.  Our

24  intent here today is to focus on the few that we think are the

25  biggest issues and that Your Honor brought up, particularly

1  force reporting and the recent ruling by the compliance

2  director that the Department is out of compliance on Task 30

3  regarding EFRBs.

4      We will also address the OBOA concerns that Your Honor has

5  just brought up.

6      So I think that the way that -- we knew that we wanted to

7  hear what the Court wanted to hear about and that I would play

8  a little bit of, for lack of a better term, ringmaster here.

9  Our intention would be to have Acting Assistant Chief Darren

10 Allison come up first and speak specifically to the issues on

11 use of force reporting and the EFRB process and the command

12 response to the entire issue surrounding the EFRB and the

13 Pawlik investigation.

14     Then I think we will have Deputy Director Virginia Gleason

15 come up and speak a little bit with respect to the recruiting

16 of communities of color and women into the hiring and

17 background process.

18     And I believe both she and the chief, who would like to

19 speak last, will directly address the OBOA issue and how the

20 Department is addressing that.  I realize that is one thing, as

21 it was somewhat new as we were filing our CMC statement, that

22 we didn't include so -- but they have taken some definite steps

23 in the last week or two and will be able to communicate to you

24 what we're going to do there.

25     We do, however, have other commanders here ready to speak

1    to any of the other tasks, including Deputy Chief Leronne

2    Armstrong on Task 34, stop data, the risk management process,

3    and the Stanford 50 recommendations; Captain Sekou Millington,

4    who's the commander of Internal Affairs, if Your Honor has any

5    specific questions related to Task 5, 45, or the discipline

6    disparity study; and Captain Kirk Coleman, who will be filling

7    in for Acting Deputy Chief Roland Holmgren, who unfortunately

8    is out of town, on data regarding recent rises in pursuits and

9    collisions.

10        The one thing I would add is Your Honor did say that you

11   would like to hear about the rise in the complaints, our

12   analysis, and the monitor's analysis at a future date.  That is

13   the one thing that we are looking into and we do not have

14   definitive answers yet, but I would expect that Captain

15   Millington would have some definitive answers for you by the

16   next case management conference.

17        **THE COURT:**  All right.

18        **MS. BLISS:**  So with that and the Court's permission,

19   I'd like to turn it over to Acting Assistant Chief Darren

20   Allison.

21        **THE COURT:**  Great.

22        **MS. BLISS:**  Thank you.

23        **ACTING ASST. CHIEF ALLISON:**  Good afternoon,

24   Your Honor.

25        **THE COURT:**  Good afternoon.

1          **ACTING ASST. CHIEF ALLISON:**  My name is Darren

2    Allison.  I am the Acting Assistant Chief for the Oakland

3    Police Department.  I'm responsible for Tasks 24, 25, and 30,

4    which, as you know, are associated with use of force and force

5    review boards.

6          I completely have the message received.  I had a prepared

7    response but as you've articulated, you know a lot about what I

8    was prepared to say, so I'm going to try and piecemeal some of

9    the things I think you may be particularly interested in.

10          So I want to start by saying that our Department values

11    the protection and sanctity of a human life.  We are committed

12    to accomplishing this police mission with respect and minimal

13    reliance on the use of physical force.  We recognize that law

14    enforcement officers are entrusted with tremendous power and

15    authority, and for the legitimacy of our organization and to

16    ensure public trust it is important that we do not misuse this

17    power.

18          Further, we must continue to review and analyze force

19    encounters providing ongoing training for our officers.  We

20    must get it right to ensure officer safety and public safety.

21          So I'm going to give you just a little tidbit of some

22    Tasks 24 and 25 and a little bit about Task 30.  I'm not going

23    to rehash the things that the Court already is aware of.

24          I will start and go right to the heart of the matter on

25    Tasks 24 and 25 when it comes to our policy modification.  We

1    are in the process of modifying our use of force policy to

2    provide clarity, particularly around interpretation of the

3    policy and reporting.  These changes are meant to ensure the

4    complete reporting of force, the collection of data anytime

5    officers use force, and a review and investigation of force.

6         We have completed a draft special order to modify the

7    applicable policy General Order K-4.  The draft policy has been

8    shared with plaintiffs' attorney Mr. Chanin and a member of the

9    Police Commission.  We have also shared it with the IMT.  In

10   fact, prior to the CMC, we had a productive conversation about

11   that special order with the IMT and Mr. Chanin and received

12   really pointed feedback that we're going to take back and

13   incorporate in our future modifications.

14        As you know, this policy falls within the jurisdiction of

15   the Police Commission.  Therefore, we have requested the Police

16   Commission to establish an *ad hoc* committee to review and

17   provide feedback on the policy.  Once established, we will work

18   with the *ad hoc* policy committee to complete our collaboration

19   in an expeditious manner.

20        When the policy is presented to the full Commission, they

21   will have 120 days to accept or reject the policy.  Once we

22   complete the Police Commission stage in the policy development,

23   we will then need to meet and confer with the OPOA.  We will

24   continue to work with stakeholders on the policy changes with

25   the goal to publish the draft special order within the next six

1    months.

2         And I think it's important to know that although the

3    policy development process can be lengthy, we did not wait for

4    the completion of the process to act.   Last September the chief

5    issued a directive to provide immediate retraining to all field

6    officers about the pointing of a firearm and reporting the type

7    of force.

8         Since the training, the Department saw an immediate

9    increase in the reported Level 4 uses of force, and I think

10   that was the marked increase that you saw in your analysis,

11   Your Honor, when it came to the increases.

12        We did also see an increase in Level 3s, but the numbers

13   are, just to give you some concept, fairly low compared to the

14   Level 4s.   We saw a range per month of Level 3 uses of force

15   anywhere from 6 in one month to a high of 14 in one month.

16        And Level 3s are typically associated with what we see

17   kind of on a repetitive basis in our Department associated with

18   takedowns.   So unfortunately I don't have the deep-dive

19   analysis as to what changed in the variance from 6 to 13 per

20   month, but where we saw the huge leap was with the pointing of

21   a firearm, which went from about in the 20s to 50s to the

22   hundreds per month, and we believe that that was a part of our

23   lineup and field officer training with the pointing of a

24   firearm.

25        So a couple other things I wanted to point out before I

1   move to Task 30 is some other things we're looking at as we

2   continue to assess our performance as an organization is

3   outlier actions when it comes to force-to-arrest ratios.  So

4   historically we've always looked at high force-to-arrest or

5   force-to-complaint ratios what we are doing in our risk

6   management meetings.

7       And we are also looking at low force-to-arrest ratios and

8   really to look at squads, officers, divisions that are engaging

9   in a lot of arrests but may not have a lot of uses of force to

10  kind of act as a point to see if things are being reported

11  appropriately, are being reviewed appropriately or investigated

12  appropriately.

13      There was also another concern in a recent monitor's

14  report where the consumers expressed that there was an inherent

15  failure to address Force Review Board deliverables in a timely

16  fashion.  As of today, they have completed over 40 tasks with

17  an additional seven to be completed.  Four of those seven I

18  anticipate will be completed in the next couple of weeks.

19      As we continue to hold Force Boards, we will continue to

20  add to the list; and in that light, we are also exploring new

21  technology to better task and track board deliverables.

