May 23, 2019

# Sixty-First Report
## *of the* Independent Monitor
## *for the* Oakland Police Department

## Introduction

This is our sixty-first status report on the Negotiated Settlement Agreement (NSA) in the case of *Delphine Allen, et al., vs. City of Oakland, et al.,* in the United States District Court for the Northern District of California under the direction of Judge William H. Orrick.  I was appointed in 2010 to oversee the monitoring process of the Oakland Police Department (OPD) that began in 2003.

This report covers our site visits of February 25-26 and March 18-19, 2019; and describes our recent assessments of NSA Tasks 5, 24, 25, and 41.  Following the Court's Order of May 21, 2015, in our status reports, we devote special attention to the most problematic component parts of the Tasks that are not yet in full or sustained compliance, and discuss the most current information regarding the Department's progress with the NSA and its efforts at making the reforms sustainable.

As we have noted previously, in a November 2018 Case Management Conference, the Court expressed its concerns with the Department's "checking boxes on compliance that will prove ephemeral over time."  The Court noted the review we conducted, which was prompted by an unexplained reduction of 75% in reported use of force during the period 2012-2017 – with principal and substantial decreases in the Level 4 category of force.  Ultimately, the Court reactivated Tasks 24 (Use of Force Reporting Policy), 25 (Use of Force Investigation and Report Responsibilities), and 31 (Officer-Involved Shooting Investigations).  Following this, we requested reports and accompanying video and other documentation for all recent use of force incidents.  Our first assessments of reactivated Tasks 24 and 25 are included in this report; our assessment of Task 31 is ongoing and will be addressed in a future status report.

### *Increasing Technical Assistance*

Each month, our Team conducts a visit to Oakland that includes both compliance assessments and technical assistance.  During our visits, we meet with Department and City officials; observe Department meetings and technical demonstrations; review Departmental policies; conduct interviews and make observations in the field; and analyze OPD documents and files, including misconduct investigations, use of force reports, crime and arrest reports, Stop Data Forms, and other documentation.  We also provide technical assistance in additional areas, especially those that relate to the remaining non-compliant Tasks or areas identified by the Department.

Within the last several months, we have provided technical assistance to OPD officials in the areas of IAD investigation quality (Task 5); stop data and related issues (Task 34); risk management and the ongoing maintenance issues and development of the Performance Reporting Information Metrics Environment (PRIME) systems (Task 41); and several Department policies and procedures, including policies related to PRIME, officer discipline, use of force, probationers and parolees, handcuffing, and the use of electronic control weapons.

## Building Internal Capacity at OPD

Also per the May 21, 2015 Court Order, we continue to work closely with the Office of Inspector General's (OIG) lieutenant and staff to identify areas that it should audit or review – and to help design approaches to these audits that are not cumbersome, so as to ensure sustainability. We review OIG's quarterly progress reports, which are a valuable resource and assist us in assessing compliance with NSA requirements. OIG published its most recent progress report (covering the last two quarters of 2018) in March 2019.

---

## Focused Task Assessments

# Task 5:  Complaint Procedures for IAD

**Requirements:**

1. *On or before December 1, 2003, OPD shall develop a policy so that, OPD personnel who become aware that a citizen wishes to file a complaint shall bring such citizen immediately, or as soon as circumstances permit, to a supervisor or IAD or summon a supervisor to the scene.  If there is a delay of greater than three (3) hours, the reason for such delay shall be documented by the person receiving the complaint.  In the event that such a complainant refuses to travel to a supervisor or to wait for one, the member/employee involved shall make all reasonable attempts to obtain identification, including address and phone number, as well as a description of the allegedly wrongful conduct and offending personnel, from the complainant and any witnesses.  This information, as well as a description of the complaint, shall immediately, or as soon as circumstances permit, be documented on a Complaint Form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander, and shall be treated as a complaint.  The supervisor or appropriate Area Commander notified of the complaint shall ensure the Communications Division is notified and forward any pertinent documents to the IAD.*

2. *An on-duty supervisor shall respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I*

*misconduct contemporaneous with the arrest. The supervisor shall ensure the Communications Division is notified and forward any pertinent documents to the IAD. All other misconduct complaints by a jail inmate shall be handled in the same manner as other civilian complaints.*

3. *In each complaint investigation, OPD shall consider all relevant evidence, including circumstantial, direct and physical evidence, and make credibility determinations, if feasible. OPD shall make efforts to resolve, by reference to physical evidence, and/or use of follow-up interviews and other objective indicators, inconsistent statements among witnesses.*

4. *OPD shall develop provisions for the permanent retention of all notes, generated and/or received by OPD personnel in the case file.*

5. *OPD shall resolve each allegation in a complaint investigation using the "preponderance of the evidence" standard. Each allegation shall be resolved by making one of the following dispositions: Unfounded, Sustained, Exonerated, Not Sustained, or Administrative Closure. The Department shall use the following criteria for determining the appropriate disposition:*

   a. *Unfounded: The investigation disclosed sufficient evidence to determine that the alleged conduct did not occur. This finding shall also apply when individuals named in the complaint were not involved in the alleged act.*

   b. *Sustained: The investigation disclosed sufficient evidence to determine that the alleged conduct did occur and was in violation of law and/or Oakland Police Department rules, regulations, or policies.*

   c. *Exonerated: The investigation disclosed sufficient evidence to determine that the alleged conduct did occur, but was in accord with law and with all Oakland Police Department rules, regulations, or policies.*

   d. *Not Sustained: The investigation did not disclose sufficient evidence to determine whether or not the alleged conduct occurred.*

   e. *Administrative Closure: The investigation indicates a service complaint, not involving an MOR violation, was resolved without conducting an internal investigation; OR*

   f. *To conclude an internal investigation when it has been determined that the investigation cannot proceed to a normal investigative conclusion due to circumstances to include but not limited to the following:*

      1) *Complainant wishes to withdraw the complaint and the IAD Commander has determined there is no further reason to continue the investigation and to ensure Departmental policy and procedure has been followed;*

      2) *Complaint lacks specificity and complainant refuses or is unable to provide further clarification necessary to investigate the complaint;*

3) *Subject not employed by OPD at the time of the incident; or*

4) *If the subject is no longer employed by OPD, the IAD Commander shall determine whether an internal investigation shall be conducted.*

