July 11, 2019

# Sixty-Second Report *of the* Independent Monitor *for the* Oakland Police Department

## Introduction

This is our sixty-second status report on the Negotiated Settlement Agreement (NSA) in the case of *Delphine Allen, et al., vs. City of Oakland, et al.,* in the United States District Court for the Northern District of California under the direction of Judge William H. Orrick.  I was appointed in 2010 to oversee the monitoring process of the Oakland Police Department (OPD) that began in 2003.

This report covers our site visits of April 3-4 and May 21-22, 2019; and describes our recent assessments of NSA Tasks 2, 26, 30, 41, and 45.  Following the Court's Order of May 21, 2015, we devote special attention to the most problematic component parts of the Tasks that are not yet in full or sustained compliance; and discuss in our status reports the most current information regarding the Department's progress with the NSA and its efforts at making the reforms sustainable.

## *Increasing Technical Assistance*

Each month, our Team conducts a visit to Oakland that includes both compliance assessments and technical assistance.  During our visits, we meet with Department and City officials; observe Department meetings and technical demonstrations; review Departmental policies; conduct interviews and make observations in the field; and analyze OPD documents and files, including misconduct investigations, use of force reports, crime and arrest reports, Stop Data Forms, and other documentation.  We also provide technical assistance in additional areas, especially those that relate to the remaining non-compliant Tasks or areas identified by the Department.

Within the last several months, we have provided technical assistance to OPD officials in the areas of IAD investigation quality (Task 5); use of force investigations (Tasks 24 and 25); stop data and related issues (Task 34); risk management and the ongoing maintenance issues and development of the Performance Reporting Information Metrics Environment (PRIME) systems (Task 41); and several Department policies and procedures, including policies related to PRIME, officer discipline, use of force, probationers and parolees, handcuffing, and the use of electronic control weapons.

## *Building Internal Capacity at OPD*

Also per the May 21, 2015 Court Order, we continue to work closely with the Office of Inspector General's (OIG) lieutenant and staff to identify areas that it should audit or review – and to help design approaches to these audits that are not cumbersome, so as to ensure sustainability.  We review OIG's quarterly progress reports, which are a valuable resource and assist us in assessing compliance with NSA requirements.

## *Focused Task Assessments*

## Task 2:  Timeliness Standards and Compliance with IAD Investigations

**Requirements:**

*Fairness to complainants, members/employees and the public requires that internal investigations be completed in a timely fashion.*

    1.    *On or before December 1, 2003, OPD shall develop policies regarding timeliness standards for the completion of Internal Affairs investigations, administrative findings and recommended discipline.*

    2.    *Compliance with these timeliness standards shall be regularly monitored by IAD command and the Department's command staff.  If IAD experiences an unusual proliferation of cases and/or workload, IAD staffing shall be increased to maintain timeliness standards.*

(Negotiated Settlement Agreement III. B.)

**Relevant Policy:**

OPD most recently revised Departmental General Order M-03, *Complaints Against Department Personnel and Procedures*, which incorporates the requirements of Task 2, on December 22, 2017.

**Commentary:**

Task 2 has long been inactive; in fact, we have not assessed Task 2 since 2015.  However, recent reporting from OPD indicates that IAD is having difficulty meeting its required timeliness standards.

**Task 2.1** requires that internal investigations (IAD and Division Level) – including review, approval, findings, and discipline – be completed in accordance with the timeliness standards developed by OPD.  To assess this subtask, we reviewed a list of all internal investigations resulting in formal findings (unfounded, sustained, exonerated, or not sustained) that were approved in April 2019, and calculated the number of days between the complaint date and the approval date for each case.  We excluded from the dataset cases that were administratively closed, those that involved on-duty traffic accidents or service complaints, and those that did not involve Manual of Rules (MoR) violations.  We segregated the remaining cases into Class I or Class II categories.  If a case involved at least one alleged Class I violation, we classified it as Class I.

OPD policy requires that at least 85% of Class I misconduct investigations and at least 85% of Class II misconduct investigations must be completed within 180 days to be considered timely.  Per DGO M-03, Class I offenses "are the most serious allegations of misconduct and, if sustained, shall result in disciplinary action up to and including dismissal and may serve as the basis for criminal prosecution."  Class II offenses include "all minor misconduct offenses."  Of the 14 Class I cases we reviewed for this assessment, only four, or 29%, were in compliance with established timelines.  One of these was completed in exactly 180 days.  Of the 30 Class II cases we reviewed, only seven, or 23%, were in compliance with established timelines.  Two of these were completed in exactly 180 days.

