August 19, 2019

# Sixty-Third Report *of the* Independent Monitor *for the* Oakland Police Department

## Introduction

This is our sixty-third status report on the Negotiated Settlement Agreement (NSA) in the case of *Delphine Allen, et al., vs. City of Oakland, et al.,* in the United States District Court for the Northern District of California under the direction of Judge William H. Orrick. I was appointed in 2010 to oversee the monitoring process of the Oakland Police Department (OPD) that began in 2003.

This report covers our site visits of June 17-18 and July 1-2, 2019; and describes our recent assessments of NSA Tasks 24, 25, and 41. Following the Court's Order of May 21, 2015, we devote special attention to the most problematic component parts of the Tasks that are not yet in full or sustained compliance; and discuss in our status reports the most current information regarding the Department's progress with the NSA and its efforts at making the reforms sustainable.

As noted previously, the Court expressed its concerns in a November 2018 Case Management Conference, following our special assessment of use of force, which was prompted by an unexplained reduction of 75% in reported use of force during the period 2012-2017. As a result of these concerns, the Court reactivated Tasks 24 (Use of Force Reporting Policy), 25 (Use of Force Investigation and Report Responsibilities), and 31 (Officer-Involved Shooting Investigations). Our second assessments of reactivated Tasks 24 and 25 are included in this report; our assessment of Task 31 is ongoing and will be addressed in a future status report.

### *Increasing Technical Assistance*

Each month, our Team conducts a visit to Oakland that includes both compliance assessments and technical assistance. During our visits, we meet with Department and City officials; observe Department meetings and technical demonstrations; review Departmental policies; conduct interviews and make observations in the field; and analyze OPD documents and files, including misconduct investigations, use of force reports, crime and arrest reports, Stop Data Forms, and other documentation. We also provide technical assistance in additional areas, especially those that relate to the remaining non-compliant Tasks or areas identified by the Department.

Within the last several months, we have provided technical assistance to OPD officials in the areas of IAD investigation quality (Task 5); use of force investigations (Tasks 24 and 25); stop data and related issues (Task 34); risk management and the ongoing maintenance issues and development of the Performance Reporting Information Metrics Environment (PRIME) system, now called Vision (Task 41); and several Department policies and procedures, including policies related to PRIME, officer discipline, use of force, probationers and parolees, handcuffing, the use of armored vehicles, and the use of electronic control weapons.

## *Building Internal Capacity at OPD*

Also per the May 21, 2015 Court Order, we continue to work closely with the Office of Inspector General's (OIG) lieutenant and staff to identify areas that it should audit or review – and to help design approaches to these audits that are not cumbersome, so as to ensure sustainability. We review OIG's quarterly progress reports, which are a valuable resource and assist us in assessing compliance with NSA requirements.

# *Focused Task Assessments*

## Overview of Our Assessments of Tasks 24 and 25

OPD had been in compliance with Tasks 24 and 25 since 2015, and we were not actively reviewing these Tasks. On November 27, 2018, as a result of concerns that had been brought forward regarding the identification and investigation of uses of force, the Court reactivated Tasks 24 and 25. The Court expressed concerns about the potential underreporting of use of force based on the analysis completed by the Monitoring Team.

For purposes of this report, we reviewed 53 Use of Force (UOF) reports that were completed by OPD personnel during December 2018 and January 2019 to assess compliance with Tasks 24 and 25. We reviewed all incidents (nine) that involved only a Level 3 use of force, two incidents that involved both Level 3 and 4 uses of force, and a sample of Level 4 uses of force (41). We also reviewed one Level 2 use of force, for which an FRB was held in January 2019. The review of the Level 2 use of force here includes only an assessment of the field investigation. Any identified concerns and final outcomes identified in FRBs we assess for Tasks 26 and 30.

Since we resumed these reviews following the Court's reactivation of these Tasks, we have provided feedback on the force investigations to OPD during each of our site visits. We have also provided input regarding OPD's proposed revisions to the use of force policy. OPD drafted Special Order 9196 to address many of the concerns that we have been identified, and the policy is currently still in the review phase. Use of force has been the subject of the Court and the Monitoring Team's attention. OIG recently completed an audit of use of force. Many of the concerns we have noted in our reviews are addressed in both the Special Order and in the findings of OIG's audit.

In our review of the 53 use of force reports completed in December 2018 and January 2019, we identified only one incident where we believe the use of force was inappropriate or excessive. This was the one Level 2 incident we reviewed – and OPD also identified this concern in its review, which resulted in the initiation of an Internal Affairs investigation.  We continue to note that in many instances, OPD personnel displayed notable restraint despite assaultive conduct, resistance, or verbal abuse from persons with whom they had contact.

