Pages 1 - 55

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

DELPHINE ALLEN, et al.,      )
                             )
            Plaintiffs,      )
                             )
   VS.                       )   **NO. C 00-4599 WHO**
                             )
CITY OF OAKLAND, et al.,     )
                             )
            Defendants.      )
_____  )

                        San Francisco, California
                        Wednesday, August 21, 2019

                  **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    LAW OFFICES OF JAMES B. CHANIN
                    3050 Shattuck Avenue
                    Berkeley, California  94705
              **BY:  JAMES B. CHANIN, ESQ.**

                    LAW OFFICES OF JOHN L. BURRIS
                    1212 Broadway, Suite 1200
                    Oakland, California  94612
              **BY:  JOHN L. BURRIS, ESQ.**


For Defendant City of Oakland:
                    OFFICE OF THE CITY ATTORNEY
                    One Frank H. Ogawa Plaza, 6th Floor
                    Oakland, California  94612
              **BY:  DAVID PEREDA, ESQ.**

         **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RDR, FCRR
              Official Reporter, CSR No. 12219

1    **APPEARANCES**:   (CONTINUED)

2    For Intervenor Oakland Police Officers' Association:
                           RAINS LUCIA STERN PC
3                          2300 Contra Costa Boulevard, Suite 230
                           Pleasant Hill, California  94523
4                      BY:   **ROCKNE A. LUCIA, JR., ESQ.**

5    Also Present:   Elizabeth "Libby" Schaaf, Frederick Shavies,
                     Barbara J. Parker, Sekou Millington,
6                    Ryan Richardson, Daren Allison,
                     Leronne Armstrong, Virginia Gleason,
7                    Kristin Burgess, Sabrina B. Landreth

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

 1   <u>**Wednesday - August 21, 2019**</u>                              <u>**3:36 p.m.**</u>

 2                          P R O C E E D I N G S

 3          THE COURT:  Good afternoon, everybody.  Please be

 4   seated.

 5          THE CLERK:  We're here in Case Number 00-4599, Allen,

 6   et al., versus City of Oakland, et al.

 7      Counsel, if you would please approach and enter your

 8   appearance for the record.

 9          MR. PEREDA:  Good afternoon, Your Honor.  David Pereda

10   for the City, and with me, among many others, are the Mayor,

11   City Attorney, the City Administrator, Chief Kirkpatrick, her

12   executive staff, and several designated experts who can address

13   any questions the Court has about specific reforms and

14   practices within the Department.

15          THE COURT:  Thank you.  Good afternoon.  Good

16   afternoon.

17          MR. LUCIA:  Good afternoon, Your Honor.  Rocky Lucia

18   for Intervenor Oakland POA.

19          MR. CHANIN:  Good afternoon, Your Honor.  James Chanin

20   for plaintiffs.

21          MR. BURRIS:  Good afternoon, Your Honor, John Burris

22   for plaintiff.

23          THE COURT:  Good afternoon to everyone.  So the

24   plaintiffs' view in this case is that OPD has regressed.  I'm

25   not sure that that's true.

**PROCEEDINGS**

1          I think -- I have been receiving reports from the City

2     that are more optimistic than reality since I took over this

3     case.  And the City's most recent report is the least searching

4     of all.

5          If OPD had truly been in compliance with the NSA, the

6     problems shown by the sex scandal, the handing of the Pawlik

7     investigation, the underreporting of uses of force, and the

8     other issues raised in the CMC would not have been possible.

9     And here we are.

10         The only way the NSA gets completed is with honest

11    information and verifiable data and evidence that OPD is asking

12    the hard questions and making the hard decisions without fear

13    or favor.

14         I'm concerned about many of the recent developments and

15    I'll mention just one, which is the use of force information

16    shown by OIG's audit.  In 36 percent of reviewed cases force

17    occurred and was not reported.  38 percent of cases did not

18    follow PDRD policy.  All of the unreported incidents involved

19    people of color.  Seventeen of 19 unreported pointing a firearm

20    cases involved African-Americans, two involved Hispanics.

21    There was potential misconduct in 45 percent of the cases.

22         And OIG's audit and recommendations were more

23    comprehensive than OPD's response to them.

24         I do not ignore that stocks are significantly down.  Also

25    the risk management meetings appear to identify real issues of

**PROCEEDINGS**

1    concern.  It's not clear to me that change is being effected as

2    a result of that identification, and I hope that becomes clear

3    in time.  The next such meeting that I want to attend will be

4    an area-level risk management meeting.

5        I was hoping today that I could applaud the City for

6    implementing vision, whose implementation has been delayed but

7    I'm hoping that I can do that in the next session.

8        The graphs at the end of the City's statement show general

9    progress.  But let's remember the focus of this case is

10   eliminating racial disparities.  I would like to expect that

11   the recruiting efforts of OPD, the training of officers, the

12   supervisory monitoring of those who need assistance and, if

13   necessary, the termination of those who cannot change with the

14   Department will make a difference.

15       That day does not seem near to me.  But, it is achievable

16   with leadership that demands the highest standards from itself

17   and its officers.  Nothing else is going to make a difference.

18   I'm not interested in PR justifications or press release status

19   reports.  I'm looking for progress.  And the best way to make

20   progress is to work together collaboratively.

21       I want to support the structure civic leadership has put

22   in place to achieve constitutional policing.  The monitoring

23   team and the compliance director have the skills and the

24   resources to help that process.  I have complete faith in them

25   and their ability, and they are the eyes and the ears of

**PROCEEDINGS**

1    the Court.

2        And, all of that said, there has not been recent progress

3    in critical areas in the NSA.  And if it takes more court

4    intervention to make that happen, then that's what will happen.

5        So I have a few questions.  I'm going to start with

6    Captan Millington.  After I have finished with my questions,

7    I'll ask the plaintiffs to make their remarks, limited to

8    10 minutes.  And then the OPA, and then I'll let the City

9    respond to everything, also in 10 minutes.

10       So, let's start with Captain Millington.

11           **MR. MILLINGTON:**  Good afternoon, Your Honor.

12           **THE COURT:**  Good afternoon.

13       So I had some questions about the IAD investigations,

14   starting with this one:  Why did the compliance rate fall so

15   low?  Why wasn't it reported earlier?  Why wouldn't I have

16   known about this before and how is this never going to happen

17   again?

18           **MR. MILLINGTON:**  Your Honor, again, just for the

19   Court, Sekou Millington, I'm the Internal Affairs Division

20   commander and responsible for this task.

21       When I assumed this assignment in 2018, there was some

22   assessments that I needed to make, one of those being our

23   division-level investigations needed to be organized,

24   recalibrated, re-accounted for.  At that time we had a few

25   challenges, what I call "perfect storm."

1          We had a staffing issue.  The internal person who tracks

2     those manually as a backup to Prime, our system that houses all

3     this information, was out.  We had an absence of the manager

4     for that position and some staffing challenges, in general,

5     with just record-keeping in Prime.

6          So, collectively, it created this group of cases which

7     actually came in, because I reviewed each and every one of them

8     in a timely fashion.  We have 180 days to complete the

9     investigation that I farmed out as a division-level

10    investigation.  It's incumbent on me and my team in Internal

11    Affairs to have those reviewed and ensure they are fair and

12    thorough and they are completed in a timely fashion.

13         Now, the cases that came in were, for the most part,

14    turned in in time.  The challenge that I had was getting them

15    reviewed and ensuring that they were thorough.  A lot of the

16    cases had to go back out for further work for more

17    clarification.  Some allegations were mis-- just process-wise,

18    it was something that I had to adjust to.  And I take ownership

19    for that.

20         I developed a plan with my team to, first, organize and

21    figure out every case that's outstanding and make sure that

22    they were accounted for.  I communicated this with the

23    compliance -- with the monitoring team commander, who I

24    communicated with on a regular basis.  And we were working on

25    systems to track more timely the division levels, where they

1    are, when they are due.

2        There was also an issue that I recognized very early and

3    that is that the investigators were complaining they weren't

4    trained well enough.  They had challenges in completing the

5    investigations because they weren't sure if they were doing

6    everything right when it came to POBOR and credibility

7    assessments.

