October 25, 2019

# Sixty-Fourth Report *of the* Independent Monitor *for the* Oakland Police Department

## Introduction

This is our sixty-fourth status report on the Negotiated Settlement Agreement (NSA) in the case of *Delphine Allen, et al., vs. City of Oakland, et al.,* in the United States District Court for the Northern District of California under the direction of Judge William H. Orrick. I was appointed in 2010 to oversee the monitoring process of the Oakland Police Department (OPD) that began in 2003.

This report covers our site visit of August 21-22, 2019; and describes our recent assessments of NSA Tasks 2, 5, 20, and 41. Following the Court's Order of May 21, 2015, we devote special attention to the most problematic component parts of the Tasks that are not yet in full or sustained compliance; and discuss in our status reports the most current information regarding the Department's progress with the NSA and its efforts at making the reforms sustainable.

As noted previously, the Court expressed its concerns in a November 2018 Case Management Conference, following our special assessment of use of force, which was prompted by an unexplained reduction of 75% in reported use of force during the period 2012-2017. As a result of these concerns, the Court reactivated Tasks 24 (Use of Force Reporting Policy), 25 (Use of Force Investigation and Report Responsibilities), and 31 (Officer-Involved Shooting Investigations). We will include assessments of these Tasks in future status reports.

### *Increasing Technical Assistance*

Each month, our Team conducts a visit to Oakland that includes both compliance assessments and technical assistance. During our visits, we meet with Department and City officials; observe Department meetings and technical demonstrations; review Departmental policies; conduct interviews and make observations in the field; and analyze OPD documents and files, including misconduct investigations, use of force reports, crime and arrest reports, Stop Data Forms, and other documentation. We also provide technical assistance in additional areas, especially those that relate to the remaining non-compliant Tasks or areas identified by the Department.

We recently provided technical assistance to OPD officials in the areas of IAD investigation quality (Task 5); use of force investigations (Tasks 24 and 25); stop data and related issues (Task 34); risk management and the ongoing maintenance issues and development of the Performance Reporting Information Metrics Environment (PRIME) system, now called Vision (Task 41); and several Department policies and procedures, including policies related to PRIME, officer discipline, use of force, probationers and parolees, handcuffing, the use of armored vehicles, and the use of electronic control weapons.

## *Building Internal Capacity at OPD*

Also per the May 21, 2015 Court Order, we continue to work closely with the Office of Inspector General's (OIG) lieutenant and staff to identify areas that it should audit or review – and to help design approaches to these audits that are not cumbersome, so as to ensure sustainability. We review OIG's quarterly progress reports, which are a valuable resource and assist us in assessing compliance with NSA requirements.

## *Focused Task Assessments*

## Task 2:  Timeliness Standards and Compliance with IAD Investigations

**Requirements:**

*Fairness to complainants, members/employees and the public requires that internal investigations be completed in a timely fashion.*

1. *On or before December 1, 2003, OPD shall develop policies regarding timeliness standards for the completion of Internal Affairs investigations, administrative findings and recommended discipline.*

2. *Compliance with these timeliness standards shall be regularly monitored by IAD command and the Department's command staff.  If IAD experiences an unusual proliferation of cases and/or workload, IAD staffing shall be increased to maintain timeliness standards.*

(Negotiated Settlement Agreement III. B.)

**Relevant Policy:**

OPD most recently revised Departmental General Order M-03, *Complaints Against Department Personnel and Procedures*, which incorporates the requirements of Task 2, on December 22, 2017.

**Commentary:**

**Task 2.1** requires that internal investigations (IAD and Division Level) – including review, approval, findings, and discipline – be completed in accordance with the timeliness standards developed by OPD.  To assess this subtask, we reviewed a list of all internal investigations resulting in formal findings (unfounded, sustained, exonerated, or not sustained) that were approved in May, June, and July 2019, and calculated the number of days between the complaint date and the approval date for each case.  We excluded from the dataset cases that were administratively closed, those that involved on-duty traffic accidents or service complaints, and those that did not involve Manual of Rules (MoR) violations.  We segregated the remaining cases into Class I or Class II categories.  If a case involved at least one alleged Class I violation, we classified it as Class I.

