December 19, 2019

# Sixty-Fifth Report *of the* Independent Monitor *for the* Oakland Police Department

## Introduction

This is our sixty-fifth status report on the Negotiated Settlement Agreement (NSA) in the case of *Delphine Allen, et al., vs. City of Oakland, et al.,* in the United States District Court for the Northern District of California under the direction of Judge William H. Orrick. I was appointed in 2010 to oversee the monitoring process of the Oakland Police Department (OPD) that began in 2003.

This report covers our site visit of October 29-30, 2019; and describes our recent assessments of NSA Tasks 24, 25, 26, and 30. Following the Court's Order of May 21, 2015, we devote special attention to the most problematic component parts of the Tasks that are not yet in full or sustained compliance; and discuss in our status reports the most current information regarding the Department's progress with the NSA and its efforts at making the reforms sustainable.

As noted previously, the Court in a November 2018 Case Management Conference reactivated Tasks 24 (Use of Force Reporting Policy), 25 (Use of Force Investigation and Report Responsibilities), and 31 (Officer-Involved Shooting Investigations). We will include our assessment of Task 31 in future status reports and will also reference the Task 31 requirements in a forthcoming review of the Department's most recent (March 2018) officer-involved shooting.

## *Increasing Technical Assistance*

Each month, our Team conducts a visit to Oakland that includes both compliance assessments and technical assistance. During our visits, we meet with Department and City officials; observe Department meetings and technical demonstrations; review Departmental policies; conduct interviews and make observations in the field; and analyze OPD documents and files, including misconduct investigations, use of force reports, crime and arrest reports, Stop Data Forms, and other documentation. We also provide technical assistance in additional areas, especially those that relate to the remaining non-compliant Tasks or areas identified by the Department.

We recently provided technical assistance to OPD officials in the areas of IAD investigation quality (Task 5); use of force investigations (Tasks 24 and 25); stop data and related issues (Task 34); risk management and the ongoing maintenance issues and development of the Performance Reporting Information Metrics Environment (PRIME) system, now called Vision (Task 41); and several Department policies and procedures, including policies related to PRIME, officer discipline, use of force, probationers and parolees, handcuffing, the use of armored vehicles, and the use of electronic control weapons.

*Building Internal Capacity at OPD*

Also per the May 21, 2015 Court Order, we continue to work closely with the Office of Inspector General's (OIG) lieutenant and staff to identify areas that it should audit or review – and to help design approaches to these audits that are not cumbersome, so as to ensure sustainability. We review OIG's quarterly progress reports, which are a valuable resource and assist us in assessing compliance with NSA requirements.

---

*Focused Task Assessments*

## Overview of Our Assessments of Tasks 24 and 25

OPD had been in compliance with Tasks 24 and 25 since 2015, and we were not actively reviewing these Tasks. On November 27, 2018, as a result of concerns that had been brought forward regarding the identification and investigation of uses of force, the Court reactivated Tasks 24 and 25. The Court expressed concerns about the potential underreporting of use of force based on the analysis completed by the Monitoring Team.

For purposes of this report, we reviewed 55 level 3 and Level 4 Use of Force (UOF) reports that were completed by OPD personnel during February and March 2019 to assess compliance with Tasks 24 and 25. We reviewed all incidents that involved at least one Level 3 use of force, and a sample of Level 4 uses of force. We also reviewed 10 Level 2 uses of force, for which an FRB was held between February and October 2019. The review of the Level 2 uses of force here includes only an assessment of the field investigation. Any identified concerns and final outcomes identified in FRBs we assess for Tasks 26 and 30.

Since we resumed these reviews following the Court's reactivation of these Tasks, we have provided detailed feedback on the force investigations to OPD during each of our site visits. In cases where we have had questions or concerns, OPD personnel have been responsive and provided follow-up where necessary. Many of the concerns we have noted in our reviews and discussions with OPD were also identified in the recent OIG audit on the use of force.

In late 2018, OPD employees received training on the requirements for use of force reporting related to the pointing of weapons. In April 2019, OPD issued an Information Bulletin that provided clarification and direction regarding the documentation of use of force. The content of this bulletin included many of the concerns we had identified with the proper reporting of force. OPD also drafted Special Order 9196 to address many of the concerns that have been identified. In addition, the Chief authored a directive email to personnel in June 2019 that specifically addressed boilerplate language in use of force reports; and in November 2019, the Chief sent an additional email to address the use of generic or boilerplate language in the administrative section of Department reports. The Department is currently revising its use of force policy, and we have provided our input during this process.

