February 17, 2020

# Sixty-Sixth Report *of the* Independent Monitor *for the* Oakland Police Department

## Introduction

This is our sixty-sixth status report on the Negotiated Settlement Agreement (NSA) in the case of *Delphine Allen, et al., vs. City of Oakland, et al.,* in the United States District Court for the Northern District of California under the direction of Judge William H. Orrick. I was appointed in 2010 to oversee the monitoring process of the Oakland Police Department (OPD) that began in 2003.

This report covers our site visits of November 20-21, and December 18-19, 2019; and describes our recent assessments of NSA Tasks 2, 41, and 45. Following the Court's Order of May 21, 2015, we devote special attention to the most problematic component parts of the NSA Tasks that are not yet in full or sustained compliance; and discuss in our status reports the most current information regarding the Department's progress with the NSA and its efforts at making the reforms sustainable.

Over one year ago, in a November 2018 Case Management Conference, the Court reactivated Tasks 24 (Use of Force Reporting Policy), 25 (Use of Force Investigation and Report Responsibilities), and 31 (Officer-Involved Shooting Investigations). Since we resumed our reviews of Tasks 24 and 25, which are ongoing, we have provided detailed feedback on the force investigations to OPD during each of our site visits. In cases where we have had questions or concerns, OPD personnel have provided follow-up where necessary. Many of the concerns we have noted in our reviews and discussions with OPD were also identified in OIG's recent audit on the use of force. We have not yet reported on our assessment of Task 31, but will do so in our forthcoming review of the Department's March 2018 officer-involved shooting.

This report is our first since the Department implemented Vision, which replaced PRIME in November 2019, as OPD's risk-related database. The development of several of Vision's features – including the data dashboards that will eventually allow supervisors to have regular access to detailed risk-related data – is ongoing, but not yet complete.

## *Increasing Technical Assistance*

Each month, our Team conducts a visit to Oakland that includes both compliance assessments and technical assistance. During our visits, we meet with Department and City officials; observe Department meetings and technical demonstrations; review Departmental policies; conduct interviews and make observations in the field; and analyze OPD documents and files, including misconduct investigations, use of force reports, crime and arrest reports, Stop Data Forms, and

other documentation.  We also provide technical assistance in additional areas, especially those that relate to the remaining non-compliant Tasks or areas identified by the Department.

We recently provided technical assistance to OPD officials in the areas of IAD investigation quality (Task 5); use of force investigations (Tasks 24 and 25); stop data and related issues (Task 34); risk management and the ongoing maintenance issues and development of the Performance Reporting Information Metrics Environment (PRIME) system, now called Vision (Task 41); and several Department policies and procedures, including policies related to PRIME, officer discipline, use of force, probationers and parolees, handcuffing, the use of armored vehicles, and the use of electronic control weapons.

## *Building Internal Capacity at OPD*

Also per the May 21, 2015 Court Order, we continue to work closely with the Office of Inspector General's (OIG) lieutenant and staff to identify areas that it should audit or review – and to help design approaches to these audits that are not cumbersome, so as to ensure sustainability.  We review OIG's quarterly progress reports, which are a valuable resource and assist us in assessing compliance with NSA requirements.

## *Focused Task Assessments*

## Task 2:  Timeliness Standards and Compliance with IAD Investigations

**Requirements:**

*Fairness to complainants, members/employees and the public requires that internal investigations be completed in a timely fashion.*

1. *On or before December 1, 2003, OPD shall develop policies regarding timeliness standards for the completion of Internal Affairs investigations, administrative findings and recommended discipline.*

2. *Compliance with these timeliness standards shall be regularly monitored by IAD command and the Department's command staff.  If IAD experiences an unusual proliferation of cases and/or workload, IAD staffing shall be increased to maintain timeliness standards.*

(Negotiated Settlement Agreement III. B.)

**Relevant Policy:**

OPD most recently revised Departmental General Order M-03, *Complaints Against Department Personnel and Procedures*, which incorporates the requirements of Task 2, on December 22, 2017.

