BARBARA J. PARKER, City Attorney, SBN 069722
RYAN RICHARDSON, Special Counsel, SBN 223548
DAVID PEREDA, Special Counsel, SBN 237982
BRIGID S. MARTIN, Special Counsel, SBN 231705
One Frank H. Ogawa Plaza, 6th Floor
Oakland, California 94612
Telephone: (510) 238-6520
Email:  DPereda@@oaklandcityattorney.org
(Doc. Id. No. 2906351)

Attorneys for CITY OF OAKLAND

JOHN L. BURRIS, SBN 69888
Law Offices of John L. Burris
Airport Corporate Centre
7677Oakport Road, Ste. 1120
Oakland, California 94621
Telephone: (510) 839-5200

JAMES B. CHANIN, SBN 76043
Law Offices of James B. Chanin
3050 Shattuck Avenue
Berkeley, California  94705
Telephone: (510) 848-4752

Attorneys for PLAINTIFFS

*(Additional Counsel on Next Page)*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| DELPHINE ALLEN, et al., )<br><br>            Plaintiffs, )<br>vs. )<br><br>CITY OF OAKLAND, et al., )<br><br>            Defendants. )<br>_____ ) | No. 00-cv-04599 WHO<br><br>**JOINT CASE MANAGEMENT STATEMENT**<br><br>Date: February 25, 2020<br>Time: 3:30 p.m.<br>Place: Dept. 2 – 17th Floor<br>         450 Golden Gate Ave.<br>         San Francisco, CA 94102<br><br>The Hon. William H. Orrick |

1  ROCKNE A. LUCIA, JR., SBN 109349
2  Rains Lucia Stern St. Phalle & Silver
   Attorneys & Counselors at Law
3  2300 Contra Costa Boulevard, Suite 500
   Pleasant Hill, CA 94523
4  Telephone: 925-609-1699
   Attorneys for OAKLAND POLICE OFFICERS ASSOCIATION
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT CASE MANAGEMENT STATEMENT (C 00-04599 WHO)

# TABLE OF CONTENTS

**PLAINTIFFS' STATEMENT**

**TASK 2 (Timeliness Standards and Compliance with IAD Investigations)** .... 1

**TASK 5 (Complaint Procedures for IAD)** ....................................................... 3

**TASK 24 (Use of Force Reporting Policy) & 25 (Use of Force Investigations and Report Responsibility)** ................................................................................. 5

**TASK 26 (Force Review Boards) & 30 (Executive Force Review Board)** ......... 9

**TASK 34 (Stop Data/Vehicle Stops, Field Investigations and Detentions)** ...... 11

**TASK 34 (Stop Data/Vehicle Stops, Field Investigations and Detentions)** ...... 11

**TASK 45 (Consistency of Discipline Policy)** .................................................. 13

**CONCLUSION** ............................................................................................... 15

**THE CITY'S STATEMENT**

**OVERVIEW** ................................................................................................... 18

**THE CITY'S EFFORTS TO REDUCE RACIAL DISPARITIES** .......................... 18

I. STOPS AND DISPARITIES ARE DECLINING ............................................. 19

II. THE DEPARTMENT HAS A NEW RISK MANAGEMENT SYSTEM .................. 24

III. THE DEPARTMENT'S BEAT INTEGRITY PROGRAM IS PROMISING ........... 24

IV. THE DEPARTMENT IS STUDYING DISPARITIES IN DISCIPLINE ................. 27

V. THE DEPARTMENT IS WORKING TO INCREASE DIVERSITY ...................... 28

   A. Department Demographics ..................................................................... 28

   B. Background and Recruitment Improvements ........................................... 29

   C. Incoming Demographics ........................................................................ 30

VI. THE DEPARTMENT CONTINUES ITS WORK WITH STANFORD ................... 31

VII. GENERAL ORDER R-02 ........................................................................ 31

**TASK 2—INTERNAL AFFAIRS TIMELINES** .................................................. 32

**TASK 5—INTERNAL AFFAIRS COMPLAINT PROCEDURES** .......................... 35

**TASK 20—SPAN OF CONTROL** ........................................................... 36

**TASKS 24/25—FORCE INVESTIGATION AND REPORTING** .............................. 37

I. THE DEPARTMENT DRILLED DOWN ON SEVENTEEN CASES

FROM THE OIG's *SPECIAL REPORT* ........................................................... 37

II. THE DEPARTMENT, THE POLICE COMMISSION, AND THE COMMUNITY

ARE COLLOBORATING TO UPDATE POLICY ........................................... 39

III. THE DEPARTMENT IS CAPTURING MORE FORCE ................................. 40

IV. THERE IS NO APPARENT UPTICK IN ACTUAL OR

UNREASONABLE FORCE ......................................................................... 41

IV. THE DEPARTMENT IS ADDRESSING BODY-CAMERA ACTIVATION

CONCERNS ............................................................................................. 41

**TASK 26—FORCE REVIEW BOARDS** ...................................................... 42

**TASK 30—EXECUTIVE FORCE REVIEW BOARDS** .................................... 44

**TASK 34—STOP DATA** ........................................................................... 45

**TASK 41—RISK MANAGEMENT** .............................................................. 45

**TASK 45—CONSISTENCY OF DISCIPLINE POLICY** ................................... 47

**VEHICLE PURSUITS** ............................................................................. 47

**CONCLUSION** ....................................................................................... 48

**THE OPOA'S STATEMENT**

**THE OPOA'S STATEMENT** ....................................................................... 49

**PLAINTIFFS' STATEMENT**

**PLAINTIFF'S CURRENT POSITION**

In Plaintiffs' most recent Case Management Conference Statement to this Court, we stated that "it is clear that OPD has regressed on multiple fronts, and across several NSA tasks, in the past year." (Docket 1303, Joint Case Management Conference Statement, p. 5) Unfortunately, the Department has been unable to reverse this downward trend over the last six months since the last Case Management Conference. In fact, OPD has gone out of compliance with yet another task (Task 26 Force Review Board) since the last Case Management Conference in August, 2019.

OPD is currently out of full compliance with eight tasks. The current list of out of compliance tasks is: 1. Task 2 (Timeliness Standards and Compliance with IAD Investigations); 2. Task 5 (Internal Affairs Division (IAD) Complaint Procedures – in partial compliance); 3. Task 24 (Use of Force Reporting Policy); 4. Task 25 (Use of Force Investigations and Report Responsibility); 5. Task 26 (Force Review Board), 6. Task 30 (Executive Force Review Board—out of compliance); 7. Task 34 (Stop Data – in partial compliance), and 8. Task 45 (Consistency of Discipline – in partial compliance). Five of these tasks (Tasks 2, 24, 25, 26, and 30) were in full compliance as recently as January of 2019.

Plaintiffs' will outline their concerns regarding specific NSA tasks, below:

Task 2 (Timeliness Standards and Compliance with IAD Investigations)

Task 2 requires that the Internal Affairs Department of the OPD complete internal investigations in a timely manner, and had been inactive between 2015 and 2019. However, the 62nd IMT report determined that "IAD is having difficulty meeting its required timeliness standards", and OPD was found no longer in compliance with this task. (62nd IMT Report, p. 2)

Immediately prior to the most recent Case Management Conference before this Court, Plaintiff's received an email (dated August 12, 2019) from Chief Kirkpatrick stating that "we do not have a backlog anymore in IA." This email was incorporated in Plaintiffs' CMC statement, and Plaintiffs' took the statement at face value.  Plaintiffs noted, in closing, that we "hope that the City will address why this backlog was created in light of the City's agreement to abide by Task 2 and what permanent steps will be taken going forward to comply with Task 2 in the future." (August 2019 CMC Statement, page 3)

The most recent (66th) IMT Report notes that, contrary to Chief Kirkpatrick's assertions above, OPD remains unable to complete internal investigations at the IAD and Division Level in accordance with the very timeliness standards established by OPD.  For example, OPD policy requires that "at least 85% of Class I misconduct investigations and at least 85% of Class II misconduct investigations must be completed within 180 days to be considered timely."  Per DGO M-03, Class I offenses "are the most serious allegations of misconduct and, if sustained, shall result in disciplinary action up to and including dismissal and may serve as the basis for criminal prosecution."

The IMT reviewed 42 Class I misconduct cases during the period covered by the Draft 66th Report, and determined that only 16 of these cases were completed in a timely manner.  This represents a paltry 38% timely-completion rate that is, per the IMT, "still *far below compliance*." (IMT's emphasis, Draft 66th IMT Report, page 3)

Similarly, of the 85 Class II cases reviewed by the IMT during the period covered by the 66th Draft IMT Report, only 56 were in compliance with established timelines. This represents a 66% compliance rate with IAD policy and is, once again per the IMT, *far below compliance*." (IMT's emphasis, Draft 66th IMT Report, page 3)

It is clear that OPD is nowhere near achieving compliance with this task. Plaintiffs are baffled by IAD's inability to complete investigations within the 180-day

time limit. There is no reasonable explanation for these abysmal IA completion rates, particularly when the OPD was in compliance with this task for so long that it became inactive for four years.

The failure of OPD to comply with the 180 Day requirement is particularly distressing to Plaintiffs' counsel.  The first monitoring team insisted on a 90-day requirement and opposed the OPD request for a 180-day timeline.  Plaintiffs sided with the Oakland Police Department and against the Monitor at that time causing problems in our relationship with them that lasted for some weeks.  The OPD got their 180-day deadline.  Now, some 12-15 years later, they are still unable to meet their own deadline.  Obviously, this is completely unacceptable.

Task 5 (Complaint Procedures for IAD)

OPD had been in partial compliance with Task 5, which pertains to Complaint Procedures for the Internal Affairs Division, since the 21st Reporting Period (May 2015). On March 23, 2016, the Court issued an Order indicating that irregularities and potential violations of the NSA occurred in IAD investigation 15-0771. The Order noted that the investigation raised issues of accountability and sustainability of compliance. The IMT's most recently assessed this task in the 64th IMT Report, published on October 10/25/2019.  This report deferred Task 5 compliance "based on the provisions of the March 23, 2016 Order, our general concerns, and the findings of our forthcoming analysis of the Department's investigation of the officer-involved shooting of March 11, 2018". (64th IMT Report, p. 9).

The OPD is in compliance with some sub-paragraphs of Task 5, including subtasks 5.1 to 5.5, and subtasks 5.6 to 5.12. However, The IMT's concerns centered on Task 5.18 (which requires that OPD resolve each allegation in a complaint investigation using the preponderance of the evidence standard) and Task 5.19 (which requires that each allegation of a complaint is identified and resolved with one of the

following dispositions: unfounded; sustained; exonerated; not sustained; or administrative closure).  The IMT reviewed 25 such cases, and expressed reservations about two of the cases.

In the first instance, the IMT determined that "a potential use of force warranted further investigation."  In this case, officers struggled with a DUI arrestee, and the investigator "noted the struggle", but determined it "was unclear if any force was used against the complainant." (64th IMT Report, p. 8).  Although the IMT concluded that the investigator's approval for a summary finding was "probably appropriate… the investigator and/or IAD reviewers should have realized that the discovered use of force should have been investigated." (64th IMT Report, p. 9)

The IMT also disagreed with the findings in a second case, where an officer was sustained for two of three allegations, which resulted in the officer's termination.  The IMT writes that "we believe the remaining allegation should have been sustained, as well." (64th IMT Report, p. 9).  Plaintiffs' are not privy to the details of this case, but the discrepancies in the assessments of the IAD investigators and the IMT fit an ongoing pattern that hinder the Department's ability to come into compliance with this all-important Task.

