April 2, 2020

# Sixty-Seventh Report
## *of the* Independent Monitor
## *for the* Oakland Police Department

## Introduction

This is our sixty-seventh status report on the Negotiated Settlement Agreement (NSA) in the case of *Delphine Allen, et al., vs. City of Oakland, et al.,* in the United States District Court for the Northern District of California under the direction of Judge William H. Orrick.  I was appointed in 2010 to oversee the monitoring process of the Oakland Police Department (OPD) that began in 2003.

The global COVID-19 crisis has profoundly changed our world and the ways we live.  Like all law enforcement agencies, OPD is learning to adapt to many new challenges brought on by the pandemic – while continuing to provide fair, just, and equitable police services to all Oakland residents.  As the Monitoring Team, we are maintaining our role as the "eyes and ears" of the Court; and continuing to provide technical assistance to help OPD achieve and sustain compliance with the NSA.

This report covers our site visits of January 28-29 and February 25-26, 2020; and describes our recent assessments of NSA Tasks 5, 20, 24, 25, and 41.  Following the Court's Order of May 21, 2015, we devote special attention to the most problematic component parts of the NSA Tasks that are not yet in full or sustained compliance; and discuss in our status reports the most current information regarding the Department's progress with the NSA and its efforts at making the reforms sustainable.

Since we published our last status report, Mayor Schaaf, on February 20, 2020 joined the City's Police Commission in terminating the Chief.  The Police Commission was established by a 2016 ballot measure to oversee OPD's policies and procedures.  There are currently efforts within the City to push for a new ballot measure to bolster the Commission's resources and independence.

## *Providing Technical Assistance*

Each month, our Team conducts a visit to Oakland that includes both compliance assessments and technical assistance.  During our visits, we meet with Department and City officials; observe Department meetings and technical demonstrations; review Departmental policies; conduct interviews and make observations in the field; and analyze OPD documents and files, including misconduct investigations, use of force reports, crime and arrest reports, Stop Data Forms, and other documentation.  We also provide technical assistance in additional areas, especially those that relate to the remaining non-compliant Tasks or areas identified by the Department.

We recently provided technical assistance to OPD officials in the areas of IAD investigation quality (Task 5); use of force investigations (Tasks 24 and 25); stop data and related issues (Task 34); risk management and the ongoing maintenance issues and development of Vision (Task 41); and several Department policies and procedures, including policies related to officer discipline, use of force, probationers and parolees, handcuffing, the use of armored vehicles, and the use of electronic control weapons.

## Building Internal Capacity at OPD

Also per the May 21, 2015 Court Order, we continue to work closely with the Office of Inspector General's (OIG) staff to identify areas that it should audit or review – and to help design approaches to these audits that are not cumbersome, so as to ensure sustainability.  We review OIG's quarterly progress reports, which are a valuable resource and assist us in assessing compliance with NSA requirements.

---

## Focused Task Assessments

## Task 5:  Complaint Procedures for IAD

**Requirements:**

1.  On or before December 1, 2003, OPD shall develop a policy so that, OPD personnel who become aware that a citizen wishes to file a complaint shall bring such citizen immediately, or as soon as circumstances permit, to a supervisor or IAD or summon a supervisor to the scene.  If there is a delay of greater than three (3) hours, the reason for such delay shall be documented by the person receiving the complaint.  In the event that such a complainant refuses to travel to a supervisor or to wait for one, the member/employee involved shall make all reasonable attempts to obtain identification, including address and phone number, as well as a description of the allegedly wrongful conduct and offending personnel, from the complainant and any witnesses.  This information, as well as a description of the complaint, shall immediately, or as soon as circumstances permit, be documented on a Complaint Form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander, and shall be treated as a complaint.  The supervisor or appropriate Area Commander notified of the complaint shall ensure the Communications Division is notified and forward any pertinent documents to the IAD.

2.  An on-duty supervisor shall respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest. The supervisor shall ensure the Communications Division is notified and forward any pertinent documents to the IAD. All other misconduct complaints by a jail inmate shall be handled in the same manner as other civilian complaints.

3.  In each complaint investigation, OPD shall consider all relevant evidence, including circumstantial, direct and physical evidence, and make credibility determinations, if feasible. OPD shall make efforts to resolve, by reference to physical evidence, and/or use of follow-up interviews and other objective indicators, inconsistent statements among witnesses.

4.  OPD shall develop provisions for the permanent retention of all notes, generated and/or received by OPD personnel in the case file.

5.  OPD shall resolve each allegation in a complaint investigation using the "preponderance of the evidence" standard. Each allegation shall be resolved by making one of the following dispositions: Unfounded, Sustained, Exonerated, Not Sustained, or Administrative Closure. The Department shall use the following criteria for determining the appropriate disposition:

    a.  Unfounded: The investigation disclosed sufficient evidence to determine that the alleged conduct did not occur. This finding shall also apply when individuals named in the complaint were not involved in the alleged act.

    b.  Sustained: The investigation disclosed sufficient evidence to determine that the alleged conduct did occur and was in violation of law and/or Oakland Police Department rules, regulations, or policies.

    c.  Exonerated: The investigation disclosed sufficient evidence to determine that the alleged conduct did occur, but was in accord with law and with all Oakland Police Department rules, regulations, or policies.

    d.  Not Sustained: The investigation did not disclose sufficient evidence to determine whether or not the alleged conduct occurred.

    e.  Administrative Closure: The investigation indicates a service complaint, not involving an MOR violation, was resolved without conducting an internal investigation; OR

    f.  To conclude an internal investigation when it has been determined that the investigation cannot proceed to a normal investigative conclusion due to circumstances to include but not limited to the following:

        1)  Complainant wishes to withdraw the complaint and the IAD Commander has determined there is no further reason to continue the investigation and to ensure Departmental policy and procedure has been followed;

> 2)  *Complaint lacks specificity and complainant refuses or is unable to provide further clarification necessary to investigate the complaint;*
>
> 3)  *Subject not employed by OPD at the time of the incident; or*
>
> 4)  *If the subject is no longer employed by OPD, the IAD Commander shall determine whether an internal investigation shall be conducted.*
>
> 5)  *Complaint fails to articulate an act or failure to act, that, if true, would be an MOR violation; or*
>
> 6)  *Complaints limited to California Vehicle Code citations and resulting tows, where there is no allegation of misconduct, shall be referred to the appropriate competent authorities (i.e., Traffic Court and Tow Hearing Officer).*
>
> g.  *Administrative Closures shall be approved by the IAD Commander and entered in the IAD Complaint Database.*

6.  *The disposition category of "Filed" is hereby redefined and shall be included under Administrative Dispositions as follows:*

> a.  *An investigation that cannot be presently completed. A filed investigation is not a final disposition, but an indication that a case is pending further developments that will allow completion of the investigation.*
>
> b.  *The IAD Commander shall review all filed cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed and may direct the closure or continuation of the investigation.*

7.  *Any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken. However, investigators, with the approval of an IAD Commander, are not required to interview and/or take a recorded statement from a member or employee who is the subject of a complaint or was on the scene of the incident when additional information, beyond that already provided by the existing set of facts and/or documentation, is not necessary to reach appropriate findings and conclusions.*

(Negotiated Settlement Agreement III. E.)

**Relevant Policy:**

There are six Departmental policies that incorporate the requirements of Task 5:  Department General Order M-03, *Complaints Against Department Personnel and Procedures* (published December 6, 2005 and revised most recently on August 22, 2013); Communications Division Policy & Procedures C-02, *Receiving and Logging Complaints Against Personnel and Use of Force Incidents* (published April 6, 2007); Training Bulletin V-T.1, *Internal Investigation Procedure Manual* (published June 1, 2006); Special Order 8270, *Booking of Prisoners at the Glenn E. Dyer Detention Facility* (published June 24, 2005); Special Order 8565, *Complaints Against Department Personnel* (published May 11, 2007); and IAD Policy & Procedures 05-02, *IAD Investigation Process* (published December 6, 2005).  In addition, NSA stipulations issued on December 12, 2005 and March 13, 2007 incorporate the requirements of this Task.


