BARBARA J. PARKER, City Attorney, CABN 069722
RYAN RICHARDSON, Special Counsel, CABN 223548
DAVID PEREDA, Special Counsel, CABN 237982
BRIGID S. MARTIN, Special Counsel, CABN 231705
One Frank H. Ogawa Plaza, 6th Floor
Oakland, California 94612
Telephone: (510) 238-3601
Facsimile: (510) 238-6500
Email:  BMartin@oaklandcityattorney.org

Attorneys for CITY OF OAKLAND

JOHN L. BURRIS, CABN 69888
Law Offices of John L. Burris
Airport Corporate Centre
7677Oakport Road, Ste. 1120
Oakland, California 94621
Telephone: (510) 839-5200
Facsimile: (510) 839-3882

JAMES B. CHANIN, CABN 76043
Law Offices of James B. Chanin
3050 Shattuck Avenue
Berkeley, California 94705
Telephone: (510) 848-4752

Attorneys for PLAINTIFFS

*(Additional Counsel on Next Page)*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| DELPHINE ALLEN, et al. | Case No. 00-cv-04599 WHO |
| Plaintiffs, | **JOINT CASE MANAGEMENT STATEMENT** |
| v. | Date: May 27, 2020 |
| CITY OF OAKLAND, et al., | Time: 3:30 p.m. |
| Defendant(s). | Courtroom 2, 17th Floor |
| | Hon. William H. Orrick |

1  ROCKNE A. LUCIA, JR., CABN 109349
   Rains Lucia Stern St. Phalle & Silver
2  Attorneys & Counselors at Law
   2300 Contra Costa Boulevard, Suite 500
3  Pleasant Hill, CA 94523
   Telephone: (925) 609-1699
4  Facsimile: (925) 609-1690

5  Attorneys for OAKLAND POLICE OFFICERS ASSOCIATION

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**PLAINTIFFS' STATEMENT**...................................................................1

PLAINTIFFS' CURRENT POSITION ......................................................1

I.   VISION..................................................................................................2

II.  CONSISTENCY OF DISCIPLINE STUDY ......................................5

III. USE OF FORCE ...................................................................................9

CONCLUSION.............................................................................................12

**THE CITY'S STATEMENT** ......................................................................14

OVERVIEW.................................................................................................14

I.   THE DEPARTMENT'S DISCIPLINE DISPARITY STUDY.....................14

II.  THE CITY'S ONGOING EFFORTS TO REDUCE RACIAL DISPARITIES.........17

III. TASK 2—INTERNAL AFFAIRS TIMELINES .........................................19

IV. TASK 5—INTERNAL AFFAIRS COMPLAINT PROCEDURES .........................20

V.  TASKS 24/25—FORCE INVESTIGATION AND REPORTING.............................21

   A. OIG Audit of Use of Force Reporting Reflects Improvement in Accuracy and
      Consistency of Reporting.......................................................................23

   B. The Department Remains Attentive to Body Worn Camera
      Activation Issues..................................................................................24

   C. The Department is Monitoring Compliance with the Recent Mandate that
      Supervisors Promptly Review Body Worn Camera Footage..............................26

   D. De-escalation is Improving...................................................................28

VI. TASKS 26/30—FORCE REVIEW BOARDS AND EXECUTIVE FORCE
    REVIEW BOARDS.................................................................................29

VII.TASKS 34/41—STOP DATA AND PAS/VISION DATABASE CONCLUSION ....29

    CONCLUSION .......................................................................................30

**THE OPOA'S STATEMENT** ..................................................................32

**PLAINTIFFS' STATEMENT**

**PLAINTIFFS' CURRENT POSITION**

Much has transpired since Plaintiffs' submitted their previous Case
Management Conference Statement to this Court.  The parties in this action
submitted their most recent Joint Case Management Conference Statement to this
Court on February 18, 2020.  The following day, February 19, 2020, a scheduled
February 25, 2020 Status Conference was continued to April 29, 2020 due to
scheduling conflicts.  One day later, on February 20, 2020, Mayor Schaaf and the
Oakland Police Commission unanimously agreed to terminate Chief Kirkpatrick.
Assistant Chief Darren Allison was appointed interim acting Chief until Chief
Susan Manheimer was appointed by Mayor Schaaf on March 23, 2020, becoming
Oakland's eighth permanent Chief since 2009, and eleventh over the past ten years.
Three days later, on March 26, 2020, this Court vacated the rescheduled Case
Management Conference in light of the Covid-19 restrictions that were in place.

Plaintiffs are cognizant that these upheavals – some self-inflicted, others
external – place great strain on the Oakland Police Department.  Plaintiffs, like all
Oaklanders, are grateful for the sacrifice, dedication, and risks borne by our first
responders, including many OPD personnel, at this precarious time.  We salute and
appreciate their efforts in the midst of this global pandemic, and we wish them well.

Plaintiffs are also hopeful that Chief Manheimer and OPD and city leaders
can finally reverse the recent slippage in compliance with outstanding NSA tasks.
Plaintiff's attorneys noted with interest that Chief Manheimer, in her first TV
interview following her appointment, said that one of her priorities would be to "get
to the core of these different stakeholder groups, find the interests, build the
respect, build those relationships, and really make sure that we move the
Department forward in this time with the NSA agreement, as well as with the
various stakeholders." (https://abc7news.com/oakland-police-susan-manheimer-new-
chief-anne-kirkpatrick-firing-department/6105963/ 3:51)  Plaintiffs stand ready to

JOINT CASE MANAGEMENT STATEMENT                                        Case No. 00-cv-4599 WHO

do all they can to help OPD finally reach full, meaningful compliance with the NSA.

The Independent Monitor for the OPD has issued one status report (the 67th Report, dated 04/02/20) since the last Case Management Conference statement was filed. OPD remains out of full compliance with the same eight tasks that were out of compliance as of the last Case Management Conference Statement: 1. Task 2 (Timeliness Standards and Compliance with IAD Investigations); 2. Task 5 (Internal Affairs Division (IAD) Complaint Procedures – in partial compliance); 3. Task 24 (Use of Force Reporting Policy); 4. Task 25 (Use of Force Investigations and Report Responsibility); 5. Task 26 (Force Review Board); 6. Task 30 (Executive Force Review Board—out of compliance); 7. Task 34 (Stop Data – in partial compliance); and 8. Task 45 (Consistency of Discipline – in partial compliance). Five of these tasks (Tasks 2, 24, 25, 26, and 30) were in full compliance as recently as January of 2019.

Many of these tasks were addressed at great length in Plaintiffs' previous Case Management Conference Statement (Dkt. 1358, filed 02/18/20), and those comments are incorporated by reference into Plaintiffs' portion of this Case Management Conference. Since the disposition of these tasks is unchanged since our most recent submission to this Court, Plaintiffs will focus on specific developments subsequent to our February 18, 2020 filing, including Vision, the recently-published Hillard Heintze OPD Discipline Disparity report, and Use of Force.

I. **VISION**

After months of delays (the City of Oakland variously told this Court that it would be "up and running" in July 2019, September 2019, and October 2019), Vision finally replaced PRIME as OPD's risk-management database in November 2019, and PRIME was deactivated. (66th IMT Report, p. 8) Oakland has invested millions of dollars in this new risk management infrastructure, and its deployment and functionality will be critical to OPD's success going forward.

