July 28, 2020

# Sixty-Ninth Report
## *of the* Independent Monitor
## *for the* Oakland Police Department

## Introduction

This is our sixty-ninth status report on the Negotiated Settlement Agreement (NSA) in the case of *Delphine Allen, et al., vs. City of Oakland, et al.,* in the United States District Court for the Northern District of California under the direction of Judge William H. Orrick.  I was appointed in 2010 to oversee the monitoring process of the Oakland Police Department (OPD) that began in 2003.

This report describes our recent assessments of NSA Tasks 2, 24, 25, 26, 30, 31, 34, and 41; and covers our virtual site visits of May 28-29 and June 23-24, 2020.  Following the Court's Order of May 21, 2015, we devote special attention to the most problematic component parts of the NSA Tasks that are not yet in full or sustained compliance; and discuss in our status reports the most current information regarding the Department's progress with the NSA and its efforts at making the reforms sustainable.

### *Providing Technical Assistance*

Each month, our Team conducts a visit to Oakland that includes both compliance assessments and technical assistance.  During our visits, we meet with Department and City officials; observe Department meetings and technical demonstrations; review Departmental policies; conduct interviews and make observations in the field; and analyze OPD documents and files, including misconduct investigations, use of force reports, crime and arrest reports, Stop Data Forms, and other documentation.  We also provide technical assistance, especially those that relate to the remaining non-compliant Tasks or areas identified by the Department -- including in the areas of IAD investigation quality (Task 5); use of force investigations and reporting (Tasks 24 and 25); stop data and related issues (Task 34); risk management and the ongoing maintenance issues and the development of Vision (Task 41).

### *Building Internal Capacity at OPD*

Also per the May 21, 2015 Court Order, we continue to work closely with the Office of Inspector General's (OIG) staff to identify areas that it should audit or review – and to help design approaches to these audits that are not cumbersome, so as to ensure sustainability.  We review OIG's quarterly progress reports, which are a valuable resource and assist us in assessing compliance with NSA requirements.  OIG's most recent quarterly report described several

noteworthy and troubling findings following its inspection of the Department's use of force reporting.  OIG found that in 11 of the 20 incidents it examined that involved alleged offenses of Penal Code 69, 148(a)(1) and/or 243(b)(c) (threatening an officer, resisting arrest, and battery on an officer), there was no documentation that sergeants reviewed the officers' BWC footage within two days, as required by policy.  OIG also found that in 20 of the incidents involving 69 officers, eight BWCs "were not activated for the entire time required by policy."

We have found similar issues related to officers' activations of BWCs and supervisory review of BWC footage in our regular assessments; and we will continue to raise these concerns with Department personnel during our site visits.

---

# Focused Task Assessments

## Task 2:  Timeliness Standards and Compliance with IAD Investigations

**Requirements:**

*Fairness to complainants, members/employees and the public requires that internal investigations be completed in a timely fashion.*

> *1.   On or before December 1, 2003, OPD shall develop policies regarding timeliness standards for the completion of Internal Affairs investigations, administrative findings and recommended discipline.*
>
> *2.   Compliance with these timeliness standards shall be regularly monitored by IAD command and the Department's command staff.  If IAD experiences an unusual proliferation of cases and/or workload, IAD staffing shall be increased to maintain timeliness standards.*

(Negotiated Settlement Agreement III. B.)

**Relevant Policy:**

OPD most recently revised Departmental General Order M-03, *Complaints Against Department Personnel and Procedures*, on December 22, 2017.

**Commentary:**

**Task 2.1** requires that internal investigations (IAD and Division Level) – including review, approval, findings, and discipline – be completed in accordance with the timeliness standards developed by OPD.  To assess this subtask, we reviewed a list of all internal investigations resulting in formal findings (unfounded, sustained, exonerated, or not sustained) that were approved in January, February, and March 2020, and calculated the number of days between the

complaint date and the approval date for each case.  We excluded from the dataset cases that were administratively closed, those that involved on-duty traffic accidents or service complaints, and those that did not involve Manual of Rules (MoR) violations.  We segregated the remaining cases into Class I or Class II categories.  If a case involved at least one alleged Class I violation, we classified it as Class I.

OPD policy requires that at least 85% of Class I misconduct investigations and at least 85% of Class II misconduct investigations must be completed within 180 days to be considered timely. Per DGO M-03, Class I offenses "are the most serious allegations of misconduct and, if sustained, shall result in disciplinary action up to and including dismissal and may serve as the basis for criminal prosecution."  Class II offenses include "all minor misconduct offenses."  Of the 45 Class I cases we reviewed for this assessment, only 31, or 69%, were in compliance with established timelines.  While this represents a slight improvement over what we found during our last review of Task 2, when we found that only 65% of Class I cases were in compliance with established timelines, it still falls far below the required compliance level.

Of the 69 Class II cases we reviewed, 58, or 84%, were in compliance with established timelines. This represents an improvement over what we found during our last review of Task 2, when we found that 81% of Class II cases were in compliance with established timelines.

Per DGO M-03, "In cases with a sustained finding, the discipline recommendation process shall be completed within 30 calendar days of the sustained finding."  We reviewed all 30 cases including a total of 54 sustained findings that were approved in January, February, and March 2020; 13 cases involved multiple sustained findings.  All (100%) of these 30 total cases were in compliance with established discipline timelines.

OPD is not in compliance with Task 2.1.

Task 2.2 requires that IAD and OPD command staff regularly monitor compliance with these timeliness standards.  The primary responsibility for monitoring compliance with timeliness standards rests with IAD, whether investigations are conducted by IAD personnel or via Division-level investigation.  As part of this monitoring, the IAD Commander discusses pending deadlines for key open investigations during IAD's weekly meetings with the Chief; the deadlines are also reflected in written agendas for these meetings.  A Monitoring Team representative regularly attends these weekly meetings.  IAD also occasionally, as needed, emails individual reminders on cases approaching due dates to investigators and their supervisors.  The Department is in compliance with Task 2.2.

Task 2.3 requires that if IAD experiences an unusual proliferation of cases and/or workload, IAD staffing be increased to maintain timeliness standards.  We routinely request and receive updates on IAD staffing levels during our site visits.

| **Task 2 compliance status** | Not in compliance |
| --- | --- |

## Overview of Our Assessments of Tasks 24 and 25

OPD had been in compliance with Tasks 24 and 25 since 2015, and we were not actively reviewing these Tasks.  In November 2018, as a result of concerns that we brought forward regarding the identification, potential underreporting, and investigation of uses of force, the Court reactivated Tasks 24 and 25.

For purposes of this report, we reviewed 51 Level 3 and 4 use of force (UOF) reports that were completed by OPD personnel during August and September of 2019 to assess compliance with Tasks 24 and 25.  We reviewed all incidents that involved at least one Level 3 use of force (14), and a sample of Level 4 uses of force (37).  We also reviewed a number of Level 2 uses of force, for which a Force Review Board (FRB) was held between April and July of 2020.  While we discuss some concerns with the field reporting of Level 2 UOFs in our assessment for Tasks 24 and 25, all identified concerns and final outcomes identified in Force Review Boards [FRBs] and Executive Force Review Boards [EFRBs] are discussed as part of our regular assessments of Tasks 26 and 30.

Since we resumed these reviews following the Court's reactivation of these Tasks, we have provided detailed feedback on the force investigations to OPD during each of our site visits.  In cases where we have had questions or concerns, OPD personnel have been responsive and provided follow-up where necessary.  In some cases, OPD has provided additional information or documentation that supports its actions, and we have concurred with the Department's assessments.  In others, we have identified concerns that had not been identified or addressed by OPD supervisors who conducted the UOF investigation, or command personnel who reviewed the investigation.  In these cases, OPD command staff have continued to direct additional review or investigation or the entry of a Supervisory Note File (SNF); or initiated an internal affairs investigation.  Many of the concerns we have noted in our reviews and discussions with OPD were also identified in OIG's global use of force audit, conducted in 2019.

In late 2018, OPD employees received training on the requirements for use of force reporting related to the pointing of weapons.  In April 2019, OPD issued an Information Bulletin that provided clarification and direction regarding the documentation of use of force.  The content of this bulletin included many of the concerns we had identified with the proper reporting of force.  In June of 2019, the then-Chief issued a directive via email that specifically addressed boilerplate language in use of force reports; and in November 2019, she followed up with an additional email to address the use of generic or boilerplate language in the administrative section of Department reports.  In December 2019, OPD completed the training developed to address deficiencies found in UOF documentation based on OIG's global use of force audit.  On February 15, 2020, OPD published Special Order 9196, which expanded and clarified the use of force policy.  On February 27. 2019, the Department published Special Order 9202, which temporarily modified the requirements for the reporting of Type 32 UOFs.

This report covers UOF reports completed by OPD in August and September 2019 – that is, *before* some of the interventions and policy revisions noted above occurred.  We have noted improvement in the reporting of uses of force in our recent reviews, and are hopeful that the actions that have been taken by OPD will continue to reduce deficiencies in the reporting of force.

In our review of the 51 Level 3 and 4 use of force reports completed in August and September 2019, we did not identify any instances where we believe the reported use of force was not appropriate or where we believe a use of force was not properly reported. This is an improvement from prior reviews where we had these types of concerns.

In the Level 3 and 4 UOFs we reviewed, there were 102 uses of force against 68 different persons. In some cases, multiple officers used force on a single person; and in others, force was used on multiple persons, either by a single officer or multiple officers. The total breakdown for the force used on the 68 persons is as follows: African Americans, 66%; Latinos, 24%; Whites, 4%; and Asians or Other, 6%. The percentage of force incidents involving African Americans increased by 5%; force incidents involving Whites decreased 2%; and force incidents involving Asians or persons categorized as Other decreased 3% from what we found in our last review, documented in our sixty-seventh status report. Uses of force involving Latinos remained the same, at 24%.

Officers engaged in a Level 4 - Type 22 UOF only, pointing of a weapon, 64 times against a total of 47 persons. We noted in our reviews for this report that there were again incidents that involved multiple suspects and numerous OPD personnel being involved in the pointing of weapons. In these 64 instances, the breakdown is as follows: African Americans, 66%, an increase from 55% in our sixty-seventh report; Latinos, 24%, a decrease from 27%; Whites, 3%, consistent with last report; and Asians or Other, 2%, a decrease from 13%.

Of the total 68 persons on whom force was used, 51 (75%) were arrested or criminally charged for felony or misdemeanor violations. The remaining 17 involved mental health holds, inability to establish criminal conduct, subjects who escaped, victims who did not want to prosecute, or subjects determined not to be a suspect after the investigation was conducted. In five of the incidents reviewed, a person claimed a minor injury, but none of these injuries required admittance to a hospital. Seven other persons were transported to a medical facility for the removal of a Taser probe, or solely to obtain a medical clearance.

In our assessment of Task 25.3 in previous reports, we identified numerous incidents where we believed that additional verbal communications and explanation with persons who were contacted might have resulted in a reduction in the need to use physical force, and where officers failed to identify themselves as police officers when contacting subjects. During our assessments for the last report, we found that, with few exceptions, where appropriate and where there was time to do so, officers made attempts at verbal communications and explanations prior to utilizing force options. We continued to note, however, numerous instances where officers did not identify themselves as police officers when contacting subjects, even when there was time to do so. (We do not include those contacts where it should be obvious to the subject that s/he is dealing with an officer.) For this report, we did not identify any Level 3 or 4 uses of force where officers failed to attempt verbal communications and de-escalation where appropriate, prior to utilizing force. While we continued to identify instances where officers did not identify themselves as police officers when contacting members of the public and there was time to do so, we noted a significant decrease in this occurring. We will continue to discuss any future concerns we identify with OPD and continue to monitor these types of instances; as is our practice during our monthly site visits, we continue to provide input to the Department on our observations.

During our review of the 51 Level 3 and 4 use of force incidents, we again noted several instances where it took multiple officers to control and secure combative persons.  In two of these instances, only a single officer who used an identified weaponless defense technique to overcome resistance was identified as having used force.  The officers who assisted in controlling the subject were listed only as witnesses.

Special Order 9196, the revision to the UOF reporting requirements, that went into effect on February 15, 2020 clarified what constitutes a "reportable use of force" and provided clearer direction on the reporting of use of force.  Special Order 9196 also added a new force type: Type 32.  A Type 32 use of force includes: overcoming resistance of a person during an arrest or detention; or defending oneself or another from combative action by another person.  Type 32 is intended to address any use of force not already covered in Types 1-31.  While we expected an increase in Level 4 use of force reporting after Special Order 9196 was issued, the immediate and significant spike in the numbers was much greater than anticipated and appeared to be primarily related to the new Type 32, as shown in the increase from 167 Level 4 UOFs in 2019 to 618 during the same time period in 2020.  We agreed with OPD's assessment that further review of the force policy was needed due to this unanticipated increase; and Special Order 9202 was issued, that at least temporarily removed the Type 32 from the category of a Level 4 reportable use of force.  Alternative means for counting these uses of force were implemented by OPD until more permanent solutions could be identified.

As a part of our use of force reviews during this reporting period, we reviewed a sample of Type 32 uses of force, after the issuance of Special Order 9196, and again after the modifications in Special Order 9202.  OPD Area Command personnel are also reviewing samples of the Type 32 uses of force on a monthly basis.  They have found that, in general, officers are properly reporting these uses of force.  We agree that field personnel appear to be making appropriate efforts to identify and properly report these uses of force.  However, it has been clear from our early reviews that there was, at least initially, some confusion regarding this reporting.  In some cases, we identified instances where a Type 32 was documented and it did not appear that a use of force had occurred; and in others, we found that Type 32 was not the appropriate force type to have been used.  We also identified concerns with officers not authoring their own supplements, failures to properly document these uses of force in required reports, and the identification of MOR violations or training issues that did not appear to have been addressed.  In June 2020, OPD began providing additional training on how to properly document Type 32 UOFs.  We will continue to closely monitor the reporting of these uses of force.

Since the issuance of Special Order 9202, the Department has identified a number of challenges in collecting data regarding Type 32 UOFs, as OPD's current technology does not allow personnel to accurately collect the information as OPD had expected it would.  The Department continues to seek a resolution to the reporting concerns.  We have had a number of discussions with OPD regarding the data collection issues, and will continue to closely monitor their progress in finding a solution.  These incidents are uses of force.  OPD must find a way to ensure that the incidents are accurately reported and factored into ongoing risk management analysis.

We continue to note in our reviews that officers use the administrative sections of their reports to document whether force was used, if force was observed, and if their PDRDs were activated. In previous reports we noted numerous concerns with the administrative section of the report being inaccurate, and sometimes not reflective of what had occurred, even when the narrative may have been accurate. For this report, we did not identify any instances where the administrative section provided information that was inconsistent with the report narrative. We did, however, continue to find some instances of officers using boilerplate or "pat" language in report narratives or the administrative section. OPD management has provided direction to their personnel regarding both boilerplate language and accuracy of reports, and it appears that this direction is beginning to improve the quality and accuracy of reports. We will continue to discuss concerns we identify with OPD during our scheduled site visits.

In our sixty-seventh report, we found that in 16 of the 47 UOF investigation we reviewed, one or more officers either failed to activate their PDRDs or activated them late, the large majority being late activations. OPD supervisors identified and addressed with appropriate documentation only six of these incidents. We discussed the remaining 10 with OPD executive staff; and, where appropriate, they issued SNFs or took other action to address the deficiencies. OPD has also implemented the 30-second buffer for PDRDs, which records video of the 30-seconds immediately prior to when the officer activates the PDRD. What the buffer does not do is capture any audio during this 30 seconds, nor does it negate the responsibility of the officer to activate the PDRD at the appropriate time.

For this report, we found that in the 51 UOF reports we reviewed, there were five instances where the PDRD had not been properly activated; all were late activations. In all but one of these five, an OPD supervisor identified and addressed the late activation. This is a significant improvement from previous reports and indicates that supervisors appear to be more closely reviewing officer PDRDs. We did continue to note, however, that there were some instances where OPD supervisors did not identify or address an officer's use of profanity or the inappropriate use of slang that was clearly evident in our review of the PDRDs. We also continue to find instances where supervisory personnel are not ensuring that no previous patterns of violations exist prior to determining if an SNF is appropriate for some violations. While we remain supportive of the use of SNFs for minor violations, supervisors must ensure that the employee does not have a pattern of similar misconduct prior to using an SNF.

The use of force analysis we conducted last year established the underreporting of Level 4 uses of force where an officer pointed a weapon at a person. Following our analysis, OPD partially addressed this concern with refresher training in September 2018 for all officers, and the Department has further addressed this issue in its use of force policy revisions. In our review of Level 3 and 4 UOFs for this report, we did not identify any instances where an officer failed to report the pointing of a weapon at a person.

In OPD's 265th Biweekly Compliance Update, dated July 1, 2020, the Department provided a comparison of year-to-date Level 3 and 4 UOFs for 2020 compared to 2019. Level 3 uses of force decreased from 59 in 2019 to 35 YTD in 2020. OPD identifies the primary drivers for this decrease as the decline in Level 3 Type 11 (Taser) usage and the Type 16 (Weaponless defense techniques) that was recategorized in Special Order 9196 and became effective in February 2020. Level 4 UOFs increased from 691 in 2019, to 1,445 year-to-date in 2020. These increases

appear to have three primary drivers.  Level 4 Type 22 UOFs – which increased 61% from 2019 to 2020 – appears to be a continuation of the results of OPDs training on the previous underreporting of these uses of force.  The addition of the Type 32 and Type 29 UOFs in Special Order 9196 appear to constitute the majority of the additional increases in Level 4 UOFs.  According to the 265th Biweekly Compliance Update, Type 32 UOFs account for approximately 33% of the increase for the two-week period between February 15-20, 2020 when these were still being reported in Vision for that two-week period.  Type 29 UOFs (all non-carotid takedowns except on a restrained person) account for approximately 22% of the increase.

As we have noted in previous reports, OPD has taken a number of actions to address the many concerns with the use of, and reporting of, force by OPD officers.  In September 2018, to address the reporting of Level 4 - Type 22 uses of force, the pointing of a firearm at a person, the then-Chief ordered refresher training on officers' use of firearms; and the number of reported Level 4 uses of force increased dramatically after that training.  OPD continues to maintain that the significant increase in these Level 4 uses of force may be related to the potential underreporting of Level 4 - Type 22 pointing a weapon at a person prior to the refresher training.

As we have previously noted, the increases in the reported uses of force between 2018 and 2020 do not appear to signal a rise in actual use of force, but rather remains the result of prior inaccurate reporting left unchecked by supervisory personnel.  While we continued to identify concerns with investigative narratives, PRIME reports, and other documentation in our review of UOF reports for August and September of 2019, there has been a decrease in the number of concerns we have identified.  OPD has taken numerous steps to address the proper reporting of use of force and the concerns that have been identified during our reviews.  The most significant steps, beyond the firearms training that occurred in late 2018, began in April 2019, with an OPD Information Bulletin that provided significant direction regarding the reporting of uses of force.  In our reviews of uses of force for August and September 2019, we have seen improvement from prior reports.  We are hopeful that OPD will continue to improve its reporting.  We will continue to monitor the impact of training and other directives from OPD executive staff should they become aware of other concerns or deficiencies that need to be addressed.

# Task 24: Use of Force Reporting Policy

**Requirements:**

*The policy shall require that:*

1. *Members/employees notify their supervisor as soon as practicable following any investigated use of force or allegation of excessive use of force.*

2. *In every investigated use of force incident, every member/employee using force, and every member/employee on the scene of the incident at the time the force was used, shall report all uses of force on the appropriate form, unless otherwise directed by the investigating supervisor.*

3. *OPD personnel document, on the appropriate form, any use of force and/or the drawing and intentional pointing of a firearm at another person.*

4. *A supervisor respond to the scene upon notification of an investigated use of force or an allegation of excessive use of force, unless community unrest or other conditions makes this impracticable.*

5. *OPD notify:*

   a. *The Alameda County District Attorney's Office immediately or as soon as circumstances permit, following a use of lethal force resulting in death or injury likely to result in death.*

   b. *The City Attorney's Office as soon as circumstances permit following the use of lethal force resulting in death or serious injury.  At the discretion of the City Attorney's Office, a Deputy City Attorney shall respond to the scene.  The Deputy City Attorney shall serve only in an advisory capacity and shall communicate only with the incident commander or his/her designee.*

   c. *Departmental investigators regarding officer-involved shootings, in accordance with the provisions of Section V, paragraph H, of this Agreement.*

6. *OPD enter data regarding use of force into OPD's Personnel Assessment System (PAS).*

(Negotiated Settlement Agreement V. A.)

**Relevant Policy:**

OPD most recently revised Departmental General Order K-4, *Reporting and Investigating the Use of Force,* on October 16, 2014.

**Commentary:**

To assess compliance with Task 24, we reviewed 51 Level 3 and 4 use of force (UOF) reports that were completed by OPD during August and September 2019. We also reviewed a number of Level 2 UOF investigations, for which an FRB was held between March and July 2020. These Level 2 UOFs are reported in our regular assessments of Tasks 26 and 30.

**Task 24.1** requires that members/employees notify their supervisor as soon as practicable following any reportable use of force or allegation of excessive use of force. In all of the UOF reports reviewed, notifications were made as required.

**Task 24.2** requires that in every reportable use of force incident, every member/employee on the scene of the incident at the time the force was used, reports all uses of force on the appropriate form, unless otherwise directed by the investigating supervisor. **Task 24.3** requires that OPD personnel document, on the appropriate form, every use of force and/or the drawing and intentional pointing of a firearm at another person.

In the 51 Level 3 and 4 UOF incidents we reviewed; officers pointed weapons at persons 76 times. We determined that officers' pointing of their firearms was appropriate in all 76 instances we assessed. We did not identify any instances where a weapon was pointed at a subject and not reported as required. We continued to identify instances where officers who assisted in restraining a combative person did not report having used force. This issue has been addressed by OPD in its revisions to the UOF policy, which provides clarification regarding reportable uses of force. We will continue to closely monitor these types of incidents to ensure that OPD personnel properly report these uses of force in the future.

**Task 24.4** requires that a supervisor respond to the scene upon notification of a Level 1, 2, or 3 use of force or an allegation of excessive use of force, unless community unrest or other conditions makes such a response impracticable. In the Level 3 uses of force we reviewed for this subtask; supervisors responded to the scene as required in all instances. Though not required, in all of the Level 4 UOF reports we reviewed, a supervisor was also either on scene at the time of the use of force, or responded to the scene upon being notified of the use of force.

**Task 24.5** specifically addresses requirements for the response and handling of Level 1 uses of force. We assess Level 1 uses of force in our regular reviews of Task 30 (Executive Force Review Boards).

**Task 24.6** requires that OPD enter all use of force data into Performance Reporting Information Metrics Environment (PRIME), which is now called Vision. In all 51 of the Level 3 and 4 UOF cases we reviewed; the data was entered as required.

The Court's reactivation of Task 24 at a November 2018 Case Management Conference resulted from our serious concerns with the Department's handling and investigation of uses of force. OPD drafted Special Order 9196 to address and clarify requirements for the proper reporting of use of force. This revision to UOF reporting requirements went into effect in February 2020. OIG's global use of force audit, conducted in 2019, also identified numerous concerns with the reporting of use of force and enumerated a number of recommendations. As noted above, OPD has taken a number of actions to address the identified concerns with the reporting of force, many of which were implemented after April 2019. While we continued to identify concerns and deficiencies in those UOFs we reviewed for this report, we also noted significant improvements. It remains to be seen if these actions will result in continued and sustained compliance. OPD remains in partial compliance with this Task.

| Task 24 compliance status | In partial compliance |
|---|---|

## Task 25: Use of Force Investigations and Report Responsibility

### Requirements:

*An on-scene supervisor is responsible for completing an investigated use of force report in accordance with the provisions of Departmental General Order K-4, "Reporting and Investigating the Use of Force."*

1. *OPD shall develop and implement a policy for conducting and documenting use of force investigations that include, at a minimum:*

    a. *Documentation of the incident in either an Offense or Supplemental Report from the member(s)/employee(s) using force; and/or, when necessary, a statement taken from the member(s)/employee(s) using force;*

    b. *Separating and separately interviewing all officers who were at the scene at the time of the incident;*

    c. *A Supplemental Report from other members/employees on the scene or a statement taken, if deemed necessary by the investigating supervisor;*

    d. *Identification and interviews of non-Departmental witnesses;*

    e. *Consideration of discrepancies in information obtained from members, employees and witnesses, and statements in the reports filed;*

    f. *Whether arrest reports or use of force reports contain "boilerplate" or "pat language" (e.g., "fighting stance", "minimal force necessary to control the situation");*

    g. *Documentation of physical evidence and/or photographs and a summary and analysis of all relevant evidence gathered during the investigation;*

*and*

   h.    *Consideration of training/tactical issues involving the availability and practicality of other force options.*

   i.    *Supervisor's justification as to why any element of the policy was not documented; and*

2.   *All supervisors shall be trained in conducting use of force investigations and such training shall be part of a supervisory training course.*

3.   *Use of force investigations shall include a recommendation whether the use of force was objectively reasonable and within Department policy and training. The recommendation shall be based on the totality of the circumstances and shall consider, but is not limited to, the following factors:*

   a.    *Whether the force used was pursuant to a legitimate law-enforcement objective;*

*Whether the type and amount of force used was proportional to the resistance encountered and reasonably related to the objective the members/employees were attempting to achieve;*

   b.    *Whether the member/employee used reasonable verbal means to attempt to resolve the situation without force, if time and circumstances permitted such attempts;*

   c.    *Whether the force used was de-escalated or stopped reasonably when resistance decreased or stopped;*

4.   *use of force reports shall be reviewed by the appropriate chain-of-review as defined by policy.*

*The type of force used, the identity of the involved members, and the report preparer shall be the determining criteria for utilizing the appropriate chain-of-review. Reviewers may include, when appropriate, the chain-of-command of the involved personnel, the appropriate Area Commander on duty at the time the incident occurred, other designated Bureau of Field Operations commanders, and as necessary, the chain-of-command of the involved personnel up to the Division Commander or Deputy Chief/Director, and the Internal Affairs Division.*

*Reviewers for Level 1-3 use of force investigations shall:*

   a.    *Make a recommendation as to whether the use of force was in or out of policy,*

   b.    *Order additional investigation and investigative resources when necessary, and*

   c.    *Comment on any training issue(s) when appropriate.*

5.   *Any recommendation that the use of force did not comply with Department policy shall result in the incident being referred to the Internal Affairs Division to conduct additional investigation/analysis, if necessary.*

6.      *Members/employees involved in a use of force incident resulting in serious injury or death and/or an officer-involved shooting, shall be separated from each other as soon as practicable at the incident scene, and kept apart until they have completed their reports and been interviewed.*

(Negotiated Settlement Agreement V. B.)

**Relevant Policy:**

OPD most recently revised Departmental General Order K-4, *Reporting and Investigating the Use of Force,* on October 16, 2014.

**Commentary:**

As noted above, in Task 24, we reviewed 51 Level 3 and 4 use of force (UOF) reports that were completed in August and September 2019. We also reviewed a number of Level 2 UOF reports, for which a Force Review Board (FRB) was held between March and July 2020.

**Task 25.1** requires that an on-scene supervisor complete a use of force report for every Level 3 use of force. In all 14 incidents where at least one Level 3 use of force occurred, a supervisor responded to the scene and completed a use of force investigation. In addition, there were three instances where a Level 3 use of force was downgraded to a Level 4 by a supervisor. In all three, documentation, justification, and approval were provided.

**Task 25.2** requires that all supervisors are trained on how to conduct use of force investigations and such training is part of a supervisory training course. OPD includes the requirement for this training in its Departmental policies. During our March 2019 site visit, we confirmed with OPD that the Department continued to require and deliver this training. We will again affirm that this training remains in place during future site visits.

**Task 25.3** requires that use of force investigations include required recommendations. Areas of recommendation include: whether the force used was pursuant to a legitimate law enforcement objective; whether the type and amount of force used was proportional to the resistance encountered and reasonably related to the objective the officers were attempting to achieve; whether the officers used reasonable verbal means to attempt to resolve the situation without force, if time and circumstances permitted such attempts; and whether the force used was de-escalated or stopped reasonably when resistance decreased or stopped.

In our assessment of the 51 Level 3 and 4 UOF reports we reviewed, we did not identify any instances where we believe the force used may not have been appropriate, nor did we identify any instances where the use of force was not deescalated or stopped reasonably when resistance decreased. Unlike our findings in prior reports, we did not identify any instances where we believe officers could have made additional efforts to explain to subjects being detained why the detention was occurring prior to using force. While we continued to note some instances where we believe officers should have identified themselves as police officers when it was appropriate and there was time to do so, we saw an increases in the number of incidents where officers did appropriately make this announcement. We are encouraged with the improvement in these

announcements and the efforts to deescalate situations prior to using force. We are hopeful that with continued direction provided by OPD executive staff that this becomes the standard of performance in these areas. During our site visits, we will continue to discuss any instances where we believe verbal communications or announcements could have resulted in a decrease in the necessity to use force; and will acknowledge those instances where OPD personnel did engage in these efforts.

**Task 25.4** requires that use of force reports be reviewed by the appropriate chain of review and appropriate recommendations are made. In all of the cases we reviewed, the reports were reviewed as required. We noted that while we continue to find some deficiencies related to the preparation and review of UOF reports for Level 3 and 4 UOFs, we are observing more instances where supervisory personnel are doing a more thorough job of both preparing and reviewing these reports. In the Level 2 UOF incidents we reviewed, we had some concerns with the field investigations, including: use of force findings; identification of all uses of force; Manual of Rules (MOR) violations; or training issues. These concerns were identified during FRBs, and are addressed in our regular assessment of Tasks 26 and 30.

**Task 25.5** requires that any determination that a use of force did not comply with Department policy result in the incident being referred to IAD to conduct additional investigation/analysis, if necessary. None of the Level 3 or Level 4 investigations we reviewed resulted in a finding by OPD that the force did not comply with policy. Concerns involving compliance for Level 2 UOFs are identified during FRBs and addressed in our regular assessment of Tasks 26 and 30.

**Task 25.6** requires that members/employees involved in a use of force incident resulting in serious injury or death and/or officer-involved shooting, are separated from each other as soon as practicable at the incident scene, and kept apart until they have completed their reports and been interviewed. This Task is not assessed here, as we review and consider it as part of the Force and Executive Force Review Boards that OPD holds to examine Level 1 and 2 uses of force.

The Court's reactivation of Task 25 at the November 2018 Case Management Conference resulted from our serious concerns with the Department's handling and investigation of recent uses of force. OPD drafted Special Order 9196 to address and clarify requirements for the proper reporting of use of force. This revision to UOF reporting requirements went into effect in February 2020. OIG's global use of force audit, conducted in 2019, also identified numerous concerns with the reporting of use of force and enumerated a number of recommendations. As noted above, OPD has taken a number of actions intended to address identified concerns with the reporting of force, many of which were implemented after April 2019. While we have seen some improvements, it remains to be seen if these actions will result in continued and sustained compliance. As a result, OPD remains in partial compliance with this Task.

| Task 25 compliance status | In partial compliance |
|---|---|

# Task 26:  Force Review Board (FRB)

## Requirements:

*OPD shall develop and implement a policy concerning its FRB proceedings.  The policy shall:*

1.   *Set out procedures, membership and a timetable for FRB review of use of force investigations involving Level 2 incidents, as defined in Department General Order K-4, REPORTING AND INVESTIGATING THE USE OF FORCE;*

2.   *Require the FRB to review all use of force investigations;*

3.   *Require the FRB to make a recommendation as to whether the use of force was in policy or out of policy;*

4.   *Require the FRB to forward sustained policy violations to the Discipline Officer.*

5.   *Require the FRB not to review any use of force allegation until the internal investigations has been completed;*

6.   *Authorize the FRB to recommend to the Chief of Police additional use of force training or changes in policies or tactics, or additional standards, investigatory policies, or training for use of force investigations;*

7.   *Require the FRB to conduct an annual review of use of force cases examined, so as to identify any patterns of use of force practices that may have policy or training implications, and thereafter, issue a report to the Chief of Police;*

8.   *Require that the FRB membership include, at a minimum, one member from the Training Division, one member from the Field Training Officer program, and either the Bureau of Field Operations Deputy Chief or his/her designee;*

9.   *Minimally, that one member of the FRB shall be replaced at least annually.*

(Negotiated Settlement Agreement V. C.)

## Relevant Policy:

OPD most recently revised Departmental General Order K-4.1, *Force Review Boards,* on December 21, 2015.

## Commentary:

OPD Force Review Boards (FRBs) are regularly convened to examine the investigations conducted relative to the deployment and application of Level 2 uses of force.[1]  OPD first

---

[1] According to OPD, Level 2 uses of force include: "1) Any strike to the head (except for an intentional strike with an impact weapon); 2) Carotid restraint is applied that does not result in the loss of consciousness; 3) Use of impact weapons, including specialty impact munitions or any other object, to strike a subject and contact is made, regardless of injury; 4) Any unintentional firearms discharge that does not result in injury; 5) A police canine bites the clothing or the skin of a subject, or otherwise injures a subject requiring emergency medical treatment (beyond first-aid) or hospital admittance; 6) Any use of force which results in injuries to the subject requiring emergency

achieved compliance with this Task during the nineteenth reporting period (April 1-June 30, 2014).  We continue to assess the compliance with this Task, including our analyses of force reports; our review of Force Review Board reports; attendance at Force Review Boards when conducted during our site visits; and observing Force Review Boards between site visits via online meeting software.

For this report, we reviewed 13 FRB reports that were completed and approved by the Chief of Police from November 2019-June 2020.  In each case, the Chief concurred with the findings without any modifications.  In all but two cases, the force was determined by the Boards to be in compliance.

In one case, an officer observed a woman, who was known to him to be a user of illicit drugs and suffering from mental illness, walking in traffic and exposing herself.  The officer detained her for a psychiatric evaluation; and as he was attempting to place her in his vehicle after handcuffing her, she attempted to break free from him.  He took her to the ground in what the Board determined to be a justified use of force.  While being restrained on the ground, she continued to struggle and attempted to sit up.  The officer pushed her back to the ground by placing both of his hands around her neck – one in the front and one in the back.  The Board identified this move, which lasted less than a second, as a noncompliant use of force.

In the other case, officers were attempting to apprehend a shooting suspect who was standing on the sidewalk just outside the perimeter established for the shooting investigation.  An officer viewed surveillance video of the initial incident and alertly spotted the suspect because of his distinctive clothing.  Two officers pointed their firearms at the suspect, in what was determined to be justifiable uses of force.  One of the officers transitioned to his electronic control weapon (ECW, or Taser) and gave commands to the subject to turn and face away from him.  As the subject began to turn, the officer deployed the Taser, which had the intended effect on the subject.  The officer indicated that he believed the subject was turning to flee, and he deployed his ECW to prevent this flight.  However, based on a review of the available body-worn camera (BWC) video, it appeared that the subject was attempting to comply with the officer's commands, despite the subject's verbal protestations and questions.

The subject filed a complaint regarding the use of force.  The use of force investigator, as well as the sergeant investigating the complaint, determined that the Taser deployment was in compliance, and it was handled as a Division-level investigation.  However, each was overruled by their respective Captains, who both testified at the Board proceedings.  The Board ruled the Taser deployment to be out of compliance with policy, and we concur.  This is an example of a Force Review Board working as intended, taking testimony from a variety of persons including subject matter experts (SMEs) and the investigators' commanding officers, and then carefully deliberating the outcome.

---

medical treatment (beyond first-aid) or hospital admittance; (NOTE: For the purposes of this order, an evaluation by a medical professional to assess a complaint of injury is not emergency treatment) 7) Any Level 3 use of force used on or applied to a restrained subject; 7.a) A restrained subject is a person who has been fully placed in a Department authorized restraint device such as both hands handcuffed, a WRAP or Rip Hobble; 7.b) A subject with only one handcuff on is not a restrained person."

In both of these cases, the Boards came to different conclusions than did the initial investigators; but in doing so, served as the check-and-balance contemplated when the process was established. The latter case also sparked some frank discussions with us regarding the apparent disconnect between the upper level commanding officers in the Department and line-level supervisors tasked with investigating uses of force; and the Board members conceded that there was work to be done to ensure that line-level investigative findings are in accord with the expectations of the administration.

In addition to reviewing the completed FRB reports, between February and July 2020, we observed 14 FRBs as they carried out their duties and deliberations, including for the two cases described above. We observed one during our regular February site visit, and 13 remotely via various online meeting platforms. (The large number of remote viewings is attributable to the ongoing COVID-19 pandemic, which has curtailed our monthly in-person site visits.)

In general, we note an overall improvement in the probing nature of the questions posed by Board members, as well as in the quality of their deliberations. They also spend a great deal of time discussing issues ancillary to the uses of force, such as tactics, supervision, force alternatives, and training opportunities. For example, during one Board evaluating the apprehension of a shooting suspect with the use of a canine, the Board discussed in detail what they perceived to be supervisory concerns, and noted in the final report that "overall supervision of this incident could have been drastically improved."

We noted at least five instances where Boards identified uses of force which were not recognized or assessed by the original investigators, and then subsequently ruled on the appropriateness of the force. In the case noted above, the Board identified an untrained tactic and ruled it out of compliance. In three other cases, the Boards added officers who participated in the takedown of suspects under various circumstances. These were ruled in compliance, and the force occurred during a period when there was clearly some confusion about what force was required to be documented in these circumstances. OPD has since issued Special Orders to clarify the reporting expectations.

We noted that two Boards did a good job of sorting through complex cases involving multiple uses of force. In one case, officers were dispatched to a domestic violence call during which the suspect, who later tested positive for methamphetamine, resisted attempts to take him into custody. Several officers struggled with the suspect for over seven minutes, and as a result, 18 uses of force were evaluated, including one identified and added by the Board. The Board, through review of video, also identified an uninvestigated complaint (the video also clearly showed that the allegation was unfounded) and further noted that an equipment failure (an ECW) was not followed up on to determine a cause.

In another case, a suspect posted a threatening message on social media, indicating that he was armed with a high capacity firearm. Officers spotted a vehicle containing the suspect, but the suspect fled from scene and eventually secreted himself in crawlspace underneath a residence. A standoff ensued, which lasted more than 12 hours. Ultimately, the Board evaluated 35 uses of force, including a canine deployment and the use of chemical agents. The high number of separate incidents is attributable in part to the large number of officers involved (for example, if two officers working in tandem introduced a chemical agent into the crawlspace, the actions of both officers were evaluated as separate uses of force), as well as attributing some uses of force to the supervisors who authorized them. The Board methodically evaluated the entire incident.

Not all of the Board votes were unanimous. This is acceptable, and highlights the deliberative process expected from Force Review Boards. In one case, officers spotted a stolen vehicle and two suspects fled. One was apprehended after an ECW deployment. The Board ruled the force in compliance by a two-to-one vote. We recognize that in some circumstances, there will be legitimate differences of opinion where the determination is not obvious. In these circumstances, we look for frank discussion and clear explanations of the differing positions.

We note that one Force Review Board was convened after the 3304 date for the incident under review. In this case, officers investigating a burglary located the suspect underneath the wooden deck of another house in the neighborhood. The suspect was taken into custody with the assistance of a canine. All uses of force were deemed in compliance, so there were no consequences to missing the 3304 date; but at our insistence, IAD was asked to look into the circumstances which resulted in the delay, since it was apparent that somewhere in the process a policy or policies intended to prevent this from occurring were not followed.

In addition to ruling on the appropriateness of uses of force, Force Review Boards will generally identify several follow-up items based on their review of the associated materials and the presentations made to them. These can include items such as counseling and training for individual officers, publication of Department-wide training materials, and modifications to policy. OPD tracks these deliverables in a spreadsheet, broken down into three categories: Individual Issues; Department-Wide Issues; and Quarterly Training Points. Based on our discussions with OPD, substantial modifications were recently made to the tracking spreadsheet, and OPD has made significant efforts to bring it up to date. At the end of the second quarter of the year, there were 28 open deliverables, including 17 which will come off of the list when they are included in the next Quarterly Training Points publication. This is down from 47 open deliverables when we last reported on this topic.

Based on this review, OPD is again in compliance with this Task.

| Task 26 compliance status | In compliance |
|---|---|

# Task 30:   Executive Force Review Board (EFRB)

**Requirements:**

1. *An EFRB shall be convened to review the factual circumstances surrounding any Level 1 force, in-custody death, or vehicle pursuit-related death incidents.  A firearm discharge at an animal shall be reviewed by the EFRB only at the direction of the Chief of Police.*

2. *The Board shall have access to recordings and/or transcripts of interviews of all personnel on the scene, including witnesses, and shall be empowered to call any OPD personnel to provide testimony at the hearing.*

3. *OPD shall continue the policies and practices for the conduct of EFRB, in accordance with the provisions of DGO K-4.1, FORCE REVIEW BOARDS.*

(Negotiated Settlement Agreement V. G.)

**Relevant Policy:**

OPD most recently revised Departmental General Order K-4.1, *Force Review Boards,* on December 21, 2015.

**Commentary:**

Executive Force Review Boards (EFRBs), consisting of three top command-level staff, conduct thorough, detailed reviews of all Level 1 uses of force, in-custody deaths, and vehicle pursuit-related deaths and serious injuries.  OPD achieved compliance with this Task during the nineteenth reporting period (April 1-June 30, 2014).  OPD has not been in compliance with this Task based on the last EFRB conducted in 2018, which reviewed the officer-involved shooting of Joshua Pawlik.  We disagreed with the Board's findings.

OPD has since convened one other EFRB, to assess the appropriateness of the use of a canine on April 17, 2019 (the incident carried over into April 18, 2019) to apprehend robbery suspects who fled into two separate backyards.  During the incident, two different suspects were bitten by the same canine at two different locations; and one suspect suffered serious disfiguring injuries to his right leg from a bite that lasted two-minutes-and-twenty-four seconds.  The Board also reviewed other lower level uses of force.  The Criminal Investigations Division (CID), the Internal Affairs Division, and the Civilian Police Review Agency (CPRA) conducted investigations into the incident.

The EFRB convened over three days – January 28 and 29, and February 5, 2020.  We observed the first two days in person, and dialed in to the third day via online meeting software.  The Chair of the Police Commission, the Executive Director of the Community Police Review Agency (CPRA), and two CPRA investigators also observed portions of the proceedings.

The EFRB did a good job of sorting through a complex case that involved a great deal of evidence, as well as testimony from CID, IAD, an outside subject matter expert (SME) and three internal SMEs.  It is clear that the Board did not merely rubber-stamp the IAD investigation; in fact, the Board overturned IAD's findings as it pertained to the most serious use of force and ruled it out of compliance.  The Board appropriately challenged some of the outside SME's opinions, since he admitted during his testimony that he would not consult on a case in which he believes a dog bite is not justified, calling into question his objectivity.  The deliberations were thorough and probing, and the votes on the most serious uses of force – the canine bites – were not unanimous.  As stated earlier, this is acceptable, and despite the dissenting opinions, we believe the Board generally came to the correct conclusions.  As previously noted, this matter was also investigated by the CPRA; and that investigative body reached slightly different conclusions on some of the allegations.  OPD and the CPRA went through the reconciliation process as required by Measure LL and the enabling legislation which established the Police Commission and the CPRA, and agreed on findings.  We do not disagree with them.

We consider this EFRB to be in compliance, in stark contrast to the last EFRB conducted by the agency.  The Board was well-run; significant concerns were raised and thoroughly discussed; and, while not all of the votes were unanimous, the Board reached the proper conclusions.  While this is a positive development, like some of the FRBs previously discussed, it highlights a disconnect which sometimes comes to light between the investigators and the Department command members which comprise the Boards.  IAD found the canine bites to be in compliance.  We do not agree, particularly as it pertains to the bite which caused the serious injury.  The EFRB's findings (as modified via the reconciliation process with CPRA) stands as the Department's findings; and so in the end, we consider this case to have been adjudicated correctly, but at his request, we provided the commanding officer of IAD with substantial feedback on the IAD investigation and its presentation to the Board.

| Task 30 compliance status | Deferred |
|---|---|

# Task 31:  Officer-Involved Shooting Investigations Review Protocol

## Requirements:

*OPD shall develop a policy to ensure that, in every officer-involved shooting in which a person is struck, Homicide and Internal Affairs investigators respond to the scene.  The Homicide Section's investigation shall be conducted in partnership with, and when deemed appropriate by, the Alameda County District Attorney's Office.  Interviews of the subject officer(s) shall be conducted jointly with the appropriate staff from Homicide and the Office of the District Attorney.  The District Attorney and City Attorney shall be notified in accordance with the provisions of Section V,_paragraph A (5), of this Agreement.  Homicide shall duplicate and provide all completed reports and documents to the District Attorney's Office, the Office of the City Attorney, and the Internal Affairs Division.  IAD shall provide information and/or documents as required by law.*
(Negotiated Settlement Agreement V. H.)

## Relevant Policy:

OPD most recently published Departmental General Order K-4, *Reporting and Investigating the Use of Force* on October 16, 2014.  IAD Policy & Procedures and Homicide Policy & Procedures are also relevant to this Task.

## Commentary:

Task 31 requires certain notifications and responses in the event of an officer-involved shooting.  The Task has long been inactive, but on November 27, 2018, the Court reactivated the Task as an active part of the Monitoring Team's responsibility.

On April 16, 2020, five OPD officers were involved in an officer-involved shooting (OIS), along with a Richmond Police Department officer.  The incident stemmed from a kidnapping and assault that began in Vallejo, with the victim being removed from the suspect vehicle in Oakland.  Sadly, she later succumbed to her injuries.  Officers responding to the call spotted the suspect vehicle, and a pursuit ensued.  The pursuit terminated in the City of Richmond, culminating in this OIS.

OPD complied with all of Task 31's requirements, although we note that because the use of force occurred in Contra Costa County, the Contra Costa County District Attorney's Office has the lead on the investigation.  Nonetheless, all of the protocols required by the Task were adhered to, with OPD working with the Contra Costa County District Attorney in lieu of Alameda County.

| Task 31 compliance status | In compliance |
|---|---|

# Task 34:  Vehicle Stops, Field Investigation, and Detentions

**Requirements:**

1. *OPD shall require members to complete a basic report on every vehicle stop, field investigation and every detention.  This report shall include, at a minimum:*

   a. *Time, date and location;*

   b. *Identification of the initiating member or employee commencing after the first year of data collection;*

   c. *Reason for stop;*

   d. *Apparent race or ethnicity, and gender of individual(s) stopped;*

   e. *Outcome of stop (arrest, no arrest);*

   f. *Whether a search was conducted, and outcome of search;*

   g. *Offense categories (felony, misdemeanor or infraction).*

2. *This data shall be entered into a database that can be summarized, searched, queried and reported by personnel authorized by OPD.*

3. *The development of this policy shall not pre-empt any other pending or future policies and or policy development, including but not limited to "Promoting Cooperative Strategies to Prevent Racial Profiling."*

(Negotiated Settlement Agreement VI. B.)

**Relevant Policy:**

Department policies relevant to Task 34 include:  General Order M-19, *Prohibitions Regarding Racial Profiling and Other Bias-Based Policing* (published November 4, 2004)*;* Special Order 9042, *New Procedures Regarding Stop Data Collection* (published June 11, 2010); Special Order 9101, *Revised Stop Data Collection Procedures* (published February 27, 2013); and Report Writing Manual (RWM) Inserts R-2, N-1, and N-2.

**Commentary:**

The Negotiated Settlement Agreement's requirements regarding stop data have become an integral part of the analysis and remediation of risk as described in Task 41.  Stop data, therefore, shares common ground with concerns involving use of force, complaints, and other risk-related activity.  It also shares common ground with the issues in analysis of those other factors.  Stop data, though, has arguably been the subject of more detailed analyses than other risk factors.  The Department has paid considerable attention to overall declines in the number of stops by police over time, and to the categories of stop outcomes – including searches, recoveries, and arrests.

The findings regarding stop data, however, should also provide a cautionary tale that applies equally to the Task 41 risk management data.  A goal of a risk management system should be to continually seek more comprehensive understanding of risk, its distribution, its impact, and its reduction.  The potential for stagnation in thinking about risk is always present in the tendency to do things the same way over time.  That potential can be amplified by data presentations that prompt the same old questions.

Stepping back from the current analyses of stop data, it becomes clear that our understanding of issues has been more limited than it may seem.  Arguably, critical questions remain unaddressed.  For example, in a projection from the RMM data, it appears that over 40% of discretionary stops result in searches but we know little of what prompts those searches.  We do know that only a small number of stops, 10% in recent data, now result in recoveries; but we know nothing about *what* is recovered.  We do know that a high number of arrests results from stops; that seems to be over 25% of all arrests made by OPD.  Yet our discussions of risk do not tell us what the arrests are for, whether they result in jail detention, or what their final outcome is with regard to conviction.  The problem is compounded by the fact we do not know the distribution by race for each of the steps in the process.

The data analyses that we have become accustomed to in the risk management process may paint completely opposite pictures of police stops.  In one, the reductions in stop numbers, and sustained high levels of arrest, may be seen as evidence that the process is working well.  In the other, the continuing high levels of African Americans and Latinos stopped – and their high search rates, low recoveries, and high arrests – can suggest just the opposite.  Without more information on what prompts stops, what prompts searches, what is recovered, what arrests are for, and what happens to the resulting cases, we cannot know which of these opposite pictures is true.

Assessing risk is about asking questions: questions about behavior and the results of that behavior.  It is backwards to allow the data to fully determine the questions asked.  The Department's risk management process and the Risk Management Meetings should provide an opportunity for more probing analyses.

| Task 34 compliance status | In partial compliance |
|---|---|

## Task 41: Use of Personnel Assessment System (PAS) and Risk Management

**Requirements:**

*Within 375 days from the effective date of this Agreement, OPD shall develop a policy for use of the system, including supervision and audit of the performance of specific members, employees, supervisors, managers, and OPD units, as well as OPD as a whole.*

*The policy shall include the following elements:*

1. *The Chief of Police shall designate a PAS Administration Unit. The PAS Administration Unit shall be responsible for administering the PAS policy and, no less frequently than quarterly, shall notify, in writing, the appropriate Deputy Chief/Director and the responsible commander/manager of an identified member/employee who meets the PAS criteria. PAS is to be electronically maintained by the City Information Technology Department.*

2. *The Department shall retain all PAS data for at least five (5) years.*

3. *The Monitor, Inspector General and Compliance Coordinator shall have full access to PAS to the extent necessary for the performance of their duties under this Agreement and consistent with Section XIII, paragraph K, and Section XIV of this Agreement.*

4. *PAS, the PAS data, and reports are confidential and not public information.*

5. *On a quarterly basis, commanders/managers shall review and analyze all relevant PAS information concerning personnel under their command, to detect any pattern or series of incidents which may indicate that a member/employee, supervisor, or group of members/employees under his/her supervision may be engaging in at-risk behavior. The policy shall define specific criteria for determining when a member/employee or group of members/employees may be engaging in at-risk behavior.*

6. *Notwithstanding any other provisions of the PAS policy to be developed, the Department shall develop policy defining peer group comparison and methodology in consultation with Plaintiffs' Counsel and the IMT. The policy shall include, at a minimum, a requirement that any member/employee who is identified using a peer group comparison methodology for complaints received during a 30-month period, or any member who is identified using a peer group comparison methodology for Penal Code §§69, 148 and 243(b)(c) arrests within a 30-month period, shall be identified as a subject for PAS intervention review. For the purposes of these two criteria, a single incident shall be counted as "one" even if there are multiple complaints arising from the incident or combined with an arrest for Penal Code §§69, 148 or 243(b)(c).*

7. *When review and analysis of the PAS threshold report data indicate that a member/employee may be engaging in at-risk behavior, the member/employee's immediate supervisor shall conduct a more intensive review of the*

*member/employee's performance and personnel history and prepare a PAS Activity Review and Report. Members/employees recommended for intervention shall be required to attend a documented, non-disciplinary PAS intervention meeting with their designated commander/manager and supervisor. The purpose of this meeting shall be to review the member/employee's performance and discuss the issues and recommended intervention strategies. The member/employee shall be dismissed from the meeting, and the designated commander/manager and the member/employee's immediate supervisor shall remain and discuss the situation and the member/employee's response. The primary responsibility for any intervention strategies shall be placed upon the supervisor. Intervention strategies may include additional training, reassignment, additional supervision, coaching or personal counseling. The performance of members/ employees subject to PAS review shall be monitored by their designated commander/manager for the specified period of time following the initial meeting, unless released early or extended (as outlined in Section VII, paragraph B (8)).*

8.  *Members/employees who meet the PAS threshold specified in Section VII, paragraph B (6) shall be subject to one of the following options: no action, supervisory monitoring, or PAS intervention. Each of these options shall be approved by the chain-of-command, up to the Deputy Chief/Director and/or the PAS Activity Review Panel.*

    *Members/employees recommended for supervisory monitoring shall be monitored for a minimum of three (3) months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor. The first at the end of one (1) month and the second at the end of three (3) months.*

    *Members/employees recommended for PAS intervention shall be monitored for a minimum of 12 months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor and designated commander/manager: The first at three (3) months and the second at one (1) year. Member/employees subject to PAS intervention for minor, easily correctable performance deficiencies may be dismissed from the jurisdiction of PAS upon the written approval of the member/employee's responsible Deputy Chief, following a recommendation in writing from the member/employee's immediate supervisor. This may occur at the three (3)-month follow-up meeting or at any time thereafter, as justified by reviews of the member/employee's performance. When a member/employee is not discharged from PAS jurisdiction at the one (1)-year follow-up meeting, PAS jurisdiction shall be extended, in writing, for a specific period in three (3)-month increments at the discretion of the member/employee's responsible Deputy Chief. When PAS jurisdiction is extended beyond the minimum one (1)-year review period, additional review meetings involving the member/employee, the member/ employee's designated commander/manager and immediate supervisor, shall take place no less frequently than every three (3) months.*

9.  On a quarterly basis, Division/appropriate Area Commanders and managers shall review and analyze relevant data in PAS about subordinate commanders and/or managers and supervisors regarding their ability to adhere to policy and address at-risk behavior.  All Division/appropriate Area Commanders and managers shall conduct quarterly meetings with their supervisory staff for the purpose of assessing and sharing information about the state of the unit and identifying potential or actual performance problems within the unit.  These meetings shall be scheduled to follow-up on supervisors' assessments of their subordinates' for PAS intervention.  These meetings shall consider all relevant PAS data, potential patterns of at-risk behavior, and recommended intervention strategies since the last meeting.  Also considered shall be patterns involving use of force, sick leave, line-of-duty injuries, narcotics-related possessory offenses, and vehicle collisions that are out of the norm among either personnel in the unit or among the unit's subunits.  Division/appropriate Area Commanders and managers shall ensure that minutes of the meetings are taken and retained for a period of five (5) years.  Commanders/managers shall take appropriate action on identified patterns of at-risk behavior and/or misconduct.

10.  Division/appropriate Area Commanders and managers shall meet at least annually with his/her Deputy Chief/Director and the IAD Commander to discuss the state of their commands and any exceptional performance, potential or actual performance problems or other potential patterns of at-risk behavior within the unit.  Division/appropriate Area Commanders and managers shall be responsible for developing and documenting plans to ensure the managerial and supervisory accountability of their units, and for addressing any real or potential problems that may be apparent.

11.  PAS information shall be taken into account for a commendation or award recommendation; promotion, transfer, and special assignment, and in connection with annual performance appraisals.  For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.

12.  Intervention strategies implemented as a result of a PAS Activity Review and Report shall be documented in a timely manner.

13.  Relevant and appropriate PAS information shall be taken into account in connection with determinations of appropriate discipline for sustained misconduct allegations.  For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.

14.  The member/employee's designated commander/manager shall schedule a PAS Activity Review meeting to be held no later than 20 days following notification to the Deputy Chief/Director that the member/employee has met a PAS threshold and when intervention is recommended.

15.   The PAS policy to be developed shall include a provision that a member/employee making unsatisfactory progress during PAS intervention may be transferred and/or loaned to another supervisor, another assignment or another Division, at the discretion of the Bureau Chief/Director if the transfer is within his/her Bureau.  Inter-Bureau transfers shall be approved by the Chief of Police.  If a member/employee is transferred because of unsatisfactory progress, that transfer shall be to a position with little or no public contact when there is a nexus between the at-risk behavior and the "no public contact" restriction.  Sustained complaints from incidents subsequent to a member/employee's referral to PAS shall continue to result in corrective measures; however, such corrective measures shall not necessarily result in a member/employee's exclusion from, or continued inclusion in, PAS.  The member/employee's exclusion or continued inclusion in PAS shall be at the discretion of the Chief of Police or his/her designee and shall be documented.

16.   In parallel with the PAS program described above, the Department may wish to continue the Early Intervention Review Panel.

17.   On a semi-annual basis, beginning within 90 days from the effective date of this Agreement, the Chief of Police, the PAS Activity Review Panel, PAS Oversight Committee, and the IAD Commander shall meet with the Monitor to review the operation and progress of the PAS.  At these meetings, OPD administrators shall summarize, for the Monitor, the number of members/employees who have been identified for review, pursuant to the PAS policy, and the number of members/employees who have been identified for PAS intervention.  The Department administrators shall also provide data summarizing the various intervention strategies that have been utilized as a result of all PAS Activity Review and Reports.  The major objectives of each of these semi-annual meetings shall be consideration of whether the PAS policy is adequate with regard to detecting patterns of misconduct or poor performance issues as expeditiously as possible and if PAS reviews are achieving their goals.

18.   Nothing in this Agreement, and more specifically, no provision of PAS, shall be construed as waiving, abrogating or in any way modifying the Department's rights with regard to discipline of its members/employees.  The Department may choose, at its discretion, to initiate the administrative discipline process, to initiate PAS review or to use both processes concurrently or consecutively.

(Negotiated Settlement Agreement VII. B.)


**Relevant Policy:**

OPD most recently revised Departmental General Order D-17, *Personnel Assessment Program*, on November 20, 2013.

**<u>Commentary:</u>**

The Department continues to make progress on Vision, its new risk management database. As expected, the implementation of Vision several months ago was largely successful. The database now forms the basis for risk management analyses across the Area Commands and the Department-level Risk Management Meetings. As expected, however, important work continues so the utility of the system can be ensured.

Chief among those tasks is the continuing work on cleaning data carried over from the PRIME database and ensuring that the system runs well. That has meant that, even after implementation, considerable time is spent identifying problems and fixing them. Alongside that work, the Department is also engaging system users in focus group assessments of the system. As expected, these groups meet online at this time. Monitoring Team members, also online, have observed two of these focus groups. The process has identified a wide range of officers' and other employees' concerns. They often deal with issues around the interpretation of data, including understanding patterns when officers change assignments or assigned areas.

Another issue that merits additional attention is the problem of data associated with police activity involving multiple subjects. For example, officers are concerned that searches, recoveries, and arrests of individuals in a group result in data showing no outcome regarding the remainder of the group. The Department's monthly Risk Management Meetings have also frequently identified this problem. A solution to this, involving also recording incident-level data, has often been discussed, but the issue remains unresolved. The focus groups have been useful, and have raised issues to be addressed as the implementation of Vision continues.

The focus groups have also made clear the value of the dashboards used for analyzing the vision data. These are regarded highly by the first line supervisors and up the chain of command. The dashboards allow supervisors to focus on the activities of officers assigned to them, and to make comparisons within and across groups. Separate queries can also be made directly to the Vision database but those will generally require additional assistance. While the merits of the dashboards are clear, there are also potential hazards in the over reliance on them. This highlights a critical issue in risk management. While establishing a set of clear questions answerable through the dashboards is important, so too is the process is exploring the data prompted by new interests and new questions regarding risks and remedies. That is a point also made in our discussion of Task 34 in this report.

Another important task also needs attention as Vision and its dashboards get wide use: It should be clear that the Risk Management Meetings will need to change. The charts and graphs used for those meetings seem destined to become historical artifacts – stepping stones to improved analyses, we should hope. And with that, the conversation should also change. The live or nearly live data, online and accessible immediately to everyone, should be the foundation of new generation of risk management at OPD. It is important to begin the redesign for a new risk management process.

| Task 41 compliance status | Deferred, due to the ongoing reconstruction of the Vision database. |
|---|---|

## Conclusion

We remain interested in the Department's response to the recent study on discipline disparity. The study, which was conducted by a consulting firm, Hillard Heintze, on behalf of the Department, found significant racial disparities in sustained complaints of misconduct between Black officers and officers of other races.  Hillard Heintze found that, during 2014-2018, Black officers were 37% more likely to have complaints against them sustained.

Over the last two months, Oakland, like so many cities around the U.S., has experienced mass demonstrations against police brutality, galvanized around calls for defunding police departments.  The encounters between the Department and demonstrators have been serious episodes.  Accordingly, we are closely monitoring the Department's handling of these events – including the staffing and supervision of officers, officers' uses of force during the demonstrations, and the Department's capacity to address complaints in a thorough and timely manner.

Chief (Ret.) Robert S. Warshaw

*Monitor*