The March 11, 2018 Shooting of Joshua Pawlik
by Oakland Police Officers:

A Report of the Monitor/Compliance Director

Chief (ret.) Robert S. Warshaw
*Monitor/Compliance Director*

August 17, 2020

## Table of Contents

Section 1:  Introduction…………………………………………………………………3

Section 2:  The Death of Joshua Pawlik…………………………………………...5

Section 3:  Our Initial Concerns……………………………………………………7

Section 4:  The Video Evidence……………………………………………………8

Section 5:  The Criminal Investigations Division (CID) Investigation……………...12

Section 6:  The Internal Affairs Division (IAD) Investigation……………………….19

Section 7:  The Executive Force Review Board (EFRB) Process………………….......25

Section 8:  The Community Policing Review Agency (CPRA) Investigation………...32

Section 9:  Developments Following the Executive Force Review Board…………..34

Section 10:  The Role of the City Administration…………………………………42

Section 11:  The Failures of Departmental Policy………………………………...43

Section 12:  The Role of the Chief of Police………………………………………46

Section 13:  Summary of Significant Findings…………………………………….49

Section 14:  Conclusion……………………………………………………………...51

## Section 1:  Introduction

In the United States, police accountability, particularly when deadly force is used, has a long and pain-filled history.  The March 2018 death of Joshua Pawlik at the hands of the Oakland Police Department is now part of that history.  Mr. Pawlik's death is marked by failures of policy, planning, supervision, City Hall oversight, and the Department's ability to critically examine itself.  Most of all, it is marked by the failure to understand and appreciate the humanity that we all shared with Joshua Pawlik, a young man who died in a hail of 22 bullets fired by four officers as he gained consciousness, with a handgun by his side, in a residential neighborhood of Oakland.  One officer fired seven times; another, six times; another, five times; and another, four times – all in a total of 2.23 seconds.

Our shared humanity should have ensured, at the least, that the Oakland Police Department would have taken better care to avoid the death of Mr. Pawlik.  Failing that, the Department should have conducted a more thorough and honest review of this event to provide a foundation for reform.  Instead, for Joshua Pawlik, for the Police Department, and for the Oakland community, there has been only a tragic litany of failures.

This report will be read against the background of recent killings by police across the country and the widespread demonstrations that have followed.  Although there are differences across these events, the nature of these deaths provide an important context from which to examine the death of Mr. Pawlik.  Deaths of the disenfranchised – be they people of color, those affected by mental illness, or those experiencing homelessness – at the hands of the police are a stain on our national character.

Only recently has this backdrop been available to the public.  In 2015, *The Washington Post* began to log every fatal shooting by an on-duty police officer in the United States.  The file now contains over 5,000 cases.  Many academics and others have been surprised to see that each year, over 1,000 people die after being shot by police.  The importance of this issue cannot be overstated.

Since 2003, the Oakland Police Department has been under oversight as a result of *Delphine Allen et al. v. City of Oakland* (commonly known as the Riders case), a civil rights lawsuit filed in the United States District Court that began under Judge Thelton E. Henderson and is now overseen by Judge William H. Orrick.  The City of Oakland and its Police Department continue to be monitored under the terms of a Negotiated Settlement Agreement (NSA).  The NSA mandates the Department to achieve compliance with 51 requirements, or Tasks, relevant to Constitutional policing, data collection, and a variety of internal accountability processes.  Under

the NSA, the Police Department has been monitored by an independent team of law enforcement and criminal justice specialists.  Retired Chief Robert Warshaw has served as the Monitor since 2010; and in 2014, he assumed additional authorities as Compliance Director.  Chief Warshaw and the Monitoring Team members assess compliance with the Tasks set forth in the NSA. When acting in his capacity as Compliance Director, Chief Warshaw has other authorities: among them, to require that the Oakland Police Department take those actions he deems necessary for the organization to achieve compliance with the requirements of the NSA.

The Oakland NSA is, in many ways, similar to Consent Decrees that are rooted in Section 14141 of Title 41 of the Violent Crime Control and Law Enforcement Act of 1994.  The law prohibits police from engaging in "a pattern or practice" of conduct that deprives persons of "rights, privileges, or immunities secured under the Constitution or laws of the United States."  In Oakland, however, the underlying case was brought by private Plaintiffs' attorneys – rather than the U.S. Department of Justice.

Police departments are empowered with extraordinary authorities – the greatest of which is the use of deadly force.  There is no greater responsibility for an individual police officer, and those to whom officers are accountable, than ensuring that a use of force comports with policy requirements and with the law.

In this incident, the City of Oakland and the Oakland Police Department failed.


## Organization of this Report

This report reviews the events surrounding Mr. Pawlik's death on March 11, 2018, after a passerby reported the presence of an apparently unconscious man who may have had a weapon. We discuss the Oakland Police Department's initial response to the incident; and the investigations, reviews, and reports that followed.  These steps involved OPD and other components of City government, including OPD's Criminal Investigations Division (CID), OPD's Internal Affairs Division (IAD), the City of Oakland's Community Police Review Agency (CPRA), and the City administration.

Following an officer-involved shooting in Oakland, both the Criminal Investigations Division and the Internal Affairs Division play crucial roles:  The Criminal Investigations Division (CID) is responsible for investigating officers' potential criminal conduct and forwarding a completed criminal investigation report to the Office of the Alameda County District Attorney, which ultimately makes prosecutorial decisions.  The Internal Affairs Division (IAD) is responsible for determining whether or not officers violated Departmental policy.

In this report, we also review the Department's Executive Force Review Board (EFRB), which heard presentations from both CID and IAD, examined this incident, and provided recommendations to the Chief of Police. We provide commentary on the Chief's overall management of this incident and also consider the responses of other City officials.

For purposes of clarity, Sections 2-12 each begin with a statement of our conclusions based on the analysis of the material that is presented in the paragraphs that follow.

This report is not intended to serve as an exhaustive summary of everything that occurred during and following the incident. Rather, we identify the numerous individual, organizational, and systemic failures that occurred throughout the investigative phases, as well as the people and processes responsible for reviewing those investigations.

## Section 2:  The Death of Joshua Pawlik

Joshua Pawlik died when Oakland Police Department Rifle Officers fired 22 shots at him from behind a large, armored, bulletproof police vehicle known as a BearCat.

On March 11, 2018, at approximately 6:15 p.m., a man walking his dog on a residential street in the City of Oakland called 911 to report that he observed an unresponsive man, who was possibly holding a firearm, lying on the ground between two houses.

The first Oakland Police Department (OPD) officer, Officer Josef Phillips, arrived at 6:19 p.m. and located the man lying in the side yard between the two houses. Officer Phillips stepped onto the front porch of one of the residences to gain a better view. He then reported to the OPD Communications Division that he observed what appeared to be a semiautomatic handgun in the man's right hand; and that the man appeared to be either sleeping or unconscious, or possibly intoxicated or under the influence of narcotics. The man was later identified as Joshua Pawlik, a 31-year-old white man who was experiencing homelessness and living in San Francisco.

Several officers and at least two supervisors arrived and secured the scene, by blocking vehicle and pedestrian traffic and setting up a perimeter. Lieutenant Alan Yu also responded and assumed the role of incident commander. At approximately 6:29 p.m., Sergeant Frank Negrete, Officer Brandon Hraiz, and Officer William Berger arrived on the scene. All three were designated as Patrol Rifle Officers and arrived armed with their patrol rifles. Sergeant Negrete requested that a specialized armored police vehicle, the BearCat, be sent to the scene. Another Patrol Rifle Officer, Craig Tanaka, drove the BearCat to the scene.

Prior to the arrival of the BearCat, Sergeant Negrete assigned several officers to serve as a Designated Arrest Team (DAT), and the DAT and other officers remained behind police vehicles on the scene. Once the BearCat arrived, Officer Hraiz positioned himself in the turret of the vehicle. Sergeant Negrete, Officer Berger, and Officer Tanaka took positions of cover behind the passenger side of the BearCat. All were armed with patrol rifles. An OPD sergeant placed his body-worn camera, known as a Portable Digital Recording Device (PDRD), facing Mr. Pawlik, on the hood of the BearCat.

After a short time, according to the officers' statements, Mr. Pawlik appeared to awaken and began to move. Several officers shouted verbal commands at Mr. Pawlik. As Mr. Pawlik began to sit up, Sergeant Negrete, Officer Berger, Officer Hraiz, and Officer Tanaka all fired their AR-15 patrol rifles. They fired a total of 22 shots in 2.23 seconds, just *two minutes* after the BearCat arrived. In addition, Officer Phillips, the first officer on the scene, fired one less-than-lethal, drag-stabilized "beanbag" shotgun round at Mr. Pawlik. Officers approached and immediately handcuffed Mr. Pawlik, who was pronounced dead at the scene at approximately 7:13 p.m. That was just under one hour from the time the initial call came into the Oakland 911 emergency communications center, and 44 minutes after the Patrol Rifle Officers arrived on the scene.

A link to a video of this incident, as it was shown on the news, can be found at: https://www.youtube.com/watch?v=z3H3CgyXbdY

## Section 3:  Our Initial Concerns

> OPD's initial press releases and our early conversations with Chief Kirkpatrick and others raised serious concerns that the Department had concluded that the shooting was justified even before its investigations were complete.

In the early stages of all critical incidents, including officer-involved shootings, the long-standing practice has been that the Chief of Police and the Internal Affairs Division (IAD) Commander notify members of the Monitoring Team and provide them with information on the incident.  On the evening of March 11, 2018, OPD's Chief at the time, Anne Kirkpatrick, called the Monitor to advise that there had been an officer-involved shooting that resulted in a death. The Chief told the Monitor that the subject had "pointed" a firearm at the officers, and she reported that the shooting "looks good."  The Monitor strongly cautioned the Chief that she should not reach conclusions so early in the process.  The following day, the then-Commander of IAD called Commander John Girvin of the Monitoring Team to provide an overview of the incident, during which he indicated that Mr. Pawlik "pointed" a firearm at officers, prompting officers to shoot Mr. Pawlik in self-defense.

Despite the similar phrasing used by the IAD Commander and Chief Kirkpatrick, there was no reference to "pointing" of the firearm in the Department's initial press releases related to this incident.  The first press release, issued on March 12, 2018, indicated, "Uniformed Oakland police officers arrived on scene and observed the man was armed with a hand gun.  Officers began giving verbal commands.  The man did not comply with the officers [sic] commands and officers discharged their service weapon."

We were concerned that this press release implied that officers may have shot Mr. Pawlik for non-compliance with their commands.  The Monitor shared this observation with Chief Kirkpatrick in a telephone conversation on March 13, 2018, during which she also expressed unease with the press release.  However, the Department's second press release, issued on March 14, 2018, only added to our concern.  The second press release stated, in part, "It was reported that Officers believed Pawlik's actions posed an immediate threat to the officers with the risk of

death or serious bodily harm.  Multiple Officers discharged their service firearms, striking Pawlik."  We believed these press releases contained veiled attempts to articulate a justification for the shooting.

At this point, although we had yet to review any video footage of the incident, we were concerned that the parsing of words in these press releases indicated that the incident did not occur as initially described to us.  Our first viewing of the available video verified these concerns.

## Section 4:  The Video Evidence

The Department failed to take advantage of the quality video it had of this incident.  Specifically, the Department failed to challenge the involved officers' claims of what occurred when it is clear that what the officers asserted was not supported by the video evidence.  OPD hired two professional outside vendors to enhance the video, but relied on a deficient analysis conducted by an OPD sergeant.

Many police incidents are recorded on body-worn cameras where video quality is often mitigated by the physical movements of the officer.  In contrast, this incident was recorded on a stationary camera that captured the actions of the involved officers and Mr. Pawlik in the moments before, and during, the use of force.  An OPD sergeant had placed his body-worn camera, or PDRD, facing Mr. Pawlik, on the hood of the BearCat shortly after the vehicle arrived on the scene.

In this section, we provide an overview of the video evidence and OPD's internal and external efforts to enhance it.  The analyses of video were critical to our assessment of this shooting. OPD contracted with two outside vendors to enhance the quality of the video.  At the request of

the Department, one of the vendors provided its analysis of what the video showed by responding to a series of questions posed by OPD. In addition, an OPD sergeant attempted to enhance the video and provided his interpretation of what the video showed.

OPD first contracted with Precision Simulations, Inc. (PSI) of Grass Valley, CA, to provide enhancements to the available video. The Internal Affairs Division (IAD) did not request that PSI provide any analysis with these enhancements, and PSI offered no opinions or analysis as to what the video showed.

PSI's video enhancement resulted in a cropped and enhanced version of the video that is approximately one-minute-and-30-seconds long, and begins one-minute-and-eight-seconds before officers fired the first shots. PSI also included a version zoomed to 200% magnification; a 10-second cropped and enhanced version, which captures just the actual shooting in slow motion; and a frame-by-frame breakdown. Among the three separate video enhancements, PSI's provided the clearest depictions of what occurred.

OPD also contracted with Imaging Forensics of Fountain Valley, CA, to provide an enhanced version of the video. Imaging Forensics delivered three products from the enhancement. The first is a three-minute video which begins approximately one-minute-and-47-seconds before the officers fired the first shots. The second is a 37-second enhanced version of the video, which begins approximately 30 seconds before the shots were fired. This version contains added notations regarding when the shots were fired; when it appears that Mr. Pawlik raised and lowered his head; and when it appears that Mr. Pawlik moved his left hand, left arm, and right arm. It also contains notations on the commands given by the officers on scene and when the shots were fired. Finally, Imaging Forensics delivered a 743-page document in which each page depicts a frame of the 37-second video, but without the notations or audio information.

After discussions with the Monitoring Team, OPD asked Imaging Forensics to address several specific issues. While it is not in dispute that Mr. Pawlik *had access* to a firearm with his right hand, Imaging Forensics was unable to discern if Mr. Pawlik had the firearm in his hand at the time he was shot. Similarly, Imaging Forensics was unable to determine the movement of Mr. Pawlik's right hand in the 30 seconds before the shooting. Imaging Forensics's report noted, "Because of the resolution, compression, low contrast light, distance from camera and the angle of view, small, subtle movements cannot be discerned. The right hand is not visible in the video prior to the shots being fired. There is some movement of the subject's head, and possibly his left arm and hand as well as his right arm during the 30 seconds prior to the first shot."

At the request of OPD's Criminal Investigations Division (CID), an OPD sergeant completed a third enhancement of the video. The sergeant was not assigned to any specialized video forensic unit. As noted in the sergeant's report, he identified video footage that he believed "possibly

captured images that would provide more detail." He used forensic video software to decompress the video, reviewed the decompressed video footage frame-by-frame, and attempted to enhance the video by identifying areas of high contrast. He also took his own video footage of the scene, well after the incident, to create a "control video" that contained a vertical stick with six-inch spaces marked with lights starting at the bottom on the ground at the area where he believed Mr. Pawlik originally lay.

The sergeant concluded that just prior to the shooting, Mr. Pawlik attempted to sit up by "rocking." The sergeant noted that there was not enough information to clearly see the gun or its exact movement, but he concluded that there was some "slight movement," and he believed that the movement was in an upward direction.

The sergeant first briefed the Monitoring Team on his conclusions on July 9, 2018, during our monthly site visit, and he provided us with a draft of his report. During that meeting, he said that he concluded Mr. Pawlik's gun moved about six inches vertically just prior to the shooting. That conclusion, however, is absent from the final version of his report, dated August 3, 2018. When we met again, on August 14, 2018, the sergeant cautioned that even with his video enhancements, the movement that he concluded took place was "not clear, not super clear," and he added, "It's not going to be like, oh, there it is."

Chief Kirkpatrick apparently first viewed this sergeant's briefing at the time the Monitoring Team received it. As noted in the Compliance Director's Addendum to the Executive Force Review Board (EFRB) Report, issued on February 19, 2019, "In the aftermath of the sergeant's presentation, the Chief discounted its usefulness, quality, and accompanying analysis. In fact, the Chief informed me [the Compliance Director] that the Department would not consider this analysis in the investigation of this case as she considered it substandard and an embarrassment. Nevertheless, it was prominently referenced in the IAD investigation, which was presented to the EFRB." Though Chief Kirkpatrick had made her views known about the inadequacy of the sergeant's analysis and expressed her embarrassment about it, she nonetheless allowed it to be used to support the conclusions of each investigation.

OPD has considerable experience viewing and interpreting police video, including video from PDRDs. The Department has generally had little problem reaching conclusions – even with suboptimal-quality videos. By contrast, the video of this incident was captured in daylight conditions from a stationary platform continuously focused on Mr. Pawlik. Despite this, IAD, CID, the Executive Force Review Board (EFRB), and ultimately Chief Kirkpatrick, allowed the involved officers' assertions to go unchallenged even though their statements were not supported by what the video showed.

The Monitoring Team has reviewed all of the available video which captures this incident – in its raw and enhanced forms – dozens, if not hundreds, of times.  It is clear that Mr. Pawlik was lying on the ground completely unresponsive for a significant period of time.  When the BearCat arrived on the scene, Mr. Pawlik began to move.

Unlike the involved officers and investigators, we do not draw any conclusions regarding Mr. Pawlik's emotional state (e.g., anger, annoyance).  In the video, Mr. Pawlik appeared disoriented.  He attempted, with some difficulty, to sit up.  He moved to a sitting position, using his right hand for support.  Then he was shot.  His right hand was clearly on the ground when the shooting started.  It snapped up from the ground in reaction to his being shot.  As he raised his right hand, its starting point is clear:  It was on the ground.  He appeared to use his right hand and arm for support as he struggled to sit up.  It also appears from the video that, at the time of the shooting, Mr. Pawlik was looking straight ahead and not to his right, in the direction of the involved officers.  This directly conflicts with some officers' assertions.

The involved officers contended that Mr. Pawlik raised and pointed the firearm in their direction.  One officer estimated that he raised the firearm up to 14 inches.  However, this is not supported by the video.  As noted, the video does show Mr. Pawlik's right hand moving upward from the ground in reaction to being shot – that is, it starts from the ground.  If Mr. Pawlik's hand was raised *before* the shooting, as several officers contended, it would have had to move *down* rapidly prior to it moving *up* rapidly.  The video does not show that.

All of the video enhancements, including the discredited enhancement conducted by the sergeant, conclude that, at best, there may have been slight movement of Mr. Pawlik's right hand.  In CID's presentation to the EFRB, the investigators noted, "Two separate analyses concluded that there is 'movement' from Pawlik's right arm or hand area prior to the officers discharging their firearms; however, the degree/amount of movement is not measurable."  But this is inaccurate.  Imaging Forensics noted that small, subtle movements cannot be discerned, and Mr. Pawlik's right hand is not visible in the video prior to the shots being fired.

Exhaustive reviews of the raw video footage, and extensive efforts to enhance it, do not support the involved officers' assertions about Mr. Pawlik's actions at the time of the shooting.

> **Standards of Proof**
>
> In this report, we discuss the Department's criminal (Criminal Investigations Division, or CID) and administrative (Internal Affairs Division, or IAD) investigations of this incident.  It is important to recognize that criminal and administrative investigations have different requirements regarding standards of proof.  The burden of proof in a criminal investigation is "beyond a reasonable doubt."  For an administrative investigation, the burden of proof is much lower:  It is a "preponderance of the evidence."  This standard has been variously described as "more likely than not," or "a slight tipping of the scales," or "greater than 51%."  In these investigations, there seemed to be confusion about these standards.

## Section 5:  The Criminal Investigations Division Investigation

The Criminal Investigations Division failed to conduct a thorough and competent investigation of the shooting of Joshua Pawlik.  CID's work was replete with errors and inadequacies.  Subject officers were not properly sequestered and their interviews were deficient.  CID asked leading questions and did not investigate contradictory statements.  CID command staff improperly inserted themselves into the process.

Best practices for the investigation of an officer-involved shooting (OIS) dictate that law enforcement agencies have clear policies and protocols in place to conduct fair and impartial investigations.  The U.S. Department of Justice, through its Bureau of Justice Assistance, and other organizations such as the International Association of the Chiefs of Police and the Major

Cities Chiefs Association, have published relevant materials that have been available to the Oakland Police Department's senior leadership, many of whom have been regular participants in forums sponsored by these organizations.

At the time of the officer-involved shooting (OIS) of Mr. Pawlik, OPD did not have a specific OIS protocol. Departmental General Order (DGO) K-4, OPD's policy for the reporting and investigation of use of force, contains limited direction for the Department's response to Level 1 (most severe) incidents. Further, the Department's Criminal Investigations Division (CID) Policy and Procedure Manual devotes less than one page to "Critical Incident Protocols," and it primarily covers administrative directions for notifications and review of completed investigations. However, neither of these documents provides sufficient directives to fully address officer-involved shootings. After the shooting of Mr. Pawlik, in response to an inquiry from the Monitoring Team, OPD acknowledged the need for such a written protocol – though as of yet, the Department has not finalized such a directive.

## Conditions of CID interviews

The fact that OPD did not have a specific written OIS protocol at the time of this incident contributed to CID's deficient investigation. To begin, CID's initial criminal interviews of the involved officers were conducted in the office of the then-Commander of CID. While OPD's facilities may not have had available a more appropriate place to conduct these types of interviews, the CID Commander's office is an unsuitable venue for interviewing, video-recording, and observation by Internal Affairs Division (IAD) personnel. As with any other criminal investigation, interviews should be conducted in a room designed for such purposes and equipped with both video-recording equipment and the ability for IAD or other appropriate personnel to monitor the interview from outside the interview room. The setting contributed to the disorganization and confusion in the process.

The CID sergeant with primary responsibility for the investigation conducted the interviews of each involved officer. A second CID sergeant, a CID lieutenant, the CID Commander, an attorney and an investigator from the District Attorney's Office, the subject officer's attorney, and an OPD employee responsible for recording the interviews were also in the room. With the exception of the employee operating the recording equipment, those present all appeared to actively participate in some part of the interview processes. The criminal investigators also noted that personnel from IAD were monitoring the interviews via telephone.

The presence and involvement of eight people in a criminal interview is excessive, and the active participation of command personnel in criminal interviews is inappropriate.  These problems led to disruptions in the flow of the interviews, particularly when participants interrupted lines of questioning by the primary investigator to ask their own questions, or to seek clarification of something that had been said.  As an example, five different people, including the CID Commander, asked questions of Officer Berger during the primary portion of his interview.

## Inadequate sequestering of officers

As is common in OIS investigations, the subject officers were initially sequestered after the shooting to ensure that their recollections of the incident were not affected by other personnel, including the other subject officers.  However, after the primary investigator interviewed the first two officers who used lethal force, and with agreement from the subject officers' counsel, the investigator postponed the interviews of the two remaining officers who had also used lethal force.  Consequently, from that point on, the purpose of sequestration was nullified.  The fifth involved officer, who had fired the beanbag round, was interviewed by other criminal investigators the night of the incident.

The reasons the two interviews were delayed were the lateness of the hour, and the decision by the primary investigator to conduct all of the subject officer interviews himself.  We are concerned that these interviews appear to have been postponed without any consideration of the need to sequester the subject officers until they could be interviewed.  There also is no documentation indicating that CID gave these officers verbal warnings not to discuss the case prior to their interviews.  The interviews of the first two officers took less than one-and-one-half hours each.  Despite the lateness of the hour, CID should have conducted the additional two interviews.  Although we do not know if the non-sequestered officers had inappropriate conversations with anyone prior to their interviews, the possibility of that having occurred remains a concern.

## Failure to challenge discrepancies among officers' statements

For the most part, the CID investigators accepted the officers' statements, even when their assertions contradicted other officers' statements.  The investigators did not follow up to clarify these statements, attempt to resolve discrepancies, or challenge initial interview statements that were not supported by the facts of the investigation.  While CID conducted follow-up criminal interviews with several of the *witness* officers to clarify what they had or had not observed, it

appears that, with the exception of the interview with Sergeant Negrete, CID did not request or conduct any second interviews with the involved officers. For a case of this importance, this was highly unusual.

The investigators did not initially have all of the information to challenge or seek clarification of some statements made by the subject officers. However, they *did* have that information after the completion of the initial interviews of both subject and witness officers. They also had the reviews of all the PDRD video, including from the PDRD that had been placed on the BearCat. CID's failure to conduct follow-up interviews of subject officers left unaddressed several critical discrepancies – particularly officers' statements on Mr. Pawlik's position just prior to and at the time of the shooting. Simply put, OPD had access to video evidence of what occurred, yet the Department made no effort to use it to challenge statements made by involved officers.

Ordinarily, the use of a single primary investigator to conduct the interviews of all subject officers provides opportunities to identify and assess any discrepancies in the statements of the officers. In this incident, there was no benefit derived from having the primary investigator conduct all of the subject officers' interviews, because he never addressed discrepancies between officers' statements during their initial interviews.

In the criminal interviews, investigative personnel consistently accepted the subject officers' statements as factual reports of what occurred – even when their statements were not supported by the other evidence. For example, when asked for examples of commands he heard at the scene, Officer Berger claimed that he heard, "Please (done) [sic] move. Get your hands up. Oakland Police." It is clear from a review of the PDRD footage that one of the officers on the scene faintly used the word "police" – but it is unlikely that Mr. Pawlik was able to hear that. There was no loud declaration of "Oakland Police." When asked how high off the ground the weapon was, Officer Berger responded, "a little over 14 inches." His statement regarding the weapon's position is significantly different from those of other subject officers, one of whom described the weapon as being raised only a couple of inches. Despite these discrepancies, CID never made any attempt to clarify or reconcile any of the officers' statements regarding the position of Mr. Pawlik, or the weapon, at the time of the shooting. We found similar inconsistencies during other subject officers' interviews, and investigators failed to address these inconsistencies.

## *Leading and suggestive questions*

During their interviews, CID investigators asked leading questions.  As an example, during Officer Berger's initial interview, what was described in the transcript as an "unknown voice" asked, "And how long did the commands last until you --you believe you were forced to use lethal force?  How much time since he is sitting up to you were forced to use lethal force?  How much time went by?"  A review of the recording suggests that in this instance, the unidentified voice belonged to the CID Commander, who asked numerous questions.  In another subject officer's interview, the CID Commander asked, "[H]ow much time passed by till when you - - you - - were forced to use the - - you were forced to use the lethal force or use your force - - using the lethal force."  In both cases, the Commander's questions suggested that not only was the lethal force justified, but that the officers had been compelled to use lethal force.

Other questions seemed to suggest a defense if the justification for the shooting was questioned – or they suggested that the questioner accepted, at face value, that the shooting was justified.  One such example was, "Um, so this - this is, uh, a pretty serious incident, right, and there are going be people who may look at this and go, you know what, hey those officers were behind an armored vehicle, right?  And this - they could have just stayed behind there.  What would you say to that?"  Later, the CID Commander asked, "What would you say if somebody said, hey you know what?  This person was just startled and woke up?"  It is unacceptable for an interviewer to suggest a defense to an officer who is under investigation in any event – let alone in an officer-involved shooting.

We also found the same line of justification and defense questions in other subject officers' interviews.  In one case, the questions were attributed to IAD, though we were able to establish, from a review of the recordings, that the questions were not asked by IAD, but by someone else who was present in the interview room.  These types of questions are inappropriate, regardless of who asks them.  Yet it is particularly disturbing that the CID Commander, in the presence of the primary investigators, would insert himself into the interview process and engage in this type of questioning.  The CID Commander's doing so unquestioningly set a tone for his subordinate investigative personnel that these types of questions were acceptable.

After the initial criminal investigation interviews, each officer was allowed to view his own body-worn camera video.  Yet CID did not ask additional clarifying questions after the officers' reviews.  Instead, CID personnel merely asked them if they had anything they wished to add – and none of them did.  That would have been the appropriate time for CID personnel to ask clarifying or probing questions, but they did not.

CID conducted only one follow-up interview with a subject officer who used lethal force in this incident.  CID's follow-up interview of Sergeant Negrete occurred in August 2018, more than four months after the incident.  By this time, investigators should have already reviewed all officers' interviews as well as all of the evidence, including the PDRD videos.  In Sergeant Negrete's follow-up interview, investigators did ask some questions regarding his decision-making and supervision of the incident.  However, they failed to use this opportunity to address inconsistencies among his and the other officers' statements and discrepancies with the PDRD video – inconsistencies and discrepancies about which by then they surely would have known.  During the interview, the CID Commander again actively participated as an interviewer and asked questions regarding how Sergeant Negrete would respond if "some people" questioned what had occurred in this incident.  The CID Commander's leading questions and his insertion into the investigative process were inappropriate.

## Transcript issues

In addition to the serious problems with the criminal interviews, there were significant issues with the interview transcripts.  There were numerous instances in the transcripts where the names of participants who asked questions during the interviews were either misidentified, listed only as "unidentified voice," or noted inaccurately.  All criminal investigations, and certainly investigations of this importance, must contain accurate information and documentation.  In this investigation, transcripts were not reviewed for accuracy.

## Conclusion of CID's investigation

CID's investigative report provided summaries of officers' interviews that contained information about what the officers said, instead of an investigative conclusion as to what had actually occurred.  Yet we are most concerned with CID's failure to adequately investigate or even attempt to resolve discrepancies or to ask probative questions.  Simply put, this was not a thorough or impartial investigation.

As CID's investigation moved forward, Chief Kirkpatrick expressed reservations about her role in approving it.  In a meeting with the Monitoring Team and in the presence of Department personnel, she stated that, when the report was completed, she would be disinclined to either review or sign it, arguing that it would cause a conflict for her in future decisions related to this matter.  The Monitor reminded her of her executive responsibilities as the Chief of Police to review the investigation.

CID concluded its investigation in October 2018. In the report, the investigator wrote, "All known evidence has been obtained during this investigation. This investigation was reviewed through the chain of command up to Chief Kirkpatrick for approval to submit to the Alameda County District Attorney's Office for possible criminal charges." Despite this assertion, there was not a full review, as it was the CID lieutenant, who participated in the interviews of the initial subject officers, that signed the report as the reviewing supervisor. In other words, the lieutenant approved his own work and that of the Criminal Investigations Division. There is no indication of approval by the CID Commander, nor any explanation why the CID Commander did not participate in the review and approval chain. The report also does not contain a signature of approval by the Deputy Chief for the Bureau of Investigations or the Assistant Chief. Therefore, contrary to what the primary investigator wrote, the CID investigation was not subject to a full chain of command review.

## Forwarding to the District Attorney's Office

The Alameda County District Attorney's (DA) Officer-Involved Shooting (OIS) Team is authorized, by agreement with each local law enforcement agency in Alameda County, to conduct a separate, parallel investigation into officer-involved shooting incidents that lead to death. The District Attorney's OIS Team typically responds to the scene of an officer-involved shooting incident, as it did in this event. It was evident from our reviews of OPD's reports that the District Attorney's Office also participated with CID investigators in their interviews of the subject officers.

On October 31, 2018, Chief Kirkpatrick approved CID's investigation and signed the investigative report. Chief Kirkpatrick failed to question and correct the numerous deficiencies and omissions in the investigation prior to finalizing and forwarding the report to the District Attorney's Office.

On March 6, 2019, the District Attorney issued a report on the shooting of Mr. Pawlik in which she declined to prosecute any of the involved officers. The report notes that the DA's Office "focuses exclusively on the question of whether there is sufficient evidence to prove beyond a reasonable doubt that a law enforcement official committed a crime in connection with the shooting death." The report states that the "OIS Team does not examine collateral issues such as whether law enforcement officials complied with internal policies, used appropriate tactics, or any issues that may give rise to civil liability." The report continues, "[T]his report should not be interpreted as expressing any opinions on non-criminal matters."

## Section 6:  The Internal Affairs Division (IAD) Investigation

The Internal Affairs Division's investigation was replete with failures.  IAD's failure to expeditiously pursue the administrative investigation resulted in the loss of potentially valuable information.  IAD investigators asked leading questions, provided information to the subject officer regarding what they believed the subject officer was trying to say, and failed to address many serious discrepancies and inconsistencies.

Unlike a criminal investigation of an officer-involved shooting, an administrative investigation conducted by OPD's Internal Affairs Division (IAD) is not intended to explore whether officers engaged in criminal conduct.  Instead, it is intended to focus on the actions or inactions of officers based on the policies and procedures of the agency.  The administrative investigation, therefore, should not be viewed as a continuation of the criminal investigation, but as a separate investigation into potential misconduct or policy violations by subject officers whether or not any criminal misconduct occurred.  Best practices recommend that police agencies direct their investigators to conduct administrative interviews as soon as possible and without unnecessary delays.

In this incident, IAD personnel appropriately responded to the scene.  They also monitored the initial criminal interviews of the subject officers telephonically.

The IAD investigators had the same information from the scene that the CID investigators had, including the raw video footage.  IAD also monitored the initial interviews of subject officers.  However, IAD investigators did not conduct their administrative interviews of the subject officers until August 2018, five months after the incident.  Not surprisingly, during their administrative interviews, several officers attributed their inability to recall some information about the incident by noting that it had occurred five months prior.  Well before August 2018, IAD investigators had the information they needed to conduct thorough interviews and address

any inconsistencies, discrepancies, or concerns they had.  Although the analysis of the PDRD footage from the camera placed on the hood of the BearCat, conducted by OPD's vendor Imaging Forensics, was not completed until September 2018, IAD investigators did have the raw video footage, as well as the enhanced versions provided by OPD's vendor Precision Simulations, Inc.  Those should have been sufficient for purposes of considering inconsistencies in officers' statements.  IAD's failure to expeditiously pursue the administrative investigation could have resulted in the loss of potentially valuable information.

### *Suggesting responses to subject officers*

As with the CID investigators, IAD investigators inappropriately made suggestions to elicit certain responses.  This practice is inconsistent with OPD's Internal Affairs Division Policy and Procedure Manual.  One example was in Sergeant Negrete's interview.  At one point, the investigator said, "[O]kay it sounds like even, uh yourself, a longtime member of the swa—uh SWAT team, has used the vehicle many times, you didn't, uh, feel probably confident enough even in your own skills shooting through a porthole, where you felt that was appropriate thing to do."

In another example, the IAD investigator questioned Sergeant Negrete by stating that "a nay sayer [sic] might say, well how could he see everything if he's right there on his gun and--and he must be totally focused in on the guy and he just said that he didn't even know that a guy was standing right next to him for 30 seconds, boy it just sounds like he was so engaged in the threat that he- -he didn't know what was going on around him."  Sergeant Negrete responded that he would say that he was "absolutely engaged in the threat."  The practice of an IAD investigator querying a subject officer as to how he might respond to a hypothetical critic in these circumstances is wholly inappropriate.  The internal investigatory process is not intended to create opportunities for officers to make exculpatory utterances for a later defense.

The credibility of an investigation is also mitigated when investigators provide both the questions and the answers to subject officers.  IAD's use of leading questions, as well as its attempts to prompt a specific response, are most apparent in the interview of Officer Phillips, who was armed with the less-than-lethal shotgun during this OIS.  In Officer Phillips's interview, IAD asked him why he did not "initially consider just walking up to the guy and disarming him yourself?"  Officer Phillips responded, "Because I could clearly see that he was armed with the handgun, and I've never seen anybody, um, armed with a gun on duty with their – with their, uh actually holding."  Officer Phillips continued, "[W]ith them actually holding it and gripping, uh, the weapon."  The investigator then asked Officer Phillips, "It – it's – you didn't approach it

because that was the first time you saw an individual with a gun in his hand.  An individual with a gun in his hand is dangerous, correct?"  After Officer Phillips answered, "Yes," the investigator continued, "[I]t's a threat, correct?"  After another affirmative response, the investigator said, "Okay.  So did you fear for your safety?"  Officer Phillips confirmed that he did.

In Officer Phillips's interview, the investigator also said, "One might say, hey, boy, this guy was out cold, you know.  Why didn't you just walk right up and grab the gun?  I mean it would have been simple.  It – what threat is he posing?  What would you say to that?"  Officer Phillips responded, "And who is this asking?"  One investigator responded, "it's – it's a hypothetical," and another investigator responded, "Joe Citizen."  The second investigator continued by clarifying that he was referring to anyone who might "critique or criticize what you did."  The leading questions; attempts to elicit specific answers; and questions that are framed to provide a justification, should anyone ask, are completely inappropriate.

In another example, IAD asked Officer Phillips to explain a statement he made in his initial criminal interview, when he was asked if he thought that Mr. Pawlik knew that the police were there.  The IAD investigator told Officer Phillips that in his CID interview, when asked by CID investigators if he believed that Mr. Pawlik had known police were on scene, he had responded that he "didn't think so."  In his IAD interview, investigators asked Officer Phillips multiple questions about why he "didn't think so," and if it could just be that he did not know if Mr. Pawlik knew police were there.  Even when Officer Phillips said that he did not believe that Mr. Pawlik appeared to be sleeping, the investigator said, "So did, just to clarify, uh, you weren't real sure."  And then later, the investigator continued, "You – you're saying you don't know," to which Officer Phillips responded "Uh, yes, sir."

These are examples of the numerous inappropriate leading questions that attempted to elicit exculpatory responses from subject officers.  The IAD Commander should have rejected the IAD investigators' tactics or insisted that the interviews continue with an additional series of objective questions.  Further, the IAD Commander should have refuted the factual value of the responses derived from leading questions.

### *Failure to address discrepancies*

In its report, IAD documented only one discrepancy involving an officer's statements or actions.  Officer Hraiz claimed in his interview that he "assessed between each round fired," and IAD explained that impossible claim as a "perception discrepancy based on the stress of the incident."  However, IAD failed to address far more critical discrepancies and inconsistencies in statements made by subject officers.  These included: Mr. Pawlik's state of consciousness as described by

witness and subject officers; the degree to which Mr. Pawlik was moving just prior to and at the time of the shooting; and how, and to what degree, Mr. Pawlik allegedly raised the gun just prior to the shooting.

The IAD investigation also identified other troubling issues but did not examine them closely. For example, during his interview, Lieutenant Yu asserted that the officers on the scene were prepared to deal with Mr. Pawlik prior to his awakening.  Lieutenant Yu claimed that he confirmed this by asking, "[A]re we set?" to which he received an affirmative response.  He said that he could not recall if he attempted this confirmation over the radio, or in person – or *who* provided the response.  Lieutenant Yu attributed his limited recall to the incident having occurred five months prior.  When the IAD investigator verified for him that this actually occurred *after* the BearCat arrived, Lieutenant Yu indicated that it had, and that he "did get a confirmation that it was a yes.  We were good to go."  It appears from the transcript that Lieutenant Yu was referring to Sergeant Negrete as having responded "yes" to his question.  He continued to explain that OPD attempted to "wake" Mr. Pawlik with announcements such as "Hey, Oakland Police Department.  Do you - - whoever you on the street."  He referred to these announcements as "the usual - - like the announcements we make to announce to police presence - - and - - that we're there."  Lieutenant Yu then said that almost immediately, "either after the announcements or during the announcements, the announcements changed to commands."  He explained this to mean that instead of announcing "Hey, Oakland Police Department," officers began issuing commands to Mr. Pawlik, "things to the effect of drop the gun or uh, or – get your hands up."

Subject officers said in their interviews that they were not all "in position" and ready to address the situation, but that Mr. Pawlik awoke unexpectedly, forcing them to do so.  In his IAD interview, Sergeant Negrete said that he had not been able to brief the officer who arrived with the BearCat because "it went active."  He explained that to mean that Mr. Pawlik "woke up." The statements by the subject officers are inconsistent with Lieutenant Yu's statement that they were, in fact, ready to address Mr. Pawlik – and IAD did not explore these inconsistencies.

In another example of IAD's failure to address critical investigative issues, in both his criminal and administrative interviews, Officer Phillips said that he believed that he had been the first officer to fire at Mr. Pawlik.  In his IAD interview, Officer Phillips said that he fired after he saw Mr. Pawlik's head and the gun move.  When asked by IAD what he remembered specifically, he responded, "I remember his head coming up.  Him looking around.  Him putting his head back down, and then, if I'm not mistaken, his legs moved a little bit, and then, his right hand, which was gripping the handgun, uh, it appeared to be moving up a little bit, and his – I could see that his head was starting to come up, and that's when I fired the bean bag round."  When asked if he had fired his less-lethal round before the other officers fired their lethal rounds, he responded,

"[T]o my recollection, I believe it was before."  He added, "I believe that I shot the bean bag round, and as I went to re-rack the round the person was already shot."  While it does not appear from our review of the PDRD footage that Officer Phillips did, in fact, fire first, IAD never identified, pursued, or challenged his statement as a discrepancy in its report.

Even with video evidence that did not support the subject officers' statements, IAD investigators failed to identify or reconcile the discrepancies regarding the manner in which Mr. Pawlik purportedly raised the weapon, at whom he allegedly pointed it, and the alleged height at which the weapon was raised.  In IAD's interviews of subject officers who used lethal force, officers' descriptions of the actions of Mr. Pawlik varied from his raising the gun from a couple of inches to his raising the gun as much as 10 or 14 inches.  Officer Hraiz, who was in an elevated position in the turret of the BearCat, said that Mr. Pawlik pointed the gun directly at him.  He said, "[I]t looked like the gun was being pointed, barrel, it looked like I was looking right down the barrel." From Officer Berger's position on the ground and to the side of the BearCat, he too said that the gun was pointed directly at him.  Sergeant Negrete also said that the weapon was pointed directly at him, and said, "I remember looking down straight at the barrel of his pistol," and then added later, "It looked like that he was pointing it directly at me."  Officer Tanaka described the actions of Mr. Pawlik as, "He raised the firearm to, like, a contact ready, uh."  When asked to clarify what he meant by "contact ready," Officer Tanaka said, "Uh, where he would be pointing the gun directly at us."

During their interviews, subject officers described their observations of Mr. Pawlik just prior to the shooting  as "alert and awake;" "appeared agitated as if the officers were bothering him;" "appeared agitated and upset;" and "appearing like he knew what was going on."  Subject officers also described him as "annoyed, bothered, analyzing the situation;" "scanning from side to side;" and "purposefully and intentionally pointing his weapon at officers."  Officer Phillips said that prior to firing the beanbag round, Mr. Pawlik appeared "to look like he was initially trying to figure out what was going on," and then described him as "kinda waking up."

In addition to the subject officers, IAD identified five additional officers on scene who were apparently able to observe Mr. Pawlik in the seconds prior to the shooting.  These witness officers described Mr. Pawlik as "having a dazed look;" "appearing drowsy;" "like anyone waking up from a sudden loud noise;" "startled from a deep sleep, extremely drunk or passed out;" "not really getting it in regards to commands;" and "like he was under the influence and did not appear lucid, or unconscious."  While in their interviews, these witness officers said that they had looked away, or could not directly see Mr. Pawlik's face or hands at the exact moment of the shooting.  These observations *contrasted* with the subject officers' statements – and IAD should have further explored these discrepancies.

## *Intent, Means, Opportunity, and Ability*

IAD considered the "intent," "means," "opportunity," and "ability" of Mr. Pawlik in its investigation, and circuitously reached conclusions on these elements. However, IAD never established that Mr. Pawlik knew what was occurring or understood the officers' commands. To support that the severity of Mr. Pawlik's behavior justified the officers' actions, IAD employed a variety of arguments, including that Mr. Pawlik had himself committed a crime, in that he "was in possession of a loaded firearm in a public place" and that he "ignored the officers' commands." IAD investigators, however, had the benefit of the best evidence in this case: the PDRD footage from the camera placed on the hood of the BearCat. Yet the IAD investigators did not pursue or challenge any line of questioning regarding what the officers said to justify their actions.

## *IAD's findings*

IAD sustained only *one* violation against an officer in its investigation of the shooting of Mr. Pawlik. IAD concluded that Sergeant Negrete was "singularly focused on Pawlik and lost effective control of his DAT in the crucial half-minute leading to the shooting," and sustained him for Manual of Rules violation 285.00-2, Supervisor Responsibilities. Interestingly, this finding is inconsistent with IAD's determination that "the involved member's actions leading up to the use of force did not aggravate the situation, or make the use of force more likely to occur."

It is clear that officers' decisions made in the more than 40 minutes prior to this shooting – including a lack of appropriate contingency planning, and failure to appropriately manage the Designated Arrest Team – were critical factors in the tragic outcome. Nonetheless, IAD's report notes, "[T]he actions also did not create the circumstances that lead to, or contributed to the use of force."

IAD failed to identify and address numerous discrepancies and inconsistencies in officers' statements; failed to adequately consider the PDRD footage captured from the hood of the BearCat; and in so doing, failed to support its investigative findings. The IAD Force Investigation Team Commander and the IAD Commander then failed to address the serious deficiencies and omissions in this investigation prior to allowing it to be finalized and forwarded to the Executive Force Review Board.

## Section 7:  The Executive Force Review Board (EFRB) Process

OPD's Executive Force Review Board (EFRB) failed in its primary responsibility to conduct a detailed review of the shooting – and in doing so, it compounded the numerous failures associated with this entire matter. Like CID and IAD, the EFRB accepted what the officers asserted at face value and without regard for any inconsistencies with available video evidence.

Departmental General Order K-4.1 (Force Review Boards) requires that an Executive Force Review Board (EFRB) be convened "to analyze and assess the factual circumstances during and proximate to all…Level 1 UOF incidents and investigations" and to "[e]stablish concluding recommendations to the COP from those circumstances."  Negotiated Settlement Agreement (NSA) Task 30 (Executive Force Review Boards) and Departmental policies place the burden on OPD to convene EFRBs consisting of high-ranking OPD personnel to review Level 1 (most severe) uses of force.

### External EFRB

As the criminal and IAD investigations neared conclusion in the fall of 2018, Chief Kirkpatrick and the Monitor discussed the prospect of establishing an EFRB comprised of non-OPD personnel.  While the Monitor initially thought that the concept had some merit, as OPD's plans progressed, Chief Kirkpatrick's interactions with the Board members proposed by the Department became problematic.  Specifically, prior to the convening of the Board, Chief Kirkpatrick had conversations with the proposed external Board Chair, a retired U.S. Magistrate Judge, in which the Chief apparently discussed her own position on the justification of the deadly force used by the officers.  When, on October 17, 2018, the Chief informed the Monitor that she had had conversations with the retired Magistrate, the Chief suggested that the Monitor might wish to talk to the retired Magistrate directly.  When the Monitor spoke with the retired

Magistrate, she confirmed that she had had conversations with the Chief, and she expressed concerns to the Monitor about the appropriateness of such discussions prior to the convening of the Board. The retired Magistrate told the Monitor that Chief Kirkpatrick had told her that the Chief was personally "fifty-fifty" on the shooting. She expressed concern that her participation could make it "murky," and she offered to withdraw from consideration.

Chief Kirkpatrick advised the Monitor that she had also spoken with the other proposed external Board members. In addition, the Monitor had concerns with the special training and investigative materials the Chief was planning to give to the panel, and the proposed compensation for each external board member.

For these reasons, it became clear that the idea of an outside board – one whose members had already heard the Chief's opinions of the case – had become inappropriate. Though an EFRB comprised of persons external to the Department was perhaps a progressive and innovative idea, it was tarnished by Chief Kirkpatrick's contacts with its potential members. This raised serious ethical questions. The Monitor called the City Administrator to inform her that the manner in which the Chief had briefed the retired Magistrate and others compromised the integrity of the process, and that the City would be ill-advised to proceed. Ultimately, and in consideration of certain legally defined time considerations, the Monitor determined that the EFRB should proceed in its customary manner.

## Convening of the EFRB

OPD convened an EFRB, chaired by a Deputy Chief, and with two captains as voting members. The Board met on November 28 and 29, 2018, and on January 8, 2019. In addition to the Department personnel who regularly support the Board's activities, the meetings were attended by the then-Chair of the City's Police Commission and members of the Monitoring Team. The retired Magistrate who was initially slated to serve as the Chair of the outside EFRB also observed the proceedings.

The shortcomings with both the CID and IAD investigations carried into their presentations to the EFRB. Neither CID nor IAD rectified their investigations' serious omissions, and both presentations relied heavily on conclusions that were not supported by the facts. Both CID and IAD took what the involved officers asserted at face value, and without regard for any inconsistencies with available video evidence. Unfortunately, the Board, for the most part, adopted the same stance. Additionally, the Board also relied on the discredited internal video analysis that was completed by an OPD sergeant and was criticized by Chief Kirkpatrick as an "embarrassment" when it was first presented.

In addition to the many flaws in IAD's presentation to the Board, it was delivered at breakneck speed. The investigator read nearly non-stop from densely packed PowerPoint slides. At the presentation's conclusion, Board members asked some probing questions of the investigator, but inexplicably failed to explore apparent inconsistencies.

During the questioning, the IAD investigator said that he had hoped that the video evidence would either prove or disprove what the officers had asserted. According to the investigator, when he determined that none of the three video analyses conclusively supported the officers' assertions, *IAD had to defer to what the officers claimed.*

The IAD investigator's logic and conclusions were troubling for several reasons. First, the video was only analyzed twice; and one analysis, completed by an OPD sergeant, should have been discounted because the Chief had already acknowledged that its quality was inferior and an "embarrassment."

Second, the video did not support what the officers asserted. The IAD investigator, both in his investigation and in his presentation to the EFRB, failed to explore the inconsistencies between the video and the officers' statements. He was certainly not compelled to defer to the officers' statements; he simply chose to. In other words, it was the position of IAD, that absent proof to the contrary, officers involved in a deadly shooting were deserving of the benefit of the doubt. This kind of thinking – deferring to officers' accounts, by default – must be rejected. It is at the core of the community's historical distrust of OPD – and nationally, of policing in general.

Third, when the IAD investigator could not answer questions with specificity, he indicated that some content in officers' answers was "implied." That is, the investigator made assumptions regarding the officers' views. During questioning by the Board, the investigator even posited that there had to be "implied intent" on the part of Mr. Pawlik. In analyzing justification for any use of force, the intent of the subject is one of the factors to be considered, as demonstrated by his actions or words. However, "implied intent" appears to be a contrived standard which has no basis in an analysis of justification.

The assertions of the patrol procedures subject matter expert (SME) who appeared before the EFRB regarding the BearCat were also troubling. This SME, who made his presentation prior to the BearCat SME, presented an illogical argument regarding the value of the cover afforded by the armored vehicle. In essence, the SME's position was that as long as *any* part of an officer is exposed from behind the BearCat, the threat is the same as if the armored vehicle was not there at all, and that the officer should react accordingly. According to the EFRB Report, "The Board asked how this guidance about protecting oneself would apply if the officers were behind cover

and/or concealment.  [The SME] replied that the training is still that officers must protect themselves and other officers; while cover and concealment might lower the risk of being struck if the subject opens fire, they do not entirely negate it."

The BearCat was described by another SME who appeared before the EFRB as a "large piece of cover that we can manipulate wherever we need it."  It is indisputable that this vehicle could have created a significant barrier between the officers and Mr. Pawlik; yet officers did not fully exploit this option.  *Any* barrier can diminish the prospect of harm to a police officer: a key component of any analysis of force justification.  The SME asserted that *any* exposure was tantamount to full exposure; and unfortunately, the Board adopted this flawed position in its analysis of the justification.  According to the EFRB Report, "While the officers were behind a piece of cover, subject matter expert…testified that a piece of cover may lower, but does not entirely negate, the chance of an officer being struck by a round, and that officers are trained accordingly."  However, in the EFRB's discussion of supervision and tactics, some members of the Board appeared to discount this position.

In the end, the Board voted twice on the appropriateness of each use of force: first, on November 29, 2018; and second, on January 8, 2019.  On November 29, 2018, when the Deputy Chief asked if there was any discussion regarding the vote on the first officer to be considered, specifically Sergeant Negrete, one of the captains said "no," but also noted that he felt uncomfortable because there were others in the room – which we presume was a reference to either a member of the Monitoring Team or the Police Commission.  We found this comment troubling from an agency that has consistently asserted it values transparency.  The remaining votes were held only one to two minutes apart, also without any substantive discussion.  On November 29, 2018, the Board's discussion and vote on the officer-involved shooting of Joshua Pawlik took only 10 minutes – from 1:41 p.m. to 1:51 p.m.

After these votes, the Board members determined that they needed additional information before they could reach a conclusion on the allegations related to supervisory responsibility and accountability.  They directed IAD to conduct further investigation and analysis of these issues, and decided that the Board should reconvene for yet another day.

The Board members voted again on the uses of force when they reconvened on January 8, 2019. This time, their discussions were only slightly more substantive.  For example, when they referred to specific slides in IAD's PowerPoint presentation, the members generally accepted the information at face value.  The captain who expressed discomfort with the first vote indicated that to the "naked eye," he did not see the gun move, and noted that the video, as viewed on YouTube, did not look good.  While this is the closest the Board ever came to noting inconsistencies between the officers' statements and the video, it nonetheless did not factor into the Board's ultimate finding.

The summary of the Board's deliberations regarding force in the EFRB Report largely consists of material copied from the officers' statements.  The Report also appears to have been premised on some information that had no factual basis.  For example, the Report indicates,

> "All four of the officers who shot Pawlik gave statements attesting to the fact that Pawlik pointed the handgun at the officers (a violation of Penal Code §417(c)), as did Officer Philips.  All of the officers were found credible by IAD, and the Board discussed that no evidence contradicts the officers' statements that Pawlik raised the gun and that it was pointed in their direction after failing to comply with commands to drop the gun.  The Board noted that the video forensic analysis presented by CID and IAD confirmed that Pawlik lifted the handgun up and pointed it towards the officers, after he had been told to drop the gun."

As noted throughout this report, the video evidence does not support the officers' statements, and there is no video forensic analysis that confirms that Mr. Pawlik lifted and pointed the handgun at officers – yet the EFRB, in its report of its findings, said that he did.

Further, not even OPD's own discredited analysis makes such a definitive conclusion.  Yet according to the EFRB Report, "The Board noted that all the involved officers reported seeing Pawlik raise the handgun and point it towards them, but that the un-enhanced PDRD video of Pawlik's movements was not clear enough to discern whether this occurred.  However, the OPD video forensic analyses showed Pawlik's arm and body moving in a manner consistent with him pointing the handgun at the officers."  And later, the Report continues, "…Pawlik made a sudden movement which was captured on [a sergeant's] PDRD and appeared to be Pawlik attempting to sit or get up.  Video forensic analyses showed further evidence that Pawlik's hand, containing the handgun, was moving upwards from the ground…"  However, none of the video analyses is as definitive as asserted in the EFRB Report.

In another example of the Board's failure to question the veracity of the involved officers' statements, the Board members appeared to accept, without question, at least three officers' stated ability to see Mr. Pawlik's face clearly and interpret his emotions. In analyzing Mr. Pawlik's intent for the individual uses of force, the Board noted, "As officers continued to give commands to drop the gun, Officer Berger reported that Pawlik sat up and appeared 'agitated', as if the officers were bothering him." In another example, the Board noted, "As officers continued to give commands to drop the gun, Officer Hraiz reported that Pawlik appeared 'agitated' and 'upset', and appeared to know what was going on around him as he glanced back and forth between the officers." And finally, the Board noted, "Officer Tanaka reported that Pawlik was frowning and appeared 'irritated', but appeared to understand the situation."

The Board, as was the case in the CID and IAD investigations, never questioned these characterizations by the officers, but nonetheless accepted them. None of the officers' rifle scopes contained magnification, and officers needed binoculars to ascertain the details of the gun near Mr. Pawlik's hand. Yet the Board accepted at face value the officers' assertions that, at the time of the shooting, they were able to discern Mr. Pawlik's facial expressions and decipher their meaning. At the time the shots were fired, however, it does not appear that Mr. Pawlik was even looking at the officers. No investigating body, including CID and IAD, or reviewers of the investigations – including the EFRB and the Chief of Police – noted any skepticism regarding the obvious similarities of the officers' accounts.

The Board spent a considerable amount of time discussing supervisory issues associated with this incident. That discussion consumed much more time than was devoted to discussing the actual uses of force. The Board's initial inability to reach a conclusion on the supervisory issues necessitated an adjournment and referral to IAD for additional work.

We concurred with the Board's determinations in finding fault with the supervisory actions of Lieutenant Yu and Sergeant Negrete. However, the Board members' votes on the use of force contrasted with many of their statements during their deliberations. The Deputy Chief was the most outspoken in his criticisms of the supervisors on the scene, and in particular, Sergeant Negrete. He indicated that Sergeant Negrete "acted with gross negligence," and that Sergeant Negrete took control in a manner that was problematic and led to the eventual outcome of this event. He described Sergeant Negrete's decisions as "outrageous," and indicated that Sergeant Negrete did not consider the importance of the preservation of life. The Deputy Chief expressed dismay that the officers did not, in fact, use the BearCat as cover – but instead used it as a platform from which to shoot.

The Deputy Chief clearly recognized the value of the cover afforded by the BearCat.  Yet, the Board completely discounted this in its analysis of the use of force.  At one point, apparently taking into account the cover available and the superior firepower possessed by OPD officers, the Deputy Chief noted that the officers were not going to be "outshot."  He said that the mere fact that Mr. Pawlik rose up "does not cross the threshold."  While this occurred during the discussions relevant to supervisory accountability, these opinions were not consistent with the Board's votes on the force itself.

On the other hand, one of the captains placed the entire blame for the shooting on Mr. Pawlik. He reiterated throughout the discussion that, in his view, the outcome was determined by Mr. Pawlik and not the officers.  The EFRB Report captures some of the exchange between the captain and the Deputy Chief, but it does not do justice to the tension in the discussion.  The Deputy Chief appeared to be uncomfortable and troubled by the positions the captain was taking. We share his dismay.

We disagreed with the Board's findings with respect to the uses of force.  During its deliberations, the Board did not review any of the available iterations of the video; and there was no extensive discussion of the video evidence.  As we have seen in other cases, there was some useful and insightful discussion regarding the non-force-related allegations, and some Board members were highly critical of the officers' actions that preceded the use of force.  Nonetheless, the Board did not give that same thoughtful consideration to the use of force analysis.  The Board failed in its primary responsibility, and its final EFRB Report compounded the tragedy of the March 11, 2018 event.

## Section 8:  The Community Policing Review Agency (CPRA) Investigation

> Instead of conducting a thorough, independent investigation, the Community Policing Review Agency (CPRA) simply reviewed OPD's investigation and rewrote it, leaving the same questions and concerns unresolved.  Following this case, the Police Commission brought in new leadership to the CPRA.

The Community Police Review Agency (CPRA) is a component of the Police Commission of the City of Oakland, and is independent of the Police Department.  The CPRA is responsible for investigating misconduct complaints brought directly by community members or falling within certain categories – including uses of force.  On April 22, 2019, the CPRA submitted its two-part Report of Investigation (ROI) on the shooting of Mr. Pawlik.  The CPRA's mandate gave the agency the authority to initiate its own investigation shortly after the incident.  The CPRA investigator noted, however, that when the case was assigned in July 2018, the CPRA only received the PDRD footage and scene photos.  The investigator claimed that it was not until January 2019, three months after the fact, when OPD advised the CPRA that the criminal investigation had been completed, that the CPRA was able to obtain the remainder of OPD's materials and initiate a full investigation.  It is unclear why this delay occurred, since Chief Kirkpatrick approved the CID investigation on October 31, 2018; and the Chief had reported to the Police Commission that the criminal investigation had been forwarded to the Alameda County District Attorney's Office on November 7, 2018, and to OPD's Internal Affairs Division (IAD) on November 9, 2018.  For the CPRA to be effective, it must receive investigative materials in a timely manner.

The CPRA's responsibility was to conduct an independent *administrative* investigation into any policy violations by OPD personnel – not to identify or address potential *criminal* misconduct.  The burden of proof in an administrative misconduct investigation is the preponderance of evidence; and while CPRA acknowledged this, its analysis does not display an understanding of that standard.  Much of CPRA's report addressed legal arguments more relevant to criminal behavior than to administrative misconduct.

The CPRA criticized IAD's investigation as inadequate, but it took no other action.  In its report, CPRA wrote, "Unfortunately, there were important details to be elicited at the time of the initial interviews of the officers immediately following the incident, yet these topics were not thoroughly explored through questioning to the satisfaction of the CPRA Investigator.  The officers should have been asked to describe in complete detail what they saw, how Mr. Pawlik was holding the gun before and at the time of the shooting, the angle of his right arm at all times, if the placement of the gun changed from when Mr. Pawlik was sleeping with it to when the allegedly lifted it up, exactly how far he lifted it up, the angles of the gun as it moved in more detail, any problems seeing the gun, the movement of the gun as he was shot, and the location of the gun after the shooting."  Despite this assessment, the CPRA did nothing to address or rectify the deficiencies it identified in OPD's investigation.  Although the CPRA investigator questioned the credibility and truthfulness of some of the involved officers, the investigator conducted only one independent interview and made no attempt to resolve the inconsistencies the CPRA found in OPD's investigation.

The CPRA investigator simply reviewed OPD's investigation and left the same questions and concerns unresolved.  The then-Director of CPRA, who also failed to identify and address the discrepancies in the report, approved the investigation.  The Police Commission was highly critical of the work of the CPRA in this investigation, and has since readjusted its personnel assignments and brought new leadership to the helm of the CPRA.

Even after identifying numerous concerns with IAD's investigation, and documenting its insufficiency, the CPRA still relied on it to arrive at its findings when it exonerated all subject officers for the use of force.  By OPD's definition, which is also used by the CPRA, the standard for a finding of exoneration is "The investigation clearly established that the actions of the police officer that formed the basis of the complaint are not violations of law or departmental policy." The CPRA sustained findings against Sergeant Negrete for failure to properly supervise this incident and against Lieutenant Yu for failure to properly supervise – but recommended no other sustained findings.  In the shooting death of Joshua Pawlik, the CPRA failed as an investigative agency.

## Section 9:  Developments Following the Executive Force Review Board

> Following the EFRB, our Team met with the Chief of Police to share our assessment and observations.  A few days later, the Chief issued an addendum to the EFRB Report.  The Chief's addendum was primarily focused on legal issues, and not the application of relevant Departmental policies – as was her charge.

As outlined in OPD Departmental General Order (DGO) K-4.1 (Force Review and Executive Force Review Boards), the EFRB provides recommended findings to the Chief of Police.  The Chief has the responsibility to determine the final disposition of each recommendation.  The policy requires that if the Chief "does not concur with any of the Board's findings or recommendations, the basis for such disagreement shall be documented as addenda to the report."

### *Meeting with the Chief*

The Executive Force Review Board submitted its report to Chief Kirkpatrick at the end of January 2019.  Prior to the Chief's final determination, we met with the Chief to provide her with our assessment based on our review of the material we had received up until that point, as well as our observations of the EFRB and its deliberations.  On February 5, 2019, the Monitor, the Deputy Monitor, and another member of the Monitoring Team met with Chief Kirkpatrick and an attorney from the Office of the City Attorney who was at that time assigned to the Police Department.

During our meeting, we reiterated that we had been concerned with this case since the evening it occurred.  The Monitor recounted his conversation with the Chief on the evening of March 11, 2018, when she had told him that the shooting "looks good."  The Monitor reminded the Chief that he had cautioned her about committing to such a conclusion so early.  We also noted our concern with the Department's two initial press releases regarding the incident, which appeared

to show a predisposition to find that the use of force was justified. We reminded the Chief of our conversation regarding the video analysis completed by an OPD sergeant. She had told us that she considered it an "embarrassment;" and we expressed dismay that CID, IAD, and the EFRB relied on that analysis in coming to their conclusions.

We also noted that the Chief had told the Monitor that she had shared the video with the Mayor in the fall of 2018, and that, according to the Chief, the Mayor had no follow-up questions, commentary, or direction. The Chief's silence on this point during our meeting suggested to us that this was accurate. We also expressed disappointment that one of the EFRB members – who was formerly the Commander of the Department's Office of Inspector General – placed the entire blame for the outcome of this incident on the deceased, Mr. Pawlik. We told the Chief that we found the captain's statements reminiscent of troubling attitudes and values historically attributed to OPD and police departments nationally.

We reminded the Chief that, regarding body-worn camera footage, OPD had video of the event that was not plagued by either sudden movements or obscurities. We shared our views with the Chief as to how the video might inform her thinking. We contrasted the video (in both its raw and enhanced forms) with the involved officers' assertions about what occurred – and we elaborated on the obvious discrepancies between the two. We noted that no investigating entity within OPD ever explored or resolved these discrepancies.

We also shared some of our observations from the EFRB and the apparent disconnect between some of the highly critical comments made by some Board members, including the Chair, and the members' votes on the force itself.

In our meeting, Chief Kirkpatrick indicated that, for her, the most compelling evidence was that it appeared that all five officers fired at "pretty much the same time." She concluded that they all must have perceived the same threat and reacted to it at the same time, and therefore, the threat must have been real. We raised the prospect of "sympathetic fire" – that is, one or more officers firing in reaction to hearing other officers fire, rather than in reaction to a threat. During one of our Team's many conversations with IAD concerning its ongoing investigation, we had suggested that investigators explore that possibility, and IAD assured us that it would. Yet, we noted that IAD's investigation did not include any examination of this issue despite the Chief's assertions that IAD investigated the possibility. In fact, after our meeting but before she rendered her decisions on the case, on February 7, 2019, IAD produced an Internal Affairs Case Update addressing this issue, which would not have been necessary if the initial investigation had been comprehensive.

## Chief's findings

Three days after our meeting, on February 8, 2019, Chief Kirkpatrick signed the EFRB Report and indicated in a handwritten note, "I agree in part and disagree in part. My findings are attached along with an addendum." Chief Kirkpatrick, concurring with the EFRB, determined that each use of force was within law and policy. Similarly, she concurred with the EFRB in its Sustained finding for Lieutenant Yu for a violation of Manual of Rules (MOR) 234.00-2, for failure to fulfill his command responsibilities.

Chief Kirkpatrick disagreed with the EFRB on two findings. She determined that the finding for MOR 314.39-2, Performance of Duty-General, regarding Officer Tanaka's self-deployment of his patrol rifle was Not Sustained, whereas the EFRB had sustained this violation. She reached a lesser finding of Sustained for the violation of MOR 285.00-2, Failure to Supervise, for Sergeant Negrete. The Board had reached a finding of Sustained for the more serious Class I MOR violation.

Consistent with what she had said in our February 5, 2019 meeting, Chief Kirkpatrick wrote in her addendum, "The most compelling evidence of a reasonably perceived threat was that the five officers shot almost simultaneously at Mr. Pawlik, with all shots fired within 2.23 seconds. I find this evidence persuasive and corroborative of the officers' statements regarding their perceptions of an immediate threat. In other words, the evidence supports that this was not the perception of just one officer, with sympathetic fire trailing the initial shot after a delay; this was the perception of multiple officers. The evidence shows the individual shots occurred too closely together to be sympathetic fire."

Chief Kirkpatrick's analysis on sympathetic fire relied heavily on the Internal Affairs Case Update assembled after our meeting on this issue, and after she received the EFRB Report. The Department did not even consider the possibility of sympathetic fire in any of its investigations or deliberations – a significant organizational omission. Chief Kirkpatrick accepted, without question, that five individuals can react simultaneously to a perceived visual cue, a slight movement by Mr. Pawlik, but dismissed the possibility that they can react similarly to an audio cue, the sound of gunfire from other officers.

We disagreed with Chief Kirkpatrick's characterization of the available video evidence when she wrote, "The video analysis was inconclusive regarding the specific movement of Pawlik's lower arm, hand and the gun just prior to the shooting. However, it is not inconsistent with the officers' statements that Pawlik looked at the officers, raised his arm and pointed the gun toward them." In fact, no video enhancement or analysis – even the Department's own discredited video analysis – supports the officers' statements, even under the preponderance of evidence standard which applied to this case.

Chief Kirkpatrick was responsible for reviewing this case in her role as the chief executive of the Department. Accordingly, with the responsibility for assessing her officers' actions, she was required to consider Departmental policies, her own professional expectations, and community values. The standard for administrative investigations is "preponderance of evidence," but the Chief's document focused more on legal considerations more typically found in criminal investigations rather than administrative investigations intended to determine compliance with Departmental policies.

## Compliance Director's addendum

The Monitor, acting in his capacity as Compliance Director, disagreed with Chief Kirkpatrick's findings. On February 19, 2019, he issued an addendum to the EFRB Report. It reviewed the deficiencies in the report and overturned Chief Kirkpatrick's conclusions. As noted in the Compliance Director's addendum,

> An essential part of any investigation is the resolution of discrepancies. IAD and CID are required to do this by Department policy, by the Negotiated Settlement Agreement (NSA), and by responsible police practices. However, in the matter at hand, the investigators – both in their questioning and analysis – failed to address the inconsistencies between officers' statements and the video evidence. The involved officers' descriptions of Mr. Pawlik's movement of his right hand range from a few inches to two feet. In both the CID and IAD investigations, the Department failed to challenge the officers on these inconsistencies. In addition, the questioning in both investigations was deficient, non-invasive, and replete with leading questions that served as attempts to support the justification of the officers' actions.

> Likewise, despite having access to the officers' statements and all versions of the video, the EFRB members did not address the apparent discrepancies between the statements and the video. With respect to the uses of force, the EFRB members

> appeared to accept IAD's recommendations at face value.  The board was duty-
> bound to resolve those discrepancies if IAD did not.  However, the board failed to
> do so.

The Compliance Director concurred with the Deputy Chief who served as the EFRB Chair in his assessment that Sergeant Negrete's conduct constituted gross dereliction of duty.  The Deputy Chief had cited multiple failures on the part of Sergeant Negrete, as outlined in the EFRB Report and subsequently in our addendum.  The most important point that the Deputy Chief made is that the outcome of this incident was so severe that it needed to be considered when determining whether Sergeant Negrete's conduct rose to the level of gross negligence.

The Compliance Director's final determinations were as follows:

- Sergeant Negrete, Officer Berger, Officer Hraiz, and Officer Tanaka; Allegation: Violation of MOR 370.27-1 (Level 1) Use of Force – Sustained.

- Officer Phillips, Allegation: Violation of MOR 370.27-1 (Level 2) Use of Force – Sustained.

- Officer Tanaka, Allegation: Violation of MOR 314.39-2, Performance of Duty-General for failure to advise the Communications Division of his rifle deployment in violation of DGO K-06 – Sustained.

- Officer Tanaka, Allegation: Violation of MOR 314.39-2, Performance of Duty-General for self-deploying as lethal cover – Not Sustained.

- Lieutenant Yu, Allegation: Violation of MOR 234.00-2, Failure to fulfill his command responsibilities – Sustained.

- Sergeant Negrete, Allegation: Violation of MOR 285.00-1, Failure to Supervise – Sustained.

## Convening of the Police Commission Discipline Committee

On April 22, 2019, the Community Police Review Agency (CPRA) submitted its investigative report on this incident, in which it found all uses of force to be Exonerated.  Additionally, CPRA reached a finding of Not Sustained for the allegation that Officer Tanaka failed to notify the Communications Division of his rifle deployment.  CPRA reached findings of Sustained for the supervision allegations for both Sergeant Negrete and Lieutenant Yu.  In each case, CPRA recommended demotion as the resulting discipline.

On June 12, 2019, in the aftermath of CPRA's findings, the Compliance Director issued discipline determinations. For all officers using force, the Compliance Director recommended termination. This recommendation also included Sergeant Negrete's violation of MOR 285.00-1, Failure to Supervise; and Officer Tanaka's violation MOR 314.39-2 Performance of Duty-General, for his failure to advise the Communications Division of his rifle deployment. For Lieutenant Yu's violation of MOR 234.00-2, for failure to fulfill his command responsibilities, the Compliance Director recommended a five-day suspension.

Both the Oakland ballot measure (Measure LL) and the enabling legislation that established Oakland's Police Commission outline a process for resolving disagreements between OPD and the CPRA with respect to findings and recommended discipline in administrative investigations. In the matter of Joshua Pawlik, the Compliance Director's findings stood as those of the Department. The Chair of the Police Commission was, therefore, required to establish a three-member Discipline Committee to resolve the differences between the CPRA's and OPD's findings. The Discipline Committee convened, and issued its findings on July 9, 2019. The Discipline Committee reached Sustained findings for all uses of force; and in each case, recommended termination. The Discipline Committee further determined that Sergeant Negrete be Sustained for a violation of MOR 285.00-1, Failure to Supervise, and recommended termination. In addition, the Discipline Committee reached a finding of Sustained for Lieutenant Yu for MOR 234.00-2, for failure to fulfill his command responsibilities, and recommended demotion.

## Skelly hearings

Pursuant to California law, prior to the imposition of sanctions, including a suspension of one day or greater, officers are entitled to a hearing, known as a *Skelly* hearing. Officers can participate in person or opt to respond in writing. In this case, the City of Oakland retained an outside hearing officer (*Skelly* officer) to provide an impartial review and render recommended findings and proposed discipline. The City selected as the *Skelly* officer, Michael Gennaco, Esq. Mr. Gennaco is a former federal prosecutor and former Chief of the Civil Rights Section at the U.S. Attorney's Office for the Central District of California. Mr. Gennaco also served as the Chief Attorney of the Office of Independent Review for Los Angeles County.

All involved officers declined to participate in an in-person *Skelly* hearing and instead provided written responses through their legal counsel.

Mr. Gennaco submitted his *Skelly* report on April 3, 2020, and reached findings based on his independent review of the evidence.  He determined that Sergeant Negrete should be Sustained for the Class I violation of MOR 285.00-1, Failure to Supervise, agreeing with the Compliance Director's finding, and that of the EFRB.  Mr. Gennaco wrote:

> This Skelly officer finds the analysis of the EFRB sound.  Most compelling in support of a finding of gross negligence and dereliction of duty was the articulation of the series of supervisory mistakes by Sergeant Negrete that left him and his team poorly prepared to address the challenges presented – and the consequential loss of life that emanated from those poor decisions.  Moreover, by his unprompted statements to team members immediately after the incident (that the subject pointed a gun at them and that they had to use deadly force), Sergeant Negrete corrupted the investigative process before it could even begin by undermining the ability of each involved officer to relate their observations and actions free from outside influence.

Notably, Mr. Gennaco also determined that all officers should be Sustained for unreasonable use of force in violation of OPD's MOR and use of force policies.  He wrote, "For this reviewer, the critical question was not limited to the 'split second' decision the officers made about whether to discharge their weapons when they perceived what they claimed was an immediate threat to them and others.  Instead, the analysis also encompassed whether the involved officers performed reasonably after responding to the call and observing an individual apparently not conscious with a gun in his hand."

Mr. Gennaco further noted that responding officers "had resources and time to devise a coordinated response," and that they were able to "have the Bearcat armored vehicle summoned and deployed before Pawlik began to awaken."  Yet they squandered that resource.  Mr. Gennaco continued, "Despite having an armored vehicle on scene that was specifically designed to provide the greatest protection for officers from firearm rounds, the team chose to use the equipment as only partial cover.  Specifically for reasons of tactical superiority and safety, the Bearcat is outfitted with ports and a turret from which officers, fully protected by the armored walls of the vehicle, could deploy their firearms.  The Bearcat is one of the few devices where a safely positioned law enforcement officer could virtually negate the threat of a an [sic] armed subject – and even receive a firearm round – before needing to respond with deadly force.  Yet the responding officers chose to forego this option and continue to place themselves in positions of vulnerability."

Lastly, Mr. Gennaco wrote, "The officers' response in this case provided few opportunities for Mr. Pawlik to escape the application of deadly force and that response can be relevant –and in this reviewer's view is highly relevant – to whether the use of force was reasonable in keeping with the dictates of Department policy."

Mr. Gennaco's discipline recommendations varied only slightly from those of the Police Commission's Discipline Committee.  He agreed with termination for all officers involved in the use of force.  He recommended that Lieutenant Yu receive a five-day suspension rather than demotion.  He also noted that the Discipline Committee failed to resolve a conflict between the Compliance Director's finding for Officer Tanaka's allegation of failure to advise the Communications Division of his rifle deployment, and the finding of the CPRA.  The Compliance Director recommended a finding of Sustained; CPRA recommended that the finding be Not Sustained.  Mr. Gennaco recommended that the Discipline Committee address this issue.

## Discipline Committee's findings

The Discipline Committee reconvened, and on May 4, 2020, it issued a memorandum to resolve these outstanding issues.  The Discipline Committee reached a finding of Not Sustained for the charge against Officer Tanaka's allegation that he failed to advise the Communications Division of his rifle deployment.  With respect to Lieutenant Yu's discipline, the Discipline Committee noted, "After further review and reconsideration of the evidence, and given the nature of the violation and the resultant consequences, the Committee has reconsidered its prior recommendation and determined that a suspension of five (5) days is warranted in this case."

## Section 10:  The Role of the City Administration

> City leadership was not actively engaged with the Chief regarding the Joshua Pawlik case.  The Mayor did not provide the Chief with any direction or request any follow-up.  The Mayor characterized the episode as "awful but lawful," which trivialized an avoidable tragedy.

Chief Kirkpatrick advised the Monitor in the fall of 2018 that she had shown the Mayor the video of the shooting of Joshua Pawlik.  The Chief said that she was not given any directions or follow-up requests from the Mayor.  Based on our meetings and other interactions, we saw no evidence that suggested that the City Administrator had been briefed by the Department or shown the video of this event.  The City Administrator did, from time to time, attend meetings that the Monitoring Team held with the Department about this episode.

As it pertains to the Negotiated Settlement Agreement, it is *the City* that is the named defendant. Police departments must be subject to oversight by the elected officials who bear responsibility for the conduct of the agencies they oversee and those whom they appoint to lead them.  The measure to which the Oakland Police Department has been held to account by City leaders has become part of the public discourse.  For far too long, the Department has functioned with a sense of autonomy, making few references to its accountability to City Hall.

The Mayor described the shooting of Mr. Pawlik to the Monitor as "awful but lawful."  The Mayor should have been more actively engaged and publicly vocal in expressing a concern.  The Mayor should have insisted on regular briefings and questioned why the Chief had not placed the officers on administrative leave.  Had she done that, the Chief might have been more dutiful and accountable to her superiors in her decision-making.  Instead, during this investigative time period, the Chief appeared to be more fixated on the status of her contract with the City, and the prospects of the Mayor renewing it.

The Mayor knew about the seriousness of this shooting and did nothing.  In the face of this, the Mayor opted to renew Chief Kirkpatrick's contract on or about November 8, 2018, two days after the Mayoral election, and three months before Chief Kirkpatrick's eventual vindication of the officers.

The Mayor terminated the Chief on February 18, 2020, nearly two years after the shooting of Mr. Pawlik.

## Section 11:  The Failures of Departmental Policy

Among the many problems exposed by this case is a significant deficit of policy relating to OPD's response to critical incidents.  Even years after the shooting, several voids in policy remain.

While the individual failures here are numerous, this incident also brought to light failures of policies and procedures.  For example, OPD has embraced the concept of Designated Arrest Teams (DATs) for years, and training on their use has been incorporated into both the basic Academy curriculum and ongoing in-service training.  However, the Department does not currently have, and has never had, a formal policy governing the composition, roles, and use of DATs.  Similarly, OPD has used armored vehicles, including the BearCat, for several years, but it has not had a policy governing their deployment and usage.  The Department did not have any specific policies relevant to unresponsive and potentially armed persons.

In May 2019, at the insistence of the Monitoring Team and the Plaintiffs' attorneys in the NSA/*Allen* case, OPD began work on three Department Training Bulletins to address these topics. We discussed them during our monthly site visits and provided final approval after our October 2019 site visit. Yet, to this day, these critical Training Bulletins remain unpublished; and consequently, any training associated with these new policies remains undelivered. These are the types of organizational deficiencies for which we have consistently found the Department to be not in compliance with NSA requirements.

Both the criminal and administrative investigative processes for Level 1 uses of force, which include deadly force, are covered in general terms in Departmental General Order (DGO) K-4 (Reporting and Investigating the Use of Force). However, DGO K-4 does not provide specific direction to those tasked with conducting these investigations. At the insistence of the Monitoring Team, the IAD Commander and the Deputy Chief for the Bureau of Investigations both committed to updating their Policy and Procedure Manuals. Those documents would provide specific direction to personnel assigned to IAD and CID, and they would address the deficiencies that came to light as the EFRB reviewed the criminal and administrative investigations. We have made repeated inquiries, but the Department has yet to produce any updates.

OPD also does not have a clear policy on when it is appropriate to place officers involved in the use of deadly force on administrative leave or reassign them to non-patrol functions within the Department. Chief Kirkpatrick's litmus test for considering administrative leave or reassignment was premised on whether it was more likely than not that an involved officer would be terminated. That standard would require the Department to come to a conclusion on the justification of deadly force prior to the completion of criminal and administrative investigations. Administrative leave decisions based on "likely outcomes" are unacceptable.

Most law enforcement agencies have standardized policies for addressing the status of officers involved in a shooting. Mandatory time off that includes, but is not limited to, employee counseling services, is common. This is often followed by temporary re-assignment, which might include disarming the officer and limiting contact with the public. OPD must develop a policy to address these issues.

At the time of the shooting of Mr. Pawlik in March 2018, OPD did not have a specific OIS protocol. The Department's Criminal Investigations Division (CID) Policy and Procedure Manual devotes less than one page to "Critical Incident Protocols," and it primarily covers administrative directions for notifications and the review of completed investigations. The absence of a clear OIS protocol at the time of this incident contributed to CID's failure to conduct a fair, thorough, or impartial investigation. During our November 2019 site visit, we

inquired as to the status of the development of this protocol, and OPD advised that CID was still working on the OIS policy.  More than two years after this event, however, the Department has yet to present even a draft of such a protocol.

IAD, as part of its investigation, identified the need for a written policy on the sequestration of the on-scene Commander.  We concur, and OPD has acknowledged that the on-scene Commander was not sequestered at the scene, nor was he interviewed on the night of the incident.

Sequestering police personnel involved in an episode of this importance is a generally accepted practice.  Senior Department personnel who arrived on the scene of this incident, and should have known better, failed to ensure this.  It is one of the most basic of police investigative practices.

The need for cultural and behavioral change has been at the forefront of our concerns and those of the community.  Leadership, as well as policy and training, are required to bring about organizational transformation.  To this day, our concerns endure.

## Section 12:  The Role of the Chief of Police

> The Chief of Police failed to adequately oversee the investigations into the officer-involved shooting of Joshua Pawlik.  The Chief formulated her conclusions on the very night of the event and attempted to persuade the District Attorney's Office to render an expedited finding to support the Department's administrative vindication of the officers.

The chief of a police department bears the responsibility for managing all activities of the agency, including overseeing the investigations of officer-involved shootings.  The ultimate responsibility for the management of the investigation into the shooting of Mr. Pawlik fell to the Chief.  In the months following the incident, the Monitoring Team came to question both the Chief's willingness and ability to oversee the investigative responsibilities of the Department.  Her reluctance to review and approve the criminal investigation was incongruous with the duties expected of a chief of police.

While the Chief often spoke of her open-mindedness, the Department's early press releases, presumably approved by the Chief, suggested otherwise.  The first press release, issued the day after the incident, without the benefit of any investigative effort, suggested that officers shot Mr. Pawlik because he did not follow their commands.  The second press release, issued two days later, commented that the actions of Mr. Pawlik "posed an immediate threat to the officers." Early on, the Monitor found it necessary to caution the Chief repeatedly about reaching conclusions in the absence of investigations and relying on anecdotal reports from persons who had been to the scene of the event.

In the aftermath of the shooting, we discussed at length with Chief Kirkpatrick the need to place the involved officers on administrative leave pending the outcome of, at least, the criminal investigation, if not also the IAD investigation.  The Chief responded, on April 17, 2018, 37 days after the death of Mr. Pawlik, with a memorandum that read, in part,

…As a point of principle, I place people on administrative leave prior to the conclusion of an IA investigation when I have enough facts to indicate that it is more likely than not that the officer is going to be terminated and the risk is too great to leave them in the field until the IA is concluded.

…Before going further, I wish to reset the stage for the sequence of events.  In doing so, I should note that while the facts in this memo represent my current understanding of the incident, the Department's administrative investigation is still in the beginning stages.  Neither I nor anyone else involved in this process are presupposing the outcome of this investigation…At this stage, I do not think they are at risk of termination so administrative leave is not warranted.

…I find it compelling that so many people who have viewed this video – although all seem to have a similar reaction and response about the tactics and supervision concerns – none point to concerns with the shooting itself.  At least 12 members of the sworn staff in CID, IA and the Executive team including [the Department's Deputy Director of the Bureau of Services] who, although not sworn, is highly competent and has been exposed to several OIS's in her career.  I also know that at least two people in the DA's office saw the PDRD - the lead senior Assistant DA and the Chief Inspector and according to [the District Attorney] they did not relay any concerns about the shooting, although she underscored how early it is in the investigation.  And lastly, [three Office of the City Attorney attorneys]…have all seen the video and they, too, did not think the shooting itself seemed to be out of policy.

…All of these factors at this stage of the investigation point to an assessment that an administrative leave is not warranted for the shooting officers at this time.

Chief Kirkpatrick's April 17, 2018 memorandum contains problematic assumptions and contradictions.  While the Chief attempted to portray herself as objective and open-minded, her words said otherwise.  The Chief wrote that the investigative process is "still in the beginning stages," and that "neither I nor anyone else involved in this process are presupposing the outcome of this investigation."  However, in referring to the two supervisors, the Chief also wrote, "At this stage, I do not think they are at risk of termination so administrative leave is not warranted."  The Chief made the same conclusion about the "shooting officers" – just over one month after the event, and prior to the completion of either the CID or IAD investigations, and nearly 10 months before her final decision of February 8, 2019.

According to the Chief's accounts, she also made several requests or inquiries of the District Attorney. We found these to be inappropriate. In addition to the Chief's references to the District Attorney in her April 17, 2018 memorandum, the Chief advised the Monitor that she had called the District Attorney to request a preliminary opinion on whether the shooting was justified. The Chief advised the Monitor that she was hoping to solicit from the District Attorney an early prosecutorial determination. According to the Chief, it was her hope that she might be able to make a more expeditious decision regarding the placement of the officers on administrative leave, as well as a finding as to their administrative culpability. It would still be months before both the criminal and administrative investigations were completed.

We found the Chief's solicitations to be highly inappropriate and irregular. She raised the issue of her communications with the District Attorney or the District Attorney's Office on several occasions with the Monitor. According to the Chief's April 17, 2018 memorandum, the District Attorney did not provide such a determination.

Initially, the Chief planned to not review the criminal investigation at all, asserting that her knowledge of its contents could mitigate her objectivity in her final administrative determinations relevant to the involved officers. This position was implausible and unprecedented. Choosing to not review the investigation would have been an abdication of her responsibilities as the Chief of Police. The Monitor informed her that, as the Chief, she was compelled to review and approve the investigation. Far too much time lapsed after this. Finally, the Monitor insisted that Chief Kirkpatrick review the investigation prior to forwarding it to the Office of the District Attorney. Chief Kirkpatrick approved the CID investigation on October 31, 2018.

## Section 13:  Summary of Significant Findings

Throughout this report, we have cited numerous issues that should be of concern to the City of Oakland and broader Oakland community.  Below we have listed our most significant findings related to the investigations of the officer-involved shooting of Joshua Pawlik.

1.  Mr. Pawlik was killed when Oakland Police Rifle Officers discharged 22 rounds at him in a time span of 2.23 seconds from near or behind an armored police vehicle that had arrived at the scene just two minutes before the shooting.

2.  Chief Kirkpatrick prematurely assessed the shooting on the evening of its occurrence, when she told the Monitor that Mr. Pawlik had "pointed" a firearm at the officers, and that the shooting "looks good."  Her expressed predispositions of that evening never wavered, even as the investigations moved forward.

3.  The Department attempted to provide a justification for the shooting through its initial press releases describing the incident.

4.  Both the Department's Criminal Investigations Division (CID) and its Internal Affairs Division (IAD) conducted incomplete and deficient investigations.

5.  CID investigators and IAD investigators consistently accepted the involved officers' accounts that Mr. Pawlik pointed his weapon at them – despite video evidence to the contrary.

6.  CID and IAD investigators failed to use the video footage of the incident to challenge the officers' statements.

7.  The Chief accepted the flawed logic that, since the video neither proved nor disproved the officers' statements, the officers' versions had to be accepted as true.

8.  The CID Commander improperly inserted himself into investigative interviews.

9.  The CID investigation, which included leading questions from the CID Commander and others, failed to reconcile inconsistencies in the officers' statements.

10.  Chief Kirkpatrick inappropriately attempted to solicit an opinion from the District Attorney, who declined the request.  The Chief also sought early opinions, prior to the completion of the investigations, from at least 15 others, including sworn and non-sworn personnel, in order to quickly vindicate the officers and avoid placing them on administrative leave.

11. Chief Kirkpatrick failed in her leadership role by seeking to avoid reviewing and approving the CID investigation before it was forwarded to the District Attorney's Office.

12. IAD investigators asked leading questions and improperly used hypothetical scenarios while ignoring inconsistencies with the video and discrepancies among officers' statements.

13. The IAD Commander and Chief Kirkpatrick did nothing to mitigate IAD's inappropriate investigative practices. Both bear responsibility for the deficiencies of the IAD investigation.

14. Chief Kirkpatrick acted improperly when, after considering the use of external personnel for the Executive Force Review Board (EFRB), she corrupted that very process by discussing her views of the shooting with prospective Board candidates.

15. The EFRB failed as the penultimate Department reviewer of the shooting when, like CID and IAD, it took what the officers asserted at face value, without challenge, and without regard for any inconsistencies that could have been resolved through a close examination of available video evidence.

16. The Community Policing Review Agency (CPRA), under its leadership at the time, did not properly investigate the shooting. Instead of conducting its own independent investigation, it simply repeated the findings of the IAD investigation in its report.

17. The Mayor's lack of engagement, even after viewing the video, provided tacit support for the Police Department's incompetence in this matter.

18. Now, more than two years after the death of Mr. Pawlik, the Department continues to struggle with policies relevant to the use of force and other issues.

19. The shooting of Mr. Pawlik exposed an appalling measure of incompetence, deception, and indifference. Too many persons charged with the responsibility of internal review and oversight quickly, and ultimately, described this tragedy as a "good" shooting and one that was consistent with law and policy. It was *not* a "good" shooting.

20. The five officers involved in the shooting of Joshua Pawlik were responsible for his death. Those who investigated, oversaw, and reviewed what followed in its aftermath compounded this tragedy – and for this, they bear responsibility.

## Section 14:  Conclusion

The 17th Century English poet John Donne wrote, "[A]ny man's death diminishes me, because I am involved in mankind…"  The question the poet did not answer is whether some deaths diminish us more than others.  Joshua Pawlik's death, as well as many others, mostly Black and Brown, who have died at the hands of the police, are to be counted among those that do.  The brutality of Joshua Pawlik's death; the incompetence and dishonesty in its aftermath; and the failure, thus far, for it to result in real change, debase us all.

Sadly, this is not just an Oakland story – but one that continues to afflict the nation, which reels in the wake of indefensible officer-involved shootings.  In cities across the country, in every state, and internationally, people protest to end the debasement implicit in those deaths – but their struggle is not new.  The history of our country is replete with commissions and studies intended to create blueprints to reform the criminal justice system and to hold to account law enforcement officers who use excessive force.  Yet against that background, and alongside many efforts to professionalize policing, problems continue to loom large.

In 1996, the videotaped beating of Rodney King by police in Los Angeles led to riots and demands for change.  More recently, the Black Lives Matter movement has lent its voice to people killed by police – among them Freddie Gray, Philando Castile, Walter Scott, Tamir Rice, Eric Garner, Breonna Taylor, George Floyd, Rayshard Brooks, Elijah McClain, and others.  In Oakland, beatings, unlawful detentions, and the planting of evidence led to the 2003 Negotiated Settlement Agreement that continues to this day.  In 2015, the death of Demouria Hogg at the hands of the Oakland Police, under circumstances similar to those that resulted in Mr. Pawlik's death, is another example of a tragic and avoidable outcome.

It must be made clear that the burden for finding the path forward still rests principally with the City of Oakland and its Police Department.  The death of Mr. Pawlik could have been avoided if the officers involved had responded differently.  The officers had other options; the supervisors and commanders had authority to provide on-scene direction and oversight.  They all failed.

In his report, the *Skelly* Officer in this case cited the multiple failures at the scene that shaped the conclusion of the event.  "The critical question," he noted, "was not limited to the 'split second' decision the officers made about whether to discharge their weapons when they perceived what they claimed was an immediate threat to them and others.  Instead, the analysis also encompassed whether the involved officers performed reasonably after responding to the call and observing an individual apparently not conscious with a gun in his hand."

The *Skelly* report documents specific failures, including officers' failure to individually justify their use of deadly force. The report continues, "…The mood of so many officers facing Mr. Pawlik with his gun in hand, waiting to see him move it, contributed to setting the response that took place. An alternate plan or any restraint was never discussed with the officers on scene who were facing Mr. Pawlik with their rifles despite the precariousness of the situation."

Later, the *Skelly* report recounts Sergeant Negrete's argument that, through his actions, Mr. Pawlik had dictated the officers' response. But in the view of the *Skelly* Officer, Negrete "misconstrues the whole point of planning, delegation, and articulation, which is to ensure that the subject is not able to dictate the response of law enforcement. A plan with contingencies on how to respond allows officers to dictate the outcome of the event."

While the *Skelly* Officer provided a critical assessment of the shooting event itself, this report extends that focus to the individual and institutional failures tied to that day. At the top of that list is what might best be described as the willful avoidance, by some, of nearly anything to do with the shooting of Mr. Pawlik.

Perhaps the most telling act of avoidance came from City Hall. According to Chief Kirkpatrick, in the fall of 2018, as the CID and IAD investigations were underway, the Chief showed the video of the shooting to the Mayor. According to the Chief, the viewing of the video was met with silence. The Mayor did not ask questions or provide direction. Although in more recent national events, the Mayor has been vocal, her steadfast silence in this matter was troubling. Her characterization of the death of Joshua Pawlik as "awful but lawful" was even more so.

In facing events like the one before us, one should hope – and, perhaps, expect – that the Chief of Police would serve as a champion for justice. At the minimum, one should expect a commitment to sound and ethical procedures. On these criteria, Chief Kirkpatrick fell short. Though the investigations had just begun, Chief Kirkpatrick prejudged the shooting as consistent with policy and law. In the process, she consistently referred to the opinions of others in lieu of her own. The Chief sought to restructure the EFRB review procedure in ways that ultimately seemed manipulative. When she was required to approve the criminal investigation, she hesitated, suggesting incorrectly that doing that would conflict with her responsibilities in the case.

Chief Kirkpatrick's actions aided an investigative process that distorted the review of the shooting. In her findings, she relied on a video analysis which was part of the EFRB Report but which she had earlier described as an "embarrassment." She allowed the officers' assertions to go unchallenged even though they were not supported by the video of the event. Significant among those assertions were the claims that Mr. Pawlik had not only raised his firearm but pointed it directly at each officer who used deadly force.

The Chief also accepted the argument that, because the video itself could not prove or disprove what the officers' reported, IAD had to accept and defer to the officers' statements. Those statements included seemingly impossibly observable details describing Mr. Pawlik's state as agitated, irritated, upset, and frowning.

It is often argued that the most powerful barrier to police reform is a corrosive police culture, which embodies unflagging mutual support within the ranks, implicit and explicit bias, and resistance to change. Some argue that one exit from that culture is through promotion into the command ranks. Chief Kirkpatrick often claimed that changing the police culture was her goal. Yet the Chief's own actions and those of the Department betrayed that stated goal.

The hallmarks of an unchecked police culture run throughout the investigations and decisions made in this case. The officers on the scene told uncannily similar stories – stories that were not supported by the video evidence – and stories with details that could not have been accurate. Officers claimed that Mr. Pawlik appeared agitated; he raised the gun; he pointed it at each officer; they looked right down the barrel of his weapon – yet detailed analyses of camera footage did not corroborate those details. Instead, investigators' leading questions aided officers in their descriptions of what happened. In too many instances, investigators' questions provided officers with foundations to defend their conduct.

One egregious demonstration of an infected police culture came from high in the ranks of the Police Department. A captain, whose duty on the EFRB panel was to probe the details of the shooting, asserted that Joshua Pawlik, alone, was responsible for each of the 22 shots that killed him. His colleagues on the EFRB failed to renounce such conclusions. The callous indifference to human life, as expressed by a police captain, can only serve to chill and harden new officers and future leaders of the Department who shall be called upon to make difficult decisions.

The Chief's failure to rein in this corrosive culture had implications beyond the Police Department. The Chief became the bridge between a police culture which sought to avoid accountability and a City Hall culture which opted to ignore its oversight responsibilities. In the end, reason came only from sources outside these cultures. It was the Monitor, acting in his capacity as Compliance Director, and the Police Commission's Disciplinary Committee that intervened. Absent these, no one would have been held to account for the death of Joshua Pawlik, and there would be no impetus for change.

There are important lessons to learn from this report. The Oakland Police Department must prevent officer-involved shootings like the one that killed Joshua Pawlik. The Department must have the courage, commitment, and cadre of leaders with an unwavering willingness to hold to

account those sworn to uphold the law.  Most importantly, the City of Oakland and its Police Department must demonstrate that they can establish and maintain community trust in the absence of Court supervision and monitoring.

Understanding the facts of this shooting is critical to responding to it, and there are resources with which to help grasp the lessons.  The first is the Negotiated Settlement Agreement itself. The provisions of the NSA set the conditions for Constitutional and effective policing, and provide direction toward best practices in the field.  While the Department has made advances under the NSA, it has repeatedly fallen short in its supervision of officers, its ability to investigate itself and bring about change on its own.  Those same deficiencies are the focus of this report.

There are also important resources that address reform from beyond the limits of Oakland's experience.  The most recent comprehensive statement of a direction for police reform is the 2015 Final Report of the President's Task Force on 21st Century Policing.  The Task Force was established to develop recommendations to build greater trust between law enforcement and citizens in the wake of the police killing of Michael Brown in Ferguson, Missouri on August 9, 2014.  The report is organized around six main topics which it labels "pillars" of modern policing, the first of which is "Building Trust and Legitimacy."  The document addresses a wide range of issues – from the need for clear and specific policies on the use of force, to the importance of principles of community policing.

Against the background of the Task Force's proposals for police reform, the City of Oakland's Police Commission was established in 2017 following a vote of broad public support.  The Commission describes itself as a civilian-run "oversight board, authorized to oversee the policies, practices, and customs of the Oakland Police Department."  The Oakland Police Commission is an important voice for police reform at a time when it is clearer than ever that a police department cannot function without the support of, and oversight by, the community it is presumed to serve.

While the death of Mr. Pawlik is an Oakland event, and one of many tragedies that have occurred at the hands of the Oakland Police, it is also an American story.  It is part of a continuing history of shooting deaths at the hands of the police.  To address this, the Oakland Police Department must be staffed with officers who have integrity, led by those who have courage, and overseen by officials who have both.  By all of those criteria, the death of Joshua Pawlik, and the City of Oakland's response to it, are tragic failures.

On April 23, 2020, the Oakland City Council voted to pay the family of Joshua Pawlik $1.4 million.