September 21, 2020

# Seventieth Report
## *of the* Independent Monitor
## *for the* Oakland Police Department

## Introduction

This is our seventieth status report on the Negotiated Settlement Agreement (NSA) in the case of *Delphine Allen, et al., vs. City of Oakland, et al.,* in the United States District Court for the Northern District of California under the direction of Judge William H. Orrick.  I was appointed in 2010 to oversee the monitoring process of the Oakland Police Department (OPD) that began in 2003.

This report describes our recent assessments of NSA Tasks 5, 41, and 45; and covers our virtual site visit of July 28-29, 2020.  Following the Court's Order of May 21, 2015, we devote special attention to the most problematic component parts of the NSA Tasks that are not yet in full or sustained compliance; and discuss in our status reports the most current information regarding the Department's progress with the NSA and its efforts at making the reforms sustainable.

## *Providing Technical Assistance*

Each month, our Team conducts a visit to Oakland that includes both compliance assessments and technical assistance.  During our visits, we meet with Department and City officials; observe Department meetings and technical demonstrations; review Departmental policies; conduct interviews and make observations in the field; and analyze OPD documents and files, including misconduct investigations, use of force reports, crime and arrest reports, Stop Data Forms, and other documentation.  We also provide technical assistance, especially those that relate to the remaining non-compliant Tasks or areas identified by the Department -- including in the areas of IAD investigation quality (Task 5); use of force investigations and reporting (Tasks 24 and 25); stop data and related issues (Task 34); risk management and the ongoing maintenance issues and the development of Vision (Task 41).

## *Building Internal Capacity at OPD*

Also per the May 21, 2015 Court Order, we continue to work closely with the Office of Inspector General's (OIG) staff to identify areas that it should audit or review – and to help design approaches to these audits that are not cumbersome, so as to ensure sustainability.  We review OIG's quarterly progress reports, which are a valuable resource and assist us in assessing

compliance with NSA requirements.  OIG's most recent quarterly report described its: (1) evaluation of the Department's promotional consideration process; and (2) review of mandatory in-service training for sworn personnel.

In the first evaluation, OIG examined how the Department considers and makes promotions to sergeant, lieutenant, and captain positions.  The report describes the promotional process and the components that are considered for each candidate – including his/her commitment to community partnership, assignment history, training history, sustained complaints within the last five years, and others.  OIG found that, for the most part, the process is working as it is intended.

In its second review, OIG examined whether sworn personnel attended the in-service training required by the Department.  OIG found some significant issues in the way the Department tracks its in-service training.  Per OIG, "None of the three electronic computer systems OPD uses to track its employees' training provide comprehensive records of the employees' training."  We will discuss this with Departmental personnel during an upcoming site visit, as the tracking of training records is a requirement of the NSA (Tasks 40 and 43).

---

## *Focused Task Assessments*

## Task 5:  Complaint Procedures for IAD

**Requirements:**

> 1.   *On or before December 1, 2003, OPD shall develop a policy so that, OPD personnel who become aware that a citizen wishes to file a complaint shall bring such citizen immediately, or as soon as circumstances permit, to a supervisor or IAD or summon a supervisor to the scene.  If there is a delay of greater than three (3) hours, the reason for such delay shall be documented by the person receiving the complaint.  In the event that such a complainant refuses to travel to a supervisor or to wait for one, the member/employee involved shall make all reasonable attempts to obtain identification, including address and phone number, as well as a description of the allegedly wrongful conduct and offending personnel, from the complainant and any witnesses.  This information, as well as a description of the complaint, shall immediately, or as soon as circumstances permit, be documented on a Complaint Form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander, and shall be treated as a complaint.  The supervisor or appropriate Area Commander notified of the complaint shall ensure the Communications Division is notified and forward any pertinent documents to the IAD.*

2.     An on-duty supervisor shall respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest.  The supervisor shall ensure the Communications Division is notified and forward any pertinent documents to the IAD.  All other misconduct complaints by a jail inmate shall be handled in the same manner as other civilian complaints.

3.     In each complaint investigation, OPD shall consider all relevant evidence, including circumstantial, direct and physical evidence, and make credibility determinations, if feasible.  OPD shall make efforts to resolve, by reference to physical evidence, and/or use of follow-up interviews and other objective indicators, inconsistent statements among witnesses.

4.     OPD shall develop provisions for the permanent retention of all notes, generated and/or received by OPD personnel in the case file.

5.     OPD shall resolve each allegation in a complaint investigation using the "preponderance of the evidence" standard.  Each allegation shall be resolved by making one of the following dispositions:  Unfounded, Sustained, Exonerated, Not Sustained, or Administrative Closure.  The Department shall use the following criteria for determining the appropriate disposition:

a.     Unfounded:  The investigation disclosed sufficient evidence to determine that the alleged conduct did not occur.  This finding shall also apply when individuals named in the complaint were not involved in the alleged act.

b.     Sustained:  The investigation disclosed sufficient evidence to determine that the alleged conduct did occur and was in violation of law and/or Oakland Police Department rules, regulations, or policies.

c.     Exonerated:  The investigation disclosed sufficient evidence to determine that the alleged conduct did occur, but was in accord with law and with all Oakland Police Department rules, regulations, or policies.

d.     Not Sustained:  The investigation did not disclose sufficient evidence to determine whether or not the alleged conduct occurred.

e.     Administrative Closure:  The investigation indicates a service complaint, not involving an MOR violation, was resolved without conducting an internal investigation; OR

f.     To conclude an internal investigation when it has been determined that the investigation cannot proceed to a normal investigative conclusion due to circumstances to include but not limited to the following:

1)     Complainant wishes to withdraw the complaint and the IAD Commander has determined there is no further reason to continue the investigation and to ensure Departmental policy and procedure has been followed;

2)     Complaint lacks specificity and complainant refuses or is unable to

provide further clarification necessary to investigate the
complaint;

3)    Subject not employed by OPD at the time of the incident; or

4)    If the subject is no longer employed by OPD, the IAD Commander
shall determine whether an internal investigation shall be
conducted.

5)    Complainant fails to articulate an act or failure to act, that, if true,
would be an MOR violation; or

6)    Complaints limited to California Vehicle Code citations and
resulting tows, where there is no allegation of misconduct, shall be
referred to the appropriate competent authorities (i.e., Traffic
Court and Tow Hearing Officer).

g.    Administrative Closures shall be approved by the IAD Commander and
entered in the IAD Complaint Database.

6.    The disposition category of "Filed" is hereby redefined and shall be included
under Administrative Dispositions as follows:

a.    An investigation that cannot be presently completed.  A filed investigation
is not a final disposition, but an indication that a case is pending further
developments that will allow completion of the investigation.

b.    The IAD Commander shall review all filed cases quarterly to determine
whether the conditions that prevented investigation and final disposition
have changed and may direct the closure or continuation of the
investigation.

7.    Any member or employee who is a subject of an internal investigation, as well as
any other member or employee on the scene of an incident at which misconduct
has been alleged by a complainant, shall be interviewed and a recorded statement
taken.  However, investigators, with the approval of an IAD Commander, are not
required to interview and/or take a recorded statement from a member or
employee who is the subject of a complaint or was on the scene of the incident
when additional information, beyond that already provided by the existing set of
facts and/or documentation, is not necessary to reach appropriate findings and
conclusions.

(Negotiated Settlement Agreement III. E.)


**Relevant Policy:**

There are six Departmental policies that incorporate the requirements of Task 5:  Department
General Order M-03, *Complaints Against Department Personnel and Procedures* (published
December 6, 2005 and revised most recently on August 22, 2013); Communications Division
Policy & Procedures C-02, *Receiving and Logging Complaints Against Personnel and Use of*

*Force Incidents* (published April 6, 2007); Training Bulletin V-T.1, *Internal Investigation Procedure Manual* (published June 1, 2006); Special Order 8270, *Booking of Prisoners at the Glenn E. Dyer Detention Facility* (published June 24, 2005); Special Order 8565, *Complaints Against Department Personnel* (published May 11, 2007); and IAD Policy & Procedures 05-02, *IAD Investigation Process* (published December 6, 2005). In addition, NSA stipulations issued on December 12, 2005 and March 13, 2007 incorporate the requirements of this Task.

**<u>Commentary:</u>**

Task 5 consists of several subtasks, briefly described below. Based on OPD's compliance history with many of the subtasks, not all are being actively monitored at this time.

**Task 5.1** requires that when a citizen wishes to file a complaint, the citizen is brought to a supervisor or IAD, or a supervisor is summoned to the scene. **Task 5.2** requires that if there is a delay of greater than three hours in supervisory response, the reason for the delay must be documented. **Task 5.3** requires that where a complainant refuses to travel to a supervisor, or wait for one, personnel make all reasonable attempts to obtain specific information to assist in investigating the complaint. **Task 5.4** requires that specific information be documented on a complaint form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander. **Task 5.5** requires that the supervisor or Area Commander notify Communications and forward any pertinent documents to IAD.

To assess compliance with Tasks 5.1 through 5.5, we reviewed the Daily Incident Logs (DILs) prepared by the Communications Division and forwarded to IAD each business day. The DIL form has been modified several times during our tenure to elicit "forced responses" that gather all of the information required to evaluate compliance with these Tasks. These modifications have significantly enhanced OPD's ability to document compliance by properly filling out and distributing the logs, and compliance rates with these subtasks have been near 100% for several years. Consequently, we no longer actively assess OPD's compliance with these subtasks, but we continue to receive both the DILs and Daily Complaint Referral Logs (used to document when Information Business Cards [IBCs] are provided to citizens in lieu of a complaint forms). We spot-check these forms regularly to verify that the quality of their completion has not diminished. OPD remains in compliance with Tasks 5.1 through and including Task 5.5.

**Task 5.6** requires that an on-duty supervisor respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest of the inmate. We have not actively monitored this subtask since December 2014, though we have reviewed cases applicable to this requirement in several reports since that time.

**Task 5.12** requires that the Watch Commander ensure that any complaints that are applicable to Task 5.6 are delivered to and logged with IAD. Under current policy, the Communications Division must record on the DILs complaints that are received and/or handled by on-duty supervisors, and the DILs is forwarded daily to IAD.

OPD remains in compliance with Tasks 5.6 and 5.12.

**Task 5.15** through **Task 5.19**, and **Task 5.21,** collectively address the quality of completed IAD investigations, and therefore remain the subject of our focused Task assessments.  To assess compliance with these Tasks, we reviewed 20 IAD cases which were closed between January 1- April 30, 2020, sampled from four of our recent document requests.  This sample included investigations completed by IAD and Division-level investigations (DLIs).  It also included cases that were resolved via formal investigation and investigations that were resolved via summary finding.[1]  As is our practice, if we had questions pertaining to a case, we consulted with the commanding officer of IAD before making our final determination.

Together, **Tasks 5.15** and **Task 5.16** require that OPD: gathers all relevant evidence; conducts follow-up interviews where warranted; adequately considers the evidence gathered; makes credibility assessments where feasible; and resolves inconsistent statements.

In all of the cases we reviewed, we believe that OPD gathered all relevant evidence available.  As we often find, in many of the cases, video and/or audio recordings proved to be a significant factor in allowing OPD to reach an appropriate conclusion.  Investigators conducted follow-up interviews to seek clarification or resolve inconsistencies in four of the 20 cases we reviewed.  In two cases, the complainants were interviewed twice; in one case, a subject officer was interviewed twice; and in the remaining case, a civilian employee (Police Communications Dispatcher) was interviewed twice.

OPD made credibility assessments for all involved parties in 12 of the 20 cases.  Six cases were approved for summary finding; and per policy, investigators are not required to assess the credibility of the involved officers and civilian employees in these instances.  Two other cases were closed via administrative closure, which similarly do not require credibility assessments.

In two cases, complainants and/or witnesses were deemed not credible.  In three cases, subject officers were deemed not credible.  We agreed with these credibility assessments, and note that OPD is more willing to identify officers as not credible when they have the evidence to do so.  In another case, we believe that a complainant should have been deemed not credible based on the information at hand.  We shared the details of this case with OPD during a virtual site visit.

In 14 of the 20 cases we reviewed, OPD successfully resolved inconsistent statements.  In 13 of the cases, PDRD recordings were available and assisted in the determination.  In the other case, recorded calls to the Communications Division assisted OPD in coming to a definitive conclusion.  Four cases resulted in at least one finding of not sustained.  Not sustained is an acceptable finding, and by definition, it implies that inconsistencies were not resolved despite investigative efforts.  Two additional cases were administratively closed, negating the need to resolve inconsistent statements.

---

[1] Summary findings are investigations in which the Department believes a proper conclusion can be determined based on a review of existing documentation with limited or no additional interviews and follow-up.

**Task 5.17** requires that OPD permanently retain all notes generated and/or received by OPD personnel in the case file. OPD personnel document that all investigative notes are contained within a particular file by completing an Investigative Notes Declaration Form. OPD has a sustained history of 100% compliance with this subtask. During this reporting period, the form was again properly completed in all of the cases we reviewed, although we did note that one file was missing a memo which was critical to the final determination. The IAD commanding officer located and provided the memo for our review.

**Task 5.18** requires that OPD resolve each allegation in a complaint investigation using the preponderance of the evidence standard. **Task 5.19** requires that each allegation of a complaint is identified and resolved with one of the following dispositions: unfounded; sustained; exonerated; not sustained; or administrative closure. Our sample of 20 cases contained 103 allegations that received dispositions as follows: 31 exonerated; 24 unfounded; seven not sustained; 22 sustained; and 19 administratively closed (two of these by Informal Complaint Resolution, or ICR).

We did not disagree with the findings in any of the cases we reviewed. In one case, however, we believed that the interviews of the involved officers were so deficient that, had they been done properly, the case may have resulted in different findings. Investigators asked several leading questions, and seemed more intent on explaining the officers' actions than did the officers or their attorney. Nonetheless, the investigation resulted in two sustained findings.

In four cases, findings were changed during the review process, after the investigations were complete. We agreed with the changed findings, and so the cases are compliant in terms of our review. In one case, IAD disagreed with the findings of a DLI investigator and added an addendum to the investigation, outlining their position and justifying the different findings. The Chief concurred with IAD. In another case, the Community Police Review Agency (CPRA) arrived at different findings than did a DLI investigator. The Chief concurred with CPRA, overturning the findings endorsed by IAD. In each of these cases, we asked OPD to ensure that the original investigators were not only advised of the changed findings, but also the reasons for the changes so that they do not repeat the apparent deficiencies in other investigations they may conduct. In another case, the Chief changed the finding on a pointing of a firearm from exonerated to not sustained. In this case, we agree that the pointing of the firearm would have been justified, but there was some doubt regarding whether or not the firearm was pointed directly at the subject. In the final case – a complaint of demeanor – the DLI investigator recommended a sustained finding, but the Chief directed that the case be closed by forced ICR. This is allowed by OPD policy.

**Task 5.20** requires that the IAD Commander review all "filed" cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed. A filed case is defined as an investigation that cannot be presently completed and is pending further developments that will allow completion of the investigation; filed is not a final disposition. Traditionally, as part of our review of this Task, we also reviewed cases that are tolling. OPD defines a tolled case as an administrative investigation that has been held in abeyance in accordance with one of the provisions of Government Code Section 3304. While we are no longer actively assessing this subtask, we note that filed and tolling cases are reviewed with the Chief or her designee during the weekly IAD meetings and are listed by case number on the

printed meeting agendas.  We receive and review these agendas regularly, and a Monitoring Team member often attends these meetings.  Additionally, we regularly receive a weekly report listing all tolled cases and all cases approaching their 3304 dates.  If we have questions regarding any of the cases in the report, the IAD Commander answers them promptly.

**Task 5.21** requires that any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken.  However, with the approval of the IAD Commander or his designee, investigators are not required to interview and/or take a recorded statement in all cases.  For example, interviews are not needed from a member or employee who is the subject of a complaint, or who was on the scene of the incident when additional information – beyond that already provided by the existing set of facts and/or documentation – is not necessary to reach appropriate findings and conclusions.  Six of the 20 cases we reviewed were resolved via summary finding, and all were appropriately approved for such closure.  In all of these cases, the availability of video and/or audio recordings was the primary reason interviews were unnecessary.  One of the cases approved for summary finding was also investigated by CPRA, which completed a full investigation and came to different conclusions than OPD, including three sustained findings.  As noted above, the Chief agreed with CPRA's findings – as do we – so the case was ultimately resolved with the appropriate dispositions, but it is concerning that IAD's conclusions were so far afield from those of CPRA and the Chief.

As is our practice, we discussed with OPD the case deficiencies that we found during our most recent virtual site visit.

| Task 5 compliance status | Deferred.  The Department was last in compliance with this Task in our 18th quarterly status report (July 2014). While the Department has made progress in this Task and has shown a capacity to better address internal investigations, OPD is currently challenged by investigations emanating from the recent demonstrations – to include a Level 1 use of force – as well as an officer-involved shooting outside the City limits.  With these episodes in mind and with the findings of our special report of August 17, 2020 as a backdrop, we will more closely scrutinize this Task in forthcoming reports. |
|---|---|

## Task 41:  Use of Personnel Assessment System (PAS) and Risk Management

**Requirements:**

*Within 375 days from the effective date of this Agreement, OPD shall develop a policy for use of the system, including supervision and audit of the performance of specific members, employees, supervisors, managers, and OPD units, as well as OPD as a whole.*

*The policy shall include the following elements:*

1. *The Chief of Police shall designate a PAS Administration Unit.  The PAS Administration Unit shall be responsible for administering the PAS policy and, no less frequently than quarterly, shall notify, in writing, the appropriate Deputy Chief/Director and the responsible commander/manager of an identified member/employee who meets the PAS criteria.  PAS is to be electronically maintained by the City Information Technology Department.*

2. *The Department shall retain all PAS data for at least five (5) years.*

3. *The Monitor, Inspector General and Compliance Coordinator shall have full access to PAS to the extent necessary for the performance of their duties under this Agreement and consistent with Section XIII, paragraph K, and Section XIV of this Agreement.*

4. *PAS, the PAS data, and reports are confidential and not public information.*

5. *On a quarterly basis, commanders/managers shall review and analyze all relevant PAS information concerning personnel under their command, to detect any pattern or series of incidents which may indicate that a member/employee, supervisor, or group of members/employees under his/her supervision may be engaging in at-risk behavior.  The policy shall define specific criteria for determining when a member/employee or group of members/employees may be engaging in at-risk behavior.*

6. *Notwithstanding any other provisions of the PAS policy to be developed, the Department shall develop policy defining peer group comparison and methodology in consultation with Plaintiffs' Counsel and the IMT.  The policy shall include, at a minimum, a requirement that any member/employee who is identified using a peer group comparison methodology for complaints received during a 30-month period, or any member who is identified using a peer group comparison methodology for Penal Code §§69, 148 and 243(b)(c) arrests within a 30-month period, shall be identified as a subject for PAS intervention review. For the purposes of these two criteria, a single incident shall be counted as "one" even if there are multiple complaints arising from the incident or combined with an arrest for Penal Code §§69, 148 or 243(b)(c).*

7. *When review and analysis of the PAS threshold report data indicate that a member/employee may be engaging in at-risk behavior, the member/employee's immediate supervisor shall conduct a more intensive review of the*

*member/employee's performance and personnel history and prepare a PAS Activity Review and Report. Members/employees recommended for intervention shall be required to attend a documented, non-disciplinary PAS intervention meeting with their designated commander/manager and supervisor. The purpose of this meeting shall be to review the member/employee's performance and discuss the issues and recommended intervention strategies. The member/employee shall be dismissed from the meeting, and the designated commander/manager and the member/employee's immediate supervisor shall remain and discuss the situation and the member/employee's response. The primary responsibility for any intervention strategies shall be placed upon the supervisor. Intervention strategies may include additional training, reassignment, additional supervision, coaching or personal counseling. The performance of members/ employees subject to PAS review shall be monitored by their designated commander/manager for the specified period of time following the initial meeting, unless released early or extended (as outlined in Section VII, paragraph B (8)).*

8.    *Members/employees who meet the PAS threshold specified in Section VII, paragraph B (6) shall be subject to one of the following options: no action, supervisory monitoring, or PAS intervention. Each of these options shall be approved by the chain-of-command, up to the Deputy Chief/Director and/or the PAS Activity Review Panel.*

*Members/employees recommended for supervisory monitoring shall be monitored for a minimum of three (3) months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor. The first at the end of one (1) month and the second at the end of three (3) months.*

*Members/employees recommended for PAS intervention shall be monitored for a minimum of 12 months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor and designated commander/manager: The first at three (3) months and the second at one (1) year. Member/employees subject to PAS intervention for minor, easily correctable performance deficiencies may be dismissed from the jurisdiction of PAS upon the written approval of the member/employee's responsible Deputy Chief, following a recommendation in writing from the member/employee's immediate supervisor. This may occur at the three (3)-month follow-up meeting or at any time thereafter, as justified by reviews of the member/employee's performance. When a member/employee is not discharged from PAS jurisdiction at the one (1)-year follow-up meeting, PAS jurisdiction shall be extended, in writing, for a specific period in three (3)-month increments at the discretion of the member/employee's responsible Deputy Chief. When PAS jurisdiction is extended beyond the minimum one (1)-year review period, additional review meetings involving the member/employee, the member/ employee's designated commander/manager and immediate supervisor, shall take place no less frequently than every three (3) months.*

9.    *On a quarterly basis, Division/appropriate Area Commanders and managers shall review and analyze relevant data in PAS about subordinate commanders and/or managers and supervisors regarding their ability to adhere to policy and address at-risk behavior. All Division/appropriate Area Commanders and managers shall conduct quarterly meetings with their supervisory staff for the purpose of assessing and sharing information about the state of the unit and identifying potential or actual performance problems within the unit. These meetings shall be scheduled to follow-up on supervisors' assessments of their subordinates' for PAS intervention. These meetings shall consider all relevant PAS data, potential patterns of at-risk behavior, and recommended intervention strategies since the last meeting. Also considered shall be patterns involving use of force, sick leave, line-of-duty injuries, narcotics-related possessory offenses, and vehicle collisions that are out of the norm among either personnel in the unit or among the unit's subunits. Division/appropriate Area Commanders and managers shall ensure that minutes of the meetings are taken and retained for a period of five (5) years. Commanders/managers shall take appropriate action on identified patterns of at-risk behavior and/or misconduct.*

10.   *Division/appropriate Area Commanders and managers shall meet at least annually with his/her Deputy Chief/Director and the IAD Commander to discuss the state of their commands and any exceptional performance, potential or actual performance problems or other potential patterns of at-risk behavior within the unit. Division/appropriate Area Commanders and managers shall be responsible for developing and documenting plans to ensure the managerial and supervisory accountability of their units, and for addressing any real or potential problems that may be apparent.*

11.   *PAS information shall be taken into account for a commendation or award recommendation; promotion, transfer, and special assignment, and in connection with annual performance appraisals. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

12.   *Intervention strategies implemented as a result of a PAS Activity Review and Report shall be documented in a timely manner.*

13.   *Relevant and appropriate PAS information shall be taken into account in connection with determinations of appropriate discipline for sustained misconduct allegations. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

14.   *The member/employee's designated commander/manager shall schedule a PAS Activity Review meeting to be held no later than 20 days following notification to the Deputy Chief/Director that the member/employee has met a PAS threshold and when intervention is recommended.*

15.    The PAS policy to be developed shall include a provision that a member/employee making unsatisfactory progress during PAS intervention may be transferred and/or loaned to another supervisor, another assignment or another Division, at the discretion of the Bureau Chief/Director if the transfer is within his/her Bureau.  Inter-Bureau transfers shall be approved by the Chief of Police.  If a member/employee is transferred because of unsatisfactory progress, that transfer shall be to a position with little or no public contact when there is a nexus between the at-risk behavior and the "no public contact" restriction.  Sustained complaints from incidents subsequent to a member/employee's referral to PAS shall continue to result in corrective measures; however, such corrective measures shall not necessarily result in a member/employee's exclusion from, or continued inclusion in, PAS.  The member/employee's exclusion or continued inclusion in PAS shall be at the discretion of the Chief of Police or his/her designee and shall be documented.

16.    In parallel with the PAS program described above, the Department may wish to continue the Early Intervention Review Panel.

17.    On a semi-annual basis, beginning within 90 days from the effective date of this Agreement, the Chief of Police, the PAS Activity Review Panel, PAS Oversight Committee, and the IAD Commander shall meet with the Monitor to review the operation and progress of the PAS.  At these meetings, OPD administrators shall summarize, for the Monitor, the number of members/employees who have been identified for review, pursuant to the PAS policy, and the number of members/employees who have been identified for PAS intervention.  The Department administrators shall also provide data summarizing the various intervention strategies that have been utilized as a result of all PAS Activity Review and Reports.  The major objectives of each of these semi-annual meetings shall be consideration of whether the PAS policy is adequate with regard to detecting patterns of misconduct or poor performance issues as expeditiously as possible and if PAS reviews are achieving their goals.

18.    Nothing in this Agreement, and more specifically, no provision of PAS, shall be construed as waiving, abrogating or in any way modifying the Department's rights with regard to discipline of its members/employees.  The Department may choose, at its discretion, to initiate the administrative discipline process, to initiate PAS review or to use both processes concurrently or consecutively.

(Negotiated Settlement Agreement VII. B.)


**Relevant Policy:**

OPD most recently revised Departmental General Order D-17, *Personnel Assessment Program*, on November 20, 2013.

## Commentary:

The Department has continued to move forward with the development and implementation of the Vision database. The Department's work on Vision has now come to include supervisory training – first at the Command level, and soon for sergeants. The data dashboards, which will provide supervisors with organized access to the Vision data for its use in reviews of officers and for use in risk management, are still in development. The Department has also recently conducted focus groups during which users discuss their concerns on the use of Vision. The Department is also issuing a survey of supervisors, officers, and civilian employees to collect information on usability issues. Early analyses have identified a variety of concerns, including issues with modules for entering and reviewing supervisory notes, and for creating PAS risk management reviews. The Vision team plans to address the issues. The development and implementation of a plan to respond to the issues raised in the focus groups and survey will be a good step forward.

With Vision active, dashboards in development, training underway, and minor improvements in process, there seems to be light at the end of the long tunnel for OPD. In 2012, after several years of frustration with various vendors and an eventual internally developed system, Personnel Assessment System (PAS), OPD first sought consultants to assist in developing a "Second Generation Early Warning System." In early 2018, the City again sought consultants, this time to modernize the ill-fated PRIME database that had replaced PAS. First known as PRIME Plus, the Vision database has been built on a very different architecture than its predecessors.

Throughout the years of sporadic progress, we supported OPD's development efforts and recognized that fulfilment of some elements of NSA Tasks 40 and 41 would need to wait for technical improvements in the data systems. By most measures, OPD has reached that point. For one thing, as early as 2007, the Department developed a "review protocol" which addresses each of the sub-tasks required under Tasks 40 and 41.

One key remaining need are the policy requirements addressing these NSA Tasks. Departmental General Order D-17 was originally enacted in 2008 and last revised in 2013. It notes the requirements regarding risk management data and the PAS review processes. Of course, there have been significant changes in both these areas since that time, as the risk management system and process have evolved. Based on the improvements in the data systems and changes in the risk management process, the Department sorely needs a review and update of the relevant policy. That review should include addressing several key issues, including the Area-level Risk Management Meetings and the monthly Bureau of Field Operations Risk Management Meetings. The policy should also clearly address stop data (Task 34) as a risk management issue, rather than as a separate consideration.

There are also significant elements in both Tasks 40 and 41 that need to be addressed. Task 41 includes a list of 20 categories of data which the Department "shall" collect and use "to promote professional police practices." This point can also focus attention on addressing risk management, not simply as a factor relevant to individual officers but also to the Department as a whole. That is to say, the data, tracked over time, provide a measure of risk summed to the Department-wide level and therefore relevant to broad management issues such as recruitment, policy, training, and supervision practices.

Prior to the problems with the PRIME database, the Department regularly produced and used data tables covering all of the 20 measures listed in Task 40 and also showing change in those over time. The Department's data collections should again be used to produce those tables, to provide them to the Monitoring Team, and to use them in the management of the Department.

Task 41 should also be reviewed in light of current risk management-related practices. The basic skeleton of the risk management process is described in the Task's paragraphs, and the Department has made significant advancements beyond some of them. On some issues, however, the Department has opted for less formal meetings than expected under the Task requirements, and there is little documentation of meeting outcomes. That is the case with Area Commander and Deputy Chief meetings, which are intended to address risk-related policy and practice issues that go beyond the behavior of individual officers.

We are at a point in time regarding risk management that has been long anticipated but difficult to achieve. The necessary technology appears to be coming fully into place. The data, and advanced methods to analyze it and understand it, are in use. And, perhaps most significantly, the potential of risk management has been extended beyond headquarters into the field through the Area-level Risk Management Meetings, and to the first-line supervisors.

All of that makes this the right time to return to basics. It is time to shore up policy to reflect current practice and goals. It is time to return to NSA requirements neglected as technological considerations dominated – including the categories of data required by Task 40. And it is time to focus on the work of risk management to help officers succeed in their careers, and to use it to make positive contributions to the management of policing in Oakland.

| Task 41 compliance status | Deferred, due to the ongoing reconstruction of the Vision database. |
|---|---|

# Task 45:  Consistency of Discipline Policy

**Requirements:**

*On or before October 6, 2003, OPD shall revise and update its disciplinary policy to ensure that discipline is imposed in a fair and consistent manner.*

  1.   *The policy shall describe the circumstances in which disciplinary action is appropriate and those in which Division-level corrective action is appropriate.*

  2.   *The policy shall establish a centralized system for documenting and tracking all forms of discipline and corrective action, whether imposed centrally or at the Division level.*

3.  *All internal investigations which result in a sustained finding shall be submitted to the Discipline Officer for a disciplinary recommendation. The Discipline Officer shall convene a meeting with the Deputy Chief or designee in the affected chain-of-command for a confidential discussion of the misconduct, including the mitigating and aggravating factors and the member/employee's overall performance.*

4.  *The COP may direct the Discipline Officer to prepare a Discipline Recommendation without convening a Discipline Conference.*

(Negotiated Settlement Agreement X. B.)

**Relevant Policy:**

Five Departmental policies incorporate the requirements of Task 45: Departmental General Order M-03, *Complaints Against Department Personnel and Procedures* (published December 6, 2005 and revised most recently on August 24, 2013); Training Bulletin V-T.1 and V-T.2, *Internal Investigation Procedure Manual* (published July 17, 2008); Internal Affairs Policy and Procedure Manual (published December 6, 2005); and Training Bulletin V-T, *Departmental Discipline Policy* (published March 14, 2014). Several of these policies are currently being revised.

**Commentary:**

Task 45.2 requires that OPD maintain a centralized system for documenting and tracking all OPD forms of discipline and corrective action, whether imposed centrally or at the division level. To assess Phase 2 compliance with this subtask, we reviewed the 40 cases that contained at least one sustained finding that were approved in March, April, and May 2020. All (100%) of these cases and findings contained all of the necessary information available on the spreadsheets generated by IAD for our review. OPD is in compliance with the requirement that it maintain an adequate system for documenting and tracking discipline and corrective action.

The NSA also requires that discipline be imposed in a manner that is fair and consistent. To this end, the Department developed a Discipline Matrix, which was adopted on September 2, 2010 and was in effect until a new Discipline Matrix was approved on March 14, 2014. This subsequent Matrix applies to violations after that date.

As noted above, we reviewed all 40 cases with sustained findings that were approved in March, April, and May 2020. (Several cases involved multiple sustained findings.)

In March, there were 12 sustained cases. Five cases involved preventable motor vehicle collisions. One case involved canine bites of two subjects and resulted in serious disfiguring injuries in one subject. (We have previously discussed this case in our assessment of the Executive Force Review Board [EFRB] of this incident.) Another case involved driving under the influence (DUI) by an off-duty civilian employee who was pulled over by an OPD officer for swerving. In another case, two officers were sustained for failing to sufficiently collect and document evidence in a battery investigation; one of the officers was also sustained for a report-

writing violation.  In another case, two officers were sustained for failing to investigate and complete a report on a neighbors' dispute.  Three cases involved employees' unintentional failure to accept or refer a complaint.  In one of these cases, two officers were sustained for failure to accept or refer a complaint; and one of the officers was also sustained for demeanor due to his "curt and confrontational tone" with the complainant.  In another of these cases, a dispatcher was sustained for failure to accept or refer a complaint and for hanging up on an Oakland resident.

In April, there were 13 sustained cases.  Four cases involved preventable motor vehicle collisions.  In one case, an officer was sustained for being untruthful when he provided a statement to IAD in another investigation; a sergeant was also sustained for obstructing the IAD process.  One case involved several sustained serious violations – including interfering with investigations, retaliation, and untruthfulness – after a traffic stop in another jurisdiction revealed that an officer was in possession of a controlled substance and armed with a firearm, and that he directed his passenger to hide drug paraphernalia during the stop.  In another case, an officer was sustained for failure to activate his Portable Digital Recording Device (PDRD) during a foot pursuit of a "tagging" subject.  One case involved several serious violations against two officers involved in an improper vehicle pursuit, and another officer was sustained for unauthorized use of electronic systems.  One case involved a sustained finding of unintentional/improper search, seizure, or arrest, after an officer looked into a residential garbage can during a vandalism investigation.  In another case, four officers were sustained for failing to conduct a proper preliminary investigation of a possible domestic battery.  In another case, a dispatcher was sustained for demeanor for handling a call rudely and cutting the caller off.  Two cases involved unintentional failure to accept or refer a complaint; in one of these cases, a sergeant was sustained for unintentional failure to accept or refer a complaint one Oakland resident made regarding officers' handling of a dispute between two sisters at an apartment complex.

In May, there were 15 sustained cases.  In two related cases, an officer was sustained for a non-compliant Taser deployment against a domestic violence suspect; and writing a substandard report on the incident.  One case involved a preventable motor vehicle collision.  In another case, an officer was sustained for a delayed PDRD activation during a vehicle enforcement stop.  One case involved an officer who was sustained for DUI while driving a Departmental vehicle and other related violations.  Two cases involved the unintentional failure to accept or refer a complaint – one by a dispatcher and one by an officer.  One Academy trainee was sustained for issues related to his plagiarism on an Academy assignment.  In another case, an officer was sustained for failure to activate his PDRD.  In another case, an officer who served as an Academy instructor was sustained for unprofessional conduct in violation of City Administrative Instruction 71 for making inappropriate comments to a trainee.  In another case, an officer was sustained for conducting a substandard preliminary investigation; and a sergeant was sustained for demeanor for his "dismissive" treatment of a resident's concerns.  In another case, an officer was sustained for writing a supplemental report that did not accurately reflect the statements of victims in a home invasion robbery case.  One case involved sustained demeanor and another finding against a dispatcher for being "argumentative" and hanging up on a caller.  In another case, an officer was sustained for failing to complete an appropriate and thorough preliminary investigation.  In one case, an officer was sustained for unintentional failure to accept or refer a complaint, and for failing to act on a request to make a report against an individual for assault.

In each case, unless otherwise documented in writing, the proposed discipline fell within the Discipline Matrix that was in effect at the time of the action for which the discipline was imposed.

We reviewed the records that OPD provided for the four total *Skelly* hearings it completed in March (no hearings), April (one hearing), and May (three hearings).  *Skelly* hearings are held for IAD cases involving employees with sustained findings in which discipline of a one-day suspension or greater was recommended.  We reviewed the *Skelly* reports for all four cases, and found that they contained adequate justification for the results documented.

One *Skelly* hearing involved a sergeant who was sustained for unintentional failure to accept or refer a complaint.  For this violation, the Chief recommended a one-day suspension; and the *Skelly* Officer recommended a written reprimand.  The Acting Chief of Police overturned the *Skelly* Officer's recommendation, noting that "the sustained finding was supported and the discipline considered the aggravating and mitigating factors."

Another *Skelly* hearing involved an officer who was sustained for failure to conduct a proper preliminary investigation – including failure to accept a citizen's arrest.  For this violation, the Chief had recommended a two-day suspension; and the *Skelly* Officer concurred.

The two other *Skelly* hearings held in May resulted from the same IAD investigation, and were heard by the same *Skelly* Officer.  In this case, one officer handed another officer his personal shotgun, and there was an accidental discharge.  One officer was sustained for performance of duty; per the investigative report, "The investigation disclosed sufficient evidence to determine [the officer] collected evidence, left the scene of an accidental discharge, preventing the UOF [use of force] from being reported immediately as soon as practical to a supervisor."  The Chief recommended that this officer receive a two-day suspension; the *Skelly* Officer instead recommended a one-day suspension.  The Chief approved this change.  The second officer in this case, as with the first officer, was sustained for the performance of duty violation; the second officer was also sustained for the accidental discharge (Level 2 use of force).  The Chief recommended that this officer receive a five-day suspension; the *Skelly* Officer instead recommended a two-day suspension.  The Chief approved this change.

Each month, we request from OPD a list of all *Skelly* officers provided with updated *Skelly* Hearing Training during the past month, and their dates trained.  OPD did not provide any recent training for *Skelly* Officers, as there were no recent promotions to Command-level positions.  For our next assessment of Task 45, we will review records once they are made available to verify that any applicable personnel who were recently promoted received the approved *Skelly* Officer Training.

OPD did not receive any arbitration decisions in March, April, or May 2020.  We will review and discuss any upcoming arbitration decisions in our next assessment of Task 45.

As noted in our last report, we are closely following the Department's response to the recent study on discipline disparity, which was conducted by a consulting firm, Hillard Heintze, on behalf of the Department. The study found significant racial disparities in sustained complaints of misconduct between Black officers and officers of other races. Hillard Heintze also found that, during 2014-2018, Black officers were 37% more likely to have complaints against them sustained. We have requested that the Department provide regular updates on its efforts to address the findings and implement the recommendations made by Hillard Heintze.

| Task 45 compliance status | In partial compliance |
| --- | --- |

## Conclusion

The Department remains immersed in dealing with public demonstrations and complaints resulting from these events. Our virtual site visits with the Department have included candid exchanges regarding use of force, policies, Vision, and other issues.

Our recent report on the March 11, 2018 officer-involved shooting raised serious concerns about policy matters brought to light by this episode. We will be closely monitoring the measure to which the Department and the City address individual and systemic deficiencies. The Department speaks optimistically about the Vision system. It is imperative that as this technology is tailored and enhanced, it is used to inform supervisors and other decision-makers so that behaviors are consistent with the principles of Constitutional policing and community values.

Chief (Ret.) Robert S. Warshaw

*Monitor*