December 10, 2020

# Seventy-First Report
## *of the* Independent Monitor
## *for the* Oakland Police Department

## Introduction

This is our seventy-first status report on the Negotiated Settlement Agreement (NSA) in the case of *Delphine Allen, et al., vs. City of Oakland, et al.,* in the United States District Court for the Northern District of California under the direction of Judge William H. Orrick.  I was appointed in 2010 to oversee the monitoring process of the Oakland Police Department (OPD) that began in 2003.

This report describes our recent assessments of NSA Tasks 2, 5, 20, and 41; and covers our virtual site visits of August 25-26 and September 22-23, 2020.  Following the Court's Order of May 21, 2015, we devote special attention to the most problematic component parts of the NSA Tasks that are not yet in full or sustained compliance; and discuss in our status reports the most current information regarding the Department's progress with the NSA and its efforts at making the reforms sustainable.

## *Providing Technical Assistance*

Each month, our Team conducts a visit to Oakland that includes both compliance assessments and technical assistance.  During our visits, we meet with Department and City officials; observe Department meetings and technical demonstrations; review Departmental policies; conduct interviews and make observations in the field; and analyze OPD documents and files, including misconduct investigations, use of force reports, crime and arrest reports, Stop Data Forms, and other documentation.  We also provide technical assistance, especially those that relate to the remaining non-compliant Tasks or areas identified by the Department -- including in the areas of IAD investigation quality (Task 5); use of force investigations and reporting (Tasks 24 and 25); stop data and related issues (Task 34); risk management and the ongoing maintenance issues and the development of Vision (Task 41).

## *Building Internal Capacity at OPD*

Also per the May 21, 2015 Court Order, we continue to work closely with the Office of Inspector General's (OIG) staff to identify areas that it should audit or review – and to help design approaches to these audits that are not cumbersome, so as to ensure sustainability.  We review OIG's quarterly progress reports, which are a valuable resource and assist us in assessing compliance with NSA requirements.  OIG's most recent quarterly report described its evaluation of the Department's promotional consideration process, which, for the most part, is working as intended.  The report also discussed OIG's examination of whether sworn personnel attended the in-service training required by the Department, and found some significant issues in the way the Department tracks its in-service training.  We will discuss this with Departmental personnel during our upcoming site visit, as the tracking of training records is a requirement of the NSA (Tasks 40 and 43).

## *Focused Task Assessments*

## Task 2:  Timeliness Standards and Compliance with IAD Investigations

**Requirements:**

*Fairness to complainants, members/employees and the public requires that internal investigations be completed in a timely fashion.*

> *1.      On or before December 1, 2003, OPD shall develop policies regarding timeliness standards for the completion of Internal Affairs investigations, administrative findings and recommended discipline.*

> *2.      Compliance with these timeliness standards shall be regularly monitored by IAD command and the Department's command staff.  If IAD experiences an unusual proliferation of cases and/or workload, IAD staffing shall be increased to maintain timeliness standards.*

(Negotiated Settlement Agreement III. B.)

**Relevant Policy:**

OPD most recently revised Departmental General Order M-03, *Complaints Against Department Personnel and Procedures*, on December 22, 2017.

Seventy-First Report of the Independent Monitor for the Oakland Police Department
December 10, 2020
Page 3 of 19

**Commentary:**

**Task 2.1** requires that internal investigations (IAD and Division Level) – including review, approval, findings, and discipline – be completed in accordance with the timeliness standards developed by OPD.  To assess this subtask, we reviewed a list of all internal investigations resulting in formal findings (unfounded, sustained, exonerated, or not sustained) that were approved in April, May, and June 2020, and calculated the number of days between the complaint date and the approval date for each case.  We excluded from the dataset cases that were administratively closed, those that involved on-duty traffic accidents or service complaints, and those that did not involve Manual of Rules (MoR) violations.  We segregated the remaining cases into Class I or Class II categories.  If a case involved at least one alleged Class I violation, we classified it as Class I.

We recently learned that the Department has been assessing its investigative timeliness by calculating the number of days between the *intake* date and the approval date for each case – not the *complaint receipt* date and the approval date that we use.  The complaint date is the date on which the Department first becomes aware of a complaint – whether it is lodged by a community member or internally generated – and the intake date is the date on which IAD begins its work on the case.  Sometimes these two dates are the same; but unfortunately, in other instances, they are not.  For example, if a community member makes a complaint to the Department on a Friday night, in most circumstances, IAD often does not learn of that complaint until Monday morning.  Holidays and other scheduled closures can also have an impact on the commencement of the IAD intake process.  However, for the cases we found to be noncompliant in this assessment, there were several delays that did not result from either weekends or holidays.  The community deserves to have its complaints about Department personnel logged and acknowledged expeditiously.  To do less, deprives community members of an assurance that their complaints are taken seriously by the Department.  We will continue to monitor this Task closely.  We will also discuss with IAD the causes of delays between the complaint date and intake date for the cases in our assessment.

At least 85% of Class I misconduct investigations and at least 85% of Class II misconduct investigations must be completed within 180 days to be considered timely.  Per DGO M-03, Class I offenses "are the most serious allegations of misconduct and, if sustained, shall result in disciplinary action up to and including dismissal and may serve as the basis for criminal prosecution."  Class II offenses include "all minor misconduct offenses."

Of the 45 Class I cases we reviewed for this assessment, only 30, or 67%, were in compliance with established timelines.  During our last review of Task 2, we found that 69% of Class I cases were in compliance with established timelines.

Of the 77 Class II cases we reviewed, 58, or 75%, were in compliance with established timelines.  During our last review of Task 2, we found that 84% of Class II cases were in compliance with established timelines.

Per DGO M-03, "In cases with a sustained finding, the discipline recommendation process shall be completed within 30 calendar days of the sustained finding."  We reviewed all 31 cases including a total of 68 sustained findings that were approved in April, May, and June 2020; 16 cases involved multiple sustained findings.  All (100%) of these 31 cases were in compliance with established discipline timelines.

OPD is not in compliance with Task 2.1.

Task 2.2 requires that IAD and OPD command staff regularly monitor compliance with these timeliness standards.  The primary responsibility for monitoring compliance with timeliness standards rests with IAD, whether investigations are conducted by IAD personnel or via Division-level investigation.  As part of this monitoring, the IAD Commander discusses pending deadlines for key open investigations during IAD's weekly meetings with the Chief; the deadlines are also reflected in written agendas for these meetings.  A Monitoring Team representative regularly attends these weekly meetings.  IAD also occasionally, as needed, emails individual reminders on cases approaching due dates to investigators and their supervisors.  The Department is in compliance with Task 2.2.

Task 2.3 requires that if IAD experiences an unusual proliferation of cases and/or workload, IAD staffing be increased to maintain timeliness standards.  We routinely request and receive updates on IAD staffing levels during our site visits.

| **Task 2 compliance status** | Not in compliance |
|---|---|

# Task 5:  Complaint Procedures for IAD

**Requirements:**

1. *On or before December 1, 2003, OPD shall develop a policy so that, OPD personnel who become aware that a citizen wishes to file a complaint shall bring such citizen immediately, or as soon as circumstances permit, to a supervisor or IAD or summon a supervisor to the scene.  If there is a delay of greater than three (3) hours, the reason for such delay shall be documented by the person receiving the complaint.  In the event that such a complainant refuses to travel to a supervisor or to wait for one, the member/employee involved shall make all reasonable attempts to obtain identification, including address and phone number, as well as a description of the allegedly wrongful conduct and offending personnel, from the complainant and any witnesses.  This information, as well as a description of the complaint, shall immediately, or as soon as circumstances permit, be documented on a Complaint Form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander, and shall be treated as a complaint.  The supervisor or appropriate Area Commander notified of the complaint shall ensure the Communications Division is notified and forward any pertinent documents to the IAD.*

2.      *An on-duty supervisor shall respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest.  The supervisor shall ensure the Communications Division is notified and forward any pertinent documents to the IAD.  All other misconduct complaints by a jail inmate shall be handled in the same manner as other civilian complaints.*

3.      *In each complaint investigation, OPD shall consider all relevant evidence, including circumstantial, direct and physical evidence, and make credibility determinations, if feasible.  OPD shall make efforts to resolve, by reference to physical evidence, and/or use of follow-up interviews and other objective indicators, inconsistent statements among witnesses.*

4.      *OPD shall develop provisions for the permanent retention of all notes, generated and/or received by OPD personnel in the case file.*

5.      *OPD shall resolve each allegation in a complaint investigation using the "preponderance of the evidence" standard.  Each allegation shall be resolved by making one of the following dispositions:  Unfounded, Sustained, Exonerated, Not Sustained, or Administrative Closure.  The Department shall use the following criteria for determining the appropriate disposition:*

    a.      *Unfounded:  The investigation disclosed sufficient evidence to determine that the alleged conduct did not occur.  This finding shall also apply when individuals named in the complaint were not involved in the alleged act.*

    b.      *Sustained:  The investigation disclosed sufficient evidence to determine that the alleged conduct did occur and was in violation of law and/or Oakland Police Department rules, regulations, or policies.*

    c.      *Exonerated:  The investigation disclosed sufficient evidence to determine that the alleged conduct did occur, but was in accord with law and with all Oakland Police Department rules, regulations, or policies.*

    d.      *Not Sustained:  The investigation did not disclose sufficient evidence to determine whether or not the alleged conduct occurred.*

    e.      *Administrative Closure:  The investigation indicates a service complaint, not involving an MOR violation, was resolved without conducting an internal investigation; OR*

    f.      *To conclude an internal investigation when it has been determined that the investigation cannot proceed to a normal investigative conclusion due to circumstances to include but not limited to the following:*

        1)      *Complainant wishes to withdraw the complaint and the IAD Commander has determined there is no further reason to continue the investigation and to ensure Departmental policy and procedure has been followed;*

2) *Complaint lacks specificity and complainant refuses or is unable to provide further clarification necessary to investigate the complaint;*

3) *Subject not employed by OPD at the time of the incident; or*

4) *If the subject is no longer employed by OPD, the IAD Commander shall determine whether an internal investigation shall be conducted.*

5) *Complainant fails to articulate an act or failure to act, that, if true, would be an MOR violation; or*

6) *Complaints limited to California Vehicle Code citations and resulting tows, where there is no allegation of misconduct, shall be referred to the appropriate competent authorities (i.e., Traffic Court and Tow Hearing Officer).*

g. *Administrative Closures shall be approved by the IAD Commander and entered in the IAD Complaint Database.*

6. *The disposition category of "Filed" is hereby redefined and shall be included under Administrative Dispositions as follows:*

a. *An investigation that cannot be presently completed.  A filed investigation is not a final disposition, but an indication that a case is pending further developments that will allow completion of the investigation.*

b. *The IAD Commander shall review all filed cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed and may direct the closure or continuation of the investigation.*

7. *Any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken.  However, investigators, with the approval of an IAD Commander, are not required to interview and/or take a recorded statement from a member or employee who is the subject of a complaint or was on the scene of the incident when additional information, beyond that already provided by the existing set of facts and/or documentation, is not necessary to reach appropriate findings and conclusions.*

(Negotiated Settlement Agreement III. E.)

**Relevant Policy:**

There are six Departmental policies that incorporate the requirements of Task 5:  Department General Order M-03, *Complaints Against Department Personnel and Procedures* (published December 6, 2005 and revised most recently on August 22, 2013); Communications Division Policy & Procedures C-02, *Receiving and Logging Complaints Against Personnel and Use of Force Incidents* (published April 6, 2007); Training Bulletin V-T.1, *Internal Investigation Procedure Manual* (published June 1, 2006); Special Order 8270, *Booking of Prisoners at the Glenn E. Dyer Detention Facility* (published June 24, 2005); Special Order 8565, *Complaints Against Department Personnel* (published May 11, 2007); and IAD Policy & Procedures 05-02, *IAD Investigation Process* (published December 6, 2005).  In addition, NSA stipulations issued on December 12, 2005 and March 13, 2007 incorporate the requirements of this Task.

**Commentary:**

Task 5 consists of several subtasks, briefly described below.  Based on OPD's compliance history with many of the subtasks, not all are being actively monitored at this time.

**Task 5.1** requires that when a citizen wishes to file a complaint, the citizen is brought to a supervisor or IAD, or a supervisor is summoned to the scene.  **Task 5.2** requires that if there is a delay of greater than three hours in supervisory response, the reason for the delay must be documented.  **Task 5.3** requires that where a complainant refuses to travel to a supervisor, or wait for one, personnel make all reasonable attempts to obtain specific information to assist in investigating the complaint.  **Task 5.4** requires that specific information be documented on a complaint form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander.  **Task 5.5** requires that the supervisor or Area Commander notify Communications and forward any pertinent documents to IAD.

To assess compliance with Tasks 5.1 through 5.5, we reviewed the Daily Incident Logs (DILs) prepared by the Communications Division and forwarded to IAD each business day.  The DIL form has been modified several times during our tenure to elicit "forced responses" that gather all of the information required to evaluate compliance with these Tasks.  These modifications have significantly enhanced OPD's ability to document compliance by properly filling out and distributing the logs, and compliance rates with these subtasks have been near 100% for several years.  Consequently, we no longer actively assess OPD's compliance with these subtasks, but we continue to receive both the DILs and Daily Complaint Referral Logs (used to document when Information Business Cards [IBCs] are provided to citizens in lieu of a complaint forms).  We spot-check these forms regularly to verify that the quality of their completion has not diminished.  OPD remains in compliance with Tasks 5.1 through and including Task 5.5.

**Task 5.6** requires that an on-duty supervisor respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest of the inmate.  We have not actively monitored this subtask since December 2014, though we have reviewed cases applicable to this requirement in several reports since that time.

**Task 5.12** requires that the Watch Commander ensure that any complaints that are applicable to Task 5.6 are delivered to and logged with IAD.  Under current policy, the Communications Division must record on the DILs complaints that are received and/or handled by on-duty supervisors, and the DILs is forwarded daily to IAD.

OPD remains in compliance with Tasks 5.6 and 5.12.

**Task 5.15** through **Task 5.19**, and **Task 5.21,** collectively address the quality of completed IAD investigations, and therefore remain the subject of our focused Task assessments.  To assess compliance with these Tasks, we reviewed 20 IAD cases which were closed between May 1-July 31, 2020, sampled from three of our recent document requests.  This sample included investigations completed by IAD and Division-level investigations (DLIs).  It also included cases that were resolved via formal investigation and investigations that were resolved via summary finding.  (Summary findings are investigations in which the Department believes a proper conclusion can be determined based on a review of existing documentation with limited or no additional interviews and follow-up.)  As is our practice, if we had questions pertaining to a case, we consulted with the commanding officer of IAD before making our final determination.

Together, **Tasks 5.15** and **Task 5.16** require that OPD: gathers all relevant evidence; conducts follow-up interviews where warranted; adequately considers the evidence gathered; makes credibility assessments where feasible; and resolves inconsistent statements.

In all of the cases we reviewed, we believe that OPD gathered all relevant evidence available.  As we often find, in many of the cases, video and/or audio recordings proved to be a significant factor in allowing OPD to reach an appropriate conclusion.  Investigators conducted follow-up interviews to seek clarification or resolve inconsistencies in three of the 20 cases we reviewed.  In two cases, the complainants were interviewed twice; and in the remaining case, the complainant, a civilian witness and a witness officer were each interviewed twice.

OPD made credibility assessments for all involved parties in 15 of the 20 cases.  Two cases were approved for summary finding; and per policy, investigators are not required to assess the credibility of the involved officers and civilian employees in these instances.  Two other cases were closed via informal complaint resolution, or ICR, and another was administratively closed.  Similarly, these three cases do not require credibility assessments.

In five cases, complainants and/or witnesses were deemed not credible.  In four of these cases, body-worn camera (BWC) footage proved instrumental in reaching a not credible determination.  In the other case, evidence contained in emails contradicted the complainant's statement.  In one case, the subject officer was deemed not credible.  We agreed with these credibility assessments.

In one case, the use of force case described below, we disagreed with an officer's credibility assessment.  OPD determined the officer to be credible; we disagree.

In eight of the 20 cases we reviewed, OPD resolved inconsistent statements.  In each of the cases, BWC recordings were available and assisted in the determination.  Nine cases resulted in at least one finding of not sustained.  Not sustained is an acceptable finding, and by definition, it implies that inconsistencies were not resolved despite investigative efforts.  Three additional cases were administratively closed (two by ICR), negating the need to resolve inconsistent statements.

Seventy-First Report of the Independent Monitor for the Oakland Police Department
December 10, 2020
Page 9 of 19

**Task 5.17** requires that OPD permanently retain all notes generated and/or received by OPD personnel in the case file. OPD personnel document that all investigative notes are contained within a particular file by completing an Investigative Notes Declaration Form. OPD has a sustained history of 100% compliance with this subtask. During this reporting period, the form was again properly completed in all of the cases we reviewed.

**Task 5.18** requires that OPD resolve each allegation in a complaint investigation using the preponderance of the evidence standard. **Task 5.19** requires that each allegation of a complaint is identified and resolved with one of the following dispositions: unfounded; sustained; exonerated; not sustained; or administrative closure. Our sample of 20 cases contained 113 allegations that received dispositions as follows: 40 exonerated; 22 unfounded; 18 not sustained; 16 sustained; and 17 administratively closed (two of these by informal complaint resolution, or ICR).

We disagreed with the findings in two of the cases we reviewed. In one case, which we first reviewed several months ago during our use of force reviews pursuant to Tasks 24 and 25, we expressed concerns regarding the justification for an electronic control weapon (ECW) deployment during the response to a domestic dispute call. We further noted that an officer's written report did not appear to reflect what occurred as clearly shown in available BWC footage, and we advised OPD of our concerns. The DLI investigator found the use of force in compliance with policy, although this determination was overturned by IAD. (See below.) The investigator also recommended a sustained finding for general Performance of Duty based on the inaccuracies in the report. We disagree; our initial reaction to the case remains unchanged. The report appears to be written to intentionally obfuscate what is apparent in BWC footage, and we believe the more serious charge of Reports and Bookings should have been sustained.

In the other case, IAD investigated an allegation of Truthfulness pertaining to a sergeant who failed to complete a use of force report in a timely manner. This case is a derivative of a case we previously reviewed; and in the initial investigation, the sergeant was deemed not credible. At that time, we inquired as to why IAD did not investigate a Truthfulness allegation, and OPD advised us that IAD opened a separate investigation of untruthfulness based on the sergeant's statements in the initial case. IAD reached a finding of not sustained for Truthfulness in this more recent case. We disagree, as there was enough evidence in the initial investigation to substantiate the allegation. We also note that the IAD investigators in this case appeared unprepared, and essentially ceded control of the interview to the sergeant's attorney, who was clearly much more prepared than they were. They also asked several leading questions during the interview.

In two cases, the Department changed the findings during the review process, after the investigations were complete. We agreed with the changed findings. In one case, officers detained two individuals after they observed what appeared to be a hand-to-hand drug transaction. One of the individuals was subsequently found to be in possession of a firearm, and he was ultimately arrested. CPRA conducted a concurrent investigation; and concluded that the detention of the second individual was improper, given the duration for which it lasted. The Chief concurred, and added the sustained findings to IAD's investigation. In the other case, described above, IAD disagreed with a DLI investigator that an ECW deployment was justified, and presented their dissenting opinion to the Chief. The Chief concurred with IAD.

Seventy-First Report of the Independent Monitor for the Oakland Police Department
December 10, 2020
Page 10 of 19

In summary, we agreed with the findings reached by OPD in 18 of the 20 cases we reviewed. We do find it concerning, however, that the cases for which we disagree both involve allegations that question officers' veracity.

**Task 5.20** requires that the IAD Commander review all "filed" cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed.  A filed case is defined as an investigation that cannot be presently completed and is pending further developments that will allow completion of the investigation; filed is not a final disposition. Traditionally, as part of our review of this Task, we also reviewed cases that are tolling.  OPD defines a tolled case as an administrative investigation that has been held in abeyance in accordance with one of the provisions of Government Code Section 3304.  While we are no longer actively assessing this subtask, we note that filed and tolling cases are reviewed with the Chief or her designee during the weekly IAD meetings and are listed by case number on the printed meeting agendas.  We receive and review these agendas regularly, and a Monitoring Team member often participates in these meetings.  Additionally, we regularly receive a weekly report listing all tolled cases and all cases approaching their 3304 dates.  If we have questions regarding any of the cases in the report, the IAD Commander answers them promptly.

**Task 5.21** requires that any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken.  However, with the approval of the IAD Commander or his designee, investigators are not required to interview and/or take a recorded statement in all cases.  For example, interviews are not needed from a member or employee who is the subject of a complaint, or who was on the scene of the incident when additional information – beyond that already provided by the existing set of facts and/or documentation – is not necessary to reach appropriate findings and conclusions.  Two of the 20 cases we reviewed were resolved via summary finding, and both were appropriately approved for such closure.  In these cases, the availability of video and/or audio recordings was the primary reason interviews were unnecessary.

As is our practice, we will discuss with OPD the case deficiencies that we found during our upcoming site visits.

| **Task 5 compliance status** | Deferred.  The Department was last in compliance with this Task in our 18th quarterly status report (July 2014). While the Department has made progress in this Task and has shown a capacity to better address internal investigations, OPD is currently challenged by investigations emanating from demonstrations in May and June – to include a Level 1 use of force – as well as an officer-involved shooting outside the City limits. |
| --- | --- |

Seventy-First Report of the Independent Monitor for the Oakland Police Department
December 10, 2020
Page 11 of 19

## Task 20: Span of Control

**Requirements:**

*On or before August 14, 2003, OPD shall develop and implement a policy to ensure appropriate supervision of its Area Command Field Teams. The policy shall provide that:*

1. *Under normal conditions, OPD shall assign one primary sergeant to each Area Command Field Team, and, in general, (with certain exceptions) that supervisor's span of control shall not exceed eight (8) members.*

2. *During day-to-day operations, in the absence of the primary supervisor (e.g., due to sickness, vacation, compensatory time off, schools, and other leaves), the appropriate Area Commander shall determine, based on Department policy and operational needs, whether or not to backfill for the absence of the sergeant on leave.*

3. *If a special operation, (e.g., Beat Feet, Special Traffic Offenders Program (STOP), etc.) requires more than eight (8) members, the appropriate Area Commander shall determine the reasonable span of control for the supervisor.*

4. *If long-term backfill requires the loan or transfer of a supervisor from another unit, the Chief of Police and/or the Deputy Chief of Police shall make that decision.*

(Negotiated Settlement Agreement IV. C.)

**Relevant Policy:**

Three Departmental policies incorporate the requirements of Task 20: Departmental General Order A-19, *Supervisory Span of Control,* issued on July 26, 2006; Departmental General Order D-13, *Assignment to Acting Higher Rank or Classification,* issued on June 17, 1999; and Departmental General Order D-13.1, *Assignment to Acting Sergeant of Police,* issued on May 14, 2014. (The publication of DGO D-13.1 cancelled Special Order 8435, which previously governed the selection process of acting sergeants.)

**Commentary:**

To assess these requirements for this report, we reviewed spreadsheets prepared by the Department for April, May, and June 2020 that, by date, note which type of sergeant supervised each applicable squad – a primary sergeant, relief sergeant, acting sergeant, other sergeant (one working overtime), or none. (The Department refers to unsupervised squads as "open.") We calculated per squad the compliance percentages for this subtask during this time period. Each of the 48 applicable squads were in compliance – that is, all applicable squads during this time period were supervised by either a primary, relief, or other/overtime sergeant for at least 85% of their working shifts. We also found that none of the applicable squads exceeded the required 1:8 supervisor to officer ratio at least 90% of their working shifts.

OPD continues to be in compliance with these requirements.  The Department has institutionalized the practices of tracking how each squad is supervised each day; planning, when possible, for expected absences; and considering how to fill in for personnel who are absent unexpectedly.

| Task 20 compliance status | In compliance |
|---|---|

## Task 41:  Use of Personnel Assessment System (PAS) and Risk Management

**Requirements:**

*Within 375 days from the effective date of this Agreement, OPD shall develop a policy for use of the system, including supervision and audit of the performance of specific members, employees, supervisors, managers, and OPD units, as well as OPD as a whole.*

*The policy shall include the following elements:*

1. *The Chief of Police shall designate a PAS Administration Unit.  The PAS Administration Unit shall be responsible for administering the PAS policy and, no less frequently than quarterly, shall notify, in writing, the appropriate Deputy Chief/Director and the responsible commander/manager of an identified member/employee who meets the PAS criteria.  PAS is to be electronically maintained by the City Information Technology Department.*

2. *The Department shall retain all PAS data for at least five (5) years.*

3. *The Monitor, Inspector General and Compliance Coordinator shall have full access to PAS to the extent necessary for the performance of their duties under this Agreement and consistent with Section XIII, paragraph K, and Section XIV of this Agreement.*

4. *PAS, the PAS data, and reports are confidential and not public information.*

5. *On a quarterly basis, commanders/managers shall review and analyze all relevant PAS information concerning personnel under their command, to detect any pattern or series of incidents which may indicate that a member/employee, supervisor, or group of members/employees under his/her supervision may be engaging in at-risk behavior.  The policy shall define specific criteria for determining when a member/employee or group of members/employees may be engaging in at-risk behavior.*

6. *Notwithstanding any other provisions of the PAS policy to be developed, the Department shall develop policy defining peer group comparison and methodology in consultation with Plaintiffs' Counsel and the IMT.  The policy shall include, at a minimum, a requirement that any member/employee who is identified using a peer group comparison methodology for complaints received*

*during a 30-month period, or any member who is identified using a peer group comparison methodology for Penal Code §§69, 148 and 243(b)(c) arrests within a 30-month period, shall be identified as a subject for PAS intervention review. For the purposes of these two criteria, a single incident shall be counted as "one" even if there are multiple complaints arising from the incident or combined with an arrest for Penal Code §§69, 148 or 243(b)(c).*

7. *When review and analysis of the PAS threshold report data indicate that a member/employee may be engaging in at-risk behavior, the member/employee's immediate supervisor shall conduct a more intensive review of the member/employee's performance and personnel history and prepare a PAS Activity Review and Report. Members/employees recommended for intervention shall be required to attend a documented, non-disciplinary PAS intervention meeting with their designated commander/manager and supervisor. The purpose of this meeting shall be to review the member/employee's performance and discuss the issues and recommended intervention strategies. The member/employee shall be dismissed from the meeting, and the designated commander/manager and the member/employee's immediate supervisor shall remain and discuss the situation and the member/employee's response. The primary responsibility for any intervention strategies shall be placed upon the supervisor. Intervention strategies may include additional training, reassignment, additional supervision, coaching or personal counseling. The performance of members/ employees subject to PAS review shall be monitored by their designated commander/manager for the specified period of time following the initial meeting, unless released early or extended (as outlined in Section VII, paragraph B (8)).*

8. *Members/employees who meet the PAS threshold specified in Section VII, paragraph B (6) shall be subject to one of the following options: no action, supervisory monitoring, or PAS intervention. Each of these options shall be approved by the chain-of-command, up to the Deputy Chief/Director and/or the PAS Activity Review Panel.*

   *Members/employees recommended for supervisory monitoring shall be monitored for a minimum of three (3) months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor. The first at the end of one (1) month and the second at the end of three (3) months.*

   *Members/employees recommended for PAS intervention shall be monitored for a minimum of 12 months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor and designated commander/manager: The first at three (3) months and the second at one (1) year. Member/employees subject to PAS intervention for minor, easily correctable performance deficiencies may be dismissed from the jurisdiction of PAS upon the written approval of the member/employee's responsible Deputy Chief, following a recommendation in writing from the member/employee's immediate supervisor. This may occur at the three (3)-month follow-up meeting*

*or at any time thereafter, as justified by reviews of the member/employee's performance. When a member/employee is not discharged from PAS jurisdiction at the one (1)-year follow-up meeting, PAS jurisdiction shall be extended, in writing, for a specific period in three (3)-month increments at the discretion of the member/employee's responsible Deputy Chief. When PAS jurisdiction is extended beyond the minimum one (1)-year review period, additional review meetings involving the member/employee, the member/ employee's designated commander/manager and immediate supervisor, shall take place no less frequently than every three (3) months.*

9. *On a quarterly basis, Division/appropriate Area Commanders and managers shall review and analyze relevant data in PAS about subordinate commanders and/or managers and supervisors regarding their ability to adhere to policy and address at-risk behavior. All Division/appropriate Area Commanders and managers shall conduct quarterly meetings with their supervisory staff for the purpose of assessing and sharing information about the state of the unit and identifying potential or actual performance problems within the unit. These meetings shall be scheduled to follow-up on supervisors' assessments of their subordinates' for PAS intervention. These meetings shall consider all relevant PAS data, potential patterns of at-risk behavior, and recommended intervention strategies since the last meeting. Also considered shall be patterns involving use of force, sick leave, line-of-duty injuries, narcotics-related possessory offenses, and vehicle collisions that are out of the norm among either personnel in the unit or among the unit's subunits. Division/appropriate Area Commanders and managers shall ensure that minutes of the meetings are taken and retained for a period of five (5) years. Commanders/managers shall take appropriate action on identified patterns of at-risk behavior and/or misconduct.*

10. *Division/appropriate Area Commanders and managers shall meet at least annually with his/her Deputy Chief/Director and the IAD Commander to discuss the state of their commands and any exceptional performance, potential or actual performance problems or other potential patterns of at-risk behavior within the unit. Division/appropriate Area Commanders and managers shall be responsible for developing and documenting plans to ensure the managerial and supervisory accountability of their units, and for addressing any real or potential problems that may be apparent.*

11. *PAS information shall be taken into account for a commendation or award recommendation; promotion, transfer, and special assignment, and in connection with annual performance appraisals. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

12. *Intervention strategies implemented as a result of a PAS Activity Review and Report shall be documented in a timely manner.*

Seventy-First Report of the Independent Monitor for the Oakland Police Department
December 10, 2020
Page 15 of 19

13.     *Relevant and appropriate PAS information shall be taken into account in connection with determinations of appropriate discipline for sustained misconduct allegations.  For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

14.     *The member/employee's designated commander/manager shall schedule a PAS Activity Review meeting to be held no later than 20 days following notification to the Deputy Chief/Director that the member/employee has met a PAS threshold and when intervention is recommended.*

15.     *The PAS policy to be developed shall include a provision that a member/employee making unsatisfactory progress during PAS intervention may be transferred and/or loaned to another supervisor, another assignment or another Division, at the discretion of the Bureau Chief/Director if the transfer is within his/her Bureau.  Inter-Bureau transfers shall be approved by the Chief of Police.  If a member/employee is transferred because of unsatisfactory progress, that transfer shall be to a position with little or no public contact when there is a nexus between the at-risk behavior and the "no public contact" restriction.  Sustained complaints from incidents subsequent to a member/employee's referral to PAS shall continue to result in corrective measures; however, such corrective measures shall not necessarily result in a member/employee's exclusion from, or continued inclusion in, PAS.  The member/employee's exclusion or continued inclusion in PAS shall be at the discretion of the Chief of Police or his/her designee and shall be documented.*

16.     *In parallel with the PAS program described above, the Department may wish to continue the Early Intervention Review Panel.*

17.     *On a semi-annual basis, beginning within 90 days from the effective date of this Agreement, the Chief of Police, the PAS Activity Review Panel, PAS Oversight Committee, and the IAD Commander shall meet with the Monitor to review the operation and progress of the PAS.  At these meetings, OPD administrators shall summarize, for the Monitor, the number of members/employees who have been identified for review, pursuant to the PAS policy, and the number of members/employees who have been identified for PAS intervention.  The Department administrators shall also provide data summarizing the various intervention strategies that have been utilized as a result of all PAS Activity Review and Reports.  The major objectives of each of these semi-annual meetings shall be consideration of whether the PAS policy is adequate with regard to detecting patterns of misconduct or poor performance issues as expeditiously as possible and if PAS reviews are achieving their goals.*

> 18.  *Nothing in this Agreement, and more specifically, no provision of PAS, shall be construed as waiving, abrogating or in any way modifying the Department's rights with regard to discipline of its members/employees.  The Department may choose, at its discretion, to initiate the administrative discipline process, to initiate PAS review or to use both processes concurrently or consecutively.*

(Negotiated Settlement Agreement VII. B.)

**Relevant Policy:**

OPD most recently revised Departmental General Order D-17, *Personnel Assessment Program,* on November 20, 2013.

**Commentary:**

Task 41 of the Negotiated Settlement Agreement elaborates the requirements of OPD's risk management system and processes.  Those requirements are closely tied to the requirements of Task 40, which delineate the required data to be incorporated into the processes of risk management.  Task 34 addresses the department's collection of stop data.  Analysis of that data has been established as an important component of the Department's efforts to manage risk, and has been incorporated into ongoing Risk Management Meetings.  Taken together then, Tasks 40, 41, and 34, and the Risk Management Meetings, themselves encompass the cluster of policies, procedures and practices that define the OPD's efforts to manage risk related to individual officers and to the Department as a whole.

Each of these elements of risk management has undergone significant changes over an extended period of time.  As long as eight years ago, serious data problems hampered the Department's achievement of full compliance with Task 40.  That spawned revision of the PAS database; which was eventually replaced by PRIME; and then which gave way to the current database, known as Vision.  As those changes occurred, so too did refinements in collection of stop data and later, implementation of Department-wide, and then also Area-level, Risk Management Meetings.

As the Department makes progress in each of these areas and approaches completion of the Vison database with its accompanying dashboards to facilitate the use of that data, it is appropriate to look across the cluster of these interrelated tasks and begin to focus on the remaining work to be done.  That is the approach we will take here.  We recognize that important work on the data systems continues.  Our most important interest, however, is to encourage looking to the future to get the most out of the anticipated advancements in applying the analysis of data to managing risk.  Below we identify six issues which will be important moving forward:

- **Administrative concerns:**  The Department recently made a change at the position of Director of Services for the Department.  Among the responsibilities of that position has been a role in shepherding the development of risk management functions – including assisting with database requirements, and training and helping to coordinate staff and contractors working on parts of the project.  A new occupant of that office will need to

prioritize those responsibilities and concentrate effort on their completion.  Other changes in staffing for the Vision system project and related work are also anticipated, including those at the administrative level and at other critical work levels.  Care must be taken not to fall behind at this critical time and to prepare new staff for their assignments.

- **Policy concerns:**  The Department's General Orders are posted on its website and are organized into files by the topics they cover.  The relevant risk management policy is known as Departmental General Order D-17 and is currently entitled "Personnel Assessment System."  It can be found in a file under "Working conditions" and not in the file labelled "Risk Management," where force related policies are found.  Furthermore, the policy was last signed off on in 2013 by the then-Chief.  It was scheduled for review one year later and for revisions at two-year intervals.  Besides the issues of misclassification and missed review and revisions, the existing policy does not accurately reflect the current state of risk management data or processes, or the current or anticipated importance of risk management moving forward.  A complete revision of the policy is needed.

- **The role of the Data Manager:**  The Department has recently filled the long-anticipated Data Manager position.  We were impressed by the final candidate's credentials and experience.  The position will be housed in OIG.  This position will bring new capabilities and capacity to the Department.  As a new position, it will be important to carefully define the Department's expectations of this researcher.  The most useful process for that will be one that engages the new Data Manager in defining the job and the new contributions it can make to the Department.

- **Risk management data issues:**  The Department and its new Data Manager will face some pressing data-related issues as Vision and its Dashboards move forward toward completion.  High on that list will be addressing the Task 40 data categories.  Although the Department has stated its confidence in the ability to collect and analyze all of the required information, those processes have not occurred routinely for some time.  The re-creation of earlier data tables will be necessary.  Although risk management has largely focused on the activity of individual officers, it will also be important to expand the focus on tracking data at the Department level – as well as in its subunits.  That will help inform consideration of the risk implication of policy and practice within the organization.  The approach will benefit from careful analyses of trends and patterns in the data.  While the new data dashboards will provide supervisors with critical access to data, care must be taken to avoid a singular focus on individuals which could miss important patterns at higher levels.

- **Re-engineering the Risk Management Meetings:**  The Department is engaged in a dramatic increase in access to information and a re-envisioning of the way that data can be used for managing risk.  The Risk Management Meetings, including their extension to the Area level, provide a significant foundation on which to build.  It should be clear, however, that *building* on them will mean *changing* them.  The Vision system and its dashboards will make data available on a nearly real-time basis, perhaps even at the meetings themselves.  Taking advantage of that will require re-engineering the risk management process from the way analysis is done, through the content of Risk

Management Meetings and the process of managing officers and the Department to
reduce risk.  It is a good time to begin to formalize what the new generation of risk
management practice will look like.

- **The impact on supervisors:**  The role of first-line supervisions has changed substantially
since the Department first took steps to identify and manage risk.  Sergeants often initiate
risk assessments, they complete reviews and make recommendations, they implement
strategies for changing officer behavior, and they supply vital information that helps
prepare others for Risk Management Meetings.  With advancement in data access
through dashboards, their role becomes even more central to the process.  They are
destined to be the linchpin in the Department's management of risk.  Engaging sergeants
by providing them with the time, tools, and training needed to accomplish their work will
be increasingly important as expectations around the use of data continue to rise.

In a significant number of our previous reports, we have expressed concern that the technology
of building and implementing new data systems might push aside the substantive issues of
identifying and managing risk at the Department.  We are optimistic that the danger of that is
passing.  The Vision database and the dashboards that provide access to it are promising.  But the
agenda outlined above, which is certainly not complete, still indicates that progress on the
technical tasks only raise the stakes for progress on the substantive processes of risk
management.

| Task 41 compliance status | Deferred, due to the ongoing reconstruction of the Vision database. |
|---|---|

# Conclusion

In our recent report on the March 11, 2018 officer-involved shooting, we raised concerns about
serious policy deficiencies on the part of the Department.  For example, we noted that OPD does
not currently have policies on when it is appropriate to place officers involved in the use of
deadly force on administrative leave or reassign them to non-patrol functions within the
Department, or the sequestration of the on-scene Commander in critical incidents.  In other areas,
existing policy is sorely outdated and needs significant revisions.  At a Case Management
Conference (CMC) in September, the Court noted, "…I appreciate that the City agrees [with] the
Monitor's findings; that it thinks that the deficiencies that are described are of immense concern,
and that Mr. Pawlik's death was horrific and avoidable.  The fact that these deficiencies existed
points to a culture that lacks accountability, a culture more interested in burying problems than
confronting them.  That kind of a culture can only exist when the leaders allow it to.  Leaders
demand accountability, integrity, and results.  Without that OPD is going to stay in an endless
loop that fails to reach the goals that it agreed to in implementing the NSA."

Seventy-First Report of the Independent Monitor for the Oakland Police Department
December 10, 2020
Page 19 of 19

During a discussion on policy development during our most recent site visit, Interim Chief Manheimer indicated that OPD is working with the City's Police Commission to finalize the policies on the subjects of unresponsive and potentially armed persons, the use of armored vehicles, and the use of Designated Arrest Teams.  However, the Department has much more work to do to address the deficiencies identified in our report on the March 11, 2018 officer-involved shooting; many additional policies need drafting or revisions.  During the September CMC, the Court requested that the Department implement all of the policies we listed in the report by the next CMC, in February.  We will continue to track the Department's progress in this area; February is only a few months away.

Chief (Ret.) Robert S. Warshaw

*Monitor*