February 5, 2021

# Seventy-Second Report
## *of the* Independent Monitor
## *for the* Oakland Police Department

## Introduction

This is our seventy-second status report on the Negotiated Settlement Agreement (NSA) in the case of *Delphine Allen, et al., vs. City of Oakland, et al.,* in the United States District Court for the Northern District of California under the direction of Judge William H. Orrick.  I was appointed in 2010 to oversee the monitoring process of the Oakland Police Department (OPD) that began in 2003.

This report describes our recent assessments of NSA Tasks 24, 25, 26, 30, 31, 41, and 45; and covers our virtual site visits of October 7-8 and November 17-18, 2020.  Following the Court's Order of May 21, 2015, we devote special attention to the most problematic component parts of the NSA Tasks that are not yet in full or sustained compliance; and discuss in our status reports the most current information regarding the Department's progress with the NSA and its efforts at making the reforms sustainable.

## *Providing Technical Assistance*

Each month, our Team conducts a visit to Oakland that includes both compliance assessments and technical assistance.  During our visits, we meet with Department and City officials; observe Department meetings and technical demonstrations; review Departmental policies; conduct interviews and make observations in the field; and analyze OPD documents and files, including misconduct investigations, use of force reports, crime and arrest reports, Stop Data Forms, and other documentation.  We also provide technical assistance, especially those that relate to the remaining non-compliant Tasks or areas identified by the Department -- including in the areas of IAD investigation quality (Task 5); use of force investigations and reporting (Tasks 24 and 25); stop data and related issues (Task 34); risk management and the ongoing maintenance issues and the development of Vision (Task 41).

## *Building Internal Capacity at OPD*

Also per the May 21, 2015 Court Order, we continue to work closely with the Office of Inspector General's (OIG) staff to identify areas that it should audit or review – and to help design approaches to these audits that are not cumbersome, so as to ensure sustainability. We review OIG's quarterly progress reports, which are a valuable resource and assist us in assessing compliance with NSA requirements. OIG's most recent quarterly report described its evaluation of the Department's promotional consideration process, which, for the most part, is working as intended. The report also discussed OIG's examination of whether sworn personnel attended the in-service training required by the Department, and found some significant issues in the way the Department tracks its in-service training. We discussed this with Departmental personnel during our December last site visit, and we will continue to follow up on this issue to ensure that the Training Division is maintaining complete and accurate training records. The tracking of training records is a requirement of the NSA (Tasks 40 and 43).

---

## *Focused Task Assessments*

## Overview of Our Assessments of Tasks 24 and 25

OPD had been in compliance with Tasks 24 and 25 since 2015, and we were not actively reviewing these Tasks. In November 2018, as a result of concerns that we brought forward regarding the identification, potential underreporting, and investigation of uses of force, the Court reactivated Tasks 24 and 25.

Between December 22, 2020, and January 14, 2021, we reviewed five Level 2 uses of force (UOFs) for which a Force Review Board (FRB) was held. Our reviews here for Tasks 24 and 25 only discuss any identified concerns with the field reporting (not the FRB proceedings) of these UOFs. In these five incidents, we noted concerns with body-worn camera activation; documentation of patterns of minor violations; a discrepancy that was left unaddressed; and in one incident, the officers failed to identify themselves at the beginning of the community contact where there was time to do so. The FRBs also identified and addressed these concerns, which are generally the same as those we continue to identify in our Level 3 and 4 UOF reviews. (More information in the Tasks 26 and 30 sections of this report.)

For purposes of this report, we reviewed 109 Level 3 and Level 4 use of force (UOF) reports that were completed by OPD personnel between October 1, 2019 and February 28, 2020 to assess compliance with Tasks 24 and 25. We reviewed all incidents that involved at least one Level 3 use of force (10), all Level 3 uses of force that were reduced to Level 4 (10), and a sample of Level 4 uses of force (89).

Since we resumed these reviews following the Court's reactivation of these Tasks, we have provided detailed feedback on the force investigations to OPD during each of our site visits.  In cases where we have had questions or concerns, OPD personnel have continued to be responsive and have provided follow-up where necessary.  In some cases, OPD has provided additional information or documentation that supports its actions, and we have concurred with the Department's assessments.  In others, we have identified concerns that had not been identified or addressed by OPD supervisors who conducted the UOF investigation, or the command personnel who reviewed the investigation.  In these cases, OPD executive staff have directed additional review; directed training; entered a Supervisory Note File (SNF); or initiated an Internal Affairs Division (IAD) investigation.  OIG identified many of the concerns we have noted in our reviews and discussions with OPD in its 2019 use of force audit.

In late 2018, OPD employees received training on the requirements for use of force reporting related to the pointing of weapons.  In April 2019, OPD issued an Information Bulletin that provided clarification and direction regarding the documentation of use of force.  The content of this bulletin included many of the concerns we had identified with the proper reporting of force.  In June of 2019, the then-Chief issued a directive via email that specifically addressed boilerplate language in use of force reports; and in November 2019, she followed up with an additional email to address the use of generic or boilerplate language in the administrative section of Department reports.  In December 2019, OPD completed the training developed to address deficiencies found in UOF documentation based on OIG's global use of force audit.  On February 15, 2020, OPD published Special Order 9196, which expanded and clarified the use of force policy.  On February 27. 2019, the Department published Special Order 9202, which temporarily modified the requirements for the reporting of Type 32 UOFs.

This report covers Level 3 and 4 UOF reports completed by OPD from October 2019 through February 2020.  Of the 109 cases we reviewed for this time period, all but two occurred prior to Special Order 9196, which clarified the use of force policy; and before Special Order 9202, issued on February 27, 2020, which temporarily modified the requirements for reporting Type 32 UOFs.  We have noted improvement in the reporting of uses of force in our reviews, and remain hopeful that the actions that have been taken by OPD – including clarifications on policy – will continue to reduce deficiencies in the required reporting of force.

In our review of the 109 Level 3 and 4 use of force reports completed for October 2019 through February 2020, we identified two instances where we believe the use of, or level of, force may not have been appropriate.  In both, the subject on whom force was used filed a complaint, and OPD appropriately initiated Internal Affairs Division investigations.  In two instances, an involved officer did not properly report a use of force.  In the first incident, the officer did not believe he had a reportable use of force, so did not report it; a supervisor discovered and appropriately addressed this incident as a reportable use of force.  In the second incident, while the officer reported the use of force, the report was not made in a timely manner.

In the Level 3 and 4 UOFs we reviewed, there were 290 uses of force against 148 different persons.  In some cases, multiple officers used force on a single person; and in others, force was used on multiple persons, either by a single officer or multiple officers.  The total breakdown for the force used on the 148 persons is as follows: African Americans, 68%; Latinos, 22%; Whites, 4%; and Asians or Other, 2%.  The percentage of force incidents involving African Americans

increased by 2%; force incidents involving Whites decreased by 3%; force incidents involving Latinos decreased by 2%; and force incidents involving Asians or persons categorized as Other decreased by 1% from what we found in our last review, documented in our sixty-ninth status report.

Officers engaged in a Level 4-Type 22 UOF, pointing of a weapon, 223 times against a total of 115 persons.  We noted in our reviews for this report that there were again incidents that involved multiple suspects and numerous OPD personnel being involved in the pointing of weapons.  In these 223 instances, the breakdown is as follows: African Americans, 64%, a decrease from 66% in our sixty-seventh report; Latinos, 26%, an increase from 24%; Whites, 5%, an increase of 2%; and Asians or Other, 4%, an increase from 2%.

Of the total 148 persons on whom force was used, 116 (78%) were arrested or criminally charged for felony or misdemeanor violations.  The remaining 32 involved mental health holds, inability to establish criminal conduct, subjects who escaped, victims who did not want to prosecute, or subjects determined not to be a suspect after the investigation was conducted.  In nine of the incidents reviewed, a person claimed an injury; but none of these injuries required admittance to a hospital.  In nine other instances, persons were transported to a medical facility for the removal of a Taser probe, for injuries that occurred prior to the use of force, or solely to obtain a medical clearance.

In our assessment of Task 25.3 in previous reports, we identified numerous incidents where we believed that additional verbal communications and explanation with persons who were contacted might have resulted in a reduction in the need to use physical force, and where officers failed to identify themselves as police officers when contacting subjects.  During our assessments for the last report, we did not find any incidents where officers did not attempt verbal communications where it was appropriate and where there was time to do so prior to utilizing force options.  We continued to note, however, instances where officers did not identify themselves as police officers when contacting subjects, even when there was time to do so.  (We do not include those contacts where it should be obvious to the subject that s/he is dealing with an officer.)

For this report, we did not identify any Level 3 or 4 uses of force where officers failed to attempt verbal communications and de-escalation where appropriate, prior to utilizing force.  We continued to identify instances where officers did not identify themselves as police officers when contacting members of the public and there was time to do so, though we note again for this report that there are fewer instances where this announcement is not made than during our earlier reviews.  We will continue to discuss any future concerns we identify with OPD and continue to monitor these types of instances; as is our practice during our monthly site visits, we continue to provide input to the Department on our observations.

Special Order 9196, the revision to the UOF reporting requirements, that went into effect on February 15, 2020 clarified what constitutes a "reportable use of force" and provided clearer direction on the reporting of use of force.  Special Order 9196 also added a new force type: Type 32.  A Type 32 use of force includes: overcoming resistance of a person during an arrest or detention; or defending oneself or another from combative action by another person.  Type 32 is intended to address any use of force not already covered in Types 1-31.  While we expected an increase in Level 4 use of force reporting after Special Order 9196 was issued, the immediate

and significant spike in the numbers was much greater than anticipated and appeared to be primarily related to the new Type 32, as shown in the increase from 167 Level 4 UOFs in 2019 to 618 during the same time period in 2020.  We agreed with OPD's assessment that further review of the force policy was needed due to this unanticipated increase; and Special Order 9202 was issued, that at least temporarily removed the Type 32 from the category of a Level 4 reportable use of force.  Alternative means for counting these uses of force were implemented by OPD until more permanent solutions could be identified.

For our sixty-ninth report, we reviewed a sample of Type 32 UOFs.  We found in these early reviews that there was, at least initially, some confusion regarding this reporting.  In some cases, we identified instances where a Type 32 was documented and it did not appear that a use of force had occurred; and in others, we found that Type 32 was not the appropriate force type to have been used.  We also identified concerns with officers not authoring their own supplemental reports, failures to properly document these uses of force in required reports, and the identification of MOR violations or training issues that did not appear to have been addressed.  In June 2020, OPD began providing additional training on how to properly document Type 32 UOFs.

As a part of our reviews for this report, we reviewed the monthly Type 32 UOF audits being conducted by OPD Area Command personnel.  They found that, in general, officers are properly reporting these uses of force.  They did not identify any instances in their reviews where they believed that a Type 32 UOF should have been classified as a different, or higher level of force.  They also found that the majority of these UOFs were the result of resistance during handcuffing, resisting while a subject was being escorted, or as a result of restraining persons with mental health issues.

During our review of the 109 Level 3 and 4 use of force incidents for this report, we again noted instances where it took multiple officers to control and secure combative persons, though these uses of force were not considered "reportable" at the time.  For those uses of force reviewed for this report, only two incidents occurred after February 15, 2020 when OPD clarified what constitutes a reportable use of force.  Neither of these two incidents had any use of force that was not reported as required under the revised OPD policies.  We expect that we will begin to see the full impact of Special Order 9196 in those UOFs that occurred beginning in March 2020, after the revisions to the policy, which we will review for our next report on Tasks 24 and 25.

The issuance of Special Order 9202 resulted in the identification of a number of challenges in collecting data regarding Type 32 UOFs, as OPD's current technology does not allow personnel to accurately collect the information as OPD had expected it would.  The Department continues to seek a resolution to the reporting concerns.  We have had a number of discussions with OPD regarding the data collection issues, and will continue to closely monitor their progress in finding a solution.  We are also working with OPD to identify an appropriate strategy for the supervisor review process for these UOFs.  As we noted in our last report, these incidents are uses of force.  OPD must find a way to ensure that the incidents are accurately reported and factored into ongoing risk management analysis.

In our sixty-ninth report, we found that in five (10%) of the 51 UOF investigations we reviewed, one or more officers had a late activation of their PDRD.  In four of the five, OPD supervisors identified and addressed these concerns with appropriate documentation.  OPD also implemented

the 30-second buffer for PDRDs, which records video of the 30-seconds immediately prior to when the officer activates the PDRD.  What the buffer does not do is capture any audio during this 30 seconds, nor does it negate the responsibility of the officer to activate the PDRD at the appropriate time.

For this report, we found that in the 109 UOF reports we reviewed, there were 23 instances (21%) where a PDRD had not been properly activated; all were late activations.  In 10 of these, an OPD supervisor identified and properly addressed the late activation.  In the remaining 13, the supervisor either failed to identify and address the late activation at the time it occurred, or failed to ensure that appropriate follow-up was conducted once it was discovered.  During the five months of reviews we conducted for this report, we found that between 20-25% of the cases had body-worn camera activation concerns.  The failure to properly activate a body-worn camera is a violation of policy; and more importantly, could result in the loss of critical information regarding the community contact.  What is more concerning is that supervisors and those who review the supervisor reports have not been consistently identifying and addressing this concern.  During each site visit, we discuss with OPD instances where we have found that body-worn camera activation did not occur appropriately.  To its credit, OPD has conducted follow-up on each, ensuring that SNFs are issued if appropriate, or in some, initiating internal investigations.  What appears to be part of the reason for the failure to properly activate the body-worn camera in the cases we reviewed for this report was an apparent belief by some officers and supervisors that the 30-second buffer time met the requirement for activation.  As OPD executive staff has acknowledged, it does not.  OPD has assured us of the Department's ongoing efforts to address body-worn camera activation concerns.

In addition to concerns we body-worn camera activations, we continued to note the use of profanity or inappropriate use of slang terms that was clearly evident upon review of body-worn camera footage.  We have also continued to find instances where supervisory personnel are not ensuring that no previous patterns of violations exist prior to determining if an SNF is appropriate for a late body-worn camera activation or other type of MOR violation.  In two of the UOFs we reviewed for this report, we brought late body-worn camera activations to OPD's attention; and then OPD determined that the involved officers were not eligible for SNFs due to a pattern of late activations and internal investigations were initiated.  These late activations and patterns should have been identified by the original supervisor who reviewed the UOF.  While we remain supportive of the use of SNFs for minor violations, we continue to emphasize that supervisors must ensure that the employee does not have a pattern of similar misconduct prior to using an SNF.

The use of force analysis we conducted in 2018 established the underreporting of Level 4 uses of force where an officer pointed a weapon at a person.  Following our analysis, OPD partially addressed this concern with refresher training in September 2018 for all officers, and the Department has further addressed this issue in its use of force policy revisions.  In our review of Level 3 and 4 UOFs for this report, we did not identify any instances where an officer failed to report the pointing of a weapon at a person.

In OPD's 278th Biweekly Compliance Update, dated December 28, 2020, the Department provided a comparison of year-to-date Level 3 and 4 UOFs for 2020 compared to 2019.  Level 3 uses of force increased from 101 in 2019, to 332 YTD in 2020.  OPD identified in this report that

use of force counts for the protests from May-June 2020 were included in this report; and that the notable increase in Level 3 UOFs was "attributable to the use of chemical agents during these events."  Prior to this, there had been an ongoing decrease in the Level 3 use of force categories. Level 4 UOFs increased from 1,429 in 2019, to 2,631 in 2020.  These increases appeared to have three primary drivers.  Level 4-Type 22 UOFs – which increased 61% from 2019 to 2020 – appeared to be a continuation of the results of OPDs training on the previous underreporting of these uses of force.  The addition of the Type 32 and Type 29 UOFs in Special Order 9196 appeared to constitute the majority of the additional increases in Level 4 UOFs.  According to the 265th Biweekly Compliance Update, Type 32 UOFs accounted for approximately 33% of the increase for the two-week period between February 15-20, 2020, when these were still being reported in Vision for that two-week period.  Type 29 UOFs (all non-carotid takedowns except on a restrained person) accounted for approximately 22% of the increase.

OPD has taken a number of actions to address the many concerns with the use of, and reporting of, force by officers.  In September 2018, to address the reporting of Level 4-Type 22 uses of force (the pointing of a firearm at a person), the then-Chief ordered refresher training on officers' use of firearms; and the number of reported Level 4 uses of force increased dramatically after that training.  OPD continues to maintain that the significant increase in these Level 4 uses of force may be related to the potential underreporting of Level 4-Type 22 pointing a weapon at a person prior to the refresher training and the impact of the short period of time where Type 32 UOFs were included in the total counts.

In OPD's 279th Biweekly Compliance Update, dated January 15, 2021, the Department provides a  review of Uses of Force between December 27, 2020 and January 9, 2021.  Though it is too early to assess any patterns or trends that may occur in 2021, we would not expect to see ongoing significant increases in the Level 4 uses of force in 2021, since it has been more than one year since OPD delivered training on Level 4 use of force in late 2019, and revised required reporting of UOF in February 2020.  We will continue to review reports to determine if the revised policies regarding both the use of force, and the reporting of force, are being followed by OPD personnel.

As we have previously noted, the increases in the reported uses of force between 2018 and 2020 did not appear to signal a rise in actual use of force, but rather was the result of prior inaccurate reporting left unchecked by supervisory personnel.  While we have continued to identify concerns with body-worn camera activations, addressing identified MOR violations, investigative narratives, PRIME reports, and other documentation in our review of UOF reports for October 2019 through February 2020, there has been a decrease in the total number of concerns we have identified.  OPD has taken numerous steps to address the proper reporting of use of force and the concerns that have been identified during our reviews.  The most significant steps, beyond the firearms training that occurred in late 2018, began in April 2019, with an OPD Information Bulletin that provided significant direction regarding the reporting of uses of force. In our reviews of uses of force for October 2019 through February 2020, we continue to see overall improvement, though there are still areas of concern.  We are hopeful that OPD will continue to improve its reporting and that the revised UOF policies will have the intended results.  We will monitor the impact of these revised policies, training delivered, and any directives from OPD executive staff to address any ongoing UOF reporting concerns.

# Task 24: Use of Force Reporting Policy

## Requirements:

*The policy shall require that:*

1. *Members/employees notify their supervisor as soon as practicable following any investigated use of force or allegation of excessive use of force.*

2. *In every investigated use of force incident, every member/employee using force, and every member/employee on the scene of the incident at the time the force was used, shall report all uses of force on the appropriate form, unless otherwise directed by the investigating supervisor.*

3. *OPD personnel document, on the appropriate form, any use of force and/or the drawing and intentional pointing of a firearm at another person.*

4. *A supervisor respond to the scene upon notification of an investigated use of force or an allegation of excessive use of force, unless community unrest or other conditions makes this impracticable.*

5. *OPD notify:*

   a. *The Alameda County District Attorney's Office immediately or as soon as circumstances permit, following a use of lethal force resulting in death or injury likely to result in death.*

   b. *The City Attorney's Office as soon as circumstances permit following the use of lethal force resulting in death or serious injury.  At the discretion of the City Attorney's Office, a Deputy City Attorney shall respond to the scene.  The Deputy City Attorney shall serve only in an advisory capacity and shall communicate only with the incident commander or his/her designee.*

   c. *Departmental investigators regarding officer-involved shootings, in accordance with the provisions of Section V, paragraph H, of this Agreement.*

6. *OPD enter data regarding use of force into OPD's Personnel Assessment System (PAS).*

(Negotiated Settlement Agreement V. A.)

## Relevant Policy:

OPD most recently revised Departmental General Order K-4, *Reporting and Investigating the Use of Force,* on October 16, 2014.

## Commentary:

To assess compliance with Task 24, we reviewed 109 Level 3 and 4 use of force (UOF) reports that were completed by OPD during August and September 2019.  We also reviewed five Level 2 UOF investigations, for which an FRB was held between December 22, 2020 and January 14, 2021.  These Level 2 UOFs are reported in our regular assessments of Tasks 26 and 30.

**Task 24.1** requires that members/employees notify their supervisor as soon as practicable following any reportable use of force or allegation of excessive use of force.  In two of the cases we reviewed for this report, notifications were not made as required.  In one, the officer did not believe he had a reportable use of force and did not report it.  This was discovered by a supervisor during a UOF review, and appropriately addressed.  In a second case, while the officer did notify a supervisor, the notification was not made as soon as practicable as required by this Task.  The supervisor appropriately addressed this with an SNF.

**Task 24.2** requires that in every reportable use of force incident, every member/employee on the scene of the incident at the time the force was used, reports all uses of force on the appropriate form, unless otherwise directed by the investigating supervisor.  **Task 24.3** requires that OPD personnel document, on the appropriate form, every use of force and/or the drawing and intentional pointing of a firearm at another person.

In the 109 Level 3 and 4 UOF incidents we reviewed; officers pointed weapons at persons 223 times.  We determined that officers' pointing of their firearms was appropriate in all instances we assessed.  There were no instances identified where officers did not report uses of force on the appropriate form.  We did identify a number of instances where officers who assisted in restraining a combative person did not report having used force.  This issue was addressed in February 2020 by OPD in its revisions to the UOF policy, which provides clarification regarding reportable uses of force.  We will continue to closely monitor these types of incidents to ensure that OPD personnel properly report these uses of force in the future.

**Task 24.4** requires that a supervisor respond to the scene upon notification of a Level 1, 2, or 3 use of force or an allegation of excessive use of force, unless community unrest or other conditions makes such a response impracticable.  In the Level 3 uses of force we reviewed for this subtask; supervisors responded to the scene as required in all instances.  Though not required, in all but 15 of the Level 4 UOF reports we reviewed, a supervisor was also either on scene at the time of the use of force, or responded to the scene upon being notified of the use of force.

**Task 24.5** specifically addresses requirements for the response and handling of Level 1 uses of force.  We assess Level 1 uses of force in our regular reviews of Task 30 (Executive Force Review Boards).

**Task 24.6** requires that OPD enter all use of force data into Performance Reporting Information Metrics Environment (PRIME), which is now called Vision.  In all 109 of the Level 3 and 4 UOF cases we reviewed; the data was entered as required.

The Court's reactivation of Task 24 at a November 2018 Case Management Conference resulted from our serious concerns with the Department's handling and investigation of uses of force. OPD drafted Special Order 9196 to address and clarify requirements for the proper reporting of

use of force.  This revision to UOF reporting requirements went into effect in February 2020.  OIG's global use of force audit, conducted in 2019, also identified numerous concerns with the reporting of use of force and enumerated a number of recommendations.  As noted above, OPD has taken a number of actions to address the identified concerns with the reporting of force.  While we have continued to identify concerns and deficiencies in those UOFs we reviewed for this report, we have also noted improvements.  To date, all but two of the Level 3 and 4 UOFs we have reviewed occurred prior to the revisions to OPD's use of force policy in February 2020.  Moving forward, we will closely monitor UOFs occurring after these revisions became effective to ensure that the revisions are resulting in the desired reporting outcomes and that OPD personnel comply with these policies.  OPD remains in partial compliance with this Task.

| Task 24 compliance status | In partial compliance |
|---|---|

## Task 25: Use of Force Investigations and Report Responsibility

### Requirements:

*An on-scene supervisor is responsible for completing an investigated use of force report in accordance with the provisions of Departmental General Order K-4, "Reporting and Investigating the Use of Force."*

1.  *OPD shall develop and implement a policy for conducting and documenting use of force investigations that include, at a minimum:*

    a.  *Documentation of the incident in either an Offense or Supplemental Report from the member(s)/employee(s) using force; and/or, when necessary, a statement taken from the member(s)/employee(s) using force;*

    b.  *Separating and separately interviewing all officers who were at the scene at the time of the incident;*

    c.  *A Supplemental Report from other members/employees on the scene or a statement taken, if deemed necessary by the investigating supervisor;*

    d.  *Identification and interviews of non-Departmental witnesses;*

    e.  *Consideration of discrepancies in information obtained from members, employees and witnesses, and statements in the reports filed;*

    f.  *Whether arrest reports or use of force reports contain "boilerplate" or "pat language" (e.g., "fighting stance", "minimal force necessary to control the situation");*

    g.  *Documentation of physical evidence and/or photographs and a summary and analysis of all relevant evidence gathered during the investigation; and*

    h.  *Consideration of training/tactical issues involving the availability and practicality of other force options.*

    i.  *Supervisor's justification as to why any element of the policy was not documented; and*

2.   *All supervisors shall be trained in conducting use of force investigations and such training shall be part of a supervisory training course.*

3.   *Use of force investigations shall include a recommendation whether the use of force was objectively reasonable and within Department policy and training. The recommendation shall be based on the totality of the circumstances and shall consider, but is not limited to, the following factors:*

    a.   *Whether the force used was pursuant to a legitimate law-enforcement objective;*

    b.   *Whether the type and amount of force used was proportional to the resistance encountered and reasonably related to the objective the members/employees were attempting to achieve;*

    c.   *Whether the member/employee used reasonable verbal means to attempt to resolve the situation without force, if time and circumstances permitted such attempts;*

    d.   *Whether the force used was de-escalated or stopped reasonably when resistance decreased or stopped;*

4.   *use of force reports shall be reviewed by the appropriate chain-of-review as defined by policy.*
*The type of force used, the identity of the involved members, and the report preparer shall be the determining criteria for utilizing the appropriate chain-of-review. Reviewers may include, when appropriate, the chain-of-command of the involved personnel, the appropriate Area Commander on duty at the time the incident occurred, other designated Bureau of Field Operations commanders, and as necessary, the chain-of-command of the involved personnel up to the Division Commander or Deputy Chief/Director, and the Internal Affairs Division.*
*Reviewers for Level 1-3 use of force investigations shall:*

    a.   *Make a recommendation as to whether the use of force was in or out of policy,*

    b.   *Order additional investigation and investigative resources when necessary, and*

    c.   *Comment on any training issue(s) when appropriate.*

5.   *Any recommendation that the use of force did not comply with Department policy shall result in the incident being referred to the Internal Affairs Division to conduct additional investigation/analysis, if necessary.*

6.   *Members/employees involved in a use of force incident resulting in serious injury or death and/or an officer-involved shooting, shall be separated from each other as soon as practicable at the incident scene, and kept apart until they have completed their reports and been interviewed.*

(Negotiated Settlement Agreement V. B.)

**Relevant Policy:**

OPD most recently revised Departmental General Order K-4, *Reporting and Investigating the Use of Force,* on October 16, 2014.

**Commentary:**

As noted above, in Task 24, we reviewed 109 Level 3 and 4 use of force (UOF) reports that were completed between October 2019 and February 2020. We also reviewed five Level 2 UOF reports, for which a Force Review Board (FRB) was held between December 22, 2020 and January 14, 2021.

**Task 25.1** requires that an on-scene supervisor complete a use of force report for every Level 3 use of force. In all 10 incidents where at least one Level 3 use of force occurred, a supervisor responded to the scene and completed a use of force investigation. In addition, there were 10 instances where a Level 3 use of force was downgraded to a Level 4 by a supervisor. In all 10, documentation, justification, and approval were provided.

**Task 25.2** requires that all supervisors are trained on how to conduct use of force investigations and such training is part of a supervisory training course. OPD includes the requirement for this training in its Departmental policies. During our August 2020 site visit, we again confirmed with OPD that the Department continued to require and deliver this training. In OPD's 279th Biweekly Compliance Update, dated January 15, 2021, the Department provided the results of its review of Task 25 requirements. OPD reviewed 15 uses of force for this audit; one was a Level 3 UOF, and 14 were Level 4 UOFs. The Department noted in this report that all supervisors had attended a Sergeants' Transition Course, where use of force investigation is part of the curriculum. We will verify that this training remains in place during future site visits.

**Task 25.3** requires that use of force investigations include required recommendations. Areas of recommendation include: whether the force used was pursuant to a legitimate law enforcement objective; whether the type and amount of force used was proportional to the resistance encountered and reasonably related to the objective the officers were attempting to achieve; whether the officers used reasonable verbal means to attempt to resolve the situation without force, if time and circumstances permitted such attempts; and whether the force used was de-escalated or stopped reasonably when resistance decreased or stopped.

In our assessment of the 109 Level 3 and 4 UOF reports we reviewed, we identified two incidents where we believe the force may not have been appropriate. In both, OPD had already initiated an internal investigation based on a complaint from the subjects on whom force had been used. We did not identify any instances where the use of force was not deescalated or stopped reasonably when resistance decreased. Unlike our findings in prior reports, we did not identify any instances where we believe officers could have made additional efforts to explain to subjects being detained why the detention was occurring prior to using force. While we continued to note a number of instances where we believe officers should have identified themselves as police officers when it was appropriate and there was time to do so, the number of these incidents has decreased since our earlier reviews. We remain encouraged by OPD's improvement in making these announcements and the continued efforts of OPD personnel to

attempt to deescalate situations prior to using force.  We are hopeful that with continued direction provided by OPD executive staff that this becomes the standard of performance.  During our site visits, we will continue to discuss any instances where we believe verbal communications or announcements could have potentially resulted in a decrease in the necessity to use force; and will continue to acknowledge those instances where OPD personnel did engage in these efforts.

**Task 25.4** requires that use of force reports be reviewed by the appropriate chain of review and appropriate recommendations are made.  In all of the cases we reviewed, the reports were reviewed as required.  We noted that while we continue to find some deficiencies related to the preparation and review of UOF reports for Level 3 and 4 UOFs, we are observing more instances where supervisory personnel are more thoroughly preparing and reviewing these reports, though we continue to find instances where they fail to identify and properly address concerns with body-worn camera activations, or other MOR violations.  In the Level 2 UOF incidents we reviewed, we also had some concerns with the field investigations, including: Manual of Rules (MOR) violations; or training issues.  These concerns were identified during FRBs, and are addressed in our regular assessment of Tasks 26 and 30.

**Task 25.5** requires that any determination that a use of force did not comply with Department policy result in the incident being referred to IAD to conduct additional investigation/analysis, if necessary.  None of the Level 3 or Level 4 investigations we reviewed resulted in a finding during the field review that the force did not comply with policy.  In two of the Level 3 UOFs we reviewed for this report, we did identify potential concerns with the UOF.  In both, the community member had filed a complaint and an IAD investigation had already been opened by OPD.  Concerns involving compliance for Level 2 UOFs are identified during FRBs and addressed in our regular assessment of Tasks 26 and 30.

**Task 25.6** requires that members/employees involved in a use of force incident resulting in serious injury or death and/or officer-involved shooting, are separated from each other as soon as practicable at the incident scene, and kept apart until they have completed their reports and been interviewed.  This Task is not assessed here, as we review and consider it as part of the Force and Executive Force Review Boards that OPD holds to examine Level 1 and 2 uses of force.

The Court's reactivation of Task 25 at the November 2018 Case Management Conference resulted from our serious concerns with the Department's handling and investigation of recent uses of force.  OPD drafted Special Order 9196 to address and clarify requirements for the proper reporting of use of force.  This revision to UOF reporting requirements went into effect in February 2020.  OIG's global use of force audit, conducted in 2019, also identified numerous concerns with the reporting of use of force and enumerated a number of recommendations.  As previously noted, OPD has taken a number of actions intended to address identified concerns with the reporting of force.  While we have continued to identify concerns and deficiencies in those UOFs we reviewed for this report, we have also continued to note improvements.  To date, all but two of the Level 3 or 4 UOFs we have reviewed, occurred prior to the revisions to OPD's use of force policy in February 2020.  Moving forward, we will closely monitor UOFs occurring after these revisions occurred to ensure that the revisions are resulting in the desired reporting outcomes and that OPD personnel comply with these policies.  OPD remains in partial compliance with this Task.

| Task 25 compliance status | In partial compliance |
|---|---|

# Task 26:  Force Review Board (FRB)

**Requirements:**

*OPD shall develop and implement a policy concerning its FRB proceedings.  The policy shall:*

1.  *Set out procedures, membership and a timetable for FRB review of use of force investigations involving Level 2 incidents, as defined in Department General Order K-4, REPORTING AND INVESTIGATING THE USE OF FORCE;*

2.  *Require the FRB to review all use of force investigations;*

3.  *Require the FRB to make a recommendation as to whether the use of force was in policy or out of policy;*

4.  *Require the FRB to forward sustained policy violations to the Discipline Officer.*

5.  *Require the FRB not to review any use of force allegation until the internal investigations has been completed;*

6.  *Authorize the FRB to recommend to the Chief of Police additional use of force training or changes in policies or tactics, or additional standards, investigatory policies, or training for use of force investigations;*

7.  *Require the FRB to conduct an annual review of use of force cases examined, so as to identify any patterns of use of force practices that may have policy or training implications, and thereafter, issue a report to the Chief of Police;*

8.  *Require that the FRB membership include, at a minimum, one member from the Training Division, one member from the Field Training Officer program, and either the Bureau of Field Operations Deputy Chief or his/her designee;*

9.  *Minimally, that one member of the FRB shall be replaced at least annually.*

(Negotiated Settlement Agreement V. C.)

**Relevant Policy:**

OPD most recently revised Departmental General Order K-4.1, *Force Review Boards,* on December 21, 2015.

**Commentary:**

OPD Force Review Boards (FRBs) are regularly convened to examine the investigations conducted relative to the deployment and application of Level 2 uses of force.[1]  OPD first achieved compliance with this Task during the nineteenth reporting period (April 1-June 30, 2014).  We continue to assess the compliance with this Task, including our analyses of force reports; our review of Force Review Board reports; attendance at Force Review Boards when conducted during our site visits; and observing Force Review Boards between site visits via online meeting software.

For this report, we reviewed five FRB reports that were completed and approved by the Chief of Police from July 2020-December 2020.  In general, we found the reports to be well-written and accurate accounts of the proceedings they documented.  At least one member of the Monitoring team observed these FRBs remotely via virtual meeting software.  In all but one case, the Chief concurred with the Boards' findings without any modifications.  The case in which the Chief overruled the FRB involved 12 uses of force by three officers as they took a domestic violence suspect into custody.  When officers arrived on scene, they observed the suspect throw a brick through the rear window of a vehicle as the vehicle drove away from the suspect.  The suspect then resisted the officers' efforts to take him into custody, and officers used weaponless defense techniques and an electronic control weapon (ECW) in their attempts to subdue the suspect.  The Board ruled that three closed-fist distractionary strikes to the suspect's head were out of compliance by a two-to-one vote.  In her handwritten comments, the Chief noted that both the Internal Affairs Division (IAD) and the Community Policing Review Agency (CPRA) found these uses of force to be in compliance, and she concurred with their determinations.

We did not disagree with any of the findings in the FRB reports we reviewed.

In addition to reviewing the completed FRB reports, between July 8, 2020 and January 14, 2021, we observed nine of the 10 FRBs convened by OPD during that period as they carried out their duties and deliberations.  We observed them all remotely via an online meeting platform due to the ongoing COVID-19 pandemic, which has curtailed our monthly in-person site visits.  One of the Boards met twice, 16 days apart.  During its first session, the Board members determined that they did not have enough information to make a determination, and directed the presenting sergeant to conduct additional investigation.  When they reconvened, after reviewing the additional investigative material and further interviewing the presenting sergeant, they determined that the force was in compliance.

---

[1] According to OPD, Level 2 uses of force include: "1) Any strike to the head (except for an intentional strike with an impact weapon); 2) Carotid restraint is applied that does not result in the loss of consciousness; 3) Use of impact weapons, including specialty impact munitions or any other object, to strike a subject and contact is made, regardless of injury; 4) Any unintentional firearms discharge that does not result in injury; 5) A police canine bites the clothing or the skin of a subject, or otherwise injures a subject requiring emergency medical treatment (beyond first-aid) or hospital admittance; 6) Any use of force which results in injuries to the subject requiring emergency medical treatment (beyond first-aid) or hospital admittance; (NOTE: For the purposes of this order, an evaluation by a medical professional to assess a complaint of injury is not emergency treatment) 7) Any Level 3 use of force used on or applied to a restrained subject; 7.a) A restrained subject is a person who has been fully placed in a Department authorized restraint device such as both hands handcuffed, a WRAP or Rip Hobble; 7.b) A subject with only one handcuff on is not a restrained person."

In general, we continue to note an overall improvement in the probing nature of the questions posed by Board members, as well as in the quality of their deliberations.  They also spend a great deal of time discussing issues ancillary to the uses of force, such as tactics, supervision, force alternatives, and training opportunities.  We did not disagree with any of the Boards' findings.

We noted two instances where Boards identified uses of force that were not recognized or assessed by the original investigators, and then subsequently ruled on the appropriateness of the force.  In the case noted above in which the Chief disagreed with the Board's findings, the Board identified a Level 4-Type 22 pointing of a firearm which occurred when officers first arrived on the scene.  The Board and the Chief ruled this force in compliance.  In the other case, while on patrol, officers spotted a warrant suspect and attempted to take him into custody.  The suspect resisted and officers used force, including the deployment of an ECW and distractionary strikes to the suspect's head.  During its deliberations, the FRB added a second ECW deployment, since the involved officer depressed the ECW trigger twice while attempting to complete a drive-stun technique (where the ECW is held against the subject's body).  The Board also noted that the two distractionary strikes delivered in quick succession were actually two uses of force, whereas the investigating sergeant had considered them one use of force.  The FRB ruled the additional force it identified to be in compliance.

It is not a requirement, but all of the Board votes we observed during this reporting period were unanimous.  While we reviewed the FRB report documenting the two-to-one vote described above during this reporting period, the FRB was actually convened in the last reporting period.  We recognize that in some circumstances, there will be legitimate differences of opinion where the determination is not obvious.  In these circumstances, we look for frank discussion and clear explanations of the differing positions.

As noted above, we observed nine of the 10 FRBs convened between July 8, 2020 and January 14, 2021.  One was convened on July 8, and another took place on August 20.  The next occurred on November 12, 84 days later.  Between December 10, 2020 and January 12, 2021, OPD scheduled seven FRBs, including two during the week between Christmas Day and New Year's Day.  It became apparent to us that the cases being reviewed were fast approaching their 3304 dates – one year from the dates of their occurrence.  Two of the investigations were presented by supervisors who did not investigate the uses of force, since the original investigating supervisors were unavailable and would not be available prior to the applicable 3304 dates.  While the cases we observed were adjudicated within the required timeframes, there was clearly a flurry of activity toward the end of the review period to complete the cases, and the schedule left little room for error.  In the case noted above in which the Board required additional investigation, they reconvened and continued their deliberations just 12 days before the 3304 date.  In addition to the procedural concerns surrounding the 3304 dates, it is clear that the schedule was very taxing to the Department's Captains who serve as Board members.  To their credit, we noted that they were all well-prepared for the FRBs they participated in; and they clearly reviewed the associated material in advance.

During our last report on this Task, we identified a case in which the Board met after the incident's 3304 date, and we requested that the matter be referred to IAD for an investigation.  We learned that an employee was sustained for a Performance of Duty violation for the scheduling lapse.  While no case went beyond its 3304 date during this reporting period, we

again raised our concerns regarding the scheduling of FRBs.  OPD advised us that despite the systems put in place to avoid a repeat of the case identified in our last report, there was still a lack of attention to detail and the backlog in scheduling was not discovered in a timely manner, resulting in the flurry of activity at the end of the year.  While this situation did not result in a lack of compliance with this Task, it is nonetheless very concerning, and something we will pay close attention to going forward.

In addition to ruling on the appropriateness of uses of force, Force Review Boards will generally identify several follow-up items based on their review of the associated materials and the presentations made to them.  These can include items such as counseling and training for individual officers, publication of Department-wide training materials, and modifications to policy.  OPD tracks these deliverables in a spreadsheet, broken down into three categories: Individual Issues; Department-Wide Issues; and Quarterly Training Points.  Based on our discussions with OPD, substantial modifications were made to the tracking spreadsheet, and OPD has made significant efforts to bring it up to date.  For the most recent report which documents activity through the end of 2020, there were 19 open deliverables.  This is down from 28 open deliverables when we last reported on this topic.

Based on this review, OPD is again in compliance with this Task, although we will continue to pay close attention to the scheduling issues described above.

| Task 26 compliance status | In compliance |
|---|---|

# Task 30:  Executive Force Review Board (EFRB)

**Requirements:**

1.  *An EFRB shall be convened to review the factual circumstances surrounding any Level 1 force, in-custody death, or vehicle pursuit-related death incidents.  A firearm discharge at an animal shall be reviewed by the EFRB only at the direction of the Chief of Police.*

2.  *The Board shall have access to recordings and/or transcripts of interviews of all personnel on the scene, including witnesses, and shall be empowered to call any OPD personnel to provide testimony at the hearing.*

3.  *OPD shall continue the policies and practices for the conduct of EFRB, in accordance with the provisions of DGO K-4.1, FORCE REVIEW BOARDS.*

(Negotiated Settlement Agreement V. G.)

**Relevant Policy:**

OPD most recently revised Departmental General Order K-4.1, *Force Review Boards,* on December 21, 2015.

**Commentary:**

Executive Force Review Boards (EFRBs), consisting of three top command-level staff, conduct thorough, detailed reviews of all Level 1 uses of force, in-custody deaths, and vehicle pursuit-related deaths and serious injuries.  OPD achieved compliance with this Task during the nineteenth reporting period (April 1-June 30, 2014).  OPD has not been in compliance with this Task based on the EFRB conducted in 2018, which reviewed the officer-involved shooting of Joshua Pawlik.  We disagreed with the Board's findings, and issued a detailed report on the incident on August 17, 2020.

OPD has since convened one other EFRB, to assess the appropriateness of the use of a canine on April 17, 2019 (the incident carried over onto the following day) to apprehend robbery suspects who fled into two separate backyards.  During the incident, two different suspects were bitten by the same canine at two different locations; and one suspect suffered serious disfiguring injuries to his right leg from a bite that lasted two minutes and 24 seconds.  The Board also reviewed other lower level uses of force.  The Criminal Investigations Division (CID), the Internal Affairs Division, and the Civilian Police Review Agency (CPRA) conducted investigations into the incident.  We found that EFRB to be in compliance.

OPD officers have since been involved in two officer-involved shootings – one on April 16, 2020 in Richmond; and the other on November 3, 2020 in Oakland.  Those incidents are still under investigation.  Given the serious concerns we identified in the report on the shooting of Joshua Pawlik, and the fact that OPD has only had one successful EFRB in the interim, we are deferring our compliance finding for this Task until the Department holds EFRBs on the most recent incidents.

| Task 30 compliance status | Deferred |
|---|---|

## Task 31:  Officer-Involved Shooting Investigations Review Protocol

**Requirements:**

*OPD shall develop a policy to ensure that, in every officer-involved shooting in which a person is struck, Homicide and Internal Affairs investigators respond to the scene.  The Homicide Section's investigation shall be conducted in partnership with, and when deemed appropriate by, the Alameda County District Attorney's Office.  Interviews of the subject officer(s) shall be conducted jointly with the appropriate staff from Homicide and the Office of the District Attorney.  The District Attorney and City Attorney shall be notified in accordance with the provisions of Section V, paragraph A (5), of this Agreement.  Homicide shall duplicate and provide all completed reports and documents to the District Attorney's Office, the Office of the City Attorney, and the Internal Affairs Division.  IAD shall provide information and/or documents as required by law.*

(Negotiated Settlement Agreement V. H.)

**Relevant Policy:**

OPD most recently published Departmental General Order K-4, *Reporting and Investigating the Use of Force* on October 16, 2014.  IAD Policy & Procedures and Homicide Policy & Procedures are also relevant to this Task.

**Commentary:**

Task 31 requires certain notifications and responses in the event of an officer-involved shooting. The Task has long been inactive, but on November 27, 2018, the Court reactivated the Task as an active part of the Monitoring Team's responsibility.

On November 3, 2020, an officer was involved in an officer-involved shooting (OIS) in the city. The officer, along with several others, responded to a reported robbery in progress of a marijuana dispensary, and they encountered a large group traveling in a caravan attempting to gain access to the dispensary.  The Bay Area had been experiencing similar activity during this time period, including on the night in question.  One officer discharged his patrol rifle, resulting in a fatality.

OPD complied with all of Task 31's requirements, and the Department has briefed on the associated investigations into this incident during each successive virtual site visit since the incident occurred.

| Task 31 compliance status | In compliance |
|---|---|

# Task 41:  Use of Personnel Assessment System (PAS) and Risk Management

**Requirements:**

*Within 375 days from the effective date of this Agreement, OPD shall develop a policy for use of the system, including supervision and audit of the performance of specific members, employees, supervisors, managers, and OPD units, as well as OPD as a whole.*

*The policy shall include the following elements:*

1. *The Chief of Police shall designate a PAS Administration Unit.  The PAS Administration Unit shall be responsible for administering the PAS policy and, no less frequently than quarterly, shall notify, in writing, the appropriate Deputy Chief/Director and the responsible commander/manager of an identified member/employee who meets the PAS criteria.  PAS is to be electronically maintained by the City Information Technology Department.*

2. *The Department shall retain all PAS data for at least five (5) years.*

3. *The Monitor, Inspector General and Compliance Coordinator shall have full access to PAS to the extent necessary for the performance of their duties under*

*this Agreement and consistent with Section XIII, paragraph K, and Section XIV of this Agreement.*

4.   *PAS, the PAS data, and reports are confidential and not public information.*

5.   *On a quarterly basis, commanders/managers shall review and analyze all relevant PAS information concerning personnel under their command, to detect any pattern or series of incidents which may indicate that a member/employee, supervisor, or group of members/employees under his/her supervision may be engaging in at-risk behavior.  The policy shall define specific criteria for determining when a member/employee or group of members/employees may be engaging in at-risk behavior.*

6.   *Notwithstanding any other provisions of the PAS policy to be developed, the Department shall develop policy defining peer group comparison and methodology in consultation with Plaintiffs' Counsel and the IMT.  The policy shall include, at a minimum, a requirement that any member/employee who is identified using a peer group comparison methodology for complaints received during a 30-month period, or any member who is identified using a peer group comparison methodology for Penal Code §§69, 148 and 243(b)(c) arrests within a 30-month period, shall be identified as a subject for PAS intervention review. For the purposes of these two criteria, a single incident shall be counted as "one" even if there are multiple complaints arising from the incident or combined with an arrest for Penal Code §§69, 148 or 243(b)(c).*

7.   *When review and analysis of the PAS threshold report data indicate that a member/employee may be engaging in at-risk behavior, the member/employee's immediate supervisor shall conduct a more intensive review of the member/employee's performance and personnel history and prepare a PAS Activity Review and Report.  Members/employees recommended for intervention shall be required to attend a documented, non-disciplinary PAS intervention meeting with their designated commander/manager and supervisor.  The purpose of this meeting shall be to review the member/employee's performance and discuss the issues and recommended intervention strategies.  The member/employee shall be dismissed from the meeting, and the designated commander/manager and the member/employee's immediate supervisor shall remain and discuss the situation and the member/employee's response.  The primary responsibility for any intervention strategies shall be placed upon the supervisor.  Intervention strategies may include additional training, reassignment, additional supervision, coaching or personal counseling.  The performance of members/ employees subject to PAS review shall be monitored by their designated commander/manager for the specified period of time following the initial meeting, unless released early or extended (as outlined in Section VII, paragraph B (8)).*

8.   *Members/employees who meet the PAS threshold specified in Section VII, paragraph B (6) shall be subject to one of the following options:  no action, supervisory monitoring, or PAS intervention.  Each of these options shall be*

*approved by the chain-of-command, up to the Deputy Chief/Director and/or the PAS Activity Review Panel.*

*Members/employees recommended for supervisory monitoring shall be monitored for a minimum of three (3) months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor. The first at the end of one (1) month and the second at the end of three (3) months.*

*Members/employees recommended for PAS intervention shall be monitored for a minimum of 12 months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor and designated commander/manager: The first at three (3) months and the second at one (1) year. Member/employees subject to PAS intervention for minor, easily correctable performance deficiencies may be dismissed from the jurisdiction of PAS upon the written approval of the member/employee's responsible Deputy Chief, following a recommendation in writing from the member/employee's immediate supervisor. This may occur at the three (3)-month follow-up meeting or at any time thereafter, as justified by reviews of the member/employee's performance. When a member/employee is not discharged from PAS jurisdiction at the one (1)-year follow-up meeting, PAS jurisdiction shall be extended, in writing, for a specific period in three (3)-month increments at the discretion of the member/employee's responsible Deputy Chief. When PAS jurisdiction is extended beyond the minimum one (1)-year review period, additional review meetings involving the member/employee, the member/ employee's designated commander/manager and immediate supervisor, shall take place no less frequently than every three (3) months.*

9.  *On a quarterly basis, Division/appropriate Area Commanders and managers shall review and analyze relevant data in PAS about subordinate commanders and/or managers and supervisors regarding their ability to adhere to policy and address at-risk behavior. All Division/appropriate Area Commanders and managers shall conduct quarterly meetings with their supervisory staff for the purpose of assessing and sharing information about the state of the unit and identifying potential or actual performance problems within the unit. These meetings shall be scheduled to follow-up on supervisors' assessments of their subordinates' for PAS intervention. These meetings shall consider all relevant PAS data, potential patterns of at-risk behavior, and recommended intervention strategies since the last meeting. Also considered shall be patterns involving use of force, sick leave, line-of-duty injuries, narcotics-related possessory offenses, and vehicle collisions that are out of the norm among either personnel in the unit or among the unit's subunits. Division/appropriate Area Commanders and managers shall ensure that minutes of the meetings are taken and retained for a period of five (5) years. Commanders/managers shall take appropriate action on identified patterns of at-risk behavior and/or misconduct.*

10. *Division/appropriate Area Commanders and managers shall meet at least annually with his/her Deputy Chief/Director and the IAD Commander to discuss*

*the state of their commands and any exceptional performance, potential or actual performance problems or other potential patterns of at-risk behavior within the unit. Division/appropriate Area Commanders and managers shall be responsible for developing and documenting plans to ensure the managerial and supervisory accountability of their units, and for addressing any real or potential problems that may be apparent.*

11. *PAS information shall be taken into account for a commendation or award recommendation; promotion, transfer, and special assignment, and in connection with annual performance appraisals. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

12. *Intervention strategies implemented as a result of a PAS Activity Review and Report shall be documented in a timely manner.*

13. *Relevant and appropriate PAS information shall be taken into account in connection with determinations of appropriate discipline for sustained misconduct allegations. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

14. *The member/employee's designated commander/manager shall schedule a PAS Activity Review meeting to be held no later than 20 days following notification to the Deputy Chief/Director that the member/employee has met a PAS threshold and when intervention is recommended.*

15. *The PAS policy to be developed shall include a provision that a member/employee making unsatisfactory progress during PAS intervention may be transferred and/or loaned to another supervisor, another assignment or another Division, at the discretion of the Bureau Chief/Director if the transfer is within his/her Bureau. Inter-Bureau transfers shall be approved by the Chief of Police. If a member/employee is transferred because of unsatisfactory progress, that transfer shall be to a position with little or no public contact when there is a nexus between the at-risk behavior and the "no public contact" restriction. Sustained complaints from incidents subsequent to a member/employee's referral to PAS shall continue to result in corrective measures; however, such corrective measures shall not necessarily result in a member/employee's exclusion from, or continued inclusion in, PAS. The member/employee's exclusion or continued inclusion in PAS shall be at the discretion of the Chief of Police or his/her designee and shall be documented.*

16. *In parallel with the PAS program described above, the Department may wish to continue the Early Intervention Review Panel.*

17. *On a semi-annual basis, beginning within 90 days from the effective date of this Agreement, the Chief of Police, the PAS Activity Review Panel, PAS Oversight*

> *Committee, and the IAD Commander shall meet with the Monitor to review the operation and progress of the PAS. At these meetings, OPD administrators shall summarize, for the Monitor, the number of members/employees who have been identified for review, pursuant to the PAS policy, and the number of members/employees who have been identified for PAS intervention. The Department administrators shall also provide data summarizing the various intervention strategies that have been utilized as a result of all PAS Activity Review and Reports. The major objectives of each of these semi-annual meetings shall be consideration of whether the PAS policy is adequate with regard to detecting patterns of misconduct or poor performance issues as expeditiously as possible and if PAS reviews are achieving their goals.*

> 18.   *Nothing in this Agreement, and more specifically, no provision of PAS, shall be construed as waiving, abrogating or in any way modifying the Department's rights with regard to discipline of its members/employees. The Department may choose, at its discretion, to initiate the administrative discipline process, to initiate PAS review or to use both processes concurrently or consecutively.*

(Negotiated Settlement Agreement VII. B.)

**Relevant Policy:**

OPD most recently revised Departmental General Order D-17, *Personnel Assessment Program,* on November 20, 2013.

**Commentary:**

This is a significant time of transition regarding the risk-related data and the process of risk management as elaborated in Task 41. Work on the Department's risk management database, Vision, continues. At the same time, there have been changes to Department personnel that are relevant to both the data and the process of risk management. The changes may reflect a changing relationship between OPD and the City Information Technology Department (ITD) regarding the risk management data. In addition to those changes, the new Data Manager is fully engaged and poised to assist in reviewing and reconsidering issues around the presentation and use of risk management data. That timing is useful, as the recent City-wide Risk Management Meeting included critical commentary on the value of some of the displays and presentations of the data. Finally, it is clearly time for a review of the multiple elements comprising the NSA requirements as elaborated in Task 41.

According to ITD, the continuing work on Vision includes ongoing work to fix problems identified in the data and the way it is displayed. Those problems now require time beyond the contracted time allotted for technical assistance. As a result, needed work identified in one month is, by necessity, pushed into the time allotted for the following month. The construction of data reports in Vision is also continuing. Those reports give the Department access to predetermined analyses that would be automatically renewed at regular intervals. Recently, for example, OPD's documentation indicated that approximately 80% of Vision reports were

completed, as were approximately 66% of reports related to the PAS risk review process.  There has been limited discussion of the use of the dashboards for access to Vision data, but a review of work completed in preparation for the Risk Management Meetings makes it clear that sergeants are relying heavily on them.

We recently learned about some changes occurring among the OPD staff members assigned to work on the Vision database project.  Key personnel who had seen the transition from the troubled PRIME system to Vision have been assigned elsewhere.  Three staff members – a civilian systems analyst, a lieutenant, and the PAS director – remain in place to manage the work related to Vision.  These changes appear to reflect planned changes in the oversight of the project from heavily dependent on OPD personnel to greater dependence on ITD.  An ITD staff member has a critical role in the project.  These changes are of interest to us, given the complexity of the work involved and the long and twisting path taken to reach this point.

The most recent City-wide Risk Management Meeting, held in December, followed the established patterns in which well over 20 tables of data are regularly reviewed.  Unlike the established patterns, however, the meeting raised significant questions about the importance and clarity of some of the data – particularly the stop data.  That can only be seen as a refreshing critique that does not detract from OPD's extraordinary use of data, but should prompt further improvements in that process.  This is an area in which the Department's new Data Manager can make significant contributions.  Regular review, refinement, and revision should be an ongoing process in light of the powerful potential of the Vision database and the associated dashboards.  The ongoing Risk Management Meetings have largely retained the presentations and analyses of the period predating the new capacities of the data systems.  It is clearly time to revise the practice.

Considering that revision also highlights another need that has been discussed but not yet been acted upon.  In the process of changing from the original PAS database to PRIME and then to Vision, it was obvious that meeting some requirements of Task 41, and the related Task 40, had to be postponed – although it was always our understanding that OPD would return to them.  The situation was further complicated by administrative changes.  Given the status of the data systems and of the risk management process itself, and in light of the absence of a functioning risk management policy, a review of the details of the Tasks' various requirements is clearly in order.

| Task 41 compliance status | Deferred, due to the ongoing reconstruction of the Vision database. |
| --- | --- |

## Task 45:  Consistency of Discipline Policy

**Requirements:**

*On or before October 6, 2003, OPD shall revise and update its disciplinary policy to ensure that discipline is imposed in a fair and consistent manner.*

1.   *The policy shall describe the circumstances in which disciplinary action is appropriate and those in which Division-level corrective action is appropriate.*

2.   *The policy shall establish a centralized system for documenting and tracking all forms of discipline and corrective action, whether imposed centrally or at the Division level.*

3.   *All internal investigations which result in a sustained finding shall be submitted to the Discipline Officer for a disciplinary recommendation.  The Discipline Officer shall convene a meeting with the Deputy Chief or designee in the affected chain-of-command for a confidential discussion of the misconduct, including the mitigating and aggravating factors and the member/employee's overall performance.*

4.   *The COP may direct the Discipline Officer to prepare a Discipline Recommendation without convening a Discipline Conference.*

(Negotiated Settlement Agreement X. B.)

**Relevant Policy:**

Five Departmental policies incorporate the requirements of Task 45:  Departmental General Order M-03, *Complaints Against Department Personnel and Procedures* (published December 6, 2005 and revised most recently on August 24, 2013); Training Bulletin V-T.1 and V-T.2, *Internal Investigation Procedure Manual* (published July 17, 2008); Internal Affairs Policy and Procedure Manual (published December 6, 2005); and Training Bulletin V-T, *Departmental Discipline Policy* (published March 14, 2014).  Several of these policies are currently being revised.

**Commentary:**

Task 45.2 requires that OPD maintain a centralized system for documenting and tracking all OPD forms of discipline and corrective action, whether imposed centrally or at the division level. To assess Phase 2 compliance with this subtask, we reviewed the 26 cases that contained at least one sustained finding that were approved in June, July, August, and September 2020.  All (100%) of these cases and findings contained all of the necessary information available on the spreadsheets generated by IAD for our review.  OPD is in compliance with the requirement that it maintain an adequate system for documenting and tracking discipline and corrective action.

The NSA also requires that discipline be imposed in a manner that is fair and consistent.  To this end, the Department developed a Discipline Matrix, which was adopted on September 2, 2010 and was in effect until a new Discipline Matrix was approved on March 14, 2014.  This subsequent Matrix applies to violations after that date.

As noted above, we reviewed all 26 cases with sustained findings that were approved in June, July, August, and September 2020.  (Several cases involved multiple sustained findings.)

In June, there were eight sustained cases.  In one case, an officer was sustained for care of property after placing a subject's wallet on the top of the police vehicle, but failing to retrieve it after the search.  In another case, an officer who has since retired was sustained for profanity, pointing a firearm, failure to document vehicle damage, involvement in a collision, and general conduct/bringing ill repute to Department.  In another case, officers brought a woman to the hospital following a family disturbance, but left her prescription medication at the hospital when they transported her to jail; one officer was sustained for care of property and failure to accept or refer a complaint, and two additional officers were sustained for failure to accept or refer a complaint.  There were two additional cases involving failure to accept or refer a complaint; in one, a sergeant failed to act after officers told him that a subject complained about them shining their flashlights in his face.  In another case, two officers were sustained for violating a carjacking suspect's *Miranda* rights; this case was brought to IAD's attention by a supervisor who had concerns about an email one of the officers wrote summarizing the interview they conducted.  In another case, an officer was sustained for an out-of-policy use of a Taser after responding to a residential burglary call.  In another case, an officer serving as a Training Division instructor made a racially insensitive comment to trainees during a driving training exercise; the officer was sustained for unprofessional conduct in violation of the City's Administrative Instruction 71 (Equal Employment Opportunity/Anti-Discrimination/Non-Harassment Policy and Complaint Procedure).

In July, there were 10 sustained cases.  Four cases involved preventable motor vehicle collisions. In one case, two officers were sustained for improper search, seizure, or arrest after "exceeding the scope and duration of a proper detention" of a suspect.  In another case, three officers were sustained for failing to complete a proper preliminary investigation after responding to a burglary call at a clothing store; one of the officers was also sustained for rudeness and failing to properly activate his body-worn camera.  In another case, an officer was sustained for failure to accept or refer a complaint after he did not ask clarifying questions of a subject of a traffic stop.  In another case, an officer was sustained for failure to conduct a thorough investigation – by not working to recover a firearm, failing to take statements from a victim and suspects, and failing to document a robbery.  Another case also involved an officer who was sustained for failing to conduct a thorough investigation after he did not properly interview witnesses or document the extensive damage to a vehicle following an accident.  In another case, a Communications dispatcher was sustained for demeanor and failure to accept or refer a complaint.

In August, there were two sustained cases.  In one case, a police technician who was dispatched to take a stolen vehicle report for a work truck mistakenly believed that since the driver was not the registered owner, the technician could not create a report.  In the other case, an officer was sustained for editing a citation without informing the driver or issuing a correction notice; the officer's sergeant was also sustained for being aware of the officer's edits.

In September, there were six sustained cases.  One case involved a preventable motor vehicle collision.  In one case, an officer was sustained for using profanity.  In another case, two officers were sustained for failing to arrest a domestic violence suspect.  In another case, an officer was sustained for custody of prisoners after not allowing a battery suspect to use the restroom.  In another case, an officer was sustained for bringing disrepute to the Department when, following a dispute with his wife, he banged on a friend's front door, leading to a call to the local Sheriff's Office.  In another case, two officers were sustained for Performance of Duty for issues involving not documenting their use of a Taser.

In each case, unless otherwise documented in writing, the proposed discipline fell within the Discipline Matrix that was in effect at the time of the action for which the discipline was imposed.

We reviewed the records that OPD provided for the six total *Skelly* hearings it completed in June, July, August, and September.  *Skelly* hearings are held for IAD cases involving employees with sustained findings in which discipline of a one-day suspension or greater was recommended.  We reviewed the reports for all six *Skelly* hearings, and found that they contained adequate justification for the results documented.

The first *Skelly* hearing involved an officer who was sustained for intentional failure to accept or refer a complaint.  For this violation, the Chief had approved a five-day suspension; and the *Skelly* Officer recommended that the sustained finding be changed to unintentional failure to accept or refer a complaint and that the officer receive counseling and training.  The Chief concurred with the *Skelly* Officer's recommendations.

The second *Skelly* hearing involved an officer who was sustained for unprofessionalism and failure to accept or refer a complaint.  For this violation, the Chief had approved a two-day suspension; and the *Skelly* Officer recommended no discipline, believing that the officer's supervisor sufficiently addressed the officer's conduct with "corrective training" and a Supervisory Note File entry.  The Chief concurred with the *Skelly* Officer's recommendation.

The third *Skelly* hearing involved an officer who was sustained for a preventable collision in a vehicle rented by the Department for undercover work.  For this violation, the Chief had approved a three-day suspension; and the *Skelly* Officer upheld the discipline.

The fourth *Skelly* hearing involved an officer who, while off duty, vandalized a business by writing an obscene word on a window with ice cream.  For this violation, the Chief had approved a one-day suspension; and the *Skelly* Officer upheld the discipline.

The fifth *Skelly* hearing involved an officer who was sustained for using profanity and transporting juvenile detainees without calling in the required updates to the Communications Division.  For this violation, the Chief had approved a three-day suspension; and the *Skelly* Officer upheld the discipline.  The *Skelly* Officer wrote, "It is true that no physical damage or harm was done, however, the damage done to the youth subjected to [the officer's] profanity laced tirade cannot be measured.  Certainly, the incident may have had an impact on the youth's ability to trust and respect police officers."

The sixth *Skelly* hearing involved an officer who was sustained for a preventable vehicle collision, the officer's fifth. For this violation, the Chief had approved a 15-day suspension, and the *Skelly* Officer upheld the discipline.

Each month, we request from OPD a list of all *Skelly* officers provided with updated *Skelly* Hearing Training during the past month, and their dates trained. For this report, OPD provided training records confirming that 32 OPD personnel – including sworn commanders and civilian managers – received two hours of training for *Skelly* Officers on September 14, 2020. We will continue to review records once they are made available to verify that any applicable personnel who were recently promoted received the approved *Skelly* Officer Training.

OPD received one arbitration decision during June, July, August, and September 2020 – on August 7, 2020. In this case, which was brought to the Department's attention via a complaint from the Alameda County District Attorney's Office, an officer was terminated by OPD for falsifying a police report (of his findings during a stop of a man riding his bicycle on the sidewalk) and for being untruthful during his IAD interviews. In its post-arbitration brief, the City maintained that the City "established by a preponderance of the evidence that [the officer] wrote a false police report, and that report was written to assist the prosecution by creating probable cause for the search [he conducted]." The City noted that the Department's Discipline Matrix "clearly states that termination is the only appropriate level of discipline for first offenses of false report writing and untruthfulness. Officers are on clear written notice of these policies." The attorney for the officer, on the other hand, argued that the officer's report was "largely accurate" and included "honest mistakes" that were "typical mistakes for a rookie officer."

The arbitrator ruled that the City "terminated [the officer's] employment without just cause," and ordered him reinstated.

We will review and discuss any upcoming arbitration decisions in our next assessment of Task 45.

We continue to closely follow the Department's response to the study conducted last year by a consulting firm, Hillard Heintze, on behalf of OPD, on discipline disparities in the Department. The study found significant racial disparities in sustained complaints of misconduct between Black officers and officers of other races. Hillard Heintze also found that, during 2014-2018, Black officers were 37% more likely to have complaints against them sustained. We requested that the Department provide regular updates on its efforts to address the findings and implement the recommendations made by Hillard Heintze. In its 279th Biweekly Compliance Update, OPD reported that the Department has implemented nearly all of the Hillard Heintze report recommendations. The Department is still creating a new procedural justice training, which it estimates will be completed by the spring of 2021. In addition, OPD is working with Stanford University researchers on several related projects, including an analysis of whether "whether the anonymization of the subjects during the presentation of sustained cases and discipline findings have led to any change in outcome."

| Task 45 compliance status | In partial compliance |
| --- | --- |

## Conclusion

At the December Risk Management Meeting, we were pleased that there was some critical commentary on the value of some of the displays and presentations of the data.  During most months, the meetings include a review over 20 tables of information – often quite overwhelming to the Area personnel who attend the meetings.  The meetings need to be useful and constructive to serve as an internal system of accountability.

The Department recently opened an internal investigation following some serious allegations of officers' misconduct.  The Court issued an Order regarding the case, noting that it "involves serious matters that go to the heart of this case – the culture of the Oakland Police Department and the efficacy of internal oversight mechanisms within the Department, which were primary reasons for the imposition of the NSA in the first place."

We will closely monitor the City's efforts to fully investigate this matter.

Chief (Ret.) Robert S. Warshaw
*Monitor*