June 22, 2021

# Seventy-Third Report
## *of the* Independent Monitor
## *for the* Oakland Police Department

## Introduction

This is our seventy-third status report on the Negotiated Settlement Agreement (NSA) in the case of *Delphine Allen, et al., vs. City of Oakland, et al.,* in the United States District Court for the Northern District of California under the direction of Judge William H. Orrick.  I was appointed in 2010 to oversee the monitoring process of the Oakland Police Department (OPD) that began in 2003.

Following the Court's Order of May 21, 2015, we devote special attention to the most problematic component parts of the NSA Tasks that are not yet in full or sustained compliance; and discuss in our status reports the most current information regarding the Department's progress with the NSA and its efforts at making the reforms sustainable.  This report describes our recent assessments of NSA Tasks 2, 5, and 20.

Each month, our Team conducts a visit to Oakland that includes both compliance assessments and technical assistance.  During our visits, we meet with Department and City officials; observe Department meetings and technical demonstrations; review Departmental policies; conduct interviews and make observations in the field; and analyze OPD documents and files, including misconduct investigations, use of force reports, crime and arrest reports, Stop Data Forms, and other documentation.

## *Focused Task Assessments*

## Task 2:  Timeliness Standards and Compliance with IAD Investigations

**Requirements:**

*Fairness to complainants, members/employees and the public requires that internal investigations be completed in a timely fashion.*

> 1.  *On or before December 1, 2003, OPD shall develop policies regarding timeliness standards for the completion of Internal Affairs investigations, administrative findings and recommended discipline.*

Seventy-Third Report of the Independent Monitor for the Oakland Police Department
June 22, 2021
Page 2 of 11

> 2. *Compliance with these timeliness standards shall be regularly monitored by IAD command and the Department's command staff.  If IAD experiences an unusual proliferation of cases and/or workload, IAD staffing shall be increased to maintain timeliness standards.*

(Negotiated Settlement Agreement III. B.)


**Relevant Policy:**

OPD most recently revised Departmental General Order M-03, *Complaints Against Department Personnel and Procedures*, on December 22, 2017.


**Commentary:**

**Task 2.1** requires that internal investigations (IAD and Division Level) – including review, approval, findings, and discipline – be completed in accordance with the timeliness standards developed by OPD.  To assess this subtask, we reviewed a list of all internal investigations resulting in formal findings (unfounded, sustained, exonerated, or not sustained) that were approved in January, February, and March 2021, and calculated the number of days between the complaint date and the approval date for each case.  We excluded from the dataset cases that were administratively closed, those that involved on-duty traffic accidents or service complaints, and those that did not involve Manual of Rules (MoR) violations.  We segregated the remaining cases into Class I or Class II categories.  If a case involved at least one alleged Class I violation, we classified it as Class I.

During our last assessment of Task 2, we learned that the Department has been assessing its investigative timeliness by calculating the number of days between the *intake* date and the approval date for each case – not the *complaint receipt* date and the approval date that we use.  The complaint date is the date on which the Department first becomes aware of a complaint – whether it is lodged by a community member or internally generated – and the intake date is the date on which IAD begins its work on the case.  Sometimes these two dates are the same; but unfortunately, in other instances, they are not.

At least 85% of Class I misconduct investigations and at least 85% of Class II misconduct investigations must be completed within 180 days to be considered timely.  Per DGO M-03, Class I offenses "are the most serious allegations of misconduct and, if sustained, shall result in disciplinary action up to and including dismissal and may serve as the basis for criminal prosecution."  Class II offenses include "all minor misconduct offenses."

For the purposes of this assessment, we calculated the number of days between the complaint receipt date and the approval date.  We removed from the denominator cases that were delayed due to tolling (held in abeyance in accordance with one of the provisions of Government Code Section 3304) or cases that did not meet the 180-day timeliness requirement exclusively due to delays in concurrent Community Police Review Agency (CPRA) investigations.  Of the 54 applicable Class I cases we reviewed for this assessment, only 29, or 54%, were in compliance with established timelines.  During our last review of Task 2, we found that 67% of Class I cases were in compliance with established timelines.

Of the 99 applicable Class II cases we reviewed, 81, or 82%, were in compliance with established timelines.  During our last review of Task 2, we found that 75% of Class II cases were in compliance with established timelines.

Per DGO M-03, "In cases with a sustained finding, the discipline recommendation process shall be completed within 30 calendar days of the sustained finding."  We reviewed all 38 cases including a total of 63 sustained findings that were approved in January, February, and March 2021; 10 cases involved multiple sustained findings.  All (100%) of these 38 cases were in compliance with established discipline timelines.

OPD is not in compliance with Task 2.1.

Task 2.2 requires that IAD and OPD command staff regularly monitor compliance with these timeliness standards.  The primary responsibility for monitoring compliance with timeliness standards rests with IAD, whether investigations are conducted by IAD personnel or via Division-level investigation.  As part of this monitoring, the IAD Commander discusses pending deadlines for key open investigations during IAD's weekly meetings with the Chief; the deadlines are also reflected in written agendas for these meetings.  A Monitoring Team representative regularly attends these weekly meetings.  IAD also occasionally, as needed, emails individual reminders on cases approaching due dates to investigators and their supervisors.  The Department is in compliance with Task 2.2.

Task 2.3 requires that if IAD experiences an unusual proliferation of cases and/or workload, IAD staffing be increased to maintain timeliness standards.  We routinely request and receive updates on IAD staffing levels during our site visits.

| Task 2 compliance status | Not in compliance |
|---|---|

## Task 5:  Complaint Procedures for IAD

**Requirements:**

1. *On or before December 1, 2003, OPD shall develop a policy so that, OPD personnel who become aware that a citizen wishes to file a complaint shall bring such citizen immediately, or as soon as circumstances permit, to a supervisor or IAD or summon a supervisor to the scene.  If there is a delay of greater than three (3) hours, the reason for such delay shall be documented by the person receiving the complaint.  In the event that such a complainant refuses to travel to a supervisor or to wait for one, the member/employee involved shall make all reasonable attempts to obtain identification, including address and phone number, as well as a description of the allegedly wrongful conduct and offending personnel, from the complainant and any witnesses.  This information, as well as a description of the complaint, shall immediately, or as soon as circumstances permit, be documented on a Complaint Form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander, and shall be treated as a complaint.  The supervisor or appropriate Area Commander notified of the complaint shall ensure the Communications Division is notified and forward any pertinent documents to the IAD.*

2. *An on-duty supervisor shall respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest.  The supervisor shall ensure the Communications Division is notified and forward any pertinent documents to the IAD.  All other misconduct complaints by a jail inmate shall be handled in the same manner as other civilian complaints.*

3. *In each complaint investigation, OPD shall consider all relevant evidence, including circumstantial, direct and physical evidence, and make credibility determinations, if feasible.  OPD shall make efforts to resolve, by reference to physical evidence, and/or use of follow-up interviews and other objective indicators, inconsistent statements among witnesses.*

4. *OPD shall develop provisions for the permanent retention of all notes, generated and/or received by OPD personnel in the case file.*

5. *OPD shall resolve each allegation in a complaint investigation using the "preponderance of the evidence" standard.  Each allegation shall be resolved by making one of the following dispositions:  Unfounded, Sustained, Exonerated, Not Sustained, or Administrative Closure.  The Department shall use the following criteria for determining the appropriate disposition:*

    a. *Unfounded:  The investigation disclosed sufficient evidence to determine that the alleged conduct did not occur.  This finding shall also apply when individuals named in the complaint were not involved in the alleged act.*

      b.     *Sustained:  The investigation disclosed sufficient evidence to determine that the alleged conduct did occur and was in violation of law and/or Oakland Police Department rules, regulations, or policies.*

      c.     *Exonerated:  The investigation disclosed sufficient evidence to determine that the alleged conduct did occur, but was in accord with law and with all Oakland Police Department rules, regulations, or policies.*

      d.     *Not Sustained:  The investigation did not disclose sufficient evidence to determine whether or not the alleged conduct occurred.*

      e.     *Administrative Closure:  The investigation indicates a service complaint, not involving an MOR violation, was resolved without conducting an internal investigation; OR*

      f.     *To conclude an internal investigation when it has been determined that the investigation cannot proceed to a normal investigative conclusion due to circumstances to include but not limited to the following:*

           1)     *Complainant wishes to withdraw the complaint and the IAD Commander has determined there is no further reason to continue the investigation and to ensure Departmental policy and procedure has been followed;*

           2)     *Complaint lacks specificity and complainant refuses or is unable to provide further clarification necessary to investigate the complaint;*

           3)     *Subject not employed by OPD at the time of the incident; or*

           4)     *If the subject is no longer employed by OPD, the IAD Commander shall determine whether an internal investigation shall be conducted.*

           5)     *Complainant fails to articulate an act or failure to act, that, if true, would be an MOR violation; or*

           6)     *Complaints limited to California Vehicle Code citations and resulting tows, where there is no allegation of misconduct, shall be referred to the appropriate competent authorities (i.e., Traffic Court and Tow Hearing Officer).*

      g.     *Administrative Closures shall be approved by the IAD Commander and entered in the IAD Complaint Database.*

6.     *The disposition category of "Filed" is hereby redefined and shall be included under Administrative Dispositions as follows:*

      a.     *An investigation that cannot be presently completed.  A filed investigation is not a final disposition, but an indication that a case is pending further developments that will allow completion of the investigation.*

> b.  *The IAD Commander shall review all filed cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed and may direct the closure or continuation of the investigation.*
>
> 7.  *Any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken.  However, investigators, with the approval of an IAD Commander, are not required to interview and/or take a recorded statement from a member or employee who is the subject of a complaint or was on the scene of the incident when additional information, beyond that already provided by the existing set of facts and/or documentation, is not necessary to reach appropriate findings and conclusions.*

(Negotiated Settlement Agreement III. E.)

**Relevant Policy:**

There are six Departmental policies that incorporate the requirements of Task 5:  Department General Order M-03, *Complaints Against Department Personnel and Procedures* (published December 6, 2005 and revised most recently on August 22, 2013); Communications Division Policy & Procedures C-02, *Receiving and Logging Complaints Against Personnel and Use of Force Incidents* (published April 6, 2007); Training Bulletin V-T.1, *Internal Investigation Procedure Manual* (published June 1, 2006); Special Order 8270, *Booking of Prisoners at the Glenn E. Dyer Detention Facility* (published June 24, 2005); Special Order 8565, *Complaints Against Department Personnel* (published May 11, 2007); and IAD Policy & Procedures 05-02, *IAD Investigation Process* (published December 6, 2005).  In addition, NSA stipulations issued on December 12, 2005 and March 13, 2007 incorporate the requirements of this Task.

**Commentary:**

Task 5 consists of several subtasks, briefly described below.  Based on OPD's compliance history with many of the subtasks, not all are being actively monitored at this time.

**Task 5.1** requires that when a citizen wishes to file a complaint, the citizen is brought to a supervisor or IAD, or a supervisor is summoned to the scene.  **Task 5.2** requires that if there is a delay of greater than three hours in supervisory response, the reason for the delay must be documented.  **Task 5.3** requires that where a complainant refuses to travel to a supervisor, or wait for one, personnel make all reasonable attempts to obtain specific information to assist in investigating the complaint.  **Task 5.4** requires that specific information be documented on a complaint form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander.  **Task 5.5** requires that the supervisor or Area Commander notify Communications and forward any pertinent documents to IAD.

To assess compliance with Tasks 5.1 through 5.5, we reviewed the Daily Incident Logs (DILs) prepared by the Communications Division and forwarded to IAD each business day.  The DIL form has been modified several times during our tenure to elicit "forced responses" that gather all of the information required to evaluate compliance with these Tasks.  These modifications have significantly enhanced OPD's ability to document compliance by properly filling out and distributing the logs, and compliance rates with these subtasks have been near 100% for several years.  Consequently, we no longer actively assess OPD's compliance with these subtasks, but we continue to receive both the DILs and Daily Complaint Referral Logs (used to document when Information Business Cards [IBCs] are provided to citizens in lieu of a complaint forms).  We spot-check these forms regularly to verify that the quality of their completion has not diminished.  OPD remains in compliance with Tasks 5.1 through and including Task 5.5.

**Task 5.6** requires that an on-duty supervisor respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest of the inmate.  We have not actively monitored this subtask since December 2014, though we have reviewed cases applicable to this requirement in several reports since that time.

**Task 5.12** requires that the Watch Commander ensure that any complaints that are applicable to Task 5.6 are delivered to and logged with IAD.  Under current policy, the Communications Division must record on the DILs complaints that are received and/or handled by on-duty supervisors, and the DILs is forwarded daily to IAD.

OPD remains in compliance with Tasks 5.6 and 5.12.

**Task 5.15** through **Task 5.19**, and **Task 5.21,** collectively address the quality of completed IAD investigations, and therefore remain the subject of our focused Task assessments.  To assess compliance with these Tasks, we reviewed 16 IAD cases which were closed between August 1-November 30, 2020, sampled from four of our recent document requests.  This sample included investigations completed by IAD and Division-level investigations (DLIs).  It also included cases that were resolved via formal investigation and investigations that were resolved via summary finding.  (Summary findings are investigations in which the Department believes a proper conclusion can be determined based on a review of existing documentation with limited or no additional interviews and follow-up.)  As is our practice, if we had questions pertaining to a case, we consulted with the commanding officer of IAD before making our final determination.

Together, **Tasks 5.15** and **Task 5.16** require that OPD: gathers all relevant evidence; conducts follow-up interviews where warranted; adequately considers the evidence gathered; makes credibility assessments where feasible; and resolves inconsistent statements.

In all of the cases we reviewed, we believe that OPD gathered all relevant evidence available.  As we often find, in many of the cases video and/or audio recordings proved to be a significant factor in allowing OPD to reach an appropriate conclusion.  Investigators conducted follow-up interviews to seek clarification or resolve inconsistencies in two of the 16 cases we reviewed.  In one case, the complainant was interviewed twice; and in other case, the complainant was interviewed four times.

OPD made credibility assessments for all involved parties in 12 of the 16 cases.  One case was approved for summary finding; and per policy, investigators are not required to assess the credibility of the involved officers and civilian employees in these instances.  Two other cases were closed via informal complaint resolution, or ICR, and another was administratively closed.  Similarly, these three cases do not require credibility assessments.

In three cases, complainants and/or witnesses were deemed not credible.  In two of these cases, body-worn camera (BWC) footage proved instrumental in reaching a not credible determination.  In the other case, the complainant's statement conflicted with those of a witness, who was deemed credible.  We agreed with these credibility assessments.

In nine of the 16 cases we reviewed, OPD resolved inconsistent statements.  In seven of these cases, BWC recordings were available and assisted in the determination.  Four cases resulted in at least one finding of not sustained.  Not sustained is an acceptable finding, and by definition, it implies that inconsistencies were not resolved despite investigative efforts.  Three additional cases were administratively closed (two by ICR), negating the need to resolve inconsistent statements.

**Task 5.17** requires that OPD permanently retain all notes generated and/or received by OPD personnel in the case file.  OPD personnel document that all investigative notes are contained within a particular file by completing an Investigative Notes Declaration Form.  OPD has a sustained history of 100% compliance with this subtask.  During this reporting period, the form was again properly completed in all of the cases we reviewed.

**Task 5.18** requires that OPD resolve each allegation in a complaint investigation using the preponderance of the evidence standard.  **Task 5.19** requires that each allegation of a complaint is identified and resolved with one of the following dispositions: unfounded; sustained; exonerated; not sustained; or administrative closure.  Our sample of 16 cases contained 54 allegations that received dispositions as follows: 14 exonerated; 16 unfounded; eight not sustained; four sustained; and 12 administratively closed (five of these by informal complaint resolution, or ICR).

We did not disagree with any of the formal findings in the cases we reviewed.  However, we disagree with the Department's handling of one case with an ICR, even though such an action was technically allowed by policy.  In this case, an officer investigating a shooting made an extremely insensitive comment to family members of the victims in the house where the shooting occurred.  The family members became irate – so much so that the officer had to remove himself from any further communication with them.  Not only was the comment inappropriate; its aftermath resulted in further chaos to an already hectic crime scene.  The officer was ultimately sustained for demeanor; but the former Interim Chief elected to handle the case with a forced ICR, which does not require the complainant's agreement.  Given the nature of the officer's comment and the understandable reaction from the family members, administratively closing this case in this manner was inappropriate.

In two Division-level investigation (DLI) cases, the findings were changed during the review process.  We agreed with the changed findings.  In one case – the case described above – the DLI investigator improperly characterized the allegation and recommended a finding of unfounded.  IAD overruled the investigator, identified the complaint as a demeanor allegation, and properly

sustained the case.  In the other case, the complainant alleged that an OPD vehicle performed an unsafe lane change, cutting off her vehicle.  The DLI investigator recommended a finding of not sustained, but the reviewing lieutenant located surveillance camera footage which he believed sustained the allegation.  IAD concurred; however, the Interim Chief again elected to use a forced ICR in this case, as well.

**Task 5.20** requires that the IAD Commander review all "filed" cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed.  A filed case is defined as an investigation that cannot be presently completed and is pending further developments that will allow completion of the investigation; filed is not a final disposition.  Traditionally, as part of our review of this Task, we also reviewed cases that are tolling.  OPD defines a tolled case as an administrative investigation that has been held in abeyance in accordance with one of the provisions of Government Code Section 3304.  While we are no longer actively assessing this subtask, we note that filed and tolling cases are reviewed with the Chief or her designee during the weekly IAD meetings and are listed by case number on the printed meeting agendas.  We receive and review these agendas regularly, and a Monitoring Team member regularly attends these meetings.  Additionally, we regularly receive a weekly report listing all tolled cases and all cases approaching their 3304 dates.  If we have questions regarding any of the cases in the report, the IAD Commander answers them promptly.

**Task 5.21** requires that any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken.  However, with the approval of the IAD Commander or his designee, investigators are not required to interview and/or take a recorded statement in all cases.  For example, interviews are not needed from a member or employee who is the subject of a complaint, or who was on the scene of the incident when additional information – beyond that already provided by the existing set of facts and/or documentation – is not necessary to reach appropriate findings and conclusions.  One of the 16 cases we reviewed were resolved via summary finding, and both were appropriately approved for such closure.  In this case, the availability of BWC video was the primary reason interviews were unnecessary.

In another case – again, the case described above – two witness officers were not interviewed as required by policy.  They were officers in training assigned to Field Training Officers (FTOs) who were the subject officers in the investigation.  There was no explanation for the lack of interviews.  The DLI investigator was aware of their presence and even referred to their BWC videos in his investigative report.

As is our practice, we have discussed with OPD the case deficiencies that we found during our virtual site visits.

| Task 5 compliance status | Deferred.  While the Department has made progress in this Task and has shown a capacity to better address internal investigations, OPD is currently challenged by investigations emanating from demonstrations last May and June– to include a Level 1 use of force – as well as an officer-involved shooting outside the City limits. |
| --- | --- |

## Task 20:  Span of Control

**Requirements:**

*On or before August 14, 2003, OPD shall develop and implement a policy to ensure appropriate supervision of its Area Command Field Teams.  The policy shall provide that:*

1. *Under normal conditions, OPD shall assign one primary sergeant to each Area Command Field Team, and, in general, (with certain exceptions) that supervisor's span of control shall not exceed eight (8) members.*

2. *During day-to-day operations, in the absence of the primary supervisor (e.g., due to sickness, vacation, compensatory time off, schools, and other leaves), the appropriate Area Commander shall determine, based on Department policy and operational needs, whether or not to backfill for the absence of the sergeant on leave.*

3. *If a special operation, (e.g., Beat Feet, Special Traffic Offenders Program (STOP), etc.) requires more than eight (8) members, the appropriate Area Commander shall determine the reasonable span of control for the supervisor.*

4. *If long-term backfill requires the loan or transfer of a supervisor from another unit, the Chief of Police and/or the Deputy Chief of Police shall make that decision.*

(Negotiated Settlement Agreement IV. C.)

**Relevant Policy:**

Three Departmental policies incorporate the requirements of Task 20: Departmental General Order A-19, *Supervisory Span of Control,* issued on July 26, 2006; Departmental General Order D-13, *Assignment to Acting Higher Rank or Classification,* issued on June 17, 1999; and Departmental General Order D-13.1, *Assignment to Acting Sergeant of Police,* issued on May 14, 2014.  (The publication of DGO D-13.1 cancelled Special Order 8435, which previously governed the selection process of acting sergeants.)

**Commentary:**

To assess these requirements for this report, we reviewed spreadsheets prepared by the Department for October, November, and December 2020 that, by date, note which type of sergeant supervised each applicable squad – a primary sergeant, relief sergeant, acting sergeant, other sergeant (one working overtime), or none.  (The Department refers to unsupervised squads as "open.")  We calculated per squad the compliance percentages for this subtask during this time period.  Each of the 47 applicable squads were in compliance – that is, all applicable squads during this time period were supervised by either a primary, relief, or other/overtime sergeant for at least 85% of their working shifts.  We also found that none of the applicable squads exceeded the required 1:8 supervisor to officer ratio at least 90% of their working shifts.

OPD continues to be in compliance with these requirements.  The Department has institutionalized the practices of tracking how each squad is supervised each day; planning, when possible, for expected absences; and considering how to fill in for personnel who are absent unexpectedly.

| Task 20 compliance status | In compliance |
|---|---|

## Conclusion

While the Department is still struggling to address issues relevant to internal investigations and making its Vision system all that it can be, we commend the Department for the recent way it addressed internal and public scrutiny over the conduct of officers during last summer's demonstrations.  Chief Armstrong has begun to bring to the agency a new level of accountability – and with it, a culture change that has long been elusive.  His commitment to strong principles of community values should be seen as a positive step towards sustainable reform.  The City's administration through the efforts of both the Mayor and City Administrator have become important support and leadership assets that should help the Department fulfill its many mandates.

Chief (Ret.) Robert S. Warshaw

*Monitor*