August 23, 2021

# Seventy-Fourth Report
## *of the* Independent Monitor
## *for the* Oakland Police Department

## Introduction

This is our seventy-fourth status report on the Negotiated Settlement Agreement (NSA) in the case of *Delphine Allen, et al., vs. City of Oakland, et al.,* in the United States District Court for the Northern District of California under the direction of Judge William H. Orrick.  I was appointed in 2010 to oversee the monitoring process of the Oakland Police Department (OPD) that began in 2003.

Following the Court's Order of May 21, 2015, we devote special attention to the most problematic component parts of the NSA Tasks that are not yet in full or sustained compliance; and discuss in our status reports the most current information regarding the Department's progress with the NSA and its efforts at making the reforms sustainable.  Our monthly reports do not address all Tasks.  This report describes our recent assessments of NSA Tasks 20, 24, 25, 26, 30, 31, 41, and 45.

Each month, our Team conducts a visit to Oakland that includes both compliance assessments and technical assistance.  During our visits, we meet with Department and City officials; observe Department meetings and technical demonstrations; review Departmental policies; conduct interviews and make observations in the field; and analyze OPD documents and files, including misconduct investigations, use of force reports, crime and arrest reports, Stop Data Forms, and other documentation.

During the February 22, 2021 Case Management Conference, the Court identified five priorities for the Department.  The Department has been making progress in these areas, and the Chief and the Monitor discuss these on a regular basis.

## *Focused Task Assessments*

## Task 20:  Span of Control

**Requirements:**

*On or before August 14, 2003, OPD shall develop and implement a policy to ensure appropriate supervision of its Area Command Field Teams.  The policy shall provide that:*

1.  *Under normal conditions, OPD shall assign one primary sergeant to each Area Command Field Team, and, in general, (with certain exceptions) that supervisor's span of control shall not exceed eight (8) members.*

2.  *During day-to-day operations, in the absence of the primary supervisor (e.g., due to sickness, vacation, compensatory time off, schools, and other leaves), the appropriate Area Commander shall determine, based on Department policy and operational needs, whether or not to backfill for the absence of the sergeant on leave.*

3.  *If a special operation, (e.g., Beat Feet, Special Traffic Offenders Program (STOP), etc.) requires more than eight (8) members, the appropriate Area Commander shall determine the reasonable span of control for the supervisor.*

4.  *If long-term backfill requires the loan or transfer of a supervisor from another unit, the Chief of Police and/or the Deputy Chief of Police shall make that decision.*

(Negotiated Settlement Agreement IV. C.)

**Relevant Policy:**

Three Departmental policies incorporate the requirements of Task 20: Departmental General Order A-19, *Supervisory Span of Control,* issued on July 26, 2006; Departmental General Order D-13, *Assignment to Acting Higher Rank or Classification,* issued on June 17, 1999; and Departmental General Order D-13.1, *Assignment to Acting Sergeant of Police,* issued on May 14, 2014.  (The publication of DGO D-13.1 cancelled Special Order 8435, which previously governed the selection process of acting sergeants.)

**Commentary:**

To assess these requirements for this report, we reviewed spreadsheets prepared by the Department for January, February, and March 2021 that, by date, note which type of sergeant supervised each applicable squad – a primary sergeant, relief sergeant, acting sergeant, other sergeant (one working overtime), or none.  (The Department refers to unsupervised squads as "open.")  We calculated per squad the compliance percentages for this subtask during this time period.  Each of the 53 applicable squads were in compliance – that is, all applicable squads

during this time period were supervised by either a primary, relief, or other/overtime sergeant for at least 85% of their working shifts.  We also found that none of the applicable squads exceeded the required 1:8 supervisor to officer ratio at least 90% of their working shifts.

OPD continues to be in compliance with these requirements.  The Department has institutionalized the practices of tracking how each squad is supervised each day; planning, when possible, for expected absences; and considering how to fill in for personnel who are absent unexpectedly.

| Task 20 compliance status | In compliance |
|---|---|

## Overview of Our Assessments of Tasks 24 and 25

OPD had been in compliance with Tasks 24 and 25 since 2015, and we were not actively reviewing these Tasks.  In November 2018, after we raised concerns regarding the identification, potential underreporting, and investigation of uses of force, the Court reactivated Tasks 24 and 25.

Between February 15-July 31, 2021, we reviewed 11 Level 2 uses of force (UOFs) for which a Force Review Board (FRB) was held, four special FRBs, and two Level 1 uses of force (UOFs) for which an Executive Force Review Board (EFRB) was held.  Consistent with our reviews of Level 3 and 4 use of force reports, we identified some concerns with the field reporting.  These concerns were appropriately addressed during the FRBs and EFRBs.  Level 1 and 2 UOFs are reported in the Tasks 26 and 30 sections of this report.  Only Level 3 and 4 uses of force are discussed in this assessment.

For purposes of this report, we reviewed 186 Level 3 and Level 4 use of force (UOF) reports that were completed by OPD personnel between March 1-October 31, 2020 to assess compliance with Tasks 24 and 25.  We reviewed all incidents that involved at least one Level 3 use of force (29), all Level 3 uses of force that were reduced to Level 4 (two), and a sample of Level 4 uses of force (155).

Since we resumed these reviews following the Court's reactivation of these Tasks, we have provided detailed feedback on the force investigations to OPD during each of our site visits.  In cases where we have had questions or concerns, OPD personnel have continued to be responsive and have provided follow-up where necessary.  In some cases, OPD has provided additional information or documentation that supports its actions, and we have concurred with the Department's assessments.  In others, we have identified concerns that had not been identified or addressed by OPD supervisors who conducted the UOF investigation, or the command personnel who reviewed the investigation.  In these cases, OPD executive staff have directed additional review; directed training; entered a Supervisory Note File (SNF); or initiated an Internal Affairs Division (IAD) investigation.

In late 2018, OPD employees received training on the requirements for use of force reporting related to the pointing of weapons.  In April 2019, OPD issued an Information Bulletin that provided clarification and direction regarding the documentation of use of force.  The content of

this bulletin included many of the concerns we had identified with the proper reporting of force. In June of 2019, the then-Chief issued a directive via email that specifically addressed boilerplate language in use of force reports; and in November 2019, she followed up with an additional email to address the use of generic or boilerplate language in the administrative section of Department reports. In December 2019, OPD completed the training developed to address deficiencies found in UOF documentation based on OIG's global use of force audit. On February 15, 2020, OPD published Special Order 9196, which expanded and clarified the use of force policy. On February 27. 2020, the Department published Special Order 9202, which temporarily modified the requirements for the reporting of Type 32 UOFs. In June and August of 2020, emails from executive staff addressed delayed BWC activations, the 30-second BWC buffer, and "pat" language being used in reports. In January 2021, an information bulletin addressed ongoing BWC activation concerns; and in May of 2021, OPD provided training on announcements of police during community contacts, BWC activations, accuracy in reporting, and identifying patterns prior to issuing SNFs for discovered MOR violations.

This report covers Level 3 and 4 UOF reports completed by OPD from March 1-October 31, 2020. All 186 of the cases we reviewed for this time period occurred after the publication of Special Order 9196, which clarified the use of force policy; and after Special Order 9202, issued on February 27, 2020, which temporarily modified the requirements for reporting Type 32 UOFs. We have continued to note improvement in the reporting of uses of force in our reviews, and believe the actions taken by OPD – including revisions and clarifications on policy – have reduced the number of deficiencies in the required reporting of force.

In our review of the 186 Level 3 and 4 use of force reports completed for March 1-October 31, 2020, we identified only one instance where we believe the use of, or level of, force may not have been appropriate. This concern was also identified by OPD, which initiated an internal investigation. We also identified 10 instances where an involved officer did not properly report a use of force. In nine of these, the unreported use of force was a Level 4-Type 32; and in one, a Level 4-Type 29 takedown. OPD supervisory personnel identified only two of the 10.

In the 186 Level 3 and 4 UOFs we reviewed, there were 501 uses of force by 385 officers, against 242 different persons. In some cases, multiple officers used force on a single person; and in others, force was used on multiple persons, either by a single officer or by multiple officers. The total breakdown for the force used on the 242 persons is as follows: African Americans, 64%; Latinos, 20%; whites, 11%; and Asians or other, 5%. The percentage of force incidents involving African Americans decreased by 4%; force incidents involving whites increased by 6%; force incidents involving Latinos decreased 2%, and force incidents involving Asians or persons categorized as "other" increased 3% from what we found in our last review, documented in our seventy-second status report.

In the total 29 Level 3 UOFs we reviewed, 28 involved the deployment of a Taser along with one or more Level 4 UOFs. One involved only the use of Taser. There was a total of 84 UOFs by 54 officers in these 29 reports. In all, we found the uses of force to be appropriate and in compliance with OPD policies. In two other UOFs originally classified as Level 3, one involving a takedown and the other involving a personal weapon strike, supervisory staff changed the initial force from a Level 3 to a Level 4 and provided appropriate justification for doing so.

In the 155 Level 4 UOFs reports we reviewed, there were 410 uses of force by 328 officers against 207 persons.  Ninety-three of the 155 reports reviewed involved a Type 22, pointing of a weapon only.  In these 93 reports, there were 254 uses of the Type 22, by 195 officers, against 137 persons.  This equates to 62% of the total 410 Level 4 uses of force we reviewed during the noted time period.  We noted in our reviews that there were again numerous incidents that involved multiple subjects with numerous OPD personnel being involved in the pointing of weapons.  In these 254 UOFs, the breakdown is as follows: African Americans, 64%, the same percentage as in our seventy-second report; Latinos, 23%, a decrease from 26%; whites, 8%, an increase of 3%; and Asians or other, 4%, the same percentage as in our seventy-second report.

In the 155 Level 4 UOFs reports we reviewed, 30 involved a Type 29 takedown only.  In these 30, there were 60 uses of the Type 29 use of force by 58 officers, 15% of the total 410 Level 4 UOFs.  Eleven reports involved a Type 25, weaponless defense technique only.  In these 11, there were 17 UOFs by 14 officers.  These account for 4% of the total 410 Level 4 UOFs reviewed.  The remaining 79 level 4 uses of force (19%) were a combination of multiple different Level 4 UOFs.

Of the total 242 persons on which a Level 3 or 4 UOF was used, 195 (81%) were arrested or criminally charged for felony or misdemeanor violations.  The remaining 47 involved mental health holds, inability to establish criminal conduct, subjects who escaped, victims who did not want to prosecute, or subjects determined not to be a suspect after the investigation was conducted.  In 13 of the incidents reviewed, a person claimed an injury; none of these injuries required admittance to a hospital.  In seven other instances, persons were transported to a medical facility for the removal of a Taser probe, for injuries that occurred prior to the use of force, or solely to obtain a medical clearance.

In our early assessments of Task 25.3 after reactivation of Tasks 24 and 25, we found numerous instances where officers did not attempt verbal communications prior to using force.  Significant improvement has occurred since that time; and in our last report, we did not identify any Level 3 or 4 UOFs where we believed that additional verbal communications and explanation with persons who were contacted might have resulted in a reduction in the need to use physical force.  We continued to note, however, instances where officers did not identify themselves as police officers when contacting subjects, even when there was time to do so.  (We do not include those contacts where it should be obvious to the subject that s/he is dealing with an officer.)

For this report, we identified three uses of force where officers failed to attempt verbal communications and de-escalation where appropriate, prior to utilizing force.  We continued to identify numerous instances where officers did not identify themselves as police officers when contacting members of the public and there was time to do so, though we note again for this report that there are fewer instances where this announcement was not made than during our earlier reviews.  We will continue to discuss any future concerns we identify with OPD and continue to monitor these types of instances; as is our practice during our monthly site visits, we continue to provide input to the Department on our observations.

Special Order 9196, the revision to the UOF reporting requirements, that went into effect on February 15, 2020, clarified what constitutes a "reportable use of force" and provided clearer direction on the reporting of use of force. Special Order 9196 also added a new force type: Type 32. A Type 32 use of force includes: overcoming resistance of a person during an arrest or detention; or defending oneself or another from combative action by another person. Type 32 is intended to address any use of force not already covered in Types 1-31. While we expected an increase in Level 4 use of force reporting after Special Order 9196 was issued, the immediate and significant spike in the numbers was much greater than anticipated and appeared to be primarily related to the new Type 32. We agreed with OPD's assessment that further review of the force policy was needed due to this unanticipated increase; and Special Order 9202 was issued, that at least temporarily removed the Type 32 from the category of a Level 4 reportable use of force. Alternative means for counting these uses of force were implemented by OPD until more permanent solutions could be identified.

For our sixty-ninth report, we reviewed a sample of Type 32 UOFs. We found in these early reviews that there was some initial confusion regarding this reporting. In some cases, we identified instances where a Type 32 was documented and it did not appear that a use of force had occurred; and in others, we found that Type 32 was not the appropriate force type to have been used. We also identified concerns with officers not authoring their own supplemental reports, failures to properly document these uses of force in required reports, and the identification of MOR violations or training issues that did not appear to have been addressed. In June 2020, OPD began providing additional training on how to properly document Type 32 UOFs.

As a part of our reviews for this report, we reviewed the monthly Type 32 UOF audits conducted by OPD Area Command personnel during this time period. They found that, in general, officers are properly reporting these uses of force. They did not identify any instances in their reviews where they believed that a Type 32 UOF should have been classified as a different, or higher level of force. They also found that the majority of these UOFs were the result of resistance during handcuffing, resisting while a subject was being escorted, or as a result of restraining persons with mental health issues.

All of the UOFs we reviewed for this report occurred after Special Order 9196 was issued, and, after Special Order 9202 was issued to address the challenges created with the required reporting of Type 32 UOFs. During our review of the 186 Level 3 and 4 use of force incidents for this report, we again noted numerous instances where it took multiple officers to control and secure combative persons. In the vast majority of cases, we found that officers were properly identifying and documenting Type 32 UOFs as required. There were nine instances identified in our reviews where we found that a Type 32 UOF had not been properly identified or reported. OPD took action when we brought these to their attention. As we expected, we have seen the full impact of Special Order 9196 and Special Order 9202 in those UOFs that we reviewed for this reporting period.

The issuance of Special Order 9202 resulted in the identification of several challenges in collecting data regarding Type 32 UOFs, as OPD's technology did not allow personnel to accurately collect the information as OPD had expected it would. There has also been a need to identify a long-term solution that will address not only how Type 32 UOFs will be documented, but how they will be reviewed. We have had several discussions with OPD and continue to work with the Department on a protocol that will ensure the appropriate identification, review, and reporting of these UOFs.

For our 72nd report, we found that in the 109 UOF reports we reviewed, there were 23 instances (21%) where a BWC had not been properly activated; all were late activations. In 10 of these, an OPD supervisor identified and properly addressed the late activation. In the remaining 13, the supervisor either failed to identify and address the late activation at the time it occurred or failed to ensure that appropriate follow-up was conducted once it was discovered. We found that between 20-25% of the cases we reviewed for this report had body-worn camera activation concerns.

For this report, we reviewed 186 UOFs for the eight-month period between March 1-October 31, 2020. In 31 (17%) of the UOF reports reviewed, we identified concerns with BWC activation by 36 different officers. We do not include documented malfunctions of BWCs or those that have been deactivated during a struggle or other contact with persons in these numbers. Of the 36 instances we identified, 18 (50%) were not identified by either the supervisor or a second-level reviewer. This is both a supervisory and command failure.

The failure to properly activate a body-worn camera is a violation of policy; and more importantly, could result in the loss of critical information regarding the community contact. What is even more concerning than the late activations themselves is that supervisors and those who review the supervisors' reports have not been consistently identifying and addressing this violation. At this point in the process, this should not be the case.

We continue to note that, in some cases, supervisors have continued to accept the 30-second buffer as an appropriate activation. As we have discussed with OPD, the buffer time does not meet the requirements for activation. The Department has clarified this to personnel through training and other communications. To its credit, OPD has continued to conduct follow-up on each of the BWC activation concerns we have raised. The Department has issued numerous SNFs to both those who fail to properly activate their BWCs and to those supervisors who fail to identify and address the failures. In those instances where a pattern has been identified, the Department has initiated internal investigations. Both the Chief and the executive staff have assured us that they will continue to address the BWC issues with appropriate training, SNFs, and – when appropriate – discipline.

In our monthly site visit meetings with OPD, we have discussed and supported OPD's proposed transition to a new BWC system that would allow additional ways to ensure proper activations. During our most recent virtual site visit in July 2021, we were advised that the budget proposal for this upgrade has been approved and that OPD will be moving forward with the new system. This will not be an immediate fix, and even with this technology, it remains the responsibility of OPD supervisors to identify and address failures to properly activate BWCs when they occur.

In addition to concerns with body-worn camera activations, we have continued to note the use of profanity or inappropriate use of slang terms that was clearly evident upon review of body-worn camera footage, though the number of such instances has decreased significantly from our early reviews.  We have also continued to find instances where supervisory personnel have failed to ensure that no previous patterns of violations exist prior to determining if an SNF is appropriate for a late body-worn camera activation or other type of MOR violation.  While we remain supportive of the use of SNFs for minor violations, we continue to emphasize that supervisors must ensure that the officer does not have a pattern of similar conduct prior to using an SNF.  We note that OPD has begun to hold officers accountable, and is holding supervisors to account when they fail to identify and address these types of concerns.

The use of force analysis we conducted in 2018 established the underreporting of Level 4 uses of force where an officer pointed a weapon at a person.  Following our analysis, OPD partially addressed this concern with refresher training in September 2018 for all officers, and the Department has further addressed this issue in its use of force policy revisions.  In our review of Level 3 and 4 UOFs for this report, we did not identify any instances where an officer failed to report the pointing of a weapon at a person.

In OPD's 293rd Biweekly Compliance Update, dated July 30, 2021, the Department provided a comparison of year-to-date Level 3 and 4 UOFs for 2021 compared to the same time period in 2020.  Overall UOF decreased from 2,856 in 2020, to 967 in 2021.  Level 3 uses of force decreased from 130 in 2020, to 40 for the same time period in 2021.  The reduction in Level 3 UOFs appears to be at least in part due to the institution of new policies and the reclassification of some uses of force from Level 3 to Level 4.  Level 4 UOFs decreased from 2,689 in 2020, to 919 for the same time period in 2021.  These decreases appear to have numerous explanations.  New policies and the adjustment of Type 32 reporting that occurred in 2020 is responsible for some of the large numbers in early 2020.  OPD command staff have been addressing the use of Type 22 UOFs, firearms control, and the number of officers who need to deploy weapons at incidents.  OPD has been offering more training on de-escalation; there has been a reduction in stops due to the necessary disbanding of specialized units due to budget constraints; and OPD is now using a consolidated, Citywide approach to stops, focusing on violent crime.  The Department's assessment is that while there is an overall reduction in stops and arrests that has contributed to the decrease in UOF, those arrests that are occurring are of a "higher quality."

OPD has taken numerous steps to address the proper reporting of use of force and the concerns that have been identified during our reviews.  In our reviews of UOFs for March 1-October 31, 2020, we have seen evidence that OPD's efforts have been fruitful.  We expect that the Department will continue to improve its reporting, and that the revised UOF policies will continue to have the intended results.  We will continue to monitor the impact of these revised policies, training delivered, and any directives from OPD executive staff that addresses any ongoing UOF reporting concerns.

# Task 24: Use of Force Reporting Policy

**Requirements:**

*The policy shall require that:*

1.  *Members/employees notify their supervisor as soon as practicable following any investigated use of force or allegation of excessive use of force.*

2.  *In every investigated use of force incident, every member/employee using force, and every member/employee on the scene of the incident at the time the force was used, shall report all uses of force on the appropriate form, unless otherwise directed by the investigating supervisor.*

3.  *OPD personnel document, on the appropriate form, any use of force and/or the drawing and intentional pointing of a firearm at another person.*

4.  *A supervisor respond to the scene upon notification of an investigated use of force or an allegation of excessive use of force, unless community unrest or other conditions makes this impracticable.*

5.  *OPD notify:*

    a.  *The Alameda County District Attorney's Office immediately or as soon as circumstances permit, following a use of lethal force resulting in death or injury likely to result in death.*

    b.  *The City Attorney's Office as soon as circumstances permit following the use of lethal force resulting in death or serious injury.  At the discretion of the City Attorney's Office, a Deputy City Attorney shall respond to the scene.  The Deputy City Attorney shall serve only in an advisory capacity and shall communicate only with the incident commander or his/her designee.*

    c.  *Departmental investigators regarding officer-involved shootings, in accordance with the provisions of Section V, paragraph H, of this Agreement.*

6.  *OPD enter data regarding use of force into OPD's Personnel Assessment System (PAS).*

(Negotiated Settlement Agreement V. A.)

**Relevant Policy:**

OPD most recently revised Departmental General Order K-4, *Reporting and Investigating the Use of Force,* on October 16, 2014.

**Commentary:**

To assess compliance with Task 24, we reviewed 186 Level 3 and 4 use of force (UOF) reports that were completed by OPD from March 1-October 31, 2020.  We also reviewed 11 Level 2 UOF investigations, for which an FRB was held between February and July 2021, four special FRBs, and two EFRBs.  These Level 1 and Level 2 UOFs are reported in our regular assessments of Tasks 26 and 30.

**Task 24.1** requires that members/employees notify their supervisor as soon as practicable following any reportable use of force or allegation of excessive use of force.  In our reviews, we identified 10 instances where notification was not properly made.  All involved Level 4 UOFs.  Nine of the incidents involved the failure to report a Type 32 UOF and one involved the failure to report a Type 29 takedown.  In two, the failure to notify a supervisor of a UOF was identified and addressed by a supervisor.  In the remaining eight, we brought these concerns to OPD, who appropriately addressed them.

**Task 24.2** requires that in every reportable use of force incident, every member/employee on the scene of the incident at the time the force was used, reports all uses of force on the appropriate form, unless otherwise directed by the investigating supervisor.  **Task 24.3** requires that OPD personnel document, on the appropriate form, every use of force and/or the drawing and intentional pointing of a firearm at another person.

In the 186 Level 3 and 4 UOF incidents we reviewed; officers used force 501 times.  In 102 of the reports, weapons were pointed at one or more subjects.  In 93 of these 102 reports, Level 4 Type 22 was the only UOF used.  We determined that officers' pointing of their firearms was appropriate in all instances we assessed.  There were no instances identified where officers did not report Type 22 UOFs.  We did identify nine instances where officers who assisted in restraining a combative person did not report a Type 32 UOF, and one where a Type 29 takedown was not reported.  We will continue to closely monitor UOFs to ensure that OPD personnel continue to properly report uses of force in the future.

**Task 24.4** requires that a supervisor respond to the scene upon notification of a Level 1, 2, or 3 use of force or an allegation of excessive use of force, unless community unrest or other conditions makes such a response impracticable.  In all 29 Level 3 uses of force we reviewed for this subtask; supervisors responded to the scene as required.  Though not required, in all but eight of the 155 Level 4 UOF reports we reviewed, a supervisor was either on scene at the time of the use of force or responded to the scene upon being notified of the use of force.

**Task 24.5** specifically addresses requirements for the response and handling of Level 1 uses of force.  We assess Level 1 uses of force in our regular reviews of Task 30 (Executive Force Review Boards).

**Task 24.6** requires that OPD enter all use of force data into Performance Reporting Information Metrics Environment (PRIME), which is now called Vision.  In all 186 of the Level 3 and 4 UOF cases we reviewed; the data was entered as required.

The Court's reactivation of Task 24 at a November 2018 Case Management Conference resulted from our serious concerns with the Department's handling and investigation of uses of force.  OPD drafted Special Order 9196 to address and clarify requirements for the proper reporting of

use of force. This revision to UOF reporting requirements went into effect in February 2020. OIG's global use of force audit, conducted in 2019, also identified numerous concerns with the reporting of use of force and enumerated recommendations. As noted throughout this report, OPD has taken a number of actions to address the identified concerns with the reporting of force. While we have continued to identify some concerns and deficiencies in those UOFs we reviewed for this report, we have also noted many improvements. This is the first report where our assessment includes only UOFs that occurred after the implementation of Special Order 9196, the revisions to OPD's use of force policy, and Special Order 9202, and includes the review of 186 Level 3 and 4 uses of force. While we will continue to closely monitor UOFs to ensure that the desired reporting outcomes continue and that OPD continues to address those deficiencies that have been identified, we find that OPD is in compliance with this Task.

| Task 24 compliance status | In compliance |
|---|---|

## Task 25: Use of Force Investigations and Report Responsibility

**Requirements:**

*An on-scene supervisor is responsible for completing an investigated use of force report in accordance with the provisions of Departmental General Order K-4, "Reporting and Investigating the Use of Force."*

1. *OPD shall develop and implement a policy for conducting and documenting use of force investigations that include, at a minimum:*

   a. *Documentation of the incident in either an Offense or Supplemental Report from the member(s)/employee(s) using force; and/or, when necessary, a statement taken from the member(s)/employee(s) using force;*

   b. *Separating and separately interviewing all officers who were at the scene at the time of the incident;*

   c. *A Supplemental Report from other members/employees on the scene or a statement taken, if deemed necessary by the investigating supervisor;*

   d. *Identification and interviews of non-Departmental witnesses;*

   e. *Consideration of discrepancies in information obtained from members, employees and witnesses, and statements in the reports filed;*

   f. *Whether arrest reports or use of force reports contain "boilerplate" or "pat language" (e.g., "fighting stance", "minimal force necessary to control the situation");*

   g. *Documentation of physical evidence and/or photographs and a summary and analysis of all relevant evidence gathered during the investigation; and*

   h. *Consideration of training/tactical issues involving the availability and practicality of other force options.*

   i. *Supervisor's justification as to why any element of the policy was not documented; and*

2. *All supervisors shall be trained in conducting use of force investigations and such training shall be part of a supervisory training course.*

3. *Use of force investigations shall include a recommendation whether the use of force was objectively reasonable and within Department policy and training. The recommendation shall be based on the totality of the circumstances and shall consider, but is not limited to, the following factors:*

   a. *Whether the force used was pursuant to a legitimate law-enforcement objective;*

   b. *Whether the type and amount of force used was proportional to the resistance encountered and reasonably related to the objective the members/employees were attempting to achieve;*

   c. *Whether the member/employee used reasonable verbal means to attempt to resolve the situation without force, if time and circumstances permitted such attempts;*

   d. *Whether the force used was de-escalated or stopped reasonably when resistance decreased or stopped;*

4. *use of force reports shall be reviewed by the appropriate chain-of-review as defined by policy.*

 *The type of force used, the identity of the involved members, and the report preparer shall be the determining criteria for utilizing the appropriate chain-of-review. Reviewers may include, when appropriate, the chain-of-command of the involved personnel, the appropriate Area Commander on duty at the time the incident occurred, other designated Bureau of Field Operations commanders, and as necessary, the chain-of-command of the involved personnel up to the Division Commander or Deputy Chief/Director, and the Internal Affairs Division.*

 *Reviewers for Level 1-3 use of force investigations shall:*

   a. *Make a recommendation as to whether the use of force was in or out of policy,*

   b. *Order additional investigation and investigative resources when necessary, and*

   c. *Comment on any training issue(s) when appropriate.*

5. *Any recommendation that the use of force did not comply with Department policy shall result in the incident being referred to the Internal Affairs Division to conduct additional investigation/analysis, if necessary.*

6.      *Members/employees involved in a use of force incident resulting in serious injury or death and/or an officer-involved shooting, shall be separated from each other as soon as practicable at the incident scene, and kept apart until they have completed their reports and been interviewed.*

(Negotiated Settlement Agreement V. B.)

### Relevant Policy:

OPD most recently revised Departmental General Order K-4, *Reporting and Investigating the Use of Force,* on October 16, 2014.

### Commentary:

As noted above, in Task 24, we reviewed 186 Level 3 and 4 use of force (UOF) reports that were completed between March 1-October 31, 2020.  We also reviewed 11 Level 2 UOF reports, for which a Force Review Board (FRB) was held, four special FRBs, and two EFRBs.

**Task 25.1** requires that supervisors complete a use of force report and that certain criteria are met in the report.  We have found that OPD consistently meets most of the required subtasks.  However, Task 25.1f addresses the use of "boilerplate" or "pat" language in reports.  While OPD has made significant strides in eliminating most of such language, we continue to find deficiencies.  Specifically, we find numerous instances where officers justify their uses of force "based on my training and experience," without any further information or explanation as to what training and experience they are referring to.  We have discussed this with OPD and have begun to see instances where officers are more descriptive in articulating what specific knowledge, training, or experience, supports their actions.

**Task 25.2** requires that all supervisors are trained on how to conduct use of force investigations and such training is part of a supervisory training course.  OPD includes the requirement for this training in its Departmental policies.  During our August 2020 site visit, we again confirmed with OPD that the Department continued to require and deliver this training.  In OPD's 279th Biweekly Compliance Update, dated January 15, 2021, the Department provided the results of its review of Task 25 requirements.  OPD reviewed 15 uses of force for this audit; one was a Level 3 UOF, and 14 were Level 4 UOFs.  The Department noted in this report that all supervisors had attended a Sergeants' Transition Course, where use of force investigation is part of the curriculum.  We will verify that this training remains in place during future site visits.  It is in this Task that we continue to find concerns about the preparation and review of UOF reports by OPD supervisors.  We continue to find instances where OPD supervisors do not identify deficiencies in officer reporting and fail to identify or address MOR violations.  Reviewers of the supervisor reports have also failed on a number of occasions to identify or address concerns.

**Task 25.3** requires that use of force investigations include required recommendations.  Areas of recommendation include: whether the force used was pursuant to a legitimate law enforcement objective; whether the type and amount of force used was proportional to the resistance encountered and reasonably related to the objective the officers were attempting to achieve;

whether the officers used reasonable verbal means to attempt to resolve the situation without force, if time and circumstances permitted such attempts; and whether the force used was de-escalated or stopped reasonably when resistance decreased or stopped.

In our assessment of the 186 Level 3 and 4 UOF reports we reviewed, we identified only one incident where we believe the force may not have been appropriate. OPD had already initiated an internal investigation based on a complaint from the subject on whom force had been used. We did not identify any instances where the use of force was not deescalated or stopped reasonably when resistance decreased. We identified three incidents where we believe officers could have made additional efforts to explain to subjects being detained why the detention was occurring prior to using force. While we continued to note instances where we believe officers should have identified themselves as police officers when it was appropriate and there was time to do so, the number of these incidents has decreased since our earlier reviews. We remain encouraged by OPD's improvement in making these announcements and the continued efforts of OPD personnel to attempt to deescalate situations prior to using force. We remain hopeful that with continued direction provided by OPD executive staff that this becomes the standard of performance. During our site visits, we will continue to discuss any instances where we believe verbal communications or announcements could have potentially resulted in a decrease in the necessity to use force; and will continue to acknowledge those instances where OPD personnel did engage in these efforts.

**Task 25.4** requires that use of force reports be reviewed by the appropriate chain of review and appropriate recommendations are made. In all of the cases we reviewed, the reports were reviewed as required. We continue to note that while many deficiencies related to the preparation and review of UOF reports for Level 3 and 4 UOFs are discovered during the review, some are not. While we are observing more instances where supervisory personnel are thoroughly preparing and reviewing these reports, we continue to find instances where they fail to identify and properly address concerns with body-worn camera activations, or other MOR violations. We have noted that these same concerns exist when the reports are reviewed by the chain of command. In the Level 2 UOF incidents we reviewed, we also had some concerns with the field investigations, including: Manual of Rules (MOR) violations; or training issues. These concerns were identified during FRBs and are addressed in our regular assessment of Tasks 26 and 30.

**Task 25.5** requires that any determination that a use of force did not comply with Department policy result in the incident being referred to IAD to conduct additional investigation/analysis, if necessary. Only one of the Level 3 or Level 4 investigations we reviewed resulted in our finding that the force did not comply with policy. OPD had already identified and addressed this concern. Concerns involving compliance for Level 2 UOFs are identified during FRBs and addressed in our regular assessment of Tasks 26 and 30.

**Task 25.6** requires that members/employees involved in a use of force incident resulting in serious injury or death and/or officer-involved shooting, are separated from each other as soon as practicable at the incident scene, and kept apart until they have completed their reports and been interviewed. This Task is not assessed here, as we review and consider it as part of the Force and Executive Force Review Boards that OPD holds to examine Level 1 and 2 uses of force.

The Court's reactivation of Task 24 at a November 2018 Case Management Conference resulted from our serious concerns with the Department's handling and investigation of uses of force. OPD drafted Special Order 9196 to address and clarify requirements for the proper reporting of use of force. This revision to UOF reporting requirements went into effect in February 2020. OIG's global use of force audit, conducted in 2019, also identified numerous concerns with the reporting of use of force and enumerated recommendations. As noted throughout this report, OPD has taken a number of actions to address the identified concerns with the investigation and reporting of force.

This is the first report where our assessment includes only UOFs that occurred after the implementation of Special Order 9196, the revisions to OPD's use of force policy, and Special Order 9202, and includes the review of 186 Level 3 and 4 uses of force. These revisions to policy, along with the many follow-up emails and training by executive staff, have identified OPD's expectations of those who prepare and review UOF reports. Despite this, we continue to see reports where supervisors have failed to identify and address deficiencies by their personnel and in some cases failed to complete appropriate documentation. While we have continued to see improvements in those reports we reviewed for this period, there is still work to be done. We will continue to closely monitor uses of force to ensure that the desired reporting outcomes occur and that OPD addresses those deficiencies that have been identified. OPD remains in partial compliance with this Task.

| Task 25 compliance status | In partial compliance |
| --- | --- |

# Task 26:  Force Review Board (FRB)

## Requirements:

*OPD shall develop and implement a policy concerning its FRB proceedings.  The policy shall:*

1. *Set out procedures, membership and a timetable for FRB review of use of force investigations involving Level 2 incidents, as defined in Department General Order K-4, REPORTING AND INVESTIGATING THE USE OF FORCE;*

2. *Require the FRB to review all use of force investigations;*

3. *Require the FRB to make a recommendation as to whether the use of force was in policy or out of policy;*

4. *Require the FRB to forward sustained policy violations to the Discipline Officer.*

5. *Require the FRB not to review any use of force allegation until the internal investigations has been completed;*

6. *Authorize the FRB to recommend to the Chief of Police additional use of force training or changes in policies or tactics, or additional standards, investigatory policies, or training for use of force investigations;*

> 7. *Require the FRB to conduct an annual review of use of force cases examined, so as to identify any patterns of use of force practices that may have policy or training implications, and thereafter, issue a report to the Chief of Police;*

> 8. *Require that the FRB membership include, at a minimum, one member from the Training Division, one member from the Field Training Officer program, and either the Bureau of Field Operations Deputy Chief or his/her designee;*

> 9. *Minimally, that one member of the FRB shall be replaced at least annually.*

(Negotiated Settlement Agreement V. C.)


**Relevant Policy:**

OPD most recently revised Departmental General Order K-4.1, *Force Review Boards,* on December 21, 2015.


**Commentary:**

OPD Force Review Boards (FRBs) are regularly convened to examine the investigations conducted relative to the deployment and application of Level 2 uses of force.[1]  OPD first achieved compliance with this Task during the nineteenth reporting period (April 1-June 30, 2014).  We continue to assess the compliance with this Task, including our analyses of force reports; our review of Force Review Board reports; attendance at Force Review Boards when conducted during our site visits; and observing Force Review Boards between site visits via online meeting software.

For this report, we reviewed 16 FRB reports that were completed and approved by the Chief of Police from December 2020-May 2021.  These include the reports from special FRBs which were convened to review the uses of force associated with the protests which occurred from May 29 through June 1, 2020.  These FRBs are described in more detail below.

---

[1] According to OPD, Level 2 uses of force include: "1) Any strike to the head (except for an intentional strike with an impact weapon); 2) Carotid restraint is applied that does not result in the loss of consciousness; 3) Use of impact weapons, including specialty impact munitions or any other object, to strike a subject and contact is made, regardless of injury; 4) Any unintentional firearms discharge that does not result in injury; 5) A police canine bites the clothing or the skin of a subject, or otherwise injures a subject requiring emergency medical treatment (beyond first-aid) or hospital admittance; 6) Any use of force which results in injuries to the subject requiring emergency medical treatment (beyond first-aid) or hospital admittance; (NOTE: For the purposes of this order, an evaluation by a medical professional to assess a complaint of injury is not emergency treatment) 7) Any Level 3 use of force used on or applied to a restrained subject; 7.a) A restrained subject is a person who has been fully placed in a Department authorized restraint device such as both hands handcuffed, a WRAP or Rip Hobble; 7.b) A subject with only one handcuff on is not a restrained person."

In general, we found the reports to be well-written and accurate accounts of the proceedings they documented.  At least one member of the Monitoring Team observed all but one these FRBs remotely via virtual meeting software.  Excluding the protest cases, which are covered separately below, the reports collectively documented the assessment of 46 uses of force associated with 12 separate incidents.  Forty-five of the 46 uses of force were found to be in compliance.  In all of the cases, the Chief concurred with the Boards' findings without any modifications.

We did not disagree with any of the findings in the FRB reports we reviewed.

In addition to reviewing the completed FRB reports, between January 15-July 31, 2021, we observed all nine of the regular FRBs convened by OPD during that period as they carried out their duties and deliberations.  We observed them all remotely via an online meeting platform due to the ongoing COVID-19 pandemic, which has curtailed our monthly in-person site visits.  One of the Boards met twice, 17 days apart.  It was determined during the first session that additional body-worn camera (BWC) footage should be reviewed before finalizing their determinations.  When they reconvened, they added two additional uses of force – one for a supervisor who authorized the use of a canine, and one for a Level 4 Type 22 firearm pointing which was missed by the original investigator.  Both uses of force were deemed to be in compliance.

In general, we continue to observe substantive discussion and deliberations among the Board members.  Members ask probing questions of the force investigators; and, where applicable, Department subject matter experts (SMEs) and IAD investigators.  They also spend a great deal of time discussing issues ancillary to the uses of force, such as tactics, supervision, force alternatives, and training opportunities.  For example, in one instance involving a potential hostage situation, the Board members were appropriately critical of the initial response and some of the direction provided by the first-line supervisors on the scene.  As is customary for all Boards, their feedback was conveyed in the form of training points to appropriate personnel.

In one instance, the Board downgraded a Level 2 use of force to a Level 4 Type 32 use of force.  While taking a suspect into custody, an officer very briefly placed his arm around the neck area of the suspect who was resisting the application of handcuffs.  The arm placement appeared inadvertent, and the officer immediately disengaged when it occurred.  Out of an abundance of caution, the incident was elevated to be investigated as a Level 2 use of force, resulting in FRB review.  The Board ruled that the force should be classified as a Type 32 use of force, which was defined as any force used to "overcome resistance of a person during an arrest or a detention; or defend oneself or another from combative action by another person" and is not categorized by any other force reporting type.  The Board ruled the force in compliance.

We did not disagree with any of the Boards' findings.

It is not a requirement, but excluding the protest FRBs, all of the Board votes we observed during this reporting period were unanimous.  We recognize that in some circumstances, there will be legitimate differences of opinion where the determination is not obvious.  In these circumstances, we look for frank discussion and clear explanations of the differing positions.

In our last report on this Task, we observed that OPD appeared to be dealing with a backlog of FRB eligible cases, and they scheduled several FRBs dangerously close to their 3304 dates – one year from the date of occurrence. We note that this trend continued into the early part of this review period. We observed nine FRBs between January 15-July 31, 2021. Six of these occurred prior to March 10. That said, with the exception of one case, all FRBs were held and compliance findings issued within the required timeframe. One FRB was convened 109 days past the 3304 date. The Board Chair opened the proceedings by acknowledging the timeliness issue. We advised the Chair that the Board would be deemed out of compliance, though that was not the fault of the Board members, who did a good job of ferreting out the issues and making appropriate compliance findings. We were also advised that prior to the Board commencing, an IAD investigation was opened to identify the causes for the lapse. We have been monitoring the progress of that IAD case.

In addition to ruling on the appropriateness of uses of force, Force Review Boards will generally identify several follow-up items based on their review of the associated materials and the presentations made to them. These can include items such as counseling and training for individual officers, publication of Department-wide training materials, and modifications to policy. OPD tracks these deliverables in a spreadsheet, broken down into three categories: Individual Issues; Department-Wide Issues; and Quarterly Training Points. In our more recent reports covering this Task, we noted that OPD made significant efforts to bring the spreadsheet up to date and address the open deliverables, particularly the older ones. In our last report, we reported that there were only 19 open deliverables at the end of 2020.

The tracking spreadsheet provided on June 30, 2021 listed 158 open items – an eightfold increase. These consisted of 41 Quarterly Training Points, 41 Individual Issues, and 76 Department-Wide Issues. The dates these issues were assigned ranged from April 28, 2020 through April 23, 2021. When we raised our concern with these numbers and the trend they represented, OPD provided us with an updated spreadsheet dated August 22, 2021. As of that date, there were six open deliverables – two which pertain to Department-wide training and four which pertain to individual training. Two of these latter four are tolling due to the medical leave of the employee requiring the training.

According to OPD, the Department has recently made a concerted effort to address a significant backlog of open Board deliverables. We are hopeful that with Bureau of Risk Management oversight, OPD will stay on top of these issues and keep them current. As we have noted in this and other reports, the deliberations which take place during the Boards are thoughtful and robust, and the outgrowth of these discussions are the identification of worthwhile opportunities to make improvements at the individual and Department level. If there is no follow-up on these opportunities, the effort in identifying them is wasted.

***Special Force Review Boards Related to Summer 2020 Protests***

In the wake of the death of George Floyd at the hands of a Minneapolis police officer on May 25, 2020, many American cities, including Oakland, experienced widespread protests and, in some instances, civil unrest, including acts of violence and destruction of property. These activities were particularly prevalent in Oakland over a four-day period from May 29-June 1, 2020, although generally peaceful protests took place on and after those dates.

In order to deal with these events, the City activated its Emergency Operations Center (EOC) and implemented its Incident Command System (ICS) – a multi-disciplinary approach to deal with large scale events through the coordination of resources and the use of pre-planned command and control structures. Most large public safety agencies around the country are familiar with and have trained in ICS concepts.

During this period, OPD required the assistance of other law enforcement agencies, which responded to both formal requests for mutual aid and also on an as-needed basis to rapidly developing situations in which immediate assistance was required. OPD similarly provided assistance to its neighboring law enforcement agencies. Between May 29-June 1, 2020, the number of outside law enforcement personnel assisting OPD ranged between 200 and 550 officers and deputies per day.

Many tactics were used to address both the peaceful protests and acts of civil unrest, among them the use of chemical munitions. Over this four-day period, OPD had over 260 deployments, not counting the numerous instances of chemical munitions deployments by outside agencies providing mutual aid. Given the Department's history with the use of chemical munitions, including lawsuits which have resulted in significant damage awards and restrictions in the use of these munitions, OPD correctly determined that there would be a thorough review of these deployments occurring during this period. Toward that end, the Department designed a special Force Review Board process for this purpose. The agency can be commended for this initiative.

As stated earlier, FRBs are convened to review Level 2 uses of force. Deployment of chemical munitions is classified as a Level 3 use of force, not normally subject to FRB review. The Boards formed to review the activities of these four days deviated from "regular" FRB protocols in a few significant ways, some of them put in place to demonstrate the level of importance the Department placed on its commitment to provide a thorough review of these events.

- The Boards were each chaired by a Deputy Chief. Such assignment is normally reserved for Executive Force Review Boards. (See Task 30.)

- The Boards were convened primarily to review Level 3 uses of force. Normally, Level 3 uses of force are not reviewed by an FRB unless the incident also involves a Level 2 use of force, triggering the convening of a Board. Each of the Boards did review isolated Level 2 uses of force, but these uses of force were not the onus for creating the special FRBs. (See below.)

- The FRBs each reviewed a day's worth of activity. Normally, FRBs review the force associated with a single incident. These Boards reviewed multiple disparate incidents occurring over several hours and in varying locations. The common denominator for review was that the force was used as part of OPD's Incident Command System

response, and the chemical munitions were used by personnel deployed within the ICS structure. Therefore, Level 2 uses of force by these personnel were reviewed with the other activities on the date they occurred, rather than being the triggering event for the FRB that reviewed them.

- Not all lower level uses of force were reviewed by the FRBs. Normally, FRBs will review Level 2 uses of force and any other force associated with the same incident, and come to a compliance finding on each use of force. There were other Level 3 uses of force and numerous Level 4 uses of force associated with each day's activities. The sheer volume precluded a presentation, discussion, and deliberation on each of them. That does not mean that each of these incidents was not investigated. They were, and the overall investigation available to each Board included the compliance findings for these other uses of force. While the Boards had the latitude to ask questions regarding any of them, they did not formally review them as they normally would and come to compliance findings of their own. That said, where appropriate, the Boards did identify and further examine instances in which a UOF may have been present to ensure that they were properly reported and investigated.

Each of these departures from traditional FRB protocol was conveyed to the Monitoring Team well in advance of the Boards taking place.

The review of these events was a massive undertaking. Each FRB was originally scheduled to last four days. One Board was completed in two days, two were completed in four days, and one Board convened for 10 non-consecutive days. Overall, the Boards were well-run, in large part because each was chaired by a Deputy Chief with a clear understanding of their charge. Collectively, they assessed over 260 Level 3 Type 17a uses of force (defined as when a chemical agent (other than OC) is deployed against or applied to an unrestrained person), as well as any other Level 2 and Level 3 uses of force associated with these incidents. We disagreed with the in-compliance finding in only one of the deployments. In this instance, individuals threw bottles at a police vehicle which was traveling to another scene to provide assistance to other officers at a skirmish line. The officers stopped the vehicle and an officer exited and deployed a CS Han-Ball at the individuals, purportedly to dissuade them from continuing to throw bottles at their moving vehicle. The same thing could have been accomplished by simply continuing to their destination, particularly since they were going to the aid of other officers. Otherwise, we concurred with the findings of all of the Boards, including the out of compliance findings reached for many of the chemical munitions deployments.

Not surprisingly, there were some logistical issues which arose, in particular with subject matter experts (SMEs). SMEs are Department personnel who are normally called to provide testimony to a Board regarding current policy and training requirements related to a particular topic. In what was a recurring issue, certain SMEs scheduled to provide testimony were also operationally involved during protests, which precluded them from testifying. This was not discovered until shortly before the Boards convened, resulting in the use of replacement SMEs who freely admitted that they did not have time to adequately review the material associated with the events they were commenting on. The Department must address this issue to ensure that this does not become a recurring pattern.

In at least two instances, individuals were called as SMEs who also observed all of Board's activities to that point. Consequently, they were exposed to the force investigators' and IAD's presentations, as well as the Board's questions and comments to these presenters. The Training Division Commander or a representative is a required attendee at all FRBs and EFRBs. One lieutenant participated in three of the four Boards in this capacity, and also served as the technical writer for two of them. Yet, he was also called as an SME. While we do not question the objectivity or the integrity of the lieutenant; this is a process issue which should be avoided. The lieutenant directly observed the proceedings of the Board in which he testified, and also observed – and where applicable as the technical writer, recorded – the testimony and deliberations from the other Boards. In some instances, his opinions conflicted with the opinions of the other SMEs he observed. Officers and supervisors who were involved in the incidents themselves were precluded from being used as SMEs. Personnel so heavily involved in the actual Boards must be similarly exempt from being used as SMEs.

These four FRBs took place over a period of approximately seven weeks. Whether by intention or chance, the same captain served on the first three Boards. This provided some level of continuity that the final Board did not benefit from. While each Board acted independently – which they are required to do – this captain was able to inform his colleagues how the previous Boards approached some of the process and decision-making issues they encountered. As a side note, he was also extremely familiar with the material associated with each of the Boards he served on. Reviewing the material for one of these Boards would be challenging; he mastered all three.

Collectively, the Boards reviewed 263 chemical munitions deployments.[2] Of those, 33 were found out of compliance with policy. Thirty-two of these not in compliance findings stemmed from the Board which reviewed the activities of June 1, 2020. Thirty of these findings were by a 2-to-1 split vote, which is allowable by policy.

We found that each of the reports documenting the Boards' activities was complete and well-written, a credit to both the technical writers and the Board Chairs who reviewed and approved the reports. The Chief approved the findings of all of the Boards without disagreement.

Based on this review, OPD remains in compliance with this Task.

| Task 26 compliance status | In compliance |
|---|---|

---

[2] In instances where a supervisor specifically authorized a deployment, that is also considered a use of force and is evaluated for justification. Therefore, a single deployment could be assessed twice.

# Task 30: Executive Force Review Board (EFRB)

**Requirements:**

1. *An EFRB shall be convened to review the factual circumstances surrounding any Level 1 force, in-custody death, or vehicle pursuit-related death incidents. A firearm discharge at an animal shall be reviewed by the EFRB only at the direction of the Chief of Police.*

2. *The Board shall have access to recordings and/or transcripts of interviews of all personnel on the scene, including witnesses, and shall be empowered to call any OPD personnel to provide testimony at the hearing.*

3. *OPD shall continue the policies and practices for the conduct of EFRB, in accordance with the provisions of DGO K-4.1, FORCE REVIEW BOARDS.*

(Negotiated Settlement Agreement V. G.)

**Relevant Policy:**

OPD most recently revised Departmental General Order K-4.1, *Force Review Boards,* on December 21, 2015.

**Commentary:**

Executive Force Review Boards (EFRBs), consisting of three top command-level staff, conduct thorough, detailed reviews of all Level 1 uses of force, in-custody deaths, and vehicle pursuit-related deaths and serious injuries. OPD achieved compliance with this Task during the nineteenth reporting period (April 1-June 30, 2014). We found OPD to not be in compliance with this Task based on the EFRB conducted in 2018, which reviewed the officer-involved shooting of Joshua Pawlik. We disagreed with the Board's findings in that case, and issued a detailed report on the incident on August 17, 2020.

In our last report on this Task, we noted that since 2018, OPD convened one other EFRB, to assess the appropriateness of the use of a canine on April 17, 2019. We found that EFRB in compliance. We observed two additional EFRBs since that report.[3] The first reviewed an officer-involved shooting which occurred on April 16, 2020 in Richmond; and the other reviewed a Level 2 use of force (Type 12, or baton strike) causing injuries, which occurred on May 31, 2020 during the widespread civil unrest in Oakland from May 29-June 1, 2020. The latter incident was upgraded to and investigated as a Level 1 use of force, which requires review by an EFRB. By policy, EFRBs are chaired by a Deputy Chief; and both of these EFRBs were chaired by the same Deputy Chief. We noted that both were well-run, thorough, and complete; and we found both EFRBs to be in compliance.

---

[3] As of this writing, we have not received or reviewed the final reports produced by these EFRBs.

The Richmond case was a particularly complicated case to review.  Six officers, including one Richmond officer, discharged their service weapons, firing over 70 rounds during the course of the incident.  The IAD presentation in this case was thorough, and made excellent use of enhanced video.  The Board took two days to receive testimony and deliberate regarding their findings.  While there were some sustained findings related to officer actions during the lengthy pursuit of the suspect's vehicle, the Board found all of the Level 1 uses of force by OPD officers to be in compliance.[4]  We agreed with these findings.

During our last report covering Task 30, we deferred our compliance findings to observe additional EFRBs.  Having observed the EFRBs described above, we have determined that OPD has again achieved compliance with Task 30.

| Task 30 compliance status | In compliance |
| --- | --- |

## Task 31:  Officer-Involved Shooting Investigations Review Protocol

**Requirements:**

*OPD shall develop a policy to ensure that, in every officer-involved shooting in which a person is struck, Homicide and Internal Affairs investigators respond to the scene.  The Homicide Section's investigation shall be conducted in partnership with, and when deemed appropriate by, the Alameda County District Attorney's Office.  Interviews of the subject officer(s) shall be conducted jointly with the appropriate staff from Homicide and the Office of the District Attorney.  The District Attorney and City Attorney shall be notified in accordance with the provisions of Section V,_paragraph A (5), of this Agreement.  Homicide shall duplicate and provide all completed reports and documents to the District Attorney's Office, the Office of the City Attorney, and the Internal Affairs Division.  IAD shall provide information and/or documents as required by law.*

(Negotiated Settlement Agreement V. H.)

**Relevant Policy:**

OPD most recently published Departmental General Order K-4, *Reporting and Investigating the Use of Force* on October 16, 2014.  IAD Policy & Procedures and Homicide Policy & Procedures are also relevant to this Task.

---

[4] OPD does not have jurisdiction over the Richmond officer who also fired his service weapon during this incident, and the EFRB did not evaluate or rule on the justification for his use of force.

**Commentary:**

Task 31 requires certain notifications and responses in the event of an officer-involved shooting. The Task has long been inactive, but on November 27, 2018, the Court reactivated the Task as an active part of our responsibility.

As described in our last report on this Task, on November 3, 2020, an officer was involved in an officer-involved shooting (OIS) in the city. The officer, along with several others, responded to a reported robbery in progress of a marijuana dispensary; and they encountered a large group traveling in a caravan attempting to gain access to the dispensary. The Bay Area had been experiencing similar activity during this time period, including on the night in question. One officer discharged his patrol rifle, resulting in a fatality.

OPD complied with all of Task 31's requirements, and the Department has briefed us on the associated investigations into this incident during each successive virtual site visit since the incident occurred.

There were no additional incidents during this reporting period (February 1, 2021-July 31, 2021) which were subject to the requirements of this Task, and OPD remains in compliance with this Task.

| Task 31 compliance status | In compliance |
|---|---|

## Task 41:  Use of Personnel Assessment System (PAS) and Risk Management

**Requirements:**

*Within 375 days from the effective date of this Agreement, OPD shall develop a policy for use of the system, including supervision and audit of the performance of specific members, employees, supervisors, managers, and OPD units, as well as OPD as a whole.*

*The policy shall include the following elements:*

1.     *The Chief of Police shall designate a PAS Administration Unit. The PAS Administration Unit shall be responsible for administering the PAS policy and, no less frequently than quarterly, shall notify, in writing, the appropriate Deputy Chief/Director and the responsible commander/manager of an identified member/employee who meets the PAS criteria. PAS is to be electronically maintained by the City Information Technology Department.*

2.     *The Department shall retain all PAS data for at least five (5) years.*

3.     *The Monitor, Inspector General and Compliance Coordinator shall have full access to PAS to the extent necessary for the performance of their duties under this Agreement and consistent with Section XIII, paragraph K, and Section XIV of this Agreement.*

4.      *PAS, the PAS data, and reports are confidential and not public information.*

5.      *On a quarterly basis, commanders/managers shall review and analyze all relevant PAS information concerning personnel under their command, to detect any pattern or series of incidents which may indicate that a member/employee, supervisor, or group of members/employees under his/her supervision may be engaging in at-risk behavior.  The policy shall define specific criteria for determining when a member/employee or group of members/employees may be engaging in at-risk behavior.*

6.      *Notwithstanding any other provisions of the PAS policy to be developed, the Department shall develop policy defining peer group comparison and methodology in consultation with Plaintiffs' Counsel and the IMT.  The policy shall include, at a minimum, a requirement that any member/employee who is identified using a peer group comparison methodology for complaints received during a 30-month period, or any member who is identified using a peer group comparison methodology for Penal Code §§69, 148 and 243(b)(c) arrests within a 30-month period, shall be identified as a subject for PAS intervention review.  For the purposes of these two criteria, a single incident shall be counted as "one" even if there are multiple complaints arising from the incident or combined with an arrest for Penal Code §§69, 148 or 243(b)(c).*

7.      *When review and analysis of the PAS threshold report data indicate that a member/employee may be engaging in at-risk behavior, the member/employee's immediate supervisor shall conduct a more intensive review of the member/employee's performance and personnel history and prepare a PAS Activity Review and Report.  Members/employees recommended for intervention shall be required to attend a documented, non-disciplinary PAS intervention meeting with their designated commander/manager and supervisor.  The purpose of this meeting shall be to review the member/employee's performance and discuss the issues and recommended intervention strategies.  The member/employee shall be dismissed from the meeting, and the designated commander/manager and the member/employee's immediate supervisor shall remain and discuss the situation and the member/employee's response.  The primary responsibility for any intervention strategies shall be placed upon the supervisor.  Intervention strategies may include additional training, reassignment, additional supervision, coaching or personal counseling.  The performance of members/ employees subject to PAS review shall be monitored by their designated commander/manager for the specified period of time following the initial meeting, unless released early or extended (as outlined in Section VII, paragraph B (8)).*

8.      *Members/employees who meet the PAS threshold specified in Section VII, paragraph B (6) shall be subject to one of the following options:  no action, supervisory monitoring, or PAS intervention.  Each of these options shall be approved by the chain-of-command, up to the Deputy Chief/Director and/or the PAS Activity Review Panel.*

*Members/employees recommended for supervisory monitoring shall be monitored for a minimum of three (3) months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor. The first at the end of one (1) month and the second at the end of three (3) months.*

*Members/employees recommended for PAS intervention shall be monitored for a minimum of 12 months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor and designated commander/manager: The first at three (3) months and the second at one (1) year. Member/employees subject to PAS intervention for minor, easily correctable performance deficiencies may be dismissed from the jurisdiction of PAS upon the written approval of the member/employee's responsible Deputy Chief, following a recommendation in writing from the member/employee's immediate supervisor. This may occur at the three (3)-month follow-up meeting or at any time thereafter, as justified by reviews of the member/employee's performance. When a member/employee is not discharged from PAS jurisdiction at the one (1)-year follow-up meeting, PAS jurisdiction shall be extended, in writing, for a specific period in three (3)-month increments at the discretion of the member/employee's responsible Deputy Chief. When PAS jurisdiction is extended beyond the minimum one (1)-year review period, additional review meetings involving the member/employee, the member/ employee's designated commander/manager and immediate supervisor, shall take place no less frequently than every three (3) months.*

9. *On a quarterly basis, Division/appropriate Area Commanders and managers shall review and analyze relevant data in PAS about subordinate commanders and/or managers and supervisors regarding their ability to adhere to policy and address at-risk behavior. All Division/appropriate Area Commanders and managers shall conduct quarterly meetings with their supervisory staff for the purpose of assessing and sharing information about the state of the unit and identifying potential or actual performance problems within the unit. These meetings shall be scheduled to follow-up on supervisors' assessments of their subordinates' for PAS intervention. These meetings shall consider all relevant PAS data, potential patterns of at-risk behavior, and recommended intervention strategies since the last meeting. Also considered shall be patterns involving use of force, sick leave, line-of-duty injuries, narcotics-related possessory offenses, and vehicle collisions that are out of the norm among either personnel in the unit or among the unit's subunits. Division/appropriate Area Commanders and managers shall ensure that minutes of the meetings are taken and retained for a period of five (5) years. Commanders/managers shall take appropriate action on identified patterns of at-risk behavior and/or misconduct.*

10. *Division/appropriate Area Commanders and managers shall meet at least annually with his/her Deputy Chief/Director and the IAD Commander to discuss the state of their commands and any exceptional performance, potential or actual performance problems or other potential patterns of at-risk behavior within the*

*unit.  Division/appropriate Area Commanders and managers shall be responsible for developing and documenting plans to ensure the managerial and supervisory accountability of their units, and for addressing any real or potential problems that may be apparent.*

11.   *PAS information shall be taken into account for a commendation or award recommendation; promotion, transfer, and special assignment, and in connection with annual performance appraisals.  For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

12.   *Intervention strategies implemented as a result of a PAS Activity Review and Report shall be documented in a timely manner.*

13.   *Relevant and appropriate PAS information shall be taken into account in connection with determinations of appropriate discipline for sustained misconduct allegations.  For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

14.   *The member/employee's designated commander/manager shall schedule a PAS Activity Review meeting to be held no later than 20 days following notification to the Deputy Chief/Director that the member/employee has met a PAS threshold and when intervention is recommended.*

15.   *The PAS policy to be developed shall include a provision that a member/employee making unsatisfactory progress during PAS intervention may be transferred and/or loaned to another supervisor, another assignment or another Division, at the discretion of the Bureau Chief/Director if the transfer is within his/her Bureau.  Inter-Bureau transfers shall be approved by the Chief of Police.  If a member/employee is transferred because of unsatisfactory progress, that transfer shall be to a position with little or no public contact when there is a nexus between the at-risk behavior and the "no public contact" restriction.  Sustained complaints from incidents subsequent to a member/employee's referral to PAS shall continue to result in corrective measures; however, such corrective measures shall not necessarily result in a member/employee's exclusion from, or continued inclusion in, PAS.  The member/employee's exclusion or continued inclusion in PAS shall be at the discretion of the Chief of Police or his/her designee and shall be documented.*

16.   *In parallel with the PAS program described above, the Department may wish to continue the Early Intervention Review Panel.*

17.   *On a semi-annual basis, beginning within 90 days from the effective date of this Agreement, the Chief of Police, the PAS Activity Review Panel, PAS Oversight Committee, and the IAD Commander shall meet with the Monitor to review the operation and progress of the PAS.  At these meetings, OPD administrators shall*

*summarize, for the Monitor, the number of members/employees who have been identified for review, pursuant to the PAS policy, and the number of members/employees who have been identified for PAS intervention. The Department administrators shall also provide data summarizing the various intervention strategies that have been utilized as a result of all PAS Activity Review and Reports. The major objectives of each of these semi-annual meetings shall be consideration of whether the PAS policy is adequate with regard to detecting patterns of misconduct or poor performance issues as expeditiously as possible and if PAS reviews are achieving their goals.*

18. *Nothing in this Agreement, and more specifically, no provision of PAS, shall be construed as waiving, abrogating or in any way modifying the Department's rights with regard to discipline of its members/employees. The Department may choose, at its discretion, to initiate the administrative discipline process, to initiate PAS review or to use both processes concurrently or consecutively.*

(Negotiated Settlement Agreement VII. B.)

**Relevant Policy:**

OPD revised and issued Departmental General Order D-17, *Personnel Assessment Program,* in November 2013.

**Commentary:**

Tasks 40 and 41 provide the framework for the Department's risk management system, with Task 40 elaborating the necessary data, and Task 41 describing the use of that data for assessing and managing risk. Over time, compliance with the requirements of these Tasks has sometimes fluctuated, as we have been concerned with interruptions in progress on data management with the Vision database and its predecessors. While many of the issues relevant to Vision have been addressed, risk management data issues remain. Managing those systems and processes will be important to continued compliance with Task 41. Our compliance finding for this Task continues to be appended with a caveat, which we look forward to removing.

The Department recently established a new Bureau of Risk Management, under the supervision of a new Deputy Chief position. The new organizational structure may support a broad understanding of the concept of risk and comprehensive approaches to identifying, assessing, and managing risk. These developments, however, are quite recent; and will require time to translate to practice. They have, though, already prompted some rethinking of the structure and process of Risk Management Meetings. The Department's progress is this regard will be the subject of focused monitoring, as this is a core issue.

That rethinking is expected to be aided by the addition of a researcher, or Data Manager, dedicated to addressing risk management data and other Departmental data issues. The success and contributions to the process by the addition of this position will be assessed. Under the emerging plan, the focus on risk-related behavior of individual officers will occur at the Area-

level Risk Management Meetings; and broader Departmental issues will be the focus of the higher-level meetings, including the Citywide Risk Management Meeting. These discussions have important implications for risk management moving forward. The consideration of Task 41, which establishes requirements for the risk management process, will be important to these developments. Another place where Task 41 will play a significant role is in the drafting of the Departmental Policy on Risk Management, the draft of which is currently labelled R-01, *Risk Mitigation*. Risk management at OPD has developed substantially beyond the details of the earlier policy.

As risk management continues to evolve in the Department, several issues could benefit from additional clarification. The City's Information Technology Department (ITD) has played a critical role in the development of the Vision database after its work on Vision's predecessor, PRIME. Over recent months, ITD seems to have reduced its role even though work, including building reports and some data correction issues, remains. A clarification of ITD's role and resources would be useful in the wake of these changes.

Finally, in the past, the Personnel Assessment System Unit, or PAS Unit, filled a prominent role in the risk management process, including the Risk Management Meetings. Although PAS reviews are occurring, the unit has not played a significant role in recent Risk Management Meetings. Since the role of PAS is outlined in Task 41, the Department needs to clarify the role of the PAS Unit.

| Task 41 compliance status | In compliance, although we are concerned that the potential of the system is, for now, surpassing its efficacious use. |
|---|---|

# Task 45:  Consistency of Discipline Policy

## Requirements:

*On or before October 6, 2003, OPD shall revise and update its disciplinary policy to ensure that discipline is imposed in a fair and consistent manner.*

1.   *The policy shall describe the circumstances in which disciplinary action is appropriate and those in which Division-level corrective action is appropriate.*

2.   *The policy shall establish a centralized system for documenting and tracking all forms of discipline and corrective action, whether imposed centrally or at the Division level.*

3.   *All internal investigations which result in a sustained finding shall be submitted to the Discipline Officer for a disciplinary recommendation. The Discipline Officer shall convene a meeting with the Deputy Chief or designee in the affected chain-of-command for a confidential discussion of the misconduct, including the mitigating and aggravating factors and the member/employee's overall performance.*

    *4.      The COP may direct the Discipline Officer to prepare a Discipline Recommendation without convening a Discipline Conference.*

(Negotiated Settlement Agreement X. B.)

**<u>Relevant Policy:</u>**

Five Departmental policies incorporate the requirements of Task 45:  Departmental General Order M-03, *Complaints Against Department Personnel and Procedures* (published December 6, 2005 and revised most recently on August 24, 2013); Training Bulletin V-T.1 and V-T.2, *Internal Investigation Procedure Manual* (published July 17, 2008); Internal Affairs Policy and Procedure Manual (published December 6, 2005); and Training Bulletin V-T, *Departmental Discipline Policy* (published March 14, 2014).  Several of these policies are currently being revised.

**<u>Commentary:</u>**

Task 45.2 requires that OPD maintain a centralized system for documenting and tracking all OPD forms of discipline and corrective action, whether imposed centrally or at the division level. To assess Phase 2 compliance with this subtask, we reviewed the 21 cases that contained at least one sustained finding that were approved in January, February, March, and April 2021.  All (100%) of these cases and findings contained all of the necessary information available on the spreadsheets generated by IAD for our review.  OPD is in compliance with the requirement that it maintain an adequate system for documenting and tracking discipline and corrective action.

The NSA also requires that discipline be imposed in a manner that is fair and consistent.  To this end, the Department developed a Discipline Matrix, which was adopted on September 2, 2010 and was in effect until a new Discipline Matrix was approved on March 14, 2014.  This subsequent Matrix applies to violations after that date.

As noted above, we reviewed all 21 cases with sustained findings that were approved in January, February, March, and April 2021.  (Several cases involved multiple sustained findings.)

In January, there were three sustained cases.  In one case, a civilian employee was sustained for failing to coordinate a Force Review Board presentation in a timely manner.  In another case, a sergeant was sustained for failure to accept or refer a complaint.  In another case, two officers were sustained for not conducting an adequate preliminary investigation of a robbery.

There were no sustained cases submitted for February.

In March, there were eight sustained cases.  Two cases involved Communications dispatchers: In one, a dispatcher was sustained for improperly entering information from a caller; and in the other, a dispatcher was sustained for inappropriately disconnecting a call.  In another case, an officer was sustained for care of property after losing an arrestee's watch.  In another case, two officers were sustained for failing to properly complete a police report.  In another case, an officer was sustained for his involvement in a preventable vehicle collision.  In another case, a civilian employee was sustained for submitting inaccurate payroll timecards.  In another case, which involved a reported assault following a vehicle accident, one officer was sustained for

failing to conduct a proper investigation; and another officer was sustained for failing to retrieve one of the drivers' driver's license from the other driver.  In another case, an officer was sustained for obedience to laws-felony and truthfulness after he vandalized the vehicle of his wife's friend, and was untruthful during his IAD interview regarding the incident.

In April, there were 10 sustained cases.  In one case, a civilian technician was sustained for driving under the influence and obedience to laws-misdemeanor/infraction.  In another case, two officers were sustained for failing to arrest an assault suspect in a family dispute.  In another case, an officer was sustained for authoring an incomplete police report.  In another case, an officer was sustained for not conducting a proper preliminary investigation.  In one case, an officer was sustained for a delayed body-worn camera activation.  Two cases involved noncompliant vehicle pursuits:  In one case, three officers were sustained; and in the other, two officers were sustained.  In another case, an officer was sustained for eight violations including being under the influence of intoxicating substances, being armed while under the influence of intoxicating substances, and untruthfulness.  In another case, two officers were sustained for failing to provide medical care to a person in custody in a timely manner.  In another case, two officers and one sergeant were sustained for failure to accept or refer a complaint.

In each case, unless otherwise documented in writing, the proposed discipline fell within the Discipline Matrix that was in effect at the time of the action for which the discipline was imposed.

We reviewed the records that OPD provided for the 15 total *Skelly* hearings it completed in January, February, March, and April 2021.  *Skelly* hearings are held for IAD cases involving employees with sustained findings in which discipline of a one-day suspension or greater was recommended.  We reviewed the reports for the *Skelly* hearings, and found that they contained adequate justification for the results documented.

The first *Skelly* hearing involved an officer who was sustained for using profanity and an unintentional/improper seizure.  For this violation, the Chief had approved a one-day suspension; and the *Skelly* Officer upheld the discipline recommendation.

The second *Skelly* hearing involved an officer who was sustained for unprofessional conduct in violation of the City's Administrative Instruction 71 (Equal Employment Opportunity/Anti-Discrimination/Non-Harassment Policy and Complaint Procedure).  The Chief had approved a seven-day suspension; the *Skelly* Officer reduced the suspension to three days, and the Chief approved the recommendation.

The third *Skelly* hearing involved an officer who was sustained for a preventable vehicle collision.  For this violation, the Chief had approved a three-day suspension; and the *Skelly* Officer upheld the discipline recommendation.

The fourth *Skelly* hearing involved an officer who was sustained for writing an inaccurate crime report after the officer's supervisor discovered a discrepancy between the report and available surveillance video.  For this violation, the Chief, departing from the Discipline Matrix range, had approved a five-day suspension; at that time, the Chief wrote, "Out of matrix based on severity of violation.  This case was troubling but did not rise to the level of intent to deceive but it was egregious and, therefore, deserving of going out of the range."  The *Skelly* Officer recommended a written reprimand, which the Chief overturned; she imposed a two-day suspension.

The fifth *Skelly* hearing involved an officer who was sustained for bringing the Department into disrepute after repeatedly banging on the door and ringing the doorbell at the residence of his former spouse's friend.  For this violation, the Chief had approved a three-day suspension.  The *Skelly* Officer recommended reducing the discipline to a one-day suspension, and the Chief concurred with the recommendation.

The sixth *Skelly* hearing involved an officer who was sustained for viewing body-worn camera footage without proper authorization, and for improperly accessing a Department records database.  For these violations, the Assistant Chief had approved a 10-day suspension.  The *Skelly* Officer recommended reducing the discipline to a five-day suspension, and the Chief concurred with the recommendation.

The seventh *Skelly* hearing involved an officer who was sustained for a preventable vehicle collision.  For this violation, the Chief had approved a five-day suspension.  The *Skelly* Officer recommended reducing the discipline to a three-day suspension, and the Chief concurred with the recommendation.

The eighth *Skelly* hearing involved an officer who was sustained for filing a false police report, insubordination, and performance of duty.  For these violations, the Chief had approved termination; and the *Skelly* Officer upheld the termination recommendation.

The ninth *Skelly* hearing involved an officer who was sustained for a preventable vehicle collision.  For this violation, the Chief had approved a three-day suspension, and the *Skelly* Officer upheld the discipline recommendation.

The tenth *Skelly* hearing involved a Communications dispatcher who was sustained for conduct toward others-demeanor and failure to accept or refer a complaint.  For these violations, the Chief had approved a two-day suspension.  The *Skelly* Officer recommended reducing the discipline to a written reprimand, and the Chief concurred with the recommendation.

The eleventh *Skelly* hearing involved an officer who was sustained for untruthfulness for providing false statements to IAD.  For this violation, the Chief had approved termination; and the *Skelly* Officer upheld the termination recommendation.

The twelfth *Skelly* hearing involved an officer who was sustained for a *Miranda* violation after he continued questioning a subject who had invoked his *Miranda* rights by requesting an attorney.  For this violation, the Chief had approved a five-day suspension, and the *Skelly* Officer upheld the discipline recommendation.

The thirteenth *Skelly* hearing involved an officer who was sustained for conduct toward others and failure to accept or refer a complaint.  For these violations, the Chief had approved a three-day suspension; and the *Skelly* Officer upheld the discipline recommendation.

The fourteenth and fifteenth *Skelly* hearings involved a Communications dispatcher who was sustained in two different IAD cases for being absent from duty.  In the first case, the Chief had approved a one-day suspension; the *Skelly* Officer recommended reducing it to a written reprimand, and the Chief concurred with the recommendation.  In the second case, the Chief had approved a one-day suspension; and the *Skelly* Officer upheld the discipline recommendation.

Each month, we request from OPD a list of all *Skelly* officers provided with updated *Skelly* Hearing Training during the past month, and their dates trained.  For the four-month period under review, OPD did not conduct any training on this issue.  We will continue to review records once they are made available to verify that any applicable personnel who were recently promoted received the approved *Skelly* Officer Training.

For the four-month period under review, OPD did not receive any arbitration decisions.  We will review and discuss any upcoming arbitration decisions in our next assessment of Task 45.

We continue to closely follow the Department's response to the discipline disparity study conducted in 2020 by an external consulting firm on behalf of OPD.  We have requested that the Department provide us with regular updates on its efforts to address the findings and implement the recommendations made in the report.

| Task 45 compliance status | In partial compliance |
| --- | --- |

## Conclusion

Many cities around the country are experiencing increasing problems of community violence concurrent with the challenges brought about by the pandemic.  Demands for reform stemming from incidents across the nation continue to echo through nearly all law enforcement agencies.

Chief LeRonne Armstrong has continued to provide strong leadership – and in so doing, he has inspired the executive team and command staff to support the continuing transformation of the Department into what can be a model police agency.  The Department's new Bureau of Risk Management has not been fully tested, but its very creation can serve as a renewed impetus for preventing and addressing the types of risk-related problems that have been of great concern during the course of the NSA.

A recent Risk Management Meeting failed to meet the quality we would have hoped for at this stage in the process.  The Chief, at the conclusion of the session, immediately expressed his dismay.  This measure of reflective, quick action on the part of the Chief is the type of leadership that the Department has needed.  Changing the culture will require not just the Chief's efforts, but the commitment by personnel at all ranks and, of course, City leadership.

We have a cautious optimism that the Department can enter the final stages of this long process. The outstanding issues are important ones, and speak to the core of the NSA.  Timeliness of investigations and the meaningfulness of risk management, not merely as a core value, but as a process that culminates in modified behaviors, are essential.  Robust and comprehensive reviews of uses of force are of paramount importance.  Addressing internal and external disparities, be they who is stopped, and why, or who is disciplined, and who is not, should help lay the foundation for sustainable reform.

Chief (Ret.) Robert S. Warshaw
*Monitor*