BARBARA J. PARKER, City Attorney, CABN 69722
RYAN RICHARDSON, Special Counsel, CABN 223548
BRIGID S. MARTIN, Special Counsel, CABN 231705
One Frank H. Ogawa Plaza, 6th Floor
Oakland, California 94612
Telephone: (510) 238-3751
Facsimile: (510) 238-6500
Email:  BMartin@oaklandcityattorney.org

Attorneys for CITY OF OAKLAND

JOHN L. BURRIS, CABN 69888
Law Offices of John L. Burris
Airport Corporate Centre
7677 Oakport Street, Ste. 1120
Oakland, California 94621
Telephone: (510) 839-5200
Facsimile: (510) 839-3882

JAMES B. CHANIN, CABN 76043
Law Offices of James B. Chanin
3050 Shattuck Avenue
Berkeley, California 94705
Telephone: (510) 848-4752

Attorneys for PLAINTIFFS

*(Additional Counsel on Next Page)*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| DELPHINE ALLEN, et al. | Case No. 00-cv-04599 WHO |
| Plaintiffs, | **JOINT CASE MANAGEMENT STATEMENT** |
| v. | Date: September 1, 2021 |
| CITY OF OAKLAND, et al., | Time: 3:30 p.m. |
| Defendant(s). | Courtroom 2, 17th Floor |
| | Hon. William H. Orrick |

ROCKNE A. LUCIA, JR., CABN 109349
Rains Lucia Stern St. Phalle & Silver
Attorneys & Counselors at Law
2300 Contra Costa Boulevard, Suite 500
Pleasant Hill, CA 94523
Telephone: (925) 609-1699
Facsimile: (925) 609-1690

Attorneys for OAKLAND POLICE OFFICERS ASSOCIATION

# TABLE OF CONTENTS

**PLAINTIFFS' STATEMENT**.................................................................................. 1

PLAINTIFFS' CURRENT POSITION ......................................................................... 1

I.   TASK 2 (TIMELINESS STANDARDS AND COMPLIANCE WITH IAD INVESTIGATIONS)........................................................................................ 2

II.  TASK 5 (COMPLAINT PROCEDURES FOR IAD)............................................... 3

III. TASKS 24 (USE OF FORCE REPORTING POLICY) & 25 (USE OF FORCE INVESTIGATIONS AND REPORT RESPONSIBILITY)............................................ 7

IV.  TASK 30 (EXECUTIVE FORCE REVIEW BOARDS) ......................................... 12

V.   TASK 34 (STOP DATA/VEHICLE STOPS, FIELD INVESTIGATIONS AND DETENTIONS) ............................................................................................ 13

VI.  TASK 41 (USE OF PERSONNEL ASSESSMENT SYSTEM AND RISK MANAGEMENT) ........................................................................................ 17

VII. TASK 30 (EXECUTIVE FORCE REVIEW BOARDS)........................................ 21

VIII. TASK 45 (CONSISTENCY OF DISCIPLINE POLICY)..................................... 21

CONCLUSION........................................................................................................ 27

**THE CITY'S STATEMENT**................................................................................. 33

OVERVIEW ........................................................................................................... 33

I.   THE CITY'S ONGOING EFFORTS TO REDUCE RACIAL DISPARITIES......... 34

     A. Internal Race and Equity Work.................................................................. 34

          1.  First Look at 2019-2020 Internal Affairs Division (IAD) Case Outcome Data............................................................................................... 36

               a.   Case Level Preliminary Findings........................................... 37

               b.   Allegation Level Preliminary Findings................................. 39

               c.   Comparison with 2014-2018 Data and Study Findings...................... 41

          2.  The Academy and Recruiting ................................................... 42

          3.  The Department is in Partial Compliance with Task 45, Consistency of Discipline Policy............................................................................. 44

   B. Reducing Racial Disparities in Policing ........................................................ 45

      1. The Department is a Leader in the Bay Area and in the Nation ............... 48

      2. The Department is in Partial Compliance with Task 34, Vehicle Stops,

      Field Investigations and Detentions (Stop Data) ........................................... 51

II. POLICY DEVELOPMENT AND PUBLICATION .................................................. 51

III. FORCE INVESTIGATION AND REPORT RESPONSIBILITY—TASK 25 ........ 52

   A. Improvement in Body-Worn Camera Activations .......................................... 54

IV. INTERNAL AFFAIRS TIMELINES—TASK 2 .................................................... 55

V. SPECIAL FORCE REVIEW BOARDS RELATED TO SUMMER 2020

   PROTESTS—TASK 26 ......................................................................................... 57

CONCLUSION ............................................................................................................ 58

**THE OPOA'S STATEMENT** ................................................................................... 60

**PLAINTIFFS' STATEMENT**

**PLAINTIFFS' CURRENT POSITION**

The Independent Monitor for the OPD has issued two status reports (the 73rd and 74th IMT Reports) since the last Case Management Conference statement was filed.  OPD remains out of full compliance with five tasks that were out of compliance as of the last Case Management Conference Statement:

1. Task 2 (Timeliness Standards and Compliance with IAD Investigations – not in compliance when most recently assessed by the IMT in the 73rd Report);

2. Task 5 (Internal Affairs Division (IAD) Complaint Procedures – deferred when most recently assessed by the IMT in the 73rd Report);

3. Task 25 (Use of Force Investigations and Report Responsibility – in partial compliance when most recently assessed by the IMT in the 74th Report);

4. Task 34 (Stop Data – in partial compliance when most recently assessed by the IMT in the 69th IMT Report); and

5. Task 45 (Consistency of Discipline – in partial compliance when most recently assessed by the IMT in the 74th Report).

Two of these tasks (Tasks 2 and 25) were in full compliance as recently as January of 2019.

Three other Tasks that were not in full compliance during the last Case Management Conference are, as of the most recent (74th) IMT Report, once again in compliance:

1. Task 24 (Use of Force Reporting Policy)

2. Task 30 (Executive Force Review Boards)

3. Task 41 (Use of a Personnel Assessment System (PAS) and Risk Management)

Plaintiffs' will outline their concerns regarding specific NSA tasks, as well as developments that impact multiple NSA tasks, below:

# I.   TASK 2 (TIMELINESS STANDARDS AND COMPLIANCE WITH IAD INVESTIGATIONS)

Task 2 requires that the Internal Affairs Department (IAD) of the OPD complete internal investigations in a timely manner.  This task was inactive between 2015 and 2019, before falling out of compliance once again.  The Oakland Police Department has made concerted efforts to bring this task back into full compliance, and there has been objective progress on this task in the last year.

OPD policy requires that "at least 85% of Class I misconduct investigations and at least 85% of Class II misconduct investigations must be completed within 180 days to be considered timely."  Per DGO M-03, Class I offenses "are the most serious allegations of misconduct and, if sustained, shall result in disciplinary action up to and including dismissal and may serve as the basis for criminal prosecution."

The IMT reviewed 54 Class I misconduct cases during the period covered by the 73rd IMT Report and determined that just 29 of these cases were completed in a timely manner.  This represents a 54% timely-completion rate, which is a downgrade from the 67% completion rate the last time the IMT assessed this Task in the 71st IMT report.  The IMT previously described a 69% timely completion rate as "still far below compliance" (69th IMT Report, page 3), and the most recent compliance rate is even worse.  Plaintiffs' attorneys note that OPD's timely-competition rate stood at a paltry 38% as recently as recently as the 66th IMT Report, indicating substantial improvement in the intervening months.  On the other hand, the most recent figures remain well short of the 85% compliance threshold required by the NSA.

Of the 99 Class II cases reviewed by the IMT during the period covered by the 73rd IMT Report, 81 were in compliance with established timelines. This represents an 82% compliance rate with IAD policy and is barely short of the 85% compliance threshold mandated by the NSA.  This 82% compliance rate for Class II

2

investigations remains similar to the previous two reporting periods, when the IMT determined OPD had completed 82% and 84% of Class II investigations in a timely manner.

Plaintiffs' can report that OPD is working systematically to meet their mandated timelines.  OPD has informally communicated that the timely-completion rate for Class I and Class II investigations that are being closed right now are both at least at the 85% threshold required for compliance.  Further, it appears that OPD has built support around investigating these cases promptly.  Chief Armstrong and the Bureau of Risk Management Deputy Chief made changes to its IAD due dates in which Commanders must now adhere to strict IAD due dates which are earlier than the 180-day due dates, to ensure that investigations do not languish until the last minute, and to allow IAD ample time to review and close out cases before the 180-day deadline.

It thus appears that the Department making progress toward once again achieving compliance with Task 2.  Task 2 compliance is categorically different from the other Tasks that remain out of compliance insofar as the threshold for compliance is strictly mathematical: there is an objective, concrete target that OPD must meet, and there is objective progress in that direction. Unfortunately, the OPD has not yet surpassed the 85% bar that is required and must be maintained. OPD leadership, and IAD leadership appear to be narrowing this gap and moving back toward full compliance.  Given that OPD was previously in compliance with this task for so long that it became inactive for four years, there is no reason OPD cannot reattain that status shortly.

## II.    TASK 5 (COMPLAINT PROCEDURES FOR IAD)

OPD is not in full compliance with Task 5, which pertains to Complaint Procedures for the Internal Affairs Division.  On March 23, 2016, the Court issued an Order indicating that irregularities and potential violations of the NSA occurred in IAD investigation 15-0771. The Order noted that the investigation raised issues

3

1    of accountability and sustainability of compliance.

2         The IMT most recently assessed this task in the 73rd IMT Report.  In this

3    report, the IMT noted that "the Department has made progress in this Task and

4    has shown capacity to better address internal investigations." (73rd IMT report, p.

5    9).  The IMT nevertheless notes that "OPD is currently challenged by investigations

6    emanating from demonstrations in May and June [2020] – to include a Level 1 use

7    of force – as well as an officer-involved shooting outside City limits." (73rd IMT

8    report, p. 9).

9         Task 5 consists of several subtasks, and the IMT has determined that many

10   of these are in compliance, including:

11        •    Task 5.1, which requires that when a citizen wishes to file a complaint,

12             the citizen is brought to a supervisor or IAD, or a supervisor is

13             summoned to the scene.

14        •    Task 5.2, which requires that if there is a delay of greater than three

15             hours in supervisory response, the reason for the delay must be

16             documented.

17        •    Task 5.3, which requires that where a complainant refuses to travel to

18             a supervisor, or wait for one, personnel make all reasonable attempts

19             to obtain specific information to assist in investigating the complaint.

20        •    Task 5.4, which requires that specific information be documented on a

21             complaint form and submitted to the immediate supervisor or, in

22             his/her absence, the appropriate Area Commander.

23        •    Task 5.5, which requires that the supervisor or Area Commander

24             notify Communications and forward any pertinent documents to IAD.

25        Every day, the Communications Division of OPD prepares Daily Incident

26   Logs (DILs) that gather all the data required to evaluate compliance with these

27   tasks.  The IMT reports that this process has "significantly enhanced OPD's ability

28   to document compliance" (73rd IMT Report, p. 10) with these subtasks.  Plaintiffs'

JOINT CASE MANAGEMENT STATEMENT                          Case No. 00-cv-4599 WHO

1  attorneys note that this streamlined, codified process is a marker of institutional

2  commitment to Task 5 compliance and commend OPD consistency in this regard.

3      The crux of Task 5 compliance, ultimately, pertains to subtasks relating to

4  the quality of IAD investigations (subtasks 5.15 to 5.19, and subtask 5.21).

5  Subtasks 5.15 and 5.16 require that OPD gathers all relevant evidence, conducts

6  appropriate follow-up interviews, considers all evidence, makes credibility

7  assessments where feasible, and resolves inconsistent statements.  In all of the

8  cases the IMT reviewed during the period covered by the 73rd IMT report, the IMT

9  determined that OPD gathered all available relevant evidence and reported that

10  investigators did conduct follow-up interviews where necessary to resolve

11  inconsistencies.  OPD also made credibility assessments in three cases reviewed by

12  the IMT, and the IMT agreed with all these credibility assessments.  In two of these

13  cases, body-worn camera (BWC) footage was "instrumental" in determining

14  complainants and/or witnesses were not credible.  This is a useful reminder that

15  BWC footage safeguards the public and OPD personnel alike and is critical to

16  sustaining public trust with the Department.

17      Despite these positive developments, Plaintiffs' attorneys remain concerned

18  about the alarming number of reports of failure to activate body worm cameras in a

19  timely manner. These issues must be addressed and, if they continue, discipline

20  must be imposed (as it was in one case reported by the IMT in their 74th Report).  If

21  such "mistakes" continue, it is only a matter of time before an officer does not use

22  his/her camera in a serious incident, resulting in a significant liability risk to the

23  City of Oakland.

24      Task 5.17 requires OPD to permanently retain all notes generated and/or

25  received by OPD in their personnel file, and OPD has a "sustained history of 100%

26  compliance with this subtask." (73rd IMT Report, p. 8.). This was once again the case

27  during the most recent reporting period evaluated by the IMT.

28      Tasks 5.18 and 5.19 require, respectively, that OPD "resolve each allegation

5

1  in a complaint investigation using the preponderance of evidence standard" (5.18)

2  and necessitates "that each allegation of a complaint if identified' be resolved with a

3  disposition of "unfounded", "sustained", "exonerated", "not sustained", or

4  administrative closure (5.19).  The IMT did not disagree with any of the formal

5  findings in any of the cases they reviewed during this period.  Over the last year, it

6  appears that the IMT has only disagreed with OPD findings in three cases.

7         Indeed, OPD reports that there has been no negative feedback from the IMT

8  regarding the quality of IAD investigations in almost one year.  Put another way:

9  from a process standpoint, IAD investigations have been consistently up to the

10 standards mandated by the NSA, and acceptable to the Monitor.  There were at

11 least two cases where the IMT appeared to disagree with the ultimate finding made

12 by the then-Chief but determined that the investigative process leading up to the

13 ultimate disposition was sufficient.  Plaintiffs' attorneys understand that, on

14 occasion, the IMT and the final arbiter(s) at OPD may come to different conclusions

15 about the disposition of an IA matter when looking at the same set of facts.  OPD

16 can nevertheless be commended from a process standpoint.  A consistent, robust

17 investigative framework is a fundamental pillar of Task 5 compliance, and OPD

18 deserves praise for consistency in this regard.

19       On January 14, 2021, this Court issued an Order regarding Internal Affairs

20 Case No. 21-0028 involving "serious matters that go to the heart of this case – the

21 culture of the Oakland Police Department and the efficacy of internal oversight

22 mechanisms within the Department, which were the primary reason for the

23 imposition of the NSA in the first place." (Dkt. 1419, page 1).  This was connected to

24 the revelation that current and former OPD employees, as well as other members of

25 Bay Area law enforcement organizations, were active participants on a racist, sexist

26 Instagram page with the online handle "@crimereductionteam" that was discussed

27 at length during the previous Case Management Conference.

28       Many of the "@crimereductionteam" posts mocked OPD policies regarding use

6

1    of force reporting and police brutality, while others were overtly racist and

2    misogynistic.  Several posts were incorporated into Plaintiffs' portion of the most

3    recent CMC Statement (see Dkt. 1423, pp. 6-12.)

4         Plaintiffs' attorneys do not know exactly when this Instagram account was

5    created.   However, Plaintiffs' attorneys are in possession of a Department-wide

6    email from September 23, 2020 that states OPD command staff "have come across a

7    page on Instagram that some officers in our department 'follow'", with appended

8    screenshots of "@crimereductionteam" posts.

9         Further, as Plaintiffs' attorneys reported to this Court at the last Case

10   Management Conference, it appears that OPD did not initiate an Internal Affairs

11   investigation regarding the "@crimereductionteam" account until the contents were

12   publicly reported by journalist Darwin Bond-Graham and others, even though OPD

13   was on notice that personnel were engaging these accounts since at least September

14   2020, when the Department-wide email regarding the @crimereductionteam

15   Instagram account was circulated.

16        The 3304 date for the investigation of this Instagram fiasco apparently falls

17   just days after this Case Management Conference.  This Court wrote that the

18   investigation into these matters "may well demonstrate the defendants'

19   commitment to accountability and the sustainability of the reforms in the NSA."

20   (Dkt. 1419).  Plaintiffs' attorneys are eager to see if OPD can do so.  While it is

21   undeniably true that these Instagram posts echo long-standing cultural problems,

22   Plaintiffs' Attorneys also recognize that it provides an opportunity for OPD to

23   demonstrate that it can self-govern, and hold itself to account, as required by the

24   Negotiated Settlement Agreement.

25   **III.   TASKS 24 (USE OF FORCE REPORTING POLICY) & 25 (USE OF**
         **FORCE INVESTIGATIONS AND REPORT RESPONSIBILITY)**
26

27        OPD had been in compliance with Tasks 24 (Use of Force Reporting Policy)

28   and 25 (Use of Force Investigations and Report Responsibility) of the NSA since

JOINT CASE MANAGEMENT STATEMENT                           Case No. 00-cv-4599 WHO

1   2015. In November 2018, this Court reactivated these Tasks as a result of Plaintiffs'

2   and the Monitoring Team's concerns about systematic underreporting of weaponless

3   defense techniques and incidents related to the pointing of firearms.  Subsequently,

4   the IMT found both Task 24 and Task 25 out of compliance. During the most recent

5   (74th) IMT Report, OPD came back into compliance with Task 24.

6       OPD was able to reattain compliance with Task 24 by working with

7   stakeholders, including Plaintiffs' attorneys, the IMT, and the Police Commission,

8   to enact policy revisions related to such Use of Force reporting.  Specifically, OPD

9   published Special Order 9196, which clarified use of force policies regarding the

10  pointing of a firearm.  This Special Order supersedes relevant sections of

11  Departmental General Orders (DGOs) K-3 (Use of Force) and K-4 (Reporting and

12  Investigating Use of Force) by eliminating all references to "intention" related to an

13  officer pointing his or her service weapon.  OPD acknowledged that determining

14  "intent", as well as language regarding the "low-ready" position", was

15  "unnecessarily subjective and did not capture the spirit of the policy: reporting

16  every time that an officer points a firearm at a person." (Special Order 9196, p. 1).

17  Level 4, Type 22 Use of Force was thus redefined "Pointing a Firearm at a Person",

18  where pointing means any incident, intentional or otherwise, where "the line of the

19  muzzle intersects with the body of the subject such that, if the firearm were to

20  discharge, the round would strike that person."

21      This led to a predictable increase in the total uses of force during 2020.  Per

22  the biweekly reports that the Department regular shares with the IMT and

23  Plaintiffs' attorneys, there were 2,996 total uses of force in 2020, up from 1,555 in

24  2019.  Level 4 uses of force, which include "Pointing of a Firearm at a Person" as

25  described above, were primary driver of this surge: while there were 1,429 total in

26  2019, that figure jumped by over 1,200 to 2,631 in 2020.

27      As Plaintiffs have previously noted, the more recent numbers are largely a

28  result of Special Order 9196, and more accurately reflect OPD's actual use of force

8

than data from previous years. The 2020 figures also provide a comprehensive baseline for subsequent comparison. According to the most recent (292nd) biweekly Compliance Update issued by OPD, there have been 851 Level 4 Uses of Force to date in 2021. This represents a dramatic year-to-year reduction: In 2020, to date, there had been 1654 Level 4 uses of force. Given that there is no indication that OPD is now undercounting certain kinds of force (especially Type 22, Pointing a Firearm at a Person), the Department deserves praise for the significant reduction in Level 4 Uses of Force.

Special Order 9196 also created several new Use of Force categories, including Level 4, Type 32 to ensure that any force used by OPD to "overcome resistance" was adequately documented. Such force includes moving subjects who had gone limp, guiding and/or pushing subjects into patrol vehicles, using restraining devices, removing people who are holding on to fixed objects, and forcibly handcuffing subjects who are resisting arrest.

Here, too, OPD must be commended. Plaintiffs' attorneys do not know of another major-city police department that has taken steps to ensure that all the above-described uses of force must always be documented and codified this into their Use of Force policy. This reflects truly progressive policing, and it is a credit to the Department that all such uses of force are now reported

The IMT reviewed 186 Level 3 and Level 4 use of force reports during the reporting period covered by the draft 74th IMT report. There were 501 discrete uses of force across these 186 incidents, including 102 where weapons were pointed at a subject. In 93 of those 102 incidents (where a weapon was pointed at a subject), Level 4, Type 22 Use of Force was the only force used, and the IMT determined that this use of force was appropriate in all instances. Further, the IMT did not identify any instances where officer did not report Type 22 Uses of Force. It thus appears that the new policy regarding reporting the pointing of a firearm is working: Type 22 force is now captured in UOF collection, is reported consistently, and is within

9

1  policy when used, according to the IMT, who determined that every instance of Type

2  22 Force they reviewed during the period covered by the 74th IMT report was

3  appropriate. (Draft 74th IMT Report, p. 10)

4      The IMT did, however, "identify nine instances where officers who assisted in

5  restraining a combative person did not report a Type 32 UOF, and one where a

6  Type 29 UOF was not reported." (Draft 74th IMT Report, p. 10).   This is, as

7  described above, a new Use of Force category that is among the most progressive in

8  the nation, and it is therefore likely that there will be hiccups related to reporting

9  this previously unreported use of force at the outset of the new policy.  OPD must

10  nevertheless ensure that all officers are trained in the new force type and attendant

11  reporting requirements, and Plaintiffs' attorneys will monitor subsequent IMT

12  reports for progress reporting Type 32 Uses of Force.

13      The Department also reports that the IMT has not deemed any Uses of Force

14  out of compliance in many months.  This is of a pattern with the IA investigations

15  described above: The IMT has not expressed substantive concerns with the

16  underlying process, even on the rare occasions where they disagree with an

17  outcome.  The IMT has, however, provided some feedback to OPD about the

18  announcement and identification of officers during initial detention, late Body Worn

19  Camera (BWC) activations, and boilerplate language regarding training and

20  experience.  These are important issues that were highlighted by OPD's own Office

21  of the Inspector General (OIG) in a 2019 Report titled "Special Report: An

22  Assessment of the Oakland Police Department's Use of Force Reporting, Usage of

23  Portable Digital Recording Devices, and Supervision of Incidents During Arrests for

24  Offenses Where There is a Significant Chance That force Would Be Used."[1]  It is

25  incumbent on OPD to immediately address these issues since they have been on

26  notice about such problems for years.

27      Even so, Plaintiffs' attorneys agree with the IMT that OPD's policies now

28  [1] http://www2.oaklandnet.com/oakca1/groups/police/documents/report/oak072446.pdf

JOINT CASE MANAGEMENT STATEMENT        Case No. 00-cv-4599 WHO

1  meet the standard required by the NSA and are therefore in compliance with Task

2  24 of the NSA.  Future revisions and modifications will inevitably be needed,

3  because policy standards are dynamic and commonly accepted best practices will

4  continue to evolve.  Indeed, changes to DGO K-3 were modified because of changes

5  in the law, and in response to the wishes of the Police Commission following the

6  murder of George Floyd.  This is a necessary component of a self-sustaining, self-

7  correcting, and progressive Police Department.  Although OPD has not yet trained

8  all officers on the revisions to DGO K-3, Plaintiffs' attorneys understand that all

9  officers will be so trained within one month from when the revised document is

10 published.  The Police Commission and OPOA (Oakland Police Officers Association)

11 are currently reviewing these changes, and Plaintiffs' attorneys are eager for this

12 process to be completed.  OPD has already completed trainings for revisions to other

13 use of force policies.

14      Task 25 remains in partial compliance for the following reasons:

15      25.1 The IMT reports that while there has been a decline in the use of

16 boilerplate language, they continue to "find numerous instances where officers

17 justify their uses of force "based on my training and experience" without any further

18 information or explanation as to what training and experience they are referring

19 to."

20      25.2 The IMT finds that they continue to find concerns about the preparation

21 and review of UOF reports by OPD supervisors and "we continue to find instances

22 where OPD supervisors do not identify deficiencies in officer reporting and fail to

23 identify or address MOR violations".

24      The IMT concludes their report on Task 25 by stating: "we continue to see

25 reports where supervisors have failed to identify and address deficiencies by their

26 personnel and in some cases failed to complete appropriate documentation.  While

27 we have continued to see improvements in those reports we reviewed for this period,

28 there is still work to be done."

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1        If OPD wants to attain NSA compliance, they must make the improvements

2   specified by the IMT for this task.  OPD had been "in compliance" before Judge

3   Orrick reactivated this Task in November 2018 and has made improvements in this

4   Task in the IMT's most recent reports.  The shortcomings here seem largely

5   supervisorial in nature.  Perhaps Commanders should consider a directive to

6   supervisors on this matter or those supervisors responsible for these shortcomings

7   should obtain additional training.  In any event, compliance appears to be in sight

8   for this Task and OPD should carefully consider what it will take to attain

9   compliance here.

10  **IV.    TASK 30 (EXECUTIVE FORCE REVIEW BOARDS)**

11       Task 30 pertains to Executive Force Review Boards (EFRBs), which consist of

12  three command-level officer who review all Level 1 uses of force, as well as in-

13  custody and pursuit-related deaths and serious injuries.  Although OPD had been in

14  compliance with this Task for some time, the IMT deferred a compliance finding for

15  Task 30 following the Joshua Pawlik shooting incident, until they (the IMT) could

16  observe additional EFRBs.  The Pawlik EFRB was discussed at great length in

17  previous Case Management Conferences.  In short, Plaintiffs' attorneys are in

18  complete agreement with the IMT's assessment that the Pawlik EFRB was deeply

19  flawed and disagreed with the EFRB findings in the Pawlik matter.

20       OPD has convened three one EFRBs since the Pawlik matter: one related to a

21  canine deployment in 2019, another related to an officer-involved shooting in

22  Richmond, CA, and a third pertaining to a baton strike which occurred during the

23  protests related to the murder of George Floyd in 2020.  Plaintiffs' attorneys were

24  not involved in any of these EFRBs and defer to the IMTs assessment that they

25  were "well-run, thorough, and complete" (Draft 74th IMT Report, p. 22), and that

26  they agreed with the findings (including some sustained findings related to officer

27  actions during the vehicle pursuit that culminated in the officer-involved shooting

28  in Richmond, CA).  The IMT determined that all three of these EFRBs were in

JOINT CASE MANAGEMENT STATEMENT               Case No. 00-cv-4599 WHO

compliance, and therefore determined that OPD is once again in compliance with Task 30 (Draft 74th IMT Report, p. 22).  Plaintiffs' attorneys congratulate the Department on this achievement and expect that OPD can and will remain in compliance with this Task moving forward.

## VI.   TASK 34 (STOP DATA/VEHICLE STOPS, FIELD INVESTIGATIONS AND DETENTIONS)

At the outset of the NSA, the Oakland Police Department did not have any mechanism to review, approve, or assess the justifications for stops and searches by its officers.  Indeed, this lack of oversight and accountability led directly to the abuses that precipitated Plaintiffs' attorneys' involvement in the NSA.  Recent progress on this front is remarkable, and a credit to the Department and all other stakeholders diligently involved in this sphere.

OPD recently demonstrated a commitment to "intelligence-led" stops, which greatly reduced the racial disparities in discretionary stops by Oakland Police officers. As recently as 2015, there were 22,506 non-dispatch stops of African Americans by Oakland police.  That number has fallen year-over-year, to just 5,870 in 2020.  The number of stops for all racial categories were reduced over this period, but two figures are especially striking since 2015: A 74% reduction in the total number of African American stops (from 22,506 to 5,780) and the 60% reduction in the total number of Hispanic stops (from 7,504 to 2,991):

///

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO



### Non-Dispatch Stops by Race 2014-2020

| Race | 2014 | 2015 | 2016 | 2017 | 2018* | 2019 | 2020 | 2019-2020 # change | 2019-2020 % change |
|------|------|------|------|------|-------|------|------|--------------------|--------------------|
| Afr American | 19,061 | 22,506 | 20,410 | 19,783 | 10,827 | 7,519 | 5,870 | -1,649 | -28% |
| Hispanic | 6,087 | 7,504 | 6,685 | 7,047 | 4,442 | 3,810 | 2,991 | -819 | -27% |
| White | 4,622 | 4,335 | 3,318 | 2,835 | 2,244 | 992 | 745 | -247 | -33% |
| Asian | 2,320 | 2,484 | 1,667 | 1,588 | 1,366 | 1,701 | 1,279 | -422 | -33% |
| Other | 1,168 | 1,190 | 1,061 | 1,152 | 871 | 627 | 476 | -151 | -32% |
| Total | 33,258 | 38,019 | 33,141 | 32,405 | 19,750 | 14,649 | 11,361 | -3,288 | -29% |

A more recent chart, recently shared by OPD personnel with Plaintiffs' attorneys, plots the number of non-dispatch stops in each quarter, and indicates that the positive momentum outlined above did not stall during the first year of the Covid-19 pandemic:

///

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO



### Non-Dispatch Stops by Race 2017-2020

| Year | Afr American | Hispanic | White | Asian | Other | Total |
|------|--------------|----------|-------|-------|-------|-------|
| 2017 | 61% (19,273) | 22% (6,909) | 9% (2,715) | 5% (1,551) | 4% (1,141) | 31,589 |
| 2018* | 55% (10,836) | 22% (4,444) | 11% (2,251) | 7% (1,367) | 4% (873) | 19,771 |
| 2019 | 51% (7,540) | 26% (3,821) | 12% (1,705) | 7% (995) | 4% (627) | 14,688 |
| 2020 | 52% (6,126) | 26% (3,110) | 11% (1,314) | 7% (768) | 4% (497) | 11,815 |

*CA Assembly Bill 953 Stop Data Collection requirements began on 12/20/2018

These decreases were accomplished with no compromise to officer safety, and the above chart indicates that OPD substantially ameliorated disparate treatment and/or outcomes during this period. OPD has also focused close attention to the categories of stop outcomes, including searches, recoveries, and arrests. Sustained high levels of arrests, for example, indicate that the intelligence-led policing model is working.  It also reflects the Department's understanding that stops based objective information has myriad benefits: it reduces the policing "footprint" within the community by decreasing the likelihood of unnecessary police interactions while also mitigating individual biases that may precipitate stops

Plaintiffs' attorneys note that the data also shows that African Americans continue to be stopped a higher rate than other demographic groups in Oakland:

JOINT CASE MANAGEMENT STATEMENT                          Case No. 00-cv-4599 WHO

### Non-Dispatch Stop Percentages by Race 2014-2020


— Afr American   — Hispanic   — White   — Asian   — Other

| Race | 2014 | 2015 | 2016 | 2017 | 2018* | 2019 | 2020 |
|---|---|---|---|---|---|---|---|
| Afr American | 57% | 59% | 62% | 61% | 55% | 51% | 52% |
| Hispanic | 18% | 20% | 20% | 22% | 22% | 26% | 26% |
| White | 14% | 11% | 10% | 9% | 11% | 7% | 7% |
| Asian | 7% | 7% | 5% | 5% | 7% | 12% | 11% |
| Other | 4% | 3% | 3% | 4% | 4% | 4% | 4% |

Even if the racial variance in stop data is not entirely attributable to OPD actions, there is much room for continued progress here, and the Department and City of Oakland have acknowledged as much in their most recent appearance in front of this Court. That said, the trend-line is undeniably positive, and the concrete data indicates that OPD is working to address some of the systemic biases within the Department.

The Risk Management Meetings which are discussed at greater length in the next section below, have been instrumental to the above-illustrated declines. Officers with significant numbers of stops of African Americans, with no yield or justification for the stop, are routinely identified and discussed and, when warranted, placed on supervisory monitoring or intervention. This process deals with discrete instances of biased policing and reinforces important cultural changes in the department by reminding all officers that OPD will not tolerate stops of

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

African Americans absent evidence- and/or intelligence-based justification for the stop.

It appears to Plaintiffs' attorneys that the Department is on the cusp of compliance with both the spirit and the letter of this Task, and OPD deserves congratulations for its significant, demonstrated progress on this Task. The year-over-year trend in the data speaks to institutionalized, sustainable change within OPD.

## VII. TASK 41 (USE OF PERSONNEL ASSESSMENT SYSTEM AND RISK MANAGEMENT)

Task 41 pertains to the Use of a Personnel Assessment System (PAS) and Risk Management and requires OPD to develop a risk management system to audit the performance of specific members, employees, supervisors, managers, units, and the Department as a whole. The IMT's most recent review of Task 41 (the Draft 74th IMT Report, dated August 2021) determined that OPD is once again in compliance with this task.

When the IMT issued their 72nd Report, they indicated that approximately 80% of Vision reports and 66% of reports related to the PAS risk review process have been completed. (72nd IMT Report, page 24) For more than a year, the new PAS system was beset with data-retention and transition issues. Much time, effort, and money has been spent migrating from the original risk management database (IPAS) to its successor (Prime) to the newly implemented Vision. It now appears that Vision is largely functional, and that it can fulfil its required role as a relational database and early-warning system than can intervene to mitigate risks in a meaningful way. The road to this point involved much complex, expensive, and time-consuming work, but now that it largely complete, Plaintiffs' attorneys are optimistic that Vision is to become the comprehensive and durable risk management tool it was designed to be and concur with the IMT's assessment in the Draft 74th Reports that "while many of the issues relevant to Vision have been

17

addressed, risk management data issues remain." (Draft 74th IMT Report, p. 28).

This is why, even though the IMT has determined that OPD is "in compliance,

although we are concerned that the potential of the system is, for now, surpassing

its efficacious use." (Draft 74th IMT Report, p. 29)

As the Court knows, there were many staffing-related delays in previous

months and years. The Department recently informed Plaintiffs' attorneys that

these issues have been remedied. The City of Oakland also hired a data manager,

Dr. Leigh Grossman, who has stressed her commitment to a sustainable, risk

management process where every dimension related to PAS is reported out in a

comprehensive manner. Dr. Grossman compiles a monthly Risk Analysis Report

that is shared with major stakeholders. Although it is admittedly a work in

progress, the data included so far is comprehensive, and includes citywide numbers,

as well as data at the Area level, for Ceasefire, for the Violent Crimes Operation

Center (VCOC), and the Criminal Investigations Division. The most recent report

also included non-intel led traffic stop percentages, as well as data regarding

officers and staff who are on PAS monitoring. The very point of a risk management

system it to filter information and process it toward solutions, including

highlighting outlier officers (or groups of officers), and this is a solid step in that

direction. Members of the Stanford team have also commended Dr. Grossman's

"rigorous cleanup" of data pertaining to potential disparities in the Department's

internal discipline process. This will be discussed at greater length in Task 45,

below.

The data that underlies Vision underpins the Department's entire risk

management apparatus, including the Risk Management Meetings (RMMs) that

take place at all supervisory levels of the Department. Plaintiffs' attorneys have

attended many of these meetings and are consistently impressed by the use of data

to discuss stop data, possible patterns of bias in stops, complaints, the ratio of

intelligence-based and non-intelligence-based stops, pursuits, and, perhaps most

JOINT CASE MANAGEMENT STATEMENT                                    Case No. 00-cv-4599 WHO

1   crucially, officers who are under supervisory monitoring and/or intervention.  It is

2   clear that there is real institutional buy-in to this process, which is reinforced by the

3   presence of command-level officers who oversee drilldowns into specific officers and

4   squads.  This is a crucial feature of the RMM process, and OPD must commit to

5   continuing this process in the coming years.  All told, Plaintiffs' attorneys can report

6   that RMMs are an unequivocal force for positive change at OPD.

7        Finally, Plaintiffs' attorneys offer two suggestions to the Department as it

8   nears compliance with this task.  First, OPD must ensure that all twenty (20)

9   components of Task 40 of the NSA are incorporated into Vision.  While most of

10  these elements are already captured and have been discussed extensively by all

11  parties over the years (stop data, pursuits, complaints), it is not clear that every

12  required element is.  Specifically, Plaintiffs' attorneys have previously highlighted

13  three components of Task 40 that have never been discussed at any RMM they have

14  attended, and may not be fully integrated into the Vision system:

- "All civil suits and/or tort claims related to members' and
  employees' employment at OPD, or which contain allegations which
  rise to the level of a Manual of Rules violation" (Task 40, item #7)
- "All charges of resisting or obstructing a police officer, assault on a
  police officer, or assault-with-a-deadly-weapon on a police officer."
  (Task 40, item #13).
- "Criminal cases dropped due to concerns with member veracity,
  improper searches, false arrests, etc." (Task 40, item #19)

23  Please note:  Assault/Battery on a Police Officer & Obstruction/Resisting a

24  Police Officer (sole charges) was discussed at the Risk Management Meeting on

25  August 25, 2021.  (Slide 8.1 at the August 25, 2021 Risk Management Meeting).

26  Very recently, Plaintiffs' Attorneys have also become aware of documents that show

27  outreach by the OPD to both the Public Defender and District Attorney regarding

28  identification on officers that have come to the attention of these entities and who

1  they believe cause problems.  Plaintiffs' attorneys have no information on what was

2  done with this information.  We will endeavor to find the answer to this question

3  and report on it at the Case Management Conference scheduled for September 1,

4  2021.

5          Second, Plaintiffs' once again urge the Department to codify the very robust

6  RMM process via a general order and/or training bulletin that details what a Risk

7  Management Meeting is, and that outlines the roles it demands of participants and

8  subjects. The Department has been proactive about using the risk management

9  data it has available since the Vision system came online.  The buy-in to this

10  process by nearly every single supervisor has been nothing short of remarkable.

11          Plaintiffs' attorneys remember the role that Doctors Eberhardt and Monin,

12  the IMT and Plaintiffs' Attorneys played as a driving force for conducting

13  investigations and drilldowns into this data. One day all these people will be gone

14  and the OPD will be responsible for the Risk Management process.  We believe that

15  the OPD can accomplish this task (particularly under the leadership of Chief

16  Armstrong), but slippage in this area cannot be tolerated by the current and future

17  leadership in the Oakland Police Department.

18          The surest way to ensure that the current RMM system is maintained in the

19  medium- to long-term future of the Department is to codify it, including specific

20  requirements that at least one command-level officers attend Area-level RMMs, and

21  that focused drilldowns into problematic officers and/or squads continue.  Absent

22  such action, the entire Risk Management apparatus is subject to the whims of

23  future OPD commanders.  Chief Armstrong recently attended a Risk Management

24  Meeting that "failed to meet the quality" (Draft 74th IMT Report, p. 33) that the

25  IMT and Plaintiffs' attorneys have come to expect.  At the conclusion of the meeting,

26  Chief Armstrong expressed his displeasure to all participants.  We agree with the

27  IMT that "this measure of reflective, quick action on the part of the Chief is the type

28  of leadership that the Department has needed." Draft 74th IMT Report, p. 33) In

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1  fact, within days, at a subsequent Area 3 Risk Management Meeting, "drill downs"

2  were discussed in detail while a Deputy Chief was present.

3      It is not lost on Plaintiffs' attorneys that a future Chief, overseeing OPD after

4  the NSA has mercifully drawn to a close, might tolerate (or even prefer) a hollowed-

5  out RMM process that is not as probing and expansive as the current iteration.

6  Plaintiffs' attorneys once again encourage OPD to take the commonsense step of

7  institutionalizing all aspects of the robust RMM process that currently exists into

8  permanent OPD policy.

9      In addition, there is a preliminary draft of the Risk Management policy that

10  has been reviewed by Plaintiffs' Attorneys.  We hope that the final document will

11  stress, at a minimum: (1) the need to "drill down" by supervisors and to report

12  outliers as has been done repeatedly in the Risk Management Meetings; (2) that a

13  Deputy Chief and/or Chief attend every Risk Management Meeting: and (3) a plan

14  as to what will be done with those officers who "live" on the charts as outliers in

15  stops without yields and other issues that have made them stay there.  As Chief

16  Joshi said in one of his last Risk Management Meetings prior to becoming Chief of

17  the Alameda Police Department, outliers cannot "live" on the charts as outliers

18  without some appropriate action being taken by supervisors and commanders.

19      Vision is the main repository for data that is germane to virtually all the

20  NSA tasks and is the key to compliance with the NSA itself.  The Department must

21  be lauded for moving back into compliance with Task 41.  The recent progress here

22  is undeniable, and truly critical to the NSA moving forward.

23  **VIII.  TASK 45 (CONSISTENCY OF DISCIPLINE POLICY)**

24      OPD is in partial compliance with Task 45, which requires that discipline is

25  imposed in a fair and consistent manner.  The Hillard Heintze "Police Discipline

26  Disparity Study" (Disparity Study) has been the major locus of Plaintiffs' attorneys

27  Task 45 discussions since it was issued in April 2020.

28      This report determined that "black sworn employees were more likely to have

JOINT CASE MANAGEMENT STATEMENT                                    Case No. 00-cv-4599 WHO

their allegations result in a sustained finding than other employees." Specifically, this report found that:

- "Over the five-year time period, black employees were 37% more likely to have an allegation against them result in a sustained finding." (Disparity Study, p. 10).

- For Class One complaints (the most serious complaints), black individuals are almost 39% more likely to have the complaint sustained, while controlling for gender and years of service." (Disparity Study, p. 10).

- The IAD policy allowed sergeants to be "fact finders and adjudicators has the potential to lessen an investigator's neutrality" and that this system "is not consistent with promising practices used in departments similar in size to Oakland." (Disparity Study, p. 11)

- "Twice as many black trainees were released [from OPDs Academy] than white or Hispanic trainees.  (Disparity Study, p. 41)

- FTO (Field Officer Training) completion rates for black and Asian trainees lagged behind those for Hispanic and white trainees." (Disparity Study, p. 42)

- Just 18.68% of sworn respondents believe that OPD's disciplinary process is fair, while 81.32 percent of respondents disagreed with the statement "OPD's disciplinary process is fair." (Disparity Study, p. 17)

At the time these apparently damning findings were published, Plaintiffs' attorneys described them as a violation of NSA Task 45, which requires consistency of discipline.  Judge Orrick subsequently described "racial disparities" as the "hardest" issue, as well as the issue that "started this case." (09.22.20 WHO CMC Transcript, p. 49), and City of Oakland and OPD leadership promised to address the

22

1   disparities uncovered by the Hillard Heintze Report.  The Disparity Study

2   concluded with series of 14 recommendations that it urged the OPD to adopt, and

3   OPD now reports that all but one of these recommendations have now been

4   implemented, with each of these recommendations codified in OPD policy and

5   procedure.  A Racial Disparity Study working group was also established.  This

6   group was tasked with working with Oakland's Data Manager, Dr. Grossman, and

7   the Stanford University SPARQ (Social Psychological Answers to Real-world

8   Problems) team, to determine how OPD could use the data at its disposal to

9   mitigate racial disparities.  The SPARQ team has also developed a curriculum

10  called "Cultural Competency Training", that will be assigned to all OPD sworn

11  personnel.

12       In the period since Plaintiffs' last Case Management Conference Statement

13  to this Court, Stanford University professors Dr. Eberhardt and Dr. Monin have

14  reported to Plaintiffs' attorneys, and the Department, that much of the data

15  underlying the original Disparity Study was not supportive of the findings. More

16  specifically, it was discovered that when the City of Oakland had given both

17  personnel files and IAB files to create the data that was given to Hillard Heintze,

18  they inadvertently counted some discipline that appeared in both these documents

19  twice, with the result that many of the data relied on by Hillard Heintze was flawed

20  and thus their findings may have been distorted too.

21       Plaintiffs' attorneys are, admittedly, not data scientists, and defer to the

22  Stanford SPARQ team's determination that the dataset that OPD originally

23  provided to Hillard Heintze was not reliable.  In addition, we are encouraged that

24  Doctor Grossman has apparently provided a fix in VISION that will prevent this

25  duplication from occurring again.

26       On very short notice (and while both stricken with COVID and on a vacation)

27  Dr. Monin, as part of the Racial Disparity Working Group, performed a preliminary

28  analysis on the "clean" data (which he describes as "rigorously cleaned up" by Data

                                23

Manager Dr. Grossman and Captain Lau of IAD).  This is a "very different dataset" from the data OPD provided to Hillard Heintze.  It incorporates fewer allegations, over a two-year period (2019-2020) that does not overlap with the data that was provided to the Hillard Heintze firm (2014-2018).

Dr. Monin's review of this data suggests that disparities in discipline outcomes do remain. Although the disparities are nowhere near as large as those reported in the Hillard Heintze Discipline Study, Dr. Monin's preliminary findings suggest that "in most analyses allegations against African Americans seem to be slightly more likely to be sustained, though this differs quite a bit between the two years analyzed (2019 and 2020), and even whether the disparities appear more in division-level or in IA investigations varies between 2019 and 2020, making it hard to locate disparities conclusively with this limited dataset."  Specifically, African American officers:

> *"...seem to benefit slightly less often than other groups from the "summary finding" – which in 99% of cases means a non-sustained case. Whereas the average for all 4 groups is 14.8% for DLI SF, it' only 12.4% for Blacks (vs. 17.2% for Hispanics). And whereas the average for IAD "summary finding" for all 4 groups is 2.0%, it's only 1.2% for Blacks (vs. 2.6% for Whites). This deserves some attention as it could be hiding disparities. Again the concern is that some groups may benefit more often from a summary finding (which again means in 99% of the cases that the allegation is not sustained), which would remove them from the other counts.* (Dr. Monin IAD – August 2021 Preliminary Analyses, p. 3)

However, Dr. Monin also found large year-to-year discrepancies in the data. Based on the small sample size, and the fluctuations between the two years, Dr. Monin requests data from more years to get a more robust picture of potential discipline disparities within OPD.  It is imperative that OPD provide such data to Dr. Monin and the SPARQ team as quickly as possible.

A subsequent preliminary report by Data Manager Dr. Grossman analyzed

JOINT CASE MANAGEMENT STATEMENT                                    Case No. 00-cv-4599 WHO

1    Division Level Investigations and Internal Affairs Investigations at the case and

2    officer level, and determined:

3

4    *For Division Level Investigations, the percentage of sustained cases*
     *varies year to year for Black officers.  In 2019, their sustained rate is*

5    *higher than any other race and in 2020, their sustained rate is in line*
     *or lower than the other races.  Overall, for Division Level Investigations*

6    *(2019 & 2020 combined), the Black sustained rate is slightly higher*
     *than the other races.*

7

8    *For Internal Affairs Investigations, the sustained rate for Black officers*
     *is relatively stable, while for officers of other races, the sustained rate*

9    *fluctuates.  It is important to note the number of Internal Affairs*
     *Investigations is much smaller than the number of Division Level*

10   *Investigations.  A small increase or decrease in the number of sustained*
     *cases could have a fairly large impact on the sustained percentage.  For*

11   *2019, the sustained percentage for Black officers is below the*
     *percentage for White officers.  In 2020, the sustained percent decreases*

12   *for all races except Black officers.  Overall, for 2019 and 2020, the*
     *sustained rate forBlackofficers is higher than the sustained rate for*

13   *officers of other races.*
     . (Dr. Grossman IAD Racial Disparity Preliminary Findings, 08/17/21,

14   p. 1)

15

16

17        Now that OPD and other stakeholders are working with an apparently

18   reliable dataset, it appears that the Department is much better positioned to

19   monitor disparities in the IAD process.  The preliminary findings excerpted above

20   appear to provide a firm foundation for future analyses of discipline disparities at

21   OPD.

22        Lastly, Plaintiffs' attorneys must once again emphasize that discipline

23   disparities can take multiple forms.   During Plaintiffs' attorneys many years of

24   involvement with OPD, we have noticed that supervisors and command staff often

25   receive lighter discipline, if any, than rank-and-file officers.  Those in charge of Risk

26   Management Meetings often direct their gaze down the organizational chart, and

27   command staff are rarely discussed with the brutal, antiseptic honesty reserved for

28   the lowest-level patrol officers.  Discrimination by rank may well be as important a

                                    25

disparity as discrimination by race.  This is suggested in the survey of officers by Hillard Heintze, which found that more than four-out-of-five respondents (including many white and Asian officers) disagreed with the statement "OPD's disciplinary process is fair." (Hillard Heintze Report, p. 7):

Only 18.68 percent of the sworn respondents agreed or strongly agreed that the disciplinary process is fair.

### The Oakland Police Department's disciplinary process is fair.

| Strongly Agree | Agree | Disagree | Strongly Disagree |
|---|---|---|---|
| 1.95% | 16.73% | 44.36% | 36.96% |

*(Note: Although these survey results appear in the same Discipline Disparity Study that was grounded in the "bad" data provided by OPD, the surveys of sworn officer regarding their subjective assessments of discipline at OPD was unrelated to said data, and therefore remains a valid data point.)*

Supervisory accountability and equitable treatment regardless of rank are critical to the OPD discipline process.  To the Department's credit, there are some recent indicators of progress on this front.  Each Report of Internal Investigation (ROI) now includes a section that specifically pertains to a supervisor's responsibility for the alleged misconduct of the officer(s) they command.  Dr. Grossman performed a study of allegations related to the George Floyd/Black Lives Matter protests last summer that determined "the sustained rate for allegations

26

against supervisors was almost twice as high as the sustained rate for officers": (Dr. Grossman Protest Analysis, August 23, 2021, p. 1)

**Allegations Against Named OPD Officers and Supervisors/Commanders**

| | Sustained Allegations | Not-Sustained | Exonerated | Unfounded | Admin Closed | Total Allegations |
|---|---|---|---|---|---|---|
| **May 29, 2020** | | | | | | |
| Officers | 9% (5) | 13% (7) | 35% (19) | 41% (22) | 2% (1) | 54 |
| Supervisors/Commanders | 14% (2) | 7% (1) | 36% (5) | 43% (6) | 0 | 14 |
| **May 30, 2020** | | | | | | |
| Officers | 20% (1) | 0 | 80% (4) | 0 | 0 | 5 |
| Supervisors/Commanders | 0 | 0 | 100% (1) | 0 | 0 | 1 |
| **May 31, 2020** | | | | | | |
| Officers | 20% (10) | 12% (6) | 47% (23) | 20% (10) | 0 | 49 |
| Supervisors/Commanders | 25% (7) | 36% (10) | 29% (8) | 11% (3) | 0 | 28 |
| **June 1, 2020** | | | | | | |
| Officers | 17% (12) | 31% (22) | 53% (38) | 0 | 0 | 72 |
| Supervisors/Commanders | 37% (7) | 0 | 37% (7) | 26% (5) | 0 | 19 |
| **Total** | | | | | | |
| Officers | 16% (28) | 19% (35) | 47% (84) | 18% (32) | 1% (1) | 180 |
| Supervisors | 26% (16) | 18% (11) | 34% (21) | 23% (14) | 0% (0) | 62 |

Dr. Grossman concedes that this one example is "not the perfect measure of accountability", but it is a data point that may indicate OPD's progress in holding supervisors to account at the same standard as subordinate officers.   Time will tell if this is an isolated example or indicative of new era of supervisory accountability within the Department.

## CONCLUSION

When Chief Armstrong was sworn-in immediately prior to our last Case Management Conference before this Court, he promised: "Under my leadership, OPD will have a laser focus on getting each [NSA] task in compliance, while practicing constitutional policing, fair and unbiased treatment of our community. This reflects the strong values of the City of Oakland. Moving the Department into compliance with the Settlement Agreement is one of my top priorities.  But in order to achieve that goal, it requires a cultural change within the organization. And that

JOINT CASE MANAGEMENT STATEMENT                              Case No. 00-cv-4599 WHO

1    change starts today."[2]

2           Six months into his tenure, Plaintiffs' attorneys are pleased to report that his

3    actions, and those of the personnel he oversees, reflect Chief Armstrong's pledge.

4    The IMT likewise commended Chief Armstrong's "strong leadership" in their most

5    recent IMT Report. (Draft 74th IMT Report, p. 33). OPD has attained compliance

6    with three NSA Tasks since the last Case Management Conference and is closer to

7    compliance in several other Tasks than it was in February 2021, including what are

8    arguably the two most important tasks in the NSA, Task 5 (Internal Affairs) and

9    Task 34 (Stop Data).  After years of backsliding, there is real momentum toward

10   substantive compliance with multiple outstanding NSA tasks.

11          OPD's progress is reflected in studies performed by police reform activists

12   monitoring OPD and other similar-sized police departments in the United States.

13   The activists at Campaign Zero, one such organization, advocate criminal justice

14   reform and use data to measure progress.  They examined the rate of police

15   shootings, fatal and non-fatal alike, per 10,000 arrests in 39 police departments

16   with jurisdictions of 400,000 people.  Oakland had the lowest rate of all cities that

17   were surveyed:

18   ///

19

20

21

22

23

24

25

26

27

28   [2] https://sanfrancisco.cbslocal.com/2021/02/08/oakland-native-leronne-armstrong-sworn-in-as-chief-of-police-in-emotional-ceremony/

JOINT CASE MANAGEMENT STATEMENT                          Case No. 00-cv-4599 WHO

# Police Shootings Rates in Cities

Rate of police shootings (fatal and nonfatal) per 10k arrests among police depts with jurisdictions of over 400k population.

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|
| DENVER, CO | 4.0 | 2.0 | 3.3 | 4.0 | 2.0 | 2.7 | 3.8 |
| JACKSONVILLE, .. | 2.7 | 3.5 | 4.2 | 4.8 | 4.1 | 2.3 | 3.7 |
| ALBUQUERQUE,.. | 4.3 | 3.1 | 4.1 | 2.9 | 4.3 | 4.5 | 3.6 |
| MILWAUKEE, WI | 3.3 | 2.5 | 4.4 | 2.9 | 2.1 | 2.6 | 3.6 |
| DALLAS, TX | 4.7 | 6.0 | 4.1 | 3.8 | 2.2 | 1.3 | 3.4 |
| EL PASO, TX | 1.5 | 0.5 | 3.3 | 1.8 | 1.2 | 1.2 | 3.1 |
| LOS ANGELES, .. | 5.0 | 3.8 | 4.2 | 4.0 | 2.6 | 2.6 | 2.9 |
| ARLINGTON, TX | 2.3 | 1.2 | 2.9 | 0.9 | 7.1 | 2.1 | 2.9 |
| CHARLOTTE–ME.. | 2.6 | 3.0 | 2.0 | 5.1 | 2.1 | 2.3 | 2.8 |
| SAN JOSE, CA | 3.3 | 2.3 | 7.4 | 3.8 | 5.7 | 3.9 | 2.7 |
| PHOENIX, AZ | 4.4 | 3.5 | 3.3 | 5.6 | 4.2 | 8.4 | 2.7 |
| MEMPHIS, TN | 2.7 | 2.3 | 3.2 | 2.8 | 1.3 | 2.6 | 2.6 |
| BALTIMORE, MD | 2.5 | 2.4 | 4.3 | 4.4 | 3.4 | 2.3 | 2.4 |
| LONG BEACH, CA | 8.2 | 3.1 | 5.8 | 5.4 | 6.6 | 3.0 | 2.4 |
| SAN FRANCISC.. | 4.6 | 5.4 | 5.4 | 2.0 | 4.3 | 3.6 | 2.1 |
| AUSTIN, TX | 2.4 | 1.1 | 2.1 | 2.6 | 3.2 | 4.5 | 2.1 |
| CHICAGO, IL | 6.0 | 7.3 | 5.9 | 7.6 | 5.9 | 3.9 | 2.0 |
| SAN DIEGO, CA | 2.2 | 2.2 | 3.3 | 1.7 | 2.0 | 1.8 | 2.0 |
| INDIANAPOLIS, .. | 2.0 | 5.3 | 5.0 | 4.3 | 2.0 | 1.2 | 2.0 |
| TUCSON, AZ | 2.8 | 1.9 | 1.9 | 2.4 | 0.7 | 3.5 | 1.9 |
| LAS VEGAS ME.. | 1.7 | 2.3 | 2.4 | 1.5 | 3.2 | 2.9 | 1.8 |
| VIRGINIA BEAC.. | 1.6 | 0.9 | 2.0 | 0.0 | 2.1 | 0.6 | 1.8 |
| MINNEAPOLIS, .. | 0.7 | 1.2 | 2.0 | 0.8 | 1.7 | 2.6 | 1.7 |
| SACRAMENTO, .. | 1.6 | 2.5 | 1.1 | 1.8 | 3.6 | 1.4 | 1.5 |
| NEW YORK, NY | 1.1 | 0.9 | 1.1 | 1.3 | 0.9 | 0.8 | 1.3 |
| MESA, AZ | 1.2 | 2.1 | 2.3 | 3.5 | 2.1 | 5.3 | 1.2 |
| MIAMI, FL | 1.6 | 0.3 | 1.2 | 1.2 | 0.5 | 1.0 | 0.5 |
| OMAHA, NE | 3.1 | 2.5 | | 3.7 | | 2.6 | 0.5 |
| OAKLAND, CA | 6.6 | 0.0 | 6.5 | | 0.0 | 1.1 | 0.0 |

(https://public.tableau.com/app/profile/ssinyangwe/viz/PoliceScorecard/PoliceShootings)

Campaign Zero also found that among these police departments, Oakland did the most to reduce black-white arrest disparities in the period between 2013-2019. This aligns with the laudable progress on Stop Data that is covered earlier in this Case Management Conference Statement:

///

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



# Arrest disparities haven't reduced.

Change in Black–white arrest disparity from 2013–19 in jurisdictions with 400k+ population. UCR arrests data and demographics from 2013 and 2019 US Census ACS.

(https://public.tableau.com/app/profile/ssinyangwe/viz/PoliceScorecard/DrugArrestDisparities)

There is more good news.  The IMT reports it did not disagree with **any** of the findings in the FRB reports they reviewed in their 74th Report.  Similarly, there was no disagreement with **any** of the Internal Affairs findings in the George Floyd

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1  Protests.

2      Of course, there are also real obstacles.  As noted above, Plaintiffs' attorneys

3  are eager to review the results of the IA investigation into the offensive Instagram

4  memes under the handle "@crimereductionteam", which is due just days after this

5  Case Management Conference.  The quality of this investigation will be a critical

6  barometer of the Department's progress toward Task 5 compliance.  In light of the

7  Hillard Heintze fiasco, Task 45 compliance will ultimately require fuller analysis of

8  discipline disparities within OPD, not only because a comprehensive investigation is

9  overdue, but also to demonstrate that OPD is able to holistically compile, refine,

10  and analyze the data its risk management apparatus produces.  External

11  institutions that can support and verify OPD's future compliance with the core

12  tenets of the NSA long after Plaintiffs' attorneys' role draws to a close, including the

13  Inspector General and the Police Commission, are expanding their capacities.  Both

14  entities can and should audit the Department as necessary.

15      Similarly, the Oakland Police Department, the elected officials that oversee

16  the Department, and the external institutions like the Police Commission and

17  Inspector General, and the Independent Monitoring Team must build on the

18  progress documented in this Case Management Conference Statement.  It is now

19  time to run through the finish line and bring OPD into full and final compliance

20  with all outstanding Tasks mandated by the NSA.

21      Toward that end Plaintiffs' Attorneys are initiating talks with City Officials

22  to set up meetings for purposes of discussing next steps forward and what final

23  compliance might look like. The details are being worked out, and we expect talks to

24  begin within several weeks. Plaintiffs' Attorneys are mindful that talks of this

25  nature began in 2015 and the end of the NSA was projected for June,2016.  The sex

26  scandal that rocked OPD put an end to these talks.  This case is now approaching

27  21 years in length, while the NSA has entered its nineteenth year of existence.

28      As the above charts indicate, the Oakland Police Department has moved from

31

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1  being the one of the worst police departments in the San Francisco Bay Area to

2  being one of the best police departments in comparable cities in the country.

3  Assuming the Instagram case is handled appropriately, there is no reason that the

4  Sustainability Period cannot start very soon.

5  *///*

JOINT CASE MANAGEMENT STATEMENT                          Case No. 00-cv-4599 WHO

1
2

**THE CITY'S STATEMENT**

**OVERVIEW**

3      In his first six months, Oakland Police Chief Armstrong has exhibited the

4 strong leadership this Department needs to sustain reform and cultural change in

5 the Department. While commanding the Department's response to the increase in

6 violent crime, Chief Armstrong has simultaneously continued to drive forward the

7 Department's commitment to fair and equitable policing to achieve compliance with

8 all NSA tasks. The City is proud to see this commitment reflected in the Monitoring

9 Team's recent report moving the Department into full compliance on Use of Force

10 Reporting (Task 24), Executive Force Review Board (Task 30), and Use of Personnel

11 Assessment System (PAS) (Task 41). The City is confident that under Chief

12 Armstrong's leadership, the Department will achieve full compliance on the tasks

13 that are in partial compliance—Use of Force Investigations and Report

14 Responsibility (Task 25), Vehicle Stops, Field Investigations, and Detentions (Stop

15 Data) (Task 34), and Consistency of Discipline Policy (Task 45), and bring the two

16 remaining out of compliance tasks into full compliance—Timeliness with Internal

17 Affairs investigations (Task 2) and Internal Affairs Complaint Procedures (Task 5).

18 The City includes in its filing an updated list of Department commanders

19 responsible for task compliance. Ex. 1, *Oakland Police Department NSA Task*

20 *Compliance Responsibility Chart* (Aug. 25, 2021).

21      In this status report, the Department and the City's leadership respectfully

22 update the Court on the following: (1) the City's efforts to ensure racial equity

23 within the Department (Task 45), (2) the Department's efforts to reduce racial

24 disparities in policing (Task 34), (3) policy development and publications, (4) the

25 Department's progress on force investigations and report responsibility (Task 25),

26 (5) the Department's progress toward meeting Internal Affairs investigation

27 timelines (Task 2), and (6) the Department's completion of special force boards

28 related to Summer 2020 protests (Task 26).

33

JOINT CASE MANAGEMENT STATEMENT                                    Case No. 00-cv-4599 WHO

I.   **THE CITY'S ONGOING EFFORTS TO REDUCE RACIAL DISPARITIES**

The City remains acutely aware that "the nut of this case remains what it was in the beginning, which is racial disparity." Dkt. 1404 at 3:22-23, Sept. 22, 2020 Court Hr'g Tr.  The Department's guiding principles center on fairness and procedural justice. Addressing racial equity both internally and externally is critically important to uphold and promote these principles and to cement the Department's foundation of sustainable reform.

A.   **Internal Race and Equity Work**

The Department-commissioned *Oakland Police Department Police Discipline Disparity Study* (May 2020) made fourteen recommendations, many particularly focused on racial equity, to infuse fairness in internal misconduct investigations and outcomes, as well as in the Academy and Field Training Programs. The Department developed an internal working group to champion implementation of the recommended measures as well as discuss, develop, and implement additional practices to ensure equity in internal investigations and training. The working group meets regularly, typically once a month, with a steering committee which includes stakeholders outside of the Department, including the Director of the City's Department of Race and Equity, representatives from police officer associations advocating racial equity, the Stanford research team, and the plaintiffs' attorneys in this case.

The Department has implemented nearly all of the Study's fourteen recommendations and designed and implemented additional measures as set forth in the attached chart, *Race and Equity Work in Discipline Disparity Study Recommendations (Aug. 2021)*. Ex. 2. Updates occurring between February and August 2021 are featured in gold.

Over the last several months, the Department completed a pilot program separating the fact finder and adjudicator in a subset of internal investigations. In

34

1  each investigation, the fact finder submitted to the reviewing supervisor only the

2  facts found during the investigation and did not submit an ultimate recommended

3  finding (e.g., sustained, unfounded). The reviewing supervisor reviewed the case

4  and made a recommended finding. The Department is still in the process, however,

5  of reviewing the results of the cases in the pilot program to determine the impact, if

6  any, of separating the fact finder and adjudicator. Regardless of whether the

7  Department decides to more widely implement the practice followed in the pilot

8  program, at a minimum, supervisors will be required to make independent

9  recommendations and articulate the facts that support the recommended

10  determinations without deference to investigators' recommended determinations.

11      The Department has also expanded the practice it developed and

12  implemented more than a year ago of anonymizing, where possible and appropriate,

13  the demographic information about Department members who are the subjects of

14  internal investigations. The Department practices anonymization in internal affairs

15  case presentations to command staff for both case outcome decisions (i.e., whether

16  an allegation should be sustained against a member) and disciplinary

17  determinations. In addition, the Internal Affairs Captain has extended this practice

18  to the Captain's review of Division Level Investigations (DLIs). The IA Captain

19  admonishes sergeants or other supervisors presenting DLI facts and

20  recommendations to the Captain or the Captain's designee that presenters must

21  refrain from identifying the name, gender, race, or ethnicity of the subject member.

22      The final remaining item is rolling out specific training for investigators and

23  supervisors regarding race and equity in internal investigations. The Department

24  has determined that it will use a Stanford-developed cultural competency

25  curriculum. The Department's internal race and equity team in collaboration with

26  the City's Department of Race and Equity determined that the cultural competency

27  curriculum is more consistent with and better reflects the City's race and equity

28  training modules than the originally planned procedural justice (level three)

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

curriculum. The curriculum also adds a homework component to the traditional lecture format to allow members to think about each training module, develop questions, improve critical thinking about the material, and receive feedback from trainers. While there has been a slight delay in implementing the training due to curriculum planning and changes, the Department intends to begin training no later than Fall 2021.

### 1. First Look at 2019-2020 Internal Affairs Division (IAD) Case Outcome Data

The Department with the assistance of Stanford's Dr. Monin worked this past year to establish a clean and usable dataset containing IAD case outcome information for 2019-2020. This dataset will allow us to analyze racial disparities in the years following the 2014-2018 Study period. Based on this dataset, the City offers a first look and preliminary analysis of the 2019-2020 case outcome data.

The data in the tables below reflects investigation outcomes for sworn officers in the four largest racial groups[3] represented in the Department in the following types of investigations: Division Level Investigation (DLI),[4] Division Level Summary Finding, Internal Affairs (IA) Investigation, and Internal Affairs Summary Finding.[5] The following investigation types were not included in the analyses primarily because they involve a different investigation process: Collision

---

[3] The analysis excludes allegations against American Indian, Filipino, or Unknown to allow for better comparisons among Asian, African American or Black, Hispanic, and white officers.

[4] A DLI is a formal investigation into allegations of misconduct that is conducted outside the Internal Affairs Division. DLIs are subject to the same investigative requirements as those conducted by IAD investigators. DLIs, typically involve only Class II allegations of misconduct.

[5] A Summary Finding is an abbreviated internal investigation in which a finding can be reached without conducting a full, formal internal investigation because the correct finding can be determined with little or minimal follow-up based on the existing documentation, evidence, statements, and crime information data (e.g., Offense Report, Use of Force Report, video or digital recordings, complainant's statement, radio purge, Law Enforcement Records Management System (LRMS) records).

JOINT CASE MANAGEMENT STATEMENT                                    Case No. 00-cv-4599 WHO

1    Boards, Pursuit Boards, Force Boards, Administrative Closures, and Informal
2    Resolutions.

3    It is important to keep in mind that this first look at the data only uses the
4    single variable of an officer's race. Many other variables may impact whether an
5    allegation is sustained against an officer. Further analyses may aim to measure the
6    impact or correlation of additional variables to the extent possible and appropriate.

7    **a.    Case Level Preliminary Findings**

8    Tables 1 and 2 reflect outcomes of DLIs or IA Investigations in 2019 and 2020
9    for officers at the case level.  Frequently, misconduct investigations involve multiple
10   officers and multiple allegations for each officer. Breaking the data down by
11   complaint investigation is not helpful in a racial disparity analysis because a
12   complaint may involve officers of various races. Conversely, breaking the data down
13   to the allegation level may result in the race of an individual officer with multiple
14   allegations related to the same incident having an inflated impact on the data.
15   Therefore, the initial preliminary analysis set forth below considers each instance
16   when an officer was the subject of an internal misconduct case—recognizing that in
17   many of these instances there were multiple allegations investigated—and
18   determining whether an officer was sustained for one or more allegations in that
19   case. Presenting the data this way yields results that are less sensitive to the
20   number of allegations made against a particular officer in a particular instance and
21   tends to be more in line with the central question of whether African American or
22   Black officers are sustained for misconduct more often than other races.[6]

23   ///

24
25
_____

26   [6] As a reminder, the most significant finding of the 2020 Study was that between
     2014 and 2018 Black or African American officers were on average 37% more likely
27   to have an investigated misconduct allegation sustained against them than officers
     of other races. Once a case was sustained, however, there were no disparities in
28   imposed sanctions.

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

**Table 1:  Division Level Investigations Including Summary Findings[7]**

| | White | | Black | | Hispanic | | Asian | | Total n | Total % |
|---|---|---|---|---|---|---|---|---|---|---|
| | n | % | n | % | n | % | n | % | | |
| **2019** | 296 | 100% | 139 | 100% | 227 | 100% | 121 | 100% | 783 | 100% |
| No Allegation Sustained | 275 | 93% | 115 | 83% | 206 | 91% | 109 | 90% | 705 | 90% |
| 1 or More Allegation Sustained | 21 | 7% | 24 | 17% | 21 | 9% | 12 | 10% | 78 | 10% |
| **2020** | 254 | 100% | 142 | 100% | 285 | 100% | 131 | 100% | 812 | 100% |
| No Allegation Sustained | 233 | 92% | 131 | 92% | 259 | 91% | 118 | 90% | 741 | 91% |
| 1 or More Allegation Sustained | 21 | 8% | 11 | 8% | 26 | 9% | 13 | 10% | 71 | 9% |
| **2019 & 2020** | 550 | 100% | 281 | 100% | 512 | 100% | 252 | 100% | 1,595 | 100% |
| No Allegation Sustained | 508 | 92% | 246 | 88% | 465 | 91% | 227 | 90% | 1,446 | 91% |
| 1 or More Allegation Sustained | 42 | 8% | 35 | 12% | 47 | 9% | 25 | 10% | 149 | 9% |

**Table 2: Internal Affairs Investigations Including Summary Findings**

| | White | | Black | | Hispanic | | Asian | | Total n | Total % |
|---|---|---|---|---|---|---|---|---|---|---|
| | n | % | n | % | n | % | n | % | | |
| **2019** | 60 | 100% | 19 | 100% | 41 | 100% | 23 | 100% | 143 | 100% |
| No Allegation Sustained | 43 | 72% | 14 | 74% | 32 | 78% | 19 | 83% | 108 | 76% |
| 1 or More Allegation Sustained | 17 | 28% | 5 | 26% | 9 | 22% | 4 | 17% | 35 | 24% |
| **2020** | 98 | 100% | 29 | 100% | 78 | 100% | 23 | 100% | 228 | 100% |
| No Allegation Sustained | 83 | 85% | 21 | 72% | 68 | 87% | 21 | 91% | 193 | 85% |
| 1 or More Allegation Sustained | 15 | 15% | 8 | 28% | 10 | 13% | 2 | 9% | 35 | 15% |
| **2019 & 2020** | 158 | 100% | 48 | 100% | 119 | 100% | 46 | 100% | 371 | 100% |
| No Allegation Sustained | 126 | 80% | 35 | 73% | 100 | 84% | 40 | 87% | 301 | 81% |
| 1 or More Allegation Sustained | 32 | 20% | 13 | 27% | 19 | 16% | 6 | 13% | 70 | 19% |

For Division Level Investigations, the percentage of sustained cases varied year to year for Black officers.  In 2019, the sustained rate for Black officers was higher than any other race, but in 2020, the sustained rate was the same as or lower than other races. Overall, for Division Level Investigations (2019 and 2020) combined), the sustained rate for Black officers was slightly higher (2-4%) than the rates for other races.

---

[7] The tables provide comparison by raw number (n) and percentage (%) of sustained outcome rates among the four largest racial groups of sworn officers.

JOINT CASE MANAGEMENT STATEMENT                         Case No. 00-cv-4599 WHO

For Internal Affairs Investigations, the sustained rate for Black officers was relatively stable, while for officers of other races the sustained rate fluctuated. It is important to note the number of IA investigations is much smaller than the number of DLIs. Thus, a small increase or decrease in the number of sustained cases has a fairly significant impact on IA sustained percentage rates. In 2019, the sustained rate for Black officers was lower than for white officers. In 2020, the sustained rate decreased for all races except Black officers. Overall, from 2019-2020, Black officers were sustained at a higher rate than officers of other races. Given the year to year fluctuation and the small number of data, it may be helpful to include data from additional years to complete a more robust and useful analysis.

**b.    Allegation Level Preliminary Findings**

Tables 3 and 4 display findings at the allegation level. At the allegation level the sustained rate generally decreases for each race, however there are trends similar to those reflected at the case and officer level. The allegation level analysis also allows us to view the disposition for each allegation. This may be a useful way to analyze the data, particularly if we are able to consider whether there are certain types of allegations that more often lead to particular outcomes.

///

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

**Table 3: Division Level Investigations Including Summary Findings**

| | White | | Black | | Hispanic | | Asian | | Total n | Total % |
|---|---|---|---|---|---|---|---|---|---|---|
| | n | % | n | % | n | % | n | % | | |
| **2019** | 498 | 100% | 228 | 100% | 386 | 100% | 237 | 100% | 1,349 | 100% |
| Sustained | 22 | 4.4% | 26 | 11.4% | 23 | 6.0% | 14 | 5.9% | 85 | 6.3% |
| Not Sustained | 26 | 5.2% | 16 | 7.0% | 25 | 6.5% | 10 | 4.2% | 77 | 5.7% |
| Exonerated | 241 | 48.4% | 97 | 42.5% | 180 | 46.6% | 119 | 50.2% | 637 | 47.2% |
| Unfounded | 195 | 39.2% | 74 | 32.5% | 143 | 37.0% | 85 | 35.9% | 497 | 36.8% |
| Admin Closure | 4 | 0.8% | 6 | 2.6% | 4 | 1.0% | 3 | 1.3%% | 17 | 1.3% |
| Informally Resolved | 10 | 2.0% | 9 | 3.9% | 11 | 2.8% | 6 | 2.5% | 36 | 2.7% |
| **2020** | 436 | 100% | 241 | 100% | 498 | 100% | 221 | 100% | 1,396 | 100% |
| Sustained | 22 | 5.0% | 15 | 6.2% | 27 | 5.4% | 15 | 6.8% | 79 | 5.7% |
| Not Sustained | 24 | 5.5% | 10 | 4.1% | 26 | 5.2% | 11 | 5.0% | 71 | 5.1% |
| Exonerated | 226 | 51.8% | 133 | 55.2% | 264 | 53.0% | 125 | 56.6% | 748 | 53.6% |
| Unfounded | 146 | 33.5% | 76 | 31.5% | 163 | 32.7% | 63 | 28.5% | 448 | 32.1% |
| Admin Closure | 10 | 2.3% | 1 | 0.4% | 5 | 1.0% | 3 | 1.4% | 19 | 1.4% |
| Informally Resolved | 8 | 1.8% | 6 | 2.5% | 13 | 2.6% | 4 | 1.8% | 31 | 2.2% |
| **2019 & 2020** | 934 | 100% | 469 | 100% | 884 | 100% | 458 | 100% | 2,745 | 100% |
| Sustained | 44 | 4.7% | 41 | 8.7% | 50 | 5.7% | 29 | 6.3% | 164 | 6.0% |
| Not Sustained | 50 | 5.4% | 26 | 5.5% | 51 | 5.8% | 21 | 4.6% | 148 | 5.4% |
| Exonerated | 467 | 50.0% | 230 | 49.0% | 444 | 50.2% | 244 | 53.3% | 1,385 | 50.5% |
| Unfounded | 341 | 36.5% | 150 | 32.0% | 306 | 34.6% | 148 | 32.3% | 945 | 34.4% |
| Admin Closure | 14 | 1.5% | 7 | 1.5% | 9 | 1.0% | 6 | 1.3% | 36 | 1.3% |
| Informally Resolved | 18 | 1.9% | 15 | 3.2% | 24 | 2.7% | 10 | 2.2% | 67 | 2.4% |

**Table 4: Internal Affairs Investigations Including Summary Findings**

| | White | | Black | | Hispanic | | Asian | | Total n | Total % |
|---|---|---|---|---|---|---|---|---|---|---|
| | n | % | n | % | n | % | n | % | | |
| **2019** | 135 | 100% | 39 | 100% | 95 | 100% | 46 | 100% | 315 | 100% |
| Sustained | 30 | 22.2% | 6 | 15.4% | 23 | 24.2% | 5 | 10.9% | 64 | 20.3% |
| Not Sustained | 11 | 8.1% | 7 | 17.9% | 6 | 6.3% | 8 | 17.4% | 32 | 10.2% |
| Exonerated | 40 | 29.6% | 14 | 35.9% | 30 | 31.6% | 13 | 28.3% | 97 | 30.8% |
| Unfounded | 54 | 40.0% | 12 | 30.8% | 36 | 37.9% | 20 | 43.5% | 122 | 38.7% |
| **2020** | 198 | 100% | 61 | 100% | 158 | 100% | 38 | 100% | 455 | 100% |
| Sustained | 24 | 12.1% | 13 | 21.3% | 16 | 10.1% | 2 | 5.3% | 55 | 12.1% |
| Not Sustained | 9 | 4.5% | 5 | 8.2% | 7 | 4.4% | 3 | 7.9% | 24 | 5.3% |
| Exonerated | 82 | 41.4% | 19 | 31.1% | 74 | 46.8% | 14 | 36.8% | 189 | 41.5% |
| Unfounded | 80 | 40.4% | 24 | 39.3% | 60 | 38.0% | 19 | 50.0% | 183 | 40.2% |
| Admin Closure | 3 | 1.5% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 3 | 0.7% |
| Informally Resolved | 0 | 0.0% | 0 | 0.0% | 1 | 0.6% | 0 | 0.0% | 1 | 0.2% |
| **2019 & 2020** | 333 | 100% | 100 | 100% | 253 | 100% | 84 | 100% | 770 | 100% |
| Sustained | 54 | 16.2% | 19 | 19.0% | 39 | 15.4% | 7 | 8.3% | 119 | 15.5% |
| Not Sustained | 20 | 6.0% | 12 | 12.0% | 13 | 5.1% | 11 | 13.1% | 56 | 7.3% |
| Exonerated | 122 | 36.6% | 33 | 33.0% | 104 | 41.4% | 27 | 32.1% | 286 | 37.1% |
| Unfounded | 134 | 40.2% | 36 | 36.0% | 96 | 37.9% | 39 | 46.4% | 305 | 39.6% |
| Admin Closure | 3 | 0.9% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 3 | 0.4% |
| Informally Resolved | 0 | 0.0% | 0 | 0.0 | 1 | 0.4% | 0 | 0.0% | 1 | 0.1% |

These analyses provide a solid first step from which to begin to analyze Internal Affairs discipline data. Due to the work conducted as part of the Racial Disparity Working Group, going forward it will be very easy to extract this data. A

JOINT CASE MANAGEMENT STATEMENT                                    Case No. 00-cv-4599 WHO

1  report has been created in Vision that anyone with access can pull. The tables

2  included herein can easily be reproduced to identify new trends in the data.

3                    **c.    Comparison with 2014-2018 Data and Study Findings**

4       The Department cannot meaningfully compare its initial 2019-2020 data

5  analysis with the 2020 Study findings. A preliminary review of the data shows that

6  the 2019-2020 dataset is significantly different from the dataset used to complete

7  the 2020 Study. For example, the raw numbers alone are markedly divergent. The

8  Study's data included roughly 25,000 allegations against sworn officers over a 5-

9  year period—approximately 5,000 cases per year. The 2019-2020 dataset consists of

10 4,062 allegations in a 2-year period. This difference is likely the result of a number

11 of measures used to clean up the 2019-2020 data including removing duplicate

12 entries.[8] In addition, the 2020 Study controlled for years of service and gender,

13 while the preliminary analysis of the 2019-2020 data looked only at race as the sole

14 variable. Therefore, while it would be fair to say that the Department's more recent

15 internal investigation outcome data appears to indicate that there was less racial

16 disparity in discipline outcomes from 2019-2020 than the Study found between

17 2014-2018, any comparison of the magnitudes of disparity would be flawed.

18      The City appreciates that this is an initial look at the 2019-2020 data. The

19 Department will continue to work with the Stanford team to further analyze the

20 data to determine whether there are important differences between IAD

21 investigation outcomes versus DLI investigation outcomes, differences between

22 outcomes for Class I and Class II misconduct investigations, and if there is a way to

23 meaningfully include or otherwise analyze allegations arising from Boards,

24

---

25 [8] It appears that the dataset used to complete the 2020 Study may have contained an unknown number of duplicate allegation entries as well as outcomes from

26 investigation types that involve significantly different processes which likely impacted the results to an unknown and probably unknowable degree.

27 Nevertheless, it is important to the Department that its internal investigations and outcomes are fair and equitable. The Department intends to continue to prioritize

28 equity in discipline, implement measures to improve equity at key points in the process, and measure the outcome data to monitor the efficacy of its work.

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1   Summary Finding, Informal Resolution, and Administrative Closure cases.

2          **2.**       **The Academy and Recruiting**

3        The Department continues to work to identify and mitigate potential bias in

4   the academy and field training programs. The Department's training division, in

5   collaboration with the Stanford team, identified areas of risk that may contribute

6   to, reflect, or correlate with potential bias impacting police officer trainees. The

7   training division now routinely tracks these areas of risk on a regularly updated

8   spreadsheet to help identify and mitigate the risk of bias and ensure equitable

9   treatment of police officer trainees in the academy and field training programs.

10        In July 2021, the Department commenced its 186th Basic Academy. Tables 5

11   and 5.1 reflects the demographics of the police officer trainees who entered the

12   186th Academy.

13   **Table 5:  OPD's 186th Basic Academy Demographics (Jul. 12, 2021)**

| Gender | | Race/Ethnicity | | Residency | | Language | | Education | |
|---|---|---|---|---|---|---|---|---|---|
| Female | 7 | Asian | 4 | Oakland | 5 | Spanish | 13 | High School | 6 |
| Male | 25 | Black or African American | 7 | Other | 27 | Cantonese | 1 | Some College | 3 |
| | | Hispanic | 15 | | | Punjabi | 1 | AA/AS | 6 |
| | | White or Caucasian | 5 | | | Tagalog | 1 | BA/BS | 16 |
| | | Other | 1 | | | Twi | 1 | MA/MS | 1 |
| | | | | | | Other | 1 | | |
| **Total** | **32** | **Total** | **32** | **Total** | **32** | | | **Total** | **32** |

24   ///

JOINT CASE MANAGEMENT STATEMENT        Case No. 00-cv-4599 WHO

**Table 5.1:  Race/Ethnicity & Gender in OPD's 186th Academy (Jul. 12, 2021)**

| Race/Ethnicity | Female | Male |
|---|---|---|
| Asian | 0 | 4 |
| Black or African American | 2 | 5 |
| Hispanic | 5 | 10 |
| White or Caucasian | 0 | 5 |
| Other | 0 | 1 |
| **Total** | **7** | **25** |

During the first week of the academy, five police officer trainees resigned. In mid-August, a sixth trainee was removed from the academy, leaving 26 trainees remaining in the 186th Basic Academy class. Table 6 reflects the gender and race of the remaining 26 trainees. More than 92% of current trainees in the 186th Academy are non-white.

**Table 6:  Race/Ethnicity and Gender in OPD's 186th Academy (Aug. 19, 2021)**

| Race/Ethnicity | Female | Male |
|---|---|---|
| Asian | 0 | 3 |
| Black or African American | 2 | 5 |
| Hispanic | 4 | 9 |
| White or Caucasian | 0 | 2 |
| Other | 0 | 1 |
| **Total** | **6** | **20** |

One of the methods that the Department employs in its effort to "recruit officers who reflect the diversity of Oakland in all of its forms" is to host recruiting booths at City events that draw a significant crowd. Dkt. 1426 at 5:14-15, Feb. 22, 2021 Court Hr'g Tr. While the lack of planned and permitted large scale events during the pandemic has afforded the Department fewer opportunities to recruit in this manner, it looks forward to increasingly resuming this practice as more events are scheduled. The Department recently recruited for the 187th Academy at the "Stand Up for a Safe Oakland" rally on July 10 which drew crowds estimated at 500-600 people, and the Department plans to recruit at anticipated upcoming events such as Oakland Pride (September), the Oakland Black Cowboy Parade

(October), the Black Joy Parade (February), and the Oakland Running Festival (March). The Department also staffs a recruiting booth at selected[9] Oakland Athletics baseball games; the booth is located at the Coliseum entry gate with the most foot traffic (Gate D). Through its engagement at these events, the Department seeks to connect with those who live, work, visit, rally, and celebrate in Oakland, and attract academy applicants from that diverse array of people.

### 3. The Department is in Partial Compliance with Task 45, Consistency of Discipline Policy

The Monitoring Team assessed Task 45, Consistency of Discipline Policy, in its most recent report and determined that the Department is in partial compliance with this task. *See* Dkt. 1465 at 33, *74th Report* (Aug. 23, 2021).

To assess this task, the Monitoring Team reviewed all cases that resulted in sustained findings between January and April 2021. *Id.* at 31. In each case, unless otherwise documented in writing, the discipline fell within the range set forth in the Discipline Matrix. *Id.* The Monitoring Team also reviewed all *Skelly* hearing records for hearings completed between January and April 2021. *Id. Skelly* hearings are held for sustained misconduct cases in which discipline of one-day suspension or greater was recommended. The *Skelly* hearing reports each contained adequate justification for the results documented. *Id.* The Monitoring Team noted that the Internal Affairs Policy & Procedure Manual (Manual) as well as Training Bulletins that reflect Internal Affairs practices incorporate the requirements of Task 45. *Id.* at 30. As set forth in the Policy Development and Publication Update below, the City is pleased to report that on August 17, 2021 the Department published the revised Manual which is now effective. Training will be updated accordingly, consistent with the revised Manual.

Finally, the Monitoring Team noted that it continues to closely follow the Department's response to the 2020 Discipline Disparity Study. *Id.* at 33. As detailed

---

[9] Staff associated with the Oakland Athletics select the games.

1   above, once the Department completes the cultural competency training, it will

2   have implemented all of the Study's recommendations plus two additional

3   measures. The Department expects that its progress will have a positive impact on

4   consistency of discipline as well as in many other areas of the Department. The

5   Department hopes to receive an assessment of full compliance on this task in the

6   near term.

7         **B.**     **Reducing Racial Disparities in Policing**

8        The Department continues to sustain and further improve its previous

9   reduction in racial disparity in police stops. In the second quarter of 2021, the

10   Department further reduced its non-dispatch stop rate of African Americans to 47%.

11   See Fig. 1, *Non-Dispatch Stop Percentages by Race, Jan. 2016 to June 2021*.

12   This is the lowest quarterly non-dispatch stop rate for African Americans

13   documented by the Department. The rate is 8-9% lower than the stop rates reported

14   in the previous two quarters. And before this quarter, the lowest documented stop

15   rate for African Americans was 50%, achieved in the third quarter of 2019.

16   *///*

JOINT CASE MANAGEMENT STATEMENT               Case No. 00-cv-4599 WHO



*Fig. 1*

The Department recognizes, however, that the second quarter of 2021 also reflects a 6% increase in the stop rate for Hispanics. The Department is continuing to analyze the upward trending stop rate for this group. Notably, however, while it appears that the stop *rate* for Hispanics is trending upward, the *number* of stops continues to trend lower year over year, despite an uptick in the number of stops in the second quarter of 2021. See Fig. 2, *Non-Dispatch Stops by Race, Jan. 2016 to June 2021*. As discussed more fully in previous filings, as the overall number of non-dispatch stops continues to decline, the reduction in footprint has the most significant impact on African Americans and Hispanics, leading to the greatest reductions in the past several years in the raw number of stops of members of each group. *See, e.g.,* Dkt. 1358 at 19, *Joint Case Management Statement* (Feb. 18, 2020). ///

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO



*Fig. 2*

While the overall number of non-dispatch stops have declined significantly, the Department's intelligence-led (intel-led),[10] non-dispatch stops are up 6% from last year for the year-to-date ending July 2021. See Fig. 3, *Monthly Risk Analysis Report—Citywide, Through July 31, 2021* (excerpted). The increase of intel-led stops and the overall decline of non-dispatch stops when taken together results in a dramatic decrease of in the number of non-intel-led, non-dispatch stops. From January to July 2020, the Department made 5,446 non-intel-led, non-dispatch stops. *See id.* This year, however, from January to July 2021, the Department made only 2,217 non-intel led, non-dispatch stops. *See id.* This is significant because non-intel-led, non-dispatch stops are the types of stops where police officers typically exercise the most discretion. For dispatch stops police have been called to respond to

---

[10] Intelligence-led policing means requiring officers to have some nexus to criminal activity before they effect stops of vehicles or people. *Id.* at 21:19-23

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

reported criminal activity, and for intel-led stops police must have knowledge of an existing nexus to criminal activity prior to making the stop.

## Monthly Risk Analysis Report – Citywide
### Through July 31, 2021

|  | Jan-Jun Ave | July 2021 | % Change | YTD 2020 | YTD 2021 | % Change |
|---|---|---|---|---|---|---|
| **Stops** | | | | | | |
| Dispatch Stops | 700.5 | 636 | -9% | 6,392 | 4,839 | -24% |
| Non-Dispatch Stops | 532.8 | 498 | -7% | 8,251 | 3,695 | -55% |
| % Intel Led | 40% | 40% | 0% | 34% | 40% | +6% |
| % Non-Intel Led African American | 44% | 44% | 0% | 47% | 44% | -3% |
| % Non-Intel Led Hispanic | 33% | 37% | +4% | 30% | 33% | +3% |
| % Non-Intel Led Traffic Stops | 83% | 85% | +2% | 80% | 84% | +4% |
| Total Stops | 1,233.3 | 1,134 | -8% | 14,643 | 8,534 | -42% |

*Fig. 3*

### 1. The Department is a Leader in the Bay Area and in the Nation

Other law enforcement agencies in the Bay Area look to the Department as a pioneer in evaluating and reducing racial disparities in police stops. The Department has been asked to give presentations to police agencies and city leadership in Berkeley, San Francisco, and Vallejo to share how the Department has sustained a significant decrease in stop rate disparity and how it promotes and uses intelligence-led policing and risk management data and meetings to achieve and sustain improvement.

Comparison of law enforcement agencies nationwide exhibits the Department as a leader among cities of similar size in reducing racial disparities in policing. See Fig. 4, *Arrest Disparities Haven't Reduced*, chart graphic reprinted from https://policescorecard.org/findings#racial-disparities-persist (last visited on August 24, 2021).[11] Although the chart's title reflects the nationwide trend that between

---

[11] The Police Scorecard is the first nationwide public evaluation of policing in the United States. The Scorecard calculates levels of police violence, accountability, racial bias and other policing outcomes for over 16,000 municipal and county law enforcement agencies, covering nearly 100% of the U.S. population. The Police Scorecard integrates data on police arrests, personnel, funding, incarceration rates and homicide clearance rates from official federal and state databases such as the

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

2013 and 2019 "Arrest disparities haven't reduced," the chart could be accurately retitled as "Oakland has reduced racial disparities in arrests the most while disparity increased in cities nationwide."



*Fig. 4*

From 2013 to 2019, Oakland outperformed every other city of similar size reducing overall Black-white arrest disparity by 26% and Black-white disparity in drug possession arrests by 36%. The city that did second best, Washington D.C.,

FBI Uniform Crime Report (UCR), the Bureau of Justice Statistics' Annual Survey of Jails, the U.S. Census Bureau's Survey of State and Local Government Finances and the California Department of Justice's OpenJustice database. *See* https://policescorecard.org/about.

JOINT CASE MANAGEMENT STATEMENT                     Case No. 00-cv-4599 WHO

reduced Black-white arrest disparity overall by 23% and drug possession arrest disparity by 22%. During that same seven-year span, the Department averaged the fewest officer-involved shootings per number of arrests among similarly sized cities. See Fig. 5, *Police Shooting Rates in Cities*, chart graphic reprinted from https://policescorecard.org/findings#clear-pattern (last visited on August 24, 2021).

## Police Shootings Rates in Cities

Rate of police shootings (fatal and nonfatal) per 10k arrests among police depts with jurisdictions of over 400k population.

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|
| DETROIT, MI | 14.9 | 13.4 | 13.8 | 9.2 | 20.6 | 6.6 | 7.5 |
| OKLAHOMA CIT.. | 4.7 | 7.2 | 5.1 | 3.8 | 4.6 | 7.6 | 7.0 |
| HOUSTON, TX | 4.3 | 5.2 | 5.7 | 4.5 | 3.2 | 4.2 | 5.6 |
| FORT WORTH, .. | 2.4 | 3.1 | 4.1 | 4.5 | 3.5 | 4.5 | 5.4 |
| TULSA, OK | 9.8 | 4.7 | 10.8 | 14.0 | 3.9 | 3.0 | 4.8 |
| LOUISVILLE ME.. | 0.6 | 1.7 | 1.5 | 0.5 | 1.9 | 2.2 | 4.8 |
| SEATTLE, WA | 4.6 | 6.8 | 2.8 | 2.7 | 4.1 | 1.3 | 4.7 |
| LOS ANGELES, .. | 5.0 | 3.4 | 5.9 | 5.1 | 6.0 | 4.7 | 4.1 |
| SAN ANTONIO, .. | 2.2 | 2.3 | 2.6 | 3.1 | 2.3 | 2.1 | 4.0 |
| WASHINGTON, .. | 5.9 | 3.8 | 7.2 | 4.6 | 4.5 | 1.5 | 4.0 |
| DENVER, CO | 4.0 | 2.0 | 3.3 | 4.0 | 2.0 | 2.7 | 3.8 |
| JACKSONVILLE, .. | 2.7 | 3.5 | 4.2 | 4.8 | 4.1 | 2.3 | 3.7 |
| ALBUQUERQUE,.. | 4.3 | 3.1 | 4.1 | 2.9 | 4.3 | 4.5 | 3.6 |
| MILWAUKEE, WI | 3.3 | 2.5 | 4.4 | 2.9 | 2.1 | 2.6 | 3.6 |
| DALLAS, TX | 4.7 | 6.0 | 4.1 | 3.8 | 2.2 | 1.3 | 3.4 |
| EL PASO, TX | 1.5 | 0.5 | 3.3 | 1.8 | 1.2 | 1.2 | 3.1 |
| LOS ANGELES, .. | 5.0 | 3.8 | 4.2 | 4.0 | 2.6 | 2.6 | 2.9 |
| ARLINGTON, TX | 2.3 | 1.2 | 2.9 | 0.9 | 7.1 | 2.1 | 2.9 |
| CHARLOTTE-ME.. | 2.6 | 3.0 | 2.0 | 5.1 | 2.1 | 2.3 | 2.8 |
| SAN JOSE, CA | 3.3 | 2.3 | 7.4 | 3.8 | 5.7 | 3.9 | 2.7 |
| PHOENIX, AZ | 4.4 | 3.5 | 3.3 | 5.6 | 4.2 | 8.4 | 2.7 |
| MEMPHIS, TN | 2.7 | 2.3 | 3.2 | 2.8 | 1.3 | 2.6 | 2.6 |
| BALTIMORE, MD | 2.5 | 2.4 | 4.3 | 4.4 | 3.4 | 2.3 | 2.4 |
| LONG BEACH, CA | 8.2 | 3.1 | 5.8 | 5.4 | 6.6 | 3.0 | 2.4 |
| SAN FRANCISC.. | 4.6 | 5.4 | 5.4 | 2.0 | 4.3 | 3.6 | 2.1 |
| AUSTIN, TX | 2.4 | 1.1 | 2.1 | 2.6 | 3.2 | 4.5 | 2.1 |
| CHICAGO, IL | 6.0 | 7.3 | 5.9 | 7.6 | 5.9 | 3.9 | 2.0 |
| SAN DIEGO, CA | 2.2 | 2.2 | 3.3 | 1.7 | 2.0 | 1.8 | 2.0 |
| INDIANAPOLIS, .. | 2.0 | 5.3 | 5.0 | 4.3 | 2.0 | 1.2 | 2.0 |
| TUCSON, AZ | 2.8 | 1.9 | 1.9 | 2.4 | 0.7 | 3.5 | 1.9 |
| LAS VEGAS ME.. | 1.7 | 2.3 | 2.4 | 1.5 | 3.2 | 2.9 | 1.8 |
| VIRGINIA BEAC.. | 1.6 | 0.9 | 2.0 | 0.0 | 2.1 | 0.6 | 1.8 |
| MINNEAPOLIS, .. | 0.7 | 1.2 | 2.0 | 0.8 | 1.7 | 2.6 | 1.7 |
| SACRAMENTO, .. | 1.6 | 2.5 | 1.1 | 1.8 | 3.6 | 1.4 | 1.5 |
| NEW YORK, NY | 1.1 | 0.9 | 1.1 | 0.9 | 0.8 | 0.8 | 1.3 |
| MESA, AZ | 1.2 | 2.1 | 2.3 | 3.5 | 2.1 | 5.8 | 1.2 |
| MIAMI, FL | 1.6 | 0.3 | 1.2 | 1.2 | 0.5 | 1.0 | 0.5 |
| OMAHA, NE | 3.1 | 2.5 | | 3.7 | | 2.6 | 0.5 |
| OAKLAND, CA | 6.6 | 0.0 | 6.5 | 0.0 | 1.0 | 1.1 | 0.0 |

*Fig. 5*

Remarkably, during roughly the same time that the Department reduced racial disparities and refrained from using firearms, from 2012 to 2017 the City also experienced a 43% reduction in homicides and a 50% reduction in non-fatal shootings. *See* Braga, A., et al., *Oakland Ceasefire Evaluation Final Report, May 2019*, at 101, https://cao-94612.s3.amazonaws.com/documents/Oakland-Ceasefire-Evaluation-Final-Report-May-2019.pdf (last visited Aug. 24, 2021).

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1

2. **The Department is in Partial Compliance with Task 34, Vehicle Stops, Field Investigations and Detentions (Stop Data)**

2

3   The Monitoring Team last assessed Task 34 in July 2020. *See* Dkt. 1387 at

4   22-23, *69th Report*. The Monitoring Team found the Department in partial

5   compliance, noting that "[a] goal of a risk management system should be to

6   continually seek more comprehensive understanding of risk, its distribution, its

7   impact, and its reduction." *Id*. at 23.

8   The Department has risen above other agencies nationwide because it

9   prioritizes critical review of its stop data and has achieved the most significant

10   reductions in racial disparity. Racial disparity in police stops is an area without

11   established and generally accepted standards. As a result, the Department is

12   constantly resetting its own goalposts beyond the gains it achieves and seeks

13   inventive ways to better understand the data and reduce disparities. The

14   Department will never cease its work to reduce racial disparity in policing. It will

15   continue that work while simultaneously working to improve the quality of each

16   interaction once a stop has occurred. In this way, the Department's work to improve

17   in these areas will never be "finished." But it is important to differentiate the

18   "finish line" for purposes of NSA Task 34 from the Department's own ever-moving

19   goalposts as it continues to advance leading agencies nationwide in reducing racial

20   disparity in police stops.

21   **II.   POLICY DEVELOPMENT AND PUBLICATION UPDATE**

22   The City provides the chart below to update the Court on the current status

23   of the remaining policy items discussed with the Court at the prior status

24   conference and in the City's April and May 2021 reports. *See* Dkts. 1433 & 1447.

25   ///

26

27

28

51

| TITLE | STATUS |
|---|---|
| **Internal Affairs Policy & Procedure Manual, Policy 21-01** | Published and effective August 17, 2021. |
| **CID Level 1 Investigations Policy & Procedure, Policy 19-01** | Remains in development. Received multiple rounds of feedback from Monitoring Team and plaintiffs' counsel. Next step is to incorporate latest feedback and sending back to Monitoring Team for further review. |
| **Chief's Directive Memorandum Re Administrative Leave** | Remains in development. Received multiple rounds of feedback from Monitoring Team. Next step is publication. |
| **DGO R-01, Risk Mitigation** | Remains in development. Received initial feedback on the Department's draft from the Monitoring Team and plaintiffs' counsel. Engaged in incorporating feedback. |
| **DGO D-17, Personnel Assessment System (PAS)** | The Department has reviewed existing policy. D-17 still accurately reflects current PAS data use and processes. In light of the anticipated robust content of the risk mitigation policy the Department is developing (DGO R-01), the Department's Policy & Publication Unit does not recommend revising D-17, but rather referencing it as appropriate in DGO R-01. In addition, the Bureau of Risk Management plans to add a memorandum to complement D-17 to support supervisors' ability to immediately address performance-related problems without the need for preliminary review by the PAS panel. |
| **Special Order 9208 re Type 32 Force Reporting** | Remains in development. Continuing to meet with Monitoring Team to try to achieve consensus on single remaining issue. |

## III.   FORCE INVESTIGATIONS AND REPORT RESPONSIBILITY—TASK 25

The Monitoring Team's current assessment is that the Department is in partial compliance with Task 25, Force Investigations and Report Responsibility. Dkt. 1465 at 15, *74th Report.*

The Monitoring Team "continued to see improvements" in Level 3 and Level 4 use of force reports. *Id.* at 15. Despite the executive team's communication of its expectations for members who prepare and review use of force reports, through

52

policy revisions, training, and follow-up emails, there remain use of force reports for which supervisors fail to identify and address subordinates' deficiencies and fail to complete appropriate documentation. *Id.* Members reviewing the supervisor reports have also failed to identify and address these concerns on a number of occasions. *Id.* at 14. The more significant oversights include failures to identify deficiencies in officer reporting and failing to identify or address Manual of Rules (MOR) violations, including body-worn camera violations. *See id.* Other reporting issues include members using "training and experience" to justify a use of force without articulating what specific knowledge, training, or experience supports their actions. The Department is working to address this issue and the Monitoring Team has "begun to see instances where officers are more descriptive." *Id.*

Significantly, of the 186 lower-level use of force reports most recently reviewed by the Monitoring Team, it identified only one incident where force may not have been appropriate. *Id.* (based on inspection of 186 Level 3 and Level 4 use of force reports prepared from March-October 2020).[12] The Monitoring Team noted, however, that to the Department's credit, it had already initiated an internal investigation of that use of force. *See id.*  In addition, the Monitoring Team did not identify any instances where the use of force was not de-escalated or stopped when resistance decreased. *Id.* The Monitoring Team remarked on the continued efforts of members to attempt to de-escalate situations prior to using force. *Id.* The Monitoring Team reported "significant improvement" compared to its early assessment of the Department's use of verbal commands prior to using force. *Id.* at 5. There has also been a reduction in the number of incidents where officers did not identify themselves as police officers when it was appropriate to do so. *See id.* at 14 ("the number of these incidents has decreased since our earlier reviews").

---

[12] Notably, in the 186 Level 3 and Level 4 use of force reports the Monitoring Team reviewed from March-October 2020, the percentage of force incidents involving African Americans decreased by 4%, and force incidents involving Latinos decreased by 2%. *Id.* at 4.

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1

**A.     Improvement in Body-Worn Camera Activations**

2

Body-worn camera activations appear to be improving, though progress has

3

somewhat slowed. As an initial matter, body-worn camera violations are now rarely

4

failures to activate but typically activations delayed by seconds or minutes. The

5

most recent Monitor Report calculated a 17% delayed activation rate in the 186 use

6

of force incidents it reviewed from March-October 2020. *74th Report* at 7. That is a

7

decrease from the 21% delayed activation rate reported in the Monitor's previous

8

assessment. *See id*. An additional issue, however, is that approximately half of the

9

delayed activations were not caught by supervisors or second level reviewers. *Id*.

10

The Department has continued to conduct follow up on each body-worn

11

camera activation concern raised by the Monitoring Team. *Id*. The Department is

12

not only holding officers accountable, it is also "holding supervisors to account when

13

they fail to identify and address these types of concerns." *Id*.

14

In addition to continuing to train, remind, and discipline[13] members to

15

encourage timely body-worn camera activations, the Department also anticipates

16

assistance from new technology will enhance its progress. The Department is

17

employing VirTra virtual de-escalation training which includes prompts to officers

18

to timely activate body-worn cameras and to announce themselves as police officers.

19

Repetitive training forcing an officer to take each of these steps in every encounter

20

should at some point make these steps automatic for every officer, making it less

21

likely that officers may forget or neglect to take these actions in the field. The City

22

has also approved funding for the Department to purchase a body-worn camera

23

system upgrade. Features of the new system will enhance body-camera activation

24

and video review. Events such as unholstering a firearm or taser, activating a police

25

vehicle's emergency siren, releasing a shotgun from its vehicle rack, or opening a

26

police vehicle door[14] will trigger automatic body-worn camera activation. In

27

---

[13] The Department imposes progressive discipline for members who exhibit a pattern of misconduct, including patterns of late or non-activations.

28

[14] This feature is programmable for select vehicle doors.  Automatic activation in

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1   addition, body-worn camera activation may also be triggered remotely allowing for

2   supervisors or command staff who may not be on scene to activate body-worn

3   cameras. The system will also allow reviewers to play multiple videos from different

4   officers' body-worn cameras on a single screen, synchronized. This will make video

5   review faster and more efficient, allowing reviewers to view use of force incidents

6   from multiple angles simultaneously.

7       While the Department appreciates the Monitoring Team's recognition of the

8   progress it has made, and the Monitor's assessment that the Department's steps to

9   address proper force reporting "have been fruitful," *id.* at 8, the Department

10  remains focused on improving body-worn camera activation, officer announcements

11  when appropriate, and, most significantly, consistent quality use of force report

12  review at every level of the organization.

13      **IV.    INTERNAL AFFAIRS TIMELINES—TASK 2**

14      The Monitoring Team last evaluated the Task 2 timelines in June 2021 and

15  found that the Department remains out of compliance. Dkt. 1455 at 3, *73rd Report*.

16  The Department must complete 85% of Class I and 85% of Class II investigations

17  within 180 days to be in compliance with this task. In addition, in cases with a

18  sustained finding, the discipline recommendation process must be completed within

19  30 calendar days of the sustained finding. *See* DGO M-03, Complaints Against

20  Departmental Personnel or Procedures.

21      The Department was previously in compliance with the timelines but fell

22  below the 85% completion rate in 2018. The Department saw improvement through

23  early 2020, completing 69% of Class I cases and 84% of Class II cases within the

24  180-day timeline. Dkt. 1387 at 3, *69th Report*. More recent Monitor Reports,

25  however, reflect some decline in progress, particularly for Class I cases. For the

26  second quarter of 2020, the Monitor reported timely completion rates of 67% for

27  _____

28  most cases will likely not be tied to the driver's door which may open and close
    innumerable times during an officer's shift.

1  Class I cases and 75% for Class II cases. Dkt. 1416 at 3, *71st Report*. And for the

2  first quarter of 2021, the Monitor reported timely completion rates of 54% of Class I

3  cases and 82% of Class II cases. Dkt. 1455 at 3, *73rd Report*. On a positive note, for

4  sustained cases the Department has routinely completed all discipline

5  recommendations within 30 days. *See 71st Report* at 4; *73rd Report* at 3.

6      The Department continues to work toward compliance with the case

7  completion timelines. The Department's progress was slowed by the volume of

8  complaints stemming from the Summer 2020 protests following the murder of

9  George Floyd in Minneapolis. The four-day period from May 29-June1, 2020

10  required the Department to respond to 134 complainants and open 59 internal

11  investigation cases. For comparison, for the entire month of April 2020, the

12  Department opened an estimated 115 internal investigation cases, including service

13  complaints, and on average in the four months preceding the protest period, the

14  Department opened approximately 123 cases each month.

15      The volume of complainants and case investigations that came in over a four-

16  day period was unprecedented. The Department lacked the experience with an

17  event of this scale that would allow it to predict with adequate accuracy the amount

18  of staff time necessary to interview this volume of complainants and complete the

19  investigations. This led to a decline in timely Task 2 completion rates in the last

20  year.

21      On a positive note, the Department gained important knowledge that will

22  allow it to more accurately assess its resource and staffing needs in the future in

23  response to a sudden influx of complaints and cases of this volume. In addition, for

24  Division Level Investigations (DLIs), investigating sergeants are no longer told

25  what the 180-date is but instead receive deadlines determined by IAD that build in

26  extra time for case investigation review. The Department therefore not only

27  anticipates that following this temporary dip it will achieve compliance in the near

28  term, but that if faced with an event of similar magnitude in the future it is now

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1  much better prepared to complete investigations within the 180-day timeline.

2       Based on IAD's current review of the data from the second quarter of 2021,

3  IAD projects that 76% of Class I investigations and 81% of Class II investigations

4  meet the 180 date. Excluding misconduct allegations associated with crowd events

5  and protests, however, the Department's timeliness rises to 90% for Class I cases

6  and 85% for Class II cases. Thus, absent the unanticipated voluminous influx of

7  investigations stemming from protests and crowd events this past year, the

8  Department would be in compliance with the Task 2 timelines.

9  ## V.   SPECIAL FORCE REVIEW BOARDS RELATED TO SUMMER 2020 PROTESTS—TASK 26

10      The Department has completed all investigations and Force Review Boards

11  (Boards) arising from the Summer 2020 protests.[15] Over the four-day period from

12  May 29-June 1, 2020, Oakland experienced widespread protests and, in some

13  instances, civil unrest, including acts of violence and destruction of property. *See*

14  *74th Report* at 19. Many tactics were used to address both the peaceful protests and

15  acts of civil unrest, among them the use of chemical munitions. *Id.* Chemical

16  munitions are classified as Level 3 uses of force and therefore not normally subject

17  to Boards, which are convened for Level 2 uses of force. The Department, however,

18  chose to hold special Boards to review each of the 263 deployments.[16]

19      The Monitoring Team appreciated that the "review of these events was a

20  massive undertaking." *Id.* at 20. In addition, the Monitoring Team "commended . . .

21  this initiative," recognizing that the unique design of these Boards "demonstrate the

22  level of importance the Department placed on its commitment to provide a thorough

23  review of these events." *Id.* at 19. Each Board was chaired by a Deputy Chief. And

24

25  [15] The discipline recommendation for the final remaining case is scheduled for
26  presentation to the Chief and the Community Review Police Agency (CPRA) on
    September 3, 2021.

27  [16] In instances where a supervisor specifically authorized a deployment, that is also
28  considered a use of force and is evaluated for justification. Therefore, a single
    deployment could be assessed twice. *Id.* at 21.

57

1   each Board reviewed a day's worth of activity involving multiple disparate incidents

2   occurring over several hours and in varying locations. *See id.* While the Boards did

3   not formally review other lower level uses of force associated with these incidents,

4   when appropriate the Boards identified and further examined certain instances

5   where force may have been used to ensure that all force was properly reported and

6   investigated. *See id.* at 20.

7         Collectively, the Boards assessed 263 chemical munitions deployments. *Id.* at

8   21. The Monitoring Team disagreed with one in-compliance finding for one of the

9   chemical deployments. *See id.* at 20. In that instance, individuals threw bottles at a

10  police vehicle traveling to another scene to assist other officers at a skirmish line.

11  *Id.* The officers stopped the vehicle and an officer got out and threw a handheld

12  chemical device at the individuals to dissuade them from continuing to throw

13  bottles at the vehicle. *Id.* Other than this instance, the Monitoring Team concurred

14  with all of the findings of all of the Boards, including the 33 deployments the Boards

15  found out of compliance with policy. *See id.* at 20 & 21 (noting that 32 of the not-in-

16  compliance findings stemmed from the Board which reviewed the activities of June

17  1, 2020).

18        The Monitoring Team acknowledged that overall, the Boards were "well-run."

19  *Id.* at 20. In addition, the Monitoring Team found that each of the reports

20  documenting the Boards' activities was complete and well-written. *Id.* at 21. As a

21  result of its review of 16 Board reports completed from December 2020-May 2021,

22  including the special protest Board reports, the Monitoring Team assessed the

23  Department remains in full compliance with Task 26, Force Review Boards. *Id.* at

24  17 & 21.

## CONCLUSION

26        Both the pandemic and surge in violent crime continue to challenge Oakland

27  residents, Department sworn and non-sworn members, and City staff.

28  Nevertheless, the Department's commitment to Constitutional policing shines

JOINT CASE MANAGEMENT STATEMENT                     Case No. 00-cv-4599 WHO

1  through in its response to every challenge. The City looks forward to further

2  discussing the foregoing issues at the upcoming Case Management Conference.

3  ///

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1

**THE OPOA'S STATEMENT**

2      As the parties move increasingly closer to achieving full compliance with the

3  Negotiated Settlement Agreement ("NSA"), Intervenor Oakland Police Officers

4  Association ("OPOA") continues to actively engage in collaborative efforts with the

5  Oakland Police Department ("OPD").

6      At the last Case Management Conference on February 22nd, the Court made

7  unambiguous urgings that the OPOA affirmatively assist in efforts to pursue

8  continued cultural change within the Department. While the OPOA has never

9  deviated from the mission of full compliance, it has enhanced efforts to reach out to

10  the Police Department administration to create a more formal structure to pursue

11  collaboration. In that regard, Barry Donelan the President of the OPOA, was

12  mindful of the Court's admonitions on February 22nd and reached out to Chief

13  Armstrong on March 1st and communicated with Chief Armstrong via email and

14  stated among other things:

15
16
17
18
19
> The OPOA has taken Judge Orrick's comments seriously
> and in response, have some specific concepts that we
> would like to discuss with you.  Together we can address
> the steps to ensure implementation of the five key tasks
> laid out by Judge Orrick.  Among other things, we believe
> that the OPOA can collaborate with the Department in
> crafting a social media policy for the Department and
> expand on the OPOA's current social media lesson plan to
> the entire Department. (OPOA "Exhibit A")

20      Chief Armstrong agreed to meet with members of the OPOA Executive Board

21  on March 24th. In advance of the meeting, the OPOA prepared an agenda

22  exclusively addressing the NSA. Specifically, the agenda (attached hereto as OPOA

23  "Exhibit B") as forwarded to Chief Armstrong focused on NSA compliance by

24  seeking to "Outline steps to address and improve cultural competencies among the

25  membership and address racism and sexism within the ranks."  It also states that

26  the OPOA was interested in having serious discussions on collaborating with the

27  Department to craft and implement Department wide social media policies and

28  related training. Finally, the OPOA specifically wanted to discuss a "blueprint" for

60

1    NSA compliance and how the OPOA can assist in the effort.

2          The meeting with Chief Armstrong was open, candid and productive. The

3    representatives of the OPOA engaged in an honest and direct exchange with Chief

4    Armstrong and expressed the OPOA's intense desire to enhance and accelerate

5    efforts to address the continued need to achieve cultural change in the Department.

6          Since the March 24th meeting the OPOA has actively engaged the

7    Department in its ongoing efforts to seek cultural change and compliance with the

8    NSA. There have been ongoing conversations between the command staff and

9    representatives of the OPOA to enact measures to resolve any lingering doubt as to

10   the intentions of the OPOA to reach out to rank-and-file members and communicate

11   the urgency of effectuating continued cultural change.

12         The OPOA remains committed to further the interests of the City by

13   continued collaboration with all parties.

14   ///

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1

2

Respectfully submitted,

3

Dated: August 25, 2021

4

BARBARA J. PARKER, City Attorney
BRIGID S. MARTIN, Special Counsel

5

6

By: _____ /s/ BRIGID MARTIN* _____
Attorneys for Defendants
CITY OF OAKLAND

7

8

JOHN L. BURRIS
Law Offices of John L. Burris

9

10

By: _____ /s/ John L. Burris _____
Attorney for Plaintiffs

11

12

JAMES B. CHANIN
Law Offices of James B. Chanin

13

14

By: _____ /s/ James B. Chanin _____
Attorney for Plaintiffs

15

16

ROCKNE A. LUCIA, JR.
Rains Lucia Stern St. Phalle & Silver

17

By: _____ /s/ Rockne A. Lucia, Jr. _____
Attorney for Intervenor
OAKLAND POLICE OFFICERS ASSOCIATION

18

19

*Per Local Rule 5-1(i)(3), the filer attests that concurrence in the filing of the

20

document has been obtained from each of the other Signatories

21

22

23

24

25

26

27

28

62

JOINT CASE MANAGEMENT STATEMENT

Case No. 00-cv-4599 WHO