**Conclusions and Recommendations**

**Re: @crimereductionteam Instagram Page**

**Oakland Police Department**

**September 5, 2021**

**CLARENCE DYER & COHEN LLP**

In January 2021, an independent law firm was retained by the City of Oakland to investigate a public Instagram page titled @crimereductionteam and any connections between the page and members of the Oakland Police Department (OPD, or the "Department").  This report sets forth the public conclusions of the investigation, along with investigators' recommendations for the Department going forward.

I.      **The @crimereductionteam Instagram Page**

The @crimereductionteam Instagram page was a social media page containing a collection of police-related "memes."  Generally speaking, each meme consisted of an image with a text caption; the combination of the image and the caption communicated a message that the author presumably intended to be humorous or satirical.  Instagram users who followed the @crimereduction page saw the memes in their Instagram "feed" when new memes were posted to the page.  Alternatively, anyone with an Instagram account could navigate to the page – which until late December 2020 was public (i.e., visible to all Instagram users rather than only approved followers) – and view all of the memes posted there.  Whether a user received the memes in his/her feed or navigated to the page, the user could "like" a meme by clicking on a button, or post a comment on a meme that would be visible to other users.

According to records subpoenaed from Instagram's owner, Facebook, the @crimereductionteam Instagram account was created on April 25, 2020 by an individual who provided an email address that is associated with a recently-terminated OPD officer.  This former officer was the subject of an internal affairs investigation related to an officer-involved shooting in March 2018 and was terminated from the Department in April 2020.

This investigation was unable to determine with precision the date on which this former officer first posted to the @crimereductionteam Instagram page.  In a meme posted on or about September 23, 2020, he hinted that only five days had elapsed since his first post. However, certain officers recalled observing posts on the page during the summer of 2020. Regardless of the exact date of the first post, the evidence shows that the officer was no longer employed by OPD when he began posting to the page. Facebook records indicate that the page was taken down on or before December 31, 2020.  After that date, there was no additional activity on the page, and the page was no longer accessible to other Instagram users.

During the lifetime of the page, several dozen memes were posted.  The vast majority of these memes related to the work of law enforcement generally, with no apparent nexus to a particular agency or location.  In this regard, the posts resembled content that is available on several other police-related social media pages on the Internet.[1]  Certain of the memes, however, referred to people or events that were uniquely associated with OPD.  For example, one meme parodied an occasion in the fall of 2020 when a junior OPD officer requested a "last radio call" on the officer's final day of work, even though that honor is traditionally reserved for more senior officers.  Another meme alluded to the supposed loneliness and futility of serving as a police officer in a "liberal city full of crime."  On a couple of memes, the page's administrator posted comments that called out Oakland community leaders by name.

---

[1] For example, officers stated during interviews that they knew of and/or followed police meme pages called @darkcopmemes, @nomerit_pd, @FOGMTA, @mike_thecop, and @officerdaniels. One officer recalled that he first encountered the @crimereductionteam page in a "Final Four" tournament of police meme pages, where viewers voted for their favorite meme page.

Some of the memes posted on the @crimereductionteam Instagram page were inoffensive. Such memes poked fun at police work without calling attention to particular individuals or groups, disrespecting the chain of command, undermining the Department's commitment to compliance with the Negotiated Settlement Agreement (NSA),[2] or otherwise bringing the Department into disrepute.[3]

However, several of the memes posted to the @crimereductionteam Instagram page clearly crossed the line.

**Sexist Memes**

Certain memes on the page were overtly demeaning to women and gender-nonconforming individuals. For example, the caption to one meme began "Me: How did you make it into all these assignments? You literally have none of the qualifi--". The response, from "Her," was an image of a woman pulling her shirt off over her head, exposing her lower breasts. Nearly every OPD member interviewed during the course of the investigation recognized the meme's implication that a female officer was not qualified for her assignments and used her body to obtain them, and most (but not all) acknowledged that the meme was degrading to women.

---

[2] Since January 2003, the Oakland Police Department has been subject to monitoring by the Federal Court pursuant to a Negotiated Settlement Agreement (NSA) in connection with *Allen, et al. v. City of Oakland, et al.*, Case No. 3:00-cv-04599-WHO. On January 14, 2021, the Court entered an order regarding the @crimereductionteam Instagram page (Dkt. No. 1419) directing the Compliance Director to "ensure that Internal Affairs Case No. 21-0028 and any related matters are properly and timely investigated, and that all appropriate follow-up actions are taken."

[3] For example, one meme reproduced a scene from the sitcom "The Office" with the caption, "When command staff buys useless equipment that no one was asking for." One depicted a bored man sitting in a darkened car under the caption, "Misdemeanor Crimes detectives on their days off." One portrayed someone holding a microphone up to his throat under the caption, "Rookies using the PA system the first time after they're cut loose." Another featured a pig puppet with its ears blowing in the breeze in response to the caption, "The new guys brought donuts and coffee but your better hurry."

Another meme borrowed an image from the animated film *Finding Nemo* that depicts a flock of seagulls perched on tree limbs peering longingly at an unidentified object and collectively asking "Mine?". On the @crimereductionteam page, the image was captioned "New Female Recruit Gets Hired," and the seagulls were labeled "Cops with wives," "LTs," "single cops," "Cops with girlfriends, "LTs with wives," and so on. The meme thus communicated the message that female recruits were objects of sexual interest to male officers who wanted the recruits to be "theirs." To this meme, the creator of the page appended a comment – "I will keep my private life unsullied as an example to all…" – which, viewed in context, was likely intended to mock the perceived hypocrisy of senior officers who claimed to lead by example.

A third meme repurposed an image of an apparently inebriated man whispering into the ear of a woman at a bar. In this meme, the man whispered to the woman that he could tell, based on her appearance alone, that she would be a good fit for his elite police squad despite her inexperience as an officer. At one point the man whispered, "Of course it helps that you're pretty." Once again, this meme implied that female officers use sexuality to get ahead because they are less competent and/or deserving than men.

Yet another meme depicted the actor Danny Trejo dressed in a woman's clothing and wearing a long blond wig, with the caption "When the only female cop in the district gets picked as the prostitution UC [undercover officer]." Taken together, the image and the caption suggested that women who serve as police officers are unattractive, extremely masculine, or both.

Each of these images conveyed the unmistakable message that female officers are less qualified than their male counterparts; held to lower standards; and/or properly objectified by their peers.

### Racist Memes

Other memes on the page were racist.  One such meme is known as the "Piper Perri Surrounded" meme, as it depicts a scene from a pornographic film starring an actress named Piper Perri.  In the meme, Piper Perri is a young, pigtailed, white woman seated cross-legged on a couch, where she is surrounded by five Black men in undershorts and shirts.  In the version of the meme posted to the @crimereductionteam page, the young white woman was labeled "Cop That Just Wants to Fight Crime," while the Black men leering at her represented "Internal Affairs," "Police Commission," "Command Staff," "Spineless Cops," and "Criminals Taking Advantage of the Situation."   The administrator of the @crimereductionteam page posted the comment "Not up in here!," suggesting, in context, awareness that the meme represented an imminent sexual assault.  Putting aside the insubordinate suggestion that "good" cops are under assault from command staff, IAD, and the Police Commission, the meme clearly draws upon repugnant tropes of Black men as sexual predators of white women.

Another meme from the @crimereductionteam page portrayed a white man wearing a long-sleeved shirt with only the top button fastened, along with sunglasses and a bandana tied around his head.  The image was captioned "White guys after being in the Hispanic gang unit for 2 weeks."  The disparaging stereotype of Latino men was offensive, as was the suggestion that an undercover officer must adopt such a hackneyed persona to be accepted by other Latinos.

*Anti-Reform Memes*

Several memes on the @crimereductionteam Instagram page ridiculed reforms OPD was required to implement to comply with the NSA.  Most prominent were memes encouraging violent policing.  For example, one meme depicted the actor Jonah Hill drawing his hand across his neck in a gesture that connotes "cut it out."  The meme was captioned: "When your partner starts telling a story about some dude you guys beat up after you had just told the Sgt. that you should be taken off UOF monitoring."  As officers acknowledged during interviews, the meme made light of a continuing pattern of violence by an officer who was already being monitored for prior uses of force.

Another meme borrowed a scene from the movie "The Hangover" in which actor Zach Galifianakis performs complex mathematical equations in his head.  Here, the meme was captioned "Trying to remember how many times you punched the suspect in the face."  In context, the meme trivialized an officer's duty to report accurately on uses of force.  The comment posted by the administrator of the @crimereductionteam page underscored this disrespect for use-of-force reporting, which is a cornerstone of the NSA.  The administrator commented: "'I used the necessary force to effect the arrest.'  Annnnnd send," suggesting that the officer resorted to a well-worn euphemism in lieu of an accurate description of the force that he applied.

In a third meme, an image of a man tearing up at a parade was captioned "Watching your boy get his first foot pursuit, use of force, and complaint."  This meme was accompanied

by the administrator's comment: "My little Goon is all grown up."[4]  The meme and comment

conveyed pride, rather than disappointment or disgust, in a young officer who used such

excessive force that it generated a use-of-force complaint.

Yet another meme depicted the Sesame Street character Elmo.  In the first frame, Elmo

was shown choosing between a pile of fruit labeled "Following Law & policy," and a pile of

white powder labeled "Gray area policing."  In the second frame, Elmo made his choice, burying

his nose in the powder.  To this meme, the administrator appended the comment "Goons make

better cops."  Once again, the clear message was that laws, policies, and established

departmental rules must and should be disregarded in the name of ostensibly "effective"

policing.

### Insubordinate Memes

In addition to the memes described above, the @crimereductionteam page included

content derogatory of city leaders.  For example, the page administrator posted a screenshot

from the website of the *San Francisco Chronicle* featuring the headline "Oakland poll finds

people feel unsafe, want to defund police, but still want plenty of officers."  Below this

headline, the administrator posted a cartoon image of a man shooting himself.  In the

comments section, a user wrote, "Commissioner Ginale Harris will Make OPD Great Again."  In

response, another user wrote, "oh she already has she's played a huge part in firing the chief so

---

[4] Officers interviewed during this investigation reported that they were not familiar with the term "goon."
According to a street-slang dictionary, it connotes "one who participates in . . . public displays of ignorance,
outward obnoxiousness, or other non-socially acceptable practices," or "an individual of sub-standard wit or
mental competency, commonly identified by a less than reputable character [or] bad personality."
https://www.urbandictionary.com/define.php?term=goon.

now there's a media puppet yes woman as chief and ruined all moral [sic] now the department

is scraping the bottom of the barrel to hire anyone that's stupid."

Other memes were disrespectful of the Internal Affairs Division.  In one meme, an

Internal Affairs investigator asked an officer, "Is there anything you'd like to add to this

interview?"  The officer responded, "You're a garbage person and you should live in a dumpster

with rotten snails," while the officer's attorney hung his head.  The administrator's comment on

this meme read: "My attorney: Don't say it.  Don't say it. don't say it. Me: ima say it."

Another meme contrasted images of a mournful Steve Carell under the caption "How IA

thinks I'll be during my suspension," with images of an elated Steve Carell under the caption

"How I actually am during my suspension."  The administrator commented, in reference to

Internal Affairs, "Fucking no-dicks."

In sum, the @crimereductionteam Instagram page was an Oakland-centric police meme

page that included a significant volume of racist, sexist, anti-reform, and/or insubordinate

content.

## II.     Discovery and Investigation

### A.     September 2020

In September 2020, an OPD lieutenant with a personal Instagram account received an

invitation to follow the @crimereductionteam Instagram page.  Concerned that the invitation

might be a ploy to gain access to officers' personal information in order to antagonize or

embarrass the officers, the lieutenant notified a sergeant in the Intelligence Unit about the

invitation he received.[5]  In a text message to the Intel sergeant, the lieutenant asked whether

the invitation could be an "Antifa or BLM-type trap," *i.e.*, an effort by an organization like Antifa

or Black Lives Matter to infiltrate a law enforcement organization.[6]  The lieutenant chose to

notify the Intel Unit because the responsibilities of the Intel Unit included assessing potential

threats to officer safety.

The Intel sergeant relayed the lieutenant's concern to the officers in the unit.  Some of

the Intel officers navigated to the page and observed at least some of the memes that were

posted to the page at that time, as well as the usernames of individuals who were following the

page.  During interviews, these officers explained that they viewed the page with an eye toward

determining whether the page posed a risk to officer safety.  Accordingly, the officers reported

that they were more focused on identifying the creator of the page than viewing the specific

memes posted to the page.  Every Intel Unit member interviewed claimed not to have

conducted a systematic review of the memes, and none considered whether the memes were

demeaning to certain members of the Department or disrespectful of OPD leadership or the

reforms instituted by the Department to comply with the NSA.

On September 23, 2020, the Intel sergeant sent an email to every sworn member of the

Department regarding the @crimereductionteam Instagram page.  The email included a

screenshot of the top of the @crimereductionteam landing page, which featured a photograph

---

[5] There is conflicting evidence concerning the exact date in September 2020 when the lieutenant notified the Intel sergeant.  It is clear, however, that the notification was made no later than September 21.

[6] To document this perspective is not to endorse it.  What matters for present purposes is what the lieutenant apparently believed, not whether that belief was warranted.

of the rear of a police car along with three memes from the page.[7]  The email cast the page as a

potential threat to officer safety and warned officers against allowing the page to access their

personal information:

> *Good Afternoon,*
>
> *In this day and age, social media is more popular than ever.  Of concern for all persons, especially those in law enforcement, is the capability of someone finding out personal information about us and then using it against us.  One of the ways people are able to do this is through pages that may look appealing to those in law enforcement.*
>
> *We have come across a page on Instagram that some officers in our department "follow."  The content on the page is very specific about policing and could be used to get information about police officers.  This is not the only page like this, but we thought this was a good example of possible targeting of law enforcement.*
>
> *This email is just a reminder – if you use social media, pay attention to the people asking to follow you and the people you decide to follow.  No one has been able to tell me who specifically is behind this account.  Something as simple as following an account that is questionable or spouts negative rhetoric could reflect poorly on you.  Even worse, we do not want any officers to be targeted either via social media or at their homes.*
>
> *Please stay vigilant and only share information with trusted sources.  If you don't know the person requesting to follow you, you probably should not accept the request.*
>
> *Take care and stay safe,*
>
> *Sergeant of Police*
> *Intelligence Division*

---

[7] The first of these memes depicted four figures in a swimming pool.  Two of the figures – a mother playing happily with a toddler – were labeled "suspects" and "command staff/community/judges."  A little boy struggling to keep his head above water was labeled "proactive cops," while submerged beneath the surface was a figure labeled "morale/victims of crime."  The second meme depicted a television news reporter atop the caption: "Anchor upset after learning suspect in fatal officer involved shooting was white. 'What the f—k am I supposed to do with this?!'" The third depicted a man staffing a table bearing a poster that reads "Walking Units Are the Laziest Cops – Change My Mind."

Three OPD members replied to the Intel sergeant's email.  Two of the three advised that they, too, had been invited to follow the page.  No one above the rank of officer, and no one from Internal Affairs, responded to the email.  Subsequent investigation revealed that several senior OPD members, including the Interim Chief, Deputy Chief and head of Internal Affairs, did not even open the email at or around the time it was sent.

**B.**      **September 23, 2020 to December 21, 2020**

Between September 23 and December 21, 2020, officers in the Intel Unit periodically reviewed the @crimereductionteam Instagram page to determine whether it was still active. One officer informed investigators that he checked to see if the total number of posts to the page changed over time, but he said he did not review the posts themselves.  Once again, the ostensible purpose of this monitoring was to assess any risk to officer safety, not to review the content of the page.

Another Intel officer assembled a list of OPD members who appeared to be following the @crimereductionteam page.  The officer assembled this list by reviewing the usernames of the users who were listed on the page as followers and linking those usernames to OPD members by reviewing the content on their Instagram accounts and cross-referencing their usernames against other sources (*e.g.*, Facebook, Twitter).  Over the course of his review, this officer assembled a list of approximately 30 current or former OPD members who appeared to be following the page.  The officer did not share this list with the Intel sergeant or anyone else in the Department, and he told investigators that, despite accessing the page regularly, he did not conduct a systematic review of the page's content or notice anything offensive.

11

Also during this time period, Intel officers overheard rumors shared among OPD

members that a former OPD officer was responsible for the page.[8]  To the best of the officers'

knowledge, these rumors were premised on the former officer's status as a disgruntled former

officer who had been terminated following his role in an officer-involved shooting.  The idea

that the page was maintained by someone with ties to OPD was reinforced by the title of the

page, which corresponded to a special unit within OPD tasked with responding to violent

crimes.[9]  A connection to OPD was also suggested by the posting of a meme that depicted a

shifty-eyed puppet under the caption "@crimereductionteam after a department wide email

comes out about us."  This meme was accompanied by a comment from the page's

administrator stating "Only took five days" followed by a rat (*i.e.*, snitch) emoji.  These

developments contributed to a sense within the Intel Unit that the @crimereductionteam page

was not created by an individual or organization for the purpose of harassing law enforcement.

Satisfied that the page did not present an active threat to officer safety, the Intel Unit turned its

attention to other priorities.[10]

### C.      December 21-22, 2020

On December 21, 2020, a reporter emailed the OPD Media team to request a copy of

what he described as "a departmentwide email sent out about [the @crimereductionteam]

---

[8] An interview subpoena was issued for the former officer in the course of this investigation, but he evaded service of the subpoena and was not interviewed.

[9] OPD members told investigators during interviews that OPD is not the only police department that utilizes the term Crime Reduction Team, and they had heard departments in Stockton and in parts of Canada also have similarly named units.  However, the term is not widespread, and some officers had never heard the term used outside OPD.

[10] These events occurred at a time when the Intel Unit was busy with regular public protests arising from the death of George Floyd and, more contemporaneously, a grand jury's decision relating to the shooting death of Breonna Taylor.

Instagram account." Upon receiving his inquiry, an officer on the OPD media team, apparently recognizing that the request pertained to the Intel sergeant's September 23 email, contacted the sergeant. In response, the Intel sergeant informed the officer that she had sent out an email "regarding people trying to get close to people on social media and to watch out for fake accounts." The Intel sergeant further stated that her unit was still looking into the Instagram account, so "I would say it's under investigation" and decline to produce anything in response. The media officer did just as the Intel sergeant suggested, responding to the reporter's inquiry with a one-line email stating that the matter was still under investigation. In fact, there was no active investigation concerning the page at that time.

The Intel sergeant told her unit that a reporter had inquired into the departmentwide email. Shortly thereafter, Intel officers reached out to two OPD members they had identified as followers of the page. Two Intel officers met in person with one of the followers to ask him whether he knew who was responsible for the page. When the officer denied such knowledge, the Intel officers cautioned him against following the page, especially given that the reporter might publish a story about it. One of the Intel officers contacted another follower of the page by phone and conveyed a similar message.

Meanwhile, on the morning of December 22, the same media officer who fielded the reporter's request for information advised the Interim Chief of Police that the reporter had requested a copy of the Intel sergeant's departmentwide email. As a result, the Interim Chief reached out to the Intel sergeant to request a copy of the email. Upon receiving the email, the Interim Chief forwarded it to the Assistant Chief and the captain of Internal Affairs. The Interim Chief noted that she had spoken to the Intel sergeant; that the Intel sergeant had reported that

there did not appear to be any MOR violations associated with the page; and that there did not appear to be anything prohibiting OPD members from reviewing or commenting on the page. She concluded by asking whether "this is something we could forward to the Integrity Unit" for review.

In response, the Assistant Chief concurred that this was something that could be assigned to the Integrity Unit, and the IAD captain confirmed he would assign it.  In turn, the IAD captain assigned the task to a sergeant in the Integrity Unit.  However, due to the press of other commitments, as well as the intervening holiday, the Integrity sergeant did no work relating to the @crimereductionteam page before January 8, 2021.[11]

### D.      January 8, 2021

On the morning of January 8, 2021, the Interim Chief was contacted by an Oakland-based attorney.  The attorney informed the Interim Chief that he was in possession of troubling images from the @crimereductionteam Instagram page.  Accompanied by the IAD captain, the Interim Chief called the Intel sergeant to inquire anew about the page; in response, the Intel sergeant reiterated that the images on the page were just "dumb" police memes and did not appear to her to constitute MOR violations.

---

[11] In late December, a male OPD officer who was following the @crimereductionteam page circulated a screen shot of the Danny Trejo meme (see *supra* p. 7) to the other members of his squad via a group text on an ephemeral messaging app.  The screen shot also captured the member's comment on the meme: "Hahaha #2reel." Several days later, a female squad mate confronted the OPD member about the text message.  The squad mate and the OPD member got into a heated discussion, during which the OPD member was dismissive of the squad mate's concern that the post undermined the seriousness of the squad's work.  The squad sergeant witnessed this dispute and intervened to inquire about the nature of the dispute.  The sergeant later reported the issue to his commanding lieutenant.  On or about January 11, 2021, the lieutenant referred the matter to Internal Affairs, where it was effectively joined with the larger investigation into the @crimereductionteam Instagram page.

The Interim Chief and the IAD captain then re-contacted the attorney by phone.  During this conversation, the attorney agreed to transmit some of the images from the page directly to the Interim Chief and the IAD captain.  Upon receiving the images, the Interim Chief and the IAD captain immediately recognized that the images were objectionable and that a full investigation should be conducted to examine the page, determine who interacted with the page, and assess whether mandatory reporting obligations and/or other MOR provisions may have been violated.

Between January 8 and January 11, 2021, a lieutenant was assigned to oversee the investigation and all relevant materials collected by the Intel unit were assembled and transferred to IAD.  Shortly thereafter, work-issued cell phones were confiscated from more than 140 officers, including officers who appeared to have followed the Instagram page as well as officers who were assigned to OPD's Crime Reduction Team or other proximate units.

E.    **Public Reaction**

On January 11, 2021, The Oaklandside, an online community news site, published an article about a "racist, sexist Instagram page" run by "someone with knowledge of internal affairs" at the Oakland Police Department.  According to the article, the Instagram page, which appeared under the handle @crimereductionteam, "used memes to undermine civilian oversight and valorize police brutality."

Reaction to this news was swift and harsh.  Oakland Mayor Libby Schaaf vowed to fire any officer who posted "these repugnant memes."  The president of the Oakland Police Officers' Association announced that officers who show support for violence have "no place in policing."  At a February 2021 hearing on OPD's compliance with the 18-year-old federal

consent decree, the judge remarked that the Department will remain under court supervision until it "roots out officers who do not respect the people they serve and treat them equally."

At the direction of the Court,[12] an independent law firm was retained to lead an investigation into the origin of the @crimereductionteam Instagram page, any connections between the page and current or former OPD members, and the adequacy of OPD's response. Over the course of six months, investigators reviewed email correspondence and cell-phone data and interviewed 43 subjects and witnesses.[13]  The investigation determined that the page was created by a recently-terminated OPD member.  However, several OPD members followed and/or interacted with the page, and some members "liked" or commented on memes that were patently offensive.

The investigation also revealed that OPD as a department took much too long to recognize the bigoted and corrosive nature of the @crimereductionteam page.  At best, this failure signals an absence of processes within the Department to ensure a safe and discrimination-free workplace committed to Court-ordered reforms.  At worst, it bespeaks a culture so hostile to women and minorities, and so wedded to a discredited model of policing, that it cannot identify discriminatory and anti-reform messaging when it sees it.

---

[12] *See Allen, et al. v. City of Oakland, et al.*, Case No. 3:00-cv-04599-WHO, Dkt. No. 1419.

[13] Because the @crimereductionteam Instagram page went offline before the investigation began, investigators were unable to access the page directly and did not have the benefit of metadata that would have allowed a precise determination of who interacted with the page and to what extent.  Instead, investigators relied on data from more than 140 department-issued cell phones, as well as screenshots taken of the Instagram page before the administrator disabled it.   To the extent that an officer may have accessed the page on a personal device, direct evidence of that access was not available to investigators.

At the conclusion of the investigation, investigators recommended that the Department sustain Manual of Rules violations against certain officers based on their interactions with the @crimereductionteam page and/or failure to report known interactions by others.  The recommended findings are contained in a separate, confidential report.  In addition, the investigation generated recommendations aimed at heightening awareness and detection of discrimination in the workplace and creating clear standards for OPD members in the social-media realm.  These recommendations are set forth below.

### III.   Recommendations

As set forth in the confidential Report of Investigation, certain members of the Oakland Police Department committed MOR violations by interacting with the @crimereductionteam Instagram page in a manner that brought disrepute to the Department; by accessing or sharing inappropriate content from the page; or by failing to report MOR violations or violations of the City of Oakland's anti-discrimination policy, AI 71, by others.[14]  Critically, however, these specific violations cannot be divorced from the context in which they occurred.  The issues surfaced by this investigation go beyond the conduct of individual officers to the culture of the Department at large.

Every sworn officer of the Oakland Police Department, including the Interim Chief and executive staff, was on notice of the @crimereductionteam Instagram page no later than

---

[14] The number of sustained MOR violations is a function of many factors, including the strength of the evidence that a particular OPD member saw or interacted with objectionable memes on the @crimereductionteam page. Given that the page was no longer active at the inception of this investigation, and considering the volume of memes posted to the page over time, it is difficult to determine retroactively what content any particular user may have seen or whether a user liked or commented on that content.  Moreover, a user may have accessed the page from a device or devices other than the one confiscated by OPD.  Significantly, a finding of "not sustained" does not constitute a determination that an alleged violation did not occur; rather, it denotes only that the violation could not be established by a preponderance of the evidence.

September 23, 2020, when the Intel sergeant sent an email about the page to every sworn

member.  Although the email discouraged officers from following the page due to purported

safety concerns, many officers acknowledged in interviews that they visited the page precisely

because the Intel sergeant sent an email about it – and other officers said they were aware of

and/or following the page even before the sergeant's email.  Nonetheless, not a single OPD

member identified or escalated the patently objectionable nature much of the page's content.

It took a phone call to the Interim Chief from an outside attorney in January 2021 – more than

three months after the Intel sergeant's email went out – to alert the Department to memes

that were unequivocally sexist, racist, insubordinate, and anti-reform.

There is no satisfactory explanation for this collective failure.  It was not simply a failure

to *report*; OPD officers uniformly acknowledged that if they encountered an MOR violation or a

breach of AI 71, they were duty-bound to report it.  The problem was a failure to *detect* – that

is, a failure to see that much of the content on the @crimereductionteam Instagram page was

inappropriate and offensive.  This failure occurred at every level of OPD.  An untold number of

OPD members viewed memes from the page that were unambiguously sexist, racist, or anti-

reform yet did nothing about it.  And the entire Intel unit, which evaluated the page from the

myopic perspective of officer safety, proved unable to see the page for what it really was: a

fount of offensive and degrading imagery.

Even when noticed for interviews in connection with this investigation, some officers

continued to insist that there was nothing troubling about offensive memes from the page.

Some officers claimed, improbably, that they did not understand the memes well enough to say

whether they were offensive or not.  Others, however, doubled down on the position that the

memes were *not* offensive.  To these officers, the memes were funny, and anyone who took offense to them just couldn't take a joke.  More than one officer claimed, incredibly, that an image of a woman sleeping her way to the top could just as easily have depicted a man; regarding another meme, several officers ascribed no significance to the fact that all of the partially naked men shown leering at a young white woman were Black.

How does one account for this gaping blind spot, especially in the face of recent efforts by OPD to acknowledge implicit bias in policing and train officers to address it?  One answer is supplied by memes from the Instagram page itself.  For example, one meme depicts two uniformed schoolgirls in a classroom; one girl's head is stuffed into the end of a tuba labeled "unconscious bias training."  The girl playing the tuba is "Command Staff"; the girl on the receiving end represents "Cops without a racist bone in their bodies"; and the comment posted by the administrator of the @crimereductionteam page reads, "Surprise! You're racist and there's nothing you can do about it."  When officers reject efforts to sensitize them to the biases we all harbor, it comes as no surprise that they are unable – or that they refuse – to recognize the offensiveness of images posted to the page.

Another meme features a little girl shrugging her shoulders exaggeratedly.  She represents "two full squads on scene," who are responding to a sergeant who asks "alright who witnessed the use of force?"  This message – that the use of force is acceptable behavior that should be covered up or denied – is antithetical to, and undermines, compliance with an 18-year-old consent decree born of excessive use of force.

But the issues at OPD don't just lurk in memes.  Incredibly, multiple officers – including women and minorities – insisted during interviews that they were not offended by overtly

offensive memes on the @crimereductionteam Instagram page.  These officers readily acknowledged that a hypothetical *someone* might be offended by a particular meme; but they maintained that they themselves were unbothered.  Asked to explain this anomaly, officers consistently explained that they have developed thick skins in this job and don't take things personally.  In other words, the attitudes exemplified by the offensive memes are so deeply ingrained in the culture of the Department that even the victims of those attitudes have been co-opted; they must deny or shrug off the offense in order to come to work every day and be part of the team.  In this way, the attitudes that must be shrugged off replicate and grow.

A similar phenomenon is evident with respect to police reform.  As described above, much of the content on the @crimereductionteam Instagram page took aim at measures implemented at OPD to curb and monitor the use of force.  Several memes celebrated not just violence, but violence committed in the face of policies designed to restrict it.  The failure of anyone at OPD to flag these memes, or to recognize the extent to which they undermined years of efforts to comply with the NSA, suggests that the views expressed by the memes remain alarmingly widespread.

Changing these attitudes will require more than lip service to principles of diversity, equity and inclusion.  The Department must implement and enforce policies that (1) put officers on clear notice that any engagement with hateful or subversive messaging may be grounds for discipline; and (2) erect a framework for identifying, evaluating, and responding to violations. These tasks must be undertaken immediately and "owned" by Department leadership, including the Chief of Police.

***OPD should adopt a Department-specific antidiscrimination policy that incorporates key concepts from AI 71.***  The City's antidiscrimination policy, AI 71, is already binding on OPD members.  However, officers' familiarity with the policy is uneven and much less robust than their understanding of policies that pertain specifically to OPD.  Accordingly, OPD, with the assistance of external professionals, should draft and implement an antidiscrimination policy that applies to all members of the Department.  Among other provisions, this policy should incorporate certain defining characteristics of AI 71, including:

- Extension of the policy beyond the physical boundaries of the workplace to reach any and all conduct and statements with a work-related nexus;

- Application of the policy to any conduct or statements that constitute discrimination, harassment, or inappropriate conduct based on protected status, whether or not a particular victim is targeted;

- Application of the policy regardless of whether an officer's conduct or statement causes actual offense to a victim, and whether or not anyone complains.

The Department should craft and deliver training modules specific to this new policy; update the Manual of Rules to specifically reference the policy; and actively enforce compliance with meaningful discipline for violations.

***OPD should devise and implement an effective social media policy.***  Despite the pervasiveness of social media, particularly among younger officers, OPD has no policy governing social media use.  OPD should implement a policy that applies to all social media use by OPD members, whether on or off duty, on both personal and work-issued devices.  As this

investigation revealed, OPD cannot readily detect and address an officer's inappropriate social media activity unless the Department's policy applies to all of the officer's devices.

In addition, the policy should include an explicit prohibition on hateful or offensive speech directed at any individual or group on the basis of any immutable trait, including but not limited to race, sex, gender identity, ethnicity, or sexual orientation.  It should further prohibit any use of social media that brings the Department into disrepute, including any posts, comments, or likes that show disrespect toward Department leadership; that undermine Department policies; or that compromise the integrity of the law enforcement function.  The social media policy should incorporate by reference the City of Oakland's recently enacted policy prohibiting association with extremist groups.[15]

*OPD should implement clear rules and regulations concerning the use of personal devices, private text communications, and ephemeral media in the conduct of police work.* Officer interviews revealed that the use of personal devices and messaging platforms to communicate on the job has become increasingly common.  Although there are often legitimate explanations for using private devices and apps, neither a social media policy nor an anti-discrimination policy can be properly enforced when work-related communications are exchanged on private platforms.  There are also security risks associated with the use of personal devices with varying levels of encryption, as well as legal risks created by the Department's lack of custody and control over work-related communications.  Accordingly, the Department should undertake a thorough analysis of officers' use of devices and messaging platforms, and then draft and implement a policy that sets clear limits on how personal devices

---

[15] Oakland City Council Resolution No. 88167 C.M.S. (Passed June 16, 2020).

and messaging platforms (including ephemeral media apps) may be used for work-related communications.

## IV.     CONCLUSION

The @crimereduction team Instagram page has rocked the Oakland Police Department on many levels.  OPD's anemic response to the page bespeaks the need for a culture shift aided by robust anti-discrimination and social media policies.  Positive steps the Department has taken in recent years toward compliance with the NSA have been temporarily overshadowed by evidence that some officers remain wedded to hurtful biases and a retrograde vision of policing.  And negative media coverage has complicated the task of new leadership to rebuild the community's trust.  For the sake of the many good officers in the Department and the relationship between the Department and the city it serves, OPD must take the necessary steps to address the root causes of this episode and erect structures to prevent the recurrence of similar events in the future.