October 5, 2021

# Seventy-Fifth Report
## *of the* Independent Monitor
## *for the* Oakland Police Department

## Introduction

This is our seventy-fifth status report on the Negotiated Settlement Agreement (NSA) in the case of *Delphine Allen, et al., vs. City of Oakland, et al.,* in the United States District Court for the Northern District of California under the direction of Judge William H. Orrick. I was appointed in 2010 to oversee the monitoring process of the Oakland Police Department (OPD) that began in 2003.

Following the Court's Order of May 21, 2015, we devote special attention to the most problematic component parts of the NSA Tasks that are not yet in full or sustained compliance; and discuss in our status reports the most current information regarding the Department's progress with the NSA and its efforts at making the reforms sustainable. Our monthly reports do not address all Tasks. This report describes our recent assessments of NSA Tasks 2, 5, and 41.

Each month, our Team conducts a visit to Oakland that includes both compliance assessments and technical assistance. During our site visits, we meet with Department and City officials; observe Department meetings and technical demonstrations; review Departmental policies; conduct interviews and make observations in the field; and analyze OPD documents and files, including misconduct investigations, use of force reports, crime and arrest reports, Stop Data Forms, and other documentation.

During the September 1, 2021 Case Management Conference, the Court reiterated its five priorities for the Department:

1. Reduce racial disparities in vehicle, pedestrian, and bicycle stops, with continued use of intelligence-led policing;
2. Implement Vision and its associated dashboards in a technologically straightforward way so that the tools are used effectively in the risk management process;
3. Recruit officers who reflect the (gender, race/ethnicity, and other) diversity of Oakland;
4. Ensure that all uses of force and instances of potential misconduct are accurately reported and rigorously investigated within set timeliness standards; and
5. Ensure that disciplinary decisions and the disciplinary process are fair and equitable.

The Department is making progress in these areas, and the Chief and the Monitor are continuing their discussions regarding these on a regular basis.

## *Focused Task Assessments*

## Task 2: Timeliness Standards and Compliance with IAD Investigations

**Requirements:**

*Fairness to complainants, members/employees and the public requires that internal investigations be completed in a timely fashion.*

1. *On or before December 1, 2003, OPD shall develop policies regarding timeliness standards for the completion of Internal Affairs investigations, administrative findings and recommended discipline.*

2. *Compliance with these timeliness standards shall be regularly monitored by IAD command and the Department's command staff. If IAD experiences an unusual proliferation of cases and/or workload, IAD staffing shall be increased to maintain timeliness standards.*

(Negotiated Settlement Agreement III. B.)

**Relevant Policy:**

OPD most recently revised Departmental General Order M-03, *Complaints Against Department Personnel and Procedures*, on December 22, 2017.

**Commentary:**

**Task 2.1** requires that internal investigations (IAD and Division Level) – including review, approval, findings, and discipline – be completed in accordance with the timeliness standards developed by OPD. To assess this subtask, we reviewed a list of all internal investigations resulting in formal findings (unfounded, sustained, exonerated, or not sustained) that were approved in April, May, and June 2021, and calculated the number of days between the complaint date and the approval date for each case. We excluded from the dataset cases that were administratively closed, those that involved on-duty traffic accidents or service complaints, and those that did not involve Manual of Rules (MoR) violations. We segregated the remaining cases into Class I or Class II categories. If a case involved at least one alleged Class I violation, we classified it as Class I.

At least 85% of Class I misconduct investigations and at least 85% of Class II misconduct investigations must be completed within 180 days to be considered timely. Per DGO M-03, Class I offenses "are the most serious allegations of misconduct and, if sustained, shall result in disciplinary action up to and including dismissal and may serve as the basis for criminal prosecution." Class II offenses include "all minor misconduct offenses."

For the purposes of this assessment, we calculated the number of days between the complaint receipt date and the approval date.  The complaint date is the date on which the Department first becomes aware of a complaint – whether it is lodged by a community member or internally generated.  We removed from the denominator cases that were delayed due to tolling (held in abeyance in accordance with one of the provisions of Government Code Section 3304) or cases in which OPD's failure to meet 180-day timeliness requirement resulted only from delays in the Community Police Review Agency (CPRA) completing its concurrent investigations.  Of the 65 applicable Class I cases we reviewed for this assessment, only 49, or 75%, were in compliance with established timelines.  This demonstrates improvement from our last review of Task 2, when we found that 54% of Class I cases were in compliance with established timelines.

Of the 104 applicable Class II cases we reviewed, 85, or 82%, were in compliance with established timelines.  This is the same compliance percentage we found for Class II cases during our last review of Task 2.

Per DGO M-03, "In cases with a sustained finding, the discipline recommendation process shall be completed within 30 calendar days of the sustained finding."  We reviewed all 23 cases including a total of 59 sustained findings that were approved in April, May, and June 2021; six cases involved multiple sustained findings.  All but one (196%) of these 23 cases were in compliance with established discipline timelines.

OPD is not in compliance with Task 2.1.

Task 2.2 requires that IAD and OPD command staff regularly monitor compliance with these timeliness standards.  The primary responsibility for monitoring compliance with timeliness standards rests with IAD, whether investigations are conducted by IAD personnel or via Division-level investigation.  As part of this monitoring, the IAD Commander discusses pending deadlines for key open investigations during IAD's weekly meetings with the Chief; the deadlines are also reflected in written agendas for these meetings.  A Monitoring Team representative regularly attends these weekly meetings.  IAD also occasionally, as needed, emails individual reminders on cases approaching due dates to investigators and their supervisors.  The Department is in compliance with Task 2.2.

Task 2.3 requires that if IAD experiences an unusual proliferation of cases and/or workload, IAD staffing be increased to maintain timeliness standards.  We routinely request and receive updates on IAD staffing levels during our site visits.

| **Task 2 compliance status** | Not in compliance |

## Task 5: Complaint Procedures for IAD

**Requirements:**

1. On or before December 1, 2003, OPD shall develop a policy so that, OPD personnel who become aware that a citizen wishes to file a complaint shall bring such citizen immediately, or as soon as circumstances permit, to a supervisor or IAD or summon a supervisor to the scene. If there is a delay of greater than three (3) hours, the reason for such delay shall be documented by the person receiving the complaint. In the event that such a complainant refuses to travel to a supervisor or to wait for one, the member/employee involved shall make all reasonable attempts to obtain identification, including address and phone number, as well as a description of the allegedly wrongful conduct and offending personnel, from the complainant and any witnesses. This information, as well as a description of the complaint, shall immediately, or as soon as circumstances permit, be documented on a Complaint Form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander, and shall be treated as a complaint. The supervisor or appropriate Area Commander notified of the complaint shall ensure the Communications Division is notified and forward any pertinent documents to the IAD.

2. An on-duty supervisor shall respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest. The supervisor shall ensure the Communications Division is notified and forward any pertinent documents to the IAD. All other misconduct complaints by a jail inmate shall be handled in the same manner as other civilian complaints.

3. In each complaint investigation, OPD shall consider all relevant evidence, including circumstantial, direct and physical evidence, and make credibility determinations, if feasible. OPD shall make efforts to resolve, by reference to physical evidence, and/or use of follow-up interviews and other objective indicators, inconsistent statements among witnesses.

4. OPD shall develop provisions for the permanent retention of all notes, generated and/or received by OPD personnel in the case file.

5. OPD shall resolve each allegation in a complaint investigation using the "preponderance of the evidence" standard. Each allegation shall be resolved by making one of the following dispositions: Unfounded, Sustained, Exonerated, Not Sustained, or Administrative Closure. The Department shall use the following criteria for determining the appropriate disposition:

    a. Unfounded: The investigation disclosed sufficient evidence to determine that the alleged conduct did not occur. This finding shall also apply when individuals named in the complaint were not involved in the alleged act.

    b.    *Sustained:* The investigation disclosed sufficient evidence to determine that the alleged conduct did occur and was in violation of law and/or Oakland Police Department rules, regulations, or policies.

    c.    *Exonerated:* The investigation disclosed sufficient evidence to determine that the alleged conduct did occur, but was in accord with law and with all Oakland Police Department rules, regulations, or policies.

    d.    *Not Sustained:* The investigation did not disclose sufficient evidence to determine whether or not the alleged conduct occurred.

    e.    *Administrative Closure:* The investigation indicates a service complaint, not involving an MOR violation, was resolved without conducting an internal investigation; OR

    f.    *To conclude an internal investigation when it has been determined that the investigation cannot proceed to a normal investigative conclusion due to circumstances to include but not limited to the following:*

        1)    *Complainant wishes to withdraw the complaint and the IAD Commander has determined there is no further reason to continue the investigation and to ensure Departmental policy and procedure has been followed;*

        2)    *Complaint lacks specificity and complainant refuses or is unable to provide further clarification necessary to investigate the complaint;*

        3)    *Subject not employed by OPD at the time of the incident; or*

        4)    *If the subject is no longer employed by OPD, the IAD Commander shall determine whether an internal investigation shall be conducted.*

        5)    *Complainant fails to articulate an act or failure to act, that, if true, would be an MOR violation; or*

        6)    *Complaints limited to California Vehicle Code citations and resulting tows, where there is no allegation of misconduct, shall be referred to the appropriate competent authorities (i.e., Traffic Court and Tow Hearing Officer).*

    g.    *Administrative Closures shall be approved by the IAD Commander and entered in the IAD Complaint Database.*

6.    The disposition category of "Filed" is hereby redefined and shall be included under Administrative Dispositions as follows:

    a.    *An investigation that cannot be presently completed. A filed investigation is not a final disposition, but an indication that a case is pending further developments that will allow completion of the investigation.*

    b.  *The IAD Commander shall review all filed cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed and may direct the closure or continuation of the investigation.*

  7.  *Any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken. However, investigators, with the approval of an IAD Commander, are not required to interview and/or take a recorded statement from a member or employee who is the subject of a complaint or was on the scene of the incident when additional information, beyond that already provided by the existing set of facts and/or documentation, is not necessary to reach appropriate findings and conclusions.*

(Negotiated Settlement Agreement III. E.)

**Relevant Policy:**

There are six Departmental policies that incorporate the requirements of Task 5: Department General Order M-03, *Complaints Against Department Personnel and Procedures* (published December 6, 2005 and revised most recently on August 22, 2013); Communications Division Policy & Procedures C-02, *Receiving and Logging Complaints Against Personnel and Use of Force Incidents* (published April 6, 2007); Training Bulletin V-T.1, *Internal Investigation Procedure Manual* (published June 1, 2006); Special Order 8270, *Booking of Prisoners at the Glenn E. Dyer Detention Facility* (published June 24, 2005); Special Order 8565, *Complaints Against Department Personnel* (published May 11, 2007); and IAD Policy & Procedures 05-02, *IAD Investigation Process* (published December 6, 2005). In addition, NSA stipulations issued on December 12, 2005 and March 13, 2007 incorporate the requirements of this Task.

**Commentary:**

Task 5 consists of several subtasks, briefly described below. Based on OPD's compliance history with many of the subtasks, not all are being actively monitored at this time.

**Task 5.1** requires that when a citizen wishes to file a complaint, the citizen is brought to a supervisor or IAD, or a supervisor is summoned to the scene. **Task 5.2** requires that if there is a delay of greater than three hours in supervisory response, the reason for the delay must be documented. **Task 5.3** requires that where a complainant refuses to travel to a supervisor, or wait for one, personnel make all reasonable attempts to obtain specific information to assist in investigating the complaint. **Task 5.4** requires that specific information be documented on a complaint form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander. **Task 5.5** requires that the supervisor or Area Commander notify Communications and forward any pertinent documents to IAD.

To assess compliance with Tasks 5.1 through 5.5, we reviewed the Daily Incident Logs (DILs) prepared by the Communications Division and forwarded to IAD each business day.  The DIL form has been modified several times during our tenure to elicit "forced responses" that gather all of the information required to evaluate compliance with these Tasks.  These modifications have significantly enhanced OPD's ability to document compliance by properly filling out and distributing the logs, and compliance rates with these subtasks have been near 100% for several years.  Consequently, we no longer actively assess OPD's compliance with these subtasks, but we continue to receive both the DILs and Daily Complaint Referral Logs (used to document when Information Business Cards [IBCs] are provided to citizens in lieu of a complaint forms).  We spot-check these forms regularly to verify that the quality of their completion has not diminished.  OPD remains in compliance with Tasks 5.1 through and including Task 5.5.

**Task 5.6** requires that an on-duty supervisor respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest of the inmate.  We have not actively monitored this subtask since December 2014, though we have reviewed cases applicable to this requirement in several reports since that time.

**Task 5.12** requires that the Watch Commander ensure that any complaints that are applicable to Task 5.6 are delivered to and logged with IAD.  Under current policy, the Communications Division must record on the DILs complaints that are received and/or handled by on-duty supervisors, and the DILs is forwarded daily to IAD.

OPD remains in compliance with Tasks 5.6 and 5.12.

**Task 5.15** through **Task 5.19**, and **Task 5.21,** collectively address the quality of completed IAD investigations, and therefore remain the subject of our focused Task assessments.  To assess compliance with these Tasks, we reviewed 20 IAD cases which were closed between December 1, 2020 and June 30, 2021, sampled from seven of our recent document requests.  This sample included investigations completed by IAD and Division-level investigations (DLIs).  It also included cases that were resolved via formal investigation and investigations that were resolved via summary finding. (Summary findings are investigations in which the Department believes a proper conclusion can be determined based on a review of existing documentation with limited or no additional interviews and follow-up.)  As is our practice, if we had questions pertaining to a case, we consulted with the commanding officer of IAD before making our final determination.

Together, **Tasks 5.15** and **Task 5.16** require that OPD: gathers all relevant evidence; conducts follow-up interviews where warranted; adequately considers the evidence gathered; makes credibility assessments where feasible; and resolves inconsistent statements.

In all of the cases we reviewed, we believe that OPD gathered all relevant evidence available.  As we often find, in many of the cases video and/or audio recordings proved to be a significant factor in allowing OPD to reach an appropriate conclusion.  Investigators conducted follow-up interviews to seek clarification or resolve inconsistencies in three of the 20 cases we reviewed.  In one case, a subject officer was interviewed twice.  In another case, the complainant and two subject officers were each interviewed twice.  In the third case, two witnesses were each interviewed twice.

In one case, we believe that a DLI investigator conducted a telephonic interview of a witness while the witness was on a speakerphone in the presence of the complainant in the case. It further appeared that the witness changed his answer to at least one question after input from the complainant. The separation of witnesses during interviews is an investigative best practice, whether the interview is in person or over the phone.

OPD made credibility assessments for all involved parties in eight of the 20 cases. Eight cases were approved for summary finding; and per policy, investigators are not required to assess the credibility of the involved officers and civilian employees in these instances. Two other cases were closed via informal complaint resolution, or ICR, and these cases do not require credibility assessments. In one case – an internally generated case opened after the arrest of an officer – there were no witnesses interviewed, and the officer resigned after his arrest without being interviewed. No credibility assessments were required.

In one case, OPD failed to conduct a credibility assessment of the complainant. Additionally, the credibility assessments which were completed in this case were boilerplate, all using the same language: the witnesses' "recall of the incident was detailed and consistent with other witnesses and subject officer statements." In fact, the witness and subject officer statements were significantly *inconsistent* with each other, resulting in not sustained findings in the case.

In five cases, complainants and/or witnesses were deemed not credible. In all of these cases, body-worn camera (BWC) footage proved instrumental in reaching a not credible determination. In addition, in one of these cases, the complainant's statement also conflicted with that of a witness, her uncle, who was deemed credible. We agreed with these credibility assessments.

In 14 of the 20 cases we reviewed, OPD resolved inconsistent statements. In 11 of these cases, BWC recordings were available and assisted in the determination. In three others, recorded phone calls were available for review. Four cases resulted in at least one finding of not sustained. Not sustained is an acceptable finding; and by definition, it implies that inconsistencies were not resolved despite investigative efforts. Two additional cases were administratively closed by informal complaint resolution (ICR), negating the need to resolve inconsistent statements.

**Task 5.17** requires that OPD permanently retain all notes generated and/or received by OPD personnel in the case file. OPD personnel document that all investigative notes are contained within a particular file by completing an Investigative Notes Declaration Form. OPD has a sustained history of 100% compliance with this subtask. During this reporting period, the form was again properly completed in all of the cases we reviewed.

**Task 5.18** requires that OPD resolve each allegation in a complaint investigation using the preponderance of the evidence standard. **Task 5.19** requires that each allegation of a complaint is identified and resolved with one of the following dispositions: unfounded; sustained; exonerated; not sustained; or administrative closure. Our sample of 20 cases contained 80 allegations that received dispositions as follows: 29 exonerated; 26 unfounded; eight not sustained; four sustained; and 13 administratively closed (three of these by informal complaint resolution, or ICR).

We disagreed with the finding in one case.  During our review of use of force cases, we identified a late body-worn camera (BWC) activation, and as is our practice, we advised OPD of this during a virtual site visit.  An OPD lieutenant concurred with our assessment, and issued a detailed Supervisory Note (SNF) to the officer, adequately documenting the late activation and the reason he came to his conclusion.  It was subsequently determined that the officer had a prior pattern of this behavior and was ineligible to have this incident handled as a "discovered violation" which can be closed with a SNF, and the case was assigned to IAD.

It should be noted that in this case the officer was working in full uniform as part of an arrest team for an auto burglary suppression operation, and he responded to assist in the apprehension of a suspect who just committed an auto burglary which was witnessed by an undercover officer who was part of the same operation.  In his investigation, the IAD investigator went to great lengths to justify his unfounded finding for a late activation and attempted to make the case that the term *prior to* is vague in this section of policy – "Members shall activate the PDRD *prior to* initiating the circumstances…"  He used terms such as "almost at the same time" and "almost at a fraction of a second."  He also wrote, "It should be noted that the policy only states 'prior to' and there is no amount of calculated time within the policy to articulate what the duration 'prior to' would cover."  He therefore concludes that any amount of time – even a fraction of a second – constitutes prior to.  He also went to great lengths to identify when the suspect's detention actually occurred, completely ignoring the fact that the officer was specifically working a crime suppression detail and responded to apprehend a suspect in a crime witnessed by an undercover officer on the same detail.  The officer should have reasonably known he would be involved in a detention at the moment he responded; that was his assigned role.  In summary, both a member of our Team and an OPD command officer had no difficulty determining that there was a late activation in this case; and it is disappointing that an investigator assigned to IAD went to such great lengths to reach a finding favorable for the officer, contrary to the evidence at hand.

**Task 5.20** requires that the IAD Commander review all "filed" cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed.  A filed case is defined as an investigation that cannot be presently completed and is pending further developments that will allow completion of the investigation; filed is not a final disposition.  Traditionally, as part of our review of this Task, we also reviewed cases that are tolling.  OPD defines a tolled case as an administrative investigation that has been held in abeyance in accordance with one of the provisions of Government Code Section 3304.  While we are no longer actively assessing this subtask, we note that filed and tolling cases are reviewed with the Chief or her designee during the weekly IAD meetings and are listed by case number on the printed meeting agendas.  We receive and review these agendas regularly, and a Monitoring Team member regularly attends these meetings.  Additionally, we regularly receive a weekly report listing all tolled cases and all cases approaching their 3304 dates.  When we have questions regarding any of the cases in the report, the IAD Commander answers them promptly.

**Task 5.21** requires that any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken.  However, with the approval of the IAD Commander or his designee, investigators are not required to interview and/or take a recorded statement in all cases.  For example, interviews are not needed from a

member or employee who is the subject of a complaint, or who was on the scene of the incident when additional information – beyond that already provided by the existing set of facts and/or documentation – is not necessary to reach appropriate findings and conclusions. Eight of the 20 cases we reviewed were resolved via summary finding, and each case was appropriately approved for such closure. Two other cases were closed via informal complaint resolution, or ICR, negating the need for interviews in these cases.

As is our practice, during our site visits, we will discuss with OPD the case deficiencies that we found.

Quality investigations, to be *quality investigations*, must be conducted within the timelines established by the Court and Department policy. The Internal Affairs Division, as the organization's principal component to ensure Departmental integrity, must be assertive in its detection of individual or group misconduct – as should have been the case in the recent Instagram matter. We will thoroughly evaluate this Task's compliance status in our next assessment upon a closer examination of these other considerations.

| **Task 5 compliance status** | Deferred |
|---|---|

# Task 41:  Use of Personnel Assessment System (PAS) and Risk Management

**Requirements:**

*Within 375 days from the effective date of this Agreement, OPD shall develop a policy for use of the system, including supervision and audit of the performance of specific members, employees, supervisors, managers, and OPD units, as well as OPD as a whole.*

*The policy shall include the following elements:*

1. The Chief of Police shall designate a PAS Administration Unit.  The PAS Administration Unit shall be responsible for administering the PAS policy and, no less frequently than quarterly, shall notify, in writing, the appropriate Deputy Chief/Director and the responsible commander/manager of an identified member/employee who meets the PAS criteria.  PAS is to be electronically maintained by the City Information Technology Department.

2. The Department shall retain all PAS data for at least five (5) years.

3. The Monitor, Inspector General and Compliance Coordinator shall have full access to PAS to the extent necessary for the performance of their duties under this Agreement and consistent with Section XIII, paragraph K, and Section XIV of this Agreement.

4. PAS, the PAS data, and reports are confidential and not public information.

5. *On a quarterly basis, commanders/managers shall review and analyze all relevant PAS information concerning personnel under their command, to detect any pattern or series of incidents which may indicate that a member/employee, supervisor, or group of members/employees under his/her supervision may be engaging in at-risk behavior. The policy shall define specific criteria for determining when a member/employee or group of members/employees may be engaging in at-risk behavior.*

6. *Notwithstanding any other provisions of the PAS policy to be developed, the Department shall develop policy defining peer group comparison and methodology in consultation with Plaintiffs' Counsel and the IMT. The policy shall include, at a minimum, a requirement that any member/employee who is identified using a peer group comparison methodology for complaints received during a 30-month period, or any member who is identified using a peer group comparison methodology for Penal Code §§69, 148 and 243(b)(c) arrests within a 30-month period, shall be identified as a subject for PAS intervention review. For the purposes of these two criteria, a single incident shall be counted as "one" even if there are multiple complaints arising from the incident or combined with an arrest for Penal Code §§69, 148 or 243(b)(c).*

7. *When review and analysis of the PAS threshold report data indicate that a member/employee may be engaging in at-risk behavior, the member/employee's immediate supervisor shall conduct a more intensive review of the member/employee's performance and personnel history and prepare a PAS Activity Review and Report. Members/employees recommended for intervention shall be required to attend a documented, non-disciplinary PAS intervention meeting with their designated commander/manager and supervisor. The purpose of this meeting shall be to review the member/employee's performance and discuss the issues and recommended intervention strategies. The member/employee shall be dismissed from the meeting, and the designated commander/manager and the member/employee's immediate supervisor shall remain and discuss the situation and the member/employee's response. The primary responsibility for any intervention strategies shall be placed upon the supervisor. Intervention strategies may include additional training, reassignment, additional supervision, coaching or personal counseling. The performance of members/ employees subject to PAS review shall be monitored by their designated commander/manager for the specified period of time following the initial meeting, unless released early or extended (as outlined in Section VII, paragraph B (8)).*

8. *Members/employees who meet the PAS threshold specified in Section VII, paragraph B (6) shall be subject to one of the following options: no action, supervisory monitoring, or PAS intervention. Each of these options shall be approved by the chain-of-command, up to the Deputy Chief/Director and/or the PAS Activity Review Panel.*

> *Members/employees recommended for supervisory monitoring shall be monitored for a minimum of three (3) months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor. The first at the end of one (1) month and the second at the end of three (3) months.*
>
> *Members/employees recommended for PAS intervention shall be monitored for a minimum of 12 months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor and designated commander/manager: The first at three (3) months and the second at one (1) year. Member/employees subject to PAS intervention for minor, easily correctable performance deficiencies may be dismissed from the jurisdiction of PAS upon the written approval of the member/employee's responsible Deputy Chief, following a recommendation in writing from the member/employee's immediate supervisor. This may occur at the three (3)-month follow-up meeting or at any time thereafter, as justified by reviews of the member/employee's performance. When a member/employee is not discharged from PAS jurisdiction at the one (1)-year follow-up meeting, PAS jurisdiction shall be extended, in writing, for a specific period in three (3)-month increments at the discretion of the member/employee's responsible Deputy Chief. When PAS jurisdiction is extended beyond the minimum one (1)-year review period, additional review meetings involving the member/employee, the member/ employee's designated commander/manager and immediate supervisor, shall take place no less frequently than every three (3) months.*

9. *On a quarterly basis, Division/appropriate Area Commanders and managers shall review and analyze relevant data in PAS about subordinate commanders and/or managers and supervisors regarding their ability to adhere to policy and address at-risk behavior. All Division/appropriate Area Commanders and managers shall conduct quarterly meetings with their supervisory staff for the purpose of assessing and sharing information about the state of the unit and identifying potential or actual performance problems within the unit. These meetings shall be scheduled to follow-up on supervisors' assessments of their subordinates' for PAS intervention. These meetings shall consider all relevant PAS data, potential patterns of at-risk behavior, and recommended intervention strategies since the last meeting. Also considered shall be patterns involving use of force, sick leave, line-of-duty injuries, narcotics-related possessory offenses, and vehicle collisions that are out of the norm among either personnel in the unit or among the unit's subunits. Division/appropriate Area Commanders and managers shall ensure that minutes of the meetings are taken and retained for a period of five (5) years. Commanders/managers shall take appropriate action on identified patterns of at-risk behavior and/or misconduct.*

10. *Division/appropriate Area Commanders and managers shall meet at least annually with his/her Deputy Chief/Director and the IAD Commander to discuss the state of their commands and any exceptional performance, potential or actual performance problems or other potential patterns of at-risk behavior within the*

      unit. Division/appropriate Area Commanders and managers shall be responsible for developing and documenting plans to ensure the managerial and supervisory accountability of their units, and for addressing any real or potential problems that may be apparent.

11. PAS information shall be taken into account for a commendation or award recommendation; promotion, transfer, and special assignment, and in connection with annual performance appraisals. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.

12. Intervention strategies implemented as a result of a PAS Activity Review and Report shall be documented in a timely manner.

13. Relevant and appropriate PAS information shall be taken into account in connection with determinations of appropriate discipline for sustained misconduct allegations. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.

14. The member/employee's designated commander/manager shall schedule a PAS Activity Review meeting to be held no later than 20 days following notification to the Deputy Chief/Director that the member/employee has met a PAS threshold and when intervention is recommended.

15. The PAS policy to be developed shall include a provision that a member/employee making unsatisfactory progress during PAS intervention may be transferred and/or loaned to another supervisor, another assignment or another Division, at the discretion of the Bureau Chief/Director if the transfer is within his/her Bureau. Inter-Bureau transfers shall be approved by the Chief of Police. If a member/employee is transferred because of unsatisfactory progress, that transfer shall be to a position with little or no public contact when there is a nexus between the at-risk behavior and the "no public contact" restriction. Sustained complaints from incidents subsequent to a member/employee's referral to PAS shall continue to result in corrective measures; however, such corrective measures shall not necessarily result in a member/employee's exclusion from, or continued inclusion in, PAS. The member/employee's exclusion or continued inclusion in PAS shall be at the discretion of the Chief of Police or his/her designee and shall be documented.

16. In parallel with the PAS program described above, the Department may wish to continue the Early Intervention Review Panel.

17. On a semi-annual basis, beginning within 90 days from the effective date of this Agreement, the Chief of Police, the PAS Activity Review Panel, PAS Oversight Committee, and the IAD Commander shall meet with the Monitor to review the operation and progress of the PAS. At these meetings, OPD administrators shall

> *summarize, for the Monitor, the number of members/employees who have been identified for review, pursuant to the PAS policy, and the number of members/employees who have been identified for PAS intervention. The Department administrators shall also provide data summarizing the various intervention strategies that have been utilized as a result of all PAS Activity Review and Reports. The major objectives of each of these semi-annual meetings shall be consideration of whether the PAS policy is adequate with regard to detecting patterns of misconduct or poor performance issues as expeditiously as possible and if PAS reviews are achieving their goals.*
>
> 18. *Nothing in this Agreement, and more specifically, no provision of PAS, shall be construed as waiving, abrogating or in any way modifying the Department's rights with regard to discipline of its members/employees. The Department may choose, at its discretion, to initiate the administrative discipline process, to initiate PAS review or to use both processes concurrently or consecutively.*

(Negotiated Settlement Agreement VII. B.)

**Relevant Policy:**

OPD revised and issued Departmental General Order D-17, *Personnel Assessment Program,* in November 2013.

**Commentary:**

After occasional periods of limited activity with reference to Task 41, there is now significant work being done on a variety of issues relevant to this Task. Vision has been declared by the City's Information Technology Department (ITD) as "fully implemented." The new Bureau of Risk Management is taking shape, the Department is drafting a comprehensive risk management policy, new personnel and other resources for the collection and use of data are in place after a lengthy process, and the Risk Management Meeting process continues to demonstrate its value.

Of course, as always, the devil is in the details, so additional commentary should be useful. In the case of Vision, the City ITD's declaration of victory seems unusual in light of the complexity of IT projects in general; and the complicated history of the PAS database, PRIME, and Vision, in particular. While the Department has made clear progress, there is continuing work. During our recent site meeting, the ongoing work prompted discussion of the need for oversight and audit processes that examine both the completeness and quality of data. The extent to which the system generates information on the use of Vision data was also unclear. That information will allow command staff to assess system usage overall – and by particular, components and members of the Police Department.

OPD's most significant innovation relevant to this Task remains the Risk Management Meeting process.  We have regularly had the opportunity to observe meetings at all the levels at which they occur – from the larger, Citywide meetings down to the Area levels and specialized units such as Ceasefire.  Each level of meeting makes its own contribution.  The Citywide meetings provide broad comparisons, while the smaller Area meetings seem most valuable when supervisors are asked to explain patterns in their local data or the activity of individual officers.  Preserving the benefits of discussion will continue to be important moving forward.

The Department's Data Manager also adds a potentially valuable resource to Risk Management Meetings.  The data regularly used now include summary information on the data elements described in Task 40.  A broader approach to analysis is also developing.  The Deputy Chief over the Bureau of Risk Management has noted the importance of both defining the concept of risk, and of measuring risk across OPD activity.  A first project identifying risk across multiple steps involved in stops by police will examine the nature of any contraband seized, the extent of immediate transfer to jail, and the nature and outcome of any criminal charges resulting from stops.

The Department clearly values the use of data particularly for identifying and managing risk.  As the commitment to this has grown, however, the results of analysis have not always been easy to interpret.  Most recently, the Department has seen multiple analyses addressing whether or not Departmental discipline procedures resulted in biased outcomes.  An early study reported findings of bias while subsequent, more detailed, analyses found mixed results particularly when compared across two years of data.  These multiple and different findings raise important questions about how to understand and use data within the Department or a similar setting.  In dedicated research settings precise conclusions matter.  But precision is less consequential in this case.  That is, these findings, regardless of limited strength or consistency, do not negate the appropriateness of interventions such as education or training or other good practices intended to support organizational and societal goals.  The Department is right to consider such options.

The best available data are better than no data and can always be improved upon in additional analyses.  The Department's commitment to data and analyses is significant and will continue to support rational decision choices.  When the goal is management of the Department, particularly for the identification and mitigation of risk, the standard for determining action may not always be driven by highly refined statistical standards.  Instead, one should expect analyses to grow stronger, and their implications more clearly supported, over time.  The key will be found in the sustained commitment to analysis-driven decision-making.

## Conclusion

Earlier this month, the law firm charged with conducting an independent investigation of what has been referred to as the "Instagram case" completed its investigation as well as a second report, released to the public by the Court. The public report, "Conclusions and Recommendations Re: @crimereductionteam Instagram Page" discusses the content – including sexist, racist, anti-reform, and insubordinate memes – of the Instagram page; officers' interaction with the page's memes; and the Department's insufficient response when it learned about the page. The report notes, "There is no satisfactory explanation for this collective failure. It was not simply a failure to *report*; OPD officers uniformly acknowledged that if they encountered an MOR violation or a breach of AI 71 [Administrative Instruction 71, the City's anti-discrimination policy], they were duty-bound to report it. The problem was a failure to *detect* – that is, a failure to see that much of the content on the @crimereductionteam Instagram page was inappropriate and offensive. This failure occurred at every level of OPD. An untold number of OPD members viewed memes from the page that were unambiguously sexist, racist, or anti-reform yet did nothing about it."

The report also sets out several recommendations for the Department, including that it should implement policies regarding social media and anti-discrimination – incorporating key concepts from AI 71; as well as "clear rules and regulations concerning the use of personal devices, private text communications, and ephemeral media in the conduct of police work."

We will closely monitor the Department's implementation of these recommendations and its response to this investigation. It would be erroneous to ignore the Instagram case against the larger context of controversial issues and matters that the Department has failed to detect on its own. As we have pointed out in the past, those who have oversight authority should not be the primary impetus for the revelation and/or investigation of unacceptable conduct. Both the Mayor and the Police Chief have been passionate about their intolerance of misconduct, but neither the Mayor nor the Chief should be expected to do this alone; cultural change is the responsibility of all members of the Department. As enforcers of the law, Department members must demonstrate courage and commitment. If they *see* something, they must *say* something.

*Robert S. Warshaw*

Chief (Ret.) Robert S. Warshaw
*Monitor*