December 8, 2021

# Seventy-Seventh Report
## *of the* Independent Monitor
## *for the* Oakland Police Department

## Introduction

This is our seventy-seventh status report on the Negotiated Settlement Agreement (NSA) in the case of *Delphine Allen, et al., vs. City of Oakland, et al.,* in the United States District Court for the Northern District of California under the direction of Judge William H. Orrick.  I was appointed in 2010 to oversee the monitoring process of the Oakland Police Department (OPD) that began in 2003.

Following the Court's Order of May 21, 2015, we devote special attention to the most problematic component parts of the NSA Tasks that are not yet in full or sustained compliance; and discuss in our status reports the most current information regarding the Department's progress with the NSA and its efforts at making the reforms sustainable.  Our monthly reports do not address all Tasks.  This report describes our recent assessments of NSA Tasks 5, 20, 41, and 45.

Each month, our Team conducts a visit to Oakland that includes both compliance assessments and technical assistance.  Due to the COVID pandemic, we have been holding our visits remotely.  During our site visits, we meet with Department and City officials; observe Department meetings and technical demonstrations; review Departmental policies; conduct interviews and make observations in the field; and analyze OPD documents and files, including misconduct investigations, use of force reports, crime and arrest reports, Stop Data Forms, and other documentation.

During the September 1, 2021 Case Management Conference, the Court reiterated its five priorities for the Department:

1. Reduce racial disparities in vehicle, pedestrian, and bicycle stops, with continued use of intelligence-led policing;

2. Implement Vision and its associated dashboards in a technologically straightforward way so that the tools are used effectively in the risk management process;

3. Recruit officers who reflect the diversity (gender, race/ethnicity, and other) of Oakland;

4. Ensure that all uses of force and instances of potential misconduct are accurately reported and rigorously investigated within set timeliness standards; and

5. Ensure that disciplinary decisions and the disciplinary process are fair and equitable.

The Department is making progress in these areas, and the Chief and the Monitor continue their discussions regarding these on a regular basis.

# *Focused Task Assessments*

## Task 5: Complaint Procedures for IAD

**Requirements:**

1. *On or before December 1, 2003, OPD shall develop a policy so that, OPD personnel who become aware that a citizen wishes to file a complaint shall bring such citizen immediately, or as soon as circumstances permit, to a supervisor or IAD or summon a supervisor to the scene. If there is a delay of greater than three (3) hours, the reason for such delay shall be documented by the person receiving the complaint. In the event that such a complainant refuses to travel to a supervisor or to wait for one, the member/employee involved shall make all reasonable attempts to obtain identification, including address and phone number, as well as a description of the allegedly wrongful conduct and offending personnel, from the complainant and any witnesses. This information, as well as a description of the complaint, shall immediately, or as soon as circumstances permit, be documented on a Complaint Form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander, and shall be treated as a complaint. The supervisor or appropriate Area Commander notified of the complaint shall ensure the Communications Division is notified and forward any pertinent documents to the IAD.*

2. *An on-duty supervisor shall respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest. The supervisor shall ensure the Communications Division is notified and forward any pertinent documents to the IAD. All other misconduct complaints by a jail inmate shall be handled in the same manner as other civilian complaints.*

3. *In each complaint investigation, OPD shall consider all relevant evidence, including circumstantial, direct and physical evidence, and make credibility determinations, if feasible. OPD shall make efforts to resolve, by reference to physical evidence, and/or use of follow-up interviews and other objective indicators, inconsistent statements among witnesses.*

4. *OPD shall develop provisions for the permanent retention of all notes, generated and/or received by OPD personnel in the case file.*

5. *OPD shall resolve each allegation in a complaint investigation using the "preponderance of the evidence" standard. Each allegation shall be resolved by making one of the following dispositions: Unfounded, Sustained, Exonerated, Not Sustained, or Administrative Closure. The Department shall use the following criteria for determining the appropriate disposition:*

   a. *Unfounded: The investigation disclosed sufficient evidence to determine that the alleged conduct did not occur. This finding shall also apply when individuals named in the complaint were not involved in the alleged act.*

   b. *Sustained: The investigation disclosed sufficient evidence to determine that the alleged conduct did occur and was in violation of law and/or Oakland Police Department rules, regulations, or policies.*

   c. *Exonerated: The investigation disclosed sufficient evidence to determine that the alleged conduct did occur, but was in accord with law and with all Oakland Police Department rules, regulations, or policies.*

   d. *Not Sustained: The investigation did not disclose sufficient evidence to determine whether or not the alleged conduct occurred.*

   e. *Administrative Closure: The investigation indicates a service complaint, not involving an MOR violation, was resolved without conducting an internal investigation; OR*

   f. *To conclude an internal investigation when it has been determined that the investigation cannot proceed to a normal investigative conclusion due to circumstances to include but not limited to the following:*

      1) *Complainant wishes to withdraw the complaint and the IAD Commander has determined there is no further reason to continue the investigation and to ensure Departmental policy and procedure has been followed;*

      2) *Complaint lacks specificity and complainant refuses or is unable to provide further clarification necessary to investigate the complaint;*

      3) *Subject not employed by OPD at the time of the incident; or*

      4) *If the subject is no longer employed by OPD, the IAD Commander shall determine whether an internal investigation shall be conducted.*

      5) *Complainant fails to articulate an act or failure to act, that, if true, would be an MOR violation; or*

      6) *Complaints limited to California Vehicle Code citations and resulting tows, where there is no allegation of misconduct, shall be referred to the appropriate competent authorities (i.e., Traffic Court and Tow Hearing Officer).*

  g. *Administrative Closures shall be approved by the IAD Commander and entered in the IAD Complaint Database.*

6. *The disposition category of "Filed" is hereby redefined and shall be included under Administrative Dispositions as follows:*

  a. *An investigation that cannot be presently completed. A filed investigation is not a final disposition, but an indication that a case is pending further developments that will allow completion of the investigation.*

  b. *The IAD Commander shall review all filed cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed and may direct the closure or continuation of the investigation.*

7. *Any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken. However, investigators, with the approval of an IAD Commander, are not required to interview and/or take a recorded statement from a member or employee who is the subject of a complaint or was on the scene of the incident when additional information, beyond that already provided by the existing set of facts and/or documentation, is not necessary to reach appropriate findings and conclusions.*

(Negotiated Settlement Agreement III. E.)

**<u>Relevant Policy:</u>**

There are six Departmental policies that incorporate the requirements of Task 5: Department General Order M-03, *Complaints Against Department Personnel and Procedures* (published December 6, 2005 and revised most recently on August 22, 2013); Communications Division Policy & Procedures C-02, *Receiving and Logging Complaints Against Personnel and Use of Force Incidents* (published April 6, 2007); Training Bulletin V-T.1, *Internal Investigation Procedure Manual* (published June 1, 2006); Special Order 8270, *Booking of Prisoners at the Glenn E. Dyer Detention Facility* (published June 24, 2005); Special Order 8565, *Complaints Against Department Personnel* (published May 11, 2007); and IAD Policy & Procedures 05-02, *IAD Investigation Process* (published December 6, 2005). In addition, NSA stipulations issued on December 12, 2005 and March 13, 2007 incorporate the requirements of this Task.

**<u>Commentary:</u>**

Task 5 consists of several subtasks, briefly described below. Based on OPD's compliance history with many of the subtasks, not all are being actively monitored at this time. As we have continued to advise, quality and timely investigations are essential to fulfilling the Department's obligation to complainants and officers alike.

**Task 5.1** requires that when a citizen wishes to file a complaint, the citizen is brought to a supervisor or IAD, or a supervisor is summoned to the scene.  **Task 5.2** requires that if there is a delay of greater than three hours in supervisory response, the reason for the delay must be documented.  **Task 5.3** requires that where a complainant refuses to travel to a supervisor, or wait for one, personnel make all reasonable attempts to obtain specific information to assist in investigating the complaint.  **Task 5.4** requires that specific information be documented on a complaint form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander.  **Task 5.5** requires that the supervisor or Area Commander notify Communications and forward any pertinent documents to IAD.

To assess compliance with Tasks 5.1 through 5.5, we reviewed the Daily Incident Logs (DILs) prepared by the Communications Division and forwarded to IAD each business day.  The DIL form has been modified several times during our tenure to elicit "forced responses" that gather all of the information required to evaluate compliance with these Tasks.  These modifications have significantly enhanced OPD's ability to document compliance by properly filling out and distributing the logs, and compliance rates with these subtasks have been near 100% for several years.  Consequently, we no longer actively assess OPD's compliance with these subtasks, but we continue to receive both the DILs and Daily Complaint Referral Logs (used to document when Information Business Cards [IBCs] are provided to citizens in lieu of a complaint forms).  We spot-check these forms regularly to verify that the quality of their completion has not diminished.  OPD remains in compliance with Tasks 5.1 through and including Task 5.5.

**Task 5.6** requires that an on-duty supervisor respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest of the inmate.  We have not actively monitored this subtask since December 2014, though we have reviewed cases applicable to this requirement in several reports since that time.

**Task 5.12** requires that the Watch Commander ensure that any complaints that are applicable to Task 5.6 are delivered to and logged with IAD.  Under current policy, the Communications Division must record on the DILs complaints that are received and/or handled by on-duty supervisors, and the DILs are forwarded daily to IAD.

OPD remains in compliance with Tasks 5.6 and 5.12.

**Task 5.15** through **Task 5.19**, and **Task 5.21,** collectively address the quality of completed IAD investigations, and therefore remain the subject of our focused Task assessments.  To assess compliance with these Tasks, we reviewed 15 IAD cases that were closed between July 1-August 31, 2021, sampled from our two most recent document requests.  This sample included investigations completed by IAD and Division-level investigations (DLIs).  It also included cases that were resolved via formal investigation and investigations that were resolved via summary finding. (Summary findings are investigations in which the Department believes a proper conclusion can be determined based on a review of existing documentation with limited or no additional interviews and follow-up.)  As is our practice, if we had questions pertaining to a case, we consulted with the commanding officer of IAD before making our final determination.

Together, **Tasks 5.15** and **Task 5.16** require that OPD: gathers all relevant evidence; conducts follow-up interviews where warranted; adequately considers the evidence gathered; makes credibility assessments where feasible; and resolves inconsistent statements.

In all of the cases we reviewed, we believe that OPD gathered all relevant evidence available. As we often find, in many of the cases video and/or audio recordings proved to be a significant factor in allowing OPD to reach an appropriate conclusion. Investigators conducted follow-up interviews to seek clarification or resolve inconsistencies in four of the 15 cases we reviewed. In one case, the complainant was interviewed seven times, and two subject officers were each interviewed twice. In another case, three witness officers were each interviewed twice. In another case, the complainant was interviewed four times, each time with the assistance of a language translation service. In the final case, the complainant was interviewed twice.

OPD made credibility assessments for all involved parties in seven of the 15 cases. We agreed with these credibility assessments, and there were no "not credible" determinations in any of these cases. Three cases were approved for summary finding; and per policy, investigators are not required to assess the credibility of the involved officers and civilian employees in these instances. The remaining five cases were administratively closed – two in whole or in part via informal complaint resolution – and credibility assessments are not required for administrative closures.

In seven of the 15 cases we reviewed, OPD resolved inconsistent statements. In four of these cases, BWC recordings were available and assisted in the determination. In one case, recorded phone calls were available for review. Three cases resulted in at least one finding of not sustained. Not sustained is an acceptable finding; and by definition, it implies that inconsistencies were not resolved despite investigative efforts. Five additional cases were administratively, negating the need to resolve inconsistent statements.

**Task 5.17** requires that OPD permanently retain all notes generated and/or received by OPD personnel in the case file. OPD personnel document that all investigative notes are contained within a particular file by completing an Investigative Notes Declaration Form. OPD has a sustained history of 100% compliance with this subtask. During this reporting period, the form was again properly completed in all of the cases we reviewed.

**Task 5.18** requires that OPD resolve each allegation in a complaint investigation using the preponderance of the evidence standard. **Task 5.19** requires that each allegation of a complaint is identified and resolved with one of the following dispositions: unfounded; sustained; exonerated; not sustained; or administrative closure. Our sample of 15 cases contained 55 allegations that received dispositions as follows: 12 exonerated; six unfounded; eight not sustained; ten sustained; and 19 administratively closed (eight of these by informal complaint resolution, or ICR). We did not disagree with the findings in any of the cases we reviewed.

**Task 5.20** requires that the IAD Commander review all "filed" cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed. A filed case is defined as an investigation that cannot be presently completed and is pending further developments that will allow completion of the investigation; filed is not a final disposition. Traditionally, as part of our review of this Task, we also reviewed cases that are tolling. OPD defines a tolled case as an administrative investigation that has been held in abeyance in

accordance with one of the provisions of Government Code Section 3304.  While we are no longer actively assessing this subtask, we note that filed and tolling cases are reviewed with the Chief or her designee during the weekly IAD meetings and are listed by case number on the printed meeting agendas.  We receive and review these agendas regularly, and a Monitoring Team member regularly attends these meetings.  Additionally, we regularly receive a weekly report listing all tolled cases and all cases approaching their 3304 dates.  When we have questions regarding any of the cases in the report, the IAD Commander answers them promptly.

**Task 5.21** requires that any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken.  However, with the approval of the IAD Commander or his designee, investigators are not required to interview and/or take a recorded statement in all cases.  For example, interviews are not needed from a member or employee who is the subject of a complaint, or who was on the scene of the incident when additional information – beyond that already provided by the existing set of facts and/or documentation – is not necessary to reach appropriate findings and conclusions.  Three of the 15 cases we reviewed were resolved via summary finding, and each case was appropriately approved for such closure.  Five other cases were administratively closed, negating the need for interviews in these cases.

| **Task 5 compliance status** | Deferred |
|---|---|

# Task 20:  Span of Control

### **Requirements:**

*On or before August 14, 2003, OPD shall develop and implement a policy to ensure appropriate supervision of its Area Command Field Teams.  The policy shall provide that:*

1. *Under normal conditions, OPD shall assign one primary sergeant to each Area Command Field Team, and, in general, (with certain exceptions) that supervisor's span of control shall not exceed eight (8) members.*

2. *During day-to-day operations, in the absence of the primary supervisor (e.g., due to sickness, vacation, compensatory time off, schools, and other leaves), the appropriate Area Commander shall determine, based on Department policy and operational needs, whether or not to backfill for the absence of the sergeant on leave.*

3. *If a special operation, (e.g., Beat Feet, Special Traffic Offenders Program (STOP), etc.) requires more than eight (8) members, the appropriate Area Commander shall determine the reasonable span of control for the supervisor.*

    4.    *If long-term backfill requires the loan or transfer of a supervisor from another unit, the Chief of Police and/or the Deputy Chief of Police shall make that decision.*

(Negotiated Settlement Agreement IV. C.)

**<u>Relevant Policy:</u>**

Three Departmental policies incorporate the requirements of Task 20: Departmental General Order A-19, *Supervisory Span of Control,* issued on July 26, 2006; Departmental General Order D-13, *Assignment to Acting Higher Rank or Classification,* issued on June 17, 1999; and Departmental General Order D-13.1, *Assignment to Acting Sergeant of Police,* issued on May 14, 2014.  (The publication of DGO D-13.1 cancelled Special Order 8435, which previously governed the selection process of acting sergeants.)

**<u>Commentary:</u>**

To assess these requirements for this report, we reviewed spreadsheets prepared by the Department for July, August, and September 2021 that, by date, note which type of sergeant supervised each applicable squad – a primary sergeant, relief sergeant, acting sergeant, other sergeant (one working overtime), or none.  (The Department refers to unsupervised squads as "open.")  We calculated per squad the compliance percentages for this subtask during this time period.  Each of the 49 applicable squads were in compliance – that is, all applicable squads during this time period were supervised by either a primary, relief, or other/overtime sergeant for at least 85% of their working shifts.  We also found that none of the applicable squads exceeded the required 1:8 supervisor to officer ratio at least 90% of their working shifts.

OPD continues to be in compliance with these requirements.  The Department has institutionalized the practices of tracking how each squad is supervised each day; planning, when possible, for expected absences; and considering how to fill in for personnel who are absent unexpectedly.

| **Task 20 compliance status** | In compliance |
|---|---|

## Task 41: Use of Personnel Assessment System (PAS) and Risk Management

**Requirements:**

*Within 375 days from the effective date of this Agreement, OPD shall develop a policy for use of the system, including supervision and audit of the performance of specific members, employees, supervisors, managers, and OPD units, as well as OPD as a whole.*

*The policy shall include the following elements:*

1. *The Chief of Police shall designate a PAS Administration Unit. The PAS Administration Unit shall be responsible for administering the PAS policy and, no less frequently than quarterly, shall notify, in writing, the appropriate Deputy Chief/Director and the responsible commander/manager of an identified member/employee who meets the PAS criteria. PAS is to be electronically maintained by the City Information Technology Department.*

2. *The Department shall retain all PAS data for at least five (5) years.*

3. *The Monitor, Inspector General and Compliance Coordinator shall have full access to PAS to the extent necessary for the performance of their duties under this Agreement and consistent with Section XIII, paragraph K, and Section XIV of this Agreement.*

4. *PAS, the PAS data, and reports are confidential and not public information.*

5. *On a quarterly basis, commanders/managers shall review and analyze all relevant PAS information concerning personnel under their command, to detect any pattern or series of incidents which may indicate that a member/employee, supervisor, or group of members/employees under his/her supervision may be engaging in at-risk behavior. The policy shall define specific criteria for determining when a member/employee or group of members/employees may be engaging in at-risk behavior.*

6. *Notwithstanding any other provisions of the PAS policy to be developed, the Department shall develop policy defining peer group comparison and methodology in consultation with Plaintiffs' Counsel and the IMT. The policy shall include, at a minimum, a requirement that any member/employee who is identified using a peer group comparison methodology for complaints received during a 30-month period, or any member who is identified using a peer group comparison methodology for Penal Code §§69, 148 and 243(b)(c) arrests within a 30-month period, shall be identified as a subject for PAS intervention review. For the purposes of these two criteria, a single incident shall be counted as "one" even if there are multiple complaints arising from the incident or combined with an arrest for Penal Code §§69, 148 or 243(b)(c).*

7. *When review and analysis of the PAS threshold report data indicate that a member/employee may be engaging in at-risk behavior, the member/employee's immediate supervisor shall conduct a more intensive review of the*

> *member/employee's performance and personnel history and prepare a PAS Activity Review and Report. Members/employees recommended for intervention shall be required to attend a documented, non-disciplinary PAS intervention meeting with their designated commander/manager and supervisor. The purpose of this meeting shall be to review the member/employee's performance and discuss the issues and recommended intervention strategies. The member/employee shall be dismissed from the meeting, and the designated commander/manager and the member/employee's immediate supervisor shall remain and discuss the situation and the member/employee's response. The primary responsibility for any intervention strategies shall be placed upon the supervisor. Intervention strategies may include additional training, reassignment, additional supervision, coaching or personal counseling. The performance of members/ employees subject to PAS review shall be monitored by their designated commander/manager for the specified period of time following the initial meeting, unless released early or extended (as outlined in Section VII, paragraph B (8)).*

8. *Members/employees who meet the PAS threshold specified in Section VII, paragraph B (6) shall be subject to one of the following options: no action, supervisory monitoring, or PAS intervention. Each of these options shall be approved by the chain-of-command, up to the Deputy Chief/Director and/or the PAS Activity Review Panel.*

   *Members/employees recommended for supervisory monitoring shall be monitored for a minimum of three (3) months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor. The first at the end of one (1) month and the second at the end of three (3) months.*

   *Members/employees recommended for PAS intervention shall be monitored for a minimum of 12 months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor and designated commander/manager: The first at three (3) months and the second at one (1) year. Member/employees subject to PAS intervention for minor, easily correctable performance deficiencies may be dismissed from the jurisdiction of PAS upon the written approval of the member/employee's responsible Deputy Chief, following a recommendation in writing from the member/employee's immediate supervisor. This may occur at the three (3)-month follow-up meeting or at any time thereafter, as justified by reviews of the member/employee's performance. When a member/employee is not discharged from PAS jurisdiction at the one (1)-year follow-up meeting, PAS jurisdiction shall be extended, in writing, for a specific period in three (3)-month increments at the discretion of the member/employee's responsible Deputy Chief. When PAS jurisdiction is extended beyond the minimum one (1)-year review period, additional review meetings involving the member/employee, the member/ employee's designated commander/manager and immediate supervisor, shall take place no less frequently than every three (3) months.*

9. *On a quarterly basis, Division/appropriate Area Commanders and managers shall review and analyze relevant data in PAS about subordinate commanders and/or managers and supervisors regarding their ability to adhere to policy and address at-risk behavior. All Division/appropriate Area Commanders and managers shall conduct quarterly meetings with their supervisory staff for the purpose of assessing and sharing information about the state of the unit and identifying potential or actual performance problems within the unit. These meetings shall be scheduled to follow-up on supervisors' assessments of their subordinates' for PAS intervention. These meetings shall consider all relevant PAS data, potential patterns of at-risk behavior, and recommended intervention strategies since the last meeting. Also considered shall be patterns involving use of force, sick leave, line-of-duty injuries, narcotics-related possessory offenses, and vehicle collisions that are out of the norm among either personnel in the unit or among the unit's subunits. Division/appropriate Area Commanders and managers shall ensure that minutes of the meetings are taken and retained for a period of five (5) years. Commanders/managers shall take appropriate action on identified patterns of at-risk behavior and/or misconduct.*

10. *Division/appropriate Area Commanders and managers shall meet at least annually with his/her Deputy Chief/Director and the IAD Commander to discuss the state of their commands and any exceptional performance, potential or actual performance problems or other potential patterns of at-risk behavior within the unit. Division/appropriate Area Commanders and managers shall be responsible for developing and documenting plans to ensure the managerial and supervisory accountability of their units, and for addressing any real or potential problems that may be apparent.*

11. *PAS information shall be taken into account for a commendation or award recommendation; promotion, transfer, and special assignment, and in connection with annual performance appraisals. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

12. *Intervention strategies implemented as a result of a PAS Activity Review and Report shall be documented in a timely manner.*

13. *Relevant and appropriate PAS information shall be taken into account in connection with determinations of appropriate discipline for sustained misconduct allegations. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

14. *The member/employee's designated commander/manager shall schedule a PAS Activity Review meeting to be held no later than 20 days following notification to the Deputy Chief/Director that the member/employee has met a PAS threshold and when intervention is recommended.*

15. *The PAS policy to be developed shall include a provision that a member/employee making unsatisfactory progress during PAS intervention may be transferred and/or loaned to another supervisor, another assignment or another Division, at the discretion of the Bureau Chief/Director if the transfer is within his/her Bureau. Inter-Bureau transfers shall be approved by the Chief of Police. If a member/employee is transferred because of unsatisfactory progress, that transfer shall be to a position with little or no public contact when there is a nexus between the at-risk behavior and the "no public contact" restriction. Sustained complaints from incidents subsequent to a member/employee's referral to PAS shall continue to result in corrective measures; however, such corrective measures shall not necessarily result in a member/employee's exclusion from, or continued inclusion in, PAS. The member/employee's exclusion or continued inclusion in PAS shall be at the discretion of the Chief of Police or his/her designee and shall be documented.*

16. *In parallel with the PAS program described above, the Department may wish to continue the Early Intervention Review Panel.*

17. *On a semi-annual basis, beginning within 90 days from the effective date of this Agreement, the Chief of Police, the PAS Activity Review Panel, PAS Oversight Committee, and the IAD Commander shall meet with the Monitor to review the operation and progress of the PAS. At these meetings, OPD administrators shall summarize, for the Monitor, the number of members/employees who have been identified for review, pursuant to the PAS policy, and the number of members/employees who have been identified for PAS intervention. The Department administrators shall also provide data summarizing the various intervention strategies that have been utilized as a result of all PAS Activity Review and Reports. The major objectives of each of these semi-annual meetings shall be consideration of whether the PAS policy is adequate with regard to detecting patterns of misconduct or poor performance issues as expeditiously as possible and if PAS reviews are achieving their goals.*

18. *Nothing in this Agreement, and more specifically, no provision of PAS, shall be construed as waiving, abrogating or in any way modifying the Department's rights with regard to discipline of its members/employees. The Department may choose, at its discretion, to initiate the administrative discipline process, to initiate PAS review or to use both processes concurrently or consecutively.*

(Negotiated Settlement Agreement VII. B.)

**Relevant Policy:**

OPD revised and issued Departmental General Order D-17, *Personnel Assessment Program,* in November 2013.

**Commentary:**

The Department continues its risk management work as defined by Task 40, which elaborates data requirements; and Task 41, which describes the required procedures for the risk management system. The Department's Risk Management Meeting processes have continued to evolve. The meetings now occur at multiple layered levels, including Area meetings and specialized units, meetings across the Bureau of Field Operations, and Department-wide reviews of risk-related data and processes. During our most recent site visit, OPD held a Department-wide meeting. These meetings are not yet codified in Department policy. The Department has sent several iterations of a draft policy, and we have discussed our recommendations and suggestions. The codification of a Department policy relevant to Risk Management Meetings should have been behind us by this time.

OPD's commitment to risk management has been reflected in the establishment of its Bureau of Risk Management (BRM). The BRM oversees the risk management process and its iterations which originated with the NSA. The initial elaboration of the Bureau's mission and processes are being defined by Chief Armstrong and the BRM's first Deputy Chief. A recent personnel change resulted in the reassignment of the Deputy Chief who has been principally charged with overseeing risk management processes and organizational components.

The Data Manager provides the analysis and presentation of data for the multiple layers of Risk Management Meetings. For the most recent Risk Management Meeting, the Data manager added new measures of risk-related issues by adding new data on outcomes of police stops – including data on searches, handcuffing, and arrests. Additional analysis was also provided for cases in which charges of assault on an officer, obstructing, or resisting arrest were not linked to other substantive charges. New reviews of complaint data were also added to the recent data presentations. All of these are valuable additions to the available risk-related data, particularly as they support analysis of potential racial disparities.

The Department is in the process of writing new policy to clarify the goals and practices of risk management at OPD. We have been working closely with OPD on this policy, to help the Department to institutionalize its new administrative structure, as well as to define and set the schedule for its Risk Management Meetings. As noted above, these meetings are currently not set out in any Department policy, and without that codification, they will not be sustainable. The policy should also ensure that the processes of identification and management of risk are significant throughout the Department and across the careers of officers.

Below are recommendations that may contribute to meeting those goals:

a. A risk management policy will benefit from clear definitions of risk and of risk management. Those definitions should set expectations and provide a foundation for a systematic process that is not simply ad hoc supervision, and that is also not confused with any form of discipline. Shared definitions of key concepts will help set expectations.

b. The discussion of risk management should have a place in the officer recruitment process. Risk management should be described as an ongoing improvement and officer development process within the Department, noting that officers' careers are supported by identifying patterns of behavior that may need further development or change.

    Likewise, the supervisory process is improved by systematic analysis of data and responses that support officer improvement. All of that has benefits for the careers of officers and supervisors.

c. The hiring process can provide opportunities to emphasize officers' obligations and Departmental expectations regarding risk management.

d. Academy Training should involve a training block dedicated to the philosophical approach of risk management, the data used and the nuts and bolts of the risk management process. It could also include training on risk management data and dashboards and review of all policies relevant to risk management.

e. Field Training should address the relationship between Field Training Officers and officers with regard to risk management as a formative process.

f. Sergeants supervising officers in their initial assignments should be expected to demonstrate positive approaches to managing risk.

g. Training should include covering the Risk Management Meeting structure and command staff, supervisor, and officer roles – as well as the PAS process.

h. Risk management training can also be important for supervisors; and may also be useful in at addressing new expectations regarding risk management roles at each promotional stage.

i. The discussion of risk management may also be useful at time of separation from the Department.

j. The NSA calls for periodic Command reviews of risk-related concerns. Beyond the regular substantive review of risk-related data, a semi-annual management team review of the risk management process and its effectiveness could be useful.

| **Task 41 compliance status** | While we find the Department in compliance, we urge the agency to understand the nexus between this Task and the broader, pending risk management policy. |

# Task 45: Consistency of Discipline Policy

**Requirements:**

*On or before October 6, 2003, OPD shall revise and update its disciplinary policy to ensure that discipline is imposed in a fair and consistent manner.*

    *1. The policy shall describe the circumstances in which disciplinary action is appropriate and those in which Division-level corrective action is appropriate.*

    *2. The policy shall establish a centralized system for documenting and tracking all forms of discipline and corrective action, whether imposed centrally or at the Division level.*

> 3. *All internal investigations which result in a sustained finding shall be submitted to the Discipline Officer for a disciplinary recommendation. The Discipline Officer shall convene a meeting with the Deputy Chief or designee in the affected chain-of-command for a confidential discussion of the misconduct, including the mitigating and aggravating factors and the member/employee's overall performance.*
>
> 4. *The COP may direct the Discipline Officer to prepare a Discipline Recommendation without convening a Discipline Conference.*

(Negotiated Settlement Agreement X. B.)

**Relevant Policy:**

Five Departmental policies incorporate the requirements of Task 45: Departmental General Order M-03, *Complaints Against Department Personnel and Procedures* (published December 6, 2005 and revised most recently on August 24, 2013); Training Bulletin V-T.1 and V-T.2, *Internal Investigation Procedure Manual* (published July 17, 2008); Internal Affairs Policy and Procedure Manual (published December 6, 2005); and Training Bulletin V-T, *Departmental Discipline Policy* (published March 14, 2014). Several of these policies are currently being revised.

**Commentary:**

Task 45.2 requires that OPD maintain a centralized system for documenting and tracking all OPD forms of discipline and corrective action, whether imposed centrally or at the division level. To assess Phase 2 compliance with this subtask, we reviewed the 40 cases that contained at least one sustained finding that were approved in May, June, July, and August 2021. All (100%) of these cases and findings contained the necessary information available on the spreadsheets that IAD generated for our review. OPD is in compliance with the requirement that it maintain an adequate system for documenting and tracking discipline and corrective action.

The NSA also requires that discipline be imposed in a manner that is fair and consistent. To this end, the Department developed a Discipline Matrix, which was adopted on September 2, 2010 and was in effect until a new Discipline Matrix was approved on March 14, 2014. This subsequent Matrix applies to violations after that date.

As noted above, we reviewed all 40 cases with sustained findings that were approved in May, June, July, and August 2021. (Several cases involved multiple sustained findings.)

In May, there were seven cases. In one case, an officer was sustained for his involvement in a preventable vehicle collision. In another case, a sergeant was sustained for unlawfully searching the glove compartment of a person's vehicle. In another case, an officer was sustained for cursing at a suspect during a foot pursuit. In another case, an officer was sustained for conducting an improper and inadequate investigation of an assault. There were also three cases that related to the George Floyd protests during the summer of 2020: In the first, several officers were sustained for their use of chemical munitions against protesters; in the second, an officer

was sustained for directing an officer of another agency to cut the straps of a protester's backpack while placing flexicuffs on the protester; and in the third, an officer was sustained for slapping a cell phone out of a protester's hand.

In June, there were 12 cases.  Four cases involved incidents during the summer 2020 George Floyd protests:  In the first case, multiple officers were sustained for using force against protesters; in the second, an officer was sustained for cursing at a protester; in the third, an officer was sustained for failure to activate his body-worn camera; and in the fourth, an officer was sustained for his noncompliant chemical munitions deployment.  In another case, a sergeant was sustained for failure to accept or refer a complaint and performance of duty after he investigated a use of force in which he was involved and failed to notify his supervisor he allegedly used excessive force.  In another case, multiple officers who were working undercover were sustained for performance of duty-care of property for puncturing the tires of a looting suspect's vehicle and a lieutenant was sustained for commanding officers-authority and responsibilities.  In another case, a Communications dispatcher was sustained for failing to ask a caller clarifying questions.  Three cases involved officers who were sustained for conducting improper preliminary investigations: two of two different vehicle accidents, by the same officer; and one of a battery.  In another case, an officer was sustained for demeanor for making rude and inappropriate comments to a man who was suspected of battery.  In another case, a member of the executive team was sustained for making inappropriate gender-based comments in violation of Administrative Instruction (AI) 71 (Equal Employment Opportunity/Anti-Discrimination/Non-Harassment Policy and Complaint Procedure).

In July, there were 13 cases.  Three cases involved sustained findings for failure to accept or refer a complaint: one against a sergeant, and two against officers.  In eight cases, officers were sustained for their involvement in preventable vehicle collisions.  In another case, a sergeant and an officer were sustained for their failure to conduct an investigation after the officer struck and seriously injured a dog as he was heading to an incident.  In another case, a sergeant was sustained for obedience to laws-misdemeanor/infraction and gifts, gratuities-soliciting or accepting after he was caught in an undercover prostitution sting.

In August, there were eight cases.  In one case, an officer was sustained for his involvement in a preventable vehicle collision.  In another case, two officers were sustained for inappropriately handling the arrest and transport of a wheelchair-bound subject.  In another case, which was referred by the Force Review Board, a sergeant was sustained for demeanor for cursing during a conversation with a subject and performance of duty for failure to conduct a proper force investigation.  In another case, an Academy trainee was sustained for demeanor for his inappropriate actions with Training Division staff members.  Four cases involved Communications dispatchers.  In the first, a dispatcher was sustained for performance of duty after she failed to log out of her Communications console when she went on her lunch break, causing several 911 calls to go unanswered.  In the second, a dispatcher was sustained for failure to accept or refer a complaint after she did not follow the proper procedures with a caller who requested to speak with a supervisor.  In the third, a dispatcher was sustained for demeanor after she used inappropriate language with a caller.  In the fourth, a dispatcher was sustained for performance of duty for failing to ask follow-up questions of a caller reporting a car accident.

In each case, unless otherwise documented in writing, the proposed discipline fell within the Discipline Matrix that was in effect at the time of the action for which the discipline was imposed.

We reviewed the records that OPD provided for the eight total *Skelly* hearings it completed in May, June, July, and August 2021. *Skelly* hearings are held for IAD cases involving employees with sustained findings in which discipline of a one-day suspension or greater was recommended. We reviewed the reports for the *Skelly* hearings, and found that they contained adequate justification for the results documented.

The first *Skelly* hearing involved an officer who was sustained for a demeanor violation for saying "Keep your mouth shut" to an arrestee he was handcuffing. For this violation, the Chief had approved a two-day suspension. The *Skelly* Officer reduced the discipline to a written reprimand, but the Chief overturned this reduction, noting that there was "not enough mitigation to drop discipline" to that level. The Chief instead reduced the discipline to a one-day suspension.

The second *Skelly* hearing involved an officer who was sustained for unprofessional conduct in violation of the City's AI 71 (Equal Employment Opportunity/Anti-Discrimination/Non-Harassment Policy and Complaint Procedure) after he made comments to a trainee regarding her age during an Academy training exercise. For this violation, the Chief approved a five-day suspension; the *Skelly* Officer recommended that the sustained finding be overturned (to not sustained), but the Chief denied the recommendation and maintained the original discipline.

The third *Skelly* hearing involved an officer who was sustained for obedience to laws-felony and truthfulness after he vandalized the vehicle of his wife's friend, and was untruthful during his IAD interview regarding the incident. For these violations, the Chief had approved termination; and the *Skelly* Officer upheld the discipline recommendation.

The fourth *Skelly* hearing involved an officer who was sustained for custody of prisoners-treatment after denying an arrestee's request to use the restroom. For this violation, the Chief had approved a four-day suspension; the *Skelly* Officer reduced the discipline to a two-day suspension, and the Chief concurred with the recommendation.

The fifth *Skelly* hearing involved an officer who was sustained for a noncompliant vehicle pursuit. For this violation, the Chief had approved a one-day suspension; the *Skelly* Officer reduced the discipline to a written reprimand, and the Chief concurred with the recommendation.

The sixth *Skelly* hearing involved a Communications dispatcher who was sustained for demeanor and failure to accept or refer a complaint for denying a caller's request to speak with a supervisor. For these violations, the Chief had approved a three-day suspension; the *Skelly* Officer reduced the discipline to a written reprimand, and the Chief concurred with the recommendation.

The seventh *Skelly* hearing involved an officer who was sustained for driving his police vehicle in an unsafe manner. For this violation, the Chief had approved a three-day suspension; and the *Skelly* Officer upheld the discipline recommendation.

The eighth *Skelly* hearing involved a police service technician who was sustained for miscoding his timesheet.  For this violation, the Chief had approved termination; and the *Skelly* Officer upheld the discipline recommendation.

Each month, we request from OPD a list of all *Skelly* officers provided with updated *Skelly* Hearing Training during the past month, and their dates trained.  For the four-month period under review, OPD did not conduct any training on this issue.  We will continue to review records once they are made available to verify that any applicable personnel who were recently promoted received the approved *Skelly* Officer Training.

For the four-month period under review, OPD received one arbitration decision, on August 29, 2021.  This case involved an officer who was terminated for filing a false report about being assaulted while jogging and for being untruthful during his IAD interview regarding the incident.  In its post-arbitration brief, the City argued that it would amount to "a violation of the public trust" to return the officer to duty after "he so obviously and readily lied" about what occurred.  The arbitrator concurred with the City that the officer "knowingly" filed a false police report and gave false statements to IAD, and upheld the termination.

We will review and discuss any upcoming arbitration decisions in our next assessment of Task 45.

We continue to follow the Department's response to the discipline disparity study conducted in 2020 by an external consulting firm on behalf of OPD.  The study found significant racial disparities in sustained complaints of misconduct between Black officers and officers of other races.  The Department is working with the Stanford University SPARQ (Center for Social Psychological Answers to Real-World Questions) to provide a Project Reset: A Cultural Change training program in response to the discipline disparity study report.  According to the Department, the program will "teach officers about culture; empower them to decide how they want to serve; create space to learn about and discuss the history of race and policing; and invite officers to propose concrete policy changes."

| **Task 45 compliance status** | In partial compliance |
| --- | --- |

# Conclusion

We are currently reviewing a list of incidents in which an officer's failure to properly activate a body-worn camera resulted in any remedial action within the last two years.  We requested this list following our most recent review of Task 24 (Use of Force Reporting Policy), where we noted our ongoing concerns with body-worn camera activations in use of force incidents and the failure of supervisors to identify and address this policy violation.  We will discuss our assessment in future reports and upcoming site visits with the Department.

During our most recent site visit, we discussed with OPD its plans for the implementation of the recommendations in the public report on what has been referred to as the "Instagram case."  While the City made public commentary about its imposition of discipline in this case, the City made no public statements about the findings of the outside law firm who had investigated the

Seventy-Seventh Report of the Independent Monitor for the Oakland Police Department
December 8, 2021
Page 19 of 19

matter and had released, through the Court, a detailed public report of its conclusions, observations, and recommendations.  The report recommends that the Department establish policies regarding social media and anti-discrimination – incorporating key concepts from the City's Administrative Instruction 71 (Equal Employment Opportunity/Anti-Discrimination/Non-Harassment Policy and Complaint Procedure); as well as "clear rules and regulations concerning the use of personal devices, private text communications, and ephemeral media in the conduct of police work."  During our visit, the Chief reported that he and other members of the executive team had met with all sergeants, lieutenants, and captains to discuss the findings of the Instagram case report; make clear the Department's expectations for supervisors; and encourage staff to be more proactive when they identify potentially intolerable behavior.  According to the Department's 301st Biweekly Compliance Update, at these meetings, "The Chief made it clear that there will be command accountability when shortcomings are not properly identified by reviewing commanders and managers."  It is crucial that the new policies developed in response to the Instagram case report include such provisions.  We will continue to follow up on the Department's progress implementing the report's recommendations during our monthly site visits.

There remain considerable cultural issues that appear to inform the decisions of officers and supervisors in the performance of their duties.  Further, the progress in Tasks that have been noncompliant has been disappointing; and we urge the Department and City leadership to elevate its attention to these matters.

*Robert S. Warshaw*

Chief (Ret.) Robert S. Warshaw
*Monitor*