BARBARA J. PARKER, City Attorney, CABN 69722
RYAN RICHARDSON, Special Counsel, CABN 223548
BRIGID S. MARTIN, Special Counsel, CABN 231705
One Frank H. Ogawa Plaza, 6th Floor
Oakland, California 94612
Telephone: (510) 238-3751
Facsimile: (510) 238-6500
Email:  BMartin@oaklandcityattorney.org

Attorneys for CITY OF OAKLAND

JOHN L. BURRIS, CABN 69888
Law Offices of John L. Burris
Airport Corporate Centre
7677 Oakport Street, Ste. 1120
Oakland, California 94621
Telephone: (510) 839-5200
Facsimile: (510) 839-3882

JAMES B. CHANIN, CABN 76043
Law Offices of James B. Chanin
3050 Shattuck Avenue
Berkeley, California 94705
Telephone: (510) 848-4752

Attorneys for PLAINTIFFS

*(Additional Counsel on Next Page)*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

|  |  |  |
|---|---|---|
| DELPHINE ALLEN, et al. | ) | Case No. 00-cv-04599 WHO |
|  | ) |  |
| Plaintiffs, | ) | **JOINT CASE MANAGEMENT** |
|  | ) | **STATEMENT** |
| v. | ) |  |
|  | ) | Date: January 5, 2022 |
| CITY OF OAKLAND, et al., | ) | Time: 3:30 p.m. |
|  | ) | Courtroom 2, 17th Floor |
| Defendant(s). | ) | Hon. William H. Orrick |
|  | ) |  |
|  | ) |  |
| _____ | ) |  |

1  ROCKNE A. LUCIA, JR., CABN 109349
   Rains Lucia Stern St. Phalle & Silver
2  Attorneys & Counselors at Law
   2300 Contra Costa Boulevard, Suite 500
3  Pleasant Hill, CA 94523
   Telephone: (925) 609-1699
4  Facsimile: (925) 609-1690

5  Attorneys for OAKLAND POLICE OFFICERS ASSOCIATION

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**PLAINTIFFS' STATEMENT** ..........................................................................1

PLAINTIFFS' CURRENT POSITION ...........................................................1

I.  TASK 2 (TIMELINESS STANDARDS AND COMPLIANCE WITH IAD INVESTIGATIONS) ...................................................................................2

II.  TASK 5 (COMPLAINT PROCEDURES FOR IAD)....................................4

III. TASKS 24 (USE OF FORCE REPORTING POLICY) & 25 (USE OF FORCE INVESTIGATIONS AND REPORT RESPONSIBILITY)...........................9

IV.  TASK 34 (STOP DATA/VEHICLE STOPS, FIELD INVESTIGATIONS AND DETENTIONS)........................................................................................13

V.  TASK 41 (USE OF PERSONNEL ASSESSMENT SYSTEM AND RISK MANAGEMENT)...................................................................................14

VI. TASK 45 (CONSISTENCY OF DISCIPLINE POLICY) ...........................16

CONCLUSION...............................................................................................18

**THE CITY'S STATEMENT** .......................................................................20

OVERVIEW....................................................................................................

I.  THE DEPARTMENT'S PROGRESS IMPLEMENTING INSTAGRAM INVESTIGATION RECOMMENDATIONS ...............................................21

II.  THE CITY'S ONGOING EFFORTS TO REDUCE RACIAL DISPARITY IN STOPS—TASK 34..................................................................................23

III.  INTERNAL AFFAIRS TIMELINES—TASK 2 ......................................29

IV. INTERNAL AFFAIRS COMPLAINT PROCEDURES—TASK 5 .........................31

V.  FORCE INVESTIGATIONS AND REPORT RESPONSIBILITY— TASK 25 ................................................................................................32

VI. CONSISTENCY OF DISCIPLINE POLICY—TASK 45 .......................34

   A. PRELIMINARY LOOK AT 2020-2021 IA CASE OUTCOME DATA ..............36

VII. RECRUITING AND IMPROVING DEPARTMENT DIVERSITY ......................42

VIII. BUREAU OF RISK MANAGEMENT ................................................43

IX. POLICY DEVELOPMENT AND PUBLICATION UPDATE ...............................45

CONCLUSION .....................................................................................................45

**THE OPOA'S STATEMENT**.......................................................................47

**PLAINTIFFS' STATEMENT**

**PLAINTIFFS' CURRENT POSITION**

The Independent Monitor for the OPD has issued three status reports (the 75th, 76th and 77th IMT Reports) since the last Case Management Conference statement was filed. OPD remains out of full compliance with the same five tasks that were out of compliance as of the last Case Management Conference Statement:

    1. Task 2 (Timeliness Standards and Compliance with IAD Investigations – not in compliance when most recently assessed by the IMT in the 76th Report);

    2. Task 5 (Internal Affairs Division (IAD) Complaint Procedures – deferred when most recently assessed by the IMT in the 77th Report);

    3. Task 25 (Use of Force Investigations and Report Responsibility – in partial compliance when most recently assessed by the IMT in the 76th Report);

    4. Task 34 (Stop Data – in partial compliance when most recently assessed by the IMT in the 69th IMT Report); and

    5. Task 45 (Consistency of Discipline – in partial compliance when most recently assessed by the IMT in the 77th Report).

Two of these tasks (Tasks 2 and 25) were in full compliance as recently as January of 2019.

Three other Tasks that came into full compliance prior to the most recent (September 2021) Case Management Conference remain in compliance:

    1. Task 24 (Use of Force Reporting Policy)

    2. Task 30 (Executive Force Review Boards)

    3. Task 41 (Use of a Personnel Assessment System (PAS) and Risk Management)

Plaintiffs' will outline their concerns regarding specific NSA tasks, as well as developments that impact multiple NSA tasks, below:

1

2

## I.   TASK 2 (TIMELINESS STANDARDS AND COMPLIANCE WITH IAD INVESTIGATIONS)

Task 2 requires that the Internal Affairs Department (IAD) of the OPD complete internal investigations in a timely manner.  This task was inactive between 2015 and 2019, before falling out of compliance once again.  The Oakland Police Department has made concerted efforts to bring this task back into full compliance and, after substantial progress on this task in the last year, OPD has fallen just short of the compliance threshold for several reporting periods in a row.

OPD policy requires that "at least 85% of Class I misconduct investigations and at least 85% of Class II misconduct investigations must be completed within 180 days to be considered timely."  Per DGO M-03, Class I offenses "are the most serious allegations of misconduct and, if sustained, shall result in disciplinary action up to and including dismissal and may serve as the basis for criminal prosecution."

The IMT reviewed 65 Class I misconduct cases during the period covered by the 75th IMT Report and determined that just 49 of these cases were completed in a timely manner.  This represents a 75% timely-completion rate, which "demonstrates improvement" (75th IMT Report, page 3) from the 54% completion rate the last time the IMT assessed this Task in the 73rd IMT report.

Of the 101 Class II cases reviewed by the IMT during the period covered by the 75th IMT Report, 85 were in compliance with established timelines. This represents an 82% compliance rate with IAD policy and is barely short of the 85% compliance threshold mandated by the NSA.  This 82% compliance rate for Class II investigations is similar to the previous three reporting periods, when the IMT determined OPD had completed 82%, 82%, and 84% of Class II investigations in a timely manner.

During the most recent Case Management Conference before this Court, OPD personnel stated that they expected to achieve the 85% timely-completion threshold

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

1    mandated by the NSA by the end of calendar year 2021.  Specifically, the George
2    Floyd protests in the summer of 2020 caused a backlog.  As a result, OPD made
3    changes to its IAD due dates which are earlier than the 180-day due dates, to
4    ensure that investigations do not languish until the last minute, and to allow IAD
5    ample time to review and close out cases before the 180 day deadline.

6            Furthermore, OPD also indicated that, in some instances, the Department's
7    failure to meet the 180 day timeliness requirement mandated by the NSA was due
8    to delays by the Community Police Review Agency (CPRA) completing its
9    concurrent investigation.

10           However, in the 76th IMT Report, the IMT found that even if misconduct
11   investigations that were delayed by concurrent CPRA review, as well as others
12   "that were delayed due to tolling/held in abeyance in accordance with one of the
13   provisions of Government Code Section 3304", were removed altogether from
14   equation, OPD still would not meet the 85% timeliness threshold required by Task
15   2. (75th IMT Report, page 3).  In other words, the very explanations OPD provided to
16   the Court in September 2021 for falling short of the 85% timeliness requirement
17   are, when siloed and removed from the math altogether, still not determinative.

18           Plaintiffs' attorneys and the Court have previously commended OPD for
19   making objective progress toward once again achieving compliance with Task 2.
20   Frankly, Plaintiffs' attorneys expected OPD to reattain compliance with this Task 2
21   prior to this Case Management Conference.  Given that OPD was previously in
22   compliance with this task for so long that it became inactive for four years and
23   given that the percent of misconduct investigations completed in a timely manner
24   doubled from under 40% to over 80% in three recent reporting periods, there was
25   good reason for such optimism.  But the fact remains that OPD has not yet
26   surpassed the 85% bar that is required by the NSA.  OPD and IAD leadership must
27   work with the CPRA to ensure that the timeliness deadlines mandated by Task 2
28   are met, and to ensure OPD moves back into full compliance with this Task. There

3

is no reason why these two organizations cannot devise a plan to meet this deadline, particularly when the compliance rate needed for this task is only 85%--- a standard well below that required in most other consent decrees.

## II.     TASK 5 (COMPLAINT PROCEDURES FOR IAD)

OPD is not in full compliance with Task 5, which pertains to Complaint Procedures for the Internal Affairs Division. Task 5 consists of several subtasks, and the IMT has determined that many of these are in compliance including:

- Task 5.1, which requires that when a citizen wishes to file a complaint, the citizen is brought to a supervisor or IAD, or a supervisor is summoned to the scene.

- Task 5.2, which requires that if there is a delay of greater than three hours in supervisory response, the reason for the delay must be documented.

- Task 5.3, which requires that where a complainant refuses to travel to a supervisor, or wait for one, personnel make all reasonable attempts to obtain specific information to assist in investigating the complaint.

- Task 5.4, which requires that specific information be documented on a complaint form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander.

- Task 5.5, which requires that the supervisor or Area Commander notify Communications and forward any pertinent documents to IAD.

On March 23, 2016, the Court issued an Order indicating that irregularities and potential violations of the NSA occurred in IAD investigation 15-0771. The Order noted that the investigation raised issues of accountability and sustainability of compliance.  Since then, the IMT has focused on subtasks 5.15 to 5.19 and subtask 5.21, which address the quality of completed IAD investigations.

The IMT most recently assessed these issues in the 77th IMT Report, reviewing 15 IAD cases that were closed between July 1 and August 31, 2021.

4

Subtasks 5.15 and 5.16 require that OPD gathers all relevant evidence, conducts appropriate follow-up interviews, considers all evidence, makes credibility assessments where feasible, and resolves inconsistent statements. In all of the cases the IMT reviewed during the period covered by the 77th IMT report, the IMT determined that OPD gathered all available relevant evidence and determined that investigators did conduct follow-up interviews where necessary to resolve inconsistencies. OPD also made credibility assessments in seven cases reviewed by the IMT, and the IMT agreed with all these credibility assessments. There were also seven cases where OPD resolved inconsistent statements using body-worn camera recordings and/or recorded phone calls. This is a useful reminder that BWC footage safeguards the public and OPD personnel alike and is critical to sustaining public trust with the Department.

Task 5.17 requires OPD to permanently retain all notes generated and/or received by OPD in their personnel file, and OPD has a "sustained history of 100% compliance with this subtask." (77th IMT Report, p. 6.). This was once again the case during the most recent reporting period evaluated by the IMT.

Tasks 5.18 and 5.19 require, respectively, that OPD "resolve each allegation in a complaint investigation using the preponderance of evidence standard" (5.18) and necessitates "that each allegation of a complaint if identified' be resolved with a disposition of "unfounded", "sustained", "exonerated", "not sustained", or administrative closure (5.19). The IMT did not disagree with any of the formal findings in any of the cases they reviewed during this period. Over the last year, it appears that the IMT has only disagreed with OPD findings in three cases.

In Plaintiffs' September 2021 Case Management Conference Statement, we noted that OPD had received no negative feedback from the IMT regarding the quality of IAD investigations in almost one year. Put another way: from a process standpoint, IAD investigations have been consistently up to the standards mandated by the NSA, and acceptable to the Monitor.

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1    Although there have been a handful of cases where the IMT apparently

2    disagreed with the ultimate finding made by the former Chief, they nevertheless

3    determined that the investigative process leading up to the ultimate disposition was

4    sufficient.  There will be instances where the IMT and OPD command staff come to

5    different conclusions about the disposition of an IA matter when looking at the

6    same set of facts, and it is heartening that even in such instances, the IMT can sign

7    off on the underlying investigative process used by IAD.

8    In light of the foregoing, it appeared that OPD was closing in on compliance

9    with Task 5, and Plaintiffs' attorneys privately encouraged the IMT to revisit its

10   "deferred" compliance status determination on this Task.   However, on January 14,

11   2021, this Court issued an Order regarding Internal Affairs Case No. 21-0028

12   involving "serious matters that go to the heart of this case – the culture of the

13   Oakland Police Department and the efficacy of internal oversight mechanisms

14   within the Department, which were the primary reason for the imposition of the

15   NSA in the first place." (Dkt. 1419, page 1).  This was connected to the revelation

16   that current and former OPD employees, as well as other members of Bay Area law

17   enforcement organizations, were active participants on a racist, sexist Instagram

18   page with the online handle "@crimereductionteam" that was discussed at length

19   during the previous Case Management Conference.  Many of the

20   "@crimereductionteam" posts mocked OPD policies regarding use of force reporting

21   and police brutality, while others were overtly racist and misogynistic.  Several

22   posts were incorporated into Plaintiffs' portion of the February 2021 CMC

23   Statement (see Dkt. 1423, pp. 6-12.)

24   The firm of Clarence Dyer & Cohen LLP was retained by the City of Oakland

25   to investigate this matter and deliver a Report to Compliance Director Robert

26   Warshaw.  This report was filed in the docket In September 2021 (Dkt. 1474-1,

27   09/20/21)

28   The report condemns OPD's "anemic response" (Dkt. 1474, p. 25) to the

6

1 "@crimereductionteam" Instagram page. Specifically, the outside investigation…

2
3
4
5
6
7

> "revealed that OPD as a department took much too long to recognize
> the bigoted and bigoted and corrosive nature of the
> @crimereductionteam page. At best, this failure signals an absence of
> processes within the Department to ensure a safe and discrimination-
> free workplace committed to Court-ordered reforms. At worst, it
> bespeaks a culture so hostile to women and minorities, and so wedded
> to a discredited model of policing, that it cannot identify discriminatory
> and anti-reform messaging when it sees it." (Dkt. 1474, p. 18)

8        Based on public statements from the City and the public Conclusions

9 and Recommendation report, several OPD personnel were sustained for

10 Manual of Rule violations and subsequently disciplined. This Case

11 Management Conference Statement is not the appropriate venue for

12 Plaintiffs' attorneys to comment on specific findings and/or discipline, which

13 remain confidential. However, Mayor Schaaf did release a press release on

14 September 17, 2021, that stated in effect that there were no terminations in

15 the Instagram case:

16
17
18
19

> "The nine officers who were found to have violated department policy
> ranged from officer to Lieutenant. The discipline issued to them
> ranged from a 3-day unpaid suspension to a 24-day unpaid
> suspension."

20        In other words, there were no terminations even though the Instagram case

21 was covered up by numerous OPD personnel from September 23, 2020 to January

22 2021. When the Instagram matter was finally exposed, it was not by the OPD, but

23 by the efforts of reporter Darwin Bond Graham, and one of the Plaintiffs' Attorneys.

24 Only when OPD became aware that individuals outside the OPD were aware of the

25 scandal, did they take efforts to implement the IAB process. And even then, there

26 were no individuals terminated despite the massive violation by an unknown yet

27 significant number of OPD personnel.

28

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1  Plaintiffs' attorneys agree with the Report's authors that "the issues surfaced
2  by this investigation go beyond the conduct of individual officers to the culture of
3  the Department at large."  (Dkt. 1474, p. 19)

4  Every sworn member of OPD, including the then-Chief and the entirety of the
5  command staff, was on notice that this Instagram page existed no later than
6  September 23, 2020, when the Department-wide email was sent by an OPD Intel
7  sergeant.   Nevertheless, "not a single OPD member identified or escalated the
8  patently objectionable nature" of this Instagram page until Plaintiffs' attorneys
9  contact the then-Chief in January 2021.  (Dkt. 1474, p. 19). Further:

10  There is no satisfactory explanation for this collective failure. It was
11  not simply a failure to report; OPD officers uniformly acknowledged
    that if they encountered an MOR violation or a breach of AI 71 [the
12  City of Oakland's antidiscrimination policy], they were duty-bound to
    report it. The problem was a failure to detect – that is, a failure to see
13  that much of the content on the @crimereductionteam Instagram page
14  was inappropriate and offensive. This failure occurred at every level of
    OPD. An untold number of OPD members viewed memes from the
15  page that were unambiguously sexist, racist, or anti-reform yet did
    nothing about it. And the entire Intel unit, which evaluated the page
16  from the myopic perspective of officer safety, proved unable to see the
17  page for what it really was: a fount of offensive and degrading
    imagery... much of the content on the @crimereductionteam Instagram
18  page took aim at measures implemented at OPD to curb and monitor
    the use of force. Several memes celebrated not just violence, but
19  violence committed in the face of policies designed to restrict it. The
20  failure of anyone at OPD to flag these memes, or to recognize the
    extent to which they undermined years of efforts to comply with the
21  NSA, suggests that the views expressed by the memes remain
22  alarmingly widespread. (Dkt. 1474, pp. 19-20).

23

24  Plaintiffs' attorneys agree with this assessment.  It is obvious that
25  these Instagram posts reflect long running cultural rot that had gone
26  unchecked by the highest levels of the OPD.  We can only hope that the new
27  Chief will send an unambiguous message that this sort of behavior will no
28  longer be tolerated.  Such a message starts with severe discipline, and that

8
JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

was not done in this case.

### III.     TASKS 24 (USE OF FORCE REPORTING POLICY) & 25 (USE OF FORCE INVESTIGATIONS AND REPORT RESPONSIBILITY)

OPD had been in compliance with Tasks 24 (Use of Force Reporting Policy) and 25 (Use of Force Investigations and Report Responsibility) of the NSA since 2015. In November 2018, this Court reactivated these Tasks as a result of Plaintiffs' and the Monitoring Team's concerns about systematic underreporting of weaponless defense techniques and incidents related to the pointing of firearms.  During the period covered by the 74th IMT Report, OPD came back into compliance with Task 24.  Tasks 24 and 25 were most recently assessed by the IMT in their 76th IMT Report.

During the period covered by the 76th IMT Report, the IMT reviewed 69 cases related to Level 3 and 4 Use of Force Reports, all of which occurred after the publication of Special Order 9196, which clarified use of force policies regarding the pointing of a firearm. The OPD also added a new force type (Type 32) which includes "overcoming resistance" of a person during arrest or detention.  Such force includes moving subjects who had gone limp, guiding and/or pushing subjects into patrol vehicles, using restraining devices, removing people who are holding on to fixed objects, and forcibly handcuffing subjects who are resisting arrest.  Plaintiffs' attorneys previously commended OPD for articulating this Use of Force type.  To our knowledge, no other major-city police department that has taken steps to ensure that all the above-described uses of force must always be documented and codified this into their Use of Force policy.

Nevertheless, the IMT noted that it "did not see continuing improvement for this (76th) report." (76th IMT Report, p. 5). Specifically, the IMT noted "numerous instances" where OPD personnel "did not identify themselves as police officers when contacting members of the public and there was time to do so." (76th IMT Report, p. 6).  This is simply unacceptable, and corrective action must be taken against officers

1   who fail to properly identify themselves to the public they serve.  The IMT also

2   found five instances where a Type 32 Use of Force was not properly identified or

3   reported. (76th IMT Report, p. 7)

4        The 76th IMT Report also encompasses a review of 69 Use of Force for the

5   period from November 1, 2020 to January 31, 2021.  In 22% of the reports received

6   by the IMT (representing 15 discrete instances), they identified concerns with body-

7   worn camera activation.  Eight of the 15 instances found by the IMT were not

8   identified by the reporting supervisors, and none of these involved documented

9   BWC malfunctions and/or BWCs that were deactivated during a physical struggle.

10  Of the eight instances not identified by the reporting supervisor, a further six were

11  also not identified by the reviewing supervisor.

12       Plaintiffs' attorneys are at a loss to comprehend this ongoing problem.  For

13  example, the 74th IMT Report, published in August 2021, found 23 instances (in a

14  review of 109 Use of Force Reports) where a body-worn camera had not been

15  properly activated, all of them late activations.  In more than half of these instances

16  (13 of 23), the "supervisor either failed to identify and address the late activation at

17  the time it occurred or failed to ensure that appropriate follow-up was conducted

18  once it was discovered." (74th IMT Report, p. 7). The failure of supervisors to

19  consistently identify and address these violations is particularly concerning. It

20  undermines officer safety, as well as public trust and evidence collection.  And it

21  should not be written-off as a "technical" problem or a "malfunction".  Recall one of

22  the memes hosted by the "@crimereductionteam" Instagram page, and liked by OPD

23  personnel:

24  ///

25

26

27

28

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO



       The suggestion that body-worn cameras (BWCs) should not be worn and/or activated during crowd control operation is a violation of OPD Departmental Order I-15, which states that "during crowd control, protest, or mass arrest incidents members shall use their PDRD consistent with this policy unless otherwise directed by the Incident Commander." (OPD GO I-15, p. 4).  Proactively turning off cameras precisely because where there is "no face, [there is no Internal Affairs] case" underlies the gravity of these offenses and testifies to a culture of impunity among at least some officers who apparently choose to deactivate BWCs in volatile situations where force is likely to be used.  It is clear that at least some BWC-related failures may be intentional.

       There is simply no acceptable explanation for this problem.  Command staff, including Chief Armstrong, have assured Plaintiffs' attorneys that this is a very high priority, and Supervisory Note Files (SNFs) and discipline have been issued to officers and supervisors who fail to identify and address BWC-related shortcomings. If this does not remedy the problem, command staff must initiate internal investigations against repeat offenders.

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1   This issue is highlighted in every single IMT Report that covers Tasks 24 and
2   25, and were also the focus of a 2019 Report by OPD's own Office of the Inspector
3   General (OIG)  titled "Special Report: An Assessment of the Oakland Police
4   Department's Use of Force Reporting, Usage of Portable Digital Recording Devices,
5   and Supervision of Incidents During Arrests for Offenses Where There is a
6   Significant Chance That force Would Be Used."[1]  It is incumbent on OPD to
7   immediately address these issues since they have been on notice about such
8   problems for years.

9   OPD has proposed transitioning to a new and/or modified BWC systems that
10   would allow additional ways to ensure proper, timely activations, including
11   automatic activation when leaving patrol vehicles.  In October of 2021, OPD advised
12   the IMT and Plaintiffs' attorneys that the budget proposal and contract for such an
13   upgrade has been approved.  This is welcome news since officers formerly
14   confronted with emergency situations, and who turn on the BWC a few seconds late,
15   will not be burdened by discipline for actions otherwise in good faith.

16   Nevertheless, Plaintiffs' attorneys concur with the IMT's pointed assessment
17   that "it remains the responsibility of supervisors to identify and address failures to
18   activate BWCs when they occur." (76th IMT Report, p. 8). Finally, the IMT has
19   apparently requested a list of all instances where OPD personnel failed to properly
20   activate their BWCs that resulted in remedial action since 2019.  Plaintiffs'
21   attorneys look forward to reviewing the IMT's assessment of this enduring problem.
22   At the same time, Plaintiffs' attorneys hope that there is a distinction between
23   those officers who activate their camera a few seconds late **in good faith** (e.g. they
24   are confronted with an emergency threat to officer safety and/or the safety of others
25   and fail to activate their camera because they are otherwise consumed with a bona
26   fide emergency) and those who are clearly not using their camera to cover up
27   misconduct or some part of an incident where the suspect demonstrates he or she is

28   [1] http://www2.oaklandnet.com/oakca1/groups/police/documents/report/oak072446.pdf

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1  not involved in criminal activity.

2      Plaintiffs' attorneys remain in agreement with the IMT that OPD's policy

3  now meets the standard required by the NSA, and are therefore in compliance with

4  Task 24 of the NSA.

5      Task 25 remains in only partial compliance for the following reasons:

6      25.1 The IMT reports that while there has been a decline in the use of

7  boilerplate language, they continue to "find numerous instances where officers

8  justify their uses of force "based on my training and experience" without any further

9  information or explanation as to what training and experience they are referring

10  to." (76th IMT Report, p 14.)

11      25.2 The IMT continues to harbor concerns about the preparation and review

12  of UOF reports by OPD supervisors and "we continue to find instances where OPD

13  supervisors do not identify deficiencies in officer reporting and fail to identify or

14  address MOR violations". (76th IMT Report, p 14.)

15      The IMT concludes their most recent report on Task 25 by stating: "We had

16  hoped to see ongoing improvement in the investigation of force and required

17  documentation. Unfortunately, that was not the case for the investigations we

18  reviewed for this report." (76th IMT Report, p. 16) This is unfortunate.  It appears

19  that OPD is close to compliance with this Task, and OPD had been making tangible

20  progress toward compliance in previous reporting periods.  Plaintiffs' attorneys do

21  not understand why recent progress has not continued and encourage the

22  Department to take the final steps necessary to bring OPD into compliance with

23  Task 25.

24  **IV.   TASK 34 (STOP DATA/VEHICLE STOPS, FIELD INVESTIGATIONS**
          **AND DETENTIONS)**

25      The IMT has not formally assessed Task 34 since its 69th IMT Report,

26  published in July of 2020.  Plaintiff's attorneys discussed OPD's remarkable

27  progress on this Task in our most recent Case Management Conference Statement

28

1   and stand by our assessment that OPD appears to be on the cusp of compliance

2   with both the spirit and the letter of this Task.  Specifically, OPD has greatly

3   reduced the racial disparities in discretionary stops by Oakland Police officers,

4   including a 74% reduction in the total number of African American stops (from

5   22,506 to 5,780) and a 60% reduction in the total number of Hispanic stops (from

6   7,504 to 2,991) in the last five years.  It remains true that African Americans

7   continue to be stopped at a higher rate than other Oaklanders, but the trend-line is

8   undeniably positive, and the concrete data indicates that OPD is working to address

9   some of the systemic biases within the Department.

10      Plaintiffs' look forward to the IMT's next assessment of Task 34, and hope

11   that OPD will attain compliance with this Task. At the same time, Plaintiffs'

12   attorneys are mindful that OPD's

13   racial bias was the reason for this case and, even if OPD attains compliance with

14   this Task and the entire NSA, they must continue to be vigilant so that people of

15   color feel that they are being treated fairly by the Oakland Police Department.

16  ## V.    TASK 41 (USE OF PERSONNEL ASSESSMENT SYSTEM AND RISK MANAGEMENT)

17
18      Task 41 pertains to the Use of a Personnel Assessment System (PAS) and

19   Risk Management and requires OPD to develop a risk management system to audit

20   the performance of specific members, employees, supervisors, managers, units, and

21   the Department as a whole.  The IMT's most recent review of Task 41 determined

22   that OPD remains in compliance, but notes that "while we find the Department in

23   compliance, we urge the agency to understand the nexus between this Task and the

     broader, pending risk management policy." (Draft 77th IMT Report, p. 14)

24      Plaintiffs' attorneys have attended many of the Risk Management Meetings,

25   including Area meetings and Department-wide meetings, and remain impressed by

26   the use of data to discuss stop data, possible patterns of bias in stops, complaints,

27   the ratio of intelligence-based and non-intelligence-based stops, pursuits, and,

28

JOINT CASE MANAGEMENT STATEMENT                          Case No. 00-cv-4599 WHO

1    perhaps most crucially, officers who are under supervisory monitoring and/or

2    intervention.  It is clear that there is real institutional buy-in to this process, which

3    is reinforced by the presence of command-level officers who oversee drilldowns into

4    specific officers and squads.

5         OPD is currently drafting a new policy to clarify the goals and practices of

6    Risk Management at OPD.  As Plaintiffs' attorneys have said many times

7    previously, it is critically important that risk management process be codified via a

8    general order and/or training bulletin that details what constitutes a Risk

9    Management Meeting; how often there should be Risk Management meetings at

10   both the City- wide level and below; and that outlines the roles it demands of

11   participants and subjects. Plaintiffs' attorneys recommend that it includes specific

12   requirements that at least one command-level officers attend Area-level RMMs, and

13   that focused drilldowns into problematic officers and/or squads continue.  Plaintiffs'

14   attorneys also concur with the policy recommendations set out by the IMT in their

15   77th Report, including:

16        • A clear definition of risk and risk management, that "set expectations

17          and provide a foundation for a systematic process that is not simply ad

18          hoc supervision, and that is also not confused with any form of

19          discipline." (77th IMT Report, p. 13)

20        • Centering risk management in the officer recruitment process, so that

21          officers recognize it as an ongoing development mechanism from their

22          outset at OPD.

23        • Emphasizing the philosophical underpinnings of risk management,

24          explaining the underlying data used in the process, and emphasizing

25          expectations regarding the risk management roles.

26        • Regular management reviews of the risk management process and its

27          effectiveness, in addition to Command reviews of risk-related concerns

28          as called for by the NSA.

JOINT CASE MANAGEMENT STATEMENT                              Case No. 00-cv-4599 WHO

1    • Training regarding the risk management process, Risk Management

2       Meeting (RMMS) structures, and the PAS process.

3

4    Plaintiffs' agree with all the above suggestions made by the IMT.  All parties

5  and stakeholders agree that the risk management process has been an unequivocal

6  force for positive change at OPD, and it is time to institutionalize the robust risk

7  management process that currently exists into permanent OPD policy.

8    There was a review of the OPD's draft of a Risk Management Meeting

9  protocol on December 13, 2021.  The meeting lasted an hour and was attended by

10 OPD representatives, the Monitoring Team, and Plaintiffs' Attorneys.  Most, if not

11 all, of the IMT's suggestions were incorporated into the document in some form.

12 However, the document is still a work in progress, and we hope for a substantive

13 update at the CMC Conference in January, if not earlier.

14 **VI.   TASK 45 (CONSISTENCY OF DISCIPLINE POLICY)**

15    OPD is in partial compliance with Task 45, which requires that discipline is

16 imposed in a fair and consistent manner.  The Hillard Heintze "Police Discipline

17 Disparity Study" (Disparity Study) has been the major locus of Plaintiffs' attorneys

18 Task 45 discussions since it was issued in April 2020.

19    This report determined that "black sworn employees were more likely to have

20 their allegations result in a sustained finding than other employees." Specifically,

21 this report found that:

22    • "Over the five-year time period, black employees were 37% more

23       likely to have an allegation against them result in a sustained

24       finding." (Disparity Study, p. 10).

25    • For Class One complaints (the most serious complaints), black

26       individuals are almost 39% more likely to have the complaint

27       sustained, while controlling for gender and years of service."

28       (Disparity Study, p. 10).

16

- The IAD policy allowed sergeants to be "fact finders and adjudicators has the potential to lessen an investigator's neutrality" and that this system "is not consistent with promising practices used in departments similar in size to Oakland." (Disparity Study, p. 11)
- "Twice as many black trainees were released [from OPDs Academy] than white or Hispanic trainees. (Disparity Study, p. 41)
- FTO (Field Officer Training) completion rates for black and Asian trainees lagged behind those for Hispanic and white trainees." (Disparity Study, p. 42)
- Just 18.68% of sworn respondents believe that OPD's disciplinary process is fair, while 81.32 percent of respondents disagreed with the statement "OPD's disciplinary process is fair." (Disparity Study, p. 17)

The IMT's most recent Report reviewed 40 cases with sustained findings that were approved between May and August of 2021, to determine if the discipline imposed was fair and consistent. In all cases reviewed by the IMT, the proposed discipline fell within the guidelines of OPD's Discipline Matrix unless otherwise documented in writing. Further, the IMT reviewed record for eight *Skelly* hearings held during these months and found that they "contained adequate justification for the results documented." (77th IMT Report, p. 17)

At the time the above-excerpted Hillard Heintze findings were published, Plaintiffs' attorneys described them as a violation of NSA Task 45, which requires consistency of discipline. Judge Orrick subsequently described "racial disparities" as the "hardest" issue, as well as the issue that "started this case." (09.22.20 WHO CMC Transcript, p. 49), and City of Oakland and OPD leadership promised to address the disparities uncovered by the Hillard Heintze Report. The Disparity

1  Study concluded with 14 recommendations that it urged the OPD to adopt, and

2  OPD reports that all but one of these recommendations have now been

3  implemented, with each of these recommendations codified in OPD policy and

4  procedure.

5      The Department has also engaged Stanford University's SPARQ (Social

6  Psychological Answers to Real-world Problems) team to provide Project Reset: A

7  Cultural Change training program.  Per OPD, this program will "teach officers

8  about culture, empower them to decide how they want to serve, create space to

9  learn about and discuss the history of race and policing, and invite officers to

10  propose concrete policy changes."

11      Finally, although Plaintiffs' attorneys recognize the danger in creating

12  mathematical formulas as to how long an officer can be on monitoring without

13  improving his or her performance, we agree with former Chief Joshi that officers

14  cannot "live" on monitoring for indefinite periods of time.

15                          **CONCLUSION**

16      When Chief Armstrong was sworn-in immediately prior to our last Case

17  Management Conference before this Court, he promised: "Under my leadership,

18  OPD will have a laser focus on getting each [NSA] task in compliance, while

19  practicing constitutional policing, fair and unbiased treatment of our community.

20  This reflects the strong values of the City of Oakland. Moving the Department into

21  compliance with the Settlement Agreement is one of my top priorities.  But in order

22  to achieve that goal, it requires a cultural change within the organization. And that

23  change starts today."[2]

24      Almost one year into his tenure, Plaintiffs' attorneys can report that the

25  Chief's actions, and those of the personnel he oversees, reflect this pledge.

26  However, where it previously appeared that OPD was nearing full compliance with

27  _____

28  [2] https://sanfrancisco.cbslocal.com/2021/02/08/oakland-native-leronne-armstrong-sworn-in-as-chief-of-police-in-emotional-ceremony/

                              18

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1   several outstanding Tasks in the fall, that momentum has stalled on some fronts.

2   The IMT has expressed "dissatisfaction" (76th IMT Report, p. 21) with use of force

3   investigation, particularly in the realm of timeliness, body-worn camera activation,

4   and supervisory inattention.  The IMT recently warned that they are likely to "fully

5   reevaluate our compliance findings for both Tasks 24 and 25" absent measurable

6   progress in the remediation of these deficiencies. (76th IMT Report, p. 21).

7       Plaintiffs' attorneys most recent Case Management Conference Statement

8   lauded Oakland for having among the lowest rate of police shootings in a survey of

9   39 police departments by the criminal justice reform organization Campaign Zero.

10  (This group also determined that Oakland did the most to reduce black-white arrest

11  disparities in the period between 2013-2019.[3]).

12      December 7, 2021 marked 21 years since the "Riders" case was filed. January

13  2022 will mark 18 years since the NSA was signed. The Oakland Police Department

14  has shown significant improvement since this case was filed. However, the recent

15  Instagram scandal has shown there are still officers in this Department who are

16  hostile to both the Negotiated Settlement Agreement and the principles set forth in

17  the agreement. The current command staff has an opportunity to push OPD over

18  the goal line and attain compliance with the NSA.  If they succeed, and the

19  Department succeeds, the personnel who are responsible for this success will be

20  remembered long after the NSA is over. OPD should seize this opportunity to be

21  remembered by current and future residents of Oakland as having accomplished

22  something that has eluded a long line of its predecessors.

23

24

25

26

27

28  _____
[3](https://public.tableau.com/app/profile/ssinyangwe/viz/PoliceScorecard/DrugArrestDisparities)

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1

**THE CITY'S STATEMENT**

2

**OVERVIEW**

3        On December 13, 2021, the Oakland Police Commission announced the City's

4   hiring of Michelle Phillips as the City's first ever "Independent Inspector General."

5   https://www.oaklandca.gov/news/2021/oakland-police-commission-announces-

6   michelle-phillips-as-oaklands-new-inspector-general (last visited on Dec. 17, 2021).

7   Phillips will join the City in January 2022 from Baltimore, where Phillips served as

8   the Deputy Inspector General of Investigations. Pursuant to City Charter

9   amendment Measure S1 passed in 2020, among other responsibilities, the Police

10  Commission's Independent Inspector General "shall audit the Department's

11  compliance with the [ ] tasks described in the Settlement Agreement in [this case],

12  and make recommendations to the Department, the Commission, and the City

13  Council based on its audit(s), even after the Settlement Agreement expires."

14  Oakland City Charter, sec. 604(f)(5). Thus, the City Charter now includes an

15  enduring mandate that an independent inspector outside of the Department use the

16  NSA as a roadmap for ongoing audits. As the Department will continue to operate

17  and evolve in accordance with the spirit of the NSA, adding an independent

18  inspector general is an important milestone in the City's efforts to sustain

19  Department oversight independent from the Court.

20        In this status report, the Department and City leadership update the Court

21  on the following: (1) the Department's progress implementing the Instagram

22  investigation recommendations, (2) understanding and reducing racial disparities in

23  stops (Task 34), (3) internal affairs timelines (Task 2), (4) internal affairs complaint

24  procedures (Task 5), (5) force investigations and report responsibility (Task 25), (6)

25  consistency in discipline policy (Task 45), (7) recruiting and improving Department

26  diversity, (8) Bureau of Risk Management, and (9) policy status updates.

27  ///

28

JOINT CASE MANAGEMENT STATEMENT                                Case No. 00-cv-4599 WHO

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.   THE DEPARTMENT'S PROGRESS IMPLEMENTING INSTAGRAM INVESTIGATION **RECOMMENDATIONS**

City and Department leadership find it completely unacceptable that the Department took months longer than it should have to recognize the @crimereductionteam Instagram account's obviously bigoted and corrosive[4] nature. It is painful to leadership to register that this "signals an absence of processes to ensure a safe and discrimination-free workplace committed to Court-ordered reforms." *See* Clarence Dyer & Cohen LLP, Conclusions and Recommendations, @crimereductionteam Instagram Page, Oakland Police Department, Sept. 5, 2021, 1474-1 at 16 (Sep. 20, 2021). The City cannot disagree that is a reasonable conclusion regarding what this *signals*. We hope that the reality is actually better than what this signals, however, and that the account itself is indicative of a backlash against the Department's follow-through on its commitment to culture change. We have worked hard to put in place safeguards and inclusive policies and practices that City and Department leadership proudly encourage and support. We are known throughout the country as champions of police reform and sought out for guidance by other reform-minded agencies. Precisely because that is who we are, City and Department leadership have been and will continue to actively assess what these findings suggest and where they may lead us to better serve our diverse City. We will face our failures with eyes open wide so we do not miss any opportunity to prevent this from ever occurring again, as City leadership publicly articulated in a press release upon our receipt of the independent investigation report the City commissioned.

The Department takes to heart the Monitoring Team's advice that internal affairs (IA) must be "assertive in its detection of individual or group misconduct – as should have been the case in the recent Instagram matter." In response to the

---

[4] "Bigoted and corrosive" are the words used by Clarence Dyer & Cohen LLP, the law firm that investigated the matter, and we agree these are the best words to describe the nature of the account.

21

investigator's recommendations, the Department has begun implementing the

measures in the table below.

| INSTAGRAM INVESTIGATION RECOMMENDATIONS | CITY IMPLEMENTATION IN PROGRESS |
|---|---|
| ●Adopt a Department-specific anti-discrimination policy that incorporates key concepts from the City's Anti-Discrimination/Non-Harassment Policy<br><br>●Devise and implement an effective social media policy<br><br>●Implement clear rules and regulations concerning the use of personal devices, private text communications, and ephemeral media in the conduct of police work | ●Department General Order (DGO) D-20, Anti-Discrimination and Anti-Harassment Policy (new policy in development)<br><br>●DGO D-18, Member Social Media Use Policy (new policy in development, governs personal social media use)<br><br>●DGO I-19, Cell Phones (update to existing policy will govern work-related social media use)<br><br>●Audits of work cell phones (Department OIG or similar will have immediate capability and risk of random audit should be anticipated<br><br>●Focus groups to determine work device use policies will meet investigative needs (e.g., use of social media applications on work cell phone, impact of audits on informant confidentiality)<br><br>●Project Reset: A Police Cultural Change Workshop Series (developed by Stanford and tailored for OPD)<br><br>●Chief's Training Series:  Outside Experts |

*Table 1*

Led by Chief Armstrong, the Department will not tolerate bigotry,

discrimination, or Department members who remain silent when encountering

either. Over a period of four days in October and November, Chief Armstrong met

with all Department sergeants to discuss the Instagram investigation findings and

emphasize that the Department will not tolerate this type of behavior, or failure to

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

report such conduct. Chief Armstrong also covered Department expectations, leadership, and attention to detail. In meetings on two subsequent days, Chief Armstrong met with lieutenants and acting lieutenants to discuss the same topics. Finally, Chief Armstrong addressed these topics with the 186th Academy class in mid-November. He talked about the responsible use of social media and underscored that certain behavior will not be tolerated by the Department. The Department will continue to educate its members about the Instagram investigation, the Department's related failures, and the importance of proactive detection and reporting of potential misconduct.

## II.   THE CITY'S ONGOING EFFORTS TO REDUCE RACIAL DISPARITIES IN STOPS—TASK 34

The City remains mindful in all of its work toward NSA compliance that at the heart of this case is racial disparity. The Department's persistent vigilance in looking for and constantly reexamining practices that may have disparate impacts or unintentionally foster potential bias continues to correspond to positive, sustained improvement.

For a second consecutive quarter, the Department maintained its lowest documented non-dispatch stop rate for African Americans. The Department posted a 47% stop rate for African Americans for the second and third quarters (April-September) of 2021. This year marks the first time that the rate has dropped below 50%. The annual average non-dispatch stop rate for African Americans from 2014 to 2020 was greater than 56%, with a quarterly high of 66% in 2016. *See* Fig. 1, below, *Non-Dispatch Stop Percentages by Race, 2014 to Sept. 2021.*

///

JOINT CASE MANAGEMENT STATEMENT                              Case No. 00-cv-4599 WHO

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15



*Fig. 1*

16

17    For context, the total number of stops continues to decline, such that the

18  absolute number of interactions is a fraction of what it was six years ago. *See* Fig.

19  1A, below, *Non-Dispatch Stop Numbers by Race, 2014 to Sept. 2021.*

///

20

21

22

23

24

25

26

27

28

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1

2

3

4

5

6

7

8

9

10

11

12

13



| | 2014 | 2015 | 2016 | 2017 | 2018* | 2019 | 2020 | 2021 Q1-Q3 |
|---|---|---|---|---|---|---|---|---|
| Afr American | 19,061 | 22,506 | 20,410 | 19,784 | 10,924 | 7,517 | 6,189 | 2,399 |
| Hispanic | 6,087 | 7,504 | 6,685 | 7,047 | 4,492 | 3,809 | 3,131 | 1,496 |
| White | 4,622 | 4,335 | 3,318 | 2,835 | 2,282 | 1,701 | 1,323 | 415 |
| Asian | 2,320 | 2,484 | 1,667 | 1,588 | 1,374 | 991 | 773 | 310 |
| Other | 1,168 | 1,190 | 1,061 | 1,152 | 899 | 627 | 507 | 209 |
| Grand Total | 33,258 | 38,019 | 33,141 | 32,406 | 19,971 | 14,645 | 11,923 | 4,829 |

14

*Fig. 1A*

15

16      The Department's sustained decrease in its African American stop rate

17 correlates with (1) its continued reduction in the percentage of its stops that are

18 non-dispatch stops, and (2) its increase in the percentage of those non-dispatch

19 stops that are intelligence-led (intel-led).[5] *See* Table 2, below, *Monthly Risk Analysis*

20 *Report—Citywide, Through Oct. 31, 2021.*

*///*

21

22

23

24

25

26  [5] Intelligence-led policing means requiring officers to have some nexus to criminal
activity before they effect stops of vehicles or people. *Id.* at 21:19-23. Intel-led stops
27 assist officers in more effectively contact the relatively few people who are causing
the most harm in our neighborhoods. Non-intel-led, non-dispatch stops are typically
28 the types of stops where police officers exercise the most discretion.

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

## Monthly Risk Analysis Report – Citywide
### Through October 31, 2021

| | Apr-Sep 2021 Avg | Oct 2021 | % Change | YTD 2020 | YTD 2021 | % Change |
|---|---|---|---|---|---|---|
| **Stops** | | | | | | |
| Dispatch Stops | 697.2 | 559 | -20% | 8,742 | 6,813 | -22% |
| Non-Dispatch Stops | 546.2 | 257 | -53% | 10,678 | 5,086 | -52% |
| % Intel Led | 38% | 50% | +12% | 36% | 41% | +5% |
| % Non-Intel Led African American | 43% | 43% | 0% | 47% | 43% | -4% |
| % Non-Intel Led Hispanic | 34% | 33% | -1% | 29% | 33% | +4% |
| % Non-Intel Led Traffic Stops | 84% | 74% | -10% | 80% | 83% | +3% |
| Total Stops | 1,243.3 | 816 | -34% | 19,420 | 11,899 | -39% |

*Table 2*

In addition to a reduction in racial disparity in stop rates, recent data reflects more equitable outcomes following the Department's cultural shift in stop expectations and direction.[6] In 2020, 1 in every 3.3 African Americans who were neither arrested nor cited at the conclusion of a stop were searched and handcuffed compared to 1 in every 3.7 whites under similar circumstances. *See 2020 Annual Stop Data Report*, https://www.oaklandca.gov/resources/stop-data (last visited Dec. 21, 2021) (written analysis to accompany source data is forthcoming). This reflects a significant reduction in racial disparity found in a similar analysis of 2014-2015 stop data. Hetey, R.C., Monin, B., Maitreyi, A., & Eberhardt, J.L., *Data for Change* (2016), available at https://sparq.stanford.edu/ (last visited Dec. 16, 2021). Department data from 2014-2015 showed that 1 in 4 African Americans were searched and handcuffed by the time a stop concluded while the same was true for only 1 in 15 persons described as white. *Id.*

The reduction in racial disparities and increase in more equitable outcomes

---

[6] These changes in stop volume, reductions in disparity, and more equitable treatment correspond with the Department's intentional focus on intel-led and precision-based stops. Precision-based policing identifies specific neighborhoods or problem locations, usually with community input, which influences enforcement or problem-solving activities. As a result, neighborhood priorities are addressed more efficiently, and the stop activity is better focused and reasoned. Stopping vehicles for dangerous moving violations at a specific location or for a specific purpose is an example of such precision.

26

1  follows the Department's intentional focus to effect such change by employing

2  practices, providing training and direction Department-wide, and holding the

3  Department accountable at every level to the resulting data via routine review of

4  the data, including during Risk Management Meetings. The data manager has

5  expanded the accessibility of additional measures for ease of ongoing routine

6  Department review, including data on stop outcomes (searches, handcuffing, and

7  arrest), "valuable additions to the available risk-related data, particularly as they

8  support analysis of potential racial disparities." *See* Dkt. 1494 at 13, *Seventy-*

9  *Seventh Report* (discussing continued compliance with and further progress on Task

10  41).

11      As the Department works to continue to reduce racial disparity in stops, a

12  natural question arises: what is the appropriate benchmark for the Department to

13  measure its stop rates against? The answer is elusive. When seeking to analyze

14  potential disparities, "[t]here is no consensus in the academic literature about which

15  benchmarks or other factors are the most appropriate to take into account." Hetey,

16  *supra*, at 31. Selecting benchmarks or other factors for analyses can be a fairly

17  contentious issue. *Id.* at 32. The focus of one or more factors tends to ignore the role

18  that other factors play in who commits crimes and where, and why officers stop and

19  arrest certain individuals more than others. *See id.* at 32 n.49. These factors may

20  include, for example, crime rates, socioeconomic data (particularly percent in

21  poverty), types of stops (dispatch/non-dispatch, intel-led/non intel-led), and

22  population in an area during the day versus night. *See id.* at 61. Many researchers

23  start with an examination of local population demographics. *Id.* at 32.

24  But this assumes that individuals are stopped and arrested where they live. The

25  Department, led by its data manager, set out to test that assumption to determine

26  the usefulness of population data as a benchmark.

27      To test whether this assumption is true in Oakland, an analysis of non-

28  dispatch, non-intelligence led stops was conducted. Non-dispatch, non-intelligence

led stops were selected because these types of stops have the most potential for bias. While all stops are made with a legal justification, dispatch stops are based on 911 calls for service and intelligence led stops are informed by additional information such as daily bulletins, civilian notifications, undercover and/or surveillance direction, and investigative follow-up. All non-dispatch, non-intelligence led stops are made based on at least one of the following legal justifications: traffic violation, reasonable suspicion, probable cause, community caretaking, known probation/parole, consensual encounter, truant; however, we acknowledge there is some room for discretion on the part of the officer and this is where bias can occur.

The beat[7] of each stop and the home address of each person stopped were already present in stop data. To conduct the analysis, home addresses were mapped and joined to the beat map to easily identify the beat where each person stopped lived, if residents of the City.[8]

Overall, 99.9% (7,367/7,376) of stops had a beat listed. Of these stops, 65% (4,817) had the home address city listed as Oakland, 30% (2,204) had a home address in another city, and 5% (346) of stops had no home address information listed. What is surprising in these overall numbers is the percentage of stops that involve individuals from other cities.

At the beat level, only 11% (775) of stops occurred in the beat where the individual lived. In many of the beats, this represented fewer than 10 people. At the area level,[9] the percentage increased to 32% (2,391); however, a significant percentage of stops in each area, between 22-47%, still involved individuals who live outside of Oakland. *See* Table 3, below.

---

[7] Beats are smaller territorial divisions throughout the City and officers are often assigned to patrol a particular beat.

[8] We understand the efficacy of the analysis to some extent depends on whether the officer entered the correct beat and whether, when identification was used to obtain an address, the identification displayed the person's current address.

[9] The Department is organized into five geographic areas and provides day-to-day police services through these divisions.

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

**2020 Non-Dispatch, Non-Intel Stops by Area**

|  | % Same Area | % Diff Area Oakland | % Oakland Not Mapped | % Different City | % No City Info | Total |
|---|---|---|---|---|---|---|
| Area 1 | 21%(247) | 25%(296) | 5%(59) | 42%(493) | 6%(76) | 1,171 |
| Area 2 | 23%(195) | 25%(208) | 2%(20) | 47%(391) | 3%(21) | 835 |
| Area 3 | 26%(295) | 33%(374) | 5%(57) | 31%(361) | 5%(61) | 1,148 |
| Area 4 | 35%(704) | 32%(646) | 8%(158) | 22%(446) | 4%(75) | 2,029 |
| Area 5 | 43%(950) | 22%(487) | 6%(121) | 25%(538) | 4%(88) | 2,184 |

*Table 3*

> % Same Area – The stop Area and the home address Area are the same.
> % Diff Area Oakland – The stop Area and the home address Area are different but the home address was in Oakland and did map.
> % Oakland Not Mapped – The home address is listed as being in Oakland, but the address would not map or was not entered.
> % Different City – The home address is listed as being outside of Oakland.
> % No City Info – No address information was entered.

*Key for Table 3*

Based on these findings, it would be generally unreasonable to expect stop demographics to reflect beat, area, or even City demographics.

The Monitoring Team last assessed Task 34 in July 2020 and found the Department in partial compliance. *See* Dkt. 1387 at 22-23, *Sixty-Ninth Report*. The Monitoring Team noted that "[a] goal of a risk management system should be to continually seek more comprehensive understanding of risk, its distribution, its impact, and its reduction." *Id.* at 23. The Department continues to seek such understanding, particularly as it relates to racial disparities. With the assistance of the Department's data manager, the Department has expanded its ability to perform more complex examinations of data both on a routine basis and as a part of longer-term special projects. The Department looks forward to continuing this important and interesting work.

## III.    INTERNAL AFFAIRS TIMELINES—TASK 2

The Department must complete 85% of Class I and 85% of Class II investigations within 180 days to be in compliance with policy and, therefore, be in

29

1  compliance with this task. *See* DGO M-03, Complaints Against Departmental

2  Personnel or Procedures, 21-22 (rev. 2017). The Department ostensibly met these

3  thresholds in the third quarter of 2021, completing 33 of 39 (85%) Class I and 98 of

4  108 (91%) of Class II investigations within 180 days. Unfortunately, the

5  Department was unable to achieve final approval on four Class I investigations

6  within the 180-day timeline because the Community Police Review Agency (CPRA)

7  did not complete its concurrent investigations. Therefore, the Monitoring Team

8  excluded from its October 2021 assessment those four Class I investigations that

9  were otherwise completed by the Department and, disappointingly, held the

10 Department out of compliance, finding that the Department completed only 83% (28

11 of 35) of Class I investigations within the 180-day timeline. Dkt. 1489 at 3 n.1,

12 *Seventy-Sixth Report.*

13      It appears that the Monitoring Team reasons that it is not counting CPRA-

14 delayed cases *against* the Department because it is removing these cases from the

15 denominator of the Department's total completed cases. Not *crediting* the

16 Department for timely completing these cases by adding the cases to both the

17 denominator *and* numerator, however, clearly has a penalizing effect, albeit a

18 smaller penalty than would result if these cases were affirmatively deemed

19 untimely.

20      Pursuant to policy, investigations shall be "completed, reviewed, and

21 approved" within "180 days of the IAD Intake Date."[10] DGO M-03 at 21. For cases

22 with sustained findings, review and approval must be completed by the Chief of

23 Police (Chief). In cases where CPRA is conducting its own investigation,

24 Department policy requires IA to coordinate with CPRA Director *prior to any case*

25 *presentation* to the Chief preceding the Chief's review and approval of sustained

26 findings, or prior to the closure of an investigation with no sustained findings to

27 _____
[10] There were no cases during this quarter that IA documented as timely completed
28 but the Monitoring Team did not due to the use of the complaint date versus intake
date to start the 180-day clock.

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1  ensure CPRA and OPD are in concurrence. Internal Affairs Policy and Procedure

2  Manual (2021), at 9.

3       What this means is that before the Chief may give final approval on any

4  sustained findings stemming from an internal affairs investigation, IA and CPRA

5  must coordinate to present to the Chief each entity's proposed findings. This is

6  where CPRA investigations that take more than 180 days result in compliance

7  consequences for the Department. Part of the difficulty lies in the fact that CPRA is

8  permitted to take longer than 180 days, and since sustained Class I cases typically

9  involve the most serious misconduct and often more complex investigations, Class I

10  cases are reasonably likely to be cases that CPRA takes the longest to complete.

11  While the City Charter first mandated only that CPRA make "every reasonable

12  effort" to complete investigations within 180 days, a November 2020 charter

13  amendment allows CPRA to remain in compliance with the charter mandate so long

14  as it completes its investigations within 250 days. Oakland City Charter, art. VI,

15  sec. 604(f)(3). The Department's policy has no such flexibility.

16       The Department is working collaboratively with the CPRA to ensure both

17  entities are making best efforts to permit the Department to achieve compliance

18  with the timelines required under this task. There will likely always be instances,

19  and those instances will likely almost always involve Class I misconduct

20  investigations, however, where CPRA requires the full 250 days permitted by the

21  charter to reasonably complete a thorough investigation. The charter measure was

22  expressly intended to give CPRA the authority to conduct independent concurrent

23  investigations, and a 250-day window, particularly when compared to IA's known

24  180-day deadline, reflects a desire to allow CPRA enough time—perhaps purposely

25  more time than IA is permitted—to conduct thorough and complete investigations

26  and ensure accountability.

27  **IV.   INTERNAL AFFAIRS COMPLAINT PROCEDURES—TASK 5**

28       Since the last Court hearing, the Monitoring Team has assessed Task 5

31

1    twice. The compliance status for Task 5 remains deferred despite little critical

2    feedback on particular investigations in the Monitor's last two reports.

3          In the Monitoring Team's review of 20 cases containing 80 allegations

4    completed between December 1, 2020 and June 30, 2021, the Monitoring Team

5    disagreed with an internal affairs investigator's finding on a single allegation. *See*

6    Dkt. 1478 at 9, *Seventy-Fifth Report*. Command staff corrected the finding. In

7    another case, although it appears the Monitoring Team agreed with the ultimate

8    finding, an investigator failed to assess a complainant's credibility and used

9    boilerplate language to address other witnesses' credibility. *Id.* at 8.

10         In its review of 15 cases completed between July 1 and August 31, 2021, the

11   Monitoring Team did not disagree with any of the findings. *Seventy-Seventh Report*

12   at 6. Its report does not catalog any investigative faults. To the contrary, the report

13   recognizes that the Department gathered all relevant evidence, completed

14   credibility assessments properly, and appropriately resolved inconsistencies.

15         The City also notes that the Monitoring Team's most recent assessments

16   appear to tether Task 5's compliance status to Task 2 compliance. *Seventy-Fifth*

17   *Report* at 10 ("Quality investigations, to be *quality investigations*, must be

18   conducted within the timelines established by the Court and Department policy.")

19   The two separate tasks have never been expressly tethered in this way before,

20   making Task 5 compliance necessarily contingent on compliance with Task 2. The

21   City is optimistic, however, that the Department's achievements on each task will

22   result in compliance on both, perhaps as soon as the next Monitoring Team review.

23   **V.    FORCE INVESTIGATIONS AND REPORT RESPONSIBILITY—
        TASK 25**

24

25         At the core of this task and an unquestionably important part of

26   constitutional policing is rigorous force investigation. Thorough and accurate force

27   review helps ensure that force is appropriate, proportional, and non-discriminatory.

28         The Department is in compliance with both Executive Force Review Boards

32

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

(Task 30) and Force Review Boards (Task 26), assessing investigation of Level 1 (lethal) and Level 2 (intermediate) force, respectively. To gauge compliance with Task 25, the Monitoring Team reviews Level 3 and Level 4 (lower level) force reports. *See Seventy-Sixth Report* at 4. In the only two Task 25 assessments that have occurred *after* the Department implemented policy changes designed to correct the reporting inconsistencies that led to reactivation of this task, the Monitoring Team has not noted any disagreement with the Department's compliance determinations. Moreover, the Department's force numbers have consistently declined in the past few years. Thus, the Department appears to be performing well overall both in terms of using only appropriate force and investigating force.

> *Any deficiencies identified in force incidents have not resulted in an inability to accurately and thoroughly investigate force.*

Since the reactivation of Tasks 24 and 25 in 2018, each month the Monitoring Team reviews a sample of Level 3 and 4 force incidents, including watching associated body-worn camera videos, and provides detailed feedback to the Department during the Monitoring Team's monthly site visit. In addition to assessing whether force was appropriately used, reported, and investigated, the Monitoring Team identifies potential deficiencies it observes in reports and on body-worn camera videos, whether actual violations of Department policy or not, and independent of whether the deficiencies noted have any material bearing on the quality or outcome of the use-of-force investigation.

While the Monitoring Team found that progress reducing recurring deficiencies had stalled in this reporting period, it is important to recognize that the Department has made significant progress. Officers are attempting de-escalation techniques more often. Officers' use of profanity and slang has decreased. Officers' use of boilerplate "in my training and experience" without citing relevant training or experience has decreased. Officers announce themselves as police officers prior to making arrests more often. And body-worn camera non-activations are rarely an

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1   issue, though delays may still occur.

2        The Monitoring Team's identification of these kinds of potential deficiencies

3   is valuable, particularly in portions of body-worn camera videos that might

4   otherwise never be reviewed (e.g., videos from cameras worn by witness officers who

5   did not use force, activation delays that are not proximal to force), as it affords the

6   Department earlier opportunities to correct officer behavior. But the Monitoring

7   Team did not note that any of its identified concerns actually impacted

8   investigators' or the Monitoring Team's ability to make an appropriate

9   determination about whether force was in compliance with policy.

10       In its last two reports, the Monitoring Team agreed with the Department's

11  assessment that 716 out of 717 Level 3 and 4 uses of force occurring between March

12  1, 2020, and January 31, 2021, were appropriate. *See* Dkt. 1465 at 14, *Seventy-*

13  *Fourth Report*; *Seventy-Sixth Report* at 15. In the single instance where the

14  Monitoring Team "believe[d] the force may not have been appropriate," the

15  Department had already initiated an internal investigation into the force. *Seventy-*

16  *Fourth Report* at 14. Thus, any potential deficiencies uncovered by the Monitoring

17  Team during its review, including body-worn camera activation delays, did not

18  ultimately hinder Department personnel's ability to accurately assess any uses of

19  force.

20       *The Department's use of force numbers continue to decline.*

21       Officers' uses of force have significantly decreased this past year.  Overall use

22  of force numbers decreased from 2,734 in 2020 (through December 11), to 1,569 in

23  2021 during the same time period. There have been in excess of 1,000 fewer Level 4

24  uses of force and 80 fewer Level 3 uses of force so far in 2021 than there were

25  during the same period in 2020. *See* 303rd Biweekly Report. The reduction is likely

26  due in some part to the adjustment of Type 32 reporting, and the reduction in the

27  ///

28

34

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1  number of stops.[11] It is also not unreasonable to attribute improved outcomes

2  during arrests to officers' efforts to deescalate.

3        *We cannot reduce human error to zero.*

4        With an average roster of more than 700 sworn officers, the Department will

5  likely continue to see to some extent the kind of deficiencies identified by the

6  Monitoring Team. There will always be some measure of human error and,

7  hopefully on fewer occasions, a lack of good judgment. The Department recognizes,

8  of course, that seemingly small deficiencies can theoretically result in serious

9  consequences in limited cases. For example, a late camera activation—even a delay

10 of only a few seconds—certainly could result in the Department's failure to capture

11 critical moments of an officer's interaction with a community member, a crime in

12 progress, or other significant public safety event, though few such identified delays

13 have had any material impact on the Department's ability to thoroughly

14 investigate. Nonetheless, it is not reasonable to expect perfection. The Department

15 can both accept that reality, however, and strive to further reduce these

16 deficiencies. So long as the Department continues to reinforce the behavior it wants

17 its officers to exhibit—by correcting or disciplining as appropriate—it anticipates

18 additional improvement over time. Though because it does not expect that it will

19 likely be able to entirely eliminate all deficiencies, one threshold measure of success

20 for this task may be:  Is the Department identifying enough of these deficiencies

21 and appropriately responding to identified deficiencies to an extent that these

22 deficiencies are having minimal impact on the reporting and investigation of force,

23 and not leading to inappropriate or increased levels of force?  The Department may

24 have achieved that critical threshold, though it will always continue to strive to

25 reduce deficiencies as much as possible.

26 ///

27 ────────────────────
   [11] The Department reclassified the lowest level uses of force—force used to overcome
28 resistance of a person during an arrest or detention, such as handcuffing, or
   defending against combative action.

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

*The Department will upgrade its body-worn camera system in January 2022.*

Finally, technology will soon help the Department ensure that critical events are captured on officers' body-worn cameras. The City has executed its contract with Axon to purchase slightly more than 800 body-worn cameras with advanced technology that provides automatic camera activation when an officer unholsters their firearm and, on equipped patrol vehicles, when lights and sirens are activated or an officer opens the door to get out of the vehicle. When the cameras are activated from standby mode (which will be required), they will capture the 30 seconds preceding activation.

## VI.    CONSISTENCY OF DISCIPLINE POLICY—TASK 45

The Monitoring Team assessed Task 45, Consistency of Discipline Policy, in its most recent report and determined that the Department remains in partial compliance with this task. *See Seventy-Seventh Report* at 18.

The City had a perfect record during the relevant reporting period on the task elements reviewed by the Monitoring Team. The Monitoring Team determined that for all 40 sustained misconduct cases approved between May and August 2021, the imposed discipline fell within the discipline matrix; that the reports for all eight *Skelly* hearings that occurred during this same period each contained adequate justification for the results documented; and that in the single arbitration that occurred, the arbitrator upheld the City's termination of an officer.

The Monitoring Team also noted that it continues to follow the Department's response to the 2020 Discipline Disparity Study. *Id.* The Department is proud to report that with the roll out of its cultural competency training, *Project Reset*, it has implemented all of the Study's recommendations plus an additional two measures to ensure equity, particularly racial equity, within the Department, including but not limited to equity in discipline. A chart summarizing the measures implemented by the Department is attached as Exhibit A. Additions made between August 2021

36

1  and December 2021 are featured in gold. Ex. A, *Race and Equity Work on Discipline*
2  *Disparity Study Recommendations (Dec. 2021)*.

3      *Project Reset:  A Police Culture Change Workshop Series* addresses the need
4  for cultural change in policing through a series of workshops. *Project Reset*
5  harnesses the science of culture—how culture is created, reinforced, and can be
6  changed—to empower police officers to become change agents. Through a series of
7  four interactive 60- to 90-minute workshops, the training is designed to: teach
8  officers about culture; empower them to decide how they want to serve; create space
9  to learn about and discuss the history of race and policing; and invite officers to
10 propose concrete policy changes. The training for *Project Reset* commenced on
11 November 9, 2021. The first phase involved a "train-the-trainer" series facilitated by
12 Stanford SPARQ.[12] Training will begin with a pilot group and a full rollout is
13 planned for early 2022. The program introduction by Chief Armstrong can be
14 viewed at https://vimeo.com/641236500/325a777ecc.

15     Finally, the Department has reviewed the impact of its pilot program
16 separating the factfinder and adjudicator in a subset of internal investigations and
17 has decided it will not adopt the process in its entirety more widely. The
18 Department found that the factfinder and adjudicator came to the same results, for
19 similar reasons, so it did not appear that there was a particular benefit to using this
20 process. On the contrary, the costs were significant. Where the first line supervisor
21 served as the independent adjudicator, investigators found it difficult not to be able
22 to speak with and receive guidance from the supervisor during the investigation.
23 And once adjudicators received the investigation packet, they felt they had to
24 reinvestigate too much of the information to ensure they were making an informed
25 decision. Usually adjudicators would have had more communication with the

26

27 [12] Stanford Social Psychological Answers to Real-world Questions (SPARQ) is a "do tank" that partners with industry leaders and changemakers to reduce societal
28 disparities and bridge social divides using insights from behavioral science. *See* https://sparq.stanford.edu/.

37

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1  investigators during the investigation allowing the supervisors more insight into

2  the investigation process and a better understanding of the facts. Ultimately, the

3  lack of communication was detrimental and slowed down the process.

4      The Department has, however, implemented the requirement that

5  supervisors make independent recommendations and articulate the facts that

6  support the recommended determinations without deference to investigators'

7  recommended determinations.

8      **A.    PRELIMINARY LOOK AT 2020-2021 IA CASE OUTCOME DATA**

9      The Department previously shared its preliminary analysis of 2019 and 2020

10  data. In this filing, the Department compares IA case outcome data collected in the

11  first three quarters of 2021 with case outcome data from the first three quarters of

12  2020.

13      The data in the tables below reflects investigation outcomes for sworn officers

14  in the four largest racial groups[13] represented in the Department. Table 4 includes

15  all investigation types.[14] Tables 5 and 6 break out Internal Affairs and division level

16  investigation outcomes, respectively, to allow separate assessment of potential

17  disparity in IA and non-IA cases.

18      Consistent with the methodology used in the initial 2019-2020 data

19  assessment, each officer is only counted once per case and the findings have been

20  _____

21  [13] The analysis excludes allegations against American Indian, Filipino, or Unknown to allow for better comparisons among Asian, African American or Black, Hispanic,

22  and white officers.

23  [14] Investigation types include administrative closure, informal complaint resolution, division level investigation, division level summary finding, internal affairs

24  investigation and internal affairs summary finding. Findings from collision and pursuit boards were excluded because they do not involve an internal affairs

25  investigation. Division level means conducted outside of the Internal Affairs Division and, while subject to the same investigative requirements, typically involve

26  only Class II misconduct allegations. Summary findings are abbreviated investigations in which a finding can be reached without conducting a full, formal

27  internal investigation because the correct finding can be determined with little or minimal follow-up based on existing documentation, evidence, statements, and

28  crime information data.

JOINT CASE MANAGEMENT STATEMENT    Case No. 00-cv-4599 WHO

1  condensed into one or more sustained allegation, or no sustained allegation. This
2  ensures consistency with how many times an officer, and that officer's race, is
3  counted. Presenting the data this way yields results that are less sensitive to the
4  number of allegations made against a particular officer in a particular instance and
5  tends to be more in line with the central question of whether African American or
6  Black officers are sustained for misconduct more often than other races.[15]

7      Looking at all investigation types (Table 4), the percentage of cases with a
8  sustained allegation is fairly consistent across the different races and years, though
9  in 2021, Black officers were sustained at lower rate and at a rate more similar to
10  other races (9% versus 14% for the same period in 2020). Table 5, which includes
11  division level investigations and division level summary findings, is fairly
12  consistent for both periods examined, with sustained rates also fairly similar across
13  races. Table 6, cases handled by Internal Affairs, reflects more variation year over
14  year, particularly in a significant swing in the sustained rate for Black officers,
15  going from 28% in 2020 to 8% in 2021. This may normalize over time with more
16  data, however, and may simply lessen any apparent significance of the 28%
17  sustained rate in 2020 rather than indicate that the 8% rate in 2021 represents a
18  sudden and significant rate reduction as a result of the Department's
19  implementation of equity measures. But it is also possible that the reduction is due
20  in some part to the changes in the Department that have taken root in the past
21  year. For example, the reduction correlates with the Department's practice of
22  anonymization of demographic information including gender and race of the subject

23

---

24  [15] As a reminder, the most significant finding of the 2020 Study was that between
    2014 and 2018 Black or African American officers were on average 37% more likely
25  to have an investigated misconduct allegation sustained against them than officers
    of other races. Once a case was sustained, however, there were no disparities in
26  imposed sanctions. As noted in our last filing, however, the dataset used to complete
    the 2020 Study may have contained an unknown number of duplicate allegation
27  entries as well as outcomes from investigation types that involve significantly
    different processes which likely impacted the results to an unknown and probably
28  unknowable degree.

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1  officer during supervisor and command staff presentation.

2        Ultimately, the 2020-2021 data does not suggest anywhere near the

3  magnitude of racial disparity in discipline outcomes found by the Study between

4  2014-2018. The Department looks forward to continuing to monitor and engage with

5  the data on a regular basis to ensure continued meaningful assessment of case

6  outcome data and, ultimately, consistent equity in disciplinary outcomes.

7
8  **Table 4: Misconduct Case Investigation Outcomes – All Investigation Types[16]**

|  | White | | Black | | Hispanic | | Asian | | Total | Total |
|---|---|---|---|---|---|---|---|---|---|---|
|  | n | % | n | % | n | % | n | % | **n** | **%** |
| **2020 Q1-Q3** | 267 | 100% | 140 | 100% | 300 | 100% | 128 | 100% | 835 | 100% |
| No Allegation Sustained | 235 | 88% | 121 | 86% | 269 | 90% | 117 | 91% | 742 | 89% |
| 1 or More Allegation Sustained | 32 | 12% | 19 | 14% | 31 | 10% | 11 | 9% | 93 | 11% |
| **2021 Q1-Q3** | 371 | 100% | 173 | 100% | 349 | 100% | 155 | 100% | 1048 | 100% |
| No Allegation Sustained | 327 | 88% | 158 | 91% | 318 | 91% | 144 | 93% | 947 | 90% |
| 1 or More Allegation Sustained | 44 | 12% | 15 | 9% | 31 | 9% | 11 | 7% | 101 | 10% |

18  ///

---

[16] The tables provide comparison by raw number (n) and percentage (%) of sustained outcome rates among the four largest racial groups of sworn officers.

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

eight

**Table 5: Misconduct Case Investigation Outcomes – Division Level Investigation and DLI Summary Finding**

| | White | | Black | | Hispanic | | Asian | | Total n | Total % |
|---|---|---|---|---|---|---|---|---|---|---|
| | n | % | n | % | n | % | n | % | | |
| **2020 Q1-Q3** | 182 | 100% | 105 | 100% | 216 | 100% | 97 | 100% | 600 | 100% |
| No Allegation Sustained | 164 | 90% | 93 | 89% | 194 | 90% | 88 | 91% | 539 | 90% |
| 1 or More Allegation Sustained | 18 | 10% | 12 | 11% | 22 | 10% | 9 | 9% | 61 | 10% |
| **2021 Q1-Q3** | 193 | 100% | 117 | 100% | 204 | 100% | 96 | 100% | 610 | 100% |
| No Allegation Sustained | 178 | 92% | 106 | 91% | 186 | 91% | 90 | 94% | 560 | 92% |
| 1 or More Allegation Sustained | 15 | 8% | 11 | 9% | 18 | 9% | 6 | 6% | 50 | 8% |

**Table 6:  Misconduct Case Investigation Outcomes – Internal Affairs Investigation and Internal Affairs Summary Finding**

| | White | | Black | | Hispanic | | Asian | | Total n | Total % |
|---|---|---|---|---|---|---|---|---|---|---|
| | n | % | n | % | n | % | n | % | | |
| **2020 Q1-Q3** | 73 | 100% | 25 | 100% | 64 | 100% | 19 | 100% | 181 | 100% |
| No Allegation Sustained | 59 | 81% | 18 | 72% | 55 | 86% | 17 | 89% | 149 | 82% |
| 1 or More Allegation Sustained | 14 | 19% | 7 | 28% | 9 | 14% | 2 | 11% | 32 | 18% |
| **2021 Q1-Q3** | 161 | 100% | 50 | 100% | 123 | 100% | 51 | 100% | 385 | 100% |
| No Allegation Sustained | 132 | 82% | 46 | 92% | 110 | 89% | 46 | 90% | 334 | 87% |
| 1 or More Allegation Sustained | 29 | 18% | 4 | 8% | 13 | 11% | 5 | 10% | 51 | 13% |

///

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1  **VII.   RECRUITING AND IMPROVING DEPARTMENT DIVERSITY**

2          In November 2021, the Department commenced its 187th Basic Academy.

3  The first two tables below, Tables 7 and 7A, reflect the demographics of the 39

4  Oakland police officer trainees who entered the 187th Academy. Twelve of the police

5  officer trainees are Oakland residents.

6  **Table 7:  OPD's 187th Basic Academy Demographics (Nov. 2021)**

| Gender | | Race/Ethnicity | | Residency | | Language | | Education | |
|---|---|---|---|---|---|---|---|---|---|
| Female | 7 | Asian | 4 | Oakland | 15 | Spanish | 15 | High School | 6 |
| Male | 32 | Black or African American | 11 | Other | 24 | Arabic | 1 | Some College | 18 |
| | | Hispanic | 15 | | | Korean | 1 | AA/AS | 3 |
| | | White or Caucasian | 3 | | | Vietnamese | 1 | BA/BS | 10 |
| | | Other | 6 | | | | | MA/MS | 1 |
| | | | | | | | | PSY.D. | 1 |
| **Total** | **39** | **Total** | **39** | **Total** | **39** | | | **Total** | **39** |

**Table 7A:  Race/Ethnicity & Gender in OPD's 187th Academy (Nov. 2021)**

| Race/Ethnicity | Female | Male |
|---|---|---|
| Asian | | 4 |
| Black or African American | 2 | 9 |
| Hispanic | 5 | 10 |
| White or Caucasian | | 3 |
| Other | | 6 |
| **Total** | **7** | **32** |

23          The Department makes a focused outreach effort to recruit women, including

24  holding virtual female-officer focused recruiting events and Q&A sessions. Women

25  are historically underrepresented among the ranks of sworn police officers. In 2019,

26  women made up only 12.8% of all full-time law enforcement officers in the United

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

States.[17] The Department's recent academy classes have consistently been more than 12.8% female (187th enrollment 18% female, 186th graduates 23% female, and 185th enrollment 19% female).  The Department's efforts and success in the last few years recruiting female officers is reflected in the increase in female officers in the Department which surpassed 15% in June 2021.[18] *See Table 8*, below.

**Table 8:  OPD Gender Percentages by Year compared with 2019 National Percentage**

| Gender | National Percentage 2019 | OPD 2018 | OPD 2019 | OPD 2020 | *OPD 2021 |
|---|---|---|---|---|---|
| Female | 12.8% | 13.0% | 13.9% | 14.6% | 15.13% |
| Male | 87.2% | 87.0% | 86.1% | 85.4% | 84.87% |

*\*2021 figure shows all OPD sworn staff as of June 30, 2021*

Additionally, five African American women graduated from the Department's last two academies, three in the 185th and two in the 186th Academy. That represents a 25% increase in the Department's African American female officers from the last quarterly staffing report which reflected that the Department employed twenty African American female officers. *Quarterly Police Staffing Report (2nd Quarter 2021),* https://cao-94612.s3.amazonaws.com/documents/OPD-Qtrly-Staffing-Memo-REVISED-09.23.21-signed.pdf (last visited on Dec. 16, 2021).

## VIII.   BUREAU OF RISK MANAGEMENT

Since the last Court hearing, Acting Deputy Chief Clifford Wong has taken the reins in the Bureau of Risk Management (BRM). Deputy Chief Mendoza is currently leading the Bureau of Field Operations (BFO) 2.

At the last Court hearing, the Court inquired about how the Department planned to evaluate the procedures and the value of the BRM and its contribution

---

[17] *See* https://www.statista.com/statistics/195324/gender-distribution-of-full-time-law-enforcement-employees-in-the-us/ (last visited Dec. 13, 2021).
[18] Previous staffing reports reflect that from 2016-2018 the Department's sworn staff remained 13% female.

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1   to managing the Department. The Department's evaluation will necessarily remain

2   dynamic as the BRM focus and direction changes over time in response to the

3   specific needs of the Department. Long term, the Department would expect to

4   observe some reduction in some areas of risk—trend lines that, however slight, are

5   moving in the right direction. In the more immediate term, however, are completion

6   of the Department's Risk Management Policy and, subsequently, training,

7   successful implementation, and compliance with the policy. The BRM's value will be

8   further reflected in the regular and effective use during risk management meetings

9   of the methods outlined in the policy. The BRM will continue to advance the

10  Department's ongoing work to improve its implementation of Vision in the risk

11  management process. Additional concrete measures include no observed significant

12  backlogs on force board scheduling or deliverables from boards.

13        One of the most valuable things the Department expects to obtain through

14  the BRM is better communication. More specifically, the Department hopes that

15  constant, efficient communication between and among the units within the BRM

16  will lead to streamlined and unified communication both from the BRM to the

17  executive team as well as well from the BRM or executive team to the entire

18  Department. While this may be impossible to measure directly, the Department

19  expects to see improved communication reflected in the operation of each unit

20  within the BRM based on the metrics of success for those units (e.g., meeting NSA

21  subtask compliance standards and effectively monitoring subtasks that fall within

22  the purview of that unit for sustainability, board deliverables being promptly

23  addressed, priority directives from BRM implemented, OIG audits of BRM unit

24  responsibilities).

25        Finally, the BRM looks forward to establishing a strong relationship with the

26  Police Commission's Inspector General (IG) who is expected to begin work in

27  January 2022.

28  ///

44

**IX.   POLICY DEVELOPMENT AND PUBLICATION UPDATE**

The City provides the chart below to update the Court on the current status of the remaining policy items previously discussed with the Court and in the City's April and May 2021 reports. *See* Dkts. 1433 & 1447. The City has added the Instagram investigation-related policies (in blue) outlined above to this chart for ease of tracking.

| TITLE | STATUS |
|---|---|
| CID Level 1 Investigations Policy & Procedure, Policy 19-01 | Approved by Police Commission on Dec. 16, 2021. Published by the Department on Dec. 21, 2021. |
| Chief's Directive Memorandum Re Administrative Leave | Published by the Department on Nov. 26, 2021 |
| DGO R-01, Risk Mitigation | Remains in development. Continuing to work closely with the Monitoring Team. The Department intends to engage plaintiffs' counsel and Police Commission on the current draft. |
| Special Order 9208 re Type 32 Force Reporting | The Department worked with the Monitoring Team to complete this order in September. The Department is preparing to submit the order to the Police Commission. |
| DGO D-18, Member Social Media Use | In development. Department's working draft submitted to Police Commission Chair to schedule ad hoc committee review. |
| DGO D-20, Anti-Discrimination and Anti-Harassment Policy | In development. Refining initial draft. |
| DGO I-19, Cell Phones | Holding focus groups to determine operational need for social media and applications on work-issued phones and devices prior to beginning to revise policy. |

**CONCLUSION**

Violent crime in Oakland is exploding as the Department's ranks decline. The City reached 132 homicides by mid-December. The City has not this many

45

1    homicides since 2006, when it reported 148. Other violent crime numbers are

2    similarly significantly higher. At the same time, the Department has experienced

3    significant attrition. The Department, budgeted for 737 sworn officers, is currently

4    down to around 671 officers with additional officers expected to retire in the next

5    few months. This is the first time in six years that the Department has dipped

6    below 700 officers.

7        In positive news, 25 police officer trainees graduate from the academy today.

8    And in early December 2021, the Mayor recommended, and the City Council

9    approved adding two additional police academies over the next two years to address

10   the vacancies resulting from the recent wave of resignations and retirements. The

11   council initially only budgeted for four police academies over the next two years,

12   adding a fifth in September and two more this month.

13       In the immediate future, however, the Department must continue to

14   determine how to strategically deploy its dwindling resources to address the

15   violence that is plaguing the City. Regardless of the strategies it chooses, however,

16   the Department will continue to employ the principles of constitutional policing and

17   meet both the mandates and the spirit of the NSA.

18       The City looks forward to further discussing the foregoing issues at the

19   upcoming Case Management Conference.

20

21

22

23

24

25

26

27

28

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1          **THE OPOA'S STATEMENT**

2          Intervenor Oakland Police Officers Association ("OPOA") continues to

3    actively engage in collaborative efforts with the Oakland Police Department

4    ("OPD") and City of Oakland ("City") to achieve compliance with the Negotiated

5    Settlement Agreement ("NSA").

6          The OPOA is acutely aware that the City and OPD have tenaciously

7    continued efforts to secure full compliance with the NSA. While those efforts

8    continue unabated, the resources and efforts of Chief Armstrong and all sworn

9    personnel at OPD, face historic and unprecedented challenges. Although media

10   accounts attempt to document the alarming increase in violence and crime in

11   Oakland, the full magnitude and impacts on the community of spiking criminal

12   activity are devastating and cannot be captured in sound bites and headlines. Each

13   day, the sworn members of OPD face staggering numbers of calls for service, many

14   of which go unanswered due to a lack of resources.

15         Chief Armstrong has made innumerable petitions to elected officials and the

16   community to provide relief to the Department by way of engagement and support.

17   Although Mayor Schaaf has attempted to address the crime and staffing problems,

18   her efforts cannot in the short term correct a structural problem that by definition

19   may take years to correct.  OPD staffing levels are at record lows and the current

20   rate of officer attrition is cause for concern. Despite these daunting challenges,

21   Chief Armstrong has directed all available resources to protect the citizens of

22   Oakland from the growing scourge of brazen and at times deadly violence.

23         The OPOA offers these insights and observations to the Court not as excuses

24   for non-compliance but simply as context for some of the perceived and actual

25   deficiencies noted by the IMT.  Despite the recent NSA related shortcomings, the

26   OPOA wants to assure the Court that OPD and every sworn member are making

27   maximum and, in most cases, heroic efforts to protect the citizens of Oakland while

28   not losing sight of the goals of the NSA.

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1

2
                              Respectfully submitted,

3

4    Dated: December 22, 2021        BARBARA J. PARKER, City Attorney
                                     BRIGID S. MARTIN, Special Counsel

5
                        By:      /s/ BRIGID MARTIN*
6                                Attorneys for Defendants
                                 CITY OF OAKLAND
7
                                 JOHN L. BURRIS
8                                Law Offices of John L. Burris

9
                        By:      /s/ John L. Burris
10                               Attorney for Plaintiffs

11                               JAMES B. CHANIN
                                 Law Offices of James B. Chanin
12

13                      By:      /s/ James B. Chanin
                                 Attorney for Plaintiffs
14

15                               ROCKNE A. LUCIA, JR.
                                 Rains Lucia Stern St. Phalle & Silver
16
                        By:      /s/ Rockne A. Lucia, Jr.
17                               Attorney for Intervenor
                                 OAKLAND POLICE OFFICERS ASSOCIATION
18

19   *Per Local Rule 5-1(i)(3), the filer attests that concurrence in the filing of the

20   document has been obtained from each of the other Signatories

21

22

23

24

25

26

27

28
                                        48
     JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO