March 18, 2022

# Eightieth Report
## *of the* Independent Monitor
## *for the* Oakland Police Department

---

## Introduction

This is our eightieth status report on the Negotiated Settlement Agreement (NSA) in the case of *Delphine Allen, et al., vs. City of Oakland, et al.,* in the United States District Court for the Northern District of California under the direction of Judge William H. Orrick.  I was appointed in 2010 to oversee the monitoring process of the Oakland Police Department (OPD) that began in 2003.

Following the Court's Order of May 21, 2015, we devote special attention to the most problematic component parts of the NSA Tasks that are not yet in full or sustained compliance; and discuss in our status reports the most current information regarding the Department's progress with the NSA and its efforts at making the reforms sustainable.  Our monthly reports do not address all Tasks.  This report describes our recent assessments of NSA Tasks 20, 24, 25, 26, 30, 31, 34, and 41.

Each month, our Team conducts a visit to Oakland that includes both compliance assessments and technical assistance.  Due to the COVID pandemic, we have been holding our visits remotely.  During our site visits, we meet with Department and City officials; observe Department meetings and technical demonstrations; review Departmental policies; conduct interviews and make observations; and analyze OPD documents and files, including misconduct investigations, use of force reports, crime and arrest reports, Stop Data Forms, and other documentation.

During the September 1, 2021 Case Management Conference, the Court reiterated its five priorities for the Department:

1. Reduce racial disparities in vehicle, pedestrian, and bicycle stops, with continued use of intelligence-led policing;

2. Implement Vision and its associated dashboards in a technologically straightforward way so that the tools are used effectively in the risk management process;

3. Recruit officers who reflect the diversity (gender, race/ethnicity, and other) of Oakland;

4. Ensure that all uses of force and instances of potential misconduct are accurately reported and rigorously investigated within set timeliness standards; and

5. Ensure that disciplinary decisions and the disciplinary process are fair and equitable.

The Department is making progress in these areas, and the Chief and the Monitor continue their discussions regarding these on a regular basis.

## Focused Task Assessments

## Task 20:  Span of Control

### Requirements:

*On or before August 14, 2003, OPD shall develop and implement a policy to ensure appropriate supervision of its Area Command Field Teams.  The policy shall provide that:*

1. *Under normal conditions, OPD shall assign one primary sergeant to each Area Command Field Team, and, in general, (with certain exceptions) that supervisor's span of control shall not exceed eight (8) members.*

2. *During day-to-day operations, in the absence of the primary supervisor (e.g., due to sickness, vacation, compensatory time off, schools, and other leaves), the appropriate Area Commander shall determine, based on Department policy and operational needs, whether or not to backfill for the absence of the sergeant on leave.*

3. *If a special operation, (e.g., Beat Feet, Special Traffic Offenders Program (STOP), etc.) requires more than eight (8) members, the appropriate Area Commander shall determine the reasonable span of control for the supervisor.*

4. *If long-term backfill requires the loan or transfer of a supervisor from another unit, the Chief of Police and/or the Deputy Chief of Police shall make that decision.*

(Negotiated Settlement Agreement IV. C.)

### Relevant Policy:

Three Departmental policies incorporate the requirements of Task 20: Departmental General Order A-19, *Supervisory Span of Control,* issued on July 26, 2006; Departmental General Order D-13, *Assignment to Acting Higher Rank or Classification,* issued on June 17, 1999; and Departmental General Order D-13.1, *Assignment to Acting Sergeant of Police,* issued on May 14, 2014.  (The publication of DGO D-13.1 cancelled Special Order 8435, which previously governed the selection process of acting sergeants.)

### Commentary:

To assess these requirements for this report, we reviewed spreadsheets prepared by the Department for October, November, and December 2021 that, by date, note which type of sergeant supervised each applicable squad – a primary sergeant, relief sergeant, acting sergeant, other sergeant (one working overtime), or none.  (The Department refers to unsupervised squads as "open.")  We calculated per squad the compliance percentages for this subtask during this time period.  Each of the 49 applicable squads were in compliance – that is, all applicable squads during this time period were supervised by either a primary, relief, or other/overtime sergeant for

at least 85% of their working shifts.  We also found that none of the applicable squads exceeded the required 1:8 supervisor to officer ratio at least 90% of their working shifts.

OPD continues to be in compliance with these requirements.  The Department has institutionalized the practices of tracking how each squad is supervised each day; planning, when possible, for expected absences; and considering how to fill in for personnel who are absent unexpectedly.

| Task 20 compliance status | In compliance |
| --- | --- |

## Overview of Our Assessments of Tasks 24 and 25

OPD had been in compliance with Tasks 24 and 25 since 2015, and we were not actively reviewing these Tasks.  In November 2018, after we raised concerns regarding the identification, potential underreporting, and investigation of uses of force, the Court reactivated Tasks 24 and 25.

Between February 8-February 22, 2022, we reviewed three Level 2 uses of force for which a Force Review Board (FRB) was held and one Level 1 use of force for which an Executive Force Review Board (EFRB) was held.  Consistent with our reviews of Level 3 and 4 use of force reports, we identified some concerns with the field reporting, which were appropriately addressed during the Boards.  Level 2 uses of force are discussed in the Task 26 section of our report, and Level 1 uses of force are discussed in the Task 30 section of our reports.  We discuss only Level 3 and 4 uses of force in this assessment.

For purposes of this report, we reviewed 90 Level 3 and Level 4 use of force (UOF) reports that were completed by OPD personnel between August 1-November 30, 2021.  We reviewed all incidents that involved at least one Level 3 use of force (seven), and a sample of Level 4 uses of force (83).  These 83 reports include one Level 3 use of force that was appropriately reduced to a Level 4 by a supervisor.

Since we resumed these reviews following the Court's reactivation of these Tasks, we have provided detailed feedback on the force investigations to OPD during each of our site visits.  In cases where we have had questions or concerns, OPD personnel have continued to be responsive and have provided follow-up where necessary.  In some cases, OPD has provided additional information or documentation that supports its actions, and we have concurred with the Department's assessments.  In others, we have identified concerns that had not been identified or addressed by supervisors who conducted the UOF investigation, or the command personnel who reviewed the investigation.  In these cases, OPD executive staff have directed additional review; directed training; entered a Supervisory Note File (SNF); or initiated an Internal Affairs Division (IAD) investigation.

In late 2018, OPD employees received training on the requirements for use of force reporting related to the pointing of weapons.  In April 2019, OPD issued an Information Bulletin that provided clarification and direction regarding the documentation of use of force.  The content of this bulletin included many of the concerns we had identified with the proper reporting of force.  In June of 2019, the then-Chief issued a directive via email that specifically addressed boilerplate language in use of force reports; and in November 2019, she followed up with an additional email to address the use of generic or boilerplate language in the administrative section of Department reports.  In December 2019, OPD completed the training developed to address deficiencies found in UOF documentation based on OIG's global use of force audit.  On February 15, 2020, OPD published Special Order 9196, which expanded and clarified the use of force policy.  On February 27. 2020, the Department published Special Order 9202, which temporarily modified the requirements for the reporting of Type 32 uses of force.  In June and August 2020, emails from executive staff addressed delayed body-worn camera (BWC) activations, the 30-second BWC buffer, and "pat" language being used in reports.  In January 2021, an information bulletin addressed ongoing BWC activation concerns; and in May 2021, OPD provided training on announcements of police during community contacts, BWC activations, accuracy in reporting, and identifying patterns prior to issuing SNFs for discovered MOR violations.  While these efforts by executive staff resulted in some improvement, there was still an unacceptable number of deficiencies in the investigation and review of uses of force.

In September 2021, OPD began conducting line-up training that covered: inappropriate use of force commands, failure to identify oneself as a police officer, the 30-second body-worn camera buffer, late BWC activations, use of profanity and slang, professional demeanor, conclusions designed as facts, boilerplate language, ensuring equipment is functional at the beginning of each shift, avoiding multiple officers giving commands during contacts with subjects, documentation of Type 32 UOF, proper preparation of SNFs, requirements for lowering or raising the level of force), and administrative due date reminders.

The Department's Risk Management 3rd quarter newsletter, published in October 2021, covered: taking complaints; boilerplate language; late BWC activations and documentation; and the 30-second buffer standby mode for BWCs.  During October and November of 2021, the Police Chief met with all sergeants, all lieutenants, and the 186th Academy class.  During these meetings, according to the Chief, he stressed UOF reporting, leadership, accountability, and timeliness – among other topics.  These most recent efforts repeat many of the directives previously provided to employees over the past two years.  We are hopeful that this continued focus on identifying deficiencies and concerns will provide necessary reinforcement and result in sustained compliance.

This report covers Level 3 and 4 UOF reports completed by OPD between August 1-November 30, 2021.  All 90 of the cases we reviewed for this time period occurred after the publication of Special Order 9196, which clarified the use of force policy; and after Special Order 9202, issued on February 27, 2020, which temporarily modified the requirements for reporting Type 32 uses of force.

In the 90 Level 3 and 4 uses of force we reviewed, there were 219 uses of force by 173 officers, against 114 different persons.  In some cases, multiple officers used force on a single person; and in others, force was used on multiple persons, either by a single officer or by multiple officers.

The total breakdown for the force used on the 114 persons is as follows: African Americans, 74%; Latinos, 16%; whites, 6%; and Asians or other, 5%.  The percentage of force incidents involving African Americans increased by 6%; force incidents involving whites increased 1%; force incidents involving Latinos decreased 5%; and force incidents involving Asians or persons categorized as "other" decreased 1%, from our last review, documented in our 78th status report.

In the seven Level 3 uses of force we reviewed, five involved the deployment of a Taser along with one or more Level 4 uses of force.  One involved only the use of a Taser, and one was a Type 16 non-carotid takedown of a handcuffed subject.  In all seven, we found the uses of force to be appropriate and in compliance with OPD policies.  Of these seven, none were completed within the required timelines.  The reports took between four and 12 weeks to complete, with the average being eight weeks.  This is an improvement from the 10-week average we noted in Report 78, but remains below compliance requirements.  We did note that additional information is being included in the UOF reports and in some, approved extensions were also noted.

In Report 78, we identified concerns with the classification and reduction of Level 3 uses of force to Level 4, finding it to be inconsistent with Department policy.  It appeared that there was some confusion in those instances where OPD personnel were restraining or lifting and carrying people without additional uses of force.  OPD agreed with our assessment and committed to conducting additional training on how to properly classify these types of uses of force.  For this report, one Level 3 UOF was reduced to a Level 4 UOF.  The classification and reduction in this incident were consistent with OPD policy.

In the 83 Level 4 UOF reports we reviewed, there were 189 uses of force by 152 officers against 107 persons.  Fifty-eight of the 83 Level 4 UOF reports reviewed involved a Type 22, pointing of a weapon only.  In these 58 reports, there were 130 uses of the Type 22, by 102 officers, against 83 persons.  This equates to 69% of the total 189 Level 4 uses of force we reviewed during this time period.  We again found in our reviews that there were numerous incidents involving multiple subjects with numerous OPD personnel being involved in the pointing of weapons.  In these 130 uses of force, the breakdown is as follows: African Americans, 69%, a increase of 1% from our 78th report; Latinos, 14%, a decrease of 4% from our 78th report; whites, 7%, the same percentage as our 78th report and Asians or other, 10%, an increase of 3% from our 78th report.  Of the 25 Level 4 UOF reports that involved use of force other than a Type 22 only, eight (10%) involved a Type 29 takedown only.  Seven (8%) involved a weaponless defense technique only, and 10 (12%) involved a combination of multiple Level 4 uses of force.

Of the total 114 persons on which a Level 3 or 4 UOF was used, 78 (68%) were arrested or criminally charged for felony or misdemeanor violations.  This is a decrease in arrests from the 70% in our 78th report.  The remaining 36 involved mental health holds, inability to establish criminal conduct, subjects who escaped, victims who did not want to prosecute, or subjects determined not to be a suspect after the investigation was conducted.  In four of the incidents reviewed, a person claimed an injury; none of these injuries required admittance to a hospital.  In nine other instances, persons were transported to a medical facility for the removal of a Taser probe only, for injuries that occurred prior to the use of force, or solely to obtain a medical clearance.

In our early assessments of Task 25.3 after reactivation of Tasks 24 and 25, we found numerous instances where officers did not attempt verbal communications prior to using force.  Significant improvement in this area has occurred over time; and again, for this report, we did not identify any uses of force where officers failed to attempt verbal communications and de-escalation where appropriate, prior to utilizing force.  While we again identified numerous instances where officers did not identify themselves as police officers when contacting members of the public and there was time to do so, we noted improvement in the number of officers who did make such announcements.  We will continue to discuss any future concerns we identify with OPD and continue to monitor these types of instances; as is our practice during our monthly site visits, we continue to provide input to the Department on our observations.

Special Order 9196, the revision to the UOF reporting requirements, that went into effect on February 15, 2020, clarified what constitutes a "reportable use of force" and provided clearer direction on the reporting of use of force.  Special Order 9196 also added a new force type: Type 32.  A Type 32 use of force includes: overcoming resistance of a person during an arrest or detention; or defending oneself or another from combative action by another person.  Type 32 is intended to address any use of force not already covered in Types 1-31.  While we expected an increase in Level 4 use of force reporting after Special Order 9196 was issued, the immediate and significant spike in the numbers was much greater than anticipated and appeared to be primarily related to the new Type 32.  We agreed with OPD's assessment that further review of the force policy was needed due to this unanticipated increase; and Special Order 9202 was issued, that at least temporarily removed the Type 32 from the category of a Level 4 reportable use of force.  Alternative means for counting these uses of force were implemented by OPD until more permanent solutions could be identified.

For our 69th status report, we reviewed a sample of Type 32 uses of force.  We found in these early reviews that there was some initial confusion regarding this reporting.  In some cases, we identified instances where a Type 32 was documented and it did not appear that a use of force had occurred; and in others, we found that Type 32 was not the appropriate force type to have been used.  We also identified concerns with officers not authoring their own supplemental reports, failures to properly document these uses of force in required reports, and the identification of MOR violations or training issues that did not appear to have been addressed.  In June 2020, OPD began providing additional training on how to properly document Type 32 uses of force; and we began to see improvement.

As part of our reviews for this report, we reviewed the monthly Type 32 UOF audits conducted by Area Command personnel during this time period.  They found again that, in general, officers are properly reporting these uses of force.  They did not identify any instances in their reviews where they believed that a Type 32 UOF should have been classified as a different, or higher, level of force.  They also found that the majority of these uses of force were the result of resistance during handcuffing, resisting while a subject was being escorted, or restraining persons with mental health issues.  We did note a couple of incidents in their review where Area Command personnel indicated a Type 32 was used as a "pain compliance" technique.  We have asked OPD to conduct some additional follow-up on these cases to determine if Type 32 was the appropriate category for these uses of force.

All of the uses of force we reviewed for this report occurred after Special Order 9196 was issued, and after Special Order 9202 was issued to address the challenges created with the required reporting of Type 32 UOF. During our review of the 90 Level 3 and 4 UOF incidents for this report, we again noted numerous instances where it took multiple officers to control and secure combative persons. In the majority of the cases, we found that officers continued to identify and document Type 32 uses of force as required – though there were again two instances identified in our reviews where we found that a Type 32 UOF had not been properly reported. OPD took appropriate action when we brought these to the Department's attention.

The issuance of Special Order 9202 resulted in the identification of several challenges in collecting data regarding Type 32 UOF, as OPD's technology did not allow personnel to accurately collect the information as OPD had expected it would. There has also been a need to identify a long-term solution that will address not only how Type 32 uses of force will be documented, but how they will be reviewed. We had several discussions with OPD; and the Department developed a protocol that will ensure the appropriate identification, review, and reporting of these uses of force. We noted in our 76th and 78th reports that this protocol was pending final review and publication. For this report, we note, again, that this protocol still has not been approved and published. It has been more than two years since Special Order 9202 was issued to temporarily address Type 32 UOF. Proper use and documentation of Level 4 Type 32 UOF is a component of overall compliance. We again urge OPD to finalize and implement this protocol as soon as possible.

For our 76th report, we reviewed 69 UOF reports for the three-month period between November 1, 2020, and January 31, 2021. In 15 (22%) of the reports reviewed, we identified concerns with BWC activation. We did not include documented malfunctions of BWCs or those that have been deactivated during a struggle or other contact with persons in these numbers. Of the 15 instances we identified, eight (53%) were not identified by the supervisor. Of the eight instances not identified by the reporting supervisor, two (25%) were identified by a reviewing supervisor.

For our 78th report, we reviewed 91 UOF reports for the four-month period between April 1-July 31, 2021. In 24 (26%) of the reports reviewed, we identified concerns with BWC late activations or failure to have the 30-second buffer activated as required. Of the 24 cases where we identified BWC concerns, OPD agree with our assessment in 19 (79%) of them. In the remaining five, OPD maintained that either the BWC activation was not specifically required by policy based on the circumstances of the incident, or that the contact had been a chance encounter and officers had not had time to activate the BWC before contacting a subject. Of the 19 where OPD agreed with our assessment, only seven were identified and addressed by supervisors. In two others, OPD noted that though there had been a late activation by an officer, a supervisor would not have been required to review the BWC as the officer had not been one of the officers that used force. OPD review requirements for BWC in the event of a UOF only requires that the footage of officers involved in a UOF be reviewed.

For this report, we reviewed 90 UOF reports for the four-month period between August 1-November 30, 2021. In 23 (26%), we again noted concerns with BWC activations, late activations, or failure to have the 30-second buffer activated as required. Of the 23, OPD agreed with our assessment in 20. In three, OPD again maintained that either the activation was not specifically required by policy; or the officer had not had time to activate the BWC before

activating the BWC.  In the 17 where OPD agreed with our assessment, 11 (65%) had been identified and addressed by a supervisor.  This is a noticeable improvement from our past reports.  In two others, while the supervisor did not identify the late activation, the activations occurred under circumstances where a review of the BWC was not required.

In those cases where the Department determined that a violation of the BWC requirements had not occurred, we do not concur in all cases that their explanation is sufficient.  What continues to be clear and more important, however, is that OPD's BWC policy requires additional explanation and clarification regarding required activation.  OPD has distributed some of the new BWCs the Department has obtained and is in the process of revising the BWC policy.  We will closely monitor the implementation of the new BWCs, and the policy revisions designed to clarify required activations.

As we have noted in numerous previous reports, the failure to properly activate a body-worn camera is a violation of policy; and more importantly, could result in the loss of critical information regarding the community contact.  OPD has continued to conduct follow-up on each of the BWC activation concerns we have raised and has issued numerous SNFs – and in some cases, discipline – to both those who fail to properly activate their BWCs and to those supervisors who fail to identify and address the failures.  For this report, we have noted that there were more instances of supervisors identifying and addressing the BWC activation concerns.  We are hopeful that this improvement will continue moving forward.

While we have continued to remain supportive of the use of SNFs for BWC violations, we have also continued to emphasize that supervisors must ensure that the officer does not have a pattern of similar conduct prior to using an SNF.  To assist in determining whether SNFs were being properly utilized to address BWC concerns, we requested OPD review SNFs issued over the two years for this violation.  As a result of a review of this information, OPD identified 11 officers who had four or five "no" or "late" activations over the last two years and 10 months.  For these 11 officers, OPD did further review of the activations to determine if SNFs were the appropriate outcomes and pulled 10 additional BWC videos for each officer to check for activation compliance.  OPD determined that the issued SNFs were appropriate for all 11 officers, but during their review of the additional BWCs, identified additional late activations which resulted in patterns being identified for two of the officers.  In both cases, the information was forwarded to IAD. An additional officer was placed on monitoring as a result of late activations and a supervisor received an SNF for not properly categorizing his BWC videos.

During the review of the BWC activations, OPD also identified that in some cases, supervisors and commanders were inconsistently categorizing SNFs; some SNFs lacked detail; in some the violation or policy issue was difficult to identify; and SNFs often lacked language documenting the supervisor's review of the employee history for patterns of similar conduct.  The Department committed to conducting additional training to address these concerns.  The Department will provide an update on its final conclusions and actions regarding the BWC reviews during our March 2022 remote site visit.

In our monthly site visit meetings with OPD, we have discussed and supported OPD's proposed transition to a new BWC system that would allow additional ways to ensure proper activations.  During our February 2022 virtual site visit, OPD advised us that the new BWCs have arrived and been issued to the majority of patrol personnel.  There is a two-hour familiarization training for

each officer and the officers have begun using the new BWCs.  The technology associated with some "automatic" activations will take longer to implement and a revised BWC policy is still in progress.  We will continue to monitor the implementation.  The technology improvements and a revised policy will likely address many of the ongoing concerns we have identified, but it will still remain the responsibility of supervisors to identify and address failures to properly activate BWCs when they occur.

The use of force analysis we conducted in 2018 established the underreporting of Level 4 uses of force where an officer pointed a weapon at a person.  Following our analysis, OPD partially addressed this concern with refresher training in September 2018 for all officers, and the Department has further addressed this issue in its use of force policy revisions.  In our review of Level 3 and 4 uses of force for this report, we did not identify any instances where an officer failed to report the pointing of a weapon at a person.

In OPD's 308th Biweekly Compliance Update, dated February 24, 2022, the Department provided a comparison of year-to-date Level 3 and 4 uses of force for 2022 compared to the same time period in 2021.  Overall UOF increased from 192 in 2021, to 201 in 2022.  Level 3 uses of force increased from seven in 2021, to nine for the same time period in 2022.  Level 4 uses of force increased from 183 in 2021, to 201 for the same time period in 2021.  The new policies and the adjustment of Type 32 reporting that occurred in 2020 was responsible for large differences in UOF numbers between 2020 and 202.  As we expected, this appears to have normalized, and the UOF so far in 2022 is fairly consistent with 2021.

OPD has taken numerous steps to address the proper reporting of use of force and the concerns that have been identified during our reviews.  In our reviews of UOF reports for March 1-October 31, 2020, we saw evidence that OPD's efforts appeared to be having a positive effect on reporting.  During our September 2021 virtual site visit, the City Administrator requested that our Team attempt to make our reviews of UOF more current.  In response to this request, we agreed to review two months of reports at each site visit, which would allow us to be as current as possible by December 2021.

We reviewed December 2020 and January 2021 UOF reports in our 76th report.  We had expected that the Department would continue to improve its reporting and there would be ongoing improvement with compliance requirements.  Unfortunately, it appeared from this review that OPD's progress had stalled.  The number of concerns with the investigation and review of UOF reports showed no appreciable improvement from our November reviews.  We also agreed to skip February and March 2021 reviews and start reviews again in April of 2021.  We were hopeful that this additional time would allow for all of the Department's directives to take root with its personnel.

In our reviews for the April 1-July 31, 2021 uses of force, our assessment was, again, that the Department had not made appreciable progress in proper activation of BWCs, supervisory review and reporting, and timeliness of UOF reporting.

In our 76th and 78th reports, despite continued emphasis on the proper completion of use of force requirements, we noted that the improvement in use of force reporting had stalled during the period between December 2020, and July 2021.  In our reviews for the August 1-November 30, 2021 uses of force, we note that there has been improvement in proper activation of BWCs,

supervisory review and reporting, and timeliness of UOF reporting.  This improvement was most significant in UOF reports completed in October and November 2021.  We are hopeful that this trend will continue.  We will continue to monitor the impact of revised policies, training delivered, and any directives from OPD executive staff that addresses any ongoing UOF reporting concerns.

## Task 24: Use of Force Reporting Policy

**Requirements:**

*The policy shall require that:*

1. *Members/employees notify their supervisor as soon as practicable following any investigated use of force or allegation of excessive use of force.*

2. *In every investigated use of force incident, every member/employee using force, and every member/employee on the scene of the incident at the time the force was used, shall report all uses of force on the appropriate form, unless otherwise directed by the investigating supervisor.*

3. *OPD personnel document, on the appropriate form, any use of force and/or the drawing and intentional pointing of a firearm at another person.*

4. *A supervisor respond to the scene upon notification of an investigated use of force or an allegation of excessive use of force, unless community unrest or other conditions makes this impracticable.*

5. *OPD notify:*

   a. *The Alameda County District Attorney's Office immediately or as soon as circumstances permit, following a use of lethal force resulting in death or injury likely to result in death.*

   b. *The City Attorney's Office as soon as circumstances permit following the use of lethal force resulting in death or serious injury.  At the discretion of the City Attorney's Office, a Deputy City Attorney shall respond to the scene.  The Deputy City Attorney shall serve only in an advisory capacity and shall communicate only with the incident commander or his/her designee.*

   c. *Departmental investigators regarding officer-involved shootings, in accordance with the provisions of Section V, paragraph H, of this Agreement.*

6. *OPD enter data regarding use of force into OPD's Personnel Assessment System (PAS).*

(Negotiated Settlement Agreement V. A.)

**Relevant Policy:**

OPD most recently revised Departmental General Order K-4, *Reporting and Investigating the Use of Force,* on October 16, 2014.

**Commentary:**

To assess compliance with Task 24, we reviewed 90 Level 3 and 4 use of force (UOF) reports that were completed by OPD from August 1-November 30, 2021. We also reviewed three Level 2 UOF investigations for which an FRB was held and one Level 1 UOF for which an EFRB was held during February 2022. These Level 1 and 2 uses of force are reported in our regular assessments of Tasks 26 and 30.

**Task 24.1** requires that members/employees notify their supervisor as soon as practicable following any reportable use of force or allegation of excessive use of force. In our reviews, we identified only two instances where a notification was not properly made or was not properly documented. In both, the UOF was a Type 32 where the officers did not realize that the UOF had occurred until they later reviewed their BWC footage. In both cases, these uses of force were then reported to a supervisor.

**Task 24.2** requires that in every reportable use of force incident, every member/employee on the scene of the incident at the time the force was used, reports all uses of force on the appropriate form, unless otherwise directed by the investigating supervisor. **Task 24.3** requires that OPD personnel document, on the appropriate form, every use of force and/or the drawing and intentional pointing of a firearm at another person.

In the 90 Level 3 and 4 UOF incidents we reviewed; officers used force 219 times. In 64 of the reports, weapons were pointed at one or more subjects. In 58 of these 90 reports, Level 4 Type 22 was the only UOF used. We determined that officers' pointing of their firearms was appropriate in all instances we assessed. There were no instances identified where officers did not report Type 22 uses of force. We did identify two instances where a use of force was not properly reported; these were addressed by OPD. Both involved the reporting of Type 32 UOF. We will continue to closely monitor force reports to ensure that OPD personnel properly report uses of force in the future.

**Task 24.4** requires that a supervisor respond to the scene upon notification of a Level 1, 2, or 3 use of force or an allegation of excessive use of force, unless community unrest or other conditions makes such a response impracticable. In all seven Level 3 uses of force we reviewed for this subtask; supervisors responded to the scene as required. Though not required, in all but 10 of the 83 Level 4 UOF reports we reviewed, a supervisor was either on scene at the time of the use of force or responded to the scene upon being notified of the use of force.

**Task 24.5** specifically addresses requirements for the response and handling of Level 1 uses of force. We assess Level 1 uses of force in our regular reviews of Task 30 (Executive Force Review Boards).

**Task 24.6** requires that OPD enter all use of force data into Performance Reporting Information Metrics Environment (PRIME), which is now called Vision.  In all 90 of the Level 3 and 4 UOF cases we reviewed; the data was entered as required.

The Court's reactivation of Task 24 at a November 2018 Case Management Conference resulted from our serious concerns with the Department's handling and investigation of uses of force. OPD drafted Special Order 9196 to address and clarify requirements for the proper reporting of use of force.  This revision to UOF reporting requirements went into effect in February 2020. OIG's global use of force audit, conducted in 2019, also identified numerous concerns with the reporting of use of force and enumerated recommendations.  As noted throughout this report, OPD has taken a number of actions to address the identified concerns with the reporting of force. This is the fourth report where our assessment includes only uses of force that occurred after the implementation of Special Order 9196, the revisions to OPD's use of force policy, and Special Order 9202, and includes the review of 90 Level 3 and 4 uses of force.  While we will continue to closely monitor uses of force to ensure that the desired reporting outcomes continue, we find OPD in compliance with this Task.

| Task 24 compliance status | In compliance |
|---|---|

## Task 25: Use of Force Investigations and Report Responsibility

<u>**Requirements:**</u>

*An on-scene supervisor is responsible for completing an investigated use of force report in accordance with the provisions of Departmental General Order K-4, "Reporting and Investigating the Use of Force."*

1. *OPD shall develop and implement a policy for conducting and documenting use of force investigations that include, at a minimum:*

   a. *Documentation of the incident in either an Offense or Supplemental Report from the member(s)/employee(s) using force; and/or, when necessary, a statement taken from the member(s)/employee(s) using force;*

   b. *Separating and separately interviewing all officers who were at the scene at the time of the incident;*

   c. *A Supplemental Report from other members/employees on the scene or a statement taken, if deemed necessary by the investigating supervisor;*

   d. *Identification and interviews of non-Departmental witnesses;*

   e. *Consideration of discrepancies in information obtained from members, employees and witnesses, and statements in the reports filed;*

   f. *Whether arrest reports or use of force reports contain "boilerplate" or "pat language" (e.g., "fighting stance", "minimal force necessary to control the situation");*

g.  *Documentation of physical evidence and/or photographs and a summary and analysis of all relevant evidence gathered during the investigation; and*

h.  *Consideration of training/tactical issues involving the availability and practicality of other force options.*

i.  *Supervisor's justification as to why any element of the policy was not documented; and*

2.  *All supervisors shall be trained in conducting use of force investigations and such training shall be part of a supervisory training course.*

3.  *Use of force investigations shall include a recommendation whether the use of force was objectively reasonable and within Department policy and training.  The recommendation shall be based on the totality of the circumstances and shall consider, but is not limited to, the following factors:*

    a.  *Whether the force used was pursuant to a legitimate law-enforcement objective;*

    b.  *Whether the type and amount of force used was proportional to the resistance encountered and reasonably related to the objective the members/employees were attempting to achieve;*

    c.  *Whether the member/employee used reasonable verbal means to attempt to resolve the situation without force, if time and circumstances permitted such attempts;*

    d.  *Whether the force used was de-escalated or stopped reasonably when resistance decreased or stopped;*

4.  *use of force reports shall be reviewed by the appropriate chain-of-review as defined by policy.*

    *The type of force used, the identity of the involved members, and the report preparer shall be the determining criteria for utilizing the appropriate chain-of-review.  Reviewers may include, when appropriate, the chain-of-command of the involved personnel, the appropriate Area Commander on duty at the time the incident occurred, other designated Bureau of Field Operations commanders, and as necessary, the chain-of-command of the involved personnel up to the Division Commander or Deputy Chief/Director, and the Internal Affairs Division.*

    *Reviewers for Level 1-3 use of force investigations shall:*

    a.  *Make a recommendation as to whether the use of force was in or out of policy,*

    b.  *Order additional investigation and investigative resources when necessary, and*

    c.  *Comment on any training issue(s) when appropriate.*

5.  *Any recommendation that the use of force did not comply with Department policy shall result in the incident being referred to the Internal Affairs Division to conduct additional investigation/analysis, if necessary.*

6.  *Members/employees involved in a use of force incident resulting in serious injury or death and/or an officer-involved shooting, shall be separated from each other as soon as practicable at the incident scene, and kept apart until they have completed their reports and been interviewed.*

(Negotiated Settlement Agreement V. B.)

**Relevant Policy:**

OPD most recently revised Departmental General Order K-4, *Reporting and Investigating the Use of Force,* on October 16, 2014.

**Commentary:**

As noted above in Task 24, we reviewed 90 Level 3 and 4 use of force (UOF) reports that were completed between August 1-November 30, 2021.  We also reviewed three Level 2 UOF reports and one Level 1 UOF report for which Force Review Boards were held in February 2022.

**Task 25.1** requires that supervisors complete a use of force report and that certain criteria are met in the report.  We have found that OPD meets many of the required subtasks.  However, Task 25.1f addresses the use of "boilerplate" or "pat" language in reports.  While OPD has made strides in eliminating most of such language, in our prior reviews, we continued to find deficiencies, specifically, numerous instances where officers justified their uses of force "based on my training and experience," without any further information or explanation as to what training and experience they were referring to.  We noted that in the UOF reports reviewed for this report, there was significant improvement in officers documenting specific information and details justifying their use of force, and few instances where specific justification was not provided.

**Task 25.2** requires that all supervisors are trained on how to conduct use of force investigations and such training is part of a supervisory training course.  OPD includes the requirement for this training in its Departmental policies.  During our August 2020 site visit, we again confirmed with OPD that the Department continued to require and deliver this training.  In OPD's 279th Biweekly Compliance Update, dated January 15, 2021, the Department provided the results of its review of Task 25 requirements.  OPD reviewed 15 uses of force for this audit; one was a Level 3 UOF, and 14 were Level 4 uses of force.  The Department noted in this report that all supervisors had attended a Sergeants' Transition Course, where use of force investigation is part of the curriculum.  During our future site visits, we will verify that this training continues to occur.

We have continued to be concerned with the preparation and review of UOF reports by supervisors. The use of force and the processes in which force is documented and reviewed are at the core of the Court's oversight. The Department has provided numerous directives on this topic. For UOF reports reviewed for this report, we found improvement in supervisors identifying deficiencies in officer reporting and identifying and addressing MOR violations. We also found improvement in the review of the supervisor reports, particularly in those UOF reports generated in October and November of 2021. Unfortunately, we have seen such improvement in the past, followed by periods where improvement stalled. We are hopeful that this improvement will be sustained and become the standard for OPD's UOF reporting.

**Task 25.3** requires that use of force investigations include required recommendations. Areas of recommendation include: whether the force used was pursuant to a legitimate law enforcement objective; whether the type and amount of force used was proportional to the resistance encountered and reasonably related to the objective the officers were attempting to achieve; whether the officers used reasonable verbal means to attempt to resolve the situation without force, if time and circumstances permitted such attempts; and whether the force used was de-escalated or stopped reasonably when resistance decreased or stopped.

In our assessment of 90 Level 3 and 4 UOF reports, we did not identify any instances where we believe the force may not have been appropriate, where the use of force was not deescalated or stopped reasonably when resistance decreased, or any instances where we believe officers could have made additional efforts to explain to subjects being detained why the detention was occurring prior to using force. While we noted an improvement in officers identifying themselves as police officers when appropriate and there is time to do so, there is still room for improvement here. During our site visits, we will continue to discuss any concerns that we identify with this Task.

**Task 25.4** requires that use of force reports be reviewed by the appropriate chain of command and appropriate recommendations are made. In all of the cases we reviewed, the reports were reviewed as required. We continue to note that while some deficiencies related to the preparation and review of UOF reports for Level 3 and 4 uses of force are discovered during the reviews, some are not. We continue to find instances where supervisors fail to identify and properly address concerns with body-worn camera activations, or other MOR violations. We have noted that these same concerns exist when the reports are reviewed by the chain of command. For the UOF reports reviewed for August 1-November 31, 2021, we did observe some improvement, particularly in those reports completed in October and November 2021. We are hopeful this trend will continue.

**Task 25.5** requires that any determination that a use of force did not comply with Department policy result in the incident being referred to IAD to conduct additional investigation/analysis, if necessary. None of the Level 3 or Level 4 investigations we reviewed resulted in our finding that the force did not comply with policy.

**Task 25.6** requires that members/employees involved in a use of force incident resulting in serious injury or death and/or officer-involved shooting, are separated from each other as soon as practicable at the incident scene, and kept apart until they have completed their reports and been interviewed. This Task is not assessed here, as we review and consider it as part of the Force and Executive Force Review Boards that OPD holds to examine Level 1 and 2 uses of force.

DRAFT Eightieth Report of the Independent Monitor for the Oakland Police Department
March 18, 2022
Page 16 of 28

The Court's reactivation of Task 25 at a November 2018 Case Management Conference resulted from our serious concerns with the Department's handling and investigation of uses of force. OPD drafted Special Order 9196 to address and clarify requirements for the proper reporting of use of force.  This revision to UOF reporting requirements went into effect in February 2020. OIG's global use of force audit, conducted in 2019, also identified numerous concerns with the reporting of use of force and enumerated recommendations.  As noted throughout this report, OPD has taken a number of actions to address the identified concerns with the investigation and reporting of force.

This is the fourth report where our assessment includes only uses of force that occurred after the implementation of Special Order 9196, the revisions to OPD's use of force policy, and Special Order 9202, and includes the review of 91 Level 3 and 4 uses of force.  These revisions to policy, along with the many follow-up emails and training by executive staff, have outlined the Department's expectations of those who prepare and review UOF reports.  In our 76th and 78th status reports, we noted that the Department's progress with the investigation of force and required documentation had stalled.  For this report, we note that OPD is improving in this area, specifically in the UOF reporting for October and November 2021.  We will continue to closely monitor uses of force to ensure that the required reporting outcomes occur and that OPD addresses the deficiencies that have been identified.  OPD remains in partial compliance with this Task.

| **Task 25 compliance status** | In partial compliance |
| --- | --- |


# Task 26:  Force Review Board (FRB)

**Requirements:**

*OPD shall develop and implement a policy concerning its FRB proceedings.  The policy shall:*

1.   *Set out procedures, membership and a timetable for FRB review of use of force investigations involving Level 2 incidents, as defined in Department General Order K-4, REPORTING AND INVESTIGATING THE USE OF FORCE;*

2.   *Require the FRB to review all use of force investigations;*

3.   *Require the FRB to make a recommendation as to whether the use of force was in policy or out of policy;*

4.   *Require the FRB to forward sustained policy violations to the Discipline Officer.*

5.   *Require the FRB not to review any use of force allegation until the internal investigations has been completed;*

6.   *Authorize the FRB to recommend to the Chief of Police additional use of force training or changes in policies or tactics, or additional standards, investigatory policies, or training for use of force investigations;*

DRAFT Eightieth Report of the Independent Monitor for the Oakland Police Department
March 18, 2022
Page 17 of 28

7.  *Require the FRB to conduct an annual review of use of force cases examined, so as to identify any patterns of use of force practices that may have policy or training implications, and thereafter, issue a report to the Chief of Police;*

8.  *Require that the FRB membership include, at a minimum, one member from the Training Division, one member from the Field Training Officer program, and either the Bureau of Field Operations Deputy Chief or his/her designee;*

9.  *Minimally, that one member of the FRB shall be replaced at least annually.*

(Negotiated Settlement Agreement V. C.)

**Relevant Policy:**

OPD most recently revised Departmental General Order K-4.1, *Force Review Boards,* on December 21, 2015.

**Commentary:**

OPD Force Review Boards (FRBs) are regularly convened to examine the investigations conducted relative to the deployment and application of Level 2 uses of force.[1]  OPD first achieved compliance with this Task during the nineteenth reporting period (April 1-June 30, 2014).  We continue to assess the compliance with this Task, including our analyses of force reports; our review of Force Review Board reports; attendance at Force Review Boards when conducted during our site visits; and observing Force Review Boards between site visits via online meeting software.

For this report, we reviewed two FRB reports that were completed and approved by the Chief of Police between November 2021 and January 2022.  In general, we found the reports to be well-written and accurate accounts of the proceedings they documented.  Two members of the Monitoring Team observed both of these FRBs remotely via virtual meeting software.  The reports collectively documented the assessment of nine uses of force associated with two separate incidents.  All uses of force were found to be in compliance.  In all of the cases, the Chief concurred with the Boards' findings without any modifications.  We did not disagree with any of the findings in the FRB reports we reviewed.

---

[1] According to OPD, Level 2 uses of force include: "1) Any strike to the head (except for an intentional strike with an impact weapon); 2) Carotid restraint is applied that does not result in the loss of consciousness; 3) Use of impact weapons, including specialty impact munitions or any other object, to strike a subject and contact is made, regardless of injury; 4) Any unintentional firearms discharge that does not result in injury; 5) A police canine bites the clothing or the skin of a subject, or otherwise injures a subject requiring emergency medical treatment (beyond first-aid) or hospital admittance; 6) Any use of force which results in injuries to the subject requiring emergency medical treatment (beyond first-aid) or hospital admittance; (NOTE: For the purposes of this order, an evaluation by a medical professional to assess a complaint of injury is not emergency treatment) 7) Any Level 3 use of force used on or applied to a restrained subject; 7.a) A restrained subject is a person who has been fully placed in a Department authorized restraint device such as both hands handcuffed, a WRAP or Rip Hobble; 7.b) A subject with only one handcuff on is not a restrained person."

In addition to reviewing the completed FRB reports, we observed all three of the FRBs convened by OPD since we last reported on this Task. These Boards met on February 15, 16, and 22, respectively. We observed them all remotely via an online meeting platform due to the ongoing COVID pandemic, which has curtailed our monthly in-person site visits. We provide immediate feedback for Board members at the conclusion of each FRB we observe.

As noted in our recent reports concerning this Task, we continue to observe substantive discussion and deliberations among the Board members. All of the Captains (and in one instance during this reporting period, a Deputy Chief) who sit as panelists have gained a great deal of experience during the past two years, and this has resulted in a certain consistency in the manner in which the Boards are conducted. Members ask probing questions of the force investigators; and, where applicable, Department subject-matter experts (SMEs) and IAD investigators. They also spend a great deal of time discussing issues ancillary to the uses of force, such as tactics, supervision, force alternatives, and training opportunities. As is customary for all Boards, their feedback was conveyed in the form of training points to appropriate personnel.

That same consistency is not necessarily apparent in the presentations of the force investigators. This is understandable, since presenting before the FRBs is a relatively infrequent experience, and we will often observe first-time presenters. We have encouraged OPD to provide training to first-line supervisors regarding expectations and best practices when appearing before these Boards.

Collectively, the FRBs found all the uses of force they reviewed to be in compliance. We did not disagree with any of the Boards' findings. It is not a requirement, but all of the Board votes we observed during this reporting period were unanimous. We recognize that in some circumstances, there will be legitimate differences of opinion where the determination is not obvious. In these situations, we look for frank discussion and clear explanations of the differing positions.

In addition to ruling on the appropriateness of uses of force, Force Review Boards generally identify several follow-up items based on their review of the associated materials and the presentations made to them. These can include items such as counseling and training for individual officers, publication of Department-wide training materials, and modifications to policy. OPD tracks these deliverables in a spreadsheet, broken down into three categories: Individual Issues; Department-Wide Issues; and Quarterly Training Points.

The last accounting of deliverables provided to us, which lists follow-up items from FRBs convened prior to January 26, 2022, identified six open items from three separate FRBs. (This information was provided to us pursuant to a standing monthly document request, and does not include deliverables from the FRBs we observed in February.) All of the items involved individual training. OPD has successfully addressed the backlog of deliverables identified in some of our earlier reports. Our three most recent reviews did not reveal any significant accumulation of unresolved commitments.

Based on this review, OPD remains in compliance with this Task.

| **Task 26 compliance status** | In compliance |
| --- | --- |

## Task 30:  Executive Force Review Board (EFRB)

**Requirements:**

1. *An EFRB shall be convened to review the factual circumstances surrounding any Level 1 force, in-custody death, or vehicle pursuit-related death incidents.  A firearm discharge at an animal shall be reviewed by the EFRB only at the direction of the Chief of Police.*

2. *The Board shall have access to recordings and/or transcripts of interviews of all personnel on the scene, including witnesses, and shall be empowered to call any OPD personnel to provide testimony at the hearing.*

3. *OPD shall continue the policies and practices for the conduct of EFRB, in accordance with the provisions of DGO K-4.1, FORCE REVIEW BOARDS.*

(Negotiated Settlement Agreement V. G.)

**Relevant Policy:**

OPD most recently revised Departmental General Order K-4.1, *Force Review Boards,* on December 21, 2015.

**Commentary:**

Executive Force Review Boards (EFRBs), consisting of three top command-level staff, conduct thorough, detailed reviews of all Level 1 uses of force, in-custody deaths, and vehicle pursuit-related deaths and serious injuries.  OPD achieved compliance with this Task during the nineteenth reporting period (April 1-June 30, 2014).  We found OPD not in compliance with this Task based on the EFRB conducted in 2018, which reviewed the officer-involved shooting of Joshua Pawlik.  We disagreed with the Board's findings in that case, and issued a detailed report on the incident on August 17, 2020.

Since we last reported on this Task, OPD convened one EFRB to review an officer-involved shooting (OIS), which occurred on November 3, 2020.  In this incident, OPD officers responded to address a roving caravan of looters who were targeting a marijuana cultivation building.  An officer discharged his patrol rifle at a subject who was backing a vehicle in the direction of another officer and the person the other officer was taking into custody.  While it was not known to the shooting officer, the vehicle operator ran over another officer shortly before the firearms discharge.  In addition to the Level 1 use of force, OPD made several arrests, and multiple officers used force in making those arrests.

As required, the Board was chaired by a Deputy Chief.  The EFRB reviewed and determined compliance for the Level 1 firearms discharge, as well as 36 other lower-level uses of force.  The EFRB was efficiently run, and Board Members received presentations from both the Criminal Investigations Division and the Internal Affairs Division.  All uses of force were deemed in compliance, and we did not disagree with the EFRB's findings.

DRAFT Eightieth Report of the Independent Monitor for the Oakland Police Department
March 18, 2022
Page 20 of 28

We did not receive or review any completed EFRB reports during this reporting period.

OPD remains in compliance with this Task.

| Task 30 compliance status | In compliance |
| --- | --- |

## Task 31:  Officer-Involved Shooting Investigations Review Protocol

**Requirements:**

*OPD shall develop a policy to ensure that, in every officer-involved shooting in which a person is struck, Homicide and Internal Affairs investigators respond to the scene.  The Homicide Section's investigation shall be conducted in partnership with, and when deemed appropriate by, the Alameda County District Attorney's Office.  Interviews of the subject officer(s) shall be conducted jointly with the appropriate staff from Homicide and the Office of the District Attorney.  The District Attorney and City Attorney shall be notified in accordance with the provisions of Section V, paragraph A (5), of this Agreement.  Homicide shall duplicate and provide all completed reports and documents to the District Attorney's Office, the Office of the City Attorney, and the Internal Affairs Division.  IAD shall provide information and/or documents as required by law.*

(Negotiated Settlement Agreement V. H.)

**Relevant Policy:**

OPD most recently published Departmental General Order K-4, *Reporting and Investigating the Use of Force* on October 16, 2014.  IAD Policy & Procedures and Homicide Policy & Procedures are also relevant to this Task.

**Commentary:**

Task 31 requires certain notifications and responses in the event of an officer-involved shooting.  The Task has long been inactive, but on November 27, 2018, the Court reactivated the Task as an active part of our responsibility.

During this reporting period (January 1-March 4, 2022), OPD did not have any officer-involved shootings.  The Internal Affairs Division did have two Level 1 incident callouts unrelated to officer-involved shootings – one on January 15 and one on March 2.  OPD confirmed that, while not required, the protocols required by this Task were followed in those instances.

OPD remains in compliance with this Task.

| Task 31 compliance status | In compliance |
| --- | --- |

## Task 34:  Vehicle Stops, Field Investigation, and Detentions

**Requirements:**

1. *OPD shall require members to complete a basic report on every vehicle stop, field investigation and every detention.  This report shall include, at a minimum:*

   a. *Time, date and location;*

   b. *Identification of the initiating member or employee commencing after the first year of data collection;*

   c. *Reason for stop;*

   d. *Apparent race or ethnicity, and gender of individual(s) stopped;*

   e. *Outcome of stop (arrest, no arrest);*

   f. *Whether a search was conducted, and outcome of search;*

   g. *Offense categories (felony, misdemeanor or infraction).*

2. *This data shall be entered into a database that can be summarized, searched, queried and reported by personnel authorized by OPD.*

3. *The development of this policy shall not pre-empt any other pending or future policies and or policy development, including but not limited to "Promoting Cooperative Strategies to Prevent Racial Profiling."*

(Negotiated Settlement Agreement VI. B.)

**Relevant Policy:**

Department policies relevant to Task 34 include:  General Order M-19, *Prohibitions Regarding Racial Profiling and Other Bias-Based Policing* (published November 4, 2004)*;* Special Order 9042, *New Procedures Regarding Stop Data Collection* (published June 11, 2010); Special Order 9101, *Revised Stop Data Collection Procedures* (published February 27, 2013); and Report Writing Manual (RWM) Inserts R-2, N-1, and N-2.

**Commentary:**

Task 34 requires OPD to complete reports on vehicle stops, field investigations, and detentions. It lists the core information to be collected in what became known as the stop data process.  The State of California subsequently passed the Racial and Identity Profiling Act (RIPA) mandating stop data collection by police departments.

Under the NSA, OPD's engagement with stop data goes beyond simply collecting and reporting the data.  Stop data is a significant element for review in the Department's risk management process, which is associated with Task 41.  Patterns and trends in stop data are reviewed at every level of the Risk Management Meetings.  The Department's analysis includes a review of behavior or conditions that prompt stops, the activity involved during stops, and the results or outcomes of stops.

The analysis and review of data during our February remote site visit continued to show trends consistent with risk management goals.  The 2020-2021 data show declines in stops, with larger declines in non-dispatched stops compared with dispatched stops.  Similarly, there were modest increases in the percentage of stops based on intelligence information.  The long-term trend has been toward focusing stops on activity associated with crime, and not on incidental traffic-related concerns.  The data also show larger declines in stops of African Americans and Latinos, compared with other groups whose numbers are lower but not declining.  Nonetheless, African Americans and Latinos remain disproportionately overrepresented among those who are stopped.

The Department also provided comparisons between OPD and 18 agencies reporting in the State's RIPA data reports, that show that OPD has substantially lower levels of stops for non-moving and equipment-based vehicle violations.

As part of the risk management process, OPD's review of data includes identification of officers with the highest levels of non-dispatched stops.  Along with the number of stops, the data include information on the race and ethnicity of those stopped; and information on the proportion of stops resulting in searches, contraband recovered, arrests, and traffic citations.  An analysis of those findings for all stops were included in the previous month.  The information on outcomes forms the basis for discussion at the Risk Management Meetings and for further attention from supervisors if necessary.

The application of stop data in the risk management process in the Department has developed over a long period of time under the NSA.  It began with attention to the number of stops being made and has matured to include analysis of the justification for stops, characteristics of those stopped, the outcomes of those stopped, and the engagement of officers in stops.  Stop data has become a critical factor in the management of risk at OPD.  As with other topics covered in the process, the increasingly sophisticated analysis of stop data and the sharing of data with officers at all levels across the Department, have been critical contributions to risk management.

| Task 34 compliance status | In compliance |
|---|---|

## Task 41:  Use of Personnel Assessment System (PAS) and Risk Management

**Requirements:**

*Within 375 days from the effective date of this Agreement, OPD shall develop a policy for use of the system, including supervision and audit of the performance of specific members, employees, supervisors, managers, and OPD units, as well as OPD as a whole.*

*The policy shall include the following elements:*

1.  *The Chief of Police shall designate a PAS Administration Unit.  The PAS Administration Unit shall be responsible for administering the PAS policy and, no less frequently than quarterly, shall notify, in writing, the appropriate Deputy Chief/Director and the responsible commander/manager of an identified member/employee who meets the PAS criteria.  PAS is to be electronically maintained by the City Information Technology Department.*

2.  *The Department shall retain all PAS data for at least five (5) years.*

3.  *The Monitor, Inspector General and Compliance Coordinator shall have full access to PAS to the extent necessary for the performance of their duties under this Agreement and consistent with Section XIII, paragraph K, and Section XIV of this Agreement.*

4.  *PAS, the PAS data, and reports are confidential and not public information.*

5.  *On a quarterly basis, commanders/managers shall review and analyze all relevant PAS information concerning personnel under their command, to detect any pattern or series of incidents which may indicate that a member/employee, supervisor, or group of members/employees under his/her supervision may be engaging in at-risk behavior.  The policy shall define specific criteria for determining when a member/employee or group of members/employees may be engaging in at-risk behavior.*

6.  *Notwithstanding any other provisions of the PAS policy to be developed, the Department shall develop policy defining peer group comparison and methodology in consultation with Plaintiffs' Counsel and the IMT.  The policy shall include, at a minimum, a requirement that any member/employee who is identified using a peer group comparison methodology for complaints received during a 30-month period, or any member who is identified using a peer group comparison methodology for Penal Code §§69, 148 and 243(b)(c) arrests within a 30-month period, shall be identified as a subject for PAS intervention review. For the purposes of these two criteria, a single incident shall be counted as "one" even if there are multiple complaints arising from the incident or combined with an arrest for Penal Code §§69, 148 or 243(b)(c).*

7.  *When review and analysis of the PAS threshold report data indicate that a member/employee may be engaging in at-risk behavior, the member/employee's immediate supervisor shall conduct a more intensive review of the*

*member/employee's performance and personnel history and prepare a PAS Activity Review and Report.  Members/employees recommended for intervention shall be required to attend a documented, non-disciplinary PAS intervention meeting with their designated commander/manager and supervisor.  The purpose of this meeting shall be to review the member/employee's performance and discuss the issues and recommended intervention strategies.  The member/employee shall be dismissed from the meeting, and the designated commander/manager and the member/employee's immediate supervisor shall remain and discuss the situation and the member/employee's response.  The primary responsibility for any intervention strategies shall be placed upon the supervisor.  Intervention strategies may include additional training, reassignment, additional supervision, coaching or personal counseling.  The performance of members/ employees subject to PAS review shall be monitored by their designated commander/manager for the specified period of time following the initial meeting, unless released early or extended (as outlined in Section VII, paragraph B (8)).*

8.  *Members/employees who meet the PAS threshold specified in Section VII, paragraph B (6) shall be subject to one of the following options:  no action, supervisory monitoring, or PAS intervention.  Each of these options shall be approved by the chain-of-command, up to the Deputy Chief/Director and/or the PAS Activity Review Panel.*

*Members/employees recommended for supervisory monitoring shall be monitored for a minimum of three (3) months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor.  The first at the end of one (1) month and the second at the end of three (3) months.*

*Members/employees recommended for PAS intervention shall be monitored for a minimum of 12 months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor and designated commander/manager:  The first at three (3) months and the second at one (1) year.  Member/employees subject to PAS intervention for minor, easily correctable performance deficiencies may be dismissed from the jurisdiction of PAS upon the written approval of the member/employee's responsible Deputy Chief, following a recommendation in writing from the member/employee's immediate supervisor.  This may occur at the three (3)-month follow-up meeting or at any time thereafter, as justified by reviews of the member/employee's performance.  When a member/employee is not discharged from PAS jurisdiction at the one (1)-year follow-up meeting, PAS jurisdiction shall be extended, in writing, for a specific period in three (3)-month increments at the discretion of the member/employee's responsible Deputy Chief.  When PAS jurisdiction is extended beyond the minimum one (1)-year review period, additional review meetings involving the member/employee, the member/ employee's designated commander/manager and immediate supervisor, shall take place no less frequently than every three (3) months.*

9.  *On a quarterly basis, Division/appropriate Area Commanders and managers shall review and analyze relevant data in PAS about subordinate commanders and/or managers and supervisors regarding their ability to adhere to policy and address at-risk behavior.  All Division/appropriate Area Commanders and managers shall conduct quarterly meetings with their supervisory staff for the purpose of assessing and sharing information about the state of the unit and identifying potential or actual performance problems within the unit.  These meetings shall be scheduled to follow-up on supervisors' assessments of their subordinates' for PAS intervention.  These meetings shall consider all relevant PAS data, potential patterns of at-risk behavior, and recommended intervention strategies since the last meeting.  Also considered shall be patterns involving use of force, sick leave, line-of-duty injuries, narcotics-related possessory offenses, and vehicle collisions that are out of the norm among either personnel in the unit or among the unit's subunits.  Division/appropriate Area Commanders and managers shall ensure that minutes of the meetings are taken and retained for a period of five (5) years.  Commanders/managers shall take appropriate action on identified patterns of at-risk behavior and/or misconduct.*

10. *Division/appropriate Area Commanders and managers shall meet at least annually with his/her Deputy Chief/Director and the IAD Commander to discuss the state of their commands and any exceptional performance, potential or actual performance problems or other potential patterns of at-risk behavior within the unit.  Division/appropriate Area Commanders and managers shall be responsible for developing and documenting plans to ensure the managerial and supervisory accountability of their units, and for addressing any real or potential problems that may be apparent.*

11. *PAS information shall be taken into account for a commendation or award recommendation; promotion, transfer, and special assignment, and in connection with annual performance appraisals.  For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

12. *Intervention strategies implemented as a result of a PAS Activity Review and Report shall be documented in a timely manner.*

13. *Relevant and appropriate PAS information shall be taken into account in connection with determinations of appropriate discipline for sustained misconduct allegations.  For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

14. *The member/employee's designated commander/manager shall schedule a PAS Activity Review meeting to be held no later than 20 days following notification to the Deputy Chief/Director that the member/employee has met a PAS threshold and when intervention is recommended.*

15. *The PAS policy to be developed shall include a provision that a member/employee making unsatisfactory progress during PAS intervention may be transferred and/or loaned to another supervisor, another assignment or another Division, at the discretion of the Bureau Chief/Director if the transfer is within his/her Bureau. Inter-Bureau transfers shall be approved by the Chief of Police. If a member/employee is transferred because of unsatisfactory progress, that transfer shall be to a position with little or no public contact when there is a nexus between the at-risk behavior and the "no public contact" restriction. Sustained complaints from incidents subsequent to a member/employee's referral to PAS shall continue to result in corrective measures; however, such corrective measures shall not necessarily result in a member/employee's exclusion from, or continued inclusion in, PAS. The member/employee's exclusion or continued inclusion in PAS shall be at the discretion of the Chief of Police or his/her designee and shall be documented.*

16. *In parallel with the PAS program described above, the Department may wish to continue the Early Intervention Review Panel.*

17. *On a semi-annual basis, beginning within 90 days from the effective date of this Agreement, the Chief of Police, the PAS Activity Review Panel, PAS Oversight Committee, and the IAD Commander shall meet with the Monitor to review the operation and progress of the PAS. At these meetings, OPD administrators shall summarize, for the Monitor, the number of members/employees who have been identified for review, pursuant to the PAS policy, and the number of members/employees who have been identified for PAS intervention. The Department administrators shall also provide data summarizing the various intervention strategies that have been utilized as a result of all PAS Activity Review and Reports. The major objectives of each of these semi-annual meetings shall be consideration of whether the PAS policy is adequate with regard to detecting patterns of misconduct or poor performance issues as expeditiously as possible and if PAS reviews are achieving their goals.*

18. *Nothing in this Agreement, and more specifically, no provision of PAS, shall be construed as waiving, abrogating or in any way modifying the Department's rights with regard to discipline of its members/employees. The Department may choose, at its discretion, to initiate the administrative discipline process, to initiate PAS review or to use both processes concurrently or consecutively.*

(Negotiated Settlement Agreement VII. B.)


**Relevant Policy:**

OPD revised and issued Departmental General Order D-17, *Personnel Assessment Program,* in November 2013.

## Commentary:

Over the past months, we have described the structure of the risk management process and its multiple layers.  These include Area-level meetings, meetings at the Bureaus and program levels, and City-wide meetings.  The Department held a City-Wide Risk Management Meeting during our February remote site visit.

At each level, the Risk Management Meetings make unique contributions to the process of analyzing and managing risk.  At the area level, the process is largely one of informal discussion using both the experience of supervisors and the risk management data.  By virtue of the close contact between officers and their supervisors, these meetings generally provide the most comprehensive reviews of individual officers.  When needed, management referrals for monitoring also come from the Area meeting process.

The program meetings focus on specific issues related to the specialized tasks of units such as Ceasefire.  Those conversations often address strategy and its consequences for risk.  Bureau meetings provide follow-up for both the Area and program meetings, and include more extensive administrative review through the addition of the Deputy Chiefs.

The City-wide meetings are overseen by the senior command staff and are the highest level of the Risk Management Meetings.  A wide variety of issues, often emanating from the meetings described above, are reviewed.  As in other meetings, the discussions include "drilling down" to the behavior of individual officers but these meetings also provide opportunities for "drilling up" to consider the risk-related consequences of policy and practice in the Department.

The meetings across these levels are also supplemented by the analysis of data from the Personnel Assessment System, administered by the PAS Unit. The work of the PAS Unit provides individually focused analyses of officer behavior that complements the narrative reviews occurring at the Risk Management Meetings.  The PAS Unit also manages the implementation of the system for supervisory monitoring when behavioral thresholds are exceeded or when supervisors believe that an administrative referral for monitoring may be useful.

The development of the risk management system in the Department has also included the recognition of the need to ensure the best use of the data available through the Vision database, which is now described by the Department as complete.  Although the data dashboards have been described as likely to be valuable tools for supervisors, they remain unfinished.  Renewals of contracts to complete that work have been described as forthcoming.

The revision of the risk management policy is a second task that is currently in process.  This policy is significant, as it will retain the structure of the risk management process and the requirements regarding analysis of data.  This preserves OPD's commitment to risk management and the innovative approach taken by the Department beyond the NSA.

An important addition to the risk management process, however, has been the long-anticipated addition of the Department's Data Manager.  Over the past several months, the Data Manager has significantly advanced the collection, review, and analysis of the risk management data.  That has included the analysis and display of data for the Risk Management Meetings, as described above and extension of that work through related analyses such as the examination of the Department's disciplinary process.  The potential for further advancements in the use of data have also been recognized, and the Department has undertaken steps for the addition of staff to work with the Data Manager in the Office of the Inspector General (OIG).

| Task 41 compliance status | In compliance |
| --- | --- |

## Conclusion

During this reporting period, the Department has made progress on the road to full compliance.  Tasks 25 and 45 remain in partial compliance.  There are indicators that Task 25 (Use of Force Investigation and Report Responsibility) may come into compliance in the near future.

Task 34 (Vehicle Stops, Field Investigation, Field Investigation and Detentions) is now in compliance.  This Task is a core issue of the NSA, and requires OPD to conduct careful analyses and take action as a result of its analyses.  While the data still shows disparities, the capture of the information and the requisite remedial actions that the Department has taken is a positive development.  The Department must continue its efforts relevant to this Task.  The community has every right to expect that OPD's commitment to the analyses of stops and detentions becomes a core value of the Department.

Chief (Ret.) Robert S. Warshaw
*Monitor*