BARBARA J. PARKER, City Attorney, CABN 69722
RYAN RICHARDSON, Special Counsel, CABN 223548
BRIGID S. MARTIN, Special Counsel, CABN 231705
One Frank H. Ogawa Plaza, 6th Floor
Oakland, California 94612
Telephone: (510) 238-3751
Facsimile: (510) 238-6500
Email:  BMartin@oaklandcityattorney.org

Attorneys for CITY OF OAKLAND

JOHN L. BURRIS, CABN 69888
Law Offices of John L. Burris
Airport Corporate Centre
7677 Oakport Street, Ste. 1120
Oakland, California 94621
Telephone: (510) 839-5200
Facsimile: (510) 839-3882

JAMES B. CHANIN, CABN 76043
Law Offices of James B. Chanin
3050 Shattuck Avenue
Berkeley, California 94705
Telephone: (510) 848-4752

Attorneys for PLAINTIFFS

*(Additional Counsel on Next Page)*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| DELPHINE ALLEN, et al. | Case No. 00-cv-04599 WHO |
| Plaintiffs, | **JOINT CASE MANAGEMENT STATEMENT** |
| v. | Date: April 27, 2022 |
| CITY OF OAKLAND, et al., | Time: 3:30 p.m. |
| Defendant(s). | Courtroom 2, 17th Floor (Virtual) |
| | Hon. William H. Orrick |

1  ROCKNE A. LUCIA, JR., CABN 109349
   Rains Lucia Stern St. Phalle & Silver
2  Attorneys & Counselors at Law
   2300 Contra Costa Boulevard, Suite 500
3  Pleasant Hill, CA 94523
   Telephone: (925) 609-1699
4  Facsimile: (925) 609-1690

5  Attorneys for OAKLAND POLICE OFFICERS ASSOCIATION

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1

**TABLE OF CONTENTS**

2   **THE PARTIES' JOINT STATEMENT**.................................................. 1

3   **THE PLAINTIFFS' STATEMENT** .................................................. 3

4   PLAINTIFFS' CURRENT POSITION .................................................. 3

5   I.   TASK 2 (TIMELINESS STANDARDS AND COMPLIANCE WITH IAD

6   INVESTIGATIONS)............................................................................. 3

7   II.  TASK 5 (COMPLAINT PROCEDURES FOR IAD)................................. 5

8   III. TASKS 24 (USE OF FORCE REPORTING POLICY) & 25 (USE OF FORCE

9   INVESTIGATIONS AND REPORT RESPONSIBILITY)........................... 8

10  IV.  TASK 34 (STOP DATA/VEHICLE STOPS, FIELD INVESTIGATIONS AND

11  DETENTIONS) ................................................................................ 11

12  V.  TASK 45 (CONSISTENCY OF DISCIPLINE POLICY) ........................ 13

13  CONCLUSION................................................................................ 29

14  **THE CITY'S STATEMENT**........................................................... 34

15  OVERVIEW ................................................................................. 34

16  I. CONSISTENCY IN DISCIPLINE POLICY—TASK 45 ........................ 35

17      A. Department's Analyses of Race in Internal Investigation

18          Outcomes and Discipline (Apr. 2022) ................................. 37

19          1.    2022 Report Findings .......................................... 38

20          2.    Department's Response ........................................ 41

21  II. RECRUITING AND IMPROVING DEPARTMENT DIVERSITY...................... 43

22  III. THE CITY'S ONGOING EFFORTS TO REDUCE RACIAL DISPARITIES IN

23  STOPS—TASK 34 ......................................................................... 47

24  IV.  FORCE INVESTIGATIONS AND REPORT RESPONSIBILITY—

25  TASK 25.................................................................................... 51

26      A. Body-Worn Cameras.................................................... 53

27      B. Force Investigation Timelines ....................................... 54

28

V. INTERNAL AFFAIRS TIMELINES AND COMPLAINT

PROCEDURES—TASKS 2 & 5 ......................................................... 55

VI. POLICY DEVELOPMENT AND PUBLICATION UPDATE............................ 55

CONCLUSION ............................................................................. 56

**THE OPOA'S STATEMENT**................................................................ 58

1    **THE PARTIES' JOINT STATEMENT**

2         In response to the Court's inquiry about how the Court can be helpful to

3    ensure the permanence of the Department's accomplishments, the parties together[1]

4    suggest five measures that the parties believe would aid in sustained substantial

5    compliance with the NSA: (1) sharing the Monitor's wisdom and experience on its

6    task assessments with the Commission's Inspector General (IG), (2) the Monitor's

7    evaluation of the Police Commission's Office of Inspector General's (OIG) task

8    audits, (3) the Monitor's continued assistance prioritizing and reviewing policy

9    drafts and revisions that memorialize NSA-related practices for submission to the

10   Police Commission, (4) the Monitor and plaintiffs' counsel's continued roles

11   otherwise remaining status quo for at least the first six months of the anticipated

12   sustainability period, and (5) an opportunity to revisit the Monitor's role after a

13   successful initial six-months of sustainability.

14        First, as the Commission OIG ramps up operations and begins its Charter-

15   mandated public NSA task compliance audits, it would be exceptionally helpful for

16   the Monitor to meet with the IG and the Police Commission Chair to discuss task

17   review scope and methodology and any helpful tips or pitfalls to avoid that the

18   Monitor may have gleaned during its years of work with the Department. As the IG

19   develops her own rigorous protocols for task audits, obtaining the Monitor's insights

20   would be a valuable complement to reviewing past Monitor reports. It is also

21   important that the IG understands how the IG's methodologies and audits may be

22   evaluated by the Monitor if the Monitor will be assessing the OIG's task audits.

23        Second, the Monitor's assessment of the OIG's task audits will provide

24   assurance that the OIG can stand in the shoes of the Monitor in perpetuity in the

25   way that's anticipated by the Charter and plaintiffs' counsel.

26        Third, to ensure that the Department's practices supporting sustained

27   

28   [1] The City and plaintiffs' counsel jointly propose the measures set forth herein. Intervenor OPOA has no objection.

1  substantial compliance are institutionalized, the Monitor's assistance prioritizing

2  and reviewing policy drafts and revisions that memorialize NSA-related practices

3  would continue to be helpful through any sustainability period.

4        Fourth, the parties agree that apart from the additional work with the IG

5  and OIG audit evaluations proposed above, it would to be constructive to have the

6  Monitor and plaintiffs' counsel's roles otherwise continue as they now exist at least

7  through the first six months of the anticipated sustainability period, with

8  continuing quarterly case management conferences with the Court.

9        Finally, the parties agree that in the event that the Department successfully

10  completes six months of the anticipated one-year sustainability period, it would be

11  helpful to revisit with the Court at that time whether the measures in place during

12  the first half of the sustainability period should continue, or whether different or

13  fewer measures may be more appropriate.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT CASE MANAGEMENT STATEMENT                                    Case No. 00-cv-4599 WHO

**PLAINTIFFS' STATEMENT**

**PLAINTIFFS' CURRENT POSITION**

The Independent Monitor for the OPD has issued three status reports (the 78th, 79th and 80th IMT Reports) since the last Case Management Conference statement was filed.  During this period, OPD attained compliance with three tasks that were out of compliance as of the last Case Management Conference Statement:

     1. Task 2 (Timeliness Standards and Compliance with IAD Investigations –in compliance when most recently assessed by the IMT in the 79th Report);

     2. Task 5 (Internal Affairs Division (IAD) Complaint Procedures – in compliance when    most recently assessed by the IMT in the 79th Report);

     3. Task 34 (Stop Data – in compliance when most recently assessed by the IMT in         the 80th IMT Report).

As of this writing, OPD remains out of full compliance with two NSA tasks:

     1. Task 25 (Use of Force Investigations and Report Responsibility – in partial compliance   when most recently assessed by the IMT in the 80th Report).

     2. Task 45 (Consistency of Discipline – in partial compliance when most recently assessed by the IMT in the 77th Report).

Plaintiffs' will outline their concerns regarding specific NSA tasks, as well as developments that impact multiple NSA tasks, below.

**I.    Task 2 (Timeliness Standards and Compliance with IAD Investigations)**

Task 2 requires that the Internal Affairs Department (IAD) of the OPD complete internal investigations in a timely manner.  This task was inactive between 2015 and 2019, before falling out of compliance until early 2022.  Over the

3

1  past year, the Oakland Police Department has consistently improved its timely-

2  investigation rate, and in February of 2022 OPD finally reattained the compliance

3  threshold for this Task.

4      OPD policy requires that "at least 85% of Class I misconduct investigations

5  and at least 85% of Class II misconduct investigations must be completed within

6  180 days to be considered timely." Per DGO M-03, Class I offenses "are the most

7  serious allegations of misconduct and, if sustained, shall result in disciplinary

8  action up to and including dismissal and may serve as the basis for criminal

9  prosecution."

10     The IMT reviewed 40 Class I misconduct cases during the period covered by

11  the 79th IMT Report and determined that 35 of these cases were completed in a

12  timely manner.  This represents an 88% timely-completion rate, which finally puts

13  OPD above the 85% threshold required for compliance with NSA Task 2.

14     Of the 77 Class II cases reviewed by the IMT during the period covered by

15  the 79th IMT Report, 71 were in compliance with established timelines. This

16  represents a 92% timely-completion rate, and is comfortably above the 85%

17  compliance threshold mandated by the NSA.  This 92% compliance rate for Class II

18  investigations represents a substantial improvement over the previous three

19  reporting periods, when the IMT determined OPD had completed 82%, 84%, and

20  82% of Class II investigations in a timely manner.

21     During the most recent Case Management Conference before this Court, OPD

22  personnel stated that they expected to exceed the 85% timely-completion threshold

23  mandated by the NSA prior to this Case Management Conference.  Plaintiffs'

24  attorneys lauded the steady progress of OPD toward once again achieving

25  compliance with Task 2, and OPD leadership assured that OPD would reattain

26  compliance with this Task 2 prior to this Case Management Conference.  The

27  Department has made good on this promise, and must be commended for this

28  achievement.  Captain Lau, who oversees the Internal Affairs Department, deserves

4

1  particular credit for his diligent efforts to bring OPD back into compliance with

2  Task 2.

3       However, Plaintiffs' attorneys caution that OPD was previously in

4  compliance with this task for so long that it became inactive.  OPD must remain

5  vigilant about meeting the timeliness deadlines mandated by Task 2 going forward,

6  lest they once again slip out of full compliance with Task 2.  The IMT's review of

7  Class I cases during the period covered by the 79th IMT Report indicates that OPD

8  just barely met the compliance threshold, completing 88% of such investigations in

9  the required timeframe.  Compliance with this Task is simply a matter of

10  arithmetic, and the 88% rate achieved by OPD during the reporting period covered

11  by the 79th IMT report surpasses the 85% required by the NSA (and, as Plaintiff's

12  have repeatedly noted, the mandated 85% timely-completion rate is substantially

13  lower than what is required by most other consent decrees).  However, there was

14  not much wiggle room for OPD in the NSA's review of Class I investigations during

15  this period.  Had just two more of these Class I investigations fallen outside of the

16  established timelines, OPD would still be out of compliance with this Task.  Given

17  this, Plaintiffs' attorneys encourage IAD to continue to aim for a compliance rate

18  well above what is mandated by the NSA, so that the Department's compliance with

19  this Task isn't contingent on any single investigation.

20  **II.**  **Task 5 (Complaint Procedures for IAD)**

21       OPD attained full compliance with Task 5, which pertains to Complaint

22  Procedures for the Internal Affairs Division, during the reporting period covered by

23  the 79th IMT Report. Task 5 consists of several subtasks, and the IMT has

24  determined that all of these are in compliance including:

25       •  Task 5.1, which requires that when a citizen wishes to file a complaint,

26          the citizen is brought to a supervisor or IAD, or a supervisor is

27          summoned to the scene.

28       •  Task 5.2, which requires that if there is a delay of greater than three

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

hours in supervisory response, the reason for the delay must be documented.

- Task 5.3, which requires that where a complainant refuses to travel to a supervisor, or wait for one, personnel make all reasonable attempts to obtain specific information to assist in investigating the complaint.

- Task 5.4, which requires that specific information be documented on a complaint form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander.

- Task 5.5, which requires that the supervisor or Area Commander notify Communications and forward any pertinent documents to IAD.

On March 23, 2016, the Court issued an Order indicating that irregularities and potential violations of the NSA occurred in IAD investigation 15-0771. The Order noted that the investigation raised issues of accountability and sustainability of compliance. Since then, the IMT had focused on subtasks 5.15 to 5.19 and subtask 5.21, which address the quality of completed IAD investigations.

The IMT most recently assessed these issues in the 79th IMT Report, reviewing 15 IAD cases that were closed between September 1 and October 31, 2021. Subtasks 5.15 and 5.16 require that OPD gathers all relevant evidence, conducts appropriate follow-up interviews, considers all evidence, makes credibility assessments where feasible, and resolves inconsistent statements. In all of the cases the IMT reviewed during the period covered by the 79th IMT report, the IMT determined that OPD gathered all available relevant evidence and determined that investigators did conduct follow-up interviews where necessary to resolve inconsistencies. OPD also made credibility assessments in six cases reviewed by the IMT during this period, and the IMT agreed with five of the six credibility assessments. In the one instance where the IMT disagreed with OPD's credibility assessment, the Department found a complainant credible even as the IMT determined "his claim of a sexual assault by the arresting officers during his

JOINT CASE MANAGEMENT STATEMENT                              Case No. 00-cv-4599 WHO

1  apprehension was clearly refuted by body-worn camera (BWC) videos." (79th IMT

2  Report, p. 8). Plaintiffs' attorneys are not privy to the specific details of this

3  complaint, nor have we reviewed the body-worn camera footage of this incident.

4  However, we note that the IMT's criticism in this case is that the Department

5  apparently afforded credibility to a complainant where the IMT determined that

6  such a credibility assessment was unwarranted. Put another way, OPD gave the

7  benefit of the doubt to a complainant where the IMT would not.  A scenario where

8  the Monitor affords a greater benefit of doubt to OPD employees than the

9  Department itself attests to a meaningful cultural change within the Department

10 that would have been unimaginable at the outset of the NSA process.

11    Task 5.17 requires OPD to permanently retain all notes generated and/or

12 received by OPD in their personnel file, and OPD has a "sustained history of 100%

13 compliance with this subtask." (79th IMT Report, p. 8.). This was once again the case

14 during the most recent reporting period evaluated by the IMT.

15    Tasks 5.18 and 5.19 require, respectively, that OPD "resolve each allegation

16 in a complaint investigation using the preponderance of evidence standard" (5.18)

17 and necessitates "that each allegation of a complaint if identified' be resolved with a

18 disposition of "unfounded", "sustained", "exonerated", "not sustained", or

19 administrative closure (5.19).  The IMT did not disagree with any of the formal

20 findings in any of the cases they reviewed during this period.  This is the second

21 consecutive period where the IMT did not disagree with the Department on any

22 formal findings.  Indeed, OPD has not received negative feedback from the IMT

23 regarding the quality of IAD investigations in over one year.

24    Since IAD investigations have been consistently up to the standards

25 mandated by the NSA, and acceptable to the Monitor, Plaintiffs' attorneys are not

26 surprised that OPD was finally deemed in compliance with Task 5 during the 79th

27 IMT Report.  Plaintiffs' attorneys concur with this assessment, and laud the

28 Department's progress on Task 5.  There will, invariably, be future instances where

7

1    reasonable observers disagree about the ultimate finding(s) resulting from IAD

2    investigations.  However, Plaintiffs' attorneys agree with the IMT that the

3    underlying investigative processes are sound and up to the standards mandated by

4    the NSA.  OPD can be congratulated for finally attaining compliance with Task 5.

5    **III.    Tasks 24 (Use of Force Reporting Policy) & 25 (Use of Force**

6    **Investigations and Report Responsibility)**

7           OPD had been in compliance with Tasks 24 (Use of Force Reporting Policy)

8    and 25 (Use of Force Investigations and Report Responsibility) of the NSA since

9    2015. In November 2018, this Court reactivated these Tasks as a result of Plaintiffs'

10   and the Monitoring Team's concerns about systematic underreporting of weaponless

11   defense techniques and incidents related to the pointing of firearms.  During the

12   period covered by the 74th IMT Report, OPD came back into compliance with Task

13   24.  Tasks 24 and 25 were most recently assessed by the IMT in their 80th IMT

14   Report.

15          During the period covered by the 80th IMT Report, the IMT reviewed 90 cases

16   related to Level 3 and 4 Use of Force Reports, all of which occurred after the

17   publication of Special Order 9196, which clarified use of force policies regarding the

18   pointing of a firearm and required that officers report pointing of their firearms as a

19   Type 22 Use of Force.  In 58 of the 90 reports reviewed by the IMT, Level 4 Type 22

20   uses of force were the only use of force used and documented by an OPD officer.

21   The IMT reviewed  these reports and determined that "officers' pointing of their

22   firearm was appropriate in all instances we assessed." (80th IMT Report, p. 11).

23   Further, the IMT did not find any instances where officers did not report Type 22

24   uses of force.

25          This means that, in every single instance reviewed by the Monitor during the

26   period covered by the 80th IMT Report, each Type 22 use of force was: 1)

27   Appropriate, and 2) Documented properly.  This is a massive improvement from

28   2019, when the Office of Inspector General released a damning report that indicated

8

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1  officers' systematically under-reported use of force incidents.  This OIG Report is

2  available at

3  http://www2.oaklandnet.com/oakca1/groups/police/documents/report/oak072446.pdf

4  (last visited April 20, 2022).  Specifically, uses of force involving weaponless defense

5  techniques and pointing of a firearm at a subject were not always being reported in

6  accordance with Department policy and procedures (*Id.*, OIG Report, p.2), and use

7  of force incidents had been systematically underreported for years, in a manner

8  incongruent with the Department's own written policies.  OPD deserves credit for

9  proactively addressing this problem, and codifying changes to the Use of Force

10 manual that ensure all such uses of force are reported.

11      In the aftermath of the above-referenced OIG Report, OPD also added a new

12 force type (Type 32) which includes "overcoming resistance" of a person during

13 arrest or detention.  Such force includes moving subjects who had gone limp,

14 guiding and/or pushing subjects into patrol vehicles, using restraining devices,

15 removing people who are holding on to fixed objects, and forcibly handcuffing

16 subjects who are resisting arrest.  Plaintiffs' attorneys lauded this step, and noted

17 that Oakland was, to our knowledge, the only major-city police department that has

18 taken steps to ensure that all the above-described uses of force must always be

19 documented and codified this into their Use of Force policy.

20      The IMT first reviewed a sample of Type 32 Uses of Force during the period

21 covered by the 69th IMT Report, and reported "confusion regarding this reporting."

22 (69th IMT Report, p. 6).  There were instances where a Type 32 Use of Force was

23 documented even though it did not appear such of use of force had occurred, other

24 instances where a Type 32 use of force was inappropriate, and instances where

25 Type 32 uses of force were not properly documented. (69th IMT Report, p. 6)

26      The most recent IMT report found just two instances where Type 32 Uses of

27 Force were not reported, and Monitor indicates that "these were addressed by

28 OPD."  (80th IMT Report, p. 11). Departmental directives, buttressed by supervisory

9

oversight and diligence, are clearly having the intended effect.  The Department's comprehensive response to the 2019 Use of Force Audit by OIG deserves credit, and Plaintiff's attorneys concur with the IMT's assessment that OPD's Use of Force policy meets the standard required by the NSA.  OPD is therefore in compliance with Task 24 of the NSA.

Task 25, however, remains in only partial compliance for the following reasons:

25.1 The IMT reports that while there has been a decline in the use of boilerplate language, they continue to "find numerous instances where officers justify their uses of force "based on my training and experience" without any further information or explanation as to what training and experience they are referring to." (80th IMT Report, p 14.)

25.2 The IMT continues to harbor concerns "with the preparation and review of UOF reports by OPD supervisors". (80th IMT Report, p. 15).  Although the Monitor notes that supervisors are improving when it comes to identifying deficiencies in officer reporting and addressing Manual of Rules violations, this progress must be sustained before OPD can attain compliance with subtask 25.2. There were previous periods of improvement which subsequently stalled, and OPD must demonstrate that they can maintain the standard of UOF Reports required by the NSA.

Task 25.3 requires that use of force investigations include required recommendations, such as whether the force used was pursuant to a legitimate law enforcement objective, whether the force used was proportional and reasonably related to the underlying objective, whether officers used reasonable verbal means to resolve a situation without force, and whether force was deescalated or stopped when it was reasonable to do so.  During their assessment of 91 Level 3 and 4 Use of Force reports in the 78th IMT Report, the Monitor found no instances where force was used inappropriately, where force was not deescalated or stopped earlier, or

10

1   where officers should have made additional efforts to explain to subjections why

2   they were being detained prior to the use of force.  However, the IMT "*did* continue

3   to identify numerous instances in our reviews for this report where officers failed to

4   identify themselves as police officers when it was appropriate and there was time to

5   do so." (78th IMT Report, p. 14, emphasis original). This is not acceptable and must

6   be remedied in order for OPD to come into compliance with this subtask.

7       The IMT concludes their most recent report on Task 25 by stating: "In our

8   76th and 78th status reports, we noted that the Department's progress with the

9   investigation of force and required documentation had stalled. For this report, we

10  note that OPD is improving in this area, specifically in the UOF reporting for

11  October and November 2021. We will continue to closely monitor uses of force to

12  ensure that the required reporting outcomes occur and that OPD addresses the

13  deficiencies that have been identified." (80th IMT Report, p. 16)

14      The IMT has determined that OPD is in partial compliance with Task 25,

15  and Plaintiffs' attorneys agree with this assessment.  It appears that the

16  Department is on the cusp of full compliance with this Task, and OPD had been

17  making tangible progress toward compliance in previous reporting periods.

18  Plaintiffs' attorneys encourage the Department to take the final steps necessary to

19  bring OPD into compliance with Task 25.

20      In fact, we hope that the Oakland Police Department will be in compliance

21  with Task 25 by the time of the Case Management Conference since it is our

22  understanding this Task will be addressed in an IMT Report which will be filed

23  right before the CMC.

24  **IV.   Task 34 (Stop Data/Vehicle Stops, Field Investigations and**

25       **Detentions)**

26      At the outset of the NSA, the Oakland Police Department did not have any

27  mechanism to review, approve, or assess the justifications for stops and searches by

28  its officers.  Indeed, this lack of oversight and accountability led directly to the

JOINT CASE MANAGEMENT STATEMENT                                    Case No. 00-cv-4599 WHO

1    abuses that precipitated Plaintiffs' attorneys' involvement in the NSA.  Task 34

2    requires OPD to complete a basic report on all vehicle stops, field investigations,

3    and detentions, and to compile this information into a database that can be

4    searched, queried, and reported by OPD.

5         The IMT did not formally assess Task 34 between its 69th IMT Report,

6    published in July of 2020, and the most recent, 80th, IMT Report.  Prior to the

7    January 2022 Case Management Conference, Plaintiffs' attorneys acknowledged

8    OPD's enormous progress on this Task, highlighted OPD's success in reducing

9    racial disparities in discretionary stops by Oakland Police officers, and concluded

10   that OPD appeared to already be in compliance with Task 34.  This conclusion was

11   rooted in hard data, which showed a 74% reduction in the total number of African

12   American stops (from 22,506 to 5,780) and a 60% reduction in the total number of

13   Hispanic stops (from 7,504 to 2,991) over the last five years.  The 80th IMT Report

14   also notes that 2020-2021 data shows declines in stops, with larger declines in non-

15   dispatched stops compared to dispatched stops, as well as an increase in the

16   percentage of stops based on intelligence information.  OPD should be congratulated

17   for each of these achievements.

18        As the Monitor notes in the 80th IMT Report, OPD has evolved in its

19   engagement with stop data.  The Department does not only collect and reported

20   stop data in order to satisfy the minimum requirements of the NSA, it now

21   consistently incorporates that data into its robust risk management process.

22   Patterns, trends, and outliers are reviewed during the Risk Management Meetings

23   (RMM), and officers with the highest levels of non-dispatched stops are flagged for

24   further attention from supervisors.  The justification for stops, characteristics of

25   those who are stopped, the outcomes of stops, and the officers involved in stops are

26   all subject to analysis via the RMM process.  The year-over-year trend in the stop

27   data speaks to institutionalized, sustainable change within OPD.

28        Plaintiffs' attorneys are consistently impressed by the use of data to discuss

12

1  stop data, possible patterns of bias in stops, complaints, the ratio of intelligence-

2  based and non-intelligence based stops, pursuits, and officers who are under

3  supervisory monitoring and/or intervention.  It is clear that there is real

4  institutional buy-in to the Risk Management process, and to the application of the

5  stop data that informs these meetings.

6        OPD's Task 34 progress has been an unequivocal force for positive change at

7  OPD, and the IMT, in its most recent (80th) Report, concurs with Plaintiffs'

8  assessment that OPD is in compliance with Task 34.  OPD's full compliance with

9  this Task is tangible evidence of the real and durable cultural change the NSA was

10  intended to achieve, and OPD must be commended for finally achieving compliance

11  with Task 34.  Going forward, the Department must remain committed to collecting

12  and analyzing stop data for the purpose of managing risk and improving policing

13  strategies and outcomes.  Plaintiffs' attorneys believe that OPD is well positioned to

14  do so.

15  **V.     Task 45 (Consistency of Discipline Policy)**

16        Plaintiffs' attorneys had hoped to report that OPD was finally in compliance

17  with Task 45, which requires that discipline is imposed in a fair and consistent

18  manner.  The IMT most recently assessed this Task in their 77th IMT Report,

19  published in January 2022, and determined that OPD was in partial compliance

20  with Task 45.

21        Plaintiffs' attorneys continue to follow OPD's response to the Police Discipline

22  Disparity Study drafted by the Hillard Heintze consulting firm.  *See*

23  https://www.oaklandca.gov/documents/oakland-police-discipline-disparity-study

24  (last visited April 20, 2022) (Disparity Study). This report determined that "black

25  sworn employees were more likely to have their allegations result in a sustained

26  finding than other employees" (Disparity Study, p. 10).  This report also included a

27  survey which revealed that supermajorities of OPD personnel did not believe that

28  OPD's disciplinary processes were equitable or fair.

13

1    The Hillard Heintze Report concluded with recommendations that it urged

2    the OPD to adopt and, in 2019, then-Chief Mannheimer formally accepted all these

3    recommendations.  Two additional recommendations, focused on the Field Training

4    program and the Police Academy, were also implemented, and Deputy Chief

5    Lindsey was assigned as the Project Manager of the Racial Disparity Study

6    responsible for the implementation of these recommendations.

7    On April 14, 2022, OPD command staff hosted a presentation – attended by

8    Plaintiffs' attorneys, the IMT, Mayor Schaaf, Professors Eberhardt and Monin of

9    Stanford University, recently-hired Independent Inspector General Michelle

10   Phillips, Data Manager Dr. Grossman, and others – to discuss OPD's disciplinary

11   processes.  At the outset of this meeting, Deputy Chief Lindsey reaffirmed that OPD

12   has implemented each of the Hillard Heintze recommendations.  A Racial Disparity

13   Study Working Group meets several times a month to ensure the implementation of

14   these recommendations, and two project managers and Data Manager Dr. Leigh

15   Grossman were hired to in furtherance of this effort.

16   During the April 14, 2022 meeting, Deputy Chief Lindsey elaborated a series

17   of internal efforts to ensure consistent discipline within OPD, including anonymized

18   complaint presentations where name, race, and gender are not disclosed to

19   discipline decision makers during case presentations, as well as a Discipline Matrix

20   designed to ensure fair and consistent implementation of discipline within OPD.

21   OPD also mandated that its Recruiting and Background Unit implement a "Whole

22   Person Assessment Approach" when considering potential hires, in order to ensure

23   that candidates are not automatically disqualified for some negative or derogatory

24   information.

25   Plaintiffs' attorneys commend each of these worthwhile efforts.  However, it

26   is not lost on Plaintiffs' attorneys that, while OPD rightly touts its implementation

27   of the Hillard Heintze recommendations, it has informed the Court that much of the

28   data underlying the original Hillard Heintze Study was not supportive of the

1  findings. OPD has provided no explanation why they felt it was important to

2  implement the Hillard Heintze recommendation when the underlying data was

3  flawed.

4        In her April 14, 2022 presentation, Dr. Grossman described "data issues" and

5  "missing variables" as "weaknesses of the Hillard Heintze Report." In fairness, Dr.

6  Grossman's criticism of the data underlying the Hillard Heintze study – which

7  relied on data provided by OPD, and which was paid for by the City of Oakland – is

8  shared by Dr. Monin of the Stanford SPARQ team. Dr. Monin informed Plaintiffs'

9  attorneys on several occasions that the dataset that OPD originally provided to

10 Hillard Heintze was not reliable, and he subsequently performed an analysis on the

11 "clean" data in August 2021. This analysis, which was forwarded to CDC Lindsey

12 and shared with Plaintiffs' attorneys, is incorporated as Exhibit 6.

13       Dr. Monin's August 2021 analysis suggested that disparities in discipline

14 outcomes do remain. Although the disparities are nowhere near as large as those

15 reported in the Hillard Heintze Discipline Study, Dr. Monin's review found that "in

16 most analyses allegations against African Americans seem to be slightly more likely

17 to be sustained, though this differs quite a bit between the two years analyzed (2019

18 and 2020), and even whether the disparities appear more in division-level or in IA

19 investigations varies between 2019 and 2020, making it hard to locate disparities

20 conclusively with this limited dataset." Specifically, African American officers:

21

22        *"...seem to benefit slightly less often than other groups from the*
          *"summary finding" – which in 99% of cases means a non-sustained*

23        *case. Whereas the average for all 4 groups is 14.8% for DLI SF, it' only*
          *12.4% for Blacks (vs. 17.2% for Hispanics). And whereas the average*

24        *for IAD "summary finding" for all 4 groups is 2.0%, it's only 1.2% for*
          *Blacks (vs. 2.6% for Whites). This deserves some attention as it could*

25        *be hiding disparities. Again the concern is that some groups may*

26        *benefit more often from a summary finding (which again means in 99%*
          *of the cases that the allegation is not sustained), which would remove*

27        *them from the other counts.* (Exhibit 6, Dr. Monin IAD – August 2021
          Preliminary Analyses, p. 3)

28

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1   However, Dr. Monin also found large year-to-year discrepancies in the data.

2   Given the limitations of the Hillard Heintze report, OPD decided to conduct their

3   own analyses on the question of racial disparity in patterns of officer discipline.  In

4   February 2022, Monitor Robert Warshaw sent an email to Chief Armstrong, the

5   Oakland City Attorney's Office, City Manager Edward Reiskin, and Plaintiffs'

6   attorneys endorsing the Department's request to undertake this project internally.

7   The resulting study, published ten weeks later and titled "Analyses of Race in

8   Internal Investigation Outcomes and Discipline", was shared with Plaintiffs'

9   attorneys during the first week of April 2022, and is incorporated herein as Exhibit

10  1.  This document was discussed by the parties at the above-described April 14,

11  2022 meeting regarding Task 45.  Mere hours before this CMC Statement was due

12  to be filed with the Court, OPD leadership forwarded a different version of this

13  document to Plaintiffs' attorneys.  OPD did not share a redlined version of the

14  revised document, nor did they point Plaintiffs' attorneys toward any differences

15  between the documents.  This amended version of the Analyses of Race in Internal

16  Investigation Outcomes and Discipline, shared with Plaintiffs' attorneys on April

17  19, 2022, is attached as Exhibit 2.

18  Both iterations of this report determined that "there were no significant

19  differences in case outcomes between white officers and officers of other races"

20  during the two periods (2014-2017 and 2018-2021) studied by the report. (Exhibit 1,

21  Original April 2022 Analyses of Race in Internal Investigation Outcomes and

22  Discipline, p. 4). Similarly, both reports found that "compared to white officers,

23  officers of other races did not receive significantly different discipline" in instances

24  where discipline was meted out by OPD. (Exhibit 1, Original April 2022 Analyses of

25  Race in Internal Investigation Outcomes and Discipline, p. 6).  These conclusions

26  are, on their face, heartening.  However, the study itself acknowledges "some

27  limitations." (Exhibit 1, Original April 2022 Analyses of Race in Internal

28  Investigation Outcomes and Discipline, p. 9).  Specifically, while the data

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1  "permitted some conclusions regarding race and discipline, additional data

2  representing other existing variables would permit a regression analysis which

3  would provide a more complete picture of which variables impact case outcomes and

4  discipline."  (Exhibit 1, Original April 2022 Analyses of Race in Internal

5  Investigation Outcomes and Discipline, p. 9)  Further, due to the small number of

6  sustained cases each year, multiple years had to be combined in order to ensure a

7  sufficiently large sample size, which "means that the current analyses cannot

8  determine whether there were differences between years." (Exhibit 1, Original April

9  2022 Analyses of Race in Internal Investigation Outcomes and Discipline, p. 9)

10  Both versions of the reports also recommend additions to the Vision system that

11  "would allow for more robust analyses and would allow for more definitive findings."

12  (Exhibit 1, Original April 2022 Analyses of Race in Internal Investigation Outcomes

13  and Discipline, p. 10)

14          Plaintiffs' attorneys are not data scientists and defer to the knowledge of the

15  stakeholders with expertise in this area, including Dr. Grossman at OPD, Dr.

16  Eberhardt and Dr. Monin at Stanford, and Dr. Klofas with the IMT.  During the

17  April 14, 2022 roundtable discussion regarding this analysis, Dr. Monin described

18  this analysis as the beginning of a living process: OPD is collecting usable data and

19  common metrics and providing this information to professional experts for analysis.

20  This allows OPD to perform specific analyses that simply were not possible at

21  earlier dates.  However, more data inputs, and more robust analyses, will be

22  required.

23          At this same meeting, Dr. Klofas highlighted tables contained in Appendix 3

24  of the original April 2022 Analyses of Race in Internal Investigation Outcomes and

25  Discipline (see Exhibit 1, pp. 14-16) showing that the 2018-2021 Sustained Rate

26  Division Level Investigations percentage was higher for Black officers than officers

27  of all other races:

28

JOINT CASE MANAGEMENT STATEMENT                                    Case No. 00-cv-4599 WHO

**Table 1: 2018-2021 Sustained Rate Division Level Investigations and Summary Findings**

|  | White | | Black | | Hispanic | | Asian/ Filipino | | Other/ Unknown | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | n | % | n | % | n | % | n | % | n | % | n | % |
| **2018** | 18 | 7% | 11 | 11% | 7 | 4% | 7 | 5% | 1 | 6% | 44 | 7% |
| **2019** | 19 | 6% | 24 | 17% | 21 | 9% | 15 | 10% | 4 | 12% | 83 | 10% |
| **2020** | 21 | 8% | 12 | 8% | 26 | 9% | 16 | 10% | 2 | 5% | 77 | 9% |
| **2021** | 18 | 7% | 15 | 11% | 18 | 7% | 9 | 6% | 4 | 11% | 64 | 8% |
| **Total** | **76** | **7%** | **62** | **12%** | **72** | **8%** | **47** | **8%** | **11** | **9%** | **268** | **8%** |

A Chi-square test was then used to determine whether there were significant differences in outcomes for white officers and officers of other races:

**Table 3: 2018-2021 DLI/IAD Chi-Square for White v Black Officers**

|  | Other than Sustained | | Sustained | | Chi-Square Value | p |
|---|---|---|---|---|---|---|
|  | Observed | Expected | Observed | Expected | | |
| **DLI** | | | | | | |
| White | 93% (974) | 91% (958) | 7% (76) | 9% (92) | 9.52 | 0.002 |
| Black | 88% (458) | 91% (474) | 12% (62) | 9% (46) | | |
| **IAD** | | | | | | |
| White | 81% (358) | 82% (360) | 19% (82) | 18% (80) | 0.20 | 0.658 |
| Black | 83% (122) | 82% (120) | 17% (25) | 18% (27) | | |

According to the accompanying analysis, "P values less than 0.05 indicate significant differences" (Exhibit, Original April 2022 Analyses of Race in Internal Investigation Outcomes and Discipline, p. 14). **In other words, the Department's own analysis appeared to show statistically significant differences in the rates at which white and black officers are sustained during Division Level Investigations (DLIs). This aligns with Dr. Monin's findings in August 2021, which are excerpted above.**

Later in the original April 2022 Analyses of Race in Internal Investigation Outcomes and Discipline, there is a note that "despite the initial significant finding of difference in outcomes for DLIs between white and Black officers, further testing reveals that those differences are likely concentrated in the earlier years of the

18

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1  data.  Future analyses should continue to monitor this data to determine whether

2  significant differences appear again." (Exhibit 1, Original April 2022 Analyses of

3  Race in Internal Investigation Outcomes and Discipline, p. 16)  Plaintiffs' attorneys

4  agree with Dr. Klofas of the IMT that this requires further investigation.  Indeed,

5  Dr. Grossman's PowerPoint presentation on April 14, 2022 also concluded with an

6  acknowledgement that "This study is not the end, just the beginning":

7



8

9

10

11

12

13

14

15

16

17  When Plaintiffs' attorneys received the Amended April 2022 Analyses of Race

18  in Internal Investigation Outcomes and Discipline (Exhibit 2) on April 19, 2022, we

19  noted that the above-quoted determination that "future analyses should continue to

20  monitor this data to determine whether significant differences appear again"

21  (Exhibit 1, p. 16) had been deleted from the revised document.  Similarly, the

22  conclusion in the original report that "the current analyses cannot determine

23  whether there were differences between years" (Exhibit 1, Original April 2022

24  Analyses of Race in Internal Investigation Outcomes and Discipline, p. 9) was also

25  deleted from the revised report (Exhibit 2).  OPD did not disclose to Plaintiffs'

26  attorneys why these statements were deleted from the revised document that

27  Plaintiffs' attorneys received on April 19, 2022.  The timeline, however, is

28

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1   unambiguous: (1) Plaintiffs' attorneys and the IMT reviewed the original April 2022

2   Analyses of Race in Internal Investigation Outcomes and Discipline (Exhibit 1) in

3   advance of the April 14, 2022 meeting to discuss Task 45 with all stakeholders; (2)

4   Plaintiffs' attorneys and IMT members raised specific concerns about these specific

5   sentences pertaining to future analysis and how that impacts current Task 45

6   compliance at that April 14, 2022 meeting; and (3) Plaintiffs' attorneys were given

7   a revised document (Exhibit 2) at the last minute that had removed the above-

8   quoted sentences only hours before this Case Management Conference Statement

9   had to be filed.

10      Implicit in the phrasing of these two sentences is that the analyses in the

11  original report was incomplete and would need to be improved upon in the future.

12  Removing those sentences – again, without telling Plaintiffs' attorneys or the IMT

13  that they had done so – might be a ploy to convince the Court that OPD is in full

14  compliance with Task 45.  It is clear, however, that as of 24 hours before the Case

15  Management Conference Statement was due to be filed with the Court, OPD itself

16  acknowledged that further analysis was still required.  OPD then scrubbed those

17  sentences from the revised report shared with Plaintiffs' attorneys on the eve of this

18  Case Management Conference.

19      It was also not lost on Plaintiffs' attorneys that the finding that "there were

20  no significant differences in case outcomes between white officers and officers of

21  other races" (Exhibit 1, Original April 2022 Analyses of Race in Internal

22  Investigation Outcomes and Discipline, p. 3) was highlighted as a principal

23  conclusion of the original April 2022 Analyses of Race in Internal Investigation

24  Outcomes and Discipline, while the more nuanced finding that Black officers appear

25  to be subject to statistically disparate Division Level Investigation outcomes is

26  buried in the appendix of the very same document.  (See Exhibit 1, Appendix 3, pp.

27  14-16). Dr. Klofas of the IMT and Plaintiffs' attorneys highlighted this during the

28  April 14, 2022 Task 45 meeting and questioned why OPD had buried the latter

20

JOINT CASE MANAGEMENT STATEMENT                                    Case No. 00-cv-4599 WHO

finding in an Appendix.  This chart was subsequently moved into the main body of the revised document (Exhibit 2, Revised April 2022 Analyses of Race in Internal Investigation Outcomes and Discipline, p. 6), and OPD concedes that it "should review the DLIs that occurred in 2019 to determine whether any specific factors caused the higher sustained rate for Black officers" that year. (Exhibit 2, Revised April 2022 Analyses of Race in Internal Investigation Outcomes and Discipline, p. 9).

This is not the only instance of OPD selectively highlighting data findings in recent weeks.  OPD's Office of Inspector General also circulated a report titled "Variability in Academy and Field Training Program Outcomes" in early April 2022. This document is incorporated herein as Exhibit 3.  As with the Analyses of Race in Internal Investigation Outcomes and Discipline, a revised version of this document was forwarded to Plaintiffs' attorneys without comment on April 19, 2022.  The revised Variability in Academy and Field Training Program Outcomes received on April 19, 2022 in incorporated as Exhibit 4.

Both versions of this document include a chart containing the gender and race breakdown of recent Police Academy attendees, along with the statement: "When broken down by race, there has been an increase in the proportion of attendees that are Black and Hispanic and a decrease in the proportion of attendees that identify as white or Asian" (Exhibit 3, Original Variability in Academy and Field Training Program Outcomes, April 2022, p. 2; Exhibit 4, Revised Variability in Academy and Field Training Program Outcomes, April 2022, p. 4):

JOINT CASE MANAGEMENT STATEMENT                              Case No. 00-cv-4599 WHO

**Table 1: Gender and Race Breakdown of Academy Attendees**

|  | 183 | | 184 | | 185 | | 186 | | 187 | | 188 | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | % | n | % | n | % | n | % | n | % | n | % | n | % | n |
| **Female** | 14% | 6 | 26% | 9 | 19% | 7 | 22% | 7 | 17% | 6 | 13% | 5 | 18% | 40 |
| Asian | 2% | 1 | 9% | 3 | 3% | 1 | 0% | 0 | 0% | 0 | 0% | 0 | 2% | 5 |
| Black | 0% | 0 | 6% | 2 | 8% | 3 | 6% | 2 | 6% | 2 | 5% | 2 | 5% | 11 |
| Hispanic | 10% | 4 | 6% | 2 | 8% | 3 | 16% | 5 | 11% | 4 | 5% | 2 | 9% | 20 |
| White | 2% | 1 | 6% | 2 | 0% | 0 | 0% | 0 | 0% | 0 | 3% | 1 | 2% | 4 |
| **Male** | 86% | 36 | 74% | 25 | 81% | 29 | 78% | 25 | 83% | 30 | 88% | 35 | 82% | 180 |
| Asian | 19% | 8 | 6% | 2 | 19% | 7 | 16% | 5 | 11% | 4 | 8% | 3 | 13% | 29 |
| Black | 24% | 10 | 21% | 7 | 25% | 9 | 16% | 5 | 22% | 8 | 20% | 8 | 21% | 47 |
| Hispanic | 24% | 10 | 24% | 8 | 19% | 7 | 38% | 12 | 33% | 12 | 40% | 16 | 30% | 65 |
| Other | 0% | 0 | 9% | 3 | 3% | 1 | 0% | 0 | 6% | 2 | 8% | 3 | 4% | 9 |
| White | 19% | 8 | 15% | 5 | 14% | 5 | 9% | 3 | 11% | 4 | 13% | 5 | 14% | 30 |
| **Total** | 100% | 42 | 100% | 34 | 100% | 36 | 100% | 32 | 100% | 36 | 100% | 40 | 100% | 220 |

The above-quoted statement is, narrowly, true: the number of (Black attendees + Hispanic attendees) did increase among both males and females. **But that obscures the fact the number of Hispanic female attendees halved between the 183rd and 188th Academies, and that the number of Black male Attendees also decreased during the same period. In both instances, that demographic has been added to a different demographic to make an overarching claim that there are more total attendees across both groups. Which is technically correct, but also misleading.**

A subsequent table, which catalogues the graduation rate of Academy Attendees between the 183rd and 186th Academies, shows that Black female recruits graduated at a much lower rate than their peers of all other races:

JOINT CASE MANAGEMENT STATEMENT                               Case No. 00-cv-4599 WHO

**Table 2: Graduation Rate of Academy Attendees for the 183rd – 186th Classes**

|  | Yes | | No | | Total |
|---|---|---|---|---|---|
|  | % | n | % | n | n |
| **Female** | **66%** | **19** | **34%** | **10** | **29** |
| Asian | 80% | 4 | 20% | 1 | 5 |
| Black | 57% | 4 | 43% | 3 | 7 |
| Hispanic | 64% | 9 | 36% | 5 | 14 |
| White | 67% | 2 | 33% | 1 | 3 |
| **Male** | **70%** | **81** | **30%** | **34** | **115** |
| Asian | 73% | 16 | 27% | 6 | 22 |
| Black | 74% | 23 | 26% | 8 | 31 |
| Hispanic | 78% | 29 | 22% | 8 | 37 |
| Other | 50% | 2 | 50% | 2 | 4 |
| White | 52% | 11 | 48% | 10 | 21 |
| **Grand Total** | **69%** | **100** | **31%** | **44** | **144** |

(Exhibit 3, Original Variability in Academy and Field Training Program Outcomes, April 2022, p. 4; Exhibit 4, Revised Variability in Academy and Field Training Program Outcomes, April 2022, p. 6)

However, there is no follow-up inquiry into this comparatively low graduation rate elsewhere in the report.  Nor is the disparity in Black and White recruits who were removed from an Academy for Manual of Rules violation (25% and 10%, respectively) discussed beyond the simple inclusion of this table on the subsequent page of each report:

JOINT CASE MANAGEMENT STATEMENT                                    Case No. 00-cv-4599 WHO

**Table 3: Reasons for Not Graduating the Academy: 183rd – 186th Classes**

| | Removed: MOR Violation | | Removed: Failed Post Objective | | COVID/Injury | | Resigned: Personal Reasons | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | % | n | % | n | % | n | % | n | n |
| **Female** | 0% | 0 | 60% | 6 | 30% | 3 | 10% | 1 | 10 |
| Asian | 0% | 0 | 100% | 1 | 0% | 0 | 0% | 0 | 1 |
| Black | 0% | 0 | 100% | 3 | 0% | 0 | 0% | 0 | 3 |
| Hispanic | 0% | 0 | 40% | 2 | 40% | 2 | 20% | 1 | 5 |
| White | 0% | 0 | 0% | 0 | 100% | 1 | 0% | 0 | 1 |
| **Male** | 12% | 4 | 41% | 14 | 12% | 4 | 35% | 12 | 34 |
| Asian | 0% | 0 | 50% | 3 | 17% | 1 | 33% | 2 | 6 |
| Black | 25% | 2 | 63% | 5 | 13% | 1 | 0% | 0 | 8 |
| Hispanic | 13% | 1 | 25% | 2 | 25% | 2 | 38% | 3 | 8 |
| Other | 0% | 0 | 50% | 1 | 0% | 0 | 50% | 1 | 2 |
| White | 10% | 1 | 30% | 3 | 0% | 0 | 60% | 6 | 10 |
| **Grand Total** | 9% | 4 | 45% | 20 | 16% | 7 | 30% | 13 | 44 |

It is clear that OPD has greatly improved in the sphere of data collection. However, this data must be marshalled productively. To the Department's great credit, this has been done very effectively when it comes to Stop Data and the Risk Management process, and OPD is therefore in compliance with those NSA Tasks. Plaintiffs' agree with the IMT that is more work to be done when it comes to consistency of discipline.

Finally, while all parties now understand that some of the Hillard Heintze conclusions were based on bad underlying data, Plaintiffs' attorneys note that there were two separate components to the Hillard Heintze report: 1. The bad-data-derived conclusions about disparate outcomes, which are now being re-investigated by Dr. Grossman and others, and 2. A survey of rank and file officers, which was not reliant on the now-discredited data used by Hillard Heintze. This survey found that more than four-out-of-five respondents (including many white and Asian officers) disagreed with the statement "OPD's disciplinary process is fair." (Disparity Study, p. 7):

JOINT CASE MANAGEMENT STATEMENT

Case No. 00-cv-4599 WHO

Only 18.68 percent of the sworn respondents agreed or strongly agreed that the disciplinary process is fair.



Similarly, according to charts on p. 21 of the report, 35.83% of OPD employees "strongly agree" or "agree" with the proposition that race plays a factor in determining the outcome of an internal investigation, and 36.51% of employees "strongly agree" or "agree" that race plays a factor in OPDs determination of discipline:

JOINT CASE MANAGEMENT STATEMENT                                    Case No. 00-cv-4599 WHO

1
2
3
4
5
6
7
8
9
10
11
12



13
14
15
16
17
18
19
20
21
22
23



24
25
26
27
28

It was especially notable that 75% of white respondents indicated that they believe that race is not a factor in the outcome of an internal investigation or the determination of discipline, while just 63% of black respondents, 60% of Asian respondents, and 56% of Hispanic respondents concurred. (Disparity Study, p. 23)

JOINT CASE MANAGEMENT STATEMENT                                    Case No. 00-cv-4599 WHO

1    OPD employees also reported that "who you know, and to which cliques you belong,

2    influence whether an investigation will be sustained and what level of discipline

3    will be administered", and that the "IAD and disciplinary processes are not

4    transparent." (Disparity Study, p. 23)

5        A discipline system that is "unfair" in the eyes of more than five of every six

6    employees is untenable and not up to the standard mandated by Task 45 of the

7    NSA.  At the outset of the April 14, 2022 meeting with various stakeholders to

8    discuss this Task, Chief Armstrong noted that, as a junior officer, he "felt the brunt

9    of unfair discipline practices."  Plaintiffs' attorneys know that this is deeply

10   personal to Chief Armstrong and acknowledge that there have been important and

11   progressive improvements made during his relatively short tenure as Chief.

12       Along with the revised April 2022 Analyses of Race in Internal Investigation

13   Outcomes and Discipline report and the revised Variability in Academy and Field

14   Training Program Outcomes forwarded to Plaintiffs' attorneys on April 19, 2022,

15   Chief Armstrong shared a letter to Monitor Warshaw with a list of

16   recommendations contained in these two OIG studies.  This letter, and the

17   appended list of recommendations, are incorporated herein as Exhibit 5.

18       Chief Armstrong writes that "much like reducing disparities inherent in

19   policing in America, reducing disparities in internal investigation outcomes is an

20   ongoing process." (Exhibit 5, p. 1).  Chief Armstrong also lists nine

21   recommendations proposed by the Risk Analysis Unit regarding IAD findings and

22   discipline, as well as Academy and Field Training Officer completion, and what

23   OPD is doing to implement those recommendations.  One of these recommendations

24   (Recommendation #4) pertains to additional analyses on DLIs that came to a

25   finding in 2019 to attempt to identify the cause of any disparities, which is precisely

26   what Plaintiffs' attorneys and the IMT requested during the April 14, 2022 meeting

27   regarding Task 45, and which was incorporated into the Revised April 2022

28   Analyses of Race in Internal Investigation Outcomes and Discipline. (Exhibit 2,

27

1  Revised April 2022 Analyses of Race in Internal Investigation Outcomes and
2  Discipline, p. 9).

3          Other recommendations are bare-bones.  For example, Recommendation #5 of
4  Exhibit #5 states that the Risk Analysis Unit "will collaborate with stakeholders to
5  inform them of future research."  This Recommendation is vague as to who the
6  stakeholders are and what "future research" will be shared with them.
7  Recommendation #6 states that the Department will conduct an audit of the
8  "specific area covered by these studies."  This Recommendation needs to be more
9  specific, and a deadline needs to be established that is more specific and less than
10 three years from the present.

11         Similarly, Recommendation #7 of Exhibit #5 asks for an Information Bulletin
12 that will be referred to the Racial Disparity Working Group and the Bureau of
13 Services.  There is no deadline for this recommendation and one should be specified.
14 Recommendation # 8 calls for a "point-by-point inspection that will be conducted
15 independently by the OPD's Office of Inspector General so this recommendation will
16 be assigned to the Bureau of Risk Management."  It is not clear to Plaintiffs'
17 attorneys what constitutes this "point by point inspection", and we also note that
18 there is no deadline for this Recommendation.  One should be set immediately.

19         In general, the recommendations in the letter signed by Chief Wong are good,
20 but they require more clarity, and a deadline should be assigned to each
21 recommendation as well as a specific person who will be responsible for meeting
22 this deadline.

23         Chief Armstrong also notes in his letter that OPD "will partner with Dr.
24 Eberhardt and SPARQ for further qualitative analysis." (Exhibit 5, p. 2). The
25 foregoing are important steps, and, if implemented as proposed, Plaintiffs' attorneys
26 are confident that OPD can soon come into compliance with Task 45, and thereby
27 usher the NSA into its final chapter.

28

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1    **Conclusion**

2           At the conclusion of the last Case Management Conference, the Court asked

3    the parties to report back regarding what we think about the best way forward for

4    the Court's oversight of the NSA and OPD is.  Specifically, the Court wanted to

5    know answers to the following questions:

6           **1.**     Are we in a place of substantial compliance?

7           **2.**     Is the Court's oversight still required and valuable?

8           **3.**     And if so, in what ways?

9

10          The parties have agreed to a Joint Statement which is incorporated herein at

11   the beginning of this Case Management Statement.  It is our hope in the coming

12   months that there can be real cooperation between the Monitor and the Police

13   Commission so that when the NSA ends, the Police Commission is equipped to

14   audit the NSA Tasks in any way they see fit. It is essential that this cooperation be

15   marked by mutual respect and courtesy which are the foundation of any successful

16   joint enterprise.

17          A lot of Plaintiffs' Attorneys' future position concerns OPD's response to Task

18   45 in the coming months and whether they can get into compliance with this task.

19   The OPD had every opportunity to close out the NSA at this CMC with a first rate

20   report created with the collaboration of Stanford's Doctors Eberhardt and Monin,

21   OPD's own Dr. Grossman, and the help of the Plaintiffs' attorneys and the IMT.

22   Unfortunately, this did not happen.

23          The April 2022 reports attached as Exhibits 1-and-2 (Original and Revised

24   April 2022 Analyses of Race in Internal Investigation Outcomes and Discipline,

25   respectively) and 3-and-4 (Original and Revised Variability in Academy and Field

26   Training Program Outcomes, respectively) contain no discussion whatsoever that

27   the overwhelming majority of OPD officers feel that the discipline system is unfair.

28   Some feel that these disparities are created by "who you know and what clique you

                                                    29

1   are in." (Disparity Study, p. 23) A significant number of other officers, while not a

2   majority, believe race is a factor in disciplinary outcomes.  Neither iteration of both

3   April 2022 OPD Reports discusses these findings at all.

4          In addition, there are numbers in these reports which cry out for an

5   explanation so they will not happen again.  Some of these numbers have been

6   alluded to earlier in this report, e.g. why the graduation rate for African American

7   Females was so much lower that the graduation rate for all other races in the 183rd-

8   187th classes.  Then there is the misleading way that the alleged increase in the

9   proportion of African American and Hispanics was described.  And the fact that

10  over twice as many African American males were removed for MOR Violations that

11  Whites in the 183rd-186th Academies.

12         Perhaps most important is the Disparity identified by the OPD themselves in

13  Appendix 3 of Exhibit 1 which concludes in part: "The tables above revealed the

14  following significant differences, white v. Black for Division Level Investigations

15  with Blacks being sustained more frequently."  (Exhibit 1, Original April 2022

16  Analyses of Race in Internal Investigation Outcomes and Discipline, p. 15).  There

17  may be rational explanations for these discrepancies.  The OPD may have taken

18  some significant steps to remedy the more negative statistics cited in this report

19  and elsewhere. The bad-mouthing of the discipline process may be no more than

20  sour grapes.

21         But Plaintiffs' attorneys cannot accept these explanations on blind faith.

22  These issues must be discussed, analyzed, and explained in order to be properly

23  evaluated. If OPD has taken imaginative steps to remedy these issues, they must be

24  detailed so they can be utilized by future officers confronted with these problems.

25         Nowhere in these reports is there any analysis of these problems, or in some

26  cases, any recognition of them.  In addition, it appears that Dr. Grossman was not

27  asked to begin work on this project in enough time to turn out a complete report.

28  Doctor Eberhardt and Doctor Monin were not asked to participate in writing the

30

1    April 2022 documents at all.  On April 19, 2022, the day before this Case

2    Management Conference Statement must be submitted to the Court, Chief

3    Armstrong wrote to Monitor Warshaw to announce that OPD "will partner with Dr.

4    Eberhardt and SPARQ for further qualitative analysis." (Exhibit 5, p. 2). If this had

5    happened months ago, Plaintiffs' attorneys believe the OPD would be in compliance

6    with Task 45.

7           In recent conversations with the City Attorney and Chief Armstrong, they

8    have informed Plaintiffs' counsel that they will argue that they are in substantial

9    compliance with the Negotiated Settlement Agreement notwithstanding their

10   obvious failure to fully comply with Task 45.  Plaintiffs' attorneys intend to oppose

11   this request although we may well be willing to agree that the OPD may enter into

12   the sustainability period while they comply with Task 45.

13          The defendants' attitude towards Task 45 raises serious questions about

14   their ability to perform without Court supervision during the sustainability period.

15   Plaintiffs' attorneys believe that we are not in a place of substantial compliance and

16   that the Court's oversight is still required and valuable. We suggest at least two

17   more Case Management Conferences in the next six months.  By the time of the

18   second Case Management Conference, six months from now, the OPD should be in

19   full compliance with Task 45 (if not sooner).  In addition, the Court will be able to

20   see if OPD has continued to remain in compliance with Tasks 2, 5, and 34 as well as

21   the other tasks in the NSA. At that time, we suggest revisiting the court's questions

22   to counsel.

23          Depending on several factors, including the IMT decision on Task 25, and

24   whether OPD attains compliance with Task 45 in no more than six months,

25   Plaintiffs' attorneys would be receptive to have the aforementioned six months

26   count towards the one year sustainability period. In other words, we are open to

27   having the Sustainability Period start now on the condition that OPD attain

28   compliance with Task 45 in the next six months. (Of course, the OPD also must stay

31

JOINT CASE MANAGEMENT STATEMENT                          Case No. 00-cv-4599 WHO

1    in compliance with the other Tasks, as directed by the Court and the IMT.)

2            Task 45 is not an insignificant task.  If the OPD cannot discipline its own

3    officers fairly, without regard to race, there will always be questions as to whether

4    they can provide equal justice in the community they serve.  The Riders case was

5    started because of egregious disparities in the black community, and everything

6    possible must be done to eradicate those disparities before the Negotiated

7    Settlement Agreement ends.

8            Upon his appointment as Chief of Police, Chief Armstrong promised: "Under

9    my leadership, OPD will have a laser focus on getting each [NSA] task in

10   compliance, while practicing constitutional policing, fair and unbiased treatment of

11   our community. This reflects the strong values of the City of Oakland. Moving the

12   Department into compliance with the Settlement Agreement is one of my top

13   priorities."[2]

14           Chief Armstrong, the Department he oversees, the Mayor he reports to, and

15   the City he serves are on the cusp of making good on this pledge.  The Department

16   has never been closer to full compliance with the NSA, and the institutional and

17   cultural reforms required to end this Court's oversight of the Department have

18   clearly taken root.

19           However, at the conclusion of the last Case Management Conference before

20   this Court, Judge Orrick stated his expectation that "all of the structures of the

21   NSA will have been in place and complied with by April 27th", the date of this Case

22   Management Conference. (Dkt. 1501, p. 52:10-12).  While Plaintiffs' attorneys laud

23   and acknowledge the OPD's enormous recent progress on multiple fronts, resulting

24   in newfound compliance with Tasks 2, 5, and 34, we cannot report that all

25   structures of the NSA have been complied with.  We agree with the IMT's

26   assessment that OPD is not (at the time this CMC Statement is written) in full

27

28   [2] https://sanfrancisco.cbslocal.com/2021/02/08/oakland-native-leronne-armstrong-
     sworn-in-as-chief-of-police-in-emotional-ceremony/

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1  compliance with Tasks 45, though we are hopeful that with effort and promised

2  follow-through, that compliance will be achieved.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1

**THE CITY'S STATEMENT**

2

**OVERVIEW**

3       We have reached a critical milestone:  the plaintiffs are open to the

4  Department entering a sustainability period. *See* Plaintiffs' Statement, 31. The

5  parties have reached consensus on some recommendations that we believe will help

6  ensure sustainability, as set forth above in the Parties' Joint Statement, and we

7  look forward to discussing the contours of a sustainability period with the Court and

8  the parties at the upcoming hearing.

9       The City continues to make tremendous progress. Following the Chief's

10  promotion earlier this month of Clifford Wong as Deputy Chief of the Bureau of

11  Risk Management (Wong had been an Acting Deputy Chief for several months), the

12  Department's executive team is fully staffed with permanent members. In the past

13  few months, the Police Commission's Inspector General (IG) has begun attending

14  Department risk management and internal affairs meetings and is now gearing up

15  to begin the Commission OIG's inaugural NSA task audit. While the IG works to

16  hire staff and structure the Commission OIG team, the Department has committed

17  resources and staff from the Department's OIG[3] to temporarily report to and assist

18  the IG.[4] In addition, since the last Court hearing the Monitoring Team has moved

19  the Department into compliance with three additional tasks:  Timeliness Standards

20  and Compliance with Internal Affairs Investigations (Task 2), Internal Affairs

21  Complaint Procedures (Task 5), and Vehicle Stops, Field Investigation, and

22  Detentions (Task 34). To date, the Monitor has assessed the final two remaining

23  tasks in partial compliance: Use of Force Investigation and Report Responsibilities

24  _____

25  [3] Effective May 1, the Department OIG will be renamed the Office of Internal
    Accountability (OIA) to clearly differentiate it from the Police Commission's OIG
    and prevent confusion.

26  [4] To the extent the Commission IG conducts task audits with assistance from the
    Department's Office of Internal Accountability, the City seeks to have up to two

27  such audits count toward the six required annual audits that the Department must
    conduct pursuant to Task 51.

28

34

1 (Task 25) (last assessed in March 2022), and Consistency of Discipline (Task 45)
2 (last assessed in December 2021).

3    Given the progress made in connection with Task 45 since the Monitor's last
4 review in December 2021, and the Monitor's note last month that there are
5 "indicators that Task 25 [ ] may come into compliance in the near future," Dkt.1510,
6 *Eightieth Report of the Independent Monitor* (Mar. 18, 2022), 28, the City is
7 optimistic that the Court will agree that the City has earned a full compliance
8 finding on both tasks. Even without a final "full compliance" finding from the
9 Monitor on these last two tasks, the City believes it is in overall substantial
10 compliance with the NSA, especially in light of the advancements discussed herein.
11 The City is prepared and eager to commence the sustainability period. We look
12 forward to further discussion of the measures set forth above in the City and
13 Plaintiffs' Joint Response that the parties agree would help support the
14 Department's sustained substantial compliance with the NSA.

15    In this status report, the Department and the City's leadership discuss the
16 following: (1) consistency in discipline policy (Task 45), (2) recruiting and improving
17 Department diversity, (3) understanding and reducing racial disparities in stops
18 (Task 34), (4) force investigations and report responsibility (Task 25), (5) internal
19 affairs timelines and complaint procedures (Tasks 2 & 5), and (6) policy
20 development and publication.

21 **I.    CONSISTENCY OF DISCIPLINE POLICY—TASK 45**

22    The Monitoring Team last assessed the Department "in partial compliance"
23 with Task 45, Consistency of Discipline Policy in December 2021. Notwithstanding
24 the Monitor's evaluation that the City was in compliance with all expressed task
25 elements, the Monitoring Team and Court have continued to closely follow the
26 Department's response to the *2020 Discipline Disparity Study*,
27 https://www.oaklandca.gov/documents/oakland-police-discipline-disparity-study
28

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1  (last visited April 20, 2022) (2020 study). *See* Dkt. 1494, *Seventy-Seventh Report of*

2  *the Independent Monitor* (Dec. 8, 2021), 18.

3      As reported at the last Court hearing, the Department has implemented all

4  race and equity measures recommended in the 2020 Study as well as two additional

5  measures. *See* Dkt. 1495, *Joint Case Mgmt. Statement,* Ex. A, *Race and Equity*

6  *Work on Discipline Disparity Study Recommendations (Dec. 2021)* (Dec. 22, 2021).

7  The Department projects that all sworn members will have completed the Stanford-

8  created *Project Reset:  A Police Culture Change Workshop Series* by September

9  2022.

10      In addition, the Department has begun in earnest what will be a long-term,

11  ongoing analyses of its internal investigation data. The Department views the

12  analysis of racial disparity in discipline as a necessary important and continuing

13  process, much in the same way it views its analysis of race in stop data:  the

14  Department will never truly be finished with this work and will continue to collect,

15  analyze, and impose remedial measures—and then repeat that cycle—indefinitely.

16      Department policy mandates that the Department analyze internal discipline

17  data quarterly and annually pursuant to the new Risk Management Policy. *See*

18  Department General Order (DGO) R-01, *Risk Management* (Apr. 2022), 5

19  ("Quarterly reports for the IAD Commander, and a yearly report for the annual PAS

20  meeting, regarding internal investigation outcomes by race."); *see also* Ex. 5, *Dept.*

21  *Response to OIG Reports*, 5 (Recommendation #5: "In addition to repeating these

22  analyses annually…," confirming that per policy comprehensive reports like the

23  2022 OIG report discussed below must be completed annually).  Plaintiffs' counsel

24  proposed placing this requirement in policy expressly to ensure that the

25  Department continues to analyze and report on its internal discipline data; the

26  Department wholeheartedly concurred. The Department published the Risk

27  Management policy on April 15, and the entire policy is in full effect.

28

1    Beyond the analyses required by policy, the Department has committed to

2    doing an additional Department OIG audit within the next three years on specific

3    areas involving racial disparity covered in the OIG's 2022 reports. Ex. 5, *Dept.*

4    *Response to OIG Reports.* at 5, Recommendation #6. The Department will continue

5    to "meet with stakeholders to discuss outstanding questions and to identify

6    additional areas for future research." *Id.*, Recommendation #5. Finally, the Chief's

7    has further committed to continuing to work with Dr. Eberhardt and Stanford. *See*

8    *Id.* at 1-2. Specifically, the Department will work with Dr. Eberhardt's team to

9    conduct qualitative analyses regarding officer perceptions of fairness and bias

10   through officer interviews similar to the interviews Dr. Eberhardt conducted several

11   years ago that led, in part, to the undertaking of the 2020 racial disparity study,

12   and similar to the polls conducted by the firm that conducted the 2020 study.

13          **A.    THE DEPARTMENT'S ANALYSIS OF RACE IN INTERNAL**
                    **INVESTIGATION OUTCOMES AND DISCIPLINE**
14
15          The Department OIG's Risk Analysis Unit, led by the Department's data

16   manager and with input from the Stanford research team, has completed its first

     internal report displaying and analyzing reliable discipline outcome data from 2014-
17
     2021. Ex. 2, *Analyses of Race in Internal Investigation Outcomes and Discipline*
18
     *(Apr. 2022)* (2022 report). After completing an initial draft of the report, the
19
     Department sent it to the Police Commission Chair, Commission Inspector General,
20
     plaintiffs' counsel, the Stanford research team, and the Monitoring Team and
21
     engaged in a formal presentation and feedback session with that group. Following
22
     the presentation, the Department revised the initial draft to reflect feedback,
23
     highlight certain findings, and add an executive summary to make the report more
24
     easily understood by the public.
25
            The 2022 report is not the final word on the Department's race and discipline
26
     analyses, rather it is an important beginning to the discussion. The 2022 report
27
     provides the necessary framework for the Department to conduct ongoing analyses
28

                                              37

of internal affairs case outcome data. Because of the concerns about the underlying data used to achieve the results set forth in the 2020 study, the Department essentially had to start from scratch to build a reliable and meaningful dataset before undertaking any type of data analysis that could be replicated moving forward. The reliability of the Department's data and establishment of consistent metrics puts the Department in a position to begin asking more questions about what the data might mean, where to look deeper to uncover potential bias, and ultimately what policies or processes the Department might best address bias when it is uncovered.

The Department's work culminating in the 2022 report directly reflects the significant advancement in expertise attributable to the Department's data manager, Dr. Grossman, and heralds a definitive shift to an internal proficiency that is critical to long-term, ongoing assessment of consistency of discipline. The Department has secured in policy continuing quarterly and annual reviews and reports of internal affairs case outcomes by race to ensure the Department's ongoing review of discipline data and provide an early warning system for identifying potential racial disparity in discipline. *See* DGO R-01, *Risk Management* at 5.

## 1. 2022 REPORT FINDINGS

The Department previously shared with the Court in prior filings a preliminary view and rudimentary analysis of some of the 2019-2021 internal affairs investigation outcome and race data. The 2022 report analyzes internal affairs case outcome data collected between 2014-2021 and compares data from 2014-2017 with more recent data from 2018-2021. Ex. 2, 2022 Report at 1, 4. The division of data allows for comparison of datasets created from time periods of similar length—each dataset contains approximately four years of internal investigation outcomes. *Id.* Each period was also of similar length to the time period reviewed in the initial 2020 study. *Id.* The 2022 report also analyzed the data for differences between investigation types. *Id.* at 1. The most common investigation

JOINT CASE MANAGEMENT STATEMENT                                    Case No. 00-cv-4599 WHO

1  types are Division Level Investigations (DLI) and Internal Affairs Division (IAD)

2  investigations. DLIs are investigated by field sergeants and IAD investigations are

3  handled by supervisors assigned to IAD and typically involve the most serious

4  allegations. *Id.*

5        Table 1 provides a simple breakdown of the sustained rate by race for DLI

6  and IAD investigations combined.[5] This rate comparison, however, cannot tell us

7  whether there is a significant relationship between the outcome of an investigation

8  and the race of the officer. *See id.* at 5. That is, simply because the sustained rate

9  for Black officers is greater than the rate for white officers in six of eight years does

10  not permit a scientific or statistical conclusion that there is a relationship between

11  race and outcome, or that this apparent disparity is of statistical significance rather

12  than random chance or coincidental variability. *See id.*

13  **Table 1: Sustained Rate for All Investigation Types**

| | White | | Black | | Hispanic | | Asian/ Filipino | | Other/ Unknown | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | n | % | n | % | n | % | n | % | n | % | n | % |
| 2014 | 26 | 11% | 10 | 10% | 12 | 9% | 6 | 6% | 1 | 17% | 55 | 9% |
| 2015 | 24 | 7% | 10 | 9% | 11 | 7% | 6 | 5% | 0 | 0% | 51 | 7% |
| 2016 | 21 | 6% | 17 | 9% | 22 | 11% | 10 | 8% | 1 | 3% | 71 | 8% |
| 2017 | 18 | 5% | 9 | 6% | 15 | 7% | 4 | 2% | 1 | 4% | 47 | 5% |
| 2018 | 39 | 11% | 18 | 13% | 14 | 6% | 13 | 8% | 2 | 8% | 86 | 9% |
| 2019 | 36 | 10% | 29 | 17% | 30 | 11% | 19 | 10% | 4 | 10% | 118 | 12% |
| 2020 | 36 | 10% | 20 | 11% | 37 | 10% | 19 | 9% | 2 | 4% | 114 | 9% |
| 2021 | 47 | 10% | 20 | 9% | 32 | 7% | 16 | 7% | 8 | 14% | 123 | 9% |
| Total | 247 | 9% | 133 | 11% | 173 | 9% | 93 | 7% | 19 | 8% | 665 | 9% |

21        The 2022 report therefore also used a statistical hypothesis test known as a

---

[5] Consistent with the methodology used in the Department's earlier preliminary analyses, the 2022 report ensured each officer is only counted once per case and the findings have been condensed into one or more sustained allegation, or no sustained allegation. This yields consistency with how many times an officer, and that officer's race, is counted per a single case. Presenting the data this way yields results that are less sensitive to the number of allegations made against a particular officer in a particular instance and tends to be more in line with the central question of whether African American or Black officers are sustained for misconduct more often than other races. Sixty-three percent of all cases contain only one allegation. Sixty-four percent of cases involving white officers have only one allegation; and 63% of cases involving Black officers have only one allegation. *Id. at* 4.

JOINT CASE MANAGEMENT STATEMENT        Case No. 00-cv-4599 WHO

chi-square test to determine whether there is a statistically significant difference between the expected outcome frequencies and the observed outcome frequencies. The chi-square test results revealed that in DLIs between 2018-2021, Black officers were sustained more frequently than white officers, as shown on Table 2, below. *See id.* at 7-8.

**Table 2: 2018-2021 DLI/IAD Chi-Square for White v Black Officer**

| | | Other than Sustained | | Sustained | | Chi-Square Value | *p* |
|---|---|---|---|---|---|---|---|
| | | Observed | Expected | Observed | Expected | | |
| DLI | | | | | | | |
| | White | 93% (974) | 91% (958) | 7% (76) | 9% (92) | 9.52 | 0.002 |
| | Black | 88% (458) | 91% (474) | 12% (62) | 9% (46) | | |
| IAD | | | | | | | |
| | White | 81% (358) | 82% (360) | 19% (82) | 18% (80) | 0.20 | 0.658 |
| | Black | 83% (122) | 82% (120) | 17% (25) | 18% (27) | | |

Table 2 shows the chi-square results for case outcomes for white versus Black officers for DLI and IAD investigations between 2018-2021. The scientifically accepted principle is that if the differences are significant, the *p* value would be less than 0.05, meaning in simple terms that there is a less than 5% probability that the results are the result of some other factor(s) or random chance. *See id.* at 5. Therefore, Table 2 reflects a statistically significant difference observed in the sustained rates between white and Black officers in DLIs between 2018-2021. There was no similar significant difference observed in these rates for IAD investigations. Looking back at Table 1, we observe that in 2019 Black officers were sustained at a rate of 17% while white officers were sustained only 10% of the time. Therefore, it appeared that 2019 might be driving the overall sustained rate disparity. A chi-square test was conducted for DLI case outcomes each year between 2018 and 2021 to test this hypothesis. *Id.* at 8. The analysis confirmed that the DLI case outcomes in 2019 were the source of the disparity, as reflected in Table 3, below. *See id.* at 9.
///

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

**Table 3: 2018-2021 DLI Chi-Square for White v Black Officers**

| | Other than Sustained | | Sustained | | Chi-Square Value | p |
|---|---|---|---|---|---|---|
| | Observed | Expected | Observed | Expected | | |
| **2018** | | | | | | |
| White | 93% (236) | 92% (233) | 7% (18) | 8% (21) | 1.33 | 0.249 |
| Black | 89% (91) | 92% (94) | 11% (11) | 8% (8) | | |
| **2019** | | | | | | |
| White | 94% (275) | 90% (265) | 6% (19) | 10% (29) | 12.32 | 0.000 |
| Black | 83% (115) | 90% (125) | 17% (24) | 10% (14) | | |
| **2020** | | | | | | |
| White | 92% (233) | 92% (233) | 8% (21) | 8% (21) | 0.00 | 0.950 |
| Black | 92% (130) | 92% (130) | 8% (12) | 8% (12) | | |
| **2021** | | | | | | |
| White | 93% (230) | 92% (227) | 7% (18) | 8% (21) | 1.53 | 0.216 |
| Black | 89% (122) | 91% (125) | 11% (15) | 9% (12) | | |

As a result of these analyses, the 2022 report recommended that the Department look more closely at the 2019 DLI outcome data and cases to determine whether there were specific factors that led to the disparate sustained rate for Black officers. *Id.* at 15.

In addition to recommending a closer look at 2019 DLI case outcomes, the 2022 report made two recommendations for data collection to permit additional analyses. Specifically, the 2022 Study recommended that the Department (1) consider whether adding pursuit, collision, and force boards as "investigation types" in Vision might make it easier to identify and remove these investigations when conducting analyses; and (2) consider adding in the "discipline" section an aggravating and mitigating factor count (or specific factors) for each member and case. While not all factors are weighed equally, a factor count may be the easiest way to capture whether additional variables impact discipline. *Id.* at 14.

## 2. THE DEPARTMENT'S RESPONSE

In response to the 2022 report findings and recommendations, the Department committed to following all recommendations set forth in the report. *See, generally,* Ex. 5, *Department's Response*. The Department will conduct

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1    additional analyses on DLIs that came to a finding in 2019 to attempt to identify

2    the cause of the statistical disparity in case outcomes (sustained rates) between

3    Black and white officers. *Id.* at 5. Furthermore, the Department intends to capture

4    the additional data (investigation types and aggravating/mitigating factors)

5    suggested by the study to permit additional analyses of the investigation outcomes

6    and discipline dataset. *Id.* at 4. The Department will also create a summary report

7    on internal discipline outcomes to publicly release on an ongoing basis to improve

8    transparency for Department members and the public. *Id.* Finally, the Department

9    added its own recommended next steps following its review of the 2022 report

10   including, importantly, developing an Informational Bulletin describing all of the

11   new processes and procedures implemented by the Department to ensure equity in

12   discipline and, to the extent appropriate, working to incorporate those practices

13   within the relevant corresponding policies. *Id.* at 5.

14        These measures, in addition to the ongoing evaluation of discipline data

15   required by DGO R-01, *Risk Management*, will ensure timely and continual race

16   and discipline data analysis. Chief Armstrong has also committed to partner with

17   Dr. Eberhardt and the Stanford Social Psychological Answers to Real-world

18   Questions (SPARQ) team to conduct a further qualitative analysis, including

19   interviews of Department members with input from officer membership

20   organizations to determine whether officers view the Department's internal

21   discipline process as fair and how views may have changed from responses given in

22   conjunction with previous Stanford qualitative interviews and polls taken as part of

23   the 2020 study. *Id.* at 1-2.

24        The Monitor has endorsed the Department's "capture of the information and

25   the requisite remedial actions" in connection with its compliance finding on Task

26   34. *Eightieth Report* at 28. The Department asks that the Court similarly endorse

27   the Department's capture of information, ongoing analyses, and disparity

28   mitigation measures in connection with the Department's compliance with Task 45.

JOINT CASE MANAGEMENT STATEMENT                          Case No. 00-cv-4599 WHO

## II.     RECRUITING AND IMPROVING DEPARTMENT DIVERSITY

The Department continues its efforts to recruit, hire, and retain diverse candidates. In March 2022, the Department commenced its 188th Basic Academy. The tables below, Tables 4 and 4A, reflect the demographics of the 40 Department police officer trainees who entered the 188th Academy. Nine of the trainees are Oakland residents.

**Table 4:  OPD's 188th Basic Academy Demographics (March 2022)**

| Gender | | Race/Ethnicity | | Residency | | Language | | Education | |
|--------|----|------|----|---------|----|----------|----|-----------|----|
| Female | 8 | Asian | 4 | Oakland | 9 | Spanish | 9 | High School | 8 |
| Male | 32 | Black or African American | 8 | Other | 31 | Samoan | 1 | Some College | 14 |
| | | Hispanic | 18 | | | Tagalog | 1 | AA/AS | 6 |
| | | White or Caucasian | 8 | | | Tibetan | 1 | BA/BS | 11 |
| | | Other | 2 | | | Vietnamese | 1 | MA/MS | 1 |
| **Total** | **40** | **Total** | **40** | **Total** | **40** | | | **Total** | **40** |

**Table 4A:  Race/Ethnicity & Gender in OPD's 188th Academy (March 2022)**

| Race/Ethnicity | Female | Male |
|----------------|--------|------|
| Asian | | 4 |
| Black or African American | 2 | 6 |
| Hispanic | 4 | 14 |
| White or Caucasian | 2 | 6 |
| Other | | 2 |
| **Total** | **8** | **32** |

The Department OIG's Risk Analysis Unit also recently began to engage in an internal analysis of attrition in the academy and field training programs following up on concerns and recommendations in the 2020 study. The 2020 study revealed disparate outcomes based on the race and gender of recruits who were released from the Academy and Field Training Programs. https://www.oaklandca.gov/documents/oakland-police-discipline-disparity-study at

JOINT CASE MANAGEMENT STATEMENT                                    Case No. 00-cv-4599 WHO

11, 38. But because the 2020 study noted the data was too limited to reach meaningful conclusions about disparities among released trainees, the study provided few recommendations to address possible racial bias in the Academy and Field Trainee Programs. Following the 2020 study, the Department implemented measures to reduce bias in the academy and field training program and improved its mentoring program and trainee tracking processes.

The OIG's 2022 report on the academy and field training programs analyzes graduation rates by race and gender for academy classes that graduated after the period assessed in the 2020 study, starting with the 183rd Academy (graduated Feb. 2020)[6]. Ex. 4, *Variability in Academy and Field Training Program Outcomes (Apr. 2022)*, 2.

As an initial matter, the Department compared Academy recruit demographics prior to the 2020 study (172nd-182nd Academy classes), and subsequent to the study (183rd-188th Academy classes). The percentage of male attendees was the same during the two periods (82%). *Id.* at 3. But in the six most recent academies there has been an increase in the percentage of attendees that are Black, Hispanic, and Other, and a decrease in the proportion of attendees that identify as white or Asian. *Id.* at 2-3; *Figure 1*, below.

**Figure 1:  Comparison – Academy Recruits by Race**



---

[6] The 2022 report includes only partial data from the 187th and 188th Academies because trainees remain in the academy.

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1    Table 5 below displays the graduation rate by gender and race for recruits in

2  the 183rd-186th Academy classes. Table 5 includes individuals who entered

3  multiple academies, so long as they ultimately graduated. Recruits who do not

4  graduate from an academy class may join a subsequent academy class if the recruits

5  have an overall academic performance of 70% or better. The Department previously

6  required an overall academic performance of 85% or better to be considered for a

7  subsequent academy. Of the 20 individuals who started in the 183rd-186th

8  Academy classes but joined a subsequent class, all but one graduated. One trainee

9  was removed for a rule violation. *Id.* at 5.

10 **Table 5:  Unique Attendee Graduation Rate (183rd-186th Academies)**

11

|  | Yes | | No | | Total |
|---|---|---|---|---|---|
|  | % | n | % | n | n |
| **Female** | **90%** | **19** | **10%** | **2** | **21** |
| Asian | 100% | 4 | 0% | 0 | 4 |
| Black | 100% | 4 | 0% | 0 | 4 |
| Hispanic | 90% | 9 | 10% | 1 | 10 |
| White | 67% | 2 | 33% | 1 | 3 |
| **Male** | **79%** | **81** | **21%** | **21** | **102** |
| Asian | 80% | 16 | 20% | 4 | 20 |
| Black | 92% | 23 | 8% | 2 | 25 |
| Hispanic | 85% | 29 | 15% | 5 | 34 |
| Other | 67% | 2 | 33% | 1 | 3 |
| White | 55% | 11 | 45% | 9 | 20 |
| **Grand Total** | **81%** | **100** | **19%** | **23** | **123** |

22    For the 183rd-186th academy classes, the overall graduation rate was 81%.

23 Some recruits who did not initially graduate joined subsequent academies and are

24 currently in the 187th or 188th academy classes. This will likely increase the

25 overall graduation rate in the future. Despite low overall numbers, female recruits

26 graduate 90% of the time. The lowest rate was for white women (67%), although

27 there were only three white female recruits during this period. Among men, white

28

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1  recruits have the lowest overall graduation rate (55%), likely because they also have

2  the highest rate of resignations and those who resign are very unlikely to be placed

3  into later academy classes. *Id.* at 6. The graduation rate for females and for Asian,

4  Black, and Hispanic males was 80% or higher.

5  **Table 6:  Field Training Completion Rate (183rd-185th Acad. Graduates)**

| | Yes | | No | | Pending | | Total |
|---|---|---|---|---|---|---|---|
| | % | n | % | n | % | n | n |
| **Female** | 100% | 12 | 0% | 0 | 0% | 0 | 12 |
| Asian | 100% | 3 | 0% | 0 | 0% | 0 | 3 |
| Black | 100% | 2 | 0% | 0 | 0% | 0 | 2 |
| Hispanic | 100% | 5 | 0% | 0 | 0% | 0 | 5 |
| White | 100% | 2 | 0% | 0 | 0% | 0 | 2 |
| **Male** | 87% | 54 | 10% | 6 | 3% | 2 | 62 |
| Asian | 85% | 11 | 15% | 2 | 0% | 0 | 13 |
| Black | 82% | 14 | 6% | 1 | 12% | 2 | 17 |
| Hispanic | 85% | 17 | 15% | 3 | 0% | 0 | 20 |
| Other | 100% | 2 | 0% | 0 | 0% | 0 | 2 |
| White | 100% | 10 | 0% | 0 | 0% | 0 | 10 |
| **Grand Total** | 89% | 66 | 8% | 6 | 3% | 2 | 74 |

The overall completion rate for the Field Training Program for graduates from the183rd-185th Academies, combined, was 89%.[7] Table 6, below.

Of the 74 trainee officers who began the field training program, only six failed to complete the program. Four trainees resigned from the program citing reasons such as "law enforcement is not a good fit," "Oakland is not a good fit," and "family." Two trainees (both Hispanic men), were removed from the program, one for a sustained Manual of Rules violation and another for performance issues.

Female trainees had a 100% completion rate (although the total number of women in the Field Training Program was very low). Black male trainees had the lowest completion rate (82%), though that rate will increase to 94% if the injured officers complete the program. The overall 89% completion rate is an increase from

---

[7] The status is pending for two Black male trainee officers because they are injured and have not yet completed the program. The 186th academy class is currently in the Field Training Program so completion rates are not available.

46

1   the 2020 study's cited 83% completion rate. *Id.* at 8.

2       Overall, the recent academy data shows that unless resigning for personal

3   reasons or removed for a Manual of Rules violation, most recruits graduate from the

4   academy. Recent changes to the standards allowing recruits to attend subsequent

5   academies have provided additional opportunities for recruits, and the

6   Department's graduation rate appears to have benefited from those changes. The

7   Department has made a concerted effort to recruit and hire a diverse police force

8   and these results show that the Department is successfully graduating recruits

9   from the academy and the vast majority of those graduates are completing the field

10  training program. *Id.* at 7.

## III. THE CITY'S ONGOING EFFORTS TO REDUCE RACIAL DISPARITIES IN STOPS—TASK 34

11

12       In its *Eightieth Report*, the Monitoring Team found the Department in full

13  compliance with Task 34, Vehicle Stops, Field Investigation, and Detentions. The

14  Monitoring Team lauded the Department's "increasingly sophisticated analysis of

15  stop data and the sharing of data with officers at all levels across the Department."

16  Dkt. 1510 at 22.

17       The Department has worked with intention to achieve a level of "engagement

18  with stop data [that] goes beyond simply collecting and reporting the data" and

19  "includes a review of behavior or conditions that prompt stops, the activity involved

20  during stops, and the results or outcomes of stops." *See id.* Furthermore, the

21  Department has documented its risk management process in Department policy,

22  including the Department's regular use of stop data, to ensure that these

23  achievements are sustained moving forward, even in the eventual absence of the

24  NSA. *See* DGO R-01, *Risk Management* (Apr. 2022).

25       The Department continues to advance its long-term focus on making stops for

26  activity associated with crime and not incidental traffic-related concerns. *See*

27  *Eightieth Report* at 22. In comparison with the 2020 data reported by 17 other

28  California law enforcement agencies, in 2020 and 2021 the Department had

JOINT CASE MANAGEMENT STATEMENT              Case No. 00-cv-4599 WHO

1  "substantially lower levels of stops for nonmoving and equipment-based vehicle

2  violations." *See id.* at 22; *Fig. 2.*



*Fig. 2*

Moreover, the Department's 2020-2021 data show declines in stops, with larger declines in non-dispatched stops compared with dispatched stops. *Eightieth Report* at 22; *Fig. 3.* Similarly, there continue to be "modest increases in the percentage of stops based on intelligence information." *Id.*

///

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

# Monthly Risk Analysis Report – Citywide
## Through December 31, 2021

| Based on Officer Assignment at time of the event | Jun-Nov 2021 Avg | Dec 2021 | % Change | YTD 2020 | YTD 2021 | % Change |
|---|---|---|---|---|---|---|
| **Stops** | | | | | | |
| Dispatch Stops | 690.0 | 585 | -15% | 10,153 | 8,218 | -19% |
| Non-Dispatch Stops | 499.5 | 357 | -29% | 11,930 | 6,035 | -49% |
| % Intel Led | 43% | 45% | +2% | 37% | 42% | +5% |
| % Non-Intel Led African American | 44% | 41% | -3% | 47% | 43% | -4% |
| % Non-Intel Led Hispanic | 33% | 42% | +9% | 29% | 34% | +5% |
| % Non-Intel Led Traffic Stops | 80% | 76% | -4% | 80% | 81% | +1% |
| Total Stops | 1,189.5 | 942 | -21% | 22,083 | 14,253 | -35% |

*Fig. 3*

        After posting the Department's lowest ever non-dispatch stop rate for African Americans for two consecutive quarters, the Department's rate rose to 53% in the last quarter of 2021.[8] *See* Fig. 4, below, *Non-Dispatch Stop Percentages by Race, 2016 to 2021.* The rate remains well below the greater-than-56% annual average non-dispatch stop rate for African Americans between 2014 and the first half of 2021.

///

---

[8] The Department's previously reported 47% non-dispatch African American stop rate has been amended to 48% based on the inclusion of late-received data.

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15



16    *Fig. 4*

17    Despite the fourth quarter increase in the African American non-dispatch

18    stop *rate*, the *number of people* the Department stopped continued to decline. The

19    Department conducted nearly 200 fewer non-dispatch stops of African Americans in

20    the last quarter of 2021 than in the previous quarter. *See* Fig. 5 below, *Non-*

21    *Dispatch Stop Numbers by Race, 2016 to 2021.*

22    ///

23

24

25

26

27

28

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO



*Fig. 5*

The City remains mindful that racial disparity is at the heart of this case. Capturing accurate stop data, analyzing the information, and using the analyses at every level within the Department to recognize and reduce racial disparity is a critical part of the Department's work. The Department is proud to be recognized as a local and national law enforcement leader in evaluating and reducing racial disparities and is confident its practices will allow the Department to continue to progress and remain a pioneer in this area. *See* Dkt. 1467, *Joint Case Mgmt. Statement* (Aug. 25, 2021), 48-50.

## IV.   FORCE INVESTIGATIONS AND REPORT RESPONSIBILITY— TASK 25

Use of force is a matter of critical concern to both the community and the Department. The Department is in compliance with Task 24 (Use of Force Reporting Policy), Tasks 26 and 30 (Force and Executive Force Review Boards), and

1    Task 31 (Officer Involved Shooting Investigations). In its March 2022 report, the

2    Monitor found the Department in partial compliance on Task 25 (Use of Force

3    Investigations and Report Responsibility), and stated that there are "indicators that

4    Task 25 [ ] may come into [full] compliance in the near future." *Eightieth Report* at

5    28.

6           Most importantly, the Monitoring team conducted task assessments following

7    Department policy changes designed to correct the reporting inconsistencies that

8    led to reactivation of Task 25, and did not note any disagreement with the

9    Department's compliance determinations in the sample of Level 3 and 4 uses of

10   force that the Monitor reviewed.[9] *See Seventy-Fourth, Seventy-Sixth, Seventy-*

11   *Eighth, and Eightieth Reports.* Furthermore, in its last three assessments, the

12   Monitoring Team has not identified any force incidents where officers failed to

13   attempt verbal communications and de-escalation where appropriate, prior to

14   utilizing force. *Seventy-Sixth Report* at 6, *Seventy-Eighth Report* at 4, *Eightieth*

15   *Report* at 6. The number of officers failing to announce and identify themselves as

16   police officers when possible and appropriate is continuing to decrease. *Eightieth*

17   *Report* at 6. Finally, the Monitor has seen improvements in two areas of particular

18   concern to the Court: timely body-worn camera activation and supervisor

19   identification of delays, and force investigation timelines. *Id.* at at 9-10

20   ("improvement in proper activation of BWCs, supervisory review and reporting, and

21   timeliness of reporting," with the most significant improvement occurring in the

22   most recent reports reviewed (Oct.-Nov. 2021)).

23   ///

24   _____

25   [9] To gauge compliance with Task 25, the Monitoring Team reviews Level 3 and
     Level 4 (lower level) force reports. *See Seventy-Sixth Report* at 4. During these

26   reviews, however, the Monitor identified two instances in each of its assessments in
     the *Seventy-Eighth* and *Eightieth Reports* where a Type 32 use of force (force

27   simply to overcome resistance, often handcuffing) had not been properly
     documented.

28

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

**A. Body-Worn Camera Activations and Supervisory Review**

The Monitor observed "more instances of supervisors identifying and addressing body-worn camera activation concerns," calling it a "noticeable improvement from [ ] past reports." *Id.* at 8. While the Monitor continues to note that the loss of body camera video footage even from short delays in activation could theoretically result in the loss of critical information regarding the community contact, it is worth noting that none of the minor delays observed in the past several months have actually resulted in a loss of critical information or hindered the Department personnel's ability to accurately assess force. *Seventy-Fourth, Seventy-Sixth, Seventy-Eights, and Eightieth Reports.*

Notwithstanding the steady capture of all significant community contacts, the Department agrees that timely activations are important and required by policy and continues to strive to increase earlier activations. The Department has been unwavering in its ongoing efforts to correct body-worn camera issues and other deficiencies that may impact force reporting and investigations. The Monitor recognized the Department's "numerous steps to address the proper reporting of use of force and the concerns that have been identified during [the Monitor's] reviews." *Eightieth Report* at 9. The Monitor's shorthand list of the Department's actions spans a full page, single spaced. *Id.* at 4.

To the extent that the Department's diligence cannot eliminate all instances of human error, the Department's upgraded body-worn camera system should further ensure that critical force incidents are captured on video. The Department has deployed more than 150 body-worn cameras with automatic activation when an officer unholsters their firearm or taser and, on equipped patrol vehicles, when lights and sirens are turned on or an officer opens the door to get out of the vehicle. The majority of patrol personnel are using the new cameras. *See id.* at 9. The Department will continue to issue cameras as quickly as it receives additional inventory and will monitor the implementation of the new system for ease of use,

53

1   effectiveness, and to help inform the Department's revision of body-worn camera

2   policy.

3          **B.     Force Investigation Timelines**

4          The Monitor has also recognized an improvement in use of force report

5   completion timelines. *Id.* at 5. Of the seven force reports the Monitor reviewed for

6   its last report (the Monitor reviewed only the Level 3 force reports), while none were

7   completed within the required base timelines (sixteen days), on average the reports

8   were completed more quickly than previously reports. The reports took between

9   four and 12 weeks to complete, with the average being eight weeks. This is an

10  improvement from the 10-week average the Monitor noted in its *Seventy-Eighth*

11  *Report. Id.* The Monitor also recognized that additional information about delays

12  and approved extensions were being included in the use of force reports. *Id.*

13         Policy allows for force investigations deadlines to be extended "as needed" so

14  long as a properly documented request for an extension is received prior to the

15  deadline and the appropriate supervisory approval is granted and documented. *See*

16  DGO K-04, *Reporting and Investigating the Use of Force*, 18, 23, 29 & 31. There are

17  no policy limits on the number or length of extensions, though of course the

18  Department's IA 180-day timeline and California Government Code, section 3304

19  certainly limit extensions as a practical matter to the extent that use of force

20  investigations involve misconduct investigations and potential discipline. The

21  Monitor's evaluation of use of force timelines does not indicate that any force

22  extensions granted have caused the Department to miss 3304 deadlines and, in fact,

23  the Department's compliance with Task 2, IA timelines, demonstrates that the

24  Department is overwhelmingly meeting internal deadlines to investigate

25  misconduct, including excessive force complaints.

26         The Department was buoyed by the initial improvements observed after Task

27  25 was reinitiated and has remained encouraged by its ability to sustain those

28  initial improvements even as the Monitor reported that the Department's progress

                                              54

JOINT CASE MANAGEMENT STATEMENT                          Case No. 00-cv-4599 WHO

1    had "stalled." The Department has continued to push for improvement and once

2    again is pleased to be making additional forward progress. What the City noted in

3    its last Court filing and presentation to the Court remains true today: none of the

4    delayed activations or other deficiencies observed by the Monitor in connection with

5    Task 25 have actually impacted the Department's ability to rigorously and

6    appropriately investigate all uses of force. Accordingly, while the Department

7    intends to continue its efforts to reduce deficiencies, the City is substantially in

8    compliance with Task 25.

9    **V.    INTERNAL AFFAIRS TIMELINES AND COMPLAINT
         PROCEDURES—TASKS 2 & 5**

10
         In February 2022, the Department moved into compliance with both Task 2

11   and Task 5, "two of the most critical requirements in the NSA." Dkt. 1505, *Seventy-*

12   *Ninth Report of the Independent Monitor* (February 22, 2022), 9.

13
         Eighty-eight percent of Class I and 92% of Class II investigations for the last

14   quarter of 2021 were completed within the established 180-day timelines. For the

15   first quarter of 2022, the Department estimates its timely completion rates will be

16   above 90% for both Class I and Class II investigations. The Department continues

17   to routinely complete the discipline recommendation process on all cases with

18   sustained findings within 30 calendar days. *See, e.g., id.* at 3.

19
         The Department appreciates and agrees that "quality and timely

20   investigations are essential to fulfilling the Department's obligation to

21   complainants and officers alike." *Id.* at 6. The Department is confident that the

22   policies and practices now in place will support its sustained compliance with these

23   tasks in the long term.

24   **VI.   POLICY DEVELOPMENT AND PUBLICATION UPDATE**

25
         The City provides the chart below to update the Court on the current status

26   of the policy items specifically identified by the Court in prior hearings. The

27   Instagram investigation-related policies are shaded blue for ease of identification.

28

JOINT CASE MANAGEMENT STATEMENT                                    Case No. 00-cv-4599 WHO

| TITLE | STATUS |
|---|---|
| **DGO R-01, Risk Management** | Published by the Department on April 15, 2022. |
| **Special Order 9208 re Type 32 Force Reporting** | Approved by Police Commission on March 25, 2022. On April 18, 2022, OPOA requested meet and confer. |
| **DGO D-18, Member Social Media Use** | Approved by Police Commission on March 25, 2022. On April 18, 2022, OPOA requested meet and confer. |
| **DGO D-20, Anti-Discrimination and Anti-Harassment Policy** | Approved by Police Commission on March 25, 2022. Currently under review by ER for possible meet and confer. ER sent to all unions on March 17, 2022 (in anticipation of Commission approval) for review. |
| **DGO I-19, Cell Phones** | Approved by Police Commission on April 14, 2022. Currently under review by ER for possible meet and confer. |

The Department submitted all five of these policies to the Police Commission between January and March 2022. Although the City Charter gives the Police Commission 120 days to review and vote on a policy submission, the Commission convened ad hoc committees to review and revise four of the policies, held a special meeting to discuss the Risk Mitigation policy, and ultimately approved all five policies much more quickly than the Charter-granted 120 days. Four of the five policies are now at the meet and confer stage, which is the very last step in the process prior to publication. The City has every reason to believe that the meet and confer process will be completed promptly. The Department published DGO R-01, *Risk Management* on April 15, 2022, effective immediately.

## CONCLUSION

The Oakland Police Department faces many challenges. Violent crime in the city remains high. The Department is enduring significant attrition. As of mid-April, the Department is down to 652 sworn officers and 261 professional staff, even though it is budgeted for 737 officers and more than 352 professional staff. Nonetheless, the Department's commitment to constitutional policing remains

1   steadfast. The Department continues to prioritize intelligence-led non-dispatch

2   stops to focus on the individuals driving the violence in Oakland. The Department is

3   increasing the number of officers available to work with Ceasefire program partners

4   to boost community outreach to those most at risk of being a perpetrator or victim of

5   gun violence. In addition, in late January 2022 the Department added a third patrol

6   area to East Oakland (Area 6) to respond to dispatch calls for service; 60% of the

7   Department's calls for service come from East Oakland.

8        As the Department maneuvers to strategically deploy its resources to

9   strengthen community safety, it continues to impress upon all members the

10  importance of employing the principles of constitutional policing and meeting both

11  the mandates as well as the spirit of the NSA.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT CASE MANAGEMENT STATEMENT                                    Case No. 00-cv-4599 WHO

**THE OPOA'S STATEMENT**

Since the last Case Management Conference, on January 5, Intervenor, Oakland Police Officers Association ("OPOA") has continuously engaged the Oakland Police Department ("OPD") and the City of Oakland ("City") representatives in dialogue concerning the Court's request that the parties develop a framework to enter into the compliance phase of Negotiated Settlement Agreement ("NSA"). During those communications representatives of the OPOA have expressed a strong desire and interest in assisting in the efforts to devise a specific approach for the compliance phase.

Barry Donelan, the president of the OPOA has spoken frequently with OPD command staff and City management conveying an interest in participating in the compliance phase planning process. All such meetings and communications were positive in tone and productive in content. While the City was in the process of developing a strategy and plan for securing full compliance, President Donelan forwarded a letter to Chief Armstrong on March 28, (attached hereto as Exhibit 7) identifying specific OPOA compliance related proposals. Those proposals are as follows:

- Ensure that a formal structure is created to replicate the collaborative role that the OPOA has had since the inception of the NSA.  Moving forward, the OPOA should be involved, to the same extent that we have been, in all things necessary to ensure that sworn   members of OPD are fully participatory and engaged in advancing the goal of providing constitutional policing to the citizens of Oakland.

- Adopt a Labor/Management Committee at OPD with quarterly meetings between the Executive Staff and the Executive Board of the OPOA to address both operational and strategic issues facing the OPD post-NSA.

- Have the Chair of the Police Commission meet quarterly with the President of the OPOA, akin to Judge Henderson's Order establishing meetings between the court appointed monitor and the OPOA President.

- Create a rotating peer review committee of members of all ranks to weigh in on discipline decisions, similar to efforts in other departments, the goal

58

Case No. 00-cv-4599 WHO

to make the discipline process transparent and aiming to adopt the tenets of fairness originally stated in the NSA.

- Establish a permanent selection process, to include criteria, for promotion to the rank of Deputy Chief of Police and higher.

- Conduct an annual review of the operational needs of the Police Department to effectively carry out our public safety duties in Oakland. To include:

  - A call reduction strategy

  - Inculcate the City of Oakland MACRO program to take police calls for service

  - Review Department deployment in anticipation of an even lower number of police officers.

- Engage with the OPOA on future technological projects for OPD to develop efficiencies through the deployment of new technologies.

The framework proposed by the OPOA identifies a strong desire of the organization to institutionalize the collaborative partnership that has continued unabated from the inception of the NSA.  The OPOA's consistent and unwavering commitment to collaboration is evident in the record of these proceedings. The OPOA has not filed any motions or objections which have impeded the party's ongoing attempts to seek full compliance. Rather, the record demonstrates the OPOA's long-standing and unequivocal commitment to bring about the cultural change sought by the parties and the court.

Since he transmitted his March 28 letter to Chief Armstrong, President Donelan has continued to have conversations with City representatives most importantly, with Chief Armstrong affirming OPOA's commitment to collaboration. As of the writing of this CMC statement, the OPOA has not been made aware of the final specific framework and plan developed by the City and OPD but is well aware that Chief Armstrong's stated intentions and representations to the OPOA give the organization confidence that it will continue to have a significant role in the compliance phase and beyond.

59

1

Respectfully submitted,

2

3  Dated:  April 20, 2022          BARBARA J. PARKER, City Attorney
                                   BRIGID S. MARTIN, Special Counsel
4

5                          By:  _____/s/ BRIGID MARTIN*_____
                                   Attorneys for Defendants
6                                  CITY OF OAKLAND

7                                  JOHN L. BURRIS
                                   Law Offices of John L. Burris
8

9                          By:  _____/s/ John L. Burris_____
                                   Attorney for Plaintiffs
10

11                                 JAMES B. CHANIN
                                   Law Offices of James B. Chanin
12

13                         By:  _____/s/ James B. Chanin_____
                                   Attorney for Plaintiffs
14

15                                 ROCKNE A. LUCIA, JR.
                                   Rains Lucia Stern St. Phalle & Silver
16
                           By:  _____/s/ Rockne A. Lucia, Jr._____
17                                 Attorney for Intervenor
                                   OAKLAND POLICE OFFICERS ASSOCIATION
18

19  *Per Local Rule 5-1(i)(3), the filer attests that concurrence in the filing of the

20  document has been obtained from each of the other Signatories

21

22

23

24

25

26

27

28

60

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO