April 26, 2022

# Eighty-First Report
## *of the* Independent Monitor
## *for the* Oakland Police Department

---

## Introduction

This is our eighty-first status report on the Negotiated Settlement Agreement (NSA) in the case of *Delphine Allen, et al., vs. City of Oakland, et al.,* in the United States District Court for the Northern District of California under the direction of Judge William H. Orrick.  I was appointed in 2010 to oversee the monitoring process of the Oakland Police Department (OPD) that began in 2003.

Following the Court's Order of May 21, 2015, we devote special attention to the most problematic component parts of the NSA Tasks that are not yet in full or sustained compliance; and discuss in our status reports the most current information regarding the Department's progress with the NSA and its efforts at making the reforms sustainable.  Our monthly reports do not address all Tasks.  This report describes our recent assessments of NSA Tasks 2, 5, 24, 25, 41, and 45.

Each month, our Team conducts a visit to Oakland that includes both compliance assessments and technical assistance.  Due to the COVID pandemic, we have been holding our visits remotely.  During our site visits, we meet with Department and City officials; observe Department meetings and technical demonstrations; review Departmental policies; conduct interviews and make observations; and analyze OPD documents and files, including misconduct investigations, use of force reports, crime and arrest reports, Stop Data Forms, and other documentation.

During the September 1, 2021 Case Management Conference, the Court reiterated its five priorities for the Department:

1. Reduce racial disparities in vehicle, pedestrian, and bicycle stops, with continued use of intelligence-led policing;

2. Implement Vision and its associated dashboards in a technologically straightforward way so that the tools are used effectively in the risk management process;

3. Recruit officers who reflect the diversity (gender, race/ethnicity, and other) of Oakland;

4. Ensure that all uses of force and instances of potential misconduct are accurately reported and rigorously investigated within set timeliness standards; and

5. Ensure that disciplinary decisions and the disciplinary process are fair and equitable.

The Department is making progress in these areas, and the Chief and the Monitor continue their discussions regarding these on a regular basis.

Eighty-First Report of the Independent Monitor for the Oakland Police Department
April 26, 2022
Page 2 of 31

## *Focused Task Assessments*

## Task 2:  Timeliness Standards and Compliance with IAD Investigations

### Requirements:

*Fairness to complainants, members/employees and the public requires that internal investigations be completed in a timely fashion.*

> 1.    *On or before December 1, 2003, OPD shall develop policies regarding timeliness standards for the completion of Internal Affairs investigations, administrative findings and recommended discipline.*
>
> 2.    *Compliance with these timeliness standards shall be regularly monitored by IAD command and the Department's command staff.  If IAD experiences an unusual proliferation of cases and/or workload, IAD staffing shall be increased to maintain timeliness standards.*

(Negotiated Settlement Agreement III. B.)

### Relevant Policy:

OPD most recently revised Departmental General Order M-03, *Complaints Against Department Personnel and Procedures*, on December 22, 2017.

### Commentary:

**Task 2.1** requires that internal investigations (IAD and Division Level) – including review, approval, findings, and discipline – be completed in accordance with the timeliness standards developed by OPD.  To assess this subtask, we reviewed a list of all internal investigations resulting in formal findings (unfounded, sustained, exonerated, or not sustained) that were approved in January, February, and March 2022, and calculated the number of days between the complaint date and the approval date for each case.  We excluded from the dataset cases that were administratively closed, those that involved on-duty traffic accidents or service complaints, and those that did not involve Manual of Rules (MoR) violations.  We segregated the remaining cases into Class I or Class II categories.  If a case involved at least one alleged Class I violation, we classified it as Class I.

At least 85% of Class I misconduct investigations and at least 85% of Class II misconduct investigations must be completed within 180 days to be considered timely.  Per DGO M-03, Class I offenses "are the most serious allegations of misconduct and, if sustained, shall result in disciplinary action up to and including dismissal and may serve as the basis for criminal prosecution."  Class II offenses include "all minor misconduct offenses."

For the purposes of this assessment, we calculated the number of days between the complaint receipt date and the approval date.  The complaint date is the date on which the Department first becomes aware of a complaint – whether it is lodged by a community member or internally generated.  We removed from the denominator cases that were delayed due to tolling (held in abeyance in accordance with one of the provisions of Government Code Section 3304) or cases in which the Department asserted that its failure to meet the 180-day timeliness requirement resulted from delays in the Community Police Review Agency (CPRA) completing its concurrent investigations.

For this reporting period, the Department remains in compliance with Task 2.  Of the 45 applicable Class I cases we reviewed for this assessment, 43, or 96%, were in compliance with established timelines.  During our last review of Task 2, we found 88% of Class I cases in compliance with established timelines.  Of the 91 applicable Class II cases we reviewed for this assessment, 87, or 96%, were in compliance with established timelines.  During our last review of Task 2, we found 92% of Class II cases in compliance with established timelines.

Per DGO M-03, "In cases with a sustained finding, the discipline recommendation process shall be completed within 30 calendar days of the sustained finding."  We reviewed all 18 cases including a total of 55 sustained findings that were approved in January, February, and March 2022; five cases involved multiple sustained findings.  All (100%) of these cases were in compliance with established discipline timelines.

OPD is in compliance with Task 2.1.

Task 2.2 requires that IAD and OPD command staff regularly monitor compliance with these timeliness standards.  The primary responsibility for monitoring compliance with timeliness standards rests with IAD, whether investigations are conducted by IAD personnel or via Division-level investigation.  As part of this monitoring, the IAD Commander discusses pending deadlines for key open investigations during IAD's weekly meetings with the Chief; the deadlines are also reflected in written agendas for these meetings.  A Monitoring Team representative regularly attends these weekly meetings.  IAD also occasionally, as needed, emails individual reminders on cases approaching due dates to investigators and their supervisors.  The Department is in compliance with Task 2.2.

Task 2.3 requires that if IAD experiences an unusual proliferation of cases and/or workload, IAD staffing be increased to maintain timeliness standards.  We routinely request and receive updates on IAD staffing levels during and between our site visits.

| Task 2 compliance status | In compliance |
|---|---|

## Task 5:  Complaint Procedures for IAD

**Requirements:**

1.  *On or before December 1, 2003, OPD shall develop a policy so that, OPD personnel who become aware that a citizen wishes to file a complaint shall bring such citizen immediately, or as soon as circumstances permit, to a supervisor or IAD or summon a supervisor to the scene.  If there is a delay of greater than three (3) hours, the reason for such delay shall be documented by the person receiving the complaint.  In the event that such a complainant refuses to travel to a supervisor or to wait for one, the member/employee involved shall make all reasonable attempts to obtain identification, including address and phone number, as well as a description of the allegedly wrongful conduct and offending personnel, from the complainant and any witnesses.  This information, as well as a description of the complaint, shall immediately, or as soon as circumstances permit, be documented on a Complaint Form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander, and shall be treated as a complaint.  The supervisor or appropriate Area Commander notified of the complaint shall ensure the Communications Division is notified and forward any pertinent documents to the IAD.*

2.  *An on-duty supervisor shall respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest.  The supervisor shall ensure the Communications Division is notified and forward any pertinent documents to the IAD.  All other misconduct complaints by a jail inmate shall be handled in the same manner as other civilian complaints.*

3.  *In each complaint investigation, OPD shall consider all relevant evidence, including circumstantial, direct and physical evidence, and make credibility determinations, if feasible.  OPD shall make efforts to resolve, by reference to physical evidence, and/or use of follow-up interviews and other objective indicators, inconsistent statements among witnesses.*

4.  *OPD shall develop provisions for the permanent retention of all notes, generated and/or received by OPD personnel in the case file.*

5.  *OPD shall resolve each allegation in a complaint investigation using the "preponderance of the evidence" standard.  Each allegation shall be resolved by making one of the following dispositions:  Unfounded, Sustained, Exonerated, Not Sustained, or Administrative Closure.  The Department shall use the following criteria for determining the appropriate disposition:*

    a.  *Unfounded:  The investigation disclosed sufficient evidence to determine that the alleged conduct did not occur.  This finding shall also apply when individuals named in the complaint were not involved in the alleged act.*

b. *Sustained: The investigation disclosed sufficient evidence to determine that the alleged conduct did occur and was in violation of law and/or Oakland Police Department rules, regulations, or policies.*

c. *Exonerated: The investigation disclosed sufficient evidence to determine that the alleged conduct did occur, but was in accord with law and with all Oakland Police Department rules, regulations, or policies.*

d. *Not Sustained: The investigation did not disclose sufficient evidence to determine whether or not the alleged conduct occurred.*

e. *Administrative Closure: The investigation indicates a service complaint, not involving an MOR violation, was resolved without conducting an internal investigation; OR*

f. *To conclude an internal investigation when it has been determined that the investigation cannot proceed to a normal investigative conclusion due to circumstances to include but not limited to the following:*

   1) *Complainant wishes to withdraw the complaint and the IAD Commander has determined there is no further reason to continue the investigation and to ensure Departmental policy and procedure has been followed;*

   2) *Complaint lacks specificity and complainant refuses or is unable to provide further clarification necessary to investigate the complaint;*

   3) *Subject not employed by OPD at the time of the incident; or*

   4) *If the subject is no longer employed by OPD, the IAD Commander shall determine whether an internal investigation shall be conducted.*

   5) *Complainant fails to articulate an act or failure to act, that, if true, would be an MOR violation; or*

   6) *Complaints limited to California Vehicle Code citations and resulting tows, where there is no allegation of misconduct, shall be referred to the appropriate competent authorities (i.e., Traffic Court and Tow Hearing Officer).*

g. *Administrative Closures shall be approved by the IAD Commander and entered in the IAD Complaint Database.*

6. *The disposition category of "Filed" is hereby redefined and shall be included under Administrative Dispositions as follows:*

       *a.    An investigation that cannot be presently completed.  A filed investigation is not a final disposition, but an indication that a case is pending further developments that will allow completion of the investigation.*

       *b.    The IAD Commander shall review all filed cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed and may direct the closure or continuation of the investigation.*

     7.    *Any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken.  However, investigators, with the approval of an IAD Commander, are not required to interview and/or take a recorded statement from a member or employee who is the subject of a complaint or was on the scene of the incident when additional information, beyond that already provided by the existing set of facts and/or documentation, is not necessary to reach appropriate findings and conclusions.*

(Negotiated Settlement Agreement III. E.)

## Relevant Policy:

There are six Departmental policies that incorporate the requirements of Task 5:  Department General Order M-03, *Complaints Against Department Personnel and Procedures* (revised most recently on December 22, 2017); Communications Division Policy & Procedures C-02, *Receiving and Logging Complaints Against Personnel and Use of Force Incidents* (revised most recently on December 7, 2009); Training Bulletin V-T.1, *Internal Investigation Procedure Manual* (revised most recently on August 23, 2018); Special Order 8270, *Booking of Prisoners at the Glenn E. Dyer Detention Facility* (published June 24, 2005); Special Order 8565, *Complaints Against Department Personnel* (published May 11, 2007); and IAD Policy & Procedures Manual 21-01, *IAD General Operating Procedures* (published August 17, 2021).  In addition, NSA stipulations issued on December 12, 2005 and March 13, 2007 incorporate the requirements of this Task.

## Commentary:

Task 5 consists of several subtasks, briefly described below.  Based on OPD's compliance history with many of the subtasks, not all are being actively monitored at this time.  As we have continued to advise, quality and timely investigations are essential to fulfilling the Department's obligation to complainants and officers alike.

**Task 5.1** requires that when a citizen wishes to file a complaint, the citizen is brought to a supervisor or IAD, or a supervisor is summoned to the scene.  **Task 5.2** requires that if there is a delay of greater than three hours in supervisory response, the reason for the delay must be documented.  **Task 5.3** requires that where a complainant refuses to travel to a supervisor, or

wait for one, personnel make all reasonable attempts to obtain specific information to assist in investigating the complaint.  **Task 5.4** requires that specific information be documented on a complaint form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander.  **Task 5.5** requires that the supervisor or Area Commander notify Communications and forward any pertinent documents to IAD.

To assess compliance with Tasks 5.1 through 5.5, we reviewed the Daily Incident Logs (DILs) prepared by the Communications Division and forwarded to IAD each business day.  The DIL form has been modified several times during our tenure to elicit "forced responses" that gather all of the information required to evaluate compliance with these Tasks.  These modifications have significantly enhanced OPD's ability to document compliance by properly filling out and distributing the logs, and compliance rates with these subtasks have been near 100% for several years.  Consequently, we no longer actively assess OPD's compliance with these subtasks, but we continue to receive both the DILs and Daily Complaint Referral Logs (used to document when Information Business Cards [IBCs] are provided to citizens in lieu of a complaint forms).  We spot-check these forms regularly to verify that the quality of their completion has not diminished.  OPD remains in compliance with Tasks 5.1 through and including Task 5.5.

**Task 5.6** requires that an on-duty supervisor respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest of the inmate.  We have not actively monitored this subtask since December 2014, though we have reviewed cases applicable to this requirement in several reports since that time.

**Task 5.12** requires that the Watch Commander ensure that any complaints that are applicable to Task 5.6 are delivered to and logged with IAD.  Under current policy, the Communications Division must record on the DILs complaints that are received and/or handled by on-duty supervisors, and the DILs are forwarded daily to IAD.

OPD remains in compliance with Tasks 5.6 and 5.12.

**Task 5.15** through **Task 5.19**, and **Task 5.21**, collectively address the quality of completed IAD investigations, and therefore remain the subject of our focused Task assessments.  To assess compliance with these Tasks, we reviewed 15 IAD cases that were closed between November 1-December 31, 2021, sampled from our two most recent document requests.  This sample included investigations completed by IAD and Division-level investigations (DLIs).  It also included cases that were resolved via formal investigation and investigations that were resolved via summary finding.  (Summary findings are investigations in which the Department believes a proper conclusion can be determined based on a review of existing documentation with limited or no additional interviews and follow-up.)  As is our practice, if we had questions pertaining to a case, we consulted with the commanding officer of IAD before making our final determination.

Together, **Tasks 5.15** and **Task 5.16** require that OPD: gathers all relevant evidence; conducts follow-up interviews where warranted; adequately considers the evidence gathered; makes credibility assessments where feasible; and resolves inconsistent statements.

In all of the cases we reviewed, we believe that OPD gathered all relevant evidence available.  As we often find, in many of the cases video and/or audio recordings proved to be a significant factor in allowing OPD to reach an appropriate conclusion.

Investigators conducted follow-up interviews to seek clarification or resolve inconsistencies in three of the 15 cases we reviewed.  In one case, the complainant was interviewed twice.  In another, two subject officers were interviewed twice.  In the third, completed by an outside investigator, four witness officers were interviewed twice; one witness officer was interviewed three times, and the subject officer was interviewed twice.  We believe a follow-up interview was warranted in another case, further described below, but it was not completed.

OPD made credibility assessments for all involved parties in seven of the 15 cases.  In one case, the complainant was deemed "not credible."  There were several inconsistencies in the complainant's statements, and at one point she ceased cooperating with the investigation.  In another case, a subject officer was deemed "not credible."  His statements were contradicted by several witness officers and two other subject officers.  We agreed with all of the credibility assessments we reviewed.

Five cases were approved for summary finding; and per policy, investigators are not required to assess the credibility of the involved officers and civilian employees in these instances.  Three cases were administratively closed – two via informal complaint resolution – and credibility assessments are not required for administrative closures.

In nine of the 15 cases we reviewed, OPD resolved inconsistent statements.  In four of these cases, BWC recordings were available and assisted in the determination.  In two other cases, recorded phone calls were available for review.  Three cases resulted in at least one finding of not sustained.  Not sustained is an acceptable finding; and by definition, it implies that inconsistencies were not resolved despite investigative efforts.  Three additional cases were administratively closed, negating the need to resolve inconsistent statements.

**Task 5.17** requires that OPD permanently retain all notes generated and/or received by OPD personnel in the case file.  OPD personnel document that all investigative notes are contained within a particular file by completing an Investigative Notes Declaration Form.  OPD has a sustained history of 100% compliance with this subtask.  During this reporting period, the form was again properly completed in all of the cases we reviewed.

**Task 5.18** requires that OPD resolve each allegation in a complaint investigation using the preponderance of the evidence standard.  **Task 5.19** requires that each allegation of a complaint is identified and resolved with one of the following dispositions: unfounded; sustained; exonerated; not sustained; or administrative closure.  Our sample of 15 cases contained 38 allegations that received dispositions as follows: 11 exonerated; three unfounded; four not sustained; ten sustained; and ten administratively closed.  Five of the administratively closed allegations were by informal complaint resolution, or ICR.  In each of these instances, the complainants' agreement with the ICRs was properly documented.

In one case, IAD added a sustained finding to a case submitted as a Division Level Investigation.  The investigator appropriately identified a demeanor issue, but addressed it with a Supervisory Note File (SNF).  This would have been appropriate, provided the officer did not have a pattern of similar conduct.  IAD discovered that he did and added the additional finding.

We did not disagree with the findings in any of the cases we reviewed.  We do, however, believe one allegation should have been further investigated and a finding should have been reached.  In this case, an officer improperly used a sick day, and was appropriately sustained for this

violation. His sergeant was interviewed as a witness, prior to the subject officer being interviewed. During the subject officer's interview, he alleged that his sergeant gave at least tacit approval to improperly use the sick day. If true, this would constitute misconduct on the sergeant's part. The sergeant should have been reinterviewed regarding the officer's claim. The investigator addressed this in the "Other Information" section of his report; he concluded, "[t]here was no evidence to support the alleged action." This should have been handled as a separate allegation of misconduct and resolved with an appropriate disposition, rather than being addressed in this ancillary fashion. In another case we reviewed – an allegation of an officer sleeping on duty – we agreed with the sustained finding; but noted that the DLI investigator was ill prepared for the interviews, asked leading questions, and failed to ask probing follow-up questions when warranted. We discussed both these cases with the Commander of IAD as we conducted our reviews. He advised that, in regards to the second case, as a result of our observations, the investigator received extensive retraining from IAD's DLI Unit.

**Task 5.20** requires that the IAD Commander review all "filed" cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed. A filed case is defined as an investigation that cannot be presently completed and is pending further developments that will allow completion of the investigation; filed is not a final disposition. Traditionally, as part of our review of this Task, we also reviewed cases that are tolling. OPD defines a tolled case as an administrative investigation that has been held in abeyance in accordance with one of the provisions of Government Code Section 3304. While we are no longer actively assessing this subtask, we note that filed and tolling cases are reviewed with the Chief or her designee during the weekly IAD meetings and are listed by case number on the printed meeting agendas. We receive and review these agendas regularly, and a Monitoring Team member regularly attends these meetings. Additionally, we regularly receive a weekly report listing all tolled cases and all cases approaching their 3304 dates. When we have questions regarding any of the cases in the report, the IAD Commander answers them promptly.

**Task 5.21** requires that any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken. However, with the approval of the IAD Commander or his designee, investigators are not required to interview and/or take a recorded statement in all cases. For example, interviews are not needed from a member or employee who is the subject of a complaint, or who was on the scene of the incident when additional information – beyond that already provided by the existing set of facts and/or documentation – is not necessary to reach appropriate findings and conclusions. Five of the 15 cases we reviewed were resolved via summary finding, and each case was appropriately approved for such closure. Three other cases were administratively closed, negating the need for interviews in these cases.

| Task 5 compliance status | In compliance |
|---|---|

## Overview of Our Assessments of Tasks 24 and 25

OPD had been in compliance with Tasks 24 and 25 since 2015, and we did not actively review these Tasks.  In November 2018, after we raised concerns regarding the identification, potential underreporting, and investigation of uses of force, the Court reactivated Tasks 24 and 25.

Between March 7-March 22, 2022, we reviewed one Level 2 use of force for which a Force Review Board (FRB) was held, and one Level 1 use of force for which an Executive Force Review Board (EFRB) was held.  Where concerns with field reporting existed, the concerns were appropriately addressed by the Boards.[1]  We discuss only Level 3 and 4 uses of force in this assessment.

For purposes of this report, we reviewed 43 Level 3 and Level 4 use of force (UOF) reports that were completed by OPD personnel between December 1, 2021-January 31, 2022.  We reviewed all incidents that involved at least one Level 3 use of force (three), and a sample of Level 4 uses of force (40).

Since we resumed these reviews following the Court's reactivation of these Tasks, we have provided detailed feedback on the force investigations to OPD during each of our site visits.  In cases where we have had questions or concerns, OPD personnel have continued to be responsive and have provided follow-up where necessary.  In some cases, OPD has provided additional information or documentation that supports its actions, and we have concurred with the Department's assessments.  In others, we have identified concerns that had not been identified or addressed by supervisors who conducted the UOF investigation, or the command personnel who reviewed the investigation.  In these cases, OPD executive staff have directed additional review; directed training; entered a Supervisory Note File (SNF); or initiated an Internal Affairs Division (IAD) investigation.

In late 2018, OPD employees received training on the requirements for use of force reporting related to the pointing of weapons.  In April 2019, OPD issued an Information Bulletin that provided clarification and direction regarding the documentation of use of force.  The content of this bulletin included many of the concerns we had identified with the proper reporting of force.  In June of 2019, the then-Chief issued a directive via email that specifically addressed boilerplate language in use of force reports; and in November 2019, she followed up with an additional email to address the use of generic or boilerplate language in the administrative section of Department reports.  In December 2019, OPD completed the training developed to address deficiencies found in UOF documentation based on OIG's global use of force audit.  On February 15, 2020, OPD published Special Order 9196, which expanded and clarified the use of force policy.  On February 27. 2020, the Department published Special Order 9202, which temporarily modified the requirements for the reporting of Type 32 uses of force.  In June and August 2020, emails from executive staff addressed delayed body-worn camera (BWC) activations, the 30-second BWC buffer, and "pat" language being used in reports.  In January 2021, an information bulletin addressed ongoing BWC activation concerns; and in May 2021, OPD provided training on announcements of police during community contacts, BWC

---

[1] We discuss Level 2 uses of force in our Task 26 assessments, and Level 1 uses of force in our Task 30 assessments.  We did not assess either of these Tasks for this report.

activations, accuracy in reporting, and identifying patterns prior to issuing SNFs for discovered MOR violations. While these efforts by executive staff resulted in some improvement, there was still an unacceptable number of deficiencies in the investigation and review of uses of force.

In September 2021, OPD began conducting line-up training that covered: inappropriate use of force commands, failure to identify oneself as a police officer, the 30-second body-worn camera buffer, late BWC activations, use of profanity and slang, professional demeanor, conclusions designed as facts, boilerplate language, ensuring equipment is functional at the beginning of each shift, avoiding multiple officers giving commands during contacts with subjects, documentation of Type 32 UOF, proper preparation of SNFs, requirements for lowering or raising the level of force), and administrative due date reminders.

The Department's Risk Management third quarter newsletter, published in October 2021, covered: taking complaints; boilerplate language; late BWC activations and documentation; and the 30-second buffer standby mode for BWCs. During October and November 2021, the Police Chief met with all sergeants, all lieutenants, and the 186th Academy class. During these meetings, according to the Chief, he stressed UOF reporting, leadership, accountability, and timeliness – among other topics. During December 2021, OPD conducted line-up training that covered takedowns, Type 32 UOF, and the criteria for lowering a Level 3 UOF to a Level 4 UOF. OPD has continued to provide direction and training regarding those areas of concern with UOF reporting; and we note that this focus has resulted in increased compliance.

This report covers Level 3 and 4 UOF reports completed by OPD between December 1, 2021-January 31, 2022. All 43 of the cases we reviewed for this time period occurred after the publication of Special Order 9196, which clarified the use of force policy; and after Special Order 9202, issued on February 27, 2020, which temporarily modified the requirements for reporting Type 32 uses of force.

In the 43 Level 3 and 4 uses of force we reviewed, there were 88 uses of force by 71 officers, against 51 different persons. In some cases, multiple officers used force on a single person; and in others, force was used on multiple persons, either by a single officer or by multiple officers. The total breakdown for the force used on the 51 persons is as follows: African Americans, 76%; Latinos, 16%; whites, 4%; and Asians or other, 4%. The percentage of force incidents involving African Americans increased by 2%; force incidents involving whites decreased 2%; force incidents involving Latinos remained at 16%; and force incidents involving Asians or persons categorized as "other" decreased 1%, from our last review, documented in our 80th status report.

In the three Level 3 uses of force we reviewed, one involved only the deployment of a Taser, one involved the use of a Taser with one or more Level 4 uses of force, and one involved a Type 16 takedown. In all three, we found the uses of force to be appropriate and in compliance with OPD policies. Of the three, two were not completed within the required timelines. Both were reviewed by OPD command staff and appropriate extensions were generated and approved. This is the first time we have seen this level of oversight, review, and approval.

In our 78th status report, we identified concerns with the classification and reduction of Level 3 uses of force to Level 4, finding it to be inconsistent with Department policy. It appeared there was some confusion in those instances where OPD personnel were restraining or lifting and carrying people without additional uses of force. OPD agreed with our assessment and

committed to conducting additional training on how to properly classify these types of uses of force. OPD conducted this training; and for our 80th status report, one Level 3 UOF was reduced to a Level 4 UOF. The classification and reduction in this incident were consistent with OPD policy. For this report, there were no instances where a Level 3 UOF was reduced to a Level 4.

In the 40 Level 4 UOF reports we reviewed, there were 83 uses of force by 67 officers against 48 persons. Twenty-three of the 40 Level 4 UOF reports reviewed involved a Type 22, pointing of a weapon only. In these 23 reports, there were 36 uses of the Type 22, by 32 officers, against 26 persons. In these uses of force, the breakdown is as follows: African Americans, 73%, an increase of 4% from our 80th status report; Latinos, 19%, an increase of 5% from our 80th status report; Asians or other, 8%, a decrease of 2% from our 80th status report; and whites, 0%, a decrease of 7% from our 80th status report. Of the total Level 4 UOF reports that involved use of force other than a Type 22 only, six (15%) involved a Type 29 takedown only. Four (10%) involved a weaponless defense technique only, and seven (18%) involved a combination of multiple Level 4 uses of force.

Of the total 51 persons on which a Level 3 or 4 UOF was used, 47 (92%) were arrested or criminally charged for felony or misdemeanor violations. This is a significant increase in arrests from the 68% in our 80th status report. The remaining four involved two mental health holds, one incident where the subject fled and was not apprehended, and one instance where a subject was determined not to have committed a criminal offense. In three of the incidents we reviewed, a person claimed an injury; none of these injuries required admittance to a hospital. In 10 other instances, persons were transported to a medical facility for the removal of a Taser probe only, for injuries unrelated to the use of force, or solely to obtain a medical clearance.

In our early assessments of Task 25.3 after reactivation of Tasks 24 and 25, we found numerous instances where officers did not attempt verbal communications prior to using force. There has been significant improvement in this area over time; and again, for this report, we did not identify any uses of force where officers failed to attempt verbal communications and de-escalation where appropriate, prior to utilizing force. While we continue to identify some instances where officers do not identify themselves as police officers when contacting members of the public and there is time to do so, there has been continuous improvement. In our most recent reviews, we have noted that supervisors are documenting those instances where these announcements are not made and providing training and guidance to the involved officers.

Special Order 9196, the revision to the UOF reporting requirements that went into effect on February 15, 2020, clarified what constitutes a "reportable use of force" and provided clearer direction on the reporting of use of force. Special Order 9196 also added a new force type: Type 32. A Type 32 use of force includes: overcoming resistance of a person during an arrest or detention; or defending oneself or another from combative action by another person. Type 32 is intended to address any use of force not already covered in Types 1-31.

While we expected an increase in Level 4 use of force reporting after Special Order 9196 was issued, the immediate and significant spike in the numbers was much greater than anticipated and appeared to be primarily related to the new Type 32. We agreed with OPD's assessment that further review of the force policy was needed due to this unanticipated increase; and Special Order 9202 was issued, that at least temporarily removed the Type 32 from the category of a Level 4 reportable use of force. Alternative means for counting these uses of force were implemented by OPD until more permanent solutions could be identified.

For our 69th status report, we reviewed a sample of Type 32 uses of force. We found in these early reviews that there was some initial confusion regarding this reporting. In some cases, we identified instances where a Type 32 was documented and it did not appear that a use of force had occurred; and in others, we found that Type 32 was not the appropriate force type to have been used. We also identified concerns with officers not authoring their own supplemental reports, failures to properly document these uses of force in required reports, and the identification of MOR violations or training issues that did not appear to have been addressed. In June 2020, OPD began providing additional training on how to properly document Type 32 uses of force; and we began to see improvement.

As part of our reviews for this report, we reviewed the monthly Type 32 UOF audits conducted by Area Command personnel during this time period. They found again that, in general, officers are properly reporting these uses of force. They did not identify any instances in their reviews where they believed that a Type 32 UOF should have been classified as a different, or higher, level of force. They also found that the majority of these uses of force were the result of resistance during handcuffing, resisting while a subject was being escorted, or restraining persons with mental health issues. Having previously noted a couple of incidents in their reviews where Area Command personnel indicated a Type 32 was used as a "pain compliance" technique, we asked OPD to review these uses of force. OPD has done so and found that these uses of force were appropriately classified as Type 32. The Department has addressed the improper use of the "pain compliance" language that has been used to describe these uses of force.

All of the uses of force we reviewed for this report occurred after Special Order 9196 was issued, and after Special Order 9202 was issued to address the challenges created with the required reporting of Type 32 UOF. During our review of the 43 Level 3 and 4 UOF incidents for this report, we again noted instances where it took multiple officers to control and secure combative persons. In these cases, we found that officers continued to identify and document Type 32 uses of force as required. There were no instances identified in our reviews where we found that a Type 32 UOF had not been properly reported.

The issuance of Special Order 9202 resulted in the identification of several challenges in collecting data regarding Type 32 UOF, as OPD's technology did not allow personnel to accurately collect the information as OPD had expected it would. There was a need to identify a long-term solution that would address not only how Type 32 uses of force would be documented, but how they would be reviewed. We had several discussions with OPD; and the Department developed a protocol that would ensure the appropriate identification, review, and reporting of these uses of force. We noted in our 76th, 78th, and 80th status reports that this protocol was pending final review and publication. For this report, we note that this protocol has been finalized and approved.

For our 76th report, we reviewed 69 UOF reports for the three-month period between November 1, 2020, and January 31, 2021. In 15 (22%) of the reports reviewed, we identified concerns with BWC activation. We did not include documented malfunctions of BWCs or those that have been deactivated during a struggle or other contact with persons in these numbers. Of the 15 instances we identified, eight (53%) were not identified by the supervisor. Of the eight instances not identified by the reporting supervisor, two (25%) were identified by a reviewing supervisor.

For our 78th status report, we reviewed 91 UOF reports for the four-month period between April 1-July 31, 2021. In 24 (26%) of the reports reviewed, we identified concerns with BWC late activations or failure to have the 30-second buffer activated as required. Of the 24 cases where we identified BWC concerns, OPD agree with our assessment in 19 (79%) of them. In the remaining five, OPD maintained that either the BWC activation was not specifically required by policy based on the circumstances of the incident, or that the contact had been a chance encounter and officers had not had time to activate the BWC before contacting a subject. Of the 19 where OPD agreed with our assessment, only seven were identified and addressed by supervisors. In two others, OPD noted that though there had been a late activation by an officer, a supervisor would not have been required to review the BWC as the officer had not been one of the officers that used force. OPD review requirements for BWC in the event of a UOF only requires that the footage of officers involved in a UOF be reviewed.

For our 80th status report, we reviewed 90 UOF reports for the four-month period between August 1-November 30, 2021. In 23 (26%), we again noted concerns with BWC activations, late activations, or failure to have the 30-second buffer activated as required. Of the 23, OPD agreed with our assessment in 20. In three, OPD again maintained that either the activation was not specifically required by policy; or the officer had not had time to activate the BWC before activating the BWC. In the 17 where OPD agreed with our assessment, 11 (65%) had been identified and addressed by a supervisor. This was a noticeable improvement from our past reports. In two others, while the supervisor did not identify the late activation, the activations occurred under circumstances where a review of the BWC was not required.

For this report, we reviewed 43 UOF reports for the two-month period between December 1, 2021-January 31, 2022. In nine (21%), we noted concerns with BWC activations, late activations, or failure to have the 30-second buffer activated. In eight of these cases (89%), supervisors properly identified and addressed the BWC concerns. We also noted that in a number of cases we reviewed, a supervisor directed the activation of BWCs when responding to, or while at a call for service.

In our reviews of BWC activations, there have been some cases where the Department determined that a violation of the BWC requirements had not occurred, and we did not concur with their decisions. Though these incidents are now rare, we continue to believe that OPD's BWC policy requires additional explanation and clarification regarding required activation. OPD has obtained and distributed many of the new BWCs the Department has obtained and is in the process of revising the BWC policy. We will monitor the ongoing implementation of the new BWCs, and the policy revisions designed to clarify required activations.

As we have noted in numerous previous reports, the failure to properly activate a body-worn camera is a violation of policy; and more importantly, could result in the loss of critical information regarding the community contact. OPD has continued to conduct follow-up on each of the BWC activation concerns we have raised and has issued numerous SNFs – and in some cases, discipline – to both those who fail to properly activate their BWCs and to those supervisors who fail to identify and address the failures. For our reviews for this report, it appears that supervisors are now identifying and addressing the majority of deficiencies with BWC activations.

We have continued to remain supportive of the use of SNFs for BWC violations, as long as supervisors ensure there is no pattern of similar conduct prior to using an SNF. To assist in determining whether SNFs were being properly utilized to address BWC concerns, we requested OPD review SNFs issued over the two years for this violation. As a result of a review of this information, OPD identified 11 officers who had four or five "no" or "late" activations over the last two years and 10 months. For these 11 officers, OPD conducted further review of the activations to determine if SNFs were the appropriate outcomes and pulled 10 additional BWC videos for each officer to check for activation compliance. OPD determined that the issued SNFs were appropriate for all 11 officers, but during their review of the additional BWCs, identified additional late activations which resulted in patterns being identified for two of the officers. In both cases, the information was forwarded to IAD. An additional officer was placed on monitoring as a result of late activations and a supervisor received an SNF for not properly categorizing his BWC videos.

During the review of the BWC activations, OPD also identified that in some cases, supervisors and commanders were inconsistently categorizing SNFs; some SNFs lacked detail; in some the violation or policy issue was difficult to identify; and SNFs often lacked language documenting the supervisor's review of the employee history for patterns of similar conduct. The Department committed to conducting additional training to address these concerns. It appears that OPD is properly using SNFs and addressing the concerns that the Department has identified with documentation.

In our monthly site visit meetings with OPD, we have discussed and supported OPD's proposed transition to a new BWC system that would allow additional ways to ensure proper activations. During our February 2022 virtual site visit, OPD advised us that the new BWCs had arrived and been issued to the majority of patrol personnel. There is a two-hour familiarization training for each officer and the officers have begun using the new BWCs. The technology associated with some "automatic" activations will take longer to implement and a revised BWC policy is still in progress. We will continue to monitor the implementation. We are hopeful that these improvements in technology and a revised policy will address any remaining concerns with BWC usage.

The use of force analysis we conducted in 2018 established the underreporting of Level 4 uses of force where an officer pointed a weapon at a person. Following our analysis, OPD partially addressed this concern with refresher training in September 2018 for all officers, and the Department has further addressed this issue in its use of force policy revisions. In our review of Level 3 and 4 uses of force for this report, we did not identify any instances where an officer failed to report the pointing of a weapon at a person.

In OPD's 310th Biweekly Compliance Update, dated March 24, 2022, the Department provided a comparison of year-to-date Level 3 and 4 uses of force for 2022 compared to the same time period in 2021. Overall UOFs increased from 305 in 2021, to 335 in 2022. Level 3 uses of force decreased from 15 in 2021, to 10 for the same time period in 2022. Level 4 uses of force increased from 286 in 2021, to 323 for the same time period in 2022. The new policies and the adjustment of Type 32 reporting that occurred in 2020 were responsible for large differences in UOF numbers between 2020 and 2021. So far, the UOF numbers in 2022 remain fairly consistent with the numbers in 2021.

OPD has taken numerous steps to address the proper reporting of use of force and the concerns that have been identified during our reviews. In our reviews of UOF reports for March 1-October 31, 2020, we saw evidence that OPD's efforts appeared to be having a positive effect on reporting. During our September 2021 virtual site visit, the City Administrator requested that our Team attempt to make our reviews of UOF more current. In response to this request, we agreed to review two months of reports at each site visit, which would allow us to be as current as possible by December 2021.

We reviewed December 2020 and January 2021 UOF reports in our 76th report. We had expected that the Department would continue to improve its reporting and there would be ongoing improvement with compliance requirements. Unfortunately, it appeared from this review that OPD's progress had stalled. The number of concerns with the investigation and review of UOF reports showed no appreciable improvement from our November reviews. We also agreed to skip February and March 2021 reviews and start reviews again in April 2021. We were hopeful that this additional time would allow for all of the Department's directives to take root with its personnel.

In our reviews for the April 1-July 31, 2021 uses of force, our assessment was, again, that the Department had not made appreciable progress in proper activation of BWCs, supervisory review and reporting, and timeliness of UOF reporting.

In our 76th and 78th status reports, despite continued emphasis on the proper completion of use of force requirements, we noted that the improvement in use of force reporting had stalled during the period between December 2020, and July 2021.  In our reviews for the August 1-November 30, 2021 uses of force, we noted that there had been improvement in proper activation of BWCs, supervisory review and reporting, and timeliness of UOF reporting.  This improvement was most significant in UOF reports completed in October and November 2021.  We were hopeful that this trend would continue.

In our review of UOF reports for December 2021 and January 2022, we continued to see the positive trend established in our review of October and November 2021 UOF reports.  We continued to see improvement in the proper activation of BWCs.  What is even more important is that we consistently saw that supervisory personnel were properly reviewing and reporting UOF by their personnel; and in those cases where UOF reports were delayed, explanations were provided.  We will continue to monitor the impact of revised policies, training, and any directives from OPD executive staff that address any ongoing use of force reporting concerns.

## Task 24: Use of Force Reporting Policy

**Requirements:**

*The policy shall require that:*

1.  *Members/employees notify their supervisor as soon as practicable following any investigated use of force or allegation of excessive use of force.*

2.  *In every investigated use of force incident, every member/employee using force, and every member/employee on the scene of the incident at the time the force was used, shall report all uses of force on the appropriate form, unless otherwise directed by the investigating supervisor.*

3.  *OPD personnel document, on the appropriate form, any use of force and/or the drawing and intentional pointing of a firearm at another person.*

4.  *A supervisor respond to the scene upon notification of an investigated use of force or an allegation of excessive use of force, unless community unrest or other conditions makes this impracticable.*

5.  *OPD notify:*

    a.  *The Alameda County District Attorney's Office immediately or as soon as circumstances permit, following a use of lethal force resulting in death or injury likely to result in death.*

      b.    *The City Attorney's Office as soon as circumstances permit following the use of lethal force resulting in death or serious injury.  At the discretion of the City Attorney's Office, a Deputy City Attorney shall respond to the scene.  The Deputy City Attorney shall serve only in an advisory capacity and shall communicate only with the incident commander or his/her designee.*

      c.    *Departmental investigators regarding officer-involved shootings, in accordance with the provisions of Section V, paragraph H, of this Agreement.*

6.    *OPD enter data regarding use of force into OPD's Personnel Assessment System (PAS).*

(Negotiated Settlement Agreement V. A.)

**Relevant Policy:**

OPD most recently revised Departmental General Order K-4, *Reporting and Investigating the Use of Force,* on October 16, 2014.

**Commentary:**

To assess compliance with Task 24, we reviewed 43 Level 3 and 4 use of force (UOF) reports that were completed by OPD from December 1, 2021-January 31, 2022. 2021.  We also reviewed one Level 2 UOF investigation for which an FRB was held and one Level 1 UOF for which an EFRB was held during March 2022.  These Level 1 and 2 uses of force are reported in our regular assessments of Tasks 26 and 30.

**Task 24.1** requires that members/employees notify their supervisor as soon as practicable following any reportable use of force or allegation of excessive use of force.  In our reviews, we did not identify any instances where a notification was not properly made or was not properly documented.

**Task 24.2** requires that in every reportable use of force incident, every member/employee on the scene of the incident at the time the force was used, reports all uses of force on the appropriate form, unless otherwise directed by the investigating supervisor.  **Task 24.3** requires that OPD personnel document, on the appropriate form, every use of force and/or the drawing and intentional pointing of a firearm at another person.

In the 43 Level 3 and 4 UOF incidents we reviewed; officers used force 88 times.  In 26 of the reports, weapons were pointed at one or more subjects.  In 23 of these 43 reports, Level 4 Type 22 was the only UOF used.  We determined that officers' pointing of their firearms was appropriate in all instances we assessed.  There were no instances identified where officers did not report Type 22 uses of force.  We did not identify any instances where a use of force was not properly reported.

**Task 24.4** requires that a supervisor respond to the scene upon notification of a Level 1, 2, or 3 use of force or an allegation of excessive use of force, unless community unrest or other conditions makes such a response impracticable.  In all three Level 3 uses of force we reviewed for this subtask; supervisors responded to the scene as required.  Though not required, in all 40 Level 4 UOF incidents we reviewed, a supervisor was either on scene at the time of the use of force or responded to the scene upon being notified of the use of force.

**Task 24.5** specifically addresses requirements for the response and handling of Level 1 uses of force.  We assess Level 1 uses of force in our regular reviews of Task 30 (Executive Force Review Boards).

**Task 24.6** requires that OPD enter all use of force data into Performance Reporting Information Metrics Environment (PRIME), which is now called Vision.  In all 43 of the Level 3 and 4 UOF cases we reviewed; the data was entered as required.

The Court's reactivation of Task 24 at a November 2018 Case Management Conference resulted from our serious concerns with the Department's handling and investigation of uses of force.  OPD drafted Special Order 9196 to address and clarify requirements for the proper reporting of use of force.  This revision to UOF reporting requirements went into effect in February 2020.  OIG's global use of force audit, conducted in 2019, also identified numerous concerns with the reporting of use of force and enumerated recommendations.  As noted throughout this report, OPD has taken a number of actions to address the identified concerns with the reporting of force.  This is the fifth report where our assessment includes only uses of force that occurred after the implementation of Special Order 9196, the revisions to OPD's use of force policy, and Special Order 9202, and includes the review of 43 Level 3 and 4 uses of force.  While we will continue to monitor uses of force to ensure that the desired reporting outcomes continue, we find OPD in compliance with this Task.

| Task 24 compliance status | In compliance |
|---|---|

## Task 25: Use of Force Investigations and Report Responsibility

**<u>Requirements:</u>**

*An on-scene supervisor is responsible for completing an investigated use of force report in accordance with the provisions of Departmental General Order K-4, "Reporting and Investigating the Use of Force."*

> 1.  *OPD shall develop and implement a policy for conducting and documenting use of force investigations that include, at a minimum:*
>
> > a.  *Documentation of the incident in either an Offense or Supplemental Report from the member(s)/employee(s) using force; and/or, when necessary, a statement taken from the member(s)/employee(s) using force;*

      *b.     Separating and separately interviewing all officers who were at the scene at the time of the incident;*

      *c.     A Supplemental Report from other members/employees on the scene or a statement taken, if deemed necessary by the investigating supervisor;*

      *d.     Identification and interviews of non-Departmental witnesses;*

      *e.     Consideration of discrepancies in information obtained from members, employees and witnesses, and statements in the reports filed;*

      *f.     Whether arrest reports or use of force reports contain "boilerplate" or "pat language" (e.g., "fighting stance", "minimal force necessary to control the situation");*

      *g.     Documentation of physical evidence and/or photographs and a summary and analysis of all relevant evidence gathered during the investigation; and*

      *h.     Consideration of training/tactical issues involving the availability and practicality of other force options.*

      *i.     Supervisor's justification as to why any element of the policy was not documented; and*

2.    *All supervisors shall be trained in conducting use of force investigations and such training shall be part of a supervisory training course.*

3.    *Use of force investigations shall include a recommendation whether the use of force was objectively reasonable and within Department policy and training. The recommendation shall be based on the totality of the circumstances and shall consider, but is not limited to, the following factors:*

      *a.     Whether the force used was pursuant to a legitimate law-enforcement objective;*

      *b.     Whether the type and amount of force used was proportional to the resistance encountered and reasonably related to the objective the members/employees were attempting to achieve;*

      *c.     Whether the member/employee used reasonable verbal means to attempt to resolve the situation without force, if time and circumstances permitted such attempts;*

      *d.     Whether the force used was de-escalated or stopped reasonably when resistance decreased or stopped;*

4.    *Use of force reports shall be reviewed by the appropriate chain-of-review as defined by policy.*

> *The type of force used, the identity of the involved members, and the report preparer shall be the determining criteria for utilizing the appropriate chain-of-review.  Reviewers may include, when appropriate, the chain-of-command of the involved personnel, the appropriate Area Commander on duty at the time the incident occurred, other designated Bureau of Field Operations commanders, and as necessary, the chain-of-command of the involved personnel up to the Division Commander or Deputy Chief/Director, and the Internal Affairs Division.*
>
> *Reviewers for Level 1-3 use of force investigations shall:*
>
> a.      *Make a recommendation as to whether the use of force was in or out of policy,*
>
> b.      *Order additional investigation and investigative resources when necessary, and*
>
> c.      *Comment on any training issue(s) when appropriate.*
>
> 5.      *Any recommendation that the use of force did not comply with Department policy shall result in the incident being referred to the Internal Affairs Division to conduct additional investigation/analysis, if necessary.*
>
> 6.      *Members/employees involved in a use of force incident resulting in serious injury or death and/or an officer-involved shooting, shall be separated from each other as soon as practicable at the incident scene, and kept apart until they have completed their reports and been interviewed.*

(Negotiated Settlement Agreement V. B.)


**Relevant Policy:**

OPD most recently revised Departmental General Order K-4, *Reporting and Investigating the Use of Force,* on October 16, 2014.


**Commentary:**

As noted above in Task 24, we reviewed 43 Level 3 and 4 use of force (UOF) reports that were completed between December 1, 2021-January 31, 2022.  We also reviewed one Level 2 UOF report and one Level 1 UOF report for which Force Review Boards were held in March 2022.

**Task 25.1** requires that supervisors complete a use of force report and that certain criteria are met in the report.  Subtask 25.1.f. addresses the use of "boilerplate" or "pat" language in reports and has been an ongoing concern that has prevented OPD from compliance with this requirement.  We found ongoing deficiencies – specifically, numerous instances where officers justified their uses of force "based on my training and experience," without any further information or explanation as to what training and experience they were referring to.  We now find that officers consistently document specific information and details justifying their use of force, and there are few instances where this specific justification is not provided.

**Task 25.2** requires that all supervisors are trained on how to conduct use of force investigations and such training is part of a supervisory training course. OPD includes the requirement for this training in its Departmental policies. During our March 2022 site visit, we again confirmed with OPD that the Department continues to require and deliver this training in the Sergeants' Transition Course, where use of force is part of the curriculum.

In our prior reports, we have identified concerns with the preparation and review of UOF reports by supervisors. The use of force and the processes in which force is documented and reviewed are at the core of the Court's oversight. The Department has provided numerous directives on this topic. For UOF reports reviewed for our last report, we found notable improvement in supervisors identifying deficiencies in officer reporting and identifying and addressing MOR violations. We also found improvement in the review of the supervisor reports, particularly in those UOF reports generated in October and November 2021. We found in our reviews of reports generated in December 2021 and January 2022 that this improvement has been sustained and are optimistic that it is becoming the standard for OPD's UOF reporting.

**Task 25.3** requires that use of force investigations include required recommendations. Areas of recommendation include: whether the force used was pursuant to a legitimate law enforcement objective; whether the type and amount of force used was proportional to the resistance encountered and reasonably related to the objective the officers were attempting to achieve; whether the officers used reasonable verbal means to attempt to resolve the situation without force, if time and circumstances permitted such attempts; and whether the force used was de-escalated or stopped reasonably when resistance decreased or stopped.

In our assessment of 43 Level 3 and 4 UOF reports, we identified only one instances where we believe the force may not have been appropriate. We have asked OPD to provide additional information on this UOF at our next site visit. We did not identify any instances where the use of force was not deescalated or stopped reasonably when resistance decreased, or any instances where we believe officers could have made additional efforts to explain to subjects being detained why the detention was occurring prior to using force. We have noted ongoing improvement in officers identifying themselves as police officers when appropriate and there is time to do so, we have also noted that supervisors are addressing those instances where officers should have identified themselves as police officers and did not do so.

**Task 25.4** requires that use of force reports be reviewed by the appropriate chain of command and appropriate recommendations are made. In all of the cases we reviewed, the reports were reviewed as required. In past reports, we continued to note that while some deficiencies related to the preparation and review of UOF reports for Level 3 and 4 uses of force were discovered during the reviews, some were not. We found instances where supervisors failed to identify and properly address concerns with body-worn camera activations, or other MOR violations. We noted that these same concerns existed when the reports were reviewed by the chain of command. For the UOF reports reviewed for August 1-November 31, 2021, we observed improvement, particularly in those reports completed in October and November 2021. In those UOF reports we reviewed for December 2021 and January 2022, we found that, with few exceptions, supervisors or the reviewing chain of command are identifying and properly addressing both body-worn camera activations and other MOR violations.

**Task 25.5** requires that any determination that a use of force did not comply with Department policy result in the incident being referred to IAD to conduct additional investigation/analysis, if necessary. While we did not identify any Level 3 or Level 4 investigations that resulted in our finding that the force did not comply with policy for this report, we did identify one Level 4 UOF that needed additional review as the finding appeared inconsistent with the findings on prior similar uses of force. OPD will be following up on this use of force, and we will discuss the Department's findings during our next site visit.

**Task 25.6** requires that members/employees involved in a use of force incident resulting in serious injury or death and/or officer-involved shooting, are separated from each other as soon as practicable at the incident scene, and kept apart until they have completed their reports and been interviewed. This Task is not assessed here, as we review and consider it as part of the Force and Executive Force Review Boards that OPD holds to examine Level 1 and 2 uses of force.

The Court's reactivation of Task 25 at a November 2018 Case Management Conference resulted from our serious concerns with the Department's handling and investigation of uses of force. OPD drafted Special Order 9196 to address and clarify requirements for the proper reporting of use of force. This revision to UOF reporting requirements went into effect in February 2020. OIG's global use of force audit, conducted in 2019, also identified numerous concerns with the reporting of use of force and enumerated recommendations. As noted throughout this report, OPD has taken a number of actions to address the identified concerns with the investigation and reporting of force.

This is the fifth report where our assessment includes only uses of force that occurred after the implementation of Special Order 9196, the revisions to OPD's use of force policy, and Special Order 9202, and includes the review of 91 Level 3 and 4 uses of force. These revisions to policy, along with the many follow-up emails and training by executive staff, have outlined the Department's expectations of those who prepare and review UOF reports. In our 76th and 78th status reports, we noted that the Department's progress with the investigation of force and required documentation had stalled. For our last report, we noted that OPD had noticeably improved, specifically in the UOF reporting for October and November 2021. For our reviews of UOF reporting for December 2021 and January 2022, we found that OPD's improvement has been sustained. Though we continue to find occasional inconsistencies in reporting or failures to meet each requirement, OPD is consistently meeting the overall requirements of Task 25. While we will continue to monitor uses of force to ensure that the required reporting outcomes continue to occur and that OPD addresses any deficiencies that are identified, OPD is in compliance with this Task.

| Task 25 compliance status | In compliance |
|---|---|

# Task 41:  Use of Personnel Assessment System (PAS) and Risk Management

## Requirements:

*Within 375 days from the effective date of this Agreement, OPD shall develop a policy for use of the system, including supervision and audit of the performance of specific members, employees, supervisors, managers, and OPD units, as well as OPD as a whole.*

*The policy shall include the following elements:*

1. *The Chief of Police shall designate a PAS Administration Unit.  The PAS Administration Unit shall be responsible for administering the PAS policy and, no less frequently than quarterly, shall notify, in writing, the appropriate Deputy Chief/Director and the responsible commander/manager of an identified member/employee who meets the PAS criteria.  PAS is to be electronically maintained by the City Information Technology Department.*

2. *The Department shall retain all PAS data for at least five (5) years.*

3. *The Monitor, Inspector General and Compliance Coordinator shall have full access to PAS to the extent necessary for the performance of their duties under this Agreement and consistent with Section XIII, paragraph K, and Section XIV of this Agreement.*

4. *PAS, the PAS data, and reports are confidential and not public information.*

5. *On a quarterly basis, commanders/managers shall review and analyze all relevant PAS information concerning personnel under their command, to detect any pattern or series of incidents which may indicate that a member/employee, supervisor, or group of members/employees under his/her supervision may be engaging in at-risk behavior.  The policy shall define specific criteria for determining when a member/employee or group of members/employees may be engaging in at-risk behavior.*

6. *Notwithstanding any other provisions of the PAS policy to be developed, the Department shall develop policy defining peer group comparison and methodology in consultation with Plaintiffs' Counsel and the IMT.  The policy shall include, at a minimum, a requirement that any member/employee who is identified using a peer group comparison methodology for complaints received during a 30-month period, or any member who is identified using a peer group comparison methodology for Penal Code §§69, 148 and 243(b)(c) arrests within a 30-month period, shall be identified as a subject for PAS intervention review. For the purposes of these two criteria, a single incident shall be counted as "one" even if there are multiple complaints arising from the incident or combined with an arrest for Penal Code §§69, 148 or 243(b)(c).*

7.      *When review and analysis of the PAS threshold report data indicate that a member/employee may be engaging in at-risk behavior, the member/employee's immediate supervisor shall conduct a more intensive review of the member/employee's performance and personnel history and prepare a PAS Activity Review and Report.  Members/employees recommended for intervention shall be required to attend a documented, non-disciplinary PAS intervention meeting with their designated commander/manager and supervisor.  The purpose of this meeting shall be to review the member/employee's performance and discuss the issues and recommended intervention strategies.  The member/employee shall be dismissed from the meeting, and the designated commander/manager and the member/employee's immediate supervisor shall remain and discuss the situation and the member/employee's response.  The primary responsibility for any intervention strategies shall be placed upon the supervisor.  Intervention strategies may include additional training, reassignment, additional supervision, coaching or personal counseling.  The performance of members/ employees subject to PAS review shall be monitored by their designated commander/manager for the specified period of time following the initial meeting, unless released early or extended (as outlined in Section VII, paragraph B (8)).*

8.      *Members/employees who meet the PAS threshold specified in Section VII, paragraph B (6) shall be subject to one of the following options:  no action, supervisory monitoring, or PAS intervention.  Each of these options shall be approved by the chain-of-command, up to the Deputy Chief/Director and/or the PAS Activity Review Panel.*

*Members/employees recommended for supervisory monitoring shall be monitored for a minimum of three (3) months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor.  The first at the end of one (1) month and the second at the end of three (3) months.*

*Members/employees recommended for PAS intervention shall be monitored for a minimum of 12 months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor and designated commander/manager:  The first at three (3) months and the second at one (1) year.  Member/employees subject to PAS intervention for minor, easily correctable performance deficiencies may be dismissed from the jurisdiction of PAS upon the written approval of the member/employee's responsible Deputy Chief, following a recommendation in writing from the member/employee's immediate supervisor.  This may occur at the three (3)-month follow-up meeting or at any time thereafter, as justified by reviews of the member/employee's performance.  When a member/employee is not discharged from PAS jurisdiction at the one (1)-year follow-up meeting, PAS jurisdiction shall be extended, in writing, for a specific period in three (3)-month increments at the discretion of the member/employee's responsible Deputy Chief.  When PAS jurisdiction is extended beyond the minimum one (1)-year review period, additional review meetings*

*involving the member/employee, the member/ employee's designated commander/manager and immediate supervisor, shall take place no less frequently than every three (3) months.*

9. *On a quarterly basis, Division/appropriate Area Commanders and managers shall review and analyze relevant data in PAS about subordinate commanders and/or managers and supervisors regarding their ability to adhere to policy and address at-risk behavior. All Division/appropriate Area Commanders and managers shall conduct quarterly meetings with their supervisory staff for the purpose of assessing and sharing information about the state of the unit and identifying potential or actual performance problems within the unit. These meetings shall be scheduled to follow-up on supervisors' assessments of their subordinates' for PAS intervention. These meetings shall consider all relevant PAS data, potential patterns of at-risk behavior, and recommended intervention strategies since the last meeting. Also considered shall be patterns involving use of force, sick leave, line-of-duty injuries, narcotics-related possessory offenses, and vehicle collisions that are out of the norm among either personnel in the unit or among the unit's subunits. Division/appropriate Area Commanders and managers shall ensure that minutes of the meetings are taken and retained for a period of five (5) years. Commanders/managers shall take appropriate action on identified patterns of at-risk behavior and/or misconduct.*

10. *Division/appropriate Area Commanders and managers shall meet at least annually with his/her Deputy Chief/Director and the IAD Commander to discuss the state of their commands and any exceptional performance, potential or actual performance problems or other potential patterns of at-risk behavior within the unit. Division/appropriate Area Commanders and managers shall be responsible for developing and documenting plans to ensure the managerial and supervisory accountability of their units, and for addressing any real or potential problems that may be apparent.*

11. *PAS information shall be taken into account for a commendation or award recommendation; promotion, transfer, and special assignment, and in connection with annual performance appraisals. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

12. *Intervention strategies implemented as a result of a PAS Activity Review and Report shall be documented in a timely manner.*

13. *Relevant and appropriate PAS information shall be taken into account in connection with determinations of appropriate discipline for sustained misconduct allegations. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

14. *The member/employee's designated commander/manager shall schedule a PAS Activity Review meeting to be held no later than 20 days following notification to the Deputy Chief/Director that the member/employee has met a PAS threshold and when intervention is recommended.*

15. *The PAS policy to be developed shall include a provision that a member/employee making unsatisfactory progress during PAS intervention may be transferred and/or loaned to another supervisor, another assignment or another Division, at the discretion of the Bureau Chief/Director if the transfer is within his/her Bureau. Inter-Bureau transfers shall be approved by the Chief of Police. If a member/employee is transferred because of unsatisfactory progress, that transfer shall be to a position with little or no public contact when there is a nexus between the at-risk behavior and the "no public contact" restriction. Sustained complaints from incidents subsequent to a member/employee's referral to PAS shall continue to result in corrective measures; however, such corrective measures shall not necessarily result in a member/employee's exclusion from, or continued inclusion in, PAS. The member/employee's exclusion or continued inclusion in PAS shall be at the discretion of the Chief of Police or his/her designee and shall be documented.*

16. *In parallel with the PAS program described above, the Department may wish to continue the Early Intervention Review Panel.*

17. *On a semi-annual basis, beginning within 90 days from the effective date of this Agreement, the Chief of Police, the PAS Activity Review Panel, PAS Oversight Committee, and the IAD Commander shall meet with the Monitor to review the operation and progress of the PAS. At these meetings, OPD administrators shall summarize, for the Monitor, the number of members/employees who have been identified for review, pursuant to the PAS policy, and the number of members/employees who have been identified for PAS intervention. The Department administrators shall also provide data summarizing the various intervention strategies that have been utilized as a result of all PAS Activity Review and Reports. The major objectives of each of these semi-annual meetings shall be consideration of whether the PAS policy is adequate with regard to detecting patterns of misconduct or poor performance issues as expeditiously as possible and if PAS reviews are achieving their goals.*

18. *Nothing in this Agreement, and more specifically, no provision of PAS, shall be construed as waiving, abrogating or in any way modifying the Department's rights with regard to discipline of its members/employees. The Department may choose, at its discretion, to initiate the administrative discipline process, to initiate PAS review or to use both processes concurrently or consecutively.*

(Negotiated Settlement Agreement VII. B.)

**Relevant Policy:**

OPD revised and issued Departmental General Order D-17, *Personnel Assessment Program,* on November 20, 2013; and issued Department General Order R-01, *Risk Management*, on April 15, 2022.

**Commentary:**

Risk management in the Oakland Police Department has continued to be consistent with the requirements of Task 40, which established standards for data, and Task 41, which sets standards for the risk management process. There have also been significant advancements in activity relevant to these Task requirements. Vision, the risk management database, appears to be functioning well. Risk Management Meetings suggest that the data are used widely by supervisors and Command staff. Those meetings regularly review data at the Area level; and also for units such as CeaseFire, the Violent Crime Operations Center (VCOC), and the Criminal Investigation Division (CID). Separate meetings also occur at the Bureau level and for the City as a whole. The addition of a Data Manager, and an additional staff person, to review and present risk-related data has made a significant contribution to the process. OPD published its long-awaited risk management policy, R-01, on April 15, 2022.

The risk management process currently involves a series of "nested" meetings which separately cover all Areas, the Bureaus, and the City as a whole. Apart from the City-wide meetings, there is limited consistency across the meetings; and the processes also change frequently depending on staffing. Some meetings cover all risk data fields, while others sometimes limit attention to a few graphs. Some processes are quite formal, while others are more spontaneous. We recommend that the Department work to reflect legitimate differences across locations while also ensuring a degree of consistency.

In the context of risk management analysis, there has been considerable discussion of the process of "drilling down" to address officer-level data and also "drilling up" to address issues of policy or common practice. However, in the Risk Management Meeting process, the "drilling up" process often receives limited attention. The Department should examine and respond to the behavior of individual officers in a broader view of Departmental practices and patterns of activity.

The focus on individual officer behavior, and potentially on some broader contexts, raises the issue of training related to risk management. The Department should assess the extent and nature of risk management-related training to ensure that it is accomplishing its goals.

In addition, the development of risk management-related data dashboards for use by supervisors received considerable attention at one time, but the discussion of them has recently been more limited. The dashboards can support refined analyses of officer behavior patterns and also enhance the skills of supervisors and contribute to career development. The state of the use of dashboards by supervisors should be examined and encouraged.

The review of stop data, with attention to issues of necessity and fairness, is a significant set of requirements (Task 34) related to risk management in the Department. However, traffic and pedestrian stops made by police reflect multiple steps, from the stops themselves to searches and

seizures of contraband, and arrests and subsequent criminal justice processing.  For the
Department, a degree of risk is tied to each step in the process – but risk can also be seen as
cumulative across the sequence of steps.  Understanding risk in the context of stop data is limited
if the Department does not examine the steps in this process, including the outcomes of stops and
arrests.

We have previously noted that PAS Unit staff have had limited roles in Risk Management
Meetings and other related activity, and therefore may arguably be seen as underutilized.  The
role of the PAS Unit should never be diminished.  As the PAS Unit staff are one of the key
Departmental staff dedicated solely to risk management efforts, it may be appropriate to increase
their skills and responsibilities and extend their contributions to the risk management process.

With the addition of the Data Manager and the additional analyst, the Department has made a
significant investment in analysis related to risk management and other Departmental functions.
OPD should make an effort to identify significant issues and relevant questions that can be better
understood through data analysis utilizing the now-available personnel resources.

The development of actionable findings should be the clear focus of analysis in the Department.
The greatest value of research will be found in its ability to inform command decision-making.
The current analyses of risk management data, which provide a means for describing and
monitoring certain types of Departmental activity, provide an excellent example of the utility of
analysis.  Command staff should expect such clarity from analysis across a wide range of issues.
Comprehensive, fully understandable, and consequential feedback from analysis should help
inform action taken by the Department.

| **Task 41 compliance status** | In compliance |
| --- | --- |

# Task 45:  Consistency of Discipline Policy

**Requirements:**

*On or before October 6, 2003, OPD shall revise and update its disciplinary policy to ensure that
discipline is imposed in a fair and consistent manner.*

> *1.    The policy shall describe the circumstances in which disciplinary action is
> appropriate and those in which Division-level corrective action is appropriate.*

> *2.    The policy shall establish a centralized system for documenting and tracking all
> forms of discipline and corrective action, whether imposed centrally or at the
> Division level.*

3.  *All internal investigations which result in a sustained finding shall be submitted to the Discipline Officer for a disciplinary recommendation.  The Discipline Officer shall convene a meeting with the Deputy Chief or designee in the affected chain-of-command for a confidential discussion of the misconduct, including the mitigating and aggravating factors and the member/employee's overall performance.*

4.  *The COP may direct the Discipline Officer to prepare a Discipline Recommendation without convening a Discipline Conference.*

(Negotiated Settlement Agreement X. B.)


**Relevant Policy:**

Five Departmental policies incorporate the requirements of Task 45:  Departmental General Order M-03, *Complaints Against Department Personnel and Procedures* (revised most recently on December 22, 2017); Training Bulletin V-T.1 and V-T.2, *Internal Investigation Procedure Manual* (revised most recently on August 23, 2018); IAD Policy & Procedures Manual 21-01, *IAD General Operating Procedures* (published August 17, 2021); and Training Bulletin V-T, *Departmental Discipline Policy* (revised most recently on December 11, 2017).


**Commentary:**

We have followed closely the Department's response to what is widely known as the discipline disparity study, conducted in 2020 by an external consulting firm on behalf of OPD.  The study also covered new officers who were terminated by the Department during their probationary periods.  The study found significant racial disparities in sustained complaints of misconduct between Black officers and officers of other races.  The Department implemented the recommendations that were in the 2020 report, some in collaboration with the Stanford University SPARQ (Center for Social Psychological Answers to Real-World Questions).

In 2021, the Department advised that the 2020 disparity study was flawed; and it began an effort to conduct its own follow-up study to address the flaws of the earlier work.  Recently, the Department issued a report that examined outcome disparities of investigations conducted by both IAD and at the Division level; it also issued a report that addressed disparities at both the Academy and in the Field Training Program.

The discipline-related report is less comprehensive than the 2020 report; it did not replicate the survey of officers that showed significant differences across racial groups in their view of the fairness of discipline in the Department.  That is meaningful data that should have been explored. The report also did not examine officer separations from the Department by considering both the process involved as well as the reasons.  That was ignored, despite administration and City leadership concerns over officer turnover levels.

The Department's report offers eight recommendations.  The recommendations did not address the issues that address the heart of Task 45 and are quite limited.  For example, one of the report's recommendations is to include a review of other investigations including collision,

pursuit, and force review boards.  But no linkage to Task 45 is made regarding this recommendation.  Similarly, the report recommends adding counts of mitigating and aggravating circumstances to the disciplinary process, but it does not relate this to possible impacts by race. But to understand the impact on discipline would most likely require the close reading of cases, since assigning those factors could both reflect unfair practices and also be used to unfairly justify discipline.  Several other recommendations also fail to directly address the issue of disparity, even though they may make other contributions to the Department.

Disparity in discipline is a significant issue.  In issuing this report, the Department has reduced the issue to simply a question of outcomes from disciplinary processes, and arguably, it has fumbled those.  The report shows that the Division-level investigation (DLI) cases, which involve less serious violations, are the most likely to show differences by race.  But that finding was buried deeply in a report appendix until we raised that in a discussion with Department officials.

In both its April 14, 2022 presentation to the Monitoring Team and the Parties, and the iterations of the reports that have been published by the Department, there were acknowledgements about work that still needs to be done, the future inclusion of outside experts, and a candid statement that "This study is not the end, it is just the beginning."  Accordingly, the Department's compliance status relevant to Task 45 remains the same.

| Task 45 compliance status | In partial compliance |
|---|---|

## Conclusion

The Oakland Police Department has reached a significant milestone, in that the Department is now in compliance with all but one of the required Tasks – and even in that one, the Department is in partial compliance.  Chief Armstrong and the leadership of the Department are to be commended for their tenacity and commitment to ensuring that the Tasks in the Negotiated Settlement Agreement, which constitute modern, progressive policing, have been met.

*Robert S. Warshaw*

Chief (Ret.) Robert S. Warshaw
*Monitor*