October 3, 2022

# First NSA Sustainability Period Report
## *of the* Independent Monitor
## *for the* Oakland Police Department

## Introduction

This is the first report of the Monitoring Team issued during the Negotiated Settlement Agreement (NSA) sustainability period in the case of *Delphine Allen, et al., vs. City of Oakland, et al.,* in the United States District Court for the Northern District of California under the direction of Judge William H. Orrick.

On May 12, 2022, the Court issued an Order placing the City into a one-year sustainability period.  The Court noted, "The Negotiated Settlement Agreement (NSA) the parties executed on January 22, 2003, contemplated that federal court oversight would terminate after the defendants achieved substantial compliance with all of the provisions of the NSA and maintained that compliance for a year.  No one expected that it would take more than nineteen years to reach substantial compliance.  The good news is that the defendants have achieved substantial compliance, and that the path here has led to tangible improvements in policing in Oakland and to the promise that a culture that understands and supports constitutional policing is taking root."

The Court also noted, "If OPD does not fully comply with the NSA and remain in full compliance during the sustainability period, the Court's oversight will continue."

As per the Order, during the sustainability period, we report to the Court on a quarterly basis; we conduct quarterly site visits; and we have appended to the Monitoring Team a member of OPD's Office of Internal Accountability (OIA), who serves as the Department's NSA sustainability liaison.

As with our site visits before the sustainability period, our site visits include both compliance assessments and technical assistance.  During our first sustainability site visit, which we held remotely, in August, we met with Department and City officials; observed the Department's Risk Management Meeting; discussed the status of several Departmental policies; and shared our observations of misconduct investigations and use of force reports.  We also inquired with the Department to ensure that it is taking steps toward sustained compliance in every area of reform outlined in the NSA, particularly as it relates to the 11 Tasks listed in the May 12, 2022 Order: Tasks 2; 5; 20; 24; 25; 26; 30; 31; 34; 41; and 45.  Our assessments of these Tasks follow.

Case 3:00-cv-04599-WHO   Document 1540   Filed 10/03/22   Page 2 of 35

First NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
October 3, 2022
Page 2 of 35

## *Task Assessments*

## Task 2:  Timeliness Standards and Compliance with IAD Investigations

**Requirements:**

*Fairness to complainants, members/employees and the public requires that internal investigations be completed in a timely fashion.*

   1.   *On or before December 1, 2003, OPD shall develop policies regarding timeliness standards for the completion of Internal Affairs investigations, administrative findings and recommended discipline.*

   2.   *Compliance with these timeliness standards shall be regularly monitored by IAD command and the Department's command staff.  If IAD experiences an unusual proliferation of cases and/or workload, IAD staffing shall be increased to maintain timeliness standards.*

(Negotiated Settlement Agreement III. B.)

**Relevant Policy:**

OPD most recently revised Departmental General Order M-03, *Complaints Against Department Personnel and Procedures*, on December 22, 2017.

**Commentary:**

**Task 2.1** requires that internal investigations (IAD and Division Level) – including review, approval, findings, and discipline – be completed in accordance with the timeliness standards developed by OPD.  To assess this subtask, we reviewed a list of all internal investigations resulting in formal findings (unfounded, sustained, exonerated, or not sustained) that were approved in April, May, and June 2022, and calculated the number of days between the complaint date and the approval date for each case.  We excluded from the dataset cases that were administratively closed, those that involved on-duty traffic accidents or service complaints, and those that did not involve Manual of Rules (MoR) violations.  We segregated the remaining cases into Class I or Class II categories.  If a case involved at least one alleged Class I violation, we classified it as Class I.

At least 85% of Class I misconduct investigations and at least 85% of Class II misconduct investigations must be completed within 180 days to be considered timely.  Per DGO M-03, Class I offenses "are the most serious allegations of misconduct and, if sustained, shall result in disciplinary action up to and including dismissal and may serve as the basis for criminal prosecution."  Class II offenses include "all minor misconduct offenses."

Case 3:00-cv-04599-WHO   Document 1540   Filed 10/03/22   Page 3 of 35

First NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
October 3, 2022
Page 3 of 35

For the purposes of this assessment, we calculated the number of days between the complaint receipt date and the approval date.  The complaint date is the date on which the Department first becomes aware of a complaint – whether it is lodged by a community member or internally generated.  We removed from the denominator cases that were delayed due to tolling (held in abeyance in accordance with one of the provisions of Government Code Section 3304) or cases in which the Department asserted that its failure to meet the 180-day timeliness requirement resulted from delays in the Community Police Review Agency (CPRA) completing its concurrent investigations.

For this reporting period, the Department remains in compliance with Task 2.  Of the 26 applicable Class I cases we reviewed for this assessment, 25, or 96%, were in compliance with established timelines.  During our last review of Task 2, we also found 96% of Class I cases in compliance with established timelines.  Of the 103 applicable Class II cases we reviewed for this assessment, 101, or 98%, were in compliance with established timelines.  During our last review of Task 2, we found 96% of Class II cases in compliance with established timelines.

Per DGO M-03, "In cases with a sustained finding, the discipline recommendation process shall be completed within 30 calendar days of the sustained finding."  We reviewed all 17 cases including a total of 36 sustained findings that were approved in April, May, and June 2022; seven cases involved multiple sustained findings.  All (100%) of these cases were in compliance with established discipline timelines.

OPD is in compliance with Task 2.1.

Task 2.2 requires that IAD and OPD command staff regularly monitor compliance with these timeliness standards.  The primary responsibility for monitoring compliance with timeliness standards rests with IAD, whether investigations are conducted by IAD personnel or via Division-level investigation.  As part of this monitoring, the IAD Commander discusses pending deadlines for key open investigations during IAD's weekly meetings with the Chief; the deadlines are also reflected in written agendas for these meetings.  A Monitoring Team representative regularly attends these weekly meetings.  IAD also occasionally, as needed, emails individual reminders on cases approaching due dates to investigators and their supervisors.  The Department is in compliance with Task 2.2.

Task 2.3 requires that if IAD experiences an unusual proliferation of cases and/or workload, IAD staffing be increased to maintain timeliness standards.  We routinely request and receive updates on IAD staffing levels during and between our site visits.

| Task 2 compliance status | In compliance |
|---|---|

## Task 5:  Complaint Procedures for IAD

**Requirements:**

1. *On or before December 1, 2003, OPD shall develop a policy so that, OPD personnel who become aware that a citizen wishes to file a complaint shall bring such citizen immediately, or as soon as circumstances permit, to a supervisor or IAD or summon a supervisor to the scene.  If there is a delay of greater than three (3) hours, the reason for such delay shall be documented by the person receiving the complaint.  In the event that such a complainant refuses to travel to a supervisor or to wait for one, the member/employee involved shall make all reasonable attempts to obtain identification, including address and phone number, as well as a description of the allegedly wrongful conduct and offending personnel, from the complainant and any witnesses.  This information, as well as a description of the complaint, shall immediately, or as soon as circumstances permit, be documented on a Complaint Form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander, and shall be treated as a complaint.  The supervisor or appropriate Area Commander notified of the complaint shall ensure the Communications Division is notified and forward any pertinent documents to the IAD.*

2. *An on-duty supervisor shall respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest.  The supervisor shall ensure the Communications Division is notified and forward any pertinent documents to the IAD.  All other misconduct complaints by a jail inmate shall be handled in the same manner as other civilian complaints.*

3. *In each complaint investigation, OPD shall consider all relevant evidence, including circumstantial, direct and physical evidence, and make credibility determinations, if feasible.  OPD shall make efforts to resolve, by reference to physical evidence, and/or use of follow-up interviews and other objective indicators, inconsistent statements among witnesses.*

4. *OPD shall develop provisions for the permanent retention of all notes, generated and/or received by OPD personnel in the case file.*

5. *OPD shall resolve each allegation in a complaint investigation using the "preponderance of the evidence" standard.  Each allegation shall be resolved by making one of the following dispositions:  Unfounded, Sustained, Exonerated, Not Sustained, or Administrative Closure.  The Department shall use the following criteria for determining the appropriate disposition:*

    a. *Unfounded:  The investigation disclosed sufficient evidence to determine that the alleged conduct did not occur.  This finding shall also apply when individuals named in the complaint were not involved in the alleged act.*

Case 3:00-cv-04599-WHO   Document 1540   Filed 10/03/22   Page 5 of 35

First NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
October 3, 2022
Page 5 of 35

b.   *Sustained:  The investigation disclosed sufficient evidence to determine that the alleged conduct did occur and was in violation of law and/or Oakland Police Department rules, regulations, or policies.*

c.   *Exonerated:  The investigation disclosed sufficient evidence to determine that the alleged conduct did occur, but was in accord with law and with all Oakland Police Department rules, regulations, or policies.*

d.   *Not Sustained:  The investigation did not disclose sufficient evidence to determine whether or not the alleged conduct occurred.*

e.   *Administrative Closure:  The investigation indicates a service complaint, not involving an MOR violation, was resolved without conducting an internal investigation; OR*

f.   *To conclude an internal investigation when it has been determined that the investigation cannot proceed to a normal investigative conclusion due to circumstances to include but not limited to the following:*

   1)   *Complainant wishes to withdraw the complaint and the IAD Commander has determined there is no further reason to continue the investigation and to ensure Departmental policy and procedure has been followed;*

   2)   *Complaint lacks specificity and complainant refuses or is unable to provide further clarification necessary to investigate the complaint;*

   3)   *Subject not employed by OPD at the time of the incident; or*

   4)   *If the subject is no longer employed by OPD, the IAD Commander shall determine whether an internal investigation shall be conducted.*

   5)   *Complainant fails to articulate an act or failure to act, that, if true, would be an MOR violation; or*

   6)   *Complaints limited to California Vehicle Code citations and resulting tows, where there is no allegation of misconduct, shall be referred to the appropriate competent authorities (i.e., Traffic Court and Tow Hearing Officer).*

g.   *Administrative Closures shall be approved by the IAD Commander and entered in the IAD Complaint Database.*

6.   *The disposition category of "Filed" is hereby redefined and shall be included under Administrative Dispositions as follows:*

a.   *An investigation that cannot be presently completed.  A filed investigation is not a final disposition, but an indication that a case is pending further developments that will allow completion of the investigation.*

Case 3:00-cv-04599-WHO   Document 1540   Filed 10/03/22   Page 6 of 35

First NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
October 3, 2022
Page 6 of 35

b.   *The IAD Commander shall review all filed cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed and may direct the closure or continuation of the investigation.*

7.   *Any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken.  However, investigators, with the approval of an IAD Commander, are not required to interview and/or take a recorded statement from a member or employee who is the subject of a complaint or was on the scene of the incident when additional information, beyond that already provided by the existing set of facts and/or documentation, is not necessary to reach appropriate findings and conclusions.*

(Negotiated Settlement Agreement III. E.)


**<u>Relevant Policy:</u>**

There are six Departmental policies that incorporate the requirements of Task 5:  Department General Order M-03, *Complaints Against Department Personnel and Procedures* (revised most recently on December 22, 2017); Communications Division Policy & Procedures C-02, *Receiving and Logging Complaints Against Personnel and Use of Force Incidents* (revised most recently on December 7, 2009); Training Bulletin V-T.1, *Internal Investigation Procedure Manual* (revised most recently on August 23, 2018); Special Order 8270, *Booking of Prisoners at the Glenn E. Dyer Detention Facility* (published June 24, 2005); Special Order 8565, *Complaints Against Department Personnel* (published May 11, 2007); and IAD Policy & Procedures Manual 21-01, *IAD General Operating Procedures* (published August 17, 2021).  In addition, NSA stipulations issued on December 12, 2005 and March 13, 2007 incorporate the requirements of this Task.


**<u>Commentary:</u>**

Task 5 consists of several subtasks, briefly described below.  Based on OPD's compliance history with many of the subtasks, not all are being actively monitored at this time.  As we have continued to advise, quality and timely investigations are essential to fulfilling the Department's obligation to complainants and officers alike.

Case 3:00-cv-04599-WHO   Document 1540   Filed 10/03/22   Page 7 of 35

First NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
October 3, 2022
Page 7 of 35

**Task 5.1** requires that when a citizen wishes to file a complaint, the citizen is brought to a supervisor or IAD, or a supervisor is summoned to the scene.  **Task 5.2** requires that if there is a delay of greater than three hours in supervisory response, the reason for the delay must be documented.  **Task 5.3** requires that where a complainant refuses to travel to a supervisor, or wait for one, personnel make all reasonable attempts to obtain specific information to assist in investigating the complaint.  **Task 5.4** requires that specific information be documented on a complaint form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander.  **Task 5.5** requires that the supervisor or Area Commander notify Communications and forward any pertinent documents to IAD.

To assess compliance with Tasks 5.1 through 5.5, we reviewed the Daily Incident Logs (DILs) prepared by the Communications Division and forwarded to IAD each business day.  The DIL form has been modified several times during our tenure to elicit "forced responses" that gather all of the information required to evaluate compliance with these Tasks.  These modifications have significantly enhanced OPD's ability to document compliance by properly filling out and distributing the logs, and compliance rates with these subtasks have been near 100% for several years.  Consequently, we no longer actively assess OPD's compliance with these subtasks, but we continue to receive both the DILs and Daily Complaint Referral Logs (used to document when Information Business Cards [IBCs] are provided to citizens in lieu of a complaint forms).  We spot-check these forms regularly to verify that the quality of their completion has not diminished.  OPD remains in compliance with Tasks 5.1 through and including Task 5.5.

**Task 5.6** requires that an on-duty supervisor respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest of the inmate.  We have not actively monitored this subtask since December 2014, though we have reviewed cases applicable to this requirement in several reports since that time.

**Task 5.12** requires that the Watch Commander ensure that any complaints that are applicable to Task 5.6 are delivered to and logged with IAD.  Under current policy, the Communications Division must record on the DILs complaints that are received and/or handled by on-duty supervisors, and the DILs are forwarded daily to IAD.

OPD remains in compliance with Tasks 5.6 and 5.12.

**Task 5.15** through **Task 5.19**, and **Task 5.21,** collectively address the quality of completed IAD investigations, and therefore remain the subject of our focused Task assessments.  To assess compliance with these Tasks, we reviewed a sample of 12 IAD cases that were closed between April 1-June 30, 2022.  In accordance with the Order issued May 12, 2022 establishing the sustainability period, we reviewed these cases with a member of OPD's Office of Internal Accountability (OIA) serving as the Department's NSA sustainability liaison.

Our sample of cases included investigations completed by IAD and Division-level investigations (DLIs).  It also included cases that were resolved via formal investigation and investigations that were resolved via summary finding.  (Summary findings are investigations in which the Department believes a proper conclusion can be determined based on a review of existing documentation with limited or no additional interviews and follow-up.)

Together, **Tasks 5.15** and **Task 5.16** require that OPD: gathers all relevant evidence; conducts follow-up interviews where warranted; adequately considers the evidence gathered; makes credibility assessments where feasible; and resolves inconsistent statements.

In all of the cases we reviewed, we believe that OPD gathered all relevant evidence available. As we have often found, in many of the cases video and/or audio recordings proved to be a significant factor in allowing OPD to reach an appropriate conclusion. In one case, further described below, we believe that OPD did not fully considered all of the relevant evidence which surfaced during the investigation.

Investigators conducted follow-up interviews to seek clarification or resolve inconsistencies in one of the 12 cases we reviewed. In this case, two witness employees were each interviewed twice. With the exception of the case described below, we do not believe follow-up interviews were warranted in the other cases we reviewed.

OPD made credibility assessments for all involved parties in six of the 12 cases. In two cases, the complainants were deemed "not credible." In one case, the complainant's statements were inconsistent with available body-worn camera (BWC) footage; and in the other case, the complainant's statements were refuted by recorded calls of the incident in question. In one case, a civilian employee, the subject of the investigation, was deemed not credible, and a truthfulness allegation was sustained as a result of the investigation. We agreed with all of the credibility assessments we reviewed.

Six cases were approved for summary finding; and per policy, investigators are not required to assess the credibility of the involved officers and civilian employees in these instances.

In ten of the 12 cases we reviewed, OPD resolved inconsistent statements. In six of these cases, BWC recordings were available and assisted in the determination. In two other cases, recorded phone calls were available for review. Two cases resulted in at least one finding of not sustained. Not sustained is an acceptable finding; and by definition, it implies that inconsistencies were not resolved despite investigative efforts.

**Task 5.17** requires that OPD permanently retain all notes generated and/or received by OPD personnel in the case file. OPD personnel document the presence of investigative notes within a particular file by completing an Investigative Notes Declaration Form. OPD has a sustained history of 100% compliance with this subtask. During this reporting period, the form was again included in all of the cases we reviewed.

**Task 5.18** requires that OPD resolve each allegation in a complaint investigation using the preponderance of the evidence standard. **Task 5.19** requires that each allegation of a complaint is identified and resolved with one of the following dispositions: unfounded; sustained; exonerated; not sustained; or administrative closure. Our sample of 12 cases contained 44 allegations that received dispositions as follows: 11 exonerated; 21 unfounded; two not sustained; four sustained; and six administratively closed.[1]

---

[1] In one case, the Report of Internal Investigation (ROI) listed five unfounded findings, but the approved Complaint Investigation Report (CIR) listed six unfounded findings. We deferred to the ROI, and we urge IAD to be mindful of, and reconcile, such differences.

Case 3:00-cv-04599-WHO   Document 1540   Filed 10/03/22   Page 9 of 35

First NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
October 3, 2022
Page 9 of 35

We did not disagree with the findings in any of the cases we reviewed.  However, we believe that in one case, OPD failed to address additional allegations that came to light during the investigation.  In this case, it was alleged that a Police Evidence Technician (PET) slept on duty, failed to respond to calls in a timely manner, and falsified overtime records, among other allegations.  The investigation of this employee's activities was thorough, and she was ultimately terminated as a result of three sustained allegations, including a lack of truthfulness in her statement to IAD investigators.  We did not disagree with the findings as they pertained to this employee.  However, numerous employees were interviewed in this case; and during these interviews, additional allegations regarding other employees were raised, including other PETs sleeping on duty, and supervisors failing to address numerous performance deficiencies after these issues were brought to their attention.  Additionally, the reporting structure associated with the PETs appears to foster a systemic lack of accountability which the Department should address.  The Member/Employee Accountability section of the Report of Investigation (ROI) correctly identified these inherent issues, but it stopped short of mentioning the numerous employees and supervisors who were aware of potential misconduct and did not address it.

**Task 5.20** requires that the IAD Commander review all "filed" cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed.  A filed case is defined as an investigation that cannot be presently completed and is pending further developments that will allow completion of the investigation; filed is not a final disposition.  Traditionally, as part of our review of this Task, we also reviewed cases that are tolling.  OPD defines a tolled case as an administrative investigation that has been held in abeyance in accordance with one of the provisions of Government Code Section 3304.  While we are no longer actively assessing this subtask, we note that filed and tolling cases are reviewed with the Chief or her designee during the weekly IAD meetings and are listed by case number on the printed meeting agendas.  We receive and review these agendas regularly, and a Monitoring Team member regularly attends these meetings.  Additionally, we regularly receive a weekly report listing all tolled cases and all cases approaching their 3304 dates.  When we have questions regarding any of the cases in the report, the IAD Commander answers them promptly.

**Task 5.21** requires that any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken.  However, with the approval of the IAD Commander or his designee, investigators are not required to interview and/or take a recorded statement in all cases.  For example, interviews are not needed from a member or employee who is the subject of a complaint, or who was on the scene of the incident when additional information – beyond that already provided by the existing set of facts and/or documentation – is not necessary to reach appropriate findings and conclusions.  Six of the 12 cases we reviewed were resolved via summary finding, and each case was appropriately approved for such closure.

In May, two disciplinary matters were referred to an outside firm for further investigation.  While these investigations are not yet complete, information that has been developed to date regarding the Department's internal investigation and discipline process is deeply troubling.  Accordingly, the status of Task 5 is moved from in compliance to deferred compliance.

First NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
October 3, 2022
Page 10 of 35

| Task 5 compliance status | Deferred |
|---|---|

# Task 20:  Span of Control

**Requirements:**

*On or before August 14, 2003, OPD shall develop and implement a policy to ensure appropriate supervision of its Area Command Field Teams.  The policy shall provide that:*

1.  *Under normal conditions, OPD shall assign one primary sergeant to each Area Command Field Team, and, in general, (with certain exceptions) that supervisor's span of control shall not exceed eight (8) members.*

2.  *During day-to-day operations, in the absence of the primary supervisor (e.g., due to sickness, vacation, compensatory time off, schools, and other leaves), the appropriate Area Commander shall determine, based on Department policy and operational needs, whether or not to backfill for the absence of the sergeant on leave.*

3.  *If a special operation, (e.g., Beat Feet, Special Traffic Offenders Program (STOP), etc.) requires more than eight (8) members, the appropriate Area Commander shall determine the reasonable span of control for the supervisor.*

4.  *If long-term backfill requires the loan or transfer of a supervisor from another unit, the Chief of Police and/or the Deputy Chief of Police shall make that decision.*

(Negotiated Settlement Agreement IV. C.)

**Relevant Policy:**

Three Departmental policies incorporate the requirements of Task 20: Departmental General Order A-19, *Supervisory Span of Control,* issued on July 26, 2006; Departmental General Order D-13, *Assignment to Acting Higher Rank or Classification,* issued on June 17, 1999; and Departmental General Order D-13.1, *Assignment to Acting Sergeant of Police,* issued on May 14, 2014.  (The publication of DGO D-13.1 cancelled Special Order 8435, which previously governed the selection process of acting sergeants.)

**Commentary:**

To assess these requirements for this report, we reviewed spreadsheets prepared by the Department for January, February, and March 2022 that, by date, note which type of sergeant supervised each applicable squad – a primary sergeant, relief sergeant, acting sergeant, other sergeant (one working overtime), or none.  (The Department refers to unsupervised squads as "open.")  We calculated per squad the compliance percentages for this subtask during this time

period. Each of the 50 applicable squads were in compliance – that is, all applicable squads during this time period were supervised by either a primary, relief, or other/overtime sergeant for at least 85% of their working shifts. We also found that none of the applicable squads exceeded the required 1:8 supervisor to officer ratio at least 90% of their working shifts.

OPD continues to be in compliance with these requirements. The Department has institutionalized the practices of tracking how each squad is supervised each day; planning, when possible, for expected absences; and considering how to fill in for personnel who are absent unexpectedly.

| Task 20 compliance status | In compliance |
|---|---|

## Overview of Our Assessments of Tasks 24 and 25

OPD had been in compliance with Tasks 24 and 25 since 2015, and we did not actively review these Tasks. In November 2018, after we raised concerns regarding the identification, potential underreporting, and investigation of uses of force, the Court reactivated Tasks 24 and 25.

Since we resumed use of force reviews following the Court's reactivation of these Tasks, we have reviewed hundreds of investigations and provided detailed feedback on the force investigations to OPD during each of our site visits. In cases where we have had questions or concerns, OPD personnel have continued to be responsive and have provided follow-up where necessary. In some cases, OPD has provided additional information or documentation that supports its actions, and we have concurred with the Department's assessments. In others, we have identified concerns that had not been identified or addressed by supervisors who conducted the UOF investigation, or the command personnel who reviewed the investigation. In these cases, OPD executive staff have directed additional review; directed training; entered a Supervisory Note File (SNF); or initiated an Internal Affairs Division (IAD) investigation. We have also tracked OPD's efforts to correct identified deficiencies, which have included: the issuance of email directives from executive staff, training bulletins, and newsletters; audits; line-up training; and revisions to UOF-related policies.

In our August 2021 report, we found OPD in compliance with Task 24 for the first time since the Court reactivated these Tasks in 2018; and in April 2022, we found OPD in compliance with Task 25.

To assess compliance, we reviewed 37 UOF reports that occurred between March 1-May 31, 2022. We reviewed all Level 3 UOF reports (11) and a sample of Level 4 UOF reports (26). In accordance with the Order issued May 12, 2022 establishing the sustainability period, we reviewed these UOF reports with a member of OPD's Office of Internal Accountability (OIA) serving as the Department's NSA sustainability liaison. We did not review the field reporting of any Level 1 or Level 2 use of force for this report.

This report covers Level 3 and 4 UOF reports completed by OPD between March 1-May 31, 2022.  All 37 of the cases we reviewed for this time period occurred after the publication of Special Order 9196, which clarified the use of force policy; and after Special Order 9202, issued on February 27, 2020, which temporarily modified the requirements for reporting Type 32 uses of force.

In the 37 Level 3 and 4 uses of force we reviewed, 60 officers used force on 41 different persons. In some cases, multiple officers used force on a single person; and in others, force was used on multiple persons, either by a single officer or by multiple officers.  The total breakdown for the force used on the 41 persons is as follows: African Americans, 63%; Latinos, 24%; whites, 5%; and Asians or other, 7%.  The percentage of force incidents involving African Americans decreased by 14%; force incidents involving Latinos increased 8%, force incidents involving whites increased 1%; and force incidents involving Asians or persons categorized as "other" increased 3%, from our last review, documented in our last monthly status report.

Of the 37 UOF reports we reviewed for the three-month period between March 1-May 31, 2022, in six (16%), we noted concerns with body-worn camera (BWC) activations, late activations, or failure to have the 30-second buffer activated.  In all six of these, supervisors properly identified and addressed the concerns.  We also continued to note some instances of officers failing to identify themselves as police officers; using unprofessional language or profanity; or continuing to use "training and experience" to justify their actions, without further specific information. OPD supervisors continue to identify and address most of these instances.

We reviewed 11 Level 3 uses of force for this report, an increase from only three in our last report.  Ten of the 11 involved the deployment of a Taser, and one involved a type 16 takedown. In six of the 10 Taser deployments, the Taser deployment was the only use of force.  In the four others, one or more Level 4 uses of force was used in addition to the Taser deployment.  Ten of the 11 Level 3 use of force reports were not completed within the required timeframe; all had approved extensions.  We identified concerns with three Level 3 uses of force, which we discuss in detail in Task 25.

In our review of UOF reports for March through May 2022, while we continued to see some concerns with the proper activation of BWCs and other actions, officers are appropriately using and reporting use of force, and supervisors are generally identifying and addressing any concerns that exist.

First NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
October 3, 2022
Page 13 of 35

# Task 24: Use of Force Reporting Policy

**Requirements:**

*The policy shall require that:*

1. *Members/employees notify their supervisor as soon as practicable following any investigated use of force or allegation of excessive use of force.*

2. *In every investigated use of force incident, every member/employee using force, and every member/employee on the scene of the incident at the time the force was used, shall report all uses of force on the appropriate form, unless otherwise directed by the investigating supervisor.*

3. *OPD personnel document, on the appropriate form, any use of force and/or the drawing and intentional pointing of a firearm at another person.*

4. *A supervisor respond to the scene upon notification of an investigated use of force or an allegation of excessive use of force, unless community unrest or other conditions makes this impracticable.*

5. *OPD notify:*

   a. *The Alameda County District Attorney's Office immediately or as soon as circumstances permit, following a use of lethal force resulting in death or injury likely to result in death.*

   b. *The City Attorney's Office as soon as circumstances permit following the use of lethal force resulting in death or serious injury.  At the discretion of the City Attorney's Office, a Deputy City Attorney shall respond to the scene.  The Deputy City Attorney shall serve only in an advisory capacity and shall communicate only with the incident commander or his/her designee.*

   c. *Departmental investigators regarding officer-involved shootings, in accordance with the provisions of Section V, paragraph H, of this Agreement.*

6. *OPD enter data regarding use of force into OPD's Personnel Assessment System (PAS).*

(Negotiated Settlement Agreement V. A.)


**Relevant Policy:**

OPD most recently revised Departmental General Order K-4, *Reporting and Investigating the Use of Force,* on October 16, 2014.  The Department issued Special Order 9208, *Level 4 Type 32 Reporting and Review,* on June 4, 2022.

**Commentary:**

To assess compliance with Task 24, we reviewed 37 Level 3 and 4 use of force (UOF) reports that were completed by OPD from March 1-May 31, 2022.

**Task 24.1** requires that members/employees notify their supervisor as soon as practicable following any reportable use of force or allegation of excessive use of force. In our reviews, we did not identify any instances where a notification was not properly made or was not properly documented.

**Task 24.2** requires that in every reportable use of force incident, every member/employee on the scene of the incident at the time the force was used, reports all uses of force on the appropriate form, unless otherwise directed by the investigating supervisor. **Task 24.3** requires that OPD personnel document, on the appropriate form, every use of force and/or the drawing and intentional pointing of a firearm at another person.

In the 37 Level 3 and 4 UOF incidents we reviewed, officers used force on 41 different persons. In nine of the reports, Level 4, Type 22, pointing a weapon, was the only force used. In one other, Type 22 was used in addition to another use of force. We determined that officers' pointing of their firearms was appropriate in all instances we assessed. We did identify one instance where, although an officer reported a Level 3 Taser deployment, he did not initially report additional uses of Level 4 force, including Type 22. His supervisor identified and appropriately addressed this omission.

**Task 24.4** requires that a supervisor respond to the scene upon notification of a Level 1, 2, or 3 use of force or an allegation of excessive use of force, unless community unrest or other conditions makes such a response impracticable. In all 11 Level 3 uses of force we reviewed for this subtask, supervisors responded to the scene as required. Though not required, in all but two of the 26 Level 4 UOF incidents we reviewed, a supervisor was either on scene at the time of the use of force or responded to the scene upon being notified of the use of force.

**Task 24.5** specifically addresses requirements for the response and handling of Level 1 uses of force. We assess Level 1 uses of force in our regular reviews of Task 30 (Executive Force Review Boards).

**Task 24.6** requires that OPD enter all use of force data into Performance Reporting Information Metrics Environment (PRIME), which is now called Vision. In all 37 of the Level 3 and 4 UOF cases we reviewed, the data was entered as required.

| Task 24 compliance status | In compliance |
|---|---|

# Task 25: Use of Force Investigations and Report Responsibility

**<u>Requirements:</u>**

*An on-scene supervisor is responsible for completing an investigated use of force report in accordance with the provisions of Departmental General Order K-4, "Reporting and Investigating the Use of Force."*

1. *OPD shall develop and implement a policy for conducting and documenting use of force investigations that include, at a minimum:*

   a. *Documentation of the incident in either an Offense or Supplemental Report from the member(s)/employee(s) using force; and/or, when necessary, a statement taken from the member(s)/employee(s) using force;*

   b. *Separating and separately interviewing all officers who were at the scene at the time of the incident;*

   c. *A Supplemental Report from other members/employees on the scene or a statement taken, if deemed necessary by the investigating supervisor;*

   d. *Identification and interviews of non-Departmental witnesses;*

   e. *Consideration of discrepancies in information obtained from members, employees and witnesses, and statements in the reports filed;*

   f. *Whether arrest reports or use of force reports contain "boilerplate" or "pat language" (e.g., "fighting stance", "minimal force necessary to control the situation");*

   g. *Documentation of physical evidence and/or photographs and a summary and analysis of all relevant evidence gathered during the investigation; and*

   h. *Consideration of training/tactical issues involving the availability and practicality of other force options.*

   i. *Supervisor's justification as to why any element of the policy was not documented; and*

2. *All supervisors shall be trained in conducting use of force investigations and such training shall be part of a supervisory training course.*

3. *Use of force investigations shall include a recommendation whether the use of force was objectively reasonable and within Department policy and training. The recommendation shall be based on the totality of the circumstances and shall consider, but is not limited to, the following factors:*

   a. *Whether the force used was pursuant to a legitimate law-enforcement objective;*

Case 3:00-cv-04599-WHO   Document 1540   Filed 10/03/22   Page 16 of 35

First NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
October 3, 2022
Page 16 of 35

  b. *Whether the type and amount of force used was proportional to the resistance encountered and reasonably related to the objective the members/employees were attempting to achieve;*

  c. *Whether the member/employee used reasonable verbal means to attempt to resolve the situation without force, if time and circumstances permitted such attempts;*

  d. *Whether the force used was de-escalated or stopped reasonably when resistance decreased or stopped;*

 4. *Use of force reports shall be reviewed by the appropriate chain-of-review as defined by policy.*

*The type of force used, the identity of the involved members, and the report preparer shall be the determining criteria for utilizing the appropriate chain-of-review. Reviewers may include, when appropriate, the chain-of-command of the involved personnel, the appropriate Area Commander on duty at the time the incident occurred, other designated Bureau of Field Operations commanders, and as necessary, the chain-of-command of the involved personnel up to the Division Commander or Deputy Chief/Director, and the Internal Affairs Division.*

  *Reviewers for Level 1-3 use of force investigations shall:*

  a. *Make a recommendation as to whether the use of force was in or out of policy,*

  b. *Order additional investigation and investigative resources when necessary, and*

  c. *Comment on any training issue(s) when appropriate.*

 5. *Any recommendation that the use of force did not comply with Department policy shall result in the incident being referred to the Internal Affairs Division to conduct additional investigation/analysis, if necessary.*

 6. *Members/employees involved in a use of force incident resulting in serious injury or death and/or an officer-involved shooting, shall be separated from each other as soon as practicable at the incident scene, and kept apart until they have completed their reports and been interviewed.*

(Negotiated Settlement Agreement V. B.)

**Relevant Policy:**

OPD most recently revised Departmental General Order K-4, *Reporting and Investigating the Use of Force,* on October 16, 2014. The Department issued Special Order 9208, *Level 4 Type 32 Reporting and Review,* on June 4, 2022.

Case 3:00-cv-04599-WHO   Document 1540   Filed 10/03/22   Page 17 of 35

First NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
October 3, 2022
Page 17 of 35

**Commentary:**

As noted above in Task 24, we reviewed 37 Level 3 and 4 use of force (UOF) reports that were completed between March 1, 2022 -May 31, 2022.

**Task 25.1** requires that supervisors complete a use of force report and that certain criteria are met in the report.  Subtask 25.1.f. addresses the use of "boilerplate" or "pat" language in reports.  While we continue to find some instances where officers justify their use of force, "based on my training and experience," without any further information or explanation as to what training and experience they were referring to.  In most cases, officers are documenting specific information and details justifying their use of force.

**Task 25.2** requires that all supervisors are trained on how to conduct use of force investigations and such training is part of a supervisory training course.  OPD includes the requirement for this training in its Departmental policies.  During our March 2022 site visit, we again confirmed with OPD that the Department continues to require and deliver this training in the Sergeants' Transition Course, where use of force is part of the curriculum.

In our prior reports, we identified concerns with the preparation and review of UOF reports by supervisors.  The use of force and the processes in which force is documented and reviewed have been at the core of the Court's oversight.  The Department has provided numerous directives on this topic.  In general, we now find that supervisors are identifying deficiencies in officer reporting and identifying and addressing MOR violations.  We also find that reviewers of the supervisors' reports are identifying and addressing concerns when appropriate.

**Task 25.3** requires that use of force investigations include required recommendations.  Areas of recommendation include: whether the force used was pursuant to a legitimate law enforcement objective; whether the type and amount of force used was proportional to the resistance encountered and reasonably related to the objective the officers were attempting to achieve; whether the officers used reasonable verbal means to attempt to resolve the situation without force, if time and circumstances permitted such attempts; and whether the force used was de-escalated or stopped reasonably when resistance decreased or stopped.

In our assessment of Level 3 and 4 UOF reports for this report, we did not identify any instances where the use of force was not deescalated or stopped reasonably when resistance decreased, or any instances where we believe officers could have made additional efforts to explain to subjects being detained why the detention was occurring prior to using force.  We did note ongoing improvement in officers identifying themselves as police officers when appropriate and there was time to do so.

In our last monthly report, we identified one instance – a Level 3 Taser deployment on a subject fleeing from OPD officers – where we believe the force used may not have been appropriate.  After we brought this to OPD's attention, the Department initiated an internal affairs investigation.  This investigation remains in progress.

Case 3:00-cv-04599-WHO   Document 1540   Filed 10/03/22   Page 18 of 35

First NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
October 3, 2022
Page 18 of 35

For this report, there were five Level 3 Taser deployments that resulted from subjects fleeing from officers. In three of the five, we identified concerns with the appropriateness of the use of force. We provided our feedback to OPD during our August 2022 site visit and requested that OPD again review these uses of force. As a direct result of our findings, OPD determined that further investigation was necessary in two of the three cases; and further, OPD referred these to IAD. In the third case, OPD provided a lengthy and detailed response to our concerns, including screenshots that depicted what was occurring at the time the officer deployed his Taser. After further review of the incident, and with the additional details and information provided by OPD, we believe this use of force was in compliance with OPD policies. Since our site visit in August, OPD has also developed a training PowerPoint presentation to address Taser deployments, particularly deployments at fleeing subjects.

We note OPD's current attention to these UOF issues, but believe that had there been more detailed reports and thorough reviews by supervisors, there would have been no need for the Monitoring Team to come upon these deficiencies. The Department is in the NSA sustainability period and should be identifying and addressing concerns without the need for us to bring them forward.

**Task 25.4** requires that use of force reports be reviewed by the appropriate chain of command and appropriate recommendations are made. In all of the cases we reviewed, the reports were reviewed as required. As noted in Task 25.3, we identified concerns with three Level 3 Taser deployments that we reviewed for this report. While the supervisor who investigates the UOF has the responsibility to identify any concerns with the appropriateness of the force, the reviewing chain of command must also ensure that the supervisor conducts a thorough investigation and arrives at the appropriate conclusion. Here again, we believe that more thorough reviews could have identified and addressed concerns prior to them being identified by our Team.

**Task 25.5** requires that any determination that a use of force did not comply with Department policy result in the incident being referred to IAD to conduct additional investigation/analysis, if necessary. As noted above, we identified three Level 3 UOF reports where we believed additional investigation was appropriate to determine if these uses of force were appropriate. OPD referred two of these incidents to IAD once we brought them to the Department's attention. We will review the IAD reports once completed, prior to determining our finding on these two uses of force. The Department has assured us that these investigations will be completed prior to the October Case Management Conference. In the third instance, OPD has now provided sufficient clarification and information for us to agree that this UOF was in compliance with OPD policy.

**Task 25.6** requires that members/employees involved in a use of force incident resulting in serious injury or death and/or officer-involved shooting, are separated from each other as soon as practicable at the incident scene, and kept apart until they have completed their reports and been interviewed. This Task is not assessed here, as we review and consider it as part of the Force and Executive Force Review Boards that OPD holds to examine Level 1 and 2 uses of force.

Case 3:00-cv-04599-WHO   Document 1540   Filed 10/03/22   Page 19 of 35

First NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
October 3, 2022
Page 19 of 35

This is our first assessment of UOF for the sustainability period.  OPD has continued to meet the overall requirements of this Task, with the exception of our noted concerns regarding the justification for the two Level 3 uses of force.  We will review the internal investigations upon their completion prior to making a final determination on the appropriateness of these uses of force.  However, as noted above, more thorough reporting and reviews could have addressed any concerns with these uses of force prior to our review.

| Task 25 compliance status | In compliance |
| --- | --- |

# Task 26:  Force Review Board (FRB)

## Requirements:

*OPD shall develop and implement a policy concerning its FRB proceedings.  The policy shall:*

1.  *Set out procedures, membership and a timetable for FRB review of use of force investigations involving Level 2 incidents, as defined in Department General Order K-4, REPORTING AND INVESTIGATING THE USE OF FORCE;*

2.  *Require the FRB to review all use of force investigations;*

3.  *Require the FRB to make a recommendation as to whether the use of force was in policy or out of policy;*

4.  *Require the FRB to forward sustained policy violations to the Discipline Officer.*

5.  *Require the FRB not to review any use of force allegation until the internal investigations has been completed;*

6.  *Authorize the FRB to recommend to the Chief of Police additional use of force training or changes in policies or tactics, or additional standards, investigatory policies, or training for use of force investigations.*

7.  *Require the FRB to conduct an annual review of use of force cases examined, so as to identify any patterns of use of force practices that may have policy or training implications, and thereafter, issue a report to the Chief of Police;*

8.  *Require that the FRB membership include, at a minimum, one member from the Training Division, one member from the Field Training Officer program, and either the Bureau of Field Operations Deputy Chief or his/her designee;*

9.  *Minimally, that one member of the FRB shall be replaced at least annually.*

(Negotiated Settlement Agreement V. C.)

Case 3:00-cv-04599-WHO   Document 1540   Filed 10/03/22   Page 20 of 35

First NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
October 3, 2022
Page 20 of 35

**Relevant Policy:**

OPD most recently revised Departmental General Order K-4.1, *Force Review Boards,* on December 21, 2015.

**Commentary:**

OPD Force Review Boards (FRBs) are regularly convened to examine the investigations conducted relative to the deployment and application of Level 2 uses of force.[2]  OPD first achieved compliance with this Task during the nineteenth reporting period (April 1-June 30, 2014).  The Order establishing the sustainability period directs that this Task continue to be monitored, and so we continue to assess compliance with this Task, including our analyses of force reports; our review of Force Review Board reports; and observing Force Review Boards between site visits via online meeting software.

For this report, we reviewed nine FRB reports that were completed and approved by the Chief of Police or his designee between February 1-July 1, 2022.  In general, we found the reports to be well-written and accurate accounts of the proceedings they documented.  At least one member of the Monitoring Team observed all of these FRBs remotely via an online meeting platform.  The reports collectively documented the assessment of 40 uses of force associated with nine separate incidents.  Three of the uses of force involved the deployment of an electronic control weapon (ECW), two of which were ruled out of compliance.  Another involved the deployment of a specialty impact munition (SIM), a Drag Stabilized Flexible Baton Round (Beanbag).

All but two of the uses of force (the ECW deployments mentioned above) were found to be in compliance.  In all but one of the cases, the Chief concurred with the Boards' findings without any modifications.  In the remaining case, he agreed with the Board, but also concurred with additional findings identified by IAD and outlined in an addendum to the report.  We did not disagree with any of the findings in the FRB reports we reviewed.

In addition to reviewing the completed FRB reports, we observed all four of the FRBs convened by OPD since we last reported on this Task.  These Boards met on March 15, April 15, and May 3, and 10, 2022, respectively.  We observed them all remotely via an online meeting platform.  We provide immediate feedback for Board members at the conclusion of each FRB we observe.

---

[2] According to OPD, Level 2 uses of force include: "1) Any strike to the head (except for an intentional strike with an impact weapon); 2) Carotid restraint is applied that does not result in the loss of consciousness; 3) Use of impact weapons, including specialty impact munitions or any other object, to strike a subject and contact is made, regardless of injury; 4) Any unintentional firearms discharge that does not result in injury; 5) A police canine bites the clothing or the skin of a subject, or otherwise injures a subject requiring emergency medical treatment (beyond first-aid) or hospital admittance; 6) Any use of force which results in injuries to the subject requiring emergency medical treatment (beyond first-aid) or hospital admittance; (NOTE: For the purposes of this order, an evaluation by a medical professional to assess a complaint of injury is not emergency treatment) 7) Any Level 3 use of force used on or applied to a restrained subject; 7.a) A restrained subject is a person who has been fully placed in a Department authorized restraint device such as both hands handcuffed, a WRAP or Rip Hobble; 7.b) A subject with only one handcuff on is not a restrained person."

Case 3:00-cv-04599-WHO   Document 1540   Filed 10/03/22   Page 21 of 35

First NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
October 3, 2022
Page 21 of 35

As noted in our previous reports concerning this Task, we continue to observe substantive discussion and deliberations among the Board members.  Members ask probing questions of the force investigators; and, where applicable, Department subject-matter experts (SMEs) and IAD investigators.  They also spend a great deal of time discussing issues ancillary to the uses of force, such as tactics, supervision, force alternatives, and training opportunities.  As is customary for all Boards, their feedback was conveyed in the form of training points to appropriate personnel.

Collectively, the FRBs found all the uses of force they reviewed to be in compliance.  We did not disagree with any of the Boards' findings.  In one case, which examined the deployment of a Drag Stabilized Flexible Baton Round (Beanbag), we advised the Board that the supervisor who authorized the deployment could also have been credited with a use of force, which would have been in compliance.  In another case, a supervisor who authorized a Taser deployment was credited with the use of force, which was also ruled in compliance.  We noted the inconsistency between these two cases.  In another case, which included a companion IAD investigation, the Board directed that IAD conduct an interview with the subject on whom the force was used, since IAD inexplicably missed this step.  In the final case, the Board reviewed 18 uses of force involving multiple officers.  They methodically discussed each one and reached the appropriate conclusions.

It is not a requirement, but all of the Board votes we observed during this reporting period were unanimous.  We recognize that in some circumstances, there will be legitimate differences of opinion where the determination is not obvious.  In these situations, we look for frank discussion and clear explanations of the differing positions.

In addition to ruling on the appropriateness of uses of force, Force Review Boards generally identify several follow-up items based on their review of the associated materials and the presentations made to them.  These can include items such as counseling and training for individual officers, publication of Department-wide training materials, and modifications to policy.  OPD tracks these deliverables in a spreadsheet, broken down into three categories: Individual Issues; Department-Wide Issues; and Quarterly Training Points.

The last accounting of deliverables provided to us, which lists follow-up items from FRBs convened prior to May 11, 2022, identified 12 open items from four separate FRBs.  Seven pertained to individual training; two pertained to Department-wide training, and three pertained to quarterly training.  OPD has successfully addressed the backlog of deliverables identified in some of our earlier reports.  Our four most recent reviews did not reveal any significant accumulation of unresolved commitments.

| Task 26 compliance status | In compliance |
|---|---|

Case 3:00-cv-04599-WHO   Document 1540   Filed 10/03/22   Page 22 of 35

First NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
October 3, 2022
Page 22 of 35

# Task 30:  Executive Force Review Board (EFRB)

**Requirements:**

1.  *An EFRB shall be convened to review the factual circumstances surrounding any Level 1 force, in-custody death, or vehicle pursuit-related death incidents.  A firearm discharge at an animal shall be reviewed by the EFRB only at the direction of the Chief of Police.*

2.  *The Board shall have access to recordings and/or transcripts of interviews of all personnel on the scene, including witnesses, and shall be empowered to call any OPD personnel to provide testimony at the hearing.*

3.  *OPD shall continue the policies and practices for the conduct of EFRB, in accordance with the provisions of DGO K-4.1, FORCE REVIEW BOARDS.*

(Negotiated Settlement Agreement V. G.)


**Relevant Policy:**

OPD most recently revised Departmental General Order K-4.1, *Force Review Boards,* on December 21, 2015.


**Commentary:**

Executive Force Review Boards (EFRBs), consisting of three top command-level staff, conduct thorough, detailed reviews of all Level 1 uses of force, in-custody deaths, and vehicle pursuit-related deaths and serious injuries.  OPD achieved compliance with this Task during the nineteenth reporting period (April 1-June 30, 2014).

Since we last reported on this Task, OPD convened two EFRBs: one to review a Taser deployment resulting in a loss of consciousness; and one to review a pursuit which ended in a fatality.  The EFRB reviewing the Taser deployment ruled the force out of compliance, as did IAD.  Additionally, the Board recommended sustained findings for two lieutenants for a Manual of Rules (MOR) violation of Command Officers Authority and Responsibility.  The Board overruled IAD, which recommended such a finding for only one lieutenant.  The EFRB reviewing the pursuit found it to be in compliance.  As required, both Boards were chaired by a Deputy Chief.  We did not disagree with the EFRBs' findings.

We reviewed one EFRB Report during the reporting period: the one associated with the pursuit review described above.  We found the report to be well-written and an accurate accounting of the EFRB we observed.

OPD remains in compliance with this Task.

| Task 30 compliance status | In compliance |
| --- | --- |

# Task 31:  Officer-Involved Shooting Investigations Review Protocol

## Requirements:

*OPD shall develop a policy to ensure that, in every officer-involved shooting in which a person is struck, Homicide and Internal Affairs investigators respond to the scene.  The Homicide Section's investigation shall be conducted in partnership with, and when deemed appropriate by, the Alameda County District Attorney's Office.  Interviews of the subject officer(s) shall be conducted jointly with the appropriate staff from Homicide and the Office of the District Attorney.  The District Attorney and City Attorney shall be notified in accordance with the provisions of Section V,_paragraph A (5), of this Agreement.  Homicide shall duplicate and provide all completed reports and documents to the District Attorney's Office, the Office of the City Attorney, and the Internal Affairs Division.  IAD shall provide information and/or documents as required by law.*

(Negotiated Settlement Agreement V. H.)

## Relevant Policy:

OPD most recently published Departmental General Order K-4, *Reporting and Investigating the Use of Force* on October 16, 2014.  IAD Policy & Procedures and Homicide Policy & Procedures are also relevant to this Task.

## Commentary:

Task 31 requires certain notifications and responses in the event of an officer-involved shooting.  During this reporting period (March 18-September 12, 2022), on May 25, 2022, an off-duty officer was involved in an officer-involved shooting.  Additionally, on June 26, 2022, the Internal Affairs Division had a Level 1 incident callout related to a fatal accident following an unauthorized pursuit.  OPD confirmed that the protocols required by this Task were followed in these instances.

OPD remains in compliance with this Task.

| Task 31 compliance status | In compliance |
|---|---|

Case 3:00-cv-04599-WHO    Document 1540    Filed 10/03/22    Page 24 of 35

First NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
October 3, 2022
Page 24 of 35

## Task 34: Vehicle Stops, Field Investigation, and Detentions *and* Task 41:  Use of Personnel Assessment System (PAS) and Risk Management

**Requirements:**

**Task 34:**

1.   *OPD shall require members to complete a basic report on every vehicle stop, field investigation and every detention.  This report shall include, at a minimum:*

   a.   *Time, date and location;*

   b.   *Identification of the initiating member or employee commencing after the first year of data collection;*

   c.   *Reason for stop;*

   d.   *Apparent race or ethnicity, and gender of individual(s) stopped;*

   e.   *Outcome of stop (arrest, no arrest);*

   f.   *Whether a search was conducted, and outcome of search;*

   g.   *Offense categories (felony, misdemeanor or infraction).*

2.   *This data shall be entered into a database that can be summarized, searched, queried and reported by personnel authorized by OPD.*

3.   *The development of this policy shall not pre-empt any other pending or future policies and or policy development, including but not limited to "Promoting Cooperative Strategies to Prevent Racial Profiling."*

(Negotiated Settlement Agreement VI. B.)


**Task 41:**

*Within 375 days from the effective date of this Agreement, OPD shall develop a policy for use of the system, including supervision and audit of the performance of specific members, employees, supervisors, managers, and OPD units, as well as OPD as a whole.*

*The policy shall include the following elements:*

1.   *The Chief of Police shall designate a PAS Administration Unit.  The PAS Administration Unit shall be responsible for administering the PAS policy and, no less frequently than quarterly, shall notify, in writing, the appropriate Deputy Chief/Director and the responsible commander/manager of an identified member/employee who meets the PAS criteria.  PAS is to be electronically maintained by the City Information Technology Department.*

2.   *The Department shall retain all PAS data for at least five (5) years.*

First NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
October 3, 2022
Page 25 of 35

3. *The Monitor, Inspector General and Compliance Coordinator shall have full access to PAS to the extent necessary for the performance of their duties under this Agreement and consistent with Section XIII, paragraph K, and Section XIV of this Agreement.*

4. *PAS, the PAS data, and reports are confidential and not public information.*

5. *On a quarterly basis, commanders/managers shall review and analyze all relevant PAS information concerning personnel under their command, to detect any pattern or series of incidents which may indicate that a member/employee, supervisor, or group of members/employees under his/her supervision may be engaging in at-risk behavior. The policy shall define specific criteria for determining when a member/employee or group of members/employees may be engaging in at-risk behavior.*

6. *Notwithstanding any other provisions of the PAS policy to be developed, the Department shall develop policy defining peer group comparison and methodology in consultation with Plaintiffs' Counsel and the IMT. The policy shall include, at a minimum, a requirement that any member/employee who is identified using a peer group comparison methodology for complaints received during a 30-month period, or any member who is identified using a peer group comparison methodology for Penal Code §§69, 148 and 243(b)(c) arrests within a 30-month period, shall be identified as a subject for PAS intervention review. For the purposes of these two criteria, a single incident shall be counted as "one" even if there are multiple complaints arising from the incident or combined with an arrest for Penal Code §§69, 148 or 243(b)(c).*

7. *When review and analysis of the PAS threshold report data indicate that a member/employee may be engaging in at-risk behavior, the member/employee's immediate supervisor shall conduct a more intensive review of the member/employee's performance and personnel history and prepare a PAS Activity Review and Report. Members/employees recommended for intervention shall be required to attend a documented, non-disciplinary PAS intervention meeting with their designated commander/manager and supervisor. The purpose of this meeting shall be to review the member/employee's performance and discuss the issues and recommended intervention strategies. The member/employee shall be dismissed from the meeting, and the designated commander/manager and the member/employee's immediate supervisor shall remain and discuss the situation and the member/employee's response. The primary responsibility for any intervention strategies shall be placed upon the supervisor. Intervention strategies may include additional training, reassignment, additional supervision, coaching or personal counseling. The performance of members/ employees subject to PAS review shall be monitored by their designated commander/manager for the specified period of time following the initial meeting, unless released early or extended (as outlined in Section VII, paragraph B (8)).*

Case 3:00-cv-04599-WHO   Document 1540   Filed 10/03/22   Page 26 of 35

First NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
October 3, 2022
Page 26 of 35

8. *Members/employees who meet the PAS threshold specified in Section VII, paragraph B (6) shall be subject to one of the following options: no action, supervisory monitoring, or PAS intervention. Each of these options shall be approved by the chain-of-command, up to the Deputy Chief/Director and/or the PAS Activity Review Panel.*

*Members/employees recommended for supervisory monitoring shall be monitored for a minimum of three (3) months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor. The first at the end of one (1) month and the second at the end of three (3) months.*

*Members/employees recommended for PAS intervention shall be monitored for a minimum of 12 months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor and designated commander/manager: The first at three (3) months and the second at one (1) year. Member/employees subject to PAS intervention for minor, easily correctable performance deficiencies may be dismissed from the jurisdiction of PAS upon the written approval of the member/employee's responsible Deputy Chief, following a recommendation in writing from the member/employee's immediate supervisor. This may occur at the three (3)-month follow-up meeting or at any time thereafter, as justified by reviews of the member/employee's performance. When a member/employee is not discharged from PAS jurisdiction at the one (1)-year follow-up meeting, PAS jurisdiction shall be extended, in writing, for a specific period in three (3)-month increments at the discretion of the member/employee's responsible Deputy Chief. When PAS jurisdiction is extended beyond the minimum one (1)-year review period, additional review meetings involving the member/employee, the member/ employee's designated commander/manager and immediate supervisor, shall take place no less frequently than every three (3) months.*

9. *On a quarterly basis, Division/appropriate Area Commanders and managers shall review and analyze relevant data in PAS about subordinate commanders and/or managers and supervisors regarding their ability to adhere to policy and address at-risk behavior. All Division/appropriate Area Commanders and managers shall conduct quarterly meetings with their supervisory staff for the purpose of assessing and sharing information about the state of the unit and identifying potential or actual performance problems within the unit. These meetings shall be scheduled to follow-up on supervisors' assessments of their subordinates' for PAS intervention. These meetings shall consider all relevant PAS data, potential patterns of at-risk behavior, and recommended intervention strategies since the last meeting. Also considered shall be patterns involving use of force, sick leave, line-of-duty injuries, narcotics-related possessory offenses, and vehicle collisions that are out of the norm among either personnel in the unit or among the unit's subunits. Division/appropriate Area Commanders and managers shall ensure that minutes of the meetings are taken and retained for a period of five (5) years. Commanders/managers shall take appropriate action on*

Case 3:00-cv-04599-WHO   Document 1540   Filed 10/03/22   Page 27 of 35

First NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
October 3, 2022
Page 27 of 35

*identified patterns of at-risk behavior and/or misconduct.*

10.     *Division/appropriate Area Commanders and managers shall meet at least annually with his/her Deputy Chief/Director and the IAD Commander to discuss the state of their commands and any exceptional performance, potential or actual performance problems or other potential patterns of at-risk behavior within the unit. Division/appropriate Area Commanders and managers shall be responsible for developing and documenting plans to ensure the managerial and supervisory accountability of their units, and for addressing any real or potential problems that may be apparent.*

11.     *PAS information shall be taken into account for a commendation or award recommendation; promotion, transfer, and special assignment, and in connection with annual performance appraisals. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

12.     *Intervention strategies implemented as a result of a PAS Activity Review and Report shall be documented in a timely manner.*

13.     *Relevant and appropriate PAS information shall be taken into account in connection with determinations of appropriate discipline for sustained misconduct allegations. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

14.     *The member/employee's designated commander/manager shall schedule a PAS Activity Review meeting to be held no later than 20 days following notification to the Deputy Chief/Director that the member/employee has met a PAS threshold and when intervention is recommended.*

15.     *The PAS policy to be developed shall include a provision that a member/employee making unsatisfactory progress during PAS intervention may be transferred and/or loaned to another supervisor, another assignment or another Division, at the discretion of the Bureau Chief/Director if the transfer is within his/her Bureau. Inter-Bureau transfers shall be approved by the Chief of Police. If a member/employee is transferred because of unsatisfactory progress, that transfer shall be to a position with little or no public contact when there is a nexus between the at-risk behavior and the "no public contact" restriction. Sustained complaints from incidents subsequent to a member/employee's referral to PAS shall continue to result in corrective measures; however, such corrective measures shall not necessarily result in a member/employee's exclusion from, or continued inclusion in, PAS. The member/employee's exclusion or continued inclusion in PAS shall be at the discretion of the Chief of Police or his/her designee and shall be documented.*

Case 3:00-cv-04599-WHO   Document 1540   Filed 10/03/22   Page 28 of 35

First NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
October 3, 2022
Page 28 of 35

16.   *In parallel with the PAS program described above, the Department may wish to continue the Early Intervention Review Panel.*

17.   *On a semi-annual basis, beginning within 90 days from the effective date of this Agreement, the Chief of Police, the PAS Activity Review Panel, PAS Oversight Committee, and the IAD Commander shall meet with the Monitor to review the operation and progress of the PAS. At these meetings, OPD administrators shall summarize, for the Monitor, the number of members/employees who have been identified for review, pursuant to the PAS policy, and the number of members/employees who have been identified for PAS intervention. The Department administrators shall also provide data summarizing the various intervention strategies that have been utilized as a result of all PAS Activity Review and Reports. The major objectives of each of these semi-annual meetings shall be consideration of whether the PAS policy is adequate with regard to detecting patterns of misconduct or poor performance issues as expeditiously as possible and if PAS reviews are achieving their goals.*

18.   *Nothing in this Agreement, and more specifically, no provision of PAS, shall be construed as waiving, abrogating or in any way modifying the Department's rights with regard to discipline of its members/employees. The Department may choose, at its discretion, to initiate the administrative discipline process, to initiate PAS review or to use both processes concurrently or consecutively.*

(Negotiated Settlement Agreement VII. B.)


**Relevant Policy:**

- **Task 34:**  OPD published General Order M-19, *Prohibitions Regarding Racial Profiling and Other Bias-Based Policing* on November 4, 2004)*;* Special Order 9042, *New Procedures Regarding Stop Data Collection* on June 11, 2010; Special Order 9101, *Revised Stop Data Collection Procedures* on February 27, 2013; and Report Writing Manual (RWM) Inserts R-2 (January 15, 2010), N-1 (April 15, 2007), and N-2 (April 15, 2007).

- **Task 41:**  OPD revised and issued Departmental General Order D-17, *Personnel Assessment Program,* on November 20, 2013; and issued Department General Order R-01, *Risk Management*, on April 15, 2022.


**Commentary:**

Task 34, which addresses the collection of stop data, is linked to Task 41 through the analysis of stop data, and through review of that data in the Risk Management Meeting process, and also in meeting State requirements for filing stop data under the California's Racial and Identity Profiling Act of 2015 (RIPA). OPD has published its own stop data summary reports since 2014 and adopted the standardized RIPA requirements in 2019. The RIPA requirements, however, do not facilitate comparison across agencies; therefore, for the purpose of risk management, the

Case 3:00-cv-04599-WHO   Document 1540   Filed 10/03/22   Page 29 of 35

First NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
October 3, 2022
Page 29 of 35

Department's data analysis focuses on comparison across officers and units, and on patterns of stop data over time. That analysis is integrated into the Department's risk management process including its Risk Management Meetings. Patterns of stops and their justification are reviewed, as is the distribution of stops by the race of those stopped. Risk Management Meetings also review decisions made in the context of stops including examining patterns of searches, seizures of contraband, and arrests. The analysis of risk in the context of that activity, however, has been limited. Assessing the risk associated with the quality and outcome of stops would require reviewing data across steps in case processing.

As described in the NSA, the assessment, management, and mitigation of risk are critically important processes for the Department. They address the requirements of Task 41 and also reflect the requirements regarding data about officer behavior, as noted in Task 40. With that, the risk management process in the Department also brings together other significant issues in the NSA including uses of force, stop data, pursuits and collisions, and reporting requirements for these and other concerns.

Contemporaneous with the revision of data collection processes and completion of the Vision database, the Department has continued to refine its structure and processes for identifying and managing risk. Within the last few years, that has included the creation of the Bureau of Risk Management (BRM) under the direction of a Deputy Chief. The Bureau includes the Office of Internal Accountability (OIA), the Internal Affairs Division (IAD), the Training Division, Research and Planning, the Personnel Assessment System (PAS) Administration Unit, and units managing data supporting Risk Management Meetings. Another accomplishment was the issuance of policy R-01, *Risk Management,* on April 15. 2022.

The Risk Management Meeting process now follows the plan described in the new policy. That calls for meetings occurring at the six Areas, and for specialized programs including CeaseFire and the Violent Crime Operations Center (VCOC), at the Bureau level, and ultimately at the Citywide level. Those meetings are held monthly and include participation from supervisors and executive team members up through the Chief, as well as representatives from the City including the City Administrator.

The sequence of meetings has demonstrated significant value. In most cases, first-level meetings have provided the highest levels of detail on officers and events and thus have been useful for identifying risk-related behavior. Those discussions frequently lay the groundwork for referrals to the PAS Unit for reviews and/or recommendations for remedial strategies. The Bureau and City-level meetings have been characterized by similar "drilling down" to the officer level and also occasionally, "drilling up" to identify policy or practices that may affect risk-related behavior. Management referrals from the risk review process are not unusual. That fact seems to support the view that risk management discussions are generally not being interpreted as leaning towards punitive.

As we have noted in previous reports, analysis for risk management should not be limited to examining data from the Vision database. The effect of doing that can be to artificially limit ideas of risk to the routinely collected data even though the concept of risk itself focuses attention on the unusual. It should be appreciated that significant internal problems and disruptive events occurring even while OPD has been under the NSA, were not discovered through the risk management process or, in many cases, were not addressed through that process.

Case 3:00-cv-04599-WHO   Document 1540   Filed 10/03/22   Page 30 of 35

First NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
October 3, 2022
Page 30 of 35

There is, however, likely to be value in supplementing the production and review of risk-related statistical data with analysis of atypical significant events and problems that may not be well defined by existing data summaries. Although this does occur informally at times, it is not now a common part of Risk Management Meetings.

The essential elements of the OPD risk management process currently include: 1) the use of data to identify potential risk; 2) examination of identified potential risks; 3) development of strategies to manage and reduce potential risk; and 4) assessment of the impact and effectiveness of those strategies. The inclusion of the Data Manager in the Department has standardized the presentation of basic risk management data.

Quantitative risk data are made available regularly for the individual areas and for specialized units and also at the Bureau and Citywide level. Area meetings vary in their format and in their level of detail. Greater coordination across areas is likely to be useful. Deputy Chiefs do attend some of those meetings and their presence typically assures high quality discussion and decision making. A positive development has been an increased prevalence of management referrals for monitoring and intervention even when risk management statistical thresholds have not been exceeded.

The Citywide meetings, often led by the Assistant Chief, provide an independent view of the issues raised in the earlier meetings. The discussion is generally detailed and well-focused on risk, and tends to have a useful mentorship character about it. It is largely focused on the details associated with identified risks and on developing or confirming plans for addressing those risks. That discussion applies to results from the area meetings and from the review of officers through the PAS process, although discussion of the PAS process is generally not extensive.

Attention to the effectiveness of risk reduction strategies is limited and generally focused on individuals. Discussion of the risk management process has emphasized both "drilling down" to review individual officers and "drilling up" to review policy and common practices. When discussed, analysis of outcomes uses data in limited ways and tends to involve subjective impressions of how individual officers are doing. "Drilling up" receives little attention. A systematic examination of the impact of the risk management process, such as an evaluation of the behavior of previously identified "high" and "low" flyers has not occurred.

As with any organizational process, risk management at OPD has certain vulnerabilities that have the potential for limiting or reducing its effectiveness, or for eliminating it all together. It is important to recognize potential vulnerabilities and to mitigate their possible impact. The details of the new risk management policy provide one barrier to some vulnerabilities. Still, the level of commitment by the Department to its process for managing risk is significant and, as such, represents one source of vulnerability. The number and diversity of Risk Management Meetings and the personnel resources involved are substantial. A commitment by the Department and the City, including commitments moving forward as personnel change, will be critical to maintaining the effectiveness of the risk management system. Likewise, a similar commitment will be necessary from command staff at all levels. That commitment will need to be reflected in promotion processes.

In light of the fact that risk management is dependent on the availability of high-quality data, data issues reflect a significant vulnerability.  This problem was illustrated by early versions of the risk management database which suffered technical problems which rendered them unreliable.  Associated with this vulnerability are potential problems with training.  Sustaining risk management will require extensive training at all levels of the Department.  Recruit officers should have some knowledge of risk management so they can make decisions with appropriate expectations in mind.  Academy training and in-service training will be important.  Training for supervisors and command staff will be critical.

There are also other vulnerabilities associated with the use of data.  Repetition and redundancy in data compilations and presentations could prove to be a limitation.  As the Department continues to gain expertise there is likely to be demand for more complete and extensive analyses.  Even current reviews of outcomes of stop data support the view that expectations will extend beyond Vision and include analysis of outcomes based on other sources of data.  This suggests that failure of imagination could become a significant source of vulnerability.  To be sustained, risk management will need to serve the interests of the City and the Department but also the interests of officers and other staff as they grow in technical knowledge and in their career expectations.

| Task 34 compliance status | In compliance |
|---|---|
| Task 41 compliance status | In compliance |

# Task 45:  Consistency of Discipline Policy

## Requirements:

*On or before October 6, 2003, OPD shall revise and update its disciplinary policy to ensure that discipline is imposed in a fair and consistent manner.*

1. *The policy shall describe the circumstances in which disciplinary action is appropriate and those in which Division-level corrective action is appropriate.*

2. *The policy shall establish a centralized system for documenting and tracking all forms of discipline and corrective action, whether imposed centrally or at the Division level.*

3. *All internal investigations which result in a sustained finding shall be submitted to the Discipline Officer for a disciplinary recommendation.  The Discipline Officer shall convene a meeting with the Deputy Chief or designee in the affected chain-of-command for a confidential discussion of the misconduct, including the mitigating and aggravating factors and the member/employee's overall performance.*

4. *The COP may direct the Discipline Officer to prepare a Discipline Recommendation without convening a Discipline Conference.*

(Negotiated Settlement Agreement X. B.)

**Relevant Policy:**

Five Departmental policies incorporate the requirements of Task 45:  Departmental General Order M-03, *Complaints Against Department Personnel and Procedures* (revised most recently on December 22, 2017); Training Bulletin V-T.1 and V-T.2, *Internal Investigation Procedure Manual* (revised most recently on August 23, 2018); IAD Policy & Procedures Manual 21-01, *IAD General Operating Procedures* (published August 17, 2021); and Training Bulletin V-T, *Departmental Discipline Policy* (revised most recently on December 11, 2017).

**Commentary:**

Task 45, which addresses consistency of discipline, is the lone Task that was not in full compliance with the requirements of the NSA at the start of the sustainability period.  Our last monthly status report noted the deficiencies of the Department's April 2022 analysis of discipline-related data.

A 2020 review of data by an external consultant had found significant racial disparities in sustained complaints of misconduct between Black officers and officers of other races.  In 2021, the Department reached the conclusions that the initial report by outside consultants was flawed and its conclusions unwarranted.  OPD moved forward with a new, albeit somewhat more limited, internal study of disciplinary outcomes.  OPD's own report concluded that there was no evidence of bias in disciplinary outcomes.

That conclusion, however, did not reflect the full analysis.  An appendix of the report showed that disciplinary decisions in Division Level Investigations (DLIs) did, in fact, show differences by race.  However, as we noted in our last monthly report, "that finding was buried deeply in a report appendix until we raised that in a discussion with Department officials."

Since that time, the Department has continued to address the issue of disparity in discipline, to include administering a survey of employees regarding their perspectives on potential bias.  These efforts demonstrate the extensive work required for data analysis to inform decision-making on this topic.

During our recent virtual site visit, we raised concerns that OPD's DLI analysis had been relegated to its report appendix – despite the statistically significant finding of bias in the outcomes of sustained DLI cases.  That analysis did not – and based on the research design, *could* not – address if there were differences by race in whether formal accusations of violations were made in the first place.  That would seem to be the appropriate starting point for this analysis.  The finding that there is no evidence of bias in the decisions to sustain or not sustain allegations does not address whether bias may exist in the process of alleging the MOR violations in the first place.  Because the initial decision as to who is or is not charged with an MOR violation determines whether or not an investigation will be undertaken, it is necessary to assess potential bias at each step of the investigative process and not simply in any final decision to sustain allegations.

OPD has made a significant commitment to data-driven decision-making.  That commitment includes internal personnel; external consultation; expanded systems for data collection and analysis; and extensive personnel resources for the collection, review, and use of data.  The level

of commitment to data analysis is best illustrated in the risk management process, where risk management data are used from the Area level through Citywide level meetings. In fact, the risk management process and the implementation of many of the requirements of the NSA have been enhanced by the Department's commitment to the analysis of data.

There is, however, a significant difference between the analysis of risk management data and the research on potential bias in the disciplinary process. The risk analysis compiles and summarizes data, largely from the Vision database. The examination of potential disparity in the disciplinary process involves far different analyses. These inevitably involve formulating and testing hypotheses and drawing conclusions from statistical analyses.

The Department presented its most recent analysis of discipline data at a meeting on September 8, 2022. The conversation, viewed as preliminary, did not include a written report provided at the time of the meeting or, more appropriately, in advance. Absent a written draft of the report, and particularly without one made available in advance of the presentation, attendees at the meeting, particularly those who had not worked on the report or seen a version of the presentation, could not provide an informed review of the data or analysis. During the meeting, the Plaintiffs' attorneys and a Monitoring Team representative voiced their concerns about this limitation. The data tables and analyses should have been provided at a reasonable time in advance to allow a comprehensive review.

On September 21, 2022, without first issuing a draft to the Plaintiffs' attorneys and Monitoring Team, the Department issued a 107-page report, "Oakland Police Department Office of Internal Accountability Discipline Equity and Internal Procedural Justice Report: Collected Documents Reflecting the Department's Examination of Data and Information to Improve Equity in the Internal investigation and Discipline Process, Academy and Field Training Programs, and Officer Diversity." The report includes some new data analyses, but also serves as a collection of documents – including an Information Bulletin that lists "Implemented Equity Interventions" by OPD's Race and Equity Team.

The report includes analyses of Department data, but also uses small sample comparisons that do not have statistical value. For example, the report discusses the Department's review of a small sample of cases involving 10 Black officers and 10 white officers. In this review, 10 persons (either sergeants or lieutenants) each reviewed two cases: one involving a Black officer, and one involving a white officer. These reviews were not blind – that is, the reviewers knew or could have known the officers involved in the cases. All reviewers concluded that the decisions in the cases were fair and unbiased, although the small sample of cases and the fact that the reviewers each examined only two cases mean that the analysis is of little use.

The report recognizes the potential for bias. For example, Black officers were more likely than their white counterparts to be sustained for discovered violations – that is, violations added by investigators during their investigations. Also, the report noted that Black officers were more likely to receive suspensions and less likely to receive counseling than their white counterparts. Despite these findings, the report offers little explanation of the racial disparities that are found.

Case 3:00-cv-04599-WHO   Document 1540   Filed 10/03/22   Page 34 of 35

First NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
October 3, 2022
Page 34 of 35

The report also discusses the results of the survey of employees that the Department recently completed. The survey itself is lengthy and wide-ranging, but it is limited to a large number of uncorrelated survey questions. Overall, survey respondents felt that they were treated fairly by supervisors; yet only about 20% of respondents felt the disciplinary process was generally fair. Future versions should provide a greater depth in analysis and in interpretation of results.

There are, undoubtedly, a variety of pathways toward ensuring the quality and value of analysis, and those are likely to share common elements. Among them would be high degrees of care in developing written research design plans in advance of data collection; reliance on expertise in the field of policing; and advisement by a number of trained researchers to provide assistance in research design, analysis, and reporting results. OPD's analysis of disparity in discipline suggests that additional attention should be paid to research and analysis in the Department. In particular, it seems that greater attention to the design of research plans and the review of results would be valuable. Even where resources may not support a fully staffed research office, there can be value in developing a protocol for determining the design of research; the data and analyses to be included; and how conclusions are reached, reviewed, and reported upon. Such a protocol would apply to research conducted in the Department as well as research conducted by outside contractors.

Although we recognize that a great deal of work by the Department has gone into the review of disparity in discipline, we also recognize the limitations of that analysis. To some extent, those limitations may be rooted in the nature of the research topic itself. The value of this research lies not just in the statistics themselves, but also in the shared level of confidence in the analysis of this data, including the survey data. An important question to ask is whether analysis done within the Department can achieve such a level of confidence on this topic. The iterations of this analysis over the past several years raise doubts.

In one view, the history of the NSA has been marked by an increasing commitment to systemic analysis. That has become a great strength for the Department and a model for police departments across the country. However, the compounding problems illustrated with the disparity analyses also suggest vulnerability and can open the Department to criticism. Meeting recognized standards for analysis, providing written plans for the research, and offering critical assessments of draft results can help correct current deficiencies but answering some questions may be best done from outside the Department.

Compliance with the requirements of Task 45 depends heavily on the analysis of the disciplinary process and its outcomes. Those analyses are clearly intended to assess the degree of fairness in the process and, if necessary based on the data, to drive corrective action. Those expectations differ greatly from the process of using data in the existing risk management process.

Prior to the Department's release of its September 21, 2022 report, the current compliance status for this Task should be recognized as a critique of the existing analyses. Following critical reviews, the Department has now extended its analysis across DLIs to compare the extent of DLIs and the types of allegations across officer demographics. It also initiated a review of a limited number of cases to supplement the statistical analyses, and it has surveyed employees on their perceptions of the disciplinary process. But small samples have severe limitations, as do internal surveys on challenging topics. Few topics may be as sensitive as questions of bias. While the September 21, 2022 report was broad in its scope, compliance determinations must be

made on the elimination of the core issue – bias – and not the quality of reports that memorialize past patterns and future steps the Department should consider taking.  The Department's current relationship with Stanford University researchers is unclear and needs to better defined.  That said, the issue in its entirety may very well be best examined by independent researchers – or at a minimum, the City could establish an independent research advisory group – to strengthen confidence in and outside the Department in the integrity of this research.

| Task 45 compliance status | In partial compliance |
|---|---|

## Conclusion

This is our first report of the NSA sustainability period.  The efforts of the Monitoring Team have been appended by a representative of the Department's Office of Internal Accountability.  We are pleased with his contributions, and the methodologies and skillsets essential for monitoring will be broadened to include other members of the OIA staff.  The quality of our first quarterly site visit meeting was good, and we thank the Department for its efforts to work with the Monitoring Team to share important information that is essential for this process.

In our Task 25 discussion, we raised concerns with the appropriateness of the use of force in some Taser deployments that resulted from subjects fleeing from officers.  In two cases, after our August site visit discussions with the Department, OPD determined that further investigation was necessary, and IAD cases are now in progress.  The Department must do a better job in its initial review of these incidents as it was the Monitoring Team, and not the line-level supervisors, that found the troublesome cases.  At this stage, the Department should be identifying and addressing concerns without the need for our Team to bring them forward.

The matter of Task 5 and the quality and integrity of Internal Affairs Division investigations needs to be more closely scrutinized internally and will be a focus of the Monitoring Team.  While much effort seems to have been directed to Task 45, remedies to mitigate the underlying problems that are impacting officers of the Department must be a priority.

Chief (Ret.) Robert S. Warshaw
*Monitor*