December 22, 2022

# Second NSA Sustainability Period Report
## *of the* Independent Monitor
## *for the* Oakland Police Department

## Introduction

This is the second report of the Monitoring Team issued during the Negotiated Settlement Agreement (NSA) sustainability period in the case of *Delphine Allen, et al., vs. City of Oakland, et al.,* in the United States District Court for the Northern District of California under the direction of Judge William H. Orrick.

On May 12, 2022, the Court issued an Order placing the City into a one-year sustainability period.  The Court noted, "The Negotiated Settlement Agreement (NSA) the parties executed on January 22, 2003, contemplated that federal court oversight would terminate after the defendants achieved substantial compliance with all of the provisions of the NSA and maintained that compliance for a year."  As per the Order, during the sustainability period, we report to the Court on a quarterly basis; we conduct quarterly site visits; and we have appended to the Monitoring Team a member of OPD's Office of Internal Accountability (OIA), who serves as the Department's NSA sustainability liaison.

As with our site visits before the sustainability period, our site visits include both compliance assessments and technical assistance.  During our second sustainability site visit, which we held remotely, in November, we met with Department and City officials; observed the Department's Risk Management Meeting; discussed the status of several Departmental policies; and shared our observations of misconduct investigations and use of force reports.

This report covers our assessments of all 11 Tasks listed in the May 12, 2022 Order:  Tasks 2; 5; 20; 24; 25; 26; 30; 31; 34; 41; and 45.

# *Task Assessments*

## Task 2:  Timeliness Standards and Compliance with IAD Investigations

**Requirements:**

*Fairness to complainants, members/employees and the public requires that internal investigations be completed in a timely fashion.*

> *1.      On or before December 1, 2003, OPD shall develop policies regarding timeliness standards for the completion of Internal Affairs investigations, administrative findings and recommended discipline.*
>
> *2.      Compliance with these timeliness standards shall be regularly monitored by IAD command and the Department's command staff.  If IAD experiences an unusual proliferation of cases and/or workload, IAD staffing shall be increased to maintain timeliness standards.*

(Negotiated Settlement Agreement III. B.)

**Relevant Policy:**

OPD most recently revised Departmental General Order M-03, *Complaints Against Department Personnel and Procedures*, on December 22, 2017.

**Commentary:**

**Task 2.1** requires that internal investigations (IAD and Division Level) – including review, approval, findings, and discipline – be completed in accordance with the timeliness standards developed by OPD.  To assess this subtask, we reviewed a list of all internal investigations resulting in formal findings (unfounded, sustained, exonerated, or not sustained) that were approved in July, August, and September 2022, and calculated the number of days between the complaint date and the approval date for each case.  We excluded from the dataset cases that were administratively closed, those that involved on-duty traffic accidents or service complaints, and those that did not involve Manual of Rules (MoR) violations.  We segregated the remaining cases into Class I or Class II categories.  If a case involved at least one alleged Class I violation, we classified it as Class I.

At least 85% of Class I misconduct investigations and at least 85% of Class II misconduct investigations must be completed within 180 days to be considered timely.  Per DGO M-03, Class I offenses "are the most serious allegations of misconduct and, if sustained, shall result in disciplinary action up to and including dismissal and may serve as the basis for criminal prosecution."  Class II offenses include "all minor misconduct offenses."

Case 3:00-cv-04599-WHO   Document 1557   Filed 12/22/22   Page 3 of 32

Second NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
December 22, 2022
Page 3 of 32

For the purposes of this assessment, we calculated the number of days between the complaint receipt date and the approval date.  The complaint date is the date on which the Department first becomes aware of a complaint – whether it is lodged by a community member or internally generated.  We removed from the denominator cases that were delayed due to tolling (held in abeyance in accordance with one of the provisions of Government Code Section 3304) or cases in which the Department asserted that its failure to meet the 180-day timeliness requirement resulted from delays in the Community Police Review Agency (CPRA) completing its concurrent investigations.

For this reporting period, the Department remains in compliance with Task 2.  Of the 26 applicable Class I cases we reviewed for this assessment, 26, or 100%, were in compliance with established timelines.  During our last review of Task 2, we found 96% of Class I cases in compliance with established timelines.  Of the 74 applicable Class II cases we reviewed for this assessment, 72, or 97%, were in compliance with established timelines.  During our last review of Task 2, we found 98% of Class II cases in compliance with established timelines.

Per DGO M-03, "In cases with a sustained finding, the discipline recommendation process shall be completed within 30 calendar days of the sustained finding."  We reviewed all 18 cases including a total of 49 sustained findings that were approved in July, August, and September 2022; 10 cases involved multiple sustained findings.  All (100%) of these cases were in compliance with established discipline timelines.

OPD is in compliance with Task 2.1.

Task 2.2 requires that IAD and OPD command staff regularly monitor compliance with these timeliness standards.  The primary responsibility for monitoring compliance with timeliness standards rests with IAD, whether investigations are conducted by IAD personnel or via Division-level investigation.  As part of this monitoring, the IAD Commander discusses pending deadlines for key open investigations during IAD's weekly meetings with the Chief; the deadlines are also reflected in written agendas for these meetings.  A Monitoring Team representative regularly attends these weekly meetings.  IAD also occasionally, as needed, emails individual reminders on cases approaching due dates to investigators and their supervisors.  The Department is in compliance with Task 2.2.

Task 2.3 requires that if IAD experiences an unusual proliferation of cases and/or workload, IAD staffing be increased to maintain timeliness standards.  We routinely request and receive updates on IAD staffing levels during and between our site visits.

| Task 2 compliance status | In compliance |
|---|---|

## Task 5:  Complaint Procedures for IAD

**Requirements:**

1.  *On or before December 1, 2003, OPD shall develop a policy so that, OPD personnel who become aware that a citizen wishes to file a complaint shall bring such citizen immediately, or as soon as circumstances permit, to a supervisor or IAD or summon a supervisor to the scene.  If there is a delay of greater than three (3) hours, the reason for such delay shall be documented by the person receiving the complaint.  In the event that such a complainant refuses to travel to a supervisor or to wait for one, the member/employee involved shall make all reasonable attempts to obtain identification, including address and phone number, as well as a description of the allegedly wrongful conduct and offending personnel, from the complainant and any witnesses.  This information, as well as a description of the complaint, shall immediately, or as soon as circumstances permit, be documented on a Complaint Form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander, and shall be treated as a complaint.  The supervisor or appropriate Area Commander notified of the complaint shall ensure the Communications Division is notified and forward any pertinent documents to the IAD.*

2.  *An on-duty supervisor shall respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest.  The supervisor shall ensure the Communications Division is notified and forward any pertinent documents to the IAD.  All other misconduct complaints by a jail inmate shall be handled in the same manner as other civilian complaints.*

3.  *In each complaint investigation, OPD shall consider all relevant evidence, including circumstantial, direct and physical evidence, and make credibility determinations, if feasible.  OPD shall make efforts to resolve, by reference to physical evidence, and/or use of follow-up interviews and other objective indicators, inconsistent statements among witnesses.*

4.  *OPD shall develop provisions for the permanent retention of all notes, generated and/or received by OPD personnel in the case file.*

5.  *OPD shall resolve each allegation in a complaint investigation using the "preponderance of the evidence" standard.  Each allegation shall be resolved by making one of the following dispositions:  Unfounded, Sustained, Exonerated, Not Sustained, or Administrative Closure.  The Department shall use the following criteria for determining the appropriate disposition:*

Case 3:00-cv-04599-WHO   Document 1557   Filed 12/22/22   Page 5 of 32

Second NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
December 22, 2022
Page 5 of 32

a.    *Unfounded:  The investigation disclosed sufficient evidence to determine that the alleged conduct did not occur.  This finding shall also apply when individuals named in the complaint were not involved in the alleged act.*

b.    *Sustained:  The investigation disclosed sufficient evidence to determine that the alleged conduct did occur and was in violation of law and/or Oakland Police Department rules, regulations, or policies.*

c.    *Exonerated:  The investigation disclosed sufficient evidence to determine that the alleged conduct did occur, but was in accord with law and with all Oakland Police Department rules, regulations, or policies.*

d.    *Not Sustained:  The investigation did not disclose sufficient evidence to determine whether or not the alleged conduct occurred.*

e.    *Administrative Closure:  The investigation indicates a service complaint, not involving an MOR violation, was resolved without conducting an internal investigation; OR*

f.    *To conclude an internal investigation when it has been determined that the investigation cannot proceed to a normal investigative conclusion due to circumstances to include but not limited to the following:*

1)    *Complainant wishes to withdraw the complaint and the IAD Commander has determined there is no further reason to continue the investigation and to ensure Departmental policy and procedure has been followed;*

2)    *Complaint lacks specificity and complainant refuses or is unable to provide further clarification necessary to investigate the complaint;*

3)    *Subject not employed by OPD at the time of the incident; or*

4)    *If the subject is no longer employed by OPD, the IAD Commander shall determine whether an internal investigation shall be conducted.*

5)    *Complainant fails to articulate an act or failure to act, that, if true, would be an MOR violation; or*

6)    *Complaints limited to California Vehicle Code citations and resulting tows, where there is no allegation of misconduct, shall be referred to the appropriate competent authorities (i.e., Traffic Court and Tow Hearing Officer).*

g.    *Administrative Closures shall be approved by the IAD Commander and entered in the IAD Complaint Database.*

6.    *The disposition category of "Filed" is hereby redefined and shall be included under Administrative Dispositions as follows:*

Case 3:00-cv-04599-WHO   Document 1557   Filed 12/22/22   Page 6 of 32

Second NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
December 22, 2022
Page 6 of 32

       a.     *An investigation that cannot be presently completed.  A filed investigation is not a final disposition, but an indication that a case is pending further developments that will allow completion of the investigation.*

       b.     *The IAD Commander shall review all filed cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed and may direct the closure or continuation of the investigation.*

    7.    *Any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken.  However, investigators, with the approval of an IAD Commander, are not required to interview and/or take a recorded statement from a member or employee who is the subject of a complaint or was on the scene of the incident when additional information, beyond that already provided by the existing set of facts and/or documentation, is not necessary to reach appropriate findings and conclusions.*

(Negotiated Settlement Agreement III. E.)

**Relevant Policy:**

There are six Departmental policies that incorporate the requirements of Task 5:  Department General Order M-03, *Complaints Against Department Personnel and Procedures* (revised most recently on December 22, 2017); Communications Division Policy & Procedures C-02, *Receiving and Logging Complaints Against Personnel and Use of Force Incidents* (revised most recently on December 7, 2009); Training Bulletin V-T.1, *Internal Investigation Procedure Manual* (revised most recently on August 23, 2018); Special Order 8270, *Booking of Prisoners at the Glenn E. Dyer Detention Facility* (published June 24, 2005); Special Order 8565, *Complaints Against Department Personnel* (published May 11, 2007); and IAD Policy & Procedures Manual 21-01, *IAD General Operating Procedures* (published August 17, 2021).  In addition, NSA stipulations issued on December 12, 2005 and March 13, 2007 incorporate the requirements of this Task.

**Commentary:**

Task 5 consists of several subtasks, briefly described below.  Based on OPD's compliance history with many of the subtasks, not all are being actively monitored at this time.  As we have continued to advise, quality and timely investigations are essential to fulfilling the Department's obligation to complainants and officers alike.

**Task 5.1** requires that when a citizen wishes to file a complaint, the citizen is brought to a supervisor or IAD, or a supervisor is summoned to the scene.  **Task 5.2** requires that if there is a delay of greater than three hours in supervisory response, the reason for the delay must be documented.  **Task 5.3** requires that where a complainant refuses to travel to a supervisor, or

Case 3:00-cv-04599-WHO   Document 1557   Filed 12/22/22   Page 7 of 32

Second NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
December 22, 2022
Page 7 of 32

wait for one, personnel make all reasonable attempts to obtain specific information to assist in investigating the complaint. **Task 5.4** requires that specific information be documented on a complaint form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander. **Task 5.5** requires that the supervisor or Area Commander notify Communications and forward any pertinent documents to IAD.

To assess compliance with Tasks 5.1 through 5.5, we reviewed the Daily Incident Logs (DILs) prepared by the Communications Division and forwarded to IAD each business day. The DIL form has been modified several times during our tenure to elicit "forced responses" that gather all of the information required to evaluate compliance with these Tasks. These modifications have significantly enhanced OPD's ability to document compliance by properly filling out and distributing the logs, and compliance rates with these subtasks have been near 100% for several years. Consequently, we no longer actively assess OPD's compliance with these subtasks, but we continue to receive both the DILs and Daily Complaint Referral Logs (used to document when Information Business Cards [IBCs] are provided to citizens in lieu of a complaint forms). We spot-check these forms regularly to verify that the quality of their completion has not diminished. OPD remains in compliance with Tasks 5.1 through and including Task 5.5.

**Task 5.6** requires that an on-duty supervisor respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest of the inmate. We have not actively monitored this subtask since December 2014, though we have reviewed cases applicable to this requirement in several reports since that time.

**Task 5.12** requires that the Watch Commander ensure that any complaints that are applicable to Task 5.6 are delivered to and logged with IAD. Under current policy, the Communications Division must record on the DILs complaints that are received and/or handled by on-duty supervisors, and the DILs are forwarded daily to IAD.

OPD remains in compliance with Tasks 5.6 and 5.12.

**Task 5.15** through **Task 5.19**, and **Task 5.21**, collectively address the quality of completed IAD investigations, and therefore remain the subject of our focused Task assessments. To assess compliance with these Tasks, we reviewed a sample of 12 IAD cases that were closed between July 1-September 30, 2022. In accordance with the Order issued May 12, 2022 establishing the sustainability period, we reviewed these cases with a member of OPD's Office of Internal Accountability (OIA) serving as the Department's NSA sustainability liaison.

Our sample of cases consisted of Division-level investigations (DLIs).[1] It also included cases that were resolved via formal investigation and investigations that were resolved via summary finding. (Summary findings are investigations in which the Department believes a proper conclusion can be determined based on a review of existing documentation with limited or no additional interviews and follow-up.) We also reviewed one case that was administratively closed with no formal findings.

---

[1] The cases we review are randomly selected, and there were not any cases completed by IAD in our sample for this review period.

Together, **Tasks 5.15** and **Task 5.16** require that OPD: gathers all relevant evidence; conducts follow-up interviews where warranted; adequately considers the evidence gathered; makes credibility assessments where feasible; and resolves inconsistent statements.

In all of the cases we reviewed, we believe that OPD gathered all relevant evidence available. As we have often found, in many of the cases video and/or audio recordings proved to be a significant factor in allowing OPD to reach an appropriate conclusion.

Investigators conducted follow-up interviews to seek clarification or resolve inconsistencies in one of the 12 cases we reviewed.  In this case, the subject officer was interviewed twice.  We do not believe follow-up interviews were warranted in the other cases we reviewed.

OPD made credibility assessments for all involved parties in five of the 12 cases.  In two cases, the complainants were deemed "not credible."  In one case, the complainant's statements were inconsistent with available body-worn camera (BWC) footage; and in the other case, the complainant's statements were affected by his mental health status.  Officers responded for a welfare check and subsequently placed the complainant on a mental health hold.  We agreed with all of the credibility assessments we reviewed, although we found the credibility assessment of a subject officer in one case to be problematic.  In this case, the assessment appeared boilerplate and did not coincide with the facts of the case.  The investigator noted that "[the subject officer's] statements were based on his recollection of the incident and consistent with BWC." The officer's statements were actually *inconsistent* with BWC video – in fact, so much so that he was called in for a second interview to reconcile the discrepancies.

Six cases were approved for summary finding; and per policy, investigators are not required to assess the credibility of the involved officers and civilian employees in these instances.  Another case was administratively closed, negating the need for credibility assessments.

In nine of the 12 cases we reviewed, OPD resolved inconsistent statements.  In eight of these cases, BWC recordings were available and assisted in the determination.  In the other case, a failure to activate a BWC was discovered during an audit.  Two cases resulted in at least one finding of not sustained.  Not sustained is an acceptable finding; and by definition, it implies that inconsistencies were not resolved despite investigative efforts.  One case was administratively closed, negating the need to assess and resolve inconsistencies.

**Task 5.17** requires that OPD permanently retain all notes generated and/or received by OPD personnel in the case file.  OPD personnel document the presence of investigative notes within a particular file by completing an Investigative Notes Declaration Form.  OPD has a sustained history of 100% compliance with this subtask.  During this reporting period, the form was again included in all of the cases we reviewed.

**Task 5.18** requires that OPD resolve each allegation in a complaint investigation using the preponderance of the evidence standard.  **Task 5.19** requires that each allegation of a complaint is identified and resolved with one of the following dispositions: unfounded; sustained; exonerated; not sustained; or administrative closure.  Our sample of 12 cases contained 55 allegations that received dispositions as follows: 17 exonerated; 22 unfounded; seven not sustained; seven sustained; and two administratively closed.

We did not disagree with the findings in any of the cases we reviewed.

**Task 5.20** requires that the IAD Commander review all "filed" cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed.  A filed case is defined as an investigation that cannot be presently completed and is pending further developments that will allow completion of the investigation; filed is not a final disposition.  Traditionally, as part of our review of this Task, we also reviewed cases that are tolling.  OPD defines a tolled case as an administrative investigation that has been held in abeyance in accordance with one of the provisions of Government Code Section 3304.  While we are no longer actively assessing this subtask, we note that filed and tolling cases are reviewed with the Chief or his designee during the weekly IAD meetings and are listed by case number on the printed meeting agendas.  We receive and review these agendas regularly, and a Monitoring Team member regularly attends these meetings.  Additionally, we regularly receive a weekly report listing all tolled cases and all cases approaching their 3304 dates.  When we have questions regarding any of the cases in the report, the IAD Commander answers them promptly.

**Task 5.21** requires that any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken.  However, with the approval of the IAD Commander or his designee, investigators are not required to interview and/or take a recorded statement in all cases.  For example, interviews are not needed from a member or employee who is the subject of a complaint, or who was on the scene of the incident when additional information – beyond that already provided by the existing set of facts and/or documentation – is not necessary to reach appropriate findings and conclusions.  Six of the 12 cases we reviewed were resolved via summary finding, and each case was appropriately approved for such closure.

As we noted in our previous quarterly status report, certain internal matters were referred to outside counsel for investigation.  Conclusions to date are troubling, and call into question the integrity of the internal investigatory process.  Accordingly, Task 5 is deemed not in compliance.

| Task 5 compliance status | Not in compliance |
| --- | --- |

# Task 20:  Span of Control

## Requirements:

*On or before August 14, 2003, OPD shall develop and implement a policy to ensure appropriate supervision of its Area Command Field Teams.  The policy shall provide that:*

1. *Under normal conditions, OPD shall assign one primary sergeant to each Area Command Field Team, and, in general, (with certain exceptions) that supervisor's span of control shall not exceed eight (8) members.*

2. *During day-to-day operations, in the absence of the primary supervisor (e.g., due to sickness, vacation, compensatory time off, schools, and other leaves), the appropriate Area Commander shall determine, based on Department policy and operational needs, whether or not to backfill for the absence of the sergeant on leave.*

3. *If a special operation, (e.g., Beat Feet, Special Traffic Offenders Program (STOP), etc.) requires more than eight (8) members, the appropriate Area Commander shall determine the reasonable span of control for the supervisor.*

4. *If long-term backfill requires the loan or transfer of a supervisor from another unit, the Chief of Police and/or the Deputy Chief of Police shall make that decision.*

(Negotiated Settlement Agreement IV. C.)

## Relevant Policy:

Three Departmental policies incorporate the requirements of Task 20: Departmental General Order A-19, *Supervisory Span of Control,* issued on July 26, 2006; Departmental General Order D-13, *Assignment to Acting Higher Rank or Classification,* issued on June 17, 1999; and Departmental General Order D-13.1, *Assignment to Acting Sergeant of Police,* issued on May 14, 2014.  (The publication of DGO D-13.1 cancelled Special Order 8435, which previously governed the selection process of acting sergeants.)

## Commentary:

To assess these requirements for this report, we reviewed spreadsheets prepared by the Department for July, August, and September 2022 that, by date, note which type of sergeant supervised each applicable squad – a primary sergeant, relief sergeant, acting sergeant, other sergeant (one working overtime), or none.  (The Department refers to unsupervised squads as "open.")  We calculated per squad the compliance percentages for this subtask during this time period.  Each of the 44 applicable squads were in compliance – that is, all applicable squads during this time period were supervised by either a primary, relief, or other/overtime sergeant for at least 85% of their working shifts.  We also found that none of the applicable squads exceeded the required 1:8 supervisor to officer ratio at least 90% of their working shifts.

Case 3:00-cv-04599-WHO   Document 1557   Filed 12/22/22   Page 11 of 32

Second NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
December 22, 2022
Page 11 of 32

OPD continues to be in compliance with these requirements.  The Department has institutionalized the practices of tracking how each squad is supervised each day; planning, when possible, for expected absences; and considering how to fill in for personnel who are absent unexpectedly.

| Task 20 compliance status | In compliance |
| --- | --- |

## Overview of Our Assessments of Tasks 24 and 25

OPD had been in compliance with Tasks 24 and 25 since 2015, and we did not actively review these Tasks.  In November 2018, after we raised concerns regarding the identification, potential underreporting, and investigation of uses of force, the Court reactivated Tasks 24 and 25.

Since we resumed use of force reviews following the Court's reactivation of these Tasks, we have reviewed hundreds of investigations and provided detailed feedback on the force investigations to OPD during each of our site visits.  In cases where we have had questions or concerns, OPD personnel have continued to be responsive and have provided follow-up where necessary.  In some cases, OPD has provided additional information or documentation that supports its actions, and we have concurred with the Department's assessments.  In others, we have identified concerns that had not been identified or addressed by supervisors who conducted the UOF investigation, or the command personnel who reviewed the investigation.  In these cases, OPD executive staff have directed additional review; directed training; entered a Supervisory Note File (SNF); or initiated an Internal Affairs Division (IAD) investigation.  We have also tracked OPD's efforts to correct identified deficiencies, which have included: the issuance of email directives from executive staff, training bulletins, and newsletters; audits; line-up training; and revisions to UOF-related policies.

In our August 2021 report, we found OPD in compliance with Task 24 for the first time since the Court reactivated these Tasks in 2018; and in April 2022, we found OPD in compliance with Task 25.  We also found OPD in compliance with Tasks 24 and 25 in our first sustainability period status report.

To assess compliance for this report, we reviewed 29 UOF reports that occurred between June 1 -August 31, 2022.  We reviewed all Level 3 UOF reports (eight) and a sample of Level 4 UOF reports (21).  In accordance with the Order issued May 12, 2022, establishing the sustainability period, we reviewed these UOF reports with a member of OPD's Office of Internal Accountability (OIA) serving as the Department's NSA sustainability liaison.  Between October 25-November 11, 2022, we also reviewed three Level 2 uses of force for which a Force Review Board (FRB) was held, and one Level 1 use of force for which an Executive Force Review Board (EFRB) was held.  The EFRB was scheduled for additional dates in December due to extensive follow-up that was needed.  Where concerns with field reporting existed, the concerns were appropriately addressed by the Boards.  We discuss only Level 3 and 4 uses of force in this assessment.

This report covers Level 3 and 4 UOF reports completed by OPD between June 1-August 31, 2022.  All 29 of the cases we reviewed for this time period occurred after the publication of Special Order 9196, which clarified the use of force policy; after Special Order 9202, issued on February 27, 2020, which temporarily modified the requirements for reporting Type 32 uses of force; and after Special Order 9208, issued on April 27, 2022, which defined the finalized reporting requirements for Level 4, type 32 uses of force.

In the 29 Level 3 and 4 uses of force we reviewed, 76 officers used force on 29 different persons. There were numerous cases where multiple officers used force on a single person, but no cases reviewed for this report where force was used on multiple subjects at the same incident.  We noted that there were 114 uses of force on the 29 persons.  Level 4, Type 32 UOFs accounted for 84 of the total uses of force; and in 15 of the 29 cases we reviewed, only Type 32 use of force was used.  The increase in total uses of force was not unexpected, given the new reporting requirements for type 32 UOF.  We noted, however, some inconsistency in the reporting of the Type 32 use of force by officers and supervisors.  Some multiple Type 32s, all occurring at virtually the same time while taking a combative subject into custody, were reported separately. In others, similar circumstances were documented as a single Type 32 UOF.  During our November 2022 site visit meetings, we discussed this inconsistency with OPD and agreed on an interpretation of reporting for this type of force.  OPD committed to ensuring that supervisors are made aware of the reporting requirements and will deliver the information using both a digital presentation and line-up training.  District Captains also continue to audit a sample of Type 32 UOF each month.

The total breakdown for the force used on the 29 persons is as follows: African Americans, 55%; Latinos, 17%; whites, 14%; and Asians or other, 14%.  The percentage of force incidents involving African Americans decreased by 8%; force incidents involving Latinos increased by 7%, force incidents involving whites increased by 9%; and force incidents involving Asians or persons categorized as "other" increased by 7%, from our last review, documented in our last quarterly status report.

Of the 29 UOF reports we reviewed for the three-month period between June 1-August 31, 2022, we noted only one late BWC activation that had not been identified and addressed by OPD supervisors.  We continued to note some instances of officers failing to identify themselves as police officers, or using unprofessional language or profanity.  We also noted one incident where a supervisor should have taken a complaint, but failed to do so and one incident where a Level 4 use of force was not properly reported.  Of the concerns we brought forward at our November 2022 site visit, the OPD UOF Command review group had already identified and addressed a number of them and taken appropriate action.

We reviewed 8 Level 3 uses of force for this report.  Six involved the use of a Taser deployment, and two involved a type 16 takedown.  In one of the Taser deployments, the Taser deployment was the only use of force.  In the five others, one or more Level 4 uses of force was used in addition to the Taser deployment.  Seven of the eight Level 3 use of force reports were not completed within the required timeframe; all had approved extensions.  We identified concerns with only one Level 3 use of force, which we discuss in detail in Task 25.

In our review of UOF reports for June-August 2022, we identified few areas of concern. In general, officers are appropriately using and reporting use of force, and supervisors are generally identifying and addressing any concerns that exist.

## Task 24: Use of Force Reporting Policy

**<u>Requirements:</u>**

*The policy shall require that:*

1. *Members/employees notify their supervisor as soon as practicable following any investigated use of force or allegation of excessive use of force.*

2. *In every investigated use of force incident, every member/employee using force, and every member/employee on the scene of the incident at the time the force was used, shall report all uses of force on the appropriate form, unless otherwise directed by the investigating supervisor.*

3. *OPD personnel document, on the appropriate form, any use of force and/or the drawing and intentional pointing of a firearm at another person.*

4. *A supervisor respond to the scene upon notification of an investigated use of force or an allegation of excessive use of force, unless community unrest or other conditions makes this impracticable.*

5. *OPD notify:*

   a. *The Alameda County District Attorney's Office immediately or as soon as circumstances permit, following a use of lethal force resulting in death or injury likely to result in death.*

   b. *The City Attorney's Office as soon as circumstances permit following the use of lethal force resulting in death or serious injury. At the discretion of the City Attorney's Office, a Deputy City Attorney shall respond to the scene. The Deputy City Attorney shall serve only in an advisory capacity and shall communicate only with the incident commander or his/her designee.*

   c. *Departmental investigators regarding officer-involved shootings, in accordance with the provisions of Section V, paragraph H, of this Agreement.*

6. *OPD enter data regarding use of force into OPD's Personnel Assessment System (PAS).*

(Negotiated Settlement Agreement V. A.)

Case 3:00-cv-04599-WHO   Document 1557   Filed 12/22/22   Page 14 of 32

Second NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
December 22, 2022
Page 14 of 32

**Relevant Policy:**

OPD most recently revised Departmental General Order K-4, *Reporting and Investigating the Use of Force,* on October 16, 2014.  The Department issued Special Order 9208, *Level 4 Type 32 Reporting and Review,* on June 4, 2022.

**Commentary:**

To assess compliance with Task 24, we reviewed 37 Level 3 and 4 use of force (UOF) reports that were completed by OPD from March 1-May 31, 2022.

**Task 24.1** requires that members/employees notify their supervisor as soon as practicable following any reportable use of force or allegation of excessive use of force.  In our reviews, we did not identify any instances where a notification was not properly made or was not properly documented.

**Task 24.2** requires that in every reportable use of force incident, every member/employee on the scene of the incident at the time the force was used, reports all uses of force on the appropriate form, unless otherwise directed by the investigating supervisor.  **Task 24.3** requires that OPD personnel document, on the appropriate form, every use of force and/or the drawing and intentional pointing of a firearm at another person.

In the 29 Level 3 and 4 UOF incidents we reviewed; officers used force on 29 different persons. In four of the reports, Level 4, Type 22, pointing a weapon, was the only force used.  In two others, Type 22 was used in addition to another use of force.  We determined that officers' pointing of their firearms was appropriate in all instances we assessed.  We did identify one instance where an officer failed to properly report two Level 4, Type 25 uses of force.  The OPD UOF Command review group had also identified this failure to report.  No action was taken as the officer is no longer with OPD.

**Task 24.4** requires that a supervisor respond to the scene upon notification of a Level 1, 2, or 3 use of force or an allegation of excessive use of force, unless community unrest or other conditions makes such a response impracticable.  In all eight Level 3 uses of force we reviewed for this subtask; supervisors responded to the scene as required.  Though not required, supervisors also responded to 14 of the 21 Level 4 uses of force or were on scene at the time of the use of force.

**Task 24.5** specifically addresses requirements for the response and handling of Level 1 uses of force.  We assess Level 1 uses of force in our regular reviews of Task 30 (Executive Force Review Boards).

**Task 24.6** requires that OPD enter all use of force data into Performance Reporting Information Metrics Environment (PRIME), which is now called Vision.  In all 29 of the Level 3 and 4 UOF cases we reviewed; the data was entered as required.

This is our second assessment of UOF reporting for the sustainability period.  OPD has continued to meet the overall requirements of this Task.

| Task 24 compliance status | In compliance |
|---|---|

# Task 25: Use of Force Investigations and Report Responsibility

**<u>Requirements:</u>**

*An on-scene supervisor is responsible for completing an investigated use of force report in accordance with the provisions of Departmental General Order K-4, "Reporting and Investigating the Use of Force."*

1. *OPD shall develop and implement a policy for conducting and documenting use of force investigations that include, at a minimum:*

   a. *Documentation of the incident in either an Offense or Supplemental Report from the member(s)/employee(s) using force; and/or, when necessary, a statement taken from the member(s)/employee(s) using force;*

   b. *Separating and separately interviewing all officers who were at the scene at the time of the incident;*

   c. *A Supplemental Report from other members/employees on the scene or a statement taken, if deemed necessary by the investigating supervisor;*

   d. *Identification and interviews of non-Departmental witnesses;*

   e. *Consideration of discrepancies in information obtained from members, employees and witnesses, and statements in the reports filed;*

   f. *Whether arrest reports or use of force reports contain "boilerplate" or "pat language" (e.g., "fighting stance", "minimal force necessary to control the situation");*

   g. *Documentation of physical evidence and/or photographs and a summary and analysis of all relevant evidence gathered during the investigation; and*

   h. *Consideration of training/tactical issues involving the availability and practicality of other force options.*

   i. *Supervisor's justification as to why any element of the policy was not documented; and*

2. *All supervisors shall be trained in conducting use of force investigations and such training shall be part of a supervisory training course.*

3. *Use of force investigations shall include a recommendation whether the use of force was objectively reasonable and within Department policy and training. The recommendation shall be based on the totality of the circumstances and shall consider, but is not limited to, the following factors:*

   a. *Whether the force used was pursuant to a legitimate law-enforcement objective;*

Case 3:00-cv-04599-WHO   Document 1557   Filed 12/22/22   Page 16 of 32

Second NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
December 22, 2022
Page 16 of 32

   b. *Whether the type and amount of force used was proportional to the resistance encountered and reasonably related to the objective the members/employees were attempting to achieve;*

   c. *Whether the member/employee used reasonable verbal means to attempt to resolve the situation without force, if time and circumstances permitted such attempts;*

   d. *Whether the force used was de-escalated or stopped reasonably when resistance decreased or stopped;*

  4. *Use of force reports shall be reviewed by the appropriate chain-of-review as defined by policy.*

*The type of force used, the identity of the involved members, and the report preparer shall be the determining criteria for utilizing the appropriate chain-of-review. Reviewers may include, when appropriate, the chain-of-command of the involved personnel, the appropriate Area Commander on duty at the time the incident occurred, other designated Bureau of Field Operations commanders, and as necessary, the chain-of-command of the involved personnel up to the Division Commander or Deputy Chief/Director, and the Internal Affairs Division.*

   *Reviewers for Level 1-3 use of force investigations shall:*

   a. *Make a recommendation as to whether the use of force was in or out of policy,*

   b. *Order additional investigation and investigative resources when necessary, and*

   c. *Comment on any training issue(s) when appropriate.*

  5. *Any recommendation that the use of force did not comply with Department policy shall result in the incident being referred to the Internal Affairs Division to conduct additional investigation/analysis, if necessary.*

  6. *Members/employees involved in a use of force incident resulting in serious injury or death and/or an officer-involved shooting, shall be separated from each other as soon as practicable at the incident scene, and kept apart until they have completed their reports and been interviewed.*

(Negotiated Settlement Agreement V. B.)


**<u>Relevant Policy:</u>**

OPD most recently revised Departmental General Order K-4, *Reporting and Investigating the Use of Force,* on October 16, 2014. The Department issued Special Order 9208, *Level 4 Type 32 Reporting and Review,* on June 4, 2022.

## Commentary:

As noted above in Task 24, we reviewed 37 Level 3 and 4 use of force (UOF) reports that were completed between March 1, 2022 -May 31, 2022.

**Task 25.1** requires that supervisors complete a use of force report and that certain criteria are met in the report.  Subtask 25.1.f. addresses the use of "boilerplate" or "pat" language in reports.  During our reviews for this report, we did not identify concerns with officers failing to document specific information and details justifying their use of force or using "boilerplate" or "pat" language in their reports.

**Task 25.2** requires that all supervisors are trained on how to conduct use of force investigations and such training is part of a supervisory training course.  OPD includes the requirement for this training in its Departmental policies.  During our March 2022 site visit, we confirmed with OPD that the Department continues to require and deliver this training in the Sergeants' Transition Course, where use of force is part of the curriculum.

In our prior reports, we identified concerns with the preparation and review of UOF reports by supervisors.  The use of force and the processes in which force is documented and reviewed have been at the core of the Court's oversight.  The Department has provided numerous directives on this topic.  In general, we now find that supervisors are identifying deficiencies in officer reporting and identifying and addressing MOR violations.  We also find that reviewers of the supervisors' reports are generally identifying and addressing concerns when appropriate.  OPD has also assigned a team of command officers to review some use of force reports as an ongoing quality control mechanism.  We have found that this additional oversight and review has identified concerns prior to our Team identifying them.

**Task 25.3** requires that use of force investigations include required recommendations.  Areas of recommendation include: whether the force used was pursuant to a legitimate law enforcement objective; whether the type and amount of force used was proportional to the resistance encountered and reasonably related to the objective the officers were attempting to achieve; whether the officers used reasonable verbal means to attempt to resolve the situation without force, if time and circumstances permitted such attempts; and whether the force used was de-escalated or stopped reasonably when resistance decreased or stopped.

In our assessment of Level 3 and 4 UOF reports for this report, we did not identify any instances where the use of force was not deescalated or stopped reasonably when resistance decreased, or any instances where we believe officers could have made additional efforts to explain to subjects being detained why the detention was occurring prior to using force.  We did note continued improvement in officers identifying themselves as police officers when appropriate and there was time to do so.

In January 2022, we identified one instance – a Level 3 Taser deployment on a subject fleeing from OPD officers – where we believed the force used may not have been appropriate.  After we brought this to OPD's attention, the Department initiated an internal affairs investigation.  In our review of UOF reports from the first sustainability period, we identified three Level 3-Taser deployments where we again identified concerns with the use of force.  As a result of our concerns, OPD initiated internal affairs investigations of two of these.  In the third, OPD provided us additional detailed information on the use of force; and after further review, we concurred with their findings of in compliance.

Of the three Taser deployments referred to IAD, two were found not in compliance upon investigation by IAD.  The third was found in compliance at the conclusion of the IAD investigation.  Both of the deployments found out of compliance resulted from subjects fleeing from officers who were not struck by the Taser probes.  After these reviews, OPD determined that they would no longer allow Taser deployments where the subject was not struck with the probe to be lowered to a Level 4 use of force.  This will ensure that they receive the same level of scrutiny as those where the probe does strike the subject.  OPD has also conducted additional training on the policy requirements for Taser deployments and investigations.  We agree with the actions of OPD and believe this will properly address the identified concerns.

For this report, we reviewed eight Level 3 uses of force.  We identified one involving a Taser deployment where we had concerns about the use of force.  In this instance, the OPD Command review group had already identified the same concerns and referred the case to IAD for investigation.

**Task 25.4** requires that use of force reports be reviewed by the appropriate chain of command and appropriate recommendations are made.  In all of the cases we reviewed, the reports were reviewed as required.  As noted in Task 25.3, we identified a concern with one Level 3 use of force that had already been identified by the OPD Command group reviewing uses of force.  The same group had also identified two additional UOF investigations that were problematic and had referred them to IAD prior to our bringing them to their attention.  OPD continues to make strides in ensuring that the chain of command is actively involved in the review of use of force and is addressing areas of concern without the need for us to bring the concerns to their attention.

**Task 25.5** requires that any determination that a use of force did not comply with Department policy result in the incident being referred to IAD to conduct additional investigation/analysis, if necessary.  As noted above, we identified one Level 3 UOF where we believed additional investigation was appropriate to determine if the use of force was appropriate and properly reported.  OPD had already identified this concern and referred the case to IAD.  We will review the IAD report once it is completed.

**Task 25.6** requires that members/employees involved in a use of force incident resulting in serious injury or death and/or officer-involved shooting, are separated from each other as soon as practicable at the incident scene, and kept apart until they have completed their reports and been interviewed.  This Task is not assessed here, as we review and consider it as part of the Force and Executive Force Review Boards that OPD holds to examine Level 1 and 2 uses of force.

Case 3:00-cv-04599-WHO   Document 1557   Filed 12/22/22   Page 19 of 32

Second NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
December 22, 2022
Page 19 of 32

This is our second assessment of UOF for the sustainability period.  OPD has continued to meet the overall requirements of this Task, and appears to be rendering additional oversight and scrutiny to use of force reporting.

| Task 25 compliance status | In compliance |
|---|---|

# Task 26:  Force Review Board (FRB)

**Requirements:**

*OPD shall develop and implement a policy concerning its FRB proceedings.  The policy shall:*

1. *Set out procedures, membership and a timetable for FRB review of use of force investigations involving Level 2 incidents, as defined in Department General Order K-4, REPORTING AND INVESTIGATING THE USE OF FORCE;*

2. *Require the FRB to review all use of force investigations;*

3. *Require the FRB to make a recommendation as to whether the use of force was in policy or out of policy;*

4. *Require the FRB to forward sustained policy violations to the Discipline Officer.*

5. *Require the FRB not to review any use of force allegation until the internal investigations has been completed;*

6. *Authorize the FRB to recommend to the Chief of Police additional use of force training or changes in policies or tactics, or additional standards, investigatory policies, or training for use of force investigations;*

7. *Require the FRB to conduct an annual review of use of force cases examined, so as to identify any patterns of use of force practices that may have policy or training implications, and thereafter, issue a report to the Chief of Police;*

8. *Require that the FRB membership include, at a minimum, one member from the Training Division, one member from the Field Training Officer program, and either the Bureau of Field Operations Deputy Chief or his/her designee;*

9. *Minimally, that one member of the FRB shall be replaced at least annually.*

(Negotiated Settlement Agreement V. C.)

**Relevant Policy:**

OPD most recently revised Departmental General Order K-4.1, *Force Review Boards,* on December 21, 2015.

Case 3:00-cv-04599-WHO   Document 1557   Filed 12/22/22   Page 20 of 32

Second NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
December 22, 2022
Page 20 of 32

**<u>Commentary:</u>**

OPD Force Review Boards (FRBs) are regularly convened to examine the investigations conducted relative to the deployment and application of Level 2 uses of force.[2]  OPD first achieved compliance with this Task during the nineteenth reporting period (April 1-June 30, 2014).  The Order establishing the sustainability period directs that this Task continue to be monitored, and so we continue to assess compliance with this Task, including our analyses of force reports; our review of Force Review Board reports; and observing Force Review Boards between site visits via online meeting software.

During this reporting period (July 1-September 30, 2022), OPD did not submit any completed FRB reports for our review.

We observed both of the FRBs convened by OPD since we last reported on this Task.  These Boards met on November 8 and 9, 2022.  We observed them all remotely via an online meeting platform.  As is our practice, we provided immediate feedback for Board members at the conclusion of each FRB we observed.

As noted in our previous reports concerning this Task, we continue to observe substantive discussion and deliberations among the Board members.  Members ask probing questions of the force investigators; and, where applicable, Department subject-matter experts (SMEs) and IAD investigators.  They also spend a great deal of time discussing issues ancillary to the uses of force, such as tactics, supervision, force alternatives, and training opportunities.  As is customary for all Boards, their feedback was conveyed in the form of training points to appropriate personnel.

Collectively, the FRBs found all the uses of force they reviewed to be in compliance.  We did not disagree with any of the Boards' findings.  In one case, the Board assessed the use of personal weapon strikes to the head of an individual (Level 2 use of force) who refused to leave a house at the request of the homeowner.  They also evaluated the take down of the individual, and force used to overcome his resistance, both Level 4 uses of force.  We noted that the sergeant who presented to the Board did an excellent job, particularly considering it was his first such presentation.

---

[2] According to OPD, Level 2 uses of force include: "1) Any strike to the head (except for an intentional strike with an impact weapon); 2) Carotid restraint is applied that does not result in the loss of consciousness; 3) Use of impact weapons, including specialty impact munitions or any other object, to strike a subject and contact is made, regardless of injury; 4) Any unintentional firearms discharge that does not result in injury; 5) A police canine bites the clothing or the skin of a subject, or otherwise injures a subject requiring emergency medical treatment (beyond first-aid) or hospital admittance; 6) Any use of force which results in injuries to the subject requiring emergency medical treatment (beyond first-aid) or hospital admittance; (NOTE: For the purposes of this order, an evaluation by a medical professional to assess a complaint of injury is not emergency treatment) 7) Any Level 3 use of force used on or applied to a restrained subject; 7.a) A restrained subject is a person who has been fully placed in a Department authorized restraint device such as both hands handcuffed, a WRAP or Rip Hobble; 7.b) A subject with only one handcuff on is not a restrained person."

In the other case, while officers were taking a subject fleeing from a stolen vehicle into custody, one officer applied a bent wrist control hold to the subject – a Level 4 use of force.  It was later learned at a hospital that the subject potentially sustained a fracture to his elbow, and the investigating sergeant elevated the force to Level 2, requiring FRB review.  His presentation was also thorough and well delivered.  The Board assessed this use of force, as well as lower-level uses of force associated with the arrest.

It is not a requirement, but both of the Board votes we observed during this reporting period were unanimous.  We recognize that in some circumstances, there will be legitimate differences of opinion where the determination is not obvious.  In these situations, we look for frank discussion and clear explanations of the differing positions.

In addition to ruling on the appropriateness of uses of force, Force Review Boards generally identify several follow-up items based on their review of the associated materials and the presentations made to them.  These can include items such as counseling and training for individual officers, publication of Department-wide training materials, and modifications to policy.  OPD tracks these deliverables in a spreadsheet, broken down into three categories: Individual Issues; Department-Wide Issues; and Quarterly Training Points.

The last accounting of deliverables provided to us, which lists follow-up items from FRBs convened prior to October 11, 2022, indicated that there were no open deliverables.  All follow-up items from previously convened Boards were closed.  This is the first time since we have been tracking this information that OPD has accomplished this.

| Task 26 compliance status | In compliance |
| --- | --- |

# Task 30:  Executive Force Review Board (EFRB)

**Requirements:**

1. *An EFRB shall be convened to review the factual circumstances surrounding any Level 1 force, in-custody death, or vehicle pursuit-related death incidents.  A firearm discharge at an animal shall be reviewed by the EFRB only at the direction of the Chief of Police.*

2. *The Board shall have access to recordings and/or transcripts of interviews of all personnel on the scene, including witnesses, and shall be empowered to call any OPD personnel to provide testimony at the hearing.*

3. *OPD shall continue the policies and practices for the conduct of EFRB, in accordance with the provisions of DGO K-4.1, FORCE REVIEW BOARDS.*

(Negotiated Settlement Agreement V. G.)

**Relevant Policy:**

OPD most recently revised Departmental General Order K-4.1, *Force Review Boards,* on December 21, 2015.

**Commentary:**

Executive Force Review Boards (EFRBs), consisting of three top command-level staff, conduct thorough, detailed reviews of all Level 1 uses of force, in-custody deaths, and vehicle pursuit-related deaths and serious injuries. OPD achieved compliance with this Task during the nineteenth reporting period (April 1-June 30, 2014).

Since we last reported on this Task, OPD convened one EFRB, but adjourned the Board after three days of presentation to allow both the Criminal Investigation Division (CID) and IAD to address several follow-up requests from the Board. As of this writing, the Board has not reconvened. We will comment on this EFRB in our next report.

We did not review any completed EFRB Reports during the reporting period.

OPD remains in compliance with this Task.

| Task 30 compliance status | In compliance |
| --- | --- |

## Task 31: Officer-Involved Shooting Investigations Review Protocol

**Requirements:**

*OPD shall develop a policy to ensure that, in every officer-involved shooting in which a person is struck, Homicide and Internal Affairs investigators respond to the scene. The Homicide Section's investigation shall be conducted in partnership with, and when deemed appropriate by, the Alameda County District Attorney's Office. Interviews of the subject officer(s) shall be conducted jointly with the appropriate staff from Homicide and the Office of the District Attorney. The District Attorney and City Attorney shall be notified in accordance with the provisions of Section V, paragraph A (5), of this Agreement. Homicide shall duplicate and provide all completed reports and documents to the District Attorney's Office, the Office of the City Attorney, and the Internal Affairs Division. IAD shall provide information and/or documents as required by law.*

(Negotiated Settlement Agreement V. H.)

**Relevant Policy:**

OPD most recently published Departmental General Order K-4, *Reporting and Investigating the Use of Force* on October 16, 2014. IAD Policy & Procedures and Homicide Policy & Procedures are also relevant to this Task.

**Commentary:**

Task 31 requires certain notifications and responses in the event of an officer-involved shooting. During this reporting period (October 4-December 16, 2022), on October 17, 2022, the Internal Affairs Division had a Level 1 incident callout related to a fatal accident during a pursuit.  OPD confirmed that the protocols required by this Task were followed in this instance.

OPD remains in compliance with this Task.

| Task 31 compliance status | In compliance |
|---|---|

# Task 34: Vehicle Stops, Field Investigation, and Detentions *and* Task 41:  Use of Personnel Assessment System (PAS) and Risk Management

**Requirements:**

**Task 34:**

1.  *OPD shall require members to complete a basic report on every vehicle stop, field investigation and every detention.  This report shall include, at a minimum:*

    a.  *Time, date and location;*

    b.  *Identification of the initiating member or employee commencing after the first year of data collection;*

    c.  *Reason for stop;*

    d.  *Apparent race or ethnicity, and gender of individual(s) stopped;*

    e.  *Outcome of stop (arrest, no arrest);*

    f.  *Whether a search was conducted, and outcome of search;*

    g.  *Offense categories (felony, misdemeanor or infraction).*

2.  *This data shall be entered into a database that can be summarized, searched, queried and reported by personnel authorized by OPD.*

3.  *The development of this policy shall not pre-empt any other pending or future policies and or policy development, including but not limited to "Promoting Cooperative Strategies to Prevent Racial Profiling."*

(Negotiated Settlement Agreement VI. B.)

## Task 41:

*Within 375 days from the effective date of this Agreement, OPD shall develop a policy for use of the system, including supervision and audit of the performance of specific members, employees, supervisors, managers, and OPD units, as well as OPD as a whole.*

*The policy shall include the following elements:*

1. *The Chief of Police shall designate a PAS Administration Unit.  The PAS Administration Unit shall be responsible for administering the PAS policy and, no less frequently than quarterly, shall notify, in writing, the appropriate Deputy Chief/Director and the responsible commander/manager of an identified member/employee who meets the PAS criteria.  PAS is to be electronically maintained by the City Information Technology Department.*

2. *The Department shall retain all PAS data for at least five (5) years.*

3. *The Monitor, Inspector General and Compliance Coordinator shall have full access to PAS to the extent necessary for the performance of their duties under this Agreement and consistent with Section XIII, paragraph K, and Section XIV of this Agreement.*

4. *PAS, the PAS data, and reports are confidential and not public information.*

5. *On a quarterly basis, commanders/managers shall review and analyze all relevant PAS information concerning personnel under their command, to detect any pattern or series of incidents which may indicate that a member/employee, supervisor, or group of members/employees under his/her supervision may be engaging in at-risk behavior.  The policy shall define specific criteria for determining when a member/employee or group of members/employees may be engaging in at-risk behavior.*

6. *Notwithstanding any other provisions of the PAS policy to be developed, the Department shall develop policy defining peer group comparison and methodology in consultation with Plaintiffs' Counsel and the IMT.  The policy shall include, at a minimum, a requirement that any member/employee who is identified using a peer group comparison methodology for complaints received during a 30-month period, or any member who is identified using a peer group comparison methodology for Penal Code §§69, 148 and 243(b)(c) arrests within a 30-month period, shall be identified as a subject for PAS intervention review.  For the purposes of these two criteria, a single incident shall be counted as "one" even if there are multiple complaints arising from the incident or combined with an arrest for Penal Code §§69, 148 or 243(b)(c).*

7. *When review and analysis of the PAS threshold report data indicate that a member/employee may be engaging in at-risk behavior, the member/employee's immediate supervisor shall conduct a more intensive review of the member/employee's performance and personnel history and prepare a PAS Activity Review and Report.  Members/employees recommended for intervention shall be required to attend a documented, non-disciplinary PAS intervention*

Case 3:00-cv-04599-WHO   Document 1557   Filed 12/22/22   Page 25 of 32

Second NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
December 22, 2022
Page 25 of 32

*meeting with their designated commander/manager and supervisor. The purpose of this meeting shall be to review the member/employee's performance and discuss the issues and recommended intervention strategies. The member/employee shall be dismissed from the meeting, and the designated commander/manager and the member/employee's immediate supervisor shall remain and discuss the situation and the member/employee's response. The primary responsibility for any intervention strategies shall be placed upon the supervisor. Intervention strategies may include additional training, reassignment, additional supervision, coaching or personal counseling. The performance of members/ employees subject to PAS review shall be monitored by their designated commander/manager for the specified period of time following the initial meeting, unless released early or extended (as outlined in Section VII, paragraph B (8)).*

8.      *Members/employees who meet the PAS threshold specified in Section VII, paragraph B (6) shall be subject to one of the following options: no action, supervisory monitoring, or PAS intervention. Each of these options shall be approved by the chain-of-command, up to the Deputy Chief/Director and/or the PAS Activity Review Panel.*

*Members/employees recommended for supervisory monitoring shall be monitored for a minimum of three (3) months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor. The first at the end of one (1) month and the second at the end of three (3) months.*

*Members/employees recommended for PAS intervention shall be monitored for a minimum of 12 months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor and designated commander/manager: The first at three (3) months and the second at one (1) year. Member/employees subject to PAS intervention for minor, easily correctable performance deficiencies may be dismissed from the jurisdiction of PAS upon the written approval of the member/employee's responsible Deputy Chief, following a recommendation in writing from the member/employee's immediate supervisor. This may occur at the three (3)-month follow-up meeting or at any time thereafter, as justified by reviews of the member/employee's performance. When a member/employee is not discharged from PAS jurisdiction at the one (1)-year follow-up meeting, PAS jurisdiction shall be extended, in writing, for a specific period in three (3)-month increments at the discretion of the member/employee's responsible Deputy Chief. When PAS jurisdiction is extended beyond the minimum one (1)-year review period, additional review meetings involving the member/employee, the member/ employee's designated commander/manager and immediate supervisor, shall take place no less frequently than every three (3) months.*

9. *On a quarterly basis, Division/appropriate Area Commanders and managers shall review and analyze relevant data in PAS about subordinate commanders and/or managers and supervisors regarding their ability to adhere to policy and address at-risk behavior. All Division/appropriate Area Commanders and managers shall conduct quarterly meetings with their supervisory staff for the purpose of assessing and sharing information about the state of the unit and identifying potential or actual performance problems within the unit. These meetings shall be scheduled to follow-up on supervisors' assessments of their subordinates' for PAS intervention. These meetings shall consider all relevant PAS data, potential patterns of at-risk behavior, and recommended intervention strategies since the last meeting. Also considered shall be patterns involving use of force, sick leave, line-of-duty injuries, narcotics-related possessory offenses, and vehicle collisions that are out of the norm among either personnel in the unit or among the unit's subunits. Division/appropriate Area Commanders and managers shall ensure that minutes of the meetings are taken and retained for a period of five (5) years. Commanders/managers shall take appropriate action on identified patterns of at-risk behavior and/or misconduct.*

10. *Division/appropriate Area Commanders and managers shall meet at least annually with his/her Deputy Chief/Director and the IAD Commander to discuss the state of their commands and any exceptional performance, potential or actual performance problems or other potential patterns of at-risk behavior within the unit. Division/appropriate Area Commanders and managers shall be responsible for developing and documenting plans to ensure the managerial and supervisory accountability of their units, and for addressing any real or potential problems that may be apparent.*

11. *PAS information shall be taken into account for a commendation or award recommendation; promotion, transfer, and special assignment, and in connection with annual performance appraisals. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

12. *Intervention strategies implemented as a result of a PAS Activity Review and Report shall be documented in a timely manner.*

13. *Relevant and appropriate PAS information shall be taken into account in connection with determinations of appropriate discipline for sustained misconduct allegations. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.*

14. *The member/employee's designated commander/manager shall schedule a PAS Activity Review meeting to be held no later than 20 days following notification to the Deputy Chief/Director that the member/employee has met a PAS threshold and when intervention is recommended.*

15. *The PAS policy to be developed shall include a provision that a member/employee making unsatisfactory progress during PAS intervention may be transferred and/or loaned to another supervisor, another assignment or another Division, at the discretion of the Bureau Chief/Director if the transfer is within his/her Bureau. Inter-Bureau transfers shall be approved by the Chief of Police. If a member/employee is transferred because of unsatisfactory progress, that transfer shall be to a position with little or no public contact when there is a nexus between the at-risk behavior and the "no public contact" restriction. Sustained complaints from incidents subsequent to a member/employee's referral to PAS shall continue to result in corrective measures; however, such corrective measures shall not necessarily result in a member/employee's exclusion from, or continued inclusion in, PAS. The member/employee's exclusion or continued inclusion in PAS shall be at the discretion of the Chief of Police or his/her designee and shall be documented.*

16. *In parallel with the PAS program described above, the Department may wish to continue the Early Intervention Review Panel.*

17. *On a semi-annual basis, beginning within 90 days from the effective date of this Agreement, the Chief of Police, the PAS Activity Review Panel, PAS Oversight Committee, and the IAD Commander shall meet with the Monitor to review the operation and progress of the PAS. At these meetings, OPD administrators shall summarize, for the Monitor, the number of members/employees who have been identified for review, pursuant to the PAS policy, and the number of members/employees who have been identified for PAS intervention. The Department administrators shall also provide data summarizing the various intervention strategies that have been utilized as a result of all PAS Activity Review and Reports. The major objectives of each of these semi-annual meetings shall be consideration of whether the PAS policy is adequate with regard to detecting patterns of misconduct or poor performance issues as expeditiously as possible and if PAS reviews are achieving their goals.*

18. *Nothing in this Agreement, and more specifically, no provision of PAS, shall be construed as waiving, abrogating or in any way modifying the Department's rights with regard to discipline of its members/employees. The Department may choose, at its discretion, to initiate the administrative discipline process, to initiate PAS review or to use both processes concurrently or consecutively.*

(Negotiated Settlement Agreement VII. B.)

**Relevant Policy:**

- **Task 34:** OPD published General Order M-19, *Prohibitions Regarding Racial Profiling and Other Bias-Based Policing* on November 4, 2004*;* Special Order 9042, *New Procedures Regarding Stop Data Collection* on June 11, 2010; Special Order 9101, *Revised Stop Data Collection Procedures* on February 27, 2013; and Report Writing Manual (RWM) Inserts R-2 (January 15, 2010), N-1 (April 15, 2007), and N-2 (April 15, 2007).

- **Task 41:** OPD revised and issued Departmental General Order D-17, *Personnel Assessment Program,* on November 20, 2013; and issued Department General Order R-01, *Risk Management*, on April 15, 2022.

**Commentary:**

As noted in our previous report, Task 40, which addresses Risk Management, and Task 34, which addresses stop data, are closely linked. For a lengthy time period, the Department has recognized that stop data – including the number of stops, particularly non-dispatched stops, the process during those stops, and the outcome of stops – represents potential risks consistent with the risk management interests of the Department. As a result, stop data has been fully integrated with the risk management process and includes reviews of dispatched and non-dispatched stops, actions taken including searches, and outcomes including citation or arrests or noting that no action resulted from the stop. The review of stop data is a central part of Risk Management Meetings at the Area level, Bureau of Field Operations analyses, and the all Department-wide meetings which include specialized unit including CeaseFire and the Violent Crime Operations Center (VCOC).

The risk management reviews include examination of uses of force, complaints, pursuits, collisions, officers on supervisory monitoring or intervention, and stop data. The Department's Police Program and Performance Audit Supervisor provides the data used in those reviews. That data includes monthly summary statistics for the Department and for each unit, and graphs and charts illustrating patterns in the risk data over time. The stop data are also submitted to the California Racial and Identity Profiling Advisory (RIPA) Board, which has produced five annual reports on the stop data from 18 law enforcement agencies, including the 15 largest agencies in the state, which includes OPD.

Since our first status report of the sustainability period, the Department has maintained its approach to collecting and analyzing risk-related data, including stop data, and has continued to use the data to the identify potential problems and take appropriate remedial action.

The risk management process continues under the direction of the designated Deputy Chief for the Bureau of Risk Management. The individual area and specialized unit meetings are led by the Captain responsible for each unit and incorporate discussion by sergeants and lieutenants from those units. The content of these meetings is generally detailed and extensive and focused on significant risk related issues and result is recommendations for appropriate action. The meetings also serve as preparation for the Department-wide meetings.

The Department Bureau of Field Operation meetings are run by the Department's Assistant Chief.  As Captains discuss their commands, it is clear that the Assistant Chief has reviewed the data ahead of time and identified issues for discussion.  When examined as a whole, the Risk Management Meetings are informed by the review of data, demanding of detailed assessments by command staff, and thorough by virtue of extensive preparation.  Finally, they result in expectation for action to address risk related issues.  One thing that the Department might find useful is to be able to systematically track the action taken based on the analysis of risk.  That could require documenting the meeting results, including expected responses to the analysis of risk-related data.  That would also include tracking the processes that have been described as "drilling down," as well as the processes addressing policy and practice that have been described as "drilling up."  Finally, OPD's risk management process reflects a commitment that sets it apart from other police departments.  What matters most, however, is the actions and outcomes that result from this process.  The effects and effectiveness of risk management at OPD will be best understood and of greatest value if those actions and outcomes are well documented.

The Department remains in compliance with the requirements of Tasks 34 and 40.

| | |
|---|---|
| **Task 34 compliance status** | In compliance |
| **Task 41 compliance status** | In compliance |

# Task 45:  Consistency of Discipline Policy

**Requirements:**

*On or before October 6, 2003, OPD shall revise and update its disciplinary policy to ensure that discipline is imposed in a fair and consistent manner.*

> *1.   The policy shall describe the circumstances in which disciplinary action is appropriate and those in which Division-level corrective action is appropriate.*
>
> *2.   The policy shall establish a centralized system for documenting and tracking all forms of discipline and corrective action, whether imposed centrally or at the Division level.*
>
> *3.   All internal investigations which result in a sustained finding shall be submitted to the Discipline Officer for a disciplinary recommendation.  The Discipline Officer shall convene a meeting with the Deputy Chief or designee in the affected chain-of-command for a confidential discussion of the misconduct, including the mitigating and aggravating factors and the member/employee's overall performance.*
>
> *4.   The COP may direct the Discipline Officer to prepare a Discipline Recommendation without convening a Discipline Conference.*

(Negotiated Settlement Agreement X. B.)

Case 3:00-cv-04599-WHO   Document 1557   Filed 12/22/22   Page 30 of 32

Second NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
December 22, 2022
Page 30 of 32

**Relevant Policy:**

Five Departmental policies incorporate the requirements of Task 45:  Departmental General Order M-03, *Complaints Against Department Personnel and Procedures* (revised most recently on December 22, 2017); Training Bulletin V-T.1 and V-T.2, *Internal Investigation Procedure Manual* (revised most recently on August 23, 2018); IAD Policy & Procedures Manual 21-01, *IAD General Operating Procedures* (published August 17, 2021); and Training Bulletin V-T, *Departmental Discipline Policy* (revised most recently on December 11, 2017).

**Commentary:**

Task 45, which addresses consistency of discipline, is the lone Task that was not in full compliance with the requirements of the NSA at the start of the sustainability period.

Our previous Task 45 compliance review during the sustainability period involved a detailed discussion of concerns regarding the Department's analysis and reporting of results regarding potential bias in the disciplinary process.  The result was a finding that the Department had not yet achieved compliance with Task 45 requirements of the Negotiated Settlement Agreement.  Since that time, the Department has conducted additional analyses and presented results of that analysis before the Court at the most recent Case Management Conference.

The text of Task 45 establishes the requirement that the disciplinary policy ensures that "discipline is imposed in a fair and consistent manner."  The principal question being examined by the department is whether there are unexplained differences in discipline processes and outcomes across officers of different demographic characteristics including the race of involved officers.  The Department has adopted using a statistical outcome measure as an important compliance criterion in its assessment of whether the "fair and consistent manner" requirements are met.

The Department's September 2022 "Discipline Equity and Internal Procedural Justice Report" examined data covering January-June 2022.  The report examined information on sustained Internal Affairs Division (IAD) cases and sustained Division-Level Investigations (DLIs).  The Department also extended its analysis of 2019 data in which it found that Black officers were more likely that white officers to be sustained for misconduct in DLIs.  Although the analyses presented in the 2022 reports included several components, including a survey of officers and examination of officer attrition, as was true in the 2019 report, the most significant review involves comparison of disciplinary procedures and outcomes for officers across demographic categories.  The 2019 analysis found no statistically significant disparities beyond the 2019 DLIs.  The 2022 document reports the data broken out by officer race, but does not include any statistical tests to assess differences in the data.  Based on conversations with the author of the report, the Department does plan on conducting tests of statistical significance for a year-end report addressing Task 45 requirements.

Based on its 2019 and 2022 analyses, the Department also produced a draft of its "Working Methodology for IA Disparity Analyses."  In preparation for the most recent version of the study methodology, there were productive discussions among OPD, a representative of Stanford University, and the Monitoring Team.

Case 3:00-cv-04599-WHO   Document 1557   Filed 12/22/22   Page 31 of 32

Second NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
December 22, 2022
Page 31 of 32

The current examination of disciplinary outcomes is the third recent study of these issues within the Department.  The first was completed by external consultants and was ultimately found flawed by the Department.  The next was completed by the Department, but concerns were raised regarding important findings being relegated to an appendix.  The current, and now third analysis, addresses the previous problems and provides greater detail.  OPD's next report, covering the annual data, is expected to include additional analyses and detailed discussion.  The Department has also agreed to sharing draft material with the Monitor and with Plaintiffs' attorneys, in advance of formal presentations.  This will support clarifications and revisions when necessary.

Recognizing that meeting the requirements of the task at hand requires a detailed statistical analysis locates the examination of data squarely within a set of commonly recognized expectations of such research.  Among them are clarity in the reporting of decisions about the data and the procedures employed, as well as the conclusions reached.  These are common elements in a technical report that would ordinarily accompany any other narrative or summary report.  A technical report for the analyses relevant to Task 45 would not only be useful for the Monitor's compliance review, but would also serve as an archive of all the analyses completed.  This would not require additional work, as those tables were created for the current analyses and would be repeated for any similar report in the future.  That will be useful for forthcoming reviews in the Department and will serve as a basis for tracking discipline disparity data over time. Department policy now calls for the annual collection and review of discipline disparity data.

As noted above, along with the completion of the analysis of discipline data, which includes analysis of a survey of officers and an assessment of the impact of officer turnover, the Department has also completed a document specifying the methodology guiding the current analysis and providing direction for similar reviews moving forward.  That document provides a step-by-step description which includes data collection, the variables to be included and the types of analyses to be completed to support demographic comparisons in cases sustained and in decisions regarding discipline.  The methodology document provides a useful template for the examination of potential disparity in discipline in the future.

The Department has taken significant steps in identifying, examining, and responding to potential disparity in the disciplinary process.  It is also committed, by policy, to annual reviews of this data.  That commitment is also enabled by the creation of a detailed written methodology which will guide similar examinations going forward.  The work to assess disparity in discipline has been extensive, and the steps taken to this point are consistent with the Task 45 goal of ensuring that discipline is imposed in a fair and consistent manner.

However, conclusions are necessarily tentative because statistical tests of the relationships in the data were not completed; and a technical report of the research is not available for review.  The completion of these, in connection with the year-end review of discipline data, will be necessary to support continued compliance with the requirements of this NSA Task.

| Task 45 compliance status | In compliance |
| --- | --- |

## Conclusion

This is our second report of the NSA sustainability period.  The Department is now in compliance with Task 45.  This is the culmination of a long, collaborative effort involving many stakeholders, to include the Plaintiffs' attorneys.

During this reporting period, a determination has been made that the Department is not in compliance with Task 5 due to serious systemic and other issues that will need to be addressed. Further information will be made known in the foreseeable future.

*Robert S. Warshaw*

Chief (Ret.) Robert S. Warshaw
*Monitor*