# Third NSA Sustainability Period Report
# *of the* Independent Monitor
# *for the* Oakland Police Department

## Introduction

This is the third report of the Monitoring Team issued during the Negotiated Settlement Agreement (NSA) sustainability period in the case of *Delphine Allen, et al., vs. City of Oakland, et al.,* in the United States District Court for the Northern District of California under the direction of Judge William H. Orrick.

On May 12, 2022, the Court issued an Order placing the City into a one-year sustainability period. The Court noted, "The Negotiated Settlement Agreement (NSA) the parties executed on January 22, 2003, contemplated that federal court oversight would terminate after the defendants achieved substantial compliance with all of the provisions of the NSA and maintained that compliance for a year." As per the Order, during the sustainability period, we report to the Court on a quarterly basis; we conduct quarterly site visits; and we have appended to the Monitoring Team a member of OPD's Office of Internal Accountability (OIA), who serves as the Department's NSA sustainability liaison.

As with our site visits before the sustainability period, our site visits include both compliance assessments and technical assistance. During our second sustainability site visit, which we held remotely, in November, we met with Department and City officials; observed the Department's Risk Management Meeting; discussed the status of several Departmental policies; and shared our observations of misconduct investigations and use of force reports.

This report covers our assessments of all 11 Tasks listed in the May 12, 2022 Order: Tasks 2; 5; 20; 24; 25; 26; 30; 31; 34; 41; and 45.

## *Task Assessments*

## Task 2:  Timeliness Standards and Compliance with IAD Investigations

### Requirements:

*Fairness to complainants, members/employees and the public requires that internal investigations be completed in a timely fashion.*

> 1. *On or before December 1, 2003, OPD shall develop policies regarding timeliness standards for the completion of Internal Affairs investigations, administrative findings and recommended discipline.*

> 2. *Compliance with these timeliness standards shall be regularly monitored by IAD command and the Department's command staff.  If IAD experiences an unusual proliferation of cases and/or workload, IAD staffing shall be increased to maintain timeliness standards.*

(Negotiated Settlement Agreement III. B.)

### Relevant Policy:

OPD most recently revised Departmental General Order M-03, *Complaints Against Department Personnel and Procedures*, on December 22, 2017.

### Commentary:

**Task 2.1** requires that internal investigations (IAD and Division Level) – including review, approval, findings, and discipline – be completed in accordance with the timeliness standards developed by OPD.  To assess this subtask, we reviewed a list of all internal investigations resulting in formal findings (unfounded, sustained, exonerated, or not sustained) that were approved in October, November, and December 2022, and calculated the number of days between the complaint date and the approval date for each case.  We excluded from the dataset cases that were administratively closed, those that involved on-duty traffic accidents or service complaints, and those that did not involve Manual of Rules (MoR) violations.  We segregated the remaining cases into Class I or Class II categories.  If a case involved at least one alleged Class I violation, we classified it as Class I.

At least 85% of Class I misconduct investigations and at least 85% of Class II misconduct investigations must be completed within 180 days to be considered timely.  Per DGO M-03, Class I offenses "are the most serious allegations of misconduct and, if sustained, shall result in disciplinary action up to and including dismissal and may serve as the basis for criminal prosecution."  Class II offenses include "all minor misconduct offenses."

For the purposes of this assessment, we calculated the number of days between the complaint receipt date and the approval date. The complaint date is the date on which the Department first becomes aware of a complaint – whether it is lodged by a community member or internally generated. We removed from the denominator cases that were delayed due to tolling (held in abeyance in accordance with one of the provisions of Government Code Section 3304) or cases in which the Department asserted that its failure to meet the 180-day timeliness requirement resulted from delays in the Community Police Review Agency (CPRA) completing its concurrent investigations.

For this reporting period, the Department remains in compliance with Task 2. Of the 40 applicable Class I cases we reviewed for this assessment, 35, or 88%, were in compliance with established timelines.[1] During our last review of Task 2, we found 100% of Class I cases in compliance with established timelines. Of the 93 applicable Class II cases we reviewed for this assessment, 92, or 99%, were in compliance with established timelines. During our last review of Task 2, we found 97% of Class II cases in compliance with established timelines.

Per DGO M-03, "In cases with a sustained finding, the discipline recommendation process shall be completed within 30 calendar days of the sustained finding." We reviewed all 20 cases including a total of 36 sustained findings that were approved in October, November, and December 2022; 11 cases involved multiple sustained findings. All (100%) of these cases were in compliance with established discipline timelines.

OPD is in compliance with Task 2.1.

Task 2.2 requires that IAD and OPD command staff regularly monitor compliance with these timeliness standards. The primary responsibility for monitoring compliance with timeliness standards rests with IAD, whether investigations are conducted by IAD personnel or via Division-level investigation. As part of this monitoring, the IAD Commander discusses pending deadlines for key open investigations during IAD's weekly meetings with the Chief; the deadlines are also reflected in written agendas for these meetings. A Monitoring Team representative regularly attends these weekly meetings. IAD also occasionally, as needed, emails individual reminders on cases approaching due dates to investigators and their supervisors. The Department is in compliance with Task 2.2.

Task 2.3 requires that if IAD experiences an unusual proliferation of cases and/or workload, IAD staffing be increased to maintain timeliness standards. We routinely request and receive updates on IAD staffing levels during and between our site visits.

| Task 2 compliance status | In compliance |
|---|---|

---

[1] We removed from the denominator two additional Class I cases because they were cases in which IAD was unable to determine (due to limited access to records resulting from the recent ransomware attack on the City's data systems) whether IAD failed to meet the 180-day timeliness requirement due to delays in the Community Police Review Agency completing its concurrent investigations.

# Task 5:  Complaint Procedures for IAD

**Requirements:**

1. *On or before December 1, 2003, OPD shall develop a policy so that, OPD personnel who become aware that a citizen wishes to file a complaint shall bring such citizen immediately, or as soon as circumstances permit, to a supervisor or IAD or summon a supervisor to the scene.  If there is a delay of greater than three (3) hours, the reason for such delay shall be documented by the person receiving the complaint.  In the event that such a complainant refuses to travel to a supervisor or to wait for one, the member/employee involved shall make all reasonable attempts to obtain identification, including address and phone number, as well as a description of the allegedly wrongful conduct and offending personnel, from the complainant and any witnesses.  This information, as well as a description of the complaint, shall immediately, or as soon as circumstances permit, be documented on a Complaint Form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander, and shall be treated as a complaint.  The supervisor or appropriate Area Commander notified of the complaint shall ensure the Communications Division is notified and forward any pertinent documents to the IAD.*

2. *An on-duty supervisor shall respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest.  The supervisor shall ensure the Communications Division is notified and forward any pertinent documents to the IAD.  All other misconduct complaints by a jail inmate shall be handled in the same manner as other civilian complaints.*

3. *In each complaint investigation, OPD shall consider all relevant evidence, including circumstantial, direct and physical evidence, and make credibility determinations, if feasible.  OPD shall make efforts to resolve, by reference to physical evidence, and/or use of follow-up interviews and other objective indicators, inconsistent statements among witnesses.*

4. *OPD shall develop provisions for the permanent retention of all notes, generated and/or received by OPD personnel in the case file.*

5. *OPD shall resolve each allegation in a complaint investigation using the "preponderance of the evidence" standard.  Each allegation shall be resolved by making one of the following dispositions:  Unfounded, Sustained, Exonerated, Not Sustained, or Administrative Closure.  The Department shall use the following criteria for determining the appropriate disposition:*

   a. *Unfounded: The investigation disclosed sufficient evidence to determine that the alleged conduct did not occur.  This finding shall also apply when individuals named in the complaint were not involved in the alleged act.*

b. *Sustained: The investigation disclosed sufficient evidence to determine that the alleged conduct did occur and was in violation of law and/or Oakland Police Department rules, regulations, or policies.*

c. *Exonerated: The investigation disclosed sufficient evidence to determine that the alleged conduct did occur, but was in accord with law and with all Oakland Police Department rules, regulations, or policies.*

d. *Not Sustained: The investigation did not disclose sufficient evidence to determine whether or not the alleged conduct occurred.*

e. *Administrative Closure: The investigation indicates a service complaint, not involving an MOR violation, was resolved without conducting an internal investigation; OR*

f. *To conclude an internal investigation when it has been determined that the investigation cannot proceed to a normal investigative conclusion due to circumstances to include but not limited to the following:*

    1) *Complainant wishes to withdraw the complaint and the IAD Commander has determined there is no further reason to continue the investigation and to ensure Departmental policy and procedure has been followed;*

    2) *Complaint lacks specificity and complainant refuses or is unable to provide further clarification necessary to investigate the complaint;*

    3) *Subject not employed by OPD at the time of the incident; or*

    4) *If the subject is no longer employed by OPD, the IAD Commander shall determine whether an internal investigation shall be conducted.*

    5) *Complainant fails to articulate an act or failure to act, that, if true, would be an MOR violation; or*

    6) *Complaints limited to California Vehicle Code citations and resulting tows, where there is no allegation of misconduct, shall be referred to the appropriate competent authorities (i.e., Traffic Court and Tow Hearing Officer).*

g. *Administrative Closures shall be approved by the IAD Commander and entered in the IAD Complaint Database.*

6. *The disposition category of "Filed" is hereby redefined and shall be included under Administrative Dispositions as follows:*

a. *An investigation that cannot be presently completed. A filed investigation is not a final disposition, but an indication that a case is pending further developments that will allow completion of the investigation.*

> b.      *The IAD Commander shall review all filed cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed and may direct the closure or continuation of the investigation.*

7.      *Any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken.  However, investigators, with the approval of an IAD Commander, are not required to interview and/or take a recorded statement from a member or employee who is the subject of a complaint or was on the scene of the incident when additional information, beyond that already provided by the existing set of facts and/or documentation, is not necessary to reach appropriate findings and conclusions.*

(Negotiated Settlement Agreement III. E.)

**Relevant Policy:**

There are six Departmental policies that incorporate the requirements of Task 5:  Department General Order M-03, *Complaints Against Department Personnel and Procedures* (revised most recently on December 22, 2017); Communications Division Policy & Procedures C-02, *Receiving and Logging Complaints Against Personnel and Use of Force Incidents* (revised most recently on December 7, 2009); Training Bulletin V-T.1, *Internal Investigation Procedure Manual* (revised most recently on August 23, 2018); Special Order 8270, *Booking of Prisoners at the Glenn E. Dyer Detention Facility* (published June 24, 2005); Special Order 8565, *Complaints Against Department Personnel* (published May 11, 2007); and IAD Policy & Procedures Manual 21-01, *IAD General Operating Procedures* (published August 17, 2021).  In addition, NSA stipulations issued on December 12, 2005 and March 13, 2007 incorporate the requirements of this Task.

**Commentary:**

Task 5 consists of several subtasks, briefly described below.  Based on OPD's compliance history with many of the subtasks, not all are being actively monitored at this time.  As we have continued to advise, quality and timely investigations are essential to fulfilling the Department's obligation to complainants and officers alike.

**Task 5.1** requires that when a citizen wishes to file a complaint, the citizen is brought to a supervisor or IAD, or a supervisor is summoned to the scene.  **Task 5.2** requires that if there is a delay of greater than three hours in supervisory response, the reason for the delay must be documented.  **Task 5.3** requires that where a complainant refuses to travel to a supervisor, or wait for one, personnel make all reasonable attempts to obtain specific information to assist in

investigating the complaint. **Task 5.4** requires that specific information be documented on a complaint form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander. **Task 5.5** requires that the supervisor or Area Commander notify Communications and forward any pertinent documents to IAD.

To assess compliance with Tasks 5.1 through 5.5, we reviewed the Daily Incident Logs (DILs) prepared by the Communications Division and forwarded to IAD each business day. The DIL form has been modified several times during our tenure to elicit "forced responses" that gather all of the information required to evaluate compliance with these Tasks. These modifications have significantly enhanced OPD's ability to document compliance by properly filling out and distributing the logs, and compliance rates with these subtasks have been near 100% for several years. Consequently, we no longer actively assess OPD's compliance with these subtasks, but we continue to receive both the DILs and Daily Complaint Referral Logs (used to document when Information Business Cards [IBCs] are provided to citizens in lieu of a complaint forms). We spot-check these forms regularly to verify that the quality of their completion has not diminished. OPD remains in compliance with Tasks 5.1 through and including Task 5.5.

**Task 5.6** requires that an on-duty supervisor respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest of the inmate. We have not actively monitored this subtask since December 2014, though we have reviewed cases applicable to this requirement in several reports since that time.

**Task 5.12** requires that the Watch Commander ensure that any complaints that are applicable to Task 5.6 are delivered to and logged with IAD. Under current policy, the Communications Division must record on the DILs complaints that are received and/or handled by on-duty supervisors, and the DILs are forwarded daily to IAD.

OPD remains in compliance with Tasks 5.6 and 5.12.

**Task 5.15** through **Task 5.19**, and **Task 5.21,** collectively address the quality of completed IAD investigations, and therefore remain the subject of our focused Task assessments. To assess compliance with these Tasks, we reviewed a sample of 12 IAD cases that were closed between October 1-December 31, 2022.

Our sample of cases consisted of investigations completed by investigators assigned to IAD, and Division-level investigations (DLIs). It also included cases that were resolved via formal investigation and investigations that were resolved via summary finding. (Summary findings are investigations in which the Department believes a proper conclusion can be determined based on a review of existing documentation with limited or no additional interviews and follow-up.)

Together, **Tasks 5.15** and **Task 5.16** require that OPD: gathers all relevant evidence; conducts follow-up interviews where warranted; adequately considers the evidence gathered; makes credibility assessments where feasible; and resolves inconsistent statements.

In all of the cases we reviewed, we believe that OPD gathered all relevant evidence available. As we have often found, in many of the cases video and/or audio recordings proved to be a significant factor in allowing OPD to reach an appropriate conclusion.

Investigators did not conduct follow-up interviews in any of the cases we reviewed. We concur that follow-up interviews were not warranted in these cases.

OPD made credibility assessments for all involved parties in seven of the 12 cases. In four cases, the complainants were deemed not credible. In three cases, the complainant's statements were inconsistent with available body-worn camera (BWC) footage; and in the other case, the complainant's statements were inconsistent with a recorded call to OPD dispatch.

Five cases were approved for summary finding; and per policy, investigators are not required to assess the credibility of the involved officers and civilian employees in these instances.

In 10 of the 12 cases we reviewed, OPD resolved inconsistent statements. In nine of these cases, BWC recordings were available and assisted in the determination. In the other case, a recorded call to OPD Dispatch proved instrumental in reaching a definitive finding. Two cases resulted in at least one finding of not sustained. Not sustained is an acceptable finding; and by definition, it implies that inconsistencies were not resolved despite investigative efforts.

**Task 5.17** requires that OPD permanently retain all notes generated and/or received by OPD personnel in the case file. OPD personnel document the presence of investigative notes within a particular file by completing an Investigative Notes Declaration Form. OPD has a sustained history of 100% compliance with this subtask. During this reporting period, the form was again included in all of the cases we reviewed.

**Task 5.18** requires that OPD resolve each allegation in a complaint investigation using the preponderance of the evidence standard. **Task 5.19** requires that each allegation of a complaint is identified and resolved with one of the following dispositions: unfounded; sustained; exonerated; not sustained; or administrative closure. Our sample of 12 cases contained 69 allegations that received dispositions as follows: 43 exonerated; 17 unfounded; three not sustained; three sustained; and three administratively closed. Twenty-two of the exonerated findings emanated from one case. Officers from the Violent Crimes Operations Center (VCOC) and the Homicide Unit served a search warrant at a residence, and the complainant later filed a lawsuit alleging improper search and arrest. Eighteen different officers were listed as subject officers. The prevalence of body-worn camera (BWC) videos allowed for the vast majority of the allegations to be handled via summary finding. Two allegations were subject to a full investigation. We approved this partial summary finding approach when the case was assigned.

We disagreed with one of the findings in each of two separate cases. In both cases, there were allegations of officers failing to provide their names and serial numbers when requested, in addition to other allegations. Special Order 9112 requires OPD members to "complete and give an IBC (Information Business card), as soon as practical, to anyone requesting: the member's name and serial number." In each of these cases – one investigated by IAD and one investigated at the Division level – the investigators noted that the officers did not follow Special Order 9112, but treated this failure to follow policy as a "discovered violation" and provided training to the officers, which they documented in a Supervisory Notes File (SNF). OPD defines a discovered violation as misconduct "discovered during the normal course of supervision, *an investigation of other alleged misconduct*, or an incident review or assessment." (Italics and underline added.)

To be treated as a discovered violation, the misconduct must be unrelated to the activity complained of. It is improper to separate failing to follow the policy of how to provide one's name and serial number from a complaint of failing to provide one's name and serial number, as if they are unrelated. They are, in essence, the same allegation.

**Task 5.20** requires that the IAD Commander review all "filed" cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed. A filed case is defined as an investigation that cannot be presently completed and is pending further developments that will allow completion of the investigation; filed is not a final disposition. Traditionally, as part of our review of this Task, we also reviewed cases that are tolling. OPD defines a tolled case as an administrative investigation that has been held in abeyance in accordance with one of the provisions of Government Code Section 3304. While we are no longer actively assessing this subtask, we note that filed and tolling cases are reviewed with the Chief or his designee during the weekly IAD meetings and are listed by case number on the printed meeting agendas. We receive and review these agendas regularly, and a Monitoring Team member regularly attends these meetings. Additionally, we regularly receive a weekly report listing all tolled cases and all cases approaching their 3304 dates. When we have questions regarding any of the cases in the report, the IAD Commander answers them promptly.

**Task 5.21** requires that any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken. However, with the approval of the IAD Commander or his designee, investigators are not required to interview and/or take a recorded statement in all cases. For example, interviews are not needed from a member or employee who is the subject of a complaint, or who was on the scene of the incident when additional information – beyond that already provided by the existing set of facts and/or documentation – is not necessary to reach appropriate findings and conclusions. Five of the 12 cases we reviewed were resolved via summary finding, and each case was appropriately approved for such closure.

Investigations conducted by outside investigators retained by the City resulted in several serious disciplinary determinations. These matters called into question the capacity of the Department to investigate its own personnel. The outside investigators also cited a host of systemic and other deficiencies that need to be addressed both in the creation of requisite policies and their resultant implementation. While some progress to remediate these issues has commenced, the Department remains not in compliance with Task 5.

| Task 5 compliance status | Not in compliance |
|---|---|

## Task 20:  Span of Control

**Requirements:**

*On or before August 14, 2003, OPD shall develop and implement a policy to ensure appropriate supervision of its Area Command Field Teams.  The policy shall provide that:*

1. *Under normal conditions, OPD shall assign one primary sergeant to each Area Command Field Team, and, in general, (with certain exceptions) that supervisor's span of control shall not exceed eight (8) members.*

2. *During day-to-day operations, in the absence of the primary supervisor (e.g., due to sickness, vacation, compensatory time off, schools, and other leaves), the appropriate Area Commander shall determine, based on Department policy and operational needs, whether or not to backfill for the absence of the sergeant on leave.*

3. *If a special operation, (e.g., Beat Feet, Special Traffic Offenders Program (STOP), etc.) requires more than eight (8) members, the appropriate Area Commander shall determine the reasonable span of control for the supervisor.*

4. *If long-term backfill requires the loan or transfer of a supervisor from another unit, the Chief of Police and/or the Deputy Chief of Police shall make that decision.*

(Negotiated Settlement Agreement IV. C.)

**Relevant Policy:**

Three Departmental policies incorporate the requirements of Task 20: Departmental General Order A-19, *Supervisory Span of Control,* issued on July 26, 2006; Departmental General Order D-13, *Assignment to Acting Higher Rank or Classification,* issued on June 17, 1999; and Departmental General Order D-13.1, *Assignment to Acting Sergeant of Police,* issued on May 14, 2014.  (The publication of DGO D-13.1 cancelled Special Order 8435, which previously governed the selection process of acting sergeants.)

**Commentary:**

To assess these requirements for this report, we reviewed spreadsheets prepared by the Department for October, November, and December 2022 that, by date, note which type of sergeant supervised each applicable squad – a primary sergeant, relief sergeant, acting sergeant, other sergeant (one working overtime), or none.  (The Department refers to unsupervised squads as "open.")  We calculated per squad the compliance percentages for this subtask during this time period.  Each of the 44 applicable squads were in compliance – that is, all applicable squads during this time period were supervised by either a primary, relief, or other/overtime sergeant for at least 85% of their working shifts.  We also found that none of the applicable squads exceeded the required 1:8 supervisor to officer ratio at least 90% of their working shifts.

OPD continues to be in compliance with these requirements. The Department has institutionalized the practices of tracking how each squad is supervised each day; planning, when possible, for expected absences; and considering how to fill in for personnel who are absent unexpectedly.

| Task 20 compliance status | In compliance |
|---|---|

## Overview of Our Assessments of Tasks 24 and 25

OPD had been in compliance with Tasks 24 and 25 since 2015, and we did not actively review these Tasks. In November 2018, after we raised concerns regarding the identification, potential underreporting, and investigation of uses of force, the Court reactivated Tasks 24 and 25.

Since we resumed use of force reviews following the Court's reactivation of these Tasks, we have reviewed hundreds of investigations and provided detailed feedback on the force investigations to OPD during each of our site visits. In cases where we have had questions or concerns, OPD personnel have continued to be responsive and have provided follow-up where necessary. In some cases, OPD has provided additional information or documentation that supports its actions, and we have concurred with the Department's assessments. In others, we have identified concerns that had not been identified or addressed by supervisors who conducted the UOF investigation, or the command personnel who reviewed the investigation. In these cases, OPD executive staff have directed additional review; directed training; entered a Supervisory Note File (SNF); or initiated an Internal Affairs Division (IAD) investigation. We have also tracked OPD's efforts to correct identified deficiencies, which have included: the issuance of email directives from executive staff, training bulletins, and newsletters; audits; line-up training; and revisions to UOF-related policies.

In our August 2021 report, we found OPD in compliance with Task 24 for the first time since the Court reactivated these Tasks in 2018; and in April 2022, we found OPD in compliance with Task 25. We also found OPD in compliance with Tasks 24 and 25 in our first and second sustainability period status reports.

To assess compliance for this report, we reviewed 22 UOF reports that occurred between September 1 -November 31, 2022. We reviewed all Level 3 UOF reports (one) and a sample of Level 4 UOF reports (21). In accordance with the Order issued May 12, 2022, establishing the sustainability period, we reviewed some of these UOF reports with a member of OPD's Office of Internal Accountability (OIA) serving as the Department's NSA sustainability liaison. Between December 13 -January 20, 2023, we attended the conclusion of one Executive Force Review Board (EFRB) involving a Level 1 use of force, and one Level 2 use of force for which a Force Review Board (FRB) was held. Where concerns with field reporting existed, the concerns were appropriately addressed by the Boards. We discuss only Level 3 and 4 uses of force in this assessment.

This report covers Level 3 and 4 UOF reports completed by OPD between September 1-November 31, 2022. All 22 of the cases we reviewed for this time period occurred after the publication of Special Order 9196, which clarified the use of force policy; after Special Order 9202, issued on February 27, 2020, which temporarily modified the requirements for reporting Type 32 uses of force; and after Special Order 9208, issued on April 27, 2022, which defined the finalized reporting requirements for Level 4, type 32 uses of force.

In the 22 Level 3 and 4 uses of force we reviewed, 58 officers used force on 25 different persons. There were numerous cases where multiple officers used force on a single person, and two instances where force was used on multiple persons. We noted that there were 118 uses of force on the 25 persons. Level 4, Type 32, UOFs accounted for 69 of the total uses of force; and in six of the 22 cases we reviewed, only Type 32 uses of force were used. As we noted in our last report, an increase in the total number of uses of force is not unexpected, given the new reporting requirements for Type 32 UOFs that were implemented in 2022. During the second sustainability period, we noted inconsistencies in the reporting of the Type 32 use of force by officers and supervisors. Some multiple Type 32s, all occurring at virtually the same time while taking a combative subject into custody, were reported separately. In others, similar circumstances were documented as a single Type 32 UOF. During our November 2022 site visit meetings, we discussed this inconsistency with OPD and agreed on an interpretation of reporting for this type of force. OPD committed to ensuring that supervisors were made aware of the reporting requirements, and we saw improved consistency in the UOF reports we reviewed after our November site visit meeting. We have also found that OPD accepted and implemented our recommendation that for those instances where the only use of force was a Type 32, the supervisor include in the Vision report whether any BWC was reviewed by the supervisor. Area Captains also continue to audit a sample of Type 32 UOF each month. In their reviews for incidents from September 1-November 31, 2022, they identified and appropriately addressed concerns with use of force reporting and documentation.

The total breakdown for the force used on the 25 persons is as follows: African Americans, 48%, a decrease from 55% in our last status report; Latinos, 28%, an increase from 17% in our last status report; whites, 8%, a decrease from 14% in our last status report; and Asians or other, 16%, an increase from 14% in our last status report.

Of the 22 UOF reports we reviewed for the three-month period between September 1-November 31, 2022, we noted only one late BWC activation that had not been identified and addressed by OPD supervisors. We continued to note during our reviews for this report that there were numerous instances of BWCs becoming dislodged during use of force events, limiting the availability of footage to review. OPD personnel did inform us during our February 2023 site visit that the Department had ordered two different types of "clips" to more securely attach BWCs to both exterior vest carriers and uniforms.

We noted a few instances in our reviews where officers failed to identify themselves as police officers, but no instances where officers used unprofessional language or profanity while dealing with members of the public. We noted one incident where we believe there was an unreported use of force, and one where we had concerns about the appropriateness of the force. Of the concerns and comments we brought forward at our February 2023 site visit, the OPD UOF Command review group had already identified and addressed all but one of the concerns we

brought forward. The Deputy Chief who is responsible for the UOF Command review group also presented during our February 2023 site visit on the results of the group's reviews, which covered UOF reports not reviewed by our Team. The Deputy Chief noted that their reviews identified concerns with tactical issues, proper categorization of UOFs, and de-escalation techniques. The Deputy Chief also noted that they had identified positive trends – including improved planning and communications, more detailed UOF reports, and sergeants and the chain of command identifying and addressing deficiencies that were found. Based on our reviews, we agree with the assessment provided.

We reviewed only one Level 3 use of force for this report. The use of force involved a Type 16 takedown. Unlike in our previous assessments, we found no instances where a Taser was deployed for any reason during our reviews. Since our November 2022 site visit, OPD has conducted training on Taser usage in multiple formats and met with Command personnel to discuss previous concerns that had been brought forward about these deployments, especially in situations where a subject is fleeing from officers.

In our review of UOF reports for September 1-November 31, 2023, we identified few areas of concern. In general, officers continue to appropriately use and report use of force, and supervisors and command personnel are identifying and properly addressing any concerns that are identified.

# Task 24: Use of Force Reporting Policy

## Requirements:

*The policy shall require that:*

1. *Members/employees notify their supervisor as soon as practicable following any investigated use of force or allegation of excessive use of force.*

2. *In every investigated use of force incident, every member/employee using force, and every member/employee on the scene of the incident at the time the force was used, shall report all uses of force on the appropriate form, unless otherwise directed by the investigating supervisor.*

3. *OPD personnel document, on the appropriate form, any use of force and/or the drawing and intentional pointing of a firearm at another person.*

4. *A supervisor respond to the scene upon notification of an investigated use of force or an allegation of excessive use of force, unless community unrest or other conditions makes this impracticable.*

5. *OPD notify:*

   a. *The Alameda County District Attorney's Office immediately or as soon as circumstances permit, following a use of lethal force resulting in death or injury likely to result in death.*

   b. *The City Attorney's Office as soon as circumstances permit following the use of lethal force resulting in death or serious injury. At the discretion of the City Attorney's Office, a Deputy City Attorney shall respond to the scene. The Deputy City Attorney shall serve only in an advisory capacity and shall communicate only with the incident commander or his/her designee.*

   c. *Departmental investigators regarding officer-involved shootings, in accordance with the provisions of Section V, paragraph H, of this Agreement.*

  6. *OPD enter data regarding use of force into OPD's Personnel Assessment System (PAS).*

(Negotiated Settlement Agreement V. A.)

**Relevant Policy:**

OPD most recently revised Departmental General Order K-4, *Reporting and Investigating the Use of Force,* on October 16, 2014. The Department issued Special Order 9208, *Level 4 Type 32 Reporting and Review,* on June 4, 2022.

**Commentary:**

To assess compliance with Task 24, we reviewed 37 Level 3 and 4 use of force (UOF) reports that were completed by OPD from March 1-May 31, 2022.

**Task 24.1** requires that members/employees notify their supervisor as soon as practicable following any reportable use of force or allegation of excessive use of force. In our reviews, we did not identify any instances where a notification was not properly made or was not properly documented.

**Task 24.2** requires that in every reportable use of force incident, every member/employee on the scene of the incident at the time the force was used, reports all uses of force on the appropriate form, unless otherwise directed by the investigating supervisor. **Task 24.3** requires that OPD personnel document, on the appropriate form, every use of force and/or the drawing and intentional pointing of a firearm at another person.

In the 22 Level 3 and 4 UOF incidents we reviewed; officers used force on 25 different persons. In two of the reports, Level 4, Type 22, pointing a weapon, was the only force used. In three others, Type 22 was used in addition to another use of force. We determined that officers' pointing of their firearms was appropriate in all instances we assessed. We did identify one instance where it appears an officer failed to properly report a Level 4, Type 25 use of force. The UOF Command review group had already referred this case to IAD for other reasons, and this concern will also now be addressed by IAD. We also identified one instance where we had concerns about whether a use of force was appropriate. The Command review group had already identified this concern and forwarded the report to IAD for investigation.

**Task 24.4** requires that a supervisor respond to the scene upon notification of a Level 1, 2, or 3 use of force or an allegation of excessive use of force, unless community unrest or other conditions makes such a response impracticable. In the Level 3 use of force we reviewed for this subtask; a supervisor did respond to the scene as required. Though not required, supervisors also responded to 12 of the 21 Level 4 uses of force or were on scene at the time of the use of force.

**Task 24.5** specifically addresses requirements for the response and handling of Level 1 uses of force. We assess Level 1 uses of force in our regular reviews of Task 30 (Executive Force Review Boards).

**Task 24.6** requires that OPD enter all use of force data into Performance Reporting Information Metrics Environment (PRIME), which is now known as Vision. In all 22 of the Level 3 and 4 UOF cases we reviewed; the data was entered as required.

This is our third assessment of UOF reporting for the sustainability period. OPD has continued to meet the overall requirements of this Task.

| Task 24 compliance status | In compliance |
|---|---|

# Task 25: Use of Force Investigations and Report Responsibility

**Requirements:**

*An on-scene supervisor is responsible for completing an investigated use of force report in accordance with the provisions of Departmental General Order K-4, "Reporting and Investigating the Use of Force."*

1.   *OPD shall develop and implement a policy for conducting and documenting use of force investigations that include, at a minimum:*

     a.   *Documentation of the incident in either an Offense or Supplemental Report from the member(s)/employee(s) using force; and/or, when necessary, a statement taken from the member(s)/employee(s) using force;*

     b.   *Separating and separately interviewing all officers who were at the scene at the time of the incident;*

     c.   *A Supplemental Report from other members/employees on the scene or a statement taken, if deemed necessary by the investigating supervisor;*

     d.   *Identification and interviews of non-Departmental witnesses;*

     e.   *Consideration of discrepancies in information obtained from members, employees and witnesses, and statements in the reports filed;*

     f.   *Whether arrest reports or use of force reports contain "boilerplate" or "pat language" (e.g., "fighting stance", "minimal force necessary to control the situation");*

      *g.     Documentation of physical evidence and/or photographs and a summary and analysis of all relevant evidence gathered during the investigation; and*

      *h.     Consideration of training/tactical issues involving the availability and practicality of other force options.*

      *i.     Supervisor's justification as to why any element of the policy was not documented; and*

2.    *All supervisors shall be trained in conducting use of force investigations and such training shall be part of a supervisory training course.*

3.    *Use of force investigations shall include a recommendation whether the use of force was objectively reasonable and within Department policy and training. The recommendation shall be based on the totality of the circumstances and shall consider, but is not limited to, the following factors:*

      *a.     Whether the force used was pursuant to a legitimate law-enforcement objective;*

      *b.     Whether the type and amount of force used was proportional to the resistance encountered and reasonably related to the objective the members/employees were attempting to achieve;*

      *c.     Whether the member/employee used reasonable verbal means to attempt to resolve the situation without force, if time and circumstances permitted such attempts;*

      *d.     Whether the force used was de-escalated or stopped reasonably when resistance decreased or stopped;*

4.    *Use of force reports shall be reviewed by the appropriate chain-of-review as defined by policy.*

*The type of force used, the identity of the involved members, and the report preparer shall be the determining criteria for utilizing the appropriate chain-of-review. Reviewers may include, when appropriate, the chain-of-command of the involved personnel, the appropriate Area Commander on duty at the time the incident occurred, other designated Bureau of Field Operations commanders, and as necessary, the chain-of-command of the involved personnel up to the Division Commander or Deputy Chief/Director, and the Internal Affairs Division.*

    *Reviewers for Level 1-3 use of force investigations shall:*

      *a.     Make a recommendation as to whether the use of force was in or out of policy,*

      *b.     Order additional investigation and investigative resources when necessary, and*

      *c.     Comment on any training issue(s) when appropriate.*

5. *Any recommendation that the use of force did not comply with Department policy shall result in the incident being referred to the Internal Affairs Division to conduct additional investigation/analysis, if necessary.*

6. *Members/employees involved in a use of force incident resulting in serious injury or death and/or an officer-involved shooting, shall be separated from each other as soon as practicable at the incident scene, and kept apart until they have completed their reports and been interviewed.*

(Negotiated Settlement Agreement V. B.)

**Relevant Policy:**

OPD most recently revised Departmental General Order K-4, *Reporting and Investigating the Use of Force,* on October 16, 2014.  The Department issued Special Order 9208, *Level 4 Type 32 Reporting and Review,* on June 4, 2022.

**Commentary:**

As noted above in Task 24, we reviewed 37 Level 3 and 4 use of force (UOF) reports that were completed between March 1, 2022 -May 31, 2022.

**Task 25.1** requires that supervisors complete a use of force report and that certain criteria are met in the report.  Subtask 25.1.f. addresses the use of "boilerplate" or "pat" language in reports.  During our reviews for this report, we again did not identify concerns with officers failing to document specific information and details justifying their use of force or using "boilerplate" or "pat" language in their reports.

**Task 25.2** requires that all supervisors are trained on how to conduct use of force investigations and such training is part of a supervisory training course.  OPD includes the requirement for this training in its Departmental policies.  During our March 2022 site visit, we confirmed with OPD that the Department continues to require and deliver this training in the Sergeants' Transition Course, where use of force is part of the curriculum.

In our prior reports, we had identified concerns with the preparation and review of UOF reports by supervisors.  The use of force and the processes in which force is documented and reviewed have been at the core of the Court's oversight.  The Department has provided numerous directives on this topic.  In general, we now find that supervisors are identifying deficiencies in officer reporting and identifying and addressing MOR violations.  We also find that reviewers of the supervisors' reports are generally identifying and addressing concerns when appropriate.  OPD has also assigned a team of command officers to review some use of force reports as an ongoing quality control mechanism.  We have found that this additional oversight and review has identified and properly addressed concerns prior to our Team identifying them.

**Task 25.3** requires that use of force investigations include required recommendations. Areas of recommendation include: whether the force used was pursuant to a legitimate law enforcement objective; whether the type and amount of force used was proportional to the resistance encountered and reasonably related to the objective the officers were attempting to achieve; whether the officers used reasonable verbal means to attempt to resolve the situation without force, if time and circumstances permitted such attempts; and whether the force used was de-escalated or stopped reasonably when resistance decreased or stopped.

In our assessment of Level 3 and 4 UOF reports for this report, we did not identify any instances where the use of force was not deescalated or stopped reasonably when resistance decreased, or any instances where we believe officers could have made additional efforts to explain to subjects being detained why the detention was occurring prior to using force. We did note continued improvement in officers identifying themselves as police officers when appropriate and there was time to do so.

In January 2022, we identified one instance – a Level 3 Taser deployment on a subject fleeing from OPD officers – where we believed the force used may not have been appropriate. After we brought this to OPD's attention, the Department initiated an internal affairs investigation. In our review of UOF reports from the first sustainability period, we identified three Level 3-Taser deployments where we again identified concerns with the use of force. As a result of our concerns, OPD initiated internal affairs investigations of two of these. In the third, OPD provided us additional detailed information on the use of force; and after further review, we concurred with their findings of in compliance.

Of the three Taser deployments referred to IAD, two were found not in compliance upon investigation by IAD. The third was found in compliance at the conclusion of the IAD investigation. Both of the deployments found out of compliance resulted from subjects fleeing from officers who were not struck by the Taser probes. After these reviews, OPD determined that they would no longer allow Taser deployments where the subject was not struck with the probe to be lowered to a Level 4 use of force. This ensures that they receive the same level of scrutiny as those where the probe does strike the subject.

Since the identification of concerns with Taser deployments, the Department has conducted training for personnel in multiple formats, including virtual training, Continued Professional Training (CPT) sessions, and training on use of force de-escalation and force multipliers. In addition, OPD has conducted one-on-one meetings with Command personnel to discuss the proper review of Taser deployments. We believe that these actions will address the concerns with these deployments. For this report, there was only one Level 3 use of force, a Type 16 takedown. No Taser deployments occurred. OPD reduced two Level 3 uses of force, both Type 16 takedowns, to Level 4 uses of force, in accordance with policy, and with the proper justifications for doing so.

**Task 25.4** requires that use of force reports be reviewed by the appropriate chain of command and appropriate recommendations are made. In all of the cases we reviewed, the reports were reviewed as required. The Command review group also reviews a select number of uses of force for follow-up review. The combination of supervisor and command review has continued to appropriately identify and address concerns with UOF reporting. OPD continues to make strides in ensuring that the chain of command is actively involved in the review of use of force and is addressing areas of concern without the need for us to bring the concerns to their attention.

**Task 25.5** requires that any determination that a use of force did not comply with Department policy result in the incident being referred to IAD to conduct additional investigation/analysis, if necessary. We identified one Level 3 UOF where we believed additional investigation was appropriate to determine if the use of force was appropriate and properly reported. OPD had already identified this concern and referred the case to IAD. We will review the IAD investigation once it is completed.

**Task 25.6** requires that members/employees involved in a use of force incident resulting in serious injury or death and/or officer-involved shooting, are separated from each other as soon as practicable at the incident scene, and kept apart until they have completed their reports and been interviewed. This Task is not assessed here, as we review and consider it as part of the Force and Executive Force Review Boards that OPD holds to examine Level 1 and 2 uses of force.

This is our third assessment of UOF for the sustainability period. OPD has continued to meet the overall requirements of this Task, and appears to be rendering additional oversight and scrutiny to use of force reporting.

| Task 25 compliance status | In compliance |
|---|---|

# Task 26:  Force Review Board (FRB)

## Requirements:

*OPD shall develop and implement a policy concerning its FRB proceedings.  The policy shall:*

1.   *Set out procedures, membership and a timetable for FRB review of use of force investigations involving Level 2 incidents, as defined in Department General Order K-4, REPORTING AND INVESTIGATING THE USE OF FORCE;*

2.   *Require the FRB to review all use of force investigations;*

3.   *Require the FRB to make a recommendation as to whether the use of force was in policy or out of policy;*

4.   *Require the FRB to forward sustained policy violations to the Discipline Officer.*

5.   *Require the FRB not to review any use of force allegation until the internal investigations has been completed;*

6. *Authorize the FRB to recommend to the Chief of Police additional use of force training or changes in policies or tactics, or additional standards, investigatory policies, or training for use of force investigations;*

7. *Require the FRB to conduct an annual review of use of force cases examined, so as to identify any patterns of use of force practices that may have policy or training implications, and thereafter, issue a report to the Chief of Police;*

8. *Require that the FRB membership include, at a minimum, one member from the Training Division, one member from the Field Training Officer program, and either the Bureau of Field Operations Deputy Chief or his/her designee;*

9. *Minimally, that one member of the FRB shall be replaced at least annually.*

(Negotiated Settlement Agreement V. C.)

**Relevant Policy:**

OPD most recently revised Departmental General Order K-4.1, *Force Review Boards,* on December 21, 2015.

**Commentary:**

OPD Force Review Boards (FRBs) are regularly convened to examine the investigations conducted relative to the deployment and application of Level 2 uses of force.[2] OPD first achieved compliance with this Task during the nineteenth reporting period (April 1-June 30, 2014). The Order establishing the sustainability period directs that this Task continue to be monitored, and so we continue to assess compliance with this Task, including our analyses of force reports; our review of Force Review Board reports; and observing Force Review Boards between our site visits via online meeting software.

For this report, we reviewed two FRB reports that were completed and approved by the Chief of Police between December 1, 2022 and January 31, 2023. In general, we found the reports to be well-written and accurate accounts of the proceedings they documented. Two members of the Monitoring Team observed both of these FRBs remotely via an online meeting platform.[3] The reports collectively documented the assessment of 10 uses of force associated with these two

---

[2] According to OPD, Level 2 uses of force include: "1) Any strike to the head (except for an intentional strike with an impact weapon); 2) Carotid restraint is applied that does not result in the loss of consciousness; 3) Use of impact weapons, including specialty impact munitions or any other object, to strike a subject and contact is made, regardless of injury; 4) Any unintentional firearms discharge that does not result in injury; 5) A police canine bites the clothing or the skin of a subject, or otherwise injures a subject requiring emergency medical treatment (beyond first-aid) or hospital admittance; 6) Any use of force which results in injuries to the subject requiring emergency medical treatment (beyond first-aid) or hospital admittance; (NOTE: For the purposes of this order, an evaluation by a medical professional to assess a complaint of injury is not emergency treatment) 7) Any Level 3 use of force used on or applied to a restrained subject; 7.a) A restrained subject is a person who has been fully placed in a Department authorized restraint device such as both hands handcuffed, a WRAP or Rip Hobble; 7.b) A subject with only one handcuff on is not a restrained person."

[3] We documented these FRBs in our last quarterly status report.

separate incidents.  The Level 2 uses of force which made these cases Board-eligible were, respectively, a Level 2, Type 9: Personal Weapon Strike to the Head; and a Level 2, Type 15-13: Control Hold Causing Injury Greater Than can be Treated with First Aid.  In the latter case, a subject being taken into custody after a fleeing from a pursuit ending in a motor vehicle accident was diagnosed at a hospital with a fractured elbow.  There was the possibility that this injury was pre-existing, but the Board appropriately assessed the force as a Level 2.  Eight other lower-level uses of force were assessed for justification by the Boards as they reviewed the cases.

All uses of force were found to be in compliance.  In both cases, the Chief concurred with the Boards' findings without any modifications.  We did not disagree with any of the findings in the reports we reviewed.

We observed the only FRB convened by OPD since we last reported on this Task.  This Board met on January 20, 2023.  We observed the FRB remotely via an online meeting platform.  As is our practice, we provided immediate feedback for Board members at the conclusion of each FRB we observed.

As noted in our previous reports concerning this Task, we continue to observe substantive discussion and deliberations among the Board members.  Members ask probing questions of the force investigators; and, where applicable, Department subject-matter experts (SMEs) and IAD investigators.  They also spend a great deal of time discussing issues ancillary to the uses of force, such as tactics, supervision, force alternatives, and training opportunities.  As is customary for all Boards, their feedback was conveyed in the form of training points to appropriate personnel.

This FRB assessed the justification for a canine bite – the Level 2 use of force which required the convening of the Board – as well as 11 other lower-level uses of force.  Six officers in total used force on three different subjects.  These subjects fled from a vehicle which had been carjacked and was also used in a robbery.  The Board found all of the uses of force to be in compliance except one – a Level 4, Type 32, in which an officer placed his hand on the back of the subject's head while he was being handcuffed.  The investigator found the force to be reasonable and justified, but he believed the tactic violated Special Order 9205, which states, in part, "If officers hold a person down while restraining them, officers shall avoid placing weight on a person's neck or head which can fracture the hyoid bone or cervical spine."  The Board concurred with the investigator's non-compliance finding, overruling IAD which also investigated the use of force.  We did not disagree with the FRB's findings.

It is not a requirement, but the Board's votes in this case were unanimous.  We recognize that in some circumstances, there will be legitimate differences of opinion where the determination is not obvious.  In these situations, we look for frank discussion and clear explanations of the differing positions.

In addition to ruling on the appropriateness of uses of force, Force Review Boards generally identify several follow-up items based on their review of the associated materials and the presentations made to them.  These can include items such as counseling and training for individual officers, publication of Department-wide training materials, and modifications to policy.  OPD tracks these deliverables in a spreadsheet, broken down into three categories: Individual Issues; Department-Wide Issues; and Quarterly Training Points.

The last accounting of deliverables provided to us, which lists follow-up items from FRBs convened prior to January 19, 2023, indicated that there was only one open deliverable – a training requirement for an individual officer.

| Task 26 compliance status | In compliance |
|---|---|

# Task 30:  Executive Force Review Board (EFRB)

### Requirements:

1. *An EFRB shall be convened to review the factual circumstances surrounding any Level 1 force, in-custody death, or vehicle pursuit-related death incidents.  A firearm discharge at an animal shall be reviewed by the EFRB only at the direction of the Chief of Police.*

2. *The Board shall have access to recordings and/or transcripts of interviews of all personnel on the scene, including witnesses, and shall be empowered to call any OPD personnel to provide testimony at the hearing.*

3. *OPD shall continue the policies and practices for the conduct of EFRB, in accordance with the provisions of DGO K-4.1, FORCE REVIEW BOARDS.*

(Negotiated Settlement Agreement V. G.)

### Relevant Policy:

OPD most recently revised Departmental General Order K-4.1, *Force Review Boards,* on December 21, 2015.

### Commentary:

Executive Force Review Boards (EFRBs), consisting of three top command-level staff, conduct thorough, detailed reviews of all Level 1 uses of force, in-custody deaths, and vehicle pursuit-related deaths and serious injuries.  OPD achieved compliance with this Task during the nineteenth reporting period (April 1-June 30, 2014).

During the last reporting period, OPD convened one EFRB, but adjourned the Board after three days of presentation to allow both the Criminal Investigation Division (CID) and IAD to address several follow-up requests from the Board.  The EFRB has since reconvened and concluded their deliberations.  The Board met for six days in total, and reviewed the circumstances surrounding a Level 1 use of force: the discharge of a firearm at a person.  The Board also evaluated several Level 4 uses of force: the pointing of firearms at the same subject.  The incident occurred on August 25, 2021.  Officers assigned to the Violent Crime Operations Center (VCOC) located the subject, who was wanted for vehicular manslaughter, at a local hotel; and as he was attempting to drive away, his vehicle was pinned against the hotel building by an OPD armored vehicle.  Other

officers and an additional armored vehicle, the Bearcat, arrived on scene. At one point during the negotiations with the subject, the subject displayed a firearm and an officer discharged five rounds at the subject. The subject was not struck by any rounds, and he surrendered shortly thereafter. The Board found all uses of force to be in compliance, and we do not disagree. The Board spent considerable time on issues that did not necessarily have bearing on the central issue of justification. The Board chair assigned a very large number of follow-up requests to CID and IAD personnel which contributed to the duration of the Board's proceedings. While the process might have been more efficient in its length, the discussions regarding the uses of force and some of the tactical and supervisory issues were substantive, and we found the EFRB to be in compliance.

We did not review any completed EFRB Reports during the reporting period.

OPD remains in compliance with this Task.

| Task 30 compliance status | In compliance |
|---|---|

## Task 31: Officer-Involved Shooting Investigations Review Protocol

**Requirements:**

*OPD shall develop a policy to ensure that, in every officer-involved shooting in which a person is struck, Homicide and Internal Affairs investigators respond to the scene. The Homicide Section's investigation shall be conducted in partnership with, and when deemed appropriate by, the Alameda County District Attorney's Office. Interviews of the subject officer(s) shall be conducted jointly with the appropriate staff from Homicide and the Office of the District Attorney. The District Attorney and City Attorney shall be notified in accordance with the provisions of Section V, paragraph A (5), of this Agreement. Homicide shall duplicate and provide all completed reports and documents to the District Attorney's Office, the Office of the City Attorney, and the Internal Affairs Division. IAD shall provide information and/or documents as required by law.*

(Negotiated Settlement Agreement V. H.)

**Relevant Policy:**

OPD most recently published Departmental General Order K-4, *Reporting and Investigating the Use of Force* on October 16, 2014. IAD Policy & Procedures and Homicide Policy & Procedures are also relevant to this Task.

**Commentary:**

Task 31 requires certain notifications and responses in the event of an officer-involved shooting. During this reporting period (December 17, 2022-March 26, 2023), on February 17, 2023, the Internal Affairs Division had a Level 1 incident callout related to an officer-involved shooting. OPD confirmed that the protocols required by this Task were followed in this instance.

OPD remains in compliance with this Task.

| Task 31 compliance status | In compliance |
|---|---|

## Task 34: Vehicle Stops, Field Investigation, and Detentions *and* Task 41: Use of Personnel Assessment System (PAS) and Risk Management

**Requirements:**

**Task 34:**

1. *OPD shall require members to complete a basic report on every vehicle stop, field investigation and every detention. This report shall include, at a minimum:*

   a. *Time, date and location;*

   b. *Identification of the initiating member or employee commencing after the first year of data collection;*

   c. *Reason for stop;*

   d. *Apparent race or ethnicity, and gender of individual(s) stopped;*

   e. *Outcome of stop (arrest, no arrest);*

   f. *Whether a search was conducted, and outcome of search;*

   g. *Offense categories (felony, misdemeanor or infraction).*

2. *This data shall be entered into a database that can be summarized, searched, queried and reported by personnel authorized by OPD.*

3. *The development of this policy shall not pre-empt any other pending or future policies and or policy development, including but not limited to "Promoting Cooperative Strategies to Prevent Racial Profiling."*

(Negotiated Settlement Agreement VI. B.)

**Task 41:**

*Within 375 days from the effective date of this Agreement, OPD shall develop a policy for use of the system, including supervision and audit of the performance of specific members, employees, supervisors, managers, and OPD units, as well as OPD as a whole.*

*The policy shall include the following elements:*

1. *The Chief of Police shall designate a PAS Administration Unit. The PAS Administration Unit shall be responsible for administering the PAS policy and, no less frequently than quarterly, shall notify, in writing, the appropriate Deputy Chief/Director and the responsible commander/manager of an identified member/employee who meets the PAS criteria. PAS is to be electronically maintained by the City Information Technology Department.*

2. *The Department shall retain all PAS data for at least five (5) years.*

3. *The Monitor, Inspector General and Compliance Coordinator shall have full access to PAS to the extent necessary for the performance of their duties under this Agreement and consistent with Section XIII, paragraph K, and Section XIV of this Agreement.*

4. *PAS, the PAS data, and reports are confidential and not public information.*

5. *On a quarterly basis, commanders/managers shall review and analyze all relevant PAS information concerning personnel under their command, to detect any pattern or series of incidents which may indicate that a member/employee, supervisor, or group of members/employees under his/her supervision may be engaging in at-risk behavior. The policy shall define specific criteria for determining when a member/employee or group of members/employees may be engaging in at-risk behavior.*

6. *Notwithstanding any other provisions of the PAS policy to be developed, the Department shall develop policy defining peer group comparison and methodology in consultation with Plaintiffs' Counsel and the IMT. The policy shall include, at a minimum, a requirement that any member/employee who is identified using a peer group comparison methodology for complaints received during a 30-month period, or any member who is identified using a peer group comparison methodology for Penal Code §§69, 148 and 243(b)(c) arrests within a 30-month period, shall be identified as a subject for PAS intervention review. For the purposes of these two criteria, a single incident shall be counted as "one" even if there are multiple complaints arising from the incident or combined with an arrest for Penal Code §§69, 148 or 243(b)(c).*

7. *When review and analysis of the PAS threshold report data indicate that a member/employee may be engaging in at-risk behavior, the member/employee's immediate supervisor shall conduct a more intensive review of the member/employee's performance and personnel history and prepare a PAS Activity Review and Report. Members/employees recommended for intervention shall be required to attend a documented, non-disciplinary PAS intervention*

*meeting with their designated commander/manager and supervisor. The purpose of this meeting shall be to review the member/employee's performance and discuss the issues and recommended intervention strategies. The member/employee shall be dismissed from the meeting, and the designated commander/manager and the member/employee's immediate supervisor shall remain and discuss the situation and the member/employee's response. The primary responsibility for any intervention strategies shall be placed upon the supervisor. Intervention strategies may include additional training, reassignment, additional supervision, coaching or personal counseling. The performance of members/ employees subject to PAS review shall be monitored by their designated commander/manager for the specified period of time following the initial meeting, unless released early or extended (as outlined in Section VII, paragraph B (8)).*

8. *Members/employees who meet the PAS threshold specified in Section VII, paragraph B (6) shall be subject to one of the following options: no action, supervisory monitoring, or PAS intervention. Each of these options shall be approved by the chain-of-command, up to the Deputy Chief/Director and/or the PAS Activity Review Panel.*

   *Members/employees recommended for supervisory monitoring shall be monitored for a minimum of three (3) months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor. The first at the end of one (1) month and the second at the end of three (3) months.*

   *Members/employees recommended for PAS intervention shall be monitored for a minimum of 12 months and include two (2) documented, mandatory follow-up meetings with the member/employee's immediate supervisor and designated commander/manager: The first at three (3) months and the second at one (1) year. Member/employees subject to PAS intervention for minor, easily correctable performance deficiencies may be dismissed from the jurisdiction of PAS upon the written approval of the member/employee's responsible Deputy Chief, following a recommendation in writing from the member/employee's immediate supervisor. This may occur at the three (3)-month follow-up meeting or at any time thereafter, as justified by reviews of the member/employee's performance. When a member/employee is not discharged from PAS jurisdiction at the one (1)-year follow-up meeting, PAS jurisdiction shall be extended, in writing, for a specific period in three (3)-month increments at the discretion of the member/employee's responsible Deputy Chief. When PAS jurisdiction is extended beyond the minimum one (1)-year review period, additional review meetings involving the member/employee, the member/ employee's designated commander/manager and immediate supervisor, shall take place no less frequently than every three (3) months.*

9. *On a quarterly basis, Division/appropriate Area Commanders and managers shall review and analyze relevant data in PAS about subordinate commanders and/or managers and supervisors regarding their ability to adhere to policy and*

address at-risk behavior. All Division/appropriate Area Commanders and managers shall conduct quarterly meetings with their supervisory staff for the purpose of assessing and sharing information about the state of the unit and identifying potential or actual performance problems within the unit. These meetings shall be scheduled to follow-up on supervisors' assessments of their subordinates' for PAS intervention. These meetings shall consider all relevant PAS data, potential patterns of at-risk behavior, and recommended intervention strategies since the last meeting. Also considered shall be patterns involving use of force, sick leave, line-of-duty injuries, narcotics-related possessory offenses, and vehicle collisions that are out of the norm among either personnel in the unit or among the unit's subunits. Division/appropriate Area Commanders and managers shall ensure that minutes of the meetings are taken and retained for a period of five (5) years. Commanders/managers shall take appropriate action on identified patterns of at-risk behavior and/or misconduct.

10. Division/appropriate Area Commanders and managers shall meet at least annually with his/her Deputy Chief/Director and the IAD Commander to discuss the state of their commands and any exceptional performance, potential or actual performance problems or other potential patterns of at-risk behavior within the unit. Division/appropriate Area Commanders and managers shall be responsible for developing and documenting plans to ensure the managerial and supervisory accountability of their units, and for addressing any real or potential problems that may be apparent.

11. PAS information shall be taken into account for a commendation or award recommendation; promotion, transfer, and special assignment, and in connection with annual performance appraisals. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.

12. Intervention strategies implemented as a result of a PAS Activity Review and Report shall be documented in a timely manner.

13. Relevant and appropriate PAS information shall be taken into account in connection with determinations of appropriate discipline for sustained misconduct allegations. For this specific purpose, the only disciplinary information from PAS that shall be considered are sustained and not sustained complaints completed within the time limits imposed by Government Code Section 3304.

14. The member/employee's designated commander/manager shall schedule a PAS Activity Review meeting to be held no later than 20 days following notification to the Deputy Chief/Director that the member/employee has met a PAS threshold and when intervention is recommended.

15.     *The PAS policy to be developed shall include a provision that a member/employee making unsatisfactory progress during PAS intervention may be transferred and/or loaned to another supervisor, another assignment or another Division, at the discretion of the Bureau Chief/Director if the transfer is within his/her Bureau. Inter-Bureau transfers shall be approved by the Chief of Police. If a member/employee is transferred because of unsatisfactory progress, that transfer shall be to a position with little or no public contact when there is a nexus between the at-risk behavior and the "no public contact" restriction. Sustained complaints from incidents subsequent to a member/employee's referral to PAS shall continue to result in corrective measures; however, such corrective measures shall not necessarily result in a member/employee's exclusion from, or continued inclusion in, PAS. The member/employee's exclusion or continued inclusion in PAS shall be at the discretion of the Chief of Police or his/her designee and shall be documented.*

16.     *In parallel with the PAS program described above, the Department may wish to continue the Early Intervention Review Panel.*

17.     *On a semi-annual basis, beginning within 90 days from the effective date of this Agreement, the Chief of Police, the PAS Activity Review Panel, PAS Oversight Committee, and the IAD Commander shall meet with the Monitor to review the operation and progress of the PAS. At these meetings, OPD administrators shall summarize, for the Monitor, the number of members/employees who have been identified for review, pursuant to the PAS policy, and the number of members/employees who have been identified for PAS intervention. The Department administrators shall also provide data summarizing the various intervention strategies that have been utilized as a result of all PAS Activity Review and Reports. The major objectives of each of these semi-annual meetings shall be consideration of whether the PAS policy is adequate with regard to detecting patterns of misconduct or poor performance issues as expeditiously as possible and if PAS reviews are achieving their goals.*

18.     *Nothing in this Agreement, and more specifically, no provision of PAS, shall be construed as waiving, abrogating or in any way modifying the Department's rights with regard to discipline of its members/employees. The Department may choose, at its discretion, to initiate the administrative discipline process, to initiate PAS review or to use both processes concurrently or consecutively.*

(Negotiated Settlement Agreement VII. B.)

**Relevant Policy:**

- **Task 34:** OPD published General Order M-19, *Prohibitions Regarding Racial Profiling and Other Bias-Based Policing* on November 4, 2004); Special Order 9042, *New Procedures Regarding Stop Data Collection* on June 11, 2010; Special Order 9101, *Revised Stop Data Collection Procedures* on February 27, 2013; and Report Writing Manual (RWM) Inserts R-2 (January 15, 2010), N-1 (April 15, 2007), and N-2 (April 15, 2007).

- **Task 41:** OPD revised and issued Departmental General Order D-17, *Personnel Assessment Program,* on November 20, 2013; and issued Department General Order R-01, *Risk Management*, on April 15, 2022.

**Commentary:**

Tasks 34, 40, and 41 relate to the Department's management of risk, a critically important piece of the NSA. The implementation of risk management is overseen by the Oakland Police Department's Bureau of Risk Management, and the required process is detailed in Department General Order R-01, *Risk Management,* effective April 15. 2022.

While Task 40 establishes requirements regarding the collection and use of data, Task 41 requirements set minimal expectations for the process and procedures of risk management. Task 34 has been recognized by OPD as relevant to risk management through the collection and analysis of data regarding police stops of drivers and pedestrians in Oakland. The review and evaluation of stop data has become fully integrated into the risk management process and into the regular Risk Management Meetings. For that reason, this review provides an assessment of compliance with Tasks 34 and 41.

OPD holds Risk Management Meetings on a monthly basis. Those meetings occur for each of the six geographic Areas and for specialized programs including CeaseFire and the Violent Crime Operations Center (VCOC). Those meetings provide the foundation for risk management meetings at the Bureau level. The highest level of Risk Management Meetings is the City-wide meeting, which also occurs on a monthly basis. All command staff generally attend that meeting which is overseen and managed by the Assistant Chief. It is also common that those meetings are attended by other City officials.

At every level of Risk Management Meeting, the agenda includes review of a wide range of issues including uses of force, police pursuits and collisions, and other unusual events. Data are drawn primarily from the Vision database and are often supplemented by the experience of supervisors. Meetings are also attended by members from the Personnel Assessment System (PAS) Unit and reviews of staff members who are considered for, or currently under, risk-related management supervision or intervention are also included. It is also common for meetings to include discussion of a wide range of information reflecting the experience of supervisors. This often covers experiences and explanations beyond what is available in the Vison database.

As noted previously, the sequence of Risk Management Meetings provides significant value. It remains true that the first-level meetings have provided the highest levels of detail on officers and events and have thus been useful for identifying risk-related behavior. Those discussions frequently lay the groundwork for referrals to the PAS Unit for reviews and/or recommendations for remedial strategies. They also provide the clearest examples of the Department's processes of "drilling down" to understand officer activity and "drilling up" to consider how policy and procedure may impact officers.

The City-wide Risk Management Meetings generally require considerable periods of time dedicated to detailed discussion of risk management issues. That time provides one measure of the commitment the Department has made to risk management. Reviewing the content of the meetings also suggests the significance and value of the process. The last meeting that we attended, in February, was led by the Acting Chief and involved high-quality discussion and use of data.

At the same time, the Captains and their staff were all engaged in a productive discussion focused on risk – a discussion that extended to include consideration of the implications of current crime levels on officer activity. That has not been a regular agenda item for these meetings. There was also a significant focus on how younger officers could benefit from understanding and engaging with the risk management process. It is also noteworthy that, early in the meeting, the Acting Chief emphasized the importance of the PAS process for helping officers to be successful in their careers. That became a significant focus in the meetings and is a direct reflection of an element of risk management that is emphasized in the NSA.

The Department remains in compliance with these Tasks.

| Task 34 compliance status | In compliance |
|---|---|
| Task 41 compliance status | In compliance |

# Task 45:  Consistency of Discipline Policy

## Requirements:

*On or before October 6, 2003, OPD shall revise and update its disciplinary policy to ensure that discipline is imposed in a fair and consistent manner.*

   1.   *The policy shall describe the circumstances in which disciplinary action is appropriate and those in which Division-level corrective action is appropriate.*

   2.   *The policy shall establish a centralized system for documenting and tracking all forms of discipline and corrective action, whether imposed centrally or at the Division level.*

3. *All internal investigations which result in a sustained finding shall be submitted to the Discipline Officer for a disciplinary recommendation. The Discipline Officer shall convene a meeting with the Deputy Chief or designee in the affected chain-of-command for a confidential discussion of the misconduct, including the mitigating and aggravating factors and the member/employee's overall performance.*

4. *The COP may direct the Discipline Officer to prepare a Discipline Recommendation without convening a Discipline Conference.*

(Negotiated Settlement Agreement X. B.)

### Relevant Policy:

Five Departmental policies incorporate the requirements of Task 45: Departmental General Order M-03, *Complaints Against Department Personnel and Procedures* (revised most recently on December 22, 2017); Training Bulletin V-T.1 and V-T.2, *Internal Investigation Procedure Manual* (revised most recently on August 23, 2018); IAD Policy & Procedures Manual 21-01, *IAD General Operating Procedures* (published August 17, 2021); and Training Bulletin V-T, *Departmental Discipline Policy* (revised most recently on December 11, 2017).

### Commentary:

For many years, we assessed Task 45 by reviewing the structure of the disciplinary process, the outcomes of cases with sustained findings, and whether the required information was included in the IAD – and eventually, Vision – database. The Department also developed a Disciplinary Matrix.

After those criteria were satisfied, an analysis of data by external researchers raised questions about equity and demonstrated the potential contribution of statistical analyses. The Department's increasing capacity for analysis later led to its current practice of involving internal statistical reviews of discipline-related data.

In our last report, we found the Department to be in compliance with the requirements of Task 45. That finding was based on the statistical analysis of data reported in the Department's September 2022 "Discipline Equity and Internal Procedural Justice Report," which examined data for January-June 2022. We also encouraged the Department to develop, and provide for review, a technical report describing the decisions made about the data and the procedures employed. We wrote, "A technical report for the analyses relevant to Task 45 would not only be useful for the Monitor's compliance review, but would also serve as an archive of all the analyses completed." The Department has yet to create a separate, stand-alone report, which we believe would be useful for forthcoming reviews in the Department; it would also serve as a basis for tracking discipline disparity data over time. OPD policy now calls for the annual collection and review of discipline disparity data.

The Department recently released its analyses of the annual data for 2022 in its "Internal Investigation Outcome and Discipline Report." This report provides a review of disciplinary allegations and the levels at which they were sustained. Initially, the document did not break down the number of disciplinary cases by race and ethnicity and make comparisons to the breakdown of Department personnel. The Department's first draft emphasized the importance of its "case" level approach (that is, individual employees who faced allegations) – but it did not provide case-level data (that is, the race or ethnicity of those individuals) to facilitate demographic comparisons. During a discussion between the Monitoring Team and the Department's research staff, the Department noted that it had already identified that issue and had begun pulling together the demographic comparisons; the information appeared in the published draft of the report.

The Department must better explain the disparity in this same report that Black officers "very clearly experience more severe discipline" than white officers for violations of Failure to Accept or Refer a Complaint (Unintentional). The Department looked at 22 officers – 12 Black, 10 white – who were sustained for this violation and found that 90% of the white officers received counseling, while 58% of the Black officers received suspensions. We look forward to hearing from the Department what the cause of this disparity might be, and what policy or procedures will be implemented to remediate this.

The January 14, 2023 public report, by the outside investigators retained by the City, brought to light significant other issues that have bearing on Task 45. These issues cannot be ignored.

Citing an instance in which a sergeant was able to "evade serious discipline," the report states, "These investigations revealed issues and shortcomings that go beyond the conduct of individual officers to the very question of whether the Oakland Police Department is capable of policing itself and effectively holding its own officers accountable for misconduct."

Systemic and other deficiencies cited by the outside investigators were exacerbated by investigative and disciplinary decisions, which were premised on the status and positional considerations of both violators and decision-makers.

Noteworthy is the Department's own survey of OPD members' perceptions of the investigative and discipline process which found that 57% of officers either disagreed or strongly disagreed with the statement, "The OPD's investigation and disciplinary process is fair." This survey was reported in the September 2022 report of the Department's Office of Internal Accountability (OIA), "Discipline Equity and Internal Procedural Justice Report."

All these constitute foundational issues of Task 45. Disparities in internal investigative and disciplinary decisions raise questions about enforcement equities in the delivery of police services to the community. The Department cannot be assessed on the quality of its analytical documents alone. Its conduct and practices must speak for themselves. OPD must demonstrate how both data and deed diminish disparities. It is not just about compliance. It is time for organizational introspection.

| Task 45 compliance status | No compliance finding |
|---|---|

## Conclusion

The Oakland Police Department is facing very serious questions about its capacity to police itself. Deep into the sustainability period, issues embedded in the history of the organization – issues that were part of the genesis of the Negotiated Settlement Agreement – have reappeared. While the Department has made unquestionable progress in its technical compliance with NSA Tasks, a myriad of cultural deficiencies linger. In the aftermath of recent developments, Mayor Sheng Thao has invoked the leadership essential to the sustainment of a culture of accountability. The Mayor has set the tone that should permeate the Department so organizationally, it is in both technical compliance and on the road to real cultural transformation.

Chief (Ret.) Robert S. Warshaw
*Monitor*