BARBARA J. PARKER, City Attorney, CABN 69722
RYAN RICHARDSON, Special Counsel, CABN 223548
BRIGID S. MARTIN, Special Counsel, CABN 231705
One Frank H. Ogawa Plaza, 6th Floor
Oakland, California 94612
Telephone: (510) 238-3751
Facsimile: (510) 238-6500
Email: BMartin@oaklandcityattorney.org

Attorneys for CITY OF OAKLAND

JOHN L. BURRIS, CABN 69888
Law Offices of John L. Burris
Airport Corporate Centre
7677 Oakport Street, Ste. 1120
Oakland, California 94621
Telephone: (510) 839-5200
Facsimile: (510) 839-3882

JAMES B. CHANIN, CABN 76043
Law Offices of James B. Chanin
3050 Shattuck Avenue
Berkeley, California 94705
Telephone: (510) 848-4752

Attorneys for PLAINTIFFS

*(Additional Counsel on Next Page)*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| DELPHINE ALLEN, et al. | Case No. 00-cv-04599 WHO |
| Plaintiffs, | **JOINT CASE MANAGEMENT STATEMENT** |
| v. | Date: April 11, 2023 |
| CITY OF OAKLAND, et al., | Time: 3:30 p.m. |
| Defendant(s). | Courtroom 2, 17th Floor |
| | Hon. William H. Orrick |

1   ROCKNE A. LUCIA, JR., CABN 109349
    Rains Lucia Stern St. Phalle & Silver
2   Attorneys & Counselors at Law
    2300 Contra Costa Boulevard, Suite 500
3   Pleasant Hill, CA 94523
    Telephone: (925) 609-1699
4   Facsimile: (925) 609-1690

5   Attorneys for OAKLAND POLICE OFFICERS ASSOCIATION

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

**PARTIES' JOINT STATEMENT**.............................................................................. 1

**PLAINTIFFS' STATEMENT**................................................................................. 5

PLAINTIFFS' CURRENT POSITION ..................................................................... 5

I.   TASK 5 (COMPLAINT PROCEDURES FOR IAD) ..................................... 6

II.  TASK 45 (CONSISTENCY OF DISCIPLINE POLICY)............................. 12

CONCLUSION............................................................................................................ 17

**CITY'S STATEMENT**............................................................................................ 18

OVERVIEW................................................................................................................. 18

I.   INTERNAL AFFAIRS COMPLAINT PROCEDURES (TASK 5)......................... 18

   A. The Department is Already Employing Practices to Prevent the Deficiencies
      Identified by the Outside Investigator and to Strengthen Internal
      Investigations in the Immediate Term ........................................................... 19

   B. Mandating Practices in Policy Will Provide Long-Term Sustainability of
      Protections and Improvements....................................................................... 23

      1. The Department's Two Proposed Alternative Recommendations................. 24

II.  CONSISTENCY OF DICIPLINE POLICY (TASK 45) ...................................... 29

II.  INTERNAL AFFAIRS TIMELINES (TASK 2)..................................................... 33

III. THE DEPARTMENT'S MAINTAINS AN EFFECTIVE RISK MANAGEMENT
      PROGRAM (TASKS 34 &41)............................................................................. 33

   A. The Department Continues to Meaningfully Use Stop Data as Part of its Risk
      Management Process......................................................................................... 34

V.   OFFICER RECRUITING, ATTRITION, DEPARTMENT
      DIVERSITY .......................................................................................................... 36

VI.  OFFICERS USE REASONABLE FORCE AND DEPARTMENT FORCE
      REVIEW IS DEPENDABLE............................................................................... 42

   A.  Force and Force Investigations (TASKS 24 & 25)......................................... 42

   B.  Force Boards (TASKS 26 & 30)...................................................................... 44

CONCLUSION ............................................................................................................ 45

**OAKLAND POLICE COMMISSION'S STATEMENT** ........................................ 46

**THE OPOA'S STATEMENT**.................................................................................... 50

1

**PARTIES' JOINT STATEMENT**

2   At the last hearing, the Court asked the parties to "engage in a discussion of

3   how to move forward in a way that finally achieves compliance." Plaintiffs' counsel

4   and the Mayor, City Administrator, City Attorney, Police Department, Police

5   Commission Chair, Inspector General, and the Community Police Review Agency

6   (CPRA) Director have been meeting together to discuss how to best implement the

7   outside investigator's recommendations as well as other ways to strengthen the

8   Department's internal investigation processes. A member of the Monitoring Team

9   has also attended those meetings. During additional party meetings involving

10   leaders from each of these City entities and plaintiffs' counsel, the parties have

11   shared perspectives on what we need to ensure the Department sustains

12   substantial compliance with the NSA absent further Court oversight.

13   The parties have reached some consensus about how to move forward in a

14   way that finally achieves compliance and ensure that the City can sustain

15   substantial compliance absent Court oversight.

16   To the extent the parties do not concur, each party sets forth its further

17   position in the party's statement to the Court.

18   The parties agree that the Department has sustained compliance on 49 of 51

19   NSA tasks. The parties agree, however, that the Department must strengthen its

20   internal investigation processes to remedy the deficiencies identified in the outside

21   investigator's January 2023 report. The Department must also ensure that those

22   processes result in fair and consistent discipline.

23   The Department is creating and revising its policies and practices to

24   implement the outside investigator's recommendations or better alternatives,

25   though the changes extend beyond merely responding to the recommendations. The

26   parties agree that the following seven new or revised policies must be in effect

27   before the City can demonstrate the Department's ability to sustain substantial

28   compliance with the NSA absent Court oversight: Department General Order

(DGO) D-22, Personal Relationships (new); Criminal Investigation Division (CID) Recusal Process Policy (revised); DGO M-04.1, Criminal Investigation of Members (revised); IAD Policy and Procedure Manual (revised); IAD Training Bulletin VT.01 (revised); CID Policy and Procedure Manual on Training (revised); and an Information Bulletin on psychological fitness for duty evaluations (new).

Although the parties have made progress concurring on the content of new policy and revisions to existing policy, there remains work to be completed. The Department has sent drafts of six of the seven policies and associated tracking forms (TF) and report templates to the Monitoring Team and plaintiffs' counsel for feedback: DGO D-22, Personal Relationships; CID Recusal Policy; Internal Affairs Division (IAD) Policy and Procedure Manual; and IAD Training Bulletin VT.01, Internal Investigations Procedures. The Department has received and incorporated Monitoring Team feedback on DGO-22, Personal Relationships; and CID Recusal Process Policy.

After the Department incorporates feedback from the Monitoring Team and plaintiffs' counsel, it will send the policies to the Police Commission. Pursuant to charter section 604(b)(5), the Commission has 120 days to review, approve, or revise these policies. The City's labor unions must also be given reasonable time to meet and confer regarding new or revised Department General Orders. Once a final policy has been reviewed and approved by all appropriate City entities, the Department's practice is to send it back to the Monitoring Team to review any substantive changes. Although it is rare, in one instance (i.e., body-worn camera policy) that additional layer of review resulted in additional changes suggested by the Monitoring Team that required the policy to be resent to and reapproved by the Police Commission which delayed policy implementation.

While the parties await publication of the policies, the Department will begin to implement certain practices consistent with these policies that are key to correcting the deficiencies identified in the outside investigator's report.

JOINT CASE MANAGEMENT
STATEMENT

Case No. 00-cv-4599 WHO

First, the Chief of Police must read all internal investigation reports involving a recommended finding of sustained for any allegation that could result in termination (i.e., has 'T" as one of the possible consequence on the Discipline Matrix; this includes Manual of Rules violations for obedience to laws felony/serious misdemeanor and DUIs, and use of force), or a recommended finding of sustained for obedience to laws misdemeanor/infraction. Second, prior to case presentations to the Chief, the deputy chief in an investigator's chain of command must review cases with recommended sustained findings for allegations that could result in termination, and allegations of violations of obedience to laws misdemeanor/infraction. Third, the Bureau of Risk Management Deputy Chief must review cases involving not sustained recommended findings for allegations that could result in termination if sustained, and not sustained allegations of violations of obedience to laws misdemeanor/infraction. Fourth, the Department has added an executive summary to investigators' presentation template that notes whether the case involves any of the following: subject removed or downgraded to witness, deletions or changes in MOR violation allegations, or an addendum of disagreement by any reviewer on the recommended findings. Fifth, any internal investigation involving an allegation that was the subject of a District Attorney or Public Defender misconduct referral must be reviewed by the Bureau of Risk Management Deputy Chief and Chief of Police, regardless of the recommended findings.

In addition to the Department's work directly impacting internal investigations on the front end, the Department must also engage in additional work to evaluate the results of its investigations, including investigation outcomes and discipline. While the Department's creation and use of a written methodology to evaluate the consistency of discipline is significant, the deficiencies identified in the January 2023 report show that inconsistencies may not always be reflected in the data. The Department must, therefore, engage not only in a statistical analysis of the data but in a qualitative analysis when appropriate. For example, the

JOINT CASE MANAGEMENT STATEMENT                                                                 Case No. 00-cv-4599 WHO

Department observed in 2022 (and in previous years) that a greater number of Black officers (in comparison to white officers) received discipline in the form of written reprimand rather than counseling and training. While not a statistically significant difference, it is an observable, apparent difference. In response, the Department began an additional qualitative investigation of these cases. That qualitative investigation remains ongoing. The Department is preparing a supplemental report to its 2022 Investigative Outcome and Discipline Report.

The Department will demonstrate its commitment and ability to sustain substantial compliance by adhering to the practices described above and implementing the new and revised policies listed herein. When the seven policies are in effect, and the Department has further evaluated the consistency of case outcomes and discipline, the parties will reassess their perspectives about the Department's ability to sustain substantial compliance absent further Court oversight. The parties are optimistic that at that time they will have a more definitive assessment about how close they believe the City is to sustaining on its own substantial compliance with the NSA.

JOINT CASE MANAGEMENT STATEMENT

Case No. 00-cv-4599 WHO

**PLAINTIFFS' STATEMENT**

**PLAINTIFFS' CURRENT POSITION**

The Independent Monitor for the OPD has issued one NSA Sustainability Period Report since the last Case Management Conference statement.  This sustainability period involves the monitoring of the "last remaining and most critical Negotiated Settlement Agreement Tasks: 2, 5, 20, 24, 25, 26, 30, 31, 34, 41, and 45." (Dkt. 1525, p. 2)

According to the Third NSA Sustainability Period Report of the IMT, OPD is in compliance with nine of these eleven Tasks:

1. Task 2 (Timeliness Standards and Compliance with IAD Investigations –in compliance when most recently assessed by the IMT in the 79th Report and in compliance

   per the Third NSA Sustainability Period Report);

2. Task 20 (Span of Control – in compliance per the Third NSA Sustainability Period Report);

3. Task 24 (Use of Force Reporting Policy – in compliance per the Third NSA Sustainability Period Report);

4. Task 25 (Use of Force Investigations and Report Responsibility – in compliance per the Third NSA Sustainability Period Report);

5. Task 26 (Force Review Board (FRB) – in compliance per the Third NSA Sustainability Period Report);

6. Task 30 (Executive Force Review Board (FRB) – in compliance per the Third NSA Sustainability Period Report);

7. Task 31 (Officer-Involved Shooting Investigations Review Protocol) – in compliance per the Third NSA Sustainability Period Report);

8. Task 34 (Stop Data – in compliance per the Third NSA Sustainability Period Report);

9. Task 41 (Use of Personnel Assessment System (PAS) and Risk

1   Management – in compliance per the Third NSA Sustainability Period

2   Report)

3

4   As of this writing, OPD is not in compliance with two NSA tasks:

5   1. Task 5 (Internal Affairs Division (IAD) Complaint Procedures – in

6   compliance when assessed by the IMT in the 79th Report, but "Deferred" in

7   the First NSA Sustainability Period Report and deemed "not in compliance"

8   according to the Second and Third NSA Sustainability Period Reports.)

9   2. Task 45 (Consistency of Discipline – this was in partial compliance during

10   the First NSA Sustainability Period Report, then was deemed in full

11   compliance during the period covered draft Second NSA Sustainability Period

12   Report.  However, in the third, most-recent Sustainability Period Report, the

13   IMT reported "no compliance finding" for this Task.  Although this language

14   is vague, and not elaborated upon by the IMT, this is clearly a step down

15   from the IMT's previous finding of "full compliance"

16

17   Plaintiffs' attorneys agree with the IMT that OPD is not currently in

18   compliance with Tasks 5 and 45.  The other nine Tasks that are being actively

19   monitored by the IMT during the Sustainability Period were also in compliance

20   during the period covered by the previous (Second) Sustainability Report and have

21   not materially changed since the January 2023 Case Management Conference in

22   this matter.  Plaintiffs will therefore focus on Tasks 5 and 45, which are not in

23   compliance, and which will determine whether OPD is able to achieve full

24   compliance with the NSA and/or continue with the Sustainability Period.

25   **I.    Task 5 (Complaint Procedures for IAD)**

26   Task 5 pertains to Complaint Procedures for the Internal Affairs Division,

27   and consists of several subtasks, all of which the IMT had previously found in

28   compliance, including:

6

Case No. 00-cv-4599 WHO

- Task 5.1, which requires that when a citizen wishes to file a complaint, the citizen is brought to a supervisor or IAD, or a supervisor is summoned to the scene.

- Task 5.2, which requires that if there is a delay of greater than three hours in supervisory response, the reason for the delay must be documented.

- Task 5.3, which requires that where a complainant refuses to travel to a supervisor, or wait for one, personnel make all reasonable attempts to obtain specific information to assist in investigating the complaint.

- Task 5.4, which requires that specific information be documented on a complaint form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander.

- Task 5.5, which requires that the supervisor or Area Commander notify Communications and forward any pertinent documents to IAD.

On March 23, 2016, the Court issued an Order indicating that irregularities and potential violations of the NSA occurred in IAD investigation 15-0771. Multiple officers were ultimately terminated and disciplined in that matter, which involved the widely reported sexual exploitation of a minor, and the Department's calamitous handling of the investigation into this matter led to this Court to appoint an outside firm to investigate and report on this matter as well as the departure of the then-Chief of Police.

In the years since this sex scandal and the resultant Swanson Report, the IMT had focused on subtasks 5.15 to 5.19 and subtask 5.21, which address the quality of completed IAD investigations. The IMT determined that subsequent IAD investigations improved to the standards mandated by the NSA and, in February 2022, OPD reattained full compliance with Task 5. It appeared that OPD had made real, sustainable progress with regard to Internal Affairs Investigations.

However, the First OPD Sustainability Report moved the status of Task 5

JOINT CASE MANAGEMENT
STATEMENT

Case No. 00-cv-4599 WHO

from "in compliance" to "deferred compliance", and OPD was downgraded to "not in compliance" in Second OPD Sustainability Report.  According to the Third Sustainability Period Report, OPD remains out of compliance with this all-important Task.

Specifically, in the Third Sustainability Period Report, the IMT writes:

> Investigations conducted by outside investigators retained by the City resulted in several serious disciplinary determinations. These matters called into question the capacity of the Department to investigate its own personnel. The outside investigators also cited a host of systemic and other deficiencies that need to be addressed both in the creation of requisite policies and their resultant implementation. While some progress to remediate these issues has commenced, the Department remains not in compliance with Task 5. (Dkt. 1577, Third Sustainability Period Report, p. 9)

Plaintiffs' attorneys first became aware of the details of this investigation on January 18, 2023, when the "Conclusions and Recommendations Re: Vehicle Collision and Elevator Discharge Incidents" drafted by the independent law firm, Clarence Dyer, & Cohen LLP (Clarence Dyer, & Cohen Report), were filed in the docket and publicly disclosed in full.  (Dkt. 1564, "Clarence Dyer Report")

We are mindful that we all have roles to play in this process that has lasted more than 22 years. We may have disagreements but that should not be read as reflective of our lack of respect for one another.

Accordingly, Plaintiffs' attorneys do not agree with all the findings made by Clarence Dyer because some of these findings were not supported by direct evidence and were more the product of conclusions that were capable of other conclusions based on the same facts.  However, we do agree with Clarence Dyer's general conclusions about the department and their recommendations.

This document echoes the catastrophic failures that plagued OPD at earlier points in the NSA process, and affirmed the IMT's conclusion that OPD is out of compliance with Task 5.  The Clarence Dyer Report documented definitive,

JOINT CASE MANAGEMENT STATEMENT

Case No. 00-cv-4599 WHO

1  comprehensive, and pervasive cultural and systemic problems within Department,

2  as well hugely significant failures by individuals in the OPD command staff.

3       The specific details were elaborated in the public Clarence Dyer Report and

4  were also summarized in Plaintiff's most recent Case Management Conference

5  Statement.  Two other Reports of Investigation by the Clarence Dyer firm were also

6  provided to Plaintiffs' attorneys -- and other stakeholders, including the Police

7  Commission -- pursuant to a protective order.  Although large portions of these

8  documents were subsequently leaked to the press and are now publicly available,

9  Plaintiffs' attorneys will not comment on the specifics contained therein in this Case

10  Management Conference.

11       After the public disclosure of these documents, as well as the most recent

12  Case Management Conference before this Court, Mayor Sheng Thao terminated

13  then-Chief of Police Armstrong, citing her commitment "to ensure that the Police

14  Department and the City can prove, once and for all, that Oakland is ready to

15  ensure constitutional policing without federal oversight... in order to finally bring

16  an end to Oakland's federal oversight – and not risk the investments we've made for

17  over 20 years – it's an absolute requirement that my administration, including the

18  Chief of Police, be able to work closely with the monitoring team and speak credibly

19  before the court."[1]

20       The Clarence Dyer Report published in the *Allen* docket "identified certain

21  procedural irregularities and possible violations of OPD policy committed by OPD

22  members who conducted the initial criminal and administrative investigations"

23  (Clarence Dyer, & Cohen Report, p. 8), which resulted in a third investigation into

24  the way that OPD's Internal Affairs and Criminal Investigation Division undertook

25  their investigations of the elevator discharge.

26  ///

27

28  [1] https://www.oaklandca.gov/news/2023/statement-of-oakland-mayor-sheng-thao

1

The Clarence Dyer, & Cohen Report concluded that:

2

3

During the course of the three confidential Internal Affairs Division
investigations referred to above – one for the vehicle collision incident,
the second for the elevator discharge incident, and the third for the
investigation into the Department's handling of the elevator discharge
– outside investigators encountered multiple deficiencies in process
and policy that undermined the full and complete discovery of the
facts. While some of these deficiencies stem from gaps in Department
policies, other deficiencies flowed from the Department's failure to
follow or implement existing Department policies. Most disturbingly,
some of the deficits appear to stem from a failure of leadership and a
lack of commitment to hold members of the Oakland Police
Department accountable for violations of its own rules... **These
investigations revealed issues and shortcomings that go
beyond the conduct of individual officers to the very question
of whether the Oakland Police Department is capable of
policing itself and effectively holding its own officers
accountable for misconduct**.
(Clarence Dyer, & Cohen Report, p. 9, emphasis NOT original)

4

5

6

7

8

9

10

11

12

13

14

Although we do not agree with every word of the Clarence Dyer report,

15

Plaintiffs' attorneys do agree that there were widespread systemic failures, as well

16

as individual failures by some high ranking OPD personnel, that are incongruous

17

with the letter and the spirit of Task 5 of NSA.  The IMT's Third Sustainability

18

Period Report also highlights "a host of systemic and other deficiencies" (Dkt. 1577,

19

Third Sustainability Period Report, p. 9) that resulted in the IMT's "not in

20

compliance" finding for this Task.

21

The Clarence Dyer Report found that the three investigations in its purview

22

"were dogged by a lack of forthrightness by multiple members, both subjects and

23

witnesses, that betrayed a lack of commitment to the pursuit of truth by the

24

Internal Affairs process."  (Clarence Dyer, & Cohen Report, p. 10). This cannot be

25

reconciled with the requirements mandated by Task 5 of the NSA, specifically, or

26

the spirit of the NSA as a whole.

27

///

28

JOINT CASE MANAGEMENT
STATEMENT

Case No. 00-cv-4599 WHO

During the January 2023 Case Management Conference, Judge Orrick stated:

> Prior to the next CMC, I expect the City to have adopted each of the recommendations in the report with respect to the Internal Affairs Division and Criminal Investigations Division or to explain why what it has done in the alternative is more effective." (Dkt. 1570, Transcript of Remote Zoom Video Conference Proceedings, p. 4).

These recommendations were as follows:

a. OPD should require all personnel involved in the investigation, review, supervision, and approval of IAD and CID cases to conform to the recusal standards of applicable policies (Dkt. 1564, p. 11)

b. OPD should adopt a policy that requires approval and documentation of all changes to draft Reports of IAD Investigations. (Dkt. 1564, p. 12)

c. OPD should adopt a policy that requires all briefings regarding ongoing IAD investigations to be documented. (Dkt. 1564, p. 13)

d. OPD should adopt a policy that requires the Chief of Police to read reports of IAD investigations before signing them. (Dkt. 1564, p. 13)

e. OPD should adopt a Department-specific policy regarding acceptable personal relationships between sworn members and when and how those relationships must be reported. (Dkt. 1564, p. 13)

f. OPD should review its implementation and training regarding the policies governing use by OPD members of OPD-issued cellular telephones and personal cellular telephones for all Department-business and to prohibit the use of personal cellular telephones for work-related communication. (Dkt. 1564, p. 14)

g. OPD should revise its rule regarding physical fitness for duty to explicitly include mental health. (Dkt. 1564, p. 15)

h. OPD, through its Office of Internal Accountability, should review and improve its policies, practices, and training regarding investigations of members accused of criminal misconduct to ensure rigor and accountability. (Dkt. 1564, p. 15)

As of the filing of this Case Management Statement, the Oakland Police Department has made progress on the drafting of these policies.  Plaintiffs' counsel will have a more updated account of this progress at the time of the Case Management Conference. Plaintiffs' counsel also believe that these policies should be approved by the Monitor, officers should be trained by the OPD in these policies, and then a suitable period should take place subject to Monitor approval where the OPD is certified as in compliance with these tasks.

JOINT CASE MANAGEMENT
STATEMENT

Case No. 00-cv-4599 WHO

1   The Clarence Dyer Report concludes that "The multiple failures, at every

2   level, to hold this sergeant responsible, belie OPD's stated position that it can police

3   itself and hold its members accountable for misconduct. Instead, investigators were

4   left with the impression that the system is designed not to uncover the truth and

5   hold those who commit misconduct to account, but instead to find ways to minimize

6   misconduct such that OPD members are able to avoid serious discipline." (Dkt.

7   1564, p. 16).  OPD has therefore breached the terms of the Sustainability Period for

8   a second consecutive Sustainability Report Period, and it is clear to Plaintiffs'

9   attorneys (and, per the Third Sustainability Report, the IMT) that OPD is still not

10   currently in compliance with Task 5.

11   The OPD's misuse and overuse of "unfounded" findings on Internal Affairs

12   cases has been a problem that has been raised by Plaintiffs' attorneys since the

13   start of the Negotiated Settlement Agreement.  Unfortunately, this problem has not

14   gone away and persists to this day.

15   California law prohibits public discussion of the specifics of many Internal

16   Affairs findings.  We will be happy to discuss this situation further with appropriate

17   safeguards consistent with California law.

18   **We are mindful that unfounded Internal Affairs findings cannot be**

19   **used for any reason including to identify problem officers in Risk**

20   **Management meetings**. (as opposed to findings of not sustained and sustained).

21   We are sure that this is a motivation for the excessive use of "unfounded" by the

22   Internal Affairs Bureau.  Until this problem is rectified, we cannot agree that OPD

23   is in compliance with Task 5.

24   **II.    Task 45 (Consistency of Discipline Policy)**

25   Task 45 requires that discipline is imposed in a fair and consistent manner.

26   Even though the IMT determined that OPD was in compliance with this NSA Task

27   during the Second Sustainability Period, Plaintiffs' attorneys were unable to make a

28   recommendation on OPD's compliance with this Task at the time of the most recent

JOINT CASE MANAGEMENT                                    Case No. 00-cv-4599 WHO
STATEMENT

1  (January 2023) Case Management Conference.

2  As noted in Plaintiffs' January 2023 Case Management Conference

3  Statement, the Clarence Dyer Report detailed a scenario where discipline was

4  imposed without a full and complete review of the facts uncovered by the Internal

5  Affairs Division.  A discipline process where the Chief of Police did not read Reports

6  of Investigation before signing them could not be compatible with Task 45.

7  Similarly, a scenario where the IA commander could demand revisions to a Report

8  of Investigation (ROI) over the objections of his subordinates without any

9  documentation about such a directive was antithetical to the goal of fair and

10  transparent discipline within the Department.

11  It is therefore unsurprising that the IMT's Third Sustainability Report cites

12  the Clarence Dyer Report as a basis for downgrading OPD's compliance status with

13  Task 45 to "no compliance finding."  The IMT found that:

14  
15  > Systemic and other deficiencies cited by the outside investigators were
> exacerbated by investigative and disciplinary decisions, which were
> premised on the status and positional considerations of both violators
16  > and decision-makers. (Dkt. 1577, Third Sustainability Period Report,
> p. 32)
17  
18  The Clarence Dyer Report also noted "investigators were left with the

19  impression that the system is designed not to uncover the truth and hold those who

20  commit misconduct to account, but instead to find ways to minimize misconduct

21  such that OPD members are able to avoid serious discipline." (Clarence Dyer, &

22  Cohen Report, p. 15).

23  This echoes some of the findings of the Hillard Heintze disparity study.

24  Although that study had widely acknowledged data problems that rendered some of

25  the resultant analysis functionally useless, there was also a survey element

26  unrelated to data-scraping from OPD's risk management systems.

27  This portion of the Hillard Heintze Disparity Study found that OPD

28  personnel believe "who you know, and to which cliques you belong, influence

13

1  whether an investigation will be sustained and what level of discipline will be

2  administered"[2], and that the "IAD and disciplinary processes are not transparent."

3  (Hillard Heintze Disparity Study, p. 23).  It also found the IAD policy which allowed

4  sergeants to be "fact finders and adjudicators has the potential to lessen an

5  investigator's neutrality" and that this system "is not consistent with promising

6  practices used in departments similar in size to Oakland." (Disparity Study, p. 11).

7       The Hillard Heintze study also determined that just 18.68% of sworn

8  respondents believe that OPD's disciplinary process is fair, while 81.32 percent of

9  respondents disagreed with the statement "OPD's disciplinary process is fair."

10 (Disparity Study, p. 17)

11

12  Only 18.68 percent of the sworn respondents agreed or strongly agreed that the disciplinary process is fair.

13

14

15

16

17

18

19

20

21

22

23

**The Oakland Police Department's disciplinary process is fair.**

- Strongly Agree: 1.95%
- Agree: 16.73%
- Disagree: 44.36%
- Strongly Disagree: 36.96%

---

24  [2] This has also been highlighted by the Police Commission in the run-up to this Case Management

25  Conference.  Attachment 2 to the Police Commission Special Meeting for 03/30/23 Agenda Packet
notes that "Related to Task 45…OPD needs far more granular information about the widely

26  expressed perception of unfair discipline, including information about what OPD employees perceive
as "cliques." The Commission currently has an Ad Hoc Committee that is tasked with investigating

27  allegations made by the members of the Oakland Black Officers Association (OBOA) that they are
subject to more severe discipline than other officers (Police Commission Special Meeting, p. 11 of

28  25)." Plaintiffs' attorneys agree with the Commission's request for more granular data regarding
perceived discipline disparities within the Department.

JOINT CASE MANAGEMENT                                    Case No. 00-cv-4599 WHO
STATEMENT

Similarly, the survey data revealed that nearly 80% of OPD respondents "agreed or strongly agreed that rank plays a factor in determining the outcome of an internal investigation and the determination of discipline." (Disparity Study, p. 22)





*Confidential and Proprietary  |  © 2020 HILLARD HEINTZE*                    22

15

JOINT CASE MANAGEMENT
STATEMENT

Case No. 00-cv-4599 WHO

The above charts and data speak to ongoing problems within the Oakland Police Department related to Task 45 and consistency of discipline. The incident involving an OPD sergeant, as detailed in the Clarence Dyer report, is a concrete example of discipline disparities that a super-majority of OPD personnel believe to be problematic. Although personnel issues prevent Plaintiffs' attorneys from specifying every reason for our view in this matter, City of Oakland officials with access to this entire investigation (as well as the IMT) know the details of why we feel this way. The portion of the Clarence Dyer report in the public Court docket shows that the minimal discipline the sergeant initially received – based on an IA process that command staff meddled in and/or intentionally averted their gaze from – was blatant favoritism related to the Sergeant's status within the Department and specific community interest groups.

A discipline system that is "unfair" in the eyes of more than five of every six employees is untenable, and not up to the standard mandated by Task 45 of the NSA. Indeed, during Plaintiffs' attorneys many years of involvement with OPD, we have noticed that supervisors and command staff often receive lighter discipline than rank-and-file officers. The Clarence Dyer, & Cohen Report's findings regarding the vehicle collision and subsequent investigatory and disciplinary process is an illustrative example of exactly this dynamic.

Finally, recent IA data has shown that African Americans are disproportionately disciplined in "unintentional failure" to refer citizens who wish to file a complaint to the appropriate complaint agency. It is concerning to us that this area—one that gives sergeants the most discretion to file any complaint against a subordinate—is the single most significant area where racial disparities appear. This must be remedied (as noted in our joint statement) and be subject to appropriate review.

Accordingly, the Department remains in breach of the parameters of the Sustainability Period as originally set out in the Negotiated Settlement Agreement.

JOINT CASE MANAGEMENT STATEMENT

Case No. 00-cv-4599 WHO

III.    **Conclusion**

The IMT has determined that OPD is out of compliance with Task 5 and has downgraded OPD's compliance with Task 45 to "no compliance status". Plaintiffs' attorneys believe OPD is not in compliance with Task 45.

In January of this year, OPD was in full compliance with ten of the eleven NSA Tasks. As of this writing, OPD is compliance with only nine. Multiple command-level officers have been disciplined for rules violations that directly impact NSA Tasks 5 and 45. The Department is, objectively, backsliding.

Tasks 5 and 45 are foundational to the NSA, and to constitutional policing. If the OPD cannot perform competent Internal Affairs Investigation or discipline its own officers fairly, there will always be questions as to whether they can police themselves, or provide equal justice in the community they serve. Plaintiffs' attorneys will never agree that the OPD has attained compliance if members of the Command Staff attempt to hide misconduct from appropriate supervisors (including the Police Commission), and/or impose inconsistent discipline based on who you know, your race, or what rank you have. These are concrete, incontrovertible breaches of the letter of NSA Tasks 5 and 45, respectively.

It is also clear that Court and IMT oversight is still required. **OPD is not in compliance with the NSA.** Plaintiffs' attorneys therefore urge the Court to modify the Sustainability Period until, at the very least, OPD regains full compliance with each and every NSA Task.

JOINT CASE MANAGEMENT
STATEMENT                                          Case No. 00-cv-4599 WHO

**CITY'S STATEMENT**

**OVERVIEW**

For the past nine months the City has sustained substantial compliance with all but two NSA tasks, Task 5, Internal Affairs Complaint Procedures, and Task 45, Consistency in Discipline Policy. To the extent that its sustained compliance continues through the one-year mark on Tasks 20, 24, 25, 26, 30, 31, 34, and 41, the City asks that the Court remove these eight tasks from further affirmative assessment by the Monitoring Team after May 31, 2023, similar to the previous reduction in task assessments imposed by the Court in its May 2022 Order. The City asks that after June 1, 2023, the Monitoring Team affirmatively assess only the three tasks related to internal investigations: Tasks 5, 45, and 2, Internal Affairs Timelines. While the City expects that the Department will sustain compliance with Task 2 timelines through the one-year sustainability period, it nonetheless appreciates how closely Task 2 is tied to Task 5. The Department must ensure that its improvements in the quality of its internal investigations do not result in a decline in timeliness. Reducing the number of affirmatively assessed tasks will allow the City to focus more of its resources where they are needed the most in the immediate term.

In this status report, the City discusses the following: (1) strengthening the Department's internal investigation processes (Task 5), (2) consistency of discipline policy (Task 45), (3) internal affairs timelines (Task 2), (4) the Department's risk management program and use of stop data to reduce racial disparities (Tasks 34 & 41), (5) officer recruiting, and attrition, and diversity, and (6) force and force investigations (Tasks 24, 25, 26 & 30).

I.   **STRENGTHENING INTERNAL INVESTIGATIONS PROCESSES (TASK 5)**

The Department has fully completed one of eight of the outside investigator's recommendations. The additional seven recommendations involve developing new

JOINT CASE MANAGEMENT
STATEMENT

Case No. 00-cv-4599 WHO

1  policy or revising existing policy. The Department has begun practices to

2  immediately address the deficiencies identified by the outside investigator while it

3  completes policy development and revision.

4  **A.  THE DEPARTMENT IS ALREADY EMPLOYING PRACTICES TO**

5  **PREVENT THE DEFICIENCIES IDENTIFIED BY THE OUTSIDE**
   **INVESTIGATOR AND TO STRENGTHEN INTERNAL**

6  **INVESTIGATIONS IN THE IMMEDIATE TERM**

7  The Department completed the additional training on DGO I-19, Electronic

8  Communication Devices (Sep. 20, 2022), regarding the use of Department-issued

9  versus personal cell phones for work-related purposes. *See* Ex. 1, *Memorandum re I-*

10  *19 Training Review and Update* (Mar. 2023). The Department also implemented

11  certain practices in response to the outside investigator's other recommendations

12  until formal policy is developed or revised.

13  Since Chief Allison assumed his role, he has been reading all internal

14  investigation reports with any sustained findings. Consistent with the parties' joint

15  statement and the Department's proposed policy changes, moving forward Chief

16  Allison must continue to read all reports of investigation with recommended

17  sustained findings that could result in termination (i.e., has "T" as one of the

18  possible consequences on the Discipline Matrix; this includes Manual of Rules

19  violations for obedience to laws felony/serious misdemeanor and DUIs, and use of

20  force), or recommended sustained findings for obedience to laws

21  misdemeanor/infraction. All internal investigation briefings are documented with

22  notes of the briefings. Any significant changes to investigation reports are approved

23  and the change and approval is documented and saved in the investigation file and

24  in the chronological log. These changes include downgrade of a subject to a witness,

25  removal of a subject, change or removal of a manual of rules allegation, and changes

26  to or disagreement with recommended findings. The Department consults the City's

27  human resources risk management team to follow the City's process for

28  psychological fitness for duty assessments. The Department follows the City's "anti-

19

1  fraternization" instruction and local ordinance regarding conflicts and reporting

2  relationships. *See* City of Oakland Administrative Instruction (AI) 72 (Oct. 28,

3  2005); Oakland Municipal Code, Chapter 2.40, Prohibition on Nepotism in City

4  Employment, sec. 2.40.030 Disclosure of Relationships, sec. 2.40.040, Prohibited

5  Supervisory Relationships. These practices will address in the immediate term the

6  deficiencies identified in the outside investigator's report.

7       In addition to practices directly responsive to the outside investigator's

8  recommendations, the Department is taking additional measures to strengthen its

9  internal investigation processes in the immediate term. Prior to presentation to the

10  Chief, a Deputy Chief reviews all reports of investigation with recommended

11  sustained findings that could result in termination or for obedience to laws

12  misdemeanor/infraction (the same category for which the Chief reads the

13  investigation reports). The Bureau of Risk Management Deputy Chief reviews cases

14  involving recommended *not sustained* findings on any allegation that could result in

15  termination if sustained or obedience to laws misdemeanor/infraction. The Chief of

16  Police and Bureau of Risk Management Deputy Chief review internal investigations

17  involving any allegation that was the subject of a prosecution or defense (e.g.,

18  District Attorney or Public Defender) misconduct refer, regardless of the

19  recommended finding. Investigation presentation templates now prominently

20  display on the first page if a case involves the downgrade of a subject to a witness,

21  removal of a subject, change or removal of a manual of rules allegation, and changes

22  to or disagreement with recommended findings. High-profile case briefings to the

23  Chief, which include but are not limited to IAD and CID investigations of members

24  accused of criminal conduct, occur at least monthly with a notetaker.

25       The Department has also taken measures to improve communication about

26  internal investigations with the Commission and CPRA. The Department has

27  granted the CPRA Director direct access to the IAD Vision database. The OIG

28  already has direct access to Vision. The Department will provide a tutorial to the

20

JOINT CASE MANAGEMENT                    Case No. 00-cv-4599 WHO
STATEMENT

1    CPRA Director about use and navigation of Vision. In addition, the Department

2    and, temporarily until the policy is in effect, the City Attorney's Office, will advise

3    the Commission and CPRA of any new proposals to hire outside investigators to

4    conduct internal investigations, and provide update status reports on subjects and

5    misconduct allegations under consideration in any outside investigations already in

6    progress. In addition, any new third-party investigation contract must include a

7    term that allows the Commission and CPRA to obtain status updates directly from

8    the investigator (the content of updates may be limited to ensure independence of

9    any parallel ongoing or anticipated CPRA investigation). Finally, CID has expanded

10   the information it provides City leadership and oversight bodies including the

11   Commission and CPRA when a Department member has been arrested or cited or is

12   under investigation for criminal conduct. Ensuring that the Commission and CPRA

13   are aware of high-profile investigations early on will allow the Commission to

14   promptly identify internal investigations that may not be charter-mandated CPRA

15   cases but nevertheless may warrant Commission direction for CPRA to investigate

16   or spur the Commission to prioritize certain document requests or policy reviews. Of

17   course, all current measures employed by the Department are based on its policy

18   proposals and may ultimately be modified in final formal policy approved by the

19   Police Commission.

20         In addition to measures that the Department has taken to strengthen its

21   internal investigation processes on the front end, the City's Office of Inspector

22   General (OIG) is responsible for identifying and addressing deficiencies in internal

23   investigations on the back end, through audits of Tasks 5 and 45 (and assessing

24   compliance with all NSA tasks), even after Court oversight ends. *See* Oakland City

25   ///

26

27

28

JOINT CASE MANAGEMENT
STATEMENT                                                    Case No. 00-cv-4599 WHO

1   Charter, sec. 604(f)(5).[3] As part of its audit function, the OIG prepares an annual

2   report on the following items:  the Department's processes and procedures for

3   investigating alleged misconduct; the Department's processes and procedures for

4   determining the appropriate level of discipline for sustained findings of

5   misconduct; the CPRA's processes and procedures for investigating alleged

6   misconduct; the Agency's processes and procedures for determining the

7   appropriate level of discipline for sustained findings of misconduct; trends and

8   patterns regarding Department training and education, and the Department's use

9   of any early warning system(s); training and/or policy issues that arise during the

10  investigations of complaints; and trends and patterns regarding use of force and

11  Department sworn employee-involved shootings. Oakland Municipal Code, sec.

12  2.45.120.

13       The OIG has been engaged with the Department regarding proposed policy

14  changes in the immediate term, and the City appreciates the OIG's continuing

15  feedback and assistance. The OIG's annual report cycle is based on the City's fiscal

16  calendar and, therefore, the OIG's annual report pursuant to local ordinance is

17  expected to be completed in or about September 2023. As part of the process,

18  however, the OIG has begun collecting data and background information from the

19  Bureau of Risk Management about the Department's internal investigations and

20  complaint procedures. The OIG has also met with Department Human Resources

21  and the Training Division commander. The OIG is preparing additional

22  information requests to assist in its evaluations.

23       The Department estimates it will take four months before final policies

24  mandating internal investigation procedures are published. Immediately

25  _____

26  [3] The OIG has aimed to avoid audits that duplicate the Monitoring Team's work.
    This avoids competing protocols and findings and results in assessment of a greater
    number of Department practices. The OIG's forthcoming audit on Task 42, the
27  Department's Field Training Program has been delayed due to the recent
    ransomware attack on the City. The OIG expected to complete the audit in April
28  2023 but it now estimates completion and publication in or about May 2023.

JOINT CASE MANAGEMENT                                Case No. 00-cv-4599 WHO
STATEMENT

1   implementing practices responsive to the outside investigator's recommendations

2   and employing additional measures identified by the Department will ensure rigor

3   and integrity in the Department's internal investigation processes.

4   **B. MANDATING PRACTICES IN POLICY WILL PROVIDE LONG-**
    **TERM SUSTAINABILITY OF PROTECTIONS AND**
5   **IMPROVEMENTS**

6       The Department remains in the process of developing and revising policy in

7   response to deficiencies identified in the outside investigator's January 2023 report

8   and the corresponding recommendations. The Department's Office of Internal

9   Accountability is leading and coordinating the Department's review of Department

10  practice and policy regarding CID and IAD investigations of members accused of

11  criminal misconduct, as well as policy, practice, and training related to improving

12  the overall rigor and integrity of the Department's internal investigations processes.

13  In most instances, the OIA has identified multiple Department policies or related

14  policy documents that it has recommended the Department develop or revise to

15  effectively address the identified deficiencies. *See* Chart 1: *Department Progress in*

16  *Response to Recommendations*, below. The OIA has also recommended additional

17  revisions to policies under review to further strengthen the Department's internal

18  investigation processes beyond revisions that are simply directly responsive to the

19  recommendations. The Progress Chart below shows which policies are being

20  developed or revised in response to each recommendation and the status of each

21  policy or recommended measure. The outside investigator's recommendations are

22  shaded in green.

23      The Department's proposal is to directly implement six of the eight

24  recommendations (including the completed training on the use of Department-

25  issued versus personal cell phones). The Department proposes a variation of two of

26  the recommendations which the Department believes will more effectively and

27  efficiently address the underlying issues from which they originated.

28  ///

23

## 1.  THE DEPARTMENT'S TWO PROPOSED ALTERNATIVE RECOMMENDATIONS

First, instead of mandating that the Chief read all reports of internal investigations, the Department has proposed draft policy that requires the Chief to read and sign a particularly significant subset of case reports. Specifically, the Department has proposed that at a minimum, the Chief must read all reports with a recommended sustained finding for any allegation that could result in termination (i.e., has 'T' as a possible consequence on the Discipline Matrix; this includes Manual of Rules violations for obedience to laws felony/serious misdemeanor and DUIs, and use of force), or a recommended finding of sustained for obedience to laws misdemeanor/infraction. In addition, the Department has proposed revisions to the investigators' presentation outline to ensure that certain facts and circumstances are highlighted for discussion. These revisions include adding an executive summary at the beginning of the outline that prominently flags whether the case involves any of the following circumstances:  subject removed or downgraded to witness, deletion or change of any alleged Manual of Rules violations, or an addendum of disagreement by any reviewer on the recommended findings. The Department has also proposed Deputy Chief-level review for cases involving any allegation with a recommended finding of either sustained or not sustained on any allegation that could result in termination and obedience to laws misdemeanor/infraction. Finally, under this proposal, the Chief of Police and Bureau of Risk Management Deputy Chief review internal investigations involving any allegation that was the subject of a prosecution or defense (e.g., District Attorney or Public Defender) misconduct refer, regardless of the recommended finding. The Department believes this combination of measures will result in greater improvement in the rigor of its internal investigations and ensure accurate reporting of key facts and circumstances that frequently necessitate further discussion and explanation. The Department's proposed alternative provides layers

24

1   of redundancy that the Department believes will strengthen its internal

2   investigation processes more than simply having the Chief read all investigation

3   reports. In addition, it allows the Chief at least some flexibility in prioritizing the

4   many and varied items the Chief must handle on a day-to-day basis.

5          The second recommendation for which the Department proposes a variation

6   is the recommendation that the Department should revise its rule regarding

7   physical fitness for duty to explicitly include mental health. Expanding the Manual

8   of Rules (MOR) fitness for duty definition which currently includes only a *physical*

9   *fitness* requirement to expressly include psychological fitness for duty may result in

10  members' mental health issues being viewed and treated as misconduct. Instead,

11  the Department proposes creating an Information Bulletin (IB) that will include

12  information about the City's policy and practice involving psychological fitness for

13  duty evaluations but tailored to the Department. The Department currently follows

14  the City's practice under the direction of City Employee Relations and Risk

15  Management. The City's practice is referenced in its administrative instruction

16  regarding procedures for providing reasonable accommodation to job applicants and

17  employees, *see* AI-139 (Jul. 1, 2009). The Department anticipates the IB will reflect

18  who may request a fitness for duty evaluation of an officer, under what

19  circumstances an officer may be required to undergo an evaluation, an officer's

20  obligations when an officer is directed to undergo an evaluation, the Department's

21  obligations with regard to confidentiality of evaluations and requests for

22  evaluations, and the officer's and Department's rights and obligations involving a

23  return to limited or full duty following an evaluation. The idea behind proposing an

24  IB is to educate the Department and all members about the psychological fitness for

25  duty evaluation process to empower the Department to exercise its ability to ask for

26  such evaluations when appropriate and to support its members by providing

27  transparency about the process and communicating unequivocally that they will not

28  be disciplined solely on the basis of concerns about psychological fitness. The IB will

JOINT CASE MANAGEMENT
STATEMENT                                                    Case No. 00-cv-4599 WHO

also aim to provide a description of mental healthcare and wellness resources available to Department members.

| Chart 1: Department Progress in Response to Recommendations | | |
|---|---|---|
| **Recommendation** | **New or Revised Policies and Related Documents** | **Status** |
| OPD should adopt a Department-specific policy regarding acceptable personal relationships between sworn members and when and how those relationships must be reported. | DGO D-22, Personal Relationship Disclosure Policy (new) | Incorporated feedback from Monitoring Team and plaintiffs' counsel.<br><br>Next step is to send these to the Police Commission for review. |
| OPD should require all personnel involved in the investigation, review, supervision, and approval of IAD and CID cases to conform to the recusal standards of applicable policies. | CID Recusal Policy 23-02 (rev.)<br><br>IAD Meeting Attendance Roster (rev.)<br><br>Investigator and Reviewer Conflict/Recusal Forms (rev.) | Incorporated feedback from Monitoring Team and plaintiffs' counsel.<br><br>Next step is to send these to the Police Commission for review. |
| OPD should adopt a policy that requires approval and documentation of all changes to draft Reports of IAD Investigations. | IAD Policy and Procedure Manual 23-01 (rev.)<br><br>Training Bulletin V-T.01, Internal Investigation Procedure Manual (rev.)<br><br>Internal investigation report template (rev.)<br><br>Addendum [reviewer disagreement] template (rev.)<br><br>Executive | Sent to Monitoring Team and plaintiffs' counsel for feedback. Working on incorporating feedback and considering additional changes. |

JOINT CASE MANAGEMENT
STATEMENT

Case No. 00-cv-4599 WHO

| | Summary/Presentation template (rev.) Command Review Checklist (rev.) | |
|---|---|---|
| OPD should adopt a policy that requires all briefings regarding ongoing IAD investigations to be documented. | IAD Policy and Procedure Manual 23-01 (rev.) | Sent to Monitoring Team and plaintiffs' counsel for feedback. Working on incorporating feedback and considering additional changes. |
| OPD should adopt a policy that requires the Chief of Police to read reports of IAD investigations before signing them. | IAD Policy and Procedure Manual 23-01 (rev.) [Note: Department proposing an alternative. Chief mandated to read subset of sustained cases. Deputy Chief review of subset of sustained cases as well as subset of not-sustained cases. Executive summary of presentation outline displays facts and circumstances that may raise red flags.] | Sent to Monitoring Team and plaintiffs' counsel for feedback. Working on incorporating feedback and considering additional changes. |
| OPD should review its implementation and training regarding the policies governing use by OPD members of OPD-issued cellular telephones and personal cellular telephones for all Department-business and to prohibit the use of personal cellular telephones for work-related | Updated training PowerPoint. Conducted additional lineup training. Created quiz for members. | Completed. *See* Ex. 1. |

| communication. | | |
|---|---|---|
| OPD should revise its rule regarding physical fitness for duty to explicitly include mental health. | Information Bulletin (IB) re Psychological Fitness for Duty Assessments (new)<br><br>[Note: Department proposing an alternative: an IB rather than changing the Manual of Rules (MOR) fitness for duty definition.] | Department working on initial draft. |
| OPD, through its Office of Internal Accountability, should review and improve its policies, practices, and training regarding investigations of members accused of criminal misconduct to ensure rigor and accountability. | DGO M-4.1, Criminal Investigation of Department Members and Outside Sworn Law Enforcement Personnel (rev.)<br><br>CID Investigative Training Program 23-01<br><br>DGO I-19, Electronic Device Policy (rev.)<br>[Additional TBD] | Sent DGO M-4.1 and CID Investigative Training policies sent to Monitoring Team and plaintiffs' counsel for feedback.<br><br>OIA policy review ongoing. |
| Improve communication with CPRA and OPC. Facilitate CPRA's ability to select appropriate cases for parallel investigation without jeopardizing CPRA's ability to conduct truly separate, independent investigations. | IAD Policy and Procedure Manual 23-01 (rev.)<br><br>DGO M-4.1, Criminal Investigation of Department Members and Outside Sworn Law Enforcement Personnel (rev.) | Sent both policies to Monitoring Team and plaintiffs' counsel for feedback. Working on incorporating feedback received on IAD Policy and Procedure. |

///

JOINT CASE MANAGEMENT STATEMENT                                    Case No. 00-cv-4599 WHO

II.     **CONSISTENCY OF DISCIPLINE POLICY (TASK 45)**

In March 2023, the Department published its 2022 Internal Investigation Outcome and Discipline Report. *See* https://cao-94612.s3.amazonaws.com/documents/2022-Internal-Investigation-Outcome-and-Discipline-Report.pdf (Mar. 2023) (last viewed Apr. 1, 2023). The annual report was the Department's first opportunity to employ its working methodology. The most straightforward part of the methodology is to determine whether there are statistically significant differences in case outcomes or officer discipline based on race, rank, or gender. There were no statistically significant disparities based on race, rank, or gender in 2022 case outcomes or officer discipline. *See id.* at 14, and Table 1.

**Table 1: *Snapshot of 2022 Internal Investigation Outcomes and Discipline Data,* from February 2023 Citywide Risk Management Meeting**

| | All Investigations | DLIs and DLI Summary Findings | IA Investigations and IA Summary Findings | Internal Origin | External Origin |
|---|---|---|---|---|---|
| White | 11% (34/323) | 9% (16/187) | 15% (18/124) | 65% (13/20) | 7% (21/303) |
| Black | 11% (23/212) | 9% (13/147) | 18% (10/55) | 30% (3/10) | 10% (20/202) |
| Hispanic | 9% (30/317) | 7% (15/213) | 17% (15/90) | 36% (4/11) | 8% (26/306) |
| Asian/Filipino | 7% (16/240) | 4% (6/168) | 15% (10/65) | 33% (3/9) | 6% (13/231) |
| Other/Unknown | 18% (7/38) | 10% (2/21) | 31% (5/16) | 100% (2/2) | 14% (5/36) |
| Total | 10% (110/1130) | 7% (52/736) | 17% (58/350) | 48% (25/52) | 8% (85/1078) |

| | All Investigations | DLIs and DLI Summary Findings | IA Investigations and IA Summary Findings | Internal Origin | External Origin |
|---|---|---|---|---|---|
| Male | 10% (94/957) | 7% (45/628) | 17% (49/289) | 53% (23/43) | 8% (71/914) |
| Female | 9% (16/173) | 6% (7/108) | 15% (9/61) | 22% (2/9) | 9% (14/164) |
| Total | 10% (110/1130) | 7% (52/736) | 17% (58/350) | 48% (25/52) | 8% (85/1078) |

| | All Investigations | DLIs and DLI Summary Findings | IA Investigations and IA Summary Findings | Internal Origin | External Origin |
|---|---|---|---|---|---|
| Officer | 9% (99/1049) | 7% (50/699) | 16% (49/307) | 51% (21/41) | 8% (78/1008) |
| Sgt or Above | 14% (11/81) | 5% (2/37) | 21% (9/43) | 36% (4/11) | 10% (7/70) |
| Total | 10% (110/1130) | 7% (52/736) | 17% (58/350) | 48% (25/52) | 8% (85/1078) |

These initial overall findings across all 2022 cases did not end the Department's analysis. In the past, the Department has observed differences on discipline imposed on Black officers for lower level misconduct when compared to

JOINT CASE MANAGEMENT STATEMENT

Case No. 00-cv-4599 WHO

1    white officers. Specifically, the Department previously observed that the

2    Department tended to impose counseling and training discipline more often for

3    misconduct committed by white officers, while Black officers might more frequently

4    receive a written reprimand. *See id.* at 12. Written reprimand is viewed as greater

5    discipline on the discipline spectrum than counseling and training. These observed

6    differences involved a very small number of cases; the Department could not test

7    whether such a small difference was statistically significant. But the Department

8    remained keenly aware of these differences and has always been clear about its

9    intention to continue to look for such differences in the data even though the

10   number of cases involved may not permit the Department to determine if the

11   differences are statistically significant. Therefore, the Department purposely

12   examined the case data to determine whether there were any similar differences in

13   the 2022 discipline. The Department observed some differences.

14          The 2022 data showed that Black officers more frequently received written

15   reprimand discipline in comparison to white officers who received counseling and

16   training discipline for the same misconduct violations. The overall difference in

17   Class II allegation outcomes was Black officers received counseling and training in

18   5 instances and written reprimand in 5 instances, while white officer received

19   counseling and training in 18 instances and written reprimand in 2 instances. *See*

20   *id.* On the one hand, these cases reflect twice as many sustained cases for white

21   officers and the number of cases in each category is too small to conduct a statistical

22   analysis; but on the other hand, we cannot ignore the observed apparent difference.

23   Thus, the Department further examined other case details to determine if it could

24   explain this apparent difference. The Department had some success learning more

25   about the circumstances behind the discipline imposed in each case.

26          As an initial matter, although these cases all involved Class II misconduct,

27   the sustained findings spanned several different rules violations. Thus, the

28   Department looked for direct comparisons for discipline meted out to Black and

JOINT CASE MANAGEMENT                           Case No. 00-cv-4599 WHO
STATEMENT

1   white officers for the same rule violation. *See id*. at 12-13. There, the Department

2   zeroed in on violations for failure to accept or refer a complaint (unintentional)

3   where 9 white officers received counseling, in comparison to 3 Black officers who

4   received counseling and 2 Black officers who received written reprimand. In

5   addition, the Department noted that for this particular rule violation, more Black

6   officers received suspensions: 7 Black officers were suspended for this misconduct

7   while only one white officer was suspended. Although as an overall matter Black

8   officers are not suspended more often than white officers, the Department's drill-

9   down investigation into this particular rule violation led them to find and focus in

10  on this additional patent difference. *See id*. at 13.

11          The Department's analysis led it to discover that the difference in the 2022

12  discipline for Black and white officers for failure to accept or refer a complaint

13  (unintentional) was explained by officers' prior similar misconduct. Officers who

14  had prior violations of the same rule received greater discipline. Thus, as an initial

15  matter there is a race neutral explanation for the difference in discipline imposed.

16  But this did not end the Department's inquiry. The Department's next question

17  was: are Black officers more likely than officers of other races to have allegations

18  lodged against them for failing to accept or refer a complaint? And, inversely, are

19  white officers less likely to have allegations lodged against them for failing to accept

20  or refer a complaint? The Department recognizes both that these are important

21  questions to ask, and difficult questions to answer. The Department is continuing

22  its analysis and intends to publish a supplemental report to the 2022 Internal

23  Investigation Outcomes and Discipline Report to further provide insight into these

24  issues. While the Department is not certain at this time where the analyses may

25  lead, the Department's next steps include a review of investigating sergeants'

26  sustained rates by race for failure to accept or refer a complaint. *Id*. at 15.

27          In its most recent report, the Monitoring Team criticized the Department for

28  having "yet to create a separate, stand-alone [technical] report" that in part might

31

JOINT CASE MANAGEMENT                                    Case No. 00-cv-4599 WHO
STATEMENT

1   serve as a "basis for tracking discipline disparity over time." Dkt. 1578, *Third NSA*

2   *Sustainability Report of the Independent Monitor* 32 (Apr. 3, 2023) (corrected report). In

3   its annual internal investigation outcomes and discipline report, the Department

4   aims to share its step-by-step approach as it follows its written working

5   methodology, including sharing all of its data analysis. When possible, the

6   Department prefers to include its data analysis within the text of the report or in an

7   appendix rather than prepare a separate, technical report. With a single report,

8   readers have context for each dataset the Department prepares and each statistical

9   test the Department uses. In addition, when the Department developed its working

10  methodology it specifically considered whether it should include some analysis of

11  aggregate data beyond one year. After discussing this possibility with researchers

12  from the Monitoring Team and Stanford, the Department intentionally decided not

13  to do aggregate data analysis because of the significant difference in data collection

14  and policy in the years preceding 2022 and to focus on looking for patterns that are

15  the result of current or more immediate practices. Of course, the Department's

16  methodology is a *working* methodology. The Department purposefully used that

17  title because it intends to continue to modify the methodology as appropriate to

18  strengthen its analyses. But there is no reason that the Department cannot use its

19  annual reports and analysis therein as the basis to track disparity over time.

20      Employing its primarily data-driven methodology to analyze investigation

21  outcomes and findings enables the Department to consistently identify and

22  investigate statistically significant disparities and observed differences across all

23  case outcomes and officer discipline. The Department appreciates, however, that

24  this methodology, while sound and necessary, may not capture all inconsistencies in

25  case outcomes or discipline. For example, one or two cases that are poorly

26  investigated or where favoritism is employed are unlikely to trigger anomalies in

27  the data or reveal a pattern of inconsistency. That is why strengthening measures

28  to improve the quality of the Department's investigations, including case review

JOINT CASE MANAGEMENT
STATEMENT                                              Case No. 00-cv-4599 WHO

redundancies, as well as having an after-the-fact audit of internal investigations is also necessary to ensure consistency and fairness in case outcomes and discipline. The measures the Department is taking to improve its internal investigation processes, therefore, will contribute not only to compliance with Task 5 but also Task 45. Whether these policy measures are truly "foundational issues" of Task 45 versus Task 5 is not a distinction worth debate. *See id.* The City's work to strengthen its internal investigations practices will certainly benefit aspects related to both tasks and, more importantly, to both appropriate and equitable officer accountability.

The City is optimistic that once it completes its supplemental investigation of the subset of cases for failure to accept or refer a complaint (unintentional) and implements measures designed to ensure rigor and integrity in the Department's internal investigations, that the Monitoring Team will replace its "no compliance finding" with the "in compliance" finding previously earned by the Department.

## III. INTERNAL AFFAIRS TIMELINES (TASK 2)

The Department remains in compliance with Task 2. *Id.* at 3. In the fourth quarter of 2022, the Department timely completed 88% of Class I and 99% of Class II investigations. *Id.* The Department continues to routinely complete the discipline recommendation process on all cases with sustained findings within 30 calendar days as required by policy. *Id.*

## IV. THE DEPARTMENT MAINTAINS AN EFFECTIVE RISK MANAGEMENT PROGRAM (TASKS 34 & 41)

The Department's risk management program continues to provide a valuable foundation to discuss issues involving individual officers as well as patterns among officers and data. The Department's effective use and understanding of data and information in the risk management process is reflected in commanders' selection of and expansion on appropriate and meaningful topics outside of the data analysis that typically constitutes the central focus of risk management meetings. The

JOINT CASE MANAGEMENT STATEMENT                                                        Case No. 00-cv-4599 WHO

Monitoring Team complimented the Department on these practices in its most recent report, making reference to specific observations to the February 2023 risk management meetings:

> The Captains and their staff were all engaged in a productive discussion focused on risk – a discussion that extended to include consideration of the implications of current crime levels on officer activity. That has not been a regular agenda item for these meetings. There was also a significant focus on how younger officers could benefit from understanding and engaging with the risk management process. It is also noteworthy that, early in the meeting, the Acting Chief emphasized the importance of the PAS process for helping officers to be successful in their careers. That became a significant focus in the meetings and is a direct reflection of an element of risk management that is emphasized in the NSA.

*Id.* at 30. The Department's comfort with its risk management program[4] shows. Command staff and supervisors have advanced their discussions "beyond what is available in the Vision database" and developed flexibility in their approach to analyzing and using data and information to identify and mitigate Department risk. *See id.* at 29.

### A. THE DEPARTMENT CONTINUES TO MEANINGFULLY USE STOP DATA AS PART OF ITS RISK MANAGEMENT PROCESS

The Department has long recognized that stop data, for all stops but particularly for non-dispatch stops, "represents potential risk consistent with the risk management interests of the Department." Dkt. 1557, *Second NSA Sustainability Period Report of the Independent Monitor* 28 (Dec. 22, 2022). As a result, stop data has been fully integrated with the risk management process and includes reviews of dispatch and non-dispatch stops, actions taken including searches, and outcomes including citation or arrests or noting that no action resulted from the stops. The Department routinely evaluates and discusses stop data, including the reflected impacts of policing on various racial or ethnic groups. Figure 1, below, is

---

[4] The Department's risk management program operates pursuant to *DGO R-01, Risk Management* (published Apr. 2022). Although the policy was published in April 2022 mandating adherence to certain practices and timelines, the Department had already employed many of those practices, some for as long as several years. *See, e.g.,* Dkt.1565, Joint Case Management Statement 32 (Jan. 23, 2023).

1  an example of a typical Citywide Risk Management slide displaying and integrating

2  related datapoints to help the Department assess if officers' actions are consistent

3  with Department directives and priorities and how those actions impact various

4  racial populations.

5

6  ### Stop Data



- Dispatch stops declined 11% in 2022 and non-dispatch stops increased 24% in 2022 (Q4 drove the increase)
- Intelligence-led rate for non-dispatch stops is at 41% for the year, down from 42% in 2021.
- African Americans comprise 41% of non-dispatch, non-intel led stops, decrease of 2%.  Hispanics comprise 37%, a 3% increase from last year.
- Traffic stops make up 88% of non-dispatch, non-intel led stops this year compared to 81% last year.
- 96% of traffic stops are moving violations, in line with Departmental directives.
- The work done in Q4 resulted in an overall 76% citation rate for traffic violations in 2022 compared to 72% in 2021.

**Stops by Traffic Officers in Q4 2022**

- Officers assigned to the traffic squad made 1,764 traffic violation stops (driver only). Of these, 99.7% were moving violations.
- 35% of traffic violations involved African American subjects. 37% of subjects were Hispanic.
- A citation was issued 98.5% of the time.
- 26% of the stops occurred in Area 5, 22% in Area 6, and 19% in Area 4.

By regular assignment as of Oct 3, 2022

**Non-Dispatch, Non-Intel Led Stops by Race**

|  | 2020 | | | | 2021 | | | | 2022 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Qtr1 | Qtr2 | Qtr3 | Qtr4 | Qtr1 | Qtr2 | Qtr3 | Qtr4 | Qtr1 | Qtr2 | Qtr3 | Qtr4 |
| Black | 45% | 48% | 47% | 49% | 44% | 45% | 41% | 44% | 47% | 45% | 39% | 38% |
| Hispanic | 27% | 31% | 28% | 29% | 32% | 33% | 35% | 36% | 39% | 31% | 40% | 37% |
| White | 16% | 11% | 13% | 10% | 13% | 10% | 8% | 8% | 5% | 10% | 10% | 10% |
| Asian | 7% | 6% | 7% | 6% | 6% | 7% | 10% | 8% | 4% | 8% | 7% | 9% |
| Other | 5% | 5% | 5% | 6% | 5% | 5% | 6% | 5% | 4% | 5% | 4% | 7% |

17  *Fig. 1,* **Slide from Feb. 2023 Citywide Risk Management Meeting**

18          The Department has used stop data in this manner to develop effective

19  strategies to reduce stops of African Americans, a population historically

20  overrepresented in law enforcement actions. The Department has consistently

21  reported to the Court on its non-dispatch stop rate as way of tracking its progress.

22  In the fourth quarter of 2022, the Department's African American non-dispatch stop

23  rate was 42%. *See OPD Quarterly Stop Data Report Q4* 2022 4,

24  https://www.oaklandca.gov/resources/2022-stop-data-and-reports (last visited Mar.

25  29, 2023). That rate was slightly lower for non-dispatch stops that were not

26  intelligence led.[5] For non-dispatch, non-intelligence led stops, the African American

27  ――――――――――――――

[5] A non-dispatch stop is a stop made because of an officer observes a violation of the law and chooses to initiate contact. An example would be an officer observes a vehicle going through a red light without stopping. *OPD Quarterly Stop Data Report*

28

JOINT CASE MANAGEMENT                                    Case No. 00-cv-4599 WHO
STATEMENT

1    stop rate fell below 40% for the last two quarters of 2022. *See Fig. 2.* Prior to 2021,

2    the Department's African American non-dispatch stop rate was never below 50%.

3    Since 2021, the Department's African American non-dispatch stop rate has been

4    below 50% in six of eight quarters. *Id.; see also* Dkt. 1515, *Joint Case Management*

5    *Statement* 54 *Fig.4* (Apr. 20, 2022). This is directly attributable to the Department's

6    use of stop data not only to implement strategies to effectively mitigate risk but to

7    effectively monitor those strategies and modify them as appropriate to ensure

8    sustained long-term change.

9    **V.    OFFICER RECRUITMENT, ATTRITION, AND DEPARTMENT**
     **     DIVERSITY**
10

11         The Department continues its strategic outreach efforts to attract and

12   actively recruit officers who reflect the diversity of Oakland, racially and otherwise,

     and who live in or have meaningful ties to the City. *See Oakland Police Dept.*
13
     *Quarterly Staffing Report (4th Quarter 2022)* 10-16 (Feb. 28, 2023),
14
     https://www.oaklandca.gov/resources/info-memo (last visited Apr. 1, 2023).
15
          The Department's recruitment for the 192nd Academy is ongoing; the
16
     Department has not commenced any additional academies since our last court
17
     hearing. Between October and December 2022, the Department hosted or attended
18
     18 recruitment events. *Id.* at 15-16. There were 17 in-person events, 11 of which
19
     occurred in Oakland, and three online events. *See Fig. 2*, below. For each event, the
20

21   *Q4* 2022 at 1, *supra*. Intelligence-led stops are a subset of non-dispatch stops and
     require officers to possess knowledge from an articulable source that leads to the
22   initiation of a stop. *Id.* at 2. The source of information may be very specific, such as
     a named or described suspect, or general information about a recent crime trend
23   tied to a specific location and involved individuals. An officer's knowledge and
     intent at the time the stop is initiated is important in determining whether the stop
24   is intelligence-led. An example is officers observe a vehicle with the left front
     headlight out. *Id.* The vehicle also matches the description and partial license plate
25   of one involved in a series of recent robberies. They conduct a traffic enforcement
     stop for section 24400(a) of the Vehicle Code. By using information and intelligence,
26   our efforts are directed at the relatively few people who cause the most harm in our
     neighborhoods. *Id.* at 3. Stops based on objective information and specific directives
27   may reduce bias in officer decision-making during non-dispatch stops. The overall
     reduction of stop activity results in a reduced policing "footprint" within the
28   community. *Id.*

JOINT CASE MANAGEMENT                                   Case No. 00-cv-4599 WHO
STATEMENT

Department tracked the number of individuals who showed interest in police officer trainee (POT) positions (graduating from the academy and becoming a sworn officer), the cadet program (part-time positions for young adults attending high school and college to provide an introduction to various sworn and non-sworn positions within the Department), or dispatcher positions (non-sworn). *Quarterly Staffing Report (4th Quarter 2022)* at 15-16, *supra*.

**4Q2022 Recruitment – Outreach Events**

| Date | Event | Location | Number of Attendees | Inquiries: Number and Type |
|------|-------|----------|---------------------|----------------------------|
| 1-Oct-22 | Oaktober Fest | 3401 Fruitvale Ave Oakland | 200 | POT 15 Dispatcher 4 Cadet 3 |
| 2-Oct-22 | Oaktober Fest | 3401 Fruitvale Ave Oakland | 200 | POT 5 Dispatcher 2 Cadet 2 |
| 4-Oct-22 | Criminal Justice Career Fair | 25800 Carlos Bee Blvd Hayward | 200 | POT 30 Dispatcher 15 Cadet 10 |
| 8-Oct-22 | Black College Expo | NRG Park Houston, TX | 600 | POT 25 Dispatcher 3 Cadet 2 |
| 13-Oct-22 | Travis Air Force Base Career Event | Travis AFB Fairfield | 300 | POT 5 Dispatcher 1 Cadet 0 |
| 16-Oct-22 | Practice Physical Ability Test | Merritt College, Oakland | 15 | POT 15 Dispatcher 0 Cadet 0 |
| 16-Oct-22 | OPD Board Workshop | Police Administration Building | 10 | POT 10 Dispatcher 0 Cadet 0 |
| 19-Oct-22 | OPD Recruiting Zoom Webinar | Online | 70 | POT 70 Dispatcher 0 Cadet 0 |
| 22-Oct-22 | Recruiting Event | Crossfit Gym San Ramon | 30 | POT 10 Dispatcher 0 Cadet 0 |
| 31-Oct-22 | Halloween Trunk or Treat | Verdese Carter Park Oakland | 700 | POT 25 Dispatcher 25 Cadet 13 |
| 5-Nov-22 | Asian Cultural Fair | Lincoln Square Recreation Center Oakland | 200 | POT 3 Dispatcher 2 Cadet 4 |
| 12-Nov-22 | Black College Expo | Sacramento State University Sacramento | 500 | POT 10 Dispatcher 2 Cadet 0 |
| 13-Nov-22 | Oral Board Workshop | Police Administration | 10 | POT 7 Dispatcher 0 |

37

| | | Building | | Cadet 0 |
|---|---|---|---|---|
| 1-Dec-22 | Recruit Military Event | Scottish Rite Center San Diego | 1,000 | POT 30 Dispatcher 25 Cadet 6 |
| 3-Dec-22 | Oakland Chinatown Improvement Council Winter Festival | 8th & Franklin Oakland | 200 | POT 10 Dispatcher 3 Cadet 4 |
| 4-Dec-22 | Oakland Chinatown Improvement Council Winter Festival | 8th & Franklin Oakland | 350 | POT 20 Dispatcher 8 Cadet 6 |
| 11-Dec-22 | Physical Training Workshop | 6th & Jefferson Oakland | 8 | POT 8 Dispatcher 0 Cadet 0 |
| 22-Dec-22 | Toys for the Town Giveaway | Police Administration Building | 2,500 | POT 3 Dispatcher 4 Cadet 0 |

*Fig. 2.*

The Department's recruiting efforts are contributing to changes in the racial demographics of sworn officers. Department attrition in 2021 and 2022 also contributed to changes in officer demographics. After experiencing an elevated attrition rate in 2021 and the first half of 2022, however, the rate has dropped to just below the average attrition rate observed from 2016-2020. The Department's sworn officer attrition rate for the second half of 2022 averaged 4 officers per month. *Quarterly Staffing Report (4th Quarter 2022)* at 6, *supra*. Demographic changes have resulted in a complement of officers that more closely resembles the City's racial demographics. *See* Table 2.

///

JOINT CASE MANAGEMENT STATEMENT

**Table 2:  *Race/Ethnicity\* by Year – OPD Sworn Staff as of Dec. 31, 2022***

| Race/Ethnicity | US 2021 Census-Oakland Pop.[6] | OPD 2019 | OPD 2020 | OPD 2021 | OPD 2022 |
|---|---|---|---|---|---|
| Asian | 15.8% | 13.3% | 18.1% | 18.6% | 15.2% |
| Black or African American | 22.7% | 16.8% | 16.7% | 18.7% | 20.6% |
| Hispanic | 27% | 26.9% | 28.2% | 28.0% | 28.6% |
| Other | 0.1% | 6.6% | 3.0% | 3.3% | 3.3% |
| White | 34.4% | 36.4% | 34.0% | 31.5% | 28.3% |

\*Note: "Asian" includes Filipino, "Other" includes Native American and Undeclared

**Table 2A: *Race/Ethnicity and Gender – OPD Sworn Staff as of Dec. 31., 2022***

| Race/Ethnicity | Female | | Male | |
|---|---|---|---|---|
| Asian | 8 | 7.69% | 98 | 16.53% |
| Black or African-American | 24 | 23.08% | 119 | 20.07% |
| Filipino | 2 | 1.92% | 26 | 4.38% |
| Hispanic or Latino | 38 | 36.54% | 161 | 27.15% |
| Native American | 1 | .96% | 2 | .34% |
| Undeclared-Other | 3 | 2.88% | 18 | 3.04% |
| White or Caucasian | 28 | 26.93% | 169 | 28.49% |
| **Total** | **104** | **100%** | **593** | **100%** |

While the Department has typically seen an annual increase in the percentage of female sworn officers over the past several years, the Department did not see an increase in the percentage of female officers in 2022 despite its targeted efforts to recruit and retain women. *See* Table 3. The Department nonetheless still maintains a greater percentage of female officers than the state and national average. *Id*. In addition, the race and ethnicity among the Department's female sworn ranks remains diverse. See Table 2A.

///

---

[6] Population by race in the city of Oakland. Source: United States Census Bureau. Quick Facts Oakland city, California 2021, https://www.census.gov/quickfacts/oaklandcitycalifornia (last visited Apr. 1, 2023).

JOINT CASE MANAGEMENT STATEMENT

Case No. 00-cv-4599 WHO

**Table 3:** *OPD Gender Percentages by Year Compared With 2021 National Percentage – OPD 2022 Sworn Staff as of Dec. 31, 2022*

| Gender | National Percentage 2021[7] | OPD 2019 | OPD 2020 | OPD 2021 | OPD 2022 |
|--------|------------------------------|----------|----------|----------|----------|
| Female | 13.3% | 13.9% | 14.6% | 15.7% | 14.2% |
| Male | 86.7% | 86.1% | 85.4% | 84.4% | 85% |

The Department is keenly aware of how few female sworn members hold supervisory positions. As of February 2023, female members comprised only 13 of 111 sergeants, one of 27 lieutenants, and zero of 9 captains. Two of the Department's four deputy chiefs are women. Thus, while women make up 14.2% of the Department's sworn membership, they hold less than 10.5% of current supervisory ranks (including the chief and assistant chief positions).

In 2022, the Department committed to the "30x30 pledge," an effort to increase the percentage of female academy recruits to 30% by the year 2030. The nationwide 30x30 initiative arose in response to the historical underrepresentation of women in law enforcement. The initiative stems from the idea that a group must achieve at least 30% representation to empower that group to influence an organization's culture.[8] The initiative explores actions an agency can take to improve the representation and experiences of women in sworn positions in all ranks. The Department aims to increase its sworn female ranks generally, as well as increase the representation of women in supervisory and commander roles.

In late 2022, the Department's Office of Internal Accountability (OIA) administered a survey developed by the 30x30 initiative. The initiative provided the

---

[7] 2020 national statistics based on https://www.statista.com/statistics/195324/gender-distribution-of-full-time-law-enforcement-employees-in-the-us/https://www.ppic.org/publication/law-enforcement-staffing-in-california/ (last visited Apr. 1, 2023). Some prominent outlets devoted to advancing women in policing actually calculate the current national percentage much lower, closer to 12%. *See, e.g.,* https://30x30initiative.org (last visited Apr. 1, 2023)

[8] https://30x30initiative.org/about-30x30/

JOINT CASE MANAGEMENT STATEMENT

Case No. 00-cv-4599 WHO

survey template and the OIA modified it slightly to better fit our agency. Exhibit 2 contains the OIA's March 2023 report on the results of the survey. The report was shared with the Department and the 30x30 initiative. Ex. 2, *30x30 Survey of Sworn Female Officers* (Mar. 2023).

The 2022 30x30 initiative survey garnered more responses (56) from sworn female members than the 2022 internal investigations and discipline survey (23).[9] Key points and recommendations from OIA are included in Chart 2.

| Chart 2: Key Findings and Recommendations Re Sworn Female Members' Responses to Department's Fall/Winter 2022 Survey | |
|---|---|
| **Finding** | **Recommendation** |
| While most respondents initially wanted to obtain a specialty assignment when they became a police officer, only 53% believe they have equal access to special/ancillary assignments. | The Department should study distribution of female sworn members throughout the Department and develop pathways to achieving equitable representation. |
| Female supervisors reported the biggest challenge was a lack of respect from other supervisors. | The Department should consider hosting a series of gender awareness trainings for supervisors to teach support skills that will contribute to equitable treatment of female sworn members. |
| Forty-four percent of sworn female members feel the promotion process allows for favoritism. Additionally, 29% believe the promotion process is subjective or biased, and the promotion process is opaque with little transparency about how decisions are made. | The promotional process, including pre-testing training opportunities, ranking within City created promotional lists, the post-test interview and essay process, availability of acting assignments, and the eventual promotions into higher ranks should be examined by the internal Race and Equity Team. |
| The most frequent theme of responses to an open-ended question about what the Department can do to make female sworn members feel valued was that the Department should show more appreciation of all officers. | The Deputy Chiefs of each Bureau should coordinate and host a quarterly event to show support and camaraderie with their assigned teams. |

---

[9]Notably, the 2022 internal investigation and discipline survey revealed that only 57% of the 23 sworn female officers who responded agreed that they "feel respected by [their] supervisors."

41

Case No. 00-cv-4599 WHO

| Chart 2: Key Findings and Recommendations Re Sworn Female Members' Responses to Department's Fall/Winter 2022 Survey | |
|---|---|
| **Finding** | **Recommendation** |
| The most frequent theme of responses to an open-ended question about what the Department can do to encourage female sworn officers to promote was to provide a mentorship program. | The Department should consider expanding its mentorship program beyond the Academy. The Department should rely upon subject matter experts to create a framework for an incentivized and renewable mentorship program, not just for Academy members, but for mid-career employees as well. |

The Department is engaged with the material provided by the 30x30 initiative. The Department received the internal survey report in mid-March 2023 and is working on its response to OIA's recommendations in addition to exploring other ideas. The Department appreciates that mentorship programs and leadership training are critical to retaining and increasing membership, particularly for officers from underrepresented groups which, in law enforcement, includes women.

## VI.    OFFICERS USE REASONABLE FORCE AND DEPARTMENT FORCE REVIEW IS DEPENDABLE

The Department has continued to demonstrate capability in sustaining substantial compliance on tasks involving use of force, reporting, and review. Officers' uses of force are generally appropriate and reported and reviewed as required by policy, and supervisors and command personnel are generally identifying and properly addressing any concerns. *See Second NSA Sustainability Report* at 13, *supra; Third NSA Sustainability Period Report* at 13, *supra.*

### A. FORCE AND FORCE INVESTIGATIONS (TASKS 24 & 25)

The Department has continued its own internal command oversight and assessment of force and force investigations using a process patterned after the Monitoring Team's review process. That process has proven successful for identifying and addressing issues related to force reporting and review. The process is also sustainable in the long term. The Monitoring Team agrees that generally the Department's "chain of command is actively involved in the review of use of force

JOINT CASE MANAGEMENT
STATEMENT

1    and is addressing areas of concern without the need for [the Monitoring Team] to

2    bring the concerns to [the Department's] attention." *Third NSA Sustainability Period*

3    *Report* at 19, *supra.*

4    During the quarterly Monitoring Team site visit in February, a deputy chief

5    presented the Department's assessment of Level 3 and Level 4 use of force reports

6    completed between September and November 2022. The Department reviewed and

7    reported out not only on the use of force reports reviewed by the Monitoring Team

8    but on additional use of force reports. The Department identified concerns with

9    tactical issues, proper categorization of uses of force, and de-escalation techniques.

10   The Department also identified positive trends – including improved planning and

11   communications, more detailed use of force reports, and sergeants and the chain of

12   command identifying and addressing deficiencies. The Monitoring Team agreed

13   with the Department's self-assessment. *See id.* at 13.

14   In its most recent report, the Monitoring Team recognized the following

15   additional achievements:

- The percentage of force incidents involving African Americans decreased 7% (*id.* at 12), a further reduction from the aggregate 22% decrease achieved in the previous two quarters (*Second NSA Sustainability Period Report* at 12, *supra*; and Dkt. 1540, *First NSA Sustainability Report of the Independent Monitor 12 (Oct. 3, 2022)*);

- There were no instances where the use of force was not de-escalated or stopped reasonably when resistance decreased (*Third NSA Sustainability Period Report* at 18);

- There were no instances where officers could have made additional efforts to explain to subjects why detention was occurring prior to using force (*id.*);

- There was continued improvement in officers identifying themselves as police officers when appropriate and there was time to do so and "few instances" where they did not do so (*id.* at 12, 18);

- There were no instances where officers failed to document specific information and details justifying use of force or using "boilerplate" or "pat" language in reports (*id.* at 17);

- There were no instances of unprofessional language or profanity (*id.* at 12);

43

- Supervisors identified and properly addressed all but one body-worn camera issue (delayed activation) (*id.*); and

- The Department has conducted member training in multiple formats to address proper Taser use and review of Taser deployments which the Monitoring Team believes will address a cluster of previously identified concerns with Taser deployments (*id.* at 18).

Finally, the Department is pleased to report that on March 23, 2023, the Oakland Police Commission approved revisions to DGO I-15.1, *Body-Worn Camera Policy*. After the meet and confer process is complete, the Department will publish the policy, begin training, and determine an appropriate effective date for the policy based on training requirements. The revised policy in conjunction with the Department's upgraded body-worn camera system is critical to the Department's ability to sustain its consistently rigorous force and force report reviews.

**B. FORCE BOARDS (TASKS 26 & 30)**

During the Third NSA Sustainability Period, the Department held two Force Review Boards to review Level 2 uses of force, and one Executive Force Review Board to review a Level 1 use of force, an officer-involved shooting. *See id.* at 20-23. The Monitoring Team did not disagree with any of the Boards' findings that officers' used force in compliance with law and policy, or the one instance where the Board determined that a use of force was out of compliance. *See id.* Furthermore, the Monitoring Team recognized a number of positive qualities characteristic of the Department's force boards that contribute to consistent and effective boards. For example, the Monitoring Team "continue[d] to observe substantive discussion and deliberations among the Board members," and noted that members "ask probing questions of the force investigators and, where applicable, Department subject-matter experts (SMEs) and IAD investigators." *Id.* at 21. The Boards "also spend a great deal of time discussing issues ancillary to the issues of force such as tactics, supervision, force alternatives, and training opportunities." *Id.*

44

1  Finally, the Monitoring Team reviewed two written Board reports completed

2  in December 2022 and January 2023 which it found were generally "well-written

3  and accurate accounts of the [Board] proceedings." *Id.* at 20.

4  **CONCLUSION**

5  The City continues to experience high levels of homicides, armed robberies,

6  and gun crimes. Department members continue to work tirelessly in their mission

7  to apprehend those responsible for the violence and keep the community safe. In the

8  past week, the Department arrested multiple individuals responsible for a series of

9  armed robberies across Oakland. *Oakland Police Department Makes Multiple*

10  *Arrests in Robbery Series* (Mar. 29, 2023),

11  https://www.oaklandca.gov/departments/police (last visited Apr. 1, 2023). In the

12  past several months the City has also faced new significant challenges, including a

13  vicious ransomware attack in early February from which the City is still recovering.

14  The City's commitment to constitutional policing is unwavering, however, no matter

15  the challenges it may face. It is the City and its independent oversight bodies, along

16  with the Department, who are together responsible for ensuring sustained

17  substantial compliance with the NSA. While certainly a focus of the City's work has

18  been and will continue to be ensuring that the Department has an effective

19  framework for rigorous and honest self-assessment and accountability, the City has

20  made clear that it does not intend to rely solely on the police to police themselves.

21  The Department has made great strides in every aspect related to the NSA. Even

22  so, the City expects and demands additional improvements particularly focused on

23  the integrity of its internal investigations. The Department, too, expects and

24  demands these improvements of itself. And even with additional Department

25  improvement, the Mayor, City Administrator, City Attorney, Oakland Police

26  Commission, Officer of the Inspector General, and Community Police Review

27  Agency provide independent Department oversight and guidance. Separately and

28  collaboratively, these entities police the police.

JOINT CASE MANAGEMENT
STATEMENT                                      Case No. 00-cv-4599 WHO

## <u>OAKLAND POLICE COMMISSION'S STATEMENT</u>[10]

The Oakland Police Commission is pleased to respond to the Court's invitation to share our perspective on the value of a Sustainability Process and the best plan and prospects for a successful exit from the NSA.

The Police Commission was created through a 2016 ballot measure that amended our City Charter and vested in us broad authority to oversee the Oakland Police Department "to ensure that its policies, practices, and customs conform to national standards of constitutional policing."

The 2016 ballot measure, along with a subsequent ballot measure in 2020, enshrines civilian oversight to supervise the Police Department, the Office of the Inspector General (OIG), which has authority to assess the Department's performance and adherence to constitutional policing practices and audit its policies and procedures, and the Community Police Review Agency (CPRA), which has authority to investigate public complaints of misconduct against police officers and internal complaints if directed by the Commission. This model was part of City leadership's long-term plan for the City of Oakland to earn resolution of the Negotiated Settlement Agreement (NSA). The Commission's bold exercise of its oversight authority, as informed by audit work of the OIG and investigatory work of the CPRA, should eventually replace the proactive compliance mandate currently imposed by the Monitor and the Independent Monitoring Team.

To earn NSA resolution, we appreciate that this Court and the Compliance

---

[10] Counsel for the Oakland Police Commission provided the City's counsel with this statement from the Oakland Police Commission and the referenced attached plan (Exhibit 3) for inclusion in the court filing pursuant to the Court's January 24, 2023 request for the Commission's perspective. The Oakland Police Commission's authority arises from the City's Charter. *See* The Charter of the City of Oakland, sec. 604, https://library.municode.com/ca/oakland/codes/code_of_ordinances?nodeId=THCHO A (last visited on Apr. 2, 2023).

JOINT CASE MANAGEMENT                                                    Case No. 00-cv-4599 WHO
STATEMENT

1   Monitor/Director both expect the City of Oakland to demonstrate that it will

2   routinely address major compliance incidents. The City can do so, first, by

3   identifying deeper structural and cultural issues those incidents reveal and, second,

4   by then implementing comprehensive response plans to keep its reform progress on

5   track. The Monitor's Status Reports have routinely emphasized the proper scope of

6   a more comprehensive response plan as integrating "broader issues of personnel,

7   discipline, risk management, supervision, and leadership into a comprehensive

8   management plan." The Oakland Police Commission's Charter authority positions it

9   to support the City in developing this more comprehensive approach.

10       That's because the Police Commission plays a broad oversight role, both in

11  leading the civilian oversight policymaking structure in Oakland and in supervising

12  a civilian-led investigation agency that prioritizes the integrity of investigations

13  into allegations against sworn officers. The Commission reforms Department

14  policies related to all NSA tasks. We set direction for the Police Chief, the Inspector

15  General, and the Executive Director of the CPRA. We can request reports about

16  important police reform issues from the Chief and the City Administrator. We set

17  the evaluation criteria for the Chief, the Inspector General, and the Executive

18  Director of the CPRA. We hold an annual hearing on the Police Department's

19  budget before the City Council approves it. We serve as a public forum for a highly

20  informed community of Oakland residents and stakeholders, many of whom are

21  organized and deeply engaged to help us set the reform agenda at our twice-

22  monthly public meetings. Advocates for stringent police reform measures also serve

23  as featured community participants of the Commission's policy committees, which

24  we establish to revise the Department's policies, procedures, and general orders. In

25  the past year alone, the Commission has taken up close to 20 detailed policies,

26  standard operating procedures, and general orders, ranging from the limited

27  authorization to use military equipment to approving all of the changes the Monitor

28  has required the City to implement, each time incorporating community

JOINT CASE MANAGEMENT
STATEMENT                                                    Case No. 00-cv-4599 WHO

1  involvement and perspectives without missing any deadlines imposed by state law

2  or this Court. Far more policies and procedures and general orders are in the

3  process of being created and revised, and we anticipate continuing to successfully

4  take on the policymaking work required to reform OPD.

5          Based on our mandate from the voters of Oakland, and recent invitations of

6  this Honorable Court, we understand that the Commission has a responsibility to

7  fully exercise all of its Charter powers to continuously set the policing agenda and

8  transform the Department from within, so that the constitutional policing measures

9  mandated by the NSA will take root beyond the Sustainability Period.

10  In the short term, the Department has taken up the recommendations issued

11  by the law firm of Clarence, Dyer, Cohen, LLP and started a detailed process of

12  implementing those recommendations via new and updated policies and training

13  materials. In addition, the Department has gone beyond those recommendations

14  and is examining other policy and procedure changes to enhance communication

15  between the Department and the CPRA and the Commission.

16          To set direction about ongoing reform efforts over the medium and long term,

17  the Commission has established a new subcommittee of Commissioners currently

18  led by Retired Judge Brenda-Harbin Forte as its Chair, other distinguished

19  Commissioners of Oakland, and featured community participants of the public to

20  lead the Commission in rendering its own determinations about what deeper

21  structural and cultural issued were evidenced by the events described in the CDC

22  Reports, in order to develop an appropriately comprehensive incident response

23  reform plan for the Commission and the City to implement over the coming months.

24  That plan is attached. Ex. 3, *OPC Memorandum, Discussion Outline of Reform Plan*

25  (Mar. 30, 2023).

26          From this latest sprint of reform work, one point of perspective the

27  Commission will share with the Court is to reemphasize the value of a near-term

28

JOINT CASE MANAGEMENT
STATEMENT                                                    Case No. 00-cv-4599 WHO

1  transition of oversight to the Commission and the civilian departments it oversees.

2  With due respect to Clarence Dyer Cohen, LLP, recommended reforms to the Police

3  Department and the City require an in-depth understanding of the City's Charter

4  structure and the model of oversight it envisions, and key policymaking reform

5  work would have been well underway by now had the Commission been read into

6  the matter at an earlier juncture. Rather than coordinating the outside

7  investigation with an Oakland-overseen investigation led by the CPRA, civilian

8  oversight was siloed out of the process that resulted in the Reports of Investigation

9  and Recommendations that Clarence Dyer Cohen LLP issued. The Commission is

10  left to develop and implement big picture reforms on a short timeline, almost as an

11  afterthought. We continue to recognize the work of the Independent Monitoring

12  Team in helping the City of Oakland reform itself, and we are encouraged by the

13  opportunity to build on the Monitor's herculean track record the Court itself

14  emphasized. We would be remiss, though, if we did not respectfully share our

15  perspective that the Commission has been empowered by the voters because of

16  widespread community sentiment that Oakland residents can set the direction of

17  the reform work required to ensure Constitutional policing.

18

19

20

21

22

23

24

25

26

27

28

JOINT CASE MANAGEMENT
STATEMENT                                    Case No. 00-cv-4599 WHO

**THE OPOA'S STATEMENT**

Since the last Case Management Conference on January 24, Intervenor, Oakland Police Officers Association ("OPOA") has made itself available to the Oakland Police Department ("OPD") and the City of Oakland ("City") to assist in the effort to maintain compliance during the sustainability period. Although there have been no overtures to the OPOA relative to NSA compliance since the last CMC, the OPOA is aware that OPD has made significant strides towards full compliance within the sustainability period. The OPOA affirms its willingness and commitment to assist the parties and the Court in whatever capacity they deem appropriate.

Respectfully submitted,

Dated:  January 23, 2023        BARBARA J. PARKER, City Attorney
                                BRIGID S. MARTIN, Special Counsel

                       By:  ___/s/ Brigid S. Martin*_____
                                Attorneys for Defendants
                                CITY OF OAKLAND

                                JOHN L. BURRIS
                                Law Offices of John L. Burris

                       By:  ___/s/ John L. Burris_____
                                Attorney for Plaintiffs

                                JAMES B. CHANIN
                                Law Offices of James B. Chanin

                       By:  ___/s/ James B. Chanin_____
                                Attorney for Plaintiffs

                                ROCKNE A. LUCIA, JR.
                                Rains Lucia Stern St. Phalle & Silver

                       By:  ___/s/ Rockne A. Lucia, Jr._____
                                Attorney for Intervenor
                                OAKLAND POLICE OFFICERS ASSOCIATION

*Per Local Rule 5-1(i)(3), the filer attests that concurrence in the filing of the document has been obtained from each of the other Signatories

50

JOINT CASE MANAGEMENT                         Case No. 00-cv-4599 WHO
STATEMENT