June 30, 2023

# Fourth NSA Sustainability Period Report *of the* Independent Monitor *for the* Oakland Police Department

## Introduction

This is the fourth report of the Monitoring Team issued during the Negotiated Settlement Agreement (NSA) sustainability period in the case of *Delphine Allen, et al., vs. City of Oakland, et al.,* in the United States District Court for the Northern District of California under the direction of Judge William H. Orrick.

On May 12, 2022, the Court issued an Order placing the City into a one-year sustainability period.  The Court noted, "The Negotiated Settlement Agreement (NSA) the parties executed on January 22, 2003, contemplated that federal court oversight would terminate after the defendants achieved substantial compliance with all of the provisions of the NSA and maintained that compliance for a year."  As per the May 12, 2022 Order, during the sustainability period, we report to the Court on a quarterly basis; we conduct quarterly site visits; and we have appended to the Monitoring Team a member of OPD's Office of Internal Accountability (OIA), who serves as the Department's NSA sustainability liaison.

As with our site visits before the sustainability period, our site visits include both compliance assessments and technical assistance.  We meet with Department and City officials to receive updates on OPD's compliance with the NSA Tasks; observe the Department's Risk Management Meeting; discuss the status of several Departmental policies; and share our observations of misconduct investigations and use of force reports.

The Court extended the sustainability period in an Order on April 18, 2023, citing "the City's inability to achieve full compliance."  The Order set out some new provisions for the sustainability period and reduced the number of active Tasks from 11 to five.  The Court noted, "The Court is wrestling with the utility of its role in helping the City achieve constitutional policing after 20 years of monitoring compliance with the NSA.  As discussed at the last Case Management Conference, much good work has been accomplished.  Fundamental questions regarding the Oakland Police Department's ability to police itself remain."

Per the April 18, 2023 Court Order, this report covers our assessments of NSA Tasks 2; 5; 24; 25; and 45.

Case 3:00-cv-04599-WHO   Document 1593   Filed 06/30/23   Page 2 of 20

Fourth NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
June 30, 2023
Page 2 of 20

## *Task Assessments*

## Task 2: Timeliness Standards and Compliance with IAD Investigations

**Requirements:**

*Fairness to complainants, members/employees and the public requires that internal investigations be completed in a timely fashion.*

1. *On or before December 1, 2003, OPD shall develop policies regarding timeliness standards for the completion of Internal Affairs investigations, administrative findings and recommended discipline.*

2. *Compliance with these timeliness standards shall be regularly monitored by IAD command and the Department's command staff. If IAD experiences an unusual proliferation of cases and/or workload, IAD staffing shall be increased to maintain timeliness standards.*

(Negotiated Settlement Agreement III. B.)

**Relevant Policy:**

OPD most recently revised Departmental General Order M-03, *Complaints Against Department Personnel and Procedures*, on December 22, 2017.

**Commentary:**

**Task 2.1** requires that internal investigations (IAD and Division Level) – including review, approval, findings, and discipline – be completed in accordance with the timeliness standards developed by OPD. To assess this subtask, we requested a list of all internal investigations resulting in formal findings (unfounded, sustained, exonerated, or not sustained) that were approved in January, February, and March 2023. Due to the ongoing effects of the ransomware attack on the City's systems in February, the Department is currently unable to produce the report, or list, from Vision that it has provided to us in the past. Accordingly, the list that we received was generated manually by IAD and Office of Internal Accountability (OIA) personnel, and it did not include all of the information that we normally receive for this purpose. Using the list, we segregated the cases into Class I or Class II categories. If a case involved at least one alleged Class I violation, we classified it as Class I.

At least 85% of Class I misconduct investigations and at least 85% of Class II misconduct investigations must be completed within 180 days to be considered timely. Per DGO M-03, Class I offenses "are the most serious allegations of misconduct and, if sustained, shall result in disciplinary action up to and including dismissal and may serve as the basis for criminal prosecution." Class II offenses include "all minor misconduct offenses."

Case 3:00-cv-04599-WHO   Document 1593   Filed 06/30/23   Page 3 of 20

Fourth NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
June 30, 2023
Page 3 of 20

For the purposes of this assessment, we calculated the number of days between the complaint receipt date and the approval date.  The complaint date is the date on which the Department first becomes aware of a complaint – whether it is lodged by a community member or internally generated.  We removed from the denominator cases that were delayed due to tolling (held in abeyance in accordance with one of the provisions of Government Code Section 3304) or cases in which the Department asserted that its failure to meet the 180-day timeliness requirement resulted from delays in the Community Police Review Agency (CPRA) completing its concurrent investigations.

Of the 32 applicable Class I cases we reviewed for this assessment, 27, or 87%, were in compliance with established timelines.  During our last review of Task 2, we found 88% of Class I cases in compliance with established timelines.  Of the 107 applicable Class II cases we reviewed for this assessment, 102, or 95%, were in compliance with established timelines.  During our last review of Task 2, we found 99% of Class II cases in compliance with established timelines.

Per DGO M-03, "In cases with a sustained finding, the discipline recommendation process shall be completed within 30 calendar days of the sustained finding."  The Department was unable to provide information about the cases in our dataset that included sustained findings to us to conduct this assessment.  As a result, for this reporting period, we were unable to determine the Department's compliance with established discipline timelines.  By our next report, if we are unable to determine discipline timeliness, it may affect the Department's compliance status with this Task.

Task 2.2 requires that IAD and OPD command staff regularly monitor compliance with these timeliness standards.  The primary responsibility for monitoring compliance with timeliness standards rests with IAD, whether investigations are conducted by IAD personnel or via Division-level investigation.  As part of this monitoring, the IAD Commander discusses pending deadlines for key open investigations during IAD's weekly meetings with the Chief; the deadlines are also reflected in written agendas for these meetings.  A Monitoring Team representative regularly attends these weekly meetings.  IAD also occasionally, as needed, emails individual reminders on cases approaching due dates to investigators and their supervisors.  The Department is in compliance with Task 2.2.

Task 2.3 requires that if IAD experiences an unusual proliferation of cases and/or workload, IAD staffing be increased to maintain timeliness standards.  We routinely request and receive updates on IAD staffing levels during and between our site visits.

| Task 2 compliance status | In compliance |
|---|---|

Case 3:00-cv-04599-WHO   Document 1593   Filed 06/30/23   Page 4 of 20

Fourth NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
June 30, 2023
Page 4 of 20

## Task 5: Complaint Procedures for IAD

**Requirements:**

1. On or before December 1, 2003, OPD shall develop a policy so that, OPD personnel who become aware that a citizen wishes to file a complaint shall bring such citizen immediately, or as soon as circumstances permit, to a supervisor or IAD or summon a supervisor to the scene. If there is a delay of greater than three (3) hours, the reason for such delay shall be documented by the person receiving the complaint. In the event that such a complainant refuses to travel to a supervisor or to wait for one, the member/employee involved shall make all reasonable attempts to obtain identification, including address and phone number, as well as a description of the allegedly wrongful conduct and offending personnel, from the complainant and any witnesses. This information, as well as a description of the complaint, shall immediately, or as soon as circumstances permit, be documented on a Complaint Form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander, and shall be treated as a complaint. The supervisor or appropriate Area Commander notified of the complaint shall ensure the Communications Division is notified and forward any pertinent documents to the IAD.

2. An on-duty supervisor shall respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest. The supervisor shall ensure the Communications Division is notified and forward any pertinent documents to the IAD. All other misconduct complaints by a jail inmate shall be handled in the same manner as other civilian complaints.

3. In each complaint investigation, OPD shall consider all relevant evidence, including circumstantial, direct and physical evidence, and make credibility determinations, if feasible. OPD shall make efforts to resolve, by reference to physical evidence, and/or use of follow-up interviews and other objective indicators, inconsistent statements among witnesses.

4. OPD shall develop provisions for the permanent retention of all notes, generated and/or received by OPD personnel in the case file.

5. OPD shall resolve each allegation in a complaint investigation using the "preponderance of the evidence" standard. Each allegation shall be resolved by making one of the following dispositions: Unfounded, Sustained, Exonerated, Not Sustained, or Administrative Closure. The Department shall use the following criteria for determining the appropriate disposition:

    a. *Unfounded:* The investigation disclosed sufficient evidence to determine that the alleged conduct did not occur. This finding shall also apply when individuals named in the complaint were not involved in the alleged act.

  b. *Sustained: The investigation disclosed sufficient evidence to determine that the alleged conduct did occur and was in violation of law and/or Oakland Police Department rules, regulations, or policies.*

  c. *Exonerated: The investigation disclosed sufficient evidence to determine that the alleged conduct did occur, but was in accord with law and with all Oakland Police Department rules, regulations, or policies.*

  d. *Not Sustained: The investigation did not disclose sufficient evidence to determine whether or not the alleged conduct occurred.*

  e. *Administrative Closure: The investigation indicates a service complaint, not involving an MOR violation, was resolved without conducting an internal investigation; OR*

  f. *To conclude an internal investigation when it has been determined that the investigation cannot proceed to a normal investigative conclusion due to circumstances to include but not limited to the following:*

    1) *Complainant wishes to withdraw the complaint and the IAD Commander has determined there is no further reason to continue the investigation and to ensure Departmental policy and procedure has been followed;*

    2) *Complaint lacks specificity and complainant refuses or is unable to provide further clarification necessary to investigate the complaint;*

    3) *Subject not employed by OPD at the time of the incident; or*

    4) *If the subject is no longer employed by OPD, the IAD Commander shall determine whether an internal investigation shall be conducted.*

    5) *Complainant fails to articulate an act or failure to act, that, if true, would be an MOR violation; or*

    6) *Complaints limited to California Vehicle Code citations and resulting tows, where there is no allegation of misconduct, shall be referred to the appropriate competent authorities (i.e., Traffic Court and Tow Hearing Officer).*

  g. *Administrative Closures shall be approved by the IAD Commander and entered in the IAD Complaint Database.*

6. *The disposition category of "Filed" is hereby redefined and shall be included under Administrative Dispositions as follows:*

Case 3:00-cv-04599-WHO   Document 1593   Filed 06/30/23   Page 6 of 20

Fourth NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
June 30, 2023
Page 6 of 20

> a. *An investigation that cannot be presently completed. A filed investigation is not a final disposition, but an indication that a case is pending further developments that will allow completion of the investigation.*
>
> b. *The IAD Commander shall review all filed cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed and may direct the closure or continuation of the investigation.*
>
> 7. *Any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken. However, investigators, with the approval of an IAD Commander, are not required to interview and/or take a recorded statement from a member or employee who is the subject of a complaint or was on the scene of the incident when additional information, beyond that already provided by the existing set of facts and/or documentation, is not necessary to reach appropriate findings and conclusions.*

(Negotiated Settlement Agreement III. E.)

### **Relevant Policy:**

There are six Departmental policies that incorporate the requirements of Task 5: Department General Order M-03, *Complaints Against Department Personnel and Procedures* (revised most recently on December 22, 2017); Communications Division Policy & Procedures C-02, *Receiving and Logging Complaints Against Personnel and Use of Force Incidents* (revised most recently on December 7, 2009); Training Bulletin V-T.1, *Internal Investigation Procedure Manual* (revised most recently on August 23, 2018); Special Order 8270, *Booking of Prisoners at the Glenn E. Dyer Detention Facility* (published June 24, 2005); Special Order 8565, *Complaints Against Department Personnel* (published May 11, 2007); and IAD Policy & Procedures Manual 21-01, *IAD General Operating Procedures* (published August 17, 2021). In addition, NSA stipulations issued on December 12, 2005 and March 13, 2007 incorporate the requirements of this Task.

### **Commentary:**

Task 5 consists of several subtasks, briefly described below. Based on OPD's compliance history with many of the subtasks, not all are being actively monitored at this time. As we have continued to advise, quality and timely investigations are essential to fulfilling the Department's obligation to complainants and officers alike.

Case 3:00-cv-04599-WHO   Document 1593   Filed 06/30/23   Page 7 of 20

Fourth NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
June 30, 2023
Page 7 of 20

**Task 5.1** requires that when a citizen wishes to file a complaint, the citizen is brought to a supervisor or IAD, or a supervisor is summoned to the scene.  **Task 5.2** requires that if there is a delay of greater than three hours in supervisory response, the reason for the delay must be documented.  **Task 5.3** requires that where a complainant refuses to travel to a supervisor, or wait for one, personnel make all reasonable attempts to obtain specific information to assist in investigating the complaint.  **Task 5.4** requires that specific information be documented on a complaint form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander.  **Task 5.5** requires that the supervisor or Area Commander notify Communications and forward any pertinent documents to IAD.

To assess compliance with Tasks 5.1 through 5.5, we reviewed the Daily Incident Logs (DILs) prepared by the Communications Division and forwarded to IAD each business day.  The DIL form has been modified several times during our tenure to elicit "forced responses" that gather all of the information required to evaluate compliance with these Tasks.  These modifications have significantly enhanced OPD's ability to document compliance by properly filling out and distributing the logs, and compliance rates with these subtasks have been near 100% for several years.  Consequently, we no longer actively assess OPD's compliance with these subtasks, but we continue to receive both the DILs and Daily Complaint Referral Logs (used to document when Information Business Cards [IBCs] are provided to citizens in lieu of a complaint forms).  We spot-check these forms regularly to verify that the quality of their completion has not diminished.  OPD remains in compliance with Tasks 5.1 through and including Task 5.5.

**Task 5.6** requires that an on-duty supervisor respond to take a complaint received from a jail inmate taken into custody by OPD, who wishes to make a complaint of Class I misconduct contemporaneous with the arrest of the inmate.  We have not actively monitored this subtask since December 2014, though we have reviewed cases applicable to this requirement in several reports since that time.

**Task 5.12** requires that the Watch Commander ensure that any complaints that are applicable to Task 5.6 are delivered to and logged with IAD.  Under current policy, the Communications Division must record on the DILs complaints that are received and/or handled by on-duty supervisors, and the DILs are forwarded daily to IAD.

OPD remains in compliance with Tasks 5.6 and 5.12.

**Task 5.15** through **Task 5.19**, and **Task 5.21,** collectively address the quality of completed IAD investigations, and therefore remain the subject of our focused Task assessments.  To assess compliance with these Tasks, we reviewed a sample of 12 IAD cases that were closed between January 1-March 31, 2023.

Our sample of cases consisted of investigations completed by investigators assigned to IAD, and Division-level investigations (DLIs).  It also included cases that were resolved via formal investigation and investigations that were resolved via summary finding.  (Summary findings are investigations in which the Department believes a proper conclusion can be determined based on a review of existing documentation with limited or no additional interviews and follow-up.)

Together, **Tasks 5.15** and **Task 5.16** require that OPD: gathers all relevant evidence; conducts follow-up interviews where warranted; adequately considers the evidence gathered; makes credibility assessments where feasible; and resolves inconsistent statements.

Case 3:00-cv-04599-WHO   Document 1593   Filed 06/30/23   Page 8 of 20

Fourth NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
June 30, 2023
Page 8 of 20

In all of the cases we reviewed, we believe that OPD gathered all relevant evidence available. As we have often found, in many of the cases video and/or audio recordings proved to be a significant factor in allowing OPD to reach an appropriate conclusion.

Investigators conducted follow-up interviews in two of the cases we reviewed. In one case, a complainant was interviewed three times. In another case, the subject officer was interviewed twice. In the remaining cases, we concur that follow-up interviews were not warranted.

OPD made credibility assessments for all involved parties in eight of the 12 cases. Five cases were approved for summary finding; and per policy, investigators are not required to assess the credibility of the involved officers and civilian employees in these instances. In three cases, including one summary finding case, the complainants were deemed not credible. In two cases, the complainant's statements were inconsistent with available body-worn camera (BWC) footage; and in the other case, the complainant's statements were inconsistent with a recorded call to OPD Dispatch. In two cases, subject officers were deemed not credible.

We disagreed with the credibility assessments in one case. Two complainants were both deemed credible. Based on the evidence in the case, and also the narrative of the credibility assessments, they should have been deemed not credible. The investigator wrote that the complainants' statements were "not accurate" and that both complainants "seemed to exaggerate and often time purposely mispresent facts."

In 10 of the 12 cases we reviewed, OPD resolved inconsistent statements. In five of these cases, BWC recordings were available and assisted in the determination. In two other cases, recorded calls to OPD Dispatch proved instrumental in reaching a definitive finding. Two cases resulted in at least one finding of not sustained. Not sustained is an acceptable finding; and by definition, it implies that inconsistencies were not resolved despite investigative efforts.

**Task 5.17** requires that OPD permanently retain all notes generated and/or received by OPD personnel in the case file. OPD personnel document the presence of investigative notes within a particular file by completing an Investigative Notes Declaration Form. OPD has a sustained history of 100% compliance with this subtask.

**Task 5.18** requires that OPD resolve each allegation in a complaint investigation using the preponderance of the evidence standard. **Task 5.19** requires that each allegation of a complaint is identified and resolved with one of the following dispositions: unfounded; sustained; exonerated; not sustained; or administrative closure. Our sample of 12 cases contained 39 allegations that received dispositions as follows: 11 exonerated; 16 unfounded; four not sustained; seven sustained; and one administratively closed.

Case 3:00-cv-04599-WHO   Document 1593   Filed 06/30/23   Page 9 of 20

Fourth NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
June 30, 2023
Page 9 of 20

We did not disagree with the findings in any of the cases we reviewed.  However, we believe that in one case, an allegation of truthfulness should have been added and sustained for the subject officer.  In this case, the officer was sustained for engaging in an inappropriate relationship with a crime victim.  The officer was appropriately deemed not credible based on his interviews.  In the investigator's analysis of the relationship allegation, he cited and appropriately applied the preponderance of evidence standard in reaching the sustained finding.  However, in his explanation for not pursuing a truthfulness allegation, the investigator appeared to apply a different, higher standard of proof.  While he justified the not credible determination, and characterized certain elements of the officer's statements as "highly questionable," he indicated that the "investigation would not ever be able to *prove* Officer [] was in fact untruthful."  (Italics added.)  The burden of proof for a truthfulness allegation is no different than for any other allegation: preponderance of the evidence.  This is often described as more likely than not, or 51%, or a slight tipping of the scales.  It does not require definitive proof.  The investigation, which was very thorough, contained enough documentation to meet the preponderance of the evidence standard with respect to truthfulness.

In another case we reviewed, a Division Level Investigation (DLI), the initial investigator reached one set of findings, including sustained findings for one of five involved officers for failure to accept or refer a complaint and for demeanor.  The investigator's captain disagreed with some of the findings and authored an addendum to the investigation.  He concurred with these sustained findings, but he disagreed with other findings reached by the investigator.  He recommended that another officer be sustained for failure to accept or refer a complaint, and also recommended that several exonerated findings be changed to not sustained.  It appears from the documentation we received that the Chief concurred with the captain's recommendations; yet we only received discipline documentation for the first officer referenced.  After repeated requests for commensurate documentation pertaining to the second sustained officer, OPD discovered that, due to an apparent clerical error, the second officer was never notified of the sustained finding or any proposed discipline.  The 3304 date has since passed, causing the Department to miss the opportunity to impose discipline if warranted based on the officer's history.  OPD attributed this issue to human error, exacerbated by the continuing effects of the Citywide ransomware attack in February and its ongoing impact on Vision.  While we realize that OPD relies heavily on Vision for many of its reporting processes, until that system is fully restored, it is incumbent on the Department to institute alternative measures to prevent occurrences such as this.

Additionally, at least half of the cases in our sample were missing interview and/or BWC recordings.  Despite numerous attempts to obtain this documentation over more than a two-week period, most of the missing material was not provided as of this writing.  While we are comfortable with our assessment of the cases based on the material at hand, in many instances, we did not have the ability to compare written summaries to actual audio or video documentation had we felt the need to do so.

**Task 5.20** requires that the IAD Commander review all "filed" cases quarterly to determine whether the conditions that prevented investigation and final disposition have changed.  A filed case is defined as an investigation that cannot be presently completed and is pending further developments that will allow completion of the investigation; filed is not a final disposition.

Case 3:00-cv-04599-WHO   Document 1593   Filed 06/30/23   Page 10 of 20

Fourth NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
June 30, 2023
Page 10 of 20

Traditionally, as part of our review of this Task, we also reviewed cases that are tolling.  OPD defines a tolled case as an administrative investigation that has been held in abeyance in accordance with one of the provisions of Government Code Section 3304.  While we are no longer actively assessing this subtask, we note that filed and tolling cases are reviewed with the Chief or his designee during the weekly IAD meetings and are listed by case number on the printed meeting agendas.  We receive and review these agendas regularly, and a Monitoring Team member regularly attends these meetings.  Additionally, we regularly receive a weekly report listing all tolled cases and all cases approaching their 3304 dates.  When we have questions regarding any of the cases in the report, the IAD Commander answers them promptly.

**Task 5.21** requires that any member or employee who is a subject of an internal investigation, as well as any other member or employee on the scene of an incident at which misconduct has been alleged by a complainant, shall be interviewed and a recorded statement taken.  However, with the approval of the IAD Commander or his designee, investigators are not required to interview and/or take a recorded statement in all cases.  For example, interviews are not needed from a member or employee who is the subject of a complaint, or who was on the scene of the incident when additional information – beyond that already provided by the existing set of facts and/or documentation – is not necessary to reach appropriate findings and conclusions.  Five of the 12 cases we reviewed were resolved via summary finding, and each case was appropriately approved for such closure.

As we noted in our last report, there have been several investigations conducted by outside investigators retained by the City.  Some of these matters are still pending; and there remain issues in the Internal Affairs Division, as well as systemic and other deficiencies, that need to be addressed.  We look forward to assessing the Department's progress under the new leadership in Internal Affairs.  The Department remains not in compliance with Task 5.

| **Task 5 compliance status** | Not in compliance |

## Overview of Our Assessments of Tasks 24 and 25

OPD had been in compliance with Tasks 24 and 25 since 2015, and we did not actively review these Tasks.  In November 2018, after we raised concerns regarding the identification, potential underreporting, and investigation of uses of force, the Court reactivated Tasks 24 and 25.

Since we resumed use of force reviews following the Court's reactivation of these Tasks, we have reviewed hundreds of investigations and provided detailed feedback on the force investigations to OPD during each of our site visits.  In cases where we have had questions or concerns, OPD personnel have continued to be responsive and have provided follow-up where necessary.  In some cases, OPD has provided additional information or documentation that supports its actions, and we have concurred with the Department's assessments.  In others, we have identified concerns that had not been identified or addressed by supervisors who conducted the UOF investigation, or the command personnel who reviewed the investigation.  In these cases, OPD executive staff have directed additional review; directed training; entered a Supervisory Note File (SNF); or initiated an Internal Affairs Division (IAD) investigation.  We

Case 3:00-cv-04599-WHO   Document 1593   Filed 06/30/23   Page 11 of 20

Fourth NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
June 30, 2023
Page 11 of 20

have also tracked OPD's efforts to correct identified deficiencies, which have included: the issuance of email directives from executive staff, training bulletins, and newsletters; audits; line-up training; and revisions to UOF-related policies.

In our August 2021 report, we found OPD in compliance with Task 24 for the first time since the Court reactivated these Tasks in 2018; and in April 2022, we found OPD in compliance with Task 25.  We also found OPD in compliance with Tasks 24 and 25 in our first, second, and third sustainability period status reports.

To assess compliance for this report, we reviewed 31 UOF reports that occurred between December 1, 2022-February 28, 2023.  We reviewed all Level 3 UOF reports (two) and a sample of Level 4 UOF reports (29).  In accordance with the Order issued May 12, 2022, establishing the sustainability period, we reviewed these UOF reports with a member of OPD's Office of Internal Accountability (OIA) serving as the Department's NSA sustainability liaison.  Between March 1-April 11, 2023, we reviewed three Level 2 UOF reports for which Force Review Boards (FRBs) were held.  Where concerns with field reporting existed, the concerns were appropriately addressed by the Boards.  We discuss only Level 3 and 4 uses of force in this assessment.

This report covers Level 3 and 4 UOF reports completed by OPD between December 1, 2022-February 28, 2023.  All 31 of the cases we reviewed for this time period occurred after the publication of Special Order 9196, which clarified the use of force policy; after Special Order 9202, issued on February 27, 2020, which temporarily modified the requirements for reporting Type 32 uses of force; and after Special Order 9208, issued on April 27, 2022, which defined the finalized reporting requirements for Level 4, type 32 uses of force.

In the 31 Level 3 and 4 uses of force we reviewed, 78 officers used force on 36 different persons.  There were numerous cases where multiple officers used force on a single person, and five instances where force was used on multiple persons at the same incident.  We noted that there were 136 uses of force on the 36 persons.  Level 4, Type 32 uses of force accounted for 60 of the total uses of force; and in 10 of the 31 cases we reviewed, only Type 32 use of force were used.  As we have noted in our last two sustainability reports, an increase in the total number of uses of force is not unexpected, given the new reporting requirements for Type 32 UOF that were implemented in 2022.

During the second sustainability period, we noted some inconsistencies in the reporting of the Type 32 use of force by officers and supervisors.  During our November 2022 site visit meeting, we discussed these inconsistencies with OPD and agreed on an interpretation of reporting for this type of force.  After our discussion, OPD ensured that supervisors were made aware of the reporting requirements; and we have seen improved consistency in those reports we have reviewed since that time.  As we requested, OPD supervisors now include on the Vision report whether any BWC was reviewed in a Type 32 use of force only incident.  Area Captains continue to audit a sample of Type 32 UOF each month.  In the Area Captains' reviews for incidents, they have identified and appropriately addressed concerns with use of force reporting and documentation.

Case 3:00-cv-04599-WHO   Document 1593   Filed 06/30/23   Page 12 of 20

Fourth NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
June 30, 2023
Page 12 of 20

The total breakdown for the force used on the 36 persons is as follows: African Americans, 42%, a decrease from 48% in our last status report; Latinos, 42%, an increase from 28% in our last status report; whites, 13%, an increase from 8% in our last status report; and Asians or other, 17%, an increase from 16% in our last status report.

Of the 31 UOF reports we reviewed for the three-month period between December 1, 2022-February 28, 2023, we identified only one late BWC activation that had not been identified and addressed by OPD supervisors. While we have continued to observe during our reviews some instances of BWCs becoming dislodged during use of force events, limiting the availability of footage to review, those numbers have declined since OPD began issuing the new "clips" to more securely attach BWCs to both exterior vest carriers and uniforms. In February, only one incident where a BWC became dislodged was noted. During our May 2023 site visit, OPD told us that its new BWC policy is nearing completion.

We noted a few instances in our reviews where officers failed to identify themselves as police officers or used unprofessional language or profanity while dealing with members of the public. We noted one incident where we believe there may have been an unreported use of force, and one where we had concerns about the appropriateness of lowering the level of force from a Level 3 to a Level 4. Of the concerns and comments we brought forward during our May 2023 site visit, the UOF Command review group had already identified and addressed all but one. The group had also identified and addressed some additional concerns with the uses of force it reviewed.

The Deputy Chief who is responsible for the UOF Command review group also presented during our May 2023 site visit on the results of the group's reviews, which also covered UOF reports not reviewed by our Team. The Deputy Chief noted that their reviews continued to identify some concerns with tactical issues, proper categorization of UOFs, and de-escalation techniques. The Deputy Chief also noted that they continued to identify ongoing positive trends – including improved planning and communications, more detailed UOF reports, more positive communications with the public, and sergeants and the chain of command identifying and addressing deficiencies that were found. Based on our reviews, we agree with the assessment provided. The Deputy Chief advised that he is rotating different Command officers onto the review group and finding that this is serving as good training for the command personnel who review uses of force.

In our review of UOF reports for December 1, 2022-February 28, 2023, we identified few areas of concern. In general, officers continue to appropriately use and report use of force, and supervisors and command personnel are identifying and properly addressing any concerns that are identified.

Case 3:00-cv-04599-WHO   Document 1593   Filed 06/30/23   Page 13 of 20

Fourth NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
June 30, 2023
Page 13 of 20

## Task 24: Use of Force Reporting Policy

**Requirements:**

> The policy shall require that:
>
> 1. Members/employees notify their supervisor as soon as practicable following any investigated use of force or allegation of excessive use of force.
>
> 2. In every investigated use of force incident, every member/employee using force, and every member/employee on the scene of the incident at the time the force was used, shall report all uses of force on the appropriate form, unless otherwise directed by the investigating supervisor.
>
> 3. OPD personnel document, on the appropriate form, any use of force and/or the drawing and intentional pointing of a firearm at another person.
>
> 4. A supervisor respond to the scene upon notification of an investigated use of force or an allegation of excessive use of force, unless community unrest or other conditions makes this impracticable.
>
> 5. OPD notify:
>
>    a. The Alameda County District Attorney's Office immediately or as soon as circumstances permit, following a use of lethal force resulting in death or injury likely to result in death.
>
>    b. The City Attorney's Office as soon as circumstances permit following the use of lethal force resulting in death or serious injury. At the discretion of the City Attorney's Office, a Deputy City Attorney shall respond to the scene. The Deputy City Attorney shall serve only in an advisory capacity and shall communicate only with the incident commander or his/her designee.
>
>    c. Departmental investigators regarding officer-involved shootings, in accordance with the provisions of Section V, paragraph H, of this Agreement.
>
> 6. OPD enter data regarding use of force into OPD's Personnel Assessment System (PAS).

(Negotiated Settlement Agreement V. A.)

**Relevant Policy:**

OPD most recently revised Departmental General Order K-4, *Reporting and Investigating the Use of Force,* on October 16, 2014. The Department issued Special Order 9208, *Level 4 Type 32 Reporting and Review,* on June 4, 2022.

Case 3:00-cv-04599-WHO   Document 1593   Filed 06/30/23   Page 14 of 20

Fourth NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
June 30, 2023
Page 14 of 20

**Commentary:**

To assess compliance with Task 24, we reviewed 31 Level 3 and 4 use of force (UOF) reports that were completed by OPD from December 1, 2022-February 28, 2023.

**Task 24.1** requires that members/employees notify their supervisor as soon as practicable following any reportable use of force or allegation of excessive use of force. In our reviews, we did not identify any instances where a notification was not properly made or was not properly documented.

**Task 24.2** requires that in every reportable use of force incident, every member/employee on the scene of the incident at the time the force was used, reports all uses of force on the appropriate form, unless otherwise directed by the investigating supervisor. **Task 24.3** requires that OPD personnel document, on the appropriate form, every use of force and/or the drawing and intentional pointing of a firearm at another person.

In the 31 Level 3 and 4 UOF incidents we reviewed; officers used force on 36 different persons. In four of the reports, Level 4, Type 22, pointing a weapon, was the only force used. In six others, Type 22 was used in addition to another use of force. We determined that officers' pointing of their firearms was appropriate in all instances we assessed. We identified one instance where it appears a use of force was improperly reported. The UOF Command review group had already referred this case to IAD. We also identified one instance where we had concerns about a Category 3 use of force being lowered to a Category 4 use of force. Again, the Command review group had already identified this concern and forwarded the report to IAD for investigation.

**Task 24.4** requires that a supervisor respond to the scene upon notification of a Level 1, 2, or 3 use of force or an allegation of excessive use of force, unless community unrest or other conditions makes such a response impracticable. In the two Level 3 uses of force we reviewed for this subtask; a supervisor did respond to the scene as required. Though not required, supervisors also responded to 24 of the 29 Level 4 uses of force or were on scene at the time of the use of force.

**Task 24.5** specifically addresses requirements for the response and handling of Level 1 uses of force. We assess Level 1 uses of force in our regular reviews of Task 30 (Executive Force Review Boards).

**Task 24.6** requires that OPD enter all use of force data into Performance Reporting Information Metrics Environment (PRIME), which is now known as Vision. In most cases, use of force data was properly entered into Vision. However, OPD experienced technical difficulties with entering some of the use of force data; and the Department continues to work on resolving this issue.

This is our fourth assessment of UOF reporting for the sustainability period. OPD has continued to meet the overall requirements of this Task.

| Task 24 compliance status | In compliance |

Case 3:00-cv-04599-WHO   Document 1593   Filed 06/30/23   Page 15 of 20

Fourth NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
June 30, 2023
Page 15 of 20

## Task 25: Use of Force Investigations and Report Responsibility

**Requirements:**

*An on-scene supervisor is responsible for completing an investigated use of force report in accordance with the provisions of Departmental General Order K-4, "Reporting and Investigating the Use of Force."*

1. *OPD shall develop and implement a policy for conducting and documenting use of force investigations that include, at a minimum:*

    a. *Documentation of the incident in either an Offense or Supplemental Report from the member(s)/employee(s) using force; and/or, when necessary, a statement taken from the member(s)/employee(s) using force;*

    b. *Separating and separately interviewing all officers who were at the scene at the time of the incident;*

    c. *A Supplemental Report from other members/employees on the scene or a statement taken, if deemed necessary by the investigating supervisor;*

    d. *Identification and interviews of non-Departmental witnesses;*

    e. *Consideration of discrepancies in information obtained from members, employees and witnesses, and statements in the reports filed;*

    f. *Whether arrest reports or use of force reports contain "boilerplate" or "pat language" (e.g., "fighting stance", "minimal force necessary to control the situation");*

    g. *Documentation of physical evidence and/or photographs and a summary and analysis of all relevant evidence gathered during the investigation; and*

    h. *Consideration of training/tactical issues involving the availability and practicality of other force options.*

    i. *Supervisor's justification as to why any element of the policy was not documented; and*

2. *All supervisors shall be trained in conducting use of force investigations and such training shall be part of a supervisory training course.*

3. *Use of force investigations shall include a recommendation whether the use of force was objectively reasonable and within Department policy and training. The recommendation shall be based on the totality of the circumstances and shall consider, but is not limited to, the following factors:*

    a. *Whether the force used was pursuant to a legitimate law-enforcement objective;*

- b. *Whether the type and amount of force used was proportional to the resistance encountered and reasonably related to the objective the members/employees were attempting to achieve;*
- c. *Whether the member/employee used reasonable verbal means to attempt to resolve the situation without force, if time and circumstances permitted such attempts;*
- d. *Whether the force used was de-escalated or stopped reasonably when resistance decreased or stopped;*

4. *Use of force reports shall be reviewed by the appropriate chain-of-review as defined by policy.*

*The type of force used, the identity of the involved members, and the report preparer shall be the determining criteria for utilizing the appropriate chain-of-review. Reviewers may include, when appropriate, the chain-of-command of the involved personnel, the appropriate Area Commander on duty at the time the incident occurred, other designated Bureau of Field Operations commanders, and as necessary, the chain-of-command of the involved personnel up to the Division Commander or Deputy Chief/Director, and the Internal Affairs Division.*

*Reviewers for Level 1-3 use of force investigations shall:*

- a. *Make a recommendation as to whether the use of force was in or out of policy,*
- b. *Order additional investigation and investigative resources when necessary, and*
- c. *Comment on any training issue(s) when appropriate.*

5. *Any recommendation that the use of force did not comply with Department policy shall result in the incident being referred to the Internal Affairs Division to conduct additional investigation/analysis, if necessary.*

6. *Members/employees involved in a use of force incident resulting in serious injury or death and/or an officer-involved shooting, shall be separated from each other as soon as practicable at the incident scene, and kept apart until they have completed their reports and been interviewed.*

(Negotiated Settlement Agreement V. B.)

**Relevant Policy:**

OPD most recently revised Departmental General Order K-4, *Reporting and Investigating the Use of Force,* on October 16, 2014. The Department issued Special Order 9208, *Level 4 Type 32 Reporting and Review,* on June 4, 2022.

Case 3:00-cv-04599-WHO   Document 1593   Filed 06/30/23   Page 17 of 20

Fourth NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
June 30, 2023
Page 17 of 20

**Commentary:**

As noted above in Task 24, we reviewed 31 Level 3 and 4 use of force (UOF) reports that were completed between December 1, 2022-February 28, 2023.

**Task 25.1** requires that supervisors complete a use of force report and that certain criteria are met in the report. Subtask 25.1.f. addresses the use of "boilerplate" or "pat" language in reports. During our reviews for this report, we did not identify any patterns of officers failing to document specific information and details justifying their use of force or using "boilerplate" or "pat" language in their reports.

**Task 25.2** requires that all supervisors are trained on how to conduct use of force investigations and such training is part of a supervisory training course. OPD includes the requirement for this training in its Departmental policies. During our March 2022 site visit, we confirmed with OPD that the Department continues to require and deliver this training in the Sergeants' Transition Course, where use of force is part of the curriculum.

The use of force and the processes in which force is documented and reviewed have been at the core of the Court's oversight. The Department has provided numerous directives on this topic. During this and our last three sustainability reports, we have found that in general, supervisors are identifying deficiencies in officer reporting and identifying and addressing MOR violations. We also find that reviewers of the supervisors' reports are generally identifying and addressing concerns when appropriate. OPD has also assigned a team of command officers to review some use of force reports as an ongoing quality control mechanism. We have found that this additional oversight and review has continued to identify and properly address concerns prior to our Team identifying them.

**Task 25.3** requires that use of force investigations include required recommendations. Areas of recommendation include: whether the force used was pursuant to a legitimate law enforcement objective; whether the type and amount of force used was proportional to the resistance encountered and reasonably related to the objective the officers were attempting to achieve; whether the officers used reasonable verbal means to attempt to resolve the situation without force, if time and circumstances permitted such attempts; and whether the force used was de-escalated or stopped reasonably when resistance decreased or stopped.

In our assessment of Level 3 and 4 UOF reports for this report, we did not identify any instances where the use of force was not deescalated or stopped reasonably when resistance decreased, or any instances where we believe officers could have made additional efforts to explain to subjects being detained why the detention was occurring prior to using force. Notably, we observed several instances during this reporting period where officers used commendable patience and empathy when dealing with members of the public who were being detained.

In our review of UOF reports from the first sustainability period, we identified three Level 3-Taser deployments where we identified concerns with the use of force. As a result of our concerns, OPD initiated internal affairs investigations of two of these. In the third, OPD provided us additional detailed information on the use of force; and after further review, we concurred with their findings of in compliance. OPD conducted additional training for officers and supervisors on the use of Tasers, specifically the use of Tasers on subjects who were fleeing on foot from officers. The Department also determined that OPD would no longer allow Taser

Case 3:00-cv-04599-WHO   Document 1593   Filed 06/30/23   Page 18 of 20

Fourth NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
June 30, 2023
Page 18 of 20

deployments where the subject was not struck with the probe to be lowered to a Level 4 use of force. This ensures that they receive the same level of scrutiny as those where the probe does strike the subject. Since that time, we have not identified any further concerns with the use of Tasers on fleeing subjects.

**Task 25.4** requires that use of force reports be reviewed by the appropriate chain of command and appropriate recommendations are made. In all of the cases we reviewed, the reports were reviewed as required. The Command review group also reviews a select number of uses of force for follow-up review. The combination of supervisor and command review has continued to appropriately identify and address concerns with UOF reporting. OPD continues to make strides in ensuring that the chain of command is actively involved in the review of use of force and is addressing areas of concern without the need for us to bring the concerns to their attention.

**Task 25.5** requires that any determination that a use of force did not comply with Department policy result in the incident being referred to IAD to conduct additional investigation/analysis, if necessary. We identified two uses of force where we believed additional investigation was appropriate to determine if the use of force was appropriate or properly reported. OPD had already identified these concern and referred the cases to IAD.

**Task 25.6** requires that members/employees involved in a use of force incident resulting in serious injury or death and/or officer-involved shooting be separated from each other as soon as practicable at the incident scene, and kept apart until they have completed their reports and been interviewed. This Task is not assessed here, as we review and consider it as part of the Force and Executive Force Review Boards that OPD holds to examine Level 1 and 2 uses of force.

This is our fourth assessment of UOF for the sustainability period. OPD has continued to meet the overall requirements of this Task, and continues to render additional oversight and scrutiny of use of force reporting.

| **Task 25 compliance status** | In compliance |

Case 3:00-cv-04599-WHO   Document 1593   Filed 06/30/23   Page 19 of 20

Fourth NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
June 30, 2023
Page 19 of 20

## Task 45: Consistency of Discipline Policy

**Requirements:**

*On or before October 6, 2003, OPD shall revise and update its disciplinary policy to ensure that discipline is imposed in a fair and consistent manner.*

1. *The policy shall describe the circumstances in which disciplinary action is appropriate and those in which Division-level corrective action is appropriate.*

2. *The policy shall establish a centralized system for documenting and tracking all forms of discipline and corrective action, whether imposed centrally or at the Division level.*

3. *All internal investigations which result in a sustained finding shall be submitted to the Discipline Officer for a disciplinary recommendation. The Discipline Officer shall convene a meeting with the Deputy Chief or designee in the affected chain-of-command for a confidential discussion of the misconduct, including the mitigating and aggravating factors and the member/employee's overall performance.*

4. *The COP may direct the Discipline Officer to prepare a Discipline Recommendation without convening a Discipline Conference.*

(Negotiated Settlement Agreement X. B.)

**Relevant Policy:**

Five Departmental policies incorporate the requirements of Task 45: Departmental General Order M-03, *Complaints Against Department Personnel and Procedures* (revised most recently on December 22, 2017); Training Bulletin V-T.1 and V-T.2, *Internal Investigation Procedure Manual* (revised most recently on August 23, 2018); IAD Policy & Procedures Manual 21-01, *IAD General Operating Procedures* (published August 17, 2021); and Training Bulletin V-T, *Departmental Discipline Policy* (revised most recently on December 11, 2017).

**Commentary:**

Since the writing of our last report, a key member of the Department's staff who was a major contributor to data-gathering and analysis left the services of the City. We look forward to the Department filling this important position.

More importantly, in our last report, we expressed our dismay that the Department had not directly responded to issues of disparities – and in fact, certain investigative outcomes illuminated the Department's failures in this regard. The Department needs to specifically address disparities in discipline and investigative outcomes.

| **Task 45 compliance status** | No compliance finding |

Case 3:00-cv-04599-WHO   Document 1593   Filed 06/30/23   Page 20 of 20

Fourth NSA Sustainability Period Report of the Independent Monitor for the Oakland Police Department
June 30, 2023
Page 20 of 20

# Conclusion

The Court Order of April 18, 2023 extended the NSA sustainability period and limited the active Tasks to 2, 5, 24, 25, and 45.  Prior to the April 18, 2023 Order, and since our last report, we observed two Force Review Boards (FRBs) convened by OPD.  One FRB assessed the appropriateness of a canine bite on a subject wanted for a felony arrest warrant who was observed in possession of a handgun.  The Board found the use of force in compliance; and the members engaged in in-depth discussions regarding the length of the bite; and whether de-escalation occurred at the earliest opportunity.  The second FRB assessed the use of both a Taser and a Specialty Impact Munition (a Drag Stabilized Flexible Baton, or "bean bag").  The subject refused to leave his aunt's residence, and was armed with a metal cane which he repeatedly waved in a threatening manner.  The force was used when he attempted to break the containment of the officers and re-enter his aunt's house.  We did not disagree with either Board's conclusions.

Additionally, for this report, we reviewed one FRB report that was completed and approved by the Chief of Police since our last report.  The FRB report documented an FRB that convened on January 20, 2023, which was observed remotely by a member of the Monitoring Team.  The Board assessed 12 uses force, including a canine bite.  The subject receiving the bite fled from a stolen vehicle that was used in an armed robbery.  We found the report to be well-written and an accurate account of the proceeding we observed.  The Chief concurred with the Board's findings without any modifications.  We did not disagree with any of the findings in the reports we reviewed.

We also reviewed one completed Executive Force Review Board (EFRB) report before the entry of the April 18, 2023 Order and since we last reported on Task 30.  The report documented the EFRB's evaluation of a Taser deployment on a fleeing suspect wanted from an earlier domestic violence incident.  Members of the Monitoring Team observed the Board when it convened on March 7-8, 2022.  We found that the report accurately documented the proceedings.  The Board found the Taser deployment out of compliance, and we did not disagree.  The Chief concurred with the Board's findings without any modifications.

Interim Chief Allison has done a commendable job in the daily operations and administration of the Department.  The Department, with the support of the City structure, must continue to address and resolve issues that are still of concern.

*Robert S. Warshaw*

Chief (Ret.) Robert S. Warshaw
*Monitor*