RYAN RICHARDSON, City Attorney, CABN 223548
BRIGID S. MARTIN, Special Counsel, CABN 231705
One Frank H. Ogawa Plaza, 6th Floor
Oakland, California 94612
Telephone: (510) 238-3601
Facsimile: (510) 238-6500
Email:  BMartin@oaklandcityattorney.org

Attorneys for CITY OF OAKLAND

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DELPHINE ALLEN, et al. | Case No. 00-cv-04599 WHO |
| Plaintiffs, | |
| v. | **DEFENDANT CITY OF OAKLAND'S STATUS REPORT** |
| CITY OF OAKLAND, et al., | |
| Defendant(s). | |

Pursuant to the Court's July 10, 2025, oral order, the City provides the following status report updating the Court on the City's ongoing efforts and any new efforts to achieve compliance. July 10, 2025, Court Hearing Tr. 48.

Public safety is, without question, a top priority for the City. City leadership is committed to providing effective public safety services to the community. City leadership also understands that constitutional policing and accountability are fundamental to effective public safety services. The City's progress in the six weeks following the July 10, 2025, Case Management Conference, reflected in the ten accomplishments described herein, demonstrates City leaders' continuing and unequivocal efforts to integrate these principles into the Department's culture by ensuring they are foundational to the Department's core public safety mission.

1. **The Chief of Police Reinforced the Importance of Accountability at Command Retreat.**

Each quarter the Chief of Police hosts a command retreat, bringing together Department commanders with the rank of lieutenant or higher to focus on critical issues and facilitate in-depth discussions. Commanders return from the retreat with a unified vision and strategy to address critical issues.

The Chief's most recent command retreat occurred at the end of July 2025. On July 22 and 29, the Department addressed investigatory accountability, including the importance of prompt completion of investigations. Ex. 1, *Internal Affairs Update Command Retreat Lesson Plan* (outline). Addressing these issues with commanders fulfills a recommendation from the Department's *Case No. 23-0459 Incident Assessment and Response* (Apr. 30, 2025) (lessons learned from the Tran investigation). Dkt. 1701, *Joint Case Mgmt. Statement*, Ex. 4 (July 3, 2025). The command retreat also featured a refresher training on the distinction between *Unfounded* and *Exonerated* findings in internal administrative investigations.

2. **The Department Enhanced Procedure to Document Instances When a Criminal Allegation Against a Member Does Not Trigger a Criminal Investigation.**

Reasonable suspicion that a Department member has committed a crime triggers explicit notification requirements to City and Department leadership. DGO M-04.1, *Criminal Investigation of Dept. Members and Outside Sworn Personnel* (rev. Nov. 2023). If the alleged criminal conduct occurred in Oakland, a criminal investigator is directed to conduct a preliminary investigation. *Id.* at 3. The Department's *Case No. 23-0459 Incident Assessment and Response* report found, however, that when the Department determined that criminal allegations did not rise to the level of reasonable suspicion, and M-04.1 notice and investigation requirements were not triggered, there was a lack of documentation about how that determination was made and who was responsible for deciding not to trigger M-04.1 protocols. *See* Dkt. 1701, Ex. 4, *supra.* Therefore, to ensure transparency and

accountability for a decision not to trigger M-04.1 notification and investigation protocols when a criminal allegation has been made against a member, the Department created a standard form to document who was involved in making the decision not to trigger M-04.1 notifications and the analysis that resulted in a determination that the allegation did not rise to the level of reasonable suspicion. The Department will present the form and accompanying materials to the monitor and stakeholders at the September 3, 2025 site visit. This fulfills another recommendation from the Department's *Case No. 23-0459 Incident Assessment and Response*.

### 3. The Department Provided Direction for Supervisors to Address Misconduct Trends.

The City previously reported that the Department restarted its publication of quarterly IAB Trend Reports. *See* Dkt. 1701, *supra* at 39. To ensure that supervisors are effectively using the trend reports in their supervision of patrol officers, the Department created a training outline and PowerPoint for the first and second quarters of 2025 for watch commanders and line supervisors to use to discuss and address misconduct trends with officers under their command. The training materials focus on both preventing the types of misconduct recently observed with greater frequency and providing positive reinforcement for professional conduct that has resulted in reductions in previously observed misconduct patterns. The Department also addressed 2025 IAB trends in its risk management meetings.

### 4. The Department Held Effective Risk Management Meetings.

Area-level risk management meetings occurred in July and early August 2025. On August 12, the Department held the risk management meeting for the Bureau of Field Operations. The quarterly Citywide risk management meeting occurred on August 26. In addition to analyzing stop rates, outcomes, and force, the meetings addressed particular complaint and misconduct trends including (1)

direction that training and supervisor feedback must continue to address officer conduct giving rise to Performance of Duty allegations and sustained findings; (2) the need to provide clear messaging that timely body-worn camera activation and truthfulness are non-negotiable integrity markers with significant disciplinary consequences; and (3) the need to further investigate complaint spikes in January and May 2025.

### 5. The Department Distributed its Draft 2024 Internal Investigation Outcomes and Discipline Report.

On August 22, 2025, the Department shared a draft of its 2024 Internal Investigation and Discipline Report with City leadership, the monitor, and plaintiffs' counsel for review in advance of the September 3, 2025, monitor site visit. The Department intends to incorporate any feedback and finalize the report following the September site visit.

The City previously reported concerning preliminary findings based on its initial analysis of the 2024 data, including a decrease in the overall sustained rate from 8% in 2023 to 5% in 2024. Dkt. 1701, *supra* at 36. Subsequent analysis revealed that a change in the Department's complaint policy designed to reduce an observed racial disparity was a substantial cause of the rate reduction.

In 2022, Black officers were sustained at a higher rate than white officers for failure to accept or refer a complaint (FTARC). To eliminate the disparity, on December 5, 2023, the Department revised its policy to allow FTARC allegations discovered by investigators in the course of investigating unrelated allegations (referred to as "self-discovered" allegations) to be handled with a supervisory note to file (SNF) if there was no pattern of misconduct. This is consistent with the way the Department handles other self-discovered Class II (lower level) misconduct allegations.

The change in policy at the end of 2023 resulted in a decrease in 2024 in the number of investigation outcomes for self-discovered FTARC allegations, since

instances where there was no pattern could be handled by SNF rather than a full investigation. Because self-discovered FTARC allegations are sustained more frequently than other allegations,[1] it was reasonable to assume that the 2024 decrease in FTARC case outcomes corresponded with a decrease in sustained outcomes.

To determine the extent to which the decrease in sustained FTARC allegations contributed to the reduction in the overall sustained rate, the Department analyzed the data for 2023 and 2024 with and without FTARC allegations included in the data set. When FTARC allegations are removed, the 2023 and 2024 overall sustained rates are nearly the same, the DLI sustained rates are equal, and the data for IAB investigations actually reflect a more pronounced *increase* in the sustained rate. *See* Table 1.

| Table 1: Allegations by Investigation Type with and without FTARC Allegations | | | | |
|---|---|---|---|---|
| | All Allegations (Including FTARC) | | FTARC Allegations Excluded | |
| | **2023** | **2024** | **2023** | **2024** |
| **Overall Sustained Rate** | 8% | 5% | 5% | 4% |
| **DLI Sustained Rate** | 6% | 4% | 4% | 4% |
| **IAB Investigation Sustained Rate** | 15% | 19% | 12% | 18% |

Thus, the data confirms that the reduction in internal investigations and findings for FTARC allegations was a substantial cause of the overall sustained rate reduction in 2024.

**6. The Department Finished Conducting its 2025 Survey on Members' Perceptions About Internal Investigations and Discipline.**

From June 20 through early August, the Department collected anonymous responses to its biannual Survey on Members' Perceptions About Internal

---

[1] The 2023 analysis found that of the top six allegations received, FTARC allegations were sustained at the highest rate by far (42% of 125), having a disproportionate impact on the overall sustained rates.

Investigations and Discipline. The Department, with technical assistance from Stanford University, is in the process of reviewing the survey responses and analyzing the data. The Department plans to work with its Race and Equity Team to develop a plan to conduct qualitative interviews with police officer associations and stakeholders to complement the survey data.

7. **The Department is Negotiating a New Technical Assistance Contract with Stanford University.**

In the past several months, the Department's Risk Analysis Unit has worked closely with Stanford to analyze data and prepare the 2024 Internal Investigation Outcomes and Discipline Report, prepare the 2025 Survey on Members' Perceptions About Internal Investigations and Discipline, and evaluate the survey data. Stanford researchers' deep understanding of the Department's data and clear grasp of the Department's objectives makes Stanford an unparalleled and exceptionally effective partner. The City's progress has been significantly accelerated by Stanford's assistance.

The Department's technical assistance contract with Stanford is scheduled to expire soon. The Department and Stanford have agreed to seek a new City contract to allow Stanford to continue to assist the Department with data analysis. Mayor Lee and City Administrator Johnson are committed to supporting the new contract throughout the City's approval process.

8. **The City Has Implemented a Comprehensive, Unified Approach to Achieve and Sustain Long-Term Task 2 Compliance.**

Although the monitor solely uses the Department's investigation completion rate to measure compliance, CPRA's completion rate indirectly impacts the Department's completion rate. Specifically, when the Department completes an investigation in 180 days but CPRA's parallel investigation is incomplete, the monitor does not credit the Department for timely completing its investigation. *See, e.g.,* Dkt. 1698, *Tenth NSA Sustainability Period Report of the Independent Monitor* 3 (June 3, 2025). Instead, the monitor completely removes from its calculations any

cases that the Department timely completed but CPRA did not. Given that most CPRA investigations involve Class I (more serious) allegations, the impact is more pronounced in the monitor's calculations of Class I completion rates. Recognizing this impact, the City has embraced a citywide approach to improve long-term stability in Task 2 compliance.

### *Increased Interagency Communication on Investigation Timelines.*

Since the last Court hearing, the Department and CPRA have increased the frequency of meetings to discuss the status and anticipated timelines of all pending cases that have hit 120 days. Case status and timeline meetings now occur each week rather than every other week.

### *The CPRA's Independent Focus on 180-Day Timelines.*

In the last three months, the CPRA has ramped up its efforts to complete or close investigations within 180 days. The CPRA has prioritized early identification of cases that fall outside of its charter mandate to allow it to more swiftly administratively close cases and expend fewer resources on such cases. CPRA leadership meets with investigators two to three times each week to review each investigator's cases and consider resource reallocation where feasible based on case timelines and priorities. CPRA has also met with City leadership to discuss possible changes to CPRA's procedures, even temporarily, to clear case backlog and improve investigation timelines. CPRA intends to explore with the Inspector General whether there may be ways to allow CPRA to increase its coordination with the Department without sacrificing its investigatory independence or ethical standards.

### *The Department's Focus on 180-Day Timelines and § 3304.*

The Department has also independently taken steps to improve its completion of investigations within 180 days and to ensure all cases are completed within the one-year statutory deadline imposed by Cal. Gov. Code § 3304. The Department has been using the Preemptive Planning Protocol that the Chief referenced at the last Court hearing. The protocol involves advance coordination

with an officer's captain when discipline is anticipated, in order to avoid delay in serving the notice of discipline. The protocol has proven critical in ensuring § 3304 compliance in cases nearing the one-year deadline, particularly where subject members are on leave.

The Department analyzed case data to determine whether certain investigators or categories of Class I investigations miss deadlines with more frequency, though it did not observe any patterns. In addition to the focus on investigation timelines at the Chief's command retreat described above, the Department also increased training on and support for the use of the following measures to improve efficient use of time and resources:

- Identifying when appropriate and following correct procedures to take advantage of the use of Summary Findings to close cases at the preliminary inquiry stage;
- Emphasizing the importance of an investigator's effective field interview of a complainant to reduce the need for follow-up interviews, particularly where a complainant may be unavailable or difficult to find or contact;
- Emphasizing the importance of conducting a thorough initial canvass for witnesses and video; and
- Encouraging immediate commander mentoring at the outset of an investigation and regular check-ins thereafter.

**The City Remains Out of Compliance with Task 2 Timelines for Class I Investigations.**

While the City observed some improvements, it did not meet the Task 2 compliance threshold for Class I cases in the first two quarters of 2025. Since January 1, 2025, however, the City has met the § 3304 deadline in 100% of cases. Moreover, the Department's Class II timely completion rate remains consistently above 85%, nearing 95% in the second quarter of 2025.

While the City continues its efforts to complete more Class I investigations within 180 days, it prioritizes conducting investigations with the integrity and rigor necessary to ensure accountability and withstand scrutiny. Cases will not be prematurely closed solely to meet the Department's 180-day policy timeline. The City will continue, however, to make its best efforts to meet both standards.

### 9. Mayor Lee is Forging Relationships with Front-Line Officers as well as Department Commanders.

Mayor Lee formally meets with Chief Mitchell at least once each week, and the two often speak multiple time in a day. The mayor and her staff—as well as other city leaders including the City Administrator, Police Commission Chair, and Inspector General—continue to participate in the Court-mandated formal biweekly meetings to discuss the Department's most significant internal investigations. In addition to working with Department commanders, Mayor Lee also makes time to engage with patrol officers and the Department's newest recruits. On August 13, 2025, Mayor Lee addressed the police officer trainees participating in the Department's 195th Academy. On August 20, 2025, Mayor Lee met with patrol officers during officer line up at the Eastmont substation.[2]. Mayor Lee views line ups as opportunities to connect with front-line officers to gain a deeper understanding of how the Department operates, learn about officers' experiences, and hear officers' perspectives about how city resources can be used to achieve better public safety outcomes. She looks forward to continuing to hold listening sessions with officers during line ups at both the downtown Police Administration Building and the Eastmont substation.

### 10. Mayor Lee Has Taken an Active Role in Officer Recruitment and Retention.

Hiring and retaining the right officers is crucial to shaping the Department's culture. A positive culture established through thoughtful recruitment and retention strategies fosters a sense of shared purpose, belonging, and accountability. Mayor Lee is collaborating with City and community leaders to implement recruiting strategies that promote inclusivity and reach populations and communities that have been historically underrepresented in the Department's applicant pool. These strategies include development of linguistically and culturally

---

[2] "Line up" is the term the Department uses to describe its roll call and officer briefing that occurs prior to the start of each shift.

appropriate recruitment initiatives and outreach materials that are clear, effective, and respectful; and identifying types of venues in Oakland where officer recruitment has not historically occurred but would be welcomed. For example, some community leaders have suggested using churches for potential recruitment events.

Mayor Lee is also exploring specific recruitment initiatives that draw candidates from the City's Community Ambassador civilian safety program[3] and Merritt College's Administration of Justice (policing degree) program, as well an initiative to revitalize the Department's cadet program. The cadet program was explicitly designed to provide experience and training for local high school and college attendees interested in a law enforcement career. Cadets are exposed to various police divisions, receive supervision from officers and civilian supervisors, and are encouraged to apply for the Police Officer Trainee position after their assignment.

Mayor Lee plans to attend recruitment events with Chief Mitchell and engage directly with community members about sworn and civilian employment at the Oakland Police Department.

**Conclusion**

At the last hearing, the Court recognized that a "monitorship is not the best tool to address cultural issues, which have been endemic since the initiation of Court supervision. Leadership from the City and OPD is key." July 10, 2025, Court Hearing Tr. 6. The City's ongoing efforts detailed herein demonstrate that City and Department leadership are focused not only on complying with the letter of the NSA, but also with the spirit of the NSA. Every one of the decisions and actions described herein have been thoughtfully designed to achieve NSA task compliance by both fulfilling specific NSA requirements and shaping Department culture. The

---

[3] *See* https://www.visitoakland.com/travel-safely-in-oakland/community-ambassadors-program/ (last visited Aug. 25, 2025).

City looks forward to the arrival of Assistant City Administrator Michelle Phillips on August 30, 2025. The City will provide a further status report to the Court on or before October 21, 2025.

Respectfully submitted,

Dated: August 26, 2025     RYAN RICHARDSON, City Attorney
                          BRIGID S. MARTIN, Special Counsel

By:     /s/ Brigid S. Martin
        Attorney for Defendant
        CITY OF OAKLAND