RYAN RICHARDSON, City Attorney, CABN 223548
BRIGID S. MARTIN, Special Counsel, CABN 231705
One Frank H. Ogawa Plaza, 6th Floor
Oakland, California 94612
Telephone: (510) 238-3601
Facsimile: (510) 238-6500
Email:  BMartin@oaklandcityattorney.org

Attorneys for CITY OF OAKLAND

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DELPHINE ALLEN, et al.,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>CITY OF OAKLAND, et al.,<br><br>　　　　Defendant(s). | Case No. 00-cv-04599 WHO<br><br>**DEFENDANT CITY OF OAKLAND'S STATUS REPORT** |

Pursuant to the Court's July 10, 2025, oral order, the City provides the following status report updating the Court on the City's ongoing efforts and any new efforts to achieve Negotiated Settlement Agreement (NSA) compliance. July 10, 2025, Court Hearing Tr. 48.

The City has made considerable progress by focusing on two things: addressing systemic issues and tackling specific, actionable mandates. This two-pronged effort moves beyond a temporary fix. It demonstrates a genuine commitment to building public trust by pairing City leaders' broad vision for a positive shift in Oakland Police Department (Department) culture with precise, targeted actions necessary to sustain task compliance.

///

# I. The City's Strategic Vision to Impact Department Culture

Under the leadership of Mayor Barbara Lee, the City has implemented a strategy that advances positive change in the Department's culture and helps ensure sustainable compliance with the NSA. This strategic vision, the "One Oakland" initiative, relies on mutual support and collaboration between committed City leaders, community leaders, and the members of the Oakland Police Department. The initiative impacts police culture by aligning Department values with the needs of the community. Mayor Lee's vision is a unifying force for diverse City and community leaders who share a commitment to public safety.

## A. Shaping Police Culture Through Community Engagement

The City's community engagement efforts are designed to impact police culture by fostering trust and legitimacy, shifting from a reactive approach to policing to an approach that emphasizes proactivity and problem solving.

As part of Mayor Lee's initiative, the City launched a comprehensive community engagement effort through a series of "One Oakland Listening Sessions." These sessions, held in partnership with City Councilmembers, Department leaders, including Chief Mitchell and Acting Assistant Chief Tedesco, were designed to foster direct dialogue, trust, and collaboration on Department policies, practices, and cultural norms. One of the goals is to encourage officers to feel more engaged and valued, build stronger relationships with the community, and become more effective problem solvers.

From June to August 2025, over 1,000 residents participated in ten collaborative workshops. The top priority identified by residents across all districts was comprehensive public safety. Residents voiced consistent support for the City's Ceasefire strategy and community-based violence prevention, and emphasized a preference for accountability, transparency, and trauma-informed approaches over an increased police presence.

In July and August 2025, Mayor Lee, alongside Chief Mitchell, Acting

1 Assistant Chief Tedesco, and Department of Violence Prevention Chief Dr. Holly
2 Joshi, conducted a series of Ceasefire Teach-ins. More than 500 residents attended
3 five sessions to learn about the Ceasefire program's strategy of combining law
4 enforcement and community-based services to intervene with individuals at high
5 risk of perpetrating or becoming victims of gun violence.

6       Mayor Lee has also engaged directly with Department patrol officers to
7 understand their perspectives on using City resources for public safety outcomes.
8 On September 23, 2025, Mayor Lee continued her series of listening sessions with
9 rank-and-file officers during a pre-shift briefing, or "line up," at the Police
10 Administration Building. She intends to continue to engage with officers at both the
11 downtown Police Administration Building and the Eastmont substation.

12       **B. Recruitment as a Tool for Culture Change**

13       The City recognizes that the recruitment and retention of qualified personnel
14 is a critical factor in shaping the Police Department's culture. The values, skills,
15 and behavior of new officers are significantly influenced by recruitment methods
16 and the subsequent training and socialization, which can either perpetuate existing
17 departmental norms or introduce more collaborative and community-oriented
18 norms.

19       Mayor Lee supports recruitment efforts for the Department as part of a
20 comprehensive public safety strategy. The 2025-2027 city budget, approved with
21 Mayor Lee's support, allocates funding for five police academies to address police
22 staffing levels. The City's recruitment effort to increase the number of sworn
23 officers is part of a broader strategy that integrates violence prevention programs,
24 Ceasefire interventions, and community policing.

25       Mayor Lee and her administration have engaged in marketing and outreach
26 campaigns to attract candidates to the Department. As part of this collaborative
27 effort, Mayor Lee convened a citywide Recruitment Task Force (Task Force). This
28 Task Force includes representatives from the Oakland Police Department (OPD),

Oakland Police Officers' Association (OPOA), NAACP, Merritt College, City Council leadership, Black Women Organized for Political Action, the Oakland Chamber of Commerce, and other business and community partners. The Task Force is responsible for developing a coordinated recruitment strategy for upcoming academies. The Task Force convened on August 27 and September 24, 2025, with monthly meetings scheduled through at least December 2025.

In September 2025, in partnership with the Oakland NAACP, a campaign was announced to encourage Oakland residents to join the police force, with an emphasis on recruiting women and people of color. The campaign invites candidates who "act with integrity" and are interested in solving crimes to become "hometown heroes" by making their city safer. By recruiting candidates from the local community who more accurately reflect Oakland's population and diverse communities, the partnership aims to foster greater trust and integration between police officers and the community.

### C. Impacting Police Culture Through Collaboration with Civilian Oversight

The City's civilian-led Police Commission and the Department are forging a more collaborative risk-management-focused approach to policy development, which has improved their working relationship and enhanced public transparency. The cooperative dynamic between the Commission and Department leadership fosters a positive culture shift by ensuring that policies are both practical for officers and responsive to community needs. A positive working relationship among leadership increases both community trust in the Department and the Department's trust in the Commission.

The most recent revision of Department policy regarding pursuits illustrates this cooperative approach. On September 26, the Commission held a community meeting to discuss policy revisions that included breakout sessions with Chief Mitchell, Commissioners, and residents to facilitate dialogue and a deeper

understanding of various perspectives. This process concluded with a unanimous Commission vote approving policy revisions. In addition, also on September 26, Chief Mitchell signed the Commission-revised DGO M-19, *Prohibitions Regarding Racial Profiling and Other Bias-Based Policing*. The Department is currently developing the training required prior to implementing the revised policy. Finally, this spirit of cooperation is reflected in Commission leadership's ongoing engagement with the Department, including Chair Garcia-Acosta's and Vice Chair Booker's participation in Department working groups addressing the culture and perceptions surrounding consistency of discipline, Department Risk Management meetings, monitor site visits, and Court-mandated biweekly important-case meetings. On August 25, Chair Garcia-Acosta attended Department line-ups at the Eastmont Substation in East Oakland to express gratitude and support, foster collaboration, set expectations and dispel misconceptions about civilian oversight.

Increased collaboration not only helps institutionalize new policies and practices, it helps improve public confidence in police accountability. Moreover, a respectful and cooperative environment allows for more open conversations about misconduct, excessive force, and bias, which in turn signals to officers throughout the Department that Department leadership supports reform efforts.

**II.  Internal Investigation Timeline Improvements (Task 2)**

Department policy established pursuant to the NSA requires the Department to complete 85% of Class I and 85% of Class II internal administrative investigations within 180 days. In the third quarter of 2025 (July-September), the Department calculated that it completed 80% of Class I and 93% of Class II investigations within 180 days.

The City is committed to completing investigations of alleged officer misconduct with the integrity and rigor necessary to ensure accountability and withstand scrutiny. Investigations need to be both as swift as possible and as thorough as possible, but speed must always take a back seat to rigor. To remain

consistent with this commitment, the City does not close cases prematurely to meet the 180-day policy timeline. While the City continues to make its best efforts to meet the standards for both rigorous investigation (Task 5) and timely resolution (Task 2), resource limitations have created challenges for both the Department's Internal Affairs Bureau (IAB) and the Community Police Review Agency (CPRA).

The bottom line is that both IAB and CPRA are understaffed, leading to unmanageable caseloads for investigators. While City leadership fully supports adding investigators, the number of investigators assigned to conduct internal investigations in the Department is currently constrained by Department policy and overall staffing levels. Department policy requires internal affairs investigators to hold the rank of sergeant. Sergeants assigned to investigate force complaints and related misconduct must have additional special training and experience including one year of prior IAB experience. *IAD 23-01 – IAD General Operating Procedures* 14, 16, 50 (rev. Nov. 30, 2023). Existing sergeants cannot be reassigned to IAB from other Department units due to "span of control" policy requirements, which would result in an impermissible ratio of supervised officers per sergeant. *DGO A-19, Supervisory Span of Control* (rev. July 9, 2018); *see also NSA Task 20* ("Under normal conditions, OPD shall assign one primary sergeant to each Area Command Field Team, and, in general, (with certain exceptions) that supervisor's span of control shall not exceed eight (8) members.").

Promoting officers from patrol to sergeant positions within IAB is not feasible either, as it would deplete patrol resources that are already stretched thin across the City, hampered by continued attrition and the lack of recent police academy graduations. The Department anticipates that it will not be able to promote additional sergeants in early 2026, following graduation of the current academy class. The City is hopeful that with the current administration's funding of five new police academies, IAB investigators may get some relief in 2026.

On a more positive note, the CPRA is actively increasing its investigative capacity. The most recent City budget increased CPRA's budget from approximately $2 million to $5.1 million annually. This funding expansion is intended to enable the agency to achieve full staffing and improve its ability to complete cases in a timely manner.

CPRA has already begun filling new positions made possible by the increased budget. The week of October 13, a new Complaint Investigator III (highest level), with previous experience as an investigator for the San Francisco Department of Police Accountability, commenced employment. The CPRA is actively interviewing applicants for up to six Complaint Investigator II positions.

Based on these resource limitations, particularly within the Department, the Department projects that it may not be able to achieve the 180-day completion rate in 85% of Class I cases until mid-2026. This projection accounts for the time required to recruit, train, and promote new officers, sergeants, and IAB investigators.

**III. Additional Measures to Ensure NSA Task Compliance**

The City has made progress on additional measures to enhance internal investigations (Task 5) and to improve the consistency of disciplinary actions (Task 45).

**A. The Department's Revision of DGO-M 4.1 (Task 5)**

As previously reported, the Department has been working to revise DGO M-04.1, *Criminal Investigation of Dept. Members and Outside Sworn Personnel*, based on recommendations from the Department's *Incident Assessment and Response in Case No. 23-0459* (often referred to as "the Tran case"). The proposed revisions ensure transparency and accountability for a decision not to trigger notifications and investigation protocols for a criminal allegation against a Department member by requiring documentation of the determination. The Department presented its revisions to the monitor and stakeholders at the September 3, 2025, site visit. Based

on stakeholder and executive team feedback, the Department refined its proposed policy changes. On October 16, 2025, the Department sent its proposed revised policy documents to the monitor and plaintiffs' counsel for review. Once the review is complete, the Department will submit the policy to the Police Commission for review and approval.

### B. The Department Entered a New Contract with Stanford Researchers (Task 45)

On October 7, 2025, City Council approved a new three-year technical assistance contract with Dr. Jennifer Eberhardt. The contract enables the Department's Risk Analysis Unit to continue working with Stanford researchers to evaluate the responses from the 2025 Survey on Members' Perceptions About Internal Investigations and Discipline.

In addition, in accordance with its separate data-sharing agreement with Stanford University, the Department has completed its production of requested body-worn camera video and related stop data, with the exception of narrative fields that require additional review prior to release. Although the data-sharing agreement has no direct financial cost to the Department, the review and production of this information requires considerable Department time and resources.

### C. The City Administrator's Biweekly Important-Case Meetings (Task 5)

Pursuant to the Court's order, the City Administrator has continued to convene biweekly meetings, during which the Department provides updates about important administrative and criminal investigations involving Department members. The meetings are attended by key stakeholders, including the Chief of Police, the City Administrator, and representatives from the Mayor's Office, City Attorney's Office, the Monitoring Team, the Inspector General, the Police Commission, and the CPRA. These meetings serve as a mechanism to update City leadership on the status of investigations.

The biweekly meetings promote accountability, ensure transparency within City leadership, and foster crucial interagency communication. The presence of the Chief of Police and the City Administrator at these meetings ensures that the highest levels of municipal leadership are directly engaged in and responsible for the progress of investigations. This direct involvement compels a higher degree of accountability for case outcomes. Regular biweekly meetings also prevent communication failures and allow concerns to be addressed in a timely manner. Finally, the participation of multiple independent oversight bodies provides an external check on the internal investigative process. This hybrid oversight model prevents accountability from resting solely within the Department.

### D. The Department is Proactively Investigating Potential Disparity in its Disciplinary Process Using Qualitative Interviews (Task 45)

In July 2025, the Department administered its most recent bi-annual survey to measure member perceptions of the internal investigation and discipline process. The Department, in collaboration with researchers from Stanford University, is currently analyzing the results of this survey. While the survey primarily relied on quantitative data collected via Likert scale questions,[1] it also included open-ended questions that allowed for free-form narrative responses. These questions were designed to elicit qualitative feedback from subjects of recent internal investigations concerning their perceptions of the fairness of the complaint initiation, findings, and disciplinary processes.

Since 2022, the Bureau of Risk Management has conducted annual reviews of internal investigation outcome and discipline data to identify potential disparities based on race, gender, and rank. The 2024 annual report (forthcoming Nov. 2025) revealed a racial disparity in internal investigation outcomes. This finding

---

[1] The Likert scale is a rating system used in questionnaires and surveys to measure attitudes, opinions, or perceptions by asking respondents to indicate their level of agreement or disagreement with a statement. Instead of a simple "yes/no" or "agree/disagree" answer, the Likert scale provides a range of response options that capture the nuance of a person's opinion.

prompted a recommendation to gather qualitative data through additional research, including interviews and focus groups. The Department has therefore convened a working group led by the Department's Race and Equity Team to conduct additional qualitative research. The group met four times in September and October to discuss and plan its research.

The objective of the qualitative research is to supplement the 2025 survey data by collecting more in-depth information. This research will focus specifically on employee perceptions of the fairness and overall understanding of the IA process through a series of interviews. The Department plans to issue a final report that will integrate the open-ended responses from the 2025 survey with the findings from the qualitative interviews. Due to the time and resources required for this extensive project, the Department does not expect the comprehensive qualitative report to be completed until the second half of 2026.

**IV. Conclusion**

The City's actions demonstrate a steadfast commitment to fulfilling not only its obligations under the NSA, but its underlying promise to Oakland's residents. Starting at the highest levels of leadership, the City is fostering a culture of compliance within the Department. As the Court noted, "monitorship is not the best tool to address cultural issues…[l]eadership from the City and OPD is key." July 10, 2025, Court Hearing Tr. 6. The City has fully embraced this guidance, thoughtfully designing and implementing reforms to achieve NSA compliance while also shaping Department culture.

The City acknowledges the pending resignation of Chief Mitchell, effective December 5, 2025. The City submits that this leadership transition will not impede the substantial progress toward NSA reforms. The comprehensive design and implementation of these reforms have been the product of a collaborative effort involving the entire City team and significant community engagement, ensuring the mission of compliance and cultural change will proceed without disruption.

Accordingly, Chief Mitchell's departure is not cause to delay the termination of Court oversight.

Respectfully submitted,

Dated: October 21, 2025          RYAN RICHARDSON, City Attorney
                                 BRIGID S. MARTIN, Special Counsel

                        By:    /s/ Brigid S. Martin
                               Attorney for Defendant
                               CITY OF OAKLAND