1  RYAN RICHARDSON, City Attorney, CABN 223548
   BRIGID S. MARTIN, Special Counsel, CABN 231705
2  One Frank H. Ogawa Plaza, 6th Floor
   Oakland, California 94612
3  Telephone: (510) 238-3751
   Facsimile: (510) 238-6500
4  Email: BMartin@oaklandcityattorney.org

5  Attorneys for CITY OF OAKLAND

6  JOHN L. BURRIS, CABN 69888
   Law Offices of John L. Burris
7  Airport Corporate Centre
   7677 Oakport Street, Ste. 1120
8  Oakland, California 94621
   Telephone: (510) 839-5200
9  Facsimile: (510) 839-3882

10 JAMES B. CHANIN, CABN 76043
   Law Offices of James B. Chanin
11 3050 Shattuck Avenue
   Berkeley, California 94705
12 Telephone: (510) 848-4752

13 Attorneys for PLAINTIFFS

14 *(Additional Counsel on Next Page)*

15                    **UNITED STATES DISTRICT COURT**

16                  **NORTHERN DISTRICT OF CALIFORNIA**

17                      **SAN FRANCISCO DIVISION**

18

19

20 DELPHINE ALLEN, et al.              )   Case No. 00-cv-04599 WHO
                                       )
21              Plaintiffs,            )   **JOINT CASE MANAGEMENT**
                                       )   **STATEMENT**
22      v.                             )
                                       )   Date: January 27, 2026
23 CITY OF OAKLAND, et al.,            )   Time: 3:00 p.m.
                                       )   Courtroom 2, 17th Floor
24              Defendant(s).          )   Hon. William H. Orrick
                                       )
25                                     )
                                       )
26 _____ )

27

28

---

1  ROCKNE A. LUCIA, JR., CABN 109349
   Rains Lucia Stern St. Phalle & Silver
2  Attorneys & Counselors at Law
   2300 Contra Costa Boulevard, Suite 500
3  Pleasant Hill, CA 94523
   Telephone: (925) 609-1699
4  Facsimile: (925) 609-1690

5  Attorneys for OAKLAND POLICE OFFICERS ASSOCIATION

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**PLAINTIFFS' STATEMENT** .........................................................................1

I.   PLAINTIFFS' CURRENT POSITION ..................................................1

II.  TASK 2 (TIMELINESS STANDARDS AND COMPLIANCE WITH IAD
     INVESTIGATIONS) ..............................................................................3

III. TASK 5 (COMPLAINT PROCEDURES FOR IAD) ...............................5

IV.  TASK 45 (CONSISTENCY OF DISCIPLINE POLICY) .........................8

CONCLUSION...........................................................................................16

**CITY'S STATEMENT** .............................................................................18

OVERVIEW................................................................................................18

I.   The City's Sustained Compliance with the Terms of the NSA is a
     Meaningful Measure of Its Readiness to Exit Court Oversight...........19

     A. The City Has Improved its Timely Completion of Internal
        Investigations (Task 2). ....................................................................19

     B. The City Continues to Comply with All Internal Affairs Complaint
        Procedures Subtasks (Task 5). .........................................................21

     C. The City Continues to Meet the Compliance Standard for Task 45 By
        Proactively Identifying and Addressing Racial Disparity In 2024
        Investigation Outcomes......................................................................22

        1.  The Department Is Working to Address Racial Disparity Identified In 2024
            Internal Investigation Sustained Rates. .......................................23

        2.  OIA Did Not Find Any Explanation for the Disparity, Though It Did Find
            that the Disparity Was More Pronounced for Allegations that Originated
            in the Department...........................................................................24

        3.  Without An Explanation for The Disparity, and With Evidence of
            Substantial Data Fluctuation In The Past Several Years, the City is Not
            Provided With Meaningful Answers About What The Disparity Means And
            How To Effectively Address The Disparity......................................26

        4.  The Department's Response to Address Disparity is Thoughtful, Informed,
            And Future-Looking.........................................................................29

II.  The City's Proposed Transition Plan Will Prevent Progress from Stalling
     Following Court Oversight by Empowering Local Ownership of Its
     Constitutional Policing Model......................................................................31

     A. The City's Executive Leadership Will Promote Cultural Alignment...........32

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

B.  The Department Instituted a Constitutional Policing Unit to Support Continued Improvement of The Department's Excellence in Constitutional Policing.......................................................................................................33

C.  The City Will Engage with Experts to Help Communicate the City's Message About The Value of Its Constitutional Policing Model................................33

D.  The City Will Share Examples of Improved Public Safety Outcomes...........34

E.  The City Recognizes That Its Constitutional Policing Model Is Dynamic......34

F.  The City Is Dedicated To Strengthening Relationships To Improve Trust.....34

CONCLUSION ..............................................................................................36

**THE OPOA'S STATEMENT** ........................................................................37

**THE POLICE COMMISSION'S STATEMENT**........................................ EXHIBIT 6

1

**PLAINTIFFS' STATEMENT**

2

**I.      PLAINTIFFS' CURRENT POSITION**

3      The Independent Monitor for the OPD has issued one NSA Sustainability

4    Period Report (Eleventh Sustainability Report) since the last Case Management

5    Conference statement.  This Sustainability Period involves the monitoring of the

6    "last remaining and most critical Negotiated Settlement Agreement Tasks: 2, 5, 20,

7    24, 25, 26, 30, 31, 34, 41, and 45." (Dkt. 1525, p. 2)

8      As of the publication of the Eleventh NSA Sustainability Period Report of the

9    IMT on November 18, 2025, OPD is in compliance with eight of these eleven Tasks:

10      1. Task 20 (Span of Control – in compliance when most recently assessed in

11        the Third NSA Sustainability Period Report);

12      2. Task 24 (Use of Force Reporting Policy – in compliance per the Eighth NSA

13        Sustainability Period Report and no longer subject to active monitoring

14        pursuant to the Court's 09/06/2024 Order regarding Internal Affairs

15        Reporting)

16      3. Task 25 (Use of Force Investigations and Report Responsibility – in

17        compliance per the Eighth NSA Sustainability Period Report and no longer

18        subject to active monitoring pursuant to the Court's 09/06/2024 Order

19        regarding Internal Affairs Reporting);

20      4. Task 26 (Force Review Board (FRB) – in compliance when most recently

21        assessed in the Third NSA Sustainability Period Report);

22      5. Task 30 (Executive Force Review Board (FRB) – in compliance when most

23        recently assessed in the Third NSA Sustainability Period Report);

24      6. Task 31 (Officer-Involved Shooting Investigations Review Protocol – in

25        compliance when most recently assessed in the Third NSA Sustainability

26        Period Report);

27      7. Task 34 (Stop Data – in compliance when most recently assessed in the

28        Third NSA Sustainability Period Report);

8. Task 41 (Use of Personnel Assessment System (PAS) and Risk Management – in compliance when most recently assessed in the Third NSA Sustainability Period Report)

As of this writing, OPD is not in compliance with three NSA tasks:

1. Task 2 (Timeliness Standards and Compliance with IAD Investigations – not in compliance when most recently assessed during the Eleventh NSA Sustainability Period Report.),

2.  Task 5 (Internal Affairs Division (IAD) Complaint Procedures – previously in compliance when assessed by the IMT in the 79th Report, "Deferred" in the First NSA Sustainability Period Report, then deemed "not in compliance" according to the Second, Third, Fourth, and Fifth NSA Sustainability Period Reports before returning to compliance in the Sixth and Seventh IMT Reports.  Task 5 then reverted to not-in-compliance during the period covered by the 8th Sustainability Report, and has remained out of compliance through the periods covered by the 9th, 10th, and now 11th Sustainability Reports), and

3. Task 45 (Consistency of Discipline – this was in partial compliance during the First NSA Sustainability Period Report, then was moved to full compliance during the period covered by Second NSA Sustainability Period Report.  Between the Third Sustainability Report and the Ninth Sustainability Report issued in December 2024, the IMT has reported "no compliance finding" for this Task.  This was upgraded to "partial compliance" in the 10th Sustainability Report issued in May 2025, and remained in "partial compliance" when most recently reviewed in the 11th Sustainability Report)

Plaintiffs' attorneys concur with the IMT's assessment that OPD is not currently in compliance with these three Tasks.  The other eight Tasks that are

JOINT CASE MANAGEMENT STATEMENT

Case No. 00-cv-4599 WHO

being monitored by the IMT -- or that are no longer subject to active monitoring pursuant to the Court's 09/06/2024 Order -- remain in compliance according to the IMT's 11th NSA Sustainability Period Report.  Plaintiffs will therefore focus on Tasks 2, 5 and 45, which will determine whether and when OPD is able to finally achieve full compliance with the NSA in the Sustainability Period.

## II.    TASK 2 (TIMELINESS STANDARDS AND COMPLIANCE WITH IAD INVESTIGATIONS)

Task 2 requires that the Internal Affairs Division (IAD) of the OPD complete internal investigations in a timely manner.  This task was inactive from 2015 to July 2019, before abruptly falling out of compliance in the 62nd IMT Report.  Task 2 was out of compliance until February 2022, when OPD once again met the mathematical threshold required for compliance.  OPD remained in compliance with this Task through the 9th Sustainability Report, issued in December 2024.  However, as of the most recent (10th) Sustainability Period Report, OPD has again fallen out of compliance with this Task.

OPD policy requires that "at least 85% of Class I misconduct investigations and at least 85% of Class II misconduct investigations must be completed within 180 days to be considered timely."  Per DGO M-03, Class I offenses "are the most serious allegations of misconduct and, if sustained, shall result in disciplinary action up to and including dismissal and may serve as the basis for criminal prosecution."

The IMT reviewed 53 Class I misconduct cases during the period covered by the Eleventh OPD Sustainability Report and determined that just 35 of these cases were completed in a timely manner.  This represented an 64% timely-completion rate, which puts OPD below the 85% minimum threshold required for compliance with NSA Task 2.

The IMT had long warned that the timely-completion rate was been slipping downward over previous sustainability period reports, and that OPD's continued

JOINT CASE MANAGEMENT STATEMENT

1   compliance with this Task was therefore in serious jeopardy.  As recently as

2   December 2022 (during the period covered by the Second Compliance Report), OPD

3   was completing 100% of Class I misconduct cases in a timely matter. (Second

4   Sustainability Period Report, p. 3).  During the period covered by the 5th through

5   9th Sustainability Reports, the IMT determined that this number had dipped to 85-

6   89% of Class I misconduct cases completed in a timely manner.  In the period

7   covered by the 10th Sustainability Period, the timely-completion rate for Class 1

8   misconduct cases was 84%, below the mandated compliance threshold.  It has now

9   dropped a further 20%, and OPD is objectively nowhere near compliance with this

10  Task.

11       The IMT also reviewed 146 Class II cases during the period covered by the

12  11th Sustainability Report and found that 127 were in compliance with established

13  timelines. This represents a 87% timely completion rate.  Although this rate is just

14  above the 85% minimum requirement, Plaintiffs' attorneys note that the completion

15  rate for Class II cases was consistently higher in previous reporting periods,

16  including at 91% in the period covered by the IMT's previous review and 98% in the

17  preceding period.  The downward trajectory does not bode well for maintaining the

18  minimum timely completion rate in future reporting periods.

19       As noted, OPD was previously in compliance with this task for so long that it

20  became inactive, before suddenly falling out of compliance.  After reattaining

21  compliance, OPD entered another cycle of slowly reducing timely-completion rates

22  during the periods covered by Sustainability Reports 3-9.  In spite of repeated

23  warnings from the IMT and Plaintiffs' attorneys that OPD was at risk of falling to

24  meet the 85% timely completion benchmark, the Department has continued to free

25  fall.

26       OPD must retain compliance with Task 2 if the Department wishes to exit

27  the Sustainability Period.  Task 2 compliance is categorically different from the

28  other Tasks that remain out of compliance insofar as the metric for compliance is

JOINT CASE MANAGEMENT
STATEMENT                                            Case No. 00-cv-4599 WHO

strictly mathematical: there is an objective target that OPD must meet, and has previously met.

Plaintiffs' attorneys have repeatedly noted that the mandated 85% timely-completion rate for OPD is substantially lower than what is required by most other consent decrees, so there is no reason OPD cannot meet this threshold. Furthermore, it should be noted that even if OPD meets this requirement, 15% of complainants are not receiving timely notice of investigation outcomes. The 64% timely completion rate for Class I cases during the most recent IMT review is wholly unacceptable and may be a basis for revoking the Sustainability Period.

## III.    TASK 5 (COMPLAINT PROCEDURES FOR IAD)

Task 5 pertains to Complaint Procedures for the Internal Affairs Division, and consists of several subtasks, all of which the IMT had previously found in compliance, including:

- Task 5.1, which requires that when a citizen wishes to file a complaint, the citizen is brought to a supervisor or IAD, or a supervisor is summoned to the scene.
- Task 5.2, which requires that if there is a delay of greater than three hours in supervisory response, the reason for the delay must be documented.
- Task 5.3, which requires that when a complainant refuses to travel to a supervisor, or wait for one, personnel make all reasonable attempts to obtain specific information to assist in investigating the complaint.
- Task 5.4, which requires that specific information be documented on a complaint form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander.
- Task 5.5, which requires that the supervisor or Area Commander notify Communications and forward any pertinent documents to IAD.

During the Sustainability Period the IMT focused on subtasks 5.15 to 5.19

5

1    and subtask 5.21, which address the quality of completed IAD investigations.

2       Prior to the onset of the Sustainability Period, the IMT determined that IAD

3    investigations had improved to the standards mandated by the NSA; in February

4    2022, OPD attained full compliance with Task 5.  However, the First OPD

5    Sustainability Report moved the status of Task 5 from "in compliance" to "deferred

6    compliance", and OPD was downgraded to "not in compliance" in the Second OPD

7    Sustainability Report.  OPD remained out of compliance with Task 5 over the next

8    four reports as the Department, Plaintiffs' attorneys, and the IMT crafted, refined,

9    and implemented policies relevant to the Internal Affairs function following the

10   publication of the "Conclusions and Recommendations Re: Vehicle Collision and

11   Elevator Discharge Incidents" drafted by the independent law firm, Clarence Dyer,

12   & Cohen LLP. (Dkt. 1564, "Clarence Dyer Report")

13       During the period covered by the 7th Sustainability Report, OPD regained

14   compliance with Task 5, and it appeared that the Department was making real

15   strides toward sustainable compliance with this Task and, therefore, was meeting

16   all requirements mandated by the NSA.

17       However, in the subsequent reporting period (covered by the Eighth

18   Sustainability Report,) the IMT "learned of investigations conducted by both the

19   Community Police Review Agency (CPRA) and an outside investigator into the

20   actions of senior members of the Department with regard to an earlier IAD

21   investigation.  The outside and CPRA investigations resulted in sustained findings

22   and discipline against several senior members of the Department – to include

23   terminations, demotions, and suspension. (8th Sustainability Report, pp. 6-7).  The

24   IMT also noted that "these personnel findings and systemic deficiencies transcend

25   the Department as a whole and call into question the capacity of the Department's

26   internal investigatory process. Based on these investigations, the serious

27   deficiencies in the Department's Internal Affairs Division render the Department

28   out of compliance with Task 5." (8th Sustainability Report, pp. 6-7).  OPD was

JOINT CASE MANAGEMENT STATEMENT            Case No. 00-cv-4599 WHO

1  accordingly found out of compliance with Task 5.  OPD has remained out of

2  compliance with this Task ever since.

3      According to the most recent IMT Sustainability Report, the "Internal Affairs

4  Bureau [has] a number of issues, concerns, and developments which are not yet

5  appropriate for public discussion.  It is our hope that the City will expeditiously

6  address these matters so that our confidence – and by extension, the community's

7  confidence – in the internal affairs process can be restored."  (Dkt. 1726, p. 9).

8      Although Plaintiffs' attorneys cannot address the specific issues that the IMT

9  categorized as "not yet appropriate for public discussion" (such as personnel issues),

10  the IMT's phrasing echoes concerns raised in previous Sustainability Period reports,

11  including that the IMT "identified some concerns with the Internal Affairs Bureau's

12  (IAB) use of unfounded and exonerated findings"  (10th Sustainability Report, p. 9),

13  and that "the Department must rectify myriad issues pertaining to leadership,

14  structure, and personnel management relevant to the Internal Affairs Bureau." (9th

15  Sustainability Period Report, p. 9).  The emphasis on "leadership" and "personnel

16  management" is revealing.

17      Plaintiffs' attorneys can note that they have participated in extensive

18  meetings with OPD personnel and the IMT regarding Departmental General Order

19  M-04.1: Criminal Investigation of Department Members and Outside Sworn Law

20  Enforcement Personnel, which is the policy pertaining to reporting allegations of

21  criminal misconduct involving OPD personnel.  These meetings have been

22  productive, and plaintiffs' attorneys affirmatively support revising policies and

23  procedures to improve the Internal Affairs functions within the Department.

24      Separate and apart from that worthy goal, it is also important to memorialize

25  that some issues within IA run deeper than specific policies.  OPD has

26  demonstrated time and time again that they are incapable of disciplining their own,

27  especially at the supervisory level.  As alluded to by the IMT excerpt above, some

28  the Department's IA-related shortcomings are more attributable to Departmental

JOINT CASE MANAGEMENT
STATEMENT

1  leadership than existing rules and policies.  This must be addressed by real, durable

2  cultural change in tandem with policy adjustments.  Put another way, these

3  problems are downstream from leadership failures, not policy shortcomings.

4  Former Chief Mitchell's public complaints to the Police Commission about the

5  "weaponization of the disciplinary process" (Exhibit 1, Who's to blame for Oakland

6  Police Chief Floyd Mitchell's resignation, *Oaklandside*, October 10, 2025) within the

7  Department are an illustrative example of culture-setting shortcomings.  OPD's

8  broader failures in regarding fair and consistent discipline will also be elaborated in

9  our review of Task 45, below.

10      Regarding Task 5, OPD's inability to fully comply with both of the actively

11  monitored Internal Affairs-related Tasks more than one year after the Court's

12  09/06/2024 Order restructuring the Internal Affairs Department is unacceptable

13  and may also be a basis for revoking the Sustainability Period.  These failures must

14  be remedied before OPD can attain compliance with the NSA.

15  **IV.    TASK 45 (CONSISTENCY OF DISCIPLINE POLICY)**

16      Task 45 requires that discipline is imposed in a fair and consistent manner.

17  OPD was in compliance with this NSA Task at the outset of the Sustainability

18  Period.  Following the publication of the Clarence Dyer Report, the IMT

19  downgraded OPD's compliance status with Task 45 to "no compliance finding",

20  citing "systemic and other deficiencies cited by the outside investigators were

21  exacerbated by investigative and disciplinary decisions which were premised on the

22  status and positional considerations of both violators and decision-makers" (Dkt.

23  1577, Third Sustainability Period Report, p. 32).  OPD remained out of compliance

24  with Task 45 through the period covered by the 9th Sustainability Report, before

25  achieving "partial compliance" in the 10th and now 11th Sustainability Period

26  Reports.

27      Although the most recent IMT reports notes that "OPD continues to take

28  steps to achieve compliance with this Task", a recent OPD internal investigation

8

revealed wide disparities in how discipline is imposed within OPD.  The Department's "2024 Internal Investigation Outcome and Discipline Report", published by the Office of Internal Accountability, is incorporated herein as Exhibit 2.

The Internal Investigation Outcome and Discipline Report investigated discipline outcomes across race, gender, and rank within OPD.  The most notable finding was a massive discrepancy between the sustained rate for white sworn members and Black sworn members.  Specifically, the investigation determined that there was a significant decrease in sustained findings among white OPD sworn personnel from 11% in 2023 to 2% in 2024:

**Table 1: Sustained Rates by Race 2023 Versus 2024[3]**

|  | 2023 | | | 2024 | | |
|---|---|---|---|---|---|---|
|  | % Sust | # Sust | Tot | % Sust | # Sust | Tot |
| **White** | **11%** | **37** | **348** | **2%** | **4** | **223** |
| **Black** | **6%** | **20** | **341** | **7%** | **23** | **351** |
| **Hispanic** | 8% | 40 | 512 | **6%** | **25** | **425** |
| Asian/Filipino | 7% | 26 | 379 | 3% | 11 | 342 |
| Other/Unknown | 9% | 6 | 68 | 1% | 1 | 76 |
| **Total** | **8%** | **129** | **1648** | **5%** | **64** | **1417** |

(2024 Internal Investigation Outcome and Discipline Report, p. 4).

Not only did white sworn members have a substantially lower sustained rate than Black and Hispanic officers, "further analysis showed that the 4 cases sustained against white sworn personnel involved only members over 40 and with 5 years of seniority.  In other words, **the sustained rate for junior white officers (less than 5 years seniority or younger than 40) was 0%.**"  (2024 Internal Investigation Outcome and Discipline Report, p. 4).

The authors of this report also compared the percentage of all allegations (sustained and not sustained/unfounded) to Department demographics to assess whether the differences in the percentage of cases aligned with the racial makeup of

9

OPD.

**Table 3: Demographic Breakdown of Department Personnel, Allegations, and Cases**

| | Sworn Personnel in the Department* | Sworn Personnel Assigned to Patrol* | Allegations against Sworn Personnel | Cases involving a Sworn Member | Sworn Members with one or more cases** |
|---|---|---|---|---|---|
| **By Race** | | | | | |
| **White** | 25% (169) | 21% (81) | 15% (312) | 16% (223) | 21% (95) |
| **Black** | 22% (145) | 24% (95) | 25% (537) | 25% (351) | 22% (103) |
| **Hispanic** | 29% (197) | 28% (112) | 31% (649) | 30% (425) | 30% (139) |
| **Asian/Filipino** | 20% (138) | 23% (89) | 23% (494) | 24% (342) | 22% (103) |
| **Other/Unknown** | 4% (27) | 4% (17) | 6% (117) | 5% (76) | 5% (21) |
| **By Gender** | | | | | |
| **Male** | 86% (578) | 86% (337) | 84% (1778) | 83% (1183) | 85% (391) |
| **Female** | 14% (98) | 14% (57) | 16% (331) | 17% (234) | 15% (70) |
| **By Rank** | | | | | |
| **Officer** | 78% (527) | 82% (323) | 94% (1991) | 94% (1331) | 88% (406) |
| **Sgt or Above** | 22% (149) | 18% (71) | 6% (118) | 6% (86) | 13% (58) |
| **TOTAL** | 676 | 394 | 2109 | 1417 | 461 |

(2024 Internal Investigation Outcome and Discipline Report, pp. 11-12).

This revealed that white sworn personnel received a lower overall percentage of cases (16%) than their demographic slice of total OPD sworn personnel (25%). Conversely, "all other races received a higher percentage of cases than the Department representation." (2024 Internal Investigation Outcome and Discipline Report, p. 12).

Further, while investigating whether members of a specific race had a disproportionate number of multiple discipline cases, the authors of this report determined that, in 2024, "white members were the least likely to have multiple

JOINT CASE MANAGEMENT STATEMENT

Case No. 00-cv-4599 WHO

cases (57%) which was significantly lower than Black, Hispanic, and Asian members (74%, 71% and 79%)." (2024 Internal Investigation Outcome and Discipline Report, p. 13).

To determine whether there are differences in sustained rates for members based on the entity conducting the investigation, the authors of the 2024 Internal Investigation Outcome and Discipline Report also compared Division Level Investigations (DLIs) with Internal Affairs (IA) Investigations. The former are generally conducted by field sergeants and typically contain less serious allegations. IA investigations involve the most serious allegations and are conducted by supervisors assigned to IAB." (2024 Internal Investigation Outcome and Discipline Report, p. 25). The results of this comparison are captured in the below chart:

**Table 20: Sustained Rate by Race 2024 (Full Investigations and Summary Findings)**

| | All Investigations | | | DLIs and DLI Summary Findings | | | IA Investigations and IA Summary Findings | | |
|---|---|---|---|---|---|---|---|---|---|
| | % Sust | # Sust | Tot | % Sust | # Sust | Tot | % Sust | # Sust | Tot |
| White | 2% | 4 | 223 | 1% | 3 | 203 | 6% | 1 | 18 |
| Black | 7% | 23 | 351 | 6% | 18 | 326 | 26% | 5 | 19 |
| Hispanic | 6% | 25 | 425 | 4% | 17 | 387 | 29% | 8 | 28 |
| Asian/Filipino | 3% | 11 | 342 | 3% | 10 | 317 | 7% | 1 | 14 |
| Other/Unknown | 1% | 1 | 76 | 1% | 1 | 73 | 0% | 0 | 2 |
| Total | 5% | 64 | 1417 | 4% | 49 | 1306 | 19% | 15 | 81 |

(2024 Internal Investigation Outcome and Discipline Report, p. 25)

Black and Hispanic sworn members had the highest sustained rates for DLIs (6% and 4%, respectively), while the White sustained rate was just 1%. This racial disparity was even more pronounced for IA investigations, where Hispanic members were sustained at a 29% rate, Black members were sustained at a 26% rate, and white members were sustained just 6% of the time. White cases were far less likely to be sustained, regardless of the level of the discipline investigation.

Another hypothesis tested by the authors of the 2024 Internal Investigation

JOINT CASE MANAGEMENT STATEMENT

Case No. 00-cv-4599 WHO

Outcome and Discipline Report was whether disparities in sustained rates by race differed depending on who initiated a case. To do so, they examined the sustained rate by race based on internal or external origin. The former are cases originally initiated by a member of the Department, while the latter are cases which were initiated by a member of the public or another organization/department. Table 23 on page 27 of the 2024 Internal Investigation Outcome and Discipline Report summarizes the findings of this investigation:

**Table 23: Sustained Rate by Race 2024**

|  | All Investigations | | | Internal Origin | | | External Origin | | |
|---|---|---|---|---|---|---|---|---|---|
|  | % Sust | # Sust | Tot | % Sust | # Sust | Tot | % Sust | # Sust | Tot |
| White | 2% | 4 | 223 | 0% | 0 | 8 | 2% | 4 | 215 |
| Black | 7% | 23 | 351 | 47% | 7 | 15 | 5% | 16 | 336 |
| Hispanic | 6% | 25 | 425 | 24% | 4 | 17 | 5% | 21 | 408 |
| Asian/Filipino | 3% | 11 | 342 | 13% | 1 | 8 | 3% | 10 | 334 |
| Other/Unknown | 1% | 1 | 76 |  |  |  | 1% | 1 | 76 |
| Total | 5% | 64 | 1417 | 25% | 12 | 48 | 4% | 52 | 1369 |

Even though internally-generated cases had a 25% sustained rate, **the sustained rate for white officers among internally generated cases was zero, compared to 47% for Black officers and 24% for Hispanic officers**. There was also a racial disparity in outcomes for externally-generated cases. The authors of the report concluded that "cases that start with an internal complaint deserve special attention to understand racial disparities". (2024 Internal Investigation Outcome and Discipline Report, p. 27)

There were also clear disparities when internal cases were broken down by gender and rank. Tables 24 and 25 on page 28 of the 2024 Internal Investigation Outcome and Discipline Report shows the sustained rate by gender and rank, respectively:

JOINT CASE MANAGEMENT
STATEMENT

Case No. 00-cv-4599 WHO

**Table 24: Sustained Rate by Gender 2024**

|  | All Investigations | | | Internal Origin | | | External Origin | | |
|---|---|---|---|---|---|---|---|---|---|
|  | % Sust | # Sust | Tot | % Sust | # Sust | Tot | % Sust | # Sust | Tot |
| Male | 5% | 54 | 1183 | 21% | 9 | 43 | 4% | 45 | 1140 |
| Female | 4% | 10 | 234 | 60% | 3 | 5 | 3% | 7 | 229 |
| Total | 5% | 64 | 1417 | 25% | 12 | 48 | 4% | 52 | 1369 |

**Table 25: Sustained Rate by Rank 2024**

|  | All Investigations | | | Internal Origin | | | External Origin | | |
|---|---|---|---|---|---|---|---|---|---|
|  | % Sust | # Sust | Tot | % Sust | # Sust | Tot | % Sust | # Sust | Tot |
| Officer | 4% | 57 | 1331 | 30% | 11 | 37 | 4% | 46 | 1294 |
| Sgt and Above | 8% | 7 | 86 | 9% | 1 | 11 | 8% | 6 | 75 |
| Total | 5% | 64 | 1417 | 25% | 12 | 48 | 4% | 52 | 1369 |

Among internally-generated cases, female officers were sustained 60% of the time, while males were sustained one-third as often, just 21% of the time. Officers were also sustained three times as often within internally-generated cases (30%) when compared to supervisors with a Sergeant rank or higher, who were sustained in 9% of cases with an internal origin. These figures demonstrate wildly disparate discipline outcomes that are incongruous with the requirements of Task 45.

Following the publication of the 2024 Internal Investigation Outcome and Discipline Report, OPD issued a memorandum that "acknowledges that the disparities identified in the 2024 report, especially in internally generated cases and additional allegations discovered by the investigator, underscore the need for improved data integrity, consistent documentation, and ongoing oversight." (Department Response to the 2024 IAM Outcome and Discipline Report, p. 2; incorporated as Exhibit 2-A to this Case Management Conference Statement.)

The Department subsequently asserts that "2024 represents an outlier rather than a trend". This is belied by the fact that many of the disparities described in the 2024 Internal Investigation Outcome and Discipline Report were previously noted by the very same OPD Office of Internal Accountability just two years previously, in a report titled "*2022 Analyses of Race in Internal Investigations*

*Outcomes and Discipline: Supplemental Report Examining Failure to Accept or Refer Complaints*" ("OIA FTARC Report").

This report determined that there were differences "in the discipline between white and Black officers for the allegation of a Manual of Rules Violation for Failure to Accept or Refer a Complaint (FTARC)." (OIA FTARC Report, p. 3 and is included as Exhibit 3 to the Case Management Conference Statement.

According to the 2022 OIA FTARC Report, there were 112 allegations for FTARC. The below table, incorporated on page 6 of the OIA FTARC Report, provided a breakdown of FTARC allegations compared to the demographics of OPD:

Breakdown of FTARC Allegations Compared to the Demographics of the Department

| 2022 | % of Members in the Dept | % Allegations Received | % Sustained Allegations |
|------|--------------------------|------------------------|-------------------------|
| Asian/Filipino | 19% | 16% (18) | 18% (8) |
| Black | 20% | 18% (20) | 27% (12) |
| Hispanic | 28% | 29% (32) | 31% (14) |
| Other/Unknown | 3% | 4% (4) | 12% (1) |
| White | 29% | 34% (38) | 22% (10) |
| Total | 100% | 100% (112) | 100% (45) |

Another table, also on page 6 of the OIA FTARC Report, shows the sustained rate for FTARC allegations within OPD:

## Sustained Rate of FTARC Allegations

| 2022 | Sustained Rate |
|------|----------------|
| Asian/Filipino | 44% (8/18) |
| Black | 60% (12/20) |
| Hispanic | 43% (14/32) |
| Other/Unknown | 25% (1/4) |
| White | 26% (10/38) |
| Total | 40% (45/112) |

The OIA FTARC Report itself noted that the wildly divergent sustained rates

JOINT CASE MANAGEMENT STATEMENT

Case No. 00-cv-4599 WHO

for white sworn members (26%) and Black sworn members (60%) represent "a statistically significant difference." (OIA FTARC Report, p. 6).

Allegation Findings by Rank and Race

| Rank | Unfounded | Exonerated | Not Sustained | Sustained | Grand Total |
|---|---|---|---|---|---|
| **Lieutenant of Police** | **0%** | **0%** | **100% (1)** | **0%** | **100% (1)** |
| White | 0% | 0% | 100% (1) | 0% | 100% (1) |
| **Sergeant of Police** | **47%** | **6% (1)** | **18% (3)** | **29%** | **100% (17)** |
| Black | 0% | 17% (1) | 17% (1) | 67% (4) | 100% (6) |
| Hispanic | 50% (1) | 0% | 0% | 50% (1) | 100% (2) |
| White | 78% (7) | 0% | 22% (2) | 0% | 100% (9) |
| **Police Officer** | **29% (27)** | **1% (1)** | **28% (26)** | **43% (40)** | **100% (94)** |
| Asian | 22% (4) | 0% | 33% (6) | 44% (8) | 100% (18) |
| Black | 21% (3) | 0% | 21% (3) | 57% (8) | 100% (14) |
| Hispanic | 33% (10) | 0% | 23% (7) | 43% (13) | 100% (30) |
| Other | 50% (2) | 0% | 25% (1) | 25% (1) | 100% (4) |
| White | 29% (8) | 4% (1) | 32% (9) | 36% (10) | 100% (28) |
| **Grand Total (Allegations)** | **31% (35)** | **2% (2)** | **27% (30)** | **(45)** | **100% (112)** |

(OIA FTARC Report, p. 14)

A different graph in that report showed that officers accounted for 84% of FTARC allegations, while Sergeants accounted for just 15% and Lieutenants accounted for less than one percent. Officers were also sustained at a much higher rate (43%) than Sergeants (29%), while Lieutenants were not sustained at all.

Given that black officers were more likely to be sustained than their colleagues, and that officers were more likely to be sustained than command-level personnel, it follows black officers were sustained at the highest rates and white commanders were sustained at the lowest rates. Specifically, the Sustained rate for Black officers in the 2022 Report, was 57%, the highest of any officer race group. The Sustained rate for Black Sergeants was a whopping 67%, the highest of any Sergeant race group. And the Sustained rate for white Sergeants – **zero percent** – was the lowest for any Sergeant race group. (OIA FTARC Report, p. 14)

The findings in the more-recently-published "2024 Internal Investigation

15

1  Outcome and Discipline Report" are therefore not an outlier.  To be clear: OPD's

2  Office of Internal Accountability should be applauded for this thorough

3  investigation.  The authors of this report were candid, meticulous, and specific

4  about the obvious discrepancies that the data reveal.  However, the Department

5  cannot brush this aside as an "outlier" when similar criticisms about disparate

6  discipline outcome were previously revealed by OPD Office of Internal

7  Accountability.

8      This is recurring theme for OPD.  The Hillard Heintze study at the outset of

9  this decade determined that black sworn employees were more likely to have their

10  allegations result in a sustained finding than other employees. Specifically, they

11  found that "over the five-year time period, black employees were 37% more likely to

12  have an allegation against them result in a sustained finding" and that "allegations

13  that result in a sustained finding are more likely for black employees".  (Exhibit 4,

14  Hillard Heintze Disparity Study, Report, p. 10.)

15      It appears that very little progress has been made in the intervening six

16  years.  The shortcomings laid out by OPD's Office of Internal Accountability

17  represent a violation of Task 45, which requires that discipline is imposed in a fair

18  and consistent manner.  OPD's own Office of Internal Accountability indicates that

19  the Department is well short of this goal, and the City's October 2025 Status Report

20  to this Court concedes that this investigation "revealed a racial disparity in internal

21  investigations outcomes." (Dkt. 1723, p. 9)

22      The Department continues to demonstrate that it cannot discipline its

23  officers to the equitable standard mandated by the NSA, and Plaintiffs' attorneys

24  therefore agree with the IMT that OPD remains out of compliance with Task 45.

25  Once again, this may be a basis for revoking the Sustainability Period.

26  **V.    CONCLUSION**

27      Although the City of Oakland continues to claim that it is on the cusp of full

28  compliance with the NSA, OPD remains out of compliance with Tasks 2, 5, and 45.

JOINT CASE MANAGEMENT
STATEMENT                                         Case No. 00-cv-4599 WHO

1  The Department has never been in compliance with all NSA Tasks in the

2  Sustainability Period.  The NSA cannot draw to a close while the Department

3  remains out of full compliance with these tasks, which are foundational to the NSA.

4  Indeed, OPD remains in breach of the terms of the Sustainability Period, as it has

5  been since the outset of the sustainability period.

6      Plaintiffs' attorneys had a recent meeting with Deputy Chief Aaron Smith,

7  Captain Hubbard Chief Bere, and attorney Brigid Martin over the disparity issue

8  discussed extensively in our statement.  We believe these people recognized the

9  problem we were describing and, unlike Chief Mitchell, have the will and the

10  potential to improve this situation. We would like to see the sustainability period

11  end soon and the NSA to finally end.  Whether it does or not will be decided in our

12  minds by sustained progress OPD makes on these issues.

13      We cannot help but believe that the way African American Officers are

14  treated within OPD is reflected in the way African American citizens are treated by

15  the OPD in Oakland.  This was the cause of the Riders case 25 years ago when

16  Officer Vasquez (who fled the country and is still at large) planted drugs on over

17  100 citizens (all but one of whom was African American). These victims went to

18  prison and served an aggregate of dozens of years for crimes they did not do.

19      OPD has changed for the better since that time. Yet the core problem

20  reflected by OPD's failure to comply with Tasks 5 and 45 still remains.  We need to

21  see more progress on these Tasks before we agree to end the Sustainability period.

22  ///

23

24

25

26

27

28

JOINT CASE MANAGEMENT
STATEMENT

Case No. 00-cv-4599 WHO

1

**THE CITY'S STATEMENT**

2

**OVERVIEW**

3      Plaintiffs' counsel John Burris's law partner Ben Nisenbaum lauded the

4   Oakland Police Department last month, recognizing the Department as a

5   "constitutional policing model." In a media event to announce a settlement

6   agreement with the Antioch Police Department, Burris's partner talked about their

7   involvement in both the Oakland and Antioch lawsuits and compared the recent

8   Antioch settlement to the Negotiated Settlement Agreement (NSA) in this case,

9   stating, "[a]nd of course, that was a case that transformed the Oakland Police

10   Department into a constitutional policing model." Fernandez, Lisa, *Antioch, Civil*

11   *Rights Attorney John Burris Reach Constitutional Policing Settlement*, KTVU Fox 2,

12   (Dec. 19, 2025, 12:44 PM), https://www.ktvu.com/news/antioch-civil-rights-attorney-

13   john-burris-reach-settlement-over-45-officers (last visited Jan. 14, 2026). The City

14   agrees. The Department is a model of constitutional policing. Its transformation is

15   evident even to those who may have at one time been among its staunchest critics.

16   The Department has state-of-the-art policies designed to improve public safety

17   outcomes for all. By and large, Department personnel comply with its policies and

18   are held accountable when they fall short. The Department has reduced racial

19   disparities in its police stops over the last decade and sustained the vast margin of

20   that decrease for the last several years. Finally, our officers prioritize community

21   care and trust as part of their crime prevention and public safety strategy,

22   proactively investing in the community in countless ways every day. The City

23   appreciates Mr. Nisenbaum's recognition of the Department and its members'

24   outstanding achievement. It is due to the accomplishments of the Department's

25   members that the City expects to soon be in a position to demonstrate to the Court

26   and community that the Department is prepared to continue its transformation

27   absent further Court oversight.

28      On December 6, 2025, Mayor Lee tapped former Assistant Chief James Beere

18

JOINT CASE MANAGEMENT
STATEMENT

Case No. 00-cv-4599 WHO

1  to serve as Interim Police Chief. Chief Beere has been a sworn member of the

2  Department for 27 years. His exemplary service has earned him some of the

3  Department's highest honors, including the Blue Star Medal for outstanding

4  command and control during a mass casualty incident and the Medal of Merit for

5  superior tactics and de-escalation in a life-threatening situation. Chief Beere is also

6  a decorated combat veteran, serving with distinction as a Command Sergeant Major

7  in the United States Marine Corps. Originally from San Francisco, he has proudly

8  called Oakland home for nearly three decades. Chief Beere promoted Casey Johnson

9  to Interim Assistant Chief, and Deputy Chief Aaron Smith to lead the IAB. Despite

10  recent changes in personnel, Department leadership has kept the NSA task

11  responsibility list up to date so that the Department's ongoing internal task

12  compliance inspections, supervised by Bureau of Risk Management (BRM) Chief

13  Deputy Chief Lisa Ausmus, continue without interruption. The most recent NSA

14  Task Responsibility list is attached as Exhibit 5.

15  **I.  The City's Sustained Compliance with the Terms of the NSA is a Meaningful Measure of its Readiness to Exit Court Oversight.**

16  
17  In the City's estimation, NSA task compliance remains an important proxy

for the City's readiness to exit Court oversight. The parties fashioned the terms of

18  the NSA so that when those terms were satisfied, the parties would have a measure

19  of confidence in the City's ability to continue to self-sustain compliance following the

20  end of Court oversight. It is largely a credit to the Department's perseverance and

21  commitment to its constitutional policing model that the City can report today that

22  as of the last quarter of 2025, it may be in compliance with all technical

23  requirements of the three remaining NSA tasks.

24  
25  **A.  The City Has Improved its Timely Completion of Internal Investigation Cases (Task 2).**

26  The City's preliminary analysis of internal affairs data for the fourth quarter

27  of 2025 shows that it likely met the Task 2 threshold requirement that it complete

28  at least 85% of Class I and 85% of Class II internal investigations within 180 days.

19

JOINT CASE MANAGEMENT
STATEMENT                                          Case No. 00-cv-4599 WHO

1  Because these results are preliminary and we have not discussed this analysis with

2  the monitor, we are remaining cautiously optimistic. In any event, it is fair to say

3  that IAB has drastically improved their case closure timelines, and the completion

4  rate is likely between 83% and 91% for Class I investigations, and above 90% for

5  Class II investigations.

6         Achieving and sustaining compliance, or near-compliance, through the first

7  half of 2026 will be a good indicator that the City can sustain long-term compliance

8  with Task 2. The City asks the Court also consider that prior to the City's recent

9  period of non-compliance, it had sustained compliance with Task 2 for three

10 consecutive years. IAB's biggest obstacle continues to be personnel resources and, as

11 a result, investigators carry exceptionally heavy caseloads. While seven complex

12 Class I investigations is considered a heavy caseload, each IAB investigators now

13 routinely carries a caseload closer to 15 cases. The City explained in its October

14 Status Report that due to lack of overall personnel, it simply does not have enough

15 sworn officers to promote additional officers to sergeant to work as IAB

16 investigators. Dkt. 1723, *Defendant's Status Report* 6 (October 21, 2025). IAB

17 continues to endeavor to make the most of available strategies to improve efficiency.

18 It is also currently working on a plan for officers to assist investigating sergeants

19 with discrete tasks, though the Department's shortage of sworn officers makes even

20 this a challenge. On January 16, 2026, the Department graduated its first academy

21 since 2024. The 14 officers will now start a 16-week Field Training program. It is

22 unlikely, however, that this addition to the Department's ranks will have an

23 immediate impact on IAB's staffing.

24        The Police Commission's investigative entity, the CPRA, has continued to

25 increase its staff. The Police Commission recently announced that CPRA's acting

26 director, Antonio Lawson, will serve as the agency's permanent Executive Director.

27 Hiring a permanent CPRA director fulfills the recommended next step by

28 consultants advising on the City's long-term plan of moving IAB investigations to

JOINT CASE MANAGEMENT
STATEMENT                                                    Case No. 00-cv-4599 WHO

1  CPRA.[1] Since October, CPRA has also hired a second Complaint Investigator III

2  (highest level), and an additional Complaint Investigator II, and elevated two

3  temporary Complaint Investigator IIs to permanent status. A new Project Manager

4  is scheduled to start work on February 2, 2026. CPRA is also in the process of

5  contracting with outside counsel to advise on complex investigations, assist with

6  drafting CPRA policies and procedures, and train CPRA employees.

7       The City is continuing to make slow but steady progress toward its long-term

8  plan to transferring IAB to CPRA, and is working diligently to ensure that in the

9  interim, IAB meets its Task 2 timelines. The Police Commission's work to support

10 CPRA is further discussed in the Commission's Statement to the Court, attached as

11 Exhibit 6.

12 **B. The City Continues to Comply with All Internal Affairs Complaint**
   **Procedures Subtasks (Task 5).**

13      The City contends that it is in compliance with Task 5. There have been

14 eleven compliance periods assessed since the Court-ordered Sustainability Period

15 began in 2022. During these eleven periods, the monitor has never assessed the

16 Department out of compliance on Task 5 due to deficiencies on any of the

17 enumerated subtasks. In most reports, the monitor has had no disagreements with

18 internal investigations, credibility findings, or dispositions in cases it reviewed. The

19 monitor has consistently stated that the Department is in compliance on all

20 subtasks. According to the three most recent reports issued by the monitor between

21 December 2024 and November 2025, the Department continued its lengthy history

22 of sustained compliance with all assessed technical requirements of Task 5. Dkt.

23 1726, *Eleventh NSA Sustainability Period Report of the Independent Monitor* 5

24 (Nov. 18, 2025); Dkt. 1698, *Tenth Sustainability Period Report* 7-9 (June 3, 2025);

---

25 [1]In its June 2025 report, *Examining the Transfer of Oakland Police Department*
26 *Internal Affairs Investigations to the Civilian-Staffed Community Police Review*
   *Agency*, the City's consultant recommended as next steps in the process of
27 transferring IAB to CPRA that the City should (1) hire a new permanent CPRA
   executive director, and (2) create a working group of stakeholders "to assess next
28 steps and course correct on issues that arise." *Id.* at 20.

JOINT CASE MANAGEMENT                                    Case No. 00-cv-4599 WHO
STATEMENT

1  Dkt. 1683, *Ninth Sustainability Period Report* 6-8 (Dec. 20, 2024).

2  　　　Furthermore, with the Police Commission's January 2026 approval of the

3  Department's revision of DGO M-04.1, *Criminal Investigation of Department*

4  *Members and Outside Sworn Law Enforcement Personnel*, the Department has

5  completed all of the recommendations from its self-initiated lessons-learned report

6  to address the investigatory failures in the Tran case, with the exception of the

7  recommendation to impact positive culture change—that will remain an ongoing,

8  continuous endeavor.

9  　　　While the Department's investigatory failures in the Chung and Tran

10  investigations provided a reasonable basis to extend Court oversight

11  notwithstanding technical task compliance, three years have elapsed since the Tran

12  case, and there have been no further similar failures to faithfully apply policy.

13  There have been no indications of the "cultural rot" that in the past compelled the

14  Court to continue oversight. *See* Dkt. 1673, Sept. 4, 2024 Court Tr. 13:15-16 (Court

15  finding "It's this area [ ]that compels continued court oversight, which is well

16  overdue to be terminated.") For these reasons, the City contends that it is in

17  compliance with Task 5.

18  　　　**C. The City Continues to Meet the Compliance Standard for Task 45**
19  　　　　　**by Proactively Identifying and Addressing Racial Disparity in**
　　　　　　　**2024 Investigation Outcomes.**

20  　　　Although the monitor assessed the City in partial compliance with Task 45,

21  Consistency of Discipline Policy, the City continues to contend that it has been in

22  substantial compliance with Task 45 since at least 2024. Dkt. 1622, *Joint Case*

23  *Mgmt. Statement* 21-25 (Jan. 19, 2024); Dkt. 1660, *Joint Case Mgmt. Statement* 47

24  (Aug. 28, 2024); Dkt. 1701 *Joint Case Mgmt. Statement* 30-35 (Jul. 3, 2025).

25  Regardless of any lack of consensus about technical NSA task compliance, however,

26  fairness and consistency of discipline remains a priority for the City. The City and

27  the Department recognize that consistency in discipline is a critical part of the

28  City's constitutional policing model. The Department has been analyzing its

JOINT CASE MANAGEMENT
STATEMENT

Case No. 00-cv-4599 WHO

internal investigation case outcomes and discipline since 2020 to identify and ameliorate discipline disparity. Department policy requires an annual inspection of outcome and discipline data to identify and address disparity based on race, gender, and rank. *See DGO R-01, Risk Management* (published Apr. 2022). The Department uses a detailed methodology to conduct the annual data analysis. The methodology was developed with the assistance of the monitoring team and Stanford researchers. The methodology is a "working" methodology, which means the Department updates the methodology after each annual data analysis because every analysis reveals areas for optimization and by updating the process and integrating lessons learned, future analyses are more robust and reliable.

### 1. The Department is Working to Address Racial Disparity Identified in 2024 Internal Investigation Sustained Rates.

At the end of October 2025, the Department's Office of Internal Accountability (OIA) finalized its 2024 Internal Investigation Outcome and Discipline Report. Ex. 2. Consistent with past practice, the OIA received assistance from a Stanford researcher in its analysis. The OIA presented its findings at the November 2025 monitor's site visit. On December 7, 2025, Chief Mitchell published the Department's response to address the OIA's findings and recommendations. Ex. 2-A.

The OIA made the following concerning findings about 2024 internal investigations outcomes:

- In 2024, Black (7%) and Latinx (6%) officers were sustained at a significantly higher rate than white officers (2%);

- There were only four cases where white sworn members were sustained;

- The racial disparity was more pronounced across sustained rates for internally-generated cases and internally-discovered violations—Black (47%), Latinx (24%), white (0%);

- There was observable gender and rank disparity across sustained rates for internally-generated cases—female (60%), male (21%); officers (30%), sergeants and above (9%).
- The number of sustained sworn member cases fell by 50% (129 to 64); and
- The overall sworn sustained rated dropped from 8% in 2023 to 5% in 2024.

While the Department still has some concern about the overall reduction in the number sustained cases and the reduction in the sustained case rate for officers, its concern is somewhat tempered by the OIA's determination that the "change in processing of [Failure to Accept or Refer a Complaint] (FTARC) allegations explains roughly half of this 50% drop." Ex. 2, *OPD OIA 2024 Internal Investigation Outcome and Discipline Report* 4 (Oct. 2025). The Department recently changed policy to allow some FTARC allegations to be handled by non-disciplinary means (i.e., Summary Note Files entry), where there is no pattern of conduct. Because FTARC allegations are a frequently occurring allegation and have a high sustained rate, it makes sense that removing many of these allegations from the data would result in a significant reduction in the number of sustained cases and, therefore, the sustained rate.

**2. OIA Did Not Find Any Explanation for the Disparity, Though it Did Find that the Disparity was More Pronounced for Allegations that Originated in the Department.**

The OIA inspected the data to determine whether the disparity correlated with particular investigators (it did not), depended on how serious the misconduct was (no), depended on the age or tenure of the officer investigated (no), whether it was investigated by IAB or DLI sergeants (no), and whether certain types of allegations tended to result more often in disparity (no).[2] The only meaningful correlation it uncovered was with case generation: the racial disparity in sustained rates was more pronounced in internally-generated cases.

---

[2] For example, there was no disparity observed in the sustained rate for FTARC cases.

JOINT CASE MANAGEMENT STATEMENT

Case No. 00-cv-4599 WHO

A case is categorized as internally generated if it is initiated by Department employees (e.g., complaint of misconduct made by a supervisor, or co-worker, or self-reported by an officer), as opposed to externally generated cases which are initiated by someone who does not work for the Department, typically a member of the public. Making things a bit more complicated, cases that are externally generated may nonetheless have allegations discovered by case investigators during the investigation. When allegations are added after the initial case generation, the additional allegations are referred to as self-discovered or internally discovered allegations. Adding internally discovered allegations does not change the case generation category from external to internal, even if only the internally discovered allegations are sustained. Because internally discovered allegations share the same origin as internally generated cases, the OIA also analyzed internally discovered allegations. Racial disparity was even more pronounced in sustained rates for internally discovered allegations. While analyzing internally generated cases, the OIA also observed a notable difference in gender and rank sustained rates that was not present in the overall data. OIA did not observe disparities in rank or gender sustained rates for internally discovered allegations.

Even when it looked more closely at the internally generated cases, however, OIA was unable to find an explanation for the disparity. Importantly, the disparity did not appear to be the result of Black or Latinx officers receiving more allegations per case. There is a 2% chance of an officer getting a sustained finding in a case with one allegation. The odds increase to 9% in cases with more than one allegation. *Id.* at 14. Therefore, if officers of a particular race tend to more often have multiple allegations in a single case, that could explain the disparity at the case level. The percentage of officers with only one allegation per case, however, stayed consistent across race. *Id.* at 22.

The OIA also evaluated whether the number of cases per officer differed based on an officer's race. Overall, white officers were the least likely to have

JOINT CASE MANAGEMENT STATEMENT

Case No. 00-cv-4599 WHO

multiple cases (57%), which was significantly lower than Black, Latinx and Asian members (74%, 71%, and 79%, respectively). Of the 461 officers who had at least one case in 2024, 104 officers had five or more cases (32 Latinx, 29 Asian, 26 Black, 12 white, and 5 other/unknown). Only 13% of white officers who had at least one case had 5 or more cases, compared to between 23% and 28% for all other races. This multiple-case statistic does not impact the sustained-rate-per-case statistic or explain the disparity in sustained rates. It does, however, explain the higher frequency with which officers of color are involved in the overall number of cases annually, suggesting a disparity in exposure or case volume rather than differential sustained rates per case. This does not necessarily mean that officers with multiple cases are engaging in misconduct more often, but rather that they may be assigned to or work in situations that involve greater risk or more frequently result in a higher volume of complaints. OIA did not, however, find that particular assignment explained the 2024 disparity. *Id.* 11-13.

The OIA also considered whether white officers had their cases resolved more frequently by less formal processes. The data does not suggest that non-white officers are more frequently subjected to harsher discipline process, or that white officers are afforded more opportunities to take advantage of less formal or more lenient processes. The percentage of cases proceeding to full investigations rather than completed through the less formal processes of Summary Findings or Informal Complaint Resolution were consistent across race. This makes it likely that the disparities arise within fully investigated cases or, in other words, that disparities start appearing only after a case is assigned to a full investigation. *Id.* at 35.

**3. Without An Explanation for the Disparity, and With Evidence of Substantial Data Fluctuation in the Past Several Years, the City is Not Provided With Meaningful Answers About What the Disparity Means and How to Effectively Address the Disparity.**

While the 2024 analysis could not provide an explanation for the disparity, it was able to provide the Department with important information and

JOINT CASE MANAGEMENT STATEMENT

Case No. 00-cv-4599 WHO

1  recommendations to allow the Department to gather additional information that
2  may improve its chances of obtaining an explanation for observed disparity in
3  future data analyses.

4      The OIA's 2024 analysis showed that a point in the discipline process worth
5  further investigation is the point at which misconduct cases or allegations are
6  generated by Department employees. It is true that these findings bear some
7  similarity to the Department's 2022 finding of racial disparity in sustained rates for
8  FTARC allegations because FTARC allegations are frequently internally discovered.
9  However, it is also important to note that there are distinct differences. First, the
10 2022 disparity was not statistically significant. Second, FTARC violations are just
11 one type of misconduct—there have not been disparities found in any other specific
12 type of misconduct allegation. Rather, the disparity was found in overall sustained
13 rates, and in cases and allegations of internal origin, generally. Third, disparity was
14 not noted in the sustained rate for FTARC allegations in 2024.

15     It is also important to note that in response to the observed disparity in the
16 sustained rate for FTARC allegations, the Department made policy changes to
17 reduce discretion and improve consistent application of adding *any* internally
18 discovered allegations—not just FTARC allegations—by requiring notification to
19 the IAB Commander within 24 hours when an allegation was added to a case
20 (Training Bulletin V-T.1, *Internal Investigation Procedure Manual*, revised
21 November 2023). Unfortunately, what OIA discovered in its 2024 analysis is that
22 the Department's data collection must be improved before it can analyze the impact
23 of the 2023 policy intervention. While we do not observe the same disparity in
24 FTARC sustained rates, the 2024 data gives us concern, generally, about allegations
25 of internal origin.

26     Additionally, as we drill down to look more closely at the data, it is important
27 to remember to drill up as well, and not to lose sight of the big picture and what
28 that tells us about trends in data beyond the 2024 data. As previously reported,

JOINT CASE MANAGEMENT
STATEMENT
Case No. 00-cv-4599 WHO

looking back five years, the data does not reflect that the disparity in the 2024 outcomes is part of a trend or pattern. *See Fig. 5.* Between 2020 and 2024, officers across all races had similar five-year average sustained rates, with white officers having the highest sustained rate. *Id.* When numbers fluctuate year-to-year but maintain a stable five-year average, it suggests that the fluctuations are not indicative of a long-term trend but rather variations around a stable baseline. Thus, while the data fluctuation between 2023 and 2024 was more extreme, fluctuations in the opposite direction in recent years result in a relatively consistent average across all races over a five-year period, with all races averaging between a sustained rate between 6% and a 9% over that period. This indicates that the variation observed in 2024 is not part of an ingrained trend of disparate treatment or a demonstration of cumulative disparate impact. In the monitor's November 2025 assessment, the monitor agreed it was relevant to consider the varying sustained rates in recent years in the consideration of the 2024 sustained rates and observed racial disparity. Dkt. 1726, *Eleventh NSA Sustainability Period Report of the Independent Monitor* 10 (Nov. 18, 2025) ("However, these figures have fluctuated over the last few years.")

**SUSTAINED CASES BY SUBJECT OFFICER RACE FIVE-YEAR AVERAGE**

| | 2020-2024 Combined | | |
|---|---|---|---|
| | Total Cases | Sustained | Percent Sustained |
| White | 1691 | 147 | 9% |
| Black | 1298 | 102 | 8% |
| Latinx | 2050 | 162 | 8% |
| Asian | 1426 | 87 | 6% |
| Other | 290 | 24 | 8% |
| Total | 6755 | 522 | 8% |

*Fig. 5*

28

### 4. The Department's Response to Address Disparity is Thoughtful, Informed, and Future-Looking.

We must remember that the reason we study past data and learn as much as we can about observed disparities is to reduce the likelihood of future disparity and improve the consistency of internal investigation outcomes and discipline. We have conducted the most thorough analysis possible on the 2024 data using the Department's robust methodology. It is now 2026. It does not make sense for the Department to continue to investigate the 2024 data and cases when the 2025 data will soon be available. The Department should take what it learned from the 2024 study and apply its knowledge and new information to its investigation of the 2025 data.

With that in mind, the Department's response to the 2024 study and proposed interventions are reasonably targeted to address the disparity based on the OIA's findings. We do not know why the disparity occurred but we are concerned that it appeared to correlate with cases where misconduct is reported by Department employees rather than members of the public. The Department agreed to keep these concerning findings in the 2024 data at top of mind when it analyzes the 2025 data, and as it reviews the 2026 quarterly data. The Department is also revising its methodology to ensure case origin is consistently analyzed as part of its mandatory annual study. It is working to improve its data collection—increasing the data collected about the misconduct allegations and cases that originate internally and intervening to improve consistent data entry by members. The OIA's recommendations are focused on how to make future data analyses more meaningful. Targeting disparity can occur in two ways: interventions designed to impact specific processes and outcomes using methods reasonably designed to mitigate the disparity, or across the board training or other interventions to reduce implicit bias and systemic issues that may be causing or supporting disparity. The 2024 data does not provide enough information to give the City a reasonable basis

JOINT CASE MANAGEMENT STATEMENT

Case No. 00-cv-4599 WHO

to believe that a targeted intervention would achieve results. The Department's response to address disparity also included additional measures aimed to impact systemic and implicit biases. Ex. 2-A. When statistically significant racial disparities exist without a clear race-neutral explanation, research and organizational best practices suggest that the disparity may be driven by systemic or implicit bias. Therefore, it is appropriate that the Department included implicit bias training and advanced race and equity courses, in addition to embedding such instruction within the Department's Continuing Professional Training and the Chief's Command Retreats, in order to improve discipline consistency.

The City and the Department will continue to work together to ameliorate disparity and improve discipline consistency. The Department has already begun working to complete the measures recommended in the OIA's report. In addition, Chief Beere and DC Smith are drafting an addendum to the Department's response to ensure that the current agency administration's response aligns with the vision of the Chief and the IAB DC. In the coming months, the Department will also (1) review the preliminary 2025 outcome data to determine whether the disparity in sustained rates is part of a continuing trend; (2) publish the results of its 2025 survey on members' perceptions about consistency and fairness in internal investigation and discipline the Department; and (3) conduct qualitative interviews to obtain both a deeper and broader understanding of members' perceptions.

Plaintiffs argue that the City is not doing enough or not doing the right things to address disparity in internal investigation outcomes and discipline. The Department can and is addressing disparity through Department-wide intervention aimed at systemic and implicit bias. A more targeted intervention or change to a particular policy or practice, however, must be thoughtful and informed. The OIA study did not provide the City with enough information to give it reason to believe that any particular targeted intervention would impact the disparity in sustained rates. The City is open to considering plaintiffs' ideas for a targeted intervention; to

30

1   date, they have not suggested any targeted interventions. Based on the information

2   the City has, it is not reasonable to decide that the City's response to this issue—

3   either in response to the 2024 study or over all—is or has been anything other than

4   informed, thoughtful, and thorough. The City is doing all that it can to intelligently

5   and comprehensively address disparity in investigation and discipline.

6        As plaintiffs note, the Department was in compliance with Task 45 in 2022

7   and its compliance status was only "downgraded" following the publication of the

8   outside investigator's report on the elevator discharge and hit and run

9   investigations (Chung cases). Pl. Br. at 7. This recognition is important because it

10  affirms that *the 2022 change in compliance status was not based on the*

11  *Department's ongoing efforts to use data and survey feedback to help it mitigate*

12  *discipline disparity*. Therefore, it would be a significant change in compliance

13  standard and, therefore, unreasonable, to now hold the Department out of

14  compliance on Task 45 based solely on the 2024 data and the Department's

15  response to address disparity in the data. Moreover, is inconceivable that the City is

16  performing worse with respect to Task 45 now than it was in 2022, in light of the

17  fact that, as discussed above, it has not experienced failures similar to the Chung or

18  Tran cases since 2023, and it has undertaken further measures to prevent similar

19  failures.

20  **II.    The City's Proposed Transition Plan Will Prevent Progress from**
        **Stalling Following Court Oversight by Empowering Local Ownership**
21      **of its Constitutional Policing Model.**

22        This City's local-ownership initiative aims to transition the City,

23  Department, and the community from a mindset of court-ordered compliance to one

24  of institutional pride in Oakland's Constitutional Policing Model. In Mayor Lee's

25  first appearance before the Court in July 2025, she stated:

26            Under my leadership, the City will focus not only on NSA compliance
            but what comes after compliance, after Court oversight ends. We will
27          remain attentive to the long term and the perpetual task of
            maintaining a culture in the Police Department that mirrors the
28          culture of the community that it serves and that brings the

31

JOINT CASE MANAGEMENT                           Case No. 00-cv-4599 WHO
STATEMENT

Department into the fold. It takes leadership, it takes focus, and it takes commitment.

Jul. 10, 2025 Tr. 47. Consistent with Mayor Lee's July 2025 statement, the City will not ask the Court to terminate oversight until the City positions itself for continued, long-term success. Success in this context is not merely sustaining technical, static compliance with the NSA indefinitely following the end of Court oversight. Success is continuing our forward momentum and cultural transformation of the Department. The City's goal is to put itself in a position where the Department has forward momentum and its vision, energy, and resources are focused on striving for even greater excellence in constitutional policing. Cultivating a sense of ownership as publicly and clearly as possible will put the City and the Department in the best possible position to successfully continue the Department's cultural transformation after Court oversight ends.

**A. The City's Executive Leadership Will Promote Cultural Alignment.**

City leadership agrees wholeheartedly with the Court's admonition that executive leadership must drive culture; culture cannot drive the leadership. The City's transition plan operationalizes that philosophy. Mayor Lee, City Administrator Johnson, and Chief Beere will jointly champion a clear message: constitutional policing makes police more effective and improves public safety outcomes. The City's constitutional policing model embodies the 51 NSA tasks and reflects the City's and the community's values.

The City and the Department have taken significant and definitive action, or modeling, to achieve compliance with the NSA, which is strong evidence that leadership and Department members appreciate the NSA's value, and recognize that it is the foundation of the City's constitutional policing model. Effective agency leaders, however, use messaging as well as modeling to ensure transparency about an agency's goals and its leader's commitment. Modeling without messaging, or messaging without modeling, can create misalignment. A leader must communicate

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

their ultimate goals and the values that inspire those goals; and a leader's actions should validate their articulated vision. The City and the Department must be vocal about the value of the NSA and our constitutional policing model, and vocal about their rejection of the false narrative that the Department only complies with NSA tasks because it is required by an external mandate.

**B. The Department Instituted a Constitutional Policing Unit to Support Continued Improvement of the Department's Excellence in Constitutional Policing.**

Assistant City Administrator Michelle Phillips will immediately serve as the interim Constitutional Policing Administrator. The City plans to hire a Department employee to permanently serve this role. The Constitutional Policing Unit will assist Mayor Lee and Chief Beere in promoting local ownership and moving beyond the historical association of the NSA and compliance with external oversight. The NSA tasks will be reframed as integral components of Oakland's constitutional policing model. This shift in terminology de-emphasizes compliance-driven mandates and instead uplifts the practices begun under the NSA as an essential part of the Department's core mission.

**C. The City Will Engage with Experts to Help Communicate the City's Message About the Value of its Constitutional Policing Model.**

The City intends to engage with national and local experts, outside of the monitoring team, to discuss with Department members, City employees, and the community the value of constitutional policing and how the tenets of the NSA support our constitutional policing model, and to help elevate the City's messaging about how our constitutional policing model improves public safety outcomes. While we recognize the monitoring team as national experts in constitutional policing and appreciate their ongoing assistance, hearing from a variety of independent experts will help build consensus on data and outcomes, and reinforce the inherent value of these practices to Department members, City employees, and the community.

///

JOINT CASE MANAGEMENT
STATEMENT

Case No. 00-cv-4599 WHO

1

2      **D. The City Will Share Examples of Improved Public Safety Outcomes.**

3

4          By proactively sharing data and anecdotes that demonstrate how the City's

5      constitutional policing model improves public safety outcomes, the City build trust

6      between the community and the Department, and encourages a value-driven view of

7      the NSA and our constitutional policing model. This strategy aims to provide a

8      direct link between constitutional policing and the City's public safety goals,

9      providing tangible evidence that these practices are not burdensome and

10     unnecessary extra work, but essential public safety agency functions. As part of the

11     transition plan, the City and Department will work to correct the misconception

12     that constitutional policing is an obstacle to, rather than a component of, public

       safety.

13

14     **E.   The City Recognizes that its Constitutional Policing Model is Dynamic.**

15         It is important to recognize and communicate that the City created the

16     framework of the NSA, but the Department, Police Commission, and community

17     have all contributed to building and honing the details of our constitutional policing

18     model. The City expects that the Department and Commission will not hesitate to

19     make improvements to our constitutional policing model as appropriate where

20     operational observations and evidence demonstrate that policy and practice must be

21     amended. It is vital that our community, which includes Department members,

22     understands that there are ways to effect change when appropriate, either to end

23     ineffectual practices or to make effective practices even better.

24     **F.   The City is Dedicated to Strengthening Relationships to Improve Trust.**

25         A core principle of sustained reform is trust—the public's trust in the

26     Department, the Police Commission, and City leadership, and trust between and

27     among the Department, the Police Commission, and City leadership.

28

34

JOINT CASE MANAGEMENT STATEMENT                                    Case No. 00-cv-4599 WHO

1    Mayor Lee continues to actively engage with members at all levels of the

2  Department. In late November 2025, she attended a listening session with the

3  Criminal Investigation Division and participated in the Chief's quarterly command

4  retreat. Mayor Lee's engagement fosters internal trust, ensures both City and

5  Department leaders are fully informed, and rejects the notion of the Department

6  carrying out its public safety mission in isolation. Rather, it positions Mayor Lee as

7  an informed policing partner. As one example of her ongoing work, tomorrow,

8  January 21, 2026, Mayor Lee will hold a press conference to announce details of the

9  City's partnership with Merritt College to help the City grow and support the

10  Department.

11    Interim Chief Beere began leading the Department five weeks ago, but his

12  consistent personal engagement with the community he lives in and serves long

13  pre-dates his tenure as Oakland's top cop. Chief Beere's participation in numerous

14  events in December and January—including faith community mixers, youth

15  violence prevention collaborations, and the Asian Police Officers' Association

16  dinner—demonstrates a broad, inclusive approach to community relations. His

17  efforts extend to the most vulnerable populations, hosting lunch at the Police

18  Administration Building for local students from several local high schools and

19  attending Ceasefire violence prevention night walks, connecting with residents in

20  underserved and under-resourced neighborhoods in East, West, and North Oakland.

21  Chief Beere's commitment and engagement is consistently recognized as

22  exceptional—last month he received a 2025 Appreciation Award from Bay Area

23  United, a local organization with deep roots in the West Oakland Yemeni and

24  immigrant community that provides inclusive and accessible youth soccer

25  programs, mentorship, and community-building initiatives, for his dedicated

26  leadership and support of at-risk youth—a testament to the positive impact of these

27  trust-building endeavors and Chief Beere's longstanding commitment to Oakland's

28  communities.

35

JOINT CASE MANAGEMENT
STATEMENT

Case No. 00-cv-4599 WHO

1    The success of the Department's trust-building efforts have garnered recent

2    attention in the national media. The "OPD Gives Back Holiday event," in December

3    2025, where officers shared dinner with and gave toys to 100 Oakland Unified

4    School District students, showcased positive interactions between law enforcement

5    and youth. Lee, Amber, *Oakland Police Host Holiday Celebration for 100 Kids to*

6    *Connect in a Positive Way*, KTVU Fox 2, (Dec. 18, 2025, 5:39 AM),

7    https://www.ktvu.com/news/oakland-police-host-holiday-celebration-100-kids-build-

8    relationships (last visited Jan. 20, 2026). A similar toy giveaway in East Oakland in

9    early January co-hosted by law enforcement and attended by Police Commission

10   Chair Garcia-Acosta, deepened community relations within the Latinx/immigrant

11   community. Additionally, on October 23, 2025, Chair Garcia-Acosta facilitated a

12   listening session for family members who lost loved ones to homicides in Oakland.

13   During the event, sponsored by local community-based violence prevention,

14   intervention, and healing non-profit Youth ALIVE!, family members shared

15   testimonials about their experiences dealing with Department members and

16   officers, including the Department's victim service liaisons.

17   These interactions work in concert to transform the police-civilian dynamic

18   from one of tension to one of shared responsibility, creating a safer and more

19   cohesive environment for all residents, bridging historical divides through shared

20   experience.

21                                   **CONCLUSION**

22   The reality is that there will never be a police department anywhere in the

23   world under a consent decree or court oversight that can guarantee that at the end

24   of oversight it will forever be a model police department. All signs, however, point to

25   the Department being on the best possible path. Empirical evidence from

26   jurisdictions exiting federal oversight suggests that the danger of backsliding

27   increases when reform remains compliance-driven rather than value-driven. Reform

28   that is perceived as merely burdensome, rather than a catalyst for improved public

JOINT CASE MANAGEMENT
STATEMENT                                                Case No. 00-cv-4599 WHO

1   safety outcomes, is less likely to be self-sustaining. The City's transition plan

2   mitigates the likelihood of regression and resistance and improves the likelihood

3   that the City's constitutional model will be self-sustaining.

4          Based on the Department's already substantial accomplishments, the City

5   expects that the Department will emerge even stronger and more resolute in its

6   accountability culture following the conclusion of Court oversight. An end to Court

7   oversight is a tangible reward that acknowledges the value of the work of not only

8   the Department's current personnel, but all of its members over the past 20 years

9   who have worked tirelessly to make the Department a model of constitutional

10  policing and earn the badge of honor that ending Court oversight will provide. We

11  look forward to the Court's feedback on the City's transition plan.

12  ///

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT CASE MANAGEMENT
STATEMENT                                                          Case No. 00-cv-4599 WHO

1

2

**THE OPOA'S STATEMENT**

Intervenor Oakland Police Officers Association ("OPOA") is confident that the

3

4

Oakland Police Department ("OPD") has made great strides toward full compliance.

5

Moreover, OPOA has complete confidence that Chief Beere is fully capable of

6

leading the Department into the next phase of these proceedings.  The OPOA

7

remains committed to work collaboratively with all parties to reach full compliance

8

with the NSA.

Respectfully submitted,

9

10

Dated:  January 20, 2026        RYAN RICHARDSON, City Attorney

11

BRIGID S. MARTIN, Special Counsel

12

By:  ___/s/ Brigid S. Martin*_____

13

Attorneys for Defendants

14

CITY OF OAKLAND

15

JOHN L. BURRIS
Law Offices of John L. Burris

16

By:  ___/s/ John L. Burris_____

17

Attorney for Plaintiffs

18

JAMES B. CHANIN

19

Law Offices of James B. Chanin

20

By:  ___/s/ James B. Chanin_____

21

Attorney for Plaintiffs

22

ROCKNE A. LUCIA, JR.

23

Rains Lucia Stern St. Phalle & Silver

By:  ___/s/ Rockne A. Lucia, Jr._____

24

Attorney for Intervenor

25

OAKLAND POLICE OFFICERS ASSOCIATION

26

*Per Local Rule 5-1(i)(3), the filer attests that concurrence in the filing of the

27

document has been obtained from each of the other Signatories

28

JOINT CASE MANAGEMENT
STATEMENT

Case No. 00-cv-4599 WHO