# EXHIBIT 2

# OAKLAND POLICE DEPARTMENT
## Office of
## Internal Accountability



## 2024 Internal Investigation Outcome and Discipline Report

### October 2025

# Table of Contents

Contents ........................................................................................................................................ 1

1. Executive Summary .................................................................................................................. 3

    Changes in Number of Cases and Sustained Rates (2023 to 2024) ......................................... 3

    Reversal in Sustained Rates between White and Black Members (2023 to 2024) ................... 3

    Disparity in Cases with an Internal Origin ............................................................................. 4

    Long-Term (5-Year) Perspective ........................................................................................... 5

    Changes in Discipline (2023 to 2024) .................................................................................... 6

    Recommendations ................................................................................................................. 6

2. Methodology ........................................................................................................................... 8

3. Breakdown of the Number of Allegations and Cases ............................................................. 11

    3.1. Are Members of Any Group Being Investigated More Often? ........................................ 11

    3.2. Did Officers from Any Given Group Receive More Allegations Per Case? ...................... 14

    3.3. Did the Type of Allegations Differ by Group? ................................................................ 16

    3.4. Did the Seriousness of the Allegation (Class I Versus Class II) Differ by Group? ............ 19

    3.5. Did the Type of Investigation Differ by Group? ............................................................ 20

4. Proportion of Cases with a "Sustained" Finding ................................................................... 22

    4.1. Is One Group More Likely to be Sustained? .................................................................. 22

    4.2. Is It Because White Officers Are Older? ........................................................................ 23

    4.3. Do Division-Level Investigations Differ from Internal Affairs Investigations? ............... 25

    4.4. Do Cases with an External Origin Differ from Cases with an Internal Origin? ............... 26

    4.5. Do Sustained Rates Differ Based on the Seriousness of the Allegation (Class I versus Class II)? .... 29

    4.6. Do Year-to-Year Fluctuations in Sustained Rates Average Out Over Time? ................... 31

    4.7. Did "Failure to Accept or Refer a Complaint" Allegations Affect Sustained Rates in 2024? .......... 32

5. Focusing on Fully Investigated Cases .................................................................................... 35

    5.1. Sustained Rates for Fully Investigated Cases ................................................................ 35

    5.2. Allegation-Level Analysis for Fully Investigated Cases .................................................. 38

    5.3. Analysis by Type of Sustained Violation for Fully Investigated Cases ............................ 41

    5.4. Did Seniority Or Age Explain The Differences In Sustained Rates for Fully Investigated Allegations? .................................................................................................................... 45

    5.5. Do Specific Investigators Stand Out in Fully Investigated Cases? .................................. 47

6. Discipline Analyses ............................................................................................................... 51

    Discipline by Class .............................................................................................................. 51

7. Recommendations ................................................................................................................. 54

Appendix 1: Chi-Square Tests Cases Per Member and Allegations Per Case ...................................56

Appendix 2: Chi-Square Tests by Investigation Type ...................................................................58

Appendix 3: Chi-Square Tests by Complaint Origin ....................................................................62

Appendix 4: 2023 Sustained Rates for Allegation Class.............................................................66

Appendix 5: 2024 Sustained IA Cases with Discipline................................................................67

# 1. Executive Summary

The Oakland Police Department (Department) is committed to ensuring that internal investigation outcomes and discipline are fair and transparent. To identify and remedy potential disparities, Department General Order R-01, *Risk Management*, requires the Department to conduct an annual inspection of internal investigation outcomes by race and prepare a report reflecting its findings. The current report covers internal investigation cases involving sworn personnel conducted at the division or Internal Affairs level[1] that came to a finding in 2024, and includes analyses of findings and discipline by race, gender, and rank. The complaint investigations included in the analysis were initiated between March 2022 and October 2024. The report excludes cases reviewed by pursuit, collision, or use-of-force boards. The analysis follows the *Department's Working Methodology for Internal Affairs Disparity Analyses* (See *2. Methodology*).

## Changes in Number of Cases and Sustained Rates (2023 to 2024)

In 2024, Department sworn members overall received fewer complaints and were sustained at a lower rate than in 2023, resulting in fewer sustained cases. This reduction is likely due at least in part to the recent change in how the Department processes Failure to Accept or Refer a Complaint (FTARC) allegations, as we document in section 4.7 (See *4.7. Did "Failure to Accept or Refer a Complaint" Allegations Affect Sustained Rates in 2024?*). One of the discoveries in last year's analysis of the 2023 data was the preponderance of FTARC among sustained allegations. In December 2023, the Department revised its policy, allowing FTARC allegations to be handled informally, outside of the IA process, if they are discovered during the normal course of supervision, an investigation or incident review and the conduct does not indicate a pattern of misconduct.[2]

Excluding cases that were reviewed by a board, there were 633 internal investigations approved in 2024 involving a sworn member. The 633 investigations, each of which could involve multiple officers with potentially multiple allegations, covered a total of 2,109 allegations of misconduct and resulted in 1,417 sworn member "cases." For the purposes of this analysis, a "case" means an investigation of a particular officer, potentially with multiple allegations. As we describe in Section *3. Breakdown of the Number of Allegations and Cases*, between 2023 and 2024, the number of investigations involving a sworn member dropped by 8% (691 to 633). The number of allegations dropped by 21% (2,680 to 2,109), and the number of sworn member cases dropped by 14% (1,648 to 1,417). At the same time, the overall sustained rate fell from 8% in 2023 (129/1,648) to 5% in 2024 (64/1,417). As a result of both trends, the total number of sustained cases fell by 50% between 2023 and 2024, from 129 to 64. The change in processing of FTARC allegations explains roughly half of this 50% drop.

## Reversal in Sustained Rates between White and Black Members (2023 to 2024)

The most notable finding in this report is the substantial decrease in white sworn member sustained findings between 2023 and 2024 (See *4.1. Is One Group More Likely to be Sustained?*). Only 4 white sworn members were sustained in 2024, down from 37 in 2023, and far lower than the number of Black (23) and Hispanic (25) sworn members sustained in 2024. Table 1 shows sustained rates (at the case level) broken

---

[1] Cases investigated by staff assigned to the Internal Affairs Bureau (IAB) are categorized as Internal Affairs (IA) level cases. Division Level Investigations (DLI) are assigned to sergeants who work in divisions outside of IAB.

[2] Special Order 9213 (dated December 5, 2023), Revising Department General Order (DGO) M-03, *Complaints Against Department Personnel or Procedure*.

down by member race for both 2023 and 2024. In 2023, white sworn members had the highest overall sustained rate of all races (11%), and Black members had the lowest overall sustained rate (6%). The higher sustained rate for white members in 2023 seems to have been due in large part to the number of FTARC allegations levied against white members: when FTARC allegations were removed, the sustained rate for 2023 dropped to 6% for white officers and 5% for Black officers. This was less of a factor in 2024 because of the change in policy regarding FTARCs (none of the cases sustained against white officers in 2024 were solely for a FTARC allegation).

The sustained rates reversed in 2024: white sworn members had the lowest sustained rate (2%) (aside from Other/Unknown), and Black members had the highest rate (7%), followed by Hispanics (6%), and both of these rates were statistically higher than the rate for white members. Further analyses showed that the 4 cases sustained against white sworn personnel involved only members over 40 and with over 5 years of seniority. In other words, the sustained rate for junior white officers (less than 5 years seniority or younger than 40) was 0%. Because sustained rates for Black and Hispanic members remained relatively stable between 2023 and 2024, it is fair to say that the racial disparity in case outcomes observed in 2024 is primarily driven by the decrease in sustained findings against white members.

**Table 1: Sustained Rates by Race 2023 Versus 2024[3]**

|  | 2023 | | | 2024 | | |
|---|---|---|---|---|---|---|
|  | % Sust | # Sust | Tot | % Sust | # Sust | Tot |
| **White** | **11%** | **37** | **348** | **2%** | **4** | **223** |
| **Black** | **6%** | **20** | **341** | **7%** | **23** | **351** |
| **Hispanic** | 8% | 40 | 512 | **6%** | **25** | **425** |
| **Asian/Filipino** | 7% | 26 | 379 | 3% | 11 | 342 |
| **Other/Unknown** | 9% | 6 | 68 | 1% | 1 | 76 |
| **Total** | **8%** | **129** | **1648** | **5%** | **64** | **1417** |

The unusually low number of sustained cases for white members in 2024 prompted additional analyses of sustained rates by race. To understand the difference between the sustained rate for white members and for Black and Hispanic members in 2024, we tried to identify where the difference was occurring by considering the type of investigation; how the case originated; the type of allegations; and the specific investigators. We also checked whether other variables such as age and tenure could explain the difference. These analyses are presented in more detail throughout the report.

### Disparity in Cases with an Internal Origin

Our report included a review of multiple variables to identify where the racial disparity was especially pronounced. We found that the greatest racial disparities arose in internally generated cases.[4] White

---

[3] Throughout this report, proportions in tables that were tested for significance using a 2 x 2 chi-square test are shaded in blue and any differences found to be statistically significant are marked in red (See *2. Methodology*).

[4] Internally generated cases are initiated by department employees (i.e., supervisor, co-worker, self-report by employee, etc.), as opposed to externally generated cases which are initiated by someone who does not work for the Department (member of the public or member of a different department or agency). Some cases that are initially generated externally may have allegations added by department supervisors or investigators. The case would be categorized as externally generated, but the added allegation would be categorized as an "internally discovered violation."

members had no sustained findings (0%) for internally generated cases, compared to Black and Hispanic members who had sustained rates of 47% and 24%, respectively. Furthermore, 50% (16/32) of the sustained allegations in internally generated cases for Black and Hispanic members were for Class I violations, the most serious violations, including *Truthfulness*, *Obedience to Laws*, *Unauthorized Use of Electronic Systems*, and *Interfering with Investigations.* Table 47 shows the allegation breakdown of sustained cases in internally generated cases (See *5.3 Analysis by Type of Sustained Violation for Fully Investigated Cases*).

We also assessed sustained rates for "internally discovered" allegations, which could only be calculated as an approximation due to incomplete data entry. The disparity in sustained rates was even larger when looking at "internally discovered" allegations (11% white members versus 67% Black members and 48% Hispanic members). Additionally, 62% (22/36) of Black sustained allegations were for internally discovered allegations, and 65% (30/46) for Hispanics, whereas it was only 40% for whites (2/5) (See *4.4. Do Cases with an External Origin Differ from Cases with an Internal Origin?*).

The analysis also revealed disparities in sustained rates by gender and rank for internally generated cases, even though these groups did not show a statistically significant difference in the overall sustained rate. For internally generated cases, female members were sustained at a much higher rate than male members (60% - 3/5 versus 21% - 9/43) and officers were sustained at a much higher rate than sergeants and above (30% - 11/37 versus 9% - 1/11).

During the review of 2022 cases, the Department found that the practice of adding "internally discovered" violations to existing cases could be a point at which disparities may arise. This was addressed by requiring notification to the IAB Commander within 24 hours when an allegation was added to a case (Training Bulletin V-T.1, *Internal Investigation Procedure Manual*, revised November 2023). While the new requirement was intended to mitigate disparity, due to the limited tracking of "internally discovered" allegations, we were unable to do a more complete analysis of these allegations.

## Long-Term (5-Year) Perspective

Because of the shifts in sustained rates between 2023 and 2024, we also looked at the last five years to check for longer-term trends and found that the combined sustained rate averaged across 2020-2024 was nearly the same for all race groups (8-9%) except for Asian/Filipinos, who had the lowest combined sustained rate (6%). Table 2 shows the sustained rates by year and race for 2020 to 2024. Except for Other/Unknown members, who have much lower numbers than other race groups, white members had the highest sustained rate for the combined five-year period (9%). The five-year comparison also shows that 2024 not only had the lowest sustained rate, but also the lowest number of sustained findings (64 sustained findings compared to 104 in 2020, the next lowest year). A preliminary review of sustained rates from January to June 2025 shows a general evening out across most race groups (4% to 6%), except for Hispanic members who had a higher rate (10%). (See *4.6. Do Year-to-Year Fluctuations in Sustained Rates Average Out Over Time?*)

**Table 2: Sustained Rates by Race 2020 to 2025**

| | 2020 | | 2021 | | 2022 | | 2023 | | 2024 | | 2020-2024 | 2025 Jan-Jun[5] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sust Rate | # Sust/ Total | Sust Rate | # Sust/ Total | Sust Rate | # Sust/ Total | Sust Rate | # Sust/ Total | Sust Rate | # Sust/ Total | **Sust Rate** | Sust Rate |
| **White** | 8% | 30/364 | 11% | 51/457 | 11% | 34/323 | 11% | 37/348 | 2% | 4/223 | **9%** | 6% |
| **Black** | 10% | 19/186 | 9% | 19/213 | 11% | 23/212 | 6% | 20/341 | 7% | 23/351 | **8%** | 6% |
| **Hispanic** | 9% | 35/ 386 | 9% | 40/434 | 9% | 30/317 | 8% | 40/512 | 6% | 25/425 | **8%** | 10% |
| **Asian/Filip** | 8% | 18/219 | 7% | 18/251 | 7% | 16/240 | 7% | 26/379 | 3% | 11/342 | **6%** | 4% |
| **Other/UNK** | 4% | 2/54 | 16% | 9/57 | 18% | 7/38 | 9% | 6/68 | 1% | 1/76 | **9%** | 6% |
| **Grand Total** | **9%** | **104/ 1209** | **9%** | **118/ 1345** | **9%** | **107/ 1136** | **8%** | **129/ 1648** | **5%** | **64/ 1417** | **8%** | **7%** |

## Changes in Discipline (2023 to 2024)

In 2024, discipline was imposed in 62 cases.[6] Of those 62 sustained cases, 52% resulted in more severe discipline (suspension or termination), compared to 44% in 2023. Class I cases, involving more serious misconduct, usually result in discipline of suspension or termination, which was the case in 2024. All received a suspension or termination, except for the only white member who was sustained for a Class I case, who instead received counseling. There was a change in Class II discipline between 2023 and 2024. White members had the highest rate of suspensions (67%, 2 of 3) in 2024, a switch from 2023 when Black members had the highest rate (46%, 6 of 13). See 6. Discipline Analyses.

## Recommendations

Our analyses produced the recommendations below. See also 7. Recommendations.

1. **Keep better record of internally discovered allegations.** Analyzing cases with an internal origin was important in identifying where disparity was more prominent. Therefore, looking at the origin of individual allegations would allow for an even more targeted analysis. While the Department has a way to track internally discovered violations, the field was left blank for 33% of allegations in 2024. Furthermore, the only data point tracked is whether or not the allegation was internally discovered. To determine whether disparity differs for allegations that originate within the Department, the Department should ensure that the internally discovered violation field is complete for all allegations. Complete and accurate tracking of internally discovered allegations seems critical to understanding where disparity might be occurring, including:
   - who discovered the violation,
   - who approved adding the allegation to the case,
   - when the allegation was added, and
   - the cause/reason for adding the allegation.

---

[5] The data reviewed for January to June 2025 is subject to change as case closure dates are finalized and updated.
[6] Discipline was not imposed in two cases that were sustained in 2024 due to the investigation exceeding the timeline allowed by California Government Code 3304.

The Department needs to improve its data collection to better understand when internal allegations are made, by whom, at what stage, and to put in place clear criteria and protocols to ensure that excessive discretion does not allow racial disparities to arise in this process, it would be important to study not only when internal allegations are added for officers of color, but also to review whether similar behavior by white officers might fail to lead to the addition of a similar internal allegation.

2. **Keep checking whether recent fluctuations constitute a trend.** The Department should continue to monitor sustained rates quarterly to see if the disparity identified in 2024 persists (as we do with Jan-Jun '25 in Table 2). The Department should also revise its methodology to place yearly findings in the context of previous years whenever possible. As Table 2 demonstrates, this provides a useful context to evaluate the magnitude of observed differences.

3. **Focus future analysis on fully investigated cases.** For future analyses, the Department should focus on fully investigated cases when identifying disparity in sustained rates since Summary Findings and Informal Complaint Resolutions (ICRs) do not result in sustained findings and, therefore, cannot exhibit disparity in sustained rates. However, prior to such a focus on full investigations it is important to make sure that there are no disparities in the rates of Summary Findings and ICRs, as disparities could be overlooked if cases against one group were unevenly dismissed before they come to a full investigation.

4. **Balance statistical significance with observed disparity.** The current methodology requires that we compute chi-squares to test statistical differences in disparity. While this tool is helpful in providing guidelines and cutoff points used to determine whether the data supports or refutes a relationship between two categories of data, it is not a perfect solution. Its utility is limited both because of the small numbers and the ability to compare only two variables. Therefore, in addition to using the statistical tools, we have to rely on common sense to decide which disparities are large enough to deserve attention, while being mindful that percentages derived from small datasets can be easily swayed by even minor fluctuations in the data.

5. **Collect qualitative data from department personnel.** The Department should gather qualitative data via interviews and focus groups with representatives from across the Department, including all ranks and bureaus, and members from police officer associations and unions to help assess high-level themes about how the results of this report impact sworn staff.

## 2. Methodology

The current report covers internal investigation cases involving sworn personnel that came to a finding in 2024 and includes an analysis of findings and discipline by race, gender, and rank for sworn personnel. The analysis follows the *Department's Working Methodology for Internal Affairs Disparity Analyses*, which includes analyses of findings and discipline by race, gender, and rank, and moderating and mediating variables, including:

- Type of investigation (DLI versus IA),
- Case origin (externally versus internally generated),
- Case seriousness (Class I vs. Class II)
- Type of allegations,
- Seniority and Age of officer, and
- Identity of investigator.

**What counts as a "finding."** For the purpose of the current analyses, we focused on findings for allegations made against sworn Department personnel that resulted from division-level investigations (DLI) or Internal Affairs Bureau investigations (IA). We therefore excluded findings based on the deliberations of collision, pursuit, and force boards because the findings for such cases are based on recommendations from a review board, not solely on the recommendations of an IA investigator or field sergeant. The investigative process for cases reviewed by a board is different than a typical internal investigation, involving more layers of review. Additionally, not all board findings are tracked by IAB. On-duty vehicle collisions, pursuits, and Level 2 uses of force that are found in compliance and have no parallel internal affairs investigation are not tracked by IAB, and therefore not included in our dataset. The only exception in the 2024 data is that we did include 4 cases involving an incident that was reviewed by a pursuit board, but where the IA investigation was for different, non-pursuit allegations.

**What counts as "2024."** This report covers cases that were approved by the Chief or Internal Affairs Bureau Commander in 2024. Cases that were concurrently investigated by the Department and the Community Police Review Agency (CPRA)[7] were included in the population, and for those cases, the date concurrence was reached between the Department and CPRA was used as the approval date. Some CPRA concurrent cases were completed by the Department in 2023 but reached concurrence with the CPRA in 2024, or were notified by the CPRA in 2024 that they would not be investigating the case, and were therefore covered in this report. Cases approved in 2024 had complaint dates (date the complaint was received by the Department) going back to 2022.

---

[7] The Community Police Review Agency (CPRA) is a civilian-run, community-centered police oversight agency that investigates allegations of misconduct by sworn officers. The CPRA generally investigates community complaints of serious misconduct. The CPRA is mandated by the City Charter to investigate public complaints about sworn officers involving police force, in-custody deaths, profiling based on a protected characteristic, untruthfulness, and First Amendment assemblies. All misconduct investigations conducted by the CPRA are also investigated by the Department. Findings and discipline for concurrently investigated cases are deliberated by IAB and the CPRA. In the event IAB and CPRA are unable to agree on a finding or the level of discipline, the case is presented to the Police Commission's Discipline Committee for a final decision. The findings included in this report are the final findings after agreement between IAB and CPRA, or review by the Discipline Committee.

**What counts as a "case."** A "case" is defined as any number of allegations that fall under a single internal affairs case number for a single employee. A case is thus determined by removing additional allegations against the same member in a case so the member is only counted one time per case. The data in this report is analyzed at both the allegation level and the case level.

**What counts as "sustained."** Internal investigations can be sustained, not sustained, exonerated, unfounded, informally resolved, or administratively closed. For purposes of this analysis, sustained findings are compared to all other findings ("sustained" versus "other than sustained"). An allegation of misconduct is sustained when the investigation discloses sufficient evidence to determine that the alleged conduct did occur and was in violation of law and/or Department rules, regulations or policies. A case is counted as "sustained" if any allegation against that particular officer in that case was sustained.

**What counts as a "fully investigated case**." Fully investigated cases go through the complete investigative process and exclude cases resolved via Summary Finding and Informal Complaint Resolution, and are the only cases that can result in a "Sustained" finding. Summary Findings are abbreviated investigations for which a finding of "Unfounded" or "Exonerated" can be determined by the existing documentation, evidence, statements, and crime information, with no or minimal follow-up required. An informal complaint resolution is an investigative outcome used under certain circumstances for Class II allegations that don't indicate a pattern of misconduct.

**What counts as "Class I versus Class II:"** Class I allegations of misconduct are the most serious allegations which, if sustained, can result in disciplinary action up to and including termination and may serve as the basis for criminal prosecution (e.g., unlawful force, untruthfulness, insubordination, and harassment). Class II allegations include all minor misconduct offenses.[8]

**What counts as "statistically significant."** We relied on 2 x 2 chi-square tests to assess the statistical significance of differences between proportions where a large enough sample size allowed it. Throughout this report, proportions in tables that were tested for significance are shaded in blue and any differences found to be statistically significant are marked in red. A chi-square test is a statistical test comparing observed frequencies (i.e., cell counts in a table) with expected frequencies. We start with the hypothesis that any two variables of interest, for example race and whether a case is sustained or not, are *not* associated. This is referred to in statistics as the Null hypothesis. The chi-square test helps determine if any observed differences can reasonably be attributed to chance alone, or whether it's more appropriate to reject the Null hypothesis that the two variables are not associated and conclude instead that there is a significant relationship between the two variables. Chi-square tests can therefore help identify if there is evidence of disparity in a sample above and beyond the normal differences that can be expected between any two sets of observed numbers – even if they were sampled from the exact same population. The *p* or probability value computed in a chi-square test is a number describing how likely it is that the obtained sample difference could have occurred in the absence of any actual difference in the population the samples are drawn from, i.e., by chance alone (the Null). The level of statistical significance is expressed as a p-value between 0 and 1. The smaller the p-value, the less likely the results occurred by random chance. For purposes of this analysis, the conventional p-value of less than 0.05 was considered statistically significant, indicating a likely association between variables.

---

[8] Department General Order M-03, *Complaints Against Department Personnel*, II.E.

Note that because the simple 2x2 chi-square formula that we used only allows pair-wise comparisons between any two categories, tests of significance for proportions involving race always contrasted non-white ethnicities against whites for the purpose of testing significance. Also, the Yates correction was used, which subtracts 0.5 from the numerical difference between the observed and expected frequencies and is made to account for the upward bias for a 2 x 2 contingency table when using the chi-square test.

**What counts as a "disparity."** Throughout this report, we use the word disparity to refer to differences in rates between groups, such as the difference in proportion of cases that came to a "Sustained" finding when comparing whites and Blacks. This only refers to a numerical difference between rates, and does not carry any assumption about the cause of the observed difference, or any aspersion about the personnel or structural processes involved in the production of those numbers. Additional work on moderators in our analysis (e.g., internal vs. external origin) casts some light on where disparities are the greatest and may give us some insight on causes, but the claim of a "disparity" is simply a numerical fact that is hopefully not controversial. Throughout this report, we will try to highlight noteworthy disparities when they arise.

# 3. Breakdown of the Number of Allegations and Cases

Excluding cases that were reviewed by a board (see 2. Methodology, What Counts as a Finding), there were 633 internal investigations approved in 2024 involving a sworn member. The 633 internal investigations had complaint dates (date the complaint was initially received by the Department) ranging between March 2022 and October 2024 – 14 in 2022, 332 in 2023, and 287 in 2024. The 633 investigations, each of which can involve multiple sworn members with potentially multiple allegations, covered a total of 2,109 allegations of misconduct, and resulted in 1,417 sworn member cases (See 2. Methodology, What Counts as a Sworn Member Case). These numbers represent a decrease from 2023. Between 2023 and 2024, the number of investigations involving a sworn member dropped by 8% (691 to 633). The number of allegations dropped by 21% (2680 to 2109) and number of sworn member cases dropped by 14% (1648 to 1417).

## 3.1. Are Members of Any Group Being Investigated More Often?

Table 3 contains the demographic breakdown of the Department as of December 2024 for reference, and the number of allegations and IAD cases (some of which may contain multiple allegations against a specific officer) that came to a finding in 2024. As of December 2024, there were 676 sworn personnel employed by the Department. There was very little change in the sworn member demographic breakdown between December 2023 and December 2024. Hispanic members made up the largest percentage of sworn personnel at 29%, followed by White members at 25% and Black members at 22%. Asian members made up 20% of sworn personnel. Male members made up 86% of the Department and Officers made up 78%.

Since 86% (1,215 of 1,417) of sworn member cases were against members assigned to patrol at the time the complaint was initiated, we looked at the demographic breakdown of the 394 members assigned to patrol in December 2024. White members were slightly underrepresented in patrol compared to the entire Department. Black and Asian members were slightly overrepresented in patrol compared to the entire Department. Hispanic and Other/Unknown members were represented nearly the same in patrol as the entire Department. It is important to note that the demographics of members assigned to patrol may change throughout the year due to personnel movement in the Department. Table 3 contains the demographics of sworn personnel assigned to patrol as of December 2024.

**Table 3: Demographic Breakdown of Department Personnel, Allegations, and Cases**

| | Sworn Personnel in the Department* | Sworn Personnel Assigned to Patrol* | Allegations against Sworn Personnel | Cases involving a Sworn Member | Sworn Members with one or more cases** |
|---|---|---|---|---|---|
| | **By Race** | | | | |
| **White** | 25% (169) | 21% (81) | 15% (312) | 16% (223) | 21% (95) |
| **Black** | 22% (145) | 24% (95) | 25% (537) | 25% (351) | 22% (103) |
| **Hispanic** | 29% (197) | 28% (112) | 31% (649) | 30% (425) | 30% (139) |
| **Asian/Filipino** | 20% (138) | 23% (89) | 23% (494) | 24% (342) | 22% (103) |
| **Other/Unknown** | 4% (27) | 4% (17) | 6% (117) | 5% (76) | 5% (21) |
| | **By Gender** | | | | |
| **Male** | 86% (578) | 86% (337) | 84% (1778) | 83% (1183) | 85% (391) |

| | | | | | |
|---|---|---|---|---|---|
| **Female** | 14% (98) | 14% (57) | 16% (331) | 17% (234) | 15% (70) |
| | **By Rank** | | | | |
| **Officer** | 78% (527) | 82% (323) | 94% (1991) | 94% (1331) | 88% (406) |
| **Sgt or Above** | 22% (149) | 18% (71) | 6% (118) | 6% (86) | 13% (58) |
| **TOTAL** | **676** | **394** | **2109** | **1417** | **461** |

*\*Source: December 2024 Police Staff Report.*
*\*\*Some sworn members received complaints as a police officer and as a supervisor in 2024. This can happen if a member is promoted during the time-period of review. Therefore, when looking at Rank, the total number of members is slightly higher.*

To assess whether differences in the percentage of cases by race were related to Department demographics, we looked at the percentage of each group among allegations, among sworn member cases and among members who received one or more cases by race (see Table 3). When comparing sworn member cases to Department demographics, we found that white sworn members received a lower percentage of cases (16%) than their representation of Department sworn personnel (25%). All other races received a higher percentage of cases than their Department representation. However, when looking at the breakdown of members who received one or more cases in 2024 (thus counting each member only once as being investigated, regardless of the number of cases -- 461 members out of a total of 676 sworn personnel), the percentage of white members with one or more cases (21%) was more in line with their department representation. This suggests that the percentage of white members who received a complaint in 2024 was only slightly below Department representation, but white members received fewer separate complaints (giving cause for fewer multiple cases) per officer than other races. For all other races, their percentage of members with one or more cases was nearly the same as their department representation.

We wanted to get a sense of sworn personnel's experience of dealing with allegations, and whether it differed by group. Table 4 provides the number of sworn personnel in each group who were investigated in at least one case that came to a finding in 2024 as a function of the size of that group at three different time points covering the entire period (Dec 23, Aug 24, and Dec 24). While it may at first glance seem straightforward to divide this number by the total number of sworn personnel in each group, this would be misleading because these cases could have originated in different quarters or even years, and the demographic composition of the Department is constantly changing with hiring, retirement, departures, etc. Having said this, we think the ratio of number of officers of a certain group being investigated at any given time is an important statistic to capture the experience of members of that group (to capture their perception of being targeted more/less than other groups), so we present these ratios below, but with the caveat that they do not capture actual proportions at any given time. We use the number of sworn members with one or more cases that came to a finding in 2024 as the numerator in all ratios, but use 3 different snapshots as denominators: December 2023, August 2024, and December 2024.

**Table 4: Ratio of Investigated Sworn Personnel in 2024, by Race**

| | Sworn Members with one or more cases closed during 2024 | As a Ratio of the Number of Sworn Officers of that Group in… | | |
| --- | --- | --- | --- | --- |
| | | Dec 23 | Aug 24 | Dec 24 |
| By Race | | | | |
| White | 95 | 49% (of 194) | 54% (of 175) | 56% (of 169) |
| Black | 103 | 66% (of 156) | 70% (of 148) | 71% (of 145) |
| Hispanic | 139 | 64% (of 217) | 70% (of 198) | 71% (of 197) |
| Asian/Filipino | 103 | 69% (of 149) | 73% (of 142) | 75% (of 138) |
| Other/Unknown | 21 | 72% (of 29) | 78% (of 27) | 78% (of 27) |
| TOTAL | 461 | 62% (of 745) | 67% (of 690) | 68% (of 676) |

While we again caution readers against taking these "proportions" too literally, these numbers interpreted broadly give us some insight into the experience of sworn personnel from each group. Notably, we see that while non-white sworn personnel experienced between two-thirds and three-quarters of their same-race colleagues being investigated (between 64% and 78%, depending on the estimate), for white members that number is closer to only half (between 49% and 56%, depending on the estimate). Regardless of the outcome of these investigations, this may already contribute to a feeling of racial disparity in the frequency of investigation for non-white groups, as the discrepancy in relative frequencies is large enough to be likely picked up by the members themselves through casual observation.

We also analyzed members who had multiple cases in 2024. To see if members of a specific race had a disproportionate number of multiple cases, we compare in Table 5 the number of members who had only one case to those who had more than one case. There were 461 members who had at least one case in 2024 and 70% of them had multiple cases. In 2024, white members were the least likely to have multiple cases (57%) which was significantly lower than Black, Hispanic and Asian members (74%, 71% and 79%), confirming the impression we formed based on Table 3.

Throughout this report, variables tested (2x2 chi-square test) are shaded in blue in our tables and any differences found to be statistically significant (by column) are in red. By race, white sworn members are used as the reference category, meaning it was the category of comparison for other races. For example, in Table 5 below, the 57% for white members was tested against the 74% for Black members (as indicated by the blue shading), and it was found to be statistically significant (as indicated by the fact that the numbers were in red); white members were sustained at a significantly lower rate than black members, p < .05. By contrast, the 57% for white members was tested against the 67% of Other/Unknown members and found not to be statistically significant (as indicated by the fact that the numbers were left in black). The chi-square test tables can be found in Appendix 1.

13

**Table 5: Cases per Sworn Member by Race 2024**

| Cases per Sworn Member | White Sworn | | Black Sworn | | Hispanic Sworn | | Asian Sworn | | Other/Unk Sworn | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | % | n | % | n | % | n | % | n | % | n | % | n |
| 13 | 0% | 0 | 2% | 2 | 0% | 0 | 0% | 0 | 0% | 0 | 0.4% | 2 |
| 12 | 0% | 0 | 1% | 1 | 0% | 0 | 0% | 0 | 0% | 0 | 0.2% | 1 |
| 10 | 1% | 1 | 1% | 1 | 0% | 0 | 0% | 0 | 5% | 1 | 1% | 3 |
| 9 | 0% | 0 | 0% | 0 | 1% | 2 | 0% | 0 | 10% | 2 | 1% | 4 |
| 8 | 0% | 0 | 4% | 4 | 3% | 4 | 4% | 4 | 0% | 0 | 3% | 12 |
| 7 | 3% | 3 | 5% | 5 | 4% | 5 | 6% | 6 | 5% | 1 | 4% | 20 |
| 6 | 4% | 4 | 4% | 4 | 7% | 10 | 8% | 8 | 5% | 1 | 6% | 27 |
| 5 | 4% | 4 | 9% | 9 | 8% | 11 | 11% | 11 | 0% | 0 | 8% | 35 |
| 4 | 6% | 6 | 12% | 12 | 12% | 16 | 9% | 9 | 19% | 4 | 10% | 47 |
| 3 | 12% | 11 | 16% | 16 | 14% | 19 | 20% | 21 | 10% | 2 | 15% | 69 |
| 2 | 26% | 25 | 21% | 22 | 23% | 32 | 21% | 22 | 14% | 3 | 23% | 104 |
| 1 | 43% | 41 | 26% | 27 | 29% | 40 | 21% | 22 | 33% | 7 | 30% | 137 |
| **Total** | **100%** | **95** | 100% | **103** | 100% | **139** | 100% | **103** | 100% | **21** | 100% | 461 |
| **More than One Case per Member** | **57%** | **54** | **74%** | **76** | **71%** | **99** | **79%** | **81** | 67% | 14 | 70% | 324 |
| **One Case per Member** | **43%** | **41** | **26%** | **27** | **29%** | **40** | **21%** | **22** | 33% | 7 | 30% | 137 |

Additionally, we calculated the percentage of members by race who had five or more cases in 2024. Of the 461 sworn members who had at least one case in 2024, 104 of them had five or more cases; 12 white members, 26 Black members, 32 Hispanic members, 29 Asian/Filipino members and 5 Other/Unknown members. Only 13% of the white members who had at least one case had 5 or more cases, compared to between 23% and 28% for all other races.

## 3.2. Did Officers from Any Given Group Receive More Allegations Per Case?

Because the bulk of our analyses in this report focuses on the "case" level of analysis, we first wanted to check whether there were any differences in the number of allegations within any case depending on the subject's race, gender, and rank. Note that, contrary to an officer being involved in multiple cases (described above), which has no effect on sustained rates per case, having multiple allegations in a case is likely to affect sustained rates directly because with more allegations in the case, the greater the likelihood that at least one of them is found sustained, which is all we need to count a case as sustained. In fact, this proved true in the 2024 data, with the sustained rate increasing as the number of allegations per case increased. The sustained rate for one allegation per case was 2%, compared to 9% for more than one allegation per case.

14

Of the 2,109 allegations of misconduct and 1,417 sworn member cases in 2024, 68% contained only one allegation, while 21% contained two allegations and the remaining 11% contained between three and eight. These 32% of cases with more than one allegation in 2024 can be compared with 39% in 2022 and 2023 – and this drop in the proportion of multi-allegation cases is observable across groups.

Tables 6 to 8 display the number of allegations by race, by gender, and by rank ("officer" and "sergeant and above"). In 2024, no race group differed significantly from white members in the proportion of cases involving more than one allegation per case (p > 0.05 in all chi-square tests performed, see our Methodology section for more details). By rank, officers did not differ significantly either in whether they received more than one allegation per case for sergeants and above. However, male sworn members did have a significantly higher percentage of cases with more than one allegation per case than female members (p < .05). This contrasts with 2023, when female members had a higher percentage than males.

**Table 6: Number of Allegations per Case by Race or Ethnicity 2024**

| # of Alleg Per Case | White Sworn | | Black Sworn | | Hispanic Sworn | | Asian Sworn | | Other/Unk Sworn | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | % | n | % | n | % | n | % | n | % | n | % | n |
| 1 | 71.3% | 159 | 64.4% | 226 | 68.2% | 290 | 69.9% | 239 | 67.1% | 51 | 68.0% | 965 |
| 2 | 22.0% | 49 | 23.9% | 84 | 18.6% | 79 | 19.9% | 68 | 19.7% | 15 | 20.9% | 295 |
| 3 | 4.0% | 9 | 8.3% | 29 | 8.7% | 37 | 7.3% | 25 | 9.2% | 7 | 7.5% | 107 |
| 4 | 1.3% | 3 | 2.0% | 7 | 2.6% | 11 | 2.0% | 7 | 1.3% | 1 | 2.0% | 29 |
| 5 | 0.9% | 2 | 1.1% | 4 | 0.9% | 4 | 0.6% | 2 | 1.3% | 1 | 1.0% | 13 |
| 6 | 0.4% | 1 | 0.0% | 0 | 0.7% | 3 | 0.3% | 1 | 1.3% | 1 | 0.4% | 6 |
| 7 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 |
| 8 | 0.0% | 0 | 0.3% | 1 | 0.2% | 1 | 0.0% | 0 | 0.0% | 0 | 0.1% | 2 |
| **Total** | **100%** | **223** | **100%** | **351** | **100%** | **425** | **100%** | **342** | **100%** | **76** | **100%** | **1417** |
| **1 Alleg per case** | 71% | 159 | 64% | 226 | 68% | 290 | 70% | 239 | 67% | 51 | 68% | 965 |
| **More than 1 Alleg per case** | 29% | 64 | 36% | 125 | 32% | 135 | 30% | 103 | 33% | 25 | 32% | 452 |

15

**Table 7: Allegations per Case by Gender 2024**

| # of Alleg Per Case | Male Sworn | | Female Sworn | | Total | |
|---|---|---|---|---|---|---|
| | % | n | % | n | % | n |
| 1 | 67% | 798 | 74% | 167 | 68% | 965 |
| 2 | 22% | 261 | 15% | 34 | 21% | 295 |
| 3 | 7% | 88 | 8% | 19 | 8% | 107 |
| 4 | 2% | 26 | 1% | 3 | 2% | 29 |
| 5 | 1% | 12 | 0% | 1 | 1% | 13 |
| 6 | 0.5% | 6 | 0% | 0 | 0.4% | 6 |
| 7 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 |
| 8 | 0.1% | 1 | 0% | 1 | 0.1% | 2 |
| **Total** | **100%** | **1192** | **100%** | **225** | **100%** | **1417** |
| **1 Alleg per case** | **67%** | **798** | **74%** | **167** | 68% | 965 |
| **More than 1 Alleg per case** | **33%** | **394** | **26%** | **58** | 32% | 452 |

**Table 8: Allegations per Case by Rank 2024**

| # of Alleg Per Case | Officer Sworn | | Sgt and Above Sworn | | Total | |
|---|---|---|---|---|---|---|
| | % | n | % | n | % | n |
| 1 | 68% | 900 | 76% | 65 | 68% | 965 |
| 2 | 21% | 281 | 16% | 14 | 21% | 295 |
| 3 | 8% | 104 | 3% | 3 | 8% | 107 |
| 4 | 2% | 25 | 5% | 4 | 2% | 29 |
| 5 | 1% | 13 | 0.0% | 0 | 1% | 13 |
| 6 | 0.5% | 6 | 0.0% | 0 | 0.4% | 6 |
| 7 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 |
| 8 | 0.2% | 2 | 0.0% | 0 | 0.1% | 2 |
| **Total** | **100%** | **1331** | **100%** | **86** | **100%** | **1417** |
| **1 Alleg per case** | 68% | 900 | 76% | 65 | 68% | 965 |
| **More than 1 Alleg per case** | 32% | 431 | 24% | 21 | 32% | 452 |

## 3.3. Did the Type of Allegations Differ by Group?

Next, allegations were reviewed by type to see if a particular race, gender, or rank received a disparate proportion of a particular violation. The top allegations in 2024 aligned with the top allegations in 2023. For the 2024 analysis, we listed the top 10 allegations received, as opposed to the top 6 in 2023. The top four allegations in 2024 (comprising 88% of levied allegations) were the same as 2023: *Performance of Duty Unintentional/Improper Search, Seizure or Arrest; Performance of Duty General; Use of Force;* and *Conduct Toward Others. Performance of Duty - Care of Property* was the fifth highest allegation in 2024 compared to *Failure to Accept or Refer a Complaint* which was the fifth highest in 2023.

16

The percentage of allegation type was relatively consistent across race and gender. There were larger differences for rank, but this may be explained by the difference in job function. Officers make arrests more often than their superiors and are therefore more often the target of allegations related to improper search, seizure and use of force. Tables 9 to 11 display the breakdown of violation type by race, gender and rank.

**Table 9: Top Allegations by Race 2024**

| Allegation | White Sworn | | Black Sworn | | Hispanic Sworn | | Asian Sworn | | Other/ Unk Sworn | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | % | n | % | n | % | n | % | n | % | n | % | n |
| **Performance of Duty – Unintentional/ Improper Search, Seizure or Arrest** | 46% | 142 | 41% | 219 | 44% | 286 | 41% | 201 | 42% | 49 | 42.5% | 897 |
| **Performance of Duty – General** | 18% | 56 | 19% | 102 | 17% | 113 | 21% | 103 | 20% | 23 | 18.8% | 397 |
| **Use of Force** | 17% | 54 | 18% | 96 | 16% | 106 | 19% | 96 | 23% | 27 | 18.0% | 379 |
| **Conduct Towards Others** | 8% | 25 | 9% | 47 | 9% | 58 | 9% | 42 | 9% | 10 | 8.6% | 182 |
| **Performance of Duty – Care of Property** | 2% | 7 | 4% | 22 | 3% | 17 | 5% | 23 | 1% | 1 | 3.3% | 70 |
| **Failure to Accept or Refer a Complaint – Unintentional** | 3% | 8 | 1% | 6 | 1% | 8 | 0% | 2 | 0% | 0 | 1.1% | 24 |
| **Refusal to Provide Name or Serial Number** | 1% | 3 | 1% | 5 | 1% | 4 | 1% | 6 | 2% | 2 | 1.0% | 20 |
| **Performance of Duty – Miranda Violation** | 1% | 2 | 1% | 4 | 1% | 6 | 1% | 6 | 0% | 0 | 0.9% | 18 |
| **Performance of Duty – PDRD** | 0% | 0 | 1% | 5 | 0% | 3 | 1% | 4 | 3% | 4 | 0.8% | 16 |
| **Truthfulness** | 0% | 1 | 1% | 3 | 1% | 7 | 0% | 1 | 0% | 0 | 0.6% | 12 |

**Table 10: Top Allegations by Gender 2024**

| Allegation | Male Sworn | | Female Sworn | | Total | |
|---|---|---|---|---|---|---|
| | % | n | % | n | % | n |
| Performance of Duty – Unintentional/ Improper Search, Seizure or Arrest | 42% | 747 | 45% | 150 | 43% | 897 |
| Performance of Duty – General | 19% | 331 | 20% | 66 | 19% | 397 |
| Use of Force | 18% | 323 | 17% | 56 | 18% | 379 |
| Conduct Towards Others | 9% | 158 | 7% | 24 | 9% | 182 |
| Performance of Duty – Care of Property | 4% | 64 | 2% | 6 | 3% | 70 |
| Failure to Accept or Refer a Complaint – Unintentional | 1% | 19 | 2% | 5 | 1% | 24 |
| Refusal to Provide Name or Serial Number | 1% | 15 | 2% | 5 | 1% | 20 |
| Performance of Duty – Miranda Violation | 1% | 13 | 2% | 5 | 1% | 18 |
| Performance of Duty – PDRD | 1% | 13 | 1% | 3 | 1% | 16 |
| **Truthfulness** | **1%** | **12** | **0%** | 0 | **1%** | **12** |

**Table 11: Top Allegations by Rank 2024**

| Allegation | Officer Sworn | | Sgt and Above Sworn | | Total | |
|---|---|---|---|---|---|---|
| | % | n | % | n | % | n |
| Performance of Duty – Unintentional/ Improper Search, Seizure or Arrest | 44% | 871 | 22% | 26 | 43% | 897 |
| Performance of Duty – General | 19% | 371 | 22% | 26 | 19% | 397 |
| Use of Force | 18% | 364 | 13% | 15 | 18% | 379 |
| Conduct Towards Others | 8% | 169 | 11% | 13 | 9% | 182 |
| Performance of Duty – Care of Property | 3% | 63 | 6% | 7 | 3% | 70 |
| Failure to Accept or Refer a Complaint – Unintentional | 1% | 16 | 7% | 8 | 1% | 24 |
| Refusal to Provide Name or Serial Number | 1% | 20 | 0% | 0 | 1% | 20 |
| Performance of Duty – Miranda Violation | 1% | 17 | 1% | 1 | 1% | 18 |
| Performance of Duty – PDRD | 1% | 16 | 0% | 0 | 1% | 16 |
| Truthfulness | 1% | 12 | 0% | 0 | 1% | 12 |

## 3.4. Did the Seriousness of the Allegation (Class I Versus Class II) Differ by Group?

We reviewed the seriousness of the allegations (Class I versus Class II) to see if a particular race, gender, or rank disproportionately received Class I or Class II allegations. Class I allegations are the most serious allegations that can result in discipline up to termination, while Class II allegations involve less serious misconduct. The breakdown of allegations by Class for race, gender and rank in 2024 was also compared to 2023 to see if any group saw a shift in the seriousness of the allegations they received.

The percentage of Class I and Class II allegations was relatively consistent across race, gender, and rank in 2024. The percentage of Class I allegations across all groups ranged between 23% and 26% and the percentage of Class II allegations ranged between 74% and 77%. When comparing 2023 and 2024 percentages, the breakdown changed very little for race and gender. For rank, the breakdown in 2023 differed from 2024. In 2024, officers and sergeants and above had the exact same percentage of Class I and Class II allegations. However, in 2023, sergeants and above had a higher percentage of Class I allegations (33%) than officers (23%). In 2024, there were no groups that had a disproportionately high percentage of Class I or Class II allegations. Tables 12 to 14 display the breakdown of allegation class by race, gender and rank.

**Table 12: Allegations – Allegation Class Percentages by Race 2023 Versus 2024**

|  | Class I Allegations 2023 | | Class II Allegations 2023 | | Class I Allegations 2024 | | Class II Allegations 2024 | |
|---|---|---|---|---|---|---|---|---|
|  | % Total | n | % Total | n | % Total | n | % Total | n |
| White | 22% | 124 | 77% | 428 | 23% | 71 | 77% | 241 |
| Black | 24% | 138 | 75% | 427 | 25% | 133 | 75% | 404 |
| Hispanic | 24% | 202 | 76% | 629 | 25% | 162 | 75% | 487 |
| Asian/Filipino | 25% | 152 | 75% | 460 | 25% | 123 | 75% | 371 |
| Other/Unknown | 31% | 36 | 69% | 79 | 26% | 31 | 74% | 86 |
| **Grand Total** | **24%** | **652** | **75%** | **2023** | **25%** | **520** | **75%** | **1589** |

**Table 13: Allegations – Allegation Class Percentages by Gender 2023 Versus 2024**

|  | Class I Allegations 2023 | | Class II Allegations 2023 | | Class I Allegations 2024 | | Class II Allegations 2024 | |
|---|---|---|---|---|---|---|---|---|
|  | % Total | n | % Total | n | % Total | n | % Total | n |
| Male | 24% | 562 | 76% | 1766 | 25% | 444 | 75% | 1334 |
| Female | 26% | 90 | 73% | 257 | 23% | 76 | 77% | 255 |
| **Grand Total** | **24%** | **652** | **75%** | **2023** | **25%** | **520** | **75%** | **1589** |

**Table 14: Allegations – Allegation Class Percentages by Rank 2023 Versus 2024**

|  | Class I Allegations 2023 | | Class II Allegations 2023 | | Class I Allegations 2024 | | Class II Allegations 2024 | |
|---|---|---|---|---|---|---|---|---|
|  | % Total | n | % Total | n | % Total | n | % Total | n |
| Officer | 23% | 568 | 76% | 1849 | 25% | 490 | 75% | 1501 |
| Sgt and Above | 33% | 84 | 67% | 174 | 25% | 30 | 75% | 88 |
| **Grand Total** | **24%** | **652** | **75%** | **2023** | **25%** | **520** | **75%** | **1589** |

## 3.5. Did the Type of Investigation Differ by Group?

It is important to assess the breakdown in type of investigations before getting to the analysis of sustained rates because Summary Findings or Informally Resolved Cases can by definition never result in a "sustained" finding. Thus, before a full investigation is conducted, the decision to assign a case or allegation to a Summary Finding or an ICR is determinative of the finding (i.e., other than sustained). We therefore focus on this upstream breakdown here and return to the issue of type of investigation as a moderator when we conduct our analysis of sustained rates in Section *4. Proportion of Cases with a "Sustained" Finding* and Section *5. Focusing on Fully Investigated Cases*.

As described above (see *2. Methodology*), fully investigated cases (352 of 1,417 cases in 2024, or 25%) go through the complete investigative process and exclude cases resolved via Summary Finding and ICR, and are the only cases that can result in a "Sustained" finding. Summary Findings are abbreviated investigations for which a finding of unfounded or exonerated can be determined by the existing documentation, evidence, statements, and crime information, with no or minimal follow-up required. An informal complaint resolution is an investigative outcome used under certain circumstances for Class II allegations that don't indicate a pattern of misconduct.

Table 15 Shows the percentage of each investigation type by race. Importantly, the percentage of cases yielding a summary finding (across IA and DLI) or an informal complaint resolution was similar for each race group, ranging from 73% for Black personnel to 76% for whites, not significant.

**Table 15: Member Cases - Type of Investigation Percentages by Race 2024**

|  | DLI Summary Finding | | IAD Summary Finding | | Informal Complaint Resolution | | DLI Full Invest | | Internal Affairs Full Invest | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | % Total | n | % Total | n | % Total | n | % Total | n | % Total | n |
| White | 74% | 164 | 1% | 3 | 1% | 2 | 17% | 39 | 7% | 15 |
| Black | 70% | 244 | 1% | 3 | 2% | 6 | 23% | 82 | 5% | 16 |
| Hispanic | 70% | 299 | 2% | 10 | 2% | 10 | 21% | 88 | 4% | 18 |
| Asian/Filipino | 74% | 252 | 1% | 2 | 3% | 11 | 19% | 65 | 4% | 12 |
| Other/Unknown | 75% | 57 | 1% | 1 | 1% | 1 | 21% | 16 | 1% | 1 |
| **Grand Total** | **72%** | **1016** | **1%** | **19** | **2%** | **30** | **20%** | **290** | **4%** | **62** |

Table 16 and 17 show similar breakdowns for gender and rank. We don't observe a sizeable gender difference in the use of summary findings (76% for women, vs. 72% for men), but rank is strongly correlated with the kind of investigation, with 51% of cases for Sgt and above being fully investigated, versus only 23% for rank-and-file officers, significant, p < .001.

**Table 16: Member Cases - Type of Investigation Percentages by Gender 2024**

| | DLI Summary Finding | | IAD Summary Finding | | Informal Complaint Resolution | | DLI Full Invest | | Internal Affairs Full Invest | |
|---|---|---|---|---|---|---|---|---|---|---|
| | % Total | n | % Total | n | % Total | n | % Total | n | % Total | n |
| Female | 74% | 173 | 2% | 4 | 1% | 2 | 21% | 48 | 3% | 7 |
| Male | 71% | 843 | 1% | 15 | 2% | 28 | 20% | 242 | 5% | 55 |
| **Grand Total** | **72%** | **1016** | **1%** | **19** | **2%** | **30** | **20%** | **290** | **4%** | **62** |

**Table 17: Member Cases - Type of Investigation Percentages by Rank 2024**

| | DLI Summary Finding | | IAD Summary Finding | | Complaint Resolution | | DLI Full Invest | | Internal Affairs Full Invest | |
|---|---|---|---|---|---|---|---|---|---|---|
| | % Total | n | % Total | n | % Total | n | % Total | n | % Total | n |
| Police Officer | 73% | 975 | 1% | 18 | 2% | 30 | 20% | 266 | 3% | 42 |
| Sgt and Above | 48% | 41 | 1% | 1 | 0% | 0 | 28% | 24 | 23% | 20 |
| **Grand Total** | **72%** | **1016** | **1%** | **19** | **2%** | **30** | **20%** | **290** | **4%** | **62** |

While not directly relevant to the disparity analysis in this report, we noted in the course of these Type of Investigation analyses that the number of cases investigated by IAB dropped dramatically from 297 in 2023 to only 81 in 2024[9]. By contrast, the number of DLI cases did not change much (1,314 versus 1,306 cases, respectively). There were 39 (25 Class I and 14 Class II) IA investigations in 2024, involving 81 sworn member cases and 166 allegations. In 2023, there were 87 (57 Class I and 30 Class II) IA investigations involving 297 sworn member cases and 624 allegations.

There was also an increase in DLI Summary Findings in 2024. In 2023, 63% of the 1314 DLIs were Summary Findings. In 2024, 78% of the 1306 DLIs were Summary Findings. The Summary Finding rate for IA investigations stayed the same (23%).

---

[9] The allegations which saw the biggest drop in IA investigations were: Performance of Duty – Unintentional/Improper Search, Seizure or Arrest (125 to 24); Use of Physical Force Comparable to Level 4 (84 to 14); Performance of Duty – General (80 to 27); Conduct Toward Others – Demeanor (42 to 6); Failure to Accept or Refer a Complaint Unintentional (31 to 6); Performance of Duty – Care of Property (30 to 8); General Conduct (24 to 4); Performance of Duty – PDRD (22 to 3); Reports and Bookings (17 to 3).

# 4. Proportion of Cases with a "Sustained" Finding

As specified in the Methodology, a case was considered sustained if any of the allegations targeted at the officer in question for this incident were sustained. Sustained rates were calculated for each independent variable (race, gender, rank) and broken down by moderating variables (investigation type and case origin). Chi-square tests were used to determine whether any differences between sustained rates were statistically significant.

## 4.1. Is One Group More Likely to be Sustained?

As presented in Table 1 (repeated below, *see 1. Executive Summary*), 5% of all cases (64 out of 1417) involving a sworn member were sustained in 2024, a drop from 8% in 2023. However, this drop was especially pronounced for white members, who went from an 11% sustained rate in 2023 to 2% in 2024. By contrast, the sustained rate for Black sworn members remained similar, from 6% to 7%. As a result, whereas white sworn members were significantly more likely to be sustained than Black sworn members in 2023, we observed the opposite in 2024, with both Black and Hispanic members significantly more likely to be sustained than white members. There was no significant difference between white members and their Asian/Filipino or Other Unknown colleagues.

**Table 1 (repeated from p. 4): Sustained Rates by Race 2023 Versus 2024**

|  | 2023 | | | 2024 | | |
|---|---|---|---|---|---|---|
|  | % Sust | # Sust | Tot | % Sust | # Sust | Tot |
| **White** | **11%** | **37** | **348** | **2%** | **4** | **223** |
| **Black** | **6%** | **20** | **341** | **7%** | **23** | **351** |
| **Hispanic** | 8% | 40 | 512 | 6% | 25 | 425 |
| **Asian/Filipino** | 7% | 26 | 379 | 3% | 11 | 342 |
| **Other/Unknown** | 9% | 6 | 68 | 1% | 1 | 76 |
| **Total** | **8%** | **129** | **1648** | **5%** | **64** | **1417** |

Cases involving male members were sustained at about the same rate (54 of 1183, or 5%) as cases involving female officers (10 of 234, or 4%). Cases involving sergeants or above were sustained 8% of the time (7 of 86), which was higher but not statistically different from the rate for officers, 4% (57 of 1274).

The most notable finding in this report is the unusually low number of white-member sustained cases in 2024 (4 for the whole year), far lower than Black (23) and Hispanic (25) sustained member cases. This was a huge shift from 2023, when white members had the second highest number of sustained cases (37) and the highest sustained rate (11%).

Note that the fact that white cases were sustained at a lower rate does not seem to be the result of white officers receiving fewer allegations per case (which is one possible pathway to disparity at the case level because more allegations per case increases the likelihood that at least one of them is sustained) since we found earlier that the percentage of white members with only one allegation per case did not differ significantly from other groups (See *3.2. Did Officers From Any Given Group Receive More Allegations Per Case?*). We did find that any investigated white officer was less likely to be the target of multiple investigations than members of other groups, but this has no bearing on the sustained rates computed here and therefore does not provide an explanation for it.

While it is difficult to identify patterns with so few sustained white-member cases, the low number of white-member sustained cases prompted additional analysis of sustained rates by race. The remainder of this report includes analysis of moderating and mediating variables to help identify where the difference was occurring and if any factors might be contributing to the disparity. The analysis is broken down by type of investigation; origination of case; type of allegations; and specific investigators. We also checked whether other variables such as age and tenure could explain the difference.

## 4.2. Is It Because White Officers Are Older?

One explanation sometimes put forward to make sense of the disparity in sustained rates between races is that as a result of the Department's recent effort to diversify its workforce, non-white officers are over-represented among junior officers. If junior officers are more likely to receive sustained allegations because (1) they spend more time in the field and/or (2) they are more likely to make mistakes in applying policy and following rules, this logic goes, the fact that more junior officers are non-white would lead to a misleading impression of racial disparity that is simply the result of the demographics of the department and expectable differences due to seniority.

To test this interpretation, we break down the case sustained rates in Table 18 below by both ethnicity and time since sworn. These data do not support the "whites are just older" interpretation. First, we see that sustained rates are not particularly higher for rookie officers: at 5%, they are similar to the rates for cases against officers with 2-5 years seniority (5%) and even over 10 years (6%). Only in the 5-10 years range is the rate a little lower at 3%. And second, we see the race difference in sustained rates surface at every level of seniority: even among rookie officers, the rate for Blacks (6%) and Hispanics (7%) differs from the rate for whites (0%). So the explanation for the racial disparity does not seem to come from the fact that non-white officers are more junior.

**Table 18: Sustained Rates by Seniority**

| Seniority | Race Clean | Sustained | | Other than Sustained | | Total |
|---|---|---|---|---|---|---|
| | | % | n | % | n | |
| **Less than 2 yrs** | White | 0% | | 100% | 59 | 59 |
| | Black | 6% | 9 | 94% | 148 | 157 |
| | Hispanic | 7% | 11 | 93% | 141 | 152 |
| | Asian/Filipino | 4% | 4 | 96% | 95 | 99 |
| | Other/Unk. | 3% | 1 | 97% | 29 | 30 |
| **< 2 yrs Total** | | 5% | 25 | 95% | 472 | 497 |
| **2-5 yrs** | White | 0% | | 100% | 25 | 25 |
| | Black | 9% | 7 | 91% | 74 | 81 |
| | Hispanic | 6% | 8 | 94% | 117 | 125 |
| | Asian/Filipino | 2% | 2 | 98% | 103 | 105 |
| | Other/Unk. | 0% | | 100% | 15 | 15 |
| **2-5 yrs Total** | | 5% | 17 | 95% | 334 | 351 |
| **5-10 yrs** | White | 3% | 2 | 98% | 78 | 80 |
| | Black | 5% | 4 | 95% | 70 | 74 |
| | Hispanic | 2% | 2 | 98% | 115 | 117 |

|  | Asian/Filipino | 4% | 4 | 96% | 85 | 89 |
|---|---|---|---|---|---|---|
|  | Other/Unk. | 0% |  | 100% | 30 | 30 |
| **5-10 yrs Total** |  | 3% | 12 | 97% | 378 | 390 |
| **Over 10 yrs** | White | 3% | 2 | 97% | 57 | 59 |
|  | Black | 8% | 3 | 92% | 36 | 39 |
|  | Hispanic | 13% | 4 | 87% | 27 | 31 |
|  | Asian/Filipino | 2% | 1 | 98% | 48 | 49 |
|  | Other/Unk. | 0% |  | 100% | 1 | 1 |
| **> 10 yrs Total** |  | 6% | 10 | 94% | 169 | 179 |
|  | **Grand Total** | 5% | 64 | 95% | 1353 | **1417** |

As another test of this interpretation, Table 19 breaks down sustained rates by age of the officer and race. Again we see that there is no clear relationship between age and sustained rates, as the progression by age group is 6%, 3%, 5%, 4%, and 6%, hardly a linear trend. One thing that this analysis reveals is that the only 4 sustained cases against white sworn personnel were all for white male members older than 40 years of age, 2 sergeants who had served longer than 10 years, and 2 officers who had served between 5 and 10 years. But not a single white officer under the age of 40 (or, per the table above, with less than 5 years of seniority) was sustained.

**Table 19 – Sustained Cases by Age of Officer**

| Age | Race Clean | Sustained | | Other than Sustained | | Total |
|---|---|---|---|---|---|---|
|  |  | % | n | % | n |  |
|  | White | 0% |  | 100% | 17 | 17 |
|  | Black | 0% |  | 100% | 25 | 25 |
| **20-25** | Hispanic | 11% | 5 | 89% | 39 | 44 |
|  | Asian/Filipino | 6% | 1 | 94% | 16 | 17 |
|  | Other/Unk. | 0% |  | 100% | 5 | 5 |
| **20-25 TOTAL** |  | 6% | 6 | 94% | 102 | 108 |
|  | White | 0% |  | 100% | 33 | 33 |
|  | Black | 4% | 4 | 96% | 102 | 106 |
| **25-30** | Hispanic | 4% | 5 | 96% | 127 | 132 |
|  | Asian/Filipino | 4% | 3 | 96% | 70 | 73 |
|  | Other/Unk. | 3% | 1 | 97% | 29 | 30 |
| **25-30 TOTAL** |  | 3% | 13 | 97% | 361 | 374 |
|  | White | 0% |  | 100% | 49 | 49 |
|  | Black | 7% | 8 | 93% | 102 | 110 |
| **30-35** | Hispanic | 7% | 8 | 93% | 110 | 118 |
|  | Asian/Filipino | 4% | 4 | 96% | 110 | 114 |
|  | Other/Unk. | 0% |  | 100% | 20 | 20 |
| **30-35 TOTAL** |  | 5% | 20 | 95% | 391 | 411 |
| **35-40** | White | 0% |  | 100% | 47 | 47 |
|  | Black | 15% | 7 | 85% | 40 | 47 |

| | | | | | |
|---|---|---|---|---|---|
| | Hispanic | 3% | 2 | 97% | 72 | 74 |
| | Asian/Filipino | 0% | | 100% | 70 | 70 |
| | Other/Unk. | 0% | | 100% | 16 | 16 |
| **35-40 TOTAL** | | 4% | 9 | 96% | 245 | 254 |
| **Over 40** | White | 5% | 4 | 95% | 73 | 77 |
| | Black | 6% | 4 | 94% | 59 | 63 |
| | Hispanic | 9% | 5 | 91% | 52 | 57 |
| | Asian/Filipino | 4% | 3 | 96% | 65 | 68 |
| | Other/Unk. | 0% | | 100% | 5 | 5 |
| **Over 40 TOTAL** | | 6% | 16 | 94% | 254 | 270 |
| **Grand Total** | | **5%** | **64** | **95%** | **1353** | **1417** |

These analyses clearly demonstrate that the racial disparity in sustained rates is not the result of non-white officers simply being younger or more junior in the job.

## 4.3. Do Division-Level Investigations Differ from Internal Affairs Investigations?

The second moderator variable we looked at was by investigation type. The data (1,417 cases) was split into two categories: Division Level Investigations (DLI) together with DLI Summary Findings[10] on the one hand (1,306 cases); and Internal Affairs (IA) investigations together with IA Summary Findings on the other (81 cases). DLIs are generally conducted by field sergeants and typically contain less serious allegations. IA investigations involve the most serious allegations and are conducted by supervisors assigned to IAB. The purpose of looking at the investigative type is to determine if there are differences in sustained rates based on the entity conducting the investigation. Informally resolved[11] cases (30 of 1,417, or 2%) were not included in this analysis because they usually proceed through a different process, that does not usually involve a DLI or IA investigation.

Table 20 below presents sustained rates broken down by race and type of investigation. The overall sustained rate for DLIs was 4% (49 of 1306) versus 19% (15 of 81) for IA investigations. In 2024, Black members had the highest sustained rate for DLIs (6%), followed by Hispanic members (4%). Hispanic members had the highest sustained rate for IA investigations (29%), followed by Black members (26%). Aside from Other/Unknown, white members had the lowest sustained rate for both DLI (1%) and IA investigations (6%). As always, the percentages in red below differ significantly according to a chi-square analysis (see Appendix), with white members as the compared group. So, for example, the 7% for Black members is statistically different from the 2% for white members when looking at all investigations, p < .05. The number of cases investigated by IA was too low to allow for statistical testing, but a look at the numbers certainly does not suggest that the racial disparity is concentrated in DLI investigations, since IA cases involving whites (6% sustained with 1 sustained case) do not yield the high sustained rates observed for Black (26%) or Hispanic (29%) IA cases.

---

[10] A Summary Finding is an abbreviated internal investigation in which a finding can be reached without conducting a full formal internal investigation because the correct finding can be determined with no or minimal follow-up and be based on the existing documentation, evidence, statements, and crime information data.

[11] An informal complaint resolution is an investigative outcome used under certain circumstances for Class II allegations that don't indicate a pattern of misconduct.

**Table 20: Sustained Rate by Race 2024 (Full Investigations and Summary Findings)**

| | All Investigations | | | DLIs and DLI Summary Findings | | | IA Investigations and IA Summary Findings | | |
|---|---|---|---|---|---|---|---|---|---|
| | % Sust | # Sust | Tot | % Sust | # Sust | Tot | % Sust | # Sust | Tot |
| **White** | **2%** | **4** | **223** | **1%** | **3** | **203** | 6% | 1 | 18 |
| **Black** | **7%** | **23** | **351** | **6%** | **18** | **326** | 26% | 5 | 19 |
| **Hispanic** | **6%** | **25** | **425** | 4% | 17 | 387 | 29% | 8 | 28 |
| Asian/Filipino | 3% | 11 | 342 | 3% | 10 | 317 | 7% | 1 | 14 |
| Other/Unknown | 1% | 1 | 76 | 1% | 1 | 73 | 0% | 0 | 2 |
| Total | 5% | 64 | 1417 | 4% | 49 | 1306 | 19% | 15 | 81 |

Note that, by contrast, in 2023, white members had among the highest sustained rates for both DLI and IA investigations and Black members had among the lowest. However, there was no statistically significant difference in sustained rates in 2023 between white members and other races for either DLIs or IA investigations.

Tables 21 and 22 below present similar breakdowns for gender and rank, and we observe no significant differences.

**Table 21: Sustained Rate by Gender 2024 (Full Investigations and Summary Findings)**

| | All Investigations | | | DLIs and DLI Summary Findings | | | IA Investigations and IA Summary Findings | | |
|---|---|---|---|---|---|---|---|---|---|
| | % Sust | # Sust | Tot | % Sust | # Sust | Tot | % Sust | # Sust | Tot |
| **Male** | 5% | 54 | 1183 | 4% | 41 | 1085 | 19% | 13 | 70 |
| **Female** | 4% | 10 | 234 | 4% | 8 | 221 | 18% | 2 | 11 |
| **Total** | 5% | 64 | 1417 | 4% | 49 | 1306 | 19% | 15 | 81 |

**Table 22: Sustained Rate by Rank 2024 (Full Investigations and Summary Findings)**

| | All Investigations | | | DLIs and DLI Summary Findings | | | IA Investigations and IA Summary Findings | | |
|---|---|---|---|---|---|---|---|---|---|
| | % Sust | # Sust | Tot | % Sust | # Sust | Tot | % Sust | # Sust | Tot |
| **Officer** | 4% | 57 | 1331 | 4% | 46 | 1241 | 18% | 11 | 60 |
| **Sgt and Above** | 8% | 7 | 86 | 5% | 3 | 65 | 19% | 4 | 21 |
| **Total** | 5% | 64 | 1417 | 4% | 49 | 1306 | 19% | 15 | 81 |

In summary, it does not seem that comparing sustained rates by race in DLI versus IA investigations gives us much insight into the factors leading to the observed racial disparity. Sustained rates were higher in IA than in DLIs overall, but white cases were less likely to be sustained in either case.

## 4.4. Do Cases with an External Origin Differ from Cases with an Internal Origin?

We next wanted to determine if disparities in sustained rates would differ depending on who initiated the case. A case was categorized as internal if it was originally initiated by an allegation made by a member of the Department (48 of 1,417 cases, or 3%). A case was categorized as external if a member of the public or a member of another organization/department made the first allegation which initiated the

investigation (1,369 of 1,417 cases, or 97%). However, it is important to note that while a complaint may be initiated by a member of the public, investigators may add allegations to a case if additional misconduct is suspected or discovered during the investigation (e.g., while reviewing Body Worn Camera footage). In these circumstances, although the allegation would be internally discovered, the case would still be categorized as external. Allegations that are discovered and added during the course of the investigation are supposed to be labeled as "internally discovered" by investigators (which is a different designation from the "Internal/External" category which only refers to the origin of the original allegation) and tracked as such in the case record.[12] Because the "internally discovered" field was not consistently available, the analyses below focus primarily on whether the origin of the case was internal or external, regardless of whether later allegations were added internally (though see Table 26 below). Table 23 presents sustained rates at the case level broken down by ethnicity and origin of investigation.

**Table 23: Sustained Rate by Race 2024**

|  | All Investigations | | | Internal Origin | | | External Origin | | |
|---|---|---|---|---|---|---|---|---|---|
|  | % Sust | # Sust | Tot | % Sust | # Sust | Tot | % Sust | # Sust | Tot |
| **White** | **2%** | **4** | **223** | 0% | 0 | 8 | 2% | 4 | 215 |
| **Black** | **7%** | **23** | **351** | 47% | 7 | 15 | 5% | 16 | 336 |
| **Hispanic** | **6%** | **25** | **425** | 24% | 4 | 17 | 5% | 21 | 408 |
| Asian/Filipino | 3% | 11 | 342 | 13% | 1 | 8 | 3% | 10 | 334 |
| Other/Unknown | 1% | 1 | 76 |  |  |  | 1% | 1 | 76 |
| Total | 5% | 64 | 1417 | 25% | 12 | 48 | 4% | 52 | 1369 |

As we see in Table 23, internally generated cases had an overall 25% (12 of 48) sustained rate compared to 4% (52 of 1369) for externally generated cases. Among internally generated cases, there was a clear disparity between white members and members of other races. Not a single (0%) of the 8 internally generated case involving white personnel were sustained, compared to nearly half (47%, or 7 of 15) for Black members, and a quarter (24%, or 4 of 17) Hispanic members. In fact, when these cases were excluded and we only looked at cases with an external origin, there was still a gap between white and Black sustained rates (2% vs. 5%) and between whites and Hispanics (2% vs. 5%), but those gaps were reduced, and these differences were no longer significant as they were when we looked at all investigations. This suggests that cases that start with an internal complaint deserve special attention to understand racial disparities. Note that we are not able to compute a chi-square test for the internal origin cases because the numbers are so small.

There was also a clear disparity between male and female members, as shown by Table 24 below. Within internally generated cases, female members were sustained 60% of the time compared to their male counterparts at 21%. We don't see a similar gap within externally generated cases (3% versus 4%), so the difference disappears when the numbers are looked at as a whole (4% versus 5%).

---

[12] Although internally discovered allegations are tracked in the IA record, the completion of this field was inconsistent for 2024 data and was therefore not a reliable data point to use for this analysis.

**Table 24: Sustained Rate by Gender 2024**

|  | All Investigations | | | Internal Origin | | | External Origin | | |
|---|---|---|---|---|---|---|---|---|---|
|  | % Sust | # Sust | Tot | % Sust | # Sust | Tot | % Sust | # Sust | Tot |
| **Male** | 5% | 54 | 1183 | 21% | 9 | 43 | 4% | 45 | 1140 |
| **Female** | 4% | 10 | 234 | 60% | 3 | 5 | 3% | 7 | 229 |
| **Total** | **5%** | **64** | **1417** | **25%** | **12** | **48** | **4%** | **52** | **1369** |

Table 25 presents the same breakdown by rank. Within internally generated cases, officers were sustained three times as often (30%) as sergeants and above (9%). By contrast, sergeants and above were twice as likely to be sustained in externally generated cases (8%) than officers (4%). Because there were many more cases of external origin, when we don't break down the rank comparison by origin ("All investigations" below) it looks like supervisors are twice as likely to be sustained, but this table reveals that this is largely driven by externally originated complaints.

**Table 25: Sustained Rate by Rank 2024**

|  | All Investigations | | | Internal Origin | | | External Origin | | |
|---|---|---|---|---|---|---|---|---|---|
|  | % Sust | # Sust | Tot | % Sust | # Sust | Tot | % Sust | # Sust | Tot |
| Officer | 4% | 57 | 1331 | 30% | 11 | 37 | 4% | 46 | 1294 |
| Sgt and Above | 8% | 7 | 86 | 9% | 1 | 11 | 8% | 6 | 75 |
| **Total** | **5%** | **64** | **1417** | **25%** | **12** | **48** | **4%** | **52** | **1369** |

As mentioned above, we coded an allegation as "internal" or "external" solely based on whether the case was *initiated* by an internal or external complainant. But since allegations can actually be added in the course of an investigation to a case that was externally generated, there is also a field in the IA record for coding each allegation either as "internally discovered" or not. This field was only completed for 67% of allegations in 2024. Due to the number of allegations that were left blank, the field was deemed not reliable. However, with some additional cleanup[13], we were able to roughly assess sustained rates for allegations that were coded as being internally discovered compared to allegations that were externally generated. For these internally discovered allegations, there was disparity between white (11% sustained) and Black (67% sustained) members and white and Hispanic (48% sustained) members.

---

[13] Of the 2109 allegations in 2024, 703 (33%) were missing the "internally discovered allegation" field (field left blank). To clean the data, all blank fields where the case was coded as internally generated were assumed to be "internally discovered allegations" and changed as such. For blank fields where the case was coded as externally generated, a cursory review of the allegation synopsis was reviewed to determine if the allegation was "internally discovered." The cleaned data only allows for an estimate since blank fields were not thoroughly vetted.

**Table 26: Sustained Rates for Internally Discovered Allegations vs Externally Generated Allegations (Fully Investigated Allegations)**

|  | Internally Discovered Allegations | | | Externally Generated Allegations | | |
|---|---|---|---|---|---|---|
|  | Sust Rate | # Sust | Total | Sust Rate | # Sust | Total |
| White | 11% | 2 | 18 | 1% | 3 | 294 |
| Black | 67% | 22 | 33 | 3% | 14 | 504 |
| Hispanic | 48% | 30 | 63 | 3% | 16 | 586 |
| Asian/Filipino | 21% | 4 | 19 | 1% | 7 | 475 |
| Other/Unknown | 0% |  | 2 | 1% | 1 | 115 |
| **Grand Total** | **43%** | **58** | **135** | **2%** | **41** | **1974** |

This analysis overlaps with the previous one but provides an even starker picture. With the caveat that the "internally discovered" field used here was only an approximation, these data suggest that the disparity is small among the 1974 externally generated allegations (1% whites vs. 3% Blacks and 3% for Hispanics) but gaping among the 135 internally discovered allegations (11% vs. 67% and 48%, respectively). Furthermore, it's equally striking to note that if we just look at sustained allegations, 62% (22/36) of Black sustained allegations were for internally discovered allegations, and 65% (30/46) for Hispanics, whereas it's only 40% for whites (2/5). These numbers are of course the result of the high sustained rate for internally discovered allegations (which makes sense), but it's still informative to be reminded that for Black and Hispanic sworn personnel at least, the modal (most frequent) sustained allegation is one that was started or added on by someone in the department, not a member of the public. Overall, 94% of allegations are external (1974/2109), but 59% of sustained allegations were internally originated or discovered – at least according to our tentative coding of internally discovered allegations.

During the review of 2022 cases, the Department found that the practice of adding "internally discovered" violations to existing cases could be a point at which disparities may arise. This was addressed by requiring notification to the IAB Commander within 24 hours when an allegation was added to a case (Training Bulletin V-T.1, *Internal Investigation Procedure Manual*, revised November 2023). While the new requirement was intended to mitigate disparity, due to the limited tracking of "internally discovered" allegations, we were unable to do a more complete analysis of these allegations.

## 4.5. Do Sustained Rates Differ Based on the Seriousness of the Allegation (Class I versus Class II)?

To determine if there was disparity in the seriousness of the allegations between groups, we assessed the sustained rates for Class I and Class II allegations for race, gender and rank. This analysis had to be done at the allegation level rather than the sworn member case level since some members may have multiple allegations in the same case that are different Classes (e.g., in the same case an officer may be investigated for Use of Force – Class I and FTARC – Class II). Above (See *3.4. Did the Seriousness of the Allegation (Class I Versus Class II) Differ by Group?*), we assessed whether a particular group was receiving a disproportionately higher percentage of Class I or Class II allegations and found that there was little difference across race, gender and rank.

Tables 27-29 present sustained rates at the Allegation Class level broken down by race, gender and rank. The overall sustained rates at the allegation level were nearly the same for race as they were at the sworn member case level, with white members sustained at a significantly lower rate than Black and Hispanic members. There was also disparity in sustained rates for Class I and Class II allegations. For Class I

allegations, the sustained rate for white members (1%) was much lower than Black members (11%) and Hispanic members (9%). For Class II allegations, white members were also sustained at a significantly lower rate than Black and Hispanic members.

Male and female members were sustained at about the same rate for Class II allegations (4% and 5% respectively). Male members, however, were sustained at a higher rate than female members in Class I allegations (7% and 3% respectively). Sergeants and above were sustained at higher rates for both Class I and Class II allegations.

**Table 27: Allegations - Sustained Rate for Allegation Class by Race 2024**

|  | All Allegations | | | Class I Allegations | | | Class II Allegations | | |
|---|---|---|---|---|---|---|---|---|---|
|  | % Sust | # Sust | Tot | % Sust | # Sust | Tot | % Sust | # Sust | Tot |
| **White** | **2%** | **5** | **312** | 1% | 1 | 71 | **2%** | **4** | **241** |
| **Black** | **7%** | **36** | **537** | 11% | 15 | 133 | **5%** | **21** | **404** |
| **Hispanic** | **7%** | **46** | **649** | 9% | 15 | 162 | **6%** | **31** | **487** |
| **Asian/Filipino** | 2% | 11 | 494 | 2% | 3 | 123 | 2% | 8 | 371 |
| **Other/Unknown** | 1% | 1 | 117 | 0% | 0 | 31 | 1% | 1 | 86 |
| **Total** | **5%** | **99** | **2109** | **7%** | **34** | **520** | **4%** | **65** | **1589** |

**Table 28: Allegations - Sustained Rate for Allegation Class by Gender 2024**

|  | All Allegations | | | Class I Allegations | | | Class II Allegations | | |
|---|---|---|---|---|---|---|---|---|---|
|  | % Sust | # Sust | Tot | % Sust | # Sust | Tot | % Sust | # Sust | Tot |
| **Male** | 5% | 85 | 1778 | 7% | 32 | 444 | 4% | 53 | 1334 |
| **Female** | 4% | 14 | 331 | 3% | 2 | 76 | 5% | 12 | 255 |
| **Total** | 5% | 99 | 2109 | 7% | 34 | 520 | 4% | 65 | 1589 |

**Table 29: Allegations - Sustained Rate for Allegation Class by Rank 2024**

|  | All Allegations | | | Class I Allegations | | | Class II Allegations | | |
|---|---|---|---|---|---|---|---|---|---|
|  | % Sust | # Sust | Tot | % Sust | # Sust | Tot | % Sust | # Sust | Tot |
| **Officer** | **4%** | **88** | **1991** | 6% | 31 | 490 | 4% | 57 | 1501 |
| **Sgt and Above** | **9%** | **11** | **118** | 10% | 3 | 30 | 9% | 8 | 88 |
| **Total** | **5%** | **99** | **2109** | **7%** | **34** | **520** | **4%** | **65** | **1589** |

We also compared the sustained rates at the allegation level by Class to those in 2023 to determine if there were changes between years. See Appendix 4 for 2023 sustained rates at the allegation level. Black (5%) and Hispanic (6%) members were sustained at the same rate for Class II allegations in 2023 and 2024, while white members dropped from a sustained rate of 10% to 2%. Asian members and Other/Unknown members also had a big drop (8% to 2% and 9% to 1%, respectively). For Class I allegations, the sustained rate increased for Black (8% to 11%) and Hispanic members (4% to 9%) between 2023 and 2024. White, Asian, and Other/Unknown members all had a sizeable drop in Class I sustained rates.

There was disparity in the sustained rates for Class II allegations between white members and Black and Hispanic members in both 2023 and 2024, but the disparity changed direction from white members being sustained at a higher rate in 2023 to Black and Hispanic members being sustained at a higher rate in 2024. For Class I allegations, there was no disparity between white members and Black members in 2023 (9%

and 8% respectively), but there was disparity in 2024 (only one white member was sustained for a Class I allegation, 1% versus 15 Black members, 11%). The difference in Class I sustained rates between white and Hispanic members also increased between 2023 and 2024. The disparity in sustained rates by allegation was driven mostly by Class II allegations in 2023, but in 2024, both Class I and Class II sustained rates contributed to the disparity. FTARC allegations (Class II) may have impacted the changes between 2023 and 2024. There were far more sustained FTARC allegations in 2023 than in 2024, particularly of white members.

The sustained rates for Class II allegations didn't change much for male and female members between 2023 and 2024. Female members had a slightly higher sustained rate than male members for Class II allegations in 2024 (5% versus 4%), which was the opposite of 2023 (4% versus 7%). When assessing rank, although the sustained rates dropped for Class I and Class II allegations for officers and sergeants and above, sergeants and above were sustained at a higher level in both years.

## 4.6. Do Year-to-Year Fluctuations in Sustained Rates Average Out Over Time?

We also looked at the last five years to check for longer-term trends and found that the combined sustained rate for 2020-2024 was nearly the same for all race groups (8-9%) except for Asian/Filipinos, who had the lowest combined sustained rate (6%) for 2020-2024. Except for Other/Unknown, who have much lower numbers than other race groups, white members had the highest sustained rate for the combined five-year period (9%). White and Asian members had a precipitous drop in sustained rates in 2024. The five-year comparison (Table 2, reproduced from the *1. Executive Summary*) also shows that 2024 not only had the lowest sustained rate, but also the lowest number of sustained findings (64 sustained findings compared to 104 in 2020, the next lowest year). A preliminary review of sustained rates from January to June 2025 shows a general evening out across most race groups, with the exception of Hispanic members.

**Table 2 (repeated from p. 6): Sustained Rates by Race 2020 to 2025**

|  | 2020 | | 2021 | | 2022 | | 2023 | | 2024 | | 2020-2024 | 2025 Jan-Jun[14] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Sust Rate | # Sust/ Total | Sust Rate | # Sust/ Total | Sust Rate | # Sust/ Total | Sust Rate | # Sust/ Total | Sust Rate | # Sust/ Total | **Sust Rate** | Sust Rate |
| **White** | 8% | 30/364 | 11% | 51/457 | 11% | 34/323 | 11% | 37/348 | 2% | 4/223 | **9%** | **6%** |
| **Black** | 10% | 19/186 | 9% | 19/213 | 11% | 23/212 | 6% | 20/341 | 7% | 23/351 | **8%** | **6%** |
| **Hispanic** | 9% | 35/ 386 | 9% | 40/434 | 9% | 30/317 | 8% | 40/512 | 6% | 25/425 | **8%** | **10%** |
| **Asian/ Filip** | 8% | 18/219 | 7% | 18/251 | 7% | 16/240 | 75 | 26/379 | 3% | 11/342 | **6%** | **4%** |
| **Other/ UNK** | 4% | 2/54 | 16% | 9/57 | 18% | 7/38 | 9% | 6/68 | 1% | 1/76 | **9%** | **6%** |
| **Grand Total** | **9%** | **104/ 1209** | **9%** | **118/ 1345** | **9%** | **107/ 1136** | **8%** | **129/ 1648** | **5%** | **64/ 1417** | **8%** | **7%** |

Looking at year-to-year changes in the five-year period, after three years (2021-2023) of among the highest sustained rate (11% in all 3 years), there was a drop for white members in 2024 (2%). The sustained rate for Black members was relatively consistent between 2020 and 2022 (9-11%), but dropped in 2023

---

[14] The data reviewed for January to June 2025 is subject to change as case closure dates are finalized and updated.

(6%) and remained about the same in 2024 (7%). The sustained rate for Hispanic members remained consistent between 2020 and 2023 (8-9%), with a small drop in 2024 (6%). Asian members also had a consistent sustained rate between 2020 and 2023 (7-8%), but they experienced a drop in 2024 (3%), similar to white members.

We also looked at the first six months of 2025 to see if sustained rates were changing. Based on preliminary results, there were 49 sustained member cases, putting the Department on track to exceed the 2024 sustained case count which was 64 for the entire year. The preliminary 2025 January to June sustained rate was 6% for White (7/109), Black (11/180), and Other/Unknown (2/33) members, and 4% (7/179) for Asian members. Hispanic members had a higher sustained rate of 10% (22/218); however, this difference compared to White members is not statistically significant ($p > 0.05$). The overall sustained rate for the first six months of 2025 is more consistent with the five-year average (7% in 2025 compared to 8% five-year average).

When numbers fluctuate year-to-year but maintain a consistent five-year average across groups, it suggests that the fluctuations are not indicative of a long-term trend but rather variations around a stable baseline. Thus, while the data fluctuation between 2023 and 2024 was more extreme, fluctuations in the opposite direction in recent years result in a relatively consistent average across all races over a five-year period, with all races averaging a sustained rate between 6% and a 9% over that period. This indicates that the variation observed in 2024 may not be part of an ingrained trend of disparate treatment or a demonstration of cumulative disparate impact. The data in the first quarter of 2025 appears to support this hypothesis about the data fluctuations. The Department should, however, continue to track the data closely.

## 4.7. Did "Failure to Accept or Refer a Complaint" Allegations Affect Sustained Rates in 2024?

Because of the impact Failure to Accept or Refer a Complaint (FTARC) allegations had on the sustained rates in 2023, we looked to see if they again had an impact on sustained rates in 2024. FTARC allegations had a big impact on sustained rates in 2023 and contributed to the higher sustained rate for white officers over Black officers. In part, as a result of the publication of these results, The Department amended its policies so that FTARC allegations can now be handled outside the IA process.[15] In 2024, FTARC allegations had little impact on the sustained rates because of the change in processing of this allegation type, resulting in far fewer investigated allegations of FTARC. We analyzed the data for both years with and without FTARC allegations included in the data set to see whether they accounted for the year-to-year change. The exclusion of FTARC allegations allowed for a more even comparison between 2023 and 2024 sustained rates. Table 31 shows the sustained rates by investigation type for 2023 and 2024 with FTARC allegations included and excluded and Table 32 shows the same for complaint origin.

---

[15] In the analysis of 2022 data, FTARC allegations impacted disparity in discipline, with Black members receiving more severe discipline than white members for said allegation. This was another contributing factor for changing the process.  https://www.oaklandca.gov/files/assets/city/v/1/police/documents/opd-data/response-outcomes/2022-internal-investigation-outcome-and-discipline-report.pdf

**Table 31: Allegations by Investigation Type with and without FTARC Allegations (2023 Versus 2024)**

|  | All Allegations | | FTARC Allegations Excluded | |
|---|---|---|---|---|
|  | 2023 | 2024 | 2023 | 2024 |
| **Overall Sustained Rate** | 8% | 5% | 5% | 4% |
| **DLI Sustained Rate** | 6% | 4% | 4% | 4% |
| **IA Investigation Sustained Rate** | 15% | 19% | 12% | 18% |

The overall sustained rate dropped from 8% to 5% between 2023 and 2024, but when removing FTARC allegations from both data sets, the sustained rates were much closer (5% and 4%). The DLI sustained rate was higher in 2023 due to FTARC allegations. When excluding FTARC allegations, the DLI sustained rate for both years was the same (4%). For IA investigations, the sustained rate rose between 2023 and 2024 for all allegations (15% to 19%), as well as when excluding FTARC allegations, but the increase was larger when FTARC allegations were excluded (12% to 18%). Hence, removing FTARC allegations eliminated the difference in sustained rates for DLI investigations, but increased the difference in rates between 2023 and 2024.

**Table 32: Allegations by Complaint Origin with and without FTARC Allegations (2023 Versus 2024)**

|  | All Allegations | | FTARC Allegations Excluded | |
|---|---|---|---|---|
|  | 2023 | 2024 | 2023 | 2024 |
| **Overall Sustained Rate** | 8% | 5% | 5% | 4% |
| **Externally Generated Case Sustained Rate** | 6% | 4% | 4% | 4% |
| **Internally Generated Case Sustained Rate** | 24% | 25% | 18% | 26% |

The externally generated case sustained rates mirrored that of DLI investigations. When removing FTARC allegations, the sustained rates for 2023 and 2024 were the same (4%). However, we didn't see the same pattern with internally generated cases. When analyzing all allegations (FTARC allegations included), the sustained rates for internally generated cases was nearly the same for 2023 and 2024. When excluding FTARC allegations, the sustained rate was higher in 2024 than 2023 (26% versus 18%). With a more even comparison by excluding FTARC allegations, the sustained rate for these allegations increased by 8% points between 2023 and 2024.

The 2023 analysis found that of the top six allegations received, FTARC allegations were sustained at the highest rate by far (42% of 125), having a disproportionate impact on the overall sustained rates. When FTARC allegations were removed from the 2023 dataset, the disparity between Black and white members nearly disappeared.

At the end of 2023, the Department changed the practice for adjudicating FTARC allegations. Per Department General Order M-03 (Complaints Against Departmental Personnel), Class II misconduct may be addressed through non-disciplinary corrective action if the misconduct is discovered by the Department and does not indicate a pattern of misconduct. Prior to December 2023, Class II FTARC allegations were the only exception: all FTARC allegations had to be investigated via the IA process. In

December 2023, policy[16] was updated to remove the exception and allow for FTARC allegations to be addressed in the same manner as other Class II misconduct.

In the 2024 dataset, there were only 24 allegations of FTARC, 4 of which were sustained (17%). This represents an 81% decrease in the number of FTARC allegations investigated.

- White members received 42 FTARC allegations in 2023 compared to only 8 in 2024, one of which was sustained.
- Black members received 16 FTARC allegations in 2023 and only 6 in 2024, one of which was sustained.
- Hispanic members received 37 FTARC allegations in 2023 and only 8 in 2024, two of which were sustained.
- Asian members received 25 FTARC allegations in 2023 and only 2 in 2024, none of which were sustained.

Additionally, in 2024, officers received 16 allegations of FTARC (1 sustained) compared to sergeants and above who received 8 allegations (3 sustained). Male members received 19 allegations of FTARC (4 sustained) compared to female members who received 5 allegations (none sustained).

In 2023 there were 129 sustained allegations, compared to only 64 in 2024, a 50% drop. When removing FTARC allegations from the data sets for both years, there were 82 sustained cases in 2023 and 63 sustained cases in 2024, a 23% drop. In 2023, there were 47 cases where sworn members were sustained solely for FTARC and in 2024 there was only one (in 3 of the 4 cases involving a sustained FTARC allegation in 2024, the case remains sustained because another allegation for the same officer in that same case was also sustained). While FTARC allegations don't account for the entire 50% drop in sustained allegations between 2023 and 2024, they account for nearly half of the drop (23%).

---

[16] Special Order 9213 (dated December 5, 2023), Revising Department General Order (DGO) M-03, *Complaints Against Department Personnel or Procedure*.

# 5. Focusing on Fully Investigated Cases

## 5.1. Sustained Rates for Fully Investigated Cases

A finding of "sustained" can only occur as a result of a full investigation (whether DLI or IA), which comprise 25% of all cases overall (352 of 1,417). As discussed earlier (See *3.5. Did the Type of Investigation Differ by Group?*), a case can be closed without a full investigation through Informal Complaint Resolution (ICR) or by Summary Finding. We did not find compelling evidence of racial disparity in terms of the proportion of cases that were moved on to a full investigation (making them eligible for a "sustained" finding). As shown in Table 15 from Section 3.5, 24% of the cases involving a white member moved to full investigations whereas 76% resulted in Summary Findings or ICRs. The proportion of full investigations was 28% for cases involving a Black member, and 25% for cases involving a Hispanic member. This makes it likely that the disparities observed overall are largely driven by disparities observed within fully investigated cases or, in other words, that disparities start appearing only after a case is assigned to a full investigation.

**Table 15 (repeated from p. 20): Member Cases - Type of Investigation Percentages by Race 2024**

| | DLI Summary Finding | | IAD Summary Finding | | Informal Complaint Resolution | | DLI Full Invest | | Internal Affairs Full Invest | |
|---|---|---|---|---|---|---|---|---|---|---|
| | % Total | n | % Total | n | % Total | n | % Total | n | % Total | n |
| White | 74% | 164 | 1% | 3 | 1% | 2 | 17% | 39 | 7% | 15 |
| Black | 70% | 244 | 1% | 3 | 2% | 6 | 23% | 82 | 5% | 16 |
| Hispanic | 70% | 299 | 2% | 10 | 2% | 10 | 21% | 88 | 4% | 18 |
| Asian/Filipino | 74% | 252 | 1% | 2 | 3% | 11 | 19% | 65 | 4% | 12 |
| Other/Unknown | 75% | 57 | 1% | 1 | 1% | 1 | 21% | 16 | 1% | 1 |
| **Grand Total** | **72%** | **1016** | **1%** | **19** | **2%** | **30** | **20%** | **290** | **4%** | **62** |

Indeed, Table 33 shows that the disparities in sustained rates are exacerbated when looking at fully investigated cases, with 7% for whites (4 of 54) versus 23% for Blacks (23 of 98) and 24% for Hispanics (25 of 106). Though the smaller numbers make it harder to test statistical significance, we also see that white/Black disparities are present in full investigations for both DLI (8% versus 22%) and IA (7% versus 31%), suggesting that neither type of investigation (DLI or IA) is solely responsible for the disparity, as already suggested above. See *4.2. Do Division-Level Investigations Differ from Internal Affairs Investigations?*

**Table 33: Sustained Rate by Race 2024 (Full Investigations Only*)**

| | Full DLI and IA Investigations | | | DLI Investigations | | | IA Investigations | | |
|---|---|---|---|---|---|---|---|---|---|
| | % Sust | # Sust | Tot | % Sust | # Sust | Tot | % Sust | # Sust | Tot |
| **White** | **7%** | **4** | **54** | 8% | 3 | 39 | 7% | 1 | 15 |
| **Black** | **23%** | **23** | **98** | 22% | 18 | 82 | 31% | 5 | 16 |
| **Hispanic** | **24%** | **25** | **106** | 19% | 17 | 88 | 44% | 8 | 18 |
| Asian/Filipino | 14% | 11 | 77 | 15% | 10 | 65 | 8% | 1 | 12 |
| Other/Unknown | 6% | 1 | 17 | 6% | 1 | 16 | 0% | | 1 |
| Total | 18% | 64 | 352 | 17% | 49 | 290 | 24% | 15 | 62 |

*This excludes summary findings and informally resolved complaints.*

We don't observe similar disparities in fully investigated cases for gender (see Table 34 below) or rank (see Table 35 below).

**Table 34: Sustained Rate by Gender 2024 (Full Investigations Only*)**

| | Full DLI and IA Investigations | | | DLI Investigations | | | IA Investigations | | |
|---|---|---|---|---|---|---|---|---|---|
| | % Sust | # Sust | Tot | % Sust | # Sust | Tot | % Sust | # Sust | Tot |
| **Male** | 18% | 54 | 297 | 17% | 41 | 242 | 24% | 13 | 55 |
| **Female** | 18% | 10 | 55 | 17% | 8 | 48 | 29% | 2 | 7 |
| Total | 18% | 64 | 352 | 17% | 49 | 290 | 24% | 15 | 62 |

*This excludes summary findings and informally resolved complaints.*

**Table 35: Sustained Rate by Rank 2024 (Full Investigations Only*)**

| | Full DLI and IA Investigations | | | DLI Investigations | | | IA Investigations | | |
|---|---|---|---|---|---|---|---|---|---|
| | % Sust | # Sust | Tot | % Sust | # Sust | Tot | % Sust | # Sust | Tot |
| **Officer** | 19% | 57 | 308 | 17% | 46 | 266 | 26% | 11 | 42 |
| **Sgt and Above** | 16% | 7 | 44 | 13% | 3 | 24 | 20% | 4 | 20 |
| Total | 18% | 64 | 352 | 17% | 49 | 290 | 24% | 15 | 62 |

*This excludes summary findings and informally resolved complaints.*

When we further broke down these fully investigated cases into their origin in Table 36, it brought racial disparities into even sharper relief: whereas 64% of fully investigated internal cases against Black sworn personnel were sustained (7 of 11), not a single one (0%) of those against white sworn personnel was sustained (0 of 5). The Black/white disparity for cases of external origin was less pronounced, but still noticeable (18% vs. 8%).

36

**Table 36: Sustained Rate by Race 2024 (Full Investigations Only*)**

| | Full DLI and IA Investigations | | | Internal Origin | | | External Origin | | |
|---|---|---|---|---|---|---|---|---|---|
| | % Sust | # Sust | Tot | % Sust | # Sust | Tot | % Sust | # Sust | Tot |
| **White** | **7%** | **4** | **54** | 0% | 0 | 5 | 8% | 4 | 49 |
| **Black** | **23%** | **23** | **98** | 64% | 7 | 11 | 18% | 16 | 87 |
| **Hispanic** | **24%** | **25** | **106** | 36% | 4 | 11 | 22% | 21 | 95 |
| **Asian/Filipino** | 14% | 11 | 77 | 20% | 1 | 5 | 14% | 10 | 72 |
| **Other/Unknown** | 6% | 1 | 17 | | | | 6% | 1 | 17 |
| **Total** | **18%** | **64** | **352** | **38%** | **12** | **32** | **16%** | **52** | **320** |

*This excludes summary findings and informally resolved complaints.*

An initial analysis of fully investigated cases by gender indicated no overall difference (18% for females and 18% for males). However, further examination revealed a higher prevalence for women in internal cases (75% versus 32% for males) and a lower prevalence in external cases (14% versus 17% for males). The small sample sizes, however, preclude a definitive assessment of statistical significance.

**Table 37: Sustained Rate by Gender 2024 (Full Investigations Only*)**

| | Full DLI and IA Investigations | | | Internal Origin | | | External Origin | | |
|---|---|---|---|---|---|---|---|---|---|
| | % Sust | # Sust | Tot | % Sust | # Sust | Tot | % Sust | # Sust | Tot |
| **Male** | 18% | 54 | 297 | 32% | 9 | 28 | 17% | 45 | 269 |
| **Female** | 18% | 10 | 55 | 75% | 3 | 4 | 14% | 7 | 51 |
| **Total** | **18%** | **64** | **352** | **38%** | **12** | **32** | **16%** | **52** | **320** |

*This excludes summary findings and informally resolved complaints.*

For rank, again looking at origin reveals otherwise potentially overlooked disparities: whereas the overall sustained rate of fully investigated cases is similar for officers (19%) and those with ranks of sergeant or above (16%), when focusing solely on cases originated internally, fully investigated cases against officers have a 50% sustained rate (11 of 22), whereas those against supervisors (sergeant and above) are sustained much more rarely at 10% (1 of 10).

**Table 38: Sustained Rate by Rank 2024 (Full Investigations Only*)**

| | Full DLI and IA Investigations | | | Internal Origin | | | External Origin | | |
|---|---|---|---|---|---|---|---|---|---|
| | % Sust | # Sust | Tot | % Sust | # Sust | Tot | % Sust | # Sust | Tot |
| Officer | 19% | 57 | 308 | 50% | 11 | 22 | 16% | 46 | 286 |
| Sgt and Above | 16% | 7 | 44 | 10% | 1 | 10 | 18% | 6 | 34 |
| **Total** | **18%** | **64** | **352** | **38%** | **12** | **32** | **16%** | **52** | **320** |

*This excludes summary findings and informally resolved complaints.*

The analyses presented in this section cast light on the same disparities as documented earlier but further highlight that they arise primarily in fully investigated cases. We found here that racial disparities in sustained rates are observed in both DLI and IA investigations, and that they are especially pronounced for cases initiated internally.

37

## 5.2. Allegation-Level Analysis for Fully Investigated Cases

One of the reasons to focus on fully sustained cases is that, since they seem to be where disparity arises, it gives us a more manageable dataset to analyze, including looking more closely at the specifics of the cases, such as what types of allegations are involved. For example, we wanted to determine whether the reason that white members received a significantly lower proportion of sustained cases and allegations might be because they were being investigated for different types of allegations. Assuming that some allegations are more likely to yield a finding of "sustained," it could constitute an upstream factor yielding the disparity, so it was important to make sure there were no disparities in the type of allegation by group.

Because the 1,417 cases often involve more than one (and different) allegation (for a total of 2,109), we need to get down to the allegation level for this analysis. Table 39 shows the breakdown for the 1,499 (71%) allegations that could yield a finding without a full investigation. Similar to what we observed at the case level, 69% of all allegations in 2024 were in summary findings cases, and 2% of allegations were categorized as informal complaint resolutions. Similar to member cases, the percentage of Summary Findings and ICRs did not differ markedly between races for allegations, ranging from 68% for Hispanic members to 72% for white members, and 70% for Black members.

**Table 39: Allegations that did Not Result in a Full Investigation, by Race**

| | DLI Summary Finding | | IAD Summary Finding | | Informal Complaint Resolution | | Total (Including Full Investigations, not shown in table) |
|---|---|---|---|---|---|---|---|
| | % Total | n | % Total | n | % Total | n | |
| White | 70% | 218 | 1% | 3 | 1% | 2 | 312 |
| Black | 67% | 360 | 1% | 5 | 2% | 9 | 537 |
| Hispanic | 64% | 418 | 2% | 16 | 2% | 11 | 649 |
| Asian/Filipino | 72% | 356 | 1% | 3 | 3% | 14 | 494 |
| Other/Unknown | 69% | 81 | 2% | 2 | 1% | 1 | 117 |
| **Grand Total** | **68%** | **1,433** | **1%** | **29** | **2%** | **37** | **2109** |

This leaves 610 (29%) allegations of misconduct that were fully investigated in 2024, corresponding to 352 sworn member cases (290 DLI and 62 IA). Allegations were categorized by investigative type and complaint origin and compared by race.

Black members had the highest percentage of allegations in internally generated cases for DLI cases (6%), while white, Hispanic and Asian members were about the same (3% and 4%). For IA cases, Black and Hispanic members had a much higher percentage of allegations in internally generated cases compared to white and Asian members (greater than 40% versus less than 20%). Table 40 Shows the breakdown of allegations by race and complaint origin for fully investigated cases.

**Table 40: Number of Allegations by Race and Complaint Origin for Fully Investigated Cases**

| | Division Level Investigation | | | Internal Affairs Investigation | | |
|---|---|---|---|---|---|---|
| | External | Internal | % Internal | External | Internal | % Internal |
| White | 61 | 2 | 3% | 22 | 4 | 15% |
| Black | 123 | 8 | 6% | 19 | 13 | 41% |
| Hispanic | 140 | 5 | 3% | 30 | 29 | 49% |
| Asian/Filipino | 99 | 4 | 4% | 15 | 3 | 17% |
| Other/Unknown | 31 | | 0% | 2 | | 0% |
| **Grand Total** | **454** | **19** | **4%** | **88** | **49** | **36%** |

Overall, Hispanic and Black members had the highest rate of sustained allegations in 2024. As Table 41 below shows, the sustained rate for Black members was highest for full DLIs and IA investigations that were internally generated (50% and 77%, respectively), while not a single one of the few full investigations against white personnel resulting from an internal source resulted in a sustained finding (both 0%).

For IA investigations that were externally generated, Black members had the lowest sustained rate (5%, versus 9% for whites), aside from other/unknown. Hispanic members had the highest sustained rate by a wide margin for IA investigations that were externally generated (37%, versus 9% for whites). Aside from other/unknown, white members had the lowest sustained rate for all categories except IA investigations that were externally generated.

Table 41 shows that the difference in sustained rates between white members and Black and Hispanic members was greatest for internally generated cases. This was the case for both investigations at the division level and IA investigations.

**Table 41: Sustained Rates by Race and Complaint Origin for Fully Investigated Cases (Allegation Level)**

| | Division Level Investigation | | | | Internal Affairs Investigation | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | External | | Internal | | External | | Internal | | Total |
| | n | % Sust | n | % Sust | n | % Sust | n | % Sust | % Sust |
| White | 61 | 5% | 2 | 0% | 22 | 9% | 4 | 0% | 6% |
| Black | 123 | 17% | 8 | 50% | 19 | 5% | 13 | 77% | 22% |
| Hispanic | 140 | 12% | 5 | 20% | 30 | 37% | 29 | 59% | 23% |
| Asian/Filipino | 99 | 9% | 4 | 25% | 15 | 7% | 3 | 0% | 9% |
| Other/Unknown | 31 | 3% | 0 | | 2 | 0% | 0 | | 3% |
| **Grand Total** | **454** | **11%** | **19** | **32%** | **88** | **17%** | **49** | **55%** | **16%** |

For allegations investigated by IA, female members had a higher percentage of internally generated cases than males. Table 42 Shows the breakdown of allegations by gender and complaint origin for fully investigated cases.

39

**Table 42: Number of Allegations by Gender and Complaint Origin for Fully Investigated Cases**

|  | Division Level Investigation | | | Internal Affairs Investigation | | |
|---|---|---|---|---|---|---|
|  | External | Internal | % Internal | External | Internal | % Internal |
| Male | 381 | 17 | 4% | 80 | 39 | 33% |
| Female | 73 | 2 | 3% | 8 | 10 | 56% |
| **Grand Total** | **454** | **19** | **4%** | **88** | **49** | **36%** |

At the sworn member case level, male members were sustained at a higher rate than female members overall. However, female members had a much higher sustained rate for internally generated cases (75% versus 32% for fully investigated cases). At the allegation level, male members had a higher sustained rate in IA investigations that were both externally and internally generated. Female members had the highest sustained rate for DLIs that were internally generated (50% versus 29%), though there were only two allegations that fell into this category. Table 43 below shows sustained rates for male and female members broken down by investigation type and complaint origin.

**Table 43: Sustained Rates by Gender and Complaint Origin for Fully Investigated Cases (Allegation Level)**

|  | Division Level Investigation | | | | Internal Affairs Investigation | | | | |
|---|---|---|---|---|---|---|---|---|---|
|  | External | | Internal | | External | | Internal | | Total |
|  | n | % Sust | n | % Sust | n | % Sust | n | % Sust | % Sust |
| Male | 381 | 11% | 17 | 29% | 80 | 19% | 39 | 59% | 16% |
| Female | 73 | 12% | 2 | 50% | 8 | 0% | 10 | 40% | 15% |
| **Grand Total** | **454** | **11%** | **19** | **32%** | **88** | **17%** | **49** | **55%** | **16%** |

Members holding the rank of sergeant and above had a higher percentage of internally generated allegations than officers in DLIs but had a lower percentage in IA investigations. Table 44 Shows the breakdown of allegations by rank and complaint origin for fully investigated cases.

**Table 44: Number of Allegations by Gender and Complaint Origin for Fully Investigated Cases**

|  | Division Level Investigation | | | Internal Affairs Investigation | | |
|---|---|---|---|---|---|---|
|  | External | Internal | % Internal | External | Internal | % Internal |
| Officer | 429 | 15 | 3% | 62 | 42 | 40% |
| Sgt and Above | 25 | 4 | 14% | 26 | 7 | 21% |
| **Grand Total** | **454** | **19** | **4%** | **88** | **49** | **36%** |

At the allegation level, officers were sustained at a much higher rate than sergeants and above for internally generated allegations. Only one sergeant was sustained for an internally generated allegation in 2024 (1 of 11, 9%). The sustained rate for officers for internally generated allegations was 56% (32 of 57). Table 45 below shows sustained rates for rank broken down by investigation type and complaint origin.

**Table 45: Sustained Rates by Gender and Complaint Origin for Fully Investigated Cases (Allegation Level)**

| | Division Level Investigation | | | | Internal Affairs Investigation | | | | |
| | External | | Internal | | External | | Internal | | Total |
| | n | % Sust | n | % Sust | n | % Sust | n | % Sust | % Sust |
|---|---|---|---|---|---|---|---|---|---|
| Officer | 429 | 11% | 15 | 40% | 62 | 13% | 42 | 62% | 16% |
| Sgt and Above | 25 | 12% | 4 | 0% | 26 | 27% | 7 | 14% | 15% |
| **Grand Total** | **454** | **11%** | **19** | **32%** | **88** | **17%** | **49** | **55%** | **16%** |

## 5.3. Analysis by Type of Sustained Violation for Fully Investigated Cases

In an effort to understand racial disparities in sustained rates, we next looked at the type of allegations that different racial groups were being sustained for. While this analysis is only partial because it leaves out the allegations that were not sustained in each case, we hoped it would give us some insight into whether one group was being systematically saddled with a sustained finding for a specific type of allegation.

The top sustained allegations for all complaint categories in 2024 were *Performance of Duty – General* (27 allegations in 18 cases), *Conduct Toward Others* (15 allegations in 12 cases), *Truthfulness* (7 allegations in 6 cases), and *Custody of Prisoners – Treatment* (5 allegations in 1 case). Table 46 shows the breakdown of sustained allegations by race for fully investigated cases. As always, the numbers are too small for clear patterns to emerge, but there is not obvious evidence of different patterns.

**Table 46: Sustained Allegations by Race for Fully Investigated Cases**

| Sustained Allegations | White | Black | Hispanic | Asian/ Filipino | Other/ Unknown | Grand Total |
|---|---|---|---|---|---|---|
| PERFORMANCE OF DUTY - GENERAL | 2 | 11 | 11 | 3 | | 27 |
| CONDUCT TOWARD OTHERS | 1 | 3 | 7 | 3 | 1 | 15 |
| TRUTHFULNESS | | 3 | 4 | | | 7 |
| CUSTODY OF PRISONERS - TREATMENT | | 3 | 1 | 1 | | 5 |
| PERFORMANCE OF DUTY - CARE OF PROPERTY | | 2 | 2 | | | 4 |
| REFUSAL TO PROVIDE NAME OR SERIAL NUMBER | | 3 | | 1 | | 4 |
| FAILURE TO ACCEPT OR REFER A COMPLAINT (UNINTENTIONAL) | 1 | 1 | 2 | | | 4 |
| PERFORMANCE OF DUTY - PDRD | | 2 | | 1 | | 3 |
| OBEDIENCE TO LAWS - FELONY | | | 3 | | | 3 |
| GENERAL CONDUCT | | 1 | 2 | | | 3 |
| OBEDIENCE TO LAWS - MISDEMEANOR/INFRACTION | | | 3 | | | 3 |
| USE OF FORCE | 1 | | | 1 | | 2 |
| UNAUTHORIZED USE OF ELECTRONIC SYSTEMS | | | 2 | | | 2 |

41

| | | | | | | |
|---|---|---|---|---|---|---|
| PERFORMANCE OF DUTY - UNINTENTIONAL/IMPROPER SEARCH, SEIZURE, OR ARREST | | | 1 | 1 | | 2 |
| OBSTRUCTING THE INTERNAL AFFAIRS PROCESS | | 2 | | | | 2 |
| REPORTING VIOLATIONS OF LAWS, ORDINANCES, RULES OR ORDERS (CLASS I) | | | 1 | | | 1 |
| DAMAGED, INOPERATIVE PROPERTY OR EQUIPMENT | | | 1 | | | 1 |
| FALSE REPORTING OF ILLNESS OR INJURY | | 1 | | | | 1 |
| PERFORMANCE OF DUTY - MIRANDA VIOLATION | | | 1 | | | 1 |
| IMPROPER DISSEMINATION OF COMPUTER INFORMATION | | | 1 | | | 1 |
| INSUBORDINATION - FAILURE TO OBEY A LAWFUL ORDER | | 1 | | | | 1 |
| SUPERVISORS - AUTHORITY AND RESPONSIBILITIES   Includes all of the 285.00 subsections except 285.90 | | | 1 | | | 1 |
| INTERFERING WITH INVESTIGATIONS | | | 1 | | | 1 |
| ABSENCE FROM DUTY | | 1 | | | | 1 |
| PROHIBITED ACTIVITY ON DUTY | | 1 | | | | 1 |
| USE OF PRIVILEGED INFORMATION | | | 1 | | | 1 |
| REFUSAL TO ACCEPT OR REFER COMPLAINT (INTENTIONAL) | | 1 | | | | 1 |
| COMMANDING OFFICERS AUTHORITY AND RESPONSIBILITIES - COMMAND | | | 1 | | | 1 |
| **Grand Total** | **5** | **36** | **46** | **11** | **1** | **99** |

It also seemed important to see what specific allegations were levied against various groups in cases that were originated internally, especially because we found a greater disparity in sustained rates in those categories. In 2024, allegations in internally generated cases were much more likely to be sustained than in externally generated cases. See *4.4. Do Cases with an External Origin Differ from Cases with an Internal Origin?*. This makes sense because internally generated cases are often based on Department employees' observations of potential misconduct. When focusing on fully investigated cases, the overall sustained rate was 49% for allegations in internally generated cases compared to 12% for externally generated cases. Table 47 below shows that white members had no sustained allegations for internally generated complaints and Asian members only had one sustained allegation, which was for a Class II violation, *Performance of Duty - General* (officer failed to complete a report). Hispanic members had 18 sustained allegations (10 Class I and 8 Class II) and Black members had 14 sustained allegations (6 Class I and 8 Class II) for internally generated complaints. The top sustained allegations for Hispanic members were *Truthfulness, Obedience to Laws, General Conduct* and *Unauthorized Use of Electronic Systems*. The top sustained allegations for Black members were *Performance of Duty - General, Truthfulness*, and *Conduct Toward Others*.

The 33 sustained allegations for internally generated cases occurred in 11 cases involving 12 members. Four cases, involving four members, made up 67% of the allegations (22 of 33) – four Hispanic members and one Black member. Two of the Hispanic members (6 and 8 allegations each) were terminated for *Truthfulness* and one Hispanic member (3 allegations) received a 10-day suspension for allegations that included *Unauthorized Use of Electronic Systems* and *Obedience to Laws - Misdemeanor/Infraction*. The Black member (5 allegations) received a 35-day suspension for multiple sustained allegations, including *Conduct Toward Others - Workplace Violence*. There were also two Black members with two allegations each who were terminated, both for *Truthfulness*, and another Black member with two allegations that received a 5-day suspension for *Absence from Duty and Insubordination*.

**Table 47: Sustained allegations by Race for Internally Generated Cases**

| Allegation | Black | Hispanic | Asian/ Filipino | Grand Total |
|---|---|---|---|---|
| PERFORMANCE OF DUTY - GENERAL | 3 | 1 | 1 | 5 |
| TRUTHFULNESS | 2 | 3 | | 5 |
| CONDUCT TOWARD OTHERS | 3 | 1 | | 4 |
| OBEDIENCE TO LAWS - MISDEMEANOR/INFRACTION | | 3 | | 3 |
| UNAUTHORIZED USE OF ELECTRONIC SYSTEMS | | 2 | | 2 |
| OBEDIENCE TO LAWS - FELONY | | 2 | | 2 |
| GENERAL CONDUCT | | 2 | | 2 |
| FALSE REPORTING OF ILLNESS OR INJURY | 1 | | | 1 |
| INSUBORDINATION - FAILURE TO OBEY A LAWFUL ORDER | 1 | | | 1 |
| INTERFERING WITH INVESTIGATIONS | | 1 | | 1 |
| IMPROPER DISSEMINATION OF COMPUTER INFORMATION | | 1 | | 1 |
| DAMAGED, INOPERATIVE PROPERTY OR EQUIPMENT | | 1 | | 1 |
| USE OF PRIVILEGED INFORMATION | | 1 | | 1 |
| ABSENCE FROM DUTY | 1 | | | 1 |
| PERFORMANCE OF DUTY - PDRD | 1 | | | 1 |
| FAILURE TO ACCEPT OR REFER A COMPLAINT (UNINTENTIONAL) | 1 | | | 1 |
| OBSTRUCTING THE INTERNAL AFFAIRS PROCESS | 1 | | | 1 |
| **Grand Total** | **14** | **18** | **1** | **33** |

A review of sustained allegations for internally generated cases by gender (Table 48), showed that male members had 28 sustained allegations for internally generated cases in eight different cases involving nine members. Nineteen of the 28 allegations (68%) were for three different officers in three different cases. The top sustained allegations for male members were *Truthfulness* (5), *Conduct Toward Others* (4) and *Performance of Duty - General* (3).

Female members only had five sustained allegations for internally generated cases. There were three cases with three sworn employees. One female member was sustained for three allegations in the same case, one of which was a Class I allegation that resulted in a 10-day suspension. The other two cases involved two separate members and each were sustained for *Performance of Duty - General*.

43

**Table 48: Sustained allegations by Gender for Internally Generated Cases**

| Allegation | Male | Female | Grand Total |
|---|---|---|---|
| PERFORMANCE OF DUTY - GENERAL | 3 | 2 | 5 |
| TRUTHFULNESS | 5 | | 5 |
| CONDUCT TOWARD OTHERS | 4 | | 4 |
| OBEDIENCE TO LAWS - MISDEMEANOR/INFRACTION | 2 | 1 | 3 |
| UNAUTHORIZED USE OF ELECTRONIC SYSTEMS | 1 | 1 | 2 |
| OBEDIENCE TO LAWS - FELONY | 2 | | 2 |
| GENERAL CONDUCT | 1 | 1 | 2 |
| FALSE REPORTING OF ILLNESS OR INJURY | 1 | | 1 |
| INSUBORDINATION - FAILURE TO OBEY A LAWFUL ORDER | 1 | | 1 |
| INTERFERING WITH INVESTIGATIONS | 1 | | 1 |
| IMPROPER DISSEMINATION OF COMPUTER INFORMATION | 1 | | 1 |
| DAMAGED, INOPERATIVE PROPERTY OR EQUIPMENT | 1 | | 1 |
| USE OF PRIVILEGED INFORMATION | 1 | | 1 |
| ABSENCE FROM DUTY | 1 | | 1 |
| PERFORMANCE OF DUTY - PDRD | 1 | | 1 |
| FAILURE TO ACCEPT OR REFER A COMPLAINT (UNINTENTIONAL) | 1 | | 1 |
| OBSTRUCTING THE INTERNAL AFFAIRS PROCESS | 1 | | 1 |
| **Grand Total** | **28** | **5** | **33** |

Finally, we looked at sustained allegations by rank for internally generated cases (Table 49). Only one sergeant was sustained for internally generated allegations (1 of 11 allegations), for *Performance of Duty - General*. Of the 11 allegations, 4 were for *Supervisor/Commander Authority and Responsibility*, unique to sergeants and above, and 3 were for reporting violations.

Officers, on the other hand, were sustained in 32 of 57 (56%) of internally generated allegations. The top three allegations were for *Truthfulness*, *Performance of Duty - General*, and *Obedience to Laws - Misdemeanor/Infraction*, and the sustained rate for these three allegations combined was 75%.

**Table 49: Sustained allegations by Rank for Internally Generated Cases**

| Allegation | Officer | Sgt and Above | Grand Total |
|---|---|---|---|
| PERFORMANCE OF DUTY - GENERAL | 4 | 1 | 5 |
| TRUTHFULNESS | 5 | | 5 |
| CONDUCT TOWARD OTHERS | 4 | | 4 |
| OBEDIENCE TO LAWS - MISDEMEANOR/INFRACTION | 3 | | 3 |
| UNAUTHORIZED USE OF ELECTRONIC SYSTEMS | 2 | | 2 |
| OBEDIENCE TO LAWS - FELONY | 2 | | 2 |
| GENERAL CONDUCT | 2 | | 2 |

| | | | |
|---|---|---|---|
| FALSE REPORTING OF ILLNESS OR INJURY | 1 | | 1 |
| INSUBORDINATION - FAILURE TO OBEY A LAWFUL ORDER | 1 | | 1 |
| INTERFERING WITH INVESTIGATIONS | 1 | | 1 |
| IMPROPER DISSEMINATION OF COMPUTER INFORMATION | 1 | | 1 |
| DAMAGED, INOPERATIVE PROPERTY OR EQUIPMENT | 1 | | 1 |
| USE OF PRIVILEGED INFORMATION | 1 | | 1 |
| ABSENCE FROM DUTY | 1 | | 1 |
| PERFORMANCE OF DUTY - PDRD | 1 | | 1 |
| FAILURE TO ACCEPT OR REFER A COMPLAINT (UNINTENTIONAL) | 1 | | 1 |
| OBSTRUCTING THE INTERNAL AFFAIRS PROCESS | 1 | | 1 |
| **Grand Total** | **32** | **1** | **33** |

The low numbers of sustained females and members holding the rank of sergeant and above made it difficult to assess patterns in violation types for gender and rank. When looking at race, 32 of the 33 sustained allegations in internally generated cases were for Black and Hispanic members. No white or Other/Unknown members and only one Asian member were sustained. No obvious patterns arose in the type of violations being sustained for Black and Hispanic members.

## 5.4. Did Seniority Or Age Explain The Differences In Sustained Rates for Fully Investigated Allegations?

Due to the disparity in sustained rates between white members and Black and Hispanic members, we examined additional variables that might explain the disparity, including age and seniority. For seniority, we tested to see if the sustained percentage was disproportionately higher for members with less seniority (assuming rookie officers make more mistakes), since a higher percentage of Black and Hispanic members have less than 5 years of seniority compared to white members.

These analyses echo the age and seniority analyses we did above at the case level, looking at all 1,147 cases. See *4.2. Is It Because White Officers Are Older?.* To be exhaustive, the analysis below (Table 50) covers the 610 allegations that were the subject of a full investigation, so this analysis overlaps but is not identical to the previous one. It enables us to verify that the patterns observed at the case level do not hide patterns at the allegation level since cases omit some allegations when a case includes multiple allegations.

Overall, the seniority group with the highest sustained rate was 2-5 years and the group with the lowest was 5-10 years. There was little difference in the sustained rates between the most junior members (less than 2 years – 19%) and the most senior members (over 10 years 15%), which indicates that seniority does not explain the disparity.

Also, noteworthy is that Black members were sustained at a higher rate than white members at every seniority level. No white members with less than five years of seniority were sustained (0 of 23 allegations sustained). Aside from the 5-10 year seniority level, Hispanic members were sustained at a higher rate than white members.

**Table 50: Sustained Rates by Seniority (Fully Investigated Allegations)**

| Seniority | Race Clean | Sustained % | Sustained n | Other than Sustained % | Other than Sustained n | Total % | Total |
|---|---|---|---|---|---|---|---|
| Less than 2 yrs | White | 0% | | 100% | 17 | 100% | 17 |
| | Black | 20% | 15 | 80% | 60 | 100% | 75 |
| | Hispanic | 26% | 21 | 74% | 59 | 100% | 80 |
| | Asian/Filipino | 11% | 4 | 89% | 31 | 100% | 35 |
| | Other/Unk. | 13% | 1 | 88% | 7 | 100% | 8 |
| Less than 2 yrs Total | | 19% | 41 | 81% | 174 | 100% | 215 |
| 2-5 yrs | White | 0% | | 100% | 6 | 100% | 6 |
| | Black | 35% | 13 | 65% | 24 | 100% | 37 |
| | Hispanic | 33% | 16 | 67% | 32 | 100% | 48 |
| | Asian/Filipino | 10% | 4 | 90% | 36 | 100% | 40 |
| | Other/Unk. | 0% | | 100% | 8 | 100% | 8 |
| 2-5 yrs Total | | 24% | 33 | 75% | 106 | 100% | 139 |
| 5-10 yrs | White | 6% | 2 | 94% | 30 | 100% | 32 |
| | Black | 15% | 5 | 85% | 28 | 100% | 33 |
| | Hispanic | 4% | 2 | 96% | 48 | 100% | 50 |
| | Asian/Filipino | 7% | 2 | 93% | 28 | 100% | 30 |
| | Other/Unk. | 0% | | 100% | 17 | 100% | 17 |
| 5-10 yrs Total | | 7% | 11 | 93% | 151 | 100% | 162 |
| Over 10 yrs | White | 9% | 3 | 91% | 31 | 100% | 34 |
| | Black | 17% | 3 | 83% | 15 | 100% | 18 |
| | Hispanic | 27% | 7 | 73% | 19 | 100% | 26 |
| | Asian/Filipino | 6% | 1 | 94% | 15 | 100% | 16 |
| Over 10 yrs Total | | 15% | 14 | 85% | 80 | 100% | 94 |
| Grand Total | | 16% | 99 | 84% | 511 | 100% | 610 |

When looking at the age of members (Table 51), there was no particular pattern, for example, sustained rates decreasing with age. The age group with the lowest sustained rate was 25-30 (12%), while the group with the highest was 30-35 (20%). The youngest members (20-25) and the oldest members (over 40) had similar sustained rates.

**Table 51: Sustained Rates by Age**

| Age categorized | Sustained % | Sustained n | Other than Sustained % | Other than Sustained n | Total % | Total n |
|---|---|---|---|---|---|---|
| 20-25 | 17% | 8 | 83% | 40 | 100% | 48 |
| 25-30 | 12% | 18 | 88% | 130 | 100% | 148 |
| 30-35 | 20% | 32 | 80% | 125 | 100% | 157 |
| 35-40 | 17% | 21 | 83% | 102 | 100% | 123 |
| Over 40 | 15% | 20 | 85% | 114 | 100% | 134 |
| Grand Total | 16% | 99 | 84% | 511 | 100% | 610 |

46

## 5.5. Do Specific Investigators Stand Out in Fully Investigated Cases?

We also looked at investigators to see if there were any patterns. There were 12 investigators who handled all of the 62 full investigations conducted by IA. Table 52 presents all their findings, ordered by decreasing number of cases. We note for example that Investigator 3 reviewed a total of 9 cases, and that the 3 cases he/she sustained all involved Black officers (out of the 5 Black cases reviewed), whereas none of their 3 cases involving white officers led to a sustained finding. Indeed, there was only 1 sustained case for a white officer in the 62 cases fully investigated by IA (out of 15 white cases). This investigator-level analysis can be misleading if one focuses too much on investigators who sustained a lot of cases involving Black officers, and on reviewing these cases to ensure they were in line with policy. But note that any investigator who does not sustain a case involving a white officer contributes just as much to the overall disparity. For example, in the table below, Investigators 6, 8, and even 12 also contribute to the overall Black-white disparity in outcomes, even though they investigated less than 5 cases each, and not a single one by a Black officer. This makes the interpretation of the investigator-level analysis difficult.

It is also important to point out that investigators do not control which cases they receive and there are several layers of review after they complete their investigative findings. In some cases, an investigator's findings may be changed during the chain of review, by the Chief of Police, the CPRA, or a Discipline Committee. Hence, the final finding used in this analysis may not have been the investigator's decision.

Three investigators (1, 2, and 3) accounted for half of the investigations (35 of 62, or 56%). To see if they might have had an outsized influence on overall disparities, we include at the bottom of Table 52 below the sustained rates per race across all 12 investigators, as well as leaving out the 3 investigators who handled half of the cases. We see that the Black/white disparity is particularly pronounced for these three investigators (30% versus 0%). As a result, we see that the Black/white disparity across all investigators (31% versus 7%) is reduced (to 33% versus 20%) when you remove these top investigators. As impressive as these numbers look, note that the change is largely in the rate of white cases, and that this is entirely driven by a single sustained white case, so this should be taken with caution. Without that single case, the disparity would be very similar in the top 3 investigators (30% versus 0%) and the rest (33% versus 0%).

**Table 52: Fully Investigated IA Cases by Investigator**

| Inv | Inv Race | # of Sustained Member Cases | # of Member Cases Investigated | Overall Sustained Rate | Sustained Rates | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | White | Black | Hispanic | Asian | Other |
| 1 | Wh | 1 | 15 | 7% | 0/3 | 0/3 | 1/2 | 0/7 | 0/0 |
| 2 | Wh | | 11 | 0% | 0/4 | 0/2 | 0/4 | 0/1 | 0/0 |
| 3 | Bl | 3 | 9 | 33% | 0/3 | 3/5 | 0/0 | 0/1 | 0/0 |
| 4 | Bl | 5 | 6 | 83% | 1/1 | 1/2 | 3/3 | 0/0 | 0/0 |
| 5 | As | 3 | 6 | 50% | 0/1 | 1/2 | 1/1 | 1/2 | 0/0 |
| 6 | Wh | | 4 | 0% | 0/1 | 0/0 | 0/2 | 0/0 | 0/1 |
| 7 | Wh | | 3 | 0% | 0/0 | 0/1 | 0/2 | 0/0 | 0/0 |
| 8* | Wh | 1 | 3 | 33% | 0/1 | 0/0 | 1/1 | 0/1 | 0/0 |
| 9 | Wh | | 2 | 0% | 0/0 | 0/1 | 0/1 | 0/0 | 0/0 |
| 10 | As | 1 | 1 | 100% | 0/0 | 0/0 | 1/1 | 0/0 | 0/0 |
| 11 | Wh | 1 | 1 | 100% | 0/0 | 0/0 | 1/1 | 0/0 | 0/0 |
| 12 | As | 1 | 1 | 0% | 0/1 | 0/0 | 0/0 | 0/0 | 0/0 |

| TOTAL | 15 | 62 | 24% | 1/15 | 5/16 | 8/18 | 1/12 | 0/1 |
|---|---|---|---|---|---|---|---|---|
| | | | | 7% | 31% | 44% | 8% | 0% |
| Top 3 Investigators (56% cases) | | | | 0% | 30% | 17% | 0% | 0% |
| Removing Top 3 Investigators (44% left) | | | | 20% | 33% | 58% | 33% | 0% |

*There was one investigator (#8) who conducted both DLIs and IA investigations during the time-period of review.*

Not surprisingly, there are many more investigators involved in DLI full investigations – a total of 68 investigating 290 cases: 29 investigated 1 or 2 cases, 23 investigated between 3 and 5, 11 between 6 and 10. As we see in Table 53 below, the remainder 72 full DLI investigations were apparently conducted by 5 investigators who each handled 12, 13, 13, 17, and 17 cases, accounting for exactly a third (25%) of all DLI fully investigated cases.

**Table 53: Fully Investigated DLI Cases by Investigator**

| Inv | Inv Race | # of Sustained Member Cases | # of Member Cases Investigated | Overall Sustained Rate | Sustained Rates | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | White | Black | Hispanic | Asian | Other |
| 13 | As | 2 | 17 | 12% | 1/6 | 0/1 | 0/6 | 1/3 | 0/1 |
| 14 | Wh | 1 | 17 | 6% | 0/2 | 1/4 | 0/7 | 0/2 | 0/2 |
| 15 | Wh | | 13 | 0% | 0/1 | 0/5 | 0/4 | 0/3 | 0/0 |
| 16 | Hi | | 13 | 0% | 0/3 | 0/2 | 0/4 | 0/3 | 0/1 |
| 17 | Hi | 5 | 12 | 42% | 0/1 | 3/4 | 1/3 | 1/4 | 0/0 |
| 18 | As | 1 | 10 | 10% | 1/3 | 0/5 | 0/1 | 0/1 | 0/0 |
| 19 | As | 2 | 8 | 25% | 0/0 | 0/2 | 2/5 | 0/1 | 0/0 |
| 20 | As | | 8 | 0% | 0/0 | 0/3 | 0/4 | 0/1 | 0/0 |
| 21 | Wh | | 8 | 0% | 0/1 | 0/4 | 0/1 | 0/1 | 0/1 |
| 22 | Hi | 1 | 8 | 13% | 0/2 | 0/1 | 1/3 | 0/2 | 0/0 |
| 23 | As | 3 | 7 | 43% | 0/0 | 2/2 | 1/4 | 0/1 | 0/0 |
| 24 | Bl | 3 | 7 | 43% | 1/1 | 0/2 | 2/2 | 0/1 | 0/1 |
| 25 | Wh | | 7 | 0% | 0/1 | 0/1 | 0/2 | 0/3 | 0/0 |
| 26 | Wh | 1 | 6 | 17% | 0/0 | 0/2 | 0/1 | 1/2 | 0/1 |
| 27 | Wh | | 6 | 0% | 0/3 | 0/0 | 0/0 | 0/3 | 0/0 |
| 28 | Hi | 3 | 6 | 50% | 0/0 | 2/4 | 1/1 | 0/1 | 0/0 |
| 29 | Bl | | 5 | 0% | 0/0 | 0/1 | 0/4 | 0/0 | 0/0 |
| 30 | Wh | | 5 | 0% | 0/1 | 0/1 | 0/1 | 0/2 | 0/0 |
| 31 | Wh | 2 | 5 | 40% | 0/0 | 1/3 | 0/0 | 1/2 | 0/0 |
| 32 | As | 2 | 5 | 40% | 0/0 | 0/0 | 1/1 | 1/3 | 0/1 |
| 33 | Hi | | 5 | 0% | 0/2 | 0/2 | 0/0 | 0/1 | 0/0 |
| 34 | Wh | | 5 | 0% | 0/1 | 0/1 | 0/1 | 0/2 | 0/0 |
| 35 | Bl | | 5 | 0% | 0/0 | 0/2 | 0/1 | 0/1 | 0/1 |
| 36 | Wh | | 4 | 0% | 0/0 | 0/0 | 0/3 | 0/1 | 0/0 |
| 37 | Bl | 1 | 4 | 25% | 0/1 | 0/0 | 1/2 | 0/1 | 0/0 |
| 38 | Bl | | 4 | 0% | 0/0 | 0/0 | 0/3 | 0/1 | 0/0 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 39 | Hi | | 4 | 0% | 0/0 | 0/1 | 0/2 | 0/0 | 0/1 |
| 40 | Wh | 3 | 4 | 75% | 0/0 | 2/2 | 0/1 | 1/1 | 0/0 |
| 41 | Wh | 1 | 4 | 25% | 0/1 | 1/1 | 0/1 | 0/0 | 0/1 |
| 42 | Hi | | 4 | 0% | 0/2 | 0/1 | 0/0 | 0/1 | 0/0 |
| 43 | As | | 3 | 0% | 0/0 | 0/2 | 0/1 | 0/0 | 0/0 |
| 44 | Hi | | 3 | 0% | 0/0 | 0/0 | 0/0 | 0/2 | 0/1 |
| 45 | Hi | | 3 | 0% | 0/0 | 0/1 | 0/0 | 0/1 | 0/1 |
| 46 | Hi | 1 | 3 | 33% | 0/1 | 0/0 | 1/2 | 0/0 | 0/0 |
| 8* | Wh | 2 | 3 | 67% | 0/0 | 1/1 | 1/2 | 0/0 | 0/0 |
| 47 | Hi | | 3 | 0% | 0/0 | 0/0 | 0/3 | 0/0 | 0/0 |
| 48 | Bl | 1 | 3 | 33% | 0/1 | 0/0 | 0/1 | 1/1 | 0/0 |
| 49 | Bl | | 3 | 0% | 0/0 | 0/1 | 0/0 | 0/2 | 0/0 |
| 50 | Wh | 2 | 3 | 67% | 0/0 | 1/1 | 0/1 | 0/0 | 1/1 |
| 51 | As | 2 | 2 | 100% | 0/0 | 0/0 | 1/1 | 1/1 | 0/0 |
| 52 | Hi | 2 | 2 | 100% | 0/0 | 0/0 | 1/1 | 1/1 | 0/0 |
| 53 | Wh | 2 | 2 | 100% | 0/0 | 1/1 | 1/1 | 0/0 | 0/0 |
| 54 | Bl | | 2 | 0% | 0/0 | 0/1 | 0/0 | 0/1 | 0/0 |
| 55 | Hi | | 2 | 0% | 0/1 | 0/0 | 0/1 | 0/0 | 0/0 |
| 56 | Wh | | 2 | 0% | 0/0 | 0/1 | 0/1 | 0/0 | 0/0 |
| 57 | Bl | 2 | 2 | 100% | 0/0 | 1/1 | 1/1 | 0/0 | 0/0 |
| 58 | Wh | | 2 | 0% | 0/0 | 0/1 | 0/0 | 0/1 | 0/0 |
| 59 | As | | 2 | 0% | 0/0 | 0/2 | 0/0 | 0/0 | 0/0 |
| 60 | Bl | | 2 | 0% | 0/0 | 0/2 | 0/0 | 0/0 | 0/0 |
| 61 | Bl | | 2 | 0% | 0/0 | 0/0 | 0/0 | 0/2 | 0/0 |
| 62 | Hi | | 2 | 0% | 0/0 | 0/1 | 0/0 | 0/1 | 0/0 |
| 63 | Bl | 1 | 2 | 50% | 0/0 | 0/0 | 1/2 | 0/0 | 0/0 |
| 64 | Wh | 1 | 2 | 50% | 0/1 | 1/1 | 0/0 | 0/0 | 0/0 |
| 65 | Wh | | 2 | 0% | 0/1 | 0/1 | 0/0 | 0/0 | 0/0 |
| 66 | Wh | | 2 | 0% | 0/0 | 0/2 | 0/0 | 0/0 | 0/0 |
| 67 | Wh | | 2 | 0% | 0/0 | 0/2 | 0/0 | 0/0 | 0/0 |
| 68 | Wh | 1 | 2 | 50% | 0/1 | 0/0 | 0/0 | 1/1 | 0/0 |
| 69 | Hi | | 1 | 0% | 0/0 | 0/0 | 0/0 | 0/0 | 0/1 |
| 70 | Wh | | 1 | 0% | 0/0 | 0/0 | 0/1 | 0/0 | 0/0 |
| 71 | As | | 1 | 0% | 0/0 | 0/0 | 0/0 | 0/1 | 0/0 |
| 72 | Wh | | 1 | 0% | 0/0 | 0/0 | 0/0 | 0/1 | 0/0 |
| 73 | Bl | | 1 | 0% | 0/1 | 0/0 | 0/0 | 0/0 | 0/0 |
| 74 | Bl | | 1 | 0% | 0/0 | 0/0 | 0/1 | 0/0 | 0/0 |
| 75 | Wh | | 1 | 0% | 0/0 | 0/1 | 0/0 | 0/0 | 0/0 |
| 76 | Wh | 1 | 1 | 100% | 0/0 | 1/1 | 0/0 | 0/0 | 0/0 |
| 77 | Hi | | 1 | 0% | 0/0 | 0/0 | 0/0 | 0/1 | 0/0 |
| 78 | Bl | | 1 | 0% | 0/0 | 0/1 | 0/0 | 0/0 | 0/0 |
| 79 | Hi | 2 | 1 | 0% | 0/0 | 0/0 | 0/0 | 0/0 | 0/1 |
| TOTAL | | 49 | 290 | 17% | 3/39 | 18/82 | 17/88 | 10/65 | 1/16 |

|  |  |  |  | 8% | 22% | 19% | 15% | 6% |
|---|---|---|---|---|---|---|---|---|
| Only Top 5 Investigators (25% cases) |  |  | 11% | 8% | 25% | 4% | 13% | 0% |
| Removing Top 5 Investigators (75% left) |  |  | 19% | 8% | 21% | 25% | 16% | 8% |

*There was one investigator (#8) who conducted both DLIs and IA investigations during the time period of review.*

Again, the last row of the table drops the top investigators – in this case the first 5, which account for a quarter of all investigations. We see that the disparity remains roughly the same between white and Black cases (8% versus 22% with all, 8% versus 21% dropping the top 5), suggesting that the overall observed disparity in fully investigated DLI cases did not result simply from these 5 frequent investigators.

# 6. Discipline Analyses

This next section includes analyses of the discipline imposed for sustained cases. Discipline is determined based on the severity and number of sustained allegations, whether the member has been sustained for that allegation in the past, and the number of aggravating and mitigating factors. Commanders of each employee produce a Pre-Discipline Report[17] which includes the above information and a recommendation for discipline. The Department's Discipline Matrix[18] is the reference for determining a range for discipline. Discipline determinations are made during a pre-discipline conference, which is attended by members of the Executive Team. Final discipline is determined by the Chief of Police or their designee, or in some cases the Oakland Police Commission Discipline Committee. Appendix 5 contains discipline for each sustained case and includes race, aggravating/mitigating factors, offense number, discipline matrix recommendation, and rank (officer/supervisor).

## Discipline by Class

Following the *Department's Working Methodology for Internal Affairs Disparity Analyses*, cases were separated by Class before analyzing discipline. Class I allegations are typically more severe and generally result in more severe discipline. If at least one of the sustained allegations against a member was a Class I allegation, the case was coded as "Class I." If the case had only Class II sustained allegations, it was coded as "Class II."

The number of cases per category for Class I and Class II cases were too small to conduct a chi-square test, so we relied on numbers and percentages to identify differences of concern. Although there were 64 sustained sworn member cases, two of these cases resulted in no discipline because the investigation exceeded the timeline allowed by California Government Code 3304. One case involved a male Asian officer who was sustained for *Use of Force* (Class I). The other case involved a female Hispanic officer who was sustained for *Conduct Toward Others* (Class II). Hence, the discipline analysis included 62 cases (22 Class I and 40 Class II).

We first looked at the percentage of discipline cases that were Class I versus Class II. Table 56 shows that, while overall the number of discipline cases dropped between 2023 and 2024, the percentage of discipline cases that were Class I increased (24% to 35%) and Class II decreased (75% to 65%). Black members had the biggest increase in percentage of Class I discipline cases (35% to 52%) and the highest percentage compared to other race groups. This means that Black members were more often being disciplined for more serious misconduct. In 2024, Hispanic members had the second highest percentage of Class I discipline cases (29%), followed by white members (25%) and Asian members (20%).

---

[17] TF 3340 Pre-Discipline Report. Revised: May 2015.

[18] Training Bulletin V-T Discipline Policy Appendix (Discipline Matrix). Effective Date: March 14, 2014.

**Table 56: Discipline by Class and Race 2023 Versus 2024**

| | Class I Discipline Cases 2023 | | Class II Discipline Cases 2023 | | Class I Discipline Cases 2024 | | Class II Discipline Cases 2024 | |
|---|---|---|---|---|---|---|---|---|
| | % Total | n | % Total | n | % Total | n | % Total | n |
| White | 24% | 9 | 76% | 28 | 25% | 1 | 75% | 3 |
| Black | 35% | 7 | 65% | 13 | 52% | 12 | 48% | 11 |
| Hispanic | 20% | 8 | 80% | 32 | 29% | 7 | 71% | 17 |
| Asian/Filipino | 23% | 6 | 77% | 20 | 20% | 2 | 80% | 8 |
| Other/Unknown | 17% | 1 | 83% | 5 | 0% | | 100% | 1 |
| **Grand Total** | **24%** | **31** | **76%** | **98** | **35%** | **22** | **65%** | **40** |

The percentage of Class I discipline cases for male and female members was about the same in 2023, but in 2024 the percentage increased for males (24% to 38%).

**Table 57: Allegations – Allegation Class Percentages by Gender 2023 Versus 2024**

| | Class I Discipline Cases 2023 | | Class II Discipline Cases 2023 | | Class I Discipline Cases 2024 | | Class II Discipline Cases 2024 | |
|---|---|---|---|---|---|---|---|---|
| | % Total | n | % Total | n | % Total | n | % Total | n |
| Male | 24% | 28 | 76% | 88 | 38% | 20 | 62% | 33 |
| Female | 23% | 3 | 77% | 10 | 22% | 2 | 78% | 7 |
| **Grand Total** | **24%** | **31** | **76%** | **98** | **35%** | **22** | **65%** | **40** |

The percentage of Class I discipline cases for sergeants and above was higher than officers in both 2023 and 2024, and rose for both in 2024.

**Table 58: Allegations – Allegation Class Percentages by Rank 2023 Versus 2024**

| | Class I Allegations 2023 | | Class II Allegations 2023 | | Class I Allegations 2024 | | Class II Allegations 2024 | |
|---|---|---|---|---|---|---|---|---|
| | % Total | n | % Total | n | % Total | n | % Total | n |
| Officer | 23% | 24 | 77% | 82 | 35% | 19 | 65% | 36 |
| Sgt and Above | 30% | 7 | 70% | 16 | 43% | 3 | 57% | 4 |
| **Grand Total** | **24%** | **31** | **76%** | **98** | **35%** | **22** | **65%** | **40** |

When looking at Class I discipline by race (Table 59), all but one Class I sustained cases resulted in suspension or termination. The only Class I case resulting in lower-level discipline was also for the only white member with a Class I sustained case. In this case, the CPRA added an allegation against a white sergeant for threatening to use force that would not have been compliant with policy should it have been used. All other members who received discipline for a sustained Class I violation were non-white, and all received a suspension or termination for their Sustained Class I cases.

White members had a significant drop in Class I sustained cases between 2023 and 2024 (9 to 1). This is reflective of the large drop in sustained cases against white members in 2024. In 2023, white members had the highest number of Class I cases compared to other race groups, and all but one resulted in

suspension or termination. The Class I cases rose between 2023 and 2024 for Black members (7 to 12) and dropped for Hispanic (8 to 7) and Asian (6 to 2) members.

There were two Black officers who were sustained for two Class I cases each in 2024. One was terminated in both cases and the other received a 35-day suspension for one case and a 20-day suspension for the other case.

**Table 59: Class I Discipline by Race 2024**

| Class I Cases | Counseling | Written | Suspension | Termination | Total |
|---|---|---|---|---|---|
| **White** | 1 | 0 | 0 | 0 | 1 |
| **Black** | 0 | 0 | 9 | 3 | 12 |
| **Hispanic** | 0 | 0 | 4 | 3 | 7 |
| **Asian** | 0 | 0 | 2 | 0 | 2 |
| **Other/Unknown** | 0 | 0 | 0 | 0 | 0 |
| **Total** | **1** | **0** | **15** | **6** | **22** |

Table 60 shows that Hispanic members had the highest number of sustained Class II cases with discipline compared to other race groups in 2024. This was a big drop from 2023 (32 to 17). White members had the biggest drop in sustained Class II cases (27 to 3). Sustained Class II cases for Asian members dropped from 20 to 8 and stayed about the same for Black members (13 to 11).

However, there was a shift in the seriousness of discipline in Class II cases between 2023 and 2024. In 2023, Black members had the highest suspension rate (as opposed to lower-level discipline – counseling and written reprimands) compared to white members (46% versus 33%). The opposite was true in 2024. White members received a higher level of discipline in 67% of cases compared to Black members in 36% of cases. There was one Black officer who was sustained in four Class II cases in 2024, three of which he received a suspension. This one officer increased the rate of suspensions for Black members.

**Table 60: Class II Discipline by Race 2024**

| Class II Cases | Counseling | | Written | | Suspension | | Demotion/ Termination | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | % | # | % | # | % | # | % | # | % | # |
| **White*** | 0% | | 33% | 1 | 67% | 2 | 0% | 0 | 100% | 3 |
| **Black** | 36% | 4 | 27% | 3 | 36% | 4 | 0% | 0 | 100% | 11 |
| **Hispanic** | 65% | 11 | 18% | 3 | 18% | 3 | 0% | 0 | 100% | 17 |
| **Asian** | 63% | 5 | 13% | 1 | 25% | 2 | 0% | 0 | 100% | 8 |
| **Other/Unknown** | 0% | | 100% | 1 | 0% | | 0% | 0 | 100% | 1 |
| **Total** | **50%** | **20** | **23%** | **9** | **28%** | **11** | **0%** | **0** | **100%** | **40** |

When looking at discipline for gender and rank, there were no significant changes between 2023 and 2024. Female members had very few Class I sustained cases and had a much lower suspension rate for Class II cases than male members in both years. Sergeants and above had a higher suspension rate than officers in both years. As stated earlier in this section, there was one sergeant who received counseling for a Class I case, while all other members received a suspension for their Class I cases. Tables 61 and 62 show discipline by gender and rank in 2024.

**Table 61: Discipline by Gender 2024**

| Class I Cases | Counseling | Written | Suspension | Demotion/ Termination | Total |
|---|---|---|---|---|---|
| Male | 1 | 0 | 13 | 6 | 20 |
| Female | | 0 | 2 | | 2 |
| Total | **1** | **0** | **15** | **6** | **22** |

| Class II Cases | Counseling | | Written | | Suspension | | Demotion/ Termination | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | % | # | % | # | % | # | % | # | % | # |
| Male | 45% | 15 | 24% | 8 | 30% | 10 | 0% | 0 | 100% | 33 |
| Female | 71% | 5 | 14% | 1 | 14% | 1 | 0% | 0 | 100% | 7 |
| Total | **50%** | **20** | **23%** | **9** | **28%** | **11** | **0%** | **0** | **100%** | **40** |

**Table 62: Discipline by Rank 2024**

| Class I Cases | Counseling | Written | Suspension | Demotion/ Termination | Total |
|---|---|---|---|---|---|
| Officer | 0 | 0 | 13 | 6 | 19 |
| Sgt and Above | 1 | 0 | 2 | | 3 |
| Total | **1** | **0** | **15** | **6** | **22** |

| Class II Cases | Counseling | | Written | | Suspension | | Demotion/ Termination | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | % | # | % | # | % | # | % | # | % | # |
| Officer | 56% | 20 | 22% | 8 | 22% | 8 | 0% | 0 | 100% | 36 |
| Sgt and Above | 0% | | 25% | 1 | 75% | 3 | 0% | 0 | 100% | 4 |
| Total | **50%** | **20** | **23%** | **9** | **28%** | **11** | **0%** | **0** | **100%** | **40** |

# 7. Recommendations

Our analyses produced the recommendations below.

1. **Keep better record of internally discovered allegations.** Analyzing cases with an internal origin was important in identifying where disparity was more prominent. Therefore, looking at the origin of individual allegations would allow for an even more targeted analysis. While the Department has a way to track internally discovered violations, the field was left blank for 33% of allegations in 2024. Furthermore, the only data point tracked is whether or not the allegation was internally discovered. To determine whether disparity differs for allegations that originate within the Department, the Department should ensure that the internally discovered violation field is complete for all allegations. Complete and accurate tracking of internally discovered allegations seems critical to understanding where disparity might be occurring, including:
   a. who discovered the violation,
   b. who approved adding the allegation to the case,
   c. when the allegation was added, and
   d. the cause/reason for adding the allegation.

The Department needs to improve its data collection to better understand when internal allegations are made, by whom, at what stage, and to put in place clear criteria and protocols to ensure that excessive discretion does not allow racial disparities to arise in this process, it would be important to study not only when internal allegations are added for officers of color, but also to review whether similar behavior by white officers might fail to lead to the addition of a similar internal allegation.

2. **Keep checking whether recent fluctuations constitute a trend.** The Department should continue to monitor sustained rates quarterly to see if the disparity identified in 2024 persists (as we do with Jan-Jun '25 in Table 2). The Department should also revise its methodology to place yearly findings in the context of previous years whenever possible. As Table 2 demonstrates, this provides a useful context to evaluate the magnitude of observed differences.

3. **Focus future analysis on fully investigated cases.** For future analyses, the Department should focus on fully investigated cases when identifying disparity in sustained rates since Summary Findings and Informal Complaint Resolutions (ICRs) do not result in sustained findings and, therefore, cannot exhibit disparity in sustained rates. However, prior to such a focus on full investigations it is important to make sure that there are no disparities in the rates of Summary Findings and ICRs, as disparities could be overlooked if cases against one group were unevenly dismissed before they come to a full investigation.

4. **Balance statistical significance with observed disparity.** The current methodology requires that we compute chi-squares to test statistical differences in disparity. While this tool is helpful in providing guidelines and cutoff points used to determine whether the data supports or refutes a relationship between two categories of data, it is not a perfect solution. Its utility is limited both because of the small numbers and the ability to compare only two variables. Therefore, in addition to using the statistical tools, we have to rely on common sense to decide which disparities are large enough to deserve attention, while being mindful that percentages derived from small datasets can be easily swayed by even minor fluctuations in the data.

5. **Collect qualitative data from department personnel.** The Department should gather qualitative data via interviews and focus groups with representatives from across the Department, including all ranks and bureaus, and members from police officer associations and unions to help assess high-level themes about how the results of this report impact sworn staff.

## Appendix 1: Chi-Square Tests Cases Per Member and Allegations Per Case

**Cases per Member**

**Table 1: Chi-Square Test by Cases per Member for White v Black Sworn Members**

|  | One Case per Member | | More than One Case per Member | | Chi-Square Value | p |
|---|---|---|---|---|---|---|
|  | Observed | Expected | Observed | Expected | | |
| White | 43% (41) | 33 | 57% (54) | 62 | 5.563 | 0.018 |
| Black | 25% (27) | 35 | 74% (76) | 67 | | |

**Table 2: Chi-Square Test by Cases per Member for White v Hispanic Members**

|  | One Case per Member | | More than One Case per Member | | Chi-Square Value | p |
|---|---|---|---|---|---|---|
|  | Observed | Expected | Observed | Expected | | |
| White | 43% (41) | 33 | 57% (54) | 62 | 4.540 | 0.033 |
| Hispanic | 29% (40) | 48 | 71% (99) | 91 | | |

**Table 3: Chi-Square Test by Cases per Member for White v Asian Members**

|  | One Case per Member | | More than One Case per Member | | Chi-Square Value | p |
|---|---|---|---|---|---|---|
|  | Observed | Expected | Observed | Expected | | |
| White | 43% (41) | 30 | 57% (54) | 65 | 9.843 | 0.002 |
| Asian | 21% (22) | 33 | 79% (81) | 70 | | |

**Table 4: Chi-Square Test by Cases per Member for White v Other/Unknown Sworn Members**

|  | One Case per Member | | More than One Case per Member | | Chi-Square Value | p |
|---|---|---|---|---|---|---|
|  | Observed | Expected | Observed | Expected | | |
| White | 43% (41) | 39 | 57% (54) | 56 | 0.339 | 0.560 |
| Other/ Unknown | 33% (7) | 9 | 67% (14) | 12 | | |

**Allegations per Case**

**Table 1: Chi-Square Test by Allegations per Case for White v Black Sworn Members**

|  | One Allegation per Case | | More than One Allegation per Case | | Chi-Square Value | p |
|---|---|---|---|---|---|---|
|  | Observed | Expected | Observed | Expected | | |
| White | 71% (159) | 150 | 29% (64) | 73 | 2.646 | 0.104 |
| Black | 64% (226) | 235 | 36% (125) | 116 | | |

**Table 2: Chi-Square Test by Allegations per Case for White v Hispanic Members**

|  | One Allegation per Case | | More than One Allegation per Case | | Chi-Square Value | p |
|---|---|---|---|---|---|---|
|  | Observed | Expected | Observed | Expected | | |
| White | 71% (159) | 155 | 29% (64) | 68 | 0.510 | 0.475 |
| Hispanic | 68% (290) | 294 | 32% (135) | 131 | | |

**Table 3: Chi-Square Test by Allegations per Case for White v Asian Members**

|  | One Allegation per Case | | More than One Allegation per Case | | Chi-Square Value | p |
|---|---|---|---|---|---|---|
|  | Observed | Expected | Observed | Expected | | |
| White | 71% (159) | 157 | 29% (64) | 66 | 0.071 | 0.790 |
| Asian | 70% (239) | 241 | 30% (103) | 101 | | |

**Table 4: Chi-Square Test by Allegations per Case for White v Other/Unknown Sworn Members**

|  | One Allegation per Case | | More than One Allegation per Case | | Chi-Square Value | p |
|---|---|---|---|---|---|---|
|  | Observed | Expected | Observed | Expected | | |
| White | 71% (159) | 157 | 29% (64) | 66 | 0.300 | 0.585 |
| Other/ Unknown | 67% (51) | 53 | 33% (25) | 23 | | |

**Table 5: Chi-Square Test by Allegations per Case for Male v Female**

|  | One Allegation per Case | | More than One Allegation per Case | | Chi-Square Value | p |
|---|---|---|---|---|---|---|
|  | Observed | Expected | Observed | Expected | | |
| Male | 67% (798) | 812 | 33% (394) | 380 | 4.284 | 0.038 |
| Female | 74% (167) | 153 | 26% (58) | 72 | | |

**Table 6: Chi-Square Test by Allegations per Case for Officer v Sgt and Above**

|  | One Allegation per Case | | More than One Allegation per Case | | Chi-Square Value | p |
|---|---|---|---|---|---|---|
|  | Observed | Expected | Observed | Expected | | |
| Officer | 68% (900) | 906 | 32% (431) | 425 | 2.006 | 0.157 |
| Sgt and Above | 76% (65) | 59 | 24% (21) | 27 | | |

# Appendix 2: Chi-Square Tests by Investigation Type

## All Investigations

**Table 1: Chi-Square Test by Investigation Type for White v Black Sworn Members**

| | Other than Sustained | | Sustained | | Chi-Square Value | p |
|---|---|---|---|---|---|---|
| | Observed | Expected | Observed | Expected | | |
| **All Investigations** | | | | | | |
| **White** | **98% (219)** | **213** | **2% (4)** | **10** | **5.87** | **0.015** |
| **Black** | **93% (328)** | **334** | **7% (23)** | **17** | | |
| **DLIs and DLI Summary Findings** | | | | | | |
| **White** | **99% (200)** | **194** | **1% (3)** | **8** | **4.357** | **0.037** |
| **Black** | **94% (308)** | **313** | **6% (18)** | **13** | | |
| IA and IA Summary Findings | | | | | | |
| White | Too few sustained cases to calculate a chi-square | | | | | |
| Black | | | | | | |

**Table 2: Chi-Square Test by Investigation Type for White v Hispanic Sworn Members**

| | Other than Sustained | | Sustained | | Chi-Square Value | p |
|---|---|---|---|---|---|---|
| | Observed | Expected | Observed | Expected | | |
| **All Investigations** | | | | | | |
| **White** | **98% (219)** | **213** | **2% (4)** | **10** | **4.80** | **0.028** |
| **Hispanic** | **94% (400)** | **406** | **6% (25)** | **19** | | |
| DLIs and DLI Summary Findings | | | | | | |
| White | 99% (200) | 196 | 1% (3) | 7 | 2.621 | 0.105 |
| Hispanic | 96% (470) | 374 | 4% (17) | 13 | | |
| IA and IA Summary Findings | | | | | | |
| White | Too few sustained cases to calculate a chi-square | | | | | |
| Hispanic | | | | | | |

**Table 3: Chi-Square Test by Investigation Type for White v Asian Sworn Members**

| | Other than Sustained | | Sustained | | Chi-Square Value | p |
|---|---|---|---|---|---|---|
| | Observed | Expected | Observed | Expected | | |
| All Investigations | | | | | | |
| White | 98% (219) | 217 | 2% (4) | 6 | 0.578 | 0.447 |
| Asian | 97% (331) | 333 | 3% (11) | 9 | | |
| DLIs and DLI Summary Findings | | | | | | |
| White | 99% (200) | 198 | 1% (3) | 5 | 0.822 | 0.364 |
| Asian | 97% (307) | 309 | 3% (10) | 8 | | |
| IA and IA Summary Findings | | | | | | |
| White | Too few sustained cases to calculate a chi-square | | | | | |
| Asian | | | | | | |

**Table 4: Chi-Square Test by Investigation Type for White v Other/Unknown Sworn Members**

| | Other than Sustained | | Sustained | | Chi-Square Value | p |
|---|---|---|---|---|---|---|
| | Observed | Expected | Observed | Expected | | |
| All Investigations | | | | | | |
| White | Too few sustained cases to calculate a chi-square | | | | | |
| Other/Unknown | | | | | | |
| DLIs and DLI Summary Findings | | | | | | |
| White | Too few sustained cases to calculate a chi-square | | | | | |
| Other/Unknown | | | | | | |
| IA and IA Summary Findings | | | | | | |
| White | Too few sustained cases to calculate a chi-square | | | | | |
| Other/Unknown | | | | | | |

**Table 5: Chi-Square Test by Investigation Type for Male v Female Sworn Members**

| | Other than Sustained | | Sustained | | Chi-Square Value | p |
|---|---|---|---|---|---|---|
| | Observed | Expected | Observed | Expected | | |
| All Investigations | | | | | | |
| Male | 95% (1129) | 1130 | 5% (54) | 53 | 0.000 | 0.981 |
| Female | 96% (224) | 223 | 4% (10) | 11 | | |
| DLIs and DLI Summary Findings | | | | | | |
| Male | 96% (1044) | 1044 | 4% (41) | 41 | 0.000 | 0.936 |
| Female | 96% (213) | 213 | 4% (8) | 8 | | |
| IA and IA Summary Findings | | | | | | |
| Male | Too few sustained cases to calculate a chi-square | | | | | |
| Female | | | | | | |

**Table 6: Chi-Square Test by Investigation Type for Officer v Sgt or Above Sworn Members**

| | Other than Sustained | | Sustained | | Chi-Square Value | p |
|---|---|---|---|---|---|---|
| | Observed | Expected | Observed | Expected | | |
| All Investigations | | | | | | |
| Officer | 96% (1274) | 1271 | 4% (57) | 60 | 1.964 | 0.161 |
| Sgt or Above | 92% (79) | 82 | 8% (7) | 4 | | |
| DLIs and DLI Summary Findings | | | | | | |
| Officer | Too few sustained cases to calculate a chi-square | | | | | |
| Sgt or Above | | | | | | |
| IA and IA Summary Findings | | | | | | |
| Officer | Too few sustained cases to calculate a chi-square | | | | | |
| Sgt or Above | | | | | | |

## Full Investigations Only (Summary Findings Excluded)

**Table 1: Chi-Square Test by Investigation Type for White v Black Sworn Members**

| | Other than Sustained | | Sustained | | Chi-Square Value | p |
|---|---|---|---|---|---|---|
| | Observed | Expected | Observed | Expected | | |
| **All Investigations** | | | | | | |
| **White** | **93% (50)** | **44** | **7% (4)** | **10** | **5.098** | **0.024** |
| **Black** | **77% (75)** | **81** | **23% (23)** | **17** | | |
| DLIs | | | | | | |
| White | 92% (36) | 32 | 8% (3) | 7 | 2.818 | 0.093 |
| Black | 78% (64) | 68 | 22% (18) | 14 | | |
| IA Investigations | | | | | | |
| White | | | | | | |
| Black | Too few sustained cases to calculate a chi-square | | | | | |

**Table 2: Chi-Square Test by Investigation Type for White v Hispanic Sworn Members**

| | Other than Sustained | | Sustained | | Chi-Square Value | p |
|---|---|---|---|---|---|---|
| | Observed | Expected | Observed | Expected | | |
| **All Investigations** | | | | | | |
| **White** | **93% (50)** | **44** | **7% (4)** | **10** | **5.266** | **0.022** |
| **Hispanic** | **76% (81)** | **87** | **24% (25)** | **19** | | |
| DLIs | | | | | | |
| White | 92% (36) | 33 | 8% (3) | 6 | 1.946 | 0.163 |
| Hispanic | 81% (71) | 74 | 19% (17) | 14 | | |
| IA Investigations | | | | | | |
| White | | | | | | |
| Black | Too few sustained cases to calculate a chi-square | | | | | |

**Table 3: Chi-Square Test by Investigation Type for White v Asian Sworn Members**

| | Other than Sustained | | Sustained | | Chi-Square Value | p |
|---|---|---|---|---|---|---|
| | Observed | Expected | Observed | Expected | | |
| All Investigations | | | | | | |
| White | 93% (50) | 48 | 7% (4) | 6 | 0.880 | 0.348 |
| Asian | 88% (66) | 68 | 14% (11) | 9 | | |
| DLIs | | | | | | |
| White | 92% (36) | 34 | 8% (3) | 5 | 0.709 | 0.310 |
| Asian | 85% (55) | 57 | 15% (10) | 8 | | |
| IA Investigations | | | | | | |
| White | | | | | | |
| Asian | Too few sustained cases to calculate a chi-square | | | | | |

**Table 5: Chi-Square Test by Investigation Type for Male v Female Sworn Members**

| | Other than Sustained | | Sustained | | Chi-Square Value | p |
|---|---|---|---|---|---|---|
| | Observed | Expected | Observed | Expected | | |
| All Investigations | | | | | | |
| Male | 82% (243) | 243 | 18% (54) | 54 | 0.036 | 0.849 |

| | Other than Sustained | | Sustained | | | |
|---|---|---|---|---|---|---|
| Female | 82% (45) | 45 | 18% (10) | 10 | | |
| DLIs | | | | | | |
| Male | 83% (201) | 201 | 17% (41) | 41 | 0.027 | 0.870 |
| Female | 83% (40) | 40 | 17% (8) | 8 | | |
| IA Investigations | | | | | | |
| Male | Too few sustained cases to calculate a chi-square | | | | | |
| Female | | | | | | |

**Table 6: Chi-Square Test by Investigation Type for Officer v Sgt or Above Sworn Members**

| | Other than Sustained | | Sustained | | Chi-Square Value | *p* |
|---|---|---|---|---|---|---|
| | Observed | Expected | Observed | Expected | | |
| All Investigations | | | | | | |
| Officer | 81% (251) | 252 | 19% (57) | 56 | 0.044 | 0.835 |
| Sgt or Above | 84% (37) | 36 | 16% (7) | 8 | | |
| DLIs | | | | | | |
| Officer | 83% (220) | 221 | 17% (46) | 45 | 0.010 | 0.752 |
| Sgt or Above | 83% (21) | 20 | 13% (3) | 4 | | |
| IA Investigations | | | | | | |
| Officer | 74% (31) | 32 | 26% (11) | 10 | 0.046 | 0.830 |
| Sgt or Above | 80% (16) | 15 | 20% (4) | 5 | | |

# Appendix 3: Chi-Square Tests by Complaint Origin

## All Investigations

**Table 1: Chi-Square Test by Complaint Origin for White v Black Sworn Members**

| | Other than Sustained | | Sustained | | Chi-Square Value | *p* |
|---|---|---|---|---|---|---|
| | Observed | Expected | Observed | Expected | | |
| **All Investigations** | | | | | | |
| **White** | **98% (219)** | **213** | **2% (4)** | **10** | **5.87** | **0.015** |
| **Black** | **93% (328)** | **334** | **7% (23)** | **17** | | |
| Internal Origin | | | | | | |
| White | | | | | | |
| Black | Too few sustained cases to calculate a chi-square | | | | | |
| External Origin | | | | | | |
| White | 98% (211) | 207 | 2% (4) | 8 | 2.380 | 0.123 |
| Black | 95% (320) | 324 | 5% (16) | 12 | | |

**Table 2: Chi-Square Test by Complaint Origin for White v Hispanic Sworn Members**

| | Other than Sustained | | Sustained | | Chi-Square Value | *p* |
|---|---|---|---|---|---|---|
| | Observed | Expected | Observed | Expected | | |
| **All Investigations** | | | | | | |
| **White** | **98% (219)** | **213** | **2% (4)** | **10** | **4.802** | **0.028** |
| **Hispanic** | **94% (400)** | **406** | **6% (25)** | **19** | | |
| Internal Origin | | | | | | |
| White | | | | | | |
| Hispanic | Too few sustained cases to calculate a chi-square | | | | | |
| External Origin | | | | | | |
| White | 98% (211) | 206 | 2% (4) | 9 | 3.141 | 0.076 |
| Hispanic | 95% (387) | 392 | 5% (21) | 16 | | |

**Table 3: Chi-Square Test by Complaint Origin for White v Asian Sworn Members**

| | Other than Sustained | | Sustained | | Chi-Square Value | *p* |
|---|---|---|---|---|---|---|
| | Observed | Expected | Observed | Expected | | |
| All Investigations | | | | | | |
| White | 98% (219) | 217 | 2% (4) | 6 | 0.580 | 0.447 |
| Asian | 97% (331) | 333 | 3% (11) | 9 | | |
| Internal Origin | | | | | | |
| White | | | | | | |
| Asian | Too few sustained cases to calculate a chi-square | | | | | |
| External Origin | | | | | | |
| White | 98% (211) | 210 | 2% (4) | 5 | 0.297 | 0.586 |
| Asian | 97% (324) | 325 | 3% (10) | 9 | | |

**Table 4: Chi-Square Test by Complaint Origin for White v Other/Unknown Sworn Members**

|  | Other than Sustained | | Sustained | | Chi-Square Value | p |
|---|---|---|---|---|---|---|
|  | Observed | Expected | Observed | Expected | | |
| All Investigations | | | | | | |
| White | | | | | | |
| Other/Unknown | Too few sustained cases to calculate a chi-square | | | | | |
| Internal Origin | | | | | | |
| White | | | | | | |
| Other/Unknown | Too few sustained cases to calculate a chi-square | | | | | |
| External Origin | | | | | | |
| White | | | | | | |
| Other/Unknown | Too few sustained cases to calculate a chi-square | | | | | |

**Table 5: Chi-Square Test by Complaint Origin for Male v Female Sworn Members**

|  | Other than Sustained | | Sustained | | Chi-Square Value | p |
|---|---|---|---|---|---|---|
|  | Observed | Expected | Observed | Expected | | |
| All Investigations | | | | | | |
| Male | 95% (1129) | 1130 | 5% (54) | 53 | 0.000 | 0.981 |
| Female | 96% (224) | 223 | 4% (10) | 11 | | |
| Internal Origin | | | | | | |
| Male | | | | | | |
| Female | Too few sustained cases to calculate a chi-square | | | | | |
| External Origin | | | | | | |
| Male | 96% (1095) | 1203 | 4% (45) | 76 | 0.206 | 0.650 |
| Female | 97% (222) | 184 | 3% (7) | 12 | | |

**Table 6: Chi-Square Test by Complaint Origin for Officer v Sgt or Above Sworn Members**

|  | Other than Sustained | | Sustained | | Chi-Square Value | p |
|---|---|---|---|---|---|---|
|  | Observed | Expected | Observed | Expected | | |
| All Investigations | | | | | | |
| Officer | 96% (1274) | 1271 | 4% (57) | 60 | 1.964 | 0.161 |
| Sgt or Above | 92% (79) | 82 | 8% (7) | 4 | | |
| Internal Origin | | | | | | |
| Officer | | | | | | |
| Sgt or Above | Too few sustained cases to calculate a chi-square | | | | | |
| External Origin | | | | | | |
| Officer | | | | | | |
| Sgt or Above | Too few sustained cases to calculate a chi-square | | | | | |

## Full Investigations Only (Summary Findings Excluded)

**Table 1: Chi-Square Test by Complaint Origin for White v Black Sworn Members**

|  | Other than Sustained | | Sustained | | Chi-Square Value | p |
|---|---|---|---|---|---|---|
|  | Observed | Expected | Observed | Expected | | |
| All Investigations | | | | | | |
| White | 93% (50) | 44 | 7% (4) | 10 | 5.098 | 0.024 |

63

| | Other than Sustained | | Sustained | | Chi-Square Value | p |
|---|---|---|---|---|---|---|
| **Black** | **77% (75)** | **81** | **23% (23)** | **17** | | |
| Internal Origin | | | | | | |
| White | Too few sustained cases to calculate a chi-square | | | | | |
| Black | | | | | | |
| External Origin | | | | | | |
| White | 92% (45) | 42 | 8% (4) | 7 | 1.862 | 0.172 |
| Black | 82% (71) | 74 | 18% (16) | 13 | | |

**Table 2: Chi-Square Test by Complaint Origin for White v Hispanic Sworn Members**

| | Other than Sustained | | Sustained | | Chi-Square Value | p |
|---|---|---|---|---|---|---|
| | Observed | Expected | Observed | Expected | | |
| **All Investigations** | | | | | | |
| **White** | **93% (50)** | **44** | **7% (4)** | **10** | **5.266** | **0.022** |
| **Hispanic** | **76% (81)** | **87** | **24% (25)** | **19** | | |
| Internal Origin | | | | | | |
| White | Too few sustained cases to calculate a chi-square | | | | | |
| Hispanic | | | | | | |
| External Origin | | | | | | |
| White | 92% (45) | 40 | 8% (4) | 9 | 3.462 | 0.063 |
| Hispanic | 78% (74) | 79 | 22% (21) | 16 | | |

**Table 3: Chi-Square Test by Complaint Origin for White v Asian Sworn Members**

| | Other than Sustained | | Sustained | | Chi-Square Value | p |
|---|---|---|---|---|---|---|
| | Observed | Expected | Observed | Expected | | |
| All Investigations | | | | | | |
| White | **93% (50)** | **48** | **7% (4)** | **6** | 0.880 | 0.348 |
| Asian | 88% (66) | 68 | 14% (11) | 9 | | |
| Internal Origin | | | | | | |
| White | Too few sustained cases to calculate a chi-square | | | | | |
| Asian | | | | | | |
| External Origin | | | | | | |
| White | 92% (45) | 43 | 8% (4) | 6 | 0.458 | 0.498 |
| Asian | 86% (62) | 64 | 14% (10) | 8 | | |

**Table 5: Chi-Square Test by Complaint Origin for Male v Female Sworn Members**

| | Other than Sustained | | Sustained | | Chi-Square Value | p |
|---|---|---|---|---|---|---|
| | Observed | Expected | Observed | Expected | | |
| All Investigations | | | | | | |
| Male | 82% (243) | 243 | 18% (54) | 54 | 0.036 | 0.849 |
| Female | 82% (45) | 45 | 18% (10) | 10 | | |
| Internal Origin | | | | | | |
| Male | Too few sustained cases to calculate a chi-square | | | | | |
| Female | | | | | | |
| External Origin | | | | | | |
| Male | 83% (224) | 225 | 17% (45) | 44 | 0.106 | 0.744 |
| Female | 86% (44) | 43 | 14% (7) | 8 | | |

64

**Table 6: Chi-Square Test by Complaint Origin for Officer v Sgt or Above Sworn Members**

| | Other than Sustained | | Sustained | | Chi-Square Value | p |
|---|---|---|---|---|---|---|
| | Observed | Expected | Observed | Expected | | |
| All Investigations | | | | | | |
| Officer | 81% (251) | 252 | 19% (57) | 56 | 0.044 | 0.835 |
| Sgt or Above | 84% (37) | 36 | 16% (7) | 8 | | |
| Internal Origin | | | | | | |
| Officer | Too few sustained cases to calculate a chi-square | | | | | |
| Sgt or Above | | | | | | |
| External Origin | | | | | | |
| Officer | 84% (240) | 240 | 16% (46) | 46 | 0.000 | 0.990 |
| Sgt or Above | 82% (28) | 28 | 18% (6) | 6 | | |

## Appendix 4: 2023 Sustained Rates for Allegation Class

The analysis of sustained rates for allegation class was not performed in the 2023 analysis and we are therefore including the 2023 sustained rates for comparison.

**Table 91: Allegations - Sustained Rate for Allegation Class by Race 2023**

|  | All Allegations | | | Class I Allegations | | | Class II Allegations | | |
|---|---|---|---|---|---|---|---|---|---|
|  | % Sust | # Sust | Tot | % Sust | # Sust | Tot | % Sust | # Sust | Tot |
| White | 10% | 53 | 553 | 9% | 11 | 124 | 10% | 42 | 428 |
| Black | 5% | 31 | 567 | 8% | 11 | 138 | 5% | 20 | 427 |
| Hispanic | 6% | 48 | 833 | 4% | 9 | 202 | 6% | 39 | 629 |
| Asian/Filipino | 8% | 47 | 612 | 8% | 12 | 152 | 8% | 35 | 460 |
| Other/Unknown | 10% | 12 | 115 | 14% | 5 | 36 | 9% | 7 | 79 |
| Total | 7% | 191 | 2680 | 7% | 48 | 652 | 7% | 143 | 2023 |

**Table 92: Allegations - Sustained Rate for Allegation Class by Gender 2023**

|  | All Allegations | | | Class I Allegations | | | Class II Allegations | | |
|---|---|---|---|---|---|---|---|---|---|
|  | % Sust | # Sust | Tot | % Sust | # Sust | Tot | % Sust | # Sust | Tot |
| Male | 8% | 177 | 2329 | 8% | 45 | 562 | 7% | 132 | 1766 |
| Female | 4% | 14 | 351 | 3% | 3 | 90 | 4% | 11 | 257 |
| Total | 7% | 191 | 2680 | 7% | 48 | 652 | 7% | 143 | 2023 |

**Table 93: Allegations - Sustained Rate for Allegation Class by Rank 2023**

|  | All Allegations | | | Class I Allegations | | | Class II Allegations | | |
|---|---|---|---|---|---|---|---|---|---|
|  | % Sust | # Sust | Tot | % Sust | # Sust | Tot | % Sust | # Sust | Tot |
| Officer | 6% | 147 | 2422 | 5% | 30 | 568 | 6% | 117 | 1849 |
| Sgt and Above | 17% | 44 | 258 | 21% | 18 | 84 | 15% | 26 | 174 |
| Total | 7% | 191 | 2680 | 7% | 48 | 652 | 7% | 143 | 2023 |

# Appendix 5: 2024 Sustained IA Cases with Discipline

\* C – Counseling, WR – Written Reprimand, S – Suspension, T – Termination

| Case # | Rank at Time of Complaint | Race | Gender | Violation | Violation Descp | Violation Class | Offense (1st, 2nd etc.) | Aggr Factors | Mitig Factors | Disc Matrix | Disc | Susp Days |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case 1 | Officer | Hi | F | 314.03-2c | GENERAL CONDUCT | Class II | 1st | 5 | 2 | C-S3 | S | 10 |
| Case 1 | Officer | Hi | F | 314.42-2g | OBEDIENCE TO LAWS - MISDEMEANOR/INFRACTION | Class II | 1st | 5 | 2 | C-S2 | S | 10 |
| Case 1 | Officer | Hi | F | 356.90-1b | UNAUTHORIZED USE OF ELECTRONIC SYSTEMS | Class I | 1st | 5 | 2 | C-T | S | 10 |
| Case 2 | Officer | Hi | M | 314.42-1e | OBEDIENCE TO LAWS - FELONY | Class I | 1st | 11 | 0 | S2-T | T | |
| Case 2 | Officer | Hi | M | 398.80-1a | TRUTHFULNESS | Class I | 1st | 11 | 0 | T | T | |
| Case 3 | Officer | Hi | M | 398.70-1b | INTERFERING WITH INVESTIGATIONS | Class I | 1st | 11 | 0 | T | T | |
| Case 3 | Officer | Hi | M | 314.42-1e | OBEDIENCE TO LAWS - FELONY | Class I | 1st | 11 | 0 | S2-T | T | |
| Case 3 | Officer | Hi | M | 314.42-1e | OBEDIENCE TO LAWS - FELONY | Class I | 1st | 11 | 0 | S2-T | T | |
| Case 3 | Officer | Hi | M | 314.42-2g | OBEDIENCE TO LAWS - MISDEMEANOR/INFRACTION | Class II | 1st | 11 | 0 | C-S2 | T | |
| Case 3 | Officer | Hi | M | 398.80-1a | TRUTHFULNESS | Class I | 1st | 11 | 0 | T | T | |
| Case 3 | Officer | Hi | M | 398.80-1a | TRUTHFULNESS | Class I | 1st | 11 | 0 | T | T | |
| Case 4 | Officer | Hi | M | 314.08-2a | CONDUCT TOWARD OTHERS - RELATIONSHIPS | Class II | 1st | 10 | 0 | S2-S5 | T | |
| Case 4 | Officer | Hi | M | 314.03-2c | GENERAL CONDUCT | Class II | 1st | 10 | 0 | C-S3 | T | |
| Case 4 | Officer | Hi | M | 356.89-1b | IMPROPER DISSEMINATION OF COMPUTER INFORMATION | Class I | 1st | 10 | 0 | C-T | T | |
| Case 4 | Officer | Hi | M | 314.42-2g | OBEDIENCE TO LAWS - MISDEMEANOR/INFRACTION | Class II | 1st | 10 | 0 | C-S2 | T | |
| Case 4 | Officer | Hi | M | 314.39-2f | PERFORMANCE OF DUTY - GENERAL | Class II | 1st | 10 | 0 | C-S2 | T | |
| Case 4 | Officer | Hi | M | 398.80-1a | TRUTHFULNESS | Class I | 1st | 10 | 0 | T | T | |
| Case 4 | Officer | Hi | M | 356.90-1b | UNAUTHORIZED USE OF ELECTRONIC SYSTEMS | Class I | 1st | 10 | 0 | C-T | T | |

| Case 4 | Officer | Hi | M | 314.70-1b | USE OF PRIVILEGED INFORMATION | Class I | 1st | 10 | 0 | S10-T | T | |
| Case 5 | Sgt and above | Bl | F | 314.39-2f | PERFORMANCE OF DUTY - GENERAL | Class II | 1st | 4 | 1 | C-S2 | S | 2 |
| Case 6 | Officer | Bl | M | 314.39-2g | PERFORMANCE OF DUTY - CARE OF PROPERTY | Class II | 1st | 4 | 2 | C-S2 | WR | |
| Case 7 | Officer | As | M | 398.77-1a | REFUSAL TO PROVIDE NAME OR SERIAL NUMBER | Class I | 1st | 1 | 3 | S3-T | S | 5 |
| Case 8 | Officer 1 | Bl | M | 314.39-2f | PERFORMANCE OF DUTY - GENERAL | Class II | 1st | 3 | 6 | C-S2 | C | |
| Case 8 | Officer 2 | As | M | 314.39-2f | PERFORMANCE OF DUTY - GENERAL | Class II | 1st | 4 | 4 | C-S2 | C | |
| Case 8 | Officer 3 | Hi | M | 314.39-2f | PERFORMANCE OF DUTY - GENERAL | Class II | 1st | 4 | 4 | C-S2 | S | 2 |
| Case 8 | Officer 3 | Hi | M | 314.39-1e | PERFORMANCE OF DUTY - MIRANDA VIOLATION | Class I | 1st | 4 | 4 | S2-T | S | 2 |
| Case 9 | Officer | Bl | M | 314.07-2b | CONDUCT TOWARD OTHERS - DEMEANOR | Class II | 3rd | 9 | 1 | S5-S30 | S | 35 |
| Case 9 | Officer | Bl | M | 314.05-1b | CONDUCT TOWARD OTHERS - WORKPLACE VIOLENCE | Class I | 1st | 9 | 1 | S5-T | S | 35 |
| Case 9 | Officer | Bl | M | 314.04-2a | CONDUCT TOWARDS OTHERS - Unprofessional Conduct in Violation of AI 71 | Class II | 1st | 9 | 1 | C-S30 | S | 35 |
| Case 9 | Officer | Bl | M | 398.76-2a | FAILURE TO ACCEPT OR REFER A COMPLAINT (UNINTENTIONAL) | Class II | 1st | 9 | 1 | C-S5 | S | 35 |
| Case 9 | Officer | Bl | M | 314.39-2i | PERFORMANCE OF DUTY - PDRD | Class II | 1st | 9 | 1 | WR-S5 | S | 35 |
| Case 10 | Officer | Hi | M | 314.07-2b | CONDUCT TOWARD OTHERS - DEMEANOR | Class II | 1st | 6 | 3 | C-S3 | S | 3 |
| Case 10 | Officer | Hi | M | 314.39-2f | PERFORMANCE OF DUTY - GENERAL | Class II | 1st | 6 | 3 | C-S2 | S | 3 |
| Case 11 | Officer | Hi | M | 314.39-2g | PERFORMANCE OF DUTY - CARE OF PROPERTY | Class II | 1st | 3 | 5 | C-S2 | C | |
| Case 12 | Sgt and above | Wh | M | 370.27-1l | USE OF PHYSICAL FORCE - Non-Reportable Use of Force | Class I | 1st | 3 | 3 | C-T | C | |
| Case 13 | Officer | Bl | M | 314.39-2f | PERFORMANCE OF DUTY - GENERAL | Class II | 1st | 3 | 5 | C-S2 | WR | |
| Case 13 | Officer | Bl | M | 314.39-2f | PERFORMANCE OF DUTY - GENERAL | Class II | 1st | 3 | 5 | C-S2 | WR | |

| Case 14 | Officer | As | M | 314.07-2b | CONDUCT TOWARD OTHERS - DEMEANOR | Class II | 1st | 2 | 2 | C-S3 | C | |
| Case 15 | Officer | As | M | 314.07-2b | CONDUCT TOWARD OTHERS - DEMEANOR | Class II | 1st | 1 | 3 | C-S3 | C | |
| Case 16 | Officer | Hi | M | 314.39-2f | PERFORMANCE OF DUTY - GENERAL | Class II | 1st | 2 | 1 | C-S2 | WR | |
| Case 17 | Officer 1 | Wh | M | 314.07-2b | CONDUCT TOWARD OTHERS - DEMEANOR | Class II | 3rd | 2 | 4 | S5-S30 | S | 17 |
| Case 17 | Officer 2 | As | M | 314.39-2i | PERFORMANCE OF DUTY - PDRD | Class II | 1st | 2 | 6 | WR-S5 | WR | |
| Case 18 | Officer | Hi | F | 314.07-2b | CONDUCT TOWARD OTHERS - DEMEANOR | Class II | 1st | | | C-S3 | Missed 3304 | |
| Case 19 | Officer 1 | Wh | M | 314.39-2f | PERFORMANCE OF DUTY - GENERAL | Class II | 1st | 4 | 2 | C-S2 | WR | |
| Case 19 | Officer 2 | Hi | F | 314.39-2f | PERFORMANCE OF DUTY - GENERAL | Class II | 1st | 2 | 5 | C-S2 | C | |
| Case 20 | Officer 1 | Hi | F | 314.39-2g | PERFORMANCE OF DUTY - CARE OF PROPERTY | Class II | 1st | 1 | 4 | C-S2 | C | |
| Case 20 | Officer 2 | Bl | M | 314.39-2g | PERFORMANCE OF DUTY - CARE OF PROPERTY | Class II | 1st | 4 | 1 | C-S2 | C | |
| Case 21 | Sgt and above | Bl | M | 398.76-1a | REFUSAL TO ACCEPT OR REFER COMPLAINT (INTENTIONAL) | Class I | 1st | 3 | 2 | S5-T | S | 5 |
| Case 22 | Officer | Bl | M | 398.77-1a | REFUSAL TO PROVIDE NAME OR SERIAL NUMBER | Class I | 1st | 6 | 2 | S3-T | S | 20 |
| Case 23 | Officer | As | M | 370.27-1f | USE OF PHYSICAL FORCE COMPARABLE TO LEVEL 1 | Class I | 1st | 7 | 0 | C-T | Missed 3304 | |
| Case 24 | Officer | Bl | M | 328.53-1b | FALSE REPORTING OF ILLNESS OR INJURY | Class I | 1st | 10 | 0 | S30-T | T | |
| Case 24 | Officer | Bl | M | 398.80-1a | TRUTHFULNESS | Class I | 1st | 10 | 0 | T | T | |
| Case 25 | Officer | Bl | M | 314.38-1c | OBSTRUCTING THE INTERNAL AFFAIRS PROCESS | Class I | 1st | 7 | 0 | C-T | T | |
| Case 25 | Officer | Bl | M | 398.80-1a | TRUTHFULNESS | Class I | 1st | 7 | 0 | T | T | |
| Case 26 | Officer 1 | Hi | M | 314.39-2e | PERFORMANCE OF DUTY - UNINTENTIONAL/IMPROPER SEARCH, SEIZURE, OR ARREST | Class II | 1st | 3 | 6 | C-S3 | C | |
| Case 26 | Officer 2 | As | M | 314.39-2e | PERFORMANCE OF DUTY - UNINTENTIONAL/IMPROPER | Class II | 1st | 3 | 6 | C-S3 | C | |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | SEARCH, SEIZURE, OR ARREST | | | | | | | |
| Case 27 | Officer | Bl | M | 314.39-2f | PERFORMANCE OF DUTY - GENERAL | Class II | 1st | 3 | 3 | C-S2 | WR | |
| Case 28 | Officer 1 | Bl | M | 370.36-1b | CUSTODY OF PRISONERS - TREATMENT | Class I | | | | C-T | S | 6 |
| Case 28 | Officer 2 | Bl | M | 370.36-1b | CUSTODY OF PRISONERS - TREATMENT | Class I | | | | C-T | S | 10 |
| Case 28 | Officer 3 | As | M | 370.36-1b | CUSTODY OF PRISONERS - TREATMENT | Class I | | | | C-T | S | 4 |
| Case 28 | Officer 4 | Hi | M | 370.36-1b | CUSTODY OF PRISONERS - TREATMENT | Class I | | | | C-T | S | 6 |
| Case 28 | Officer 5 | Bl | M | 370.36-1b | CUSTODY OF PRISONERS - TREATMENT | Class I | | | | C-T | S | 6 |
| Case 29 | Officer | Hi | M | 314.07-2b | CONDUCT TOWARD OTHERS - DEMEANOR | Class II | 1st | 4 | 5 | C-S3 | C | |
| Case 30 | Officer | Bl | M | 314.39-2f | PERFORMANCE OF DUTY - GENERAL | Class II | 2nd | 3 | 3 | WR-S5 | S | 1 |
| Case 31 | Officer | Hi | M | 314.07-2b | CONDUCT TOWARD OTHERS - DEMEANOR | Class II | 1st | 4 | 5 | C-S3 | C | |
| Case 32 | Officer 1 | As | M | 314.07-2b | CONDUCT TOWARD OTHERS - DEMEANOR | Class II | | | | | S | 18 |
| Case 32 | Officer 2 | Hi | F | 314.04-2a | CONDUCT TOWARDS OTHERS - Unprofessional Conduct in Violation of AI 71 | Class II | | | | | C | |
| Case 33 | Officer | Hi | F | 314.39-2f | PERFORMANCE OF DUTY - GENERAL | Class II | 1st | 3 | 7 | C-S2 | C | |
| Case 33 | Officer | Hi | F | 314.39-2f | PERFORMANCE OF DUTY - GENERAL | Class II | 1st | 3 | 7 | C-S2 | C | |
| Case 34 | Officer | Hi | M | 314.39-2f | PERFORMANCE OF DUTY - GENERAL | Class II | 1st | 2 | 6 | C-S2 | C | |
| Case 35 | Officer | Bl | M | 314.03-2c | GENERAL CONDUCT | Class II | 1st | 8 | 0 | C-S3 | T | |
| Case 35 | Officer | Bl | M | 314.38-1c | OBSTRUCTING THE INTERNAL AFFAIRS PROCESS | Class I | 1st | 8 | 0 | C-T | T | |
| Case 35 | Officer | Bl | M | 328.07-2c | PROHIBITED ACTIVITY ON DUTY | Class II | 1st | 8 | 0 | C-S2 | T | |
| Case 35 | Officer | Bl | M | 398.80-1a | TRUTHFULNESS | Class I | 1st | 8 | 0 | T | T | |
| Case 36 | Officer | Bl | M | 314.39-2f | PERFORMANCE OF DUTY - GENERAL | Class II | 1st | 4 | 2 | C-S2 | S | 2 |
| Case 36 | Officer | Bl | M | 314.39-2f | PERFORMANCE OF DUTY - GENERAL | Class II | 1st | 4 | 2 | C-S2 | S | 2 |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case 37 | Sgt and above | Hi | M | 285.00-2b | SUPERVISORS - AUTHORITY AND RESPONSIBILITIES Includes all of the 285.00 subsections except 285.90 | Class II | 1st | 2 | 2 | C-S5 | WR | |
| Case 37 | Officer | Bl | M | 314.39-2f | PERFORMANCE OF DUTY - GENERAL | Class II | 1st | 4 | 2 | C-S2 | S | 5 |
| Case 38 | Officer | Hi | M | 314.07-2b | CONDUCT TOWARD OTHERS - DEMEANOR | Class II | 1st | 4 | 4 | C-S3 | WR | |
| Case 39 | Officer 1 | Bl | M | 314.39-2f | PERFORMANCE OF DUTY - GENERAL | Class II | 1st | 3 | 5 | C-S2 | C | |
| Case 39 | Officer 2 | As | M | 314.39-2f | PERFORMANCE OF DUTY - GENERAL | Class II | 1st | 6 | 1 | C-S2 | S | 2 |
| Case 40 | Officer | Bl | M | 328.49-2b | ABSENCE FROM DUTY | Class II | 1st | 5 | 5 | C-S2 | S | 5 |
| Case 40 | Officer | Bl | M | 314.30-1c | INSUBORDINATION - FAILURE TO OBEY A LAWFUL ORDER | Class I | 1st | 5 | 5 | S3-T | S | 5 |
| Case 41 | Officer | Unk | F | 314.07-2b | CONDUCT TOWARD OTHERS - DEMEANOR | Class II | 1st | 5 | 1 | C-S3 | WR | |
| Case 42 | Officer | Bl | M | 398.77-1a | REFUSAL TO PROVIDE NAME OR SERIAL NUMBER | Class I | 1st | 4 | 3 | S3-T | S | 10 |
| Case 43 | Officer 1 | Hi | M | 314.39-2f | PERFORMANCE OF DUTY - GENERAL | Class II | 1st | 1 | 6 | C-S2 | C | |
| Case 43 | Officer 2 | As | M | 314.39-2f | PERFORMANCE OF DUTY - GENERAL | Class II | 1st | 1 | 6 | C-S2 | C | |
| Case 44 | Officer | Bl | F | 314.39-2i | PERFORMANCE OF DUTY - PDRD | Class II | 1st | 4 | 4 | WR-S5 | S | 3 |
| Case 44 | Officer | Bl | F | 398.77-1a | REFUSAL TO PROVIDE NAME OR SERIAL NUMBER | Class I | 1st | 4 | 4 | S3-T | S | 3 |
| Case 45 | Officer | Hi | M | 314.39-2f | PERFORMANCE OF DUTY - GENERAL | Class II | 1st | 1 | 3 | C-S2 | C (Retired) | |
| Case 46 | Officer | Hi | M | 342.19-2b | DAMAGED, INOPERATIVE PROPERTY OR EQUIPMENT | Class II | 1st | 3 | 1 | C-S2 | S | 1 |
| Case 47 | Officer | Bl | F | 314.39-2f | PERFORMANCE OF DUTY - GENERAL | Class II | 1st | 4 | 4 | C-S2 | C | |
| Case 48 | Sgt and above 1 | Hi | M | 234.12-2b | COMMANDING OFFICERS AUTHORITY AND RESPONSIBILITIES - COMMAND | Class II | 1st | 6 | 0 | C-S5 | S | 15 |
| Case 48 | Sgt and above 1 | Hi | M | 398.76-2a | FAILURE TO ACCEPT OR REFER A COMPLAINT (UNINTENTIONAL) | Class II | 1st | 6 | 0 | C-S5 | S | 15 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Case 48 | Sgt and above 1 | Hi | M | 314.39-2f | PERFORMANCE OF DUTY - GENERAL | Class II | 1st | 6 | 0 | C-S2 | S | 15 |
| Case 48 | Sgt and above 1 | Hi | M | 314.48-1b | REPORTING VIOLATIONS OF LAWS, ORDINANCES, RULES OR ORDERS (CLASS I) | Class I | 1st | 6 | 0 | C-T | S | 15 |
| Case 48 | Sgt and above 2 | Hi | M | 398.76-2a | FAILURE TO ACCEPT OR REFER A COMPLAINT (UNINTENTIONAL) | Class II | 3rd | 6 | 0 | S5-S30 | S | 10 |
| Case 48 | Sgt and above 3 | Wh | M | 398.76-2a | FAILURE TO ACCEPT OR REFER A COMPLAINT (UNINTENTIONAL) | Class II | 2nd | 6 | 0 | S2-S5 | S | 4 |
| Case 48 | Sgt and above 3 | Wh | M | 314.39-2f | PERFORMANCE OF DUTY - GENERAL | Class II | 1st | 6 | 0 | C-S2 | S | 4 |

**Note: Case 28 and Case 32 are missing offense number and aggravating and mitigating factors. For both cases, discipline was determined by the Oakland Police Commission's Discipline Committee and the missing fields were not captured in the Committee's report.**