# EXHIBIT 3

# Oakland Police Department

## Office of Internal Accountability



# 2022 Analyses of Race in Internal Investigation Outcomes and Discipline: Supplemental Report Examining Failure to Accept or Refer Complaints

**Oakland Police Department**
**Office of Internal Accountability**
455 7th Street, 9th Floor | Oakland, CA  94607 | Phone: (510) 238-3868

1

# Contents

*Ctrl+ Click Chapter Title to Follow Link*

I.          Background ......................................................................................................... 3

II.         Summary of Findings and Recommendations .................................................... 4

            Finding 1 ........................................................................................................... 4

            Recommendation 1 ........................................................................................... 4

            Finding 2 ........................................................................................................... 4

            Recommendation 2 ........................................................................................... 4

            Finding 3 ........................................................................................................... 4

            Recommendation 3 ........................................................................................... 5

            Finding 4 ........................................................................................................... 5

            Recommendation 4 ........................................................................................... 5

            Finding 5 ........................................................................................................... 5

            Recommendation 5 ........................................................................................... 5

III.        Overview of Sustained 2022 FTARC Allegations ............................................... 6

IV.         Themes for Findings .......................................................................................... 7

            IV.1 Externally Generated .................................................................................. 10

            IV.2 When Other Parties Recommend Different Findings ................................. 11

            IV.3 Case Review for Different Recommendations with Theme "Did not Ask Both
            Clarifying Questions" ........................................................................................ 12

            IV.4 Case Reviews of Different Recommendations Confirm Subjectivity ......... 13

V.          Sergeants and their Role in Investigations ...................................................... 14

            V.1 Rank as a Factor ......................................................................................... 14

            V.2 By Origin of Allegation ............................................................................... 14

            V.3 By Investigator ........................................................................................... 19

            V.4 Sergeant A................................................................................................... 21

VI.         Division Level Investigations (DLI) v Internal Affairs Division Investigations (IAD).......... 26

VII.        Discipline by Race ........................................................................................... 29

            VII.1 Who is Recommending Discipline?........................................................... 29

            VII.2 Elevation / Lowering / Confirming of Recommended Discipline.............. 30

VIII.       Qualitative Analysis of 2022 FTARC Allegations ............................................. 33

Appendix A  ........................................................................................................... 37

            Chi-Square Calculation for Sustained Rate of FTARC Allegations..................... 37

            FTARC As Stand-Alone Sustained Allegation .................................................... 37

# I.    Background

The 2022 Internal Investigation Outcome and Discipline Report discovered differences, albeit among a small sample size, in the discipline between white and Black officers for the allegation of a Manual of Rules Violation for Failure to Accept or Refer a Complaint (FTARC). This follow up inspection focuses on the internal application of that specific area of identified difference.

From the OPD Manual of Rules (MOR):

> *398.76 REFUSAL TO ACCEPT OR REFER COMPLAINT – Members and employees shall not refuse to accept a citizen complaint, fail to refer a citizen to the IAD (when the citizen can be reasonably understood to want to make a citizen's complaint), fail to forward a complaint to the IAD, discourage a person from filing a complaint, and/or knowingly provide false, inaccurate, or incomplete information about the IAD process. Members and employees shall not fail to follow any of the procedures for accepting, referring, or forwarding a complaint.*

From the OPD Discipline Matrix:

- 398.76 - Class 1          REFUSAL TO ACCEPT OR REFER A COMPLAINT    (INTENTIONAL)
  Discipline:    1st Offense: S5-T        2nd Offense: T

- 398.76 - Class 2          FAILURE TO ACCEPT OR REFER A COMPLAINT    (UNINTENTIONAL)
  Discipline:    1st Offense: C-S5        2nd Offense: S2-S5        3rd Offense: S5-S30

In 2022 there were 112 allegations of FTARC investigated. 45 of those allegations were Sustained. The remainder were other than sustained (Exonerated, Not Sustained, or Unfounded). The 45 Sustained allegations emanated from 19 overall investigations.

## II.    Summary of Findings and Recommendations

This follow-up inspection of FTARC allegations was an analysis of various aspects of the administrative investigation which may have led to the identified disparity. The mandate was to locate areas of discretion within the Internal Affairs processes for findings and discipline and to suggest solutions for limiting the opportunity for such discretion to result in biased outcomes.

What follows is the OIA's understanding of various reasons for how the infrastructure around FTARC could have allowed for disparate outcomes, and the offering of recommendations to address the issues within the process.

Findings 1 and 2 address issues of policy and training. Findings 3 and 4 address issues of an individual investigator and of a unit within Internal Affairs having an outsized influence upon the process.

### Finding 1
(Section IV) [1]
Many determinations of finding for FTARC require, by current policy, an assessment of whether the subject was "unsure" if someone wanted to make a complaint and therefore should have asked "clarifying questions." This standard assigns the investigator the unenviable task of having to judge the subject's certainty about a situation at the time it occurred, but through the lens of hindsight. This is an area of opinion and discretionary judgement, which may lead to biased outcomes.

#### Recommendation 1
Section III.A.7 of Department General Order M-03 ("unsure" and clarifying questions") should be revisited and addressed in order to limit the opportunity for judgement, discretion and bias to play as central a role as it has done in 2022.

### Finding 2
(Section IV, Section V)
Eleven of the nineteen cases resulting in at least one of the 45 FTARC Sustained findings were sustained while relying on subjective argumentation, some of which included language not otherwise standardized via training or policy. Some investigations declared a subject "should have" comported themselves in a particular manner, perhaps not one prescribed by policy, but one which seemed reasonable in the investigator's estimation.

#### Recommendation 2
The Department should consider quality control training for commanders reviewing IAD investigations or DLIs to ensure consistent quality, content, and lack of subjective argumentation unless specifically called for.

### Finding 3
(Section VI)
There are inconsistent Sustained Rates for FTARC between those investigated as DLIs and those investigated as IAD investigations, a dynamic that is complicated by the role and actions of the DLI Coordinator Unit within the Internal Affairs Division.

---

[1] Follow hyperlink to go straight to relevant section.

### Recommendation 3

The Department should consider requiring the DLI Coordinator Unit show their work, documenting recommendations or changes to investigations emanating from the Unit in a transparent manner, whether via chron log or other means.

## Finding 4

([Section V.4](#))

A single Sergeant of Police investigated 49% of all FTARC allegations in the Department in 2022 (55/112). The same sergeant was the most prolific accuser[2] of internally generated allegations of FTARC against other employees in 2022.

### Recommendation 4

The Department should consider the manner in which allegations of FTARC are added to investigations and explore a checks and balances approach to adding such allegations on any given case to any given subject member.

## Finding 5

([Section VII](#))

Differing recommended findings or recommended discipline by investigators, the chain of command, CPRA, and others are not currently tracked by the Department in an analyzable manner. This area is one wherein discussion, negotiation, and compromise may occur and one wherein judgement by a singular deciding figure (the Chief of Police) often holds as final. It is an important facet of any future analysis of internal affairs matters.

### Recommendation 5

The Department should consider tracking differing recommended findings and differing recommended disciplines between investigators, the chain of command, CPRA, and others in an accessible and analyzable manner, perhaps via VISION.

---

[2] Within this report, "accuser" refers to the person who identified FTARC as an allegation against a subject and motivated the adding of said allegation to the list of Manual of Rules violations to be investigated.

## III.    Overview of Sustained 2022 FTARC Allegations

In 2022, there were 112 allegations for FTARC.  Table 1 provides the breakdown by race and compares it to the percentage breakdown of the Department. It also includes the breakdown of sustained allegations. Compared to their representation in the Department, white sworn members are over-represented in the number of allegations received but under-represented in the number of sustained allegations.

➢ Black sworn members are under-represented in the number of allegations received and over-represented in the sustained allegations.

Breakdown of FTARC Allegations Compared to the Demographics of the Department

| 2022 | % of Members in the Dept | % Allegations Received | % Sustained Allegations |
|---|---|---|---|
| Asian/Filipino | 19% | 16% (18) | 18% (8) |
| Black | 20% | 18% (20) | 27% (12) |
| Hispanic | 28% | 29% (32) | 31% (14) |
| Other/Unknown | 3% | 4% (4) | 12% (1) |
| White | 29% | 34% (38) | 22% (10) |
| Total | 100% | 100% (112) | 100% (45) |

Since Black sworn members are under-represented in the number of allegations received, and over-represented in the number of sustained allegations, their sustained rate would  be higher than the sustained rate of white sworn members.

Sustained Rate of FTARC Allegations

| 2022 | Sustained Rate |
|---|---|
| Asian/Filipino | 44% (8/18) |
| Black | 60% (12/20) |
| Hispanic | 43% (14/32) |
| Other/Unknown | 25% (1/4) |
| White | 26% (10/38) |
| Total | 40% (45/112) |

➢ White sworn members had a sustained rate of 26% while Black sworn members had a sustained rate of 60%, a statistically significant difference.

## IV.    Themes for Findings

Themes were identified that captured the reason for the sustained finding.  For the 45 sustained allegations, 68 reasons for the sustained finding were identified.  In some instances, multiple reasons for the sustained allegation were identified.  From these 68 reasons, four themes were developed.  Note that because some allegations engage with multiple themes, the percentages below need not sum up to 100%.

62% of the sustained allegations involved the asking of clarifying questions.  DGO M-03 articulates what members are required to do regarding complaints. If a member is unsure if an individual would like to file a complaint, they shall ask clarifying questions.

Within Department General Order M-03, the following language can be found (emphasis added):

*7. If a member or employee is **unsure** whether a citizen wishes to make a complaint, he/she shall:*
*a. Not discourage or deter citizens from exercising their right to complain to the Department or the CPRB;*
*b. Ask **clarifying questions**, including but not limited to:*
*1) Would you like to speak to a supervisor?*
*2) Do you want to make a complaint?*
*c. Provide the citizen with an OPD Informational Business Card and/or Complaint Form (TF-3208) with his/her name, serial number and CAD Incident Number;*
*d. Enter a CAD notation to the call;*
*e. Use the Radio Disposition Code of "IBC" (Informational Business Card); and*
*f. Call the Communications Section Supervisor with the date of the referral, incident number and brief description of the incident to be added to the Complaint Referral Log (TF3367) within 24 hours of the referral.*

The next most common theme (identified in 47% of sustained allegations) involved not notifying or not properly notifying a supervisor the individual wanted to make a complaint.

The third most common theme (33%) was not providing or not following the Information Business Card (IBC) process. DGO M-03 Complaints Against Departmental Personnel states that if an employee receives a complaint, they shall provide the complainant an IBC.  They shall additionally enter a CAD notation, use the Radio Disposition Code of "IBC", and call the Communications Supervisor so the information can be added to the Complaint Referral Log.  Additionally, if a member is unsure if a citizen wishes to make a complaint, they are to provide an IBC.

Finally, in four instances, the sworn member did not recognize an allegation of misconduct was being made.  Three of the four members were sergeants, and one was an officer.

7

FTARC Allegation Themes

| Theme | % of Allegations with this Theme |
|---|---|
| **Sustained** | |
| Did not ask clarifying questions. | 62% |
| Did not properly advise the supervisor. | 47% |
| Did not provide or follow the IBC card process. | 33% |
| Did not recognize that a complaint was being made. | 9% |
| **Other Than Sustained** | |
| Could not prove the subject heard an allegation of misconduct. | 51% |
| Subject was not in a position to hear an allegation of misconduct being made. | 22% |
| Subject accepted or referred the complaint in accordance with policy. | 15% |
| No allegation of misconduct was made to, or in front of, the subject. | 12% |

* Total may be greater than 100% because some allegations had more than one theme identified.

73% of the other than sustained findings involved *assessing the officer's proximity to the complainant* when allegations were made. Individual investigators used different perspectives and evidence to come to findings regarding proximity, but all noted whether it *seemed reasonable* for any given officer on any given scene to have heard the allegations and been therefore required to have either asked clarifying questions, or to have summoned a Sergeant to the scene to accept a complaint.

Themes for Sustained by Race

| 2022 | ASIAN | BLACK | HISPANIC | WHITE | OTHER | Total |
|---|---|---|---|---|---|---|
| Did not ask clarifying questions. | **75% (6)** | **46% (7)** | 31% (8) | **40% (6)** | **100% (1)** | **43% (28)** |
| Did not properly advise the supervisor. | 25% (2) | 27% (4) | **38% (10)** | 27% (4) | | 31% (20) |
| Did not provide or follow the IBC card process. | | 27% (4) | 27% (7) | 27% (4) | | 23% (15) |
| Did not recognize that a complaint was being made. | | | 4% (1) | 1% (1) | | 3% (2) |
| Total | 100% (8) | 100% (15) | 100% (26) | 100% (15) | 100% (1) | 100% (65) |

* Total may not equal 100% because some allegations had more than one theme identified.

➢ The most common theme used to recommend a Sustained finding for Asian, Black, White and Other race groups was "Did not ask clarifying questions."

Themes for Other Than Sustained Findings By Race

| 2022 | ASIAN | BLACK | HISPANIC | WHITE | OTHER | Total |
|---|---|---|---|---|---|---|
| Can't prove officer heard | 60% (6) | 38% (3) | 50% (9) | 54% (15) | 33% (1) | 51% (34) |
| Did not hear | 30% (3) | 0% | 39% (7) | 14% (4) | 33% (1) | 22% (15) |
| No misconduct allegations made | 10% (1) | 38% (3) | 6% (1) | 11% (3) | 0% | 12% (8) |
| Subject fulfilled their duty | 0% | 25% (2) | 6% (1) | 21% (6) | 33% (1) | 15% (10) |
| Total | 100.00% (10) | 100% (8) | 100% (18) | 100% (28) | 100% (3) | 100% (67) |

The theme "cannot prove the officer heard" (and therefore cannot prove the officer was obligated by policy to have taken any action to accept or refer a complaint) is akin to a "Not Sustained' finding. Thus, it follows that those allegations were likely appropriately added, as the question remained unresolved even at the end of the investigation.

The theme "did not hear" is akin to an "Exonerated" finding, in that it acknowledges a misconduct allegation may have been made, but that the subject officer did not hear it and was therefore not obligated by policy to have taken any action to accept or refer a complaint.

Within internally generated allegations, if the theme "No allegations of misconduct made" is akin to saying, the complainant made no allegations of misconduct against an officer, so the officer was under no policy obligation to take any action to accept or refer a complaint.  Why was FTARC alleged at all?

Similarly, if the officer fulfilled their duty and accepted or referred a complaint, was the FTARC allegation added prematurely, without examining all the evidence first?

The theme "No allegation of misconduct" appeared in 12% of the "other than sustained" cases. The theme "Subject fulfilled their duty" appeared in 15% of the cases. Combined, these two small shares of the themes accounted for 27% of the total.

To investigate these two themes further, we focused on internally generated allegations, ostensibly by members who are familiar with the MOR and the parameters surrounding compliance with said MOR.

Other Than Sustained by Theme and Race (Internally Generated Allegations Only)

| 2022 | ASIAN | BLACK | HISPANIC | OTHER | WHITE | Grand Total |
|---|---|---|---|---|---|---|
| Can't prove officer heard | 5 | 3 | 7 | 1 | 13 | 29 |
| Did not hear | 1 | | 7 | | 4 | 12 |
| No allegations made | 1 | 2 | 1 | | 2 | 6 |
| Subject fulfilled their duty | | 1 | 1 | 1 | 3 | 6 |
| Grand Total | 7 | 6 | 16 | 2 | 22 | 53 |

12 of the 53 (23%) other than sustained, internally generated, allegations used themes of "No misconduct allegations made" or "Subject fulfilled their duty."

Yet, 50% (3 of 6) of the other than sustained allegations against Black members relied on themes of "No allegations made" or "Subject fulfilled their duty." This was the largest rate for those two themes out of any race group, except for Other. (Asian: 1/7, Hispanic: 2/16, Other: ½, White: 5/13)

If the themes "No misconduct allegations made" and "Subject fulfilled their duty" are indicative of unnecessary allegations against officers, then Black subjects received a higher percentage per capita of such allegations than other races.

## IV.1 Externally Generated
One of the early surprises in examining the data was the higher Sustained rate for externally generated allegations versus internally generated. An examination of the 8 Sustained Externally generated allegations revealed they emanated from 4 investigations.

The following themes emerged in reviewing justifications used for sustaining the personnel. The themes were consistent with those identified from the examination of all Sustained findings in 2022. The majority of sustained allegations were Sustained over some failure surrounding the asking of "clarifying questions."

Themes use for Sustained finding in Externally Generated FTARC Allegations

| Theme | Allegations | Cases |
|---|---|---|
| Did not ask clarifying questions | 6 | 2 |
| Did not properly advise the supervisor. | 1 | 1 |
| Did not recognize that a complaint was being made. | 1 | 1 |
| Total | 8 | 4 |

However, this is a specific area of the policy with which a non-employee would not be familiar. Thus, while the allegation was generated externally, the reasons offered for the Sustained finding were based on a reading of policy and processes surrounding said policy, a very *internal* arena.

> ➢ There was no instance wherein a complainant specifically alleged that a subject had failed to ask two specific clarifying questions of them, yet that was the dominant theme and the foundation for 75% of the sustained externally generated allegations.

10

The disconnect between what the public complained about and the Sustained findings of sometimes only the FTARC allegation is further indication of the room for discretion and interpretation in the application of the policy requirements to the MOR and then against the facts of a case.

## IV.2 When Other Parties Recommend Different Findings

An investigator's recommended finding is not the only factor in the final decision-making process. There are other parties and intervenors who may present their own opinion of the allegations for consideration by the Chief of Police. Such intervenors include the Community Police Review Agency (CPRA), the Division Level Investigation (DLI) Coordinators, as well as any link in the reviewing Chain of Command who disagree with an investigator's recommendation.

There were 19 cases with at least 1 Sustained FTARC finding in 2022, accounting for 45 Sustained FTARC allegations. Different recommendations were offered in 11 (24%) of the 45 total allegations which ended up being Sustained in 2022, addressed within five separate investigations.

2022 Different Recommendations Resulting in Sustained Findings

| Sustained Case # | Race of Subject Member(s) | Investigator Recommendation | Alternate Recommendation by | Alternate Recommendation |
|---|---|---|---|---|
| 2 | 1 White | Exonerated | Second Investigator (different patrol supervisor) | Sustained |
| 3 | 1 Black, 2 White | Unfounded | DLI Coordinator | Sustained |
| 5 | 2 Black, 1 Hispanic, 1 Asian, 1 White | Unfounded | CPRA | Sustained |
| 11 | 1 Hispanic | Unfounded | CPRA | Sustained |
| 13 | 1 Black | Unfounded | DLI Coordinator | Sustained |

When a different recommendation existed, the recommendation therein was always to Sustain. The different recommendation of Sustained was affirmed as the final finding 100% of the time.

- ➤ The different recommendations were based on a different framing of the analysis of the same facts by the addendum author.

  - o 40% (2) of the different recommendations emanated from the DLI Coordinators.
  - o 40% (2) of the different recommendations emanated from the CPRA.
  - o 20% (1) of the different recommendations emanated from a secondary investigator.

- o Four Black subject members were Sustained as a result of different recommendations, which was 40% of the total Sustained FTARC allegations against Black members in 2022.

- o Four White subject members were Sustained as a result of different recommendations, which was 44% of the total Sustained FTARC allegations against White members in 2022.

11

- o Two Hispanic subject members were Sustained as a result of different recommendations, which was 20% of the total Sustained FTARC allegations against Hispanic members in 2022.

- o One Asian subject member was Sustained as a result of different recommendations, which was 17% of the total Sustained FTARC allegations against Asian members in 2022.
- o

Themes from the Different Recommendations fell into at least one, but sometimes more, of the below categories.

Different Recommendation - Sustained FTARC Themes

| 2022 | Asian | Black | Hispanic | White | Grand Total |
|---|---|---|---|---|---|
| Did not ask clarifying questions. | | 1 | | | 1 |
| Did not ask clarifying questions. Did not log IBC card | | 1 | | 2 | 3 |
| Did not notify the Sgt. Did not follow IBC card policy. | | | | 1 | 1 |
| Did not properly advise the Sgt. | 1 | 1 | 1 | 1 | 4 |
| Did not recognize the comments as a complaint. | | | 1 | | 1 |
| Sgt should have taken the complaint. | | 1 | | | 1 |
| **Grand Total** | **1** | **4** | **2** | **4** | **11** |

> ➢ The theme "did not ask both clarifying questions" accounted for 50% of the different recommendations for Sustained against Black and White subject members.

## IV.3 Case Review for Different Recommendations with Theme "Did not Ask Both Clarifying Questions"

*Table 8 Case #3 Review* (1 Black subject & 2 White subjects Sustained)

The initial investigator was a sergeant assigned to a field duty. In 2017, during a car stop, verbal complaining were made by the complainant about racial motivations for "the police" (not the officers in specific) stopping him regularly. The officers asked if the complainant wanted to speak to a supervisor. The complainant stated he did not and added that he wasn't trying to give anyone a hard time, he was just frustrated. The officers provided the complainant their business cards (IBC).

5 years later, during the filing of a separate complaint, the complainant confirmed he had not wanted to in 2017, and still did not want to, file a complaint against the officers for the 2017 conduct. The DLI Coordinator recommended Sustained, citing a section within the policy relevant to circumstances wherein an officer was "unsure" and was therefore required to ask, "clarifying questions," but made no analysis nor offered any evidence of the officer's certainty ("sureness") before recommending Sustained.

*Table 15 Case #5 Review* (1 Black subject)

A complainant called OPD to file a complaint against officers for conduct. During the phone conversation with a field supervisor who was assigned to accept the complaint, the complainant expressed frustration with the manner in which the supervisor interrupted her. The supervisor accepted the initial complaint against the officers but did not inquire as to whether the complainant wanted to file a complaint against the supervisor themselves. During subsequent review of that recorded phone conversation in the IAD intake phase, the allegation of FTARC was added against the supervisor.

The assigned investigating Sergeant re-contacted the complainant and specifically inquired as to whether the complainant wanted to then file a complaint against the subject supervisor about the nature of the subject's phone conversation. The complainant affirmed they did. The initial investigator accepted the complaint and conducted the investigation. The investigating sergeant recommended Unfounded.

Left unanswered was whether the complainant had wanted to file a complaint against the supervisor on the phone during the initial phone call, *in that moment, while on the phone with the subject supervisor* and was otherwise thwarted or denied in doing so.

The addendum was authored by a DLI Coordinator. Language in the addendum seemed to offer a standard not listed in policy or training documents in OPD:

> *Knowledge that a complainant is upset with a member should **reasonably** trigger the above two questions which DGO M-3 states shall be asked.*

The two questions referred to are the "clarifying questions", which are relevant, per policy, when a member is "unsure" as to whether someone wants to make a complaint. "Upset" is not a standard that's been trained internally or legislated in policy.

The word "reasonably" is indicative of a subjective assessment. The subject was specifically asked about their certainty and stated they were "sure" the complainant didn't want to file a complaint at the time.

In the addendum, the DLI coordinator relied on the fact the complainant later advised the investigating sergeant they did indeed want to file complaint against the subject supervisor. There was no analysis or clarification as to whether the complainant had wanted to file a complaint against the subject in the initial interaction, or only later, once asked about it directly by the investigating sergeant in the subsequent interview.

The DLI coordinator goes further in alleging the investigating sergeant and their chain of command should receive supervisory notes in their personnel file for having come to the "incorrect" conclusion.

## IV.4 Case Reviews of Different Recommendations Confirm Subjectivity

The review of two cases wherein "clarifying questions" were intrinsic to the Alternate Recommendation revealed areas of discretion and judgement which were subjective. Any judgement as to another person's "certainty" (whether or not an officer was "unsure" and therefore subject to policy requirements to clarify said uncertainty) is difficult to standardize.

Recommended Sustained findings for Black subjects come from various investigating entities. Different recommendations than those offered by the investigator prevailed as the final finding from the Chief of Police. Different recommendations accounted for 40% of the Sustained findings against Black members in 2022. The themes used to Sustain said Black members via different recommendations were subjective and open for varying viewpoints and analysis.

# V.    Sergeants and their Role in Investigations

## V.1 Rank as a Factor

Rank is an area of difference between personnel, and one that has previously been identified as a believed source of disparity in findings and discipline, as found in 2022's Discipline and Internal Procedural Justice Report.[3] All of the sustained allegations against personnel in 2022 were investigated by investigators holding the rank of Sergeant. This is consistent with common practice at the Department.

Allegation Findings by Rank and Race

| Rank | Unfounded | Exonerated | Not Sustained | Sustained | Grand Total |
|---|---|---|---|---|---|
| **Lieutenant of Police** | **0%** | **0%** | **100% (1)** | **0%** | **100% (1)** |
| White | 0% | 0% | 100% (1) | 0% | 100% (1) |
| **Sergeant of Police** | **47%** | **6% (1)** | **18% (3)** | **29%** | **100% (17)** |
| Black | 0% | 17% (1) | 17% (1) | 67% (4) | 100% (6) |
| Hispanic | 50% (1) | 0% | 0% | 50% (1) | 100% (2) |
| White | 78% (7) | 0% | 22% (2) | 0% | 100% (9) |
| **Police Officer** | **29% (27)** | **1% (1)** | **28% (26)** | **43% (40)** | **100% (94)** |
| Asian | 22% (4) | 0% | 33% (6) | 44% (8) | 100% (18) |
| Black | 21% (3) | 0% | 21% (3) | 57% (8) | 100% (14) |
| Hispanic | 33% (10) | 0% | 23% (7) | 43% (13) | 100% (30) |
| Other | 50% (2) | 0% | 25% (1) | 25% (1) | 100% (4) |
| White | 29% (8) | 4% (1) | 32% (9) | 36% (10) | 100% (28) |
| **Grand Total (Allegations)** | **31% (35)** | **2% (2)** | **27% (30)** | **(45)** | **100% (112)** |

In 2022, Officers received the highest percentage (84%) of the FTARC allegations in 2022 and were Sustained at the highest rate (43%).

Sergeants received 15% of the FTARC allegations in 2022 and were Sustained  29% of the time.

Lieutenants received <1% of the FTARC allegations in 2022 and were Sustained 0% of the time.

Incorporating race, the Sustained rate for:
- Black Officers was the highest of any officer race group.        (57%)
- Black Sergeants was the highest of any Sergeant race group.        (67%)
- White Sergeants was the lowest of any Sergeant race group.        (0%)

## V.2 By Origin of Allegation

Sergeants serve as the investigator on most IAD and DLI investigations, recommending findings at the conclusion of their investigation. However, the investigating sergeant may or may not be the same one

---

[3] https://cao-94612.s3.amazonaws.com/documents/Dept-Response-and-OIA-Discipline-Equity-and-Internal-Proc-Justice-Report-Sept-2022.pdf

to have initiated an allegation of FTARC against a subject. Before examining the results of investigations, we will examine the origins of FTARC allegations in 2022.

*Externally Generated Allegation*: One that emanates directly from a non-OPD employee. For example, a FTARC allegation would be labeled externally generated if a citizen complainant specifically stated an officer had not taken steps to accept or refer a complaint responsive to the citizen's voiced concern about misconduct on the part of an OPD employee.

*Internally Generated Allegation*: One that emanates from an OPD employee. A FTARC allegation would be labeled internally generated if an OPD employee identified potential misconduct by another employee in the course of their own duty – for example as a result of investigating another complaint and reviewing the case.

There are three phases of an investigation wherein allegations of any MOR can be added. At each phase, a human is responsible for making such assessments, whether they be the accuser, the receiver, the investigator or the reviewers. There are opportunities for different understandings of how to apply the MOR framework to the facts. Each phase is reliant on the interpretation of the facts of a case and the application of the Manual of Rules to the policy and then analysis of both to the facts of the case.

1. The Intake Phase
    a. Allegation may be added by the complainant. (Externally generated)
    b. Allegation may be added by the supervisor within any Division who accepted a complaint and authored the initial memorandum (referred to as a Preliminary Inquiry, or "P.I.").
    c. Internal Affairs Intake technicians and officers may identify and add allegations as they process the P.I. and compile the case file.
    d. Internal Affairs Intake Section supervisors or commanders may similarly identify and add allegations during the course of their Intake review.
2. The Investigative Phase
    a. An assigned investigator may add the allegation at any time during their investigative process.
3. The Review Phase
    a. A reviewing supervisor or commander (to include the DLI Coordinators a Chain of Command up through the Chief of Police when applicable, may add the allegation.)

➤ 89% (100 of the 112) of the 2022 FTARC allegations were generated internally.

Rates of FTARC Findings, Internally Generated vs Externally Generated

| 2022 | Sustained | Other Than Sustained |
|---|---|---|
| **Internally** Generated | 38% (37/100) | 62% (63/100) |
| **Externally** Generated | 66% (8/12) | 34% (4/12) |

The low Sustained rate for internally generated allegations was unexpected. Internal accusers of FTARC (OPD members who identify a possible violation) appear to have added the allegation to investigations at an early juncture in the process. A larger number of final other-than-sustained findings implies a lack of evidence was unearthed via subsequent investigation. Thus, the standard for adding an allegation to a subject was lower than the standard to subsequently Sustain the same subject.

➤ Internal allegations of FTARC appear to have been added more liberally than only when the accuser had an affirmative indication the MOR violation had occurred.

15

An examination of the eight externally generated Sustained allegations revealed they emanated from just four investigations. The following themes emerged in reviewing justifications used for sustaining the personnel.

Theme use for Sustained finding in Externally Generated FTARC Allegations (2022)

| Theme | Allegations | Cases |
|---|---|---|
| A complainant's demand for Officer names and serial numbers should have triggered further steps be taken to accept or refer a complaint. | 4 | 1 |
| An officer asked if a complainant wanted to speak with their supervisor but did not specifically ask if the complainant wanted to file a complaint. | 2 | 1 |
| Officer did not summon their Sergeant upon specific request from a complainant. | 1 | 1 |
| Complainant alleged generalized racial motivation for actions taken by police officers. The complaint lacked specific, articulable actions taken that were alleged to have been racially motivated. The Sergeant provided an Information Business Card (IBC), but did not open the complaint for further investigation. | 1 | 1 |
| Total | 8 | 4 |

In 2022, the number of internal accusers per race group was as follows:

Number of Accusers by Race

| Race of Accuser | Number of Accusers | Number of Personnel[4] | % Accusers of Total Personnel |
|---|---|---|---|
| Asian | 2 | 197 | 1% |
| Black | 1 | 281 | .4% |
| Hispanic | 1 | 272 | .4% |
| Other | 0 | 35 | 0% |
| White | 12 | 259 | 5% |

> ➢ White Members were the most likely to add allegations of FTARC in 2022.

The following table provides this information per FTARC allegations by race of accuser and race of subject member.

Internally Generated FTARC Allegations by Race of Accuser

| 2022 | Asian Subject | Black Subject | Hispanic Subject | Other Subject | White Subject | Total |
|---|---|---|---|---|---|---|

---

[4] Total combined sworn and professional staff, as of 31 Dec 22. Any employee may make an allegation of FTARC against another.

| Race of Accuser | Sustained | Other Than Sustained | Sustained | Other Than Sustained | Sustained | Other Than Sustained | Sustained | Other Than Sustained | Sustained | Other Than Sustained | Sustained | Other Than Sustained |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Asian |  |  | 1 | 1 |  | 1 |  |  |  | 2 | 1 | 4 |
| Black |  |  | 1 |  |  |  |  |  |  | 1 | 1 | 1 |
| Hispanic | 1 |  |  | 1 | 1 | 2 |  |  |  | 1 | 2 | 4 |
| White | 7 | 10 | 7 | 6 | 9 | 14 | 1 | 3 | 9 | 21 | 33 | 54 |
| Total | 8 | 10 | 9 | 8 | 10 | 17 | 1 | 3 | 9 | 25 | 37 | 63 |
| Total as % | 44% | 56% | 53% | 47% | 37% | 63% | 25% | 75% | 26% | 74% | 37% | 63% |

White internal accusers accounted for 87 of the 100 internally generated FTARC allegations against all races in 2022.

➢ Black subjects were the only group for whom a majority of internally generated FTARC allegations were sustained (53%).

The following table explores the Sustained Rate per Race of the accuser.

Internally Generated Sustained Rate by Race of Accuser, Count of Allegations

| Race of Accuser | Sustained | Other Than Sustained | Total | Sustained Rate |
|---|---|---|---|---|
| Asian | 1 | 4 | 5 | 20% |
| Black | 1 | 1 | 2 | 50% |
| Hispanic | 2 | 4 | 6 | 33% |
| White | 33 | 54 | 87 | 38% |
| Total | 37 | 63 | 100 | 37% |

White accusers accounted for 87% of the internally generated allegations for the year. The White accuser group's data weighed heavily upon the whole, as reflected in consistency between the 38% Sustained Rate from White accusers and the 37% Total Sustained rate. Between the other accuser race groups rates of Sustained vary widely, which may be attributed to the small sample size within those accuser groups.

➢ Two White IAD Sergeants accounted for the bulk of the internally generated Sustained allegations by white accusers (15/33 (45.45%)).

Assignment of Internal Accusers

| Race of Accuser | Assignment of Accuser | Number of Allegations |
|---|---|---|
| Asian | IAD | 5 |
| Black | IAD | 2 |
| Hispanic | BFO | 6 |
| White | BFO | 17 |
| | IAD | 56 |
| | OCOP | 14 |
| Total | | 100 |

BFO had 10 separate accusers, accounting for 23 allegations. IAD had 11 separate accusers, accounting for 63 allegations (63%) of the total allegations levied against subjects. The 7 White accusers assigned to IAD accounted for 56% (56/100) of the year's total internally generated allegations.

Who are the Internal White Accusers?

| Identifier | Rank | Gender | Assignment | Time at OPD (Yrs.) | Time in Rank (Yrs.) | Total FTARC Allegations | Sustained Rate for Allegations | Sustained FTARC Allegations against Black Subjects |
|---|---|---|---|---|---|---|---|---|
| A | Sgt | M | IAD Inv. | 23 | 12 | 34 | 29% (10) | 1 |
| B | Ofc | M | IAD Intake | 25 | 25 | 3 | 100% (3) | 1 |
| C | Sgt | M | Patrol | 23 | 9 | 1 | 100% (1) | 1 |
| D | Lt | M | SOD | 15 | 3 | 2 | 100% (2) | 0 |
| E | Sgt | M | IAD Inv. | 16 | 7 | 6 | 83% (5) | 1 |
| F | Ofc | M | IAD Intake | 26 | 26 | 7 | 71% (5) | 2 |
| G | OCOP | OCOP | OCOP | | | 5 | 100% (5) | 0 |
| H | Sgt | M | Patrol | 15 | 2 | 2 | 50% (1) | 0 |
| J | Sgt | F | Patrol | 23 | 2 | 1 | 50% (1) | 1 |
| K | Sgt | M | IAD Inv. | 9 | 1 | 4 | 0% (0) | 0 |
| L | Ofc | M | IAD Intake | 9 | 9 | 1 | 0% (0) | 0 |
| M | Sg | M | IAD Inv. | 23 | 7 | 1 | 0% (0) | 0 |

The two White officers who levied Sustained FTARC allegations against Black members (B and F) both worked within IAD – Intake during the period and added the allegations during the Intake phase.

The White lieutenant (D) accounted for 2 allegations. The lieutenant added the allegation during the review phase and returned the file for the investigating sergeant to assess.

Only one White female sergeant (J) internally generated an allegation of FTARC which led to a Sustained finding (11%). Eight male sergeants internally generated an allegation of FTARC which led to a Sustained finding (89%).

The average time as an OPD member for the White accusers was 18.81 years. The average time in rank for the White accusers was 9.36 years.

18

## V.3 By Investigator

An allegation of FTARC cannot be resolved via Class II supervisory note in lieu of a finding. The recommendation as to finding offered by the investigator is taken into consideration during the review process and may ultimately be agreed with by the Chief of Police (final decider for finding).

All sergeants in the Department are capable and available to investigate allegations of misconduct. There are 121 Sergeants at the Department.

➤ 25 different sergeants investigated at least one FTARC allegation in 2022.

This section will look at whether there was a racial imbalance between those assigned to investigate FTARC allegations as compared to the body of sergeants as a whole. The assignments for the 25 FTARC investigators and distribution of sergeants throughout the Department was as follows:

Findings by Investigator Assignment and Race

| Assignment | # of FTARC Investigators in 2022 | | | | | # of Sergeants Per Division in 2022 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Asian | Black | Hispanic | White | Total | Asian | Black | Hispanic | White | Total |
| BFO | 3 | 1 | 3 | 8 | 60% (15) | 6 | 9 | 16 | 37 | 75% (68) |
| IAD | 3 | | | 4 | 28% (7) | 6 | 2 | | 7 | 17% (15) |
| Ceasefire | | 1 | | 1 | 8% (2) | 1 | 1 | 1 | 1 | 4% (4) |
| BRM | | | | 1 | 4% (1) | 2 | 1 | | 1 | 4% (4) |
| Total | 24% (6) | 8% (2) | 12% (3) | 56% (14) | 100% (25) | 16% (15) | 14% (13) | 19% (17) | 51% (46) | 100% (91) |

Some sergeants did not investigate FTARC allegations in 2022 and some of them were assigned to other Bureaus or Divisions that are therefore not represented in the above table, including Bureau of Investigations and Bureau of Services. The Sergeants who investigated FTARC allegations in 2022 came from a pool of 91, representing BFO, IAD, Ceasefire, and BRM[5].

15% (2/13) of Black sergeants from these represented divisions investigated an allegation of FTARC. 30% (14/46) of White sergeants from these represented divisions investigated an allegation of FTARC.

Within the four listed Divisions, White sergeants were twice as likely to investigate an allegation of FTARC in 2022 than Black sergeants.

22% (15/68) of BFO sergeants investigated FTARC allegations.  47% of IAD sergeants investigated FTARC allegations. IAD sergeants were twice as likely to investigate an allegation of FTARC in 2022 than BFO sergeants.

---

[5] IAD falls under the Bureau of Risk Management umbrella, but was separated here due to the specific, relevant nature of the Division's function in investigating IAD cases, as contrasted with other sections of BRM (including the Training Section and the Office of Internal Accountability.)

Recommended Findings per FTARC Investigator

| Inv # | Inv. Race | Assign. | Black Subject | | Non-Black Subject | |
|---|---|---|---|---|---|---|
| | | | Sustained | Other Than Sustained | Sustained | Other Than Sustained |
| 1 | W | BFO | 100% (1) | | 100% (4) | |
| 2 | W | BFO | 100% (1) | | | |
| 6 | H | BFO | | | 50% (2) | 50% (2) |
| 7 | H | BFO | 100% (1) | | | |
| 8 | A | BFO | | | | 100% (2) |
| 9 | W | BFO | | | | 100% (1) |
| 10 | A | BFO | | | | 100% (1) |
| 11 | B | BFO | | | | 100% (1) |
| 12 | W | BFO | | 100% (1) | | 100% (3) |
| 18 | W | BFO | | | | 100% (1) |
| H | W | BFO | | | 50% (1) | 50% (1) |
| 20 | H | BFO | | | 100% (2) | |
| 22 | W | BFO | | | | 100% (3) |
| 23 | W | BFO | 50%(2) | 50% (2) | | 100% (1) |
| 24 | A | BFO | 100% (1) | | 100% (3) | |
| 5 | W | BRM | | | | 100% (1) |
| 16 | B | CF | | 100% (1) | | 100% (2) |
| 21 | W | CF | | | 100% (2) | |
| 3 | W | IAD | | | | 100% (1) |
| A | W | IAD | 34% (2) | 66% (4) | 35% (17) | 65% (32) |
| 13 | A | IAD | | 100% (2) | | 100% (2) |
| 14 | A | IAD | 100% (1) | | | 100% (2) |
| 15 | A | IAD | | | | 100% (1) |
| E | W | IAD | | 100% (1) | | |
| 25 | W | IAD | | | | 100% (4) |

*Note: The sergeants in the prior table represented by a letter (A, E, H) are the same sergeants represented by the same letter in the prior table entitled "Who Are the White Accusers?"

There were only two Sergeants who recommended Sustained findings for more than one FTARC allegation against a Black Subject member in 2022: Sergeant A and Sergeant 23.

*Sergeant 23*
Sergeant 23 generated no internal allegations of FTARC. Sergeant 23 was assigned investigations involving five different FTARC allegations.

Sergeant 23 was assigned to investigate two separate FTARC allegations against the same Black subject member. In one instance, Sergeant 23 recommended Sustained. In the other instance, Sergeant 23 recommended other than sustained.

The other than sustained recommendation was overruled by the then Chief of Police and the Black subject member received their second of two Sustained violations for FTARC in the space of one month.

## V.4 Sergeant A

The inspection also sought to investigate aberrations within the data which might lead to a person, or particular unit, in the Department contributing to the disparate outcomes. When outliers were identified (such as with Sergeant A), a deeper, qualitative review was conducted.

The review of Sergeant A revealed that a source of deviation within their data was the number of internally generated FTARC allegations he levied and the Sustained Rate outcomes of those cases. While Sergeant A did not appear to be "over-sustaining"[6] any particular race group, there was an area[7] wherein the question arose whether Sergeant A was "under-sustaining"[8] the white race group.  To inspect that, we conducted a qualitative review of Sergeant A's investigative reports.

In examining the relevant cases, among other observations contained later in this section, we also found that just one of Sergeant A's cases, containing eleven allegations against white members, was responsible for 52% of the sergeant's findings against White members. The findings for those 11 members were other than sustained.

Had this single case been assigned to a different investigator, Sergeant A's sustained rate for White members would have been more closely aligned with other races and the sergeant would not necessarily have been an outlier for Sustained Rates. Additionally, exploring the hypothetical further, had Sergeant A not been assigned the single case, would another assigned investigator have identified FTARC as an allegation needing to be added to all the subjects and would they have investigated it in the same manner?

There are a number of moderating and mediating factors which intertwine to affect the body of data that comprised 2022's FTARC allegation investigations: the assignment of field personnel, which personnel responded to any given scene, what sergeant investigated the case, what member added an allegation of FTARC to the complaint, what evidence was available, the list goes on and on. There is discretion wielded in nearly every phase of the process.

Still, it was striking that one white Sergeant (Sergeant A) accounted for 34 of the 100 internally generated FTARC allegations in 2022, the most internally generated allegations by a single member, by far. Only two of the 34 (6%) FTARC allegations added by Sergeant A were against Black members, one of which was sustained. Sergeant A added the most allegations against White and Hispanic members (71%). None of the allegations added by Sergeant A against White members were sustained. Sergeant A has worked in IAD in different capacities over his career, totaling approximately 4 years and 8 months out of 23 years total. (20.36% of his career.)

---

[6] Recommending a higher rate of sustained findings against one particular race group versus another.
[7] The area being FTARC allegations internally generated by Sergeant A and investigated by Sergeant A.
[8] Recommending a lower rate of sustained findings for one particular race group versus all others.

Sergeant A's  Internally Generated vs Assigned Allegations

| 2022 | | Unfounded | Exonerated | Not Sustained | Sustained | Total | Sustained Rate |
|---|---|---|---|---|---|---|---|
| Asian | Generated | 1 | 0 | 1 | 4 | 6 | 67% |
| Asian | Assigned | 0 | 0 | 2 | 3 | 5 | 60% |
| Black | Generated | 0 | 0 | 1 | 1 | 2 | 50% |
| Black | Assigned | 1 | 0 | 1 | 2 | 4 | 50% |
| Hispanic | Generated | 2 | 0 | 4 | 4 | 10 | 40% |
| Hispanic | Assigned | 4 | 0 | 0 | 0 | 4 | 0% |
| Other | Generated | 1 | 0 | 0 | 1 | 2 | 50% |
| Other | Assigned | 1 | 0 | 0 | 0 | 1 | 0% |
| White | Generated | 3 | 0 | 11 | 0 | 14 | 0% |
| White | Assigned | 2 | 0 | 1 | 4 | 7 | 57% |
| Grand Total | | 15 | 0 | 21 | 19 | **55** | 35% |

You'll recall from the prior section; Sergeant A was the most prolific *accuser* of FTARC allegations (34). In the table above, you can also see Sergeant A was the most prolific *investigator* of FTARC allegations across all races (55). Sergeant A recommended a Sustained finding for Black members for FTARC allegations 34% of the time and for other-than-Black members 35% of the time. However, in the above table, having broken apart the other-than-black member group into its components,  you'll note Sergeant A's Sustained finding rate for White members was 0% when Sergeant A added the allegation, and 57% when the case was assigned to Sergeant A with the allegation already present. Sergeant A levied 14 allegations against White subjects, then found 11 Not Sustained and 3 Unfounded.

For no other race group did Sergeant A generate an allegation of FTARC and then other-than-sustain all of them as he did within the White group. The noticeable gap between Sergeant A's recommended findings per allegation origin was explored further via case review.

Case Review - Sergeant A's Other Than Sustained Findings for White Subjects

| Case # | Notes | Recommended Findings |
|---|---|---|
| 1 | This case is discussed in a later table, entitled "Sustained Cases with Areas of Concern." The area of concern would have affected the white subject sergeant, who was Unfounded, but within the report there was left open an unanalyzed concern, emanating from the subject sergeant's own statement and which may call into question the Unfounded finding. | 1 Hispanic Officer: Sustained<br>1 Black Officer: Sustained<br>1 Other Officer: Sustained<br>1 Hispanic Officer: Not Sustained<br>1 White Sergeant: Unfounded |
| 24 | The justification for the Sergeant being Not Sustained cited external factors which could have blocked the Sergeant's hearing of the request to speak with a Sergeant. By contrast, it seemed the two officers heard the complainant make an allegation of misconduct but took no further action. The allegations emanated during a conversation, which had been an easy back and forth between the complainant and officers during the booking process at jail. At the allegation to the officers that they'd "fucked over my rights," the officers became momentarily silent toward the complainant. In their statements the officers denied recollection of hearing the allegations. There is not a substantive analysis of proximity or external factors that could have obscured the officers' hearing of the allegation. Instead, the Investigator opined, "This investigation finds that this one comment should not be viewed as an allegation of misconduct by (complainant)." The "one comment" standard does not appear elsewhere in 2022 FTARC cases. | 1 White Officer: Not Sustained<br>1 Hispanic Officer: Not Sustained<br>1 White Sergeant: Not Sustained |
| 9 | No concerns identified. | 1 White Sergeant: Not Sustained, 1 Black Sergeant: Not Sustained, 2 Asian Officer: Not Sustained, 3 Hispanic Officers: Unfounded<br>2 White Officers: Unfounded, 2 Asian Officers: Sustained, 3 White Officers: Sustained |
| 11 | The Chief overruled the Unfounded finding recommendation for the Hispanic Sergeant with a Sustained. | 1 Hispanic Sergeant: Unfounded<br>1 Hispanic Officer: Sustained<br>1 Asian Officer: Not Sustained<br>1 Hispanic Officer: Not Sustained<br>1 White Sergeant: Not Sustained<br>1 White Sergeant: Unfounded<br>1 White Officer: Unfounded<br>1 White Lieutenant: Not Sustained<br>7 White Officers: Not Sustained |

All 17 of Sergeant A's other than sustained recommended findings emanated from just 4 cases, each containing multiple subject officers of varying ranks and racial group membership.

Further, Case #11 accounted for 11 of Sergeant A's 17 (65%) other than sustained FTARC recommendations against White subjects in 2022. With one case containing so many allegations, and predominantly against White subjects, the weighting of such a case within Sergeant A's FTARC allegation portfolio was outsized as compared to its weight as a single case. Removing Case #11 from the mix would leave Sergeant A's sustained rate against White subjects for internally generated FTARC allegations at 0/6 (still 0%) rather than 0/14 (the current 0%).

More impactfully, with Case #11 accounting for 11 other-than-sustained findings for White members, a hypothetical removal of this case from the set would have fundamentally changed the outcome of apparent disparity for the whole years' worth of data. The overall Sustained Rate for White subjects was 26% in 2022. The hypothetical offered would have changed the White subject Sustained Rate to 37%, still lower than the 60% Sustained Rate for Black subjects, but an 11% swing from the Table 2 data. The lower numbers involved in a year's worth of data can lead to one investigation with multiple officers on the scene having an outsized effect upon the whole.

The two cases above (#1 and #24) wherein there seemed to be a question as to the justification for the findings serve as further evidence of the varied manner in which the assessment of FTARC occurs, sometimes even between cases conducted by the same investigator. Case #24's Unfounded recommendation for the White sergeant seemed logical and appropriate. The "one comment" argument was an outlier in this review and served to Not Sustain 1 Hispanic and 1 White officer. Hypothetically, if the investigation had found the two officers Sustained, the result would have delivered the following Sustained rate for Sergeant A's internally generated FTARC allegations:

➢  Hispanic: 50% (5/10), up 10%.
➢  White: 7% (1/14), up 7%.

Due to low numbers in the sample size, one allegation's hypothetical swing to a Sustained finding results in a 7% and 10% corresponding movement. The percentages reveal areas of concern but should be considered in the context of the small sample size serving as the foundation.

Sergeant A alone investigated 49% of all FTARC allegations in the Department in 2022 (55/112). Removing Sergeant A's own internally generated allegations, Sergeant A would have  investigated 19% (21/112) of the total 2022 FTARC allegations.

To attempt to better understand how such a concentrated impact could have landed with a single investigator, the author inquired with the Internal Affairs Chain of Command. (Sergeant A was assigned to the Internal Affairs Division during 2022.) The Chain of Command responded with the following statement,

*(Sergeant A) is a trusted and efficient investigator. His judgement is valued,*
*respected, and well-articulated. He routinely carries a case-load twice the size of*
*other investigators in the Section and is capable of deep analysis while still adhering*
*to timelines for investigations. His additions of (FTARC) allegations during 2022 was a*
*product of being sensitive to the nature of the (FTARC) MOR, noting potential*
*violations of it, and adding it to the case for all potential subject officers prior to*

24

*interviewing subject officers such that questioning about (FTARC) could be done in accordance with Government Code 3300 et. seq.*

The dominating number and percentage of all FTARC allegations investigated by Sergeant A may provide us the answer as to why White sergeants investigated FTARC allegations at a higher rate than other races.

Simply put, with 49% of all allegations being investigated by one Sergeant (who is White), cases which might have otherwise been disseminated across other investigators, belonging to different race groups instead remained with Sergeant A.

## VI.    Division Level Investigations (DLI) v Internal Affairs Division Investigations (IAD)

Investigations into misconduct take two forms within the Department. After being processed through the IAD Intake Section, a case file may either be assigned to a sergeant investigator in the Internal Affairs Investigations Section (referred to as Internal Affairs Investigations), or to a sergeant assigned to another part of the Department  (referred to as Division Level Investigations).

Division Level Investigations (DLI) are, as prescribed by policy, contain largely Class II  (lower level) offenses.[9] Internal Affairs Investigations (IAD) contain largely Class I (higher level) offenses. The packaging and assignment of a case as either a DLI or IAD investigation is the responsibility of the Internal Affairs Division -  Intake Section, headed by a Lieutenant of Police, working for the IAD Commander (Captain). The assignment of cases may not always follow the strict delineations of policy, as the Lieutenant in charge of IAD Investigations Section may request some Class I cases be sent out as DLI when the caseload of the IAD Section has become untenable.

Once a case has been designated as a DLI, it is packaged into a case file and distributed via the Bureau of Field Operations – Administrative Section. Two Sergeants are currently assigned to this unit, working to disseminate, track, and retrieve numerous DLI case files as they are funneled back to the chain of command overseeing the subject officer. The Captain(s) and Lieutenant(s) overseeing the subject officer's chain of command may assign the DLI back to the subject officer's own Sergeant. If work load or operational concerns intervene, however, then the Captains and Lieutenants may choose to assign the DLI to a different Sergeant to investigate it.

Further, units other than those assigned to the Bureau of Field Operations may be assigned DLI to investigate and review when workloads overwhelm the field personnel. In these instances, the investigating and reviewing chain of command may have no regular supervisory responsibility over the subject officer.

The Internal Affairs Investigations Section sergeants' only role is to investigate allegations of misconduct. Sergeants assigned to other areas of the Department handle Division Level Investigations in addition to their normal duties. There are 121 sergeants in the Department, 8 of whom are assigned as Internal Affairs Investigators. There are therefore potentially 113 sergeants are available to investigate Division Level Investigations ancillary to their regular assignment.[10]

In 2022, 25 sergeants investigated at least one allegation of FTARC. 18 of the 25 sergeants investigated said allegations as Division Level Investigations. 7 of the 25 sergeants investigated said allegations as Internal Affairs Investigations.

The following table displays the distribution of 2022 cases investigated as either DLI or IAD and how each type's findings were distributed.

---

[9] DGO M-03 Complaints Against Departmental Personnel or Procedures, VI. A.: *Class I offenses shall be investigated by IAD and Class II offenses shall be investigated or resolved at the division-level unless otherwise directed by the COP, Assistant Chief of Police, Acting Chief of Police, or Deputy Chief of the Bureau of Risk Management.*

[10] 113 being the ceiling, as there are some Sergeants on Administrative or Medical leave, as well as some assigned to the Homicide Section, who are not additionally burdened with DLI assignment. Further, while no personnel other than sergeants investigated FTARC allegations in 2022, any supervisor or commander may assume responsibility as primary investigator.

Type of Investigation and Findings

| 2022 | Sustained | Exonerated | Not Sustained | Unfounded | Grand Total |
|------|-----------|------------|---------------|-----------|-------------|
| Division Level Investigation | 56% (24) | 2% (1) | 14% (6) | 28% (12) | 100% (43) |
| Internal Affairs Investigation | 30% (21) | 1% (1) | 35% (24) | 33% (23) | 100% (69) |
| Grand Total | 40% | 2% | 27% | 31% | 100% |

Relatively few Sergeants, (eight) investigated 62% (69) of the total FTARC allegations, as Internal Affairs Investigations. The findings resultant from Internal Affairs Investigations were evenly distributed across Not Sustained, Sustained, and Unfounded, all in the low to mid 30% range.

By contrast, 18 Sergeants investigated the remaining 38% (43) of FTARC allegations as Division Level Investigations. The findings resultant from Division Level Investigations revealed a wider range between findings, with ~14% Not Sustained, ~28% Unfounded, and ~56% Sustained.

➢ The sustained rate for FTARC allegations investigated as DLIs was higher than those investigated within IAD Investigations.

Most of the difference seems to result from the lower usage of Not Sustained as a finding within DLIs, about a 1/3 of IAD. The larger number of sergeants investigating DLI FTARC allegations indicates the DLI investigating sergeants each worked on fewer FTARC per investigator than those sergeants assigned to IAD. This is consistent with normal practice in BFO wherein commanders are careful to not assign more than two DLI to a field supervisor at any given time. There is no policy prohibition against assigning more, but the added burden of a third DLI would overwhelm the sergeant's normal operational duties.

The wider range in use of findings may be indicative of the varied chains of command and locations from which DLIs matriculate through the investigative process as opposed to the IAD Investigations' more contained, controlled, City Attorney accessible, and less extraneously burdened process. IAD Investigators' only job function is to investigate misconduct allegations. IAD investigators work as part of a small unit with routine interactions with Executive Command and lawyers from the City Attorney's Office to help inform opinion and finding.

In contrast, DLIs are investigated by a wider swath of sergeants and reviewed by a wider swath of supervisors, all of whom are tasked with participating in the DLI process over and above their primary assignment functions. It is little wonder that whatever ethos informed the IAD Investigations' findings may not have scaled and represented in the same extent within the array of DLIs, thus accounting for an 80% difference in Sustained rates, and a threefold difference in non-sustained rates.

However, a moderating variable (the DLI Coordinator Unit (1 Acting Lieutenant, White, and 2 Sergeants, 1 White, 1 Asian)) is housed within IAD. The DLI Coordinators are intended to act as quality control for DLI investigations, reviewing content for appropriateness of findings, correcting formatting and grammatical errors, and preparing cases for presentation to the IAD Commander or Chief of Police. The DLI Coordinators may serve as advisors to Investigators, recommending findings or further investigative steps for an investigator to carry out.

➢ A DLI Coordinator's work and influence is largely invisible within any given investigative file.

For instance, a final finding may be shown within the DLI Report of Investigation (ROI) as Sustained, but without an accompanying trail to show what the DLI-level Investigator's initial recommended finding was, and what suggestions were offered, or pressure exerted, to change said finding, if any, by the DLI Coordinator.

The name of the DLI Coordinator shepherding any given case through the DLI investigative process may not appear anywhere in the file. In two instances in 2022, a DLI Coordinator authored an addendum (See Alternate Recommendations section for further) when they disagreed with a finding offered in a DLI investigation. The DLI Coordinators' addenda only recommended Sustained findings in place of other-than-sustained findings.

Though a small sample, the addenda may be indicative of a different mindset towards using the Sustained finding with regard to FTARC allegations, resulting in the higher Sustained rate in DLI investigations than in IAD Investigations. A deeper look at addenda can be found later in this report.

Re-examining the DLI vs IAD allegations, with race of the subject officer as a factor, resulted in the following table.

DLI v IAD by Finding and Race



| | Exonerated | Not Sustained | Sustained | Unfounded | Exonerated | Not Sustained | Sustained | Unfounded |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Division Level Investigation | | | | Internal Affairs Investigation | | | |
| ASIAN | 0.00% | 42.86% | 14.29% | 42.86% | 0.00% | 27.27% | 63.64% | 9.09% |
| BLACK | 10.00% | 10.00% | 80.00% | 0.00% | 0.00% | 30.00% | 40.00% | 30.00% |
| HISPANIC | 0.00% | 15.38% | 69.23% | 15.38% | 0.00% | 26.32% | 26.32% | 47.37% |
| WHITE | 0.00% | 0.00% | 46.15% | 53.85% | 4.00% | 48.00% | 16.00% | 32.00% |
| OTHER | | | | | 0.00% | 25.00% | 25.00% | 50.00% |

➢ The large difference in Sustained rates between races evident in the 2022 data, combined with the invisible nature in which the DLI Coordinator unit appears to operate within any given case file is of concern.

## VII.   Discipline by Race

Having explored aspects of findings, we turn now to discipline disparity within the FTARC allegation.

The Department's Executive Command has stated to the Court that anonymization protocols instituted in 2022 during IAD Findings and Discipline Meetings were designed to eliminate the opportunity for bias to affect decision-making. The effects of the anonymization were not immediately auditable, as the Department has not initiated quantification of when anonymization protocol were strictly adhered to throughout a case presentation, or when it was undercut via BWC review, accidental mentioning of the subject's identity, or an instance wherein the Chief of Police had already been briefed on the matter.

## VII.1 Who is Recommending Discipline?

Within OPD, discipline recommendations emanate from a Captain or Lieutenant, but most often the Captain overseeing the Division within which the Sustained subject currently works. The discipline recommendation occurs after the determination of finding by the Chief, usually at a different meeting on another date. The recommender is provided recent Performance Appraisals, the IAD investigative report, and a pre-discipline report (standardized OPD form) to fill out, ensuring they account for mitigating and aggravating factors when ascertaining appropriate discipline recommendations. The OPD Discipline Matrix provides parameters per MOR violation and per count (1st Offense, 2nd Offense etc.) The recommender may hold a discipline conference with direct supervisors of the sustained subject officer to solicit feedback and recommendations.

The Captain presents their recommendation to the Executive Command Team (Deputy Chiefs, Assistant Chief and Chief of Police). The Community Police Review Agency may also present discipline recommendations at that time.

The Chief of Police determines final discipline. The pre-discipline report, with the final determination of discipline as authorized and signed by the Chief, is included in the IAD file.

Discipline recommendations were offered by 16 different individuals during 2022. There was no Asian or Other race discipline recommender in 2022.

> ➤ White recommenders accounted for 56% of the discipline recommendations in 2022.

FTARC Number of Discipline Recommendations by Race of Recommender

| Race of Recommender | # of Discipline Recommendations 2022 |
|---|---|
| Black | 11 |
| Hispanic | 1 |
| N/A | 8 |
| White | 25 |
| Grand Total | 45 |

Not Applicable (N/A) was used when no Discipline Recommendation was offered. In these instances, the Chief was asked to ascertain discipline directly. This may occur in instances where the sustained subject has since resigned from the Department and has no direct chain of command. In one case, a Discipline Recommendation form was filled out by a white Lieutenant, but the recommendation was explicitly that there was no recommendation from the Chain of Command.

In 2022, the then-Chief of Police determined final discipline in 44 of the 45 sustained allegations. A Deputy Chief (who was Acting Chief briefly in 2022) determined final discipline in the remaining case.

## VII.2 Elevation / Lowering / Confirming of Recommended Discipline

Upon receiving recommended discipline, the Chief may elevate the level of discipline, lower it, or confirm the recommendation as final discipline. "N/A" in the below table indicates instances wherein there the Chief ascertained discipline without a discipline recommendation.

Sustained FTARC Allegation Recommended Discipline v Final Discipline and Race

| Movement from Recommended to Final Discipline | OTHER | ASIAN | BLACK | HISPANIC | WHITE | Grand Total |
|---|---|---|---|---|---|---|
| Confirmed | 1 | 5 | 6 | 7 | 5 | 24 |
| Elevated | | | 5 | | | 5 |
| Lowered | | 1 | 1 | 4 | 1 | 7 |
| N/A | | 2 | | 3 | 4 | 9 |
| Grand Total | 1 | 8 | 12 | 14 | 10 | 45 |

➢ The only race group to receive elevated discipline by the Chief from the recommended discipline was Black subjects.

S(#)  = Number of Days Suspension
WR = Written Reprimand
C&T = Counseling and Training

2022 Discipline for FTARC Sustained Black Subjects

| Case # | Recommended Discipline (RD) | RD within the Matrix? | Elevated (E)/ Lowered (L) / Confirmed (C) | Final Discipline | Final Discipline within the Matrix? | CPRA Parallel Investigation? | Notes |
|---|---|---|---|---|---|---|---|
| 1 | S1 | Yes | C | S1 | Yes | Yes | |
| 2 | C&T | Yes | C | C&T | Yes | No | |
| 3 | C&T | No (below) | E | WR | No (still below) | Yes | Subject had 1 prior offense for same.<br>2 other officers on same case received C&T and had no priors for same. |
| 4 | C&T | Yes | E | WR | Yes | Yes | No explanation documented. |
| 5a | S5 | Yes | E | S8 | Yes | Yes | Subject had 1 prior offense for same and was sustained for other MOR violation on this case. |
| 5b | S2 | Yes | E | S3 | Yes | Yes | Subject had 1 prior for same MOR. |
| 10 | WR | No (below) | E | S2 | Yes | No | Subject had 1 prior for same MOR. |
| 13 | S2 | Yes | C | S2 | Yes | No | Subject had 1 prior for same MOR. |
| 14 | S2 | Yes | C | S2 | Yes | No | |
| 15 | S3 | Yes | C | S3 | Yes | No | |
| 17 | WR | Yes | L | C&T | Yes | No | No explanation documented. |
| 18 | C&T | Yes | C | C&T | Yes | No | |

No discipline recommendations were received for discipline above the matrix range.

Two discipline recommendations were received for discipline below the matrix range. The subject officers in both cases had 1 prior offense for FTARC, which were subject to 2nd Offense ranges of discipline pursuant to the Department's progressive discipline practice.

Both below-matrix recommendations were offered by white male commanders (one Lieutenant and one Captain). One below-matrix discipline recommendation was elevated by the then-Chief to within the matrix for a second offense. The other was elevated, but to a Written Reprimand, still below the matrix for a second offense, but one rung more severe than the two other sustained subjects on the same case, neither of whom had prior offenses for FTARC.

One discipline recommendation was lowered, from within the matrix to still within the matrix. The recommendation was offered by a white male commander (Lieutenant). The discipline was lowered by a Deputy Chief serving in an Acting Chief role during the discipline meeting. The final discipline was consistent with what other officers received for their first offense of FTARC.

 ➢ There were 5 Sustained allegations receiving elevated discipline from the recommendation. Four of the five (80%) allegations were also investigated by CPRA. There appeared to be correlation between CPRA's involvement in the discipline recommendation and the final decision for discipline being elevated from the OPD recommendation.

In one of the cases (#4) the sustained subject had no prior offenses yet was elevated from the recommended C&T to WR, which was still within the matrix. The elevation appeared inconsistent with how other discipline was meted out for first offenses for FTARC. The subject was a Sergeant in this case, which may have weighed more heavily in the decision-making process. For comparison, another Sergeant (Hispanic) was sustained for their first offense of FTARC in 2022 and also received a Written Reprimand from the then Chief.

 ➢ The common reasons Black subjects received elevated discipline from the recommended discipline was for either:
    ➢ having a prior offense for the same MOR violation (4/5) or
    ➢ being a Supervisor (1/5).

However, the mere presence of a first offense in the record cannot retroactively ensure said first offense was equitably processed at the time. The occurrence of a second offense within a Black subject's IAD record may be further indication of a longer period of discipline disparity evidenced against those individuals, much as current first offenses may one day serve as but the first data point in an individual's discipline disparity trajectory if the Department does not remain vigilant in pro-actively locating and addressing such issues. A qualitative review follows.

## VIII.   Qualitative Analysis of 2022 FTARC Allegations

As the first offenses for most of the 2022 sustained Black subjects occurred in various years' past, under different chains of command, with different IAD procedures in place, it was an imperfect comparison when we attempted to delve into those cases and draw parallels to 2022 case evaluations. Instead, to assess OPD's current procedures, findings and discipline integrity, the assessors undertook a qualitative analysis of all 112 investigated allegations of FTARC in 2022.

In 2022 there were 112 allegations of FTARC. Of those 112 allegations, 45 of them were found Sustained. The 45 Sustained allegations emanated from 19 investigations.

The following are notes on the 19 Sustained cases. Wherein opportunity for differing opinions, discretion, or bias was identified, it is noted.

Sustained Cases with Areas of Concern

| Sustained Case #[11] | Notes | Results |
|---|---|---|
| 1 | A 5150 WI detainee made numerous verbal allegations while being detained by Officers. No one relayed the allegations to the sergeant. The detainee was gone from scene by ambulance at the time the sergeant arrived. The sergeant had no cause to follow detainee or indication the detainee made allegations of misconduct. The sergeant had no duty to review UoF video (pursuant to policy at the time), but stated they actually did review snippets and clips and didn't notice any allegations. The allegation against the sergeant was deemed Unfounded for FTARC.<br><br>Yet, if the sergeant did review the video as claimed, how did they miss the screaming of allegations by the detainee? | Sustained: 1 Black, 1 Other, 1 Hispanic, 1 Asian Officers<br><br>Unfounded: 1 White Sergeant<br><br>Not Sustained: 1 Hispanic Officer |
| 2 | This case was reviewed previously in this report. Officers on scene were Sustained, but the sergeant was listed as a witness in the case and culpability was not assessed. | Sustained: 3 Hispanic, 1 White, 1 Black Officers<br><br>Witness Only: 1 White Sergeant |
| 3 | This case was reviewed previously in this report. The complainant did not want to file a complaint in 2017, nor in 2022, yet the officers were sustained for asking one but not a secondary clarifying question. | Sustained: 1 Black and 2 white Officers |
| 4 | No area of concern identified. | |
| 5 | Investigator produced an addendum to their own report, changing allegations for 4 subject officers (1 Black, 1 White, 1 Asian, 1 Hispanic) from Unfounded to Sustained. Officers assumed the on-scene sergeant, who was speaking directly with the complainant, would obtain relevant information for any complaints the complainant may have had. The sergeant received the same allegations the officers received, so their assumption was correct. The sergeant's failure to open the complaint, armed with the same information the officers had, trickled down to each officer that failed to personally debrief the sergeant with their own personal observations. | Sustained: 1 Hispanic, 1 Asian, 1 Black, 1 White Officers; 1 Black Sergeant |

---

[11] These case numbers are not reflective of the actual identifying IAD case file numbers but are used only for differentiation within this report.

| | The addendum referred to the changes in findings as "it was decided," implying something less than agreement by the investigator.<br><br>The CPRA's Sustained recommendation hinges on a reading of a portion of DGO M-03 which states officers shall "notify and provide his/her supervisor with all information obtained from the complainant as soon as practical." The same CPRA investigation applied this standard differently to other subjects in the same case, exonerating two officers for knowing affirmatively that all the same allegations they'd heard had been told to sergeant by the complainant, while sustaining the others for not knowing the same, even when the Sustained officers had seen the sergeant speaking directly with the complainant. | |
|---|---|---|
| 6 | No area of concern identified. | |
| 7 | No area of concern identified. | |
| 8 | No area of concern identified. | |
| 9 | The subject officer stated they didn't hear allegations at the time. The Investigator argued the officer "should have" heard them. The sergeant, who was on scene alongside the subject officer, was Not Sustained with the same argument, having stated the same thing. | Sustained: 2 Asian, 3 White Officers<br><br>Not Sustained: 1 White Sergeant, 1 Black Sergeant, 2 Asian Officers |
| 10 | No area of concern identified. | |
| 11 | Investigator produced addendum to their own report, changing allegations for the sergeant subject (Hispanic) from Unfounded to Sustained. Per the addendum, "it was decided" by the Chief and the investigator was ordered to change the findings.<br><br>The CPRA investigation relied upon a section of DGO K-04 (Reporting and Investigating Force) that says "If any force investigation *indicates* misconduct..." The CPRA applied that standard to an allegation from a citizen. It is debatable whether a mere allegation of misconduct is equivalent to an investigation which produces actual evidence indicating misconduct had occurred. This may have been a misapplication of policy during the analysis. | Sustained: 1 Hispanic Sergeant<br><br>Unfounded: 1 White Officer, 1 White Sergeant<br>Not Sustained: 1 Asian, 1 Hispanic, 7 White Officers, 1 White Sergeant, 1 White Lieutenant |
| 12 | No area of concern identified. | |
| 13 | Addendum by DLI Coordinator, overruling investigating sergeant's finding. Sets a new standard that's not listed in policy or training: "Knowledge that a complaint is upset with a member should reasonably trigger the above two questions which DGO M-3 states shall be asked." "Upset" is not a standard that's found in OPD training or policy. The two questions referred to are "clarifying questions", which are appropriate when a member is "unsure" as to whether someone wants to make a complaint. The subject was specifically asked about this and he stated he was "sure. " During the subsequent investigation, the investigator spoke with the complainant again, who said she did want to file a complaint against the subject for tone and demeanor. The DLI coordinator used the later affirmation of wanting to file a complaint against the subject for not previously asking "clarifying questions" of the complainant in the initial interaction. There is no analysis or clarification as to whether the complainant had wanted to file a complaint against the subject during the | Sustained: 1 Black Sergeant |

| | | |
|---|---|---|
| | initial interaction, or only later, once asked about it directly by the investigator. The DLI coordinator alleged the investigating sergeant as well as the Lieutenant and Captain all came to the "incorrect" conclusion and should receive negative notes in their files. | |
| 14 | No area of concern identified. | |
| 15 | Officers attempted to arrest DV suspect who refused to exit residence. Officers left the apartment complex without making the arrest. As they left suspect shouted at them for their names and badge numbers. The officers said they'd give them to him if he came down (a ruse to make the arrest). The suspect said never mind, he'd get their car numbers. Officers did not leave IBC information in front of the suspect's house. There is no training or policy for how or where officers should leave IBC information for someone who is refusing personal contact with them. | Sustained: 3 Hispanic, 1 Black Officers |
| 16 | No area of concern identified. | |
| 17 | The officer "*should*" have asked clarifying questions to the complainant to see if she wanted to speak with a supervisor or file a complaint. The complainant, while speaking with the subject officer, did not say or express to him that she wanted to file a complaint, however the allegations of misconduct that she was "*inferring*" required him to ask clarifying questions. Reliance in the analysis of interpreting the complainant's inferences and what the subject should have picked up on is subjective. | Sustained: 1 Black Officer |
| 18 | Only Officer 1 was sustained for FTARC. The analysis leading to the allegation against the sergeant being Unfounded doesn't include the fact that Officer 2 had indicated to the sergeant the complainant was making allegations. The analysis relies only on Officer 1 telling the sergeant that everything was ok and he didn't need to speak with the complainant. The sergeant didn't deconflict the differing statements between Officer 1 and 2 and a complaint was not accepted or referred. | Sustained: 1 Black Officer<br><br>Unfounded: 1 White Sergeant |
| 19 | A complaint was accepted by the sergeant on scene. As the officers drove the complainant (an arrestee) to jail, the complainant added additional allegations. The officers knew a complaint had already been accepted and did not re-summon or update the sergeant with additional allegations. There is no training or policy covering how many times, or under what circumstances additional allegations need to be advised to the sergeant when a complaint has already been opened. The analysis cited the 'unsure' / 'clarifying questions' section of DGO M-03, which was not applicable. | Sustained: 1 Hispanic, 1 White Officers |

Out of the 19 Sustained cases in 2022, the qualitative assessment identified areas of concern, including inconsistency, discretion, or subjective judgement in 58% (11/19).

35

Within these 11 cases were the following Sustained allegations against subjects, by race.

Sustained Allegations Within Cases Containing Areas of Concern

| Race of Sustained | Number of Allegations Sustained within 11 Cases with Areas of Concern | Total Allegations 2022 | Rate of Sustained (with Analyses Containing Areas of Concern) |
|---|---|---|---|
| Asian | 4 | 18 | 22% |
| Black | 9 | 20 | 45% |
| Hispanic | 10 | 32 | 31% |
| Other / Unknown | 1 | 4 | 25% |
| White | 8 | 38 | 21% |

> ➤ 45% of all the 2022 FTARC allegations against Black subjects came to a Sustained finding within investigative reports that relied on inconsistent, subjective, or discretionary analysis. This next highest race group percentage was Hispanic, at 31%.

Qualitative analysis revealed areas of concern (inconsistency, discretion, subjective judgement) in 11 of the 19 sustained FTARC cases in 2022.

> ➤ Common themes from the cases containing areas of concern included:
> - Reliance on "unsure" and "clarifying questions" sections of DGO M-03, whether the subject was "sure" or otherwise.
> - Sergeants speaking with complainants but receiving different information from complainant than what the complainant had stated previously to officer(s); the officer(s) being held responsible for those differences.
> - Sergeants were not assessed as subjects or were found "other-than-sustained."

# Appendix A

## Chi-Square Calculation for Sustained Rate of FTARC Allegations

White sworn members had a sustained rate of 26% while Black sworn members had a sustained rate of 60%, a statistically significant difference.

| | Other than Sustained | | | Sustained | | | Chi-Square | $p$ |
|---|---|---|---|---|---|---|---|---|
| | Observed | Expected | | Observed | Expected | | Value | |
| White | 28 | 23.6 | 1.06 | 10 | 14.4 | 0.65 | 4.97 | 0.026 |
| Black | 8 | 12.4 | 2.02 | 12 | 7.6 | 1.23 | | |

Sustained Rate of FTARC Allegations

| 2022 | Sustained Rate |
|---|---|
| Asian/Filipino | 44% (8/18) |
| Black | 60% (12/20) |
| Hispanic | 43% (14/32) |
| Other/Unknown | 25% (1/4) |
| White | 26% (10/38) |
| Total | 40% (45/112) |

## FTARC As Stand-Alone Sustained Allegation

There were 19 cases in 2022 wherein at least one allegation of FTARC was found Sustained, covering 45 separate allegations.

Cases Where Subjects Were Sustained for FTARC vs Other Allegations

| Case # | FTARC Allegations Sustained | Other Allegations Sustained in the same Case | Cases Where at Least One Subject Was Black |
|---|---|---|---|
| 1 | 4 | 4 | ✓ |
| 2 | 5 | 0 | ✓ |
| 3 | 3 | 0 | ✓ |
| 4 | 1 | 0 | ✓ |
| 5 | 5 | 1 | ✓ |
| 6 | 2 | 1 | |
| 7 | 1 | 2 | |
| 8 | 1 | 0 | |
| 9 | 5 | 2 | |
| 10 | 1 | 0 | ✓ |
| 11 | 2 | 0 | |
| 12 | 2 | 3 | |

| 13 | 1 | 1 | ✓ |
| 14 | 1 | N/A (only allegation was for FTARC) | ✓ |
| 15 | 4 | 4 | ✓ |
| 16 | 3 | 2 | |
| 17 | 1 | 0 | ✓ |
| 18 | 1 | 0 | ✓ |
| 19 | 2 | 0 | |
| **TOTAL** | **45** | **20** | **11** |

Within 9 of the 19 cases there were allegations for other MOR violations, but FTARC was the *only* allegation sustained. The nine cases accounted for 17 (38%) of the 45 Sustained allegations for year.

In 11 (58%) of the 19 cases at least one subject member was Black. A Black member was Sustained in 6 (67%) out of 9 of the cases where FTARC was the *only* allegation Sustained.

Put another way, 38% of the time wherein a subject of any race was Sustained for FTARC MOR violations they were other-than-sustained (exonerated, unfounded or not sustained) for the underlying conduct they may have unintentionally failed to accept or refer.

*Table 28 Case #2 Review*
In case #2, which resulted in a Sustained finding for one Black subject and three Hispanic subjects, and one White subject, FTARC was the only Sustained allegation, one for each. The other allegations under investigation included four allegations of improper search, seizure, or arrest, all of which were found Exonerated.

Officer 1 called their sergeant to the scene due to verbal allegations made by an arrestee. The sergeant interrupted the officer during the phone call, saying he was already in route. Once on scene the sergeant did not speak with Officer 1, who was guarding the arrestee. The Sergeant spoke with Officers 2 and 3. The Sergeant deferred investigative tactics and decisions to Officers 2 and 3 and asked no questions about complaints or force. The officers volunteered they had used low level force (Level 4 Type 32) to restrain the arrestee in handcuffs.

The arrestee's attitude evolved during the interaction and became compliant and friendly. Officer 1 later testified that he believed Officers 2 and 3 had updated the sergeant as to the initial allegation while the sergeant was on scene and later, as the arrestee's attitude changed, Officer 1 became sure the arrestee no longer wanted to make a complaint.

All officers were Sustained for FTARC for not informing the sergeant of the nature of the verbalized allegations at the early portion of the interaction. Officer 4 and 5, who were not directly involved in the calling of the sergeant or of meeting with the sergeant, but who were on scene and assisting, were deemed Sustained as well.

The investigation's analysis did not take into account that it was not Officer 1, 4 or 5's fault that Officers 2 and 3 failed to describe the allegations to the sergeant, nor does it allow for it to have been reasonable for those officers to have assumed Officers 2 and 3 would cover the relevant information with the sergeant.

38

The implication from the investigation was that, upon arrival on any scene where any allegation has been lodged, each officer is equally responsible for personally informing the sergeant of any perceived allegation, regardless of whether any individual officer who was likewise aware of the allegation, had already briefed the sergeant. Further, the analysis makes no assessment as to the sergeant's own responsibility to check with Officer 1, who called him to the scene for a reason.

In this case, Officer 4 was black, was on scene to assist Officer 1, 2 and 3, knew Officer 1 had called the sergeant to the scene, and knew Officers 2 and 3 had spoken with the sergeant. Officer 4 had an attenuated level of responsibility to ensure the sergeant was properly informed of the allegations made by the arrestee. This was not articulated or offered as mitigation in the analysis. The sergeant was white. His own culpability was not assessed as he was never a subject of the investigation but was rather labeled and interviewed as a witness. If the failure to accept or refer a complaint from the arrestee was one, it was a team failure, and the lack of opportunity to assess the sergeant's own involvement in the matter may be seen as a deficiency.

> ➢ The choice to label the sergeant as a witness and not assess their participation in the failure to accept or refer a complaint while on scene  may be attributed to investigator's discretion. Yet, the same case was reviewed through multiple  layers of chain of command, and the deficiency remained, thus diffusing responsibility for said deficiency across a number of personnel. This case serves as another example of the systemic problem of confusion, assumptions, and opportunities for discretion inherent in assessing FTARC allegations.