# EXHIBIT 4



# Oakland Police Department

## POLICE DISCIPLINE DISPARITY STUDY

Final Report

April 23, 2020

*Confidential and Proprietary*

HILLARD HEINTZE

A JENSEN HUGHES COMPANY

Protecting What Matters®



April 23, 2020

Darren Allison
Acting Chief of Police
Oakland Police Department
455 7th Street
Oakland, California 94607

Dear Acting Chief Allison:

Please find attached our final report on police discipline disparities in the Oakland Police Department (OPD). Our report reflects a thorough and independent assessment of the OPD's internal investigations and discipline processes, including a review of recruits released from probation while at the police academy or in the field training program. It also includes a statistical analysis of the OPD's internal investigations and disciplinary outcomes for sworn employees from 2014 to 2018. We provide recommendations to improve the internal affairs and discipline process to help ensure fair and consistent investigation and discipline.

This revision is a result of the OPD's staff and stakeholders' reviews. One of the most significant aspects of this revision is limiting the statistical analysis to sworn Department employees. It should be noted that the overall disparity among sworn employees varied little from the analysis of the disparity among all employees.

We commend the commitment of the City and the OPD for opening the department to an independent assessment. We know that you have already made great strides in improving many aspects of the OPD and believe that this assessment and our associated recommendations can help you to continue that progress.

This report is a confidential and proprietary work document between Hillard Heintze and the Oakland Police Department.

Sincerely,
HILLARD HEINTZE LLC

Arnette F. Heintze
President, Jensen Hughes Global Security
Founder, Hillard Heintze





# Table of Contents

**EXECUTIVE SUMMARY** ................................................................................................ **5**

    **Strategic Context: The Need to Conduct This Assessment** ........................................... 5

    **Assignment: What You Asked Us to Do** ..................................................................... 5

    **Methodology and Approach: A Highly Integrated Process** ......................................... 6

    **About Hillard Heintze: The Assessment Team** ........................................................... 7

    **Overview of Our Assessment: What We Discovered** ................................................... 9

**KEY FINDINGS** ......................................................................................................... **10**

**STAKEHOLDER INPUT** ............................................................................................... **13**

    **Interview Summaries** ............................................................................................. 13

    **Analysis of Stakeholder Input** ................................................................................ 13

**SURVEY RESULTS OF OPD MEMBERS' PERCEPTIONS OF INVESTIGATION AND DISCIPLINE** ........................... **15**

**ANALYSIS OF A SAMPLE OF COMPLAINT INVESTIGATIONS** .......................................... **24**

**POLICIES AND PROCEDURES FOR HANDLING COMPLAINTS AND DISCIPLINE** ................ **26**

    **Comparison of OPD Policies and Procedures to Best Practices** ................................. 26

    **Internal Affairs Organizational Structure** .............................................................. 29

    **Internal Affairs and Division-Level Investigations** .................................................. 29

    **Corrective Action and Discipline** ............................................................................ 33

    **Internal Investigations and Due Process Considerations.** ....................................... 35

    **Observations from Interviews** ................................................................................ 36

**PROBATIONARY RELEASES FROM THE OPD'S ACADEMY AND FIELD TRAINING PROGRAMS** ................ **38**

    **The Academy** ........................................................................................................ 38

    **Field Training Program** .......................................................................................... 42

        Observations ................................................................................................... 43



**REVIEW OF COMPLAINT AND DISCIPLINE DATA FROM 2014 TO 2018** ........................................................ **44**

    **Overview** ................................................................................................................................ **44**

    **Summary Data** ........................................................................................................................ **44**

    **Relationship Between Race and Finding** ................................................................................ **50**

    **Relationship Between Gender and Findings** ......................................................................... **52**

    **Logistical Regression for Other Factors** ............................................................................... **53**

    **Relationship Between Race, Gender and Discipline** ............................................................. **56**

    **Summary** ................................................................................................................................ **59**

**RECOMMENDATIONS** ...................................................................................................................... **60**

**CONCLUSIONS AND NEXT STEPS** ..................................................................................................... **62**

# Executive Summary

## STRATEGIC CONTEXT: THE NEED TO CONDUCT THIS ASSESSMENT

The Oakland Police Department (OPD) has been operating under a Negotiated Settlement Agreement (NSA) since 2003, which was intended to resolve allegations of police misconduct by plaintiffs in a civil lawsuit. The NSA called for reforms in several areas, including internal affairs and training. To date, the OPD has addressed many of the tasks outlined in the NSA, but it continues to be subject to some of its provisions including those related to internal investigations.

Amid concerns the public voiced about potential racial disparities in the OPD's disciplinary process, Chief Anne Kirkpatrick and the OPD command staff sought an independent review of the data to determine whether the perception of disparity was accurate. They stated that if a disparity existed, they wanted to determine why it is occurring and how to prevent it in the future. Their stated goal was to ensure that the Department's disciplinary systems are legitimate and recognized as such.

## ASSIGNMENT: WHAT YOU ASKED US TO DO

The City of Oakland contracted Hillard Heintze to conduct a comprehensive study to determine if a racial and/or gender bias existed in the OPD administrative discipline process, including in resignations and removals of recruits from the Oakland Police Academy and the Field Training Program. The City asked Hillard Heintze to focus the study on five years of data taken from administrative investigations of sworn personnel and police officer trainees in the Oakland Police Academy and its Field Training Program. As part of the study, Hillard Heintze conducted reviews of the following.

- Existing Department policies, procedures and practices regarding misconduct investigations and discipline

- The Department's historical data on misconduct investigations and discipline to determine if the data shows patterns of disparity in the treatment of minority officers and/or in relation to an officer's gender

- The Department's data on attrition from the academy and field training programs to see if the data shows patterns of disparity in the treatment of minority recruits and/or in relation to a recruit's gender.



## METHODOLOGY AND APPROACH: A HIGHLY INTEGRATED PROCESS

### Six Key Principles

Emerging from our experiences as leaders in a variety of law enforcement-related fields, the Hillard Heintze methodology is based on the following six strategic principles.

1  Independent and objective analysis

2  Solicitation of multiple perspectives and viewpoints

3  An acute focus on collaboration and partnership

4  An information-driven, decision-making mindset

5  A structured and highly disciplined engagement approach

6  Clear and open lines of communication.

### An Intensive Approach

During this engagement, the Hillard Heintze assessment team performed the following tasks.

- Conducted interviews with the following individuals.
  - OPD Chief and command staff members
  - Internal Affairs Department (IAD) Captain and staff, including investigators
  - Sergeants responsible for division-level Investigations
  - Training section staff
  - Department stakeholders including representatives from the Oakland Black Officers' Association, the Oakland Asian Police Officers' Association and the Oakland Police Officers' Association
- Observed a meeting of the Independent Monitoring Team
- Conducted file reviews of a random selection of Internal Affairs files back to 2014
- Completed an analysis of OPD investigation and discipline data
- Observed a meeting of the Discipline Review Board
- Administered a Department-wide survey to measure member perception of bias in internal investigations and discipline.

**ABOUT HILLARD HEINTZE: THE ASSESSMENT TEAM**

Hillard Heintze is one of this nation's foremost strategic advisory firms specializing in independent ethics, integrity and oversight services – with a special focus on federal, state and local law enforcement agencies, including police departments, sheriff's departments and internal affairs bureaus. We provide strategic thought leadership, trusted counsel and implementation services that help leading organizations target and achieve strategic and transformational levels of excellence in law enforcement, security and investigations. Many of our team members have been responsible for leading the significant transformation of many major city police departments and law enforcement agencies.

**Rob Davis, Senior Vice President, Law Enforcement Consulting, Project Oversight**



Robert Davis is a highly regarded and innovative national leader in policing and public safety with extensive experience assessing federal, state and local law enforcement agencies across the U.S. Rob served in a variety of capacities during his 30 years' career with the San Jose Police Department, including as the Chief of Police for seven years. During his time as chief, Rob also served as the President of the Major Cities Chiefs Association. He provided consulting services for the U.S. State Department, traveling on numerous occasions to Central and South America to provide training in community policing methods addressing gang prevention, intervention and suppression. Since retiring from San Jose, Rob has been involved in numerous assessments of police departments across the nation, including serving as the Project Director for Hillard Heintze's U.S. Department of Justice Collaborative Reform Initiative for Technical Assistance contract.

**Robert Boehmer, Esq., Vice President, Law Enforcement Consulting**



Robert Boehmer is an experienced facilitator, trainer and public speaker, with expertise in collaborative problem solving, community policing, partnership development and information sharing. For the past several years, he has been facilitating sessions for the Department of Homeland Security's Building Communities of Trust Initiative, focusing on developing trust among law enforcement, fusion centers and the communities they serve. As a Vice President in the Law Enforcement Consulting practice at Hillard Heintze, Robert manages complex law enforcement assessments and helps police agencies transform their organizations and adopt national best practices and industry standards central to improving accountability, transparency and community trust.

**Dr. Alexander Weiss, Lead Researcher**



Dr. Alexander Weiss (Ph.D., Northwestern University) has over 30 years' experience as a public safety practitioner, researcher, trainer, and consultant. For nine years he was director of the Northwestern University Center for Public Safety and Professor of Management and Strategy at the J.L. Kellogg Graduate School of Management at Northwestern. He currently is adjunct professor of criminal justice at Michigan State University. Prior to his appointment at Northwestern, Alex was a member of the faculty of the department of criminal justice at Indiana University, Bloomington. During that time, he also served as a senior advisor to the Indianapolis Police Department. Dr. Weiss has 12 years of experience with law enforcement agencies in Colorado. During his



tenure with the Colorado Springs Police Department, he served as a field supervisor and directed the then newly created operations analysis unit. Weiss earned a Doctorate in Political Science from Northwestern University in 1992, a Master of Public Administration from the University of Colorado in 1984 and a Bachelor of Arts from Colorado Technical College in 1978.

### Michael Dirden, Esq., Subject Matter Expert



Michael Dirden joined Hillard Heintze following a long and successful career with the Houston Police Department. As the Executive Assistant Chief of Police, Michael provided leadership and oversight for the department's Investigative, Strategic and Field Operations, including accountability for Patrol Operations, Traffic Enforcement, the Mental Health Division, Apartment Enforcement and Differential Police. Michael's body of work in law enforcement highlights an enduring commitment to advancing the profession through community engagement. He has served on numerous national committees focused on use of force, internal affairs and community building with trust. Within the Houston Police Department, Michael developed a strong understanding of the collective bargaining practices used by departments to maximize efficiencies. Working through the department ranks, he rose from Sergeant, Organizational Development Unit, where he helped review and redesign the department's core processes and structure, to the role of Assistant Chief of Police, where he was instrumental in providing Professional Standards and Criminal Investigations oversight.

### Marcia K. Thompson, Esq., Vice President, Law Enforcement Consulting



Marcia K. Thompson is an attorney and law enforcement practitioner with over 20 years working in the criminal justice field. As a Vice President within our Law Enforcement Consulting practice, she provides oversight, management and technical assistance on various law enforcement assessments, trainings and reviews. Marcia has served as a law enforcement administrator within the Department of Safety at the University of Chicago Police Department, where she oversaw professional standards, accreditation, compliance, training, records management, recruitment, field training, in-service training, leadership development, succession planning, community engagement, youth outreach and the community advisory committee in support of the universities transparency and inclusion initiative. Marcia is a Virginia Supreme Court certified mediator as well as a collaborative problem-solver, change management facilitator, and equal employment opportunity (EEO) and civil rights professional. For many years, Marcia has served as a federal fact finder, EEO counselor, trained EEO investigator and hearing officer, providing neutral hearings and drafting administrative appellate determinations.



OAKLAND POLICE DEPARTMENT
Police Discipline Disparity Study

**OVERVIEW OF OUR ASSESSMENT: WHAT WE DISCOVERED**

Our review of internal affairs processes included reviewing data for the last five years from 2014 to 2018, including complaints, investigations, academy files and various policies, practices and procedures. The OPD has experienced large leadership turnover within the last three years, which inherently affects the continuity of progress and the OPD's changing culture. Much of that turnover may be the result of high-profile incidents in 2015 and 2016 that put the OPD in the public spotlight regarding how personnel handled allegations made against officers and their ability to properly investigate those allegations.

However, during our current review of the cases, policies, procedures and the current leadership structure, we observed how the OPD has improved in areas that directly impact the ability to create a more consistent and fairer internal affairs process. We specifically reviewed the current policies largely implemented since 2016 regarding Internal Affairs investigations of Department members involved in misconduct and other interrelated policies. We are mindful that as recently as 2017, the Swanson report[1] and other outside investigations noted significant deficiencies in classifying, investigating and reporting serious allegations made against officers, which ultimately resulted in various terminations.

Those findings, investigations and court filings resulted in several recommendations to help improve the way internal investigations and disciplining Department members are handled. They specifically recommended that the OPD improve policies regarding the internal affairs process, procedures and how coordination occurs with the Criminal Investigation Division (CID). As noted above, OPD personnel amended many of these policies by the end of 2017 and changed some of the Internal Affairs Division processes.

We provide this historical context to emphasize the improvements OPD personnel have made since 2013 in embracing best practices in handling internal affairs cases and employee discipline. However, the investigative deficiencies in 2015 and 2016 highlighted a larger-scale problem within the Department. Our review of the processes and our findings reflect that the current checks and balances for investigations may not have existed and/or been strictly adhered to prior to 2017. This was noted based on our review and analysis of five years of recent data.

---

[1]   At the request of the Independent Monitoring Team overseeing the Negotiated Settlement Agreement, the City hired an independent investigator to consider the quality and sufficiency of the OPD's investigation of potential officer sexual misconduct. This report has been referred to as the Swanson Report.



# Key Findings

**Key Finding #1: The OPD's current directives regarding how it conducts internal affairs investigations, makes disciplinary determinations and ensures fairness in its recruit training efforts are generally consistent with quality practices.**

For example, the disciplinary review panel includes individuals from across the Department, which is a best practice. These individuals meet to provide input to the Chief to assist her in determining the proper level of discipline. This practice is consistent with promising practices widely recognized for agencies similar in size to the OPD.

We also commend OPD leadership's dedication to its trainees. The practice of allowing trainees struggling with the Police Academy program to join a later academy class is an accepted practice and reflects the OPD's commitment to providing trainees with opportunities to succeed.

Additionally, the Field Training Program's practice of rotating officers and trainees helps to prevent biased-based decision making by providing a variety of perspectives on the trainee's performance. The OPD's Field Training Program is consistent with quality practices in law enforcement.

**Key Finding #2: Allegations that result in a sustained finding are more likely for black employees. After a complaint is sustained, race does not appear to affect disciplinary outcomes.**

In our data analyses, we determined that race and outcome are statistically dependent for each year since 2014. Even after controlling for other factors — such as age, gender and years of service — black sworn employees were more likely to have their allegations result in a sustained finding than other employees. Over the five-year time period, black employees were 37 percent more likely to have an allegation against them result in a sustained finding.

Based on our assessment, we determined employee race and type of discipline are independent. Once a complaint is sustained, race does not appear to be a factor in disciplinary outcomes.

**Key Finding #3: Class Two complaints are more likely to be sustained than Class One complaints. For Class One complaints, black individuals are almost 39 percent more likely to have the complaint sustained, while controlling for gender and years of service. For Class Two complaints, the biggest predictor is the class itself, but black individuals are still 25 percent more likely to have a complaint sustained.**

Class Two complaints being more likely to be sustained could have several explanations. For example, these cases are less complex, and the evidence may be more readily attainable, or that since the consequences are less severe, the agency may be more inclined to sustain the complaint. Interestingly, even while controlling with the effects of MOR Class, black officers are still 25 percent more likely to have a complaint sustained.



**Key Finding #4: Although our review revealed disparities based on race and gender in regard to probationary releases from the Academy and Field Training Programs, the data is too limited to draw further conclusions.**

Our review of data and available documents regarding the probationary releases of recruits from the Academy and the Field Training Program indicated some disparities based on race and gender. The data was too limited, however, to permit any meaningful conclusions.

**Key Finding #5: The IAD's policy that allows sergeants to be 'fact finders' and adjudicators has the potential to lessen an investigator's neutrality.**

The OPD's IAD processes allow the sergeant investigating a misconduct complaint (also known as the 'fact finder') to determine, as the adjudicator, whether the case should be sustained. Though higher-level supervisors review and approve these findings, this practice is more common in smaller agencies and is not consistent with promising practices used in departments similar in size to Oakland.

This practice raises questions of investigator neutrality. Specifically, it could potentially contribute to biased decision making and the perception of investigator bias, as the investigators may pursue evidence that supports their theory of a case while ignoring evidence that does not support or fit the theory. In recent years, the IAD program has evolved, and the Department has created more checks and balances in this area to help minimize the perception. However, this practices of allowing sergeants to be 'fact finders' and adjudicators at the same time is still not aligned with best practices.

**Key Finding #6: The inclusion of an employee's disciplinary history in IAD case files beyond the past five years could have a negative impact on OPD's ability to eliminate bias and enhance consistency in progressive discipline.**

The OPD case file for an investigation includes the accused Department member's disciplinary history, such as sustained allegations and other investigations, that occurred prior to five years ago. According to a Department policy, cases greater than five years old should not be considered in determining discipline and should not be included in the case file used to determine discipline.

Though we did not see any indications that these records were used to determine discipline, including the Department member's entire history, whether cases are sustained or not, leaves the Department vulnerable, in that this older history could potentially be considered inappropriately when imposing corrective action or discipline.



OAKLAND POLICE DEPARTMENT
Police Discipline Disparity Study

**Key Finding #7: More training is needed for field sergeants assigned to division-level investigations (DLIs). Additional training could allow DLI supervisors to conduct investigations more effectively and enhance the supervision they provide their officers in the field.**

The OPD provides limited training on how to conduct internal investigations for field sergeants assigned to DLIs. This training is important to ensure that investigations are conducted thoroughly without violating OPD members' rights. The absence of comprehensive training can also contribute to inconsistent outcomes.

Supervisors conducting DLIs feel overburdened with the investigations and would benefit from greater support and training from IAD representatives. This is especially important because these supervisors also have a responsibility to engage with their officers proactively in the field while conducting these investigations.

**Key Finding #8: The DLI Unit is understaffed for the size of its caseload.**

The personnel in the IAD DLI Unit appear to be diligent but are managing a large caseload. The IAD previously had a lieutenant and a civilian manager overseeing the DLI process, but the previous civilian manager left, and the position has not been filled. This has resulted in a reduced level of supervision. Proper leadership and oversight are necessary to ensure a proper review of investigations and assessment of potential bias in investigations occurs.



# Stakeholder Input

As part of our assessment, we conducted several interviews of Department personnel, including command staff members and members of the Oakland Police Officer's Association (OPOA), the Oakland Black Officer's Association (OBOA) and Oakland Asian Police Officers Association (OAPOA). These interviews helped us learn more about the OPD process and provided important additional context. The following summary reflects the higher-level themes gathered from the interviews and does not necessarily represent the views of all persons interviewed.

### INTERVIEW SUMMARIES

During these interviews, members shared that the culture at the OPD contributes to the perception of internal unfair treatment in Department operations and that several factors beyond race contribute to this perception. Race was not ruled out as a factor, but the majority of those interviewed noted how power, cliques and the lack of accountability within the OPD structure affect the ability to stop, observe or avoid behaviors that reduce the fairness in discipline.

For example, "favored groups" consisting of individuals in specialty positions may receive different treatment in some administrative actions. Individuals considered to have good reputations — such as the "great street cop" or "good dope guy" — are reportedly favored over those in the investigation and disciplinary process. Friendships, past affiliations and belonging to specialized units such as Special Weapons and Tactics (SWAT) were also cited as impacting how a person would be treated in the disciplinary process. Many others believed that rank was a factor in determining whether a member should be investigated, whether a finding is sustained and how much discipline is imposed.

Many interviewees also indicated that they believe that the OPD receives few formal complaints about the disciplinary process because those who complain may be ostracized or not receive desired assignments.

Generally, the interviewees noted that while the perception of disparity exists, they were not sure as to whether the disparity was real or just a belief. They all expressed support for looking at the data and determining whether the system is fair for everyone. They said that if evidence of disparate treatment is found, they wanted to identify ways to stop it.

### ANALYSIS OF STAKEHOLDER INPUT

The Equal Employment Opportunity Commission (EEOC) created a task force and conducted a study in 2016 on harassment in the workplace. The findings described the risk factors organizations should evaluate when trying to impede discriminatory behaviors.

In our interviews with stakeholders, we noted several of these risk factors when the interviewees explained the OPD's culture, processes and how the "favored group," "top producers" or "go-get-them" officers would be allowed to misbehave and not be held accountable nor receive the same level of discipline as those not involved in cliques.



Some of the top risk factors that may be present at OPD include the following.

- Workplaces with "high-value employees" [i.e.,SWAT team members or other favored groups]

- Workplaces with significant power disparities (i.e., organizational hierarchy overriding investigations or direction of investigations)

- Workplaces that are Isolated or decentralized (i.e., DLI investigations and autonomous divisions handling bulk of IAD cases inconsistently)

- Workplaces where some employees do not conform to workplace norms (i.e., various scandals involving poorly handled investigations such as those identified in the Swanson findings and other independent reviews)

In addition to determining whether bias based on race and/or gender exists, we attempted to holistically address bias and determine contributing factors to the overall perceptions of bias and whether these risk factors contribute to any disparities. Many of those we interviewed shared that leadership played a big role in allowing the culture to continue and not holding certain groups accountable for their behavior, which leads to perceptions of favoritism and perceived bias in the outcomes of investigations.

As with any police organization, accountability and values have to resonate from the top, and each level of supervision has to be held accountable to ensure the core values of the organization are being implemented fairly at every level with appropriate checks and balances, particularly regarding investigations, discipline and hiring.

## Survey Results of OPD Members' Perceptions of Investigation and Discipline

We surveyed Department members to understand their perceptions of IAD investigations and disciplinary outcomes. The 22-question survey focused on internal procedural justice concepts addressing transparency and fairness. We asked specific questions about whether the respondents thought that race, gender or rank impacted the results of investigations and/or disciplinary determinations. We administered the survey, but we had the OPD's training division send the introduction and the survey link to its department-wide email list. The survey opened on August 6, 2019 and closed on August 15, 2019.

When reviewing the following survey results, it is important to keep the following caveats in mind.

- Because it was important to protect the identities of the respondents, we did not track the identity of the respondents. As a result, OPD employees could potentially respond more than once, which could impact the results.

- Ninety percent of the respondents indicated that they had been the subject of an internal investigation by the OPD and 70 percent of the respondents reported that they have been disciplined. While it is important to reflect the opinions of those who have experienced the investigative and disciplinary process, the results do not necessarily reflect the perceptions of those who have not been involved in the process.

- Though the results of the survey are not necessarily statistically significant and may not represent the opinions of all stakeholders, they still provide valuable insight into some stakeholders' perceptions of the OPD process and supplement the information already received from stakeholder interviews and our data analysis.

Below are the demographics of the 303 Department members who responded to the survey.

| Race | Percent of Respondents | Number of Respondents |
|------|------------------------|------------------------|
| White | 24.09 | 73 |
| Black or African American | 14.19 | 43 |
| Latino or Hispanic | 14.19 | 43 |
| Asian | 6.93 | 21 |
| Native Hawaiian or Other Pacific Islander | 1.65 | 5 |
| American Indian or Alaskan Native | 0.33 | 1 |
| Two or more races | 8.25 | 25 |
| Prefer not to answer | 30.36 | 92 |
| **Total** | **100** | **303** |



OAKLAND POLICE DEPARTMENT
Police Discipline Disparity Study

Of the survey respondents, 68.9 percent identified themselves as men, 25.75 percent identified as women and 5.35 percent identified as "other." Over half of the respondents are assigned to field operations and slightly less than 20 percent are civilian staff. Almost 47 percent of the respondents are patrol officers. Of the respondents, 86.5 percent have been the subject of an IAD investigation, while the Department disciplined 65.5 percent.

As the focus of this report is discipline among the sworn officers of the department, we analyzed the overall results to focus on the 260 sworn members of the Department who responded to the survey.

| Race | Percent of Respondents | Number of Respondents |
|------|------------------------|------------------------|
| White | 26.92 | 70 |
| Black or African American | 10.00 | 26 |
| Latino or Hispanic | 15.38 | 40 |
| Asian | 3.85 | 10 |
| Native Hawaiian or Other Pacific Islander | 1.54 | 4 |
| American Indian or Alaskan Native | 0.38 | 1 |
| Two or more races | 7.69 | 20 |
| Prefer not to answer | 34.23 | 89 |
| **Total** | **100** | **260** |

Ninety percent of the sworn respondents have been the subject of an OPD internal investigation and 70 percent reported that the OPD has disciplined them. As indicated below, overall, 41.63 percent of the sworn respondents agreed or strongly agreed that the OPD treats employees with dignity and respect during internal investigations.





Only 18.68 percent of the sworn respondents agreed or strongly agreed that the disciplinary process is fair.





Only 12.50 percent of Hispanic respondents strongly agreed or agreed that the disciplinary process is fair as opposed to 30 percent of Asian respondents, 25 percent of black respondents, 25 percent of Native Americans and Pacific Islanders and 21.43 percent of white respondents.





Only 17.94 percent of the sworn respondents felt that the disciplinary process is transparent and that Department members understand it well. Though gender did not account for a significant difference for many of the questions, 26.6 percent of female sworn respondents answered that the Department's disciplinary process was transparent and well understood, while only 16.34 percent of men agreed or strongly agreed with that statement.





Responses to these questions were also analyzed based on race. Only 27.50 percent of Latino or Hispanic respondents agreed or strongly agreed that employees are treated with dignity and respect during IAD investigations, compared to 56 percent of black and 51.42 percent of white respondents.



The survey asked a series of questions about whether the respondents thought that race, gender or rank played a factor in the outcome of investigations or the discipline imposed. Almost 36 percent of respondents said that race and gender are a factor in internal investigations and discipline. Responses varied based on the race of the respondent. For example, though around 25 percent of white respondents agreed or strongly agreed that race plays a factor, 35 percent of black respondents, 44 percent of Hispanics and 40 percent of Asian respondents agreed or strongly agreed that race plays a factor in the outcome of investigations or discipline imposed. Women (41 percent) were somewhat more likely to agree or strongly agree with the statement that gender played a role in investigations and discipline than men (32 percent).



OAKLAND POLICE DEPARTMENT
Police Discipline Disparity Study







OAKLAND POLICE DEPARTMENT
Police Discipline Disparity Study

Nearly 80 percent of respondents agreed or strongly agreed that rank plays a factor in determining the outcome of an internal investigation and the determination of discipline.







The survey also asked members if issues that concern race and gender are openly dealt with and resolved constructively in the OPD. Overall, 40.73 percent agreed or strongly agreed with that statement. We did not note significant differences based on race or gender of the respondent.

**Summary of Survey Results**

- Almost three-fifths of the sworn respondents believe that OPD employees are not treated with dignity and respect during internal investigations. Hispanics (72.5 percent) were more likely to report that employees are not treated with dignity and respect as compared to white (48.5 percent), black (44 percent) or Asian (10 percent) respondents.

- 83.2 percent of respondents reported that they believe that the disciplinary process is not fair. This response varied somewhat based on race, with 87.5 percent of Hispanics, 78.5 percent of white respondents, 75 percent of black respondents and 70 percent of Asian respondents responding that the disciplinary process was not fair.

- Around 75 percent of white respondents, 63 percent of black respondents, 60 percent of Asian respondents and 56 percent of Hispanics responded that race is not a factor in the outcome of an internal investigation or the determination of discipline.

- Women (41 percent) were somewhat more likely to agree or strongly agree with the statement that gender played a role in investigations and discipline than men (32 percent).

- Nearly 80 percent of respondents agreed or strongly agreed that rank plays a factor in determining the outcome of an internal investigation and the determination of discipline

The survey also asked an open-ended question: "Is there anything else that you would like to tell us about the Oakland Police Department's internal investigations and discipline process?" We received 151 responses to the question. These responses included specific instances of perceived mistreatment, general positive and negative comments about the fairness of the process, and specific policy suggestions, as summarized below.

- Several respondents indicated that under the current Chief, efforts have been made to improve the fairness and transparency of the process.

- Many were concerned that external politics and media attention impact investigations and discipline. Respondents noted that they felt public opinion and political ramifications heavily sway internal investigations for high-profile or emotional incidents.

- Like what we heard in our interviews, respondents said that who you know, and to which cliques you belong influence whether an investigation will be sustained and what level of discipline will be administered.

- Respondents reported that although improvement have been made, the IAD and disciplinary processes are not transparent.

- Some respondents indicated that too much time is spent on minor violations and that some of these minor violations should be addressed at the supervisory level rather than in the IAD process.

## Analysis of a Sample of Complaint Investigations

**Methodology**

To gain a greater understanding of the OPD's internal affairs investigations process and to review cases for potential indicators of bias, we selected two sets of random samples of cases to review. The first set included five percent (45) of 2017 to 2018 DLIs, five percent (10) of 2017 to 2018 cases handled by internal affairs investigators and five percent (33) of sustained cases from 2014 to 2018, some of which had multiple allegations.

The second set of file reviews focused on cases that resulted in discipline. While we sought to sample five percent of all those cases, in instances where the number of cases for a type of discipline was smaller than 10, we sampled all those cases. The process resulted in sampling the following number of cases.

| Type of Discipline | Number of Cases Reviewed |
|---|---|
| No Discipline | 2 |
| Counseling and Training | 17 |
| Held in Abeyance | 3 |
| Written Reprimand | 12 |
| Last Chance Agreement | 1 |
| Suspension | 7 |
| Released from Probation | 7 |
| Termination | 5 |

We reviewed the cases to observe the processes used to investigate the cases in relation to demographic factors and attempted to identify any areas that could contribute to bias-based decision making. Based on our review, we made the following observations.

**Improvement in Internal Investigations**

Internal investigations have noticeably improved over the past two years. We observed additional documented layers of review and clear indications in the chronology logs and notes that DLI sergeants, as well as captains, are reviewing investigations and providing appropriate input, rather than simply signing off on investigations with minimal review. This is consistent with the Independent Monitoring Team (IMT) observation in its November 2018 report that "with respect to DLIs, chain of command reviews as well as reviews of these cases by IAD personnel are becoming more thorough" and "notes contained in these files indicate that cases are being returned to the initial investigator with greater frequency."

*Confidential and Proprietary* | © 2020 HILLARD HEINTZE

OAKLAND POLICE DEPARTMENT
Police Discipline Disparity Study

**Internal Investigators Serving as Both Fact Finders and Adjudicators**

Internal investigators act as both fact finders and adjudicators, in that they conduct the investigation and determine whether the complaint should be sustained. Though supervisors and command staff review this determination, this practice is inconsistent with recommended practices. In the current era of policing, leaders must be cognizant not only of concerns of external legitimacy, but internal legitimacy as well. Questions regarding objectivity and neutrality may be heightened when an investigator serves as both fact finder and adjudicator. Despite the availability of supervisory and command channel review, perceptions of bias may be attributable to the role given to investigators in the current internal investigation process.

**Inclusion of a Complete Disciplinary History in Case Files**

For cases that result in discipline, supervisors are required to review the accused Department member's history of sustained cases for the past five years. However, file review indicated that the index for the accused Department member's entire disciplinary history is included in the file. Keeping the entire history in the file creates the possibility that conduct outside of the past five years could be at least subconsciously considered in meting out corrective action or discipline.

**Signatures for Approvals of Investigations and Disciplinary Recommendations**

Approvals of investigations and disciplinary recommendations include signatures of approving officers; however, the signatures are often difficult to read. These signatures were often missing the reviewers' serial numbers, preventing subsequent reviewers from determining who reviewed and approved the investigations and/or discipline. Required signatures are a visible representation of review by all members of the chain of command. They provide additional evidence of unbiased decision-making that is consistent with procedural justice. It should be noted that the PRIME database does include a log of everyone touching and approving each case file.

**Training for Assessing Credibility**

We reviewed credibility assessments of accused Department members, witness officers and complainants. We noted that in almost all the cases, the officers were deemed credible. While that finding is not unusual, we have questions regarding the level of training investigators receive in assessing credibility. Assessing credibility is one area where bias can arise if investigators are not trained properly. This is particularly a concern when the person is known to the investigator.

Officer, complainant and witness statements were frequently written in the first person. Statements should be attributed properly to avoid charges that the investigator is biased and choosing a perspective to believe.

# Policies and Procedures for Handling Complaints and Discipline

We reviewed OPD's internal affairs practices and policies to (1) understand the processes in greater detail, (2) compare these practices and policies to best and promising practices with other similarly sized police agencies and (3) determine existing areas where disparities can arise.

## COMPARISON OF OPD POLICIES AND PROCEDURES TO BEST PRACTICES

The OPD practices governing internal investigations are established in the Department's internal directives, which primarily included the following.

- Department General Order M-03 Complaints Against Departmental Personnel or Procedures

- Department General Order M-3.1 Informal Complaint Resolution Process

- M-04.1: Criminal Investigation of Department Members and Outside Sworn Agency Personnel

DGO M-03 provides the basis for complaint processing and administration from inception to conclusion. Like policies in similarly sized agencies, the OPD policy includes directives that describe the following functions: intaking and receiving complaints; classifying complaints; determining complaint categories; and conducting preliminary inquiry and investigation of complaints.

Intake procedures are described in Section III Receiving and Processing Complaints. Importantly, this section establishes the Department's prevailing philosophy of accepting all complaints of violation of the Manual of Rules, including anonymous complaints. In addition, Department members are required to report instances of misconduct that come to their attention and follow the provided detailed instructions when a complaint is received. Employees are subject to discipline or corrective action for not ensuring such complaints are handled in accordance with policy.

Like comparably sized departments, complaints are classified as Class I or Class II depending on the nature of the alleged misconduct and categorized as misconduct or service complaint.



**Section E of Oakland Department General Order DGO M-03**
**Complaints Against Department Personnel**

1    Complaints against Departmental personnel shall be categorized as Class I or Class II offenses. Class I offenses are the most serious allegations of misconduct and, if sustained, shall result in disciplinary action up to and including dismissal and may serve as the basis for criminal prosecution.

The Class I offenses include but are not limited to:

a    Use of excessive, unnecessary and/or unlawful force;

b    Fabrication or destruction of evidence, including the planting of inculpatory evidence or the omission or destruction of exculpatory evidence;

c    Untruthfulness, including perjury;

d    Knowingly and intentionally filing a false police report or other work related documentation as specified in Manual of Rules (MOR) section 370.45. This includes but is not limited to video, photographs, diagrams, roster, etc., as well as the intentional omission of pertinent information or facts;

e    Insubordination;

f    Commission of a felony or serious misdemeanor;

g    Bias or harassment, actions of a retaliatory nature, or failure to take reasonable steps to prevent retaliation;

h    Solicitation or acceptance of gifts or gratuities as specified in MOR section 314.69;

i    Use of position for personal gain;

j    Knowingly or should have reasonably known that he/she made a false arrest or illegal detention;

k    Failure to report others, in accordance with MOR section 314.48, who commit any Class I offense or a Class II offense that indicates a pattern of misconduct or threatens the rights of private persons and/or the well-being and reputation of Department personnel and/or the Department;

l    Failure of a supervisor/manager to detect a pattern of misconduct;

m    Failure of a supervisor/manager to properly supervise, and/or take corrective action for misconduct that he/she knew or reasonably should have known about;

n    Failure to properly identify self, including refusing to provide name, deliberate concealment of a badge or name plate;

o    Knowingly and intentionally obstructing the Internal Affairs investigation process in any manner; and

p    Driving under the influence

2    II offenses shall include all minor misconduct offenses.



The guidance regarding preliminary inquiry and investigation of complaints is consistent with other similar policies at other departments. However, given the current perception of bias in the investigation and discipline of employees of color, the Department may consider providing stronger oversight of the preliminary inquiry process, since it is in this stage where personnel are determining whether the complaint is investigated, and if so, how the compliant is classified.

Upon conducting a preliminary inquiry, a supervisor and IAD intake personnel may make any of the following recommendations for handling a case

- **Conduct Further Investigation:** The complaint requires further investigation beyond steps already completed in the Preliminary Inquiry

- **Handle at the Supervisory Level:** The alleged offense is a Class II offense, which does not indicate a pattern of misconduct, was discovered during the Preliminary Inquiry, and the complainant is agreeable to the informal complaint resolution process.

- **Administrative Closure**: This occurs when a complaint is a service complaint that does not involve a violation of the Manual of Rules and was resolved without an Information Complaint Resolution; if personnel determined that the investigation cannot continue for a normal investigative conclusion; or under circumstances such as the complainant withdrawing the complaint or the subject is no longer employed by the Department.

- **Summary Finding**: This is an abbreviated form of internal investigation in which a finding can be reached without conducting a formal internal investigation as it can be determined with no or minimal follow-up based on the existing documentation, evidence, statements and crime data.

The Department appears to have adequate structure and processes for ensuring preliminary inquiry determinations are in accordance with policy; however, inadequate training and insufficient staffing may result in inadequate review, creating circumstances where favoritism may exist. Importantly, Department personnel indicated that being involved in the right clique, one's rank, or having favorable relations with a supervisor are key indicators of perceived bias, so training reviewers to recognize, understand and avoid these potential biases is important to help ensure a fair preliminary review.

The OPD policy providing detailed instructions for the proper handling of allegations of criminal misconduct is an example of a promising practice. Department General Order M-04.1 Criminal Investigation of Department Members and Outside Sworn Law Enforcement Personnel provides guidelines for notification of and handling of complaints based on articulable, reasonable suspicion. Pursuant to DGO M-03, an employee is subject to discipline for not reporting reasonable suspicion of criminal misconduct coming to their attention. If a decision to investigate is made, the Bureau of Investigation, Criminal Investigations Division conducts the investigation. Importantly, the policy contains appropriate oversight responsibilities and includes appropriate cautions regarding the use of information derived from a concurrent or tolled IAD investigation.

Departmental General Order M-3.1 is another policy that is consistent with recommended practices. Pursuant to this policy, service complaints or Class II misconduct allegations that do not indicate a pattern of misconduct may be resolved informally. While this policy illustrates a recommended practice, the practice should be closely monitored as it is potentially an area where favoritism or bias may occur.
The OPD is among a growing number of departments subject to outside review of internal investigations.



Unlike most agencies that imbed guidelines within their internal investigations general order, OPD has promulgated a specific, standalone policy governing Department member interaction with those conducting external reviews and the responsibility to cooperate with independent reviewers of internal affairs investigations.

The Citizens' Police Review Board (CPRB), which was active during a portion of our data review period, was an independent body with the authority to accept, investigate and review complaints regarding the conduct of Department members. While the Department exercises no authority over the CPRB, Department General Order M-3.2 Citizens' Police Review Board sets forth the Department's expectations regarding employee and citizen interaction with the CPRB by "encouraging private citizens to bring forward allegations of misconduct or inadequate police service" to the CPRB and by requiring Department members to "fully cooperate" with the CPRB whether providing assistance in processing or investigation of complaints or responding to civil processes.

As a result of a 2016 ballot initiative, the CPRB was disbanded and replaced by the Community Police Review Agency (CPRA), which the Oakland Police Commission oversees. In this assessment, we did not examine the activities of the CPRA or Oakland Police Commission.

## INTERNAL AFFAIRS ORGANIZATIONAL STRUCTURE

The IAD is led by a Captain of Police, who has two lieutenants as direct reports: one for administration and one for investigations. The lieutenant in charge of administration oversees the Administrative Support Unit, Intake/Pitchess Unit and DLI Compliance. These units include a mix of sworn and civilian staff, including two sergeants assigned to the DLI Compliance Unit to monitor internal investigations conducted by field supervisors. The Lieutenant in charge of investigations oversees the Force Investigation Section while the Captain oversees the Integrity Unit.. These units are staffed primarily by sworn personnel.

## INTERNAL AFFAIRS AND DIVISION-LEVEL INVESTIGATIONS

The OPD's general order Complaints about Department Personnel (DGO M-03) informs "all employees and the public of procedures for accepting, processing and investigating complaints concerning allegations of member employee misconduct."

**Pitchess Motion**

Pitchess Motion Contents of internal investigations are generally confidential by law. However, *California, Pitchess v. Superior Court 11 Cal.3d 531, 537, 538, 113 Cal.Rptr.897* provides that when a criminal defendant seeks information from a peace officer's personnel records concerning prior complaints, a motion showing good cause must be submitted to the court.

While this is the primary policy guiding complaint investigations, several other policies are applicable, including Informal Complaint Resolution (DGO M-3.1), Criminal Investigation of Department Members Outside Sworn Law Enforcement Personnel (DGO M-4.1) and the Department's discipline policy.



OAKLAND POLICE DEPARTMENT
Police Discipline Disparity Study

The Department's policy is to accept all complaints about employee misconduct to determine the validity of allegations and to impose disciplinary actions that are justified in a timely and consistent manner. Complaints alleging employee misconduct can be brought to the Department in a number of ways, including:

- Generated in the field – i.e., a call to a supervisor

- Calling the complaint phone number

- A transfer from one of the external review bodies, such as the CPRA

- Internally generated through a supervisory review of video or otherwise

Allegations of employee misconduct are categorized in the following ways.

- **Class I** offenses are the most serious allegations of misconduct and, if sustained, result in disciplinary action up to and including termination and may serve as the basis for criminal prosecution

- **Class II** allegations and Class I allegations approved by the IAD commander are assigned for DLIs

Most complaints are taken in the field, such as by a supervisor on a scene where a person makes an allegation of misconduct by a Department member. In these instances, the supervisor is required to complete preliminary work to take the complainant's statement, determine the nature of the violation and gather additional relevant information from the scene.

IAD personnel conduct a review of call logs every morning to determine whether any complaints have been filed. Generally, all cases start with review by the intake staff (three civilian and two sworn individuals, whom have taken the mandatory internal affairs course after they were assigned to the unit) and one sergeant. The Unit is in the process of adding an additional intake person.

Whether a complaint is initiated in the field or through the IAD intake process, a Preliminary Inquiry (PI) is completed on all complaints upon receipt by a supervisor or IAD intake personnel. The purpose of the PI is for the assigned investigator to do a preliminary investigation within 14 calendar days of receiving the complaint.

Minimum steps to be taken in a PI include, but are not limited to,:

- Obtain a briefing by directly involved members and employees

- Interview the complainant to determine the nature of the complaint

- Take a recorded statement from the complainant

- Visit the scene of the incident, if feasible, to look for evidence and canvass for potential witnesses

- Interview witnesses, if any, and take recorded statements, if appropriate

- Explain relevant policy, procedure and governing laws to the complainant, if applicable

- Review Portable Digital Recording Device (PDRD) recordings

- Confer with first-level commander/manager regarding recommendations and best course of action

After the PI, the supervisor or IAD intake personnel completes a Complaint Memorandum which minimally includes:

- Summary of complaint.
- Investigative steps taken
- Case file recommendation

The first-level commander or manager ensures the completed and reviewed Complaint Memorandum (including any dissenting memoranda) is hand-delivered to the IAD within seven calendar days.

This 21-day Preliminary Inquiry/Complaint Memorandum process does not constitute an internal investigation.

Complaints can be informally resolved if they are service complaints or Class II allegations and the Department member has not demonstrated a pattern of similar misconduct in the past. Informal resolutions may not be used if the complainant does not consent. A resolution involving the informal complaint resolution (ICR) process is not an admission of guilt or wrongdoing and cannot be used as a factor in determining progressive discipline but is not considered a sustained finding and is incorporated into the employee's complaint history. The ICR process also does not limit a supervisor from providing training or taking non-disciplinary corrective action (see DGO M-3.1).

Most investigations are DLIs, as they are related to Class II allegations. DLI sergeants and the intake staff assigned to internal affairs try to complete some of the initial work to get the investigation started. DLIs are assigned from IAD to the captain of the division where the alleged misconduct occurred or where the accused Department member is assigned. IAD typically provides the file associated with the case to the captain. This file typically contains the complaint paperwork, any associated police reports, the Department member's CIR index, references to the employee's PDRD footage if applicable and other information. Generally, IAD personnel attempt to assign cases to the field within 45 days of receipt

The commander, often through their lieutenant, assigns the investigation to a field supervisor, who is tasked with completing the investigation within 30 days. Captains report that they generally assign the investigation to the accused Department member's supervisor but remain aware of DLI caseloads for each supervisor to ensure that no supervisor is overloaded. These timeframes are important because according to California law, allegations of misconduct against a police officer must be adjudicated with one year of the discovery of the allegation.[2]

Once the field supervisor completes the investigation, they forward the DLI to a field lieutenant for review. The lieutenant may send the investigation back to the supervisor for corrections or further investigation. Once the lieutenant approves the investigation, the investigation is sent to the captain or commander for further review and approval. Once the captain or commander approves, the entire investigation, including the recommendation as to the finding, is returned to one of the DLI sergeants in the IAD, who then reviews the entire file.

---

[2]    California Government Code Section 3304



The IAD is staffed with DLI sergeants who serve as liaisons to a division-level investigator, providing quality control at the back end of the process when the case is completed in the field. These sergeants review the investigations to make sure the field supervisor has conducted a thorough investigation. The sergeant looks for documents that need to be in the file and uses a checklist to make sure all the items are included.

If the DLI sergeant does not think the investigation is thorough, they may send it back to the field supervisor for corrections or clarifications before final approval. The DLI sergeants can serve as a resource to field supervisors if they have any questions about the investigative process. Our review of selected internal affairs case files indicated that DLI sergeants take an active role in reviewing investigations and are returning files for corrections and/or additional investigation.

The field sergeant conducting the investigation makes the initial recommendation regarding the findings of the investigation. As noted above, the captain must approve the finding prior to returning the investigation to the IAD. The potential findings are as follows.

- **Unfounded**: The investigation disclosed sufficient evidence to determine that the alleged conduct did not occur. This finding also applies when individuals named in the complaint were not involved in the alleged act.

- **Exonerated**: The investigation disclosed sufficient evidence to determine that the alleged conduct occurred but was in accordance with law and with all OPD rules, regulations or policies.

- **Not Sustained**: The investigation did not disclose sufficient evidence to determine whether the alleged conduct occurred.

- **Sustained**: The investigation disclosed sufficient evidence to determine that the alleged conduct occurred and was in violation of law and/or OPD rules, regulations or policies.

If the case results in a finding of exonerated or not sustained, the IAD captain reviews the case and can approve a final determination. Sustained investigations are approved by the IAD lieutenant and passed through the chain of command to the Chief for approval. In determining whether to approve a sustained finding, the chief convenes a roundtable of command staff and the field investigator to review the investigation, ask questions and decide the disciplinary outcome. If the Chief approves the sustained finding, the Chief sends the case back through the chain of command to the accused Department member's commander for recommendations to the Chief for the level of discipline appropriate for the case.

IAD investigators conduct Class I investigations. Internal guidelines provide that the investigator must complete the investigation within 180 days. IAD investigators develop an investigative plan and are assisted by their lieutenant, and, if required, a City attorney assigned to the Unit. All cases undergo command channel review and, if sustained, review by the Chief for concurrence with the findings of the case. Consistent with practices in most large police agencies, the IAD captain is the final reviewer on cases that are adjudicated as not sustained, unfounded or exonerated.

## CORRECTIVE ACTION AND DISCIPLINE

The principle of progressive discipline guides corrective action or discipline in the Department, which is supported by a disciplinary matrix outlining the range of discipline for Manual of Rule violations. The matrix provides guidelines for disciplinary recommendations and includes the type of misconduct, the class of offense and penalty ranges for first, second and third sustained allegations of Manual of Rule violations.

The accused member's captain makes the initial recommendation of discipline after reviewing the Pre-Disciplinary Report (PDR) the first-line supervisor completed and after conferring with the subject member's supervisor and lieutenant. The captain considers the nature of the misconduct, prior discipline and aggravating and/or mitigating circumstances when determining recommended discipline or corrective action necessary to remediate behavior. The PDR includes:

- Subject's five-year disciplinary history[3]

- The two most recent performance evaluations

- The Complaint Investigation Report (CIR)

- The Report of Investigation (ROI)

- An analysis of aggravating and mitigating factors

The subject's immediate supervisor generally completes the PDR, which is subject to command channel review. The PDR requires the review of aggravating and mitigating circumstances in applying the disciplinary matrix and determining the proper level of discipline. In administering the matrix, most supervisors reported it is the practice within the Department to start at the middle range of penalties for the offense and then adjust based on aggravating or mitigating circumstances.

The division captain convenes a pre-disciplinary conference with the sergeant and lieutenant to listen to their input on the discipline recommendation. Once the captain approves the PDR, they send the file through the chain of command for ultimate review and approval by the Chief or designee. For sustained preventable accidents, the captain sends the PDR to the Assistant Chief for approval of appropriate discipline. A discipline determination of counseling and/or training or a written reprimand may be approved by the Assistant Chief of Police for minor misconduct discovered at the division level, while other discipline requires the approval of the Chief.

Prior to imposing discipline, the Chief convenes a weekly roundtable of command staff, the City attorney and others to review and approve disciplinary recommendations. The captain who approved the initial recommendation generally present the factors behind their determination and is available to answer questions. Based on the presentation and group discussion, if any, the Chief then approves the discipline recommendation or changes the discipline. The practice of convening a cross-section of staff to advise the Chief on disciplinary decisions is consistent with promising practices widely recognized for agencies similar in size to the OPD.

---

[3]    We noted that files routinely included the Department member's entire disciplinary history. Even though we did not observe any PDRs that specifically cited discipline beyond the five-year period as a factor in the recommendation, a more appropriate practice would be to limit the disciplinary history to five years in the file so that the reviewer does not have access to that older information.



The following are the levels of discipline that can be imposed.

- **Counseling and training**

  Informal corrective action provided by supervisors for observed conduct is deemed not disciplinary and is not considered in progressive discipline for a sustained finding.

- **Written reprimand**

- **Salary reduction**

- **Fine**

- **Suspension**

  The Chief of Police or his or her designee must approve suspensions from duty up to 10 days. The City administrator, upon recommendation of the Chief, approves suspensions that exceed 10 days.

- **Demotion**

  The City administrator administers a reduction in rank, upon recommendation of the Chief, when a sustained finding for an offense compromises or prevents a member or employee from functioning in a supervisory capacity.

- **Termination**

  The City administrator administers termination upon the recommendation of the Chief.



### INTERNAL INVESTIGATIONS AND DUE PROCESS CONSIDERATIONS.

Every sworn member of the Department is entitled to a *Skelly* "due process" hearing when the Chief has provisionally approved discipline higher than a written reprimand. A *Skelly* hearing is conducted by an impartial and non-involved reviewer who determines whether reasonable grounds exist for the proposed discipline.

> *Skelly* **Hearings**
>
> A *Skelly* hearing is not a full trial-type hearing. The member has no right to representation by counsel to confront or cross-examine witnesses. A member may instead choose to respond in writing and forgo a hearing.
>
> In determining whether reasonable grounds exist for proposed discipline, the Skelly Officer needs to consider the following:
>
> - Did the Department adequately warn the member or employee of the consequences of their conduct?
>
> - Did the Department investigate the allegation before administering discipline?
>
> - Was the investigation complete, fair and objective?
>
> - Did the investigation establish a preponderance of evidence to support the finding?
>
> - Were the rules, orders, and penalties applied without bias?
>
> - Is the proposed discipline just, considering the member or employee's past disciplinary record?

While an at-will or probationary employee has no property interest in employment, they have a right to a *Lubey* hearing if they are terminated for reasons that could result in imposing stigma or limit future employment opportunities. *Lubey* hearings are conducted in the same manner as Skelly hearings.

Finally, pursuant to California Government Code Section 3304 (d), "no punitive action, nor denial of promotion on grounds other than merit, shall be undertaken for any act, omission, or other allegation of misconduct if the investigation of the allegation is not completed within one year of the public agency's discovery by a person authorized to initiate an investigation of the allegation of an act, omission, or other misconduct and the subject is notified of any proposed disciplinary action." OPD policy requires the investigation to be completed, reviewed and approved within 180 days.

## OBSERVATIONS FROM INTERVIEWS

### Supervisors' Role in Internal Investigations

Field sergeants are responsible for most internal investigations. These investigations are conducted during their work hours while they also have responsibility for their duties of overseeing officers and providing guidance. Some field sergeants expressed concern about being burdened with many investigations and being taken away from active supervision in the field. This is especially important given the short turnaround time expected.

However, involving supervisors in investigations has shown to improve supervision. Supervisors who handle complaint investigations have a better understanding of misconduct issues in the field and are in a position to mitigate the problems in the future as their awareness of potential issues increases.

### Training for DLIs

Field sergeants receive very little training on how to conduct DLIs. The 2019 Sergeant Transition Course included only two hours of training from IAD regarding DLIs. Supervisors are also required to attend an 80-hour Peace Officer Standards and Training (POST) Sergeant's course, but it reportedly spends very little time on internal affairs and is not Oakland-specific. Given that most of the internal investigation are DLIs assigned to field sergeants, it is important that the field sergeants be sufficiently trained. Limited training and time to conduct investigations can lead to inconsistency, delay and inadequate investigations.

### Tracking System

Field sergeants, lieutenants and captains do not appear to have a uniform tracking system for tracking timelines for submitting completed investigations, which may lead to requests for extensions beyond the statutorily required timelines.

### Checks and Balances

The OPD's practice of conducting multiple levels or review of investigations and disciplinary decisions creates some checks and balances in the system and is a good practice to assist in ensuring that investigations are thorough and unbiased.

### Sharing IAD Data

The Department does not share overall IAD data with its employees to help address the perception of fairness, which the Department's leadership may want to reconsider. Many departments have mechanisms to share key data, without revealing the identity of disciplined personnel, to help educate employees on the disciplinary process and to make the process more transparent.

### Disciplinary Matrix

OPD captains and command staff consistently use a disciplinary matrix, which is a best practice and can be helpful to ensure that consistency and fairness in discipline. However, we noted that not everyone using the matrix uses it the same way (i.e., while some reported that they start in the middle and work up or down while others may start at the bottom and go up). This autonomy also could increase perceptions of bias regarding disciplinary outcomes.



**Disparities in Discipline**

Interviewees expressed concern about disparities in discipline but more often cited cliques or groups as a factor, rather than race or gender. While favoring individuals of a clique may not be an overt sign of bias based on race or gender, the impact may still result in a disparate impact on certain races and genders depending on the makeup of the cliques.



OAKLAND POLICE DEPARTMENT
Police Discipline Disparity Study

# Probationary Releases from the OPD's Academy and Field Training Programs

While the OPD provided us with data regarding attrition from the Academy and the Field Training Programs, our review focused on those individuals who were released from probation from the Academy for some type of misconduct as well as those individuals who did not successfully complete the Field Training Program. The data should be reviewed with caution and also requires a thorough understanding of the Department's recruitment efforts and the backgrounds of those that apply for the police officer position. In some instances, the data may show that those of a certain gender or race have increased rates of release from probation from the academy or lower rates of FTO program success. We describe some of the data here, but our focus is on the procedural aspects related to resignation or removal from the academy or FTO programs.

### THE ACADEMY

The OPD's academy program is 26 weeks long, covering 1,100 hours of instruction, which is greater than the 664 hours required by the California Commission on POST. The course is divided into 43 individual learning domains, which must be passed in order to graduate from the academy.

The OPD provided us its Academy Attrition Master list. The list includes data from Academy 172 (2015) to Academy 182 (2019). The list included the academy number, gender and race of the trainee, as well as information about whether the person graduated and a reason for not completing.

After cleaning the data and removing duplicates, the data showed that of the 415 individuals entering the Academy, the overwhelming number of persons entering the academy during that time period were male (341). The following charts show the number of people entering the Academy broken down by gender and race.





OAKLAND POLICE DEPARTMENT
Police Discipline Disparity Study

Hispanics (35 percent) were the highest percentage of academy entries, followed by white (27 percent), Asian (20 percent) and black (18 percent) respondents, as demonstrated below.





OAKLAND POLICE DEPARTMENT
Police Discipline Disparity Study

We further broke down the academy entries by race and gender together as follows:

| Race | Male | Female |
|------|------|--------|
| White | 92 | 18 |
| Black | 63 | 11 |
| Hispanic | 108 | 38 |
| Asian | 87 | 6 |
| Native American | 1 | None |

As the focus on this analysis was releases from probation from the academy based on some type of behavioral issue, we reviewed cases where an individual in the academy was released or resigned with a termination pending. For the academy classes 172 through 182 (roughly between 2014 and 2018), 17 individuals were released prior to completing the academy. The racial breakdown for those individuals is contained in the following table.

| Race | Number Released from Probation |
|------|-------------------------------|
| White | 4 |
| Black | 7 |
| Hispanic | 5 |
| Asian | 1 |
| Native American | None |

Thirteen of the released individuals were men and four were women. Of the four females released, two were black and two were Hispanic.

*Confidential and Proprietary*  |  © 2020 HILLARD HEINTZE



OAKLAND POLICE DEPARTMENT
Police Discipline Disparity Study

Finally, we looked at releases from probation from the academy by race as compared to the total population of persons of that race entering the academy. The following chart shows that black individuals were more likely to be released as opposed to other individuals of another race.



As detailed above, 9.46 percent percent of black employees were released from the Academy during that time period as opposed to 3.64 percent of white, 3.42 percent of Hispanic and 1.19 percent of Asian individuals. It is important to note that most of these releases were during the 2017 177th Academy class with nine individuals released from that class. Five of these nine were male black recruits. The remaining were a white man, an Asian man, a Hispanic man and a Hispanic woman. The data we received did not indicate that releases from probation occurred after the 180th Class.

The next step in our analysis was to review the reasons for release from probation from the academy and supporting documents. The reasons varied and included integrity issues, truthfulness, cheating, failure to disclose Class-1 misconduct, safety violations, general demeanor, using offensive and derogatory language and arrests by outside agencies. These releases were well documented with memos to the Chief of Police and containing the release recommendation and supporting information.

We reviewed available files documenting the reasons for release from probation from the academy and observed the following.

- While twice as many black trainees were released than white or Hispanic trainees, our review of the files associated with the releases indicated that on a surface level, the releases seemed to be appropriate.

- In some instances, we noted that some release from probation justifications included peer review and associated comments to support release. At the recommendation of the OPD's Office of Inspector General, OPD leadership codified the practice of using academy peer evaluations into written policies to be used as both a risk management tool and a hiring and performance training metric. While peer



reviews can be helpful to identify potential performance issues, the academy coordinator should be cautious in the use of these peer reviews as they could be problematic and present an opportunity where bias can exist.

## FIELD TRAINING PROGRAM

The OPD's Field Training Program consists of 16 weeks of in-car instruction between a trainee officer and a series of FTOs. The FTO, the FTO's patrol sergeant and the Field Training Program Coordinator monitors their progress. Trainees complete four, four-week rotations with three different FTOs. The first and fourth rotations are generally with the same FTO.

The training program includes daily evaluations, which are documented by the FTO in the Daily Observation Reports (DORs). Trainees are evaluated on 35 different categories of performance. Trainees also are expected to meet weekly with the patrol sergeant and FTO to discuss the recruits' overall progress and discuss their strengths or weaknesses.

Two senior FTOs serve as field training coordinators. These field training coordinators are responsible for monitoring the progress of a group of trainees and developing remedial plans to assist the trainee as required. Field training coordinators are expected to meet every four weeks with the FTOs and patrol sergeants to discuss the recruit's performance and address any special training needs.

The field training coordinators are required to conduct a personal interview with each trainee prior to the trainee being assigned to a new FTO.

If trainees are not deemed successful during the 16-week program, they can be offered remedial plans to assist them in completing the program. A trainee can receive several extensions as long as they demonstrate responsiveness to training. The extensions mirror Phase 4 of the Field Training Program.

When a decision is made to remove an unsuccessful trainee, the lieutenant in charge of the FTO program meets with the FTO coordinators to discuss the decision to terminate. Ultimately, Human Resources and the Chief must approve the decision to terminate.

We reviewed FTO completion rates by race and gender to look for any significant disparities. The table below shows completion rates for black and Asian trainees lagged behind those for Hispanic and white trainees. Asian trainees had the lowest completion rate based on rate. We also note that they also had the highest rate of resignation.



OAKLAND POLICE DEPARTMENT
Police Discipline Disparity Study

| RACE | # Complete | % Complete | # Removed | % Removed | # Resigned | % Resigned |
|------|-----------:|-----------:|----------:|----------:|-----------:|-----------:|
| Asian | 59 | 74.7 | 5 | 6.3 | 14 | 17.7 |
| Black | 56 | 80.0 | 5 | 7.1 | 9 | 12.9 |
| Hispanic | 120 | 84.5 | 5 | 3.5 | 13 | 9.2 |
| White | 120 | 87.0 | 2 | 1.4 | 15 | 10.9 |
| Other | 2 | 100.0 | 0 | 0 | 0 | 0 |
| Unknown | 17 | 85.0 | 1 | 5.0 | 2 | 10.0 |
| Overall Total | 374 | 82.9 | 18 | 4.0 | 53 | 11.8 |

Importantly, of the 60 women who entered the field training program, 57 completed it successfully, while two resigned and one was removed for poor performance.

Our review of complaint records, as well as interviews with various staff, indicated that concerns had been raised that FTOs were attempting to convince trainees to resign, rather than face the prospect of being removed from the academy. The OPD informed us that it recently clarified the policy to FTOs that they should not discuss potential resignations with the trainees.

### Observations

- Prohibiting FTOs from discussing resignation with a recruit who is struggling in the training program is an appropriate practice. It may be appropriate for supervisors to conduct such discussions if they are provided training and guidance to assist in avoiding the appearance of impropriety and bias. The prior practice could have led to concerns and perception of bias towards groups who may have felt that they were being unduly pressured to resign when they were struggling.

- Ensuring that a trainee works with different FTOs is a good practice in that it provides checks and balances to ensure that decisions are not made because of bias or other issues.

- Once a trainee has successfully completed the field training program, the Training Division does not track them; however, supervisors and chain of command still track officers. Additionally, the Department's PRIME database tracks performance for all employees, Because the Training Division does not track officers during their probationary periods in the field, the Department loses the opportunity to measure efficiently how well individuals who complete the program perform in the field, especially those who have been provided additional chances to pass. This information can provide valuable input to the OPD to modify its training to ensure the long-term success of its officers.

- The Training Unit has begun to invite candidates' families to see the academy and participate in social events. This provides an opportunity to create a support group for the trainees and their families.

- The OPD is developing a mentoring program that pairs a trainee with a mentor who is not their FTO. This is a good practice that OPD should consider expanding to include individuals in the training academy and those who have completed the Field Training Program.



OAKLAND POLICE DEPARTMENT
Police Discipline Disparity Study

# Review of Complaint and Discipline Data from 2014 to 2018

## OVERVIEW

In this section of the report, we examine the factors that influence whether a complaint against a sworn member of the OPD was sustained after investigation. Our analysis is based on data obtained from the IAD records system. The system includes complaints received since 2014.

This section includes a technical detailed analysis of complaints, outcomes and the race and gender of the involved members. It is important to include the detailed analyses in this section so that a reader familiar with research methods can understand how we were able to reach certain conclusions. Those conclusions are summarized at the end of this section.

The data is arranged so that each separate allegation receives a unique system identifier. That is, each allegation lodged against an employee represents a record in the file. As a result, one incident can result in many records. For example, if a complaint is lodged alleging that officer X was rude and used excessive force during the same incident, that would result in a single case number but two unique records in the file. Moreover, if the same complaint was filed against two officers (e.g., two-officer police unit), the file would have four unique records (2X2). Importantly, each allegation has a finding, and that is the unit of analysis for our inquiry.

We eliminated two categories of cases from the file. First, we discounted the cases in which the subject of the complaint was listed as "unknown." Second, we eliminated cases in which the investigation was not yet complete. As a result, each of our cases has a named employee and a finding. After this reduction, our data set consisted of 26,333 records. These represent employee allegation cases. In this data set, we identified 741 unique sworn members.

## SUMMARY DATA

First, we examine the summary data. Table 1 illustrates the distribution by gender and Table 2 shows the distribution by race.[4] About 58 percent of complaints are lodged against sworn members who identify as a minority.

Table 1: Distribution by gender

| Gender | Count |
|--------|-------:|
| Female | 2,710 |
| Male | 23,623 |
| Total | 26,333 |

---

[4]    For some individuals in the data set, we received their name but no information about their race.



OAKLAND POLICE DEPARTMENT
Police Discipline Disparity Study

Table 2: Distribution by race

| Race | Count |
|------|-------:|
| Asian | 3,535 |
| Black | 4,315 |
| Filipino | 949 |
| Hispanic | 6,250 |
| Native American | 142 |
| White | 11,142 |
| Total | 26,333 |

Table 3 illustrates the job classification for the members.[5] Of this group, 3,295 complaints (13 percent) have been lodged against supervisory or command personnel.

Table 3: Job classifications

| Race | Count |
|------|-------:|
| Captain of Police (PERS) | 51 |
| Deputy Chief of Police (PERS) | 20 |
| Lieutenant of Police (PERS) | 303 |
| Lieutenant of Police-84 (PERS) | 11 |
| Police Officer (PERS) | 20,953 |
| Police Officer-84 (PERS) | 2,085 |
| Sergeant of Police (PERS) | 2,765 |
| Sergeant of Police-84 (PERS) | 145 |
| Total | 26,333 |

---

[5]    This analysis only includes complaints lodged against sworn personnel of all ranks. We sometimes use the word officer to describe this group of employees.

In Table 4, we observe the nature of Manual of Rules (MOR) violations for the 26,333 cases.

Table 4: Manual of Rules (MOR) violations

| MOR Description | Count |
|---|---|
| Absence From Duty | 3 |
| Accessing, Viewing, Downloading, Providing, Sharing Inappropriate Material | 1 |
| Assisting Criminals | 222 |
| Commanding Officers - Authority And Responsibilities (Gross Dereliction Of Duty) Includes All Of The 234.00 Subsections | 4 |
| Commanding Officers - Authority And Responsibilities Includes All Of The 234.00 Subsections | 155 |
| Compromising Criminal Cases | 2 |
| Conduct Toward Others Demeanor | 1,762 |
| Conduct Toward Others Harassment And Discrimination | 1,196 |
| Conduct Toward Others Identity Profiling By Gender | 9 |
| Conduct Toward Others Identity Profiling By Mental Disability | 3 |
| Conduct Toward Others Identity Profiling By Race Or Ethnicity | 458 |
| Conduct Toward Others Identity Profiling By Religion | 4 |
| Conduct Toward Others Identity Profiling By Sexual Orientation | 6 |
| Conduct Toward Others Relationships | 1 |
| Conduct Toward Others Workplace Violence | 2 |
| Conduct Towards Others - Unprofessional Conduct In Violation Of Ai 71 | 29 |
| Consumption Of Intoxicants | 24 |
| Court Appearances | 2 |
| Custody Of Prisoners - Treatment | 454 |
| Custody Of Prisoners - Treatment And Maintaining Control | 8 |



OAKLAND POLICE DEPARTMENT
Police Discipline Disparity Study

| MOR Description | Count |
|---|---|
| Damaged, Inoperative Property Or Equipment | 7 |
| Department Property And Equipment - Collision W/ Gross Negligence | 2 |
| Department Property And Equipment - Improper Use/Care/Failure To Carry | 1 |
| Department Property And Equipment - Loss/Damage | 4 |
| Department Property And Equipment - Misappropriation/Misuse | 10 |
| Department Property And Equipment - Preventable Collision | 315 |
| Department Property And Equipment - Securing Weapon | 2 |
| Endorsements And Referrals No Fee Is Exchanged | 2 |
| Failure To Accept Or Refer A Complaint (Unintentional) | 699 |
| General Conduct | 367 |
| Gifts, Gratuities Soliciting Or Accepting | 20 |
| Identification As Police Officer | 4 |
| Improper Dissemination Of Computer Information | 4 |
| Insubordination – Disrespect | 7 |
| Insubordination - Failure To Obey A Lawful Order | 6 |
| Insubordination - Refusal To Obey A Lawful Order | 2 |
| Interfering With Investigations | 18 |
| Intoxicants On Departmental Premises | 1 |
| No Mor Violation | 29 |
| Notification – Criminal | 3 |
| Notification Of Subpoena To Testify For The Defense | 1 |
| Obedience To Laws Driving Under The Influence | 42 |
| Obedience To Laws Felony | 381 |



| MOR Description | Count |
|---|---|
| Obedience To Laws Misdemeanor/Infraction | 140 |
| Obstructing The Internal Affairs Process | 7 |
| Other Terminology/Direction - Rules/Regulations | 6 |
| Other Terminology/Direction - Rules/Regulations | 1 |
| Performance Of Duty – General | 4,321 |
| Performance Of Duty Care Of Property | 3,861 |
| Performance Of Duty Intentional Search, Seizure, Or Arrest | 158 |
| Performance Of Duty Miranda Violation | 106 |
| Performance Of Duty Pdrd | 395 |
| Performance Of Duty Planting Evidence | 27 |
| Performance Of Duty Unintentional/Improper Search, Seizure, Or Arrest | 5,413 |
| Prevention Of Harassment, Discrimination And Retaliation | 4 |
| Prohibited Activity On Duty | 11 |
| Refusal To Accept Or Refer Complaint (Intentional) | 63 |
| Refusal To Provide Name Or Serial Number | 428 |
| Reporting Violations Of Laws, Ordinances, Rules Or Orders (Class I) | 173 |
| Reports And Bookings | 74 |
| Retaliation | 32 |
| Security Of Departmental Business | 12 |
| Service Complaint | 4 |
| Supervisors - Authority And Responsibilities (Gross Dereliction Of Duty) Includes All Of The 285.00 Subsections Except 285.90 | 9 |
| Supervisors - Authority And Responsibilities Includes All Of The 285.00 Subsections Except 285.90 | 143 |



OAKLAND POLICE DEPARTMENT
Police Discipline Disparity Study

| MOR Description | Count |
|---|---|
| Truthfulness | 86 |
| Use Of Physical Force – Any | 519 |
| Use Of Physical Force - Non-Reportable Use Of Force | 127 |
| Use Of Physical Force - Unintentional Discharge Of Firearm | 2 |
| Use Of Physical Force Comparable To Level 1 | 132 |
| Use Of Physical Force Comparable To Level 2 | 568 |
| Use Of Physical Force Comparable To Level 3 | 766 |
| Use Of Physical Force Comparable To Level 4 | 2,394 |
| Use Of Privileged Information | 77 |
| Use Of Tobacco Products While On Duty | 2 |
| **Total** | **26,333** |

As indicated above, more than 54 percent of the complaints are related to performance of duty and just over 15 percent are related to use of force.

Table 5 illustrates the classification of allegation by seriousness. Class One are the more serious offenses.

Table 5: MOR code classifications

| MOR Code | Count |
|---|---|
| 0 | 33 |
| 1 | 8,634 |
| 2 | 17,666 |
| **Total** | **26,333** |



In Table 6, we observe the outcomes of the investigations. As we can see, 2,065 (about 8 percent) investigations resulted in a sustained finding.

Table 6: Distribution of outcomes

| Findings | Count |
|---|---|
| Admin Closure | 229 |
| Exonerated | 7,113 |
| Informally Resolved | 681 |
| Not Sustained | 1,592 |
| Sustained | 2,065 |
| Unfounded | 14,653 |
| Total | 26,333 |

## RELATIONSHIP BETWEEN RACE AND FINDING

Our first analysis looks at the relationship between the race of the employee who has received a complaint and whether that complaint resulted in a sustained finding. Our approach consists of a contingency table and a Chi-Square Test. In this type of analysis, we compare the actual distribution of outcome by race and whether an investigation resulted in a sustained finding.[6]

Table 7 shows our observed data. In the first column, we see the employee race. The following four columns demonstrate observed versus expected numbers for other than sustained and sustained cases. The bottom row and last column that illustrate the column and row totals.

So, for example, a total of 6,250 complaints involved Hispanic officers. Of that number, 467 (7.4 percent) were sustained. White officers received, 11,142 complaints, of which 797 (7.2 percent) were sustained. This data reflects what is **observed**.

As for the **expected** data, we calculated the expected values for each cell we use the following formula.

**EXPECTED:**     Row Total X Column Total

                  Total Cases

---

[6]    The OPD has a separate category of outcome called "not sustained." We use the term "other than sustained" to describe all dispositions other than sustained.



OAKLAND POLICE DEPARTMENT
Police Discipline Disparity Study

For example, if we want to find the expected value for Asians and sustained complaints, we would multiply 3,817 (officer total) X 2,432 (sustained total) and divide that product by 29,248 (total cases). The result is 317.39.

Table 7: Observed versus expected data sets and number of complaints sustained

| RACE | OTHER THAN SUSTAINED Observed | OTHER THAN SUSTAINED Expected | SUSTAINED Observed | SUSTAINED Expected | TOTAL By Race |
|---|---|---|---|---|---|
| Asian | 3,257 | 3,257.79 | 278 | 277.21 | 3,535 |
| Black | 3,874 | 3,976.62 | 441 | 338.38 | 4,315 |
| Filipino | 873 | 874.58 | 76 | 74.42 | 949 |
| Hispanic | 5,783 | 5,759.88 | 467 | 490.12 | 6,250 |
| Native American | 136 | 130.86 | 6 | 11.14 | 142 |
| White | 10,345 | 10,268.26 | 797 | 873.74 | 11,142 |
| TOTAL By Result[7] | | 24,268 | | 2,065 | 26,333 |

One way to think about Table 7 is to consider that if race is not a factor in the finding, the observed values would be equal to the expected values, given that all other things being equal. However, for example, we observe that complaints against black officers were sustained 441 times, but we would expect that they would be sustained 338 times.

We can actually conduct a statistical test to determine whether the differences between the two tables are large enough to suggest an effect of race. It is called the Chi-Square Test of Independence.

In this test, we construct null and alternative hypotheses. The null hypothesis H0 states there is no difference between employee race and the case finding — that they are independent. The alternative hypothesis H1 suggests that they are not independent.

We conduct a statistical test and the results are illustrated below.

---

[7]    We rounded these totals up due to negligible percentage differences.

OAKLAND POLICE DEPARTMENT
Police Discipline Disparity Study

Table 8: Results of Chi-Square Test

| Chi Square Test for Independence | |
|---|---|
| H0 | Race and Findings are Independent |
| H1 | Race and Findings are Dependent |
| Degrees of Freedom | 5 |
| Chi Square (Table Value .05 Significance) | 11.07 |
| Chi Square (Calculated) | 44.88 |
| P value is Less than .05 We can reject H0 | |

In this case, we reject the null hypothesis. As a result, we can argue that race and case findings are not independent. We are assuming that the two variables are related to one other, that they covary, that the dependent variable is influenced by the independent variable – that the finding you get *does* depend on your race.

## RELATIONSHIP BETWEEN GENDER AND FINDINGS

Next, we look at the relationship between finding and gender. We can see the observed and expected values in Table 9.

Table 9: Observed versus expected data sets for gender and sustained cases

| GENDER | OTHER THAN SUSTAINED Observed | OTHER THAN SUSTAINED Expected | SUSTAINED Observed | SUSTAINED Expected | TOTAL By Gender |
|---|---|---|---|---|---|
| Female | 2,538 | 2,497.49 | 172 | 212.51 | 2,710 |
| Male | 21,730 | 21,770.51 | 1,893 | 1,852.49 | 23,623 |
| TOTAL By Result | | 24,268 | | 2,065 | 26,333 |

This analysis indicates that complaints against female sworn employees are sustained less than would be expected, while complaints against male sworn employees are sustained more than would be expected.



OAKLAND POLICE DEPARTMENT
Police Discipline Disparity Study

We also provide the Chi-Square Test results and, like the analysis of race and finding, gender and finding are also dependent.

Table 10: Chi Square Results for Gender

| Chi Square Test for Independence | |
|---|---|
| **H0** | Gender and Findings are Independent |
| **H1** | Gender and Findings are Dependent |
| **Degrees of Freedom** | 2 |
| **Chi Square (Table Value .05 Significance)** | 3.84 |
| **Chi Square (Calculated)** | 9.34 |
| **P value is Less than .05 We can reject H0** | |

## LOGISTICAL REGRESSION FOR OTHER FACTORS

Thus far, we have only examined the unique relationship between employee race, gender and finding. Next, we want to find out the extent, if at all, other factors might influence the finding.

The usual approach for this type of analysis is multiple regression. This allows the researcher to identify the effects of one or more independent variables on a dependent variable. Importantly, because independent variables often contribute jointly to a finding (e.g., parent's education and child's education often both contribute to the child's annual salary) multiple regression allows you to identify the effect on a single variable while holding the others constant.

In our case, we need to use a special form of regression analysis: logistic regression. This is because our dependent variable (finding) is binary (sustained versus other than sustained).

In order to conduct this analysis, we construct what are commonly called "dummy variables." For example, our data set has a variable called employee race. We transformed that variable into six dummy variables. That is, we created a new variable called "Hispanic." For that variable, if a person was Hispanic, they would be coded as 1, if not zero. We did that for all of the racial categories and for gender. We also included a variable for years of service. Finding is coded 1 for sustained and 0 for other than sustained.



We conducted this analysis in two stages. In the first analysis, we included race, gender and years of service. The results of this logistic regression analysis appear below.

Table 11: Results of logistic regression

| Characteristic | Coefficients | Odds |
|---|---|---|
| Intercept | -0.0546 | 0.9468 |
| Male | -0.0269 | 0.9735 |
| Female | -0.3067 | 0.7359 |
| Years of Service | 0.0071 | 1.0072 |
| Asian | 0.0352 | 1.0358 |
| black | 0.3191 | 1.3759 |
| Filipino | 0.0160 | 1.0161 |
| Hispanic | -0.0173 | 0.9828 |
| Native American | -0.4472 | 0.6394 |
| White | -0.0532 | 0.9482 |

When a logistic regression is calculated, the regression coefficient is the estimated increase in the log odds of the outcome per unit increase in the value of the independent variable.

In the column for Coefficients, we observe the effect of the independent variable on the finding while controlling for the other variables. Other than Sustained is coded zero, so that a variable with a negative coefficient indicates that it would more likely lead to an "Other than Sustained" finding.

The odds ratio is more informative. Odds ratios are used to compare the relative odds of the occurrence of the outcome given exposure to the variable of interest. The odds ratio can also be used to determine whether a particular exposure is a factor for a particular outcome, and to compare the magnitude of various risk factors for that outcome.[8]

- OR=1 Exposure does not affect odds of outcome

- OR>1 Exposure associated with higher odds of outcome

- OR<1 Exposure associated with lower odds of outcome.

In our case, many of the odds ratios are less than one, suggesting that they would be less likely to result in a sustained finding. By contrast, for black officers, the odds ratio is 1.37, suggesting that even after controlling

---

[8]    https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2938757/



OAKLAND POLICE DEPARTMENT
Police Discipline Disparity Study

for other factors, those members are 37 percent more likely to have their allegation result in a sustained finding.

For the second analysis, we have added the MOR class to the equation. Recall that Class One offenses are more serious than Class Two. The table below shows the percentage of allegations sustained based on the MOR Code. MOR Code 0 was reflected in the dataset, but these cases refer to allegations that were determined to not be violations of the Department's rules.

Table 12: Percentage of allegations sustained based on the MOR Code

| MOR Code | Other Than Sustained | Sustained | Total | Percentage Sustained |
|---|---|---|---|---|
| 0 | 33 | 0 | 33 | N/A |
| 1 | 8,303 | 331 | 8,634 | 3.83 |
| 2 | 15,932 | 1,734 | 17,666 | 9.82 |
| Total | 24,268 | 2,065 | 26,333 | 8.51 |

In order to do the logistic regression, we constructed two dummy variables. "MOR 1" is coded 1 if it is a Class One offense and 0 if not. MOR 2 is coded 1 if it is a Class Two Offense and 0 if not. Table 13 illustrates the analysis that includes the MOR 1 variable.

Table 13: Logistic regression results including MOR Code 1

| Characteristic | Coefficients | Odds |
|---|---|---|
| Intercept | -0.089 | 0.915 |
| Male | 0.241 | 1.272 |
| Female | -0.040 | 0.961 |
| Years of Service | 0.007 | 1.007 |
| Asian | 0.092 | 1.097 |
| Black | 0.327 | 1.387 |
| Filipino | 0.023 | 1.023 |
| Hispanic | 0.027 | 1.027 |
| Native American | -0.403 | 0.668 |
| White | -0.058 | 0.944 |
| MOR Code 1 | -1.004 | 0.367 |

When we add the MOR Class, we observe some interesting findings. First, we observe that the likelihood of obtaining a sustained finding is very small for MOR Code 1 complaints (odds ratio is .367). Next, the odds for a black individual is unchanged from the earlier analysis.

The following table shows the results when we include the MOR 2 variable.

Table 14: Logistic regression with MOR Code 2 variable

| Characteristic | Coefficients | Odds |
|---|---|---|
| Intercept | -0.481 | 0.618 |
| Male | -0.275 | 0.759 |
| Female | -0.556 | 0.574 |
| Years of Service | 0.007 | 1.007 |
| Asian | -0.009 | 0.991 |
| Black | 0.227 | 1.255 |
| Filipino | -0.079 | 0.924 |
| Hispanic | -0.074 | 0.928 |
| Native American | -0.505 | 0.604 |
| White | -0.159 | 0.853 |
| MOR Code 2 | 1.010 | 2.744 |

Note the significant change when we look at the MOR 2 cases. As we can see, the strongest predictor of whether a Class Two case is sustained is that it is a Class Two and not a Class One. That is, Class Two offenses are much more likely to be sustained than Class One offenses.

This could be explained in a variety of ways. For example, these cases are less complex and the evidence may be more readily attainable, or that because the consequences are less severe, the agency may be more inclined to sustain the complaint. Interestingly, even while controlling with the effects of MOR Class, black officers are still 25 percent more likely to have a complaint sustained.

### RELATIONSHIP BETWEEN RACE, GENDER AND DISCIPLINE

We now turn our attention to the relationship between race, gender and discipline. Our study is based on 606 cases in which an officer was disciplined. We use the same contingency table approach. The following tables demonstrate the observed versus expected data for race and discipline.

OAKLAND POLICE DEPARTMENT
Police Discipline Disparity Study

Table 15: Observed values for race and discipline

| DISCIPLINE DESCRIPTION | ASIAN | BLACK | FILIPINO | HISPANIC | N.A. | WHITE | TOTAL By Discipline |
|---|---|---|---|---|---|---|---|
| Assoc. Other Cases | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| C - Counseling & Training | 29 | 50 | 11 | 70 | 3 | 111 | 274 |
| Held in Abeyance | 0 | 0 | 0 | 1 | 0 | 0 | 1 |
| L- Last Chance Agreement | 0 | 0 | 0 | 1 | 0 | 0 | 1 |
| N - No Discipline | 0 | 0 | 0 | 1 | 0 | 1 | 2 |
| P - Released from Probation | 0 | 0 | 0 | 1 | 0 | 1 | 2 |
| R - Resigned | 1 | 0 | 0 | 1 | 0 | 0 | 2 |
| Refer to Log | 0 | 0 | 0 | 1 | 0 | 0 | 1 |
| Retired | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| S - Suspension | 14 | 23 | 1 | 30 | 1 | 44 | 113 |
| T - Termination | 2 | 2 | 0 | 1 | 0 | 6 | 11 |
| W - Written Reprimand | 24 | 38 | 4 | 51 | 1 | 79 | 197 |
| TOTAL By Race | 70 | 114 | 16 | 158 | 5 | 243 | 606 |

Table 16: Expected values for race and discipline

| DISCIPLINE DESCRIPTION | ASIAN | BLACK | FILIPINO | HISPANIC | N.A. | WHITE | TOTAL By Discipline |
|---|---|---|---|---|---|---|---|
| Assoc. Other Cases | 0.12 | 0.19 | 0.03 | 0.26 | 0.01 | 0.40 | 1 |
| C - Counseling & Training | 31.65 | 51.54 | 7.23 | 71.44 | 2.26 | 109.87 | 274 |
| Held in Abeyance | 0.12 | 0.19 | 0.03 | 0.26 | 0.01 | 0.40 | 1 |
| L- Last Chance Agreement | 0.12 | 0.19 | 0.03 | 0.26 | 0.01 | 0.40 | 1 |
| N - No Discipline | 0.23 | 0.38 | 0.05 | 0.52 | 0.02 | 0.80 | 2 |
| P - Released from Probation | 0.23 | 0.38 | 0.05 | 0.52 | 0.02 | 0.80 | 2 |
| R - Resigned | 0.23 | 0.38 | 0.05 | 0.52 | 0.02 | 0.80 | 2 |
| Refer to Log | 0.12 | 0.19 | 0.03 | 0.26 | 0.01 | 0.40 | 1 |
| Retired | 0.12 | 0.19 | 0.03 | 0.26 | 0.01 | 0.40 | 1 |
| S - Suspension | 13.05 | 21.26 | 2.98 | 29.46 | 0.93 | 45.31 | 113 |
| T - Termination | 1.27 | 2.07 | 0.29 | 2.87 | 0.09 | 4.41 | 11 |
| W - Written Reprimand | 22.76 | 37.06 | 5.20 | 51.36 | 1.63 | 79.00 | 197 |
| TOTAL By Race | 70 | 114 | 16 | 158 | 5 | 243 | 606 |



Below, we illustrate the Chi-Square test of independence for race and discipline.

Table 17: Results of Chi-Square Test of Independence

| Chi Square Test for Independence | |
|---|---|
| **H0** | Discipline and Race are Independent |
| **H1** | Discipline and Race are Dependent |
| **Degrees of Freedom** | 55 |
| **Chi Square (Table Value .05 Significance)** | 73.31 |
| **Chi Square (Calculated)** | 28.18907366 |
| **P value is More than .05 We cannot reject H0** | |

As shown above, the observed values are very close to the expected values.

Next, we examine the contingency table analysis for gender and discipline. The table shows the observed and expected values.

Table 18: Observed versus expected values for gender

| DISCIPLINE DESCRIPTION | FEMALE Observed | FEMALE Expected | MALE Observed | MALE Expected | TOTAL By Discipline |
|---|---|---|---|---|---|
| Assoc. Other Cases | 1 | 0.125 | 0 | 0.875 | 1 |
| C - Counseling & Training | 42 | 34.363 | 232 | 239.637 | 274 |
| Held in Abeyance | 0 | 0.125 | 1 | 0.875 | 1 |
| L- Last Chance Agreement | 0 | 0.125 | 1 | 0.875 | 1 |
| N - No Discipline | 0 | 0.251 | 2 | 1.749 | 2 |
| P - Released from Probation | 0 | 0.251 | 2 | 1.749 | 2 |
| R - Resigned | 0 | 0.251 | 2 | 1.749 | 2 |
| Refer to Log | 0 | 0.125 | 1 | 0.875 | 1 |
| Retired | 0 | 0.125 | 1 | 0.875 | 1 |
| S - Suspension | 14 | 14.172 | 99 | 98.828 | 113 |
| T - Termination | 0 | 1.380 | 11 | 9.620 | 11 |
| W - Written Reprimand | 19 | 24.706 | 178 | 172.294 | 197 |
| TOTAL by Gender | | 76 | | 530 | 606 |

OAKLAND POLICE DEPARTMENT
Police Discipline Disparity Study

Table 19 shows the results of the Chi-Square test of independence. In this, the type of discipline administered is affected by gender. For example, that female officers are more likely than male officers to receive counseling and training for discipline than expected.

Table 19: Chi-Square results for gender and discipline

| Chi Square Test for Independence | |
|---|---|
| H0 | Discipline and Gender are Independent |
| H1 | Discipline and Gender are Dependent |
| Degrees of Freedom | 11 |
| Chi Square (Table Value .05 Significance) | 19.68 |
| Chi Square (Calculated) | 14.87 |
| P value is Less than .05 We cannot reject H0 | |

### SUMMARY[9]

Our key findings include the following.

- An officer's race and gender affect whether an allegation lodged against them is sustained.

- For all complaints, black individuals are 37 percent more likely to have their complaints sustained while controlling for gender and years of service.

- Complaints classified as Class Two are much more likely to be sustained than Class One complaints.

- For Class One complaints, black individuals are almost 39 percent more likely to have the complaint sustained, while controlling for gender and years of service.

- For Class Two complaints, the biggest predictor is the class itself, but black individuals are still 25 percent more likely to have a complaint sustained.

- Complaints against female sworn employees are sustained less than would be expected, while complaints against male sworn employees are sustained more than would be expected.

- An officer's race does not affect the type of discipline administered, but their gender does. For example, female officers are more likely than male officers to receive counseling and training for discipline than expected.

---

[9]    We used the following sources to inform our data analysis.

"Examining racial disparity in the police discipline process" Jeff Rojek, Scott Decker. Police Quarterly Volume 12:4, 2009

Statistics for Criminology and Criminal Justice Fourth Edition. Ronet D. Bachman, Raymond Paternoster. Sage: 2016

Statistics in Criminal Justice. Weisburd, David, Britt, Chester. Springer 2014

*Confidential and Proprietary*  |  © 2020 HILLARD HEINTZE



## Recommendations

| Recommendations | |
|---|---|
| 1 | Regularly audit and spot check processes and monitor data regarding **internal investigation outcomes and discipline** to measure progress in eliminating disparities based on race. |
| 2 | Exercise caution in using the IAD investigator as both **fact finder and adjudicator**, as this raises challenges to principles of investigative neutrality and may contribute to perceptions of investigator bias. The fact finder for an internal investigation should not be the same individual who makes the determination of the finding. At a minimum, the next-level supervisor should read the investigative report and decide as to the finding of the complaint. |
| 3 | Have the lieutenant or command staff member who approved the sustained finding present the **reasoning for the investigation's outcome** to the Chief's disciplinary roundtable, rather than the investigator. The investigator should be available for questions. |
| 4 | Explore the possibility of assigning an **administrative sergeant** within a division to assist with DLIs. |
| 5 | Increase the number of **DLI sergeants** in the IAD to conduct more of the preliminary work related to a DLI and to aid field sergeants assigned to investigate complaints. |
| 6 | Have field sergeants and IAD investigators provide **additional training** on internal investigation techniques, including report writing and guidance to ensure that complainant, subject member or witness statements are not written in the first person. Statements should be attributed properly to avoid a charge that the investigator is biased when choosing a perspective to believe. Training should also include guidance on how to incorporate procedural justice concepts into the internal investigation and discipline process. |
| 7 | Increase the **transparency** of internal investigation and disciplinary outcomes by distributing quarterly summaries of open cases, cases closed with a finding, and disciplinary outcomes. While protecting the identity of accused Department members, the summaries should include brief fact patterns and reference the number of prior sustained findings when discussing case outcomes. |
| 8 | Ensure that PDRs only include disciplinary history of sustained cases within the **five year period.** |
| 9 | Have the academy integrate opportunities for **FTOs** to engage with the candidates before they are formally released to the Field Training Program to establish some familiarity and rapport. This could be accomplished through guest lecture opportunities or meet-and-greets on topics and scenarios to expect when the recruits enter the FTO stage. |
| 10 | Ensure that command staff have some consistent **visibility** at the academy to provide new officers with a familiarity of their command structure prior to graduation. |
| 11 | Start the OPD's mentoring program for trainees at the beginning of the academy and continue through the Field Training Program to provide additional assistance or mentoring as the trainees move through various stages of the process. |



| 12 | Expand the practice of conducting focus groups of trainees in the Field Training Program to include additional **feedback mechanisms** such as pre- and post-surveys and listening sessions. Continue to conduct **confidential exit interviews** with trainees who did not successfully complete the academy or field training program. |
|---|---|
| 13 | Develop a policy that states that once a decision is made to release a trainee from probation during the Field Training Program, the trainee should be placed on **administrative leave** or in an assignment that does not involve public contact until all appropriate paperwork is completed. |
| 14 | Expand the **tracking of trainees** after completion of their training program so that leadership can gain additional feedback about the success rate of individuals who leave the program, especially those who have been provided additional chances to meet training standards. This expands upon the recommendation of the OPD's Inspector General to prioritize an electronic system of record keeping allowing for a quick and comprehensive review of all trainees and academy performance. |



## Conclusions and Next Steps

Current IAD and OPD leadership genuinely appear to be attempting to improve and change policies and practices regarding investigating complaints and disciplining officers. As mentioned earlier in our report, the OPD has undergone significant modifications to policies and procedures in the last two years as a result of the NSA and other significant deficiencies in how investigations were being handled. Even with a significant backlog in investigations and shortages in staff, the IAD was able to temporarily add staff to address it.

The IAD should continue to coordinate with all relevant units to ensure efficient processing of complaints and ensure training is provided to all the parties involved in the process. If the Department has provided procedural justice training to everyone or is still in the process of doing so, it should ensure that IAD staff and first-line and command staff receive that training as it relates to internal procedural and organizational justice.

The perceptions of distrust and bias in the disciplinary process and in the academy will continue to perpetuate if leadership are not modeling what is being taught at the academy and being required by the NSA and the most recent court actions.

Our statistical analyses indicated that over the five-year study period, black officers were more likely to have an investigative case sustained against them than officers of other races. Additionally, once a case was sustained, we found no disparities in disciplinary outcomes based on race.

Although we could not identify specific reasons that caused the disparity in investigative outcomes, we highlighted that those who shared their concerns perceived that the system is unfair, and this remains a primary concern for many OPD officers and staff. The OPD must remain vigilant to identify areas of subjectivity in the processing of complaints and ensure all complaints are documented, including those of high-profile, high-ranking or favored groups.