# EXHIBIT 6

# STATEMENT OF THE OAKLAND POLICE COMMISSION

## I. Introduction

At its last Case Management Conference (CMC), this Court emphasized that compliance with the terms of the Negotiated Settlement Agreement (NSA) will necessitate a change in the culture of the Oakland Police Department (OPD or the Department). According to the Court, this "culture change [will] require [] strong leadership at all levels. Executive leadership has to drive culture. The culture cannot drive the leadership." (CMC Transcript at 7:3-6 (July 11, 2025)). The Court's words are important now more than ever. The Oakland Police Commission has begun the process of finding a permanent OPD Chief and is excited to continue its work with future leadership, key stakeholders, and the local community on the task of repairing a decades-long culture that, when faced with officer misconduct, often wrongly labels corrective disciplinary action as weaponization and punishment. As this Statement confirms, collaboration places the Department's feet on the path to culture change and demonstrates that an independent oversight body is a benefit, rather than a hindrance, to the goal of effective and constitutional policing.

Oakland voters overwhelmingly approved Measure LL which established the Oakland Police Commission (the Commission or OPC) to serve as an engine of Department reform . Composed of three parts – a governing body of Commissioners, the Community Police Review Agency (CPRA or the Agency), and the Office of the Inspector General (OIG) (which was created via Measure S1) (collectively the Commission) – the Commission was created, not only to ensure effective *external* review of the OPD's disciplinary process, but to step in and function as the primary oversight vehicle once the Department reaches compliance with – and exits from – the NSA. The Commission is therefore committed to an enduring change in Department culture which will extend beyond the lifetime of the NSA. Three factors are critical to accomplishing this goal: (1) the Commission's continued effective and productive relationships with key City and community stakeholders, including the Oakland Police Department and an independent OIG; (2) beginning the transfer of certain Internal Affairs Bureau (IAB) investigations to CPRA and further standardizing the disciplinary process; and (3) the City's commitment to the long-term fiscal stability of the OPC's independent civilian oversight structure (including restoration of funding for the OIG and

OPC's administrative functions to allow completion of their charter mandates) that will cement constitutional policing within the core of the Department.

## II. Constructive Independent Oversight in Action

In recent months, the Commission's role in overseeing the Department's policies and procedures has been spotlighted in Oakland. Amidst recent criticism of certain OPD proposals and the Commission/Department relationship, the Commission has worked diligently with the Department to review, revise, and prepare to implement a number of OPD policies. At an October 2025 Commission meeting, the Department's liaison to the Commission described how – even in the face of disagreements – both bodies had worked hand-in-hand in the previous year to refine policies and resolve challenges. As an example, the Commission consulted with the Department on a proposal to revise OPD Special Order 9214 (Use of Force Investigation Timelines). According to OPD, the policy (as it stood), resulted in an administrative burden for Captains and Sergeants. Via efforts mostly invisible to the public, this consultation brought forth an OPD request for policy modification that received unanimous Commission approval. The newly revised policy is reported to have helped tremendously in reducing officer requests for extensions and in eliminating duplicative reporting - which in turn put more officers on the street while lowering the need for overtime. This policy revision exemplifies how the Commission collaborates with the Department to alleviate unnecessary restrictions while ameliorating effective policing.

Despite public concerns that OPD policing practices targeted residents of certain races, until recently, Department policy addressing racial profiling was severely outdated, having sat untouched for well over a decade. As part of its Charter authority, the Commission's independent Office of the Inspector General (OIG) reviewed Department General Order M-19 (Prohibition Regarding Racial Profiling and Other Race-Based Policing) to identify gaps in the primary document outlining the Department's commitment to fair, equitable, and unbiased service. Upon examination, the OIG offered six substantive recommendations for improvement (along with three additional consideration points).[1] The Commission's Racial Profiling Ad Hoc Committee

---

[1] The Commission is profoundly concerned that the City's budget does not fully fund the OIG, leaving the IG understaffed and unable to fully perform these kinds of critical duties.

(made up of Commissioners, OPD staff, and a member of the public) accepted the Inspector General's report, then crafted both a policy update for the Department's Manual of Rules and a Cultural Accountability Statement that acknowledged OPD's documented link between modern policing and profiling/ harassment of people of color. Endorsed by the full Commission, the policy update was recently approved by the Chief. The revised policy demonstrates how the independent OIG, the Commission's governing body, and OPD can coordinate to align Department policy with national standards for constitutional policing; improve consistency of policy implementation; and increase accountability for officer actions – all of which will advance OPD's compliance with the NSA.

As the Court is aware, soon after former Chief Mitchell assumed his post, the City Council referred the OPD's General Order J-4 Policy on Vehicle Pursuits (commonly known as the OPD Pursuit Policy) to the Commission for review and recommendation. Once the Commission recommended no changes to the Policy, Chief Mitchell, elected officials, and the Oakland community became more involved in the process, resulting in the Chief himself proposing specific modifications to the Pursuit Policy. After discussion with the Chief and the receipt of significant community input, the Commission reached agreement with the Department and voted to approve the Chief's modifications to the Pursuit Policy. Despite efforts to describe the Department and the Commission as foes, the Commission's unanimous vote demonstrates that the Commission and OPD can cooperate to reach resolution on controversial and pivotal matters.

At its first meeting of 2026, the Commission also reviewed and unanimously accepted the Department's revisions to Department General Order (DGO) M-04.1 – Criminal Investigation of Department Members and Outside Sworn Law Enforcement Personnel. As part of its retrospective on the revelations involved in the criminal investigation of Detective Phong Tran, the Department recommended a revision of its DGO M-04.1. Among other things, the amended policy updates the Criminal Investigation Division's responsibilities, timelines, investigative procedures, and decision-making and disposition requirements when confronted with an officer arrested for, or otherwise

suspected to have committed, criminal misconduct. Requirements include clarifying that an officer arrested by a non-OPD law enforcement agency must notify the OPD chain of command (even if the outside law enforcement agency does not itself notify the Department) and that the Department affirmatively document all investigative steps and Command decisions in such criminal investigations of its officers. The modified policy details are intended not only to prevent a repeat of the situation with Mr. Tran, but to improve NSA compliance, particularly with Task 2.

In establishing relationships with key stakeholders, the Commission's efforts extend beyond collaborations with the Chief. Commission leadership has attended officer line-ups to advise that the Commission supports the Department, to ensure officers that OPD command staff convey officer concerns to the Commission, and to dispel misconceptions (such as that the Commission is against or "out to get" officers) that instill mistrust of the Commission in OPD officers. Fostering connections with officers enables them to see that Commission oversight is not anti-law enforcement and to embrace the practices associated with cultural change. The Commission also has engaged in improved coordination with City leadership, such as attending twice-monthly Core NSA Group meetings. These recurring meetings permit members to discuss and coordinate around outstanding NSA Tasks, strengthening communication about the Department in general and the status of NSA Tasks in particular. Commission leadership's participation in Independent Monitor Team site visits similarly provide insight into the specific areas in which the OPD can fine-tune its work to comply with the remaining NSA Tasks. The City's Municipal Code gives the Commission's Inspector General (IG) a corresponding opportunity to evaluate OPD's disciplinary process. As part of the OIG's oversight responsibilities, Chapter 2.45.110(E) authorizes the IG to attend OPD's Skelly hearings[2] – the proceeding by which a sworn officer may contest proposed discipline before it takes effect. The Inspector General has observed one such hearing to evaluate the proceeding's fairness, consistency, and adherence to Departmental policies and procedures. Building on this initial observation, the IG intends to continue to attend Skelly hearings to assess the

---

[2] In the last 17 months, after consistent inquiry by the Commission about the number of officers on administrative leave while awaiting Skelly hearings, OPD has expanded the list of persons who can serve as Skelly officers – resulting in an increase in the number of discipline cases moving forward to hearing.

Department's disciplinary process; reinforce accountability and transparency; and safeguard officers' due process rights. All of these Commission efforts advance the Department toward the goals of cultural change, NSA termination, and sustained compliance post-federal oversight.

Finally, the Commission's most significant partnership with Mayor Barbara Lee is its role in appointing an Interim Chief and hiring a new permanent OPD Chief. James Beere, a 28-year veteran OPD officer, was named Interim Oakland Police Chief in the wake of former Chief Floyd Mitchell's resignation.[3] With Beere installed as Interim Chief, the Commission is now moving purposefully to once again mount a recruitment of exceptionally qualified applicants to interview for the permanent Oakland Police Chief position. Once the applicants are reviewed, the Commission will present the most capable candidates to Mayor Lee for her ultimate consideration. In coordination with the Mayor, the Commission intends its search to yield a Chief with the commitment to improve OPD culture and the dedication to compliance necessary for long-term success in a post-NSA environment.

For additional information on the Commission's recent accomplishments, the Court is encouraged to review the Annual Reports linked below:

OPC Annual Report
https://simplebooklet.com/2024opcannualreportfinalfin1#page=1

CPRA Annual Report
https://drive.google.com/file/d/1aTgy9bol_c_qZpCTYJcIBYBNH0ihmBCn/view?usp=drive_link

OIG Annual Report
https://drive.google.com/file/d/1ChoOJ3yv5bt4vLsOo35jFVp26Tw69MSG/view?usp=drive_link

**III.    The Work of CPRA, the Investigative Agency That Polices the Police**

The Community Police Review Agency (CPRA or the Agency) investigates citizens' allegations of misconduct against sworn OPD officers. As an impartial body outside OPD, CPRA's determinations are independent of Department influence. CPRA is Oakland's go-to agency to guard against the unmistakable conflict of interest associated with having the Department police itself.

---

[3] Beere served as Acting Chief until former Chief Mitchell's formal departure on December 5, 2025.

CPRA investigates allegations of misconduct by sworn OPD officers involving uses of force, in-custody deaths, profiling, and First Amendment assemblies. CPRA continues to tackle issues designed to enhance its ability to hold accountable any officer or Department leader that engages in or conceals misconduct.

At the time of the Summer 2025 Case Management Conference before the Court, CPRA was led by Interim Director Antonio Lawson. Since then, Mr. Lawson accepted the Commission's offer to service as permanent CPRA Director. Director Lawson brings to the office over 20 years of investigation and monitoring class action litigation and settlements. An accomplished attorney, Director Lawson has deep experience with police oversight, having served for a decade as independent counsel to both CPRA and Oakland's Citizens' Police Review Board (the predecessor to the Oakland Police Commission). Installing Director Lawson in this permanent role allows the Commission to retain a talented leader with deep institutional knowledge while ensuring that there is no interruption in CPRA duties during this critical time for the Agency and the Commission.

Adopted in 2018, Oakland's City Ordinance No. 13498 (Municipal Code Chapter 2.45.070) requires the Commission, in coordination with CPRA and the Chief of Police, to establish a mediation program. After overcoming numerous obstacles and delays, on September 25, 2025, CPRA presented a mediation plan to the Commission, which unanimously approved the Mediation Policies and Procedures. The Mediation Program will offer community members and police officers the option to mediate complaints *for which officer discipline is not a potential outcome*. Founded on restorative justice principles and administered by CPRA, the program's goal is to further improve communication and cooperation by providing citizens the opportunity to meet with OPD officers and discuss individual complaints in an open, non-confrontational environment.

In addition, CPRA remains focused on collaborating with OPD on the transfer of certain of OPD's Internal Affairs Bureau (IAB) investigative duties to the Agency. In April 2025, an independent consultant completed its report on the transition. Transferring certain IAB investigative duties to CPRA will reduce costs to the City while enhancing the independence of the investigative and disciplinary processes. CPRA's additional objectives include improving the efficiency and effectiveness of the OPD discipline process (including a reduction in time for the completion of

Skelly hearings); developing strategies for compliance with NSA Task 2 (Timeliness in IAB Investigations); resolving inconsistencies in discipline within the Department (NSA Task 45); and increasing the quality of investigations. Each of these goals is crucial to instilling long-term confidence in the City's ability to manage the investigative process and to impose appropriate discipline (where necessary) both now and once the Department is no longer subject to judicial oversight.

Along these lines, CPRA and the Commission have cooperated with the City to build the internal capacity necessary for the transfer of additional IAB obligations. Full CPRA staffing requires no fewer than 17 permanent employees of which (according to the City Charter) at least seven must be investigators. In the second quarter of 2025, CPRA staff consisted of just seven permanent employees and three contract employees with only three investigators. This shortfall remained even after Interim CPRA Director Lawson agreed to cut the position from which he had been elevated to Interim Director in order to forestall further cuts to investigative staff. The new mayoral administration has, however, more than doubled CPRA's budget, allowing the Agency to begin recruiting and hiring new staff. These include a Project Manager to assume IAB transition tasks, manage the new Mediation Program, and to decrease the time for the completion of OPD's Skelly review process for officers on administrative leave. A fully staffed CPRA can be the most effective in providing accountability and independent, unbiased investigations of alleged police misconduct.

## IV.    Ensuring Commission Stability

In the realm of Oakland administrative bodies, the OPC is a fairly new commission. In its eight years of operation, the all-volunteer Commission has successfully set up new systems despite an ever-decreasing support staff and repeated slashes to its budget. Building upon a foundation established by prior Commissioners and members of the public, the current Commission has shown itself to be one of the most effective to-date. Under current OPC leadership, Commissioners have solidified their positive working relationships internally with CPRA and the OIG and extending outward to the Chief of Police and the Department. As previously noted, the Commission has begun the essential process of recruiting a qualified applicant pool for interviewing and presentation of

select Chief candidates to Mayor Lee. These duties include coordination with the City Administrator's office to identify a search firm and to set expectations and timelines. Any disturbance in Commission-functioning risks disruption of, not only the task of identifying a successor Chief of Police, but the greater goal of implementing effective and sustained independent oversight. Now more than ever, the Commission's stability is fundamental to that project. The City's commitment to uplift Oakland's designated independent police oversight governing body is the only way to ensure the Commission's continued success and to avoid any risk of decreased compliance with the NSA (or a short-lived exit from the agreement), post-federal oversight.

**V.      Conclusion**

The Commission's primary goal is to transform OPD culture by promoting accountability and fairness through appropriate Department policies and equitable disciplinary actions. Through its ad hoc committee efforts and its CPRA and independent OIG branches, the Commission has made significant headway in working with the Department to revise OPD policies to make constitutional policing an efficient, real, and manageable daily practice. Therefore, neither the City nor the Department should be distrustful of civilian investigative oversight or any discipline due to officer misbehavior. Yet, within OPD and parts of City government, the fallacy persists that officer accountability for misconduct is punitive and anti-law enforcement, rather than a welcome demonstration of transparency and a desire for improvement. Despite significant challenges, the Commission remains intent on the mission set before it by the Oakland community: to serve as the standard-bearer for advancing constitutional policies and practices within Oakland law enforcement. The Commission looks forward to locating a Chief of Police who is committed to continued partnership and further improving Department culture to accomplish that goal.

//
//
//
//

8

THE OAKLAND POLICE COMMISSION'S STATEMENT

Respectfully Submitted,

Ricardo Garcia-Acosta

Chair, Oakland Police Commission

Omar Farmer

Chair, NSA Ad Hoc Committee

Alternate Commissioner, Oakland Police Commission

NSA Ad Hoc Committee Members:

Shawana Booker, Vice Chair, Oakland Police Commission

Antonio Lawson, Executive Director, Community Police Review Agency, Oakland Police Commission

Zurvohn Maloof, Inspector General, Oakland Police Commission

Mariano Contreras, African American-Latino Action Alliance