1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

DELPHINE ALLEN et al.,                    3:00-cv-04599-WHO

            Plaintiffs,                   January 27, 2026

       vs.                                San Francisco, CA

CITY OF OAKLAND et al.,

            Defendants.


          BEFORE THE HONORABLE WILLIAM H. ORRICK
              UNITED STATES DISTRICT JUDGE

        TRANSCRIPT OF CASE MANAGEMENT CONFERENCE

A P P E A R A N C E S:

For the Plaintiffs:   John L. Burris, Esq.
                      The Law Offices of John L. Burris
                      Airport Corporate Centre
                      7677 Oakport Street, Suite 1120
                      Oakland, CA 94621
                      john.burris@johnburrislaw.com
                            -and-
                      James B. Chanin, Esq.
                      Law Offices of James B. Chanin
                      3050 Shattuck Avenue
                      Berkeley, CA 94705
                      jbcofc@aol.com


   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -


            ROBIN L. HERRERA, RMR, CRR, CRC
             (Via Zoom Videoconferencing)
             United States Court Reporter
                401 West Evans Street
                 Florence, SC 29501
            robin_herrera@scd.uscourts.gov

         (Stenotype/Computer-Aided Transcription)

A P P E A R A N C E S   C O N T I N U E D:

For the Defendants:     Brigid S. Martin, Esq.
                        Office of Oakland City Attorney
                          Ryan Richardson
                        One Frank Ogawa Plaza, Sixth Floor
                        Oakland, CA 94612
                        bmartin@oaklandcityattorney.org


For the Intervenor:     Rockne Anthony Lucia, Jr., Esq.
                        Rains Lucia & Wilkinson
                        2300 Contra Costa Boulevard, Suite 230
                        Pleasant Hill, CA 94523
                        rlucia@rlslawyers.com


Also Present:           Chief James Beere
                        Assistant Chief Casey Johnson
                        Deputy Chief Aaron Smith
                        Deputy Chief Lisa Ausmus
                        City Attorney Ryan Richardson, Esq.
                        Director Reverend Damita Davis-Howard
                        Chair Ricardo Garcia-Acosta
                        Inspector General Zurvohn Maloof
                        Mayor Barbara Lee
                        City Administrator Jestin Johnson
                        Assistant City Administrator
                          Michelle Phillips

SAN FRANCISCO, CA; TUESDAY, JANUARY 27, 2026

HONORABLE WILLIAM H. ORRICK, PRESIDING

* * *

*(Proceedings commence at 3:05 PM.)*

THE COURT:  Good afternoon, everybody.  Please be seated.

THE CLERK:  We are here in Case Number 00-4599, Allen et al. v. City of Oakland et al.

Counsel, if you would please come forward and state your appearance for the record.

MR. CHANIN:  James Chanin for Plaintiff, Your Honor.

MR. BURRIS:  John Burris for Plaintiff.  Good afternoon, Your Honor.

MS. MARTIN:  Good afternoon, Your Honor. Brigid Martin representing the defendant City of Oakland, and I have a host of City officials and leadership here with me:

I have City Attorney Ryan Richardson; I have Mayor Barbara Lee; I have the Director of Public Safety, Reverend Damita Davis-Howard; City Administrator Jestin Johnson; Assistant City Administrator Michelle Phillips; Police Commission Chair Ricardo Garcia-Acosta; the Police Commissions' Inspector General, Zurvohn Maloof; the Oakland Police Department Chief, James Beere; Assistant Chief Casey

Robin L. Herrera, RMR, CRR, CRC

Johnson; the Deputy Chief of the Internal Affairs Bureau, Aaron Smith; and the Deputy Chief of the Bureau of Risk Management, Lisa Ausmus.

THE COURT:  Perfect.  Thank you all for being here.  Good afternoon.

MR. LUCIA:  Good afternoon, Your Honor, Rockne Lucia for Intervenor Oakland POA.

THE COURT:  So I would like to think that we're on the threshold of the institutionalization of constitutional policing in Oakland.

For the first time since I've been involved in this case -- and I suspect for the first time ever -- the City has prioritized constitutional policing in word, deed, and resources, building on the foundation of compliance with most of the tasks in the NSA: intelligence-led traffic stops, risk management meetings targeting areas and officers in need of attention, use of technology and data to pinpoint progress, and a diverse and able police force; leadership in the form of a constitutional policing administrator who is an assistant city administrator virtually embedded at OPD, and a mayor committed not just to achieving compliance with the NSA, but to institutionalize constitutional policing so that it lasts long after federal court involvement is ancient history, making me very optimistic about the future.

But we're not there yet.  For those of you who

have signed petitions urging me to close down the court's oversight function, I hear you.  I agree with most of your sentiment.  The elected and appointed leaders of the City and OPD -- including the police commission and not the federal court -- should be 100 percent responsible for policing in Oakland.

But there's a reason the City agreed 25 years ago to achieve 100 percent compliance with the NSA, and that is a recognition of the paramount importance of constitutional policing and the destructive legacy of racism, corruption, brutality, and cultural rot exemplified by the writers. It's taken much longer to achieve that compliance than anyone expected, and it's clear that there's more work to do.

First, I want to focus on Task 45, specifically the racial disparity and discipline.  The City has taken steps to address this issue, and the statistics looked at over the last five years are encouraging, but the findings of the department's inspection of the 2024 internal affairs data are deeply troubling.

As the parties' statements recognize, there's a substantial decrease in sustained finding for white sworn officers -- members between 2023 and 2024.  Only four white sworn members were sustained in 2024, down from 37 in 2023. That compares with 23 Black sworn members and 25 Hispanic

sworn members sustained in 2024.

And the greatest racial disparities arose in internally generated cases.  White members had no sustained findings for internally generated cases, compared to Black and Hispanic members who had sustained rates of 47 percent and 24 percent, respectively.  And that could be a one-year anomaly, as the City suggests, or it may be caused by implicit bias and systemic issues, as the City also acknowledges.

Its inequities in the department's disciplinary system call into question inequities in the delivery of police services to the community.  I know that the department is looking at strategies such as interventions, command retreats, and training to address this issue; so I'm going to set a CMC for May 27th of this year and order that the 2025 statistics be prepared by May 1st, at least, if not before then, so that the parties have current data that may inform our analysis and discussion.

Tasks 2 and 5 also remain out of compliance, although they seem to be trending in the right direction.  Task 2 is about more than just fulfilling an NSA requirement.  It's about assuring officers and community members alike the complaints are taken seriously, and offering both officers and community members redress and resolution.

Task 5 requires leadership and integrity.  A commitment to running internal affairs without fear or favor.

I'm aware there's recently been some amount of turmoil in the Internal Affairs Bureau.  I'm looking forward to the new OPD management team addressing these tasks.  I'll have a few questions for Michelle Phillips, the interim constitutional policing administrator, and Deputy Chief Aaron Smith, in a few moments.

I'm heartened that the Mayor had put together a team that is committed to doing the right thing.  Most importantly, she is committed to doing so in a way that will ensure sustainability.  I appreciate her active engagement in the internal workings of the police department and her interaction with the Plaintiffs' attorneys and with the monitor.

I'm advised that the Mayor and the Mayor's representatives consistently participate in an array of meetings relevant to the issues at hand and that they ask informed and thoughtful questions about the IA process and other issues relevant to the NSA and constitutional policing in general.

So at the end of these proceedings, I'm looking forward to hearing from the Mayor, but before we get there, I'd like to just start with Chief Beere.

CHIEF BEERE:  Good afternoon, Your Honor.

THE COURT:  Good afternoon, Chief Beere.  Welcome here.

CHIEF BEERE:  Thank you, sir.

THE COURT:  So first of all, I know that you've made appointments to the leadership team.  Can you tell me who the team is now and what backgrounds and skill sets they're bringing to the table to make the complete sustainability of the NSA a reality?

CHIEF BEERE:  Yes, Your Honor.  So as soon as I took over, I brought Assistant Chief Casey Johnson onboard.  He's replaced me as the assistant chief.  Real strong operational background.  He's worked in patrol, special operations division.  He has a good grasp on operations and resources of police city-wide.

I then appointed Deputy Chief Aaron Smith to be in charge of our Internal Affairs Bureau, which has been very helpful.  The communication piece with the deputy chief reporting directly to me, I have a good working relationship with Deputy Chief Smith.  His reputation is beyond reproach.  He's very well versed with the inner workings of the police department, to include some of the challenges we have to overtake.  So that was one of the things when I first took over.

We did look at the 2024 disparity report, and

immediately him and I sat down and kind of discussed how both of us were going to go forward with that.  We're going to have -- actually, we're working on a memo to submit at the next CMC on our efforts to get ahead of that as well.  And it did raise some concerns on our end, you know, when we sat down to discuss it.

Director Sull [ph] still remains in charge of our personnel.  Deputy Chief Ausmus is still the Bureau of Risk Management, and then currently we have Deputy Chief Tedesco that's in charge of our Bureau of Field Operations.  We still have two acting deputy chiefs.  Those two positions are still under evaluation to see who would end up taking over there permanently.

THE COURT:  And so specifically with respect to -- let's start with the Tasks 2 and 5, how are you trying to address and achieve compliance in those areas?

CHIEF BEERE:  Yes, Your Honor.

Well, again, to go back to my working relationship with Deputy Chief Smith, it really has been truly helpful for me that he reports directly to me.  It gives me a better understanding.  Obviously, I read all the investigations for when they're sustained, the presented force, but I get more of a vision on how the investigations come about and overall any trends within the department and how to get ahead of that.

With respect to Tasks 2, 5, and 45 because they all seem to be -- they all touch each other, you know, one of the things that we started is to kind of address some of the, I guess, misunderstandings or at least increase transparency within the police department when it comes to the investigations for the more serious sustained cases, Deputy Chief Smith and I are going to actually meet with the officers currently right now.  One of the most recent changes in recent times is the captain would issue the discipline and explain how the discipline got there.

For us, you know, taking more of a role since the deputy chief of Internal Affairs Bureau has been reporting to the chief, you know, I think taking more ownership of it going forward and actually explaining to the members how we got there will actually give a little bit more clarity and to explain how the whole process works.

And we understand that we're not -- not everything falls solely on us because a lot of the cases also involve the CPRA and the police commission, and I think that we've established more open lines of communication with them, with Director Lawson and Chair Ricardo Garcia-Acosta; so I think it's a total team effort.

But again, the biweekly meetings to discuss both the administrative and the criminal investigations have been super helpful for the entire City team.  But as far as

Deputy Chief Smith and I, I think we're more lockstep into actually being in tune with the investigations and looking back into the trends that occurred before we took over has kind of helped us, guided us going forward.

THE COURT:  So do you see any impediments, anything in the way of achieving full compliance with those tasks while you're in the chair?

CHIEF BEERE:  That's a great question, Your Honor. One of the things, honestly -- and it's been talked about previously -- is staffing, and we're looking at innovative ways to address that.  Obviously it's a challenge throughout the police department for many of the tasks, just the service that we give our own community to begin with.

But the investigation piece, we've really looked at how the complaints are coming in and tried to break down the outside noise that isn't responsible so the investigations can get started more streamlined along the way.  We're discussing transferring more officers and personnel to the Internal Affairs Bureau.

On it currently we do have a shortage of sergeants; so part of the decision to kind of help alleviate that is to send officers over there and then actually create an acting sergeant's position, which we've utilized in the past, where the officers are trained in an acting sergeant's course and then will be sent through an Internal Affairs

Bureau investigation course.

They'll still report to a sergeant, it'll be monitored by the lieutenant, but that should help us kind of get ahead of the issue with regards to the timelines. Cutting down initial training, working with our command staff, to include all the supervisors and commanders throughout the department, but specifically for Internal Affairs Bureau they need more personnel, more resources.

So in the short term, it's going to be to train the staff we do have, but to make sure that they are given the tools and the resources necessary to be successful. And long term, want to restart building the department back up, and we can still transfer additional supervisors to the Internal Affairs Bureau.

THE COURT: That's great. Well, I'm looking forward to the fruits of your leadership in this position, and I appreciate the attention that you're paying to these things.

CHIEF BEERE: Thank you, Your Honor.

THE COURT: Thank you.

And how about Deputy Chief Aaron Smith?

DEPUTY CHIEF SMITH: Good afternoon, Your Honor.

THE COURT: How are you?

DEPUTY CHIEF SMITH: I am well. How are you?

THE COURT: I am doing well.

So back in September of '24, I directed that the Internal Affairs Bureau be headed by a deputy chief who would be a direct report to the chief.  I've just heard something about that.  Would you give me your assessment of how IAB's operating today and what you see your mission as deputy chief is.

DEPUTY CHIEF SMITH:  Very good question, Your Honor.  I think just in looking at the 2024 outcomes report just to get a sense of where we were as a department as it relates to discipline, there were some concerns there.  I think that the report was comprehensive, and it gave us some insight into what the potential issues could be.  I was most interested in where we've been so far in 2025.  At that time -- at the time of my appointment, that information was not available.

I'm encouraged by some preliminary information that we've seen so far in terms of improvement, and so Task 2 would completely agree that the timeliness of an investigation is not just about meeting a task, but if I were a resident of Oakland and had a complaint, I'd want to see that complaint handled in a way that was timely.

But in the same way, for officers, there's stress involved in having cases that are outstanding.  Same for 5.  We want to make sure that the quality of those investigations are there, and then outcomes is something

that I take very, very seriously, things that I've taken exception to before but in a different role.

And so I bring that lens to this position, and I think having direct -- a direct reporting relationship with the chief means that we're in constant communication about cases, we're in constant communication about chokepoints, we're able to quickly identify staffing issues and some of the lower-hanging impediments, if you would, to try and improve internal affairs overall.

So I would agree that the coordination between IAB and the City Attorney's Office, IAB and the Community Police Review Agency is also something that I'm encouraged by, because so far everybody's been available to me to help me not just learn while on the job, but also looking forward at ways that we can innovate to get things done in a timely manner.

THE COURT:  Do you see problems being structural or personnel or lack of training?  What are the things that you're focusing on right now?

DEPUTY CHIEF SMITH:  I think it may be a combination.  With the 2024 outcomes and the inability to really drill down to determine in a real way how these disparities came about, I think there's a lot of conjecture there, but I think it's also at that time there could have been a lack of oversight.  There could have been training

issues, things that potentially were not caught.  And as an agency that, unfortunately, has challenges around staffing and has for a long time, I think sometimes we tend to learn to do more or even suffice with less.

And so that to me presents some specific risk, particularly for IAB.  So, you know, to have that direct relationship with the chief to talk about staffing and come up with innovative ways to staff when your investigators have somewhere between 18 and 20 cases apiece, you know that there are going to be some challenges meeting not just the 180, not just your timelines, but also ensuring consistency in those investigations and making sure that those outcomes are consistent.

THE COURT:  And so is that the biggest impediment that you see to achieving full compliance?  What would you say the biggest impediment is?

DEPUTY CHIEF SMITH:  Well, I think that the cross-communication -- we're not -- the Internal Affairs Bureau has expectations laid out by the tasks, but those expectations will also require a full partnership with our stakeholders that includes the community police review agency, that includes the police commission and our partnership with the City Attorney's Office.

So I think that a good strategy moving forward that we're all bought into is going to be important.  But I

would be reluctant to say that it's staffing alone.  I think that there's also the ability to train.  As we look into some of our quantitative endeavors moving forward in terms of procedural justice and ways that we can really hone in on the potential for bias and completing an investigation, then I would be comfortable in saying it's just more than one thing, in my view.

THE COURT:  I think what you have to do, what Internal Affairs has to do is one of the hardest things that anybody has to do because you have to do it knowing sometimes it's personnel.  It's particularly true when it is people that you know, and how you separate out implicit and not so implicit bias and deal with people who have some power within the organization, and just do it because it's the right -- make the right call because that's the only way that the department will achieve the real goals that it has.

It's the only way you get the constitutional policing is doing things without fear or favor, and so you're the man right now with respect to that, I'm just telling you.  And next May, I'm going to be coming back to you and saying so what if you don't -- how is this set up for the future?  Thank you.

DEPUTY CHIEF SMITH:  Absolutely.

THE COURT:  And Michelle Phillips, please.

MS. PHILLIPS:  Good afternoon, Judge.

THE COURT:  Good afternoon.  Nice to see you.

MS. PHILLIPS:  You too.

THE COURT:  So I'm really interested in how you spend your day.  What does a constitutional policing administrator do, and what's your assessment of sort of where things stand and where they're going?

MS. PHILLIPS:  So I start my day at the PAB with our police department.  I do have an office, I'm very appreciative, it's on the eighth floor of the chief's suite.

So I talk to our deputy chief, our assistant chief, our chief.  I have regular standing meetings with our deputy chief, and I constantly am in Chief Beere's, office like, "Chief, can I talk to you?  Chief, can I talk to you?"

Very observant for the first couple of weeks trying to understand the inner workings, the culture within the police department and that floor.  Doing assessments, I did take the opportunity -- Deputy Chief Smith and myself went down to IAB and spent several hours down there getting a soup-to-nuts understanding of the intake process procedurally and how it conforms to the policy that is written, as well as our investigatory process for internal affairs as well.

Sat down, took several notes and debriefed with the chief about what we can do to better streamline the process to take any impediments out, see if there were any

challenges that directly impacted our ability to assess, to your point, bias, whether it is implicit or explicit bias as we move forward through the investigatory process.

I go to several meetings -- the police department has a lot of meetings -- which is good because that's an opportunity to share information and for me to garner information and identify any areas and gaps potentially in policy, procedure, or application as we continue to move towards very good comprehensive constitutional policing.

I also share and debrief with my boss, City Administrator Jestin Johnson, about where we are, any ideas or recommendations I will have particularly around staffing, any impediments, whether it is our contractual process, our hiring recruitment.

Mayor Lee and her chief of staff have created a working group for us to do the background and recruitment assessments and identify areas where we can really, really hone in on what we need as far as our recruitment strategy for or police department both sworn and non-sworn, as well as just any kind of areas where we have some concerns with our Bureau of Risk Management.

And I'll just be very candid, I was at the PAB until about 7:30 last night with Deputy Chief Ausmus going through our procedural justice kind of application and training ideas that she has as we start to move forward to

identify what is necessary for Task 45 so we do not have the opportunity to backslide when we do gain complete compliance.  Partial compliance is not acceptable.  I think taking that ownership over the past month and a half I've been at the PAB, I have absolutely seen a transformation of the culture.

It is something that I think is very encouraging for me to see on the outside looking in, the continued communication, folks going from office to office, really engaged in talking about police reform efforts in a way that is ingrained in the fabric of the department and not just a concept as if the negotiated settlement agreement is something separate and apart from constitutional policing and police reform efforts.

I really want to thank the mayor's administration for leaning into and investing monetary resources and staffing resources as well as the City Administrator's Office for making sure that that implementation happens via the constitutional policing administrator position, because I think it is absolutely necessary.

Long answer, but to the second part of your question, I think making sure that there is an apparatus that directly has a line to the mayor and the city administrator that does not report to the chief of police is important.

I believe Chief Beere sees me as an advisor. She's told me plenty of times "Michelle, I really want your recommendations. Let's sit down and let's talk." And that is for the entire command staff. They seek out guidance. They seek out my subject matter expertise in this work, which for me speaks to the fact that we have really started to see some cultural change because they're invested holistically into this reform effort. And I am here to make sure that that happens while we are under the settlement agreement and that it is embedded in our policies and cultures as we exit, sir.

THE COURT: So I'm very excited by everything that you've said. I think that this is the -- I think that one of the first -- probably the first recognition that the City and OPD succeed together and they fail by pointing fingers at each other and the -- your position, I agree with you, I think is pivotal for the long-term success of constitutional policing in Oakland, and so I'll be looking to you in May as well to see how well things are progressing. Thank you very much.

MS. PHILLIPS: Yes, sir. Thank you, Judge.

THE COURT: So on to the lawyers. Mr. Chanin. Away from the substance, on to the lawyers. Please come on up.

MR. CHANIN: Good afternoon, Your Honor. Nice to

see you.

THE COURT:  Good to see you.

MR. CHANIN:  I'm very excited about the people and place at the current time.  I think they have the will to do these tasks that are outstanding, something which has not always been true.  In fact, it hasn't been true for much of the time we've been here.  But it is true now, and I'm very, very happy about that, and I'm excited to see them succeed, which I hope they do.

I want to take -- briefly go through the tasks because you've done that, and that's been done a little.  The City says that it's going to be in compliance in 2025 -- 2026, and we're looking forward to that.  But the fact remains they are not in compliance in 2025, and they've actually fallen, as the monitor reports, quite a bit, in I think it's Class 1 and Class 2; so -- yeah, Class 1 and Class 2; so we're hoping that's reversed, but it hasn't been.  So we agree with the monitor's assessment they're not in compliance at this time, and we're hopeful that they will be in compliance in the near future.

As to Task 5, the Tran case, the City attorney goes through this recital that the Tran case is an old case, and I have two responses.  First of all, the Tran case is an old case, but it wasn't brought forth.  The monitor never knew about the Tran case, and the Tran case involved almost

every major supervisor in the police department that -- well, not everyone, but many of them, including the chief, the head of Internal Affairs, one of the deputy chiefs; they were all involved.

And it's very disturbing to see after so many years that something of this scale happens.  I'm not looking for perfection, but there's a difference from perfection and what happened in the Tran case, which was awful.

And I think the City -- I don't think there's anything wrong with expecting some time to pass before we see that this Tran case, which is evocative of other scandals throughout the time we've been here, is not repeated in the form that it is.

That doesn't mean mistakes won't be made.  We're talking about massive mistakes not -- of many supervisors, not just one mistake by one supervisor, some minor screwup. We can deal with that; no one's perfect, least of all me, and so that's okay.  But of this size and magnitude, it's unacceptable, and it can't happen anymore as it has over and over again.

And the Tran case did not involve a single officer.  They were all supervisors.  And they all shouldn't have done what they did.  It's just that simple.  And we now have new supervisors, who I feel much more confident in than I did with the old ones, and that includes the chief of

police who I have a lot of confidence in at this time.

As for task 45, I disagree with the City attorney that they're in compliance. But I think on the other hand, the fact that this disparity report by Ms. Burgess was done by the OPD itself is highly, highly significant.

This wasn't a hired report where they just, you know, couldn't deal with some outside findings. This was their own report, and I feel really good about that, and I feel the right people are in place to remedy this issue. But it has to be remedied. It doesn't -- it's there, contrary to what the City attorney said in her brief.

But I think on the other hand, the people are there to make it dissipate -- not go away, because nothing is perfect -- but dissipate to the point where we don't talk about it because it's in compliance.

And the City also said that there's been no -- Plaintiffs have not suggested any targeted intervention. I'm not sure what they're referring to. I was at a meeting with Chief Beere, Captain Hubbard, and Aaron Smith, yes, and the City attorney, and with John as well, and we did suggest a solution to this and that was that the existing -- there was some -- the cases where African Americans were unfairly or fairly singled out be drilled down and that we find out who did them and why, and we find out if there's any substance to it.

We also find out if maybe there is substance to it but the white officer is doing the same thing and he gets away or she gets away with a warning or some sort of slap on the wrist, whereas the African American officer is very harshly disciplined in a very formal way. That's another possibility. We don't know what it is, but we want to see it done, and we do have a solution, and a targeted one, which I just laid out, and we laid out in our brief as well.

And I don't know where the City has disagreed with their own report in this brief and with the monitor and with us about Task 45, but I hope that's just something that we can talk about historically rather than right now.

THE COURT: Okay. Thank you.

MR. CHANIN: Thank you.

THE COURT: Mr. Burris.

MR. BURRIS: As we talked about the lawyers, I thought of Nancy Grace, when you knew you were in big trouble.

Judge, I think this is all very nice, pleased to hear about the efforts on the part of the City personnel, but as the Court may know from the very beginning, and certainly from the start I have been involved in this case, that the operative words here are "trust" and "verify." And I certainly am inclined and would like to and have always trusted the environment to the people here, but

unfortunately in a lot of instances it has not come forward and verified what we want to occur.

It is no secret here that the issue of racial disparity, 45, is a fundamentally important issue here.  We have been -- and she went through all the various other tasks, and I am very heartened when I look at what happened in Minnesota where there's no way of, so far, being able to hold officers accountable, the internal mechanism that might exist that would hold officers accountable, we don't have that problem here, except when an officer's involved.

And that's the problem I see, and my concern is the systems and all the policies that have been written, they're great, you know, and we worked hard on them.  The only issue is when a process develops, do you follow it?  Do you really follow it?

And we know that in the Tran case and other cases we've had down through the years that when push comes to shove and an officer who was liked, well defended, that somehow the rules are not followed.

And I do think there is some very important -- and that to me raises the question of the racial issues here because there has to be some reason why we're having numbers like this.  They should not -- if people are making decisions that are objective and nonracial, then the data should not be obscured the way it is.

And so that is troubling to me as to how -- and for the City to find out and to dig deep to identify why and where the decisions are made that is causing these numbers to be obscured in one direction or another.

I don't see how we get to true constitutional policing -- even though we have in other areas -- if we can't take care of this problem internally. And one might argue why Mr. Burris has brought on this issue, but it is an issue that is very important to me because how you treat the officers within the department may reflect how you treat the people in the community. So to me it all goes together.

So the question here to me is can the department drill down in such a way to identify where it is that the discrepancies are taking place and then put something in place to ensure that it does not happen again or does not happen on a consistent basis.

Because it is not -- and I've said this quote before -- it is not how we feel today, it's how the department functions five years from now. It's for the officers who are coming in tomorrow and how the people in the community are living here the next day and the day after that. That is our objective, and that is what our future has to be about.

And so it's beautiful. I've been here a long time, as the Court knows, and there's been great people here

on this side of the table every time I've come here.  But the problem still exists, whether I -- whether the people are good or not.

And so the question to this group here is drilling down, identifying the problem, and so that this issue has been cemented in such a way that I refer to it as a hole in a leaky ship.  That if we leave this here, no matter what, the ship sill sink at some later point, and we don't want that to occur.

So all I'm really saying is that it is important that the Court hone in on this particular issue -- which the Court has done -- and for the staff to understand that we're not leaving until this deal is done.

And everybody's good, good faith, but it's not -- the proof is in the pudding, and so we have not got there yet, and I'm hopeful that we will in the near future because we'd like to leave too.

So anyways, that's my views about it, and everybody is great, but at the end of the day, the proof is in the pudding and you got to get it done; all right?

THE COURT:  Mr. Burris, that's exactly why I'm having the CMC in May and requiring that the stats for 2025 be prepared by May 1st so that you have data -- so that we all have data as well as the analysis of the deputy chief and everybody else with knowledge so that we can drill into

this issue because it is the hardest of the issues that remain, and it remains.

MR. BURRIS:  Right.

THE COURT:  So I'll underline most of what you said -- I don't want to endorse all of it -- but I'll underline all of it.

MR. BURRIS:  That's okay.  Thank you.

THE COURT:  Okay.  All right.  Thank you.

Mr. Lucia.

MR. LUCIA:  Your Honor, on behalf of the Oakland Police Officers Association, I just want to share our enthusiasm and confidence in the new structure that the City's built, and in particular the elevation of Chief Beere and his command staff as currently structured, along with Michelle Phillips, I think, is a change to what we've seen in the past.

And I think Michelle spoke to what she's doing, and I know that Chief Beere has grown up in the city of Oakland and in the Oakland Police Department, and a lot of his command staff members, we are very familiar with.

I do know that there is a great degree of collaboration between the Oakland POA and the command staff, and I know that this command staff, they've got a lot of challenges ahead.  They've got critically low staffing levels, they've got crime that they have to deal with to

serve the citizens of Oakland, and they have to accomplish what we're here to talk about, which is, you know, complying with the NSA while providing constitutional policing.

I personally and professionally believe that Chief Beere and his command staff are up to the task. Most of his command staff members that I'm familiar with are highly respected. I'm not familiar with all of them, but most of them are, and that's a great sign for the future as they will, I think, imbue into the entire ranks up and down the sense of purpose and commitment, and having Chief Beere as a resident of Oakland is very important.

I know many of the police officers that are now serving -- and those numbers are increasing -- are residents of Oakland. So I think they are committed to the people of Oakland, and that's really what this is about.

THE COURT: Great. Thank you.

So Mr. Garcia-Acosta, I would love to hear from you about your perspective on the police commission and the issues that we've been talking about.

MR. GARCIA-ACOSTA: May it please the Court, Your Honor. Ricardo Garcia-Acosta, chair of the Oakland Police Commission. We thank you for this opportunity to share our perspective and be able to update the court on some of our efforts over the last several months.

At the last case management conference, you asked

our collective group to think about what it means to sustain cultural change.  For our part in this task, the Oakland Police Commission remain just steadfast and committed to our work and accomplishing what a lot of folks may think is impossible or may be outside of the capabilities of civilian volunteers.

On the contrary, our efforts integrating the CPRA and the Office of the Inspector General have created an effective community-centered oversight body that supports OPD with the critical tools for constitutional policing and transparency.

We've worked hand in hand with executive leadership, and we want to continue doing this and putting our best foot forward to continue to drive cultural transformation after court oversight.

The commission recognizes and applauds the strong leadership of Mayor Lee, the city administrator Johnson, and Chief Beere and his team, and we stand with them to champion a clear message to our city that constitutional policing makes for better policing, effective and improved public safety, and the outcomes are going to reflect the City's values and what the communities and residents and Oakland wish to see in their police department.

We do appreciate since the last time we've presented ourselves here at the court that we have more of

an intentional seat at the table.  We've been meeting biweekly with the NSA core group that Mayor Lee has convened, and collectively the totality of this work is what you see today.

The proof is in the pudding.  You see tangible results, you've heard testimony today from our team and City leadership, and it's not just -- as you've heard, just something theoretically.  There's something that's been put in action that you can feel in the halls of PAB, that you can feel in the halls of city hall, and you can feel in Oakland.

And so we really want to continue to work and lay the foundation to move this forward, support Chief Beere now, and continue the work of solidifying the search for a permanent chief -- right? -- to continue this collaborative work.

We're really excited at the direction we're going, and despite any challenges that may be out there -- I'm sure you've seen articles, you've seen things going on -- that doesn't stop the work that we're doing here as a commission, and it doesn't stop our partnership that we've been able to build with the City leadership.

So as we prioritize planning for the future, we really want to focus and hone in on the things that we do well and really manage our capacity, leverage resources,

work with CPRA, OIG, with our offices, and make sure that we're moving forward in a way that makes sense not only for the City, but for our work as well as the police commission.

The OPC leadership also welcomes our continued learning and different opportunities and further discussion with the federal monitor, with our City leadership, with the police department, so that we can continue working our role in being as effective as possible as we move into the next phase of this work.

We'll continue to work tirelessly and to ensure OPC's long-term fiscal stability and make sure that we're doing our part in this whole ecosystem to make sure that there's strong constitutional policing and to continue to highlight the effectiveness of our current oversight body and all the progress that the department and the City has been making.

So thank you, and I appreciate the opportunity to address the Court.

THE COURT:  Thank you.

Ms. Martin.

MS. MARTIN:  Thank you, Your Honor.

And for the court reporter, Brigid Martin for the City of Oakland.

I think it's remarkable that we're here today, and one of our main sticking points and areas of disagreement

between attorneys has to do with Task 45 but specifically with looking at aggregated data to see if we can spot trends to tell us more information about how we can impact disparities in our policies, in our processes, and in our system.

That's something that frankly 20 years ago when we agreed to make all these changes and have our constitutional policing model, I don't think any of us saw that as a possibility, and we have that as an additional tool now and it's amazing.

For 20 years, the monitor's assessments and how the police department looked at (audio interruption) --

COURT REPORTER:  She's cutting out.

THE COURT:  Okay.  We'll be taping it as well; so please, Ms. Martin, go ahead.

MS. MARTIN:  Thank you.

For the last 20 years how we've really looked at whether or not there's consistency in discipline is on the individual case level.  That's how the monitor assessed it for a long time.

If you read past monitor reports, it talks about, "Well, we looked at these case outcomes.  Were they disciplined within the discipline matrix?  Were the outcomes appropriate?  If they were outside of the discipline matrix, was that documented as to the reasons why?  Is this case

specifically disciplined appropriately?"  And that's one way of looking at consistency of discipline.  A very different way of looking at it is to look at the aggregated data and to see if we can spot trends.

Now, statistics and what you make of them and how you impact the processes and our policies and our work based on those is very different than how we look at and how we impact our work if we see that a specific case was not handled inappropriately -- or handled appropriately.

And what's been keeping us from getting to the end of the sustainability period so far has really been more focused on these failures with specific cases -- inconsistency in discipline in the Tran case, in the Chung case, whether it's favoritism or looking the other way -- some people were not treated the same way as others.  And that is a different question than are there disparate impacts in our processes and in our policies.

Now, we've all worked together to create state-of-the art policies that are race neutral on their face and that we hope are the best that we can do for constitutional policing.  If there are trends and disparate impacts, now that's something that we have to look at how we intervene to reduce those disparate impacts to the extent we can.  Part of that is figuring out what's causing them.

Now, we've gotten some information on this 2024

disparity with the internal case intake and where the cases are coming from, and that's important. And I agree with Mr. Chanin and Mr. Burris when they say that we've talked about how we can drill down on that a little bit more. Let's get more information and look at things like when you look at the cases were those specific cases decided appropriately?

We did look to see if there were particular officers or investigators who were involved and if that was a correlating factor. That was not. But that's still -- that's looking, then, at the specific cases, and we can still do that, but that may not tell us what is causing it. That may not allow us to take a scalpel and surgically address and fix the problem as easily as that.

It may be that it takes things like additional procedural justice training. That should be and is an ongoing thing that the department has because that has to -- instead of throwing a precise dart or using a scalpel, that has to address the entire system and make sure that we're all aware of implicit bias and how bias can creep into a system. But these are two different tools, and we are lucky to have these two different tools now to identify that.

Now, there's no one saying that we don't care about or that the trends and the disparity from the aggregated data is somehow different or less meaningful.

That is just as meaningful to us, and we care deeply about trying to reduce both disparate treatment in the specific cases and disparate impacts that we can identify through these trends.

One of the things that makes these two tools very different, though, is that we do need a monitor or a third party to oversee and report on the disparity that's in individual cases, and that's because those are confidential and we can't just give that information to Plaintiffs' counsel without the Court oversight so they can see how we're doing.

The difference with the data is that the aggregated data is all public.  That will be available to Plaintiffs' counsel, to union representatives, to the police commission, to everyone in the public going forward.  So this is something that we can continue to address without Court oversight and without the monitor.  There will be no additional information that they won't have.  So that is a very different and a significant difference between those two kinds of tools that we have and how we can address them going forward.

We have seen a cohesiveness within the city based on the mayor's work and with the mayor's leadership that is very heartening.  People are coming together in a way to really own our constitutional policing model and understand

that this is not simply an external mandate that has to be followed. This is our -- based on our values, what the City has promised to do, and there's a reason behind every single task and subtask.

And I think with everyone coming together to understand that this is our model and that we are empowered to own that constitutional policing model and to make it better is really going to be key and help us to get to a position where we're not only hoping or fighting against backsliding or resistance, but that we continue to make this momentum forward and continue this transformation because that is something that we're hoping to do even after we end court oversight.

THE COURT: Great. Thank you, Ms. Martin.

Mayor Lee, I would love to hear whatever you have to say.

MAYOR LEE: Barbara Lee, mayor of the City of Oakland. Well, good afternoon, Your Honor. It's really good to see you again.

THE COURT: Good afternoon.

MAYOR LEE: When we were here last July, I promised that under my leadership the City would focus not only on NSA compliance but what comes after the court oversight ends. And I want this done, as I said, under my watch; so it's all hands on deck to get into compliance on

the remaining tasks and to prepare the department and the City to be in the best possible position to keep the momentum going in the right direction even after we are out of court oversight, and we certainly have accomplished a lot in the past several months toward these goals, but we still have much more work to do.

Now, in December, our monitor, Chief Warshaw, came to Oakland, and I met with the monitor to make sure that we are on the same page and in agreement on what needs to be done.

Now, we have instituted a constitutional policing unit inside of OPD to oversee our roadmap for compliance. You heard Michelle Phillips -- she's well respected, experienced, and is doing a phenomenal job -- who served also as the Oakland Police Commission's very first inspector general, and she's now serving, of course, as our interim constitutional policing administrator in that unit until we make a permanent hire.

Also I want to also acknowledge Reverend Damita, who is a member of my public safety -- she's actually my public safety director in my office, who has been so instrumental in moving this process forward.

Now, let me just mention my relationship with and commendation of Chief Beere.  I just want to say that he and his team have been very effective in working together with

our office.  You heard his presentation and the answers to his questions -- to your questions, and he and his team are committed to moving forward and making this a priority within OPD.

Now, with regard to Task 2, under our strategy the City's internal affairs case timelines, they have improved, and the information that I have received from the department is that every indication is that we will exceed 85 percent for the last quarter of 2025.  But, of course, it's not only meeting the numbers, but it's also what you said earlier in terms of making sure that we keep in compliance and what that really means by meeting these numbers.

OPD is adding officers to assist primary care -- excuse me -- investigations.  OPD and Michelle Phillips are evaluating case intake to remove delays in assigning and starting investigations, and we're making sure OPD and CPRA are better coordinating on timelines with regard to Tasks 5 and 45.

For the tasks involving the quality of our investigations and the consistency of discipline, Task 5 and Task 45 is OPD's constitutional policing administrator Michelle Phillips.  She's also focused on both the integrity of internal investigations as well as the consistency of discipline, which as we know and you know and the attorneys have laid out this morning and over the course of the last

20-some years.

Now, as Attorney Burris said, "Yes, trust, but verify." In other words, we must be intentional, intentional. And, yes, it is the hardest issue, but racial justice is critical to constitutional policing; so it's hard but we've got to be intentional about correcting this, and we're in the process of doing just that.

And I want to say that I share the same concerns about ensuring accountability for Oakland's police officers. I've read the most recent report from OPD that shows that in 2024 Black and brown officers had the worst outcomes, more so than white officers, in internal affairs investigations. So we need to make sure that all of our officers are being treated fairly.

Our constitutional policing model is not just about how we treat members of the public, but also how we treat our own officers. It's important to the City and to me personally that the men and women who serve in our department are treated fairly, and that's why I've asked Chief Beere and Deputy Chief Aaron Smith to draft their own response to the 2024 report, for us to discuss together, to make sure that we understand all the information that we have about discipline outcomes and appropriately addressing these concerns to make sure that the discipline process is fair for all of our officers.

Now, as I've said before, I'm not just interested in task compliance, Your Honor, I want to make sure that we are continuing to move the culture of our police department in a positive direction and a big part of that is hiring the right people.

Now, please bear with me for just a few minutes while I just get into a few of the weeds of this because I've become very in tune with policing in a few months that -- how many months now since May 20th?  Since I've been mayor, but I love getting into the weeds of OPD because this is about public safety and it's also about accountability.

And so we need to build up our department, but we need to do it the right way.  We need a police department that mirrors the culture of the community that it serves and that brings the partnership issues and the importance of the partnership with the community and OPD together.

To do that I have really been focusing on recruitment strategies and partnerships with local community groups, nonprofits, and businesses that promote inclusivity and reach populations and communities within our city that have historically been underrepresented in the department's applicant pool.  After going for more than a year without a police academy, OPD just graduated an academy with 14 new officers, and there is a second academy underway that started in November.

I also understand from Chief Beere there are a number of officers who left the department that now want to return.  So we may have enough for an entire class of 12 to 15 lateral officers, we'll see.  And I'm deeply grateful to Chief Beere for making this a priority.

And one example that I'm especially proud of is just last week we announced that the City, thanks to a partnership with some of our local businesses, Kaiser and PG&E, along with Merritt College, we're restarting the OPD cadet program.

This program allows young people in our community who are attending college to get paid work experience working part time at OPD.  The cadet program brings more resources to OPD, the kind of resources to make a positive cultural impact and will hopefully lead to more academy recruits from our community.

Another example, we've partnered with a local community college, Merritt College.  Merritt College's administrative of justice degree program began a pre-police academy class on January 20th, and that's an eight-week program designed to prepare students for the physical, academic, and professional demands of the Oakland Police Academy.  Twenty-eight students, mind you, are currently enrolled in the course.  Again, we're partnering locally to build our own department to reflect communities

demographically and culturally, and this is part of the cultural change that we have to make sure that we sustain the gains that we're making.

I'm also trying to get a program started where we have graduate interns in master's of social work programs serving as interns in the department to infuse some of the strategies employed in social work programs into the department's culture to institutionalize and systemize our constitutional policing principles.  I'm a social worker by profession.  I have my MSW from UC Berkeley, and I know the importance of having this input into good constitutional policing.

Also let me just say we've been involved very intimately with having community engagements and finding a way to make sure that the community understands what the NSA is and what oversight means.  Why does it exist?  Why are we working to complete the tasks and maintain the integrity of the outcomes?  I learned very quickly that so many people did not know what these three tasks were, and so part of what we're doing is educating everyone in Oakland as to why this is important.

And, of course, hiring a new police chief is also a priority now, and finding a way to move forward, the right fit is very important to continuing our important work in carrying this forward.

Robin L. Herrera, RMR, CRR, CRC

Outside of the department I'm also working to add new members to our police commission who understand and will promote constitutional policing and accountability and continue to help build a positive relationship with the department and the community.

And I have to say the term "constitutional policing," after Michelle Phillips was hired a lot of people were asking me "What is it?  What does that mean?"  And so I'm beginning to see now the understanding in the community of what constitutional policing really means, whereas prior to now I don't believe people really knew the importance of that and what it really meant, Your Honor.

And you may be aware that I have the privilege of appointing two members to serve on the police commission to shape civilian oversight of the department, and so I have nominated two community members who have agreed to serve as volunteers on the City's police commission.  They will both be excellent additions to the commission.  They are retired Superior Court Judge Evelio Grillo, and retired Contra Costa Firefighter Doug Wong.

Judge Grillo holds a law degree from Harvard Law School as well as a master's degree in public policy and a bachelor's in political science from the University of California at Berkeley.  He has also taught at UC Berkeley and Stanford University law schools.

Doug Wong, in addition to being a firefighter for nearly 30 years, has worked as staff for the Oakland Unified School District, was chief of staff to former Berkeley City Council Member Diane Woolen [ph] for ten years, is currently on the American Red Cross Leadership Council East Bay.  He also is president of the Chinese American Citizens Alliance, Oakland Chapter.

Now, these two volunteers are committed to empowering our city and the community to take ownership of our constitutional policing model and to end our need -- sooner or later, preferably sooner -- for court oversight. And so again, we're doing a deep dive on what exactly is necessary to complete this oversight.

And finally, Your Honor, let me just say to you I did say at the last hearing that I really wanted this ended under my watch, and I want to thank everyone in the city and OPD, the Plaintiffs' attorneys, for understanding that I'm not ready either to end this, but I do believe we will be able to complete these tasks.  It's all hands on deck, and I want to thank you for the instructions from yourself and the court for making sure that we stay on track.  Thank you again.

THE COURT:  Thank you, Mayor Lee.

I have to say there have been a few mayors who've who have been here and have given very thoughtful

expressions of what they wanted to do.  Nobody has shown a sort of holistic understanding of what it's going to take and what's necessary.  And if I had, you know, gone back and thought for a year about the different sort of policy and other things that I could do, I'm not sure I could have come up with everything that you're doing, Mayor Lee.  So I just -- I am very optimistic.

There is -- this is still -- we've got to bring it across the finish line, and so I'm looking forward to the CMC in May where I hope to learn about all of the drilling down and the understandings, and I hope that the data that's already cooked turns out to be a lot better than what we saw in 2024, and that we sort of push on and continue to push in the direction that you are leading the city in.  So thank you very much.

MAYOR LEE:  Thank you, Your Honor.  I want to just say I think working with our legal team and with the City and coming as a former community activist -- still, maybe -- and with a social work lens, that's helping me see the big picture, and I think their input and their expertise really is what's driving this to help me pull all of this together.

THE COURT:  You're listening to them, which also matters.

MAYOR LEE:  Thank you.

THE COURT:  Thank you.

All right.  So I guess the only other thing that I would say is I'd be remiss in not thanking Chief Warshaw and the monitor's team for their dogged efforts in helping OPD understand how to achieve compliance, and I'm really looking forward -- this is -- I'm looking forward a lot more than I thought I would be to May 27th and our next CMC.

So thank you-all very much for being here.  I look forward to seeing you then.

*(Proceedings adjourn at 4:15 PM.)*

* * *

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_/s/ Robin L. Herrera_          February 17th, 2026
Robin L. Herrera, RMR, CRR, CRC     Date
Official Court Reporter