RYAN RICHARDSON, City Attorney, CABN 223548
BRIGID S. MARTIN, Special Counsel, CABN 231705
One Frank H. Ogawa Plaza, 6th Floor
Oakland, California 94612
Telephone: (510) 238-3751
Facsimile: (510) 238-6500
Email:  BMartin@oaklandcityattorney.org

Attorneys for CITY OF OAKLAND

JOHN L. BURRIS, CABN 69888
Law Offices of John L. Burris
Airport Corporate Centre
7677 Oakport Street, Ste. 1120
Oakland, California 94621
Telephone: (510) 839-5200
Facsimile: (510) 839-3882

JAMES B. CHANIN, CABN 76043
Law Offices of James B. Chanin
3050 Shattuck Avenue
Berkeley, California 94705
Telephone: (510) 848-4752

Attorneys for PLAINTIFFS

*(Additional Counsel on Next Page)*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| DELPHINE ALLEN, et al. | Case No. 00-cv-04599 WHO |
| Plaintiffs, | **JOINT CASE MANAGEMENT STATEMENT** |
| v. | Date: May 27, 2026 |
| CITY OF OAKLAND, et al., | Time: 3:30 p.m. |
| Defendant(s). | Courtroom 2, 17th Floor<br>Hon. William H. Orrick |

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

ROCKNE A. LUCIA, JR., CABN 109349
Rains Lucia Stern St. Phalle & Silver
Attorneys & Counselors at Law
2300 Contra Costa Boulevard, Suite 500
Pleasant Hill, CA 94523
Telephone: (925) 609-1699
Facsimile: (925) 609-1690

Attorneys for OAKLAND POLICE OFFICERS ASSOCIATION

JOINT CASE MANAGEMENT STATEMENT                                    Case No. 00-cv-4599 WHO

## TABLE OF CONTENTS

**PARTIES' JOINT STATEMENT** ..................................................................................... 1

**PLAINTIFFS' STATEMENT** ........................................................................................... 1

I.  Task 2 (Timeliness Standards and Compliance With IAB Investigations) ................................................................................................... 3

II.  Task 5 (Complaint Procedures for IAB) ..................................................................... 6

III. Task 45 (Consistency of Discipline Policy) ................................................................ 10

IV. Conclusion ................................................................................................................... 11

**CITY'S STATEMENT** ..................................................................................................... 15

I.  The City Has Improved Its Ability to Detect and Address Department Discipline Disparity by Using Both Statistical Data and Direct Feedback to Look Beyond the Numbers (Task 45) .................................................. 15

  A.  The Internal Affairs Bureau Conducted a Case-by-Case Review to Understand Why Disparity Was Observed in 2024 Outcomes ....................... 16

  B.  The Office of Internal Accountability is Still Preparing the Final 2025 Outcomes Report, But the Data is Encouraging ......................................... 16

  C.  Moving Beyond Statistics to Address the Lived Experiences and Cultural Origins of Disciplinary Disparity. ................................................. 17

  D. The City's Recent Actions to Eliminate Discipline Disparity ....................... 18

II. Current Data Reflects a Return to Sustained Compliance with Task 2 Investigative Timelines ................................................................................................ 19

III. Task 5 Lessons Learned: The City is Committed to Protecting the Integrity of Its Investigations ...................................................................................................... 20

IV. The City Deepens Community Trust and Sustains Long-Term Public Safety by Institutionalizing Its Accountability Practices .............................................................. 21

  A. City Leadership and Command Staff Unify Messaging to Establish Constitutional Standards as a Permanent Objective .................................... 21

  B. Broadened Mayoral Engagement and Public Forums Transform Compliance into a Shared Community Value ................................................................... 22

  C. Investment in Recruitment Pipelines and Strategic Partnerships Directly Advances Constitutional Policing Reforms .................................................. 22

    1. Reinstating the Police Cadet Program Establishes an Enduring Recruitment Pipeline for Local Youth .................................................. 25

///

V. Conclusion……………………………………………………………………………25

**THE OAKLAND POLICE COMMISSION'S STATEMENT**………………………..…...26

JOINT CASE MANAGEMENT STATEMENT                    Case No. 00-cv-4599 WHO

**PARTIES' JOINT STATEMENT**

The parties agree that the Department is moving in the right direction. The 2025 internal investigation outcomes and discipline data is an improvement from the 2024 data. The parties are awaiting the Department's completion of three key items: the Department's formal response to the 2025 internal investigation outcomes and discipline data report, the release of the Department's 2025 survey on members' perceptions of fairness in the internal investigation process, and the Department's formal response to the survey data. The parties respectfully request to return to Court in late September or October to address the City's progress. By that time, the key items identified by the parties should be completed with enough time for the Monitoring Team to provide a further compliance and sustainability assessment.

**PLAINTIFFS' STATEMENT**

The Independent Monitor for the OPD has issued just one NSA Sustainability Period Report (Twelfth Sustainability Report) since the last Case Management Conference statement. The IMT represented that a further report would be forthcoming prior to this May 2026 Case Management Conference, but that has not been published as of this writing.

The Sustainability Period involves the monitoring of the "last remaining and most critical Negotiated Settlement Agreement Tasks: 2, 5, 20, 24, 25, 26, 30, 31, 34, 41, and 45." (Dkt. 1525, p. 2)

As of the publication of the Twelfth NSA Sustainability Period Report of the IMT in March, 2026, OPD is in compliance with nine of these eleven Tasks:

1. Task 5 (Internal Affairs Division (IAD) Complaint Procedures – newly in compliance as of the 12th IMT Sustainability Period Report);

2. Task 20 (Span of Control – in compliance when most recently assessed in the Third NSA Sustainability Period Report);

3. Task 24 (Use of Force Reporting Policy – in compliance per the Eighth NSA Sustainability Period Report and no longer subject to active monitoring

JOINT CASE MANAGEMENT
STATEMENT                                                    Case No. 00-cv-4599 WHO

pursuant to the Court's 09/06/2024 Order regarding Internal Affairs Reporting)

4. Task 25 (Use of Force Investigations and Report Responsibility – in compliance per the Eighth NSA Sustainability Period Report and no longer subject to active monitoring pursuant to the Court's 09/06/2024 Order regarding Internal Affairs Reporting);

5. Task 26 (Force Review Board (FRB) – in compliance when most recently assessed in the Third NSA Sustainability Period Report);

6. Task 30 (Executive Force Review Board (FRB) – in compliance when most recently assessed in the Third NSA Sustainability Period Report);

7. Task 31 (Officer-Involved Shooting Investigations Review Protocol – in compliance when most recently assessed in the Third NSA Sustainability Period Report);

8. Task 34 (Stop Data – in compliance when most recently assessed in the Third NSA Sustainability Period Report);

9. Task 41 (Use of Personnel Assessment System (PAS) and Risk Management – in compliance when most recently assessed in the Third NSA Sustainability Period Report)

As of this writing, OPD is not in compliance with two NSA tasks:

1. Task 2 (Timeliness Standards and Compliance with IAD Investigations – not in compliance when most recently assessed during the Eleventh NSA Sustainability Period Report.), and

2. Task 45 (Consistency of Discipline – this was in partial compliance during the First NSA Sustainability Period Report, then was moved to full compliance during the period covered by Second NSA Sustainability Period Report.  Between the Third Sustainability Report and the Ninth Sustainability Report issued in December 2024, the IMT has reported "no compliance finding" for this Task.  This was upgraded to "partial compliance"

2

in the 10th Sustainability Report issued in May 2025, and remained in "partial compliance" when most recently reviewed in the March 2026 12th Sustainability Report)

Plaintiffs' attorneys concur with the IMT's assessment that OPD is not currently in full compliance with these two Tasks. We applaud the Department for reattaining compliance with Task 5. The other eight Tasks that are being monitored by the IMT -- or that are no longer subject to active monitoring pursuant to the Court's 09/06/2024 Order -- remain in compliance according to the IMT's 12th NSA Sustainability Period Report.

Plaintiffs will therefore focus on Tasks 2 and 45, which will determine whether and when OPD is able to finally achieve full compliance with the NSA in the Sustainability Period. We will also discuss Task 5, which is back in compliance for the first time in four years, as well as a substantial uptick in uses of force and non-intelligence led, non-dispatch stops in the first quarter of 2026 that is germane to multiple NSA Tasks and the NSA as a whole.

**I.   Task 2 (Timeliness Standards and Compliance with IAD Investigations)**

Task 2 requires that the Internal Affairs Division (IAD) of the OPD complete internal investigations in a timely manner. This task was inactive from 2015 to July 2019, before abruptly falling out of compliance in the 62nd IMT Report. Task 2 was out of compliance until February 2022, when OPD once again met the mathematical threshold required for compliance. OPD remained in compliance with this Task through the 9th Sustainability Report, issued in December 2024. However, OPD fell out of compliance with this Task during the period covered by the 10th compliance report, and remains out compliance with this Task as of the most recently published (12th) IMT report.

OPD policy requires that "at least 85% of Class I misconduct investigations and at least 85% of Class II misconduct investigations must be completed within

3

JOINT CASE MANAGEMENT STATEMENT

Case No. 00-cv-4599 WHO

180 days to be considered timely." Per DGO M-03, Class I offenses "are the most serious allegations of misconduct and, if sustained, shall result in disciplinary action up to and including dismissal and may serve as the basis for criminal prosecution."

The IMT reviewed IAB cases that were approved in both the second and third quarters of 2025 for this report. Of the combined 126 Class I misconduct cases reviewed during this period, 99 were completed in a timely manner. This represents a combined 79% compliance during the period covered by the Twelfth OPD Sustainability Report, which puts OPD below the 85% minimum-threshold required for compliance with NSA Task 2.

The IMT had long warned that the timely-completion rate was been slipping downward over previous sustainability period reports, and that OPD's continued compliance with this Task was therefore in serious jeopardy. As recently as December 2022 (during the period covered by the Second Compliance Report), OPD was completing 100% of Class I misconduct cases in a timely matter. During the period covered by the 5th through 9th Sustainability Reports, the IMT determined that this number had dipped to 85-89% of Class I misconduct cases completed in a timely manner. In the period covered by the 10th Sustainability Period, the timely-completion rate for Class 1 misconduct cases was 84%, below the mandated compliance threshold, and in the 11th Sustainability period it was 77%. It appears that OPD has arrested this decline for now.

The IMT also reviewed a combined 211 Class II cases during the two quarters covered by the 12th Sustainability Report and found that 199 were in compliance with established timelines. This represents a 94% timely completion rate, up from 87% in the previous IMT report.

As noted, OPD was previously in compliance with this task for so long that it became inactive, before suddenly falling out of compliance. Task 2 compliance is categorically different from the other Task that remains out of compliance insofar

JOINT CASE MANAGEMENT STATEMENT                                  Case No. 00-cv-4599 WHO

as the metric for compliance is strictly mathematical: there is an objective target that OPD must meet and has previously met.

Plaintiffs' attorneys have repeatedly noted that the mandated 85% timely-completion rate for OPD is substantially lower than what is required by most other consent decrees, so there is no reason OPD cannot meet this threshold. Furthermore, it should be noted that even if OPD meets this requirement, 15% of complainants are not receiving timely notice of investigation outcomes.

There is nevertheless cause for optimism.  The Bureau of Risk Management (BRM) issues monthly compliance updates explaining why specific internal investigation timelines missed the 180-day investigation deadlines.  As recently as one year ago, the Department offered a laundry list of vague, self-inflicted, and otherwise unacceptable explanations for not meeting these deadlines.

For example, during the period covered by the 352nd update (incorporated as Exhibit 1), in May 2025, OPD variously blamed: "case complexity" (Exhibit 1, p. 1, IA Case 23-0510,  "external delays" (Exhibit 1, p. 1, IA Case 23-0510), "scheduling conflicts with involved officers and pending CPRA concurrence" (Exhibit 1, p. 2, IA Case 24-0067), "investigator reassignments" (Exhibit 1, p .3, IA Case 24-0115), "administrative delays" (Exhibit 1, p. 3, IA Case 24-0198), "significant case assignment delays" (Exhibit 1, p. 3, IA Case 24-0232), "severe administrative processing failures and case tracking errors" (Exhibit 1, p. 4, IA Case 24-0742), "cascading scheduling conflicts and personnel unavailability" (Exhibit 1, p. 3, IA Case 24-0755), "case prioritization issues" (Exhibit 1, p. 3, IA Case 24-0743). "procedural complications" (Exhibit 1, p. 5, IA Case 24-0036),  "extraordinary scope and resource limitations" (Exhibit 1, p. 5, IA Case 24-0167), "administrative reassignments" (Exhibit 1, p. 5, IA Case 24-0114), "witness volume and resource limitations" (Exhibit 1, p. 5, IA Case 24-0142), "substantial assignment delays" (Exhibit 1, p. 6, IA Case 24-0649), and "delayed case assignment" (Exhibit 1, p. 6, IA Case 24-1070).

5

JOINT CASE MANAGEMENT STATEMENT

Case No. 00-cv-4599 WHO

The most recent BRM update (dated May 2026 and incorporated herein as Exhibit 2) contains none of these vague buzzwords and deflections.  Of the 12 listed cases that were not completed within the 180 investigative timespan, eight were tolled for more than 180 days due to an associated criminal investigation.  This is beyond the Department's control.  Two others were completed within the 180 deadline, but CPRA concurrence occurred after the 180-day timeline.  One was referred to the City Administrator, who then hired an outside investigator, and the last one is described as a "complex case involving digital forensics, physical canvassing… and multiple failed attempts to contact the complainant" (Exhibit 2, 364th Monthly Compliance Update, p. 2).

Plaintiffs' attorneys are not privy to the specific details of this investigation, and OPD may be partially or completely culpable in instances where the CPRA does not receive an investigation packet in time to review it within the 180 day window.  Nevertheless, Plaintiffs' attorneys share the IMT's impression that OPD leadership is very focused on meeting investigation deadlines, and that there is no tolerance for the nebulous explanations that were provided to the IMT just one year ago.  This is undeniable progress and warrants cautious optimism that OPD may attain compliance with Task 2 before the end of the year.

## II.   **Task 5 (Complaint Procedures for IAD)**

Task 5 pertains to Complaint Procedures for the Internal Affairs Division, and consists of several subtasks, all of which the IMT had previously found in compliance, including:

- Task 5.1, which requires that when a citizen wishes to file a complaint, the citizen is brought to a supervisor or IAD, or a supervisor is summoned to the scene.

- Task 5.2, which requires that if there is a delay of greater than three hours in supervisory response, the reason for the delay must be documented.

6

JOINT CASE MANAGEMENT                                Case No. 00-cv-4599 WHO
STATEMENT

- Task 5.3, which requires that when a complainant refuses to travel to a supervisor, or wait for one, personnel make all reasonable attempts to obtain specific information to assist in investigating the complaint.

- Task 5.4, which requires that specific information be documented on a complaint form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander.

- Task 5.5, which requires that the supervisor or Area Commander notify Communications and forward any pertinent documents to IAD.

During the Sustainability Period the IMT focused on subtasks 5.15 to 5.19 and subtask 5.21, which address the quality of completed IAD investigations.

Prior to the onset of the Sustainability Period, the IMT determined that IAD investigations had improved to the standards mandated by the NSA; in February 2022, OPD attained full compliance with Task 5. However, the First OPD Sustainability Report moved the status of Task 5 from "in compliance" to "deferred compliance", and OPD was downgraded to "not in compliance" in the Second OPD Sustainability Report. OPD remained out of compliance with Task 5 over the next four reports as the Department, Plaintiffs' attorneys, and the IMT crafted, refined, and implemented policies relevant to the Internal Affairs function following the publication of the "Conclusions and Recommendations Re: Vehicle Collision and Elevator Discharge Incidents" drafted by the independent law firm, Clarence Dyer, & Cohen LLP. (Dkt. 1564, "Clarence Dyer Report")

During the period covered by the 7th Sustainability Report, OPD regained compliance with Task 5, and it appeared that the Department was making real strides toward sustainable compliance with this Task and, therefore, meeting all requirements mandated by the NSA.

However, in the subsequent reporting period (covered by the Eighth Sustainability Report,) the IMT "learned of investigations conducted by both the Community Police Review Agency (CPRA) and an outside investigator into the

JOINT CASE MANAGEMENT                                                           Case No. 00-cv-4599 WHO
STATEMENT

actions of senior members of the Department with regard to an earlier IAD investigation.  The outside and CPRA investigations resulted in sustained findings and discipline against several senior members of the Department – to include terminations, demotions, and suspension. (8th Sustainability Report, pp. 6-7).  The IMT also noted that "these personnel findings and systemic deficiencies transcend the Department as a whole and call into question the capacity of the Department's internal investigatory process. Based on these investigations, the serious deficiencies in the Department's Internal Affairs Division render the Department out of compliance with Task 5." (8th Sustainability Report, pp. 6-7).  OPD was accordingly found out of compliance with Task 5.  OPD remained out of compliance with this Task until the period covered by the most recently published (12th) IMT report

According to the most recent IMT Sustainability Report, "the Department has put energy and commitment into its efforts to achieve compliance with this Task.  It is with these things in mind that we have made a compliance determination."  (Dkt. 1742, 12th IMT Report, p. 9).

Plaintiffs' attorneys have participated in extensive meetings with OPD personnel and the IMT to revise policies and procedures to improve the Internal Affairs functions within the Department.  Plaintiffs' attorneys have also noted that many Task 5-related shortcomings resulted from leadership failures, not policy shortcomings.  It appears the new leadership at OPD understands this. We concur with the IMT's assessment that the Department has put real "energy and commitment" into attaining with Task 5 compliance.

Finally, the percentage of internally generated allegations that are sustained is too low and it suggests that some OPD members are filing complaints to avoid adverse consequences to themselves.   An officer or supervisor who discovers some sort of misconduct should not always have his or her complaint sustained, but the sustained rate as shown on table 26 of OPD's "2025 Preliminary Internal

8

Investigation Outcome and Discipline Report" from April 2026 (Dkt. 1744-1) should not be as low as 17% for white officers or even 34% for Black and Hispanic officers:

**Table 26: Sustained Rates for Internally Discovered Allegations vs Externally Discovered Allegations 2025 (All Allegations)**

|  | Internally Discovered Allegations | | | Externally Discovered Allegations | | |
|---|---|---|---|---|---|---|
|  | Sust Rate | # Sust | Total | Sust Rate | # Sust | Total |
| White | 17% | 15 | 87 | 2% | 5 | 279 |
| Black | 34% | 37 | 108 | 3% | 11 | 419 |
| Hispanic | 34% | 38 | 113 | 3% | 17 | 549 |
| Asian/Filipino | 24% | 10 | 41 | 2% | 8 | 495 |
| Other/Unknown | 0% | 0 | 5 | 5% | 5 | 107 |

34

(Dkt. 1744-1, p. 34)

In detailed conversations with command staff, it was learned that officers and other members will be disciplined for failure to report misconduct but never be disciplined for reporting misconduct. Therefore, Internal Affairs is overworked with internally-generated complaints that should not have been filed with IAB. The greater use of Supervisory Notes is a possible remedy for this problem. Supervisory Notes are retained in the officer's file and can be addressed more quickly than a complaint, which by its very nature takes longer to address.

Obviously, meritorious complaints should be filed and investigated. Serious complaints should always be subject to the formal Internal Affairs process. And repeat offenders who have a pattern of similar minor misconduct should also be subject to the formal internal affairs process. This is a complex problem that was discussed in detail at a meeting with OPD leadership May 19, 2026. At that time, it was disclosed that OPD on its own has already started to look into this problem significantly before it was raised on May 19, 2026. This was a very positive development that demonstrates that OPD is not the same Department that existed in 2003 when the NSA began.

9

JOINT CASE MANAGEMENT STATEMENT                                           Case No. 00-cv-4599 WHO

Finally, we cannot ignore that, despite improvement in the statistics for 2025 as compared to 2024, the sustained rate of Internally Discovered Allegations for Black Officers and Hispanic Officers is twice as high as the sustained rate for White Officers (see table 26 above).  Thus, even when an allegation is "Internally Discovered" (i.e. by a member of the OPD), the sustained rate for white officers is only 17%.  Thus, 5 out of 6 Internally Discovered complaints against white officers are not sustained.  These figures defy logic why so many OPD members file internal complaints that are not sustained and cannot help but impede Internal Affairs from investigating important and legitimate complaints.

**III.    Task 45 (Consistency of Discipline Policy)**

Task 45 requires that discipline is imposed in a fair and consistent manner.  OPD was in compliance with this NSA Task at the outset of the Sustainability Period.  Following the publication of the Clarence Dyer Report, the IMT downgraded OPD's compliance status with Task 45 to "no compliance finding", citing "systemic and other deficiencies cited by the outside investigators were exacerbated by investigative and disciplinary decisions which were premised on the status and positional considerations of both violators and decision-makers" (Dkt. 1577, Third Sustainability Period Report, p. 32).  OPD remained out of compliance with Task 45 through the period covered by the 9th Sustainability Report, before achieving "partial compliance" in the 10th, 11th, and now 12th Sustainability Period Reports.

The most recently published IMT report provides only a three sentence review of Task 45, excerpted in full, below:

"We are confident that OPD understands the seriousness of this Task.  We have found the Department is now more aggressively acting on the results of its data.  The Chief and his staff have clearly made this a priority, and we encourage them to continue on this path." (Dkt. 1742, 12th IMT Report, p. 10).

This comports with Plaintiffs' attorneys' observations of the new leadership

10

JOINT CASE MANAGEMENT                                        Case No. 00-cv-4599 WHO
STATEMENT

at OPD.  Command staff agree that the wide disparities in how discipline is imposed within OPD as revealed by the Department's "2024 Internal Investigation Outcome and Discipline Report" are unacceptable.

This report articulated large discrepancies between the sustained rates for white sworn members and non-white sworn members in both division level and IA investigations and was discussed at length during the most recent Case Management Conference, where all parties agreed that OPD was not yet in full compliance with Task 45.

Last month, the OPD Office of Internal Accountability published the "2025 Preliminary Internal Investigation Outcome and Discipline Report". (Dkt. 1744-1) It appears that OPD leadership recognizes the steps they must take to demonstrate it can discipline its officers to the equitable standard mandated by the NSA and attain sustained Task 45 compliance.  We look forward to a more comprehensive report from the IMT when it issues its next Sustainability Period report.

## IV.   Conclusion

The City of Oakland continues to represent that it is on the cusp of full compliance with the NSA.  Plaintiffs' attorneys agree that the Department is headed in the right direction.  Still, OPD remains out of compliance with Tasks 2 and 45, and the Department has never been in compliance with all NSA Tasks in the Sustainability Period.

However, the trendlines are promising.  The IMT notes that Mayor Lee "has personally immersed herself" (Dkt. 1742, 12th IMT Report, p. 10) in the two outstanding Tasks, and Plaintiffs' attorneys agree that her leadership and involvement has been beneficial. The command staff at OPD is working aggressively to attain compliance, and has impressed Plaintiffs' attorneys with their diligence and focus on full NSA compliance.  Of course, the NSA cannot draw to a close while the Department remains out of full compliance with two vital NSA tasks still not in full compliance but there has been real progress toward attaining

11

JOINT CASE MANAGEMENT
STATEMENT

Case No. 00-cv-4599 WHO

compliance in both of these tasks.

It is crucial that OPD does not lose sight of the other NSA Tasks that fall under of the purview of the IMT during the Sustainability Period. For example, Plaintiffs' attorneys have noticed a substantial uptick in uses of force and stops in the first quarter of 2026. At an April 2026 Risk Management Meeting, Plaintiffs' attorneys and OPD command staff reviewed use of force and stop data for each of the six "Areas" within the City. The relevant portions of the slide deck for Area 6 are incorporated as Exhibit 3 as an illustrative example.

Chart 2.1 of this document depicts a jump in total uses of force beginning in January of 2026:



(Exhibit 3, p. 2)

Chart 1.4 shows a large increase in non-intelligence led, non-dispatch stops during the same period:

JOINT CASE MANAGEMENT STATEMENT

Case No. 00-cv-4599 WHO



(Exhibit 3, p. 1)

OPD leadership has informally communicated that these figures reflect an intentional policy choice to police more proactively.  They point out that murder and violent crime rates are coming down, and that the increase in stops and uses of force are a byproduct of increased on-the-ground policing.  Plaintiffs' attorneys are not privy to the underlying data and policy discussions, and are therefore not in a position to comment about the validity of this specific approach.  However, we explicitly caution the Department that, given the intentional choice to be more proactive, there is an increased burden on supervisors and command staff to ensure the Department practices constitutional, unbiased policing.  Supervisors must consistently identify and address any policy violations or systemic discrepancies.

Plaintiffs' attorneys have previously lauded OPD for greatly reducing racial disparities in discretionary stops by Oakland Police officers, including a 74% reduction in the total number of African American stops (from 22,506 to 5,780) and a 60% reduction in the total number of Hispanic stops (from 7,504 to 2,991) between

13

2016 and 2021.  It remains true that African Americans continue to be stopped at a higher rate than other Oaklanders, but the recent trend-line was undeniably positive, and the concrete data indicated that OPD has successfully addressed some of the systemic biases within the Department.  It is critical that the Department does not backslide in this area.  OPD's racial bias was the original reason for the NSA, and the department and all other stakeholders must remain vigilant and proactive to ensure that the hard-fought gains that has brought OPD to the brink of NSA compliance are not squandered.

Plaintiffs' attorneys believe that OPD has come a long way, especially in recent years, and that the Department is approaching total compliance with the NSA.  In this regard, it is important to note that it was the OPD who discovered the racial disparities as set out in detail in the OIG 2024 report.  Once discovered, the OPD did not mince words about discussing their shortcomings in detail, and acted on the problem on its own.

The subsequent 2025 report, while not sufficient, showed tremendous improvement from the 2024 report.  Moreover, it showed that OPD is capable and did make substantial progress on this issue and shows every sign of making further progress on its own.

This self-initiated discovery of issues and undertaking work to remedy them on such a vital task demonstrates that the OPD can make progress without the necessity of the Negotiated Settlement Agreement.  Equally importantly, false arrests, wanton brutality and unnecessary shootings have all but disappeared in Oakland.  Those few officers who violate Department policy can now look forward to appropriate discipline when warranted.

Plaintiffs' Attorneys look forward to the next Case Management Conference where the Monitor may find that the OPD is in full compliance with the Negotiated Settlement Agreement.  Plaintiffs' attorneys hope they will be positioned to join the Monitor in recommending that the NSA be brought to a successful conclusion.

14

JOINT CASE MANAGEMENT STATEMENT

Case No. 00-cv-4599 WHO

**THE CITY'S STATEMENT**

More than 20 years ago, Oakland promised its community a police department firmly rooted in constitutional policing, backed by compliance with the 51 tasks that comprise the NSA. Today, the City is on the threshold of delivering on its promise. While achieving substantial compliance with the NSA is a critical first step, it is only the beginning. The City must ensure it is structurally equipped to maintain its momentum and continue to advance cultural change through transparency and accountability.

As described herein, the City has already begun to vigorously prepare for the eventual transition from Court oversight to local ownership of NSA compliance. Under the leadership of Mayor Barbara Lee, the City has further institutionalized its internal capacity and fostered the organizational culture necessary to maintain the City's constitutional policing model, independent of Court oversight. NSA compliance has been increasingly integrated into the Department's daily operations, policies, and procedures, establishing a durable framework for self-driven advancement in the absence of Monitor and Court oversight. Supported by a concrete plan for post-oversight sustainability, the City has moved beyond a vision of reform toward a perpetual cycle of progress and constant refinement of its policing practices.

**I. The City Has Improved Its Ability to Detect and Address Department Discipline Disparity by Using Both Statistical Data and Direct Feedback to Look Beyond the Numbers (Task 45).**

Consistency of discipline is a critical component of the City's constitutional policing model. Public credibility rests on the premise that the City is capable of holding its police officers to the highest standards fairly and impartially. Additionally, officers are far more likely to respect internal accountability mechanisms when they trust that conduct is reviewed objectively, and that resulting discipline is both proportionate and predictable. Accordingly, identifying and eliminating any actual or perceived unfairness in the police disciplinary process

15

JOINT CASE MANAGEMENT                                              Case No. 00-cv-4599 WHO
STATEMENT

remains an ongoing focus for the City. To follow up on the disparities observed in the 2024 report, the Department's new leadership initiated further investigation to examine those outcomes, implement recommendations, and evaluate them against the newly available 2025 data.

### A. The Internal Affairs Bureau Conducted a Case-by-Case Review to Understand Why Disparity Was Observed in 2024 Outcomes.

As part of its commitment to looking beyond surface-level statistics, the Internal Affairs Bureau (IAB) completed a formal addendum to the Department's response to the 2024 outcomes. Ex. 4, Department Memorandum Re 2024 IAB Outcomes and Discipline Report. Under the oversight of Interim Chief Beere, IAB conducted an exhaustive case-by-case audit of investigation files to isolate any patterns of potential bias or procedural unfairness.

Deputy Chief (DC) Smith personally reviewed every 2024 sustained case involving Black officers and female officers, concluding that the findings in each case were appropriate. Conversely, DC Smith reviewed a representative sample of cases where white officers were investigated but not sustained; the review confirmed that no viable allegations were overlooked and that all findings were appropriate. This review underscores the Department's deep investment in this issue and highlights its ongoing commitment to ensuring a fair, equitable system for all members.

### B. The Office of Internal Accountability is Still Preparing the Final 2025 Outcomes Report, But the Data is Encouraging.

Pursuant to the Court's Order, the City provided the 2025 Internal Affairs outcome and discipline data to the Court, along with a statistical analysis and comparison to 2024 data. Dkt. 1744, 2025 Preliminary Internal Investigation Outcome and Discipline Report (Apr. 13, 2026). The Office of Internal Accountability is now working to finalize its annual report, including any recommendations it may have based on the data. Once that report is finished, Interim Chief Beere will issue the Department's formal response.

16

JOINT CASE MANAGEMENT STATEMENT

Case No. 00-cv-4599 WHO

Even though the final report is still being written, the 2025 data shows improvement. *Id.* For example, the five-point gap in sustained rates between white and Black officers in 2024 (2% versus 7%) shrank to a two-point difference in 2025 (5% versus 7%). This stabilization is consistent with the sustained rate for white officers more than doubling, bringing disciplinary outcomes across race and ethnicity into closer alignment. When we look at a broad five-year perspective (2021–2025), white officers actually hold the highest combined sustained rate (9%) alongside members categorized under the "other/unknown" race or ethnicity designation.

The City looks forward to sharing with the Court and the parties the final 2025 Internal Investigations Outcome and Discipline Report and the Department's response. While the data shows the Department is moving in the right direction, it will continue its work in this critical area.

### C. Moving Beyond Statistics to Address the Lived Experiences and Cultural Origins of Disciplinary Disparity.

The City recognizes that data alone cannot capture the origins of disparity or the nuances of internal reporting. Following the 2024 IAB Outcome study and a departmental perception survey in 2025 (forthcoming)—which indicated that a majority of respondents perceive the disciplinary process as unfair—the Department commenced a Qualitative Research Study. Ex. 5, Qualitative Research Study Working Group Presentation.

The study is structured to identify the root causes of disparities by capturing insights from personnel across ranks and bureaus. To date, the working group has finalized a research protocol, including consent forms and interview questions. Critically, Interim Chief Beere has executed a Special Order, approved by the Police Commission, clarifying that disclosures made by participants during study interviews are exempt from the mandatory reporting requirements of DGO M-03. This measure secures a confidential environment that invites feedback. The City is

17

partnering with affinity groups, professional associations, and resource groups to socialize the project's objectives and maximize volunteer turnout. This project will culminate in an implementation plan with success measures to ensure recommendations translate into improvements for personnel and the community. Given that this project requires interviewing a cross-section of personnel, coding the transcripts, and subsequently consolidating and reflecting on the insights, the City anticipates its work on this project will continue into 2027.

**D. The City's Recent Actions to Eliminate Discipline Disparity.**

Since the last Court hearing, the City has undertaken three distinct interventions to eliminate disparity in the Department's discipline process. First, the City updated the Vision database to track information more accurately. The system now includes fields for Department members to enter whether each allegation originated internally (from a Department employee) or externally (from a member of the public). This is important because past discipline data, including the 2024 data, shows that there is a more pronounced disparity in internally-generated case outcomes. Additionally, the system now mandates that Department members enter the specific Manual of Rules (MOR) section whenever a Supervisory Notes File (SNF) is issued as a non-disciplinary informal corrective action. This will allow the Department to conduct a more meaningful analysis of potential disparity in the use of SNF corrective actions to address officer behavior rather than requiring a formal investigation, finding, and discipline.

Second, the City is conducting an analysis of corrective action SNFs. An analyst from Mayor Lee's office is helping the Office of Internal Accountability review entries to analyze potential disparity in the SNF process. One of the areas of focus is corrective action SNFs for Failure to Accept or Refer a Complaint (FTARC). Following policy changes that allow FTARC complaints to be handled informally via corrective action SNFs when there is no pattern of misconduct, the Department wants to ensure that the disparity previously observed in FTARC case outcomes has

18

JOINT CASE MANAGEMENT STATEMENT

Case No. 00-cv-4599 WHO

not simply been diverted into corrective action SNFs.

Third, the Department conducted implicit bias training targeted specifically to address the impact of implicit bias on internal complaints and investigations. The Department of Race and Equity assisted the Department in the training, conducted at the Chief's command retreat on March 17 and 20, 2026, and attended by members holding the rank of lieutenant and above. Ex. 6, Department Command Retreat Implicit Bias Training Presentation. On an organizational level, the curriculum focused on standardizing investigative procedures, monitoring outcome data for patterns of disparity, and building an environment where employees feel comfortable reporting perceived unfairness. For individual supervisors, the training provided methods to counteract bias in decision-making by applying disciplinary criteria uniformly to eliminate ambiguity, engaging with people from different backgrounds to break down subconscious stereotypes, and slowing down administrative processes to minimize system strain. *Id.*

Through this combination of rigorous case auditing and targeted data review, the City continues to move beyond the statistics to ensure a fair disciplinary system.

## II. Current Data Reflects a Return to Sustained Compliance with Task 2 Investigative Timelines.

The City's preliminary analysis of internal affairs data for the fourth quarter of 2025, and the first quarter of 2026, indicates that the City met the threshold requirement of completing at least eighty-five percent of Class I and Class II internal investigations within 180 days. While these results await formal compliance review by the Monitor, the City is confident that the Department's case closure timelines have markedly improved.

The City remains focused on meeting investigation timelines. While acknowledging the operational impact of staffing challenges and caseload burdens within the Department and the Community Police Review Agency (CPRA), both

19

agencies continue to implement measures to strengthen investigative capacity and facilitate improved communication. Beyond process improvements, the City is addressing the staffing vacancies that have historically strained the IAB. The City is currently working to hire a civilian intake technician directly into the IAB to assist with case intake, administration, and tracking. The application period closes on May 20, 2026, and the City will begin interviewing candidates.

### III. Task 5 Lessons Learned: The City is Committed to Protecting the Integrity of Its Investigations.

The Monitor's assessment confirming OPD's compliance with Task 5 marks a significant milestone and the Department remains fully committed to maintaining these rigorous standards to prevent the recurrence of past operational lapses. To that end, the City has integrated the recommendations from its self-initiated Tran investigation "lessons-learned" report into its operations. By memorializing in policy specific procedural safeguards based on these lessons, the City has worked to ensure the long-term prevention of past investigatory lapses. More than three years have elapsed since those events, and the Department continues to apply the lessons learned to its daily operations to preclude the recurrence of systemic failures and ensure that past cultural issues do not re-emerge to compromise the integrity of its internal investigations.

The City continues to hold its court-ordered, biweekly meetings to review significant internal investigations. The meetings are attended by the Mayor's Office, City Administration, Police Commission leadership (Commission Chair and Inspector General), City Attorney's Office, and Department leadership. These recurring, high-level sessions ensure that complex matters receive sufficient attention and allow leadership to address issues in real time. The Monitor's agreement that the City meets the Task 5 standards confirms that the City's accountability practices work. The City will keep using these tools to maintain a fair disciplinary system and strive for continuous improvement.

20

JOINT CASE MANAGEMENT STATEMENT

Case No. 00-cv-4599 WHO

**IV. The City Deepens Community Trust and Sustains Long-Term Public Safety by Institutionalizing Its Accountability Practices.**

The City is focused on making sure our accountability practices stay strong and seamless as we move forward. Keeping our policing and disciplinary systems fair is a shared responsibility that connects City leaders, the Department, civilian oversight boards, and the community.

**A. City Leadership and Command Staff Unify Messaging to Establish Constitutional Standards as a Permanent Objective.**

Value-driven consistent leadership is essential for long-term progress. To ensure these practices are embedded in the Department's culture, the City has established a dedicated Constitutional Policing Unit to make accountability a permanent part of daily operations. The City is currently going through a recruiting and hiring process for the constitutional policing administrator to lead the unit. In the meantime, Assistant City Administrator (ACA) Michelle Phillips is filling the role. ACA Phillips will transition out after the City hires an administrator. The Constitutional Policing Administrator will report to ACA Phillips.

Interim Chief Beere has repeatedly reinforced the message both in his command retreats and in public updates that accountability is a priority within the department, emphasizing that shifting the Department's internal culture toward high investigative and operational standards that comply with the NSA is a permanent goal. In recent press interviews, Interim Chief Beere highlighted the Mayor's leadership in "breaking down silos" and noted that for the first time in his career, City departments are "working together as one." Roselyn Romero, *Oakland's Interim Police Chief Has Long-Term Plans*, OAKLANDSIDE (Mar. 25, 2026, 12:58 PM), https://oaklandside.org/2026/03/25/opd-chief-james-beere-interview/ (last visited Apr. 28, 2026).

Chief Beere has characterized ongoing discussions with the federal Monitor as promising, recognizing a shared vision to reduce crime and provide the best possible service in partnership with the community. *Oakland's Interim Police Chief*

JOINT CASE MANAGEMENT STATEMENT                                    Case No. 00-cv-4599 WHO

*Eyes Permanent Role*, KTVU (Mar. 24, 2026, 5:38 PM), https://www.ktvu.com/news/oakland-police-chief-james-beere-interview (last visited Apr. 28, 2026). This collaborative environment demonstrates that constitutional policing is a citywide commitment.

**B. Broadened Mayoral Engagement and Public Forums Transform Compliance into a Shared Community Value.**

To build lasting community trust, the City has expanded its public messaging and educational outreach. Honoring her promise of direct communication, on March 12, 2026, Mayor Lee held the first in a series of "Safety-First Community Town Halls" at Taylor Memorial Methodist Church in West Oakland. Ex. 7, Public Safety Town Hall Bulletin. The meeting was a key part of Mayor Lee's effort to address crime reduction and Department accountability as connected community values.

The forum provided the public with an update on the City's NSA compliance. City leadership explained that rigorous oversight actively improves law enforcement effectiveness. Furthermore, they emphasized that fair internal standards are critical to recruiting and retention for funded to providea diverse department. A second Safety-First Town Hall is scheduled for June 25, 2026, in East Oakland to continue the community dialogue.

These forums include a deliberate educational component designed to demonstrate how NSA compliance and constitutional policing are direct drivers of public safety. By explaining the link between rigorous oversight and effective, fair, and impartial law enforcement, the City is helping the public understand its position that the NSA tasks are essential tools for reducing crime and building a more reliable policing system. This educational element aims to transform compliance into a shared community value, affirming that a constitutionally-grounded Department is a more effective Department.

**C. Investment in Recruitment Pipelines and Strategic Partnerships Directly Advances Constitutional Policing Reforms.**

The City is investing in new pipelines that integrate professional values and

22

JOINT CASE MANAGEMENT                                    Case No. 00-cv-4599 WHO
STATEMENT

community-focused experience into the Department's future. The City has invested in a new generation of officers to strengthen the Department and better reflect the community it serves.

On April 27, 2026, the Department commenced its 197th Basic Academy. With 42 police officer trainees, this is the Department's largest academy class since 2019. Forty trainees are Oakland Police Department trainees; two are from neighboring jurisdictions (one each from the Piedmont Police Department and BART Police Department). This significant influx of personnel represents a critical investment in the Department's operational capacity. The City expects these additional resources to support continuing compliance with investigative timelines as well as ensure the long-term sustainability of constitutional policing reforms. Tables 3-1 and 3-2 reflect the demographics of the Oakland police officer trainees currently enrolled in the 197th Academy. More than 92% of the entering class are non-white. Women make up 12.5% of the entering academy class. Finally, six of the trainees are Oakland residents (15%). These figures demonstrate the City's ongoing commitment to recruiting a diverse force that reflects the community it serves. While these figures represent significant progress in racial diversity, the City recognizes that it must continue to strengthen its efforts and improve its strategies for recruiting women to the Department.

///

23

JOINT CASE MANAGEMENT
STATEMENT

Case No. 00-cv-4599 WHO

**Table 3-1: OPD's 197th Basic Academy Demographics (Apr. 27, 2026)**

| Gender | | Race/Ethnicity | | Residency | | Language | | Education | |
|---|---|---|---|---|---|---|---|---|---|
| Female | 5 | Asian | 6 | Oakland | 6 | Spanish | 9 | High School | 2 |
| Male | 35 | Black or African American | 14 | Other | 34 | Arabic | 1 | Some College | 20 |
| | | Filipino | 2 | | | Urdu | 1 | AA/AS | 3 |
| | | Hispanic | 11 | | | Vietnamese | 1 | BA/BS | 14 |
| | | | | | | Hindi | 3 | MA/MS | 1 |
| | | White or Caucasian | 3 | | | Cantonese | 1 | | |
| | | Other | 4 | | | Punjabi | 3 | | |
| | | | | | | Swedish | 1 | | |
| | | | | | | Tagalog | 1 | | |
| | | | | | | Creole | 1 | | |
| | | | | | | Amharic | 1 | | |
| Total* | 40 | Total | 40 | Total | 40 | Total | 23 | Total | 40 |

**Table 3-2: Race/Ethnicity & Gender in OPD's 197th Academy (Apr. 27, 2026)**

| Race/Ethnicity | Female | Male |
|---|---|---|
| Asian | 1 | 5 |
| Black or African American | 1 | 13 |
| Filipino | | 2 |
| Hispanic | 3 | 8 |
| White or Caucasian | | 3 |
| Other | | 4 |
| Total* | 5 | 35 |

**\*Excludes trainees from non-OPD agencies.**

///

24

JOINT CASE MANAGEMENT
STATEMENT

Case No. 00-cv-4599 WHO

### 1. Reinstating the Police Cadet Program Establishes an Enduring Recruitment Pipeline for Local Youth.

The City has also revived the Department's cadet program, which provides college students with paid, part-time internships to gain experience in both sworn and civilian capacities. The City is also working to expand this program to include similar paid opportunities for high school students. Funded by a collaborative public-private partnership announced in early 2026, the program will provide training, compensation, and equipment for nine cadet positions over the next two years.

## V. Conclusion

Oakland has entered a new chapter of local leadership that connects constitutional policing directly to public safety. As we move forward, the City remains focused on strengthening the Department's internal systems, improving its relationship with the community, and continuing positive cultural change within the Department. To ensure the City stays on this trajectory, it will continue to be proactive about communicating directly with officers and the community about the importance of constitutional policing and how it enhances our broader public safety goals.

The work highlighted herein demonstrates the ongoing cultural shift taking place across the Department and serves as a foundation for further progress. The Mayor's Office, City Administration, and Department leadership are united in their efforts to embed the City's core values of transparency, equity, and internal accountability directly into the Department's daily operations. While the Court continues to hold the City accountable to these operational benchmarks, these are ultimately the promises Oakland made to its own community more than twenty years ago. Task compliance is a necessary milestone, but the ultimate goal is ensuring these reforms serve as a permanent foundation for further growth.

///

25

JOINT CASE MANAGEMENT STATEMENT

Case No. 00-cv-4599 WHO

# THE OAKLAND POLICE COMMISSION'S STATEMENT

## I.   Introduction

As detailed in its last Case Management Statement Section, the Oakland Police Commission's (Commission) proposal for the transition structure best suited to facilitate sustained compliance is to work collaboratively with the Oakland Police Department (OPD) and City of Oakland leadership (City) towards satisfaction of the three outstanding sustainability tasks, while building the Commission's capacity to maintain long-term local civilian oversight for the remainder of the Negotiated Settlement Agreement (NSA). The current Charter structure vests the Commission with the autonomy, capacity, and connections to the Oakland community to drive the kind of results that can hasten an NSA exit and ensure sustained compliance with the final outstanding tasks. The Commission welcomes future discussions and cooperation with the City to identify a transition of duties to ensure that the Commission has a sufficient amount of time during which both the Compliance Director and the Independent Monitoring Team (IMT) can work directly, and share its institutional knowledge, with the body that will ultimately take charge of oversight.

In preparation for moving into a robust, post-NSA oversight role, the Commission spent the last monitoring reporting period focused on this Court's statement that sustained compliance with the terms of the NSA necessitates a change in the culture of the Oakland Police Department (Department or OPD). The Commission took the opportunity to elaborate on this important concept in its January 20, 2026 Case Management Statement, when it emphasized three factors critical to accomplishing cultural change: (1) the Commission's continued effective and productive relationships with key City and community stakeholders, including the Oakland Police Department and an independent OIG; (2) ensuring an intentional plan for the transfer of certain Internal Affairs Bureau (IAB) investigations to CPRA and further standardizing the disciplinary process; and (3) the City's commitment to

26

JOINT CASE MANAGEMENT
STATEMENT

Case No. 00-cv-4599 WHO

the long-term fiscal stability of the OPC's independent civilian oversight structure.

What remains important to emphasize is that the Commission's Charter authorities, adopted by the overwhelming majority of residents in 2016 and again in 2020, are designed to empower the Commission to serve as a singular, community-led civilian oversight entity uniquely positioned to encourage the kind of cultural change that will ensure the Department's sustainable compliance. As the Court and the NSA Parties rightly focus on the three outstanding reform tasks (whose satisfaction will earn the City dissolution of Court oversight), the Commission continues the work of preparing a solid foundation to step in and function as Oakland's primary police oversight system once the Department reaches compliance with, and exits from, the NSA.

## II.   Substantial Progress on the Appointment of the Chief of Police

During the most recent Monitoring Period, the Commission made substantial progress in conducting its Charter-outlined community process for vetting applicants for a new, permanent Chief in a way that only civilian oversight uniquely empowered under the Charter can achieve. The Police Commission hosted six community forums across Oakland; received nearly 200 surveys outlining what residents want to see in the next Chief; and (once informed with that feedback) completed interviews with all applicants. It will soon relay a list of select candidates to the Mayor, which will enable the City to proceed with a Chief who will lead the next chapter of OPD's work.

## III.   Exercising Charter Authorities To Advance Comprehensive Police Reform in Oakland

In parallel track with ensuring timely compliance with its Charter role in appointing a new Chief, the Commission has continued to engage in comprehensive policy work that showcases its uniquely tailored role in driving cultural change and broader police reform to better ensure Constitutional policing in Oakland.

*A. Strategic Plan for Officer Wellness*

As one of several vital, broad-scope reform responsibilities vested in the

27

JOINT CASE MANAGEMENT
STATEMENT

Case No. 00-cv-4599 WHO

Commission pursuant to the City Charter and the City Council's Enabling Ordinance, the Commission shall "[r]eview and comment on the education and training the Department provides its sworn employees regarding the management of job-related stress, and regarding the signs and symptoms of post-traumatic stress disorder, drug and alcohol abuse, and other job-related mental and emotional health issues." (Oakland Municipal Code Chapter 2.45.070 (C).) To this end, the Mental Health and Wellness Committee has developed a draft Wellness Strategic Plan. The Wellness Strategic Plan demonstrates the Commission's role in establishing a coordinated trauma-informed approach to strengthening the health resilience and effectiveness of OPD personnel - founded on the principle that officer and staff wellness is fundamental to public safety. It envisions the Commission's role in developing a trauma-informed systems approach that recognizes (1) the cumulative impact of trauma exposure on officers that conduct police work and (2) the role of organizational culture, leadership, and training in shaping public safety outcomes. In conjunction with the Plan, the Commission will issue a formal Request for Information about officer health and wellness priorities, then leverage the information it receives to craft recommendations to strengthen workforce well-being and public safety. This represents one of several ways the Commission exhibits what is possible with civilian oversight of policing.

*B. MOU Recommendations*

When the Commission (per its Charter authority) proposes changes to Department policies, those modifications are often subject to collective bargaining constraints. To proactively coordinate its policy suggestions with the City of Oakland and its labor partners, the Commission expects to soon present its and community's priority areas to the City Council for consideration. These areas will offer the City the opportunity to seek to better align collective bargaining agreements with constitutional policing best practices and the remaining NSA tasks.

*C. Follow up on J-4, M-19, Community Policing, Sexual Harassment*

JOINT CASE MANAGEMENT STATEMENT

Case No. 00-cv-4599 WHO

The Commission also anticipates working alongside OPD on significant policies in the immediate near term, including sexual harassment policies pertaining to sworn officers' public interactions (to supplement the City's up-to-date, staff-to-staff sexual harassment policies), voluntary pursuits of suspects, racial profiling, and community policing.

**IV.     Continued Constructive Engagement**

In the spirit of collaboratively exercising its Charter role, on February 26, 2026, the Commission deliberated and voted to ensure the Department was promptly granted a waiver to allow for a limited exemption of the reporting requirements of Department General Order (DGO) M-03 (Complaints Against Departmental Personnel or Procedures) for personnel who participate in the Qualitative Study on the Internal Affairs Process. The Commission notes that the Monitor lauded the Department's effort as putting "energy and commitment into its effort to achieve compliance with [Task 5 – Complaint Procedures for IAD]."

**V.     The Community Police Review Agency**

As the Court knows, the Commission's Charter role is broader than overseeing the Department. The Commission supervises the work of, and serves as the hiring entity that selects, the Department leaders for the Community Police Review Agency (CPRA or the Agency) and for the Office of the Inspector General (OIG). Both offices have engaged in capacity building and continued preparation for the post-NSA era in which they will play enhanced roles in ensuring OPD sustains constitutional policing practices.

*A. Increased Staffing and Capacity*

With last year's budget increase for CPRA, the Agency will be able to increase staffing from seven (7) permanent employees to 15-17 permanent employees. CPRA is currently soliciting applicants for two (2) to four (4) Complaint Investigator positions for which the Agency plans to hire in June/July 2026. CPRA's improved budget has also enabled the Agency to hire a Managing Investigator in October 2025

JOINT CASE MANAGEMENT                                     Case No. 00-cv-4599 WHO
STATEMENT

and a Project Manager in February 2026. CPRA's new Project Manager will manage, track, and report data relating to police oversight. This vital work will enhance effective case and document management in order to better enable CPRA to identify and monitor trends, practices and incidents. In addition, CPRA is contracting with two independent attorneys to augment the Agency's investigation capabilities. The new staff will have a significant impact on CPRA's ability to finalize investigations within the NSA's 180-day timeline.

Looking to the next year of budgetary allocations, CPRA's goal is to reach a full staff of 17 permanent employees. This includes an Executive Director, Deputy Director of Investigations, Staff Attorney, Administrative Analyst, Project Manager; two (2) Complaint Investigator IIIs; seven (7) Complaint Investigator IIs; and three (3) Intake Specialists. A fully staffed CPRA will prove integral to police oversight and accountability, and continued fulfillment of the NSA goals.

*B. Mediation Program*

CPRA has long been hard at work with the Police Commission, OPD, and community partners to design and implement its own mediation program, with the first mediation expected to occur quite soon. The Mediation Program was first codified in Oakland City Ordinance No. 13498 in 2018. Following significant engagement with stakeholders and policy efforts, on September 25, 2025, CPRA presented - and the Commission unanimously approved – the Mediation Program's Policies and Procedures. The mediation program provides Oakland residents who have submitted complaints against sworn officers with the opportunity to meet and discuss their complaints in an open, non-confrontational environment. Grounded in the concept of restorative justice, the Program is geared, not toward reaching specific determinations or findings, but is instead designed to allow the community and OPD to come together for cooperative discussions thereby furthering communication and cooperation between the Oakland community and OPD.[1] This Program represents a

---

[1] The program offers community members and police officers the option to mediate only those

capstone of significant police reform work by CPRA and the City of Oakland more broadly.

*C. Transition of OPD Internal Affairs investigations to CPRA*

In cooperation with the City Administrator's office, CPRA is working to establish a task force to evaluate the feasibility of transitioning IAB duties to CPRA. The task force will build on an official Consultant's Report that was funded by City Council in 2023 and completed in April 2025. Transitioning certain Departmental investigative duties to CPRA will enhance independent oversight of policing while reducing costs to the City.

**VI.   Office of the Inspector General**

*A. Improving Operational Practices*

The Office of the Inspector General (OIG) has conducted or project-managed many oversight projects which resulted in recommendations and considerations for procedural improvement. The OIG continues to work toward improving OPD's and CPRA's operational practices and adhering to Charter mandated requirements with current projects, including:

- Policy Review and Assessment of DGO I-12 (Automated License Plate Readers)
- Compliance Audit of NSA Tasks 4, 7, 8, 9, 11, 13, and 34
- Audit of OPD and CPRA regarding specific closure of discrimination complaints

In addition to its current oversight projects, the OIG seeks to enhance understanding and conduct risk assessments of administrative processes by attending officer Skelly hearings, bi-weekly meetings with the Chief of Police regarding Criminal Investigative Division (CID) and Internal Affairs Division (IAD) updates, weekly IAD discipline meetings, Independent Monitoring Team (IMT) Site Visits, and OPD trainings to name a few areas.

*B. Strengthening Outreach and Academic Partnerships*

---

complaints *for which officer discipline is not a potential outcome.*

JOINT CASE MANAGEMENT STATEMENT

Case No. 00-cv-4599 WHO

Along with extensive outreach activities to foster engagement with the community, the OIG has sought to build strong partnerships with local academic institutions to provide research expertise and community-focused perspectives into the work of the OIG. The OIG is currently partnered with UC Berkeley School of Law – Samuelson Law, Technology & Public Policy Clinic; UC Berkeley Criminal Law & Justice Center; Northeastern University Oakland Campus (formerly Mills College); UC Berkeley Public Service Center; and Cal State University East Bay; and the Center for Youth Development through Law (CYDL).

## VII.    Conclusion

The Police Commission commends the Department's progress documented in the Twelfth NSA Sustainability Period Report of the Independent Monitor and Independent Monitoring Team, which further underscores the strength in our City's partnership and we look forward to thoughtful engagement with all stakeholders to collectively ensure a near-term future when the Police Commission's Charter role will prove central to the Department sustaining compliance after exit from Court monitorship.

Respectfully Submitted,


Ricardo Garcia-Acosta Chair, Oakland Police Commission

Omar Farmer, Chair, NSA Ad Hoc Committee &
Commissioner, Oakland Police Commission

*NSA Ad Hoc Committee Members:*

Shawana Booker, Vice Chair, Oakland Police Commission

Antonio Lawson, Executive Director,
Community Police Review Agency, Oakland Police Commission

Zurvohn Maloof, Inspector General, Oakland Police
Commission

32

JOINT CASE MANAGEMENT
STATEMENT

Case No. 00-cv-4599 WHO

Respectfully submitted,

Dated:  May 20, 2026          RYAN RICHARDSON, City Attorney
                             BRIGID S. MARTIN, Special Counsel

                        By: _____/s/ Brigid S. Martin*_____
                             Attorneys for Defendants
                             CITY OF OAKLAND

                             JOHN L. BURRIS
                             Law Offices of John L. Burris

                        By: _____/s/ John L. Burris_____
                             Attorney for Plaintiffs

                             JAMES B. CHANIN
                             Law Offices of James B. Chanin

                        By: _____/s/ James B. Chanin_____
                             Attorney for Plaintiffs

*Per Local Rule 5-1(i)(3), the filer attests that concurrence in the filing of the document has been obtained from each of the other Signatories

33

JOINT CASE MANAGEMENT                          Case No. 00-cv-4599 WHO
STATEMENT