# EXHIBIT 4



*INTER OFFICE MEMORANDUM*

| | | | |
|---|---|---|---|
| **TO:** | James P. Beere<br>Chief of Police<br>Oakland Police Department | **PREPARED BY:** | Aaron R. Smith<br>Deputy Chief of Police<br>Internal Affairs Bureau<br>Oakland Police Department |
| **SUBJECT:** | 2024 IAB Outcomes and<br>Discipline Report Recommendations<br>Internal Affairs Bureau (Addendum) | **DATE:** | March 31, 2026 |

## PURPOSE

The Oakland Police Department (Department) is committed to ensuring that internal investigation outcomes and the related discipline is fair, transparent and consistent. The Department's Internal Affairs Bureau (IAB) has reviewed the *2024 Internal Affairs Bureau (IAB) Outcome and Discipline Report*. The purpose of this memorandum is for IAB to provide responses to the four recommendations that came out of this report. This memorandum also serves as an addendum to the written response prepared by the Bureau of Risk Management Deputy Chief, under the direction of former Chief Mitchell, published on November 7, 2025.

## BACKGROUND

Pursuant to Department General Order R-01 – Risk Management, the Oakland Police Department's Office of Internal Accountability (OIA) is required to perform an annual inspection of IAB cases. The 2024 annual inspection analyzed the following:

- 633 IAB investigations
  - 1,417 sworn member cases[1]
  - 2,109 individual allegations[2]

A key finding in the report was that Black officers were more likely to be 'sustained' in misconduct investigations. White officers were sustained at a rate of about 2% while Black officers were sustained at a rate of 7%, the highest sustained rate across all sworn member races.

---

[1] A single IAB investigation could result in multiple officers receiving complaints. For example, one case could have five officers with one allegation a each.
[2] An individual officers may receive multiple allegations in a single case. For example, one case may have two officers that receive allegations of two different manual of rule violations.

This represented a change in the year-over-year (2023 vs 2024) comparison, where White officers were sustained at a rate of 11% and Black officers a rate of 6%, the lowest overall sustained rate across all races.

OPD Executive Command recognizes the disparity within these findings and has immediately taken steps to address them.  The original recommendations were as follows:

1. Improved recordkeeping of internally discovered allegations
2. Quarterly monitoring of sustained rates to identify potential trends
3. Focus analysis on fully investigated cases
4. Participate in qualitative and quantitative focus groups

IAB identified four additional key objectives:

5. Managed caseloads
6. Evaluating Stakeholder input that may contribute to disparities
7. Exploring industry best practices
8. 2024 Analysis on identified cases involving:
   - Black Officers – Sustained cases
   - Female Officers – Sustained cases
   - White Officer – Non-Sustained cases

## 1. Internally generated allegations - Codified procedures to document and review internally discovered allegations

Accurately documenting and tracking critical data will ensure accuracy and accountability in reporting case outcomes. IAB will document and track all internally discovered allegations in a standardized format utilizing the department's Vision database.  This means creating process that captures internally generated allegations by identifying the added MOR violation, employee/member who identified the violation, associated subject officer(s), the commander approving the addition, and the justification for the allegation.   Creating this mechanism is mostly technical and will involve working with the City of Oakland's Information Technology Department to accomplish.  This work has begun and is likely to be completed in or around June 2026.  IAB will also develop a training plan for the department to help supervisors and commanders with this new tracking.  Training will begin in Sergeant's Continued Professional Training (CPT) and Command Retreats, in the second quarter of 2026.

Capturing enough useful data can only be accomplished over time.  Based on the projected full rollout of this process (June 2026), I anticipate having sufficient useful data for analysis by the end of 2026.   Reporting on the analysis of this data will likely occur within the first quarter of 2027, however the data will likely reflect roughly six months of sufficient data.

## 2. Quarterly monitoring of sustained rates to identify potential trends

IAB works directly with the Oakland Police Department's Office of Internal Accountability (OIA) to track and analyze 'sustained' rates on a quarterly basis.  This report anonymizes the subject officers, but highlights outcomes in discipline, MOR trends and discipline outcomes by Race.  This analysis will help us to quicky identify any potential patterns or trends in cases where disparate outcomes may exist.  This information is synthesized by IAB and shared during monthly risk-management meetings, with the OPD Training Section and with Commanders during Command Retreats. This work has started and remains a priority today.

**3. Focus future analysis on fully investigated cases**

Fully investigated cases are typically cases that are investigated by the Internal Affairs Bureau's Investigations Section. Thise cases are generally more serious with a higher level of complication and typically involve Class I allegations of misconduct.  Because we know these cases can also take longer to investigate given their level of complexity, our focus is on the quality of these investigations.  This also means making sure that these cases are completed in a way that is consistent and timely.   Cases investigated by the Community Police Review Agency or involving OPD Commanders and above are more likely to be investigated by private investigations firms.  These cases are still considered 'fully investigated' and will be part of our focus in ensuring timeliness and consistency in discipline.

**4. Equity Studies - Qualitative & Quantitative**

We understand that the interpretation of fairness and equity can vary from person to person and want to learn more from our employees. Our upcoming qualitative and quantitative studies being led by the OIA and the City of Oakland's Department of Race and Equity will enable us to achieve this.  The OPD Office of Internal Accountability has already begun the task of forming a comprehensive working group to start this work.  The working group will include the department's affinity groups, labor unions, sworn & professional staff of all ranks, and members of the Oakland Police Commission. This working group will conduct a comprehensive qualitative study, guided by OPD and City partner SMEs. This study will utilize individual, confidential interviews to gather diverse perspectives and experiences related to the IAB and discipline process.

In an effort to safeguard anonymity, Special order 9219 was drafted, which exempts participants from being required to report misconduct, pursuant to Department General Order M-03.  Any criminal misconduct reported during these interviews will still require reporting pursuant to DGO M-04.1.  Members of the IAB investigations, DLI and intake teams will participate as part of this working group.  Learning from these studies will guide our organization into appropriate responses and a better understanding of where we can make meaningful changes in our policies and practices to manage this perception. This work has already begun, with a goal of completion by the third quarter of 2026.

**5. Managed Caseloads**

Investigators assigned to IAB are currently working to manage excessive caseloads.  Investigators are carrying up to 20 cases each.   A more manageable caseload for an investigator would typically hover around 5-7 cases.  We are currently working to supplement additional investigators at the rank of Acting Sergeant, to assist with the outstanding investigations.  This process will incentivize senior officers with investigative experience, to be cross-trained in conducting division-level investigations while advancing their careers.  Efficiently managed caseloads ensure timely and quality investigations (Task 2 & 5).  Additionally, IAB will conduct a comprehensive review of:

- Investigative forms and documents for consistency.  Using standardized forms and formats help in quality control, sufficiency of content, consistency and record keeping.
- Internal Affairs and other investigative training to improve investigative judgement.  To make certain that IAB investigators benefit from high-quality training and industry best practices in investigative methodology.

Sharing trends and patterns observed in investigation with department leadership in a way that is timely and supportive. This can be accomplished through regular presentations at the OPD Command Retreats, Continued Professional Training and lineups.

**6. Evaluating stakeholder input that may result in disparities**

IAB Investigators and field level supervisors (Sergeants) are responsible for completing investigations that rely on the reviewing of proof of facts, evidence, interviewing subjects, witnesses, determining creditability and reaching appropriate findings.  The standard of proof is a preponderance of evidence and the burden of proof rests with our agency.

OPD recognizes that case outcomes and discipline are the result of a complex and thorough process which involves, not only OPD but also regularly involves the Community Police Review Agency (CPRA), the Oakland Police Commission's Discipline Committee (OPC), the Office of the City Attorney (OCA), private outside investigator firms, and, at times, the City Administrator and Mayor. OPD remains committed to identifying and analyzing the discipline continuum in the IAB process where there is potential for contributing to disparities.   These processes outside of IAB may have the ability to influence, or is directly responsible for, case outcomes and discipline.  As the City of Oakland team, it is our collective responsibility to ensure fair and equitable outcomes in misconduct investigations.

**7. Exploring Industry Best Practices**

Opportunities exist to develop standards and best practices in Internal Affairs work and learn from other law enforcement agencies who prioritize progressive policing and who were previously or currently under consent.  The basis is to study the broader factors of resolving community complaints in ways that are creative and effective, while still addressing misconduct.  Examples of this exploration include:

- Reviewing the OPD discipline matrix and how it's applied during penalty assessment:
    - Should we start in the low, middle, or high end of the penalty range and why?
    - What constitutes a pattern of misconduct?  First, second or third offense?
    - Are Supervisory Note File entries considered?  Should they be?
    - How do other agencies determine discipline?

- Exploring procedures for more timely resolutions to lower-level misconduct allegations (i.e. More supervisory discretion in immediate actions like mediation, other creative complaint resolution options and re-working the Informal Complaint Resolution process – Task 2).  Timely feedback for officers engaged in low-level misconduct prevents on-going, substandard behavior and performance.  Timely feedback is important for community members who make allegations of misconduct and the subjects of these complaints.

-  Exploring alternatives to traditional discipline: Traditional punitive discipline operates under a theory akin to criminal justice.  An offense committed and a punishment is imposed as a response.  Whether or not prescribed suspensions, letters of discussion or supervisory notes serve to change performance or behavior is debatable.  Identifying appropriate discipline through strategies that fit, not only the offense, but also the employee and their learning style may be ideal.  More severe punishment in the form of financial loss does not always reveal or necessarily resolve the underlying problem motivating misconduct (Task 45).

I have developed relationships with two key agencies to further explore best practices.  The Los Angeles Police Department and the Philadelphia Police Department.  In March 2026, I visited the Los Angeles Police Department's Professional Standards Bureau and Internal Affairs Division.  I learned that many of their processes mirror ours with some exceptions.  LAPD faces similar challenges in the due process for officers and in consistency in discipline.  There is much more to learn from LAPD and this collaboration will continue.  I am in the beginning stages of learning from the Philadelphia Police Department.  PPD also has similar challenges, like a current consent decree, backlogged disciplinary cases, and building community trust.  One of the programs that PPD has implemented is captivating, which provides a very specific kind of behavioral training for lower-level misconduct.  This and other alternatives to traditional discipline are worth exploring.

**8. 2024 Analysis on identified cases where disparities existed**

<u>**DISPARITIES FOR BLACK OFFICERS**</u>

There was a total of 21 cases identified where **Black Officers** were sustained. We conducted a review of each of these cases. This analysis sought to identify any potential bias or patterns in the investigations. For each case, examined:

- Race, rank and tenure of the investigator
- Deviation from standard investigative procedures
- Appropriate MOR and policy application
- Skelly outcomes (If applicable)
- CPRA concurrent case outcomes (If applicable)
- Deviation from the Discipline Matrix (If applicable)


What did the analysis reveal? - Overview

<u>**Discipline**</u>
Average Suspension – 9 days
Counseling and Training – 19%
Written Reprimand – 14%
Termination – 14%
<span style="color:red">Discipline outside of Matrix – 0%</span>

<u>**CPRA**</u>
14% cases CPRA (Non-Concurrent case decided by the Oakland Police Commission Discipline Committee)

<u>**Skelly**</u>
24% of cases proceeded to Skelly
10% of cases resulted in reduced discipline
10% of cases resulted in original discipline upheld


<u>**DISPARITIES FOR FEMALE OFFICERS**</u>

There was a total of 20 cases identified where **Female Officers** were sustained. We conducted a review of each of these cases. This analysis sought to identify any potential bias in the following:

- Race, gender, rank and tenure of the investigator
- Deviation from standard investigative procedures
- Appropriate MOR and policy application
- Skelly outcomes (If applicable)
- CPRA concurrent case outcomes (If applicable)
- Deviation from the Discipline Matrix (If applicable)

What did the analysis reveal? - Overview

<u>**Discipline**</u>
Counseling and Training – 60%
Written Reprimand – 15%
Termination – 15%
Suspension – 10%
Average Suspension – 4 days
<span style="color:red">Discipline outside of Matrix – 0%</span>

What did the analysis reveal? – Overview (FEMALE OFFICERS CONT'D)

**Skelly**
15% of cases proceeded to Skelly
5% of cases resulted in reduced discipline
10% of cases resulted in original discipline upheld

**Case origination**
100% Internally Generated

**NON-SUSTAINED CASES FOR WHITE OFFICERS**

There was a total of 62 cases identified where **White Officers** (were either 'Not sustained', 'Exonerated' or 'Unfounded.' We conducted a review of each of these cases.   This analysis sought to identify any potential bias in the following:

- Race, rank and tenure of the investigator
- Deviation from standard investigative procedures OR missed investigative procedure?
- MOR and policy application?
- Appropriate finding reached?

What did the analysis reveal? - Overview

**Origin of Allegation**
95% Externally Generated
  5% Internally Generated

**Allegation Class**
77% of cases Class II allegations
23% of cases Class I allegations

**Findings**
65% Exonerated
26% Unfounded
 7% Not Sustained
 2% Informally Resolved
All findings were found to be appropriate

**Division Level**
58% Division Level Summary Finding
32% Division Level Investigation
 7% Internal Affairs Bureau Investigation
 1% Informally Resolved

The accompanying PowerPoint presentation provides an analysis of each case reviewed.

Chief,

In closing I am confident that the Internal Affairs Bureau, managed properly, can achieve sustained NSA compliance. My effort as your newly appointed Deputy Chief is to set a general set of principles, expectations and guidelines that shape a bureau that engages in fundamental Internal Affairs practices <u>consistent</u> with constitutional, contemporary American policing.   I believe in doing so, we will demonstrate that we can effectively hold ourselves accountable in a manner that enhances public trust.


Respectfully,


Aaron R. Smith
Deputy Chief of Police
Internal Affairs Bureau