# Coalition for Police Accountability

To: The Honorable William H. Orrick III
In re: Delphine Allen, et al. v. City of Oakland, et.al Docket Number 3:00-cv-04599-WHO

September 21, 2026

Dear Judge Orrick,

On May 22, 2026, the Independent Monitoring Team's Thirteenth NSA Sustainability Period Report advised that the Oakland Police Department had satisfied all 52 Tasks identified in the NSA. However, we have learned that since then OPD has fallen out of compliance with Task 2 concerning the timeliness of Internal Affairs investigations. More importantly, the City has chosen to underfund the Charter-mandated independent civilian oversight that is intended to take over upon the termination of the NSA thus putting sustainability of the reforms achieved in the past 23 years in serious doubt.

Nevertheless, we believe that the City intends to ask for the termination of the NSA at the Case Management Conference on September 29.

We urge the Court to either postpone termination and to retain jurisdiction of the case or, alternatively, to make termination conditional on a stipulation by the parties that sufficient funding will be made available for effective independent civilian oversight that is ready to take over the work the federal monitor has been performing. If there is a stipulation, it must include enough specificity so that its implementation is not in doubt.
Compliance with the 52 NSA tasks must be an ongoing process. Other cities have exited federal oversight only to back-slide. The significance of falling out of compliance with Task 2 is that OPD did not bother to prioritize compliance at such a critical juncture; it seems naively optimistic to expect more energetic efforts if they are left to answer to no one.

**The City of Oakland is Not Prepared to Support Independent Oversight**
Oakland's Charter anticipates the termination of the NSA and specifically allocates its tasks to the Office of Inspector General (OIG) in the following section:
*604(F)(5) The OIG shall audit the Department's compliance with the fifty-two (52) tasks described in the Settlement Agreement in United States District Court case number C00-4599, Delphine Allen, et al., v. City of Oakland, et al., and make recommendations to the Department, the Commission, and the City Council based on its audit(s), even after the Settlement Agreement expires.*

However, instead of supporting the voter-created and Charter-mandated structure for independent police oversight, the City has starved it of resources. The Police Commission in its statement to the Court for the upcoming CMC has made this very clear.

To fulfill its Charter-mandated job, an appropriately staffed OIG would require at least a Policy Analyst, three Auditors, and a Public Information Officer. However, the OIG is now without a single auditor or reviewer. The office's Policy Analyst position was cut, and other positions have been frozen or eliminated. Its outside resources consist of part-time student interns and contract auditors. This puts the OIG's current personnel far below the level needed to perform in-depth audits on 52 separate issues. Furthermore, although the OIG has performed two policy reviews this year, the office is responsible for analyzing and assessing the full retinue of OPD policies. With current staffing levels, the IG will be able to review barely a modicum of the Department's countless policies. The profound lack of resources has caused the Inspector General's Office to be out of compliance with its Charter mandate.

In the past ten years OPD has been involved in scandals that have one thing in common—they would not have come to light absent the federal monitor and the investigative work of CPRA. As recently as 2023, OPD's Internal Affairs Bureau engaged in cover-ups of two serious scandals. This was a motivation in the decision to shift investigations to CPRA but that implementation is in jeopardy after an entire year of stalling by the City Administrator's office and reduced funding in the current City budget. Funding for OPD's Internal Affairs remains robust.

After an initial funding increase, CPRA is now in a precarious financial position, jeopardizing investigative capacity as well as the transition of investigations from OPD's Internal Affairs Bureau to CPRA civilians; its ability to assist in decreasing the time for the completion of OPD's Skelly reviews for officers on administrative leave; and the launch of the Mediation Program. An under-subsidized CPRA cannot provide accountability and independent, unbiased investigations of alleged police misconduct.

Nor can the Commission's governing arm be ignored. The Commission's members have demonstrated their commitment to the body's oversight mandate by struggling to deliver meaningful work product despite funding levels that do not provide the institutional resources the work and City Charter demand.

The City may argue that resources are limited and it cannot afford to fund these institutions. However, recent budget decisions reflect policy decisions, not simply a deficit. The City budget slashed independent oversight resources more than other departments proportionally, although the cuts are de minimis to the City's budget woes. The City Administrator's office created a Constitutional Administrator position that parallels the work of the Inspector General, but within the control of the City. A position inside the City might be helpful to support constitutional policing, but this unmandated position was funded at

$450,000, demonstrating that resources are available, although withheld from the Charter-mandated independent oversight structure.

In the past twenty years the City has paid tens of millions of dollars for police misconduct. The City recently agreed to a $17 million settlement for OPD misconduct for a single incident. The recent spate of shootings and deaths will likely result in more settlements. Effective independent civilian oversight costs some money, but it saves far more.

The legal and administrative structure for oversight of OPD exists, but the City's commitment to provide sufficient funding to actually perform that oversight is in doubt. Before the NSA ends, the City must fund the Commission, the OIG, and CPRA.

The NSA has been a 23-year project that represents an enormous amount of time and money for the City, and decades-long commitment by plaintiffs, and the Court. Oakland residents were protected from the old practices of an unregulated police department. To terminate now, without necessary funding for independent civilian oversight, would jeopardize all that work. Certainly, the plaintiffs have the right to ask for that funding as a condition of ending the NSA.

**Successful Independent Oversight Is Endangered**

Although the City's lack of commitment to independent oversight reflected by budgeting is concerning, there are other troubling warning signs.

There has been a dedicated and focused campaign attacking independent oversight that has had an impact on City politics and the commission. The City Administrator has intruded inappropriately with the independent Selection Panel, the Police Commission, and even instructed OPD that they should not respond to Inspector General information requests for certain audits. The City Council has exerted inappropriate pressure on the Selection Panel and Police Commission and sought specific funding cuts and staffing cuts to undermine independent oversight. A Council member proposed, although it has been temporarily withdrawn, a Charter amendment to limit the authority of the commission and participation of the community.

As a result, there has been a notable shift. Commissioners publicly discuss working to not antagonize the city administration, council, and OPD in their decision-making process. The commissioners' discussion around the letter to the Court used phases like "putting a target on our backs" and worried about upsetting the City and OPD. More time was spent discussing partnering with OPD than on the impacts on oversight from the lack of funding. The chair of the commission has spoken repeatedly about his priority of not upsetting OPD and the City. The commission debated using the term "advocate" for mandated funding levels. Ultimately, they decided against the word as too antagonistic to the City and OPD.

**OPD Culture Remains An Obstacle**

It appears that the culture has not changed as much as may be characterized. One warning sign is the increase in police shootings in the past year. The shooting by OPD officers of an

apparently mentally ill person needs to be fully investigated. Within the past year, two other people were shot by OPD; those investigations are not completed. This past week, two OPD officers were indicted by a federal grand jury for misconduct.

In the most recent shooting, 90 seconds after OPD arrived, the knife-wielding homeless person with a history of mental health challenges was dead, with the final shot after he fell. OPD was reticent in making any body camera footage available and have still only provided edited footage. The community has discussed asking the commission to review the policies on making body camera footage available and when edited footage should be allowed. Community members have lost some confidence in the commission's capacity and willingness to address issues that are opposed by OPD.

Another disoriented man with apparent mental health challenges died while being restrained by OPD officers in October 2025. This case reminded observers that community members have been asking for a review of new policies created by the commission. For several years, residents have specifically and repeatedly asked for a review of the implementation of 2021 Special Order Banning of the Carotid Restraint and All Forms of Asphyxia written by the Police Commission. But the under-resourced Inspector General's office has not yet done so.

Community members have also repeatedly asked both the commission and city council to monitor and identify the obstacles resulting in the failure of the program (opposed by the police union) to respond to low-level 911 calls to be successfully implemented. No action has been taken on this program that exists to limit police interaction, especially during mental health calls.

It is untenable and unreasonable to end the NSA without the needed resources for independent oversight. At the bare minimum, maintaining jurisdiction enables intervention if necessary. If our concerns are not borne out, there will simply be no intervention. Without this step, there is no protection for constitutional policing in Oakland, especially given that the Department of Justice will not intervene in any law enforcement departments under the current administration. We cannot pass the job of police oversight over to mechanisms that both do not have the resources to do the job and have been pressured not to advocate for either resources or independence.

Thank you for your time and consideration,

*Millie Cleveland*

Millie Cleveland
Chair, Steering Committee
Coalition for Police Accountability

*Larry C. White*

Larry C. White
Primary Author, Measures LL & S1