RYAN RICHARDSON, City Attorney, CABN 223548
BRIGID S. MARTIN, Special Counsel, CABN 231705
One Frank H. Ogawa Plaza, 6th Floor
Oakland, California 94612
Telephone: (510) 238-3751
Facsimile: (510) 238-6500
Email: BMartin@oaklandcityattorney.org

Attorneys for CITY OF OAKLAND

JOHN L. BURRIS, CABN 69888
Law Offices of John L. Burris
Airport Corporate Centre
7677 Oakport Street, Ste. 1120
Oakland, California 94621
Telephone: (510) 839-5200
Facsimile: (510) 839-3882

JAMES B. CHANIN, CABN 76043
Law Offices of James B. Chanin
3050 Shattuck Avenue
Berkeley, California 94705
Telephone: (510) 848-4752

Attorneys for PLAINTIFFS

*(Additional Counsel on Next Page)*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| DELPHINE ALLEN, et al.<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF OAKLAND, et al.,<br><br>Defendant(s). | Case No. 00-cv-04599 WHO<br><br>**JOINT CASE MANAGEMENT STATEMENT**<br><br>Date: September 29, 2026<br>Time: 3:30 p.m.<br>Courtroom 2, 17th Floor<br>Hon. William H. Orrick |

ROCKNE A. LUCIA, JR., CABN 109349
Rains Lucia Stern St. Phalle & Silver
Attorneys & Counselors at Law
2300 Contra Costa Boulevard, Suite 500
Pleasant Hill, CA 94523
Telephone: (925) 609-1699
Facsimile: (925) 609-1690

Attorneys for OAKLAND POLICE OFFICERS ASSOCIATION

# TABLE OF CONTENTS

**PLAINTIFFS' STATEMENT**........................................................................1

I. Task 2 (Timeliness Standards and Compliance With IAB Investigations)..........................................................................3

II. Task 5 (Complaint Procedures for IAB)..........................................................5

III. Task 45 (Consistency of Discipline Policy).......................................................6

IV. Conclusion ........................................................................................................11

**CITY'S STATEMENT** ..........................................................................................14

I. The City Has Already Met the NSA's One-Year Sustained Compliance Requirement for Task 2, and a Two-Percent or Two-Case Variance Does Not Constitute Extraordinary Circumstances Warranting Continued Court Oversight (Task 2) .......................................................................................... 15

II. Focused Reforms Have Led to Measurable, Sustained Reductions in Stop Disparities................................................................................................... 18

III. The City Is Strengthening Internal Accountability to Ensure Fair and Consistent Discipline (Task 45) ....................................................................... 23

A. 2025 Internal Investigation Outcome Data Shows Meaningful Progress in Equitable Discipline ....................................................................... 24

B. Preliminary 2026 Data Shows Continued Equity in Internal Investigations ................................................................................... 26

C. The Supervisory Note File (SNF) Special Project Audit Shows Proactive, Careful Work to Detect and Prevent Discipline Disparities ......................... 27

D. The Department Takes Workforce Trust Seriously and Uses Member Feedback to Strengthen Accountability ....................................................... 30

E. The Department's Qualitative Interview Project Aims to Strengthen Transparency and Build Long-Term Internal Trust ..................................... 31

IV. The Department's Regular Compliance Checks Respond to the Court's Directive to Confirm Continued Adherence to Unmonitored NSA Tasks ............................... 33

V. Key Lessons Learned Under Court Oversight That Now Guide Oakland's Long-Term Commitment to Constitutional Policing ............................................... 36

VI. Oakland Is Fulfilling the Transition Plan It Presented to the Court and Continuing to Strengthen Local Ownership ............................................................ 39

A. Empowering Local Ownership Through Institutionalized Risk Management ......................................................................................... 39

B. Identifying Best Practices Through Strategic Consultation with National Experts ............................................................................................ 40

C. Advancing Community-Driven Priorities and Equitable Technology Deployment ........ 41

VII. Information Requested by the Court Regarding Police Misconduct Filings and Settlement Amounts ........ 42

Conclusion........ 42

**THE OAKLAND POLICE COMMISSION'S STATEMENT**........ 44

**THE OPOA'S STATEMENT**........ 48

## PLAINTIFFS' STATEMENT

## I. Plaintiffs' Current Position

The Independent Monitor for the OPD has issued just one draft NSA Sustainability Period Report (draft 14th Sustainability Report) since the last Case Management Conference statement in May 2026.

The Sustainability Period involves the monitoring of the "last remaining and most critical Negotiated Settlement Agreement Tasks" (Dkt. 1525, p. 2) and, as of the most recent Case Management Conference on May 27, 2026, OPD was in compliance with all of eleven actively monitored NSA Tasks:

1. Task 2 (Timeliness Standards and Compliance with IAD Investigations – newly in compliance when assessed during the period covered by the 13th NSA Sustainability Period Report, but once again out of compliance during the period covered by the draft 14th Sustainability Report),
2. Task 5 (Internal Affairs Division (IAD) Complaint Procedures –in compliance as of the 12th IMT Sustainability Period Report);
3. Task 20 (Span of Control – in compliance when most recently assessed, during the Third NSA Sustainability Period Report);
4. Task 24 (Use of Force Reporting Policy – in compliance per the Eighth NSA Sustainability Period Report and no longer subject to active monitoring pursuant to the Court's 09/06/2024 Order regarding Internal Affairs Reporting)
5. Task 25 (Use of Force Investigations and Report Responsibility – in compliance per the Eighth NSA Sustainability Period Report and no longer subject to active monitoring pursuant to the Court's 09/06/2024 Order regarding Internal Affairs Reporting);
6. Task 26 (Force Review Board (FRB) – in compliance when most recently assessed, during the Third NSA Sustainability Period Report);
7. Task 30 (Executive Force Review Board (FRB) – in compliance when most

recently assessed, during the Third NSA Sustainability Period Report);

8. Task 31 (Officer-Involved Shooting Investigations Review Protocol – in compliance when most recently assessed, during the Third NSA Sustainability Period Report);

9. Task 34 (Stop Data – in compliance when most recently assessed, during the Third NSA Sustainability Period Report);

10. Task 41 (Use of Personnel Assessment System (PAS) and Risk Management – in compliance when most recently assessed, during the Third NSA Sustainability Period Report), and

11. Task 45 (Consistency of Discipline – "partial compliance" through the March 2026 12th Sustainability Report, then upgraded to full compliance in the 13th Sustainability Report and still in compliance per the draft 14th Sustainability Report)

The May 2026 CMC represented the first time during the Sustainability Period where OPD was in full compliance with all NSA tasks, and it appeared that OPD was on track to exit the NSA this month. At the Case Management Conference, Judge Orrick and plaintiffs' attorneys congratulated the City of Oakland for finally attaining full compliance even as the Court presciently cautioned that "No one can say "Mission accomplished."' [1]

Plaintiffs' attorneys are now in receipt of the draft 14th Sustainability Period Report. This report indicates that OPD has once again fallen out of compliance with NSA Task 2, which requires that the Internal Affairs Division (IAD) of the OPD complete internal investigations in a timely manner.

///

[1] https://oaklandside.org/2026/05/27/opd-nsa-reforms-completed-federal-oversight-ending/

## II. Task 2 (Timeliness Standards and Compliance with IAD Investigations)

Task 2 was inactive from 2015 to July 2019, before abruptly falling out of compliance in the 62nd IMT Report. This task then remained out of compliance until February 2022, when OPD reattained the mathematical threshold required for compliance. Between February 2022 and December 2024, OPD was in compliance with Task 2. OPD once again fell out of compliance with this Task during the period covered by the 10th compliance report, and remained out compliance with this Task through the periods covered by the 11th and 12th IMT reports. After reattaining compliance in the 13th Sustainability Period Report -- published immediately prior to the May 2026 Case Management Conference -- OPD is now newly out of compliance with this Task.

OPD policy requires that "at least 85% of Class I misconduct investigations and at least 85% of Class II misconduct investigations must be completed within 180 days to be considered timely." Per DGO M-03, Class I offenses "are the most serious allegations of misconduct and, if sustained, shall result in disciplinary action up to and including dismissal and may serve as the basis for criminal prosecution."

The IMT reviewed IAB cases that were approved in the first quarter of 2026 for this report. Of the 93 Class I misconduct cases reviewed during this period, 77 were completed in a timely manner. This represents an 83% timely-completion rate during the period covered by the draft Fourteenth OPD Sustainability Report, which once again puts OPD below the 85% minimum-threshold required for compliance with NSA Task 2.

This is not acceptable. The Department must reckon with the underlying issue(s) that have allowed this recurring failure, and OPD must attain compliance with Task 2 or whatever replaces it.

As Plaintiffs' attorneys have noted time and time again, Task 2 compliance is

categorically different from the other Tasks that remain out of compliance insofar as the metric for compliance is strictly mathematical: there is an objective target that OPD must meet and has previously met. Hitting this benchmark is entirely within the Department's control. Whether or not OPD achieves the minimum passing grade is not in any way subjective, colorable, or open to interpretation. Furthermore, Plaintiffs' attorneys have noted repeatedly that the NSA mandated 85% timely-completion rate is **much** lower than what is required by most other consent decrees, so there is no reason OPD cannot achieve this timely completion rate.

The IMT write that they "are disappointed that, for the first quarter of 2026, OPD is not in compliance with this Task due to our 83% compliance finding for Class I cases. However, we remain optimistic that IAB leadership is working diligently to continue to streamline the intake and investigative process, track cases closely as they make their way through the investigative process, and manage investigators' caseloads and respond swiftly when investigators go on leave. All of these efforts will help the Department regain compliance with this important Task." (draft 14th Sustainability Period Report, p. 3).

It is unclear to Plaintiffs' attorneys whether such optimism is warranted. The Department continues to yo-yo in and out of compliance with Task 2. The City could and should have marshalled every available resource to demonstrate that it could maintain its Task 2 compliance status and finally exit the NSA. It is incomprehensible and bitterly disappointing that OPD is once again in this position.

Having said all this, Plaintiffs' attorneys believe OPD can work through this issue without the necessity for the NSA continuing. OPD is working hard to craft an alternative to Task 2 and do not require the NSA to continue to meet this goal. Since 2003, Oakland has established a Police Commission that can oversee this sole remaining task that is very near compliance and has been in compliance in the past. In addition, The OPD Internal Affairs Bureau has competent officers who can help

do this job.

Plaintiffs' attorneys would rather see the OPD in full compliance. However, we realize that the OPD today bears virtually no resemblance to the OPD prior to 2000. Prior to 2000, Supervisors seldom disciplined officers for excessive force and some of them actually encouraged such activity. Today, most Supervisors discipline officers who violate OPD Standards, particularly acts of excessive force. There is a Police Commission that, if functioning and funded in compliance with the Oakland Charter, that also does this job. In addition, the OPD was in compliance with all remaining tasks at the last CMC and almost attained compliance again in the IMT's most recent 14th Sustainability Report. Given all these factors, Plaintiffs' attorneys will not ask the court to continue the NSA in its present form because of OPD's failure to fully comply with Task 2.

Finally, plaintiffs' attorneys are aware the OPD is currently working hard to rewrite Task 2 to both accomplish the goals of that Task and reflect the current realities of the way complaints are investigated in Oakland today. We have confidence that supervisors working on this project can attain this goal. We have worked with these Supervisors for years and believe they are totally dedicated to establish a system that can fully and timely investigate complaints.

**III. Task 5 (Complaint Procedures for IAD)**

Task 5 pertains to Complaint Procedures for the Internal Affairs Division, and consists of several subtasks, all of which the IMT had previously found in compliance, including:

- Task 5.1, which requires that when a citizen wishes to file a complaint, the citizen is brought to a supervisor or IAD, or a supervisor is summoned to the scene.
- Task 5.2, which requires that if there is a delay of greater than three hours in supervisory response, the reason for the delay must be documented.

- Task 5.3, which requires that when a complainant refuses to travel to a supervisor, or wait for one, personnel make all reasonable attempts to obtain specific information to assist in investigating the complaint.
- Task 5.4, which requires that specific information be documented on a complaint form and submitted to the immediate supervisor or, in his/her absence, the appropriate Area Commander.
- Task 5.5, which requires that the supervisor or Area Commander notify Communications and forward any pertinent documents to IAD.

During the Sustainability Period the IMT focused on subtasks 5.15 to 5.19 and subtask 5.21, which address the quality of completed IAD investigations. Prior to the onset of the Sustainability Period, the IMT determined that IAD investigations had improved to the standards mandated by the NSA; in February 2022, OPD attained full compliance with Task 5. However, the First OPD Sustainability Report moved the status of Task 5 from "in compliance" to "deferred compliance", and OPD was downgraded to "not in compliance" in the Second OPD Sustainability Report. OPD was intermittently in and out compliance with Task 5 until the period covered by the 12th IMT report, and remains in compliance as of the draft 14th Sustainability Report.

According to the most recent IMT Sustainability Report, "the Department continues to make the requirements of Task 45 – and, more importantly, the values underlying Task 45 – a priority." (draft 14th IMT Report, p. 9). Plaintiffs' attorneys concur with this assessment, and have lauded the new leadership at OPD for their focus on Task 5 compliance.

## IV. Task 45 (Consistency of Discipline Policy)

Task 45 requires that discipline is imposed in a fair and consistent manner. OPD was in compliance with this NSA Task at the outset of the Sustainability Period. Following the publication of the Clarence Dyer Report, the IMT downgraded OPD's compliance status with Task 45 to "no compliance finding",

citing “systemic and other deficiencies cited by the outside investigators were exacerbated by investigative and disciplinary decisions which were premised on the status and positional considerations of both violators and decision-makers” (Dkt. 1577, Third Sustainability Period Report, p. 32). OPD remained out of compliance with Task 45 through the period covered by the 9th Sustainability Report, before achieving “partial compliance” in the 10th, 11th, and 12th Sustainability Period Reports. OPD attained full compliance with Task 45 in the 13th Sustainability Period Report, and remains in compliance as of the most recent draft 14th Sustainability Period Report.

The draft 14th Sustainability Report highlights the “2025 Preliminary Investigation Outcome and Discipline Report” that was issued by the OPD Office of Internal Accountability (OIA) in June of 2026. This report is incorporated as Exhibit 1, and follows up on the Department’s “2024 Internal Investigation Outcome and Discipline Report”, which found wide disparities in how discipline is imposed within OPD.

The 2024 report articulated large discrepancies between the sustained rates for white sworn members and non-white sworn members in both division level and IA investigations. Although the findings were troubling, it is important to note that it was OPD that discovered these racial disparities and published them. OPD’s OIA, under the capable leadership of Police Program & Audit Supervisor Kristin Burgess, have done consistently commendable and thorough work, including this most recent report.

///

The "2025 Preliminary Investigation Outcome and Discipline Report" shows internal improvements from the 2024 report, although troubling discrepancies remain. The chart on page 4 of this report is illustrative:

Proportion of Member Cases that were "Sustained"

**Table 1: Sustained Rates at the Member Case Level 2024 versus 2025**

| | 2024 | | | 2025 | | |
|---|---|---|---|---|---|---|
| | % Sust | # Sust | Tot | % Sust | # Sust | Tot |
| White | 2% | 4 | 223 | 5% | 11 | 222 |
| Black | 7% | 23 | 351 | 7% | 21 | 303 |
| Hispanic | 6% | 25 | 425 | 8% | 33 | 406 |
| Asian/Filipino | 3% | 11 | 342 | 4% | 12 | 336 |
| Other/Unknown | 1% | 1 | 76 | 7% | 5 | 69 |
| **Total** | **5%** | **64** | **1417** | **6%** | **82** | **1336** |
| | | | | | | |
| Male | 5% | 54 | 1183 | 7% | 74 | 1135 |
| Female | 4% | 10 | 234 | 4% | 8 | 201 |
| **Total** | **5%** | **64** | **1417** | **6%** | **82** | **1336** |
| | | | | | | |
| Officer | 4% | 57 | 1331 | 6% | 67 | 1201 |
| Sgt and Above | 8% | 7 | 86 | 11% | 15 | 135 |
| **Total** | **5%** | **64** | **1417** | **6%** | **82** | **1336** |

This table shows that sustained rates increased for all races except Black members between 2024 and 2025, although the sustained rate for White officers remained lower than Black and Hispanic sustained rates in 2025. Whereas Black and Hispanic officers were sustained at three times the rate of White officers in 2024, the two and three percentage point difference, respectively, in 2025 is not statistically significant according to OIA. Plaintiffs' attorneys are not data scientists or statisticians, but take OIA at its word that this is not a statistically significant difference.

///

The report also analyzed whether disparities in sustained rates differed based on who initiated a case. The data for 2024 and 2025 are reproduced in table form on page 34 of the 2025 Preliminary Investigation Outcome and Discipline Report:

**Table 23: Sustained Rate by Race 2025 (Full Investigations and Summary Findings)**

| | All Cases | | | Internal Origin | | | External Origin | | |
|---|---|---|---|---|---|---|---|---|---|
| | % Sust | # Sust | Tot | % Sust | # Sust | Tot | % Sust | # Sust | Tot |
| White | 5% | 11 | 222 | 14% | 5 | 35 | 3% | 6 | 187 |
| Black | 7% | 21 | 303 | 30% | 10 | 33 | 4% | 11 | 270 |
| Hispanic | 8% | 33 | 406 | 35% | 12 | 34 | 6% | 21 | 372 |
| Asian/Filipino | 4% | 12 | 336 | 31% | 4 | 13 | 2% | 8 | 323 |
| Other/Unknown | 7% | 5 | 69 | 0% | 0 | 4 | 8% | 5 | 65 |
| **Total** | **6%** | **82** | **1336** | **26%** | **31** | **119** | **4%** | **51** | **1217** |

**Table 23: Sustained Rate by Race 2024 (Full Investigations and Summary Findings)**

| | All Investigations | | | Internal Origin | | | External Origin | | |
|---|---|---|---|---|---|---|---|---|---|
| | % Sust | # Sust | Tot | % Sust | # Sust | Tot | % Sust | # Sust | Tot |
| White | 2% | 4 | 223 | 0% | 0 | 8 | 2% | 4 | 215 |
| Black | 7% | 23 | 351 | 47% | 7 | 15 | 5% | 16 | 336 |
| Hispanic | 6% | 25 | 425 | 24% | 4 | 17 | 5% | 21 | 408 |
| Asian/Filipino | 3% | 11 | 342 | 13% | 1 | 8 | 3% | 10 | 334 |
| Other/Unknown | 1% | 1 | 76 | 0% | 0 | 0 | 1% | 1 | 76 |
| **Total** | **5%** | **64** | **1417** | **25%** | **12** | **48** | **4%** | **52** | **1369** |

The disparity in sustained rates for 2024 cases with an internal origin is enormous: zero percent for White officers, 24% for Hispanic officers, and 47% for Black officers. In 2025, the gap in sustained rates for internally-generated cases narrowed somewhat, to 14% for White officers, 30% for Black officers, and 35% for Hispanic officers. According to OIA, this "difference was not significant." However, we observed that white members were sustained at half the rate of Black, Hispanic, Asian members (14% versus 30-35%)." (2025 OIA Report, p. 34).

Plaintiffs' attorneys do not agree that the 2025 statistics, where Blacks Officers received twice as many complaints of Internal Origin as White Officers is something that OPD can dismiss as not statistically significant, especially without studies that show such a significant gap (greater than 2 to 1) lacks significance.

Based on the foregoing discrepancies, OIA recommended that "the Department should continue to closely monitor sustained rates for internally generated cases to identify trends and potential areas of concern." (2025 OIA Report, p. 71). The OIA report also recommended that OPD provide training on how to enter Internally Discovered Violations into the complaint for, and that the Department more closely monitor data entry for investigation type.

Following the publication of the 2025 OIA Report, then-interim Chief Beere issued a memorandum titled "Response of OIA's 2025 Internal Investigation Outcomes and Discipline Report." This document is incorporated as Exhibit 2.

In this memorandum, Chief Beere accepts each of the above OIA recommendations, and states that the Department has begun implementing all three. Chief Beere also reports that the Department also undertook a review of data from the first quarter of 2026 and that "the preliminary results show that White and Black officers had nearly the same overall sustained rates, which were double the sustained rates for all other races. For internally generated cases, Black officers had the lowest sustained rate among all races." (Exhibit 2, p. 3)

///

The final paragraph of Chief Beere's memorandum is also worth highlighting in full. It speaks to some of the institutional reforms that have been brough about by the NSA and the newfound emphasis on consistency of discipline at the highest level of the Department.

> **CONCLUSION**
>
> The consistency of internal discipline is our goal and the standard the Department owes to both its employees and the public. The Department is firmly committed to sustaining this goal. The 2025 Study presented some data that raised concerns. While these results are concerning, we will continue to leverage data-driven insights through analytics and engage in meaningful qualitative and quantitative work. This will inform and refine our approach and responses to areas of improvement moving forward. The Department is committed to consistently examining its conduct, as outlined in the Department's policies, as a permanent instrument of accountability, independent of the status of federal oversight.
>
> Respectfully,
>
> 
>
> James P. Beere
> Interim Chief of Police
> Oakland Police Department

(Exhibit 2, p. 4)

This explicit commitment to ensuring consistency of internal discipline "independent of the status of federal oversight" is commendable. It is not lost on plaintiffs' attorneys that OPD itself researched, discovered, and then acted upon the discipline discrepancies outlined in the two OIA report. Chief Beere, his leadership team, and OIA have demonstrated that they understand the steps they must take to demonstrate OPD can discipline its officers to the equitable standard mandated by the NSA and sustained Task 45 compliance.

## Conclusion

Plaintiffs' attorneys hoped to celebrate the conclusion of the NSA at this Case Management Conference. Indeed, after the most recent Case Management Conference in May, Plaintiffs' attorneys expected we would join the Monitor to recommend that the NSA be brought to a conclusion. OPD was finally in compliance with all NSA Tasks for the first time in the Sustainability Period, and

the trendlines were promising. The Department simply needed to avoid backsliding for three months.

The Court concluded the most recent CMC by instructing all parties to reflect on the lessons they have learned over the course of the NSA. There are many, and they are overwhelmingly positive and sustainable. Committed leaders can enact systemic reforms. Constitutional policing is not incompatible with effective, proactive policing. Leadership matters. Buy-in matters. Incremental progress over time can lead to wholesale reform. There is so much good work to be lauded. But another lesson that Plaintiffs' attorneys and Oaklanders have learned and re-learned is that the Department finds new and creative ways to snatch defeat from the jaws of victory. Task 2 compliance is fully within the Department's control. It is a mathematical equation. No action taken by any external party (including the Plaintiffs' attorneys, the IMT, or anyone else) changes that math, there is no subjective or interpretive component to be evaluated. Oakland could simply do everything in its power to maintain Task 2 compliance. Their inability to do so while everyone is paying attention and rooting for their success is an enormous let down.

In May, Plaintiffs' attorneys lauded the Department and highlighted the IMT's assessment that Mayor Lee "has personally immersed herself" (Dkt. 1742, 12th IMT Report, p. 10) in completing the NSA. This is still the case. Command staff at OPD have worked aggressively to attain compliance and have impressed Plaintiffs' attorneys with their diligence and focus on full NSA compliance. This also remains true. Chief Beere, his leadership team, and OIA also deserve a lot of credit for their work to date.

Plaintiffs' Attorneys would end the NSA if OPD had attained full compliance in the sustainability period. The Negotiated Settlement Agreement has lasted for more than 23 years. It was supposed to last 5 years with a maximum of 7 years. To Plaintiffs' attorneys' knowledge, it is the longest lasting consent decree over a police

department in the history of the United States.

Yet OPD is still not in compliance. It has sustained full compliance in 2022 and other short periods since that time. The Sustainability Period was supposed to last one year. It has now lasted for 4 years and the OPD is still not in compliance.

Nevertheless, the Commanders and Supervisors in place now appear to be capable. Oakland has a Police Commission with a committee devoted to the NSA.

In light of all these developments, we believe the NSA should end in its present form, which includes Plaintiffs' attorneys having no future role in this case. Of course, if the Court, or the City of Oakland (in the case of Mr. Chanin, only) feel otherwise, Plaintiffs' attorneys will comply. The Court should retain jurisdiction for one year. During this time, the Oakland Police Department and the Oakland Police Commission would report to the court to the extent the court wishes. At the end of this one year, the Police Commission would issue a report to the Court which would include whatever information the parties and the Court would deem appropriate. Hopefully, at that time, this case would be dismissed.

**THE CITY'S STATEMENT**

The parties appear to agree on a fundamental point: Court oversight of the NSA—as it was conceived and has operated for 23 years—should end. Plaintiffs acknowledge that the Department that exists today "bears virtually no resemblance" to the Department in the early 2000s, and "believe OPD can work through [the Task 2] issue without the necessity for the NSA continuing" (see *supra* p. 4, 5). Plaintiffs further recognize that Oakland's Police Commission and the Internal Affairs Bureau are fully capable of carrying out the accountability functions historically associated with Task 2, and that they, Plaintiffs' counsel, no longer seek a role in monitoring or managing this case. In this respect, the parties are aligned—the City is prepared to assume local ownership of its constitutional policing obligations, and Plaintiffs are prepared to withdraw.

Where the parties diverge is on the appropriate way for the Court's oversight to come to a close. The City respectfully requests that the Court dismiss the case with prejudice and return oversight of the NSA to the City. Plaintiffs likewise agree that oversight should return to the City, but they propose that, even after the Plaintiffs withdraw from the case, the City should continue reporting to the Court for an additional year. Respectfully, that structure is not workable. The Police Commission and the Department are the City itself; asking the City to assume full local ownership while simultaneously remaining subject to continued federal court supervision—without any participating plaintiffs—creates a framework that no longer resembles litigation. Moreover, the Police Commission's involvement and accountability functions Plaintiffs identify are already mandated by the City Charter and will continue regardless of any further Court order.

The City's readiness to assume local oversight of the NSA is the product of years of deliberate operational and cultural reform. Recognizing that constitutional policing is a daily obligation rather than a single milestone, the City remains committed to ongoing work to sustain and build on the foundation it has created.

The principles underlying the NSA remain a permanent, non-negotiable priority reflected in the City Charter's civilian oversight and continuous NSA auditing provisions.

To ensure stability and prevent backsliding, the City has already begun implementing a comprehensive transition plan designed to reinforce local ownership and sustain forward momentum. Dkt. 1733, Joint Case Management Statement 35-40 (Jan. 20, 2026). Civilian oversight remains central to this framework. Additionally, in July 2026, Mayor Barbara Lee appointed James Beere as permanent Chief of Police, ensuring leadership continuity within the team that developed and launched the City's transition plan. *Id.* at 36, 37, 39.

Court oversight of the NSA may end, but the City's resolve to uphold its commitments to Oakland's community will not. The systems now in place will continue—this year, next year, and for the years that follow—without the need for Court supervision.

## I. THE CITY HAS ALREADY MET THE NSA'S ONE-YEAR SUSTAINED COMPLIANCE REQUIREMENT FOR TASK 2, AND A TWO PERCENT OR TWO-CASE VARIANCE DOES NOT CONSTITUTE EXTRAORDINARY CIRCUMSTANCES WARRANTING CONTINUED COURT OVERSIGHT (TASK 2).

In the first quarter of 2026, the Department completed 92% of Class II investigations within required timelines and remained in full compliance with Subtasks 2.2 and 2.3. The Department also completed most Class I investigations on time; however, its 83% Class I completion rate fell just below the 85% benchmark, placing Subtask 2.1 out of compliance for this reporting period. The City acknowledges this variance. But the margin between compliance and non-compliance amounted to only two cases. Had the City closed two additional complex Class I matters within 180 days, it would have remained in compliance. Additionally, it is important to consider this limited variance in the context of the City's prior performance, as it previously sustained Task 2 compliance for more than two continuous years during the sustainability period.

The Court has consistently applied the standard that tasks demonstrating sustained compliance are not subject to active monitoring, and that monitoring will resume only in "extraordinary circumstances." Dkt. 1525, Order Placing City of Oakland into Sustainability Period 3 ("Absent extraordinary circumstances, the Monitor… need not assess compliance with Tasks other than those listed above."); Dkt. 1606, Order Further Extending Sustainability Period 2 (same). Task 2 has already met the same threshold applied to other tasks. From the beginning of the sustainability period in June 2022 through the Ninth Reporting Period in late 2024, the City exceeded the 85% timeliness benchmark for both Class I and Class II investigations in every quarter and the Monitoring Team deemed the City in compliance for a continuous period of more than two years. See Dkts. 1540, 1557, 1578, 1593, 1602, 1618, 1637, 1656, & 1683, First through Ninth NSA Sustainability Period Reports of the Independent Monitor. Under the Court's established practice, this record represents sustainability sufficient to discontinue affirmative monitoring of Task 2.

While other tasks with similar sustainability records have long been deemed inactive, Task 2 has remained under active monitoring for a different reason: its close relationship to Task 5. Even after the City had sustained Task 2 compliance for the proscribed period, the parties agreed that continued monitoring was warranted to ensure that improvements in investigative quality under Task 5 was not wholly at the expense of Task 2. In other words, the parties wanted to ensure that fixing Task 5 did not cause Task 2 completion rates to plummet. This reflected a deliberate, prudent decision to observe both tasks in parallel while the Department strengthened its investigative rigor. The Department has resumed and sustained compliance with Task 5, and Task 2 completion rates have not plummeted.

To be clear, the Department is required to and strives to achieve both speed and thoroughness in its investigations. Unduly prolonged investigations impose a

severe toll on this system; they leave a cloud of uncertainty hanging over officers' careers and force community members to wait too long for accountability. Both the public and Department members are entitled to a definitive, timely resolution. The City is ultimately more encouraged, however, that the Department remains in compliance with the core mandates of Task 5, internal affairs procedures, and is not compromising the integrity of any of its investigations simply to meet Task 2 deadlines. Dkt. 1766, Fourteenth NSA Sustainability Period Report of the Independent Monitor 8 (Sept. 15, 2026). Missing the Class I timeline requirement for the first quarter of 2026 by two cases does not indicate systemic non-compliance or a lack of institutional will that requires external intervention.

There will likely always be instances where the Department or the CPRA require more than 180 days to complete Class I investigations to achieve the quality and thoroughness required in many serious and complex investigations. This is the structural tension inherent in the NSA. Task 2 imposes a strict 180-day timeline; Task 5 requires thorough, evidence-based, and credible investigations. In some complex matters, these mandates naturally place pressure on one another. The Department's two percent or two-case variance below the 85% threshold for Class I cases falls within the reasonable and normal scheme of operational challenges of managing complex investigations under strict timelines. A variance that dips slightly below the mandated threshold is an operational challenge appropriately handled by internal management rather than through continued Court oversight.

In fact, the City was already taking measures to improve Class I timelines well before the Monitor's most recent report. Department strategies include defining investigative paths at case assignment; clarifying and refining tolling documentation practices; reducing delays between intake approval and case assignment; exploring structured checkpoints at day 60 and day 120 to monitor remaining time; reviewing opportunities to streamline Reports of Investigation; and assessing whether certain lower-level cases may appropriately be handled at the

field-supervisor level. Ultimately, the City's active monitoring and persistent adjustments to Task 2 demonstrate that it has already put in place the internal controls necessary to manage this quarterly timeliness variance independent of the Monitor and the Court.

For the foregoing reasons, the City respectfully submits that the recent Task 2 variance is not an extraordinary circumstance that warrants continued Court intervention.

## II. FOCUSED REFORMS HAVE LED TO MEASURABLE, SUSTAINED REDUCTIONS IN STOP DISPARITIES.

One of the most profound demonstrations of the Department's cultural shift under monitoring and Court oversight lies in its use of data and data-driven initiatives to achieve substantial and long-term change. By prioritizing intelligence-led stops, reducing searches based solely on parole or probation conditions, and de-emphasizing stops for non-moving and equipment violations, the Department has successfully permanently decreased historical racial disparities in its day-to-day police operations.

The City remains committed to addressing the historical overrepresentation of Black individuals detained during police encounters. State-level data confirms that Black residents are considerably overrepresented in police stops statewide, whereas white and Latinx residents are represented proportionally relative to their overall population share.[2] To correct this imbalance, the Department implemented comprehensive policy changes and command directives designed to reduce non-dispatch stops and increase the percentage of non-dispatch stops that are based on intelligence. Over the past decade, these interventions have yielded a significant decline in both the absolute volume of Black individuals stopped and the overall Black stop rate. The Department's most recent stop-data confirms that it has

---

[2] Magnus Lofstrom, et al., *Racial Disparities in Law Enforcement Stops*, 6-7 (2021), https://www.ppic.org/publication/racial-disparities-in-law-enforcement-stops/ (last visited Sept. 8, 2026) (discussed by City in Dkt. 1660 at 28-29).

continued to sustain these meaningful reductions through the first half of 2025. See Fig. 1.

**Figure 1: Annual Non-Dispatch Stop Rate by Race (2016-2025)**

| | Black/African American | Hispanic | White | Asian | Other |
|---|---|---|---|---|---|
| **2016** | 62% | 20% | 10% | 5% | 3% |
| **2017** | 61% | 22% | 9% | 5% | 4% |
| **2018** | 55% | 22% | 11% | 7% | 5% |
| **2019** | 51% | 26% | 12% | 7% | 4% |
| **2020** | 52% | 26% | 11% | 6% | 4% |
| **2021** | 50% | 31% | 8% | 6% | 4% |
| **2022** | 46% | 35% | 9% | 6% | 5% |
| **2023** | 41% | 35% | 10% | 8% | 5% |
| **2024** | 43% | 34% | 9% | 9% | 5% |
| **2025** | 45% | 34% | 9% | 7% | 5% |




The empirical shift between 2016 and 2025 underscores the efficacy of the Department's thoughtful and targeted policies. In 2016, Black individuals accounted for 62% of all non-dispatch stops; between 2022 and 2025, Black individuals accounted for an average of 44% of non-dispatch stops. *Id.* This translates to a substantial real-world impact on Black individuals residing in or

visiting Oakland. This statistical shift translates directly to 15,000 to 17,000 fewer non-dispatch stops of Black individuals each year. The Department stopped 75% fewer Black people during non-dispatch encounters in 2025 than it did in 2016. See Fig. 2.

**Figure 2: Non-Dispatch Stops by Race (2016-2025)**

| | Black/African American | Hispanic | White | Asian | Other | Grand Total |
|---|---|---|---|---|---|---|
| 2016 | 20,410 | 6,685 | 3,318 | 1,667 | 1,061 | 33,141 |
| 2017 | 19,784 | 7,047 | 2,835 | 1,588 | 1,152 | 32,406 |
| 2018 | 10,924 | 4,492 | 2,282 | 1,374 | 899 | 19,971 |
| 2019 | 7,517 | 3,809 | 1,701 | 991 | 627 | 14,645 |
| 2020 | 6,189 | 3,131 | 1,323 | 773 | 507 | 11,923 |
| 2021 | 3,099 | 1,890 | 513 | 381 | 259 | 6,142 |
| 2022 | 3,570 | 2,724 | 681 | 485 | 365 | 7,825 |
| 2023 | 4,306 | 3,643 | 1,036 | 875 | 557 | 10,417 |
| 2024 | 4,884 | 3,848 | 1,071 | 1,018 | 605 | 11,426 |
| 2025 | 5,082 | 3,851 | 1,011 | 754 | 551 | 11,249 |




.

**A. Intelligence-Led Policing Helps Distinguish Disparity Driven by Crime-Related Intelligence From Disparity Driven by Officer Discretion.**

The Department's long-term shift toward intelligence-led policing has been central to its strategy to reduce racial disparities in stops.[3] Intelligence-led stops occur when officers base their decision to detain someone on verified investigative information, a documented nexus to criminal activity, or identification of a known suspect. These stops differ from discretionary, non-dispatch encounters, where officers may rely more on intuition or subjective judgment.

It is important to clarify that increases in intelligence-led stops do not necessarily produce less racial disparity. In some periods, the racial composition of intelligence-led stops may reflect greater disparity than in non-intelligence led stops. When disparity appears in intelligence-led policing, however, it carries a very different meaning: it may reflect an underlying disparity in crime-related intelligence rather than a disparity resulting from officer discretion, prejudice, or unconscious bias. Thus, when it comes to analyzing disparities in intelligence-led stops, the City should still consider the influence of systemic or institutional bias but disparity is far less likely to signal biased enforcement at the officer level because officers are responding to investigative leads rather than making subjective decisions.

This distinction is central to the Department's racial-equity strategy. The Department's priority, and where the Department can exercise some control over racial disparity in enforcement stops, is reducing disparity that arises from or may creep into officer decision-making. When the proportion of non-dispatch stops that are intelligence-led increases, encounters based on officers' subjective judgment

[3] Intelligence-led (intel-led) policing means requiring officers to have some nexus to criminal activity before they effect stops of vehicles or people. Intel-led stops assist officers in more effectively contacting the relatively few people who are causing the most harm in our neighborhoods. Non-intel-led, non-dispatch stops are typically the types of stops where police officers exercise the most discretion.

decrease, and any racial disparity present is more likely tied to documented criminal activity and verified information, and potential systemic bias, rather than to variability in officer-initiated stops. Ultimately, increasing intelligence-led stops protects innocent citizens, cuts down on unfair targeting, and builds deeper trust within the community.

The Department began tracking intelligence-led stops in 2016, though the data collected in the first year is incomplete because tracking began sometime after January 2016.

**Figure 3: Percentage of Non-Dispatch Stops That Were Intelligence-Led**

| Year | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 1-2Q2026 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Intel-led % | 28% | 27% | 31% | 36% | 37% | 42% | 42% | 28% | 32% | 38% | 44% |

The vast majority of non-dispatch, non-intelligence-led stops are traffic enforcement stops. As a result, when the Department prioritizes traffic enforcement or structures its operations to support greater traffic enforcement, the proportion of intelligence-led non-dispatch stops naturally decreases. This dynamic was clearly reflected in late 2022: when traffic squads were reinstated, the number of non-dispatch traffic stops rose, and the percentage of intelligence-led stops fell. See Fig. 3. After the Department disbanded its traffic squads in the third quarter of 2025, the percentage of intelligence-led stops immediately increased, demonstrating that the Department's commitment to prioritizing intelligence-led stops had remained in place but had been temporarily obscured by the volume of traffic enforcement activity. *Id.*

Although the majority of traffic stops during these periods of heightened traffic enforcement were not intelligence-led, they were not wholly subjective. The

Department conducts moving-violation enforcement using objective criteria developed in collaboration with the City's Department of Transportation and community stakeholders. Enforcement is concentrated at high-injury networks and dangerous intersections—locations identified through collision data, fatality statistics, and traffic-safety research. This targeted approach ensures that even non-intelligence-led traffic stops are guided by verifiable risk factors rather than officer discretion alone. By focusing traffic enforcement on making specific locations safer, the Department maintains an objective basis for these stops, reduces arbitrary policing, and protects the communities most impacted by unsafe driving.

## III. THE CITY IS STRENGTHENING INTERNAL ACCOUNTABILITY TO ENSURE FAIR AND CONSISTENT DISCIPLINE (TASK 45).

At the core of this litigation is the mandate to identify, address, and eliminate racial disparity. This principle governs not only the Department's enforcement activities in the community, but also its internal systems of accountability, investigation, and discipline. Constitutional policing requires parity across both dimensions: external legitimacy in public-facing interactions and internal integrity in how the Department evaluates and disciplines its personnel. To ensure that internal disciplinary processes are administered fairly, consistently, and without demographic bias, the City relies on established monitoring structures alongside proactive, specialized interventions. Specifically, the Department conducts routine outcome monitoring by evaluating annual and preliminary Internal Affairs Bureau (IAB) data while utilizing its biennial member perception survey as a regular diagnostic tool to measure internal confidence and procedural compliance.

Furthermore, demonstrating the Department's active prioritization of this work, the Department has undertaken two targeted special projects designed to isolate data trends and cultural concerns that standard reporting cannot fully capture. First, the Department executed a dedicated Supervisory Note File (SNF)

special audit to track informal supervisory resolutions, ensuring that recent policy updates regarding minor complaint handling did not conceal underlying discipline disparities. Second, the Department has launched a comprehensive qualitative research study to move beyond the numbers, investigating the cultural and historical drivers of employee mistrust directly through confidential interviews with personnel. Together, these permanent monitoring systems and resource-intensive special projects demonstrate the City's sustained commitment to diagnosing disparities, identifying root causes, and implementing enduring institutional reforms.

### A. 2025 Internal Investigation Outcome Data Shows Meaningful Progress in Equitable Discipline.

The Department routinely monitors consistency of discipline through an annual evaluation of formal internal investigation case dispositions and discipline. In collaboration with the Independent Monitoring Team and academic researchers from Stanford University, the City developed an empirical framework to detect and remedy discipline disparities, refining this methodology each year during its analyses of internal investigation outcomes and discipline. The Department's 2025 outcome data reflected no statistically significant race- or gender-based disparities in investigative findings or imposed discipline. Ex. 1, Oakland Police Department Office of Internal Accountability, 2025 Internal Investigation Outcome and Discipline Report (June 2026). This represents a marked improvement over 2024 data, which had demonstrated sustained rate disparities between Black and white officers—a gap that widened in internally generated complaints—as well as elevated sustained rates for female and Latinx officers in internally generated matters.[4]

---

[4] Internally generated cases are initiated by department employees (i.e., supervisor, co-worker, self-report by employee, etc.), as opposed to externally generated cases which are initiated by someone who does not work for the Department (member of the public or member of a different department or agency). Some cases that are initially generated externally may have allegations added by department supervisors or investigators. The case would be categorized as externally generated,

Specifically, in 2025, the Department's overall sustained rate rose from 4.5% to 6.1%. Sustained rates increased across racial groups while remaining stable at 7% for Black officers. *Id.* at 4. Concurrently, the sustained rate for white officers increased from 2% to 5%, substantially narrowing the disparity observed in 2024.[5] *Id.* Consequently, the five-percentage-point difference between Black and white sworn personnel in 2024 narrowed to a non-statistically significant two-percentage-point difference in 2025. Similarly, the four-percentage-point differential between Latinx and white personnel narrowed to three percentage points, also falling below standard thresholds of statistical significance. The 2025 data revealed no gender-based disparities, and while rank-and-file officers were sustained more frequently than supervisors, that differential declined from 21 percentage points to 9 percentage points and was not statistically significant. *Id.* at 5-6.

Because internally generated matters and discovered allegations inherently rely upon supervisory discretion, the Department prioritizes continuous monitoring of these trends even when differentials do not reach statistical significance. As Chief Beere emphasized in the Department's formal response to the 2025 data, the Department views these results as meaningful progress rather than a conclusive determination that disparity has been permanently resolved. See Ex. 2, Department's Response to OIA's 2025 Internal Investigation Outcomes and Discipline Report (June 18, 2026). To enhance institutional controls, the Department deployed a specialized Vision module in May 2026, requiring investigators to record how an internal allegation was discovered, who authorized the investigation, and the underlying basis for the allegation. The Department is

---

but the added allegation would be categorized as an "internally discovered violation."

[5] The City uses the term "disparity" interchangeably with "statistically significant differences." Statistical significance is a measurement of how likely it is that the difference between two groups (e.g., race, gender, rank) occurred by chance or occurred because the two variables are actually related to each other. Put another way, it measures whether the outcomes are linked to a variable (e.g., race), versus whether the outcomes occurred randomly.

concurrently conducting mandatory training regarding the accurate entry of internally discovered violations into complaint tracking forms, and IAB will formally audit the resulting data during the first quarter of 2027. *Id.* at 2-3.

**B. Preliminary 2026 Data Shows Continued Equity in Internal Investigations.**

To ensure that the equitable trends established in 2025 have remained durable into the current calendar year, the Department conducts ongoing, real-time reviews of its provisional case metrics. Preliminary data from the first and second quarters of 2026 demonstrate sustained adherence to the benchmarks achieved in the prior annual period. Initial analyses indicate no statistically significant disparities across race, gender, or supervisory rank. While the City will publish a comprehensive analysis upon completion of its annual year-end review, these preliminary metrics confirm consistent, equitable administration in internal investigative outcomes and disciplinary sanctions, showing continued movement in the right direction. See Fig. 4.

///

**Figure 4: 1-2Q 2026 Internal Investigation Outcomes**[6]

**Overall Sustained Rate**

| | Sustained Rate | # Sustained | Total |
|---|---|---|---|
| WHITE | 11% | 15 | 132 |
| BLACK | 12% | 15 | 129 |
| HISPANIC | 6% | 14 | 238 |
| ASIAN/FILIPINO | 6% | 10 | 175 |
| OTHER | 3% | 1 | 36 |
| **Grand Total** | **8%** | **55** | **710** |

**Overall Sustained Rate**

| | Sustained Rate | # Sustained | Total |
|---|---|---|---|
| MALE | 8% | 50 | 604 |
| FEMALE | 5% | 5 | 106 |
| **Grand Total** | **8%** | **55** | **710** |

**Internally Generated Cases**

| | Sustained Rate | # Sustained | Total |
|---|---|---|---|
| WHITE | 35% | 9 | 26 |
| BLACK | 44% | 11 | 25 |
| HISPANIC | 16% | 4 | 25 |
| ASIAN/FILIPINO | 47% | 7 | 15 |
| OTHER | 0% | | 4 |
| **Grand Total** | **33%** | **31** | **95** |

**Internally Generated Cases**

| | Sustained Rate | # Sustained | Total |
|---|---|---|---|
| MALE | 35% | 29 | 82 |
| FEMALE | 15% | 2 | 13 |
| **Grand Total** | **33%** | **31** | **95** |

### C. The Supervisory Note File (SNF) Special Project Audit Shows Proactive, Careful Work to Detect and Prevent Discipline Disparities.

While formal internal affairs case findings provide clear data to analyze, the Department recognized that recent policy modifications shifted certain misconduct allegations from formal internal investigations and findings to informal tracking systems, requiring a specialized audit to ensure comprehensive oversight. Specifically, the Department previously identified disparities in sustained rates for officers alleged to have an Unintentional Failure to Accept or Refer a Complaint

[6] Cases approved January-June 2026, using CPRA approval dates for CPRA concurrent cases.

(FTARC). In 2022, Black officers were sustained for FTARC allegations at a higher rate than other demographics; in 2023, white officers exhibited the highest sustained rate. Prior to 2024, FTARC violations required a formal internal investigation regardless of how the misconduct came to light and regardless of whether the subject officer had a history of prior similar behavior. In late 2023, the Department modified its policy to allow internally discovered Class II FTARC violations without an established pattern of similar behavior to be resolved informally through SNFs, consistent with other Class II administrative procedures which allow informal handling where there is no pattern.

Because this policy change diverted FTARC allegations away from the formal IAB investigation and disposition process, assessing whether disparities persisted in 2024 and 2025 required a resource-intensive audit of both formal sustained findings and informal SNF entries. The Department's policy change means that FTARC violations no longer automatically result in full internal investigations and formal discipline. Because of this shift, the Department examined whether the racial disparities previously observed in internal investigation outcomes had instead been displaced into the City's informal tracking system, corrective SNFs.

To complete the analysis, the Office of Internal Accountability (OIA) and an analyst from the Mayor's Office worked together to conduct a manual, comprehensive audit to isolate and analyze FTARC-related SNF entries. To allow this type of analysis to be conducted with greater ease in the future, the Department amended its reporting software in May 2026 to include a dedicated field classifying corrective SNF entries by violation type.

///

The resulting audit demonstrated that in 2024, white officers were underrepresented among total FTARC violations (combining SNFs and sustained IAB matters) by 13 percentage points relative to their share of the sworn workforce, whereas Asian/Filipino officers were overrepresented by 8 percentage points. Ex. 3, Oakland Police Department Office of Internal Accountability, Supervisory Note File Analysis: Discipline Disparities Follow-Up 9 (Sept. 2026). In 2025, these figures normalized, and FTARC violations across all racial and ethnic groups aligned more proportionally with department-wide demographics. *Id.*

RESULTS

**In 2024, white officers were underrepresented in FTARC violations while Asian/Filipino officers were overrepresented. In 2025, rates were mostly aligned with shares of sworn personnel.**

| | 2024 | | | 2025 | | |
|---|---|---|---|---|---|---|
| Race/Ethnicity | # FTARCs | % FTARCs | % Sworn Personnel | # FTARCs | % FTARCs | % Sworn Personnel |
| White | 7 | 12% | 25% | 11 | 24% | 23% |
| Black | 14 | 24% | 21% | 8 | 18% | 21% |
| Hispanic | 19 | 33% | 29% | 11 | 24% | 30% |
| Asian/Filipino | 16 | 28% | 20% | 11 | 24% | 21% |
| Other/Unknown | 2 | 3% | 4% | 4 | 9% | 5% |
| **TOTAL** | **58** | **100%** | **100%** | **45** | **100%** | **100%** |

In 2024, white officers were underrepresented by 13 percentage points & Asian/Filipino officers were overrepresented by 8 percentage points.

In 2025, shares of FTARC violations were largely aligned with each group's share of sworn personnel.

*Fig. 5*

An analysis of the data across four years, from 2022 through 2025, indicated that no racial, ethnic, or gender demographic group experienced consistent over- or underrepresentation in corrective SNF entries for FTARC violations. While minor annual fluctuations and variances occurred in individual years—such as in 2024 as noted above—these differences leveled out or reversed in 2025.

Ultimately, the data reflects year-to-year variation rather than systemic, institutional disparity, and the Department maintains vigilant oversight of these

files to identify and correct any emerging demographic disparities. The City's analysis demonstrates a genuine and comprehensive effort to ensure that the policy change did not simply relocate prior racial disparities into an alternative, informal mechanism.

**D. The Department Takes Workforce Trust Seriously and Uses Member Feedback to Strengthen Accountability.**

It is important for the City to not only understand the mechanics of its formal and informal discipline systems, but to also understand how personnel actually experience these systems. To capture that perspective, the Department uses its biannual member perception survey as a regular monitoring tool to assess internal confidence, communication gaps, and perceived fairness. Administered between June and August 2025 to 252 respondents (179 sworn officers and 73 professional staff), the survey reflected a decline in internal confidence since 2022. See Oakland Police Department, Results of the 2025 Survey of OPD Personnel Perceptions of Internal Investigation and Discipline (July 2026), https://www.oaklandca.gov/Public-Safety-Streets/Police/OPD-Policies-and-Resources/Office-of-Internal-Accountability (last visited Sept. 22, 2026). A statistical majority of respondents reported concerns that internal investigations are unfair (52%), that the disciplinary process itself is unfair (61%), and that the discipline matrix is applied inconsistently (51%). *Id.* at 16. Additionally, 42% indicated that the Department does not consistently follow its own policies and procedures during disciplinary proceedings. *Id.* at 3.

These concerns were most concentrated among sworn, rank-and-file personnel, with Black sworn officers reporting the highest level of skepticism about procedural compliance. *Id.* While less than half of respondents across all demographics attributed disciplinary outcomes to race or gender, many personnel cited supervisory rank and perceived favoritism as influential factors. *Id.* The survey also captured significant skepticism among sworn staff regarding external

political influence, media coverage, and the procedural role of the Community Police Review Agency (CPRA). *Id.* at 3, 17, 23. Notably, 21% of sworn respondents declined to state their race and 18% declined to state their gender, underscoring a broader trust deficit across the workforce. *Id.* at 9.

The Department recognizes that these perceptions are rooted in both empirical data and institutional history. The survey followed the release of the Department's 2024 outcome data, which documented statistically significant racial disparities in sustained rates, particularly in internally generated matters. Workforce confidence was also likely shaped by high-profile internal investigation deficiencies revealed in recent years, where concerns about favoritism, inconsistent discipline, and administrative failures generated significant internal and external scrutiny. These experiences reasonably influenced how personnel view the accountability system today.

City and Department leadership take these trust concerns seriously and have implemented institutional corrective measures. Supervising commanders must now conduct mandatory exit conferences with subject officers following sustained findings to explain the case outcome, and the Chief of Police personally conducts these briefings for suspensions and dismissals. Ex. 4, Department Response to the 2025 IAB Perception Survey (July 31, 2026). The Department has also expanded scenario-based training using anonymized historical cases to demonstrate consistent application of the discipline matrix, and command staff continue routine manual audits of supervisory files to reduce arbitrary decision-making. *Id.* at 4-6. In addition, the Department and CPRA are co-developing mandatory citywide training to clarify jurisdiction and investigative roles, and the Department of Race and Equity provides ongoing supervisory instruction on objective case evaluation, due process requirements, and implicit bias mitigation. *Id.* at 7.

**E. The Department's Qualitative Interview Project Aims to Strengthen Transparency and Build Long-Term Internal Trust.**

The Department recognizes that understanding and addressing employee skepticism requires more than data analysis and targeted operational changes alone. Structured, narrative engagement is essential to uncovering the historical and cultural factors that shape how personnel experience internal accountability systems. To that end, the Department launched a comprehensive Qualitative Research Study designed to collect candid, detailed insights from employees across all ranks and bureaus. This in-depth inquiry allows the Department to better understand workplace dynamics and the lingering influence of past internal affairs issues, helping leadership address the deeper drivers of trust concerns.

To encourage open participation, the working group established strict confidentiality protections. Chief Beere issued Special Order 9219—formally approved by the Police Commission—which exempts interview disclosures from the mandatory reporting requirements of Department policy, except for allegations involving criminal misconduct. The Department completed an extensive stakeholder review of all survey instruments, questionnaires, consent materials, and outreach plans, engaging the executive team, Monitoring Team, employee affinity groups, labor unions, and the Office of the City Attorney to ensure participant anonymity and confidence in the process.

The City's initial August 2026 recruitment yielded a volunteer participant pool comprising both sworn and professional staff from various ranks and investigative roles. The Department subsequently extended the application period through September to allow for additional applicant diversity. To maintain strict anonymity, identifying information is limited to the designated research lead, and interviews are selected using anonymized demographic profiles. The 90-minute virtual interviews are scheduled to conclude by November 2026, with audio files destroyed immediately following transcription. Formal qualitative coding and thematic analysis will be completed in December 2026, with a final report and actionable recommendations expected by February 2027. This study will provide a

stronger empirical foundation for improving procedural transparency, reducing perceived favoritism, and building durable internal trust.

Taken together, the Department's monitoring systems and specialized diagnostic projects—including this qualitative initiative—demonstrate meaningful, ongoing progress toward more equitable disciplinary practices. By pairing objective data audits with a candid analysis of internal culture, the City is well-positioned to identify emerging disparities and sustain a fair, transparent, and constitutionally compliant system of accountability.

## IV. THE DEPARTMENT'S REGULAR COMPLIANCE CHECKS RESPOND TO THE COURT'S DIRECTIVE TO CONFIRM CONTINUED ADHERENCE TO UNMONITORED NSA TASKS.

At the May 27, 2026 hearing, the Court directed the City to review the 48 NSA tasks not currently assessed by the Independent Monitoring Team to "satisfy itself that it remains in compliance with the letter and the spirit of those tasks." May 27, 2026 Tr. at 5:3–7. In practice, the Department already maintains an institutionalized compliance structure designed for this very purpose. Under this system, the Chief of Police assigns executive team members ongoing responsibility for specific NSA tasks, each governed by a detailed evaluation rubric. Responsible commanders conduct periodic inspections within their portfolios, identify any non-compliant practices, implement corrective actions, and recommend policy or training adjustments as needed.

To meet the Court's directive, the Deputy Chief of the Bureau of Risk Management (BRM) directed the commanders responsible for each task to provide a task compliance inspection for the annual period of April 2025 through March 2026. After reviewing and consolidating these submissions, the City is satisfied that the Department remains in substantial compliance with the letter and spirit of the 48 unmonitored NSA tasks, some of which have been consistently sustained for many years.

The inspection flagged a few areas where additional reminders, training, or

focused follow-up were warranted, all of which involved the format or documentation of required supervisory meetings or consultations. Under Subtask 21.2, supervisors in designated units are required to conduct bi-monthly, one-on-one performance reviews. The inspection confirmed that supervisors were meeting regularly with personnel about performance, in many cases more frequently than required, but some meetings did not follow the prescribed one-on-one format or the one-on-one aspect was not clearly documented. The Department is subsequently reinforcing expectations under Department General Order B-06, Performance Appraisals, with updated training for incoming and acting sergeants specifically focusing on the one-on-one meeting requirement.

The inspection also identified follow-up needs under Subtask 44.4 which requires a documented consultation between supervisors when an officer's assignment changes during an appraisal period and, as a result, the officer has more than one supervisor in that period. An inspection of a sample of officers with multiple supervisors in a single appraisal period indicated that the Department needs to improve the consistency of these consultations and their documentation. The Department has added Task 44 to the command retreat training topics for the third quarter of 2026.

Finally, under Task 48, Departmental Management and Annual Management Report, the required annual command-level meetings have not yet been completed by Chief Beere's administration. To address this, Chief Beere has directed the meetings for the 2025 cycle to occur by October 1, 2026. For 2026, the Department has a plan to remind commanders starting in December that annual reports are due on January 31, 2026, and the BRM has been directed to send reminders every two weeks. In mid-February the BRM will start scheduling commander meetings to ensure the meetings are concluded by March 2026, leaving plenty of time to write the final report by the June 2026 deadline.

The internal task inspection also underscored areas of compliance in which

internal oversight operates at an advanced and self-sustaining level. Most notably, the Department's command-level process for reviewing use of force reporting and investigations uses a methodology that mirrors the Monitoring Team's methodology. Initiated in 2022 under then-Deputy Chief Beere and continued under Deputy Chief Tedesco, this command review panel evaluates approximately 30 use of force reports and incidents per quarter, comprehensively examining Level 3 and Level 4 force incidents. This review team has worked with the Office of Internal Accountability to implement a Compliance Assessor Form to standardize the review of use of force reports and body-worn camera footage. Ex. 5, Compliance Assessor Form, PDF version. The fillable form acts as a sort of flowchart which ensures review of multiple overlapping NSA subtasks during every use of force evaluation. When evaluating an incident, reviewers use a digital rubric to ensure specific compliance determinations are documented for each individual requirement. For every use of force incident reviewed, the panel concurrently audits compliance with Task 18 for proper supervisory arrest approval; Tasks 24 and 25 for use of force investigation and reporting, including appropriate body-worn camera activation, announcing police presence, using appropriate language, and avoiding boilerplate writing in reports; Task 35 for use of force witness identification; Task 36 for precise body-worn camera activation and mileage logs during detainee transport; and Task 38 for witness signatures on statements. The form requires reviewers to document corrective actions for any identified deficiency, embedding accountability directly into the review process. This structure supports uniform data collection, facilitates real-time correction of deviations, and allows the leadership team to intervene promptly when needed. To broaden Department-wide competency, the commanding Deputy Chief rotates command-level personnel through the panel, expanding familiarity with rigorous oversight practices.

Overall, the Department's assessment confirms substantial compliance with all inactive NSA tasks. The City's established oversight systems—particularly in

areas such as use-of-force review—are durable, mature, and capable of sustaining constitutional policing standards independent of external monitoring. By pairing continuous executive inspections with BRM oversight and immediate remediation where necessary, the Department maintains strong adherence to both the letter and the spirit of its long-standing NSA obligations.

## V. KEY LESSONS LEARNED UNDER COURT OVERSIGHT THAT NOW GUIDE OAKLAND'S LONG-TERM COMMITMENT TO CONSTITUTIONAL POLICING.

Over more than two decades of Court supervision, the City has confronted moments where it appeared technically close to compliance while still experiencing localized breakdowns in internal accountability. That tension—between outward progress and hidden structural weakness—forced an honest evaluation of how earlier reforms sometimes rested on foundations that were not durable. Through this process, the City and Department learned critical lessons about what real, sustainable compliance requires, and those lessons now anchor Oakland's long-term constitutional policing strategy.

These lessons—established through experience, reflection, and accountability—form the foundation of Oakland's continued work to maintain a disciplined, transparent, and community-centered police department.

### 1. The Cover-Up is Always Worse Than the Mistake.

The City's experience shows that attempts to minimize, overlook, or conceal misconduct cause far greater harm to institutional integrity than the underlying misconduct or mistake itself. Avoiding or delaying full internal accountability even in a few isolated cases creates lasting damage within the Department, eroding trust in the disciplinary system; and in the community, eroding trust in the Department's ability to hold its officers accountable. In contrast, when the Department consistently addresses allegations of misconduct through established accountability channels, then when details of an investigation come to light in a court proceeding or in the media, it reinforces organizational trust, stability, and long-term

institutional legitimacy. Durable reform requires confronting operational failures directly, promptly, and within the Department's established accountability systems rather than ignoring warning signs or allowing issues to linger.

**2. Data Must Be Actively Used, Not Just Collected.**

The Department has learned that data has limited value unless it is used as an active diagnostic tool. Over the last several years, the Department transformed data collection from a passive reporting requirement into a foundation for early intervention. Through quarterly risk-management meetings at the area, bureau, and citywide levels—codified in DGO R-01—supervisors analyze micro-trends such as shifts in discretionary stops or squad-level anomalies. Regular force and Internal Affairs trend reports help command staff identify potential racial disparities or performance concerns early, enabling timely corrective action.

**3. Numbers Alone Cannot Capture Real-World Experience.**

Quantitative benchmarks reflect important structural progress—including reductions in racial disparities and greater parity in discipline—but data alone cannot capture workforce morale or lived community experience. The Department learned that sustainable reform requires pairing quantitative metrics with qualitative insight. Initiatives like Special Order 9219 and the Department's Qualitative Research Study allow leadership to examine cultural and historical factors driving skepticism and to address root causes rather than only surface-level symptoms.

**4. Smart Stops Are More Effective Than High-Volume Stops.**

The Department replaced outdated, high-volume stop practices with an intelligence-led, problem-solving model that protects civil liberties while supporting public safety. The Department now prioritizes stops based on confirmed safety concerns, high-injury collision intersections, and evidence-based Ceasefire missions. By sharply reducing non-actionable discretionary encounters, the Department has shown that focused, data-driven enforcement strategies can reduce violent crime

while strengthening trust in the communities most affected by policing.

///

**5. Civilian Oversight Is Essential to Public Trust, Independent Accountability, and Shared Community Ownership of Reform.**

The City learned that civilian oversight is an essential component of legitimate, community-centered policing. Oakland's Charter-based oversight bodies—the Police Commission, the Inspector General, and the Community Police Review Agency—provide an independent layer of accountability so the Department is not simply policing itself. By engaging regularly with these oversight partners and incorporating their perspectives into accountability discussions, the Department strengthens the role of community voice in its disciplinary systems and reinforces that constitutional policing is a shared responsibility. These relationships help maintain public trust and ensure that the Department's internal accountability work is informed not only by departmental requirements, but by the expectations of the community it serves.

**6. Leadership Must Embody the Standards It Sets.**

Sustained compliance cannot rest solely on policies—it must be modeled consistently by leadership. The Department's executive team and City officials reinforce constitutional policing principles across command-staff retreats, Department lineups, and community-facing Town Halls. By consistently demonstrating accountability in public and internal forums, leadership reinforces that constitutional integrity is expected at every rank.

**7. Community Engagement Cannot Be Limited to Moments of Crisis.**

The Department learned that procedural justice grows out of routine, everyday interactions—not only enforcement or emergencies. In recent years, the Department has emphasized non-adversarial engagement through faith-based community walks, youth mentorship supported by the Oakland Police Foundation, and neighborhood listening sessions. These sustained efforts help officers build trust and mutual respect across Oakland long before critical incidents occur.

**8. Constitutional Policing Requires Whole-City Ownership.**

The City learned that meaningful constitutional policing is a citywide responsibility, not a department-isolated effort. The City improved cross-agency coordination, demonstrated, for example, by Mayor Lee's audit team member collaborating with the Department's Office of Internal Accountability on the SNF project mentioned earlier, and establishing the Constitutional Policing Administrator as an institutional bridge. This alignment ensures accountability standards are maintained as an ongoing and shared municipal priority.

## VI. OAKLAND IS FULFILLING THE TRANSITION PLAN IT PRESENTED TO THE COURT AND CONTINUING TO STRENGTHEN LOCAL OWNERSHIP.

Building on the milestones and lessons outlined above, the City continues to carry out the transition and local-ownership plan it presented to the Court in January 2026. As detailed in the City's January 2026 brief, the plan was designed to shift Oakland from a framework of court-ordered compliance to a sustainable, institutionally rooted model of constitutional policing supported by durable internal structures. See Dkt. 1733, Joint Case Management Statement 35-40 (Jan. 20, 2026). Over the past year, the City has taken significant steps to implement that plan, deepen internal ownership, engage national experts, and strengthen community-driven accountability partnerships.

### A. Empowering Local Ownership Through Institutionalized Risk Management.

The City continues expanding the transition plan by strengthening its risk-management systems, both internally and publicly. To support transparency in data and constitutional-policing results, the Department will host a public Citywide Risk Management Meeting on September 22, 2026. This evening forum is designed to maximize community access, offering both in-person attendance and a virtual viewing-only option. Community members may submit questions before and during the meeting. All information presented publicly will be anonymized and

non-confidential, distinguishing these sessions from the Department's internal Risk Management Meetings while still ensuring meaningful transparency. The City intends to hold these public meetings twice annually to complement the Department's existing internal reviews and strengthen shared local accountability.

The Department also continues transitioning from interim structures to permanent infrastructure that supports long-term local ownership. The City is accepting applications to hire a permanent, full-time Constitutional Policing Administrator to take over for Assistant City Administrator Michelle Phillips who is currently the Interim Constitutional Policing Administrator. This civilian administrator will work directly with the Department's executive team to help maintain and reinforce the compliance standards developed under the NSA, ensuring that the principles underlying those requirements remain integrated into daily operations.

**B. Identifying Best Practices Through Strategic Consultation with National Experts.**

City leadership recognizes that sustaining a constitutional policing model requires proactive engagement with national subject matter experts to align departmental culture with modern best practices. To that end, Mayor Lee and Chief Beere have consulted and continue to consult with Dr. Charles Ramsey, a leading national authority on 21st-century policing strategies. This partnership provides high-level executive guidance to the leadership team, with specific planning underway to collaborate with Dr. Ramsey and his team to onboard and structure the portfolio of the incoming permanent Constitutional Policing Administrator. The City's work with Dr. Ramsey also includes the development of the Department's long-term strategic plan, anchored in community-driven operations and built around a ten-year vision. Additionally, the Department is consulting with Athena Yerganian about using data to develop and measure strategic directives. Yerganian is renowned for the data-driven internal review system she and former Los Angeles

Police Chief and New York City Police Commissioner Bratton originally pioneered together.

Furthermore, the Department continues its long-term collaboration with researchers from Stanford University to drive internal accountability and measure progress. The Department's Office of Internal Accountability regularly consults with Stanford researchers familiar with police data analysis regarding its evaluation of internal data to ensure consistency and equity in the administration of employee discipline.

The Department is also actively providing comprehensive field data to Dr. Jennifer Eberhardt to facilitate advanced studies on field practices. Dr. Eberhardt's research provides the analytical feedback loop necessary to evaluate the Department's progress in constitutional policing by measuring field performance, ensuring that data-driven insights are translated into actionable training protocols for police officers.

**C. Advancing Community-Driven Priorities and Equitable Technology Deployment.**

True local ownership also requires that the Department's strategies reflect community values and expectations. To ensure that enforcement approaches and technology deployment remain equitable across neighborhoods, Mayor Lee and Chief Beere maintain regular engagement with key community partners, including the NAACP, the African American Chamber of Commerce, and a broad network of faith-based and neighborhood leaders. These ongoing conversations help anchor the Department's strategic direction in community priorities and reinforce the shared responsibility for public safety.

The City also continues robust field engagement to maintain visibility and trust. Command staff and executive leadership regularly attend community forums, including visits to faith institutions, participation in Town Night Out, appearances at Oakland First Fridays, and localized enforcement reviews. At the City's August

31, 2026 Clean and Safe Town Hall, while the agenda centered on municipal service coordination and illegal dumping, Department leadership used the event to provide direct updates on police resource allocation, enforcement strategies, and localized safety priorities—further embedding community voice in the City's transition efforts.

## VII. INFORMATION REQUESTED BY THE COURT REGARDING POLICE MISCONDUCT FILINGS AND SETTLEMENT AMOUNTS.

During the May 27, 2026 proceedings, the Court requested information regarding "the number of police misconduct cases that have been filed against the City or OPD or individual officers in state and federal court and the annual amount of settlement payments each year from about 2000 to the present." May 27, 2026 Tr. at 5. In response, the City has compiled the requested list of filings seeking damages for police misconduct and the associated settlement amounts. Ex. 6, City of Oakland Filed Lawsuits Involving Allegations of Police Misconduct, Jan. 1, 2000-Aug. 31, 2026.

## CONCLUSION

Oakland has entered a new chapter of local leadership, where constitutional policing and public safety are directly and deliberately linked. The City's long-term investments in data-driven risk management, collaboration with nationally recognized experts, engagement with Charter-based civilian oversight, and sustained community partnerships all demonstrate a mature and thoughtful approach to preserving reform.

The City's work over the past year reflects steady, measurable progress in carrying out the transition and local-ownership plan the City presented to the Court in January 2026. Oakland has moved beyond technical compliance and developed durable internal systems that support constitutional policing without reliance on federal oversight. The City has continued to strengthen transparency, reinforce equitable practices, and maintain high standards of internal accountability as core

elements of this transition.

The Department's continued improvements in stop-disparity reduction, strengthened internal-discipline monitoring, expanded qualitative assessment of workplace culture, and responsible compliance reviews of inactive NSA tasks further underscore the City's commitment to long-term accountability. The Department, the Mayor's Office, the City Attorney's Office, and City Administration remain united in supporting a policing model grounded in transparency, equity, and procedural integrity. City leaders continue to reinforce the principles underlying the NSA to ensure they remain embedded in daily operations and future planning.

Although the City fell below the 85% threshold for Task 2 in the first quarter of 2026, both parties agree that this circumstance does not warrant a continuation of Court supervision in the same form. Plaintiffs themselves acknowledge that the Department no longer resembles the department that it was at the outset of this case, and that the systems necessary to support and strengthen Task 2 already exist within the City's established accountability structure. Those systems will continue to operate regardless of Court oversight.

Oakland appreciates the Court's guidance throughout this process and expresses its gratitude to the Independent Monitoring Team, the Compliance Director, and plaintiffs' counsel for their sustained work, collaboration, and professionalism. The City remains committed to maintaining strong, responsive systems capable of preserving both the letter and the spirit of the reforms promised to the Oakland community more than twenty years ago.

///

**STATEMENT OF THE OAKLAND POLICE COMMISSION**

On May 22, 2026, the Independent Monitoring Team's Thirteenth NSA Sustainability Period Report advised that the Oakland Police Department (OPD or Department) had satisfied all 52 Tasks identified in the NSA. The Oakland Police Commission (Commission) commends the City and the Department for achieving full NSA compliance for the first time in the settlement's 23-year history. Should the Court release OPD from Monitorship, the NSA will not vanish. Once the NSA sunsets, the Commission, the Office of the Inspector General (OIG), and the Community Police Review Agency (CPRA) will be the oversight body for OPD. They are designed to be independent of the City Administration so that the same authority that supervises the Department does not also supervise oversight of the Department.

In the last months, the Commission has demonstrated its vital role in overseeing (and working with) the Department. This Statement highlights some of the Commission's work that has aided OPD in arriving at full NSA compliance. A fully funded OIG, Community Police Review Agency (CPRA), and Commission governing body is necessary for OPD to maintain its current compliance status and verify that cultural change occurs within the Department.

**I. Oakland's Independent Civilian Oversight Mandate in Action**

Since the close of the last Monitoring Period, the Commission presented to Mayor Barbara Lee a slate of select candidates, each well-qualified to lead OPD into its next chapter. On July 9, 2026, the Mayor announced her selection of James Beere as the new Chief of the Oakland Police Department. His appointment facilitates consistency in OPD's executive leadership.

The Commission is currently coordinating with the Department and community stakeholders to review and revise OPD's Departmental General Order O-10 (Immigration & Customs Enforcement (ICE) Policy). Revised DGO O-10 will incorporate both community feedback and recent modifications to the Oakland's "City of Refuge" Ordinance. The Commission's efforts have also reactivated the

advancement of Departmental General Order D-24 (Sexual Harassment and Sexual Misconduct Prevention Policy) toward completion.

In May and July 2026, the Inspector General (IG) released reports assessing the Department's policies on unmanned aerial systems (or "drones") and automated license plate readers (the Flock system). Between the two reports, the OIG outlined 13 recommendations and two additional considerations for policy improvement. The OIG also recommended that the Department collaborate with the Commission to review and revise OPD's Training Bulletin III A.05: Community Oriented Policing. These proposals would clarify the policies and assist the Department in strengthening community trust that it operates in compliance with applicable law.

**II. Transition from Independent Monitoring Team to Independent Civilian Oversight**

As the office responsible for ensuring that OPD sustains compliance, the OIG must chart a course by which to perform its Charter-mandated policy reviews and audits of the 52 tasks. The Commission's Charter commands that the "OIG *shall* audit the Department's compliance with the fifty-two (52) tasks … and make recommendations to the Department, the Commission, and the City Council based on its audit(s), *even after the Settlement Agreement expires*." Charter of the City of Oakland (Charter) §604(f)(5) (emphasis added). For over 23 years, the Independent Monitoring Team's efforts came at a significant financial cost to the City. After the NSA terminates, with the redirection of the resources now devoted to the Federal Monitor and Compliance Director to the Commission, the Commission will be in a better position to provide effective independent oversight.

A successful, fully staffed OIG would require "a sufficient budget for the OIG to perform its functions and duties as set forth in [OMC Chapter] 2.45.120" including a Policy Analyst and a supervising auditor. OMC Chapter 2.45.110(C)-(D). The lack of these positions puts the OIG's personnel at a level below what is necessary to perform the Charter-mandated in-depth audits of the 52 tasks after the NSA sunsets.

CPRA too requires Charter-mandated staff consisting of no fewer than one line investigator for every 100 sworn Department officers (rounded to the nearest 100), with at least one investigator being a licensed attorney. Charter §604(e)(4). With this staffing CPRA will be able to meet its required duties of ensuring oversight of the disciplinary process.

The Commission's members have demonstrated their commitment to the body's oversight mandate by delivering meaningful work product despite funding levels that do not provide the institutional resources the work demands. That the volunteer Commissioners produce substantive outcomes under such circumstances is a testament to their dedication and commitment to the body's mission. Advancement into this next chapter of independent civilian oversight will require a fiscal investment to support the infrastructure, staffing, and operational capacity of the Commission's governing arm.

After struggling for far longer than any other law enforcement agency that has experienced court oversight, the Department reached full compliance. Despite other cities' comparatively brief time under judicial monitoring, the real test came after the termination of their settlement agreements. Without post-exit plans or dedicated funding, many police departments quickly fell into prior patterns of poor policing and misconduct. After 23 years, the City cannot afford to suffer a similar fate. One or two negative incidents could lead to backsliding on critical tasks and a correspondingly swift erosion of community trust. The Commission stands as OPD's Charter-mandated transition plan and long-term insurance policy. The City's commitment to uplifting Oakland's designated independent police oversight body with sufficient financing coupled with a detailed implementation plan will strengthen the Commission's work to ensure constitutional policing.

## III. Conclusion

The goals embedded in the NSA Tasks transcend policy adjustments and a "moment-in-time" compliance. Instead, true sustainability is rooted in every day

compliance. The Department must maintain its achievements. The Commission's Charter role has proven central to OPD's accomplishments and must continue in order to sustain compliance after exit from Court monitorship. Effective oversight requires adequate funding and planning. The Commission, CPRA, the OIG, and community stakeholders look forward to working with City leadership to obtain the financial resourcing needed to ensure that independent civilian oversight and constitutional policing remain a permanent fixture for the City of Oakland.

Respectfully Submitted,

Ricardo Garcia-Acosta
Chair, Oakland Police Commission

Omar Farmer
Chair, NSA Ad Hoc Committee
Commissioner, Oakland Police Commission

NSA Ad Hoc Committee Members
Antonio Lawson, Executive Director, Community Police Review Agency
Zurvohn Maloof, Inspector General, Office of the Inspector General
Mariano Contreras, African American-Latino Action Alliance
Rev. Dr. Jacqueline A. Thompson, Allen Temple Baptist Church

**THE OPOA'S STATEMENT**

Intervenor Oakland Police Officers' Association ("Association") has considered the Court's remarks, admonishments and assessments during the last Case Management Conference held on May 27th, 2026 and is well aware of the import of the Case Management Conference scheduled for September 29th. Based upon the actions of the Police Department since May, it is apparent that the Oakland Police Department ("Department") is in full compliance with the relevant tasks as well as the spirit and intent of the Negotiated Settlement Agreement ("NSA"). Specifically, the Department has shown that it is fully capable of policing and responding to incidents involving members failing to adhere to Department policies and procedures. The vast majority of the rank-and-file membership have consistently complied with all of the policies and practices that have become institutionalized in the Department.

The Association's optimism about the future of the Department is buoyed by the fact that Chief James Beere was sworn in as the permanent chief in July. Chief Beere's tenure and accomplishments position him well to lead the Department during the anticipated transition from the NSA. Moreover, the fact that Chief Beere is a long-time resident of Oakland is demonstrable evidence of his personal interest in the success of the Oakland Police Department and the City of Oakland ("City") generally.

In a very recent and significant development, the City and Association concluded negotiations over a successor collective bargaining agreement/memorandum of understanding ("MOU"). While there remains one additional vote by the Oakland City Council it is anticipated that the MOU will be fully approved. The tentative agreement outlining the terms of the MOU was overwhelmingly ratified by the Association membership. The MOU provides further opportunities to enhance recruitment and retention efforts to bolster the depleted ranks of sworn officers in the Department. Most importantly, the agreement is a

five-year contract which provides the Association members, Chief Beere and the City with a clear path of sustainability and certainty.

The Court should also be aware that the Association has elected a new president, Cesar Leyva. Cesar was born and raised in Oakland and currently has two brothers who are also serving as sworn police officers in the City. Throughout Cesar's eleven years at the Department he has worked in Patrol and is well aware of the changes that have occurred during the tenure of the NSA. Cesar is also well situated to collaborate with the Department and the City generally in its efforts to continue constitutional policing.

Finally, the Association firmly believes that the Department has gone through a serious cultural change resulting in full compliance with the NSA. The Association will continue to collaborate with Chief Beere and his command staff through the next phase of oversight.

Respectfully submitted,

Dated: September 22, 2026

RYAN RICHARDSON, City Attorney
BRIGID S. MARTIN, Special Counsel

By: /s/ Brigid S. Martin*
Attorneys for Defendants
CITY OF OAKLAND

JOHN L. BURRIS
Law Offices of John L. Burris

By: /s/ John L. Burris
Attorney for Plaintiffs

JAMES B. CHANIN
Law Offices of James B. Chanin

By: /s/ James B. Chanin
Attorney for Plaintiffs

ROCKNE A. LUCIA, JR.
Rains Lucia Stern St. Phalle & Silver

By: /s/ Rockne A. Lucia, Jr.
Attorney for Intervenor
OAKLAND POLICE OFFICERS ASSOCIATION

*Per Local Rule 5-1(i)(3), the filer attests that concurrence in the filing of the document has been obtained from each of the other Signatories