# EXHIBIT 3

# OAKLAND POLICE DEPARTMENT
# Office of
# Internal Accountability

# Supervisory Note File Analysis: Discipline Disparities Follow-up

September 2026

Lindsey Moore, Data Analytics Manager | i-team, Office of Mayor Barbara Lee
Kristin Burgess-Medeiros, Police Services Manager | OPD, Bureau of Risk Management

## Table of Contents


Introduction ........ 3

Background ........ 3

Methodology Overview ........ 5

Limitations ........ 6

Results ........ 7

Other Observations and Recommendations ........ 13

Conclusion ........ 14

Appendix 1: Key Research Questions ........ 16

Appendix 2: Methodology Detail ........ 16

Appendix 3: Results for IAB-Related SNFs ........ 19

Appendix 4: Results for FTARC Searches ........ 20

Appendix 5: Conclusions to Original Research Questions ........ 24

## Introduction

Supervisory Note Files (SNFs) represent a detailed source of data designed to help OPD's supervisors, commanders, and managers identify patterns of exemplary and substandard performance and behavior among employees. SNFs are used to document incidents deserving of a commendation or award, prepare performance appraisals, and are also the primary mechanism for documenting non-disciplinary corrective action. For example, if a supervisor observes a policy violation that constitutes minor misconduct (Class II) that is not representative of a pattern of similar misconduct for that employee, the supervisor can memorialize the violation in an SNF rather than referring the violation to the Internal Affairs Bureau (IAB) for an investigation.[1]

Prior to 2024, Failure to Accept or Refer a Complaint (FTARC) violations, unlike other Class II violations, required a formal internal investigation regardless of how the misconduct was discovered and even if there was no pattern of similar misconduct. At the end of 2023, Department policy changed to allow for internally discovered Class II FTARC policy violations to be addressed via an SNF, like the process for other Class II violations with no pattern of misconduct. Since OPD has observed racial disparities in sustained findings for FTARC violations in the past, it is critical that the Department is able to track these violations. However, the change in policy means that the data related to FTARC violations has largely moved from being easily identifiable within the IA tracking system to being more difficult to separate from the large population of SNFs that document content ranging from refresher training on policies to positive feedback to non-disciplinary corrective action. With FTARC violations no longer necessarily going through the IA process and coming to a finding, the Department must now be able to review FTARC violations that are handled via SNF to assess whether violations are disproportionately impacting members of a particular race or other protected group.

## Background

In 2022 and 2023, FTARCs were still managed via the IA process only, meaning that every allegation of FTARC, even if it arose as a result of substantive evidence (like body camera footage), went through an investigative process and came to a finding: sustained, not sustained, exonerated, or unfounded. The rates of how many IA cases get sustained, and thus disciplined, are monitored across racial/ethnic groups to ensure that no group is experiencing differential rates of discipline. In 2022 and 2023, differences were observed in sustained rates for sworn officers' FTARC violations by race. In 2022, Black members were more likely than other race groups to be sustained for an

[1] Any allegation of misconduct made by a member of the public or an outside agency must be investigated via the internal affairs process. Misconduct discovered by OPD is eligible for non-disciplinary corrective action, documented in an SNF.

FTARC allegation[2], while, in 2023, white members were more likely to be sustained. In 2023, this difference in FTARC sustained rates drove the overall sustained rate for white members higher than for non-white members and, upon removing FTARC allegations from the population, the sustained rates equalized[3].

At the end of 2023, a policy change allowed many FTARC allegations to be handled outside of the IA process and, subsequently in 2024, a significant disparity in overall sustained rates between Black and white officers was identified (Black 7% and white 2%)[4]. Because FTARC violations were largely no longer included in the IA process and because of their impact on overall sustained rates in prior years, the Department wanted to confirm if any disparities in FTARC violations persisted in the non-disciplinary correction actions documented by SNFs. For this reason, it is now important to review SNFs for potential racial disparities in FTARC violations in 2024 and beyond.

However, prior to May 2026, SNF entries were not coded in a way to allow for easy identification of FTARC violations, necessitating the development of a process to find FTARC-related SNFs within the broad SNF population. Once found, they could then be checked against personnel race, and rates of violations calculated for each racial group to be compared for disparity analysis. The complaint record structure was updated in May 2026 with a field to designate the type of violation, one option being FTARC violation, for each corrective action entry, so going forward it will be more straightforward to pull a report of all FTARC violations.

We acknowledge that comparing rates of FTARC-related SNFs across racial groups is not equivalent to comparing sustained rates of FTARC-related IA cases across racial groups. Because FTARC violations are typically discovered internally and are often a first offense, the majority of FTARC violations only become documented via SNF as an observed violation, rather than being an allegation that gets investigated, leading to a Sustained or Other than Sustained finding. Thus, for 2024 and 2025 data we do not have a denominator of allegations from which to calculate a sustained rate: we only know the total number of documented violations. Therefore, a perfect comparison between 2022-2023 and 2024 and after data is not possible. However, we can reasonably compare the rates of FTARC violations per racial/ethnic group to their shares of sworn personnel across all years 2022-2025. While FTARC violations were investigated and documented differently in 2022-2023 versus 2024-2025, comparing shares per racial/ethnic group is still worthwhile to examine each dataset for disparate trends. Furthermore, any trends that persist across datasets and years would especially warrant further investigation as they could indicate a larger pattern of bias in disciplining FTARC violations.

---

[2] The full 2022 IA Outcomes & Discipline Study can be found here and a follow-up study further investigating the differential outcomes can be found here

[3] The full 2023 IA Outcomes & Discipline Study can be found here

[4] The full 2024 IA Outcomes & Discipline Study can be found here

This document describes the methodology used to search for 2024-2025 FTARC violations and analyze discipline rates, as well as the results of this project.

## Methodology Overview

We divided our analysis into 2 phases – Phase 1: to explore and learn the data to develop a methodology to test and Phase 2: to refine the methodology used to identify FTARC violations from the full SNF population. Full details are included in Appendix 2 with an overview summarized here.

Due to the large number of SNF records, we identified a limited sample of SNFs from 2025 for sworn personnel that were related to IAB cases and coded to a category indicating they were more likely to be corrective actions (as opposed to positive observations or regular performance reviews). We manually reviewed this sample, reading the narrative descriptions and coding each SNF to its related Manual of Rules (MOR) violation, FTARC being one option. This process helped us understand trends in how SNFs are written, find inconsistencies in the data, and identify keywords used to describe FTARC violations. Appendix 3 contains the results of Phase 1, including qualitative learnings about the SNF data.

We then used keywords identified from Phase 1, as well as other keywords that we brainstormed, to search the narrative descriptions of SNFs to flag records for potential FTARC violations. Flagged SNFs were manually reviewed and coded as “Confirmed FTARC Violations” or “Not Confirmed FTARC Violations”, allowing us to compare the accuracy of different keywords. Through this process, a list of the most accurate keywords was used to identify FTARC-related SNFs from the full populations of SNFs in 2024 and 2025 for sworn personnel. Appendix 4 details the search terms explored and the results. This methodology will likely only be needed for SNF data from January 2024 to May 2026 as the recent addition of a data field to indicate which rule/policy was violated will allow for direct reporting on FTARC-related SNFs.

With a dataset of documented FTARC violations constructed, we could then conduct demographic analysis to look for any disparities in discipline rates. Since the majority of 2024-2025 violations did not go through the IAB process, we could not compare sustained rates for demographic groups, as was done in prior years. Instead, we decided to test the assumption that if there were no disparities in discipline rates, then we would expect to see percentages of FTARC violations for each demographic group align with each group’s share of the population of sworn personnel. A large difference between a certain group’s share of FTARC violations and their share of sworn personnel could indicate a disparity – that members of the group are more or less likely than others to receive a documented FTARC violation. While a difference in a single year is not in and of itself proof of a disparity, it is important to track and monitor these differences over time. A pattern of the same difference(s) repeated across years could indicate a larger disparity and would require further investigation.

Because the number of FTARC violations in each given year is not very large, we cannot be confident that every difference in percentages is indicative of a real pattern. For the purposes of this report, we focused on percentage differences that meant a difference in three or more FTARC violations than what one would expect to see based on a demographic group's share of sworn personnel. Differences that meet the "three or more" threshold are **emphasized with red text** in tables throughout this report, while smaller differences are left unformatted.

## Limitations

We acknowledge that this project and its results are subject to the following limitations:

- This project cannot measure disparities resulting from potential bias in the decision-making process of supervisors electing to memorialize incidents via SNFs. In some cases, supervisors may be the primary observer of a violation and could fail to document the incident. This study was not designed to measure potential bias in when supervisors decide to document incidents.
- As discussed above, a corrective SNF documenting an FTARC violation is not equivalent to an IA case investigating an allegation of FTARC that reaches a sustained finding. While we combine the number of sustained FTARC allegations in IA cases with the documented FTARC violations in SNFs in 2024 and 2025 in an attempt to capture the most complete population of FTARC violations, we do not intend to equate the two figures. A sustained IA case has gone through an investigative process, gathering evidence, with opportunity for rebuttal, while an SNF does not require the same level of deliberation. We acknowledge that comparing sustained rates for 2022-2023 with FTARC-related SNFs + Sustained IA cases is not an exact comparison, however, it is still useful to look at the trends across years and datasets for any consistencies.
- As the dataset of FTARC-related SNFs for sworn personnel in 2024-2025 was built from keyword searches, it is possible that it does not include all SNFs documenting FTARC violations. Because rates are in line with sustained FTARC violations in previous years, however, we had sufficient confidence to proceed with analysis.
- This project is not meant to provide a complete answer as to whether there are racial/ethnic or gender disparities in discipline rates of sworn personnel – it represents only one dataset and, thus, one discipline process where disparities could appear. To more fully answer the question, these results must be considered along with other evidence across other datasets and timeframes.

While the results from this analysis should bear the above considerations in mind, they are still a useful addition to the body of work analyzing discipline rates for racial/ethnic and gender groups of sworn personnel, filling a gap in previous analysis. Furthermore, the data structure has been updated to allow for more accurate reporting in the future.

## Results

With the final iteration of our list of search terms, we found the following FTARC violations in our population of SNFs created for sworn personnel in 2024 and 2025 (see Table 1):

**Table 1: FTARC-related SNFs for Sworn Personnel by Year (2024-2025)**

| Year | # SNFs Flagged | # Validated as FTARC Violations | % Validated | Total # SNFs Created | Validated FTARC / SNF |
|---|---|---|---|---|---|
| 2024 | 100 | 54 | 54% | 4344 | 1.24% (54/4344) |
| 2025 | 44 | 38 | 86% | 3372 | 1.13% (38/3372) |
| **TOTAL** | **144** | **92** | **64%** | **7716** | **1.19% (92/7716)** |

Out of a total of 144 SNFs that were flagged as potential FTARC violations, 92 were confirmed across 2024 and 2025. We see many more violations flagged in 2024, but manual review of all flagged SNFs confirmed that instances of proactive training about complaint procedures were more frequent in 2024. This aligns with the timing of when policy changes took effect and when supervisors were encouraged to socialize the changes. The drop in the number of confirmed FTARC violations from 54 in 2024 to 38 in 2025 aligns with the difference in the number of SNFs created in 2024 versus 2025 – the rates of FTARC violations per SNF for both years are similar at slightly more than one FTARC violation for every 100 SNF records.

We also coded the records as to how the FTARC-related SNFs originated to understand the level of evidence supporting each violation. 92% of FTARC-related SNFs were created in response to a related case or investigation, most citing BWC footage of the incident. Two SNFs arose in response to information documented in an incident report; two SNFs resulted from a conversation with a supervisor recounting an incident; and only three SNFs did not have enough information in the record narratives to determine how they occurred (see Table 2 below).

**Table 2: FTARC-related SNFs by Origination Source, 2024 & 2025**

| Source | 2024 Qty | 2025 Qty | TOTAL | TOTAL % |
|---|---|---|---|---|
| Use of Force Investigation | 10 | 18 | 28 | 30% |
| IAB Investigation | 30 | 12 | 42 | 46% |
| Division Level Investigation | 2 | 6 | 8 | 9% |
| Preliminary Inquiry | 0 | 1 | 1 | 1% |
| Body Worn Camera Review | 3 | 0 | 3 | 3% |
| Audit | 2 | 0 | 2 | 2% |
| Skelly Hearing | 0 | 1 | 1 | 1% |
| Incident Report | 2 | 0 | 2 | 2% |
| Conversation w/ Supervisor | 2 | 0 | 2 | 2% |
| Unknown | 3 | 0 | 3 | 3% |
| **TOTAL** | **54** | **38** | **92** | **100%** |

*Percentages are rounded to the nearest whole number and may not sum to exactly 100%.*

## Demographic Disaggregation

Since FTARC violations can be resolved either through the formal IA process or via a SNF, starting in 2024, combining the two categories gives us the most complete population of FTARC violations. However, while there are more FTARC allegations that go through the IA process and receive a finding other than sustained, only sustained violations are comparable to SNFs because, as described earlier, SNFs do not have an analogous process of moving from being alleged, investigated, and coming to a finding. Table 3 shows the total number of FTARCs from both categories (FTARC-related SNFs and sustained FTARC violations from the IA process) in 2024 and 2025, as well as the sustained violations from 2022 and 2023. The combined annual totals for 2024 and 2025 are reasonably in-line with the number of sustained FTARC violations in prior years.

**Table 3: FTARC Violations by Corrective Action Process (SNFs v. IA)**

| Year | # FTARCs from SNFs | # Sustained FTARC Violations from IA | Annual Total |
|---|---|---|---|
| 2022 | N/A | 45 | 45 |
| 2023 | N/A | 52 | 52[5] |
| 2024 | 54 | 4 | 58 |
| 2025 | 38 | 7 | 45 |
| **TOTAL** | **92** | **108** | **200** |

To investigate the question of whether FTARC violations align with department representation, we compared the share of FTARC violations for each demographic category to each group's share of sworn personnel. A share of FTARC violations that is either larger or smaller than a group's proportion of sworn personnel can be problematic – an overrepresentation could indicate that a group is being disciplined too often while an underrepresentation could indicate that a group is not receiving its equitable share of discipline. It is especially concerning if any single trend can be seen in different years and/or in different datasets as this could indicate a larger pattern.

[5] The number of sustained FTARC violations listed reflects the number analyzed in the 2023 IA Outcomes and Discipline Study. However, since allegations reviewed by a Board are excluded from the analysis and there were sustained FTARC violations resulting from a Board review in 2023, this number (52) is lower than the actual total that year.

Disaggregating FTARC violations by racial categories, we found the following results (see Table 4):

**Table 4: 2024 FTARC-Related SNFs + Sustained FTARC Violations from IA Cases**

| Race/Ethnicity | # FTARCs | % FTARCs | % Sworn Personnel | Expected # FTARCs[6] |
|---|---|---|---|---|
| White | 7 | **12%** | **25%** | 14 |
| Black | 14 | 24% | 21% | 12 |
| Hispanic | 19 | 33% | 29% | 17 |
| Asian/Filipino | 16 | **28%** | **20%** | 12 |
| Other/Unknown | 2 | 3% | 4% | 3 |
| **TOTAL*** | **58** | **100%** | **100%** | **58** |

**Includes 4 Sustained IA Cases: 1 white, 1 Black, 2 Hispanic. **Cells with red text indicate differences of 3 or more violations compared to what we expect to see based on shares of sworn personnel.***

Comparing the share of 2024 FTARC violations across racial demographic groups to the share of total officers (Table 4), we see sizeable differences with white officers receiving 13 percentage points fewer and Asian/Filipino officers receiving 8 percentage points more FTARC violations than we would expect based on their respective shares of the population of sworn personnel. Differences are marginal for all other demographic groups.

**Table 5: 2025 FTARC-Related SNFs + Sustained FTARC Violations from IA Cases By Race/Ethnicity**

| Race/Ethnicity | # FTARCs | % FTARCs | % Sworn Personnel | Expected # FTARCs |
|---|---|---|---|---|
| White | 11 | 24% | 23% | 11 |
| Black | 8 | 18% | 21% | 9 |
| Hispanic | 11 | 24% | 30% | 13 |
| Asian/Filipino | 11 | 24% | 21% | 10 |
| Other/Unknown | 4 | 9% | 5% | 2 |
| **TOTAL*** | **45** | **100%** | **100%** | **45** |

** Includes 7 Sustained IA Cases: 1 white, 2 Black, 2 Hispanic, 2 Asian/Filipino. Percentages are rounded to the nearest whole number and may not sum to exactly 100%.*

Comparing the share of 2025 FTARC violations per racial demographic group to the share of total officers (Table 5), we see smaller differences than in 2024. The largest difference is for Hispanic officers who received 6 percentage points fewer FTARC violations than their share of the officer population, but this translates to a difference of only 2 FTARC violations.

To check whether any observed differences arose from a circumstance where a small number of officers committed multiple violations, we coded officers based on numbers of violations and

[6] Expected # FTARCs shows how many FTARC cases we would see if each racial/ethnic group had FTARC incidents at the same rate as their representation in the population of sworn personnel. For each race/ethnicity in each year, [Expected # FTARCs] = (Total # FTARCs)*(% Sworn Personnel).

found similar, low levels of repeat offenders across all racial groups. We also checked for instances of a single incident resulting in FTARC violations affecting large groups of officers at once and did not find any substantial repetition within a single group of FTARC violations. Thus, the data represents rates of documented FTARC violations for each racial group of personnel.

While we see a possible pattern when comparing FTARC-related SNFs for white versus Asian/Filipino personnel in 2024, we do not see the trend continuing through 2025. In the full IA Outcomes and Discipline Study for 2024, the finding that white officers received fewer IA case allegations overall was a top concern. Similarly, this data also shows a lower rate of FTARC violations for white personnel in 2024. However, in 2025, the rates of FTARC-related SNFs evened out and rates for white and Asian/Filipino personnel were both aligned with their shares of personnel.

We also recreated the same comparison (% of sustained FTARC violations from IA cases versus % sworn personnel across race/ethnicity) for 2022 and 2023 to assess the long-term trends (Table 6).

**Table 6: 2022 and 2023 Sustained FTARC Violations from IA Cases by Race/Ethnicity**

| | 2022 | | | 2023 | | |
|---|---|---|---|---|---|---|
| **Race/Ethnicity** | **# FTARCs** | **% FTARCs** | **% Sworn Personnel** | **# FTARCs** | **% FTARCs** | **% Sworn Personnel** |
| White | 10 | **22%** | **29%** | 20 | **38%** | **26%** |
| Black | 12 | **27%** | **20%** | 4 | **8%** | **21%** |
| Hispanic | 14 | 31% | 28% | 16 | 31% | 29% |
| Asian/Filipino | 8 | 18% | 19% | 10 | 19% | 20% |
| Other/Unknown | 1 | 2% | 3% | 2 | 4% | 4% |
| **TOTAL** | **45** | **100%** | **100%** | **52** | **100%** | **100%** |

Again, we see fluctuations in the data for each year. In 2022, Black officers were over-represented in sustained FTARC violations by 7 percentage points, while white officers were under-represented by 7 percentage points. This flipped in 2023, when Black officers were under-represented by 13 percentage points and white officers were over-represented by 12 percentage points.

When we combine the data across years, we see that shares of FTARC violations largely align with shares of sworn personnel (see Table 7 below). The sworn personnel percentages represent the annual average across the four years.

**Table 7: 2022-2025 Total FTARC Violations by Race/Ethnicity vs Average Annual Sworn Personnel Breakdown**

| Race/Ethnicity | # FTARCs | % FTARCs | % Sworn Personnel | Expected # FTARCs |
|---|---|---|---|---|
| White | 48 | 24% | 26% | 52 |
| Black | 38 | 19% | 21% | 41 |
| Hispanic | 60 | 30% | 29% | 58 |
| Asian/Filipino | 45 | 23% | 20% | 40 |
| Other/Unknown | 9 | 5% | 4% | 8 |
| **TOTAL** | **200** | **100%** | **100%** | **200** |

*Note that the difference threshold of three or more violations does not apply here because a difference of three violations across four years is less meaningful than in a single year.*

The largest difference is that Asian/Filipino officers are overrepresented in their share of FTARC violations by three percentage points. However, this translates to only a difference of five violations, which, spread across the longer timeframe, is less significant. This is an indication that none of the observed differences have continued long-term and that some amount of random fluctuation can be expected from year to year, especially given the relatively small numbers of FTARC violations each year. This is not to deny the impact of short-term disparities, in fact, it underscores the importance of tracking disciplinary actions by race over longer periods of time to ensure that no disparate patterns of discipline show up repeatedly.

When we disaggregate FTARC violations by gender groups, we see the following results (see Tables 8 and 9):

**Table 8: 2024 FTARC-Related SNFs + Sustained FTARC Violations from IA Cases By Gender**

| Gender | # FTARCs | % FTARCs | % Officers | Expected # FTARCs |
|---|---|---|---|---|
| Female | 4 | **7%** | **15%** | 9 |
| Male | 54 | **93%** | **85%** | 49 |
| **TOTAL*** | **58** | **100%** | **100%** | **58** |

**Includes 4 Sustained IA Cases: 4 Male, 0 Female*

**Table 9: 2025 FTARC-Related SNFs + Sustained FTARC Violations from IA Cases By Gender**

| Gender | # FTARCs | % FTARCs | % Officers | Expected # FTARCs |
|---|---|---|---|---|
| Female | 10 | **22%** | **16%** | 7 |
| Male | 35 | **78%** | **84%** | 38 |
| **TOTAL*** | **45** | **100%** | **100%** | **45** |

**Includes 7 Sustained IA Cases: 6 Male, 1 Female*

In 2024, FTARC violations committed by female officers are 8 percentage points less than we would expect based on their share of the officer population. But in 2025, the trend reversed and FTARC

violations committed by female officers were 6 percentage points higher than we would expect. While we see disparities in 2024 and 2025 individually, taken as a whole, violations in 2024 & 2025 yield results almost exactly aligned with population ratios. While 2026 data is not available and the elevated levels for female officers in 2025 are worth keeping an eye on, this aligns with the overall trend of seeing fluctuations in single years that even out over time.

As we did with race/ethnicity, we assessed the longer trend by looking at the same comparison for 2022 and 2023.

**Table 10: 2022 and 2023 Sustained FTARC Violations from IA Cases by Gender**

| | 2022 | | | 2023 | | |
|---|---|---|---|---|---|---|
| **Gender** | **# FTARCs** | **% FTARCs** | **% Sworn Personnel** | **# FTARCs** | **% FTARCs** | **% Sworn Personnel** |
| Female | 8 | 18% | 15% | 4 | **8%** | **14%** |
| Male | 37 | 82% | 85% | 48 | **92%** | **86%** |
| **TOTAL** | **45** | **100%** | **100%** | **52** | **100%** | **100%** |

Female officers were over-represented in FTARC violations in 2022 and under-represented in 2023, further illustrating the year-to-year fluctuations.

When we disaggregate the results by rank, we see the following results (see Tables 11 and 12):

**Table 11: 2024 FTARC-Related SNFs + Sustained FTARC Violations from IA Cases by Rank**

| Rank | # FTARCs | % FTARCs | % Sworn Personnel |
|---|---|---|---|
| Officer | **51** | **88%** | 74% |
| Sgt and Above | **7** | **12%** | 21% |
| Trainee | **0** | **0%** | 4% |
| Annuitants | 0 | 0% | 1% |
| **TOTAL*** | **58** | **100%** | **100%** |

**Includes 4 Sustained IA Cases: 1 Officer, 3 Sgt+*

**Table 12: 2025 FTARC-Related SNFs + Sustained FTARC Violations from IA Cases by Rank**

| Rank | # FTARCs | % FTARCs | % Sworn Personnel |
|---|---|---|---|
| Officer | 34 | 76% | 74% |
| Sgt and Above | 10 | 22% | 22% |
| Trainee | 1 | 2% | 3% |
| Annuitants | 0 | 0% | 1% |
| **TOTAL*** | **45** | **100%** | **100%** |

**Includes 7 Sustained IA Cases: 4 Officer, 3 Sgt+*

In 2024, the share of FTARC-related SNFs committed by Officers was 14 percentage points greater than we would expect based on their share of the population of sworn personnel. While this is a large difference, unlike when comparing rates across racial groups, we do expect Officers to have a

larger share of FTARC violations than their representation in the population of personnel given that Officers are generally less experienced than Sergeants & above and that Officers' more public-facing roles are more likely to lead to complaints. In 2022-2023, we saw Officers responsible for 83% and 89% of sustained FTARC violations (see Table 13). In that context, Officers committing 88% of FTARC violations in 2024 is in line with prior years. However, it is worth monitoring as such a large share sustained over time could indicate an entrenched disparity. Fortunately, in 2025, the share of FTARC-related SNFs for Officers more closely aligned with their share of sworn personnel.

**Table 13: 2022 and 2023 Sustained FTARC Violations from IA Cases by Rank**

| | 2022 | | | 2023 | | |
|---|---|---|---|---|---|---|
| **Rank** | **# FTARCs** | **% FTARCs** | **% Sworn Personnel** | **# FTARCs** | **% FTARCs** | **% Sworn Personnel** |
| Officer | 40 | **89%** | **77%** | 43 | **83%** | **78%** |
| Sgt and Above | 5 | **11%** | **23%** | 9 | **17%** | **22%** |
| **TOTAL** | **45** | **100%** | **100%** | **52** | **100%** | **100%** |

## Other Observations and Recommendations

Though not a primary focus of this project, through our analysis, we also observed trends in how SNF data is entered. Overall, SNF narratives were detailed, thorough, and easy to understand. Most SNFs documenting corrective actions described the original incident being referenced, the violation(s) observed, and the corrective action steps taken. A majority of SNFs cited the specific OPD policy(ies) governing the situation and highlighted how an officer's conduct differed from policy. Many SNFs also described proactive options that officers could take to improve in the future. The high level of detail included in SNFs made this analysis possible and we are grateful to the supervisors for their time and effort spent on thorough documentation.

We also noticed opportunities to improve the accuracy of certain SNF record fields (not impacting the data quality for this project). To improve the usefulness of SNF data overall, the following efforts could be considered:

- Conduct a systematic analysis of SNF records to understand where and why common inconsistencies occur
- Review and edit the lists of options for the Note Category and Note Type fields – options may be redundant and/or unclear, leading to incorrect categorization
- Provide definitions of Note Category and Note Type options in an easy-to-reference location; offer specific training to supervisors about how to code these fields
- Consider if any additional fields would better support reporting on SNF data
- Consider if any less frequently used fields could be deleted to streamline data entry
- Improve data validation of certain fields to ensure completion and/or quality

The data structure has already been updated to better facilitate reporting on FTARC-related disciplinary actions to ensure that analyzing FTARC violation data for potential disparities will be easier in the future. It is possible that other small adjustments to the data structure, technical system, and/or data collection processes could further support making SNF data easier to access, more useful, and better able to provide insight.

## Conclusion

To follow up on observed disparities in sustained rates of FTARC-related IA cases in 2022 and 2023 across Black and white officers, we set out to conduct a demographic analysis of FTARC violations for 2024 and 2025. Due to policy changes, we could not use the same IA case data used previously to compare sustained rates, and, instead, developed a process to identify FTARC-related SNF records. Through the process described above, we identified a substantial number of FTARC-related SNFs from 2024 and 2025. Occurrences of FTARC violations documented via SNFs, combined with sustained FTARC violations from IA, were in line with past levels of sustained FTARCs in IA cases, when all FTARC allegations were required to come to a formal finding through the IA process. This gave us reasonable confidence that we had a sufficient sample with which to pursue demographic disparity analysis.

Analysis of 2024 and 2025 FTARC-related SNFs allowed us to assess whether demographic disparities in FTARC violations persisted after FTARC-related discipline was largely moved from the IA process to SNFs. We found that in 2024, white officers were underrepresented among FTARC violations (combining SNFs and sustained IA cases) by 13 percentage points while Asian/Filipino officers were overrepresented by 8 percentage points compared to their respective shares of the population of sworn personnel. The underrepresentation of white officers among FTARC violations was consistent with their significantly lower sustained rate in 2024, indicating disparity in both sustained rates and FTARC-related SNFs that year. Notably, while Asian/Filipino officers were overrepresented among FTARC-related SNFs in 2024, they had a lower sustained rate in IA cases, comparable to that of white officers. However, the levels evened out in 2025 with proportions of FTARC violations largely aligning with each racial demographic group’s share of total sworn personnel. We also saw reduced disparity in sustained rates among racial demographic groups in 2025.

Looking at the longer-term trends from 2022-2025, annual comparisons of FTARC violations to department demographics show fluctuations across all race/ethnicity groups. White officers experienced the greatest variation in FTARC violations between 2022 and 2024, while Black officers experienced more significant fluctuations in 2022 and 2023. There was less variation among the other groups, however, no demographic group experienced any consistent over- or under-representation across all four years.

While prior studies have not focused on gender disparity in FTARC violations, we also checked for any disparity between male and female officers for FTARC violations in 2024 and 2025 (FTARC-related SNFs and sustained FTARC violations from the IA process). We found that female officers were underrepresented among FTARC violations by 8 percentage points compared to males in 2024, but this reversed in 2025 when females were overrepresented by 6 percentage points. We also went back to 2022 and 2023 and found that female officers were slightly overrepresented in sustained FTARC violations in 2022 and underrepresented by 6 percentage points in 2023. Again, this illustrates the year-to-year fluctuations.

Though we saw differences in rates of demographic groups' shares of FTARC violations compared to their shares of sworn personnel in individual years, no single trend showed up consistently over time. The fact that we do see differences in some years indicates that this data should continue to be monitored in order to track trends over time. Because a single year's number of FTARC violations is relatively small, a difference of just a couple of violations in a single year can look like a disparity, when it may not truly be. If any of these trends were to reoccur in future years, it could indicate that there is a more serious underlying reason, like a group being targeted or protected.

Overall, the 2024 and 2025 data do not indicate that any single demographic group was consistently over- or under-represented in FTARC violations. Rather, the combined evidence from the 2024 and 2025 FTARC-related SNFs and the 2022 and 2023 FTARC sustained rates suggests that differences between groups fluctuate from year to year. Although this analysis found no consistent disparities over time, continued monitoring remains of paramount importance in order to quickly identify and address any emerging disparities to prevent them becoming entrenched.

## Appendix 1: Key Research Questions

Below are the specific research questions that guided this project.

1. Can we identify specific Manual of Rules (MOR) violations associated with SNFs from the narrative data?
    a. And if so, how much effort is required?
2. Can a careful manual coding effort of a sample of SNFs generate a routine methodology for identifying MOR violations based on narrative data with a reasonable amount of fidelity?
    a. Specifically, can we figure out a manageable way to identify SNFs recording Failure to Accept or Refer Complaint (FTARC) violations from the narrative data?
3. How reliable are coded categories (related to corrective actions taken associated with SNFs) when comparing field inputs to narrative descriptions?
4. If we can identify a substantial number of FTARC-related SNFs, do we see any disparities in documented incident levels across demographic groups (race, gender and rank)?

## Appendix 2: Methodology Detail

We divided analysis into 2 phases- Phase 1: to explore and learn the data and Phase 2 to test and refine the methodology to identify FTARC violations from the full SNF population.

### Phase 1: Initial Data Exploration

In 2025, there were 4,420 SNFs recorded for all OPD personnel. Due to the large number of observations, we first focused on a small sample to review to better understand patterns of how SNFs are written, test coding SNFs to their related policy violations, and maximize our chances of finding FTARC violations to identify keywords used frequently.

For this initial trial, we narrowed the total population by a number of criteria: (we'll refer to this sample as the IA Sample throughout this document)

- **SNFs related to Sworn personnel**- since analyses of racial disparity in investigative outcomes and discipline have focused on sworn personnel, we maintained that focus in our SNF analysis.
- **SNFs related to IA cases-** to maximize the chance that we would find a number of FTARC violations within a small sample, we focused on SNFs related to IA cases.
- **Note Types that indicate some kind of corrective action-** we excluded note types & categories related to positive observations & exceptional conduct to focus on instances of policy violations.

This left us with a sample of 142 SNFs, which was a manageable number to review.

### Coding Process

Each SNF Narrative was carefully reviewed, a list of possible MOR violations was made, and the primary violation selected based on definitions from the Manual of Rules. Rationale for MOR

violation selection was denoted. In cases where the MOR violation was not clear, the SNF record was flagged for further review. All uncertainty was noted in the "MOR Vio Rationale" field, points of uncertainty were discussed among the project team, and decisions made and documented for consistency. SNFs with substantial uncertainty were flagged for secondary review within the project team and confirmed or updated.

Other items tracked included:

- Brief descriptions of violations in plain language
- Whether the Supervisor (SNF writer) cited a specific policy, and if so, which one
- Whether the SNF spanned violations of multiple policies
- Whether the SNF referenced an FTARC violation

## Initial Data Exploration Learnings

1. Narrative descriptions tend to describe events in past tense terms so keyword searches should likely be phrased accordingly.
2. 56% of the SNFs in the IA sample contained a reference to specific policy documentation. This indicated that searching for FTARC related policy references could be an avenue to explore in searching for FTARCs.
    a. Policies cited were often more specific than the MOR, making this less of an avenue for coding SNFs to MOR violations. But this could also support searching for FTARCs by searching for the specific documents governing complaint procedures.
    b. Supervisors are not always consistent in typing the exact policy name- abbreviations & punctuation vary, making this a more challenging avenue for keyword searches.
3. Many SNFs refer to violations as "failure to do X" or "executed Y, but improperly". This was important to note for framing keyword searches.
4. 88% of SNFs were clearly focused on one violation, meaning most can be easily coded to one clear MOR policy.
5. 56% of SNFs in the IA sample were coded as a violation of MOR 314.39: Performance of Duty. These violations covered a range of issues from violations of BWC policies to violations of report writing policies to violations of driving policies. It may be worth considering further coding this data in order to better understand the behavior being addressed.
    a. The next most common violations were 342.00 Department Property & Equipment at 17% – usually referencing a minor vehicle accident – and 314.07 Conduct Toward Others- Demeanor at 11% of IA-related SNFs. See Appendix 3 for full list of MOR violations.
    b. We found 9 instances of FTARC violations, representing 6% of the sample. We used learnings from these SNFs to inform the next phase of our work.

## Phase 2: Searching Broader SNF Population for FTARC Violations

Using the learnings from Phase 1 about how FTARC violations show up in SNF data, we set out to develop a methodology to filter out SNFs related to FTARC from the full dataset.

### Sample

To maximize our chances of finding FTARC violations while limiting chances of finding less relevant records, we filtered the population of 2025 SNFs by:

- Personnel Type=Sworn
- Note Category & Types=categories more likely to include disciplinary actions

| Note Category | Note Type |
|---|---|
| Supervisor Meeting | Other Supervisor Meeting |
| Supervisor Meeting | Counseling |
| Supervisory Observations | Substandard Conduct |
| Supervisory Observations | N/A |
| Supervisory Observations | Other Negative Observation |
| Other | Informal Complaint Resolution |
| Training | Corrective Training |
| Training | Elective Training |
| Training | Refresher Training |
| Training | Required Training |
| Training | Training |
| Corrective Action | Body Worn Camera |
| Corrective Action | Conduct |
| Corrective Action | Performance Deficiency Notice |
| Corrective Action | Other Corrective Action |

This reduced the sample from 4,420 records to 780 records.

## Methodology

We searched this sample for specific terms (single words or phrases) that may be indicative of FTARC violations to flag candidate SNFs, reviewed the SNF narrative of each SNF that matched any search terms, and coded the SNFs for whether potential flagged FTARC violations were confirmed or not. Search terms fell along the following themes:

- **Language related to violation name, "Failure to Accept or Refer a Complaint":** FTARC, Complaint, Refer a Complaint, Accept a complaint, Failure to accept, Failure to refer
- **Language related to an officer's failure to ask if someone wants to speak to a supervisor:** Failed to ask, fail to ask, speak to a supervisor, speak with a supervisor, clarifying question, discourage, deter

- **Language related to a potential complainant's dissatisfaction with an aspect of the officer's handling of the incident:** dissatisfaction, dissatisfied, lawsuit, sue, false arrest, falsely arrested
- **Language related to physical harm that occurs to a citizen involved in an incident:** injury, hurt, plant (referring to allegations of planting evidence)
- **Terms related to the specific policy documents that govern complaint procedures:** M-03 (refers to Department General Order M-03), 9213 (refers to Special Order 9213)

Rates of confirmed FTARC violations were compared across search terms to generate insights about which search terms could best be used to generate reports of potential FTARC violations from the full population of SNFs.

Our initial broad list of search terms (see Appendix 4A for full list) yielded 135 candidate SNFs. After review, 39 of the 135 potential FTARC-related SNFs were confirmed to reference an FTARC violation, for a total accuracy rate of 29%. We saw a range of accuracy rates for individual search terms, from 0% accurate to 100% accurate across different search terms and used these rates to narrow our list of keywords to increase our overall accuracy rate.

We then tested different lists of search terms across larger populations of SNFs from 2024 & 2025, across note types (still limited to SNFs directed to sworn personnel) to refine the list of search terms for accuracy (see Appendix 4B & 4C for more detail).

## Appendix 3: Results for IAB-Related SNFs

A. Coding SNFs for Citation of Rules & Policies

| **SNFs that Cite Rules/Policies** | | |
|---|---|---|
| | **Count** | **Percentage** |
| Yes- cites rule/policy document | 79 | 56% |
| No- doesn't cite rule/policy document | 62 | 44% |
| N/A | 1 | 1% |
| **TOTAL** | **142** | |

B. Coding SNFs for Referencing Multiple Violations

| **SNFs that Cite Multiple Violations** | | |
|---|---|---|
| | **Count** | **Percentage** |
| Yes- references multiple violations | 4 | 3% |
| Maybe | 10 | 7% |
| No- doesn't reference multiple violations | 125 | 88% |
| N/A | 1 | 1% |
| Unknown | 2 | 1% |
| **TOTAL** | **142** | |

C. Coding SNFs to MOR Policy Violation

| SNFs Coded to MOR Policy Violation | | | |
|---|---|---|---|
| **MOR #** | **MOR Name** | **Count** | **Percentage** |
| 234.12 | Commanding Officers- Command | 2 | 1% |
| 234.84 | Reports & Records | 2 | 1% |
| 314.03 | General Conduct | 2 | 1% |
| 314.07 | Conduct Toward Others- Demeanor | 15 | 11% |
| 314.39 | Performance of Duty | 79 | 56% |
| 342.00 | Department Property and Equipment | 24 | 17% |
| 370.36 | Custody of Prisoners | 2 | 1% |
| 398.76 | Failure to Accept or Refer Complaint (FTARC) | 9 | 6% |
| 398.77 | Refusal to Provide Name and Serial Number | 1 | 1% |
| Unknown | Unknown | 5 | 4% |
| N/A | N/A | 1 | 1% |
| **TOTAL** | | **142** | |

## Appendix 4: Results for FTARC Searches

A. The table below shows all of the search terms we tested in the sample of 2025 SNFs for sworn officers w/ note categories likely to focus on officer corrections.

- Search Term = the word or phrase searched for across SNF Narratives
- Qty Found = number of records that included the search term
- Qty Validated = number of records that included the search term & were confirmed to indicate an FTARC violation
- % Validated = Qty Validated / Qty Found
- Notes/Conclusions = conclusions about whether a search term should be used to search for FTARC violations based on the results of this test or other items of note related to a given search term
- Note that the totals in the final row refer to unique records; a record can match many search terms

| **Search Term** | **Qty Found** | **Qty Validated** | **% Validated** | **Notes/Conclusions** |
|---|---|---|---|---|
| FTARC | 0 | 0 | N/A | We don't see supervisors using this acronym |
| Complaint | 87 | 35 | 40% | Many SNFs arise as a result of complaints, but are not about the complaint process itself, thus "complaint" is too broad of a search term. |
| Failed to ask | 3 | 3 | 100% | References whether an officer fails to ask more questions in response to a potential complaint, a common way |

| | | | | |
|---|---|---|---|---|
| | | | | that officers violate complaint procedure |
| Fail to ask | 0 | 0 | N/A | Confirms our finding that using past tense language tends to be more accurate |
| speak to a supervisor | 18 | 18 | 100% | Language included in the FTARC policy- many supervisors quote policies directly in documenting violations |
| Speak with a supervisor | 24 | 20 | 83% | The 4 unvalidated references are instances of officers speaking w/ their own supervisors |
| Dissatisfaction | 13 | 13 | 100% | References to citizens being dissatisfied with their service/treatment |
| Dissatisfied | 0 | 0 | N/A | "Dissatisfaction" performed much better than "dissatisfied" as a search term. |
| 9213 | 27 | 18 | 67% | Some references to SO 9213 about complaint process, but unvalidated SNFs cite SO 9213 for its portion governing the discipline process. |
| M-03 | 25 | 23 | 92% | Includes a couple of instances of M-03 applying to failure to identify as police officer |
| Refer a complaint | 11 | 11 | 100% | Strong predictor, pulling substantial number of instances |
| Clarifying question | 12 | 12 | 100% | Strong predictor, pulling substantial number of instances |
| Lawsuit | 1 | 1 | 100% | Strong predictor, but more rare |
| Sue | 1 | 1 | 100% | If using, be sure to search for " sue " to avoid pulling other words like "issue" |
| False arrest | 0 | 0 | N/A | |
| Falsely arrested | 0 | 0 | N/A | |
| Accept a complaint | 4 | 4 | 100% | Strong predictor, pulling a few instances |
| officers' treatment | 0 | 0 | N/A | |
| IBC | 14 | 12 | 86% | Refers to Information Business Card, a requirement of the policy. 2 unvalidated instances are simply documenting that an IBC was given. |
| Complaint Referral Log | 10 | 10 | 100% | Strong predictor, pulling substantial number of instances |
| Discourage | 15 | 13 | 87% | "Discouraged" is sometimes used referencing officer reactions to |

| | | | | |
|---|---|---|---|---|
| | | | | receiving feedback, often phrased as "not discouraged" |
| Deter | 14 | 13 | 93% | Make sure to search for " deter " to avoid pulling other words like "determined"; strong predictor. |
| Injury | 24 | 1 | 4% | Poor predictor, "injury" is often used to describe the incident that officers are responding to. |
| Hurt | 7 | 3 | 43% | Poor predictor, similarly, "hurt" occurs in many contexts surrounding the original incident. |
| Objection | 0 | 0 | N/A | |
| Grievance | 0 | 0 | N/A | |
| Criticism | 10 | 0 | 0% | Poor predictor; usually references officers' demeanors |
| Appeal | 0 | 0 | N/A | |
| Protest | 3 | 0 | 0% | Poor predictor |
| Clarify | 15 | 12 | 80% | Did not find any additional instances that "clarifying" missed |
| Plant | 2 | 2 | 100% | Strong predictor, but rare |
| Failure to accept | 11 | 11 | 100% | Strong predictor |
| Failure to refer | 2 | 2 | 100% | Strong predictor, but rare |
| M-3 | 5 | 2 | 40% | Weak predictor, rare |
| M3 | 0 | 0 | N/A | |
| | **Qty Found** | **Qty Validated** | **% Validated** | |
| TOTAL | 135 | 39 | 29% | We should narrow the search terms to increase overall accuracy |

B. Refined List of Search Terms in 2024-2025 SNFs Across Note Types

| **Search Term** | **Qty Found** | **Qty Validated** | **% Validated** | **Notes/Conclusions** |
|---|---|---|---|---|
| Failed to ask | 8 | 7 | 88% | Strong predictor |
| speak to a supervisor | 63 | 52 | 83% | Strong predictor |
| Dissatisfaction | 47 | 39 | 83% | Strong predictor |
| Refer a complaint | 38 | 21 | 55% | Less accurate predictor, but 16/17 unvalidated instances are due to a one-time proactive training about related policies |
| Clarifying question | 39 | 35 | 90% | Strong predictor |
| Lawsuit | 3 | 3 | 100% | Strong predictor |
| Sue | 1 | 1 | 100% | Strong predictor, though rare |
| Accept a complaint | 12 | 12 | 100% | Strong predictor |
| Complaint Referral Log | 39 | 33 | 85% | Strong predictor |

| | | | | |
|---|---|---|---|---|
| Plant | 15 | 2 | 13% | Weak predictor |
| M-03 | 84 | 58 | 69% | Includes instances of proactive training, but also captures instances of validated FTARCS that no other keyword could (and did not include other keywords that make sense to search for) |
| 9213 | 101 | 43 | 43% | Weak predictor |
| | **Qty Found** | **Qty Validated** | **% Validated** | |
| TOTAL | 181 | 92 | 51% | If the 16 proactive training-related instances were removed, the total % validated would be 56% |

C. Further Refined List of Search Terms in 2024-2025 SNFs Across Note Types

| **Search Term** | **Qty Found** | **Qty Validated** | **% Validated** | **Notes/Conclusions** |
|---|---|---|---|---|
| Failed to ask | 8 | 7 | 88% | Strong predictor |
| speak to a supervisor | 63 | 52 | 83% | Strong predictor |
| Dissatisfaction | 47 | 39 | 83% | Strong predictor |
| Refer a complaint | 38 | 21 | 55% | Less accurate predictor, but 16/17 unvalidated instances are due to a one-time proactive training about related policies |
| Clarifying question | 39 | 35 | 90% | Strong predictor |
| Lawsuit | 3 | 3 | 100% | Strong predictor |
| Sue | 1 | 1 | 100% | Strong predictor, though rare |
| Accept a complaint | 12 | 12 | 100% | Strong predictor |
| Complaint Referral Log | 39 | 33 | 85% | Strong predictor |
| Failure to accept | 34 | 17 | 50% | Includes 16 proactive-training related SNFs |
| Failure to refer | 2 | 2 | 100% | |
| M-03 | 84 | 58 | 69% | Includes instances of proactive training, but also captures instances of validated FTARCS that no other keyword could (and did not include other keywords that make sense to search for) |
| | **Qty Found** | **Qty Validated** | **% Validated** | |
| TOTAL | 144 | 92 | 64% | If the 16 proactive training-related instances were removed, the total % validated would be 72% |

## Appendix 5: Conclusions to Original Research Questions

Returning to our original research questions, we can now say the following:

Q1: Yes, we can identify related MOR violations from the narratives of SNF records. It requires familiarity with or training in the MOR and manually reviewing SNFs to code them to their associated MOR violation. Depending on the purpose, it may be necessary to do additional coding to understand more specifically which policies were violated as some MOR rules cover many broad areas of policy. Furthermore, many supervisors are already in the habit of identifying the MOR violation for documentation and can likely be trained to fill in a field if it existed for better tracking.

Q2: Yes, we identified a list of keywords which can be used to filter SNF records to those that could be related to FTARC violations. A manual review is still necessary to confirm FTARC violations, but filtering limits records to a manageable number. A similar procedure could be developed for other MOR violations of interest. If tracking FTARCs specifically is of interest in the future, it should be considered to add a checkbox or flag or field to capture this information. Supervisors frequently cite complaint procedure documentation in the SNF narratives and could likely be trained to check a box or fill out another field to allow for easier flagging of FTARC violations.

Q3: Though we did not explore this question in-depth, initial exploration showed that SNF data categories are not entirely reliable. A few themes were identified:

- There are many note categories and types, some of which have similar names (e.g. counseling versus training, multiple types of training, etc.). This likely leads to confusion about when to code an SNF under which category and makes filtering by note types less reliable.
- Note categories/types may not be mutually exclusive- for example, if a supervisor is providing counseling related to a BWC policy violation, it may not be clear whether to code the SNF as counseling or a Body Worn Camera Corrective Action.
- Fields for related cases are not reliably being filled out- nearly all of FTARC-related SNFs mentioned a related case (IA case, UOF case, etc.), even often naming the case number in the narrative, but only about half of the SNF records had the fields for “Associated Record” and “Record Number” filled out.

While we did not fully explore this question, initial exploration shows that there are opportunities for clearer definitions, training for supervisors, and data structure clean-up to improve the usefulness of SNF records.

Q4: See Results section