UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DELPHINE ALLEN, et al.,

Plaintiffs,

v.

CITY OF OAKLAND, et al.,

Defendants.

Case No. 00-cv-04599-WHO

**ORDER DISMISSING AND CLOSING CASE**

I have decided to end federal court oversight of the Oakland Police Department ("OPD" or "Department") and to dismiss this action with prejudice. The City of Oakland and the Department achieved substantial compliance with the Negotiated Settlement Agreement ("NSA") that was executed in 2003, shown that they are committed to constitutional policing, and have the leadership and structures necessary to maintain it going forward. No institution or individual is perfect: there will always be real problems that arise. But leaders with integrity, courage, and commitment can and should overcome them. While it was important for this Court to have played the role it has over the last 23 years for the City and OPD to reach substantial compliance, now it is important for the Court to get out of the way and let the people of Oakland and their leaders build the future. To everything there is a season, and the season for judicial oversight arising from the actions of The Riders is over.

For the historical record, I asked Chief Robert Warshaw, who has been the Monitor for the past sixteen years, to list some of OPD's and the City's accomplishments during his tenure.[1] Here

[1] At the final Case Management Conference on September 29, 2026, I recognized Chief Warshaw and his monitoring team for their excellent and steadfast work, without which OPD would not have achieved substantial compliance with the NSA. I also thanked Dr. Jennifer Eberhart for her thoughtful analyses and guidance of OPD, John Burris and Jim Chanin, the plaintiffs' lawyers

United States District Court
Northern District of California

is his list:

- Incorporated every NSA requirement (51 Tasks) into Department policy.
- Incorporated the NSA's constitutional policing values and the history of the NSA and the Riders case into the Academy and professional training provided to officers throughout their careers. Established clear operating guidelines for the Training Division and for the trainees, field training officers, and staff in the Field Training Program.
- Discontinued the inhumane, humiliating practice of "curbing."
- Reduced the number of officer-involved shootings.
- Implemented Executive Force Review Boards and Force Review Boards, which closely examine every serious incident in which officers use force. OPD uses results and lessons learned from the Review Board proceedings to identify and train individuals throughout the Department to reduce the number of future incidents and potential lawsuits.
- Established the professional Office of Internal Accountability, or OIA, within OPD, which conducts regular audits and reviews on various aspects of the Department; makes findings and recommendations; and requires Department leadership to respond, in writing, to the findings and task the recommendations. The OIA produces, among other reports, the annual Internal Affairs Bureau outcome study.
- Developed a Discipline Matrix, which provides clear guidelines to the Chief to mete out fair, progressive discipline; and a discipline review process, which involves the chain of command in making discipline recommendations based on the mitigating and aggravating factors in the sustained misconduct.
- Implemented a host of changes in the Internal Affairs Bureau – including having a Deputy Chief, who is directly accountable to the Chief of Police, head the Bureau. The Internal Affairs Bureau's other significant changes include: anonymizing case presentations to

---

who initiated and saw through 26 years of litigation, negotiation, and advocacy for constitutional policing in Oakland, the City Attorney's Office, which worked collaboratively with the Monitor and plaintiffs' counsel during this period, and of course my predecessor on this case, the Hon. Thelton Henderson, whose courage and wisdom made the changes described in this Order possible.

United States District Court
Northern District of California

reduce bias; providing support to Division-level investigators from within IAB; dividing up the functions of Intake and Investigation within the Bureau; collaborating and communicating with the Community Police Review Agency (CPRA) when the CPRA conducts concurrent investigations; setting up the Integrity Unit to supplement administrative investigations; examining in each investigation whether supervisors played a role in any misconduct; refining the Informal Complaint Resolution (ICR) process; improving overall investigative timeliness; streamlining communication with subject employees and complainants; establishing clear protocols for administrative leave; and many more.

- Began treating assignments to the Internal Affairs Bureau as career-building steps where officers can conduct serious investigative work that can assist them in other stages of their careers.
- Began collecting and reviewing information on all pedestrian, bicycle, and vehicle stops and analyzing trends of racial disparities and other outcomes based on these stops. On top of this, the Department engaged the services of Dr. Jennifer Eberhardt and her colleague Dr. Benoit Monin of Stanford University to conduct research on OPD data and train the full Department on implicit bias and procedural justice, among other topics.
- Set up Vision, which replaced several antiquated systems – some electronic, some spreadsheets, and even some paper-and-pencil processes.. Developing the necessary technology took a long time but is now an integral part of the Department's work and ability to hold itself accountable. Vision continues to be improved as the technology advances.
- Created the Citywide and Bureau-specific Risk Management Meetings. These meetings allow the Department leadership to discuss trends in uses of force, misconduct complaints, pursuits, absenteeism, and many other factors.
- Expanded the role of sergeants throughout the Department. One of the NSA Tasks, Task 21, requires "every OPD commander or manager to meet at least twice per year with each of his/her subordinate members, employees, and supervisors, to coach them regarding their

strengths and weaknesses, and documents these meetings." As a result of the implementation of Supervisory Notes Files, body-worn camera reviews, dashboard verifications, arrest approvals and report reviews, supervisors are now required to have much more regular conduct with their subordinates, often multiple times each shift.

- Began referring officers and other staff for supervisory monitoring or intervention. The Department, overall, learned that this process is not punitive or disciplinary; just like the Risk Management Meetings, this process helps identify personnel who need extra support and supervision to do their jobs well.
- Began working with – not against or around – the Office of the City Attorney. OPD has now, for years, had its own in-house counsel. City attorneys now regularly review proposed policy revisions; attend Executive Force Review Board hearings; and provide counsel on all stages of the internal investigation, discipline, and arbitration process.
- Became more accountable to City leadership – including the Mayor and the Office of the City Administrator – and now provide regular updates to the Mayor and her staff on crime statistics, high-profile cases, policy changes, and other issues. Assistant City Administrator Michelle Phillips has been focused on transparency and accountability within the Police Department. The newly created Constitutional Policing Administrator position, once hired, will be answerable to Ms. Phillips.

That last bullet point describes the development that convinced me that federal court oversight is no longer necessary. One of the reasons oversight lasted as long as it did was the instability and inconsistency of leadership at OPD and in City Hall. Mayor Barbara Lee has changed all that. She set up a structure within City Hall that recognizes that the City is responsible for ensuring that OPD is pursuing constitutional policing and hired qualified personnel dedicated to that task. In addition, the current Chief of Police, James Beere, has spent his career in OPD under the directives of the NSA and knows well its requirements, its value, and the pitfalls of past implementation efforts. Civilian oversight through the Police Commission, which was established in 2016, provides additional protection for constitutional policing. The commitment of these institutions and leaders makes federal court involvement superfluous.

Of the many achievements of OPD, one of the most dramatic and tangible is the reduction in annual non-dispatch stops, both in total and in racial disparity. Here are the statistics reported by the City in the Joint Case Management Statement filed on September 22, 2026 ("Joint CMC Statement") (Dkt. No. 1768):

**Figure 1: Annual Non-Dispatch Stop Rate by Race (2016-2025)**

| | Black/African American | Hispanic | White | Asian | Other |
|---|---|---|---|---|---|
| **2016** | 62% | 20% | 10% | 5% | 3% |
| **2017** | 61% | 22% | 9% | 5% | 4% |
| **2018** | 55% | 22% | 11% | 7% | 5% |
| **2019** | 51% | 26% | 12% | 7% | 4% |
| **2020** | 52% | 26% | 11% | 6% | 4% |
| **2021** | 50% | 31% | 8% | 6% | 4% |
| **2022** | 46% | 35% | 9% | 6% | 5% |
| **2023** | 41% | 35% | 10% | 8% | 5% |
| **2024** | 43% | 34% | 9% | 9% | 5% |
| **2025** | 45% | 34% | 9% | 7% | 5% |



United States District Court
Northern District of California

**Figure 2: Non-Dispatch Stops by Race (2016-2025)**

| | Black/African American | Hispanic | White | Asian | Other | Grand Total |
|---|---|---|---|---|---|---|
| 2016 | 20,410 | 6,685 | 3,318 | 1,667 | 1,061 | 33,141 |
| 2017 | 19,784 | 7,047 | 2,835 | 1,588 | 1,152 | 32,406 |
| 2018 | 10,924 | 4,492 | 2,282 | 1,374 | 899 | 19,971 |
| 2019 | 7,517 | 3,809 | 1,701 | 991 | 627 | 14,645 |
| 2020 | 6,189 | 3,131 | 1,323 | 773 | 507 | 11,923 |
| 2021 | 3,099 | 1,890 | 513 | 381 | 259 | 6,142 |
| 2022 | 3,570 | 2,724 | 681 | 485 | 365 | 7,825 |
| 2023 | 4,306 | 3,643 | 1,036 | 875 | 557 | 10,417 |
| 2024 | 4,884 | 3,848 | 1,071 | 1,018 | 605 | 11,426 |
| 2025 | 5,082 | 3,851 | 1,011 | 754 | 551 | 11,249 |

Consider that in 2016, Black individuals accounted for 62% of all non-dispatch stops; between 2022 and 2025, Black individuals accounted for an average of 45% of non-dispatch stops. Meanwhile, the total number of non-dispatch stops decreased by 64%. This statistical shift translates directly to over 15,000 fewer non-dispatch stops of Black individuals each year; the Department stopped 75% fewer Blacks during non-dispatch encounters in 2025 than it did in 2016.

OPD's emphasis on intelligence-led policing has helped lead to this transformation. The reduction in discretionary stops means less opportunity for bias to impact those interactions between the police and the community they serve. That, along with the implementation of the NSA, better Risk Management to train, guide and course correct officers, and the concomitant cultural changes that have occurred, has had a causal effect on the number of lawsuits filed against the City for the actions of OPD—the number of cases has dropped by about two-thirds since 2003, as shown in Exhibit 6 to the Joint CMC Statement.

These results also would not have been possible without OPD's embrace of data in Risk Management Meetings, which now occur at every level of the Department. The quality of the Vision system, and the willingness to use data to improve understanding, supervision and analysis

United States District Court
Northern District of California

of the force, is making a big difference.

Contemporary police practices and policies provide the scaffolding for line officers to understand what's needed for constitutional policing and for leadership to ensure compliance. These will evolve over time, but what is now in place is working. Those policies are part of the DNA of everyone at OPD, from officers through the command staff.

In addition, in recent years significant attention has been paid to internal accountability for fair and consistent discipline. That will have a positive ripple effect throughout OPD and collateral positive impacts on interactions between officers and the community.

Of course, all of these accomplishments are works in progress. OPD, like any institution or entity, is dynamic. Constitutional policing requires attention from all levels of City and OPD leadership, and respect for civilian oversight, every day. It requires accountability and integrity up and down the chain, especially when it is uncomfortable to do the right thing. One of the disheartening recurring problems during this Court's oversight was the failure of leaders to identify, take responsibility for, and own the inevitable problems that arise in any organization; instead, they often attempted to conceal or ignore misconduct when that seemed the easier choice. Public trust is earned through commitment to constitutional policing and honesty when problems arise—the leadership of OPD must understand that the cover up is almost always worse than the crime itself.

The work of the last 23 years shows that constitutional policing is compatible with effective, proactive policing. Committed leaders can enact systemic reforms. But leadership must embody the standards it sets. I congratulate the men and women of the Oakland Police Department, the current City and OPD leadership, and all the past leaders and officers who helped bring OPD into substantial compliance with the NSA and for their on-going commitment to the goals of constitutional policing.

Accordingly, IT IS ORDERED, ADJUDGED AND DECREED that:

1. As of September 30, 2026, federal court monitorship of the Oakland Police Department and the Negotiated Settlement Agreement is concluded.
2. By October 16, 2026, the Monitor shall close its office in Oakland and return any

United States District Court
Northern District of California

equipment to the City. The City shall compensate the Monitor and his staff for the time necessary for winding up the affairs of the Monitor in Oakland until October 16, 2026. Nothing prevents the City and Monitor or the members of his team from entering into any consulting agreement after October 16, 2026.

3. The Court has previously required the City to pay the legal expenses of the Monitor with respect to matters related to his work for the Court. Dkt. No. 1235 (February 28, 2019 Order). The Court will retain jurisdiction to review and approve any invoices for payment by the City to the Monitor's counsel. At this writing, the Court is unaware of any such matters, and it is hoped that there will be none.

4. Except to the extent set forth above, this matter is DISMISSED WITH PREJUDICE.

**IT IS SO ORDERED.**

Dated: October 8, 2026

William H. Orrick
United States District Judge