22      So as I transition, I'm going to transition to Task 30 and

23  Executive Force Review Boards.

24          **THE COURT:**  Okay.  Before you do that --

25          **ACTING ASST. CHIEF ALLISON:**  Yes, sir.

1           **THE COURT:**  -- are you confident today that the data

2      that you're collecting regarding use of force is accurate?

3           **ACTING ASST. CHIEF ALLISON:**  Your Honor, I think

4      it's -- officers are -- in my opinion, are reporting force in a

5      manner that is if you're in doubt, to report it.  I think that

6      there's cleanup that needs to be done with our special order

7      where there is subjectivity that needs to be less subjective

8      and more objective.

9           I honestly believe, especially since 2012, we've had about

10     488 new officers in our 750-officer Police Department that have

11     come on under this force policy that want to do the right

12     thing, but I think the subjectivity lends themselves to that

13     interpretation that we can't afford.

14          And so when it comes to a culture change, this is what

15     they know, but I think the policy needs to give them objective

16     guidance to know what do I need to do and what not to do.  And

17     I think that our current draft will get that objectivity there

18     and rely less on subjectivity where we can really be accurate

19     in the data to a precise degree.

20          **THE COURT:**  Okay.

21          **ACTING ASST. CHIEF ALLISON:**  So for Task 30, we

22     recently, as you noted, were found out of compliance as a

23     result of the recent EFRB regarding the officer-involved

24     shooting that resulted in the unfortunate death of Joshua

25     Pawlik.  Prior to this EFRB, the Department held 17 EFRBs over

1    the past seven years.  All the EFRBs were conducted in

2    compliance with the NSA and Department policy.

3         Our CMC statement has covered why the Department believes

4    the EFRB process for the Pawlik OIS is compliant with both the

5    NSA and Department policy.  We recognize, however, there's

6    always room for improvement.

7         As with all our Force Boards, the Pawlik OIS presented the

8    Department with an opportunity to review our training, tactics,

9    supervision, and investigation-related critical incidents to

10   ensure best practices.  To that end, we are working on the

11   following:

12        First, the chief has directed the Department's trainers

13   and subject-matter experts to outline tactical considerations

14   and strategies for safely mitigating the high-risk incidents,

15   particularly incidents that involve sleeping, unconscious, or

16   unresponsive armed individuals.

17        Our training -- our trainers have already incorporated

18   training for these incidents into current reality-based

19   scenario practical exercises and classroom education.  The

20   training will be delivered in the academy and in-service

21   continued professional training.

22        To enhance the training, the chief has also directed

23   trainers to engage other agencies around the country and review

24   their policies and procedures and training for critical

25   incidents involving unresponsive armed individuals.

1    Further, the Department has been reviewing our own past

2    encounters with sleeping or unresponsive armed individuals.

3    Since 2016, OPD has responded to 11 incidences where officers

4    encountered sleeping or unresponsive armed individuals that did

5    not result in an officer-involved shooting.  Of the 11

6    incidents, 9 were resolved with individuals being detained with

7    no force or minimal force.  In 2 of the incidents, the

8    individuals fled and eluded capture.

9        The Department will review these incidents to identify

10   noteworthy tactics and/or lessons learned.  The Department will

11   also partner with the Police Commission in developing a

12   protocol for handling high-risk incidents, including a policy

13   to focus on addressing sleeping, unconscious, or unresponsive

14   armed individuals, the use of designated arrest teams, and the

15   use of armored vehicles.  As always, the policy will be shared

16   with the IMT and the plaintiffs' counsel.

17       For the second part of the strategy, the chief has ordered

18   a team of CID and IAD commanders to explore improvements to the

19   Department's investigation of serious uses of force.  The

20   Bureau of Investigations Deputy Chief Oliver Cunningham is

21   working on modifications to the homicide section policy and

22   procedure as it relates to officer-involved shooting

23   investigations.  Deputy Chief Cunningham is here if Your Honor

24   would like additional details in that endeavor.

25       Finally, the Department is examining the EFRB process for

1    potential improvements, including developing a proposal for

2    incorporating additional voting or nonvoting EFRB members from

3    outside the Department.

4        I want to assure Your Honor that Force Board members

5    undertake their duties with great attention to detail and with

6    understanding of the gravity and consequences of the issues

7    being discussed.

8        As a learning organization, we will continue to critically

9    and objectively evaluate our performance.  So with that, I'm

10   sure Your Honor may have some questions for me and I'd be happy

11   to answer any other pointed questions for you.

12       **THE COURT:**  I'm not going to dig in at the moment to

13   those questions so thank you very much.

14       **ACTING ASST. CHIEF ALLISON:**  Thank you, Your Honor.

15       **MS. BLISS:**  I'd like to call up Deputy Director

16   Virginia Gleason, who is over background and recruiting and

17   will speak to some of the issues regarding the OBOA letter and

18   any other.

19       **THE COURT:**  Great.  Good afternoon.

20       **DEPUTY DIRECTOR GLEASON:**  Good afternoon.

21       Virginia Gleason, Deputy Director at OPD.  I'm overseeing

22   a bureau of services that has IT and PRIME and now VISION, as

23   well as personnel, background, recruiting, the Com Center,

24   records, and several support services.

25       Would you like to hear anything about the current status

1    of PRIME?  Because we do have a few updated things this week if

2    that's of interest to you.

3         **THE COURT:**  Well, are you on track to have everything

4    ready by July?  That's what I'm really interested in.

5         **DEPUTY DIRECTOR GLEASON:**  We are on track to have the

6    system operational by July, but one of -- as you're talking

7    about cultural change, we have one key component of the system

8    which we are going to be able to do the first entry-level

9    demonstration tomorrow with the monitoring team that shows how

10   we have changed how this data is going to be available to

11   supervisors both in the ease of use of it to monitor behavior,

12   as well as the recency of the data.

13        Currently for those risk management meetings, I realize

14   that you have seen one of them, that data is six weeks old

15   because that's the way we have to gather it.  The new system

16   that will be operational this summer, the data will be 24 hours

17   old, and we will not have to have a third party gather together

18   the information to package it for the supervisors to use.  It

19   will be immediately available the next day by squad, by area.

20   They'll be able to do all those drill-downs without having to

21   have that time lag, and they'll also be able to spread out and

22   look at trends over longer periods of time.

23        So we're very excited that that's coming along, and we're

24   happy to do -- the demonstration of the -- the single dashboard

25   that's working so far and the one that we selected that we

thought would be the most timely would be to show them how
supervisors now will be able to look at use of force
information that is only 24 hours old.

    **THE COURT:**  And so do you have the expertise in-house
to make the best use of this system, and are you confident that
the people that you're conveying this information to also
understand how VISION works and will be able to implement it to
its fullest potential?

    **DEPUTY DIRECTOR GLEASON:**  I'm very happy you asked
that because I have a couple other great pieces of news.  One
of them -- well, first of all, the system is so much easier to
use than what we had before.  What most people knew PRIME as
just this very clunky, slow, difficult-to-use, there was not
any intuitive path of how to use the system, that has
significantly changed.

    But the other part that's helpful is we're getting
technical assistance from the monitoring team as we're creating
the system, and they're giving us some suggestions about
periods of time that it's helpful to look at long-term trends
and when you want to have a shorter period of time to look at
maybe squad-related trends, as well as things as simple as how
you put the data together on a particular bar chart.  If you
have something like complaints that there's a very high number
of them, you might want to put them separate than also have
something with a low number, like pursuits, because it will

1    artificially deflate any increase.  So you may go from two

2    pursuits to eight pursuits, which would be, you know, a very

3    significant increase but it's going to look relatively small if

4    you put it on a chart together with items that are in the

5    hundreds.

6        So things -- that was very helpful.  We worked with our

7    developers and they're helping us so that we can look at those

8    things in isolation so those differences are more meaningful

9    and more understandable.

10       I think it would be -- we'd be very happy to give a

11   demonstration and show how supervisors are going to be using

12   it.  By the time of our next CMC, we will have the system built

13   out in its entirety and we'll be able to give a wonderful demo,

14   but we have the first mini one that we're doing tomorrow.  I

15   got a preview of it this morning and I was very pleased.

16       The part that I think is helpful as far as the long-term

17   sustainability, we have two hires which are imminent.  One is a

18   hire that's actually going to be in the City IT Department and

19   it is a deputy CIO who will be a director of public safety.

20       I know a lot of people talk about how you can't recruit

21   good people into government.  We have outstanding candidates

22   and our hard part was screening it down to interview 10 because

23   they were all so very qualified and interested in the job.

24   Those interviews take place the week -- on the 15th, 16th, 17th

25   of April we will have the interviews for those positions.

1          The other position that we've been talking about that came

2     as a result of the Stanford recommendations so that we have a

3     data manager in our office, that position also has been

4     advertised, and we worked closely with the City's HR Department

5     so that it was in the appropriate description and pay band that

6     we would attract good people.

7          We have had -- we have several applicants.  We'll be

8     looking at them.  We also had so many great applicants for the

9     deputy CIO job, that we've asked our HR Department to reach out

10    to the people who didn't make the cut for interviews and ask

11    them if they would also like to be considered for the data

12    manager job because some of these people specifically were

13    interested in a job with law enforcement, and there's not very

14    many like the one we're looking at.

15         So we will have some permanent internal people who will be

16    able to help us with the data.  We're also bringing in some

17    internal trainers and some other folks.  So that part is going

18    very, very well.

19              **THE COURT:**  Great.  Okay.  Go on to recruiting.

20              **DEPUTY DIRECTOR GLEASON:**  Okay, recruiting.  So the

21    last time we were here it was during a period of time where

22    there was a question about a particular waiver that we had and

23    whether, as part of that waiver, we were asking applicants

24    whether they had ever been a victim of sexual assault.

25         As it turns out, that wasn't what was happening, but it

1    did reveal to us that we had a whole bunch of really old

2    waivers that we hadn't looked at very closely for a long time,

3    and that event caused us to go through and start looking at the

4    details of our hiring forms and comparing them with what POST

5    has and making the ones individual to Oakland when necessary.

6         As we started doing that, we decided -- we just recently

7    had some very big success in staffing our Com Center, and we

8    looked at some of the improvements and the ways that we

9    streamline processes in that to see if we could apply those as

10   well to hiring the police officer trainees.

11        One of the things that has been my experience, and I have

12   been working hiring police officers for almost 20 years, and

13   for a brief period of time, well, I took a medical leave for a

14   member of my family, I ran a company that all they did was

15   police backgrounding and hiring for several dozen departments

16   in the state of Washington, and we ran through thousands and

17   thousands of people every year, and I learned some streamlining

18   tools.

19        My experience, as well as other -- the experience of other

20   people is if you have a streamlined process that does not have

21   large gaps, you tend to be able to increase the diversity of

22   your hiring pool.  One particular type of hiring and recruiting

23   that specifically will attract a larger female applicant pool

24   is if you vary the dates and times and locations of where you

25   test.  For whatever reason, women tend not to be as flexible in

1    their schedules and if your only tests are on Saturdays or the

2    third Saturday of the month, you tend to get a less diverse

3    pool.

4         About a year and a half ago, our recruiting section

5    reached out and found resources so that they could dramatically

6    expand the locations, dates, and times where they did testing.

7    What we found was that did dramatically increase the size,

8    diversity, and the geographic range of our pool but it was

9    giving us a larger group to work with.

10        Then we had to work on streamlining recruiting and

11   backgrounding practices in our Department because now we had --

12   we have widened the funnel so large and we felt it was a

13   priority to move people through quickly.  We had to come up

14   with ways to make sure that we weren't letting things fall

15   between the cracks.

16        The concerns -- and I'm not specifically addressing, you

17   know, other issues that I think the chief is going to talk

18   about later -- I went through and I rescreened people for the

19   last year, and what I saw was an attempt to make the effort to

20   respond to some of the things that came up as a result of the

21   sex scandal case where we said we really want to be very

22   careful in hiring and recruiting.

23        I certainly didn't see anything that caused me alarm.  The

24   couple areas where I did have a lot of concern and where we are

25   making some changes are going back and trying to make sure that

1    we're revalidating our physical requirements to make sure that

2    they are definitely validated and job relevant to the essential

3    job functions.  Our last validation was in 2005 so we are

4    working to get that done again because sometimes if your

5    physical requirements aren't matched up to your current

6    essential job functions, you unintentionally exclude a lot of

7    people.

8        Now that we've sped up the testing and the backgrounding

9    process, we're finding that our pools are much larger and we

10   have more viable candidates.  The experience we had in Dispatch

11   was we have more candidates than we have spots and we have a

12   waiting list for people to come in, but it allowed us to feel

13   like we could spend more time doing really background and

14   hiring processes that were very much linked to the central job

15   functions.

16       We made a couple other changes.  We're looking at ways to

17   recruit women in different ways through a wider variety of

18   outreach.  We've looked at ways to use social media better

19   because that definitely is more appealing to the generation of

20   people we're trying to attract.  So we have a social media

21   coordinator specifically working on that.

22       But the other thing is with our chief and, you know,

23   frankly our City administration from the top all the way down

24   is very appealing to women, and so we're trying to figure out

25   how to leverage that because having a female mayor and a female

1    chief and a female City administrator is very striking to a lot

2    of people.  There's not a lot of cities that can say that.  So

3    we're trying to build on that because they have the opportunity

4    to go out and speak a lot of places and then try to scoop up

5    interest as soon as we can.

6         We're also doing some special weekend hiring events that

7    we're trying to focus on women.

8         I think that important message about women in policing, we

9    focus on the number of sworn officers but the City of Oakland,

10   there's 40 percent of us, myself included, who are not sworn

11   officers who play a very meaningful role in the culture of the

12   Department, have as many contacts with the public.  And so we

13   have eight kind of high-level managerial positions in the

14   Department, seven of them are held by women, including managing

15   our budget, and that is very influential in the

16   Police Department.  The one that is not filled by a woman is

17   vacant.  We're currently hiring for it.

18        So I think that when we look at the totality of the

19   numbers and how we hire and how we're trying to encourage women

20   to come to the Department, we really need to look at the

21   Department as a whole.  Like I say, I am a civilian but I am at

22   the deputy chief level.  I have one of the largest bureaus in

23   the Department, and I think that we shouldn't discount that

24   when we look at the numbers.

25        One of the other things we are considering, because we're

at about 14 percent women in our Department, which is a couple
percentage points bigger than the national average, but it's
hard to get women in policing at all.  There are just certain
aspects of policing that are not always friendly to women so we
have looked at those departments that have more success for
doing things like job shares and other opportunities.  So we're
looking at those and also other things that are friendly to
women as they grow and they manage families, and we've explored
those, some with our City administrator and with members of the
City Council that we have talked to, and they have been
overwhelmingly supportive of exploring these ideas because some
of them are not cheap.  They cost money.  So we really have
been encouraged about the amount of support that we've got all
the way up through the City.

What we really want to do is figure out ways that we can
make it as friendly to women as other people, kind of level
whatever the cultural social playing fields are in the
Department.  We really want to make it a destination for women.
We have a lot of women in our Department that have pretty deep
roots in the Department -- in the community.  Both of our
public media officers are women.  They're out there, you know,
in the community a lot.  We have other women throughout the
ranks that are heavily involved in the community, and we are
trying to take those relationships and encourage across the
Department, whether it's in the training or in the -- you know,

```
 1   what we make available for women with families, trying to make
 2   it friendly to women.
 3       So far our academy that started last Monday was 20 percent
 4   women, which is pretty amazing.  We would have had one other,
 5   but she had a medical issue that she wasn't able to attend.  So
 6   we're pleased with that and we are hoping that that's going to
 7   continue.
 8           THE COURT:  That's a lot better than zero.
 9   Congratulations.
10           DEPUTY DIRECTOR GLEASON:  It is a lot better than
11   zero.  Thanks.
12           THE COURT:  Thank you.
13           MS. BLISS:  Your Honor, I think the chief would like
14   to speak to you and address also the OBOA issue.
15       I did want to offer one other, although I don't want to
16   impinge too much on the plaintiffs' time.  Your Honor made one
17   comment in the introductory statements about the drop in stops,
18   and I can understand your concern about the validity of that
19   data given the issues we've had around force reporting.  It
20   would probably take only two minutes for Deputy Chief Armstrong
21   to come up and tell you how we have validated that data and why
22   we feel that that --
23           THE COURT:  All right.
24           MS. BLISS:  -- if that is --
25           THE COURT:  That's fine.
```

1          **DEPUTY CHIEF ARMSTRONG:**  Good afternoon, Your Honor.

2          **THE COURT:**  Good afternoon.

3          **DEPUTY CHIEF ARMSTRONG:**  Leronne Armstrong, Deputy

4   Chief of Police assigned to the Bureau of Field Operations,

5   East End.

6          So Your Honor I believe had some questions around the

7   validity of the data.  So before we even release the new

8   numbers around the new stop data, reductions that we pushed out

9   in the CMC, we wanted to make sure that we validated it, sir,

10  just based on obviously the issues with the use of force data.

11         So what we did was assign a group of officers to go back

12  and research our actual CAD data, which is where officers would

13  actually call the Dispatch center and advise them of the actual

14  traffic stop.

15         Now, a traffic stop obviously for law enforcement is

16  probably one of the most serious circumstances they face.  It's

17  the unknown and it's a safety issue; and based on the history

18  of the Police Department, we know based on our own experiences

19  of how critical it is that dispatch understands where we are.

20  So that is a primary core of the Department, is that when you

21  make a stop, you have to put out your location.  It's the only

22  way we can actually come and assist you if there's a safety

23  concern.

24         So what we did was we took the data -- the stop data

25  collection forms that we had that the officer had filled out as

1    a result of stops, and then we compared those to the actual CAD

2    data, when the officers notified Dispatch that they were

3    actually on a stop.  And those two lines -- we graphed them and

4    then those two lines correlated right next to each other, which

5    demonstrated to us that when a stop is made, it is, in most

6    cases, almost always put out over the CAD.  And so we've seen

7    the consistency, meaning that when there was a stop, there was

8    a stop data form filled out as it related to that.

9          And then we also have additional measures where each stop

10   data form is actually reviewed by a supervisor, and so we feel

11   confident that based on that analysis, that the data that we

12   have put before you is actually accurate.

13         **THE COURT:**  So that's great to hear.  Before you go,

14   what about the other issue, the 55 percent of the stops are of

15   African Americans?  That was true when the stops were so much

16   higher.

17         **DEPUTY CHIEF ARMSTRONG:**  Yeah.

18         **THE COURT:**  What are you doing about that?

19         **DEPUTY CHIEF ARMSTRONG:**  So I think there's a couple

20   things that we're doing.  I think the reductions, first,

21   Your Honor, was a representation of a reduction in footprint.

22   And so the researchers have advised us that there is a

23   reduction in disparity just solely based on the significant

24   decrease in who you actually stop.  So going from 31,000 stops

25   to down to 19,000 stops.

1              **THE COURT:**  It's great.  Okay.

2              **DEPUTY CHIEF ARMSTRONG:**  And then the other issue with

3    disparity is the idea that we now are doing what we call

4    area-wide risk management meetings.  And these allow us --

5    you've been to the risk management where it's at the executive

6    level, but the area level allows the captain to actually begin

7    to question the lieutenant and the sergeant about the

8    individual officer's activity.  And now we have captains that

9    are asking supervisors directly:  What stops are this officer

10   engaged in?  And this is looking at every single stop for every

11   single officer and examining the need to make that stop.

12            The intelligence factor percentage when we initially

13   started in 2016 hovered around 5 percent, meaning that officers

14   only represented -- only had 5 percent of information -- only

15   had information 5 percent of the time prior to making a stop.

16   That number now is around -- a little bit over 30 percent.  So

17   we know that now our officers are making more intelligent stops

18   meaning that they have much more information before they make

19   the stops.

20            But driving down disparities comes along with a different

21   focus, and so one of the things that Chief Kirkpatrick has

22   piloted in one district, in District 2, was to do what we call

23   a beat focus, being that not allowing the officers in that

24   district to make traffic stops outside of their particular beat

25   to see if that helps to drive down disparity by saying to the

1  officer "You should only be making these sort of

2  traffic-related stops on your particular beat."  And so we've

3  seen some success in Area 2 with their disparity coming down as

4  well.

5      And so we'll continue to pilot those things.  We obviously

6  know that there is no model in the country right now that can

7  actually show us that this works, and so we're trying different

8  ways in which to bring down disparity, Your Honor.

9          **THE COURT:**  Okay.  Great.  Thank you.

10         **CHIEF KIRKPATRICK:**  Good afternoon, Your Honor.

11         **THE COURT:**  Good afternoon, Chief.

12         **CHIEF KIRKPATRICK:**  Thank you for giving me the

13  privilege of addressing you personally in court today.  I want

14  to get to the heart of the matter by saying that I believe

15  there are two questions you have of me.  The first is:  Do I

16  really get it when it comes to reform?  And the second question

17  is:  Is the Oakland Police Department going backwards under my

18  leadership?

19      I can emphatically answer, yes, not only do I get reform,

20  I understand transformation.  You get the culture change when

21  hearts and minds change.

22      I can also answer emphatically, no, we are not going

23  backwards under my leadership.

24      I have been a police officer for over 30 years, a chief

25  for almost 20 years.  I'm also a licensed attorney and have

1    been for almost 29 years.

2        I am not a neophyte when it comes to reviewing and

3    applying legal and policy standards and making decisions

4    regarding the legitimate use of force.  In fact, I was a

5    sitting chief when two of my former officers were prosecuted

6    for unlawful uses of force, and even one went to prison for

7    almost four years.

8        I know that this is not the time or the place to litigate

9    the specifics of the Joshua Pawlik shooting, but I do not want

10   you to know -- or I do want you to know that I did not simply

11   sign off on the recommendations that were made to me by the

12   Internal Affairs and the Executive Force Review Board.  I

13   personally reviewed all of the evidence and the lengthy EFRB

14   report.  I sought counsel.  I discussed the evidence and

15   considered the views of individuals in the Department and the

16   City who are familiar with the standards governing excessive

17   force.  This included members of the City Attorney's Office;

18   the former president of the City's Police Commission, who is

19   also a lawyer; and a retired federal magistrate, both of whom

20   observed all three days of the Executive Force Review Board.  I

21   also considered the views of those outside of the Department.

22       This is my usual and consistent process in important cases

23   involving use of force because different people look at

24   evidence with different viewpoints.

25       I have said and I will continue to say that reasonable

1    people can disagree.  Indeed, this is why we can get split

2    decisions in juries and why some judicial decisions get

3    overturned in Courts of Appeal.

4        I feel it is important that you understand my personal

5    process, not only in this matter but in all future matters, and

6    know that I have been thorough, I have been complete, and I

7    have been intellectually honest in my decision-making.

8        But, more importantly, you should understand that in every

9    case involving the use of deadly force, the Department is,

10   indeed, committed to a thorough examination of its practices

11   and procedures in hopes of minimizing or avoiding a similar use

12   of force in the future.

13       That is why I have ordered that the Department examine and

14   improve its training curriculums and protocols for responding

15   specifically to sleeping and unresponsive persons armed with a

16   gun.  This unfortunately is not an atypical situation in

17   Oakland and it does usually end peacefully.

18       As part of our review, we will examine the tactics of

19   similar calls for service involving unresponsive persons armed

20   with a gun that did not involve the use of deadly force to see

21   what lessons can be learned and applied to our new training

22   curriculum and protocols.

23       Turning to the second question, the Oakland Police

24   Department is definitely not going backwards nor is it stalled

25   out.  We are indeed moving forward.

1        I came here to be a part of the reform and transformation

2    of not only Oakland but policing in America.  What happens in

3    Oakland does affect American policing.  I believe in the

4    Oakland Police Department, and I do believe that the men and

5    women of this Department have received very little public

6    acknowledgment for their enormous accomplishments.

7        The Department is, indeed, leading the nation in stop

8    data, collection, and how to ask meaningful questions of that

9    data.  We have totally transformed how we do day-to-day

10   policing.  We practice precision-paced and intelligence-led

11   policing.  We are reducing our racial disparity percentages,

12   which means we have stopped fewer African Americans and Latino

13   citizens by the thousands.

14       Through the work of our own Office of the Inspector

15   General, we have caught trends that needed to be looked into

16   and have opened audits on the pointing of a firearm, uses of

17   force, pursuits, hiring and training, and a host of other

18   issues important to community policing and running a

19   Police Department on best practices.

20       Even the monitor has noted that on the audit on reporting

21   use of force, all, not some but all of the underlying uses of

22   force were constitutional and done with professionalism.

23       Finally, I do want to speak for a moment about the

24   plaintiffs' focus on the concerns publicly raised by the

25   Oakland Black Officers Association regarding the Department's

1   recruiting and background efforts.

2       While I cannot speak publicly about some of the personnel

3   issues involved in this matter, I do want the Court to know

4   that my approach to this issue is consistent with the City's

5   values and the Department's overall commitment to

6   self-reflection, transparency, and transformation.

7       In this particular case, at my direction Deputy Director

8   Gleason has led an overhaul of how we recruit background with a

9   special emphasis on eliminating practices that could have

10  disparate impact on African Americans, Latinos, and female

11  recruits.

12      And just last week I asked the director of the City's

13  Department of Race and Equity to assist us in examining and

14  addressing the concerns addressed by the OBOA letter.  I have

15  asked her to be thorough and probing, and I have asked her to

16  show us the path forward.  She will begin next week, and I've

17  told her our goal is nothing short of cultural change and

18  legitimacy.

19      The Department is making other important advances.  We are

20  in the process of transforming how we train those new police

21  recruits with an emphasis on officers as guardians and problem

22  solvers and not warriors or soldiers.  We are not at war with

23  our community.

24      We have drafted one of the most progressive policies on

25  probation and parole searches in America, and our renewed focus

1    on violent crime and intelligence-led policing has helped us

2    drop out of the top 10 list of the most violent cities in

3    America.

4         Your Honor, in closing, I do want you to know that I

5    respect the role of this Court, the monitor, and the

6    plaintiffs' attorneys.  Our intellectual disagreements will not

7    hamper my work or the Department's efforts to work with them

8    and our Police Commission to achieve a sustainable reform and

9    continued transformation of the Oakland Police Department.  We

10   are going to be nothing but the best police agency in this

11   country.

12        I believe deeply in police accountability and with that, I

13   will support officers when they have done nothing wrong and I

14   will not hesitate to discipline when corrections need to be

15   made.  I am proud to be the Chief of Police of Oakland and I

16   believe in this Police Department.  I do see a path forward for

17   not only bringing us into complete compliance but

18   transformation and sustainability.

19        Thank you, Your Honor.

20        **THE COURT:**  Thank you.

21        All right.  From the plaintiffs, who's -- Mr. Chanin.

22        **MR. CHANIN:**  Thank you, Your Honor.

23        When discussing the Pawlik case, I will refrain from

24   discussing many but not all of the specific details in this

25   case since it will ultimately be decided in other forums, such

as a civil case filed in federal court and the discipline
process pursuant to the decisions of the Police Commission, the
compliance director, and the process pursuant to the Police
Officers Bill of Rights and the MOU agreement between the
Oakland Police Officers Association and the City of Oakland.

However, there are aspects of the Pawlik case that must be
discussed here.  As you said, Your Honor, there are tasks that
will undoubtedly be affected by the monitor, compliance
directors, and the Court's view of the quality of the OPD's
investigation into the death of Joshua Pawlik on March 11th,
2018.

In fact, Task 30 was recently declared out of compliance
in significant part due to the Oakland Police Department's
handling of the Pawlik case.  That task has been in compliance
since 2014.  I agree with the monitor's decision in this
matter.

In December 2015, OPD General Order K-4.1 was issued and
still governs the operation of Force Review and Executive Force
Review Boards.  An important change in the process was that
without changing the standards and rules governing discipline,
the OPD Force Review Boards were charged with analyzing the use
of force incident to identify deficient or exceptional
performances as they related to a wide variety of issues,
including but not limited to Department policy or procedure
revision, any tactics, strategies, and options pursued as

events unfolded that may have led to the use of force, and
additional training that may be required or existing training
that may need to be made more frequent.

Under the new state law that took effect on January 1st,
the entire Executive Force Review Board report on this case was
recently made public.  So everything that I discuss today is
already part of the public record.

A review of the EFRB report shows that there was little
reported discussion of alternative tactics that could have led
to an outcome consistent with officer safety which would have
saved Mr. Pawlik's life.

The City says otherwise in its portion of the case
management conference statement, and I have heard there was
discussion of positioning of the BearCat and less than lethal
options, but I did not see what I expected in the written EFRB
report.  Instead, there was an extensive series of deliverables
recommended, some of which are listed on page 8 of the
plaintiffs' portion of the case management conference statement
and the rest are set forward on pages 47 to 49 of the FRB
report.

Plaintiffs' attorneys will be closely examining whether
and how soon OPD effectively produces these deliverables and
improves its training on responding to unconscious or
nonresponsive armed people, which at this point is inadequate
at best.

1   I believe the EFRB missed an important opportunity to have

2   a more robust discussion of how Mr. Pawlik's life could have

3   been saved consistent with officer safety and, equally

4   important, to memorialize the discussion in the EFRB report for

5   future use.

6       These people at the EFRB were the ideal group to discuss

7   and memorialize in writing the possibility of alternative

8   tactics that could have saved Mr. Pawlik's life.  They sat for

9   three days and listened to testimony on this case.  Maybe this

10  discussion did take place, but it was not reduced to writing.

11      Obviously there was discussion as evidenced by the

12  impressive list of deliverables, as well as the

13  Internal Affairs training and policy recommendations on page 36

14  of the FRB report; but a specific discussion as to what, if

15  any, alternative tactics could have been employed to save

16  Mr. Pawlik's life is not in the report.

17      And I would call upon the chief to reconvene the FRB and

18  have them discuss such alternative tactics as part of their

19  review of the whole Pawlik incident.  It would not be

20  disciplinary.  It would just be what can we do to do better

21  next time.

22      Sergeant Jones testified at the FRB that there was no

23  training as to how to respond to armed nonresponsive persons

24  outside the OPD basic academy.  In other words, an officer who

25  had been on the force for 20 years had not received this

1   training in 20 years, absent some clearly inadequate,

2   nonspecified training on critical incidents referred to on

3   page 7 of the FRB report.

4        Given that the Pawlik shooting is at a minimum the third

5   death of an armed nonresponsive person in the history of the

6   negotiated settlement agreement, this lack of training is

7   completely unacceptable.

8        Reading the account of the lieutenant and sergeant in

9   charge of the Pawlik operation, it is hard to believe that

10  either of them were extensively trained on the operation of the

11  designated arrest team and the duties and leader of the DAT.

12  Sergeant Jones testified at the FRB hearing there is no

13  specific training to supervisors regarding the supervision of

14  DATs.

15       The sergeant in charge of the Pawlik incident almost

16  completely abandoned his role as leader of the designated

17  arrest team, which was to think of, and I quote, "possible

18  contingencies based on the scenario at hand and formulate

19  response plans," quoting Sergeant Jones at page 8 of the FRB

20  report.

21       He allowed multiple -- that's the sergeant -- allowed

22  multiple officers to give Mr. Pawlik commands almost

23  simultaneously and, in fact, one of them was in the middle of

24  giving a command when the shots were fired.

25       He took the role of both team leader and talker/cuffer,

1  which split his attention and did not allow him to effectively

2  supervise the team.   That's on page 43 of the FRB report.   And

3  he participated in shooting Mr. Pawlik even though there were

4  two designated officers with rifles as primary cover officers.

5       As for the lieutenant on the scene, his presence at the

6  scene had no real value at all.   He failed to tell the sergeant

7  to put away his rifle and concentrate on leading the designated

8  arrest team.   He expressed total confidence in his sergeant's

9  ability to run the operation to the point where he effectively

10 abandoned his own assignment.

11      His conduct was the only conduct that the four entities

12 who looked at this -- Internal Affairs, the FRB, Chief

13 Kirkpatrick, and the monitor -- could agree on.   That agreement

14 was to sustain the lieutenant's conduct as a Class II

15 violation.

16      Recently I have been informed by OPD members that there

17 are more than 10 incidents that the Department has resolved in

18 confrontations with armed nonresponsive persons by not

19 killing -- and they have not killed the subject.   I look

20 forward to hearing more about these incidents but, more

21 importantly, I hope that OPD members study these incidents for

22 innovative ideas as to how to resolve more of these situations,

23 again consistent with officer safety, without killing the armed

24 person.

25      The OPD EFRB policy says the review process is intended to

1   help the Department achieve its goal of using the least amount

2   of force consistent with the safety of all persons.   The

3   Oakland Police Department has a reverence for life.   There is

4   no doubt that the number of officer-involved shootings has

5   fallen dramatically in recent years.   That being said, the

6   coming months will determine if the promise of the EFRB policy

7   that the Oakland Police Department has a reverence for all life

8   is true for some of us or for all of us, including the homeless

9   and the mentally ill.

10          I would like to compliment the compliance director and the

11   monitor team for their work on this matter.   As we said in our

12   case management statement, it is difficult to escape the

13   conclusion that the compliance director's decision to overrule

14   the Oakland Police Department on the Pawlik case was the

15   driving force for the recent explosion of activity by the OPD

16   in dealing with the problem of armed unresponsive citizens.

17          This does not reassure us that the OPD will undertake this

18   kind of proactive activity when we are gone, especially when

19   one considers this problem is a recurring issue that has gone

20   on for many years.

21          Once we believe that the Oakland Police Department can

22   make mistakes, as we all do, and deal with it in a forthright

23   manner on their own, there will be no need for this case to

24   continue.

25          At the last case management conference, I addressed the

1    Court about the rise in the Oakland Police Department's use of

2    force and the alarming failure of a significant number of

3    officers who failed to report the use of force, the increase in

4    the number of complaints against Oakland police officers, the

5    rise in the number of pursuits, and the alarming lack of women

6    recruits in the Oakland Police Academy.

7        There have been a number of developments to address the

8    underreporting of the use of force.  The OPD Office of

9    Inspector General has analyzed 14 cases identified by the

10   monitor in one of their recent reports.  The Police Department

11   has agreed that nine of the uses of force identified by the

12   monitor as not reported should, in fact, have been reported,

13   while five of them were not instances of force that should have

14   been reported per the current force policy.

15       As a result, 11 cases were sent to Internal Affairs for

16   nonreporting use of force, supervision problems related to the

17   nonreporting of force, and ancillary problems that were

18   identified by the OIG review of the PDRDs in question.

19       The Office of Inspector General then looked at the third

20   and fourth quarter reports -- that's up to November of 2018 --

21   involving use of force using similar methodology used by the

22   monitor.  Of the 80 cases reviewed, the OPD OIG identified 17

23   in which they wanted to look at the associated PDRDs.  As a

24   result, there were additional referrals to Internal Affairs due

25   to the failure to report the use of force.  Training and

1  supervision problems were also noted.

2      The OIG then sorted uses of force reports by squads to see

3  if the failure to report use of force was a systemic problem

4  and/or a more isolated problem involving a smaller number of

5  officers who were not reporting their use of force.

6      As a result of this process, four outlier squads were

7  identified that had basically unexplainable very low use of

8  force statistics compared with other squads in the OPD.  These

9  squads stop data statistics were then examined as part of an

10  overall review to see if the sharp decline in stopping African

11  Americans was as great as has been reported.

12      There are no conclusive statistics to report at this

13  point.  However, despite the possible correlation of these four

14  squads with underreporting stop data statistics, the overall

15  decline in the stopping of African Americans in Oakland appears

16  to be valid at this point.

17      There are also efforts to review the use of force policy

18  to correct ambiguities and problems raised by the monitor in

19  their reviews.  The Oakland Police Department reports several

20  meetings on this issue to address problems of interpretation

21  regarding pointing a firearm at a person and to ensure

22  collection of data anytime officers are using force during a

23  detention or arrest.

24      One of these changes is to remove the word "intentional"

25  from language regarding the pointing of a firearm and using new

1   language that will have a simple yes-or-no test.  This will

2   compel officers to report their pointing a firearm at a person

3   without inserting the issue of whether the pointing was

4   intentional or not.

5       This new policy is a work in progress, as was said

6   earlier, which has not been finalized or approved by the IMT,

7   plaintiffs' attorneys, or the Police Commission.  We met this

8   morning and we all agreed to move this as quickly as we

9   possibly can.  The Police Commission has 120 days to act, but

10  the Police Department is going to try and contact them and move

11  this along faster than 120 days.

12      Overall, there is a lot of activity in the area of use of

13  force but no definitive policy, no final decision on the cases

14  referred to Internal Affairs by the Office of Inspector

15  General, and no subsequent test to see if the failure to report

16  uses of force has been discouraged by all this activity.  There

17  is also no reliable data on uses of force at the current time.

18      And, Your Honor, you asked:  Are you confident that the

19  statistics on use of force are accurate?  My answer is no, I

20  have no confidence at all in that.

21      And the data that does exist shows a massive increase that

22  we reported on page 6 of our case management conference

23  statement.  The size of this increase from 76 to 331 comparing

24  March of 2018 to March of 2019 calls into question the validity

25  of much of the OPD's statistics regarding use of force in past

1    years.

2          It also calls into question whether the increase in use of

3    force, particularly in Level 3 and 4 uses of force, are

4    systemic problems and if not, in addition to the isolated

5    problem -- and that's in addition to the isolated problem with

6    force reporting by a few squads, which I mentioned earlier.

7          The relentless rise in complaints since 2015, which is

8    documented in our case management conference statement, is

9    still largely unexplained by the OPD.  There needs to be an

10   accounting as to how many of these complaints involved

11   excessive force, discourtesy, or other types of complaints that

12   indicate a problem that must be addressed.

13         If the increase is largely due to so-called service

14   complaints, such as complaints that the officer took too long

15   to arrive, this may indicate a resource problem or a deployment

16   problem that could possibly be addressed.  In any event, the

17   only way to see if this explanation -- if there is an

18   explanation for this increase is to analyze it and not to

19   speculate about it.

20         The rise in complaints may well indicate a serious problem

21   that is capable of a solution.  The rise in pursuits is also

22   detailed in our case management conference statement.

23         **THE COURT:**  Mr. Chanin, I'm doing what I often do in

24   trials.  I'm looking down at the length of the examination

25   that's going on or the speech, and I see a lot left; and so --

1          **MR. CHANIN:**  It's not much, Your Honor.

2          **THE COURT:**  -- so what I'd like -- so I have two

3     things.  One is, I'd like you to file what you have --

4          **MR. CHANIN:**  I don't have it that way but I will.

5          **THE COURT:**  -- on ECF just so I can read the whole

6     thing; and then if you would just summarize for me the

7     remaining high points, that would be very helpful.

8          **MR. CHANIN:**  Okay.  So let's talk -- let's move on and

9     talk about the number of stops that has dropped from 19,185 to

10    10,874, a 43 percent drop from 2017 to 2018.

11         What I want to say about this, and this is important and

12    it's not in our case management conference statement, is what

13    this indicates is that approximately 8,000 stops of African

14    Americans who were stopped in 2017 were most likely detained

15    without any discernible impact on the Oakland Police

16    Department's core mission of fighting crime.

17         Since the 2017 statistics are typical and not an

18    aberration, this indicates a staggering number of African

19    Americans who have been stopped for many years with no impact

20    on crime.

21         This has caused a dramatic impact on the African American

22    community, which has undoubtedly contributed to the justifiable

23    fear and anger, the getting of records by young black men, and

24    decline in police community relations.

25         These Oakland statistics are not atypical and the only

difference between them and the other cities in most of California is that most American cities have done nothing to address this problem, and it is going on today just as it has gone on for many, many years.

The stop data figures are in no small part due to the OPD's risk management meetings, which isolate squads and officers with outlier stop data statistics and hold their commanders accountable for their problems.

I've attended a number of these meetings and I am impressed by the thoroughness and probing questions. The one improvement I would like to see is a more thorough accounting of the deliverables ordered as a result of these risk management meetings. I believe the follow-through on this issue can be improved. Overall, however, I am impressed with this process and hope that these figures will improve in the future.

Last page, Your Honor.

The academy class that just graduated, unlike the last one, does have four women out of 25 graduates. This is not enough, especially considering there are no African American women who have graduated from the academy for the last two classes.

The good news is there are a large number of Latinos, including three out of four of the women graduates. However, there are only four African Americans in the class, well below

the average of African Americans in Oakland and less than is needed given the problems involving OPD's police community relations in the African American community.

One note on PRIME.  We've been told that there are some problems integrating the PDRD videos with the PRIME system and that officers are going to insert something, I'm not a techie, but something into some sort of machine that's going to transfer the PDRD into the PRIME system.  I would like to see that and be assured that it's working because the initial plan, which was to integrate the videos with PRIME, has not worked out and we learned that recently.

THE COURT:  All right.

MR. CHANIN:  Finally, no mention of the recent developments concerning the Police Academy can be complete without a reference to the letter from the Oakland Black Officers Association, which was recently published in the *Oakland Post*, a local paper.  This letter raises very serious issues that appear to have validity given the personnel action taken by the mayor and the City administrator.

There are also questions as to whether the OBOA's initial complaints fell on deaf ears when presented to the highest levels of the Police Department.

These developments and more will be discussed by John Burris who will go next.  Thank you, Your Honor.

THE COURT:  All right.  Thank you.

1          Telescoped, Mr. Burris.

2              **MR. BURRIS:**  I only have two.

3                     (Laughter)

4              **MR. BURRIS:**  Good afternoon, Your Honor.

5          Obviously the big issues that I think that the Court

6     raised are fundamental issues that go to the very essence of

7     what this case is about and how we would like to leave it when

8     it's over when we leave, and that's the cultural question.

9          You know, I wrote in 1999 before this case started about

10    Oakland and the culture and the impediments that I thought that

11    culture presented as it relates to constitutional policing, and

12    so obviously when the *Riders* case happened, and I was very

13    pleased with the opportunity to sort of tackle these particular

14    issues.  Unfortunately, I didn't expect to be here 20 years

15    later but sobeit, I am here.

16         Part of the reasons why I wanted to deal with the

17    discipline study issue is because I believed that it would give

18    us some indication as to what the culture was in the Department

19    as it relates to how officers are treated, which I think is

20    very, very important because a culture cannot be straight up

21    and fair if there are people within the Department feeling that

22    they're being treated in a disparate way.

23         And so hopefully this study, as we have now finally gotten

24    to the point where it's going to get off the ground, that we

25    should be able to start this -- get the -- have the data

1   collection process start pretty soon, and hopefully at the end

2   of the process we'll be in a position to determine what

3   procedures and processes should be in place to guarantee that

4   discriminatory conduct treatment of officers will not occur in

5   the future.  That's the hole.

6       However, unfortunately there's a giant hole in all of that

7   because it did not -- in terms of the study and certainly in my

8   own lack of understanding, that did not include the hiring and

9   recruiting process even though fundamentally I understood that

10  that was important going forward because it considers the first

11  step in the process; and how that conduct -- how people are

12  treated at that step really determines whether they get in or

13  not, and then they become a function -- they function within

14  the Department.

15      Well, that process that we put together in terms of the

16  employment, the disparity study, did not include that.  And so

17  I have had -- I did have conversations with Captain Millington

18  about this before this letter came about, and really thinking

19  through my concerns about this issue, and we had discussions

20  about it and certainly that issue has developed even more so

21  now.  We've heard the chief talk about it.  We've had other

22  more discussions about it.

23      But to me it is an extraordinarily important area and how

24  do we determine that people who want to be police officers are

25  not arbitrarily dismissed or knocked out for a person's

1    arbitrary notions about what it should be or should not be in
2    terms of a police officer.
3        Now, this is not a new process because I've had many
4    discussions down through the years with other people, and they
5    would tell me that there are personnel issues.  And I hate to
6    say it's personnel driven, but this is a people office and
7    people in certain positions make decisions that eliminate --
8    apply their own personal criteria to who can become a police
9    officer or not.
10       And I'm concerned that that sort of process has created a
11   situation where African Americans, men and women, Hispanics,
12   have not received fair consideration, or I should say fair
13   consideration in terms of criteria that's equally applied to
14   them as it applies to others.
15       And so the letter from the OBOA, which to me goes as much
16   to culture, the culture that exists within the Department as it
17   does in terms of being concerned about who gets hired and who
18   doesn't get hired.  Because when they talk about unfair bias
19   treatment in personnel decisions and unfair bias
20   Internal Affairs investigations and disciplines, then
21   overlooking qualified black officers and members of the -- for
22   assignments and positions, bias and unfair treatment of black
23   Africans during hiring, academy, and the field training
24   program, this kind of goes to the essence of the Department
25   itself.

1    And if there is this feeling or this belief that African

2    American officers are being sort of marginalized early in the

3    process even before they get in and then once they get in, even

4    marginalized further, then you have a situation where the

5    culture itself is not working fairly to everyone.

6    And it is true that this NSA is going to get completed.

7    The Is are going to be dotted and the Ts are going to get

8    crossed, but that is not going to be where we want to end it.

9    We want to know that there's an issue of sustainability here

10   and that whatever we have planted now, that it will grow and we

11   will see and others will see that what has taken place here has

12   left its mark and it's left its mark in such a way that new

13   officers, some young person in West Oakland or East Oakland or

14   Walnut Creek who wants to be a police officer will have a fair

15   opportunity of being that and not being eliminated or

16   marginalized as a consequence of some arbitrary standard.

17   So what I think is necessary is that a set of criterias

18   has to be developed by the Department that sets forth a

19   mechanism for recruiting and for ultimately hiring new people

20   and that it's consistently applied to go along.

21   Now, maybe that can be part of the consistency study or a

22   by-product of it, but I am concerned about it, and I do want to

23   know that efforts are being made to allow for young people,

24   people -- old people, whoever want to come into the Department,

25   will not be judged by some person's discretion or arbitrary

1    notions about what the criteria is of being an officer.

2        I have no doubt and I don't question the credibility or

3    the professionalism of the chief or Ms. Gleason or any of the

4    other people who have presented today or the Department itself.

5    I'm only concerned about how we are going to treat people who

6    come to this Department aside from the other issues about

7    racial profiling and all that.  That's being dealt with and Jim

8    and the others have talked about it.  But this is an issue that

9    I think is important as it relates to the culture of the

10   Department and the future culture of the Department, and I

11   think this Court should be mindful of that and we should have

12   some standards and approach that allows us to address itself to

13   these issues in the very near future.

14       Thank you, Your Honor.

15           **THE COURT:**  All right.  Thank you.

16       Mr. Lucia?

17           **MR. LUCIA:**  Your Honor, the OPOA has nothing further

18   at this point.

19           **THE COURT:**  All right.  So I think one thing, for the

20   next status conference I'm going to have a slightly different

21   procedure and anybody who wants to make a statement about

22   things that aren't in the -- that they haven't already said in

23   the joint status reports should file it two days in advance so

24   that everybody can take a look at it, and then we can explore

25   more specifically the points that people want to raise.

1      This is a charged moment in this case and I understand

2   that people wanted to make their points, which is fine; but I

3   think we're going to continue -- I'm going to continue to have

4   status reports and conferences because I want to know what's

5   going on and I want to know that there is the progress that the

6   chief believes is happening is happening and is reflected in

7   the facts and the evidence throughout the various sources of

8   information that we get.

9      So I want that, and I don't -- and I am glad that

10  everybody has high-minded hopes and I have high-minded hopes,

11  but what I want to see is on-the-ground facts of transformation

12  that the chief was describing.  That's what I want to see, and

13  that is going to -- it starts -- I'm very happy to see the

14  leadership of the City here and you're taking time out from so

15  many different important things, and so I'm grateful that

16  you're here and I'm glad that you heard what I had to say.

17  Because I really think at the end of the day, this is the City,

18  this is the City's responsibility and it's not something that

19  is going away, as you can tell because it's been here for 15

20  years.  You haven't, Mayor Schaaf, but --

21      **MAYOR SCHAAF:**  I have -- 20 years I've been with the

22  City of Oakland.

23      **THE COURT:**  Okay.  So you've seen this and the court

24  part of it needs to stop.  The court part needs to end, but it

25  can't end until the City and the Police Department are taking

1    full responsibility for making sure that there is

2    constitutional policing, that it's not somebody from the

3    outside who's prodding you, that this is all something that is

4    internal and it's built into what the City -- it's built into

5    the DNA of the force and the leadership of the City.  And

6    that's not true now, and I am hopeful that it's going to be and

7    it will be obvious over the next few status reports.

8         So the next one I'd like to schedule for August 21st at

9    3:30.  By that time I expect that VISION will be fully

10   implemented and maybe, if I'm not in trial, I'll have an

11   opportunity to have come over and see what it looks like.

12        So thank you-all for your presentations, and I will see

13   you in August.

14                  (Proceedings adjourned at 5:04 p.m.)

15                            ---oOo---

16

17

18

19

20

21

22

23

24

25

1

2

3                        **CERTIFICATE OF REPORTER**

4          I certify that the foregoing is a correct transcript

5   from the record of proceedings in the above-entitled matter.

6

7   DATE:   Friday, April 26, 2019

8

9

10

11   _____

12          Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                        U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25