5) *Complainant fails to articulate an act or failure to act, that, if true, would be an MOR violation; or*

6) *Complaints limited to California Vehicle Code citations and resulting tows, where there is no allegation of misconduct, shall be referred to the appropriate competent authorities (i.e., Traffic Court and Tow Hearing Officer).*

g. *Administrative Closures shall be approved by the IAD Commander and entered in the IAD Complaint Database.*

6. *The disposition category of "Filed" is hereby redefined and shall be included under Administrative Dispositions as follows:*

a. *An investigation that cannot be presently completed. A filed investigation is not a final disposition, but an indication that a case is pending further developments that will allow completion of the investigation.*

b. *The IAD Commander shall review all filed cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed and may direct the closure or continuation of the investigation.*

7. *Any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken. However, investigators, with the approval of an IAD Commander, are not required to interview and/or take a recorded statement from a member or employee who is the subject of a complaint or was on the scene of the incident when additional information, beyond that already provided by the existing set of facts and/or documentation, is not necessary to reach appropriate findings and conclusions.*

(Negotiated Settlement Agreement III. E.)

**Relevant Policy:**

There are six Departmental policies that incorporate the requirements of Task 5: Department General Order M-03, *Complaints Against Department Personnel and Procedures* (published December 6, 2005 and revised most recently on August 22, 2013); Communications Division Policy & Procedures C-02, *Receiving and Logging Complaints Against Personnel and Use of Force Incidents* (published April 6, 2007); Training Bulletin V-T.1, *Internal Investigation Procedure Manual* (published June 1, 2006); Special Order 8270, *Booking of Prisoners at the Glenn E. Dyer Detention Facility* (published June 24, 2005); Special Order 8565, *Complaints*

*Against Department Personnel* (published May 11, 2007); and IAD Policy & Procedures 05-02, *IAD Investigation Process* (published December 6, 2005).  In addition, NSA stipulations issued on December 12, 2005 and March 13, 2007 incorporate the requirements of this Task.

## Commentary:

OPD had been in partial compliance with Task 5 since the twenty-first reporting period.  That status reflected a Court-ordered investigation regarding OPD and the City's discipline and arbitration process.  On March 23, 2016, the Court issued a new Order indicating that irregularities and potential violations of the NSA occurred in IAD investigation 15-0771.  The Order noted that the investigation raised issues of accountability and sustainability of compliance.

Task 5 consists of several subtasks, briefly described below.  Based on OPD's compliance history with many of the subtasks, not all are being actively monitored at this time.

**Task 5.1** requires that when a citizen wishes to file a complaint, the citizen is brought to a supervisor or IAD, or a supervisor is summoned to the scene.  **Task 5.2** requires that if there is a delay of greater than three hours in supervisory response, the reason for the delay must be documented.  **Task 5.3** requires that where a complainant refuses to travel to a supervisor, or wait for one, personnel make all reasonable attempts to obtain specific information to assist in investigating the complaint.  **Task 5.4** requires that specific information be documented on a complaint form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander.  **Task 5.5** requires that the supervisor or Area Commander notify Communications and forward any pertinent documents to IAD.

To assess compliance with Task 5.1 through and including Task 5.5, we reviewed the Daily Incident Logs (DILs) prepared by the Communications Division and forwarded to IAD each business day.  The DIL form has been modified several times during our tenure to elicit "forced responses" that gather all of the information required to evaluate compliance with these Tasks.  These modifications have significantly enhanced OPD's ability to document compliance by properly filling out and distributing the logs, and compliance rates with these subtasks have been near 100% for several years.  Consequently, we no longer actively assess OPD's compliance with these subtasks, but we continue to receive both the DILs and Daily Complaint Referral Logs (used to document when Information Business Cards [IBCs] are provided to citizens in lieu of a complaint forms).  We spot-check these forms regularly to verify that the quality of their completion has not diminished.  OPD remains in compliance with Tasks 5.1 through and including Task 5.5.

**Task 5.6** requires that an on-duty supervisor respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest of the inmate.  This subtask has not been actively monitored since December 2014, though we have reviewed cases applicable to this requirement in recent reports.

**Task 5.12** requires that the Watch Commander ensure that any complaints that are applicable to Task 5.6 are delivered to and logged with IAD.  Under current policy, the Communications Division must record on the DILs complaints that are received and/or handled by on-duty supervisors, and the DILs is forwarded daily to IAD.

OPD remains in compliance with Tasks 5.6 and 5.12.

**Task 5.15** through **Task 5.19**, and **Task 5.21,** collectively address the quality of completed IAD investigations, and therefore remain the subject of our focused Task assessments.  To assess compliance with these Tasks, we reviewed 19 IAD cases that were approved in October, November and December of 2018.  This sample included investigations completed by IAD and Division-level investigations (DLIs).  It also included cases that were resolved via formal investigation and investigations that were resolved via summary finding.[1]

Together, **Tasks 5.15** and **Task 5.16** require that OPD: gathers all relevant evidence; conducts follow-up interviews where warranted; adequately considers the evidence gathered; makes credibility assessments where feasible; and resolves inconsistent statements.

In all of the cases we reviewed, we believe that OPD gathered all relevant evidence available.  As we often find, in many of the cases, video and/or audio recordings proved to be a significant factor in allowing OPD to reach an appropriate conclusion.  In two cases, we do not believe investigators adequately considered the evidence at hand, and we disagreed with their findings.

Investigators conducted follow-up interviews to seek clarification or resolve inconsistencies in six of the 19 cases we reviewed.  In three cases, the complainants were interviewed twice; in one case, a witness was interviewed twice; in one case, a subject officer was interviewed twice; and in the remaining case, one subject officer was interviewed twice and another was interviewed three times.

OPD made credibility assessments for all involved parties in 12 of the 19 cases.  Six cases were approved for summary finding; and per policy, investigators are not required to assess the credibility of the involved officers and civilians in these instances.  Another case was resolved via informal complaint resolution, or ICR.

In four cases, the complainants were deemed not credible, and in two cases, the subject employees (one sworn, one civilian) were deemed not credible.  We agreed with these assessments, based on PDRD videos and other available evidence. In two division-level investigations (DLIs), the investigators equivocated on the credibility assessments – something that should have been caught during the review process.

In 12 of the 19 cases we reviewed, OPD successfully resolved inconsistent statements.  In 11 of the cases, PDRD recordings were available and assisted in the determination.  In another case, a recorded call to Communications allowed for a definitive conclusion.  Five cases resulted in at least one finding of not sustained.  Not sustained is an acceptable finding, and by definition, it implies that inconsistencies were not resolved despite investigative efforts.  We believe one other case should have resulted in a not sustained finding, as further described below.

---

[1] Summary findings are investigations in which the Department believes a proper conclusion can be determined based on a review of existing documentation with limited or no additional interviews and follow-up.

**Task 5.17** requires that OPD permanently retain all notes generated and/or received by OPD personnel in the case file. OPD personnel document that all investigative notes are contained within a particular file by completing an Investigative Notes Declaration Form. OPD has a sustained history of 100% compliance with this subtask. During this reporting period, the form was again properly completed in all of the cases we reviewed.

**Task 5.18** requires that OPD resolve each allegation in a complaint investigation using the preponderance of the evidence standard. **Task 5.19** requires that each allegation of a complaint is identified and resolved with one of the following dispositions: unfounded; sustained; exonerated; not sustained; or administrative closure. Our sample of 19 cases contained 118 allegations that received dispositions as follows: 28 exonerated; 69 unfounded; 10 not sustained; seven sustained; and four administratively closed (one of these by forced ICR). One case in particular contributed to the high number of allegations. It stemmed from a civil suit involving the service of an exigent search warrant, and there were 37 subject officers named. The FBI also participated in the search.

We disagreed with the findings in two of the cases we reviewed. One case involved the mishandling of evidence. The investigator's case substantiated untruthfulness on the part of a subject officer – and the officer was deemed not credible – but the investigator arrived at a finding of not sustained. After we reviewed this case with OPD, the Department changed the finding.

In the other case, a complainant alleged that an officer stopped and searched him without cause, and during the encounter the officer pointed his firearm at him. The stop and detention were exonerated, but we believe there was no justification for the stop and findings of sustained are appropriate. Additionally, the pointing of a firearm was unfounded, but the more appropriate finding is not sustained. The investigator based this latter finding on the complainant's cell phone video, but the video did not capture the entirety of the encounter and the officer did not have his PDRD as required by policy.

**Task 5.20** requires that the IAD Commander review all "filed" cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed. A filed case is defined as an investigation that cannot be presently completed and is pending further developments that will allow completion of the investigation; filed is not a final disposition. Traditionally, as part of our review of this Task, we also reviewed cases that are tolling. OPD defines a tolled case as an administrative investigation that has been held in abeyance in accordance with one of the provisions of Government Code Section 3304. While we are no longer actively assessing this subtask, we note that filed and tolling cases are reviewed with the Chief during her weekly IAD meetings and are listed by case number on the printed meeting agendas. We receive and review these agendas regularly, and a Monitoring Team member often attends these meetings. Additionally, we now receive a weekly report listing all tolled cases and all cases approaching their 3304 dates.

**Task 5.21** requires that any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken. However, with the approval of the IAD Commander or his designee, investigators are not required to interview and/or take a recorded statement in all cases. For example, interviews are not needed from a

member or employee who is the subject of a complaint, or who was on the scene of the incident
when additional information – beyond that already provided by the existing set of facts and/or
documentation – is not necessary to reach appropriate findings and conclusions.  Six of the 19
cases we reviewed were resolved via summary finding, and all were appropriately approved for
such closure.  In all of these cases, the availability of video and/or audio recordings was the
primary reason interviews were unnecessary.

| Task 5 compliance status | Not in compliance, based on the provisions of the March 23, 2016 Court Order and several troubling issues noted in this most recent assessment. |
| --- | --- |

## Overview of Our Assessments of Tasks 24 and 25

OPD had been in compliance with Tasks 24 and 25 since 2015, and we were not actively
reviewing these Tasks.  On November 27, 2018, as a result of concerns that had been brought
forward regarding the identification and investigation of uses of force, the Court reactivated
Tasks 24 and 25.  As noted above, the Court expressed concerns about the potential
underreporting of use of force based on the analysis completed by the Monitoring Team.

For purposes of this report, we reviewed 71 Use of Force (UOF) reports that were completed by
OPD during August, September, and November 2018 to assess compliance with Tasks 24 and
25.  We reviewed all Level 3 uses of force (12) and a sample of Level 4 uses of force (59).  We
did not include Level 1 and 2 uses of force in this review, as we review them at the time of the
Force Review Board (FRB) or Executive Force Review Board (EFRB) and included in our
assessment of Tasks 26 and Task 30.

After our review of the August and September use of force reports, we provided feedback in a
meeting with OPD personnel during our March site visit to discuss the findings and concerns that
were identified in our reviews.  We also provided feedback regarding OPD's proposed revisions
to the use of force policy.

In our review of the 71 use of force reports completed by OPD in August, September, and
November 2018, we did not identify any instances where we believe the use of force was
inappropriate or excessive.  We noted, as in the past, that in many instances OPD personnel
displayed notable restraint despite assaultive conduct, resistance, or verbal abuse from persons
with whom they had contact.

The total breakdown for the 71 use of force events reviewed is as follows: Black, 67%; Hispanic,
18%, and White, 7%.  The remaining 8% of UOFs included Asian and Native American persons.
Thirty-five incidents involved an officer or officers pointing a weapon at one or more persons.
In those 35 cases, the breakdown is as follows: Black, 71%; Hispanic, 17%; Asian and Native
American, 11%.  In the 71 uses of force, 57 involved the arrest or criminal charging of the
persons on whom the force was used.  Eight involved mental health holds; two involved persons
who were believed to have a weapon but did not; and the remaining four involved incidents
where officers were unable to establish enough evidence to make an arrest, a victim declined

prosecution, or the subjects contacted were ultimately determined not to be the persons being sought by OPD.  In 16 of the incidents reviewed, a person claimed some type of injury.  Some of the injuries required only first aid at the scene.  In other incidents, persons were transported to a medical facility for treatment of minor injuries that did not require hospitalization, or solely to obtain a medical clearance.

As noted in our assessment of Task 25.3, we believe that additional verbal communication and explanation for the reason for contact or detention might result in a reduction in the need to use physical force.  We discussed this with OPD during our March site visit and will continue to monitor these types of instances and provide input to OPD.  We encourage OPD to consider whether additional training is needed for their personnel on how to approach; and, when necessary, detain persons they encounter.

During our review of the 71 use of force incidents, we noted numerous instances where it took multiple officers to control and secure combative persons.  In many of these instances, only a single officer who used an identified weaponless defense method (leg sweep, arm bar, etc.) to overcome resistance was identified as having used force.  This is unacceptable and speaks to a cultural issue and an absence of supervision and command.  The officers who assisted in controlling the subject were listed as witnesses, as they believed their actions were not considered to be reportable uses of force.  The Department is currently revising its use of force policy, and will be redefining a "reportable use of force."  We believe this change will provide clearer direction to officers.  We also note that this revision will undoubtedly significantly *increase* the number of reportable uses of force.  OPD should track the revisions once implemented, to determine the effects that this and any other policy change has upon the reported use of force numbers.

In seven of the 71 investigations we reviewed, OPD personnel failed to activate their PDRDs during the contact; or activated them after the initial contact; and in some cases, after the use of force.  In all but one of the cases, supervisors identified the concern and documented that they had met with the officer and prepared a Supervisory Note.  This should not be occurring at this late stage of the NSA process.  This too raises serious cultural and internal oversight questions. What was missing in some of the instances is any information in the Supervisory Note or command review that the same or similar conduct had or had not occurred with the same officer in the past.  While a training session and Supervisory Note may clearly be appropriate in some cases, OPD needs to ensure that supervisors review and consider any prior similar conduct *before* proceeding with such action.  We discussed this with OPD during our March site visit and encouraged the Department to require that such documentation be included in the Use of Force Report or Supervisory Note.  We identified this same concern for other identified conduct, including officers' use of profanity, or failure to use an appropriate tactical approach.

During our review of the 71 Level 3 and 4 uses of force, we found that it appears to be unclear to OPD employees in some cases what constitutes a Level 3 use of force.  Nine of the 12 Level 3 uses of force involved the use of a Taser, which is clearly defined as a Level 3 use of force in OPD policy.  Three additional cases classified as Level 3 uses of force involved weaponless defense take-downs, including leg sweeps.  Nine cases initially documented as Level 3 uses of force were reduced to Level 4 uses of force by the supervisor or other reviewer.  OPD policy allows supervisors to make this decision based on a number of factors, including whether the

person needs medical care that exceeds first aid treatment, or the person makes a complaint regarding the use of force.  We discussed the Level 3 use of force definitions and what we believe is a lack of clarity with OPD during our March site visit.  As part of its revisions to its use of force policy, OPD will include new definitions that should provide more clarity on what criteria determines whether a use of force is a Level 3 or 4.  We are supportive of this revision and have provided our input to OPD on the revisions.

The use of force analysis we conducted last year established the underreporting of Level 4 uses of force where an officer pointed a weapon at a person.  We also noted two instances during our review of the 71 cases where a weapon was pointed at a subject and not documented as a use of force.  This concern had been addressed by OPD with refresher training in September 2018 for all officers, and the Department intends to clarify this issue in its use of force policy revisions.

In our review of OPD's 232nd Biweekly Compliance Update, dated March 27, 2019, we noted that year to date, Level 4 uses of force for 2019 was 331.  Level 4 uses of force for the same time period in 2018 was 69.  OPD explained that the Chief had ordered the refresher training on officers' use of firearms in September of 2018, and that the number of reported uses of force has increased since that time.  OPD notes that the significant increase in Level 4 uses of force may be related to the potential underreporting of Level 4 - Type 22 pointing a weapon at a person prior to the refresher training.

In this same Compliance Update, OPD noted that Level 3 uses of force year to date for 2019 was 40.  During the same time period in 2018, 16 Level 3 uses of force were reported.  We recently asked OPD for an explanation for this increase, and requested that the Department conduct some research and analysis to attempt to determine why these uses of force have increased more than 100% in 2019.  OPD responded to our request for information, and has identified that the most significant increase is in Level 3 - Type 16 use of force, which is a weaponless defense technique other than the use of a control hold.  This type of force increased from four in 2018 to 26 during the same timeframe in 2019, a 550% increase.  The other noted increase was in the use of Taser - Type 11 and 18.  This use of force increased from 12 to 21 in the identified timeframes, an increase of 75%.

In the 234th Biweekly Compliance Update, dated April 24, 2019, OPD notes that Level 4 uses of force continue to increase compared to 2018.  There have been 453 Level 4 uses of force year to date in 2019, compared to 84 during the same time period in 2018.  OPD continues to note that the cause of this increase may be related to the potential underreporting of Type 22, pointing a weapon at a person.  OPD noted that Level 3 uses of force year to date are 49 compared to 23 during the same time period in 2018.  OPD is still in the process of learning why the Level 3 uses of force may have increased.

# Task 24: Use of Force Reporting Policy

**Requirements:**

*The policy shall require that:*

1.  *Members/employees notify their supervisor as soon as practicable following any investigated use of force or allegation of excessive use of force.*

2.  *In every investigated use of force incident, every member/employee using force, and every member/employee on the scene of the incident at the time the force was used, shall report all uses of force on the appropriate form, unless otherwise directed by the investigating supervisor.*

3.  *OPD personnel document, on the appropriate form, any use of force and/or the drawing and intentional pointing of a firearm at another person.*

4.  *A supervisor respond to the scene upon notification of an investigated use of force or an allegation of excessive use of force, unless community unrest or other conditions makes this impracticable.*

5.  *OPD notify:*

    a.  *The Alameda County District Attorney's Office immediately or as soon as circumstances permit, following a use of lethal force resulting in death or injury likely to result in death.*

    b.  *The City Attorney's Office as soon as circumstances permit following the use of lethal force resulting in death or serious injury.  At the discretion of the City Attorney's Office, a Deputy City Attorney shall respond to the scene.  The Deputy City Attorney shall serve only in an advisory capacity and shall communicate only with the incident commander or his/her designee.*

    c.  *Departmental investigators regarding officer-involved shootings, in accordance with the provisions of Section V, paragraph H, of this Agreement.*

6.  *OPD enter data regarding use of force into OPD's Personnel Assessment System (PAS).*

(Negotiated Settlement Agreement V. A.)

**Relevant Policy:**

OPD most recently revised Departmental General Order K-4, *Reporting and Investigating the Use of Force* on October 16, 2014.  DGO K-4 incorporates the requirements of Task 24.

**Commentary:**

We reviewed 71 Use of Force (UOF) reports that were completed by OPD during August, September, and November 2018 to assess compliance with Task 24.  We reviewed all Level 3 uses of force (12) and a sample of Level 4 uses of force (59).

**Task 24.1** requires that members/employees notify their supervisor as soon as practicable following any reportable use of force or allegation of excessive use of force.  In all but one of the 71 Level 3 and Level 4 UOF reports completed in August, September, and November 2018, notifications were made as required.

**Task 24.2** requires that in every reportable use of force incident, every member/employee on the scene of the incident at the time the force was used, reports all uses of force on the appropriate form, unless otherwise directed by the investigating supervisor.  **Task 24.3** requires that OPD personnel document, on the appropriate form, every use of force and/or the drawing and intentional pointing of a firearm at another person.

In the 71 Level 3 and Level 4 UOF reports we reviewed, 35 involved the pointing of a weapon at a subject by one or more officers.  We determined that officers' pointing of their firearms to be appropriate in all 35 instances we assessed.  We also noted two additional instances where officers appropriately pointed weapons at persons, but these UOFs were not properly documented.  This is a behavior that cannot be tolerated.  In one case, while there were multiple uses of force that were properly documented, the UOF report did not include one officer's pointing of a weapon at a person.  The officer had properly documented the UOF in his departmental report, but it was not included in the UOF report.  In a second case, the pointing of a firearm at a person by one officer was documented as a UOF.  However, it appears from our review of the PDRD video that at least one additional officer pointed a firearm at a person.  This UOF was not identified or included in the report.  This observation does not speak well of the supervisor or the chain of command.

**Task 24.4** requires that a supervisor respond to the scene upon notification of a Level 1, 2, or 3 use of force or an allegation of excessive use of force, unless community unrest or other conditions makes such a response impracticable.  In the 12 Level 3 uses of force we reviewed for this subtask, supervisors responded to the scene as required in all instances.  In addition, though not specifically required for compliance with Task 24.4, in all but one of the Level 4 uses of force, a supervisor was either on scene at the time of the use of force, or responded to the scene upon being notified of the use of force.

**Task 24.5** specifically addresses requirements for the response and handling of Level 1 or 2 uses of force.  As previously noted, we are assessing these uses of force in Tasks 26 and 30.

**Task 24.6** requires that OPD enter all use of force data into the Personnel Assessment System (PAS), now known as Performance Reporting Information Metrics Environment (PRIME).  In all 71 UOF cases we reviewed, the data was entered as required.

The Court's reactivation of Task 24 at a November 2018 Case Management Conference resulted from our serious concerns with the Department's handling and investigation of recent uses of force. It remains to be seen if forthcoming policy revisions and other changes, prompted by our involvement and our review of previously unexplained reductions in reported use of force, will have a positive outcome on this issue. As a result, OPD is in partial compliance with this Task.

| Task 24 compliance status | In partial compliance |
|---|---|

## Task 25: Use of Force Investigations and Report Responsibility

**Requirements:**

*An on-scene supervisor is responsible for completing an investigated use of force report in accordance with the provisions of Departmental General Order K-4, "Reporting and Investigating the Use of Force."*

1. *OPD shall develop and implement a policy for conducting and documenting use of force investigations that include, at a minimum:*

   a. *Documentation of the incident in either an Offense or Supplemental Report from the member(s)/employee(s) using force; and/or, when necessary, a statement taken from the member(s)/employee(s) using force;*

   b. *Separating and separately interviewing all officers who were at the scene at the time of the incident;*

   c. *A Supplemental Report from other members/employees on the scene or a statement taken, if deemed necessary by the investigating supervisor;*

   d. *Identification and interviews of non-Departmental witnesses;*

   e. *Consideration of discrepancies in information obtained from members, employees and witnesses, and statements in the reports filed;*

   f. *Whether arrest reports or use of force reports contain "boilerplate" or "pat language" (e.g., "fighting stance", "minimal force necessary to control the situation");*

   g. *Documentation of physical evidence and/or photographs and a summary and analysis of all relevant evidence gathered during the investigation; and*

   h. *Consideration of training/tactical issues involving the availability and practicality of other force options.*

   i. *Supervisor's justification as to why any element of the policy was not documented; and*

2.   *All supervisors shall be trained in conducting use of force investigations and such training shall be part of a supervisory training course.*

3.   *Use of force investigations shall include a recommendation whether the use of force was objectively reasonable and within Department policy and training. The recommendation shall be based on the totality of the circumstances and shall consider, but is not limited to, the following factors:*

   a.   *Whether the force used was pursuant to a legitimate law-enforcement objective;*

   b.   *Whether the type and amount of force used was proportional to the resistance encountered and reasonably related to the objective the members/employees were attempting to achieve;*

   c.   *Whether the member/employee used reasonable verbal means to attempt to resolve the situation without force, if time and circumstances permitted such attempts;*

   d.   *Whether the force used was de-escalated or stopped reasonably when resistance decreased or stopped;*

4.   *use of force reports shall be reviewed by the appropriate chain-of-review as defined by policy.*

   *The type of force used, the identity of the involved members, and the report preparer shall be the determining criteria for utilizing the appropriate chain-of-review. Reviewers may include, when appropriate, the chain-of-command of the involved personnel, the appropriate Area Commander on duty at the time the incident occurred, other designated Bureau of Field Operations commanders, and as necessary, the chain-of-command of the involved personnel up to the Division Commander or Deputy Chief/Director, and the Internal Affairs Division.*

   *Reviewers for Level 1-3 use of force investigations shall:*

   a.   *Make a recommendation as to whether the use of force was in or out of policy,*

   b.   *Order additional investigation and investigative resources when necessary, and*

   c.   *Comment on any training issue(s) when appropriate.*

5.   *Any recommendation that the use of force did not comply with Department policy shall result in the incident being referred to the Internal Affairs Division to conduct additional investigation/analysis, if necessary.*

> 6.      *Members/employees involved in a use of force incident resulting in serious injury*
> *or death and/or an officer-involved shooting, shall be separated from each other*
> *as soon as practicable at the incident scene, and kept apart until they have*
> *completed their reports and been interviewed.*

(Negotiated Settlement Agreement V. B.)

### Relevant Policy:

OPD most recently revised Departmental General Order K-4, *Reporting and Investigating the Use of Force* on October 16, 2014.  DGO K-4 incorporates the requirements of Task 25.

### Commentary:

As noted for Task 24, we reviewed 71 use of force (UOF) reports that were completed by OPD during August, September, and November 2018 to assess compliance with Task 25.  In total, we reviewed all Level 3 uses of force reports (12) and a sample of Level 4 uses of force reports (59).

**Task 25.1** requires that an on-scene supervisor complete a Use of Force Report for every Level 3 use of force.  In all 12 Level 3 uses of force reviewed for this subtask, a supervisor responded to the scene and completed a use of force investigation.  In addition, there were nine instances where a Level 3 use of force was downgraded to a Level 4 by a supervisor who was at the scene. In all nine of these instances, documentation, justification, and approval were provided.  We had concerns with one incident, initially a Level 4 that was upgraded to a Level 3, and then downgraded again to a Level 4.  In this instance, upon review of the incident by OPD personnel, the force was upgraded from a Level 4 to a Level 3 and an internal investigation was initiated based on a complaint of excessive force that was made at the scene.  The complainant did not pursue the complaint, there was no indication in the review of the PDRD video that any excessive force had occurred, and the force was returned to Level 4 status.  While we agree that the use of force was appropriate, we disagree that incidents should be considered one use of force, upgraded to another, and then downgraded again.  We discussed this concern with OPD during our March site visit.  This should be a concern to the Department and City leadership, as well as the community,

**Task 25.2** requires that all supervisors are trained on how to conduct use of force investigations and such training is part of a supervisory training course.  OPD includes the requirement for this training in their department policies.  During our March site visit, we confirmed with OPD that they continue to require and deliver this training.

**Task 25.3** requires that use of force investigations include required recommendations.  Areas of recommendation include: whether the force used was pursuant to a legitimate law enforcement objective; whether the type and amount of force used was proportional to the resistance encountered and reasonably related to the objective the officers were attempting to achieve; whether the officers used reasonable verbal means to attempt to resolve the situation without force, if time and circumstances permitted such attempts; and whether the force used was de-escalated or stopped reasonably when resistance decreased or stopped.

In our assessment of the 71 cases for this subtask, we did not identify any instance where we believe the force used was not pursuant to a legitimate law enforcement objective, was inappropriate or excessive, or where the use of force was not deescalated or stopped reasonably when resistance decreased.  We did, however, identify several instances where we believe OPD officers could have made additional efforts to explain to subjects being detained why the detention was occurring.  In some cases, the need to use physical force may have been decreased or eliminated had some additional verbal explanation been provided.  This is a cultural issue and one that is also tied to instances where de-escalation might facilitate a better outcome.  During our March site visit, we discussed one specific case with OPD where our concerns were particularly heightened; and we will discuss additional cases we have noted since that time during our upcoming site visit.

**Task 25.4** requires that use of force reports are reviewed by the appropriate chain of review and appropriate recommendations are made.  In all but one of the 71 cases we reviewed for this subtask, the reports were reviewed as required.  We discussed the one case where a review did not occur with OPD during our March site visit.

**Task 25.5** requires that any determination that a use of force did not comply with Department policy result in the incident being referred to IAD to conduct additional investigation/analysis, if necessary.  There were no determinations made that any of the 71 uses of force did not comply with Department policy.

**Task 25.6** requires that members/employees involved in a use of force incident resulting in serious injury or death and/or officer-involved shooting, are separated from each other as soon as practicable at the incident scene, and kept apart until they have completed their reports and been interviewed.  This Task is not assessed here, as we review and consider it as part of the Force and Executive Force Review Boards that OPD holds to examine Level 1 and 2 uses of force.

The Court's reactivation of Task 25 at a November 2018 Case Management Conference resulted from our serious concerns with the Department's handling and investigation of recent uses of force.  It remains to be seen if forthcoming policy revisions and other changes, prompted by our involvement and our review of previously unexplained reductions in reported use of force, will have a positive outcome on this issue.  As a result, OPD is in partial compliance with this Task.

| Task 25 compliance status | In partial compliance |
|---|---|

## Task 41:  Use of Personnel Assessment System (PAS) and Risk Management

**Requirements:**

*Within 375 days from the effective date of this Agreement, OPD shall develop a policy for use of the system, including supervision and audit of the performance of specific members, employees, supervisors, managers, and OPD units, as well as OPD as a whole.*

*The policy shall include the following elements:*

1. *The Chief of Police shall designate a PAS Administration Unit.  The PAS Administration Unit shall be responsible for administering the PAS policy and, no less frequently than quarterly, shall notify, in writing, the appropriate Deputy Chief/Director and the responsible commander/manager of an identified member/employee who meets the PAS criteria.  PAS is to be electronically maintained by the City Information Technology Department.*

2. *The Department shall retain all PAS data for at least five (5) years.*

3. *The Monitor, Inspector General and Compliance Coordinator shall have full access to PAS to the extent necessary for the performance of their duties under this Agreement and consistent with Section XIII, paragraph K, and Section XIV of this Agreement.*

4. *PAS, the PAS data, and reports are confidential and not public information.*

5. *On a quarterly basis, commanders/managers shall review and analyze all relevant PAS information concerning personnel under their command, to detect any pattern or series of incidents which may indicate that a member/employee, supervisor, or group of members/employees under his/her supervision may be engaging in at-risk behavior.  The policy shall define specific criteria for determining when a member/employee or group of members/employees may be engaging in at-risk behavior.*

6. *Notwithstanding any other provisions of the PAS policy to be developed, the Department shall develop policy defining peer group comparison and methodology in consultation with Plaintiffs' Counsel and the IMT.  The policy shall include, at a minimum, a requirement that any member/employee who is identified using a peer group comparison methodology for complaints received during a 30-month period, or any member who is identified using a peer group comparison methodology for Penal Code §§69, 148 and 243(b)(c) arrests within a 30-month period, shall be identified as a subject for PAS intervention review. For the purposes of these two criteria, a single incident shall be counted as "one" even if there are multiple complaints arising from the incident or combined with an arrest for Penal Code §§69, 148 or 243(b)(c).*

7. *When review and analysis of the PAS threshold report data indicate that a member/employee may be engaging in at-risk behavior, the member/employee's immediate supervisor shall conduct a more intensive review of the*

*member/employee's performance and personnel history and prepare a PAS Activity Review and Report. Members/employees recommended for intervention shall be required to attend a documented, non-disciplinary PAS intervention meeting with their designated commander/manager and supervisor. The purpose of this meeting shall be to review the member/employee's performance and discuss the issues and recommended intervention strategies. The member/employee shall be dismissed from the meeting, and the designated commander/manager and the member/employee's immediate supervisor shall remain and discuss the situation and the member/employee's response. The primary responsibility for any intervention strategies shall be placed upon the supervisor. Intervention strategies may include additional training, reassignment, additional supervision, coaching or personal counseling. The performance of members/ employees subject to PAS review shall be monitored by their designated commander/manager for the specified period of time following the initial meeting, unless released early or extended (as outlined in Section VII, paragraph B (8)).*

8. *Members/employees who meet the PAS threshold specified in Section VII, paragraph B (6) shall be subject to one of the following options: no action, supervisory monitoring, or PAS intervention. Each of these options shall be approved by the chain-of-command, up to the Deputy Chief/Director and/or the PAS Activity Review Panel.*

   *Members/employees recommended for supervisory monitoring shall be monitored for a minimum of three (3) months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor. The first at the end of one (1) month and the second at the end of three (3) months.*

   *Members/employees recommended for PAS intervention shall be monitored for a minimum of 12 months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor and designated commander/manager: The first at three (3) months and the second at one (1) year. Member/employees subject to PAS intervention for minor, easily correctable performance deficiencies may be dismissed from the jurisdiction of PAS upon the written approval of the member/employee's responsible Deputy Chief, following a recommendation in writing from the member/employee's immediate supervisor. This may occur at the three (3)-month follow-up meeting or at any time thereafter, as justified by reviews of the member/employee's performance. When a member/employee is not discharged from PAS jurisdiction at the one (1)-year follow-up meeting, PAS jurisdiction shall be extended, in writing, for a specific period in three (3)-month increments at the discretion of the member/employee's responsible Deputy Chief. When PAS jurisdiction is extended beyond the minimum one (1)-year review period, additional review meetings involving the member/employee, the member/ employee's designated commander/manager and immediate supervisor, shall take place no less frequently than every three (3) months.*

9.    On a quarterly basis, Division/appropriate Area Commanders and managers shall review and analyze relevant data in PAS about subordinate commanders and/or managers and supervisors regarding their ability to adhere to policy and address at-risk behavior.  All Division/appropriate Area Commanders and managers shall conduct quarterly meetings with their supervisory staff for the purpose of assessing and sharing information about the state of the unit and identifying potential or actual performance problems within the unit.  These meetings shall be scheduled to follow-up on supervisors' assessments of their subordinates' for PAS intervention.  These meetings shall consider all relevant PAS data, potential patterns of at-risk behavior, and recommended intervention strategies since the last meeting.  Also considered shall be patterns involving use of force, sick leave, line-of-duty injuries, narcotics-related possessory offenses, and vehicle collisions that are out of the norm among either personnel in the unit or among the unit's subunits.  Division/appropriate Area Commanders and managers shall ensure that minutes of the meetings are taken and retained for a period of five (5) years.  Commanders/managers shall take appropriate action on identified patterns of at-risk behavior and/or misconduct.

10.   Division/appropriate Area Commanders and managers shall meet at least annually with his/her Deputy Chief/Director and the IAD Commander to discuss the state of their commands and any exceptional performance, potential or actual performance problems or other potential patterns of at-risk behavior within the unit.  Division/appropriate Area Commanders and managers shall be responsible for developing and documenting plans to ensure the managerial and supervisory accountability of their units, and for addressing any real or potential problems that may be apparent.

11.   PAS information shall be taken into account for a commendation or award recommendation; promotion, transfer, and special assignment, and in connection with annual performance appraisals.  For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.

12.   Intervention strategies implemented as a result of a PAS Activity Review and Report shall be documented in a timely manner.

13.   Relevant and appropriate PAS information shall be taken into account in connection with determinations of appropriate discipline for sustained misconduct allegations.  For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.

14.   The member/employee's designated commander/manager shall schedule a PAS Activity Review meeting to be held no later than 20 days following notification to the Deputy Chief/Director that the member/employee has met a PAS threshold and when intervention is recommended.

15.     *The PAS policy to be developed shall include a provision that a member/employee making unsatisfactory progress during PAS intervention may be transferred and/or loaned to another supervisor, another assignment or another Division, at the discretion of the Bureau Chief/Director if the transfer is within his/her Bureau.  Inter-Bureau transfers shall be approved by the Chief of Police.  If a member/employee is transferred because of unsatisfactory progress, that transfer shall be to a position with little or no public contact when there is a nexus between the at-risk behavior and the "no public contact" restriction.  Sustained complaints from incidents subsequent to a member/employee's referral to PAS shall continue to result in corrective measures; however, such corrective measures shall not necessarily result in a member/employee's exclusion from, or continued inclusion in, PAS.  The member/employee's exclusion or continued inclusion in PAS shall be at the discretion of the Chief of Police or his/her designee and shall be documented.*

16.     *In parallel with the PAS program described above, the Department may wish to continue the Early Intervention Review Panel.*

17.     *On a semi-annual basis, beginning within 90 days from the effective date of this Agreement, the Chief of Police, the PAS Activity Review Panel, PAS Oversight Committee, and the IAD Commander shall meet with the Monitor to review the operation and progress of the PAS.  At these meetings, OPD administrators shall summarize, for the Monitor, the number of members/employees who have been identified for review, pursuant to the PAS policy, and the number of members/employees who have been identified for PAS intervention.  The Department administrators shall also provide data summarizing the various intervention strategies that have been utilized as a result of all PAS Activity Review and Reports.  The major objectives of each of these semi-annual meetings shall be consideration of whether the PAS policy is adequate with regard to detecting patterns of misconduct or poor performance issues as expeditiously as possible and if PAS reviews are achieving their goals.*

18.     *Nothing in this Agreement, and more specifically, no provision of PAS, shall be construed as waiving, abrogating or in any way modifying the Department's rights with regard to discipline of its members/employees.  The Department may choose, at its discretion, to initiate the administrative discipline process, to initiate PAS review or to use both processes concurrently or consecutively.*

(Negotiated Settlement Agreement VII. B.)

**Relevant Policy:**

OPD revised and issued Departmental General Order D-17, *Personnel Assessment Program,* in November 2013.  The Department has begun to address General Order D-17 as part of the Department's ongoing policy review and revision program.  The revised version of the relevant policy is currently under review.

**Commentary:**

The reconstruction of the risk management database continues to be one of the major initiatives related to Tasks 40 and 41.  Equally significant are the continuing efforts to refine the risk management meeting process, including initiating regular Risk Management Meetings in all of the Area commands.

The Department's risk management database development has included work with external contractors to make significant improvements in the operation of the system and to add several new data sources to the comprehensive database.  The new data includes the addition of personnel information through the City's Human Resources Department and the addition of training data, including Academy and in-service training, by using new data systems.  Access to stop data and to body-worn camera videos are also included in the project.  Additionally, the project involves enhanced analysis of the data, improved report development, and advanced access to information through dashboards tailored to match responsibilities as defined by the organizational chart.  To separate the new system from its past, and to highlight its new capabilities, the risk management database has been renamed as "Vision."

Progress on Vision is continuing; and, to date, minor setbacks have not resulted in changes in the expected date (July) for full implementation.  In the meantime, considerable work is continuing.  That includes both making the expected programming changes and preparation for Department-wide training on the new system.

The addition of training information has been largely completed through the City's Information Technology Department.  Work is also continuing on adding personnel records.  Progress on body-worn camera video is advancing, and the central issues seem to relate to convenience in accessing data and not whether the task can be accomplished.

The addition of stop data to the Vision system is also moving forward, but this has been complicated by the state of California's initiative to collect similar data across the state.  The Department has incorporated the use of the mandated data fields and is working on modeling the data to allow the tracking of stop data currently as well as matching it with the data collected over the prior years.  That will support the trend analyses that are of interest to the Department.

This approach to analyzing stop data is consistent with the Department's full integration of stop data analysis into the risk management process.  The use of stop data – along with other risk factors such as use of force, complaints, and pursuits – reflects a comprehensive approach to assessing and managing risk.

We recently viewed a demonstration of the data dashboards being developed as part of the Vision initiative.  The contractor involved has worked closely with the Department to understand its data access and evaluation needs.  That has led to a plan for the development of 10 dashboards addressing core areas of risk-related data.  The dashboards will provide easily understandable data and will facilitate comparisons across time and across police units.  This will also include measures normed by arrest levels as a means of understanding the key comparisons.  The dashboards will provide new, and mostly easy, access to critically important risk-related information.

The potential impact of this step forward should not be underestimated.  At each level, from front line staff and supervisors to the Chief, this access to information can be expected to have a major influence.  One area for that is certain to be on the nature of the Risk Management Meetings themselves.  That issue was the focus of technical assistance we conducted during recent visits.  We began this technical assistance process by considering broad data issues, including methods for comparisons and approaches to presenting and using data.  This process also included a discussion of the process of "drilling down" by asking the right questions and providing meaningful data visualizations to maximize the understanding and usefulness of the data.

The impact of the new analytic capacity associated with the data dashboards can potentially be substantial.  For example, supervisors across the Department should now have near real-time data available.  With regard to Risk Management Meetings, their task should no longer be to study the accumulated data in search of trends and patterns.  Instead, they should be able to continuously use data in ongoing management decisions.  Just as the risk management process and the associated meetings have evolved since they began, this will undoubtedly lead to additional change.  It will add to problem-solving processes by allowing field supervisors to elaborate their understanding of tends and patterns and to seek the advice of command staff.  If Department leadership manages this project effectively, it could lead to an even better use of supervisors' knowledge and an even stronger use of command experience and expertise.

| Task 41 compliance status | In compliance |
| --- | --- |

## Conclusion

At the April 3, 2019 Case Management Conference, City personnel mentioned the concept of a "learning organization" to describe the Oakland Police Department's strategy for coming into compliance with the Negotiated Settlement Agreement.  That concept can be a useful for determining the path forward, as well as understanding the long path travelled to this point in time.

Setting aside the long arc that has brought us all to the current level of compliance, it is clear that progress continues to be made.  After false starts and untold technical glitches, the development of the new risk management database, previously known as PRIME 2.0 and now known as Vision, appears to be on track.  The collection, analysis, and use of stop data have become important elements in the management of the Department.  The Department has established a risk management process that is admirable in its comprehensiveness of procedures.  The overall

level of compliance with NSA requirements – regardless of how the length of time taken to achieve it is judged – reflects the learning process the organization has undergone.

As should be expected, however, the greater the degree of success, the more difficult further progress becomes and the greater the possibility of sliding backwards.  The most complex and challenging tasks, are by their nature, the most difficult to bring into compliance.  That fact suggests the value of the learning organization perspective in understanding the past and planning the path forward.

In what has been described as a  "checking boxes" approach to compliance, the Department has sometimes failed, using its own internal processes, to recognize critical issues.  And, when the Monitoring Team has identified problems, the Department's first response has sometimes been to resist the underlying analysis and to fail to recognize the need for reform.  The Department has had numerical successes with many of the compliance requirements.  But the cultural challenge of breaking from old habits and neglecting to comply with practices that by now should be fully institutionalized are a great concern and raise questions about the organization's capacity to sustain progress in all that is required.

Our recent review of use of force reporting is illustrative.  We found significant levels of non-reporting.  The initial response from the Department was to defend its processes and question the identified problematic cases.  After further consideration, the Department's own audit conducted by OIG supported the initial findings; and the Department initiated some changes in policy and practice.  Over time, similar fits and starts have marked many Department experiences.

In these cases, the Department has often found its way to eventually undertaking appropriate reviews and implementing needed change.  But significant reform does not flow freely from a narrow view of achieving compliance.  Achieving and sustaining meaningful reform is most likely where the capacity for introspection expands and where the specific direction for change is guided by the values that were originally, and that continue to be, at the core of the Negotiated Settlement Agreement.

A commitment to sustainability will require strong leadership at all levels in the Department and the City structure.  In its most essential elements, the NSA requires that the Department be capable of critical self-examination.  With that must come the capacity for self-directed reform, driven by an unflinching pursuit of the truth.

*Robert S. Warshaw*

Chief (Ret.) Robert S. Warshaw

*Monitor*