Per DGO M-03, "In cases with a sustained finding, the discipline recommendation process shall be completed within 30 calendar days of the sustained finding."  We reviewed all 16 cases involving sustained findings that were approved in April 2019; one case involved three sustained findings.  Of these 16 cases, 15 (94%) were in compliance with established discipline timelines.  In the one case that was not in compliance, the Department completed the discipline recommendation process within 33 calendar days of the sustained finding.  We will inquire with OPD during our upcoming site visit to learn more about what occurred in this case.

OPD is not in compliance with Task 2.1.

Task 2.2 requires that IAD and OPD command staff regularly monitor compliance with these timeliness standards.  The primary responsibility for monitoring compliance with timeliness standards rests with IAD, whether investigations are conducted by IAD personnel or via Division-level investigation.  As part of this monitoring, the IAD Commander discusses pending deadlines for key open investigations during IAD's weekly meetings with the Chief; the deadlines are also reflected in written agendas for these meetings.  A Monitoring Team representative regularly attends these weekly meetings.  IAD also occasionally, as needed, emails individual reminders on cases approaching due dates to investigators and their supervisors.  The Department is in compliance with Task 2.2.

Task 2.3 requires that if IAD experiences an unusual proliferation of cases and/or workload, IAD staffing be increased to maintain timeliness standards.  According to OPD, IAD recently brought sergeants and lieutenants to review completed Division-level investigations.  During our upcoming site visit, we will inquire with IAD personnel to learn more about the current status of IAD personnel, and OPD's specific plans for long-term IAD staffing, especially given the disappointing findings of this assessment.

| **Task 2 compliance status** | Not in compliance |
|---|---|

## Task 26: Force Review Board (FRB)

**Requirements:**

*OPD shall develop and implement a policy concerning its FRB proceedings. The policy shall:*

1. *Set out procedures, membership and a timetable for FRB review of use of force investigations involving Level 2 incidents, as defined in Department General Order K-4, REPORTING AND INVESTIGATING THE USE OF FORCE;*

2. *Require the FRB to review all use of force investigations;*

3. *Require the FRB to make a recommendation as to whether the use of force was in policy or out of policy;*

4. *Require the FRB to forward sustained policy violations to the Discipline Officer.*

5. *Require the FRB not to review any use of force allegation until the internal investigations has been completed;*

6. *Authorize the FRB to recommend to the Chief of Police additional use of force training or changes in policies or tactics, or additional standards, investigatory policies, or training for use of force investigations;*

7. *Require the FRB to conduct an annual review of use of force cases examined, so as to identify any patterns of use of force practices that may have policy or training implications, and thereafter, issue a report to the Chief of Police;*

8. *Require that the FRB membership include, at a minimum, one member from the Training Division, one member from the Field Training Officer program, and either the Bureau of Field Operations Deputy Chief or his/her designee;*

9. *Minimally, that one member of the FRB shall be replaced at least annually.*

(Negotiated Settlement Agreement V. C.)

**Relevant Policy:**

Department General Order K-4.1, *Force Review Boards,* was originally published on February 17, 2006, and revised on December 21, 2015.

**Commentary:**

OPD Force Review Boards (FRBs) are regularly convened to examine the investigations conducted relative to the deployment and application of Level 2 uses of force.[1] OPD achieved compliance with this Task during the nineteenth reporting period (April 1-June 30, 2014). However, we continue to assess the compliance with this Task, including our analyses of force reports, our review of Force Review Board reports, attendance at Force Review Boards when conducted during our site visits, and on occasion observing Force Review Boards between site visits via online meeting software.

For this report, we reviewed six Force Review Board Reports that were completed and approved by the Chief of Police from February-May 2019. In all cases, the force was determined by the Boards to be in compliance. In each case, the Chief concurred with the findings without any modifications.

In one case, the Board noted deficiencies in the force investigation conducted by the Patrol supervisor, as well as issues with his demeanor captured on body-worn camera (BWC) video. The Board appropriately noted that the IAD investigation failed to address these issues. The Board wrote in its report, "Given the fact that the Board had held an extensive session of questioning of [the supervisor] regarding this exact issue during his force presentation, it was determined that it was not feasible to initiate a misconduct investigation. Instead, the Board treated this issue as self-discovered misconduct and, consistent with DGO M-03, directed training and a supervisory note file (SNF) entry in [the supervisor's] file to memorialize the training." The Chief further noted in handwritten comments when she approved the report that, "Per AOCA [Assistant Office of the City Attorney] I could not treat this case as a misconduct – demeanor matter without violating POBAR," referring to the Public Safety Officers' Procedural Bill of Rights Act.

In addition to reviewing the completed FRB reports, we observed five FRBs as they carried out their duties and deliberations. We observed three during our regular site visits, and two remotely via Skype. One of these latter FRBs was conducted over a two-day period because of the need to have a crowd control subject matter expert (SME) testify. These boards followed appropriate policies and protocols.

In addition to ruling on the appropriateness of uses of force, Force Review Boards will generally identify several follow-up items based on their review of the associated materials and the presentations made to them. These can include items such as counseling and training for

---

[1] According to OPD, Level 2 uses of force include: "1) Any strike to the head (except for an intentional strike with an impact weapon); 2) Carotid restraint is applied that does not result in the loss of consciousness; 3) Use of impact weapons, including specialty impact munitions or any other object, to strike a subject and contact is made, regardless of injury; 4) Any unintentional firearms discharge that does not result in injury; 5) A police canine bites the clothing or the skin of a subject, or otherwise injures a subject requiring emergency medical treatment (beyond first-aid) or hospital admittance; 6) Any use of force which results in injuries to the subject requiring emergency medical treatment (beyond first-aid) or hospital admittance; (NOTE: For the purposes of this order, an evaluation by a medical professional to assess a complaint of injury is not emergency treatment) 7) Any Level 3 use of force used on or applied to a restrained subject; 7.a) A restrained subject is a person who has been fully placed in a Department authorized restraint device such as both hands handcuffed, a WRAP or Rip Hobble; 7.b) A subject with only one handcuff on is not a restrained person."

individual officers, publication of Department-wide training materials, and modifications to policy. These deliverables are tracked in a spreadsheet, broken down into three categories: Individual Issues; Department-Wide Issues; and Quarterly Training Points. There were 46 open deliverables out of 145 total deliverables included in all three categories. While OPD has made notable progress in addressing some of the more dated deliverables, there are still some open deliverables assigned to personnel who have long since retired, and there does not appear to be consistency to the notations used to indicate closed deliverables. We will discuss these issues with appropriate personnel during an upcoming site visit.

OPD remains in compliance with this Task.

| **Task 26 compliance status** | In compliance |
|---|---|

## Task 30: Executive Force Review Board (EFRB)

**Requirements:**

1. *An EFRB shall be convened to review the factual circumstances surrounding any Level 1 force, in-custody death, or vehicle pursuit-related death incidents. A firearm discharge at an animal shall be reviewed by the EFRB only at the direction of the Chief of Police.*

2. *The Board shall have access to recordings and/or transcripts of interviews of all personnel on the scene, including witnesses, and shall be empowered to call any OPD personnel to provide testimony at the hearing.*

3. *OPD shall continue the policies and practices for the conduct of EFRB, in accordance with the provisions of DGO K-4.1, FORCE REVIEW BOARDS.*

(Negotiated Settlement Agreement V. G.)

**Relevant Policy:**

Department General Order K-4.1, *Force Review Boards,* was published on February 17, 2006, and revised on December 21, 2015.

**Commentary:**

Executive Force Review Boards (EFRBs), consisting of three top command-level staff, conduct thorough, detailed reviews of all Level 1 uses of force, in-custody deaths, and vehicle pursuit-related deaths and serious injuries. OPD achieved compliance with this Task during the nineteenth reporting period (April 1-June 30, 2014). OPD conducted six EFRBs in 2018. There have been no EFRBs conducted in 2019.

The final EFRB of 2018 reviewed an officer-involved shooting that occurred in March 2018, and the Board identified several deliverables as a result. Those deliverables are tracked in the same spreadsheet discussed above. On May 16, 2019, we participated in a conference call with members of OPD's executive staff to discuss the status of those deliverables. These include the development of several new or enhanced policies. We have been reviewing various iterations of these policies between and during our recent site visits.

Based on the last EFRB conducted, we found the Department to no longer be in compliance with this Task. This is a serious and disturbing finding.

| **Task 30 compliance status** | Not in compliance |
|---|---|

## Task 41:  Use of Personnel Assessment System (PAS) and Risk Management

**Requirements:**

*Within 375 days from the effective date of this Agreement, OPD shall develop a policy for use of the system, including supervision and audit of the performance of specific members, employees, supervisors, managers, and OPD units, as well as OPD as a whole.*

*The policy shall include the following elements:*

1. *The Chief of Police shall designate a PAS Administration Unit. The PAS Administration Unit shall be responsible for administering the PAS policy and, no less frequently than quarterly, shall notify, in writing, the appropriate Deputy Chief/Director and the responsible commander/manager of an identified member/employee who meets the PAS criteria. PAS is to be electronically maintained by the City Information Technology Department.*

2. *The Department shall retain all PAS data for at least five (5) years.*

3. *The Monitor, Inspector General and Compliance Coordinator shall have full access to PAS to the extent necessary for the performance of their duties under this Agreement and consistent with Section XIII, paragraph K, and Section XIV of this Agreement.*

4. *PAS, the PAS data, and reports are confidential and not public information.*

5. *On a quarterly basis, commanders/managers shall review and analyze all relevant PAS information concerning personnel under their command, to detect any pattern or series of incidents which may indicate that a member/employee, supervisor, or group of members/employees under his/her supervision may be engaging in at-risk behavior. The policy shall define specific criteria for determining when a member/employee or group of members/employees may be engaging in at-risk behavior.*

6. *Notwithstanding any other provisions of the PAS policy to be developed, the Department shall develop policy defining peer group comparison and methodology in consultation with Plaintiffs' Counsel and the IMT. The policy shall include, at a minimum, a requirement that any member/employee who is identified using a peer group comparison methodology for complaints received during a 30-month period, or any member who is identified using a peer group comparison methodology for Penal Code §§69, 148 and 243(b)(c) arrests within a 30-month period, shall be identified as a subject for PAS intervention review. For the purposes of these two criteria, a single incident shall be counted as "one" even if there are multiple complaints arising from the incident or combined with an arrest for Penal Code §§69, 148 or 243(b)(c).*

7. *When review and analysis of the PAS threshold report data indicate that a member/employee may be engaging in at-risk behavior, the member/employee's immediate supervisor shall conduct a more intensive review of the member/employee's performance and personnel history and prepare a PAS Activity Review and Report. Members/employees recommended for intervention shall be required to attend a documented, non-disciplinary PAS intervention meeting with their designated commander/manager and supervisor. The purpose of this meeting shall be to review the member/employee's performance and discuss the issues and recommended intervention strategies. The member/employee shall be dismissed from the meeting, and the designated commander/manager and the member/employee's immediate supervisor shall remain and discuss the situation and the member/employee's response. The primary responsibility for any intervention strategies shall be placed upon the supervisor. Intervention strategies may include additional training, reassignment, additional supervision, coaching or personal counseling. The performance of members/ employees subject to PAS review shall be monitored by their designated commander/manager for the specified period of time following the initial meeting, unless released early or extended (as outlined in Section VII, paragraph B (8)).*

8. *Members/employees who meet the PAS threshold specified in Section VII, paragraph B (6) shall be subject to one of the following options: no action, supervisory monitoring, or PAS intervention. Each of these options shall be approved by the chain-of-command, up to the Deputy Chief/Director and/or the PAS Activity Review Panel.*

    *Members/employees recommended for supervisory monitoring shall be monitored for a minimum of three (3) months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor. The first at the end of one (1) month and the second at the end of three (3) months.*

    *Members/employees recommended for PAS intervention shall be monitored for a minimum of 12 months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor and designated commander/manager: The first at three (3) months and the second at one (1)*

> year. Member/employees subject to PAS intervention for minor, easily correctable performance deficiencies may be dismissed from the jurisdiction of PAS upon the written approval of the member/employee's responsible Deputy Chief, following a recommendation in writing from the member/employee's immediate supervisor. This may occur at the three (3)-month follow-up meeting or at any time thereafter, as justified by reviews of the member/employee's performance. When a member/employee is not discharged from PAS jurisdiction at the one (1)-year follow-up meeting, PAS jurisdiction shall be extended, in writing, for a specific period in three (3)-month increments at the discretion of the member/employee's responsible Deputy Chief. When PAS jurisdiction is extended beyond the minimum one (1)-year review period, additional review meetings involving the member/employee, the member/ employee's designated commander/manager and immediate supervisor, shall take place no less frequently than every three (3) months.

9. *On a quarterly basis, Division/appropriate Area Commanders and managers shall review and analyze relevant data in PAS about subordinate commanders and/or managers and supervisors regarding their ability to adhere to policy and address at-risk behavior. All Division/appropriate Area Commanders and managers shall conduct quarterly meetings with their supervisory staff for the purpose of assessing and sharing information about the state of the unit and identifying potential or actual performance problems within the unit. These meetings shall be scheduled to follow-up on supervisors' assessments of their subordinates' for PAS intervention. These meetings shall consider all relevant PAS data, potential patterns of at-risk behavior, and recommended intervention strategies since the last meeting. Also considered shall be patterns involving use of force, sick leave, line-of-duty injuries, narcotics-related possessory offenses, and vehicle collisions that are out of the norm among either personnel in the unit or among the unit's subunits. Division/appropriate Area Commanders and managers shall ensure that minutes of the meetings are taken and retained for a period of five (5) years. Commanders/managers shall take appropriate action on identified patterns of at-risk behavior and/or misconduct.*

10. *Division/appropriate Area Commanders and managers shall meet at least annually with his/her Deputy Chief/Director and the IAD Commander to discuss the state of their commands and any exceptional performance, potential or actual performance problems or other potential patterns of at-risk behavior within the unit. Division/appropriate Area Commanders and managers shall be responsible for developing and documenting plans to ensure the managerial and supervisory accountability of their units, and for addressing any real or potential problems that may be apparent.*

11. *PAS information shall be taken into account for a commendation or award recommendation; promotion, transfer, and special assignment, and in connection with annual performance appraisals. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

12. *Intervention strategies implemented as a result of a PAS Activity Review and Report shall be documented in a timely manner.*

13. *Relevant and appropriate PAS information shall be taken into account in connection with determinations of appropriate discipline for sustained misconduct allegations. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

14. *The member/employee's designated commander/manager shall schedule a PAS Activity Review meeting to be held no later than 20 days following notification to the Deputy Chief/Director that the member/employee has met a PAS threshold and when intervention is recommended.*

15. *The PAS policy to be developed shall include a provision that a member/employee making unsatisfactory progress during PAS intervention may be transferred and/or loaned to another supervisor, another assignment or another Division, at the discretion of the Bureau Chief/Director if the transfer is within his/her Bureau. Inter-Bureau transfers shall be approved by the Chief of Police. If a member/employee is transferred because of unsatisfactory progress, that transfer shall be to a position with little or no public contact when there is a nexus between the at-risk behavior and the "no public contact" restriction. Sustained complaints from incidents subsequent to a member/employee's referral to PAS shall continue to result in corrective measures; however, such corrective measures shall not necessarily result in a member/employee's exclusion from, or continued inclusion in, PAS. The member/employee's exclusion or continued inclusion in PAS shall be at the discretion of the Chief of Police or his/her designee and shall be documented.*

16. *In parallel with the PAS program described above, the Department may wish to continue the Early Intervention Review Panel.*

17. *On a semi-annual basis, beginning within 90 days from the effective date of this Agreement, the Chief of Police, the PAS Activity Review Panel, PAS Oversight Committee, and the IAD Commander shall meet with the Monitor to review the operation and progress of the PAS. At these meetings, OPD administrators shall summarize, for the Monitor, the number of members/employees who have been identified for review, pursuant to the PAS policy, and the number of members/employees who have been identified for PAS intervention. The Department administrators shall also provide data summarizing the various*

> *intervention strategies that have been utilized as a result of all PAS Activity Review and Reports. The major objectives of each of these semi-annual meetings shall be consideration of whether the PAS policy is adequate with regard to detecting patterns of misconduct or poor performance issues as expeditiously as possible and if PAS reviews are achieving their goals.*
>
> 18. *Nothing in this Agreement, and more specifically, no provision of PAS, shall be construed as waiving, abrogating or in any way modifying the Department's rights with regard to discipline of its members/employees. The Department may choose, at its discretion, to initiate the administrative discipline process, to initiate PAS review or to use both processes concurrently or consecutively.*

(Negotiated Settlement Agreement VII. B.)

**Relevant Policy:**

OPD revised and issued Departmental General Order D-17, *Personnel Assessment Program,* in November 2013. The Department has begun to address General Order D-17 as part of the Department's ongoing policy review and revision program. The revised version of the relevant policy is currently under review.

**Commentary:**

OPD continues to report progress in the redesign and reconstruction of the data system – at one point called PRIME, but now known as Vision. Some recognized deficiencies in the earlier system has resulted in additions of links to human resource information, training data, stop data, and access to body-worn camera videos.

Our May site visit also provided a preview of progress made on the development of data dashboards by a key contractor. The project is expected to include 10 dashboards, which will provide supervisors and command staff with easy access to key data on issues such as uses of force, complaints, collisions, and pursuits. The dashboards will support review of that data in increasing detail from the Department-wide level, through the Area level, squad level, and to the data associated with individual officers. The dashboard demonstration suggested that this approach to organizing the data could have benefits for management and supervision in the Department.

Several months ago, a question arose at a Department-wide Risk Management Meeting about the potential for extending the Risk Management Meeting process to include regular meetings at the Area level. The goal of that extension would include closer examination of risk issues by Area supervisors and command staff. It would also broaden the command and supervisor experience, which would support the development of key personnel.

OPD initiated such Area-level meetings a few months ago. At the meetings, command staff, after reviewing area data and identifying what they regarded as important issues, presented those for discussion with lieutenants and sergeants. The meetings largely mirrored the Department meetings, but provided opportunity for more detailed and extended review with the supervisors. OPD personnel discussed patterns of complaints and uses of force, in addition to more general questions regarding officer performance.

The extension of these meetings to the area level can clearly make important contributions to risk management and to supporting supervisors and officers in their career paths. One issue, however, was raised by the way the meetings were conducted. Command staff opted to exclude sergeants from the room when issues regarding officers who were not under their supervision were discussed. While that decision may reflect a concern with privacy, it is not consistent with other goals including the development of staff by engaging them in the broader context of issues facing the local Area. It seems clear that command staff can distinguish between those personnel issues that require private consultation and those that can broadly inform supervisors as they work to understand and address common concerns and Area-wide problems, as well as to prepare for advancement in their own careers. When appropriate, to favor inclusion over exclusion would seem desirable.

| **Task 41 compliance status** | In compliance |
|---|---|

## Task 45: Consistency of Discipline Policy

**Requirements:**

*On or before October 6, 2003, OPD shall revise and update its disciplinary policy to ensure that discipline is imposed in a fair and consistent manner.*

*1.  The policy shall describe the circumstances in which disciplinary action is appropriate and those in which Division-level corrective action is appropriate.*

*2.  The policy shall establish a centralized system for documenting and tracking all forms of discipline and corrective action, whether imposed centrally or at the Division level.*

*3.  All internal investigations which result in a sustained finding shall be submitted to the Discipline Officer for a disciplinary recommendation. The Discipline Officer shall convene a meeting with the Deputy Chief or designee in the affected chain-of-command for a confidential discussion of the misconduct, including the mitigating and aggravating factors and the member/employee's overall performance.*

*4.  The COP may direct the Discipline Officer to prepare a Discipline Recommendation without convening a Discipline Conference.*

(Negotiated Settlement Agreement X. B.)

**Relevant Policy:**

Five Departmental policies incorporate the requirements of Task 45: Departmental General Order M-03, *Complaints Against Department Personnel and Procedures* (published December 6, 2005 and revised most recently on August 24, 2013); Training Bulletin V-T.1 and V-T.2, *Internal Investigation Procedure Manual* (published July 17, 2008); Internal Affairs Policy and Procedure Manual (published December 6, 2005); and Training Bulletin V-T, *Departmental Discipline Policy* (published March 14, 2014). Several of these policies are currently being revised.

**Commentary:**

Task 45.2 requires that OPD maintain a centralized system for documenting and tracking all OPD forms of discipline and corrective action, whether imposed centrally or at the division level. To assess Phase 2 compliance with this subtask, we reviewed the 16 cases that contained at least one sustained finding that were approved in April 2019. All (100%) of these cases and findings contained all of the necessary information available on the spreadsheet generated by IAD for our review. OPD is in compliance with the requirement that it maintain an adequate system for documenting and tracking discipline and corrective action.

The NSA also requires that discipline be imposed in a manner that is fair and consistent. To this end, the Department developed a Discipline Matrix, which was adopted on September 2, 2010 and was in effect until a new Discipline Matrix was approved on March 14, 2014. This subsequent Matrix applies to violations after that date.

As noted above, we reviewed all 16 cases with sustained findings that were approved in April 2019. (One case involved three sustained findings.) Nine cases involved preventable motor vehicle collisions. Two cases involved officers who acted rudely toward members of the public; one officer used profanity. Two cases involved the failure to accept or refer a complaint – one against an officer; and the other against a Communications dispatcher who was unprofessional toward a member of the public and did not generate a call for service as required. One case involved a supervisor who made inappropriate comments to a subordinate about the subordinate's pregnancy. One case involved an officer who failed to secure his personal firearm in his vehicle. In another case, an officer failed to take a crime report.

In each case, unless otherwise documented in writing, the proposed discipline fell within the Discipline Matrix that was in effect at the time of the action for which the discipline was imposed.

During April and May 2019, OPD held one *Skelly* hearing. *Skelly* hearings are held for IAD cases involving employees with sustained findings in which discipline of a one-day suspension or greater was recommended. We reviewed the *Skelly* report for the one case, and found that it contained adequate justification for the results documented. The case involved a sustained Obedience to Laws-Misdemeanors/Infractions allegation (for improper storage of a firearm in an officer's personal vehicle's glove compartment), for which the Discipline Matrix offered a possible discipline range of counseling/training to a two-day suspension. In this case, the Chief of Police had initially approved a two-day suspension; the *Skelly* Officer instead recommended a

written reprimand.  On the *Skelly* Report, the Chief wrote, "Based on the potential significant consequence in this case I think a suspension is still in order."  She upheld the two-day suspension, placing one suspension day in abeyance for one year.

We also reviewed the training records that OPD provided, and confirmed that all *Skelly* hearing officers received the approved *Skelly* Officer Training in January 2016.  Additionally, all active *Skelly* officers received refresher training on April 26, 2017; and again on December 3 and 10, 2018, on which the Department held a three-hour training on the *Skelly* process and discipline for commanders.

OPD did not receive any arbitration decisions during the period under review.

OPD remains in partial compliance with Task 45.

| **Task 45 compliance status** | In partial compliance |

## Conclusion

The breadth of risk management-related work under the NSA has come to include several ongoing key components.  Task 34, which focuses on stop data, has been recognized as complementary with Tasks 40 and 41, the main risk management-related requirements.  Additionally, the continued development of the Department's data capacity serves all of these key risk-focused tasks.

With regard to stop data, the Department recently reported progress in several areas.  That included a review of the 50 recommendations made based on the original stop data report completed by Dr. Jennifer Eberhardt and her team at Stanford University.  Forty-eight of the 50 recommendations are now reported as completed by the Department.  The most significant of those may be the release and posting on the Department's website of the long promised "2016-2018 Racial Impact Report."  In the report, the Department provides a review of key issues and progress, and then provides a detailed presentation of data in the extensive appendix.  In its discussion of the report, it is clear that the Department remains concerned over issues of racial disparity and continues to examine the stops that do not result in any form of enforcement action.  The report also notes the dramatic reduction in stops by OPD in 2016-2018:  Discretionary stops declined from a high of 22,500 to under 11,000.  While these numbers are remarkable on paper, the proportion of African Americans among those stopped remains high.

Overall, progress in the area of risk management as covered in Tasks 40 and 41, and with the requirements noted for Task 34, deserves recognition.  There are, however, significant caveats to bear in mind.  To start with, the broad impacts of the failure of the PRIME database must be acknowledged.  Those problems resulted not only in the struggle for accurate information, but they hampered a process by postponing progress in that area, and they slowed advances in thinking about risk.  In that light, the progress on the new Vision system – with its new data and dashboards – should be seen as largely procedural, rather than substantive.  While the refinement of OPD's monthly Risk Management Meetings is significant, the fact remains that risk management cannot be reduced to data and meetings.  It is instead a process of continuous

improvement in which risks, broadly defined, are examined and averted through a process that best serves the City and its residents, and the Department and its officers.  Risk management cannot be independent of other issues that challenge the Department.  Data and meetings are, at best, tools that serve common interests of justice.

Our findings for Task 2 are concerning.  Along with Tasks 24 (Use of Force Reporting Policy), 25 (Use of Force Investigation and Report Responsibilities), and 31 (Officer-Involved Shooting Investigations) – which the Court reactivated on November 27, 2018 – forward progress in some of the Department's technologies has again been mitigated by deficiencies in police practice and accountability issues.

Chief (Ret.) Robert S. Warshaw
*Monitor*