Eighty officers used force against 61 persons in the reports we reviewed.  In some cases, multiple officers used force on a single person; and in others, force was used on multiple persons, either by a single officer or multiple officers.

The total breakdown for the force used on the 61 persons is as follows: African American, 57%; Hispanic, 25%; and White, 13%.  The remaining 5% of incidents included Asian and other persons.  Officers pointed a weapon at persons 44 times.  In these 44 instances, the breakdown is as follows: African American, 52%; Hispanic, 30%; White, 14%; and Asian or other (5%).

In the total 53 incidents, 48 persons on whom force was used were arrested or criminally charged; 47 for felony violations; one for a misdemeanor crime.  Four of the incidents involved mental health holds, five involved incidents where a crime could not be established at the time, and two involved incidents where the complainant or victim could not be located.  In 12 of the incidents reviewed, a person claimed some type of injury.  Some of the injuries required only first aid at the scene.  In other incidents, persons were transported to a medical facility for treatment of minor injuries that did not require hospitalization, or solely to obtain a medical clearance.

As noted in our assessment of Task 25.3 in our 61st status report, we again identified numerous incidents in our reviews where we believe that additional verbal communications and explanation with persons who were contacted might result in a reduction in the need to use physical force.  We have discussed this with OPD; and we will continue to monitor these types of instances and, as is our practice during our monthly site visits, provide input to the Department.  We encourage OPD to consider whether additional training is needed for their personnel on how to approach; and, when necessary, detain persons they encounter.

During our review of the 53 use of force incidents, we again noted instances where it took multiple officers to control and secure combative persons.  In some of these instances, only a single officer who used an identified weaponless defense method (leg sweep, arm bar, etc.) to overcome resistance was identified as having used force.  The officers who assisted in controlling the subject were listed only as witnesses.  The Department is currently revising its use of force policy, and will clarify what constitutes a "reportable use of force."  We believe this change will provide clearer direction to officers.  We also note that this revision will undoubtedly and significantly *increase* the number of reportable uses of force.  OPD should track the revisions once implemented, to determine the effects that this and any other policy change have upon the reported use of force numbers.

We also noted that some officers included in their reports that they did not observe any use of force by other OPD personnel, when it is apparent from our reviews that they were in a position during the incident to do so. This demonstrates a failure on the officers' part to properly identify the use of force by others; an erroneous belief that the force observed was not reportable; or a failure to accurately report observations. This continues to raise concerns about officers' understanding of use of force and internal oversight by supervisors and should not be occurring at this late stage of the NSA process. We will discuss these cases with OPD during our upcoming site visit, as is our practice during our monthly site visits.

In one of the 53 investigations we reviewed, OPD personnel failed to activate their PDRDs during the use of force. This issue was identified and addressed by the supervisor. In three other cases we reviewed, the reports indicate that the PDRD was activated, but the video files were not included for our review so we were unable to verify their existence. In one case, there was no PDRD video of the incident and no explanation was provided. Supervisors continue to use training sessions and Supervisory Note Files to address the failure to activate PDRDs and to address other concerns – including officers' use of profanity, or the use of appropriate tactics. In one case, after a review of the officer's use of profanity in an incident, the supervisor identified that this officer had prior similar incidents and initiated an IAD investigation. It is critical that supervisors continue to make and document these assessments prior to determining how to handle those deficiencies they identify.

The use of force analysis we conducted last year established the underreporting of Level 4 uses of force where an officer pointed a weapon at a person. Following our analysis, OPD partially addressed this concern with refresher training in September 2018 for all officers, and the Department will further address this issue in its use of force policy revisions. In our review of cases for this report, we found one incident where the officer reported the pointing of a weapon and included it in his criminal investigation report. The sergeant failed to address this use of force in the report. We did not identify any additional incidents where the pointing of a weapon at a person was not reported.

In our review of OPD's 239th Biweekly Compliance Update, dated July 3, 2019, we noted that year to date in 2019, there were 684 Level 4 uses of force. There were 141 Level 4 uses of force during the same time period in 2018. As noted above, the Chief ordered refresher training on officers' use of firearms in September of 2018, and the number of reported uses of force has increased dramatically since that time. OPD notes that the significant increase in Level 4 uses of force may be related to the potential underreporting of Level 4 - Type 22 pointing a weapon at a person prior to the refresher training.

In this same Compliance Update, OPD noted that there were 67 Level 3 uses of force, year to date for 2019.  During the same time period in 2018, 29 Level 3 uses of force were reported.  We previously asked OPD for any explanation for this increase.  The Department identified that the most significant increase is in Level 3 - Type 16 use of force, which is a weaponless defense technique other than the use of a control hold.  The other noted increase was in the use of Taser, Level 3 - Type 11 and 18.  During our July 2019 site visit, OPD representatives cited multiple possible factors to account for this increase, including: lessons OPD personnel have learned from prior incidents; that officers are now more apt to identify the use of force; and that the Chief has given direction that if there is any doubt about whether the force used was reportable, it should be reported.

While we acknowledge OPD's explanations regarding the increases in both Level 3 and 4 uses of force, and the Department's current efforts to address proper reporting, it is extremely concerning that none of the reported increases appear to have anything to do with a change in the number of actual uses of force by OPD personnel.  Instead, it appears that OPD employees had simply not been properly reporting use of force for a lengthy period of time, and this went unchecked by OPD supervisory and command personnel.

## Task 24: Use of Force Reporting Policy

**Requirements:**

> *The policy shall require that:*
>
> 1. *Members/employees notify their supervisor as soon as practicable following any investigated use of force or allegation of excessive use of force.*
>
> 2. *In every investigated use of force incident, every member/employee using force, and every member/employee on the scene of the incident at the time the force was used, shall report all uses of force on the appropriate form, unless otherwise directed by the investigating supervisor.*
>
> 3. *OPD personnel document, on the appropriate form, any use of force and/or the drawing and intentional pointing of a firearm at another person.*
>
> 4. *A supervisor respond to the scene upon notification of an investigated use of force or an allegation of excessive use of force, unless community unrest or other conditions makes this impracticable.*
>
> 5. *OPD notify:*
>
>     a. *The Alameda County District Attorney's Office immediately or as soon as circumstances permit, following a use of lethal force resulting in death or injury likely to result in death.*
>
>     b. *The City Attorney's Office as soon as circumstances permit following the use of lethal force resulting in death or serious injury.  At the discretion of the City Attorney's Office, a Deputy City Attorney shall respond to the*

> *scene. The Deputy City Attorney shall serve only in an advisory capacity and shall communicate only with the incident commander or his/her designee.*
>
> c. *Departmental investigators regarding officer-involved shootings, in accordance with the provisions of Section V, paragraph H, of this Agreement.*
>
> 6. *OPD enter data regarding use of force into OPD's Personnel Assessment System (PAS).*

(Negotiated Settlement Agreement V. A.)

**Relevant Policy:**

OPD most recently revised Departmental General Order K-4, *Reporting and Investigating the Use of Force* on October 16, 2014. DGO K-4 incorporates the requirements of Task 24.

**Commentary:**

We reviewed 53 Use of Force (UOF) reports that were completed by OPD during August, September, and November 2018 to assess compliance with Task 24. We reviewed all Level 3 uses of force and a sample of Level 4 uses of force. We also reviewed one Level 2 UOF, for which an FRB was held in January 2019. The review of this UOF includes only an assessment of the field investigation.

**Task 24.1** requires that members/employees notify their supervisor as soon as practicable following any reportable use of force or allegation of excessive use of force. In all but two of the 53 UOF reports completed in completed in December 2018 and January 2019, notifications were made as required.

**Task 24.2** requires that in every reportable use of force incident, every member/employee on the scene of the incident at the time the force was used, reports all uses of force on the appropriate form, unless otherwise directed by the investigating supervisor. **Task 24.3** requires that OPD personnel document, on the appropriate form, every use of force and/or the drawing and intentional pointing of a firearm at another person.

In the 53 UOF incidents we reviewed, officers pointed weapons at persons 44 times. We determined that officers' pointing of their firearms to be appropriate in all 44 instances we assessed. In one of the 44 instances, though the officer noted in his criminal report that he had pointed a weapon at a person, the supervisor did not list or address this use of force in the report. In two instances, officers who assisted in restraining a combative person did not report having used force. This continues to be a reoccurring issue. In its revisions to the UOF policy, OPD is providing clarification regarding reportable uses of force. We will continue to closely monitor these types of incidents to ensure that OPD personnel properly report these uses of force.

**Task 24.4** requires that a supervisor respond to the scene upon notification of a Level 1, 2, or 3 use of force or an allegation of excessive use of force, unless community unrest or other conditions makes such a response impracticable.  In the Level 2 and Level 3 uses of force we reviewed for this subtask, supervisors responded to the scene as required in all instances.  In all but three of the Level 4 uses of force, a supervisor was either on scene at the time of the use of force, or responded to the scene upon being notified of the use of force.

**Task 24.5** specifically addresses requirements for the response and handling of Level 1 uses of force.  As previously noted, we are assessing these uses of force in Tasks 26 and 30.

**Task 24.6** requires that OPD enter all use of force data into Performance Reporting Information Metrics Environment (PRIME), which is now called Vision.  In all 53 UOF cases we reviewed, the data was entered as required.

The Court's reactivation of Task 24 at a November 2018 Case Management Conference resulted from our serious concerns with the Department's handling and investigation of recent uses of force.  OPD has authored Special Order 9196 to address and clarify requirements for the proper reporting of use of force.  OIG's recent audit should be troubling to the Department, the City, and the community, as it has identified numerous concerns with the reporting of use of force and enumerated a number of recommendations.  It remains to be seen if forthcoming policy revisions and other changes, prompted by our involvement and our review of previously unexplained reductions in reported use of force, will have a positive outcome on this issue.  As a result, OPD remains in partial compliance with this Task.

| **Task 24 compliance status** | In partial compliance |
|---|---|

## Task 25: Use of Force Investigations and Report Responsibility

**Requirements:**

*An on-scene supervisor is responsible for completing an investigated use of force report in accordance with the provisions of Departmental General Order K-4, "Reporting and Investigating the Use of Force."*

    1.    *OPD shall develop and implement a policy for conducting and documenting use of force investigations that include, at a minimum:*

        a.    *Documentation of the incident in either an Offense or Supplemental Report from the member(s)/employee(s) using force; and/or, when necessary, a statement taken from the member(s)/employee(s) using force;*

        b.    *Separating and separately interviewing all officers who were at the scene at the time of the incident;*

        c.    *A Supplemental Report from other members/employees on the scene or a statement taken, if deemed necessary by the investigating supervisor;*

        d.    *Identification and interviews of non-Departmental witnesses;*

  e. *Consideration of discrepancies in information obtained from members, employees and witnesses, and statements in the reports filed;*

  f. *Whether arrest reports or use of force reports contain "boilerplate" or "pat language" (e.g., "fighting stance", "minimal force necessary to control the situation");*

  g. *Documentation of physical evidence and/or photographs and a summary and analysis of all relevant evidence gathered during the investigation; and*

  h. *Consideration of training/tactical issues involving the availability and practicality of other force options.*

  i. *Supervisor's justification as to why any element of the policy was not documented; and*

2. *All supervisors shall be trained in conducting use of force investigations and such training shall be part of a supervisory training course.*

3. *Use of force investigations shall include a recommendation whether the use of force was objectively reasonable and within Department policy and training. The recommendation shall be based on the totality of the circumstances and shall consider, but is not limited to, the following factors:*

  a. *Whether the force used was pursuant to a legitimate law-enforcement objective;*

  b. *Whether the type and amount of force used was proportional to the resistance encountered and reasonably related to the objective the members/employees were attempting to achieve;*

  c. *Whether the member/employee used reasonable verbal means to attempt to resolve the situation without force, if time and circumstances permitted such attempts;*

  d. *Whether the force used was de-escalated or stopped reasonably when resistance decreased or stopped;*

4. *use of force reports shall be reviewed by the appropriate chain-of-review as defined by policy.*

*The type of force used, the identity of the involved members, and the report preparer shall be the determining criteria for utilizing the appropriate chain-of-review. Reviewers may include, when appropriate, the chain-of-command of the involved personnel, the appropriate Area Commander on duty at the time the incident occurred, other designated Bureau of Field Operations commanders, and as necessary, the chain-of-command of the involved personnel up to the Division Commander or Deputy Chief/Director, and the Internal Affairs Division.*

*Reviewers for Level 1-3 use of force investigations shall:*

   a. *Make a recommendation as to whether the use of force was in or out of policy,*

   b. *Order additional investigation and investigative resources when necessary, and*

   c. *Comment on any training issue(s) when appropriate.*

5. *Any recommendation that the use of force did not comply with Department policy shall result in the incident being referred to the Internal Affairs Division to conduct additional investigation/analysis, if necessary.*

6. *Members/employees involved in a use of force incident resulting in serious injury or death and/or an officer-involved shooting, shall be separated from each other as soon as practicable at the incident scene, and kept apart until they have completed their reports and been interviewed.*

(Negotiated Settlement Agreement V. B.)

**Relevant Policy:**

OPD most recently revised Departmental General Order K-4, *Reporting and Investigating the Use of Force* on October 16, 2014. DGO K-4 incorporates the requirements of Task 25.

**Commentary:**

As noted for Task 24, we reviewed 53 use of force (UOF) reports that were completed in December 2018 and January 2019 to assess compliance with Task 25. In total, we reviewed one Level 2 use of force; nine Level 3 only uses of force; two incidents that had both Level 3 and level 4 uses of force; and a sample of Level 4-only uses of force (41).

**Task 25.1** requires that an on-scene supervisor complete a Use of Force Report for every Level 3 use of force. In all 11 Level 3 uses of force reviewed for this subtask, a supervisor responded to the scene and completed a use of force investigation. In addition, there were seven instances where a Level 3 use of force was downgraded to a Level 4 by a supervisor who was at the scene. In all seven of these instances, documentation, justification, and approval were provided

**Task 25.2** requires that all supervisors are trained on how to conduct use of force investigations and such training is part of a supervisory training course. OPD includes the requirement for this training in its Departmental policies. During our March site visit, we confirmed with OPD that that it continues to require and deliver this training.

**Task 25.3** requires that use of force investigations include required recommendations. Areas of recommendation include: whether the force used was pursuant to a legitimate law enforcement objective; whether the type and amount of force used was proportional to the resistance encountered and reasonably related to the objective the officers were attempting to achieve; whether the officers used reasonable verbal means to attempt to resolve the situation without force, if time and circumstances permitted such attempts; and whether the force used was de-escalated or stopped reasonably when resistance decreased or stopped.

In our assessment of the 52 Level 3 and 4 UOFs we reviewed, we did not identify any instance where we believe the force used was not pursuant to a legitimate law enforcement objective, was inappropriate or excessive, or where the use of force was not deescalated or stopped reasonably when resistance decreased.  We again found, however, several instances where we believe OPD officers could have made additional efforts to explain to subjects being detained why the detention was occurring.  In some cases, the need to use physical force may have been decreased or eliminated had some additional verbal explanation been provided.  This is a cultural issue and one that is also tied to instances where de-escalation might facilitate a better outcome.  During our site visits in June and July 2019, we again discussed cases where we believe additional verbal communications should have been attempted and could have resulted in a decrease in the necessity to use of force.

**Task 25.4** requires that use of force reports are reviewed by the appropriate chain of review and appropriate recommendations are made.  In all of the cases we reviewed, the reports were reviewed as required.

**Task 25.5** requires that any determination that a use of force did not comply with Department policy result in the incident being referred to IAD to conduct additional investigation/analysis, if necessary.  There was one Level 2 UOF referred to IAD to investigate the force used.

**Task 25.6** requires that members/employees involved in a use of force incident resulting in serious injury or death and/or officer-involved shooting, are separated from each other as soon as practicable at the incident scene, and kept apart until they have completed their reports and been interviewed.  This Task is not assessed here, as we review and consider it as part of the Force and Executive Force Review Boards that OPD holds to examine Level 1 and 2 uses of force.

The Court's reactivation of Task 25 at a November 2018 Case Management Conference resulted from our serious concerns with the Department's handling and investigation of recent uses of force.  As noted above, OPD has drafted Special Order 9196 to address and clarify requirements for the proper reporting of use of force.  OIG's recent audit identified numerous, troubling concerns with the reporting of use of force and enumerated a number of recommendations.  It remains to be seen if forthcoming policy revisions and other changes, prompted by our involvement and our review of previously unexplained reductions in reported use of force, will have a positive outcome on this issue.  As a result, OPD remains in partial compliance with this Task.

| **Task 25 compliance status** | In partial compliance |

## Task 41: Use of Personnel Assessment System (PAS) and Risk Management

**Requirements:**

*Within 375 days from the effective date of this Agreement, OPD shall develop a policy for use of the system, including supervision and audit of the performance of specific members, employees, supervisors, managers, and OPD units, as well as OPD as a whole.*

*The policy shall include the following elements:*

1. *The Chief of Police shall designate a PAS Administration Unit. The PAS Administration Unit shall be responsible for administering the PAS policy and, no less frequently than quarterly, shall notify, in writing, the appropriate Deputy Chief/Director and the responsible commander/manager of an identified member/employee who meets the PAS criteria. PAS is to be electronically maintained by the City Information Technology Department.*

2. *The Department shall retain all PAS data for at least five (5) years.*

3. *The Monitor, Inspector General and Compliance Coordinator shall have full access to PAS to the extent necessary for the performance of their duties under this Agreement and consistent with Section XIII, paragraph K, and Section XIV of this Agreement.*

4. *PAS, the PAS data, and reports are confidential and not public information.*

5. *On a quarterly basis, commanders/managers shall review and analyze all relevant PAS information concerning personnel under their command, to detect any pattern or series of incidents which may indicate that a member/employee, supervisor, or group of members/employees under his/her supervision may be engaging in at-risk behavior. The policy shall define specific criteria for determining when a member/employee or group of members/employees may be engaging in at-risk behavior.*

6. *Notwithstanding any other provisions of the PAS policy to be developed, the Department shall develop policy defining peer group comparison and methodology in consultation with Plaintiffs' Counsel and the IMT. The policy shall include, at a minimum, a requirement that any member/employee who is identified using a peer group comparison methodology for complaints received during a 30-month period, or any member who is identified using a peer group comparison methodology for Penal Code §§69, 148 and 243(b)(c) arrests within a 30-month period, shall be identified as a subject for PAS intervention review. For the purposes of these two criteria, a single incident shall be counted as "one" even if there are multiple complaints arising from the incident or combined with an arrest for Penal Code §§69, 148 or 243(b)(c).*

7. *When review and analysis of the PAS threshold report data indicate that a member/employee may be engaging in at-risk behavior, the member/employee's immediate supervisor shall conduct a more intensive review of the*

> *member/employee's performance and personnel history and prepare a PAS Activity Review and Report. Members/employees recommended for intervention shall be required to attend a documented, non-disciplinary PAS intervention meeting with their designated commander/manager and supervisor. The purpose of this meeting shall be to review the member/employee's performance and discuss the issues and recommended intervention strategies. The member/employee shall be dismissed from the meeting, and the designated commander/manager and the member/employee's immediate supervisor shall remain and discuss the situation and the member/employee's response. The primary responsibility for any intervention strategies shall be placed upon the supervisor. Intervention strategies may include additional training, reassignment, additional supervision, coaching or personal counseling. The performance of members/ employees subject to PAS review shall be monitored by their designated commander/manager for the specified period of time following the initial meeting, unless released early or extended (as outlined in Section VII, paragraph B (8)).*

> 8. *Members/employees who meet the PAS threshold specified in Section VII, paragraph B (6) shall be subject to one of the following options: no action, supervisory monitoring, or PAS intervention. Each of these options shall be approved by the chain-of-command, up to the Deputy Chief/Director and/or the PAS Activity Review Panel.*
>
> *Members/employees recommended for supervisory monitoring shall be monitored for a minimum of three (3) months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor. The first at the end of one (1) month and the second at the end of three (3) months.*
>
> *Members/employees recommended for PAS intervention shall be monitored for a minimum of 12 months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor and designated commander/manager: The first at three (3) months and the second at one (1) year. Member/employees subject to PAS intervention for minor, easily correctable performance deficiencies may be dismissed from the jurisdiction of PAS upon the written approval of the member/employee's responsible Deputy Chief, following a recommendation in writing from the member/employee's immediate supervisor. This may occur at the three (3)-month follow-up meeting or at any time thereafter, as justified by reviews of the member/employee's performance. When a member/employee is not discharged from PAS jurisdiction at the one (1)-year follow-up meeting, PAS jurisdiction shall be extended, in writing, for a specific period in three (3)-month increments at the discretion of the member/employee's responsible Deputy Chief. When PAS jurisdiction is extended beyond the minimum one (1)-year review period, additional review meetings involving the member/employee, the member/ employee's designated commander/manager and immediate supervisor, shall take place no less frequently than every three (3) months.*

9. *On a quarterly basis, Division/appropriate Area Commanders and managers shall review and analyze relevant data in PAS about subordinate commanders and/or managers and supervisors regarding their ability to adhere to policy and address at-risk behavior. All Division/appropriate Area Commanders and managers shall conduct quarterly meetings with their supervisory staff for the purpose of assessing and sharing information about the state of the unit and identifying potential or actual performance problems within the unit. These meetings shall be scheduled to follow-up on supervisors' assessments of their subordinates' for PAS intervention. These meetings shall consider all relevant PAS data, potential patterns of at-risk behavior, and recommended intervention strategies since the last meeting. Also considered shall be patterns involving use of force, sick leave, line-of-duty injuries, narcotics-related possessory offenses, and vehicle collisions that are out of the norm among either personnel in the unit or among the unit's subunits. Division/appropriate Area Commanders and managers shall ensure that minutes of the meetings are taken and retained for a period of five (5) years. Commanders/managers shall take appropriate action on identified patterns of at-risk behavior and/or misconduct.*

10. *Division/appropriate Area Commanders and managers shall meet at least annually with his/her Deputy Chief/Director and the IAD Commander to discuss the state of their commands and any exceptional performance, potential or actual performance problems or other potential patterns of at-risk behavior within the unit. Division/appropriate Area Commanders and managers shall be responsible for developing and documenting plans to ensure the managerial and supervisory accountability of their units, and for addressing any real or potential problems that may be apparent.*

11. *PAS information shall be taken into account for a commendation or award recommendation; promotion, transfer, and special assignment, and in connection with annual performance appraisals. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

12. *Intervention strategies implemented as a result of a PAS Activity Review and Report shall be documented in a timely manner.*

13. *Relevant and appropriate PAS information shall be taken into account in connection with determinations of appropriate discipline for sustained misconduct allegations. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

14. *The member/employee's designated commander/manager shall schedule a PAS Activity Review meeting to be held no later than 20 days following notification to the Deputy Chief/Director that the member/employee has met a PAS threshold and when intervention is recommended.*

15. *The PAS policy to be developed shall include a provision that a member/employee making unsatisfactory progress during PAS intervention may be transferred and/or loaned to another supervisor, another assignment or another Division, at the discretion of the Bureau Chief/Director if the transfer is within his/her Bureau. Inter-Bureau transfers shall be approved by the Chief of Police. If a member/employee is transferred because of unsatisfactory progress, that transfer shall be to a position with little or no public contact when there is a nexus between the at-risk behavior and the "no public contact" restriction. Sustained complaints from incidents subsequent to a member/employee's referral to PAS shall continue to result in corrective measures; however, such corrective measures shall not necessarily result in a member/employee's exclusion from, or continued inclusion in, PAS. The member/employee's exclusion or continued inclusion in PAS shall be at the discretion of the Chief of Police or his/her designee and shall be documented.*

16. *In parallel with the PAS program described above, the Department may wish to continue the Early Intervention Review Panel.*

17. *On a semi-annual basis, beginning within 90 days from the effective date of this Agreement, the Chief of Police, the PAS Activity Review Panel, PAS Oversight Committee, and the IAD Commander shall meet with the Monitor to review the operation and progress of the PAS. At these meetings, OPD administrators shall summarize, for the Monitor, the number of members/employees who have been identified for review, pursuant to the PAS policy, and the number of members/employees who have been identified for PAS intervention. The Department administrators shall also provide data summarizing the various intervention strategies that have been utilized as a result of all PAS Activity Review and Reports. The major objectives of each of these semi-annual meetings shall be consideration of whether the PAS policy is adequate with regard to detecting patterns of misconduct or poor performance issues as expeditiously as possible and if PAS reviews are achieving their goals.*

18. *Nothing in this Agreement, and more specifically, no provision of PAS, shall be construed as waiving, abrogating or in any way modifying the Department's rights with regard to discipline of its members/employees. The Department may choose, at its discretion, to initiate the administrative discipline process, to initiate PAS review or to use both processes concurrently or consecutively.*

(Negotiated Settlement Agreement VII. B.)

**Relevant Policy:**

OPD revised and issued Departmental General Order D-17, *Personnel Assessment Program,* in November 2013. The Department has begun to address General Order D-17 as part of the Department's ongoing policy review and revision program. The revised version of the relevant policy is currently under review.

**Commentary:**

With regard to risk management data, the Department continues to make progress on the collection and use of information. The Department notes that it is collecting all of the categories of data outlined in Task 40. Furthermore, report formats have been prepared under the new Vision database (formerly known as PRIME) to produce tables that present the required data. We look forward to reviewing that data in the near future. The Department also reports that 62 reports have been developed to support the presentation and review of data from the Vision database.

Those reports are separate from the development of the data dashboards, which will be used by supervisors and command staff for the daily tasks of management from the individual officer level through squads, Areas, and OPD as a whole. The Department's external contractor has completed drafts of 10 data dashboards, which are in the process of review and revision as needed. The reports and dashboards will also be integral to the risk management process and the work of the PAS Unit.

During our July site visit, we met with OPD officials to address key issues around measurement and data use, as well as plans for training the Department on the use of the new Vision database. The working group on these topics included appropriate Command staff, external consultants, and key staff members working on the database and the PAS risk management process.

The measurement issues included review of useful ways to facilitate comparisons over time and across individuals and units, from the squad level through the Department as a whole. It is important that the Department establish consistent and easily interpreted measures to support supervision and planning. Simplicity and consistency will help assure that the new data systems will provide the most value for identifying and managing risk in the Department.

Preparation for bringing the new Vision database on line also included discussion of training for command staff and officers. We discussed some new approaches, including conducting training in the Areas and in conjunction with Area-level Risk Management Meetings. The OPD group is in the process of producing a plan for comprehensive training on the Vision system and its use for supervision and risk management.

As noted above, the dashboard development is nearly complete, and the developers and the City Information Technology Department are preparing for user acceptance training (UAT). Despite these developments, the project continues to experience delays; and OPD reports that it now expects that full implementation will not occur until October. Data quality issues, especially regarding information collected under earlier OPD systems, remain a concern; we will monitor how much historical data the Department will collect.

| **Task 41 compliance status** | In compliance |

## Conclusion

Our Team continues to engage in work that monitors the Oakland Police Department's compliance with the Negotiated Settlement Agreement (NSA), reviews Departmental processes and outcomes, and provides technical assistance intended to increase the capacity of the Department to meet or exceed NSA requirements.  In the course of this work, we review data on Departmental activities including, but not limited to: the use of force; complaints; investigations; discipline; and risk management.  We provide feedback to the Department and continue to assess its progress.

The City and OPD leadership continue to struggle with using the specific stipulations of the NSA to increase the Department's capacity to identify problems – and, most importantly, to implement effective solutions.  Our goal remains to support the progress made by OPD, to assist the Department in moving forward, and to note when OPD falls short of the requirements of the NSA.

Our site visits and related work provide opportunities to closely consider the Department's capacity for self-examination and change.  Most recently, that has included our review of the Department's analysis of issues related to reporting the use of force, as conducted by the OPD Office of the Inspector General (OIG) and recently released in the report entitled, "An Assessment of the Oakland Police Department's Use of Force Reporting, Usage of Portable Digital Recording Devices, and Supervision of Incidents During Arrests for Offenses Where There is a Significant Chance That Force Would be Used."

As noted in our earlier reports, our review of a sample of arrests found significant evidence that use of force were not being accurately reported.  The finding was initially met with resistance but ultimately lead the Department to conduct its own analysis of reporting of the use of force, as well as compliance with the Department's PDRD video recording policy.  That exercise in self-analysis came to the indisputable conclusion that the problems were even more extensive than we discovered.

Whether induced by the Court, the Monitoring Team, or self-initiated, OIG is to be commended for the quality of its report.  The report's results and analysis were disturbing, and the Department's written response was incomplete.  Use of force is a central issue of the NSA.  When distilled to its most basic findings, the audit found that, in the 47 reviewed incidents where force was found to have been used, the force was not reported in 17, or 36%, of the cases.  In 38% of the incidents, some of the officers involved did not follow the PDRD policy.  According to the report, potential misconduct was found in 45% of the reviewed incidents.

As a result of the analysis, the problematic cases were appropriately referred to the Internal Affairs Division (IAD) for investigation.  We have expressed concerns that the chains of command that initially approved the reports associated with these incidents would now be tasked with investigating the deficiencies.  We will closely monitor IAD's progress with these investigations, and review them once they are completed.

The recommendations in the report largely addressed issues of training and policy clarification. Taken as a whole, the Department's analysis of the reporting of uses of force and compliance with videotaping policy provides an important opportunity for reform-focused management.  It raises a concern frequently noted by Chief Kirkpatrick: the need to change the culture within the Department.

At this point in time, however, it is clear that the Department has not formulated a comprehensive approach to addressing the concerns with culture raised by the report.  The training and policy recommendations are undoubtedly sound – but also obvious.

The Department's response must integrate broader issues of personnel, discipline, risk management, supervision, and leadership into a comprehensive management plan.

The approach to this problem has followed an all-too-familiar pattern.  When the Department has learned of significant problems, often from external sources, the response begins with an analysis of data.  As was the case in the "sex scandal," the Training Academy problems, assorted stop data issues, the utility of PAS reviews, and officers unnecessarily pointing firearms, analyses give rise to detailed problem description that only culminate in the most obvious changes in training and policy.  A written response to the problem often follows, as it has from the Chief following the use of force report.  The Chief's written response to OIG's report should not be confused with a comprehensive plan for reform.

An illustration of the limits to this approach can be seen in a significant, but largely unaddressed, finding in OIG's report.  The analysis of force reporting and PDRD policy violations includes the finding that squads with the highest rates of problems also had the highest number of officers in monitoring and intervention under the risk management process.  That suggests the limited effectiveness of risk management in addressing these issues.  That weakness, however, is not addressed.  The risk management process, a potentially powerful resource for changing the culture, is ignored in the Chief's written response to the problems detailed in OIG's report.

The concept of culture, as used by the Chief, suggests a broad and powerful influence that permeates a wide range of police activities and seems likely to change for the better only through continuous and comprehensive efforts.  Problems associated with culture may reveal themselves in sound analyses of Departmental activity.  That is the case here.  But, like the problems themselves, broad and powerful responses must be identified and *implemented* to accomplish the goals the Chief espouses.

In the end, analysis is a necessary but not sufficient tool for bringing about reform.  Policy revision and training have similar limitations.  Changes in officer conduct must be brought about by robust supervision, intervention – and if necessary, discipline.  In the end, real change requires real change.

*Robert S. Warshaw*

Chief (Ret.) Robert S. Warshaw
*Monitor*