8        A lot of feedback which -- and direction that I got from

9    the IMT, we implemented in the way of training.  We developed

10   training to deal with the folks that were most problematic.  I

11   also looked to reach outside and I communicate and contracted

12   with the Third Degree Communication, so we could hold two

13   courses yearly.  It's a three-day course that they would come

14   and teach us our basic internal affairs investigations is what

15   my investigators were mandated to have.  I heard that was a

16   reoccurring problem.

17       In addition to that three-day training, what we did was,

18   we recognized that all of the training that we kept seeing that

19   were problematic, the reason why we had to send cases back out,

20   and my division-level admin lieutenant added one day of

21   training, so total of four days during that time period.

22       In addition to that, we made the training a monthly

23   training for commanders in order to review the case thoroughly,

24   and then also investigators to investigate.  We worked

25   tirelessly with the City Attorneys Office who helped us form

1  the training and participated in administrative training.

2       All that said, I had a backlog of close to well over 100

3  cases.  It was troubling to me.  My staff had two

4  division-level investigators at the time, two recent transfers,

5  to the detection, learning what the expectations were.  We

6  weren't moving at a very fast click because I wanted to make

7  sure we also didn't get questioned when the review time came

8  with IMT.  I had to be sure about that.

9       In any case, I'm not making any excuses.  There was a

10  backlog.  And what we did to fix it, we developed a plan.

11  There was a staffing issue where I needed more investigators.

12  We prepared a proposal, which I presented to the chief, and she

13  accepted it.  We were able to recruit and vet close to 13

14  sergeants and lieutenants, collectively, to push through this.

15       The review started.  It took about three months.  What we

16  had to do was also train those investigators to make sure we

17  meet the expectations of the IMT before the review.  Not only

18  for them, but for us, for investigative sufficiency.  Once they

19  were trained, we handed them cases and got ourselves caught up.

20       The filing cabinet where those are housed are now empty

21  and we're actually going to get them removed, because I don't

22  plan on having them filled back up.

23       A couple of things we did to ensure that this won't happen

24  again, first of all, I'm directly involved with the cases.

25  This is a daily thing for me.  Once the cases are presented to

1   the chief and there is discipline, or what have you, there is a

2   very quick turnaround in getting those cases to the commander

3   who they're assigned to.

4       We have looked at lack of planning to include the analyst

5   assigned to the Internal Affairs Division.  She does the

6   tracking.  Then a notification, in addition to the task that

7   the commanders have, to the commanders when the cases are

8   meeting close to about a month out from the 180 days.  So

9   that's occurring.  If there is an issue with that, we have a

10  protocol that she would include me, that I would get involved.

11  That only had to happen twice and we have been on top of that.

12      I think, in addition to the training that's been going on,

13  the investigations are coming back, they are a bit more

14  thorough.  There is less push-back we have to do.  There are

15  still a few tweaks that we have to make to it, to the system as

16  a whole, but I have no doubt we will not be missing this

17  particular task again.

18          **THE COURT:**  All right.  So do you have now the quality

19  and quantity of staff in order to meet -- in order to comply

20  with the standard in the NSA?

21          **MR. MILLINGTON:**  Yes, Your Honor.  I, additionally,

22  asked the chief for an additional division-level investigator.

23  I had two when this occurred.  Now I have three.  And I feel

24  like that's going to be adequate to maintain and manage the

25  case loads that we currently have.

1    **THE COURT:**  Are you satisfied that the way in which

2    you addressed the backlog, by bringing in a number more people

3    in order to do the investigations and get them completed, that

4    they were done with the same rigor and appropriateness that any

5    other investigation was done in your office?

6    **MR. MILLINGTON:**  I would say, yes, with the caveat

7    being that these were investigators who were not assigned to my

8    division.  But, they were vetted properly, and we also made

9    sure that we trained them up to the standard we were expecting.

10   So, I don't see that we're going to have a deficient problem.

11   I think we're just fine in what was completed.

12   **THE COURT:**  I'm going to ask the IMT to take a look --

13   **MR. MILLINGTON:**  Yes, sir.

14   **THE COURT:**  -- at some of those backlogged cases to

15   see, make sure that that's the case.

16   **MR. MILLINGTON:**  Absolutely.

17   **THE COURT:**  Let me push on to -- I just had one

18   question on a complaint that you may or may not be familiar

19   with the answer, but there is one case where an investigator

20   deemed an officer not credible --

21   **MR. MILLINGTON:**  Yes.

22   **THE COURT:**  -- and then did not sustain the complaint.

23   And so I'm interested in how that conclusion was reached and

24   what happened to the officer.

25   **MR. MILLINGTON:**  So, I will, without getting into

1   personnel issues, I can explain the circumstances around it.

2   When the case was completed, I didn't review it.  I believe, if

3   I'm not mistaken, it was brought to my attention by

4   Commander Irvin through the course of his reviews that we

5   normally have on a monthly basis.

6        When I reviewed the case myself, I saw that it was

7   troubling.  I immediately saw that there was concern and so

8   there was actually an addendum written -- so the subject was

9   separated from the Department, and was also sustained for

10  multiple allegations.

11       The issue with the credibility was addressed, because we

12  reassessed the allegation that it pertained to, and the subject

13  was sustained -- ultimately sustained for that allegation.  So

14  it was corrected.

15       I didn't wait to be told to have that done.  I understood

16  what the expectation was.  I also wasn't comfortable with the

17  credibility assessment and, ultimately, was not sustained.  We

18  corrected it.  I included it in an addendum with regards to the

19  facts of the case, and I felt that it was resolved

20  appropriately.

21            **THE COURT:**  Okay.  Great.  Thank you,

22  Captain Millington.

23            **MR. MILLINGTON:**  You're welcome, sir.

24            **THE COURT:**  Now, Assistant Chief Allison.

25            **MR. ALLISON:**  Good afternoon, Your Honor.  Daren

1    Allison.

2          THE COURT:   Good afternoon.

3        So, obviously, I'm interested in the use of force and the

4    OIG's finding of systematic underreporting, particularly with

5    respect to African-American and Hispanic subjects, and I want

6    to know what you're doing about it.

7          MR. ALLISON:   So, Your Honor, there were several

8    recommendations, as you are aware, that came out of that audit.

9        One of the foundational principles that came out of that

10   audit had to do with some of the policy issues that were raised

11   in the previous Task 22, that had to do with pointing a

12   firearm, the subjectivity of the certain force reportings and,

13   additionally, pointing a firearm or defensive tactics

14   takedowns.  And so part of the issue that we feel would fix a

15   lot of these issues is that clarity.

16       In fact, we met today with the monitoring team to work out

17   some nuances.  We have actually presented it to the Police

18   Commission.  They did all vote on it, with an additional change

19   that we need to -- just sort of analyze and discuss and make

20   sure that it is clear and appropriate.  But that's one fix.

21       The other fix that came out of the recommendations had to

22   do with retraining, particularly around the use of video, the

23   use of relationships between supervision, and how to better

24   link supervisors to the arrest approvals, report reviews, use

25   of force investigations.

1            And so we started with a focus group to hear from the

2      doers, what can help you get the job done, make sure that there

3      is communication at hand.  We held a focus group and our

4      training division is preparing training to roll out in person

5      to the rank and file to talk about those issues at hand.

6            Regarding the disparity, as you mentioned, that was very

7      apparent that -- I think it was 88 percent were

8      African-Americans and, I believe, the other 12 percent

9      Hispanics.  We also looked at a pool of that.  So 47, we pulled

10     out 17 that were unreported.  We also noted the disparity in

11     the pool of the 47, where 83 percent were African-Americans and

12     12 percent Hispanics.  So we had a pool that had clear

13     disparities and the sample that was reviewed had actual

14     underreporting.

15           So the disparities, as you know, are very important to the

16     organization.  We take a very close look at it, not only with

17     our risk management and the use of force stop data, and how we

18     intervene, income disparities.  And that is one of those things

19     that has helped us drive down, not only the footprint of

20     African-Americans that are stopped, but even having a reduction

21     in African-American disparities by, I believe, about 10 percent

22     on average.  And we are intentional about continuing that work

23     to continue to make an impact and be very focused on how we

24     police in the City.

25           **THE COURT:**  Are you focused on the fact that it's

1   100 percent people of color that were the people who suffered

2   from the underreporting?

3         MR. ALLISON:  Absolutely.  It's not lost on me to know

4   that was that high disparity.  It was 100 percent.

5         THE COURT:  It's really not lost on me.  For the

6   length of time that this case has been going on and for that to

7   be a fact in 2019 is deeply disturbing.

8         MR. ALLISON:  We have taken back -- just to kind of

9   give you an update on the 17 cases.  As the Court knows, 17

10  cases were referred for underreporting to Internal Affairs.

11  And we'll take a whole look at the actual contact, assessing

12  performance and supervision of the incidents, along with an

13  additional five that didn't involve underreporting, but were

14  other discovered violations.

15       I know that Internal Affairs has completed seven

16  investigations that I'm aware of.  Six of them were for

17  underreporting.  One was for the additional moral violations.

18  And so, as far the findings that have been reported out are --

19  of the six underreported, four came with exonerated unfounded

20  findings, and two came with sustained facts for the

21  underreporting part of it.

22       THE COURT:  You mentioned the risk management meeting

23  which had helped address some of this.  And the last one I went

24  to, I was very impressed with the questions that were being

25  asked and the depth of understanding of the captains who were

1    responding.  I really was.

2        How do you explain the fact that there were four squads of

3    people who were responsible for a significant number of these

4    problems?  Why hasn't that been understood through the risk

5    management meetings and addressed?

6        It really makes me question whether there is an analytical

7    piece and then an implementation piece that are separate and

8    not working very well together.

9        **MR. ALLISON:**  Your Honor, that's a very -- that is a

10   good point in how we use risk management to discover the

11   underreporting.  That's something that, after the first audit,

12   the executive team really kind of grappled with, how can we

13   assess that.

14       If we look at the data, what's typically looked in these

15   past risk management meetings, we always looked at high-flyers.

16   That was always sort of the go-to, high stops, high

17   disparities, high complaints, high uses of force.

18       In 2018, which is the span of the audit, we really weren't

19   looking at low-flyers.  And the only time we really looked at

20   low-flyers were for just activity, in general.  You know, how

21   many people being stopped, in general, just to see, is there

22   some ways of going out and is there some kind of de-policing

23   going on.

24       We didn't look at, okay, what about the squads that have

25   low force-to-arrest ratios?  And this is before the theme of

1   underreporting.  And once OIG made their findings back in late

2   2018, for the 2019 risk management, we started looking at

3   low-flyers of force-to-arrest ratios saying, okay, you have a

4   lot of arrests -- say 300 arrests -- but the squad didn't use

5   any force.  So let's take a look.  It's a 0 percent

6   force-to-arrest ratio.  Let's take a look at why that is.  Are

7   they not reporting correctly?  Are they coming into encounters

8   that are more likely to have force?  Or maybe are they using

9   good tactics that are avoiding the use of force?

10       So we have been setting up deliverables in 2019 from those

11  risk management meetings to not only look at the high-flyers

12  but look at the low ratio of force-to-arrest and coming back

13  with area-driven audits to see if there is something there with

14  underreporting.

15       With the four squads, because of that mindset and premise,

16  we weren't necessarily looking for low-flyers in 2018.  But I

17  will say there are some squads that did have some individuals

18  on monitoring.  And the monitoring intervention process was

19  never intended to be punitive, but to prevent people from

20  walking down a path that would eventually lead them to trouble.

21       And so for some of the squads we looked at, for example,

22  one of the four squads, they had one person in monitoring for

23  the span of 2018.  When you look at the individual's high-flyer

24  indicators, there wasn't anything popping up on the radar for

25  2018.  So if we step back and maybe, in retrospect, maybe

1  looked at low-flyers for the arrest-to-force ratio, maybe that

2  would have bubbled itself up to where we could have actually

3  taken a deeper dive.

4      So I think coming out of the OIG audit there were some

5  good points that we learned from and some lessons learned that

6  we took back and put into the 2019 year risk management.

7          THE COURT:  You mentioned the supervisory monitoring.

8  There is a mention in the CMC that in Maricopa County they

9  videotaped supervisory monitoring.  What do you think about

10  that?

11         MR. ALLISON:  I think that just from an honest gut

12  reaction -- I think from a point of having an officer -- and I

13  think that -- well, let me back up.

14     People are placed on monitoring for various reasons.  It

15  could be performance reasons or personal reasons.  One of the

16  things we want to encourage is self-reflection and

17  self-awareness.  Part of that is being honest and open about

18  whatever you are going through, either personally or

19  professionally.

20     I think that sometimes, if there is a sense that we're

21  videotaping that type of potentially intimate dialogue, it can

22  have a chilling effect and be counterintuitive to what we're

23  trying to accomplish with that relationship building and just

24  that self-awareness we're trying to achieve.

25         THE COURT:  And so how should I judge the

**PROCEEDINGS**

1   effectiveness of the supervisory monitoring?

2        **MR. ALLISON:**  I think one of things we need to look at

3   is:  If you're placed on monitoring -- it's not punitive -- but

4   we see a change in behavior.  Maybe complaints are down.  Force

5   is going down.  The high-risk indicators are having an impact.

6   Then I think you can say that:  All right, monitoring is having

7   an impact.

8        So we're looking for, again, a change in behavior to

9   prevent them from walking down a path that can get you,

10  ultimately, in trouble.

11       **THE COURT:**  Was there anything -- changing the subject

12  a little bit.  Was there any correlation that you saw between

13  intelligence-led stops and the failure to report use of force?

14  Did you look at that?

15       **MR. ALLISON:**  So I looked at it from a sense of

16  on-views versus dispatch calls for service.  I didn't really

17  get into the intel-led driven piece of it.

18       And I'll tell you that of the cases I looked at -- and let

19  me back up.  Strike that.

20       So the underreporting, no.  But I actually was looking at

21  it from the Level 3's.  I looked at two sets of data.  So

22  Level 3 I looked at from a sense of intel-led versus dispatch.

23  For the actual 17 cases, I didn't do a deep-dive into how they

24  got to that state but I can go back and look at those 17 cases

25  to see how that was led.

1        **THE COURT:**  What about the use of -- the violation I

2    should say of the PDRD policy and the unreported or

3    underreported use of force?

4        **MR. ALLISON:**  I think that goes along with the

5    reporting use of force.  I think the two things that

6    highlighted from the OIG audit is there will be training,

7    which, one, we have done.

8        Two, for intentionality in misconduct, the referrals to IA

9    to see if, in fact, there was misconduct there.

10       And then the third thing that we worked on is to actually

11   get to try and mitigate -- because, understanding that there

12   will be stress situations.  You know, that for the delayed

13   activation -- which, in my experience, I tend to see a lot more

14   of than, quite frankly, no activation -- is to set the system

15   to where we have a buffer.  So if -- you can be in high-risk:

16   Oh, I have got to activate that.  When you do activate, the

17   system is set up to have a 30-second buffer to catch up and

18   actually catch the sustaining facts leading up to the incident.

19       And we're also exploring technology -- this is another

20   reference in the OIG audit -- and we have met with a couple of

21   different companies.  And we're looking for a VRP process,

22   so -- later on this year -- is technology that, not only when

23   you drag your firearm from the holster that will indicate that

24   you're drawing your firearm from the holster, but that can

25   actually activate cameras in those kind of high-stress

**PROCEEDINGS**

 1    situations as well.

 2        So the Department is exploring different ways to mitigate

 3    any misconduct, even potential human errors.

 4        **THE COURT:**  Okay.  All right.  I think that's all the

 5    questions I have.  Thank you.

 6        **MR. ALLISON:**  Thank you, Your Honor.

 7        Chief Armstrong.

 8        **MR. ARMSTRONG:**  Good afternoon, Your Honor, Leronne

 9    Armstrong.

10        **THE COURT:**  Good afternoon.  So tell me about the

11    status of recruiting for African-Americans for the force, both

12    recruiting and hiring.  How are things going?

13        **MR. ARMSTRONG:**  Your Honor, I think recruiting and

14    hiring is in the training division shop specifically, I think.

15        **THE COURT:**  So let's bring up that person.  Just stay

16    here, though.

17        **MR. ARMSTRONG:**  I'll stay, Your Honor.

18        **THE COURT:**  So who should I be asking for?

19        **MR. PEREDA:**  That will be Director Gleason, Your

20    Honor.

21        **THE COURT:**  Okay.

22        **MS. GLEASON:**  Good afternoon, Virginia Gleason, Bureau

23    of Services.

24        **THE COURT:**  Great.  I was going to ask you later about

25    vision, so I'm glad you're here.  But now tell me about hiring

 1   and recruiting efforts that you're making everywhere.

 2       So I'm particularly interested in African-Americans,

 3   women, people of color.  Where are you?

 4       **MS. GLEASON:**  Great.  I happened to bring a handout

 5   for you today that I can pass up for you now, or later.

 6       So we have tried a number of very interesting things.  We

 7   are leveraging some technology in different ways than we have,

 8   because we realized that reaches out to a different group of

 9   people.

10       We put priority on focusing in the Greater Oakland area.

11   We try not to say specifically "the City of Oakland," because

12   then we may be pricing a lot of candidates out because it is so

13   expensive to live there now.

14       We recently did a campaign that was very innovative where

15   we used BART stations within the City of Oakland to recruit.

16   And we have a new academy class that starts Monday the 26th of

17   August.  We have 44 people in that academy.  And we have eight

18   women and we have 36 men.  Or -- I'm sorry.  We have 11

19   Hispanic men, 10 Asian men, six African-American men, three

20   Caucasian men, three Pacific Islander men.  And of our women,

21   we have four Caucasian, three Hispanic, and one Asian.  So that

22   is how people came through the process as they went through the

23   backgrounding process.

24       And we have spent some time looking at all kinds of

25   different risk factors as they relate to a person's history as

**PROCEEDINGS**

1    they come in.  We are looking at the totality of the person,

2    their whole life, good, bad, otherwise.  We try to consider the

3    age at which they maybe did foolish things in their past.  And

4    spent some time looking at both the behavioral and also the

5    neurological changes that occur in an individual over time to

6    be able to evaluate those throughout a person's life.

7         We also look to see how people have made efforts to

8    restore themselves so they meet the standards that are required

9    by the State.

10        And we are pretty excited about this class.  We will meet

11   them all collectively Monday as they start.

12        I got -- as of this last week, I got the last data about

13   our recent push of our candidates that we have coming in.  One

14   of the most significant changes there is almost 30 percent of

15   the current people who have applied are women.  That's very

16   high for us.  And so we're trying to make sure that we don't

17   have any artificial barriers for women applicants along the

18   way.

19        Right now what we're focusing on is looking at our

20   pre-hire physical requirements to make sure they are validated

21   to the essential job functions.

22        And we are spending quite a bit of time, as any person

23   drops out of the process along the way, we have them have an

24   independent interview, separate from our academy, where they

25   get to talk to someone about why they are leaving.  And then we

1  go back and look to see if maybe there are things in the

2  background we missed.

3      Because we realize we are substantially widening the

4  funnel of people that are coming in.  And if we are learning --

5  if we're learning something along the way, we want to make sure

6  we're having the feedback -- it happens very quickly -- so we

7  can change course along the way.

8      **THE COURT:**  How long is the training program for the

9  44 people that are just starting?

10     **MS. GLEASON:**  I want to say -- I can't say the exact

11 number of hours, weeks.  I know we adjusted, added some weeks

12 on.  It's a little over six months.

13     **MR. ARMSTRONG:**  26 weeks.

14     **MS. GLEASON:**  26 weeks.  There we go.

15     **THE COURT:**  I sorry to keep you standing here, Chief.

16     Let me ask you while you're here, Director Gleason, about

17 vision implementation.  What happened so that it wasn't online

18 when everybody thought it was going to be online and when will

19 it be online?

20     **MS. GLEASON:**  So we have our Deputy CEO for the City.

21 So the primary project managers for the Vision system are the

22 City IT department.  And working jointly with them, we're sort

23 of the customer of the system, that as we were doing our

24 validation and user-acceptance testing, we found a few areas

25 where the data wasn't very good.

1        And so working with our City IT department -- and they

2   ultimately made the decision about the go-live date.  They felt

3   they wanted to work on the data quality issues a little bit

4   more.  So rather than have the systems go forward and have to

5   correct data -- and we completely agreed with that.  So as they

6   work on cleaning up some of the data so that the dashboards --

7   which are functional.  The issue is the data coming into them.

8   The dashboards themselves are working fine -- that we wanted to

9   make sure that we had all the correct information.

10        **THE COURT:**  Okay.  And the date?

11        **MS. GLEASON:**  The date -- currently, the date that we

12   have been given by the City CIO is October -- is when we hope

13   that it will be live.

14        **THE COURT:**  Some day in October.

15        **MS. GLEASON:**  So we're doing the training.  We started

16   user-acceptance testing today.  And they have allowed me to

17   make the offer to you that they would come and do a

18   demonstration for you -- we can't do an open-court

19   demonstration because of the nature of some of the data -- of

20   it for you and the plaintiffs' attorney, the monitoring team, a

21   small group of people, so you could see how it's working and

22   how they can manipulate it and what level of detail it allows

23   them to see.

24        One of the best parts of the system is that the delay that

25   used to occur as the information was batched up for the risk

 1  management meetings, the delay now is it only 24 hours.

 2  Previously it was a month or so.

 3      THE COURT:  Okay.  And so the time to do that would be

 4  sometime in October?

 5      MS. GLEASON:  Well, we have a data set that we can use

 6  that -- I mean, for us it matters because maybe Officer Smith

 7  actually should be in this squad and he is not.  So

 8  irrespective of the names, the functionality of it is something

 9  that you could see sooner than that, maybe within the next few

10  weeks, if you would like.

11      THE COURT:  Okay.  Thank you very much.

12      MS. GLEASON:  They have also offered to come here, if

13  that's --

14      THE COURT:  That's a very nice offer, but I don't want

15  to put people out.  And everybody else might be over in

16  Oakland.  So maybe I can do that and combine it with an area

17  risk management meeting, which I would enjoy going to.

18      MS. GLEASON:  Either way, they are proud of it and

19  happy to show it to anyone.

20      THE COURT:  Thank you.

21    So, Chief, back to you.  Tell me where things stands with

22  Task 34.

23      MR. ARMSTRONG:  Your Honor, we believe that we're

24  making a lot of progress with Task 34.  We are moving forward.

25  We believe that our stop data collection is strong.  Ever since

1    we implemented the requirements of AB 953, we have the most

2    comprehensive data collection form, probably, in the state,

3    which includes not only the mandated required information, but

4    also the additional information that is used to compile stats

5    for the risk management meeting.  So we made the decision --

6    the Chief made the decision at the beginning of that process to

7    not just collect the mandated data, but also collect the

8    additional data.  So I do think from that perspective we have

9    continued to move forward.

10        I think the risk management meetings have proven to be

11   strong.  Our captains and command staff have really taken on

12   the responsibility of taking deep dives into their staff.  I

13   think it was mentioned earlier, the squads, one of those four

14   squads that you mentioned earlier, was actually identified in a

15   risk management meeting.  That squad was broken up as a result

16   of that.

17        **THE COURT:**  As a result of the risk management

18   meeting?

19        **MR. ARMSTRONG:**  Yes.  As a result of the risk

20   management meeting identifying high-flyer officers in that

21   squad, drilled down and looked at the behavior of some officers

22   in that squad, actually led to the supervisor being removed

23   from the squad because of the activity of the officers, as well

24   as even the acting commander -- who was preparing to be

25   promoted to lieutenant -- was not promoted because of what

1    we -- what came out of our analysis based on them being

2    identified during the risk management process.

3         That was even prior to the area risk management meetings,

4    which we really feel are important because they allow a captain

5    to really begin to filter it down to the lowest levels, having

6    sergeants be a part of that risk management, which Your Honor

7    will get a chance to see.  We've seen much more buy-in, much

8    more clear understanding for supervisors of what's expected of

9    them and sort of how we're reviewing the data.

10        We are moving forward with the dashboards.  That is the

11   part of the vision.  We expect those to be ready in October.

12   We have seen some early templates of the slides that will be

13   used.  It is really a unique system that will give us a lot

14   more information in realtime, much more than we have now.

15        So now we issue the slides on a monthly basis when the

16   dashboards are ready.  Sergeants and officers and command staff

17   will be able to look at data immediately on their computers,

18   so -- which will allow them to have more meaningful

19   conversations with their staff, not wait until risk management

20   meeting, or area risk management.

21        So we hope to continue to filter that down, so even the

22   police officers understand the way in which they are being

23   evaluated, the way in which we are trying to examine risk.  I

24   think that's our overall goal to Task 34.

25        I think the other thing that you mentioned, Your Honor,

 1   around Task 34 is the disparities.  We -- obviously the chief

 2   and all of the executive team know that the disparities rate is

 3   much too high.  We have been trying different strategies to

 4   help bring that disparities number down.

 5       Like Chief Allison mentioned, over the last 18 months we

 6   have seen that disparity percentage come down 10 percent,

 7   particularly African-Americans.  And that is really -- the

 8   chief -- the chief wanted to try some different things, like

 9   beat integrity, where we instructed officers, particularly when

10   we're talking about non-intel-led stops; these are equipment

11   violations, things of that nature, to limit those to the beat

12   that you're assigned to, what we call in policing is

13   "poaching," where an officer is working one beat, he goes over

14   to another beat to make stops.

15       So we want to reduce that by saying:  If you're going to

16   make traffic stops, they need to be traffic safety stops.  We

17   want to make it clear, intelligence-led stops are what we focus

18   on.  We don't want to make the community unsafe by not making

19   traffic stops, traffic safety stops they are violent to public

20   safety, but we want them done on your particular beat.

21       So really trying to emphasize that.  We think it is having

22   an impact by officers reducing the number of stops they go out

23   and chase and just staying on the beat they're assigned to,

24   looking for traffic crimes in the area they're assigned to.  So

25   strategies like that, we believe are helping to bring down the

PROCEEDINGS

1    disparities.

2        Don't know, this is new for us, so we'll continue to try

3    to -- our command staff is very creative.  They all understand

4    what we're asking.  So they are coming up with different

5    strategies in order to do that.

6        Captain Joshi who was in Area 4, one of the things he did

7    in particular was give officers things that they can do in lieu

8    of making stops.  Community-based things, going out and meeting

9    with community members, walking, different things that they

10   could engage in, besides using traffic enforcement stops.  So

11   these are things, Your Honor, that we continue to move forward

12   on.

13       **THE COURT:**  Thank you very much.

14       All right.  Plaintiffs.  Mr. Chanin.

15       **MR. CHANIN:**  Thank you, Your Honor.

16       Your Honor, Defendants' portion of the case management

17   conference statements fails to seriously confront the fact

18   that, when force was used, every person for whom there was no

19   use of force was either Latino or African-American.  The

20   Defendants' brief says and I quote:  Lastly, in the very small

21   sample size, too small to draw any statistical conclusions, the

22   percentage of African-Americans who are arrested was lower than

23   the percentage of unreported force against African-Americans.

24       Your Honor, in fact, OIG found that 100 percent of those

25   subject to force that went unreported were Hispanic or

1  African-American.  This finding cries out for a more

2  comprehensive study, but the OPD is silent on what they plan to

3  do about these figures, and do not even mention any further

4  study that would allow them to draw any statistical conclusion

5  as to just how big this problem is.

6      The monitor has noted in his most recent report that,

7  quote:  We, again, identified numerous incidents in our review

8  where we believe that additional verbal communications and

9  explanations with persons who were contacted might result in

10  reduction in the need to use physical force.

11      We would like a study to focus on this unreported and,

12  perhaps, unnecessary force, whether it's largely confined to

13  Latinos and African-Americans as was -- as is suggested.  For

14  while it is true that the reported -- use of force reported was

15  within policy, using extra force against people on the basis of

16  race is unconstitutional even with -- if within -- in policy.

17      I would now like to turn to risk management.  When the OIG

18  began their investigation, I met with them and made the

19  suggestion:  Arrange all the cases in your sample of

20  non-reporting by squad.  If, at the end of the process, the

21  incidents of non-reporting are spread evenly over the

22  approximately 50 squads in the OPD, you probably have a

23  training or policy problem.  However, if the non-reporting is

24  confined to a relatively small number of squads, you probably

25  have a discipline problem.

1    The OIG found that 12 of the 17 incidents of

2  underreporting involved just four squads of officers.

3  Furthermore, 12 of the 43 officers and sergeants assigned to

4  the four squads were under supervisory monitoring at some point

5  in 2017.  So it is clear that the problem involves a small

6  number of squads who are allowed to exist for an unacceptable

7  period of time after it became clear that they were problem

8  squads.

9    Your Honor, this has been an ongoing problem for the

10  Oakland Police Department for many years, going back to the

11  rioters and perhaps before them.  It has always been a small

12  group of officers whose conduct hurt the reputation of a

13  greater number of officers who come to work every day and do

14  the difficult job of policing Oakland in a manner that brings

15  appropriate praise and credit to the OPD.  However, it is the

16  failure of the command staff over many years who failed to

17  timely recognize and appropriately discipline a small group of

18  outliers who bring discredit to the many police officers who

19  are doing a good job.

20    Now, the OPD recently informed me that the squads had been

21  broken up, so the question remains when and why they were

22  broken up.  And I have been nagging them about that for a

23  couple of weeks now without an answer until today.

24    Did the risk management process really work?  We just

25  heard that it worked on one squad.  What about the other

1  squads?  Were they broken up not until the annual rotation?  Or

2  were the quads broken up because of the OIG report and its

3  attendant publicity?

4       Were the squads broken up because of some serious

5  incidents, such as the Pawlik shooting?  How much time passed

6  before it became clear these squads were outliers?  How long

7  after it became clear the squads were outliers were they broken

8  up?

9       The monitor said, and I quote, in his recent report:  The

10 analysis of force reporting and PDRD policy violations includes

11 the finding that squads with the highest rates of problems also

12 had the highest number of officers in monitoring and

13 intervention under the risk management process.

14      That suggests the limited effectiveness of risk management

15 in addressing these issues.  That weakness is not, however,

16 addressed.  The risk management process, a potentially powerful

17 resource for the changing the culture, is ignored in the

18 chief's written response to the problems detailed in the OIG

19 report.

20      Your Honor, we agree with that.  Thank you.

21          **THE COURT:**  Thank you.

22      Mr. Burris, did you have anything you wanted to add?

23          **MR. BURRIS:**  Yes, Your Honor.

24      Your Honor, there are some areas that are kind of

25 disturbing to me in the monitor's last two reports and they go

1    to the fundamental issues of the length of time that this

2    matter has occurred and continues to occur.  It goes to the

3    culture.

4         You know, we had a lot of discussions before this case

5    started and I wrote a book about policing and culture and you

6    can't really -- and the challenge of it.

7         And I look at some of the comments that were made, it just

8    seems to me some of it is so fundamental to the constitution of

9    policing that it's hard for me to imagine why it continues for

10   16 years unless there is a deep-seated form of culture that is

11   resistant to it.  And that's disturbing to me.

12        The monitor makes reference to the issue of deescalation.

13   And we talk about deescalation all the time, but it doesn't

14   have to be mentally-impaired people.  It could be everyday

15   cases.  What the monitor suggests is that there were a number

16   of force cases they looked at that deescalation, verbal

17   contact, communication should have taken place.

18        To me it is very disturbing that if you, in fact, can use

19   verbal persuasion -- verbal judo as it's been called in some

20   places -- that ought to be done, as opposed to physical force,

21   if possible.

22        And so it seems to me that's part of a culture that

23   exists, that you go to force when you don't have to go to

24   force.  And I think that some efforts should be made by the

25   Department to look at those kind of issues to see whether any

**PROCEEDINGS**

1   kind of force was necessary or whether verbal measures should

2   have taken place.

3       The other area that was noted -- and this goes to the --

4   and I think the Court may have referenced this earlier -- and

5   that is the underreporting of force of contact.

6       It's not just the drawing of the weapons but when you have

7   more than one person that uses force on a person, the monitor

8   suggests that only one of those people is reporting it.  Well,

9   the truth of the matter is, if all of them are using it, using

10  some force, they all should be reported.

11      And it seems to me when you get to the integrity of the

12  use force by the Department or its officers, then it should be

13  noted as part of the rules and regulations that anyone who uses

14  force on an incident, whether it's one, two, three, or four

15  people, it ought to be reported as use of force.  So that goes

16  to the issue of underreporting.

17      And, of course, the other issue that has been the bugaboo

18  of policing, not only here but everywhere, and that is officers

19  who are present on a scene, all of whom may have seen what

20  happened, but most of them don't report what they saw, what

21  happened.  And it goes to the whole questions of code of

22  silence.  When you have seen something and you act like you

23  didn't see it, to me, that's a violation of one's duty and

24  integrity.  And it also goes to the culture of the Department,

25  goes to the culture of policing.

1      So I think examination should be made about when a number

2  of officers are present on the scene and one or more of them

3  uses force, but others did not and they claim they did not see

4  it, to me, that's a travesty.

5      And I remember very clearly when we were doing the Rodney

6  King case, there were a number of officers on the scene.  There

7  were LAPD officers.  There were LA school -- Unified School

8  officers.  But when it came down it to -- and CHP officers --

9  none of them saw it.  And there was -- it was difficult trying

10  to get to all of them.  And we had a lot of discussion.  But it

11  was about something within the culture of the Department that

12  allows officers or caused them not to report bad things when

13  they have seen it.

14      And seems to me we don't ever get to a department that is

15  substantially free of a -- substantially in tune with a sound

16  culture of constitutional policing until all officers buy into

17  that concept.  And it seems to me, after 16 years, that should

18  not be at issue, but it is and so I have some real concerns

19  about that.

20      One last point I want to go to, and this is about the

21  recruiting and hiring practices.  Certainly sounds as if good

22  efforts are being made since we last talked about this, when

23  the concerns were raised by the Black Officers Association and

24  others.  But that doesn't go to the issue that I have the most

25  concerns about.

1      Granted, it looks like a worthy effort has been made to

2   get a good academy and other good people have been promoted.

3   But the question is:  What if?  What if five years from now, it

4   changes, and these people are gone?

5      And so we don't know -- and so what I was concerned about,

6   which -- I raise this issue whenever I can with -- the question

7   that we want:  Is the criteria that is established for the

8   evaluation and the selection of new police officers one that

9   has some standards that could go on and be used in the future

10  and so that everyone knows what those standards are?

11     Now, granted that flexibilities occur with changing times

12  and things of that nature.  But there ought to be a set of

13  criteria that's used for the evaluation and the selection

14  process.

15     And so, I think there is not enough to say:  We have this

16  set now.  What's important is, do we have a set of criteria for

17  future evaluations when these individuals are not here and

18  people may be in place that are not as consistent, which is

19  what was the complaints were before that -- how this came

20  about.  Because there was complaints about inconsistency of how

21  new recruits were selected.  So I want to make sure that,

22  before we leave this process, that we have got a consistent set

23  of criteria for evaluation.

24     Now, understand that -- and maybe it all should have been

25  focused around the same disparity study team who did that, and

**PROCEEDINGS**

1  the officers responsible for that should have been part of

2  that, but I thought that a committee was being put in place

3  that included the stakeholders who would then sit down and work

4  through what the criteria ought to be.  It could be the very

5  criteria established for the group, but it ought to be a

6  roadmap or footprint for the next person in the position.

7      That's what I think we should be looking at.  It's all

8  part of work trying to get to constitutional policing, because

9  that's what it is.  And all the issues around race and those

10  issues have all been discussed.  I think the Court has been

11  clear and pointed about what the direction ought to be.

12      Thank you.

13          **THE COURT:**  Thank you.

14      Mr. Lucia.

15          **MR. LUCIA:**  Good afternoon, Rocky Lucia for OPOA.

16      Your Honor, we have, as you know, a very limited role as

17  intervenor.  From our CMC statement we continue to beat the

18  drum of collaboration and assistance.

19      I'm concerned, as OPOA is, that there is a suggestion or

20  at least a feeling that the culture hasn't changed, perhaps,

21  enough.  And as I sat here today in court I thought:  What

22  could the OPOA do other than engage in regular meetings?

23      We have participated in the monthly meetings.  We

24  participate in meet and confers.  The leadership of the OPOA

25  has been very active in assisting the implementation.  We have

1   not been an impediment in any way whatsoever since the

2   inception.  I have been here since the inception.

3       So -- and I understand Your Honor's concern.  You are new

4   to the case.

5           **THE COURT:**  Not so new as I was.  I am a lot more

6   senior than I hoped to be.

7           **MR. LUCIA:**  So, to jib John and I, you are new to the

8   case.

9       So what I'm just going to put out there -- and my client

10  has not sanctioned this -- is an invitation to you to think of

11  some way to hear the voices of the men and women who are really

12  at issue here.  The men and women who really are trying,

13  I believe, as a group to conform.

14      Most of the men and women who we're talking about who are

15  working today weren't around when the case started.  Most of

16  the men and women who are here today in positions of leadership

17  weren't in this courtroom or in Judge Henderson's courtroom

18  when this case started.

19      I can tell you that there has been a cultural change.  But

20  I'm not here to offer evidence and my opinion personally

21  doesn't matter.  But I don't know any other way for you,

22  personally -- I can write pleadings.  I can write narrative.  I

23  can stand up here for an hour.  I know you're not going to let

24  me.  I have ten minutes.  But the reality is, I would just like

25  you to think about, when you do venture across the bridge and

1   you do visit members of the command staff, that you think about

2   venturing over to 555-Fifth Street, to the building that houses

3   the union, and meet with the men and women who really are

4   trying.  And they are doing a really good job.

5       Jim referred to outliers.  That group of outliers is very

6   small.  They, the command staff, the mayor, the chief, they are

7   winnowing that number down dramatically.

8       The reference to constitutional policing, we don't see a

9   lot of claims.  We don't see a lot of headlines.  We see a lack

10  of reporting, maybe a lack of oversight.  But we don't see

11  evidence of unconstitutional policing in the bigger picture.

12      So I would just say --

13          THE COURT:  Mr. Lucia, let me just stop you there.

14          MR. LUCIA:  Yes.

15          THE COURT:  First of all, I have the highest regard

16  for the police officers who work in Oakland.  And they put

17  their lives on the line, they are doing extraordinary -- they

18  have great heroism and courage.

19      You just said that there is no evidence of

20  unconstitutional policing, and that's all I see when I look at

21  the racial disparities that occur.  I mean, just start with the

22  use of force underreporting.

23      So don't make a claim like that.  I accept your argument

24  that almost all of the members of the OPOA are working hard and

25  trying to make things right.  You're not there yet.  And the

**PROCEEDINGS**

 1  City is not there yet.  And that's where we have to get to.

 2      So and I appreciate your offer about having a meeting and

 3  I'll take that -- keep that and figure out a way of doing that.

 4  That would be useful.

 5          **MR. LUCIA:**  Sure.  What I meant was that we don't

 6  have -- there are violations and disparities in numbers.  I'm

 7  not denying that's a problem.  But we don't have sustained

 8  complaints of excessive force, meaning it's -- the number has

 9  shrunken compared to where we started.

10      I guess what I am trying to say is there is evidence of

11  cultural change.  Is it where it should be?  Absolutely not.

12  But I would like you to think about some way to speak directly

13  to the men and women who are out there pushing the patrol cars

14  around and doing their best.

15      Respectfully submitted.

16          **THE COURT:**  Thank you.

17      Mr. Pereda.

18          **MR. PEREDA:**  David Pereda for the City.  Your Honor, I

19  take the Court's guidance on the statements to heart and we

20  will adjust going forward.

21      As far as reforms and progress and the path forward and

22  all the issues that have been raised by plaintiffs, I think it

23  would be important for the Court to hear from the chief and the

24  mayor themselves.

25          **THE COURT:**  All right.

PROCEEDINGS

```
 1        MS. KIRKPATRICK:  Anne Kirkpatrick, Chief of Police of
 2   Oakland.
 3        Your Honor, I appreciate very much going last, actually
 4   other than the mayor, to hear the comments that were made to
 5   you.
 6        When I was in your court the last time, you actually made
 7   a remark that I have reflected on quite a bit.  You said,
 8   basically, you appreciate that I had high-minded hopes, but
 9   that you needed to see real change.  So from a macro
10   perspective, I'm going to speak with you about those real
11   changes.
12        I first want to say and lay the foundation that I know
13   many years ago, as you do, that we can all look at one set of
14   facts the same set of facts, but come to different conclusions.
15   But I also know that facts in context is what is the most
16   important.  Facts out of context will never lead to the truth.
17   So I'm going to put some of our facts into context to show
18   progress and not regression.
19        I appreciate as well, and I had a few statements as well
20   to make to you about the Task 2, and you brought
21   Captain Millington forward.  And what I simply wanted to say is
22   to use an analogy, that what happened in IA, associated with
23   the backlog, is very similar to a car factory that goes either
24   offline in the production or slows down their production in
25   order to retool the factory in order to make a better product
```

1    and be more efficient as the system that is the sustainability

2    system, so that no matter who is sitting in the seat as the

3    commander of IA, we have chosen and purposely allowed the

4    backlog in order to retool.  I see that as being a progressive

5    approach to a problem and not a regressive one.

6        I also want to speak in terms of context that people do

7    not, I think, have perspective.  So through June of this year

8    alone, our officers have responded to 183,996 calls for

9    service.  They have touched the lives of around 200,000 people.

10       Of those real-life human contacts, they have garnered 648

11   complaints.  That's a large number when you look at it in a raw

12   term, but when you put it into context that's .0045 or one-half

13   of 1 percent.

14       Those stats are consistent with our use of force.  We used

15   force in those 200,000 contacts, this year alone at .0047.

16   That is also one-half of 1 percent of the time.

17       That does not sound like an agency that is in deep

18   backslide.  Context matters and that is the change that you are

19   looking for.

20       Since I have been here, I have administered 9,376 hours of

21   suspicion.  I have terminated 14 full-time officers.  And that

22   does not take into consideration the academy recruits that have

23   a very high attrition rate.  We get rid of people that we see

24   early on are going to be a risk factor to us.

25       This is police accountability in the form of discipline.

1    Not all police accountability involves punishment.  It also

2    involves the intervention.  That's what we used these early

3    warning intervention systems for.  We first started using that

4    system called PAS in the year 2004.  During the entire year,

5    only one person, one officer was referred to that system.

6        In my first year, in 2017, we referred 43.  Exponential

7    change.  Exponential mindset change.  Today we have 55 officers

8    actively involved in intervention.  Intervention is designed to

9    strengthen competencies for success, and that is our endgame.

10       Moreover, we have not had one officer arrested for over a

11   year for DUI because, thanks to the OPOA and such strong

12   leadership there, and joining in collaborating with us, the

13   message is out that enough is enough, and it will not be

14   tolerated.

15       We have not had one officer involved in a shooting in over

16   a year.

17       We have embraced trauma-informed care and wellness

18   programs internally and our own in-house counselor has reported

19   50 percent increase in officers tapping into wellness support

20   systems.

21       You have already heard about our dramatic drop in stops.

22   That's, indeed, as a result of police tactics that are a total

23   paradigm shift in the world of law enforcement.  Yes, 10,000

24   fewer African-Americans have been impacted by not being

25   stopped.  A positive footprint.  And despite the predictions

1  otherwise, we are indeed continuing to drive down the

2  disparity, particularly of our African-American community.

3  That is real change.

4      Lastly, I want to speak to the culture.  We initiated true

5  culture shifts in our department on the topic of race and

6  equity.  On our own not a result of the IMT initiating or

7  prorating us.  We, on our own.

8      I personally reached out to the City's Director of Race

9  and Equity, Ms. Darlene Flynn.  I asked her to come in to OPD

10 and do four academy sessions on race and equity.  That alone

11 was a paradigm shift for us.

12     We would like to stand on the fact that we're a diverse

13 organization.  But, as Mr. Burris has referenced, and the

14 OPOA's letter pointed out, you could indeed be diverse and not

15 equitable.

16     We are now building systems that are the sustainability

17 things, no matter of who is here 10 years later, that would

18 address equity outliers, not only in how we hire, but how we

19 promote, who gets training opportunities, and who get choice

20 assignments.

21     And, through our work with Darlene Flynn, we are creating

22 systems that will be sustainable that will address equity

23 issues.  We have begun robust conversations about race and we

24 continue to challenge our biases, as you have seen, in our own

25 risk management system.

**PROCEEDINGS**

1        We are indeed continuing our relationship with

2    Dr. Eberhardt.  There has been a delay due to conflict over

3    discussions about the contract issue, but Dr. Eberhardt and I

4    have spoken.  She has now sent me a proposal to address the

5    very issues that Mr. Chanin and Mr. Burris have addressed

6    regarding how she can join with us to address those 100 percent

7    African-American contacts and Latinos that are affected by

8    force, to help her come in help us address and look at those

9    issues.  So we are, indeed, continuing that relationship.

10       But we're also expanding our relationship with other

11   academic partners.  We have built out a new leadership training

12   program through the Goldman School of Public Policy at

13   Berkeley.

14       I know my time is limited and I could go on and on and

15   talk about the cultural shift program we're bringing into the

16   Department.  I sent a whole team of officers to New Orleans to

17   look at the EPIC program, which we're bringing back to Oakland.

18   And what's EPIC?  It stands for "Ethical Policing Is

19   Courageous."  It's about interventions and how to intervene at

20   a peer level.

21       So Your Honor, OPD is on the move.  We are progressive.

22   We are not regressive.

23       I have not dismissed the criticisms of the plaintiffs or

24   the monitors and their reports.  Although they are staining,

25   regardless I always look for the essence of truth in any

1    criticisms, and I have adjusted accordingly.

2       The reason I know we are on the right track is that the

3    plaintiffs' counsel has shared with me that their ultimate

4    measuring stick of true change in OPD is that they no longer

5    get any calls from citizens complaining about us.

6       So, Your Honor, it is true that I espouse high-minded

7    hopes, but I also know how to operationalize them into change,

8    really lasting change.  Thank you, sir.

9          **THE COURT:**  Thank you.  Before you go, Chief, what do

10   you think is your biggest challenge?

11         **MS. KIRKPATRICK:**  The narrative.

12         **THE COURT:**  Communication?

13         **MS. KIRKPATRICK:**  No, sir, the narrative that we are

14   not moving forward.

15         **THE COURT:**  That's communication.

16         **MS. KIRKPATRICK:**  That's what I meant.

17         **THE COURT:**  That's what you think your biggest

18   challenge is?

19         **MS. KIRKPATRICK:**  I think that's a challenge.  I think

20   there are other -- I think that's the challenge.  I think that

21   we do indeed have culture shift.  I think we have failed in

22   explaining the proofs --

23         **THE COURT:**  If you could change one thing, if you

24   could address one substantive issue, as opposed to a

25   communication issue, that you think is important for OPD to be

1  doing that you're not doing, what would it be?

2      MS. KIRKPATRICK:  I would say that probably the most

3  substantive issue would be to have the complaints of our

4  community towards us and our uses of force drop, because I

5  think that those are the most important, as well as the race

6  impacts and disparities.  If those numbers could actually drop

7  to a level that our community would say -- as well as you or

8  the monitoring team and everyone, would be able to say that

9  that reflects that change that you are looking for.  That would

10  be what -- would be the one thing.

11      And I want to know what that is.  And I do know that there

12  is a balance between trying to find a metric that is measurable

13  and one that is not a check-in-the-box.  What's the balance?

14  But knowing the goal line is very important.

15      THE COURT:  So for the next status conference I would

16  like the City's report to include what you have done to focus

17  on that particular issue to improve it.  Okay?

18      MS. KIRKPATRICK:  Yes, sir.

19      THE COURT:  All right.  Thank you.

20      Ms. Schaaf, thank you for taking the time to come over

21  here.  I think it is very important that you do and I

22  appreciate your being here.

23      MS. SCHAAF:  Your Honor, may it please the Court.  I

24  am Libby Schaaf.  I am proud to be the mayor of my hometown,

25  Oakland, California.

**PROCEEDINGS**

1        Oakland is determined to have the most effective and

2   progressive police department in America.  We are determined to

3   complete all NSA tasks but, more importantly, to engage in the

4   continual work of being an industry leader in what is at the

5   very heart of the NSA, constitutional policing and putting an

6   end to racial bias.  That work is eternal work.

7        Now, the Chief and the City Attorney are focused on the

8   tasks appropriately, but I want to focus my remarks on the

9   systems that we have created and need to create to sustain

10  reforms, as well as ensure that we are constantly evolving,

11  constantly striving to improve and be the best.

12       Now, to ensure sustained excellence, we must maintain

13  multiple institutionalized systems.  Each perspective will have

14  blind spots.  We must have redundancy in our systems, and they

15  must be designed to outlive any particular leader.

16       And this work must be continually doing three things, in

17  my mind:  Adopt and embrace the most progressive practices and

18  policies; find and fix performance lapses, because they will

19  happen; and hold people accountable for failure and inadequate

20  progress.  That is the work that I am most focused on.

21       So I want to share where I think we have these systems and

22  what our work ahead is.  Systems to adopt and embrace the most

23  progressive practices and policies.

24       I am also extremely pleased with how embedded our

25  partnership is with Stanford and Dr. Jennifer Eberhardt is.

**PROCEEDINGS**

1   The kind of work we are doing is industry-leading.  It is

2   ground-breaking.  It is utilizing technology and methods that

3   weren't ever even contemplated in 2003 when we entered into the

4   NSA.  The use of machine learning and artificial intelligence

5   to analyze the audio data that's collected from PDRDs, this is

6   literally, I believe, a national contribution to the important

7   conversation around race disparity and racial bias, both

8   explicit and, more important, implicit in policing.  And I am

9   thrilled that we are going to be continuing this kind of

10   analysis of verbal choices and tone.  It's incredible.

11       I recently interviewed Dr. Eberhardt about her book,

12   "Bias" -- which I hope you have read.  It's a fabulous read.

13       And she said she does not know of any other department in

14   the country that is doing this level of work.  And she

15   personally has observed tremendous change within this

16   department.  Because I said not just "adopt policies and

17   practices," I said "embrace."  And I think that has been one of

18   the biggest challenges over this journey, the officers

19   themselves embracing these changes.

20       I also really want to express my gratitude to our Police

21   Commission and the chair, Regina Jackson, is here.  I believe,

22   some other commissioners are here.  And really congratulate

23   their, again, what is recognized as probably the most

24   progressive parole and probation search policy in the country.

25       And evidence from me that this is not just being imposed

**PROCEEDINGS**

 1   on the Department, but is being embraced by it:  The fact that

 2   we already have seen a 50 -- roughly 50 percent drop in these

 3   searches before the policy has actually been put in place

 4   formally, shows that this work was collaborative and embraced

 5   by our officers.

 6       But there is no substitute for this external role that the

 7   Commission is playing in and is going to continue to play in

 8   policy development.

 9       And, finally, I'm very excited about the work that is

10   being done with the director of our Department of Race and

11   Equity, as the chief referenced, Darlene Flynn.  The CMC report

12   talked about the trainings, but it didn't talk to you about

13   what the next step is, which is, I believe, is most exciting,

14   which is allowing officers, themselves, to self-select to

15   participate in equity teams for the Department.  This is a

16   strategy that we have been using in other departments within

17   the City.

18       And so, again, there is a structure and a system set up to

19   support these teams to do constant and ongoing work to

20   recognize the damage of racial discrimination, historically,

21   and how it is our duty to not just stop perpetuating it, but to

22   actually make up for the past wrongs.  Oakland is unafraid to

23   have the difficult conversations about race.

24       And I also want to appreciate Darlene Flynn for her

25   leadership and partnership with Fred Shavies, one of our

**PROCEEDINGS**

1   officers who is co-training with her within the police

2   department.   Because this is the some kind of structure that is

3   going to support continued internal cultural change.

4        Lord knows, Oakland has a lot of the external forces that

5   are going to push change on our police department constantly.

6   What I have not seen enough of over my years in public service

7   is that internal push.   This system and structure, I believe,

8   is what is going to actually create that, particularly around

9   racial equity.

10       The second area:   Finding and fixing performance lapses.

11   You said that we have to ask the hard questions.   And make the

12   hard decisions and I, again, want to recognize the role that

13   our Office of Inspector General has played in early

14   identification of problems like the underreporting of force.

15       Now, I ask myself:   Is this bad news welcomed and heard

16   and acted upon?   And how will that change, how could that

17   change once our monitoring team goes away?

18       And so, I believe that the work in front of us -- because

19   while I feel confident that right now that is happening,

20   I believe we do need to put some structures and systems in

21   place to ensure that external systems, particularly the mayor,

22   is constantly hearing what is coming out of the OIG's office

23   and ensuring that it is taken seriously and acted upon rapidly.

24       I do want to commend the OIG for identifying the

25   underreporting of force.   The IAD backlog which, again, I have

1   read about right away from the bi-weekly report -- which I

2   receive and read -- as well as the failure to use PDRD.  And,

3   again, that gives me the ability to be on top of it early and

4   often.

5       But I do believe that we need to think of a structure and

6   system, particularly, that replaces what we call the

7   "all-parties meeting," which is currently a system that allows

8   us to have those kind of regular check-ins and to create the

9   kind of relationship that makes the OIG feel supported and

10  independently kind of verified.

11      And finally, we need systems to hold people accountable

12  for failure and for inadequate progress.

13      Again, I want to commend the Police Commission and

14  recognize their new role that they play in officer discipline,

15  as well as our risk management system, again, an ever-evolving

16  and improving system.

17      I am pleased to see how evolutions in that risk management

18  system is continuing to increase the number of officers that

19  have been identified for early intervention for monitoring and

20  coaching.  Last year a total of 55 officers were identified and

21  supported through this process.  And I intend to continue to

22  see whether that correlation results in, also, reductions in

23  the undesirable behaviors.

24      So those are just some of the systems that I see working

25  and some of the work that I believe is ahead.

**PROCEEDINGS**

1    I do want to end by just saying what I appreciate about

2    this chief of police.  I have worked for the City of Oakland

3    for 20 years.  During that time, I have known well and worked

4    with six police chiefs and all five interim chiefs.  And I

5    apologize in advance to them for what I'm about to say:  I have

6    not worked with a chief who possesses such a strong desire and

7    heart to make these reforms, and possesses the ability and

8    skill to start changing the culture within the Department with

9    the rank and file.  I have seen leaders that have had one or

10   the other, but not so much of both.

11   Oakland is a city that is full of community that is

12   fiercely passionate about civil rights, social justice, and

13   racial justice.  There will always be external forces,

14   including politicians, that will demand these kinds of outcomes

15   and behaviors.  I believe that what has failed in the past is

16   leadership that has put in internal structures that will last,

17   as well as reform the culture.  I am encouraged by what I see

18   and I have seen a lot.

19   I am happy to answer any questions.

20   **THE COURT:**  I don't have any questions.  I appreciate

21   your time and your perspective.  And I very much appreciate the

22   work that you have to do, all the different demands that a

23   mayor has to face, particularly in complex cities.  I just want

24   to commend you for that.

25   And I want to add my perspective.  The buck stops with

1   you.  You are the mayor and the successes of the police

2   department reflect on you and the failures of the department to

3   meet the obligations that it has under the NSA also stop with

4   you.  And so, I appreciate your goals and I think they are

5   great, and they are not for the chief to make for you.  They

6   are for you to make for the City of Oakland.

7         And so thank you for being here and giving me that

8   perspective, because it's a very helpful one.  And if all of

9   the things that you and the chief have laid out for me today

10  can come to pass, I will be as happy as -- there will be a lot

11  of happy people in this room, but I will be as happy as any of

12  them.

13         **MS. SCHAAF:**  Thank you.

14         **THE COURT:**  Thank you all very much.  Final thing is

15  December 18th, will be our next status.

16         **MR. CHANIN:**  December 18?

17         **THE COURT:**  December 18th, 3:30.

18      Thank you all very much.

19              (Proceedings adjourned at 5:00 p.m.)

20                   ---o0o---

21

22

23

24

25

## <u>**CERTIFICATE OF REPORTER**</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Thursday, August 29, 2019

_____

Ruth Levine Ekhaus, RDR, FCRR, CSR No. 12219
Official Reporter, U.S. District Court