OPD policy requires that at least 85% of Class I misconduct investigations and at least 85% of Class II misconduct investigations must be completed within 180 days to be considered timely.  Per DGO M-03, Class I offenses "are the most serious allegations of misconduct and, if sustained, shall result in disciplinary action up to and including dismissal and may serve as the basis for criminal prosecution."  Class II offenses include "all minor misconduct offenses."  Of the 89 Class I cases we reviewed for this assessment, only 30, or 34%, were in compliance with established timelines.  This represents a mere five-percentage-point improvement over what we found during our last review of Task 2, and it is still far below compliance.  One of the Class I cases was completed in exactly 180 days.  Of the 156 Class II cases we reviewed, only 56, or 36%, were in compliance with established timelines.  While this represents slight improvement over what we found during our last review of Task 2, when we found that only 23% of Class II cases were in compliance with established timelines, it is also still far below compliance.  Four of the Class II cases were completed in exactly 180 days.

Per DGO M-03, "In cases with a sustained finding, the discipline recommendation process shall be completed within 30 calendar days of the sustained finding."  We reviewed all 35 cases including a total of 64 sustained findings that were approved in May, June, and July 2019; 16 cases involved multiple sustained findings.  Of these 35 cases, 34 (97%) were in compliance with established discipline timelines.   The discipline recommendation process for one case, which included eight sustained findings and resulted in an officer's termination, took 36 days.

OPD is not in compliance with Task 2.1.

Task 2.2 requires that IAD and OPD command staff regularly monitor compliance with these timeliness standards.  The primary responsibility for monitoring compliance with timeliness standards rests with IAD, whether investigations are conducted by IAD personnel or via Division-level investigation.  As part of this monitoring, the IAD Commander discusses pending deadlines for key open investigations during IAD's weekly meetings with the Chief; the deadlines are also reflected in written agendas for these meetings.  A Monitoring Team representative regularly attends these weekly meetings.  IAD also occasionally, as needed, emails individual reminders on cases approaching due dates to investigators and their supervisors.  The Department is in compliance with Task 2.2.

Task 2.3 requires that if IAD experiences an unusual proliferation of cases and/or workload, IAD staffing be increased to maintain timeliness standards. IAD recently enlisted sergeants and lieutenants to review completed Division-level investigations when it faced a backlog of over 100 cases. Over the next few months, we will review a sample of these "backlog" cases to determine if they are in compliance with Task 2 timeliness standards and other standards required by other NSA Tasks.

| **Task 2 compliance status** | Not in compliance |
|---|---|

## Task 5: Complaint Procedures for IAD

**Requirements:**

*1. On or before December 1, 2003, OPD shall develop a policy so that, OPD personnel who become aware that a citizen wishes to file a complaint shall bring such citizen immediately, or as soon as circumstances permit, to a supervisor or IAD or summon a supervisor to the scene. If there is a delay of greater than three (3) hours, the reason for such delay shall be documented by the person receiving the complaint. In the event that such a complainant refuses to travel to a supervisor or to wait for one, the member/employee involved shall make all reasonable attempts to obtain identification, including address and phone number, as well as a description of the allegedly wrongful conduct and offending personnel, from the complainant and any witnesses. This information, as well as a description of the complaint, shall immediately, or as soon as circumstances permit, be documented on a Complaint Form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander, and shall be treated as a complaint. The supervisor or appropriate Area Commander notified of the complaint shall ensure the Communications Division is notified and forward any pertinent documents to the IAD.*

*2. An on-duty supervisor shall respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest. The supervisor shall ensure the Communications Division is notified and forward any pertinent documents to the IAD. All other misconduct complaints by a jail inmate shall be handled in the same manner as other civilian complaints.*

*3. In each complaint investigation, OPD shall consider all relevant evidence, including circumstantial, direct and physical evidence, and make credibility determinations, if feasible. OPD shall make efforts to resolve, by reference to physical evidence, and/or use of follow-up interviews and other objective indicators, inconsistent statements among witnesses.*

*4. OPD shall develop provisions for the permanent retention of all notes, generated and/or received by OPD personnel in the case file.*

5. OPD shall resolve each allegation in a complaint investigation using the "preponderance of the evidence" standard. Each allegation shall be resolved by making one of the following dispositions: Unfounded, Sustained, Exonerated, Not Sustained, or Administrative Closure. The Department shall use the following criteria for determining the appropriate disposition:

   a. *Unfounded:* The investigation disclosed sufficient evidence to determine that the alleged conduct did not occur. This finding shall also apply when individuals named in the complaint were not involved in the alleged act.

   b. *Sustained:* The investigation disclosed sufficient evidence to determine that the alleged conduct did occur and was in violation of law and/or Oakland Police Department rules, regulations, or policies.

   c. *Exonerated:* The investigation disclosed sufficient evidence to determine that the alleged conduct did occur, but was in accord with law and with all Oakland Police Department rules, regulations, or policies.

   d. *Not Sustained:* The investigation did not disclose sufficient evidence to determine whether or not the alleged conduct occurred.

   e. *Administrative Closure:* The investigation indicates a service complaint, not involving an MOR violation, was resolved without conducting an internal investigation; OR

   f. To conclude an internal investigation when it has been determined that the investigation cannot proceed to a normal investigative conclusion due to circumstances to include but not limited to the following:

      1) Complainant wishes to withdraw the complaint and the IAD Commander has determined there is no further reason to continue the investigation and to ensure Departmental policy and procedure has been followed;

      2) Complaint lacks specificity and complainant refuses or is unable to provide further clarification necessary to investigate the complaint;

      3) Subject not employed by OPD at the time of the incident; or

      4) If the subject is no longer employed by OPD, the IAD Commander shall determine whether an internal investigation shall be conducted.

      5) Complainant fails to articulate an act or failure to act, that, if true, would be an MOR violation; or

      6) Complaints limited to California Vehicle Code citations and resulting tows, where there is no allegation of misconduct, shall be referred to the appropriate competent authorities (i.e., Traffic Court and Tow Hearing Officer).

   g. *Administrative Closures shall be approved by the IAD Commander and entered in the IAD Complaint Database.*

 6. *The disposition category of "Filed" is hereby redefined and shall be included under Administrative Dispositions as follows:*

   a. *An investigation that cannot be presently completed. A filed investigation is not a final disposition, but an indication that a case is pending further developments that will allow completion of the investigation.*

   b. *The IAD Commander shall review all filed cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed and may direct the closure or continuation of the investigation.*

 7. *Any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken. However, investigators, with the approval of an IAD Commander, are not required to interview and/or take a recorded statement from a member or employee who is the subject of a complaint or was on the scene of the incident when additional information, beyond that already provided by the existing set of facts and/or documentation, is not necessary to reach appropriate findings and conclusions.*

(Negotiated Settlement Agreement III. E.)

### Relevant Policy:

There are six Departmental policies that incorporate the requirements of Task 5: Department General Order M-03, *Complaints Against Department Personnel and Procedures* (published December 6, 2005 and revised most recently on August 22, 2013); Communications Division Policy & Procedures C-02, *Receiving and Logging Complaints Against Personnel and Use of Force Incidents* (published April 6, 2007); Training Bulletin V-T.1, *Internal Investigation Procedure Manual* (published June 1, 2006); Special Order 8270, *Booking of Prisoners at the Glenn E. Dyer Detention Facility* (published June 24, 2005); Special Order 8565, *Complaints Against Department Personnel* (published May 11, 2007); and IAD Policy & Procedures 05-02, *IAD Investigation Process* (published December 6, 2005). In addition, NSA stipulations issued on December 12, 2005 and March 13, 2007 incorporate the requirements of this Task.

### Commentary:

Task 5 consists of several subtasks, briefly described below. Based on OPD's compliance history with many of the subtasks, not all are being actively monitored at this time.

**Task 5.1** requires that when a citizen wishes to file a complaint, the citizen is brought to a supervisor or IAD, or a supervisor is summoned to the scene. **Task 5.2** requires that if there is a delay of greater than three hours in supervisory response, the reason for the delay must be documented. **Task 5.3** requires that where a complainant refuses to travel to a supervisor, or wait for one, personnel make all reasonable attempts to obtain specific information to assist in investigating the complaint. **Task 5.4** requires that specific information be documented on a complaint form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander. **Task 5.5** requires that the supervisor or Area Commander notify Communications and forward any pertinent documents to IAD.

To assess compliance with Tasks 5.1 through 5.5, we reviewed the Daily Incident Logs (DILs) prepared by the Communications Division and forwarded to IAD each business day. The DIL form has been modified several times during our tenure to elicit "forced responses" that gather all of the information required to evaluate compliance with these Tasks. These modifications have significantly enhanced OPD's ability to document compliance by properly filling out and distributing the logs, and compliance rates with these subtasks have been near 100% for several years. Consequently, we no longer actively assess OPD's compliance with these subtasks, but we continue to receive both the DILs and Daily Complaint Referral Logs (used to document when Information Business Cards [IBCs] are provided to citizens in lieu of a complaint forms). We spot-check these forms regularly to verify that the quality of their completion has not diminished. OPD remains in compliance with Tasks 5.1 through and including Task 5.5.

**Task 5.6** requires that an on-duty supervisor respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest of the inmate. This subtask has not been actively monitored since December 2014, though because of our sampling process we have reviewed cases applicable to this requirement in recent reports.

**Task 5.12** requires that the Watch Commander ensure that any complaints that are applicable to Task 5.6 are delivered to and logged with IAD. Under current policy, the Communications Division must record on the DILs complaints that are received and/or handled by on-duty supervisors, and the DILs is forwarded daily to IAD.

OPD remains in compliance with Tasks 5.6 and 5.12.

**Task 5.15** through **Task 5.19**, and **Task 5.21,** collectively address the quality of completed IAD investigations, and therefore remain the subject of our focused Task assessments. To assess compliance with these Tasks, we reviewed 25 IAD cases that were approved in January, February, March, and April 2019. This sample included investigations completed by IAD and Division-level investigations (DLIs). It also included cases that were resolved via formal investigation and investigations that were resolved via summary finding.[1]

Together, **Tasks 5.15** and **Task 5.16** require that OPD: gathers all relevant evidence; conducts follow-up interviews where warranted; adequately considers the evidence gathered; makes credibility assessments where feasible; and resolves inconsistent statements.

---

[1] Summary findings are investigations in which the Department believes a proper conclusion can be determined based on a review of existing documentation with limited or no additional interviews and follow-up.

In all of the cases we reviewed, we believe that OPD gathered all relevant evidence available. As we often find, in many of the cases, video and/or audio recordings proved to be a significant factor in allowing OPD to reach an appropriate conclusion.  In two cases, we do not believe investigators adequately considered the evidence at hand.  In one of these cases, we disagreed with the findings.  In another, we do not believe all allegations were identified or investigated.

Investigators conducted follow-up interviews to seek clarification or resolve inconsistencies in four of the 25 cases we reviewed.  In two cases, the complainants were interviewed twice; in one case, the complainant was interviewed three times; and in the fourth case, both the complainant and a subject officer were interviewed twice.

OPD made credibility assessments for all involved parties in 11 of the 25 cases.  Seven cases were approved for summary finding; and per policy, investigators are not required to assess the credibility of the involved officers and civilians in these instances.  Six cases were resolved via either informal complaint resolution (ICR) or administrative closure.  In one case, there was no credibility assessment for a witness.  When we raised this during one of our regular case feedback sessions, IAD retroactively added it to the file.  In one case, we found the credibility assessments to be boilerplate, citing statements that were "consistent with the evidence and witnesses," even though the police witnesses and a civilian witness disagreed on what occurred.

In six cases, the complainants were deemed not credible, and in two cases, the subject officers were deemed not credible.  We agreed with these assessments, based on PDRD videos and other available evidence.

In 15 of the 25 cases we reviewed, OPD successfully resolved inconsistent statements.  In 12 of the cases, PDRD recordings were available and assisted in the determination.  In another case, video evidence from other sources was used.  In another case, a recorded call to Communications allowed for a definitive conclusion.  Four cases resulted in at least one finding of not sustained. Not sustained is an acceptable finding, and by definition, it implies that inconsistencies were not resolved despite investigative efforts.

**Task 5.17** requires that OPD permanently retain all notes generated and/or received by OPD personnel in the case file.  OPD personnel document that all investigative notes are contained within a particular file by completing an Investigative Notes Declaration Form.  OPD has a sustained history of 100% compliance with this subtask.  During this reporting period, the form was again properly completed in all of the cases we reviewed.

**Task 5.18** requires that OPD resolve each allegation in a complaint investigation using the preponderance of the evidence standard.  **Task 5.19** requires that each allegation of a complaint is identified and resolved with one of the following dispositions: unfounded; sustained; exonerated; not sustained; or administrative closure.  Our sample of 25 cases contained 102 allegations that received dispositions as follows: 20 exonerated; 48 unfounded; seven not sustained; 10 sustained; and 17 administratively closed (five of these by ICR).

In one case, we believe a potential use of force warranted further investigation.  Officers struggled with an arrestee in a DUI processing room in the North County Jail as they attempted to get her to comply with a court-ordered blood draw.  While the investigator noted the struggle, he indicated, "[I]t was unclear if any force was used against the complainant."  The case was initially approved for a summary finding.  That approval was probably appropriate given the

allegations (which did not involve force) and the availability of Portable Digital Recording Device (PDRD) and jail video. However, the investigator and/or IAD reviewers should have realized that the discovered use of force should have been investigated and a finding reached. If there was any uncertainty as to what occurred, the involved officers should have been interviewed, negating the initial approach of a summary finding.

We disagreed with the findings in one of the cases we reviewed. The investigation was thorough and complete, and the officer was sustained for two of the three allegations. While the case resulted in the officer's termination, we believe the remaining allegation should have been sustained, as well, rather than not sustained. As is our ongoing practice, we will discuss the cases we reviewed in detail with OPD personnel during our upcoming site visit.

**Task 5.20** requires that the IAD Commander review all "filed" cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed. A filed case is defined as an investigation that cannot be presently completed and is pending further developments that will allow completion of the investigation; filed is not a final disposition. Traditionally, as part of our review of this Task, we also reviewed cases that are tolling. OPD defines a tolled case as an administrative investigation that has been held in abeyance in accordance with one of the provisions of Government Code Section 3304. While we are no longer actively assessing this subtask, we note that filed and tolling cases are reviewed with the Chief during her weekly IAD meetings and are listed by case number on the printed meeting agendas. We receive and review these agendas regularly, and a Monitoring Team member often attends these meetings. Additionally, we now receive a weekly report listing all tolled cases and all cases approaching their 3304 dates. If we have questions regarding any of the cases in the report, the IAD Commander answers them promptly.

**Task 5.21** requires that any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken. However, with the approval of the IAD Commander or his designee, investigators are not required to interview and/or take a recorded statement in all cases. For example, interviews are not needed from a member or employee who is the subject of a complaint, or who was on the scene of the incident when additional information – beyond that already provided by the existing set of facts and/or documentation – is not necessary to reach appropriate findings and conclusions. Six of the 25 cases we reviewed were resolved via summary finding, and all were appropriately approved for such closure. In all of these cases, the availability of video and/or audio recordings was the primary reason interviews were unnecessary. As noted above, while one case was properly approved for a summary finding, developments during the investigation warranted rescinding this status and interviewing the officers involved.

| **Task 5 compliance status** | Deferred, based on the provisions of the March 23, 2016 Order, our general concerns, and the findings of our forthcoming analysis of the Department's investigation of the officer-involved shooting of March 11, 2018. |

## Task 20:  Span of Control

**Requirements:**

*On or before August 14, 2003, OPD shall develop and implement a policy to ensure appropriate supervision of its Area Command Field Teams.  The policy shall provide that:*

1. *Under normal conditions, OPD shall assign one primary sergeant to each Area Command Field Team, and, in general, (with certain exceptions) that supervisor's span of control shall not exceed eight (8) members.*

2. *During day-to-day operations, in the absence of the primary supervisor (e.g., due to sickness, vacation, compensatory time off, schools, and other leaves), the appropriate Area Commander shall determine, based on Department policy and operational needs, whether or not to backfill for the absence of the sergeant on leave.*

3. *If a special operation, (e.g., Beat Feet, Special Traffic Offenders Program (STOP), etc.) requires more than eight (8) members, the appropriate Area Commander shall determine the reasonable span of control for the supervisor.*

4. *If long-term backfill requires the loan or transfer of a supervisor from another unit, the Chief of Police and/or the Deputy Chief of Police shall make that decision.*

(Negotiated Settlement Agreement IV. C.)

**Relevant Policy:**

Three Departmental policies incorporate the requirements of Task 20: Departmental General Order A-19, *Supervisory Span of Control,* issued on July 26, 2006; Departmental General Order D-13, *Assignment to Acting Higher Rank or Classification,* issued on June 17, 1999; and Departmental General Order D-13.1, *Assignment to Acting Sergeant of Police,* issued on May 14, 2014.  (The publication of DGO D-13.1 cancelled Special Order 8435, which previously governed the selection process of acting sergeants.)

**Commentary:**

To assess these requirements for this report, we reviewed spreadsheets prepared by the Department for the months of April, May, and June 2019 that, by date, note which type of sergeant supervised each applicable squad – a primary sergeant, relief sergeant, acting sergeant, other sergeant (one working overtime), or none.  (The Department refers to unsupervised squads as "open.")  We calculated per squad the compliance percentages for this subtask during this time period.  Each of the 49 applicable squads were in compliance – that is, all applicable squads during this time period were supervised by either a primary, relief, or other/overtime sergeant for at least 85% of their working shifts.  We also found that none of the applicable squads exceeded the required 1:8 supervisor to officer ratio at least 90% of their working shifts.

OPD continues to be in compliance with these requirements. The Department has institutionalized the practices of tracking how each squad is supervised each day; planning, when possible, for expected absences; and considering how to fill in for personnel who are absent unexpectedly.

| **Task 20 compliance status** | In compliance |
|---|---|

## Task 41: Use of Personnel Assessment System (PAS) and Risk Management

**Requirements:**

*Within 375 days from the effective date of this Agreement, OPD shall develop a policy for use of the system, including supervision and audit of the performance of specific members, employees, supervisors, managers, and OPD units, as well as OPD as a whole.*

*The policy shall include the following elements:*

1. *The Chief of Police shall designate a PAS Administration Unit. The PAS Administration Unit shall be responsible for administering the PAS policy and, no less frequently than quarterly, shall notify, in writing, the appropriate Deputy Chief/Director and the responsible commander/manager of an identified member/employee who meets the PAS criteria. PAS is to be electronically maintained by the City Information Technology Department.*

2. *The Department shall retain all PAS data for at least five (5) years.*

3. *The Monitor, Inspector General and Compliance Coordinator shall have full access to PAS to the extent necessary for the performance of their duties under this Agreement and consistent with Section XIII, paragraph K, and Section XIV of this Agreement.*

4. *PAS, the PAS data, and reports are confidential and not public information.*

5. *On a quarterly basis, commanders/managers shall review and analyze all relevant PAS information concerning personnel under their command, to detect any pattern or series of incidents which may indicate that a member/employee, supervisor, or group of members/employees under his/her supervision may be engaging in at-risk behavior. The policy shall define specific criteria for determining when a member/employee or group of members/employees may be engaging in at-risk behavior.*

6. *Notwithstanding any other provisions of the PAS policy to be developed, the Department shall develop policy defining peer group comparison and methodology in consultation with Plaintiffs' Counsel and the IMT. The policy shall include, at a minimum, a requirement that any member/employee who is identified using a peer group comparison methodology for complaints received*

    *during a 30-month period, or any member who is identified using a peer group comparison methodology for Penal Code §§69, 148 and 243(b)(c) arrests within a 30-month period, shall be identified as a subject for PAS intervention review. For the purposes of these two criteria, a single incident shall be counted as "one" even if there are multiple complaints arising from the incident or combined with an arrest for Penal Code §§69, 148 or 243(b)(c).*

7. *When review and analysis of the PAS threshold report data indicate that a member/employee may be engaging in at-risk behavior, the member/employee's immediate supervisor shall conduct a more intensive review of the member/employee's performance and personnel history and prepare a PAS Activity Review and Report. Members/employees recommended for intervention shall be required to attend a documented, non-disciplinary PAS intervention meeting with their designated commander/manager and supervisor. The purpose of this meeting shall be to review the member/employee's performance and discuss the issues and recommended intervention strategies. The member/employee shall be dismissed from the meeting, and the designated commander/manager and the member/employee's immediate supervisor shall remain and discuss the situation and the member/employee's response. The primary responsibility for any intervention strategies shall be placed upon the supervisor. Intervention strategies may include additional training, reassignment, additional supervision, coaching or personal counseling. The performance of members/ employees subject to PAS review shall be monitored by their designated commander/manager for the specified period of time following the initial meeting, unless released early or extended (as outlined in Section VII, paragraph B (8)).*

8. *Members/employees who meet the PAS threshold specified in Section VII, paragraph B (6) shall be subject to one of the following options: no action, supervisory monitoring, or PAS intervention. Each of these options shall be approved by the chain-of-command, up to the Deputy Chief/Director and/or the PAS Activity Review Panel.*

    *Members/employees recommended for supervisory monitoring shall be monitored for a minimum of three (3) months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor. The first at the end of one (1) month and the second at the end of three (3) months.*

    *Members/employees recommended for PAS intervention shall be monitored for a minimum of 12 months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor and designated commander/manager: The first at three (3) months and the second at one (1) year. Member/employees subject to PAS intervention for minor, easily correctable performance deficiencies may be dismissed from the jurisdiction of PAS upon the written approval of the member/employee's responsible Deputy Chief, following a recommendation in writing from the member/employee's immediate supervisor. This may occur at the three (3)-month follow-up meeting*

*or at any time thereafter, as justified by reviews of the member/employee's performance. When a member/employee is not discharged from PAS jurisdiction at the one (1)-year follow-up meeting, PAS jurisdiction shall be extended, in writing, for a specific period in three (3)-month increments at the discretion of the member/employee's responsible Deputy Chief. When PAS jurisdiction is extended beyond the minimum one (1)-year review period, additional review meetings involving the member/employee, the member/ employee's designated commander/manager and immediate supervisor, shall take place no less frequently than every three (3) months.*

9. *On a quarterly basis, Division/appropriate Area Commanders and managers shall review and analyze relevant data in PAS about subordinate commanders and/or managers and supervisors regarding their ability to adhere to policy and address at-risk behavior. All Division/appropriate Area Commanders and managers shall conduct quarterly meetings with their supervisory staff for the purpose of assessing and sharing information about the state of the unit and identifying potential or actual performance problems within the unit. These meetings shall be scheduled to follow-up on supervisors' assessments of their subordinates' for PAS intervention. These meetings shall consider all relevant PAS data, potential patterns of at-risk behavior, and recommended intervention strategies since the last meeting. Also considered shall be patterns involving use of force, sick leave, line-of-duty injuries, narcotics-related possessory offenses, and vehicle collisions that are out of the norm among either personnel in the unit or among the unit's subunits. Division/appropriate Area Commanders and managers shall ensure that minutes of the meetings are taken and retained for a period of five (5) years. Commanders/managers shall take appropriate action on identified patterns of at-risk behavior and/or misconduct.*

10. *Division/appropriate Area Commanders and managers shall meet at least annually with his/her Deputy Chief/Director and the IAD Commander to discuss the state of their commands and any exceptional performance, potential or actual performance problems or other potential patterns of at-risk behavior within the unit. Division/appropriate Area Commanders and managers shall be responsible for developing and documenting plans to ensure the managerial and supervisory accountability of their units, and for addressing any real or potential problems that may be apparent.*

11. *PAS information shall be taken into account for a commendation or award recommendation; promotion, transfer, and special assignment, and in connection with annual performance appraisals. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

12. *Intervention strategies implemented as a result of a PAS Activity Review and Report shall be documented in a timely manner.*

13. *Relevant and appropriate PAS information shall be taken into account in connection with determinations of appropriate discipline for sustained misconduct allegations. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

14. *The member/employee's designated commander/manager shall schedule a PAS Activity Review meeting to be held no later than 20 days following notification to the Deputy Chief/Director that the member/employee has met a PAS threshold and when intervention is recommended.*

15. *The PAS policy to be developed shall include a provision that a member/employee making unsatisfactory progress during PAS intervention may be transferred and/or loaned to another supervisor, another assignment or another Division, at the discretion of the Bureau Chief/Director if the transfer is within his/her Bureau. Inter-Bureau transfers shall be approved by the Chief of Police. If a member/employee is transferred because of unsatisfactory progress, that transfer shall be to a position with little or no public contact when there is a nexus between the at-risk behavior and the "no public contact" restriction. Sustained complaints from incidents subsequent to a member/employee's referral to PAS shall continue to result in corrective measures; however, such corrective measures shall not necessarily result in a member/employee's exclusion from, or continued inclusion in, PAS. The member/employee's exclusion or continued inclusion in PAS shall be at the discretion of the Chief of Police or his/her designee and shall be documented.*

16. *In parallel with the PAS program described above, the Department may wish to continue the Early Intervention Review Panel.*

17. *On a semi-annual basis, beginning within 90 days from the effective date of this Agreement, the Chief of Police, the PAS Activity Review Panel, PAS Oversight Committee, and the IAD Commander shall meet with the Monitor to review the operation and progress of the PAS. At these meetings, OPD administrators shall summarize, for the Monitor, the number of members/employees who have been identified for review, pursuant to the PAS policy, and the number of members/employees who have been identified for PAS intervention. The Department administrators shall also provide data summarizing the various intervention strategies that have been utilized as a result of all PAS Activity Review and Reports. The major objectives of each of these semi-annual meetings shall be consideration of whether the PAS policy is adequate with regard to detecting patterns of misconduct or poor performance issues as expeditiously as possible and if PAS reviews are achieving their goals.*

> 18.  *Nothing in this Agreement, and more specifically, no provision of PAS, shall be construed as waiving, abrogating or in any way modifying the Department's rights with regard to discipline of its members/employees. The Department may choose, at its discretion, to initiate the administrative discipline process, to initiate PAS review or to use both processes concurrently or consecutively.*

(Negotiated Settlement Agreement VII. B.)

**Relevant Policy:**

OPD revised and issued Departmental General Order D-17, *Personnel Assessment Program,* in November 2013.

**Commentary:**

OPD continues to move forward, albeit more slowly than was anticipated, with the development of the new risk management database and the associated analytic tools. After first anticipating implementation of the system in July, and then October, the City now reports that implementation is slated for November. The Department is continuing its user acceptance testing and training staff. As the teams of professional developers release their work to users, undoubtedly, real challenges should be expected and additional delays may occur. They will likely add to the long list of challenges that impacted progress over the last several years, since enthusiasm for the now-abandoned PRIME system waned.

As implementation approaches, the Department is shoring up the information-related infrastructure upon which the system will rest. This is evident in the ongoing commitment to the regular Department-wide Risk Management Meetings and the extension of those meetings to the Area level. OIG is currently clarifying the methodology and definitions of terms used in the risk management process.

Consensus around such ideas as norming data to allow comparisons of rates of complaints and rates of force being used will be critical to tracking levels of risk and the Departmental responses. The standardization of the methods and definitions involved may help address the occasional problems of shifting interpretations that have sometimes led to confusion. Of course, on balance, the Department's risk management system must also support the increasing depth of analyses over time, and avoid overly rigid restrictions of understanding.

That last point may be illustrated in the data presented in the Department's ongoing biweekly compliance reports. Among other things, these reports present data on uses of force and now show large increases in their number. This is driven largely by Level 4 uses of force, involving the pointing of a firearm. That, in turn, appears to be the result of policy and practice changes which resulted from the recent OIG use of force audit.

Time series analyses provide the most useful way of tracking risk and response in the Department but must also recognize, without dismissing the value of, any unusual patterns. In this particular case, the increases in reported Level 4s has had the potentially beneficial effect of raising concern that further training and better documentation may be useful at reducing the number of these events. We will follow that process closely.

We have also been interested in following the progress of the risk management process as it has incorporated Risk Management Meetings at the Area level. We have had the opportunity to review the risk management data for these meetings and to observe these meetings, either in person or via telephone.

The Area meetings have the virtue of expanding participation in the review process through the addition of more sergeants and lieutenants, and by setting higher expectations for their engagement in risk management. These meetings also appear to differ in important ways from the larger Department-wide meetings. The smaller size of these meetings allows for more extensive and less formal conversations about risk. They encourage supervisors to know their officers well; and to understand their strengths, as well as their potential for improvement. While it may have originally been expected that these meetings would simply be smaller versions of the Department-wide experience, they seem, instead, to be useful extensions of the larger meetings. At the Area meetings, more detailed and more directed examination of risk can occur.

Along with being able to observe their added value, review of the Area meetings also provide additional focus on the strengths and weaknesses of these meetings. Data on risk – as observed in complaints, uses of force, and stops of pedestrians and drivers – is the central element for discussion at the Area, as well as Departmental, Risk Management Meetings. The task at hand in these meetings is to understand the level of these indices and, particularly, their variation – over time, across Areas, across squads, and across officers.

The task, then, is to explain why things may be different and to determine if those differences may signal problems. But interpreting data can be difficult. At the Area meetings, participants are strongest in explaining overall levels of measures, but they are frequently less able to explain differences at the various levels. For example, high rates of "no action" are often explained as resulting from stops with multiple passengers where action is taken only against the driver, but stop data is collected on everyone. But that does not explain high levels of variation across Areas, squads, or officers.

Recognizing and trying to explain variation is key in risk management analyses. Data is a critical part of the risk management process and that will expand as the Vision system comes on line. The Department should seek ways to expand, at every level of the Department, the capacity for analysis of data. It is an overlooked but obvious training need, one that becomes more critical all the time.

| Task 41 compliance status | In compliance |

## Conclusion

In some ways, this may feel like a time of waiting for the Department.  Major projects that could revolutionize Oakland policing are in process, but they may seem slow in coming.  There have been delays in implementing the new risk management system, which is now slated for November.  It had been slated for implementation in July, and then the City modified that to October.  OPD must continue to address the serious concerns raised by the recent use of force audit conducted by OIG.  Several recent critical force incidents have not yet been fully investigated.  For the Department as a whole, while there has been some progress, important changes have yet to arrive.

There is work to be done.  That was the clear statement to come out of the August 21, 2019 Case Management Conference.  It is a time to be sure the Department gets the most out of its new technologies and data systems, a time for the risk management system to continue to prepare supervisors for their new roles and officers for new expectations. It is a time to strengthen internal investigations and to not rely solely on the Court, the Monitoring Team, and outside experts to identify Departmental problems.  It is a time to deal directly with the difficult issues of force, racial disparities in stops, and disparities in discipline.  It is a time to help new generations of Oakland police officers, who may know little of the events that led up to the NSA, to realize their goals as law enforcement professionals.  And, as always, it is a time to serve the community of Oakland.  As noted by the Court on August 21, 2019, the reforms are "achievable with leadership that demands the highest standards from itself and its officers.  Nothing less is going to make a difference."

*Robert S. Warshaw*

Chief (Ret.) Robert S. Warshaw
*Monitor*