While this status report covers UOF reports completed prior to April 2019 – that is, before the majority of the interventions noted above occurred – we are hopeful that these actions by OPD will reduce future deficiencies in the reporting of force.

In our review of the 55 Level 3 and Level 4 uses of force reports completed in February and March 2019, we did not identify any incidents where we believe the use of force was inappropriate or excessive. In our review of Level 2 uses of force, we identified two instances where additional uses of force had been used and not reported. The Force Review Boards for these incidents addressed these additional uses of force. We did identify one incident where we believe the UOF should have been found out of policy. The Force Review Board found this force within policy. Details of this UOF and our findings are included in our assessment of FRBs, in Task 26.

In the Level 3 and Level 4 UOFs we reviewed, officers used force against 64 persons. In some cases, multiple officers used force on a single person; and in others, force was used on multiple persons, either by a single officer or multiple officers.

The total breakdown for the force used on the 64 persons is as follows: African American, 52%; Latino, 24%; White, 14%; and Asian or other, 10%. These percentages are similar to those reported in our sixty-third status report. Officers pointed a weapon at persons 74 times, an increase of 30 from what we found in our last review, documented in our sixty-third status report. We noted in our reviews for this report that there were several incidents that involved multiple suspects, prolonged incidents, or barricaded subjects, which resulted in numerous OPD personnel being involved. In these 74 instances, the breakdown is as follows: African American, 52%; Latino, 24%; White, 14%; and Asian or other, 10%. This is, again, generally consistent with the percentages reported in our sixty-third status report.

In the 55 Level 3 and 4 incidents, 40 persons on whom force was used were arrested or criminally charged for felony or misdemeanor violations. The remaining 15 involved mental health holds, inability to establish criminal conduct, subjects who escaped, victims who did not want to prosecute, or subjects determined not to be a suspect after investigation conducted. In eight of the incidents reviewed, a person claimed some type of injury. Some of the injuries required only first aid at the scene. In other incidents, persons were transported to a medical facility for treatment of minor injuries that did not require hospitalization, for the removal of a Taser probe, or solely to obtain a medical clearance.

As noted in our assessment of Task 25.3 in our sixty-first and sixty-third status reports, we again identified incidents in our reviews where we believe that additional verbal communications and explanation with persons who were contacted might result in a reduction in the need to use physical force, and incidents where OPD failed to identify themselves as police officers when contacting subjects. We have discussed this with OPD and will continue to monitor these types of instances; as is our practice during our monthly site visits, we will provide input to the Department. We continue to encourage OPD to consider whether additional training is needed for personnel on how to approach; and, when necessary, detain persons they encounter.

During our review of the 55 Level 3 and 4 use of force incidents, we again noted instances where it took multiple officers to control and secure combative persons.  In some of these instances, only a single officer who used an identified weaponless defense technique (leg sweep, arm bar, etc.) to overcome resistance was identified as having used force.  The officers who assisted in controlling the subject were listed only as witnesses.  The Department's pending revision to its use of force policy will clarify what constitutes a "reportable use of force" and provide clearer direction of the reporting of use of force.  We again note that this revision will undoubtedly and significantly *increase* the number of reportable uses of force.  OPD should track the revisions once implemented, to determine the effects that this and any other policy change have upon the reported use of force numbers.

We also continue to note in our reviews that officers use the administrative sections of their reports to document whether force was used, if force was observed, and if their PDRDs were activated.  Again, we found that this administrative section is sometimes inaccurate and does not reflect what occurred, even when the narrative for the reports may reflect accurate information.  In some cases, we also noted that officers indicated that their PDRDs were activated in this section, but failed to document that the PDRD had been activated late, or in some cases malfunctioned.  Using this "boilerplate" or "pat" language in the administrative section raises concerns about both the accuracy of reporting and the quality of supervisory reviews conducted.  As we noted in our sixty-third status report, these kinds of reporting deficiencies should not be occurring at this late stage of the NSA process.  OPD has addressed the concerns we have identified with the accuracy of reporting and boilerplate language with written directives to their personnel.  We will continue to discuss these kinds of cases with OPD during our upcoming site visit.

In 10 of the 55 investigations we reviewed, OPD personnel either failed to activate their PDRDs or activated them late.  This is a large number of deficiencies, especially considering the years that OPD has been using this technology.  In the majority of these cases, the supervisor addressed the issue with a Supervisory Note File (SNF).  We did note, however, that in some of these cases, the supervisor did not establish whether the officer had a pattern of failing to activate the PDRD prior to issuing the SNF.  We also noted two cases where the failure to activate, or late activation, was not addressed by the supervisor.  We have shared these specific incidents with OPD during our site visits, and they have since been addressed.  While we support OPD's use of SNFs to address some concerns – including failure to activate the PDRD, use of profanity, or proper use of tactics – it is only appropriate to do so if a pattern does not exist.  It remains critical that supervisors review prior work performance before determining how to handle those deficiencies they identify.

The use of force analysis we conducted last year established the underreporting of Level 4 uses of force where an officer pointed a weapon at a person.  Following our analysis, OPD partially addressed this concern with refresher training in September 2018 for all officers, and the Department will further address this issue in its use of force policy revisions.  In our review of cases for this report, we did not identify any instances where an officer failed to report the pointing of a weapon at a person.

Case 3:00-cv-04599-WHO   Document 1347   Filed 12/19/19   Page 5 of 16

Sixty-Fifth Report of the Independent Monitor for the Oakland Police Department
December 19, 2019
Page 5 of 16

In our review of OPD's 249th Biweekly Compliance Update, dated November 20, 2019, we noted that year to date in 2019, there were 1,277 Level 4 uses of force. There were 404 Level 4 uses of force during the same time period in 2018. As noted above, the Chief ordered refresher training on officers' use of firearms in September 2018, and the number of reported uses of force has increased dramatically since that time. OPD continues to note that the significant increase in Level 4 uses of force may be related to the potential underreporting of Level 4 - Type 22 pointing a weapon at a person prior to the refresher training.

In this same Compliance Update, OPD noted that there were 96 Level 3 uses of force, year to date for 2019. During the same time period in 2018, 66 Level 3 uses of force were reported. We previously asked OPD for any explanation for this increase. The Department identified that the most significant increase is in Level 3 - Type 16 use of force, which is a weaponless defense technique other than the use of a control hold. The other noted increase was in the use of Taser, Level 3 - Type 11 and 18. During our July 2019 site visit, OPD representatives cited multiple possible factors to account for this increase, including: lessons OPD personnel have learned from prior incidents; that officers are now more apt to identify the use of force; and that the Chief has given direction that if there is any doubt about whether the force used was reportable, it should be reported. Again, during our most recent site visit in November 2019, OPD told us they continue to believe the explanations previously provided are the likely causes for the increases in the reporting of both Level 3 and Level 4 uses of force.

As we have previously noted, the increases in the reported uses of force do not appear to signal a rise in actual use of force, but rather is a result of prior inaccurate reporting left unchecked by supervisory personnel. In addition, we have identified concerns with the investigative narratives, PRIME reports, and other documentation. OPD has now taken numerous steps to address the proper reporting of use of force and the concerns that have been identified during our reviews. The most significant steps, beyond the firearms training that occurred in late 2018, began in April 2019. Our next report including Tasks 24 and 25 will cover uses of force occurring in April and May 2019, and we are hopeful that we will start to see the impact of the directives from OPD executive staff in that review.

## Task 24: Use of Force Reporting Policy

**Requirements:**

> *The policy shall require that:*
>
> 1. *Members/employees notify their supervisor as soon as practicable following any investigated use of force or allegation of excessive use of force.*
>
> 2. *In every investigated use of force incident, every member/employee using force, and every member/employee on the scene of the incident at the time the force was used, shall report all uses of force on the appropriate form, unless otherwise directed by the investigating supervisor.*

3. *OPD personnel document, on the appropriate form, any use of force and/or the drawing and intentional pointing of a firearm at another person.*

4. *A supervisor respond to the scene upon notification of an investigated use of force or an allegation of excessive use of force, unless community unrest or other conditions makes this impracticable.*

5. *OPD notify:*

   a. *The Alameda County District Attorney's Office immediately or as soon as circumstances permit, following a use of lethal force resulting in death or injury likely to result in death.*

   b. *The City Attorney's Office as soon as circumstances permit following the use of lethal force resulting in death or serious injury. At the discretion of the City Attorney's Office, a Deputy City Attorney shall respond to the scene. The Deputy City Attorney shall serve only in an advisory capacity and shall communicate only with the incident commander or his/her designee.*

   c. *Departmental investigators regarding officer-involved shootings, in accordance with the provisions of Section V, paragraph H, of this Agreement.*

6. *OPD enter data regarding use of force into OPD's Personnel Assessment System (PAS).*

(Negotiated Settlement Agreement V. A.)

**Relevant Policy:**

OPD most recently revised Departmental General Order K-4, *Reporting and Investigating the Use of Force* on October 16, 2014. DGO K-4 incorporates the requirements of Task 24.

**Commentary:**

To assess compliance with Task 24, we reviewed 55 Level 3 and Level 4 Use of Force (UOF) reports that were completed by OPD during February and March 2019. We also reviewed 10 Level 2 UOF investigations, for which an FRB was held between February-October 2019. The review of Level 2 UOFs includes only an assessment of the field investigations.

**Task 24.1** requires that members/employees notify their supervisor as soon as practicable following any reportable use of force or allegation of excessive use of force. In all of the 65 UOF reports reviewed, notifications were made as required.

**Task 24.2** requires that in every reportable use of force incident, every member/employee on the scene of the incident at the time the force was used, reports all uses of force on the appropriate form, unless otherwise directed by the investigating supervisor. **Task 24.3** requires that OPD personnel document, on the appropriate form, every use of force and/or the drawing and intentional pointing of a firearm at another person.

In the 65 UOF incidents we reviewed, officers pointed weapons at persons 74 times. We determined that officers' pointing of their firearms was appropriate in all 74 instances we assessed. We did not identify any instance where a weapon was pointed at a subject and not reported as required. In six instances, officers who assisted in restraining a combative person did not report having used force. This continues to be a reoccurring issue and we have discussed these specific instances with OPD during our site visits. In its revisions to the UOF policy, the Department is providing clarification regarding reportable uses of force. We will continue to closely monitor these types of incidents to ensure that OPD personnel properly report these uses of force in the future.

**Task 24.4** requires that a supervisor respond to the scene upon notification of a Level 1, 2, or 3 use of force or an allegation of excessive use of force, unless community unrest or other conditions makes such a response impracticable. In the Level 2 and Level 3 uses of force we reviewed for this subtask, supervisors responded to the scene as required in all instances. In all but six of the Level 4 uses of force, a supervisor was also either on scene at the time of the use of force, or responded to the scene upon being notified of the use of force.

**Task 24.5** specifically addresses requirements for the response and handling of Level 1 uses of force. As previously noted, we are assessing these uses of force in Tasks 26 and 30.

**Task 24.6** requires that OPD enter all use of force data into Performance Reporting Information Metrics Environment (PRIME), which is now called Vision. In all 65 UOF cases we reviewed, the data was entered as required.

The Court's reactivation of Task 24 at a November 2018 Case Management Conference resulted from our serious concerns with the Department's handling and investigation of recent uses of force. OPD has drafted Special Order 9196 to address and clarify requirements for the proper reporting of use of force. OIG's recent audit also identified numerous concerns with the reporting of use of force and enumerated a number of recommendations. As noted above, OPD has taken a number of actions to address the identified concerns with the reporting of force, many of which were implemented after April 2019. It remains to be seen if these actions will result in a positive outcome on this issue. As a result, OPD remains in partial compliance with this Task.

| **Task 24 compliance status** | In partial compliance |

## Task 25: Use of Force Investigations and Report Responsibility

**Requirements:**

*An on-scene supervisor is responsible for completing an investigated use of force report in accordance with the provisions of Departmental General Order K-4, "Reporting and Investigating the Use of Force."*

1. *OPD shall develop and implement a policy for conducting and documenting use of force investigations that include, at a minimum:*

    a. *Documentation of the incident in either an Offense or Supplemental Report from the member(s)/employee(s) using force; and/or, when necessary, a statement taken from the member(s)/employee(s) using force;*

    b. *Separating and separately interviewing all officers who were at the scene at the time of the incident;*

    c. *A Supplemental Report from other members/employees on the scene or a statement taken, if deemed necessary by the investigating supervisor;*

    d. *Identification and interviews of non-Departmental witnesses;*

    e. *Consideration of discrepancies in information obtained from members, employees and witnesses, and statements in the reports filed;*

    f. *Whether arrest reports or use of force reports contain "boilerplate" or "pat language" (e.g., "fighting stance", "minimal force necessary to control the situation");*

    g. *Documentation of physical evidence and/or photographs and a summary and analysis of all relevant evidence gathered during the investigation; and*

    h. *Consideration of training/tactical issues involving the availability and practicality of other force options.*

    i. *Supervisor's justification as to why any element of the policy was not documented; and*

2. *All supervisors shall be trained in conducting use of force investigations and such training shall be part of a supervisory training course.*

3. *Use of force investigations shall include a recommendation whether the use of force was objectively reasonable and within Department policy and training. The recommendation shall be based on the totality of the circumstances and shall consider, but is not limited to, the following factors:*

    a. *Whether the force used was pursuant to a legitimate law-enforcement objective;*

    b. *Whether the type and amount of force used was proportional to the resistance encountered and reasonably related to the objective the*

> *members/employees were attempting to achieve;*
>
> c.   *Whether the member/employee used reasonable verbal means to attempt to resolve the situation without force, if time and circumstances permitted such attempts;*
>
> d.   *Whether the force used was de-escalated or stopped reasonably when resistance decreased or stopped;*
>
> 4. *use of force reports shall be reviewed by the appropriate chain-of-review as defined by policy.*
>
> *The type of force used, the identity of the involved members, and the report preparer shall be the determining criteria for utilizing the appropriate chain-of-review. Reviewers may include, when appropriate, the chain-of-command of the involved personnel, the appropriate Area Commander on duty at the time the incident occurred, other designated Bureau of Field Operations commanders, and as necessary, the chain-of-command of the involved personnel up to the Division Commander or Deputy Chief/Director, and the Internal Affairs Division.*
>
> *Reviewers for Level 1-3 use of force investigations shall:*
>
> a.   *Make a recommendation as to whether the use of force was in or out of policy,*
>
> b.   *Order additional investigation and investigative resources when necessary, and*
>
> c.   *Comment on any training issue(s) when appropriate.*
>
> 5. *Any recommendation that the use of force did not comply with Department policy shall result in the incident being referred to the Internal Affairs Division to conduct additional investigation/analysis, if necessary.*
>
> 6. *Members/employees involved in a use of force incident resulting in serious injury or death and/or an officer-involved shooting, shall be separated from each other as soon as practicable at the incident scene, and kept apart until they have completed their reports and been interviewed.*

(Negotiated Settlement Agreement V. B.)


**Relevant Policy:**

OPD most recently revised Departmental General Order K-4, *Reporting and Investigating the Use of Force* on October 16, 2014. DGO K-4 incorporates the requirements of Task 25.

**Commentary:**

As noted for Task 24, we reviewed 55 Level 3 and Level 4 use of force (UOF) reports that were completed in February and March 2019. We also reviewed 10 Level 2 UOF reports, for which an FRB was held between February and October 2019.

**Task 25.1** requires that an on-scene supervisor complete a Use of Force Report for every Level 3 use of force. In all 13 Level 3 uses of force reviewed for this subtask, a supervisor responded to the scene and completed a use of force investigation. In addition, there were nine instances where a Level 3 use of force was downgraded to a Level 4 by a supervisor who was at the scene. In all nine of these instances, documentation, justification, and approval were provided.

**Task 25.2** requires that all supervisors are trained on how to conduct use of force investigations and such training is part of a supervisory training course. OPD includes the requirement for this training in its Departmental policies. During our March site visit, we confirmed with OPD that that it continues to require and deliver this training.

**Task 25.3** requires that use of force investigations include required recommendations. Areas of recommendation include: whether the force used was pursuant to a legitimate law enforcement objective; whether the type and amount of force used was proportional to the resistance encountered and reasonably related to the objective the officers were attempting to achieve; whether the officers used reasonable verbal means to attempt to resolve the situation without force, if time and circumstances permitted such attempts; and whether the force used was de-escalated or stopped reasonably when resistance decreased or stopped.

In our assessment of the 55 Level 3 and 4 UOFs we reviewed, we did not identify any instance where we believe the force used was not pursuant to a legitimate law enforcement objective, was inappropriate or excessive, or where the use of force was not deescalated or stopped reasonably when resistance decreased. We again found, however, several instances where we believe OPD officers could have made additional efforts to explain to subjects being detained why the detention was occurring or where OPD officers failed to identify themselves when contacting people. In some cases, the need to use physical force may have been decreased or eliminated had officers identified themselves or provided some additional verbal explanation. This is a cultural issue and one that is also tied to instances where de-escalation might facilitate a better outcome. During our site visits, we discuss specific cases where we believe additional verbal communications should have been attempted and could have resulted in a decrease in the necessity to use of force. We also identified one Level 2 UOF where we believe officers did not use reasonable verbal means to attempt to resolve the situation without force, when time and circumstances permitted such an attempt.

**Task 25.4** requires that use of force reports are reviewed by the appropriate chain of review and appropriate recommendations are made. In all of the cases we reviewed, the reports were reviewed as required.

**Task 25.5** requires that any determination that a use of force did not comply with Department policy result in the incident being referred to IAD to conduct additional investigation/analysis, if necessary. None of the Level 3 or Level 4 investigations we reviewed resulted in a finding that the force did not comply with policy. In two of the Level 2 UOF incidents, the FRBs determined the force used was not within policy and appropriately handled necessary follow-up. In one

case, we believe that a Level 2 UOF was not within policy and should have been addressed, despite the FRB's finding to the contrary.

**Task 25.6** requires that members/employees involved in a use of force incident resulting in serious injury or death and/or officer-involved shooting, are separated from each other as soon as practicable at the incident scene, and kept apart until they have completed their reports and been interviewed.  This Task is not assessed here, as we review and consider it as part of the Force and Executive Force Review Boards that OPD holds to examine Level 1 and 2 uses of force.

The Court's reactivation of Task 25 at the November 2018 Case Management Conference resulted from our serious concerns with the Department's handling and investigation of recent uses of force.  OPD has drafted Special Order 9196 to address and clarify requirements for the proper reporting of use of force.  OIG's recent audit also identified numerous concerns with the reporting of use of force and enumerated a number of recommendations.  As noted earlier in this report, OPD has taken a number of actions intended to address identified concerns with the reporting of force, many of which were implemented after April 2019.  It remains to be seen if these actions will result in a positive outcome on this issue.  As a result, OPD remains in partial compliance with this Task.

| **Task 25 compliance status** | In partial compliance |
|---|---|

# Task 26:  Force Review Board (FRB)

**Requirements:**

*OPD shall develop and implement a policy concerning its FRB proceedings.  The policy shall:*

   1. *Set out procedures, membership and a timetable for FRB review of use of force investigations involving Level 2 incidents, as defined in Department General Order K-4, REPORTING AND INVESTIGATING THE USE OF FORCE;*

   2. *Require the FRB to review all use of force investigations;*

   3. *Require the FRB to make a recommendation as to whether the use of force was in policy or out of policy;*

   4. *Require the FRB to forward sustained policy violations to the Discipline Officer.*

   5. *Require the FRB not to review any use of force allegation until the internal investigations has been completed;*

   6. *Authorize the FRB to recommend to the Chief of Police additional use of force training or changes in policies or tactics, or additional standards, investigatory policies, or training for use of force investigations;*

   7. *Require the FRB to conduct an annual review of use of force cases examined, so as to identify any patterns of use of force practices that may have policy or*

> *training implications, and thereafter, issue a report to the Chief of Police;*
>
> 8. *Require that the FRB membership include, at a minimum, one member from the Training Division, one member from the Field Training Officer program, and either the Bureau of Field Operations Deputy Chief or his/her designee;*
>
> 9. *Minimally, that one member of the FRB shall be replaced at least annually.*

(Negotiated Settlement Agreement V. C.)

**Relevant Policy:**

Department General Order K-4.1, *Force Review Boards,* was originally published on February 17, 2006, and revised on December 21, 2015.

**Commentary:**

OPD Force Review Boards (FRBs) are regularly convened to examine the investigations conducted relative to the deployment and application of Level 2 uses of force.[1] OPD achieved compliance with this Task during the nineteenth reporting period (April 1-June 30, 2014). We continue to assess the compliance with this Task, including our analyses of force reports; our review of Force Review Board reports; attendance at Force Review Boards when conducted during our site visits; and on occasion, observing Force Review Boards between site visits via online meeting software.

For this report, we reviewed six FRB reports that were completed and approved by the Chief from June-October 2019. In all but one case, the force was determined by the Boards to be in compliance. In each case, the Chief (or where applicable, the Assistant Chief in her stead) concurred with the findings without any modifications.

In one case, the Board found a Level 2 use of force out of compliance. The force was identified as Use of an Impact Weapon with Contact (Level 2, Type 12), and occurred during a crowd control situation. While the force was minor – the officer pushed an individual back with his long baton – the Board noted that "the immediate threat posed by this subject did not rise to the level of justifying an intermediate use of force, such as the use of the long baton," and that "training specifically dictates to refrain from using the long baton in [that] manner."

---

[1] According to OPD, Level 2 uses of force include: "1) Any strike to the head (except for an intentional strike with an impact weapon); 2) Carotid restraint is applied that does not result in the loss of consciousness; 3) Use of impact weapons, including specialty impact munitions or any other object, to strike a subject and contact is made, regardless of injury; 4) Any unintentional firearms discharge that does not result in injury; 5) A police canine bites the clothing or the skin of a subject, or otherwise injures a subject requiring emergency medical treatment (beyond first-aid) or hospital admittance; 6) Any use of force which results in injuries to the subject requiring emergency medical treatment (beyond first-aid) or hospital admittance; (NOTE: For the purposes of this order, an evaluation by a medical professional to assess a complaint of injury is not emergency treatment) 7) Any Level 3 use of force used on or applied to a restrained subject; 7.a) A restrained subject is a person who has been fully placed in a Department authorized restraint device such as both hands handcuffed, a WRAP or Rip Hobble; 7.b) A subject with only one handcuff on is not a restrained person."

In two other cases, the FRB reports noted that the Boards identified uses of force that were not initially identified and investigated by the investigating supervisors.  In both cases, we observed the Boards' proceedings and pointed out the potential uses of force during our feedback sessions.  The Boards went back into session and the additional instances of use of force were found to be in compliance.  We concurred with these determinations.  We are hopeful that the ongoing adjustments to the use of force policies will clear up the confusion as to what constitutes a reportable use of force for both line- and command-level personnel.

In addition to reviewing the completed FRB reports, we observed four FRBs as they carried out their duties and deliberations.  We observed one during a regular site visit, and three remotely via Skype.  Two of the FRBs were conducted over two-day periods (not necessarily consecutively) because of the need for additional testimony or deliberations.

We disagreed with the findings of the Board in one of the FRBs we observed.  The force in question consisted of the firing of a less lethal specialty impact munition (SIM), commonly referred to as a bean-bag round, at an individual who was armed with a large stick.  The individual had assaulted a passerby with the stick, prompting a call to 911.  The responding officers quickly – and correctly – deduced that the individual was suffering from mental illness.  Officers established a close perimeter around the subject, who was standing in front of a storefront, and began a dialogue with him.  The officer who used force heard the call on the radio and self-deployed to the scene with the less lethal munitions.  The officers on scene attempted to establish a rapport with the individual, and appeared to be making some headway, but the officer who used force began giving commands to the subject as soon as he approached him, and fired the bean bag round less than one minute-and-a-half later, and only 11 minutes after the first officer arrived on scene.  There did not appear to be any communication with the officers already on the scene; and at the time of the discharge, the subject's demeanor and his actions had not changed in any significant way.

Prior to voting, the Board members, appropriately expressed concerns regarding the rapidity with which the officer deployed the round so soon after his arrival, and noted that the officers on the scene appeared to be making progress in establishing a rapport with the subject, who refused to put down the stick.  They noted that the subject was contained and they questioned the urgency to use force.  They also noted that the one supervisor on the scene was not providing any direction whatsoever.

It is clear from the several body-worn camera (BWC) videos that at the time of the discharge, the subject was not an immediate threat to anyone, including the officers on scene, all of whom appeared relaxed and almost nonchalant.

We agreed with all of the Board's concerns regarding scene supervision and the need to use force at the time it was used, and we were quite frankly surprised that they voted the force in compliance with policy with little deliberation.  At the close of the Board, we provided our observations, and the Board chair decided to reconvene the Board 16 days later.

When they reconvened, the Board took testimony from an internal Subject Matter Expert (SME) in use of force training.  The testimony appeared focused on establishing support for the Board's original determination.  At one point, the Board asked the SME if OPD's use of force policy allowed for preemptive use of force.  Implicit in this question is an acknowledgement that at the

time of the discharge, there did not appear to be an immediate threat posed by the subject. This is in accord with our observations and in line with the concerns expressed by the Board during their first session. The SME indicated that he preferred to refer to such force as "anticipatory" rather than preemptive. Neither "preemptive" nor "anticipatory" use of force is described in OPD's use of force policy.

During the second session, the Board minimized some of the very concerns they expressed in their first session and reaffirmed their original vote, deeming the force in compliance. In a scenario we have seen play out before – most notably in the most recent officer-involved shooting, in March 2018 – the Board was highly critical of the actions of a supervisor and an officer in this case; yet the Board members did not take their own concerns into account when determining the appropriateness of the force. They all questioned the timing of the use of force – in essence, they questioned the *need* for the force to be used when it was used – but they lacked the will to act on their concerns if it meant determining a use of force out of compliance. Their report noted, "Although the Board ultimately found the SIM deployment in compliance, there was extensive discussion regarding how the situation could have been better handled. The Chair exclaimed the need for the Department to do a better job in in [sic] training officers and supervisors to brining [sic] events like these to a conclusion."

At some point, and if the circumstances had changed, it is conceivable that the use of a bean-bag round may have been an appropriate way to resolve this situation. However, to deploy the round within 90 seconds of approaching a subject who was obviously contained, who was conversing with officers, and who was not an immediate threat to officers or passersby, is not preemptive or anticipatory – it is premature, at best.

In addition to ruling on the appropriateness of uses of force, Force Review Boards will generally identify several follow-up items based on their review of the associated materials and the presentations made to them. These can include items such as counseling and training for individual officers, publication of Department-wide training materials, and modifications to policy. OPD tracks these deliverables in a spreadsheet, broken down into three categories: Individual Issues; Department-Wide Issues; and Quarterly Training Points. In the most recent spreadsheet reviewed for this report, there were 47 open deliverables out of 196 total deliverables included in all three categories, as compared to 46 open deliverables out of 145 total when we last reported on this issue. OPD has made progress in addressing some of the more dated deliverables.

Based on this review, OPD is not in compliance with this Task.

| **Task 26 compliance status** | Not in compliance |
|---|---|

## Task 30:  Executive Force Review Board (EFRB)

**Requirements:**

1. *An EFRB shall be convened to review the factual circumstances surrounding any Level 1 force, in-custody death, or vehicle pursuit-related death incidents.  A firearm discharge at an animal shall be reviewed by the EFRB only at the direction of the Chief of Police.*

2. *The Board shall have access to recordings and/or transcripts of interviews of all personnel on the scene, including witnesses, and shall be empowered to call any OPD personnel to provide testimony at the hearing.*

3. *OPD shall continue the policies and practices for the conduct of EFRB, in accordance with the provisions of DGO K-4.1, FORCE REVIEW BOARDS.*

(Negotiated Settlement Agreement V. G.)

**Relevant Policy:**

Department General Order K-4.1, *Force Review Boards,* was published on February 17, 2006, and revised on December 21, 2015.

**Commentary:**

Executive Force Review Boards (EFRBs), consisting of three top command-level staff, conduct thorough, detailed reviews of all Level 1 uses of force, in-custody deaths, and vehicle pursuit-related deaths and serious injuries.  OPD achieved compliance with this Task during the nineteenth reporting period (April 1-June 30, 2014).  OPD conducted six EFRBs in 2018.  To date, there have been no EFRBs conducted in 2019, although one is scheduled for this month.

The final EFRB of 2018 reviewed an officer-involved shooting that occurred in March 2018, and the Board identified several deliverables as a result.  Those deliverables are tracked in the same spreadsheet discussed above (in Task 26).  On May 16, 2019, we participated in a conference call with members of OPD's executive staff to discuss the status of those deliverables.  These include the development of several new or enhanced policies.  We have been reviewing various iterations of these policies between and during our recent site visits.  During our October site visit, we discussed the remaining open deliverables from this EFRB, as there did not appear to be much progress on them based on a review of the spreadsheet.  We received verbal updates on the open items, and OPD committed to sending written documentation with our next document request.

Based on the last EFRB conducted, we found the Department to no longer be in compliance with this Task.

| **Task 30 compliance status** | Not in compliance |
|---|---|

## Conclusion

In late November, after a few scheduled delays, OPD implemented Vision, its new risk management database. Vision replaced PRIME, which was developed a few years ago and presented ongoing problems for the Department and the City. While it appears that the implementation of Vision went smoothly, the system does not yet include the data dashboards, which are still being developed by an external contractor. Supervisors and command staff will eventually be able to use the dashboards to review and manage, on a daily basis, data about individual officers, squads, Areas, and OPD as a whole – including uses of force, complaints, and other key information. We look forward to learning more about the development of the dashboards and the use of Vision during our upcoming site visit.

We are very concerned with the use of force episode that we cited in our review of Task 26. The dialogue of the Board members during their deliberations, and the ultimate decision, were incongruous. We find this to be troubling, and we made our views known to the Department before a decision was finalized.

*Robert S. Warshaw*

Chief (Ret.) Robert S. Warshaw
*Monitor*