**Commentary:**

**Task 2.1** requires that internal investigations (IAD and Division Level) – including review, approval, findings, and discipline – be completed in accordance with the timeliness standards developed by OPD.  To assess this subtask, we reviewed a list of all internal investigations resulting in formal findings (unfounded, sustained, exonerated, or not sustained) that were approved in August, September, and October 2019, and calculated the number of days between the complaint date and the approval date for each case.  We excluded from the dataset cases that were administratively closed, those that involved on-duty traffic accidents or service complaints, and those that did not involve Manual of Rules (MoR) violations.  We segregated the remaining cases into Class I or Class II categories.  If a case involved at least one alleged Class I violation, we classified it as Class I.

OPD policy requires that at least 85% of Class I misconduct investigations and at least 85% of Class II misconduct investigations must be completed within 180 days to be considered timely.  Per DGO M-03, Class I offenses "are the most serious allegations of misconduct and, if sustained, shall result in disciplinary action up to and including dismissal and may serve as the basis for criminal prosecution."  Class II offenses include "all minor misconduct offenses."  Of the 42 Class I cases we reviewed for this assessment, only 16, or 38%, were in compliance with established timelines.  This represents a slight improvement over what we found during our last review of Task 2, when we found that only 34% of Class I cases were in compliance with established timelines – and it is still *far below compliance*.  One of the Class I cases was completed in exactly 180 days.

Of the 85 Class II cases we reviewed, only 56, or 66%, were in compliance with established timelines.  While this is better than what we found during our last review of Task 2, when we found that only 36% of Class II cases were in compliance with established timelines, it is also still *far below compliance*.  One of the Class II cases was completed in exactly 180 days.

Per DGO M-03, "In cases with a sustained finding, the discipline recommendation process shall be completed within 30 calendar days of the sustained finding."  We reviewed all 10 cases including a total of 37 sustained findings that were approved in August, September, and October 2019; six cases involved multiple sustained findings.  Of these 10 cases, nine (90%) were in compliance with established discipline timelines.  The discipline recommendation process for one case, which included four sustained findings, took 48 days.

OPD is not in compliance with Task 2.1.  While OPD has improved slightly since we reinitiated reviews of Task 2 last year, we remain concerned with the Department's backsliding on IAD timeliness issues.

Task 2.2 requires that IAD and OPD command staff regularly monitor compliance with these timeliness standards.  The primary responsibility for monitoring compliance with timeliness standards rests with IAD, whether investigations are conducted by IAD personnel or via Division-level investigation.  As part of this monitoring, the IAD Commander discusses pending deadlines for key open investigations during IAD's weekly meetings with the Chief; the deadlines are also reflected in written agendas for these meetings.  A Monitoring Team representative regularly attends these weekly meetings.  IAD also occasionally, as needed, emails individual reminders on cases approaching due dates to investigators and their supervisors.  The Department is in compliance with Task 2.2.

Task 2.3 requires that if IAD experiences an unusual proliferation of cases and/or workload, IAD staffing be increased to maintain timeliness standards.  A few months ago, IAD faced a backlog of over 100 cases and enlisted sergeants and lieutenants to review completed Division-level investigations.  We are currently reviewing a sample of these "backlog" cases to determine if they are in compliance with NSA requirements.  Our report on these investigations is forthcoming.

| **Task 2 compliance status** | Not in compliance |
|---|---|

# Task 41:  Use of Personnel Assessment System (PAS) and Risk Management

**Requirements:**

*Within 375 days from the effective date of this Agreement, OPD shall develop a policy for use of the system, including supervision and audit of the performance of specific members, employees, supervisors, managers, and OPD units, as well as OPD as a whole.*

*The policy shall include the following elements:*

1. *The Chief of Police shall designate a PAS Administration Unit.  The PAS Administration Unit shall be responsible for administering the PAS policy and, no less frequently than quarterly, shall notify, in writing, the appropriate Deputy Chief/Director and the responsible commander/manager of an identified member/employee who meets the PAS criteria.  PAS is to be electronically maintained by the City Information Technology Department.*

2. *The Department shall retain all PAS data for at least five (5) years.*

3. *The Monitor, Inspector General and Compliance Coordinator shall have full access to PAS to the extent necessary for the performance of their duties under this Agreement and consistent with Section XIII, paragraph K, and Section XIV of this Agreement.*

4. *PAS, the PAS data, and reports are confidential and not public information.*

5. *On a quarterly basis, commanders/managers shall review and analyze all relevant PAS information concerning personnel under their command, to detect any pattern or series of incidents which may indicate that a member/employee, supervisor, or group of members/employees under his/her supervision may be engaging in at-risk behavior. The policy shall define specific criteria for determining when a member/employee or group of members/employees may be engaging in at-risk behavior.*

6. *Notwithstanding any other provisions of the PAS policy to be developed, the Department shall develop policy defining peer group comparison and methodology in consultation with Plaintiffs' Counsel and the IMT. The policy shall include, at a minimum, a requirement that any member/employee who is identified using a peer group comparison methodology for complaints received during a 30-month period, or any member who is identified using a peer group comparison methodology for Penal Code §§69, 148 and 243(b)(c) arrests within a 30-month period, shall be identified as a subject for PAS intervention review. For the purposes of these two criteria, a single incident shall be counted as "one" even if there are multiple complaints arising from the incident or combined with an arrest for Penal Code §§69, 148 or 243(b)(c).*

7. *When review and analysis of the PAS threshold report data indicate that a member/employee may be engaging in at-risk behavior, the member/employee's immediate supervisor shall conduct a more intensive review of the member/employee's performance and personnel history and prepare a PAS Activity Review and Report. Members/employees recommended for intervention shall be required to attend a documented, non-disciplinary PAS intervention meeting with their designated commander/manager and supervisor. The purpose of this meeting shall be to review the member/employee's performance and discuss the issues and recommended intervention strategies. The member/employee shall be dismissed from the meeting, and the designated commander/manager and the member/employee's immediate supervisor shall remain and discuss the situation and the member/employee's response. The primary responsibility for any intervention strategies shall be placed upon the supervisor. Intervention strategies may include additional training, reassignment, additional supervision, coaching or personal counseling. The performance of members/ employees subject to PAS review shall be monitored by their designated commander/manager for the specified period of time following the initial meeting, unless released early or extended (as outlined in Section VII, paragraph B (8)).*

8. *Members/employees who meet the PAS threshold specified in Section VII, paragraph B (6) shall be subject to one of the following options: no action, supervisory monitoring, or PAS intervention. Each of these options shall be approved by the chain-of-command, up to the Deputy Chief/Director and/or the PAS Activity Review Panel.*

> *Members/employees recommended for supervisory monitoring shall be monitored for a minimum of three (3) months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor. The first at the end of one (1) month and the second at the end of three (3) months.*
>
> *Members/employees recommended for PAS intervention shall be monitored for a minimum of 12 months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor and designated commander/manager: The first at three (3) months and the second at one (1) year. Member/employees subject to PAS intervention for minor, easily correctable performance deficiencies may be dismissed from the jurisdiction of PAS upon the written approval of the member/employee's responsible Deputy Chief, following a recommendation in writing from the member/employee's immediate supervisor. This may occur at the three (3)-month follow-up meeting or at any time thereafter, as justified by reviews of the member/employee's performance. When a member/employee is not discharged from PAS jurisdiction at the one (1)-year follow-up meeting, PAS jurisdiction shall be extended, in writing, for a specific period in three (3)-month increments at the discretion of the member/employee's responsible Deputy Chief. When PAS jurisdiction is extended beyond the minimum one (1)-year review period, additional review meetings involving the member/employee, the member/ employee's designated commander/manager and immediate supervisor, shall take place no less frequently than every three (3) months.*

9. *On a quarterly basis, Division/appropriate Area Commanders and managers shall review and analyze relevant data in PAS about subordinate commanders and/or managers and supervisors regarding their ability to adhere to policy and address at-risk behavior. All Division/appropriate Area Commanders and managers shall conduct quarterly meetings with their supervisory staff for the purpose of assessing and sharing information about the state of the unit and identifying potential or actual performance problems within the unit. These meetings shall be scheduled to follow-up on supervisors' assessments of their subordinates' for PAS intervention. These meetings shall consider all relevant PAS data, potential patterns of at-risk behavior, and recommended intervention strategies since the last meeting. Also considered shall be patterns involving use of force, sick leave, line-of-duty injuries, narcotics-related possessory offenses, and vehicle collisions that are out of the norm among either personnel in the unit or among the unit's subunits. Division/appropriate Area Commanders and managers shall ensure that minutes of the meetings are taken and retained for a period of five (5) years. Commanders/managers shall take appropriate action on identified patterns of at-risk behavior and/or misconduct.*

10. *Division/appropriate Area Commanders and managers shall meet at least annually with his/her Deputy Chief/Director and the IAD Commander to discuss the state of their commands and any exceptional performance, potential or actual performance problems or other potential patterns of at-risk behavior within the*

> unit. Division/appropriate Area Commanders and managers shall be responsible for developing and documenting plans to ensure the managerial and supervisory accountability of their units, and for addressing any real or potential problems that may be apparent.
>
> 11. PAS information shall be taken into account for a commendation or award recommendation; promotion, transfer, and special assignment, and in connection with annual performance appraisals. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.
>
> 12. Intervention strategies implemented as a result of a PAS Activity Review and Report shall be documented in a timely manner.
>
> 13. Relevant and appropriate PAS information shall be taken into account in connection with determinations of appropriate discipline for sustained misconduct allegations. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.
>
> 14. The member/employee's designated commander/manager shall schedule a PAS Activity Review meeting to be held no later than 20 days following notification to the Deputy Chief/Director that the member/employee has met a PAS threshold and when intervention is recommended.
>
> 15. The PAS policy to be developed shall include a provision that a member/employee making unsatisfactory progress during PAS intervention may be transferred and/or loaned to another supervisor, another assignment or another Division, at the discretion of the Bureau Chief/Director if the transfer is within his/her Bureau. Inter-Bureau transfers shall be approved by the Chief of Police. If a member/employee is transferred because of unsatisfactory progress, that transfer shall be to a position with little or no public contact when there is a nexus between the at-risk behavior and the "no public contact" restriction. Sustained complaints from incidents subsequent to a member/employee's referral to PAS shall continue to result in corrective measures; however, such corrective measures shall not necessarily result in a member/employee's exclusion from, or continued inclusion in, PAS. The member/employee's exclusion or continued inclusion in PAS shall be at the discretion of the Chief of Police or his/her designee and shall be documented.
>
> 16. In parallel with the PAS program described above, the Department may wish to continue the Early Intervention Review Panel.
>
> 17. On a semi-annual basis, beginning within 90 days from the effective date of this Agreement, the Chief of Police, the PAS Activity Review Panel, PAS Oversight Committee, and the IAD Commander shall meet with the Monitor to review the operation and progress of the PAS. At these meetings, OPD administrators shall

> *summarize, for the Monitor, the number of members/employees who have been identified for review, pursuant to the PAS policy, and the number of members/employees who have been identified for PAS intervention. The Department administrators shall also provide data summarizing the various intervention strategies that have been utilized as a result of all PAS Activity Review and Reports. The major objectives of each of these semi-annual meetings shall be consideration of whether the PAS policy is adequate with regard to detecting patterns of misconduct or poor performance issues as expeditiously as possible and if PAS reviews are achieving their goals.*
>
> 18. *Nothing in this Agreement, and more specifically, no provision of PAS, shall be construed as waiving, abrogating or in any way modifying the Department's rights with regard to discipline of its members/employees. The Department may choose, at its discretion, to initiate the administrative discipline process, to initiate PAS review or to use both processes concurrently or consecutively.*

(Negotiated Settlement Agreement VII. B.)

**Relevant Policy:**

OPD revised and issued Departmental General Order D-17, *Personnel Assessment Program,* in November 2013.

**Commentary:**

In late November, the Vision database replaced PRIME, which presented ongoing, multiple problems for the Department and the City since its implementation a few years ago. While the Department has deactivated PRIME, the Department continues development of a number of related work processes related to Vision. Most notable among those is the continuing work on the data dashboards. The completion of the data dashboards will make a significant contribution to risk management by providing all supervisors with easy access to detailed risk-related data.

Despite the advancements to this point, we are concerned that once again, there are serious impediments to progress. Critical work on the data dashboards – as well as other important tasks – seems stalled, caught up in a lapsed contract with a critical vendor and with capacity issues in the City's Information Technology Division. The Department and the City must take care so as not to repeat problems that have long delayed completion of the risk management infrastructure.

Some other data issues also continue, including the completion of processes relating to maintaining training data and the completion of recording the relevant data for those events that occurred during the transition to the new system. These cases have been described as "in flight" cases. There is also other ongoing work to identify and fix problems, to make additional enhancements as requested by OPD, and to continue to design and build the estimated 60 data reports that the system will regularly produce. We recognize that, even as some work may have slowed, the transition to Vision marks a significant step forward in the Department's application of risk analysis to ongoing management.

At this point, the Department is also tackling the training needs associated with the new data systems. The complete roll-out of training on Vision will take several weeks and will be provided via computer for first line supervisors. Additional training is planned for command staff who will oversee the use of the system and provide the last line of review of risk-related issues.

Since the beginning of the development of the failed system known as PRIME, and throughout the development of its successor, we have often noted the importance of finding an appropriate balance between the *technical aspects* of managing data and the *processes* of using data for sound risk management decisions. The dashboards hide the complex technology behind data presentations that will be easily accessible and useful for supervisors at all levels, and for the officers themselves. We believe that continued caution is advisable. The data itself should never command center stage – and our compliance findings and the community's and Department's interests are best served by the quality of the analysis, the understanding gained through it, and the outcomes of the resultant decision-making. Meeting these goals will require constant attention and are at the core of the NSA.

We are drawn to make this point again by our continuing observations of the Department's Risk Management Meetings. At these meetings, both Area Captains and their lieutenants continue to demonstrate knowledge of their officers and the Areas they oversee. We have also seen supervisors, on their own, initiating monitoring and intervention when they feel it is needed – rather than waiting on the PAS Unit, as in the past.

However, our reviews of these meetings still raise old questions. One issue that was at the heart of early risk analyses was disturbing. Race came in only late in the discussion and received only the most cursory attention. Ironically, that is a point that was made only in the discussion that occurred after a recent meeting. The Department's years-long and continuing discomfort with forthright discussion of race continues to loom over this entire project, yet it is the genesis and heart of the NSA.

As it pertains specifically to Risk Management Meetings how such an omission could occur at this point in time is worth considering. One place to look for an explanation may be in the process of data analysis that is associated with the meetings. OPD's usual process is to count risk-related behaviors such as uses of force, stops, and complaints received – and then to use the counts to drill down from Area to squad to individual officer levels. But arguably, *attributing these details only to individuals can mask trends and patterns that are important to understanding and ultimately to changing the Department.* The near total omission of race from the discussion should not be seen as an oversight, or as failure to recognize wayward behavior in individuals. It should instead be considered a failure to recognize that trends and patterns in behavior go beyond individuals and, therefore, require analysis and remediation that by necessity must go beyond individuals.

This may, in fact, be a potential problem lurking behind every data table and every analysis of risk.  Should risk be seen as a characteristic of individuals, or is it more appropriately seen as a product of organizations and their cultures – or perhaps both?  And, of course, the key question is how does an agency reduce risk when it is defined either way?  In a police department, these are not simply academic questions.

OPD has come a long way in collecting and analyzing data.  But each step forward has revealed new challenges.  Sometimes those have been technical.  For example, how do we tally uses of force or arrests if we seek to make comparisons over time?  But some questions are more complicated.  For example, does the racial distribution of stop data reflect the behavior of individuals or is it better understood as a pattern produced by the Department?

Questions like these are necessarily linked to how the Department chooses to analyze the data.  But those choices must be made at the Departmental level.  Now, with new and advanced data systems coming online, it may be the time to make those choices more clearly.  That would mean developing written plans for how data are analyzed for the purpose of managing risk.  The Department should develop plans to address how data should be analyzed, including data on uses of force, complaints, and stop data.  Recent Department Risk Management Meetings – with their limited, at best, attention to issues of race – suggest that such guidance is needed.  The data technology behind risk management has advanced considerably under the Vision project.  It remains to be seen if meaningful interpretation of that data through clear guidance from the Department will follow suit.

| **Task 41 compliance status** | In compliance, although we are concerned that the potential of the system is, for now, surpassing its efficacious use. |
|---|---|

## Task 45:  Consistency of Discipline Policy

**Requirements:**

*On or before October 6, 2003, OPD shall revise and update its disciplinary policy to ensure that discipline is imposed in a fair and consistent manner.*

> 1. *The policy shall describe the circumstances in which disciplinary action is appropriate and those in which Division-level corrective action is appropriate.*
>
> 2. *The policy shall establish a centralized system for documenting and tracking all forms of discipline and corrective action, whether imposed centrally or at the Division level.*

> 3. All internal investigations which result in a sustained finding shall be submitted to the Discipline Officer for a disciplinary recommendation. The Discipline Officer shall convene a meeting with the Deputy Chief or designee in the affected chain-of-command for a confidential discussion of the misconduct, including the mitigating and aggravating factors and the member/employee's overall performance.
>
> 4. The COP may direct the Discipline Officer to prepare a Discipline Recommendation without convening a Discipline Conference.

(Negotiated Settlement Agreement X. B.)

**Relevant Policy:**

Five Departmental policies incorporate the requirements of Task 45: Departmental General Order M-03, *Complaints Against Department Personnel and Procedures* (published December 6, 2005 and revised most recently on August 24, 2013); Training Bulletin V-T.1 and V-T.2, *Internal Investigation Procedure Manual* (published July 17, 2008); Internal Affairs Policy and Procedure Manual (published December 6, 2005); and Training Bulletin V-T, *Departmental Discipline Policy* (published March 14, 2014). Several of these policies are currently being revised.

**Commentary:**

Task 45.2 requires that OPD maintain a centralized system for documenting and tracking all OPD forms of discipline and corrective action, whether imposed centrally or at the division level. To assess Phase 2 compliance with this subtask, we reviewed the 36 cases that contained at least one sustained finding that were approved in August, September, and October 2019. All (100%) of these cases and findings contained all of the necessary information available on the spreadsheets generated by IAD for our review. OPD is in compliance with the requirement that it maintain an adequate system for documenting and tracking discipline and corrective action.

The NSA also requires that discipline be imposed in a manner that is fair and consistent. To this end, the Department developed a Discipline Matrix, which was adopted on September 2, 2010 and was in effect until a new Discipline Matrix was approved on March 14, 2014. This subsequent Matrix applies to violations after that date.

As noted above, we reviewed all 36 cases with sustained findings that were approved in August, September, and October 2019. (Several cases involved multiple sustained findings.) We selected this time period for review because the Department is currently unable to retrieve reliable information about IAD cases beginning with data from November, when OPD implemented Vision.

In August, there were 14 sustained cases. Five cases involved preventable motor vehicle collisions. Four cases involved employees (two different officers, one sergeant, and one dispatcher) who acted rudely toward members of the public. In one of those cases, a sergeant was also sustained for the failure to discover violations of the Manual of Rules during his review

of a pursuit. One case involved an officer who, while off duty, vandalized a business by writing an obscene word on the window with ice cream. One case involved an officer who failed to take a crime report, and one case was sustained for conducting a substandard preliminary investigation of a battery. In another case, an officer was sustained for failure to keep his body-worn camera activated while engaged in a pursuit. In another case – which involved four sustained findings – the officer, who was still on employment probation, was sustained for making a false claim of inappropriate conduct against a former friend, among other violations.

In September, there were seven sustained cases. One case involved a preventable motor vehicle collision. One case involved three sustained findings – including rudeness, failing to properly code a call for service, and not providing her name when asked – against one dispatcher. In two cases, officers were sustained for rudeness. In another case, two sergeants were sustained for unintentionally failing to accept or refer a complaint. In another case, an officer was sustained for failure to activate his body-worn camera as he initiated a vehicle pursuit, as required. In the last case, there were two sustained findings: one against an officer for conducting a felony traffic stop without reasonable suspicion; and one against a sergeant for improper supervision.

In October, there were 15 sustained cases. Four cases involved preventable motor vehicle collisions. Four cases involved officers' or a sergeant's failure to accept or refer a complaint; one of these cases involved 12 sustained findings against multiple officers for this violation and others, including writing a deficient police report. Two cases involved rudeness. In one case, an officer was sustained for failure to care for a subject's property (cellphone). In another case, a sergeant was sustained for failure to perform his duties during a use of force. In another case, an officer was sustained for improperly deploying an electronic control weapon. In another case, an officer was sustained for failing to write an accurate crime report. The last case involved nine sustained findings – including tampering with evidence and failing to notify his chain of command when he learned that he was possibly under criminal investigation – against one officer, who was terminated for the case.

In each case, unless otherwise documented in writing, the proposed discipline fell within the Discipline Matrix that was in effect at the time of the action for which the discipline was imposed.

We reviewed the records that OPD provided for the 12 total *Skelly* hearings it held in September (five hearings), October (five hearings), and November (two hearings). *Skelly* hearings are held for IAD cases involving employees with sustained findings in which discipline of a one-day suspension or greater was recommended. We reviewed the *Skelly* reports for all 12 cases, and found that they contained adequate justification for the results documented.

One *Skelly* hearing involved a non-sworn employee who was driving under the influence of alcohol. For this violation, the Chief recommended a 10-day suspension; and the *Skelly* Officer agreed with the recommendation but placed the discipline in abeyance for one year. The Chief concurred with the *Skelly* Officer.

One *Skelly* hearing involved an officer's demeanor. The Chief recommended a one-day suspension, but the *Skelly* Officer recommended a written reprimand; the Chief concurred with the *Skelly* Officer.

One *Skelly* hearing involved sustained findings of performance of duty and conduct toward others against a Communications dispatcher. In this case, the *Skelly* Officer upheld the Chief's recommendation of a two-day suspension.

Another *Skelly* hearing involved a sustained finding of failure to activate a body-worn camera. In this case, the *Skelly* Officer upheld the Chief's recommended one-day suspension; but the Chief ultimately reduced the discipline to a written reprimand.

Another *Skelly* hearing involved a sustained finding of using profanity. The *Skelly* Officer in this case upheld the Chief's recommended one-day suspension; but the Chief ultimately reduced the discipline to a written reprimand.

Another *Skelly* hearing involved a sustained finding of refusing to provide a name or serial number. In this case, the *Skelly* Officer disagreed with the Chief's recommended seven-day suspension, and reduced it to five days; the Chief concurred with the reduction.

Three cases involved officers' out of compliance vehicle pursuits. In two of these cases, the Chief recommended one-day suspensions; and the *Skelly* Officers upheld them. In the third case, the *Skelly* Officer upheld the Chief's recommendation for a three-day suspension.

Three *Skelly* hearings involved preventable vehicle collisions. In two cases, the *Skelly* Officer concurred with the Chief's recommendation of one-day suspensions. In the third, the *Skelly* Officer reduced the Chief's recommendation of a 10-day suspension to a five-day suspension; and the Chief concurred.

We also reviewed the most recent training records that OPD provided. On August 2, 2019, two then-Acting Captains received the approved *Skelly* Officer Training; on August 9, 2019, two non-sworn professional managers received the approved *Skelly* Officer Training. OPD did not conduct any *Skelly* Officer Training in September or October 2019. We will review more recent records once they are made available to verify that all applicable personnel who were recently promoted received the approved *Skelly* Officer Training.

OPD received one arbitration decision in September, in the case of a civilian employee who had, according to the City's post-arbitration hearing brief, "well-documented unacceptable job performance." The City had recommended that the employee be terminated, and the arbitrator sided with the City.

OPD did not receive any arbitration decisions in August or October 2019.

OPD remains in partial compliance with Task 45.

| **Task 45 compliance status** | In partial compliance |
| --- | --- |

## Conclusion

Our long experience with OPD and the City of Oakland demonstrates that there are important lessons to be found in the history of risk management in the Department. Chief among them is the recognition that new structures do not, by themselves, ensure meaningful change. While we all hope that the long road to the new Vision system will serve as a lesson in the importance of persistence, the novelty of the system must be matched by its positive impact over the long run. The Negotiated Settlement Agreement makes clear the need for an effective, data-based, risk management process.

We are concerned that yet another structure intended to promote reform within the Department has yet to consistently bear fruit. We have seen this in several areas of the NSA. For example, while it has slightly improved since our last review, the Department has yet to return to compliance with its required timeliness standards for IAD investigations – and the results of our Task 2 assessment are concerning. In addition, we have found flaws in the process for reporting uses of force, and we have objected to decisions regarding the justification and even the legality of some uses of both the lower and highest levels of force. We will discuss this further in our forthcoming review of the Department's March 2018 officer-involved shooting.

*Robert S. Warshaw*

Chief (Ret.) Robert S. Warshaw
*Monitor*