Finally, Plaintiffs note that OPD would be better-positioned to attain meaningful and sustainable compliance with this Task if the City of Oakland had functional relationship with the new Oakland Police Commission, which will be the ultimate arbiter on most complaints against Oakland Police Department personnel.  However, to date, the working relationship between the Oakland Police Department, the City Administrator's Office, the City Attorney's Office, and the Police Commission has been difficult at best, and overtly hostile at other times.  This dynamic is not sustainable if OPD wishes to attain compliance with Task 5, and Plaintiffs' encourage the Department to pursue a more collaborative relationship with other stakeholders in this process.

JOINT CASE MANAGEMENT STATEMENT (C 00-04599 WHO)

1

2    <u>Tasks 24 (Use of Force Reporting Policy) & 25 (Use of Force Investigations and Report</u>

3    <u>Responsibility)</u>

4          OPD had been in compliance with Tasks 24 (Use of Force Reporting Policy) and

5    25 (Use of Force Investigations and Report Responsibility) of the NSA since 2015. In

6    November 2018, this Court reactivated these Tasks as a result of Plaintiffs' and the

7    Monitoring Team's concerns about Use of Force Reporting procedures at OPD.

8          Plaintiffs' have also elaborated their concerns in this regard at great length

9    previously.  Oakland reported that use of force levels had decreased for years, and

10   Department and City leadership stated publicly that this represented real and lasting

11   cultural change within the Department.  Per the 56th IMT report, uses of force data

12   between 2012 and 2017 dropped 75%, and as of October 6, 2018, reported force data

13   indicated an additional decrease of 23%.  However, when published use of force rates

14   skyrocketed in late 2018, Plaintiffs' attorneys reported to this Court that Use of Force

15   incidents had, apparently, been systematically underreported for years, in a manner

16   incongruent with the Department's own written policies, and demanded that a

17   comprehensive investigation must be undertaken to identify the root causes of this

18   problem.  (November 16, 2018 Case Management Statement, Dkt. No. 1221).

19         More recent IMT Reports suggested there were other recent Uses of Force that

20   were not reported besides the pointing of a firearm at a person.  For example, the 57th

21   IMT report highlighted a number of cases where "it is unclear whether force was used

22   and/or there is no actual video of the arrest" (page 2, 57th IMT Report).  On November

23   14, 2018, the IMT provided follow-up information regarding the 57th IMT Report to

24   Plaintiffs' attorneys, the Chief of Police, and the City of Oakland which indicated that

25   they reviewed over one hundred (100) police reports. The IMT subsequently requested

26   body camera footage for 38 selected videos containing possible charges (such as assault

27   on an officer, obstructing, resisting arrest, etc.) that had no accompanying use of force

28

report.  After reviewing the videos, the IMT determined that in 14 cases that were reviewed, officers used force without completing a use of force report.  Six of those incidents involved the use/pointing of a service weapon, and eight others contained force other than the pointing of a firearm.  This means that more than half of the unreported Use of Force incidents that the IMT recently discovered could not be attributable in any way to confusion about the wording regarding the low ready/retention position in General Order K-4.

In July 2019, just prior to the most recent Case Management Conference in this case, OIG (Office of Inspector General) released a damning report that indicated officers' systematically under-reported use of force incidents. [1] Specifically, uses of force involving weaponless defense techniques and pointing of a firearm at a subject were not always being reported in accordance with Department policy and procedures. (OIG Report, p.2).

The OIG Audit identified five incidents of unreported weaponless defense techniques (i.e., hand/palm/elbow strikes; kicks; take-downs; leg sweeps; arm-bar takedown; and control holds such as escort via elbow, bent wrist, twist lock, and arm-bar hammerlock).  One incident involved a takedown of a handcuffed subject, which was considered a Level 3 use of force but, per policy, should have been investigated as a Level 2 use of force, requiring review by the Force Review Board (FRB). Further, no use of force was even reported by the subject officer.  The OIG audit also found four other incidents where Level 3 Uses of Force were unreported.  The most recent IMT report  (66th IMT report) notes further instances where the IMT noted failures in the FRB process, and those are discussed in greater length below, at Task 26.

When the OIG Report was published last summer, Plaintiffs' were especially alarmed by OIG's determination that "the percentage of African American subjects of force that went unreported is higher than the percentage of African American

---

[1] http://www2.oaklandnet.com/oakca1/groups/police/documents/report/oak072446.pdf

1   arrestees." (p. 2, OIG Audit) Of the five above-described incidents where reportable

2   uses of force were not reported, four of the subjects of force (80%) were African

3   American, and the other (20%) was Hispanic.  Similarly, there were 19 incidents

4   where OPD Officers did not report pointing their firearms at a subject, even though

5   OPD policy mandates that this is a reportable Use of Force.  17 of these 19 incidents

6   (89%) involved an African-American subject, while the other two (11%) involved

7   Hispanic subjects. (OIG Report, p. 15).

8        As we noted at the time, this means that in every instance where the OIG Audit

9   determined that officers did not properly report Use of Force, the subject of the

10   unreported force was either Hispanic or African American.  This finding cries out for a

11   comprehensive study, but the silence from the OPD has been deafening.  Chief

12   Kirkpatrick, in her response to the OIG report, claimed that OPD "officers' patience

13   and professionalism in their community interactions reflect the cultural change within

14   the Department." (Kirkpatrick Response, p. 2)  It is unfathomable that anybody,

15   especially the Chief, could describe the OIG's findings in this regard as evidence of

16   positive "cultural change" or progress.

17        The City of Oakland, in its most recent Case Management Conference,

18   concluded:

19
20        "Lastly, in the very small sample size – too small to draw
        any statistical conclusions – the percentage of African
21        Americans who were arrested was lower than the
        percentage of underreported force against African
22        Americans." (August 2019 CMC Statement, page 22).

23        The suggestion that some Oakland Police are failing to file Use of Force Reports

24   on the basis of race demands further investigation. Has OPD made any effort to see if

25   this "small sample size" is accurate when compared with a larger sample, and thus

26   reflects a major problem beyond the mere failure to report the Use of Force?  If so,

27   what does OPD plan on doing about it?  These questions have apparently failed to be

28

1    answered since this allegedly small sample size was reported some six months ago.  If

2    so, the apparent  lack of follow through from the OPD on this finding is a big part of

3    the reason why the Oakland Police Department is still not in compliance with the

4    Negotiated Settlement Agreement.

5        The IMT's most recently published review of use Level 3 and 4 uses of force did

6    not find any incidents where such uses of force were inappropriate. (65th IMT Report,

7    page 3) However, such uses of force continue to disproportionately impact minority

8    citizens in Oakland.  The IMT reviewed all Level 3 and Level 4 uses of force in

9    February and March of 2019 and determined the racial breakdown for said uses of

10   force was 52% African American, 24% Latino, 14% White, and 10% Asian or other.

11   (65th IMT Report, page 3) These figures are generally consistent with earlier IMT

12   reviews.  Minority citizens in Oakland continue to face disproportionate rates of force

13   usage compared to non-minority Oaklanders, and this remains unacceptable to

14   Plaintiffs.

15       Even if such force is "within policy", the Oakland Police Department needs to

16   examine if the same force is used equally in the white and African American

17   communities.  The work of Doctor Jennifer Eberhardt has already found that

18   handcuffing is used on African Americans more than Whites in analogous situations.

19   She has also found that some OPD officers talk to African Americans differently than

20   they talk to Caucasians.  Given these findings, the possibility that force is also used on

21   African Americans when it is not used on Caucasians in analogous situations is not a

22   remote possibility.

23       Finally, upon review of Level 3 and 4 uses of force in February and March of

24   2019 (the most recent data covered in a published IMT Report, in this case the 65th

25   IMT Report), the IMT identified incidents where "additional verbal communications

26   and explanation with persons… might result in a reduction in the need to use physical

27   force", and other incidents "where OPD failed to identify themselves as police officers

28

JOINT CASE MANAGEMENT STATEMENT (C 00-04599 WHO)

1   when contacting subjects." (65th IMT Report, page 3).  The IMT's review of Level 2

2   uses of force during this period also found two instances where "additional uses of

3   force had been used and not reported."  These are addressed in great detail at Task 26,

4   below.

5

6   <u>Tasks 26 (Force Review Boards) and 30 (Executive Force Review Board)</u>

7        Force Review Boards (FRBs) are convened to examine and review Level 2 uses

8   of force.  OPD was previously in compliance with this Task as recently as the 19th IMT

9   Report.  During the period covered by 65th IMT report, the IMT reviewed six FRB

10  reports, and disagreed with the Board in one of the FRBs they observed, where a

11  specialty impact munition (colloquially known as a bean-bag) was fired at an

12  individual holding a stick.  Prior to the officers' arrival, the subject had used the stick

13  and struck some innocent bystanders but he was standing alone, holding the stick in a

14  non-threatening manner, when the officers arrived. The officers who initially

15  responded to the scene deduced that said individual was suffering from mental illness,

16  and had made some progress in establishing a rapport with him.  According to the

17  Body-worn camera (BWC) footage reviewed by the IMT, "the subject was not an

18  immediate threat to anyone, including the officers on scene, all of whom appeared

19  relaxed and almost nonchalant." (65th IMT Report, p. 13) Another officer then arrived

20  at the scene and "began giving commands to the subject as soon as he approached him,

21  and fired the bean bag round less than one minute-and-a-half later." (65th IMT Report,

22  p. 13)

23        According to the IMT, FRB members "appropriately expressed concerns

24  regarding the rapidity with which the officer deployed the round so soon after his

25  arrival, and… noted that the subject was contained and they questioned the urgency

26  to use force." (65th IMT Report, p. 13) The FRB also expressed concerns regarding

27  scene supervision.  However, the Board subsequently found the supervisor out of

28

1    compliance, but the shooter in compliance.  Plaintiffs' note that sequence of events is

2    similar the Pawlik shooting in March 2018, and the IMT describes this as "as scenario

3    we have seen play out before [where] the Board was highly critical of the actions of a

4    supervisor and an officer in this case; yet the Board members did not take their own

5    concerns in account when determining the appropriateness of the force.  They all

6    questioned the timing of the use of force – in essence, they questioned the *need* for the

7    force to be used when it was used – but they lacked the will to act on their concerns if

8    it meant determining a use of force out of compliance." (65th IMT Report, p. 14) The

9    FRB's own report on this incident concedes that "although the Board ultimately found

10   the SIM deployment in compliance, there was extensive discussion regarding how the

11   situation could have been better handled.  The Chair expressed the need for the

12   Department to do a better job in training officers and supervisors to bringing events

13   like these to a conclusion." (65th IMT Report, p. 14)

14        Once again, the IMT and the OPD have made starkly divergent determinations

15   about a use of force incident.  Given the description of the FRB articulated by the IMT

16   report, Plaintiffs' cannot understand why the above-described use of a bean bag round

17   by the self-deployed officer was deemed appropriate or reasonable.  The subject matter

18   expert (SME) who testified before the FRB described this use of force as "anticipatory",

19   but OPD's use of force policy does not prescribe or allow for "anticipatory" uses of force.

20   The City of Oakland nevertheless submitted a response to the IMT's 65th Report with

21   this Court (Document 1348), which stated that Chief Kirkpatrick asked two outside

22   SMEs to review the case, and "both experts found that the use of force complied with

23   the law and Department policy." (Document 1348, City of Oakland's Response to

24   Independent Monitor's Sixty-fifth Report, p. 3) The City concludes that "reasonable

25   minds will sometimes differ" on such matters (Document 1348, City of Oakland's

26   Response to Independent Monitor's Sixty-fifth Report, p. 4).

27

28

In fact, OPD is once again at odds with the IMT and Compliance Director when it comes to reviewing and assessing Use of Force incidents.  Task 30, which covers Executive Force Review Boards (EFRBs), has not been specifically assessed by the IMT since the most recent Case Management Conference in front of this Court.  It is clear, however, that OPD is out of compliance for this Task for many of the same reasons as Task 26.  OPD was found to no longer be in compliance with Task 30 March 2019, after being in compliance since 2014, for reasons pertaining to the Executive Force Review Board in the Pawlik matter.  Chief Kirkpatrick was overruled by the Oakland Police Commission, the civilian-led body that is tasked with overseeing the Oakland Police Department.  As this Court knows, the Discipline Committee (which consists of Commission Chair Regina Jackson, Commissioner Jose Dorado, and Commissioner Edwin Prather, two of whom were appointed directly by Mayor Schaaf and are not community appointees) of the Oakland Police Commission previously reviewed the circumstances of the Pawlik matter and sustained *MOR 370.27 – 1f Use of Physical Force* violations against four officers and one sergeant, and concluded that termination was the appropriate discipline for each of these officers.

This dovetails with the FRB described by the IMT, above, insofar as independent outside entities disagreed vehemently with OPD's conclusions following its review of a Use of Force incident. The Pawlik matter represented the first time that both the Compliance Director and the Police Commission overruled any OPD Chief on a discipline matter.  Given the IMT's deep reservations about the Force Review Board related to the above-described beanbag incident, as articulated by the IMT in the 65th Report, it appears unlikely to be the last.

Task 34 (Stop Data/Vehicle Stops, Field Investigations and Detentions

No report on the OPD can be complete without mentioning the significant decline in Discretionary Stops of African Americans between 2017 and 2018. In 2017,

1  there were 19,185 discretionary stops of African Americans, and in 2018 there were

2  10,874 stops of African Americans.  This decrease was accomplished with no

3  compromise to officer safety and no causal increase in crime.  The Oakland Police

4  Department deserves congratulations for this significant accomplishment.

5      The Risk Management Meetings are undoubtedly a major factor in causing this

6  sharp decline.  Officers with significant numbers of stops of African Americans, with

7  no yield or justification for the stop, are identified and discussed.  If warranted, these

8  officers are placed on supervisory monitoring or intervention.  This process serves as a

9  message to the rank and file—the Oakland Police Department will no longer tolerate

10  stops of African Americans unless there is a justification for the stop.

11      The Risk Management Meetings still need improvement.  Sergeants are

12  occasionally discussed, but not with the same thoroughness as the officers under their

13  command. Even though there is follow through with "deliverables", officers are rarely,

14  if ever, subjected to a transfer or desk job assignments even when their names come

15  up month after month in Risk Management Meetings.  That is not to say there is a

16  total absence of follow through.  Squads are occasionally broken up by the more

17  proactive Area Captains.  However, identifying problem officers is often an end in

18  itself, and effective follow through does not always happen.

19      The study on the failure to report use of force found some significant correlation

20  between officers who failed to report force and officers who were identified as outliers

21  in Risk Management Meetings discussing stop data issues.  It is possible that there

22  was some follow through when the same officers appeared as outliers in failure to

23  report use of force and outliers in stop data.  If so, plaintiffs' attorneys would

24  appreciate the court and the plaintiff attorneys being informed as to what, if any,

25  action has been taken.

26

27

28

JOINT CASE MANAGEMENT STATEMENT (C 00-04599 WHO)

1    Task 45 (Consistency of Discipline Policy)

2        The 66th IMT Report found that the OPD remained in partial compliance with

3    Task 45.  It is hard to believe that OPD will be in compliance with this task in the

4    near future, following  the publication of the Hillard Heintze report which will have

5    remained in "draft form" for nearly six months without being finalized, and without

6    the OPD taking any reported steps to remedy its extremely negative findings.

7        Plaintiffs' attorneys anticipate that they will be criticized for discussing a report

8    that is only in "draft" form.  Yet the essential findings of the report have not changed

9    for nearly six months. And the alternative to Plaintiffs' attorneys speaking out would

10   be to acquiesce to the current discipline process when we are on notice that the OPD

11   discipline process is racially biased. Plaintiffs' attorneys are simply unable to be silent

12   under those circumstances.

13       Both drafts of the Hillard Heintze report have been consistent in their central

14   finding that "black sworn employees were more likely to have their allegations result

15   in a sustained finding than other employees." Specifically they found that "over the

16   five-year time period, black employees were 37% more likely to have an allegation

17   against them result in a sustained finding." (Hillard Heintze Draft Report, p. 10). The

18   report also concluded that for Class One complaints (the most serious complaints),

19   black individuals are almost 38% more likely to have the complaint sustained, while

20   controlling for gender and years of service." (Hillard Heintze Draft Report, p. 10)

21       The report also found that the IAD policy which allows sergeants to be "fact

22   finders and adjudicators has the potential to lessen an investigator's neutrality" and

23   that this system "is not consistent with promising practices used in departments

24   similar in size to Oakland." (Hillard Heintze Draft Report, p. 11)  Another troubling

25   finding was that many (police officer) "interviewees …indicated that they believe that

26   the OPD receives few formal complaints about the disciplinary process because those

27   who complain may be ostracized or not receive desired assignments".  The report also

28

1  found that "Field Sergeants receive very little training on how to conduct those

2  investigations that are assigned to them." (Hillard Heintze Draft Report, p. 36)

3      The Report also investigated releases from the Academy. These findings were

4  more couched with possible issues with their conclusions than were their findings on

5  discipline in general.  For example, while the report concluded that black individuals

6  were more likely to be released from the academy as opposed to other individuals of

7  another race, they also stated that:

8
9      "While twice as many black trainees were released than
       white or Hispanic trainees, our review of the files
10     associated with the releases indicated that on a surface
       level, the releases seemed to be appropriate.  However, no
11     information was available to indicate whether other
       trainees may have exhibited the same behavior but were
12     treated differently."  (Hillard Heintze Draft Report, p. 41)

13     The Report also looked at FTO (Field Officer Training) completion rates by race

14  and gender. They included a table that shows completion rates for black and Asian

15  trainees lagged behind those for Hispanic and white trainees." (Hillard Heintze Draft

16  Report, p. 42)

17     One of the reports' conclusions was that "our analyses also revealed that the

18  disparity between the sustaining of complaints against black officers and officers of

19  other races "revealed that this disparity was reduced over the last two years as OPD

20  improved its policies and processes." (Hillard Heintze Draft Report, p. 62)

21  Unfortunately, the report did not quantify this conclusion, nor did they say what

22  "policies and processes" had caused this disparity to be reduced.

23     The Report had a series of recommendations that it urged the OPD to adopt.

24  Although these recommendations were known to the OPD command staff for over six

25  months as of the date of this  Case Management Conference, it is unclear which

26  recommendations, if any, have been adopted and/or implemented.

27

28

JOINT CASE MANAGEMENT STATEMENT (C 00-04599 WHO)

14

1       Hillard Heintze's findings – which include a "Key Finding" that "allegations

2  that result in a sustained finding are more likely for black employees" (Hillard Heintze

3  Draft Report, p. 10) – is an obvious violation of Task 45 which  requires Consistency of

4  Discipline.  It is unfathomable to plaintiffs' attorneys that OPD can be anywhere near

5  compliance with Task 45, which mandates that "discipline is imposed in a fair and

6  consistent manner."  If OPD fails to take appropriate action to resolve this disparity

7  without delay, the Compliance Officer and the Court need to do it for them.

8

9                    **CONCLUSION**

10       The Oakland Police Department recently gave a report to the Public Safety

11  Committee of the City Council.  The report included an "Attachment A" which

12  contained graphs showing "All Use of Force Complaints 2008-2018", "Demeanor

13  Complaints 2008-2018", and "Pursuits 2012-2018".  All three graphs showed steep

14  declines from 2008-2014 and increases thereafter.  In the case of pursuits, the

15  numbers rose sharply from 2017-2018.

16       These figures, like the relentless rise in the number of tasks out of compliance,

17  show that the Oakland Police Department is moving in the wrong direction.  After

18  seventeen years of the Negotiated Settlement Agreement, this can no longer be

19  tolerated.  Indeed, the underlying fault line of race which precipitated this action

20  twenty years ago, and which the consent decree has sought to address for seventeen

21  years, persists.

22       Plaintiffs' attorneys note the issue of race pervades the problems OPD has with

23  a number Tasks still not in compliance: Task 24 (Use of Force Reporting Policy), Task

24  25 (Use of Force Investigations and Report Responsibility), Task 34 (Stop Data – in

25  partial compliance), and  Task 45 (Consistency of Discipline – in partial compliance) in

26  particular have siginifant problems related to race.  While OPD has made some

27  significant progress on these issues, it is clear much work remains to be done.  The

28

continuation of this problem after so many years is particularly disappointing to Plaintiffs' attorneys, given that the Riders case itself contained so many issues related to race.

There is no doubt that the OPD has improved over the life of the Negotiated Settlement Agreement.  There are many fine officers in the Oakland Police Department.  They have a difficult job to do, and most of them do it very well.  Moreover, officer-involved shootings and stops of African Americans and Latinos have seen significant drops since the beginning of the NSA.

The central problem seems to be at the top.  There are a relatively small group of officers causing most of the problems.  In many cases, they have been identified.  However, not enough has

been done to effectively supervise and discipline them.  Something has to be done by the Monitor/Compliance Officer to bring this and related problems to an end and get the Oakland Police Department into compliance with the Negotiated Settlement Agreement.

In 2012, Plaintiffs' attorneys filed a motion to put the Oakland Police Department in receivership.  That motion was settled by Judge Thelton Henderson's Order of December 12, 2012.  Prior to this Order, the Monitor could only decide whether a given task was in compliance or not, and had no means of forcing compliance on the Oakland Police Department.  Judge's Henderson's December 12, 2012 order created the Compliance Director position to remedy this shortcoming the oversight process, and vested this person with the authority to force changes on the Oakland Police Department.  This was a central goal which had prompted Plaintiffs' motion for a receiver.

The court stated that the Compliance Director's mission "will bring defendants into sustainable compliance with the NSA" (Judge Henderson's December 12, 2012

Order, p. 2), and the Compliance Director was given broad powers to bring the OPD into compliance with the NSA.

The Compliance Director cannot be blamed for the OPD's failure to attain compliance with the NSA up to this point.  He has done a commendable job, and nothing in this Case Management Conference should be read to conclude that Plaintiffs' attorneys believe this current travesty is the fault of anyone other than the Oakland Police Department and the City of Oakland. Nevertheless, some sort of immediate action appears necessary to force the OPD into compliance or, at the very least, reverse this relentless trend of more and more tasks (many of which have been in compliance for years) falling out of compliance. The Compliance Director is the obvious person to try and take such appropriate action, and Plaintiffs' urge him to forcefully assert the authority vested in him by Judge Henderson's December 12, 2012 Order moving forward.

Plaintiffs' attorneys hope that this Case Management Conference will mark the beginning of a new trend which ultimately results in the OPD attaining compliance with the NSA.  But that can only happen if the City of Oakland and its police department is prepared to take drastic steps both to reform itself and take the necessary steps to attain full compliance with this settlement agreement that it and its experts helped draft and did promise to fulfill over ten years ago.

JOINT CASE MANAGEMENT STATEMENT (C 00-04599 WHO)

## THE CITY'S STATEMENT

### OVERVIEW

The City respectfully submits an update on the following:

- **The City's efforts to reduce racial disparities**
- **Task 2**—Internal Affairs Timelines
- **Task 5**—Internal Affairs Complaint Procedures
- **Task 20**—Span of Control
- **Tasks 24/25**—Force Investigation and Reporting
- **Task 26**—Force Review Boards
- **Task 30**—Executive Force Review Boards
- **Task 34**—Stop Data
- **Task 41**—Risk Management
- **Task 45**—Consistency of Discipline
- **Vehicle Pursuits**

In addition, the City's leaders and subject matter experts look forward to addressing any topics the Court raises at the CMC.

### REDUCING RACIAL DISPARITIES IN POLICING

Reducing racial disparities is the point and prize of the City's reform efforts. That precept is foundational to every policy, practice, and investment the Department makes. Disparities plague policing across the nation. NSA or not, the City is fixed on reducing disparities within Oakland.

In just the first half of 2019, the Department responded to nearly 184,000 service calls and touched the lives of more than 200,000 people. In responding to these calls and doing their jobs, officers dutifully strive to be good guardians of the community they serve.

On a range of fronts, there have been letdowns. To name some, a sample of seventeen instances of force underreporting all involved African American or Latinx

JOINT CASE MANAGEMENT STATEMENT (C 00-04599 WHO)

persons; the Department's force-reporting policy was unclear; in certain situations, officers or their supervisors should have employed better tactics; the Department's risk-management computer system performed poorly, and it is taking longer than anyone hoped to install a new one; there were disparities in sustained findings (none were found in the discipline imposed); and the Department has missed certain timelines for Internal Affairs cases.

The City owns this. At the same time, there has been real progress, largely owing to the officers' earnest efforts and strong, top-down leadership.

Against that backdrop, two things are true: there are positive things to report about the City's efforts to combat disparities, and challenges remain.

## I.     STOPS AND DISPARITIES ARE DECLINING

Both stops *and disparities* among whom officers stop are decreasing. As the City previously reported, the Department reduced its total number of stops to 19,900 in 2018, down from 30,000 in 2017. That reduction most significantly impacted African Americans. African Americans were subject to 10,924 stops in 2018, down from 19,185 stops the prior year. Forty-three percent fewer African Americans were stopped in 2018. That translates to 8,261 fewer times that African Americans were stopped.

This trend persists. Citywide in 2019, there were 14,232 total stops.  African Americans were stopped 7,255 times—a further thirty-four percent reduction from 2018.

Along with a smaller footprint—please see Dr. Eberhardt's discussion about why this matters, Ex. A, *Oakland Stories* Transcript, at 23-25—recent data reflects this trending decrease in actual disparities across every patrol area:



### 4.4 BFO1 Non-Dispatch Stop Percentages by Race
### Jun-Aug to Sep-Nov 2019 Comparisons



As Dr. Eberhardt points out, the Department is making progress:

Q. -- as the mayor of Oakland, I need to know from you, have you seen evidence of culture change within the Oakland Police Department?

A. I have. I mean, I've seen evidence of it; and I think that culture change started even before we got there, you know. I think it -- you know, if we sort of look at other, you know, people like Jim Chanin and John Burris, they tell me they don't get the calls they used to get, you know, of people who feel they were harmed by somebody from the OPD, you know. So they think, you know, that this has been happening slowly for over the last ten years. But I've been there almost five years now and I've seen it happen myself in -- just in the time that I've been there. And other members of the Stanford team, we've all seen it. Real -- I mean, I think I can give you some examples of that, if you want.

Q. Well -- and are you seeing it, though, as something that's really been imposed by the community, demanded by City leadership? Or are you seeing some of this come from within the department, within rank-and-file?

A.  I think it was coming from all places, but the thing that I have seen that has changed in the five years is that it's coming from within the department, that people believe in the work and they're excited about the changes and that they're able to move these outcomes.  And I think that was especially the case for the intel-led stops that we were just talking about.  That was a team effort.  That wasn't something that was imposed.  That was something that, you know, people from all sectors of the department worked with us on and we worked together and came up with a metric, a way to track, you know, this and measure it.  And, you know, we've found just from measuring which stops are intel-led.  The measuring of it actually has increased the number, the percentage, of intel-led stops.  And so, you know, that in and of itself is a victory and that's helping to, we believe, to bring down the overall number of stops.

Q.  So the officers themselves are seeing the value --

A.  Yeah.

Q.  -- of slowing down, of being more thoughtful about the reasons for their actions?

A.  Right, right.  And they know, you know, which stops, you know, are going to take high priority.  They're thinking about maybe, you know, when they see a person that they're considering stopping, you know, they're thinking about, you know, is this a high-priority stop?  How many of my other stops have been, you know, high-priority stops?  And so it causes them to pause, right, and -- and that pausing actually is what you want, right, to arrest even the potential for bias. . .

And they're doing that; and so they're not -- you know, you're less likely to stop someone now based on intuition, you know, than they were before.

Q.  -- some of these actual kind of changes in policy and practice --

A.  Right.

Q.  -- came out of this working group --

A.  Right.

Q.  -- which had rank-and-file from every level --

A.  Yes.

Q.  -- of the organization, not just the command staff.

A.  That's right.

1    Q. Yeah.

2    A.   That's right.   And they embraced the change.   They
     believed in it; and when we implemented it, it actually had a
3    huge outcome.  And then other people could see that outcome,
     right?  And so, then, that's a way, too, that you can see how,
4    you know, a change in narrative can happen, right.  Because
     for many years, at least for the first few years we were there,
5    you know, they would always say, Well, you know, we can't
     really bring down the number of stops without the crime rate
6    going up.  And, you know, it just is what it is and, you know,
     so we have to kind of just take what we get.  And they didn't
7    see the role of themselves or the role of policy in, you know, in
     the        numbers,        you        know,        in        producing        the
8    outcome.  But I think after this, after adding that intel-led,
     you're seeing a policy change leading to a different outcome.
9    And so then that changes the narrative about whether we
     needed this kind of policing, whether we needed to stop that
10   many people, right . . .

11   A.  Because the crime rate is still going down. . . .

12   Q.   You know, now, is what Oakland is doing, are all
     departments doing this?   Or do you think that there's
13   something about what the Oakland Police Department is
     doing that other departments could benefit from?
14
     A.   I think -- yes.   So not -- I don't know of any other
15   departments who are doing this.  I think the OPD is pretty
     progressive on this front and I think -- I'm hoping that other
16   departments will, you know, follow suit and learn from this
     and that they would see the value in this; and I think -- I'm
17   hopeful that they will.  It's -- it's been -- I think part of the
     issue, though, is, I think, you know, after producing the
18   report, to not just drop the report and leave.  I think part of
     the -- the issue has to do with really working together to figure
19   out some solution.  If you want, you know, some change in
     outcome, that we can figure that out together.  I think that
20   would have been hard to just have a report with some
     recommendations and then, you know, you're kind of out.  So
21   -- and so not only do we -- actually, are thinking about doing
     this with other police departments, but other, you know --
22   other -- other types of sectors, right . . .

23   Q.  Let's end . . . with you telling Oakland residents if there's
     one thing you want residents to know about the Oakland
24   Police Department and their efforts to eliminate racial bias.
     What do you want Oaklanders to know?
25
     A.  Well, I think I want them to know that change is possible,
26   that change is happening, 'cause sometimes it looks like
     things are the same.  But they're not.  I mean, there are a lot
27   of people who are working on these issues, who care about the
     issues.   There are people, both within the department and
28

JOINT CASE MANAGEMENT STATEMENT (C 00-04599 WHO)

1
2
3
4
5
6

> outside of it, who are pushing to move the needle on this and we've had some wins, right.  We have been able to push the needle in lots of ways.  And I also want the city to know that there are just really innovative things happening within the department that other police departments will – I believe -- will pick up and find useful.  And I think, especially -- you know, we were talking about the intel-led work, but also the body-worn camera way to improve police-community relations.  I think it's huge and it's -- to the extent that we're not doing that and other departments aren't doing that, I feel like it's a real missed opportunity.  And so I applaud the -- you know, the department for going in that direction.

7   Ex. A, *Oakland Stories* Transcript (https://youtu.be/modnb_nP7ME), at 25-32 (Oct. 25,

8   2019).

9   ## II.    THE DEPARTMENT HAS A NEW RISK MANAGEMENT SYSTEM

10      The Department's new risk management system, VISION, went online just

11  before the new year.  VISION offers three main tools: a personnel database, an early

12  warning system, and interactive dashboards (the dashboards are not yet online).

13  Compared to its predecessor, VISION is faster, more reliable, and easier to use.

14      Most significantly, once fully implemented, VISION will allow supervisors to

15  zoom in and out on stops, arrests, force, complaints, collisions, pursuits, and other

16  data by individual officer, squad, or larger groups in real time.

17      The Department is committed to making the most of this system and using it to

18  further enrich its risk management meetings.  Each meeting includes an assignment

19  of deliverables to commanders based on the meeting and "an extensive review of

20  [those] deliverables" at the next meeting.  Dkt. No. 1240, at 21.  In its most recent

21  report, the IMT discussed this process.  Dkt. No. 1357, *66th Report*, at 10 (Feb. 17,

22  2020).   Please see the *TASK 41—RISK MANAGEMENT* section below for further

23  detail.

24  ## III.   THE DEPARTMENT'S BEAT INTEGRITY PROGRAM IS PROMISING

25      The Department is continually examining new methods to combat disparities.

26  The Chief, for instance, has made clear that the Department places little value on low-

27

28

JOINT CASE MANAGEMENT STATEMENT (C 00-04599 WHO)

level equipment stops that do not present immediate safety risks unless they are tied to a crime.  Overall, the Department is concentrating on intelligence-led policing.

In this vein, the Department has been underscoring so-called "beat integrity." The idea is to focus officer presence and patrol activity on assigned beats.  This encourages officers to better understand their beat, learn the needs of the community on that beat, and cooperate with community members to determine the best ways to address those needs.

Area supervisors study data about beats and the officers who serve each beat. That review informs supervisors' direction to officers.  Supervisors stress beat pride, beat accountability, activity other than stops (such as high visibility, security checks, and investigative follow-ups), and intelligence-led stops.

Here is an example of those mandates and messaging, as set forth in an email a commander sent to officers:

- Take care of one another and our community; demonstrate safe, fast, and professional response to calls; conduct excellent preliminary investigations; demonstrate Beat pride and integrity; contribute meaningful discretionary stops, patrols and security check activity. Help us succeed by proactively managing calls, coverage, and direction to meet expectations
- Knowledge and awareness of recent 10851, 215, 211, 459 IntSum info, DBs and descriptions for intel-led stops
- Constant focus on main corridors for intel-led stops, high visibility deterrence, security checks (Advise dispatcher or use MDT to create/log Security check incidents), and fast response to priority robberies and burglaries
- Are your discretionary stops meaningful and done with the intent to address crime and public safety with as much effectiveness as possible?

  ➢ Is the stop necessary to address *__a traffic or public safety hazard__*? This stop addresses observed unlawful behavior that causes danger in our community.  To address

  allegations of profiling or bias, we know and remind ourselves that our stops are made due to the observed unlawful activity and need to intervene **regardless** of the type of vehicle involved or description of pedestrian/driver/occupant.  It is not a pretextual stop or a stop made in a high crime area for the purpose of deterring more serious criminal activity in any way. Examples:
    o Vehicle runs a stop sign, stop light, or commits some other dangerous moving violation
    o Vehicle's equipment is inoperable or damaged to the extent that a traffic and public safety issue exists (headlights out/off during hours of darkness, brake lights inoperable, etc. and condition may lead to collision)

  ➢ Is the stop *__precision-based__*? This stop results from the identification of a specific problem and/or problem location – usually in partnership with the community – and is accompanied by a Beat officer request for enforcement, directive, or problem-solving response.  Examples:
    o Homeless encampment problem-solving project with requests to identify and contact persons drinking in a park in public;
    o Fire danger in the hills with request to security check and contact persons associated to groups that may be drinking, smoking, and lighting fireworks in the identified location
    o Specific traffic safety moving violations at identified locations/times/intersections/addresses
    o Security checks in a high auto burglary neighborhood and person observed looking into parked vehicles and checking door handles

  ➢ Is the stop *__intelligence-led__*? An intel-led stop requires that we know information – prior to the initiation of the stop – that the driver, occupant, vehicle or pedestrian about to be stopped is described or named and related to a specific criminal want/trend/offense/warrant/Intsum, etc. By using information and intelligence, we can more effectively contact the relatively few people who are causing the most harm in our Area.  Examples:
    o A blue 211 vehicle with paper plates is listed in the DB and seen in the Area – pretext stop to identify occupants.
    o A photo and warrant provided via investigator email and individual is observed
    o A named individual connected to an Area gang is prioritized and identified for a probation search

JOINT CASE MANAGEMENT STATEMENT (C 00-04599 WHO)

The results are promising, as this Area 2 data shows:

| | Feb. 1, 2018 to May 31, 2018 | Feb. 1, 2018 to May 31, 2019 |
|---|---|---|
| **Non-Intelligence-Led Stops** | 561 | 284 **49% reduction** |
| **Non-Intelligence-Led Stops of African Americans** | 352 | 138 **60% reduction** |

Given these results, the Department is increasing its emphasis on beat integrity.

## IV.    THE DEPARTMENT IS STUDYING DISPARITIES IN DISCIPLINE

The Department, with input from Plaintiffs' counsel and other stakeholders, contracted the Hillard Heintze, risk management consulting firm to study whether there are disparities in officer discipline, and if so, to identify causal or correlative factors.  The firm mined data from 2014 through 2018.   At least within law enforcement, there is no apparent prior study as expansive as this one.  The stakeholders guiding the study include the Internal Affairs Commander, the City's Race & Equity Director, Plaintiffs' counsel, the Oakland Black Officers Association, and other officer affinity groups.

When the City received the study's first draft, all stakeholders agreed that significant revisions were required.  For one thing, the study did not differentiate between sworn and civilian personnel.  For another, in certain places the study did not distinguish between not-sustained, exonerated, and unfounded findings.  The firm thus had to re-run the data and re-examine the results.  Earlier this month, the firm provided a second draft, which the stakeholders are reviewing.

The most significant finding is that African American officers were thirty-nine percent more likely to have Class 1 complaints sustained, and twenty-five percent

more likely to have Class 2 complaints sustained.  Interestingly, there is no disparity in discipline imposed for sustained complaints.

These results are extremely concerning to the Department and City leaders; the Department is taking immediate steps address this issue.  First, the Department has increased its training of investigators.  Second, the City is looking to add personnel— including a civilian commander—to Internal Affairs.  Third, the City is assessing the idea of reassigning some or most Department-Level Investigations to Internal Affairs, with the aim of boosting consistency and efficiency within those investigations.

The Department is also considering the lack of disparity in discipline and whether this finding may shed additional light on the origins of disparity in sustained complaints.  Because the executive staff are consistently involved in every aspect of the imposition of discipline, the lack of disparity is perhaps unsurprising.  The Department is interested in exploring whether there are ways to make investigations similarly more consistent, and the impact that may have on the reflected disparity in sustained complaints.

## V.    THE DEPARTMENT IS WORKING TO INCREASE DIVERSITY

Increasing the Department's diversity is a priority for the City.  The goal is for the Department to reflect the community it serves.  The top commanders—the Chief, the Assistant Chief, three Deputy Chiefs, and a Director—are a diverse group that includes three African Americans, three women, and one person who grew up in Oakland.  The City has committed resources to injecting more diversity into the rest of the Department.

### A.    Department Demographics

There are approximately 749 sworn officers.  Roughly ten percent live in Oakland.  Demographics are as follows:

JOINT CASE MANAGEMENT STATEMENT (C 00-04599 WHO)

| Race/Ethnicity | Female (number) | Male (number) |
|---|---|---|
| **Asian** | 7 | 91 |
| **African American** | 19 | 108 |
| **Pacific Islander** | 1 | 28 |
| **Latinx** | 34 | 171 |
| **Native American** | 1 | 2 |
| **Undeclared** | 4 | 15 |
| **White** | 38 | 232 |

Over the years, the demographics have been as follows:

| Race/Ethnicity | 2018 Census | OPD 2016 | OPD 2017 | OPD 2018 | OPD 2019 |
|---|---|---|---|---|---|
| **White** | 36.7% | 39.7% | 38.8% | 38.4% | 36.4% |
| **African American** | 24.3% | 18% | 17.3% | 16.7% | 16.9% |
| **Asian** | 15.9% | 15.1% | 15.3% | 16.9% | 13.3% |
| **Latinx** | 27% | 23.7% | 24.6% | 25.2% | 26.9% |
| **Other** | -- | 3.5% | 4% | 2.7% | 6.6% |

## B.    Background and Recruitment Improvements

Over the last two years, the Department has been overhauling its Background and Recruitment process.  Here are some examples of those changes:

- The Bureau of Services took over the process.
- The Department began using more testing locations.
- The Department began recruiting lateral officers.
- The Department expanded its background investigator bench.

- The Department contracted with "Interview Now" to use its special technology to recruit candidates, contact them, and collect their demographic data.
- The Department beefed up its recruitment efforts within Oakland.
- All background investigators received the 32-hour POST background investigation training. POST approved an in-house training for new investigators.
- The Department eliminated discretionary screening. All eligible candidates are now assigned to a background investigator.
- All candidates are evaluated in a "whole person assessment." There are no automatic drug or economic disqualifiers. All non-felony criminal behavior is evaluated according to the circumstances, the person's age, and the person's later behavior.
- Applicants are no longer sorted into priority piles.
- The Department eliminated non-validated pre-hire physical tests, such as pull-ups.
- The Department adopted POST-validated oral board questions.
- The Training and Background units meet regularly to review background information on candidates who fail, quit during the academy or field training, or are terminated during training.

**C.    Incoming Demographics**

Later this month, the 183rd Academy will graduate. Race and gender demographics are as follows:

| Race/Ethnicity | Number |
|---|---|
| Asian | 8 |
| African American | 11 |
| Latinx | 16 |
| White | 4 |
| Other | 4 |

## VI.    THE DEPARTMENT CONTINUES ITS WORK WITH STANFORD

The Department is expanding its work with Dr. Jennifer Eberhardt and her Stanford team.  Dr. Eberhardt's team will examine the extent to which situational factors—such as the location of the incident, underlying crime rate of the neighborhood, subject demographics, officer service history, and de-escalation training—may influence an officer's decision to use force and construe the encounter as a use-of-force incident.  Decades of social science research suggest ways in which situational features and the broader environment impact cognition, perception, and behavior toward others.  It is difficult to determine, however, what role these features play in use-of-force decisions.

The study will focus on the degree of choice officers feel they can exercise when deciding whether to use force, officers' perception of threat based on the body movement of suspects, and training takeaways.  The City is extremely grateful for Dr. Eberhardt's innovative work.

## VII.   GENERAL ORDER R-02

The Department has a new, data-driven policy on searching people who are on probation and parole.  Dkt. No. 1303-7, *General Order R-02.*  It is widely lauded by many, including the Alameda County Public Defender's Office, as ahead of the curve. The policy is now in effect.

JOINT CASE MANAGEMENT STATEMENT (C 00-04599 WHO)

31

1

### TASK 2—INTERNAL AFFAIRS TIMELINES

2          Since the last CMC, the Department carefully examined its failure to meet Task

3    2 timelines and adopted corrective measures.  These fixes are not meant to simply

4    check the box for the timelines; rather, they are meant to achieve lasting change.

5          Task 2 centers on the idea that "[f]airness to complainants, members/employees

6    and the public requires that internal affairs investigations be completed in a timely

7    fashion."  To help achieve that goal, Task 2 provides two things:

8

9          1.      . . . OPD shall develop policies regarding timeliness
                  standards for the completion of Internal Affairs
10                 investigations, administrative findings and recommended
                  discipline.

11         2.      Compliance with these timelines standards shall be
                  regularly monitored by IAD command and the Department's
12                 command staff.  If IAD experiences an unusual proliferation
                  of cases and/or workload, IAD staffing shall be increased to
13                 maintain timeliness standards."

14         The Department has timelines to help make sure it completes thorough

15   investigations and does not miss the opportunity to impose appropriate discipline.  To

16   that end, the Department requires that 85% of Class I and Class II misconduct

17   investigations be completed within 180 days.

18         In 2016, the Department hit that mark in 94% of its cases.  The next year, it did

19   so in 93% of its cases.  In the first half of 2018, though, the percentage declined to 67%.

20   And over the next year, the percentage continued to drop.

21         In late 2018, Internal Affairs began monitoring the backlog.  By Spring 2019,

22   the Chief redirected resources to completely clear the backlog—though a new one then

23   formed.  In July 2019, the IMT found that the Department was not complying with

24   Task 2.  Dkt. No. 1296, at 2-3, *62nd Report* (July 11, 2019).

25         All along, the Department has been stressing investigatory quality over

26   checking the box for deadlines.  In a recent audit, the Department's Office of Inspector

27

28

General (OIG) found that in 100% of the cases with sustained findings it reviewed, the Department met the state's statutory deadline for imposing discipline.

The OIG made the following findings and recommendations as part of the audit:

## Findings and Recommendations

| OIG Findings | OIG Recommendations |
|---|---|
| **Finding #1**<br>An unstable environment due to implementation of new technology, inevitable personnel changes in management, and not having effective controls to minimize the effects of such changes contributed to investigations involving allegations of Class I and Class II employee misconduct and approved by the Internal Affairs Division Captain/Chief of Police from January 1, 2018 to June 30, 2019 to exceed the Oakland Police Department's 180-day timeline over a 15-month period. | **Recommendation #1**<br>Revise Internal Affairs Division Policy 10-01, Internal Affairs Policy and Procedures Manual, dated January 19, 2010, to include procedures related to technology issues causing a slowdown in the processing of complaints. Not having procedures in place to minimize the effects technology issues can have on an operation is a contributing factor to some investigations exceeding the 180-day timeline and lasting approximately 15 months. |
| **Finding #2**<br>In 77% of the sampled cases, the Intake Section's processing of complaints exceeded 48 days, rendering the process to range from 49 to 123 days.<br><br>Upon the completion of the Intake Section's processing of a complaint, the OPD took 15 days or less before assigning an investigator to the case in only 58% of the sampled cases.<br><br>The absence of an established, documented benchmark for each unit, section, division and bureau's handling of an investigation is a contributing factor to investigations involving allegations of Class I and Class II employee misconduct offenses and approved by the IAD Captain/Chief of Police from January 1, 2018 to June 30, 2019 to exceed the OPD's 180-day timeline. Goal setting is most important when striving to achieve excellence.<br><br>**Finding #3**<br>In 60% of the sampled cases, the assigned investigator completed the investigation within 93 days. However, all but one case took an additional 53 to 257 days of review and/or additional investigation prior to the review and approval by the IAD Captain/Chief of Police. | **Recommendation #2**<br>The OPD should ensure its Executive Team routinely receives reports that include, at minimum, the compliance status of timelines and cases approaching and exceeding the 180-day timeline.<br><br>**Recommendation #3**<br>The OPD should invest in investigation case management software to ensure more effective and or efficient methods of tracking investigations' progress and status, allowing for the early detection of issues or concerns that could cause delays and increase the potential to exceed the 180-day timeline. Investigation case management software will allow the Department to collect incident and investigation summaries, interviews, evidence, relevant documents, links and more, all in one centralized location. In addition, it efficiently manages investigator workloads with a clear view into which cases they are assigned to, how many cases are open, and how long they have been active. With this data, the Department will have the insight they need to mitigate future investigations and protect the organization from risks. |

JOINT CASE MANAGEMENT STATEMENT (C 00-04599 WHO)

| OIG Findings | OIG Recommendations |
|---|---|
| The Chronological Activity Logs are poorly documented, in that the reason(s) for taking more than 30 days for the IAD Captain's/Chief of Police's review and approval are not explicitly stated.<br><br>**Finding #4**<br>In 40% of the sampled cases, the assigned investigator exceeded 93 days to complete the investigation, and all but five cases took an additional 33 to 217 days of review and/or additional investigation prior to being finalized for review and approval by the IAD Captain/Chief of Police.<br><br>**Finding #5**<br>Dates are not routinely entered in PRIME's "Date the Investigator is Assigned" and the "Investigation Due Date" data fields, precluding the OPD the capability of determining the length of time it takes to assign an investigator to a case and how often investigators are adhering to the due dates. | **Recommendation #4**<br>The OPD should adopt the *DLI Review Tips and Guidance* information the IAD Captain provided in the notice he sent to all commanders and managers, via email, dated August 30, 2019 — and which is infused throughout this audit as a Department Response— by codifying the information in a Departmental Training Bulletin or an Organization Unit Policy and Procedures such as Bureau of Field Operations Policy and Procedures, the Internal Affairs Division Policy and Procedures, the Communications Division Policy and Procedures, etc.<br><br>**Recommendation #5**<br>To ensure efficiency throughout the entire investigation process, the OPD should establish documented benchmarks for each unit, section, division and bureau's handling of an investigation, striving to complete most investigations much sooner than 180 days.<br><br>**Recommendation #6**<br>The OPD should ensure the date an investigator is assigned and the date the investigation is due is entered in the PRIME data fields to monitor whether investigators are adhering to due dates.<br><br>**Recommendation #7**<br>The OPD should conduct value stream maps to analyze its current complaint investigation process and design a future investigation process with reduced lean wastes.<br><br>**Recommendation #8**<br>The OPD should conduct caseload assessments for division-level investigations to ensure investigators are capable of completing investigations in a timely manner. |

| OIG Findings | OIG Recommendations |
|---|---|
| **Finding #2 Additional Observation**<br>The OPD's BFO centralized tracking system is inefficient and prohibits the OPD from knowing the whereabouts of all its division-level investigations. | **Recommendation #9**<br>The OPD should ensure the BFO Administrative Sergeant is notified by email of all DLI's that are returned directly to the Internal Affairs Department. |

JOINT CASE MANAGEMENT STATEMENT (C 00-04599 WHO)

1    *Please see* Ex. B, *Combined Quarterly Report*, and Ex. C *Response*.

2        The Department is adopting each recommendation.  The Department is

3 rewriting its Policy and Procedures manual.  Area commanders are more closely

4 tracking deadlines and submitting tracking data to Bureau Chiefs and the Chief's

5 Executive Team.  There is a single tracking document that all involved at every level

6 can use.  The Department is providing more guidance for Department-Level

7 Investigations.  And the Department is considering the prospect of a new case

8 management system.

9        In addition, the Department plans to create another civilian leader position

10 within Internal Affairs and assessing whether to have Internal Affairs personnel

11 rather than field sergeants perform Department-Level Investigations.

12

13                **TASK 5—INTERNAL AFFAIRS COMPLAINT PROCEDURES**

14        The IMT last reviewed Task 5 in its *Sixty-Fourth Report*.  Dkt. No. 1337, *64th*

15 *Report*, at 4-9 (Oct. 25, 2019).  The IMT "deferred" its compliance finding "based on the

16 provisions of the March 23, 2016 Order, [the IMT's] general concerns, and the findings

17 of our forthcoming analysis of the Department's investigation of the [*Pawlik* incident]."

18 The IMT has not yet released that report. Since July 2018, Task 5 reviews have been

19 mainly positive.  Dkt. No. 1240, at 14-16, *JCMS* (March 22, 2019).   The City has

20 implemented all of the Court Investigator's recommendations concerning subtasks.

21 *Id.*

22        Here is a snapshot of the IMT's findings as to the subtasks dealing with the

23 quality of investigations, which are the key subtasks:

24

25

26

27

28

| SUBTASK | 56TH REPORT | 58TH REPORT | 61ST REPORT | 64TH REPORT |
|---|---|---|---|---|
| **5.15/ 5.16** | The Department gathered all relevant evidence and conducted appropriate follow-up interviews but the IMT disagreed with how the Department assessed the evidence in one of 15 cases. | The Department gathered all relevant evidence, conducted appropriate interviews, and properly assessed the evidence in all 18 cases. | The Department gathered all the relevant evidence, but the IMT disagrees with how the Department assessed the evidence in two of 19 cases. | The Department gathered all the relevant evidence, but the IMT disagreed with the Department's findings in one of 25 cases. |
| **5.17** | "OPD has a sustained history of 100% compliance with this task." | "OPD has a sustained history of 100% compliance with this task." | "OPD has a sustained history of 100% compliance with this task." | "OPD has a sustained history of 100% compliance with this task." |
| **5.18/ 5.19** | The IMT disagreed with findings in one out of 15 cases. | "We did not disagree with the findings in any of the [18] cases reviewed." | The IMT disagreed with the findings in two of 19 cases. | The IMT disagreed with the Department's findings in one of 25 cases. |
| **5.21** | The IMT approved of all the administrative closures in the sample. | The IMT approved of all the administrative closures in the sample. | The IMT approved of all the administrative closures in the sample. | The IMT approved of all the administrative closures in the sample. |

As this chart shows, the IMT has approved of 95% of the cases it reviewed in the past three reviews. Going back to 2010, there has been an over-90% approval rate.

## TASK 20—SPAN OF CONTROL

The IMT reviewed Task 20 in its *Sixty-Fourth Report.* Dkt. No. 1337, *64th Report,* at 10-11 (Oct. 25, 2019). Finding that the Department complies with this task, the IMT said that the Department "has institutionalized the practices of tracking how

1  each squad is supervised each day; planning when possible, for expected absences, and

2  considering how to fill in for personnel who are absent unexpectedly." *Id.*

3

4  ### TASKS 24/25—FORCE INVESTIGATION AND REPORTING

5   In its *Sixty-Fifth Report*, the IMT found that the Department has "taken

6  numerous steps to address the proper reporting of use of force and the concerns that

7  have been identified." Dkt. No. 1347, *65th Report*, at 5 (Dec. 19, 2019).

8   Those concerns surfaced as early as March 2018, when the OIG began flagging

9  potential force-reporting irregularities, including for the IMT.   Since then, the OIG

10  published a firearm-pointing audit in 2018, *2018 Third Quarterly Report* (2018), and a

11  global-force-reporting audit in 2019, *Special Report* (July 30, 2019).  The IMT most

12  recently discussed Tasks 24 and 25 in its *Sixty-Fifth Report* (Dec. 19, 2019).  Dkt. No.

13  1347.

14   The OIG will continue to review force reporting each year.

15   In addition, the Department is strongly and repeatedly messaging to officers its

16  expectations concerning the use of force, reporting that use, and body-camera

17  activations.

18   The City provides the following update on key issues born of the OIG's report,

19  including Internal Affair's review of seventeen cases, policy revisions, and force

20  reporting statistics.

21

22  ### I. THE DEPARTMENT DRILLED DOWN ON SEVENTEEN CASES FROM

23  ###  THE OIG's *SPECIAL REPORT*

24   The OIG found that in seventeen 2018 incidents—twelve involving a firearm

25  pointing and five a weaponless defense technique—officers failed to fill out use-of-force

26  forms.  The OIG referred those incidents to Internal Affairs, which has investigated

27  each one.

28

Here is a summary of the findings:

| Case No. | Summary | Findings |
|---|---|---|
| **1** | The OIG referred the case based on the potential failure to report force. | There were sustained findings for the failure to report force and for profanity. No unreasonable force was used. |
| **2** | The OIG referred the case based on the potential failure to report force—pointing of a firearm. | There was no sustained finding for the failure to report force. |
| **3** | The OIG referred the case based on the potential failure to report force—pointing of a firearm—and other performance of duty violations. | There was no sustained finding for the failure to report force. Supervisory notes were placed in the officer's file based on other findings. |
| **4** | The OIG referred the case based on the potential failure to report force—Level 4. | There was a sustained finding for the failure to report force. There was no finding of unreasonable force. |
| **5** | The OIG referred the case based on the potential failure to report force—Level 3 takedown. | There was no sustained finding. |
| **6** | The OIG referred the case based on the potential failure to report force and other performance of duty violations—Level 4. | There was a sustained finding for the failure to report force. There was no finding of unreasonable force. |
| **7** | The OIG referred the case based on the potential failure to report force and other performance of duty violations—Level 2. | There were sustained findings for the failure to report force and for use of force inconsistent with OPD policy. |
| **8** | The OIG referred the case based on the potential failure to report force—pointing of a firearm. | There was a sustained finding for the failure to report force. There was no finding of unreasonable force. |
| **9** | The OIG referred the case based on the potential failure to report force—Level 4. | There was no sustained finding. |

| | | |
|---|---|---|
| **10** | The OIG referred the case based on the potential failure to report force—Level 3. | There was no sustained finding. |
| **11** | The OIG referred the case based on the potential failure to report force—pointing of a firearm. | There was a sustained finding for the failure to report force. There was no finding of unreasonable force. |
| **12** | The OIG referred the case based on the potential failure to report force—pointing of a firearm. | There was no sustained finding. |
| **13** | The OIG referred the case based on the potential failure to report force—pointing of a firearm. | There was no sustained finding. |
| **14** | The OIG referred the case based on the potential failure to report force—pointing of a firearm. | There was no sustained finding. |
| **15** | The OIG referred the case based on the potential failure to report force—pointing of a firearm. | There was no sustained finding for the failure to report force. There was a sustained finding for demeanor. |
| **16** | The OIG referred the case based on the potential failure to report force—pointing of a firearm. | There was no sustained finding for the failure to report force. |
| **17** | The OIG referred the case based on the potential failure to report force—pointing of a firearm. | There was no sustained finding. |

## II.    THE DEPARTMENT, THE POLICE COMMISSION, AND THE COMMUNITY ARE COLLOBORATING TO UPDATE POLICY

The Department, the Police Commission, and the community are working together to enhance policies on force and force reporting.

First, the Department and the Police Commission together penned and published Special Order 9196. The order rewrites General Orders K-3 and K-4 to

1   make clear the types of force that must be reported, including firearm pointing.

2   Training on the new policy is underway.

3       Here are some of the key changes:

4   ▪ Striking subjective language—such as "intentional" and "low and ready"—

5       that could lead to uncertainty about when officers must report firearm

6       pointing.

7   ▪ Redefining "takedowns" to mean "physical force used by a member to cause a

8       person to go to the ground not under their control."

9   ▪ Clarifying when injuries trigger reporting.

10  ▪ Reclassifying certain force.

11      In addition, the Department, the Police Commission, and community members

12  together updated General Order K-3 to track California Assembly Bill 392's

13  framework concerning lethal force. The ACLU participated in the process. Last

14  month, the City adopted the new policy. Now, the same committee is meeting

15  regularly to further rewrite and enhance the policy.

16      Finally, the Chief issued Special Order 9191 requiring supervisors to review

17  body-camera footage when officers report that a person threatened an officer, resisted

18  arrest, or battered an officer.[2] Those types of incidents may be more likely to involve

19  force.

20  **III.   THE DEPARTMENT IS CAPTURING MORE FORCE**

21      At root, all these efforts—and those described in the last status report, Dkt. No.

22  1303, *JCMS*, at 20-25 (Aug. 14, 2019)—have made a difference. The Department is

23  accurately capturing more force:

24

25

26

27

28

---

[2] The specific laws are Cal. Penal Code §§ 69 (obstructing or resisting executive officer), 148 (resisting, delaying, or obstructing), and 243(b),(c) (battery on a peace officer).

JOINT CASE MANAGEMENT STATEMENT (C 00-04599 WHO)

| Type | Description | 2018 | 2019 | Change |
|------|-------------|------|------|--------|
| **16** | Weaponless Defense Technique Other Than a Control Hold—Level 3 | 25 | 56 | 124% |
| **22** | Intentionally Pointing a Firearm at a Person | 382 | 1236 | 224% |
| **26-16** | Weaponless Defense Technique Other Than a Control Hold—Type 16 lowered to Level 4 | 68 | 143 | 110% |

## IV.   THERE IS NO APPARENT UPTICK IN ACTUAL OR UNREASONABLE FORCE

Two months ago, the IMT noted that the increased reporting does "not appear to signal a rise in the actual use of force." Dkt. No. 1347, *65th Report*, at 5 (Dec. 24, 2019). For that report, the IMT reviewed fifty-five cases involving the use of Level 3 or Level 4 force. *Id.* at 2. In no case was the use of force "inappropriate or excessive," the IMT found. *Id.* at 3. Likewise, the OIG found no case of an officer using unreasonable force (although there was one sustained finding upon further review by Internal Affairs).

## V.   THE DEPARTMENT IS ADDRESSING BODY-CAMERA ACTIVATION CONCERNS

In the *Sixty-Fifth Report*, the IMT raised concerns about failed or late body-camera activations, and about boilerplate language in force reports. *Id.* at 4. As noted in that report, the Department is addressing both issues. *Id.*

First, the Department is holding officers accountable. The first time an officer forgets to activate their camera, the officer receives counseling and a note in their personnel file. If it happens again, there is progressive discipline. The Department has made clear to its supervisors that they must ensure that officers are complying with the body-camera policy.

Second, when the OIG looks at other subject matters, the OIG will also assess compliance with the body-camera policy.

Third, in August 2019, the Department set its cameras to have a thirty-second buffer.  This means that the camera recordings will include footage from the thirty-second window prior to activation.

Finally, it is worth noting that in 2019, there were 286,970 body-camera activations.  There were seven sustained findings for activation failures.

## TASK 26—FORCE REVIEW BOARDS

The IMT last reviewed Task 26 in its *Sixty-Fifth Report*.  Dkt. No. 1347, *65th Report* (Dec. 19, 2019).  Below, the City incorporates its response to that report.  Dkt. No. 1348, *Response to 65th Report*, at 1-2 (Dec. 24, 2019).

The Department convenes Force Review Boards to critically review the use of Level 2 force, hold officers accountable, and enhance policies and practices.  See OPD General Order K-4.1 (Dec. 15, 2016).  Since 2014, the Department has been in compliance with Task 26.  Dkt. No. 1219, *57th Report* (Nov. 2 2018), at 5 (discussing the City's compliance history).  Over the past five years the IMT has observed more than sixty FRBs, and more than 95% percent of the time the IMT agreed with the Boards' findings on whether force was used within policy.  At least once before, the Board and the IMT have reached different conclusions.  *Id.*  Overall, though, the IMT has "consistently found review boards to be detailed and thorough."  *Id.*

Most recently, the IMT reviewed six FRBs that were held this year.  Dkt.  No. 1347, *65th Report*, at 12 (Dec. 19, 2019).  The IMT disagreed with one of the Board's findings in one case, stating, "[the IMT] agreed with all of the Board's concerns regarding scene supervision and the need to use force at the time it was used, and we were quite frankly surprised that they voted the force in compliance with little deliberation."  *Id.* at 13.

To begin with, the Department has made clear that it strongly prefers different tactics in the subject scenario.  To that end, the Board and Chief Kirkpatrick agreed

that the scene supervisor should receive discipline for not exercising better control and not making better tactical plans.  Further, the Board ordered the supervisor's Captain and Lieutenant to assess the training he needs to improve in those areas.   In addition, the Board ordered the Department's Training Division to review its Crisis Intervention Team curriculum to make sure that the Department is following best practices for interacting with people who are experiencing mental health crises.  The Board also ordered the Training Division to assess whether one of its subject matter experts in this field should continue to serve in that role.

The City believes that all this demonstrates that the Board followed a "detailed and thorough" FRB process.  The Board carefully reviewed all the relevant records, video footage, and policies.  Over two sessions, the Board scrutinized this evidence, heard from four subject matter experts, and had meaningful exchanges with each other and the IMT.   The Board then wrote a detailed, 33-page report with recommendations on discipline, training, and policy.   The FRB report makes plain that there were pointed and probing deliberations.  The Board immediately saw the need for accountability and for a better approach.   At the same time, the Board recognized that the question of whether the use of force itself failed to comply with the law and the Department's policy and training was a separate issue.

On that question, the Board and Chief Kirkpatrick each deliberated extensively.  Chief Kirkpatrick, for instance, asked two respected outside subject matter experts on force—one a retired chief and the other a leading expert in the state—to review the policy and body camera footage.  Both experts found that the use of force complied with the law and Department policy.

This case prompted the Department to evaluate changes to both policy and training.  As a result, the Department may now propose revisions.  During the FRB, however, the Board considered and interpreted existing policy.

1   In sum, two things are true: the process was searching, and reasonable minds

2   differ on one of the Board's findings.  The Board's conclusions are supported by specific

3   Ninth Circuit cases, policies, training, and evidence.  And the Department did not shy

4   away from handing down discipline it expects to uphold.

5   Given all of this this, combined with the Department's strong compliance

6   history on this task, the City seeks guidance on the compliance metric that applies.

7   Task 26 does not mandate that the Board and the IMT agree on every finding in every

8   case.  Nor should it.  Reasonable minds will sometimes differ, and thus a standard of

9   one-hundred percent agreement between the Board and the IMT is not workable.  Yet

10  taking the City out of compliance based on a disagreement over a single finding

11  suggests such a standard.

12

13  ### TASK 30—EXECUTIVE FORCE REVIEW BOARDS

14  The IMT has found that seventeen of the past eighteen EFRBs complied with

15  the NSA.  *See* Dkt. No. 1240, *JCMS*, at 16-17 (March 22, 2019).  There was no EFRB

16  in 2019.  There was one EFRB in January 2020, concerning a canine deployment.  The

17  proceedings were thorough and lasted three days.

18  The City remains committed to holding independent and rigorous review

19  boards.  To that end, the Department is refining the Criminal Division's officer-

20  involved-shooting investigatory process, focusing on increased supervisory

21  responsibility, more training for investigators, implicit bias, community outreach, and

22  best industry practices.

23  In addition, the City has requested to have a non-voting outside observer

24  participate in EFRBs.  The City would like to work with the IMT to implement this

25  procedure.

26  The Department's training and messaging—which EFRB's help shape—is

27  having an impact.  For instance, officers recently showed extreme restraint in

28

attempting to arrest an armed man who was ramming OPD equipment with his car. A citizen captured part of that incident:

https://twitter.com/hyphy_republic/status/1225180110782775296

### TASK 34—STOP DATA

The IMT has not reviewed Task 34 since the last CMC.  A final step to complying with that task is fully implementing Stanford's 50 recommendations.  Two of them remain outstanding: No. 12—Build a stop data dashboard, and No. 17—Hire a data manager.

### TASK 41—RISK MANAGEMENT

In its most recent report, the IMT found that the Department is complying with Task 41 but said it is "concerned that the potential of the system is, for now, surpassing its efficacious use." Dkt. No. 1357, *66th Report*, at 10 (Feb. 17, 2020).

As noted above, the Department's new risk management system, VISION, is online.  There have been disappointing delays, though, in developing a key tool, dashboards.  Part of the reason for this is that the City's vendor was unable for some time to enter a further contract needed to complete the project because the vendor was being acquired by another company.  The City is devoting substantial resources to thoughtfully building the system, acculturating its supervisors on what to get out of it, and training its officers on how to use it.

The Department intends to make the most of its investment.  This means using the data to reduce disparities and to avoid other harms to the community and its relationship with the Department.

In its most recent report, the IMT noted that the Department's risk management process has come a long way and that commanders have a handle on supervising officers:

1

2          We are drawn to make this point again by our continuing
   observations of the Department's Risk Management

3    Meetings.  At these meetings, both Area Captains and their
   lieutenants continue to demonstrate knowledge of their

4    officers and the Areas they oversee.   We have also seen
   supervisors, on their own, initiating monitoring and

5    intervention when they feel it is needed – rather than waiting
   on the PAS Unit, as in the past.

6    *Id.* at 9.

7          But the IMT is now concerned that the Department may look so closely at

8    individuals that it may be losing sight of the bigger picture:

9

10         OPD's usual process is to count risk-related behaviors such as
   uses of force, stops, and complaints received – and then to use

11   the counts to drill down from Area to squad to individual
   officer levels.  But arguably, attributing these details only to

12   individuals can mask trends and patterns that are important
   to   understanding   and   ultimately   to   changing   the

13   Department.   The near total omission of race from the
   discussion should not be seen as an oversight, or as failure to

14   recognize wayward behavior in individuals.  It should instead
   be considered a failure to recognize that trends and patterns

15   in behavior go beyond individuals and, therefore, require
   analysis and remediation that by necessity must go beyond

16   individuals.

17   *Id.* at  9.

18         Over the years, in contrast, the need to "drill down" on individual officers was a

19   drumbeat point of criticism in the IMT's reports.  Here is an example:

20

21         [D]espite repeated recommendations to do so, OPD continued
   to resist conducting a drill-down or in-depth analyses of squad

22   or specific individual officer data to ascertain the basis for
   and/or to appropriately address such indicators when present.

23   Rather,  the  discussion  instead  generally  focuses  on
   operational elements, including strengths and shortcomings

24   of  the  OPD  intelligence-led  policing  model,  which  we
   acknowledge are also important.

25   Dkt. No. 1219, *57th Report*, at 8 (Nov. 2, 2018).

26         The Department understands that it must look at individuals without losing

27   sight of the larger landscape.  The Department is looking at individuals and patterns

28

1   at each risk management meeting.  At each one, the Department reviews data for

2   *individuals, squads, areas, and the City as a whole*.  The Department never digs into

3   data for only one or some of those categories.

4       The IMT suggests writing out a plan for risk management meetings.  Dkt. No.

5   1357, *66th Report*, at 10 (Feb. 17, 2020).  The Department thinks this is a good idea

6   and requests that the IMT provide an example it has designed or reviewed in the past.

7

8                         **TASK 45—CONSISTENCY OF DISCIPLINE POLICY**

9       Since the last CMC, the IMT assessed Task 45 once.  Dkt. No. 1357, at 12-14,

10  *66th Report* (Feb. 17, 2020).  As in the prior two reviews, the IMT found the

11  Department is doing what the task requires: documenting and maintaining an

12  adequate system for tracking discipline and corrective action; consistently imposing

13  discipline; and appropriately training *Skelly* officers.  *Id*.  In addition, the City has

14  implemented all of the Court Investigator's recommendations stemming from IA No.

15  15-0771.  *See* Dkt. No. 1240, at 25-26, *JCMS* (March 22, 2019).

16      Without explanation, however, the IMT again found the City in only partial

17  compliance.   Dkt. No. 1357, at 12-14, *66th Report* (Feb. 17, 2020).

18      In its last two statements, the City sought guidance on what steps are needed to

19  achieve full compliance.  The City respectfully renews that request.

20

21                                    **VEHICLE PURSUITS**

22      The OIG recently studied and reported on vehicle pursuits.  The OIG reports

23  that the Department's Safety Committee found that 101 of the 104 pursuits in 2018

24  complied with policy.  The OIG found that the Department's process for reviewing

25  pursuits identifies and appropriately handles most issues.

26      The OIG made the following recommendations, which the Department is

27  adopting:

28

JOINT CASE MANAGEMENT STATEMENT (C 00-04599 WHO)

1   ▪ The Department should closely monitor the pursuit activity of officers

2   who have high pursuit numbers and help those officers manage risk.

3   ▪ The Department should assess the risks and benefits of pursuing vehicles

4   tied to strong-arm robberies by minors.

5   ▪ The Department should update its policies to ensure its pursuit review

6   policy aligns with its pursuit policy.

7   ▪ The Department should assess which teams should respond to collisions.

8   ▪ The Department should look to increase its air support.

9   ▪ The Department should explore technologies, such as StarChase, that

10   mitigate pursuit risks.

11   ▪ The Department should provide more pursuit data to supervisors.

12   *Please see* Ex. B, *Combined Quarterly Report*, and Ex. D, *Response.*

13

14   **CONCLUSION**

15   The City appreciates the Court's time and guidance and looks forward to further

16   discussing the foregoing issues at the CMC.

17

18

19

20

21

22

23

24

25

26

27

28

JOINT CASE MANAGEMENT STATEMENT (C 00-04599 WHO)

1

**OPOA'S STATEMENT**

2    Since the inception of the Negotiated Settlement Agreement ("NSA") nearly 20

3  years ago, the Oakland Police Officers Association ("OPOA" & "Association") has

4  consistently demonstrated its unequivocal commitment to further the goals and

5  purposes of the NSA. The record in these proceedings is devoid of evidence that the

6  OPOA has been an impediment of any type toward the implementation and

7  compliance with the terms of the NSA. To the contrary, the record reflects that the

8  OPOA, through its leadership has furthered efforts to secure compliance and cultural

9  change in the Department.

10    The men and women who lead the OPOA reflect the diversity of rank,

11  experience, gender, race and ethnicity of their sworn members of the Oakland Police

12  Department ("OPD"). The filings, assertions and representations of the OPOA in these

13  proceedings reflects a constant insistence of zero tolerance for prejudice, bias and

14  disparate treatment of members of the Oakland community.  Those same sentiments

15  and lack of tolerance also apply when the OPOA advocates for its members where

16  there may be discrimination against a member by OPD or the City of Oakland ("City").

17  For the most part, the formal and informal efforts undertaken by the OPOA to

18  eradicate discrimination and bias unfortunately are not usually reflected in

19  Departmental reporting, media accounts or filings in these proceedings.

20    The diverse leaders of the OPOA collectively have many decades of personal

21  experience at OPD and regularly interact with the hundreds of men and women who

22  are sworn to protect the public in the City of Oakland.  The individual members of the

23  OPOA leadership can attest to the cultural change in the Department since the

24  inception of the NSA in 2003. The cultural change has occurred through promulgation

25  of NSA driven policies, procedures and practices that have been overwhelmingly

26  embraced by the sworn members of OPD.

27

28

JOINT CASE MANAGEMENT STATEMENT (C 00-04599 WHO)

1    While the OPOA in these proceedings has been limited to intervener status, the

2    Association has a keen and vested interest in assisting efforts to identify and resolve

3    challenges that come to the attention of this Court through various resources. The

4    OPOA is familiar with the confidential draft "Oakland Police Department, Police

5    Discipline Disparity Study" ("Study") issued February 6, 2020 issued by Hillard

6    Heintze.  The OPOA continues to be supportive of the effort to conduct an analysis of

7    the Department's disciplinary process vis-à-vis disparities in investigations and

8    discipline.  In that regard, while the draft Study notes challenges and deficiencies, it is

9    apparent that there has been substantive progress in identifying structural problems

10   which may have caused disparities in investigative findings and ultimate discipline of

11   members.  The OPOA views the Study as an additional tool for OPD to engage in self-

12   review and improvement.  The OPOA will continue to support all efforts to eradicate

13   perceived and actual bias and looks forward to the issuance of the final report with

14   recommendations.

15   The 66th Report of the Independent Monitor ("Report") dated February 17,

16   provides an interesting perspective into the issue of risk analysis and the role of race.

17   While the OPOA is not a regular participant in the risk management meetings

18   referenced in the IMT discussion of Task 41, the Report confirms that the

19   Department's continued development of monitoring and self-reporting has provided

20   invaluable tools and insights to enhance what are already benchmark police

21   department practices. The NSA developed tools of oversight and accountability have

22   prepared OPD to reach full compliance.

23   While the OPOA, and its leadership, continue to push toward NSA compliance,

24   the OPOA wants the Court to be aware of the fact that the external factors, well

25   beyond the control of the OPOA, have continued to put enormous pressure on the men

26   and women charged with protecting the safety of Oakland citizens. Despite the fact

27   that crime increased in 2019 in nearly every category, for the first time in five years

28

1    the current staffing levels have dropped.  There are less police officers to fight more

2    crime.

3         The primary purpose of the Oakland Police Department and its sworn members

4    is to protect the citizens of Oakland.   OPD has done an exceptional job in fighting and

5    preventing crime in the community especially considering its limited resources. While

6    the primary mission of OPD is to fight crime, it has most notably, become the most

7    progressive, transparent and accountable police department in the State of California.

8    The leadership of the OPOA have routine communications with law-enforcement labor

9    leaders throughout the State.  Based on anecdotal evidence provided to OPOA leaders,

10   it is apparent that the policies, procedures, oversight and accountability at OPD

11   exceed those of any other major city police department.  The OPOA would urge the

12   Parties to commission a study to compare and contrast the nature of constitutional

13   policing efforts at OPD and other cities across the State, or perhaps the nation.  The

14   OPOA is confident that such an effort would be instructive to the Court.

15        OPD continues to distinguish itself by producing quality commanders and police

16   officers.  While a distinct few may stray from the mission and goals of the Police

17   Department, many others such as former Deputy Chief Danielle Outlaw and former

18   Police Captain Sekou Millington have very recently gone on to other police

19   departments where their leadership, skill and professionalism will serve other

20   communities.  In that regard, Danielle Outlaw was recently named the Police

21   Commissioner for the City of Philadelphia where she oversees America's fourth largest

22   police force with over 6,500 police officers.  Sekou Millington was recently hired as the

23   Chief of Police in Tracy, California. Finally, while there are countless examples of rank

24   and file members serving the community without notoriety, a rookie police officer was

25   recently distinguished by receiving the prestigious Jefferson Award for public service

26   to the community by counseling and mentoring young children of incarcerated

27

28

JOINT CASE MANAGEMENT STATEMENT (C 00-04599 WHO)

1   parents. These are but a few examples of the quality of the men and women who serve

2   in the Oakland Police Department.

3         Finally, the OPOA wishes to convey to the Court its strongest desire that the

4   men and women who serve at the Oakland Police Department be acknowledged for the

5   excellent work, progress and efforts undertaken to afford the citizens of Oakland a

6   safe community.  The efforts undertaken by these men and women have not been

7   exclusive of their significant accomplishments in changing the culture and reforming

8   the Oakland Police Department.

9

10        Respectfully submitted,

11  Dated: February 18, 2020    BARBARA J. PARKER, City Attorney

12      DAVID A. PEREDA, Special Counsel

13      By: _____/s/ David Pereda*_____

14      Attorneys for Defendants
    CITY OF OAKLAND

15      JOHN L. BURRIS

16      Law Offices of John L. Burris

17      By: _____/s/ John L. Burris_____
    Attorney for Plaintiffs

18      JAMES B. CHANIN

19      Law Offices of James B. Chanin

20      By: _____/s/ James B. Chanin_____
    Attorney for Plaintiffs

21      ROCKNE A. LUCIA, JR.

22      Rains Lucia Stern St. Phalle & Silver

23      By: _____/s/ Rockne A. Lucia, Jr._____
    Attorney for Intervenor

24      OAKLAND POLICE OFFICERS ASSOCIATION

25

26  *Per Local Rule 5-1(i)(3), the filer attests that concurrence in the filing of the

27  document has been obtained from each of the other Signatories.

28  JOINT CASE MANAGEMENT STATEMENT (C 00-04599 WHO)