**Commentary:**

This is a special Task 5 Review.  As indicated in our sixty-second status report (issued July 1, 2019), our review of Task 2 found that the majority of IAD cases were not in compliance with the investigative timelines required by the NSA and OPD policy.  Specifically, we noted that of the 14 Class I cases we reviewed, only four, or 29%, were in compliance with established timelines.  Of the 30 Class II cases we reviewed, only seven, or 23%, were in compliance with established timelines.

OPD implemented a plan to address this backlog.  A key element of this plan, as highlighted in the Joint CMC Statement filed August 14, 2019, involved training and assigning additional experienced supervisors to review the backlogged investigations.  During the Case Management Conference held on August 21, 2019, the then-commanding officer of IAD provided an overview of the plan to the Court, and declared that the backlog had been addressed.  The Court expressed its concern that these cases be investigated with "the same rigor and appropriateness" applied to any other investigation, and asked the Monitoring Team concern to review some of these cases to ascertain if that was the case.  This constitutes our review.

OPD identified 136 cases which the Department believed comprised the backlog, and which were subject to the review of the specially trained investigators (supervisors assigned outside of IAD) or experienced IAD investigators.  From this list, we selected a random sample of 30 cases – 25 reviewed by non-IAD supervisors and five reviewed by IAD investigators.[1]

As a reminder, Task 5 consists of several subtasks, briefly described below.  Based on OPD's compliance history with many of the subtasks, not all are being actively monitored at this time.  Tasks 5.1, 5.2, 5.3, 5.4, 5.5, 5.6 and 5.12 were not reviewed for this special assessment, other than mentioned in their descriptions below.

**Task 5.1** requires that when a citizen wishes to file a complaint, the citizen is brought to a supervisor or IAD, or a supervisor is summoned to the scene.  **Task 5.2** requires that if there is a delay of greater than three hours in supervisory response, the reason for the delay must be

---

[1] All IAD cases, regardless of their origin, require the review and sign-off of the IAD commanding officer, as well as one of his lieutenants.  This final review is in addition to the reviews described above.

documented.  **Task 5.3** requires that where a complainant refuses to travel to a supervisor, or wait for one, personnel make all reasonable attempts to obtain specific information to assist in investigating the complaint.  **Task 5.4** requires that specific information be documented on a complaint form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander.  **Task 5.5** requires that the supervisor or Area Commander notify Communications and forward any pertinent documents to IAD.

To assess compliance with Tasks 5.1 through 5.5, we reviewed the Daily Incident Logs (DILs) prepared by the Communications Division and forwarded to IAD each business day.  The DIL form has been modified several times during our tenure to elicit "forced responses" that gather all of the information required to evaluate compliance with these Tasks.  These modifications have significantly enhanced OPD's ability to document compliance by properly filling out and distributing the logs, and compliance rates with these subtasks have been near 100% for several years.  Consequently, we no longer actively assess OPD's compliance with these subtasks, but we continue to receive both the DILs and Daily Complaint Referral Logs (used to document when Information Business Cards [IBCs] are provided to citizens in lieu of a complaint forms).  We spot-check these forms regularly to verify that the quality of their completion has not diminished.  OPD remains in compliance with Tasks 5.1 through and including Task 5.5.

**Task 5.6** requires that an on-duty supervisor respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest of the inmate.  This subtask has not been actively monitored since December 2014, though because of our sampling process we have reviewed cases applicable to this requirement in recent reports.

**Task 5.12** requires that the Watch Commander ensure that any complaints that are applicable to Task 5.6 are delivered to and logged with IAD.  Under current policy, the Communications Division must record on the DILs complaints that are received and/or handled by on-duty supervisors, and the DILs is forwarded daily to IAD.

OPD remains in compliance with Tasks 5.6 and 5.12.

**Task 5.15** through **Task 5.19**, and **Task 5.21,** collectively address the quality of completed IAD investigations, and therefore remain the subject of our focused Task assessments.  To assess compliance with these Tasks, we reviewed 30 IAD cases from the backlog list that were approved between May and August 2019.  This sample consisted mainly of Division-level cases (DLIs), as they constituted the overwhelming majority of the backlogged cases.  It also included cases that were resolved via formal investigation and investigations that were resolved via summary finding.  As is our practice, if we had questions pertaining to a case, we consulted with the commanding officer of IAD before making our final determination.

Together, **Tasks 5.15** and **Task 5.16** require that OPD: gathers all relevant evidence; conducts follow-up interviews where warranted; adequately considers the evidence gathered; makes credibility assessments where feasible; and resolves inconsistent statements.

In all of the cases we reviewed, we believe that OPD gathered all relevant evidence available. As we often find, in many of the cases, video and/or audio recordings proved to be a significant factor in allowing OPD to reach an appropriate conclusion.  In two cases, we do not believe investigators adequately considered the evidence at hand.  In both of these cases, we disagreed with the findings.

Investigators conducted follow-up interviews to seek clarification or resolve inconsistencies in five of the 30 cases we reviewed.  In two cases, the complainants were interviewed twice; in one case, the complainant and two witnesses were each interviewed twice; in one case, the complainant was interviewed four times and a witness three times; and in the remaining case, one subject officer was interviewed twice.

OPD made credibility assessments for all involved parties in 14 of the 30 cases.  Fourteen cases were approved for summary finding; and per policy, investigators are not required to assess the credibility of the involved officers and civilians in these instances.  Two other cases were closed via administrative closure, which similarly do not require credibility assessments.

In 10 cases, complainants and/or witnesses were deemed not credible.  While this appears to be a high number, it is not concerning given the large number of cases closed via summary finding. (Summary findings are investigations in which the Department believes a proper conclusion can be determined based on a review of existing documentation with limited or no additional interviews and follow-up.)  In eight summary finding cases, complainants and/or witnesses were deemed not credible based on their statements conflicting with body-worn camera recordings. We agreed with all but one of these credibility assessments, based on PDRD videos and other available evidence.  In the one case where we disagreed with the not credible determination, we also disagreed with the findings.

In 22 of the 30 cases we reviewed, OPD successfully resolved inconsistent statements.  In 17 of the cases, PDRD recordings were available and assisted in the determination.  In two other cases, recorded calls to the Communications Division assisted OPD in coming to a definitive conclusion.  Six cases resulted in at least one finding of not sustained.  Not sustained is an acceptable finding, and by definition, it implies that inconsistencies were not resolved despite investigative efforts.

**Task 5.17** requires that OPD permanently retain all notes generated and/or received by OPD personnel in the case file.  OPD personnel document that all investigative notes are contained within a particular file by completing an Investigative Notes Declaration Form.  OPD has a sustained history of 100% compliance with this subtask.  During this reporting period, the form was again properly completed in all of the cases we reviewed, although we did note that one file was missing a memo which was critical to the final determination.  The IAD commanding officer located and provided the memo for our review.

**Task 5.18** requires that OPD resolve each allegation in a complaint investigation using the preponderance of the evidence standard.  **Task 5.19** requires that each allegation of a complaint is identified and resolved with one of the following dispositions: unfounded; sustained; exonerated; not sustained; or administrative closure.  Our sample of 30 cases contained 114 allegations that received dispositions as follows: 52 exonerated; 29 unfounded; five not sustained; 10 sustained; and 18 administratively closed.

We disagreed with the findings in three of the cases we reviewed.  One case, conducted via Division-level investigation, stemmed from a parole search conducted by a Task Force which included members of OPD.  In this case, some findings were reached; but the final determination was administrative closure.  An entry in the chronological log indicated that "…all involved OPD members where [sic] assisting another agency conduct an operation and the allegations of misconduct were not directed at any action of an OPD member."  Yet this is not borne out by the Report of Investigation submitted with the case.

In another case, officers effected a citizen's arrest on the complainant; and he complained that the arrest was improper and based on a substandard investigation.  The investigator sustained the substandard investigation allegation, finding that had the officer conducted a proper preliminary investigation, it would have showed that the citizen's arrest was unwarranted.  But the investigator inexplicably exonerated the arrest because the other party requested it, even though the investigator concluded that the officer was dutybound to conduct a more thorough investigation which would have refuted the other party's claims.

In the third case, officers towed a broken-down vehicle which was blocking a traffic lane.  The complainant – the vehicle's owner – was upset that her vehicle was being towed and ignored repeated requests to stay away from the vehicle while it was being attended to by the tow truck operator.  The officers ended up forcibly restraining her, face-down, on the hood of a nearby parked car and handcuffing her.  In her complaint, she alleged that the officers "slammed her head" against the parked car.  There is one body-worn camera (BWC) video of the force.  (One officer's BWC was dislodged and only recorded sound of the incident at the crucial point.)  The investigator investigated the "slamming" claim literally, and deemed that it did not occur (unfounded finding).  Yet the BWC does not capture the complainant's head for the entire duration of the force, so the most appropriate finding is not sustained if the slamming of the head is the investigator's focus.  More importantly, the investigator should have investigated the merits of the force in general, rather than keying in on the slamming allegation and attempting to refute it.  Force was used to overcome the complainant's resistance while she was being handcuffed.  She was forcibly placed face down on the hood of a parked car, clearly against her will and again to overcome her resistance.  The complainant's description of the encounter is not unreasonable from her perspective.  Both the complainant and a witness were determined to be not credible, also because they both indicate she was "slammed."  We disagree with this determination.

**Task 5.20** requires that the IAD Commander review all "filed" cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed.  A filed case is defined as an investigation that cannot be presently completed and is pending further developments that will allow completion of the investigation; filed is not a final disposition.  Traditionally, as part of our review of this Task, we also reviewed cases that are tolling.  OPD defines a tolled case as an administrative investigation that has been held in abeyance in accordance with one of the provisions of Government Code Section 3304.  While we are no longer actively assessing this subtask, we note that filed and tolling cases are reviewed with the Acting Chief or his designee during the weekly IAD meetings and are listed by case number on the printed meeting agendas.  We receive and review these agendas regularly, and a Monitoring Team member often attends these meetings.  Additionally, we regularly receive a weekly report

listing all tolled cases and all cases approaching their 3304 dates.  If we have questions regarding any of the cases in the report, the IAD Commander answers them promptly.

**Task 5.21** requires that any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken.  However, with the approval of the IAD Commander or his designee, investigators are not required to interview and/or take a recorded statement in all cases.  For example, interviews are not needed from a member or employee who is the subject of a complaint, or who was on the scene of the incident when additional information – beyond that already provided by the existing set of facts and/or documentation – is not necessary to reach appropriate findings and conclusions.  Fourteen of the 30 cases we reviewed were resolved via summary finding, and all were appropriately approved for such closure.  In all but one of these cases, the availability of video and/or audio recordings was the primary reason interviews were unnecessary.  We do not believe one of the summary findings we reviewed was appropriate for such closure.  A complainant indicated that he was not notified that his stolen vehicle was recovered by OPD, and only learned of it after he incurred substantial storage fees.  A Police Services Technician (PST) indicated in a report that he attempted to call the complainant when the vehicle was recovered, but he did not receive an answer and could not leave a voicemail.  There is no independent record of this attempt, such as a recording or a phone record (the latter would possibly have been available had the case been investigated in a timelier manner).  We are left with conflicting claims by the complainant and the PST, and so consequently the PST should have been interviewed.

Nearly 50% of the cases in our sample were handled via summary finding.  That appears to indicate that the backlog was more a function of a *management* issue than one of a *workload* issue.  Summary findings are meant to streamline and fast-track investigations to closure when there is clear and convincing evidence to either refute the allegations or exonerate the employees' actions.  (Summary findings cannot be used if the findings will be either sustained or not sustained; these require full investigations.)  If these cases were properly monitored and managed, their nature is such that they could have been closed quickly and efficiently.  However, in most of the cases we reviewed, including these summary findings, we noted long periods of inactivity in the chronological logs – where no work was being completed.  As a consequence, they became overdue and ultimately were designated as backlogged cases, subject to OPD's plan to clear them.

That said, the majority of the cases in our review were properly investigated and closed, as OPD asserted in the aforementioned status conference.  As is our practice, we will discuss the cases we believe were lacking during our upcoming site visit.

| **Task 5 compliance status** | Deferred, based on our general concerns, and the findings of our forthcoming analysis of the Department's investigation of the officer-involved shooting of March 11, 2018. |
| --- | --- |

## Task 20:  Span of Control

**Requirements:**

*On or before August 14, 2003, OPD shall develop and implement a policy to ensure appropriate supervision of its Area Command Field Teams.  The policy shall provide that:*

1. *Under normal conditions, OPD shall assign one primary sergeant to each Area Command Field Team, and, in general, (with certain exceptions) that supervisor's span of control shall not exceed eight (8) members.*

2. *During day-to-day operations, in the absence of the primary supervisor (e.g., due to sickness, vacation, compensatory time off, schools, and other leaves), the appropriate Area Commander shall determine, based on Department policy and operational needs, whether or not to backfill for the absence of the sergeant on leave.*

3. *If a special operation, (e.g., Beat Feet, Special Traffic Offenders Program (STOP), etc.) requires more than eight (8) members, the appropriate Area Commander shall determine the reasonable span of control for the supervisor.*

4. *If long-term backfill requires the loan or transfer of a supervisor from another unit, the Chief of Police and/or the Deputy Chief of Police shall make that decision.*

(Negotiated Settlement Agreement IV. C.)

**Relevant Policy:**

Three Departmental policies incorporate the requirements of Task 20: Departmental General Order A-19, *Supervisory Span of Control,* issued on July 26, 2006; Departmental General Order D-13, *Assignment to Acting Higher Rank or Classification,* issued on June 17, 1999; and Departmental General Order D-13.1, *Assignment to Acting Sergeant of Police,* issued on May 14, 2014.  (The publication of DGO D-13.1 cancelled Special Order 8435, which previously governed the selection process of acting sergeants.)

**Commentary:**

To assess these requirements for this report, we reviewed spreadsheets prepared by the Department for July, August, and September 2019 that, by date, note which type of sergeant supervised each applicable squad – a primary sergeant, relief sergeant, acting sergeant, other sergeant (one working overtime), or none.  (The Department refers to unsupervised squads as "open.")  We calculated per squad the compliance percentages for this subtask during this time period.  Each of the 49 applicable squads were in compliance – that is, all applicable squads during this time period were supervised by either a primary, relief, or other/overtime sergeant for at least 85% of their working shifts.  We also found that none of the applicable squads exceeded the required 1:8 supervisor to officer ratio at least 90% of their working shifts.

OPD continues to be in compliance with these requirements.  The Department has institutionalized the practices of tracking how each squad is supervised each day; planning, when possible, for expected absences; and considering how to fill in for personnel who are absent unexpectedly.

| Task 20 compliance status | In compliance |
| --- | --- |

## Overview of Our Assessments of Tasks 24 and 25

OPD had been in compliance with Tasks 24 and 25 since 2015, and we were not actively reviewing these Tasks.  On November 27, 2018, as a result of concerns that we brought forward regarding the identification, potential underreporting, and investigation of uses of force, the Court reactivated Tasks 24 and 25.

For purposes of this report, we reviewed 47 Level 3 and Level 4 use of force (UOF) reports that were completed by OPD personnel during June and July 2019 to assess compliance with Tasks 24 and 25.  We reviewed all incidents that involved at least one Level 3 use of force (10), and a sample of Level 4 uses of force (37).  We also reviewed one Level 1 and five Level 2 uses of force, for which an Executive Force Review Board (EFRB) or Force Review Board (FRB) was held between January and March of 2020.  Our review of the Level 1 and Level 2 uses of force here includes only an assessment of the field investigation.  (Any identified concerns and final outcomes identified in Force Review Boards [FRBs] and Executive Force Review Boards [EFRBs] that we discuss as part of our regular assessments of Tasks 26 and 30.)

Since we resumed these reviews following the Court's reactivation of these Tasks, we have provided detailed feedback on the force investigations to OPD during each of our site visits.  In cases where we have had questions or concerns, OPD personnel have been responsive and provided follow-up where necessary.  In some cases, OPD has provided additional information or documentation that supports its actions, and we have concurred with the Department's assessments.  In others, we have identified concerns that had not been identified or addressed by OPD supervisors who conducted the UOF investigation, or command personnel who reviewed the investigation.  In these cases, OPD command staff have directed additional review or investigation or the entry of a Supervisory Note File (SNF); or initiated an internal affairs investigation.  Many of the concerns we have noted in our reviews and discussions with OPD were also identified in OIG's global use of force audit, conducted in 2019.

In late 2018, OPD employees received training on the requirements for use of force reporting related to the pointing of weapons.  In April 2019, OPD issued an Information Bulletin that provided clarification and direction regarding the documentation of use of force.  The content of this bulletin included many of the concerns we had identified with the proper reporting of force.  In June of 2019, the then-Chief issued a directive via email that specifically addressed boilerplate language in use of force reports; and in November 2019, she followed up with an additional email to address the use of generic or boilerplate language in the administrative section of Department reports.  In December 2019, OPD began delivering the training developed to address

deficiencies found in UOF documentation based on OIG's global use of force audit. The Department published a revised use of force policy in February which expanded and clarified the reporting of uses of force and added an additional Level 4 type of force.

This status report covers UOF reports completed by OPD in June and July 2019 – that is, before the majority of the interventions noted above occurred. We are hopeful that the actions now being taken by OPD will reduce future deficiencies in the reporting of force.

In our review of the 47 Level 3 and Level 4 use of force reports completed in June and July 2019, we identified one incident where we believe the reported use of force may not have been appropriate and where a possible second use of force was not reported. We have discussed this case with OPD, which has committed to conduct additional follow-up. Details of the Level 1 and Level 2 UOFs and our findings are included in our regular assessments of FRBs in Task 26 and EFRBs in Task 30.

In the Level 3 and Level 4 UOFs we reviewed, there were 99 uses of force against 54 different persons. In some cases, multiple officers used force on a single person; and in others, force was used on multiple persons, either by a single officer or multiple officers.

The total breakdown for the force used on the 54 persons is as follows: African American, 61%; Latino, 24%; White, 6%; and Asian or Other, 9%. The percentage of force incidents involving African Americans increased by 9%, and force incidents involving Whites decreased 8% from what we found in our last review, documented in our sixty-fifth status report. We note that one incident alone, involving the use of force by three officers on four African Americans during a high risk stop of a suspect vehicle in an armed robbery resulted in 12 uses of force. This incident may, at least in part, account for the increase in UOFs involving African Americans for this review period.

Officers engaged in a Level 4 - Type 22 UOF only, pointing of a weapon, 63 times at a total of 33 persons. We noted in our reviews for this report that there were again incidents that involved multiple suspects or prolonged incidents that resulted in numerous OPD personnel being involved in the pointing of weapons. In these 63 instances of force on 33 persons, the breakdown is as follows: African American, 55%; Latino, 27%; White, 3%; and Asian or Other, 15%. This is fairly consistent with the percentages reported in our sixty-third and sixty-fifth status reports for both African Americans and Latinos.

In the 47 Level 3 and 4 incidents we reviewed, 41 persons on whom force was used were arrested or criminally charged for felony or misdemeanor violations. The remaining seven involved mental health holds, inability to establish criminal conduct, subjects who escaped, victims who did not want to prosecute, or subjects determined not to be a suspect after the investigation was conducted. In two of the incidents reviewed, a person claimed a minor injury, but neither required treatment at a hospital. Four other persons were transported to a medical facility for the removal of a Taser probe, or solely to obtain a medical clearance.

In our assessment of Task 25.3 in our sixty-fifth status report, we continued to identify numerous incidents where we believed that additional verbal communications and explanation with persons who were contacted might have resulted in a reduction in the need to use physical force, and incidents where OPD failed to identify themselves as police officers when contacting subjects. During our assessments for this report, we found that, with few exceptions, where appropriate

and there was time to do so, OPD officers made attempts at verbal communications and explanations prior to utilizing force options.  We continued to note, however, that there are still numerous instances where OPD officers do not identify themselves as police officers when contacting subjects, even when there is time to do so.  (We do not include those contacts where it should be obvious to the subject that s/he is dealing with an OPD officer.)  We have discussed these concerns with OPD, and we will continue to monitor these types of instances; as is our practice during our monthly site visits, we continue to provide input to the Department on our observations.

During our review of the 47 Level 3 and 4 use of force incidents, we again noted several instances where it took multiple officers to control and secure combative persons.  In three of these instances, only a single officer who used an identified weaponless defense technique (leg sweep, arm bar, etc.) to overcome resistance was identified as having used force.  The officers who assisted in controlling the subject were listed only as witnesses.  Special Order 9196, a revision to the UOF reporting requirements, went into effect in February of 2020 and clarifies what constitutes a "reportable use of force" and provides clearer direction on the reporting of use of force.  Special Order 9196 also added a new force type: Type 32.  A Type 32 use of force includes: overcoming resistance of a person during an arrest or detention; or defending oneself or another from combative action by another person.  Type 32 is intended to address any use of force not already covered in Types 1-31.  While we expected an increase in force reporting after Special Order 9196 was issued, the immediate and significant spike in the numbers was much greater than anticipated and appears to be primarily related to the new Type 32, as shown in the increase from 167 Level 4 UOFs in 2019 to 618 during the same time period in 2020.  We agreed with OPD's assessment that further review of the force policy was needed due to this unanticipated increase; and Special Order 9202 was issued, that at least temporarily, removes the Type 32 from the category of a Level 4 reportable use of force.  However, alternative means for counting these uses of force have been implemented until more permanent solutions can be identified.  We will continue to work with OPD to find a long-term solution to address the reporting of this type of force.

We continue to note in our reviews that officers use the administrative sections of their reports to document whether force was used, if force was observed, and if their PDRDs were activated.  Again, we found that this administrative section is sometimes inaccurate and does not reflect what occurred, even when the narrative for the reports may reflect accurate information.  Officers continue to indicate that their PDRDs were activated in the administrative section, but have failed, in some cases, to document that the PDRD had been activated late, or in some cases had malfunctioned.  Using this "boilerplate" or "pat" language in the administrative section raises concerns about both the accuracy of reporting and the quality of supervisory reviews conducted.  As we noted in our sixty-third and sixty-fifth status reports, these kinds of reporting deficiencies should not be occurring at this late stage of the NSA process.  OPD has addressed the concerns we have identified with the accuracy of reporting and boilerplate language with written directives to their personnel.  We will continue to discuss these kinds of cases with OPD during upcoming site visits.

In 16 of the 47 investigations we reviewed, one or more officers either failed to activate their PDRDs or activated them late, the large majority being late activations.  This is an increase in deficiencies from what we noted in our sixty-fifth status report – and remains particularly concerning considering the years that OPD has been using this technology.  In six of the 16 instances, an OPD supervisor identified the PDRD issue and documented the deficiency in a Supervisory Note File (SNF).  In all but one of these six, the supervisor also noted whether the officer had a pattern of failing to activate the PDRD, prior to issuing the SNF.  In 10 incidents, we believe that PDRDs were either not activated, or activated late, and the concern was not identified or addressed by OPD.  We shared the incidents discovered in the June 2019 reviews with OPD during a recent phone conference.  They are conducting further review of these and will provide their response during a future site visit.  Those incidents identified in our July 2019 reviews will also be discussed with OPD during a future site visit, and follow-up will be requested.  While we continue to support OPD's use of SNFs to address some concerns – including failure to activate the PDRD, use of profanity, or proper use of tactics – these deficiencies must be identified and properly addressed.

The use of force analysis we conducted last year established the underreporting of Level 4 uses of force where an officer pointed a weapon at a person.  Following our analysis, OPD partially addressed this concern with refresher training in September 2018 for all officers, and the Department has further addressed this issue in its use of force policy revisions.  In our review of Level 3 and Level 4 UOFs for this report, we did not identify any instances where an officer failed to report the pointing of a weapon at a person.

OPD's 255th Biweekly Compliance Update, dated February 11, 2020, provided a comparison of year end UOFs for 2018 and 2019.  Level 1 UOFs decreased 75% from four (all occurring in the same incident) in 2018 to two (both occurring in the same incident) in 2019.  Level 2 UOFs decreased from 35 to 24, a decrease of 31%.  However, the Level 4 UOFs increased from 521 in 2018 to 1431 in 2019, an increase of 175%.  Level 3 UOFs increased from 73 in 2018 to 101 in 2019, an increase of 38%.  Overall, UOFs increased 146% from 2018 to 2019.

As we have noted in previous reports, OPD has taken a number of actions to address the many concerns with the use of, and reporting of, force by OPD officers.  To address the reporting of Level 4 - Type 22 uses of force, the pointing of a firearm at a person, the Chief ordered refresher training on officers' use of firearms in September 2018, and the number of reported Level 4 uses of force increased dramatically after that training.  OPD continues to note they believe that the significant increase in Level 4 uses of force may be related to the potential underreporting of Level 4 - Type 22 pointing a weapon at a person prior to the refresher training.

In our discussions with OPD about the increases in Level 3 UOFs from 2018 to 2019, particularly in Level 3 - Type 16, weaponless defense technique other than the use of a control hold, and Level 3 - Type 11 and 18, use of a Taser, OPD representatives have cited multiple possible factors to account for this increase.  These include: lessons OPD personnel have learned from prior incidents; that officers are now more apt to identify the use of force; and that the then-Chief gave direction that if there is any doubt about whether the force used was reportable, it should be reported.

In its 257th Biweekly Compliance Update, dated March 11, 2020, OPD reported a total of 634 UOFs year to date, compared to 167 during the same time period in 2018.  This update showed five were Level 2 UOFs, the same number as the comparable 2019 timeframe.  The Level 3 UOFs year to date shows a decrease from 37 to 11 for the comparable time frames.  This update also shows 618 Level 4 UOFs in 2020, compared to 167 during the same time frame in 2019.  As noted previously in this report, OPD Special Order 9196 went into effect in February 2020, and the addition of the Level 4 - 32 reporting requirement appears to account for the huge spike in Level 4 UOFs.

As we have previously noted, the increases in the reported uses of force between 2018 and 2019 do not appear to signal a rise in actual use of force, but rather is a result of prior inaccurate reporting left unchecked by supervisory personnel.  In addition, we have continued to identify concerns with the investigative narratives, PRIME reports, and other documentation in our review of UOF reports reviewed for June and July of 2019.  OPD has taken numerous steps to address the proper reporting of use of force and the concerns that have been identified during our reviews.  The most significant steps, beyond the firearms training that occurred in late 2018, began in April 2019, with an OPD Information Bulletin that provided significant direction regarding the reporting of uses of force.  In our reviews of uses of force for June and July 2019, we have yet to see what we would call significant improvement since this Information Bulletin was published, but recognize that the training associated with the April 2019 Bulletin and the OIG global use of force audit did not begin until December 2019.  We will continue to monitor the impact directives and training has on UOF reporting and are hopeful that improvement will occur.

# Task 24: Use of Force Reporting Policy

**Requirements:**

*The policy shall require that:*

1. *Members/employees notify their supervisor as soon as practicable following any investigated use of force or allegation of excessive use of force.*

2. *In every investigated use of force incident, every member/employee using force, and every member/employee on the scene of the incident at the time the force was used, shall report all uses of force on the appropriate form, unless otherwise directed by the investigating supervisor.*

3. *OPD personnel document, on the appropriate form, any use of force and/or the drawing and intentional pointing of a firearm at another person.*

4. *A supervisor respond to the scene upon notification of an investigated use of force or an allegation of excessive use of force, unless community unrest or other conditions makes this impracticable.*

5.    *OPD notify:*

   a.    *The Alameda County District Attorney's Office immediately or as soon as circumstances permit, following a use of lethal force resulting in death or injury likely to result in death.*

   b.    *The City Attorney's Office as soon as circumstances permit following the use of lethal force resulting in death or serious injury.  At the discretion of the City Attorney's Office, a Deputy City Attorney shall respond to the scene.  The Deputy City Attorney shall serve only in an advisory capacity and shall communicate only with the incident commander or his/her designee.*

   c.    *Departmental investigators regarding officer-involved shootings, in accordance with the provisions of Section V, paragraph H, of this Agreement.*

6.    *OPD enter data regarding use of force into OPD's Personnel Assessment System (PAS).*

(Negotiated Settlement Agreement V. A.)

**Relevant Policy:**

OPD most recently revised Departmental General Order K-4, *Reporting and Investigating the Use of Force* on October 16, 2014.  DGO K-4 incorporates the requirements of Task 24.

**Commentary:**

To assess compliance with Task 24, we reviewed 47 Level 3 and Level 4 use of force (UOF) reports that were completed by OPD during February and March 2019.  We also reviewed one Level 1 UOF and five Level 2 UOF investigations, for which an EFRB or FRB was held between January-March 2020.

**Task 24.1** requires that members/employees notify their supervisor as soon as practicable following any reportable use of force or allegation of excessive use of force.  In all of the  UOF reports reviewed, notifications were made as required.

**Task 24.2** requires that in every reportable use of force incident, every member/employee on the scene of the incident at the time the force was used, reports all uses of force on the appropriate form, unless otherwise directed by the investigating supervisor.  **Task 24.3** requires that OPD personnel document, on the appropriate form, every use of force and/or the drawing and intentional pointing of a firearm at another person.

In the 47 Level 3 and 4 UOF incidents we reviewed, officers pointed weapons at persons 63 times.  We determined that officers' pointing of their firearms was appropriate in all 63 instances we assessed.  We did not identify any instances where a weapon was pointed at a subject and not reported as required.  In one instance, we are concerned that a Level 3 - Type 16 (weaponless defense) use of force occurred but was not properly assessed as a reportable use of force.  At our

request, OPD is conducting additional follow-up on this incident.  In other instances, officers who assisted in restraining a combative person did not report having used force.  This issue has been addressed by OPD in its revisions to the UOF policy, which provides clarification regarding reportable uses of force.  We will continue to closely monitor these types of incidents to ensure that OPD personnel properly report these uses of force in the future.

**Task 24.4** requires that a supervisor respond to the scene upon notification of a Level 1, 2, or 3 use of force or an allegation of excessive use of force, unless community unrest or other conditions makes such a response impracticable.  In the Level 1, 2 and Level 3 uses of force we reviewed for this subtask, supervisors responded to the scene as required in all instances.  Though not required, in all but six of the Level 4 uses of force we reviewed, a supervisor was also either on scene at the time of the use of force, or responded to the scene upon being notified of the use of force.

**Task 24.5** specifically addresses requirements for the response and handling of Level 1 uses of force.  We assess Level 1 uses of force in our regular reviews of Task 30 (Executive Force Review Boards).

**Task 24.6** requires that OPD enter all use of force data into Performance Reporting Information Metrics Environment (PRIME), which is now called Vision.  In all 53 UOF cases we reviewed, the data was entered as required.

The Court's reactivation of Task 24 at a November 2018 Case Management Conference resulted from our serious concerns with the Department's handling and investigation of uses of force.  OPD drafted Special Order 9196 to address and clarify requirements for the proper reporting of use of force.  This revision to UOF reporting requirements went into effect in February 2020.  OIG's global use of force audit, conducted in 2019, also identified numerous concerns with the reporting of use of force and enumerated a number of recommendations.  As noted above, OPD has taken a number of actions to address the identified concerns with the reporting of force, many of which were implemented after April 2019.  It remains to be seen if these actions will result in a positive outcome on this issue.  As a result, OPD remains in partial compliance with this Task.

| Task 24 compliance status | In partial compliance |
|---|---|

# Task 25: Use of Force Investigations and Report Responsibility

**<u>Requirements:</u>**

*An on-scene supervisor is responsible for completing an investigated use of force report in accordance with the provisions of Departmental General Order K-4, "Reporting and Investigating the Use of Force."*

1. *OPD shall develop and implement a policy for conducting and documenting use of force investigations that include, at a minimum:*

   a. *Documentation of the incident in either an Offense or Supplemental Report from the member(s)/employee(s) using force; and/or, when necessary, a statement taken from the member(s)/employee(s) using force;*

   b. *Separating and separately interviewing all officers who were at the scene at the time of the incident;*

   c. *A Supplemental Report from other members/employees on the scene or a statement taken, if deemed necessary by the investigating supervisor;*

   d. *Identification and interviews of non-Departmental witnesses;*

   e. *Consideration of discrepancies in information obtained from members, employees and witnesses, and statements in the reports filed;*

   f. *Whether arrest reports or use of force reports contain "boilerplate" or "pat language" (e.g., "fighting stance", "minimal force necessary to control the situation");*

   g. *Documentation of physical evidence and/or photographs and a summary and analysis of all relevant evidence gathered during the investigation; and*

   h. *Consideration of training/tactical issues involving the availability and practicality of other force options.*

   i. *Supervisor's justification as to why any element of the policy was not documented; and*

2. *All supervisors shall be trained in conducting use of force investigations and such training shall be part of a supervisory training course.*

3. *Use of force investigations shall include a recommendation whether the use of force was objectively reasonable and within Department policy and training. The recommendation shall be based on the totality of the circumstances and shall consider, but is not limited to, the following factors:*

   a. *Whether the force used was pursuant to a legitimate law-enforcement objective;*

  *b. Whether the type and amount of force used was proportional to the resistance encountered and reasonably related to the objective the members/employees were attempting to achieve;*

  *c. Whether the member/employee used reasonable verbal means to attempt to resolve the situation without force, if time and circumstances permitted such attempts;*

  *d. Whether the force used was de-escalated or stopped reasonably when resistance decreased or stopped;*

*4. use of force reports shall be reviewed by the appropriate chain-of-review as defined by policy.*

*The type of force used, the identity of the involved members, and the report preparer shall be the determining criteria for utilizing the appropriate chain-of-review.  Reviewers may include, when appropriate, the chain-of-command of the involved personnel, the appropriate Area Commander on duty at the time the incident occurred, other designated Bureau of Field Operations commanders, and as necessary, the chain-of-command of the involved personnel up to the Division Commander or Deputy Chief/Director, and the Internal Affairs Division.*

*Reviewers for Level 1-3 use of force investigations shall:*

  *a. Make a recommendation as to whether the use of force was in or out of policy,*

  *b. Order additional investigation and investigative resources when necessary, and*

  *c. Comment on any training issue(s) when appropriate.*

*5. Any recommendation that the use of force did not comply with Department policy shall result in the incident being referred to the Internal Affairs Division to conduct additional investigation/analysis, if necessary.*

*6. Members/employees involved in a use of force incident resulting in serious injury or death and/or an officer-involved shooting, shall be separated from each other as soon as practicable at the incident scene, and kept apart until they have completed their reports and been interviewed.*

(Negotiated Settlement Agreement V. B.)

**Relevant Policy:**

OPD most recently revised Departmental General Order K-4, *Reporting and Investigating the Use of Force* on October 16, 2014.  DGO K-4 incorporates the requirements of Task 25.

**Commentary:**

As noted above, in Task 24, we reviewed 47 Level 3 and Level 4 use of force (UOF) reports that were completed in June and July 2019.  We also reviewed one Level 1 and five Level 2 UOF reports, for which an Executive Force Review Board (EFRB) or Force Review Board (FRB) was held between January and March 2020.

**Task 25.1** requires that an on-scene supervisor complete a use of force report for every Level 3 use of force.  In all 10 incidents where at least one Level 3 use of force occurred, a supervisor responded to the scene and completed a use of force investigation.  In addition, there were eight instances where a Level 3 use of force was downgraded to a Level 4 by a supervisor.  In all eight, documentation, justification, and approval were provided.

**Task 25.2** requires that all supervisors are trained on how to conduct use of force investigations and such training is part of a supervisory training course.  OPD includes the requirement for this training in its Departmental policies.  During our March 2019 site visit, we confirmed with OPD that the Department continued to require and deliver this training.  We will again affirm that this training remains in place during our next site visit meeting.

**Task 25.3** requires that use of force investigations include required recommendations.  Areas of recommendation include: whether the force used was pursuant to a legitimate law enforcement objective; whether the type and amount of force used was proportional to the resistance encountered and reasonably related to the objective the officers were attempting to achieve; whether the officers used reasonable verbal means to attempt to resolve the situation without force, if time and circumstances permitted such attempts; and whether the force used was de-escalated or stopped reasonably when resistance decreased or stopped.

In our assessment of the 47 Level 3 and 4 UOFs we reviewed, we identified one instance where we believe the force used may not have been appropriate; and we asked OPD to conduct additional follow-up.  We did not identify any instances where the use of force was not deescalated or stopped reasonably when resistance decreased.  Again, we found several instances where we believe OPD officers could have made additional efforts to explain to subjects being detained why the detention was occurring, but we also noted several incidents where officers did provide verbal explanations to those persons they had contact with and spent considerable time attempting to verbally deescalate situations.  We continue to note that OPD officers who engage in contact with persons rarely identified themselves as police officers, even when it appeared from our reviews that it was appropriate to do so, and there was time for the identification to have been made.  We also continue to note that in some cases, the need to use physical force may be decreased or eliminated when officers identify themselves or provide verbal explanations to persons they contact; we encourage OPD to continue to attempt to resolve conflicts, without the use of force, when appropriate and possible to do so.  We also encourage OPD to address the general failure by officers to identify themselves as police officers when it is possible and

appropriate to do so.  This remains a cultural issue – and one that is also tied to instances where de-escalation might facilitate a better outcome.  During our site visits, we will continue to discuss specific cases where we believe additional verbal communications should have been attempted and could have resulted in a decrease in the necessity to use of force; and will acknowledge those instances where OPD personnel did engage in efforts to verbally deescalate situations.

**Task 25.4** requires that use of force reports be reviewed by the appropriate chain of review and appropriate recommendations are made.  In all of the cases we reviewed, the reports were reviewed as required.

**Task 25.5** requires that any determination that a use of force did not comply with Department policy result in the incident being referred to IAD to conduct additional investigation/analysis, if necessary.  None of the Level 3 or Level 4 investigations we reviewed resulted in a finding by OPD that the force did not comply with policy.  We identified one Level 3 UOF where we have concerns about the use of force; we have asked OPD to conduct further follow-up.  In the Level 1 UOF incident, the EFRB determined that some of the force used did not fall within policy; and appropriately handled necessary follow-up.  OPD found all five Level 2 UOFs we reviewed in policy, and we agree with those findings.

**Task 25.6** requires that members/employees involved in a use of force incident resulting in serious injury or death and/or officer-involved shooting, are separated from each other as soon as practicable at the incident scene, and kept apart until they have completed their reports and been interviewed.  This Task is not assessed here, as we review and consider it as part of the Force and Executive Force Review Boards that OPD holds to examine Level 1 and 2 uses of force.

The Court's reactivation of Task 25 at the November 2018 Case Management Conference resulted from our serious concerns with the Department's handling and investigation of recent uses of force.  OPD drafted Special Order 9196 to address and clarify requirements for the proper reporting of use of force.  This revision to UOF reporting requirements went into effect in February 2020.  OIG's global use of force audit, conducted in 2019, also identified numerous concerns with the reporting of use of force and enumerated a number of recommendations.  As noted above, OPD has taken a number of actions intended to address identified concerns with the reporting of force, many of which were implemented after April 2019.  It remains to be seen if these actions will result in a positive outcome on this issue.  As a result, OPD remains in partial compliance with this Task.

| **Task 25 compliance status** | In partial compliance |
| --- | --- |

## Task 41:  Use of Personnel Assessment System (PAS) and Risk Management

**Requirements:**

*Within 375 days from the effective date of this Agreement, OPD shall develop a policy for use of the system, including supervision and audit of the performance of specific members, employees, supervisors, managers, and OPD units, as well as OPD as a whole.*

*The policy shall include the following elements:*

1.  *The Chief of Police shall designate a PAS Administration Unit.  The PAS Administration Unit shall be responsible for administering the PAS policy and, no less frequently than quarterly, shall notify, in writing, the appropriate Deputy Chief/Director and the responsible commander/manager of an identified member/employee who meets the PAS criteria.  PAS is to be electronically maintained by the City Information Technology Department.*

2.  *The Department shall retain all PAS data for at least five (5) years.*

3.  *The Monitor, Inspector General and Compliance Coordinator shall have full access to PAS to the extent necessary for the performance of their duties under this Agreement and consistent with Section XIII, paragraph K, and Section XIV of this Agreement.*

4.  *PAS, the PAS data, and reports are confidential and not public information.*

5.  *On a quarterly basis, commanders/managers shall review and analyze all relevant PAS information concerning personnel under their command, to detect any pattern or series of incidents which may indicate that a member/employee, supervisor, or group of members/employees under his/her supervision may be engaging in at-risk behavior.  The policy shall define specific criteria for determining when a member/employee or group of members/employees may be engaging in at-risk behavior.*

6.  *Notwithstanding any other provisions of the PAS policy to be developed, the Department shall develop policy defining peer group comparison and methodology in consultation with Plaintiffs' Counsel and the IMT.  The policy shall include, at a minimum, a requirement that any member/employee who is identified using a peer group comparison methodology for complaints received during a 30-month period, or any member who is identified using a peer group comparison methodology for Penal Code §§69, 148 and 243(b)(c) arrests within a 30-month period, shall be identified as a subject for PAS intervention review. For the purposes of these two criteria, a single incident shall be counted as "one" even if there are multiple complaints arising from the incident or combined with an arrest for Penal Code §§69, 148 or 243(b)(c).*

7.  *When review and analysis of the PAS threshold report data indicate that a member/employee may be engaging in at-risk behavior, the member/employee's immediate supervisor shall conduct a more intensive review of the*

*member/employee's performance and personnel history and prepare a PAS Activity Review and Report.  Members/employees recommended for intervention shall be required to attend a documented, non-disciplinary PAS intervention meeting with their designated commander/manager and supervisor.  The purpose of this meeting shall be to review the member/employee's performance and discuss the issues and recommended intervention strategies.  The member/employee shall be dismissed from the meeting, and the designated commander/manager and the member/employee's immediate supervisor shall remain and discuss the situation and the member/employee's response.  The primary responsibility for any intervention strategies shall be placed upon the supervisor.  Intervention strategies may include additional training, reassignment, additional supervision, coaching or personal counseling.  The performance of members/ employees subject to PAS review shall be monitored by their designated commander/manager for the specified period of time following the initial meeting, unless released early or extended (as outlined in Section VII, paragraph B (8)).*

8.   *Members/employees who meet the PAS threshold specified in Section VII, paragraph B (6) shall be subject to one of the following options:  no action, supervisory monitoring, or PAS intervention.  Each of these options shall be approved by the chain-of-command, up to the Deputy Chief/Director and/or the PAS Activity Review Panel.*

*Members/employees recommended for supervisory monitoring shall be monitored for a minimum of three (3) months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor.  The first at the end of one (1) month and the second at the end of three (3) months.*

*Members/employees recommended for PAS intervention shall be monitored for a minimum of 12 months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor and designated commander/manager:  The first at three (3) months and the second at one (1) year.  Member/employees subject to PAS intervention for minor, easily correctable performance deficiencies may be dismissed from the jurisdiction of PAS upon the written approval of the member/employee's responsible Deputy Chief, following a recommendation in writing from the member/employee's immediate supervisor.  This may occur at the three (3)-month follow-up meeting or at any time thereafter, as justified by reviews of the member/employee's performance.  When a member/employee is not discharged from PAS jurisdiction at the one (1)-year follow-up meeting, PAS jurisdiction shall be extended, in writing, for a specific period in three (3)-month increments at the discretion of the member/employee's responsible Deputy Chief.  When PAS jurisdiction is extended beyond the minimum one (1)-year review period, additional review meetings involving the member/employee, the member/ employee's designated commander/manager and immediate supervisor, shall take place no less frequently than every three (3) months.*

9.     *On a quarterly basis, Division/appropriate Area Commanders and managers shall review and analyze relevant data in PAS about subordinate commanders and/or managers and supervisors regarding their ability to adhere to policy and address at-risk behavior.  All Division/appropriate Area Commanders and managers shall conduct quarterly meetings with their supervisory staff for the purpose of assessing and sharing information about the state of the unit and identifying potential or actual performance problems within the unit.  These meetings shall be scheduled to follow-up on supervisors' assessments of their subordinates' for PAS intervention.  These meetings shall consider all relevant PAS data, potential patterns of at-risk behavior, and recommended intervention strategies since the last meeting.  Also considered shall be patterns involving use of force, sick leave, line-of-duty injuries, narcotics-related possessory offenses, and vehicle collisions that are out of the norm among either personnel in the unit or among the unit's subunits.  Division/appropriate Area Commanders and managers shall ensure that minutes of the meetings are taken and retained for a period of five (5) years.  Commanders/managers shall take appropriate action on identified patterns of at-risk behavior and/or misconduct.*

10.     *Division/appropriate Area Commanders and managers shall meet at least annually with his/her Deputy Chief/Director and the IAD Commander to discuss the state of their commands and any exceptional performance, potential or actual performance problems or other potential patterns of at-risk behavior within the unit.  Division/appropriate Area Commanders and managers shall be responsible for developing and documenting plans to ensure the managerial and supervisory accountability of their units, and for addressing any real or potential problems that may be apparent.*

11.     *PAS information shall be taken into account for a commendation or award recommendation; promotion, transfer, and special assignment, and in connection with annual performance appraisals.  For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

12.     *Intervention strategies implemented as a result of a PAS Activity Review and Report shall be documented in a timely manner.*

13.     *Relevant and appropriate PAS information shall be taken into account in connection with determinations of appropriate discipline for sustained misconduct allegations.  For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

14.     *The member/employee's designated commander/manager shall schedule a PAS Activity Review meeting to be held no later than 20 days following notification to the Deputy Chief/Director that the member/employee has met a PAS threshold and when intervention is recommended.*

Sixty-Seventh Report of the Independent Monitor for the Oakland Police Department
April 2, 2020
Page 25 of 28

15. *The PAS policy to be developed shall include a provision that a member/employee making unsatisfactory progress during PAS intervention may be transferred and/or loaned to another supervisor, another assignment or another Division, at the discretion of the Bureau Chief/Director if the transfer is within his/her Bureau.  Inter-Bureau transfers shall be approved by the Chief of Police.  If a member/employee is transferred because of unsatisfactory progress, that transfer shall be to a position with little or no public contact when there is a nexus between the at-risk behavior and the "no public contact" restriction.  Sustained complaints from incidents subsequent to a member/employee's referral to PAS shall continue to result in corrective measures; however, such corrective measures shall not necessarily result in a member/employee's exclusion from, or continued inclusion in, PAS.  The member/employee's exclusion or continued inclusion in PAS shall be at the discretion of the Chief of Police or his/her designee and shall be documented.*

16. *In parallel with the PAS program described above, the Department may wish to continue the Early Intervention Review Panel.*

17. *On a semi-annual basis, beginning within 90 days from the effective date of this Agreement, the Chief of Police, the PAS Activity Review Panel, PAS Oversight Committee, and the IAD Commander shall meet with the Monitor to review the operation and progress of the PAS.  At these meetings, OPD administrators shall summarize, for the Monitor, the number of members/employees who have been identified for review, pursuant to the PAS policy, and the number of members/employees who have been identified for PAS intervention.  The Department administrators shall also provide data summarizing the various intervention strategies that have been utilized as a result of all PAS Activity Review and Reports.  The major objectives of each of these semi-annual meetings shall be consideration of whether the PAS policy is adequate with regard to detecting patterns of misconduct or poor performance issues as expeditiously as possible and if PAS reviews are achieving their goals.*

18. *Nothing in this Agreement, and more specifically, no provision of PAS, shall be construed as waiving, abrogating or in any way modifying the Department's rights with regard to discipline of its members/employees.  The Department may choose, at its discretion, to initiate the administrative discipline process, to initiate PAS review or to use both processes concurrently or consecutively.*

(Negotiated Settlement Agreement VII. B.)


**Relevant Policy:**

OPD revised and issued Departmental General Order D-17, *Personnel Assessment Program,* in November 2013.

Sixty-Seventh Report of the Independent Monitor for the Oakland Police Department
April 2, 2020
Page 26 of 28

**Commentary:**

In our last status report, we noted our concerns, and those also expressed within the Department, that OPD's transition from PRIME to the new risk management database, Vision, was slowing and there was risk of stagnation. While there were several issues to consider, high among them was a not-yet finalized contract with the vendor developing the data dashboards, which will provide easy access to data and analysis for supervisors and command staff. The vendor has completed extensive work on the dashboards; but a few months ago, OPD and the City Information Technology Department reported that the vendor had not worked on the project since October as it awaited a new contract. Work with another vendor to continue to build out the database and to provide any needed system maintenance had also slowed.

These issues now appear to have been resolved, and the work in progress now focuses on two related tasks. The first involves the completion of dashboards, and then their connection to the real data in the Vision database. The dashboards had been constructed using mock data, and now it is time to complete final steps. The second, related task is the completion of the design of 70-80 "reports" which will be produced regularly by the database.

The concern with both of these tasks is to ensure that the dashboards and reports reflect the data correctly. The complex, and apparently tedious, work will require subject matter experts within the Department to review the data output to ensure accuracy. At this stage, there seems to be no alternative to the manual review of the content of reports and dashboards. Organizing the subject experts, while the regular work of the Department continues, is itself a complicated task.

In light of the importance of these final stages in the development of the new system, the City's Director of Information Technology has recommended that the beginning of work by the dashboard vendor be delayed by two weeks to maximize productivity. The Department and the Monitor have agreed with the recommendation and will track progress.

As work toward the new database continues, there are parallel developments in the analysis of data and in the risk management process. On the analysis front, there are several important developments. A draft of the long-in-process review of disparity in discipline in the Department was delivered by outside consultants and roundly criticized as inadequate. It was returned for significant revisions, and the second iteration of the report is under review. The process within the Department and with the engagement of the Plaintiffs' attorneys in this endeavor reflects an appropriate sophistication in seeking and engaging data-based assessments of Departmental processes and activities.

The Department is also seeking to buttress its commitment to the use of data in decision-making by increasing the staff resources trained to contribute to this process. An experienced auditor with strong analysis skills has recently been hired to work with OIG on its numerous reviews of Departmental processes. Additionally, the Department continues to seek to fill a position which has variously been described as a data scientist or data manager. Commitment to that position has now been in place for over one year. We look forward to progress in finding suitable candidates.

The value of enhancing analysis skills is frequently evident in discussions with the Department. During our February site visit, is was noted that following changes in its use of force policy, the Department has seen large increases in use of force reports involving officers encountering resistance by people being placed in handcuffs.  Under the revised policy, these are reported as Level 4 - Type 32 uses of force.  These cases were discussed as possibly contributing to delays and backed-up calls for service as officers time spent completing reports may have increased.  At the same time, a discussion of Level 4 - Type 32 cases included an example in which three officers were required to restrain a resisting subject while being put under arrest.  Clearly, there is a need for analysis of this issue to consider the extent to which the new designation has resolved problems of under-reporting but may also have affected other work requirements.

The issues of data analysis also continue to be relevant in the risk management process.  In our last status report, we noted the limited discussion of issues of race in review of the data on stops made by the police.  Of course, the issue of race has been at the heart of concern over police stops of pedestrians and automobiles.  At issue has been the levels of disparity in stops and the outcomes which show that few enforcement actions often result from those stops.

These discussions have been important in the risk management reviews that take place regularly in OPD.  During the monthly Risk Management Meeting that occurred during our February site visit, stop data and the related issues of race were discussed more extensively.  Potential patterns of bias in stops – as well as stop outcomes – were reviewed.  The ratio of intelligence-based stops versus non-intel led stops was also considered.  There was also discussion of officers currently under monitoring or intervention as part of the risk management process.  The meeting addressed the concerns raised in our last report.

Finally, during our February site visit, we participated in a significant meeting on the future of risk-related analysis in the Department.  That meeting began by introducing the new dashboard approach to analysis to two Sergeants.  They indicated that the new data presentation would be useful in their supervision of officers.  The main point, however, was to discuss the extension of approaches to analysis.  The focus has often been on a process of "drilling down" to identify individual officers engaged in risk related behavior.  In addition, the meeting focused on a process of "drilling up" to identify trends and patterns in the data that suggest the need to review and change policies or practices that support undesirable risk-related behavior.

As the new Vision database comes on line, it is clear that maximizing the contributions of the new technology will require additional analytic capacity and related training in the Department.

| Task 41 compliance status | In compliance.  We restate our previous concern that the potential of the system may be surpassing its efficacious use. |
|---|---|

## Conclusion

Our February site visit focused heavily on issues of risk, and responses to it, as it is linked to Tasks 40 and 41.  Progress on the data systems required for risk analysis continues, and supports the Department's risk management meeting processes.  As we have noted, those analyses are joined by other efforts to inform decision-making with data.  The extent of these effort to use data for improved management; however, this also sheds light on the limited resources available to support the work.  The progress thus far has been accomplished largely by key staff with a wide range of responsibilities but limited training in data analysis.  Even now, those resources are stretched heavily.

OPD will soon have new leadership.  We encourage the Department to be sensitive to community anxiety during the current health crisis.  We also urge OPD to forge sustainable relations with the interim City Administrator and the Police Commission, the latter being an oversight body charged with the responsibility to ensure the agency is accountable to the community at large.

Chief (Ret.) Robert S. Warshaw

*Monitor*