1       The IMT's 66th IMT Report noted concerns about "serious impediments to

2   progress" regarding the implementation of Vision.  (Dkt. 1357, p. 8) Specifically, the

3   IMT warned that "critical work on the data dashboards – as well as other important

4   tasks – seems stalled, caught up in a lapsed contract with a critical vendor and with

5   capacity issues in the City's Information Technology Division." (66th IMT Report, p.

6   8) The IMT also noted data retention and transition issues while moving from

7   PRIME to Vision, as well as training issues.  Most worrying to Plaintiffs' was the

8   Monitor's conclusion race received only "the most cursory" attention in early risk

9   analyses. (66th IMT Report, p. 9) Plaintiffs' strongly second the IMT's admonition

10  that OPD's "years-long and continuing discomfort with forthright discussion of race

11  continues to loom over this entire project, yet it is the genesis and heart of the

12  NSA." (66th IMT Report, p. 9).  This is undeniably true, and bleeds into all aspects

13  this matter, including the recently-published Hillard Heintze disparity report which

14  will be elaborated upon at greater length, below.

15      Plaintiffs' understand that OPD and the City Information Technology

16  Department are currently completing the Vision dashboards, and connecting those

17  to the data in the Vision database.  During the most recent (virtual) site visit, the

18  Information Technology Department explained that Oakland continues to struggle

19  with back-end data reporting, and that more resources are required.  Plaintiffs' are

20  aware that Oakland's Information Technology Department is understaffed, and are

21  a cognizant of their efforts, led by Chief Information Officer Andrew Peterson, to

22  develop and implement Vision.  Given these efforts, and the vast amount of money

23  that has been invested in this system, Plaintiffs' cannot comprehend why OPD's

24  Data Manager position has been unfilled for over a year.

25      The Data Manager will be OPD's point person for analyzing the massive

26  amounts of data incorporated into Vision.  In fact, this very data manager position

27  was one of Stanford's 50 recommended actions to mitigate racial disparities and

28  improve police-community relations, a document that was published in 2016!

JOINT CASE MANAGEMENT STATEMENT              Case No. 00-cv-4599 WHO

(Specifically, recommendation #17 reads, in full: "hire a data manager.")  This Court has inquired about this unfilled position for more than year, and the City has represented that it was on the cusp of filling this position.  An Information Technology Department employee recently analogized the data manager position to a missing fighter pilot where Vision is a finely-tuned and massively expensive fighter jet.  It is unconscionable that Oakland is building this massive risk management database without locating and hiring the right people to put it to real-world use.   This is especially concerning to Plaintiffs' given the City's implied representation to this Court that this position was already filled in their 08/14/2019 Case Management Conference, where they wrote: "For instance, in addition to the data manager mentioned under the Stanford recommendations, the City has already hired a new Deputy CIO whose sole job is to support the Public Safety IT needs." (Dkt. 1303, pp. 32-33)

Finally, Plaintiffs were deeply troubled to receive a forwarded copy of the "Chiefs' Weekly Updates" for the week of May 8, 2020, wherein Chief Manheimer was asked "When will we abandon Vision and go back to Word documents and Excel spreadsheets that take less time, since we're having to do that anyway, and cause fewer headaches?"

This is completely unacceptable, and speaks to a devastating failure in leadership at OPD.  Plaintiffs' attorneys do not blame line officers for complaining about a system that they have been inadequately trained to use.  Commanders must take responsibility for the criticism of their subordinates.

As noted repeatedly, millions of dollars have been invested into Vision.  The City, the Department, and OPD personnel must embrace this new database, and Plaintiffs' expect Chief Manheimer to advocate for Vision, ensure that all OPD personnel become fluent in the usage of this system, and that supervisors – beginning with the Chief herself – redouble their commitments to collecting and analyzing data for the purpose of managing risk and improving policing strategies

4

1   and outcomes. The very fact that junking the whole system is up for discussion, and

2   that it was entertained as a reasonable inquiry by Chief Manheimer, undercuts the

3   Departments representations that Vision will be a critical tool for the department

4   moving forward.

5   **II.      CONSISTENCY OF DISCIPLINE STUDY**

6          On Friday, May 15, OPD published a "Police Discipline Disparity Study."

7   Although the report itself is dated April 23, 2020, it was commissioned from Hillard

8   Heintze in March of 2019, and the principle findings contained in this report are

9   essentially unchanged since Plaintiffs' first obtained a "draft" report in August

10  2019.

11         Hillard Heintze determined that "allegations that result in a sustained

12  finding are more likely for black employees." (Hillard Heintze report, p. 10).

13  Specifically, the data analyses performed during this study "determined that race

14  and outcome are statistically dependent for each year since 2014." (p. 10, "Key

15  Finding #2)  Even after controlling for other factors such as years of service,

16  employee gender, and employee age, African American employees were "37 percent

17  more likely to have an allegation against them result in a sustained finding. " (p.

18  10)  For class one complaints, black individuals are 39% more likely to have a

19  complaint sustained, even after age, gender, and years of service are controlled for.

20  Similarly, black officers are 25% more likely to have a Class 2 complaint sustained.

21         OPD's own "Response to the Police Discipline Disparity Study" , which

22  accompanied the release of the Disparity Report itself, concedes that this is "the

23  study's most important finding" (Oakland Police Department Response, p. 1).

24  Indeed, this finding is devastating, and incompatible with an equitable workplace or

25  a modern police department.  It is antithetical to the "core principles [of] equity and

26  procedural justice" that OPD purports to embody in their very Response (Response,

27  p. 2). It is also an egregious violation of NSA Task 45, which requires Consistency of

28  Discipline.

Oakland has been on notice that black employees are subject to disparate discipline outcomes since at least August of 2019, when Plaintiffs first viewed a draft of this report, and the relative disparity percentage remains unchanged at 37%. This means that, even as Hillard Heintze was meeting with OPD command staff and providing them with concrete proof that race and discipline outcomes were statistically dependent since at least 2014, absolutely no efforts were made to mitigate or rectify this problem. Even though OPD has been on notice for at least nine months now, they passively allowed this disparity to persist.

The Hillard Heintze report also found that "although our review revealed disparities based on race and gender in regard to probationary releases from the Academy and Field Training Programs, the data is too limited to draw further conclusions." (Report, p. 11, Key Finding #4) The Report also looked at FTO (Field Officer Training) completion rates by race and gender, and included a table that shows completion rates for black and Asian trainees lagged behind those for Hispanic and white trainees." (Hillard Heintze Report, p. 43) To the extent that the data is, in fact, too limited, Plaintiffs believe that it is incumbent on OPD create and retain comprehensive data about all recruits, precisely so that the underlying causes of such discrepancies can be investigated and remedied moving forward. Otherwise this inequity will persist and continue to go unchallenged.

Key finding #5 of the Hillard Heintze report concerns the IAD policy which allows sergeants to be "fact finders and adjudicators (which) has the potential to lessen an investigator's neutrality." The report authors note that this system "is not consistent with promising practices used in departments similar in size to Oakland." (Hillard Heintze Report, p. 11) Plaintiffs emphatically agree that this system can contribute to biased decision-making and/or perpetuate a perception of investigator bias. Indeed, upon review of draft versions of this report, Plaintiffs' suggested that OPD command staff that they deviate from this practice on a trial basis in order to determine whether this would lead to an fewer disciplinary

disparities.  No such change was made.  OPD must remedy this moving forward.

The Hillard Heintze Report includes several telling employee surveys that attest to the systemic rot.  According to charts on p. 21 of the report, 35.83% of OPD employees "strongly agree" or "agree" with the proposition that race plays a factor in determining the outcome of an internal investigation.  36.51% of employees "strongly agree" or "agree" that race plays a factor in OPDs determination of discipline.  Put another way, one-third of the entire department sees evidence of systematic racial discrimination at their workplace.  Notably, 75% of white respondents indicated that they believe that race is not a factor in the outcome of an internal investigation or the determination of discipline, while just 63% of black respondents, 60% of Asian respondents, and 56% of Hispanic respondents concurred.  (Hillard Heintze Report, p. 23)  OPD employees also reported that "who you know, and to which cliques you belong, influence whether an investigation will be sustained and what level of discipline will be administered", and that the "IAD and disciplinary processes are not transparent." (Hillard Heintze Report, p. 23)

These numbers pale in comparison with the number of sworn respondents who believe that OPD's disciplinary process is fair.  Just 18.68 percent "agree" or "strongly agree" with this sentiment.  The other 81.32 percent of respondents disagree, with a whopping 36.96% strongly disagreeing. A discipline system that is "unfair" in the eyes of more than five of every six employees is untenable, and by definition broken.

Similarly, nearly eighty percent of respondents agreed or strongly agreed that rank plays a factor in determining the outcome of an internal investigation and the determination of discipline. (Hillard Heintze Report, p. 22).  This is a long-standing problem within the Department.  One constant over Plaintiffs' 17-year-involvement in this action is that lower-ranking officers bear the brunt of discipline.  This is especially true in circumstances that derive from systemic failures (related, for example, to training or supervision).  Those at the bottom of the organizational

1  pyramid are disciplined disproportionately while commanders and leadership are

2  not held equally accountable for the shortcomings of their subordinates.

3  　　　The Hillard Heintze Report concludes with 14 recommendations that it urged

4  the OPD to adopt.  The Department's published response variously promises that

5  OPD "looks forward to engaging with our Race and Equity team with the expertise

6  and consultation of the City's Department of Race and Equity and with technical

7  assistance from Dr. Eberhardt" (Response, p. 2) and that "the Department will work

8  with the Department of Race and Equity to evaluate the fourteen recommendations

9  made by Hillard Heintze." (Response, p. 4)

10  　　　As already noted above, OPD has known about racially disparate discipline

11  outcomes for at least nine months.  There is no evidence that OPD took any

12  meaningful actions to remedy this fiasco for the vast majority of this time.

13  Plaintiffs of course encourage OPD to consult with City's Department of Race and

14  Equity and Dr. Eberhardt.  They are invaluable assets. Plaintiffs are also reminded

15  that OPD still has not implemented Dr. Eberhardt's 2016 recommendation to hire a

16  data manager.  Follow-through is key.

17  　　　There are some grounds for cautious optimism on this front.  Specifically,

18  Chief Manheimer has indicated directly to Plaintiffs' attorneys that discipline

19  disparity will be a priority, and Plaintiffs' attorneys received a comprehensive

20  memorandum from Chief Manheimer outlining disparity-reduction and diversity-

21  enhancement measures.  This is a proactive first step.  Subsequent concrete action

22  to resolve the disparities and systematic differential treatment on the basis of race

23  is crucial.  If OPD cannot or will not decisively remedy the problems uncovered by

24  the Hillard Heintze report, it is incumbent on the Compliance Officer and this Court

25  to intervene.  OPD also remains on notice that disparate discipline will continue

26  unabated until concrete action is taken, and all parties must hold the Department

27  accountable every single day that they fail to act.

28

### III.    USE OF FORCE

The Use of Force and Force Review Boards were extensively discussed by Plaintiffs' attorneys in the last Joint Case Management Conference Statement which was filed on February 18, 2020. (See pages 5-11, Case Management Conference Statement filed February 18, 2020) Since the Case Management Conference on February 25, 2020 was never held, Plaintiffs incorporate those pages by reference into this statement and, with the Court's permission, will feel free to raise those issues in this Case Management Conference.

There is one point, however, which does warrant repetition. The Office of Inspector General (OIG) issued a report nearly a year ago (July 2019) which determined that "the percentage of African American subjects of force that went unreported is higher than the percentage of African American arrestees" (OIG audit p2).  In fact, every person in the sample referenced by the OIG was  either Latino or African American. (Case Management Conference filed 2.18.20, Document 1358, 6:24-7:16).

The City of Oakland in its portion of the August 2019 CMC Statement dismissed this finding as follows:

"Lastly, in the very small sample size—too small to draw any statistical conclusions" the percentage of African Americans who were arrested was lower than the percentage of Underreported force against African Americans" (August 2019 CMC Statement, page 22)."

Since the City's statement on this issue, and despite the request by the Plaintiffs that the City conduct a study with a larger sample size if they felt that the subject sample size was insufficient to draw any conclusions, the City has not made any effort to drill down on this critical issue.  Instead, a new study has revealed that the disparity noted by the Oakland Police Department's own Inspector General extends to discipline with the ranks of the OPD itself.

The issue of disparate treatment, which prompted the Negotiated Settlement

9

Agreement over seventeen years ago, is still at the forefront of OPD's problems with the community it serves.  Only when this core issue is aggressively confronted to the maximum extent possible in this society, will the OPD attain compliance with the Negotiated Settlement Agreement.

The OPD made a significant redefinition of Use of Force which caused the number of Uses of Force reported to skyrocket, particularly in Level 4 Use of Force and the pointing of the firearm. The OPD worked with the Police Commission and published Special Order 9196 which was discussed by the City in its portion of the last Case Management Conference (See Pages 39-40, Case Management Conference Statement filed February 18, 2020, Document 1358).

The Monitor's 67th Report, filed April 2, 2020, states that "the increases in the reported uses of force between 2018 and 2019 do not appear to signal a rise in actual use of force, but rather is the result of prior inaccurate reporting left unchecked by supervisory personnel" (Monitor's 67th Report, page 15).  Even if this is true, there is a significant failure of supervisory accountability on reporting force which must be remedied.

The scope of the problems with supervisors' reporting and reviewing the Use of Force is detailed in the recent 4th Quarterly Progress Report of the Oakland Police Department Office of the Inspector General. A "Key finding" in that report is that in 11 of the 20 incidents in which offenses of Penal Code 69, 148 (a)(1) and/or 243(b)(c) allegedly occurred, there were no annotations indicating a sergeant had reviewed the respective police officers' body worn camera footage within two days, as required by OPD policy.  Five of the 11 incidents had annotations indicating that a supervisor or lieutenant reviewed the video within 5 to 32 days. Although the report is not clear on this issue, apparently 6 of the 20 incidents contained no indication that the Body Worn Camera footage was ever reviewed at all. The sergeant responsible for the BWC review was on the scene in one of the 6 incidents with no indication that the Body Worn Camera Footage was reviewed so there is a

JOINT CASE MANAGEMENT STATEMENT                                   Case No. 00-cv-4599 WHO

1   colorable argument that this review was made in person so the failure to notate the
2   review was an error of form and not of substance.  However, the fact remains that in
3   five of the 20 incidents in which offenses of Penal Code 69, 148(a)(1) and/or 243(b)(c)
4   allegedly occurred, there was no indication whatsoever that a supervisor reviewed
5   the body worn camera footage at all.

6          Alleged offenses of Penal Code 69 and 148(a)(1)  are among the most critical
7   incidents that must be reviewed by supervisors.  Although these offenses can be
8   legitimately charged, Plaintiffs' attorneys, when they practiced criminal law,
9   routinely tried these cases when they were charged as the only offense. This was
10  due to the fact that these charges, when charged alone, were often "cover charges"
11  for police excessive force, cases of "contempt of cop" (when the person charged
12  "flunked the attitude test" but committed no crime), and/or was often a person of
13  color.  As such, it is critically important that these incidents be carefully reviewed,
14  which is why the Oakland Police Department specifically requires  that supervisors
15  review Body Worn Camera footage in incidents involving violations of Penal Code
16  69, 148, and/or 243(b)(c).

17         A related issue is the failure of officers to activate their body worn camera as
18  required by OPD policy. The Office of Inspector General found that "in the 20
19  incidents reviewed involving 69 officers, 8 of the 69 officers' body worn cameras
20  were not activated for the entire time required by policy.  Additionally, there were
21  three officers whose body worn camera did not fully capture the arrested subject
22  during the transportation of that subject, which is again required by OPD policy.

23         In addition, upon reviewing the police officers' body worn camera (BWC) for
24  the 20 incidents involving arrests of subjects who allegedly resisted a peace officer,
25  and were therefore charged with violating Penal Code 69, 148(a)(10 and/or 243(b)(c)
26  along with any of other offenses, the Lead Auditor found nine incidents in which
27  there was missing footage (all of part of the incident) from one or more police
28  officers involved in the incident.

JOINT CASE MANAGEMENT STATEMENT                              Case No. 00-cv-4599 WHO

The body worn camera issues fell into three categories: 1) no video located, 2) late activations and 3) incomplete video footage related to transporting subjects. The collective failure here is not only a supervisory failure but is also a risk management problem.  Citizens who have charges of this kind dismissed are much more likely to sue the City of Oakland than most other people who are dissatisfied with their encounters with the police.  If the camera footage of these events are either incomplete or completely missing, it increases the chances that the citizen in question will prevail in their litigation with the City.

The reporting of Use of Force needs substantial improvement.  There is some evidence that the failure to report force is racially motivated and that possibility needs immediate attention.  Beyond this, there is an overall sloppiness that may be acceptable on occasion, but is totally unacceptable in the degree it has been found in a number of audits by the Monitor and the Office of Inspector General.  These failures will no doubt become greater when the Negotiated Settlement Agreement is finally over.  Such behavior does incalculable harm to the majority of officers who follow the rules and the City that employs them.

**CONCLUSION**

Plaintiffs' most recent Case Management Conference Statement concluded with the observation that "the central problem seems to be at the top." (Dkt. 1358, p. 18)  The Police Commission and Mayor Schaaf apparently agreed, and it is time for the City of Oakland, OPD, and all stakeholders to make decisive progress on the remaining outstanding NSA tasks.  To quote Chief Manheimer: "Where there is great challenge, there is great opportunity." (https://abc7news.com/oakland-police-susan-manheimer-new-chief-anne-kirkpatrick-firing-department/6105963/ 1:50)

The issues outlined in this Case Management Conference Statement, as well as the task-by-task dissection of the specific tasks that remain in our previous CMC statement, lay bare substantial and deeply-rooted issues that OPD must remedy.  The issue of race continues to pervade OPD's shortcomings, both externally in their

interactions with the community they serve, and internally, within the Department itself.  Given that the Riders case which precipitated Plaintiffs' involvement in this matter and the NSA itself centered on issues of race, it is disheartening that there is still so much work to be done.

Plaintiffs' attorneys are hopeful that Chief Manheimer's appointment will mark the beginning of a new trend which ultimately results in the OPD attaining compliance with the NSA. The Department's inability to attain compliance with the eight NSA tasks that are not currently in compliance is unacceptable some 17 years after the NSA was signed.  More specifically germane to this statement, the problems surrounding Vision, documentation of use of force, as well as the systemic racial disparities within OPD uncovered by the Hillard Heintze Report, are deep-seated and long-standing. The City of Oakland, the Oakland Police Department, the Compliance Director, and this Court should be prepared to take decisive action to ensure OPD advances steadily toward full compliance with this settlement agreement that Oakland promised to emerge from over a decade ago.

# THE CITY'S STATEMENT

## OVERVIEW

This statement supplements the City's February 18, 2020 Case Management Statement (Dkt. 1358) filed in anticipation of the parties' Court appearance rescheduled from February 25, 2020, to May 27, 2020.

Since the parties' last filing, much has changed in the world, and new leadership has joined the City. In March, the City welcomed Steven Falk as Interim City Administrator, and on May 20, former Assistant City Administrator Ed Reiskin took the helm as the new City Administrator. In April, the Department welcomed Interim Police Chief Susan E. Manheimer, former longtime San Mateo Police Chief and former San Francisco Police Department member. All this came amid the COVID-19 pandemic. The City's response to the pandemic is a necessary priority but we have not lost sight of our obligations under the NSA and our commitment to fair and equitable policing. The Department's continued progress despite the pandemic and leadership changes is evidence that the important positive changes the Department has made have truly taken root within the Department's culture.

In addition to updates on the Department's recently completed Discipline Disparity Study, the City offers an update on outstanding tasks and tasks recently reviewed by the independent monitoring team (IMT). The City's leaders and subject matter experts look forward to answering any questions the Court has at the conference.

## I.     THE DEPARTMENT'S DISCIPLINE DISPARITY STUDY

On May 15, 2020, following extensive feedback by stakeholders, including plaintiffs' counsel, the Department released the *Oakland Police Department Police Discipline Disparity Study* completed by consulting firm Hillard Heintze. Ex. A (April 23, 2020). The Department simultaneously published its response to the study. Ex. B, *Oakland Police Dep'ts Resp. to the Police Discipline Disparity Study*

JOINT CASE MANAGEMENT STATEMENT                                        Case No. 00-cv-4599 WHO

(May 15, 2020), https://www.oaklandca.gov/documents/oakland-police-discipline-disparity-study (last visited May 19, 2020).

The study's most important finding is that between 2014 and 2018, African American officers were on average 37% more likely to have an investigated misconduct allegation sustained against them than officers of other races. *Id.* at 10. This disparity increased to 39% for Class One complaints. *Id.* For Class Two complaints (less serious), African American officers were 25% more likely to have the complaint sustained. *Id.* Once a case was sustained, however, there were no disparities in imposed sanctions, the study found. *Id.*

The study also revealed disappointing, disparate outcomes based on the race and gender of recruits who were released from the Academy and Field Training Programs. *Id.* at 11, 38. This is especially troubling given how imperative it is for the Department to infuse diversity within its ranks and to reflect the community it serves. Because the study noted the data was too limited to reach meaningful conclusions about disparity among trainee releases, the study provided scant recommendations to address possible racial bias in the Academy and Field Trainee Programs. *Id.*

These disparities are unacceptable. The Department's guiding principles center on fairness and procedural justice; it is vital that those tenets are adhered to both internally and externally.

The City is taking action. While the study could not identify the specific reasons for the disparities, the City embraces the findings and is taking aggressive steps to reduce the disparities. In the last nine months, the Department has implemented the following measures it expects will infuse fairness into its internal investigations and result in a reduction in racial disparity:[1]

---

[1] The City is building on institutional changes seeded by the Court-appointed investigator. Between 2015 and 2017, the Court-appointed investigator issued three separate reports on aspects of the Department's discipline process. The three reports made several recommendations, which the Department has implemented over the past five years. Unfortunately, because the discipline disparity study did

JOINT CASE MANAGEMENT STATEMENT                                    Case No. 00-cv-4599 WHO

- The Internal Affairs Division (IAD) has issued and published clear guidance department-wide on the review process to ensure fair, thorough, and prompt internal investigations, and to increase accountability. All Sergeants and Lieutenants have received training on this new guidance.

- The Department has reallocated staffing in the Division Level Investigations (DLI) Unit and added a Commander to ensure quality of review due to the increased number of investigations.

- The IAD has shifted resources to add an additional DLI Coordinator to assist in field level investigation reviews.

- The Department is working with IT to build a report to allow IAD to sort and review investigations by investigator and by subject officer/employee race, to allow the Department to promptly identify racial disparities.

Most significantly, the City's Department of Race and Equity will partner with the Oakland Police Department's Race and Equity Team to conduct a *Race and Equity Impact Analysis* on the Department's disciplinary process. The City will collaborate with noted experts in the field as well as the stakeholder groups already involved in this important endeavor. This analysis will focus in part on whether the measures the Department has already implemented are working and examine the potential efficacy of additional measures – including recommendations from the study that have not yet been implemented. The Department will also utilize the *Race and Equity Impact Analysis* to further assess and address potential racial and gender disparities in its academy and field training programs.[2]

The City is proud of the work it has done with plaintiffs' counsel and the

not include a year-over-year assessment of disparities, it is impossible to tell whether implementation of these recommendations may have resulted in some reduction in disparity in the later years of the study.

[2]The Department has also made strides in the last several months to make changes to its academy and field training programs to safeguard against disparate treatment of trainees. These efforts include changes to the mentoring program to allow trainees to select a mentor, elimination or reduction of physical training practices and requirements not closely related to essential job functions, a shift in the role of the field training officer to trainer and coach rather than evaluator, and movement toward a training program more compatible with a wider range of learning styles and recommended by the President's Taskforce on 21st Century Policing.

JOINT CASE MANAGEMENT STATEMENT                              Case No. 00-cv-4599 WHO

stakeholder group to complete this pioneering discipline disparity study. Unfortunately, because this area of study is so novel, there is no established roadmap for the City to follow to take swift and sure steps to reduce the disparities. The City will continue to collaborate with its partners in this endeavor to construct a path to move forward.  Seeing this effort through and rooting out the disparities is a top priority for City leadership. The City does not tolerate disparate treatment of officers and employees based on race, gender, or any protected class.

## II.   THE CITY'S ONGOING EFFORTS TO REDUCE RACIAL DISPARITIES

The City previously reported a reduction between 2017 and 2019 in racial disparities among the people being stopped by officers and an overall reduction in stops, particularly impacting African Americans. The pandemic has certainly impacted policing in the past three months. So far in 2020, the overall number of non-dispatch stops is 4,179, putting the Department on track to have fewer non-dispatch stops than in 2019, but only by an average of approximately 172 stops per month. *See Fig.* 1, below. The reductions in disparity achieved in 2018 and 2019, however, remain – including, most significantly, the Department's reduction in its percentage of stops of African Americans.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15



16    *Fig. 1.*

17        The City acknowledges that African Americans and Latinos in combination

18    still account for most stops – 77%, an overall combined percentage that has not

19    changed since 2018. This is a reduction from previous years, however, including

20    2017, when that combined percentage was 83%. In 2018, the Department began

21    reducing emphasis on supervised release searches, and by mid-October 2019, the

22    Department had fully implemented policy developed in collaboration with the Police

23    Commission deemphasizing supervised release searches. Dkt. 1303-7, *General*

24    *Order R-02* (Oct.11, 2019); Ex. C, *Oakland Police Department PowerPoint Training*

25    *on General Order R-02* (Aug. 2019). The Department's initiation of that practice

26    correlates with the reduction in race disparity in the Department's stops. The

27    Department looks forward to examining the data more closely after this policy has

28    been fully implemented for at least one year to gain more meaningful insights about

18

1  its impact.

2  　　The City is committed to exploring other opportunities to deemphasize

3  practices that disproportionately impact African Americans and Latinos and

4  affirmatively embrace practices that evidence has shown have more race-neutral

5  impacts.

6  **III.   TASK 2—INTERNAL AFFAIRS TIMELINES**

7  　　The IMT last evaluated Task 2 in February 2020 and found the Department

8  out of compliance. Dkt. 1357 at 4, *66th Report* (Feb. 17, 2020).

9  　　The Department and the NSA require that 85% of Class I and Class II

10 misconduct investigations be completed within 180 days to ensure thorough

11 investigation relatively close in time with the conduct and ample opportunity to

12 impose appropriate discipline.

13 　　The Department was previously in compliance on this task but fell to a 67%

14 timely completion rate in 2018. Dkt. 1358 at 32, *JCMS* (Feb. 18, 2020). Accordingly,

15 the Department adopted the corrective measures discussed more fully in the

16 February 18, 2020 JCMS, addressed the backlog of cases, and is steadily

17 approaching an 85% timely completion rate. *Id.* at 33-35. Between January 1 and

18 April 16, 2020, IAD met the 180-day deadline in 79% of the 161 investigations it

19 completed and closed. *See 260th Biweekly Compliance Update* (Apr. 22, 2020).

20 　　IAD's steady gain is encouraging. The Department's corrective measures are

21 not a quick fix. Rather, the measures are intended to allow the Department to

22 achieve and sustain change with no *reduction* in the quality of investigations.

23 Reaching and maintaining the 85% timely completion rate takes diligent tracking,

24 rigorous testing, constant teaching, and constructive feedback. This feedback

25 necessarily takes different forms for sergeants who are taking on misconduct

26 investigations for the first time versus experienced sergeants and supervisors who

27 may need redirection and remedial training.  The Department's measures ensure

28 both types of training and critical feedback are occurring on a regular basis. The

19

Department is committed to sustaining an 85% timely completion rate and, even once that is sustained, the Department will continue to strive to improve the quality of the investigations.

The IMT has been monitoring IA investigations to make sure that an improvement in timeliness does not come at the expense of quality. In the IMT's *Sixty-Seventh Report*, discussed further below in connection with Task 5, it found that "the majority of the cases in [the IMT's] review were properly investigated and closed." Dkt. 1363 at 9, *67th Report*.

## IV.  TASK 5—INTERNAL AFFAIRS COMPLAINT PROCEDURES

The IMT has deferred its assessment of the Department's compliance with Task 5 based on "general concerns" and pending its forthcoming analysis of the Department's investigations of the March 2018 officer-involved shooting. *Id.* at 9.

The IMT conducted a special Task 5 review in its *Sixty-Seventh Report* to ensure that IAD investigated the backlog of cases with "the same rigor and appropriateness" applied to any other investigation. *Id.* at 2-9. The IMT's determination reflects that the quality of IAD's investigations, despite the number of backlogged cases, did not suffer.

Of the 136 backlogged cases, the IMT audited a random sample of 30 cases – 25 reviewed by non-IAD supervisors, and five reviewed by IAD investigators. *Id.* at 6. In all 30 cases, the IMT found that the Department gathered all relevant evidence available. *Id.* at 7. The IMT did not agree with the Department's findings in three of the 30 cases. *Id.* In two of those cases, the IMT did not believe that investigators adequately considered the evidence, and ultimately disagreed with the findings. In the third case, the IMT disagreed with the determination that the complainant was not credible and disagreed with the findings. *Id.*

Overall, investigators conducted follow-up interviews when necessary, and made best efforts to resolve inconsistencies. *See id.* Officers made credibility assessments where appropriate, and except for the one instance noted above, the

1  IMT agreed with the credibility determinations. *Id.* The IMT agreed with the

2  Department in 90% of the cases reviewed. Since 2010, the IMT's approval rate has

3  frequently exceeded 90%, and has never fallen below that threshold. *See* Dkt. 1358

4  at 36, *JCMS* (Feb. 18, 2020).

5      Nonetheless, the IMT has continued to defer its compliance finding "based on

6  [the IMT's] general concerns, and the findings of [the IMT's] forthcoming analysis of

7  the Department's investigation of the [*Pawlik*] officer-involved shooting of March

8  11, 2018." Dkt. 1363 at 9, *67th Report*. The IMT has not yet released that report.

9  Since July 2018, Task 5 reviews have been mainly positive. *See* Dkt. 1240 at 14-16,

10  *JCMS* (Mar. 22, 2019). The IMT's most recent assessment is no exception.

11      The City has implemented all the Court-appointed investigator's

12  recommendations concerning subtasks. *See id.* We will continue to work to improve

13  the overall quality of investigations as we await receipt of the *Pawlik* after-action

14  report.

15  **V.      TASKS 24/25—FORCE INVESTIGATION AND REPORTING**

16      The IMT's current assessment is that the Department is in partial

17  compliance with Tasks 24 and 25. Dkt. 1363 at 17 & 28, *67th Report*.

18      The City recognizes that accurate force reporting and use of force

19  investigations are crucial to police accountability. The IMT found that the

20  Department was in compliance with these tasks as recently as 2018. *See* Dkt. 1284

21  at 8, *60th Report* (May 23, 2019). In 2018, the OIG and IMT each identified

22  inconsistencies in the Department's reporting of uses of force. *See id.; see also* Dkt.

23  1231, Ex. A, *OIG 3rd Quarterly Progress Report Jul.-Sep.* 2018. In 2019, the OIG

24  published two audits in which it found the Department's force reporting

25  "insufficient." *See* Ex. D at 2, *OIG 4th Quarterly Progress Report Oct.-Dec. 2019.*

26      The Department's ongoing efforts to ensure that uses of force are accurately

27  and consistently reported appear in the OIG's and IMT's most recent force reporting

28  audits. The OIG's audit exposed a single failure to report force during the period of

June 1, 2019, and September 30, 2019, specifically, a failure to report an intentional pointing of a firearm. *Id.* at 3. In comparison, the OIG found that in 17 incidents occurring in 2018 – 12 involving pointing of a firearm, and 5 involving weaponless defense techniques – officers failed to fill out use-of-force forms. *See OIG Special Report, An Assessment of the OPD's Use of Force Reporting, Usage of PDRDs, and Supervision of Incidents During Arrests for Offenses Where There is a Significant Chance That Force Would be Used* (2019), http://www2.oaklandnet.com/oakca1/groups/police/documents/report/oak072446.pdf (last visited May 15, 2020). Additionally, the IMT's inspection of 47 Level 3 and Level 4 (lower-level) use of force reports completed in June and July 2019 revealed one incident where the reported use of force may not have been appropriate and where a second possible use of force was not reported. Dkt. 1363 at 12, *67th Report*. This is progress.

The Department is mindful, however, that the IMT's report reflects that a higher percentage (85%) of officers' Level 3 and Level 4 uses of force in June and July 2019 were against African American (61%) and Latino (24%) individuals. Dkt. 1363 at 12, *67th Report*. A single incident involving use of force against four African Americans during a high-risk vehicle stop resulted in 12 reported uses of force may account, at least in part, for this higher-than-usual number. *Id*. The Department is committed to an ongoing earnest and thoughtful study of the racial disparity reflected in its use of force numbers. To that end, as discussed more fully in the City's previous filing, the City has engaged Dr. Eberhardt and her Stanford team to examine the Department's use of force incidents between 2016 and 2019 to gain insight about officers' decisions to use force, in an effort to ultimately determine how to effectively address potential bias and reduce racial disparities in the use-of-force statistics. Dkt. 1358 at 31, *JCMS*.

**A.      OIG Audit of Use of Force Reporting Reflects Improvement in Accuracy and Consistency of Reporting**

On May 14, 2020, the OIG released its annual audit of use of force-reporting, covering the period from June 1 through September 30, 2019. Ex. D, *OIG 4th Quarterly Progress Report Oct.-Dec. 2019*. The auditors inspected a random sample of 91 incidents with no reported uses of force that fell into categories more likely to involve force or involving events that have historically correlated more frequently with failures to report force.[3] *Id.* at 9. From this selection, auditors conducted a comprehensive review of 43 incidents most likely to have involved some reportable use of force based on auditors' initial review of incident reports, such as incidents where multiple officers reported unholstering or drawing firearms. *Id.* at 9-11. The comprehensive review included review of all body-worn camera footage associated with each of the 43 incidents. Of the 43 incidents reviewed, no reportable force was identified in 40 incidents; reportable force could not be definitively confirmed in two incidents; and in one incident, the auditors identified a reportable pointing of a firearm. *Id.* at 11.

The circumstances do not indicate that the single failure to report was intentional or was intended to cover up the officer's actions. A cover officer had his service weapon out and reported that he held it "at low ready" as he approached a crime suspect. *Id.* The suspect slipped and fell, and the cover officer approached with his gun out and held low. The officer's service weapon appeared from body camera footage of the incident to be pointed at the suspect. *Id.* The auditors deemed

---

[3]Of the 552 arrests made in 513 incidents where officers reported no uses of force, the OIG randomly selected a sample of 100 incidents. Ex. D at 9, *OIG 4th Quarterly Progress Report Oct.-Dec. 2019*. Nine incidents were deselected because of duplicate report numbers or because auditors found a completed use of force report corresponding to the incident. Of the remaining 91 incidents, 14 involved arrests of persons who were experiencing mental health crises, 20 involved arrests of persons for crimes where a person threatened an officer, resisted arrest, or battered an officer (Cal. Penal Code, secs. 69, 148(a)(1), and 243(b) or (c)), 13 involved evasion arrests, 29 involved robbery, assault, or firearms arrests, and 15 were other offenses in which officers are prone to use reportable uses of force. *Id.*

1   the force should have been reported. *Id.* In the two inconclusive incidents, officers

2   had service weapons drawn but body-camera footage did not allow auditors to

3   definitively confirm that the officers were pointing the firearms at an individual.[4]

4   *Id.* at 11-12. No other force was identified that should have been reported. *Id.* at 11.

5        The Department is committed to consistently accurate force-reporting. To

6   that end, in collaboration with the Police Commission, and with the approval of the

7   IMT, the Department wrote and published Special Order 9196 in December 2019, to

8   remove subjective language and clarify reporting requirements for firearm pointing

9   and weaponless defense techniques, types of force which have historically been

10   reported less accurately. *See id.* at 4. The Department is hopeful that this will allow

11   it to meaningfully and consistently track and evaluate force and help the

12   Department improve the use of verbal de-escalation to avoid and prevent use of

13   force whenever possible.

14   **B.     The Department Remains Attentive to Body Worn Camera**
             **Activation Issues**

15

16        Body worn cameras are another important accountability tool the

17   Department uses to both investigate uses of force and ensure accurate force

18   reporting. Department policy requires body worn cameras to be activated prior to

19   initiating a detention or arrest and remain on until involvement in the arrest or

20   detention has concluded. The Department is actively monitoring body-camera

21   activation compliance and appreciates that the OIG and IMT review activations in

22   any inspection involving review of body camera video.

23        In its force reporting review, the IMT found that in 16 of the 47

24   investigations completed in June and July 2019, one or more officers activated body

25

26   [4] At the time of the OIG audit, training on the reporting of pointing of a firearm had
     occurred, but the revisions to policy were still in progress. Special Order 9196,

27   revising Department General Order K-4, was finalized in December 2019, after the
     time period evaluated in the audit. Ex. D at 5, fn.2, *OIG 4th Quarterly Progress*

28   *Report Oct.-Dec. 2019.*

JOINT CASE MANAGEMENT STATEMENT              Case No. 00-cv-4599 WHO

worn cameras late or not at all, the large majority being late activations. Dkt. 1363, at 14, *67th Report*. At the time it received the IMT's report, the Department had already discovered and addressed the body camera activation issue in six of these incidents. *Id.* The Department has now investigated and followed up where appropriate with officers and officers' supervisors in the remaining investigations involving late or no camera activation. *Id.* For the June 2019 cases, the Department made summary notes to personnel files (SNFs) for six officers and sustained a finding against one officer who had one or more prior issues with body-camera activation. The Department determined after further review that two officers did not have late activations. For the July 2019 cases, there were five incidents with five officers identified. One incident was independently identified by the officer's sergeant, and one incident investigated by IAD concluded that the late activation was reasonable. The remaining three July cases remain pending.

The OIG also documented in its force reporting audit any missing body-worn camera footage or delayed activations in the 20 incidents involving arrests of individuals for threatening, resisting, or battering an officer. Ex. D at 13-16, *OIG 4th Quarterly Progress Report Oct.-Dec. 2019*. Auditors inspected the 20 incidents involving 69 officers. *Id.* at 9. Eight of the 69 officers' body worn cameras were not activated for the entire time required by policy. *Id.* at 3, 14. No officer had more than one body worn camera issue. *Id.* at 14.

The auditors recognized a decline in the number of body-worn camera issues over the inspection period. More issues occurred during June compared to July through September 2019. *Id.* at 15.

| Month Inspected | Number of Incidents Reviewed | Number of Incidents with Body Worn Camera Issues | Percentage |
|---|---|---|---|
| June 2019 | 7 | 5 | 71% |
| July 2019 | 5 | 2 | 40% |
| August 2019 | 4 | 1 | 25% |
| September 2019 | 4 | 1 | 25% |

*Fig. 2. Id.* at 16.

The Department reviewed each instance of delayed activation or failure to activate body worn cameras identified by the OIG and took corrective action where appropriate.  The Department determined that SNFs were appropriate for six officers who had no prior documented pattern of body-camera activation issues. In the single instance where the Department identified an officer with a pattern of body-camera activation failures, the Department was already handling the issue as part of the officer's supervisory monitoring related to prior activation failures.

On August 19, 2019, the Department implemented a 30-second buffer which records 30 seconds prior to body-worn camera activation. *See id.* While officers will always be expected to timely activate their body-worn cameras in accordance with policy, the buffer will help ensure more complete recordings even if officers have a delayed activation.

The Department continues to take measures to reinforce the importance of timely activation of body worn cameras as well as timely reporting of equipment failures. The Department has sent a clear message to officers and supervisors that members must comply with the body-camera policy or face progressive discipline for repeated failures to comply.

**C.     The Department is Monitoring Compliance with the Recent Mandate that Supervisors Promptly Review Body Worn Camera Footage**

The OIG also reviewed sergeants' documentation confirming timely review of subordinate officers' body worn camera footage. *Id.* at 10. Department Special Order 9191 requires that sergeants review within two days all body-worn camera footage

1    involving arrests and incidents involving California Penal Code, sections 69,

2    148(a)(1), and 243(b) or (c), and to document the review in the software system. Ex.

3    E, *Special Order 9191* (Nov. 27, 2018). The Department effected Special Order 9191

4    in response to previous audits by the OIG and IMT which revealed that potential

5    failures to report use of force occurred more frequently among certain types of

6    incidents. *See id.* The OIG reviewed in its audit 20 incidents that triggered

7    supervisor review of body-camera videos and documentation of that review, in

8    compliance with Special Order 9191. Ex. D at 12, *4th Quarterly Progress Report*

9    *Oct.-Dec. 2019.* Of those 20 incidents, supervisors timely reviewed officers' body

10   camera footage in nine cases, supervisors completed review of video from five

11   additional incidents within 5-32 days, and in one incident the sergeant witnessed

12   the officer's actions on-scene at the time of the arrest. *Id.* at 13. Only seven

13   incidents contained the appropriate annotation confirming a supervisor's review. *Id.*

14        The Department requires sergeants to review body worn camera footage as a

15   safeguard to ensure that unreported uses of force are identified, corrected, and

16   otherwise addressed in a timely manner by officers' immediate supervisors. While

17   body-camera videos in 75% of incidents were reviewed within 32 days, only half of

18   incidents were reviewed within two days as required by Special Order 9191. *See id.*

19   Fewer than one-third of the incidents reflected the appropriate annotation. *See id.*

20   Certainly, prompt review is the central, significant action required by Special Order

21   9191, but the Department acknowledges that annotation must not be overlooked

22   and ignored as collateral. Consistent annotation using the procedure outlined in

23   Special Order 9191 permits supervisors, command staff, and auditors to quickly and

24   easily determine whether sergeants or officers' other immediate supervisors are

25   informed and accountable. Informed and accountable supervisors ensure prompt

26   identification of failures to report force, immediate correction and training, and

27   ultimately more accurate use of force reporting pursuant to Department policy. The

28   Department appreciates that the audit uncovered a lag or lapse in annotation

required by the Special Order and has taken corrective action to ensure body-worn camera video review and annotation are occurring as required. The Department issued SNFs to all of the sergeants who failed to review and annotate video as required, with the exception of the sergeant who witnessed the event on scene. In addition, the Department scheduled refresher training on Special Order 9191 for all sergeants.

**D.    De-escalation Efforts are Improving**

In its previous assessment of Task 25.3, the IMT found "several instances where [the IMT] believe[s] OPD officers could have made additional efforts to explain to subjects being detained why the detention was occurring or where OPD officers failed to identify themselves when contacting people.  In some cases, the need to use physical force may have been reduced or eliminated had officers identified themselves or provided some additional verbal explanation." Dkt. 1347 at 10, *65th Report*. The Department responded to this feedback and has improved. In its most recent report, the IMT found that "with few exceptions, where appropriate and there was time to do so, OPD officers made attempts at verbal communications and explanations prior to utilizing force options." Dkt. 1363 at 12-13, *67th Report*. The IMT still noted "numerous instances where OPD officers do not identify themselves as police officers when contacting subjects, even when there is time to do so." *Id.* at 13.

The City appreciates that an officer's announcement of themselves as a peace officer is a form of verbal persuasion, is often a powerful control tool, and may assist with de-escalation. This issue is addressed in the forthcoming proposed policy amendment to the Department's use of force general order currently under development by an ad hoc committee involving Police Commissioners and plaintiffs' counsel. In addition, the Department will include a training reminder about the importance of on-scene officer identification in its next quarterly Information Bulletin on Force Review Boards and anticipates improvement in this area.

JOINT CASE MANAGEMENT STATEMENT                          Case No. 00-cv-4599 WHO

## VI.     TASKS 26/30—FORCE REVIEW BOARDS AND EXECUTIVE FORCE REVIEW BOARDS

The IMT last evaluated Tasks 26 and 30 in December 2019 and found the Department out of compliance on both tasks. Dkt. 1347 at 14-15, *65th Report.*

The Department has had one Level 1 use of force incident in 2020. On April 16, 2020, multiple Oakland Police officers and a Richmond Police officer were involved in an officer-involved shooting of a kidnapping and attempted murder suspect in Richmond, California. The Contra Costa County District Attorney's Office is leading the criminal investigation into the officer-involved shooting, assisted by the Richmond Police Department. The Oakland Police Department's Criminal Investigation Division (CID) is monitoring and assisting in the investigation, but CID is not conducting a separate investigation. IAD is independently investigating the incident, and an Executive Force Review Board will later convene according to policy.

## VII.     TASKS 34/41—STOP DATA AND PAS/VISION DATABASE

The IMT last evaluated Task 34 in March 2019 but did not expressly assess compliance. *See* Dkt. 1238, *60th Report* (Mar. 19, 2019). The IMT's current assessment is that the Department is in compliance with Task 41. Dkt. 1363 at 17. The City anticipates in the short term an updated assessment from the IMT on these tasks. The City will be prepared to respond at the Court hearing to any additional evaluation offered by the IMT which occurs after the parties' filing but prior to the Court hearing.

The Department's new risk management system, VISION, is functional and the Department is already deriving some benefit from the system in culling data for use at risk-management meetings. In its most recent report, the IMT found that the risk-management meeting it attended during the February 2020 site visit addressed the concerns raised in its prior report. Dkt. 1363 at 27, *67th Report*. The IMT had previously expressed concern that the Department may look so closely at individual

officers that it may be losing sight of the bigger picture and overall trends. Dkt. 1357 at 9, *66th Report*. While the IMT again found the Department in compliance with Task 41 in its most recent report, it repeated its prior concern "that the potential of the system is, for now, surpassing its efficacious use." Dkt. 1363 at 10, *67th Report*.

The Department expects to see further benefits from VISION once the build-out is complete, which we anticipate will happen by the end of June 2020. The City is in the processes of hiring a data manager which will substantially enhance the Department's ability to use the VISION data. The City recently reposted the opening after the candidate it originally selected ultimately declined the position. The posting closes on May 27, and the City will then screen and interview candidates. The City's recruiter's efforts include advertising the position on social media and Code for America outlets likely to have broad reach to potential applicants in the technological sector in the Bay Area and beyond. Hiring could occur by July 2020, depending on scheduling and ability to manage the process with social distancing strictures in place.

Hiring a data manager and building the stop data dashboard are the only two of Stanford's 50 recommendations that remain outstanding. The Interim Chief of Police, City Administrator, and the City's Chief Information Officer comprise the new project oversight team working diligently to realize final completion and full implementation of the VISION dashboards. The City will follow through on these remaining recommendations without delay so that the Department may fully realize all the capabilities of this long-awaited, robust system.

## CONCLUSION

Even in these unprecedented times, the City has never lost sight of its core values. Equity is among the City's core values. The City remains committed to achieving equitable outcomes with respect to police practices within our community, as well as internal Department practices impacting our employees. The City looks

JOINT CASE MANAGEMENT STATEMENT                          Case No. 00-cv-4599 WHO

forward to further discussing the foregoing issues at the Case Management

Conference.

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1

### THE OPOA'S STATEMENT

2   Intervener Oakland Police Officers Association ("OPOA") continues its

3   collaborative effort to assist the parties in achieving full compliance with the NSA.

4   OPOA participates in many facets of NSA implementation, including the effort to

5   identify areas adversely impacting OPOA members including racial disparity and

6   unfair disciplinary procedures.  Specifically, when the OPOA first became aware of

7   the possibility of potential disparities in the disciplinary process it immediately

8   encouraged and supported efforts to discern the nature and extent of the problem.

9   That effort resulted in collaboration with all NSA parties to retain Hillard Heintze

10   to evaluate various issues associated with the disciplinary process.

11   The Hillard Heintze findings are of great concern to the OPOA. The

12   assessment of racial disparity and overall member distrust of the disciplinary

13   process is foreboding.  While in some respects the results highlight legitimate and

14   ominous undercurrents of institutional problems, the OPOA recognizes that OPD is

15   well-suited to remediate.  Racial bias, discrimination and disparate treatment in

16   any form are not acceptable in the current culture of OPD where a significant

17   number of members are in protected classes.  Moreover, the findings point to a

18   perception of an unfair or overly aggressive attitude towards member investigations

19   and disciplinary procedures, and this too cannot be tolerated in a progressive

20   Department such as OPD.  The OPOA is confident that these identified deficiencies

21   can be rooted out through internal investigations and diligent  policy development

22   which encourages an even handed and thoughtful approach to police investigations

23   and discipline.  Finally, the City of Oakland must also take effective measures to

24   ensure that the civilian oversight function be mindful of the impacts of overly

25   aggressive and unchecked disciplinary efforts.

26

27

28

JOINT CASE MANAGEMENT STATEMENT                                   Case No. 00-cv-4599 WHO

1

Respectfully submitted,

2

3   Dated: May 20, 2020         BARBARA J. PARKER, City Attorney
                                BRIGID S. MARTIN, Special Counsel
4

5                       By:        /s/ BRIGID MARTIN*
                                Attorneys for Defendants
6                               CITY OF OAKLAND

7                               JOHN L. BURRIS
                                Law Offices of John L. Burris
8

9                       By:        /s/ John L. Burris
                                Attorney for Plaintiffs
10

11                              JAMES B. CHANIN
                                Law Offices of James B. Chanin
12

13                      By:        /s/ James B. Chanin
                                Attorney for Plaintiffs
14

15                              ROCKNE A. LUCIA, JR.
                                Rains Lucia Stern St. Phalle & Silver
16                      By:        /s/ Rockne A. Lucia, Jr.
                                Attorney for Intervenor
17                              OAKLAND POLICE OFFICERS ASSOCIATION

18

19  *Per Local Rule 5-1(i)(3), the filer attests that concurrence in the filing of the

20  document has been obtained from each of the other Signatories.

21

22

23

24

25

26

27

28

---

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO